# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| JPMORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE COMPLAINT OR TO STAY PROCEEDINGS

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

*Attorneys for JPMorgan Chase Bank, N.A. and Citibank, N.A.*

POLSINELLI PC
Christopher A. Ward (No. 3877)
Stephen J. Astringer (No. 6375)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920

*Attorneys for BMO Harris Bank, N.A.*

MORRIS JAMES LLP
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6853

*Attorneys for SunTrust Bank*

December 13, 2017

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF PROCEEDINGS ..................................................................1

SUMMARY OF ARGUMENT .................................................................3

STATEMENT OF FACTS ..................................................................6

    A.    The Credit Facility ......................................................... 6

    B.    The DOJ Investigation ........................................................ 10

    C.    The Litigation.................................................................. 14

ARGUMENT ..................................................................15

I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL FRAUDULENT TRANSFER ......................................................... 16

    A.    The Complaint Does Not Attempt To Plead the Existence of a Confluence of Badges of Fraud................................................. 17

    B.    Plaintiff Cannot Plead Intentional Fraudulent Transfer By Alleging Material Misstatements or Omissions In The Term Loan Marketing Materials .................................................... 20

II.    THE COMPLAINT FAILS TO STATE A CLAIM FOR CONSTRUCTIVE FRAUDULENT TRANSFER ......................................................... 23

    A.    The Complaint Does Not Allege That The Fees Were Not Fair Market Value For The Professional Services Provided .................................... 25

    B.    Plaintiff Cannot Plead Lack Of Reasonably Equivalent Value By Focusing On The Dividend Distribution Rather Than The Fees Themselves...................... 27

    C.    Plaintiff Has Not Otherwise Pled Lack Of Reasonably Equivalent Value.......... 29

III.    IN THE ALTERNATIVE, THIS CASE SHOULD BE STAYED PENDING RESOLUTION OF THE LENDER TRUST ACTION......................................... 33

CONCLUSION..................................................................36

# TABLE OF AUTHORITIES

## Cases

*Ameritox, Ltd. v. Millennium Laboratories, Inc.*,
  803 F.3d 518 (11th Cir. 2015) ........................................................................ 11

*Bash v. Textron Fin. Corp.*,
  524 B.R. 745 (N.D. Ohio 2015) ...................................................................... 32

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ........................................................................................ 15

*BFP v. Resolution Tr. Corp.*,
  511 U.S. 531 (1994) .................................................................................. 21, 25

*Boston Trading Grp. v. Burnazos*,
  835 F.2d 1504 (1st Cir. 1987) ........................................................................ 22

*Crescent Res. Litig. Trust ex rel. Bensimon v. Duke Energy Corp.*,
  500 B.R. 464 (W.D. Tex. 2013) ................................................................ 34, 35

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009) ........................................................................... 15

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995) ............................................................................. 28

*Husky Int'l Elecs., Inc. v. Ritz*,
  136 S. Ct. 1581 (2016) .................................................................................... 21

*Image Masters, Inc. v. Chase Home Finance*,
  489 B.R. 375 (E.D. Pa. 2013) ......................................................................... 27

*In re AgFeed USA, LLC*,
  546 B.R. 318 (Bankr. D. Del. 2016) ............................................................... 17

*In re Bernard L. Madoff Inv. Sec. LLC*,
  773 F.3d 411 (2d Cir. 2014) ........................................................................... 34

*In re Byrd*,
  No. ADV 12-3003DM, 2012 WL 3018087
  (Bankr. N.D. Cal. July 20, 2012) ................................................................... 31

*In re Churchill Mortg. Inv. Corp.*,
  256 B.R. 664 (Bankr. S.D.N.Y. 2000) ............................................................ 27

*In re Commercial Loan Corp.*,
  396 B.R. 730 (Bankr. N.D. Ill. 2008) ............................................................. 19

RLF1 18606729v.1

*In re Dreier LLP*,
   453 B.R. 499 (Bankr. S.D.N.Y. 2011) .................................................................... 30

*In re Fedders N. Am., Inc.*,
   405 B.R. 527 (Bankr. D. Del. 2009) ..................................................... 17, 18, 19, 20

*In re First Alliance Mortgage Co.*,
   471 F.3d 977 (9th Cir. 2006) .............................................................................. 21

*In re Foxmeyer Corp.*,
   286 B.R. 546 (Bankr. D. Del. 2002) ....................................................................... 30

*In re Fruehauf Trailer Corp.*,
   444 F.3d 203 (3d Cir. 2006) ..................................................................... 23, 25, 29

*In re Greektown Holdings, LLC*,
   No. 08-53104, 2015 WL 8229658
   (Bankr. E.D. Mich. Nov. 24, 2015) ........................................................................ 35

*In re Halt Med., Inc.*,
   No. 17-10810(LSS), 2017 WL 5466708
   (Bankr. D. Del. May 3, 2017) ................................................................................ 29

*In re Hill*,
   342 B.R. 183 (Bankr. D.N.J. 2006) ........................................................................ 18

*In re Lancelot Inv'rs Fund*,
   467 B.R. 643 (Bankr. N.D. Ill. 2012) ..................................................................... 34

*In re Lehman Bros. Holding, Inc.*,
   469 B.R. 415 (Bankr. S.D.N.Y. 2012) .................................................................... 34

*In re Nat'l Serv. Indus., Inc.*,
   No. 12–12057 (MFW), Adv. No. 14-50377 (MFW),
   2015 WL 3827003 (Bankr. D. Del. June 19, 2015) ................................................ 18

*In re Old CarCo, LLC*,
   454 B.R. 38 (Bankr. S.D.N.Y. 2011) ...................................................................... 16

*In re Plassein Int'l Corp.*,
   405 B.R. 402 (Bankr. D. Del. 2009) ....................................................................... 26

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996) .............................................................................. 24, 29

*In re Route 70 & Mass., L.L.C.*,
   No. 09–14771, 2011 WL 1883856
   (Bankr. D.N.J. May 17, 2011) ........................................................................ 28, 29

RLF1 18606729v.1

*In re Sharp Int'l Corp.*
    403 F.3d 43 (2d Cir. 2005) ................................................................................ 22

*In re Syntax-Brillian Corp.*,
    573 F. App'x 154 (3d Cir. 2014) ................................................................. 16, 17

*In re Tribune Co.*,
    464 B.R. 126 (Bankr. D. Del. 2011) ................................................................. 19

*In re United Tax Grp. LLC*,
    No. 14–10486 (LSS), Adv. No. 16–50088 (LSS),
    2016 WL 7235622 (Bankr. D. Del. Dec. 13, 2016) ................................. 16, 24, 26

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) ................................................................... 23

*In re Zambrano Corp.*,
    478 B.R. 670 (Bankr. W.D. Pa. 2012) ............................................................. 18

*Indeck Maine Energy, L.L.C. v. ISO New England Inc.*,
    167 F. Supp. 2d 675 (D. Del. 2001) ................................................................. 16

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
    945 F.2d 635 (3d Cir. 1991) ...................................................................... 25, 30

*MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.*,
    910 F. Supp. 913 (S.D.N.Y. 1995) ................................................................. 20

*Ruddy v. U.S. Postal Serv.*,
    455 F. App'x 279 (3d Cir. 2011) ..................................................................... 16

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*,
    181 F.3d 410 (3d Cir. 1999) ............................................................................. 2

*United States v. Lavin*,
    942 F.2d 177 (3rd Cir. 1991) .......................................................................... 30

*United States v. Tabor Realty Corp.*,
    803 F.2d 1288 (3d Cir. 1986) ......................................................................... 28

*VFB LLC v. Campbell Soup Co.*,
    482 F.3d 624 (3d Cir. 2007) ........................................................................... 25

*Zazzali v. Hirschler Fleischer, P.C.*,
    482 B.R. 495 (D. Del. 2012) ........................................................................... 24

**Statutes**

11 U.S.C. § 101(22) ........................................................................................... 33

11 U.S.C. § 101(32)(A)................................................................................................... 23

11 U.S.C. § 546(e) ................................................................................................. passim

11 U.S.C. § 548(a)(1)(A) ...................................................................................... passim

11 U.S.C. § 548(a)(1)(B) ...................................................................................... passim

11 U.S.C. § 548(a)(1)(B)(i) ......................................................................................... 30

11 U.S.C. § 548(d)(2) ................................................................................................. 25

11 U.S.C. § 741(7) ..................................................................................................... 34

11 U.S.C. § 741(7)(A)(i) ............................................................................................ 34

11 U.S.C. § 741(7)(A)(vii) ......................................................................................... 34

11 U.S.C. § 741(7)(A)(viii) ........................................................................................ 34

12 U.S.C. § 632 ......................................................................................................... 14

Fed. R. Bankr. P. 7009 ........................................................................................... 1, 16

Fed. R. Bankr. P. 7012(b) ...................................................................................... 1, 15

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 1, 15

Fed. R. Civ. P. 9(b) ................................................................................................ 1, 16

## Other Authorities

5-548 COLLIER ON BANKRUPTCY ....................................................................... 17, 30, 31

Allissa Wickham, *Millennium Gets Claims Cut From Ameritox False Ad Suit*,
    LAW 360 (Apr. 14, 2014),
    https://www.law360.com/articles/528142/millennium-gets-claims-cut-from-
    ameritox-false-ad-suit............................................................................................ 11

Duff Wilson, *U.S. drug testing firm probed for alleged fraud, intimidation*,
    REUTERS (Nov. 16, 2012) *available at* https://www.reuters.com/article/us-
    millenium-investigation/exclusive-u-s-drug-testing-firm-probed-for-alleged-
    fraud-intimidation-idUSBRE8AF0XQ20121116 .............................................. 10, 12

