# EXHIBIT A

RLF1 28568147v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
THEIR MOTION TO STRIKE CERTAIN PORTIONS OF
THE RULE 26(a)(2) REPORT OF YVETTE AUSTIN SMITH**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

*List of Counsel Continued on Next Page*

Adv. Docket No. 249
Filed: 8/22/22

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7500

-and-

Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000

*Attorneys for JPMorgan Chase Bank, N.A.*

POLSINELLI PC
Christopher A. Ward (No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920

-and-

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone: (212) 318-3000

*Attorneys for BMO Harris Bank, N.A.*

Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000

*Attorneys for Citibank, N.A.*

MORRIS JAMES LLP
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6853

-and-

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2191

-and-

John C. Toro
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: (404) 572-2806

*Attorneys for SunTrust Bank*

August 22, 2022

**TABLE OF CONTENTS**

**Page**

NATURE AND STAGE OF PROCEEDINGS ...................................................................1

SUMMARY OF ARGUMENT ........................................................................................1

BACKGROUND ............................................................................................................3

      A.     Austin Smith's Report...................................................................................3

      1.     The Balance Sheet Test.................................................................................4

      2.     The Ability to Pay Debts Test.......................................................................7

      3.     The Capital Adequacy Test............................................................................8

LEGAL STANDARD......................................................................................................8

ARGUMENT ..................................................................................................................9

**I.**     THE 14.8% WACC, AND CONCLUSIONS BASED ON IT, MUST BE STRUCK BECAUSE AUSTIN SMITH ADOPTED THE ANALYSIS OF A THIRD PARTY WITHOUT EXPLANATION OR JUSTIFICATION...........................9

      A.     Austin Smith Adopted Vantage Point's WACC as Her Own Without Any Analysis...................................................................................................10

      B.     Austin Smith's *Post Hoc* Efforts to Explain Her Adoption of Vantage Point's WACC Cannot Be Considered ................................................12

**II.**    THE WACC THAT AUSTIN SMITH BORROWED WAS DERIVED FROM AN UNSOUND METHODOLOGY .................................................................14

      A.     The 14.8% WACC Incorporates a Company-Specific Risk Premium That Has Been Rejected by Financial Economists and Courts .......................14

      B.     The 14.8% WACC Relies on Comparable Companies That Austin Smith Determined Were Not Comparable to Millennium ...............................17

**III.**   AUSTIN SMITH'S ABILITY TO PAY DEBTS AND CAPITAL ADEQUACY TESTS SHOULD BE STRUCK BECAUSE THEY LACK AN ANALYSIS OF MILLENNIUM'S ABILITY TO RAISE ADDITIONAL CAPITAL..............................18

CONCLUSION...............................................................................................................19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Erecting & Dismantling Co.* v. *U.S. Steel Corp.*,
2020 WL 4676351 (W.D. Pa. Aug. 12, 2020) ....................................................... 9-10

*Calhoun* v. *Yamaha Motor Corp., U.S.A.*,
350 F.3d 316 (3d Cir. 2003).........................................................................14

*Chemipal Ltd.* v. *Slim-Fast Nutritional Foods Int'l, Inc.*,
350 F. Supp. 2d 582 (D. Del. 2004).................................................................9

*Daubert* v. *Merrell Dow Pharms., Inc.*,
509 U.S. 579, 593 (1993)..........................................................................9, 14

*In re EBC I, Inc.*,
380 B.R. 348 (Bankr. D. Del. 2008) ............................................................ 18-19

*Feit* v. *Great-West Life & Annuity Ins. Co.*,
460 F. Supp. 2d 632 (D.N.J. 2006)..................................................................14

*Hamlett* v. *Carroll Fulmer Logistics Corp.*,
176 F. Supp. 3d 1360 (S.D. Ga. 2016)......................................................... 13-14

*Hill* v. *Koppers Indus.*,
2009 WL 3246630 (N.D. Miss. Sept. 30, 2009).....................................................13

*Jacked Up, L.L.C.* v. *Sara Lee Corp.*,
807 F. App'x 344 (5th Cir. 2020) ...................................................................12

*Johnson* v. *Vanguard Mfg., Inc.*,
34 F. App'x 858 (3d Cir. 2002) .....................................................................12

*Krys* v. *Aaron*,
112 F. Supp. 3d 181 (D.N.J. 2015) .................................................................13

*LG Display Co.* v. *AU Optronics Corp.*,
265 F.R.D. 189 (D. Del. 2010) .....................................................................12

*Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*,
945 F.2d 635 (3d Cir. 1991)...................................................................... 4-5

*MFS/Sun Life Tr.-High Yield Series* v. *Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995) ..................................................................18

*MOSAID Techs. Inc.* v. *LSI Corp.*,
 2014 WL 807877 (D. Del. Feb. 28, 2014) ........................................................9, 10

*Oddi* v. *Ford Motor Co.*,
 234 F.3d 136 (3d Cir. 2000) ..............................................................................9

*In re Orchard Enters. Inc.*,
 2012 WL 2923305 (Del. Ch. July 18, 2012) ............................................... 15-16

*Peltz* v. *Hatten*,
 279 B.R. 710 (D. Del. 2002) ............................................................................18

*Reed* v. *Binder*,
 165 F.R.D. 424 (D.N.J. 1996) .....................................................................12, 13

*In re R.M.L., Inc.*,
 92 F.3d 139 (3d Cir. 1996) ............................................................................ 4-5

*Safeguard Scis., Inc.* v. *Saints Cap. Dakota, L.P.*,
 2013 WL 12158979 (D. Del. Mar. 28, 2013) ....................................................13

*Samsung Elecs. Co.* v. *Nvidia Corp.*,
 314 F.R.D. 190 (E.D. Va. 2016) ................................................................. 12-13

*Schneider* v. *Fried*,
 320 F.3d 396 (3d Cir. 2003) ..............................................................................9

