# **EXHIBIT B**

RLF1 28568147v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

*List of Counsel Continued on Next Page*

Adv. Docket No. 251
Filed: 8/22/22

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7500

-and-

Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000

*Attorneys for JPMorgan Chase Bank, N.A.*

POLSINELLI PC
Christopher A. Ward (No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920

-and-

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone: (212) 318-3000

*Attorneys for BMO Harris Bank, N.A.*

Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000

*Attorneys for Citibank, N.A.*

MORRIS JAMES LLP
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6853

-and-

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2191

-and-

John C. Toro
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: (404) 572-2806

*Attorneys for SunTrust Bank*

August 22, 2022

**TABLE OF CONTENTS**

**Page**

**NATURE AND STAGE OF PROCEEDINGS**..............................................................1

**SUMMARY OF ARGUMENT**................................................................................1

**STATEMENT OF FACTS**....................................................................................4

     A.    Millennium's Rapid Growth After Its Founding in 2007 ........................4

     B.    The April 2014 Dividend Recapitalization.................................................5

     C.    Investigation and Litigation Regarding Millennium's Business Practices.............7

          1.    The Business Practices at Issue.....................................................8

          2.    The DOJ Investigation and *Ameritox* Litigation..........................10

          3.    Legal Due Diligence .....................................................................12

     D.    Millennium Files for Bankruptcy 18 Months After the 2014 Transaction ............13

**LEGAL STANDARD** .........................................................................................16

**ARGUMENT** ....................................................................................................17

**I.**    **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INTENTIONAL FRAUDULENT TRANSFER CLAIM**...................17

     A.    Plaintiff Cannot Establish a Triable Issue of Fact as to Millennium's Intent to Hinder, Delay, or Defraud ..................................................................18

          1.    There Are No Badges of Fraud that Support an Inference of Fraudulent Intent.............................................................................18

          2.    No Other Facts Support an Inference of Fraudulent Intent........................20

**II.**    **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONSTRUCTIVE FRAUDULENT TRANSFER CLAIM**..............24

     A.    Plaintiff Has No Evidence that Millennium Did Not Receive Reasonably Equivalent Value for the Fees Paid to Defendants .................................................25

          1.    Plaintiff Can Show No Genuine Dispute that Millennium Received Reasonably Equivalent Value in Exchange for the Fees ...........................26

2.      Plaintiff Cannot Save His Claim by Recourse to the Collapsing
Doctrine ..............................................................................................27

B.      Plaintiff Cannot Establish a Triable Issue as to Solvency .....................................29

**CONCLUSION** ...........................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ameritox, Ltd.* v. *Millennium Labs*,
803 F.3d 518 (11th Cir. 2015) ...................................................................12, 14

*Celotex Corp.* v. *Catrett*,
477 U.S. 317 (1986)............................................................................................17

*In re Eastern Livestock Co.*,
544 B.R. 640 (Bankr. S.D. Ind. 2015) ..............................................................20

*In re F-Squared Invest. Mgmt., LLC*,
633 B.R. 663 (Bankr. D. Del. 2021) ..................................................................17

*In re Fedders N. Am., Inc.*,
405 B.R. 527 (Bankr. D. Del. 2009) ..................................................................19

*In re Fruehauf Trailer Corp.*,
444 F.3d 203 (3d Cir. 2006)........................................................................25, 26

*In re Hechinger Inv. Co. of Del.*,
327 B.R. 537 (D. Del. 2005)..............................................................19, 20, 29

*In re HH Liquidation, LLC*,
590 B.R. 211 (Bankr. D. Del. 2018) .............................................................7, 30

*In re Jevic Holding Corp.*,
2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ..........................................28

*In re Millennium Lab Holdings II, LLC*,
2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019) ...........................................18

*Kirschner* v. *JPMorgan Chase Bank, N.A.*,
2020 WL 2614765 (S.D.N.Y. May 22, 2020) ...................................................16

*Kirschner* v. *JPMorgan Chase Bank, N.A.*,
2020 WL 9815174 (S.D.N.Y. Dec. 1, 2020) .....................................................16

*Kirschner* v. *JPMorgan Chase Bank, N.A.*,
2021 WL 4499084 (S.D.N.Y. Sept. 30, 2021).....................................................16

*In re LTC Holdings, Inc.*,
597 B.R. 554 (Bankr. D. Del. 2019) ..................................................................18

*Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*,
   945 F.2d 635 (3d Cir. 1991)............................................................................26

*MFS/Sun Life Trust-High Yield Series* v. *Van Dusen Airport Servs. Co.*,
   910 F. Supp. 913 (S.D.N.Y. 1995) ................................................................20

*In re Midway Games Inc.*,
   428 B.R. 303 (Bankr. D. Del. 2010) ..................................................18, 19, 20

*In re Old CarCo LLC*,
   435 B.R. 169 (Bankr. S.D.N.Y. 2010)............................................................24

*In re Pinto Trucking Serv., Inc.*,
   93 B.R. 379 (Bankr. E.D. Pa. 1988) ...............................................................19

*In re Plassein Int'l Corp.*,
   405 B.R. 402 (Bankr. D. Del. 2009) ...............................................................29

*In re R.M.L., Inc.*,
   92 F.3d 139 (3d Cir. 1996).............................................................................25

*In re Route 70 & Mass., L.L.C.*,
   2011 WL 1883856 (Bankr. D.N.J. May 17, 2011) .........................................28

*In re Syntax-Brillian Corp.*,
   573 F. App'x 154 (3d Cir. 2014) ....................................................................27

*United States* v. *Tabor Ct. Realty Corp.*,
   803 F.2d 1288 (3d Cir. 1986).....................................................................27, 28

*In re Vaso Active Pharmaceuticals, Inc.*,
   2012 WL 4793241 (Bankr. D. Del. Oct. 9, 2012) ..........................................19

**Statutes and Rules**

11 U.S.C. § 548..............................................................................17, 27, 28, 30

Fed. R. Bankr. P. 2004.....................................................................................16

Fed. R. Bankr. P. 7056.....................................................................................17

Fed. R. Civ. P. 56(a) ........................................................................................17

## NATURE AND STAGE OF PROCEEDINGS

Marc S. Kirschner, in his capacity as Trustee of the Millennium Corporate Claim Trust ("Plaintiff"), commenced this adversary proceeding on November 7, 2017, bringing claims for fraudulent transfer under sections 548(a)(1)(A) and 548(a)(1)(B) of the Bankruptcy Code against defendants JPMorgan Chase Bank, N.A. ("JPMorgan"), Citibank, N.A. ("Citi"), BMO Harris Bank, N.A. ("BMO"), and SunTrust Bank ("SunTrust" and, collectively with JPMorgan, Citi, and BMO, "Defendants").  The Court denied Defendants' motion to dismiss on February 28, 2019 (D.I. 53), and the parties proceeded to discovery.  Fact and expert discovery closed on May 16, 2022.  Following a conference before the Court on June 21, 2022, the parties jointly stipulated to a briefing schedule for summary judgment and *Daubert* motions, which the Court entered on June 28, 2022.  In accordance with that schedule, Defendants now submit this memorandum in support of their Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

In April 2014, the four defendant banks were paid a combined $35.3 million for arranging and providing a firm commitment to fund a $1.775 billion syndicated loan for Millennium Laboratories LLC ("Millennium").  Millennium was at that time a promising company with a strong record of growth.  Scores of sophisticated institutional lenders, after conducting their own due diligence, participated in the loan, and the record shows that all involved expected the company to continue to thrive.  More than a year after the loan closed, however, Millennium's fortunes unexpectedly changed.  In May 2015, the company entered into a $256 million settlement with the Department of Justice ("DOJ") to resolve allegations that Millennium had engaged in illegal business practices, and the company ultimately filed for bankruptcy in November 2015.

Plaintiff seeks to claw back as a fraudulent transfer the fees paid to Defendants, but it is undisputed that the banks provided financial services to Millennium—Millennium was after all

able to borrow $1.775 billion—and that the banks' fees reflected the market rate for their services. Nevertheless, Plaintiff contends that Millennium paid the fees to the banks with the specific intent to defraud the syndicate lenders and, alternatively, that the payments were constructively fraudulent because Millennium did not receive reasonably equivalent value and either was insolvent at the time of the 2014 loan transaction or became insolvent as a result.  But after obtaining Millennium's books and records, receiving an additional 800,000 pages of documents from Defendants and third parties in discovery, and taking a dozen depositions (including of Millennium's most senior executives), Plaintiff has no evidence to support his theories.