*Global Syndicated Loans League Tables- FY 2016*,
    BLOOMBERG PROF'L SERV. (Jan. 3, 2017),
    https://www.bloomberg.com/professional/blog/global-syndicated-loans-league-
    tables-fy-2016/ ...................................................................................................... 7

Jeff Overley, *Millennium Labs Can't Derail Ameritox's Kickbacks Suit*,
LAW 360 (Aug. 1, 2012), https://www.law360.com/articles/365923?scroll=1 ........................ 11

MILLENNIUM TRUSTS: FREQUENTLY ASKED QUESTIONS AS OF NOVEMBER, 2016,
*available at* https://cases.primeclerk.com/millenniumtrusts/Home-
DownloadPDF?id1=504344&id2=0 ...................................................................................... 13

Scott Dance, *Pain drug abuse fuels competition, legal battles for companies*,
THE BALTIMORE SUN (Sept. 3, 2013),
http://www.baltimoresun.com/business/bs-bz-ameritox-lawsuits-20130830-
story.html ............................................................................................................................. 11

STANDARD & POOR'S, A GUIDE TO THE LOAN MARKET (2011),
https://www.lcdcomps.com/d/pdf/LoanMarketguide.pdf ........................................................ 7

UNIF. FRAUDULENT TRANSFER ACT (1984) ............................................................................. 31

RLF1 18606729v.1

Defendants JPMorgan Chase Bank, N.A. ("JPMC Bank"), Citibank N.A. ("Citi"), BMO Harris Bank, N.A. ("BMO"), and SunTrust Bank ("SunTrust," and collectively, "Defendants") respectfully submit this memorandum in support of their motion to dismiss the Complaint filed by Marc S. Kirschner in his capacity as Trustee of the Millennium Corporate Claim Trust ("Plaintiff" or the "Trustee") pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7012(b) and 7009.[1]

## NATURE AND STAGE OF PROCEEDINGS

This suit seeks to avoid, under 11 U.S.C. §§ 548(a)(1)(A) and 548(a)(1)(B), payments of fees made by Millennium Laboratories LLC ("Millennium") to Defendants as compensation for financial services provided by Defendants to Millennium, a drug testing company, in connection with its April 2014 senior secured credit facility (the "Credit Facility"). Through the instant motion, Defendants seek to dismiss this action in its entirety with prejudice.

Defendants and certain of their affiliates are also named in a suit filed by Plaintiff on August 1, 2017 in New York in his capacity as Trustee of the Millennium Lender Claim Trust (the "Lender Trust Action"). The complaint filed in that action (the "Lender Trust Complaint") mischaracterizes the syndicated term loan component of the Credit Facility as a securities distribution and, on that basis, alleges that marketing materials made available to potential lenders contained material misstatements and omissions that are actionable under various state

---

[1] As required by Fed. R. Bankr. P. 7012(b) and Rule 7012-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Defendants state that they do not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

securities laws.[2]  Like the instant action, the Lender Trust Action is without merit.  Defendants also intend to seek dismissal of the Lender Trust Action.

The Complaint in this adversary proceeding, filed on November 7, 2017 [Adv. D.I. 1], substantially duplicates the Lender Trust Complaint's allegations[3] but now tries to assert that the routine and fully disclosed fees that Millennium paid to Defendants as consideration for extending hundreds of millions of dollars in credit to Millennium and arranging and syndicating its Credit Facility were somehow intended by Millennium to hinder, delay, or defraud the lenders who participated in the lending syndicate.  The Complaint also alleges that Millennium received less than reasonably equivalent value in exchange for the fees at issue—not because the bargained-for services were not performed, or because the fees were in excess of reasonable market rates, but because Plaintiff contends not all of the proceeds of the syndicated term loan were utilized by Millennium in a manner consistent with its supposed best interests (notwithstanding that the proposed use was fully disclosed at the time).

On November 22, 2017, the parties in this action entered into a stipulation whereby Defendants accepted service of the Complaint and agreed to answer, move, or otherwise respond to the Complaint on or before December 13, 2017 [Adv. D.I. 8].  Also on November 22, 2017, the Court entered a notice scheduling a pretrial conference for January 4, 2018 [Adv. D.I. 9].

---

[2] A copy of the Lender Trust Complaint is attached hereto as Ex. 1.  Because the Lender Trust Complaint contains assertions by Plaintiff Kirschner that are part of the public record, that complaint may be considered here.  *See, e.g.*, *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

[3] The Lender Trust Complaint, however, alleges that the Credit Facility was a security whereas, if the Credit Facility is deemed to be a security in this case, the fees at issue would be immune from avoidance under the securities safe harbor provision of Section 546(e).  Plaintiff cannot have it both ways and take inconsistent legal positions against the same defendants in different proceedings.

RLF1 18606729v.1

## SUMMARY OF ARGUMENT

Just as he does in the pending Lender Trust Action, Plaintiff here seeks to hold Defendants liable for their failure to predict the future.  Specifically, notwithstanding explicit assurances to the contrary from Millennium, Millennium's experienced outside counsel and Millennium's sophisticated auditors that there would be no material impact on Millennium from the Department of Justice's publicly-reported investigation, Plaintiff alleges that Defendants should have predicted that one year after the loan, Millennium would settle with the government for $256 million and end up in bankruptcy.  These hindsight allegations are without merit and do not provide any basis to avoid the fees Defendants received for the work they performed in connection with the April 2014 senior secured Credit Facility, as Plaintiff fails to allege that Defendants did not perform the services for which they were compensated or that the consideration paid by Millennium was anything other than the market rate for such work.

Plaintiff's intentional fraudulent transfer claim brought under 11 U.S.C. § 548(a)(1)(A) (Count I) and constructive fraudulent transfer claim brought under 11 U.S.C. § 548(a)(1)(B) (Count II) are insufficiently pled and otherwise legally defective.  They should be dismissed with prejudice as to all Defendants for the following reasons.

First, the intentional fraudulent transfer claim fails because Plaintiff does not allege any conduct to hinder, delay or defraud creditors with respect to the payment of fees to Defendants.  Instead, Plaintiff attempts to base its claims on the purported fraudulent inducement of the syndicated term loan lenders through alleged misstatements and omissions in marketing materials provided to those lenders during the loan syndication process.  But, even if there were any truth to the allegations about the marketing of the syndicated term loan, they would fail to state a claim under 11 U.S.C. § 548(a)(1)(A).  To recover under Section 548(a)(1)(A), Plaintiff needs to establish that the debtor transferred its assets with the *intent and purpose* of improperly

3

sheltering those assets from the debtor's creditors.  Nothing in the Complaint even remotely suggests that the fee payments at issue were intended to shelter those funds from Millennium's creditors, and allegations purporting to show negligent or fraudulent inducement of the lenders are irrelevant and fail to state a fraudulent transfer claim.  Nor does Plaintiff attempt to demonstrate the existence of a confluence of the "badges of fraud"—the indicia of intent to hinder, delay or defraud creditors that are commonly employed to plead and prove intentional fraudulent transfer claims—and it is clear from the allegations of the Complaint that Plaintiff has no basis to do so.

Second, Plaintiff's constructive fraudulent transfer claim fails because, *inter alia*, Plaintiff has not sufficiently pled that Millennium received less than reasonably equivalent value in exchange for its payment of the fees to Defendants.  The Complaint does not allege that the services at issue were not performed, that the full amount of the agreed credit was not made available to Millennium, or that the fees Millennium paid were excessive, otherwise not in line with market rates for comparable financial services, or other than as specified in the parties' agreement.  Instead, Plaintiff attempts to attack the value provided to Millennium in consideration for the fees by claiming—with the benefit of hindsight—that the way Millennium utilized some of the proceeds of the Credit Facility was not in its best interests.  Specifically, the Complaint alleges, as was clearly disclosed to potential lenders in the marketing materials, that certain term loan proceeds were used to pay dividends to Millennium's shareholders.  Plaintiff then alleges that this use of funds rendered Millennium unable to pay the subsequent settlement it entered into with the Department of Justice a full year later.  In making these allegations, however, Plaintiff is focusing on the wrong transactions.  As a matter of law, Plaintiff cannot conflate the two independent transfers by attempting to "collapse" into a single transaction the

fees Millennium paid to Defendants and the much larger dividends Millennium paid to other parties (all of whom have been released from fraudulent transfer claims in Millennium's confirmed chapter 11 bankruptcy plan (the "Plan")).  These were distinct transfers of funds from Millennium to entirely separate recipients, not an integrated transfer of funds through a series of intermediaries, which is necessary for any attempt to "collapse" the transactions.

Third, Plaintiff's constructive fraudulent transfer claim also fails because Plaintiff improperly seeks to plead lack of reasonably equivalent value based on Defendants' purported lack of good faith in connection with the transaction.  These allegations—which contend in substance that Defendants should have predicted the magnitude of Millennium's settlement with the Department of Justice one year before it happened, despite reassurances by Millennium's sophisticated outside counsel and auditors that the litigation risk was immaterial—are implausible.  Moreover, even if a lack of good faith could be pleaded by alleging a failure to accurately predict a third party's future litigation exposure (which Defendants dispute), a purported lack of good faith on the part of a transferee cannot, without more, establish a lack of reasonably equivalent value for purposes of a fraudulent transfer claim under 11 U.S.C. § 548(a)(1)(B).

While dismissal of the Complaint with prejudice is appropriate, in the alternative, Defendants respectfully submit that the Court should stay this case pending resolution of the Lender Trust Action.  In that proceeding, Plaintiff seeks to recharacterize the syndicated term loan as a securities distribution and to hold Defendants and their affiliates liable under state securities statutes.  Defendants dispute that any component of the Credit Facility can properly be characterized as a security rather than as a syndicated bank loan.  However, should the court in the Lender Trust Action determine that the term loan constitutes a security, the payments at issue

here would be immune from avoidance under 11 U.S.C. § 548(a)(1)(B)  by virtue of the securities safe harbor provision contained in 11 U.S.C. § 546(e).  That provision exempts payments "by or to … [a] financial institution … in connection with a securities contract" from avoidance under the Bankruptcy Code's constructive fraud provisions.  Defendants are financial institutions, and if the term loan were found to be a security, as Plaintiff contends, then the payments at issue are clearly payments "in connection with a securities contract" and hence immune from attack under the safe harbor provisions of Section 546(e).