*Solar Cells, Inc.* v. *True N. Partners, LLC*,
 2002 WL 749163 (Del. Ch. Apr. 25, 2002) ......................................................16

*In re Stone Panels, Inc.*,
 2021 WL 4436166 (Bankr. N.D. Tex. Sept. 27, 2021) ......................................19

*UGI Sunbury LLC* v. *A Permanent Easement for 1.7575 Acres*,
 949 F.3d 825 (3d Cir. 2020) ..............................................................................9

*Union Ill. 1995 Inv. Ltd. P'ship* v. *Union Fin. Grp., Ltd.*,
 847 A.2d 340 (Del. Ch. 2004) ..........................................................................16

*ZF Meritor, LLC* v. *Eaton Corp.*,
 696 F.3d 254 (3d Cir. 2012) ........................................................1, 9, 10, 11

**Other Authorities**

Fed. R. Evid. 702 .................................................................................2, 8, 14

Fed. R. Civ. P. 26 ........................................................................................12

**NATURE AND STAGE OF PROCEEDINGS**

Defendants submit this memorandum in support of their Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette R. Austin Smith (the "Motion").[1]

**SUMMARY OF ARGUMENT**

In order to prevail on his constructive fraudulent transfer claim, Plaintiff must prove that Millennium was insolvent at the time of the 2014 Transaction, or became insolvent as a result. Plaintiff proffers Yvette Austin Smith, Principal and Chairman of The Brattle Group (a litigation consulting firm), as his valuation expert, and her report (Ex. 64) is Plaintiff's only evidence on insolvency. That report must be struck as unreliable. Austin Smith devotes the vast majority of her report to describing a balance sheet test of solvency, a foundational piece of which is the weighted average cost of capital ("WACC"). Not only is the 14.8% WACC that Austin Smith used in her test demonstrably wrong, it is not her work. Austin Smith never explained, justified, or supported it with any independent analysis. She merely stated in her report that the "discount rate is calculated by Vantage Point," Millennium's solvency advisor for the 2014 Transaction, and then adopted it as her own. (Ex. 64 ¶ 143.) When asked at her deposition how the WACC she used would change if different inputs were used, Austin Smith responded, "[y]ou would have to ask Vantage Point." (Ex. 60 (Austin Smith Dep. Tr.) at 305:10-25.) As the Third Circuit has held, an expert cannot rely on the analysis of others "without knowing the circumstances under which such [figures] were created or the assumptions on which they were based." *ZF Meritor, LLC* v. *Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012). That is precisely what Austin Smith did here.

---

[1] Further information regarding the nature and stage of these proceedings can be found in the *Memorandum of Law in Support of Defendants' Motion for Summary Judgment* ("Defendants' Summary Judgment Memorandum"), filed concurrently herewith. Capitalized terms used but not defined herein shall have the meanings given to them in Defendants' Summary Judgment Memorandum. Citations in the format "Ex. __" refer to exhibits to the Declaration of Mark A. Popovsky, filed concurrently herewith ("Popovsky Decl.").

Austin Smith tried to justify her unsupported use of Vantage Point's WACC at her deposition, but these after-the-fact attempts to salvage her opinion should be disregarded as untimely. Regardless, they do not make sense. At times, Austin Smith suggested that she simply relied on Vantage Point's calculation, while at other times she suggested that she had conducted her own ill-defined analysis that is entirely absent from her report. She also repeatedly claimed that she relied on documents or information regarding the 14.8% WACC that she admitted she had not seen until *after* her report was submitted. Ultimately, however, no amount of explanation or independent analysis—even if it had been clearly articulated and timely provided—could support the use of a 14.8% WACC because it was reached using flawed methodologies, including the application of an arbitrary company-specific risk premium and the use of inconsistent comparable companies to determine the beta (*i.e.*, systematic risk).

Austin Smith's failure to provide any explanation as to why she believed Vantage Point's WACC calculation was sufficiently reliable to undergird her own analysis is particularly striking, given that the vast majority of her report is dedicated to demonstrating all of the inadequacies in Vantage Point's other inputs and conclusions. (*See* Ex. 64 ¶¶ 54-59, 61, 63-72, 106-18, 123, 128, 132-41.) In Austin Smith's view, Vantage Point's analysis is fundamentally flawed in nearly every conceivable way—notably *except* with respect to the WACC, an input that was essential to reaching her desired conclusion of insolvency. Yet she never explained (or, apparently, even looked into) why Vantage Point somehow got this one aspect—and seemingly *only* this one aspect—of its analysis right.

Without even a modicum of clarity regarding why Austin Smith uncritically adopted Vantage Point's flawed WACC, her use of it is not sufficiently reliable to "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). And, as detailed in

Defendants' Summary Judgment Memorandum, without the WACC or the conclusions that depend on the WACC, Plaintiff has failed to establish a triable issue as to Millennium's insolvency. (*See* Defs.' SJ Mem. pp. 29-30.)  Indeed, even accepting all of Austin Smith's baseless adjustments to Millennium's projected cash flows, if the Court were to apply a WACC of 7.2% (which is what Austin Smith's WACC becomes when corrected for errors), Millennium was *solvent* in 2014, even under Austin Smith's balance sheet test.  (*See* Ex. 65 (Hutton Report), App'x E1.)

The two other tests that Austin Smith conducted—the ability to pay debts and capital adequacy tests, to which she dedicated a collective five pages of her 93-page report—do nothing to save her analysis and require only brief consideration.  Under both tests, one must consider whether the company at issue could have raised additional capital or refinanced its debt.  Austin Smith performed no such analysis, and never opined that Millennium could not have raised additional capital.  Her conclusions are thus unreliable and must be struck.