*First*, Plaintiff cannot establish a triable issue on his claim of *intentional* fraudulent transfer because there is zero evidence of fraudulent intent by Millennium.  There is no evidence that anyone involved in the transaction—including Millennium's management, Millennium's sponsor private equity firm, the defendant banks, or any of the parties' respective legal counsel—believed or had reason to believe that Millennium would be unable to repay the loan.  To the contrary, documents indicate and witnesses repeatedly testified that everyone believed at the time that Millennium would continue to grow, that the company was confident in the legality of its business practices, and that the DOJ investigation (which had been publicly reported) would not have a material impact on the company.  Plaintiff may fall back on the "badges of fraud"—circumstantial evidence that, when sufficiently numerous, can indicate fraud—but they will not help Plaintiff. There was nothing unusual or suspicious about the arrangement of the loan in April 2014:  the process was transparent, the participants were sophisticated and operated at arm's length, the fees were market rate, and Millennium received the services for which it paid.

*Second*, Plaintiff cannot establish a triable issue on his claim of *constructive* fraudulent transfer.  He cannot demonstrate that Millennium received less than reasonably equivalent value

in exchange for the fees, nor can he show that Millennium was insolvent or became insolvent as a result of the payment of the fees—*both* of which are necessary to prevail on a constructive fraudulent transfer claim. To the contrary, the record shows that Millennium paid Defendants market-rate fees, negotiated at arm's length, and in exchange received valuable financial services. Nobody involved has suggested otherwise, either contemporaneously or during deposition testimony. Plaintiff may attempt to get around this lack of evidence by resorting to the "collapsing doctrine," demanding that the Court measure the value of the fees against the amount of the shareholder dividends paid from the loan proceeds instead of the actual services for which the fees were paid. But such an application would tear this narrow equitable doctrine from its original context—protecting *unsecured* creditors in leveraged buyout transactions—and instead protect the *secured* creditors (the litigation trust's beneficiaries) that chose to participate in a loan, accepted the risk of lending to Millennium, and were compensated for taking on that risk.

Plaintiff also cannot establish that the payment of a $35.3 million fee rendered Millennium—then valued at over $1 billion—insolvent. To try to prove insolvency, Plaintiff will again rely on a misapplication of the collapsing doctrine to try to sweep the loan and the dividend into the calculation. But even assuming collapsing were appropriate for purposes of determining insolvency, the *only* evidence that Plaintiff has put forward is an unreliable and inadmissible expert report. As explained in detail in Defendants' concurrently filed Motion to Strike, Plaintiff's expert reached her conclusion of insolvency by plugging into her analysis a weighted average cost of capital taken from an external source that was incorrect and that the expert never verified. Third Circuit law does not permit such a shortcut, and the expert's insolvency opinion must be struck, leaving Plaintiff with no evidence for trial on insolvency.

Plaintiff cannot establish a triable issue of fact on either of his claims, and the Court should grant summary judgment for Defendants and bring this matter to a close.

## STATEMENT OF FACTS

### A.  Millennium's Rapid Growth After Its Founding in 2007

Millennium was a drug testing company founded in San Diego, California in December 2007. (Ex. 1 (Confidential Information Memorandum ("CIM")) at -0555.)[1]  Its business focused on urine drug testing ("UDT"), which is used by physicians to monitor their patients' use of prescription medication and to identify drugs of abuse. (*Id.* at -0531.)  Payment for Millennium's services typically came from third-party payors, including Medicare and Medicaid, as well as private health insurance and workers' compensation programs. (*Id*. at -0550.)  As a participant in Medicare and Medicaid, Millennium was subject to regulation and oversight by federal, state, and local authorities, including with respect to healthcare fraud and abuse. (Ex. 2 (Decl. of W. B. Hardaway, *In re Millennium Lab Holdings II, LLC*, No. 15-12284 (Bankr. D. Del. Nov. 10, 2015), D.I. 3 ("First Day Decl.")) ¶ 15.)

In the years after its founding, Millennium grew rapidly as demand for UDT increased with the opioid crisis. (Ex. 1 at -0555.)  In 2010, TA Associates, a private equity firm, acquired a 49% stake in Millennium. (*See* Ex. 3 (Deal Memo) at -5501; Ex. 4 (TA Dep. Tr.) at 15:8-16, 27:7-28:11.)  Millennium's net revenue increased significantly from $64 million in 2009 to $633 million in 2013, a compound annual growth rate of 77%. (Ex. 5 (Lender Presentation) at -3969.)  Between 2011 and 2013, Millennium steadily increased its processing of UDT specimens as well, from 200,000 in Q1 2011 to over 600,000 in Q4 2013. (*Id.* at -3992.)  This rapid growth was supported,

---

[1]     Citations in the form "Ex. [_]" refer to exhibits to the Declaration of Mark A. Popovsky, filed contemporaneously herewith.

in part, by a $310 million (later increased by $52 million) syndicated term loan and a $20 million (later $30 million) revolving line of credit arranged by JPMorgan, SunTrust, GE Capital, BMO, and Fifth Third Bank in March 2012.  (Ex. 2 (First Day Decl.) ¶ 12.)

### B.      The April 2014 Dividend Recapitalization

Millennium's continued growth "far exceeded its expectations and projections," and in 2013, Millennium, TA Associates, and JPMorgan began a series of discussions about a possible dividend recapitalization.  (Ex. 6 (JPMorgan Dep. Tr.) at 52:15-53:5; Ex. 4 (TA Dep. Tr.) at 28:14-31:24, 34:13-35:23, 123:16-124:3.)[2]   In early 2014, both JPMorgan and Citi discussed various transaction options with Millennium.  (Ex. 7 (1/21/2014 email from JPM); Ex. 8 (2/20/2014 email from Millennium) at -5297.)   By the end of February 2014, the parties settled on a fully underwritten syndicated term loan B transaction.  In an underwritten transaction, "the bank actually commits to . . . providing the loan in the event the market falls away due to market conditions." (Ex. 6 at 21:21-22:14.)   There is "heightened risk" for the bank in an underwritten transaction because it "is essentially backstopping the transaction."  (*Id.*)

Both JPMorgan and Citi initially proposed a fee of 2.25% of the loan amount, a "very standard" rate for fully committed loans that JPMorgan, at least, typically considers "not negotiable."  (*Id*. at 27:15-29:13; Ex. 9 (2/20/2014 Citi proposal) at -5353.)  But through forceful negotiation, Millennium and TA Associates were able to obtain a lower 2.00% fee.  (Ex. 8 at -5296 ("I made sure [JPMorgan] knew that they needed to be at lower fees than the 2.25% they already proposed."); Ex. 11 (Fee Letter) at -4146.)  In February 2014, Millennium named JPMorgan as

---

[2]      At the time of the 2014 Transaction, Millennium's management included James Slattery, Chairman and founder; Howard Appel, President; Brock Hardaway, CEO; Tim Kennedy, CFO; and Martin Price, General Counsel.  (Ex. 1 (CIM) at -0596-0600.)

lead arranger on the transaction; JPMorgan committed to fund 55% of the loan, Citi committed to 30%, and SunTrust and BMO each committed to 7.5%. (*See* Ex. 12 (2/27/2014 email from JPM).)

On March 16, 2014, Millennium entered into a Commitment Letter with Defendants. In exchange for a $35.3 million fee, the banks would arrange and syndicate a $1.765 billion term loan (later increased to $1.775 billion) and agreed to underwrite the full amount—*i.e.*, to provide the full amount of the loan upfront regardless of whether there were enough third-party lenders that decided to participate (the "2014 Transaction"). The banks also agreed to provide a $50 million revolving loan, but that loan and the fees that Defendants were paid for it are not at issue in this case. (Ex. 13 (Commitment Letter) at -5397; Ex. 11 (Fee Letter) at -4146; Ex. 14 (2014 Syndication Update to Lenders); Ex. 15 (Final Funds Flow).) The fees, once paid to the banks for these services, were "not . . . refundable under any circumstances." (Ex. 11 at -4148.)