Plaintiff should not be able to seek damages from Defendants in the Lender Trust Action by alleging that the term loan syndication constitutes a securities distribution, while at the same time actively litigating claims in this action that would be barred as a matter of law if that were the case.  Because the issue of whether the term loan constitutes a security is squarely before the court in the Lender Trust Action and must be determined as a matter of non-bankruptcy law, a stay of this action is appropriate should this Court determine that Plaintiff's claims survive dismissal.

## STATEMENT OF FACTS

### A.    The Credit Facility

This case concerns the payment of $35 million in total fees (the "Fees") to four banks in exchange for financial services they provided to Millennium in connection with its April 2014 senior secured $1.825 billion Credit Facility.  Millennium agreed to pay these fees pursuant to the terms of a March 16, 2014 Commitment Letter among Millennium, JPMC Bank, Citi, BMO affiliates, SunTrust, and other affiliates of Defendants (the "Commitment Letter"), which set forth the specific services that Defendants would perform in exchange for the Fees.  Compl. ¶

70.[4]  Among other things, the parties agreed in the Commitment Letter that JPMC Bank, Citi, a BMO affiliate, and SunTrust would arrange a credit facility to Millennium consisting of a $50 million revolving loan and a $1.765 billion term loan (later increased to $1.775 billion) (the "Term Loan"), for which JPMC Bank, a BMO affiliate, SunTrust, and a Citi affiliate would serve as "Initial Lenders."  Compl. ¶ 68; *see also* Lender Trust Compl. ¶ 12.  The Commitment Letter contemplated that the banks would syndicate the Term Loan to other lenders (Compl. ¶ 68),[5] but also provided that the banks would be obligated to fund the Credit Facility regardless of the success of their syndication efforts.  *See* Commitment Letter at 2 (stating that "neither the commencement nor completion of the syndication of any Initial Lenders' commitments … shall constitute a condition to the availability of the Senior Secured Facilities on the Closing Date or at any time thereafter").  To support this process, Millennium obtained credit ratings from ratings agencies.[6]  The detailed terms of the Credit Facility were set forth in a Credit Agreement, which was entered into effective as of April 16, 2014, the closing date of the Credit Facility.  Compl.

---

[4] A copy of the Commitment Letter is attached hereto as Ex. 2.  On this motion to dismiss, the Court properly may consider the Commitment Letter and other documents cited herein.  *See* note 18, *infra*.

[5] Loan syndications such as the Term Loan are a frequently-used lending structure through which interests in a large loan are assigned to a number of other commercial lenders via one or more banks acting as "arrangers," thus facilitating the extension of a greater amount of credit than a single bank would be able or willing to provide.  *See* STANDARD & POOR'S, A GUIDE TO THE LOAN MARKET 7 (2011), https://www.lcdcomps.com/d/pdf/LoanMarketguide.pdf ("A syndicated loan is ... provided by a group of lenders and is structured, arranged, and administered by one or several commercial or investment banks known as arrangers. … Syndicated loans are less expensive and more efficient to administer than traditional bilateral, or individual, credit lines.").  Nearly 3,500 syndicated loan transactions, totaling approximately $2 trillion, were entered into in the U.S. in 2016 alone.  *See Global Syndicated Loans League Tables- FY 2016*, BLOOMBERG PROF'L SERV. (Jan. 3, 2017), https://www.bloomberg.com/professional/blog/global-syndicated-loans-league-tables-fy-2016/.

[6] The Commitment Letter clearly contemplates that, under the parties' agreement, Millennium was responsible for seeking and maintaining credit ratings, not the banks.  *See* Commitment Letter at 2, A-11.  As a separate matter, Defendants dispute Plaintiff's mischaracterization of documents related to Millennium's interaction with ratings agencies.

¶¶ 1, 69; *see also* Credit Agmt. § 1.1 (defining "Closing Date").[7]  In addition, a separate "Fee

Letter" detailed the calculation of the Fees and their allocation in proportion to the value of

Defendants' respective commitments as Initial Lenders.  Compl. ¶ 7; Fee Letter at 1.[8]

      Defendants  allegedly  also  worked  with  Millennium,  as  contemplated  by  the

Commitment Letter, to "prepare[] a Confidential Information Memorandum" ("CIM") as well as

a "series of over 50 PowerPoint slides" concerning Millennium and the Credit Facility.  Compl.

¶ 55.[9]   These  marketing  materials  were  used  to  present  information  to  other  lenders  who

qualified  as  potential  members  of  the  lending  syndicate.   They  prominently  indicated  that

Millennium intended to use approximately $304 million in Term Loan proceeds to retire $304

million  in  existing  bank  debt,  and  approximately  $1.2  billion  to  pay  dividends  and  other

distributions  to  its  shareholders.   CIM  at  22.   They  also  made  clear  that  the  underlying

information  in  the  marketing  materials  had  been  provided  by  Millennium,  not  Defendants  or

their affiliates.  *See* CIM at 6 (stating that "Recipient acknowledges and agrees that [] Arranger

received the Evaluation Material from third party sources (including Borrower) and it is provided

to Recipient for informational purposes, [and] Arranger and its affiliates have no responsibility,

and  shall  not  be  liable,  for  the  accuracy  or  completeness  or  lack  thereof  of  the  Evaluation

Material or any information contained therein").[10]

      As  a  condition  of  receiving  these  marketing  materials,  potential  lenders  represented

that  they  were  "sophisticated  and  experienced  in  extending  credit  to  entities  similar  to

---

[7] A copy of the Credit Agreement is attached hereto as Ex. 3.

[8] A copy of the Fee Letter is attached hereto as Ex. 4.

[9] A copy of the CIM is attached hereto as Ex. 5.

[10] "Arranger" refers, for these purposes, to non-party J.P. Morgan Securities LLC.  *See* CIM at 5.

[Millennium]." CIM at 6. The CIM contained clear disclaimers that it did "not purport to be all-inclusive or to contain all of the information that a potential lender may consider material or desirable in making its decision to become a lender." *Id.* The CIM also instructed each prospective lender to "take such steps as it deems necessary to assure that it has the information it considers material or desirable in making its decision to become a lender and [to] perform its own independent investigation and analysis of the Facilities or the transactions contemplated thereby and the creditworthiness of Borrower." *Id.* To enable potential lenders to do so, potential lenders were given access to a data room containing information about Millennium. *See* Lender Trust Compl. ¶ 78. The CIM and other materials provided to potential lenders included the information typically included in leveraged loan documents provided to lenders. *See* Compl. ¶ 56; Lender Trust Compl. ¶ 73 (explaining why the parties determined not to include generic risk factors in the CIM).

At closing, JPMC Bank, in its capacity as "Initial Lender," extended the total sum of the Term Loan to Millennium, and subsequently syndicated the loan to the syndicated lenders by entering into assignment and assumption agreements, which made each lender a party to the Credit Agreement. Lender Trust Compl. ¶ 95. Consistent with industry practice for loans of this type, in committing to loan funds to Millennium and entering into the Credit Agreement, the lenders expressly disclaimed any reliance on any investigation or underwriting conducted by Defendants or their affiliates. Credit Agmt. § 9.6. The Credit Agreement memorialized the parties' understanding that JPMC Bank, the other Defendants, and their non-party affiliates had not made any representations or warranties to the lenders. *Id.* The lenders also represented that they had made their own appraisals of Millennium's creditworthiness "independently and

without reliance upon any Agent,"[11] and would "continue to make [their] own credit analys[es]." *Id.*  The Fees at issue in this litigation were also paid to Defendants at closing.  Compl. ¶ 70.

### B.    The DOJ Investigation

Two years before the execution of the 2014 Credit Agreement, in 2012, the Department of Justice, through the U.S. Attorney's Office for the District of Massachusetts ("Boston USAO"), began an investigation into Millennium's sales and marketing practices (the "DOJ Investigation").  The investigation became public later that same year.  *See, e.g.*, Duff Wilson, *U.S. drug testing firm probed for alleged fraud, intimidation*, REUTERS (Nov. 16, 2012).[12]  Millennium had hired Michael Loucks of Skadden, Arps, Slate, Meagher & Flom LLP, a former high-ranking prosecutor from the Boston USAO, to lead Millennium's defense of the DOJ Investigation.  Compl. ¶ 44.  Given his previous position at the Boston USAO, his specialized knowledge of that office and its prosecutors, and his lead role in Millennium's legal defense, Millennium held out Loucks as its expert on potential regulatory and criminal liabilities. *Id.* ¶¶ 44-45, 63.

The drug testing industry in which Millennium operated was also well-known at the time to be a litigious space.  *See* Wilson, *supra* note 12 ("The burgeoning industry has spawned two previously disclosed prosecutions and scores of suits and countersuits by companies accusing each other of wrongdoing.").  Millennium was involved in a variety of publicly-filed civil suits involving competitors, including a civil lawsuit filed by rival drug testing firm Ameritox, Ltd. (the "Ameritox Litigation").  *See* Compl. ¶ 40.  Michael Loucks was also the lead

---

[11] "Agent" is defined in the Credit Agreement so as to refer to JPMC Bank, SunTrust, and non-parties Citibank Global Markets Inc. and BMO Capital Markets Corp.  *See* Credit Agmt. § 1.1.