## BACKGROUND

### A.   Austin Smith's Report

On November 15, 2021, Plaintiff served the Rule 26(a)(2) Report of Yvette R. Austin Smith ("Report").  In the Report, Austin Smith started with financial projections prepared by Millennium's management (the "Management Projections"), which had been used by Vantage Point and TA, and stress tested by Defendants, at the time of the 2014 Transaction.[2]  (The

---

[2]      For example, Vantage Point conducted a solvency analysis that relied on, among other things, the Management Projections and a WACC of 14.8%.  (*See* Ex. 18 (Vantage Point Solvency Analysis) at -3291.)  Vantage Point estimated Millennium's value to be between $2.2 and $2.8 billion.  (*Id.* at -3288.)  Including downside scenarios and based on the Management Projections, Citi valued Millennium at between $1.9 and $5.4 billion using a WACC range of 8.5% to 9.5% (*see* Ex. 20 (Citi Analysis) at -8308) and JPMorgan valued Millennium at between $2.8 and $4.3 billion using a WACC of 6.7% (*see* Ex. 68 (JPMorgan Analysis)).  Under its base case, SunTrust valued Millennium at between approximately $3.5 and $4.2 billion using a WACC of 5.93% (s*ee* Ex. 22 (SunTrust Analysis) at -1813).  Notably, Vantage Point's 14.8% WACC is nearly 60%

Management Projections appear in the contemporaneous documents and in the parties' expert reports as the "Padres Projections," reflecting Millennium management's project name for the 2014 Transaction.)  Notwithstanding that she has never worked in or received training in the healthcare industry,[3] Austin Smith modified the Management Projections to, in her words, "more accurately and reasonably reflect risk factors and historical trends that were known or knowable as of the 2014 Transaction" (the "Modified Projections").  (Ex. 64 ¶ 106.)  In the aggregate, these modifications reduce Millennium's value by an improbable $1 billion (at least).  Based on, among other things, the Modified Projections, Austin Smith opined that Millennium "was rendered balance sheet insolvent" and "equity insolvent" due to the 2014 Transaction under three solvency tests:  balance sheet, ability to pay debts, and capital adequacy.  (*Id.* ¶ 7.)[4]

### 1.    The Balance Sheet Test

Austin Smith first conducted a balance sheet test using a discounted cash flow ("DCF") analysis.  (*Id*. ¶ 142.)  Under a balance sheet test, "'assets and liabilities are tallied at fair valuation to determine whether the corporation's debts exceed its assets.'"  *In re R.M.L., Inc.*, 92 F.3d 139, 155 (3d Cir. 1996) (emphasis omitted) (quoting *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945

---

greater than even the highest WACC that any of these sophisticated financial institutions used contemporaneously in their own internal modeling.

[3]    *See, e.g.*, Ex. 60 (Austin Smith Dep. Tr.) at 46:6-47:20 (no expertise in "urine and drug testing industry," "medical billing," or "Medicare reimbursement[s]"); 184:19-23 (no experience "analyzing medically unlikely edits"); 185:13-17 (no experience with CMS guidance or regulations concerning MUEs); 220:8-25 (no experience with local coverage determinations).

[4]    Defendants do not accept any of Austin Smith's adjustments to the Management Projections, which are highly speculative and will be the subject of cross-examination at trial, if necessary.  But the Court need not consider any of these adjustments on the Motion or Defendants' Motion for Summary Judgment.  The separate methodological flaws addressed here render Austin Smith's conclusions unreliable as a matter of law (and are alone enough to require summary judgment for Defendants on Plaintiff's constructive fraudulent transfer claim (*see* Defs.' SJ Mem. pp. 29-30)).

4

F.2d 635, 648 (3d Cir. 1991)).  To conduct the DCF analysis, Austin Smith relied on "the [Modified Projections] to calculate Millennium's annual unlevered free cash flow as net operating profit after taxes, less investments in working capital and less capital expenditure, and after adding back non-cash charges (*i.e.*, depreciation and amortization)," and then "discount[ed] both the seven-year projected cash flows and the terminal value using a [WACC] . . . of 14.8%."  (Ex. 64 ¶ 143.)[5]  The 14.8% WACC is critical to Austin Smith's conclusion regarding Millennium's solvency because, even with all of her other proposed adjustments to the Management Projections, Millennium would be solvent under Austin Smith's analysis if she used a WACC of 7.2%, which is what Austin Smith's WACC would become once corrected for errors Hutton identified.  (Ex. 65 (Hutton Report) ¶¶ 27, 32, 42, 104.)

Austin Smith provided no meaningful explanation—let alone any supporting substantive analysis—as to why this 14.8% WACC should be applied.  Instead, she stated only that the 14.8% "discount rate is calculated by Vantage Point for the solvency analysis dated as of April 30, 2014" and apparently used it for her analysis simply because Vantage Point used it for theirs—all while picking apart almost every other assumption that Vantage Point made.  (Ex. 64 ¶ 143.)  Austin Smith provided no analysis to show that Vantage Point's 14.8% WACC was even within the bounds of reason, much less that it was the appropriate WACC to use for this exercise.

Strikingly, there is no evidence that Austin Smith even looked at any of the materials in the record showing Vantage Point's underlying methods, assumptions, or calculations in deriving the 14.8% WACC before adopting it as her own.  The document reflecting Vantage Point's

---

[5]    As Dr. Amy Hutton, Defendants' expert and a Professor of Business Administration at the Carroll School of Management at Boston College, explained, a "WACC is the weighted average of the cost of all of a company's sources of capital," which represents "the equity rate of return and the debt rate of return" together.  (*See* Ex. 65 (Hutton Report), App'x F ¶ 1; Ex. 66 (Hutton Dep. Tr.) at 37:4-11.)