As arrangers of the loan, the banks created marketing materials, connected Millennium with prospective lenders, and organized diligence calls for the prospective lenders. (*Id.* at -4147-48.) The banks announced the transaction in late March 2014 through a "Confidential Information Memorandum" that provided details to prospective lenders about Millennium and the transaction, including that Millennium intended to use $304 million of the loan proceeds to "repay the existing Term Loan A [from 2012]," and approximately $1.27 billion to provide a "distribution to shareholders." (Ex. 1 (CIM) at -0537.) The explanation of how the proceeds would be used was repeated in the Credit Agreement (to which all lenders ultimately became a party). (Ex. 16 (Credit Agreement) § 4.16.) The participants in the transaction were institutional lenders, each representing that it was "sophisticated and experienced in extending credit to entities similar to [Millennium]." (Ex. 1 (CIM) at -0521.) At closing on April 16, 2014, over 60 of these sophisticated lenders had elected to participate and lend a portion of the term loan to Millennium,

6

to be paid back at an interest rate of 4.25% over LIBOR.  (Ex. 17 (Lender allocation); Ex. 14 (2014 Syndication Update to Lenders).)

In connection with the 2014 Transaction, Millennium's solvency advisor, Vantage Point Advisors, performed a valuation analysis that determined that Millennium had an estimated enterprise value of between $2.4 and $2.8 billion prior to the 2014 Transaction.  (Ex. 18 (VPA Solvency Opinion) at -3288.)   Separately, the banks each assessed Millennium's ability to undertake the dividend recapitalization and whether it possessed sufficient cash flow to repay the proposed debt, including by conducting stress testing and sensitivity analyses of financial models that Millennium prepared for the 2014 Transaction (the "Padres Projections").[3]  Millennium's Padres Projections "assum[ed] a little bit of erosion in [Millennium's] margins" and therefore was "already a very conservative model to start with."  (Ex. 6 (JPMorgan Dep. Tr.) at 143:13-17.)  The banks' stress testing subjected the Padres Projections to even more unfavorable assumptions and "sensitivities and downsides" (*id*. at 143:18-144:9; *see also* Ex. 21 (Citi Dep. Tr.) at 76:11-77:15), and unanimously determined that Millennium would be solvent following the transaction.

C.      **Investigation and Litigation Regarding Millennium's Business Practices**

Almost three years before the 2014 Transaction, as early as July 2011, it was publicly reported that certain of Millennium's business practices were the subject of an investigation by the Department of Justice for possible violations of federal healthcare laws—including the Anti-Kickback Statute and Stark law.  (*See* Ex. 25 (July 2011 press report).)  Some of these business practices were also the subject of claims in an April 2011 civil suit brought by Ameritox, a rival drug-testing firm.  (*See* Compl., *Ameritox, Ltd.* v. *Millennium Labs., Inc.*, No. 11-cv-775 (M.D.

---

[3]      (Ex. 19 (3/14/2014 email from JPMorgan); Ex. 6 (JPMorgan Dep. Tr.) at 139:2-141:9; Ex. 20 (Citi Model); Ex. 21 (Citi Dep. Tr.) at 82:17-23, 125:21-126:23; Ex. 22 (SunTrust Model); Ex. 23 (SunTrust Dep. Tr.) at 69:9-19, 70:9-71:2, 89:23-24, 90:22-24; Ex. 24 (BMO Dep. Tr.) at 134:9-135:7, 135:23-25.)

Fla. Apr. 8, 2011), D.I. 1.)  The investigation and litigation were subjects of the banks' and the potential lenders' due diligence in advance of the 2014 Transaction.

### 1.    The Business Practices at Issue

***POC Test Cup Program.***  In late 2009, Millennium began entering into point of care ("POC") test cup agreements with physicians whereby Millennium would provide the physicians with free urine collection cups containing a testing strip that provided preliminary test results before the patient left the physician's office.  (*See* Ex. 26 (Voluntary Disclosure) at -5459-61.)  In order to comply with the Stark law and Anti-Kickback Statute, the physicians receiving such cups had to agree not to bill patients or third-party payors for the testing services.  (*See id.* at -5461.)

Over several years, Millennium "repeatedly sought, obtained, and followed expert legal advice" regarding the legality of its POC test cup program.  (*Id.* at -5469; *see* Ex. 27 (Price Dep. Tr.) at 203:5-18, 207:23-208:7.)  In 2009, the company consulted Jane Pine Wood, an attorney at McDonald Hopkins LLC specializing in healthcare compliance, about the legality of its POC test cup program.  (Ex. 28 (Wood Decl.) ¶¶ 3, 6.)  Wood opined that "if the physician was willing to execute a legally binding agreement not to bill for [POC] testing[,] . . . Millennium could supply test cups to the physician at no charge without violating the Stark law (or the anti-kickback statute)."  (Ex. 26 at -5460; *see* Ex. 29 (10/31/2009 email from J. Wood).)  She also opined that "Millennium's cup agreement program was consistent with the practices of other laboratories [she] was advising at the time."  (Ex. 28 ¶ 8.)

Separately, in 2010, Millennium sought advice from Ronald Wisor and Helen Trilling, healthcare compliance attorneys at Hogan Lovells US LLP, about its test cup program.  (Ex. 30 (Appel Dep. Tr.) at 197:23-199:18.)  In October 2010, consistent with the advice Millennium had received from Wood, Wisor confirmed that Millennium's test cup program was compliant with the Stark and anti-kickback laws because "physicians have agreed not to bill for the point-of-care

8

testing" and therefore the program "would not provide any financial benefit to the physicians." (Ex. 31 (Wisor Oct. 2010 opinion) at -2989.)  Wisor reaffirmed this advice in 2011 (Ex. 32 (Wisor Jan. 2011 opinion) at -9523 (federal law permits furnishing test cups "*without charge*" "where physicians do not bill for point-of-care testing")), and again in 2012 (Ex. 33 (3/19/12 Wisor email)).  In response to the *Ameritox* suit, which made claims for unfair trade practices and unfair competition, Millennium in 2013 retained Lew Morris, former Chief Counsel to the Inspector General of the U.S. Department of Health and Human Services, as an expert witness.  (Ex. 27 (Price Dep. Tr.) at 203:5-12, 209:19-211:21.)  Morris opined that "Millennium's provision of [POC test] cups exhibits the hallmarks of a program consistent with the federal fraud and abuse laws, including the federal Anti-Kickback Statute ('AKS') and the Stark Law."  (Ex. 34 (Morris Report) ¶ 3.)  Based on these analyses and opinions, Millennium believed "very strongly" in the legality of its POC test cup program.  (Ex. 27 at 410:21-411:21.)

*Custom Profiles.*    Millennium's UDT physician requisition forms included "custom profiles"—panels of tests that a physician would commonly order for patients.  (*See* Ex. 35 (Test Requisition Form).)  This practice was "pretty typical in healthcare" (Ex. 36 (Kennedy Dep. Tr.) at 32:4-8), as it "help[ed] facilitate the ordering from a physician, so they wouldn't have to fill out the entire requisition every time" (Ex. 37 (Pencak Dep. Tr.) at 50:18-51:2).  Healthcare regulators cautioned laboratories to ensure that customizable testing panels did not lead to medically unnecessary testing.  (Ex. 34 (Morris Report) ¶ 99.)  Accordingly, Millennium's physician-customers had flexibility to "either order a custom [profile] . . . or they could order custom tests" (Ex. 38 (Hardaway Dep. Tr.) at 48:9-23), depending on a patient's medical need (*see* Ex. 35 (option for "DO NOT use Custom Profile")).  As with its POC test cup program, Millennium repeatedly received expert legal advice on its custom profile program intended to ensure

compliance with applicable laws.    (Ex. 27 (Price Dep. Tr.) at 188:14-24 (testifying that "Millennium received advice from outside counsel concerning the legality of its business practices," including "the custom [profiles] policy"); *id* at 223:22-24 ("Helen [Trilling] specifically worked closely with Howard [Appel] to revamp our test requisition forms.").)

*Troubled Practices.*    In 2011, Millennium began a review of physician partners that it considered "troubled practices" based on the payor mix and tests per specimen ordered. Millennium considered terminating these partnerships if margins did not improve.    (*See* Ex. 39 (Presentation to DOJ) at -8875-86.)  This review involved fewer than 5% of Millennium's active customers, and Millennium "management emphasized that any changes [to a physician's testing orders] must be based on the physician's determination of medical necessity"—in other words, that the troubled practices review should *not* lead to an increase in tests that are medically unnecessary.  (*Id*. at -8889-909.)  By late 2012, Millennium ended the troubled practices review because it did not lead to an increase in testing volume.  (*Id*. at -8886, -8908-09.)