[12] Available at https://www.reuters.com/article/us-millenium-investigation/exclusive-u-s-drug-testing-firm-probed-for-alleged-fraud-intimidation-idUSBRE8AF0XQ20121116.

attorney responsible for Millennium's defense of the Ameritox Litigation. *Id.* ¶ 44. Millennium's portfolio of civil litigation was itself the subject of public news reports and updates.[13]

As discussed in the Lender Trust Complaint, Loucks participated in calls with Defendants and Millennium's executives during which the parties discussed Millennium's litigation and regulatory risks. Lender Trust Compl. ¶¶ 55-58. Loucks "stated without caveats that in his informed opinion, the conduct of which the Company stood accused in the DOJ Investigation was less egregious than that of other laboratory companies that had settled with governmental entities for $20 million or less." *Id.* ¶ 57. Loucks also confirmed that it was reasonable to conclude that Millennium's exposure was lower than $20 million because of its relative non-culpability, and stated that "'[t]here does not feel to me to be a material result' to Millennium from the DOJ Investigation." *Id.* ¶ 58 (alteration in original).

The DOJ Investigation and other civil litigation, including the Ameritox Litigation, were also discussed on conference calls among Millennium, Defendants, and prospective lenders. Compl. ¶¶ 62, 63.[14] The prospective lenders received the same information that Defendants received: Millennium's principal outside counsel at Skadden, a "former high-ranking

---

[13] *See, e.g.*, Jeff Overley, *Millennium Labs Can't Derail Ameritox's Kickbacks Suit*, LAW 360 (Aug. 1, 2012), https://www.law360.com/articles/365923?scroll=1; Scott Dance, *Pain drug abuse fuels competition, legal battles for companies*, THE BALTIMORE SUN (Sept. 3, 2013), http://www.baltimoresun.com/business/bs-bz-ameritox-lawsuits-20130830-story.html; Allissa Wickham, *Millennium Gets Claims Cut From Ameritox False Ad Suit*, LAW 360 (Apr. 14, 2014), https://www.law360.com/articles/528142/millennium-gets-claims-cut-from-ameritox-false-ad-suit.

[14] In June 2014, after the Credit Agreement was signed and the Term Loan closed, a jury returned a verdict against Millennium in the Ameritox Litigation, consisting of a $2.755 million compensatory damages award and a $12 million punitive award, later reduced to $8.5 million. Lender Trust Compl. ¶¶ 110-11. The Eleventh Circuit later overturned this verdict, finding that Ameritox had "advanced outlandish [state law] legal theories" over which the District Court should not have exercised supplemental jurisdiction, and that the verdict was "patently unsupported by actual law." *Ameritox, Ltd. v. Millennium Laboratories, Inc.*, 803 F.3d 518, 539 (11th Cir. 2015).

official in the Boston USAO … believed that the result of the Investigation would not be material in terms of the Company's finances," and "Millennium's conduct under investigation was less culpable than that in two comparable lab company settlements and that the likely exposure of Millennium in the DOJ Investigation was no more than $20 million." Lender Trust Compl. ¶¶ 85, 87. These statements were consistent with the public reporting on the investigation, which disclosed that Millennium's competitors, including Ameritox, had in recent years settled similar regulatory investigations for $20 million or less. *See* Wilson, *supra* note 12 ("In March [2012], Calloway Laboratories of Woburn, Mass., paid $20 million to settle a Massachusetts state Medicaid case accusing it of paying kickbacks for unnecessary screening. … And in 2010, Ameritox, based in Baltimore, Md., paid $16.3 million to settle similar claims by the federal government.").

Millennium's audited financial statements, which were also made available to potential lenders, similarly did not treat this potential liability as material. Compl. ¶ 60 (alleging that Millennium's financial statements "were false and misleading because they failed to account for known loss contingencies relating to the impact on the Company's assets and liabilities from the *qui tam* suits and DOJ Investigation, as required by GAAP and GAAS"). Instead, the financial statements disclosed that "it is management's current belief that any potential liabilities resulting from [litigation and government investigations], individually or in the aggregate, will not have a material impact on the Company's consolidated financial position and results of operations," and that "[t]he Company believes it is in compliance in all material respects with all statutes, regulations, and other requirements applicable to its laboratory operations."[15]

---

[15] *See* Ex. 6 (Consolidated Financial Statements of Millennium as of December 31, 2013 and 2012), at 22 n.13.

Plaintiff alleges that in December 2014, months after the closing of the Credit Agreement, the DOJ "notified Millennium that it would intervene in False Claims Act proceedings previously commenced by *qui tam* relators over the Company's health law violations." Compl. ¶ 5. Plaintiff also alleges that, "beginning in February 2015, the federal Centers for Medicare and Medicaid Services ('CMS') threatened to revoke Millennium's ability to bill Medicare." *Id.* Millennium's business model was highly dependent on government health care programs, and the impending loss of these billing privileges led to Millennium agreeing, in May 2015, to a $256 million settlement, payable no later than the end of 2015, that would resolve both the DOJ investigation and the Medicare billing issues. *See id.* ¶ 6; Lender Trust Compl. ¶¶ 119-23.

Soon after the settlement was finalized on October 16, 2015, Millennium filed for bankruptcy. Compl. ¶ 6. The Company's Plan released all claims against Millennium's shareholders, who had received the $1.2 billion in dividends from Millennium, in exchange for a $300 million payment which was primarily used to fund the DOJ settlement. *See* Notice of Entry of Order Confirming Am. Prepackaged Joint Plan of Reorganization at 15 (Amended Plan), D.I. 195-1 (Dec. 14, 2015) (defining "Released Parties" under the Plan). The Plan also established two litigation trusts: the Corporate Trust, which was assigned the Millennium estate's alleged causes of action that were not released in the Plan, and the Lender Trust, which was assigned alleged causes of action held by certain syndicated lenders related to the Term Loan. Plaintiff Marc S. Kirschner serves as Trustee of both litigation trusts, which are also governed by identical boards and are represented by the same outside counsel.[16]

---

[16] *See* MILLENNIUM TRUSTS: FREQUENTLY ASKED QUESTIONS AS OF NOVEMBER, 2016, *available at* https://cases.primeclerk.com/millenniumtrusts/Home-DownloadPDF?id1=504344&id2=0.

C.      **The Litigation**

On August 1, 2017, Mr. Kirschner, in his capacity as Trustee of the Lender Trust, commenced the Lender Trust Action in New York state court against Defendants named in this action and certain of their affiliates.  The Lender Trust Complaint asserts both state securities law claims and common law claims, and generally alleges that Defendants made actionable misstatements and omissions to the syndicated lenders in connection with the syndication of the Term Loan, on the basis that Defendants purportedly should have predicted the materiality of Millennium's future settlement with the Department of Justice before it happened, and failed to disclose this to the syndicated lenders.  The Lender Trust's state securities law claims are premised on a mischaracterization of the Term Loan as a "security" subject to securities laws, rather than a syndicated bank loan.  In keeping with this tactic, the Complaint also describes the Term Loan using terminology related to securities offerings, rather than loans.  Defendants dispute that the Term Loan or any interests therein constitute securities subject to state or federal securities laws.  Any such mischaracterization is contrary to decades-old settled law.[17]

Mr. Kirschner, in his capacity as Trustee of the Corporate Trust, filed the Complaint on November 7, 2017.  The Complaint asserts two causes of action, the first for avoidance of intentional fraudulent transfers under 11 U.S.C. § 548(a)(1)(A), and the second for avoidance of constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B).  Both claims seek recovery of the Fees paid to Defendants as consideration for the services they provided to Millennium in

---

[17] On August 21, 2017, Defendants removed the Lender Trust Action to U.S. District Court for the Southern District of New York under the Edge Act, 12 U.S.C. § 632, which provides for federal jurisdiction in civil actions to which federally-chartered banks are parties and that involve international banking transactions or other international financial operations.  Plaintiff filed a motion for remand, and briefing on that motion was completed on November 22, 2017.  By so-ordered stipulation, the deadline for Defendants to respond to the Lender Trust Complaint has been extended until 21 days after the District Court rules on Plaintiff's remand motion.

connection with the Credit Facility.  Plaintiff does not contend that Defendants failed to perform the services for which they were retained by Millennium, or that the consideration paid by Millennium for such services was inflated or outside the typical market rate of such services. Instead, Plaintiff generally alleges that (i) the CIM and other so-called "offering materials" for the Term Loan contained material misrepresentations and omissions concerning the DOJ investigation and the legality of the underlying business practices at issue in that investigation; (ii) the distribution of Term Loan proceeds to Millennium's shareholders "led to [Millennium's] demise [and] was not in [its] best interests"; and (iii) Defendants assisted Millennium in structuring the Credit Facility and had knowledge that Term Loan proceeds would be used, *inter alia*, to pay the dividends.

## ARGUMENT

Federal Rule of Civil Procedure 12(b)(6), applicable through Federal Rule of Bankruptcy Procedure 7012(b), requires dismissal of a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face," or if its allegations, "however true, could not raise a claim of entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 558 (2007); *see Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) ("[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts.").  "It is not sufficient to plead threadbare recitals of a cause of action's elements supported by mere conclusory statements.  Rather, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."  *In re United Tax Grp., LLC*, No. 14–10486 (LSS), Adv. No.