calculation of the WACC, which was produced by Vantage Point in this litigation (Ex. 67 (Solvency Analysis Underlying Materials) (VP_ML_00002551)), is not on her list of materials relied upon—a list that Austin Smith confirmed multiple times during her deposition was "complete." (Ex. 60 (Austin Smith Dep. Tr.) at 22:7-13; *see also id.* at 25:8-13; 110:2-10.)  When asked specifically about the Vantage Point document, she claimed that it was "unclear" whether she had reviewed it prior to the submission of her report. (*Id.* at 134:19-135:8.)  Austin Smith also had no basis to trust Vantage Point's work.  She testified that she did not believe that she had "ever worked with Vantage Point previously" and did not know about their reputation in the industry. (*Id.* at 127:6-9; *see also id.* at 127:15-21 ("Q.  And do you know what [Vantage Point's] reputation is in the industry?  A.  No. . . . It's not a company that I have worked a lot with.  There are companies that I have worked more in this space with but not Vantage Point.").)[6]

At her deposition, Defendants asked Austin Smith about her basis for using the 14.8% WACC.  When asked whether she independently estimated the WACC or relied on Vantage Point's WACC, she stated for the first time that she calculated an "observed WACC" based on the five Guideline Public Companies ("GPC") that she identified in her Report; never said what that "observed WACC" was; and ultimately rejected it. (Ex. 60 (Austin Smith Dep. Tr.) at 121:19-122:12.)  She then apparently "sought to understand what the market data points were" and "whether those data points were confirmatory of" Vantage Point's 14.8% WACC. (*Id.* at 121:19-122:12; 124:19-125:6.)  These "data points" were (1) the FTI Consulting WACC calculated as of

---

[6]      In the Report, Austin Smith notes that "FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%" (Ex. 64 ¶ 143).  If she meant to imply that her adoption of Vantage Point's 14.8% WACC is somehow justified because of FTI Consulting's 14.0% WACC, that comparison is inapposite.  FTI Consulting used a 14.0% WACC in a valuation it performed as of December 18, 2015—20 months after the 2014 Transaction.

December 2015, nearly 20 months after the 2014 Transaction and after Millennium had filed for bankruptcy (and referenced only in passing in the Report (*see* Ex. 64 ¶ 143)), and (2) a TA Associates discount rate that was not mentioned in the Report at all and which Austin Smith admitted that she only saw "after [she] received . . . the report of [Dr.] Hutton." (Ex. 60 (Austin Smith Dep. Tr.) at 119:4-10; 120:7-13.)[7]  She apparently did not consider the WACCs used by Defendants at the time of the 2014 Transaction to be relevant data points.

Finally, as part of her balance sheet test, Austin Smith also conducted and described in her Report a GPC valuation that showed that Millennium was *solvent* following the 2014 Transaction. (Ex. 64 ¶ 157 & Table 9 (Millennium's implied equity value ranges between $23 million and $1.5 billion); Ex. 65 (Hutton Report) ¶ 86.)  Austin Smith, however, disavowed the results of her own analysis because she determined that the five companies she used "are not sufficiently comparable to Millennium to provide a reliable estimate of value." (Ex. 64 ¶ 152.)  In other words, Austin Smith relied on the asserted incomparability of these companies to reject the unhelpful (to her) conclusion that Millennium was solvent.

### 2.    The Ability to Pay Debts Test

Austin Smith dedicated three pages of her 93-page report to an ability to pay debts test.  To perform this test, Austin Smith used the Modified Projections to "analyze[] Millennium's ability to pay its debt obligations as they became due." (Ex. 64 ¶ 164.)  She determined that, based on her Modified Projections, Millennium would have exhausted its cash reserves in 2018 and that Millennium would be around "the median leverage ratio for 'Caa-C' credits" as of December 31, 2020. (*Id.* ¶ 169.)  Austin Smith made this assertion without performing a full credit analysis or

---

[7]    The discount rate employed by TA Associates was "not a WACC in the same sense" as Vantage Point's WACC because it reflected TA Associates' "view of the opportunity cost of [TA Associates'] capital" invested in Millennium instead of "the cost of equity capital," which is what the WACC used in a valuation represents. (Ex. 66 (Hutton Dep. Tr.) at 162:13-165:17.)

providing any basis for this credit rating other than a comparison of leverage ratios under her "expected case." (*Id.*) She nevertheless concluded—contrary to the determination of Defendants and the sophisticated lenders who participated in the 2014 Transaction—that "[t]here was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021" and, thus, "the 2014 Transaction encumbered Millennium with debt beyond the company's ability to pay." (*Id.* ¶ 7) Nowhere in her Report or at her deposition did Austin Smith opine that Millennium would have been unable to raise additional capital or refinance the existing debt based on her projected credit rating.

### 3.    The Capital Adequacy Test

Even more of an afterthought was Austin Smith's capital adequacy test, to which she dedicated barely over one page of her report. To perform this test, Austin Smith "determined Millennium's financial condition under" what she described as "a reasonable downside scenario." (*Id.* ¶ 170.) Even though Austin Smith's Modified Projections already reflected a substantial "downside scenario" in relation to Millennium management's projections—decreasing Millennium's value by at least $1 billion based on nothing more than speculation and conjecture unmoored to any actual experience in the industry (*see supra*, p. 4)—Austin Smith added *further* substantial downward adjustments on top of those to conclude that "the 2014 Transaction left Millennium with unreasonably small capital." (Ex. 64 ¶ 172.) Again, in performing this analysis, Austin Smith never considered whether Millennium could have raised additional capital to meet its debt obligations.