### 2.    The DOJ Investigation and *Ameritox* Litigation

In March 2012, Millennium received a subpoena from the DOJ requesting information regarding the company's "sales, marketing, or promotion of [UDT]" and "reimbursement process."  (Ex. 40 (subpoena) at -0384.)  DOJ investigations in the drug testing industry are not uncommon; two of Millennium's competitors settled with the DOJ in 2010 and 2011, and Millennium's General Counsel considered such investigations to be "prevalent in the industry." (Ex. 27 (Price Dep. Tr.) at 180:20-181:23, 222:21-24.)  Over the course of the next few years, Millennium cooperated with the DOJ, but the investigation dragged on with not "much happening" and without any charges being brought or claims made.  (*Id.* at 227:17-18; Ex. 41 (3/21/14 Skadden Ltr. to KPMG) at -0059 ("The Company has been cooperating with the [DOJ] investigation . . . .  To date, the [DOJ] has not filed any civil or criminal charges.").)

Michael Loucks, a partner at Skadden, Arps, Slate, Meagher & Flom LLP, led Millennium's response to the DOJ investigation.  (Ex. 27 (Price Dep. Tr.) at 94:3-95:2, 205:20-206:20.)  Having "r[un] the healthcare fraud unit" in the U.S. Attorney's Office conducting the investigation, Loucks was considered by Millennium to be "an expert in his field" with insight into "U.S. Attorney Office DOJ investigations."  (*Id*. at 206:8-23, 238:5-17.)  Neither Loucks nor his law firm "ever advise[d] Millennium that its business practices were illegal" (*id*. at 205:20-211:21), and prior to the 2014 Transaction, no one at Millennium believed that the DOJ investigation would have a material impact on Millennium's finances or operations.  The investigation appeared to Millennium and its counsel to be part of "an industry-wide inquiry" by the DOJ.  (*Id.* at 224:4-12.)[4]  In March 2014, right before the 2014 Transaction closed, the perception of Millennium's General Counsel was that "the investigation . . . was pretty dormant" and "did not appear [to have] an agenda."  (*Id.* at 420:5-14; *see also* Ex. 43 (Litigation memo) at -0809 ("the focus of the [DOJ's] investigation is still a 'moving target'").)

Indeed, on a March 7, 2014 call, Loucks assured the banks and their counsel, Simpson Thacher & Bartlett LLP, that similar investigations had settled for $20 million or less, and that the DOJ investigation would not lead to a "material result" for Millennium.  (Ex. 44 (attorney notes) at -0035-36.)  During that same call, Wisor reaffirmed his view that the POC test cup program was compliant (*id.* ("there's nothing there")), and Loucks agreed (*id.* ("I thought it was fine")).  Millennium also believed that its competitors had reached settlements for $20 million or less for "grossly more egregious conduct than had even been suggested in the civil lawsuits [against

---

[4]       (Ex. 42 (attorney notes) at -0010 ("this may be an industry-wide inquiry"); Ex. 27 (Price Dep. Tr.) at 226:6-7 (in 2013 "we knew there was a lot of activity in the space" by DOJ).)

11

Millennium]" and based on "dead to rights evidence" of fraud. (Ex. 27 (Price Dep. Tr.) at 249:10-20; 426:11-21; Ex. 44 (attorney notes) at -0035-36.)

Since April 2011, Millennium had also been litigating the *Ameritox* action against its competitor in Florida federal court. Such litigation among competitors was widespread in the industry. (Ex. 27 (Price Dep. Tr.) at 213:16-25 ("You don't have to spend a lot of time on Pacer to find lawsuits between companies in the toxicology space before Millennium even came into existence, and that continued . . . as [Millennium] began to carve out market share.").) Ameritox claimed that several of Millennium's business practices, including its POC test cup program, violated the Stark and Anti-Kickback laws. *See Ameritox, Ltd.* v. *Millennium Labs*, 803 F.3d 518, 523-24 (11th Cir. 2015). From the start, Millennium "was expecting to . . . prevail on the claims brought by Ameritox." (Ex. 27 at 254:23-25; *see also* Ex. 43 (Litigation memo) at -0811 ("Millennium believes that it has a strong case, and its strategy is to 'plow ahead'").) Price, who was "pretty involved in the discovery and the motions practice," "felt very strongly with [Millennium's] lineup of experts and witnesses"; he was "not expecting [an] adverse judgment." (Ex. 27 at 410:15-411:21.)

### 3.    Legal Due Diligence

Prior to and during due diligence for the 2014 Transaction, Millennium provided updates to the banks on its outstanding regulatory and litigation matters. During 2012 and 2013, Millennium kept JPMorgan and its counsel, Simpson Thacher, up to date on the DOJ investigation. (*See* Ex. 45 (11/29/2012 email from JPM); Ex. 46 (2/7/2013 email from M. Price).) In November 2013, Price informed JPMorgan and Citi (with whom it had been discussing a potential initial public offering) that, with respect to the "investigation by the US Attorney in Boston . . . [t]here are no outstanding claims/charges at this time," and "[t]he main reason for the investigation is the fact that a lot of competitors have been fi[l]ing claims with the same allegations." (Ex. 47

(11/27/2013 email from JPM); Ex. 48 (11/27/2013 invite to Litigation Update Call).) Price also informed them that "all of the cases filed against [Millennium] have been dismissed without prejudice, which makes [Millennium] confident in a similar outcome." (Ex. 47 (11/27/2013 email from JPM) at -7347.) During a February 28, 2014 call between JPMorgan, Millennium's management, TA Associates, and Millennium's legal counsel, participants discussed "[k]ey due diligence topics," which included a "[l]egal and regulatory update, including status of outstanding litigation." (*See*, *e.g.*, Ex. 49 (2/28/2014 Pre-Organizational Materials) at -7660.)

The DOJ investigation and *Ameritox* litigation also were not unknown to the syndicate lenders. A number of potential lenders focused on those matters when conducting their diligence in advance of the 2014 Transaction. (*See*, *e.g.*, Ex. 50 (Diligence Questions) at -5566-67.) The banks either answered potential lenders' questions directly or connected them with Millennium's counsel for an "overview of the outstanding cases." (Ex. 51 (4/13/2014 email re Oaktree).) For example, JPMorgan bankers spoke with Apollo and Oaktree, two potential lenders, to discuss the DOJ investigation, and then referred both to Millennium's General Counsel for further information. (*See* Ex. 52 (3/26/2014 email re Apollo); Ex. 51 (4/13/2014 email re Oaktree).) JPMorgan even shared with one potential lender and offered to "walk [them] through" a litigation analysis by Simpson Thacher that was based on Millennium's counsel, Loucks, conveying his belief that the investigation would not have a "material result." (*See* Ex. 54 (4/8/2014 email from JPM, attaching Litigation memo) at -0810.)

### D. Millennium Files for Bankruptcy 18 Months After the 2014 Transaction

In June 2014, two months after the 2014 Transaction, the jury in the *Ameritox* case returned a nearly $15 million verdict against Millennium, finding that its POC test cup program ran afoul of the Stark and Anti-Kickback laws and that Millennium had thus engaged in state law unfair competition. (*See* Ex. 55 (6/17/2014 email re *Ameritox* loss).) Millennium assured lenders that

13

the verdict was inconsistent with advice it had received from "top legal experts for years," and that

it "disagree[d] with [the] verdict" and would appeal.  (Ex. 56 (6/23/2014 Carlyle call notes) at

-0323.)  In 2015, the Eleventh Circuit overturned the verdict, holding that Ameritox had "advanced

outlandish [state law] legal theories."  *Ameritox, Ltd.*, 803 F.3d at 539.   In the meantime,

Millennium took a "conservative approach" and "[v]oluntarily stopped" the POC test cup program.

(Ex. 56 at -0323.)  In August 2014, Millennium also made a voluntary disclosure of the program

to the Centers for Medicare & Medicaid Services ("CMS"), including Millennium's potential

liability if the program ultimately were found to be illegal.  (*See* Ex. 26 (Voluntary Disclosure).)

Months later, in December 2014, the DOJ intervened in a *qui tam* suit against Millennium,

alleging that its POC test cup program, use of custom profiles, and review of unprofitable practices

each violated the False Claims Act.[5]  In early 2015, Millennium engaged in settlement discussions

with the DOJ, opening with a $4 million offer that it believed, based on discussions with "outside

counsel at Goodwin and Skadden," was a "justifiable" offer to resolve the case.  (Ex. 27 (Price

Dep. Tr.) at 263:13-19; Ex. 57 (1/25/2015 Goodwin email) at -4824-25.)[6]  The DOJ responded to

Millennium's offer by stating that "they expect this case is [worth] over $100 million."  (Ex. 58

(1/29/2015 Goodwin email).)  This "was the first" time that Millennium's General Counsel "heard

of any quantification of damages at all, let alone in a range of that level," and he considered the

DOJ's damages claim to be "without merit and utterly unprovable."  (Ex. 27 at 265:2-18.)