16–50088 (LSS), 2016 WL 7235622, at *2 (Bankr. D. Del. Dec. 13, 2016) (footnotes and internal quotations omitted).[18]

In addition, Federal Rule of Civil Procedure 9(b), made applicable here by Federal Rule of Bankruptcy Procedure 7009, requires that Plaintiff plead the elements of his intentional fraudulent transfer claim with particularity. *See, e.g.*, *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 162 n.11 (3d Cir. 2014) (to withstand dismissal of intentional fraudulent transfer claims, a plaintiff must "sufficiently allege[] actual fraud under the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure"). The claims asserted in the Complaint in this action are both implausible and defective as a matter of law under any standard and should be dismissed with prejudice.[19]

## I.     THE COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL FRAUDULENT TRANSFER

In order to plead a claim for avoidance of actual fraudulent transfers under 11 U.S.C. § 548(a)(1)(A), Plaintiff must allege facts establishing that the debtor, Millennium, made the transfer of the Fees with "actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. §

---

[18] On this motion to dismiss, the Court may consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Ruddy v. U.S. Postal Serv.*, 455 F. App'x 279, 283 (3d Cir. 2011) (citation omitted); *see also id.* ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (citation omitted). The contracts governing the Term Loan are explicitly relied on in and integral to the Complaint, *see, e.g.*, Compl. ¶¶ 55-58, 70, 74, 92-93, and may be properly considered by the Court. *See, e.g.*, *Indeck Maine Energy, L.L.C. v. ISO New England Inc.*, 167 F. Supp. 2d 675, 678-79 (D. Del. 2001).

[19] The Complaint was not written on a blank slate. As a result of Millennium's bankruptcy proceedings and the terms of the governing Plan documents and litigation trust agreements, Plaintiff has had access to all of Millennium's records. In addition, Plaintiff has had access to the substantial productions made by Defendants to the Trustee under Rule 2004. *See* Order, D.I. 394 (Dec. 2, 2016). Accordingly, dismissal should be with prejudice, rather than with leave to replead. *See In re Old CarCo, LLC*, 454 B.R. 38, 60 (Bankr. S.D.N.Y. 2011) (dismissing complaint with prejudice where trustee had full access to pre-suit discovery "to attempt to present a sustainable complaint").

548(a)(1)(A); see also *Syntax-Brillian Corp.*, 573 F. App'x at 161-62; 5-548 COLLIER ON

BANKRUPTCY ¶548.04, Transfers Made with Actual Intent to Hinder, Delay or Defraud;

§ 548(a)(1)(A), at *2:

> Section 548(a)(1)(A) does not contain any reference to the state of mind or
> knowledge of the transferee. The only inquiry concerning actual intent that
> matters is that of the debtor: whether the debtor causing the transfer or
> incurring the obligation intended to hinder, delay or defraud its creditor.

The Complaint fails to allege such facts and accordingly should be dismissed. *See In re AgFeed*

*USA, LLC*, 546 B.R. 318, 337 (Bankr. D. Del. 2016) ("conclusory language that simply mirrors

the statute is insufficient" to withstand a motion to dismiss).

A.     <u>The Complaint Does Not Attempt To Plead the Existence of a Confluence of
Badges of Fraud</u>

     Fraudulent transfer claims under Section 548(a)(1)(A) are typically pleaded through

allegations that a challenged transfer bore the so-called "badges of fraud," which are often

identified as "(1) the relationship between the debtor and the transferee; (2) consideration for the

conveyance; (3) insolvency or indebtedness of the debtors; (4) how much of the debtor's estate

was transferred; (5) reservation of benefits, control or dominion by the debtor over the property

transferred; and (6) secrecy or concealment of the transaction." *In re Fedders N. Am., Inc.*, 405

B.R. 527, 545 (Bankr. D. Del. 2009), citing *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551

(D. Del. 2005). Pleading a single badge of fraud is insufficient; rather, a "confluence of several

in one transaction" is generally required. *In re Fedders*, 405 B.R. at 545. Here, the Complaint

barely attempts to plead any of the recognized badges of fraud, and manifestly fails to

sufficiently plead facts demonstrating the existence of a confluence of these factors that would

suffice to state a claim. *See, e.g.*, *id.* at 545-46 (plaintiff failed to plead intentional fraudulent

transfer claim against lenders where only badge pleaded was insolvency and there were no well

pleaded facts "indicating anything other than an arm's length relationship between [debtor] and the Lenders.").

First, the Complaint does not, and cannot, allege a close relationship between Millennium and Defendants.   "In determining the closeness of the relationship, courts have found the essential question is 'the degree to which the transferee is able to exert control or influence over the debtor.'" *In re Hill*, 342 B.R. 183, 199 (Bankr. D.N.J. 2006) (citation omitted).   Here, the Complaint alleges nothing more than a standard commercial relationship in which Defendants had the ordinary commercial motive of earning fees for services rendered. *See, e.g.*, *Fedders*, 405 B.R. at 545-46 (relationship between debtor and lenders was not "anything other than an arm's length relationship" and thus did not constitute a badge of fraud). There is no allegation that any of the Defendants were directors or officers of Millennium, that Millennium and any Defendant were under common control, or that Defendants otherwise controlled Millennium.   *See* Compl. ¶¶ 13-16 (describing Defendants); *cf. In re Nat'l Serv. Indus., Inc.*, No. 12–12057 (MFW), Adv. No. 14-50377 (MFW), 2015 WL 3827003, at *5 (Bankr. D. Del. June 19, 2015) (close relationship existed where transfers were made to "officers and members of the Debtor's board"); *In re Zambrano Corp.,* 478 B.R. 670, 692 (Bankr. W.D. Pa. 2012) (finding "close relationship" where both entities were controlled by members of the same family).

Second, as discussed in Section II, *infra*, Plaintiff has failed to allege that Millennium did not receive reasonably equivalent value in exchange for payment of the Fees and, therefore, the Complaint does not sufficiently plead the presence of this badge.   The debtor received the funds that the banks committed to provide, the benefit of the syndication of that debt, and access to substantial revolving credit.   And, even assuming that the Complaint adequately pleaded

Millennium's insolvency, merely pleading insolvency does not suffice. *In re Fedders*, 405 B.R. at 545 (dismissing claim where plaintiff had only adequately alleged insolvency as a badge of fraud); *see also In re Commercial Loan Corp.*, 396 B.R. 730, 747 (Bankr. N.D. Ill. 2008) ("If the elements of constructive fraud were enough to demonstrate actual fraud, the constructive fraud provisions ... would be superfluous.").

Third, the Complaint does not even purport to allege that the transfer of the Fees to Defendants amounted to a significant portion of Millennium's assets. Indeed, the total amount of the Fees constituted only 2% of the value of the Credit Facility. *See* Fee Letter at 1. Nor does the Complaint purport to allege that Millennium maintained any control over the Fees once transferred to Defendants, or that the transfer of the Fees was otherwise intended to shelter those funds from Millennium's creditors.

Finally, the Complaint contains no allegation that the transfer of the Fees was "secret and hasty" or otherwise concealed. To the contrary, the Complaint describes the public nature of the Credit Facility and the provision of information about the Credit Facility to potential lenders via the CIM and other materials. Compl. ¶¶ 55-67; *see also In re Tribune Co.*, 464 B.R. 126, 161-62 (Bankr. D. Del. 2011), *on recons.*, 464 B.R. 208 (Bankr. D. Del 2011) (no badge of fraud where the relevant financial information was disclosed). The materials in this case clearly and explicitly disclosed the sources and uses of the funds to be loaned to Millennium in the Credit Facility, including the use of $1.2 billion in Term Loan proceeds to "provide a distribution to shareholders" and the use of $45.4 million in Term Loan proceeds to "pay transaction related fees and expenses," including the Fees at issue here. CIM at 22 ("Transaction Overview").[20]

---

[20] *See also* Credit Agmt. ¶ 4.16 (Term Loan proceeds shall be used to make "distributions … to shareholders," repay the existing credit agreement, and "pay the fees and expenses incurred in connection with the foregoing transactions"); *id.* ¶ 5.1(h) ("The Lenders, the Arrangers and the Administrative Agent

Nor does the Complaint contain any allegations that the transfers were made using fictitious parties. The transfer of the Fees was made to Defendants on the date of the closing of the Credit Facility (Compl. ¶ 69) and the Complaint alleges that the transfers were made by simply deducting JPMC Bank's portion of the Fees from the loan proceeds advanced to Millennium and transferring the remaining amounts directly to the other Defendants by wire transfer. *Id.* ¶ 70. As such, the Complaint also fails to allege this badge of fraud. *See, e.g.*, *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995) (badges of fraud absent in "arm's-length transaction by sophisticated businesspeople" which was "not secretive" and not "structured in a manner unusual for an LBO"); *In re Fedders*, 405 B.R. at 545 (dismissing intentional fraudulent transfer claim where "the facts pled in the complaint show that Fedders' dealings with Lenders were anything but concealed. Fedders' borrowing was disclosed in a public filing with the SEC, as was the fact that it was seeking the refinancing it ultimately obtained from the Lenders.").

**B.**     **Plaintiff Cannot Plead Intentional Fraudulent Transfer By Alleging Material Misstatements or Omissions In The Term Loan Marketing Materials**

Plaintiff's Complaint focuses on allegations that the marketing materials used in connection with the syndication of the Term Loan "misrepresented or omitted to state material facts." Compl. ¶ 2; *see also id.* ¶ 54 (alleging that Defendants had "discovered facts that would have caused any reasonable underwriter, arranger or manager of a loan distribution to investigate further the materiality of the DOJ Investigation and the legality of the Company's business practices ..."); *id.* ¶¶ 55-67 (describing alleged misstatements and omissions in Term Loan marketing materials and Millennium's historical financial statements); *id.* ¶ 87 ("The intent of

---

shall have received all fees required to be paid … on or before the Closing Date," and "[a]ll such amounts will be paid with proceeds of Loans made on the Closing Date ...").

the Debtors to hinder, delay or defraud Millennium's creditors is apparent from the false and misleading information it disseminated, with the assistance of the Defendants," to the lenders who committed to extend credit to Millennium under the Term Loan.).    These allegations duplicate the allegations in the Lender Trust Action, which asserts disclosure-based claims.  *See* Lender Trust Compl. ¶¶ 1, 77-79.  While Defendants dispute these allegations, regardless of their truth or falsity they cannot suffice to plead or prove a claim under Section 548(a)(1)(A).