### <u>LEGAL STANDARD</u>

Federal Rule of Evidence ("FRE") 702 provides that evidence from a properly qualified expert may be introduced to "help the trier of fact to understand the evidence or to determine a fact in issue," so long as (i) the expert has "scientific, technical, or other specialized knowledge";

(ii) "the testimony is the product of reliable principles and methods" that "the expert has reliably applied . . . to the facts of the case"; and (iii) the expert's testimony will help the finder of fact "to understand the evidence or to determine a fact in issue."  Trial courts act as a "gatekeeper" to ensure that the trier of fact only considers evidence that overcomes this "trilogy of restrictions on expert testimony."  *Schneider* v. *Fried*, 320 F.3d 396, 404 (3d Cir. 2003); *see also UGI Sunbury LLC* v. *A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020) ("Rule 702 applies whether the trier of fact is a judge or a jury.").  Thus, where the proponent of the evidence cannot demonstrate "'by a preponderance of proof'" that each prong of FRE 702 is satisfied, the expert's evidence must be excluded.  *Oddi* v. *Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (quoting *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 n.10 (1993)).

## ARGUMENT

**I.**     **THE 14.8% WACC, AND CONCLUSIONS BASED ON IT, MUST BE STRUCK BECAUSE AUSTIN SMITH ADOPTED THE ANALYSIS OF A THIRD PARTY WITHOUT EXPLANATION OR JUSTIFICATION.**

In "some circumstances," courts may accept the testimony of an expert whose opinion relies on an analysis conducted by someone else, "but to do so, the expert must explain why [s]he relied on such estimates and must demonstrate why [s]he believed the estimates were reliable."  *ZF Meritor*, 696 F.3d at 292.  It is not sufficient for an expert to "simply adopt[]" an analysis upon which the expert's conclusion relies "without reviewing its underpinnings."  *Chemipal Ltd.* v. *Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 590 (D. Del. 2004).  Accordingly, courts require that an expert "independently verif[y]" the "assumptions . . . contained in" any external analysis before an expert opinion relying on that analysis can be considered sufficiently reliable to assist the trier of fact.  *MOSAID Techs. Inc.* v. *LSI Corp.*, 2014 WL 807877, at *2 (D. Del. Feb. 28, 2014).  Such verification requires the expert to take "steps to assure [her]self of the reasonableness of [the] data" contained in the external analysis and "undert[ake] significant due

diligence" before relying on the external analysis. *Allied Erecting & Dismantling Co.* v. *U.S. Steel Corp.*, 2020 WL 4676351, at *4 (W.D. Pa. Aug. 12, 2020) (citing *ZF Meritor*, 696 F.3d at 292). Where the expert instead relies on the analysis of others without "personal knowledge of the assumptions that were made" in that analysis "or the qualifications of those persons in charge of making the assumptions," the expert's conclusions flowing from that analysis "must be excluded as unreliable under Federal Rule of Evidence 702." *MOSAID*, 2014 WL 807877, at *3.

### A.    Austin Smith Adopted Vantage Point's WACC as Her Own Without Any Analysis.

The Report states only that the WACC—on which the entire conclusion of her balance sheet test relies—was "calculated by Vantage Point." (Ex. 64 ¶ 143.) She provided no other basis in her report for her use of 14.8% as the WACC other than a passing reference to FTI Consulting using a different (and lower) WACC for Millennium, based on a different set of WACC inputs, as of the date the company emerged from bankruptcy (nearly two years later). (*Id.*) As far as can be gleaned from reading her report, Austin Smith used Vantage Point's WACC—which conveniently leads to a conclusion of insolvency using her Modified Projections—for no other reason than that Vantage Point used it. And, as Austin Smith's deposition testimony shows, she did not even know the methodology used by Vantage Point or the assumptions on which Vantage Point's WACC was based before adopting it as her own. (*See supra* p. 6.)

In *ZF Meritor*, the Third Circuit affirmed the exclusion of an expert opinion on damages because the expert "relied on a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based." 696 F.3d at 292. The district court had concluded that those estimates "could not serve as a reliable basis for [the expert's] opinion because he was unaware of the qualifications of the individuals who prepared the document, or the assumptions on which the estimates were based."

*Id.* While the record established that the estimates had been presented to the company's board of directors, revised to address management inquiries, and relied on by the board in making business decisions, the expert "lacked critical information that would be necessary . . . to effectively cross-examine him" because the expert did not know who initially calculated the relevant figures, the methodology used to create them, or the assumptions on which they were based. *Id.* at 293.

So too here. The lack of any analysis by Austin Smith of the WACC she adopted precludes Defendants from being able "to effectively cross-examine" her about its bases. *ZF Meritor*, 696 F.3d at 293. For example, Vantage Point used an unlevered beta of 1.0 in its calculation, despite the average beta of its eight identified comparable companies being 0.77 (Ex. 65 (Hutton Report) ¶ 41 n.82; *see also* Ex. 67 (Solvency Analysis Underlying Materials)); chose specific companies as comparable to Millennium (Ex. 67; Ex. 18 (Vantage Point Solvency Analysis) at 20-23); and added an arbitrary 5% company-specific risk premium to the cost of equity (Ex. 65 ¶ 34; *see also* Ex. 67). Defendants are entitled to answers regarding why the WACC Austin Smith used incorporates these methodological choices. But without having even *looked* at the underlying data before submitting her report, Austin Smith could not have known the bases for them at the time she prepared the Report.

Austin Smith explicitly acknowledged at her deposition that Vantage Point chose a different set of comparable companies for its 14.8% WACC calculation than she did for her alleged "observed WACC." (Ex. 60 (Austin Smith Dep. Tr.) at 297:16-298:2.) This leaves Defendants with *no one* to ask about the reasoning behind the selection of Vantage Point's eight companies that are incorporated in the 14.8% WACC, since Austin Smith admitted that she in fact selected a different set. Indeed, when asked at her deposition how the 14.8% WACC would change if it relied on Austin Smith's five identified (but ultimately disavowed) comparable companies rather

11

than Vantage Point's eight, Austin Smith said, "[y]ou would have to ask Vantage Point."  (*Id.* at 305:10-25.)  Unfortunately for Plaintiff, it is Austin Smith—not Vantage Point— who offered the opinion in this litigation that relied on the 14.8% WACC, and her inability to answer basic questions about the analysis renders its use unreliable.  "[W]here, as here, the expert fails to show any basis for believing someone else's projections," Rule 702 "and the requirements of *Daubert* are not satisfied."  *Jacked Up, L.L.C.* v. *Sara Lee Corp.*, 807 F. App'x 344, 349 (5th Cir. 2020) (internal quotation marks omitted).  Austin Smith's 14.8% WACC should be struck.