In February 2015, CMS for the first time threatened to revoke Millennium's Medicare

billing privileges due to "alleged administrative billing abuses" related "to 59 Medicare

---

[5]    (Ex. 27 (Price Dep. Tr.) at 174:10-18; *see* Compl. in Intervention ¶¶ 88-113, *United States ex. rel. McGuire* v. *Millennium Labs., Inc.*, No. 12-cv-10132 (D. Mass. Mar. 19, 2015), D.I. 85.)

[6]    In 2015, the Goodwin Procter law firm began advising Millennium regarding the DOJ investigation in addition to Skadden.  (Ex. 27 at 207:11-19.)

14

beneficiaries."  (Ex. 2 (First Day Decl.) ¶ 18.)  This development added leverage to the DOJ's settlement position, since "with a CMS revocation [Millennium] would have been out of business." (Ex. 27 (Price Dep. Tr.) at 268:8-19; *see also* Ex. 38 (Hardaway Dep. Tr.) at 283:5-12 ("[CMS and DOJ] used the hammer, which was the removal of our provider number[,] and effectively shook us down through that to get a big settlement.").)  Although Millennium initially resisted the DOJ's settlement demands, it had few options in the face of the impending revocation of its Medicare billing privileges.  (*See* Ex. 59 (6/20/2015 Price email) at -2295 ███████████████████ ██████████████████████).)  In May 2015, Millennium informed the banks and the lenders that it had reached an agreement in principle to pay $256 million to resolve the DOJ investigation and the pending CMS revocation.  (Ex. 2 (First Day Decl.) ¶¶ 27-28.)

On July 22, 2015, Millennium informed the DOJ that "it would not be able to pay the lump sum settlement amount" and that "a restructuring of the Company would be necessary to facilitate the settlement payment."  (*Id*. ¶ 30.)  In November 2015, it filed for chapter 11 bankruptcy.  *See In re Millennium Lab Holdings II, LLC*, No. 15-12284 (Bankr. D. Del. Nov. 10, 2015).

Millennium's restructuring plan created two litigation trusts, to which claims belonging to the company and to the lenders were transferred, and appointed Plaintiff Kirschner as the trustee of both trusts.  (*See* Bankr. D.I. 194-1 (Am. Plan) at Annex C.)  The beneficiaries of both trusts are the sophisticated, secured lenders who were a part of the 2014 syndicated loan to Millennium. In addition to the present action, Kirschner brought claims at common law and under state Blue Sky laws against Defendants and certain of their affiliates.  Kirschner alleged that the banks (directly or through Millennium) "misrepresented, and omitted to state, material facts concerning the underlying business practices" under investigation by the DOJ.  Complaint, *Kirschner* v. *JPMorgan Chase Bank, N.A.*, No. 17-cv-6334 (S.D.N.Y. Aug. 21, 2017), D.I. 1-1.  In May 2020,

15

Judge Gardephe dismissed Kirschner's complaint in its entirety for failure to state a claim. 2020 WL 2614765 (S.D.N.Y. May 22, 2020). Kirschner filed a proposed amended complaint refashioning his claims as common law fraud. In well-reasoned opinions, the magistrate judge recommended that Judge Gardephe deny leave to amend on futility grounds, 2020 WL 9815174 (S.D.N.Y. Dec. 1, 2020), and Judge Gardephe accepted that recommendation, 2021 WL 4499084 (S.D.N.Y. Sept. 30, 2021). Kirschner's appeal of those rulings is pending before the Second Circuit. *See Kirschner* v. *JPMorgan Chase Bank, N.A.*, No. 21-2726.

Upon creation of the litigation trusts, Plaintiff obtained access to every document and piece of information at Millennium, including its financial information and emails. Plaintiff also received hundreds of thousands of pages of documents in Fed. R. Bankr. P. 2004 discovery from the banks, Simpson Thacher, and KPMG. (*See* Bankr. D.I. 393.) The parties in this action then engaged in additional discovery starting in 2019. Over the course of three years, Plaintiff received hundreds of thousands of pages of additional documents from the banks and several non-parties, including TA Associates and Vantage Point. The parties have also taken the depositions of Millennium's former management and its alleged "insiders," including Slattery, Hardaway, Appel, Price, and TA Associates, and Plaintiff has deposed a corporate representative from each of the defendant banks. Following the close of fact discovery, Plaintiff served an expert report addressing Millennium's solvency, in response to which Defendants served two rebuttal reports. Upon the completion of expert depositions, discovery closed on May 16, 2022.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, a "court shall grant summary judgment" when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The "burden on the moving party may be discharged by

showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986) (quotation marks omitted). Where the moving party establishes such an absence of evidence, "the burden of proof shifts to the nonmovant, who must offer definite, competent evidence to rebut the motion." *In re F-Squared Invest. Mgmt., LLC*, 633 B.R. 663, 668 (Bankr. D. Del. 2021) (quotation marks omitted). If the nonmoving party "fails to properly address" the movant's "assertion of fact" supported by appropriate evidence, "the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment . . . if the movant is entitled to it." *Id.* (quoting Fed. R. Civ. P. 56(e)).

## **ARGUMENT**

### I.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INTENTIONAL FRAUDULENT TRANSFER CLAIM.

To prove an intentionally fraudulent transfer under section 548(a)(1)(A) of the Bankruptcy Code, Plaintiff must show that the debtor made a transfer "with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). There is no evidence of actual intent here, and even the circumstantial evidence does not come close. Instead, the record is replete with witness testimony confirming what the documentary record shows: Millennium's management believed that the 2014 Transaction would establish the company in the institutional lending markets, helping it to gain exposure and continue to grow, and, consistent with what was disclosed to prospective lenders, compensate the founders and early investors. Management also uniformly believed that Millennium would be able to make payments on the loan. Only over the course of the subsequent 18 months did a host of unexpected developments occur that, together, forced Millennium into bankruptcy. "Simply put, there is no evidence of an intent to defraud," *In re HH Liquidation, LLC*, 590 B.R. 211, 265 (Bankr. D. Del. 2018), and thus judgment for Defendants is appropriate.

17

**A.      Plaintiff Cannot Establish a Triable Issue of Fact as to Millennium's Intent to Hinder, Delay, or Defraud.**

Plaintiff cannot credibly dispute the absence of direct evidence of an intent to hinder, delay, or defraud creditors.  Not a single witness provided testimony remotely suggesting that Millennium paid Defendants their fees with the intent to defraud creditors.  To the contrary:  every witness who was asked vehemently denied such an intent.[7]  Nor can Plaintiff point to any documents in the record that even suggest actual intent.  Plaintiff's claim, therefore, can survive only if he has adduced "circumstantial evidence to infer such an intent." *In re Millennium Lab Holdings II, LLC*, 2019 WL 1005657, at *3 (Bankr. D. Del. Feb. 28, 2019).  Only when various circumstantial badges of fraud are sufficiently "deep or numerous" can "they support a suspicion of wrongdoing and allow the case to survive summary judgment." *In re LTC Holdings, Inc.*, 597 B.R. 554, 564 (Bankr. D. Del. 2019).  At the motion to dismiss stage, the Court held that certain of Plaintiff's allegations, when accepted as true without consideration of the evidence, could potentially support an inference of fraudulent intent.  2019 WL 1005657, at *4.  But now, with the benefit of a fully developed record, the lack of supporting evidence has shown Plaintiff's allegations to be hollow.

**1.      There Are No Badges of Fraud that Support an Inference of Fraudulent Intent.**

A review of the classic "badges of fraud" shows that Plaintiff does not have the "deep or numerous" evidence necessary to support his claims.  *See In re LTC Holdings*, 597 B.R. at 564.