"As a basic point, fraudulent conveyances are not an inducement-based fraud." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1587 (2016).  Instead, fraudulent transfer claims "typically involve 'a transfer to a close relative, a secret transfer, a transfer of title without transfer of possession, or grossly inadequate consideration.'" *Id.* (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 540-41 (1994)).  "In such cases, the fraudulent conduct is not in dishonestly inducing a creditor to extend a debt." *Husky Int'l*, 136 S. Ct. at 1587.  Yet it is precisely such an inducement-based fraud that Plaintiff attempts to plead in the Complaint.  This ersatz approach to pleading intentional fraudulent transfer claims is contrary to law.

Courts have consistently recognized that allegations such as these—*i.e.*, that a transferee had notice of or facilitated a debtor's inducement-based fraud—do not in themselves state a claim for intentional fraudulent transfer.  For example, in *In re First Alliance Mortgage Co.*, 471 F.3d 977 (9th Cir. 2006), the Ninth Circuit addressed aiding and abetting fraud claims and fraudulent transfer claims brought against a Lehman Brothers affiliate that had provided financing to an insolvent mortgage lender that had been found liable for defrauding its borrowers.  The court affirmed Lehman's aiding and abetting liability, finding that Lehman "kn[ew] that First Alliance loans were originated through deceptive sales procedures" and provided financing to First Alliance that facilitated its fraud. *Id.* at 987.  The court, however,

21

rejected claims that loan repayments to Lehman constituted fraudulent transfers. *Id.* at 1009. The court explained that fraudulent transfer law attempts to prevent "scheme[s] to hide assets from creditors," but is not generally aimed at preventing or redressing fraud. *Id.* Thus, the fact that "Lehman substantially assisted First Alliance in fraud" did not mean that loan repayments from First Alliance to Lehman constituted "a scheme to fraudulently transfer First Alliance assets." *Id.*

Similarly, in *Boston Trading Grp. v. Burnazos*, now-Justice Breyer, writing for the First Circuit, found that repayment of a loan using funds fraudulently acquired from a third party did not constitute a fraudulent transfer. 835 F.2d 1504, 1510 (1st Cir. 1987). In so holding, the court noted "the potentially confusing coincidence that we are dealing with a form of initial dishonesty [by the transferor] that itself happens to be called fraud," but recognized that no fraudulent transfer existed because "the fraud or dishonesty in this example concerns not [the transferor's] transfer to [the defendant], but *the manner in which the original debt to* [the defrauded third party] *arose.*" *Id.* at 1510 (emphasis in original). The court also noted that it had found "no modern case (nor any reference in any modern case, treatise, or article to any case in the past 400 years) that has found a fraudulent conveyance in such circumstances." *Id.* Along the same lines, *In re Sharp Int'l Corp.* involved a loan repayment by a debtor engaged in widespread fraud to a lender that "knew that the funds used to repay the [preexisting debt] were fraudulently obtained." 403 F.3d 43, 55 (2d Cir. 2005). The Second Circuit held that plaintiff "inadequately allege[d]" that the loan repayment transaction constituted a fraudulent transfer; the alleged fraud related to "the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds to State Street." *Id.*

22

These same principles apply here. Plaintiff's intentional fraudulent transfer claims do not arise from any actual allegation that the transfer of the Fees was intended to hide Millennium's assets or otherwise hinder, delay, or defraud Millennium's creditors in collecting a debt. They are instead based on allegations of fraudulent inducement or negligent misrepresentation with respect to the syndicated lenders by means of purportedly "false and misleading information [Millennium] disseminated, with the assistance of the Defendants." Compl. ¶ 87. Rather than properly pleading an intentional fraudulent transfer under Section 548(a)(1)(A), Plaintiff has presented a nonviable, disguised tort claim that substantively duplicates the claims Plaintiff is concurrently asserting in the Lender Trust Action. The Section 548(a)(1)(A) claim before this Court is not legally cognizable and should be dismissed with prejudice.

## II. THE COMPLAINT FAILS TO STATE A CLAIM FOR CONSTRUCTIVE FRAUDULENT TRANSFER

To state a claim for avoidance of allegedly constructively fraudulent transfers under 11 U.S.C. § 548(a)(1)(B), Plaintiff must plead facts establishing both that "the transfer resulted in no value for the debtor or the value received was not 'reasonably equivalent' to the value of the relinquished property interest" and that "the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210-11 (3d Cir. 2006) .[21] "Conclusory or bare-bones allegations no longer suffice to survive a motion to dismiss" a constructive fraud claim. *In re USDigital, Inc.*, 443 B.R. 22, 39 (Bankr. D. Del. 2011) (dismissing claim where "the Trustee fail[ed] to provide any factual allegations supporting the assertion that [the debtor] did not receive reasonably equivalent value"); *see also Zazzali v.*

---

[21] Under the Bankruptcy Code, "insolvent" is defined as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation …" 11 U.S.C. § 101(32)(A).

*Hirschler Fleischer, P.C.*, 482 B.R. 495, 520-21 (D. Del. 2012) (same); *United Tax Grp.*, 2016 WL 7235622, at *4 (dismissing constructive fraud claim where allegations of insolvency and lack of reasonably equivalent value were "too conclusory"). The Complaint fails to plead that the transfers of the Fees were not supported by the exchange of reasonably equivalent value in the form of services provided by Defendants to Millennium. The constructive fraudulent transfer claims must therefore be dismissed.

The reasonably equivalent value analysis is a two-part inquiry into (i) "whether the debtor received any value [for the transfer] at all," and (ii) if so, whether that value was "reasonably equivalent" to the value of the transfer. *In re R.M.L., Inc.*, 92 F.3d 139, 149, 152 (3d Cir. 1996). Here, the Fees were paid pursuant to written agreements as consideration for services provided by Defendants to Millennium related to the Credit Facility, including the extension of $50 million in revolving credit to Millennium and the arrangement and syndication of the $1.775 billion Term Loan. Plaintiff does not claim that these services were not performed, or that Millennium did not otherwise receive value from the performance of those services. Nor does Plaintiff allege that Millennium paid a price that was unreasonable or outside of market norms for the services Defendants provided. Instead, Plaintiff claims that Millennium "got very little of value" because Millennium's distribution of the dividends to parties other than Defendants out of the proceeds of the Credit Facility "severely damaged Millennium and ultimately caused it to file bankruptcy." Compl. ¶ 85 ("Millennium *got very little of value* in exchange for agreeing to pay, and for paying the Fees.") (emphasis added).

Even assuming this were true, it is not the appropriate framework to analyze Plaintiff's constructive fraudulent transfer claim for payment of the Fees to Defendants. First, in exchange for payment of the Fees, Millennium received exactly the value that it bargained for—

24

Defendants provided the agreed commitments to lend and syndication services, Millennium in turn received the agreed loan proceeds and revolving credit availability, and Millennium expended the proceeds exactly as contemplated and disclosed to the lenders and used the proceeds in part to retire antecedent debt, which under 11 U.S.C. § 548(d)(2) constitutes "value." *Compare* CIM at 22 (disclosing Millennium's contemplated use of Credit Facility proceeds) *with* Compl. ¶¶ 47, 51 (Plaintiff's allegations concerning the same).   Moreover, the constructive fraudulent transfer claim must be assessed based on the relevant transfer, rather than through a hindsight assessment of the ultimate overall utility to Millennium of separate transfers made in connection with the Credit Facility; the relevant transfer here is the 2% fee payment to Defendants, not the dividend distribution to shareholders.   Whether, in hindsight, by making a dividend payment, Millennium's management did or did not make an effective use of the Term Loan proceeds has no bearing on whether Millennium received financial services from Defendants that were of reasonably equivalent value to the fee payments Millennium made.

### A.    The Complaint Does Not Allege That The Fees Were Not Fair Market Value For The Professional Services Provided

"[A] party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.'" *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (quoting *Fruehauf Trailer Corp.*, 444 F.3d at 213).   As explained by the Supreme Court, "the 'reasonably equivalent value' criterion will … ordinarily [have] a meaning similar to fair market value." *BFP*, 511 U.S. at 545; *see also Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) ("The touchstone [of the reasonably equivalent value inquiry] is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred.").

The Fees were paid by Millennium as consideration for substantial services provided by Defendants. These services included (i) extending credit to Millennium, in the form of the revolving loan entered into alongside the Term Loan; (ii) structuring and documenting the Credit Facility; (iii) preparing, with Millennium, marketing materials for use by potential lenders; (iv) serving as Initial Lenders to Millennium under the Term Loan; and (v) obtaining commitments from potential lenders and facilitating the syndication of the Term Loan. *See, e.g.*, Compl. ¶¶ 1, 3, 49, 54, 55. Defendants were compensated for these services, as set forth in the Fee Letter, with fees amounting to 2% of the value of their respective commitments as Initial Lenders. *See* Fee Letter at 1.

Plaintiff pleads no facts that even suggest that the Fees were outside "the range of usual and customary fees payable" for the services rendered. *In re Plassein Int'l Corp.*, 405 B.R. 402, 413 (Bankr. D. Del. 2009), *aff'd*, 428 B.R. 64 (D. Del. 2010) (concluding that debtor received reasonably equivalent value in return for the payment of management fees). Indeed, the Complaint never alleges that Fees paid by Millennium represented anything other than the fair market value of the services rendered to Millennium by Defendants, or that the Commitment Letter or Fee Letter were anything other than arms-length market transactions between sophisticated commercial counterparties. Instead, the Complaint simply recites the statutory language (*see* Compl. ¶¶ 80, 82) and asserts in a conclusory fashion that Millennium received "very little" or "virtually no" value in exchange for its agreement to pay, and payment of, the Fees. *Id.* ¶¶ 1, 85. These conclusory allegations do not suffice to plead a lack of reasonably equivalent value. *See, e.g.*, *United Tax Grp.*, 2016 WL 7235622, at *4 (dismissing Section 548(a)(1)(B) claim where "the Trustee fail[ed] to set out a factual basis for his contention that the Debtor received less than a reasonably equivalent value for the transfers on the AmEx account"

but instead merely recited that "the Debtor received less than a reasonably equivalent value in exchange for the transfers.").