**B.     Austin Smith's *Post Hoc* Efforts to Explain Her Adoption of Vantage Point's WACC Cannot Be Considered.**

At her deposition, Austin Smith tried to explain away her uncritical adoption of Vantage Point's WACC.  But these explanations were not included in her Report and therefore should not be considered in determining whether her adoption of Vantage Point's WACC is reliable.  "Federal Rule of Civil Procedure 26(a)(2)(B) provides that an expert report shall contain a complete statement of *all opinions* to be expressed and the basis and reasons [for them]," *LG Display Co.* v. *AU Optronics Corp.*, 265 F.R.D. 189, 192 (D. Del. 2010) (emphasis added) (internal quotation marks omitted), and "[a] party that fails to disclose evidence required by Rule 26(a) will not be allowed to use that evidence unless the failure to disclose the evidence is harmless," *Johnson* v. *Vanguard Mfg., Inc.*, 34 F. App'x 858, 859 (3d Cir. 2002).  "The test" of an expert's report, therefore, "is whether it was sufficiently complete, detailed and in compliance with the Rules so that surprise is eliminated, unnecessary depositions are avoided, and costs are reduced."  *Reed* v. *Binder*, 165 F.R.D. 424, 429 (D.N.J. 1996).  When an expert report fails to adequately disclose the basis for the expert's opinions, "notice in a deposition testimony does not render [such] failure to disclose . . . unsurprising or curable, even when that deposition testimony completely covers the

material that should have been disclosed." *Samsung Elecs. Co.* v. *Nvidia Corp.*, 314 F.R.D. 190, 198 (E.D. Va. 2016).

Contrary to these principles, Austin Smith's report contained no explanation for her use of the 14.8% WACC beyond noting that it was the WACC calculated by Vantage Point. (Ex. 64 ¶ 143.) Only at her deposition did Austin Smith first reference the vague "independent analysis" that she supposedly conducted (Ex. 60 (Austin Smith Dep. Tr.) at 124:7), and even then she never disclosed the results. She offered no detail, for example, regarding what calculations or assumptions went into her own supposed WACC; on what basis she concluded that WACC did not appropriately address the relevant risk; or why she found Vantage Point's WACC to be more reliable than the one that she purportedly developed herself. Defendants' expert therefore could not assess Austin Smith's alleged methodology or respond to it in her rebuttal report, which is both prejudicial to Defendants and entirely contrary to the purpose of Rule 26 disclosures. *See Reed*, 165 F.R.D. at 430 ("[n]othing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion"); *see also, e.g.*, *Krys* v. *Aaron*, 112 F. Supp. 3d 181, 207 (D.N.J. 2015) ("such an untimely inclusion deprives the adversary of adequate notice, and the ability to assess the underpinnings of the opinion in connection with that expert's deposition"). As numerous courts have held, it is entirely inappropriate for an expert to rely upon new opinions, analyses, or bases for opinions not disclosed in his or her report, and which came to light only during the deposition of the expert.[8] Austin Smith's *post hoc* attempts at her deposition

---

[8]     *See, e.g.*, *Safeguard Scis., Inc.* v. *Saints Cap. Dakota, L.P.*, 2013 WL 12158979, at *1 (D. Del. Mar. 28, 2013) (excluding expert's "untimely damages theories . . . disclosed for the first time at his . . . deposition"); *Hill* v. *Koppers Indus.*, 2009 WL 3246630, at *2 (N.D. Miss. Sept. 30, 2009) (granting motion to strike because "during the depositions of [plaintiff's experts], it was revealed that there were opinions, data, and or methodologies used by the experts in reaching their opinions that were not disclosed in their expert reports"); *Hamlett* v. *Carroll Fulmer Logistics Corp.*, 176 F. Supp. 3d 1360, 1364-65 (S.D. Ga. 2016) (excluding "the new opinions that [expert]

to explain her reliance on the Vantage Point WACC should not be considered to establish that her use of the 14.8% WACC was reliable.

## II.  THE WACC THAT AUSTIN SMITH BORROWED WAS DERIVED FROM AN UNSOUND METHODOLOGY.

Austin Smith's use of the Vantage Point WACC is separately unreliable because the methodology behind it is unsound.  To be admissible, expert testimony must be "the product of reliable principles and methods."  Fed. R. Evid. 702(c).  The opinion "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *Calhoun* v. *Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Daubert*, 509 U.S. at 590); *see also Feit* v. *Great-West Life & Annuity Ins. Co.*, 460 F. Supp. 2d 632, 637 (D.N.J. 2006) ("[C]ourts need not admit bare conclusions or mere assumptions proffered under the guise of 'expert opinions.'").  An expert also must have "'good grounds' for his or her belief.'" *Calhoun*, 350 F.3d at 321 (quoting *Daubert*, 509 U.S. at 590). Austin Smith's WACC also should be struck because it was not derived from reliable methods and Austin Smith did not have good grounds for its use.

### A.  The 14.8% WACC Incorporates a Company-Specific Risk Premium That Has Been Rejected by Financial Economists and Courts.