***Relationship between the Parties.***  In analyzing the "badges of fraud," courts consider "the relationship between the debtor and the transferee." *In re Midway Games Inc.*, 428 B.R. 303, 325 (Bankr. D. Del. 2010).  Here, far from there being some "incestuous relationship between [the]

---

[7]      (*See* Ex. 10 (Smith Dep. Tr.) at 222:14-18; Ex. 37 (Pencak Dep. Tr.) at 445:16-22; Ex. 61 (Slattery Dep. Tr.) at 184:12-185:5; Ex. 27 (Price Dep. Tr.) at 269:11-19; Ex. 38 (Hardaway Dep. Tr.) at 301:10-20; Ex. 36 (Kennedy Dep. Tr.) at 307:16-25; Ex. 4 (TA Dep. Tr.) at 293:4-12.)

defendants" and Millennium, *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551 (D. Del. 2005), there can be no dispute that Defendants and Millennium "ha[d] an arm's length business relationship." (Ex. 13 (Commitment Letter) at -5402; *see also* Ex. 27 (Price Dep. Tr.) at 233:4-5 (relationship between the parties "seemed as arm's length as it could be").) Millennium was a sophisticated company, supported by skilled management, an experienced private equity firm, and outside legal counsel, dealing with sophisticated banks. The "absence of facts indicating anything other than an arm's length relationship" leaves Plaintiff with no basis to suggest fraudulent intent. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545-46 (Bankr. D. Del. 2009).

***Proportion of the Estate.*** Courts also will look at "how much of the debtor's estate was transferred." *Midway Games*, 428 B.R. at 325. The question is whether the transfer was "substantially all" of the debtor's assets. *In re Vaso Active Pharmaceuticals, Inc.*, 2012 WL 4793241, at *13 (Bankr. D. Del. Oct. 9, 2012). The $35.3 million in fees paid to Defendants, which constituted *less than 1.5%* of Millennium's estimated value at the time (*see supra* p. 7), was not. It did not "fundamentally change[]" the company and was not "outside the course of business," which might indicate potential fraudulent intent. *Vaso*, 2012 WL 4793241, at *14. Rather, the size and nature of a $35.3 million fee payment would not be unusual for a company with $633 million in revenue the year before the transaction. (*See supra* p. 4.)

***Dominion over the Property.*** Courts also will consider the extent to which "the debtor retained possession or control of the property transferred after the transfer." *In re Pinto Trucking Serv., Inc.*, 93 B.R. 379, 386 (Bankr. E.D. Pa. 1988). "[T]his badge is directed towards transactions where the [d]ebtor, because of an arrangement with a friendly transferee, retains significant rights and use of the property transferred," yet avoids the claims of creditors. *Id.* at 386-87. Here, instead of granting Millennium any access to or potential control over the fees through a "friendly"

arrangement, the governing contract makes clear that, once paid, the fees "shall not be refundable under any circumstances." (Ex. 11 (Fee Letter) at -4148; *see also* Ex. 10 (Smith Dep. Tr.) at 221:6-10 (Millennium did not "maintain any control over the fees once they were transferred").)

***Secrecy and Structure of the Transaction.*** Courts may determine that efforts to conceal a transaction or structure it in a deceptive manner support an inference of fraudulent intent. *See Hechinger*, 327 B.R. at 551. But, here, Plaintiff has already conceded "that the transfer was not secret or concealed." (D.I. 34 at 7 n.26.) "[N]or was it structured in a manner unusual" for a loan of this type. *MFS/Sun Life Trust-High Yield Series* v. *Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995); (*see also* Ex. 24 (BMO Dep. Tr.) at 58:2-20 (arrangers viewed "dividend recap[italization] [a]s a very standard transaction" that was "prevalent in the leveraged loan market")). Plaintiff cannot show that Millennium attempted to conceal payment of the fees or any other aspect of the 2014 Transaction because Millennium expressly disclosed in the marketing materials provided to potential lenders and in the Credit Agreement documenting the loan the fees and that the proceeds would be used to refinance the company's existing debt and pay a dividend to shareholders. (*See* Ex. 1 (CIM) at -0537); Ex. 16 (Credit Agreement) § 4.16.)

***Adequate Consideration.*** Nor can Plaintiff demonstrate that Millennium received "inadequate consideration" in exchange for the fees paid. *Midway Games*, 428 B.R. at 325. As detailed further below (*see infra* pp. 26-27), there is no evidence that the fees were anything "other than the going fair market price," which precludes an inference of fraudulent intent based on this factor. *In re Eastern Livestock Co.*, 544 B.R. 640, 648 (Bankr. S.D. Ind. 2015).

### 2.    No Other Facts Support an Inference of Fraudulent Intent.

Unable to rely on the typical badges of fraud, Plaintiff likely hoped that discovery would reveal evidence that Millennium told lenders that its business practices were legal, while knowing that this was false and that a significant settlement with the DOJ was imminent. (*See* Compl. ¶ 87.)

20

But the evidence necessary to support such a theory never materialized.  To the contrary, the record shows that Millennium reasonably believed—based on advice from trusted and knowledgeable advisors—that its business practices were lawful at the time of the 2014 Transaction.

Millennium was repeatedly advised by counsel that the business practices that later became the subject of the DOJ settlement were lawful.  Year after year, Millennium sought expert advice on its POC test cup program, and each time Millennium was advised that the program was compliant—by Jane Pine Wood in 2009; Hogan Lovells in 2010, 2011, and 2012; and Lew Morris in 2013.  (*See supra* pp. 8-9.)  When brought on in 2013, Michael Loucks from Skadden reaffirmed this advice.  (*See supra* p. 11.)  Given these numerous opinions from reliable sources, nothing in the record supports an inference that Millennium did not genuinely believe at the time of the 2014 Transaction that "its practices [were] defensible and that it utilized higher standards than its competitors."  (Ex. 43 (Litigation memo) at -0809.)  Millennium's former CEO, Brock Hardaway, explained that he did not believe that "Millennium . . . engaged in either unlawful or potentially unlawful business practices" and that he was unaware of practices that Millennium was "apprised . . . were unlawful."   (Ex. 38 (Hardaway Dep. Tr.) at 141:4-22, 276:19-277:5.)   No former Millennium employee testified otherwise.[8]

Nor can Plaintiff show that Millennium secretly believed that it was likely to enter into a significant settlement with the DOJ.  The evidence shows that at the time of the transaction, the investigation seemed to lack an "agenda."  (*See supra* p. 11.)  Loucks advised Millennium at the time that the DOJ investigation would not have "a material result," based on healthcare fraud

---

[8]     Indeed, the testimony of other former Millennium employees matched that of Hardaway's. (*See* Ex. 61 (Slattery Dep. Tr.) at 184:10-20 ("Q:  At that point in time [April 2014] did you believe Millennium was engaged in any illegal business practices? A:  No."); Ex. 27 (Price Dep. Tr.) at 206:24-207:3 ("Q:  Did Mr. Loucks or Skadden ever advise Millennium that its business practices were illegal? A:  No.").)

settlements that DOJ had recently reached with competitors for far more "egregious" conduct. (*See supra* pp. 11-12.) Millennium's General Counsel reiterated that everyone at Millennium believed that the investigation would not lead to a material result given that, in the settlements with Millennium's competitors, there was "dead to rights evidence" of "grossly more egregious conduct than had even been suggested" of Millennium. (Ex. 27 (Price Dep. Tr.) at 249:10-20; 426:11-14.) This testimony is consistent with internal correspondence in the months leading up to the 2014 Transaction. In December 2013, Loucks advised ██████████████████████████████ ████████████████████████████████████████ (Ex. 62 (12/15/2013 email from M. Loucks) at -8393.) And on the uncontested testimony of Millennium's General Counsel, this view of the settlement value persisted until at least January 2015—*nine months* after the 2014 Transaction closed. (*See* Ex. 27 at 262:24-264:6 (in January 2015, Millennium considered "$5 million . . . [as] a reasonable number to get [the DOJ investigation] settled").)[9]

Millennium, with Defendants' help, provided lenders with every opportunity to investigate Millennium's business. As discussed above (*see supra* p. 13), lenders actively sought additional information about Millennium's operations and compliance, including the DOJ investigation and the *Ameritox* litigation. In response, Defendants arranged for prospective lenders to speak with Millennium's management. (*See supra* p. 13.) JPMorgan even shared an overview of litigation against Millennium with one of the prospective lenders and offered to "walk [them] through" it. (*Supra* p. 13.) Indeed, every lender that decided to participate in the loan affirmed that it "made its own appraisal of and investigation into" Millennium. (Ex. 16 (Credit Agreement) § 9.6.)

---

[9] Plaintiff's effort to show a broad conspiracy to defraud by pointing to the *Ameritox* litigation is similarly baseless. The litigation was public at the time of the 2014 Transaction; Millennium did not (and could not) hide it. The record is unambiguous that Millennium thought little of Ameritox's claims and "was expecting to . . . prevail on the claims brought by Ameritox." (*See* supra p. __.) Indeed, as expected, Millennium ultimately prevailed on appeal.