### B.    Plaintiff Cannot Plead Lack Of Reasonably Equivalent Value By Focusing On The Dividend Distribution Rather Than The Fees Themselves

Because Plaintiff cannot plead that Millennium did not receive reasonably equivalent value for the Fees, Plaintiff attempts to conflate the payment of the $35 million in Fees to Defendants with Millennium's subsequent payment of the $1.2 billion dividend to Millennium's shareholders.  *See* Compl. ¶ 72.  Plaintiff alleges that because of these dividend distributions, the Credit Facility "led to the Debtors' demise, was not in the Debtors' best interests, and provided virtually no value to the operating entity, Millennium."  *Id.* ¶ 1; *see also id.* ¶ 85 (the dividend distributions "severely damaged Millennium and ultimately caused it to file [for] bankruptcy"). Even crediting these allegations for purposes of this motion, this case does not seek return of those dividends; those claims were released in the Plan.  This case is about the Fees, and accordingly, Plaintiff's allegations are focused on the wrong transfers and fail to state a claim. *See, e.g.*, *Image Masters, Inc. v. Chase Home Finance*, 489 B.R. 375, 390 (E.D. Pa. 2013) ("The proper focus of the reasonably equivalent value inquiry is the specific transaction sought to be avoided, not the transfer's collateral effects on the welfare of a debtor's business.  Indeed, the Bankruptcy Code defines the test as whether the debtor 'received less than a reasonably equivalent value in exchange *for such transfer*.'") (citations omitted); *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 681 (Bankr. S.D.N.Y. 2000) (even though "improvident purchases," for example, "may be said to exacerbate the harm to creditors and diminish the debtor's estate from an overall perspective does not mean that the debtor received less than reasonably equivalent value in respect of each particular transaction.") (internal quotation marks omitted).

In attempting to conflate the Fees with the dividends paid to Millennium's shareholders, the Complaint invokes the "collapsing" doctrine, under which a court may, in certain exceptional circumstances, "'collapse' multiple ... transactions for purposes of a fraudulent transfer analysis [to] consider the economic reality of the integrated whole." *Syntax-Brillian Corp.*, 573 F. App'x at 160.  In this regard, Plaintiff claims that Defendants "had knowledge of all components of the 2014 Transaction" and that "neither the execution of the Fee Letter nor the closing of the 2014 Transaction would have happened on its own." Compl. ¶ 7. The collapsing doctrine, however, is inapplicable to the simple, bilateral transfers of the Fees at issue in this case and requires more than Plaintiff's "but for" argument.

The collapsing doctrine is an equitable doctrine designed to ensure that form is not placed over substance when analyzing a "series of separate transactions [that] achieved a result that could have been properly achieved by a simpler transaction." *In re Route 70 & Mass., L.L.C.*, No. 09–14771, 2011 WL 1883856, at *7 (Bankr. D.N.J. May 17, 2011).  The "paradigmatic" situation in which courts have, in certain circumstances, collapsed two transactions is where "one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995); *see also United States v. Tabor Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986) (collapsing two transactions where "the loan proceeds went from [the lender] to [the borrower], which immediately turned the funds over to [a third party]").

Here, Millennium's payment of the Fees to Defendants and its distribution of certain Term Loan proceeds to its shareholders as dividends are two entirely separate sets of transfers, not a multi-step transfer to a single beneficiary "that could have been properly achieved by a

simpler transaction." *Route 70 & Mass.*, 2011 WL 1883856, at *7.  To the contrary, as the Complaint alleges, the transfers of the Fees were straightforward bilateral payments made by Millennium to each Defendant in exchange for services rendered to Millennium, full stop.  *See* Compl. ¶ 70.  Accordingly, the collapsing doctrine is inapplicable, and Plaintiff cannot manufacture an alleged lack of reasonably equivalent value by conflating the payment of the Fees in exchange for the arrangement of the Credit Facility with the independent, fully-disclosed use of a portion of the Term Loan proceeds to pay dividends.

### C.    Plaintiff Has Not Otherwise Pled Lack Of Reasonably Equivalent Value

In addition to the fair market value of the transaction at issue, courts in the Third Circuit have considered "'the existence of an arm's-length relationship between the debtor and the transferee'" and "the transferee's good faith" as further factors relevant to assessing reasonably equivalent value. *Fruehauf Trailer Corp.*, 444 F.3d at 213 (in analyzing reasonably equivalent value, courts "look to the 'totality of the circumstances,' including (1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (3) the transferee's good faith.") (quoting *R.M.L.*, 92 F.3d at 148-49, 153).  Plaintiff's attempt to plead lack of reasonably equivalent value fails this test.

In assessing the totality of the circumstances, courts treat issue of "good faith" as similar to the "arms-length relationship" issue—*i.e.*, as a means to assess whether a superficially reasonable transaction is in fact a collusive or sham transaction between related parties.  *See, e.g.*, *In re Plassein*, 405 B.R. at 412-13 (finding that parties entered into agreements "in good faith and at arm's length"); *cf. In re Halt Med., Inc.*, No. 17-10810(LSS), 2017 WL 5466708 (Bankr. D. Del. May 3, 2017) (DIP financing order finding that "[t]he Debtor and the Lender proposed and negotiated the terms of the DIP Loan Agreement in good faith, at arm's length and

29

without collusion").  The Complaint nowhere alleges that the payment of the Fees to Defendants was anything other than an arm's length transaction, *i.e.*, a "transaction negotiated by unrelated parties, each acting in his or her own self-interest," as opposed to a sham or collusive transaction among related parties or insiders.  *United States v. Lavin*, 942 F.2d 177, 188 n.14 (3rd Cir. 1991); *see also* Section I.A, *supra* (discussing absence of allegations of a close relationship between the parties).  Instead, the Complaint attempts to plead that Defendants lacked "good faith" in receiving the Fees because they purportedly had "actual knowledge or notice" of Millennium's "likely liability" to the DOJ and concealed this information from the lenders who participated in the syndication of the Term Loan.  Compl. ¶ 74.  This is not a viable approach to pleading lack of reasonably equivalent value. Defendants are aware of no authority for the proposition that the absence of reasonably equivalent value can be pleaded and proved based solely on allegations of a transferee's allegedly tortious business dealings involving the debtor, rather than with reference to the challenged transfer itself.  *See, e.g.*, *Mellon Bank*, 945 F.2d at 647 ("The touchstone [of the reasonably equivalent value analysis] is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred.").  Nor are Defendants aware of any cases within this Circuit in which a transferee's lack of good faith formed the sole basis of viable allegations of a lack of reasonably equivalent value.[22]  This is consistent with the longstanding principle that fraudulent transfer law focuses on

---

[22] Indeed, numerous courts and commentators have concluded that good faith is not properly an element of reasonably equivalent value under Section 548(a)(1)(B), but rather solely an element of the "good faith and value defense" that only comes into play once a *prima facie* case for constructive fraudulent transfer has been established.  *See, e.g.*, *In re Foxmeyer Corp.*, 286 B.R. 546, 570 (Bankr. D. Del. 2002) ("[I]f relatively equal value is given but not in good faith, then a transfer is constructively fraudulent under the [Uniform Fraudulent Conveyance Act] even though it is not under 11 U.S.C. § 548(a)(1)(B)."); *In re Dreier LLP*, 453 B.R. 499, 512-13 (Bankr. S.D.N.Y. 2011) **("Unlike 'reasonably equivalent value' under the Bankruptcy Code § 548(a)(1)(B)(i), 'fair consideration' also requires that the transferee acquire the obligation or receive the conveyance in 'good faith.'"); *see generally* 5-548 COLLIER ON

the challenged transfer itself, not on the defendant-transferee's state of mind.  *See, e.g.*, *In re Byrd*, No. ADV 12-3003DM, 2012 WL 3018087, at *5 (Bankr. N.D. Cal. July 20, 2012) ("A judgment that a transfer is constructively fraudulent does not require a showing of intent on the part of the transferor or transferee; an actually fraudulent transfer judgment can be based solely on the intent of the transferor.").  To conclude that allegations of a lack of good faith, standing alone, state a claim would give Plaintiff license to recast negligence or fraudulent inducement-based tort claims that properly belong to third parties—and which Plaintiff would be precluded from bringing in its own right for lack of standing or by virtue of *in pari delicto*—as fraudulent transfer claims that are not subject to those defenses.  *See In re First Alliance*, 471 F.3d at 1009 (transferee's aiding and abetting of debtors' fraud was not a basis for fraudulent transfer liability; imposing fraudulent transfer liability, "on top of making [the defendant] pay" tort damages, "would stretch the facts of this case and the relevant principles of bankruptcy law too far").

In any event, Plaintiffs' allegations that Defendants lacked good faith are deficient.  First, while Plaintiff pleads in conclusory fashion that Defendants "had actual knowledge or notice" of the magnitude of Millennium's future liability to the DOJ, the Complaint contains no well-pleaded allegations supporting any claim of actual knowledge.  To the contrary, all the Complaint alleges is that Defendants "discovered facts that would have caused any reasonable underwriter, arranger or manager of a loan distribution to investigate further the materiality of the DOJ Investigation and the legality of the Company's business practices under scrutiny in that

---

BANKRUPTCY ¶ 548.05, Constructively Fraudulent Transfers; § 548(a)(1)(B), at *2 n.9 (contrasting reasonably equivalent value under § 548(a)(1)(B) with "fair consideration" under the Uniform Fraudulent Conveyance Act on the basis that the latter "required not only an objective 'fair equivalent,' but also subjective good faith"); UNIF. FRAUDULENT TRANSFER ACT (1984), prefatory note ("Reasonably equivalent value is required in order to constitute adequate consideration under the revised Act.  The revision follows the Bankruptcy Code in eliminating good faith on the part of the transferee or obligee as an issue in the determination of whether adequate consideration is given by a transferee or obligee.").