The 14.8% WACC includes a company-specific risk premium of 5%, but the underlying calculation provides no explanation of or basis for this inclusion.  (*See* Ex. 67 (Solvency Analysis Underlying Materials).)  There is no support for the inclusion of a company-specific risk premium, which depresses a company's enterprise value, in the computation of a WACC.  Indeed, "[a] basic principle in finance is that investors earn a return that compensates them for the systematic or non-diversifiable risks they take."  (Ex. 65 (Hutton Report) ¶ 35.)  Austin Smith seemed to agree,

---

supplied at his deposition because "[i]t is unacceptable to make a party wait, and thus be surprised, at a deposition").

acknowledging that a DCF analysis uses "a discount rate that reflects both the time value of money and *non-diversifiable* risk." (Ex. 64 ¶ 41 (emphasis added).) Company-specific risks, however, are inherently *diversifiable* because an investor can invest in other and additional assets, thereby diversifying the risk of their portfolio. "Hence, the WACC should not contain a company-specific risk premium because investors can diversify their holdings to offset company-specific risks." (*See* Ex. 65 ¶ 35.)

At her deposition (but not in the Report), Austin Smith claimed, without providing a basis, that she believed the company-specific risk premium was appropriate because "the measure of diversifiable risk" that she derived from her GPC analysis does "not sufficiently account for Millennium." (Ex. 60 (Austin Smith Dep. Tr.) at 149:19-150:7.) In other words, she claimed that a company-specific risk premium was necessary because the *systemic* risk observed from the identified comparable companies was "insufficient to compensate for risk" *specific* to Millennium. (*Id*. at 150:24-151:12.)

This methodology is flawed: "[T]he appropriate way to incorporate company-specific risk is not in the discount rate but is in the expected cash flows." (Ex. 66 (Hutton Dep. Tr.) at 133:6-9.)[9] Delaware courts agree: "A company-specific risk premium is not an addition to the CAPM [capital asset pricing model] that is accepted by corporate finance scholars. . . . [T]he calculation of a CAPM discount rate should not include company-specific risk for the obvious reason that it is inconsistent with the very theory on which the model is based." *In re Orchard Enters. Inc.*,

---

[9]    Notably, Vantage Point *also* adjusted the systematic risk—the beta—of its identified comparable companies from 0.77 to 1.0 without explanation. (Ex. 65 (Hutton Report) ¶ 41 n.82.) As a result, the 14.8% WACC reflects higher systemic risk than the beta that results from the identified comparable companies, in addition to adding the company-specific risk premium. Austin Smith did not even acknowledge, much less provide a justification for, this adjustment in her report.

15

2012 WL 2923305, at *19-20 (Del. Ch. July 18, 2012).[10]  Instead, "company-specific risks should be addressed by appropriate revisions in cash-flow estimates."  *Union Ill. 1995 Inv. Ltd. P'ship* v. *Union Fin. Grp., Ltd.*, 847 A.2d 340, 354 n.28 (Del. Ch. 2004); *see also Orchard Enters.*, 2012 WL 2923305, at *20 ("If there are concerns about projection risk . . . it would be better for the expert to directly express his skepticism by adjusting the available projections in some way.") Delaware courts also recognize that "'the company-specific risk premium often seems like the device experts employ to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick.'"  *Orchard Enters.*, 2012 WL 2923305, at *19 n.132 (quoting *Del. Open MRI Radiology Assocs.* v. *Kessler*, 898 A.2d 290, 339 (De. Ch. 2006)).  As a result, courts are "understandably . . . suspicious of expert valuations . . . that incorporate subjective measures of company specific risk premia, as subjective measures may easily be employed as a means to smuggle improper risk assumptions into the discount rate so as to affect dramatically the expert's ultimate opinion on value."  *Solar Cells, Inc.* v. *True N. Partners, LLC*, 2002 WL 749163, at *6 n.11 (Del. Ch. Apr. 25, 2002).  Austin Smith both substantially adjusted Millennium's projections in the Modified Projections *and* relied on a WACC that is inflated by a duplicative company-specific risk premium, all seemingly to reach her desired result.  The inclusion in the WACC of a company-specific risk premium finds no support in the case law and "has no basis in financial theory and the academic literature."  (Ex. 65 (Hutton Report) ¶ 34.)

---

[10]  The Capital Asset Pricing Model is used to determine the cost of equity, which—together with the cost of debt—is one of two primary inputs in the calculation of a WACC, and was used by Vantage Point in formulating the 14.8% WACC here.  (*See* Ex. 65, Ex. 4; Ex. 60 (Austin Smith Dep. Tr.) at 125:10-14.)

**B.      The 14.8% WACC Relies on Comparable Companies That Austin Smith Determined Were Not Comparable to Millennium.**

In her Report, Austin Smith identified five comparable companies to perform her GPC valuation, which she ultimately disavowed because she determined that "these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value." (Ex. 64 ¶ 152.) (She did so presumably because she did not like that her GPC valuation showed that Millennium was solvent following the 2014 Transaction. (*Id.* ¶ 157 & Table 9.)) But the 14.8% WACC that Austin Smith took from Vantage Point relies on eight comparable companies, *including all five companies that Austin Smith determined to be insufficiently comparable.* The remaining three comparable companies used by Vantage Point were apparently so incomparable that Austin Smith never even mentions them specifically in her Report. (*Compare id.* ¶¶ 150, 152, *with* Ex. 18 (Vantage Point Solvency Analysis) at 20-23.)

Austin Smith did not explain this inconsistency, and when confronted with it at her deposition, her answer was incoherent:

> [W]here we do agree, where Vantage Point and I, and for that matter FTI and TA Associates all agree, is that if you take a view of companies that are publicly traded, because they have to be publicly traded for this purpose, publicly traded and as comparable as you can get to Millennium, however you colloquially slice or dice that collection of companies you are going to arrive at a WACC that underestimates the risk.
>
> So I chose five companies that I believe are the most comparable among a non-comparable set of publicly traded companies.

(Ex. 60 (Austin Smith Dep. Tr.) at 296:21-298:11.) Whatever this means, it does not explain why Austin Smith used a WACC that relied on the very comparable companies she asserted were incomparable when disavowing her analysis that showed that Millennium was solvent.