Finally, to the extent that Plaintiff tries to establish fraudulent intent by asserting that Millennium knew or should have known that it would not be able to repay the debt incurred in the 2014 Transaction (*see* Compl. ¶¶ 73-87), the record flatly contradicts this allegation. Each of Millennium's senior financial employees unequivocally testified the opposite. Millennium's CFO, Tim Kennedy, stated that "[n]ever in a million years" did he "anticipate that Millennium would be filing for bankruptcy" (Ex. 36 (Kennedy Dep. Tr.) at 305:15-17), and VP of Financial Planning and Analysis, Daniel Pencak, testified that he "did not" "anticipate that Millennium would be entering bankruptcy" at "the time of the 2014 transaction" (Ex. 37 (Pencak Dep. Tr.) at 445:11-22). Hardaway stated that he not only "felt like [Millennium] could service the debt," but that it would provide Millennium access to "the capital markets that [it] previously did not have access to." (Ex. 38 (Hardaway Dep. Tr.) at 299:8-301:20.) As JPMorgan's representative explained, the loan transaction would "expos[e] [Millennium] to a much broader, deeper capital market," "putting [it] on a path to . . . bigger and better things." (Ex. 6 (JPMorgan Dep. Tr.) at 122:4-123:14.)

This view was shared by TA Associates, an experienced private equity firm, and the Defendants. TA Associates' corporate representative testified that "TA [did not] think that Millennium was likely to become insolvent following the April 2014 dividend recapitalization," nor "[w]ould TA have wanted to be associated with that transaction if it thought that the debt would cause Millennium to be insolvent." (Ex. 4 (TA Dep. Tr.) at 293:4-12.) JPMorgan's corporate representative testified that "there was absolutely no debate" at the bank that Millennium "was solvent at the time." (Ex. 6 (JPMorgan Dep. Tr.) at 50:25-51:2.) Citi's corporate representative agreed that even in a downside scenario, there was "significant free cash flow in the business that would be able to service the debt interest." (Ex. 21 (Citi Dep. Tr.) at 89:19-21.) Plaintiff cannot point to any record evidence contradicting this testimony.

23

Moreover, it is implausible that dozens of sophisticated lenders would have agreed to contribute to a $1.775 billion financing, where they had access to all relevant information, if there was a reasonable basis to conclude that Millennium would soon fail.  (*See supra* pp. 12-13.)  On this point, *In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010), is instructive.  There, Chrysler's then-owner sold a subset of the company's assets to third parties in advance of selling a controlling interest in Chrysler to Cerberus Capital Management, a private equity firm.  *Id.* at 178-80.  Almost two years later, Chrysler filed for bankruptcy.  *Id.* at 174.  The trustee sought to claw back the proceeds from the asset sales, arguing that Chrysler's eventual insolvency was a basis to find that the sale of Chrysler's assets had been made with fraudulent intent.  *Id.* at 192-93.  But the court rejected that argument, explaining that the "involvement of sophisticated and independent market participants"—coupled with the fact that "financial information concerning" Chrysler was "readily available"—render it "implausible to suggest than an investor, such as Cerberus, would invest $7 billion to acquire a controlling position in a finance company whose value depended upon the performance of a company that was poised to fail." *Id.* at 193.

In sum, any suggestion that Millennium knew or should have known that its finances and "operations were inflated by unlawful activities" (Compl. ¶ 74) is belied by the contemporaneous legal advice that Millennium received, the stated views of Millennium's former employees, and the opinions of sophisticated market participants.  Plaintiff cannot establish a triable issue of fact with respect to Millennium's actual intent to hinder, delay, or defraud lenders.

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONSTRUCTIVE FRAUDULENT TRANSFER CLAIM.

Plaintiff likewise cannot establish a triable issue of fact regarding at least two essential elements of his constructive fraudulent transfer claim.  To prevail on that claim, Plaintiff must show, among other things, *both* that "the transfer resulted in no value for the debtor or the value

24

received was not 'reasonably equivalent' to the value of the relinquished property" *and* that "the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210-11 (3d Cir. 2006). Plaintiff can show neither. The undisputed record shows that Millennium paid market-rate fees in exchange for Defendants' commitment to underwrite and arrange the 2014 Transaction. And as set forth in Defendants' concurrently filed Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette Austin Smith, Plaintiff's expert's conclusions regarding Millennium's solvency must be struck. Summary judgment for Defendants on Plaintiff's constructive fraud claim is warranted on either ground.

### A. Plaintiff Has No Evidence that Millennium Did Not Receive Reasonably Equivalent Value for the Fees Paid to Defendants.

Courts in the Third Circuit employ a two-part test to determine whether a debtor received reasonably equivalent value: The court must first decide if the debtor received "any value" for the transferred property. *In re R.M.L., Inc.*, 92 F.3d 139, 152 (3d Cir. 1996). If the debtor received at least some value, then the court must determine whether "whatever value was conferred was not reasonably equivalent to" the value of the transferred property. *Id.* (quotation marks omitted).

It is undisputed that, in exchange for the fees they received, Defendants provided the initial funding for the credit facility and worked diligently over several months to arrange and syndicate the loan. (*See supra* p. 6.) Defendants also committed to funding the entire amount of the loan and bore the risk if they could not syndicate the loan to third-party lenders. (*See supra* pp. 5-6.) Defendants' services afforded Millennium the "ability to borrow money," which "has considerable value in the commercial world," *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991), and positioned the company to access the broader capital markets in the future (*see supra* p. 23). Accordingly, Plaintiff can only prevail on this claim if he can show that the

$1.775 billion underwrite and the arranging services provided by Defendants were not of "reasonably equivalent value" to the fees Defendants received.  He cannot do so.

        **1.**        **Plaintiff Can Show No Genuine Dispute that Millennium Received Reasonably Equivalent Value in Exchange for the Fees.**

Courts look to several factors to determine if value is "reasonably equivalent," including: (i) the "fair market value" of the benefit received; (ii) whether there was "an arm's-length relationship between the debtor and transferee"; and (iii) "the transferee's good faith." *Fruehauf*, 444 F.3d at 213.  None of these factors presents a genuine dispute for trial on the record here.

*First*, the fees paid to Defendants were consistent with market rates for arranging and providing a firm commitment to fund a syndicated loan.  Multiple parties on both sides of the 2014 Transaction stated in contemporaneous correspondence—and later confirmed during deposition testimony—that the fee paid to Defendants was in line for a fully committed financing of that size. (*See supra* p. 5.)  Tony Marsh, then a Director of Capital Markets at TA Associates who had significant experience negotiating leveraged finance fees (*see* Ex. 4 (TA Dep. Tr.) at 297:21-298:16), stated at the time that the "fees aren't bad" (Ex. 63 (2/21/2014 email from T. Marsh) at -7400).  In fact, the 2.00% fee was *below* JPMorgan's "very very standard . . . two and a quarter percent" fee. (Ex. 6 (JPMorgan Dep. Tr.) at 27:18-19.)  There is no evidence to the contrary.

*Second*, the fees were negotiated at arm's length.  JPMorgan and Citi each proposed a 2.25% fee, but Millennium and TA Associates were able to convince Defendants to reduce that fee by approximately $4.5 million (to 2.00%).  Indeed, Hardaway and Marsh were both forceful in seeking lower fees for Millennium, to which the banks ultimately agreed. (*See supra* p. 5.)

*Third*, Plaintiff cannot point to any evidence in the record supporting the theory that Defendants accepted the fees in bad faith—*i.e.*, believing that Millennium's business practices were illegal, that a historically large settlement with the DOJ was coming, or that Millennium

26

would be unable to service the debt.  To the contrary, JPMorgan, for example, believed that "there was absolutely no debate" that Millennium would remain solvent.  (Ex. 6 (JPMorgan Dep. Tr.) at 50:25-51:2.)  Defendants performed extensive diligence on Millennium's business and provided the lenders with information from and access to Millennium's management, including regarding the status of the DOJ investigation and *Ameritox* litigation.  (*See supra* pp. 12-13.)[10]

2. **Plaintiff Cannot Save His Claim by Recourse to the Collapsing Doctrine.**

Millennium plainly received significant value in exchange for the fees it paid to Defendants—the banks arranged and fully committed to provide a $1.775 *billion* loan.  To circumvent this fatal obstacle, Plaintiff has asked the Court to look beyond the specific fee payment that he seeks to avoid and compare the value that Millennium received against the amount of the fees *and* the subsequent dividend that Millennium paid to its shareholders.  (*See* D.I. 34 at 15-21.) The only possible means of looking beyond the fee payment itself is the collapsing doctrine, but that doctrine is wholly inapplicable here, outside of the LBO context and in connection with standard transaction-service fees.