31

Investigation and the Ameritox Litigation." Compl. ¶ 54. And the only pleaded "facts" allegedly discovered by Defendants are that (i) it "should have been clear" to Defendants from Millennium's descriptions of its meetings with the DOJ that the DOJ was "actively investigating" Millennium's practices, and that (ii) Millennium's General Counsel "warned" Defendants that a future adverse ruling in the Ameritox Litigation "would fuel the DOJ investigation." *Id.* ¶ 52. Based on these thin allegations, Plaintiff claims that Defendants somehow should have been able to predict the magnitude and effect of Millennium's unprecedented future settlement with the DOJ, despite repeated assurances from Millennium and its counsel that any exposure was not material, and that Defendants should have known that Millennium's historical financial statements were false, despite the attestation of Millennium's auditor, KPMG LLP, that those financial statements fully complied with GAAP. *Id.* This is a far cry from allegations of actual knowledge. At most, Plaintiff is attempting to allege that Defendants were negligent in failing to connect the dots and predict the ultimate outcome of the DOJ's investigation into Millennium. Even if these allegations pleaded negligence, this would not constitute a lack of good faith. *See, e.g.*, *Bash v. Textron Fin. Corp.*, 524 B.R. 745, 760 (N.D. Ohio 2015) ("The good faith standard is not a negligence standard." (quoting *In re Davis*, No. 5:12-cv-987, 2011 WL 5429095, at *24 (W.D. Tenn. Oct. 5, 2011)).

In sum, the payment of the Fees in exchange for the services rendered by Defendants was an arms-length transaction between sophisticated commercial counterparties, and is not alleged to have been a sham or collusive transfer by related parties or insiders. Accordingly, the fact that the Fees were exchanged for services that were undeniably rendered by Defendants, and the lack of any allegations that the price of such services was outside of usual and customary

market norms for similar services, require dismissal of Plaintiff's constructive fraudulent transfer claims.

### III.    IN THE ALTERNATIVE, THIS CASE SHOULD BE STAYED PENDING RESOLUTION OF THE LENDER TRUST ACTION

Should the Court determine that Plaintiff's claims withstand dismissal, the Court should stay this action pending resolution of the Lender Trust Action.  As discussed above, the Lender Trust Action, brought by Mr. Kirschner in his capacity as Trustee of the Lender Trust, asserts a variety of state-law claims against Defendants and their affiliates concerning, *inter alia*, the marketing and syndication of the Term Loan to the syndicated lenders.  Six of the eleven claims asserted in the Lender Trust Action depend on the mischaracterization of the Term Loan as a security subject to state and federal securities laws, as opposed to a syndicated bank loan.  If the court were to hold that the Term Loan, or any interest therein, constituted a security, then the Fees that are the subject of this avoidance action would constitute transfers "in connection with a securities contract" that would be exempt from avoidance as constructive fraudulent transfers under the safe harbor provided for by 11 U.S.C. § 546(e).  While Defendants disagree that the Term Loan constitutes a security, Plaintiff should not be permitted to assert in another forum that the Term Loan constitutes a security while at the same time actively litigating claims in this forum that would be barred if Plaintiff prevailed in its other pending action.

The Bankruptcy Code's securities contract safe harbor provides that, notwithstanding Section 548(a)(1)(B), "the trustee may not avoid a transfer that is ... made by or to (or for the benefit of) a ... financial institution ... in connection with a securities contract."  11 U.S.C. § 546(e).  Defendants, each nationally or state-chartered banks, plainly fall within the definition of "financial institutions."  11 U.S.C. § 101(22) (defining "financial institution" to include, *inter alia*, "an entity that is a commercial or savings bank").  Thus, if the Term Loan were found to

constitute a security, the Credit Agreement and other relevant agreements (such as the assignment agreements by which the lenders acquired their interests in the Term Loan) would constitutes securities contracts, and the Fees paid to Defendants "in connection with" such securities contracts would be exempt from avoidance under the safe harbor.[23]

Courts have construed the securities contract safe harbor provision of Section 546(e) liberally, concluding that "a transfer is 'in connection with' a securities contract if it is 'related to' or 'associated with' the securities contract." *See, e.g.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418, 421-22 (2d Cir. 2014) ("Section 546(e) sets a low bar for the required relationship between the securities contract and the transfer sought to be avoided."); *Crescent Res. Litig. Trust ex rel. Bensimon v. Duke Energy Corp.*, 500 B.R. 464, 476 (W.D. Tex. 2013) ("[I]in the context of avoidance of transfers [the 'in connection with' language] has been interpreted to mean 'related to an agreement.'") (citing *In re Lancelot Inv'rs Fund*, 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012)); *In re Lehman Bros. Holding, Inc.*, 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) ("[T]he words 'in connection with' are to be interpreted liberally."). Therefore, to qualify for the safe harbor, a transfer need not be made pursuant to the terms of the securities contract, so long as it relates to, or is associated with, the securities contract.

Here, if the Term Loan were found to constitute a security, Plaintiff's constructive fraud claim would be barred on the face of the Complaint. The Complaint alleges that "[t]he

---

[23] Section 546(e) incorporates the expansive definition of "securities contract" contained in 11 U.S.C. § 741(7). *See In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418 (2d Cir. 2014). This statutory definition includes, *inter alia*, "a contract for the purchase, sale, or loan of a security," and also encompasses "any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph" and "any combination of the agreements or transactions referred to in this subparagraph." 11 U.S.C. §§ 741(7)(A)(i), (vii), (viii). The Bankruptcy Code does not, however, define the set of instruments that can constitute a security, which must instead be determined as a matter of non-bankruptcy law.

payment of the Fees was contingent on the closing of the 2014 Transaction and the closing of the 2014 Transaction was contingent on payment of the Fees," Compl. ¶ 7, and that "[i]ncurring the obligation to pay, and paying the Fees, was essential to the consummation of the 2014 Transaction." *Id.* ¶ 85.    Given Plaintiff's pleading of the alleged interdependent relationship between the transfers of the Fees and the alleged "securities" transaction, these transfers would constitute transfers made "in connection with" a securities contract under Section 546(e). *See, e.g.*, *In re Greektown Holdings, LLC*, No. 08-53104, 2015 WL 8229658, at *2 & n.4, *17 (Bankr. E.D. Mich. Nov. 24, 2015) (concluding that "[p]ayment of estimated fees and expenses related to the ... Transaction" were made "in connection with" the securities contract where the agreement at issue "described and contemplated" those payments); *Crescent Res.*, 500 B.R. at 476 (payment that was "intricately 'related to' this sale of securities, as the sale price was dependent upon the distribution occurring," fell under the safe harbor).    Plaintiff cannot have it both ways.    Should Plaintiff's fraudulent transfer claims withstand dismissal (and for the reasons set forth herein, they should not), Defendants respectfully submit that the threshold substantive determination as to whether the Term Loan syndication constitutes a security should be made in the first instance in the Lender Trust Action, and that any further litigation of Plaintiff's fraudulent transfer claims in this forum should be deferred pending the resolution of this issue.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.  In the alternative, if the Court determines that any portion of this action should survive dismissal, this action should be stayed pending the disposition of the Lender Trust Action.

Dated: Wilmington, Delaware
          December 13, 2017

RICHARDS, LAYTON & FINGER, P.A.

By: */s/ Mark D. Collins*
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
          stearn@rlf.com
          madron@rlf.com

-and-

Mary Beth Forshaw
William T. Russell, Jr.
Isaac M. Rethy
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017-3954
Tel:    (212) 455-2000
          (212) 455-2502
Email: mforshaw@stblaw.com
          wrussell@stblaw.com
          irethy@stblaw.com

*Attorneys for JPMorgan Chase Bank, N.A.*

RICHARDS, LAYTON & FINGER, P.A.

By: */s/ Mark D. Collins*
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
          stearn@rlf.com
          madron@rlf.com

-and-

Michael Luskin
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York  10036
Tel:    (212) 597-8200
          (212) 974-3205
Email: luskin@lsellp.com

*Attorneys for Citibank, N.A.*

POLSINELLI PC

By: */s/ Christopher A. Ward*
Christopher A. Ward (No. 3877)
Stephen J. Astringer (No. 6375)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Tel:    (302) 252-0920
Fax:    (302) 252-0921
Email:  cward@polsinelli.com
        sastringer@polsinelli.com

-and-

Stephen Mark Dollar
David B. Schwartz
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Tel:    (212) 318-3000
Fax:    (212) 318-3400
Email: steve.dollar@nortonrosefulbright.com
david.schwartz@nortonrosefulbright.com

-and-

Kyle Schindler
NORTON ROSE FULBRIGHT US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Tel:    (214) 855-8000
Email:
kyle.schindler@nortonrosefulbright.com

*Attorneys for BMO Harris Bank, N.A.*

MORRIS JAMES LLP

By: */s/ Stephen M. Miller*
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel:    (302) 888-6853
Fax:    (302) 571-1750
Email: smiller@morrisjames.com

-and-

J. Emmett Murphy (admitted *pro hac vice*)
King & Spalding LLP
1185 Avenue of the Americas
New York, New York 10036
Tel:    (212) 556-2191
Fax:    (212) 556-2222
Email: jemurphy@kslaw.com

-and-

John C. Toro (admitted *pro hac vice*)
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30033
Tel:    (404) 572-2806
Fax:    (404) 572-5100
Email: jtoro@kslaw.com

*Attorneys for SunTrust Bank*

37