*            *            *

17

Austin Smith adopted Vantage Point's WACC without any independent, confirmatory analysis of its calculation or assumptions and without any familiarity with Vantage Point's work. That alone is enough for the Court to strike the WACC as unreliable. But there is more: the WACC is derived from a demonstrably unsound methodology, incorporating a technique that financial economists and courts have rejected as unreliable. Without the WACC, the conclusions of Austin Smith's balance sheet test fall apart; a balance sheet test without a WACC is fundamentally incomplete. And without the balance sheet test—Austin Smith's primary basis for opining that Millennium was insolvent—Plaintiff cannot establish a triable issue as to Millennium's solvency. (*See* Defs.' SJ Mem. pp. 29-30.)[11]

## III. AUSTIN SMITH'S ABILITY TO PAY DEBTS AND CAPITAL ADEQUACY TESTS SHOULD BE STRUCK BECAUSE THEY LACK AN ANALYSIS OF MILLENNIUM'S ABILITY TO RAISE ADDITIONAL CAPITAL.

Both the ability to pay debts and capital adequacy tests require consideration of whether a debtor will be able to refinance its debt or otherwise raise additional capital. *See Peltz* v. *Hatten*, 279 B.R. 710, 745 (D. Del. 2002) ("The test for unreasonably small capital should include . . . all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period.") (internal quotation marks omitted); *MFS/Sun Life Tr.-High Yield Series* v. *Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (finding no inability to pay debts where, among other reasons, plaintiff presented no evidence that debtor "would be unable to refinance its debt"); *In re EBC I, Inc.*, 380 B.R. 348, 359 (Bankr. D. Del. 2008) ("[T]he unreasonably small capital test . . . analyzes whether at the time of the transfer the company had insufficient capital, *including access*

---

[11] Moreover, even accepting all of Austin Smith's other (unreliable) adjustments to the Management Projections, Millennium would be solvent under her analysis when the corrected WACC of 7.2% is applied. (Ex. 65 (Hutton Report), Ex. 1.)

*to credit*, for operations.") (emphasis added); *In re Stone Panels, Inc.*, 2021 WL 4436166, at \*9, \*12 (Bankr. N.D. Tex. Sept. 27, 2021) (rejecting plaintiff's expert's "assumption that [debtor] would not have been able to refinance any amount of the debt . . . upon maturity" in connection with the "unreasonably small capital" and "knowingly incurring debt beyond ability to repay" tests).

Here, however, Austin Smith never concluded that Millennium would be unable to refinance the term loan or raise additional capital. She merely stated that Millennium would be around "the median leverage ratio for 'Caa-C' credits" as of December 31, 2020 for the purposes of refinancing the Term Loan. (Ex. 64 ¶ 169.) But this is far short of a conclusion that Millennium would not be able to raise additional capital, likely because companies with "C" credit ratings raise capital all the time.[12] Austin Smith's methodology with respect to her ability to pay debts and capital adequacy tests is unsound and her conclusions thereunder must be struck.

## CONCLUSION

For the foregoing reasons, the Court should strike Austin Smith's use of the 14.8% WACC and all aspects of her opinion that rely on it, as well as the conclusions of her balance sheet, ability to pay debts and capital adequacy tests.

---

[12] (*See, e.g.*, Ex. 53 (Moody's Analytics, "Loans Impart an Upward Bias to High-Yield Downgrade per Upgrade Ratio," dated October 24, 2019) at 4 (noting that, as of 2015, 18.6% of high-yield bonds were rated Caa or lower).)

Dated: August 22, 2022
        Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.


By:    */s/ Jason M. Madron*
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
        stearn@rlf.com
        madron@rlf.com


-and-

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Tel:    (202) 956-7500
Fax:    (202) 293-6330
Email: Viapianoc@sullcrom.com
        Engebretsono@sullcrom.com
        Petifordj@sullcrom.com


-and-

Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel:    (212) 558-4000
Fax:    (212) 558-3588
Email: Ostragerae@sullcrom.com
        Popovskym@sullcrom.com

*Attorneys for JPMorgan Chase Bank, N.A.*

RICHARDS, LAYTON & FINGER, P.A.


By:    */s/ Jason M. Madron*
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
        stearn@rlf.com
        madron@rlf.com


-and-

Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:    (212) 450-4000
Fax:    (212) 701-5351
Email: ben.kaminetzky@davispolk.com
        lara.buchwald@davispolk.com
        tina.joe@davispolk.com

*Attorneys for Citibank, N.A.*


MORRIS JAMES LLP


By:    */s/ Stephen M. Miller*
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel:    (302) 888-6853
Fax:    (302) 571-1750
Email: smiller@morrisjames.com

20

POLSINELLI PC

                                                      -and-

                                          J. Emmett Murphy
By:    /s/ Christopher A. Ward            KING & SPALDING LLP
Christopher A. Ward (No. 3877)            1185 Avenue of the Americas
222 Delaware Avenue, Suite 1101           New York, New York 10036
Wilmington, Delaware 19801                Tel:    (212) 556-2191
Tel:    (302) 252-0920                    Fax:    (212) 556-2222
Fax:    (302) 252-0921                    Email: jemurphy@kslaw.com
Email:  cward@polsinelli.com

                                                      -and-
         -and-
                                          John C. Toro
Stephen Mark Dollar                       Paige Nobles Clifton
NORTON ROSE FULBRIGHT US LLP              KING & SPALDING LLP
1301 Avenue of the Americas               1180 Peachtree Street, NE
New York, New York 10019-6022             Atlanta, Georgia 30309
Tel:    (212) 318-3000                    Tel:    (404) 572-2806
Fax:    (212) 318-3400                    Fax:    (404) 572-5100
Email: steve.dollar@nortonrosefulbright.com   Email: jtoro@kslaw.com
                                                  pclifton@kslaw.com

*Attorneys for BMO Harris Bank, N.A.*         *Attorneys for SunTrust Bank*

21