The collapsing doctrine is a judge-made "equitable tool," *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 160 (3d Cir. 2014), by which courts, under certain circumstances, "collapse" separate transfers and consider them as "one integrated transaction," *United States* v. *Tabor Ct. Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986).  The doctrine departs from the statutory text, which instructs courts to determine if a debtor received "reasonably equivalent value in exchange for *such transfer*" that the trustee seeks to avoid.  11 U.S.C. § 548(a)(1)(B)(i) (emphasis added).

---

[10]    For similar reasons, Plaintiff's attempt to rescind the fee payment is barred by the Bankruptcy Code's "good faith" defense. *See* 11 U.S.C § 548(c). Defendants are not affirmatively moving for summary judgment on the basis of that defense, but anticipate a robust presentation of evidence on this defense at trial, should that be necessary.

The collapsing doctrine reflects "courts' equitable solicitousness of creditors existing at the time of the challenged transaction" and is therefore "most commonly applied to leveraged buyouts ('LBOs')." *In re Route 70 & Mass., L.L.C.*, 2011 WL 1883856, at \*6 (Bankr. D.N.J. May 17, 2011). In an LBO, shareholders are often able "to 'cash out' their equity ahead of creditors, while allowing secured creditors to take their place," "improperly putting unsecured creditors" at the time of the transaction "at risk." *Id*. Collapsing LBOs ensures that "formalities" do not "shield a party" from its role in "an overall scheme to defraud" creditors "by depleting all the assets." *In re Jevic Holding Corp.*, 2011 WL 4345204, at \*6 (Bankr. D. Del. Sept. 15, 2011). But those fairness concerns are not present here. Plaintiff represents the *secured* creditors who participated in the transaction with full knowledge of how the funds would be used, and were compensated for and consented to the amount of risk involved. (*See supra* pp. 5-7, 15.) As knowing participants in the term loan, the lenders do not need to be protected by an equitable doctrine developed in the context of LBOs where unsecured, non-participating creditors are very differently situated.

Moreover, it makes particularly little sense to apply an equitable test developed in the LBO context to fees for banking services. Although the fees arguably have a tangential relationship to everything that subsequently occurred, including the payment of the dividend, they are exchanged for actual services that the banks provided to Millennium. It is thus unsurprising that courts have not applied the collapsing doctrine to assess whether reasonably equivalent value was received in exchange for transaction-service fees—even when a mechanical application of the three-factor test might suggest collapsing could be appropriate. *See In re Plassein Int'l Corp.*, 405 B.R. 402, 412-13 (Bankr. D. Del. 2009) (assessing the value of fees paid for transaction-related services based on the market rate for such services, not based on the ultimate impact on the debtor of the related transactions); *Hechinger*, 327 B.R. at 542-46, 553 (despite "collapsing" the transaction for other

28

purposes, assessing the value of "transaction fees" based on work performed and the "industry standard").  As in *Plassein* and *Hechinger*, this Court should not apply the collapsing doctrine to analyze reasonably equivalent value for fees for financial services that indisputably were provided.

### B.    Plaintiff Cannot Establish a Triable Issue as to Solvency.

Plaintiff's constructive fraudulent transfer claim also fails because Plaintiff cannot demonstrate that Millennium was insolvent at the time of the 2014 Transaction or became insolvent as a result of the payment of fees that he is now seeking to claw back.

It is undisputed that the payment of $35.3 million in fees did not render Millennium insolvent.  Plaintiff's theory of insolvency hinges on the application of the collapsing doctrine, as he is forced to rely on the impact of the separate dividend distribution to shareholders to claim insolvency.  As explained above, however, the judge-made exception of the collapsing doctrine was not derived to protect secured lenders who knowingly and willingly participate in a transaction and are compensated for doing so, and it is thus inappropriate here.  (*See supra* pp. 27-28.) Whether or not the payment of a *dividend* to shareholders rendered Millennium insolvent is therefore irrelevant to whether the *fees* paid to Defendants should be avoided.

Even if the Court were to look beyond the fee payment to the impact of the syndicated loan and dividend distribution, Plaintiff has adduced no admissible evidence of insolvency because the expert opinion on which he relies is methodologically flawed and inadmissible as a matter of law. As set forth in Defendants' Motion to Strike, Plaintiff's expert, Yvette Austin Smith, relies primarily on a balance sheet test to conclude that Millennium became insolvent as a result of the 2014 Transaction (not as a result of the fees paid).  But that balance sheet test uses a 14.8% weighted average cost of capital ("WACC") that Austin Smith took from Vantage Point without any independent analysis.  (*See* Mot. to Strike pp. 9-13.)  Austin Smith does not opine in her report that 14.8% is the correct WACC, and she admitted at her deposition that it was "unclear" whether

29

she had even seen the underlying calculations that Vantage Point used to determine the WACC prior to submitting her report. (*See id.* at 6.) When asked how the WACC that *she used* would change if certain inputs were modified, she responded: "You would have to ask Vantage Point." (Ex. 60 (Austin Smith Dep. Tr.) at 305:10-25.) Austin Smith's lack of independent analysis of, or even basic familiarity with, the 14.8% WACC renders it unreliable, and her use of it must be struck. Without a WACC, the balance sheet test falls apart, and there is no evidence of insolvency. Indeed, Millennium would be solvent under Austin Smith's test even accepting all of her over $1 billion in unsupported adjustments to management's projections, which Austin Smith imposes without any industry expertise to support her results-oriented choices. (*See* Mot. to Strike pp. 4-5.)

Austin Smith's other two tests of solvency—the ability to pay debts and capital adequacy tests, to which she dedicates a collective five pages of her 93-page report—are similarly unreliable.[11] Both require an expert to consider whether a company could raise or borrow additional capital to pay its debts or fund its operations. (*See id.* at 18-19.) Austin Smith never reaches that necessary conclusion that Millennium would be unable to raise additional capital. Without this analysis, her conclusions using the ability to pay debts test and capital adequacy test cannot be admitted. And without this evidence, plaintiff's claim fails as a matter of law. *See HH*, 590 B.R. at 266 (claim fails where "no evidence that [debtor] was insolvent").

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment and enter judgment for Defendants on both of Plaintiff's claims.

---

[11]    Austin Smith's ability to pay debts test is Plaintiff's effort to satisfy the requirement of 11 U.S.C. § 548(a)(1)(B)(III) that Millennium "intended to incur, or believed that [it] would incur, debts that would be beyond [its] ability to pay as such debts matured." As shown above (*see supra* pp. 23-24), the record contains no evidence of such intent.

Dated: August 22, 2022
     Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

By:    */s/ Jason M. Madron*
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
        stearn@rlf.com
        madron@rlf.com

-and-

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Tel:    (202) 956-7500
Fax:    (202) 293-6330
Email: viapianoc@sullcrom.com
        engebretsono@sullcrom.com
        petifordj@sullcrom.com

-and-

Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel:    (212) 558-4000
Fax:    (212) 558-3588
Email: ostragerae@sullcrom.com
        popovskym@sullcrom.com

*Attorneys for JPMorgan Chase Bank, N.A.*

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
        stearn@rlf.com
        madron@rlf.com

-and-

Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:    (212) 450-4000
Fax:    (212) 701-5351
Email: ben.kaminetzky@davispolk.com
        lara.buchwald@davispolk.com
        tina.joe@davispolk.com

*Attorneys for Citibank, N.A.*

MORRIS JAMES LLP

By:  /s/ Stephen M. Miller
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel:   (302) 888-6853
Fax:   (302) 571-1750
Email: smiller@morrisjames.com

-and-

J. Emmett Murphy (admitted *pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Tel:   (212) 556-2191
Fax:   (212) 556-2222
Email: jemurphy@kslaw.com

-and-

John C. Toro (admitted *pro hac vice*)
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Tel:   (404) 572-2806
Fax:   (404) 572-5100
Email: jtoro@kslaw.com
         pclifton@kslaw.com

*Attorneys for SunTrust Bank*

POLSINELLI PC

By:  /s/ Christopher A. Ward
Christopher A. Ward (No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Tel:   (302) 252-0920
Fax:   (302) 252-0921
Email:  cward@polsinelli.com

-and-

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Tel:   (212) 318-3000
Fax:   (212) 318-3400
Email: steve.dollar@nortonrosefulbright.com

*Attorneys for BMO Harris Bank, N.A.*

32