# **EXHIBIT C**

RLF1 28568147v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

**DECLARATION OF MARK A. POPOVSKY IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE
CERTAIN PORTIONS OF THE RULE 26(a)(2) REPORT OF YVETTE AUSTIN SMITH**

MARK A. POPOVSKY hereby declares:

1.      I am a member in good standing of the Bar of the State of New York and have been admitted *pro hac vice* to practice before this Court.  I am a special counsel at the law firm of Sullivan & Cromwell LLP and am counsel to defendant J.P. Morgan Chase Bank, N.A. ("JPMorgan") in the above-captioned adversary proceeding.  I submit this declaration in support of Defendants' Motions for Summary Judgment and to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette Austin Smith.

2.     Attached hereto as **Exhibit 1** are excerpts from a true and correct copy of the Millennium Laboratories Confidential Information Memorandum, dated March 31, 2014 and bearing production number JPMC-MIL-CORP-00220516 on the first page.

3.     Attached hereto as **Exhibit 2** are excerpts from a true and correct copy of the Declaration of William B. Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, dated November 10, 2015 and filed in *In re Millennium Lab Holdings II, LLC*, No. 15-12284 (Bankr. D. Del.) (D.I. 3).

4.     Attached hereto as **Exhibit 3** are excerpts from a true and correct copy of a document entitled "Warm Deal Memorandum," dated May 6, 2010 and bearing production number TA_MLH-00085500 on the first page.

5.     Attached hereto as **Exhibit 4** are excerpts from a true and correct copy of the transcript of the July 14, 2021 deposition of Jennifer M. Mulloy as the corporate representative of TA Associates, Inc. in this action.

6.     Attached hereto as **Exhibit 5** are excerpts from a true and correct copy of a document entitled "Investor Presentation," dated March 2014 and bearing production number ML_DE_00013955 on the first page.

7.     Attached hereto as **Exhibit 6** are excerpts from a true and correct copy of the transcript of the July 22, 2021 deposition of Ryan Griswold as the corporate representative of J.P. Morgan Chase Bank, N.A. in this action.

8.     Attached hereto as **Exhibit 7** is a true and correct copy of a January 21, 2014 email from Stathis Karanikolaidis to Jennifer Mulloy and others, bearing production number JPMC-MIL-CORP-00218935.

2

9.    Attached hereto as **Exhibit 8** is a true and correct copy of a February 22, 2014 email from Howard Appel to Brock Hardaway and others, bearing production number ML_DE_00035295 on the first page.

10.    Attached hereto as **Exhibit 9** is a true and correct copy of a document entitled "Dividend Recapitalization Discussion," dated February 20, 2014 and bearing production number ML_DE_00035351 on the first page.

11.    Attached hereto as **Exhibit 10** are excerpts of a true and correct copy of the transcript of the April 29, 2021 deposition of Millennium's former VP of Finance, Heidi Smith, in this action.

12.    Attached hereto as **Exhibit 11** is a true and correct copy of a document entitled "$1,765 million Term Loan Facility $50 million Revolving Facility Fee Letter," dated March 16, 2014 and bearing production number JPMC-MIL-CORP-00194146 on the first page.

13.    Attached hereto as **Exhibit 12** is a true and correct copy of a February 27, 2014 email from Benjamin Chiarelli to Stathis Karanikolaidis and others, bearing production number JPMC-MIL-CORP-00241288.

14.    Attached hereto as **Exhibit 13** are excerpts from a true and correct copy of a document entitled "$1,765 million Term Loan Facility $50 million Revolving Facility Commitment Letter," dated March 16, 2014 and bearing production number ML_DE_00015397 on the first page.

15.    Attached hereto as **Exhibit 14** is a true and correct copy of a document entitled "Syndication Update," dated April 14, 2014 and bearing production number JPMC-00071249.

3

16.     Attached hereto as **Exhibit 15** are excerpts from a true and correct copy of a document entitled "Final Funds Flow," dated April 16, 2014, and produced in this action in native format bearing production number ML_DE_00027915.

17.     Attached hereto as **Exhibit 16** are excerpts from a true and correct copy of the 2014 Credit Agreement, dated April 16, 2014 and bearing production number JPMC-MIL-CORP-00160936 on the first page.

18.     Attached hereto as **Exhibit 17** is a true and correct copy of a document entitled "Lender Allocation," dated April 15, 2014 and bearing production number JPMC-MIL-CORP-00201658 on the first page.

19.     Attached hereto as **Exhibit 18** is a true and correct copy of a document entitled "Vantage Point Advisors Millennium Lab Holdings II, LLC Solvency Analysis," dated April 30, 2014 and bearing production number ML_DE_00263273 on the first page.

20.     Attached hereto as **Exhibit 19** is a true and correct copy of a March 14, 2014 email, including excerpts from its attachments, from Ryan Griswold to J.P. Casey and others, bearing production number JPMC-MIL-CORP-00237302 on the first page.

21.     Attached hereto as **Exhibit 20** are excerpts from a true and correct copy of a document entitled "Millennium Labs Final Approval Memo," dated March 13, 2014 and bearing production number CITI-DE-00088256 on the first page.

22.     Attached hereto as **Exhibit 21** are excerpts from a true and correct copy of the transcript of the July 15, 2021 deposition of Michael Tortora as the corporate representative for Citibank, N.A. in this action.

23.     Attached hereto as **Exhibit 22** are excerpts from a true and correct copy of a document titled "Millennium Laboratories, Inc. DCC Memo," dated March 2014 and bearing production number SunTrust_MIL-DE-00011758 on the first page.

24.     Attached hereto as **Exhibit 23** are excerpts from a true and correct copy the transcript of the July 27, 2021 deposition of David M. Felty as the corporate representative for SunTrust Bank in this action.

25.     Attached hereto as **Exhibit 24** are excerpts from a true and correct copy of the transcript of the July 28, 2021 deposition of Phillip Ho as the corporate representative of BMO Harris Bank, N.A., in this action.

26.     Attached hereto as **Exhibit 25** is a true and correct copy of a July 11, 2011 press report by Kimberly Mirando entitled "Government Investigating Millennium Laboratories Whistleblower Lawsuit," published by Legafi and obtained on August 8, 2022 from https://web.archive.org/web/20120110193743/http://www.legafi.com/lawsuits/fraud-qui-tam-whistleblower/793-government-investigating-millennium-laboratories-whistleblower-lawsuit.

27.     Attached hereto as **Exhibit 26** are excerpts from a true and correct copy of a document entitled "Millennium Laboratories, LLC – Voluntary Self-Referral Disclosure," dated August 15, 2014 and bearing production number ML_DE_00325457 on the first page.

28.     Attached hereto as **Exhibit 27** are excerpts from a true and correct copy of the transcript of the deposition of Millennium's former General Counsel, Martin Price, in this action, which took place on April 12, 2021 and June 7, 2021.

29.     Attached hereto as **Exhibit 28** is a true and correct copy of a document entitled "Declaration of Jane Pine Wood, Esq.," dated January 15, 2014 and submitted in *Ameritox, Ltd.* v.

5

*Millennium Laboratories, Inc.*, No. 8-11-cv-00775-SCB-TBM (M.D. Fla.), and bearing production number ML_DE_00306539 on the first page.

30.    Attached hereto as **Exhibit 29** is a true and correct copy of an October 31, 2009 email from Jane Wood to Howard Appel and others, bearing production number ML_DE_00672437.

31.    Attached hereto as **Exhibit 30** are excerpts from a true and correct copy of the transcript of the deposition of Millennium's former President, Howard Appel, in this action, which took place on October 4, 2021 and October 13, 2021.

32.    Attached hereto as **Exhibit 31** is a true and correct copy of a document entitled "Furnishing Point-of-Care Testing Cups to Physicians," dated October 6, 2010 and bearing production number ML_DE_00132988 on the first page.

33.    Attached hereto as **Exhibit 32** is a true and correct copy of a document entitled "Velocity Medical Services Test Cup Offer," dated January 24, 2011 and bearing production number ML_DE_00239522 on the first page.

34.    Attached hereto as **Exhibit 33** is a true and correct copy of a March 19, 2012 email from Ronald Wisor to Martin Price, bearing production number ML_DE_00274055 on the first page.

35.    Attached hereto as **Exhibit 34** are excerpts of a true and correct copy of a document entitled "Rebuttal Report of Lewis Morris," dated December 6, 2013 and submitted in *Ameritox, Ltd.* v. *Millennium Laboratories, Inc.*, No. 8-11-cv-00775-SCB-TBM (M.D. Fla.), and bearing production number ML_DE_00145398 on the first page.

36.    Attached hereto as **Exhibit 35** is a true and correct copy of a Millennium urine drug test requisition form, dated October 2011 and bearing production number ML_DE_00044647 on the first page.

37.    Attached hereto as **Exhibit 36** are excerpts from a true and correct copy of the transcript of the September 30, 2021 deposition of Millennium's former CFO, Tim Kennedy, in this action.

38.    Attached hereto as **Exhibit 37** are excerpts from a true and correct copy of the transcript of the deposition of Millennium's former VP of Financial Planning and Analysis, Daniel Pencak, in this action, which took place on July 1, 2021 and July 12, 2021.

39.    Attached hereto as **Exhibit 38** are excerpts from a true and correct copy of the transcript of the July 20, 2021 deposition of Millennium's former CEO, Brock Hardaway, in this action.

40.    Attached hereto as **Exhibit 39** are excerpts from a true and correct copy of a document entitled "Troubled Practices Millennium Laboratories Presentation to the United States Attorney's Office District of Massachusetts," dated April 8, 2014 and bearing production number ML_DE_00398857 on the first page.

41.    Attached hereto as **Exhibit 40** are excerpts from a true and correct copy of a *subpoena duces tecum* from the U.S. Department of Justice to Millennium Laboratories, Inc., dated March 27, 2012 and bearing production number ML_DE_00670376 on the first page.

42.    Attached hereto as **Exhibit 41** is a true and correct copy of an annotated version of a letter from James Carroll to Samantha Mohr, dated March 21, 2014, produced by KPMG US LLC in this action and bearing production number KPMG-ML-eA2013YE-0000057 on the first page.

43. Attached hereto as **Exhibit 42** is a true and correct copy of a redacted version of handwritten notes taken by Lynn Neuner, partner at Simpson Thacher & Bartlett LLP ("Simpson"), dated March 27, 2012, produced by Simpson in this action and bearing production number STB_ML-00000008 on the first page.

44. Attached hereto as **Exhibit 43** is a true and correct copy of a document entitled "Overview of Pending Litigation Involving Millennium Laboratories," dated March 17, 2014 and bearing production number JPMC-00030809 on the first page.

45. Attached hereto as **Exhibit 44** are excerpts from a true and correct copy of a redacted version of handwritten notes taken by Lynn Neuner, dated March 7, 2014, produced by Simpson in this action and bearing production number STB ML-00000023 on the first page.

46. Attached hereto as **Exhibit 45** is a true and correct copy of a November 29, 2012 email from Iryna Chakanava to Cory Rapkin and others, bearing production number JPMC-MIL-CORP-00215705 on the first page.

47. Attached hereto as **Exhibit 46** is a true and correct copy of a February 7, 2013 email from Martin Price to Lynn Neuner and others, bearing production number ML_DE_00679020 on the first page.

48. Attached hereto as **Exhibit 47** is a true and correct copy of a November 27, 2013 email from Ryan Griswold to Alla Christoforou and others, bearing production number JPMC-MIL-CORP-00187347 on the first page.

49. Attached hereto as **Exhibit 48** is a true and correct copy of a November 27, 2013 email from Sean Kensil to Mark Floyd and others, bearing production number CITI-DE-00024069.

50. Attached hereto as **Exhibit 49** are excerpts of a true and correct copy of a document entitled "Pre-Organizational Materials," dated February 28, 2014 and bearing production number JPMC-00077654 on the first page.

51. Attached hereto as **Exhibit 50** is a true and correct copy of a document entitled "Business Due Diligence Questions," dated March 2014 and bearing production number ML_DE_00385563 on the first page.

52. Attached hereto as **Exhibit 51** is a true and correct copy of an April 13, 2014 email from Ryan Griswold to Alla Christoforou and others, bearing production number JPMC-00069883.

53. Attached hereto as **Exhibit 52** is a true and correct copy of a March 26, 2014 email from Ryan Griswold to Benjamin Chiarelli and others, bearing production number JPMC-MIL-CORP-00228635.

54. Attached hereto as **Exhibit 53** are excerpts from a true and correct copy of an article by John Lonski, entitled "Loans Impart an Upward Bias to High-Yield Downgrade per Upgrade Ratio," dated October 24, 2019 and available at https://www.moodysanalytics.com/-/media/article/2019/weekly-market-outlook-loans-impart-upward-bias-to-high-yield-downgrade-per-upgrade-ratio.pdf.

55. Attached hereto as **Exhibit 54** is a true and correct copy of an April 8, 2014 email, including its attachment, from Stathis Karanikolaidis to Ryan Griswold and others, bearing production number JPMC-00030808 on the first page.

56. Attached hereto as **Exhibit 55** is a true and correct copy of a June 17, 2014 email from Calvin Liou to "Project Chargers Whole Team," bearing production number JPMC-MIL-CORP-00230140.

57.    Attached hereto as **Exhibit 56** is a true and correct copy of notes from a conference call between The Carlyle Group, Millennium and JPMorgan, dated June 23, 2014 and bearing production number JPMC-00080323 on the first page.

58.    Attached hereto as **Exhibit 57** is a true and correct copy of a January 25, 2015 email from Joseph Savage to Michael Loucks and others, bearing production number ML_DE_00664823 on the first page.

59.    Attached hereto as **Exhibit 58** is a true and correct copy of a January 29, 2015 email from Joseph Savage to Martin Price and others, bearing production number ML_DE_00350293 on the first page.

60.    Attached hereto as **Exhibit 59** is a true and correct copy of a June 21, 2015 email from Robin Keller to Michael Silver and others, bearing production number ML_DE_00602292 on the first page.

61.    Attached hereto as **Exhibit 60** are excerpts from a true and correct copy of the transcript of the May 2, 2022 deposition of Yvette Austin Smith in this action.

62.    Attached hereto as **Exhibit 61** are excerpts from a true and correct copy of the transcript of the deposition of Millennium's founder, James Slattery, in this action, which took place on June 4, 2021 and July 8, 2021.

63.    Attached hereto as **Exhibit 62** is a true and correct copy of a December 19, 2013 email from Joseph Savage to Martin Price, bearing production number ML_DE_00298390 on the first page.

64.    Attached hereto as **Exhibit 63** is a true and correct copy of a February 21, 2014 email from Tony Marsh to Jennifer Mulloy, bearing production number TA_MLH-00027400 on the first page.

65.    Attached hereto as **Exhibit 64** is a true and correct copy of the November 15, 2021 Rule 26(a) Report of Yvette R. Austin Smith, proffered by Plaintiff in this action.

66.    Attached hereto as **Exhibit 65** is a true and correct copy of the February 14, 2022 Rule 26(a) Report of Dr. Amy Hutton, proffered by Defendants in this action.

67.    Attached hereto as **Exhibit 66** are excerpts from a true and correct copy of the transcript of the May 5, 2022 deposition of Dr. Amy Hutton in this action.

68.    Attached hereto as **Exhibit 67** are excerpts from a true and correct copy of the underlying materials from the Vantage Point solvency analysis, produced in this action in native format bearing production number VP_ML_00002551.

69.    Attached hereto as **Exhibit 68** are excerpts from a true and correct copy of a document entitled "270 Model," dated April 2014 and produced in this action in native format, bearing production number JPMC-00005076.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in New York, New York on August 22, 2022

*/s/ Mark A. Popovsky*
Mark A. Popovsky

11

# EXHIBIT 1

STRICTLY PRIVATE AND CONFIDENTIAL



# MILLENNIUM LABORATORIES®

# Confidential Information Memorandum

| | |
|---|---|
| $1,815,000,000 | Senior Secured Credit Facilities, consisting of: |
| $50,000,000 | *First Lien Revolving Credit Facility* |
| $1,765,000,000 | *First Lien Term Loan* |

*Confidential Information Memorandum for Public Side Investors*

*See special notice on the next page*

J.P.Morgan

CONFIDENTIAL

The terms and conditions of Part I of this Notice and Undertaking shall apply until you become a party to the definitive agreements evidencing the Facilities and thereafter the provisions relating to confidentiality contained in such agreements shall govern. If you do not enter into the Facilities, this Notice and Undertaking shall terminate on the date falling one year after the date hereof.

## II. Information

Recipient acknowledges and agrees that (i) Arranger received the Evaluation Material from third party sources (including Borrower) and it is provided to Recipient for informational purposes, (ii) Arranger and its affiliates have no responsibility, and shall not be liable, for the accuracy or completeness or lack thereof of the Evaluation Material or any information contained therein, (iii) no representation regarding the Evaluation Material is made by Arranger or its affiliates, (iv) neither Arranger nor its affiliates has made any independent verification as to the accuracy or completeness of the Evaluation Material and (v) Arranger and its affiliates shall have no obligation to update or supplement any Evaluation Material or otherwise provide additional information.

The Evaluation Material has been prepared to assist potential lenders in making their own evaluation of Borrower and the Facilities and does not purport to be all-inclusive or to contain all of the information that a potential lender may consider material or desirable in making its decision to become a lender. Each Recipient of the information contained herein should take such steps as it deems necessary to assure that it has the information it considers material or desirable in making its decision to become a lender and should perform its own independent investigation and analysis of the Facilities or the transactions contemplated thereby and the creditworthiness of Borrower. Recipient represents that it is sophisticated and experienced in extending credit to entities similar to Borrower. The information contained herein are not a substitute for Recipient's independent evaluation and analysis and should not be considered as a recommendation by Arranger or any of its affiliates that any Recipient enter into the Facilities.

The Evaluation Material may include certain forward looking statements and projections provided by Borrower. Any such statements and projections reflect various estimates and assumptions by Borrower concerning anticipated results. No representations or warranties are made by Borrower or any of its affiliates as to the accuracy of any such statements or projections. Whether or not any such forward looking statements or projections are in fact achieved will depend upon future events some of which are not within the control of Borrower. Accordingly, actual results may vary from the projected results and such variations may be material. Statements contained herein describing documents and agreements are summaries only and such summaries are qualified in their entirety by reference to such documents and agreements.

This Notice and Undertaking shall be governed by and construed in accordance with the law of the State of New York, without regard to principles of conflicts of law (except Section 5-1401 of the New York General Obligation Law to the extent that it provides that the law of the State of New York shall govern).

J.P.Morgan



CONFIDENTIAL INFORMATION MEMORANDUM

CONFIDENTIAL

JPMC-MIL-CORP-00220521

CONFIDENTIAL INFORMATION MEMORANDUM

# Table of contents

1. **Executive summary** ................................................................................................ **16**
   Company overview    16
   Industry overview    19
   Transaction overview    22
   Sources and uses    22
   Pro forma capitalization    22
   Summary terms and conditions    23
   Summary corporate structure    24
   Historical financial summary    25
   Sponsor overview    26

2. **Key credit highlights** ........................................................................................... **27**
   Large, expanding and underpenetrated market opportunity    28
   Strong competitive position    31
   Barriers to entry    33
   Platform and operating leverage    34
   Diversified customer base and strong payor relationships    35
   Research and education    37
   Industry-leading margin profile with high free cash flow    38
   Execution-oriented management team with strategic vision    39

3. **Company overview** ................................................................................................ **40**
   Company history    40
   Urine Drug Testing overview    43
   Pharmacogenetic Testing overview    47
   RxAnte overview    49
   Recurring revenue business model    52
   Sales force    53
   Compliance    56
   Research and development    56
   Research and education initiatives    57
   Overview of test menu    59
   Employees    60
   Facilities    61

4. **Industry overview and opportunities** ................................................................. **62**
   Chronic pain    62
   Drugs of abuse    62
   UDT market and opportunities    66
   PGT market and opportunities    69
   RxAnte market and opportunities    72
   Key macro drivers of growth    74
   Competitive landscape    79

5. **Management overview** .......................................................................................... **81**

J.P.Morgan



CONFIDENTIAL

JPMC-MIL-CORP-00220529

**6.   Historical financial overview** ................................................................ **86**

**7.   Management discussion and analysis** ........................................... **88**

**8.   Regulatory environment** ...................................................................... **91**

CONFIDENTIAL INFORMATION MEMORANDUM

J.P.Morgan



CONFIDENTIAL

JPMC-MIL-CORP-00220530

CONFIDENTIAL

# 1. Executive summary

## Company overview

Millennium Laboratories, LLC ("Millennium" or the "Company" or the "Borrower") is the leader in the science of toxicology and pharmacogenetics transforming the way healthcare professionals manage prescription and non-prescription drugs. The Company's suite of innovative, industry-leading solutions includes Urine Drug Testing ("UDT"), Pharmacogenetic Testing ("PGT") and predictive analytics ("RxAnte"), which together provide customers with an end-to-end, personalized solution for improving medication use. UDT is employed by the clinicians to monitor prescription medication use and identify drugs of abuse. Millennium also offers Oral Fluid Drug Testing ("ODT"), an alternative to UDT that allows for the testing of individuals that are unable to provide a urine sample. The Company operates multiple Clinical Laboratory Improvement Amendments ("CLIA") licensed laboratories powered by proprietary, cutting-edge technologies, algorithms and customized methods. Millennium provides clinicians with a broad therapeutic offering of diagnostic tests and delivers results with superior sensitivity, specificity and accuracy in industry-leading turnaround time. The Company's PGT solution detects genetic variations in enzymes associated with the metabolism of certain medications. This information helps clinicians more effectively predict the most appropriate drug therapy for each patient and thus, personalize treatment. PGT has a high potential for cost savings by preventing and reducing adverse drug affects (safety) and starting patients on a targeted drug therapy (efficacy). The patent-pending RxAnte system uses advanced analytics, decision analytics and evaluation analytics to drive improved medication use and outcomes. The RxAnte suite of tools combines "big data" and powerful analytical capabilities with deep subject matter expertise in medication use to improve overall medication adherence in a cost-effective manner.

The Company offers best-in-class customer service support, clinical research and education. Since its inception in late 2007, Millennium has grown organically to become one of the largest clinical laboratories and the largest medication monitoring specialty laboratory in the U.S. To date, the Company has analyzed and tested over 6.4 million patient specimens, of which approximately 2.4 million occurred in 2013. Millennium has a broad, national footprint and currently serves over 6,700 active physician and other healthcare professional practices. The Company also has over 197 network contracts covering 168 million lives and growing. Additionally, RxAnte has approximately 8 million lives under management and has issued over 90 million adherence scores to date.

Millennium has achieved exceptional success by putting customers first, providing innovative solutions that deliver high-quality results. The Company:

▦ addresses a large and growing unmet need;

▦ offers a unique, high-quality, customer-centric solution;

▦ provides three highly synergistic offerings which combine to deliver an end-to-end, personalized solution that benefits patients, clinicians and payors;

▦ utilizes cutting-edge, proprietary technologies and methods with a focus on innovation;

▦ operates a highly efficient business model with low capital and working capital requirements;

▦ has a stable and diversified customer and payor mix;

▦ has an extensive network of national and regional payor agreements;

▦ is a leading voice in the clinical, research and academic communities;

▦ has a proven financial and performance track record; and

J.P.Morgan

citi

16

CONFIDENTIAL

▨ is led by an execution-oriented management team with strategic vision.

Millennium provides its services to treating clinicians such as pain practitioners, primary care physicians, addictionologists, orthopedic specialists, spine and sports medicine specialists, neurologists, anesthesiologists, psychiatric specialists, obstetric and gynecologic specialists, and other high prescribers of pain medications, psychiatric medications and other medications across an expanding therapeutic spectrum. These clinicians have a growing incentive to monitor patients on prescription and non-prescription drugs due to highly variable non-compliance within the target patient population, worsening misuse and abuse of these drugs, and heightening state and federal focus on drug diversion and abuse. In addition, UDT can be used to effectively monitor and improve adherence to medications in areas beyond drugs of abuse. Millennium's UDT, PGT and RxAnte solutions represent the most advanced and objective tools available to aid clinicians in making informed decisions for prescribing and monitoring medications for their patients.

Millennium provides clinicians with the flexibility to choose a single diagnostic assay, or customizable combinations of assays as well as the testing method/technology to personalize individual patient testing at the clinicians' discretion. This is in contrast to most other UDT companies and laboratories that only offer large, predefined, pre-set panels of tests. For each test result, Millennium delivers an easy-to-read summary through its proprietary reports with comprehensive explanations and analysis to assist clinicians' decision making. In addition to these reports, Millennium also assists the clinicians through access to its dedicated toxicology hotline, PGT Call Center, telephonic consultation and on-site presentations through its staff of PhDs, PharmDs and clinical educators. In addition, the Company provides a growing array of clinician tools such as its PGT mobile app. Millennium has from inception, and will continue to, focus on providing customers with high-quality, clinically actionable information.

Millennium believes it is the only major laboratory within the drugs of abuse and clinical drug monitoring space exclusively utilizing the latest cutting-edge technology, Liquid Chromatography – Mass Spectrometry/Tandem Mass Spectrometry ("LC-MS/MS") for its quantitative testing.[1] This highly scalable and automated technology quantitatively detects the presence and precise levels of drugs in a patient's urine at low concentrations (cut-off levels) compared to other technologies. Testing specimens with high-throughput LC-MS/MS technology driven by the Company's proprietary algorithms and customized methods enables Millennium to report results to customers generally by the next business day, if not within 24 hours. This compares to the Company's primary competitors, who often take from three to five days or even up to two weeks to deliver results.

Customer service is a key differentiator and core component of Millennium's business strategy. The Company has a high-touch, national sales and service organization focused on developing new business as well as deepening existing relationships with clinicians. Approximately 40% of Millennium's 1,379 employees are in the field, allowing its sales and customer service specialists to visit their customers, on average, every seven to ten days. The Company has developed a comprehensive, easy-to-read report for clinicians, known as Rapid Assessment of Drug Adherence Report, or RADAR[SM] ("RADAR"). RADAR reports are enhanced with charts and graphs which provide additional context to individual patient results over time, as well as more tools to enhance the clinical decision making process. Millennium also offers clinicians live decision support on RADAR with its expert clinical support and resolution team, including

---

[1]    99.5% of testing is performed through LC-MS/MS technology

J.P.Morgan



CONFIDENTIAL

JPMC-MIL-CORP-00220532

CONFIDENTIAL INFORMATION MEMORANDUM

CONFIDENTIAL

## Transaction overview

Millennium Laboratories, LLC ("Millennium" or the "Company" or the "Borrower") has engaged J.P. Morgan Securities LLC ("J.P. Morgan") and Citigroup Global Markets ("Citi") as joint lead arrangers and joint bookrunners (in such capacities, collectively, the "Lead Arrangers") and BMO Capital Markets and SunTrust Robinson Humphrey as co-managers and agents to raise a new $50 million Revolving Credit Facility (the "RCF" or "Revolver") and $1,765 million Senior Secured Term Loan B (the "Term Loan" or "TLB", collectively with the RCF the "Senior Secured Credit Facilities"). J.P. Morgan Chase Bank, N.A. will serve as Administrative Agent.

The Company intends to use proceeds: (i) repay the existing Term Loan A, (ii) provide a distribution to shareholders, (iii) redeem outstanding warrants, debentures and stock options and (iv) pay transaction related fees and expenses. Pro forma for the Transaction, Millennium will have total funded net senior secured debt of $1,715 million, resulting in net senior secured leverage of 4.54x, and total net debt of $1,751.7 resulting in total net leverage of 4.63x, based on FYE December 31, 2013 Adjusted EBITDA of $378.1 million.

## Sources and uses

Exhibit 1.2

| Sources and uses | | | |
|---|---|---|---|
| Sources | Amount ($ million) | Uses | Amount ($ million) |
| New R/C facility | – | Distribution to shareholders | 1,269.6 |
| New Term Loan B | 1,765.0 | Refinance Term Loan A | 304.0 |
| Balance sheet cash | 50.0 | Convert/take out TA debentures | 196.0 |
| | | Fees and expenses | 45.4 |
| **Total** | **1,815.0** | **Total** | **1,815.0** |

## Pro forma capitalization

Exhibit 1.3

| Pro forma capitalization | | |
|---|---|---|
| ($ million) | Pro forma | xAdjusted EBITDA[8] |
| Cash | $50.0 | |
| $50 million R/C facility due 2019 | – | |
| New Term Loan B due 2021 | 1,765.0 | |
| Total secured debt | 1,765.0 | 4.67x |
| Net secured debt | 1,715.0 | 4.54x |
| Other debt[9] | 36.7 | |
| Total debt | 1,801.7 | 4.77x |
| Net debt | 1,751.7 | 4.63x |
| Adjusted EBITDA/Pro forma interest expense | | 4.75x |
| (Adjusted EBITDA-capex)/Pro forma interest expense | | 4.36x |

---

[8]   Based on FY13 12/31/2013 Adjusted EBITDA of $378.1 million
[9]   Excludes approximately $18 million related to the Company's facilities owned by a related party

J.P.Morgan



CONFIDENTIAL

JPMC-MIL-CORP-00220537

## Diversified customer base and strong payor relationships

The Company has a diverse base of over 6,700 active practices, with no single practice accounting for more than 0.8% of specimen volume in Q4 2013 and with the top 10 practices representing only 6.2% of total specimen volume in Q4 2013.

**Exhibit 2.6**

| Top 10 customers and payors – Q4 2013 (based on volume) | | | |
|---|---|---|---|
| **Top 10 customers** | **% of Total** | **Top 10 payors** | **% of Total** |
| Practice A | 0.8% | Payor A | 18.1% |
| Practice B | 0.7% | Payor B | 9.7% |
| Practice C | 0.7% | Payor C | 3.8% |
| Practice D | 0.6% | Payor D | 2.6% |
| Practice E | 0.6% | Payor E | 1.8% |
| Practice F | 0.6% | Payor F | 1.6% |
| Practice G | 0.6% | Payor G | 1.5% |
| Practice H | 0.6% | Payor H | 1.3% |
| Practice I | 0.5% | Payor I | 1.2% |
| Practice J | 0.5% | Payor J | 1.2% |
| **Top 10 customers** | **6.2%** | **Top 10 payors** | **42.8%** |
| Remaining | 93.8% | Remaining | 57.2% |
| **Total** | **100.0%** | **Total** | **100.0%** |

Source: Millennium Management

In addition, Millennium has a diversified payor mix with over 5,000 unique payors. No single commercial health plan represented more than 10% of specimen volume in Q4 2013. Government health plans, including commercially managed government plans, were approximately 42% of specimen volume in Q4 2013 with traditional Medicare and Medicaid representing 18% and 9%, respectively. In addition, 13% of total volume reflects out-of-network volume for which the Company receives minimal to no reimbursement. As such, contracts achieved with these health plans will only be accretive to revenue and EBITDA. The remaining 24% of out-of-network volume is very fragmented amongst a diverse payor mix. The top 30 out-of-network health plans comprise less than 8% of the Company's total volume.

**Exhibit 2.7**



Diverse payor mix

By specimen volume — Medicare 18.0%, Other 1.0%, Medicaid 9.0%, Workers comp 4.0%, Patient pay 10.0%, Commercial 58.0%

In/out of network distribution — Out of network[1] 13.0%, Out of network[2] 24.0%, In-network 63.0%

[1] Opportunity: Out of network volume from payors with little to no reimbursement – aggregate average reimbursement of <$50
[2] Top 30 plans represents less than 8% volume

Note: As of March 2014

J.P.Morgan                                                         citi

CONFIDENTIAL INFORMATION MEMORANDUM

CONFIDENTIAL

The Company currently has approximately 197 network contracts covering more than 168 million lives. Approximately 63% of Millennium's claims are processed under contractual agreements. The Company has achieved in-network status with some of the largest commercial health plans in the country, including UnitedHealthcare, Humana, Wellcare, and numerous Blue Cross Blue Shield entities covering 24 states. In addition, Millennium has contracted with a number of workers compensation plans. These long-term contracts with key managed care organizations provide the Company with significant revenue visibility and stability.

**Exhibit 2.8**



| Selected contracts | |
| --- | --- |
| Select commercial contracts | Workers' compensation referral agreements |

Millennium has established an experienced and dedicated Managed Markets team with national coverage whose mandate is to proactively pursue network agreements to drive sales growth and maintain the Company's competitive advantage. By utilizing clinical data and research to educate national and regional health plans and government insurers, the Company is able to illustrate the clinical benefits and potential cost savings associated with their solution. These payor relationships are also shared with RxAnte, further enhancing the value proposition of RxAnte's predictive analytics solution.

RxAnte has contractual relationships with certain health plans and payors that Millennium does not currently have, allowing for additional cross-selling opportunities. RxAnte has contracts with large, national Medicare Advantage health plans such as Coventry (now part of Aetna), WellCare, and others. The Company also contracts with PBMs, commercial health plans, drug manufacturers, employers, and other specialty organizations interested in improving medication use through advanced analytics. RxAnte has approximately 8 million lives under contract and to date has issued more than 90 million medication adherence scores.

J.P.Morgan



CONFIDENTIAL INFORMATION MEMORANDUM

CONFIDENTIAL

JPMC-MIL-CORP-00220551

CONFIDENTIAL

# 3. Company overview

## Company history

Millennium was founded in December 2007 by its Chairman, James Slattery, with a focus on technology, customer service and innovation to address the needs of people suffering from chronic pain. From inception, the Company set out to employ best-in-class technologies to develop a solution that would improve patient outcomes and offer significant benefits to clinicians and payors when compared to the traditional standards of care in drugs of abuse testing and clinical medication monitoring. Millennium's first service offering was in the urine drug testing ("UDT") space where they set out to deliver fast, highly accurate results using LC-MS/MS technology driven by proprietary algorithms and customized methods. The Company's targeted strategy initially focused on high-prescribing pain drug clinicians and allowed Millennium to effectively penetrate the medication monitoring market. In a short period of time, Millennium's management team has made significant strides in growing and diversifying its customer base, establishing a national presence and capturing the leadership position in UDT.

**Exhibit 3.1**



While the execution of the UDT business strategy was a critical first step and continues to be core to the business today, it was just the beginning of realizing Mr. Slattery's vision of providing a complete, end-to-end solution empowering physicians to provide their patients with truly personalized and targeted medication therapy. To that end, in 2012, Millennium launched its pharmacogenetic testing ("PGT") offering which allows physicians to more accurately predict the most effective drug therapy and dose for each patient based on a genetic analysis of that individual's metabolism. The most recent extension of the Millennium portfolio came through the acquisition of RxAnte in December 2013. RxAnte's predictive analytic solution is the most

J.P.Morgan



CONFIDENTIAL

JPMC-MIL-CORP-00220555

CONFIDENTIAL

advanced population medication management solution on the market today and is proven to help customers achieve better adherence, lower costs and improve patient outcomes.

**Exhibit 3.2**



The Millennium solution

Millennium's synergistic portfolio combines to form a complete solution that allows the Company to provide relevant, clinically actionable information to physicians that is valuable to payors with industry-leading speed and accuracy for the benefit of patients.

Millennium's key offerings include the following:

- Urine Drug Testing ("UDT") testing for patient medication monitoring and adherence

- Oral Fluid Drug Testing ("ODT") testing for individuals unable to provide a urine sample

- Pharmacogenetic Testing ("PGT") testing to help physicians predict how an individual will respond to a particular drug therapy which increases safety and efficacy for truly personalized medicine

- RxAnte, a suite of predictive analytic tools and decision support

Millennium provides clinicians with tools, resources, and clinically insightful and actionable information allowing them to more effectively prescribe and manage patients' medication therapy, leading to more successful outcomes. By improving the safety and efficacy of prescribing while simultaneously improving adherence to the right drugs and preventing drug-to-drug interactions, Millennium is enabling clinicians to optimize treatment. Beyond this, Millennium helps clinicians meet regulatory requirements and adhere to national guidelines.

Millennium is able to provide greater efficiency in overall healthcare utilization and yield substantial savings in the overall cost of treatment, benefiting payors. By providing guidance to assist clinicians in identifying individual patients at higher risk of non-adherence, misuse or abuse of prescription medication, identifying personalized drugs and dosages, as well as ensuring proper monitoring, Millennium is able to reduce adverse outcomes. For those patients who do require intervention, Millennium helps payors determine the most effective and efficient intervention for each patient. As a result, patients receive higher quality-of-care and drug therapy becomes more efficient.

J.P.Morgan

citi

CONFIDENTIAL                                                                JPMC-MIL-CORP-00220556

CONFIDENTIAL

# 5. Management overview

Millennium's senior management team has a proven track record of delivering exceptional operational and financial results.

**Exhibit 5.1**

### Millennium senior management

| Name | Experience | Current Position |
|---|---|---|
| James Slattery | >35 years | Founder, Chairman |
| Brock Hardaway | >20 years | Chief Executive Officer |
| Howard Appel | >25 years | President |
| Mark Winham | ~30 years | Chief Operating Officer |
| Tim Kennedy | >20 years | Chief Financial Officer |
| Josh Benner, PhD. | >15 years | President, RxAnte |
| Martin Price | >15 years | General Counsel |
| Elizabeth Peacock | >25 years | EVP of Emerging Opportunities |

**James Slattery**
*Founder, Chairman*



James Slattery is the founder and Chairman of Millennium Laboratories. He founded Millennium Laboratories because of his own direct experience with people who suffer with chronic pain, and established Millennium's two-fold mission:

- Help alleviate human suffering through leading research and education that increases industry and public awareness of pain management
- Transform the science of toxicology from its traditional forensics model to improving clinical care for people in pain

Among his many entrepreneurial accomplishments, Mr. Slattery was recognized with the Ernst & Young Entrepreneur of the Year 2011 San Diego region award for entrepreneurial excellence. Prior to Millennium Laboratories, he achieved success in real estate development and broadcast communications, creating the first satellite network in the United States, which he later sold to a Fortune 500 broadcast company.

Mr. Slattery served for eight years as the Commissioner of Aeronautics for the State of Massachusetts. He continues to utilize his aviation background in the service of others through his role as a mission pilot for Angel Flight West, a non-profit organization that provides free medical assistance flights in the thirteen Western states. Mr. Slattery holds a Bachelor's degree from the University of Massachusetts.

J.P.Morgan



CONFIDENTIAL

JPMC-MIL-CORP-00220596

CONFIDENTIAL

## Brock Hardaway
*Chief Executive Officer*



Brock Hardaway joined Millennium Laboratories in 2013 as Chief Executive Officer. Mr. Hardaway provides the strategic direction for the Company's long-term growth, including growing Millennium's product and service offerings, increasing brand recognition, and maximizing earnings potential. He has two decades of leadership experience in healthcare and a strong track record of growth and performance.

He most recently served as Executive Vice President of Operations for Kindred Healthcare (NYSE: KND), which operated approximately 225 nursing and rehabilitation centers and 120 long-term acute care hospitals in 26 states, with a combined capacity of more than 36,000 beds.

While there, he oversaw day-to-day operations of 47 inpatient hospitals with approximately 11,000 employees, the largest region of the largest business unit within Kindred, responsible for generating a significant portion of Kindred's nearly $6.2 billion in annual net revenue. Hardaway was retained by Kindred post acquisition of RehabCare, where he had served as executive vice president and hospital division president, reporting directly to the CEO. In that capacity, Hardaway improved performance of hospital operations at RehabCare by more than 45 percent year-over-year and successfully took former RehabCare hospitals from an operating loss to a substantial operating profit.

Before joining Kindred, Mr. Hardaway was President and Chief Operating Officer of Triumph HealthCare, prior to its acquisition by RehabCare. He led the company through an unprecedented period of growth, and played a key role in the sale of the company to RehabCare Group.

## Howard Appel
*President*



Howard Appel is President of Millennium Laboratories. Prior to his promotion to President in January 2010, he served as the Company's Chief Financial Officer. As President, Mr. Appel is responsible for oversight of the Company's operations and implementation of its strategic initiatives. Mr. Appel has extensive knowledge of operational and financial leadership as well as keen insight into the needs of the customers that Millennium serves.

Mr. Appel has more than twenty-five years of experience as a Chief Executive Officer, Chief Financial Officer and Certified Public Accountant. Prior to joining Millennium, he was CEO of a capital equity firm. He spent much of his career as Chief Financial Officer at Laffer Associates, an economic research and consulting firm, focusing on the macroeconomic, political, and demographic changes affecting global financial markets. In addition, Mr. Appel has served on the Board of Directors of a number of publicly and privately held firms.

J.P.Morgan

citi

CONFIDENTIAL
JPMC-MIL-CORP-00220597

CONFIDENTIAL INFORMATION MEMORANDUM

CONFIDENTIAL

## Mark Winham
### *Chief Operating Officer*



With almost 30 years of laboratory and medical experience, Mark A. Winham joined Millennium Laboratories in July 2013 as Chief Operating Officer and is responsible for the strategic planning and development of laboratory operations.

Most recently, Winham was the vice president of global manufacturing at Life Technologies, where he was responsible for the operations of over 30 sites world-wide with over 2,500 manufacturing professionals. Prior to his latest role, Winham held various management roles in manufacturing and operations throughout his 11 years at Life Technologies. Winham also has 14 years of experience in the laboratory at Johnson & Johnson, Sanofi-Aventis, and the UK National Health Service. Winham holds a bachelor's degree in life sciences from Napier University in Edinburgh, United Kingdom and a business diploma in company direction from the Institute of Directors in London.

## Tim Kennedy
### *Chief Financial Officer*



With over 20 years of experience in financial operations and management in the healthcare industry, Tim Kennedy joined Millennium Laboratories in July 2013 as Chief Financial Officer. Kennedy oversees all financial functions for the Company.

Most recently, he served as the CFO and general manager of PLUS Diagnostics where he developed the infrastructure to support rapid growth, executed process improvements that maximized profit margins, increased product offerings, and enabled expansion to become a national service provider.

Previously, Kennedy served as owner and CFO of Diagnostic Imaging Management for more than 10 years, and grew the company from nine centers to 33 centers throughout 17 states. Before that, he was at LabCorp as the vice president of finance and the corporate controller where he led more than 50 acquisitions, adding to significant growth in revenue and was integral in the merger to form LabCorp. Kennedy received a bachelor's degree in business, accounting and information systems from Kean University in New Jersey.

J.P.Morgan



CONFIDENTIAL INFORMATION MEMORANDUM

JPMC-MIL-CORP-00220598

CONFIDENTIAL

### Josh Benner, PhD
*President - RxAnte*



Josh Benner is the President of RxAnte, a provider of science-based information technology solutions for improving quality and lowering the cost of healthcare. The RxAnte Solution™ helps healthcare organizations improve medication adherence objectively and efficiently by applying proprietary predictive analytics and decision analytics to ensure the right patient gets the right intervention at the right time. The company's analytic technology was previously incubated at Crimson Health, LLC.

A leading voice on medication adherence, Dr. Benner's award-winning research and numerous publications have shed new light on the problem of non-adherence and identified promising approaches to improving it. Prior to RxAnte, Dr. Benner was Fellow and Managing Director at the Brookings Institution's Engelberg Center for Healthcare Reform, where he focused on medical technology policy. Prior to Brookings, Dr. Benner was principal at ValueMedics Research, an analytic and consulting services firm. Following the successful sale of ValueMedics to IMS Health in 2007, he served as senior principal in health economics and outcomes research and global lead for medication adherence at IMS. Dr. Benner received his Doctor of Pharmacy degree from Drake University and his Doctor of Science in health policy and management from the Harvard University School of Public Health. He remains a Visiting Scholar in Economic Studies at Brookings, and is an adjunct scholar in Clinical Epidemiology and Biostatistics at the University of Pennsylvania School of Medicine.

### Martin Price
*General Counsel*



As General Counsel of Millennium Laboratories Martin Price is responsible for the oversight of all legal affairs of the company. He is involved in the company's continued expansion throughout the United States and in its development of strategic alliances and partnerships.

Before joining Millennium Laboratories, Mr. Price acted as outside counsel to the company while a Partner with the international law firm Hogan Lovells U.S. LLP. Previously he was an associate with the international law firm Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates and a law clerk to the Honorable W. Curtis Sewell (ret.) of the U.S. District Court for the Eastern District of Virginia.

Mr. Price has a prolific record of legal experience that includes serving as lead trial counsel on behalf of major U.S. and international corporations in defending class actions, government investigations, civil litigation, and prosecuting litigation against competitors. He has handled matters ranging from constitutional challenges to federal Medicare/Medicaid programs to clinical drug-testing laboratory litigation involving misappropriation of trade secrets, false and deceptive advertising, violation of non-competition/solicitation agreements, and unfair trade practices. His substantial healthcare expertise covers the full spectrum of federal and state compliance matters for clinical testing laboratories, including the federal Stark and anti-kickback laws, HIPAA and Hi-Tech and various state rules.

As an adjunct professor of law at the George Washington University Law School, Mr. Price taught numerous courses and was also the Co-chair of the Hogan Lovells Litigation Department's associate training program. He holds dual BA degrees, with honors, from the George Washington University and a MA degree from Duke University. He received his J.D. with honors from the George Washington University Law School, where he served as an editor of the George Washington University Law Review.

J.P.Morgan

citi

CONFIDENTIAL

JPMC-MIL-CORP-00220599

CONFIDENTIAL

**Elizabeth Peacock**
*Executive Vice President of Emerging Opportunities*



As Executive Vice President of Emerging Opportunities, Elizabeth Peacock brings more than 20 years of U.S. and international sales management experience in the medical device and pharmaceutical industries. Her pain management medication monitoring marketing experience includes her tenure as the Senior Vice President of Sales and Marketing for Ameritox where she built the company's initial direct sales team.

Ms. Peacock held Vice President level positions in sales and marketing with Baxter Cardiovascular Group and Hancock Jaffe Laboratories, a start-up company manufacturing biological grafts for Cardiovascular and Vascular Bypass and Hemodialysis Access. At Hancock Jaffe she was responsible for developing and implementing the company's entry into the U.S. market following FDA approval including successfully building the company's U.S. sales team. She also served as Director of Sales for Research Medical, Inc.

Educated in Europe, Peacock attended schools in England, France and Italy. She holds a Bachelor of Arts in Business and Modern Languages from the University of Bath and a Master's degree in Education and German from the University of Reading, both located in the United Kingdom.

J.P.Morgan



CONFIDENTIAL

JPMC-MIL-CORP-00220600

# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| In re: | : Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, et al., | : Case No. 15-12284 (____) |
| Debtors.[1] | : Joint Administration Pending |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF WILLIAM BROCK HARDAWAY IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, William Brock Hardaway, being duly sworn, depose and say:

1. I am the Chief Executive Officer of Millennium Lab Holdings II, LLC ("Holdings"), a limited liability company organized under the laws of the state of Delaware and the ultimate parent of the other debtors and debtors-in-possession in the above captioned chapter 11 cases (collectively with Holdings, the "Debtors" and, together with the non-debtor affiliates and subsidiaries of Holdings, the "Company"). I am also the Chief Executive Officer of Millennium Health, LLC, a limited liability company organized under the laws of the state of California ("Millennium"), which is a wholly-owned subsidiary of Holdings and the direct parent of Debtor RxAnte, LLC ("RxAnte"). To minimize any disruption to the Debtors' business and ensure a smooth transition into chapter 11, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with these chapter 11 cases (the "Chapter 11 Cases").[2] I submit this declaration in support of the

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California, 92127.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Pleadings filed contemporaneously herewith.

("MLH"), a Delaware corporation, holds all 550 outstanding Class B Units. Finally, MLHCU, LLC, a Delaware limited liability company, holds all 58.4194 outstanding Class C Units.[6]

C.      **Events Leading to Chapter 11 Filing**

The Reorganization and Dividend Recapitalization Transaction

12.     On March 29, 2012, the Company entered into a Credit Agreement (as amended, supplemented, or otherwise modified, the "2012 Credit Agreement"), by and among MLH and Millennium as borrowers, JPMorgan Chase Bank, N.A. as prior administrative agent, and the lenders party thereto, which provided for a $310 million term loan facility and a $20 million revolving credit facility. The 2012 Credit Agreement was subsequently amended and restated in December 2013 to provide for an additional term loan of approximately $52 million and an increase of the revolving credit facility to $30 million (the term loan and revolver facilities collectively, as so amended and restated, the "2013 Credit Facility"). The proceeds from the 2013 Credit Facility were used to consummate the Company's purchase of 100% of the outstanding stock of RxAnte. The 2013 Credit Facility was scheduled to mature on March 29, 2017.

13.     In April 2014, the Company undertook a reorganization of its corporate structure in conjunction with a dividend recapitalization transaction (collectively, the "April 2014 Transaction"). These transactions, as described in further detail herein, ultimately resulted in the present corporate and capital structure of the Debtors.

14.     On April 16, 2014, the Company entered into the Existing Credit Agreement, as detailed above. The proceeds from the Existing Credit Agreement were primarily utilized to satisfy all of the Company's outstanding obligations under the 2013 Credit Facility

---

[6]     Class C Units reflect profits interests for certain management employees of the Company.

and to pay a special dividend to stockholders. Millennium Laboratories, Inc. (predecessor-in-interest to Millennium), RxAnte, Inc., and non-Debtor subsidiary Pain In the Air, Inc. each converted to a limited liability company, Holdings was formed, and MLH (the parent company to Millennium Laboratories, Inc.) exchanged its equity interests in Millennium Laboratories, Inc. for 100% of the membership interests in Holdings. Next, MLH remitted 45% of its membership interests in Holdings to TA in satisfaction of certain debt securities previously issued by MLH and all obligations outstanding under such debt securities, including accrued but unpaid interest and the redemption of stock purchase warrants in MLH.

<u>USA Investigation and Lawsuit</u>

15.     The Company, like other clinical laboratory companies, participates in the Medicare and Medicaid programs, and is subject to regulation and oversight by various federal, state, and local government agencies. These agencies regulate and oversee a wide variety of subjects, including licensure and operation of clinical laboratories, payment for laboratory services, healthcare fraud and abuse, and various safety issues, including quality, environmental, and occupational safety.

16.     Beginning in early 2012, the Company's business became subject to an investigation by the Office of the United States Attorney for the District of Massachusetts, operating as an arm of the United States Department of Justice (the "<u>DOJ</u>"). The DOJ's investigation continued through 2014. The Company cooperated in the investigation, producing nearly 11 million pages of documents and meeting with the DOJ on numerous occasions to discuss, among other things, document productions and the general subject areas under investigation.

17.     In late December 2014, the DOJ informed the Company that the DOJ would be pursuing certain civil claims against the Company. Shortly thereafter in early 2015, the DOJ, on behalf of the USA, commenced negotiations and settlement discussions with the Company regarding the USA's claims. On March 19, 2015, the DOJ, on behalf of the United States of America ("USA"), filed a civil complaint in intervention in several already pending *qui tam* lawsuits against the Company. That complaint, like the relator complaints in the pending *qui tam* suits, was filed under seal.

<p align="center">CMS Notices of Revocation</p>

18.     By letter dated February 9, 2015, Noridian Healthcare Solutions, LLC ("Noridian"), a Medicare Administrative Contractor ("MAC") of the Centers for Medicare and Medicaid Services ("CMS") notified the Debtors that, effective as of March 11, 2015, Millennium's Medicare billing privileges would be revoked on account of alleged administrative billing abuses relating to claims allegedly submitted by Millennium for services provided, after their dates of death, to 59 Medicare beneficiaries. On February 19, 2015, the Debtors provided Noridian with notice that it was seeking reconsideration of Noridian's findings that a basis existed for revoking the Company's Medicare privileges.

19.     Medicare reimbursement is the Debtors' largest single source of revenue by a considerable margin. Additionally, a revocation of the Company's Medicare billing privileges could trigger defaults under and/or termination of many of the Debtors' commercial payor contracts. Thus, termination of these billing privileges could cause an immediate and potentially near-complete loss of revenue and be fatal to the Debtors' business.

20.     The Company met with CMS on March 4, 2015 to discuss the revocation action. Following the March 4th meeting with CMS, counsel for Millennium contacted DOJ and

<p align="center">9</p>

Additionally, on April 27, 2015, the CMS MAC issued an appeal decision finding that Millennium had been underpaid for certain claims that were part of a claims review separate from the review that resulted in the overpayment determination.

Settlement Discussions with DOJ, CMS, and the Office of Inspector General

25.    As noted above, beginning in March 2015, the Debtors were involved in negotiations and settlement discussions with the DOJ, on behalf of the USA, and certain plaintiff states (the "Plaintiff States" and together with the USA, the "USA Settlement Parties"). The settlement discussions led to the execution of a Terms Sheet (the "USA Terms Sheet").

26.    In conjunction with a potential settlement with USA, on April 30, 2015, the Debtors sent a letter to OIG to begin discussions regarding a Corporate Integrity Agreement ("CIA"). The Debtors then met with OIG on May 5, 2015 to initiate the process of agreeing upon the CIA's terms. The Debtors and OIG continued discussing the terms of the CIA while the Company continued its settlement discussions with the USA Settlement Parties.

27.    On May 20, 2015, Millennium entered into the USA Terms Sheet with the USA and certain Plaintiff States, which contemplated, among other things, the resolution of the pending investigative and administrative matters. The USA Terms Sheet provided, in relevant part, that the Company would pay $256 million[7] to the USA Settlement Parties to settle the USA's and Plaintiff States' allegations. The settlement payment was conditioned upon, among other things, the resolution of the CMS revocation proceeding and OIG's agreement to not exercise its permissive exclusion authority against the Debtors. The USA Terms Sheet also outlined certain releases and dismissals to be granted by the USA Settlement Parties.

---

[7]    The settlement initially provided that the Company would pay $250 million in total consideration and was later amended to provide for a payment by the Company of $256 million in total consideration to resolve the alleged outstanding Noridian overpayment amount.

11

Restructuring Negotiations With Prepetition Lenders

28.     Immediately following the Company's May 20, 2015 execution of the USA Terms sheet, the Company disclosed the primary terms of the proposed settlement to the Prepetition Lenders. An ad hoc group of Prepetition Lenders (the "Ad Hoc Group") organized in June 2015 and retained advisors. At the same time, the Company and its advisors prepared an updated five-year forecast which reflected the expected impact on the Company's business of, among other things, (a) changes in reimbursement trends, (b) the proposed settlement with the USA Settlement Parties, (c) projected post-settlement operational adjustments required under a CIA, and (d) additional regulatory pressures. The Company concluded that its capacity to service its debt had diminished. Accordingly, the Company, the Ad Hoc Group, and the Members engaged in discussions to develop and implement a transaction to satisfy the Company's monetary obligations under the proposed settlement with the USA Settlement Parties and restructure the financial obligations of the Company.

29.     In the course of negotiations, the Ad Hoc Group articulated claims and causes of action against the Members in connection with the April 2014 Transaction. The Members deny any liability. Accordingly, the scope of the negotiations expanded to encompass a resolution of these issues as well.

Negotiations Leading to the RSA and USA Settlement Agreements

30.     Following the execution of the USA Terms Sheet, the Company continued to negotiate with the DOJ on behalf of the USA, the Plaintiff States and other parties in interest. On July 22, 2015, the Company informed the DOJ that (1) it would not be able to pay the lump sum settlement amount originally negotiated due to the financial state of the Company and its debt burden; and (2) a restructuring of the Company would be necessary to facilitate the

12

settlement payment. On July 22, 2015, DOJ set a mid-September 2015 deadline for the Company

to present a payment plan that could be approved by the USA's financial analysts at DOJ. By

mid-August 2015, the respective counsel to MLH, TA and the Ad Hoc Group were involved in

negotiations with the DOJ.

31.     On September 21, 2015, the parties informed the DOJ that they had the

framework for a proposal that would allow the Company to satisfy its monetary obligations

under the Terms Sheet. Subsequently, the DOJ, on behalf of the USA, set October 2, 2015 as the

deadline (the "USA Deadline") by which the Company was required to finalize its proposal

supported by the Prepetition Lenders, MLH, and TA for funding the Company's monetary

obligations under the settlement embodied in the USA Terms Sheet.

32.     During a September 30, 2015 meeting between the DOJ, on behalf of the

USA, the Company and its counsel, counsel to the Ad Hoc Group, counsel to MLH, and counsel

to TA, the USA agreed to extend its USA Deadline to October 16, 2015 (and CMS agreed to

extend the revocation effective date to the same date) in exchange for, among other things, the

Company's promise to pay an initial $50 million deposit toward its obligations under the USA

Terms Sheet. Specifically, by October 16, 2015, the Company was required to (i) execute

definitive settlement agreements with the USA Settlement Parties, including CMS, (ii) fund the

$50 million deposit, and (iii) establish irrevocable support of a restructuring of the Company's

financial obligations evidenced by a restructuring support agreement between the Company,

Prepetition Lenders holding at least a majority in number and 66 2⁄3% in amount of outstanding

principal under the 2014 Credit Agreement, and TA and MLH.

33.     After nearly four months of intense settlement discussions and

negotiations among the various parties in interest, the parties were ultimately successful in

13

things, full and complete releases. In that scenario, the USA could seek to terminate the Debtors'

Medicare billing privileges, which could be fatal to the Debtors' business.

107.    The RSA was intensively negotiated among the Debtors, the Prepetition

Lenders, and the Members at arms' length over a period of several months and provides the

framework for an expeditious and value-enhancing restructuring and binds the Debtors' key

stakeholders to support that restructuring. Again, as required by the RSA, sufficient holders of

Existing Credit Agreement Claims have voted to accept the plan, thus positioning the Debtors for

prompt consummation of a consensual Plan. Absent timely consummation of a Plan consistent

with the RSA, the Debtors would have no practical means to satisfy their monetary obligations

under the USA Settlement Agreements, which could result in termination of the Debtors'

Medicare billing privileges. As stated above, I believe termination of Medicare billing privileges

could be fatal to the Debtors' business. I believe that the RSA represents the Debtors' the best

opportunity to successfully restructure and maximize the value of their estates.

108.    Additionally, assumption of the RSA and USA Settlement Agreements is

required under the RSA. Accordingly, I believe that prompt assumption of all such agreements is

in the best interests of stakeholders.


Dated:  San Diego, California
        November 10, 2015


                                        By:     */s/ William Brock Hardaway*_____
                                                Name: William Brock Hardaway

45

# EXHIBIT 3



Boston ▪ Menlo Park ▪ London ▪ Mumbai

TA Associates, Inc.
64 Willow Road
Suite 100
Menlo Park, CA 94025

Telephone (650) 473-2200
Fax: (650) 473-2235

www.ta.com

## WARM DEAL MEMORANDUM

**TO:**    Investment Staff

**FROM:**    JMM, JTC, JRH, MWH

**DATE:**    May 6, 2010

**RE:**    Millennium Laboratories, Inc.

### Overview

Millennium Laboratories, Inc., based in San Diego, CA, is a leading provider of therapeutic drug testing, monitoring, and education to physicians and staff treating chronic pain patients. Millennium Laboratories' medication monitoring services include qualitative, presumptive urine testing at the point of care; quantitative confirmation testing; and assistance interpreting the results. The Company has created a scalable, centralized laboratory utilizing liquid chromatography-mass spectrometry/mass spectrometry (LC-MS/MS) technology.

Founded in 2007, the Company has seen explosive growth in sales and EBITDA over the past two years. Millennium had 2008 revenue and EBITDA of $11.9 million and $6.8 million, respectively, and 2009 revenue and EBITDA of $66.3 million and $43.2 million, respectively. Millennium is projecting 2010 revenue of $128.0 million and EBITDA of $80.0 million, representing current year growth of 93.1% and 85.1%, respectively.

### Deal Background

JMM first heard about Millennium during a banker meeting at the JP Morgan Healthcare Conference in San Francisco in early 2010. We were told the Company had grown very quickly and CJC promptly followed up and was able to connect with David Cohen, the COO at Millennium, on January 29th. JMM, JTC and CJC met with Jim Slattery, the founder and CEO, and David Cohen on March 11th at the Company's offices. After a very interesting first meeting, JMM and JTC visited Jim and David again on March 31st to present a minority proposal to the Company. After subsequent conference calls and another meeting with Jim, David and Howard Appel, the President, TA signed an LOI with Millennium on April 22nd, 2010.

1

CONFIDENTIAL    TA_MLH-00085500

**Proposed Transaction**

On April 22nd, TA signed a term sheet and was granted 30 days of initial exclusivity (with 15-day auto-extensions) to acquire 49% of the Company at a $400 million enterprise value representing a valuation of 9.3x 2009 EBITDA, 4.2x Q1 2010 run rate EBITDA, and 5.0x 2010 EBITDA. The structure also contemplates a shifting range of TA ownership from 45% to 53% should TA's exit value be above or below a 3x (i.e. TA ownership shifts to 45% at an exit value of $1.5 billion and 53% at an exit value of $900 million). The transaction contemplated would be funded with TA equity in a manner as to maintain the Company's current Subchapter S structure. Jim, the CEO and founder, owns approximately 94% of the Company and plans to continue running the business going forward.

**Compelling Positives**

- High Margin, Fast Growth Business – For a company that saw its first dollar of revenue in 2008, Millennium has experienced tremendous growth and margins. Millennium has generated these results on the basis of providing quality quantitative testing services with a rapid turnaround time and a high level of customer service tailored to pain physicians. The Company has funded itself through internally generated cash flow from operations and has essentially been profitable since inception. Margins are impressive with gross and net income margins in excess of 80% and 60%, respectively. The Company has achieved its high margins to date due to a combination of high reimbursement from out-of-network payors and additional scale and leverage from its state of the art lab system.

- Growing Market Opportunity – The American Academy of Pain Management, the American Pain Society, and the American Society of Addiction Medicine issued a consensus statement in 2004 regarding the responsibilities of healthcare professionals in the use of opioids for the treatment of pain. Healthcare specialists increasingly recognize the need for vigilance and close monitoring relating to the prescription of opioids in order to avoid non-compliance, misuse, and potential diversion of patient medications. As such, Urine Drug Testing (UDT) is increasingly becoming clinical best practice among pain specialists, and its importance is gaining awareness among general practitioners as well. While the use of drug testing and medication management is increasing, there are still a number of specialists and general practitioners who don't use such services and the market is expected to grow as adoption increases.

- Increasing Legislative Mandate – To date, 33 states have enacted legislation requiring prescription drug monitoring programs with 25 of those programs currently operating and eight in the start-up phase. 15 additional states are in the process of proposing, preparing, or considering legislation. These states include Alaska, Arizona, Arkansas, Delaware, Florida, Kansas, Maryland, Minnesota, Missouri, Montana, Nebraska, New Jersey, New Hampshire, Oregon, and South Dakota. As states continue to establish and enforce legislative measures encouraging and requiring medication management related to pain treatment, the market opportunity will grow and utilization will increase.

- Strong Clinical Drivers – There is a growing list of reasons why UDT is a vital tool for pain specialists. It provides critical data to avoid unexpected or unknown drug

2

CONFIDENTIAL                                                                                          TA_MLH-00085501

# EXHIBIT 4

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

---------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

     Debtors.

MARC S. KIRSCHNER, solely in his

capacity as TRUSTEE OF THE

MILLENNIUM CORPORATE CLAIM TRUST,

      Plaintiffs,

  vs.

JPMORGAN CHASE BANK, N.A.,

CITIBANK N.A., BMO HARRIS BANK,

N.A., and SUNTRUST BANK,

     Defendants.

---------------------------------------X

  VIDEOTAPE 30(b)(6) DEPOSITION OF

     JENNIFER M. MULLOY

    VIA ZOOM VIDEOCONFERENCE

      July 14, 2021

      10:06 a.m.

Reported by:

Maureen Ratto, RPR, CCR

Page 14

JENNIFER M. MULLOY

Q. And once an investment is approved and partners are appointed, are there other groups or committees that periodically, for example, a portfolio committee, to whom sponsors report?

A. We have a number of different committees that monitor our portfolio. There is a valuation committee and portfolio committee that reviews the valuations of our portfolio companies. There are a number of different processes throughout our firm that touch all the different portfolio companies.

Q. Would TA Associates and its funds be something called a private equity investor?

A. Yes.

Q. And so when you talk about valuation, there would be some kind of valuation formed of the particular equity interest that TA has in a portfolio company?

MR. POPOVSKY: Objection to form.

Page 15

JENNIFER M. MULLOY

A. We -- when we invest there is a valuation set and then at least typically there is a quarterly valuation on the books that is held, at least that's how we do it and I imagine most people do.

Q. Now, this exhibit with the Warm Deal Memorandum, which proposes a transaction involving Millennium Laboratories, that was, in fact, approved and undertaken, correct?

A. Yes. I don't know that it was exactly as described here. As is often the case, the details can evolve but this was -- this was ultimately approved.

Q. Well, if you -- you've anticipated my question.

If you go to page 2 of the document under the Proposed Transaction it refers to a term sheet and I understand this is just a very high level description, but in the middle it refers a shifting range of TA ownership from 45% to 53% should TA's exit value be above or

Page 16

JENNIFER M. MULLOY

below a 3x figure. Do you see that?

A. Yes, I see that.

Q. Is that ultimately your best recollection of what happened?

A. I don't recall if it's exactly as described here, but directionally that -- that was the directional structure. You know, things do sometimes change between a term sheet and final deal, so I just don't recall every last detail but I think that was pretty close to what eventually was the deal structure.

Q. What is meant by exit value?

A. That means when we ultimately sell a portfolio company the value at which that portfolio company is sold.

Q. And would a leveraged recapitalization with a dividend also constitute an exit for purposes of TA investments?

MR. POPOVSKY: Objection.

MR. BRACERAS: Objection.

A. Yes, please.

(Pending question is read back

Page 17

JENNIFER M. MULLOY

by the reporter.)

A. I would not -- I would not typically think that would be the case. Usually we're talking about a sale or, you know, a sale of the company 100%.

Q. In connection with the leveraged recapitalization and dividend of Millennium in 2014, was TA's investment, it's original 2010 investment, viewed as an exit such that its ownership went to 45%?

MR. BRACERAS: Objection.

MR. POPOVSKY: Objection, form.

MR. BRACERAS: You can answer, Jen.

A. Okay. Can you repeat the question, actually?

Q. Sure. In connection -- you received a -- TA received a dividend in 2014 in connection with Millennium, correct?

A. Yes.

Q. And it received an equity

5 (Pages 14 - 17)

Page 18

JENNIFER M. MULLOY

interest in the direct parent of
Millennium of 45%; is that correct?

MR. POPOVSKY:  Objection to
form.

A.   I believe so.

Q.   Now, how is the 3x figure
determined? Why is that -- is that a
particular target that is often used?

MR. BRACERAS:  Objection.

A.   Yes. Sorry.

MR. BRACERAS:  That's fine.

THE WITNESS:  I'm not used to
all these objections.

MR. TRETTER:  I'm not either.

A.   The 3x is a -- is the goal of
our investment returns.  And so we
typically, when we're talking to
companies about an investment, talk about
a goal of a 3x return over a period of
several years within the life of our
investments.  And if there is interim
liquidity along the way that, you know,
gets to that level, even if it's viewed
as a step along the way, you may elect

Page 19

JENNIFER M. MULLOY

to, you know, view that as sort of a stop
along the process that would then lead to
something like the 45% here referenced.
It wasn't viewed as an exit at the time,
obviously.

Q.   In general, what is the timing
of or the goal in terms of timing for
receipt of the 3x investment?

MR. BRACERAS:  Objection.

A.   Our funds have a ten-year life
that we are given capital to invest on
behalf of our limited partners and the
first few years of that ten-year life
were typically investing and then over
the next several years were hopefully
growing those companies and helping them
appreciate and then monetizing in the
back part of that ten-year period and
then sometimes, you know, we'll have
extensions.

We often, when we're talking
to companies, talk about a goal of a 3x
return in, you know, something like three
to six years.  But it can range from, you

Page 20

JENNIFER M. MULLOY

know, shorter to on the outside, you
know, ten-plus years.

Q.   Was there a particular TA fund
that made the majority of the investment
in Millennium?

A.   Yes.

Q.   Which TA fund was that?

A.   There are typically a couple,
but the main fund -- and the main fund
was TA XI.

Q.   XI, and that's a Roman
Numeral?

A.   Yes. Yes.

Q.   And how far into the life of
TA XI was it when you made the investment
in Millennium?

A.   This happened to be the first
investment in TA XI, I believe, which is
just a coincidence of timing.

We raise funds and then
different portfolio companies, depending
on when they -- the opportunity arises,
sort of fall into different funds
chronologically typically.

Page 21

JENNIFER M. MULLOY

Q.   Is it your recollection that
TA, the initial investment in Millennium,
was 196 million?

A.   Yes.

Q.   And that was in the form of
debentures and warrants?

A.   Yes.

Q.   If you would turn to page 8 of
this exhibit, there's a category called
Issues?

A.   Yes.

Q.   And there is a statement at
the end of the first paragraph, "We
believe Millennium's margins will
decrease over time through a combination
of going 'in network' with its payors and
the potential for Medicare to reduce its
reimbursement period."

Was that true and accurate at
the time of your belief of the sponsors?

A.   Yes. We believed it to be.

Q.   And there is a second bullet
point, "Was currently approximately one
third of Millennium's revenue comes from

6 (Pages 18 - 21)

Page 22

JENNIFER M. MULLOY

Medicare." And it said, "Future changes to the reimbursement for these codes would materially impact Millennium's profitability."

Did you believe that to be true and correct at the time?

A. This is a section in which we sort of highlight potential risks, and so this was a potential risk that we had identified in our due diligence.

Q. There is a reference to CPT codes. Do you see that?

A. Yes.

Q. And you understand that those are codes that are used by medical professionals to designate a particular, in this case, laboratory test?

A. Yes.

Q. And in addition to CPT codes, were you aware at this time that, at least on the Medicare side, that there were contractors called Medicare Administrative Contractors?

A. I don't know. I learned -- I

Page 23

JENNIFER M. MULLOY

learned more about that term. I don't remember what I knew exactly about that term at that moment in time.

Q. Okay. If you go to the next page, there is a -- there's more bullet points under Issues and one of them is Team New to Healthcare. Do you see that?

A. Yes.

Q. And towards the middle it says, "Given the highly regulated and reimbursement sensitive environment in which they" -- meaning management -- "operate, it is unclear whether they have the knowledge or right individuals in place to navigate this tricky requirement."

MR. POPOVSKY: Objection. It says "unclear to us".

MR. TRETTER: Okay. "To us." I'm sorry.

Q. Do you -- do you recall whether TA, as part of its diligence into Millennium, talked to any of Millennium's outside clients, consultants or auditors?

Page 24

JENNIFER M. MULLOY

A. I can't recall exactly with whom we spoke.

Q. Well, do you have any recollection, sitting here today, of performing diligence with anyone other than a Millennium employee or board member?

MR. POPOVSKY: Objection to form.

A. Yes. We always do a range of due diligence when we're looking at investments, and so typically we will hire accountants to help review financials as well as legal counsel to review the company's legal processes and if -- and it's always tailored to the company and the specifics of that company and I believe we did that here, just as we do with all of our investments.

Q. I'm not talking necessarily about your own advisors but I'd like to -- while we're on that subject, did you use KPMG to help you vet this investment?

A. I believe we did.

Page 25

JENNIFER M. MULLOY

Q. And did you use a law firm? Was it Goodwin?

A. Yes. And yes, I presume it was Goodwin.

Q. Okay. What I was trying to get at was whether you can recall either yourself or KPMG or Goodwin speaking with advisors of Millennium?

MR. BRACERAS: Objection.

MR. POPOVSKY: Join.

A. I can't recall or I couldn't say.

Q. All right. Let's go to tab 2, which we'll mark as Exhibit 181.

(Plaintiff Exhibit 181, email string dated April 11, 2011, Bates ML_DE_00718791 was received and marked on this date for identification.)

MR. TRETTER: Is that available now to the defense group?

MR. POPOVSKY: Not yet. I will let you know.

CONCIERGE: It should be now.

7 (Pages 22 - 25)

Page 26

JENNIFER M. MULLOY

MR. POPOVSKY: All right. I can see it.

Q. This exhibit reflects a couple of emails in April of 2011 regarding a lawsuit that was filed against Millennium by a company called Ameritox.

Do you recall learning at some point that that litigation had been filed?

A. Yes.

Q. What generally, once the investment had been approved and made by TA, did TA do to stay abreast of legal matters at Millennium?

MR. POPOVSKY: Objection.

MR. BRACERAS: Objection.

A. So just as a reminder, we were -- we were debt holders here and looked at debenture and warrant, and we were observers for the board. So we monitored the company in that capacity.

I can't recall why specifically this email came from Bingham, for example. It was a long time

Page 27

JENNIFER M. MULLOY

ago. But -- but we monitor and track all of our portfolio companies and something like, you know, litigation we would obviously hope to be aware of and monitor.

Q. Did TA have observer status on the board of Millennium Holdings?

A. TA had observer status. I can't remember the exact entity, but we had observer status.

Q. Would you have, from time to time, access to the General Counsel to find out if there was anything important going on from the legal point of view of the company?

MR. POPOVSKY: Objection to form.

A. We -- we monitored the company as -- as we typically would and that would include conversations with different people at the company. I can't recall which specific people at the company.

Q. Well, did you have contact at

Page 28

JENNIFER M. MULLOY

the company with its then CEO and Chairman, Mr. Slattery?

A. Yes. We had connect with him.

Q. And its president, Mr. Appel?

A. Yes. And I can't recall if I spoke to their General Counsel versus other people.

Q. But if you had wanted to ask a question, you could have?

A. Yes.

MR. POPOVSKY: Objection.

MR. BRACERAS: Objection.

Q. Why don't we go to our next document, which is tab 3, I guess Plaintiff's Exhibit 182.

(Plaintiff Exhibit 182, email dated December 16, 2011, Bates ML_DE_00719881 was received and marked on this date for identification.)

MR. POPOVSKY: It's available to defendants.

Q. This is a series of emails in December of 2011. You can see that

Page 29

JENNIFER M. MULLOY

there's the name Benjamin Chiarelli, C-H-I-A-R-E-L-L-I, who is affiliated with JPMorgan.

Did you know Mr. Chiarelli at that time?

A. I don't recall.

Q. There is a reference in the top email by Mr. Appel to Mr. Chiarelli about an NDA. Do you understand that to be a non-disclosure agreement?

A. Yes.

Q. And there is a discussion of an analysis by JPM with a business and range of options and at the end it says, "You also indicated in our prior discussions to assess if a fully underwritten JPM deal is possible." Do you see that?

A. Yes.

Q. Were you aware in this time period that Millennium was retaining JPMorgan to perform an initial analysis of the business and perform a -- and to analyze a range of options?

8 (Pages 26 - 29)

Page 30

JENNIFER M. MULLOY

MR. POPOVSKY: Objection to form.

A. I don't recall with specificity. I see I'm copied on this email, the original email that references a Harry, which I presume was maybe an accidental email that was meant for Howard.

I know that the company looked at strategic alternatives a number of times and this must have been, you know, one of those times but I can't recall with specificity.

Q. You mention the term "strategic alternatives". Is that, for example, a sale of the company?

A. When I use the term strategic alternatives we typically view it as looking at a potential, for example, sale to a strategic, sale to a financial sponsor, an IPO, other liquidity options, allá a debt financing.

So we'll often look at a range of alternatives on behalf, you know.

Page 31

JENNIFER M. MULLOY

Q. And one of those could be a leveraged recapitalization with a dividend?

A. Sometimes.

Q. And when you see something like a fully underwritten JPM deal, do you understand that to be some sort of leveraged finance that would be underwritten by JPM on a firm commitment as opposed to a best efforts basis?

MR. BRACERAS: Objection.

MR. POPOVSKY: Join.

A. I wouldn't be able to -- that would be my guess but I wouldn't be able to say more specifically, just -- I didn't write this email.

Q. I'm just saying -- I'm just saying your understanding as a reader of this email, when you saw something like this in 2010 would that be consistent with your understanding?

MR. BRACERAS: Objection.

A. That would be my guess.

Q. All right. That's all I have

Page 32

JENNIFER M. MULLOY

on that document. Let's go to tab 4.

(Plaintiff Exhibit 183, email dated January 17, 2012, Bates ML_DE_00720021 was received and marked on this date for identification.)

MR. TRETTER: By the way, if you ever need a break just signal that you want a break and we'll go off the record.

THE WITNESS: Thank you. I appreciate it.

MR. POPOVSKY: Defendants can see what's marked as Exhibit 183.

Q. This is just a couple of emails in the January 2012 time period between you and Mr. Appel of Millennium. It refers to an investment in TA Fund III.

Did any Millennium executives, themselves, invest in the TA funds?

A. We -- I believe what he's referring to here is what is sort of described, at least at that time maybe,

Page 33

JENNIFER M. MULLOY

as our strategic partners or strategic partners fund and sometimes we have a small, a relatively small pool of capital that executives or others that have worked with TA either in the past or sometimes currently invest in. So I think that's what he's referring to here.

Q. Did, in fact, Millennium executives invest in TA Fund III?

MR. POPOVSKY: Objection to form.

A. I think a couple of them did. I would have to look back to say specifically. I actually don't -- I don't recall exactly who did. It's a large number of people who -- who are sometimes in that small pool of capital.

Q. And when you say "a small pool of capital", what is the total pool of capital?

A. I don't recall. It's a -- it's a subset of what we do and a -- and a very small one relative to our funds under management.

9 (Pages 30 - 33)

Page 34

JENNIFER M. MULLOY

Q.   And what did TA Fund III invest in, private companies?

A.   Yes. They would just invest alongside all our other investments in that period of investment.

Q.   Do you have any recollection in dollar terms of size of the Millennium executives' investments?

MR. BRACERAS:  Objection, form.

A.   I do not.

Q.   All right. That's all I had for that document.  Let's move to tab 5, which will be Plaintiff's Exhibit 183 -- 184.

(Plaintiff Exhibit 184, email dated February 12, 2012, Bates ML_DE_00720405 was received and marked on this date for identification.)

MR. POPOVSKY:  Defendants can see exhibit with Bates ending 0405, Exhibit 184.

Q.   This is a series of emails

Page 35

JENNIFER M. MULLOY

between representatives of JPMorgan, Millennium and TA in around February of 2002.  And if you go to the back of the document which is numbered 4 there is the earliest in time email from Mr. Appel to some of the JPMorgan people copied to you with the subject Meeting. There's a discussion about kicking off a process and, you know, the prior page number three about a transaction being an important first step in a relationship with you.

Do you recall that in or around this time period Millennium engaged in a transaction with JPMorgan?

A.   Again, this would be an example of sort of looking at strategic alternatives of some sort. I can't recall the full range of alternatives that were being considered back then but this would be the start of exploring -- this is an example of the start of exploring that.

Q.   All right. That's all I had on that document.

Page 36

JENNIFER M. MULLOY

If you turn to the next one, which will be 185, we'll discuss that when it appears on the Defendants' screen.

CONCIERGE:  Tab 6?

MR. TRETTER:  It is. Thank you, Hiawatha.

(Plaintiff Exhibit 185, Recapitalization Agreement dated March 29, 2012, Bates TA_MLH-00085302 was received and marked on this date for identification.)

MR. POPOVSKY:  Defendants can see what's marked as 185 with Bates number ending in 5302.

Q.   Thank you.  Exhibit 185 is something called a Recapitalization Agreement and it has some recitals, some substantive provisions, signature pages and then some schedules.

If I can first direct your attention to the first page, the document is dated March 29, 2012 and the -- let's

Page 37

JENNIFER M. MULLOY

see -- the fourth or third "whereas" clause referred to a Senior Credit Agreement. Do you see that?

A.   Yes.

Q.   Do you recall that in or around March of 2012 Millennium entered into a Senior Credit Agreement with JPMorgan and other bankers or institutional investors?

A.   I probably recall that. I couldn't tell you which banks exactly offhand, but yes.

Q.   It was a small group of maybe six to eight lenders.

A.   I don't recall.

Q.   Do you recall that at that time there was a restatement or exchange of TA's investment in Millennium?

MR. POPOVSKY:  Objection.

Q.   In debenture and warrants, specifically, that they were exchanged for -- the original warrants were exchanged for new debentures and warrants?

10 (Pages 34 - 37)

Page 122

JENNIFER M. MULLOY

be Howard Appel of Millennium?

A.   Correct.

Q.   So was it the practice of JPMorgan to send to TA liquidity proposals prior to sharing them with the portfolio company, itself?

MR. BRACERAS:  Objection.

MR. POPOVSKY:  Objection as outside the scope, among other things.

MR. BRACERAS:  She can't know what JPM's practice is.

Q.   Let me ask you this, was it -- did you often receive from bankers investment or liquidity proposals with respect to portfolio companies before the management of the portfolio company did?

MR. BRACERAS:  Object.

MR. POPOVSKY:  Objection.

A.   I mean, we often get proposals all the time on different alternatives for our companies. So that's -- that's a typical practice.

The sequencing of it is -- is

Page 123

JENNIFER M. MULLOY

nothing, nothing that I particularly comment on. It's just a -- but we do get lots of proposals all the time with lots of ideas from people.

Q.   And at this point TA was still just a debt -- a minority, a debenture investor?

A.   Correct.

Q.   Do you recall whether at this time in mid 2013 the JPMorgan analysis or discussion materials were shared with Millennium management?

MR. POPOVSKY:  Objection.

A.   I don't recall.

Q.   Would it be fair to say that from TA's perspective prior to 2013 you were warming up to a dividend recapitalization despite the adverse or potential for changing of the structure and the adverse tax consequences?

MR. POPOVSKY:  Objection to form.

A.   I'd say it differently. I would say we were constantly assessing

Page 124

JENNIFER M. MULLOY

alternatives and this is an example of that, like we do in all our companies.

Q.   Let's go to tab 20, which will be 197, I believe.

(Plaintiff Exhibit 197, email dated November 5, 2013, Bates TA_MLH-00011678 was received and marked on this date for identification.)

CONCIERGE:  Yes, sir.

MR. POPOVSKY:  Defendants can see a document with production number ending 1678 marked as Exhibit 197.

Q.   These are some emails in November of 2013, subject is Millennium Acquisition Financing.  It appears to be the communication, at least the bottom one, between you and Tim Kennedy.

Do you recall Mr. Kennedy is the CFO of Millennium at that time?

A.   I believe so, yes.

Q.   Okay. And you're introducing him to somebody named Tony Marsh who had

Page 125

JENNIFER M. MULLOY

recently joined TA.

Do you recall at around the time Mr. Marsh was retained or joined TA?

A.   I don't recall exactly.

Q.   Do you recall that he was -- his main focus was on leveraged finance for your portfolio companies?

A.   Correct.

MR. POPOVSKY:  Objection.

A.   He works in -- he focuses in the capital markets area on behalf of all TA portfolio companies.

Q.   Did -- is  Mr. Marsh still with TA?

A.   He is.

Q.   And in this period was Mr. Marsh advising portfolio companies not only on acquisition financing but on leveraged loan recapitalizations and dividends?

A.   Tony works in all aspects of debt financing. He works on new transactions, existing portfolio, he helps out in all those different

32 (Pages 122 - 125)

Page 290

JENNIFER M. MULLOY

Did TA participate in any due diligence sessions with the arranging banks or potential lenders?

A. I don't recall if we were in any of those sessions.

Q. I'm going to introduce I think what will now be -- let me make sure I have the number correct -- Defendant's Exhibit 30.

(Defendant Exhibit 30, email dated March 26, 2014, Bates TA_MLH-00003968 was received and marked on this date for identification.)

A. Is this something that is in the binder or is this something new?

Q. This is something I will share with you. I appreciate your patience, just give me one moment. Again, this is Defendant's Exhibit 30. Let me share this so that you can see.

So this is an email from March 26, 2014, has the subject: ML Latest CIM Draft, it's from Tony Marsh. I will

Page 291

JENNIFER M. MULLOY

scroll down so that you can see the extent of the document.

Just stepping back from this particular document real quick, are you familiar with how the 2014 loan was marketed to potential lenders?

A. What aspects of that are you referring to?

Q. Are you familiar that a confidential information memorandum was put together for the 2014 debt recapitalization?

A. I expect that to be the case. I don't remember any of the details around it.

Q. In this email from Mr. Marsh, in response to an email from Alla Christoforou, in which he writes, "Attached is the latest CIM. We welcome any input." Mr. Marsh responded, "Can we add a Sponsor Overview section?" And also wrote, "It's really important that TA is visible on this one given it is such a marquis transaction for us. (Please also

Page 292

JENNIFER M. MULLOY

make sure we are mentioned in the LCD article). Trying to get more visibility for the firm in the institutional loan market that will help us on other deals."

Did TA want to be more visibly associated with this transaction?

A. I think by virtue of Tony's email, he's, you know, saying that we want and are proud to be associated in that context.

Q. Why did TA want to be more visibly associated with Millennium?

MR. BRACERAS: Objection.

A. Yeah, I mean, I think that Tony was just -- wanted to make sure that we were, you know, affiliated with the company as it related to talking to lenders.

Q. I'll stop sharing this document.

Just generally, did TA think that the 2014 dividend recapitalization with Millennium would be good for TA's reputation?

Page 293

JENNIFER M. MULLOY

A. Yes. We didn't think anything other than that.

Q. Did TA think that Millennium was likely to become insolvent following the April 2014 dividend recapitalization?

A. No.

Q. Would TA have wanted to be associated with that transaction if it thought that the debt would cause Millennium to become insolvent?

A. No.

Q. I'm just going to introduce one additional document. One moment. This should be Defendant's Exhibit 31.

(Defendant Exhibit 31, email attaching 2014 confidential information memorandum, Bates ML_DE_00005592 was received and marked on this date for identification.)

Q. This is a bit larger so it may take a second, apologies.

A. No problem.

Q. Ms. Mulloy, are you able to

74 (Pages 290 - 293)

Page 294

JENNIFER M. MULLOY

see this exhibit?

A. Yes.

Q. And I will represent to you that the attachment is a copy of the confidential information memorandum associated with the 2014 dividend recapitalization.

Now, if we scroll down to page ending in 5613, give me a moment to get there, there's a heading that reads Transaction Overview. Do you see that?

A. Yes.

Q. And if you look at the second paragraph there it reads, "The Company intends to use proceeds: i, repay the existing Term Loan A; ii, provide a distribution to shareholders; iii, redeem outstanding warrants debentures and stock options; iv, pay transaction related fees and expenses."

Is that how TA understood that the proceeds from this transaction would be used?

A. Yes.

Page 295

JENNIFER M. MULLOY

Q. In the table below that it lists several amounts in millions of dollars. What do those figures represent?

A. Are you referring to the sources and uses?

Q. Yes.

A. Yeah. Well, one side is the source of funding and the other side is where the funding will go.

Q. Sorry. I think our audio briefly cut out. Would you mind just repeating your answer?

A. One side has the sources of funding and the other side has where the funding will go.

Q. Thank you. The figure on the right, which is -- looks like $1,269.6 billion and it's labeled Distribution to Shareholders. Is that the dividend?

A. That I guess -- I would imagine that that would be -- that could be described as the dividend.

Q. And was it TA's understanding this confidential information memorandum

Page 296

JENNIFER M. MULLOY

was distributed to all potential lenders?

A. Yes, I would imagine so.

Q. Is it typical in these confidential information memorandums to state upfront the planned uses for proceeds?

A. I would imagine so, yes.

Q. Was the use of proceeds discussed in other materials distributed to potential lenders?

A. I don't know. I would presume so but I don't -- I couldn't say for sure.

Q. To TA's knowledge did potential lenders ask questions about the use of proceeds, of the proceeds?

A. I wasn't on the front lines for those conversations, so I couldn't tell you.

Q. Is TA aware of any potential lender who was provided inaccurate or incomplete information about the proceeds from the syndicated term loan?

A. Not to my knowledge.

Page 297

JENNIFER M. MULLOY

MR. ENGEBRETSON: I know we haven't been going too long. I will say I don't think that we'll have a ton more questioning, so if it's all right with the witness and with Plaintiff's counsel it might be helpful for us to take a very brief break.

MR. BRACERAS: That makes sense.

VIDEOGRAPHER: The time is 4:50 p.m. Going off the record.

(Recess is taken.)

VIDEOGRAPHER: The time is 5:02 p.m. Back on the record.

Q. Ms. Mulloy, I want to talk specifically about the fees paid in connection with the April 2014 dividend recap.

Just more generally, did individuals at TA have experience negotiating bank fees in connection with leveraged finance transactions?

A. Yes. And Tony Marsh

75 (Pages 294 - 297)

Page 298

JENNIFER M. MULLOY

particularly is in charge within TA of that negotiation.

Q. And he led those negotiations for the April 2014 deal, correct?

A. At least from the TA perspective, yes.

Q. And what was Tony Marsh's background or experience? What was Tony Marsh's experience with negotiating bank fees in connection with leveraged finance transactions?

A. He was a from a leveraged finance background, I believe and when he joined TA he was given the role of helping our portfolio companies on that.

Q. If we look now, I want to turn your attention to -- this should be tab 32, in your binder and this was introduced as Plaintiff's Exhibit 208. I'll give you a moment to turn to that.

A. Yes. Tab 32?

Q. Yes.

A. Okay. I've got it.

Q. And if you look down to early

Page 299

JENNIFER M. MULLOY

on in the chain, this is Mr. Marsh's email from 7:04 p.m. in response to an email from Ryan Griswold, Mr. Marsh writes, "I'm sorry but I'm a little confused. Is this your proposal on a stretch first lien? And does the fee proposal below really represent your most aggressive proposal? The fee proposal isn't even in the same neighborhood of where it needs to be. If I show this to the Company they will seriously throw it out the window."

Does Mr. Marsh's statement accurately reflect TA's reaction to Mr. Griswold's proposal?

A. Well, Tony wrote this but clearly he was looking for a more aggressive proposal, at least from my read of it.

Q. And when Mr. Marsh writes that, "the Company will seriously throw it out the window", is that referring to the fee proposal?

A. I would presume so.

Page 300

JENNIFER M. MULLOY

Q. Was Millennium aggressive in seeking low fees in connection with this transaction?

MR. TRETTER: Objection, form.

A. I believe that the company was trying to get the best pricing it could for the transaction.

Q. Was TA aggressive in seeking low fees in connection with this transaction?

A. Yes. Similarly TA was trying to help the company get the best proposals they could to review.

MR. TRETTER: Same objection.

Q. If we look up a little further, this is an email from Mr. Karanikolaidis -- I'm not as good as Mark -- and this is the one that spans 2844 to 2845. If you look at the end of his email he writes, "An underwrite would cost 2.25% and flex would roughly be 150 bps, depending on the length of the commitment."

What was TA's understanding at

Page 301

JENNIFER M. MULLOY

the time of what a market range for an underwriting fee would be on a loan transaction of this size?

A. I don't know what you mean by "market range".

MR. TRETTER: Objection.

Q. Would the 2.25% proposal here, to TA's understanding and based on TA's experience, is this a reasonable rate for a fee on an underwritten deal of this size?

MR. TRETTER: Same objection.

MR. BRACERAS: Objection.

A. I couldn't really opine on that specifically outside of the greater proposals that were included elsewhere in the binder.

Q. You forwarded this email to several individuals at TA and you wrote in the top there, "We've been playing JPM and Citi off each other here to good effect."

How was TA playing JP and Citi off each other?

76 (Pages 298 - 301)

# EXHIBIT 5
# (Filed Under Seal)

# EXHIBIT 6

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

----------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

        Debtors.

MARC S. KIRSCHNER, solely in his

capacity as TRUSTEE OF THE

MILLENNIUM CORPORATE CLAIM TRUST,

        Plaintiffs,

    vs.

JPMORGAN CHASE BANK, N.A.,

CITIBANK N.A., BMO HARRIS BANK,

N.A., and SUNTRUST BANK,

        Defendants.

----------------------------------------X


        "HIGHLY CONFIDENTIAL"

    VIDEOTAPE 30(b)(6) DEPOSITION OF

            RYAN GRISWOLD

        VIA ZOOM VIDEOCONFERENCE

            July 22, 2021

                9:00 a.m.


    Reported by:

    Maureen Ratto, RPR, CCR

Page 18

GRISWOLD - HIGHLY CONFIDENTIAL

Q.   Was anyone else present at this meeting?

A.   No.

Q.   Other than counsel that you've identified, have you spoken with anyone else regarding your deposition today?

A.   I have not, other than telling my wife that I was going to be deposed, but not on the topic.

Q.   Understood. How many meetings did you have with counsel?

A.   Three.

Q.   And approximately how long total did those three meetings last?

A.   I would say probably nine, ten hours, all in.

Q.   When was the first meeting?

A.   Last Monday or Tuesday, last Tuesday.

Q.   So the three meetings were all within the last seven to ten days?

A.   That's correct.

Q.   Did you email anyone at JPMorgan with any questions or requests

Page 19

GRISWOLD - HIGHLY CONFIDENTIAL

for information in preparation for the deposition?

MS. OSTRAGER:  Asked and answered.

A.   I did not.

Q.   Did you ask counsel to email anyone at JPMorgan requesting information for the deposition today?

A.   I did not.

Q.   Did you have any phone calls with anyone at JPMorgan, other than Justin who was in your meetings, in preparation for the deposition today?

A.   No.

Q.   And did you have any teleconference via Zoom or otherwise with anyone from JPMorgan in preparation for today's deposition?

A.   I did not.

Q.   Mr. Griswold, are you the most knowledgeable person at JPMorgan regarding Topics 1 through 7?

A.   I'm -- I'm very qualified to answer, you know, the line the

Page 20

GRISWOLD - HIGHLY CONFIDENTIAL

questioning on these topics.

Q.   Are you the most qualified individual at JPMorgan to answer those questions?

A.   Hard to say "most", but I'm very qualified, you know, yes.

Q.   Who else at JPMorgan would be qualified or knowledgeable to answer the questions on Topics 1 through 7?

A.   I mean, look, there's many people that worked on the deal team. But, again, why I'm hesitating, it's hard to calibrate relatively.  But I was, you know, definitely I'm very -- I'm very qualified. It's just relative but there was a lot of people on the deal team as I'm sure you've seen through emails, so...

Q.   And do you know the knowledge that those other individuals on the deal team have?

MS. OSTRAGER:  Objection.

A.   It's hard to know what, you know, is in people's heads.

Page 21

GRISWOLD - HIGHLY CONFIDENTIAL

Q.   And you didn't ask them in preparation for this deposition, did you?

A.   I did not.

MS. OSTRAGER:  Objection, asked and answered.

Q.   Mr. Griswold, most of my questions today are going to be focused on the 2014 transaction.

Just so we're on the same page, what is your understanding of what the 2014 transaction was?

A.   So the 2014 transaction was an underwritten dividend recapitalization of the company.

So what that means is, you know, the company is taking on a loan to facilitate a -- a dividend out to its owners.  So that simply would be the transaction that we did.

Q.   And when you say it's "underwritten", what do you mean by that?

A.   So in our business there is two types of transactions; there is best efforts and there is underwritten. But

6 (Pages 18 - 21)

Page 22

GRISWOLD - HIGHLY CONFIDENTIAL

best efforts would mean, you know, the bank takes a client through the market and whatever the terms of the deal are, you know, that's -- that's the outcome.

In an underwritten transaction, the bank actually commits to -- to providing the loan in the event the market falls away due to market conditions. And so, there is obviously a little bit more heightened risk in that situation and the company is essentially, you know -- or JPMorgan is essentially backstopping the transaction.

Q. And so JPMorgan backstopped the 2014 transaction; is that correct?

A. That's correct.

Q. Were there negotiations regarding whether this would be a best efforts or a fully underwritten transaction?

A. Not so much negotiations but there was debate and, you know -- and an attempt to understand the two options, sure.

Page 23

GRISWOLD - HIGHLY CONFIDENTIAL

Q. And who was the debate with?

MS. OSTRAGER: Objection.

A. Again, I don't think it's a debate. I think it was a conversation with both the owners and, ultimately, the company.

Q. And when you say "the owners", who are you referring to?

A. I'm referring to Jim Slattery, TA Associates and, you know, management has some ownership of the -- of the company as well.

Q. And when you say "the company", who were you referring to?

A. I'm referring to the senior management of the company.

Q. Was there anyone on the senior management of the company who was not also an owner?

A. Probably. Although, I don't recall. Right? There's three or four levels of management.

My guess is that not all of them had ownership. For example, you

Page 24

GRISWOLD - HIGHLY CONFIDENTIAL

know, Tim Kennedy, the CFO, I don't know if he had ownership; Brock Hardaway, I bet he had ownership; Howard Appel, I bet he had ownership. So that's my recollection. So I wouldn't want to make the statement that all, you know, that they're all one and the same.

Q. You referenced discussions that you had regarding the two options with the owners and the company. And my question is, is there -- there is an individual or anyone, other than the owners, who represented the company in those negotiations -- or discussions? I'm sorry. You said discussions.

A. Can you repeat it? Actually, I'm a little unclear on what you're -- what you're asking.

Q. Yes. That's fair.

You referenced and I believe you used the term "discussions" regarding the two options being best efforts or underwritten, and that those discussions were with the owners and with the

Page 25

GRISWOLD - HIGHLY CONFIDENTIAL

company.

My question is, who represented the company in those discussions, other than any of the owners?

MS. OSTRAGER: Object to the form.

A. Well, it all depends on who we had the conversations with. It was TA and it was Brock, Howard and probably Tim and probably their General Counsel, Martin Price. Those were the folks that, you know -- you know, we talked about we presented the options, we, you know, we -- we had back and forths on. And that would be customary, right? You wouldn't negotiate the type of a transaction with anyone other than the senior management or the owners.

Q. What was JPMorgan's preference for the two options?

A. Completely agnostic, whatever the client would like to do, both were, you know, imminently doable and felt

7 (Pages 22 - 25)

Page 26

GRISWOLD - HIGHLY CONFIDENTIAL

confident in either outcome.

Q.    As an underwritten deal you referenced earlier JPMorgan would take on more risk; is that correct?

A.    That's correct.

Q.    Is there an increased cost to the company for JPMorgan taking on an additional risk?

A.    Yeah, it's about double. And that is, you know, very much standard, very conventional.  And that is to account for, you know, the risk that the markets, which are volatile, you know, are in a much different spot from when we underwrote the transaction to when we syndicate the transaction and because of that market volatility, the potential that JPMorgan, you know, potentially loses money because of that market movement there is an increased cost to a company for doing that and that's, to this day, is all very standard.

Q.    And was there an increased cost in the 2014 transaction because it

Page 27

GRISWOLD - HIGHLY CONFIDENTIAL

was underwritten as opposed to best efforts?

A.    Are you asking relative to a best efforts transaction?

Q.    I am. Thank you for the clarification.

A.    Yes, there was. Again, about double.

Q.    And that was going to be my next question. I know you'd referenced general market.  And I wanted to know, specific to this transaction, was the cost to the company about double?

A.    Yes.  JPMorgan charges the same underwriting fee for a committed deal for any of the transactions we do. It's very very standard, it's two and a quarter percent, and that's a function of opportunity costs, it's a function of market convention, precedent, you know, again, all of those and most importantly, the market risk that you're taking on when you're signing up to a transaction.

Q.    So if JPMorgan has a standard

Page 28

GRISWOLD - HIGHLY CONFIDENTIAL

fee that they charge, are there any negotiations surrounding that fee?

A.    With regards to the committed deal, you know, people try to negotiate but it's really not negotiable, honestly.

We have a set amount of capital that we can deploy towards a committed deal.  There's many, you know, people that would like committed deals from JPMorgan.  And if folks are willing to -- you know, want something lower than the market norm, we'll move on and we're not willing to have that precedent, you know, in the marketplace because that would seriously impair our business.

So, you know, again, it's two, to two and a quarter, and that's kind of it.  There is not much negotiation around it at all, as opposed to a best efforts deal, there is more wiggle room.

Q.    Was there any negotiation surrounding JPMorgan's fee in connection with the 2014 transaction?

A.    My recollection is there was a

Page 29

GRISWOLD - HIGHLY CONFIDENTIAL

good bit of it on a best efforts deal or when, you know, they were exploring that option.  When it pivoted to a committed deal, you know, there may have been, you know, an attempt at negotiation but, you know, it really wasn't negotiable, you know, beyond maybe one, one or two back-and-forths.  But, you know, again, we probably proposed two and a quarter, we landed on two. There is no way it would have gone any lower than that.  We would have walked away.

Q.    You made a comment in your answer, "when it pivoted to a committed deal".  When did that occur?

A.    I'm trying to recall but probably,  you know, a month out, you know, three weeks, four weeks out, something like that from, you know, the ultimate path forward.  I guess.  We had about a month, you know, before going to market, is my recollection.

Q.    So would this, trying to put a timeframe on it, would this have been

8 (Pages 26 - 29)

Page 46

GRISWOLD - HIGHLY CONFIDENTIAL

this a little bit flexible.  But, again it's designed to generally coach them on how to launch a loan.

Q.   And it's designed to essentially provide an outline of the tasks that need to be done and the timing for completion of those tasks along the way; is that correct?

A.   I think that's accurate.

Q.   All right. Are each one of these tasks on the checklist required for a leveraged loan transaction?

A.   I think -- I think generally that's a fair statement, but, you know, every deal is different. So, again, you're going to -- you're going to morph a little bit.  Some may not be accurate, some other things could be introduced. Again, but this is if you're taking your regular way loan, you know, the vast vast majority of these are, you know, are adhered to.

For example, not all deals have, you know, highly confidence, not

Page 47

GRISWOLD - HIGHLY CONFIDENTIAL

all deals have -- sometimes you post a credit agreement a few days later or earlier.

So again, there's some judgment with probably most of these. But, again, I think it's a fair representation of a standard loan process.

Bank Meeting, right, sometimes you don't have a bank meeting, you have a call. Lender Presentation -- as we said here, Lender Presentations, not for every deal.

So,  again, there is some flexibility. This is not, you know, everything, every deal must look like this. It's a -- it's a fair characterization of what a loan looks like most of the time.

Q.   Did JPMorgan -- sorry.  Go ahead.

A.   For example, Check Stress Models, not all deals have stress models, right. So, again, I think this is an

Page 48

GRISWOLD - HIGHLY CONFIDENTIAL

attempt to remind people and then again, they use some professional judgment to say that is not applicable here or I need to do, you know, something a little bit above and beyond, you know, because of this situation.

Q.   Who, in a regular leveraged loan transaction, who on the deal team has the authority to decide whether or not items on this checklist are required?

A.   It depends on the significance. If it's something unusually significant, it would be the MD.  If it's something, you know, more, I don't know more menial or of lesser significance, a VP could do it, an associate could do it. Again, it's a collective deal team sort of judgment and conversation based on the circumstances of the deal.

Q.   If you look in the Settlement/Preclosing Checklist, do you see that on the right-hand side of the first page?

A.   Yes.

Page 49

GRISWOLD - HIGHLY CONFIDENTIAL

Q.   The third from the bottom within that is the Solvency Opinion. Do you see that?

A.   Yes.

Q.   Was there a solvency opinion for the 2014 transaction?

A.   I honestly don't recall. That is -- that is, you know, something that the lawyers typically deal with. So I don't -- I don't recall. I probably never looked at it, a solvency opinion.

Q.   And you don't know if there was a solvency opinion for the 2014 transaction?

A.   I don't.

Q.   Did --

A.   We had no reason to question the solvency of a such -- such a well performing company at the time.

Q.   Did you have any communications with anyone concerning a solvency opinion in connection with the 2014 transaction?

A.   Can you repeat that?

13 (Pages 46 - 49)

Page 50

GRISWOLD - HIGHLY CONFIDENTIAL

Q.   Yes. Did you have any communications regarding a solvency opinion with anyone in connection with the 2014 transaction?

What I'm trying to get at -- what I'm trying to get at is I understand you didn't see the opinion and you don't know if there was one or not. My question is, did you have any discussions of whether or not there was going to be a solvency opinion?

A.   I don't recall having any conversations about that. There was no reason to question the solvency. And my guess is if the company couldn't deliver a solvency opinion there would be no credit agreement.

So I believe you have a -- I think that's a conditions precedent to closing a loan is a company delivering a solvency opinion, if I understand the question right.

So again, there was -- there was absolutely no debate of whether this

Page 51

GRISWOLD - HIGHLY CONFIDENTIAL

company was solvent at the time.

Q.   And what do you mean "by the company delivering a solvency opinion?"

A.   I think, again, a little outside my expertise because I'm not a loan lawyer, but I believe a credit agreement has a solvency opinion that is -- that the company provides, I believe. Again, it's a little outside of my -- my area of expertise.

Q.   Is that solvency opinion a third-party opinion?

A.   There is not third parties brought in.  It's either -- I don't believe it's the bankers, and it's either the counsel or -- or the company providing it.

Q.   So it's a representation of the company as to the solvency of the company; is that right?

A.   That's my understanding.

Q.   You can put that exhibit away.

Mr. Griswold, earlier we were focusing on the timing of the 2014

Page 52

GRISWOLD - HIGHLY CONFIDENTIAL

transaction and I believe the discussions of the two options. I want to go back to that time and I think you referenced late 2013 was when the discussions commenced regarding a potential transaction.

When -- instead of me trying to put a timing on this, let me just ask the question. When was the 2014 transaction first started?

A.   You know, again, I don't recall the exact date and time. But I think the dividend transaction had been discussed for many months, if not years.

We did a deal in 2012.  The company had far exceeded its expectations and projections at that time. So, you know, it certainly happened in 2013 where we sort of -- we sort of told the company that they could do a dividend.  You know, we probably gave them those alternatives, you know, in probably closer to the end of the 2012 transaction and the beginning of the 2014 transaction, so let's call it, you know, middle of 2013. And then

Page 53

GRISWOLD - HIGHLY CONFIDENTIAL

the company didn't sort of start saying, you know, let's go until probably the latter parts of 2013. That's my recollection.

Q.   Who did JPMorgan first have discussions with regarding any potential dividend transaction? And, again, I'm talking about after 2012.

A.   Yeah. The first -- the first salvo (sic) was probably with TA Associates.

Q.   Why was the first communications regarding a dividend transaction for Millennium with TA Associates and not the company?

A.   So TA Associates is a private equity firm. They owned a large -- a large chunk of the company, I don't think majority but, you know, a significant amount. Being a private equity firm and dealing with the capital markets and loans and bonds and, you know, they're the most facile with regard to some of these alternatives.  So we wanted to at

14 (Pages 50 - 53)

Page 118

GRISWOLD - HIGHLY CONFIDENTIAL

cash, was the latter part of the debate here.

Q.   And what was the final decision or final outcome on the cash on the balance sheet?

A.   I believe we sent the vast majority of it out with the loan proceeds.

Q.   And the vast majority -- I'm sorry, Mr. Griswold.  I talked over you and I didn't hear your comment.

A.   I don't recall the exact specifics of how much we left, but it was -- but it was a majority of it, I believe.

Q.   The majority was left or the majority was sent out as part of the transaction?

A.   The majority was sent out.

Q.   And was that sent out as payment to the owners?

A.   Yes.

Q.   If you see an email from Ms. Li right in the middle of that page

Page 119

GRISWOLD - HIGHLY CONFIDENTIAL

she says, "I am concerned about the sheer size of the dividend." Do you see that?

A.   I do.

Q.   Was JPMorgan concerned about the sheer size of the dividend in March of 2014?

A.   So, look, it was a large dividend. I mean, I think it's fair to characterize it as such.

At some point the market says, you know, enough is enough.  And so I think, you know, we're all as team members debating, you know, what is that threshold where the market sort of has an emotional reaction just about the quantum, putting aside the leverage multiples, the company's ability to pay and all that, it's just an emotional reaction from the market, that, you know, they say enough is enough and they were having that debate.

It's not so much can the company handle it, it's just, look, it's a big dividend.  And as you pointed out

Page 120

GRISWOLD - HIGHLY CONFIDENTIAL

correctly, it was the largest for a debut.

So I think we're trying to manage, you know, the pure metrics of it, you know, ability to pay, leveraged multiple relative to enterprise value, all the sort of credit analysis we do which are very technical and unemotional, with the emotion of a lender looking at, you know, an investor saying, man, they're getting -- they're getting a good chunk of money, I'm not.  So, you know, it's just pure emotion that sort of takes over at that point, not credit analysis.

Q.   And we've talked a little bit about the size of the dividend, the overall size of the transaction, the 1.8 billion, the discussions about the cash on the balance sheet and that the vast majority of that cash was sent out as payment as part of the transaction to the owners.

So in connection with the 2014 transaction, TA Associates received a

Page 121

GRISWOLD - HIGHLY CONFIDENTIAL

benefit, correct?

MS. OSTRAGER:  Object to the form.

A.   TA got a dividend, yeah. If you want to say that's a benefit, sure.

Q.   But they had an initial investment in the company and they were able to essentially cash out on that initial investment and make a profit from that initial investment; is that correct?

A.   That's correct.

Q.   And the Millennium insiders received financial benefit as a result of the 2014 transaction, correct?

A.   The management team that had equity ownership, yes, they got a dividend and, you know, a benefit.

Q.   What benefit did the company get?

A.   So, again, it's a little gray because management, although, owners are also, you know -- I kind of lump them in with the company.  But, you know, doing a loan like this is -- is part of the

31 (Pages 118 - 121)

Page 122

GRISWOLD - HIGHLY CONFIDENTIAL
evolution of a company, right? You put together a lot of marketing materials, you put them in front of a new investor constituency, you put them in front of the rating agencies, all of those are, you know, designed to give them access to capital, access to, you know, to make acquisitions, to fund CapEx, to do a whole host of things. You know, so you're exposing them to a much broader, deeper capital market.

You're also giving them, you know -- it's almost like an IPO light, right? Because you are doing a lot of the same preparations for, you know, presentations and that sort of thing. Management is getting more comfortable telling the Millennium story.

So, you know, it's oftentimes an interim step to, you know, a broader capital markets exercise. And then the other benefits are, we're doing a ton of work for them, right? We're putting together the presentations, we're

Page 123

GRISWOLD - HIGHLY CONFIDENTIAL
coaching them, we're in there just in the weeds kind of making them more mature as an overall enterprise, I would say, getting their, you know, their presentations ready to go and that sort of thing.

So I think there's an immediate piece of just the work we did to prepare them, but then the -- the bigger benefit is, you know, putting them on a path to, you know, even bigger and better things, as well as, you know, access to other pockets of capital beyond the bank market.

Q.   The 2014 transaction increased the debt obligations of the company, correct?

A.   That's correct.

Q.   You referenced in your prior answer putting the company onto bigger and better things. Do you recall that?

A.   I do.

Q.   What bigger and better things was JPMorgan envisioning at the time of

Page 124

GRISWOLD - HIGHLY CONFIDENTIAL
the 2014 transaction?

A.   At the time of this transaction I think we all thought of Millennium as a potential IPO candidate, right?

So doing that would have clearly rewarded, you know, other constituency beyond just the C-Suite, right, of having the ability to give employees stock and that sort of thing.

So, you know, with the growth trajectory that we all believed in, we definitely saw that there were some other things, i.e., an IPO or they could have sold it to another private equity firm, right.  That would have -- there's other things that could have happened and this was an interim step and an IPO was definitely on the table.

Q.   Did JPMorgan have any rights to first refusal in connection with an IPO or a sale to private equity?

A.   I would be very surprised if they ever give you, you know, future

Page 125

GRISWOLD - HIGHLY CONFIDENTIAL
business, but we definitely would have been in a leadership position for the good work that we did here. You know, if you do a good job for a company, you know, unless you screw up, you are in a pull position, but nothing is ever promised to you in this very competitive market.

Our equity colleagues are different from our debt colleagues.  So, you know, who knows what would have happened down the road.  But so I would be surprised if it was promised.  But, look, we did a good job here, people were appreciative of the effort and, you know, I think that would have helped us down the road.

Q.   And that was part of JPMorgan's business was to do a good job in the hopes of having additional work with the company down the road, correct?

A.   We try to do a good job for every single company we do and want a long-term relationship out of all of our

32 (Pages 122 - 125)

Page 138

GRISWOLD - HIGHLY CONFIDENTIAL

Q.   If you look at the top under Project PadresMARL14, it's titled Dividend Recapitalization of Millennium Laboratories, Inc. by TA Associates. Do you see that?

A.   I do.

Q.   Why was the project by TA Associates?

A.   Just to highlight the fact that there was a private equity firm involved you would usually sort of say something to that regard. But I think "by" implies that they were doing it. I don't think that's accurate but it was an acknowledgment that there was a private equity firm involved.

Q.   And TA Associates was involved in the 2014 transaction, correct?

A.   They were.

Q.   And then you have a brief business description and then you have some fiscal year end numbers, revenue, EBITDA, margins, CapEx, correct?

A.   Correct.

Page 139

GRISWOLD - HIGHLY CONFIDENTIAL

Q.   Where did you get your -- and by "you" I mean JPMorgan -- where did you get the year end numbers for 2011, 2012 and 2013?

A.   A combination of, you know, the company and their historical financials that were audited by their auditor, you know, they were also, you know, in compliance certificates that they gave probably to adhere to the terms of the initial 2012 loan.

Q.   And at this point in time, which is March 14th of 2014, were the 2013 financials audited?

A.   It's March, so typically for a company they may -- the books have closed but they may be dotting I's and crossing T's on their actual audit. It may have been a draft audit, but it was far enough long that, you know, we had a good ballpark where it came out. I just don't recall whether it was an actual audit or, you know, that was done, you know, a few weeks later. You know, I would say it's a

Page 140

GRISWOLD - HIGHLY CONFIDENTIAL

12/31 year end. So I think -- I think it was the audit, though.

Q.   And then you also include estimates for 2014 and 2015, correct?

A.   Correct.

Q.   Where did JPMorgan get those estimated numbers from?

A.   That would have come from the company and their, you know, their model, their projections.

Q.   When you say "their model, their projections", are you referring to a particular model?

A.   As part of our underwriting due diligence you are typically given a model from the company from which, you know, you do your diligence off of and you try to understand it, you pressure test it, that sort of thing. I think that's the page prior, right, all those assumptions and output, you know, come from the company and then feed into some of our internal modeling to sort of diligence and say, you know, does this

Page 141

GRISWOLD - HIGHLY CONFIDENTIAL

margin profile, does that feel right? Is that growth rate, you know, is that in line with historicals? You know, you're sensitizing and questioning and asking, you know, every single line item that you're getting from a company in their model, but you got to start somewhere and that's from the company.

Q.   And again, I appreciate the description, did the company's model have a name that you're aware of?

A.   I mean, it had a file name that was sent across, you know, but I don't recall it had, like, some, you know, other more memorable name.

Q.   And have you heard it referred to as the Padres model?

A.   Not -- not that I recall but it very plausibly could have been. We had to have some sort of nomenclature associated with it.

Q.   And so I understand correctly, you have the company's model, which you then incorporate and I think you said

36 (Pages 138 - 141)

Page 142

GRISWOLD - HIGHLY CONFIDENTIAL

stress test that model; is that fair?

A.  That's fair.

Q.  If you look at the next two pages, there is a sensitivity analysis, both revenue, EBITDA and EBITDA margin on what's internally numbered page 0, and then page 1 is a sensitivity analysis FCF heatmap. Do you see those two pages?

A.  I do.

Q.  What were -- what were these sensitivity analyses?

A.  Yeah.  So maybe I'll draw your attention to the output that was the page before the Padres March '14 highly confidential, the 270 sum sheet, it's 37304.

Q.  Okay.

A.  This is the company's base case model with the capital structure that they're looking to achieve, i.e., the 1.7 introduced to it, right?

So it's their income statement, their sales, their EBITDA, and then introducing the debt and the

Page 143

GRISWOLD - HIGHLY CONFIDENTIAL

interest expense and the associated cash flows.

And I draw -- I bring you back to that one because that's the base model that we're all sort of working off of and sensitizing.  And even in that base model their growth rates in the outer years are half of what they were in historical periods, and there is very little margin expansion given -- that we're assuming, right?

So the company had high margins.  We're actually assuming a little bit of erosion in those margins.  So it's already a very conservative model to start with in our minds at the time.

So then we take it a step further and we say, well, what happens if you, you know, we're wrong and margins are even lower?  Or revenue growth is slower?  Or the CapEx is higher?  Or -- you know, you introduce all these downside scenarios in all of these cases to sort of say, can they, if they are

Page 144

GRISWOLD - HIGHLY CONFIDENTIAL

under a lot of pressure and sensitivities and downsides, can they still service the debt obligation that we're putting on the company?  And all of this sensitivity and all this work, you see the management case, you see no contribution from any of their new initiatives, do you see, you know, probably there is a downside case.

We're stressing it every which way we possibly can to say; can they pay back this 1.7?  And in every one of those scenarios they can pay back the 1.7.  And we're demonstrating that to our senior management in all the work we had done to not just take the company's word that this is gospel, this is going to happen.  We say no, what if it doesn't happen and we sensitize it, and look how the debt gets paid back under all those circumstances.  So it's the rigor from which we're sensitizing their base model, which is already conservative.

Q.  So you have the base model and then, I don't know if you referred to it

Page 145

GRISWOLD - HIGHLY CONFIDENTIAL

or are you then stress testing that model under various scenarios to see how the company would perform?

A.  Right.

Q.  And the sensitivity analysis here is you're stress testing that base model, correct?

A.  Correct.  And we're stress testing the income statement and we're stress testing the cash flow statement.

Q.  And in the sensitivity analysis, you have a volume -- you have volume growth numbers in the left-hand column. Do you see that?

A.  I do.

Q.  Where did you get -- what was the basis for the volume growth numbers?

A.  My recollection is that they probably in their model that, you know, spit out revenue, there was some volume and growth assumptions built in there and we're taking those and we're, you know, applying percentages, you know, down to then derive revenue and revenue growth

37 (Pages 142 - 145)

# EXHIBIT 7

**From:** Karanikolaidis, Stathis
**To:** jmulloy@ta.com; Marsh, Tony
**CC:** Carli, M F; Griswold, Ryan P; Guttilla, Michael T; Lee, Jenny Y.
**Sent:** 1/21/2014 10:57:24 PM
**Subject:** Millennium Labs
**Attachments:** Millennium Labs Discussion Materials 1.21.2014 vF.pdf

Good afternoon:

Pursuant to a discussion I had with Jennifer, attached are our thoughts on a broader dividend recapitalization for Millennium, with the following options:

- Maximum pro rata
- Maximum 1st lien TLB
- Maximum leverage through a combination of 1st and 2nd lien term loans

Take a look at the attached and let us know of a convenient date/time to go through it and answer any questions. The debt markets are in very strong shape with demand significantly outpacing supply and we believe that a financing for Millennium would be very well received.

Regards,
Stathis

Stathis Karanikolaidis
Managing Director
Leveraged Finance
J.P. Morgan Securities LLC
Office: 212-270-7374
Cell: 917-406-8907

CONFIDENTIAL

# EXHIBIT 8

Message

| | |
|---|---|
| **From:** | Howard Appel [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=HOWARD APPELBDC13407] |
| **Sent:** | 2/22/2014 4:20:43 AM |
| **To:** | Brock Hardaway [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Brock Hardaway9d9] |
| **CC:** | Howard Appel [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Howard Appelbdc13407] |
| **Subject:** | Re: Fwd: Re: RE: RE: Fwd: RE: |

Started process with Tim this afternoon.  Rerunning financial model

Will assess impact early next week.  Lets talk tomorrow.   Will be on cell most of day

Howard Appel
President
Millennium Laboratories, Inc.

On Feb 21, 2014, at 6:04 PM, "Brock Hardaway" <Brock.Hardaway@millenniumlabs.com> wrote:

assume you have probably already today had someone do this, but we should assess worst case impact here if all ugly pricing variables were in play.  how much does all this flex on pricing move the dial on our real costs of capital???

call me tonight or over weekend

Sent from my iPad

Begin forwarded message:

**From:** "Mulloy, Jennifer" <jmulloy@ta.com>
**Date:** February 21, 2014, 2:29:12 PM EST
**To:** "Marsh, Tony" <tmarsh@TA.com>
**Cc:** Brock Hardaway <Brock.Hardaway@millenniumlabs.com>, Howard Appel <Howard@milleniumlaboratories.com>
**Subject: Re: RE: RE: Fwd: RE:**

Shall we see if they'll go higher on leverage if we guarantee that our debenture is converted to the preferred?  I think it's worth an ask before final decisions.

Jennifer M. Mulloy
TA Associates
(650) 473-2229

On Feb 21, 2014, at 11:11 AM, "Marsh, Tony" <tmarsh@TA.com> wrote:

Just talked to JPM.  Here is where they are coming out on a fully underwritten deal (this has been fully vetted internally):

- <!--[if !supportLists]--><!--[endif]-->4.75x stretch first lien (will only increase to over 5x based on demand)
- <!--[if !supportLists]--><!--[endif]-->2% underwriting fee
- <!--[if !supportLists]--><!--[endif]-->Flex Provisions:

Confidential

1.    <!--[if !supportLists]--><!--[endif]-->+150 bps in interest rate flex.  TBD amount may take the form of OID (they will get back to me on that point).

2.    <!--[if !supportLists]--><!--[endif]-->Additional +25 bps interest rate flex if ratings are equal to B2/B or lower

3.    <!--[if !supportLists]--><!--[endif]-->Up to 5% amortization per year

A couple of more items:

-    <!--[if !supportLists]--><!--[endif]-->They have a strong preference for the current sub debt to be repaid/equitized at close or very soon thereafter.  They are concerned that potential lenders will have a lot of heartburn over that extra leverage and interest expense.  Their committee may come back and require this as a part of the underwrite.

-    <!--[if !supportLists]--><!--[endif]-->Also, they need to confirm with the underwriting committee whether they can commit to a portable capital structure.  They are likely to come back to us with "happy to try, but cannot underwrite."

I am available this afternoon to speak at the group's convenience.

Tony

---

**From:** Brock Hardaway [mailto:Brock.Hardaway@millenniumlabs.com]
**Sent:** Friday, February 21, 2014 1:27 PM
**To:** Marsh, Tony
**Cc:** Howard Appel; Mulloy, Jennifer
**Subject:** Re: RE: Fwd: RE:

Nothing new on our end. I have been tied up all day today in health plan mtgs and I know Howard has been on something else. I would like to know what Jpm final terms are before I talk to Jim again to just reiterate where they are now. So I would suggest that you push Jpm to get us final this afternoon and I will talk to Jim after to discuss go/no go. Howard you agree ?

I am now in a mtg from 230 to 430 est.

Sent from my iPhone

On Feb 21, 2014, at 12:35 PM, "Marsh, Tony" <tmarsh@TA.com> wrote:

We received a note from JPM and I spoke with Ryan Griswold at JPM on their status.  They are having discussions today with their most senior folks to get approval on specific terms and fees of an underwritten deal.  They promised they would give us status updates throughout the day.  When I spoke to Ryan I made sure he knew that they needed to be at lower fees than the 2.25% they already proposed.

Any other updates from others for the group?

---

**From:** Howard Appel [mailto:Howard@milleniumlaboratories.com]
**Sent:** Thursday, February 20, 2014 11:52 AM
**To:** Mulloy, Jennifer
**Cc:** Brock Hardaway; Marsh, Tony; Howard Appel
**Subject:** Re: Fwd: RE:

ST played a larger role the first time and I know bmo stepped it up on the recent refi. I don't recall if st did or they carried over the existing debt

ML_DE_00035296

We gave st the rate cap business.  Who can help us more today   If equal then Brock and I should talk.  Thanks

Howard Appel
President

On Feb 20, 2014, at 8:23 AM, "Mulloy, Jennifer" <jmulloy@ta.com> wrote:

Thanks Brock. On the line up below, I would suggest SunTrust before BMO and potentially differentiated slightly. They were a bigger player and played a more lead role the last go around. Howard - What do you think?

Jennifer M. Mulloy
Managing Director
TA Associates
(650) 473-2229

On Feb 20, 2014, at 7:57 AM, "Brock Hardaway" <Brock.Hardaway@millenniumlabs.com> wrote:

Ok let me know when you get Jpm. I would like to see the fee at 2 or less. Unless something crazy , I think we are all generally on same page:

Jpm as lead 50 pct
Citi 35 pct
BMO 7.5 pct
Sun trust 7.5 pct

Doing an underwritten deal. Howard or I will need to talk to Jim once we have terms from banks (covenants etc ) but I think we are close . I have a mtg from 11 to 1230 cst

Sent from my iPhone

On Feb 20, 2014, at 9:24 AM, "Marsh, Tony" <tmarsh@TA.com> wrote:

FYI, from Citi.  Still waiting on JPM.  They have proposed only a first lien / second lien.

Fees are 2.25% on the first and 3.00% on the second.

Still don't have full flex terms, but some more detail here.  Let's find a time to discuss once we have JPM's proposal.

Tony Marsh
TA Associates
(617) 574-6779
tmarsh@ta.com

Begin forwarded message:

**From:** "Cole, Thomas " <thomas.cole@citi.com>
**Date:** February 20, 2014 at 7:03:15 AM PST
**To:** "'Marsh, Tony'" <tmarsh@TA.com>

Confidential

**Cc:** "Blake, Barry " <barry.blake@citi.com>, "Sarin, Aradhana " <aradhana.sarin@citi.com>, "Dickson, Stuart G " <stuart.g.dickson@citi.com>, "Tortora, Michael " <michael.tortora@citi.com>
**Subject: RE:**

Attached please find our term sheet to reflect the underwritten transaction. The next step would be to engage a lawyer and proceed to a much more detailed term sheet. We look forward to working with you on this transaction.


-----Original Message-----
From: Marsh, Tony [mailto:tmarsh@TA.com]
Sent: Thursday, February 20, 2014 10:00 AM
To: Cole, Thomas [ICG-CMO]
Cc: Mulloy, Jennifer
Subject:

Tom, any update regarding your underwritten proposal?


Tony Marsh
TA Associates
(617) 574-6779
tmarsh@ta.com

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to other confidentiality protections. If you are not a designated recipient, you may not review,copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

This message is intended only for the designated recipient(s). It may contain
confidential or proprietary
information and may be subject to other confidentiality protections. If you are not a
designated recipient, you may
not review,copy or distribute this message. If you receive this in error, please notify
the sender by reply e-mail
and delete this message. Thank you.

<Millennium Financing Discussion_vFINAL.PDF>

This message is intended only for the designated recipient(s). It may contain
confidential or proprietary
information and may be subject to other confidentiality protections. If you are not a
designated recipient, you may
not review,copy or distribute this message. If you receive this in error, please notify
the sender by reply e-mail
and delete this message. Thank you.

This message is intended only for the designated recipient(s). It may contain
confidential or proprietary
information and may be subject to other confidentiality protections. If you are not a
designated recipient, you may
not review,copy or distribute this message. If you receive this in error, please notify
the sender by reply e-mail
and delete this message. Thank you.

This message is intended only for the designated recipient(s). It may contain
confidential or proprietary
information and may be subject to other confidentiality protections. If you are not a
designated recipient, you may

Confidential

not review,copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail
and delete this message. Thank you.

Confidential

ML_DE_00035299

# EXHIBIT 9

Citigroup Global Markets Inc. | Leveraged Finance

citi

February 20, 2014

# Dividend Recapitalization Discussion



Strictly Private and Confidential
Confidential

ML_DE_00035351

# Transaction Overview

## Assumptions

- Dividend Recap with $1.5bn shareholder dividend

- Transaction is financed with new $1.45bn 1st Lien Term Loan and $400mm 2nd Lien Term Loan

  - $1,450 million in new First Lien Term Loan @ L + 300-325 with a 1.0% floor issued at 99.5

  - $400 million in new Second Lien Term Loan @ L + 650-675 with a 1.0% floor issued at 99.0

- PF Secured Total leverage 5.2x 2013E EBITDA

- PF Total Leverage of 5.8x 2013E EBITDA

- TA Debentures will remain in place

## Sources & Uses of Funds
*($ in millions)*

| Sources | $ | % |
|---|---|---|
| New First Lien Debt | $1,450 | 78% |
| New Second Lien Debt | 400 | 22 |
| Total Sources | $1,850 | 100% |

| Uses | $ | % |
|---|---|---|
| Shareholder Dividend | $1,500 | 81% |
| Repay Existing Debt | 326 | 18 |
| Financing Fees | 20 | 1 |
| Cash to Balance Sheet | 4 | 0 |
| Total Uses | $1,850 | 100% |

## Pro Forma Capitalization
*($ in millions)*

| | As of 12/31/13 | | |
|---|---|---|---|
| | Millennium | Adj. | Pro Forma |
| Cash and Cash Equivalents | $199.5 | $5.0 | $204.5 |
| **Millennium Secured Debt** | | | |
| Term Loan A due 2017 | 312.5 | (312.5) | -- |
| New First Lien Debt | -- | 1,450.0 | 1,450.0 |
| Other Secured Debt | 57.9 | (13.9) | 44.0 |
| **Total First Lien Debt** | **$370.4** | **$1,123.5** | **$1,494.0** |
| New Second Lien Debt | -- | 400.0 | 400.0 |
| Total Secured Debt | $370.4 | $1,523.5 | $1,894.0 |
| TA Debentures | $196.0 | -- | 196.0 |
| Total Debt | $566.4 | $1,523.5 | $2,090.0 |

| **Credit Statistics** | | | |
|---|---|---|---|
| 2013E PF EBITDA | $361.2 | -- | $361.2 |
| First Lien Debt / EBITDA | -- | | 4.0 |
| Total Secured Debt / EBITDA | 1.0 | | 5.2 |
| Total Debt / EBITDA | 1.6 | | 5.8 |
| Net Total Debt / EBITDA | 1.0 | | 5.2 |

Source: Company presentation and model.
Confidential

citi

ML_DE_00035352

# Summary Terms – Senior Secured Credit Facilities

| | |
|---|---|
| Borrower: | Millennium Laboratories, Inc. |
| Facilities: | $1,450 million First-Lien Term Loan ("1st Lien TL")<br>$400 million Senior Secured Second-Lien Term Loan ("2nd Lien TL") |
| Guarantors: | Each existing and subsequently acquired or organized wholly-owned domestic subsidiary of the Borrower |
| Security: | 1st Lien TL: Perfected first-priority security interest in substantially all the material owned assets of the Borrower and each Subsidiary Guarantor<br>2nd Lien TL: Same as the first-lien credit facilities, but on a second- priority basis |
| Tenor: | 1st Lien TL: 7.0 years<br>2nd Lien TL: 8.0 years |
| Amortization: | 1st Lien TL: 1.00% per year, paid quarterly, with balance due at maturity<br>2nd Lien TL: None |
| Pricing: | 1st Lien TL: L + 300-325 bps<br>2nd Lien TL: L + 650-675 bps |
| LIBOR Floor: | 1st Lien TL: 1.00%<br>2nd Lien TL: 1.00% |
| Issue Price : | 1st Lien TL: 99.5<br>2nd Lien TL: 99.0 |
| Price Flex: | 1st Lien TL: 150 bps<br>2nd Lien TL: 225 bps |
| Other Flex: | To be agreed |
| Mandatory Prepayments: | (i) 100% of debt issuance (except for permitted indebtedness), (ii) 50% excess cash flow sweep with step-downs to be agreed, (iii) 100% of asset sales (subject to customary reinvestment rights), and (iv) change of control carve out provisions to be agreed |
| Call Protection: | 1st Lien TL: 101 soft call protection for 6 months<br>2nd Lien TL: 102, 101 hard call protection in years 1-2, respectively, then par thereafter (flex to 103, 102, 101 hard call protection in years 1-3, respectively) |
| Negative Covenants: | Usual and customary for transactions of this type, including, but not limited to, limitations on debt incurrence; liens; fundamental changes; restrictions on subsidiary distributions; asset sales; and restricted payments |
| Financial Covenants: | None |
| Underwriting Fees | 1st Lien TL: 2.25%<br>2nd Lien TL: 3.00% |

citi

ML_DE_00035353

*IRS Circular 230 Disclosure: Citigroup Inc. and its affiliates do not provide tax or legal advice. Any discussion of tax matters in these materials (i) is not intended or written to be used, and cannot be used or relied upon, by you for the purpose of avoiding any tax penalties and (ii) may have been written in connection with the "promotion or marketing" of any transaction contemplated hereby ("Transaction"). Accordingly, you should seek advice based on your particular circumstances from an independent tax advisor.*

*In any instance where distribution of this communication is subject to the rules of the US Commodity Futures Trading Commission ("CFTC"), this communication constitutes an invitation to consider entering into a derivatives transaction under U.S. CFTC Regulations §§ 1.71 and 23.605, where applicable, but is not a binding offer to buy/sell any financial instrument.*

*However, this is not a recommendation to enter into any swap with any counterparty or a recommendation of a trading strategy involving a swap. Prior to recommending a swap or a trading strategy involving a swap to you, Citigroup would need to undertake diligence in order to have a reasonable basis to believe that the recommended swap or swap trading strategy is suitable for you, obtain written representations from you that you are exercising independent judgment in evaluating any such recommendation, and make certain disclosures to you. Furthermore, nothing in this pitch book is, or should be construed to be, an offer to enter into a swap.*

Any terms set forth herein are intended for discussion purposes only and are subject to the final terms as set forth in separate definitive written agreements. This presentation is not a commitment to lend, syndicate a financing, underwrite or purchase securities, or commit capital nor does it obligate us to enter into such a commitment, nor are we acting as a fiduciary to you. By accepting this presentation, subject to applicable law or regulation, you agree to keep confidential the information contained herein and the existence of and proposed terms for any Transaction.

Prior to entering into any Transaction, you should determine, without reliance upon us or our affiliates, the economic risks and merits (and independently determine that you are able to assume these risks) as well as the legal, tax and accounting characterizations and consequences of any such Transaction. In this regard, by accepting this presentation, you acknowledge that (a) we are not in the business of providing (and you are not relying on us for) legal, tax or accounting advice, (b) there may be legal, tax or accounting risks associated with any Transaction, (c) you should receive (and rely on) separate and qualified legal, tax and accounting advice and (d) you should apprise senior management in your organization as to such legal, tax and accounting advice (and any risks associated with any Transaction) and our disclaimer as to these matters. By acceptance of these materials, you and we hereby agree that from the commencement of discussions with respect to any Transaction, and notwithstanding any other provision in this presentation, we hereby confirm that no participant in any Transaction shall be limited from disclosing the U.S. tax treatment or U.S. tax structure of such Transaction.

We are required to obtain, verify and record certain information that identifies each entity that enters into a formal business relationship with us. We will ask for your complete name, street address, and taxpayer ID number. We may also request corporate formation documents, or other forms of identification, to verify information provided.

Any prices or levels contained herein are preliminary and indicative only and do not represent bids or offers. These indications are provided solely for your information and consideration, are subject to change at any time without notice and are not intended as a solicitation with respect to the purchase or sale of any instrument. The information contained in this presentation may include results of analyses from a quantitative model which represent potential future events that may or may not be realized, and is not a complete analysis of every material fact representing any product. Any estimates included herein constitute our judgment as of the date hereof and are subject to change without any notice. We and/or our affiliates may make a market in these instruments for our customers and for our own account. Accordingly, we may have a position in any such instrument at any time.

Although this material may contain publicly available information about Citi corporate bond research, fixed income strategy or economic and market analysis, Citi policy (i) prohibits employees from offering, directly or indirectly, a favorable or negative research opinion or offering to change an opinion as consideration or inducement for the receipt of business or for compensation; and (ii) prohibits analysts from being compensated for specific recommendations or views contained in research reports. So as to reduce the potential for conflicts of interest, as well as to reduce any appearance of conflicts of interest, Citi has enacted policies and procedures designed to limit communications between its investment banking and research personnel to specifically prescribed circumstances.

© 2013 Citigroup Global Markets Inc. Member SIPC. All rights reserved. Citi and Citi and Arc Design are trademarks and service marks of Citigroup Inc. or its affiliates and are used and registered throughout the world.

Citi believes that sustainability is good business practice. We work closely with our clients, peer financial institutions, NGOs and other partners to finance solutions to climate change, develop industry standards, reduce our own environmental footprint, and engage with stakeholders to advance shared learning and solutions. Highlights of Citi's unique role in promoting sustainability include: (a) releasing in 2007 a Climate Change Position Statement, the first US financial institution to do so; (b) targeting $50 billion over 10 years to address global climate change: includes significant increases in investment and financing of renewable energy, clean technology, and other carbon-emission reduction activities; (c) committing to an absolute reduction in GHG emissions of all Citi owned and leased properties around the world by 10% by 2011; (d) purchasing more than 234,000 MWh of carbon neutral power for our operations over the last three years; (e) establishing in 2008 the Carbon Principles; a framework for banks and their U.S. power clients to evaluate and address carbon risks in the financing of electric power projects; (f) producing equity research related to climate issues that helps to inform investors on risks and opportunities associated with the issue; and (g) engaging with a broad range of stakeholders on the issue of climate change to help advance understanding and solutions.

Citi works with its clients in greenhouse gas intensive industries to evaluate emerging risks from climate change and, where appropriate, to mitigate those risks.

## efficiency, renewable energy and mitigation

# EXHIBIT 10

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                              ) Chapter 11
                                    )
MILLENNIUM LAB HOLDINGS II,         )
LLC, et al.,                        ) Case No. 15-12284(LSS)
                                    )
            Debtors.                )
                                    )
                                    )
MARC S. KIRSCHNER solely in         )
his capacity as TRUSTEE OF THE      )
MILLENNIUM CORPORATE CLAIM          )
TRUST,                              )
                                    )
            Plaintiff,              ) Adv. Pro. No. 17-51840
                                    )
vs.                                 )
                                    )
J.P. MORGAN CHASE BANK, N.A.        )
CITIBANK N.A., BMO HARRIS BANK,     )
N.A., and SUNTRUST BANK,            )
                                    )
            Defendants.             )
                                    )

REMOTE DEPOSITION OF HEIDI SMITH
Thursday, April 29, 2021

Reported Remotely and Stenographically by:
JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Page 218

Q. Do you recognize this as Millennium's unaudited financials for the first half of 2014?

A. Yes.

Q. Turn to page 13 of this document, which is Bates ending 239813.

A. Okay.

Q. At the bottom it says, under "Contingencies," the second sentence says -- and let me first say that it appears that the dollars in these financials are in thousands. Do you agree?

A. Are in thousands? Is that what you said?

Q. Uh-huh. Yes.

A. Yes.

Q. The second sentence under contingent- -- the third sentence under "Contingencies" says:

"On June 16, 2014, the jury reached a verdict in the plaintiffs' favor in the amount of $14,755, consisting of $2,755 in compensatory damages and $12,000 in punitive damages."

Do you see that?

A. Yes.

Q. Okay. And then the second-to-last sentence starts:

"Absent adequate relief, the Company

Page 219

intends to vigorously pursue an appeal of the judgment on multiple grounds. As of June 30th, 2014, no amount has been accrued in the condensed consolidated financial statements as the loss cannot be reasonably estimated."

Do you see that?

A. Yes.

Q. Do you know how this conclusion was reached?

A. The conclusion of the last sentence or the whole clause?

Q. The last sentence starting, "As of June 30th, 2014."

A. Typical liability, you have to have probable and a reasonable estimate, and we did not have that since it had -- had not completed the whole process of the appeals.

So we did -- there was nothing to book based on GAAP. But because we did have the jury's returned verdict, that was included in the footnote. But the matter was not closed and, therefore, we did not have a final amount, if there was an amount. We didn't know at the time.

Q. Okay. You can set that aside. Turning to a different topic.

Page 220

As part of the 2014 transaction, Millennium paid fees to the four lender banks. Were you familiar with those fees?

A. At the time, yes.

Q. Were you part of the negotiations over the banks' fees?

A. No.

Q. Where did your familiarity with the fees come from?

A. I don't recall the exact document or how the information was provided to me.

Q. And were you familiar with the fees because, for example, you had a role in paying the fees or a different role in connection with the fees?

MS. HALLINAN: Objection.

THE WITNESS: Once they were established, I would have known them at some point. I don't recall when, but they would have been on some document as part of the process of the transaction and that -- I would have been aware of that.

BY MS. JOE:

Q. Do you know who from Millennium was part of the negotiations over the banks' fees?

A. I do not.

Q. Did you think that the fees for the 2014

Page 221

transaction were reasonable?

MS. HALLINAN: Objection.

THE WITNESS: I didn't have an opinion on them at the time.

BY MS. JOE:

Q. Did Millennium maintain any control over the fees once they were transferred to the banks?

MS. HALLINAN: Objection.

THE WITNESS: No. They were -- they were paid.

BY MS. JOE:

Q. Do you know what services the banks were rendering Millennium in exchange for those fees?

MS. GERCHIK: Objection.

MS. HALLINAN: Objection.

THE WITNESS: They were the agent or the syndicate that managed the transaction. I don't recall the exact term of the role they played, but they oversaw the transaction.

BY MS. JOE:

Q. Was the banks' work in line with Millennium's expectations?

MS. HALLINAN: Objection.

MS. GERCHIK: Objection.

THE WITNESS: I don't have an opinion

Veritext Legal Solutions

212-279-9424                www.veritext.com                212-490-3430

Page 222

on that.

BY MS. JOE:

Q. In your opinion, was Millennium solvent at the time that it paid the banks their fees?

MS. HALLINAN: Objection.

THE WITNESS: I'm sorry. Could you repeat that?

BY MS. JOE:

Q. In your opinion, was Millennium solvent at the time that it paid the banks their fees?

A. Yes.

MS. HALLINAN: Objection.

BY MS. JOE:

Q. Did Millennium enter into the transaction with the intent to defraud anyone?

MS. HALLINAN: Objection.

MS. GERCHIK: Objection.

THE WITNESS: Not in my knowledge, no.

BY MS. JOE:

Q. At the time of the 2014 transaction, did you anticipate that Millennium would be entering bankruptcy in late 2015?

A. No.

Q. When did Millennium realize that bankruptcy was likely?

Page 223

MS. HALLINAN: Objection.

THE WITNESS: I wasn't involved in the discussions around those decisions.

BY MS. JOE:

Q. Do you know who was?

A. I do not.

MS. JOE: Okay. Let's go off the record.

THE VIDEOGRAPHER: Okay. Thank you.

This marks the end of media No. 7. Going off the record at 4:33 p.m. Pacific.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record at 4:48 p.m. Pacific. This marks the beginning of media No. 8 in the deposition of Heidi Smith, volume 1.

You may proceed, Counsel.

MS. JOE: Okay. So during the break I got a corrected version of document 8, which had been marked as Defendants' Exhibit 21 until I realized that it was missing some pages.

So if there are no objections, what I would like to do is have the concierge remove current Defendants' Exhibit 21 from the folder and mark what is in my private folder labeled as "8 corrected" as Defendants' Exhibit 21.

Page 224

MS. HALLINAN: No objections.

TECHNICIAN: It's taking a while to load. One moment, please.

BY MS. JOE:

Q. Okay. Miss Smith, let me know when you are ready.

A. Okay.

Q. Can you please turn to page 60 of the PDF, which is Bates ending 239618.

A. What were the last three digits?

Q. 618.

A. 618?

Q. Yes.

A. Okay.

Q. Let me know when you are ready.

A. My document is stopping with ending 616, and then it goes into a spreadsheet, but there is no codes on the bottom.

Q. Yeah, if you scroll past that, that is the native that was attached to the email. You scroll past that and then you will reach 618.

A. Okay.

THE VIDEOGRAPHER: And, Counsel Gerchik, can I have you mute your microphone?

THE WITNESS: Okay. I have it.

Page 225

BY MS. JOE:

Q. Okay. Do you recognize this as Millennium's audited financials for 2013 and 2012?

A. Yes.

Q. Can you turn to page 22 of the financials, which is Bates ending 239641.

A. Okay.

Q. Okay. At the bottom of that page, the last sentence says -- excuse me -- the header is "Contingencies."

The last sentence is:

"While management is unable to predict the exact outcome of such matters, it is management's current belief that any potential liabilities resulting from these contingencies, individually or in the aggregate, will not have a material impact on the Company's consolidated financial position and results of operations."

Do you see that?

A. Yes.

Q. Do you know how this conclusion was reached?

MS. HALLINAN: Objection.

THE WITNESS: It was based on our process of

57 (Pages 222 - 225)

# EXHIBIT 11

| J.P. MORGAN SECURITIES LLC | CITIGROUP GLOBAL MARKETS INC. | SUNTRUST ROBINSON HUMPHREY, INC. | BMO CAPITAL MARKETS CORP. |
|---|---|---|---|
| JPMORGAN CHASE BANK, N.A. | 390 Greenwich Street New York, New York 10013 | SUNTRUST BANK | |
| 383 Madison Avenue New York, New York 10179 | | 3333 Peachtree Road Atlanta, Georgia 30326 | BANK OF MONTREAL 115 South LaSalle Street Chicago, Illinois 60603 |

March 16, 2014

$1,765 million Term Loan Facility
$50 million Revolving Facility
Fee Letter

Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA 92127
Attention: Howard Appel, President

Ladies and Gentlemen:

Reference is made to the Commitment Letter dated the date hereof (the "Commitment Letter") among you and us.  Capitalized terms used but not defined herein are used with the meanings assigned to them in the Commitment Letter.  This letter agreement is one of the Fee Letters referred to in the Commitment Letter.

1.    Fees

As consideration for the commitments and agreements of the Commitment Parties under the Commitment Letter, you agree to pay or cause to be paid the following fees:

(i)    To each Initial Lender, for its own account (or for allocation in whole or in part to any of its affiliates), an underwriting fee (the "Underwriting Fee"),  in an amount equal to 2.00% of its ratable share of the aggregate principal amount of the commitments in respect of the Senior Secured Facilities as of the Closing Date (without giving effect to any syndication or assignment), payable on the Closing Date;

(ii)    To JPMorgan Chase Bank (for the account of the Lenders), upfront fees (the "Upfront Fees") (calculated as a percentage of each Lender's allocated commitments to the Revolving Facility and the Term Loans) in an amount equal to 0.5% with respect to the Revolving Facility and the Term Loans as of the Closing Date, which may take the form of Original Issue Discount ("OID"), payable on the Closing Date.

2.    Alternate Transaction

509265-1664-11227-Active.15460088.12

CONFIDENTIAL

JPMC-MIL-CORP-00194146

In the event that during the period commencing on the date hereof and ending on the earlier of the date twelve months hereafter or the Closing Date, you or any of your subsidiaries consummate any non-affiliate senior secured credit financing transaction (other than the Senior Secured Facilities) the proceeds of which are used to finance a payment in excess of $50 million in respect of outstanding capital stock, stock options, warrants or debentures issued by you (and not an acquisition financing, trade financing, receivables financing, securitization or working capital or general corporate financing) (any such non-excluded transaction, an "Alternate Transaction"), you agree that unless we have otherwise terminated the Commitment Letter with respect to the Senior Secured Facilities, you will pay to the Commitment Parties (other than any such Commitment Parties that have breached their obligations to provide the Senior Secured Facilities on the terms and conditions of the Commitment Letter) at the time of funding of such Alternate Transaction an amount equal to 50% of the fee contemplated by clause (i) above in Section 1; provided that such amount shall not be payable to any Commitment Party that was offered an opportunity to participate in such Alternate Transaction (on the same terms and conditions as other lenders who have proposed to provide such Alternate Transaction and acting in the roles specified in the Commitment Letter and with not less than the percentage of compensatory economics applicable to us as specified in the Commitment Letter) and declined to do so.

3.    Market Flex

With respect to the Term Loan Facility, the Lead Arrangers shall be entitled, without your consent, at any time on or prior to the earlier of a Successful Syndication (as defined below) and the date that is 30 days after the Closing Date, to make the following changes to the terms of the Term Loan Facility if the Lead Arrangers reasonably determine (i) that such changes are necessary or advisable to ensure a Successful Syndication or (ii) that a Successful Syndication cannot be consummated during the syndication period:

(i)    increase the yield on the Term Loan Facility through an increase in the interest rate margins thereunder by an amount not to exceed 175 basis points; provided that the interest rate margins may be increased by an additional 25 basis points if the Borrower's corporate family rating by Moody's or corporate credit rating by S&P is lower than B1 (stable outlook) or lower than B+ (stable outlook), it being understood that the increase in the interest rate margins pursuant to this paragraph (i) may be implemented by use of upfront fees, OID (based on an assumed four-year average life and without any present value discount (e.g., 25 basis points of margin so utilized equals 100 basis points in upfront fees)) or an increased Eurodollar Rate floor; provided that the aggregate amount of OID or upfront fees increased pursuant to this paragraph (i) shall not exceed 1.75%;

(ii)    replace the "soft call" prepayment premium payable upon voluntary prepayment of the Term Loan Facility with (A) a "hard call" prohibiting any optional or mandatory prepayment of the Term Loans during the first year after the Closing Date unless the Make-Whole Premium (as defined below) is paid  (but permitting payments during that first year after the Closing Date for (i) scheduled amortization, Excess Cash Flow payments and mandatory prepayments as a result of an asset sale and (ii) prepayments as a result of a change of control of the Borrower (in which case such prepayment shall be subject to a prepayment premium of 2% of the prepaid Term Loans as a result of such change of control) and (B) a "soft call" prepayment premium payable upon a voluntary prepayment as a result of a repricing of the Term Loan Facility made during the second and the third years after the Closing Date, so long as such prepayment premium does not exceed (i) 2% prior to the second anniversary of the Closing Date, and (ii) 1% on or after the second anniversary of the Closing Date but before the third anniversary of the Closing Date.

509265-1664-11227-Active.15460088.12

"Make-Whole Premium" means, with respect to any principal amount of Term Loans prepaid during the period commencing on the Closing Date through the date that is the first anniversary of the Closing Date (the "Make-Whole Termination Date"), the sum of (i) the present value on the date of such prepayment, computed using a discount rate equal to the Treasury Rate plus 50 basis points, on all interest that would accrue on the applicable repaid Term Loans from the date of prepayment to the Make-Whole Termination Date and (ii) a prepayment premium of 2% of the prepaid Term Loans;

(iii)    change the initial "excess cash flow sweep" percentage applicable to the Term Loan Facility to 75%, provided that (i) Excess Cash Flow for fiscal year 2014 shall only be required in relation to the last two quarters of that fiscal year and (ii) amortization payments and Excess Cash Flow payments in respect of fiscal year 2014 shall not in the aggregate exceed $35 million, and amortization payments and Excess Cash Flow payments in respect of fiscal year 2015 shall not in the aggregate exceed $45 million;

(iv)    reduce the Leverage Ratio required to be satisfied in connection with the availability of an unlimited principal amount of the Incremental Facilities to 4.25 to 1.0; and

(v)    reduce the Term Maturity Date to six years after the Closing Date.

The term "Successful Syndication" shall mean that the Initial Lenders and their respective affiliates shall hold commitments with respect to, or loans under, the Term Loan Facility of not more than $0.

4.    Miscellaneous

You agree that, once paid, the fees or any part thereof payable hereunder and under the Commitment Letter shall not be refundable under any circumstances. All fees payable hereunder and under the Commitment Letter shall be paid in immediately available funds and shall be in addition to reimbursement of our out-of-pocket expenses to the extent reimbursable pursuant to the Commitment Letter. You agree that we may, in our sole discretion, share all or a portion of any of the fees payable pursuant to this Fee Letter with any of the other Lenders.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing. Such obligation, if any, shall be set forth and be subject to the terms and conditions set forth in the Commitment Letter. This Fee Letter may not be amended or waived except by an instrument in writing signed by each of us and you. This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Fee Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

You agree that this Fee Letter and its contents are subject to the confidentiality provisions of the Commitment Letter.

509265-1664-11227-Active.15460088.12

CONFIDENTIAL                                                                    JPMC-MIL-CORP-00194148

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____

Name:
Title:

Dawn L. LeeLum
Executive Director

J.P. MORGAN SECURITIES LLC

By: _____

Name:
Title:

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
　　　Name:
　　　Title:

J.P. MORGAN SECURITIES LLC

By: _____
　　　Name: Ryan Griswold
　　　Title: Vice President

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

CITIGROUP GLOBAL MARKETS INC.

By: _____

Name:

Title:          Stuart G. Dickson
                Managing Director

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

BMO CAPITAL MARKETS CORP.

By: _____

Name:   Michael Hsieh
Title:   Director

BANK OF MONTREAL

By: _____

Name:   Phillip Ho
Title:   Director

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

JPMC-MIL-CORP-00194152

BMO CAPITAL MARKETS CORP,

By: _____
    Name:
    Title:

BANK OF MONTREAL

By: _____
    Name:
    Title:

**Phillip Ho**
Director

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

JPMC-MIL-CORP-00194153

SUNTRUST ROBINSON HUMPHREY, INC.

By: _____
    Name:   William Monroe
    Title:   Director


SUNTRUST BANK

By: _____
    Name:   David M. Felty
    Title:   Director


*Signature Page to Arranger Fee Letter*

CONFIDENTIAL                                              JPMC-MIL-CORP-00194154

Accepted and agreed to as of
the date first written above by:

MILLENNIUM LABORATORIES, INC.

By: _____
    Name: Howard Appel
    Title: President

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

# EXHIBIT 12

| | |
|---|---|
| **From:** | Chiarelli, Benjamin R <benjamin.r.chiarelli@jpmorgan.com> |
| **To:** | Karanikolaidis, Stathis <Stathis.Karanikolaidis@jpmorgan.com>;Murray, Gerry <GERRY.MURRAY@jpmorgan.com>;Lee, Jenny Y." <Jenny.Y.Lee@jpmorgan.com>;LeeLum, Dawn <DAWN.LEELUM@jpmorgan.com>;Rapkin, Cory <Cory.Rapkin@jpmorgan.com>;Mainelli, Matthew" <Matthew.Mainelli@jpmorgan.com> |
| **CC:** | Griswold, Ryan P <ryan.p.griswold@jpmorgan.com>;Guttilla, Michael T" <michael.t.guttilla@jpmorgan.com>;Christoforou, Alla" <alla.christoforou@jpmorgan.com>;Berler, Keren" <keren.berler@jpmorgan.com>;Liou, Calvin O <calvin.o.liou@jpmorgan.com> |
| **Sent:** | 2/27/2014 11:14:03 PM |
| **Subject:** | RE: Millennium labs |

Great news

Ryan - will give you a buzz

_____

Benjamin R. Chiarelli | Vice President | Healthcare Investment Banking | J.P. Morgan
383 Madison Avenue, 37th floor | New York, New York 10179
T: 212.622.7229 | F: 646.224.5595 | benjamin.r.chiarelli@jpmorgan.com

Alternate contact: Jean Meehan | Executive Assistant | T: 212.622.2168 |
jean.a.meehan@jpmorgan.com

-----Original Message-----
From: Karanikolaidis, Stathis
Sent: Thursday, February 27, 2014 6:12 PM
To: Murray, Gerry; Lee, Jenny Y.; LeeLum, Dawn; Rapkin, Cory; Mainelli, Matthew; Chiarelli, Benjamin R
Cc: Griswold, Ryan P; Guttilla, Michael T; Christoforou, Alla
Subject: Millennium labs

We just received a call from management. We are lead left on the dividend recapitalization for millennium labs. $1,750mm TLB, which will be underwritten. JPM at 55%, citi at 30% and 2 other junior bookrunners at 7.5% each. We will start drafting commitment papers and continue our due diligence next week at the company's headquarters in San Diego. We will seek final approval from Jim in the coming days. Thanks everyone for your help and support.

Regards,
Stathis

Sent with Good (www.good.com)

CONFIDENTIAL

# EXHIBIT 13

| J.P. MORGAN SECURITIES LLC | CITIGROUP GLOBAL MARKETS INC. | SUNTRUST ROBINSON HUMPHREY, INC. | BMO CAPITAL MARKETS CORP. |
|---|---|---|---|
| JPMORGAN CHASE BANK, N.A. | 390 Greenwich Street New York, New York 10013 | SUNTRUST BANK | |
| 383 Madison Avenue New York, New York 10179 | | 3333 Peachtree Road Atlanta, Georgia 30326 | BANK OF MONTREAL 115 South LaSalle Street Chicago, Illinois 60603 |

March 16, 2014

Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA 92127
Attention: Howard Appel, President

<u>$1,765 million Term Loan Facility</u>
<u>$50 million Revolving Facility</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

You have advised JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank"), J.P. Morgan Securities LLC ("JPMorgan"), Citi (as defined below) ("Citi"), BMO Capital Markets Corp. ("BMO Capital"), Bank of Montreal ("Bank of Montreal"), SunTrust Robinson Humphrey, Inc. ("STRH") and SunTrust Bank ("SunTrust Bank" and, together with JPMorgan Chase Bank, JPMorgan, Citi, BMO Capital, Bank of Montreal and STRH, the "Commitment Parties", "us" or "we") that Millennium Laboratories, Inc. ("you" or the "Borrower") intends to enter into the Senior Secured Facilities described on the Exhibits attached hereto (which shall include the Term Loan Facility and the Revolving Facility as described thereon) for an aggregate principal amount of $1,815 million. Capitalized terms used but not defined herein are used with the meanings assigned to them on the Exhibits attached hereto (such Exhibits, together with this letter, collectively, the "Commitment Letter"). For purposes of this Commitment Letter, "Citi" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein.

1. Commitment

JPMorgan Chase Bank is pleased to advise you of its several, but not joint, commitment to provide an amount of 55% of the aggregate principal amount of the Senior Secured Facilities, (b) Citi is pleased to advise you of its several, but not joint, commitment to provide an amount of 35% of the aggregate principal amount of the Senior Secured Facilities, (c) Bank of Montreal is pleased to advise you of its several, but not joint, commitment to provide an amount of 5% of the aggregate principal amount of the Senior Secured Facilities and (d) SunTrust Bank is pleased to advise you of its several, but not joint, commitment to provide an amount of 5% of the aggregate principal amount of the Senior Secured Facilities, in each case, upon the terms and subject to the conditions set forth in this Commitment Letter

509265-1664-11227-Active.15459523.20

Confidential

negotiation, documentation and closing of the Senior Secured Facilities and any related documentation (including this Commitment Letter and the definitive financing documentation), regardless of whether the Closing Date occurs; provided, however, that the Borrower shall not be responsible for any fees, charges or disbursements of counsel to the Commitment Parties incurred in connection with the negotiation, documentation and closing of the Senior Secured Facilities in an aggregate amount in excess of $1,000,000.

It is agreed that the Commitment Parties shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the Senior Secured Facilities on a several, and not joint, basis with any other Commitment Party. No Lender Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, gross negligence, bad faith, or material breach of this Commitment Letter, the Fee Letters or the Senior Secured Credit Documentation of or by such Lender Indemnified Person (or any of its Related Parties). None of the Lender Indemnified Persons or you or any of your subsidiaries or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letters, the Senior Secured Facilities or the transactions contemplated hereby; provided that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 7.

8.   Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party (or an affiliate) is a full service securities firm and such person may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you or your affiliates and of other companies that may be the subject of the transactions contemplated by this Commitment Letter. Each Commitment Party and its affiliates will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Party and its affiliates of services for other companies or persons and each Commitment Party and its affiliates will not furnish any such information to any of their other customers. You acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates

6

509265-1664-11227-Active.15459523.20

ML_DE_00015402

with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

9. Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letters nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) you, TA Associates, L.P. and your and their respective officers, directors, employees, affiliates, members, partners, stockholders, option holders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent practicable under the circumstances and to the extent permitted by applicable law, to inform us promptly thereof), (c) in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter and/or the Fee Letters, (d) upon notice to the Commitment Parties, this Commitment Letter and the existence and contents hereof (but not the Fee Letters or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed in any syndication or other marketing material in connection with the Senior Secured Facilities or in connection with any public filing requirement, and (e) the Term Sheets may be disclosed to potential Lenders in connection with the Senior Secured Facilities and to existing lessors and secured lenders to the Borrower and its subsidiaries. The foregoing restrictions shall cease to apply in respect of the existence and contents of this Commitment Letter (but not in respect of the Fee Letters and the contents thereof) three years following the date of this Commitment Letter.

The Commitment Parties shall use all nonpublic information received by them in connection with the Senior Secured Facilities solely for the purposes of providing the services that are the subject of this Commitment Letter and shall maintain as confidential all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to any Lenders or participants or prospective Lenders or participants, (b) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (c) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "Representatives") on a need-to-know basis who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its respective affiliates on a need-to-know basis (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its affiliates' compliance with this paragraph) and (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in breach of this Commitment Letter; provided that the disclosure of any such information to any Lenders or participants or prospective Lenders or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Commitment Party or customary market standards for dissemination of such type of information and subject to the agreement of such Lender or prospective Lender or participant or prospective participant to be bound by the terms of this paragraph (or language substantially similar to this paragraph). The provisions of this paragraph shall automatically terminate three years following the date of this

7

509265-1664-11227-Active.15459523.20

ML_DE_00015403

# EXHIBIT 14



Date:          April 14, 2014

To:            Millennium Laboratories Lenders and Commitment Parties

RE:            Syndication Update

---

The revised terms of the Term Loan are outlined below.

| | Launch | Revised |
|---|---|---|
| **Size ($mm)** | USD: $1,765 | USD: $1,775 |
| **TLB Pricing** | L+350 – 375 | L+425 |
| **TLB LIBOR floor** | 1.00% | Unchanged |
| **TLB OID** | 99.50 | 99.00 |
| **Soft-call Protection** | 12 months | Unchanged |
| **ECF Sweep** | 50% with stepdowns to 25% if Leverage is ≤3.75x and 0% if Leverage is ≤2.75x | 75% with stepdowns to 25% if Leverage is ≤3.75x and 0% if Leverage is ≤2.75x |
| **ECF Sweep Cap** | 2014: $35mm<br>2015: $45mm | Removed |
| **Incremental Debt Basket** | $175mm | $125mm |
| **Incremental Debt Incurrence Test Level** | 4.50x | 4.25x |
| **Assignments (Deemed Consents)** | 10 days | 5 days |

Please reconfirm your commitment to your J.P. Morgan sales representative by 5:00 PM (New York time) on Monday, April 14, 2014.

Questions of a business nature may be directed to Michael Guttilla (michael.t.guttilla@jpmorgan.com; 212-270-6223) or Alla Christoforou (alla.christoforou@jpmorgan.com; 212-270-3932) at J.P. Morgan. Questions of a legal nature may be directed to Ismael Duran (iduran@stblaw.com; 212-455-3425) at Simpson Thacher & Bartlett LLP.

CONFIDENTIAL

# EXHIBIT 15

**Closing Date**                          **04/16/14**

**Millennium Laboratories, LLC**

| Sources | | Uses | |
|---|---|---|---|
| New Term Loan B | $1,775,000,000.00 | Refinance existing Term Loan A | $303,827,648.00 |
| | | Accrued interest | $293,995.11 |
| | | Admin agent fees | ($74,235.21) |
| | | | |
| | | OID on Term Loan B | $17,750,000.00 |
| | | Upfront fees on R/C | $250,000.00 |
| | | Arrangement fees | $36,300,000.00 |
| | | Legal Fees and Expenses | $875,000.00 |
| | | Out-of-Pocket Expenses | 145,416.34 |
| | | | |
| | | Distribution to shareholders | 1,415,632,175.76 |
| | | | |
| **Total** | **$1,775,000,000.00** | **Total** | **$1,775,000,000.00** |

**OID on Term Loan B**

| | |
|---|---|
| 99.0% | $17,750,000.00 |
| | $17,750,000.00 |

**Upfront fees on R/C**

| | | Commit % | Fee % |
|---|---|---|---|
| J.P. Morgan | $114,583.33 | 46% | 0.50% |
| Citi | $72,916.67 | 29% | 0.50% |
| BMO | $12,500.00 | 5% | 0.50% |
| Suntrust | $50,000.00 | 20% | 0.50% |
| | $250,000.00 | | |

**Arrangement Fees (R/C)**

| | | Commit % | Fee % |
|---|---|---|---|
| J.P. Morgan | $550,000.00 | 55% | 2.00% |
| Citi | $350,000.00 | 35% | 2.00% |
| BMO | $50,000.00 | 5% | 2.00% |
| Suntrust | $50,000.00 | 5% | 2.00% |
| | $1,000,000.00 | | |

**New Term Loan B for fee calc purposes**          $1,765,000,000.00

**Arrangement Fees (TLB)**

| | | Commit % | Fee % |
|---|---|---|---|
| J.P. Morgan | $19,415,000.00 | 55% | 2.00% |
| Citi | $12,355,000.00 | 35% | 2.00% |
| BMO | $1,765,000.00 | 5% | 2.00% |
| Suntrust | $1,765,000.00 | 5% | 2.00% |
| | $35,300,000.00 | | |

**Refinance existing Term Loan A**

| | |
|---|---|
| | $303,827,648.00 |
| | $303,827,648.00 |

**Accrued interest**

| | |
|---|---|
| Accrued interest due on R/C | $3,333.33 |
| Accrued interest due on TLA | $290,661.78 |
| | $293,995.11 |

**Admin Agent fees**

| | |
|---|---|
| Unamortized admin fee on existing facilities | ($95,068.54) |
| Admin fee on new facilitites ($100,000 paid quarterly) | $20,833.33 |
| | ($74,235.21) |

**Legal Fees and Expenses**

| | |
|---|---|
| | $875,000.00 |
| | $875,000.00 |

**Out-of-Pocket Expenses**

| | |
|---|---|
| J.P. Morgan | $133,413.69 |
| Citi | $4,542.26 |
| BMO | $3,305.85 |
| Suntrust | $4,154.54 |
| | $145,416.34 |

| Institution | Allocation | % of total |
|---|---:|---:|
| J.P. Morgan | $22,916,666.67 | 45.8% |
| Citi | $14,583,333.33 | 29.2% |
| Suntrust | $10,000,000.00 | 20.0% |
| BMO | $2,500,000.00 | 5.0% |
| **Total** | **$50,000,000.00** | **100.0%** |

| Cumulative % of total |
| --- |
| 45.8% |
| 75.0% |
| 95.0% |
| 100.0% |
| |

| Institution | Allocation | % of total | Cumulative % of total |
|---|---|---|---|
| Franklin Floating Rate Trust | $215,000,000.00 | 12.1% | 12.1% |
| Symphony Asset Management LLC | $140,000,000.00 | 7.9% | 20.0% |
| Invesco Advisers Inc as Agent | $135,000,000.00 | 7.6% | 27.6% |
| ING Investment Management LLC as Agt | $105,000,000.00 | 5.9% | 33.5% |
| Oppenheimer Funds Inc as Agent | $102,000,000.00 | 5.7% | 39.3% |
| Eaton Vance Management as Agt | $100,000,000.00 | 5.6% | 44.9% |
| Fidelity Management & Research Co as Agt | $70,000,000.00 | 3.9% | 48.8% |
| Ares Management LLC (as Agt) | $65,000,000.00 | 3.7% | 52.5% |
| Lord Abbett & Co as Agt | $62,500,000.00 | 3.5% | 56.0% |
| Blackrock Financial Management as Agt | $50,000,000.00 | 2.8% | 58.8% |
| Brigade Capital Management LLC | $45,000,000.00 | 2.5% | 61.4% |
| OZ Advisors LP | $45,000,000.00 | 2.5% | 63.9% |
| Post Advisory Group as Agt | $45,000,000.00 | 2.5% | 66.5% |
| Octagon Credit Investors LLC | $40,000,000.00 | 2.3% | 68.7% |
| Suntrust Bank | $40,000,000.00 | 2.3% | 71.0% |
| Crescent Capital Group LP (as Agt) | $30,000,000.00 | 1.7% | 72.6% |
| Pacific Investment Management Company as Agt | $30,000,000.00 | 1.7% | 74.3% |
| Guardian Investor Services LLC as Agt | $27,000,000.00 | 1.5% | 75.9% |
| Fraser Sullivan Investment Management LLC | $25,000,000.00 | 1.4% | 77.3% |
| Oaktree Capital Management LP | $25,000,000.00 | 1.4% | 78.7% |
| Midocean Partners LP | $22,000,000.00 | 1.2% | 79.9% |
| APG Investments US Inc-APG Treasury Centre BV | $20,000,000.00 | 1.1% | 81.0% |
| General Electric Capital Corporation | $20,000,000.00 | 1.1% | 82.2% |
| Metropolitan Life Insurance Company | $20,000,000.00 | 1.1% | 83.3% |
| New York Life Investment Management as Agent | $20,000,000.00 | 1.1% | 84.4% |
| American Capital, Ltd. | $17,500,000.00 | 1.0% | 85.4% |
| Loomis Sayles and Company LP as Agt | $17,500,000.00 | 1.0% | 86.4% |
| MJX Asset Management LLC | $17,500,000.00 | 1.0% | 87.4% |
| Seix Investment Advisors Incorporated as Agt | $17,500,000.00 | 1.0% | 88.4% |
| Sound Point Capital Management LP | $17,500,000.00 | 1.0% | 89.4% |
| BNP Paribas Investment Partners Luxembourg (Agt) | $14,000,000.00 | 0.8% | 90.1% |
| Apidos Capital Management LLC | $12,500,000.00 | 0.7% | 90.8% |
| Liberty Mutual Insurance Company | $12,500,000.00 | 0.7% | 91.5% |
| Mackenzie Financial Corporation as Agent | $12,500,000.00 | 0.7% | 92.3% |
| Marathon Asset Management LP | $10,000,000.00 | 0.6% | 92.8% |
| THL Credit Inc | $10,000,000.00 | 0.6% | 93.4% |
| Trimaran Advisors LLC | $9,000,000.00 | 0.5% | 93.9% |
| Allstate Investment Management Company as Agt | $8,500,000.00 | 0.5% | 94.4% |
| Loews Corporation | $8,000,000.00 | 0.5% | 94.8% |
| The Guardian Life Insurance Company of America | $8,000,000.00 | 0.5% | 95.3% |
| Feingold O'Keefe Capital LLC | $7,500,000.00 | 0.4% | 95.7% |
| Aegon USA Investment Management as Agt | $6,000,000.00 | 0.3% | 96.0% |
| Credit Value Partners LP | $6,000,000.00 | 0.3% | 96.4% |
| Landmark Funds LLC | $6,000,000.00 | 0.3% | 96.7% |
| Deutsche Investment Management Americas Inc as Agent | $5,000,000.00 | 0.3% | 97.0% |
| Kingsland Capital Management LLC | $5,000,000.00 | 0.3% | 97.3% |
| KVK Investments, Inc. | $5,000,000.00 | 0.3% | 97.5% |
| Metropolitan West Asset Management LLC as Agt | $5,000,000.00 | 0.3% | 97.8% |
| Whitehorse Capital Partners LP | $4,500,000.00 | 0.3% | 98.1% |
| Canaras Capital Management LLC | $4,000,000.00 | 0.2% | 98.3% |
| First Trust Advisors LP as Agent | $4,000,000.00 | 0.2% | 98.5% |
| HRS Investment Holdings LLC | $4,000,000.00 | 0.2% | 98.8% |
| PPM America Incorporated as Agent | $4,000,000.00 | 0.2% | 99.0% |
| Princeton Advisory Group Inc | $3,000,000.00 | 0.2% | 99.2% |
| Triumph Savings Bank, SSB | $3,000,000.00 | 0.2% | 99.3% |
| Zais Grp LLC | $3,000,000.00 | 0.2% | 99.5% |
| Harch Capital Management LLC | $2,000,000.00 | 0.1% | 99.6% |
| Steele Creek CLO 2014-1, Ltd. | $2,000,000.00 | 0.1% | 99.7% |
| Tall Tree Investment Management LLC | $2,000,000.00 | 0.1% | 99.8% |
| Cutwater Asset Management | $1,500,000.00 | 0.1% | 99.9% |
| Saratoga Capital Management LLC (as Agent) | $1,500,000.00 | 0.1% | 100.0% |
| **Total** | **$1,775,000,000.00** | | |

# EXHIBIT 16

EXECUTION VERSION

$1,825,000,000

CREDIT AGREEMENT

among

MILLENNIUM LAB HOLDINGS II, LLC,

as Holdings,

MILLENNIUM LABORATORIES, LLC,

as Borrower,

The Several Lenders from Time to Time Parties Hereto,

and

JPMORGAN CHASE BANK, N.A.,

as Administrative Agent

Dated as of April 16, 2014

J.P. MORGAN SECURITIES LLC

and

CITIBANK GLOBAL MARKETS INC.,

as Joint Lead Arrangers and Joint Bookrunners

CITIBANK GLOBAL MARKETS INC., as Syndication Agent

BMO CAPITAL MARKETS CORP. and SUNTRUST BANK,

as Co-Managers and Co-Documentation Agents

CONFIDENTIAL

4.15 <u>Subsidiaries</u>. Except as disclosed to the Administrative Agent by the Borrower in writing from time to time after the Closing Date, (a) Schedule 4.15 sets forth the name and jurisdiction of incorporation or formation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and whether or not such Subsidiary is a Restricted Subsidiary and (b) there are no outstanding subscriptions, options, warrants (other than the TA Warrants to be redeemed by Millennium Holdings on or substantially concurrently with the Closing Date), calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Restricted Subsidiary, except as created by the Loan Documents.

4.16 <u>Use of Proceeds</u>. The proceeds of the Tranche B Term Loans shall be used (i) to make certain distributions, redemption and/or other compensation payments to shareholders, warrant holders and option holders of Holdings or the Borrower, including, without limitation, to the extent not funded with cash and Cash Equivalents, to make those payments and distributions referenced in Section 7.6(f), (ii) to repay all amounts outstanding under the Existing Credit Agreement, and (iii) to pay the fees and expenses incurred in connection with the foregoing transactions. The proceeds of the Revolving Loans and the Swingline Loans, and the Letters of Credit, shall be used for working capital needs and general corporate purposes of the Borrower and its Subsidiaries, including the Permitted Acquisitions and other Investments and distributions. The proceeds of Incremental Facilities shall be used, in the Borrower's discretion, (i) to finance acquisitions, investments and distribution to shareholders not prohibited hereunder and (ii) for other general corporate purposes of the Borrower and its Subsidiaries.

4.17 <u>Environmental Matters</u>. Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:

(a) the facilities and properties owned, leased or operated by any Group Member (the "<u>Properties</u>") do not contain any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or would give rise to liability under, any Environmental Law;

(b) no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "<u>Business</u>"), nor does Holdings or the Borrower have actual knowledge or reason to believe that any such notice will be received or is being threatened;

(c) Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that would give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that would give rise to liability under, any applicable Environmental Law;

(d) no judicial proceeding or governmental or administrative action is pending or, to the actual knowledge of Holdings and the Borrower, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e) there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Group Member in

509265-1664-11227-Active.15480116.26

   JPMC-MIL-CORP-00161001

has received notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders) or the Majority Facility Lenders under the applicable Facility; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6     Non-Reliance on Agents and Other Lenders. Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates.

9.7     Indemnification. The Lenders agree to indemnify each Agent and its officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an "Agent Indemnitee") (to the extent not reimbursed by Holdings or the Borrower and without limiting the obligation of Holdings or the Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

509265-1664-11227-Active.15480116.26

                                                          JPMC-MIL-CORP-00161034

# EXHIBIT 17

## MILLENNIUM LABORATORIES, INC.
**$1,775mm TL B - L+425, 1.00% floor @ 99.00%**
Maturity - 04/2021
Call Protection - 101 Soft Call for 12 Months
Corporate Ratings - B1/B+
Facility Ratings - B1/B+

| | Lenders | TL B / 7Yr / $1,775mm | |
|---|---|---|---|
| | | Commit Amt | Allocation Amt |
| 1 | FRANKLIN FLOATING RATE TRUST | 243.00 | 215.00 |
| 2 | SYMPHONY ASSET MANAGEMENT LLC | 150.00 | 140.00 |
| 3 | INVESCO ADVISERS INC AS AGENT | 150.00 | 135.00 |
| 4 | OPPENHEIMER FUNDS INC AS AGENT | 125.00 | 125.00 |
| 5 | ING INVESTMENT MANAGEMENT LLC AS AGT | 131.00 | 105.00 |
| 6 | EATON VANCE MANAGEMENT AS AGT | 100.00 | 100.00 |
| 7 | FIDELITY MANAGEMENT & RESEARCH CO AS AGT | 70.00 | 70.00 |
| 8 | ARES MANAGEMENT LLC (AS AGT) | 90.00 | 65.00 |
| 9 | LORD ABBETT & CO AS AGT | 70.00 | 62.50 |
| 10 | BLACKROCK FINANCIAL MANAGEMENT AS AGT | 55.00 | 50.00 |
| 11 | BRIGADE CAPITAL MANAGEMENT LLC | 50.00 | 45.00 |
| 12 | OZ ADVISORS LP | 50.00 | 45.00 |
| 13 | POST ADVISORY GROUP AS AGENT | 50.00 | 45.00 |
| 14 | OCTAGON CREDIT INVESTORS LLC | 44.00 | 40.00 |
| 15 | SUNTRUST BANK | 40.00 | 40.00 |
| 16 | CRESCENT CAPITAL GROUP LP (AS AGT) | 30.00 | 30.00 |
| 17 | PACIFIC INVESTMENT MANAGEMENT COMPANY AS AGT | 30.00 | 30.00 |
| 18 | GUARDIAN INVESTOR SERVICES LLC AS AGT | 32.00 | 27.00 |
| 19 | FRASER SULLIVAN INVESTMENT MANAGEMENT LLC | 30.00 | 25.00 |
| 20 | OAKTREE CAPITAL MANAGEMENT LP | 30.00 | 25.00 |
| 21 | MIDOCEAN PARTNERS LP | 25.00 | 22.00 |
| 22 | APG INVESTMENTS US INC-APG TREASURY CENTRE BV | 25.00 | 20.00 |
| 23 | NEW YORK LIFE INVESTMENT MANAGEMENT ASAGENT | 25.00 | 20.00 |
| 24 | GENERAL ELECTRIC CAPITAL CORPORATION | 20.00 | 20.00 |
| 25 | METROPOLITAN LIFE INSURANCE COMPANY | 20.00 | 20.00 |
| 26 | AMERICAN CAPITAL, LTD. | 25.00 | 17.50 |
| 27 | LOOMIS SAYLES AND COMPANY LP AS AGT | 20.00 | 17.50 |
| 28 | MJX ASSET MANAGEMENT LLC | 20.00 | 17.50 |
| 29 | SEIX INVESTMENT ADVISORS INCORPORATED AS AGT | 20.00 | 17.50 |
| 30 | SOUND POINT CAPITAL MANAGEMENT LP | 20.00 | 17.50 |
| 31 | BNP PARIBAS INVESTMENT PARTNERS LUXEMBOURG(AGT) | 18.00 | 14.00 |
| 32 | APIDOS CAPITAL MANAGEMENT LLC | 15.00 | 12.50 |
| 33 | LIBERTY MUTUAL INSURANCE COMPANY | 15.00 | 12.50 |
| 34 | MACKENZIE FINANCIAL CORPORATION AS AGENT | 15.00 | 12.50 |
| 35 | MARATHON ASSET MANAGEMENT LP | 15.00 | 10.00 |
| 36 | THL CREDIT INC | 15.00 | 10.00 |
| 37 | TRIMARAN ADVISORS LLC | 12.00 | 9.00 |

CONFIDENTIAL                                                                                          JPMC-MIL-CORP-00201658

2/15/2014  4:03 PM

## MILLENNIUM LABORATORIES, INC.
## $1,775mm TL B - L+425, 1.00% floor @ 99.00%
## Maturity - 04/2021
## Call Protection - 101 Soft Call for 12 Months
## Corporate Ratings - B1/B+
## Facility Ratings - B1/B+

| | Lenders | TL B / 7Yr / $1,775mm | |
|---|---|---|---|
| | | Commit Amt | Allocation Amt |
| 38 | ALLSTATE INVESTMENT MANAGEMENT COMPANYAS AGT | 12.00 | 8.50 |
| 39 | LOEWS CORPORATION | 10.00 | 8.00 |
| 40 | THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA | 8.00 | 8.00 |
| 41 | FEINGOLD O'KEEFFE CAPITAL LLC | 10.00 | 7.50 |
| 42 | CREDIT VALUE PARTNERS LP | 8.00 | 6.00 |
| 43 | AEGON USA INVESTMENT MANAGEMENT AS AGT | 6.00 | 6.00 |
| 44 | LANDMARK FUNDS LLC | 6.00 | 6.00 |
| 45 | METROPOLITAN WEST ASSET MANAGEMENT LLCAS AGT | 10.00 | 5.00 |
| 46 | KINGSLAND CAPITAL MANAGEMENT LLC | 6.00 | 5.00 |
| 47 | KVK INVESTMENTS, INC. | 6.00 | 5.00 |
| 48 | DEUTSCHE INVESTMENT MANAGEMENT AMERICASINC AS AGENT | 5.00 | 5.00 |
| 49 | WHITEHORSE CAPITAL PARTNERS LP | 6.00 | 4.50 |
| 50 | CANARAS CAPITAL MANAGEMENT LLC | 5.00 | 4.00 |
| 51 | FIRST TRUST ADVISORS L P AS AGENT | 5.00 | 4.00 |
| 52 | PPM AMERICA INCORPORATED AS AGENT | 5.00 | 4.00 |
| 53 | HRS INVESTMENT HOLDINGS LLC | 4.00 | 4.00 |
| 54 | PRINCETON ADVISORY GROUP INC | 4.00 | 3.00 |
| 55 | TRIUMPH SAVINGS BANK, SSB | 4.00 | 3.00 |
| 56 | ZAIS GRP LLC | 3.00 | 3.00 |
| 57 | HARCH CAPITAL MANAGEMENT LLC | 3.00 | 2.00 |
| 58 | STEELE CREEK CLO 2014-1, LTD. | 3.00 | 2.00 |
| 59 | TALL TREE INVESTMENT MANAGEMENT LLC | 3.00 | 2.00 |
| 60 | CUTWATER ASSET MANAGEMENT | 3.00 | 1.50 |
| 61 | SARATOGA CAPITAL MANAGEMENT LLC(AS AGENT) | 1.50 | 1.50 |
| | **Total** | **2,031.50** | **1,798.00** |

CONFIDENTIAL

JPMC-MIL-CORP-00201659

# EXHIBIT 18
## (Filed Under Seal)

# EXHIBIT 19

| | |
|---|---|
| **From:** | Griswold, Ryan P |
| **To:** | Griswold, Ryan P; Casey, Jp; Murray, Gerry; Lee, Jenny Y.; Rapkin, Cory; Mainelli, Matthew; Chiarelli, Benjamin R; Karanikolaidis, Stathis; Guttilla, Michael T; Christoforou, Alla; Yeh, Hank; Liou, Calvin O; Eichenberger, Stephen; LeeLum, Dawn; Chakanava, Iryna A |
| **CC:** | Ferrara, Alessandro X |
| **Sent:** | 3/14/2014 12:42:44 PM |
| **Subject:** | RE: Millennium Discussion |
| **Attachments:** | Largest div recaps 2013-present v10.pdf; Millennium_3_13 14 Launch Terms LIBOR (Base case) v1 $1,715 TLB.PDF; ML UW Approval 3_13_14 v2.pdf; Project Padres Credit Committee Presentation vF-pdf.zip; Project PadresL14 - Sensitivity Analyses (2014-03) v5.pdf |

**From:** Griswold, Ryan P
**Sent:** Friday, March 14, 2014 5:42:44 AM
**To:** Griswold, Ryan P; Casey, Jp; Murray, Gerry; Lee, Jenny Y.; Rapkin, Cory; Mainelli, Matthew; Chiarelli, Benjamin R; Karanikolaidis, Stathis; Guttilla, Michael T; Christoforou, Alla; Yeh, Hank; Liou, Calvin O; Eichenberger, Stephen; LeeLum, Dawn; Chakanava, Iryna A
**CC:** Ferrara, Alessandro X

In advance of our conversation this morning, attached are the following documents which we'll reference:

-Capital Markets Overview Package
-270 output
-dividend recap comps
-underwriting one pager
-reimbursement rate sensitivity analysis

**Ryan P. Griswold** | Vice President | Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

**Alternate contact:** Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

CONFIDENTIAL

**Millennium Labs 270 sum sheet – Case 1: Max 1st lien Launch Terms Base Case: $1,715mm Term Loan B**  3/14/2014

($ millions)

### Pro forma capitalization

| | Commitment | Funded | % of debt | % of cap | x PF LTM EBITDA | Pricing (bps) | LIBOR Floor | Upfront fees | Fees |
|---|---|---|---|---|---|---|---|---|---|
| Cash | $50.0 | $50.0 | | | | | | | |
| Revolver | $50.0 | $0.0 | 0.0% | 0.0% | 0.00x | L + 300 / 25 | 0.00% | 50.00bps | 2.00% |
| TLB (1st Lien) | 1,715.0 | 1,715.0 | 97.9% | 45.4% | 4.54x | L + 300 | 1.00% | 99.50 | 2.00% |
| Total Sr. Secured Debt | $1,715.0 | $1,715.0 | 97.9% | 45.4% | 4.54x | | | | |
| Other debt | $36.7 | $36.7 | 2.1% | 1.0% | 0.10x | | | | |
| Total other debt | $36.7 | $36.7 | 2.1% | 1.0% | 0.10x | | | | |
| Total debt | $1,751.7 | $1,751.7 | 100.0% | 46.3% | 4.63x | | | | |
| Equity | | $2,029.5 | | 53.7% | 5.37x | | | | |
| Assumed Capitalization | | $3,781.2 | | 100.0% | 10.00x | | | | |

### Sources and Uses

| Sources | Amount | | Uses | Amount |
|---|---|---|---|---|
| TLB (1st Lien) | $1,715.0 | | Dividend | 1,212.3 |
| Cash from Balance Sheet | $50.0 | | Fees | 44.1 |
| | | | Refinanced TA debenture | 196.0 |
| | | | Refinanced TLA | 312.5 |
| TOTAL SOURCES | $1,765.0 | | TOTAL USES | $1,765.0 |

**Assumptions**
Note: 2013 EBITDA includes ~$20mm of one time adjustments

### Financial Summary

| FYE DECEMBER 31 | 2009A | 2010A | 2011A | 2012A | 2013PF | 2014PF | 2015PF | 2016PF | 2017PF | 2018PF | 2019PF | 2020PF | 2021PF | 2022PF | 2023PF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net sales | $64.5 | $160.7 | $232.6 | $522.2 | $632.6 | $733.3 | $788.8 | $853.1 | $933.0 | $1,008.1 | $1,070.6 | $1,134.7 | $1,180.1 | $1,227.3 | $1,276.4 |
| % Growth | | 149.3% | 44.8% | 124.5% | 21.2% | 15.9% | 7.6% | 8.2% | 9.4% | 8.0% | 6.2% | 6.0% | 4.0% | 4.0% | 4.0% |
| EBITDA (pre SBC) | $41.3 | $102.2 | $109.3 | $329.8 | $378.1 | $417.9 | $435.8 | $459.0 | $498.0 | $532.2 | $564.4 | $594.3 | $618.1 | $642.8 | $668.5 |
| % Margin | | 63.6% | 47.0% | 63.2% | 59.8% | 57.0% | 55.2% | 53.8% | 53.4% | 52.8% | 52.7% | 52.4% | 52.4% | 52.4% | 52.4% |
| % Growth | | 147.3% | 6.9% | 201.8% | 14.6% | 10.5% | 4.3% | 5.3% | 8.5% | 6.9% | 6.1% | 5.3% | 4.0% | 4.0% | 4.0% |
| Interest Income | $0.0 | $0.2 | $0.0 | $0.0 | $0.0 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $0.3 | $1.1 |
| Interest Expense | ($0.1) | ($0.3) | ($13.8) | ($32.4) | ($42.2) | ($71.2) | ($65.5) | ($71.0) | ($72.0) | ($68.9) | ($59.6) | ($45.9) | ($29.5) | ($11.9) | ($3.1) |
| Net interest expense | ($0.1) | ($0.1) | ($13.8) | ($32.4) | ($42.2) | ($70.9) | ($65.3) | ($70.8) | ($71.7) | ($68.6) | ($59.4) | ($45.7) | ($29.2) | ($11.6) | ($2.0) |
| Capital expenditures | (3.3) | (10.1) | (7.9) | (9.2) | (15.3) | (23.9) | (15.5) | (19.3) | (24.5) | (34.6) | (34.6) | (34.6) | (34.6) | (34.6) | (34.6) |

### Cash Flow Reconciliation

| FYE DECEMBER 31 | 2009A | 2010A | 2011A | 2012A | 2013PF | 2014PF | 2015PF | 2016PF | 2017PF | 2018PF | 2019PF | 2020PF | 2021PF | 2022PF | 2023PF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Libor Assumptions | | | | | 0.24% | 0.30% | 0.90% | 1.89% | 2.69% | 3.41% | 3.82% | 4.08% | 4.22% | 4.32% | 4.45% |
| EBITDA | | | | | $378.1 | $417.9 | $435.8 | $459.0 | $498.0 | $532.2 | $564.4 | $594.3 | $618.1 | $642.8 | $668.5 |
| Less: cash interest | | | | | (23.2) | (81.4) | (69.7) | (74.9) | (75.7) | (72.4) | (62.8) | (48.7) | (32.2) | (14.6) | (5.0) |
| Less: income tax | | | | | (154.4) | (154.4) | (182.2) | (198.3) | (216.2) | (236.8) | (255.1) | (272.0) | (293.5) | (315.8) | (334.4) |
| Plus: non cash interest expense | | | | | 2.3 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Less: repayment of cap lease obligations | | | | | (12.7) | (14.6) | (10.6) | (2.5) | (0.8) | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) | (1.2) |
| Less: Non-tax distributions net of TA interest payment | | | | | (1.2) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Less: capex | | | | | (20.3) | (23.9) | (15.5) | (19.3) | (24.5) | (34.6) | (34.6) | (34.6) | (34.6) | (34.6) | (34.6) |
| Less: chg in NWC | | | | | (26.4) | (17.6) | (3.1) | (7.1) | (7.8) | (6.9) | (6.9) | (6.9) | (6.9) | (6.9) | (6.9) |
| Free cash flow | | | | | $142.2 | $126.1 | $154.5 | $157.0 | $173.0 | $180.3 | $203.8 | $230.9 | $249.6 | $269.7 | $286.4 |
| Cumulative free cash flow available | | | | | | 126.1 | 280.6 | 437.5 | 610.5 | 790.8 | 994.6 | 1,225.5 | 1,475.1 | 1,744.8 | 2,031.2 |

1st lien debt paydown by year 7: 71.5%
Total debt paydown by year 7: 70.0%

### Debt Balances

| FYE DECEMBER 31 | 2009A | 2010A | 2011A | 2012A | 2013PF | 2014PF | 2015PF | 2016PF | 2017PF | 2018PF | 2019PF | 2020PF | 2021PF | 2022PF | 2023PF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | | | | | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $79.8 | $366.2 |
| Revolver | | | | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| TLB (1st Lien) | | | | | 1,715.0 | 1,588.9 | 1,434.4 | 1,277.5 | 1,104.5 | 924.2 | 720.4 | 489.5 | 239.9 | 0.0 | 0.0 |
| Total Sr. Secured debt | | | | | $1,715.0 | $1,588.9 | $1,434.4 | $1,277.5 | $1,104.5 | $924.2 | $720.4 | $489.5 | $239.9 | $0.0 | $0.0 |
| Net debt | | | | | 1,665.0 | 1,538.9 | 1,384.4 | 1,227.5 | 1,054.5 | 874.2 | 670.4 | 439.5 | 189.9 | (79.8) | (366.2) |
| % of TLB outstanding | | | | | | 92.6% | 83.6% | 74.5% | 64.4% | 53.9% | 42.0% | 28.5% | 14.0% | 0.0% | 0.0% |
| Other debt | | | | | 36.7 | 34.0 | 30.9 | 19.1 | 14.3 | 11.9 | 11.9 | 11.9 | 11.9 | 11.9 | 11.9 |
| Total debt | | | | | $1,751.7 | $1,622.9 | $1,465.3 | $1,296.5 | $1,118.8 | $936.1 | $732.4 | $501.5 | $251.8 | $11.9 | $11.9 |
| Net debt | | | | | 1,701.7 | 1,572.9 | 1,415.3 | 1,246.5 | 1,068.8 | 886.1 | 682.4 | 451.5 | 201.8 | (67.9) | (354.3) |

### Ratio Summary

| FYE DECEMBER 31 | 2009A | 2010A | 2011A | 2012A | 2013PF | 2014PF | 2015PF | 2016PF | 2017PF | 2018PF | 2019PF | 2020PF | 2021PF | 2022PF | 2023PF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sr. Secured Debt / EBITDA (pre SBC) | | | | | 4.54x | 3.80x | 3.29x | 2.78x | 2.22x | 1.74x | 1.28x | 0.82x | 0.39x | 0.00x | 0.00x |
| Sr. Secured Net Debt / EBITDA (pre SBC) | | | | | 4.40x | 3.68x | 3.18x | 2.67x | 2.12x | 1.64x | 1.19x | 0.74x | 0.31x | nm | nm |
| Total Debt / EBITDA (pre SBC) | | | | | 4.63x | 3.88x | 3.36x | 2.82x | 2.25x | 1.76x | 1.30x | 0.84x | 0.41x | 0.02x | 0.02x |
| Total Net Debt / EBITDA (pre SBC) | | | | | 4.50x | 3.76x | 3.25x | 2.72x | 2.15x | 1.67x | 1.21x | 0.76x | 0.33x | nm | nm |
| EBITDA (pre SBC) / Interest expense | | | | | 8.96x | 5.89x | 6.68x | 6.49x | 6.94x | 7.76x | 9.50x | 13.01x | 21.16x | 55.51x | 333.04x |
| (EBITDA (pre SBC) - Capex) / Interest expense | | | | | 8.48x | 5.56x | 6.44x | 6.21x | 6.60x | 7.25x | 8.92x | 12.25x | 19.97x | 52.52x | 315.78x |
| FCF / Total Debt | | | | | 0.08x | 0.08x | 0.11x | 0.12x | 0.16x | 0.20x | 0.28x | 0.47x | 1.04x | nm | nm |
| S&P: Debt / EBITDA | | | | | 4.67x | 3.92x | 3.39x | 2.86x | 2.28x | 1.79x | 1.32x | 0.87x | 0.00x | 0.00x | 0.00x |
| Moody's: Debt / EBITDAR | | | | | 4.64x | 3.90x | 3.38x | 2.84x | 2.26x | 1.78x | 1.32x | 0.86x | 0.00x | 0.00x | 0.00x |
| Coverage ratio: EBITDAR / (Interest+rent) | | | | | 8.55x | 5.74x | 6.48x | 6.32x | 6.75x | 7.53x | 9.18x | 12.42x | 0.00x | 0.00x | 0.00x |

CONFIDENTIAL

JPMC-MIL-CORP-00237304

# Project PADRESMARL14

HIGHLY CONFIDENTIAL


MILLENNIUM LABORATORIES

**Dividend Recapitalization of Millennium Laboratories, Inc by TA Associates**
Date: March, 2014
Project name: Project PADRESMARL14
JPM mandated role: Lead Left arranger and bookrunner, admin agent
**Expected corporate ratings: [B2/B]**

| Industry Coverage | SLF Originations | Capital Markets | Credit |
|---|---|---|---|
| Cory Rapkin | Stathis Karanikolaidis | Jenny Lee | Dawn LeeLum |
| Matthew Mainelli | Ryan Griswold | | Iryna Chakanava |
| Ben Chiarelli | Mike Guttilla | | |
| Hank Yeh | Alla Christoforou | | |
| Calvin Liou | | | |

## Brief business description

- Leader in medication monitoring and drug detection for clinicians in the chronic pain space
- Key products:
  - Urine Drug Testing ("UDT") – testing for patient medication monitoring and adherence
  - Oral Fluid Testing ("OFT") – testing for patient medication monitoring and adherence for individuals unable to provide a urine sample
  - Pharmacogenetic Testing ("PGT") – testing to determine how an individual will respond to a particular drug therapy. Highly effective tool for increasing safety and efficacy for truly personalized medicine
- Analyzed and tested approximately 6,000,000 specimen throughout its history (March 2008 – 2013)
  - ~2,400,000 in 2013 alone; average daily tests have increased from ~6,000/day at beginning of 2012 to over 10,700/day at the end of 2013 (~78.3% daily average volume increase)
- Leading market share with national presence in UDT space, increased focus and growing market share in PGT segment
- 500+ payor relationships, including 185 network contracts covering over 150 million lives
- Attractive payor mix (by volume)
  - 60% Commercial; 30% Medicare/ Medicaid; 10% Self-pay
  - ~66% is contracted (including Medicare, Medicaid and commercial plans)
- Key contracts include UnitedHealthcare, Aetna, Humana, Wellcare, and numerous regional BCBS plans

| FYE12/31 ($mm) | 2011 | 2012 | 2013 | 2014E | 2015E |
|---|---|---|---|---|---|
| Revenue | $233 | $522 | $632 | $733 | $789 |
| EBITDA | $109 | $330 | $378 | $418 | $436 |
| % margin | 46.8% | 63.2% | 59.8% | 57.2% | 55.2% |
| Capex | $10 | $11 | $15 | $24 | $15 |

## S&U and pro forma capitalization

| Sources | Amount ($mm) | Uses | Amount ($mm) |
|---|---|---|---|
| New R/C facility | $ - | Dividend | $1,212.3 |
| New Term Loan B | 1,715.0 | Refinance Term Loan A | 312.5 |
| Balance sheet cash | 50.0 | Refinance TA debentures | 196.0 |
| | | Fees and expenses[1] | 44.1 |
| **Total** | **$1,765.0** | **Total** | **$1,765.0** |

| ($mm) | Pro forma | xEBITDA[2] | % of cap | Tenor | Execution rates |
|---|---|---|---|---|---|
| Cash | $50.0 | | | | |
| $50mm R/C facility due 2019 | - | | | 5 years | L+300 / 25 bps / 99.5 |
| New Term Loan B due 2021 | 1,715.0 | | | 7 years | L+300, 100 floor / 99.5 |
| **Total secured debt** | **$1,715.0** | **4.54x** | **97.9%** | | |
| **Net secured debt** | **$1,665.0** | **4.40x** | **95.1%** | | |
| Other debt | 36.7 | | | | |
| **Total debt** | **$1,751.7** | (4.63x) | **100.0%** | | |
| **Net debt** | **$1,701.7** | **4.50x** | **97.1%** | | |

[1] Fees and expenses assumes 2% arrangement fee and 50bps OID/upfront fee
[2] FY13 Estimated EBITDA of $378.1mm

MILLENNIUM LABORATORIES

## Key risks and mitigants

- **Competitive industry environment; sustainability of top line growth and margins in the long term (margin impact from obtaining in network status with payors)**
  - First mover advantage, with the newest, most efficient technology, which allowed the Company to achieve the fastest test turnaround time of ~24 hours among national labs
  - Value-added services, including predictive analytics (newly acquired RxAnte) and physician education through Millennium Research Institute, provide competitive edge
  - In-network relationships allow the Company to gain volume and market share
  - Ability to grow business via new products/investments
- **Potential reimbursement pressures.** Given the focus of Healthcare Reform on cost containment, Millennium, along with other providers, may be subject to reimbursement pressures
  - Diversified payor mix, with Medicare and Medicaid comprising only ~30% of revenue; limited state-specific Medicaid concentration, with 8.5% of revenue derived from Medicaid
- **Litigation / Investigation.** Due to the nature of the industry, the Company is subject to investigations and a number of lawsuits
  - Based on prior discussions with the counsel and management, the downside impact of any of the existing cases is limited; the Company insures a portion of its litigation costs
  - Millennium is a plaintiff in the majority of the cases and received favorable rulings in a number of cases (e.g. Calloway case in Massachusetts and Ameritox case in Maryland)
- **Integration risk/ability to turn RX Ante into profitable business**
  - Management intends to manage the RxAnte business on a standalone basis. Most of the Company's existing personnel will stay in place and continue to run the business, which should help ensure a smooth integration

## Draft flex and other underwrite terms of term loans

### Terms

- **Fees:**
  - R/C: 2.0%
  - Term Loan B: 2.00%
- **Tenor:**
  - R/C: 5-year
  - TLB: 7-year
- **Indicative pricing:**
  - R/C: L+300/25, 50.0
  - TLB: L+300, 1.00%, 99.5
- **Redemption:**
  - TLB:101 soft call for 6 months
- **Marketing period:**
  - 3 weeks

- **Covenant(s):**
  - RC: Total leverage ratio
  - TL: Capex
- **Commitment:**
  - JPM 55%
  - Commitment length – 45 days
  - Incremental: $175mm plus unlimited amounts as long as the pro forma Leverage Ratio does not exceed 4.50x

### Flex

- **Pricing:**
  - TLB total: 1.50%
  - Up to 37.5 of OID flex (max OID of 98.0)
  - 25 bps flex if ratings are below B1 or B+ stable/stable
- **Redemption:**
  - TLB: flex to 102, 101 soft call in year 1 and 2
- **Mandatory Prepayment**
  - Change the initial "excess cash flow sweep" percentage to 75%, provided that the aggregate excess cash flow sweep shall not exceed $35 million with respect to the fiscal year ended December 31, 2014 and $45 million with respect to the fiscal year ended December 31, 2015
  - Tenor flex of 7 to 6 years

J.P.Morgan

JPMC-MIL-CORP-00237305

# Sensitivity analysis — Revenue, EBITDA and EBITDA margin

## Price and volume sensitivity on Core UDT business

**Base case assumptions**
2021 price per specimen (32.3% decline) — $179.43
2021 volume (9.1% CAGR) — 4,693,352

**Specific case assumptions**
- Assumes no benefit from UDT emerging opportunities, PGT or RxAnte
- Cost margins held constant per Management Base Case

Approximate current out of network rate
Base case
United rates

**EBITDA Sensitivity Notes:**
- Across the top of the table is the total price decline from 2013 to 2020 and the implied 2020 price per specimen
- The vertical variable is the volume CAGR from 2013 to 2020 and the implied 2020 volume
- The table shows the implied 2020 EBITDA at these various metrics assuming base case cost margin assumptions

### 2021 Revenue Sensitivity ($mm)

| Volume | | Growth | $39.74 | $50.00 | $52.98 | $66.23 | $79.47 | $92.72 | $105.97 | $119.21 | $132.46 | $145.70 | $158.95 | $172.19 | $179.35 | $185.44 | $198.68 | $211.93 | $225.18 | $238.42 | $251.67 | $264.91 |
| | | | -85.0% | -81.1% | -80.0% | -75.0% | -70.0% | -65.0% | -60.0% | -55.0% | -50.0% | -45.0% | -40.0% | -35.0% | -32.3% | -30.0% | -25.0% | -20.0% | -15.0% | -10.0% | -5.0% | 0.0% |
| | | | -21.1% | -18.8% | -18.2% | -15.9% | -14.0% | -12.3% | -10.8% | -9.5% | -8.3% | -7.2% | -6.2% | -5.2% | -4.8% | -4.4% | -3.5% | -2.8% | -2.0% | -1.3% | -0.6% | 0.0% |
| 1,008,474 | -1,334,269 | -10.0% | 40 | 50 | 53 | 67 | 80 | 94 | 107 | 120 | 134 | 147 | 160 | 174 | 181 | 187 | 200 | 214 | 227 | 240 | 254 | 267 |
| 1,202,340 | -1,140,403 | -8.0% | 48 | 60 | 64 | 80 | 96 | 111 | 127 | 143 | 159 | 175 | 191 | 207 | 216 | 223 | 239 | 255 | 271 | 287 | 303 | 319 |
| 1,428,063 | -914,680 | -6.0% | 57 | 72 | 76 | 95 | 113 | 132 | 151 | 170 | 189 | 208 | 227 | 246 | 256 | 265 | 284 | 303 | 322 | 340 | 359 | 378 |
| 1,690,030 | -652,713 | -4.0% | 67 | 85 | 90 | 112 | 134 | 157 | 179 | 201 | 224 | 246 | 269 | 291 | 303 | 313 | 336 | 358 | 381 | 403 | 425 | 448 |
| 1,993,119 | -349,624 | -2.0% | 79 | 100 | 106 | 132 | 158 | 185 | 211 | 238 | 264 | 290 | 317 | 343 | 357 | 370 | 396 | 422 | 449 | 475 | 502 | 528 |
| 2,342,743 | 0 | 0.0% | 93 | 117 | 124 | 155 | 186 | 217 | 248 | 279 | 310 | 341 | 372 | 403 | 420 | 434 | 465 | 496 | 528 | 559 | 590 | 621 |
| 2,744,897 | 402,154 | 2.0% | 109 | 137 | 145 | 182 | 218 | 255 | 291 | 327 | 364 | 400 | 436 | 473 | 492 | 509 | 545 | 582 | 618 | 654 | 691 | 727 |
| 3,206,206 | 863,463 | 4.0% | 127 | 161 | 170 | 212 | 255 | 297 | 340 | 382 | 425 | 467 | 510 | 552 | 575 | 595 | 637 | 679 | 722 | 764 | 807 | 849 |
| 3,733,976 | 1,391,233 | 6.0% | 148 | 187 | 198 | 247 | 297 | 346 | 396 | 445 | 495 | 544 | 594 | 643 | 670 | 692 | 742 | 791 | 841 | 890 | 940 | 989 |
| 4,336,254 | 1,993,511 | 8.0% | 172 | 217 | 230 | 287 | 345 | 402 | 459 | 517 | 574 | 632 | 689 | 747 | 778 | 804 | 862 | 919 | 976 | 1,034 | 1,091 | 1,149 |
| 4,702,433 | 2,359,690 | 9.1% | 187 | 235 | 249 | 311 | 374 | 436 | 498 | 561 | 623 | 685 | 747 | 810 | 843 | 872 | 934 | 997 | 1,059 | 1,121 | 1,183 | 1,246 |
| 5,021,878 | 2,679,135 | 10.0% | 200 | 251 | 266 | 333 | 399 | 466 | 532 | 599 | 665 | 732 | 798 | 865 | 901 | 931 | 998 | 1,064 | 1,131 | 1,197 | 1,264 | 1,330 |

### 2021 EBITDA Sensitivity ($mm)

| Volume | | Growth | $39.74 | $50.00 | $52.98 | $66.23 | $79.47 | $92.72 | $105.97 | $119.21 | $132.46 | $145.70 | $158.95 | $172.19 | $179.35 | $185.44 | $198.68 | $211.93 | $225.18 | $238.42 | $251.67 | $264.91 |
| | | | -85.0% | -81.1% | -80.0% | -75.0% | -70.0% | -65.0% | -60.0% | -55.0% | -50.0% | -45.0% | -40.0% | -35.0% | -32.3% | -30.0% | -25.0% | -20.0% | -15.0% | -10.0% | -5.0% | 0.0% |
| | | | -21.1% | -18.8% | -18.2% | -15.9% | -14.0% | -12.3% | -10.8% | -9.5% | -8.3% | -7.2% | -6.2% | -5.2% | -4.8% | -4.4% | -3.5% | -2.8% | -2.0% | -1.3% | -0.6% | 0.0% |
| 1,008,474 | -1,334,269 | -10.0% | -1 | 6 | 8 | 17 | 26 | 35 | 43 | 52 | 61 | 70 | 79 | 88 | 92 | 96 | 105 | 114 | 123 | 132 | 141 | 150 |
| 1,202,340 | -1,140,403 | -8.0% | -1 | 7 | 10 | 20 | 31 | 41 | 52 | 62 | 73 | 83 | 94 | 104 | 110 | 115 | 126 | 136 | 147 | 157 | 168 | 178 |
| 1,428,063 | -914,680 | -6.0% | -1 | 9 | 11 | 24 | 36 | 49 | 61 | 74 | 87 | 99 | 112 | 124 | 131 | 137 | 149 | 162 | 174 | 187 | 199 | 212 |
| 1,690,030 | -652,713 | -4.0% | -1 | 10 | 13 | 28 | 43 | 58 | 73 | 88 | 102 | 117 | 132 | 147 | 155 | 162 | 177 | 191 | 206 | 221 | 236 | 251 |
| 1,993,119 | -349,624 | -2.0% | -2 | 12 | 16 | 33 | 51 | 68 | 86 | 103 | 121 | 138 | 156 | 173 | 183 | 191 | 208 | 226 | 243 | 261 | 278 | 296 |
| 2,342,743 | 0 | 0.0% | -2 | 14 | 19 | 39 | 60 | 80 | 101 | 121 | 142 | 162 | 183 | 204 | 215 | 224 | 245 | 265 | 286 | 306 | 327 | 347 |
| 2,744,897 | 402,154 | 2.0% | -2 | 17 | 22 | 46 | 70 | 94 | 118 | 142 | 166 | 190 | 214 | 239 | 252 | 263 | 287 | 311 | 335 | 359 | 383 | 407 |
| 3,206,206 | 863,463 | 4.0% | -3 | 19 | 26 | 54 | 82 | 110 | 138 | 166 | 194 | 222 | 251 | 279 | 294 | 307 | 335 | 363 | 391 | 419 | 447 | 475 |
| 3,733,976 | 1,391,233 | 6.0% | -3 | 23 | 30 | 63 | 95 | 128 | 161 | 194 | 226 | 259 | 292 | 324 | 342 | 357 | 390 | 423 | 455 | 488 | 521 | 554 |
| 4,336,254 | 1,993,511 | 8.0% | -3 | 26 | 35 | 73 | 111 | 149 | 187 | 225 | 263 | 301 | 339 | 377 | 397 | 415 | 453 | 491 | 529 | 567 | 605 | 643 |
| 4,702,433 | 2,359,690 | 9.1% | -4 | 28 | 38 | 79 | 120 | 161 | 202 | 244 | 285 | 326 | 367 | 409 | 431 | 450 | 491 | 532 | 574 | 615 | 656 | 697 |
| 5,021,878 | 2,679,135 | 10.0% | -4 | 30 | 40 | 84 | 128 | 172 | 216 | 260 | 304 | 348 | 392 | 436 | 460 | 480 | 524 | 569 | 613 | 657 | 701 | 745 |

### 2021 EBITDA Margin Sensitivity %

| $39.74 | $50.00 | $52.98 | $66.23 | $79.47 | $92.72 | $105.97 | $119.21 | $132.46 | $145.70 | $158.95 | $172.19 | $179.35 | $185.44 | $198.68 | $211.93 | $225.18 | $238.42 | $251.67 | $264.91 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| -85.0% | -81.1% | -80.0% | -75.0% | -70.0% | -65.0% | -60.0% | -55.0% | -50.0% | -45.0% | -40.0% | -35.0% | -32.3% | -30.0% | -25.0% | -20.0% | -15.0% | -10.0% | -5.0% | 0.0% |
| -21.1% | -18.8% | -18.2% | -15.9% | -14.0% | -12.3% | -10.8% | -9.5% | -8.3% | -7.2% | -6.2% | -5.2% | -4.8% | -4.4% | -3.5% | -2.8% | -2.0% | -1.3% | -0.6% | 0.0% |
| NM | 12.1% | 15.1% | 25.3% | 32.1% | 37.0% | 40.6% | 43.5% | 45.7% | 47.6% | 49.2% | 50.5% | 51.1% | 51.6% | 52.6% | 53.4% | 54.2% | 54.8% | 55.4% | 56.0% |

Volume growth - Core UDT *(vertical axis label for Revenue and EBITDA tables)*

Growth in price per specimen *(horizontal axis label across all tables)*

MILLENNIUM LABORATORIES        0        J.P.Morgan

JPMC-MIL-CORP-00237306

# Sensitivity analysis — FCF heat map

## Price and volume sensitivity on Core UDT business

**FCF Sensitivity Notes:**
- Across the top of the table is the total price decline from 2013 to 2021 and the implied 2021 price per specimen
- The vertical variable is the volume CAGR from 2013 to 2021 and the implied 2021 volume
- The table shows the year that FCF available for debt paydown turns negative under each assumption

Approximate current out of network rate
Base case
United rates

**Cash flow heat map — Year that FCF available for debt paydown goes negative**



| Volume growth - Core UDT | Absolute % | CAGR | $39.74 / -85.0% / -21.1% | $50.00 / -81.1% / -18.8% | $52.98 / -80.0% / -18.2% | $66.23 / -75.0% / -15.9% | $79.47 / -70.0% / -14.0% | $92.72 / -65.0% / -12.3% | $105.97 / -60.0% / -10.8% | $119.21 / -55.0% / -9.5% | $132.46 / -50.0% / -8.3% | $145.70 / -45.0% / -7.2% | $158.95 / -40.0% / -6.2% | $172.19 / -35.0% / -5.2% | $179.35 / -32.3% / -4.8% | $185.44 / -30.0% / -4.4% | $198.68 / -25.0% / -3.5% | $211.93 / -20.0% / -2.8% | $225.18 / -15.0% / -2.0% | $238.42 / -10.0% / -1.3% | $251.67 / -5.0% / -0.6% | $264.91 / 0.0% / 0.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,008,474 | -57% | -10.0% | 2016 | 2016 | 2016 | 2017 | 2017 | 2017 | 2017 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2019 | 2020 | 2020 | 2020 | 0 |
| 1,202,340 | -49% | -8.0% | 2016 | 2017 | 2017 | 2017 | 2017 | 2017 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2019 | 2019 | 2020 | 2020 | 2020 | 0 | 0 | 0 |
| 1,428,063 | -39% | -6.0% | 2016 | 2017 | 2017 | 2017 | 2017 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2020 | 2020 | 2020 | 2020 | 0 | 0 | 0 | 0 | 0 |
| 1,690,030 | -28% | -4.0% | 2017 | 2017 | 2017 | 2017 | 2018 | 2018 | 2018 | 2018 | 2019 | 2019 | 2020 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1,993,119 | -15% | -2.0% | 2017 | 2017 | 2017 | 2017 | 2018 | 2018 | 2018 | 2018 | 2019 | 2020 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,342,743 | 0% | 0.0% | 2017 | 2017 | 2017 | 2018 | 2018 | 2018 | 2019 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2,744,897 | 17% | 2.0% | 2017 | 2017 | 2017 | 2018 | 2018 | 2019 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3,206,206 | 37% | 4.0% | 2017 | 2018 | 2018 | 2018 | 2018 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3,733,976 | 59% | 6.0% | 2017 | 2018 | 2018 | 2018 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4,336,254 | 85% | 8.0% | 2017 | 2018 | 2018 | 2018 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4,702,433 | 101% | 9.1% | 2018 | 2018 | 2018 | 2019 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5,021,878 | 114% | 10.0% | 2018 | 2018 | 2018 | 2020 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Debt to be refinanced Notes:**
- Outlines the amount of debt outstanding when:
  - FCF available for debt paydown goes negative
  - forecast period reaches 2020, the time to refinance TLB

**Debt to be refinanced, 2020 ($mm)**

| Volume growth - Core UDT | Absolute % | CAGR | $39.74 / -85.0% / -21.1% | $50.00 / -81.1% / -18.8% | $52.98 / -80.0% / -18.2% | $66.23 / -75.0% / -15.9% | $79.47 / -70.0% / -14.0% | $92.72 / -65.0% / -12.3% | $105.97 / -60.0% / -10.8% | $119.21 / -55.0% / -9.5% | $132.46 / -50.0% / -8.3% | $145.70 / -45.0% / -7.2% | $158.95 / -40.0% / -6.2% | $172.19 / -35.0% / -5.2% | $179.35 / -32.3% / -4.8% | $185.44 / -30.0% / -4.4% | $198.68 / -25.0% / -3.5% | $211.93 / -20.0% / -2.8% | $225.18 / -15.0% / -2.0% | $238.42 / -10.0% / -1.3% | $251.67 / -5.0% / -0.6% | $264.91 / 0.0% / 0.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,008,474 | -57% | -10.0% | 1,591 | 1,580 | 1,578 | 1,560 | 1,544 | 1,530 | 1,517 | 1,503 | 1,487 | 1,473 | 1,458 | 1,445 | 1,438 | 1,432 | 1,420 | 1,403 | 1,383 | 1,360 | 1,330 | 1,319 |
| 1,202,340 | -49% | -8.0% | 1,585 | 1,573 | 1,568 | 1,548 | 1,531 | 1,516 | 1,500 | 1,482 | 1,465 | 1,449 | 1,434 | 1,419 | 1,409 | 1,399 | 1,375 | 1,344 | 1,310 | 1,298 | 1,271 | 1,245 |
| 1,428,063 | -39% | -6.0% | 1,578 | 1,561 | 1,556 | 1,536 | 1,518 | 1,500 | 1,479 | 1,459 | 1,441 | 1,424 | 1,404 | 1,376 | 1,358 | 1,339 | 1,299 | 1,285 | 1,254 | 1,224 | 1,195 | 1,166 |
| 1,690,030 | -28% | -4.0% | 1,570 | 1,550 | 1,545 | 1,523 | 1,503 | 1,479 | 1,456 | 1,436 | 1,416 | 1,387 | 1,350 | 1,303 | 1,299 | 1,282 | 1,246 | 1,211 | 1,177 | 1,144 | 1,111 | 1,080 |
| 1,993,119 | -15% | -2.0% | 1,560 | 1,538 | 1,533 | 1,510 | 1,483 | 1,457 | 1,433 | 1,409 | 1,374 | 1,325 | 1,293 | 1,251 | 1,228 | 1,210 | 1,170 | 1,132 | 1,094 | 1,057 | 1,022 | 986 |
| 2,342,743 | 0% | 0.0% | 1,548 | 1,526 | 1,520 | 1,492 | 1,462 | 1,434 | 1,407 | 1,366 | 1,321 | 1,271 | 1,223 | 1,177 | 1,152 | 1,132 | 1,088 | 1,046 | 1,004 | 964 | 924 | 886 |
| 2,744,897 | 17% | 2.0% | 1,537 | 1,513 | 1,507 | 1,472 | 1,440 | 1,410 | 1,364 | 1,312 | 1,255 | 1,201 | 1,148 | 1,097 | 1,070 | 1,048 | 1,000 | 953 | 908 | 863 | 820 | 777 |
| 3,206,206 | 37% | 4.0% | 1,525 | 1,500 | 1,491 | 1,452 | 1,418 | 1,371 | 1,312 | 1,247 | 1,185 | 1,125 | 1,067 | 1,011 | 982 | 957 | 905 | 853 | 803 | 754 | 706 | 659 |
| 3,733,976 | 59% | 6.0% | 1,513 | 1,481 | 1,471 | 1,430 | 1,387 | 1,324 | 1,249 | 1,178 | 1,109 | 1,044 | 980 | 919 | 887 | 860 | 802 | 746 | 690 | 637 | 584 | 532 |
| 4,336,254 | 85% | 8.0% | 1,501 | 1,462 | 1,451 | 1,408 | 1,344 | 1,263 | 1,181 | 1,103 | 1,028 | 957 | 887 | 820 | 785 | 755 | 691 | 629 | 569 | 510 | 452 | 395 |
| 4,702,433 | 101% | 9.1% | 1,493 | 1,451 | 1,440 | 1,391 | 1,314 | 1,228 | 1,142 | 1,060 | 981 | 906 | 833 | 762 | 725 | 694 | 627 | 562 | 498 | 436 | 375 | 315 |
| 5,021,878 | 114% | 10.0% | 1,485 | 1,442 | 1,431 | 1,376 | 1,293 | 1,198 | 1,108 | 1,023 | 941 | 863 | 787 | 713 | 675 | 642 | 572 | 504 | 438 | 373 | 309 | 247 |

**Debt-to-EBITDA - Positive Cash Flow Scenarios**

| Volume growth - Core UDT | Absolute % | CAGR | $39.74 / -85.0% / -21.1% | $50.00 / -81.1% / -18.8% | $52.98 / -80.0% / -18.2% | $66.23 / -75.0% / -15.9% | $79.47 / -70.0% / -14.0% | $92.72 / -65.0% / -12.3% | $105.97 / -60.0% / -10.8% | $119.21 / -55.0% / -9.5% | $132.46 / -50.0% / -8.3% | $145.70 / -45.0% / -7.2% | $158.95 / -40.0% / -6.2% | $172.19 / -35.0% / -5.2% | $179.35 / -32.3% / -4.8% | $185.44 / -30.0% / -4.4% | $198.68 / -25.0% / -3.5% | $211.93 / -20.0% / -2.8% | $225.18 / -15.0% / -2.0% | $238.42 / -10.0% / -1.3% | $251.67 / -5.0% / -0.6% | $264.91 / 0.0% / 0.0% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,008,474 | -57% | -10.0% | 223.9 | 101.9 | 88.5 | 55.3 | 40.3 | 31.7 | 26.1 | 22.2 | 19.3 | 17.0 | 15.2 | 13.8 | 13.1 | 12.6 | 11.6 | 10.6 | 9.8 | 9.1 | 8.4 | 7.9 |
| 1,202,340 | -49% | -8.0% | 191.2 | 87.0 | 75.4 | 47.0 | 34.2 | 26.9 | 22.2 | 18.8 | 16.3 | 14.4 | 12.8 | 11.6 | 11.0 | 10.5 | 9.6 | 8.7 | 8.0 | 7.5 | 6.9 | 6.4 |
| 1,428,063 | -39% | -6.0% | 163.8 | 74.3 | 64.4 | 40.1 | 29.2 | 22.9 | 18.8 | 15.9 | 13.8 | 12.2 | 10.8 | 9.7 | 9.1 | 8.7 | 7.8 | 7.2 | 6.6 | 6.0 | 5.6 | 5.2 |
| 1,690,030 | -28% | -4.0% | 140.6 | 63.6 | 55.1 | 34.3 | 24.9 | 19.5 | 16.0 | 13.5 | 11.7 | 10.2 | 9.0 | 7.9 | 7.5 | 7.2 | 6.5 | 5.9 | 5.3 | 4.9 | 4.5 | 4.1 |
| 1,993,119 | -15% | -2.0% | 120.9 | 54.6 | 47.3 | 29.5 | 21.3 | 16.6 | 13.6 | 11.5 | 9.8 | 8.4 | 7.4 | 6.6 | 6.2 | 5.9 | 5.2 | 4.7 | 4.3 | 3.9 | 3.6 | 3.3 |
| 2,342,743 | 0% | 0.0% | 104.2 | 47.1 | 40.8 | 25.3 | 18.2 | 14.2 | 11.6 | 9.7 | 8.2 | 7.0 | 6.1 | 5.4 | 5.0 | 4.8 | 4.2 | 3.8 | 3.4 | 3.1 | 2.8 | 2.5 |
| 2,744,897 | 17% | 2.0% | 90.0 | 40.6 | 35.2 | 21.7 | 15.6 | 12.2 | 9.8 | 8.1 | 6.8 | 5.8 | 5.0 | 4.4 | 4.1 | 3.8 | 3.4 | 3.0 | 2.7 | 2.4 | 2.2 | 1.9 |
| 3,206,206 | 37% | 4.0% | 78.0 | 35.2 | 30.4 | 18.7 | 13.4 | 10.3 | 8.2 | 6.7 | 5.6 | 4.7 | 4.1 | 3.5 | 3.3 | 3.1 | 2.7 | 2.4 | 2.1 | 1.8 | 1.6 | 1.4 |
| 3,733,976 | 59% | 6.0% | 67.7 | 30.4 | 26.2 | 16.1 | 11.5 | 8.7 | 6.8 | 5.5 | 4.6 | 3.8 | 3.3 | 2.8 | 2.6 | 2.4 | 2.1 | 1.8 | 1.6 | 1.4 | 1.2 | 1.0 |
| 4,336,254 | 85% | 8.0% | 58.9 | 26.3 | 22.7 | 13.9 | 9.8 | 7.3 | 5.7 | 4.6 | 3.7 | 3.1 | 2.6 | 2.2 | 2.0 | 1.8 | 1.6 | 1.3 | 1.1 | 1.0 | 0.8 | 0.7 |
| 4,702,433 | 101% | 9.1% | 54.6 | 24.3 | 21.0 | 12.8 | 8.9 | 6.6 | 5.1 | 4.1 | 3.3 | 2.7 | 2.3 | 1.9 | 1.7 | 1.6 | 1.3 | 1.1 | 0.9 | 0.8 | 0.6 | 0.5 |
| 5,021,878 | 114% | 10.0% | 51.3 | 22.8 | 19.7 | 12.0 | 8.3 | 6.1 | 4.7 | 3.7 | 3.0 | 2.5 | 2.0 | 1.7 | 1.5 | 1.4 | 1.1 | 0.9 | 0.8 | 0.6 | 0.5 | 0.4 |

MILLENNIUM LABORATORIES                    1                    J.P.Morgan

JPMC-MIL-CORP-00237307

# Summary P&L and credit metrics

*Management base case*

## Summary P&L ($)

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Total Net Revenue | $632,631,707 | $733,282,004 | $788,757,886 | $853,080,931 | $933,007,909 | $1,008,083,933 | $1,070,617,966 | $1,134,683,416 | $1,201,935,596 |
| % Y/Y Growth | | 15.9% | 7.6% | 8.2% | 9.4% | 8.0% | 6.2% | 6.0% | 5.9% |
| | | | | | | | | | |
| Total COGS | $75,256,154 | $93,804,609 | $114,200,474 | $131,573,093 | $148,541,786 | $165,618,251 | $178,350,694 | $192,811,044 | $208,028,994 |
| | | | | | | | | | |
| Total Gross Profit | $557,375,553 | $639,477,395 | $674,557,412 | $721,507,838 | $784,466,123 | $842,465,682 | $892,267,273 | $941,872,372 | $993,906,602 |
| % Margin | 88.1% | 87.2% | 85.5% | 84.6% | 84.1% | 83.6% | 83.3% | 83.0% | 82.7% |
| % Y/Y Growth | | 14.7% | 5.5% | 7.0% | 8.7% | 7.4% | 5.9% | 5.6% | 5.5% |
| | | | | | | | | | |
| Total Operating Expenses | 214,483,975 | 262,799,458 | 276,474,705 | 289,453,546 | 312,428,131 | 336,101,992 | 356,676,759 | 375,929,423 | 398,517,618 |
| | | | | | | | | | |
| Adjustments: | | | | | | | | | |
| D&A | 16,904,549 | 22,730,384 | 23,237,967 | 22,094,928 | 20,891,743 | 20,455,422 | 23,248,164 | 22,479,648 | 22,785,336 |
| Stock-based Compensation | 3,047,670 | 3,977,381 | 4,176,250 | 4,385,062 | 4,604,315 | 4,834,531 | 5,102,995 | 5,391,854 | 5,693,015 |
| RxAnte Transaction Expenses | 2,702,855 | 13,987,910 | 9,766,315 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Income (Shared Service Reimbursement by MRI & Clinical Supply) | 493,619 | 499,747 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| Other Adjustments | 12,080,589 | | | | | | | | |
| | | | | | | | | | |
| Adjusted EBITDA | $378,120,860 | $417,873,359 | $435,763,239 | $459,034,283 | $498,034,050 | $532,153,644 | $564,441,673 | $594,314,450 | $624,367,336 |
| | | | | | | | | | |
| Less: Interest Expense | 9,179,779 | 72,448,734 | 65,227,551 | 57,927,309 | 56,246,479 | 55,861,341 | 48,598,631 | 35,063,975 | 16,317,223 |
| | | | | | | | | | |
| Pre-tax Income | 333,711,799 | 304,229,203 | 332,855,157 | 374,126,983 | 415,791,513 | 450,502,349 | 486,991,882 | 530,878,974 | 579,071,762 |
| | | | | | | | | | |
| Less: Coporate Taxes at 1.0% | 3,337,118 | 3,042,292 | 3,328,552 | 3,741,270 | 4,157,915 | 4,505,023 | 4,869,919 | 5,308,790 | 5,790,718 |
| Less: Taxes distribution to shareholders - No ISt Effect (Tax Rate at 52.6%) | 175,602,486 | 160,088,449 | 175,151,712 | 196,869,359 | 218,793,652 | 237,058,841 | 256,259,998 | 279,353,824 | 304,713,352 |
| Less: Deferred financing fees | | 8,825,000 | 8,825,000 | 8,825,000 | 8,825,000 | 8,825,000 | 0 | 0 | 0 |
| | | | | | | | | | |
| Net Income | 330,374,681 | 292,361,911 | 320,701,605 | 361,560,713 | 402,808,598 | 437,172,326 | 482,121,963 | 525,570,184 | 573,281,044 |

## Summary Credit Metrics

| ($mm) | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Debt / EBITDA | 4.5x | 3.7x | 3.2x | 2.6x | 2.1x | 1.6x | 1.1x | 0.6x | 0.1x |
| Net debt / EBITDA | 4.0x | 3.5x | 3.0x | 2.5x | 1.9x | 1.5x | 1.0x | 0.5x | 0.0x |
| EBITDA / Interest Expense | | 5.7x | 6.7x | 7.9x | 8.8x | 9.5x | 11.6x | 16.8x | 37.7x |
| (EBITDA - Capex) / Interest Expense | | 5.5x | 6.4x | 7.6x | 8.4x | 8.9x | 11.1x | 16.1x | 37.3x |

MILLENNIUM LABORATORIES

2

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00237308

# Summary P&L and credit metrics

## No contribution from UDT emerging, PGT and RxAnte

### Summary P&L ($)

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Total Net Revenue | $620,623,166 | $696,565,338 | $697,064,147 | $706,968,036 | $740,716,579 | $772,901,957 | $795,316,587 | $818,381,255 | $842,114,812 |
| % Y/Y Growth | | 12.2% | 0.1% | 1.4% | 4.8% | 4.3% | 2.9% | 2.9% | 2.9% |
| | | | | | | | | | |
| Total COGS | $75,256,154 | $82,309,982 | $87,868,912 | $94,102,410 | $101,309,955 | $109,875,498 | $115,369,342 | $121,137,881 | $127,194,851 |
| | | | | | | | | | |
| Total Gross Profit | $557,375,553 | $614,255,356 | $609,195,235 | $612,865,626 | $639,406,624 | $663,026,459 | $679,947,245 | $697,243,374 | $714,919,961 |
| % Margin | 89.8% | 88.2% | 87.4% | 86.7% | 86.3% | 85.8% | 85.5% | 85.2% | 84.9% |
| % Y/Y Growth | | 10.2% | -0.8% | 0.6% | 4.3% | 3.7% | 2.6% | 2.5% | 2.5% |
| | | | | | | | | | |
| Total Operating Expenses | 214,483,975 | 234,548,664 | 244,372,066 | 257,188,868 | 270,445,165 | 284,307,100 | 292,786,502 | 300,066,245 | 309,580,734 |
| | | | | | | | | | |
| Adjustments: | | | | | | | | | |
| D&A | 16,904,549 | 22,730,384 | 22,853,594 | 21,246,407 | 19,681,604 | 18,905,400 | 21,013,738 | 19,845,442 | 19,655,281 |
| Stock-based Compensation | 3,047,670 | 3,977,381 | 4,107,171 | 4,216,661 | 4,337,614 | 4,468,191 | 4,612,537 | 4,760,026 | 4,910,957 |
| RxAnte Transaction Expenses | 2,702,855 | 13,987,910 | 9,604,773 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Income (Shared Service Reimbursement by MRI & Clinical Supply) | 493,619 | 499,747 | 491,730 | 480,798 | 471,038 | 462,112 | 451,944 | 441,409 | 431,314 |
| Other Adjustments | 12,080,589 | | | | | | | | |
| | | | | | | | | | |
| Adjusted EBITDA | $378,120,860 | $420,902,113 | $401,880,438 | $381,620,624 | $393,451,715 | $402,555,062 | $413,238,962 | $422,224,006 | $430,336,779 |
| | | | | | | | | | |
| Less: Interest Expense | 9,179,779 | 72,416,795 | 65,524,041 | 59,419,643 | 60,165,639 | 64,071,101 | 62,704,434 | 56,411,137 | 46,094,477 |
| | | | | | | | | | |
| Pre-tax Income | 333,711,799 | 307,289,897 | 299,299,128 | 296,257,114 | 308,795,820 | 314,648,258 | 324,456,310 | 340,765,992 | 359,244,750 |
| | | | | | | | | | |
| Less: Coporate Taxes at 1.0% | 3,337,118 | 3,072,899 | 2,992,991 | 2,962,571 | 3,087,958 | 3,146,483 | 3,244,563 | 3,407,660 | 3,592,448 |
| Less: Taxes distribution to shareholders - No ISt Effect (Tax Rate at 52.6%) | 175,602,486 | 161,699,016 | 157,494,194 | 155,893,456 | 162,491,448 | 165,571,060 | 170,732,154 | 179,314,472 | 189,038,180 |
| Less: Deferred financing fees | | 8,825,000 | 8,825,000 | 8,825,000 | 8,825,000 | 8,825,000 | 0 | 0 | 0 |
| | | | | | | | | | |
| Net Income | 330,374,681 | 295,391,998 | 287,481,137 | 284,469,543 | 296,882,862 | 302,676,775 | 321,211,747 | 337,358,332 | 355,652,303 |

### Summary Credit Metrics

| ($mm) | 2013E | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|---|---|---|
| Debt / EBITDA | 4.5x | 3.6x | 3.5x | 3.3x | 2.9x | 2.5x | 2.1x | 1.7x | 1.2x |
| Net debt / EBITDA | 4.0x | 3.5x | 3.3x | 3.2x | 2.7x | 2.4x | 1.9x | 1.5x | 1.1x |
| EBITDA / Interest Expense | | 5.8x | 6.1x | 6.4x | 6.5x | 6.3x | 6.6x | 7.5x | 9.3x |
| (EBITDA - Capex) / Interest Expense | | 5.5x | 5.9x | 6.1x | 6.1x | 5.7x | 6.2x | 7.0x | 9.2x |

CONFIDENTIAL    JPMC-MIL-CORP-00237309

# Summary P&L and credit metrics

*No contribution from UDT emerging, PGT and RxAnte; OpEx margins held at 2013 levels*

## Summary P&L ($)

| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Total Net Revenue | $620,623,166 | $696,565,338 | $697,064,147 | $706,968,036 | $740,716,579 | $772,901,957 | $795,316,587 | $818,381,255 | $842,114,812 |
| % Y/Y Growth | | 12.2% | 0.1% | 1.4% | 4.8% | 4.3% | 2.9% | 2.9% | 2.9% |
| | | | | | | | | | |
| Total COGS | $75,256,154 | $82,309,982 | $87,868,912 | $94,102,410 | $101,309,955 | $109,875,498 | $115,369,342 | $121,137,881 | $127,194,851 |
| | | | | | | | | | |
| Total Gross Profit | $557,375,553 | $614,255,356 | $609,195,235 | $612,865,626 | $639,406,624 | $663,026,459 | $679,947,245 | $697,243,374 | $714,919,961 |
| % Margin | 89.8% | 88.2% | 87.4% | 86.7% | 86.3% | 85.8% | 85.5% | 85.2% | 84.9% |
| % Y/Y Growth | | 10.2% | -0.8% | 0.6% | 4.3% | 3.7% | 2.6% | 2.5% | 2.5% |
| | | | | | | | | | |
| Total Operating Expenses | 214,483,975 | 243,956,628 | 243,327,870 | 245,569,665 | 255,668,898 | 265,374,298 | 272,388,866 | 278,225,895 | 286,307,697 |
| | | | | | | | | | |
| **Adjustments:** | | | | | | | | | |
| D&A | 16,904,549 | 22,730,384 | 22,853,594 | 21,246,407 | 19,681,604 | 18,905,400 | 21,013,738 | 19,845,442 | 19,655,281 |
| Stock-based Compensation | 3,047,670 | 3,977,381 | 4,107,171 | 4,216,661 | 4,337,614 | 4,468,191 | 4,612,537 | 4,760,026 | 4,910,957 |
| RxAnte Transaction Expenses | 2,702,855 | 13,987,910 | 9,604,773 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Income (Shared Service Reimbursement by MRI & Clinical Supply) | 493,619 | 499,747 | 491,730 | 480,798 | 471,038 | 462,112 | 451,944 | 441,409 | 431,314 |
| Other Adjustments | 12,080,589 | | | | | | | | |
| | | | | | | | | | |
| Adjusted EBITDA | $378,120,860 | $411,494,150 | $402,924,634 | $393,239,827 | $408,227,982 | $421,487,865 | $433,636,598 | $444,064,355 | $453,609,816 |
| | | | | | | | | | |
| Less: Interest Expense | 9,179,779 | 72,516,005 | 65,713,542 | 59,479,602 | 59,920,613 | 63,289,115 | 61,166,690 | 53,976,022 | 42,654,184 |
| | | | | | | | | | |
| Pre-tax Income | 333,711,799 | 297,782,723 | 300,153,823 | 307,816,359 | 323,817,113 | 334,363,046 | 346,391,689 | 365,041,456 | 385,958,080 |
| | | | | | | | | | |
| Less: Coporate Taxes at 1.0% | 3,337,118 | 2,977,827 | 3,001,538 | 3,078,164 | 3,238,171 | 3,343,630 | 3,463,917 | 3,650,415 | 3,859,581 |
| Less: Taxes distribution to shareholders - No ISt Effect (Tax Rate at 52.6%) | 175,602,486 | 156,696,247 | 157,943,943 | 161,976,046 | 170,395,803 | 175,945,178 | 182,274,770 | 192,088,464 | 203,095,001 |
| Less: Deferred financing fees | | 8,825,000 | 8,825,000 | 8,825,000 | 8,825,000 | 8,825,000 | 0 | 0 | 0 |
| | | | | | | | | | |
| Net Income | 330,374,681 | 285,979,896 | 288,327,285 | 295,913,195 | 311,753,942 | 322,194,416 | 342,927,772 | 361,391,042 | 382,098,500 |

## Summary Credit Metrics

| ($mm) | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Debt / EBITDA | 4.5x | 3.7x | 3.5x | 3.2x | 2.7x | 2.3x | 1.9x | 1.5x | 1.0x |
| Net debt / EBITDA | 4.0x | 3.6x | 3.3x | 3.1x | 2.6x | 2.2x | 1.8x | 1.4x | 0.9x |
| EBITDA / Interest Expense | | 5.6x | 6.1x | 6.6x | 6.8x | 6.6x | 7.1x | 8.2x | 10.6x |
| (EBITDA - Capex) / Interest Expense | | 5.4x | 5.9x | 6.3x | 6.4x | 6.1x | 6.7x | 7.7x | 10.4x |

MILLENNIUM LABORATORIES

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00237310

# EXHIBIT 20

CONFIDENTIAL

## Corporate and Investment Banking

# Millennium Labs Final Approval Memo

March 13th, 2014

Strictly Private and Confidential



CONFIDENTIAL

# B. Projected Financial Analysis

CITI-DE-00088301



CONFIDENTIAL

# Financial Summary – Management Case

| | 2011A | 2012A | 2013A | PF LTM 3/31/14 | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2014-2021 CAGR [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Statistics** | | | | | | | | | | | | | |
| Millennium Revenue | $533 | $602 | $633 | $688 | $733 | $789 | $853 | $933 | $1,008 | $1,071 | $1,135 | $1,202 | 7.3% |
| % Growth | NA | 124.5% | 21.2% | -- | 15.9% | 7.6% | 8.2% | 9.4% | 8.0% | 6.2% | 6.0% | 5.9% | |
| Adjusted EBITDA | $193 | $338 | $373 | $387 | $418 | $436 | $459 | $498 | $532 | $564 | $594 | $624 | 5.8% |
| % Margin | 47.0% | 60.2% | 58.8% | 56.9% | 57.0% | 55.2% | 53.8% | 53.4% | 52.8% | 52.7% | 52.4% | 51.9% | |
| % Growth | NA | 201.8% | 14.6% | -- | 10.5% | 4.3% | 5.3% | 8.5% | 6.9% | 6.1% | 5.3% | 5.1% | |

| | | | | | 9ME 2014 | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | Q1 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | | | | | $239 | $328 | $388 | $382 | $426 | $482 | $503 | $143 | |
| Plus: Depreciation & Amortization | | | | | 17 | 23 | 22 | 21 | 20 | 23 | 22 | 6 | |
| Less: Capex | | | | | (13) | (15) | (19) | (25) | (35) | (24) | (25) | (6) | |
| Less: Increase in NWC | | | | | (2) | (3) | (7) | (8) | (7) | (6) | (6) | (4) | |
| Plus: Stock Based Compensation | | | | | 3 | 4 | 4 | 5 | 5 | 5 | 5 | 1 | |
| Free Cash Flow | | | | | $237 | $336 | $388 | $386 | $410 | $460 | $500 | $142 | 8.4% |
| Less: Distributions for shareholder taxes | | | | | (141) | (197) | (215) | (235) | (254) | (271) | (289) | (74) | |
| Free Cash Flow Available for Debt Repayment | | | | | $96 | $138 | $143 | $159 | $156 | $190 | $211 | $67 | 8.8% |
| Cumulative Free Cash Flow | | | | | 96 | 234 | 377 | 527 | 684 | 873 | 1,084 | 1,152 | |
| % of Total Debt | | | | | 5.4% | 13.2% | 21.3% | 29.8% | 38.6% | 49.3% | 61.3% | 65.1% | |
| Less: Mandatory Amortization | | | | | (24) | (29) | (29) | (21) | (18) | (19) | (19) | (5) | |
| Free Cash Flow Available for Voluntary Debt Repayment | | | | | $71 | $109 | $114 | $139 | $138 | $171 | $192 | $62 | 11.9% |
| Cumulative Free Cash Flow | | | | | 71 | 181 | 295 | 434 | 563 | 733 | 925 | 987 | |
| % of Total Debt | | | | | 4.0% | 10.2% | 16.5% | 24.0% | 31.8% | 41.4% | 52.3% | 55.8% | |

| **Balance Sheet Data** | | | | At Close [2] | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | Q1 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | | | | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | |
| Revolver | | | | -- | -- | -- | -- | -- | -- | -- | -- | -- | |
| New Term Loan | | | | 1,715 | 1,631 | 1,504 | 1,373 | 1,226 | 1,071 | 883 | 674 | 608 | |
| Capitalized Leases | | | | 41 | 30 | 20 | 17 | 16 | 15 | 14 | 11 | 11 | |
| PNC Notes | | | | 14 | 13 | 12 | 3 | -- | -- | -- | -- | -- | |
| Total Secured Debt | | | | $1,770 | $1,674 | $1,536 | $1,393 | $1,243 | $1,086 | $897 | $686 | $619 | |
| TA Notes | | | | -- | -- | -- | -- | -- | -- | -- | -- | -- | |
| Total Debt | | | | $1,770 | $1,674 | $1,536 | $1,393 | $1,243 | $1,086 | $897 | $686 | $619 | |
| **Leverage Statistics** | | | | | | | | | | | | | |
| Total Secured Debt / Adj EBITDA | | | | 4.7 | 4.0 | 3.5 | 3.0 | 2.5 | 2.0 | 1.6 | 1.2 | 1.0 | |
| Net Secured Debt / Adj EBITDA | | | | 4.5 | 3.9 | 3.4 | 2.9 | 2.4 | 1.9 | 1.5 | 1.1 | 0.9 | |
| Total Debt / Adj EBITDA | | | | 4.7 | 4.0 | 3.5 | 3.0 | 2.5 | 2.0 | 1.6 | 1.2 | 1.0 | |
| Interest Coverage Ratio | | | | 6.6 | 7.2 | 6.0 | 6.2 | 6.4 | 6.8 | 7.9 | 9.9 | 13.2 | |
| Fixed Charge Coverage Ratio [3] | | | | 3.9 | 4.3 | 3.7 | 3.7 | 4.0 | 4.0 | 4.8 | 5.5 | 9.9 | |
| Total Debt Repayment Capacity [4] | | | | 1.9 | 2.2 | 2.2 | 2.4 | 2.6 | 2.8 | 3.5 | 4.4 | 6.2 | |

(1) Free cash flow CAGRs represent 2015E - 2020E cash flows.
(2) Leverage statistics at close use financing EBITDA of $378mm.
(3) Defined as EBITDA / (Cash Interest+Cash Taxes+Dividends+Capital Expenditures+Current Portion of Long Term Debt)
(4) Defined as EBITDA / (Cash Interest+Cash Taxes+Dividends+Capital Expenditures+7% of Total Debt)

CITI-DE-00008302



CONFIDENTIAL

# Financial Assumptions – Management Case

**Commentary**

» Based on Management estimates

» Management projections include sales growth driven by strong UDT sales, increasing PGT penetration, and strong sales from RxAnte platform

— Operating leverage and the company's technology platform are key drivers of projections

— ~30% reduction in pricing as a result of reimbursement pressure is built into management case financial projections

— RxAnte acquisition closed in January 2014 (with contribution to revenue beginning in 2014)

— Projections do not include growth from planned acquisitions

**Revenue / Adj. EBITDA Growth**

» Total Revenue CAGR of 7.3% from 2013E – 2021E

» Adj. EBITDA CAGR of 5.9% from 2013E – 2021E

» EBITDA margins decreasing ~510bps over projection period to account for reimbursement pressures and increased competition

**Other Projection Observations**

» Capital expenditures normalizing at ~2% of sales

— Millennium recently purchased a new facility in Michigan to expand and diversify capacity

» 1% tax rate due to S-corp status; cash tax rate of 52.6%

**Free Cash Flow Post Distributions**

» Generates cumulative FCF of $987mm through 2021E

**Debt**

» New $1,715mm term loan with assumed amortization of 1%, cash flow sweep, and voluntary repayment over projection period

» TA Notes retired upfront



CITI-DE-0008303

# Financial Summary – Base Case

CONFIDENTIAL

| | 2011A | 2012A | 2013A | PF LTM 3/31/14 | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2014-2021 CAGR [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Statistics** | | | | | | | | | | | | | |
| Millennium Revenue | $333 | $522 | $633 | $648 | $696 | $745 | $793 | $843 | $893 | $938 | $971 | $1,000 | 5.3% |
| % Growth | NA | 124.5% | 21.2% | -- | 10.0% | 7.0% | 6.5% | 6.3% | 6.0% | 5.0% | 3.5% | 3.0% | |
| Adjusted EBITDA | $169 | $330 | $378 | $382 | $394 | $407 | $419 | $441 | $463 | $485 | $495 | $509 | 3.7% |
| % Margin | 47.0% | 63.2% | 59.6% | 58.9% | 56.7% | 54.7% | 52.8% | 52.4% | 51.8% | 51.7% | 51.4% | 51.0% | |
| % Growth | NA | 201.8% | 14.6% | -- | 4.3% | 3.4% | 2.9% | 5.4% | 4.8% | 4.9% | 2.8% | 2.1% | |

| | | | | | 9ME 2014 | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | Q1 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | | | | | $213 | $298 | $318 | $336 | $358 | $379 | $382 | $118 | |
| Plus: Depreciation & Amortization | | | | | 17 | 22 | 21 | 19 | 18 | 20 | 19 | 5 | |
| Less: Capex | | | | | (13) | (19) | (19) | (25) | (36) | (24) | (25) | (8) | |
| Less: Increase in NWC | | | | | (1) | (3) | (7) | (7) | (6) | (5) | (5) | (3) | |
| Plus: Stock Based Compensation | | | | | 3 | 4 | 4 | 4 | 4 | 4 | 5 | 1 | |
| Free Cash Flow | | | | | $219 | $308 | $317 | $328 | $337 | $375 | $386 | $114 | 6.3% |
| Less: Distributions for shareholder taxes | | | | | (131) | (180) | (191) | (202) | (212) | (222) | (231) | (60) | |
| Free Cash Flow Available for Debt Repayment | | | | | $88 | $128 | $126 | $126 | $126 | $153 | $156 | $54 | 8.6% |
| Cumulative Free Cash Flow | | | | | 88 | 214 | 340 | 466 | 592 | 745 | 910 | 963 | |
| % of Total Debt | | | | | 5.0% | 12.1% | 19.2% | 26.3% | 33.4% | 43.1% | 51.4% | 54.4% | |
| Less: Mandatory Amortization | | | | | (24) | (29) | (29) | (21) | (18) | (19) | (19) | (5) | |
| Free Cash Flow Available for Voluntary Debt Repayment | | | | | $64 | $97 | $97 | $106 | $107 | $134 | $146 | $49 | 8.4% |
| Cumulative Free Cash Flow | | | | | 64 | 161 | 258 | 363 | 471 | 605 | 750 | 799 | |
| % of Total Debt | | | | | 3.6% | 9.1% | 14.6% | 20.5% | 26.6% | 34.2% | 42.4% | 45.1% | |

| **Balance Sheet Data** | At Close [2] | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | Q1 2021 |
|---|---|---|---|---|---|---|---|---|---|
| Cash | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 |
| Revolver | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| New Term Loan | 1,715 | 1,639 | 1,524 | 1,410 | 1,287 | 1,160 | 1,012 | 849 | 796 |
| Capitalized Leases | 41 | 30 | 20 | 17 | 16 | 15 | 14 | 11 | 11 |
| PNC Notes | 14 | 13 | 12 | 3 | -- | -- | -- | -- | -- |
| Total Secured Debt | $1,770 | $1,682 | $1,556 | $1,430 | $1,304 | $1,178 | $1,026 | $860 | $807 |
| TA Notes | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| Total Debt | $1,770 | $1,682 | $1,556 | $1,430 | $1,304 | $1,178 | $1,026 | $860 | $807 |
| **Leverage Statistics** | | | | | | | | | |
| Total Secured Debt / Adj EBITDA | 4.7 | 4.3 | 3.8 | 3.4 | 3.0 | 2.5 | 2.1 | 1.7 | 1.6 |
| Net Secured Debt / Adj EBITDA | 4.5 | 4.1 | 3.7 | 3.3 | 2.8 | 2.4 | 2.0 | 1.6 | 1.5 |
| Total Debt / Adj EBITDA | 4.7 | 4.3 | 3.8 | 3.4 | 3.0 | 2.5 | 2.1 | 1.7 | 1.6 |
| Interest Coverage Ratio | 6.5 | 5.8 | 5.6 | 5.6 | 5.4 | 5.6 | 6.1 | 7.0 | 8.4 |
| Fixed Charge Coverage Ratio [3] | 3.9 | 4.0 | 3.5 | 3.4 | 3.5 | 3.4 | 3.9 | 4.3 | 5.9 |
| Total Debt Repayment Capacity [4] | 1.9 | 2.1 | 2.1 | 2.2 | 2.2 | 2.3 | 2.8 | 3.2 | 4.1 |

(1) Free cash flow CAGRs represent 2015E - 2020E cash flows.
(2) Leverage statistics at close use financing EBITDA of $378mm.
(3) Defined as EBITDA / (Cash Interest+Cash Taxes+Dividends+Capital Expenditures+Current Portion of Long Term Debt)
(4) Defined as EBITDA / (Cash Interest+Cash Taxes+Dividends+Capital Expenditures+7% of Total Debt)



CITI-DE-00008304

CONFIDENTIAL

# Financial Assumptions – Base Case

Commentary

» Based on Citi haircut to management estimates

Revenue / Adj. EBITDA Growth

» Total Revenue CAGR of 5.3% from 2014E – 2021E

- ~Revenue growth flattening to ~3% growth over projection period to reflect increased competition and slower uptake of PGT services and RxAnte platform

» Adj. EBITDA CAGR of 3.7% from 2014E – 2021E

- ~50bps increase to COGS and ~50bps increase to SG&A over projection period to reflect increased cost, competition, and potential litigation expenses

Other Projection Observations

» Capital expenditures normalizing at ~2% of sales

- Millennium recently purchased a new facility in Michigan to expand and diversify capacity

» 1% tax rate due to S-corp status; cash tax rate of 52.6%

Free Cash Flow Post Distributions

» Generates cumulative FCF of $799mm through 2021E

Debt

» New $1,715mm term loan with assumed amortization of 1%, cash flow sweep, and voluntary repayment over projection period

» TA Notes retired upfront

CITI-DE-00008305



CONFIDENTIAL

# Financial Summary – Downside Case

| | 2011A | 2012A | 2013A | PF LTM 3/31/14 | Pro Forma Fiscal Year Ending December 31, | | | | | | | | 2014-2021 |
| | | | | | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | CAGR [1] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Statistics** | | | | | | | | | | | | | |
| Millennium Revenue | $233 | $522 | $633 | $644 | $677 | $641 | $585 | $608 | $633 | $652 | $658 | $666 | (0.3%) |
| % Growth | NA | 124.5% | 21.2% | -- | 7.0% | (20.0%) | 6.0% | 4.0% | 4.0% | 3.0% | 1.0% | 1.0% | |
| Adjusted EBITDA | $109 | $330 | $378 | $377 | $374 | $237 | $256 | $278 | $303 | $315 | $319 | $323 | (2.1%) |
| % Margin | 47.0% | 63.2% | 59.6% | 58.5% | 55.3% | 43.8% | 43.8% | 45.4% | 47.9% | 48.4% | 48.5% | 48.6% | |
| % Growth | NA | 201.8% | 14.6% | -- | (1.1%) | (36.5%) | 8.0% | 7.7% | 9.7% | 3.9% | 1.3% | 1.3% | |

| | | | | | 9ME 2014 | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | Q1 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | | | | | $138 | $135 | $157 | $165 | $184 | $192 | $198 | $74 | |
| Plus: Depreciation & Amortization | | | | | 16 | 16 | 15 | 14 | 13 | 14 | 13 | 3 | |
| Less: Capex | | | | | (13) | (16) | (19) | (26) | (36) | (24) | (25) | (6) | |
| Less: Increase in NWC | | | | | (1) | (2) | (5) | (5) | (4) | (3) | (4) | (2) | |
| Plus: Stock Based Compensation | | | | | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 1 | |
| Free Cash Flow | | | | | $203 | $136 | $151 | $152 | $161 | $181 | $185 | $70 | 6.3% |
| Less: Distributions for shareholder taxes | | | | | (121) | (115) | (133) | (99) | (110) | (112) | (113) | (38) | |
| Free Cash Flow Available for Debt Repayment | | | | | $82 | $21 | $18 | $53 | $51 | $68 | $72 | $32 | 27.4% |
| Cumulative Free Cash Flow | | | | | 82 | 103 | 121 | 174 | 225 | 294 | 366 | 398 | |
| % of Total Debt | | | | | 4.6% | 5.8% | 6.8% | 9.8% | 12.7% | 18.6% | 20.7% | 23.5% | |
| Less: Mandatory Amortization | | | | | (24) | (29) | (29) | (21) | (18) | (19) | (19) | (5) | |
| Free Cash Flow Available for Voluntary Debt Repayment | | | | | $57 | ($7) | ($12) | $33 | $33 | $50 | $53 | $27 | NM |
| Cumulative Free Cash Flow | | | | | 57 | 50 | 38 | 71 | 104 | 154 | 207 | 234 | |
| % of Total Debt | | | | | 3.2% | 2.8% | 2.2% | 4.0% | 5.9% | 8.7% | 11.7% | 13.2% | |

| **Balance Sheet Data** | | | | At Close [2] | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | 2020E | Q1 2021 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash | | | | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | |
| Revolver | | | | -- | -- | 7 | 19 | -- | -- | -- | -- | -- | |
| New Term Loan | | | | 1,715 | 1,645 | 1,626 | 1,611 | 1,580 | 1,539 | 1,463 | 1,392 | 1,361 | |
| Capitalized Leases | | | | 41 | 30 | 20 | 17 | 16 | 15 | 14 | 11 | 11 | |
| FNC Notes | | | | 14 | 13 | 12 | 3 | -- | -- | -- | -- | -- | |
| Total Secured Debt | | | | $1,770 | $1,888 | $1,680 | $1,630 | $1,596 | $1,545 | $1,476 | $1,404 | $1,372 | |
| TA Notes | | | | -- | -- | -- | -- | -- | -- | -- | -- | -- | |
| Total Debt | | | | $1,770 | $1,888 | $1,680 | $1,630 | $1,596 | $1,545 | $1,476 | $1,404 | $1,372 | |
| **Leverage Statistics** | | | | | | | | | | | | | |
| Total Secured Debt / Adj EBITDA | | | | 4.7 | 4.5 | 7.0 | 6.4 | 5.8 | 5.1 | 4.7 | 4.4 | 4.2 | |
| Net Secured Debt / Adj EBITDA | | | | 4.5 | 4.4 | 6.8 | 6.2 | 5.6 | 4.9 | 4.5 | 4.2 | 4.1 | |
| Total Debt / Adj EBITDA | | | | 4.7 | 4.5 | 7.0 | 6.4 | 5.8 | 5.1 | 4.7 | 4.4 | 4.2 | |
| Interest Coverage Ratio | | | | 6.5 | 6.4 | 3.1 | 3.1 | 2.9 | 3.9 | 2.9 | 3.0 | 3.2 | |
| Fixed Charge Coverage Ratio [3] | | | | 3.9 | 3.9 | 2.0 | 2.0 | 2.0 | 1.9 | 2.1 | 2.1 | 2.9 | |
| Total Debt Repayment Capacity [4] | | | | 1.9 | 2.0 | 1.2 | 1.2 | 1.2 | 1.2 | 1.4 | 1.4 | 1.6 | |

(1) Free cash flow CAGRs represent 2015E - 2020E cash flows.
(2) Leverage statistics at close use financing EBITDA of $378mm.
(3) Defined as EBITDA / (Cash Interest + Cash Taxes + Dividends + Capital Expenditures + Current Portion of Long Term Debt)
(4) Defined as EBITDA / (Cash Interest + Cash Taxes + Dividends + Capital Expenditures + 7% of Total Debt)

CITI-DE-00008306

43



# Financial Summary – Downside Case

Commentary

» Based on Citi haircut to management estimates

Revenue / Adj. EBITDA Growth

» Total Revenue CAGR of (0.3%) from 2014E – 2021E

— As a result of significant disruption to business as result of episodic event at plant, 2015 revenue is haircut by (20%), with business recovering in subsequent projection years

— Revenue growth normalizing at ~1% due to increased competitive pressures post recovery from business disruption

» Adj. EBITDA CAGR of (2.1%) from 2014E – 2021E

— ~90bps increase to COGS margin and ~100bps increase to SG&A margin on average over projection period to reflect increased cost, competition, and more significant litigation expenses, as well as steeper reduction in 2015 due to production disruption

— Reflects additional margin pressure from investing in new, capital intensive projects that do not pay off

Other Projection Observations

» Capital expenditures normalizing at ~2% of sales

— Millennium recently purchased a new facility in Michigan to expand and diversify capacity

» 1% tax rate due to S-corp status; cash tax rate of 52.6%

Free Cash Flow Post Distributions

» Generates cumulative FCF of $234mm through 2021E

Debt

» Millennium draws on its revolver in 2015 and 2016 as a result of the production disruption, with a return to FCF generation from 2017E-2021E

» New $1,715mm term loan with assumed amortization of 1%, cash flow sweep, and voluntary repayment over projection period

» TA Notes retired upfront



CONFIDENTIAL

CITI-DE-0008307

44

# Valuation Analysis

*($ in millions)*

| | | | Implied FV / 2014 Base | | Commentary |
|---|---|---|---|---|---|
| | | | Revenue | EBITDA | |
| Comps - Base | $3,943 | $5,125 | 5.7x - 7.4x | 10.0x - 13.0x | › Based on 2014E EBITDA multiple range of 10.0x – 13.0x, using 2014E base case EBITDA of $394.3mm |
| Precedents - Base | $3,781 | $4,689 | 5.4x - 6.7x | 9.6x - 11.9x | › Based on PF 2013E EBITDA multiple range of 10.0x – 12.4x, using 2013 EBITDA of $378.1mm |
| DCF - Downside | $1,861 | $2,242 | 2.7x - 3.2x | 4.7x - 5.7x | › 5 year DCF<br>  › 8.5% – 9.5% WACC<br>  › 0.0% - 1.0% perpetuity growth rate |
| DCF - Base | $3,718 | $4,517 | 5.3x - 6.5x | 9.4x - 11.5x | › 5 year DCF<br>  › 8.5% – 9.5% WACC<br>  › 0.0% - 1.0% perpetuity growth rate |
| DCF - Management | $4,424 | $5,394 | 6.4x - 7.8x | 11.2x - 13.7x | › 5 year DCF<br>  › 8.5% – 9.5% WACC<br>  › 0.0% - 1.0% perpetuity growth rate |

45    Market Data as of 03/7/14.



CONFIDENTIAL

CITI-DE-00008308

# EXHIBIT 21

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

---------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

        Debtors.

MARC S. KIRSCHNER, solely in his

capacity as TRUSTEE OF THE

MILLENNIUM CORPORATE CLAIM TRUST,

          Plaintiffs,

   vs.

JPMORGAN CHASE BANK, N.A.,

CITIBANK N.A., BMO HARRIS BANK,

N.A., and SUNTRUST BANK,

          Defendants.

---------------------------------------X

   VIDEOTAPE 30(b)(6) DEPOSITION OF

          MICHAEL TORTORA

      VIA ZOOM VIDEOCONFERENCE

            July 15, 2021

              9:30 a.m.

Reported by:

Maureen Ratto, RPR, CCR

Page 74

MICHAEL TORTORA

MS. SAMET BUCHWALD:  Objection to form.

A.   No. We generally, as part of the approval process, will have mitigants to any risk that we identify and the risks, again, can be both company specific and industry specific. Generally, there is mitigants to any material or immaterial risk that we identify.

Q.   In the 2014 time period, was Citi aware of any new government regulations or proposals that would have affected Millennium's reimbursements?

A.   Not any specific -- not any specific proposals. I don't remember any specific proposals at the time.

Q.   And another risk listed there a litigation. Do you see that?

A.   Yes.

Q.   And it states, "In March 2012 Millennium Labs received a HIPAA subpoena from U.S. Attorney concerning high Federal health reimbursement claims." Do

Page 75

MICHAEL TORTORA

you see that?

A.   Yes.

Q.   And it also refers to "litigation from competitors." Do you see that in the next line?

A.   Yes.

Q.   In connection with the 2014 transaction, was Citi provided with financial statements and financial projections from Millennium?

A.   Yes, we were.

Q.   Did Citi conduct any of its own analysis of the financial documents provided by Millennium?

A.   We would have reviewed the documents in their totality and we would have held calls with the management team to discuss any questions we had on the financials or in the projection, projection models.

Q.   Did Citi complete any of its own financial projections in connection with the 2014 transaction?

A.   All of our projections and

Page 76

MICHAEL TORTORA

projections that we received in our final committee memo would have been based upon the original model management projections that was given to us.  And we, as an institution, would have ran different scenarios in order to -- in order to sensitize the management model.

Q.   And what do you mean by "sensitize the management model"?

A.   In our approval process, and specifically in the final approval process and the Final Approval Memo, we generally present three model cases to our committee.

The first one is the management model, which comes directly from the management team who obviously spend time with the management team discussing the assumptions and the rationale behind their model, but that is just a, you know, a version -- not a version, the version that the management team sends to us. We'll then also run what we call the base case, which is a

Page 77

MICHAEL TORTORA

haircut to the management model, whether that's revenue, EBITDA, more CapEx or less CapEx, some type of sensitivity and then we'll also run a third case, which we call the downside case, which is oftentimes a very Draconian scenario that one even has a hard time envisioning ever happening in real life, but we will run that in order to further sensitize and further make sure that we are comfortable with the cash flow profile of the company's ability, the ability of the business to -- to pay its interest expense.

Q.   With respect to the base case, I believe you referred to that as "a haircut to the management model." What do you mean by that?

A.   Generally speaking, we will take a slight haircut.  So to give you an example, if a management team is projecting 10% revenue growth, we might lower that revenue growth to something like 7% or 8% just to account for the

20 (Pages 74 - 77)

Page 78

MICHAEL TORTORA

fact that over a period of six to seven years there may not be continued growth at what the management team is projecting for unforeseen circumstances or unforeseen reasons.

So we just like to -- I think it's prudent to slightly sensitize management's numbers to something a little bit more conservative in order to have, you know, two different pictures of what the company's cash flow profile looks like.

Q.   And when you lower the revenue growth, is that a blanket number that is always chosen or is that based on a number of different factors particular to that company?

MS. SAMET BUCHWALD:  Objection to form.

A.   Generally, it's based upon a number of different factors in relation to both the company as well as the industry at large, as well as what the view on the macro environment of just

Page 79

MICHAEL TORTORA

generally in the world is, which is, do we believe that the overall world is going to experience lower growth, more growth over the next six to seven years, we think a particular industry is going to experience more growth or lower growth, et cetera. So it's based on a number of different factors and going all the way up to an extremely macro level.

Q.   Did Citi share its base case or downside or any other modeling it did with anyone outside of Citi?

A.   Not that I'm aware of.  And generally speaking, we would not share the base case or the downside case with people outside of -- outside of Citi, since it's our own internal projections.

Q.   In early 2014, prior to the transaction closing, do you recall whether Citi received any feedback from potential buyers that Millennium's margins were unsustainable?

MS. SAMET BUCHWALD:  Objection to form.

Page 80

MICHAEL TORTORA

A.   I don't recall specific feedback from specific people, but it would not surprise me to learn in healthcare companies that certain sponsors were thinking through the reimbursement or potential reimbursement changes in healthcare generally and then for Millennium specifically.

So that would not surprise me if we had received that feedback but I can't name a specific sponsor that gave that feedback.

MS. HALLINAN:  Can we go to the next document, 64, please.

(Plaintiff Exhibit 233, email dated January 12, 2014, Bates CITI-DE-00052087 was received and marked on this date for identification.)

A.   Okay.

Q.   Exhibit 233 has the top email from Dragi Ristevski dated January 12, 2014. Do you see that?

A.   Yes.

Page 81

MICHAEL TORTORA

Q.   And the subject is Sonic. Do you see that?

A.   Yes.

Q.   You can read whatever you like but I'm going to focus on the top email. And in the second line on the top email it states, "Generally, the Sonic guy said they know ML's business well but do not see their business as target market. One of the main issues Sonic mentioned was that they see ML's strength in drug testing which is highly competed with unsustainable margins.  They specifically refer to ML's lawsuit with Ameritox of the level of competition within the setting of the market and they also cited issues re: Reimbursement of MLs end markets."  Do you see that?

A.   Yes.

MS. SAMET BUCHWALD:  And I do want to make sure that Mr. Tortora has had an opportunity to review the chain since he's just opened it up.

21 (Pages 78 - 81)

Page 82

MICHAEL TORTORA

A.   Okay.

Q.   Sonic was a potential buyer for Millennium; is that correct?

MS. SAMET BUCHWALD:  Objection to form.

A.   I don't remember who Sonic was.

Q.   This email refers to unsustainable margins, correct, in the fourth line on that top email?

A.   That is what the email says.

Q.   After receiving this information or feedback, did Citi do any analysis of Millennium's margins as a result?

A.   I don't remember exactly the timeframe, but as part of our final approval process, we would have sensitized and pressure tested in our model all aspects of the model, including the revenue, including the margins, including the CapEx line.

Q.   And in the last line in that top email it refers to issues re:

Page 83

MICHAEL TORTORA

Reimbursement and ML's end markets. Do you see that?

A.   Yes.

Q.   What is Citi's understanding of what issues re: Reimbursement and ML and end markets means?

MS. SAMET BUCHWALD:  Objection to form.

A.   To me this doesn't strike me as unusual in healthcare.

Generally speaking, there is always a risk of reimbursement pressure within healthcare companies.  And depending upon what your view is, whether you're a buyer, whether you're a lender, different people will take different views on how strong the reimbursement risk is at any particular time, based upon, you know, both company-specific and more macro, more macro environment issues.

Q.   Did Citi evaluate or conduct any analysis of Millennium's reimbursements or any issues related to

Page 84

MICHAEL TORTORA

Millennium's reimbursements?

MS. SAMET BUCHWALD:  Objection to form.

A.   Generally speaking, our investment banking healthcare coverage would be considered experts on the healthcare industry and would have a view as to the magnitude of risk associated with reimbursement pressures and if any reimbursement pressures that may come to fruition would have a material impact on the company, and through our approval process we did not find that to be the case.

Q.   Would that process you described be documented anywhere?

A.   That process, I would say, would be documented throughout the formulation of Greenlight Memos and Final Approval Memos.

Q.   If Citi had done some type of analysis on Millennium's reimbursements, would that have been documented in any workpapers even though the results may

Page 85

MICHAEL TORTORA

have ended up in the Final Approval Memo?

A.   Generally speaking, any analysis that gets done will be included in the Final Approval Memo.

Q.   So if there is no reference in the Final Approval Memo to analysis or evaluations of Millennium's reimbursements, would that imply that that analysis was not done?

MS. SAMET BUCHWALD:  Objection to form.

A.   No. The analysis is done in regards to what I described here, which is a base case and a downside case, which sensitizes revenue growth and margins within the financial model based upon what our judgment is as to the risk and magnitude of those reimbursement pressures. So that is -- that's where it would be documented and that's where the rationale for a base case and a downside case would -- would come from partly.

MS. HALLINAN:  We can go to the next document, number 99.

22 (Pages 82 - 85)

Page 86

MICHAEL TORTORA

(Plaintiff Exhibit 234, email dated March 6, 2014, Bates CITI-T-00003179 was received and marked on this date for identification.)

A.   Okay.

Q.   Exhibit 234 is an email chain with the bottom email from yourself. Do you see that?

A.   Yes.

Q.   And it would appear that you attended a Millennium meeting; is that correct?

A.   Yes.  I attended alongside some healthcare investment banking coverage, Aradhana Sarin in particular, I attended a diligence session at the company's headquarters.

Q.   Okay. And the middle email is from yourself and you write, on March 6, 2014 at 3 p.m., "It's an unbelievable story that one guy built this in five years. They know that their margins are too good to be true and are going to get

Page 87

MICHAEL TORTORA

hit over time but the volume potential is so enormous and there is so much operating leverage in the business they can hit the rates really really hard and still be fine given the volume potential." Do you see that?

A.   Yes.

Q.   Was a concern that Citi had at this time that Millennium's margins maybe too good to be true?

A.   No, not a concern. I believe what we and even the company believed at the time was that the -- we're operating in a very competitive industry, that there would be continued entrants into and that over time, given the competition that would come into the market, their margins would come down.

However, given that it's only one aspect of profitability, the margins, the revenue potential being the other volume, there is a belief that even if margins did come down due to competitive pressures that they would still be a very

Page 88

MICHAEL TORTORA

successful company, given all of the volume that they should be able to grow into.

Q.   You did write here that the margins are too good to be true; is that right?

MS. SAMET BUCHWALD:  Objection to form.

A.   I did write that. I think that's a figure of speech. I could have -- I could write that and say sustainable or something along those lines.

Q.   And Thomas Cole writes "Grab another glass of cool aide." Do you see that?

A.   Yes.

Q.   And Stuart Dickson writes, "Save the cool aide for 3:30 p.m."  Do you see that?

A.   Yes.

Q.   Do you understand that to mean that Thomas Cole and Stuart Dickson disagreed with your view?

A.   I don't -- I don't know what

Page 89

MICHAEL TORTORA

they were thinking.

Q.   Do you recall any discussions during this time period at Citi where it was discussed whether margins were sustainable or not?

A.   I don't recall any specific conversations back in 2014, but I do remember that I believe the company's projection model that was sent to us had declining margins and in the sensitivity that we would have ran in both the base case and the downside case, we also would have sensitized margins in a downward fashion and the conclusion of all of that over time and talking to our committee was that this is, even in the -- even with margins that may be declining, there were still significant free cash flow in the business that would be able to service debt interest.

Q.   You referred to in your email "volume potential". Did Citi conduct any analysis on how Millennium expected to increase its volume?

23 (Pages 86 - 89)

Page 90

MICHAEL TORTORA

A.   In the same way that we would have conducted our diligence in regards to reimbursement, we have industry bankers within healthcare that are experts in the healthcare field that spend all their time talking to different companies and participants within the healthcare industry.

So we would have relied upon them and their knowledge and judgment to attempt to measure or quantify how much growth potential was in this -- was in this business from an industry perspective and that's what we would have -- we would have relied upon.

Q.   Outside of Millennium's financial projections and financial statements, did Citi review any underlying documents regarding the increase in volume potential that would have -- that Citi would have considered for its analysis?

MS. SAMET BUCHWALD:  Objection to form.

Page 91

MICHAEL TORTORA

A.   I can't recall any specific document.  But, again, our industry bankers who would have been as a general matter reading, you know, the macro healthcare industry news, talking to healthcare participants and otherwise just being a subject-expert on the matter would have been our primary source of knowledge and judgment on the volume potential of the industry.

Q.   So is it correct that Citi did not consider any data from Millennium outside of its financial projections?

MS. SAMET BUCHWALD:  Objection to form.

A.   I can't recall any specific report or data that we would have looked at that measured the specific volume potential of Millennium, but we would have done so and made a judgment call based upon our healthcare's general knowledge of the space and their judgment as to the volume potential of the business, based upon their expertise

Page 92

MICHAEL TORTORA

within healthcare.

Q.   Can you identify any of those healthcare specialists that you refer to that would have worked on the Millennium transaction?

A.   Aradhana Sarin would have been the main point of contact.

MS. HALLINAN:  We can go to the next document, number 114, please.

(Plaintiff Exhibit 235, email dated March 13, 2014, Bates CITI-DE-00067780 was received and marked on this date for identification.)

Q.   Exhibit 235 should be in your folder, the top email is from Ms. Sarin dated March 13, 2014.

A.   Okay.

Q.   If you take a look at the bottom email and Ms. Sarin writes, "Spoke with Mark Floyd." Do you see that?

A.   Yes.

Q.   Do you know who Mark Floyd is?

Page 93

MICHAEL TORTORA

A.   Mark Floyd is a member of our risk committee and he still works at Citigroup.

Q.   And she continues, "-- to address some of these questions on the business why is it different, too good to be true, et cetera."  Do you see that?

A.   Yes.

Q.   Did Citi have any discussions within its risk group about why Millennium might be too good to be true?

MS. SAMET BUCHWALD: Objection, form.

A.   I don't recall specific conversations in regards to that but as a general matter we would spend a substantial amount of time with our risk committee talking about all aspects of the business and all aspects of the financial performance and the projections going forward and the risk and mitigants to those projections over time.

Q.   And the top email is dated March 13, 2014 at 2:45 p.m.  Do you see

24 (Pages 90 - 93)

Page 122

MICHAEL TORTORA

Consequently, the company faces potential risk of lower volumes." Do you see that?

A.    Yes.

Q.    Other than general market considerations, was there anything specific to Millennium that Citi considered with respect to the government reducing payments for certain services?

MS. SAMET BUCHWALD:  Object to form.

A.    To my knowledge, there is no specific third-party report that was commissioned to look at Millennium specific reimbursement dynamics. That would be extremely unusual for us to do in any transaction, to commission a third-party report.  Instead, we would rely on our general knowledge and expertise within the healthcare group to formulate an opinion and oftentimes, many of these reimbursement trends or predictions are written about, commented about and analyzed in public forums, whether that's newspaper articles or

Page 123

MICHAEL TORTORA

industry publications, et cetera, that our healthcare bankers would have had access to and more than likely would have considered as their overall analysis and judgment of the issue.

Q.    Were there any government regulations or policies that would have been specific to Millennium that Citi considered?

MS. SAMET BUCHWALD:  Object to form.

A.    Can you repeat the question?

Q.    Yeah. Let me rephrase that for you.

Were there any government policies or procedures that Citi analyzed specific to Millennium and the impact that they may have on Millennium?

A.    I'm not sure what you mean by "policies and procedures". Can you maybe rephrase that again?

Q.    Are there any government regulations or proposed regulations that Citi considered specific to Millennium

Page 124

MICHAEL TORTORA

and the impact that those proposed regulations or regulations that were enacted that would have on Millennium?

A.    Yeah.  We would have, as part of our diligence process, analyzed and gotten comfortable with through conversations and diligence from the company that the company was complying in all material respects with the rules and regulations that they should have been complying with from an industry perspective.

So in that regard we would have -- we would have considered that in addition to making sure that the industry that they are operating in was going to be operating under the same rules and regulations that they had been in the past for the foreseeable future.

Q.    Did Citi, as part of its due diligence, try to quantify the potential risk of lower volumes as a result of government regulations?

MS. SAMET BUCHWALD:  Objection

Page 125

MICHAEL TORTORA

to form.

A.    We didn't try to quantify in the respect that that would be a pure hypothetical situation.

What we tried to do, what we did do, was sensitize revenue growth to account for downward pressure, which would be a direct result of industry changes, and to be able to be comfortable at that -- at that sensitivity that the free cash flow profile of the company would still be very strong.

Q.    At a high level what was Citi's general process for underwriting or performing due diligence in connection with leveraged loan lending activities in 2014?

MS. SAMET BUCHWALD:  Object to form.

A.    So the general process would be we would participate in and convene a Greenlight committee, which would include a relatively fulsome memo that listed out industry details, the transaction that

32 (Pages 122 - 125)

Page 126

MICHAEL TORTORA

was being contemplated by that company, the historical and financial performance of the company that we were looking to work with as well as any other benefits, considerations, et cetera of the transaction. We would hold a Greenlight meeting, educate our committee, look to -- looking to formulate an opinion as to whether we thought the transaction was viable and then formulate a plan as to additional diligence that would be needed to complete our analysis. We would then hold various meetings and phone calls with the company, collect the due diligence material, process and analyze that material and then when that was done, we would convene a final approval meeting with our committee to go over the findings of the due diligence and followup from any Greenlight meeting we may have had and ultimately approve the transaction or not.

Q.   After the Millennium 2014 transaction was approved, did Citi

Page 127

MICHAEL TORTORA

conduct any additional due diligence on the company?

A.   Well, by way of being a lender to the company ourselves, which I believe we were in the revolving credit facility that Millennium had, we would have participated in a quarterly, I believe quarterly review internally of the company's results.  And to the extent that we had followup questions on the company's ongoing operating performance as a lender, normally we would attempt to receive answers to that.

I don't remember specifically in the Millennium transaction what our quarterly review process was at the time but, generally, that is what we would have done as a lender in the revolver.

Q.   Okay. Would you go to document number 122, please?

(Plaintiff Exhibit 240,
Millennium Laboratories
Organizational Materials Bates
CITI-T-00002235 was received and

Page 128

MICHAEL TORTORA

marked on this date for identification.)

Q.   Exhibit 240 should be in your folder now.

A.   Okay.

Q.   Do you see that it's a Millennium Laboratories, Inc. in that gray box and underneath it says Organizational Materials?

A.   Yes.

Q.   And the JPMorgan logo is in the right-hand corner. Do you see that?

A.   Yes.

Q.   And on page 1 there is a Transactional Review. Do you see that?

A.   Yes.

Q.   Summary Terms and Conditions and then Execution Timetable and then next page has four key Due Diligence topics. Do you see that that page?

A.   Yes.

Q.   And there's a number of business due diligence questions that are listed there. Do you see that?

Page 129

MICHAEL TORTORA

A.   Yes.

Q.   For the Millennium transaction, was it JPMorgan that took the lead with respect to due diligence of the company?

A.   Generally speaking, on these type of transactions the lead left, who is JPMorgan, would take the lead in formulating the diligence topics list and then on a call running through those questions with the company, with the other underwriters present on the business due diligence call.

Q.   Did Citi look into any of these topics, itself, on its own?

A.   We would have formulated our own opinions based upon the answers we received from the company, as well as the fact that we had a relationship with the company going back at least a year from the term loan transaction where we would have been collecting our own thoughts around the business just by way of our relationship with them and talking to

33 (Pages 126 - 129)

# EXHIBIT 22

# MILLENNIUM LABORATORIES, INC.

## DCC MEMO

Part A – Transaction Overview / Term Sheets / Distribution Commentary............ p. 2

Part B – Comps / Market Data / Existing Facilities / Ratings................................ p. 11

Part C – Credit Approval Memo ................................................................................ p.19

## MARCH 2014

CONFIDENTIAL

SunTrust_MIL-DE-00011758

**Millennium Laboratories, Inc.**  **Credit Approval Memo – March 2014**

## Management Case

**Millennium Laboratories, Inc.**
**Management Case**
*($ in thousands)*

| | Historical 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | Projected 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | CAGR 14 - '20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Select Income Statement Statistics** | | | | | | | | | | | |
| Revenue | $232,619 | $522,164 | $632,632 | $733,282 | $788,758 | $853,081 | $933,008 | $1,008,084 | $1,070,618 | $1,134,683 | 7.5% |
| % Growth | N/A | 124.5% | N/A | 15.9% | 7.6% | 8.2% | 9.4% | 8.0% | 6.2% | 6.0% | |
| COGS (excludes D&A) | 31,197 | 44,401 | 75,256 | 93,805 | 114,200 | 131,573 | 148,542 | 165,618 | 178,351 | 192,811 | |
| % Margin | 13.4% | 8.5% | 11.9% | 12.8% | 14.5% | 15.4% | 15.9% | 16.4% | 16.7% | 17.0% | |
| Gross Profit | 201,422 | 477,763 | 557,376 | 639,477 | 674,557 | 721,508 | 784,466 | 842,466 | 892,267 | 941,872 | |
| % Margin | 86.6% | 91.5% | 88.1% | 87.2% | 85.5% | 84.6% | 84.1% | 83.6% | 83.3% | 83.0% | |
| Operating Expenses (excludes D&A) | 93,137 | 156,684 | 197,579 | 240,069 | 253,237 | 267,359 | 291,536 | 315,647 | 333,429 | 353,450 | |
| % Margin | 40.0% | 30.0% | 31.2% | 32.7% | 32.1% | 31.3% | 31.2% | 31.3% | 31.1% | 31.1% | |
| **EBITDA** | **108,285** | **321,079** | **359,796** | **399,408** | **421,321** | **454,149** | **492,930** | **526,819** | **558,839** | **588,423** | **6.7%** |
| % Margin | 46.6% | 61.5% | 56.9% | 54.5% | 53.4% | 53.2% | 52.8% | 52.3% | 52.2% | 51.9% | |
| Stock Based Compensation | 212 | 373 | 3,048 | 3,977 | 4,176 | 4,385 | 4,604 | 4,835 | 5,103 | 5,392 | |
| RxAnte Transaction Expenses | 0 | 0 | 2,703 | 13,988 | 9,766 | 0 | 0 | 0 | 0 | 0 | |
| Shared Service Reimbursement by MRI & Clinical Suppl | 0 | 0 | 494 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | |
| Other Adjustments | 0 | 8,397 | 12,081 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Adjusted EBITDA** | **$108,497** | **$329,849** | **$378,121** | **$417,873** | **$435,763** | **$459,034** | **$498,034** | **$532,154** | **$564,442** | **$594,314** | **6.0%** |
| % Margin | 46.6% | 63.2% | 59.8% | 57.0% | 55.2% | 53.8% | 53.4% | 52.8% | 52.7% | 52.4% | |
| **Select Balance Sheet Statistics** | | | PF at Close | | | | | | | | |
| Cash | $30,088 | $143,796 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | |
| Accounts Receivable | 44,087 | 65,051 | 93,813 | 107,405 | 111,677 | 120,784 | 132,101 | 142,730 | 151,584 | 160,655 | |
| Goodwill & Other Intangibles | 0 | 0 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | |
| PP&E | 45,463 | 72,891 | 112,002 | 105,996 | 98,232 | 95,424 | 99,037 | 113,226 | 114,182 | 116,392 | |
| **Long Term Debt** | | | | | | | | | | | |
| Revolving Credit Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Existing Term Loan A | 0 | 286,032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| New Term Loan B | 0 | 0 | 1,800,000 | 1,702,013 | 1,575,042 | 1,437,808 | 1,289,419 | 1,134,833 | 946,936 | 737,817 | |
| PNC Debt | 15,019 | 14,798 | 13,710 | 12,104 | 2,541 | 0 | 0 | 0 | 0 | 0 | |
| Capital Leases | 11,714 | 28,462 | 41,257 | 19,802 | 17,298 | 16,487 | 15,307 | 13,654 | 11,394 | 8,352 | |
| **Total Senior Secured Debt** | **26,733** | **329,292** | **1,854,966** | **1,733,919** | **1,594,881** | **1,454,295** | **1,304,727** | **1,148,487** | **958,330** | **746,169** | |
| TA Sub Debt | 187,550 | 196,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Total Funded Debt** | **$214,283** | **$525,292** | **$1,854,966** | **$1,733,919** | **$1,594,881** | **$1,454,295** | **$1,304,727** | **$1,148,487** | **$958,330** | **$746,169** | |

**Free Cash Flow** (12 Months)

| | | | | 12 Months | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | | | | $417,873 | $435,763 | $459,034 | $498,034 | $532,154 | $564,442 | $594,314 | |
| Interest Expense, net | 7-Yr Cum. FCF | $1,108,797 | | (74,268) | (69,487) | (75,247) | (78,780) | (78,635) | (71,787) | (60,328) | |
| Taxes | % Senior Debt | 59.8% | | (189,841) | (198,357) | (216,315) | (236,847) | (255,229) | (272,110) | (290,560) | |
| Change in Working Capital | % Total Debt | 59.8% | | (1,504) | (3,140) | (7,101) | (7,834) | (6,907) | (5,683) | (6,075) | |
| Capital Expenditures | | | | (16,725) | (15,474) | (19,286) | (24,505) | (34,644) | (24,205) | (24,690) | |
| Cash Expenses Related to Acquisition | | | | (13,988) | (9,766) | 0 | 0 | 0 | 0 | 0 | |
| **Free Cash Flow** | | | | **121,048** | **139,038** | **140,586** | **149,568** | **156,239** | **190,157** | **212,161** | |
| **Cumulative FCF** | | | | **121,048** | **260,086** | **400,672** | **550,240** | **706,479** | **896,636** | **1,108,797** | |
| Term Loan B Amortization [1] | | | | (97,987) | (126,971) | (137,234) | (148,388) | (154,586) | (187,897) | (209,120) | |
| PNC Debt Repayment | | | | (1,606) | (9,563) | (2,541) | 0 | 0 | 0 | 0 | |
| Capital Leases Repayment | | | | (21,454) | (2,504) | (811) | (1,180) | (1,653) | (2,261) | (3,041) | |
| **Total Debt Repayment** | | | | **(121,048)** | **(139,038)** | **(140,586)** | **(149,568)** | **(156,239)** | **(190,157)** | **(212,161)** | |

**Selected Metrics** (PF LTM)

| | PF LTM | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Senior Debt / Adj. EBITDA | 4.91x | 4.15x | 3.66x | 3.17x | 2.62x | 2.16x | 1.70x | 1.26x | | |
| Total Debt / Adj. EBITDA | 4.91x | 4.15x | 3.66x | 3.17x | 2.62x | 2.16x | 1.70x | 1.26x | | |
| Net Debt / Adj. EBITDA | 4.77x | 4.03x | 3.55x | 3.06x | 2.52x | 2.06x | 1.61x | 1.17x | | |
| (Adj. EBITDA - Capex - Taxes) / (Int.+Principal) | | 5.78x | 7.38x | 10.46x | 12.34x | 12.33x | 13.23x | 13.26x | | |

(1) Assumes minimum cash balance of $50MM with 100% ECF sweep to amortize outstanding Term Loan B balance.

CONFIDENTIAL

SunTrust_MIL-DE-00011802

**Millennium Laboratories, Inc.**                                    **Credit Approval Memo – March 2014**

## Management Case Assumptions:

The Management Case incorporates a bottoms-up analysis of revenue and costs on a volume and price per-specimen basis. As such, the projected revenue and EBITDA of the Company, includes operating assumptions guidance from Millennium management.

- The management case excludes acquisitions and associated revenue and expenses.
- See comparison charts in this section for price, volume, and profitability on a per-specimen basis by sensitivity case.
- Consolidated organic revenue growth CAGR of 7.5% from 2014 – 2020.
- Annual specimen volume growth CAGR of 11.7%, with declining net revenue per specimen (CAGR of -3.7%) from 2014 – 2020, respectively, as the Company takes a more conservative view on potential reimbursement cuts in the future.
- Operating expense margin is held constant at ~31 – 32% of revenue.
- Financing assumptions include a 100% ECF sweep (full-deleveraging) and $0MM in non-tax related distributions.
- Management case assumes Adjusted EBITDA per specimen declines from $145 in 2014 to $106 in 2020.

## Management Case Results:

- Revenue increases from $733MM at 12/31/14 to over $1,130MM by 2020, or at a 7.5% CAGR.
- Pro Forma Adjusted EBITDA margins decrease slowly and steadily throughout the projection period from 57% in 2014 to ~52% in 2020.
- Pro forma Adjusted EBITDA increases from $417MM at 12/31/14 to $594MM by 2020, which represents a 6.0% CAGR.
- The Company is able to fully meet its debt service obligations and pays down $1,063MM of the Term Loan B by 2020 (full-deleveraging).
- Total leverage declines from 4.91x at close to 1.25x in 2020.  Net leverage declines from 4.77x to 1.17x in 2020.
- The Company generates cumulative cash flow of $1,109MM over a projected seven year period, or 59.8% of senior / total debt at closing.

| | Historical | | | | | Management Case | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Net Revenues | $ 64,463,500 | $ 160,681,000 | $ 232,619,000 | $ 522,164,264 | $ 632,631,707 | $ 733,282,004 | $ 788,757,886 | $ 853,080,931 | $ 933,007,909 | $ 1,008,083,933 | $ 1,070,617,966 | $ 1,134,683,416 |
| Specimens Tested | 177,000 | 496,000 | 1,118,000 | 1,808,889 | 2,406,000 | 2,881,088 | 3,337,018 | 3,814,408 | 4,313,655 | 4,835,609 | 5,198,587 | 5,590,227 |
| % Growth | n/a | 180.2% | 125.4% | 61.8% | 33.0% | 19.7% | 15.8% | 14.3% | 13.1% | 12.1% | 7.5% | 7.5% |
| Net Revenue per Specimen | $ 364.20 | $ 323.95 | $ 208.07 | $ 288.67 | $ 262.94 | $ 254.52 | $ 236.37 | $ 223.65 | $ 216.29 | $ 208.47 | $ 205.94 | $ 202.98 |
| % Growth | n/a | -11.1% | -35.8% | 38.7% | -8.9% | -3.2% | -7.1% | -5.4% | -3.3% | -3.6% | -1.2% | -1.4% |
| Avg. Monthly Volume | 14,750.0 | 41,333.3 | 93,166.7 | 150,740.8 | 200,500.0 | 240,090.6 | 278,084.9 | 317,867.3 | 359,471.3 | 402,967.4 | 433,215.6 | 465,852.3 |
| Avg. Daily Volume | 678.2 | 1,900.4 | 4,283.5 | 6,930.6 | 9,218.4 | 11,038.6 | 12,785.5 | 14,614.6 | 16,527.4 | 18,527.2 | 19,918.0 | 21,418.5 |
| % Growth | n/a | 180.2% | 125.4% | 61.8% | 33.0% | 19.7% | 15.8% | 14.3% | 13.1% | 12.1% | 7.5% | 7.5% |
| Adjusted EBITDA | $ 41,705,800 | $ 101,902,000 | $ 108,497,000 | $ 329,849,400 | $ 378,120,860 | $ 417,873,359 | $ 435,763,239 | $ 459,034,283 | $ 498,034,050 | $ 532,153,644 | $ 564,441,673 | $ 594,314,450 |
| Adj. EBITDA per Specimen | $ 235.63 | $ 205.45 | $ 97.05 | $ 182.35 | $ 157.16 | $ 145.04 | $ 130.58 | $ 120.34 | $ 115.46 | $ 110.05 | $ 108.58 | $ 106.31 |
| COGS | | 25,703,500 | 37,028,522 | 54,943,000 | 75,256,154 | 93,804,609 | 114,200,474 | 131,573,093 | 148,541,786 | 165,618,251 | 165,618,251 | 165,618,251 |
| SG&A | | 33,075,500 | 87,093,478 | 137,371,864 | 179,254,693 | 240,069,074 | 253,236,738 | 267,358,617 | 291,536,388 | 315,646,570 | 333,428,595 | 353,449,775 |
| Total Expenses (excl. D&A) | | 58,779,000 | 124,122,000 | 192,314,864 | 254,510,847 | 315,408,645 | 352,994,647 | 394,046,648 | 434,973,859 | 475,930,290 | 506,176,293 | 540,368,966 |
| As % of Total Expenses: | | | | | | | | | | | | |
| COGS | | 43.7% | 29.8% | 28.6% | 29.6% | 29.7% | 32.4% | 33.4% | 34.1% | 34.8% | 32.7% | 30.6% |
| SG&A | | 56.3% | 70.2% | 71.4% | 70.4% | 76.1% | 71.7% | 67.8% | 67.0% | 66.3% | 65.9% | 65.4% |
| Total Expenses (excl. D&A) | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Net per Specimen: | | | | | | | | | | | | |
| Revenue | | $ 323.95 | $ 208.07 | $ 288.67 | $ 262.94 | $ 254.52 | $ 236.37 | $ 223.65 | $ 216.29 | $ 208.47 | $ 205.94 | $ 202.98 |
| COGS | | $ 51.82 | $ 33.12 | $ 30.37 | $ 31.28 | $ 32.56 | $ 34.22 | $ 34.49 | $ 34.44 | $ 34.25 | $ 31.86 | $ 29.63 |
| SG&A | | $ 66.68 | $ 77.90 | $ 75.94 | $ 74.50 | $ 83.33 | $ 75.89 | $ 70.09 | $ 67.58 | $ 65.28 | $ 64.14 | $ 63.23 |
| Total Expenses (excl. D&A) | | $ 118.51 | $ 111.02 | $ 106.32 | $ 105.78 | $ 109.48 | $ 105.78 | $ 103.30 | $ 100.84 | $ 98.42 | $ 97.37 | $ 96.66 |
| EBITDA | | $ 205.45 | $ 97.05 | $ 182.35 | $ 157.16 | $ 145.04 | $ 130.58 | $ 120.34 | $ 115.46 | $ 110.05 | $ 108.58 | $ 106.31 |
| Margin | | 63.4% | 46.6% | 63.2% | 59.8% | 57.0% | 55.2% | 53.8% | 53.4% | 52.8% | 52.7% | 52.4% |

CONFIDENTIAL                                                              SunTrust_MIL-DE-00011803

**Millennium Laboratories, Inc.**                                    **Credit Approval Memo – March 2014**

The charts below highlight historical and projected specimen volume and per specimen financial statistics for 2012 through 2020. Key observations:

- Total costs per specimen have been, and are expected to remain, at approximately $105/specimen processed. COGS are approximately $30/specimen, while SG&A and operating expenses are approximately $75, representing the majority of the costs.

- Revenue per specimen was nearly $290 in 2012, and has gradually declined since then. It is expected to remain above $200 during the projection period. Note that AFES views management's assumptions regarding these rate declines (~30% cumulative decline through 2020) as quite conservative, as these are well beyond any expected rate cuts from CMS / Medicare.

- Also note that based on the expected specimen volume and demonstrated stability of the cost structure, the Company's break-even price per specimen appears to be approximately $105 (same as the total cost per specimen), and that at a $200 per specimen price point, the Company continues to generate nearly 50% EBITDA margins.



CONFIDENTIAL                                                        SunTrust_MIL-DE-00011804

**Millennium Laboratories, Inc.**                                    **Credit Approval Memo – March 2014**

## Base Case

| Millennium Laboratories, Inc. Base Case ($ in thousands) | Historical 12/31/2011 | Historical 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | Projected 12/31/2016 | Projected 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | CAGR 14 - '20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Select Income Statement Statistics* | | | | | | | | | | | |
| Revenue | $232,619 | $522,164 | $632,632 | $711,810 | $751,005 | $797,340 | $864,263 | $925,478 | $974,012 | $1,032,609 | 6.4% |
| % Growth | *N/A* | *124.5%* | *N/A* | *12.5%* | *5.5%* | *6.2%* | *8.4%* | *7.1%* | *5.2%* | *6.0%* | |
| | | | | | | | | | | | |
| COGS (excludes D&A) | 31,197 | 44,401 | 75,256 | 92,867 | 110,774 | 127,626 | 142,600 | 157,337 | 169,433 | 183,170 | |
| % Margin | *13.4%* | *8.5%* | *11.9%* | *13.0%* | *14.8%* | *16.0%* | *16.5%* | *17.0%* | *17.4%* | *17.7%* | |
| | | | | | | | | | | | |
| Gross Profit | 201,422 | 477,763 | 557,376 | 618,944 | 640,230 | 669,714 | 721,663 | 768,141 | 804,579 | 849,439 | |
| % Margin | *86.6%* | *91.5%* | *88.1%* | *87.0%* | *85.2%* | *84.0%* | *83.5%* | *83.0%* | *82.6%* | *82.3%* | |
| | | | | | | | | | | | |
| Operating Expenses (excludes D&A) | 93,137 | 156,684 | 197,579 | 240,481 | 253,655 | 267,727 | 291,948 | 316,100 | 333,934 | 353,998 | |
| % Margin | *40.0%* | *30.0%* | *31.2%* | *33.8%* | *33.8%* | *33.6%* | *33.8%* | *34.2%* | *34.3%* | *34.3%* | |
| | | | | | | | | | | | |
| **EBITDA** | **108,285** | **321,079** | **359,796** | **378,463** | **386,575** | **401,987** | **429,715** | **452,041** | **470,645** | **495,440** | 4.6% |
| % Margin | *46.6%* | *61.5%* | *56.9%* | *53.2%* | *51.5%* | *50.4%* | *49.7%* | *48.8%* | *48.3%* | *48.0%* | |
| | | | | | | | | | | | |
| Stock Based Compensation | 212 | 373 | 3,048 | 3,977 | 4,176 | 4,385 | 4,604 | 4,835 | 5,103 | 5,392 | |
| RxAnte Transaction Expenses | 0 | 0 | 2,703 | 13,988 | 9,766 | 0 | 0 | 0 | 0 | 0 | |
| Shared Service Reimbursement by MRI & Clinical Suppl | 0 | 0 | 494 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | |
| Other Adjustments | 0 | 8,397 | 12,081 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | | | |
| **Adjusted EBITDA** | **$108,497** | **$329,849** | **$378,121** | **$396,928** | **$401,018** | **$406,872** | **$434,819** | **$457,375** | **$476,248** | **$501,332** | 4.0% |
| % Margin | *46.6%* | *63.2%* | *59.8%* | *55.8%* | *53.4%* | *51.0%* | *50.3%* | *49.4%* | *48.9%* | *48.6%* | |
| | | | | | | | | | | | |
| *Select Balance Sheet Statistics* | | | *PF at Close* | | | | | | | | |
| Cash | $30,088 | $143,796 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | |
| Accounts Receivable | 44,087 | 65,051 | 93,813 | 104,260 | 106,332 | 112,892 | 122,367 | 131,034 | 137,906 | 146,203 | |
| Goodwill & Other Intangibles | 0 | 0 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | |
| | | | | | | | | | | | |
| PP&E | 45,463 | 72,891 | 112,002 | 103,488 | 93,403 | 87,701 | 87,638 | 96,631 | 93,956 | 92,463 | |
| | | | | | | | | | | | |
| *Long Term Debt* | | | | | | | | | | | |
| Revolving Credit Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Existing Term Loan A | 0 | 286,032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| New Term Loan B | 0 | 0 | 1,800,000 | 1,701,788 | 1,585,713 | 1,468,575 | 1,346,838 | 1,223,939 | 1,076,571 | 913,553 | |
| PNC Debt | 15,019 | 14,798 | 13,710 | 12,104 | 2,541 | 0 | 0 | 0 | 0 | 0 | |
| Capital Leases | 11,714 | 28,462 | 41,257 | 19,802 | 17,298 | 16,487 | 15,307 | 13,654 | 11,394 | 8,352 | |
| **Total Senior Secured Debt** | **26,733** | **329,292** | **1,854,966** | **1,733,693** | **1,605,552** | **1,485,062** | **1,362,145** | **1,237,593** | **1,087,965** | **921,905** | |
| | | | | | | | | | | | |
| TA Sub Debt | 187,550 | 196,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Total Funded Debt** | **$214,283** | **$525,292** | **$1,854,966** | **$1,733,693** | **$1,605,552** | **$1,485,062** | **$1,362,145** | **$1,237,593** | **$1,087,965** | **$921,905** | |

| *Free Cash Flow* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | *12 Months* | | | | | | | |
| EBITDA | | | $396,928 | $401,018 | $406,872 | $434,819 | $457,375 | $476,248 | $501,332 | |
| Interest Expense, net | 7-Yr Cum. FCF | $933,061 | (74,263) | (69,709) | (76,284) | (81,332) | (83,397) | (79,346) | (71,290) | |
| Taxes | % Senior Debt | 50.3% | (174,839) | (178,996) | (189,003) | (203,423) | (214,707) | (222,776) | (237,280) | |
| Change in Working Capital | % Total Debt | 50.3% | 2,150 | (751) | (4,202) | (5,819) | (4,772) | (3,423) | (5,216) | |
| Capital Expenditures | | | (14,216) | (13,153) | (16,393) | (20,829) | (29,448) | (20,574) | (20,986) | |
| Cash Expenses Related to Acquisition | | | (13,988) | (9,766) | 0 | 0 | 0 | 0 | 0 | |
| **Free Cash Flow** | | | **121,273** | **128,142** | **120,490** | **122,917** | **124,552** | **149,628** | **166,060** | |
| Cumulative FCF | | | 121,273 | 249,415 | 369,904 | 492,821 | 617,373 | 767,001 | 933,061 | |
| Term Loan B Amortization [1] | | | (98,212) | (116,075) | (117,138) | (121,737) | (122,899) | (147,368) | (163,019) | |
| PNC Debt Repayment | | | (1,606) | (9,563) | (2,541) | 0 | 0 | 0 | 0 | |
| Capital Leases Repayment | | | (21,454) | (2,504) | (811) | (1,180) | (1,653) | (2,261) | (3,041) | |
| **Total Debt Repayment** | | | **(121,273)** | **(128,142)** | **(120,490)** | **(122,917)** | **(124,552)** | **(149,628)** | **(166,060)** | |

| *Selected Metrics* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | PF LTM | | | | | | | | |
| Senior Debt / Adj. EBITDA | 4.91x | 4.37x | 4.00x | 3.65x | 3.13x | 2.71x | 2.28x | 1.84x | |
| Total Debt / Adj. EBITDA | 4.91x | 4.37x | 4.00x | 3.65x | 3.13x | 2.71x | 2.28x | 1.84x | |
| Net Debt / Adj. EBITDA | 4.77x | 4.24x | 3.88x | 3.53x | 3.02x | 2.60x | 2.18x | 1.74x | |
| (Adj. EBITDA - Capex - Taxes) / (Int.+Principal) | | 5.69x | 6.95x | 9.44x | 10.98x | 10.85x | 11.50x | 11.55x | |

(1) Assumes minimum cash balance of $50MM with 100% ECF sweep to amortize outstanding Term Loan B balance.

CONFIDENTIAL                                           SunTrust_MIL-DE-00011805

**Millennium Laboratories, Inc.**                                    **Credit Approval Memo – March 2014**

---

## Base Case Assumptions:

The Base Case incorporates a bottoms-up analysis of revenue and costs on a volume and price per-specimen basis. The projected revenue and EBITDA, includes operating assumptions guidance from Millennium management.

- The Base case excludes acquisitions and associated revenue and expenses.
- See comparison charts in this section for price, volume, and profitability on a per-specimen basis by sensitivity case.
- Consolidated organic revenue growth CAGR of 6.4% from 2014 – 2020.
- Annual specimen volume growth CAGR of 10.9%, with declining net revenue per specimen (CAGR of -4.1%) from 2014 – 2020, respectively, which we note the Company took a highly conservative view on potential reimbursement cuts in their Management Case already.
- Operating expense margin is held constant at ~34% of revenue.
- Financing assumptions include a 100% ECF sweep (full-deleveraging) and $0MM in non-tax related distributions.
- Adjusted EBITDA per specimen declines from $139 in 2014 to $94 in 2020.

## Base Case Results:

- Revenue increases from $711MM at 12/31/14 to over $1,032MM by 2020, or at a 6.4% CAGR.
- Pro Forma Adjusted EBITDA margins decrease steadily throughout the projection period from ~56% in 2014 to ~49% in 2020.
- Pro forma Adjusted EBITDA increases from $397MM at 12/31/14 to $501MM by 2020, which represents a 4.0% CAGR.
- The Company is able to fully meet its debt service obligations and pays down $886MM of the Term Loan B by 2020 (full-deleveraging).
- Total leverage declines from 4.91x at close to 1.84x in 2020. Net leverage declines from 4.77x to 1.74x in 2020.
- The Company generates cumulative cash flow of $933MM over a projected seven year period, or 50.3% of senior / total debt at closing.

---

CONFIDENTIAL                                    SunTrust_MIL-DE-00011806

**Millennium Laboratories, Inc.**                                             **Credit Approval Memo – March 2014**

## Downside Case

**Millennium Laboratories, Inc.**
**Downside Case**
($ in thousands)

| | Historical 12/31/2011 | 12/31/2012 | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | CAGR 14 - '20 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Select Income Statement Statistics* | | | | | | | | | | | |
| Revenue | $232,619 | $522,164 | $632,632 | $683,566 | $699,801 | $732,323 | $774,124 | $812,552 | $855,608 | $898,395 | *4.7%* |
| *% Growth* | *N/A* | *124.5%* | *N/A* | *8.1%* | *2.4%* | *4.6%* | *5.7%* | *5.0%* | *5.3%* | *5.0%* | |
| COGS (excludes D&A) | 31,197 | 44,401 | 75,256 | 94,227 | 110,032 | 123,399 | 135,507 | 147,690 | 159,044 | 171,939 | |
| *% Margin* | *13.4%* | *8.5%* | *11.9%* | *13.8%* | *15.7%* | *16.9%* | *17.5%* | *18.2%* | *18.6%* | *19.1%* | |
| Gross Profit | 201,422 | 477,763 | 557,376 | 589,339 | 589,769 | 608,923 | 638,617 | 664,862 | 696,564 | 726,456 | |
| *% Margin* | *86.6%* | *91.5%* | *88.1%* | *86.2%* | *84.3%* | *83.1%* | *82.5%* | *81.8%* | *81.4%* | *80.9%* | |
| Operating Expenses (excludes D&A) | 93,137 | 156,684 | 197,579 | 247,496 | 261,087 | 275,618 | 300,509 | 325,352 | 343,753 | 364,402 | |
| *% Margin* | *40.0%* | *30.0%* | *31.2%* | *36.2%* | *37.3%* | *37.6%* | *38.8%* | *40.0%* | *40.2%* | *40.6%* | |
| **EBITDA** | **108,285** | **321,079** | **359,796** | **341,843** | **328,683** | **333,306** | **338,107** | **339,511** | **352,811** | **362,054** | *1.0%* |
| *% Margin* | *46.6%* | *61.5%* | *56.9%* | *50.0%* | *47.0%* | *45.5%* | *43.7%* | *41.8%* | *41.2%* | *40.3%* | |
| Stock Based Compensation | 212 | 373 | 3,048 | 3,977 | 4,176 | 4,385 | 4,604 | 4,835 | 5,103 | 5,392 | |
| RxAnte Transaction Expenses | 0 | 0 | 2,703 | 13,988 | 9,766 | 0 | 0 | 0 | 0 | 0 | |
| Shared Service Reimbursement by MRI & Clinical Suppl | 0 | 0 | 494 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | |
| Other Adjustments | 0 | 8,397 | 12,081 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Adjusted EBITDA** | **$108,497** | **$329,849** | **$378,121** | **$360,308** | **$343,125** | **$338,191** | **$343,212** | **$344,845** | **$358,414** | **$367,946** | *0.4%* |
| *% Margin* | *46.6%* | *63.2%* | *59.8%* | *52.7%* | *49.0%* | *46.2%* | *44.3%* | *42.4%* | *41.9%* | *41.0%* | |
| *Select Balance Sheet Statistics* | | | PF at Close | | | | | | | | |
| Cash | $30,088 | $143,796 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | |
| Accounts Receivable | 44,087 | 65,051 | 93,813 | 100,123 | 99,082 | 103,686 | 109,605 | 115,046 | 121,142 | 127,200 | |
| Goodwill & Other Intangibles | 0 | 0 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | 51,867 | |
| PP&E | 45,463 | 72,891 | 112,002 | 101,815 | 90,183 | 82,552 | 80,039 | 85,567 | 80,473 | 76,510 | |
| *Long Term Debt* | | | | | | | | | | | |
| Revolving Credit Facility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Existing Term Loan A | 0 | 286,032 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| New Term Loan B | 0 | 0 | 1,800,000 | 1,711,064 | 1,617,647 | 1,530,476 | 1,449,001 | 1,378,526 | 1,293,598 | 1,202,918 | |
| PNC Debt | 15,019 | 14,798 | 13,710 | 12,104 | 2,541 | 0 | 0 | 0 | 0 | 0 | |
| Capital Leases | 11,714 | 28,462 | 41,257 | 19,802 | 17,298 | 16,487 | 15,307 | 13,654 | 11,394 | 8,352 | |
| **Total Senior Secured Debt** | **26,733** | **329,292** | **1,854,966** | **1,742,970** | **1,637,485** | **1,546,963** | **1,464,308** | **1,392,181** | **1,304,992** | **1,211,270** | |
| TA Sub Debt | 187,550 | 196,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| **Total Funded Debt** | **$214,283** | **$525,292** | **$1,854,966** | **$1,742,970** | **$1,637,485** | **$1,546,963** | **$1,464,308** | **$1,392,181** | **$1,304,992** | **$1,211,270** | |

**Free Cash Flow**

| | | | | 12 Months | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | | | | $360,308 | $343,125 | $338,191 | $343,212 | $344,845 | $358,414 | $367,946 | |
| Interest Expense, net | | 7-Yr Cum. FCF | $643,696 | (74,460) | (70,585) | (78,632) | (86,080) | (91,741) | (92,187) | (89,469) | |
| Taxes | | % Senior Debt | 34.7% | (155,169) | (147,924) | (152,007) | (153,838) | (153,423) | (157,917) | (163,163) | |
| Change in Working Capital | | % Total Debt | 34.7% | 8,348 | 2,740 | (2,065) | (1,759) | (1,072) | (2,467) | (2,575) | |
| Capital Expenditures | | | | (12,543) | (11,606) | (14,465) | (18,379) | (25,983) | (18,154) | (18,517) | |
| Cash Expenses Related to Acquisition | | | | (13,988) | (9,766) | 0 | 0 | 0 | 0 | 0 | |
| **Free Cash Flow** | | | | **111,997** | **105,484** | **90,522** | **82,655** | **72,127** | **87,189** | **93,722** | |
| **Cumulative FCF** | | | | **111,997** | **217,481** | **308,003** | **390,658** | **462,786** | **549,974** | **643,696** | |
| Term Loan B Amortization [1] | | | | (88,936) | (93,417) | (87,171) | (81,475) | (70,474) | (84,928) | (90,680) | |
| PNC Debt Repayment | | | | (1,606) | (9,563) | (2,541) | 0 | 0 | 0 | 0 | |
| Capital Leases Repayment | | | | (21,454) | (2,504) | (811) | (1,180) | (1,653) | (2,261) | (3,041) | |
| **Total Debt Repayment** | | | | **(111,997)** | **(105,484)** | **(90,522)** | **(82,655)** | **(72,127)** | **(87,189)** | **(93,722)** | |

**Selected Metrics**

| | PF LTM | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Senior Debt / Adj. EBITDA | 4.91x | 4.84x | 4.77x | 4.57x | 4.27x | 4.04x | 3.64x | 3.29x | | |
| Total Debt / Adj. EBITDA | 4.91x | 4.84x | 4.77x | 4.57x | 4.27x | 4.04x | 3.64x | 3.29x | | |
| Net Debt / Adj. EBITDA | 4.77x | 4.70x | 4.63x | 4.43x | 4.12x | 3.89x | 3.50x | 3.16x | | |
| (Adj. EBITDA - Capex - Taxes) / (Int.+Principal) | | 5.27x | 6.11x | 8.04x | 8.92x | 8.42x | 9.00x | 8.85x | | |

(1) Assumes minimum cash balance of $50MM with 100% ECF sweep to amortize outstanding Term Loan B balance.

CONFIDENTIAL                                             SunTrust_MIL-DE-00011807

**Millennium Laboratories, Inc.**                                                      **Credit Approval Memo – March 2014**

## Downside Case Assumptions:

The Management Case incorporates a bottoms-up analysis of revenue and costs on a volume and price per-specimen basis. As such, the projected revenue and EBITDA of the Company, includes operating assumptions guidance from Millennium management.

- The downside case excludes acquisitions and associated revenue and expenses.
- See comparison charts in this section for price, volume, and profitability on a per-specimen basis by sensitivity case.
- Consolidated organic revenue growth CAGR of 4.7% from 2014 – 2020.
- Annual specimen volume growth CAGR of 9.5%, with declining net revenue per specimen (CAGR of -4.4%) from 2014 – 2020, respectively.
- Operating expense margin between ~36 – 40% of revenue.
- Financing assumptions include a 100% ECF sweep (full-deleveraging) and $0MM in non-tax related distributions.
- Adjusted EBITDA per specimen declines from ~$127 in 2014 to ~$75 in 2020.

## Downside Case Results:

- Revenue increases from $733MM at 12/31/14 to over $1,130MM by 2020, or at a 6.4% CAGR.
- Pro Forma Adjusted EBITDA margins decrease steadily throughout the projection period from ~53% in 2014 to 41% in 2020.
- Pro forma Adjusted EBITDA is relatively flat growing from $360MM at 12/31/14 to $368MM by 2020, which represents a 0.4% CAGR.
- The Company is able to fully meet its debt service obligations and pays down $597MM of the Term Loan B by 2020 (full-deleveraging).
- Total leverage declines from 4.91x at close to 3.29x in 2020.  Net leverage declines from 4.77x to 3.16x in 2020.
- The Company generates cumulative cash flow of $643.7MM over a projected seven year period, or 34.7% of senior / total debt at closing.

CONFIDENTIAL                                              SunTrust_MIL-DE-00011808

**Millennium Laboratories, Inc.**                                                    **Credit Approval Memo – March 2014**

---

CUSHIONS OF PROTECTION

**Liquidity and Free Cash Flow:**

- Short-term liquidity is considered strong, with ample cash on the balance sheet post-closing of no less than $50MM and access to the $50MM Revolver (undrawn at close).
- FCF before (non-tax related) distributions has increased from $25.1MM in FYE 2009 to $260.2MM in FYE 2012 and is $1,109MM over the projected seven year period, or 59.8% of senior / total debt at closing.

**Tangible Asset / Liquidation Analysis:**

- While the credit facilities are secured by all the assets of the Company, asset coverage is weak given the nature of the business. The chart below outlines the main assets of the business and the discount values that would be assumed in a liquidation scenario. The margined values of these assets only cover 5.6% of outstanding senior debt at the close of the transaction and 5.5% of senior debt assuming a fully funded Revolver. As such, maximum recovery would likely be achieved by a sale of the business to a strategic or financial buyer as outlined in further detail below in the Enterprise Valuation Analysis section.

| Asset Coverage Analysis | | | |
|---|---|---|---|
| *$ in 000s* | Book Value | Margin | Value |
| Cash | $     156,145 | 0.0% | $          - |
| Accounts Receivable | 89,552 | 80.0% | 71,642 |
| Inventory | - | 50.0% | - |
| PP&E | 99,564 | 30.0% | 29,869 |
| **Total Tangible Asset Value** | **$     345,261** | | **$     101,511** |
| Senior Debt | | | $  1,800,000 |
| *Asset Coverage* | | | *5.6%* |
| Fully Funded Senior Debt | | | $  1,850,000 |
| *Asset Coverage* | | | *5.5%* |

**Enterprise Valuation (EV) Analysis:**

I.   **Asset Value:**  N/A – See discussion above.

II.   **Sale of Enterprise: Publicly Traded and Precedent Transaction Comparables:**

- The Company is not publicly traded, but has many peer comparables that can be used as a test of market value; see list of equity market comps in **Appendix A**. Millennium's laboratory peers currently trade at an average multiple of 8.6x EV/EBITDA. Using the Company's projected 2013 adjusted EBITDA of $378MM, Millennium would yield an EV of $3.3BN. This valuation would cover senior lenders, even in the event of a fully funded Revolver, 1.8x.
- Given that a sale of enterprise would result in a maximum recovery by lenders, M&A comparables are essential to computing the value of an ongoing concern should a sale occur. The precedent transactions, which can be found in **Appendix A**, shows deals done at an industry average EV/EBITDA multiple of 11.8x. Assuming a sale price at this multiple, Millennium would be valued at $4.5BN assuming the projected 2013 adjusted EBITDA of $378MM. In this instance, senior lenders (including a fully funded $50MM Revolver) would be covered 2.4x.
- In terms of potential recovery, applying a distressed multiple of 6.0x EV/EBITDA and assuming a 20% discount to projected FY 2015 EBITDA of $401MM, we arrive at an estimated EBITDA of $321MM and believe the Company could conservatively be sold for approximately $1.9BN, covering total debt by approximately 1.03x.

III.   **Income / DCF Value:**

- Based on our assumptions regarding discount rate and terminal value, and using the Base Case projections, DCF indicates an enterprise valuation range of $3.4 - $4.4BN.
- See **Appendix B** for full DCF assumptions and other detail.

---

CONFIDENTIAL                                                    SunTrust_MIL-DE-00011809

**Millennium Laboratories, Inc.**  **Credit Approval Memo – March 2014**

| Total Estimated Discounted Cash Flow $ Valuation | | | | | |
|---|---|---|---|---|---|
| | | Terminal Value | | | |
| | | 7.00x | 7.50x | 8.00x | 8.50x | 9.00x |
| Cost of Equity | 14.5% | $ 3,379,793 | $ 3,538,652 | $ 3,697,511 | $ 3,856,370 | $ 4,015,229 |
| | 13.5% | $ 3,455,774 | $ 3,618,863 | $ 3,781,953 | $ 3,945,043 | $ 4,108,132 |
| | 12.5% | $ 3,533,941 | $ 3,701,391 | **$ 3,868,840** | $ 4,036,290 | $ 4,203,739 |
| | 11.5% | $ 3,614,368 | $ 3,786,311 | $ 3,958,254 | $ 4,130,198 | $ 4,302,141 |
| | 10.5% | $ 3,697,131 | $ 3,873,706 | $ 4,050,281 | $ 4,226,856 | $ 4,403,431 |

Based on the market value and income / DCF value approach, enterprise valuation range estimations are as follows:



RISK MANAGEMENT & RATINGS DISCUSSION

**Financial Covenants**
Projected financial covenants are the following: Maximum Total Leverage Ratio Covenant - **TBD**

**Ratings Discussion**

1.  **Obligor Rating:**
    Millennium is currently rated a PRISM 12. Pro forma for the transaction, Moody's RiskCalc proposes an EDF of 5.88% which combined with historical and pro forma financials and qualitative factors, maps to a PRISM 14.

2.  **Facility Rating:**
    The Senior Credit Facilities will be secured by the assets of the Borrower, which provide minimal asset coverage. Both MRA and the SunTrust EV Model suggest a 'K' facility rating and we recommend this downgrade from the current rating of 'F'. The downgrade is driven based on the increase in pari passu debt through the anticipated issuance of the Term Loan B.

**Final Rating: 14K**
*Potential for Upgrade:* A PRISM upgrade would be warranted if the Company continues to grow at the historic rates through market share expansion and client penetration and uses excess cash flow to reduce leverage.

*Potential for Downgrade:* The rating could be downgraded if the Company experiences any material unexpected results in performance, potentially as a result of (but not limited to) the following: i) any significant cuts to reimbursement from private and/or government payors, ii) substantial weakening of specimen volumes, and/or iii) financial difficulties associated with operating with these elevated leverage levels for the first time in Company history.

CONFIDENTIAL

SunTrust_MIL-DE-00011810

**Millennium Laboratories, Inc.**                                    **Credit Approval Memo – March 2014**

---

RECOMMENDATION

Based on the diligence completed, the presented opportunity to provide up to a $10 million commitment to the Company's $50 million Revolving Credit Facility and hold up to $40 million of the Company's $1.8 billion Term Loan B is supported by the Acquisition Finance team. The key risks of the proposed transaction have been identified throughout this document and are thought to be of an acceptable level to the Bank based on the diligence conducted. In accordance with our request for approval, the AFES team recommends a 14K risk rating and notes the following key points:

- At closing, senior and total leverage is expected to be 4.91x.

- With our expectations for free cash flow generation, we expect total leverage to peak at closing, and then gradually reduce over time, well within the maximum total leverage ratio.

For our commitment, STRH will receive a Co-Documentation Agent title on the transaction. Additionally, total fees for the transaction will be ~$2.05 million ($1.8 million in total syndication fees + $250K upfront fees (50 bps) based on a $10 million Revolver allocation and $40 million Term Loan B). The RAROC is expected to exceed 4.0% over the tenor of the facility.

APPENDIX

      *A.*      *Public Trading and Precedent Transaction Comparables*

      *B.*      *DCF Analysis*

      *C.*      *Sponsor Overview*

CONFIDENTIAL                                                    SunTrust_MIL-DE-00011811

**Millennium Laboratories, Inc.**                                                                **Credit Approval Memo – March 2014**

<u>Appendix A</u>
**Public Trading and Precedent Transaction Comparables**

## Public Trading Comparables

| ($MM, except per share data) Company | Price | % 52-Wk High | Mkt Cap | Enterprise Value | EV / EBITDA CY2014 | CY2015 | Price / Earnings CY2014 | CY2015 |
|---|---|---|---|---|---|---|---|---|
| **Labs** | | | | | | | | |
| Quest Diagnostics Inc. | $52.38 | 81.7% | $7,595.5 | $10,768.5 | 7.6x | 7.4x | 13.0x | 12.2x |
| Laboratory Corp. of America Holdings | 92.68 | 85.8% | 8,201.8 | 10,817.6 | 9.0x | 8.8x | 13.9x | 13.1x |
| Sonic Healthcare Limited | 15.47 | 96.9% | 6,236.8 | 7,985.2 | 11.4x | 10.6x | 16.6x | 15.1x |
| Bio-Reference Laboratories Inc. | 25.03 | 65.9% | 698.3 | 736.4 | 6.6x | 6.0x | 14.6x | 12.2x |
| **Mean** | | **82.6%** | | | **8.6x** | **8.2x** | **14.5x** | **13.1x** |
| **Median** | | **83.8%** | | | **8.3x** | **8.1x** | **14.3x** | **12.6x** |
| **Diagnostics** | | | | | | | | |
| Alere Inc. | $35.89 | 89.9% | $2,939.9 | $6,420.3 | 9.4x | 9.0x | 13.8x | 12.0x |
| IDEXX Laboratories, Inc. | 124.58 | 98.1% | 6,599.4 | 6,748.7 | 19.1x | NM | 32.5x | 28.4x |
| Cepheid | 52.93 | 95.4% | 3,883.3 | 4,155.0 | NM | NM | NM | NM |
| Myriad Genetics Inc. | 37.01 | 94.5% | 2,944.3 | 2,590.7 | 10.0x | 11.5x | 18.4x | 19.4x |
| Meridian Bioscience, Inc. | 20.64 | 74.5% | 889.1 | 845.4 | 11.5x | 10.2x | 20.8x | 19.0x |
| Genomic Health Inc. | 26.20 | 67.2% | 858.6 | 753.2 | NM | NM | NM | NM |
| **Mean** | | **86.6%** | | | **12.5x** | **10.2x** | **21.4x** | **19.7x** |
| **Median** | | **92.2%** | | | **10.7x** | **10.2x** | **19.6x** | **19.2x** |
| **Disease State Management** | | | | | | | | |
| Foundation Medicine, Inc. | $34.07 | 82.2% | $1,009.9 | $887.1 | NM | NM | NM | NM |
| **Mean** | | **82.2%** | | | **NM** | **NM** | **NM** | **NM** |
| **Median** | | **82.2%** | | | **NM** | **NM** | **NM** | **NM** |
| **Medical Cost Management** | | | | | | | | |
| ExamWorks Group, Inc. | $36.10 | 96.5% | $1,572.7 | $1,893.2 | 16.9x | 14.9x | NM | NM |
| **Mean** | | **96.5%** | | | **16.9x** | **14.9x** | **NM** | **NM** |
| **Median** | | **96.5%** | | | **16.9x** | **14.9x** | **NM** | **NM** |
| **Mean** | | **86.7%** | | | **11.3x** | **9.8x** | **16.0x** | **16.4x** |
| **Median** | | **87.9%** | | | **10.0x** | **9.6x** | **15.6x** | **14.1x** |

## Precedent Transaction Comparables



| Date | Target / Seller | Buyer | EV ($MM) | Acquisition Multiple |
|---|---|---|---|---|
| 01/2014 | AEGIS | NVLX | $465.0 | 9.4x |
| 10/2013 | PLUS Diagnostics | Miraca Life Sciences | $83.0 | N/A |
| 08/2013 | ATN | Quest Diagnostics | N/A | N/A |
| 07/2012 | MEDTOX | LabCorp | $248.2 | 16.6x |
| 10/2011 | CARIS LIFE SCIENCES | Miraca | $725.0 | 14.5x |
| 06/2011 | Genoptix | NOVARTIS | $330.0 | 8.4x |
| 11/2010 | CBLPATH | SONIC HEALTHCARE | $123.5 | 8.3x |
| 07/2010 | SRL Diagnostics | RELIGARE | $128.6 | 14.0x |

CONFIDENTIAL

SunTrust_MIL-DE-00011812

**Millennium Laboratories, Inc.**                                    **Credit Approval Memo – March 2014**

## Appendix B
## DCF Analysis

**Discounted Cash Flow Analysis:**   Base Case

| ($'s in millions) | | Fiscal Year-Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2013 | 12/31/2014 | 12/31/2015 | 12/31/2016 | 12/31/2017 | 12/31/2018 | 12/31/2019 | 12/31/2020 | |
| Year | | 1.00 | 2.00 | 3.00 | 4.00 | 5.00 | 6.00 | 7.00 | |
| **EBITDA** | | $ 396,928 | $ 401,018 | $ 406,872 | $ 434,819 | $ 457,375 | $ 476,248 | $ 501,332 | |
| Less: | | | | | | | | | |
| Cash Taxes | | $ (174,839) | $ (178,996) | $ (189,003) | $ (203,423) | $ (214,707) | $ (222,776) | $ (237,280) | |
| Capital Expenditures | | $ (14,216) | $ (13,153) | $ (16,393) | $ (20,829) | $ (29,448) | $ (20,574) | $ (20,986) | |
| Change in Working Capital | | $ 2,150 | $ (751) | $ (4,202) | $ (5,819) | $ (4,772) | $ (3,423) | $ (5,216) | |
| **Unlevered Free Cash Flow to Firm** | | $ 210,024 | $ 208,117 | $ 197,274 | $ 204,749 | $ 208,449 | $ 229,474 | $ 237,850 | |

**Average Tax Rate**   53.60%   ← *Calculated based on the average tax rate over the projected period.*

**Capitalization:**

| | $ | % of Total | Cost of Debt | Wtd. Cost |
|---|---|---|---|---|
| Senior Debt - TLB | $ 1,800,000 | 466.0% | 3.30% | 3.20% |
| Senior Debt - Other | $ 54,966 | 14.2% | 5.00% | 0.15% |
| Subordinated / Mezzanine Debt | $ - | 0.0% | 0.00% | 0.00% |
| Total Debt | $ 1,854,966 | 480.2% | | 3.35% |
| Estimated Equity Value | $ (1,468,697) | -380.2% | | |
| Total Capitalization | $ 386,269 | 100.0% | | |

*Opening capital structure and debt costs are linked from the "Base Case" tab of the CIB Projection Model. In some cases (eg. refinancing), equity value may need to be adjusted to reflect estimated market value, not book value.*

**Normalized Capital Structure:**

| | |
|---|---|
| Total Debt | 60.0% |
| Equity Value | 40.0% |
| Total Capitalization | 100.0% |

**Weighted Averaged Cost of Debt:**   1.55%   (after-tax)

**Cost of Equity:**   12.50%   ← *INPUT: Assumed at 12.5% for all Companies / Industries; may be manually input as necessary.*

**Weighted Average Cost of Capital (WACC):** [1]   5.93%   ← *Calculated as the weighted average cost of equity and after-tax cost of debt; normalized capital structure.*

**Terminal Value Multiple (x EBITDA):**   8.00x   ← *INPUT: Terminal value estimation using median EV/EBITDA based on public comps; manually input.*

**Calculations:**

| | | | |
|---|---|---|---|
| Terminal EBITDA at Year 7 | $ 501,332 | ← | *EBITDA from final year of the projection model.* |
| Estimated Terminal Value at Year 7 | $ 4,010,658 | ← | *Estimated Terminal Value (Terminal EBITDA times the Terminal Value Multiple).* |
| Present Value of Terminal Value | $ 2,679,193 | 69.3% | *Estimated Terminal value, discounted to the present value by the WACC.* |
| Present Value of Annual Cash Flows | $ 1,189,647 | 30.7% | *Projected cash flows during period, discounted to the present value by the WACC.* |
| Total Estimated Value per DCF | $ 3,868,840 | 100.0% | *Total Estimated Valuation = Sum total of PV of Terminal + PV of Cash Flows.* |

Base Case

**Total Estimated Discounted Cash Flow $ Valuation**

| | | Terminal Value | | | | |
|---|---|---|---|---|---|---|
| | | 7.00x | 7.50x | 8.00x | 8.50x | 9.00x |
| Cost of Equity | 14.5% | $ 3,379,793 | $ 3,538,652 | $ 3,697,511 | $ 3,856,370 | $ 4,015,229 |
| | 13.5% | $ 3,455,774 | $ 3,618,863 | $ 3,781,953 | $ 3,945,043 | $ 4,108,132 |
| | 12.5% | $ 3,533,941 | $ 3,701,391 | **$ 3,868,840** | $ 4,036,290 | $ 4,203,739 |
| | 11.5% | $ 3,614,368 | $ 3,786,311 | $ 3,958,254 | $ 4,130,198 | $ 4,302,141 |
| | 10.5% | $ 3,697,131 | $ 3,873,706 | $ 4,050,281 | $ 4,226,856 | $ 4,403,431 |

(1) Based on "normalized" capital strucutre of 60% debt / 40% equity.

CONFIDENTIAL                                    SunTrust_MIL-DE-00011813

**Millennium Laboratories, Inc.**                                                          **Credit Approval Memo – March 2014**

Appendix C
Sponsor Overview
TA Associates

## Overview of TA Associates

- One of the oldest private equity firms, TA Associates ("TA" or the "Sponsor") was founded in 1968 and is based in Boston, MA (additional offices in Menlo Park, London and Mumbai). TA is a generalist firm with industry specialties in technology, financial services, business services, media and telecommunications, healthcare and consumer products and services. A handful of reputable private equity firms such as Advent International, Alta Communications, Spectrum Equity Investors, Summit Partners and M / C Venture Partners were spun out of TA or founded by TA alum.

- TA typically commits between $50 million to $500 million per investment to companies with enterprise values between $150 million and $3.0 billion. TA will also provide $10 million to $50 million in sub-debt transactions that value

- TA's ownership position in companies typically ranges from 15% to 90%, but they are always an active, lead investor regardless of ownership

## Discussion of TA Associates' Performance

- The Sponsor has raised $18 billion since inception

- The Sponsor manages over $16 billion in capital and has invested in over 400 businesses since inception

- Despite a challenged macroeconomic environment, in August 2009, TA closed its latest U.S. buyout fund, TA XI, with $4.0 billion in committed capital, above the fund's $3.5 billion target

- Apart from its traditional U.S. private equity fund mentioned above, TA also invests out of its $1.75 billion TA Atlantic and Pacific VI fund and the $778 million TA Subordinated Debt Fund II. The Sponsor is also in the process of raising TA Atlantic and Pacific VII and had their first close at $1.05 billion.

| Fund | Vintage | Status | Fund Size ($MM) | Performance IRR (%) | Quartile |
|------|---------|--------|-----------------|---------------------|----------|
| TA / Advent VIII | 1997 | Closed | 800 | 23.4 | 1 |
| TA / Atlantic & Pacific IV | 1999 | Closed | 500 | 14.2 | 1 |
| TA IX | 2000 | Closed | 2,000 | 22.0 | 1 |
| TA Subordinated Debt | 2000 | Closed | 500 | 15.6 | 2 |
| TA Atlantic & Pacific V | 2005 | Closed | 800 | 7.8 | 3 |
| TA X | 2006 | Closed | 3,500 | (2.3) | 4 |
| TA Subordinated Debt II | 2006 | Closed | 778 | 7.3 | 3 |
| TA Atlantic & Pacific VI | 2008 | Closed | 1,750 | 1.0 | 4 |
| TA Subordinated Debt III | 2010 | Closed | 520 | 7.6 | 3 |
| TA XI | 2010 | Closed | 4,000 | 7.3 | 2 |
| TA Atlantic & Pacific VII | 2011 | Raising | 1,047 | NMF | NMF |

*Source: Preqin*

## STRH's Relationship with TA Associates

- TA Associates is Focus relationship for FSG covered by both Scott McLallen on the East Coast and Brian Carr on the West Coast. Several industry groups at STRH including Consumer, FST and Media & Communications have solid relationships with TA and maintain active dialogue.

- STRH has been involved with several of TA's portfolio companies dating back to 2006 when we co-managed the IPO of Clayton Holdings for a fee of $1.0 million:

- February 2014 – STRH served as buyside advisor on the acquisition of Dymatize by Post Holdings

- January 2014 – STRH served as left-lead on $170 million facilities for Answers

- October 2013 – STRH served as joint bookrunner on the $190 million dividend recp for eRewards

- July 2013 – STRH served as Left-lead arranger on the $375 million credit facilities for Medsolutions' dividend recapitalization

- December 2012 – STRH served as joint bookrunner on the $100 million credit facilities financing Medsolutions' recapitalization

Page 38 of 39

CONFIDENTIAL                                                          SunTrust_MIL-DE-00011814

**Millennium Laboratories, Inc.**                                         **Credit Approval Memo – March 2014**

- March 2012 – STRH served as joint bookrunner on the $80 million credit facilities financing Dymatize's add-on acquisition of Supreme Protein
- March 2012 – STRH served as joint bookrunner on the $350 million credit facilities refinancing Millennium Laboratories' existing debt
- April 2011 – STRH served as sole arranger and sole bookrunner on the $105 million credit facilities refinancing MedSolutions' existing debt
- December 2010 – STRH served as joint lead arranger on the $135 million credit facilities financing a dividend recapitalization of Numara Software
- As of January 2014, SunTrust had $20.6 million of credit exposure to TA via majority-owned portfolio company, Dymatize (70% ownership). SunTrust also has $41.3 million of credit exposure to TA via minority-owned Answers Corporation.

| Majority-Owned Portfolio Company Exposure Client Name | Credit Exposure ($MM) | 2013 Credit Exposure ($MM) | 2012 Credit Exposure ($MM) |
|---|---|---|---|
| Dymatize | $20.6 | $21.8 | $22.5 |
| Total | $20.6 | $21.8 | $22.5 |

CONFIDENTIAL                                                SunTrust_MIL-DE-00011815

# EXHIBIT 23

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

-------------------------------------------*

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                    Debtors.

MARC S. KIRSCHNER, solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                    Plaintiffs,

        vs.

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                    Defendants.

-------------------------------------------*

          STENOGRAPHIC AND VIDEO-RECORDED

       REMOTE VIRTUAL 30(b)(6) DEPOSITION OF

                  DAVID M. FELTY

             Tuesday, July 27, 2021

                   9:31 a.m.


Reported by:

Josephine H. Fassett, RPR, CCR

Page 66

FELTY - SunTrust

expectation for us to lead this deal.

Q.   Who would have expected SunTrust to lead the deal?

MR. MURPHY:  Objection to form.

A.   Sorry, say that question again.

Q.   So you said that there might have been some people who expected that SunTrust would lead the deal.  Who at SunTrust would think that?

A.   I'm simply -- I'm not aware of anybody who -- at SunTrust who expected us to lead this deal.  I'm simply leaving open the possibility that there might have been people who expected that.  I'm not aware of that.

You'll notice clearly when we discuss with a company and we pitch alternatives, you'll notice we refer to ourselves in that role as the lead arranger.  So it is our goal initially to always be the lead whenever we are proposing an idea to a company.  But that does not necessarily mean that we all expect that that is going to be the outcome.

Q.   Okay.  Thank you.  That's it for that document.

MS. CROUTIER:  Wallace, could you

Page 67

FELTY - SunTrust

please introduce document number 9 as the next exhibit.

(Email Exchange, Bates SUN-ML0000003 to SUN-ML0000004, marked as Exhibit 306, as of this date.)

THE CONCIERGE:  Now introducing Exhibit 306.

A.   Yes, reviewing now.

Okay.

Q.   Okay.  And you see that the top email is an email from you?

A.   Yes.

Q.   Dated March 2, 2014, to David Dupuy and cc'ing David Yates and Ben Cumming.  And who was Ben Cumming?

A.   Ben Cumming was a colleague of mine on the acquisition finance healthcare team.

Q.   And two emails down -- so it says, David Dupuy says, "I will come back to this team once we have additional color on the timing/model, but I wanted you in the loop as early as possible."

And then that's forwarded to you, "see emails below about Millennium Labs."

Why were you being looped in at this

Page 68

FELTY - SunTrust

point?

A.   I'm sorry, you broke up.  Why was I being looped in?

Q.   Yes, you personally.

A.   I had worked on and had knowledge of the company from the 2012 financing transaction, so we typically staffed our deals to the person who was most knowledgeable about the company, so I -- David Dupuy included Ben Cumming on an email when, in short, he probably should have included me and Ben was just looping me into it because I had, I had experience with Millennium Labs and would be the one to work on this new transaction.

Q.   All right.  And what was your role going to be on this new transaction?

A.   I was referred to as the senior underwriter.

Q.   And what would you do, what would you do as a senior underwriter?

A.   As a senior underwriter on a transaction in general I would be responsible for performing the underwriting or credit diligence on a company and -- which can be rather extensive.  And that work culminates in the production of a credit

Page 69

FELTY - SunTrust

approval package that we use to submit for the bank to consider committing capital to a transaction.

Q.   Okay.  And at a high level, what was SunTrust's general process for underwriting or performing due diligence in connection with the leveraged loan lending activities in 2014?

A.   Yes.  In general, we have a transaction that involves an extensive analysis of the borrower, its historical financial performance, its expected future financial performance given current industry trends, competitive dynamics, and then developing our, you know, different projection models based on different assumptions and determining the companies to -- determining the company's ability to repay the proposed investments, testing the creditworthiness of the borrower.

Q.   And you just mentioned developing different project models, projects models based on different assumptions.  What kind of assumptions would those be?

MR. MURPHY:  Objection to form.  I don't think he said "project models," I

18 (Pages 66 - 69)

Page 70

FELTY - SunTrust

think that's the --

MS. CROUTIER:  Oh, sorry.

MR. MURPHY:  -- realtime, but --

A.  Right, it's not --

MR. MURPHY:  -- it's not projection models.

Q.  Not projection models.

A.  It's not projection models, yes.

One of the things that we require in analyzing the company's ability to repay its debt are projections from the company that cover the length of the loan agreement.  For example, if it's a five-year loan, we require five-year projections from the company.  And as part of our due diligence, we don't take those projections at face value and assume those are what we believe will happen, but we develop our own model based on our own analysis of the industry and the company. So that model, which is typically -- and I've only seen it to be more conservative than a management model.  It typically, because more consecutive than a management model, is yet a further -- based on additional diligence beyond just what the company provides to us.  So that is one projection

Page 71

FELTY - SunTrust

alternative, if you will.

Q.  Okay.  And you developed a projections model for the 2014 transaction of Millennium, correct?

A.  Well, to clarify, we didn't develop a projection model, we analyzed the model the company provided and then made certain adjustments to assumptions based on our analysis of our view of the industry and the other factors I mentioned previously.

Q.  Okay.  At a high level, what was SunTrust's general process for risk assessment and acceptance criteria for leveraged loan transactions?

A.  Well, the entire underwriting process was aimed at risk assessment to make sure the loan was rated internally appropriately -- you're familiar with how banks risk rate, risk rate their credit exposures -- and to assess all of the risks of the transaction and present those risks to decision makers to determine whether or not it was an acceptable risk to move forward with that transaction.

Q.  Okay.

Page 72

FELTY - SunTrust

MS. CROUTIER:  Wallace, can you please introduce document number 11 as the next exhibit.

(Email Exchange, Bates SUN-ML0004927 to SUN-ML0004928, marked as Exhibit 307, as of this date.)

THE CONCIERGE:  Now introducing Exhibit 307.

BY MS. CROUTIER:

Q.  Mr. Felty, were you able to open the exhibit?

A.  I am opening it now, yes.

Q.  Okay.

A.  I see it, yes.

Q.  Okay.  In the top email from Tom Scharfenberg to Robert Tincher, Chris Wood, cc'ing Glenn Stewart.  Subject Millennium Labs - Important.  This is dated March 2, 2014.  Who is Tom Scharfenberg?

A.  Sorry, you broke up.  Can you repeat that question?

Q.  Who is Tom Scharfenberg?

A.  Tom Scharfenberg is part of our capital markets risk team.

Page 73

FELTY - SunTrust

Q.  And what was his role in the 2014 transaction?

A.  One second, I'm reviewing the email below.

The -- Tom Scharfenberg would be getting involved in a deal that involved distribution.

Q.  Okay.  And he writes, "I see nothing immediately alarming, but I don't know the company, there are no projections, there is no memo.  Seems like a client risk at this point, since we have no information."

If SunTrust thought that Millennium was a client risk at what point what would the next steps be?

A.  Sorry, I want to just clarify.  You said, "seems like a client risk," and my copy says "seems like client risk."

Q.  Oh, okay.  "So seems like client risk at this point since we have no information."  What does he mean when he's saying that?

A.  Client risk is a term that we use to refer to communicating something to the client that is perhaps in anticipation of a formal approval.  In this case when we refer to client

19 (Pages 70 - 73)

Page 86

FELTY - SunTrust

Q. Okay. Thank you.

So if you go to page 26 of the PDF. You see where it says the page 26, if you go to 26 out of 60?

A. Yes.

Q. So the fourth bullet down under Due Diligence Conducted says, "Reviewed and analyzed the Company's projected financial performance and sensitized model to develop SunTrust Base and Downside Cases."

A. I apologize, I was on the wrong page.

Q. Oh, it's the page end -- it's the page ending in 81, the Bates number.

A. 81. I'm sorry. I gotcha now. Fourth bullet point down?

Q. Yes.

A. Yes.

Q. So in connection with the 2014 transaction, was SunTrust provided with financial statements and financial projections from Millennium?

A. That's my understanding, yes.

Q. Okay. And did it conduct any of its own analysis of the financial documents provided by

Page 87

FELTY - SunTrust

Millennium?

A. Specifically yes, of historical and projected financial performance.

Q. Okay. And did it complete any of its own financial projections?

A. As I stated earlier, we developed our own, what we call the SunTrust base case that represents our best view of the most likely outcome on the financial -- of the company's financial performance, projected financial performance.

Q. And did it account for any downside scenarios in those projections?

A. Are you referring to the base case and the loan or other scenarios?

Q. Other scenarios as well.

A. The base case, as I said, is meant to represent what we believe is the most likely outcome, taking into consideration all the factors and information we have available at that time, which could include changes in volume, changes in reimbursement rates, changes in overall industry dynamic. It is our best view based on the information that we have of what we believe the

Page 88

FELTY - SunTrust

realistic and expected projections of the company will be.

There are other cases that we can and sometimes develop that show worst-case scenario, if you will, various scenarios that, you know, you can sort of, what if this happens, what if this happens, for example. What if they lose their largest company -- their largest customer, for example, that we might analyze as part of this diligence.

Q. Were any worst-case scenarios run for the 2014 transaction?

A. We developed a -- what we refer to here as the SunTrust downside case.

Q. Okay.

A. We did not -- I don't want to characterize that as a worst-case scenario, but as a -- generally referred to as a reasonable downside.

Q. And what were the downside risk factors that it considered?

A. I could take you to the SunTrust base -- the SunTrust downside case and walk you through the assumptions that were used in that; is that

Page 89

FELTY - SunTrust

what you're asking?

Q. That would be great.

A. I'll take you first to page 25 of 39 or the marked page 801.

Q. I'm there.

A. Sorry. Do you see it?

Q. Yes, I see it. Thank you.

A. So at a high level this chart summarizes the financials from -- at a high level again -- things like revenue and EBITDA that are presented in the management case over the projection period and compares those numbers to what we developed as the SunTrust base case which, again, is the -- our best view of what the likely outcome is. And in that comparison you also see the downside case, which is what we considered to be based on the risks, as we understand it, with the company that one or more of those risks come to some kind of fruition or effect a reasonable downside.

And if I could continue, I'll just say, generally, our base case, as you can tell from the column to the far right, is a more conservative view from what the company presents. And the downside case is typically much -- even more

23 (Pages 86 - 89)

Page 90

FELTY - SunTrust

conservative than that. The actual assumptions that were used in the downside case are listed on page 32 of 39 or page 808, marked page 808.

Q. I see that. Thank you. Thank you for --

A. Visually -- yeah, I'm sorry, just one more thing if you want to -- one second.

I'm sorry. Yeah, go ahead with your question. I was looking for something else and I don't see it in here.

Q. Okay. So this page ending in Bates 807 lists the risk factors that it considered in its downside case?

MR. MURPHY: Objection to form.

A. Yeah. To be clear, the risk that we've identified with the credit, the credit risks associated with the company are taken in consideration, our best view is taken in consideration in the base case. That is -- that case is used to drive the decision for credit approval. The downside case is meant to just for to show further stress on the company. Not the most likely scenario. But these assumptions that are used for the downside case are not necessarily

Page 91

FELTY - SunTrust

our view of the realistic risks of the company but a very conservative view.

For example, not specific to this case, but if we -- if the company expected reimbursement rates to go down 10 percent, our base case may say they go down 12 and a half percent and our downside case may show 20 percent, even though nobody in the industry believes that that would be possible or likely. It's simply meant to show unexpected things that might happen that are -- but not necessarily what we believe will happen. So the risks here in this downside case are not what we believed, we believed the company would experience.

Q. Okay. And were there any downside risks or scenarios run with respect to legal risks or the pending DOJ investigation at this time?

MR. MURPHY: Objection to form. Compound.

MS. CROUTIER: I'll break that up.

Q. Did you run a downside scenario with respect to the pending DOJ investigation?

A. Our assessment of the risk related to this transaction did not involve a quantifiable

Page 92

FELTY - SunTrust

nor any sort of high-level probability of any, any type of negative financial impact from the, from the investigations as we were disclosed but as we were led to believe by the company. So had we believed that those issues were quantifiable real risks, we would have, I believe, we would have included that analysis -- we would have included those in a downside case, but we did not see them as material risks at the time of the underwriting.

Q. Why did SunTrust not see it as a material risk?

A. Through ongoing discussions with the company over the period of our credit relationship, but more specifically as a result of this transaction where we were re-underwriting the credit, if you will. Not just relying on our historical information and relationship but, again, reevaluating the company entirely for this transaction. The company's representations to us as it relates to those legal and regulatory issues did not disclose anything that was beyond or anything real different than what they had ever talked to us about. There was nothing apparent from those disclosures or from the legal diligence

Page 93

FELTY - SunTrust

that was done by our agent counsel that would seem to indicate there was any reason to take anything -- take those issues into consideration.

Q. Okay. That's it for this document.

MS. CROUTIER: I think this might be a good time to stop because I know we're running out of tape.

THE VIDEOGRAPHER: Thank you. Is that okay, Mr. Murphy, to go off the record?

MR. MURPHY: Sure.

THE VIDEOGRAPHER: Thank you. The time is 12:20. We're going off the record. This is the end of Media File 2.

(Whereupon, off the record.)

(Whereupon, lunch recess.)

24 (Pages 90 - 93)

# EXHIBIT 24

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

---------------------------------------*

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                    Debtors.

MARC S. KIRSCHNER, solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                    Plaintiffs,

        vs.

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                    Defendants.

---------------------------------------*

        STENOGRAPHIC AND VIDEO-RECORDED

      REMOTE VIRTUAL 30(b)(6) DEPOSITION OF

                  PHILLIP HO

              Wednesday, July 28, 2021

                    9:06 a.m.

Reported by:

Josephine H. Fassett, RPR, CCR

Page 54

HO - BMO Harris

IPO and I think they were -- well, you could sell more of the equity in Millennium to some other equity buyers. But, you know, again, like who would that be. And how would you do it is really what they're -- that's what all the questions are. How do you do it in a fair way, I guess, would kind of be part of it.

Q. And then the final point 4 is preparation option. What does that entail?

A. I don't remember this, what specifically the team was getting at here.

It looks like they're saying some preparatory steps to either sell the company or go public, but that's all my -- that's all I can read into this.

Q. All right. Do you know which of these options BMO recommended at this time?

MR. DOLLAR: Objection. Form.

A. Well, I think, BMO was just exploring to see which one the company preferred, and I don't think we recommended any one over the other. They all seemed to be valid, have validity, from a business point of view, so it was really -- I think this was the investment banking team trying

Page 55

HO - BMO Harris

to get direction from the company on what they preferred.

Q. Okay.

A. And that's not -- and that's very -- and that's not atypical, right. I mean, that's -- actually, I should say, that's very typical for investment bankers. They're trying to figure out where -- what does the company really want to do. What direction do they want to take the company. The management team, I mean. So, and they're, they're always -- investment bankers are always sort of outside looking in and so they're guessing as best they can.

Q. And did BMO find out from Millennium which option or what they were trying to pursue?

MR. DOLLAR: Objection. Form.

A. Well, when we found out in 2014 they wanted to do a dividend recap, so. But prior to that, no, I don't think we got very far, to the best of my recall.

Q. All right.

MS. CLARK: Concierge, can you please introduce document 8.

(Email Exchange, Bates BMO-ML-00048401

Page 56

HO - BMO Harris

to BMO-ML-00048402, marked as Exhibit 320, as of this date.)

BY MS. CLARK:

Q. So Exhibit 320 should be in your Marked Exhibits folder now. It's an email dated July 27, 2012, beginning Bates number BMO-ML-00048401. Do you see that document?

A. I do.

Q. And this email follows another call with Howard Appel, correct?

A. Yes, it looks like it.

Q. And at the end of the second-to-last line in the first paragraph you write, "For the first time, he said they think the strategic event is somewhere in late 2013." Do you see that?

A. Yes.

Q. And did this come to a surprise as BMO?

MR. DOLLAR: Objection. Form.

A. I don't know if it's surprise but it was a relevant new indication that came from the company that we hadn't heard before.

Q. And then in the second paragraph you write that Millennium wanted to discuss the possibility of engaging BMO along with SunTrust to

Page 57

HO - BMO Harris

be their advisors as part of an advisory group. Do you see that?

A. Yes, I do see that.

Q. And what was BMO's understanding of what this would entail?

A. Well, I think --

MR. DOLLAR: Objection. Form.

A. It was about, very generically about advising them as to both options that were put in front of them earlier that we've -- that were referenced in the earlier email and about how if they -- if and when they chose to do one of those four options, or maybe even more than, more than four, maybe there are others as well, then, you know, they would look to us and SunTrust to provide our best advice, is this the right way to go. And so my recall is this never came about. I don't think we were ever hired to be their advisor, so.

Q. Now, below that second paragraph there's his other points, and the third bullet under other points discusses a dividend recap option. Do you see that?

A. Yes.

15 (Pages 54 - 57)

Page 58

HO - BMO Harris

Q.  Is this the first time that this dividend recap option was discussed?

A.  Well, between us and them, yes.  But others might have very likely would have presented it as well to them.  So this -- that's a standard. A dividend recap is a very standard transaction involving a private equity sponsored company. Private equity sponsor-owned company.  It happens with frequency every year.  So it would have been wrong of BMO not to have followed it.  It would have been sloppy to not have considered it because it was so prevalent in the leveraged loan market.

Q.  And you said others would have discussed it with Millennium?

A.  Yeah.  I would imagine JPMorgan or --

MR. DOLLAR:  Objection.  Form.

A.  -- JPMorgan or Citi or SunTrust would have, you know, certainly put the idea in front of the company as well.

Q.  Okay.  And towards the bottom of that bullet you write that this option has appeal because of the tax issue Tom G. discussed.  Is Tom G. referring to Tom Glover?

A.  Yes.

Page 59

HO - BMO Harris

Q.  And what's the --

A.  Yes, talking about, I don't remember what the tax issue was specifically, quite frankly.

Q.  Okay.

MS. CLARK:  Concierge, can you please introduce document 9.

(Presentation titled Millennium Laboratories Strategic Alternatives Follow-Up Discussion, Bates BMO-ML-00015522 to BMO-ML-00015575, marked as Exhibit 321, as of this date.)

BY MS. CLARK:

Q.  So Exhibit 321 should be in your exhibit folder.  And this is a document beginning Bates BMO-ML-00015522.

And this is another large document, so if you want to take your time to review, my first question will just be:  Do you recognize this document?

A.  I am reviewing it, but I do recognize it, yes.

Q.  Just let me know when you're done reviewing.

Page 60

HO - BMO Harris

A.  Okay.

Q.  So like the last document or presentation we looked at, there's a list of employees on page 2.  Are these the people who would have created this presentation?

A.  Yes.  Yes, it would have been.

Q.  Okay.  And then if you could just turn to page 5 titled Situation Overview.

A.  Yes.

Q.  On that page, the third section is called Additional Management Concerns.  Do you see that?

A.  Yes.

Q.  I'm sorry -- okay.  And the second bullet in that section is, "Potential estate planning issues need to be addressed."

What's your understanding of the estate planning issues that are being referenced?

MR. DOLLAR:  Objection.  Form.

A.  I assume it's Jim Slattery's estate.

Q.  Had there been discussions of his estate planning issues with -- among BMO?

A.  I think it might have come up in the earlier meeting with the Millennium team, but

Page 61

HO - BMO Harris

BMO's not an estate planner or a tax planner, so we would not have been able to provide any assistance there.  It was just something to keep in mind.

Q.  So I want to turn to page 21 next.  And that's titled Transaction Considerations: Dividend Recap.

A.  Hold on one second.  It's slow.

Yeah, okay.

Q.  And this discusses a dividend recap option that BMO wanted to propose to Millennium?

MR. DOLLAR:  Objection.  Form.

A.  Yes.

Q.  And below the title there's a dark box on the left-hand side that says Key Transaction Considerations, correct?

A.  Yeah.

Q.  And the third bullet in that section says, "Institutional investors will require explanation of the Millennium story."  Why was this a key consideration?

A.  Oh, just the -- this is very typical, right, that you need to sell your -- you need to tell your, your story.  How did you get -- where'd

16 (Pages 58 - 61)

Page 130

HO - BMO Harris

differently than our leveraged finance team.

Yeah, we actually came out with a better rating than the earlier memo, and I'm not sure why. I don't know when these were done in terms of time.

Q. And then it says that was a downgrade from I-6. Do you know why that was?

MR. DOLLAR: Objection. Form.

A. Yeah, because they were -- for the 2014 transaction they were incurring much more debt and so that would be typical. You wouldn't want to -- you would -- you got to -- credit risk or the risk rating has to be adjusted when they're taking on more debt leverage.

Q. Okay.

A. Reflecting increased risk. The balance, increased balance sheet risk of the company.

Q. Okay. So if you could go to page 10, please.

A. Yep.

Q. And I'm looking at specifically towards the bottom of the page the deleveraging test.

A. Yes.

Q. What does that relate to?

Page 131

HO - BMO Harris

A. Yes, so one of our requirements within BMO is we had certain leverage lending guidelines that's referenced here. And one of the requirements that we needed to show our internal, for our internal approval process -- and this has nothing to do with what the market thinks or what any other lender thinks or is -- or is doing, this is strictly within BMO. We have a requirement that they need to show that over a seven year -- when a loan was a, quote-unquote, leveraged loan that they -- we needed to show that over a seven-year time frame that they can pay down a significant portion of the debt in that time frame. Not entirely, not pay off entirely the loan but pay down, reduce a significant portion of that debt, and that's what this is showing. Not -- I'm sorry. Not only pay down the loan in dollar amount, but also to reduce the leverage as calculated by debt divided by EBITDA by growing EBITDA over that time frame, and that's what this shows.

Q. Okay. So it says that in applying the seven-year test, CB recognizes the company -- company does not fully amortize senior secured

Page 132

HO - BMO Harris

debt in that time frame.

A. Correct.

Q. So that was not an issue?

MR. DOLLAR: Objection. Form.

A. No. No. All the -- any lender that's involved in these term loan B transactions, as I referenced earlier, the understanding is that the company is not going to be able to pay down -- pay off from its cash flows the entire amount of the loan in, you know, five years or seven years or eight years because that's just the nature of the way of that loan. And so there's -- everybody is understanding, everybody who buys into that loan understands that there is -- they're taking, quote-unquote, refinancing risk. That the company at some point in the future will have to do a new loan to pay off the old loan, but that's how the market functions and everybody -- everybody involved in it understands that.

Q. And how did BMO complete this analysis?

MR. DOLLAR: Objection. Form.

A. How did it complete it?

Q. Yes.

A. Well, I mean, we -- the inputs, as you

Page 133

HO - BMO Harris

see there in that little box, is the EBITDA projected by the company. And then the growth from 2014 to 2020 in that EBITDA. And then the line below there is -- FCF Before Sweep is the free cash flow generated by the company based upon its forecast. And then there's a, quote-unquote, sweep of some of that free cash flow and applied to pay down the loan. And then so there's some -- there's some pay down of the principal amount of the loan over that seven years. And then that -- but also at the same time you're growing your EBITDA so the calculation of, quote-unquote, leverage, which is debt divided by EBITDA, is coming down. So you can see there from the net senior debt divided by EBITDA line, which is the second line from the bottom, you see it go from 4.5 to 3.0.

Q. Okay. And does -- was that based on, you said, projections from Millennium?

A. Yep. That's standard. We would do that based upon the management's forecast.

Q. And did BMO run its own projections for this analysis also?

A. Not for --

34 (Pages 130 - 133)

Page 134

HO - BMO Harris

MR. DOLLAR: Objection. Form.

A.  Not for this analysis, no, that was not required by our team.

Q.  So this memo also references a base case?

A.  Yes.

Q.  What is a base case?

A.  Well, the base case would have been what we think the most likely performance case projection for the company would be over a certain time period. Typically, very typically, it's based upon what management and the private equity sponsors provide. Sometimes we'll adjust it for things we think we want to include, we want to factor in.

Oh, actually, as I come down here, you can see we came up with our own base case. We -- because we were waiting for the full model from the company. So ours was probably a little bit more conservative in terms of growth, but it would have been very similar to what management provided probably.

Q.  Do you recall, and specifically with respect to the 2014 transaction, if you did

Page 135

HO - BMO Harris

compare BMO's base case to management's base case?

MR. DOLLAR: Objection. Form.

A.  We would have, I just don't remember, you know, what it -- what the results were. We would have done that. That would have been very standard.

Q.  And did BMO share its base case with any of the other banks participating in the transaction?

MR. DOLLAR: Same objection.

A.  No. That's no, no bank would ever do that. No.

Q.  Okay.

A.  Everything is done, all lenders keep their cases internal.

Q.  And what about with the investors in the term B loan?

MR. DOLLAR: Same objection.

A.  That's what I mean, they wouldn't share their, their -- their base case with anybody else either.

Q.  And BMO also prepared a downside case; is that correct?

A.  Yes. Yeah. We did that standard. We

Page 136

HO - BMO Harris

always have to do that for our -- to get our approvals, yes.

Q.  Okay. If you can just go back up to page 5.

A.  Okay.

Q.  And this is the Risks & Mitigants section.

A.  Yes.

Q.  And this appears to list the same risks and mitigants that we saw in the underwriting memo in the previous exhibit?

A.  Correct.

MR. DOLLAR: Objection. Form.

A.  Yeah.

Q.  So they would -- there wouldn't be different risks and mitigants identified by the different groups or teams?

MR. DOLLAR: Objection. Form.

A.  Typically not. Oh, but, again, you know, the one thing I did mention earlier, right, they, the leveraged -- I'm sorry -- yeah, the leveraged finance team is looking also at, quote-unquote, market risk. So that's something we wouldn't, on the credit side, wouldn't care

Page 137

HO - BMO Harris

about that much. Not directly anyway. So we wouldn't highlight it in our materials because we're not taking -- we wouldn't be taking market risk. Market risk is the ability to sell a transaction or a part of the loan into to other, other investors in the market.

Q.  And that relates to that 90 million holding that BMO had?

MR. DOLLAR: Objection. Form.

A.  Yeah. Right, yeah. We talked about that market risk.

Q.  Okay.

A.  Yeah.

MS. CLARK: Can the concierge please introduce document 30:

MR. DOLLAR: Counselor, we have -- we're at 12:20 right now. Could I suggest a lunch break until, call it one p.m.?

MS. CLARK: Yeah, that works.

MR. DOLLAR: And just for planning purposes -- well, I'll wait until we go off the record.

THE VIDEOGRAPHER: Thank you. The time is 12:19. We're going off

35 (Pages 134 - 137)

# EXHIBIT 25

The Wayback Machine - https://web.archive.org/web/20150711062928/http://www.legafi.com:80/lawsuits/fraud-qui-tam-whistleblower/793-government-inv…



Google™

search...          Search

○ Web   ● LegaFi.com

| Home | Lawsuits | Start a Class Action | Bankruptcy Help | FAQ | Attorney Network | About Us | Newsletter | Legal Notice | . |

### Active Investigations

Wage & Hour, Unpaid Overtime Class Action Lawsuit Investigation

Government Investigating Millennium Laboratories Whistleblower Lawsuit

Rating 0.00 (0 Votes)

Monday, 11 July 2011 16:25

**Follow us on Â TwitterÂ andÂ FacebookÂ for the latest Lawsuit News!**

### Government Investigating Millennium Laboratories Whistleblower Lawsuit

By Kimberly Mirando

Â

(LEGAFI)Â --Â The Department of Justice is investigating allegations made in a 2009 whistleblower lawsuit that national pain medication monitoring company Millennium Laboratories defrauded taxpayers through fraudulent billing practices.

The Millennium Laboratories whistleblower lawsuit alleges the San Diego company engaged in a conspiracy to defraud government health programs, including Medicare and Medicaid, by encouraging thousands of doctors and health care providers to bill for drug testing services that they didnâ€™t provide, or which should have been billed at a lower rate. The government joins 14 states and the District of Columbia in looking into the whistleblowerâ€™s allegations.

The Millennium Laboratories lawsuit alleges the company has been conducting â€œa cleverly thought out schemeâ€ that brings Millennium big profits and fills doctorsâ€™ wallets, making physicians essentially complicit in fraudulent urine-testing and medical billing. The lawsuit alleges Millennium encouraged physicians to bill the government for multiple tests, even when only one had been performed, as early as 2007, the year the company was founded. Millennium allegedly told doctors if they billed 20 tests a day their practice could earn $2.3 million a year.

The DOJ hasnâ€™t formally joined the Millennium Laboratories whistleblower lawsuit, but it recently wrote in court documents that it continues to investigate the allegations. If the government joins a whistleblower lawsuit and reaches a settlement, the whistleblower stands to receive 15 to 25 percent of any money recovered. If the government declines to join the suit, the whistleblower can still pursue the case on his or her own.

The whistleblower in this case, Robert Cunningham, died last year. The lawsuit continues to be pursued by the law firm that represented Cunningham.
Â

### Top News

Marlabs RICO Class Action Lawsuit
Third Johnson & Johnson Plant Under Investigation
Ex-Fresno Housing Authority Worker Wins $2M

Â
Updated July 11th, 2011

# EXHIBIT 26



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

August 15, 2014

**By Electronic Mail**

Division of Technical Payment Policy
ATTN:  Provider and Supplier Self-Disclosure
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mailstop C4-25-02
Baltimore, MD  21244-1850

Re:      **Millennium Laboratories, LLC – Voluntary Self-Referral Disclosure**

To Whom It May Concern:

On behalf of Millennium Laboratories, LLC ("Millennium" or the "Company"), we make this submission pursuant to the CMS Voluntary Self-Referral Disclosure Protocol to resolve a potential violation of the "Stark" physician self-referral law (Section 1877 of the Social Security Act). This disclosure relates to Millennium's prior practice of providing point-of-care drug test cups at no charge to certain of its physician customers for use as a specimen collection device.  Millennium believes – with support from a number of health care legal experts it has consulted on this issue over the past several years – that it provided the test cups in question under conditions that did not effectuate a "financial relationship" for purposes of the Stark law, and thus did not trigger the law's prohibitions. Specifically, the physicians who received test cups without charge (a) used them primarily to collect and transport specimens to Millennium's drug testing lab, and (b) agreed in writing not to bill third party payers or patients for the preliminary results generated by the cups (and, in fact, did not bill).

However, the Company's primary competitor, Ameritox, challenged Millennium's test cup agreements in a Lanham Act and state unfair competition action filed in the U.S. District Court for the Middle District of Florida.  On June 16, 2014, the jury in that case found that notwithstanding the agreement not to bill, Millennium's provision of no-charge test cups to physicians for specimen collection violated the Stark law.

Millennium has moved to set aside that verdict and, if necessary, intends to appeal.  But because of that verdict, and in recognition that a violation of the Stark law may have occurred, we submit this disclosure for the purpose of resolving any potential liability Millennium may have under the Stark law in connection with its provision of no-charge test cups to referring physicians for use as a specimen collection device.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante   Amsterdam   Baltimore   Beijing   Brussels   Caracas   Colorado Springs   Denver   Dubai   Dusseldorf   Frankfurt   Hamburg   Hanoi   Ho Chi Minh City   Hong Kong   Houston   Johannesburg   London   Los Angeles   Luxembourg   Madrid   Miami   Milan   Moscow   Munich   New York   Northern Virginia   Paris   Philadelphia   Prague   Rio de Janeiro   Rome   San Francisco   São Paulo   Shanghai   Silicon Valley   Singapore   Tokyo   Ulaanbaatar   Warsaw   Washington DC   Associated offices: Budapest   Jakarta   Jeddah   Riyadh   Zagreb.  For more information see www.hoganlovells.com

\\DC - 036365/000007 - 5750782 v5

Confidential

ML_DE_00325457

CMS Division of Technical Payment Policy                    - 2 -                    August 15, 2014

## 1. Background Information

The past decade has seen a rapid rise in the use of powerful opioid medications in the treatment of chronic pain, as well as in the misuse and abuse of these drugs. Along with this increased drug utilization, and in order to ensure safe and effective patient care, the need arose for prescribing physicians to monitor their patients through periodic drug testing to assess treatment compliance, to identify potentially dangerous drug abuse and drug interaction issues, and to detect inappropriate drug seeking or drug diversion behavior.

In response to this clinical need, a number of established and new laboratory companies, including Millennium, have developed drug testing services specifically for the medication monitoring needs of physicians treating chronic pain patients. The testing performed by Millennium and these other laboratories typically is billed by the labs to third party payers, including Medicare and other federal health care programs. In this growing market, Millennium has been able to successfully distinguish itself through its leading-edge technology, its extensive testing menu, its rapid one-day results, its comprehensive reports, and its commitments to customer service, research, education, and the highest standards of ethical business practices.

As Millennium has grown over the past several years through its superior test offerings and customer service, it eventually displaced Ameritox as the nation's leading drug testing laboratory, which has led to a series of contentious litigation matters between the two companies. In fact, since 2011, Ameritox has brought claims against Millennium in at least eight separate forums, including direct actions by Ameritox against Millennium, actions by Ameritox against Millennium employees, and actions ostensibly brought by third parties that, in fact, have been paid for and directed by Ameritox. Until the recent test cup verdict, these repetitive actions have been largely unsuccessful. By contrast, in a Lanham Act case for false advertising brought against Ameritox by Millennium in the District of Maryland (Millennium Laboratories, Inc. v. Ameritox, Ltd., Case No. 1:10-cv-3327), a federal court ruled that Ameritox had falsely marketed one of its drug testing systems as having the ability to determine whether a patient is taking the correct dosage of a prescribed medication and entered a consent decree halting certain advertisements and requiring corrective action. In addition, in November 2010, Ameritox paid the government $16.3 million to resolve kickback and false claims allegations against the company. As a result of that settlement, Ameritox presently operates under a corporate integrity agreement (or "CIA") with the Office of Inspector General of the Department of Health and Human Services ("OIG").

In the action recently tried in the Middle District of Florida (Ameritox, Ltd. v. Millennium Laboratories, Inc., Case No. 8:11-cv-0775-T-24), Ameritox asserted a federal Lanham Act claim against Millennium, as well as a number of state unfair trade practices and common law claims. In one claim, Ameritox asserted that Millennium had improperly induced physicians by providing "free" point-of-care test cups in exchange for referrals.[1] Millennium disputed this allegation, asserting that its provision of the test cups, pursuant to a written agreement with each physician containing a promise that the physician would not submit a bill for the preliminary test results provided by the cups, was not "remuneration" and did not implicate the Stark law.

---

[1] In the interest of submitting a properly focused disclosure, we have not included a number of the pleadings, motions, and orders in the Ameritox, Ltd. v. Millennium Laboratories, Inc. case. We will, however, provide any such documents to CMS upon request.

\\DC - 036365/000007 - 5750782 v5

Confidential                                                    ML_DE_00325458

CMS Division of Technical Payment Policy                          - 3 -                                    August 15, 2014

Of all the issues litigated in the case, only three of Ameritox's claims, including the "free" test cup allegation, were presented to the jury.[2] All of Ameritox's other allegations were either dismissed by the court or abandoned at trial. And the court and the jury found for Ameritox only on the test cup issue, thus prompting this disclosure.

## 2. Provider Information

Millennium is a privately-held clinical laboratory company based in San Diego, California. The Company is not owned, controlled, or otherwise part of a health system or network. Its identifying information is as follows:

| Name | Address | NPI | CCN | Tax ID No. |
|---|---|---|---|---|
| Millennium Laboratories, LLC | 16981 Via Tazon San Diego, CA 92127 | 1497933162 | 05D1078705 | 26-1565558 |

We are the Company's designated representatives for purposes of this disclosure.

## 3. Nature of Matter Being Disclosed

This disclosure involves the provision of point-of-care test cups to the small subset of Millennium's physician customers – approximately 10%[3] – who received such cups for specimen collection purposes without charge on the condition that they agree in writing not to seek payment from patients or third party payers for the qualitative measurements obtained through their use of the cups. More specifically, the potential violation relates to whether the provision of test cups under these conditions creates a "compensation arrangement," as defined in 42 C.F.R. § 411.354, for which there is no statutory or regulatory exception, so that the referral of clinical laboratory services[4] to Millennium by physicians who received no-charge cups was prohibited by the Stark law.

### A. Background Regarding Millennium's Provision of Test Cups

The cups in question function first and foremost as a specimen collection device for urine drug testing performed at Millennium. Secondarily, the cups also function as an immunoassay testing device at the point-of-care. The cups contain chemically activated strips that provide an instant qualitative test result for certain drug classes – that is, the cups are able to detect the presence of certain drugs in a patient's urine, but cannot quantify the amount of any given drug present or distinguish between different substances in a drug class (so, for example, the test cups can identify the presence of an opiate, but cannot indicate how much or tell the user whether it is codeine, morphine, or any of the other drugs or metabolites in the opiate class). The test cups also cannot detect the presence of drugs or metabolites at low or even moderate levels of concentration. Thus,

---

[2] The other two issues presented to, and rejected by, the jury in the Ameritox case were allegations that Millennium (a) facilitated below fair market value prices on analyzers and related supplies used by physicians to perform more sophisticated in-office testing, and (b) provided non-public billing, coding, and reimbursement advice at no charge.

[3] In terms of volume, requests for testing in connection with the test cups at issue here represented approximately 16 to 17% of Millennium's business, at its peak.

[4] Clinical laboratory services are the only Stark designated health services furnished by Millennium.

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                                                    ML_DE_00325459

CMS Division of Technical Payment                    - 4 -                                        August 15, 2014
Policy

the standard FDA-approved labeling for all of these point-of-care test cups specifically advises users that the cups provide "only a preliminary analytical test result" and that a "more specific alternate chemical method must be used in order to obtain a confirmed analytical result." A picture and the package insert for one of the cups commonly furnished by Millennium (the Amedica™ Drug Test Cup) is attached as Exhibit A.

Despite their limitations, these test cups are useful in providing preliminary results at the "point-of-care," meaning in the treating physician's office or clinic. In particular, the results can be used to guide treatment discussions and initial prescribing decisions while the patient is still present in the office, as well as to inform physicians on whether to order additional confirmatory testing and what confirmatory tests to order. Confirmatory testing is performed on the same specimen, typically by an outside laboratory like Millennium (which receives the specimen in the point-of-care test cup), using more sophisticated quantitative testing technology, such as liquid chromatography/tandem mass spectrometry ("LC/MS-MS," which is the state-of-the art technology used by Millennium) or gas chromatography/mass spectrometry ("GC/MS").

Where physicians purchase point-of-care test cups, they are able to bill third party payers, including Medicare, for the initial drug screening performed using the cups. Medicare pays approximately $20 for these initial qualitative screens under HCPCS code G0434. Notably, some commercial insurers pay considerably more, in some cases in excess of $150 per screen. Point-of-care test cups can be purchased by physicians from a variety of sources for approximately $4 to $7 per cup, depending on the number of drug classes tested. Millennium sells point-of-care test cups to physicians at market rates through an affiliated company, Millennium Laboratories Clinical Supply ("MLCS").

This disclosure involves the small minority of Millennium's customers who do not seek to receive any reimbursement for point-of-care testing, but still would like to obtain the preliminary information available through the test cups as part of the urine drug testing process, including to inform them on what additional testing to order for their patients.

### B. Development of Millennium's Policy on the Provision of Test Cups

In late 2009, Millennium for the first time entered into a written "cup agreement" with a physician who elected not to bill for point-of-care testing, as a number of other drug testing labs were doing at the time. The Company's President consulted with Jane Pine Wood, a nationally-recognized legal expert on clinical laboratory regulatory issues, who advised that if the physician was willing to execute a legally binding agreement not to bill for point-of-care testing, so that the cups received from Millennium would not yield an economic benefit, Millennium could supply test cups to the physician at no charge without violating the Stark law (or the anti-kickback statue). In a declaration confirming this advice filed in the Ameritox litigation and attached as Exhibit B, Ms. Wood indicates she also "reviewed and approved" Millennium's initial form of cup agreement (which is included within Ms. Wood's declaration) and that "Millennium's cup agreement was consistent with the practices of other laboratories [she] was advising at the time."

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                                                            ML_DE_00325460

CMS Division of Technical Payment                - 5 -                                August 15, 2014
Policy

This firm, which also is recognized as having one of the nation's leading health care law practices,[5] also began advising Millennium in late 2009 and confirmed that the Stark law and the anti-kickback statute did not prohibit the Company from providing test cups at no charge to physicians who agreed not to bill for their use of the cups. Our advice to the Company included an October 6, 2010 letter (attached as Exhibit C), which was intended as a summary analysis for use in informing physicians of the relevant legal and regulatory considerations. We also advised Millennium on subsequent versions of its form cup agreement and, like Ms. Wood, were aware of a number of other drug testing labs that provided test cups to physicians consistent with Millennium's cup agreement. Indeed, we understood the provision of no-charge test cups for specimen collection to be a fairly common practice among urine drug testing laboratories.

It is worth noting that the Middle District of Florida rebuffed Ameritox's challenges to our legal advice concerning the test cups at issue in this disclosure. The 2010 Hogan Lovells letter at Exhibit C was the basis for Ameritox's Lanham Act false advertising claim against Millennium. In essence, Ameritox claimed that by circulating the letter, Millennium falsely advertised that its provision of test cups was lawful. The court rejected that claim and, in a summary judgment order, held that there was "no clear case law" or other authority demonstrating Millennium's cup program to be illegal.

As the Company grew over the past few years, its number of cup agreements grew proportionately and generally stayed at around 10% of its customer accounts. In addition, the Company implemented an increasing number of compliance measures aimed at ensuring physician adherence to the terms of its cup agreements. This, most notably, included purchasing billing data from independent sources to confirm that physicians with cup agreements were not seeking reimbursement from third party payers for point-of-care testing. Millennium's full cup agreement policy is attached as Exhibit D.

Millennium continued and vigorously defended its cup agreement arrangements throughout the Ameritox litigation, believing they were both legally appropriate and an important component of medication monitoring by physicians who agreed to forgo seeking reimbursement. The Company terminated these arrangements in June 2014, after receiving the jury's verdict. Millennium strongly disagrees with the verdict, has asked the court to set it aside and/or order a new trial, and intends to appeal if necessary.

### 4. Legal Analysis

### A. Basic Legal Analysis

Based on the jury's recent decision in Ameritox, Ltd. v. Millennium Laboratories, Inc., Millennium acknowledges the potential that it had "financial relationships" with physicians receiving the point-of-care test cups at no charge (and agreeing not to bill for testing), to which no Stark law exception was applicable. The Company's policy regarding the provision of no-charge test cups was designed in anticipation that the cups would not be considered "remuneration," and that the Stark law thus would not apply.

---

[5] Specifically, for several years running, the Hogan Lovells Washington, D.C. health care practice has received the highest "Band 1" ranking from Chambers USA. The firm also is ranked "First Tier" for healthcare and life sciences in The Legal 500.

\\DC - 036365/000007 - 5750782 v5

barring Millennium's legal experts from testifying as to their opinion that Millennium's provision of test cups was consistent with the lab supplies carve out, as it has been interpreted by CMS.

∞ Flawed jury instructions that did not advise the jury, consistent with the CMS and OIG guidance outlined above, that (a) the provision of items or services that are integrally related to a lab's services, and that have no independent economic value to the physician, is not remuneration, and (b) the provision of clinical information is not remuneration.

∞ The Company was precluded from introducing evidence to demonstrate that it repeatedly sought, obtained, and followed expert legal advice in implementing its cup agreement program, including the 2010 letter from this firm in support of the program.

∞ Ameritox's failure to adequately prove any damages specific to the test cup issue.

Despite its disagreement with the jury's verdict, Millennium has suspended its test cup arrangements while it awaits a ruling on its post-trial motions, considers an appeal, and addresses with CMS the potential violation of the Stark law through this disclosure.

## 6. Enforcement History

Millennium has no history of other Stark law violations or of any prior criminal, civil, or regulatory enforcement actions.

## 7. Compliance Program

Perhaps the best evidence of Millennium's commitment to compliance is the fact that it repeatedly sought, obtained, and followed expert legal advice in implementing its cup agreements with physicians.  In responding to Ameritox's allegations, that prior advice was confirmed by two prominent legal experts, including the OIG's former Chief Counsel, Mr. Morris, who testified at trial that "Millennium undertook important steps, including consulting with experts at the time of the free cup agreements to insure that to the best of its ability the Company was complying with the law."

Mr. Morris also undertook a thorough review of Millennium's complete compliance program, and in his report at Exhibit H, concludes "that Millennium has had in place all of the necessary elements of a comprehensive compliance program and that its employees believe they work for a company with a culture of integrity."  A more complete summary of Millennium's compliance efforts is included in Mr. Morris' report.  A separate review of Millennium's compliance program conducted by Strategic Management Services LLC ("SMS") and overseen by former HHS Inspector General Richard Kusserow, similarly concluded that Millennium operated a compliance program in accordance with all the elements of the OIG's Compliance Program Guidance for Clinical Laboratories (see Exhibit I).

Further evidence of Millennium's good faith and its sincere commitment to compliance is reflected in its decision to immediately terminate the cup agreement program and to initiate this self-disclosure, even while it has post-trial motions pending and clear grounds for an eventual appeal.

\\DC - 036365/000007 - 5750782 v5

# EXHIBIT 27

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

-------------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                        Debtors.

MARC S. KIRSCHNER solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                        Plaintiff,

 -against-

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                        Defendants.

Case No. 15-12284 (LSS)

-------------------------------------------X

                        April 12, 2021

                        9:02 a.m.


        ***CONTAINS CONFIDENTIAL PORTIONS***


        VIDEO-RECORDED DEPOSITION of MARTIN

PRICE, taken pursuant to Notice, held virtually

via Zoom, before Fran Insley, a Notary Public

of the States of New York and New Jersey.

Page 90

PRICE

Q. What you're telling Mr. Wisor at this time is that physicians were not completing the Section A?

MR. WERNER: Object to the form.

MS. CASSADY: Object to the form.

A. I'm sorry, is there a question?

Q. Yes. What you were telling Mr. Wisor is that physicians were not completing Section A. You were getting 20,000 forms per month that did not have Section A completed?

MR. WERNER: Object to the form.

MS. CASSADY: Object to the form.

A. I'm still not sure that's a question, but that's what's stated here.

Q. And in those instances, Millennium's practice was to default to the custom profile and test what was in the custom profile, correct?

MS. CASSADY: Object to the form.

A. I don't recall specifically. There were an evolving series of steps we took to address this issue.

Q. If you would go to the entry on page ending 2028 -- actually, there are two entries

Page 91

PRICE

I would like to bring your attention to. That would be page 37 of the document. There's a reference on September 8, 2010 where it says, "Greg Root tours and conducts on-site interviews," and then skipping one, then it says on September 9, 2010, "Greg Root's (?) Notes." Do you see that?

A. I see that, yes.

Q. And if you look at the notes entry, it says, "Notes re 'provision of [free] testing cups' state 'The arrangements will not comply with Stark and antikickback provisions.' The testing cups are clearly not used to 'solely collect the specimen'." You'll see these are dated September, which is about a month before that Hogan letter of October 2010 on the concept of cups. Does this refresh your recollection at all that the Roots were the first to opine on the legality of the cups under the Stark Law?

MS. CASSADY: Object to the form.

A. No, it doesn't.

Q. Now, you mentioned that the Collora firm sort of took the front position with

Page 92

PRICE

respect to the DOJ investigation after a while and Hogan worked in the background. Did there come a time when Collora resigned?

A. Yes.

MR. TRETTER: If we can mark the next exhibit at tab 12.

(Whereupon Plaintiff's Exhibit 12 was marked for identification.)

Q. Okay, we have on the screen Exhibit 12. It looks like an e-mail from Mr. William Kettlewell to you and to others at Millennium, including Brock Hardaway and Howard Appel. Mr. Hardaway was at that time the chief executive officer of Millennium; is that correct?

A. That's correct.

Q. And Mr. Kettlewell was the lead attorney at the Collora firm for the purposes of the DOJ engagement; is that correct?

A. He was certainly the one I was dealing with. I recall the engagement came in through Cathy Weinman, but for my purposes Bill was the primary point of contact at Collora.

Q. And this was to give you notice that

Page 93

PRICE

the Collora firm was resigning as counsel?

A. Yes.

Q. And he cites as a reason, "Among other things, you have insisted on pursuing objectives that we consider to be imprudent." Do you see that?

A. I see that, yes.

Q. Do you recall what Mr. Kettlewell believed the difference in strategy was?

MR. WERNER: Object to the form.

A. I'm trying to put this into temporal context, 'cause I recall, you know, we had a -- both with Hogan, with Mike Shepherd, with Steve Immelt, with Bill, and then even later with Mike Loucks, consistent concern around the civil litigation that was going on while the DOJ investigation was proceeding. That's the principal item I recall.

Q. But you don't recall anything specific about what objectives that the Collora firm had expressed to you that they considered to be imprudent?

MR. WERNER: Object to the form.

A. Within the context of the DOJ

24 (Pages 90 - 93)

Page 94

PRICE

investigation, never.

Q. You mentioned Mike Loucks. After Collora resigned, Mr. Loucks of the Skadden firm took over the company's defense of the DOJ investigation; is that correct?

A. That's correct.

Q. And the company had already retained Skadden in 2013 to assist with the Ameritox litigation; is that correct?

A. That's correct.

Q. And at that time they were also assisting the Collora firm in the DOJ litigation, correct?

A. We were keeping a lot of Boston law firms busy. The answer is yes.

Q. And Mr. Loucks had been in the Boston U.S. Attorney's Office prior to joining Skadden?

A. He was the First Assistant U.S. Attorney and the head of the Healthcare Fraud Unit for a number of years.

Q. And you believed he would be well-equipped to help Millennium in the DOJ investigation?

Page 95

PRICE

A. Yes.

Q. And he ultimately advised against relying on an advice of counsel defense for Millennium with respect to the cup program?

A. I don't recall that sitting here today, no.

MR. TRETTER: I'm going to ask that the reporter mark, and we'll have to keep track of, tab 14 as Exhibit 13.

(Whereupon Plaintiff's Exhibit 13 was marked for identification.)

A. This is one I don't have in my binder; is that right?

Q. No, you should. It should be tab 14.

A. Oh, I'm sorry.

Q. It's going to be a series e-mails between Mr. Loucks, you and a Joseph Savage among others at I guess Goodwin Procter and Skadden.

A. Okay.

Q. Mr. Savage was your personal or your individual attorney in the DOJ investigation, correct?

Page 96

PRICE

A. Initially, yes.

Q. So the company had its counsel, which had been Hogan, and then Collora, and then Skadden, and a lot of the directors and officers had their own individual counsel as well, correct?

A. Correct.

Q. And Mr. Savage was initially your individual counsel, but then later in 2015 he also started to act for the company, correct?

A. I'm trying to think through the exact timing, but I recall it was a declination from the criminal side of the U.S. Attorney's Office, at which point Joe took on a role on behalf of the company.

Q. And if we look in the series of e-mails, there appears to be, I guess earliest in time, a rather lengthy one from Mr. Loucks to you and Mr. Savage that starts on page ending in 041 and continues over into 043. Do you see that?

A. Yep.

Q. And in the second paragraph of that he says, "I woke up in the middle of the night

Page 97

PRICE

worrying about this strategy and came in this morning and re-read" - there's a typo - it should be "all of the interview memos and attached exhibits." Do you see that?

A. Yes.

Q. And the subject matter of this is "Privileged Communications Subject to JDA - Considerations on use of Ron and Helen." Do you see that?

A. Yes.

Q. And so this was the idea of whether to introduce Ron Wisor and Helen Trilling and make them available for interviews with the U.S. Attorney's Office in Boston, correct?

A. I mean, without reading Mike's full treatise here, that seems to be the topic.

Q. And Mr. Loucks in this treatise is basically saying I've reread all of the interview memos and attached exhibits, meaning the interview memos of people like Ron Wisor and Helen Trilling and the various documents similar to what we've gone through this morning?

MS. CASSADY: Object to the form.

25 (Pages 94 - 97)

Page 166

PRICE

of deposition.

MR. TRETTER:  But look, there's going to be -- there's no question that there is going to be some sort of motion practice with respect to this.

MR. WERNER:  Then I would suggest -- then let me just suggest this.  If the defendants are saying that they have or they're going to take their full amount of time, then it is their time to go and then they should be allowed to go.  It sounds like to me, Lyndon, you're the only one who's asking for more than you're allotted three and a half hours.

MR. TRETTER:  There's no allotted time.  As you know, we spoke about this all the time and I've done everything I could.  I have 60 deposition exhibits that I need to get through.  Unless the witness is going to appear at trial, we've got to get this done one way or another, and so maybe that's an issue.  Is the witness going to appear at trial?

MR. WERNER:  No.  But that doesn't

Page 167

PRICE

change the fact that a deposition is seven hours.  That's what the rules provide.  If you want to go to court and get more deposition time, that's your prerogative, but we're not going to agree just to allow everyone to have more time simply because you say you need it.

MR. TRETTER:  Well, I'm going to go for at least another half an hour right now, and I will turn over the questioning at that time, and we'll just have to reserve our rights and resume this at the appropriate occasion.  Okay?

MS. CASSADY:  Just for the record, defendants reserve all of our rights as well.

MR. TRETTER:  Of course.

MR. VIAPIANO:  So at 2:05 we're stopping and you're turning over the witness, 2:05 Eastern.

MR. TRETTER:  That's fine.

Q.   Are we ready to go, Mr. Price?

A.   Yes, sir.

MR. TRETTER:  I think the concierge

Page 168

PRICE

has brought up tab 50, which is now Exhibit 27.

(Whereupon Plaintiff's Exhibit 27 was marked for identification.)

Q.   And this is a Unanimous Written Consent of the Board of Managers of Millennium Lab Holdings II, LLC and it's dated April 16, 2014.  Do you remember or do you recall a company called Millennium Lab Holdings II, LLC being created as part of the transaction?

A.   Not specifically, but I think as we talked about earlier, my recollection was there was a Millennium Lab Holdings LLC.  So this makes sense to me.  I just don't recall it sitting here today.

Q.   Do you recall generally that there was an intermediate holding company that was created as part of the transaction?

A.   No.

Q.   Take a quick look at the headings of this document.  It refers to, first, the "Senior Credit Transactions, Distributions by OpCo to the Company, Company Distributions to Holdco, Redemption of TA Debentures and

Page 169

PRICE

Warrants, Leveraged Distribution of Holdco and Investors, Employee Bonuses, Option Cancellation and Additional Authorizations."  Is it your understanding that the transactions outlined in this unanimous written consent occurred at or around the same time on April 16, 2014?

MR. WERNER:  Object to the form.

A.   Sitting here today, that sounds like the right time frame.  I see this as an executed document so I have no reason to say that is not correct.  But I don't have an independent recollection of it occurring on April 16 as opposed to some other date.

Q.   And each of these subheadings were dependent on the other, meaning that none would have happened without all being successfully accomplished; isn't that correct?

MS. CASSADY:  Object to the form.

MR. WERNER:  Object to the form.

A.   I don't -- I can't answer that question.  I don't recall that or I'm not sure if I ever would have known the answer to that.

Q.   Well, let me put it in simpler

43 (Pages 166 - 169)

Page 170

PRICE

terms. The distribution to the holders of over a billion dollars would not have happened without the loan; is that correct?

MS. CASSADY: Object to the form.

A. Our proceeds, there wouldn't have been a distribution, that's correct.

Q. And the purpose of the loan was to be able to pay the equity holders a distribution, correct?

MS. CASSADY: Object to the form.

A. That was at least one of the purposes, correct.

Q. And the other purposes were to refinance the 2012 credit, correct?

A. I don't recall that specifically. It may have been.

Q. How about do you recall paying off the debentures that TA Associates had?

A. Sitting here today, I don't recall that, but that doesn't mean it -- I just don't recall all the different deal points at this point, Lyndon. I'm sorry, I just can't recall at that level of specificity today.

Q. Do you recall that there was an

Page 171

PRICE

additional -- in addition to the loan that 92 million and cash was distributed by the company, by the operating company?

MS. CASSADY: Object to the form.

A. I don't recall that specifically. There was cash distributed by the company, as I recall. The amounts, sitting here today, I don't recall specifically what that was.

Q. And part of the transaction was to pay people like you for the cancellation of certain stock options, correct?

MR. WERNER: Objection to form.

MS. CASSADY: Objection to form.

A. I'm not -- I'm not sure that was the purpose for the folks who were making the decision to do this or not.

Q. But did it happen?

MR. WERNER: Object to the form.

MS. CASSADY: Object to form.

A. In some shape or form there was a cancel, and I just -- you know, I'm not a transactional lawyer. I'm a litigator by trade, as you know. And so I'm not arguing the overall point, only that I can't speak

Page 172

PRICE

specifically to the stricture. But there was a cancellation of the option agreement. There was a distribution made to a number of categories of people. I was included in one of those. My recollection was that came out of operating cash and not out of the proceeds from the term loan.

MR. TRETTER: I'd ask the concierge to mark tabs 52 and 53 as our next two exhibits.

(Whereupon Plaintiff's Exhibits 28 and 29 were marked for identification.)

MR. TRETTER: So these I think would be 28 and 29. So Exhibit 28 is a document called an "Option Cancellation Agreement," and I think Exhibit 29 will be something called "Closing Compensation and Bonus Agreement."

THE CONCIERGE: Do you want to see it right now?

MR. TRETTER: Are you able to do both, Hiawatha?

A. I'm looking at them on paper so I can see them.

Page 173

PRICE

Q. These were for the cancellation and payments to you, correct, in connection with this transaction around April 16, 2014?

A. These are documents related to payments to me, correct.

Q. And it has your signature on the end of each document?

A. Yes.

Q. And if you go to Exhibit A to the bonus agreement -- I'm sorry. May be Exhibit A to the option cancellation agreement, which is Exhibit 52, there is a reference to your vested option equity of $9.8 million on a pretax basis?

A. Yes.

Q. And did you receive that money?

A. Yes.

Q. And there's a reference to $3.1 million of unvested option equity?

A. Right, yes.

Q. To be paid over the next four calendar quarters?

A. Yes.

Q. Did you receive any of that?

44 (Pages 170 - 173)

Page 174

PRICE

A.   I believe that I did.

Q.   That's all I had on those.

MR. TRETTER:  If we could mark tab 54 as our next exhibit.  So what is this, Exhibit 30 or 29?

THE CONCIERGE:  Thirty, correct.

(Whereupon Plaintiff's Exhibit 30 was marked for identification.)

Q.   We are up to January of 2015 in this document.  Now, do you recall that sometime around the end of December or end of 2014 in December that the Department of Justice informed you that it intended to intervene as a plaintiff in existing False Claims Act qui tams against Millennium?

A.   I have a very vivid recollection of that phone call from Mike Loucks, yes.

Q.   And shortly thereafter you learned that the government was also going to file an amicus brief in support of Ameritox in the appeal of its litigation with Millennium, correct?

A.   I see that in the e-mail thread with the [unclear] firm -- I mean, I see that in the

Page 175

PRICE

e-mails, yes.

Q.   In Exhibit 30 on the first page, the bottom e-mail, you're writing to Mr. Savage about $15 million at risk.  That's a reference to the Ameritox jury verdict, correct?

MS. CASSADY:  Object to form.

A.   Yes.

Q.   And that included both compensatory and punitive damages?

A.   I believe that's -- yeah.  I think that's -- yeah, that sounds right.  It is like 11 and a half and three and a half.  That sounds about right.

Q.   And you said, "and the likely follow-on from commercial payors and other labs."  Do you see that?

A.   Yes.

Q.   Commercial payors would be examples like a Harvard Pilgrim or perhaps a Humana?

A.   Humana is a better example, but yeah.

Q.   And you were saying that Millennium, in this e-mail, has far more exposure to such payors than Medicare as a result of the

Page 176

PRICE

Ameritox verdict?

MS. CASSADY:  Object to form.

A.   Eventually.  That's what I'm saying, yes.

MR. TRETTER:  If we mark the next exhibit, tab 55 as Exhibit 31.

(Whereupon Plaintiff's Exhibit 31 was marked for identification.)

THE CONCIERGE:  Repeat.  What tab?

MR. TRETTER:  Tab 55 as Exhibit 31.

THE CONCIERGE:  Gotcha.

Q.   This is a document that was produced by JPMorgan in the litigation.  It seems to mostly relate to a Debtwire article about "Millennium targeted by Humana as litigation widens, revolver terminated."  Do you recall that Humana did in fact bring arbitration proceedings against Millennium?

MR. WERNER:  Object to the form.

A.   Yeah, I don't recall whether they did or they threatened to.  I have a general recollection of an issue -- of a dispute coming up with Humana and that being resolved, but I don't -- I can't sit here today and tell you

Page 177

PRICE

whether they actually formulated or initiated arbitration or just sent a demand letter.

Q.   And while you were general counsel of Millennium, did other commercial payors bring proceedings, whether litigation or arbitration, against Millennium for conduct similar to that raised in the DOJ investigation and the Ameritox litigation?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to the form.

A.   They may have.  Sitting here today, I don't recall.  It wouldn't surprise me if they did and it wouldn't surprise me if it didn't.  I, just sitting here today, don't recall.  There was a lot of litigation over my tenure.

MR. TRETTER:  Can we mark, Mr. Concierge, tab 56.  So this will be Exhibit 32, I believe.

(Whereupon Plaintiff's Exhibit 32 was marked for identification.)

THE CONCIERGE:  It's a large document.  It will be ready in a second.

MR. TRETTER:  Maybe we have the

45 (Pages 174 - 177)

Page 178

PRICE

wrong one.  The one I am looking at, tab 56, would be just a few e-mails.

THE CONCIERGE:  It's coming up.  It's just slow.

A.   I have it if you want to start your questioning.

Q.   I just need defense counsel to be on the same page as we are.  So it's a series of e-mails from June 2015.  The subject matter is "Millennium Financial Model - Version 2."  And if you'll go to the last page of the exhibit which is Bates stamp 339, it looks like this model was forwarded to Mr. Hardaway by somebody named Elizabeth Pomerantz at Alvarez & Marsal.  Do you recall retaining Alvarez & Marsal on behalf of Millennium in 2015?

A.   I do.

Q.   And the purpose of that was to consider restructuring options in light of the DOJ settlement; is that correct?

MR. WERNER:  Object to the form.

A.   That was at least part of their scope at one point.  I recall they were brought in initially on a narrower, discrete topic.  I

Page 179

PRICE

recall the scope of the engagement evolving over time, but what you describe is correct.  That was certainly a piece of that.

Q.   In this particular exhibit it looks like Mr. Hardaway forwards the model to a number of people including you and that you forward it to Mr. Slattery.  Do you see that?

A.   Yes.

Q.   And do you recall in this time period a part of non-equity management of Millennium to interest the equity holders in parting with some of their equity to incentivize the non-equity management?

MS. CASSADY:  Object to the form.

MR. WERNER:  Object to form.

A.   I guess I don't -- well, now that I hear you say that, it brings back, I recall there -- that does sound familiar.  I don't have any specific recollection of it.  So I do recall some discussion around that.  I just -- specifically I can't -- I don't have any recollection.

Q.   Well, if you take a look at Mr. Hardaway's e-mail that you were copied on,

Page 180

PRICE

in this first full paragraph on the top of the page that ends in 338, he says, "You will note, of course, that the model we are presenting now has changed from the model we provided to TA most recently.  While we have a bridge provided in the model, the biggest difference is volume."  Do you see that?

A.   Yes.

Q.   And volume is a reference to the number of samples sent by physicians to Millennium for testing; is that correct?

MR. WERNER:  Object to the form.

A.   Yes.

Q.   So volume one of the drivers of Millennium's revenues?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to the form.

A.   Yes.

Q.   And Mr. Hardaway continues, "After digging into details with A&M last week, we came to the conclusion that our volume assumptions were aspirational.  In particular, we had previously assumed a 10% reduction in volumes related to some big issues (DOJ

Page 181

PRICE

settlement news and transition away from custom profiles - CP) starting in second half of 2015 and into '16, but then assumed an increase in 2017 and after.  After looking closely at the impact on volumes of companies in our space that have had DOJ settlements, we have decided it is much more defensible and realistic to make some changes to our volume assumptions.  Specifically, Ameritox had a roughly 50% drop in volumes and Callaway had a roughly 30% drop in volume after they each announced DOJ investigations/settlements."  Those settlements occurred prior to the leveraged recap in this particular case, in March of 2014; did they not?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to the form.

A.   Did Ameritox and Callaway?

Q.   Yes.

A.   You're talking about their DOJ settlements?  Yes.  Those were 2011 and 2010, as I recall.

Q.   So this information on the drop in volumes between Ameritox and Callaway in light

46 (Pages 178 - 181)

PRICE

that would have come together.  Obviously, it's a limited pool of revenue in the business and we have obligations under the term loan, and if we make commitments to the government we'd have to satisfy those.

MR. TRETTER:  Subject to what I said before about generally needing more time and having to go back to the court if necessary, I'm going to turn over the questioning to the defense group at this time.

MS. CASSADY:  Why don't we take a brief break so we can just regroup and try to eliminate duplicate exhibits.  So can we take about 20 minutes, Lyndon, and Mr. Price?

MR. WERNER:  Fine.

THE VIDEOGRAPHER:  Off the record, 14:01.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record at 14:23.

EXAMINATION BY

MS. CASSADY:

PRICE

Q.   Mr. Price, as I said this morning, my name is Elizabeth Cassady.  I'm from Sullivan & Cromwell and I represent JPMorgan.  I'll be asking you some questions this afternoon.

You testified in response to questions from Mr. Tretter about Millennium's point of care testing cup program.  Do you know when Millennium first implemented the program?

A.   I think, as I testified earlier, there are a number of iterations of that program.  I believe it began back in, I would guess -- oh, I don't want to guess.  2010, maybe.

Q.   Were you at Hogan when the cup program was first implemented?

A.   Yeah, maybe I wasn't clear in my last answer.  My recollection is there was some form of a cup program before they began using Millennium, is what I'm trying to say.  So what they did before then, I'm speculating now, there was some cup program after Millennium began advising them.

Q.   And did you have any role in the

PRICE

development of the cup program?

MR. WERNER:  Objection to the form.

A.   Yeah, it's hard to answer that question specifically.  I mean, that was -- in terms of the legal regulatory compliance analysis, that was predominantly handled by subject matter experts at the company, and in terms of the operational implementation and execution of the program, that was handled by others at the company.  Was I generally familiar with those different aspects along the way?  Yes.

Q.   And you testified that Millennium received advice from outside counsel concerning the legality of its business practices; is that correct?

A.   Yes.

Q.   And did that include the POC cup program and the cup agreement?

A.   On multiple occasions, yes.

Q.   And did that include the custom profile's policy?

A.   Yes.

Q.   I'm going to walk through some of

PRICE

the outside counsel we've already spoken about today.  So starting with Hogan Lovells, do you recall why Millennium retained Hogan?

A.   The initial -- I recall the initial engagement focused around a discrete CMS issue.  I believe it was in the reimbursement for qualitative point of care testing.  I was involved in the initial pitch.  The work with the com -- the work -- Hogan's work for the company grew and evolved over time.

Q.   What was Hogan Lovells' reputation in the healthcare legal industry?

MR. TRETTER:  Objection.

A.   Hogan I know has traditionally been ranked amongst the highest -- the top-tier for healthcare regulatory compliance work.  I know from conversation that the reason Millennium chose Hogan was because of their deep experience in the clinical diagnostic space, particularly their deep relationship with Labcorp and with a number of toxicology labs.  So, you know, there really is no -- I can't think of another law firm that has the breadth of clinical diagnostic lab experience that

Page 198

PRICE

sequence, but his opinion letter that I am familiar with came shortly thereafter.

Q.   And so did this document reflect that prior to that, what I believe is an October 6, 2010 opinion letter, Millennium had already been receiving advice from Hogan Lovells on the POC cup program?

A.   Yeah.  Again, I don't remember that specifically.  I know that they have had advice from Jane Pine Wood on the cup program prior to working with Hogan in which she had provided some contours of what that -- or I shouldn't say contours, she had drafted the cup agreement policy prior to Hogan getting involved, and my understanding and recollection is that the company was implementing the program consistent with Jane Pine Wood's advice.

MS. CASSADY:  We're going to pull up what will be marked as Defendants' Exhibit number 2.

(Whereupon Defendants' Exhibit 2 was marked for identification.)

Q.   This is a March 19th, 2012 e-mail from Ron Wisor to you, Mr. Price, regarding "A

Page 199

PRICE

Test Cup Opinion," with an attachment "HL Test Cup Letter, (10-6-2010)."  On March 19th, 2012, this is a few years after Mr. Wisor provides the opinion letter on the POC cup program, Elizabeth Peacock e-mails you and asks for "the OIG guidance document that outlines no-charge test cups as permissible as long as they are utilized as a container to transport specimens to a lab."  And take a minute to look at this document, but what did you understand Ms. Peacock to be asking for?

A.   Sitting here today, I can only read what's in the e-mail, which is asking for the legal support behind our cup agreement program, and specifically the OIG -- any OIG guidance related to that.

Q.   Mr. Wisor responds by attaching the HL test cup letter 10/6/2010 and 42 USCA Section 1395NN.  Is your understanding that this is the same October 6, 2010 legal opinion from Mr. Wisor that we've been discussing?

A.   I don't see it attached here, but that -- I'm familiar with a October 2010 cup agreement letter and we used that.  I referred

Page 200

PRICE

to that repeatedly during my tenure as general counsel.

Q.   Did you understand in March 2012 that the October 6, 2010 opinion letter continued to reflect Mr. Wisor's view of the applicable law?

MR. WERNER:  Object to the form.

A.   Yes.

Q.   And was that consistent with your view in March of 2012?

A.   Yes.

Q.   Did you have any basis at this time to reexamine Mr. Wisor's opinion?

A.   Again, timing-wise, I can't answer that question specifically.  I know periodically, particularly as it came up in civil litigation and the U.S. Attorney's and the DOJ investigation, we constantly revisited that question to validate the opinion, not only of Ron, but then we asked -- as you may know, we asked some other leading healthcare experts to opine on this matter for us.  I guess to answer your question, we were constantly reevaluating our legal -- you know, these

Page 201

PRICE

opinions to make sure that we were compliant with the law.

MS. CASSADY:  We will pull up what we will mark as Defendants' Exhibit Number 3.

(Whereupon Defendants' Exhibits 3 and 4 were marked for identification.)

MR. TRETTER:  Liz, before you get going, just so I know and can follow, do I have to refresh -- these are not being done by Hiawatha, right?  They're being done by you guys?

MS. CASSADY:  Right.  But they should be loading into your Exhibit Share, which if you refresh, they should be automatically --

MR. TRETTER:  I have to hit refresh each time?

THE CONCIERGE:  Or F5, it's the same thing.

MR. TRETTER:  Okay, thank you.

Q.   This is a January 21st, 2014 e-mail from you to Nick Simoni.  Who is Nick Simoni, if you recall?

51 (Pages 198 - 201)

Page 202

PRICE

A.   Nick was a sales rep in the midwest region, if I recall.

Q.   And you write, "As discussed, attached is a legal opinion that may be shared with a customer regarding "ML's Cup Agreement Program."  And the attachment is the October 6, 2010 opinion letter from Hogan Lovells.  Is this the same opinion letter from Ron Wisor of Hogan that we just discussed?  You can pull up the attachment.

A.   That's the same October 2010 legal opinion letter.

Q.   Does this reflect that Millennium was continuing to rely on this legal opinion in January of 2014?

A.   Yes.

Q.   And were you continuing to rely on this legal opinion in 2014?

A.   Yes.

Q.   Mr. Price, do you recall Hogan pushing back if they disagreed with something that Millennium wanted to do?

MR. TRETTER:  Objection to the form.

A.   Yeah, and Helen and Ron don't -- are

Page 203

PRICE

not -- you know, I think that was reflected in an earlier e-mail you saw with Lyndon, I mean, they are not ones to be pushed around.

Q.   You previously testified Millennium was also receiving advice from other outside legal counsel as well on these issues, correct?

A.   By early 2014 we had an additional opinion, as I recall, from Lew Morris, who was the former general counsel of the Office of Inspector General at CMS opining on the cup agreement program.  And obviously, of course, Mike Loucks, the former -- head of the healthcare fraud unit at the U.S. Attorney's Office in Massachusetts.  I believe we also had an opinion from -- wasn't it John Brennan, maybe, as well as Richard Kusserow in the Strategic Management firm.

Q.   I'm going to be asking you some questions about them in a minute, but first I wanted to turn back to Jane Pine Wood, who you identified previously as outside counsel.  Do you recall what firm Ms. Wood was associated with?

A.   Initially, I believe, she was not

Page 204

PRICE

affiliated with the firm, although I could be wrong about that, but eventually she was part of McDonald Hopkins and today she works for a clinical diagnostic lab.

Q.   Do you have any knowledge of why Millennium retained Ms. Wood to provide legal advice?

A.   Someone would have recommended her to Howard.  I know someone recommended her to Howard.  I don't remember who that was.

Q.   Do you recall Millennium seeking advice from Ms. Wood on the cup agreement or the cup program?

A.   During my tenure I don't recall that.  I recall -- I don't recall that.  There was some engagement with her around her later opinion, but I don't recall that.  I don't recall the details of that specifically.

MS. CASSADY:  Let's pull up our tab 57.  This has been marked Defendants' Exhibit 5.

(Whereupon Defendants' Exhibit 5 was marked for identification.)

Q.   Mr. Price, as you previously

Page 205

PRICE

testified about the Ameritox litigation which was filed in the Middle District of Florida, and this is a January 16, 2014 declaration that was submitted by Jane Wood in that lawsuit.  Do you recall this document?

A.   No.

Q.   Ms. Wood states in her declaration that "Millennium's cup agreement program was consistent with the practices of other laboratories I was advising at the time."  Do you have any basis to believe that the statements in Ms. Wood's declaration were not truthful or accurate?

A.   No.

MR. TRETTER:  Objection to the form, lack of personal knowledge.

MS. CASSADY:  We can take that one down.

Q.   Turning to Skadden, you previously testified that Skadden also served as outside counsel to Millennium.  Do you recall when Skadden started advising Millennium?

A.   From a healthcare compliance standpoint it would have been in the fall of

52 (Pages 202 - 205)

PRICE

2013. The company represented -- Skadden represented us in litigation prior to that, but I don't recall -- if that's what you're asking. In terms of healthcare compliance, it would have been when we retained Mike Loucks and that team.

Q. Why did Millennium choose Skadden and Mr. Loucks to begin representing them with respect to healthcare compliance issues?

MR. WERNER: Objection to form.

A. There is a short list of folks in Boston and Massachusetts that you call when you have a healthcare matter with the U.S. Attorney's Office, and Mike is at the top of that list. He had just left the position as Acting U.S. Attorney, he was the First Assistant, and ran the healthcare fraud unit when Susan Winkler and others who were involved in this case were there.

Q. Would you consider Mr. Loucks an expert in his field?

A. Yes.

Q. Did Mr. Loucks or Skadden ever advise Millennium that its business practices

PRICE

were illegal?

A. No.

Q. You also testified that Goodwin Procter was outside counsel to Millennium. Is that correct?

A. Yes, at one point.

Q. And do you recall when Goodwin started advising Millennium?

A. As I covered with Lyndon before, Goodwin represented me personally, I recall, through the end of 2014 and then began representing the company in the beginning of 2015.

Q. Joseph Savage was the attorney at Goodwin who was the lead counsel representing Millennium; is that correct?

A. He was the partner at Goodwin representing Millennium, correct.

Q. What was Mr. Savage's expertise?

A. Joe was also a white collar lawyer with a specialty in healthcare fraud and abuse.

Q. So is it fair to say that Millennium was consistently seeking and obtaining legal advice on its business practices from highly

PRICE

reputable law firms and attorneys?

A. Yes.

Q. And you relied on this advice throughout your tenure as general counsel to Millennium?

A. Yes.

Q. And in addition to obtaining legal advice from reputable outside counsel, you also mentioned that Millennium obtained advice from industry experts; is that correct?

A. Correct.

Q. Did Millennium hire Strategic Management in 2012 to conduct an independent compliance audit?

A. Yes.

Q. And what is Strategic Management?

A. Strategic Management is a well-regarded, large-sized consulting group based in Alexandria, Virginia, was founded by Dick Kusserow, who was the former Inspector General, and they perform any number of functions for healthcare companies and have a number of folks with deep experience in the clinical lab space.

Q. Do you recall the scope of the

PRICE

compliance audit that Strategic Management and Dick Kusserow performed for Millennium?

A. I don't. I believe that they did a couple of things over time. The best of my recollection is that it began as a annual healthcare compliance audit of the organization.

Q. Do you recall what Strategic Management concluded in its 2012 audit?

A. Not specifically other than the overall grade was a passing one. We had met the seven elements of the OIG model plan for a compliance program. My recollection is they have, you know, fairly lengthy opinion -- they have a fairly lengthy summary and there were surely some things we were doing, you know, exemplary and some we needed improvement on.

Q. You also mentioned an individual named Lew Morris. Who was Mr. Morris?

A. Lew was the general counsel, I don't recall for how long, but it was a decent tenure at -- for the Office of Inspector General at Health and Human Services.

Q. And was Mr. Morris retained as an

Page 210

PRICE

independent expert by Millennium in the Callaway and Ameritox litigations?

A. Yes.

Q. And do you generally recall what Mr. Morris's opinions were with respect to those reports that he submitted?

A. Yes.

Q. And what were those?

A. My recollection is that Lew found that the Millennium programs were compliant with federal healthcare laws and regulations. I think he also provides some opinions around our competitors' business practices and found some of them to be suspect.

Q. And do you recall Mr. Morris opining on the POC cup program specifically?

A. Yes.

Q. And how about the custom profile policy?

A. I don't recall that specifically, but it would not surprise me if he did.

Q. Did Millennium engage Mr. Morris to consult on compliance work outside of the civil litigations?

Page 211

PRICE

A. Yes.

Q. Do you recall what type of work Mr. Morris did in that capacity?

A. I remember that we had developed a relationship with Lew through his engagement as an independent -- as an outside expert in some of our civil matters. Lew's reputation, you know, was exceedingly strong and we weren't -- I recall not being sure whether he was in the business of advising clinical labs on a regular basis like ours, but if we could get someone like him to help to work with us, I recall thinking that would be very helpful, and I recall he agreed to do that.

Q. Do you recall generally whether Millennium implemented the advice of Strategic Management and Mr. Morris with respect to compliance issues?

A. I don't recall specifically, but I can't think of any instance where we did not.

Q. I'm going to refer back to what I believe was marked Plaintiff's Exhibit 6. So it should be in your binder. Let's look at 5B. This relates to the draft 2010 audit that was

Page 212

PRICE

conducted by CodeMap. Is it correct that Millennium sought the advice from outside counsel on whether to move forward with the audit report?

A. Yes.

Q. And in this e-mail that Mr. Tretter pointed you to before, Helen Trilling of Hogan asks, "One question is why Root would be addressing issues in which we have opined at all." And by "we," did she mean Hogan?

MR. WERNER: Object to the form.

A. That's how I would read the e-mail.

Q. Do you have a view on the scope of the audit report and Root's engagement?

MR. TRETTER: Objection.

A. No. I shared Helen and Ron's view or I would say questioning around why Root was providing legal and compliance advice given his background and expertise.

Q. You viewed this draft audit report as going outside of the scope of Root's expertise?

A. Yes.

Q. And I believe you testified that

Page 213

PRICE

Millennium continued using CodeMap and Root for other services, such as billing; is that correct?

A. Yes.

Q. Is that because you viewed that area as within their expertise?

A. Yes.

Q. I would like to ask some questions now about the civil litigations that you referred to earlier. It's correct that Millennium was involved in several civil litigations during the 2010 to 2014 time period, right?

A. Yes.

Q. Was it common for competitors to sue each other in this industry?

A. Yeah, that practice was pretty rife before Millennium ever came to being. You don't have to spend a lot of time on Pacer to find lawsuits between companies in the toxicology space before Millennium even came into existence, and that continued, you know, the first couple of years as we began to carve out market share.

54 (Pages 210 - 213)

Page 214

PRICE

Q. Did the claims that were brought by competitors cause you to question Millennium's business practices?

A. Not really. Most of the lawsuits were initiated by Millennium. In fact, almost all of them were that I can think of offhand. And that was largely to call out practices of competitors that we did not think were lawful and compliant.

Q. Did you think the claims brought by competitors in the civil litigations were meritorious?

MR. TRETTER: Objection to form.

A. By and large, no. I would say no. There may be some narrow exception to that, but by and large, no.

Q. Are you familiar with qui tam actions filed under the False Claims Act?

A. Yes.

Q. And what is your understanding of FCA qui tam actions?

A. Well, I'm not a False Claims Act expert. There's a provision under the False Claims Act that provides for whistleblower

Page 215

PRICE

actions for those who have unique and specialized information about a company's business practice that they believe are unlawful, to raise those with the federal government and receive compensation in the event there's a recovery.

Q. Do you recall a qui tam suit filed by Robert Cunningham against Millennium in the United States District Court for the District of Massachusetts?

A. Yes.

Q. What is your recollection of that qui tam suit?

A. I honestly sitting here couldn't tell you what the subject matter was. This was a long line of qui tams and civil litigations that were paid for by competitors. This was a qui tam brought by a lab director at Callaway. I believe it had something to do with our testing practices. Mr. Cunningham died. The government declined to intervene and then two of our commercial competitors invested significant resource to try to keep that case alive, ultimately taking it to the First

Page 216

PRICE

Circuit, where it was thrown out.

MS. CASSADY: Let's pull up what has been marked Defendant's Exhibit 6.

(Whereupon Defendants' Exhibit 6 was marked for identification.)

Q. This is a March 19, 2012 KPMG audit response letter from Hogan. If you take a look at the page ending 8321, Exhibit A provides a list of descriptions.

A. I'm sorry, counsel. Is that in my paper copies here or should I look on the screen?

Q. No, if you could just look on the screen for this one, please.

A. Okay.

Q. Does this refresh your recollection about the allegations in the Cunningham complaint?

A. Yes.

Q. It accurately reflects your recollection of the allegations in the Cunningham complaint?

A. Yes.

Q. Do you recall Millennium receiving a

Page 217

PRICE

Civil Investigative Demand, a CID, from the Department of Justice in December of 2010?

A. Yes.

Q. And was that in relation to the Cunningham lawsuit?

MR. WERNER: Objection to the form.

A. I'm not sure we knew that at the time but ultimately it turned out to be.

Q. You were at Hogan when Millennium received that Civil Investigative Demand, correct, in 2010?

A. Yes.

Q. Were you involved in the response?

A. I played a role in it, yes.

Q. What was your role?

A. Again, I was really the relationship partner with Millennium and so, as I recall for that matter, we had a, you know, white collar team, Steve Immelt, and we had our healthcare regulatory compliance attorneys, Ron and Helen, involved. And, you know, my role was to, you know, shepherd it along and, you know, play the role of the relationship partner.

Q. You testified that the government

55 (Pages 214 - 217)

Page 218

PRICE

decided not to intervene in the Cunningham case; is that correct?

A. Correct.

Q. And was that after Millennium responded to the CID?

A. Yeah, it must have been. I don't recall specifically, but I'm sure it was after.

Q. And do you recall what happened with the Cunningham lawsuit once the government decided not to intervene?

A. It was picked up and propagated by Ameritox and Callaway. You know, I can get into more of the details of the why, but it's not relevant probably to your question. It was picked up by those folks, or [unclear] series of motions practice with the district court or it was dismissed. I think it's -- and then ultimately they appealed it up to the First Circuit, or the estate of Robert Cunningham, which was being propped up by Ameritox and Callaway, took it up to the First Circuit and ultimately it was dismissed.

Q. Did the government's decision not to intervene in the lawsuit have any impact on

Page 219

PRICE

your view of the legality of Millennium's business practices?

A. It was reassuring. And they had validated -- it validated what Helen and Ron had been telling us and the decision by the company to -- I know because -- the decision by the company to take its legal work to Hogan.

MS. CASSADY: I think we've been going a little over an hour now. Do you mind if we take a quick ten-minute break?

THE WITNESS: That's fine.

THE VIDEOGRAPHER: Off the record, 15:14.

(Off the record.)

THE VIDEOGRAPHER: Back on the record at 15:25.

Q. Mr. Price, I'm going to switch topics now and talk about the 2012 time period. And I'll refer you back to Plaintiff's Exhibit 1, which is tab 1 in your binder. This is the March 27, 2012 e-mail chain between you, Lynn Neuner, Bill Sheehan and Donald Conklin about the DOJ subpoena.

A. Okay.

Page 220

PRICE

Q. And if you refer down, you write to Ms. Neuner, "Hogan, as you know, helped us implement various policies in late 2009 in anticipation that Government would ultimately look into these issues." Does this reflect your understanding that Hogan began looking into Millennium's policies in late 2009?

A. Yes.

Q. And this would have been before the draft audit report by CodeMap in 2010?

A. Yes.

Q. You also make a statement about "So they offer the regulatory perspective on what the DOJ seemed focused on and how ML is positioned relative to the field." Do you understanding at the time of how Millennium was positioned relative to the field?

A. As I mentioned before, you know, in some -- you know, we had brought on Hogan, our business was scaling. We understood that as a large provider of diagnostic services we would have a target on us and began through the engagement of Hogan to validate our and where necessary adjust our policies and programs to

Page 221

PRICE

comply with the law in an environment -- in a competitive environment where most of our competitors had not done so.

(Continued on next page for confidential portion.)

56 (Pages 218 - 221)

Page 222

PRICE - CONFIDENTIAL

Q.   I'm going to refer you now to Plaintiff's Exhibit number 2, which is tab 2 in your binder.  Again these are notes prepared by Lynn Neuner titled, "Conference Call Re Millennium, dated 3/27/12."  And you previously testified, I believe, that you understand these to be the notes from the call that we just referred to?

A.   These look to be notes from a call that I participated in with the folks at Simpson Thacher, yes.

Q.   And on the first page, which is ending 0008, again Ms. Neuner writes, "Came in a couple of hours ago, prevalent in our industry, not that different from first CID."  You testified, I believe, that this refers to the 2012 DOJ subpoena; is that correct?

A.   Yes.

Q.   Do you agree with the statement and the notes that this type of subpoena was prevalent in our industry?

A.   Yes.

Q.   Is it also consistent with your

Page 223

PRICE - CONFIDENTIAL

recollection that it was not that different from the first CID?

A.   Yes.

Q.   The CID refers to the CID issued in connection with the Cunningham qui tam complaint that we discussed earlier?

A.   Correct.

Q.   And you believe the 2012 subpoena raised similar issues as the first CID?

A.   Yes.  I believe they were overlapping issues.

Q.   And further down on the page by the numbers 1 and 2, 1. "use of custom profiles, standing orders, 2. confirmation testing of negative tests/screen results CMS was concerned about.  In 2009 Hogan started working on these issues."  Does this refresh your recollection that in 2009 Hogan started working on the custom profile policy issues in addition to the POC cup agreement?

A.   Yeah, Helen specifically worked closely with Howard to revamp our test requisition forms.  I remember that well.  I was not deeply involved in that, but that would

Page 224

PRICE - CONFIDENTIAL

have included both the custom profile and the standard test requisition form.

Q.   If you refer to the page ending 0010, in the middle of the page it says, "This may be an industry-wide inquiry."  Is it consistent with your recollection that at the time Millennium believed the subpoena may relate to an industry-wide inquiry?

MR. TRETTER:  Objection to form.

A.   Yes, that was our understanding at the time.

Q.   Turning to the page ending 0012.  At the very bottom of this page it says, "Howard, we are confident AB" - about, I believe - "our practices.  We are happy to go head to head with our competitors.  In early days these are the issues we worked on for eight months before adopting them in 2009."  Do you understand "Howard" to refer to Howard Appel?

A.   Yes.

Q.   Do you recall this statement being made by Mr. Appel on the call?

A.   No.

Q.   Sitting here today, do you agree

Page 225

PRICE - CONFIDENTIAL

with the statement made by Mr. Appel on the call?

MR. TRETTER:  Objection to the form.

A.   I can only answer that question from the time period when I joined the business.  I was very confident about our practices and was happy to go head to head with competitors.  And I agree that many of the issues raised in the HIPAA subpoena of 2012 were previewed in the work that was done with Hogan beginning in 2009.

Q.   Turning to the last page of the notes ending 0013.  At the top it says, "We believe we'll be fine."  Do you agree with the statement at the time that Millennium would be, quote, fine?

A.   Yes.

Q.   And what was that based on?

A.   We had our policies and practices reviewed by the most highly regarded outside legal counsel we could find.  We knew what our practices were relative to the competitive landscape.  And we're also mindful that a number of these topics had been reviewed as

57 (Pages 222 - 225)

Page 226

PRICE - CONFIDENTIAL

part of the 2010, 2011 CID.

(End of Confidential Portion.

Transcript continued on next page.)

Page 227

PRICE

Q. Mr. Price, I'd now like to ask you some questions about the status of the Ameritox litigation and the DOJ investigation in the 2013 time period leading to up to the 2014 transaction. Did the DOJ investigation continue to progress over the course of 2013?

MR. WERNER: Object to the form.

A. In my recollection from 2013 is that the investigation was largely dormant. The Reuters article in late 2012 seemed to take a lot of wind out of the sails and enthusiasm of the U.S. Attorney's Office, as I think they were surprised to learn how much of what they had heard in the grand jury testimony was sponsored by Ameritox and some of our other competitors. So I don't recall much happening in 2013 as part of the DOJ investigation. Susan Winkler, as I mentioned earlier, was commonly known in the legal circles of Boston, was either looking for another role within the U.S. Attorney's Office or in private practice. So I recall we were producing documents and not getting much feedback throughout the 2013 period.

Page 228

PRICE

MR. TRETTER: Let me just object to the extent that the witness is testifying of what's in the minds of the U.S. Attorney's Office personnel.

Q. Were you and others at Millennium concerned that the investigation was still ongoing?

A. Of course. Until the investigation is closed we're concerned about it. We had civil litigation that we needed to actively defend and pursue at the competitor and, you know, as I touched on with Mr. Tretter earlier, we were balancing a number of our individuals with individual counsel and whether to take Fifth Amendment protection rather than testify.

Q. And was Millennium cooperating with the government during 2013 in connection with the investigation?

A. Yes.

Q. In 2013 did Millennium still think that the inquiry could be industry-wide, if you recall?

A. I don't recall specifically in 2013. I know we learned that Ameritox had also

Page 229

PRICE

received a subpoena at some point. We knew about government investigations of other labs during that time frame. So I don't recall, specifically in 2013, did I know this was broader based other than we knew there was a lot of activity in the space.

MS. CASSADY: Let's pull up our tab 53.

MR. TRETTER: Is this going to be Defendant's Exhibit 7?

MS. CASSADY: Yes, this will be Defendant's Exhibit 7.

(Whereupon Defendants' Exhibit 7 was marked for identification.)

Q. Mr. Price, this is a December 19, 2013 e-mail chain with Michael Loucks that you forwarded to Joseph Savage at Goodwin Procter. And it's about "Various Things." Why don't we scroll down. It's a longer e-mail and I want to give you a chance to take a look at the document. And just note it was produced in this fashion with the characters. Let's scroll down to the part that begins "Settlement window."

58 (Pages 226 - 229)

Page 230

PRICE

A.   Okay.

Q.   Do you recall this e-mail from Mr. Loucks?

A.   Not specifically, no.

Q.   Do you have an understanding of what "settlement window" he was referring to?

A.   I mean, this came up in two -- with the transition from -- with the transition from and Ms. Winkler's departure from the case, I recall discussions around utilizing that window to try to resolve the matter in 2013.

Q.   On the page that ends 8397, Loucks writes, "We have to consider agreeing to pay up to 15 million and I think our opening offer should be in the several million dollar range, e.g., 5 million."  Was this consistent with your own estimate of Millennium's potential exposure at the time?

MR. TRETTER:  Objection to form, lack of foundation.

A.   I don't recall having gone through the exercise of thinking about a settlement posture or damages.  We hadn't -- nothing had happened.  My recollection is not much had

Page 231

PRICE

happened in that case in over a year other than we spent a lot of money on law firms.

Q.   Would you agree that at this time, in December 19 of 2013, Mr. Loucks's assessment was that Millennium might have to consider agreeing up to 15 million?

A.   Other than seeing it here in the e-mail, I don't recall that specifically, no.

Q.   Okay, we can put that one away.  So let's turn to the 2014 transaction that you testified about earlier.  This was the approximately $1.8 billion term loan in April of 2014.  Do you recall when Millennium first started to contemplate the transaction?

A.   No.  We looked at some e-mails earlier and there are a number of moving pieces.  I think we had a couple of, let's say, false starts, but we had a couple of steps taken in that regard that preceded that.  So in terms of this particular transaction, I don't, sitting here today, have a specific recollection of when it began.

Q.   What was your role in Millennium's decision to pursue the transaction?

Page 232

PRICE

A.   I don't think I had any role in the decision to pursue the transaction.

Q.   Do you recall who did?

A.   That would have been primarily the equity holders, TA, Jim Slattery.  I'd say to a much, much lesser extent Howard and David, but it was really a TA and -- TA-driven and Jim-supported exercise is my recollection.

Q.   And the transaction was a loan syndication; is that correct?

MR. TRETTER:  Objection to the form.

A.   My understanding is that ultimately it was.  I think it was underwritten by JPMorgan and they then syndicated it out.  It became a syndicate.  I'm not sure that that's how it was put together from our perspective.

Q.   And were you involved in negotiating the transaction with the defendant banks?

A.   Only at a very topical level.  It was primarily handled if not exclusively handled by our counsel, outside counsel.

Q.   Would you agree that the relationship between JPMorgan, Citi, SunTrust, BMO and Millennium was a standard commercial

Page 233

PRICE

relationship?

MR. TRETTER:  Objection to form.

A.   It seemed as arm's length as it could be.  I'm not familiar with any other relationship between the entities prior to the transaction.

Q.   Previously you discussed with Mr. Tretter that the transaction involved the dividend payment; is that right?

A.   The proceeds were used to pay a dividend, as I recall.  And again, the parlances, I may not have it right but there was a distribution made to the equity holders, and I believe it took the form of a dividend.

Q.   And that was disclosed to potential lenders?

A.   Yes.  I can recall specifically in documents like the confidential information memoranda where that was disclosed and highlighted earlier on in the document.  I don't think it was any -- I don't think it was any secret that the -- anyone that the purpose was to fund a -- you know, at least in part a distribution to the equity holders.

59 (Pages 230 - 233)

Page 234

PRICE

Q.   And the transaction also involved the retirement of outstanding debt; is that correct?

A.   I don't -- I think that -- that sounds right.  I know we had a initial term loan with JPMorgan and I believe that this retired that and then became part of this loan.

Q.   And that was also disclosed to potential lenders, correct?

A.   That's my recollection, yes.

Q.   Did you have any involvement in negotiating the fees that were paid to defendants in connection with the 2014 transaction?

A.   I was not involved in negotiations directly with the lenders or the brokers.  I recall internal discussions on the topic.

Q.   And what do you recall about those internal discussions?

A.   Well, the only vivid recollection I have is Jim Slattery was not at all happy about the size of the fee going to JPMorgan and the others.

Q.   I understand you to mean that he

Page 235

PRICE

thought the fee was too high?

A.   Yes, he absolutely thought it was too high and was not happy about it, and would have -- I recall pushing back on that.  The extent to which he was successful in that, I don't have any recollection on, but Jim -- you know, I don't have a lot of vivid memories of that period, but when it affected Jim's wallet you'd hear about it and he was upset about the size of the fee, but ultimately got comfortable that the -- it reflected, you know, the market rate for this kind of instrument, these kind of services.

Q.   So is it fair to say that Millennium pushed back on the fee that was being paid to the defendants in connection with the 2014 transaction?

A.   Well, like I said, I wasn't involved in that.  I was not JPMorgan or bank facing, but that's my understanding.

Q.   Would you agree that fees were competitively bid and negotiated?

MR. TRETTER:  Objection to the form, lack of foundation.

Page 236

PRICE

A.   That was my understanding.

Q.   And do you know whether Millennium considered other lenders in connection with the 2014 transaction?

A.   I believe that we did.

Q.   Do you have any reason to believe that the fees were something other than standard and fair market value?

MR. TRETTER:  Objection, lack of foundation.

A.   No.

Q.   There was a diligence process for the 2014 loan transaction, correct?

A.   Yes.

Q.   Did you have any involvement in the diligence process?

A.   Yes.

Q.   What was your involvement?

A.   I recall there was -- at a high level it was litigation diligence and information detail around the DOJ investigation.

Q.   Do you recall there being due diligence calls?

Page 237

PRICE

A.   Yes, there were.

Q.   Did you participate in those calls?

A.   Yes, I did.

Q.   Who was the primary point person at Millennium when it came to the bank's questions about litigation and regulatory matters?

A.   That would have been me.

MS. CASSADY:  So let's pull up our tab Exhibit 62.  This will be Defendants' Exhibit 8.

(Whereupon Defendants' Exhibit 8 was marked for identification.)

Q.   This is a 3/13/2014 e-mail chain with Lynn Neuner, who asks to set up a follow-up legal due diligence call for 3/14/2014.  And the e-mail discusses a diligence call on legal litigation matters planned for Friday, March 7.  Do you have any recollection of the March 7, 2014 legal diligence call?

A.   Can you scroll down just a little bit to the lengthier e-mail that I wrote?  You look like you passed by a lengthier one that I wrote.  There it is.  Can you scroll down a

60 (Pages 234 - 237)

Page 238

PRICE

little bit further? (Witness reviewing document). I just want to see what I'm responding to.

Q. Looking at the page ending in 2015, which is at the end. I'll give you a chance to look at it. So in response to Bill Sheehan and Lynn Neuner, you state that you will "likely ask Mike Loucks of Skadden's Boston team to join for the discussion of the DOJ matter." Why did you intend to ask Mr. Loucks to join the call?

A. Mike is an expert on these U.S. Attorney Office DOJ investigations and I felt like it was important to get a non-company perspective in front of the -- you know, onto the diligence call.

Q. Let's look at the page ending 2013. You also provide Ms. Neuner and Mr. Sheehan a list of the open cases and you offer to provide state court filings or unsealed pleadings. Looking at this list, to your knowledge, was this a complete list of pending civil cases in which Millennium was a party as of March 10, 2014, the date of your e-mail?

Page 239

PRICE

A. Sitting here today, I can't testify to an exhaustive list, but I have to imagine it was. Certainly anything that was material.

Q. Scroll up to page 2012. You also tell Ms. Neuner that "I may also invite Hogan to join." Why were you also inclined to ask Hogan to join the diligence call?

A. The same reason as Mike. It provides some color behind the legal and regulatory items in the investigation. [Unclear] there's also overlap with some of these civil cases. They've been working with the company since 2009 on almost all of the items that were at issue in the claims brought against the company, outside of the employment cases and things like that. So it would be unusual for me not to call upon Hogan and/or Skadden for this type of conversation.

MS. CASSADY: Pull up our tab 61. We will pull up what we will mark as Defendants' Exhibit 9.

(Whereupon Defendants' Exhibit 9 was marked for identification.)

(Continued on next page for

Page 240

PRICE - CONFIDENTIAL

confidential portion.)

Q. These are notes from Lynn Neuner dated March 7, 2014. At the time she writes, "Millennium Update Call" and "Martin Price, GC" among other names. Are these notes, to the best of your knowledge, referring to the March 7th diligence call that we just discussed?

MR. WERNER: Object to the form.

MR. TRETTER: I don't believe that he can authenticate the notes, but you can ask him questions on it.

A. So I recall at least three conversations in the diligence process. One with the Simpson Thacher folks, one that was broader and opened up to the syndicate candidates of those who were in the process, and then I recall some narrow follow-up on the Ameritox case where I cannot remember who it was asked for some of the expert reports, some documentation around that. So I recall, you know, really two substantive. One which I led and the other which Mike Loucks would have led and Mike would have led the call with the

Page 241

PRICE - CONFIDENTIAL

lenders, I would have led the call with, you know, Simpson and reps from the underwriters. So this is consistent with me being on a call with this group. I can't speak exactly to what these notes represent.

Q. In the middle of the page it says "M. Price" and then you'll see one, two, three and it lists "Aegis, Callaway, American Chemical Lab"?

A. "Clinical."

Q. "Clinical Lab," thank you. Does this refer to some of the pending civil litigations with competitors?

A. Yeah. This would have been part of the civil litigation docket at the time.

Q. Let's scroll down to the next page. In the 4 and 5, also reference, you might know better than I do, oral fluid, oval fluid?

A. Yeah, there's a company called -- I think it was called Oral -- I think the acronym was OFL. Oral Fluid Labs. They were a competitor in -- they were a competitor, yes.

Q. And 5 was Ameritox, which we've discussed. And then it says, "A record has

61 (Pages 238 - 241)

Page 242

PRICE - CONFIDENTIAL

been unblemished." Is this consistent with your recollection at the time that Millennium's record in the civil litigations was unblemished?

A. As of March 2014, I think that is accurate to my knowledge -- to my recollection.

Q. And what do you understand unblemished to mean?

A. We had reached successful outcomes in each of these cases, either with an affirmative award in claims that we brought, a rejection of claims that a competitor had brought, and in some cases we received compensation in cases where the competitor's claims were dismissed and we were awarded fees or sanctions.

Q. Turning to the page ending 0026. There's a heading in the middle of the page that says, "Open civil cases. No money paid. Any practices modified or changed as a result? No." And, again, is this consistent with your recollection that as of March 7th, 2014 no money had been paid in the civil litigations by Millennium?

Page 243

PRICE - CONFIDENTIAL

A. That's consistent with my recollection.

Q. Further down on the page it states, in response to a question that was posed, "You've not lost, no. We've invested in regulatory compliance with Hogan. Huge effort to ensure our sales and marketing practices were appropriate." Do you agree that at this time Millennium had invested in regulatory compliance with Hogan?

A. Yes.

Q. Do you agree that at the time Millennium had made a huge effort to ensure its sales and marketing practices were appropriate?

A. Yes.

Q. And then in the page ending 0032, Ms. Neuner writes, "The Government team not communicative." And on page 033 it states, "Timeline slow and uncertain." What do you understand "Government team not communicative" to mean?

MR. TRETTER: Objection to the form.

A. I mean, I don't know what Lynn was responding -- I can't speak to what Lynn was

Page 244

PRICE - CONFIDENTIAL

trying to convey with that word other than I could -- it's consistent with what I had testified I think with Lyndon that, you know, 2013 was relatively -- was quiet, 2014 a new team came on that was unfamiliar with the case and didn't provide any information as to what their theories of liability were or what evidence they were relying upon. We were delivering information to them to try to expedite their analysis and hopefully exit from the case. We were not getting a lot of feedback.

Q. So that is consistent with this next statement on the page. It says, "Government does not have a good sense of allegations to pursue." Do you see that?

A. Yes.

Q. Is that consistent with your recollection of the status of the DOJ investigation at the time?

A. Yeah. I mean, throughout the government's case was largely about parroting what they had seen and been heard from by competitors and what was going on in civil

Page 245

PRICE - CONFIDENTIAL

litigation.

Q. Let's go down to page 0034. And at the bottom of this page it says, "M. Price, CIAs, one in Callaway, one in Ameritox. Looking at those we feel good about cap compliance." What is a CIA?

A. In this context it's a corporate --

MR. TRETTER: I just want to interject. I don't know about "cap compliance." I'm just lodging an objection to perhaps the reading of the handwriting.

MS. CASSADY: "Corp. compliance"?

MR. TRETTER: Maybe. I find it to be illegible.

MS. CASSADY: Okay.

A. To answer your question, CIA in this context refers to a corporate integrity agreement. When Ameritox and Callaway or any -- for the most part when any healthcare provider enters into a settlement with DOJ they then enter into a corporate integrity agreement that's monitored by OIG for typically five years thereafter. And what I'm referring to

62 (Pages 242 - 245)

Page 246

PRICE - CONFIDENTIAL

here is there were settlements with Callaway in 2010 and I recall the Ameritox was maybe 2012. I could be getting that off by a little bit. And what we would typically do and what good healthcare programs do is look at those corporate integrity agreements and the requirements of those to guide the implementation of their own compliance program. And that's what, you know, one of the first things I did at Millennium was to look at the CIAs from competitor labs and make sure that the things the government was looking for those labs to do that we were also doing ourselves from a compliance standpoint.

Q.   And at the top of the next page it says, "Loucks, there have been strong efforts to build strong compliance program." Do you agree with this statement that Millennium had made strong efforts to build a strong compliance program?

A.   Yes.

Q.   And the notes also state, in the middle of the page, "Martin, Lew Morris says our policies are appropriate given our level of

Page 247

PRICE - CONFIDENTIAL

maturity. We are still developing." Lew Morris refers to the individual that we discussed earlier; is that correct?

A.   Yes.

Q.   And Mr. Morris had also advised Millennium that its policies were appropriate?

A.   Yes.

Q.   Do you recall what you meant here, "We are still developing"?

A.   You know, compliance isn't black and white. Compliance is evolving and fluid for an organization, and so we're constantly evaluating our policies and programs to ensure compliance. I suspect, you know, and that's a general statement around how we operate the company. We were also getting into pharmacogenetics genetics. We had a population health management company. So our compliance program was continuing to evolve and enhance.

Q.   Looking at the next page, which is 0036. At the top of the page it says, "Ron Weiser," which I believe should be Wisor, "looked at it years ago, said it was fine. Loucks: Last summer -- I thought it was fine.

Page 248

PRICE - CONFIDENTIAL

Lew Morris - last fall - it's fine.  Ron: Recently:  There's nothing here."  Do you understand "it" referring to Millennium's business practices?

MR. TRETTER:  Objection to the form.

A.   Can you scroll up to the bottom of the page before?  This seems like it's a reference to the cup agreement program specifically.

Q.   Is this list of statements consistent with your recollection of what Millennium had been advised by its outside counsel and independent experts regarding the POC cup program as of March 7th, 2014?

A.   Yes.

Q.   Look at the page that ends 0036.  So in the middle of the page it says, "Cory, from your other examples why shouldn't I conclude that if 20M is for egregious conduct then why aren't we less?"  Do you understand this to refer to Cory Rapkin?

MR. WERNER:  Object to the form.

A.   I don't think there was another Cory involved in the transaction, so that makes

Page 249

PRICE - CONFIDENTIAL

sense. I don't recall him specifically interposing questions during a diligence call, but he may well have.

Q.   The notes then reflect, "Mr. Loucks, you could conclude that" and "Loucks, there does not feel to me to be a material result." Do you recall Mr. Loucks making this statement?

A.   I do.

Q.   Did you agree with the statement at the time that there would not feel to be a material result?

A.   I think we all believed given the settlements that had been reached in of the Callaway and the Ameritox cases, which involved grossly more egregious conduct than had even been suggested in the civil lawsuits, we thought those represented, you know, kind of a high watermark for what any settlement might look like if there was a settlement.

Q.   And did Millennium rely on the advice of Mr. Loucks, its outside counsel, and his assessment that there did not feel to him to be a material result?

MR. TRETTER:  Objection to the form.

63 (Pages 246 - 249)

Page 250

PRICE - CONFIDENTIAL

A.   I'm not sure we were relying on Mike's advice on that topic.  You know, I think we believed -- it was not unique to Mike to have that view and was consistent with our own understanding.  Mike affirmed our understanding and as we had discussed with others on the topic.

Q.   So it was your independent understanding at the time that there did not feel to be a material result from the DOJ investigation?

A.   There did not and, you know, Mike and others corroborated that.

Q.   At the page ending 0037, Ms. Neuner writes, after what appears to be your name, M. Price, "They haven't told us what they're concerned about."  Do you recall that in March of 2014 the government still was not telling Millennium what it was concerned about with respect to Millennium's business practices?

A.   They had not told us what they were concerned about at this time.  That's my recollection, that's my understanding.

     (End of confidential portion.)

Page 251

PRICE

Q.   Do you recall a follow-up call with Lynn Neuner and others from March 14th of 2014?

A.   Right around -- I had other calls with Lynn and others subsequent to March.  Do you mean right in that immediate time frame?

Q.   Yes.

A.   Like I said, I recall a couple of calls with the Simpson Thacher and related team and I recall there being three of them, but there may have been more.

     MS. CASSADY:  Let's pull up our tab 63.  This is what has been marked as Defendants' Exhibit 10.

     (Whereupon Defendants' Exhibit 10 was marked for identification.)

Q.   And this is a March 14, 2014 e-mail chain from you to Ronald Wisor about JPM diligence, and you ask Mr. Wisor, "Are you available for this call?  I don't know what they intend to ask beyond what was covered earlier in the week but I'd rather not have Mike join on the call to provide an unsolicited dissertation on the mechanics of the USAO."  Were you referring to Michael Loucks here?

Page 252

PRICE

A.   Yes.

Q.   Do you have any recollection of why you preferred that Mr. Loucks not join this specific call?

A.   Not beyond what's in the e-mail here.  My recollection is we covered the topics of the DOJ investigation previously, but those are not specific recollections.

Q.   Did your statement have any bearing on the legal advice that Mr. Loucks was providing to Millennium regarding the DOJ investigation?

A.   No.

     MS. CASSADY:  I think we've been going about an hour again.  Why don't we take another ten-minute break, if that's okay.

     THE WITNESS:  Okay.

     THE VIDEOGRAPHER:  Off the record, 16:16.

     (Off the record.)

     THE VIDEOGRAPHER:  Back on the record.  It's 16:27.

Q.   Mr. Price, did you have any basis to

Page 253

PRICE

think in April 2014 that the DOJ investigation could potentially result in a settlement in the range of $250 million?

A.   No.

Q.   I'm going to turn now and ask you some questions about the post-closing period, and by that I'm referring to the post-April 2014 time period.  Did the DOJ continue to request meetings or documents from Millennium in the second half of 2014, to your knowledge?

A.   My general recollection is summer and fall of 2014 were focused on the Ameritox litigation.  At some point in 2014 the government subpoenaed or, I don't know, I can't recall if was subpoenas or CIDs, a couple of employees.  I remember them being mostly low level folks.

Q.   Do you recall when the Ameritox verdict came down specifically?

A.   Sometime in the summer of 2014 is my recollection.

     MS. CASSADY:  Let's pull up tab 79.  This will be Defendants' Exhibit 11.

64 (Pages 250 - 253)

Page 254

PRICE

(Whereupon Defendants' Exhibit 11 was marked for identification.)

Q. This is a June 17, 2014 e-mail chain between you, Tim Kennedy, Brock Hardaway and Howard Appel discussing the Ameritox verdict. Did this refresh your recollection, Mr. Price, that the Ameritox verdict came down in June of 2014?

A. I don't see anything here specifically referencing the date of verdict, but this seems to be the right time frame.

Q. Did the $14 million jury award in the Ameritox case surprise you?

MR. TRETTER: Objection to the form.

A. Yep. Yes.

Q. Was it higher than what you expected the damages to be?

MR. WERNER: Object to the form.

MS. CASSADY: Strike that.

Q. Why were you surprised by the Ameritox verdict?

A. I was expecting to succeed on our affirmative claims and to also prevail on the claims brought by Ameritox against the company.

Page 255

PRICE

Q. You write in this e-mail that "in the context of a $3.5 billion enterprise, it's merely a blip." Do you recall --

MR. TRETTER: Excuse me. Is there an end to the question?

MS. CASSADY: I was just letting Mr. Price read the e-mail.

Q. And when you're ready, Mr. Price, you wrote that "in the context of a $3.5 billion enterprise, it's merely a blip." Do you recall what you meant?

A. (Witness reviewing document). Not beyond what's in the e-mail here. It's a $14 million judgment. We're going to have to post a bond during the appeal that's going to be probably five percent of that number. I felt confident on our legal position with respect to the appeal which ultimately borne out in a vacate of the award. So, you know, consistent -- I think that's -- my recollection is consistent with what I put here, what I wrote here.

Q. Did you think that the Ameritox verdict would have any impact on Millennium's

Page 256

PRICE

ability to finance its outstanding debt?

A. No.

MS. CASSADY: Let's put up our tab 27. Let's put up what will be marked Defendants' Exhibit 12.

(Whereupon Defendants' Exhibit 12 was marked for identification.)

Q. Mr. Price, this is a complaint in U.S. ex rel. Mark McGuire vs. Millennium Laboratories, 12-CV-10132, filed in the United States District Court for the District of Massachusetts. Are you familiar with this lawsuit filed by Mark McGuire?

A. Generally speaking, I'm familiar with it.

Q. This was a qui tam lawsuit, correct?

A. Yeah. This was filed under seal apparently at the date that's noted on the stamp on the top. I don't recall, sitting here, exactly when I would have learned about it or seen it.

Q. Do you recall when you first learned about the existence of this lawsuit?

A. Sitting here today, I don't recall

Page 257

PRICE

that specifically when we got a copy -- oh, now that I think about it, it was some point in the spring of 2015 is my recollection. But I could be off on that. That's when I believe some of these sealed qui tams were provided to the company, but I'm sure the documentation history will spell out exactly when that happened.

MS. CASSADY: So let's pull up what's our tab 82. And this will be Defendants' Exhibit 13.

(Whereupon Defendants' Exhibit 13 was marked for identification.)

Q. This is a December 24, 2014 e-mail from you to Ron Wisor, Helen Trilling and Stephen Immelt. And in it you state, "At 5:30 pm last evening AUSA Henderson called Mike Loucks and advised that the government has decided to intervene and file suit against the government." Does this refresh your recollection that Millennium was notified on December 23rd of 2014 about the intervention?

A. I know we were notified about the intervention on the -- my recollection it was the 22nd of December of 2014. I don't recall

65 (Pages 254 - 257)

Page 258

PRICE

receiving -- if this relates to the prior line of questioning, I don't recall receiving a copy of any of the complaints and intervention at that time, but I may have. I recall those came later.

Q. So you were notified by Mr. Loucks of the government's decision to intervene in December of 2014, correct?

A. December 22nd in the evening, yes, I remember that vividly.

Q. And you write, "This was remarkable for several reasons, the least of which is that they have NEVER told us what claims they were considering to bring, gave us an opportunity to address these claims with senior DOJ/USAO management, or an attempt to resolve the case short of litigation." Does this reflect your feeling at the time that it was remarkable that the government had decided to intervene?

A. Yes.

Q. And why did you think it was remarkable?

A. I can't expand much beyond what's in the text or the e-mail here other than to say,

Page 259

PRICE

you know, I recall Mike calling me late in the evening on the 22nd. He had a couple of follow-up calls with Bunker that evening and the next day. And what he conveyed to me was that the judge on the case unexpectedly declined to the government's request for a further extension of the seal. The government had no choice but to make an intervention decision. At that point they hadn't identified any theories of liability, any claims, couldn't point to any specific item of evidence on which to rest a case, hadn't thought through, contemplated any damage theories, any amount of damages, and yet made a decision to intervene which would -- I knew would be disruptive to our business, and I was obviously shocked and frustrated by that development.

Q. You also write in the e-mail that "by the nature of the questioning of our employees we were beginning to believe an unfavorable intervention decision was inevitable." Do you recall when you first started to develop that belief?

A. Not what's beyond in the e-mail

Page 260

PRICE

here. I don't have any specific recollection beyond what I state here.

Q. Do you recall whether it was after April 2014?

A. It was certainly after April 2014. Based on reading this e-mail the timing of that would have been in late 2014 leading up to this intervention in December.

Q. In the last paragraph you write that you were glad you "would have an opportunity to expose the vast holes in the government's case." Do you see that?

A. I do.

Q. And what did you mean by that statement?

A. You know, an investigation is a one-sided process. You don't get any opportunity but, you know, to respond substantively. The government's theories, to the extent that they came up out at all, which were largely just extrapolations of what had come up in civil cases, I don't want to say they were meritless because that sounds pejorative, but there were gaping holes in

Page 261

PRICE

those cases. The least of which was on the cup program, this was allegedly this grand inducement to develop Millennium's business, yet when we terminated the cup program we saw no decline in referrals from those accounts that have them. As I start talking about it, more will come back to me, and I know that's not the purpose of your question, but there were a lot of areas that we were anxious to combat the government on, on the holes and weaknesses of their case, and the credibility of the witnesses and the evidence that they had apparently been relying upon.

Q. Were you still confident, at this time in December of 2014, that the government did not have strong claims against Millennium?

A. Hundred percent.

MS. CASSADY: Let's pull up our tab 83. This will be Defendants' Exhibit 14.

(Whereupon Defendants' Exhibit 14 was marked for identification.)

Q. This is a January 25, 2015 e-mail between Joe Savage, yourself, Michael Loucks and Abra Bron regarding "Settlement Discussions

66 (Pages 258 - 261)

Page 262

PRICE

with the Government." I'll give you a minute to review it.

A. Can you scroll up so I can see who is -- these are Joe's comments to Mike's e-mail. Okay. Can you scroll down a little bit? (Witness reviewing document). Okay, I have read this portion.

Q. I'm sorry, there's more. Do you want to just take a minute and scroll down a little more?

A. (Witness continuing to review document). Okay.

Q. It's a long one, take your time.

MR. TRETTER: There's no question pending, right?

MS. CASSADY: No.

A. Okay, I've read enough of it.

Q. Do you recall discussing potential settlement figures with your outside counsel after you learned that the government was going to intervene?

A. Yes.

Q. And in this e-mail conversation there's discussion of a potential settlement

Page 263

PRICE

offer of 3.7 million to 5 million; is that correct?

A. Yes, that's the discussion here.

Q. Does this reflect that in January of 2015 Millennium still thought that a settlement offer in the range of 3.7 million to 5 million was reasonable?

A. Well, the e-mail speaks for itself, but, you know, we were struggling to come up with any damage number outside of perhaps the sober home item. So the answer to your question is, you know, without this -- I thought based upon the guidance of Joe and Mike, our outside counsel at Goodwin and Skadden, that this was a reasonable effort to resolve this case completely in the range of, you know, a justifiable range of three and a half to $5 million.

Q. And $5 million was the high end of what you viewed as reasonable at the time to settle?

A. I thought that was a reasonable number to get it settled. That doesn't mean I believed it was a reasonable number that was

Page 264

PRICE

tied to an actual damage case. But I believe that was a reasonable number to settle it given all of the costs of the case and the impact, the unsealing and continued investigation it would have on the business.

MS. CASSADY: Put that one away and let's pull up our tab 84. This will be Defendants' Exhibit 15.

(Whereupon Defendants' Exhibit 15 was marked for identification.)

Q. This is a January 29, 2015 e-mail, again with Michael Loucks and Joseph Savage, and if you can scroll down to the end of the e-mail. I'm going to focus on this e-mail from Mr. Savage, which is on January 29, 2015 at 2:38 p.m. If you want to take a minute and review that.

A. (Witness reviewing document). Okay.

Q. In the first sentence here it says, "Mike and I met today with Abe George, Bunker Henderson and Rosenthal was on the phone." Do you understand this to reflect a meeting with individuals from the Department of Justice?

A. Yes.

Page 265

PRICE

Q. And in this e-mail Mr. Savage writes that "Millennium's 4 million offer was not in the same universe that they are in and that they expect this case is over 100 million or hundreds of millions." Was this the first time you had heard settlement figures in this range from the government?

A. I'm not sure I can characterize these assessment ranges, but this was the first I heard of any quantification of damages at all let alone in a range of that level.

Q. What was your reaction to these damages figures that the government was putting forth?

MR. TRETTER: Objection to the form.

A. They are without merit and utterly unprovable.

MS. CASSADY: Let's put that one away. This will be Defendants' Exhibit 16.

(Whereupon Defendants' Exhibit 16 was marked for identification.)

Q. This is a February 26, 2015 e-mail chain between you, Mr. Loucks, Joseph Savage,

67 (Pages 262 - 265)

Page 266

PRICE

regarding "Preliminary thoughts on a framework of what to say." Take a minute to review it. It's not a long one.

A. (Witness reviewing document). I don't know what you are planning to ask so I don't know if I should tell you to scroll up or down.

Q. This is the end of it, so why don't we scroll up.

A. Can I just read my e-mail here?

Q. Yes.

A. (Witness continuing to read document). Okay.

Q. Do you recall Millennium making a settlement offer of 63 million to the government?

A. Yes.

Q. Do you recall the government's reaction to that offer?

A. I mean, this was such a tortured back and forth, but, generally speaking, I recall they said something along the lines of, you know, we were at this point the negotiations had become very complexed and

Page 267

PRICE

interwoven with some administrative processes that were going on. Some of that's reflected in the e-mail here. And each of those is really its own narrative. But I recall them because we had a potentially impending -- well, I'm speculating now on the timing. I probably shouldn't do that. If you have a specific question, I'll try to answer that.

Q. Do you recall that Millennium continued to negotiate the settlement amount with the DOJ?

A. Yes.

Q. Do you recall approximately what the final settlement amount was?

A. Final settlement was $256 million.

MS. CASSADY: I think I'm nearing the end, so if we could take one more ten-minute break, I think we're close.

THE VIDEOGRAPHER: Off the record, 16:58.

(Off the record.)

THE VIDEOGRAPHER: We are back on the record, 17:13.

Q. Mr. Price, do you recall that in

Page 268

PRICE

2015 CMS threatened to revoke Millennium's license?

A. Yes.

Q. And did you believe the threat of revocation was justified?

A. No.

Q. Did the threat of revocation have any impact on the ongoing settlement negotiations with the government?

A. Ultimately that drove the settlement almost entirely.

Q. And by drove the settlement entirely, what do you mean?

A. I mean with a CMS revocation we would have been out of business. There was -- there would have been no settlement to pay and it took any rational discussion around an appropriate settlement number off the table.

MS. CASSADY: This will be Defendants' Exhibit 17.

(Whereupon Defendants' Exhibit 17 was marked for identification.)

Q. Mr. Price, this is a June 22nd, 2015 e-mail chain. I'm going to focus you to the

Page 269

PRICE

end of the chain, beginning 1852.

A. (Witness reviewing document). Okay.

Q. Mr. Price, are these your notes?

A. Yes, that's an e-mail I wrote.

Q. Do they reflect your recollection at the time?

A. They certainly accurately represent my thoughts and feelings at the time.

Q. You can put that one away.

Mr. Price, did you ever intend to defraud Millennium's creditors?

A. No.

MR. TRETTER: Objection to the form.

Q. Do you believe that anyone else at Millennium ever intended to defraud Millennium's creditors?

MR. TRETTER: Same objection.

A. To my knowledge, no.

Q. Mr. Price, for the record, prior to this morning have you or I ever spoken?

A. No.

MS. CASSADY: That concludes my questions for today and I thank you very much for your time.

68 (Pages 266 - 269)

Page 270

PRICE

MR. TRETTER: I don't know what you want to do, Paul, with the witness. I'm happy to start a direct examination or redirect in the nature of recross with the time that we have left. I'm also happy to say, well, we don't have enough time -- we probably don't have time to finish that and I haven't my direct examination.

MS. CASSADY: Lyndon, at least for defendants, we view your questioning having been concluded. We let you go over the time that was allotted of your seven hours, and we don't think it's appropriate for you to do a redirect of the witness.

MR. TRETTER: Okay. Well, that's fine. That will just -- I guess if you object to the continuation of the deposition, that's another thing. But I think the judge will find that is wrong. But we'll let the witness and his counsel guide us in this regard.

MR. WERNER: Well, look, if you had five minutes of redirect and that was going to conclude all of your

Page 271

PRICE

depositioning of Martin, I would be fine with it. But based on what you've said, you have hours more deposing to do that you intend to seek relief from the court to obtain, and if that's the case, then I think we should conclude. And I also hear and was going to raise the objection from defense counsel that, as I understand it, you've used all of and more than the time that you're actually allotted today.

So I think we are done for today unless a few minutes of further questioning would resolve the objections around an additional day or whatever it is you're going to be seeking of depositioning.

MR. TRETTER: Well, what I would propose is that we at least do the seven hours since the witness is here.

MR. WERNER: The defense team is objecting to that because you can't just borrow from their time, as I understand it, so I don't think that's going to work.

MR. TRETTER: I don't think they are

Page 272

PRICE

properly describing what the protocol is. It just says that the defense is entitled to equal time. It doesn't mean that I'm cut off from questioning in the nature of recross or redirect.

MR. WERNER: That's not our fight. You can have it out with them on that.

MR. TRETTER: So the question is for you whether you're willing to have the witness sit for another 45 minutes to accomplish as much as we can accomplish.

MR. WERNER: No, because it's on the premise that you have hours more of depositioning to do, which we object to. If you were going to conclude today and we'd be done, I would be okay with it. But you're not going to conclude today, so we don't see the need.

MR. TRETTER: I might be able to conclude my redirect examination in 45 minutes.

MR. WERNER: And I think the objection is still on the table that you don't have any time to use for redirect.

Page 273

PRICE

MR. TRETTER: Okay. Well, I think that they're wrong and I'll just say that I think this is unfortunate and we'll probably all be back together again very soon.

MR. WERNER: Perhaps, perhaps not.

MR. TRETTER: Okay. So I just want it to be clear that I was prepared to go forward with the nature of redirect and recross within the seven hours.

All right. With that I can't force the witness to -- are you directing the witness not to answer, Paul?

MR. WERNER: I don't think it's a matter of directing him not to answer. It's a matter of you've got multiple objections around what time you actually have left. So, no, if you're going to ask for more time, go ask for more time and we can deal with it then.

MR. TRETTER: I'm just asking right now are you directing the witness not to answer anything further?

MR. WERNER: I'm not, but I believe

69 (Pages 270 - 273)

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - -x

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                          Debtors.

MARC S. KIRSCHNER solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                          Plaintiff,

        -against-

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                          Defendants.

Case No. 15-12284 (LSS)

- - - - - - - - - - - - - - - - - - - -x

                    June 7, 2021

                    1:31 p.m.

            CONTINUED VIDEO-RECORDED

DEPOSITION of MARTIN PRICE, taken

pursuant to Notice, held virtually via

Zoom, before Sharon Pearce, RMR, CRR,

CRC, NYRCR, a Registered Merit Reporter,

Certified Realtime Reporter, and Notary

Public of the State of New York.

Page 407

PRICE

Q. What was your intent with those slides?

A. This was a national sales meeting. There was a lot of -- there was a lot of litigations rolling in our space. It had some lawsuits with former employees who had left and taken customers and trade secrets and accounts and were making statements in the -- you know, to customers about the company, so we were in litigation. It was impacting many of our sales reps' books of business.

So my intent was to, you know, demonstrate to them that they had a fighter, and they had an ally in the legal department and that we were going to as aggressively pursue litigation against these folks. As they were coming out, as our reps are going out, they're trying to win business.

There was, you now, no intent -- there were hundreds of people in this room. There was no intent to do anything more nefarious than to try to rile up the

Page 408

PRICE

troops and say, you know, home office is working hard. You guys continue to work hard. That was the intent.

Q. Thank you.

I'd like to turn back to what plaintiff introduced as Exhibit 103, which I believe is Tab 32 in your binder. And these are notes from Lynn Neuner dated May 14, 2014.

Can I ask you to turn to the second page with the Bates number ending in 002.

A. Okay.

Q. Okay. At the top of the page, underlined, it says "Florida trial." And then down towards the bottom of the page, it looks like there's a judge's name.

Do you recognize that name?

A. I don't. I can't -- A, I can't read the writing. But sitting here today, I'm not sure I can -- I couldn't tell you who our trial judge was.

Q. Okay. Would it refresh your memory if I told you the trial judge was

Page 409

PRICE

Susan Bucklew?

A. Oh, Susan Bucklew. Right. That sounds right.

Q. And I see you -- the notes hear say "Good judge." And then the notes continue, "Bad if she said it's illegal. $200 million verdict."

Do you remember discussing the Ameritox trial on this call?

A. Well, I mean, as I recall, the trial hadn't occurred yet. So, you know, we're responding to, at this stage, the Ameritox damage expert reports and talking about a number of -- you know, at that point, we're -- they're teeing up the fact that this trial is on calendar, on docket for June of 2014.

Q. Okay. Did the reports conclude that there could potentially be a $200 million verdict against Millennium?

A. I don't recall, sitting here today, what their expert reports said. But in terms of their damage expert reports, I'm sure their damage experts put

Page 410

PRICE

a big number on it. I mean, we also had claims against them, as you may recall, that had damage expert reports that had big numbers on them.

Q. If you could remember, back to what you might have thought at the time of this call, how likely did you think it would be that there would be an outcome from the trial where Millennium paid $200 million?

A. Zero.

Q. And could you tell me what that's based on?

A. You know, I mean, I was pretty involved in the discovery and the motions practice. You know, I looked at our expert witnesses relative to theirs. We had had a -- at that point, a very strong track record of litigation.

You know, I recall Ameritox filed this case on the eve of trial in a prior Federal District court case in Maryland. Right on the eve of trial, trying to leverage settlement posture,

34 (Pages 407 - 410)

Page 411

PRICE

they filed three cases -- a patent case, this case, and then a different case in Maryland. And, you know, that's not to say we didn't give them a lot of weight. We did. Skadden Arps spent millions of dollars defending it.

But, you know, at the end of it, this is just a competitor that had been beaten in the marketplace, and we didn't find -- we had experts like Lew Morris and others attesting to the appropriateness of our programs, our policies. We felt really good about, you know, going into trial. We had claims against them.

So, you know, I felt -- I felt very strongly with our lineup of experts and witnesses, claims we had made going into that trial. I was not expecting adverse judgment. Obviously, you know, as was demonstrated here, through a very confused and self-contra -- inherently contradicting jury verdict. Anytime you get a jury, you don't know what you're

Page 412

PRICE

going to get. We appealed it.

Q. Are you aware of anyone at Millennium at the time who disagreed with your view or your assessment of whether or not there might be a $200 million verdict come out of the Ameritox trial?

A. I'm not aware of anyone at Millennium that thought there was a risk of a $200 million verdict against the company at that time, not at all.

Q. And are you aware of anyone at Skadden or any of Millennium's other outside counsel that had a different view than what you just described?

A. No.

Q. Okay. I would like to introduce --

MR. ENGEBRETSON: Mark, before we move on to another document, I just want to clarify for the record that the document you're referring to is Plaintiff's Tab 32 that was marked as Plaintiff's Exhibit 104, not 103.

MR. POPOVSKY: I apologize. And

Page 413

PRICE

thank you for that helpful correction.

BY MR. POPOVSKY:

Q. And I would like to introduce a document which I believe is going to be Defendant's Exhibit 18.

MR. POPOVSKY: Oli, can you put that up. And if you could introduce it, Oli, and then I'm going to ask for a screen share while we're talking.

(Defendant's Exhibit 18, An email dated April 8, 2014, Bates JPMC-00030808, with attached memorandum, was hereby marked for identification, as of this date.)

Q. This is going to be the memorandum that Mr. Tretter introduced earlier. You may have heard me object that it was being introduced without a cover email. This is a complete version of that document with the cover email and then the same memorandum following it.

MR. POPOVSKY: And Oli, if you can just let me know when that's up.

MR. ENGEBRETSON: Yes.

Page 414

PRICE

Introducing it shortly. It's been introduced, and I will now share my screen.

MR. POPOVSKY: Thanks. If you could share the cover page.

BY MR. POPOVSKY:

Q. This is the one page that won't already be in your binder, Mr. Price.

A. I'm sorry. What tab in the binder was it?

Q. No, no. This cover page wasn't introduced. That's why I'm reintroducing the exhibit.

A. I understand. But where is the rest of the document?

Q. I believe that is Tab 31.

A. Okay. Thank you.

MR. ENGEBRETSON: I need to be given screen-sharing rights. It's currently disabled. Apologies.

THE CONCIERGE: Giving you that permission now.

MR. ENGEBRETSON: Thank you.

THE CONCIERGE: That's been

Page 415

PRICE

enabled.

MR. POPOVSKY:  Excellent.

Thanks, Oli.

BY MR. POPOVSKY:

Q.  So you'll see this is an email from Stathis Karanikolaidis.

Do you remember who that is?

A.  I do remember Stathis.

Q.  And what was his role?

A.  There were a number of folks at JPM.  He was, as I recall -- well, I recall he and had Corey had sort of spearheaded -- sort of -- as two of the lead folks in the transaction.

Q.  Okay.  So he was one of the JPMorgan employees involved with the --

A.  Yes.  JPMorgan was involved. Yes.

Q.  Excellent.  Thank you.

And if you look at the header, you'll see you weren't on this email, and I don't expect you would have ever seen it before.

Do you -- and you see it's being

Page 416

PRICE

sent from Mr. Karanikolaidis with some other JPMorgan employees copied to an email address mmcinerny@metlife.com.

Do you know who that is?

A.  No, I don't.  It doesn't ring a bell.

Q.  Sure.  Do you recall if MetLife was a potential lender in the 2014 term loan?

A.  I don't.

Q.  Okay. All right.  And then if you scroll down, as I explained before, the rest of the document you've already seen.  It's a memorandum entitled "Overview of Pending Litigation Involving Millennium Laboratories."

Did you know that JPMorgan might share this memorandum or any document concerning Millennium's legal or regulatory risk with potential lenders?

MR. TRETTER:  Objection to form. Lack of foundation.

A.  Yeah.  I don't -- I don't know. I can't -- I don't know one way or the

Page 417

PRICE

other.  I mean, this document is marked privileged and confidential and attorney-client communication.  I can't recall -- I don't know who it was to and from, but --

Q.  Okay.

A.  So I would expect that attorney-client communications would not be shared, but the substance of this, we were -- you know, we were -- there was -- I don't recall anything -- well, I'll leave it at that.

Q.  Did you ever personally have any conversations with potential lenders about Millennium's litigation or regulatory risk?

A.  I don't think so.  I recall the group sessions that were organized by JPM. I don't recall offhand any other one-offs or any one-offs.  Yeah.  I don't recall, sitting here today, any other one-offs.

Q.  Okay.  You mentioned some calls that JPMorgan organized.

Did you ever present or speak on

Page 418

PRICE

those calls?

A.  With respect to the litigation topics and, in particular, the one that we invited Mike Loucks and Ron Wisor to join, I don't recall whether or not I spoke on that or not.  It's entirely possible I did in some fashion.  But at least on the topic of USAO investigation, I would have deferred to those guys.

Q.  Okay.  And then I'm going to -- you should take whatever time you need to look at the document, but I'm going to ask you a question starting on the second paragraph of the page ending 0809, which is the first page.

All right.  And there's -- tell me when you're ready.

A.  You want me to read the full paragraph that --

Q.  Yeah.  You don't have to read it aloud, but I'm going to ask you a question about that.

A.  Yeah.  I'm on page 1.  To the top of page 2?

36 (Pages 415 - 418)

Page 419

PRICE

Q. No. I apologize.

I'm talking about the paragraph that starts "Timeframe for Investigation."

A. Oh, I'm sorry.

(Witness perusing document.)

I see that.

Q. Thanks. And the second-to-last sentence says, "Millennium believes the new lawyers" -- and this would be at the U.S. Attorney's Office -- "are trying to figure out if there was a case to pursue, which Millennium finds encouraging."

Do you remember your view at the time -- and again, this is March 17, 2014, -- about what the status of the U.S. Attorney's Office investigation was?

A. I mean, I feel like I've answered this several times in different ways. But, you know, at that time, the civil and criminal side had turned over. There was a sense that this was -- you know, my own personal opinion was that this was Susan Winkler's case. It had

Page 420

PRICE

been diminished or discounted when it came out that most of the witnesses in the grand jury had been paid for by Ameritox.

And the investigation had slowed quite a bit. It was pretty dormant. Susan came out to our lab, as I recall, in the prior fall. Productive, cordial meeting. Schumacher came in. The civil team had not seen any of the documentation at all.

They certainly did not appear to me at that time to have come in with a -- you know, an agenda. They were trying to get smart on what this case is about. It's been lingering for a while. So we viewed that as a positive. And we had been obviously pretty engaged in the case in our presentations and wanted to get them up to speed and see if we couldn't get this matter resolved.

Q. Very good.

Are you aware of --

MR. TRETTER: Let me just get a belated objection to the extent that

Page 421

PRICE

he's talking about mental impressions or actually the hearsay statements of others.

Q. Are you aware of anyone else at Millennium who had a different view at this time from what you just described?

A. No.

Q. And are you aware of anyone at Skadden or any of Millennium's other outside counsel that had a different view of the investigation at this time, March 17, 2014?

A. I'm not aware of any, no. I mean, you know, we looked at some of Mike's emails, and those speak for -- you know, that's the record that it is. But in terms of having a different view, my view at the time was informed by what my -- I was learning from my outside counsel, Mike, and Skadden and folks who knew these processes and prosecutors far better than I would.

Q. I'm going to draw your attention to the next page of the memorandum. And

Page 422

PRICE

this actually is the paragraph you were suggesting looking at before.

You might want to read the whole paragraph. I only have questions about one sentence in here. But take a minute to look at it.

A. This is the witness intimidation file?

Q. Exactly. Exactly.

A. Okay.

Q. Okay. You'll see a sentence in here that says, "We also asked about the allegations that Millennium destroyed documents."

Do you remember any allegations that Millennium destroyed documents?

A. I don't recall in the context at all of the government investigation. There's probably -- there's not an allegation that Ameritox did make at some point in our ten years and multiple lawsuits, so it could have been raised there. I don't recall -- I don't recall specifically in the context of the

37 (Pages 419 - 422)

Page 423

PRICE

government investigation that ever coming up, but that's sitting here today.

Q.   Understood.

And then the next sentence says, "Martin explained that Millennium did not destroy any documents and that, in fact, Millennium has provided unredacted copies of a voluminous amount of documents to the government."

Is that statement accurate?

A.   Yes.

Q.   Okay.  And then I want to ask you some questions about the next paragraph, starting "Potential exposure."

If you could take a look at that.  Let me know when you're ready.

A.   (Witness perusing document.)

I see that.

Q.   Okay.  And there's a sentence maybe about six lines up from the bottom.  I believe Mr. Tretter asked you about it before.  "The Government determines monetary payments through financial analysis of damage rather than meting out

Page 424

PRICE

'rough justice' by comparing the current case to the past cases."

Do you see that?

A.   I do.

Q.   And does that accurately reflect your understanding of how the government was most likely to assess damages in connection with any enforcement or regulatory action?

A.   That's generally how -- that's my general recollection of what my outside counsel told me through our, you know, experts in this area.

Q.   All right.  And then the sentence immediately before that starts -- reads or -- in part, "He does" -- and it's talking about Mr. Loucks -- "He does not believe there will be a 'material result' in terms of the company's finances."

And this would be arising out of the Department of Justice investigation.

Do you see that?

A.   I do.

Q.   Okay.  In -- do you know how he

Page 425

PRICE

arrived at the $20 million number?

A.   I'm not sure Mike -- well, I'm not sure Mike arrived at that number.  I think -- my recollection is Mike was contextual -- Mike was using these other two cases as, you know, context for lab enforcement actions in the tox space, and that $20 million number was for, you know, a large company and far more egregious contact.  My recollection is Mike sort of agreed with a statement like that as opposed to offering any number.

Q.   Okay.  Do you see -- do you believe there's any inconsistency between this paragraph, which first talks about potentially comparable settlements as a measure of damages, and then it includes the sentence I asked you about before, it determines monetary payments through a financial analysis of damages?

MR. TRETTER:  Objection to the form.

A.   No.  I mean, I don't -- well, I don't, but I don't -- you know, I don't

Page 426

PRICE

think Mike's point -- I shouldn't speak for Mike.  I never presented, when I talked about it, Calloway or Ameritox, as saying, look at how they got to a damage number here.  Look at how they got to a damage number here, and, you know, therefore, that should set the ceiling for -- or anything that's determinative of what happens here.

It was just -- it was context that the more egregious cases where we knew they had dead to rights evidence of handing out cash for referrals.  That's an egregious False Claims Act case.  And there had been no sign of anything like that here.  So that sort of, like -- it's contextual for where -- you know, what we -- how we viewed the current investigation, which was meandering at best in early 2014.

Q.   Okay.  Thank you.

Did Millennium ever set a litigation reserve in connection with the government investigation?

38 (Pages 423 - 426)

Page 427

PRICE

A.   I don't believe so.  No.  I don't recall.  But I don't believe so.

Q.   Would you -- would you expect to have been involved in any discussions about litigation reserves?

A.   Yes.

Q.   Okay.  And do you know if there was a litigation reserve for the Ameritox litigation?

A.   I don't believe there was, no.

Q.   Okay.  Do you remember any discussions about whether or not there should be a reserve?

A.   For which case?

Q.   For the government investigation.

A.   I mean, that comes up a lot, you know, many times this litigation.  I don't have a specific recollection of that conversation with respect to the government investigation or Ameritox.  But it would have been part of the -- it would have been a conversation that we had with the company with each litigation.

Page 428

PRICE

Q.   And who -- other than you, who would have been involved in those conversations?

A.   It would have been myself, outside counsel, potentially Brian Fowler, who was responsible for litigation at the company, and probably whomever was in the CFO's seat at that time.

Q.   And do you remember ever providing Millennium's management with any advice about whether or not there should be a litigation reserve for the government investigation?

A.   I don't have a specific recollection around that.  Like I said, my -- you know, I can only -- I can only speak to what my general practice would have been, which would have been to provide an update to the senior executive team and the CFO when litigation came in or when there was a -- you know, a pivot point in a litigation that would have changed how I thought about a reserve and we would have brought outside counsel into

Page 429

PRICE

the discussion and taken whatever with respect to either I recommended or they recommended.

Q.   Do you remember any specific litigations at all, not necessarily connected with what we're discussing today, where Millennium did have a litigation reserve?

A.   I don't recall specifically prior to 2014 a reserve in any case.  Again, you know, I sort of go back to while we took each case on its own merits, we also just dealt with a -- you know, a slew of cases against the company, none of which resulted in Millennium having to pay any damages; favorable outcomes in each of them.

And so, you know, in hindsight, it's easy to say that.  It's easy to be second guessed.  But in the moment, you know, I didn't think that Ameritox case -- I thought we would win money.  And frankly, I still shake my head at the jury verdict.  But, you know, we missed on that

Page 430

PRICE

one.  You know, sometimes that happens.  But that was the first time.  You know, we had folks sue us who ended up having to pay us money again.  That was the track record.  We felt really strong about our case and the integrity of our business practices.

Q.   Okay.  I'm going to now direct your attention to -- sorry.  I'm hearing a bit of an echo.  But if anyone can't hear me well, please let me know.

I'm going to direct your attention to what plaintiffs introduced as Exhibit 102, and that should be Tab 33 in your binder produced by Millennium with Bates number ending 5455.

Do you see it?

A.   Sorry.  I'm dealing with some background noise here, which might be some of the feedback you're getting.

I'm on Tab 32.  Yes.

Q.   Sorry.  Tab 33.

A.   Oh, I'm sorry.

Q.   Which is Plaintiff's Exhibit

39 (Pages 427 - 430)

# EXHIBIT 28

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| AMERITOX, LTD., | ) |
| | ) |
| Plaintiff/Counter-defendant, | ) Case No.: 8-11-cv-00775-SCB-TBM |
| | ) |
| v. | ) |
| | ) |
| MILLENNIUM LABORATORIES, INC., | ) |
| | ) |
| Defendant/Counter-claimant. | ) |
| | ) |

**DECLARATION OF JANE PINE WOOD, ESQ.**

I, Jane Pine Wood, Esq., pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I have personal knowledge of the matters set forth below and can testify competently as follows:

2.      I am a member of the McDonald Hopkins law firm, and a member of the bars of Massachusetts, Ohio and Tennessee.  I graduated from the Vanderbilt University School of Law in 1987.

3.      I specialize in advising companies and individuals involved in the practice of medicine and/or business of health care.  My practice includes representation of several hundred clinical and anatomic laboratories and physicians, as well as many imaging centers, home health agencies, mental health providers, clinics, hospitals, other healthcare providers, and professional societies in corporate, regulatory, reimbursement, contractual and other matters.

4.      A list of my publications is attached as Exhibit A.

{4652061:}

Confidential                                                                                      ML_DE_00306539

5.      In providing this declaration, it is not my intention to disclose the substance of any privileged communications that I have had with Howard Appel of Millennium Laboratories. In 2009-10, Mr. Appel consulted with me regularly about matters relating to Millennium's business of providing quantitative urine drug testing.

6.      In June 2009, Mr. Appel consulted with me on the topic of whether Millennium could supply point of care ("POC") test cups (with embedded immunoassay test strips) at no charge to doctors who did not want to bill for any POC testing using such cups and were willing to sign an agreement to that effect. I reviewed and approved the form of cup agreement that to my understanding Millennium began using later that year. An example of the form of agreement is attached as Exhibit B.

7.      Separately in 2009, Mr. Appel consulted with me on the general topic of whether clinical laboratories competing with Millennium could arrange for specimen collectors to assist doctors and their staffs in collecting samples from patients for shipment to a laboratory. In a letter dated October 29, 2009, following up on telephonic conversations that I had with Mr. Appel, I advised him that New York barred the placement of specimen collectors in a doctor's office. A copy of this letter is attached as Exhibit C.

8.      In the letter, I also wrote that another part of the same New York regulation "prohibits the provision of specimen collection cups that have test strips on the side, unless the physicians pay for the collection cups." In providing this information, my best recollection is that I was not opining that Millennium's separate cup agreement program -- which I had recently approved -- was impermissible in New York. Rather, I was addressing the practice of some competitors to provide free POC test cups to doctors in the absence of an agreement such as

{4652061:}

Confidential                                                                          ML_DE_00306540

Millennium used.  (In that regard, Millennium's cup agreement program was consistent with the practices of other laboratories I was advising at the time.)

I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 15, 2014 in the Commonwealth of Massachusetts.

_____
Jane Pine Wood, Esq.

{4652061:}

Confidential

ML_DE_00306541

# EXHIBIT 29

| | |
|---|---|
| **From:** | Wood, Jane <jwood@mcdonaldhopkins.com> |
| **Sent:** | Saturday, October 31, 2009 10:31 AM |
| **To:** | howard@milleniumlaboratories.com |
| **Cc:** | elizabeth@milleniumlaboratories.com; kim@milleniumlaboratories.com |
| **Subject:** | Re: Cup Supplies agreement (no billing) - Jane's opinion |

At the end of the sentence explaining that you could provide cups at fmv for hos own testing, I suggest adding: "pursuant to a separate written agreement".

Otherwise, this looks fine.

Jane

IRS CIRCULAR 230 DISCLOSURE:

To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this communication (including any attachments), was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (1) avoiding any penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any transaction matter addressed herein.

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY ME BY TELEPHONE AND PERMANENTLY DELETE THE ORIGINAL AND ANY COPY OF THIS E-MAIL AND DESTROY ANY PRINTOUT THEREOF.

---

**From:** Howard Appel <howard@milleniumlaboratories.com>
**To:** Wood, Jane
**Cc:** 'Elizabeth Peacock' <elizabeth@milleniumlaboratories.com>; kim@milleniumlaboratories.com <kim@milleniumlaboratories.com>
**Sent:** Fri Oct 30 18:10:09 2009
**Subject:** Cup Supplies agreement

Jane, can you please review the attached.  We wish to use an agreement such as this going forward, thanks and have a great weekend.

**Howard Appel**
Chief Financial Officer

16981 Via Tazon Ste F
San Diego, Ca 92127
Phone: 858-451-3535
Fax: 858-451-3636



1

Confidential                                                                    ML_DE_00672437

# EXHIBIT 30

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                                ) Chapter 11
                                      )
MILLENNIUM LAB HOLDINGS II,           )
LLC, et al.,                          ) Case No. 15-12284(LSS)
                                      )
            Debtors.                  )
                                      )
                                      )
MARC S. KIRSCHNER solely in           )
his capacity as TRUSTEE OF THE        )
MILLENNIUM CORPORATE CLAIM            )
TRUST,                                )
                                      )
            Plaintiff,                ) Adv. Pro. No. 17-51840
                                      )
vs.                                   )
                                      )
J.P. MORGAN CHASE BANK, N.A.          )
CITIBANK N.A., BMO HARRIS BANK,       )
N.A., and SUNTRUST BANK,              )
                                      )
            Defendants.               )
                                      )

REMOTE VIDEOTAPED DEPOSITION OF HOWARD APPEL

WEDNESDAY, OCTOBER 13, 2021

VOLUME II

Reported Remotely and Stenographically by:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Page 193

identification.)

MR. ENGEBRETSON: Mark, I believe this one will be 46.

MR. POPOVSKY: Oh, I apologize. This will be Defendants Exhibit 46.

MR. ENGEBRETSON: And it should now be available.

MR. POPOVSKY: Thank you.

BY MR. POPOVSKY:

Q. This document is a series of emails. I'm going to ask you to turn to several pages in, the page -- the production numbers ends 4336. It is only one page in. I apologize.

A. Okay.

Q. Okay. And if you look at the bottom there, you will see a February 23, 2010 email from you to Miss Wood, and there is a copy to someone named Pam -- I undoubtedly am going to butcher the last name Wojtonek.

Do you know who Miss Wojtonek, or however that name is pronounced, was?

A. I do not.

Q. And if you look, the Subject of the email says, "POC cup agreement." And then I'll just quote from -- let me find it in the email. Starting

Page 194

around right around the middle line you say:

"Can we provide the doc with the POC CUP at no cost as long as he or she is not billing for the specimen with the use of the cup."

Do you remember sending this email?

A. No, I do not.

Q. In looking at it today, can you explain what you meant by that question?

A. Let's see. Hold on. Let me read it again.

I believe what I was saying there was asking the question about provided the doctor who was using point-of-care cup, as long as they do not bill, that we can provide -- that the company would provide the cup to the doctor.

Q. Okay. And then if you look towards the top of the page, you will see her response on the same day. And I'll read it.

"If the client has an analyzer, why would the work go to Millennium for confirmation? I am concerned that the payer could consider this to be double-billing. Perhaps there is a good clinical reason that I'm missing."

Page 195

Okay. End quote. Looking at this today, do you understand what she meant?

MR. PREIS: Calls for speculation.

You can respond.

THE WITNESS: I have a vague recollection.

BY MR. POPOVSKY:

Q. Tell me what that is.

A. I think what we were trying to determine is to make sure that if the doctor also analyzed their own point-of-care test, that we shouldn't be doing it. It would be double billing. That's the basis of that question.

Q. Okay. And then if you jump back to the first page of this document, the page that has production number ending 4335, you respond to her question that same day, February 23rd. This is the bottom email on that page.

If you need to, take a minute to read your response and then if, sitting here today, you can explain what you meant.

A. Okay. I've read it.

Q. And again, sitting here today, do you -- can you explain what you meant in your response?

A. Specific to this email, I cannot. But I think the issue was trying to still determine what

Page 196

the company could do with respect to physicians who did some point of point-of-care testing, how we should respond to it.

Q. All right. And then if you scroll up to the top email which, again, is the last in time in this chain, and it's on that same day, February 23rd, you say:

"Agree totally, the POC device is simply an immediate diagnostic tool. Can you take a look at our current POC agreement and suggest comments."

And sitting here today, did you understand this to mean that you were asking her to look at the point-of-care test cup agreement as it existed at that time and provide legal advice or any comments on it that she wanted to?

A. As I look at it today, from a long time ago, I believe that's what I was asking. But it also shows the bigger issue is that we were always seeking advice from outside counsel on how to make -- you know, to make decisions.

Q. Okay. And now I'm going to ask you to turn a little further into the series. And I honestly don't know why the emails were printed out this way. This is just how we received the document.

8 (Pages 193 - 196)

Page 197

But if you turn to the page ending 4343.

A. Okay. I have it.

Q. Okay. And if you look at the bottom of the page, you see that same email I just asked you about, the one you sent to her 5:46 p.m., February 23rd. You say:

"Can you take a look at our current POC agreement and suggest comments."

And then she responds above, apparently the next day, on February 24th:

"Dear Howard, I just added one sentence to emphasize that the physician won't be billing."

Sitting here today and looking at that, do you understand her to mean that with her suggested edit, the agreement would be lawful?

MR. TRETTER: Objection.

MR. PREIS: Objection.

You can respond.

THE WITNESS: Yes, that would be my interpretation today.

BY MR. POPOVSKY:

Q. Okay. Do you know who Helen Trilling is?

A. Yes.

Q. And who is she?

Page 198

A. She was an attorney at Hogan Lovells, I believe.

Q. Okay. And do you know what type of work she did for Millennium?

A. I don't recall all the work, but I'm sure it was around the regulatory aspects. I believe she was a healthcare specialist.

Q. And do you know who Ron Wisor is?

A. Yes.

Q. Okay. And what type of work did he do for Millennium?

MR. PREIS: Objection. Calls for speculation.

You can respond.

THE WITNESS: Again, I don't recall all the specifics, but I imagine it was probably the same type of work --

BY MR. POPOVSKY:

Q. Okay.

A. -- as Helen Trilling.

Q. Okay. And I think I may have skipped a question.

Was he also an attorney for Hogan Lovells?

A. Yes.

Q. Was Hogan Lovells -- and, again, I'm talking

Page 199

about the time period where you were serving as president of Millennium -- was Hogan Lovells Millennium's primary source for legal advice concerning regulatory compliance and legal compliance?

MR. PREIS: Objection. Vague.

THE WITNESS: I believe so, along with our general counsel.

BY MR. POPOVSKY:

Q. And did you have an opinion about Hogan Lovells' reputation concerning compliance with federal healthcare laws?

MR. TRETTER: Objection. Vague.

MR. PREIS: Objection.

THE WITNESS: I don't know if I had an opinion. I was told, I believe, by Martin Price that they're one of the best healthcare specialist attorneys out there.

BY MR. POPOVSKY:

Q. And did anything in your experience with them suggest otherwise?

MR. PREIS: Same objection.

THE WITNESS: No.

BY MR. POPOVSKY:

Q. Who from Millennium normally would have

Page 200

communicated directly with Miss Trilling or Mr. Wisor?

MR. PREIS: Calls for speculation.

You can respond.

MR. TRETTER: What period of time?

MR. POPOVSKY: Again, when Mr. Appel was serving as president.

MR. PREIS: That's a long period of time.

MR. POPOVSKY: So if the answer is more than one person or it changed over time, and the witness knows, the witness can tell me that.

THE WITNESS: I mean, I know that I communicated with the firm a lot. Their outside counsel did, and there could have been others within the company that also talked to them directly.

BY MR. POPOVSKY:

Q. Okay. Did you understand them to have -- strike that.

I want to show a document that has previously been introduced as Defendants Exhibit 4, and this is going to be tab 15 in your binder.

Ollie, you can let me know when it's available in the shared folder for others to see.

MR. ENGEBRETSON: It should be available now.

# EXHIBIT 31



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

October 6, 2010

Howard Appel
President
Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA  92127

**Re:   Furnishing Point-of-Care Testing Cups to Physicians**

Dear Mr. Appel:

This is in response to your request that we summarize the legal compliance issues associated with furnishing point-of-care testing cups to physicians.  In particular, Millennium Laboratories furnishes free test cups to physicians for use in collecting and shipping urine specimens to Millennium for drug testing, but requires physicians receiving free cups to certify that they do not bill patients or third party payers for the preliminary screening test that the cups provide at the point-of-care.  Millennium charges fair market value for the same cups when furnished to physicians who want to bill for the preliminary screen.  You asked us to address the legal compliance rationale for this approach to the furnishing of point-of-care testing cups.

The key legal provision here is the "Stark" physician self-referral law, which prohibits physicians, subject to certain exceptions, from referring Medicare patients to a clinical laboratory with which they have a financial relationship.  Specifically excluded from the Stark law, however, is the furnishing by a laboratory of "items, devices, or supplies…that are used solely to collect, transport, process, or store specimens" for testing by the laboratory.  In other words, when such items are used for lab-related purposes only, they have no independent economic value to the physician and, thus, do not create a financial relationship between the physician and the laboratory for purposes of the Stark law.  Rather, such items essentially are considered part of the services furnished by the laboratory.  Likewise, where lab-related supplies are furnished under circumstances that do not confer any financial benefit on the physician, they also do not implicate the federal anti-kickback statute, which is a separate criminal prohibition on the provision of remuneration – meaning anything of value – that is intended to induce the referral of federal health care program business.

Thus, with regard to point-of-care testing cups, the question is whether they are being furnished under circumstances that benefit physicians financially.  Since the cups themselves are CLIA-waived testing devices that produce a preliminary result, in many cases physicians may be able to bill patients or third party payers for an initial qualitative drug screen from their use of the cups.

Confidential

Howard Appel                                   - 2 -                                   October 6, 2010

To the extent physicians do bill and receive reimbursement for point-of-care testing using the cups, that clearly is a financial benefit to the physicians, who otherwise would have to purchase the cups from a vendor.  Accordingly, an independent clinical laboratory that furnishes free testing cups to physicians without an agreement from the physicians not to bill for such testing likely would be considered in violation of both the Stark law and the anti-kickback statute.  To avoid this serious legal risk – and the potential for substantial fines, penalties and even criminal prosecution – we believe it is essential that laboratories charge fair market value when furnishing testing cups to physicians who may bill for the point-of-care testing performed before the specimen is sent to the laboratory for additional testing.

By contrast, where physicians have agreed not to bill for the point-of-care testing, then the furnishing of free test cups for use in collecting and transporting specimens to the laboratory would not provide any financial benefit to the physicians.  We understand that the physicians in this case still get the benefit of the preliminary test result, but that information advances patient care and does not involve a *financial* benefit to the physician that implicates either the Stark law or the anti-kickback statute. Instead, we believe the preliminary result in that situation is properly viewed as part of the testing services furnished by the lab.

I trust this provides the summary guidance you were seeking.  If we can provide any additional assistance on this matter, please do not hesitate to contact me.

Sincerely yours,

Ronald L. Wisor Jr.

Partner
ron.wisor@hoganlovells.com
D 202.637.5658

                                                                      ML_DE_00132989

# EXHIBIT 32



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

January 24, 2011

Howard Appel
President
Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA  92127

**Re:   Velocity Medical Services Test Cup Offer**

Dear Mr. Appel:

This is in response to your request for our analysis, under the federal health care fraud and abuse laws, of offers from Velocity Medical Services to sell physicians point-of-care drug test cups at prices substantially below fair market value.  As we explain below, we believe the proposed arrangement presents serious legal compliance risks not only for Velocity and its laboratory business partner, but also for any physicians who purchase cups and order laboratory testing through the arrangement. While this letter focuses on Velocity's offer to sell test cups to physicians for $1, the analysis below would apply to any arrangement where the sale of test cups at less than fair market value is tied to referrals to a particular urine drug testing laboratory.

We understand that Velocity's business involves assisting physicians in establishing and managing ancillary services and risk management programs within their practices, including patient screening for drugs of abuse.  According to its public website, Velocity also has established "partnerships" with other health care providers to assist in the delivery of these services.  One of those partnerships apparently is a co-marketing arrangement with SECON Laboratories, a urine drug testing laboratory located in Worcester, Massachusetts.

You explained that Velocity has approached two of your physician practice customers in Ohio with an offer to sell the practices an 11-panel drug test cup for $1 per cup.  These cups would be used by the practices to perform point-of-care drug screens in their offices, which the practices would bill to patients and to third party payers at a profit.  Velocity's $1 per cup offer is substantially below the market price for 11-panel drug test cups – which you indicate is in the range of $5 to $8 per cup – and almost certainly below Velocity's acquisition cost for the cups.  Importantly, Velocity's offer is conditioned on the use of SECON Laboratories for any confirmatory or quantitative testing in follow-up to the point-of-care screens performed by the practice with the purchased test cups.  Thus, SECON likely is underwriting the cost of the cups, either directly or indirectly through the financial terms of its co-marketing agreement with Velocity.

Confidential

Howard Appel                                  - 2 -                              January 24, 2011

The fraud and abuse compliance problem with Velocity's offer is that the physicians will be billing and receiving payment for point-of-care screens they perform with test cups acquired at less than fair market value.  Notably, where physicians do not bill for point-of-care testing, the federal fraud and abuse laws permit urine drug testing labs to furnish test cups and other lab supplies to physicians *without charge* because those items are being used solely in connection with the laboratory's services and do not provide any independent financial value to the physicians.  Where physicians use test cups to perform their own billable services, however, there is a financial benefit to the physicians in being able to acquire those items at less than their market value, and so the health care fraud and abuse laws clearly are implicated.

More specifically, the "Stark" physician self-referral law (42 U.S.C. § 1395nn) prohibits physicians, subject to certain exceptions, from referring Medicare patients to a clinical laboratory with which they have any kind of direct *or indirect* financial relationship.  Under the law's terms, this prohibition extends to in-kind compensation arrangements, such as the provision of items or services for less than fair market value.  In this context, fair market value is defined in the attached regulation to mean the "general market price" at which "bona fide sales have been consummated for assets of like type, quality and quantity in a particular market…, where the price…has not been determined in any manner that takes into account the volume or value of anticipated referrals."  In other words, if 11-panel drug test cups cannot be purchased in the marketplace for $1, but Velocity is willing to offer that nominal price on the condition that testing be referred to a particular laboratory, then by definition that price is not fair market value.  Thus, given the apparent co-marketing relationship between SECON and Velocity and the use of the test cups to perform billable point-of-care testing, the provision of cups for less than fair market value likely would be considered a form of indirect compensation to the physicians and a prohibited financial relationship under the Stark law.

Similarly, the federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)) prohibits the provision of any "remuneration" – meaning anything of value – that is intended to induce the referral of federal health care program business.  It is well-established that the provision of items or services for less than fair market value is a form of remuneration that implicates the anti-kickback statute, which is a criminal provision.  Indeed, according to the Office of Inspector General of the U.S. Department of Health & Human Services, "[w]henever a laboratory offers or gives to a source of referrals anything of value not paid for at fair market value, the inference may be made that the thing of value is offered to induce the referral of business" in violation of the anti-kickback statute.[*]

Because of the Stark and anti-kickback law restrictions, Millennium requires physician practices to pay fair market value for test cups used for billable point-of-care testing.  However, you indicated that Velocity reportedly has told your physician customers in Ohio that they are able to offer test cups at less than fair market value because they are acting as a "medical supply company," rather than as a clinical laboratory.  This, of course, does not exempt their offer from the fraud and abuse laws, especially given that it is conditioned on referrals to a laboratory with which Velocity apparently has some kind of co-marketing relationship.  As noted above, the Stark law applies to both direct *and indirect* financial relationships involving clinical laboratories.  At the same time, the anti-kickback statute is not limited to health care providers, but instead applies to any individual or entity that offers

---

[*] *See* OIG Special Fraud Alert, "Arrangements for the Provision of Clinical Lab Services" (October 1994), available at http://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

or pays remuneration to induce federal health care program business, either for itself or for a business partner. Simply put, the fraud and abuse laws cannot be avoided by acting through third parties. Rather, the fact that Velocity requires physicians purchasing $1 test cups to use SECON highlights the unlawful nature of its offer.

For the benefit of your customers who are considering Velocity's offer, they should understand that it could have serious legal consequences for them personally. In particular, the anti-kickback statute ascribes criminal liability to parties on both sides of an impermissible "kickback" transaction. Moreover, a violation of the anti-kickback statute also is punishable through civil penalties and is grounds for mandatory exclusion from Medicare and other federal health care programs. In addition, anti-kickback and Stark law violations may be pursued under the federal False Claims Act (31 U.S.C. §§ 3729-3733), which provides for treble damages and civil penalties of up to $11,000 per violation for submitting, or causing the submission of, false or fraudulent claims to the federal government. The False Claims Act notably includes whistleblower provisions that authorize private citizens to initiate cases on the government's behalf and entitle them to a share of the government's recovery. Thus, in addition to the potential for direct enforcement by government officials, arrangements that violate the anti-kickback statute or the Stark law place all of the parties involved at risk for a whistleblower action. Accordingly, physicians would be wise to consult qualified legal counsel on Velocity's offer.

Finally, although this letter addresses application of the federal fraud and abuse laws to Velocity's offer, we also note that Ohio has state anti-kickback and physician self-referral laws (Ohio Rev. Code §§ 3999.22 and 4731.66, copies attached) that are modeled on the federal provisions and that also appear to prohibit the sale of testing cups at less than fair market value in connection with referrals to a clinical laboratory. It should be noted, however, that unlike the federal fraud and abuse laws, these Ohio provisions are applicable to all payers, not just federal health care program patient referrals.

I trust this provides the legal analysis you were seeking. If we can provide any additional assistance on this matter, please do not hesitate to contact me.

Sincerely yours,

Ronald L. Wisor Jr.

Partner
ron.wisor@hoganlovells.com
D 202.637.5658

Attachments

Code of Federal Regulations
  Title 42. Public Health
    Chapter IV. Centers for Medicare & Medicaid Services, Department of Health and Human Services
      Subchapter B. Medicare Program
        ⌐▣ Part 411. Exclusions from Medicare and Limitations on Medicare Payment
          ⌐▣ Subpart J. Financial Relationships Between Physicians and Entities Furnishing Designated Health Services

### ➡ § 411.351 Definitions.

As used in this subpart, unless the context indicates otherwise:

\* \* \*

*Fair market value* means the value in arm's-length transactions, consistent with the general market value. "General market value" means the price that an asset would bring as the result of bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party, or the compensation that would be included in a service agreement as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party, on the date of acquisition of the asset or at the time of the service agreement. Usually, the fair market price is the price at which bona fide sales have been consummated for assets of like type, quality, and quantity in a particular market at the time of acquisition, or the compensation that has been included in bona fide service agreements with comparable terms at the time of the agreement, where the price or compensation has not been determined in any manner that takes into account the volume or value of anticipated or actual referrals. With respect to rentals and leases described in § 411.357(a), (b), and (l) (as to equipment leases only), "fair market value" means the value of rental property for general commercial purposes (not taking into account its intended use). In the case of a lease of space, this value may not be adjusted to reflect the additional value the prospective lessee or lessor would attribute to the proximity or convenience to the lessor when the lessor is a potential source of patient referrals to the lessee. For purposes of this definition, a rental payment does not take into account intended use if it takes into account costs incurred by the lessor in developing or upgrading the property or maintaining the property or its improvements.

ML_DE_00239525

Baldwin's Ohio Revised Code Annotated
  Title XXXIX. Insurance
    Chapter 3999. Crimes Relating to Insurance
      False Health Insurance Claims
        ➡ **3999.22 Kickbacks, bribes, and rebates prohibited**

(A) As used in this section:

(1) "Claim" means any attempt to cause a health care insurer to make payment of a health care benefit.

(2) "Health care benefit" means the right under a contract or a certificate or policy of insurance to have a payment made by a health care insurer for a specified health care service.

(3) "Health care insurer" means any person that is authorized to do the business of sickness and accident insurance, any health insuring corporation, and any legal entity that is self-insured and provides health care benefits to its employees or members.

(B) No person shall knowingly solicit, offer, pay, or receive any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual for the furnishing of health care services or goods for which whole or partial reimbursement is or may be made by a health care insurer, except as authorized by the health care or health insurance contract, policy, or plan. This division does not apply to any of the following:

(1) Deductibles, copayments, or similar amounts owed by the person covered by the health care or health insurance contract, policy, or plan;

(2) Discounts or similar reductions in prices;

(3) Any amount paid within a bona fide legal entity, or within legal entities under common ownership or control, including any amount paid to an employee in a bona fide employment relationship;

(4) Any amount paid as part of a bona fide lease, management, or other business contract.

(C) Nothing in this section shall be construed to apply to any of the following:

(1) A provider who provides goods or services requested by an individual that are not covered by the individual's health care or health insurance contract, policy, or plan;

(2) A provider who, in good faith, provides goods or services ordered by another health care provider;

(3) A provider who, in good faith, resubmits a claim previously submitted that has not been paid or denied within thirty days of the original submission, if the provider notifies the payor or returns any duplicate payment within sixty days after receipt of the duplicate payment;

(4) A provider who, in good faith, makes a diagnosis that differs from the interpretation of a diagnosis reached by a health care insurer in the payment of claims.

(D) Whoever violates this section is guilty of a felony of the fifth degree on a first offense and a felony of the fourth degree on each subsequent offense.

Confidential

Baldwin's Ohio Revised Code Annotated
  Title XLVII. Occupations--Professions
    ▧ Chapter 4731. Physicians; Limited Practitioners
      ▧ Prohibited Referrals
        ➡ **4731.66 Prohibited referrals**

(A) Except as provided in sections 4731.67 and 4731.68 of the Revised Code, no holder of a certificate under this chapter to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery shall refer a patient to a person for a designated health service if the certificate holder, or a member of the certificate holder's immediate family, has either of the following financial relationships with the person:

(1) An ownership or investment interest in the person whether through debt, equity, or other means;

(2) Any compensation arrangement involving any remuneration, directly or indirectly, overtly or covertly, in cash or in kind.

(B) No person to which a certificate holder has referred a patient in violation of division (A) of this section shall bill the patient, any third-party payer, any governmental health care program, or any other person or governmental entity for the designated health service rendered pursuant to the referral.

(C) No person shall knowingly enter into an arrangement or scheme, including a cross-referral arrangement, that has a principal purpose of assuring referrals by a certificate holder to a particular person that, if the certificate holder directly made referrals to such person, would violate division (A) of this section.

ML_DE_00239527

# EXHIBIT 33
# (Filed Under Seal)

# EXHIBIT 34

Highly Confidential Pursuant to Protective Order

# Ameritox, Ltd. v. Millennium Laboratories, Inc., 8:11-cv-00775-SCB-TBM

## REBUTTAL REPORT OF LEWIS MORRIS

Lewis Morris, Esq.
Dated: December 6, 2013

Confidential

I, Lewis Morris, Esquire, am over the age of eighteen, and the opinions, statements, and conclusions expressed in this report are based on my personal knowledge, experience, and the review of the discovery materials described and cited therein. If called to testify, I could testify on the matters set forth in this report.

1.      I submitted an expert report in this matter on October 25, 2013. This report supplements my prior report, which I incorporate by reference. While I do not repeat here my qualifications, I have provided in Exhibits A-D of my October 25, 2013 expert report my qualifications, publications, list of testimony since 2009 and documents I have considered in forming my opinions. I reserve the right to supplement or modify my opinions as information becomes available to me, in particular because I understand that discovery in this matter is ongoing and does not close until (at least) several weeks after the issuance of this report.

2.      I have reviewed the Expert Report of Thomas J. Crane (the "Crane Report"), submitted by Ameritox on October 25, 2013. I understand that Mr. Crane renders six opinions on various aspects of Millennium's current or historical business practices. In this report, I address each of Mr. Crane's opinions, as well as other aspects of his report. This report is not necessarily exhaustive, however, and I should not be deemed to agree with anything Mr. Crane has written simply because I have not addressed it here.

**Crane Opinion 1:**     ***"Millennium's Provision Of Free POC Test Cups To Referring Physicians Is Incompatible With The Fundamental Principles Of The Federal Fraud And Abuse Laws And Subject To Prosecution Under Such Laws."***

3.      Mr. Crane's first opinion is that Millennium's provision of POC test cups to referring physicians pursuant to an agreement is incompatible with the fundamental principles of the federal fraud and abuse laws and is subject to prosecution under those laws. I do not agree. In my opinion, Millennium's provision of POCT cups exhibits the hallmarks of a program

ML_DE_00145399

consistent with the federal fraud and abuse laws, including the federal Anti-Kickback Statute ("AKS") and the Stark Law.

4.      Mr. Crane contends that Millennium provided POC cups "under several scenarios: (1) free POC test cup agreements; (2) 'split cup' arrangements, which included free POC test cups; and (3) analyzer-related deals.  Each scenario had essentially the same conditions: (1) that the physician agreed not to bill Medicare and other third party payers for the preliminary qualitative drug screen test performed with the POC test cup; and (2) that the physician referred his/her confirmatory quantitative testing to Millennium."[1]

> **(a)      The Provision Of POCT Cups Pursuant To An Agreement Is Compatible With The Stark Law Because The Cups Do Not Constitute Remuneration**

5.      The Stark Law generally prohibits a physician, subject to certain exceptions, from referring Medicare patients for the provision of certain designated health services to entities with which they have a financial relationship.  For purposes of the Stark law, "financial relationships" include "compensation arrangements."  A compensation arrangement is defined by regulation as "any arrangement involving remuneration between a physician (or an immediate family member of such physician) and an entity" covered by the Stark Law, such as clinical laboratories.

6.      Specifically excepted from the Stark Law definition of remuneration, however, is the furnishing by a laboratory of "items, devices, or supplies . . . that are used solely to collect, transport, process, or store specimens" for the laboratory providing the supplies.  Also excepted are "items, devices, or supplies" used "to order or communicate the results of tests or procedures for the entity."  Thus, if an item, device, or supply is provided to a physician for any one of these laboratory functions, its provision is not considered remuneration under the Stark Law.

---

[1]      Crane Report ¶ 40.

Confidential                                                                                        ML_DE_00145400

7.      The cups at issue contain chemical indicators that give within approximately five minutes a color response in the event of the presence of certain chemicals in the patient's urine. The cup generates "a color response of chemical indicators" that communicates to the physician the result of this preliminary qualitative test.[2]  Thus, after urine is collected in the cup, the doctor can process the urine to obtain a preliminary qualitative result by placing the cup on its side.

8.      The cup can be purchased for $7.00 or less (depending on the type of cup, the number of test strips and the volume purchased)[3] and can only be used once.  The test cup provided to health care providers makes clear that the cup has a limited use.  Specifically, the manufacturer's package insert and directions for the cup state that the result from the cup is only preliminary and that a secondary analytic testing method must be used "to obtain a confirmed result."[4]  The cup communicates information to Millennium that is important to that quantitative confirmation testing:  depending on the confirmation requested by the health care provider (and the forms used), the cup can dictate certain terms of the order.  For example, if a health care provider orders confirmation of preliminary positive screening results, that order cannot be fulfilled without the cup itself (which indicates which results are positive).

9.      Thus, the cups at issue here (1) are used to collect, transport, and store urine for confirmatory tests by Millennium; (2) process the urine to produce preliminary results as a step to getting final confirmatory results from Millennium; and (3) communicate those preliminary results as an additional step to getting final confirmatory results from Millennium.  The only meaningful difference between the cups at issue here and a "Dixie" cup is that with the former,

---

[2]      MLATOX-FL-0013330.

[3]      MLATOX-FL-0086101.

[4]      MLATOX-FL-0013331.

3

that same document (which I understand to be Kelly Nelson's notes from the meeting) later states that growth solutions include "1) Offering new tests 2) **Review current test protocol and increasing medically necessary confirmations** 3) Have office send Quest/LabCorp unprofitable specimens and keep profitable ones 4) Managed Care activity 5) collect missing information 6) reduce/eliminate self pay specimens[.]"[135] This contradicts Mr. Crane's assertion that Millennium was encouraging medically unnecessary testing.

99.    Additionally, the OIG Compliance Program Guidance For Clinical Laboratories reminds laboratories that sound compliance practice is to encourage only medically necessary tests and to design the requisition forms to require affirmative certification that ordered tests are medically necessary.[136] The Program Guidance also states that laboratories that offer custom profiles should provide an annual notice to their physician-customers concerning the medical necessity of ordered tests.[137] Millennium has adopted that Program Guidance and issues an annual notice, and ensures its requisition forms are consistent with that guidance.[138] In particular, through its test order forms (discussed in my opening report) and periodic notices, Millennium provides physicians with a full choice to order the individual tests that they believe are medically necessary and highlights the need for physicians to make deliberate ordering decisions for each patient.

100.    Mr. Crane cites to the "Lab Scam" prosecutions to support the proposition that "labs are at risk of significant scrutiny if they routinely encourage any kind of testing -- here,

---

[135]    MLATOX-FL-0121483 (emphasis added).

[136]    63 Fed. Reg. 45078 at 45079-80.

[137]    Id.

[138]    MLATOX-FL-0002968; MLATOX-FL-0086696; MLATOX-FL-0001334.

44

    ML_DE_00145442

quantitative confirmatory testing -- without regard to clinical considerations and professional judgment related to individual patient needs."[139]  However, the Lab Scam prosecutions, in which I was personally involved as part of the investigative team, concerned affirmative misrepresentations by laboratories to health care providers -- hence the "scam" term in the moniker.  I do not view this case as similar to the Lab Scam.

**Crane Opinion 6:**     *"Millennium's Efforts Regarding Its Past Illegal Business Practices Of Routinely Waiving Copayment Amounts Were Insufficient."*

101.    Mr. Crane's final opinion concerns Millennium's purported past business practice of routinely waiving copayment amounts.  Mr. Crane asserts that Millennium's "remedial efforts" regarding this purported practice were "insufficient."[140]

102.    In 1994, the OIG issued a "Special Fraud Alert" on the issue of routine waivers of copayments and deductibles by charge-based providers, practitioners or supplies.[141]  OIG typically issues guidance, such as a Special Fraud Alerts, when it intends to put the healthcare industry on notice of its views of a particular practice that it deems to be widespread or pervasive.  Based on my experience as a member of the OIG, I believe that OIG issued a Fraud Alert about the routine waiver of copayments, because that practice was widespread and pervasive.

103.    Numerous clinical laboratories were engaging in what appeared to be the routine waiver of copayments during the relevant time period.  A July 13, 2009 letter by Attorney Jane Pine Wood, which is appended to Millennium's 2010 billing manual, states that the practice is

---

[139]    Crane Report ¶ 131.

[140]    Id. ¶ 151.

[141]    OIG Special Fraud Alert, *Arrangements for the Provision of Clinical Lab Services*, 59 Fed. Reg. 63572 (Dec. 19, 1994).

45

                                                    ML_DE_00145443

# EXHIBIT 35

**MILLENNIUM LABORATORIES**

**Millennium Laboratories**
16981 Via Tazon, San Diego, CA 92127
Phone: 877.451.3534  Fax: 858.451.3636
Lab Director: Amadeo Pesce, PhD, DABCC
CLIA ID# 05D10 78705; License # DRH 98; File ID# 45785

A 012345
A 012345
A 012345
SPECIMEN ID NUMBER

## 6-PANEL POC TEST REQUISITION

### PRACTICE INFORMATION

REQUESTING PHYSICIAN

DIAGNOSIS CODE(S)

### PATIENT INFORMATION

LAST NAME     FIRST NAME

IF WORKER'S COMP:

SSN     DATE OF BIRTH     DATE OF INJURY:

M ☐  F ☐

GENDER     HEIGHT     WEIGHT

CIRCLE PAIN SCORE: 0 1 2 3 4 5 6 7 8 9 10

**IMPORTANT: PLEASE ATTACH A COPY OF PATIENT FACE SHEET AND INSURANCE CARD**

### SPECIMEN INFORMATION

DATE COLLECTED

TIME COLLECTED

Temperature read within 4 minutes and is in range of 32.5 - 37.7°C (90.5 - 99.8°F)

☐ YES  ☐ NO

If NO: Actual Temp_____

AA 012345

## A  SELECT YOUR TESTING OPTION (1)

☐ USE Custom Profile; perform additional tests, if ordered below     ☐ DO NOT use Custom Profile; perform tests only as ordered below

## B  RECORD POINT-OF-CARE RESULTS & ORDER TESTS

NOTE: If Point-of-Care result is NOT marked it will default to a NEGATIVE result.

| | RECORD POC TEST RESULTS | | CONFIRM/QUANTIFY POC RESULT (2) |
| --- | --- | --- | --- |
| | POS (+) | NEG (–) | |
| COCAINE | ☐ | ☐ | ☐ |
| OPIATES (3) | ☐ | ☐ | ☐ |
| AMPHETAMINES (4) | ☐ | ☐ | ☐ |
| METHAMPHETAMINE (4) | ☐ | ☐ | ☐ |
| BENZODIAZEPINES (5) | ☐ | ☐ | ☐ |
| OXYCODONE (6) | ☐ | ☐ | ☐ |

## C  ORDER TESTS NOT ON POC DEVICE

Select from either C-1 or C-2

| Drug Name | C-1 ORDER SINGLE QUANTITATIVE TEST (7) | C-2 ORDER IMMUNOASSAY TEST (8) | CONFIRM/QUANTIFY POSITIVE RESULT (2) (9) |
| --- | --- | --- | --- |
| ACETAMINOPHEN | — | ☐ | — |
| ALCOHOL (10) | ☐ | — | — |
| BARBITURATES (11) | ☐ | ☐ | ☐ |
| BUPRENORPHINE | ☐ | ☐ | ☐ |
| CARISOPRODOL | ☐ | ☐ | ☐ |
| CATHINONES (Bath salts) | ☐ | — | — |
| DULOXETINE (Cymbalta®) | ☐ | — | — |
| ETHYL GLUCURONIDE | ☐ | ☐ | ☐ |
| FENTANYL | ☐ | ☐ | ☐ |
| FLUOXETINE | ☐ | — | — |
| GABAPENTIN | ☐ | — | — |
| HEROIN | ☐ | ☐ | ☐ |
| KETAMINE | ☐ | — | — |
| MDMA (4) | ☐ | ☐ | ☐ |
| MEPERIDINE | ☐ | — | — |
| METHADONE | ☐ | ☐ | ☐ |
| METHYLPHENIDATE | ☐ | ☐ | ☐ |
| NALTREXONE | ☐ | ☐ | ☐ |
| NICOTINE METABOLITE | — | ☐ | — |
| PAROXETINE | ☐ | — | — |
| PHENCYCLIDINE | ☐ | ☐ | ☐ |
| PREGABALIN (Lyrica®) | ☐ | — | — |
| PROPOXYPHENE | ☐ | ☐ | ☐ |
| SYNTHETIC CANNABINOIDS (Spice) | ☐ | — | — |
| TAPENTADOL | ☐ | — | — |
| THC | ☐ | ☐ | ☐ |
| TRAMADOL | ☐ | ☐ | ☐ |
| TRICYCLIC ANTIDEPRESSANTS (12) | ☐ | ☐ | ☐ |
| VENLAFAXINE (Effexor®) | ☐ | ☐ | ☐ |
| ZOLPIDEM (Ambien®) | ☐ | ☐ | ☐ |

## D  ORDER SPECIMEN VALIDITY TESTING

☐ PERFORM Specimen Validity Testing
Includes creatinine (CPT 82570), pH (CPT 83986), specific gravity (CPT 81003) and nitrite (CPT 84311), each billed separately.

☐ DO NOT PERFORM Specimen Validity Testing

## E  PATIENT'S PRESCRIBED MEDICATIONS

Indicating a medication in this section DOES NOT constitute a test request.

| | | | |
| --- | --- | --- | --- |
| ☐ ACTIQ | ☐ FENTANYL | ☐ MORPHINE | ☐ RESTORIL |
| ☐ ADDERALL | ☐ FENTORA | ☐ MS CONTIN | ☐ RITALIN |
| ☐ ALPRAZOLAM | ☐ FIORICET | ☐ MSIR | ☐ ROXICET |
| ☐ AMBIEN | ☐ FIORINAL | ☐ NALOXONE | ☐ ROXICODONE |
| ☐ AMITRIPTYLINE | ☐ FLEXERIL | ☐ NALTREXONE | ☐ SERAX |
| ☐ ATIVAN | ☐ FLUOXETINE | ☐ NEURONTIN | ☐ SOMA |
| ☐ AVINZA | ☐ GABAPENTIN | ☐ NORCO | ☐ SUBOXONE |
| ☐ BUTRANS | ☐ HYDROCODONE | ☐ NORTRIPTYLINE | ☐ SUBUTEX |
| ☐ CHLORDIAZEPOXIDE | ☐ HYDROCODONE/APAP | ☐ NUCYNTA | ☐ TAPENTADOL |
| ☐ CLONAZEPAM | ☐ HYDROMORPHONE | ☐ OPANA | ☐ TEMAZEPAM |
| ☐ CYCLOBENZAPRINE | ☐ KADIAN | ☐ OXECTA | ☐ TRAMADOL |
| ☐ CYMBALTA | ☐ KETAMINE | ☐ OXYCODONE | ☐ TYLOX |
| ☐ DEMEROL | ☐ KLONOPIN | ☐ OXYCONTIN | ☐ ULTRAM |
| ☐ DIAZEPAM | ☐ LORAZEPAM | ☐ OXY IR | ☐ VALIUM |
| ☐ DILAUDID | ☐ LORCET | ☐ PAROXETINE | ☐ VENLAFAXINE |
| ☐ DURAGESIC | ☐ LORTAB | ☐ PAXIL | ☐ VICODIN |
| ☐ EFFEXOR | ☐ LYRICA | ☐ PERCOCET | ☐ VICOPROFEN |
| ☐ ELAVIL | ☐ MEPERIDINE | ☐ PREGABALIN | ☐ XANAX |
| ☐ EMBEDA | ☐ METHADONE | ☐ PRISTIQ | ☐ ZOLPIDEM |
| ☐ ENDOCET | ☐ METHYLPHENIDATE | ☐ PROZAC | |

OTHER(S) _____

### SPECIAL INSTRUCTIONS

### PATIENT AUTHORIZATION

I certify that I have voluntarily provided a fresh and unadulterated urine specimen for analytical testing. The information provided on this form and on the label affixed to the specimen cup is accurate. I authorize Millennium Laboratories to release the results of this testing to the treating physician or facility. I hereby authorize my insurance benefits to be paid directly to Millennium Laboratories for services I received. I acknowledge that Millennium Laboratories may be an out-of-network provider with my insurer. I am also aware that in some circumstances my insurer will send the payment directly to me. I agree to endorse the insurance check and forward it to Millennium Laboratories within 30 days of receipt. Failure to do so may result in my account being forwarded to Collections and reported to a Credit Bureau. I understand that Millennium Laboratories may use my specimen and any testing performed on that specimen, for research, development and potential publication purposes, so long as the information has been properly de-identified pursuant to law.

Patient Signature:                               Date:

### PHYSICIAN SIGNATURE

Physician Signature:                               Date:

NOTE: YOU MUST COMPLETE ALL YELLOW HIGHLIGHTED SECTIONS

SEE REVERSE SIDE FOR NOTES.

Millennium Laboratories logo is a trademark or registered trademark of Millennium Laboratories Inc or its subsidiaries in the United States and other countries. All other trademarks used herein are the property of their respective owners.
MLI-MKT28204-BCBS-LA
© 2011 Millennium Laboratories, Inc. 10/2011
ORIGINAL - MILLENNIUM LABORATORIES COPY     CANARY - MILLENNIUM LABORATORIES COPY     PINK - PHYSICIAN COPY     GOLDENROD - PATIENT COPY

## 6-PANEL POC TEST REQUISITION

### NOTES

**(1)** If no box is marked, Millennium will test in accordance with your Custom Profile and additional tests as ordered below.

**(2)** Quantify qualitative results at lower limits with drug specificity. Each separate drug tested is billed with relevant quantitative CPT test code. Note that quantitative testing should be ordered ONLY if the physician deems it necessary to have information that qualitative testing alone will not provide.

**(3)** Quantitative test includes Codeine, Morphine, Hydrocodone and Hydromorphone; billed as a single unit with CPT 83925.

**(4)** Billed as a single unit with CPT code 82145.

**(5)** Quantitative test includes Alprazolam, Clonazepam, Lorazepam, Nordiazepam, Temazepam and Oxazepam; billed as single unit with CPT 80154.

**(6)** Quantitative test includes Oxymorphone.

**(7)** This option offers a single quantification test by LC-MS/MS for each of the drugs indicated. There is no second confirmatory test. Each separate drug is billed with the relevant quantitative CPT test code, and provides results quantified at lower limits with drug specificity. Note that quantitative testing should be ordered ONLY if the physician deems it necessary to have information that qualitative testing alone will not provide.

**(8)** Each separate drug and/or drug class tested is billed with CPT 80101 or for Medicare as a group with G0431. Note that qualitative tests alone have high cutoffs and do not identify individual drugs and metabolites.

**(9)** If quantify positive is selected, this will be billed as a single quantification test only. Initial EIA test will not be billed.

**(10)** This is available as a semi-quantitative enzyme assay test only and is billed with CPT code 82055.

**(11)** Quantitative test includes Phenobarbital (CPT 80184), Secobarbital (CPT 82205), and Butalbital (CPT 82205); each billed separately. Please note in the 'Special Instructions' section those individual tests you do not want performed.

**(12)** Quantitative test includes Amitriptyline (CPT 80152), Cyclobenzaprine (CPT 80299), Desipramine (CPT 80160), Imipramine (CPT 80174), and Nortriptyline (CPT 80182); each billed separately by CPT Code. Please note in the 'Special Instructions' section those individual tests you do not want performed.



Millennium Laboratories logo is a trademark or registered trademark of Millennium Laboratories Inc or its subsidiaries in the United States and other countries. All other trademarks used herein are the property of their respective owners.
MLI-MKT28204-BCBS-LA

© 2011 Millennium Laboratories, Inc. 10/2011

# EXHIBIT 36

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

In re:                       ) Chapter 11

)

MILLENNIUM LAB HOLDINGS II,     )

LLC, et al.,              ) Case No. 15-12284(LSS)

)

         Debtors.         )

)

)

MARC S. KIRSCHNER solely in     )

his capacity as TRUSTEE OF THE    )

MILLENNIUM CORPORATE CLAIM      )

TRUST,                    )

)

         Plaintiff,      ) Adv. Pro. No. 17-51840

)

vs.                     )

)

J.P. MORGAN CHASE BANK, N.A.,    )

CITIBANK N.A., BMO HARRIS BANK, )

N.A., and SUNTRUST BANK,       )

)

         Defendants.      )

)

REMOTE VIDEOTAPED DEPOSITION OF TIM KENNEDY

Thursday, September 30, 2021

Reported Remotely and Stenographically by:

JANIS JENNINGS, CSR No. 3942, CLR, CCRR

Page 30

A. Yes.

Q. Okay. And another metric that drove Millennium's -- when I refer to "UDT," you will understand I mean urine drug testing, right, as shorthand?

A. Sure.

Q. Okay. And another metric that drove Millennium's UDT revenue and performance was a metric known as "net revenue per specimen"; correct?

MS. BUCHWALD: Object to form.

THE WITNESS: Correct.

BY MR. COVIELLO:

Q. And Millennium's business model was focused on increasing each of those metrics, including volume, test per specimen and net revenue per specimen; correct?

MS. BUCHWALD: Object to form.

MR. WERNER: Join.

THE WITNESS: Yeah. I wouldn't say that that -- did you say that was Millennium's business model?

BY MR. COVIELLO:

Q. Let me -- let me rephrase the question. Part of Millennium's business model in seeking to increase its financial performance was increasing

Page 31

testing metrics such as volume, test per specimen and net revenue per specimen; is that fair?

MR. WERNER: Object to the form.

MS. BUCHWALD: Form.

THE WITNESS: Typically the things that you have control of, just as a general manner in healthcare, is certainly volume by selling more customers on your product. Generally speaking, you don't have a lot of control over the reimbursement rate, but the quantity of tests that are being ordered, the control that you would have, if any, over that is just offering more tests to physicians that can order those tests, but you don't have control over the quantity of the tests that physicians do order.

BY MR. COVIELLO:

Q. Whether Millennium had control or not, Millennium -- one of Millennium's goals was to increase tests per specimen if possible; right?

MR. WERNER: Object to the form.

MS. BUCHWALD: Join.

THE WITNESS: It's not -- I wouldn't characterize it as a goal. I would characterize it as providing the ability for physicians to order more tests, assuming that you're able to research

Page 32

and develop those tests and add them to your test compendium.

BY MR. COVIELLO:

Q. Okay. Were you familiar with a business practice or feature known as "custom profiles" during your time at Millennium?

A. That's pretty -- pretty typical in healthcare, yes.

Q. Okay. And at Millennium, that referred to a -- generally speaking, a pre-fill test order form that would include a standard list of tests; right?

A. Yes.

Q. Okay.

A. Typically, Jeff, approved by the referring physician that would commonly order that profile or that group of tests.

Q. Okay. And was the use of custom profiles one of the ways that Millennium sought to increase tests per specimen?

A. No.

MS. BUCHWALD: Object to form.

BY MR. COVIELLO:

Q. Were you familiar with the term "trouble practices" during your time at Millennium?

A. That does not sound familiar to me, no.

Page 33

Q. Okay. What about, whether it was called "trouble practices" or not, just generally, a program at Millennium where the company monitored practices that were deemed insufficiently profitable due to low number of tests per specimen?

A. I don't recall specifically anything associated with that. But looking at unprofitable accounts would certainly be a -- commonplace, again, in any healthcare business.

Q. Okay. And were you familiar with the business practice at Millennium during the relevant period known as the "cup program"?

A. What?

Q. The cup program.

A. I'm assuming you are referring to urine drug testing cup.

Q. Right. But specifically, Millennium's practice of providing free cups to physicians to encourage them to refer samples back to Millennium for further testing; is that something you're familiar with?

MR. WERNER: Object to the form.

MS. BUCHWALD: Object to the form.

THE WITNESS: Yeah. I would not -- I wouldn't phrase it in the manner in which you did,

9 (Pages 30 - 33)

Page 302

Q.  And were you responsible for hiring some portion of those two to three hundred people?

A.  I would be involved in the hiring of the heads of those departments, not the individuals underneath them unless the department had wanted my opinion on a candidate.

Q.  Okay.  And in addition to hiring, were you responsible for overseeing the work performance of some subset of that two to three hundred people?

A.  Again, mainly, the leads of those departments.  You know, I never had any turnover in finance; that was Daniel Pencak's area.  I never had any turnover in Heidi Smith's area, but I did have turnover in billing/collections, that area.  Like I think I mentioned earlier that that Carol Stolya or Stolya, she was not -- she wasn't capable of growing with the company.  She wasn't very good with people.

Brought in Susan Ahl.  Susan, I felt, was good, but she didn't really get along all that well with some other individuals within the company and, unfortunately, there was personality conflicts there.

And then I brought in Ken Baxter, who was the head of billing/collection after Susan.  Ken was great.  He was phenomenal.  I liked Susan a lot.

Page 303

She just couldn't get along -- she got along great with me.  She just couldn't get along with other managers and stuff.

Q.  Okay.  And the leads that you directly oversaw, for example, were you comfortable with their experience in the roles that they had?

MR. COVIELLO:  Object to the form.

THE WITNESS:  Yes, absolutely, otherwise, I would have let them go like I turned over the head of billing/collections.

BY MS. BUCHWALD:

Q.  And as of April 2014, in your view, did the finance group perform its role adequately?

MR. COVIELLO:  Object to the form.

THE WITNESS:  Yes.

BY MS. BUCHWALD:

Q.  As of April 2014, in your view, did you have a sufficient number of employees in the finance group?

A.  Yes.

MR. COVIELLO:  Object to the form.

THE WITNESS:  From time to time -- I don't remember whether it was 2014 or after or before, there were some additional new hires in that area, and I believe Danny had recommended a few people

Page 304

that really weren't, you know, functioning and pulling their weight within the department.  And I believe he turned those over, if I recall correctly.

BY MS. BUCHWALD:

Q.  Turning back to the 2014 transaction briefly, are you familiar with the four banks that were agents and leads in connection with the transaction?

A.  Do you mean JP Morgan and Citigroup?

Q.  I do.  And are you familiar with two other banks who had roles?

A.  I don't remember the other two.  I believe, if I recall correctly, we predominantly dealt with JP Morgan and Citigroup.

Q.  Okay.  And do you understand that the banks received fees for their roles in the transaction?

A.  Don't they always?  I have to deal with that today with investment bankers and raising capital out in the public market, so yeah.

Q.  Fair enough.  Did you play any role in negotiating the bank's fees in connection with the April 2014 transaction?

A.  No.  That was predominantly done -- I believe that was with Howard Appel and Brock Hardaway.

Page 305

Q.  Do you know whether the banks received their fees in April 2014?

A.  Do I know if the banks received their fees?

Q.  Correct.

A.  I don't have any proof that they did, but -- you know, I don't even remember what the percentage was of the overall capital that was raised, but I mean, I would imagine they were paid in full, yes, of course.

Q.  In your opinion, was Millennium solvent at the time the banks were paid in April of 2014?

MR. COVIELLO:  Object to the form.

THE WITNESS:  Absolutely.

BY MS. BUCHWALD:

Q.  And in April 2014, did you anticipate that Millennium would be filing for bankruptcy?

A.  Never in a million years.

Q.  When did you realize that Millennium was going to need to file for bankruptcy?

A.  I don't remember the exact timing, but I remember what caused it.

Q.  And what's your recollection?

A.  That Medicare -- first of all, DOJ was working with Medicare, number one, to force a settlement on Millennium, which I understand said

77 (Pages 302 - 305)

Page 306

that settlement was actually paid for by Jim Slattery and T&A Associates, and not the company after the dividend recap.

But the main thing that ultimately drove the reduction in revenue and Millennium's inability to service its debt was, I believe, a two-third reduction in reimbursement rates for medication monitoring. That, in and of itself, was the straw that -- it was a single straw, and it just literally caused the entire company to go, what the heck, you know, where did that come from? And, you know, how the heck are we supposed to service this debt?

It was literally impossible for us to do it with a two-thirds reduction in reimbursement rate, which meant that we would have gone from 700-ish million, you know, down to 200 or something like that. It was ridiculous.

And like I said, I kind of experienced that once before, which was, again, a shocking situation, in the Diagnostic Imaging business, because there was tremendous reduction in reimbursement rates there as well. I don't -- they weren't quite, I don't believe, two-thirds but, I mean, they just kind of come out of the clear blue. And you just go, What the heck is going on? Where did this come

Page 307

from?

Q.   And if the transaction that we've been talking about was in April 2014, and the bankruptcy filing was at the end of 2015, do you recall where in that time window this two-third reduction in reimbursement rates happened?

A.   I actually don't think it -- I'm sorry.

MR. COVIELLO:  Go ahead.

THE WITNESS:  Oh.  I'm trying to remember. Okay?  But I don't believe that the reduction in reimbursement rates actually happened in 2015.  I think they went into effect in the beginning of 2016, but I don't -- don't hold me to that.  That's just my recollection.

BY MS. BUCHWALD:

Q.   Mr. Kennedy, in your view did Millennium enter into the April 2014 transaction with the intent to defraud its creditors?

MR. COVIELLO:  Object --

THE WITNESS:  Absolutely --

MR. COVIELLO:  -- to form.

THE WITNESS:  -- I could tell you that Tim Kennedy didn't enter into that transaction with the intent to defraud its creditors.  I would never do that.  That's not me, if you knew me over the years.

Page 308

What you see is what you're getting.  And I would never, ever do that to anybody.

And I'm really saddened by the fact that it occurred, but I honestly truly believe that -- that the OIG, DOJ and Medicare worked in conjunction and worked together to basically destroy a company that, you know, had built a great -- you know, it was a great company.  And it was really disappointing to see that happen.

BY MS. BUCHWALD:

Q.   Are you aware of anyone in management who entered into the transaction with the intent to defraud creditors?

MR. COVIELLO:  Object to the form.

THE WITNESS:  No, I'm not.

MR. COVIELLO:  Lack of foundation.

THE WITNESS:  No, I'm not.

BY MS. BUCHWALD:

Q.   Are you aware of anyone on Millennium's board in April of 2014 who entered into the transaction with the intent to defraud creditors?

MR. COVIELLO:  Objection.  Form.

THE WITNESS:  No, I'm not.  But Millennium didn't really have a board.  The board was basically

Page 309

Jim Slattery, if I remember correctly.  And maybe there was some, you know, input from TA Associates, but that was it.

BY MS. BUCHWALD:

Q.   Okay.  Are you aware of anyone at Millennium who participated in the decision-making with respect to the transaction who had the intent to defraud any of Millennium's creditors?

MR. COVIELLO:  Object to the form.

THE WITNESS:  No.  No, not at all.

MS. BUCHWALD:  So why don't we do this. Let's take two minutes.  I may well be done.  I don't know if Mr. Coviello has any other questions, but I think I'm done for the day.  But if you'd just bear with me for two minutes, I can go through my list and make sure we are good.

THE WITNESS:  Okay.  I could use a bio break anyway.

THE VIDEOGRAPHER:  Going off the record. The time is 5:57.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record.  The time is 6:00 p.m.

BY MS. BUCHWALD:

Q.   Mr. Kennedy, I have one final question,

78 (Pages 306 - 309)

# EXHIBIT 37

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
-----------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
          Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,
                        Plaintiff,

        - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,
                        Defendants.
-----------------------------------------X
                        July 1, 2021
                        10:32 a.m.

          Remote video-teleconference
deposition via Zoom of DANIEL PENCAK,
pursuant to notice, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.

Page 46

PENCAK

Q.    Again, you understand that to mean custom profile?

A.    Yes.

Q.    Millennium again was drawing a connection here between not using the custom profile and having low tests per specimen, right?

MS. BUCHWALD:  Objection to form.

A.    There are thousands of accounts, so on this particular account, that's right.

But I'm not sure if that's -- you can draw that specific conclusion on one account from this.

Q.    I'm just asking in this instance you agree that this account had low tests per specimen and Millennium is noting that the account is not using a custom profile, right?

A.    Yes, that's right.

Q.    And it is reasonable to see some connection between the two?

MS. BUCHWALD:  Objection to

Page 47

PENCAK

form.

A.    Yeah, I think that's right.

Q.    If you scroll down, it is across from the Mid Florida Physicians practice name under the left-most column, and if you follow it across to driver, you see low tests per specimen for that practice as well?

A.    What was the name of the practice?

Q.    This one looks like Mid Florida Physicians, Inc..

A.    I see high self-pay percentage under that.

Q.    If you look below it you see low tests per specimen.

MS. BUCHWALD:  Objection.

A.    Yes, I do.

It's hard to tell which account that relates to, but I do see one that says low tests per specimen.

Q.    Okay.

Understood, based on the way the rows line up, it is either Florida

Page 48

PENCAK

Physicians or Tristate Medical Care, agreed?

A.    Yeah, that's right.

Q.    And this says, in the status column, one of the remarks is "9/27, new CP to be received with 15 tests plus validity," right?

A.    That's right, I see that.

Q.    So for this account that was unprofitable due to low tests per specimen, Millennium was taking note of the introduction of a new custom profile with 15 tests and validity, correct?

A.    Well, it appears it was also a payor mix issue, because Millennium wasn't paid by, it looks like, Medicaid of Illinois didn't pay very well either, so it was a combination of issues is what it appears to be.

Q.    One of the remedies of low profitability from Millennium's perspective was to get a new custom profile in place with more testing, correct?

Page 49

PENCAK

MS. BUCHWALD:  Objection to form.

A.    I am not sure if that would cure the profitability issue, but it does say that they have converted to 12-panel cups and they are no longer using the six-panel cups.

I'm not sure if the custom profile would make it profitable, if that's what you're asking.

Q.    You understood at the time that Millennium utilized custom profiles as a way to increase tests per specimen, is that fair?

MS. BUCHWALD:  Objection.

A.    I am not sure if that ultimately causes more tests per specimen.

From what I recall, I would just have a more consistent ordering pattern.

Q.    Do you dispute one of the reasons that Millennium had a custom profile in place was to encourage more testing per specimen?

13 (Pages 46 - 49)

Page 50

PENCAK

A.    I don't think I am qualified to answer that question.

Q.    Is it your testimony that custom profiles at Millennium had nothing to do with a desire to increase tests per specimen?

A.    It's not my position to gauge whether it had an impact on tests per specimen.

I just looked at whether -- the end result of what was ultimately ordered and how that impacted revenue.

Q.    You never heard anyone during your time at Millennium discuss custom profiles leading to an increase in tests per specimen?

A.    No, I mean, from what I recall, you know, the primary objective of custom profiles was to help facilitate the ordering from a physician, so they wouldn't have to fill out the entire requisition every time, that it would help facilitate the ordering process, so it wouldn't take long to fill out the

Page 51

PENCAK

requisition.

Q.    Millennium was certainly aware at this point in time that there was a potential for custom profiles to lead to medically unnecessary testing, right?

A.    Is that a question?

Q.    Yes.

A.    I am not sure, I guess I am not really sure of the question you're asking.

Q.    I guess what I'm asking you is, to your understanding, based on your time at Millennium, people at Millennium understood that there was a potential for custom profiles to lead to medically unnecessary testing, is that fair?

MS. BUCHWALD:  Objection to form.

A.    I can't speak for other folks at Millennium, what they thought.

Q.    Okay.

Did you think that?

A.    I just don't recall exactly how -- what I thought of custom profiles at the time, I don't recall.

Page 52

PENCAK

I remember that they had more consistent ordering patterns, so it was more predictable in terms of what the revenue profitability would be and I do recall that it helped facilitate ordering, because once custom profiles were no longer used, the frequency of samples being ordered went down.

So, again, my recollection is that custom profiles drove more volume of samples because it was easier for them to do the ordering.

But I don't necessarily think there was a high correlation with custom profiles and revenue.

Q.    In your role at Millennium, you had to stay on top of reimbursement trends, right?

A.    That's right.

Q.    Part of that was understanding how payors such as Medicare looked at your business practices, right?

A.    I am not sure what you mean by looking at our business practices.

Page 53

PENCAK

Q.    Well, during this time period there was a focus by Medicare and others on cutting down medically unnecessary testing at labs such as Millennium, isn't that right?

A.    What time period are you referencing?

Q.    Let's say 2012 forward.

A.    I wasn't aware of Medicare specifically looking at Millennium regarding unnecessary testing.

Q.    I want to put aside Millennium, okay, put yourself back in your seat at Millennium in 2012 --

A.    Okay.

Q.    -- as to looking at reimbursement trends and help with the modeling of impacts on the business, right?

A.    Correct.

Q.    Putting aside whether you recall a particular focus on Millennium, you and others at Millennium understood at the time that Medicare was focused on

14 (Pages 50 - 53)

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

------------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

         Debtors.

MARC S. KIRSCHNER, solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                    Plaintiff,

    - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK

N.A., BMO HARRIS BANK, N.A. and SUNTRUST

BANK,

                    Defendants.

------------------------------------------X

                July 12, 2021

                7:32 a.m. (pst)

        V O L U M E   I I

      Remote video-teleconference continued deposition via Zoom of DANIEL PENCAK, pursuant to Adjournment, before Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

Page 444

PENCAK - VOLUME II

Q.    Did you work with Vantage Point in performing a 409A valuation at any point prior to 2014?

A.    I don't recall if I did or not.

Q.    And sitting here today, do you have an understanding of the differences in the processes that Vantage Point would have undertaken in a 409A valuation versus a solvency opinion?

A.    I don't.

Q.    Turning back to the 2014 transaction, as part of the transaction Millennium paid fees to four banks, do you understand that?

A.    I believe that's the case.

Q.    Did you participate in any negotiations relating to the banks' fees?

A.    No.

Q.    Do you know who negotiated the banks' fees?

A.    I do not.

Q.    Were you involved at all in the paying of the banks' fees?

A.    No.

Page 445

PENCAK - VOLUME II

Q.    Do you know what services the banks provided in exchange for the fees?

A.    No.

Q.    In your opinion, was Millennium solvent at the time it paid the banks their fees in April of 2014?

MR. COVIELLO:  Object to the form.

A.    Yes.

Q.    At the time of the 2014 transaction, did you anticipate that Millennium would be entering bankruptcy?

MR. COVIELLO:  Object to form.

A.    I did not.

Q.    In your view, did Millennium enter into the 2014 leverage loan transaction with the intent to defraud any of its creditors?

MR. COVIELLO:  Object to the form.

A.    No.

Q.    Mr. Pencak, I am going to ask you to pull up one of the documents that Mr. Coviello asked you about a

Page 446

PENCAK - VOLUME II

week-and-a-half ago and that's Plaintiff's Exhibit 178, it should be in the same folder of exhibits marked in your system.

(Witness complying.)

A.    Okay.

Q.    Do you recall being asked about this e-mail chain?

A.    I recall, yes.

Q.    You were asked by Mr. Coviello whether you were "motivated or incentivized by the prospect of receiving a bonus for your work on the 2014 transaction," do you recall that question?

A.    I do.

Q.    And you responded, "Yes, I had a motivation to have the deal close as most management would for a situation like this."

Do you recall that?

A.    I do.

Q.    And by agreeing that you had a motivation to have the deal close, were you suggesting that you cut corners in order to have the deal close?

Page 447

PENCAK - VOLUME II

MR. COVIELLO:  Object to the form.

A.    No.

Q.    And by agreeing that you had a motivation to have the deal close, were you suggesting that you altered any projections to have the deal closed?

MR. COVIELLO:  Object to the form.

A.    I didn't alter any numbers to get the deal to close.

Q.    By agreeing that you had a motivation to have the deal close, were you testifying that you did anything other than work hard to get the deal done?

MR. COVIELLO:  Object to the form.

A.    That's right.

Q.    Sitting here today, are you confident that you exercised reasonable judgment in connection with your work on the 2014 leverage loan transaction?

MR. COVIELLO:  Object to the form.

35 (Pages 444 - 447)

# EXHIBIT 38

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

----------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

      Debtors.

MARC S. KIRSCHNER, solely in his

capacity as TRUSTEE OF THE

MILLENNIUM CORPORATE CLAIM TRUST,

        Plaintiffs,

   vs.

JPMORGAN CHASE BANK, N.A.,

CITIBANK N.A., BMO HARRIS BANK,

N.A., and SUNTRUST BANK,

      Defendants.

----------------------------------------X

VIDEOTAPE DEPOSITION OF

WILLIAM BROCK HARDAWAY

VIA ZOOM VIDEOCONFERENCE

July 20, 2021

8:59 a.m.

Reported by:

Maureen Ratto, RPR, CCR

Page 46

WILLIAM BROCK HARDAWAY

and I recall that doctors, as they do in every sector of healthcare, have what you would think of as a standing order. They do it in every sector of healthcare; radiology, lab, everything else, and we had our version of a standing order.

Q.   And that was called a custom profile while you were there, correct?

A.   Correct.

Q.   And you also understood that there were laws surrounding medical necessity; is that correct?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Object to the form.

A.   Can you be -- I mean, sure. Sure.

Q.   Well, in particular, in the laboratory context that the -- both Federal law and commercial payors required that instead of relying on a standing order, that the doctor specify for each particular patient why a

Page 47

WILLIAM BROCK HARDAWAY

particular test was necessary at a particular time?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Join.

Q.   Do you understand that to have been the law that related to laboratories at the time that you became the CEO?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Join.

A.   I mean, I was aware that in Medicare regulations that medical necessity governs every sector of healthcare reimbursement and if the patient doesn't have medical necessity there is a -- depending on the sector, there is a consequence to that, either payment not happening or something else.

Q.   And did you also understand that Section A of the Millennium requisition form was designed to comply with medical necessity laws?

MR. WERNER:  Object to the

Page 48

WILLIAM BROCK HARDAWAY

form.

MR. POPOVSKY:  Join.

A.   It was my understanding that all of the documents used by Millennium Section A and other things had been thoroughly vetted by counsel from all avenues.

Q.   Was it your understanding as CEO that Section A of the requisition form was a part of the form in which the physician would say or memorialize whether to use the custom profile or to perform some other kind of testing?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Objection.

A.   Sure. I mean, the doctors could do whatever they want to. They could either order a custom or have a custom profile or they could order custom tests. They can do whatever they wanted to.

Q.   All I'm asking is, is it your recollection that that choice was made in

Page 49

WILLIAM BROCK HARDAWAY

Section A of the requisition form?

A.   I honestly -- it sounds like it probably was. I don't recall for sure.

Q.   And do you recall that Millennium, that one of the issues in the government investigation was the concept of ambiguous orders?  Does that term ring a bell?

MR. POPOVSKY:  Objection, form.

A.   No. I don't know exactly what you mean by that in the context.

Q.   Where physicians were not necessarily filling out Section A but in default Millennium was applying the custom profile, do you recall that being an issue facing the company?

MR. WERNER:  Objection, form.

MR. POPOVSKY:  Objection.

A.   I -- the only thing I recall is that staff within the office of the physician was filling out the custom profiles.  But that's -- again, that

13 (Pages 46 - 49)

Page 138

WILLIAM BROCK HARDAWAY

underwriting would be higher than a best efforts underwriting; is that correct?

MR. WERNER: Form.

MR. POPOVSKY: Join.

A. Yes.

Q. Was there discussion in or around this time period among Millennium management, yourself and TA about whether to pursue a best efforts underwriting or a firm commitment underwriting for a leveraged loan transaction if indeed the leveraged loan transaction was going to be the option selected?

MR. WERNER: Objection to the form.

MR. POPOVSKY: Objection.

A. Yes, I believe there was discussion.

Q. And what took place? What kind of discussion were you involved in?

A. Discussion that I recall was that, you know, when you go to market on these kind of transactions or really any transaction, your information, despite it

Page 139

WILLIAM BROCK HARDAWAY

being confidential, is all over the market and everybody knows about it, including your competitors. And Jim Slattery had a very high level of sensitivity to having our confidential information be out in the market and run the risk of not having a successful transaction.

So if -- the discussion was, if we're going to go to market and we're going to have potentially our competitors knowing about our confidential and extremely sensitive information, then we want to be certain that we can get a transaction closed. And that was the -- that was the totality of the issue and the reason that Jim felt compelled to do the underwritten deal was that the bankers could not guarantee him that it would close and couldn't also guarantee that our information wouldn't get out in the market.

Q. Thank you. Was there any discussion at this time period about a

Page 140

WILLIAM BROCK HARDAWAY

do-nothing strategy, just to continue and look to see what would happen with the company's organic growth, the government investigation and not do any kind of leveraged recap or sale transaction?

A. These are all smart people. I'm sure there was, you know, discussion of scenarios including that but I don't recall specifically that we discussed, you know, what the pros and cons of doing nothing was but I'm -- I'm sure that that was on the list.

Q. Do you recall ever advocating for one position or another?

A. Not really, no, I don't.

Q. Were you -- in 2013 had you been party to discussions with TA in which they said, in words or substance, we'd like to see what happens to the government investigation before we engage in any extraordinary transaction?

MR. WERNER: Objection to the form.

MR. POPOVSKY: Objection.

Page 141

WILLIAM BROCK HARDAWAY

A. I certainly don't ever recall that explicit if/then discussion.

Q. Do you recall any discussions either with TA or Millennium management about the ongoing investigation and the Ameritox litigation being an overhang on an extraordinary transaction?

MR. WERNER: Object to the form.

MR. POPOVSKY: Objection.

A. I don't -- I mean, listen, the company had litigation. As I've already testified, all companies do. Litigation is always a part of a transaction discussion. So it wasn't anything out of the ordinary.

And as relates to the government investigation, there was really nothing happening at the time, so there was nothing really to be concerned about.

Q. I'm asking specifically whether there was discussion about awaiting the outcome of the investigation

36 (Pages 138 - 141)

Page 142

WILLIAM BROCK HARDAWAY

before engaging in an extraordinary transaction?

MR. POPOVSKY: Object to the form.

MR. WERNER: Join.

A. I don't recall whether or not there was explicitly that discussion or not.

Q. Or recommending to anybody that people quantify the exposure in terms of Medicare billings of Millennium before considering such a transaction?

MR. WERNER: Object to the form.

MR. POPOVSKY: Objection to form.

A. Again, there was no awareness of what the government was actually investigating at this time.

Q. Well --

A. I know that's not what you -- go ahead.

Q. You can answer my question, which is whether you recommended an

Page 143

WILLIAM BROCK HARDAWAY

analysis of Millennium's exposure in a government investigation based on its billings to Medicare?

MR. WERNER: Objection to form.

MR. POPOVSKY: Objection to form.

A. I think I've already testified that I didn't recommend that we evaluate something that was unknown, no.

Q. Did you ultimately -- strike that.

If you had wanted to, could you have figured out what your billings to Medicare were in a particular year?

MR. POPOVSKY: Objection to form.

A. Of course I could.

Q. And Millennium was one of -- you're familiar with something called Medicare Part B, as in boy?

A. Yes.

Q. And Millennium billed through Medicare Part B; is that correct?

Page 144

WILLIAM BROCK HARDAWAY

A. Yes. I can't recall if everything was part B, but most.

Q. And do you recall that Millennium, in years up until that period, was one of the biggest Medicare Part B billers to the government of any of the billings?

MR. WERNER: Object to the form.

MR. POPOVSKY: Objection, form.

A. I don't know if that's true or not.

Q. In your work in hospitals had that been Medicare Part A, to the extent it was a government biller?

A. Yes.

Q. Let's go to the next document. This is tab 23 and I think we have to mark this as a new exhibit.

(Plaintiff Exhibit 268, email dated February 20, 2014, Bates ML_DE_00036121 was received and marked on this date for

Page 145

WILLIAM BROCK HARDAWAY

identification.)

CONCIERGE: Yes. It should be 268, I believe.

MR. TRETTER: Thank you.

CONCIERGE: And that has been introduced and should be loaded now.

MR. POPOVSKY: I still can't see it yet.

Okay. Defendants can see a document with production number ending 6121 marked as Exhibit 268.

Q. Mr. Hardaway, these are some emails between and among Mr. Pencak, Mr. Kennedy and yourself in February of 2014. The subject seems to be PGT Break-Even Analysis.

And PGT is that business we were talking about the pharmacogenetic business?

A. Yes.

Q. Is that right?

A. Yes.

Q. And in this -- in this series

37 (Pages 142 - 145)

Page 274

WILLIAM BROCK HARDAWAY

us.

Q. I'll ask the Concierge to introduce tab 31. I believe this will be introducing Defendant's Exhibit 36 with Bates number ending 602292 and as far as I know, this is not in front of you, Mr. Hardaway, so we'll put it up on the screen share.

(Defendant Exhibit 36, email dated June 21, 2015, Bates ML_DE_00602292 was received and marked on this date for identification.)

Q. Just take a minute to look at that. You know what, actually given that it's an email and they print in reverse order it maybe easier if we scroll to the bottom and you can -- and I can see there is a lot there. Stop there.

Do you see the first email in this chain is dated June 20th, 2015 from Martin Price directly to Chris Donoho and Michael Silver and then you, together with David Kurtz, are copied on it. I'll

Page 275

WILLIAM BROCK HARDAWAY

ask you a couple of things that Mr. Price wrote in here. You may want to look at the section.

(Deponent reviews the document.)

A. I guess after looking at this maybe Kusserow was the guy I was referencing earlier that I couldn't remember the name.

Q. Okay. I was going to ask, and again in light of the fourth bullet, open circled bullet, that begins "2012 hired strategic management/Dick Kusserow to conduct independent compliance audit."

Does that refresh your memory about who Mr. Kusserow was?

A. Personally, I had no involvement with him but I knew there was somebody that had been prior to my time that did that.

Q. Oh, that was all prior to your time. And then if you skip over the next bullet and there is a dash, and then there is another bullet open circle that

Page 276

WILLIAM BROCK HARDAWAY

starts "Lew Morris had been retained". Do you see that?

A. Yes.

Q. "Lew Morris had been retained as an expert in Calloway/Ameritox matters and opined on the quality of ML's" -- I assume that's Millennium's -- "compliance program and the legality challenged in those cases."

Does this refresh your memory about who Dr. Morris was?

A. Again, I had no involvement with Lew directly. I don't remember what he did versus Kusserow or they were effectively doing the same things but I did remember the name and knew he was involved.

Q. Okay. At the time of the April 2014 dividend recapitalization, were you aware of any business practices at Millennium that were unlawful or that you were apprised that were unlawful?

A. None.

Q. And do you know of anyone else

Page 277

WILLIAM BROCK HARDAWAY

at Millennium who thought Millennium was engaged in either unlawful or potentially unlawful business practices?

A. No, not to my awareness. We had employed litigation but nothing specific around any kind of improper business practices, as I was aware of.

Q. I believe it came up in your testimony with Mr. Tretter earlier that -- and if it didn't I'll make this representation to you -- that in March 2012 Millennium received the subpoena from the Department of Justice. That obviously would have been before you had started at Millennium.

Do you remember when you first learned about that?

A. Well, I read the Reuters article sometime prior to starting. So sometime in the late fall of 2012. I don't recall exactly when I became aware of the actual production of a subpoena, but probably sometime after I actually joined the company.

70 (Pages 274 - 277)

Page 278

WILLIAM BROCK HARDAWAY

Q.   In the -- and now, I'm focused on the time period in the months before the 2014 dividend recapitalization, so let's say January through April 2014.

What do you remember about the status of the Department of Justice investigation at that time?

A.   It was literally crickets. There was no communication whatsoever from the DOJ around what was going on, what the case was about. So there was nothing, really.

As I mentioned in my testimony earlier, the lead investigator had left the DOJ or maybe been transferred, I can't remember, sometime late in 2013 and we had actually even -- I'm blanking on her name, but we had actually invited her to San Diego, to the lab at some point late in '13, trying to help her to understand what we actually did and to see if we could get more awareness of what the case was about, and there was nothing. And then she left and there was

Page 279

WILLIAM BROCK HARDAWAY

literally no communication whatsoever with the DOJ for months.

Q.   And did you state correctly that you met with her during that visit?

A.   I did.

Q.   Alone or with others?

A.   Well, I don't remember who all was there, but I do recall it was me and Martin Price and Slattery. There could have been others.

Q.   And do you remember her telling you anything about the focus of the investigation at that time?

A.   I only remembered that we left the meeting thinking that if there was anything going on that she was the most positive poker player we'd ever seen. Because she was highly complimentary of the lab and the people and the process, et cetera. But there was no -- she made no comments whatsoever about what the case was about.

Q.   And, again, I'm still focused in this January through April 2014

Page 280

WILLIAM BROCK HARDAWAY

period.

Do you remember if the investigation was requiring a lot of your attention as CEO at the time?

A.   At the time it wasn't requiring much, that I recall. There may have been the regular meetings that Martin and I had because the DOJ was being radio silent about the case and there was really nothing for us to do at that time.

Q.   Okay. Thinking back to that point, and I'm focused on April 2014, did you have expectations then about what the most likely outcome of the investigation would be?

A.   We had literally no expectations because, you know, as you may know, there are plenty of DOJ investigations that don't amount to anything. So we didn't know whether this fell into that bucket or fell into the bucket of something that would develop. There are plenty of DOJ investigations

Page 281

WILLIAM BROCK HARDAWAY

that go nowhere.

Q.   Okay. And once again, I'm focused -- and I appreciate it's hard to remember eight years ago exactly what you thought at different points, but, again, I'm trying to focus in January through April 2014.

Do you remember any conversations around that time about potential worst case scenarios from the DOJ investigation?

A.   Again, I don't believe that at that time -- I don't recall there being any discussion around what the economic kind of scenarios might look like. I believe there was a point at which our counsel advised us that he thought it was substantially smaller and I remember, you know, $5 million as the number that I had in my head, I just don't know exactly when that advice came from him, whether it was much later in '14 or exactly when it came.

Q.   And who was it that you

71 (Pages 278 - 281)

Page 282

WILLIAM BROCK HARDAWAY

remember providing that advice?

A.   Mike Loucks.

Q.   Mike Loucks. Do you remember when you first realized that resolving the DOJ investigation might involve a sum of money that could potentially render Millennium insolvent?

A.   Gosh. I don't know that -- a simple way to answer that question. So I'll try and you can stop me here. But as you may know, the CMS used a tool that they don't use often and I'm not sure how -- we weren't the first -- where essentially in February of '15 they issued us, through Noridian, a notification of removal of our provider number, our billing provider number. It was probably several months after receiving that notification and meeting with DOJ and CMS that we figured out that --

(Audio interference.)

VIDEOGRAPHER:  Back to normal.

A.   So after a series of meetings

Page 283

WILLIAM BROCK HARDAWAY

with DOJ, CMS, others, including advisors and so forth, on our team I guess it became clear to me at some point in the summer of '15 that CMS and DOJ were working together and that there was going to be an outcome here that was going to be a big check because they -- they had used the hammer, which was the removal of our provider number and effectively shook us down through that to get to a big settlement dollar amount with the DOJ.

Q.   Just to clarify, you're describing a time in 2015, I think you said summer of 2015. So that means -- is it true that at no point in 2014 you suspected the DOJ investigation might result in a settlement of that size?

MR. TRETTER:  Objection.

THE WITNESS:  Sorry.

MR. TRETTER:  Go ahead.

Q.   Let me rephrase. At no point in 2014 you thought Millennium -- you thought the -- let me start once again.

Does that mean at no point in

Page 284

WILLIAM BROCK HARDAWAY

2014 you thought the resolution of the DOJ investigation might result in a settlement that could potentially render Millennium insolvent?

MR. TRETTER:  Same objection.

A.   Yeah, I would say that in 2014, because we didn't -- the government didn't even take the case until December and we didn't really know obviously the details of that laid out until probably early summer or maybe late spring of 2015.

So, again, just to be clear, absent all the reimbursement cuts that happened throughout '15, the DOJ settlement, in and of itself, absent all the reimbursement cuts, probably would not have rendered the company insolvent.

MR. TRETTER:  Motion to strike the answer.  It's not based on any analysis.  It's just off the cuff.

MR. POPOVSKY: Yeah, like a lot of your questions.

Q.   I'm going to introduce one

Page 285

WILLIAM BROCK HARDAWAY

other document that, again, I don't think is in front of you. It is tab 33. I'll put it on the screen share.

And this document -- while we're waiting for it to load, it ends in production number 5881. It's Millennium's consolidated financial statements December 31st, 2013 and 2012. Again, we'll have it up on the screen share very soon.

(Defendant Exhibit 37, 2012 and 2013 Millennium Lab Holdings Consolidated Financial Statements, Bates JPMC-MIL-CORP-00195881 was received and marked on this date for identification.)

Q.   So the cover page I just described, it's, again, consolidated financial statements December 31st, 2013 and 2012. And then I'm going to ask you to scroll down to the page with the Bates -- two more pages down. You can see it starts with a cover letter from KPMG which describes the independent auditor's

72 (Pages 282 - 285)

Page 294

WILLIAM BROCK HARDAWAY

expertise. So we would have -- I certainly would have depended on Kevin and Jennifer for their expertise there because even our CFO was not -- you know, that's beyond his capacity as well. So I don't know --

Q.   Would --

A.   Go ago ahead. Sorry.

Q.   No. No. I didn't mean to -- I was just going to ask if anyone else at Millennium might have been involved either in the sense if their approval was needed or their advice was sought about the type of financing transaction that the company would proceed with?

A.   Certainly Jim as the -- on the board would have had discussions with Jennifer around, you know, if there were significant options and pros and cons of those options.

I don't recall ever having any discussion myself about it, but if there was, it would have -- it could have been between the two of them.

Page 295

WILLIAM BROCK HARDAWAY

Q.   Okay. And do you remember, and again, we're seven eight years later, but do you remember what other options were seriously considered before the specific course that Millennium eventually took was settled on?

A.   You know, I think we thought about things such as, you know, IPO and other options and I think the decision was this was, given the timing and what was going on in the debt markets, was the best route for us to take.

Q.   And what do you remember about what was going on in the debt market at that time?

A.   It was just -- it was pretty much a friendly environment for, you know, companies pursuing debt and so we felt like it was, you know, given where our EBITDA was trending at that time, it was a safe transaction, the company could handle the leverage.

Q.   Okay. Were there any discussions that you were either a part

Page 296

WILLIAM BROCK HARDAWAY

of or aware of that this syndicated loan could be a potential first step to an IPO down the road?

A.   You know, I think that we probably discussed that, you know, once you're in the market people become aware and then there is always a chance that somebody -- you could either have a sell event or IPO because of being in the market allows people to be aware of you and it makes an IPO easier. But other than that, I don't recall anything specific.

Q.   Okay. Do you remember who any of those discussions would have been with where those discussions might have come up?

A.   You know, at the time it seems like Corey Rapkin at JPMorgan kind of led our relationship thinking with JPMorgan. So I'm sure if those discussions took place it would have been including him and his team.  But, again, I don't really remember explicitly that we did have

Page 297

WILLIAM BROCK HARDAWAY

those discussions.  I just wouldn't be surprised if we did.

Q.   Okay. Did you believe that the 2014 term loan would help Millennium grow its business in the long-term?

A.   You know, I guess I believed that the term loan was serviceable and that by being aware -- being in the market and being someone that -- as a company that debt holders now had familiarity with, that we would be able to go to market easier and get additional liquidity and capital for growth.

Q.   Okay. Would it be fair to say that the term loan might help Millennium increase the access to capital in the future?

A.   Yes.

Q.   And after the term loan closed, did Millennium continue to explore either potential sale or an IPO?

A.   I believe that we did. So many things happened in the course of that next year that I believe at some point in

75 (Pages 294 - 297)

Page 298

WILLIAM BROCK HARDAWAY

'14 we did. In fact, I believe that we worked with Corey to evaluate options, but I just don't know exactly what timeline.

Q. Okay. Is it fair to say that taking the term loan did not foreclose the possibility of an IPO in the near to medium term?

A. No, neither an IPO or other exit events.

Q. Do you know how Millennium determined how much to borrow in the 2014 transaction?

A. I can't say that I really have the knowledge of what led to that, other than we felt like that we could handle the debt under what was probably marketed to us as maximum leverage and that the company could handle that given our growth and kind of outlook. But I don't know what went into, you know, TA or others did their own modeling to say what's appropriate here.

Q. And would you have had to

Page 299

WILLIAM BROCK HARDAWAY

approve the final amount borrowed?

A. I guess in the context of it, yes, I mean the board was obviously driving much of what was happening but I was the one leading the effort that had to approve where we ended up, yes.

Q. And were you comfortable giving that approval?

A. Yes. I mean, I felt like we could -- again, at that time I felt like the company could easily service the debt and continue to grow and do what we were doing.

Q. And what was that belief based on?

A. You know, the company really had grown so much over the course of the previous six or seven years and then in my first year we had grown that much or more. So I really didn't see anything that would suggest that things were going to slow down, other than, you know, obviously the normal, can we execute on meeting customer demands and those

Page 300

WILLIAM BROCK HARDAWAY

things. But there was no reason to believe that we weren't going to continue in a very rapid growth phase.

Q. Did you have any concerns about how paying the dividends would impact the company's growth?

A. You mean in terms of paying out the dividend to the shareholders?

Q. Yes.

A. No. I really didn't because, again, I felt like that we could service the debt and that it gave us access to people that -- and to the capital markets that we previously did not have access to, really.

Q. And are you aware of anyone at Millennium that had concerns about whether or not Millennium would be able to service the debt?

A. No one that I'm aware of.

Q. Okay. Are you aware of anyone at TA Associates who believed taking this debt might render the company insolvent?

A. Certainly no one that raised

Page 301

WILLIAM BROCK HARDAWAY

that issue to me.

Q. Okay. And are you aware of anyone at any of the banks involved with the deal? And by "the banks", I mean JPMorgan, Citi, SunTrust and Bank of Montreal, that believed taking on the debt would render the company insolvent?

A. No.

Q. Okay. And as CEO, would you have -- would you have agreed to allow Millennium to enter into the transaction if you thought Millennium might not be able to service the debt?

A. Certainly not. If people had brought to my attention or I was aware myself that it would create a problem for us down the road, I would have not been supportive of doing it and would have raised that to the board.

Q. I'll introduce one more document. If you could introduce tab 11?

(Defendant Exhibit 39, email dated April 30, 2014, Bates BML_DE_00059019 was received and

76 (Pages 298 - 301)

Page 302

WILLIAM BROCK HARDAWAY

marked on this date for identification.)

Q.   Just one more document we'll have to put on the screen share. What is the number? It's going to be Defendant's Exhibit 39, with Bates ending 9019.  And as people will see as it comes up on the screen share, it's an email chain between you and Mr. Brian Conway.

MR. TRETTER:  Did we just have Exhibit 39? Maybe I'm behind.

Q.   So it's a one-page email. Just take a look at it and let me know when you're ready.

Do you know who Brian Conway is?

A.   Brian was then and I believe he is now I believe the Chairman of TA.

Q.   And I can see at the time he had a TA email address. I'm interested in the last sentence, the last sentence in the first paragraph, "More fundamentally".

He writes to you, "More

Page 303

WILLIAM BROCK HARDAWAY

fundamentally thanks for getting the company to the position it is today; we are excited about the future and look forward to more good news."

Do you know why he was excited about the future?

MR. TRETTER:  Objection to form.

A.   You know, again, I'm sure that Jennifer had shared with him the things that we were doing, the team we were building, the outlook that we had. And so probably all those things he felt like we had a team that could take the company to a new place.

Q.   And would it be fair to say, and again we're talking about April 30th, 2014, so about two weeks after the term loan closed, were you excited about Millennium's future at that time?

A.   No question, yes, very much so.

Q.   And can you tell me a little more about why, what growth you either

Page 304

WILLIAM BROCK HARDAWAY

expected or hoped might come with Millennium?

A.   Yeah. I mean, look, we -- you know, so this is at this time April, back of the transaction, my team that I have hired, not just the executive team but people beneath them, had only been with me for a year.  So I was still feeling like we were relatively new with each other and had so much to do. And so I think that we were excited about, you know, the RxAnte transaction and being able to use data to predict how and when people should be tested.

So, you know, we actually bought a company that was a data company, when we were a lab testing company, for the purpose of using their data analytics and their data skills to totally innovate this industry and think about how could we change, you know, when and why people are tested and we could use data to do that.

So it was things like that

Page 305

WILLIAM BROCK HARDAWAY

that I felt like would, you know, in my simple way of thinking about it, would change us from being a lab company to a solutions company. So I was very excited about the team that we had and people that could help us achieve that vision that I had.

Q.   Do you remember how JPMorgan was selected as the lead arranger?  Do you remember the process that resulted in -- in selecting the lead arranger for the 2014 term loan?

A.   You know, I really don't. I don't know how much of it was pricing versus, you know, size and I really don't remember, but I tended to let TA lead those efforts and I don't recall exactly what went into the decision, one versus the other.

Q.   You said TA led those efforts. Would anyone else at Millennium, other than you, have been involved?

A.   No. Howard might have given his opinion about it but we were second

77 (Pages 302 - 305)

# EXHIBIT 39
## (Filed Under Seal)

# EXHIBIT 40



**U.S. Department of Justice**

*Carmen M. Ortiz*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts  02210*

March 27, 2012

By HAND

Capitol Corporate Services, Inc.
10 Milk St. Suite 1055
Boston, MA 02108

  Re: Subpoena Regarding Millenium Laboratories, Inc.

Dear Sir/Madam:

  Enclosed is a Department of Justice subpoena for Millenium Laboratories, Inc.  Their corporate records indicate you are registered agent. If you are not authorized to accept service, please call the undersigned as soon as possible.

       Very truly yours,

       CARMEN M. ORTIZ
       United States Attorney

By:       SUSAN G. WINKLER
       Assistant U.S. Attorney
       (617) 748-3270

Confidential

ML_DE_00670376



**U.S. Department of Justice**

*Carmen M. Ortiz*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

March 27, 2012

To: Recipient of Enclosed Department of Justice Subpoena

**Re: Health Oversight/Place for Production of Records**

The enclosed HIPAA subpoena issued on December 7, 2011 requires you to produce information which may include individually identifiable health information which could be covered by the patient privacy regulations, 45 C.F.R. §§ 164.102- 164.534. This information is being sought by the Department of Justice in its capacity as a health oversight agency, and this information is necessary to further health oversight activities. 45 C.F.R. 164.512(d); 45 C.F.R. 164.501.

The enclosed subpoena requires production of documents to the United States Attorney's Office in the District of Massachusetts. You may make such production either in person by appearing at the date and time indicated, or, as noted in the attached letter, you may send the documents to the United States Attorney's Office by mail to the address listed. If your place of business is more than 500 miles from Boston, the keeper of the records for your business does not have to appear personally in Boston at the time indicated to produce the records. The relevant statute provides only for production in person at a location within 500 miles from the location of service of the subpoena (your place of business). 18 U.S.C. section 3486 (a)(3). We have included as an option production of the records by mail to minimize your expense and time commitment in complying with the subpoena.

In the event that your place of business is more than 500 miles from Boston and you do not wish to produce the requested materials by mailing them to the address listed in the enclosed letter, please call me at 617-748-3270, and we will identify a United States Attorney's office within 500 miles of your place of business where you may personally appear to produce the requested documents.

SUSAN G. WINKLER
Assistant U.S. Attorney
Health Care Fraud Unit
District of Massachusetts

Confidential

ML DE 00670377

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

## SUBPOENA DUCES TECUM

**TO:** Millennium Laboratories, Inc., 16981 Via Tazon, San Diego, CA 92127

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE* _____
*Assistant United States Attorney Susan Winkler*
*an official of the U.S. Department of Justice, and you are hereby required to bring with you and produce the following:  See attached*

*which are necessary in the performance of the responsibility of the U.S. Department of Justice to investigate Federal health care offenses, defined in 18 U.S.C. § 24(a) to mean violations of, or conspiracies to violate: 18 U.S.C. §§669, 1035, 1347, or 1518; and 18 U.S.C. §§ 287, 371, 664, 666, 1001, 1027, 1341, 1343, or 1954 if the violation or conspiracy relates to a health care benefit program (defined in 18 U.S.C. § 24(b)).*

**PLACE AND TIME FOR APPEARANCE:**
United States Attorney's Office, One Courthouse Way, Suite 9200, Boston, MA 02210, on April 30, 2012 at 10 o'clock A.M, or at your option, the documents may be mailed to the Assistant U.S. Attorney listed at:

> AUSA Susan Winkler
> U.S. Attorney's Office, 5th Floor
> 408 Atlantic Avenue (John Williams Coastguard Building)
> Boston, MA 02110

if received prior to the date and time for appearance.

---

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

Issued under authority of Sec. 248 of the Health Insurance
Portability & Accountability Act of 1996, Public Law No. 104-91
(18 U.S.C. § 3486)

*IN TESTIMONY WHEREOF*

*SUSAN G. WINKLER*
*Health Care Fraud Chief, USAO Massachusetts*
*the undersigned official of the U.S. DEPARTMENT OF*
*JUSTICE, has hereunto set her hand this*
*27th day of March, 2012*

(SIGNATURE)

FORM CRM-180
MAR. 97

Confidential

ML DE 00670378

Confidential

RETURN OF SERVICE

**UNITED STATES OF AMERICA**
**DEPARTMENT OF JUSTICE**

I, being a person over 18 years of age, hereby
certify that a copy of this subpoena was duly
served on the person named herein by means of --

1.  personal delivery to an individual, to wit:

**SUBPOENA DUCES TECUM**

_____
*(Name)*

_____
*(Title)*

_____
*(Address)*

2.  personal delivery to an address, to wit:

_____
*(Description of premises)*

_____
*(Address)*

_____

3.  registered or certified mailing to:

*Upon contumacy or refusal to obey, this*
*subpoena shall be enforceable by order of the*
*appropriate United States District Court.*

_____
*(Name)*

_____
*Address)*

_____

     ( ) a.m.
at ____ ( ) p.m. on _____

_____
*(Signature)*

_____
*(Title)*

ML DE 00670379

ATTACHMENT TO 3/27/2012 HIPAA SUBPOENA

I.    DEFINITIONS

A.    "Document(s)" means, without limitation, any written, printed, typed, photographed, recorded or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, pictures, sounds or symbols, or any combination thereof. This definition includes copies or duplicates of documents contemporaneously or subsequently created which have any non-conforming notes or other markings and the backsides of any communication or representation which all contain any of the above. "Document(s)" includes, but is not limited to: correspondence; memoranda; notes; drafts; records; letters; envelopes; telegrams; messages; electronic mail; voicemails; analyses; agreements; accounts; working papers; reports and summaries of investigations; trade letters; press releases; comparisons; books; notices; drawings; diagrams; instructions; manuals; calendars; diaries; articles; magazines; newspapers; brochures; guidelines; notes or minutes of meetings or of other communications of any type, including inter- and intra-office or company communications; questionnaires; surveys; charts; graphs; photographs; films or videos; power point presentations; audio information; discs; data cells; bulletins; printouts of information stored or maintained by electronic data processing or word processing equipment; electronic claims filing, invoices, all other data compilations from which information can be obtained including electromagnetically sensitive stored media such as floppy discs, hard discs, hard drives and magnetic tapes; and any preliminary versions, drafts or revisions of any of the foregoing.

B.    The "Company," "Millenium," "you," or "your" means Millenium Laboratories, Inc. and any of its parents, subsidiaries, affiliates, segments, divisions, both presently existing and those which previously existed, and any present or former officers, directors, representatives, employees, attorneys, consultants, contractors, agents, or members of the board of directors, acting or purporting to act or appearing to act on behalf of the Company, whether or not their actions were authorized by the Company or were within the proper scope of their authority.

C.    "Contact Information" means the business, residence, and, if different, last known address, social security numbers, e-mail address(es), telephone number(s), fax number(s), or other information as to the location and means of contacting an individual or entity.

D.    "Concerning" means referring to, relating to, describing, evidencing, constituting, supporting, identifying, or refuting.

E.    "Communication" or "Communications" means the transmittal of information(in the form of facts, ideas, inquiries, or otherwise), whether oral or written, including but not limited to transmittal via telephone, voicemail, letter, memorandum, email, text message, Instant Messaging, and/or notes.

1

Confidential                                                                    ML_DE_00670380

F.    "Employee" means any person, including but not limited to any past or present independent contractor or agent, all past and present directors, officers, agents, representatives, attorneys, accountants, advisors, and consultants who acted or purported to act on behalf of the Company or who have performed any service for the Company or under its name (whether on a full-time, part-time, piece-work, commission, or other basis, and whether paid or unpaid).

G.    "Person" includes within its meaning natural persons and corporations, companies, partnerships, unincorporated business associations and any other entity composed of natural persons.

H.    The words "and" and "or" in this subpoena shall be read in both the conjunctive and the disjunctive (*i.e.*, "and/or"), so as to give the document request its broadest meaning.

I.    The term "any" shall be construed to include the word "all" and the term "all" shall be construed to include the word "any."

2

Confidential

ML_DE_00670381

## II.    INSTRUCTIONS

A.    In lieu of appearing at the date and time specified, you may, at your option, produce the records sought to Assistant United States Attorneys Susan Winkler and Sonya A. Rao, United States Attorney's Office, 1 Courthouse Way, Suite 9200, Boston, MA 02210.

B.    Please identify a qualified custodian of records who will be available to testify at the place and time indicated, concerning the production and authentication of documents and records required to be produced by this subpoena.

C.    If a claim of privilege is asserted in response to any document requested by this subpoena, and such document, or any part thereof, is not produced on the basis of such claim, for each such document or part thereof that is not produced, a privilege log is required wherein you identify the type of document being withheld (e.g., letter, memorandum, handwritten notes, marginalia, etc.), the author(s), all actual and intended recipients of the document, its date, and the specific privilege being asserted, all with sufficient particularity so as to allow the United States Attorney's Office, and potentially the Court, to assess the validity of the claim of privilege.

D.    Please produce original documents and include all copies that differ in any respect (such as marginalia and/or notations), all markings and post-it notes and other similar documents attached thereto, as well as all attachments referred to or incorporated by the documents.

E.    Relevant time period: Unless otherwise indicated, the relevant time period for each document request in this subpoena shall be January 1, 2008 through the present and shall include all documents created or prepared during that period, or referring or relating to that period, regardless of when the document was created or prepared.

F.    Scope of search required: This subpoena calls for all documents in your possession, custody or control, including, but not limited to, your officers, directors, employees, agents, consultants and contractors. You are required to search all files reasonably likely to contain responsive documents, including files left behind by former officers, directors, agents and employees.

G.    Manner of production: All documents produced in response to this subpoena shall comply with the following instructions:

        a.    You shall conduct a search for responsive documents in a manner sufficient to identify the source and location where each responsive document is found. PLEASE NOTE: A production log is required sufficient to show where responsive documents were located, such that appropriate custodians can be called to testify regarding those documents found in their individual files, whether hard copy or electronic.

3

Confidential

ML DE 00670382

b.      All documents produced in response to this subpoena shall be segregated and labeled to show the document request to which the documents are responsive and the source and location where the document was found.

c.      To the extent that documents are found in file folders and other similar containers which have labels or other identifying information, the documents shall be produced with such file folder and label information intact.

d.      To the extent that documents are found attached to other documents, by means of paper clips, staples or other means of attachment (including, but not limited to, electronic attachments), such documents shall be produced together in their condition when found.

H.      In the event there are no documents responsive to a particular subpoena request, please specify that you have no responsive documents.

I.      If you know of documents you once possessed or controlled, but no longer possess or control, which would have been responsive to this subpoena, state what disposition was made of such documents, including identification of the persons who are or are believed to be in possession or control of such documents currently.

J.      To facilitate the handling and return of the submitted documents, please mark each page with an identifying logo or the first three letters of your company's name and number each page sequentially beginning with "00001." The marks should be placed in the lower right hand corner of each page but should not obscure any information on the document. All documents should be produced in enclosures bearing the name of your company, the date of the subpoena and the paragraphs of the subpoena to which the documents respond.

K.      Much of the information requested in this subpoena is likely maintained electronically. Such material is required to be produced electronically. To the extent electronic productions are made, where possible, please follow the production specifications attached. Some information may be maintained and useable only in conjunction with particular software. If so, please call the Assistant U.S. Attorney on the face of the subpoena to discuss prior to production.

4

Confidential

ML DE 00670383

### III.    ATTACHMENT TO SUBPOENA DUCES TECUM

1.      Copies of management and organizational charts and/or other documents sufficient to identify and describe the Company's (a) management structure and management personnel, and (b) corporate structure, including relationships to parent(s), subsidiary(ies), and divisions of the Company, or other related entities associated with the Company, and the legal status of each such entity.

2.      Such documents as will show the Contact Information, date of birth, position/title, and employment status (whether a current or former employee) of all Employees in each division of the Company that is responsible for sales, marketing, and/or billing of urine drug testing/screening.

3.      All documents concerning the compensation structure, bonuses, and incentives for Employees (including, but not limited to, sales representatives and their supervisors) who sell, market, and/or promote urine drug testing/screening (including the confirmation testing of negative results or custom profiles).

4.      All documents concerning performance evaluations, field coaching guides or reports, or ratings for Employees (including, but not limited to, sales representatives and their supervisors) who sell, market, and/or promote urine drug testing/screening (including the confirmation testing of negative results or custom profiles).

5.      All documents (including electronic and accounting databases, meeting minutes, memoranda, and policies) relating to the Company's policies or procedures concerning:

(a)      the sales, marketing, or promotion of urine drug testing/screening (including the confirmation testing of negative results or custom profiles); and

(b)      the reimbursement process for urine drug testing or urine drug screening, (including reimbursement for confirmation testing of negative results or for testing resulting from custom profiles).

6.      All documents concerning any education, instructions, or training of Employees with respect to any issues concerning:

(a)      the sales, marketing, or promotion of urine drug testing or urine drug testing/screening (including the confirmation testing of negative results or custom profiles);

(b)      the reimbursement process for urine drug testing or urine drug screening (including reimbursement for confirmation testing of negative results or for

Confidential

ML DE 00670384

testing resulting from custom profiles);

(c)   kickbacks or illegal or prohibited remuneration, or conduct that may violate or implicate 42 U.S.C. § 1320a-7b; or

(d)   federal health care statutes, rules, regulations, and advisory opinions.

7.   All documents concerning communications with physicians, referring entities, ordering entities or customers and/or health care payors concerning rules, regulations, or codes for the sales, marketing, and/or billing of urine drug testing/screening (including the confirmation testing of negative results or custom profiles).  Such documents include, but are not limited to: coding books; correspondence; reference materials; notices; publications; and any materials provided, produced or generated by health care benefit programs, containing information related to billing for laboratory and other health care services, billing codes, billing procedures, handling of health care claims, and necessary credentials of providers to be billed.

8.   Such documents as will show the Contact Information of all physicians, referring entities, ordering entities or customers that (a) utilize Millenium's urine drug testing/screening services; (b) that previously utilized Millennium's urine drug testing/screening services and no longer do; (c) that were solicited for Millennium's urine drug testing/screening business and did not utilize Millennium's services.

9.   All documents constituting or regarding communications with referring entities or ordering entities and/or physicians that utilize Millennium's urine drug testing/screening services, including, but not limited to, all documents evidencing agreements and contracts between the Company and such entities and/or physicians.

10.   All documents sufficient to show the identity and any Contact Information for each physician, referring entity, ordering entity or customer who received copies of promotional or educational materials about urine drug testing/screening (including information concerning confirmation testing of negative results or custom profiles), or with whom such materials were discussed, irregardless of whether the promotional or educational materials were directly or indirectly provided or financed by the Company, as well as a copy of the materials provided or discussed.

11.   Such documents as will show the Contact Information and date of birth of all patients on or for whom Millenium provides or provided urine drug testing/screening services.

12.   With respect to each patient identified in response to Request No. 11, all records maintained by Millenium and/or provided to any person or entity that provided billing services for Millenium, including, but not limited to, laboratory requisition forms, laboratory

6

Confidential

ML DE 00670385

order forms, referrals, prescriptions, primary care physician approval forms, laboratory test results, medical necessity forms, custom profile documents, and explanation of benefit forms.

13.    With respect to each patient identified in response to Request No. 11, please provide all medical records/charts, including, but not limited to, referrals, orders, progress notes, consultation reports and all other records relating to medical history and treatments; and correspondence with or relating to the identified patients.

14.    All documents concerning visits with physicians, referring entities, ordering entities or customers, by any Employees (including, but not limited to, sales representatives and their supervisors) who sell, market, and/or promote urine drug testing/screening (including the confirmation testing of negative results or custom profiles). Such documents include, but are not limited to, call reports, verbatims, or other reports of the visits. To the extent this information is kept electronically in one or more databases, such databases should also be produced.

15.    All documents regarding remuneration provided to physicians, referring entities, ordering entities or customers, including without limitation: Contact Information for the physician, referring entity, ordering entity or customer; type of remuneration; amount of remuneration; and date of each provision of remuneration. To the extent this information is kept electronically in one or more databases, such databases should also be produced.

16.    One copy of all non-identical materials and data (including in electronic format) provided to Employees (including, but not limited to, sales representatives and their supervisors) concerning the sales, marketing, and/or promotion of urine drug testing/screening (including the confirmation testing of negative results or custom profiles) and the reimbursement thereof.

17.    All documents concerning any consideration or analysis of any benefit (whether actual, anticipated, or perceived, including anticipated but not realized), or financial projection of expected revenues or profits to the Company, including return on investment ("ROI") documents and marketing analyses, from:

(a)    any form of payment or remuneration to physicians, referring entities, ordering entities or customers, or their affiliated entities or associations; or

(b)    any confirmation testing of urine drug testing/screening negative results or custom profiles.

18.    All documents concerning the amounts of sales and/or revenues (including data broken down annually, quarterly, and by month or more frequently) resulting from confirmation testing of urine drug testing/screening negative results or custom profiles. Such documents should include, but not be limited to, documents concerning:

7

Confidential

ML DE 00670386

(a) the sales/revenue in volume and dollar value of each physician, referring entity, ordering entity or customer;

(b) a breakdown of all sales/revenue by CPT code or diagnostic code; and

(c) a breakdown of all sales/revenue by location or region.

19. All claims for payment submitted to all payors for all patients. For each patient, such documents/information shall include, but not be limited to, the patient's primary, secondary and/or third insurance information. For each claim, such documents/information shall include, but not be limited to: date(s) of service; CPT codes; diagnosis codes; claim denial (if any); amount of claim submitted; amount of reimbursement; explanation of benefit forms; and all other information related to the claim.

20. All documents concerning the Company's document retention policy.

21. All capital expenditure requests and justifications for expenditure of capital to purchase equipment needed to perform urine drug testing/screening (including the confirmation testing of negative results or custom profiles).

22. For the time period 2007 to the present, complete personnel files (including but not limited to all salary, bonus, stock, and other annual compensation information; performance evaluations/reviews) for (a) Howard Appel; (b) James M. Slattery; and (c) Martin Price.

8

Confidential

ML DE 00670387

# EXHIBIT 41
## (Filed Under Seal)

# EXHIBIT 42
## (Filed Under Seal)

# EXHIBIT 43

Privileged & Confidential                                    Date: March 17, 2014
Attorney-Client Communication

## OVERVIEW OF PENDING LITIGATION INVOLVING MILLENNIUM LABORATORIES

### I.      *Boston U.S. Attorney's Office Investigation*

Grand Jury and Focus of Investigation: Millennium disclosed that the Government empaneled a grand jury as part of its investigation. Millennium believes four to six former employees (who also filed wrongful termination suits against Millennium) have testified before the grand jury. Millennium believes that Ameritox has been pressing the Government to investigate the allegations it has raised in its civil litigation. Millennium also has "strong suspicions" that a False Claims Act whistleblower may be driving the inquiry. Millennium does not know whether the grand jury is investigating any other companies. From Millennium's perspective, the focus of the Government's investigation is still a "moving target." Millennium made two presentations to the Government lawyers in the last few weeks, which it believes have been positive. A new team of lawyers has taken over the Government's case (both civil and criminal), so these meetings have largely involved Millennium educating the lawyers on Millennium's business practices and the urine testing industry more broadly. In the meetings, the Government was particularly interested in Millennium's "custom profile" and urine cup program, among other things. The Government has also asked for information about Millennium's "troubled accounts" program, whereby the company advised certain doctors that it would end the parties' relationship because the doctors' accounts were not profitable. Millennium believes that each of its practices was defensible and that it utilized higher standards than its competitors. Millennium does not believe that its positive financial results have made the Government suspicious of Millennium's practices.

Timeframe for Investigation: Millennium could not predict a "time horizon" for the investigation. Millennium believes both the staffing turnover and tighter restrictions on granting witness immunity have slowed the pace of the investigation. For example, Susan Winkler, the previous lead criminal prosecutor, was replaced by David Schumacher, who has a reputation for being "slow but thorough." Millennium believes the new lawyers are trying to figure out if there is a case to pursue, which Millennium finds encouraging. Millennium is meeting with the Government again the week of March 17.

Production of Information: Although Millennium indicated in our February 12, 2013 call that the Government had asked to meet with a handful of Millennium employees, those interviews never occurred. Millennium believes this is because of the new witness-immunity policy, which makes it more difficult for the Government to grant individuals immunity for witness interviews. Millennium does not expect any movement on the interviews while the policy remains in effect. Millennium completed its document production in the summer of 2013 and is not aware of any follow-up document requests from the Government. However, Millennium asked the Government to issue a subpoena for documents Millennium received in civil discovery showing that Ameritox has been paying the legal fees of the ex-employees suing Millennium for wrongful termination (and who have also testified before the grand jury).

Witness Intimidation / Obstruction Allegations: We asked Martin Price about the allegations lodged by the civil litigants that Millennium engaged in witness intimidation when Martin made a January 2012 internal presentation that used images of body bags to depict former employees

1

Privileged & Confidential                                              Date: March 17, 2014
Attorney-Client Communication

Millennium was litigating against (such as Ed Zicari). Martin stated that the presentation was "facetious" and was generally received that way, except by the wrongful-termination civil litigants and Ameritox. Upon request, Millennium provided the presentation to the Government (after waiving privilege) in 2012, and it was reportedly shown to the grand jurors. The Government lawyers have not brought the issue up recently with Millennium or Martin. We also asked about the allegations that Millennium destroyed documents. Martin explained that Millennium did not destroy any documents and that, in fact, Millennium has provided unredacted copies of a voluminous amount of documents to the Government. Martin did acknowledge that Ameritox has been pushing these allegations with the Government, although the Government has not focused on the topic with Millennium.

Potential Exposure: Millennium does not yet know whether the ultimate resolution will be civil or criminal, but stated that it is common for these inquiries to begin as both criminal and civil but to end with a civil-only resolution. Millennium believes that if the investigation is resolved civilly, the outcome would likely be a monetary penalty. Millennium could not offer a specific figure but supplied two recent settlements for comparison. First, Calloway settled with Massachusetts state prosecutors for $20 million after the company and several executives were indicted. Calloway also entered into a civil settlement with the Boston U.S. Attorney's Office for $7.7 million. Second, Ameritox settled with Florida federal prosecutors for $16 million. Michael Loucks of Skadden, Millennium's outside counsel, characterized the conduct in both the Calloway and Ameritox cases as more "egregious" than the allegations against Millennium. When asked if Millennium's exposure was, accordingly, capped at around $20 million, Loucks acknowledged the force of this reasoning and stated that he does not believe there will be a "material result" in terms of the company's finances. Although these examples were relayed for comparison, Millennium stated its views that the Government determines monetary payments through financial analysis of damages, rather than meting out "rough justice" by comparing the current case to past cases. In addition to a monetary penalty, the Government might also impose a Corporate Integrity Agreement, although such agreements are apparently less frequent now because of the compliance costs involved. Martin does not believe a Corporate Integrity Agreement, if imposed, would have much of an impact on Millennium because he believes Millennium's practices are stronger than those typically required in such agreements.

## II.    *Litigation Involving Ameritox*

Florida Case: Millennium has pending litigation with Ameritox in Florida federal court, which was consolidated with the federal case in San Diego. Ameritox alleges that Millennium falsely advertised its services; Millennium counterclaims that Ameritox engaged in similar unfair business practices. Discovery is closed and summary judgment motions are fully briefed. A trial is set for June 2014. Ameritox seeks damages in the range of $190 million to $210 million, based on a claim for the disgorgement of Millennium's profits. (Ameritox is not seeking "lost profits" because it cannot show that Millennium's conduct caused Ameritox to lose business.) Roughly 80% to 90% of Ameritox's damages claim relates to the urine cup program. According to Millennium, the key legal issue is whether or not the urine cup program is "unambiguously illegal." Millennium believes that it can show that the program is *not* unambiguously illegal because several healthcare experts have opined that the program is legal. (We note that these experts, such as Ron Wisor and Lew Morris, are retained by Millennium and may not be viewed

2

                                                                 JPMC-00030810

Privileged & Confidential                                    Date:  March 17, 2014
Attorney-Client Communication

by the court as independent.)  Millennium indicated that if the court does not award damages to Ameritox, it might nonetheless provide injunctive relief, such as requiring Millennium to issue corrective advertising.  Martin acknowledged that one risk of the lawsuit is that if the judge or jury finds that Millennium's business practices are illegal, this may fuel the U.S. Attorney's Office investigation.  Martin stated that the issue of the legality of the program "would not be a fight that would go quietly."  Millennium believes it has a strong case, and its strategy is to "plow ahead."

Wisconsin Case: Millennium has pending litigation with Ameritox in Wisconsin federal court (which was originally filed in Maryland federal court), in which Ameritox claims that Millennium's use of a bell curve in its RADAR report infringes two patents registered to the Marshfield Clinic and for which Ameritox has exclusive licensing rights.  Millennium initiated proceedings with the U.S. Patent and Trademark Office, which concluded with the U.S.P.T.O. declaring the patents invalid.  Ameritox is appealing that ruling.  Ameritox also recently filed an amended complaint to add the  Marshfield Clinic as a party to the lawsuit.  The case has a March 2015 discovery deadline and an April 2015 trial date.  Discovery has yet to begin.  In terms of exposure, Martin explained that there are two types of damages Ameritox could seek: (1) payment of a licensing fee; and (2) lost profits.  Regarding the licensing fee, Millennium estimated its highest exposure would be a figure "well south of $5 million" paid out over three years.  Regarding lost profits, Martin stated that Ameritox's case is weak because in the Florida case, Ameritox has already tied 80% to 90% of its damages to the urine cup issue, not the patent issue.  Accordingly, one could estimate that the exposure on the lost-profits issue in the patent case is about $20 million, though there have been no expert reports issued in the case.

### III.    Litigation Involving Calloway

Federal Case: Millennium achieved a favorable result in the lawsuit brought by Calloway's former compliance officer in 2009 (but effectively pursued by Calloway), which alleged that various Millennium billing and testing practices violated the False Claims Act and similar state statutes.  In April 2013, the First Circuit largely affirmed the district court's dismissal of Calloway's claims but remanded the case for the determination of a few issues.  In January 2014, the district court dismissed the remainder of the case, denied Calloway's motion for leave to amend its complaint, and entered judgment for Millennium.  Although Calloway has moved to alter the district court's judgment, Martin believes Calloway's argument is weak.  Millennium is considering seeking reimbursement of its legal fees because it believes the lawsuit was initiated for competitive reasons, not out of a genuine belief in False Claims Act violations.

State Cases: In 2013, Millennium reached an out-of-court settlement with Calloway to globally resolve the parties' direct lawsuits in state court.  In these lawsuits in Massachusetts and New York state courts, Millennium alleged that Calloway "engaged in a misinformation campaign" about Millennium's practices and orchestrated the False Claims Act case; Ameritox's claims involved allegations similar to those in the False Claims Act case.  The resolution involved an agreement by each side to drop all pending claims.

3

                                    JPMC-00030811

Privileged & Confidential                                      Date: March 17, 2014
Attorney-Client Communication

## IV.    *Litigation Involving Former Employees*

Millennium has several cases in which former employees allege they were wrongfully terminated for refusing to participate in Millennium's illegal business practices. From an exposure standpoint, each case is essentially cabined by the employee's earnings. Martin estimates that each case presents exposure of, at most, the hundreds-of-thousands range. Martin acknowledged that although the cases have low exposure amounts, they can nonetheless be "ugly" in terms of the accusations that are leveled. The U.S. Attorney's Office is apparently following the proceedings in these cases.

Kelly Nelson (Arizona federal and state court): In October 2013, the federal court dismissed the majority of Nelson's 20 claims. Nelson's remaining claims involve allegations that Nelson refused to provide free testing services. The parties briefed summary judgment motions in January 2014, which are pending. Millennium moved for sanctions on two grounds: (1) Nelson's sharing of confidential information with Ameritox; and (2) Ameritox's payment of Nelson's legal fees. In April 2013, Millennium sued Nelson in state court. In August 2013, Nelson filed counterclaims that are "identical" to her claims in the federal case. Millennium is looking for a favorable outcome in the federal case to use as *res judicata* in the state case. Martin stated that Nelson had been working since she was fired and believes her damages would be a couple hundred thousand.

Jodie Strain (Texas state court): Summary judgment motions have been fully briefed and a trial is set for May 2014. As with the other suits, Ameritox is paying all of Strain's legal fees. Strain's claim for damages is around $480,000.

Ed Zicari (Texas state court): Summary judgment motions have been fully briefed, and a trial is set for October 2014. Millennium also filed a motion for sanctions regarding Zicari's discovery responses, which falsely denied that Ameritox is paying Zicari's legal fees. Zicari has not submitted a report on his alleged damages yet.

Joshua Hugo (Tennessee federal court): In January 2014, the court granted Millennium's motion for summary judgment. Hugo is now pursuing an appeal in the Sixth Circuit.

NicSyd Enterprises (Arbitration): Millennium has one outstanding arbitration with a former employee, Steve Johnson, who helped Millennium set up its sales force in 2008 and 2009. He claims unpaid commissions for a four-month period in 2009 after he was terminated. The case has been largely inactive; for example, no discovery has proceeded. Martin finds the case "hard to gauge," but any damages exposure would be low (could be less than $100,000).

## V.    **Review of Closed Cases**

Millennium was previously engaged in litigation with others in the industry, including Aegis Sciences Corporation, American Clinical Solutions, Universal Oral Fluid Laboratories, and eLab Consulting. All of these lawsuits have been resolved favorably, with nothing now pending.

4

                                                                                       JPMC-00030812

# EXHIBIT 44

Redacted

Millennium Update Call                3/7/14

Martin Price, GC                                    Jennings
                                                    Staros
Brad Mastrobuono, Jennings Str      Mastrobuono, JSS
Michael S   (Espinne)                               ↓
Russell DaSilva     Hogan                   Prior deals.
Mike Silver
Ron Weiser

Ryan   Bian, Ben, Cory        JPM
                              Citi
                              DB   Brian Mashack
                              BMO
M. Price                      Sun Trust

1. Aegis
      resolved favorably

2. Calloway
      resolved early 2013

3. Am Clinical Lab
      dismissed
      no payment from M

CONFIDENTIAL

Lorielle: There have been strong efforts to build strong compliance programs.

Length of investigation: 2 years
not long! in this space
, recently, triggered by new counsel.
new attys do not want to
make quick decision

Cong: ~~that~~ CIA does not necess mean old policies are bad.

Mahan: (Lori Morris) says our policies are approp given our level of maturity.
We are still developing.

Cong: what's the exposure?

Mahan: No.
2 other ~~set~~ resolutions
Calloway ~ $20 m. Mass. Atty.
Conduct was egregious
shell cos. to funnel. SI to employ

Arevitox ~ $16.5 m. ~~Roxx~~, DOJ
I don't see any parallel to our ongoing
✱   ex. pt-of-care test cups issue

CONFIDENTIAL

STB_ML-00000035

Ron Weiser: looked at it yrs ago, said it was fine
Lonchs: last summer - I thought it was fine -
Lon Morris: last fall — it's fine

Ron: Recently: there's nothing here.

Cong: From your other examples,
   why shouldn't I conclude that
      it ^20m is for egregious conduct
         then why aren't we less?

MRonchi: You could conclude that.
   there does not feel to me to be a
      material result

No # has been said to me or to
   prior counsel.

Cong: does M's growth play into this?

ML: No.
   Court looks at conduct
      rather b. Co & customer to see it
         customers are ordering unnecesr tests.
   So, Dr. orders tests.
      Lab can't second-guess Dr's order

CONFIDENTIAL

# EXHIBIT 45

| From: | Chakanava, Iryna A <iryna.a.chakanava@jpmorgan.com> |
|---|---|
| To: | Rapkin, Cory <Cory.Rapkin@jpmorgan.com>;Mainelli, Matthew" <Matthew.Mainelli@jpmorgan.com>;Karanikolaidis, Stathis" <Stathis.Karanikolaidis@jpmorgan.com>;Griswold, Ryan P" <ryan.p.griswold@jpmorgan.com>;LeeLum, Dawn <DAWN.LEELUM@jpmorgan.com>;Chiarelli, Benjamin R <benjamin.r.chiarelli@jpmorgan.com>;Guttilla, Michael T <michael.t.guttilla@jpmorgan.com>;Zabaloieff, Alexander J" <alexander.j.zabaloieff@jpmorgan.com> |
| Sent: | 11/29/2012 4:25:32 PM |
| Subject: | Millennium Laboratories |

Team -

Please see a summary of yesterday's Millennium Labs call below. Let us know if you have any questions.

### Revenue
| | |
|---|---|
| 3Q: | $137mm actual vs. $76mm forecast. Up 11% Q-o-Q |
| YTD: | $359mm actual vs. $217mm forecast. |
| FYE 2012 Forecast: | $490mm |

### EBITDA
| | |
|---|---|
| 3Q: | $87mm actual vs $36mm forecast. Up 14.4% Q-o-Q |
| YTD: | $218mm actual vs $102mm forecast |
| FYE 2012 Forecast: | $294mm |

### Key drivers

- 10% Q-o-Q growth in volume (across all geographic regions); volume for the quarter was 28% above forecast
- Net revenue per specimen stabilization (NRPS stabilized at $285 in Q3)
- Introduction of new test offerings (resulted in 9.3% increase in NRPS)
- Penetration of treatment centers (accounted for 40% of overall revenue growth)
- New key payor contracts, particularly with the Blue Cross Blue Shield

### 2013 Growth Initiatives
- Entering new markets, including international and new locations in the US (received certification to enter Florida)
- Continued growth of OBGYN segment
- New and expanded test offerings
- Continue to expand payor relationships, enter into new capitated health plan contracts
- Workers compensation opportunity

### Amendment
- To be able to support its growth and continue to expand Millennium requested for the increase of its capex limits under the credit agreement as follows:

-
Proposed/Existing:
2012: $45MM/$35MM
2013: $35MM/$20MM
2014:$30MM/$15MM
2015: $30MM/$15MM

- The lenders are also asked to consent to forego 2nd lien on the equipment currently under BOA lease financing arrangements, which the Company intended to seek to obtain.

### Litigation Update:

CONFIDENTIAL

JPMC-MIL-CORP-00215705

- On the current subpoena – there is nothing new to report on the legal end. The Company has gathered that ~3 former sales reps who were terminated due to cause were contacted by Reuters, giving the story more press than previously anticipated. With that said, the Company feels they have handled the situation well in the field and the doctors with whom they work understand this type of whistleblower activity is part of the field. There have been no dates nor timetables set, but the Company's counsel has advised them this could be a drawn out process
- Boston case (Callaway) – the case was initially dismissed, but Callaway appealed the ruling and the appeal is currently being reviewed. Company expects the dismissal to be upheld
- Florida case (Ameritox) – Millennium successfully stayed the discovery until February 2014, so there will not be much action until then.

## Other notes

- Millennium is now working with the Clinton administration's former head of Indian Affairs and they will be meeting with tribal leaders in the coming months to address abuse issues in the Indian nation. Millennium will work to create a large presence in this market
- Management update: the Company is expanding its management team; they brought in new hires, including Steven Passik and a new Chief Medical Officer Dr. Alex Cahana, and are looking to add CEO and CFO roles to the management team. See short bios for the new hires below.

## Alex Cahana

Dr. Cahana is an internationally recognized anesthesiologist and pain specialist. He joined the faculty of the University of Washington Department of Anesthesiology and Pain Medicine to lead as chief of the newly formed Division of Pain Medicine in 2008. Born in Israel, he studied medicine at Tel Aviv University and was awarded the Purple Heart as a medical officer in the Marine Corps. He completed his training in anesthesiology in his native Israel and completed a fellowship in pain management and palliative care at Vanderbilt University. Most recently, he served as director of the Postoperative and Interventional Pain Program at Geneva University Hospitals in Switzerland. He is leading the creation of the National Pain Registry and is developing the Washington State Opioid Reform Initiative. In addition to his medical degree, Dr. Cahana holds a master's degree in bioethics and medical humanities from the Faculty of Theology, University of Lausanne. He is the associate editor in the journals Pain Practice, Pain Medicine and Pain Physician and is chair of the research committee of the American Academy of Pain Medicine. He is the assistant-at-large to the president of the World Institute of Pain.

http://www.uwmedicine.org/bios/view.aspx?centralid=173616

## Steven Passik

Dr. Steven Passik, Ph.D. serves as Professor of Psychiatry and Anesthesiology at Vanderbilt University Medical Center. Dr. Passik serves as a Member of The Scientific Advisory Board at PharmacoFore, Inc. (a/k/a Signature Therapeutics, Inc.). Dr. Passik serves as a Member of Emerging Solutions-Pain Advisory Board at MediCom Worldwide, Inc. Dr. Passik serves as a Member of many scientific and medical societies including the American Psychological Association, International, Psycho-Oncology Society and American Society of Psychiatric Oncology/AIDS, all organizations of specialists in his field. He has also written extensively on the interface of pain management and addiction. Dr. Passik is a clinical psychologist and has areas of expertise include the general psychological aspects of cancer including palliative care, and symptom management with an emphasis on pain, depression, nausea and fatigue. He also leads the symptom studies and pharmacotherapy laboratory. His research interests include examining pain medication usage among cancer patients; assessing abnormal drug usage among cancer and HIV+ patients; and developing psychosocial interventions for cancer patients.

http://investing.businessweek.com/research/stocks/private/person.asp?personId=138480360& privcapId=134732350&previousCapId=1632625& previousTitle=Gunderson%20Dettmer%20Stough%20Villeneuve%20Franklin%20&%20Hachigian,%20LLP

CONFIDENTIAL

# EXHIBIT 46
## (Filed Under Seal)

# EXHIBIT 47

| | |
|---|---|
| **From:** | Griswold, Ryan P <ryan.p.griswold@jpmorgan.com> |
| **To:** | Christoforou, Alla <alla.christoforou@jpmorgan.com> |
| **CC:** | Guttilla, Michael T <michael.t.guttilla@jpmorgan.com> |
| **Sent:** | 11/27/2013 7:00:48 PM |
| **Subject:** | RE: ML litigation update |

Thank you. Same to you.

Ryan P. Griswold | Vice President | Leveraged Finance | J.P. Morgan | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

Alternate contact: Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

-----Original Message-----
**From:** Christoforou, Alla
**Sent:** Wednesday, November 27, 2013 01:46 PM Eastern Standard Time
**To:** Griswold, Ryan P
**Cc:** Guttilla, Michael T
**Subject:** ML litigation update

Ryan,

Please see below the litigation update for Millennium. The update was in line with what we heard from them on the due diligence call.

Please let me know if you'd like me to provide more details on any of the points below.

Happy Thanksgiving!
Alla

Millennium Litigation Update by Martin Price:

An open investigation by the US Attorney in Boston:

1. There are no outstanding claims/charges at this time.
2. None of the employees have been asked to testify in front of the jury.
3. Only 4 former employees have testified, all of which are involved in civil lawsuits against the company.
4. The company is cooperating with the Attorney's office.
5. ML is providing all necessary documents to the Attorney's office upon request (Sales/mkt materials, core groups of custodians, testing data from State of Massachusetts claims to specify how the company bills for specimen validity)
6. The claim was filled in Massachusetts due to the fact that it used to have the most aggressive lawyer specializing in healthcare fraud, however, currently it's not the case (California, NJ, etc).
7. The main reason for the investigation is the fact that a lot of competitors have been filling claims with the same allegations, which is a red flag. However, all of the cases filed against the Company have been dismissed without prejudice, which makes ML confident in a similar outcome.
8. The attorney that has been working on the case recused herself form the case due to search of outside employment. The case currently does not have an attorney assigned to it, which might cause the process to lengthen (in case another attorney will have to pick it up and start the work from scratch). According to

JPMC-MIL-CORP-00187347

company's estimate, this type of law suits takes ~2 years to conclude.

9.   The company had a meeting with the Attorney's office about 10 days ago, the case still does not have an assigned attorney.

10.  In 2012 ML had a lawsuit brought up by Robert Cunningham, a former compliance officer of Calloway regarding ML's billing practices, which was dismissed for lack of subject matter. This outcome reiterates the company's belief in success of the outstanding case.

Three are 2 civil cases outstanding brought up by Ameritox:

1.   Both of the cases filed in 2011 and are pending at the moment.
2.   The cases are based on the claim regarding display of information depicting test report result based on bell curve (Ameritox patented it in 2011) and unfair business practices. One of the cases was dismissed for lack of jurisdiction and has been refilled.
3.   The company has had several similar law suits brought up since 2008 by Calloway and all of them have been dismissed.

Civil cases filled by former employees:

1.   The company has discovered that the cases have been sponsored by Ameritox.
2.   Summary judgments are pending for all of the cases.

Millennium has filled claims against Ameritox as well. The claims are similar to the claim brought up by Ameritox against ML.

---

**Alla Christoforou** | Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3932 | C: 917.767.9987 | F: 917.464.2378 | alla.christoforou@jpmorgan.com | jpmorgan.com

CONFIDENTIAL

JPMC-MIL-CORP-00187348

# EXHIBIT 48

From: Kensil, Sean [ICG-CIB] sk42881@imcnam.ssmb.com
Subject: FW: Millennium Labs Litigation Update Call
Location: Dial-in: 888 575 5762 / Passcode: 3486-7736#

Start: Wed 11/27/2013 12:00:00 PM
End: Wed 11/27/2013 12:30:00 PM

Recurrence: None

Required Attendees: Floyd, Mark [NAM-RISK]; Dickson, Stuart G [ICG-CMO]; Tortora, Michael [ICG-CMO]; Kulikova, Polina [ICG-CMO]; De Velasco, Alvaro [ICG-CIB]; Yermash, Eugene [ICG-CIB]

Importance: Normal

-----Original Appointment-----
From: Kensil, Sean [ICG-CIB]
Sent: Monday, November 25, 2013 8:45 PM
To: Kensil, Sean [ICG-CIB]; Sarin, Aradhana [ICG-CIB]; Carpenter, Benjamin [ICG-CIB]; Boyd, Philip [ICG-CIB]; West, Emily [ICG-CIB]; Evans, Pat [NCB-CCB]; Litten, Gary [NCB-CCB]; Preston, Trevor [NCB-CCB]; Jans, Dennis J [NCB-NACB]; O Callahan, Brian [NCB-CCB]
Subject: Millennium Labs Litigation Update Call
When: Wednesday, November 27, 2013 12:00 PM-12:30 PM (UTC-05:00) Eastern Time (US & Canada).
Where: Dial-in: 888 575 5762 / Passcode: 3486-7736#


Dial-in: 888 575 5762
Passcode: 3486-7736#

CONFIDENTIAL                                                                                                CITI-DE-00024069

# EXHIBIT 49

FEBRUARY 2014



## MILLENNIUM LABORATORIES, INC.

Pre-Organizational Materials

**Organizational Call:**

Friday, February 28th 11:00 a.m. ET / 8:00 a.m. PT

Conference Call
Dial in:      888-575-5762
Passcode:  1895-9232#

*Please contact Alla Christoforou (alla.christoforou@jpmorgan.com) with any changes or updates to the working group list*

STRICTLY PRIVATE AND CONFIDENTIAL

J.P.Morgan

JPMC-00077654

CONFIDENTIAL

# Table of contents

1.   Meeting agenda ...................................................................................................2

2.   Transaction overview ...........................................................................................3

3.   Summary terms and conditions ...........................................................................4

4.   Execution timetable .............................................................................................5

5.   Key due diligence topics ......................................................................................6

6.   Working Group List ..............................................................................................7
     Millennium Laboratories, Inc.                                    7
     TA Associates, Inc.                                              7
     J.P. Morgan Securities LLC                                       8
     Jennings, Strouss & Salmon, PLC                                  10
     Simpson Thacher & Bartlett, LLP                                  11

J.P.Morgan

JPMC-00077655

CONFIDENTIAL

# 1. Meeting agenda

- Participants
  - Borrower – Millennium Laboratories, Inc.
  - Sponsor – TA Associates, Inc.
  - Lead-arranger/Bookrunner – J.P. Morgan Securities LLC

- Transaction overview
  - Transaction summary
  - Sources and uses
  - Pro forma capitalization table

- Summary terms and conditions

- Execution timeline

- Key due diligence topics

- Next steps
  - STB / JPM to distribute Commitment Papers
  - Company to distribute 7-year projection model (with quarterly figures for 2014 and 2015)
    - Company to send draft year-end / Q4 financial statements and compliance certificates
  - Schedule Monday's Organizational Call for other bank(s) and lawyers
  - Schedule and conduct in-person due diligence

MILLENNIUM LABORATORIES, INC.

2

J.P.Morgan

JPMC-00077656

CONFIDENTIAL

## 2. Transaction overview

### Estimated sources and uses of funds

| Sources | Amount ($mm) | Uses | Amount ($mm) |
|---|---|---|---|
| New Term Loan B | $1,715.0 | Dividend | $1,250.0 |
| Balance sheet cash | 87.1 | Refinance TLA | 312.5 |
| | | Refinance TA debentures | 196.0 |
| | | Fees and expenses[1] | 43.6 |
| **Total** | **$1,802.1** | **Total** | **$1,802.1** |

[1] Assumes 2% arrangement fee and 50bps OID/upfront fee

### Pro forma capitalization

| ($mm) | Pro forma | xEBITDA[1] |
|---|---|---|
| Cash | $112.4 | |
| $30mm R/C facility due 2019 | - | |
| New 1st lien Term Loan due 2021 | 1,715.0 | |
| **Total secured debt** | **$1,715.0** | **4.75x** |
| **Net secured debt** | **$1,602.6** | **4.44x** |
| Other debt | 57.9 | |
| **Total debt** | **$1,772.9** | **4.91x** |
| **Net debt** | **$1,660.5** | **4.60x** |

[1] Based on Projected 12/31/13 Adj. EBITDA of $361.2 million

MILLENNIUM LABORATORIES, INC.

J.P.Morgan

JPMC-00077657

CONFIDENTIAL

## 3. Summary terms and conditions

**For discussion purposes only**

| | |
|---|---|
| **Borrower** | Millennium Laboratories, Inc. (the "Company" or "Borrower") |
| **Guarantors** | Holdings and all material domestic subsidiaries |
| **Purpose** | Refinance all existing indebtedness, TA debentures, dividend distribution, and pay fees and expenses |
| **Facility size** | ▪ $30mm RC<br>▪ $1,715mm TLB |
| **Tenor** | ▪ RC: 5 years<br>▪ TLB: 7 years |
| **Security** | First lien on all tangible and intangible assets and stock of the Borrower and its domestic subsidiaries; 2/3 of the stock of foreign subsidiaries |
| **Covenants:** | ▪ RC: Maintenance covenant TBD<br>▪ TLB: covenant lite |
| **Negative covenants** | Usual and customary for transactions of this type, including:<br><br>▪ Limitations on indebtedness<br>▪ Limitations on restricted payments and investments<br>▪ Limitations on liens<br>▪ Limitations on transaction with affiliates<br>▪ Limitations on asset sales, mergers and consolidations and other fundamental changes<br>▪ Limitations on restrictions on subsidiary dividends and other restrictive agreements<br>▪ Restricted payments and investments covenants |
| **Prepayments** | ▪ 101 soft-call for 6 months |

MILLENNIUM LABORATORIES, INC.

4

J.P.Morgan

JPMC-00077658

CONFIDENTIAL

# 4. Execution timetable

| March 2014 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 | | | | | |

| April 2014 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

Denotes key near-term dates

### Transaction timetable

| Week | Ratings | Term Loan |
|---|---|---|
| March 3rd | ▪ Begin drafting Rating Agency Presentation ("RAP")<br>▪ Finalize projection model | ▪ Organizational Call (March 3rd)<br>▪ Business due diligence on site (March 5th / 6th)<br>▪ Begin legal due diligence<br>▪ Begin accounting, tax and environmental due diligence |
| March 10th | ▪ Continue drafting RAP<br>▪ Call rating agencies to schedule meetings | ▪ Begin drafting Confidential Information Memorandum ("CIM")<br>▪ Begin drafting Credit Agreement ("CA") |
| March 17th | ▪ Finalize RAP<br>▪ Meet with S&P and Moody's in NYC | ▪ Begin converting RAP into Lender Presentation ("LP")<br>▪ Continue drafting CIM<br>▪ Continue drafting CA<br>▪ Pre-screen key lenders |
| March 24th | ▪ Complete necessary follow-up with agencies | ▪ Finalize LP<br>▪ Finalize CIM<br>▪ Continue drafting CA<br>▪ Post invites via IntraLinks |
| March 31st | ▪ Receive / announce ratings | ▪ Post TS, LP, CIM, and financial model to Intralinks<br>▪ Launch via Lender meeting in NYC<br>▪ Continue drafting CA |
| April 7th | ▪ Send final Credit Agreement to agencies | ▪ Syndication continues<br>▪ Finalize and post CA for Lenders' review<br>▪ Commitments and comments due |
| April 14th | | ▪ Finalize allocations<br>▪ Close and fund |

MILLENNIUM LABORATORIES, INC.

J.P.Morgan

JPMC-00077659

CONFIDENTIAL

## 5. Key due diligence topics

- Industry update, including competitive dynamics

- Impact of healthcare reform and high deductible health plans / collection rates

- Payor relationships overview, including new in-network contracts and renewal rates for existing contracts

- Update on Pharmacogenetics business; any other new product offerings and/or new therapeutic areas

- Operating performance overview for 4Q and full year 2013 as well as update on YTD 2014 trends

- Historical and projected pricing and volume trends

- Key model assumptions, including top line and margin drivers, working capital and capex requirements, tax assumptions

- Sustainability of EBITDA margins in the long term

- Major capex projects currently underway; capex trends going forward; maintenance vs. growth spending break down

- Growth strategy going forward, including organic and growth through acquisitions

- Legal and regulatory update, including status of outstanding litigation and the OIG subpoena

- Rx Ante acquisition integration status; performance relative to expectations

- Ownership structure and type of corporation (S-corp / C-corp) pro forma for the conversion of the PIK debenture

**Note:** Comprehensive due diligence list to follow

MILLENNIUM LABORATORIES, INC.

6

J.P.Morgan

JPMC-00077660

# EXHIBIT 50

**PROJECT PADRESL14**

# Business due diligence questions

### Industry overview

1.  Review the general business environment for Millennium
    a)  Discuss expectations for the clinical lab industry (including industry size, expected growth, consolidation, etc.)
    b)  Discuss the impact of current economic environment on the segment

2.  Discuss industry competitive dynamics
    a)  Overview of direct competition such as Ameritox, Aegis, Calloway etc.
    b)  Discuss Millennium's key differentiators and competitive advantage
    c)  Comment on Millennium's historical and projected market share
    d)  Discuss the competition from LabCorp and Quest Diagnostic – to what extent have they penetrated this segment, and why hasn't there been more penetration?

3.  Discuss the impact of healthcare reform on the Company's business and industry generally
    a)  Comment on the impact from high deductible health plans / collection rates

4.  Discuss reimbursement environment
    a)  Key margin differences among different payors
    b)  Please discuss your revenue by payor and how each of the following factors will impact your revenue and margin profile going forward
        i.   Changes in Medicare reimbursement
        ii.  High deductible health plans / collection rates
        iii. Any additional payor related changes that may materially impact future results
    c)  Discuss current commercial relationships overview, including new in-network contracts and renewal rates for existing contracts
    d)  Discuss recent trends in the out-of-network commercial business

### Operations

1.  Please discuss any key operational or technological enhancements that have been made to the lab in the last 12 months to increase efficiency, accuracy, and/or profitability
    a)  How do you evaluate making the investments in these types of opportunities (e.g. hurdle ROI?)
    b)  Are there any current plans for additional enhancements planed or being considered for the current lab operations

2.  Discuss current capacity, anticipated need to expand and associated capital investments
    a)  How do you go about evaluating the need to expand and the evaluation process to implement such expansion (e.g. metrics evaluated)
    b)  Please also discuss your past capacity expansions and, if possible, the ROI on those investments

3.  Discuss backup for operations/ability to operate should issues occur with current site and cost to replicate
    a)  Where is the location of and capacity of your current alternate site
    b)  How long would it take to get this alternate site up and running and what is your estimate on potential losses that may be incurred if a move to these facilities was needed

4.  Employee retention
    a)  Please discuss your retention/turnover of key employees
        i.   Discuss the trend over the past three years
    b)  How do you retain key talent (e.g. compensation, training programs, etc.)

Confidential

ML_DE_00385564

c)  Please discuss your current salesforce and their compensation structure
   ii.  Discuss turnover in your sales organization specifically
   iii.  Do you have a clear understanding if your rep productivity and is this a metric you use in forecasting the business
   iv.  Do you have plans to expand your current salesforce and, if so, how many more reps do you need to add to achieve your current plan

**Business strategy and recent developments**

1.  Please discuss any material events that have occurred since 2013Q3

2.  Please provide an update on the Company's growth strategy
   a)  Discuss the drivers of organic growth. How does Millennium plan on continuing to drive deeper physician penetration and increase physician utilization?
   b)  Are there any thoughts to expand business internationally? If so, which countries/ regions will you focus on and why?
   c)  Recent or anticipated new product launches and/or new therapeutic areas
   d)  Discuss the acquisition pipeline (after RxAnte)

3.  Please provide an update on integration of RxAnte and its performance relative to expectations

4.  Discuss Millennium's margins relative to competition and key drivers of outperformance
   a)  Comment on sustainability of margins in the long term

5.  Discuss product pricing strategy and the importance of CPT codes

6.  Comment on the Company's relationships with key partners
   a)  Any material supplier contracts entered into, terminated or modified?
   b)  Any defaults under material contracts?
   c)  Any disputes with significant suppliers or threats to supplier relationships?

7.  Discuss Company's Compliance Plan/Program description or manual

8.  Are there any other recent developments or strategic initiatives related to a more comprehensive drug management / pain management / patient management strategy (or other) that J.P. Morgan should be made aware of?

**Products/Technology**

1.  Provide an update on Pharmacogenetics testing business
   a)  Discuss any new collaborations/partnerships the Company entered into in connection with this offering
   b)  Is this business still utilizing the Luminex technology?  If so, are any other platforms being considered or tested?

2.  Overview of blood serum and oral fluid testing as alternatives to UDT
   a)  Are there any other recent or anticipated types of testing the Company intends to launch
   b)  Apart from these types, have there been any developments in potential alternatives to urine testing?

3.  Discuss any new therapeutic areas Millennium intends to enter

4.  Are there any other new initiatives on the horizon that will require additional capital investments that have not already been discussed?

5.  Discuss the essence of GC-MS technology used by competitors and the advantages of LC-MS/MS utilized by Millennium

2

Confidential

ML_DE_00385565

6. Is any of the testing technology or equipment utilized by Millennium under patent or licensed patent? If so, when do these patents (licensed patents) expire?

7. Is Millennium currently evaluating or considering implementing any new technology platforms in the core business?
   a) If so what are the benefits of these new technologies
   b) How will they impact the financial profile of the business going forward
   c) What would the cost be to implement the new technologies

**Financial Performance**

1. Review Millennium's recent financial performance (including 4Q 13 and full year 2013, as well as YTD 2014)
   a) Revenue performance vs. internal targets
   b) Discuss revenue per sample performance (historical trends and expectations going forward)
   c) Productivity gains
   d) Volume trends

2. Provide updated financial projections (pro forma for the transaction)
   a) Discuss key model assumptions, including top line and margin drivers, working capital and capex requirements, tax assumptions

3. Capital expenditure plans
   a) Major capex projects currently underway; capex trends going forward; maintenance vs. growth spending break-down

4. Are there any near term contract maturities that we should be aware of?

5. What is your revenue concentration by state?

6. If all of your out-of-network volume were at in-network rates what would your 2013 and 2014 EBITDA be?

**Management/Ownership/Structure**

7. Discuss ownership structure and type of corporation (S-corp / C-corp) pro forma for the conversion of the PIK debenture

8. Discuss relationships with the affiliates, including Millennium Laboratories Clinical Supply and Millennium Research Institute. Comment on the relationship of Millennium with Pain In The Air and Pain In San Diego.

9. Any anticipated changes in management/Board of Directors pro forma for the transaction?

**Legal / Regulatory**

10. Discuss latest update on litigation developments and whether reserves have been established
    a) What is the estimate for damages or potential changes in current practices and impact? What amount is covered by insurance? Has there been any development in terms of the insurance companies' willingness to cover litigation expenses?
    b) Has the Company established any reserves?

11. Provide an update on the status of OIG subpoena. Has there been any recent communication with OIG? Any additional requests for documentation?

3

Confidential

ML_DE_00385566

12. List any violations of regulatory inspections, audits or non-compliance incidences

4

Confidential

ML_DE_00385567

# EXHIBIT 51

| | |
|---|---|
| **From:** | Griswold, Ryan P <ryan.p.griswold@jpmorgan.com> |
| **To:** | Christoforou, Alla <alla.christoforou@jpmorgan.com> |
| **CC:** | Guttilla, Michael T <michael.t.guttilla@jpmorgan.com> |
| **Sent:** | 4/13/2014 9:58:04 PM |
| **Subject:** | RE: Millennium Laboratories Litigation Discussion |

Thx Alla.

Ryan P. Griswold | Vice President | Leveraged Finance | J.P. Morgan | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

Alternate contact: Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

-----Original Message-----
**From:** Christoforou, Alla
**Sent:** Sunday, April 13, 2014 05:51 PM Eastern Standard Time
**To:** Griswold, Ryan P
**Cc:** Guttilla, Michael T
**Subject:** Millennium Laboratories Litigation Discussion

FYI - Just got off the phone with Martin and Narmeen on the litigation update. All went well, Martin gave her a good overview of the outstanding cases without being overly biased. Also I think he was able to address all of her concerns around any potential large immediate settlements.

**Alla Christoforou** | Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3932 | F: 917.464.2378 | alla.christoforou@jpmorgan.com | jpmorgan.com

-----Original Appointment-----
**From:** Griswold, Ryan P
**Sent:** Sunday, April 13, 2014 4:12 PM
**To:** Christoforou, Alla
**Subject:** Tentatively accepted: Millennium Laboratories Litigation Discussion
**When:** Sunday, April 13, 2014 5:00 PM-6:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Dial in: +1-888-575-5762; International: +1 857 318 0900; Passcode: 8188-6357#

CONFIDENTIAL

JPMC-00069883

# EXHIBIT 52

| | |
|---|---|
| **From:** | Griswold, Ryan P <ryan.p.griswold@jpmorgan.com> |
| **To:** | Chiarelli, Benjamin R <benjamin.r.chiarelli@jpmorgan.com>;Lee, Jenny Y. <Jenny.Y.Lee@jpmorgan.com>;Karanikolaidis, Stathis" <Stathis.Karanikolaidis@jpmorgan.com> |
| **CC:** | Mainelli, Matthew <Matthew.Mainelli@jpmorgan.com> |
| **Sent:** | 3/26/2014 4:23:12 PM |
| **Subject:** | RE: ML |

I think the cleanest way to address is offer up a call w/ Martin (GC) post bank meeting.

---

**Ryan P. Griswold** | Vice President | Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

**Alternate contact:** Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

---

**From:** Chiarelli, Benjamin R
**Sent:** Wednesday, March 26, 2014 12:17 PM
**To:** Lee, Jenny Y.; Griswold, Ryan P; Karanikolaidis, Stathis
**Cc:** Mainelli, Matthew
**Subject:** RE: ML

Should we offer up a call with the GC?  Important account and company would be happy to make that happen

---

**Benjamin R. Chiarelli** | Vice President | Healthcare Investment Banking | **J.P. Morgan**
383 Madison Avenue, 37th floor | New York, New York 10179
T: 212.622.7229 | F: 646.224.5595 | benjamin.r.chiarelli@jpmorgan.com

**Alternate contact:** Jean Meehan | Executive Assistant | T: 212.622.2168 | jean.a.meehan@jpmorgan.com

---

**From:** Lee, Jenny Y.
**Sent:** Wednesday, March 26, 2014 12:05 PM
**To:** Griswold, Ryan P; Karanikolaidis, Stathis
**Cc:** Chiarelli, Benjamin R; Mainelli, Matthew
**Subject:** ML

Which one of you did a call with Adam Hinman at Apollo?  Adam thought the call was very good.  Will need more detail on the o/s litigation and DOJ investigation, but he appreciated the time.

CONFIDENTIAL

JPMC-MIL-CORP-00228635

# EXHIBIT 53



## WEEKLY MARKET OUTLOOK

Moody's Analytics Research

*Weekly Market Outlook Contributors:*

*Moody's Analytics/New York:*

John Lonski
Chief Economist
1.212.553.7144
john.lonski@moodys.com

Yukyung Choi
Quantitative Research

*Moody's Analytics/Asia-Pacific:*

Katrina Ell
Economist

*Moody's Analytics/Europe:*

Ross Cioffi
Economist

Barbara Teixeira Araujo
Economist

*Moody's Analytics/U.S.:*

Mark Zandi
Chief Economist

Ryan Sweet
Economist

Steven Shields
Economist

Editor
Reid Kanaley

Contact: help@economy.com

# Loans Impart an Upward Bias to High-Yield Downgrade per Upgrade Ratio

## Credit Markets Review and Outlook  *by John Lonski*

Loans Impart an Upward Bias to High-Yield Downgrade per Upgrade Ratio

» FULL STORY PAGE 2

## The Week Ahead

We preview economic reports and forecasts from the US, UK/Europe, and Asia/Pacific regions.

» FULL STORY PAGE 5

## The Long View

Full updated stories and key credit market metrics: Regardless of what's in the next FOMC policy statement, the Fed will take its cue from the market following October 30's likely rate cut.

| | |
|---|---|
| Credit Spreads | Investment Grade: We see year-end 2019's average investment grade bond spread above its recent 119 basis points. High Yield: Compared with a recent 426 bp, the high-yield spread may approximate 480 bp by year-end 2019. |
| Defaults | US HY default rate:  Moody's Investors Service's Default Report has the U.S.' trailing 12-month high-yield default rate rising from September 2019's actual 3.2% to a baseline estimate of 3.7% for September 2020. |
| Issuance | For 2018's US$-denominated corporate bonds, IG bond issuance sank by 15.4% to $1.276 trillion, while high-yield bond issuance plummeted by 38.8% to $277 billion for high-yield bond issuance's worst calendar year since 2011's $274 billion. In 2019, US$-denominated corporate bond issuance is expected to rise by 2.6% for IG to $1.309 trillion, while high-yield supply grows by 35.7% to $377 billion. The very low base of 2018 now lends an upward bias to the yearly increases of 2019's high-yield bond offerings. |

» FULL STORY PAGE 11

## Ratings Round-Up

U.S. Upgrades Outnumber Downgrades

» FULL STORY PAGE 15

## Market Data

Credit spreads, CDS movers, issuance.

» FULL STORY PAGE 19

## Moody's Capital Markets Research  *recent publications*

Links to commentaries on: VIX, fundamentals, next recession, liquidity and defaults, cheap money, fallen angels, corporate credit, Fed moves, spreads, yields, inversions, unmasking danger, divining markets, upside risks, high leverage, revenues and profits, riskier outlook.

» FULL STORY PAGE 24

Click here for *Moody's Credit Outlook*, our sister publication containing Moody's rating agency analysis of recent news events, summaries of recent rating changes, and summaries of recent research.

Moody's Analytics markets and distributes all Moody's Capital Markets Research, Inc. materials. Moody's Capital Markets Research, Inc. is a subsidiary of Moody's Corporation. Moody's Analytics does not provide investment advisory services or products. For further detail, please see the last page.

## Credit Markets Review and Outlook
By John Lonski, Chief Economist, Moody's Capital Markets Research, Inc.

## Loans Impart an Upward Bias to High-Yield Downgrade per Upgrade Ratio

The credit rating revisions of loan-only high-yield issuers reveal a higher frequency of rating downgrades compared to issuers with outstanding high-yield bonds. For high-yield credit rating changes, downgrades have been more numerous relative to upgrades after excluding rating revisions that applied to outstanding high-yield bonds. Third-quarter 2019's U.S. high-yield downgrade per upgrade ratio of 1.73:1 rose to 1.94:1 after excluding the rating revisions of high-yield bonds.

For those high-yield rating changes that applied to outstanding high-yield bonds and often other credit market instruments including loans, third-quarter 2019's downgrade per upgrade ratio was 1.48:1. These rating changes will be referred to here as bond revisions.

The high-yield downgrade per upgrade ratio was a much higher 2.14:1 for the third quarter's rating revisions that (i) applied to corporate family ratings and/or loan ratings and (ii) did not affect high-yield bond ratings. The rating changes of high-yield CFRs and bank loans frequently overlap and may include revisions of speculative-grade liquidity ratings. Henceforth, these rating changes will be referred to as CFR/loan revisions.

For rating revisions that were limited to speculative-grade liquidity ratings, third-quarter 2019's downgrade per upgrade ratio was a relatively low 1.25:1.

During 2019's first nine months, the overall U.S. high-yield downgrade per upgrade ratio of 1.94:1 includes ratios of 2.37:1 for CFR/loans, 1.64:1 for bonds, and 1.29:1 for standalone SGLR changes. After excluding the CFR/loan rating revisions, January-September 2019's high-yield downgrade per upgrade ratio fell to 1.69:1.

For some time, the CFR and loan rating changes have imparted an upward bias to the downgrade per upgrade ratio of U.S. high-yield rating revisions. Calendar-year 2018's overall high-yield downgrade per upgrade ratio of 1.06:1 included ratios of 1.28:1 for CFR/loans, 0.80:1 for bonds, and 0.95:1 for SGLRs. Moreover, 2017's high-yield downgrade per upgrade ratio of 1.09:1 stemmed from ratios of 1.98:1 for CFR/loans, 0.74:1 for bonds, and 0.33:1 for SGLRs.

**Figure 1: Moving Yearlong U.S. High-Yield Downgrade per Upgrade Ratios: Q3-2019 Shows the CFR/Bank Loan Downgrade per Upgrade Ratio of 2.2:1 Topping Overall High-Yield Ratio of 1.8:1 and Bond Ratio of 1.5:1**
*source: Moody's Analytics*



### Credit Markets Review and Outlook

The CFR/loan category's higher downgrade per upgrade ratio helps to explain why October-to-date's estimated 490 basis points rate spread for leveraged loans is wider than its 444 bp median for a sample commencing with October 1996, while October-to-date's average high-yield bond spread of 448 bp is less than its comparably measured sample median of 492 bp. The latest high-yield loan spread implicitly projects an increase by the U.S. high-yield loan default rate from September 2019's 2.6% to 3.1% by the summer of 2020.

#### Global High-Yield Loan Default Rate May Again Top Bond Default Rate

However, analysts at Moody's Investors Service now supply a global baseline forecast of 4.1% for September 2020's default rate of loan-only issuers, which doubles September 2019's actual loan-only default rate of 2.0%. For bond only issuers, the MIS baseline forecast has the global default rate increasing from September 2019's 3.0% to 3.2% by September 2020.

The sample medians are 3.5% for the global bond-only high-yield default rate and 2.5% for the global loan-only high-yield default rate. If the baseline forecast proves true and the loan default rate tops the bond default during June 2020 through September 2020, this will not be the first where the loan-only default rate exceeds the bond-only default rate. For the available 230-month sample that begins with August 2000, the global loan default rate was at least 0.1 of a percentage point greater than the bond-only default rate in a significant 52, or 22.6%, of the months.

**Figure 2: Loan-Only High-Yield Default Rate Is Expected to Surpass Bond-Only Default Rate in June 2020 for First Time since May 2014**
*Global default rates*
*sources: Moody's Investors Service, NBER, Moody's Analytics*



#### Loan-Only Default Rate Becomes More Prominent since Great Recession

Nevertheless, a loan default rate above the bond default rate has been far more common since the Great Recession. The loan default rate was greater than the bond default rate in only 6.7% of the sample's months prior to 2008. By contrast, the loan default rate has exceeded the bond default rate in 34.1% of the months since June 2009, or the final month of the Great Recession.

The loan default rate last eclipsed the bond default rate in May 2014. Prior to that, the loan default rate exceeded the bond default rate in 43 of the 46 months beginning with March 2010 and ending in December 2013.

The rise by the loan-only default rate relative to the bond-only default rate and the growth of high-yield loan debt relative to high-yield bond debt explain why the U.S.' average yield spread between high-yield bonds and high-yield loans has plunged from the 174 bp of August 2000 through December 2007 to the -16 bp of July 2009 through October 2019.

For U.S. high-yield issuers, September 2019's overall default rate of 3.2% was joined by a high-yield bond default rate of 3.6% and a high-yield loan default rate of 2.6%. According to the baseline forecast of

Credit Markets Review and Outlook

analysts from Moody's Investors Service, the overall U.S. high-yield default rate may reach 3.65% by September 2020. The median gap between the U.S. high-yield bond and loan default rates has narrowed from 150 bp prior to 2008 to 99 bp since June 2009.

**Figure 3: September 2019's U.S. High-Yield Bond Default Rate of 3.6% Topped U.S. High-Yield Loan Default Rate of 2.6%**
*sources: Moody's Monthly Default Report, Moody's Capital Markets*



Caa Bond Spread Widens by 326 Basis Points from a Year Earlier

Lately, much has been written about the high-risk, Caa segment of the speculative-grade bond market. According to ICE, Caa rated bonds supplied an average yield of 12.07% and an average yield spread of 1,045 bp on October 22. By contrast, the Caa yield and spread were 10.20% and 719 bp, respectively, on October 22, 2018. Nevertheless, the latest metrics on the Caa market compare favorably with the 13.59% yield and 1,105 bp spread of year-end 2018.

The latest available data showed that U.S. businesses had $1.207 trillion of outstanding high-yield bonds, which was a deep 10.2% under fourth-quarter 2016's record high of $1.344 trillion. Of the $1,207 billion of outstanding high-yield bonds, only $170 billion, or 14%, were graded Caa or lower—the smallest such share since the 13.6% of 1998's final quarter.

During the final three years of 2002-2007's business cycle upturn, the share of high-yield bonds rated Caa or lower averaged 18.6% in 2015, 16.4% in 2006, and 20.8% in 2007. The percent of high-yield bonds rated Caa or lower would then soar to annual averages of 29.5% for 2008 and 2009's 37.6% for 2009. During 2008-2009's Great Recession, bonds rated less than B3 peaked at a record high 41.6% of outstanding speculative-grade bonds in 2009's first quarter.

Researchers at Moody's Investors Service have estimated the average annual, or one-year, default rates at 3.6% for the B3 rating category, 4.4% for Caa1, 8.6% for Caa2, and 19.5% for Caa3. After five years, the cumulative default rates are 23.6% for B3, 26.2% for Caa1, 34.9% for Caa2, and 51.0% for Caa3. In other words, the historical record suggests that half of today's Caa3-rated bonds are likely to default at some point in the next five years.

October-to-date's Investment-Grade Bond Issuance Slows Considerably

After an exuberant September, the issuance of US$-denominated corporate bonds has slowed considerably thus far in October. Compared to the year earlier span, the issuance of US$-denominated investment-grade corporate bonds plunged by 57% during October 1 through 21, 2019.

However, because of the atypically low issuance of a year earlier, October-to-date's offerings of US$-denominated high-yield bonds advanced by 71% annually. For all of October, US$-denominated high-yield bond supply is likely to fall roughly 8% short of its $25 billion average for the Septembers of the five-years-ended 2018. Newly rated high-yield bank loan programs have also eased from September's pace.

# EXHIBIT 54

**From:**      Karanikolaidis, Stathis <Stathis.Karanikolaidis@jpmorgan.com>
**To:**        mmcinerny@metlife.com <mmcinerny@metlife.com>
**CC:**        Griswold, Ryan P <ryan.p.griswold@jpmorgan.com>;Lee, Jenny Y." <Jenny.Y.Lee@jpmorgan.com>
**Sent:**      4/8/2014 3:20:02 PM
**Subject:**   FW: Litigation Update
**Attachments:** 15539551_1.DOCX


As discussed, attached is the memo.  Happy to have a call to walk you through it.

Regards,
Stathis

Stathis Karanikolaidis
Managing Director
Leveraged Finance
J.P. Morgan Securities LLC
Office: 212-270-7374
Cell: 917-406-8907

CONFIDENTIAL                                                                                          JPMC-00030808

Privileged & Confidential                                    Date:  March 17, 2014
Attorney-Client Communication

## OVERVIEW OF PENDING LITIGATION INVOLVING MILLENNIUM LABORATORIES

### I.     *Boston U.S. Attorney's Office Investigation*

Grand Jury and Focus of Investigation: Millennium disclosed that the Government empaneled a grand jury as part of its investigation.  Millennium believes four to six former employees (who also filed wrongful termination suits against Millennium) have testified before the grand jury. Millennium believes that Ameritox has been pressing the Government to investigate the allegations it has raised in its civil litigation.   Millennium also has "strong suspicions" that a False Claims Act whistleblower may be driving the inquiry.   Millennium does not know whether the grand jury is investigating any other companies.  From Millennium's perspective, the focus of the Government's investigation is still a "moving target."  Millennium made two presentations to the Government lawyers in the last few weeks, which it believes have been positive.  A new team of lawyers has taken over the Government's case (both civil and criminal), so these meetings have largely involved Millennium educating the lawyers on Millennium's business practices and the urine testing industry more broadly.  In the meetings, the Government was particularly interested in Millennium's "custom profile" and urine cup program, among other things.  The Government has also asked for information about Millennium's "troubled accounts" program, whereby the company advised certain doctors that it would end the parties' relationship because the doctors' accounts were not profitable.  Millennium believes that each of its practices was defensible and that it utilized higher standards than its competitors.  Millennium does not believe that its positive financial results have made the Government suspicious of Millennium's practices.

Timeframe for Investigation: Millennium could not predict a "time horizon" for the investigation.  Millennium believes both the staffing turnover and tighter restrictions on granting witness immunity have slowed the pace of the investigation.  For example, Susan Winkler, the previous lead criminal prosecutor, was replaced by David Schumacher, who has a reputation for being "slow but thorough."  Millennium believes the new lawyers are trying to figure out if there is a case to pursue, which Millennium finds encouraging.  Millennium is meeting with the Government again the week of March 17.

Production of Information: Although Millennium indicated in our February 12, 2013 call that the Government had asked to meet with a handful of Millennium employees, those interviews never occurred.  Millennium believes this is because of the new witness-immunity policy, which makes it more difficult for the Government to grant individuals immunity for witness interviews. Millennium does not expect any movement on the interviews while the policy remains in effect. Millennium completed its document production in the summer of 2013 and is not aware of any follow-up document requests from the Government.  However, Millennium asked the Government to issue a subpoena for documents Millennium received in civil discovery showing that Ameritox has been paying the legal fees of the ex-employees suing Millennium for wrongful termination (and who have also testified before the grand jury).

Witness Intimidation / Obstruction Allegations: We asked Martin Price about the allegations lodged by the civil litigants that Millennium engaged in witness intimidation when Martin made a January 2012 internal presentation that used images of body bags to depict former employees

1

                                                    JPMC-00030809

Privileged & Confidential                                         Date: March 17, 2014
Attorney-Client Communication

Millennium was litigating against (such as Ed Zicari). Martin stated that the presentation was "facetious" and was generally received that way, except by the wrongful-termination civil litigants and Ameritox. Upon request, Millennium provided the presentation to the Government (after waiving privilege) in 2012, and it was reportedly shown to the grand jurors. The Government lawyers have not brought the issue up recently with Millennium or Martin. We also asked about the allegations that Millennium destroyed documents. Martin explained that Millennium did not destroy any documents and that, in fact, Millennium has provided unredacted copies of a voluminous amount of documents to the Government. Martin did acknowledge that Ameritox has been pushing these allegations with the Government, although the Government has not focused on the topic with Millennium.

Potential Exposure: Millennium does not yet know whether the ultimate resolution will be civil or criminal, but stated that it is common for these inquiries to begin as both criminal and civil but to end with a civil-only resolution. Millennium believes that if the investigation is resolved civilly, the outcome would likely be a monetary penalty. Millennium could not offer a specific figure but supplied two recent settlements for comparison. First, Calloway settled with Massachusetts state prosecutors for $20 million after the company and several executives were indicted. Calloway also entered into a civil settlement with the Boston U.S. Attorney's Office for $7.7 million. Second, Ameritox settled with Florida federal prosecutors for $16 million. Michael Loucks of Skadden, Millennium's outside counsel, characterized the conduct in both the Calloway and Ameritox cases as more "egregious" than the allegations against Millennium. When asked if Millennium's exposure was, accordingly, capped at around $20 million, Loucks acknowledged the force of this reasoning and stated that he does not believe there will be a "material result" in terms of the company's finances. Although these examples were relayed for comparison, Millennium stated its views that the Government determines monetary payments through financial analysis of damages, rather than meting out "rough justice" by comparing the current case to past cases. In addition to a monetary penalty, the Government might also impose a Corporate Integrity Agreement, although such agreements are apparently less frequent now because of the compliance costs involved. Martin does not believe a Corporate Integrity Agreement, if imposed, would have much of an impact on Millennium because he believes Millennium's practices are stronger than those typically required in such agreements.

## II.    *Litigation Involving Ameritox*

Florida Case: Millennium has pending litigation with Ameritox in Florida federal court, which was consolidated with the federal case in San Diego. Ameritox alleges that Millennium falsely advertised its services; Millennium counterclaims that Ameritox engaged in similar unfair business practices. Discovery is closed and summary judgment motions are fully briefed. A trial is set for June 2014. Ameritox seeks damages in the range of $190 million to $210 million, based on a claim for the disgorgement of Millennium's profits. (Ameritox is not seeking "lost profits" because it cannot show that Millennium's conduct caused Ameritox to lose business.) Roughly 80% to 90% of Ameritox's damages claim relates to the urine cup program. According to Millennium, the key legal issue is whether or not the urine cup program is "unambiguously illegal." Millennium believes that it can show that the program is *not* unambiguously illegal because several healthcare experts have opined that the program is legal. (We note that these experts, such as Ron Wisor and Lew Morris, are retained by Millennium and may not be viewed

2

Privileged & Confidential                                    Date:  March 17, 2014
Attorney-Client Communication

by the court as independent.)  Millennium indicated that if the court does not award damages to
Ameritox, it might nonetheless provide injunctive relief, such as requiring Millennium to issue
corrective advertising.  Martin acknowledged that one risk of the lawsuit is that if the judge or
jury finds that Millennium's business practices are illegal, this may fuel the U.S. Attorney's
Office investigation.  Martin stated that the issue of the legality of the program "would not be a
fight that would go quietly."  Millennium believes it has a strong case, and its strategy is to
"plow ahead."

Wisconsin Case: Millennium has pending litigation with Ameritox in Wisconsin federal court
(which was originally filed in Maryland federal court), in which Ameritox claims that
Millennium's use of a bell curve in its RADAR report infringes two patents registered to the
Marshfield Clinic and for which Ameritox has exclusive licensing rights.  Millennium initiated
proceedings with the U.S. Patent and Trademark Office, which concluded with the U.S.P.T.O.
declaring the patents invalid.  Ameritox is appealing that ruling.  Ameritox also recently filed an
amended complaint to add the  Marshfield Clinic as a party to the lawsuit.  The case has a March
2015 discovery deadline and an April 2015 trial date.  Discovery has yet to begin.  In terms of
exposure, Martin explained that there are two types of damages Ameritox could seek: (1)
payment of a licensing fee; and (2) lost profits.  Regarding the licensing fee, Millennium
estimated its highest exposure would be a figure "well south of $5 million" paid out over three
years.  Regarding lost profits, Martin stated that Ameritox's case is weak because in the Florida
case, Ameritox has already tied 80% to 90% of its damages to the urine cup issue, not the patent
issue.  Accordingly, one could estimate that the exposure on the lost-profits issue in the patent
case is about $20 million, though there have been no expert reports issued in the case.

### III.   Litigation Involving Calloway

Federal Case: Millennium achieved a favorable result in the lawsuit brought by Calloway's
former compliance officer in 2009 (but effectively pursued by Calloway), which alleged that
various Millennium billing and testing practices violated the False Claims Act and similar state
statutes.  In April 2013, the First Circuit largely affirmed the district court's dismissal of
Calloway's claims but remanded the case for the determination of a few issues.  In January 2014,
the district court dismissed the remainder of the case, denied Calloway's motion for leave to
amend its complaint, and entered judgment for Millennium.  Although Calloway has moved to
alter the district court's judgment, Martin believes Calloway's argument is weak.  Millennium is
considering seeking reimbursement of its legal fees because it believes the lawsuit was initiated
for competitive reasons, not out of a genuine belief in False Claims Act violations.

State Cases: In 2013, Millennium reached an out-of-court settlement with Calloway to globally
resolve the parties' direct lawsuits in state court.  In these lawsuits in Massachusetts and New
York state courts, Millennium alleged that Calloway "engaged in a misinformation campaign"
about Millennium's practices and orchestrated the False Claims Act case; Ameritox's claims
involved allegations similar to those in the False Claims Act case.  The resolution involved an
agreement by each side to drop all pending claims.

3

Privileged & Confidential                                   Date: March 17, 2014
Attorney-Client Communication

## IV.    *Litigation Involving Former Employees*

Millennium has several cases in which former employees allege they were wrongfully terminated for refusing to participate in Millennium's illegal business practices. From an exposure standpoint, each case is essentially cabined by the employee's earnings. Martin estimates that each case presents exposure of, at most, the hundreds-of-thousands range. Martin acknowledged that although the cases have low exposure amounts, they can nonetheless be "ugly" in terms of the accusations that are leveled. The U.S. Attorney's Office is apparently following the proceedings in these cases.

Kelly Nelson (Arizona federal and state court): In October 2013, the federal court dismissed the majority of Nelson's 20 claims. Nelson's remaining claims involve allegations that Nelson refused to provide free testing services. The parties briefed summary judgment motions in January 2014, which are pending. Millennium moved for sanctions on two grounds: (1) Nelson's sharing of confidential information with Ameritox; and (2) Ameritox's payment of Nelson's legal fees. In April 2013, Millennium sued Nelson in state court. In August 2013, Nelson filed counterclaims that are "identical" to her claims in the federal case. Millennium is looking for a favorable outcome in the federal case to use as *res judicata* in the state case. Martin stated that Nelson had been working since she was fired and believes her damages would be a couple hundred thousand.

Jodie Strain (Texas state court): Summary judgment motions have been fully briefed and a trial is set for May 2014. As with the other suits, Ameritox is paying all of Strain's legal fees. Strain's claim for damages is around $480,000.

Ed Zicari (Texas state court): Summary judgment motions have been fully briefed, and a trial is set for October 2014. Millennium also filed a motion for sanctions regarding Zicari's discovery responses, which falsely denied that Ameritox is paying Zicari's legal fees. Zicari has not submitted a report on his alleged damages yet.

Joshua Hugo (Tennessee federal court): In January 2014, the court granted Millennium's motion for summary judgment. Hugo is now pursuing an appeal in the Sixth Circuit.

NicSyd Enterprises (Arbitration): Millennium has one outstanding arbitration with a former employee, Steve Johnson, who helped Millennium set up its sales force in 2008 and 2009. He claims unpaid commissions for a four-month period in 2009 after he was terminated. The case has been largely inactive; for example, no discovery has proceeded. Martin finds the case "hard to gauge," but any damages exposure would be low (could be less than $100,000).

## V.    Review of Closed Cases

Millennium was previously engaged in litigation with others in the industry, including Aegis Sciences Corporation, American Clinical Solutions, Universal Oral Fluid Laboratories, and eLab Consulting. All of these lawsuits have been resolved favorably, with nothing now pending.

4

CONFIDENTIAL                                                                JPMC-00030812

# EXHIBIT 55

| From: | Liou, Calvin O <calvin.o.liou@jpmorgan.com> |
|-------|-----------------------------------------------|
| To: | Project Chargers Whole Team <Project_Chargers_Whole_Team@restricted.chase.com> |
| Sent: | 6/17/2014 1:36:39 AM |
| Subject: | Millennium v. Ameritox - loss |

# Ameritox Awarded $14.775 Million in Unfair Competition Case Against Millennium Laboratories

Federal Jury: Millennium Laboratories Provided Kickbacks to Physicians in Violation of Federal Law

PR Newswire

TAMPA, Fla., June 16, 2014

TAMPA, Fla., June 16, 2014 /PRNewswire/ -- A federal jury in Florida today found that Millennium Laboratories' provision of free point-of-care testing cups to physicians violates federal Stark and Anti-Kickback laws. The jury awarded Ameritox $14.775 million in damages.

The jury rejected all counterclaims that Millennium brought against Ameritox.

Baltimore-based Ameritox sued Millennium Laboratories in April 2011, citing unfair competition for Millennium's practice of providing physicians with free point-of-care test cups in order to secure their business. In deciding the key contested issue, the jury found that the provision of free point-of-care cups under a so-called "cup agreement" in exchange for business violates federal law.

According to evidence presented during trial, Millennium gave its customers at least 750,000 free point-of-care test cups through 2013 alone – amounting to millions of dollars in giveaways. For example, Millennium provided one Florida clinic over 8,000 free test cups, according to court documents. The evidence suggested, however, that Millennium would provide the free goods only if the physician sent Millennium the urine specimens and further agreed to have Millennium conduct a minimum number of tests on each specimen, thus driving up profits for Millennium.

"All Ameritox wanted was a level playing field and we're pleased that the jury rejected Millennium's practice of providing free point-of-care test cups to physicians," said Scott Walton, chief executive of Ameritox. "The ruling underscores our belief that the significant health-care challenges facing our country require steadfast adherence to the highest compliance standards, ethical business practices and quality of service."

In view of this Order, Ameritox believes that Millennium should cease these activities immediately.

The Stark Law as it applies to the healthcare space prohibits doctors from referring their Medicare and Medicaid patients to business entities with which the doctors have a financial relationship. The Anti-Kickback Statute prohibits healthcare providers from knowingly and willfully offering payment to induce a doctor to refer a patient for services covered under Medicare or Medicaid.

Read more: http://www.digitaljournal.com/pr/1991271#ixzz34r8jov1v

CONFIDENTIAL    JPMC-MIL-CORP-00230140

# EXHIBIT 56

Project: Chargers
Conference Call with Carlyle
6/23/14 – 1:00PM

| Carlyle attendees | Millennium attendees | J.P. Morgan attendees |
|---|---|---|
| Will McMullan | Brock Hardaway | Cory Rapkin |
| Joe Bress | Martin Price | Eric Anderson |
| Mike Moynihan | Howard Appel | Steve Weiner |
| Steve Wise | | Hank Yeh |
| | | Calvin Liou |
| | | Justin Look |
| | | Michael Oleferchik |

## Summary

Additional questions relating to Ameritox ruling (cups), quantitative vs qualitative testing rationale, future of reimbursements policies

## Notes

- **As it relates to Ameritox suit, what does it means for your business practice?  What have you done in the past that you will not do moving forward?**
    - Small set of customer base affected (496/7000 customers – 4 states)
    - Voluntarily stopped cup program
        - Haven't lost any customers affected by this
- **What were you supplying to these customers? Cups for quick qualitative tests?**
    - The agreement was they were not going to bill for Point of Care cups
    - Now the doctors can buy cups from either ML or someone else
    - Gave background on the legal history: how they developed the agreement and who they reached out to for advice
        - Vetted the agreement through top legal experts for years
            - Jane Pinewood – can't give away but if agreement no to bill/resell then can
            - Lou Morris (head counsel @ OIG) & Compliance Firm Kutrow agreed
    - Decision to suspend the program was a conservative approach
        - Not an admission of wrongdoing, disagree with verdict
        - Jury did not need to decide whether to end program, but company decided to end it because they wanted to be one step ahead of new ACA regulation
        - Company is going to appeal and talk with CMS Inspector General to clarify the government's position (not rely on nonbinding civil case in FL)
- **What were criteria of the customers impacted?  Why so small?**
    - Only ~75% do POC test, ½ bill and ½ don't
    - Many of them don't use these type of cups
- **What are the customers affected as a % of revenue?**
    - It is a small number, ML to provide the exact number
    - Typically these customers are low volume
        - Expensive to hire biller for all codes/correcting wrong codes

CONFIDENTIAL

JPMC-00080323

- ▪ Wanted to avoid the overhead of figuring out where to get the cups from
  - o More established, efficient practices have their own billing systems
  - o These fall on the lower volume spectrum
- **Aren't these customers capped at $20 per test on Medicare reimbursement?**
  - o Yes, for Medicare customers
- **There is a next layer of qualitative tests where you use an analyzer, are these on the $180/test level?**
  - o Closer to $100/test, less in some states
  - o Analyzers are four years into the market, do not consider this
- **With a customer who has the analyzer, could they do the $20 test, not bill, and then do the analyzer test with your cups?**
  - o There are 20 clients nationwide that do that (<1/2% volume)
  - o If the customer cannot convert the cup to cash, it is not a striker kickback
  - o It would be okay if customer sent the cup and ML read them the information on the phone, but ML wanted to make it easier on them, get results into physician hands quicker
- **Doctors having the analyzer vs not having one wasn't really a factor in the cup agreement decision**
  - o There were separate agreements for customers with analyzers
  - o Didn't lose any of these customers when they changed the program
  - o Customers are upset with Ameritox for fighting this and making it more of a hassle for them
- **The cups that you provide, what is the incumbent advantage that you derive from your cups?**
  - o Unique thing was ML's special cup that doesn't leak, others have high rate of failure
  - o That is the reason ML wants the customers to use these cups
  - o Customers are free to use whatever cups they want
- **Just as easy to send your cups to other customers?**
  - o Yes
  - o We try to make it a practice to not give ML cups to customers who are sending to other labs
    - ▪ Track orders so don't waste inventory on customers that don't send back
- **How does ML ensure it comes back to the lab?**
  - o Sleeve of 25, can't individually ID
  - o Give them FedEx bags and rec form to send to ML – makes process easy
- **You are giving the clear cups to the doctors?**
  - o Yes, anyone who wants them can get them
    - ▪ These doctors do not believe in the point of care tests
    - ▪ Individual practitioner decision
- **Have you had volume minimums or agreements like that with physicians?**
  - o No.  Could have one specimen a month.
  - o Keep accounts open for 3-4 months even without activity (some will spike for quarterly tests)

JPMC-00080324

Project: Chargers
Conference Call with Carlyle
6/23/14 – 1:00PM

- **Ameritox case**
  - In trial, Ameritox did not present a customer that left Ameritox because ML had cup agreement
  - Ameritox researched this issue, and the cup agreement was not among the reasons customers switched
    - Bain did study and top reasons for choosing ML were speed, ease of use etc.
- **Do you guys do anything else for the doctors?  What is the content of these interactions?**
  - Making sure ML collects information:
    - Staff turnover
    - Talking about PGT and the clinical value of this with new information
    - Making sure physician has proper supplies
  - Building trust through relationships
    - Visit every 7-10 days
  - Talk about new tests offerings, changes in coverage, or technical write-up that ML puts together to clarify results
  - Try to arm employees with a value-added reason to visit customers
- **Is it always clinically focused or do you answer reimbursement questions?  What can you say/do to doctors vs. what you can't?**
  - STARK and Kickback have most of the guidance on this -  keep things general
    - Can always go in and talk about educational material
      - New test offerings
      - CMEs
    - Publically available information is something you can offer
      - With billing and coding, ML has put together collections of documents so that reps can help doctors understand these things
    - Cannot talk about how to bill a particular patient or payor; not experts in billing
- **Can you advise a doctor to buy an analyzer because they will make more money?**
  - ML will provide pro's and con's of this decision with metrics and data
    - Leave the decision up to the doctor, but give them facts
- **You aren't providing any other kinds of equipment to the doctors?**
  - No, and there are competitors who provide some of these things like leasing, etc.
  - Sometimes will provide laptops or printers that are for ordering ML tests, disable all other functionality
  - There is a section of STARK that allows for ML providing these things
  - Small scale though, maybe 50 printers and 20 laptops
    - Can track toner/paper/connections
- **You're not able to help arrange the purchase and help doctors to get discounts through ML?**
  - No, approached by a GPO and declined

CONFIDENTIAL

JPMC-00080325

Project: Chargers
Conference Call with Carlyle
6/23/14 – 1:00PM

- **Switching to reimbursement, Medicare $20 cup test, analyzer test, any reimbursement news coming on the quantitative test side?**
    - AMA has a proposal that allow some groupings
    - Nothing on the physician level has been discussed for lab services
    - There has been talk about a supertest for a flat fee
        - This is advantageous to ML; only company that could economically do this
- **Reimbursement expectations for supertest?**
    - No discussion on that yet, still in early stages
- **On the quantitative test you do, any literature or concern that ML migrates to a world where quantitative tests are used for surprise scenarios where you find something?**
    - Moving in the opposite direction, people see value in doing confirmation testing
    - Offered customers the choice between qualitative and quantitative tests, physicians see value in quantitative tests
        - High false positive/negative (30-50% misses)
    - Asked physicians ~ 99.5% test quantitative only
        - Payer perspective, why do both if quantitative provides more value
- **Would you say that the analyzer test has a similar false positive/ false negative range?**
    - Yes, it does.
    - Analyzer only provides the drug class, not the drug breakdown
    - Different drugs have different sensitivities
- **Why do 75% of customers use qualitative test?**
    - They use this at a point-of-care test
- **What does this quick-read give them?**
    - So when the patient is sitting there, doctor can address the issue immediately
    - This, in some cases, has the patient disclose their situation
    - Of limited clinical utility, but there is some
- **It seems like the waste is on the point of care side, right?**
    - Customers are doing less and less point of care testing
- **It sounds like they will come out with new urine drug codes in the next few weeks?  How do you think about that?  What are you hearing? (SGR patch)**
    - The majority of ML codes are not on the list
    - Very likely that ML sees a 1-2% positive
    - ML thinks there will be codes on there they currently can't bill for because the codes haven't been updated in a number of years
    - Some payors put limits on how many times you can bill for a code
        - With new codes, there will be more categories and ML will not be subject to previous limitations around billing
    - There could be some of ML codes that are negatively impacted, but ML thinks it will be an overall positive
    - Any non-medicare reimbursement will be evaluated for each CPT code

CONFIDENTIAL

# EXHIBIT 57
## (Filed Under Seal)

# EXHIBIT 58
## (Filed Under Seal)

# EXHIBIT 59
## (Filed Under Seal)

# EXHIBIT 60

CONFIDENTIAL

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


----------------------------------x

MARC S. KIRSCHNER, solely in his

capacity as TRUSTEE OF THE

MILLENNIUM CORPORATE CLAIM TRUST,

      Plaintiffs,

  vs.    Adv. Pro. No. 17-51840(LSS)

JPMORGAN CHASE BANK, N.A.,

CITIBANK N.A., BMO HARRIS BANK,

N.A., and SUNTRUST BANK,

      Defendants.

----------------------------------x

      "CONFIDENTIAL"

    VIDEOTAPE DEPOSITION OF

     YVETTE AUSTIN SMITH

   VIA ZOOM VIDEOCONFERENCE

      May 2, 2022

       9:00 a.m.


Reported by:

Maureen Ratto, RPR, CCR

CONFIDENTIAL

Page 18

YVETTE AUSTIN SMITH

in the report?

A.   No.

Q.   Okay. And are you aware of any inaccuracies in the report?

A.   There is one reference in the report, if needed I can find the page in the report, in which I refer to a Table 9 and it should have been Table 4.

Q.   Understood. There may be a question about that later, but helpful. Other than that, you're not aware of any inaccuracies in the report?

A.   There is one other typo. There is a sentence, and it's around the same paragraph or in the same paragraph that has the Table 4/Table 9 reference in which the sentence reads something like, and if we get to it later I can point it out specifically, but the sentence reads something like; growth rates decreased. Or maybe I probably should do this when we have the paragraph in front of us but there is a reference to growth rates that is not exactly correct. It's the rate of

Page 19

YVETTE AUSTIN SMITH

increase versus the rate, itself.

Q.   Okay. If we end up discussing that paragraph, and we might, we can discuss the details of the change then.

A.   Absolutely.

Q.   Is there anything in the report that you wish to amend, correct or clarify?

A.   No.

Q.   Okay. Since completing your report, have you conducted any additional analyses or calculations for this matter?

A.   I have reviewed some additional documents, mostly documents that were referenced in either the reports of Ms. Hutton or Ms. Matevich and I don't recall performing any additional calculations, though.

Q.   And do you remember any specific documents that you reviewed?

A.   One, in particular, was a valuation model that was prepared by TA Associates. I reviewed some of the documents that Ms. Matevich cited. I

Page 20

YVETTE AUSTIN SMITH

believe there were two additions of a newsletter calls Laboratory Economics, I reviewed those, I had not previously reviewed those. There may have been one or two other documents that I reviewed in connection with either Ms. Hutton or Ms. Matevich's reports that were documents that were cited by them, so I was reviewing those documents.

Q.   And did those materials cause you to change any of the opinions in your report?

A.   No.

Q.   And you mention that you -- just to confirm, you mention that you've read both Professor Hutton's report and Ms. Matevich's expert report in this matter; is that correct?

A.   That's correct.

Q.   And I believe you said that caused you to form some additional opinions in response to those; is that correct?

A.   Yes. So I had some responses

Page 21

YVETTE AUSTIN SMITH

in connection to those reports which would not have been in my affirmative report.

Q.   Can you tell me what those additional opinions or responses are?

A.   Well, I don't think I can give you a full list of them, but so I can say, just as a starting point, it didn't change any of the opinions in my affirmative report. There were, for example, I'll just give you, Ms. Matevich -- pardon me -- cites to some documents with respect to growth rates and one of the opinions that I reached is that at least some of the documents that she cites to are not robust sources for industry growth rates.

Q.   Okay. And are there any other of these either additional opinions or responses that you remember now?

A.   There were -- I mean, I had a series of responses to both reports. I'm happy to walk through those but I want to

6 (Pages 18 - 21)

Page 22

YVETTE AUSTIN SMITH

be cognizant of your time.

Q.   I'm going to ask you to turn to Appendix E of your report, which is both tab 1 in your binder and Exhibit 1.

A.   Yes, I have it in front of me.

Q.   All right. And this is entitled Documents Relied Upon by Yvette Austin Smith. Is this a complete and accurate list of all the documents that you considered in drafting your report?

A.   It's a complete list of documents relied upon.

Q.   Okay. And so at this time you're not aware of any documents that should be added to this list that were inadvertently omitted?

A.   I'm not aware of any omissions.

Q.   Did you review all of these materials personally?

A.   No, I would have reviewed many of them personally but some of them would have been reviewed by my team members.

Q.   Okay. And then how did they

Page 23

YVETTE AUSTIN SMITH

report what they learned from the documents to you?

A.   Yes.

Q.   Sorry. I asked how did they do that?

A.   Oh, how. My apologies. It would depend on the nature of the document. Sometimes there was an analysis that was prepared and shown to me, sometimes it was a verbal description of the document, other times it was -- there were documents that were included in the report as footnote support for an assumption in the report. So there are a variety of ways in which they would have reported to me the contents of a document.

Q.   Okay. And I'm not going to make you go document by document, but are there particular documents in here or groups or sets of documents that you know or you can explain now you didn't look at personally and relied on your team for?

MR. LONERGAN:  Objection to

Page 24

YVETTE AUSTIN SMITH

form.

A.   I wouldn't be able to recite it from this list, in part, because some of the documents are just referenced by Bates number and so I don't know what those are or I don't know what they are, sitting here right now. I'm just looking over the list to see if I can categorize specific documents.

On page 103 of my report, so the last page, just as an example, there is a document that's about four or five up from the bottom, SIC Industry Descriptions. I believe my team would have looked at that as a primary document. I don't believe I reviewed that personally as a primary document, but I'm certainly familiar with the document. Some of the detailed information from Loan Connector, which is on page 102, I'm certainly familiar with Loan Connector but a team member of mine had the primary responsibility for reviewing the documents from Loan Connector.

Page 25

YVETTE AUSTIN SMITH

Those are the documents that I can identify by title and, as I said, the documents that are referenced with respect to an exhibit number or a Bates number, I just wouldn't be able to make that recollection right now.

Q.   Okay. And in looking at this list now, are there any materials that you think may have been included in error on the list?

A.   No. I'm not aware of any materials that were included in error.

Q.   And we discussed your team at Brattle and you've described at least some of the ways they assisted you in your answer to the question about the documents.

Are there other ways that the team at Brattle assisted you in preparing your report?

A.   The team's efforts were primarily focused on conducting the first research -- pardon me -- conducting the first level or iteration of analysis and

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

YVETTE AUSTIN SMITH

to a lesser degree some preliminary text drafting. But for my reports, even if I have a team member draft, you know, a section or a part of a section, ultimately I am the author of the report and in almost all instances will be making revisions to that initial text.

Q.   And how did you supervise their work?

A.   Fairly ordinary course. I did have a project manager on this project. I say "did". He left the firm just in the ordinary course of things and so John Anthony, who was the project manager at the time, certainly had the day-to-day supervision, but the typical process is we meet several times at the beginning of the engagement, discuss the scope of the analysis, discuss the hypotheses that we will be seeking to answer and discuss the information, at least the initial set of information that I think will be most relevant for answering those hypotheses. Then the team will typically spend some

Page 27

YVETTE AUSTIN SMITH

time undertaking some research in response to that outline and providing some preliminary analysis in response to that outline. It then becomes an iterative process.

So periodically I am reviewing that analysis, I am reviewing the sources that are the results of the research and that process just continues. So it would not be uncommon to be meeting with the team in a working session, particularly in remote days in a working session once or twice a week.

Q.   Okay. I'm going to turn to Appendix F of your report, which is your CV.

I see that you graduated from Harvard College. When was that?

A.   Wow, 1992. My 30th is coming up.

Q.   Congratulations.

A.   Thank you.

Q.   And you obtained that Bachelors of Arts in Government and

Page 28

YVETTE AUSTIN SMITH

Philosophy; is that correct?

A.   That's correct.

Q.   And then you conducted graduate studies in mathematical finance at the Courant Institute of Mathematics at New York University; is that right?

A.   That's correct.

Q.   And when was that?

A.   Around 1993, '94. No. I'm sorry. It would be later than that. 1996, 1998, somewhere in that timeframe.

Q.   Did you obtain a degree in connection with those studies?

A.   I didn't. I transferred the credits, if you will, to Columbia Business School and obtained my MBA from Columbia.

Q.   Okay. And when was that?

A.   I received that degree in 2001, I believe.

Q.   And in that period after graduating from Harvard and before graduating or up until your graduation from the Business School at Columbia, did

Page 29

YVETTE AUSTIN SMITH

you work during that period?

A.   I did.

Q.   Can you -- do you remember what jobs?

A.   Sure. So right after college I joined what was PriceWaterhouse, inhouse PricewaterhouseCoopers in their Office of Government Services in Washington, D.C. I believe I was there for a little over a year before returning -- I moved to New York, I started actually an undergraduate mathematics program at NYU. It was -- it wasn't a degree program but it was a precursor to starting the studies at the Courant Institute. And while I was at NYU I was also working at a non-profit think tank, if you will, which was the Center For Criminal Justice, which was part of -- oh boy, it was part of one of the CUNY schools but I would have to wrack my brain to remember which. And so was providing actually education and educational support to incarcerated youth and incarcerated pregnant women at

8 (Pages 26 - 29)

CONFIDENTIAL

Page 42

YVETTE AUSTIN SMITH

testimony and so probably -- you could probably easily double this list that's on my CV, which would be matters in which I was engaged as a testifying expert and that would range from having prepared a draft report all the way from having prepared draft and rebuttal reports, but the matter settled or in some way was resolved before testimony.

Q. And in roughly speaking, can you give a proportion of how many of those matters were bankruptcy-related matters?

A. On average, half of the work. So my current book of business, and it has been this way for quite some time, is, you know, over a year and a half, two year average, half of the matters I'm working on are M & A and half of the matters I'm working on are bankruptcy matters, because the link between them is usually I'm looking at a contested transaction, contested for a couple of different reasons but a contested either

Page 43

YVETTE AUSTIN SMITH

M & A transaction or financing transaction. And then if you include the non-litigation work, the solvency opinions, obviously those aren't -- a prospectus solvency opinion isn't done in the context of bankruptcy but it is done in a framework of bankruptcy. So I've been working on -- I think my first bankruptcy matter was probably with Ernst & Young in 1998. I believe there were a series of hedge funds and other private investment funds that failed for a variety of reasons, not including default on Russian debt. So I believe my first bankruptcy experience would have been about 1998.

Q. And have you ever served in a -- as an expert in a case where Mr. Kirschner -- have you ever been served as an expert in a case where Mr. Kirschner was one of the parties on behalf of whom you were testifying?

A. Yes.

Q. How many cases?

Page 44

YVETTE AUSTIN SMITH

A. I'm only aware of one other which is the Physiotherapy case.

Q. Physiotherapy. And is that still ongoing or has it concluded?

A. That case has concluded.

Q. And it looked from your CV like -- it looks like you provided testimony in court maybe about ten times; is that roughly right?

A. That sounds right.

Q. Okay. Has a judge ever excluded your testimony?

A. Not excluded in totality. I did have one matter in which a section of my report, had the matter gone to testimony -- gone to trial, pardon me, would have been excluded.

Q. And why was that section of your report excluded?

MR. LONERGAN: Objection to form.

A. So the most accurate answer to that is to read the motion, itself, but if I can paraphrase -- well, actually, I

Page 45

YVETTE AUSTIN SMITH

hesitate paraphrasing a legal opinion, a legal document. So maybe the motion should speak for itself, actually. It's probably available.

Q. Okay. And staying here in Appendix F, your CV on pages 2 and I guess onto the top of page 3, is a list of articles that you've published.

Is this list still current and accurate?

A. To my knowledge. I don't recall publishing anything after this, and I don't recall anything being omitted, mind you.

Q. Okay. And for purposes of this matter, what's the field in which you consider yourself to be an expert?

A. Valuation -- well, it's not just this matter. In general, I describe my expertise as valuation, credit and solvency analysis. That's the expertise that I draw on for the mass majority of instances in which I'm engaged as an expert. Occasionally I will provide

12 (Pages 42 - 45)

## CONFIDENTIAL

Page 46

YVETTE AUSTIN SMITH
custom and practice testimony, but here valuation, credit and solvency analysis were the areas of expertise that I employed in reaching my opinions here.

Q. Okay. Do you consider yourself to be an expert in the urine and drug testing industry?

MR. LONERGAN: Objection to form.

A. I consider myself to be a valuation -- an expert in valuation and credit insolvency analysis, which means if I'm going to provide that expertise in any given industry I have to understand the industry sufficiently to support my opinions.

Q. And do you consider yourself to be a medical billing or Medicare billing or Medicare reimbursement expert?

MR. LONERGAN: Objection to form.

A. So I would repeat my prior answer and I would add to that that I have been an expert and I have provided

Page 47

YVETTE AUSTIN SMITH
analysis of a number of businesses for which Medicare reimbursement is a relevant consideration for understanding the cash flows of that company.

Q. And do you consider yourself to be an expert in healthcare law?

MR. LONERGAN: Objection to form.

A. I certainly don't claim any legal expertise. However, given the nature of the work that I do, and that's both litigation work but also goes back to the opinion work, the fairness opinion and solvency opinion work, the work that I do is undertaken in a legal framework. So I do develop an understanding of the legal framework that impacts my financial and economic analysis, but not saying obviously that I have legal expertise.

Q. Were there any opinions in this matter that you were asked to provide that you declined to provide?

A. No.

Q. Have you ever declined to

Page 48

YVETTE AUSTIN SMITH
provide an opinion that was requested of you in a case?

MR. LONERGAN: Objection to form.

A. Yes. The answer is yes.

Q. And just, I mentioned before, I know the Plaintiff's lawyer has changed since you filed your report. I hopefully will refer to Plaintiff's counsel, and by that I'm meaning both the lawyers at McKool Smith and the lawyers at Wollmuth Maher, but if it's ever confusing or ambiguous about what I'm asking about just let us know.

Did any of Plaintiff's counsel cabin, frame or limit the scope of your inquiry in any way?

A. No.

Q. Did Plaintiff's counsel provide you with any facts in the case that you did not verify for yourself?

A. No. I was just pausing for a moment.

Occasionally in a report I

Page 49

YVETTE AUSTIN SMITH
will say explicitly; counsel has provided this legal interpretation of a concept. I don't believe there is a phrase like that in this report and certainly factual information that is the basis of my opinion is something that I would always seek to confirm.

Q. And did you form any opinions that you did not include in the report?

MR. LONERGAN: Objection to form.

A. No opinions that are contrary to the opinions that are here in the report.

Q. Okay. So does that mean there are some opinions you formed that you did not include in the report?

A. I discussed certain -- obviously not mentioning the nature of those discussions, I discussed certain findings with counsel and not all of those findings are in this report but none of those findings contradict or undermine the opinions that are in this

13 (Pages 46 - 49)

Page 106

YVETTE AUSTIN SMITH

A.   I'm sorry. Could you repeat the question? I think I got lost a little bit along the way.

Q.   Yes. I think I will even change the question.

Have you ever been asked to value a company where, at the beginning of the process, you felt like you did not have an understanding of the industry in which the company operates?

A.   It generally is the case that I would not say I do not have any understanding of the industry. However, there are certain industries in which I have supported, suggested that a companion industry expert be introduced, used, so that the valuation analysis can proceed on that basis.

So I just recently completed a matter that involved the valuation of a clinical stage biotech company.  The company is developing compounds for treatment for cancer treatments. So in that case I worked with a pharmacologist

Page 107

YVETTE AUSTIN SMITH

because some of the questions that arose, that were relevant to the valuation, is whether certain kinds of compounds might have been more efficacious in addressing cancer than other kinds of compounds. And because that relied on medical and pharmacological information that is not part of my expertise, I relied on an outside expert, a second industry expert.

Q.   And in preparing your opinion here in the Millennium matter, am I correct that you did not bring in an outside industry expert to assist with the valuation?

A.   That's correct, because the information, the industry information that I needed to support and develop my solvency analysis here is industry information that I have.

So I have a long history of valuing healthcare companies, both healthcare service companies and pharmaceutical companies.  And the reason why the pharmaceutical company segment is

Page 108

YVETTE AUSTIN SMITH

relevant is because part of the value that drives those pharmaceutical products is the payment regime that will ultimately be used to compensate the developer or the owner of those pharmacological products.

So I have a long history of valuing healthcare companies, I have a long history of understanding the impact of CPT codes, diagnostic codes, et cetera, on revenues and cash flows that are derived by healthcare companies.  I have relevant experience in analyzing things like average wholesale prices of drugs and the relationship between the average retail price of a drug, the selling price of that drug and the reimbursement regime for that drug.

So in this case there was not industry information that I needed but did not have for the purposes of completing my solvency analysis.

Q.   And to the extent you determine there was information you

Page 109

YVETTE AUSTIN SMITH

needed and did have -- strike that.

To the extent you determined there was industry-specific information that you needed and you did have sufficiently to prepare your report here, did that come from your experience valuing other companies or did you learn that information from other sources?

MR. LONERGAN:  Objection to form.

A.   A combination. So it certainly comes from my experience with other cases but it is part of my practice generally and was part of my practice here to also look, for example, to peer-reviewed literature, to look to information of the type that relevant parties will rely on at the time of the transaction, and other regulatory -- other sources of information from either regulatory bodies, themselves, or entities that can reliably and accurately, for example, describe a relevant regulatory regime or framework.

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

YVETTE AUSTIN SMITH

Q. And to the extent you did look at such sources here, would they all have been listed in the appendix to your report where you list the materials that you relied on?

A. To the extent that I relied on them, yes. So to the extent that I relied on them, they would be in that exhibit -- excuse me -- that appendix to my report.

Q. Going back to your report now, if I understood it, generally you conducted three different analyses; a balance sheet test; ability to pay debt test; and adequate capital test; is that right?

A. Those are the three solvency analyses I undertook. That's correct.

Q. Okay. And let's start with the balance sheet test. And I may refer in some of these questions to specific paragraphs in your report, but if you think it would be helpful in answering to refer me to others or to look at your report, just let me know.

Page 111

YVETTE AUSTIN SMITH

Can you walk me through generally the balance sheet analysis that you conducted here?

A. Certainly. Although, I will say that I will summarize it and the specific details are in my report. But in summary, a balance sheet test measures the value of the company of the assets relative to the debt, right? And so, the balance sheet test is at its heart a valuation test because you're measuring the value of the company's assets and you're comparing that to the company's debt.

There are three valuation analyses that are typically at least considered in the initial phase. There are income-based approaches, market-based approaches and asset-based approaches.

Without going too far down the path, the two most relevant, as I explained here, were an income-based approach and a market-based approach. And so I used the discounted cash flow

Page 112

YVETTE AUSTIN SMITH

analysis as the income-based approach and I used or attempted to use the Guideline Public Company and the precedent transaction methodologies as market-based approaches.

For the discounted cash flow analysis and for the -- well, directly for the discounted cash flow analysis it was important to use projections that reflected information that was known or knowable as of the April 2014 transaction.

So there is a significant discussion in my report about how I developed those projections from the projections which are called the Padres Projections in my report that did not reflect those reasonably known and knowable facts and circumstances.

So having developed those projections I conducted a discounted cash flow analysis. I also used those projections with respect to the multiples that were developed under the Guideline

Page 113

YVETTE AUSTIN SMITH

Public Company approach. So that's the very general description of the balance sheet test.

Q. Am I correct in understanding that when you conducted -- strike that.

In order to conduct the discounted cash flow analysis, it requires the application of a discount rate to the projected for cash back to the date of the valuation; is that correct?

A. Yes. So more specifically, it requires the application of a discount rate so you can calculate the present value of those cash flows back to the date of valuation, that's correct.

Q. Okay. What is the best methodology for determining the appropriate discount rate to use for a valuation exercise?

MR. LONERGAN: Objection to form.

A. With some caution about using "best", because there are circumstances

29 (Pages 110 - 113)

CONFIDENTIAL

Page 118

YVETTE AUSTIN SMITH

the factor that most impacts beta.

So I've developed a set of companies, I understood what the implied or observed weighted average cost of capital would be for those companies based on their observed beta and determined that observed weighted average cost of capital was too low.

So then I sought to look at what additional market evidence existed with respect to measuring a more appropriate and accurate weighted average cost of capital for Millennium.

So I do note in the report that management, itself, relied upon a 14.8% WACC in conducting the solvency analysis upon which the April 2004 transaction was based. I then looked at additional market evidence, which was the weighted average cost of capital that FTI derived which, as I say here, was actually quite similar and given that it was for the fresh start accounting directionally it was consistent with my

Page 119

YVETTE AUSTIN SMITH

expectation, which is that the weighted average cost of capital may have actually decreased from the April 2014 date. And then lastly, a document that I reviewed actually after I received I believe it was the report of Ms. Hutton, I looked at a TA Associates analysis and, in fact, they derived a very similar weighted average cost of capital for Millennium.

So understanding the empirical analysis that I had undertaken, developing an opinion based on the facts that are described in the report as to why that observed weighted average cost of capital would be too low, and then looking to at least three market data points that support an upward adjustment to the directly observed WACC and, again, kind of concluding with the fact that the company, itself, relied on that weighted average cost of capital for the solvency opinion, I was very -- I'm quite confident that 14.8 is a quite reasonable estimate for the weighted average cost of

Page 120

YVETTE AUSTIN SMITH

capital for Millennium.

Q.   Okay. And you referred toward the end of that answer to three data points. I just want to make sure I have them right.

Those three data points are the Vantage Point number 14.8%, the FTI number, and then something that is not in your report but you subsequently looked at from TA Associates. Were those the three data points you were referencing?

A.   That's correct.

Q.   And you said -- just one clarification in your answer, at least once maybe twice I think you said management relied on the 14.8% number.

Now, in your report you say that the rate is calculated by Vantage Point. So I just want to make sure I understand this correctly.

You're saying Vantage Point created the number but then management relied on it?

A.   That's correct.

Page 121

YVETTE AUSTIN SMITH

Q.   Okay. Did they -- when you say "relied on it", are you referencing exclusively the solvency opinion or did they rely on it for any other purposes?

A.   Well, they also relied on the 14% developed by FTI for the fresh start accounting.

Q.   Right. But the 14.8% that Vantage Point used, I just want to make sure I understand what you mean when you say management relied on it and what I really want to understand is if you are talking about the solvency analysis or if management used that number for any other purposes?

A.   I was talking about the solvency analysis.

Q.   Okay. Did you independently estimate the WACC to use?

A.   I came to an independent conclusion that the directly observed WACC from the -- I'm going to put in quotes, if you will, "comparable companies", because I describe that I

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

YVETTE AUSTIN SMITH
don't think they're sufficiently comparable, but the Guideline Public Companies maybe I'll say, I came to an independent conclusion that the directly observed WACC from the Guideline Public Companies was -- did not sufficiently compensate investors for the risk of Millennium, i.e., the weight was too low. And so as a next step I sought to understand what the market data points were with respect to my observed WACC.

Q. What do you mean when you say your "observed WACC"?

A. So I identify five Guideline Public Companies. I describe in my report why I think they're not sufficiently comparable.

Having said that, there is a beta that is observed from those five companies. That beta can be used as an input in the Capital Asset Pricing Model to derive a WACC that would be observed from those five companies.

Q. And is that the analysis that

Page 123

YVETTE AUSTIN SMITH
you conducted that led you to 14.8%?

A. No. Because as I said, that observed WACC is lower than 14.8%, and more importantly, from an analytical point of view, is insufficient to compensate investors for the risk of Millennium's cash flows. It's too low.

I describe why these companies are less, and certainly at the time of the transaction, were less risky than Millennium. And so because beta is a measure of risk, and all else being equal, the higher the risk of the company the higher the beta, and these companies were less risky than the observed beta from those companies would also be too low, which would lead to a WACC that would be too low.

Q. Right. So I'm interested in the WACC that you did use, the 14.8%. And I guess my question is ultimately this; did you conduct any analysis yourself that arrived at 14.8% as the conclusion or did you use the 14.8%, as I had

Page 124

YVETTE AUSTIN SMITH
understood it from paragraph 143, because it's the discount rate calculated by Vantage Point for the solvency analysis?

MR. LONERGAN: Objection to form.

A. So the independent analysis that I conducted was to; A, calculate what the directly observed WACC would be for the five Guideline Public Companies that I identified; I then sought to understand the relationship between the 14.8 WACC that the company had relied upon previously to other market data points, and so FTI, as noted in my report and subsequently confirmed by the analysis that was undertaken by TA Associates.

So the independent analysis was to calculate a WACC, develop an opinion as to whether that WACC was a reasonable representation of the WACC that would be appropriate for Millennium, and then undertake an analysis of other data points and understand whether those

Page 125

YVETTE AUSTIN SMITH
data points were confirmatory of the weighted average cost of capital that the company had relied upon in connection with the solvency analysis, the contemporaneous solvency analysis.

Q. Did you examine the methodologies Vantage Point used to arrive at a 14.8% WACC?

A. To the extent that I could. So Vantage Point -- first of all, Vantage Point uses the Capital Asset Pricing Model, which is a model that I use all the time and believe to be reliable.

Second, I looked at the companies, let's call it Vantage Point's Guideline Public Companies, they might use comparable companies but I looked at the companies that Vantage Point used for the basis of its analysis, and saw that there was a significant overlap between the companies that I had independently identified and the companies that Vantage Point had identified.

I then understood how -- that

32 (Pages 122 - 125)

Page 126

YVETTE AUSTIN SMITH

Vantage Point had used a size premium from a supportable source that used to be Ibbotson's, which is now Duff & Phelps. It is a data source that I have used myself previously. And then I understood that Vantage Point had derived what they called a specific company premium which I believe was 5%.

And so one of the questions, in particular that I undertook, was because the use of the CAPM is fairly standard, the estimate of the risk-free rate, it can vary a little bit but it's fairly standard, the estimate of the equity risk premium, all these being inputs to the Capital Asset Pricing Model can vary a little bit but is fairly standard, the input that I was most interested in comparing to other market data points was this specific company risk premium.

And so the Vantage Point materials don't describe their derivation of the specific company risk premium but

Page 127

YVETTE AUSTIN SMITH

they do describe a specific company risk premium and I sought to compare that specifically and the WACC calculation more generally to other data points.

Q.   Have you ever worked with Vantage Point previously?

A.   No, I don't recall. I don't believe so, pardon me.

Q.   Had you ever heard of them before this matter?

A.   I think I have heard of them but I have not worked closely with them, for sure.

Q.   And do you know what their reputation is in the industry?

A.   No. I mean, that's a subjective question. It's not a company that I have worked a lot with. There are companies that I have worked more in this space with but not Vantage Point.

Q.   You mentioned the three data points that we discussed, the Vantage Point number, the FTI number and the TA Associates analysis.

Page 128

YVETTE AUSTIN SMITH

Turning to the FTI number, am I correct that the number they used was 14.0%?

A.   That's -- well, yes.  They looked at the value over a range. They looked at the value of the company, pardon me, over a range of WACC values but 14.0 was the midpoint.

Q.   Okay. And when did FTI conduct its analysis arriving at that 14% number?

A.   December 2015.

Q.   Okay. And do you know when Millennium filed for bankruptcy?

A.   November of '15, I believe. I have to look back but I believe it's November, but I'm -- I'm happy to reconfirm.

Q.   No need. In your experience does a company filing for bankruptcy affect its WACC?

MR. LONERGAN:  Objection to form.

A.   Potentially, but this is for fresh start accounting. So this is -- FTI

Page 129

YVETTE AUSTIN SMITH

was not calculating a WACC prior to the confirmation of a plan. So this was for the fresh start accounting.

So under that circumstance, as I had said before, I was not surprised to see that the WACC may decrease a little bit because some of the liabilities and risks had been adjusted or addressed through the bankruptcy process, but Millennium then reemerged as an operating company.

Q.   I want to make sure I understand that. You're saying that to you it's reasonable that after the bankruptcy Millennium's cost of capital is lower than it was 20 months before the bankruptcy?

A.   Well, to be more specific, not just after the bankruptcy, after a plan confirmation and the company has reemerged and so this is a valuation for fresh start accounting.

So if I am valuing the company in the midst of bankruptcy, before there

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

YVETTE AUSTIN SMITH

is a confirmed plan, my answer would differ, but that's not what FTI was doing here.

Q.   Okay. Just to clarify what you mean by that term, fresh start accounting.  Do I understand correctly that you mean accounting for the -- the accounting for the company as of the date it has reemerged from bankruptcy, going forward from there?

A.   That's -- that's generally correct. There is some technical definition to fresh start accounting but yes, it is the reemerged company.

Q.   Okay. Can I ask you to turn to tab 8 in your binder, which I think somebody will correct me if I'm wrong we're going to introduce as Exhibit 8?

(Austin Smith Exhibit 8, presentation deck from Vantage Point Advisors re: Millennium Lab Holdings II LLC Solvency Analysis dated April 30th, 2014 was received and marked on this date for

Page 131

YVETTE AUSTIN SMITH

identification.)

A.   Yes, I have it in front of me.

Q.   Okay. Just for the record, while this is loading, this is a presentation deck says Vantage Point Advisors, and then the title underneath Millennium Lab Holdings II LLC Solvency Analysis, dated April 30th, 2014 and it has a production number in the corner ending -3273. And I am told it is available to those on Exhibit Share.

And, again, I'll ask you about a few sections of this but you should feel free to go through this document as necessary.

So my first question is, is this the document you are referring to in your report, you don't necessarily have to go back to, but the bit I read before in paragraph 143 where you discuss, where you state, "The discount rate is calculated by Vantage Point for the solvency analysis dated April 30th, 2014?"

Page 132

YVETTE AUSTIN SMITH

A.   I believe this is the document, yes.

Q.   I'm going to ask you to turn to page 16 of the Exhibit 8, and that will have in the upper right-hand corner the production number ending -3288.

I see there's some bullets and one of them that's bolded Gordon Growth Method and that references a 14.8% WACC, and then says minus 3% growth to get a number of 11.8%.

Is this where in the report you obtain the 14.8% WACC?

A.   I don't know if this is the only page that has it.  But so, for example, page 18 shows the 14.8% WACC. So I don't know that it was this page specifically, but it was this document.

Q.   I see. Is there anything in this deck where Vantage Point explains how it came to use the WACC of 14.8%?

A.   I believe that is in a different document, and I'd have to look back at the footnotes in my report. There

Page 133

YVETTE AUSTIN SMITH

is a footnote in my report that speaks to Vantage Point's use of a specific company risk premium and a size premium that might have been in -- I believe that was in a different document than this one.

Q.   Okay. I don't know which footnote you're referring to. It might be 285. If you take a look at your report, if you're able to find that footnote you're referencing, I would appreciate that.

A.   If you give me just a minute I think I could probably find it pretty quickly.

So footnote 285, sorry, took me a minute to find it, makes reference to WACC compiled from identified Guideline Public Companies, plus the size premium adopted by Vantage Point, i.e., 10%. I thought there was a reference to the 5% specific company risk premium but I'm not sure that is a footnote. And one of the things -- one of the documents I reviewed upon receiving the Hutton report

34 (Pages 130 - 133)

## CONFIDENTIAL

Page 134

YVETTE AUSTIN SMITH

was a document that she had pointed to that had additional detail with respect to the Vantage Point valuation analysis or WACC calculation specifically.

Q.   Do you remember what that document is?

A.   The document in the Hutton report?

Q.   Yes. I thought you said you reviewed after reading the Hutton report.

A.   I'd have to go back to the Hutton report to identify the document.

Q.   Okay.

A.   I'm happy to do that but I don't know it, sitting right here.

Q.   No need for that right now. Thank you.

But am I correct in understanding that this document is something that you did not review in preparing your report?

A.   The honest answer is it's unclear whether I reviewed that report because we did look at, my team and I,

Page 135

YVETTE AUSTIN SMITH

looked at a document that described the size premium that Vantage Point used and the specific company risk premium that Vantage Point used.  And so I don't know if it was from that document or a different one of the documents that is cited by reference to Bates number.

Q.   And are you able to explain how Vantage Point reached 14.8%?

A.   Oh, I thought I did. So they used a Capital Asset Pricing Model and so for I think the risk-free rate I think they used the ten-year Treasury for the risk-free rate. For the equity risk premium I believe they used the supply side equity risk premium from what was Ibbotson and now Duff & Phelps for the -- that was for the equity risk premium. For the size premium I believe it came from the same source.

They started with eight companies that they determined to be comparable for their purposes, observed the levered beta, unlevered the beta

Page 136

YVETTE AUSTIN SMITH

using the Hamada Formula, which is a pretty common formula to unlever beta, so you get an unlevered beta. And then I believe they took, I'm not sure if it was a median or average of the unlevered beta, relevered the beta for a capital structure for Millennium.

Actually, there they did review the betas but I actually think they modified the beta that -- they modified either the unlevered or the levered, but I think they modified the unlevered beta that they used for their calculation. And with those components and the capital asset pricing formula it's then pretty straightforward to derive a weighted average cost of capital.

Q.   And did you do any work to verify their analysis or any of the individual steps in the analysis that you just described?

A.   So I understood that they used the Capital Asset Pricing Model.  So the

Page 137

YVETTE AUSTIN SMITH

first question for me was; what was the methodology they used?

I then understood that there was a significant overlap between the Guideline Public Companies that I had identified as comparable as one was going to find for publicly traded companies. So they had selected eight companies. The five companies that I selected are a subset of that eight and then the remaining -- two of the remaining three are or all three of the remaining three, I'd have to go back and check now, are what I had identified, if you will, as tier two comparable companies.

So those tier two companies did not come into my analysis in a quantitative way, but it would have been, if you will, sort of the next concentric circle of comparability.

So all that to say that even though we had some disagreements on the exact companies, there was a good degree of overlap in the five companies and the

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

YVETTE AUSTIN SMITH

companies that did not overlap were companies that I had at least reviewed for comparability.

I looked at the sources from which they identified the equity risk premium and the size premium, that being that Ibbotson, now Duff & Phelps, source, it's a widely used source.

So in those ways I sought to review and understand how Vantage Point had derived their weighted average cost of capital. But it was also important to me that the company contemporaneously relied on that weighted average cost of capital in the solvency analysis that was done in support of the transaction, and that the company subsequently relied on the very similar estimate from the FTI work.

Q. Did Plaintiff's counsel instruct you to use the 14.8% WACC?

A. No.

Q. Did you consider using any other WACC in your analysis?

Page 139

YVETTE AUSTIN SMITH

A. I did not identify or derive a, what I would consider, a more accurate estimate of WACC. So no.

You do see in my report that I conducted some sensitivity analysis, but it remains my opinion that 14.8 is the best estimate of WACC for Millennium's cash flows at that time.

Q. We discussed previously when we were walking through some of your prior testimony and statements that WACC is comprised of a cost of equity and a cost of debt.

For the 18.8% (sic) WACC you used what was the cost of equity here?

A. I believe you said 18.8. I think you might have meant 14.8 or I misheard you, so I apologize.

I'd have to look back at the component of cost of equity here -- I'd have to look back. I'd have to look back at my workpapers.

Q. Is that discussed in your report?

Page 140

YVETTE AUSTIN SMITH

A. I think it's only discussed -- I think -- I think I only find it in my workpapers. I don't think I described it in my report, no.

Q. I want to turn to paragraph 41 in your report which, again, is Exhibit 1. And I'll start reading from just about the middle of the paragraph, "The projected free cash flows of the firm" -- I understand that to be Millennium -- "are discounted back to the date of valuation using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows." Do you see that?

A. I do.

Q. What do you mean by non-diversifiable risk here?

A. So this is a -- this is a section of the report that talks in general about valuation methodologies, and it's a section that I include in almost all of my reports.

So non-diversifiable risk here

Page 141

YVETTE AUSTIN SMITH

is harkening back to the description of non-diversifiable risk in the Capital Asset Pricing Model. And so under the pure academic framework of the Capital Asset Pricing Model investors are compensated -- excuse me -- are not compensated for risks that are diversifiable or unsystematic. I always have to pause on those two words.

So what this is saying is what you are compensated for is risk that you cannot diversify away. That is not what non-diversifiable means here and, again, it harkens back to the framework for CAPM.

Q. And is a company-specific risk premium diversifiable or non-diversifiable?

A. Well, this is where you have to separate the academic theory from the practicality. Because the Capital Asset Pricing Model assumes fully efficient markets, which we know in the real world don't actually exist.

36 (Pages 138 - 141)

Page 146

YVETTE AUSTIN SMITH

form.

A. I'm sorry. What is the "this"?

Q. I'm sorry. The 1.9% that you were just discussing.

A. I don't believe so.

Q. Is it common for you to include a company-specific risk premium when you do a valuation?

A. It is fairly common that one is unable to identify sufficiently comparable companies if you are valuing, for example, a private company, a small or private company, for example. So it is not uncommon.

To say it another way, it is not uncommon that you are unable to identify sufficiently comparable companies. And so the question of how you derive your estimate of WACC from that point can have a couple of different answers. One of those answers is the use of a specific company unsystemic risk premium. You can also, as TA Associates did, discount the observed multiple.

Page 147

YVETTE AUSTIN SMITH

MR. POPOVSKY: I'm looking at the time and realizing we are approaching about an hour and a half since our last break. I'm going to propose we go off the record.

VIDEOGRAPHER: Off the record. This concludes media 2 at 12:11.

(Lunch recess is taken.)

VIDEOGRAPHER: This begins media 3 of the videotaped deposition of Yvette Austin Smith. The time is 12:47. We are on the record.

Q. Welcome back.

A. Thank you.

Q. You had no obligation during the break other than to eat your lunch, but before the break you had mentioned a document you reviewed or looked at in response to Professor Hutton's report that provided some information about the Vantage Point analysis.

I don't know if anything

Page 148

YVETTE AUSTIN SMITH

during the break jogged your memory about that or you had any more information about where that document is or where I might find it?

A. So I did not look into that over the break. If one of the documents in my exhibit binder is the Hutton report I could find it for you but I have not looked at the other documents in my binder.

Q. Okay. It's not but maybe we'll pull that up later.

Just a few more questions. You had mentioned about the WACC you used for your analysis you mentioned several data points. One of them was the TA Associates analysis, and correct me if I'm wrong, I believe you said you hadn't looked at when you prepared your report but you looked at in response to Professor Hutton's report and concluded that it was consistent with your findings; is that right?

A. That's correct.

Page 149

YVETTE AUSTIN SMITH

Q. Do you know why TA Associates prepared that analysis?

A. Other than that it was the largest equity holder in the company, and it was done contemporaneous to the transaction, I don't have any additional information.

Q. And do you know if their objective in preparing that report was to analyze the fair market value of Millennium?

MR. LONERGAN: Objection to form.

A. I can tell from the document the intent was to value the company. That's all I can tell from the document, itself.

Q. When I asked a question earlier about the company-specific risk premium, which I understood and this is probably a oversimplification and you correct me if I'm wrong, that generally you thought was necessary to include here to account for non-systemic risk; is that

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

YVETTE AUSTIN SMITH

right?

A. I would more accurately say it was necessary here because the measure of diversifiable risk that derives from the Guideline Public Companies does not sufficiently account for Millennium.

Q. Are you aware of any academic literature or research that supports the use of a company-specific risk premium as a component to a WACC when the Guideline Public Companies analysis, as you say happened here, doesn't account for that non-diversifiable risk?

A. I'm more aware of it as a custom and practice. So both as an investment banker, as a consulting and testifying expert, as someone who has reviewed the investment banking analyses and valuation analyses of other companies, for example, here Vantage Point and FTI, it is quite a common practice.

I'm also aware of case law in Delaware that has accepted a

Page 151

YVETTE AUSTIN SMITH

company-specific risk premium and the common motivation that I have viewed in all of those circumstances is when you have an observed measure of beta that is insufficient to compensate for risk and generally that inefficiency arises because there is limited comparability between the company that is being valued and its benchmark or guideline companies or comparable companies, depending on the language.

Q. And other than including a company-specific risk premium in a WACC, is there any other way to account for that risk?

A. As I've discussed before the break, the way that TA Associates did it, which is also common, I'm just using this as an example, is to adjust an observed multiple.

So you see that, for example, a set of companies is trading at, I'm going to make a hypothetical example, an EBIT multiple of seven. Because of the

Page 152

YVETTE AUSTIN SMITH

limited comparability between the company being valued and the Guideline Public Companies it's quite common to say even those seven is, for example, the median multiple that's observed in the market, I'm going to apply a lower multiple to this company for these specific reasons. And so that is the same exact exercise.

So lowering a discount rate is exactly the same analytical exercise as -- excuse me. Let me make sure I state this correctly.

Lowering the valuation multiple is exactly the same analytical exercise as increasing the discount rate, because a multiple is just an inverse of a discount rate.

Q. So do I understand correctly that -- strike that.

Are there certain situations where one of those is preferable to the other or should I understand from what you're saying it's really indifferent and just different ways to see the same math?

Page 153

YVETTE AUSTIN SMITH

A. It's effectively different ways to do the same math. I say "effectively" because often you're talking about an EBITDA multiple and EBITDA is a proxy for free cash flow, which is the quantity to which a discount rate is typically applied.

So it's not exactly apples to apples but it's quite close. And if you used a multiple of free cash flow, which happens just to be less common, then it is exactly apples to apples.

Q. So that's what I was going to ask you. Is there a third way to factor it into the free cash flows? And am I understanding correctly that you are saying yes, there is, but that's less common?

A. It is less common because often the information that you need to estimate free cash flow is -- it's more difficult to accurately estimate free cash flow from publicly available information than it is to accurately

39 (Pages 150 - 153)

Page 182

YVETTE AUSTIN SMITH

acquisitions. And others included growth rates with acquisitions and at the end of that sentence there that you were reading says "including growth from acquisitions". So this would have been a median estimate of the acquisition-driven growth rate estimates.

Q. We can look at -- if you don't mind turning to, there are a lot of pages, but up to tab 21 in your binder. And I'll introduce that as Exhibit 9. Is that right?

(Austin Smith Exhibit 9, report from Piper Jaffray dated January 30, 2014 re: Quest Diagnostics was received and marked on this date for identification.)

Q. So that's -- well, for the benefit of the record, this is -- at the top a document says Piper Jaffray dated January 30th, 2014. It says Company Note, it mentions Quest Diagnostics, and everyone will let me know -- I'm told it's available to those on Exhibit Share.

Page 183

YVETTE AUSTIN SMITH

Am I correct that this is the document you are referencing in footnote 219?

A. I believe so. I believe so. The quote here seems to -- looks familiar.

Q. And did the 4.1 or 2.6% numbers that we discussed in the footnote or that you discussed in the footnote, do they come from here? Do you know? I should give you time to look at this.

A. I believe this is one of the reports that has qualitative commentary. So if you look under -- if you look in the first paragraph, about four lines down, "We believe organic volume growth will remain weak and reimbursement headwinds will continue to pressure growth and margins throughout the year."

So that was one of the qualitative -- in summary, that was one of the qualitative data points that I considered in deriving my estimate for Millennium's future growth rates.

Page 184

YVETTE AUSTIN SMITH

Q. And separately, you propose some adjustments to the Padres Projections related to medically unlikely edits, which you referred to, and we can refer to here as MUEs; is that right?

A. That's correct. It's a standard industry terms, MUEs.

Q. And then if you go to paragraph 110 of your report, the first sentence, "The first adjustment" --

A. Just give me -- got it. I have it in front of me.

Q. No problem. "The first adjustment I made to the Padres Projections was to restate Millennium's first quarter of 2014 financial results to account for the impact of MUEs."

Now, prior to preparing this report, what experience did you have analyzing medically unlikely edits?

A. I don't know that I had specific experience with MUEs but certainly had experience with reimbursements based on medical codes,

Page 185

YVETTE AUSTIN SMITH

I'm going to call them, whether they're CPT codes or otherwise or diagnostic codes, and have always been familiar with the fact that there are various discounts, adjustments, caps, limitations to those codes.

So this, the MUEs that came into effect here were newly implemented in January 2014 but the concept of restriction on ability to bill codes is quite common.

Q. And prior to preparing this report, had you examined any CMS guidance or regulations concerning MUEs?

A. Not that I recall for MUEs specifically but, again, the change -- the MUE implementation here that was relevant were changes that came into effect in January 2014 and for a limited number of codes, as it turns out codes that were significant to Millennium's operations.

Q. And in looking through this section of your report I see, for

47 (Pages 182 - 185)

CONFIDENTIAL

Page 186

YVETTE AUSTIN SMITH

example, at footnote 220 you cite to the CMS website's definition of a MUE and then I guess the Frequently Asked Question page of that website, I think you cite to that somewhere else, and elsewhere in the section you cite to various internal Millennium documents.

So based on our discussions before about what you relied on, am I correct in understanding that the only documents or source you looked at, other than internal Millennium documents, in developing your opinion concerning MUEs is the CMS website?

MR. LONERGAN:  Objection to form.

A.    I would have to look back. If I relied on anything else it would be footnoted in the report. Sitting here, outside of a CMS universe of documents and internal documents, I don't recall. But I also can't say these are the only two documents cited in a discussion of MUE in my report.

Page 187

YVETTE AUSTIN SMITH

Q.    But if you had relied on other material you're saying it would be cited in the report --

A.    That's right. That's right. I'm not aware of anything that's missing from my citations.

Q.    Okay. What is a medically unlikely edit?

A.    Effectively, it is a mechanism to limit the reimbursement that a provider can seek for a particular code. And so I describe in the report, there are different ways in which those limitations are established. And one of the relevant changes here was the change from a claim line edit to a date of service edit.  The date of service edit being even more restrictive, but it is effectively to limit a provider's ability to seek reimbursement from a single code in either one patient encounter, one date of service or another relevant time period or universe of interaction.

Q.    And you mentioned, in your

Page 188

YVETTE AUSTIN SMITH

answer you mentioned two different terms. I wanted to make sure I'm understanding correctly.  What is a claim line edit?

A.    So there's a good example of this in Table 6 of my report.  But for a given date of service a provider may actually submit multiple claim lines for the same specimen, so in this case the same patient. And depending on the nature of that code, they could actually include that code in multiple claim lines.

So if the procedure is a -- if the code is a procedure versus the testing for a specific substance, you might use that same procedure to test for multiple substances in the same specimen. So that code might come up twice.

Let's just use a hypothetical. You used that procedure to test for cocaine in one instance and you use that procedure to test for heroin in another instance, same specimen, same date of service.  So that's going to come up on two different claim lines.

Page 189

YVETTE AUSTIN SMITH

So the first type of MUE restriction limits the number of times you can claim for reimbursement in a single claim line. The second type of MUE limits the number of times you can claim reimbursement for that code for a single patient and a single date of service. And so you see how this plays out in the hypothetical, for example, in Table 6, if you look at the code 83925, it is denied under a date of service, it may be denied under a date of service MUE and allowed under a claim line MUE.

Q.    And actually, on that same page, on paragraph 113, the first sentence, "According to communication between Millennium and its counsel at the time it appears to have been counsel's understanding that on January 1st, 2014 two MUE codes 83925 (opioids drugs measurements) and 82542 (chemical analysis using chromatography technique) converted from claim line edits to DOS edits." Do you see that?

48 (Pages 186 - 189)

## CONFIDENTIAL

Page 218

YVETTE AUSTIN SMITH

from the contemporaneous documents is that Millennium does not appear to have been including information with respect to medical necessity in its appeals.

So given that the date of service edit regime had been announced a year ago, the implementation of data service edits had been explained to Millennium on multiple occasions, Millennium had actually started receiving denials under exactly that regime and using exactly that interpretation that it had been provided, I did not see significant uncertainty with respect to Millennium's ability to collect that reimbursement revenue.

Q. And do you explain that in your report?

A. So all of the documents that we look at, that we looked at, the contemporaneous record are cited in my report. And I also describe the fact that by July 2014 Millennium had, in fact, changed its billing practices and it

Page 219

YVETTE AUSTIN SMITH

ultimately wrote off that revenue. So all of that is described in my report.

Q. And another one of the adjustments you propose to the Padres Projections we'll refer to as LCD adjustments. And when I say that I assume you understand that LCD refers to local coverage determinations?

A. That's correct.

Q. Can you explain what local coverage determinations are?

A. It is another type of restriction that Medicare, CMS more broadly as administered through the MACs, the Medicare Administrative Contractors, it's another restriction that limits the ability of providers to seek reimbursement.

Now, whereas, the MUE restrictions are focused more on volume of reimbursement under a particular code, the LCD determinations are really focused more on whether it's appropriate to claim reimbursement for a particular type of

Page 220

YVETTE AUSTIN SMITH

service, quote, at all.

So they're slightly different in that regard but they're similar in the sense that both seek to impose restrictions on a provider's ability to seek reimbursement from CMS.

Q. And prior to preparing this report, did you have any experience evaluating the impact of proposed LCD's?

A. Not proposed LCDs specifically. But, again, the concept of limitations, whether they arise from caps or otherwise, and reimbursement by code is quite common.

Q. And do you have any professional experience tracking proposed LCDs through the process from the initial point of proposal to any adoptions or modifications and then to final adoption, if they are in fact adopted?

A. Not LCDs, specifically. Although, I took to undertake -- undertook, pardon me, that research in connection with this report.

Page 221

YVETTE AUSTIN SMITH

Q. Okay. What did you -- what research did you do?

A. So I reviewed the LCD that was proposed and actually there were a couple of different iterations that were proposed, I reviewed the analysis of that LCD by a contractor or a consultant that Millennium had hired at the time, I believe Avalere, I sought to understand the company's interpretation of the LCD and how the LCD would likely be implemented, and then ultimately after the transaction, the company's modeling of when that impact would likely come into effect.

Q. Okay. And in your discussion of LCDs, which ends on page 67 of your report, you refer in a number of different footnotes, for example, 239, 240, 245, to a document that you describe as Noridian LCD Draft.

I'm going to ask you to turn to tab 12 of your binder, which we'll introduce as Exhibit 12.

56 (Pages 218 - 221)

Page 222

YVETTE AUSTIN SMITH

(Austin Smith Exhibit 12, document re: Drugs of Abuse Testing Noridian Healthcare Solutions LLC, was received and marked on this date for identification.)

Q.   And this is the document, the header says Drugs of Abuse Testing Noridian Healthcare Solutions LLC, and then it has, among other things, a stamp that says Draft on it looks like at least six different times on the front page. And I'm told it is -- and the production number ends -5508, and I'm told it is available to those on Exhibit Share.

Is this the document you're referring to, for example, in footnotes 239, 240 and 245?

A.   I believe it is. I'm just going to -- yes, it is.

Q.   And did you look at any other Noridian draft LCDs in coming up with your LCD adjustment?

A.   I believe I did, and not just other Noridian LCDs, but many of the

Page 223

YVETTE AUSTIN SMITH

draft LCDs are published and so I reviewed those. But equally important, I also reviewed a report that a consultant that Millennium had retained, a report drafted by that consultant, which describe the Noridian draft LCD and the likelihood of that LCD being adopted.

Q.   And am I correct that your proposed LCD adjustment was to apply a 18.3 reduction to net revenue per specimen effective October 2015; is that right?

A.   That is correct. Although I will just clarify that the 18.3 was actually calculated by Millennium.

Q.   That was my next question. How did you come up with that number?

A.   So Millennium prepared multiple analyses of the likely LCD impact on their business. I describe them in my report. There was an analysis that showed I believe a 5.6% impact, there is an analysis that shows a 18.6, or something like that, percent impact and

Page 224

YVETTE AUSTIN SMITH

then there are at least two analyses, and perhaps three, that show a 30% impact. And so I walked through my, in my report, why I chose Millennium's analysis that showed the 18-plus-percent impact and that impact was calculated in an Excel spreadsheet or Excel spreadsheets that were produced as part of this matter.

Q.   Did you do anything to independently verify the 18.3% calculation?

A.   Yes. So the first thing was to understand the assumptions that underlied that calculation, and so I describe some of that.

So, for example, why didn't I rely on the 5.6% quantification or estimate? Because that 5.6% estimate assumes confirmation testing for almost all tests, irrespective of whether the point of care test is affirmative or positive. And as I describe in my report, that is inconsistent with the guidelines that were being promulgated at that time.

Page 225

YVETTE AUSTIN SMITH

So I sought to understand not just the number, itself, but how the number was calculated and the extent to which that calculation seems to include or incorporate assumptions that were consistent with the regulatory guidance at the time.

Q.   So I understood from that answer why you ruled out 5.6.  But my question, and maybe I didn't ask it clearly, was for the 18.3 number that you did go with, did you do any work to independently verify that 18.3 was correct, other than rule out 5.6?

A.   It seemed -- the 18.6% included assumptions with one potential exception that seemed broadly consistent with the regulatory guidance. I mentioned one exception. There is an offset that I describe in my report that has the effect of reducing what would have been a higher estimate down to 18.-- I'm sorry I don't remember what the decimal point is, the 18-plus percentage point reduction.

57 (Pages 222 - 225)

CONFIDENTIAL

Page 294

YVETTE AUSTIN SMITH

not paying for results in the past, you're paying for results in the future.

So with that, and given that the impacts of the changes to the Padres Projection do not become fully realized on an annualized basis until 2016, there were not 2016 multiples but we do have 2015 multiples, which include some but not all of the impact of the risks facing Millennium in the modified Padres Projections. So if you look at the 2015 -- so I would start by looking at 2015 multiples.

The second thing, as I describe in the report, is that because these companies are not comparable or sufficiently comparable, the multiples that these companies command I would not immediately apply to Millennium. And we know, in fact, that Millennium was unable to sell itself at even the minimum multiple on this table or below the minimum multiple.

So the most relevant results

Page 295

YVETTE AUSTIN SMITH

from this table would be the low of the valuation multiples, there is low and medium shown, and it would be the low and it would be for 2015.

So if you look at on a revenue basis the implied equity value is negative and if you look at it on an EBITDA basis, at best you're talking about an equity value of 23 million, but relative to $1.8 billion in debt, that would not be a solvent company. That would be a company, as I say here, with unreasonably small capital.

Q.   And I referenced this before I think in maybe more than place but certainly paragraph 157 you mention that in its solvency analysis Vantage Point identified eight comparable companies and which include the five GPCs that you identified.

How did Vantage Point use the comparable companies in this analysis?

A.   I believe -- well, my focus on how Vantage Point used it was in deriving

Page 296

YVETTE AUSTIN SMITH

the beta that is an input to the weighted average cost of capital that they calculated, the 14.8. I would have to review the Vantage Point materials again, I just don't recall whether they used or implemented a Guideline Public Company approach. Although, I do recall them saying that none of the companies that they identified were identical to Millennium.

Q.   So there are eight companies, comparable companies -- strike that.

So was Vantage Point's WACC of 14.8%, did that rely on eight comparable companies that it identified?

A.   Yes. It derived the 14.8% from the observed betas for the eight companies they identified. That's correct.

Q.   And if you don't agree that these companies are sufficiently comparable to Millennium to provide reliable information, why are you comfortable using a WACC that

Page 297

YVETTE AUSTIN SMITH

incorporates them?

A.   So this goes back to the conversation we had earlier. So where we do agree, where Vantage Point and I, and for that matter FTI and TA Associates all agree, is that if you take a view of companies that are publicly traded, because they have to be publicly traded for this purpose, publicly traded and as comparable as you can get to Millennium, however you colloquially slice or dice that collection of companies you are going to arrive at a WACC that underestimates the risk.

So I chose five companies that I believe are the most comparable among a non-comparable set of publicly traded companies. Vantage Point chose eight, two or three of which were in my tier two set, FTI chose eight companies, not the same eight companies, mind you, as Vantage Point, but their companies also included my companies and TA Associates chose two companies, those two companies

75 (Pages 294 - 297)

CONFIDENTIAL

Page 298

YVETTE AUSTIN SMITH

are included in my five companies.

So all of the data points do use slightly different configurations of companies as a starting point, but all reached exactly the same conclusion, which is that the observed -- the WACC that can be observed or can be calculated from the observed beta is insufficient to account for the risk of Millennium's cash flows.

Q.   Another adjustment in your report relates to emerging opportunities discussed in a few places in your report but I'm looking right now in paragraph 67, you have some they're not quite bullets, they're dashes, in the last one -- well, I guess from the beginning you say, "The Padres Projections further included a category of revenue labeled 'emerging opportunities'."  And then, "For the following reasons the emerging opportunity should not form part of the expected cash flows in assessing balance sheet solvency."  Actually, I should just

Page 299

YVETTE AUSTIN SMITH

read a little further, "The revenues appear aspirational rather than expected, according to the Padres Projection no revenue associated with this category until 2015, around nine months following the 2014 transaction." And then it goes on. I don't need to read it all into the record, although, obviously you should read whatever you need to answer my questions.

Am I correct that one of the emerging opportunities included in the projections were Federal contracts with the Department of Defense and the Department of Veteran Affairs?

A.   I believe based on the call transcript that has been produced they weren't contracts, they were the right to bid on contracts.

Q.   And what were those contracts for?

A.   I only know the detail that's in that call, that's the only reference to a description of the emerging

Page 300

YVETTE AUSTIN SMITH

opportunities. So I believe that call describes them as the right to bid on contracts for Department of Defense and Department of Veteran Affairs, I believe.

Q.   Okay. So do I understand correctly, you didn't do any independent analysis of, well, of those particular emerging opportunities related to the government contracts or right to bid on government contracts?

MR. LONERGAN:  Objection to form.

A.   There was nothing in the record that even allowed me to undertake any kind of an analysis. There was just no description of what those emerging opportunities were supposed to be. So there was no way to come to an assessment other than the text that was included in that call transcript.

Q.   Okay. And you also state in the section, I guess this is now the third of those bullets or dashes in paragraph 67, "The emerging opportunities

Page 301

YVETTE AUSTIN SMITH

do not appear in the subsequent management model dated June 8th, 2015."

Would the June 2015 model have been available to Millennium's management at the time of the April 2014 transaction?

A.   Respectfully, that's sort of the wrong question.

So the question of whether to include the emerging opportunities doesn't turn on whether the June 2015 model would have been available at April 2014, rather, it turns on the question of what does the June 2015 model tell you about what existed at April 2014.

So the reference to that model is not because that specific model was available, but what does it tell you about what existed as of the date of valuation.

Q.   And what did it tell you about what existed as of the date of the valuation?

A.   That the emerging

76 (Pages 298 - 301)

CONFIDENTIAL

Page 302

YVETTE AUSTIN SMITH

opportunities, as of April 2014, were highly speculative. If these were opportunities -- and for a number of reasons but I'll confine my answer right now to the June 2015 model, that's what you asked me about. But as it relates to the June '15 model, it would be unusual that the company was making specific investments to generate specific revenue and cash flow in April of 2014. And by the time you get just to June 2015, so about a year later, there is simply no discussion at all, not only not a discussion of continuing whatever these emerging opportunities were, but no discussion of ending whatever investments that were supposed to be made into growing these emerging opportunities.

So I would either expect to see; this is how we're going to continue these emerging opportunities, we're going to shut down the emerging opportunities and these are the costs that we're going to incur to shut it down or something,

Page 303

YVETTE AUSTIN SMITH

there is simply no discussion at all. So to me, along with some other information that I cite to here, it supports that the emerging opportunities were quite speculative.

Q.    Jumping ahead now, I want to direct you to paragraph 171 of your report.

A.    Yes. I have it in front of me.

Q.    Okay. And so this is, the top of the page the section is entitled Adequate Capital Test.

Am I correct that as part of your performing an adequate capital test you created a reasonable downside scenario?

A.    That's correct.

Q.    What adjustments did you make to create that reasonable downside scenario?

A.    So they're listed here on paragraph 171. So I, instead of modeling in the impact of the local coverage determination at 18.3, I modeled in at

Page 304

YVETTE AUSTIN SMITH

33%, which was consistent with the company's higher contemporaneous estimate of the impact of the LCD.

In addition, I decreased or I modeled the impact of the DOJ settlement on specimen volumes, not at the 30%, which is in my expected case, but at the 50%, which is the higher estimate that Millennium management identified at the time.

Q.    When you say at the time, am I correct, and I'm looking at your footnote here, that you're really referring to a June 8, 2015 email?

A.    That is the date of the email, but as we discussed earlier, that information was known about Ameritox earlier than that, as of the date of the transaction. And I see no reason why the Callaway information, if it was not known, would have also been knowable, at a minimum was knowable as of the date of the transaction.

MR. POPOVSKY:  Okay. I'm going

Page 305

YVETTE AUSTIN SMITH

to propose we go off the record.

VIDEOGRAPHER:  Off the record at 4:38.

(Recess is taken.)

VIDEOGRAPHER:  We are back on the record at 4:50.

Q.    Welcome back.

A.    Thank you.

Q.    How would Vantage Point's analysis resulting in the 14.8% WACC have changed if they used the five comparable companies you listed in paragraph 151 instead of the eight companies they did use?

MR. LONERGAN:  Objection to form.

A.    You would have to ask Vantage Point. As I said, I, Vantage Point, FTI and TA Associates used overlapping but slightly different sets of companies, but all arrived at a very similar conclusion. So you would have to ask Vantage Point specifically how their analysis would change.

77 (Pages 302 - 305)

CONFIDENTIAL

Page 306

YVETTE AUSTIN SMITH

Q.   Okay. So just to make sure I understand, you didn't attempt to put your five companies into their analysis and understand what the result would be?

A.   No, because I was -- I was looking to incorporate market information that I did not develop, I was looking for a market information to confirm, be a confirmatory piece of input to the market -- to the analysis that I conducted. So to mix the two together would actually work against that purpose.

Q.   How is that?

A.   Because I independently identified a set of five companies, I derived what was the observed WACC implied by those five companies, and I came to a conclusion that that observed WACC did not sufficiently compensate investors for the risk of Millennium cash flows.

I then sought to understand whether there was market data that was confirmatory of my conclusions. And in

Page 307

YVETTE AUSTIN SMITH

fact, when I looked at the FTI analysis, the Vantage Point analysis and the TA Associates analysis, all of those analyses are confirmatory of my conclusion and actually one of the aspects that I think reinforces the robustness of the analysis is that even using slightly different companies and slightly different either methodologies or inputs, depending how you want to describe it, all arrived at the same conclusion.

MR. POPOVSKY:  Thank you. I don't have any further questions at this time.

MR. LONERGAN:  Okay. I don't have any questions either. So the deposition is closed.

VIDEOGRAPHER:  Let me go off the record here.

This concludes today's testimony given by Yvette Austin Smith. The total number of Media Units used was 5 and will be

Page 308

YVETTE AUSTIN SMITH

retained by Veritext. We are off the record at 4:54.

(The proceedings were adjourned at 4:54 p.m.)

Page 309

C E R T I F I C A T E

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, YVETTE AUSTIN SMITH was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

*Maureen Ratto*
MAUREEN M. RATTO, RPR
License No. 817125

78 (Pages 306 - 309)

# EXHIBIT 61

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT DELAWARE

Chapter 11
Civil Action No. 15-12284 (LLS)
Jointly Administered
Adv. No.:  17-51840 (LLS)

IN RE:
MILLENNIUM HOLDINGS II, LLC., et al.,

Debtors.
---------------------------------------------X
MARC S. KIRSCHNER, solely in his capacity as
Trustee of THE MILLENNIUM CORPORATE CLAIM TRUST,
Plaintiff,
vs.
J.P. MORGAN CHASE BANK, N.A.;
CITIBANK, N.A.; BMO HARRIS BANK
N.A., and SUNTRUST BANK,
Defendants.
---------------------------------------------X

REMOTE VIDEOTAPED CONTINUED DEPOSITION OF
JAMES SLATTERY

Volume 2
Pages 137 through 214
Thursday, July 8, 2021
10:00 a.m. - 11:46 a.m.  (MDT)

Stenographically Reported By:
Kimberly Fontalvo, RPR, CLR
Realtime Systems Administrator

Page 181

who quit, somewhere in that area, that time, that I was spread out.

And we asked several people, how could that be? And basically they said that you have too much money on the table. There's too much money in Millennium from that loan and they see it as an easy target. They implied if we hadn't taken the loan we would have never been such a huge target for them to get the money out of.

Q.   Just to make sure I have the timeline correct, does that mean -- the first conversations where you began to understand a settlement with the government might be greater than $20 million happened after the 2014 term loan closed; is that correct?

MR. TRETTER:  Objection.

A.   Oh, sure, quite a while afterwards. We had no idea during that negotiation. Everything we knew was disclosed and we couldn't possibly have any idea of what was going to happen a year or year and a half later, or that the government was going to see a bunch of cash and decide, okay, we're an easy target. So, no, we had no idea at that time.

BY MR. POPOVSKY:

Q.   Okay.  So, again, just to focus on the

Page 182

timeline, you mentioned a year, year and a half later, am I correct in understanding that these conversations -- and, again, the ones where you first began to realize the settlement with the government might be more than $20 million -- happened, in your words, a year or a year and a half later after the --

A.   I forget the timeline but it was certainly considerably after the term loan was closed.

Q.   When you first learned that the Department of Justice was investigating Millennium, do you remember your reaction and what you thought about the investigation?

A.   Well, when I first -- the very first one that came out, I was concerned and upset. And then I do what I always did, which was, went out to Howard, to our legal teams, got a reading on what was going on.

I had been already told that we should -- before we had our first run-in that we were warned through some people that were connected to Medicare, that the government had gotten in new super computers, that they had gone through all the pharmaceutical companies and that they were going to be targeting laboratories to try to get money

Page 183

because we were told that Obamacare was suffering for funds and they were going after everybody they could to generate as much money as they could to support Obamacare.

Q.   Okay.  Did the fact that the Department of Justice was investigating Millennium and had issued a subpoena, did that cause you to -- did that raise any concerns with you that Millennium might not be compliant with certain federal laws?

A.   No.  The only thing that it concerned me is that we -- that there might be something going on with the sales team that I didn't know about. But the allegations in there about cups being illegal and all that good stuff was absolute crap. Because somebody writes a Complaint doesn't mean any of it's true.

So I knew what was true and wasn't true and I wasn't concerned about that. But I was concerned about the sales team, that somebody -- somebody out there, when you have as many salesmen, you can't control what everyone says, you can only direct them to do it right.

Q.   And did you have any reason to believe that if the issues you were concerned about were true, as you just said, if there were a salesperson

Page 184

doing something that were improper, did you have any reason to believe that that would result in a settlement with the government that would have a material impact on the Millennium's finances?

A.   No.  Because we had already gotten the best advice we could in every corner and reserved that kind of money.

So it was already reserved.  We didn't have any concern about it whatsoever.

Q.   And now I want to focus on April 2014 around the time that the term loan closed.

At that point in time did you believe Millennium was engaged in any illegal business practices?

A.   No.

Q.   Are you aware of anyone at Millennium who at that time in April 2014 believed there was a possibility that the investigation might result in Millennium becoming insolvent?

A.   No of course not.

Q.   And are you aware of anyone at the four banks involved, J.P. Morgan, Citi, SunTrust, and Bank of Montreal, in April of 2014 who believed there was a possibility that the Department of Justice investigation might result in Millennium

Page 185

becoming insolvent?

A.   Absolutely not.  Nor would they have any way or reason to know the future of what it was going to be.  None of us had any knowledge of what ended up happening.

Q.   And at that time in April 2014, one lawsuit that was ongoing was the litigation with Ameritox?

A.   Yes.

Q.   The trial in that was set for later that summer.

Did you have a view then about the likely outcome of that trial?

A.   Well, the likely -- that was a competitor trial about a process of who was using -- who was stepping on each other's method patents.  So that had no bearing on our solvency.  If that's what you're asking.  Maybe I misunderstood.

Q.   No, no, no, that's -- Do you remember when you first learned that the Department of Justice was intending to file an action against Millennium?

A.   No.

Q.   And just to recap a conversation we had earlier, I believe you said it was at some point, maybe a year or more after the term loan closed,

Page 186

when you first realized that the resolution of the Department of Justice investigation might have a material impact on Millennium's finances; is that right?

A.   What I remember is it was significantly after the closing.  I can't tell you it was a year or a year and a half.  So -- but -- it certainly was -- first I heard about it was way after it closed.

Q.   Would that have been before or after the revocation of the -- the CMS revocation of Millennium's ability to seek reimbursements.

A.   I don't remember the exact dates.  But I remember this:  I remember -- I remember one of -- I can't remember which attorney saying to me, this is unbelievable that we have to deal with this because you're only a week away from the two-year statute -- the limitation on -- with the banks.  So that this happened a week, if I remember correctly, this would have been almost two years after the loan closed.

Q.   Are you aware of anyone at Millennium who believed before that point that Millennium faced legal or regulatory risk with the Department of Justice or otherwise that could have a material impact on the company?

Page 187

MR. TRETTER:  Objection to the question about other people's suggested beliefs.

A.   No.  Nobody I spoke to, nobody in our management that I spoke to or heard from had any concern about any of the legal issues being more than the $20 million that we had.

BY MR. POPOVSKY:

Q.   Did you think that the Department of Justice was making a mistake bringing an action again Millennium?

MR. TRETTER:  Objection to form.

A.   Do I think they were making a mistake?

BY MR. POPOVSKY:

Q.   Yes.

A.   They follow up -- that's the way they generate income nowadays.  Whistleblower suits are common.  There's law firms, as you know, all over the place who just scour the records of people who have been fired and apply for unemployment and approach them to be whistleblowers.  We just assumed that was the case.

And we -- and we knew who the whistleblower was, even though -- he had gone into a deposition, he was fighting us because he was fired.  So we just thought it was a simple matter of the

Page 188

government was going to come in, they would do their thing, and that's what everybody told us, we ought to reserve $15 million because you can't get away any cheaper, and that's the typical thing that they would -- and they came to us with a series of cases to show us that, including Ameritox had been through the exact same thing.  And I think they paid ten.

But nobody had the cash on the table.  The government saw the cash and they -- they fined us more money than the biggest banks in the country putting a million new accounts illegally on their books.  They got fined 80 million.  So it's absurd.

Q.   I want to turn to one other point that came up in your previous testimony on the first day.

And in connection with, what was called the troubled practices program, Mr. Tretter referred you to paragraph 90 of the Department of Justice complaint.  And, again, for the record, that's Plaintiffs' Exhibit 82.  And, Mr. Slattery, this is the same document that we were looking at before, which I believe is in binder Number 1.

A.   Okay.

Q.   Do you mind turning to page 24 of the Complaint, paragraph 90.

A.   Yes.

# EXHIBIT 62
## (Filed Under Seal)

# EXHIBIT 63

**From:** Marsh, Tony [tmarsh@TA.com]
**Sent:** 2/21/2014 2:21:08 PM
**To:** Mulloy, Jennifer [jmulloy@ta.com]
**Subject:** RE: RE: RE: Fwd: RE:

Quantum is where I thought they would come out and fees aren't bad. Interest rate flex is OK. Overall at L+450 is not bad at all. Don't like amort, but might be OK given we will have 25-50% excess cash flow sweep anyway.

Is it most likely the sub debt is gone anyway? Maybe if we commit now that it will be gone, we can push them to 5x?

Otherwise, I think this gets us what we need with limited downside. Guaranteed total dividend of $1.35bn with possibility of getting to $1.5bn.

---

**From:** Mulloy, Jennifer
**Sent:** Friday, February 21, 2014 2:16 PM
**To:** Marsh, Tony
**Subject:** Re: RE: RE: Fwd: RE:

What do you think?

Jennifer M. Mulloy
TA Associates
(650) 473-2229

On Feb 21, 2014, at 11:11 AM, "Marsh, Tony" <tmarsh@TA.com> wrote:

Just talked to JPM. Here is where they are coming out on a fully underwritten deal (this has been fully vetted internally):

- 4.75x stretch first lien (will only increase to over 5x based on demand)
- 2% underwriting fee
- Flex Provisions:
1. +150 bps in interest rate flex. TBD amount may take the form of OID (they will get back to me on that point).
2. Additional +25 bps interest rate flex if ratings are equal to B2/B or lower
3. Up to 5% amortization per year

A couple of more items:
- They have a strong preference for the current sub debt to be repaid/equitized at close or very soon thereafter. They are concerned that potential lenders will have a lot of heartburn over that extra leverage and interest expense. Their committee may come back and require this as a part of the underwrite.
- Also, they need to confirm with the underwriting committee whether they can commit to a portable capital structure. They are likely to come back to us with "happy to try, but cannot underwrite."

I am available this afternoon to speak at the group's convenience.

Tony

---

**From:** Brock Hardaway [mailto:Brock.Hardaway@millenniumlabs.com]
**Sent:** Friday, February 21, 2014 1:27 PM
**To:** Marsh, Tony

TA_MLH-00027400

**Cc:** Howard Appel; Mulloy, Jennifer
**Subject:** Re: RE: Fwd: RE:

Nothing new on our end. I have been tied up all day today in health plan mtgs and I know Howard has been on something else. I would like to know what Jpm final terms are before I talk to Jim again to just reiterate where they are now. So I would suggest that you push Jpm to get us final this afternoon and I will talk to Jim after to discuss go/no go. Howard you agree ?

I am now in a mtg from 230 to 430 est.

Sent from my iPhone

On Feb 21, 2014, at 12:35 PM, "Marsh, Tony" <tmarsh@TA.com> wrote:

We received a note from JPM and I spoke with Ryan Griswold at JPM on their status. They are having discussions today with their most senior folks to get approval on specific terms and fees of an underwritten deal. They promised they would give us status updates throughout the day. When I spoke to Ryan I made sure he knew that they needed to be at lower fees than the 2.25% they already proposed.

Any other updates from others for the group?

---

**From:** Howard Appel [mailto:Howard@milleniumlaboratories.com]
**Sent:** Thursday, February 20, 2014 11:52 AM
**To:** Mulloy, Jennifer
**Cc:** Brock Hardaway; Marsh, Tony; Howard Appel
**Subject:** Re: Fwd: RE:

ST played a larger role the first time and I know bmo stepped it up on the recent refi. I don't recall if st did or they carried over the existing debt

We gave st the rate cap business. Who can help us more today   If equal then Brock and I should talk. Thanks

Howard Appel
President

On Feb 20, 2014, at 8:23 AM, "Mulloy, Jennifer" <jmulloy@ta.com> wrote:

Thanks Brock. On the line up below, I would suggest SunTrust before BMO and potentially differentiated slightly. They were a bigger player and played a more lead role the last go around. Howard - What do you think?

Jennifer M. Mulloy
Managing Director
TA Associates
(650) 473-2229

On Feb 20, 2014, at 7:57 AM, "Brock Hardaway" <Brock.Hardaway@millenniumlabs.com> wrote:

Ok let me know when you get Jpm. I would like to see the fee at 2 or less. Unless something crazy , I think we are all generally on same page:

Jpm as lead 50 pct

CONFIDENTIAL                                                                                      TA_MLH-00027401

Citi 35 pct
BMO 7.5 pct
Sun trust 7.5 pct

Doing an underwritten deal. Howard or I will need to talk to Jim once we have terms from banks (covenants etc ) but I think we are close . I have a mtg from 11 to 1230 cst

Sent from my iPhone

On Feb 20, 2014, at 9:24 AM, "Marsh, Tony" <tmarsh@TA.com> wrote:

FYI, from Citi.  Still waiting on JPM.  They have proposed only a first lien / second lien.

Fees are 2.25% on the first and 3.00% on the second.

Still don't have full flex terms, but some more detail here.  Let's find a time to discuss once we have JPM's proposal.

Tony Marsh
TA Associates
(617) 574-6779
tmarsh@ta.com

Begin forwarded message:

**From:** "Cole, Thomas " <thomas.cole@citi.com>
**Date:** February 20, 2014 at 7:03:15 AM PST
**To:** "'Marsh, Tony'" <tmarsh@TA.com>
**Cc:** "Blake, Barry " <barry.blake@citi.com>, "Sarin, Aradhana " <aradhana.sarin@citi.com>, "Dickson, Stuart G " <stuart.g.dickson@citi.com>, "Tortora, Michael " <michael.tortora@citi.com>
**Subject: RE:**

Attached please find our term sheet to reflect the underwritten transaction.  The next step would be to engage a lawyer and proceed to a much more detailed term sheet.  We look forward to working with you on this transaction.

-----Original Message-----
From: Marsh, Tony [mailto:tmarsh@TA.com]
Sent: Thursday, February 20, 2014 10:00 AM
To: Cole, Thomas [ICG-CMO]
Cc: Mulloy, Jennifer
Subject:

Tom, any update regarding your underwritten proposal?

Tony Marsh
TA Associates
(617) 574-6779
tmarsh@ta.com

CONFIDENTIAL                                                                                    TA_MLH-00027402

This message is intended only for the designated recipient(s). It may contain confidential or proprietary information and may be subject to other confidentiality protections. If you are not a designated recipient, you may not review,copy or distribute this message. If you receive this in error, please notify the sender by reply e-mail and delete this message. Thank you.

This message is intended only for the designated recipient(s). It may contain
confidential or proprietary
information and may be subject to other confidentiality protections. If you are not a
designated recipient, you may
not review,copy or distribute this message. If you receive this in error, please notify
the sender by reply e-mail
and delete this message. Thank you.

<Millennium Financing Discussion_vFINAL.PDF>

This message is intended only for the designated recipient(s). It may contain
confidential or proprietary
information and may be subject to other confidentiality protections. If you are not a
designated recipient, you may
not review,copy or distribute this message. If you receive this in error, please notify
the sender by reply e-mail
and delete this message. Thank you.

This message is intended only for the designated recipient(s). It may contain
confidential or proprietary
information and may be subject to other confidentiality protections. If you are not a
designated recipient, you may
not review,copy or distribute this message. If you receive this in error, please notify
the sender by reply e-mail
and delete this message. Thank you.

# EXHIBIT 64

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 15-12284 (LSS) |
| MILLENNIUM LAB HOLDINGS II, LLC, et al., | Jointly Administered |
| **Debtors.** | |
| ------------------------------------------------------------------------------ | |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE of THE MILLENNIUM CORPORATE CLAIM TRUST, | Adv. Pro. No. 17-51840 (LSS) |
| **Plaintiff(s)** | |
| **v.** | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A. and SUNTRUST BANK, | |
| **Defendant(s)** | |

EXPERT REPORT OF

# YVETTE R. AUSTIN SMITH

**NOVEMBER 15, 2021**

CONTENTS

**I.  Expert Qualifications**................................................................................................1

**II.  Assignment and Summary of Opinions** ................................................................2

**III.  Basic Factual Overview** ..........................................................................................4
    A.  Overview of Millennium's Business ..............................................................4
    B.  Millennium's Competitors..............................................................................6
    C.  Historical Financial Metrics of Millennium's Business ..................................7

**IV.  2014 Financing Transaction**...................................................................................15

**V.  Framework for Solvency Analysis** ......................................................................21
    A.  Balance Sheet Test .......................................................................................23
    B.  Ability to Pay Debt Test ...............................................................................26
    C.  Adequate Capital Test ..................................................................................27
    D.  Summary of Millennium Solvency Analysis ................................................28

**VI.  Millennium Financial Projections in connection with the 2014 Transaction**..................29
    A.  Padres Projections ........................................................................................29
    B.  Vantage Point Solvency Analysis Based On Padres Projections ...................37

**VII.Solvency Analysis of Millennium Using the Correct Solvency Framework**....................40
    A.  Millennium Business Trends as of 2014 Transaction ....................................40
    B.  Regulatory and Legal Environment as of 2014 Transaction ..........................45
    C.  Post-Transaction Events Related to Known or Knowable Risks in April 2014..............55
        1.  Verdict in Ameritox 2011 Lawsuit.........................................................55
        2.  $90 Million Quantifiable Exposure Related to Free Specimen Cups ......56
        3.  Escalating US DOJ Investigations .........................................................57
    D.  Millennium files for bankruptcy....................................................................59
    E.  Modified Padres Projections..........................................................................60
        1.  UDT Revenue Projections......................................................................61
        2.  PGT Revenue and RxAnte Projections ..................................................75
    F.  Expense Projections.......................................................................................75
    G.  Summary of Modified Padres Projections......................................................76
    H.  Balance Sheet Test .......................................................................................79
        1.  Discounted Cash Flow Analysis .............................................................79
        2.  Guideline Public Companies...................................................................83
        3.  Precedent Transaction Analysis .............................................................88
        4.  Balance Sheet Test Conclusion ..............................................................88

    I.    Ability to Pay Debts Test ................................................................88

    J.    Adequate Capital Test ....................................................................92

    K.   Solvency Conclusion ......................................................................93

**Appendix A : Solvency Test Exhibits**..........................................................**94**

    A.1 Expected Case DCF Analysis....................................................94

    A.2 Expected Case EBIT Derivation ...............................................94

**Appendix B : Comparable Companies Analysis Exhibits**........................**95**

    B.1 Description of SIC Industry Codes.............................................95

    B.2 Description of Potential Comparable Companies .......................96

**Appendix C : Custom Profile Exhibit**.........................................................**97**

**Appendix D : Sensitivity Analysis of Millennium's Equity Value**............**98**

**Appendix E : Documents Relied Upon of Yvette Austin Smith**................**99**

**Appendix F : Curriculum Vitae**..................................................................**104**

## I.    EXPERT QUALIFICATIONS

1.   My name is Yvette Austin Smith. I am a Principal and Chairman of The Brattle Group and co-lead the firm's Mergers & Acquisitions ("M&A") Litigation practice and previously led the firm's Bankruptcy and Restructuring practice.  I specialize in M&A and bankruptcy disputes with subject matter expertise in valuation and credit and solvency analysis. I regularly provide testifying and consulting expert services in litigation matters related to mergers and acquisitions, leveraged buyouts, recapitalization, debt recharacterization and avoidance actions. Prior to joining The Brattle Group, I provided M&A advisory services, including buy-side and sell-side advisory, fairness opinions, solvency opinions and commercially reasonable debt opinions.

2.   I hold a Master's Degree in Business Administration from Columbia University's Graduate School of Business and a Bachelor's degree from Harvard College in Philosophy and Government, with *cum laude* honors. I have completed additional graduate coursework in financial mathematics at the Courant Institute of Mathematical Sciences at New York University. I have been an instructor at Harvard University Extension School, teaching the graduate finance course, Business Analysis and Valuation.

3.   I have written a number of publications and presented on valuation and credit analysis for organizations including the American Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, Thomson Reuters, and Bloomberg Law. I am a contributing author to the Model Merger Agreement for the Acquisition of a Public Company, published by the ABA's Mergers and Acquisitions Committee, and a contributing researcher to The Standard & Poor's Guide to Fairness Opinions: A User's Guide for Fiduciaries. I am also Co-Chair of the American Bar Association Joint Task Force on M&A Litigation and the founder and former Co-Chair of the ABA Financial Advisor Task Force. I was a contributing researcher to *Estimating Future Claims – Case Studies from Mass Torts and Product Liability*.  I have also authored and presented multiple continuing legal education courses and other seminars on valuation, solvency and credit analysis.

4.   The Brattle Group is compensated for my work in this matter at my current billing rate of $800 per hour. In preparing this report, I have also been assisted by Brattle staff members working

under my direction. The Brattle Group is being compensated for their work in this matter at standard commercial rates ranging from $285 to $455 per hour. Neither the amount nor the payment of fees to me or The Brattle Group in connection with this matter is contingent upon the opinions expressed herein or the outcome of the above-captioned litigation (the "Litigation").[1]

5. A list of documents I relied upon to form my opinions appears in Appendix E. My CV is attached as Appendix F. I reserve the right to express additional opinions, supplement or amend the opinions expressed herein, and to respond to opinions offered by Defendants' experts in this case.[2]

## II.   ASSIGNMENT AND SUMMARY OF OPINIONS

6. I have been retained by Wollmuth Maher & Deutsch LLP, counsel for the Plaintiff Marc S. Kirschner, solely in his capacity as Trustee of the Millennium Corporate Claim Trust, to evaluate the solvency of Millennium as of April 16, 2014, the date on which Millennium closed on a $1.825 billion syndicated loan facility and the related credit agreements became effective (the "2014 Transaction").  For the purpose of the solvency analysis described herein, April 16, 2014 is the date of valuation.

7. Based on the analyses below, my expert opinions are:

- Millennium created the "Padres Projections" to support the 2014 Transaction, and the projections were provided to both the underwriters and Vantage Point Advisors, Inc. ("Vantage Point"), the contemporaneous solvency advisor. However, the Padres Projections were significantly flawed in that they failed to reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction.

- At the time of the 2014 Transaction, several trends were impacting Millennium's business and were reasonably expected to further impact the business going forward. Taken together, these trends indicated that Millennium was facing significant reimbursement,

---

[1]   Throughout this report, I use the term "I" when describing who completed the analyses upon which my opinions are based.  This is for ease of writing and should be understood to mean me, personally, or other professionals at The Brattle Group working under my direction.

[2]   Throughout this report I cite to specific record evidence.  The cited evidence is intended to be representative but not exhaustive.  I reserve the right to rely on additional record evidence.

legal, and regulatory risks and that the company was very likely to encounter slowing or negative growth and declining profitability. The Padres Projections failed to reasonably account for these risks.

- To accurately calculate value using a Discounted Cash Flow or "DCF" methodology, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation. This was not done at the time of the 2014 Transaction and a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction.

- Giving effect to the 2014 Transaction, Millennium's equity value was no greater than *negative* $958.9 million, before considering the company's significant contingent liabilities. In other words, the 2014 Transaction rendered Millennium balance sheet insolvent. Including a conservative estimate of the liabilities relating to the then pending litigation and government investigations, Millennium's equity value was no greater than *negative* $1,003.9 million.

- Due to the limited comparability of the identified public companies, I did not rely on the Guideline Public Company or "GPC" methodology. Nonetheless, I note that the *minimum* EBITDA multiple derived from the identified public companies is *above* the EBITDA multiple at which Millennium's financial advisors unsuccessfully attempted to sell the company just prior to the 2014 Transaction.

- Courts have found that unreasonably small capital is a financial condition *prior to* equitable insolvency. The results of the balance sheet test demonstrate that Millennium was equity insolvent. Nonetheless, I also conducted a second analysis that shows that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with unreasonably small capital.

- The 2014 Transaction encumbered Millennium with debt beyond the company's ability to pay as that debt matured. Indeed, by 2018, Millennium would have had insufficient liquidity to meet interest payments required under the 2014 Transaction. Liquidity that may have otherwise been available via the company's revolving loan in 2018 was not projected to be available due to a projected covenant breach.

## III.   BASIC FACTUAL OVERVIEW

### A.   OVERVIEW OF MILLENNIUM'S BUSINESS

8. Millennium Laboratories, Inc. ("Millennium" or the "Company")[3] was founded in San Diego, California in December 2007. The company received its first specimen for testing in March 2008 and completed its first full year of operation in 2009.[4] Millennium was founded as a company that exclusively provided urine drug testing ("UDT").[5] UDT is employed by clinicians to monitor prescription medication use and identify drugs of abuse.[6]

9. The UDT industry focuses on identifying the presence of certain of types of drugs ("qualitative testing") and the more precise measurement of the specific drug and quantity of drugs in a urine specimen ("quantitative testing"). A qualitative test, such as immunoassay testing provided at the point-of-care, is able to detect the presence of certain drugs in a patient's urine, but cannot quantify the amount of any given drug present or distinguish between multiple substances in the same drug class.[7] These qualitative results are typically used in a physician's office to guide treatment discussions and initial prescribing decisions while the patient is still present in the office, and to inform physicians' judgment on the medical necessity, if any, of ordering and billing the patient or his/her insurer for additional confirmatory or quantitative testing.[8] Such quantitative testing is typically performed by a laboratory company via complex testing

---

[3]   Throughout its history, the Company experienced various changes in name and in corporate structure. For instance, Millennium Laboratories, Inc. was converted to an LLC prior to the closing date of the 2014 Transaction. *See* Millennium Laboratories Confidential Information Memorandum, p. 24 [ML_DE_00269115] ("Confidential Information Memorandum"). For the purposes of this report, I use the term "Millennium" to refer to the operating company that was the borrower in the 2014 Transaction regardless of time frame and the form of the Company at the time.

[4]   Confidential Information Memorandum, p. 40.

[5]   Confidential Information Memorandum, p. 40: "Millennium's first service offering was in the urine drug testing ("UDT") space where they set out to deliver fast, highly accurate results using LC-MS/MS technology driven by proprietary algorithms and customized methods."

[6]   Confidential Information Memorandum, p. 16.

[7]   Millennium Self-Disclosure Statement, p. 3 [ML_DE_00670668 at 0670]. According to Hogan Lovells US LLP (Millennium's legal counsel), the self-disclosure statement was made on behalf of Millennium "pursuant to the CMS Voluntary Self-Referral Disclosure Protocol to resolve a potential violation of the "Stark" physician self-referral (Section 1877 of the Social Security Act). This disclosure relates to Millennium's prior practice of providing point-of-care drug test cups at no charge to certain of its physician customers for use also as a specimen collection device." *See* Millennium Self-Disclosure Statement, p. 1 [ML_DE_00670668 at 0668].

[8]   Millennium Self-Disclosure Statement, p. 4 [ML_DE_00670668 at 0671].

---

technology to identify the specific drug type and quantify the precise amount in the specimen.[9] A laboratory may also perform "specimen validity testing" to determine whether the urine sample has been adulterated in some manner.[10]

10. Since its inception, Millennium focused on the pain management industry, an industry that prescribes drugs to relieve pain, including drugs that were susceptible to abuse.[11] Millennium's growth was influenced by the rapid increase in medical use and illicit abuse of opioid drugs, which were becoming a serious and growing health problem.[12] The UDT industry grew rapidly in the years leading up to the 2014 Transaction. From 1991 to 2010, U.S. opioid prescriptions (measuring only a portion of opioid use) grew by a 5.5% per annum compound annual growth rate ("CAGR").[13]

11. Clinicians who were customers of Millennium included pain practitioners, primary care physicians, addictionologists, orthopedic specialists, spine and sports medicine specialists and psychiatric specialists.[14] Millennium's customers were dispersed throughout the United States, with significant concentrations in Florida and the New England and Southwest regions.[15] Typically, urine samples were collected from the patient in a clinical setting and sent to a Millennium laboratory for analysis. Using Liquid Chromatography – Mass Spectrometry / Tandem Mass Spectrometry ("LC – MS/MS"), Millennium provided quantitative testing that detected the presence and precise level of drugs in a patient's urine.[16]

12. In June 2012, Millennium expanded its business operations to include pharmacogenetic testing ("PGT").[17] PGT detects genetic variations in enzymes associated with the metabolism of certain medications, which assists clinicians in identifying an appropriate drug therapy for a given

---

[9]   Millennium Self-Disclosure Statement, p. 4 [ML_DE_00670668 at 0671].

[10]   US DOJ Complaint [ML_DE_00595094 at footnote 2].

[11]   Confidential Information Memorandum, p. 40.

[12]   Confidential Information Memorandum, p. 40.

[13]   Confidential Information Memorandum, p. 62.

[14]   Confidential Information Memorandum, p. 17.

[15]   *See* Padres Projections (ML_DE_00057999), April 12 2014, tab "Volume".

[16]   Confidential Information Memorandum, p. 17.

[17]   Confidential Information Memorandum, p. 40.

patient.[18] In December 2013, Millennium acquired RxAnte. RxAnte intended to provide clinicians with data-driven analytics designed to improve the targeting of medication. Even after these business expansions, UDT remained Millennium's largest business segment. For the year ended December 31, 2013, for instance, UDT represented 98.1% of the Company's total revenue.[19]

### B.   MILLENNIUM'S COMPETITORS

13.   The UDT industry was highly competitive at the time of the 2014 Transaction. Barriers to entry were low, as witnessed by high growth of independent and physician-owned laboratories.[20] Millennium's primary competitors were private companies such as Ameritox, Aegis, and Calloway. Millennium claimed that its key competitive advantage was faster turnaround times than its competitors. The Company sought to report test results by the next business day, compared to 3-4 days (or longer) for its competitors.[21]

14.   To a lesser extent, Millennium also competed against larger clinical laboratory testing companies like Laboratory Corporation of America Holdings ("LabCorp") and Quest Diagnostics ("Quest"). LabCorp and Quest were significantly larger than Millennium and both provided other clinical diagnostic testing services in addition to UDT. Unlike Millennium, Quest and LabCorp developed their toxicology segments in 2012 and 2013 via acquisitions.[22] At the time of the 2014 Transaction, there was ongoing consolidation in the clinical laboratory testing business.[23] Larger companies such as LabCorp and Quest maintained a competitive advantage over smaller

---

[18]   Confidential Information Memorandum, p. 16.

[19]   *See* Padres Projections, April 12 2014, tab "Summary".

[20]   Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013 filed February 25, 2014 at p.5.

[21]   Confidential Information Memorandum, p. 80. Millennium further stated that it was the only operator to rely almost exclusively on liquid chromatography – mass spectrometry/tandem mass spectrometry ("LC-MS/MS") for testing. Confidential Information Memorandum, p. 17.

[22]   Quest Diagnostics Incorporated Form 10-K for the fiscal year ended December 31, 2013, filed February 18, 2014, at pp. 6 and 48; Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013, filed February 25, 2014, at F-13.

[23]   Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013, filed February 25, 2014, at p. 5.

companies like Millennium due to the cost efficiencies and large service networks.[24] A more efficient cost structure was particularly valuable in the face of expected reductions in reimbursement rates. Larger clinical laboratory testing companies represented a potential threat to Millennium as they began to expand further into the UDT industry.[25]

### C.    HISTORICAL FINANCIAL METRICS OF MILLENNIUM'S BUSINESS

15. Millennium generated the vast majority of its revenue from third-party payor arrangements. That is, Millennium was not paid directly by the patient in most instances.[26] Rather, a third-party entity reimbursed Millennium for the testing services. Third-party payors primarily consist of private health insurance, managed care organizations, workers compensation programs, and the government-sponsored programs of Medicare and Medicaid. Non-governmental third-party payors (*i.e.*, excluding Medicare and Medicaid and some workers compensation insurers), are commonly referred to generically as "commercial payors."

16. Millennium regularly conducted multiple tests on a single urine specimen. For example, as of December 2013, Millennium was conducting approximately 23 tests, on average, for each urine specimen.[27] After increasing the average number of tests per specimen at the end of 2011 and through the beginning of 2012, Millennium's average tests per specimen had remained fairly constant prior to the 2014 Transaction. *See* Figure 1. It is noteworthy that Millennium billed almost the same average number of tests per specimen to Medicare as to commercial payors,[28]

---

24    *Id.*

25    S&P credit rating report, dated March 28, 2014. ("While we believe Millennium holds the leading market position among its small niche competitors, its market share remains relatively small compared to the larger industry powerhouses Quest Diagnostics and Laboratory Corp. of America Holdings. Large competitors' presence in niche markets is currently small, but there is a potential threat that they might further expand into the field that exhibits relatively low barriers to entry.").

26    For the year-ended December 31, 2013, less than 0.7% of Millennium's revenue was identified as "self pay." *See* ML_DE_00732288 (Yearly 2009-2015M5 tab); 0.1% if all "patient" revenue is included; 0.7% if both "patient" and "client" revenue is included.

27    ML_DE_00732288 (Quarterly 2012-2015Q1 tab, cell CJ140)

28    For example, in 2013 Millennium billed an average 22.6 tests per specimen to Medicare, as compared with 23.6 tests on average across all payors. Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC. For the purposes of this analysis, I have defined these payors as the commercial payors. *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab).

despite Medicare's population likely skewing towards a much older age group.[29] As discussed further herein, government investigators alleged that Millennium maintained a regular practice of improperly billing Medicare for medically unnecessary tests, including tests for drugs that were not commonly abused by the older Medicare age cohort.[30]  At the time of the 2014 Transaction, Millennium knew or should have known, from its own billing records, the risks of continuing to bill Medicare for medically unnecessary tests.   These risks included not only declining test-per-specimen levels in the future but also exposure to monetary damages or fines for past billings to Medicare.



**FIGURE 1: QUARTERLY TESTS PER SPECIMEN**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab), YAS Workpaper 4.

---

[29]  *See* Centers for Medicare & Medicaid Services, *Original Medicare Enrollment: Part A and/or Part B Enrollees by Demographic Characteristics, Calendar Year 2013* 1 (2020), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/2013/Downloads/MDCR_ENROLL_AB/CPS_MDCR_ENROLL_AB_11.pdf

[30]  US Complaint In Intervention, United States of America, et al v. Millennium Laboratories, Inc. at 5 ("US DOJ Complaint") [ML_DE_00595094 at 5096].  *See also* : Center for Behavioral Health Statistics and Quality, *Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings* 18, 21 (2012), https://www.samhsa.gov/data/sites/default/files/NSDUHresults2012/NSDUHresults2012.pdf (showing that illicit drug use among those aged 60 to 64 was 3.6 percent in 2012, as compared to 7.0% among all adults aged 26 or older).

17. The amount of revenue that Millennium generated per specimen (known as "net revenue per specimen" or "NRPS") was based not only on the number of tests per sample, but also the type of tests performed and the third-party payor providing reimbursement. Each test corresponded to a pre-identified code in a coding system commonly used in the healthcare industry. For commercial payors, the coding system was the Common Procedures Terminology ("CPT") developed by the American Medical Association. Medicare and Medicaid use a comparable coding system, the Healthcare Common Procedure Coding System ("HCPCS").[31] Millennium received payment (or "reimbursement") for each code it billed. For example, if Millennium conducted 23 separate tests on a single urine specimen, Millennium could receive up to 23 payments corresponding to that single specimen.[32] The actual amount of the reimbursement for a specific code was determined by individual reimbursement contracts between Millennium and the third-party payor. Medicare (under the fee for service model) provided reimbursement to Millennium through a similar fee schedule.

18. There was a wide diversion between individual reimbursement rates for separate codes. For instance, in 2014, Millennium received reimbursement from Medicare for quantitative tests for alcohol (82055) and acetaminophen (83516) at $14.74 and $12.66, respectively.[33] On the other hand, quantitative tests for hydromorphone (82649) and serotonin (84260) were reimbursed at the significantly higher rates of $35.07 and $42.26, respectively.[34] It is relevant to note that although commercial payors provided reimbursement at amounts that differed from Medicare (or, CMS more broadly), there is an established industry practice of commercial reimbursement rates following the trend of CMS reimbursement rates. For example, decreases in CMS

---

[31] Both HCPCS and CPT were developed to report medical procedures and services. HCPCS Level I codes are identical to CPT. However, HCPCS also includes Level II codes (non-physician services like ambulance rides, wheelchairs, walkers, other durable medical equipment, etc.) and HCPCS modifiers which differentiate it from CPT. *See* https://www.medicalbillingandcoding.org/hcpcs-codes/.

[32] These payments may be subject to caps and aggregations. For example, as of January 1, 2014, additional limitations were placed on the amount of tests that could be billed to certain codes for the same beneficiary for the same date of service. *See* Section VII.E.1.a.

[33] Millennium Health, 2014 Annual Physician Notice [ML_DE_00164030] at p. 4.

[34] Millennium Health, 2014 Annual Physician Notice [ML_DE_00164030] at p. 6.

reimbursement rates are frequently followed by decreases in commercial reimbursement rates. Millennium understood this practice at the time of the 2014 Transaction.[35]

19. Table 1 displays revenue and specimen volume figures for the top five payors in Millennium's UDT business for the year ended December 31, 2013, the last fiscal year prior to the 2014 Transaction.

**TABLE 1: TOP 5 PAYORS FOR UDT BUSINESS IN 2013: REVENUE AND SPECIMEN VOLUME**

| Rank | Payor | Revenue ($ millions) | % of Total Revenue |
|---|---|---|---|
| 1 | Medicare | 198.55 | 32.82% |
| 2 | Blue Cross Blue Shield | 84.89 | 14.03% |
| 3 | Medicaid - Contract | 51.23 | 8.47% |
| 4 | UHC | 50.32 | 8.32% |
| 5 | Managed Government | 49.75 | 8.22% |

| Rank | Payor | Specimen Volume (thousands) | % of Total Specimen Volume |
|---|---|---|---|
| 1 | Medicare | 428.56 | 18.62% |
| 2 | Blue Cross Blue Shield | 367.47 | 15.97% |
| 3 | Managed Government | 332.98 | 14.47% |
| 4 | Patient | 223.68 | 9.72% |
| 5 | UHC | 222.31 | 9.66% |

Source: ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab). "Other Payors" category excluded in ranking.[36]

---

[35] Pencak Deposition 209:21 - 210:20 and Plaintiff Ex. 158 [ML_DE_00045459]:

"Q. This [Pl's Ex. 158] is an email from Kenneth Kirsch to Charles Haley at Noridian dated March 13, 2014, the subject is 'Noridian LCD response.' The attachment is a March 13, 2014, letter, to a Bernice Hecker at Noridian. I really want to draw your attention to the bottom of page 2. Millennium writes there, "It is widely known that 'as Medicare goes, so go the other payors, ' many of whom will likely be emboldened by an opportunity provided by the policies in the LCD to cut a growing source of cost to their plans." Do you see that?

A. Yes.

Q. Is that consistent with your understanding of Millennium's view at the time?

A. Yeah, as I mentioned earlier, I mean, it's generally, especially if it is a savings, then commercial payors would likely adopt it."

[36] Throughout this report I refer to two different Padres Projections, being ML_DE_00044521 and ML_DE_00057999. These models are dated 3/14/2014 and 4/12/2014 respectively. The model dated 4/12/2014 is the most contemporaneous model to the 2014 Transaction. The total revenue from these two models is

20. As shown in Table 1, 18.62% of Millennium's 2013 total specimen volume related to patients covered by Medicare. However, because Medicare's reimbursement rates (for a given test) were significantly higher than commercial reimbursement rates, Medicare reimbursement accounted for an even higher percentage of Millennium's revenue - nearly 33% for 2013. This is consistent with published research at the time finding that Medicare paid between 18-30 percent more than commercial payors for the same laboratory tests.[37] In 2013, Millennium was the largest of *any* Medicare Part B biller by dollar amount.[38]

21. Members of the Blue Cross Blue Shield network and United Healthcare ("UHC") were Millennium's largest commercial payors. In aggregate, reimbursement payments from these payors equaled approximately 22% of Millennium's 2013 revenue. Reimbursement from *all* commercial payors equated to approximately 35% of Millennium's 2013 revenue.[39] Thus, Medicare, Blue Cross Blue Shield and UHC represented 55% of Millennium's 2013 revenue and Medicare and all commercial payors represented approximately 68% of Millennium's 2013 revenue. Also noted in Table 1, Managed Government comprised 14.5% of specimen volume but only 8.2% of revenue. Managed Government represents commercial payors approved by Medicare to administer Medicare coverage and add-on coverage for categories of care not always reimbursed by Medicare, such as dental and vision.[40] Notwithstanding that Millennium's Managed Government segment administered coverage under Medicare, the reimbursement rates for Managed Government were significantly lower than the reimbursement rates for "traditional" Medicare (also known as "fee for service"). As a result, Millennium's NRPS for Managed

---

identical, however the earlier model dated 3/14/2014 contains additional content (*e.g.*, more granular data by payor) that is useful for my analysis.

[37] Department of Health and Human Services, Office of Inspector General "Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings", June 2013, p. 9.

[38] Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. *See also* Medicare Physician and Other Supplier PUF Methodology describing the dataset, p. 4 (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Medicare-Physician-and-Other-Supplier-PUF-Methodology.pdf) and US DOJ Complaint at ¶ 2. Medicare Part B covers a wide variety of outpatient services, of which laboratory testing services is only one component.

[39] *See* ML_DE_00732288 (Yearly 2009-2015M5 tab).

[40] *See* https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans. Also includes dual health plans where a patient qualifies for both Medicaid and Medicare. For example, *see* https://www.uhccommunityplan.com.

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 11

Government was almost three times lower than its Medicare NRPS, despite a similar number of tests per specimen.[41]

22. Similarly, there were large differences in reimbursement rates amongst commercial payors, as evidenced by significant differences in NRPS.[42] For example, Millennium's NRPS for Aetna was more than two times higher than that for UHC and Humana even though Millennium's average tests per specimen for these payors was broadly similar.[43] Millennium actively sought to reduce its exposure to payors with low reimbursement rates.[44]

23. Millennium received reimbursement from billing to dozens of codes in a given year. For example, in each of 2012 and 2013, Millennium received reimbursement from Medicare in connection with more than 25 codes.[45] However, in 2012 and 2013, Millennium generated a disproportionate percentage of its Medicare revenue from reimbursement for billings under two specific HCPCS codes, 83925 (opioids drugs measurements) and 82542 (chemical analysis using chromatography technique).

---

[41]   *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), column AI and AW, rows 129 and 132. In 2013, NRPS for Medicare and Managed Government was $467 and $144 respectively. In 2013, average tests per specimen for Medicare and Managed Government was 22.6 and 23.8 respectively.

[42]   Tests per specimen was relatively consistent across commercial payors. *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), column AW, rows 124-137.

[43]   *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), columns AJ and AX, rows 124 and 135. In 2014, average NRPS for Aetna and UHC was $449 and $203 respectively. In 2014, average tests per specimen for Aetna and UHC was 25.3 and 23.4 respectively.

[44]   Plaintiff Exhibit 17 to Price Deposition:

> "Summer/Fall 2011: one troubled practice offered to 'double-up on its testing' and ML declined and terminated the relationship"

> "Dr. O'Connell's practice ordered few tests/specimen and ML terminated the relationship 'because they did not think he was serious about quality UDT results'"

Pencak Deposition, Plaintiff Exhibit 135:

> "They both seem to be newer practices so please make it a priority to follow up with the respective reps to make sure they are considering payor mix and tests per specimen when signing on new practices."

[45]   Code level reimbursement is not available for Millennium's other payor types. Codes billed to Medicare are assumed to represent a subset of the total codes billed by Millennium to all payor types.  Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. CMS data indicates Millennium billed 33 codes to CMS in 2012 and 30 codes in 2013.

24. As shown in Table 2, for the year ended December 31, 2013, Millennium generated approximately 33% of its Medicare revenue from these two codes alone. The amount of revenue Millennium generated from these codes reflected the facts that these codes were associated with a high volume of tests performed by Millennium *and* that the reimbursement rates for these two codes were among the highest Medicare reimbursement rates for codes billed by Millennium. As discussed below, these two codes also were the focus of important new (or newly implemented) Medicare coverage determinations, policies, and restrictions (*i.e.*, medically unlikely edits ("MUEs")[46] and local coverage determinations ("LCDs"))[47] at the time of the 2014 Transaction.

**TABLE 2: MEDICARE REIMBURSEMENT AND VOLUME FOR 83925 AND 82542**

| HCPCS Code Subject to MUE | % of Millennium's Total Medicare Reimbursement | | % of Millennium's Total Medicare Test Volume | |
|---|---|---|---|---|
| | 2012 | 2013 | 2012 | 2013 |
| 83925 | 25.22% | 23.49% | 20.12% | 19.58% |
| 82542 | 1.56% | 9.54% | 1.34% | 8.61% |
| **Total** | **26.77%** | **33.04%** | **21.46%** | **28.19%** |

Source: Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

25. Prior to the 2014 Transaction, Millennium was engaged in two specific business practices that the Company acknowledged significantly contributed to its growth and profitability: the use of "Custom Profiles" and the provision of free specimen testing cups to Millennium customers.[48]

---

[46]   MUEs are used by Medicare Administrative Contractors ("MACs") to reduce improper payments for Part B claims. *See* Section VII.E.1.b for further explanation of MUEs and their impact on Millennium.

[47]   An LCD is a determination by a fiscal intermediary (under Medicare Part B, a MAC) as to whether or not a particular item or service is eligible for reimbursement under Medicare. See Section VII.E.1.c for further explanation of LCDs and their impact on Millennium.

[48]   *See*, *e.g.*, Exhibit 4 to the US DOJ Complaint. ("As you know, the standing order is critical to our confirmation and billing process") [ML_DE_00628896 at 8897]. Exhibit 5 to the US DOJ Complaint ("If an account does not want a Standing Order in place for the 6 drugs not covered by the [POC test], we do not want to do business

Early versions of both of these business practices had been implemented by the end of Millennium's first full year of operation. Millennium initiated the practice of Custom Profiles in 2008.[49] Custom Profiles were standing orders indicating a panel of tests to be performed on a specimen, and which remained in effect for the physician's practice until and unless changed.[50] Thus, the panel of tests indicated by a Custom Profile was not specific to an individual patient (or specimen). When submitting an individual patient urine specimen to Millennium for testing, a customer with a Custom Profile would typically select one of three options on the test requisition form: (i) use Custom Profile, (ii) use Custom Profile and add additional tests (as indicated) or (iii) do not use Custom Profile and perform certain tests (as indicated).[51] As of the 2014 Transaction, approximately 64% of Millennium's customers used Custom Profiles. As explained more fully below, Millennium began transitioning away from the use of Custom Profiles in March 2015, approximately one year after the 2014 Transaction.[52]

---

with them") [ML_DE_00628899 at 8900]. Exhibit 7 to the US DOJ Complaint ("WE DON'T WANT TESTING TO DECLINE BY UPDATING THE CP WITH LESS TESTS") (capitalization in original) [ML_DE_00628908] at 8911. Exhibit 12 to the US DOJ Complaint ("There are not enough tests on the CP and [Mr. Appel] *will not approve*") (emphasis added) [ML_DE_00628930 at 8931]. Exhibit 13 to the US DOJ Complaint ("If practice falls below ML profitability guidelines, cup agreement will be denied") [ML_DE_00628932 at 8934]. Exhibit 66 to the US DOJ Complaint ("This cup agreement is vital to our practice") [ML_DE_00629092 at 9094].

[49] *See* US DOJ Complaint at ¶ 210 [ML_DE_00595094 at 5149] (Tampa Pain Relief Center used a Standing Order since 2008).

[50] US DOJ Complaint at ¶¶ 89-90 [ML_DE_00595094 at 5117] (A Custom Profile was alternately referred to as a Standing Order or Test Protocol).

[51] Exhibit 55 to the US DOJ Complaint [ML_DE_00629045 at 9046].

[52]

26. Millennium initiated the use of free specimen testing cup agreements in late 2009.[53] Under these agreements, Millennium provided specimen collection cups with integrated test strips to its customers free of charge. The specimen cups and test strips provided by Millennium allowed healthcare providers to perform qualitative UDT at the point of care. The agreements stated that in exchange for receiving the specimen cups free of charge, physicians agreed to use the cups for "collecting and transporting specimens for testing by our [Millennium's] laboratory."[54] The agreement also stated that Millennium would invoice the physicians for "excess cups" which were sent to the physician's office and had not been sent back to Millennium for quantitative testing.[55] According to Millennium, as of the 2014 Transaction, approximately 10% of Millennium's customers had entered into the free specimen cup agreements, representing 16% to 17% of total specimen volume.[56] As explained further below, Millennium terminated the free specimen cup agreements in June 2014, approximately two months after the 2014 Transaction.[57]

## IV.    2014 FINANCING TRANSACTION

27. In mid-2013, Millennium began conversations with J.P. Morgan, its primary banker, to refinance the Company's existing debt. Millennium's existing debt consisted primarily of a $330 million term loan syndicated among a few banks and a large commercial finance provider in March, 2012 (the "2012 Transaction").[58] J.P. Morgan was the Administrative Agent and "left lead"

---

53   Millennium Self-Disclosure Statement at p. 4 [ML_DE_00670668 at 0671].

54   Exhibit 39 to US DOJ Complaint [ML_DE_00_629262 at 9263] (second emphasis added):

"To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory. While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that 1) you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups, 2) you will not bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups and 3) you will not resell or redistribute these cups. In addition, you agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing."

55   Exhibit 39 to US DOJ Complaint [ML_DE_00_629262 at 9263].

56   Millennium Self-Disclosure Statement at p.3 [ML_DE_00670668 at 0670]. This assumes that the disclosed percentage of customers is consistent with the percentage of customers at the time of the 2014 Transaction.

57   Millennium Self-Disclosure Statement at p.5 [ML_DE_00670668 at 0672].

58   Exhibit 116 to Deposition of J. Lee (J.P. Morgan), June 23, 2021 [JPMC-MIL-CORP-00183881].

bookrunner for the 2012 Transaction. Prior to the 2014 Transaction, J.P. Morgan held $75.9 million in credit exposure from the 2012 Transaction.[59]

28. A significant motivation for the 2014 Transaction appears to have been to provide liquidity to Millennium's equity holders,[60] following earlier and unsuccessful attempts to sell the Company over an approximately three year period. In 2011, the Company engaged UBS to explore a sale transaction. After marketing to up to 16 potential acquirers, the sale process was considered "unsuccessful"; only one bid emerged, and that bid was far below the valuation expectations of $1.5 billion.[61] Risks around reimbursement were identified as a key reason for the unsuccessful sales process.[62] A second motivation of the refinancing transaction appears to have been to reduce J.P. Morgan's credit exposure to Millennium.[63]

29. In 2013, Millennium attempted, for a second time, to sell the Company or otherwise provide liquidity to its equity holders. However, perceived reimbursement risks appear to have also

---

[59]   J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]: "JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

[60]   Exhibit 116 to Deposition of J. Lee (J.P. Morgan), June 23, 2021 [JPMC-MIL-CORP-00183881] (emphasis added):

"Attached please find our thoughts on a dividend recapitalization for Millennium. We have taken into consideration a number of factors:

- Avoid issuing public securities and stay in the loan market
- Keep the entire capital structure pre-payable without friction, in case there is a monetization event in the near to intermediate term
- Maintain modest leverage, given management's as well as TA's institutional perspective around pursuing the maximum available leverage

Take a look at the attached and let's have a call to walk you through it at your convenience. The markets remain strong and the Company has performed extremely well, allowing for a significant dividend, while keeping leverage at reasonable levels."

[61]   Exhibit 14 to Price Deposition. [BMO-ML-00030001]:

"The process was unsuccessful, although did receive an offer from at least one party, which was far below valuation expectations (UBS indicated valuation would be closer to $1.5B in its pitch process)."

[62]   Exhibit 14 to Price Deposition. [BMO-ML-00030001]:

"Buyer concerns were mostly related to reimbursement and that TA had just invested."

[63]   J.P. Morgan Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]:

"**Transaction Rationale**

…

**Exposure Reduction**: JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

---

thwarted this second sales process. In October 2013 Millennium signed an engagement letter with Citi to pursue various strategic alternatives including a sale, recapitalization, issuing additional equity and liquidation.[64] Millennium asked Citi to explore if there was an opportunity to sell to a private equity sponsor at a valuation of 6x to-7x EBITDA or else take the Company public.[65] Citi noted at the time that private equity sponsors "have been generally skeptical of the business and risk of reimbursement."[66] Nonetheless, Citi reached out to potential buyers and in January 2014 pitched the transaction to a potential strategic buyer in Australia.[67] This potential buyer was described as "know[ing] ML's business well" but declined to engage in the sales process citing concern that Millennium operated in a "highly competed" industry with "unsustainable margins." The buyer also cited "issues re reimbursement in ML's end-markets."[68] On the heels of these two failed sales processes, Millennium pursued the 2014 Transaction.

30. The 2014 Transaction was ultimately structured as a $50 million revolving loan and a $1.775 billion Term Loan.[69] It appears that the decision to pursue the 2014 Transaction in the leveraged loan market was at least partially motivated by a desire to monetize the investment made by TA Associates ("TA") ahead of any potential regulatory/the United States Department of Justice ("US DOJ") investigation issues, notwithstanding the loss of substantial tax advantages.[70]

---

[64]  Letter from Citi Corporate and Investment Banking to Millennium, October 21, 2013, Exhibit 15 to Price Deposition [CITI-DE-00005790].

[65]  Email from Sarin to Blake, Re: Millennium update, October 12, 2013, Exhibit 223 to Deposition of M. Tortora (Citi), July 15, 2021 [CITI-DE-00071523 at 1523].

[66]  *Id.*

[67]  Email from Ristevski to Phin and Sarin, Re: Sonic, January 12, 2014, Exhibit 233 to Deposition of M. Tortora (Citi) [CITI-DE-00052087]. The potential buyer is believed to be Sonic Healthcare, referred to as "Sonic" in the Citi emails.

[68]  *Id.*

[69]  The syndicated term loan facility was upsized from $1.765 to $1.775 billion to accommodate an additional original issue discount to attract lenders, and the revolving credit facility was $50 million, for a total of $1.825 billion. *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014.

[70]  *See* email from James Hart of TA (Plaintiff Exhibit 198 TA Associates Deposition) [TA_MLH-00011849]:Email from Tony Marsh of TA (Plaintiff Exhibit 198 TA Associates Deposition) [TA MLH-00011849]:

"The implication of doing a debt recap there is massive from a tax structuring standpoint. We would blow the structure with the potential to lose the full step up at the next transaction that could be worth $100s of millions depending on the form of the exit."

*See also* Email from Kevin Landry of TA (Plaintiff Exhibit 194 TA Associates Deposition) [TA_MLH-00009903]:

Proceeds from the 2014 Transaction plus additional cash on Millennium's balance sheet were used to fully repay debt held by TA, fully repay the debt issued in connection with the 2012 Transaction, pay an approximately $1.3 billion dividend to shareholders and warrant holders in Millennium's parent companies and to fund transaction fees, including fees to underwriters. In addition, certain members of management received cash distributions at the time of the 2014 Transaction.[71] Table 3 shows estimated sources and uses of proceeds for the 2014 Transaction.

**TABLE 3: ESTIMATED SOURCES AND USES OF FUNDS: 2014 TRANSACTION ($ MILLIONS)**

| Sources | Amount ($M) | Uses | Amount ($M) |
|---|---|---|---|
| New Revolver ($50M) | - | Dividend to Shareholders | 1,269.6 |
| New Term Loan B | 1,775.0 | Refinance Term Loan A | 304.0 |
| Cash from Balance Sheet | 50.0 | Refinance TA Sub Debt | 196.0 |
|  |  | Estimated Fees and Expenses | 55.4 |
| **Total Sources** | **1,825.0** | **Total Uses** | **1,825.0** |

Source: Confidential Information Memorandum [ML_DE_00269115 at 9136], updated by Brattle to account for the final Original Issue Discount (*see* footnote 69).

31. The 2014 Transaction was underwritten by J.P. Morgan, Citi, Suntrust and Bank of Montreal ("BMO").[72] The underwriters agreed to take on minimal credit exposure to Millennium beyond

---

"Millennium is obviously a VERY important asset for TA. We discussed the real economic tradeoffs of doing another recap in the second half of 2013, but under the "bird in the hand v. two in the bush" theory, it might make sense to pursue a recap sooner rather than later, despite the tax costs. From conversations after the PC meeting, I understand we may all be in violent agreement, but wanted to reinforce that the Portfolio Committee agrees with the approach of pushing for additional liquidity as soon as possible, given the size of a potential recap, the importance of Millennium to TA, and potential regulatory issues."

*See also* email from Mark Carter of TA (Plaintiff Exhibit 195 TA Associates Deposition) [TA_MLH-00041365]:

"I know you are contemplating a recap versus the government inquiry but for what it is worth, you may want to explore the stretch senior market. Cov-lite probably up to 4.5x leverage L+350. The good news is there are no breakage costs so if you decide to redo the cap structure later after the government provides the all-clear, no problem. This may be an issue for senior management given the risks this presents but you could always provide a special bonus to them. The bonus would go against the strike price of their options so it isn't a double dip. I have used this mechanism recently so happy to discuss. You have done such a good job with Millennium that I am focused on de-risking this all important investment. I would ignore the hundreds of millions in tax benefits and blow it up."

[71] *See* email from Heidi Smith [ML_DE_00062278] and Excel attachment [ML_DE_00062280]; *see also* Martin Price Deposition Transcript, dated April 12, 2021, at 169:23-172:25.

[72] J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494]; Citi Millennium Labs Final Approval Memo, March 13, 2014 [CITI-DE-00017912]; BMO Loan Underwriting

---

the initial underwriting risk, committing to hold only the shorter tenor revolver (which contained lending covenants not provided to the term loan lenders) and entitling them to sell down 100% of the Term Loan to other investors.[73] In particular, notwithstanding its "strong relationship" with Millennium, J.P. Morgan appears to have been uncomfortable with assuming even the underwriting risk.[74] Indeed, J.P. Morgan internally expressed concern as to whether there was sufficient market demand to successfully syndicate the loan. In an email dated January 14, 2014, a J.P. Morgan employee noted that many banks had declined to be involved in the 2012 Transaction due to concerns about litigation risk, debt structure, and the use of proceeds.[75] The 2014 Transaction required new money, and it was noted that litigation risk and use of proceeds remained a hurdle for new lenders. During the course of the syndication, J.P. Morgan asked BMO to hold a portion of the Term Loan. The contemporaneous communications confirm that J.P. Morgan was having difficulty syndicating (*i.e.*, selling) the loan in the market.[76] Furthermore, following syndication, J.P. Morgan elected to reduce its credit exposure to

---

Committee Memorandum, March 11, 2014 [BMO-ML-00009109]; SunTrust DCC Memo, March 2014 [Suntrust_MIL-DE-00006771].

[73]   The Master Consent to Assignment shows the initial allocation of the Term Loan amongst investors [ML_DE_00465366 at 5370-5371].

[74]   TA Associates deposition, Exhibit 216 (emphasis from original): "One important point: to note: JPMorgan does NOT want the fact that this is an underwritten deal to get out in the marketplace with accounts. We should all be careful not to talk about this deal and the underwritten point, specifically." [TA_MLN-00013228].

[75]   Exhibit 125 to Deposition of J. Lee (J.P. Morgan), June 23, 2021:

"Most likely suspects to revisit, all turned it down in 2012 over use of proceeds or litigation or TA debt structure-- Wells, BAM L, Sumitomo, US Bank, Union Bank, Raymond James, BBVA Compass, Bank of the West, BB&T, Cal Bank&Trust, Key, RBC, would/could check of bunch of others. Stating the obvious but use of proceeds and litigation will remain the hurdle for new guys. At the appropriate time, would make sense to screen existing guys early/pre launch for a reality check on capacity." [JPMC-MIL-CORP-00189654].

[76]   Email from Phillip Ho, April 9, 2014 (Plaintiff's Exhibit 343 to Deposition of Phillip Ho) [ML00009325 at 326]:

"Can we have a call this morning? JP called last night. Management getting nervous; Howard's asked if BMO would consider holding some of the B. Ryan at JP and I both understood that's very unlikely given cov lite. But Suntrust saying they'd hold 40mm, which Ryan and I are very surprised about.

Books at just over $lbn. There are "some" limit orders at L400 and 99. Lot of guys still working. Ryan says JP very confident theVII be well inside of flex caps when deal gets flexed; not ready to do that yet since still more time before the deadline. JP won't hold B and he's not sure where Citi is on this.

I told Ryan we'd get back to Howard today, possibly this morning. Because I knew he'd call Howard last night, told him we'd try really hard but definitely no promises. CB for sure can't hold any. Maybe the BMO CLO could do 5mm??"

---

Millennium from $75.9 million to no more than $27.5 million of the revolver capacity.[77] The revolver was ultimately terminated on June 4, 2015, which allowed Millennium to avoid an event of default in the event of a breach of the leverage covenant (*i.e.*, the term loan did not contain the leverage covenant).[78] As discussed below, it was reasonable to expect that Millennium would breach the leverage covenant (contained only in the revolver agreement) by the third quarter of 2015.

32. The terms of the underwriting included the ability to "flex" (or modify) the loan terms to complete syndication of the loan. Market flex language is designed to partially mitigate the risk to underwriters that they cannot syndicate a loan, due to either changes in market conditions or negative sentiment towards a credit. Underwriters initially indicated to the market that the Term Loan would price at LIBOR plus 350-375 basis points with a 50 basis point original issue discount ("OID") to investors, however this was increased to 425 basis points and a 100 basis point OID to investors. The loan size was increased by $10 million to fund the additional OID. In addition, the excess cash flow sweep was increased, the cap on sweeps removed, and restrictions on other debt tightened.[79] The substantial revisions to the terms are consistent with a very difficult syndication. This is consistent with contemporaneous email communications from the lead syndicator for JP Morgan (Jenny Lee): "[W]e came within 37.5 bps of our cap and we had 175 bps of flex. Never worked so hard in my life on a deal."[80]

---

[77]   J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]: "JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

[78]   Termination Notice, June 24, 2015 [JPMC-MIL-CORP-00108741].
       Email from Martin Price to Brock Hardaway, June 29, 2015 [ML_DE_00601573]:

       █████████████████████████████████████████████████████████████████████
       █████████████████████████████████████████████████████████████████████
       █████████████████████████████████████████████████████████████

       J.P. Morgan had advised Millennium prior to the closing of the 2014 Transaction that it could cancel the revolver to avoid a declaration of an event of default thereunder that might lead to acceleration of the term loan. *See* email from Stathis Karanikolaidis to Brock Hardaway [ML_DE_00001946].

[79]   *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014; Loanconnector, "Corrected: Millennium Labs launches $1.8B dividend recap loan", March 31, 2014.

[80]   *See* email dated April 16, 2014 from Jenny Lee to Brian Dolan [JPMC-00031194].

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 20

## V.  FRAMEWORK FOR SOLVENCY ANALYSIS

33.  Solvency is an economic concept, the definition of which is informed by law and legal precedent. Consequently, an economic analysis of solvency must consider these sources of authoritative guidance. Section 548 of the U.S. Bankruptcy Code describes two circumstances under which a pre-petition transaction may be avoided: actual fraud and constructive fraud. The pre-petition transaction in question may be a transfer of value or the incurrence of an obligation. The first circumstance is if the transaction is undertaken "with actual intent to hinder, delay, or defraud" a creditor. This has been defined as "actual fraud."[81]

34.  For a determination of actual fraud, courts have looked to several indicia, including so-called "badges of fraud." However, I note that in this Litigation, the Court has stated that "badges of fraud is just one substitute for direct evidence" and that "a court may consider factors other than badges of fraud in its analysis"[82] such as circumstantial evidence that the "natural consequence" of a debtor's action is "to hinder, delay or defraud creditors."[83]

35.  The Uniform Voidable Transactions Act ("UVTA")[84] provides a non-exclusive list of the "badges of fraud". They are:

    **i.**       Whether the transfer or obligation was to an insider;

    **ii.**      Whether the transferor retained possession or control of the property after the transfer

    **iii.**     Whether the transfer or obligation was concealed or disclosed

---

[81]  *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 210 (3d Cir. 2006) ("'Actual' fraud is prohibited by § 548(a)(1)(A), which allows a trustee to avoid a transfer made 'with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted.'").

[82]  *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Memorandum, February 29, 2019, at p. 7.

[83]  *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Memorandum, February 29, 2019, at p. 7.

[84]  In July 2014, the UVTA replaced the Uniform Fraudulent Transfer Act, which (at that time) was in force in 43 states (all states except Alaska, Kentucky, Louisiana, Maryland, New York, South Carolina, and Virginia). Uniform Law Commission, *Fraudulent Transfer Act* [https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3]; Jones Day, *Uniform Voidable Transactions Act Approved by Uniform Law Commission to Replace UFTA*, September/October 2014, https://www.jonesday.com/en/insights/2014/10/uniform-voidable-transactions-act-approved-by-uniform-law-commission-to-replace-ufta.

iv.    Whether, before the transfer was made or obligation was incurred, a creditor sued or threatened to sue the debtor

v.    Whether the transfer was of substantially all the debtor's assets

vi.    Whether the debtor had absconded

vii.    Whether the debtor had removed or concealed assets

viii.    Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred

ix.    Whether the debtor was insolvent or became insolvent shortly after the transfer was made or obligation was incurred

x.    Whether the transfer occurred shortly before or shortly after a substantial debt was incurred

xi.    Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor

36. The second circumstance under which a transaction may be avoided, known as "constructive fraud," requires two elements:

   i.    The first element is that the transferor "received less than a reasonably equivalent value in exchange for such transfer or obligation."

   ii.    The second element is that he transferor must meet at least one of the following economic tests:

      a.    was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation (often referred to as the "balance sheet test"); *or*

      b.    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital (often referred to as the "adequate capital" test); *or*

    c.   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured (often referred to as the "ability to pay debts" test).[85]

37. Note that reasonably equivalent value and insolvency are implicated under both actual fraud and constructive fraud.

38. Several standard economic analyses are used to assess the elements of constructive fraud and some of the indicia of actual fraud. These analyses are discussed in the following sections.

### A.   BALANCE SHEET TEST

39. Under the balance sheet test, a company is considered insolvent if at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.[86] Debt is defined broadly to include liabilities associated with an obligation whether or not that obligation "is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[87] Under the assumption that a company will continue as a going-concern, its business enterprise value ("BEV") is equivalent to the sum of all of the company's assets at fair valuation.[88]

40. BEV refers to the value of a firm that is available to compensate all capital providers (i.e., both equity and debt) to the firm. The difference between a company's BEV and its total liabilities represents the company's equity value. Equity value is available to compensate the firm's equity holders. It represents the firm's residual value, after repaying the firm's debt and other liabilities. Thus, the balance sheet test determines if a company's equity value is positive or negative.[89] If

---

[85]   11 U.S.C. § 548 (a)(1)(B).

[86]   *See* UVTA, Section 2 and United States Code, Title 11, Chapter 1, Section 101.  Fair valuation is not defined in the UVTA or the Bankruptcy Code.  However, case law has defined it in a manner consistent with fair market value. *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 348 B.R. 234, 274 (Bankr. D. Del. 2005)("Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value.").

[87]   *See* 11 U.S.C. § 101.

[88]   BEV is intended to include the value of a company's non-operating assets (if any).

[89]   By definition, the sum of a company's assets is equal to the total sources of financing for those asset (*i.e.*, Assets = Debt + Equity). Re-arranging the equation, Assets – Debt = Equity.  Therefore, if Debt > Assets then Equity < 0 (*i.e.*, Equity is negative).

the fair value of a company's equity is negative, it indicates that the company is insolvent. The methodologies to calculate BEV can be categorized into three fundamental approaches: income, market and asset.

41. Income-based approaches calculate the value of a firm based on various measures of cash flow produced by the firm. The cash flow measures should be projected (or forward-looking) and should represent best estimates of expected cash flows. The most common income-based approach is the discounted cash flow ("DCF") methodology. DCF calculates the value of a firm using projected unlevered free cash flows, also referred to as "debt-free cash flows." In summary, free cash flows are calculated as revenue less cash operating expenses, taxes, investments in working capital and capital expenditures. Unlevered free cash flows do not reflect either debt service payments or distributions to equity holders (*e.g.*, dividends). The projected free cash flows of the firm are discounted back to the date of valuation, using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows. It is important to note that the DCF methodology utilizes future (projected) cash flows to ascertain the value of a company at as specific point in time (*i.e.*, the date of valuation). For valuation analysis in connection with constructive or actual fraud there are two relevant valuation dates: (i) immediately prior to the transaction subject to avoidance and (ii) immediately upon giving effect to the transaction subject to avoidance. To accurately calculate value using DCF, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation.[90]

42. Capitalization of earnings or cash flow is another, though less common, income-based valuation methodology. Capitalization may be used as an alternative to DCF if the income stream to be capitalized is anticipated to grow at a constant rate from the date of valuation into perpetuity.

43. Market-based approaches calculate the value of a firm based on market transactions involving the purchase or sale of comparable companies or ownership interests in those companies. Guideline Public Companies and Precedent Transaction methodologies are both market-based approaches. The Guideline Public Company ("GPC") methodology begins by identifying a

---

[90] *See*: Fishman, Jay E., Pratt, Shannon P. and Morrison, William J.; *Standards of Value: Theory and Applications*, John Wiley & Sons, Inc. 2007, p. 61 (quoting from Bogdanski, Federal Tax Valuation, at 2.01[3][a].

cohort of publicly-traded companies that are reasonably comparable to the firm being valued. Comparability is established through identification of specific, relevant qualitative and quantitative factors. After identifying a cohort of comparable companies, valuation multiples are calculated for each comparable company by expressing an observable measure of the company's value as a function of an operating or financial metric for the company. Under the GPC methodology, the most common observable measure of enterprise value is the sum of (i) market capitalization and (ii) the face value of outstanding debt.[91] This sum may be reduced by the company's excess cash. The most common observable measure of equity value is market capitalization. Identical to DCF, market capitalization and the value of debt are measured as of the date(s) of valuation for the subject company. Enterprise value-to-EBITDA ("EV/EBITDA"), price-to-earnings ("P/E") and price-to-book value of equity ("P/B") are examples of valuation multiples. P/E and P/B multiples are calculated using observed measures of equity value. Due to differences in accounting policies among the comparable companies or non-recurring events that affect the financial or operational metrics of a comparable company, it may be necessary to adjust or "normalize" the valuation multiples for one or more of the comparable companies to ensure that the multiples are calculated on a consistent basis.

44.  The valuation multiples derived from the cohort of comparable companies may be expressed as a range, an average or another point estimate derived from the cohort (*e.g.*, a quartile value). The range or point estimate of one or more valuation multiples is, then, applied to the relevant operating or financial metric of the firm being valued (the "subject company"). As an illustrative example, the average EV/EBITDA multiple derived from the cohort of comparable companies may be applied to the EBITDA of the subject company. In this way, one can calculate the BEV for the subject company.[92] In a typical circumstance, the metric used to derive the valuation multiples should be the same metric used to calculate the value of the subject company. For example, if the valuation multiple is based on 1-year projected EBITDA, the value of the subject

---

[91]  The observable measure of value may differ when the company's capital structure includes preferred equity or other classes of equity that are not publicly traded (the value of which may not be fully reflected in market capitalization). In addition, in some instances of valuation analysis (exclusive of solvency analysis), it may be appropriate to use the market value of debt instead of the face value of debt.

[92]  Some valuation multiples, such as P/E, derive an estimate of the *equity* value of the company instead of the *enterprise* value of the company.

company is determined by applying the valuation multiple to the subject company's 1-year projected EBITDA.

45. The Precedent Transaction methodology also relies on valuation multiples to calculate the value of a firm. However, the observable measure of value for the Precedent Transaction methodology differs from that of the GPC methodology. The measure of value for the Precedent Transaction methodology is the transaction price paid in a transaction in which the acquired company (also known as the "target company") is comparable to the firm being valued. The Precedent Transaction methodology derives an estimate of enterprise value and expresses that value as a function of an operating or financial metric for the target company.[93] By definition, this methodology relies on transactions that will have been priced and closed prior to the date of valuation for the subject company. Therefore, consideration must be given to the relationship between the market conditions at the time of the precedent transactions and the market conditions contemporaneous to the date of valuation.

46. Asset-based methodologies calculate the value of a firm as the sum of the value of the assets owned by the firm. Net asset value will typically represent the aggregate value of the assets less debt and other liabilities. Asset-based methodologies are typically limited to circumstances in which the value of a firm is not well-represented by a predictable measure of future cash flow and the firm's assets can be readily identified and accurately and discretely valued.

### B.   ABILITY TO PAY DEBT TEST

47. Under the ability to pay debt test a company is considered insolvent if, at the time of the transaction subject to avoidance, the company intended to incur, or believed that it would incur, debts that would be beyond the company's ability to pay as such debts matured. The definition of debt is identical to that under the balance sheet test. A company's ability to pay its debts is assessed by comparing the company's projected cash flows and cash reserves to the expected debt service requirements and a payoff or refinancing of the principal balance upon maturity. Debt service requirements are the cash flows and maintenance covenants required by the relevant

---

[93]   It is common to use a last twelve month (LTM) metric under the Precedent Transaction methodology, as projected data is often unavailable for the target company.

credit agreements. The most common cash flow requirements are interest and principal payments. In addition, credit agreements may require that the company maintain specified operating ratios. A common such ratio (referred to as a leverage ratio) is a limit on the amount of the company's debt relative to a company's EBITDA. Typically, if a company fails to comply with debt service requirements, such a failure is defined as an event of default under the relevant credit agreement. Furthermore, the occurrence of an event of default under a single credit agreement can give rise to additional events of default where the borrower is subject to cross-default provisions.

### C.    ADEQUATE CAPITAL TEST

48. The third test for constructive fraud is whether a company engaged (or was about to engage) in a "business or a transaction for which any property remaining with the debtor was an unreasonably small capital."[94]   Capital refers to how a company finances its business operations. Most companies rely significantly (if not, primarily) on internally generated cash to finance operations. However, when internally generated cash flows are insufficient to fully finance operations, companies will raise either debt or equity capital from outside investors.[95]   Thus, capital refers to the combination of internal cash flows, equity and debt. For the purpose of assessing the adequate capital test, courts have said that an adequately capitalized company has sufficient capital, including access to capital, to sustain operations.[96] Access to capital typically refers to the ability to raise equity, raise debt, reduce cash flow obligations or generate cash flows through the sale or other monetization of assets.

---

[94]   As of 2016: the UFTA (which currently is in force in 35 states, the District of Columbia, and the U.S. Virgin Islands) and the UVTA, which has been adopted by nine states, include the phrase "the remaining assets of the debtor were unreasonably small in relation to the business or transaction" in place of the corresponding language regarding "unreasonably small capital" in section 548(a)(1)(B)(ii)(II). *See* UFTA § 4(a)(2)(i); UVTA § 4(a)(2)(i). The older UFCA, which remains in effect only in New York and Maryland, tracks the "unreasonably small capital" language in section 548(a)(1)(B)(ii)(II). *See* N.Y. Debt. & Cred. L. § 274; *see also* https://www.jonesday.com/en/insights/2016/08/the-third-circuit-weighs-in-again-on-the-meaning-of-unreasonably-small-capital-in-constructively-fraudulent-transfer-avoidance-litigation.

[95]   For example, *see* Principles of Corporate Finance, Brealey, Myers, Allen, 10th edition, January 1, 2012 at pp. 341-342.

[96]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

49. Courts have indicated that the test for unreasonably small capital is "reasonable foreseeability"[97] as of the date of the challenged transaction. That is, a company has unreasonably small capital if it is reasonably foreseeable that the transaction will leave the company with capital insufficient to sustain operations. To assess reasonable foreseeability, "the critical question"[98] is whether the company's projections supporting the challenged transaction (which presumably showed that the company would be able to sustain operations) were reasonable when made. Reasonable projections do not merely rely on the company's historical operations. Rather, to be reasonable, the projections "must also account for difficulties that are likely to arise."[99] If the projections supporting the challenged transaction are found to be unreasonable, "it will follow that the debtor was left with an unreasonably small capital."[100] Finally, courts have found that unreasonably small capital is not synonymous with insolvency but, rather, "denotes a financial condition short of equitable insolvency."[101]

50. Multiple methodologies may be used to assess the adequacy of a company's capital. One set of methodologies considers the company's expected cash flows under a reasonable downside scenario. For example, is the company able to finance operations and maintain debt service under such a scenario? A second set of methodologies analyzes the company's leverage ratios (including expected leverage ratios). For example, is the company's leverage significantly in excess of leverage levels for comparable companies? The exact implementation of these methodologies will depend on the industry and/or other specific circumstances of the company in question.[102]

### D.    SUMMARY OF MILLENNIUM SOLVENCY ANALYSIS

51. To assess the solvency of Millennium as of the 2014 Transaction, I valued Millennium to determine if the value of the Company's assets exceeded the value of the Company's debt, including the debt incurred in the 2014 Transaction. I valued Millennium using a DCF analysis.

---

[97]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[98]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[99]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[100]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[101]   *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[102]   Collier on Bankruptcy ¶ 548.05[3][b] (16th ed. 2016).

Expert Report of Yvette R. Austin Smith                              Adv. Pro. No.17-51840 (LSS) | 28

As I demonstrate below, a proper DCF analysis shows that Millennium was balance sheet insolvent as a result of that transaction, with an equity value of no greater than *negative* $958.9 million, before accounting for contingent liabilities. I also sought to value Millennium using the GPC and Precedent Transaction methodologies. Due to the limited comparability of the identified public companies, I did not rely on the GPC methodology as my primary indication of value. Nonetheless, the most likely conclusion of value that results from the GPC methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital. I was unable to identify sufficiently comparable precedent transactions.

52. Courts have found that unreasonably small capital is a financial condition prior to equitable insolvency. Therefore, by definition, a balance sheet insolvent company is a company with unreasonably small capital. Nonetheless, I also conducted a second analysis that shows that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with unreasonably small capital. To address the third component of the solvency analysis, I also show below that the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay that debt as it matured.

## VI.   MILLENNIUM FINANCIAL PROJECTIONS IN CONNECTION WITH THE 2014 TRANSACTION

### A.   PADRES PROJECTIONS

53. Millennium created financial projections (the "Padres Projections") to support the 2014 Transaction, which were provided to both the underwriters and Vantage Point, the contemporaneous solvency advisor. In the aggregate, the Padres Projections covered the period 2014 through 2020. However, the Padres Projections reflected more detailed and monthly data from the first quarter of 2014 through the fourth quarter of 2018. For 2019 and 2020, the Padres Projections reflect less detailed and annual data.[103]

---

[103] For example, the Padres Projections include payor-specific NRPS, on a quarterly basis, through the fourth quarter of 2018. Payor-specific NRPS is not available for the 2019 and 2020 projection years. *See* ML_DE_00044521 Padres Working Model_03-14.xlsx.

54. The Padres Projections were significantly flawed in that the projections failed to reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction. The primary risk factors were regulatory and administrative curtailment by Medicare in allowed testing and reductions in reimbursement rates, reductions in reimbursement rates by commercial payors, loss of Millennium business (*e.g.*, reductions in specimen volume and NRPS) and liabilities and costs associated with governmental investigations and litigation, and follow-on private party litigation. These risk factors were clearly known based on both historical trends that were evident leading up to the 2014 Transaction and on information that was either publicly available or told to Millennium by its outside legal, regulatory and financial advisors. In some instances, and as explained more fully below, these factors had been explicitly identified and/or modeled by Millennium prior to the 2014 Transaction, but were omitted from the Padres Projections. Further, in the weeks prior to the 2014 Transaction, Millennium's in-house and outside legal counsel met on multiple occasions with criminal and civil investigators from the U.S. Attorneys' Office in Boston and they were preparing for an unfair competition trial brought by a competitor (*see* Ameritox litigation, below).[104]  In this Section of the report, I describe the flaws in the Padres Projections. In Section E, I discuss how I modified the Padres Projections to correct these flaws prior to conducing the solvency analysis.

55. As a result of omitting or failing to reasonably account for these known or knowable risk factors, the Padres Projections significantly overstated Millennium's projected revenue as of the 2014 Transaction. In addition, the Padres Projections failed to take into account liabilities relating to the then pending litigation and government investigations. Had these risk factors and historical trends been reasonably taken into account, it would have been clear that the 2014 Transaction rendered Millennium balance sheet insolvent, with unreasonably small capital and an inability to pay its debts as those debts matured.

56. The following charts compare the Padres Projections to Millennium's then-recent historical results, based on three key statistics for the UDT business: specimen volume, NRPS, and payor mix. These are metrics that Millennium regularly reviewed in the operations of its business.[105] In

---

[104]   Martin Price Deposition Transcript at 134:5-136:6.

[105]   *See,* for example, the June 2014 Financial Summary [ML_DE_00034943].

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 30

each instance, the Padres Projections are unreasonable because they ignore historical trends and factors that were known or knowable as of the 2014 Transaction. Figure 2 compares historical and projected specimen volumes for Millennium's two largest payor groups: Medicare and commercial. The projected volumes are the Padres Projections.



**FIGURE 2: QUARTERLY SPECIMEN VOLUMES BY PAYOR GROUP**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 3.

57. As shown in Figure 2, the Padres Projections assumed strong continued growth in specimen volumes for Medicare and commercial payors. The Padres Projections assumed that Medicare and commercial specimen volumes would grow by 21.0% and 16.7% in 2014 respectively.[106] Afterwards, Medicare and commercial specimen volumes were <u>both</u> projected to grow by 9.3% in 2015 and by approximately 10% per annum from 2016 through 2018.[107] There are two

---

[106]  Refer to YAS Workpaper 3 for 2013-2014 growth rate to derive growth of actual volumes from 2013 and Padres projections.

[107]  *See* ML_DE_00044521 Padres Working Model_03-14.xlsx.  ("VolumeBuild – UDT" tab). Beyond 2018 the projections are not broken down to the payor level.

obvious flaws in these volume projections that render them unreasonable when made. First, the Padres Projections assume that specimen volume for Medicare and commercial payors will grow at the same rate, notwithstanding very different historical trends in specimen volumes for these two payor groups. Second, the strong projected growth trend ignores that growth had been slowing for *both* payor groups in the years leading up to the 2014 Transaction. Indeed, in an email addressing assumptions in the Padres Projections, Daniel Pencak, Head of Financial Planning and Analysis,[108] who oversaw Millennium's financial modelling, stated that the volume build-up was "rather arbitrary".[109]  In addition, no consideration was given to potential reductions in specimen volume from a settlement of the DOJ Investigation.  Millennium was aware of this risk prior the 2014 Transaction, as Millennium had previously acknowledged the decline in Ameritox's specimen volume following its governmental settlements in 2010.[110]

58. Table 4 shows the annual and first quarter 2014 growth rates in specimen volume for Medicare, commercial payor and Millennium's aggregate specimen volume (across all payor groups). In all years, from 2010 to 2014, Medicare specimen volume growth rates were lower than the rates for commercial payor specimen volume. Furthermore, the disparity in growth rates *increased* over this time period. Indeed, in first quarter of 2014, the quarter immediately prior to the 2014 Transaction, Millennium's Medicare specimen volume *contracted* by 3.2%,[111] whereas commercial specimen volume grew by 4.4%.[112] I have seen no support for the assumption that projected specimen volume growth rates for commercial and Medicare would be equal after the 2014 Transaction.

---

[108]   Pencak Deposition at 17:23 - 18:13.

[109]   Plaintiff Ex. 171 to Pencak Deposition:

> "As for volume, since the build-up was rather arbitrary, I think we will simply build the sensitivity analysis around a sliding scale of volume growth/decline vs. whatever pricing we show based on the various pricing assumptions (i.e. Medicare reimbursement changes, commercial contracts, traditional Medicaid changes, etc.)."

[110]   *See* Section B.

[111]   *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, growth percentage of cell K132 with respect to J132).

[112]   *See* ML_DE_00559340, tab 'Payor Stats – UDT'. ML_DE_00732288 (Quarterly 2012-2015Q1 tab, rows 124-126, 128 and 135). According to the management model dated June 8, 2015 ("Revised Management Model"), actual commercial specimen volume (comprising BCBS, UHC, Aetna, Cigna, Humana) in the first quarter of 2014 was 222,784, implying an actual commercial quarterly growth rate of 0.2% in the first quarter of 2014. Figure 2 shows the higher (4.4%) specimen volume growth for the first quarter of 2014, consistent with the more contemporaneous data source.

59. In addition, the Padres Projections do not adequately reflect the fact that the growth in Millennium's specimen volume had been slowing over time. The growth rate of Millennium's total specimen volume had been declining by approximately one-half, each year from 2010 to 2013. For example, the growth rate was 64.4% from 2011 to 2012 but only 30.5% from 2012 to 2013. The slowing growth trend was even more pronounced for Medicare specimen volume, decreasing to only 12.9% from 2012 to 2013 and *contracting* by 3.2% from the fourth quarter of 2013 to the first quarter of 2014. This is in contrast to the first quarter of 2013, during which Millennium's Medicare specimen volume increased by 0.4%, when compared to the fourth quarter of 2012.[113]

**TABLE 4: SPECIMEN VOLUME GROWTH 2009-2014**

|  |  | 2009 | 2010 | 2011 | 2012 | 2013 | 2013 Q4 | 2014 Q1 |
|---|---|---|---|---|---|---|---|---|
| Medicare | [1] | 45,835 | 119,599 | 250,691 | 379,051 | 428,009 | 111,203 | 107,685 |
| *Period-on-Period Growth* | [2] |  | 160.9% | 109.6% | 51.2% | 12.9% |  | -3.2% |
| Commercial | [3] | 55,195 | 155,040 | 348,521 | 607,323 | 810,881 | 222,344 | 232,225 |
| *Period-on-Period Growth* | [4] |  | 180.9% | 124.8% | 74.3% | 33.5% |  | 4.4% |
| Total Specimen Volume | [5] | 171,807 | 489,609 | 1,092,041 | 1,795,631 | 2,343,150 | 633,637 | 647,798 |
| *Period-on-Period Growth* | [6] |  | 185.0% | 123.0% | 64.4% | 30.5% |  | 2.2% |

Source: ML_DE_00732288 ('Yearly 2009-2015M5' and 'Quarterly 2012-2015Q1' tabs).

Commercial comprises BCBS, UHC, Aetna, Cigna, and Humana.

60. Figure 3 compares Millennium's historical and projected NRPS for Medicare and commercial payors.

---

[113]   Medicare quarterly specimen volumes for the fourth quarter of 2012 and the first quarter of 2013 are 101,788 and 102,229 respectively.

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 33



FIGURE 3: QUARTERLY NET REVENUE PER SPECIMEN BY PAYOR GROUP

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 3.

61. As shown in Figure 3, in 2015 the Padres Projections assumed only a modest decline in NRPS for Medicare and commercial payors. From the start of the Padres forecast (first quarter of 2014) through the end of the more detailed projection through the fourth quarter of 2018, the Padres Projections assume a 20.6% and 26.2% reduction, respectively, in commercial and Medicare NRPS. From 2014 to 2020, the Padres Projections assumed an aggregate decrease of 26.5% in Millennium's UDT NRPS, across all payor groups. This is not consistent with contemporaneous efforts by both payor groups to significantly reduce reimbursement levels and tests per specimen, or the broader initiatives within the industry to reduce the incurrence of medically unnecessary tests.[114] Both of these trends were expected to play out over the shorter-term, and have a

---

[114] *See*, for example, Special Fraud Alert: Laboratory Payments to Referring Physicians, Department of Health and Human Services Office of Inspector General, June 25, 2014. Hawk, PollyBeth, "Ready or Not: Hospital Value-Based Purchasing Poised to Transform Healthcare Reimbursement Model and Introduce New Fraud Targets Under the False Claims Act," Winter, 2013. Questionable Billing for Medicare Part B Clinical Laboratory

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 34

significantly larger impact than assumed in the Padres Projections. Indeed, in late February and early March 2014, it appears that Millennium modelled – outside the Padres Projections – a 30% reduction in Medicare NRPS beginning on July 1, 2014.[115]

62.  Figure 4 compares Millennium's historical and projected payor mix, reflecting the payor contributions by Medicare, commercial and managed government. Payor contributions are measured by specimen volume.



**FIGURE 4: PAYOR MIX**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 3.

63.  As shown in Figure 4, the Padres Projections assumed a relatively constant payor mix. However, the significantly different growth rates in payor group specimen volume, during the period

---

Services, Department of Health and Human Services Office of Inspector General, August 2014. A Strategy for Medicare Payment Reform, Center for American Progress, May 2015.

[115]  *See* Plaintiff Exhibit 165 and 165A [ML DE 00058384] dated 2/28/2014 under "Net revenue per specimen (pricing):

    "Assumed 30% reduction in Medicare reimbursement effective June 1, 2014"

*See also* email from Daniel Pencak to Brock Hardaway and Tim Kennedy dated 3/2/2014 [ML_DE_00068651]:

    "Brock - see attached for the 2nd version that assumes a 30% reimbursement reduction in June 2014 related to Medicare"

leading up to the 2014 Transaction, completely undermines such an assumption.[116]  For example, as of the first quarter of 2012, specimen volume covered by Medicare reimbursement equaled 22.4% of Millennium's total specimen volume.  By the first quarter of 2014, Millennium's specimen volume covered by Medicare reimbursement had steadily declined to 16.6%. In contrast, the Padres Projections assumed that Medicare specimen volume would continue to equal 18.6% of Millennium's total specimen volume over the entire forecast period.  By overstating the proportion of Medicare specimen volume, the Padres Projections overstated Millennium's projected revenue (due to the higher Medicare NRPS relative to other payor groups).

64.  As shown in Figure 4, the Padres Projections assume growth in the contribution of Managed Government, consistent with the historical trend. This is projected to coincide with a large decline in "Patient" specimen volumes, which I understand represents revenue from self-pay patients.[117] This assumption has a significant impact on projected revenue, as Managed Government NRPS is significantly higher than Patient NRPS. For example, in March 2014, Managed Government NRPS was $168, whereas Patient NRPS was $2.

65.  The Padres Projections also assumed very high revenue growth rates for Millennium's non-UDT businesses. For the PGT business, the Padres Projections assumed that revenue would grow from $12 million in 2013 to $119.9 million in 2020, equating to an annual average growth rate (or CAGR) of 39%. The PGT business was expected to grow from 3.3% of Millennium's revenue in 2014 to 10.6% by 2020. Millennium's projected CAGR for the PGT business was more than three times that of the expected industry CAGR of 12.7%.[118]

---

[116]  In the Padres Projections, payor mix derived from the 'Payor Mix' tab remains constant for all payor groups throughout the forecasted period except for Managed Government, patient, and Medicaid Contract in certain periods. Managed Government is projected to increase from 14.5% in January 2015 to 19.3% in December 2018; patient pay is projected to decline from 9.8% to 2.0%; and Medicaid Contract is projected to increase from 7.7% to 10.3%.

[117]  For example, between March 2014 and December 2016, Management Government increases its contribution from 14.5% to 19.3%, whereas Patient declines from 9.8% to 2.0%. *See* ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab).

[118]  US Pharmocogentic Testing Market industry trend data. Refer to YAS Workpaper 1, tab 'US Report.' CAGR represents growth from 2015 to 2020.

66. Similarly, RxAnte's revenue was projected to grow from $12.8 million in 2014 to $87.8 million in 2020 (a CAGR of 38%). RxAnte's business share was expected to increase from 1.7% of Millennium's revenue in 2014 to 7.7% by 2020.

67. The Padres Projections further included a category of revenue labeled "Emerging Opportunities." For the following reasons, Emerging Opportunities should not form part of the expected cash flows when assessing balance sheet solvency:

- The revenues appear aspirational rather than expected. According to the Padres Projections, there was no revenue associated with this category until 2015, around nine months following the 2014 Transaction.

- The Confidential Information Memorandum contains limited discussion on the composition of Emerging Opportunities. Rather, discussion is limited to a description of the employment background of Elizabeth Peacock, the "Executive Vice President of Emerging Opportunities".

- The Emerging Opportunities do not appear in the subsequent management model dated June 8, 2015 (the "Revised Management Model").[119]

## B.    VANTAGE POINT SOLVENCY ANALYSIS BASED ON PADRES PROJECTIONS

68. Millennium retained a financial advisor, Vantage Point, to conduct a solvency analysis in connection with the 2014 Transaction.[120] In its work, Vantage Point relied significantly on the flawed Padres Projections.[121] Vantage Point conducted its discounted cash flow analysis using the unmodified Padres Projections.[122] Given that the Padres Projections significantly overstated Millennium's projected revenue, it is unsurprising that Vantage Point's DCF analysis wrongly concluded that Millennium would be solvent immediately following the 2014 Transaction.

---

[119]   ML_DE_00559340.

[120]   Exhibit 56 to Smith Deposition [VP_ML_00014656]; Exhibit 59 to Smith Deposition [VP_ML_00015683].

[121]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.15, April 30, 2014 [ML_DE_00263273 at 3287].

[122]   I compared the management projections on page 15 of the Vantage Point report with the Padres Projections. *See* ML_DE_00263273 at 3287 and the projections in the April 12, 2014 model [ML_DE_00057999].

69. In addition, Vantage Point appears to have undertaken only a very limited analysis to understand whether it was reasonably foreseeable that the 2014 Transaction would result in Millennium being left with unreasonably small capital. Notwithstanding Vantage Point's inaccurate conclusion that Millennium was balance sheet solvent, a separate analysis of the adequacy of Millennium's capital was still necessary to determine if the 2014 Transaction constituted a fraudulent conveyance.

70. To assess Millennium's capital adequacy, Vantage Point "examin[ed] the cash flows of the Company [Millennium]" and "considered the debt ratios of comparable companies."[123] For the cash flow analysis, Vantage Point performed what it called a "stress test" of the Company's cash flows. However, instead of estimating the declines in cash flows that could result from stress factors that were known or knowable as of April 2014, Vantage Point simply identified mathematical decreases in EBITDA that, in the opinion of Vantage Point, would "call into question" debt service payments. For example, Vantage Point concluded that a 19.9% decline in FY2015 EBITDA (relative to projected levels) would jeopardize debt service payments.[124] However, the Vantage Point presentation does not discuss the *probability* of Millennium encountering a 19.9% decline in EBITDA. I note, by way of high-level comparison, for the 12-month period ended December 31, 2013 to the 12-month period ended December 31, 2015, Millennium's actual EBITDA declined by 59%.[125]

71. In considering the debt ratios of comparable companies, Vantage Point relied on publicly-traded companies, notwithstanding that Millennium was most comparable to privately-held companies

---

[123] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.34, April 30, 2014 [ML_DE_00263273 at 3306].

[124] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.32, April 30, 2014 [ML_DE_00263273 at 3304].

[125] Millennium filed for bankruptcy on November 10, 2015.

2013 EBITDA of $364.8 million based on 2013 financial statements [ML_DE_00187601 at 7606 and 7608]. Income from operations of $344.9 million, plus depreciation and amortization of $16.9 million, plus stock based comp of $3.0 million, equals $364.8 million.

2015 EBITDA of $148.0 million based on 2015 financial statements [KPMG-ML-EA15WB-0001528 at 1533 and 1535]. Income from operations of $120.9 million, plus depreciation and amortization of $27.1 million, equals $148.0 million.

According to the Confidential Information Memorandum [ML_DE_00269115 at 9201], EBITDA was $356.4 million in 2013. This would imply a reduction in EBITDA of 59%.

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 38

such as Ameritox and Calloway. Furthermore, the Vantage Point presentation does not discuss whether the publicly-traded companies had a greater ability to maintain higher leverage. For example, Vantage Point identified Labcorp as a comparable company to Millennium.[126] In 2013, Labcorp offered a broad range of clinical laboratory tests across several countries. Unlike Millennium, Labcorp had experienced relatively steady growth of around 2% per annum over the prior two years. Labcorp reported that just 3% of its 2013 revenue related to drugs of abuse testing, and it was 9.2 times the size of Millennium by 2013 revenue.[127] As a larger and more diversified company with a more stable history of growth, Labcorp was less vulnerable to regulatory changes in any one clinical testing segment, much less the significant business, legal, and regulatory risks and exposure faced by Millennium in April 2014.

72. Notwithstanding the known business trends and significant risk factors facing Millennium in April 2014, Vantage Point's solvency presentation contains no mention of Millennium's declining Medicare revenue and declining NRPS, risks associated with Millennium's use of Custom Profiles or free specimen testing cups, impacts of MUEs or LCDs, or commercial payor reimbursement pressures. Vantage Point also appears to have ignored obvious litigation and regulatory risks, relying instead on highly questionable representations from Millennium.[128] At the time the Vantage Point solvency opinion was issued, Millennium had received multiple subpoenas from the US DOJ, was aware of multiple qui tam lawsuits, and was engaged in litigation with Ameritox. Although Vantage Point states that it did not have legal expertise,[129] it is customary market practice when providing a solvency opinion to seek out third-party expertise for the purpose of adequately assessing the risks to the company's solvency.[130]

---

[126] Vantage Point notes that "none of the selected companies were identical or directly comparable to the [Millennium]". *See* Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.15, April 30, 2014 [ML_DE_00263273 at 3292].

[127] Labcorp's 2013 revenue was $5,808 million (source: S&P CapIQ), whereas Millennium's 2013 revenue was $633 million *See* ML_DE_00044521 Padres Working Model_03-14.xlsx ("Summary" tab).

[128] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p. 9, April 30, 2014 [ML_DE_00263273 at 3281]; Exhibit 56 to Smith Deposition [VP_ML_00014656].

[129] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.7 and p.9, April 30, 2014 [ML_DE_00263273 at 3279, 3281].

[130] Based on my professional experience, including observing the practices of other financial advisors when providing solvency analyses.

## VII.   SOLVENCY ANALYSIS OF MILLENNIUM USING THE CORRECT SOLVENCY FRAMEWORK

### A.   MILLENNIUM BUSINESS TRENDS AS OF 2014 TRANSACTION

73.  At the time of the 2014 Transaction, the UDT industry, especially quantitative testing, was under significant pressure from government and commercial payors. Concerns were increasing about the expansive use of expensive urine drug tests without sufficient demonstration of medical necessity.[131]

74.  At the time of the 2014 Transaction, several trends, reflecting these same pressures, were impacting Millennium's business. Taken together, these trends indicated that Millennium was facing significant business, reimbursement, legal, and regulatory risks and exposures, and that the Company was very likely to encounter slowing or negative growth and declining profitability. The first trend was declining NRPS for Millennium's two largest payor groups: Medicare and commercial.[132] *See* Figure 5.

---

[131]   For example, *see* https://www.nytimes.com/2013/08/02/business/increase-in-urine-testing-raises-ethical-questions.html ("...urine-testing companies are aggressively marketing their services to physicians by trumpeting the big profits that await if they test their patients…"); *see also*: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782 ("Pain specialists order costly tests for illegal drugs such as cocaine and angel dust, which few seniors ever use").

[132]   As noted, Millennium reported billing data (including NRPS) for certain commercial payors, including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC.

**FIGURE 5: QUARTERLY NET REVENUE PER SPECIMEN**



Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 4.

75. As shown in Figure 5, after peaking in the third quarter of 2012, NRPS for Millennium's Medicare business was trending down as of the 2014 Transaction. From the third quarter of 2012 to the first quarter of 2014, Medicare NRPS declined by 12.8%.[133] This decline is largely attributable to reductions in tests per specimen[134] and reductions in Medicare billing rates.[135,136]

---

[133]   Quarterly Medicare NRPS dropped from $518 in the third quarter of 2012 to $451 in the first quarter of 2014 (12.8% drop). *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, columns BE and BL, row 132).

[134]   ML_DE_00732288 (Quarterly 2012-2015Q1 tab). For Medicare, quarterly trends for Tests Per Specimen (columns CC to CO) appear consistent with quarterly trends for NRPS (columns BC to BO).

[135]   2012 Annual Physician Notice (Exhibit 3 to DOJ Complaint) [ML_DE_0628891], 2013 Annual Physician Notice [ML_DE_00134548], and 2014 Annual Physician Notice [ML_DE_00164030]. Comparison of each HCPCS codes' billing rates from 2012-2014 indicate an annual decline in billing rates for the majority of HCPCS codes.

[136]   According to KPMG work papers (see below), in an apparent effort to increase Medicare billings, Millennium changed its billing practices. In February 2014, Millennium increased billings to Medicare from 100% to 250% of the scheduled rate. As a result of this change, Millennium experienced a reduction in payments from "over 90%" of billed claims, to approximately 50% of billed claims. I have seen no evidence that such a strategy led to higher collections.

   *See* KPMG 2014 work papers [KPMG-ML-EA14WB-0000347.xlsx, tab "2 - KPMG Look Back Analysis" (emphasis added):

Expert Report of Yvette R. Austin Smith                          Adv. Pro. No.17-51840 (LSS) | 41

76. NRPS for Millennium's commercial business also declined prior to the 2014 Transaction. Commercial NRPS declined by 14.3% from the second quarter of 2012 to the first quarter of 2014.[137] The observed decline was consistent with the contemporaneous negotiations between Millennium and multiple commercial payors. For example, effective in the first quarter of 2014, UHC, one of Millennium's largest commercial payors, reduced rates by 19%.[138] This followed discussions between Millennium and UHC in 2013, wherein UHC expressed concerns over inappropriate overutilization of UDT, the lack of value in quantitative testing, and over-testing due to custom profiles.[139] Other commercial payors were similarly seeking to reduce the number of reimbursable tests per year.[140] Furthermore, commercial NRPS was highly vulnerable to follow-on reductions linked to reductions in Medicare reimbursement rates. For example, during contract negotiations with UHC, Millennium agreed to a fee reduction equal to "42% of

---

"Per discussion with Rick Guzman, Sr. Director Revenue Cycle Management, the Company did not collect as expected from Medicare and Medicaid during the year due to multiple factors. **In February the Company began billing all payor groups including Medicare/Medicaid at 250% of the Medicare rate (previously billed at 100%).** Only the client payor group is billed at contractually agreed upon rates and have 100% expected collection rates. As a result of the increased billed claims, the Company saw a reduction of payments from Medicare from over 90% of billed claims to approximately 50%."

[137]   Quarterly commercial NRPS dropped from $298 in the third quarter of 2012 to $255 in the first quarter of 2014 (14.3% drop). As noted, Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC. For the purposes of this analysis, I have defined these payors as the commercial payors. *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, sum of "Estimated Revenue" divided by "Priced Accession Volume" for commercial payors).

[138]   Marbach email to Appel dated August, 9, 2013 [ML_DE_00061777]. Email indicates rate reductions would be effective Q4 2013, however, the Padres Projections indicate that the 19% reduction actually occurred in the first quarter of 2014. *See* ML_DE_00057999 Padres Working Model_04-12-14.xlsx ("Payor Mix" tab row 20, column AB).

[139]   Plaintiff Exhibit 141 to Pencak Deposition [ML_DE_0008373]

"Issues Raised:

Inappropriate overutilization of UDT, the lack of value to the providers for quantification vs. offering qualitative results, providers chasing a number+ the ability of providers to understand the nuances of reported results.

...

"CP's continue to be of great concern, since their perception is that providers are lazy & take the easy road instead of evaluating each patient's need for specific drug monitoring. That leads to higher # of tests / specimen & $$$."

[140]   Beginning January 1, 2014, Tufts health plan "will not compensate for qualitative drug screen when billed with any combination of more than twenty (20) units within 365 days per Member, as it exceeds clinical guidelines." Tufts Plan changes, [ML_DE_00305155 at 5156]. Martin Price's email circulating the updated reimbursement policy [ML_DE_00305151 at 5152] states that "[w]e expect the other payors in MA to adopt something similar."

---

Medicare for UHC commercial business."[141] In November 2014, Aetna also instituted a strict reimbursement policy.[142]

77. As shown in Figure 5, from the fourth quarter of 2012 to the first quarter of 2014, the only payor group for which Millennium saw an increase in NRPS was Managed Government. However, even with a slight increase, NRPS for Managed Government remained significantly below that for Medicare and commercial payors.

78. A second trend impacting Millennium's business prior to the 2014 Transaction was slowing growth in specimen volume. As shown in Figure 6, between the first quarter of 2012 and first quarter of 2014, quarterly specimen volume growth declined from 14.5% to 2.2%.



**FIGURE 6: QUARTERLY TOTAL SPECIMEN VOLUME GROWTH**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

---

[141]  Marbach email to Appel August, 9, 2013 [ML_DE_00061777]. *See also* Roger Feldman, Bryan Dowd, and Robert Coulam, "Medicare's Role in Determining Prices throughout the Health Care System", October 2015.

[142]  [ML_DE_00202842]:

"Aetna allows eight (8) qualitative drug test encounters per 12 month period. Aetna allows eight (8) quantitative drug tests per day and eight (8) quantitative drug test encounters per 12 month period."

79. A third trend impacting Millennium's business prior to the 2014 Transaction was a shift in Millennium's payor mix away from traditional Medicare. As shown in Figure 7, specimen volume growth for Medicare was modest from the first quarter of 2012 to the first quarter of 2014 relative to the significant growth in specimen volume for commercial, Managed Government and "other" payors. "Other" payors reflects workers compensation, patient self-pay, and Medicaid. As a result, the proportion of specimen volume for which Millennium received Medicare reimbursement decreased over time. *See* Figure 8. Due to the significant difference in NRPS between Medicare and other payors (as noted – *see* Figure 5), the financial result of this shift in payor mix away from Medicare was a significant decrease in Millennium's aggregate NRPS (*i.e.*, NRPS across all payor groups), even assuming reimbursement rates for a given payor group were held constant.

**FIGURE 7: QUARTERLY SPECIMEN VOLUMES BY PAYOR GROUP**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.



**FIGURE 8: PAYOR MIX**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

### B.  REGULATORY AND LEGAL ENVIRONMENT AS OF 2014 TRANSACTION

80. Regulatory and legal scrutiny of the UDT industry had been increasing as of the 2014 Transaction. As early as 1998, the U.S. Department of Health and Human Services, Office of Inspector General ("HHS OIG") issued guidance to all clinical laboratories seeking reimbursement from Medicare and Medicaid. The HHS OIG guidance cautioned against the use of "standing orders" similar to Millennium's Custom Profile. Although the guidance did not prohibit this practice, it noted the propensity of standing orders to result in tests that were not reasonable and medically necessary. The guidance concluded that "as a result of the potential problems standing orders may cause, the use of standing orders is discouraged."[143]

---

[143]  Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45081:

"Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. Accordingly, the insurer may reject standing orders as evidence that a test is reasonable and necessary. Medicare contractors can and may require additional

81. The HHS OIG guidance also outlined methods by which laboratories could monitor whether unnecessary tests were occurring. This included hiring an external consultant to analyze patterns of utilization and determine the cause of any excessive growth in claims submitted to Medicare.[144] HHS OIG proposed that an annual increase in test utilization of 10% or greater would occasion additional scrutiny as potentially excessive growth. As discussed below, Millennium did hire such an external consultant (CodeMap), who concluded that Millennium faced significant legal and regulatory risk arising from the Company's business practices.[145]   As shown in Table 5, as part of my review of Millennium's billings to Medicare, I noted that test utilization increased by 10% or more for multiple test codes.[146] In an April 2015 letter from Millennium's legal counsel to HHS OIG, Millennium claimed that beginning in 2010 it identified practices with high tests per specimen and "asked these practices to review their

---

documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged."

*Id.* pp. 45079-45080:

"In addition to the general notices above, laboratories that continue to offer clients the opportunity to request customized profiles should provide annual written notices that: (1) Explain the Medicare reimbursement paid for each component of each such profile; (2) inform physicians that using a customized profile may result in the ordering of tests which are not covered, reasonable or necessary and that tests will not be billed; and (3) inform physicians that the OIG takes the position that an individual who knowingly causes a false claim to be submitted may be subject to sanctions or remedies available under civil, criminal and administrative law."

[144]   Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45080:

"There are many methods by which a laboratory may determine excessive utilization of laboratory services. One approach to self-monitoring is to hire an outside consultant to analyze the laboratory's patterns of utilization, and investigate any potential problems or aberrancies. Another approach is to analyze test utilization data by CPT or HCPCS code, for the top 30 tests performed each year. Laboratories could do this by keeping track of the number of tests performed by CPT or HCPCS code or of the number of claims submitted for each test. The laboratories would then compute the percentage growth in the number of tests or claims submitted for each of the top 30 tests from one year to the next. We believe that if a test's utilization grows more than 10 percent, the laboratory should undertake a reasonable inquiry to ascertain the cause of such growth. If the laboratory determines that the increase in test utilization occurred for a benign reason, such as the acquisition of a new laboratory facility, then the laboratory need not take any action. However, if the laboratory determines that the increase in utilization was caused by a misunderstanding or ignorance by the ordering physicians or other authorized individuals regarding the billing consequences of the tests they ordered or an action on the part of the facility, the laboratory should take any steps that it deems reasonably necessary to address the issue and to ensure misconduct is not occurring."

[145]   Draft Annual Compliance Audit Report by Greg Root/CodeMap (Exhibit 5-A to Price Deposition), 11/24/2010 [ML_DE_00511984 at 2026]; Martin Price Deposition at 52:2353:3. Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

[146]   Note that coding practices change over time, and changes in test utilization for a particular code may not always represent a change in testing practices.

---

ordering patterns and determine whether any changes were appropriate."[147] I have seen no evidence that there was any change in the behavior of practices with high tests per specimen. Indeed, the average number of tests per specimen in 2013 (23.6) was almost identical to that in 2010 (24.0).[148]

82. Seemingly contrary to OIG guidance, Millennium specifically targeted medical practices with low tests per specimen (the so-called "Troubled Practices Program"). Under the Troubled Practices Program, each practice with low tests per specimen was reviewed for potential "improvement." If the Custom Profiles for these Troubled Practices did not contain what Millennium considered a sufficient number of tests, or where Custom Profiles were not being utilized, Millennium threatened to remove the commissions paid to Millennium salespeople for these accounts unless they "improved."[149] According to Millennium, a major driver of increases in test per specimen in late 2011 was a focus on more "comprehensive testing", whereby Millennium would penalize underperforming practices, review Custom Profiles and/or require Lab Service Assistants or cup agreements.[150]

---

[147] Letter from Martin Price to Andrea Berlin, April 30, 2015 [ML_DE_00594719].

[148] The average number of tests per specimen was 24.0 in 2010, 17.6 in 2011, 23.8 in 2012, 23.6 in 2013 and 23.4 in 2014. *See* ML_DE_00732288 (Yearly 2009-2015 M5 tab, columns AT-AX, row 138).

[149] For example, for Walter M. Kidwell, MD, it was stated under "status" in a document tracking the Troubled Practices Program that "The MA [medical assistant] was checking the DO NOT use custom profile incorrectly. They are now making sure to check Custom Profile – it has 9 tests plus validity", and that "Commissions suspended due to low tests. Reps need to ensure CP is being used." Other accounts noted that "Commissions to be paid based on updated CP." *See* Pencak Deposition, Plaintiff Exhibit 134 at p.2.

[150] *See* Pencak Deposition, Plaintiff Exhibit 138. Millennium's commentary relates to an increase in tests per specimen from 16.4 in August 2011 to 20.1 in January 2012 (emphasis added):

"We have experienced an increase of 3.7 tests since a low of 16.4 in Aug-11.

The growth was due to the following:

· New test introductions accounted for .97 of the 3.7 (26%) test growth.

· Panel tests of opiates/barbs/TCA attributed 1.33 of the 3.7 (36%) test growth.

· Remaining 38% due to increase in existing drug offerings - further focus on importance of comprehensive testing **(i.e. penalizing underperforming practices, reviewing initial custom profiles, requiring comprehensive testing for LSA [Lab Service Assistant] or cup agreement)."** (emphasis added).

**TABLE 5: MILLENNIUM'S CODES EXCEEDING CHANGE IN TEST VOLUME BY OVER 10% (2012 - 2013)**

| HCPCS Code | Change in Volume 2012 v. 2013 |
|---|---|
| G0431 | 17.94% |
| 82649 | 14.21% |
| 82646 | 14.19% |
| 82542 | 614.74% |
| 80152 | 13.59% |
| 83805 | 13.89% |
| 80160 | 13.57% |
| 80174 | 13.57% |
| 83840 | 13.65% |
| 80182 | 13.86% |
| 82205 | 37.20% |
| 80184 | 27.01% |
| 82055 | 38.56% |
| 83516 | 56.55% |

Source: Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

83. Another indication of the increased regulatory and legal scrutiny of the UDT industry and medically unnecessary testing were multiple legal and regulatory actions taken against some of Millennium's key competitors: Ameritox Ltd. and Calloway Laboratories.

84. Ameritox was a privately-held UDT company based in Midland, Texas, before ceasing operations in May 2018.[151] At the time of the closure, Ameritox was in a dispute with a medical insurance company, Humana, over uncovered, unnecessary and duplicative testing.[152] Ameritox was identified by Millennium as one of its four key competitors.[153] In fact, 99.7% of Ameritox's

---

[151]  https://www.bizjournals.com/triad/news/2018/03/08/drug-testing-company-to-close-greensboro-facility.html
https://www.bizjournals.com/baltimore/news/2018/03/07/drug-testing-company-plans-to-close-columbia.html

[152]  *Id.*

[153]  Confidential Information Memorandum [ML_DE_00269115 at 9193].

Expert Report of Yvette R. Austin Smith                                      Adv. Pro. No.17-51840 (LSS) | 48

2013 Medicare revenue derived from billing to reimbursement codes also billed by Millennium.[154]

85. In 2010, Ameritox entered into a settlement with the federal government and several state governments after being charged with various violations of the Anti-Kickback and Stark laws. As I understand, the Stark Law prohibits claims for services where the referring physician has a financial relationship with the service provider (in this case, a laboratory services company).[155] The settlement pertained to Ameritox business conduct over the years 2003 to 2010. The US DOJ charged Ameritox with providing customers benefits in exchange for the use of the companies' services that resulted in excessive, medically unnecessary UDT testing.[156] It was also alleged that Ameritox sent all urine screens automatically to a confirmation test without physician request, resulting in unnecessary testing, over testing, and overbilling.[157] As part of the settlement, Ameritox agreed to pay $16.3 million to the federal government and a number of states.[158] Ameritox also agreed to execute a corporate integrity agreement with the federal government, which required scrutiny of Ameritox's future business practices by HHS OIG.[159]

---

[154] Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. Ameritox had a slightly different distribution of its revenue by code. In particular, Ameritox derived 15.49% of 2013 Medicare revenue from qualitative tests (code G0431), relative to 0.42% for Millennium. Ameritox did not bill at all to certain codes, for example, codes related to tests for certain anti-depressants.

[155] US DOJ Complaint [ML_DE_00595094 at 5107], pp. 14-15:

"The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception."

[156] Second Amended Complaint – Maul et al v. Ameritox, LLC. at ¶ 13.

[157] Second Amended Complaint – Maul et al v. Ameritox, LLC. at ¶ 15. iii.ii. Ameritox was also alleged to have misbranded its patented RX Guardian urine-testing technology by telling doctors it was approved by the FDA when in fact it was not. *Id.*

[158] Medicare programs in various states received $814,000 of the total settlement, while plaintiff Debra Maul received $3.4 million from the total settlement. Norton, Christopher, "Ameritox to Pay $16M to Resolve Medicaid FCA Suit," November 17, 2010. Retrieved from Law360 (www.law360.com/articles/209926/ameritox-to-pay-16m-to-resolve-medicaid-fca-suit).

[159] *See* Christopher Norton, "Ameritox To Pay $16M To Resolve Medicaid FCA Suit", Law 360, November 17, 2010.

---

According to Millennium, following the US DOJ settlement, Ameritox's specimen volumes declined by 50% in the first year and 30% over two years.[160]

86. In 2012, another Millennium competitor, Calloway Laboratories,[161] a privately-held company based in Massachusetts, entered into the first of several government settlements regarding multiple violations of Anti-Kickback and Stark laws.[162] In March 2012, Calloway Labs agreed to pay $20 million to settle charges by the Commonwealth of Massachusetts that the company defrauded Medicaid of millions of dollars through an elaborate kickback scheme to managers of sober houses paid through straw companies. In return, managers required the tenants of the sober houses to undergo excessive urine screening.[163] Millennium estimated that Calloway experienced a 30% decline in annual specimen volume following the March 2012 settlement.[164] Calloway Labs was then acquired by Ampersand Capital Partners in late 2012 and it eventually ceased operations in October 2015.[165]

87. Prior to the 2014 Transaction, Millennium received specific advice regarding its business practices in light of the heightened legal and regulatory scrutiny of the UDT industry. In January 2011, three years prior to the 2014 Transaction, Millennium was notified by its outside compliance auditor (CodeMap) as part of Millennium's 2010 Annual Compliance Audit that its free specimen cup agreement entailed "substantial risk of violating the Stark Law."[166] CodeMap characterized the risk to Millennium in connection with its testing protocols and the provision of free cups a "1" level of risk.[167] This was the highest level of risk on a sliding scale of 1-4. For

---

[160] Email from Martin Price to Kennedy and Hardaway, April 3, 2015 [ML_DE_00597259]; Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[161] Similarly to Millennium, Calloway focused on UDT, although Calloway was smaller than Millennium and had a slightly different business profile. According to CMS data, 94.9% of Calloway's 2013 Medicare revenue came from the same HCPCS codes billed by Millennium. However, 55.0% of Calloway's 2013 Medicare revenue was derived from qualitative testing (G0431), compared to 0.42% for Millennium.

[162] Patricia Wen, "Calloway Labs of Woburn agrees to $20 million settlement of Medicaid fraud case", March 30, 2012.

[163] Id.

[164] Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[165] Boston Business Journal, "Woburn-based Calloway Labs, fined $20M in kickback scandal, to close and layoff 240 employees", October 8, 2015

[166] Draft Annual 2010 Compliance Audit Report by Greg Root/CodeMap, 11/24/2010, p. 31 [ML_DE_00512026].

[167] Id. at 41-42.

---

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 50

these 1-level risks, CodeMap's recommendation was to "strongly encourage Millennium to implement the recommendation, and that failure to do so will result in **an unreasonable risk** (emphasis added) of civil, criminal, or administrative law liability or adversely affect the effectiveness of Millennium's compliance program."[168]



[169] In April 2012, Millennium's general counsel (Martin Price) received a copy of an April 2011 letter (addressed to a third party) in which the attorney from McDonald Hopkins (Jane Wood)

[170]

---

[168]  *Id.* at 41.

[169]  Ronald Wisor states on 4/4/2012 that Greg Root provided the opinion "a few years back" that the cup program was a grey area and that Wisor had offered an opinion at the time that it was a gray area [ML_DE_00569414].

According to Wisor: "Having had a chance to look more closely at the Stark rules and commentary, as well as the Florida rules, I think there is a decent argument to be made the provision of InstaCups by drug testing labs should be considered lawful, although the issue certainly is not free from doubt." *See* Wisor email dated 11/18/2009, Exhibit 3 to Price Deposition, [ML_DE_00498951].



*See also*: Draft Annual Compliance Audit Report by Greg Root/CodeMap, 11/24/2010 [ML_DE_00512026]; Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

[170]  Jane Pine Wood letter April 2012, Exhibit 10 to Martin Price deposition [ML_DE_00512070]; *see also* Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

89.  In April 2011, a few months after CodeMap issued its draft report, Millennium was named in a lawsuit filed by Ameritox alleging that Millennium's specimen cup agreement was a violation of Anti-Kickback and Stark laws.[171] The complaint alleged (among other claims) that Millennium "implemented a scheme of providing improper and unfair financial inducements to health care providers…that violate state and federal laws in an attempt to increase its market share."[172] It further stated that "Millennium's unfair and deceptive scheme of improper inducements and kickbacks involved, in part, an agreement with health care providers and patients not to collect payments, which Millennium is required by law to collect, in exchange for the referral of patients. The purpose of the scheme was to improperly induce, influence, and encourage health care providers to engage in business with Millennium by providing the health care providers and their patients with an improper financial benefit."[173] Millennium's outside counsel ███████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████[174] Millennium's

outside counsel ██████████████████████████████

████████████████[175]

90.  As early as 2010, Millennium was aware that its use of Custom Profiles was contrary to the guidance from HHS OIG and that their use increased the risk of Millennium's being found liable for billing for medically unnecessary tests. █████████████████

█████████████████████████████████████

█████████████████████████████████████

███████████[176] In February 2012, Martin Price sent an email to Millennium representatives

---

[171]  Between 2011 and 2014, Ameritox brought claims against Millennium in at least eight separate forums, that included direct actions against Millennium, its employees and actions brought by third parties. *See* Millennium Voluntary Self-Referral Disclosure at p.2 [ML_DE_00670668 at 0669]

[172]  Ameritox, Ltd v. Millennium Laboratories, Inc, April 8, 2011, 8:11-cv-775-T-24-TBM (the "Ameritox Complaint) at ¶ 13.

[173]  Ameritox Complaint at ¶ 14.

[174]  *See* Email from Ronald Wisor to Martin Price, April 4, 2012 [ML_DE_00569414].

[175]  *See* Email from Ronald Wisor to Martin Price, April 4, 2012 [ML_DE_00569414].

[176]  According to a letter from Millennium's legal counsel on April 30, 2015:

████████████████████████████████████████

████████████████████████████████████████

informing them of Millennium's policies around Custom Profiles and noting the rationale for such policies. In this email,



[black redaction] [177]

91. Since its inception, Millennium had been the target of at least eight qui tam lawsuits.[178] In a qui-tam lawsuit, also known as a "whistleblower" lawsuit, a private citizen brings a lawsuit against a

---



*See* letter from Skadden, Arps, Slate, Meagher & Flom LLP, April 30, 2015 (emphasis added) [ML_DE_00594736 at 4741].

[177] *See* email from Martin Price to Millennium's sales representatives, dated February 10, 2012 (Exhibit 137 of Pencak Deposition) (emphasis added) [ML_DE_00236719 – 6720]:

[178] Fred Schulte and Elizabeth Lucas, "Liquid Gold: Pain Doctors Soak Up Profits By Screening Urine for Drugs", November 6, 2017 (https://khn.org/news/liquid-gold-pain-doctors-soak-up-profits-by-screening-urine-for-drugs/). Qui tam lawsuits are typically filed under seal.

person or company who is believed to have violated the law in the performance of a contract with the government or in violation of a government regulation. Millennium's contracts with Medicare and Medicaid were the subject of the qui tam lawsuits. Federal or state governments occasionally intervene and become a party in a qui tam lawsuit. This is particularly true when the lawsuit is "based on significant violations which involve fraudulent or criminal acts and not technical violations and/or errors."[179] In fact, in December 2014 (eight months after the 2014 Transaction), the federal government did intervene in three qui tam lawsuits that had been filed against Millennium in January 2012, April 2012 and April 2013.[180]

92. Prior to November 2012, there had been at least five grand jury subpoenas seeking records on Millennium.[181] Four witnesses testified that Millennium was encouraging doctors to order unnecessary urine tests and was charging excessive fees to Medicare and private insurers.[182]

93. In addition to the qui tam law suits, by December 2012, Millennium was aware that the US DOJ was conducting a joint civil and criminal investigation of the Company. The conduct under investigation included (but was not limited to) health care fraud offenses and violation of the Anti-Kickback Act and False Claims Act in connection with billings of fraudulent claims to Federal healthcare programs and/or other payors, payment of remuneration to physicians and/or others to induce referrals of laboratory work to Millennium, and interference with witnesses and/or destruction of evidence.[183]

---

[179]   https://dictionary.law.com/default.aspx?selected=1709
[180]   US DOJ Complaint, March 19, 2015 [ML_DE_00629274].
[181]   Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation", November 16, 2012.
[182]   Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation", November 16, 2012.
[183]   Deposition of Daniel Pencak, July 1, 2021 ("Pencak Deposition) Exhibit 140; Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040 at 5043].

### C. POST-TRANSACTION EVENTS RELATED TO KNOWN OR KNOWABLE RISKS IN APRIL 2014

#### 1. Verdict in Ameritox 2011 Lawsuit

94. Ameritox filed a complaint against Millennium on April 8, 2011 in Florida.[184] The complaint alleged that Millennium's specimen cup agreement was a violation of Anti-Kickback and Stark laws. Following trial, on June 16, 2014, a jury rendered its verdict that Millennium's provision of free POC cups to doctors who signed an agreement to not bill for the POC cups constituted "remuneration under the Stark Law" and "remuneration under the Anti-Kickback Statute."[185] Following the verdict, J.P. Morgan informed Millennium executives that they believed that the verdict would reduce Millennium's valuation by $500 million.[186] Consistent with an anticipated decrease in company value, Millennium ███████████████████████████████ ████████████████████████████████████████████████.[187] Shortly before the 2014 Transaction, Millennium's General Counsel informed J.P. Morgan's outside counsel that an adverse verdict in the then impending Ameritox trial would "fuel" the DOJ Investigation.[188]

---

[184] Ameritox, Ltd v. Millennium Laboratories, Inc, April 8, 2011, 8:11-cv-775-T-24-TBM.

[185] Jury Verdict, Ameritox, Ltd v. Millennium Laboratories, Inc, June 16, 2014, 8:11-cv-775-T-24-TBM [ML_DE_00080267]. Millennium later disclosed that it strongly disagreed with the verdict and that it requested the court to set it aside and / or order a new trial, ultimately appealing the decision. Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668 at 72].

[186] Email from Martin Price, June 16, 2014 (Exhibit 106 to Price Deposition) [ML_DE_00669350]:



[187] Email from Martin Price to Tim Kennedy, April 2, 2015 [ML_DE_00597259 at 7260]:

[188] Exhibit 131 to the Lee Deposition [JPMC-MIL-CORP_00050228 at 0231].

### 2.   $90 Million Quantifiable Exposure Related to Free Specimen Cups

95.   As discussed above, prior to the 2014 Transaction Millennium was aware of the risks posed by its free specimen cup agreements. More specifically, notwithstanding that Millennium was in a position to quantify the financial impact of this risk *prior to the 2014 Transaction*, in fact, Millennium did so only *after* the Ameritox verdict.

96.   On August 15, 2014, two months after the Ameritox verdict and pursuant to CMS's Voluntary Self-Referral Disclosure Protocol, Millennium's outside counsel submitted a letter to CMS ("Voluntary Self-Referral Disclosure") in order to "resolve [Millennium's] potential violation" of the "Stark" physician self-referral law.[189] By this time, Millennium had cancelled its free specimen cup program.

97.   In this disclosure, Millennium argued that its free specimen cup agreement did not create a "compensation arrangement" of the type that is prohibited by the Stark law, but nevertheless acknowledged (in Exhibit K to the submission) that, during the four years prior to the cancellation of the cup agreement in June 2014, it had received approximately $90 million from Medicare alone relating to physicians with cup agreements.[190] Deposition testimony by Martin Price, confirmed that the books and records necessary for Millennium to quantify this liability were available prior to the 2014 Transaction.[191]

---

[189]   Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668].

[190]   Exhibit K to Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00514819] shows "payments received from Medicare for testing services ordered by physicians during the period which they or their practice had a cup agreement in place with Millennium over the four-year period prior to Millennium's termination of all such agreements in June 2014…" *See* Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668 at 81].

[191]   Martin Price Deposition Transcript, dated April 12, 2021, at 323:23-324:16:

"Q. Now, this liability was eminently calculable not just as of August 2014 but also as of April 2014; correct? Just as a matter of the books and records of the company.

MR. POPOVSKY: Objection to form.

MR. WERNER: Objection to form.

A. Was it -- is the question could we have calculated our Medicare billings from those customers who had cup agreements in April of 2014 –

Q. Yes.

A. -- if we had -- if we had set out -- if someone had asked us to do that? I don't doubt the company could have generated that number. I don't know if that's your question…"

### 3.    Escalating US DOJ Investigations

98.   As discussed above, by December 2012 (more than a year before the 2014 Transaction) Millennium was aware that the US DOJ was conducting a joint civil and criminal investigation of the Company. By August 2013, Millennium and its counsel were aware that former Millennium employee, Ryan Uehling, was at least one of the qui tam "relators."[192] In addition, Millennium made at least three presentations to representatives of the Boston U.S. Attorney's Office in March – April 2014, while the 2014 Transaction was in progress, concerning its business practices under investigation.[193] Only eight months after the 2014 Transaction, these known risks began to materialize.

99.   On December 19, 2014, the US DOJ intervened in consolidated complaints filed by Mark McGuire, Ryan Uehling, and Omni Healthcare Inc. under the qui tam provisions of the False Claims Act.[194] According to the US DOJ and qui tam complaints, Millennium "knowingly submitted many thousands of false and fraudulent claims to Medicare and Florida Medicaid for excessive and unnecessary testing, and for testing referred in violation of the Stark Law and the Anti-Kickback Statute, and was improperly paid many millions of dollars in reimbursement for these claims."[195]

100.  The United States alleged that Millennium systematically billed federal health care programs for excessive and unnecessary drug testing from January 1, 2008 through May 20, 2015.[196] The allegations stated that "Millennium caused physicians to order [urine drug tests] that were not reasonable and necessary,"[197] in part through Custom Profiles, leading to the over-billing of federal health care programs. The United States also alleged that Millennium "knowingly

---

[192]   *See* email from M. Price [ML_DE_00672098].

[193]   *See* Price Deposition at 132:8–136:6.

[194]   US DOJ Complaint [ML_DE_00595094 at ¶¶12-15].

[195]   US DOJ Complaint [ML_DE_00595094 at ¶ 8]. *See also United States of America ex rel Omni Healthcare Inc, and John Doe, v. Millennium Laboratories Inc.* at ¶¶ 2-3, *United States of America ex rel. Mark McGuire v. Millennium Laboratories, Inc.* at ¶ 2, and *United States of America ex rel. Ryan Uehling v. Millennium Laboratories, Inc.* at ¶ 2.

[196]   US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[197]   US DOJ Complaint [ML_DE_00595094 at §VA]

submitted claims to Medicare for UDT that was referred in violation of the Stark and Anti-Kickback Statue"[198] by providing physicians with free drug test cups on the condition that the physicians return the specimens to Millennium for "over $90 million"[199] dollars' worth of additional testing. Additional claims included the "dissemination of false and misleading statements about drug abuse rates and the value of its testing"[200] despite Millennium having been warned by "consultants, customers, competitors, insurers and regulators" that "its marketing schemes were illegal."[201]

101. On October 2015, Millennium entered multiple settlement agreements (together, the "US DOJ Settlement"). Millennium agreed to pay $256 million in the form of two False Claims Act settlements between Millennium and the US DOJ and an administrative settlement agreement between Millennium and the Department of Health and Human Services.[202] First, Millennium agreed to pay $227 million to resolve False Claims Act allegations that it systematically billed federal health care programs for excessive and unnecessary drug testing from January 1, 2008 through May 20, 2015.[203] Millennium also agreed to pay $10 million to resolve allegations that it submitted false claims to federal health care programs for medically unnecessary genetic testing that was performed on a routine and preemptive basis from January 1, 2012 through May 20, 2015.[204] Finally, Millennium agreed to pay a $19 million settlement to CMS to resolve administrative actions regarding Millennium's claims to Medicare for certain drug test billing codes. These claims were the subject of claim denials and an overpayment action initiated by CMS and its contractors.[205] The settlement payments established in October 2015 were in addition to earlier Medicare claim denials. For example, over the period July 2013 to July 2014,

---

[198]   US DOJ Complaint [ML_DE_00595094 at ¶ 178].

[199]   US DOJ Complaint [ML_DE_00595094 at ¶ 6].

[200]   US DOJ Complaint [ML_DE_00595094 at ¶ 3].

[201]   US DOJ Complaint at ¶ 7 [ML_DE_00595094].

[202]   US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[203]   *Id.*

[204]   *Id.*

[205]   *Id.*

approximately $27 million of Millennium's Medicare claims were rejected because they exceeded MUE limits.[206] The $27 million in claim denials is discussed in greater detail, below.

### D.   MILLENNIUM FILES FOR BANKRUPTCY

102.   As of the date of the US DOJ Settlement, Millennium lacked the cash on hand to satisfy the obligation to pay $256 million plus accrued interest.[207] After signing the term sheet with the US DOJ and several plaintiff states in May 2015, Millennium launched negotiations with prepetition lenders, including an ad hoc group that warned it might pursue claims and causes of actions related to the 2014 Transaction.[208] In July 2015, the Company informed the US DOJ that it would not be able to pay the settlement amount and its debt burden, and would need to restructure its balance sheet in order to do so; in response, the US DOJ set a mid-September deadline for the Company to present a payment plan.[209]

103.   In addition to the US DOJ Settlement, Millennium was burdened by the $1.75 billion of debt it had incurred from the 2014 Transaction. As of the Chapter 11 petition date, Millennium had $1.75 billion outstanding from the Term Loan and a $46.6 million outstanding "early commitment facility," the latter of which Millennium had entered into just prior to bankruptcy.[210] The Company attempted to restructure out-of-court, but could not garner the necessary support of 97% of its senior creditors.[211] Nevertheless, more than 93% by amount and value of its senior claims voted in favor of the proposed restructuring plan, and on November 10,

---

[206]   Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1.

[207]   KPMG-ML-EA15WB-0001034.

[208]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶¶ 28-29; *see also* Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[209]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶ 30.

[210]   Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[211]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶ 39.

2015, the Company filed voluntary prepackaged chapter 11 petitions in the U.S. Bankruptcy Court for the District of Delaware in order to implement the plan.[212]

104. The restructuring plan resulted in a reduction in the Company's debt by more than $1.15 billion, as the $1.75 billion senior facility was converted to $600 million of new term loans and the new term loan lenders received 100% of the equity in reorganized Millennium.  Total recovery under the $1.75 billion facility was estimated at 34%.[213] The restructuring plan also stipulated that Millennium and TA pay $325 million to the estate to pay the US DOJ Settlement and provide working capital, with $256 million plus $5.8 million of accrued interest to the US DOJ and the remainder to Millennium.[214]  In connection with these payments, Millennium executives and investors received certain releases.[215]

105. Lastly, the plan created two litigation trusts (one of which is the plaintiff in this Litigation) to prosecute and monetize legal claims and causes of action held by the debtor and prepetition lenders. The executed Confirmation Order Plan was filed on December 14, 2015, and Millennium emerged from its Chapter 11 reorganization on December 18, 2015.[216]

### E.   MODIFIED PADRES PROJECTIONS

106. The Padres Projections were significantly flawed in that the projections failed to reasonably reflect significant business, reimbursement, legal, and regulatory risks and exposures.  It was known or knowable as of the 2014 Transaction that, as a result of these risks, the Company was very likely to encounter slowing or negative growth and declining profitability.  Below I describe each of the adjustments I made to the Padres Projections to more accurately and reasonably

---

[212] Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[213] Debtwire, "Millennium Health opt-out lenders, US Trustee attack plan's forced third-party releases," December 8, 2015, https://www.debtwire.com/intelligence/view/prime-2142085.

[214] KPMG audit work paper "4.5.5.11 Filing of Chapter 11 Bankruptcy" [KPMG-ML-EA15WB-0001034].

[215] KPMG-ML-EA15WB-0001034; *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Exhibit 1 (Amended Plan) to Notice of (I) Entry Of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., and (II) Occurrence of Effective Date, December 14, 2015, at p. 35; *see also* pp. 58-62.

[216] Debtwire, "Millennium Health completes financial restructuring, emerges from prepackaged Chapter 11" December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950.

reflect risk factors and historical trends that were known or knowable as of the 2014 Transaction. I refer to the revised projections as the "Modified Padres Projections."

### 1.    UDT Revenue Projections

*a.    Adjustment to Projected Specimen Volume Growth Rates for Medicare and Commercial Payors*

107.    I made specific adjustments to the Padres Projections to more accurately incorporate the known risks described above. Specifically, I adjusted the Padres Projections to reflect risks associated with: (i) Medically Unlikely Edits ("MUE"); (ii) Local Coverage Determination ("LCD"); (iii) discontinuance of Custom Profiles; (iv) the escalation of the DOJ investigation; and (v) discontinuance of the free specimen cup agreement. However, adjusting the Padres Projections for only these specific risks still does not result in a reasonable forecast for Millennium as of the 2014 Transaction. The MUE and LCD adjustments are one-time adjustments to Medicare NRPS. The discontinuance of Custom Profiles is a similar one-time adjustment to commercial payor NRPS. The adjustment for the escalation of the DOJ investigation decreases projected specimen volume over a two-year period. Finally, the discontinuance of the free specimen cup agreement represented a one-time decrease in UDT specimen volume.

108.    None of these adjustments adequately address the exaggerated specimen volume growth rates in the Padres Projections.[217] Even in the hypothetical absence of the known specific risks facing Millennium as of the 2014 Transaction, the specimen volume growth rates in the Padres Projections were significantly inconsistent with Millennium's historical trends, Millennium's reasonably anticipated future trends and with broader UDT industry trends.  Immediately below, I describe the adjustments I made to the specimen volume growth rates in the Padres Projections. In the next sections, I describe (in greater detail) the additional adjustments for each of the specific risk factors.

---

[217]    As an illustrative example: Assuming specimen volume was originally projected to be 100 in Year 1 and 125 in Year 2, representing a 25% growth rate from Year 1 to Year 2, a one-time adjustment to specimen volume might illustratively reduce the specimen volume in Year 1 to 75 (from 100). Applying the same growth rate (*i.e.*, 25%) would result in Year 2 specimen volume of 93.75. However, if the 25% growth rate was unreasonable, making the one-time adjustment to specimen volume would be insufficient to result in reasonable projections.

109. As discussed in Section A, the Padres Projections included specimen growth rate assumptions that were unreasonable because they were inconsistent with contemporaneous trends. Further, longer term projections were inconsistent with projected laboratory testing industry growth. In particular, the projected specimen CAGR of 9.8% from 2014 to 2018 for Medicare was unreasonably high given declining growth rates and *negative* growth of 3.4% in the first quarter of 2014 actuals when compared to the fourth quarter of 2013 actuals.[218] By comparison, Medicare specimen volume increased modestly (+0.4%) between the first quarter of 2013 actuals when compared to the fourth quarter of 2012 actuals.  As shown in Table 9, specimen volumes had been declining since 2009. Further, the Padres Projections assumed the *same* growth rates for Medicare and commercial payors, an unreasonable assumption given different trends in growth rates at the time of the 2014 Transaction. A further reason to discredit this assumption is the known fact that overall reimbursement trends for commercial payors followed reimbursement trends for Medicare.  Thus, there was a known risk that commercial growth rates would eventually follow the steeper declines represented by Medicare growth rates.  Prior to making the specimen volume growth adjustments described below, I adjust these underlying specimen volume growth assumptions for Medicare to 0% in 2014, 2% in 2015 and 3% for 2016 onwards. A longer term growth rate of around 3% per annum is consistent with the projected growth rate for the broader industry, as represented by the larger publicly listed laboratory companies.[219] For commercial specimen volume growth, I assume significant underlying ongoing growth of 10% in 2014 (consistent with high but declining contemporaneous growth rates), reducing to 5% in 2015 and the long term industry growth rate of 3% in 2016 onwards. I

---

[218]  2013 actuals were derived from ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab), and 2014 actuals were derived from the 'Payor Stats – UDT' tab of the Revised Management Model [ML_DE_00559340].

[219]  Analyst reports projected an overall volume growth rate of 2.5% for LabCorp (Piper Jaffray report on LabCorp, March 10, 2014, at p. 1) and 4.60% for Quest for 2014E (Morgan Stanley report on Quest Diagnostics Inc., January 31, 2014, at p. 2).

Our long-term growth rate of 3% is consistent with broader laboratory industry median volume growth forecasts of 4.1% in 2014 and 2.6% in 2015 including growth from acquisitions (Maxim Group report on LabCorp, February 5, 2014; Piper Jaffray report on LabCorp, March 10, 2014; Morgan Stanley report on Quest, January 31, 2014; Deutsche Bank report, April 14, 2014; and Piper Jaffray report on Quest, January 30, 2014).

Moreover, 3% is conservative relative to the projected median laboratory industry organic volume growth rate of 1% in 2014 and 0.6% in 2015 (Maxim Group report on LabCorp, February 5, 2014; Piper Jaffray report on LabCorp, March 10, 2014; and Piper Jaffray report on Quest, January 30, 2014).

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 62

conservatively retain the Padres Projections' specimen volume growth assumptions for payor categories other than Medicare and commercial.

### b.    Medically Unlikely Edits (MUEs)

110. The first adjustment I made to the Padres Projections was to restate Millennium's first quarter of 2014 financial results to account for the impact of MUEs, which are discussed further below, because the Padres Projections used *projected* financial results for the first quarter of 2014 as the starting point notwithstanding that the 2014 Transaction closed in April 2014. This adjustment involved two steps. As a first step, I modified the Padres Projections to reflect Millennium's actual (and lower) first quarter of 2014 results as a starting point. As a second step, as discussed below, I adjusted Millennium's *actual* first quarter of 2014 financial results to reflect the impact of MUE claim denials.

111. MUEs are used by MACs to reduce improper payments for Medicare Part B claims.[220] Billings in excess of the units of service limits established by MUEs receive significant scrutiny from the MACs and may not be reimbursed by Medicare. This type of MUE claim denial is the focus of this portion of the analysis. In addition to denials of present claims, MUEs may also result in demands for recoupment of overpayments already made in excess of MUE limits.  As discussed further below, such recoupment represented an additional exposure for Millennium. MUEs may either be claim line edits or date of service ("DOS") edits.[221] If the MUE is a claim line edit, each line of a claim is adjudicated against the MUE limit for the HCPCS/CPT code on that claim line; if the units of service ("UOS") on the claim line exceeds the MUE limit, all UOS for that claim line are denied. If the MUE is a date of service MUE, all UOS for the HCPCS/CPT code reported by the same provider/supplier for the same beneficiary for the same date of service are aggregated. The aggregated value is compared to the MUE limit, and if the sum is greater than the MUE limit, *all* UOS for the code on the current claim are denied. Therefore, a date of service MUE creates the potential for a large disallowed claim amount as compared to a claim line MUE. Table 6 displays an illustrative example.

---

[220]    CMS website (https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE)

[221]    Letter from DLA Piper to Brock Hardaway, July 24, 2014 [ML_DE_00225152 at 5153]. *See also* CMS website, NCCI FAQs (https://www.cms.gov/medicare/national-correct-coding-initiative-edits/ncci-faqs).

**TABLE 6: ILLUSTRATIVE CLAIM EXAMPLE (SINGLE BENEFICIARY)**

| Date | Code | Units of Service | Adjudication if 83925 is: | |
|---|---|---|---|---|
| | | | If Claim Line Edit MUE (where MUE Limit = 6) | If Date of Service MUE (where MUE Limit = 6) |
| 1/1/2013 | 83925 | 8 | Denied (8 > 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |
| 1/1/2013 | 82542 | 12 | Approved | Approved |
| 1/1/2013 | 83925 | 2 | Approved (2 < 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |
| 1/1/2013 | 81242 | 16 | Approved | Approved |
| 1/1/2013 | 83925 | 1 | Approved (1 < 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |

112.   As shown in Table 6, the movement to DOS MUE for code 83925 leads to denial of all claims (for the same patient and the same provider) for that date of service. Under the claim line MUE, claim lines for 1-2 tests are allowed, as the claims are below the maximum limit of 6 claims for that code. Under the DOS MUE, all the claims for that beneficiary on the same date of service are aggregated and denied, as total aggregated claims for that date exceeds the MUE limit of 6.

113.   According to communication between Millennium and its counsel at the time, ██████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████[222] As discussed above, for the year ended December 31, 2013, Millennium generated approximately 33% of its Medicare revenue, or approximately $70 million, from these two MUE codes alone. As Millennium was frequently billing in excess of DOS MUE limits, this change in the CMS MUE policy had an immediate and significant impact on Millennium's revenue.[223]   However, the reimbursement risk relating to DOS MUEs was known prior to January 1, 2014.

---

[222]   Letter from DLA Piper to Brock Hardaway, July 24, 2014 [ML_DE_00225152 at 5153, 5154]. ████

[223]   Prior to the 2014 Transaction, Millennium incurred significant denials under these codes. *See* "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 and ML_DE_00054258].

114. First, CMS announced on its website that effective April 1st, 2013, (*i.e.*, more than one year prior to the close of the 2014 Transaction), CMS would convert some claim line MUEs to DOS MUEs for certain CPT codes. CMS did not specify which codes would become DOS MUEs because of concerns about fraud and abuse.[224] This policy announcement also stated that if claim denials based on DOS edits were appealed, "MACs may pay UOS [units of service] in excess of the MUE value if there is adequate documentation of medical necessity of correctly reported units."[225] Second, according to Millennium's MAC, Noridian Healthcare Solutions ("Noridian"), CMS provided instructions in or around mid-2013 that "a quantity over [the MUE] limit must be denied in total (not just up to the limit [as Millennium] requested over and over again) and the need, once claims have been reviewed that _all_ aspects of medical necessity be present on reviewed claims (emphasis in original)."[226] Third, by as early as February 2014 Millennium was aware that its Medicare claims containing CPT codes 82542 and 83925, where units counts (per beneficiary, per day) exceeded the 6 and 4 limits, respectively were being denied at the rate of approximately $4 million per month, and Millennium continued to receive MUE denials under these two codes up until the time of the 2014 Transaction.[227]

115. Over the period July 2013 through July 2014,[228] approximately $27 million of Millennium's Medicare claims in connection with CPT codes 82542 and 83925 were rejected because they exceeded MUE limits for these codes.[229] This suggests that Millennium was billing above the

---

[224] Department of Health and Human Services Centers for Medicare & Medicaid Services Revised Modification to the Medically Unlikely Edit (MUE) Program [ML_DE_00206157].

[225] Department of Health and Human Services Centers for Medicare & Medicaid Services Revised Modification to the Medically Unlikely Edit (MUE) Program [ML_DE_00206157 at 6158].

[226] 2014-09-18 MUE Denial History Memo (18) [ML_DE_00206242]:

"Tim Kennedy, CFO, again brought up the issue of payment limits by MUEs and the difference in administration to these limits under Palmetto a year ago from Noridian once it assumed the contract. I then again went carefully through exactly what MUEs are, how they were developed, the role of specialty societies, the instructions from CMS about a year ago that a quantity over this limit must be denied in total (not just up to the limit as they requested over and over again) and the need, once claims have been reviewed that all aspects of medical necessity be present on reviewed claims."

[227] "Re: Medicare" e-mail dated February 14, 2014 [ML_DE_00060270], "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 at 8392 and ML_DE_00054258], "Medicare MUE – update on denials" email dated March 18, 2014 [ML_DE_00054044].

[228] KPMG-ML-EA14WB-0000347.xlsx ("1 – Summary Tab," cell B81, first paragraph).

[229] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584 at 585] at p. 1. *See also* Administrative Settlement Agreement [ML_DE_00101487].

existing MUE limits even prior to the conversion to DOS MUEs on January 1, 2014. However, of the $27 million in claim denials, at least $21.9 million (81%) pertained to billings between January and July 2014.[230] Thus, the conversion to DOS MUE significantly increased Millennium's claim denials under these two codes. In or about July 2015, Millennium revised its reported 2014 financial results to reflect a revenue write-off of approximately $27 million.[231]

116. Notwithstanding that MUE denials were known or knowable to Millennium as of the 2014 Transaction, the Company's recorded financial results (at that time) did not reflect the impact of – and subsequent revenue write-off from – such denials. Therefore, as a starting point for the Modified Padres Projections, I adjusted the Company's then-recorded first quarter of 2014 revenue to reflect the known reimbursement risk associated with MUEs.

117. Using the total MUE-impacted revenue in 2014 as of July 2014 ($21.9 million),[232] the number of months impacted (7 months),[233] and monthly Medicare UDT volumes from January to March 2014, I estimated the monthly NRPS decrease due to MUE claim denials for the 3-month period

---

[230] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1. Millennium wrote off $24.7 million in 2014 and $2.2 million in 2013 due to MUE. When making the adjustment to the Padres Projections for MUE, I conservatively assume that the 2014 write-off did not account for the $2.8 million in underpayments in Claims Universe A.

[231] *Id.*

See Administrative Settlement Agreement, October 16, 2015, pp. 1 and 2 [ML_DE_00101487 at 1488]:

"Millennium submitted to Medicare 322,588 claim lines for Current Procedural Terminology ("CPT") codes 83925 and 82542 with claims dates between December 1, 2013 and July 31, 2014 for which the number of units of CPT codes 83925 and 82542 exceeded the Medically Unlikely Edit (MUE) thresholds for those CPT codes (referred to herein as "Claim Universe A").

Medicare partially denied payment for services in Claims Universe A. An Appeal Process Agreement was signed and dated on December 12, 2014, between CMS's Part A/B Medicare Administrative Contractor (MAC), Noridian Healthcare Solutions, LLC ("Noridian") and Millennium, under which the parties agreed that Statistical Sampling and Extrapolation (SSOE) would be used to calculate the amount of Medicare overpayment and/or underpayment. Based on the SSOE, Noridian calculated a Medicare underpayment in the amount of $2,824,558.12 for services in Claims Universe A."

[232] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1. As noted, I conservatively deducted the Claims Universe A underpayments.

[233] Number of months corresponding to Jan - July 2014 period. From August 2014, Millennium only billed up to the MUE limit. *See* KPMG-ML-EA14WB-0000347.xlsx.

---

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 66

prior to the 2014 Transaction.[234] This initial analysis produced a monthly NRPS decrease between \$83.5 and \$89.9 for the first quarter of 2014 (January – March).[235]

118. I further adjusted this NRPS decrease to exclude potential overlapping NRPS impacts from other adjustments in our model, specifically the impact on NRPS of the proposed Medicare LCD policy (further explained in the following paragraphs). According to Millennium's analyses assessing the potential impacts of LCD, one of the CPT codes subject to the revised MUE limit, (82542 – quantitative tests for cannabinoids), would also be potentially impacted by LCD changes.[236] As a result, I quantified the monthly NRPS contributions from this test and adjusted our initial NRPS adjustment to exclude these contributions. Ultimately, I calculated a monthly Medicare NRPS decrease between \$77.7 and \$83.7 from January to March 2014 to reflect only allowed billing under MUE limits. As a result, the starting point for Medicare NRPS in the Modified Padres Projections is lower, reflecting the MUE adjusted NRPS in the first quarter of 2014.

119. In August 2014, a little more than three months after the close of the 2014 Transaction, Millennium, consistent with advice it had previously received from its MAC, began billing Medicare within the MUE limits for these two codes.[237]

<p style="text-align:center"><em>c.   Local Coverage Determination</em></p>

120. An LCD is a determination by a fiscal intermediary (under Medicare Part B, a MAC) as to whether or not a particular item or service is eligible for reimbursement under Medicare.[238]

---

[234]   This implies a monthly impact of approximately \$3.1 million (\$21.9 million / 7). This is conservative relative to the internal estimate of \$4 million per month made by Richard Guzman (Millennium Senior Director Revenue Cycle Management) on February 20, 2014. *See* "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 at 8392].

[235]   *See* YAS Workpaper 1.

[236]   Excel attachment to the email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[237]   KPMG-ML-EA14WB-0000347.xlsx ("1 – Summary Tab", cell B81, first paragraph).

[238]   *See* https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs, "What is an LCD?":

   Local coverage determinations (LCDS) are defined in Section 1869(f)(2)(B) of the Social Security Act (the Act). This section states: "For purposes of this section, the term 'local coverage determination' means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A)."

Towards the end of January 2014, Millennium began reviewing its MAC's (Noridian) draft revised LCD policy.[239] Noridian's draft LCD policy was intended to address "distinctions between qualitative, confirmation and quantitative drug of abuse testing" and to "clearly indicate" that Medicare reimbursement was dependent on documentation of medical necessity.[240] Consistent with this purpose, Noridian's policy emphasized two key priorities, including the appropriate use of (i) quantitative testing to confirm qualitative (usually, point of care) testing, and (ii) specimen validity testing.

121. In February 2014 (two months prior to the 2014 Transaction), Millennium was advised by Avalere, a healthcare reimbursement consulting firm, that Noridian was likely to finalize its draft LCD largely in its current draft form, noting its similarity to another LCD policy that had just been finalized in January 2014 by another MAC.[241] Millennium began modeling scenarios for assessing the potential financial impact of Noridian's LCD policy on its Medicare NRPS. According to a February 3, 2014 analysis, Millennium estimated a 33.3% decline in Medicare NRPS due to the LCD.[242] Another analysis from February 5, 2014, shows two scenarios with declines in Medicare NRPS of 18.3% and 5.6% due to the LCD.[243] However, the scenario indicating a 5.6% decline assumed routine confirmation testing for illicit drugs,[244] which did not appear to be consistent with LCD guidance that required positive qualitative tests before confirmation testing for drugs of abuse.[245,246] I note that while the 18.3% decline assumes a

---

See https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs

[239] Email from Simmons to Hardaway, "Re: Noridian LCD", January 1, 2014 [ML_DE_00035507]. Noridian LCD draft was an attachment to the email. See [ML_DE_00035508]

[240] Noridian Healthcare Solutions, LLC, Draft Drugs of Abuse Testing Policy, p. 3. [2014-01-20 ML_DE_00035508_Noridian LCD Draft]

[241] Avalere Coding and Reimbursement Assessment for Drugs of Abuse Testing, February 21, 2014, at pp. 4 & 44.

[242] Excel attachment to the email from Adams to Pencak,"Subject: Order by drugs v3.xlsx", February 3, 2014 [ML_DE_00060308].

[243] Excel attachment to the email from Pencak to Hardaway, "Subject: LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[244] Email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320].

[245] Noridian Healthcare Solutions, LLC, Drugs of Abuse Testing at p. 25 [ML_DE_00035508 at 5532].

[246] The 18.3% scenario assumed that the reduction in quantitative testing is partially offset by a substantial increase in high-complexity qualitative tests (code CPT Code G0431). Specifically, the 18.3% scenario assumed that 57.5% of specimens would be subject to a high-complexity qualitative test (compared to 1.8% of specimens in December 2013). See Excel attachment to the email from Pencak to Hardaway, "Subject: LCD Impact", February 5, 2014 [ML_DE_00054320, 3421]. Code G0431 is defined as "Drug screen, qualitative: multiple

decrease in confirmatory quantitative testing and an elimination of specimen validity testing (reducing NRPS), the financial impact of these changes are significantly offset by an assumed significant increase in high complexity qualitative testing (G0431 – Drug Screen (per patient encounter)).[247] The assumed increase in billings under G0431 is modeled to increase Medicare NRPS by $40.74 (an offsetting increase of approximately 9%).[248]

122.  A third Millennium analysis dated February 28, 2014 modeled a "30% reduction in Medicare reimbursement effective June 1, 2014."[249] In deposition testimony, Mr. Pencak agreed that the 30% reduction in Medicare NRPS effective June 2014 was "fairly close" to the impact he had modeled earlier in 2014 for the potential LCD impact,[250] and that a 30% reimbursement reduction for Medicare was within Millennium's contemplation as of March 2014.[251] A subsequent analysis that Millennium conducted after the 2014 Transaction was confirmatory of the LCD policy impact that Millennium envisioned prior to the 2014 Transaction—*i.e.*, a greater than 30% reduction in Medicare NRPS. Specifically, the June 2015 Revised Management Model projected Medicare NRPS declining from $383 in September 2015 to $248 in October 2015, or a reduction of 35%.[252] The modeled decline to $248 represented an ever greater decline when compared to Millennium's Medicare NRPS for the first quarter of 2014 (immediately prior to the 2014 Transaction). The Revised Management Model projected a *45% decline* in Medicare NRPS, as compared to the first quarter of 2014.[253]

---

drug classes by high complexity test method (e.g., immunoassay, enzyme assay)." For example, *see* https://www.cgsmedicare.com/partb/pubs/news/2012/0412/cope18723.html.

[247]  Notes to the model suggest that this increase is explained in whole or in part by changing the billing for Synthetic Cannabinoids Quantification (or "Spice") from 82542 to G0431. As Pencak contemporaneously notes, the new billing code is modeled to increase the reimbursement amount from $24 to $97.

[248]  If the modeled increase in billings under G0431 is eliminated, LCD is modeled to reduce Millennium's Medicare NRPS by 26.6% (versus 18.3%).

[249]  Excel attachment to the email from Kennedy to Pencak, "Re:Leveraged Recap Summary" February 28, 2014 [ML_DE_00058384, 8385].

[250]  Pencak Deposition at 251:13 – 23, Exhibit 165-A.

[251]  Pencak Deposition at 255:12 – 24.

[252]  ML_DE_00559340, decrease of NRPS derived from cells M8 to N8 from the "UDT Rev" tab.

[253]  ML_DE_00732288 tab "Quarterly 2012-2015Q1" cell BK132 states NRPS of $451 in the first quarter of 2014 (calculation: 248/451-1 = -45%).

123. Based on the above, I conservatively modified the Padres Projections to reflect a Medicare NRPS reduction of 18.3%, effective as of October 2015, due to elimination of coverage for certain negative confirmation testing and specimen validity testing (as dictated by the LCD).[254] This is consistent with the lower end of Millennium's own pre-transaction analysis and far less than the impact (*i.e.*, 35% to 45%) that was modeled *after* the 2014 Transaction.

<p style="text-align:center"><em>d.      Expected Impact Due to the Discontinuance of Custom Profiles</em></p>

124. Discontinuance of Millennium's Custom Profiles was expected to significantly reduce the number of tests per specimen, resulting in a reduction in NRPS. As discussed above, "standing orders" such as the Custom Profiles were known to increase the risk of medically unnecessary tests. Although the Padres Projections do reflect a decline in Millennium's commercial payor NRPS, there is no indication that this projected decline is intended to represent the impact of the likely discontinuance of Custom Profiles. Notwithstanding the known risks associated with the Custom Profiles, there is no indication that Millennium sought to model the impact of the elimination of Custom Profiles until the Revised Management Model prepared in June 2015.

125. The Revised Management Model incorporated only a 7% decline in commercial payor NRPS due to the discontinuance of Custom Profiles. The decline was modeled to occur in July 2015.[255] However, based on data available as of the 2014 Transaction, the impact of the anticipated discontinuance of Custom Profiles – and the resulting decline in medically unnecessary tests – should have reasonable been estimated to cause a much larger decline in commercial payor NRPS.

126. To estimate the anticipated impact on commercial NRPS due to the elimination of Custom Profiles, I used Millennium's Medicare billings as a proxy.[256] Specifically, I compared Millennium's Medicare reimbursements by code to that of its closest competitors, using 2013

---

[254]   Excel attachment to the email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[255]   ML_DE_00559340, tab 'UDT Rev.'

[256]   Comparable data was not available for Millennium's billings to commercial payors. However, given the similar reimbursement trends between Medicare and commercial payors, I believe this analysis provides a reasonable estimate for this purpose.

billing data. To identify Medicare reimbursements and Millennium's competitors, I used the 2013 CMS Physician and Other Supplier Public Use File ("Physician and Other Supplier PUF"), which contains information on all submitted Part B Medicare claims in 2013 including reimbursement, quantity of tests or services performed, HCPCS code, and the identification of the provider that submitted the claim via a National Provider Identifier ("NPI").[257] I confirmed the companies closest to Millennium by selecting the providers that billed the quantity of tests, codes, and reimbursement and volumes per code most similar to Millennium's in 2013; these competitors were Ameritox and Aegis.[258] Similar to Millennium, these two companies focus almost exclusively on UDT and were cited by Millennium as competitors.[259]

127. Next, I identified the HCPCS codes for which Millennium received reimbursement from Medicare but for which neither Ameritox nor Aegis received Medicare reimbursement. Of the 30 codes for which Millennium received Medicare reimbursement in 2013, there were 9 codes for which neither Ameritox nor Aegis received Medicare reimbursement. I then calculated the percentage of Millennium's 2013 Medicare NRPS derived from these 9 codes. In 2013, Millennium derived 21.8% of its Medicare NRPS from these codes.[260]

128. My analysis assumes that UDT companies predominantly bill to a common universe of billing codes. I also took into account the fact that by 2013, Ameritox had entered into a settlement with the federal government and several state governments related to excessive and medically unnecessary testing. Thus, it is possible that the universe of reimbursement codes used by Ameritox had contracted by 2013. Based on a public records search, I was unable to find any

[257] Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[258] *See* Appendix C: Custom Profile Revenue Impact Analysis. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[259] Confidential Information Memorandum [ML_DE_00269115 at 9193].

[260] *See* Appendix C: Custom Profile Revenue Impact Analysis. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

similar settlements involving Aegis with respect to excess or medically unnecessary testing.[261] Thus, it is probable that the universe of reimbursement codes used by Aegis was more consistent with medically necessary testing. Therefore, billing codes that were billed *only* by Millennium were more likely to represent medically unnecessary tests. For example, in 2013, Millennium received $4.8 million in reimbursement from Medicare for HCPCS/CPT code 80174. In 2013, neither Ameritox nor Aegis received reimbursement from Medicare for this code. This code is described as a test for tricyclic antidepressant (imipramine) and was highlighted in the US DOJ Complaint as a code associated with medically unnecessary testing.[262] Based on the foregoing analysis, I applied a 21.8% reduction in Millennium's commercial payor NRPS due to the elimination of Custom Profiles and the resulting reduction in medically unnecessary tests. In keeping with the Revised Management Model, I have assumed that this reduction occurs in July 2015.

129. However, it is important to note that this estimate may underestimate the quantity of medically unnecessary testing driven by Custom Profiles. The estimate of 21.8% does not take into account instances in which Millennium may have billed medically *unnecessary* tests to a code to which a competitor billed only medically *necessary* tests.

130. As confirmation of the likely impact of the discontinuance of Custom Profiles, I considered a second data point. Under the Modified Padres Projections, the combined impact of the revised MUE and new LCD policies is a 36.3% decline in Medicare NRPS.[263] As the revised MUE and new LCD policies focused significantly on the elimination of medically unnecessary tests, and given the history of commercial payors following the trend of Medicare reimbursement, I

---

[261] I searched Bloomberg Law and Lexis using the keywords Aegis (within 3 words of) insurance and Medicare. There were no cases related to Medicare billing practices or any other business practice that was filed under codes "375" False Claims Act or "376" Qui Tam statutes.

[262] US DOJ Complaint [ML_DE_00595094 at ¶134].

Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[263] ~36.3% decline in Medicare NRPS = 18.0% MUE related decline (adjusted for LCD) + 18.3% decline due to LCD. 18.0% MUE related decline is calculated as the average Medicare NRPS decline in the first quarter of 2014 due to adjustment for claim values over MUE threshold ($81.2) / average Medicare NRPS in the first quarter of 2014 ($451.3). 18.3% decline due to LCD changes based on the scenario ran by Millennium in February 2014 to assess impact of LCD.

considered the Medicare NRPS reduction to be a relevant proxy for Millennium's commercial NRPS reduction following the discontinuance of Custom Profiles. To avoid potential double counting due to the reduction in medically unnecessary tests, I do not explicitly model the impact of the elimination of Custom Profiles on Medicare claims.

> e.    *Expected Impact on Specimen Volume due to US DOJ Investigation and Settlement*

131.    At the time of the 2014 Transaction, Millennium knew that Ameritox had suffered significant customer attrition and specimen volume declines following its settlement with the DOJ.[264] Millennium unreasonably failed to account for this risk in the Padres Projections. An April 2015 email from Mr. Price (Millennium's general counsel) to Mr. Kennedy (Millennium's Chief Financial Officer)



[266] He further added that

---

[264]    *Ameritox, Ltd. v. Millennium Laboratories* [ML DE 00165024 at 165035], at A636, filed May 24, 2014 (emphasis added):

> "Finally, Ameritox responds that it is only fair to allow the introduction of evidence of this investigation if the Court allows Millennium to introduce evidence of the DOJ investigation of Ameritox and Ameritox's settlement of those allegations. The Court rejects this argument, **because the Court is only allowing evidence regarding the DOJ investigation and settlement to the extent that such evidence was made public, and that evidence is being used to prove Millennium's theory that customers left Ameritox because of such negative publicity**."

> *Ameritox, Ltd. v. Millennium Laboratories* [ML DE 00164789 at 165005], at A613, filed May 5, 2014 (emphasis added):

> *"*Millennium also challenges the Composite Benchmark Model, arguing that Dr. Cantor makes erroneous assumptions regarding Millennium's growth and Ameritox's losses during this period, such as: (1) Dr. Cantor erroneously assumes that all of Millennium's growth in market share in each quarter after the first quarter of 2010 was solely due to the challenged conduct… **(6) she failed to consider alternative causal factors that occurred after the first quarter of 2010, such as…(d) Ameritox's $16.3 million payment to settle a healthcare fraud claim that received widespread press.**"

> In a report dated December 13, 2013, Millennium's own expert states that:

> "**Ameritox's sales volumes exhibited a significant flattening and subsequent decline during the period following the False Claims Act Settlement**, signing of the Corporate Integrity Agreement and the RxGuardian judgment. Dr. Cantor's analysis makes no mention of these issues and does not identify the potential impact of each of these issues on her damages calculations."

> *See* Rebuttal Expert Report of David S. Williams [ML DE 00495232 at 5248] at 16 (emphasis added).

[265]    Ameritox agreed to a US DOJ settlement in November 2010. *See* Tampa Bay Business Journal, "Ameritox agrees to $16.3M settlement", November 16, 2010. (https://www.bizjournals.com/tampabay/news/2010/11/16/ameritox-agrees-to-163m-settlement.html)

[266]    Email from Kennedy to Hardaway, "Re: Privileged", April 3, 2015 [ML_DE_00597259 at 7260].

---



[267] A June 2015 email from CEO Brock Hardaway noted that "█████████████████████████████████████████████████████████████████████████████████████████████████████████████"[268]

132. Based on the above, I have incorporated a 30% reduction (15% reduction each in 2015 and 2016) to the Padres Projections' total volumes assumptions across Millennium's UDT and PGT businesses to account for the reputational impact of an expected US DOJ Settlement.

    *f. Expected Impact Due to the Discontinuance of the Free Specimen Cup Agreement*

133. According to Millennium, "at its peak" approximately 10% of its customer accounts, representing 16%-17% of total specimen volume, had entered into the free specimen cup agreement.[269] As of the 2014 Transaction, the free specimen cup agreement was at significant risk of discontinuance. Millennium had received advice that the agreement violated anti-kickback statutes and Millennium was subject to an adverse ruling in the pending Ameritox litigation. I incorporated a 1.6% reduction in UDT volume in July 2014 using the analysis performed by Millennium on customers that cancelled their agreements in June 2014, the date of the Ameritox verdict (and only two month after the 2014 Transaction).[270] The 1.6% reduction in specimen volume is conservative, as it ignores customers that may have cancelled prior to (or after) June 2014, which is likely given that the Ameritox complaint against Millennium was filed in April 2011. I also note from the US DOJ Complaint that a number of customers discontinued their business with Millennium prior to 2014.[271] Furthermore, the 1.6% decline ignores any impact on future growth. As alleged in the Ameritox complaint, the specimen cup agreement facilitated higher growth rates for Millennium. It follows that future growth rates may have been lower following the discontinuance of the free specimen cup agreement.

---

[267] Email from Kennedy to Hardaway, "Re: Privileged", April 3, 2015 [ML_DE_00597259 at 7260]

[268] Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[269] Millennium Self-Disclosure Statement at p.3 [ML_DE_00670668 at 0670].

[270] Millennium Cancelled Cup Agreements [2014-10-13 ML_DE_00567499].

[271] Exhibit 74 to the DOJ Complaint [ML_DE_00629123].

## 2.    PGT Revenue and RxAnte Projections

134. At the time of the 2014 Transaction, the DOJ investigation was expected to impact specimen volume for the PGT businesses. I modeled this impact similar to the impact modeled for Millennium's UDT business. Starting with the Padres Projections, I apply a 30% reduction in PGT specimen volume growth (15% reductions in January 2015 and 2016) to account for the DOJ investigation. This reduces the PGT specimen volume growth rate from 140% and 37.9% under the Padres Projections for 2015 and 2016 respectively, to 87.0% and 14.4% respectively under the Modified Padres Projections. After the impact of this adjustment, PGT revenue comprises 3.6% and 13.6% of total revenue in 2014 and 2020 respectively (compared to 3.3% and 10.6% respectively under the Padres Projections), a slight increase in the 2020 revenue percentage given the more optimistic UDT assumptions in the Padres Projections. I conservatively assume no other changes to PGT revenue projections in the Padres Projections.

135. I conservatively assume no changes from the underlying Padres Projections for RxAnte revenue (including no impact from the DOJ investigation). After the impact of the DOJ investigation on PGT and UDT revenue, RxAnte revenue comprises 1.9% and 15.2% of total revenue in 2014 and 2020 respectively.

### F.    EXPENSE PROJECTIONS

136. To complete the free cash flow analysis under the Modified Padres Projections, I use the same unit costs assumptions as the Padres Projections. Unit costs are calculated by dividing each expense by specimen volume. For example, to calculate the cost of goods sold ("COGS") unit costs, I divided COGS by specimen volume. I calculated unit costs for COGS, operating expenses (including salaries and benefits, insurance, information technology, research and development) and travel and entertainment. To estimate expenses under the Modified Padres Projections, I multiplied the unit costs by the adjusted UDT and PGT volumes discussed above. Similarly, I assume that all fixed costs in the Padres Projections do not change.

G.    SUMMARY OF MODIFIED PADRES PROJECTIONS

137. Figure 9 through Figure 11 show the collective impact of the revenue adjustments and the expense assumptions described above (*i.e.*, the Modified Padres Projections).

**FIGURE 9: MODIFIED PADRES PROJECTIONS - REVENUE**

Notes:  Modified Padres projection utilizes 2014 Q1 actuals in addition to projections for the rest of the year

138. As shown in Figure 9, the full impact of the modifications occurs by 2016. Thereafter, NRPS grows in line with the Padres Projections, however, revenue growth remains lower than the Padres Projections due to lower Medicare and commercial specimen volume growth. Under the Modified Padres Projections, 2015 revenue is 27% lower than the Padres Projections and 2016 revenue is 43% lower than the Padres Projections. By the end of the projection period, 2020 revenue is 49% lower than the Padres Projections.

Expert Report of Yvette R. Austin Smith                                                        Adv. Pro. No.17-51840 (LSS) | 76



**FIGURE 10: MODIFIED PADRES PROJECTIONS - EBITDA**

Notes:  Modified Padres projection utilizes 2014 Q1 actuals in addition to projections for the rest of the year

139.  Under the Modified Padres Projections shown in Figure 10, EBITDA immediately declines and by 2015 reaches $263 million, or 40% below the Padres Projections, and by 2016 dips to $176 million, or 62% below the Padres Projections. By 2020, projected EBITDA is 67% lower than the Padres Projections. The percentage decline in EBITDA by the end of the projection period is larger than the percentage decline in revenue, as certain fixed costs that must still be incurred by Millennium remain in place. As noted, I retain the same unit cost assumptions as the Padres Projections, and I make no adjustments to designated fixed costs.

140.  Figure 11 below shows free cash flow projections. The free cash flow projections reflect the EBITDA projections above, as well as the Padres Projections for income tax rates, capital expenditure, working capital, and reductions in variable costs. For comparability purposes, in

Figure 11, I have used the same definition of free cash flow as the Padres Projections, which includes a deduction for debt amortization.[272]

**FIGURE 11: MODIFIED PADRES PROJECTIONS - FREE CASH FLOW**

Notes: Modified Padres projects free cash flow only reflects 3 quarters worth of data in 2014.

141. As shown in Figure 11, free cash flow under the Modified Padres Projections starts declining in 2016, following a small increase in 2015. In contrast, the Padres Projections projected a CAGR of approximately 16.8% per annum. In 2015 and 2016, respectively, free cash flow under the Modified Padres Projections equals $38.1 million and negative $15.5 million, as compared to $90.7 million and $95.0 million for the same periods under the Padres Projections.

---

[272]  Free Cash Flow is defined under the Padres Projections as net income, plus (i) depreciation and amortization, and (ii) stock-based compensation, less (i) distributions for shareholder taxes, (ii) increase in working capital, (iii) capital expenditure, and (iv) debt amortization.

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 78

### H.  BALANCE SHEET TEST

#### 1.  Discounted Cash Flow Analysis

142. For the balance sheet test, I conduct a discounted cash flow ("DCF") analysis to value Millennium as of April 2014. Given the availability of the necessary data through the first quarter of 2014, I conduct the discounted cash flow analysis as of March 31, 2014. I am not aware of any significant change in the operations or financial condition of Millennium between March 31, 2014 and April 16, 2014 (the date the 2014 Transaction closed). As such, it is reasonable to assume that the valuation as of March 31, 2014 is a reliable indication of value as of April 16, 2014. The DCF analysis is based on the Modified Padres Projections to ensure that the resulting valuation reasonably reflects actual performance and trends, and the reasonably likely risks and difficulties that were known or knowable as of the valuation date —*i.e.*, risks related to: (i) medically unlikely edits (MUEs), (ii) local coverage determinations (LCDs), (iii) the elimination of Custom Profiles, (iv) the investigation by the DOJ, and (v) the elimination of the free specimen cup agreement. Consistent with the Padres Projections, the Modified Padres Projections reflect a seven-year discrete projection period from second quarter of 2014 to fourth quarter of 2020 and a terminal year.

143. Consistent with standard corporate finance methodology, I use the Modified Padres Projections to calculate Millennium's annual unlevered free cash flow as net operating profit after taxes, less investment in working capital and less capital expenditure, and after adding back non-cash charges (*i.e.*, depreciation and amortization). I then discount both the seven-year projected cash flows and the terminal value using a weighted average cost of capital ("WACC") (or discount rate) of 14.8%. The discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014.[273] I also note that FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%.[274] The calculation of Millennium's unlevered free cash flow is shown in 0.

---

[273]  Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at pp. 16 and 19, April 30, 2014 [ML_DE_00263273 at 3288 and 3291].

[274]  FTI Consulting, Millennium Health, LLC Enterprise Valuation As of December 18, 2015 at p.7, April 10, 2016 [KPMG-ML-EA15WB-0000743 at 772].

144.  To calculate the terminal value, I relied upon the Gordon Growth (or Perpetuity Growth) model. I have projected a long-term growth rate for Millennium free cash flows of 3%, in line with projected longer-term growth of other laboratory companies. As of the end of 2013, U.S. real GDP was expected to grow between 2.7% to 3.4% annually for the period 2014 - 2018.[275] The assumed long-term growth is also broadly in line with the 30-year Treasury bond yield of 3.56% as of the Date of Valuation, a common benchmark for terminal growth rates.[276] The terminal value represents the value of all of Millennium's future unlevered free cash flows beyond the discrete seven-year projection period.

145.  The discounted cash flow analysis demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction. The enterprise value (in this instance, equivalent to asset value) of Millennium was $802.9 million compared with $1,761.7 million of outstanding debt. Thus, the face value of Millennium's debt was greater than the value of Millennium's assets. In other words Millennium had a *negative* equity value of $958.9 million, giving effect to the 2014 Transaction (and before consideration of the liabilities relating to the then pending litigation and government investigations, discussed below).  As unreasonably small capital is a financial condition short of balance sheet insolvency, the DCF analysis also clearly demonstrates that the 2014 Transaction left Millennium with unreasonably small capital. In Appendix D, I sensitize the valuation to changes in key risk factors. Over a broad range of assumptions with respect to risks to Millennium, that were known or knowable as of the 2014 Transaction, Millennium is consistently shown to be balance sheet insolvent. Millennium's equity value as of the 2014 Transaction never exceeds *negative* $313 million, even under a significantly more optimistic (and unrealistic) view of the relevant risks.

146.  In addition to the known business risks and historical trends that necessitate the cash flow adjustments discussed in Section VI.B, Millennium also faced liabilities relating to the then pending litigation and government investigations. These risks included but were not limited to:

---

[275]  Congressional Budget Office (CBO), The Budget and Economic Outlook 2014 to 2024, February 2014.

[276]  30-year treasury rate as of 3/31/2014. Daily yield curve data derived from US Department of the Treasury, available at https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView.aspx?data=yieldYear&year=2014

- Medicare recoupment related to free specimen cup agreements: In August 2014, Millennium estimated that it had received in excess of $90 million in Medicare reimbursement, during the four years prior to June 2014, in connection with customers using Millennium's free cup agreement.[277] The verdict in the Ameritox litigation confirmed that Millennium's free cup agreement violated both the Stark Law and the Anti-Kickback statute. In October 2015, Millennium agreed to resolve claims by the federal government and state Medicaid programs for $256 million.[278]  This included Millennium's liability in connection with the Medicare reimbursement connected to the free specimen cups and other medically unnecessary testing.[279]

- Commercial payor litigation:  Millennium faced significant risk of "copy-cat" commercial payor litigations based on the Ameritox lawsuit and the DOJ investigation. In an April 2015 email, for example, Martin Price (Millennium's General Counsel)



[280]

- Legal fees:

[281]

- Claim B Universe:  Millennium had potential exposure relating to the repayment of Medicare overpayments it received from reimbursements for units of service billed above the MUE thresholds from January 2012 through December 2013.  This exposure was later quantified at $42 million, as "Claims Universe B", in Millennium's DOJ settlement.[282]

---

[277]   Exhibit K to Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00514819].

[278]   US DOJ Complaint ¶¶ 6, 150, 265 [ML_DE_00629274 at 9341]

[279]   US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[280]   Email from Price to Kennedy, Re: Privileged, April 3, 2015 [ML_DE_00604336].

[281]   *Id.*

[282]   *See* Administrative Settlement Agreement, October 16, 2015, p. 2 [ML_DE_00101487 at 1488]. Millennium was overpaid $42 million on claim lines at issue in Claims Universe B.

147. None of these amounts are included in the Padres Projections or the Modified Padres Projections. All of these risks — even if resolved for less than the total potential exposure as of the 2014 Transaction —further decreased Millennium's equity value and thus, exacerbated Millennium's balance sheet insolvency as of the 2014 Transaction.[283] For the purpose of the solvency analysis, I have been instructed by counsel to assume that aggregate dollar value of Millennium's exposure, reasonably anticipated as of the 2014 Transaction, was at least $45 million. As this represents only one-half of the billings to Medicare for companies with free specimen cup agreements – and does not include *any* of the other contingent liabilities – this is a conservative estimate of the contingent liabilities facing Millennium at the time of the 2014 Transaction. Based on this assumption, the value of Millennium's equity giving effect to the 2014 Transaction further decreases to *negative* $1,003.9 million.[284]

148. Millennium was balance sheet insolvent over a wide rage of WACCs. As shown in Table 7 below, sensitivity analysis for WACCs ranging from 9.8% to 14.8% shows Millennium had an equity value of *negative* $482.3 million to *negative* $958.9 million, even before accounting for its legal/regulatory exposure.[285]

---

[283] I noted that the consideration and quantification of contingent liabilities for a solvency analysis may differ from the recognition of those liabilities for accounting purposes. Further, I am instructed by counsel that under applicable case law (i) some or all of the above-referenced liabilities might be regarded as "disputed" rather than "contingent" for solvency purposes, (ii) a "disputed" liability is one where, although the amount might be subject to dispute, the facts giving rise to the liability have already occurred as of the time of the subject transfers, and (iii) for solvency purposes, it may be appropriate to value a disputed liability in the amount of its ultimate resolution.  Accordingly, this renders the estimate of Millennium's legal/regulatory liabilities discussed herein even more conservative.

[284] Negative $958.9 million less $45 million = negative $1,003.9 million.

[285] The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies *plus* the size premium adopted by Vantage Point (*i.e.*, 10.0%). However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk.  Thus, 9.8% underestimates an appropriate WACC for Millennium.

**TABLE 7: EXPECTED CASE SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE**

| | $ Millions | | | | |
| Discount Rate | Enterprise Value | Net Debt Value | Equity Value Before Contingent Liabilities and Fees | Contingent Liabilities | Equity Value After Contingent Liabilities and Fees |
|---|---|---|---|---|---|
| 9.8% | 1,279.4 | 1,761.7 | (482.3) | (45.0) | (527.3) |
| 10.8% | 1,135.6 | 1,761.7 | (626.2) | (45.0) | (671.2) |
| 11.8% | 1,024.3 | 1,761.7 | (737.5) | (45.0) | (782.5) |
| 12.8% | 935.5 | 1,761.7 | (826.2) | (45.0) | (871.2) |
| 13.8% | 863.1 | 1,761.7 | (898.6) | (45.0) | (943.6) |
| **14.8%** | 802.9 | 1,761.7 | **(958.9)** | (45.0) | **(1,003.9)** |

Notes and Sources:

Values derived from Table 11: Discounted Cash Flow Analysis (second quarter of 2014 through 2020) assuming different discount rates.

## 2.  Guideline Public Companies

149.  I used my standard methodology to attempt to identify comparable companies for use in the Guideline Public Company ("GPC") valuation of Millennium. First, I relied on industry knowledge gained from a combination of my professional experience, industry research and proprietary and non-proprietary industry information obtained by Brattle. Second, I relied on industry information obtained from documents produced in discovery and depositions. Third, I relied on electronically assisted searches using industry classification codes and other descriptive company data. From a combination of these efforts, I developed a list of possible guideline public companies.

150.  As part of this methodology I performed an independent analysis based on Standard Industrial Classification ("SIC") codes from the United States Department of Labor SIC Manual, including 8071 Medical Laboratories, 2835 In Vitro and In Vivo Diagnostic Substances, and 8734 Testing Laboratories. A description of these codes is contained in Appendix B. I limited my search to companies geographically located in the United States and Canada with publicly available financials and an enterprise value of at least $100 million. This method returned 30 unique potential GPC's. I also considered the comparable companies identified by Millennium and its financial advisors, which included Vantage Point, Lazard, and FTI Consulting. This method returned 17 unique potential guideline companies.

151. Combined, these two methods returned a list of 39 unique potential GPC's.[286] I reviewed each of these possible GPC's for comparability, focusing on diagnostic testing, whether the company conducted urinalyses and drugs-of-abuse testing, and the size of the company (as measured by enterprise value and revenue). After careful consideration, I arrived at five potential GPC's with at least a portion of their business that was somewhat similar to Millennium. These include Alere Inc. ("Alere"), Bio-Reference Laboratories Inc. ("Bio-Reference"), LabCorp, Myriad Genetics Inc. ("Myriad"), and Quest.[287]

152. However, for several reasons, these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value. Drugs of abuse UDT represents a relatively small portion of revenue for each of these five companies. Millennium identifies just two of these companies as competitors – LabCorp and Quest.  However, both LabCorp and Quest were significantly larger and more diversified than Millennium. LabCorp reported that just 3% of its 2013 revenue related to drugs of abuse testing and it was 11 times larger than Millennium.[288] Quest was similarly focussed on other types of laboratory testing[289] and was also approximately 11 times larger than Millennium.[290]

153. A third company, Alere, identified that 20% of its revenue came from toxicology, however this segment also included testing equipment and services. Alere had a significant focus on analytical software, and also performed diagnostic tests for infectious diseases, cardiology, diabetes, oncology, and women's health.[291]

---

[286]  Millennium's financial advisors returned 17 unique companies, while Brattle's independent analysis returned 30 unique companies. Eight companies appeared in both methodologies, resulting in 39 unique potential companies overall.

[287]  *See* Appendix B. Description of Potential Comparable Companies for a detailed description of these companies.

[288]  LabCorp's 2013 revenue was 9.2 times higher than Millennium. Source: S&P CapIQ.

[289]  The company's "Diagnostic Information Services" business group also include gene-based and esoteric testing and anatomic pathology services in addition to routine testing. Quest was further diversified with its "Diagnostic Solutions" business group, which provides risk assessment services for the life insurance industry and information technology solutions. Quest Diagnostics Incorporated Form 10-K filed for the fiscal year ended December 31, 2013 filed February 18, 2014 at p. 5.

[290]  Quests's 2013 revenue was 11.3 times higher than Millennium. Source: S&P CapIQ.

[291]  *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Alere.

154. Bio-Reference was similar in size to Millennium in terms of revenue and focused on processing laboratory test requisitions. However, Bio-Reference largely focused on diagnosing diseases related to esoteric testing, molecular diagnostics, cancer pathology, genetics, women's health, anatomical pathology, etc. Although the Company's "Routine Testing" segment (40% of net revenues as of Jan. 2014) offered urinalyses and substance abuse tests, this business segment also tested for pregnancy, cholesterol level, and blood cell counts. The Company also had a Medical Information business segment (data analysis) that was unrelated to Millennium's product offerings.[292]

155. Finally, I included Myriad as it operated a genetic testing business. However, unlike Millennium's PGT business, Myriad's focus was on testing for risk of disease, rather than how an individual would respond to medication. Moreover, as noted, PGT represented a very small portion of Millennium's business.[293]

156. Notwithstanding very limited, and ultimately insufficient, comparability between Millennium and the GPCs, I computed valuation multiples based on multiples of enterprise value to EBITDA. For both sets of multiples, I computed the multiples as of the Date of Valuation on a Last Twelve Months ("LTM"), forecasted 2014, and forecasted 2015 basis. The latter two estimates are based on analyst consensus estimates made at the time of the Transaction. The valuation multiples are shown in Table 8.

---

[292]  *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Bio-Reference.

[293]  *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Myriad.

**TABLE 8: GUIDELINE PUBLIC COMPANY MULTIPLES**

| | LTM Q1 2014 Multiple | | | | | |
|---|---|---|---|---|---|---|
| | EV / EBITDA | EV / 2014 EBITDA Forecast | EV / 2015 EBITDA Forecast | EV / Revenue | EV / 2014 Revenue Forecast | EV/ 2015 Revenue Forecast |
| Alere | 12.6x | 10.2x | 9.7x | 2.8x | 2.3x | 2.1x |
| Bio-Reference Laboratories | 8.7x | 7.4x | 6.8x | 1.1x | 1.0x | 0.9x |
| Laboratory Corp. of America Holdings | 9.6x | 9.4x | 9.1x | 1.9x | 1.9x | 1.8x |
| Myriad Genetics | 6.7x | 7.1x | 8.6x | 2.6x | 2.7x | 2.7x |
| Quest Diagnostics | 8.3x | 8.0x | 7.8x | 1.6x | 1.6x | 1.6x |
| Minimum | 6.7x | 7.1x | 6.8x | 1.1x | 1.0x | 0.9x |
| Median | 8.7x | 8.0x | 8.6x | 1.9x | 1.9x | 1.8x |
| Mean | 9.2x | 8.4x | 8.4x | 2.0x | 1.9x | 1.8x |
| Maximum | 12.6x | 10.2x | 9.7x | 2.8x | 2.7x | 2.7x |

157. The resulting estimates of Millennium's enterprise value are shown in Table 9 below. However, given the lack of comparability between the GPC's and Millennium, I do not consider these multiples as a reliable measure of value. In its solvency analysis, Vantage Point identified eight comparable companies, which included the five GPCs I identified.[294] Vantage Point similarly noted that none of the companies they identified "were identical or directly comparable" to Millennium.[295]

158. In addition (and as noted above), just prior to the 2014 Transaction, Millennium's management was exploring whether there was an opportunity to sell to a private equity sponsor at a valuation of 6-7x EBITDA.[296] Notwithstanding that Millennium failed to sell the Company at these valuation levels, this would place Millennium at or below the minimum valuation multiples derived from the GPC analysis. This is indicative of the lack of comparability between the GPC companies and Millennium. As a result, I have given zero weight to the GPC analysis in my assessment of the solvency of Millennium.

159. Although I do not explicitly rely on the GPC for my solvency analysis of Millennium, I note that the most likely conclusion of value that results from the GPC methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital.

---

[294] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis [ML_DE_00263273 at 3292].

[295] *Id.*, p. 20.

[296] Email from Sarin to Blake, Re:Millennium update, October 12, 2013, Exhibit 223 [CITI-DE-00071523 at 1524]

160. A primary assumption when applying market multiples is that the subject company financial metric, to which the multiple is applied, represents a steady state metric.[297] Given the substantial expected deviation in profitability of Millennium from historical results (due to known or knowable risk factors), references to valuations based on LTM or 2014 revenue or EBITDA should not be considered indicative of Millennium's valuation.  As the Revised Padres Projections demonstrate, the impact of the known or knowable risks were not anticipated to impact Millennium's cash flows until 2015 (and not on a full-year basis, until 2016).  Thus, indications of value derived from Millennium's 2015 financial results are a relatively more accurate estimate of Millennium's value (as compared to LTM or 2014 financial metrics). Table 9 shows that when applying the 2015 forecasted revenue and EBITDA multiples, Millennium's implied equity values are *negative* $1,238 million or only a modest value of $23 million, respectively.  As a company with debt of at least $1.775 billion and equity value of only $23 million, Millennium would have unreasonably small capital.

**TABLE 9: GUIDELINE PUBLIC COMPANY VALUATION ($ MILLIONS)**

| As of April 16th, 2014 | Brattle Model Value | Multiple | | Implied Enterprise Value | | Implied Equity Value | |
|---|---|---|---|---|---|---|---|
| | [A] | [B] | | [C] | | [D] | |
| | | Low | Median | Low | Median | Low | Median |
| Revenue | | | | | | | |
| LTM | 644.2 | 1.1x | 1.9x | 705 | 1,221 | (1,056) | (540) |
| 2014 | 676.9 | 1.0x | 1.9x | 680 | 1,259 | (1,081) | (503) |
| 2015 | 573.1 | 0.9x | 1.8x | 524 | 1,042 | (1,238) | (720) |
| EBITDA | | | | | | | |
| LTM | 371.9 | 6.7x | 8.7x | 2,494 | 3,218 | 733 | 1,456 |
| 2014 | 368.1 | 7.1x | 8.0x | 2,609 | 2,961 | 847 | 1,200 |
| 2015 | 262.6 | 6.8x | 8.6x | 1,785 | 2,253 | 23 | 491 |
| Net Debt | 1,761.7 | | | | | | |

Source and Notes:

[A]: LTM EBITDA figure contains Raven related revenues and costs to calculate EBITDA.

[B]: Retrieved from S&P CapIQ.

[C]: [A] × [B].

---

297    Steady state may refer to the nominal amount or to a nominal amount that is expected to grow at a steady growth rate.

[D]: [C] - [Net Debt]. Used Brattle Model Net Debt value of $1,761.7 million.

### 3.   Precedent Transaction Analysis

161. I also attempted to estimate the enterprise value of Millennium based on the Precedent Transaction methodology. To develop the list of precedent transactions, I screened in Capital IQ for transactions using a keyword search and SIC code analysis. I used the keywords "urine drug," "urine testing," "drug testing," and "toxicology" and additionally searched for transactions that were classified under the same three SIC codes that were used in the Guideline Public Company analysis: 8734 (Testing Laboratories), 8071 (Medical Laboratories), and 2835 (In Vitro and In Vivo Diagnostic Substances). I limited the search results to transactions closed after 1/1/2010 and prior to the Date of Valuation. I further limited the results to transactions in which a majority stake was acquired in the target company, and a transaction value greater than $25 million.

162. Based on this search criteria, I was unable to identify any precedent transactions for which the target companies were sufficiently comparable to Millennium to produce a reliable estimate of value.

### 4.   Balance Sheet Test Conclusion

163. Based on the foregoing analysis I concluded that Millennium was rendered balance sheet insolvent and left with unreasonably small capital as a result of the 2014 Transaction.

### I.   ABILITY TO PAY DEBTS TEST

164. As a second test of solvency, I analyzed Millennium's ability to pay its debt obligations as they became due. Giving effect to the 2014 Transaction, Millennium had total indebtedness of $1.812 billion.[298] Of this amount, $1.775 billion represented the outstanding principal balance of the Term Loan. The Revolver was undrawn as of the Date of Valuation. To assess Millennium's

---

[298]   Term Loan of $1.775 billion plus other debt of $36.7 million. *See* Table 3 and the Confidential Information Memorandum, p. 22.

ability to pay its debts I determined whether Millennium was anticipated to be able to pay the scheduled interest and principal payments on the Term Loan.

165.   To project Millennium's unlevered cash flow through December 31, 2020, I relied upon the Modified Padres Projections. All cash flows are projected on a monthly basis. I identified required debt service payments from the Padres Projections. The Term Loan required interest payments of approximately $90 million in 2015, increasing over time in line with projected LIBOR rates, until the final payment at maturity in April 2021.[299] In addition, the Term Loan required an amortization payment of $17.75 million per annum (representing 1% of the beginning Term Loan balance).[300]

166.   Beginning in 2016, Millennium starts generating negative free cash flow (*i.e.*, cash flow that is available to make interest payments is negative).[301] By 2018, Millennium has insufficient cash reserves to meet interest payments. In the event that Millennium retains access to the Revolver, the additional $50 million of liquidity allows Millennium to meet interest payments for an additional 12 months. However, by 2019, cash requirements exceed the amount of liquidity available under the Revolver. In total, by maturity in April 2021, Millennium requires $124 million of additional liquidity to meet interest payments.[302]

167.   Notwithstanding that the Revolver did not provide sufficient liquidity to meet the projected cash shortfall, any dependence on the Revolver to meet its debt service requirements (even temporarily) is problematic. The credit agreement governing the Revolver required that Millennium be solvent as of the date of any draw down on the Revolver.[303] The definition of solvent in the credit agreement is inclusive of balance sheet solvency as measured in this

---

[299]   The Term Loan paid interest at LIBOR plus a margin of 425 basis points. *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014, and the revolving credit facility was $50 million, for a total of $1.825 billion.

[300]   *See* Padres Projections (ML_DE_00057999), April 12, 2014, tab "Leverage Model," cells Q-V 151.

[301]   Free Cash Flow under the Padres Projections is defined as net income, plus (i) depreciation and amortization, and (ii) stock-based compensation, less (i) distributions for shareholder taxes, (ii) increase in working capital, (iii) capital expenditure, and (iv) debt amortization.

[302]   The shortfall would be larger, as I have not considered interest payments under the Revolver.

[303]   *See* Sections 4.22 and 5.2 of the 2014 Credit Agreement [ML_DE_00602906].

report.[304] In light of Millennium's balance sheet insolvency as of the Date of the Valuation, Millennium would not have retained access to the Revolver. In addition to a solvency requirement, the credit agreement also contained a maintenance covenant requiring that the "Consolidated Leverage Ratio" remain below certain levels.[305] Millennium's continuing failure to comply with these covenants would constitute a technical default for the Revolver under the credit agreement.

168. A review of Millennium's projected cash flow under the expected case indicates that Millennium was anticipated to be in violation of the Consolidated Leverage Ratio covenant starting in the third quarter of 2015 (*see* Figure 12). As a result, Millennium would have been unlikely to have had access to the Revolver. Alternatively, in the event that Millennium had drawn on the revolver prior to the covenant breach, Millennium would have been unable to repay and cancel the Revolver to avoid such covenant breach. Under any scenario, the Revolver would not have been available to meet Millennium's liquidity requirements once it exhausted its cash reserves in 2018.

---

[304] Solvent is defined as:

"Solvent": when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, ( c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured."

*See* 2014 Credit Agreement [ML_DE_00602906 at 941].

[305] *See* Section 7.1 of the 2014 Credit Agreement [ML_DE_00602906].

Expert Report of Yvette R. Austin Smith                                   Adv. Pro. No.17-51840 (LSS) | 90

**FIGURE 12: LEVERAGE RATIO COVENANT**



Source and Notes:

Padres Projections leverage ratio derived from April 12, 2014 Padres Projections (ML_DE_00057999), 'Leverage Model' Tab. Expected case and reasonable downside case are as defined in prior sections.

169. I further considered Millennium's prospects for refinancing the Term Loan at maturity in April 2021. Even under the expected case projections, the leverage ratio was 8.7 times at December 31, 2020. Under the reasonable downside projections, the leverage ratio was 19.8 times at December 31, 2020. As of December 2013, the median leverage ratio for 'Caa-C' credits was 8.3 times.[306] Moody's defines 'Caa' credits, the highest quality credits in the 'Caa-C' range as "speculative of poor standing and are subject to very high credit risk."[307] Thus, even under the expected case projections, Millennium was above the levels typically associated with Caa-C credits. There was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021.

---

[306] Moody's Financial Metrics Key Ratios By Rating And Industry For North American Non-Financial Corporations: December 2013, tab "App-8". Available at www.moodys.com.

[307] Credit rating definitions are available at www.moodys.com. 'C' credits are "typically in default, with little prospect for recovery of principal or interest."

### J.   ADEQUATE CAPITAL TEST

170.   By definition, a balance sheet insolvent company is a company with unreasonably small capital. Millennium was rendered balance sheet insolvent by the 2014 Transaction. Nonetheless, I undertook a second analysis to assess the reasonableness of Millennium's capital, giving effect to the 2014 Transaction. Under this second analysis, I determined Millennium's financial condition under a reasonable downside scenario because the Padres Projections were not reasonable or prudent when made. If a company is left with unreasonably small capital under a reasonable downside scenario, it follows that the company's unreasonably small capital is reasonably foreseeable.

171.   In my reasonable downside scenario, I made two adjustments to the Modified Padres Projections. Both adjustments are consistent with contemporaneous estimates made by Millennium. Specifically, I adjusted the Modified Padres Projections by:

   i.   Increasing the reduction in Medicare NRPS due to LCD from 18.3% to 33.3%, consistent with higher contemporaneous estimates prepared by Millennium.[308] The difference in the estimates are driven by two key assumptions. First, there is an assumed increase in the specimens that are subject to point of care ("POC") testing. Increased POC testing reduces the volume of quantitative testing (reducing NRPS). Second, there is no assumed increase in billings under G0431. Thus, the offset (*i.e.*, increase in NRPS) described above does not occur.

   ii.   Increasing the decline in UDT and PGT specimen volumes due to an expected settlement of the DOJ investigation from 30% to 50%. This is consistent with Millennium's higher estimate of Ameritox's specimen volume decline following its government settlement.[309]

172.   As shown in Table 10 below, under a reasonable downside scenario, Millennium had an equity value of negative $1,048.8 million to negative $1,274.8 million at WACCs ranging from 9.8% to

---

[308]   Attachment to the email from Adams to Pencak, Re: Order by drugs v3.xlsx, February 3, 2014 [ML_DE_00060308] (forecasting a 33.3% drop in Medicare NRPS due to LCD impact).

[309]   Internal Millennium emails discussed volume declines ranging from 30% to 50%. Email from Hardaway to Mulloy, Re: FW: Millennium financial model – version 2. [ML_DE_00559337 at 9338] (In a June 8, 2015 email, Hardaway conceded that "our volume assumptions [i.e., 10% reduction] were aspirational" and noting that "Ameritox had a roughly 50% drop in volumes and Callaway [sic] had a roughly 30% drop after they each announced DOJ investigations/settlements.")

14.8%, without even taking into account Millennium's contingent liabilities. Under the reasonable downside scenario, the negative equity values confirm that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with capital insufficient to sustain operations. In other words, the 2014 Transaction left Millennium with unreasonably small capital.

**TABLE 10: DOWNSIDE CASE SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE**

| | $ Millions | | |
|---|---|---|---|
| Discount Rate | Enterprise Value | Net Debt Value | Equity Value Before Contingent Liabilities and Fees |
| 9.8% | 712.9 | 1,761.7 | (1,048.8) |
| 10.8% | 645.0 | 1,761.7 | (1,116.8) |
| 11.8% | 592.3 | 1,761.7 | (1,169.5) |
| 12.8% | 550.2 | 1,761.7 | (1,211.6) |
| 13.8% | 515.7 | 1,761.7 | (1,246.0) |
| **14.8%** | **487.0** | **1,761.7** | **(1,274.8)** |

Notes and Sources:

Values derived from YAS Workpaper 1 (second quarter of 2014 through 2020) assuming different discount rates.

## K.    SOLVENCY CONCLUSION

173. The foregoing analyses show that Millennium was rendered balance sheet insolvent by the 2014 Transaction. Thus, by definition, the 2014 Transaction left Millennium with unreasonably small capital.  The inadequacy of Millennium's capital is confirmed by examining the value of Millennium under a reasonable downside scenario. Finally, the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay as that debt matured.

November 15, 2021

_____

Yvette R. Austin Smith

_____

Date

## APPENDIX A: SOLVENCY TEST EXHIBITS

### A.1   EXPECTED CASE DCF ANALYSIS

#### TABLE 11: DISCOUNTED CASH FLOW ANALYSIS

| | | Input | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | TV |
|---|---|---|---|---|---|---|---|---|---|---|
| Long-Term Industry Growth Rate | [1] | 3% | | | | | | | | |
| WACC | [2] | 14.8% | | | | | | | | |
| Valuation Date | [3] | 3/31/2014 | | | | | | | | |
| Income Tax Rate | [4] | 52.6% | | | | | | | | |
| | | | | | | | | | | |
| EBIT | [5] | | 251,513,148 | 227,713,042 | 152,354,557 | 159,655,306 | 160,355,671 | 166,487,811 | 172,154,148 | |
| Income Tax | [6] | | (132,295,916) | (119,777,060) | (80,138,497) | (83,978,691) | (84,347,083) | (87,572,589) | (90,553,082) | |
| D&A | [7] | | 16,992,365 | 20,960,697 | 19,335,544 | 18,909,765 | 18,704,370 | 22,756,358 | 22,722,173 | |
| Stock-based Comp | [8] | | 2,996,657 | 4,176,250 | 4,385,062 | 4,604,315 | 4,834,531 | 5,102,995 | 5,391,854 | |
| Increase in working capital | [9] | | (6,176,340) | 20,826,415 | 11,898,636 | (2,014,401) | (936,127) | (1,407,164) | (1,420,757) | |
| Capex | [10] | | (12,543,471) | (9,285,371) | (11,812,307) | (19,121,300) | (28,782,070) | (19,589,370) | (19,631,600) | |
| Unlevered Free Cash Flow | [11] | | 120,486,443 | 144,613,973 | 96,022,995 | 78,054,995 | 69,829,292 | 85,778,042 | 88,662,735 | 773,920,487 |
| | | | | | | | | | | |
| Discount Period in Years | [12] | | 0.25 | 1.25 | 2.25 | 3.25 | 4.25 | 5.25 | 6.25 | 6.25 |
| Discount Factor | [13] | | 0.97 | 0.84 | 0.73 | 0.64 | 0.56 | 0.48 | 0.42 | 0.42 |
| | | | | | | | | | | |
| PV of Free Cash Flow | [14] | | 116,410,932 | 121,709,353 | 70,395,850 | 49,846,035 | 38,844,154 | 41,564,472 | 37,423,584 | 326,663,491 |
| NPV of Free Cash Flow | [15] | 802,857,872 | | | | | | | | |
| | | | | | | | | | | |
| Net Debt Amount (March 2014) | [16] | 1,761,746,604 | | | | | | | | |
| | | | | | | | | | | |
| Initial Equity Value | [17] | -958,888,732 | | | | | | | | |

### A.2   EXPECTED CASE EBIT DERIVATION

#### TABLE 12: EBIT DERIVATION

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| UDT Revenue | [1] | 485,969,878 | 503,348,741 | 393,916,554 | 400,753,903 | 403,309,079 | 407,100,185 | 410,926,926 |
| PGT Revenue | [2] | 20,236,066 | 45,203,209 | 50,847,042 | 60,873,211 | 68,207,474 | 73,095,944 | 78,319,614 |
| RxAnte Revenue | [3] | 9,569,000 | 24,527,167 | 42,893,995 | 56,164,117 | 69,382,853 | 79,790,281 | 87,769,309 |
| Total Revenue | [4] | 515,774,944 | 573,079,117 | 487,657,592 | 517,791,230 | 540,899,406 | 559,986,409 | 577,015,849 |
| | | | | | | | | |
| UDT Cost of Sales | [5] | 59,650,021 | 71,784,017 | 66,064,739 | 70,265,877 | 74,778,320 | 77,021,670 | 79,332,320 |
| PGT Cost of Sales | [6] | 9,628,539 | 20,085,426 | 22,885,192 | 27,581,585 | 31,366,631 | 33,761,472 | 36,896,574 |
| | | | | | | | | |
| Gross Profit | [7] | 446,496,384 | 481,209,673 | 398,707,660 | 419,943,768 | 434,754,454 | 449,203,267 | 460,786,956 |
| Operating Expenses | [8] | 195,358,046 | 253,996,631 | 246,853,103 | 260,788,461 | 274,898,783 | 283,215,456 | 289,132,808 |
| Operating Income | [9] | 251,138,338 | 227,213,042 | 151,854,557 | 159,155,306 | 159,855,671 | 165,987,811 | 171,654,148 |
| | | | | | | | | |
| Other Income | [10] | 374,810 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| | | | | | | | | |
| EBIT | [11] | 251,513,148 | 227,713,042 | 152,354,557 | 159,655,306 | 160,355,671 | 166,487,811 | 172,154,148 |

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 94

## APPENDIX B: COMPARABLE COMPANIES ANALYSIS EXHIBITS

### B.1     DESCRIPTION OF SIC INDUSTRY CODES

| Code | | Description |
|---|---|---|
| 8071 Medical Laboratories | [1] | Establishments primarily engaged in providing professional analytic or diagnostic services to the medical profession, or to the patient on prescription of a physician. |
| 8734 Testing Laboratories | [2] | Establishments primarily engaged in providing testing services. Establishments primarily engaged in performing clinical laboratory testing for the medical profession are classified in Industry 8071. |
| 2835 In Vitro and In Vivo Diagnostic Substances | [3] | Establishments primarily engaged in manufacturing in vitro and in vivo diagnostic substances, whether or not packaged for retail sale. These materials are chemical, biological, or radioactive substances used in diagnosing or monitoring the state of human or veterinary health by identifying and measuring normal or abnormal constituents of body fluids or tissues. |

Sources and Notes:

[1]: SIC Industry Description," NAICS Association, accessed September 21, 2021, https://www.naics.com/sic-industry-description/?code=8071.

[2]: SIC Industry Description," NAICS Association, accessed September 21, 2021, https://www.naics.com/sic-industry-description/?code=8734.

[3]: SIC Industry Description," NAICS Association, accessed September 21, 2021, https://www.naics.com/sic-industry-description/?code=2835.

## B.2    DESCRIPTION OF POTENTIAL COMPARABLE COMPANIES

| Company | Description |
|---|---|
| Alere | Alere Inc. provides diagnostic tests for infectious disease, cardiometabolic disease, and toxicology in the United States and internationally. The company's infectious disease products/services include antibodies, assays, diagnostic products, and a line of automated instrumentation to process tests. The company's cardiometabolic products/services include rapid diagnostic test systems to detect various drugs of abuse, point-of-care analyzers, over-the-counter tests, diabetes products, rapid diagnostic tests, and data management systems for point-of-care testing. Lastly, the Company's toxicology products/services include various device and reagent platforms to detect the illicit and prescription drugs of abuse or alcohol. The company was founded in 1981 and is based in Waltham, Massachusetts. As of October 3, 2017, Alere Inc. operates as a subsidiary of Abbott Laboratories. |
| Bio-Reference Laboratories | Founded in 1981 and headquartered in Elmwood Park, New Jersey, Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in the United States. The company focuses on esoteric testing, molecular diagnostics, anatomical pathology, genetics, women's health, and correctional health care services. It offers chemical diagnostic tests, such as blood and urine analysis; blood chemistry; hematology services; serology; radio-immuno analysis; toxicology, including drug screening; pap smears; tissue pathology comprising biopsies; and other tissue analysis, as well as cancer cytogenetic testing, genetic testing, and cytology testing services. The company also operates a clinical knowledge management service unit and a Web-based connectivity portal solution for laboratories and physicians. It serves physicians, geneticists, hospitals, clinics, and correctional and other health facilities. |
| Laboratory Corp. of America Holdings | Laboratory Corporation of America Holdings operates as an independent clinical laboratory company worldwide. It operates in two segments, Labcorp Diagnostics (Dx) and Labcorp Drug Development (DD). It offers various tests, such as blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, hemoglobin A1C and vitamin D products, prostate-specific antigens, tests for sexually transmitted diseases, hepatitis C tests, microbiology cultures and procedures, and alcohol and other substance-abuse tests. In addition, it provides online and mobile applications and end-to-end drug development, medical device, and diagnostic development solutions. The company was founded in 1971 and is headquartered in Burlington, North Carolina. |
| Myriad Genetics | Myriad Genetics, Inc., a molecular diagnostic company, develops and markets predictive, personalized, and prognostic medicine tests in the United States and internationally. The company offers DNA sequencing tests for hereditary and breast and ovarian cancers, personalized medicine tools, DNA genotyping tests, protein quantification tests, prenatal and prenatal screening tests, RNA expression tests, biomarker discovery, and pharmaceutical and clinical services to the pharmaceutical, biotechnology, and medical research industries. Myriad Genetics, Inc. was founded in 1991 and is headquartered in Salt Lake City, Utah. |
| Quest Diagnostics | Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. The company develops and delivers diagnostic information services, such as routine testing, non-routine and advanced clinical testing, anatomic pathology testing, and other diagnostic information services. It offers diagnostic information services to patients, clinicians, hospitals, independent delivery networks, health plans, employers, direct contract entities, and accountable care organizations through a network of laboratories, patient service centers, phlebotomists in physician offices, call centers and mobile paramedics, nurses, and other health and wellness professionals. The company also provides risk assessment services for the life insurance industry; and healthcare organizations and clinicians robust information technology solutions. Quest Diagnostics Incorporated was founded in 1967 and is headquartered in Secaucus, New Jersey. |

Source: S&P CapIQ.

## APPENDIX C: CUSTOM PROFILE EXHIBIT

### TABLE 13: CUSTOM PROFILE REVENUE IMPACT ANALYSIS

| 2013 Millennium Code | Not Billed by Both Ameritox & Aegis | CMS Code Description | NRPS (as of Dec 2013) |
|---|---|---|---|
| [A] | [B] | [C] | [D] |
| G0431 | | Drug screen, qualitative; multiple drug classes by high complexity test method (e g , immunoassay, enzyme assay), per patient encounter | 1 71 |
| 82101 | X | Urine alkaloids level | 5 60 |
| 82649 | X | Dihydromorphinone (drug) level | 30 76 |
| 82646 | X | Dihydrocodeinone (drug) measurement | 24 71 |
| 83925 | | Opiates (drug) measurement | 109 72 |
| 80154 | | Benzodiazepines level | 21 60 |
| 82542 | | Chemical analysis using chromatography technique | 112 33 |
| 82544 | | Chemical analysis using chromatography technique | 0 00 |
| 80152 | | Amitriptyline (antidepressant) level | 12 67 |
| 83805 | | Meprobamate (sedative) level | 13 29 |
| 80160 | X | Desipramine level | 12 18 |
| 80174 | X | Imipramine level | 12 18 |
| 83840 | | Methadone level | 19 61 |
| 82145 | | Amphetamine or methamphetamine level | 17 75 |
| 82520 | | Cocaine (drug) level | 17 35 |
| 80173 | X | Haloperidol level | 0 18 |
| 83992 | | PCP drug level | 9 26 |
| 80182 | X | Nortriptyline level | 9 59 |
| 80102 | X | Drug confirmation test | 0 00 |
| 82205 | | Barbiturates level | 23 45 |
| 80184 | X | Phenobarbital level | 11 72 |
| 82055 | | Alcohol (ethanol) level | 2 89 |
| 83516 | | Analysis of substance using immunoassay technique | 0 84 |
| 84311 | | Chemical analysis using spectrophotometry (light) | 8 03 |
| 82570 | | Creatinine level to test for kidney function or muscle injury | 5 94 |
| 83986 | | Body fluid pH level | 4 11 |
| 81003 | | Automated urinalysis test | 2 57 |

| Revenue Impact | | |
|---|---|---|
| Total NRPS of UDT Codes Not Billed by Both | [1] | 106 92 |
| *% Impact on 2013 Revenue* | [2] | *21.81%* |

Sources and Notes:

NRPS contribution information unavailable for 3 codes that Millennium billed CMS in 2013: 83789, 81226, 81225. However, these codes were also billed by either Aegis or Ameritox, and therefore do not impact the analysis.

[A] - [C]: Centers for Medicare & Medicaid Services Physician and Other Supplier Public Use Files. Data retrieved from https://www cms gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[D]: 2014-02-05 ML_DE-00054321.xlsx ("Sc. 1 (no - on ill)" tab). *See* column F.

[1]: Sum of [D] for UDT codes not billed by both parties.

[2]:[1] ÷ 490.27 (Total NRPS as of Dec. 2013). Figure retrieved from cell F70 of 2014-02-05 ML_DE_00054321.xlsx ("Sc. 1(no - on ill)" tab).

# APPENDIX D: SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE

## TABLE 14: SENSITIVITY ANALYSIS

|  |  | Low | Expected | High | Range | Range | Range | Range |
|---|---|---|---|---|---|---|---|---|
| MUE Medicare NRPS Adjustment | [1] | ON | ON | ON | ON | ON | ON | ON |
| LCD Medicare NRPS Reduction | [2] | ON | ON | ON | ON | ON | ON | |
| Elimination of Custom Profile | [3] | ON | ON | ON | ON | ON | | |
| DOJ Settlement Reputational Impact | [4] | ON | ON | ON | ON | | | |
| Cancellation of Free POC Cups | [5] | ON | ON | ON | | | | |
| Initial Equity Valuation | [6] | -833.3 | -958.9 | -1,074.9 | -818.0 to -1,056.1 | -489.7 to -614.6 | -381.0 to -441.1 | -313.2 to -340.0 |

Notes and Sources:

Initial equity valuation derived from YAS Workpaper 1.

All values in the table are after adjusting for Millennium's specimen volume growth assumptions (*see* Section E.1) and for first quarter 2014 actual results. Does not include contingent liabilities.

[1]: Low adjustment consists of lowering expected Medicare NRPS corrections by a multiple of 0.9x and high adjustment consists of increasing Medicare NRPS corrections by a multiple of 1.1x.

[2]: Low adjustment consists of lessening expected -18.3% NRPS impact to -14.3% and high adjustment consists of increasing NRPS impact to -22.3%.

[3]: Low adjustment consists of lessening expected -21.81% NRPS impact to -16.81% and high adjustment consists of increasing NRPS impact to -26.81%.

[4]: Low adjustment consists of lessening expected two-time -15% specimen volume impact to -12% and high adjustment consists of increasing two-time specimen volume impact to -18%.

[5]: Low adjustment consists of lowering expected -1.6% specimen volume impact by a multiple of 0.8x and high adjustment consists of increasing specimen volume impact by a multiple of 1.2x.

## APPENDIX E: DOCUMENTS RELIED UPON OF YVETTE AUSTIN SMITH

**Court Documents**

*Ameritox, Ltd. v. Millennium Laboratories* (Case 8:11-cv-775-T-24-TBM)

Complaint, April 8, 2011

Rebuttal Expert Report of David S. Williams, December 6, 2013

Jury Verdict, June 16, 2014

*In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS)

Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015

Exhibit 1 (Amended Plan) to Notice of (I) Entry Of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., and (II) Occurrence of Effective Date, December 14, 2015

Memorandum, February 29, 2019

*Maul et al v. Ameritox, LLC.,* (Case 8:07-cv-00953-RAL-EAJ)

Second Amended Complaint, October 19, 2009

*United States of America ex rel. Mark McGuire v. Millennium Laboratories, Inc.* (Case 1:12-cv-10132-NMG, No. 12cv1063 l-NMG, No. 13cv10825-NMG)

Complaint, January 26, 2012

Complaint, April 9, 2012

Complaint, April 10, 2013

United States' Complaint in Intervention, December 19, 2014

Exhibit 3

Exhibit 4

Exhibit 5

Exhibit 7

Exhibit 12

Exhibit 13

Exhibit 39

Exhibit 55

Exhibit 66

Exhibit 74

Administrative Settlement Agreement, October 16, 2015

**Depositions and Exhibits**

Daniel Pencak

Deposition of Daniel Pencak

Exhibit 134

Exhibit 135

Exhibit 137

Exhibit 138

Exhibit 140

Exhibit 141

Exhibit 158

Exhibit 165

Exhibit 165-A

Exhibit 179

Heidi Smith

Exhibit 56

Exhibit 59

Jennifer Mulloy

Exhibit 194

Exhibit 195

Exhibit 198

Exhibit 216

Jenny Lee
  Exhibit 116
  Exhibit 125
  Exhibit 131

Martin Price
  Deposition of Martin Price
  Exhibit 3
  Exhibit 5-A
  Exhibit 9
  Exhibit 10
  Exhibit 13
  Exhibit 14
  Exhibit 15
  Exhibit 106

Michael Tortora
  Exhibit 223
  Exhibit 233

Phillip Ho
  Exhibit 343

**Millennium Documents**

BMO-ML-00009109
CITI-DE-00017912
JPMC-00031194
JPMC-MIL-CORP-00108741
JPMC-MIL-CORP-00159494
KPMG-ML-EA14WB-0000347
KPMG-ML-EA15WB-0000743
KPMG-ML-EA15WB-0001034
KPMG-ML-EA15WB-0001528
ML_DE_00001946
ML_DE_00034943
ML_DE_00035507
ML_DE_00035508
ML_DE_00044521
ML_DE_00054044
ML_DE_00054258
ML_DE_00054320
ML_DE_00054321
ML_DE_00057999
ML_DE_00058384
ML_DE_00058385
ML_DE_00058388
ML_DE_00060270
ML_DE_00060308
ML_DE_00061777
ML_DE_00068651
ML_DE_00079584
ML_DE_00083249
ML_DE_00134548
ML_DE_00164030
ML_DE_00187601
ML_DE_00202842

| |
|---|
| ML_DE_00206157 |
| ML_DE_00206242 |
| ML_DE_00225152 |
| ML_DE_00263273 |
| ML_DE_00269115 |
| ML_DE_00305155 |
| ML_DE_00308623 |
| ML_DE_00465366 |
| ML_DE_00514819 |
| ML_DE_00559337 |
| ML_DE_00559340 |
| ML_DE_00567499 |
| ML_DE_00569414 |
| ML_DE_00594719 |
| ML_DE_00594736 |
| ML_DE_00597259 |
| ML_DE_00601573 |
| ML_DE_00602906 |
| ML_DE_00604336 |
| ML_DE_00670668 |
| ML_DE_00672098 |
| ML_DE_00732288 |
| Suntrust_MIL-DE-00006771 |

**Publicly Available Documents**

*Analyst Reports*

Deutsche Bank, "Q1 Snap Preview: Weather is a Rear-View Mirror Issue," April 14, 2014.

Maxim Group,"Assuming Coverage Laboratory Corp. of America Holdings, Inc.," February 5, 2014.

Piper Jaffray, "Quest Diagnostics Maintain Neutral and Tweaking Estimates for Solstas Following Weak 2014 Outlook," January 30, 2014.

Piper Jaffray, "LabCorp of America Transferring Coverage with a Neutral Rating and $91 Price Target," March 10, 2014.

Morgan Stanley, "Quest Diagnostics Inc. Guidance Reflects Measured View of CY14 Challenges," January 31, 2014.

*Articles*

Barry Meier, "Increase in Urine Testing Raises Ethical Questions," August 1, 2013.

Boston Business Journal, "Woburn-based Calloway Labs, fined $20M in kickback scandal, to close and layoff 240 employees," October 8, 2015.

Christopher Norton, "Ameritox To Pay $16M To Resolve Medicaid FCA Suit," Law 360, November 17, 2010.

Christopher Weaver and Anna Mathews, "Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill; Pain specialists order costly tests for illegal drugs such as cocaine and angel dust, which few seniors ever use," The Wall Street Journal, November 10, 2014.

Debtwire, "Millennium Health completes financial restructuring, emerges from prepackaged Chapter 11," December 21, 2015.

Debtwire, "Millennium Health opt-out lenders, US Trustee attack plan's forced third-party releases," December 8, 2015.

Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015.

Fred Schulte and Elizabeth Lucas, "Liquid Gold: Pain Doctors Soak Up Profits By Screening Urine for Drugs," November 6, 2017.

Hawk, PollyBeth, "Ready or Not: Hospital Value-Based Purchasing Poised to Transform Healthcare Reimbursement Model and Introduce New Fraud Targets Under the False Claims Act," Winter, 2013.

Holden Wilen, "Drug Testing Company Plans to Close Columbia Headquarters, Lay Off 99 Employees," Baltimore Business Journal, March 7, 2018.

Jones Day, The Third Circuit Weighs In Again on the Meaning of "Unreasonably Small Capital" in Constructively Fraudulent Transfer Avoidance Litigation , July/August 2016.

Jones Day, Uniform Voidable Transactions Act Approved by Uniform Law Commission to Replace UFTA, September/October 2014, https://www.jonesday.com/en/insights/2014/10/uniform-voidable-transactions-act-approved-by-uniform-law-commission-to-replace-ufta.

Loanconnector, "Corrected: Millennium Labs launches $1.8B dividend recap loan," March 31, 2014.

Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB," April 14, 2014.

Patricia Wen, "Calloway Labs of Woburn agrees to $20 million settlement of Medicaid fraud case," March 30, 2012.

Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation," November 16, 2012.

Roger Feldman, Bryan Dowd, and Robert Coulam, "Medicare's Role in Determining Prices throughout the Health Care System," October 2015.

Tampa Bay Business Journal, "Ameritox agrees to $16.3M settlement," November 16, 2010.

Todd Gardner, "Drug Testing Company to Close Greensboro Facility, Lay Off 113," Triad Business Journal, March 8, 2018.

US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians," October 19, 2015.

### Books

Collier on Bankruptcy, 16th edition, 2016.

Fishman, Jay E., Pratt, Shannon P. and Morrison, William J.; Standards of Value: Theory and Applications, John Wiley & Sons, Inc. 2007.

Principles of Corporate Finance, Brealey, Myers, Allen, 10th edition, January 1, 2012.

### Case Law

Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056 (3d Cir. 1992).

Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.) , 444 F.3d 203, 210 (3d Cir. 2006)

Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.), 348 B.R. 234, 274 (Bankr. D. Del. 2005)

### Financial Statements and Filings

Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013 filed February 25, 2014.

Quest Diagnostics Incorporated Form 10-K filed for the fiscal year ended December 31, 2013 filed February 18, 2014.

### Other Public Sources

A Strategy for Medicare Payment Reform, Center for American Progress, May 2015.

Center for Behavioral Health Statistics and Quality, Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings 18, 21 (2012), https://www.samhsa.gov/data/sites/default/files/NSDUHresults2012/NSDUHresults2012.pdf.

Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

Centers for Medicare & Medicaid Services, Original Medicare Enrollment: Part A and/or Part B Enrollees by Demographic Characteristics, Calendar Year 2013 1 (2020), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/2013/Downloads/MDCR_ENROLL_AB/CPS_MDCR_ENROLL_AB_11.pdf

Centers for Medicare & Medicaid Services, "What is an LCD?," https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs.

CGOS, https://www.cgsmedicare.com/partb/pubs/news/2012/0412/cope18723.html.

CMS website, https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE.

Congressional Budget Office (CBO), The Budget and Economic Outlook 2014 to 2024, February 2014.

Data Bridge Market Research US Pharmacogenetic Testing Market Industry Trend Report

Department of Health and Human Services Office of Inspector General, "Questionable Billing for Medicare Part B Clinical Laboratory Services," August 2014.

Department of Health and Human Services Office of Inspector General, "Special Fraud Alert: Laboratory Payments to Referring Physicians," June 25, 2014.

Department of Health and Human Services Office of Inspector General, "Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings," June 2013.

Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices.

MB&CC, HCPCS Codes, https://www.medicalbillingandcoding.org/hcpcs-codes/.

Medicare Physician and Other Supplier PUF Methodology (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Medicare-Physician-and-Other-Supplier-PUF-Methodology.pdf).

Medicare.gov, "Medicare Advantage Plans," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans.

Moody's Financial Metrics Key Ratios By Rating And Industry For North American Non-Financial Corporations: December 2013, tab "App-8". Available at www.moodys.com.

S&P CapIQ.

S&P credit rating report March 28, 2014.

SIC Industry Description," NAICS Association, accessed Sepember 21, 2021.

The People's Law Dictionary, *Qui Tam Action,* https://dictionary.law.com/default.aspx?selected=1709.

U.S. Department of The Treasury, Resource Center, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView.aspx?data=yieldYear&year=2014.

Uniform Law Commission, *Fraudulent Transfer Act,* https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3.

United Healthcare Community Plan, https://www.uhccommunityplan.com.

**APPENDIX F: CURRICULUM VITAE**

**Ms. Austin Smith** is Chairman of The Brattle Group and co-leads the firm's M&A Litigation Practice. She specializes in M&A and bankruptcy disputes with subject matter expertise in valuation and credit and solvency analysis. She provides testifying and consulting expert services in litigation and disputes related to mergers and acquisitions, dissenting shareholder actions, leveraged buyouts, financing transactions/recapitalization, debt recharacterization and avoidance actions. Yvette has also served as an expert in international trade subsidy disputes. She has submitted expert oral and written testimony in multiple venues including state courts in Delaware and New York, U.S. federal bankruptcy and district courts, international courts in Canada and Australia and the World Trade Organization and other international arbitration forums.

In addition to opining on valuation, Yvette has also provided expert testimony on market practice and transaction structure in M&A disputes. As representative bankruptcy engagements, Yvette has been retained as a solvency or valuation expert in connection with the bankruptcies of Lehman Brothers (on behalf of JPMorgan Chase), Caesars Entertainment Operating Company (on behalf of Apollo Global Management), Physiotherapy Associates Holdings (on behalf of a litigation trustee), U.S. Steel Canada (on behalf of United States Steel) and Purdue Pharma (on behalf of 58 U.S. states and territories).

Ms. Austin Smith has written a number of publications and presented on valuation and credit analysis, for organizations including the American Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, the Delaware State Bar Association, Thomson Reuters, and Bloomberg Law. She is a contributing author to the Model Merger Agreement for the Acquisition of a Public Company, published by the ABA's Mergers and Acquisitions Committee, and a contributing researcher to The Standard & Poor's Guide to Fairness Opinions: A User's Guide for Fiduciaries. She is Co-Chair of the American Bar Association Joint Task Force on M&A Litigation and is founder and former Co-Chair of the ABA Financial Advisor Task Force.

Ms. Austin Smith has also been a member of the teaching faculty of Harvard University Extension School, where she taught a graduate finance course and a past faculty member of the American Bar Association's National Institute of Negotiating Business Acquisitions.

## Yvette Austin Smith

Ms. Austin Smith serves on the Board of Directors for The Brattle Group and was recently named Board Chair.  She is also the Vice-Chair of the Board of Directors for the Appalachian Mountain Club.

Prior to joining The Brattle Group, Yvette provided investment banking advisory services including mergers and acquisitions, fairness opinions, solvency opinions and commercially reasonable debt opinions.

## AREAS OF EXPERTISE

- Valuation
- M&A Litigation
- Bankruptcy Litigation
- Credit and Solvency Analysis

## EDUCATION

- M.B.A. (Finance) from Columbia University
- Graduate Studies in Mathematical Finance, Courant Institute of Mathematics, New York University
- A.B., Government and Philosophy, Harvard College

## PUBLICATIONS

- "Valuation Analysis of Related Party Transactions," ABI Journal, March 2018.
- "Snapshot of Delaware Public Company Appraisals Post-CKx," *Deal Points*, publication of the American  Bar Association's M&A Committee, Winter 2017.
- "Asset Value Trumps Discounted Cash Flow in Another Bankruptcy Valuation Dispute," Yvette R.  Austin Smith and Evan Cohen, *The Brattle Group: Critical Insights*, July 29, 2014.
- "Rural Metro Redefines Investment Banks' Role in M&A," Yvette R. Austin Smith and Torben Voetmann, *Law360*, March 28, 2014.
- "Solvency Analysis in the Context of Fraudulent Transfer after Eleventh Circuit's TOUSA Reversal," American Bankruptcy Institute's Business Reorganization Committee newsletter, (Volume 11/No. 3),  June 2012.
- "Recent M&A Litigation Provides Updated Guidance for Fairness Opinions," *Deal Points*, publication of  the American Bar Association's M&A Committee, Spring 2012.
- "Why Do Solvency Opinions Fail?"  Spring 2011.
- Contributing author to: *Model Public Company Acquisition Agreement with Commentary*; by The Mergers & Acquisitions Committee of the American Bar Association; Chicago: American Bar Association, August 2011. Authored chapter on determining stock exchange ratios in mergers and  acquisition transactions.
- Contributing author to: The Standard & Poor's Guide to Fairness Opinions: A User's Guide for



**Yvette Austin Smith**

Fiduciaries; by Phillip J. Clements and Philip Wisler; New York: McGraw Hill, 2005

## TESTIMONY EXPERIENCE

*Snow Phipps Group, LLC, and DecoPac Holdings Inc., Plaintiff, v. KCake Acquisition, Inc., et al., Defendants,* Court of Chancery of the State of Delaware, C.A. No. 2020-0282-KSJM (Deposition testimony, December 2020; Trial testimony, January 2021)

*GiGi Jordan, Plaintiff against Raymond A. Mirra, JR., et al., Defendants,* United States District Court for the District of Delaware, C.A. No. 14-01485-SLR-SRF  (Deposition testimony, December 2020)

*Falcon Distribuidora, Armazenamento e Transporte S.A. v. Hypera S.A.,* International Chamber of Commerce Arbitration No 23896/GSS (Hearing testimony, November 2020)

*In Re Comtech/Gilat Merger Litigation* Court of Chancery of the State of Delaware, C.A. No. 2020-0605-JRS (Deposition testimony, October 2020)

*Dillon Trust Company LLC, et al. v. United States,* Court of Federal Claims Nos. 17-1898T, 17-2022T, 17-2023T  (Deposition Testimony, September 2020)

*IC Power Asia Development Ltd. (Israel), Claimant v. Republic of Guatemala, Respondent,* Under the Arbitration Rules of the United Nations Commission on International Trade Law (Hearing testimony, July 2020)

*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. No. 13-50530.* (Deposition testimony January 2020)

*Canada – Measures Concerning Trade in Commercial Aircraft, World Trade Organization (DS522)* (Testimony at First Substantive Meeting, September 2019)

*Crown Resorts Limited v Commissioner of Taxation Federal Court of Australia Proceedings, No. VID 831, 833 - 837 & 1635 - 1637 of 2018.* (Trial testimony, June 2019)

*The Mangrove Partners Master Fund, Ltd., Petitioner, v. Calamos Asset Management, Inc., Respondent,* Court of Chancery of the State of Delaware, *C.A. No. 2017-0139-JTL.* (Deposition testimony, December 2018)

*Polar Multi-Strategy Master Fund v. The Stars Group Inc.,* Superior Court of Justice – Ontario, *CV-18-599612-00-CL,*  (Hearing testimony, July 2018)

*In re: Physiotherapy Holdings, Inc. et al. in the matter PAH Litigation Trust, Plaintiff v. Water Street Healthcare Partners, L.P. et al., Defendants* (Case No. 13- 12965 (KG)).  United States District Court for the District of Delaware.  (Deposition testimony, May 2018)

*Domain Associates, L.L.C., v. Nimesh Shah,* Court of Chancery of the State of Delaware, *C.A. No. 12921-VCL.* (Deposition testimony, January 2018; Trial testimony, February 2018)



3

**Yvette Austin Smith**

*Charles Almond as Trustee for the Almond Family 2001 Trust, Almond Investment Fund, LLC, Charles Almond, and Andrew Franklin, Plaintiffs v Glenhill Advisors, LLC, et al., Defendants and Design Within Reach, Inc., Intervenor and Counterclaim Petitioner,* Court of Chancery of the State of Delaware, C.A. No. 10477-CB (Deposition testimony, October 2017; Trial testimony, November 2017)

*Blueblade Capital Opportunities LLC and Blueblade Capital Opportunities, Petitioners, v. Norcraft Companies, Inc., a Delaware Corporation, Respondent,* Court of Chancery of the State of Delaware, C.A. No. 11184-VCS (Deposition testimony, May 2017; Trial testimony, June 2017)

*In re: Caesars Entertainment Operating Company, Inc. et al.* United States Bankruptcy Court Northern District Of Illinois Eastern Division, Case No. 15-01145 ABG. (Expert declaration, December 2016).

*JD Holdings, LLC, et al. v. Jacqueline a. Dowdy, as Trustee of The Revocable Trust of John Q. Hammons,  dated December 28, 1989, as Amended and Restated, et al.,* Court Of Chancery of The State of Delaware, Case No. 7480-VCL (Deposition testimony, June 2016).

*George L. Miller, Chapter 7 Trustee v. Sun Capital Partners, Inc. et al,* United States District Court for the District of Delaware, Case No. 13-CV-01996-RGA  (Deposition testimony, April 2016).

*In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended and in  the Matter of A Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada Inc.* and *In the Matter of A Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada  Inc.* Superior Court of Justice - Ontario (Trial testimony, January 2016)

*Nathan Owen v. Energy Services Group et al,* Court of Chancery of the State of  Delaware, C.A. No. 8860-CB (Deposition testimony, August 2014; Trial testimony, November 2014)

*Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors of Lehman Brothers  Holdings Inc., v. JPMorgan Chase Bank N.A.,* Adversary Proceeding No 10-03266 (JPM), United States Bankruptcy Court for the Southern District of New York. (Deposition testimony, September 2014)

*Out Publishing Inc. v. Lipo Liquidating Corp., et al,* Index No. 07/601855 (Bransten), Supreme Court  of the State of New York County of New York Commercial Division. (Deposition testimony, February  2010)



# EXHIBIT 65

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MILLENNIUM LAB HOLDINGS II, LLC, et al.,<br><br>Debtors.<br><br>------------------------------------------------------------------------<br><br>MARC S. KIRSCHNER solely in his capacity as TRUSTEE of THE MILLENNIUM CORPORATE CLAIM TRUST,<br><br>Plaintiff,<br><br>-against-<br><br>J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A.<br>and SUNTRUST BANK,<br><br>Defendants. | Chapter 11<br><br>Case No. 15-12284 (LSS)<br><br>Jointly Administered |

**EXPERT REPORT OF AMY HUTTON**

**February 14, 2022**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

I.    Qualifications, Compensation, and Materials Relied Upon ................................................4

    A.    Qualifications ........................................................................................................4

    B.    Compensation........................................................................................................5

    C.    Materials Relied Upon..........................................................................................6

II.    Assignment ...................................................................................................................6

III.    Summary of Opinions ..................................................................................................6

IV.    Summary of Ms. Austin Smith's Solvency Analysis ...............................................13

    A.    Ms. Austin Smith's Modified Padres Projections ..............................................15

    B.    Ms. Austin Smith's DCF and comparable companies analyses ..........................18

    C.    Ms. Austin Smith's analysis of Millennium's ability to pay its debts and capital adequacy ................................................................................................20

V.    Ms. Austin Smith's Discounted Cash Flow Analysis is Flawed and Unreliable ..............21

    A.    Ms. Austin Smith's findings depend on a number of assumptions and approaches that are unsupported, flawed, and unreliable......................................24

        1.    Ms. Austin Smith's valuation depends on application of an incorrect and substantially inflated WACC....................................................24

        2.    Ms. Austin Smith's treatment of operating expenses is flawed ................29

        3.    Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact of a potential DOJ settlement .................................32

        4.    Ms. Austin Smith provides no reliable basis for the elimination of the revenue from Millennium's "Emerging Opportunities".......................34

        5.    Ms. Austin Smith's other adjustments related to Millennium's business practices are unfounded, rely on hindsight, and are created based on an ad hoc and unreliable methodology......................................36

    B.    Ms. Austin Smith's analysis is at odds with those completed by financial professionals in the period leading up to the 2014 Transaction ..........................43

        1.    Millennium's management prepared financial projections based on its standard practice .............................................................................44

        2.    Ms. Austin Smith disregards the contemporaneous analyses by various third parties, which contradict her conclusion that Millennium was insolvent ..........................................................................46

    C.    Ms. Austin Smith's Modified Padres Projections and her valuation estimate resemble most closely projections and valuations created around Millennium's bankruptcy ...................................................................................52

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

VI.      Comparable Companies Analysis ................................................................54

     A.      Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent under her EBITDA multiples analysis.................................................................54

VII.     Ability to Pay Debt Test............................................................................56

     A.      Ms. Austin Smith's conclusion that Millennium would be unable to pay its debts is unreliable ...........................................................................57

     B.      Ms. Austin Smith fails to engage with the credit ratings for the 2014 Transaction ....................................................................................58

VIII.    Capital Adequacy Test .................................................................................60

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## I.    QUALIFICATIONS, COMPENSATION, AND MATERIALS RELIED UPON

### A.  Qualifications

1.    I am a Professor of Business Administration at Boston College's Carroll School of Management.  I joined the Carroll School's faculty in 2006 and was promoted to Full Professor in 2010.  Previously, I served as an Associate Professor at the Tuck School of Business at Dartmouth College, an Assistant and Associate Professor at Harvard Business School, and a visiting scholar at Stanford University's Graduate School of Business.

2.    I have a Ph.D. in Business Administration from the Simon Business School at the University of Rochester, with written qualifiers in Accounting, Finance, and Organizations & Markets.  Before obtaining my Ph.D., I worked for Chemical Bank in its investment banking group for one year.  During that year, I worked on several large transactions, mostly leveraged buyouts, in which Chemical Bank provided the bridge financing for the deals.

3.    In 2003, I was elected to the Board of Directors of Bandag, Inc. (NYSE, Fortune 1500 company), where I served on the Audit and Corporate Governance and Nominating Committees, and, in 2005, I was appointed chair of the Audit Committee.  As a board member, I actively participated in several merger negotiations, and was involved in reviewing the performance and approving the compensation of top executives.  When Bandag acquired a majority interest in Speedco, a privately held company, in 2004, I played an active role in the board's deliberations, including examining the implicit assumptions underlying our financial advisor's use of comparable multiples to value Speedco.  I was also actively engaged in the deliberations and analysis performed in connection with Bridgestone's 2007 acquisition of Bandag for just under $1 billion.

4.    While I have taught various courses over the years, my specialty is Financial Statement Analysis and Valuation ("FSAV"), a capstone case-method course that draws on my real-world experiences, as well as my research and study in the areas of Strategy, Financial Economics, and Accounting.  In my courses, I teach students and executives how to value investment ventures. The FSAV course includes detailed analyses of merger and acquisition ("M&A") transactions.  I teach students how to conduct detailed M&A analyses from assessing the stand-alone value of the target prior to the merger talks to assessing the likely synergies and premium paid.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

5.      My research areas include: empirical assessments of valuation methods, methods for detecting "earnings management" (a term connoting exploitation of opportunities to make accounting decisions that change reported income), effective corporate disclosure strategies, policy changes in response to Regulation Fair Disclosure and the Sarbanes-Oxley Act of 2002, and the roles of capital market intermediaries and regulators in determining market values of company stocks.  In my academic research, I have used statistical techniques to examine how information is incorporated into securities prices, including event studies.

6.      Based on my research, I was named to the 2001 Congressional Review Board, opining on the Securities Industry Association's best practices for equity research.  My research was used in the development of the Global Analyst Research Settlement between the Securities and Exchange Commission and numerous Wall Street firms.[1]

7.      In 2010, I won the Distinguished Contribution to Accounting Literature Award for my "Groundbreaking Research" demonstrating how strong corporate governance combats earnings management.

8.      With over 30,000 Google Scholar citations, my work has appeared in publications such as the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Accounting Review*, *Contemporary Accounting Research*, the *Journal of Accounting Research*, the *Review of Accounting Studies*, the *Harvard Business Review,* and the *Journal of Applied Corporate Finance*. I served as an Editor for the *Accounting Review* from 2011 to 2014.  I also serve as a referee for the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, and *Contemporary Accounting Research*.

9.      A copy of my curriculum vitae is attached as **Appendix A.**  A list of my testimony over the last four years is attached as **Appendix B**.

     **B.   Compensation**

10.      I am being compensated at my standard billing rate of $990 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me

---

[1] "SEC Fact Sheet on Global Analyst Research Settlements," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/news/speech/factsheet.htm, accessed on February 7, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

### C.  Materials Relied Upon

11.    In preparing this report, I have relied upon my education and experience in accounting, corporate finance, valuation, and investments; documents produced in this matter; publicly available information, such as academic articles, analyst reports, and public press; and other materials.  **Appendix C** lists documents and other sources I have relied upon in forming my opinions in this matter.  My work on this matter is ongoing, and I reserve the right to modify or supplement my opinions in the event that I become aware of additional information regarding this matter.

## II.    ASSIGNMENT

12.    I have been retained by counsel for J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank N.A. ("Citi"), SunTrust Bank ("SunTrust"), and BMO Harris Bank, N.A. ("BMO") (together the "Arrangers") to respond to certain opinions set forth in the report of Yvette R. Austin Smith ("Austin Smith Report"), filed on November 15, 2021, which purports to assess whether Millennium Laboratories, LLC ("Millennium" or the "Company") was solvent on April 16, 2014, following the $1.825 billion syndicated term loan transaction ("2014 Transaction").[2]

## III.    SUMMARY OF OPINIONS

13.    In addressing the question of Millennium's solvency at the time of the 2014 Transaction, Ms. Austin Smith conducts several analyses.  My report assesses each of these.  First, Ms. Austin Smith conducts a solvency analysis using the discounted cash flow ("DCF") method and the comparable companies method (referred to as "Guideline Public Companies" in the Austin Smith

---

[2] "For the purpose of the solvency analysis described herein, April 16, 2014 is the date of valuation." Austin Smith Report, ¶ 6.  By entering into the 2014 Transaction, the Company borrowed $1.775 billion under a senior secured credit facility.  The 2014 Transaction "initially also provided for a revolving loan in a principal amount not to exceed $50 million, which was to terminate on April 16, 2019," but it was never utilized and terminated in full as of June 30, 2015. *In re Millennium Lab Holdings II, LLC, et al.*, "Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings," filed on November 10, 2015 ("Hardaway Declaration"), ¶ 9.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Report).  Then she considers Millennium's ability to pay its debts, and finally she addresses the question of the adequacy of Millennium's capital.

14.     Based on my experience and expertise, my review of the Austin Smith Report, her backup documents and files, and the analyses discussed in further detail below, I have reached the conclusion that Ms. Austin Smith's assertion that her DCF analysis "demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction" is based on flawed and unreliable analyses.[3]  As summarized immediately below and set forth in detail throughout this report, Ms. Austin Smith's analysis of Millennium's solvency and her conclusions rely on unsupported assumptions, suffer from hindsight bias, and reflect flawed applications of widely accepted valuation principles.

- ***Substantially Inflated Discount Rate***:  Ms. Austin Smith's analysis assumes that Millennium's weighted average cost of capital ("WACC") was 14.8%.[4]  But this WACC is inconsistent with other assumptions that she makes in her solvency analysis. For example, while her comparable companies analysis identifies a specific set of *five* comparable companies, her WACC of 14.8% uses a different set of *eight* comparable companies, thereby rendering her WACC estimation internally inconsistent with other opinions in the report.  She also inflates her WACC by improperly including a company-specific risk premium and a small company risk premium.  The inclusion of a company-specific risk premium has no basis in the field of financial economics because the WACC, even according to Ms. Austin Smith, should only include non-diversifiable risks.[5]  Similarly, the inclusion of a small company risk premium is without any theoretical basis; the practice arose from an empirical observation in the 1980s that was later shown to not hold.  Adjusting the WACC to correct these errors results in a WACC of 7.2%—less than half the 14.8% WACC Ms. Austin Smith uses.  Using the corrected WACC of 7.2%—even while accepting Ms. Austin Smith's other assumptions and adjustments (which I do not)—implies an enterprise value of

---

[3] Austin Smith Report, ¶ 145.

[4] Austin Smith Report, ¶ 143.

[5] Austin Smith Report, ¶ 41.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

$1,970.8 million and an equity value of $209.1 million, rendering Millennium balance sheet *solvent*.[6]

- ***Unsupported and Unreliable Revenue and Operating Expenses Adjustments***: Ms. Austin Smith creates "modified projections" for her work in this litigation in which she substantially reduces revenue, by adjusting specimen volume and net revenue per specimen ("NRPS"), as compared to those created by management.[7] Specifically, as of early 2014, she assumes that Millennium's revenue would decline by approximately 28% in the following two years.[8] By 2018, she assumes that the Company would have just over half of the revenue originally projected by management.[9] Ms. Austin Smith's analysis, as I discuss below, is unsupported and unreliable, and among other things, it suffers from hindsight bias. Ms. Austin Smith also asserts that her proposed adjustments are "one-time adjustments," but she fails to acknowledge that their impact affects all subsequent years creating a permanent effect that substantially reduces her estimate of Millennium's enterprise value. **Exhibit 1** shows the value impact of each of Ms. Austin Smith's adjustments to management projections, while maintaining all her other adjustments and assumptions, using her WACC of 14.8% and the corrected WACC of 7.2%.

    (a) ***Flawed Operating Expenses Adjustment***: Ms. Austin Smith fails to offer a reliable basis for her estimate of Millennium's operating expenses. Despite her substantially reduced projected revenue, she estimates that operating expenses would have increased as a proportion of revenue from 38% in 2014 to 51% of revenue in 2016, a proportionate increase of about one-third. She provides no basis as to why management would maintain such levels of

---

[6] Ms. Austin Smith estimates the equity value by subtracting the $1,761.7 million of outstanding debt from the enterprise value. Austin Smith Report, Table 7.

[7] Specimen volume refers to the specimen count and represents "the volume of specimen processed in the laboratory and submitted for payment in the billing system (i.e. excludes rejections and other non-billable specimen included in the specimen count)." Millennium Laboratories, "Confidential Information Memorandum for Public Side Lenders," March 31, 2014, ML_DE_00269115 ("2014 Confidential Information Memorandum") at ML_DE_00269139.

[8] **Appendix H1A**.

[9] **Appendix H1A**.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

operating expenses if it indeed expected revenues to decline as substantially as she suggests. Ms. Austin Smith's unsupported assumptions regarding operating expenses imply substantial reductions to Millennium's EBITDA margins without a basis. Modifying her excess operating expenses alone—even while using her inflated WACC of 14.8%—would increase Millennium's enterprise value by approximately $220.7 million to $1,023.6 million. Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by approximately $645.3 million to $2,616.1 million.

(b)  ***Unsupported Specimen Volume Adjustment Related to a Potential Settlement with the Department of Justice***: Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact on specimen volume of a potential Department of Justice ("DOJ") settlement. To reach her estimate of the reputational impact on specimen volume, she uses the volume declines experienced by Ameritox, Ltd. ("Ameritox") and Calloway Laboratories, Inc. ("Calloway") following their respective settlements with the DOJ. She provides no explanation regarding the causes of the revenue declines for these two companies. Instead, she assumes without basis that the volume declines were due to reputational effects and does not consider whether they may have been the result of other unrelated factors. She also fails to explain why Millennium would experience a volume decline similar to those experienced by these two companies. Modifying this unsupported adjustment alone— even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $383.8 million to $1,186.6 million. Making this modification and using the corrected WACC

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $1,138.7 million to $3,109.47 million.

(c)     ***Unsupported Elimination of Revenue from "Emerging Opportunities"***:  Ms. Austin Smith provides no reasonable basis for the elimination of the revenue from Millennium's "Emerging Opportunities."  She merely characterizes these revenue as "aspirational" and completely ignores Millennium's business actions related to the "Emerging Opportunities."  Ms. Austin Smith statement that she excludes the "Emerging Opportunities" because they did not appear in a subsequent management model—created more than 13 months later, in June 2015—is inconsistent with fundamental principles of DCF analysis and suffers from hindsight bias.  Eliminating this unsupported adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $192.8 million to $995.7 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $663.6 million to $2,643.5 million.

(d)     ***Ad Hoc Specimen Volume Growth Rate Adjustments***:  Ms. Austin Smith's ad hoc specimen volume growth rate adjustments from 2014 are based on an improper extrapolation of trends from a small sample of quarterly historical data that are inconsistent with longer historical trends and stand at odds with expected growth trends both for Millennium and the industry.  Modifying this ad hoc adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $155.0 million to $957.9 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Smith's analysis) would increase Millennium's enterprise value by $499.0 million to $2,469.8 million.

(e)   ***Unfounded Specimen Volume and NRPS Adjustments Related to Millennium's Business Practices***:   Ms. Austin Smith adjusts management's projections for the impact of Medically Unlikely Edit ("MUE") denials, the discontinuance of the Point-of-Care ("POC") Free Test Cup program, and the elimination of the custom profiles practice.[10]   She does not provide a basis as to why her adjustments more reasonably incorporate the expected risks related to Millennium's business practices.  In her analyses of MUE denials and POC Free Test Cup program, Ms. Austin Smith relies on hindsight as she uses analyses that Millennium performed in July 2014 and does not establish whether the information was available prior to the 2014 Transaction.  Furthermore, her ad hoc and unsupported adjustment for the elimination of the custom profiles practice—a 21.8% reduction in commercial payors NRPS—is substantially higher than the one management implemented—a 7% reduction in commercial payors NRPS—in 2015, following Millennium's bankruptcy and after certain risks had already materialized and the custom profile practice was eliminated.  She fails to explain why her 21.8% is more appropriate, let alone why it should have been reasonably expected back in April 2014. Modifying each adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value between $17.4 million to $101.6 million, to between $820.2 million to $904.4 million.  Making these modifications and using the

---

[10] An MUE is "the maximum units of service that a provider would report under most circumstances for a single beneficiary on a single date of service." "Medically Unlikely Edits," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE, accessed on February 7, 2022. The POC Free Test Cup Program refers to Millennium's practice of "providing point-of-care drug test cups at no charge to certain of its physician customers for use also as a specimen collection device."  Millennium Laboratories, LLC - Voluntary Self-Referral Disclosure, August 15, 2014, ML_DE_00325457 ("Millennium Self-Referral Disclosure") at ML_DE_00325457.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value between $45.2 million to $303.8 million, to between $2,016.0 million to $2,274.6 million.

- *Outlier Results:* Ms. Austin Smith's analysis is at odds with the contemporaneous analyses by various financial professionals, including: the Arrangers; TA Associates (Millennium's private equity sponsor); and Vantage Point Advisors ("VPA") (Millennium's contemporaneous solvency advisor).[11] Notably, Ms. Austin Smith's enterprise value of $802.9 million is well below even the downside scenarios contained in available contemporaneous valuations. In fact, her analysis resembles more closely those prepared around the time of Millennium's bankruptcy in November 2015 (19 months after the 2014 Transaction closed), or indeed after Millennium entered bankruptcy. This includes a valuation conducted by FTI Consulting ("FTI") as of December 2015 that estimated Millennium's enterprise value at $979.5 million, approximately $177 million higher than Ms. Austin Smith's estimate.[12] FTI's analysis was conducted after the adverse events that Ms. Austin Smith claims should have been accounted for had already materialized.

15.     Ms. Austin Smith also conducts but then disregards a comparable companies analysis, which shows that Millennium was balance sheet *solvent*, based on her EBITDA multiples

---

[11] J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)"); TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH-00090311, TA_MLH-00090312 ("TA Associates Model"); Vantage Point Advisors, "Millennium Lab Holdings II, LLC Solvency Analysis," April 30, 2014, ML_DE_00263273 ("2014 VPA Solvency Analysis"). Ms. Austin Smith notes that "[t]o accurately calculate value using a Discounted Cash Flow or 'DCF' methodology, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation. This was not done at the time of the 2014 Transaction and a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction." Austin Smith Report, ¶ 7. However, she provides no analysis of other contemporaneous analyses or explanation as to why these contemporaneous analyses did not "reflect all relevant information that was known or knowable as of the date of valuation."

[12] FTI Consulting, "Millennium Health LLC:  Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743 ("FTI December 2015 Valuation") at KPMG-ML-EA15WB-0000767; Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

analysis. Specifically, Ms. Austin Smith finds that Millennium's implied equity value based on her EBITDA multiples ranges between *positive* $23 million and *positive* $1,456 million, which demonstrates that Millennium was balance sheet *solvent*.[13]

16.    Ms. Austin Smith's test of Millennium's ability to pay its debts is flawed because it relies on her unsupported revenue adjustments. Ms. Austin Smith has provided no reliable basis for her adjustments that substantially decrease Millennium's revenue and as a result, constrain its ability to pay its debt. Moreover, the contemporaneous credit rating agencies analyses, which Ms. Austin Smith disregards, concluded that Millennium's credit rating was *not* near default, with S&P noting that the Company had "the capacity to meet its financial commitments" following the 2014 Transaction.[14] Ms. Austin Smith's tests of Millennium's capital adequacy are similarly flawed, as they too rely on her unsupported adjustments.

## IV.    SUMMARY OF MS. AUSTIN SMITH'S SOLVENCY ANALYSIS

17.    In connection with the 2014 Transaction, Millennium put together financial projections ("Padres Projections") for the period 2014 through 2020, consistent with the maturity of the 2014 Transaction.[15] The Padres Projections contained quarterly projections for 2014 and 2015, and annual projections thereafter for Millennium's three lines of business: urine drug testing

---

[13] Austin Smith Report, Table 9.

[14] "Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014 ("S&P Rating"); "Research Update: Millennium Laboratories Inc. Assigned 'B+' Rating And Stable Outlook; $1.82 Billion FirstLien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014 ("S&P Rating Update"); "Moody's Assigns B1 CFR to Millennium Labs; Sr. Secured Credit Facilities Rated B1; Outlook Is Stable," *Moody's*, March 31, 2014 ("Moody's Rating"); "Global Ratings Definitions," *Standard & Poor's*, November 10, 2021, available at https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352, accessed on February 7, 2022, (S&P Global Ratings Definitions").

[15] Millennium Management Projections, April 12, 2014, ML_DE_00057999 ("Padres Projections").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

("UDT"),[16] pharmacogenetic testing ("PGT"), and predictive analytics ("RxAnte").[17]  In her solvency analysis, Ms. Austin Smith adjusts the Padres Projections for the purpose of this litigation ("Modified Padres Projections"), in what she claims to be "the correct solvency framework," in order to "reasonably reflect significant business, reimbursement, legal, and regulatory risks and exposures."[18]  She asserts that "[i]t was known or knowable as of the 2014 Transaction that, as a result of these risks, the Company was very likely to encounter slowing or negative growth and declining profitability."[19]

18.     Ms. Austin Smith then conducts a DCF analysis and a comparable companies analysis to "evaluate the solvency of Millennium as of April 16, 2014."[20]  Based on the DCF analysis Ms. Austin Smith concludes that Millennium "was rendered balance sheet insolvent by the 2014 Transaction."[21]  While her comparable companies analysis suggests that when focusing on EBITDA multiples, Millennium was balance sheet *solvent*, Ms. Austin Smith says that "[d]ue to the limited comparability of the identified public [comparable] companies" she does not rely on the comparable companies analysis to reach any solvency conclusions.[22]  Ms. Austin Smith also purports to examine Millennium's ability to pay its debts and to estimate the Company's capital adequacy.[23]  She concludes that Millennium had inadequate capital after examining a single

---

[16] Millennium also offered Oral Fluid Drug Testing ("ODT"), an alternative to UDT that allows for the testing of individuals that are unable to provide a urine sample.  2014 Confidential Information Memorandum at ML_DE_00269130; Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation") at JPMC-MIL-CORP-00170158.

[17] Following the 2014 Transaction, Millennium was the parent company of two subsidiaries, RxAnte, LLC, and Pain In The Air, LLC.  Millennium itself was a subsidiary of Millennium Lab Holdings II, LLC, which in turn was a subsidiary of Millennium Lab Holdings, Inc.  Pain In The Air, LLC, primarily owned aircrafts, which were leased to Millennium.  Concurrent to the 2014 Transaction, Millennium Lab Holdings, Inc. transferred a 45% ownership stake in Millennium Lab Holdings II, LLC, to TA Associates Holding Corp.  2014 VPA Solvency Analysis at ML_DE_00263276; Confidential Information Memorandum at ML_DE_00269138; Hardaway Declaration, p. 47.

[18] Austin Smith Report, ¶ 106.

[19] Austin Smith Report, ¶ 106.

[20] Austin Smith Report, ¶¶ 6, 142–148, 149–160.

[21] Austin Smith Report, ¶ 173.

[22] Austin Smith Report, ¶ 7.

[23] Austin Smith Report, ¶¶ 164–169, 170–172.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

"downside" scenario and that "the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay as that debt matured."[24]

### A.   Ms. Austin Smith's Modified Padres Projections

19.    Ms. Austin Smith starts by adjusting the Padres Projections for the first quarter of 2014 ("1Q2014") and uses the actual 1Q2014 financial results.[25]  Next:

- *Operating Expenses Adjustment*:  Ms. Austin Smith adjusts management's projected operating expenses.  She uses the unit cost assumptions of the Padres Projections and she multiplies the unit costs by the adjusted UDT and PGT specimen volume to estimate operating expenses.[26]  She assumes that all "fixed costs" in the Padres Projections remain unchanged.[27]

- *Specimen Volume Adjustment Related to DOJ Settlement*:  She reduces UDT and PGT specimen volume by 15% in 2015 and another 15% in 2016 (for a total of 30%) to account for the purported reputational impact of the DOJ settlement.[28]

- *Elimination of Revenue from "Emerging Opportunities"*:  Millennium's "Emerging Opportunities" included government contracts with the Department of Defense and

---

[24] Austin Smith Report, ¶ 173.

[25] Austin Smith Report, ¶ 110.  Ms. Austin Smith adjusts management's projected revenue by adjusting specimen volume and NRPS for Medicare and a set of commercial payors for UDT and PGT.  Austin Smith Report, ¶¶ 107–135.  "Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC.  For the purposes of this analysis, I have defined these payors as the commercial payors." Austin Smith Report, FN 28.  For the remaining payors and RxAnte, Ms. Austin Smith maintains the Padres Projections. Austin Smith Report, ¶ 135.  Millennium's payor mix comprised of government health plans (Medicare, Medicaid, commercially managed government plans, and workers' compensation programs), commercial payors, and self-pay patients. 2014 Confidential Information Memorandum at ML_DE_00269149.  Workers' compensation plans are programs that provide medical coverage for employment-related injuries and occupational diseases.  Self-pay refers to patients who do not have medical insurance and are otherwise not covered by government or commercial payors.  "Workers' Compensation Program," *U.S. Department of the Interior*, available at https://www.doi.gov/pmb/hr/workerscompensation, accessed on February 7, 2022; "Insurance vs. Self Pay," *Kittitas Valley Healthcare*, available at https://www.kvhealthcare.org/patients-and-visitors/billing/insurance-vs-self-pay, accessed on February 7, 2022.

[26] Austin Smith Report, ¶ 136.

[27] Austin Smith Report, ¶ 136.

[28] Austin Smith Report, ¶ 132.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Department of Veteran Affairs, and international opportunities.[29]  Ms. Austin Smith completely removes revenue from "Emerging Opportunities" claiming that they "appear aspirational rather than expected."[30]

- *Specimen Volume Growth Rate Adjustments*:  The Padres Projections assumed a compound annual growth rate ("CAGR") of 9.8% from 2014 through 2018 for Medicare UDT specimen volume growth rate and 9.8% for commercial payors.[31] Ms. Austin Smith decreases the Medicare UDT specimen volume growth rate to 0% in 2014, 2% in 2015, and 3% for 2016 onwards, and the commercial payors growth rate to 10% in 2014, 5% in 2015 and 3% from 2016 onwards.[32]

- *Specimen Volume and NRPS Adjustments Related to Millennium's Business Practices*:

   (a)   Ms. Austin Smith reduces UDT specimen volume by 1.6% in July 2014 following the verdict in the Ameritox litigation to account for the discontinuance of the POC Free Test Cup program.[33]

   (b)   Ms. Austin Smith reduces the monthly Medicare NRPS in the Padres Projections to between $77.7 to $83.7 from January to March 2014, in order to, as she claims, "reflect only allowed billing

---

[29] Lender Presentation at JPMC-MIL-CORP-00170164–0167; Millennium Laboratories, "Management Presentation," March 2014, ML_DE_00058283 ("Management Presentation") at ML_DE_00058293; Millennium Laboratories, "Lender Presentation Audio File," March 31, 2014, JPMC-00089412 ("Lender Presentation Audio") at minute 35:00 ("So we are now one of two companies nationwide that has a federal supply schedule meaning we actually have a ticket to get into the dance to talk to any VA hospital, any Department of Defense local lab service so basically you have to have a federal supply schedule contract in order to provide services to either the VA or to the Department of Defense.  So the opportunity for us we think going forward is significant.  We were awarded the contract in June as I said and in reality we think that market is well over 400 million dollars.")

[30] Austin Smith Report, ¶ 67.

[31] **Appendix H1B**.

[32] Austin Smith Report, ¶ 109.

[33] Austin Smith Report, ¶ 133.  In 2011, Ameritox filed a complaint against Millennium, claiming that Millennium had engaged in anticompetitive behavior, partly due to its POC Free Test Cup program.  A $14.8 million judgment against Millennium was announced in June 2014, two months after the 2014 Transaction closed.  Email from C. Liou to Project Chargers Whole Team, "Millennium v. Amertitox - loss," June 17, 2014, JPMC-MIL-CORP-00165260. The POC Free Test Cup program was discontinued in June 2014 after the Ameritox verdict.  Millennium Self-Referral Disclosure at ML_DE_00325461.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

under MUE limits."[34]  Specifically, Ms. Austin Smith decreases January, February, and March 2014 Medicare NRPS by $69.32, $74.97, and $73.06, respectively.[35]  These decreases correspond to 15.4%, 16.6%, and 16.2% of the 1Q2014 actual Medicare NRPS for each respective month.[36]

(c)    Ms. Austin Smith reduces Medicare NRPS by 18.3% effective as of October 2015, "due to elimination of coverage for certain negative confirmation testing and specimen validity testing" in light of Noridian Healthcare Solutions ("Noridian")'s *draft* local coverage determination ("LCD"), which, as I understand from counsel, was

---

[34] Austin Smith Report, ¶ 118.

[35] YAS Workpaper 1, tabs "MUE w LCD Adjustment," "UDT Revenue," and "Padres UDT NRPS."

[36] The 1Q2014 actual Medicare NRPS for January, February, and March 2014 is $451.6, $451.4, $451.1, respectively.  Hence, for January, Ms. Austin Smith's percentage decrease of Medicare NRPS is 15.4%, i.e., $69.32 over $451.6.2.  The same calculation applies for February and March, 2014.  YAS Workpaper 1, tab "Padres UDT NRPS."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

not implemented until more than a year after the 2014 Transaction.[37]

(d)    Ms. Austin Smith reduces commercial payors NRPS by 21.8% starting in July 2015, "due to the elimination of Custom Profiles and the resulting reduction in medically unnecessary tests."[38]

20.    **Exhibits 2A**, **2B**, and **2C** show Millennium's actual and projected (from the Padres Projections), as well as Ms. Austin Smith's adjusted revenue, adjusted EBITDA, and adjusted EBITDA margins.[39]

### B.    Ms. Austin Smith's DCF and comparable companies analyses

21.    Ms. Austin Smith conducts a DCF analysis to value Millennium as of April 2014[40] and concludes that the Company had an enterprise value of $802.9 million and a negative equity value

---

[37] Austin Smith Report, ¶ 123.  Noridian was the Medicare Administrative Contractor ("MAC") for the State of California starting from August 24, 2013 and hence, Millennium's MAC.  From 2007 to August 24, 2013, Palmetto GBA ("Palmetto") was the MAC for the State of California.  United States' Complaint in Intervention, filed on March 19, 2015, ML_DE_00629274 ("DOJ Complaint") at ML_DE_00629281.  MACs are "multi-state, regional contractors responsible for administering both Medicare Part A and Medicare Part B claims."  "What's a MAC," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC, accessed on February 7, 2022.  LCDs are decisions made by a MAC whether to cover a particular item or service in a MAC's jurisdiction in accordance with section 1862(a)(1)(A) of the Social Security Act.  "Local Coverage Determinations (LCD) challenge," *Medicare*, available at https://www.medicare.gov/claims-appeals/local-coverage-determinations-lcd-challenge, accessed on February 7, 2022.  As I understand from counsel, the Noridian LCD in question was on "Drugs of Abuse Testing" and given a Document ID of CL34692, reflecting its draft status.  Its revision history can be reviewed by inputting its Document ID into the search box on the Medicare Coverage Database Archive website, "MCD Archive," "Medicare Coverage Database Archive," *Centers for Medicare & Medicaid Services*, available at https://localcoverage.cms.gov/mcd_archive/search.aspx?clickon=search, accessed on February 7, 2022.

[38] Austin Smith Report, ¶ 128.

[39] EBITDA refers to "Earnings before Interest, Taxes, Depreciation, and Amortization."  Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation:  Theory, Evidence & Practice,* 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*"), Chapter 1, p. 17.  Within the Padres Projections, Adjusted EBITDA for Millennium is calculated as Operating Income plus the sum of Depreciation and Amortization, Stock-Based Compensation, Transaction Expenses, and Other Income.  Padres Projections, tabs "LeverageModel" and "Quarterly IS".  Ms. Austin Smith maintains this assumption.

[40] Ms. Austin Smith conducts the DCF analysis as of March 31, 2014 and claims that she is "not aware of any significant change in the operations or financial condition of Millennium between March 31, 2014 and April 16, 2014 (the date the 2014 Transaction closed).  As such, it is reasonable to assume that the valuation as of March 31, 2014 is a reliable indication of value as of April 16, 2014."  Austin Smith Report, ¶ 142.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

of $958.9 million.[41]  For her DCF analysis, Ms. Austin Smith relies on her Modified Padres Projections and uses a seven-year projection period extending from 2Q2014 through 4Q2020 and a terminal year.[42]  To discount the projected cash flows and terminal value, Ms. Austin Smith uses a WACC of 14.8%.[43]  In doing so, she references—without explanation—the WACC that VPA used in its April 2014 solvency analysis, but fails to explain in her report why it is appropriate to adopt.[44]  To estimate the terminal value, Ms. Austin Smith uses the Gordon Growth model (a standard valuation methodology) and assumes a terminal growth rate of 3%, the same that VPA assumed.[45]

22.     For the comparable companies analysis, Ms. Austin Smith identifies five potential comparable companies and uses this set of comparable companies to estimate multiples of

---

[41] Austin Smith Report, ¶¶ 142, 145.  The equity value is the value that remains for the shareholders after any debts have been paid off.  Ms. Austin Smith estimates the equity value of negative $958.9 million by subtracting the $1,761.7 million of outstanding debt from the enterprise value of $802.9 million.

[42] Austin Smith Report, ¶¶ 143–144.  YAS Workpaper 1, tab "DCF".  Ms. Austin Smith, similar to management, assumes that the terminal year is 2021.  The terminal year is the year when the valued company is assumed to reach a steady state.  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 6, p. 255 ("[A] steady state company is also a company that has evolved to the point of generating constant economic returns on its investments.").

[43] Austin Smith Report, ¶ 143 ("I then discount both the seven-year projected cash flows and the terminal value using [WACC] (or discount rate) of 14.8%.  The discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014.  I also note that FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%.").  As I understand, VPA conducted a solvency analysis for Millennium ahead of the 2014 Transaction.  2014 VPA Solvency Analysis.

[44] Ms. Austin Smith also provides results based on several sensitivities to her asserted WACC of 14.8%; for example, she considers a WACC of 9.8%, which is the lowest WACC for which she provides results.  Austin Smith Report, FN 285 ("The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%).  However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk.  Thus, 9.8% underestimates an appropriate WACC for Millennium.").

[45] Austin Smith Report, ¶ 144.  2014 VPA Solvency Analysis at ML_DE_00263288.  A "constant growth perpetuity valuation model for discounting dividends is called the Gordon growth model."  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 1, p. 12.  The "Gordon growth model relates the value of a stock to its expected dividends in the next time period, the cost of equity and the expected growth rate in dividends" and "can be used to value a firm that is in 'steady state' with dividends growing at a rate that can be sustained forever."  Damodaran, A., *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 2nd ed., Wiley, 2002 ("Damodaran, *Investment Valuation*"), Chapter 13, p. 2.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

revenue and EBITDA.[46]  Notably, Ms. Austin Smith's EBITDA multiples analysis yields an implied equity value for Millennium between *positive* $23 million and $1,456 million, i.e., it implies that Millennium was balance sheet *solvent*, which is starkly different from the conclusions in Ms. Austin Smith's own DCF analysis.[47]  Ms. Austin Smith ultimately discards her comparable companies analysis because in her words, "these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value."[48]

### C.  Ms. Austin Smith's analysis of Millennium's ability to pay its debts and capital adequacy

23.     To perform the ability to pay debts test for Millennium, Ms. Austin Smith estimates the Company's unlevered free cash flows using her Modified Padres Projections and assumes the level of Millennium's indebtedness remains constant following the 2014 Transaction.[49] Ms. Austin Smith concludes that by 2018, Millennium would have insufficient cash reserves to meet interest payments.[50]  Ms. Austin Smith purports to consider "Millennium's prospects for refinancing the Term Loan at maturity in April 2021" and notes that "Millennium was above the levels typically associated with Caa-C credits."[51]

24.     To perform the capital adequacy test for Millennium, Ms. Austin Smith creates a single "downside" scenario in which she makes two adjustments to her already substantially negative Modified Padres Projections.  She increases the percentage reduction in Medicare NRPS due to

---

[46] Austin Smith Report, ¶¶ 151, 156.  Valuation multiples are a ratio of an observed measure of an asset's value (such as price) in the numerator to a financial metric of the firm, such as "earnings, book values, or sales" in the denominator.  In relative valuation, multiples are a method to "standardize the values" of an asset to allow for comparison to comparable companies in the market.  Damodaran, *Investment Valuation*, Chapter 17, pp. 1–2. Similarly, "[t]o form a valuation multiple we need both numerators and denominators.  The two numerators most often used in comparables analysis are enterprise value (EV) and equity market capitalization (= market cap or equity market value).  The former measures the market value of all the securities of the company, whereas the latter measures the market value of just the common stock.  Next, we need some denominators.  The most intuitive denominators are proxies for cash flow.  Indeed, all multiples have some deep connection to a cash flow ratio, even if the connection is not apparent."  Metrick, A., and Yasuda, A., *Venture Capital and the Finance of Innovation*, 3rd ed., Wiley, 2021, Kindle Edition ("Metrick and Yasuda, *Venture Capital*"), Chapter 12, p. 184.

[47] Austin Smith Report, Table 9.

[48] Austin Smith Report, ¶ 152.

[49] Austin Smith Report, ¶ 164.

[50] Austin Smith Report, ¶ 166.

[51] Austin Smith Report, ¶ 169.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Noridian's draft LCD from 18.3% to 33.3%.[52]  She also increases her ad hoc assessment of the decline in UDT and PGT specimen volume due to the purported reputational impact of an expected DOJ settlement from 30% to 50% (rather than a decline of 15% in 2015 and 2016, the decline is 25% in each year).[53]  She concludes that under this downside scenario, Millennium's equity value would range from negative $1,048.8 million to $1,274.8 million, leaving "Millennium with capital insufficient to sustain operations."[54]

## V.   MS. AUSTIN SMITH'S DISCOUNTED CASH FLOW ANALYSIS IS FLAWED AND UNRELIABLE

25.   Ms. Austin Smith asserts that her DCF analysis "demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction.  The enterprise value . . . of Millennium was $802.9 million compared with $1,761.7 million of outstanding debt. . . . In other words Millennium had a negative equity value of $958.9 million, giving effect to the 2014 Transaction."[55]  Ms. Austin Smith's DCF analysis is flawed and unreliable.

26.   Ms. Austin Smith opines without providing an explanation in her report that the proper discount rate for this exercise is a WACC of 14.8%.[56]  Ms. Austin Smith's WACC estimation is incorrect and without basis because of several errors.  Specifically,

- Ms. Austin Smith improperly includes a company-specific risk premium of 5%.

- Ms. Austin Smith incorrectly includes a small company risk premium of 1.9%.  The small company risk premium is inappropriate, does not have a theoretical basis, and is not supported by the academic literature.

- Ms. Austin Smith relies on a different set of comparable companies than the one she relies on in her comparable companies analysis.

---

[52] Austin Smith Report, ¶¶ 170–171.

[53] Austin Smith Report, ¶ 171.

[54] Austin Smith Report, ¶172; Table 10.

[55] Austin Smith Report, ¶ 145.

[56] Ms. Austin Smith does not provide a description of the basis for her estimate of the WACC.  She simply references the 2014 VPA Solvency Analysis.  In FN 285 in the Austin Smith Report, she claims that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%)."  The components of the WACC are provided in the VPA Solvency Analysis Underlying Materials, VP_ML_00002551 ("WACC Underlying Materials"), which as I understand is the underlying analysis of the 2014 VPA Solvency Analysis.  Ms. Austin Smith only references the 2014 VPA Solvency Analysis and not the WACC Underlying Materials.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

27.     Ms. Austin Smith's errors lead to a substantially inflated WACC.  As described below, correcting the above noted errors and inconsistencies in Ms. Austin Smith's WACC yields a corrected WACC of 7.2%, which implies an enterprise value of $1,970.8 million and a *positive* equity value of $209.1 million.  That is, using the corrected WACC, Millennium would be balance sheet *solvent* following the 2014 Transaction, even if one were to accept *all* of the other unsupported adjustments and assumptions Ms. Austin Smith created for this litigation (which I do not).

28.     Ms. Austin Smith's Modified Padres Projections project substantially reduced revenue. Given her revenue projections, Ms. Austin Smith does not offer a reliable basis for estimating Millennium's projected operating expenses.  While, Ms. Austin Smith projects a revenue decrease of 28% from 2014 to 2016, she projects operating expenses, as a percentage of revenue, to increase from 38% in 2014 to 51% in 2016, a proportionate increase of about one-third, without providing a basis as to why management would maintain such levels of operating expenses if management indeed had expected such substantially reduced revenues.[57]

29.     As detailed below, Ms. Austin Smith performs multiple adjustments to Millennium's specimen volume and NRPS, as well as projected revenue from "Emerging Opportunities," which are unsupported and lack a reliable basis.[58]  She also asserts that her proposed adjustments are "one-time adjustments," but she fails to acknowledge that their impact affects *all subsequent years* creating a *permanent* effect that substantially reduces her estimate of Millennium's enterprise value.[59]

30.     Notably, she relies on hindsight to justify certain of her adjustments.  It is well-settled in the academic literature and standard valuation textbooks that employing hindsight in valuations leads to unreliable results.  For example, a well-known academic paper states that "hindsight should not be used.  Rather, the stream of returns should be estimated using the information

---

[57] **Appendix H1A**; **Exhibit 5C**.

[58] Ms. Austin Smith makes several mechanical adjustments to the Padres Projections, not all of which are described in her report, in order to implement her adjustments.  These mechanical adjustments are apparent in her work-papers and I do not modify or alter several of them.  I modify only the ones I explicitly mention in my report and accompanying exhibits.

[59] Austin Smith Report, ¶ 107.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

available as of the [relevant] time [and] expectations as of that time are particularly relevant."[60] Similarly, a standard valuation textbook notes that dramatic financial reversals are often unanticipated and while "[w]ith the benefit of hindsight, the valuations of [certain companies that experienced dramatic drop in value] (and the analyst recommendations) made in 1992 can be criticized, . . . they were reasonable, given the information available at that time."[61]

31.     Ms. Austin Smith also fails to consider that management projections incorporated a 30% haircut to the NRPS forecasts to account for reimbursement risks.[62]  Ms. Austin Smith however, without support, purports to be able to provide a "better" or "more reasonable" expectation for each risk and ignores management's contemporaneous expectations and the resulting financial projections.

---

[60] Fisher, F.M. and Romaine, R.C. (1990), "Janis Joplin's Yearbook and the Theory of Damages," *Journal of Accounting, Auditing, and Finance*, 5(1), pp. 145–157 at 153.  In this paper, Fisher and Romaine provide an example to illustrate the problems with an approach that relies on hindsight, noting that if one was to lose a yearbook with Janis Joplin's signature prior to her becoming a superstar, that does not mean that one would be deprived of a yearbook containing the autograph of a rock star.  One would be deprived of a yearbook plainly worth as much as a yearbook that contained one or more signatures, i.e., a small amount.  Associated with that yearbook was uncertainty as to whether any of the autographs it contained would ever be worth anything.  The price of the yearbook included the value of the small probability that they would.  It also included the value of the rather more likely outcome that they would not.  A yearbook equally valued by the owner at the time could have been purchased for said small value, and the owner could have, in effect, mitigated the damage by purchasing a replacement and acquiring an essentially identical asset.

[61] Damodaran, *Investment Valuation,* Chapter 1, p. 5.

[62] Padres Projections, tab "Payor Mix"; Email from A. Christoforou to J. Lee, "ML Q&A Tracker," March 30, 2014, JPMC-MIL-CORP-00219684 ("Lender Question Tracker") at JPMC-MIL-CORP-00219685; Citi Model (April 2014).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> ### A. Ms. Austin Smith's findings depend on a number of assumptions and approaches that are unsupported, flawed, and unreliable
>
> #### 1. Ms. Austin Smith's valuation depends on application of an incorrect and substantially inflated WACC

32.  Ms. Austin Smith discounts her modified projected cash flows using a WACC of 14.8%.[63] This WACC is obtained by reference to the WACC from the 2014 VPA Solvency Analysis but Ms. Austin Smith provides no other basis, documentation, or analysis for this figure in her report.[64] Ms. Austin Smith's WACC of 14.8% is incorrect and overstated. Correcting certain errors in Ms. Austin Smith's WACC results in a WACC of 7.2%. **Exhibit 4** shows the components of the WACC as asserted by Ms. Austin Smith and the corrections to Ms. Austin Smith's WACC that yield the corrected WACC of 7.2%. Using this corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $1,168.0 million to $1,970.8 million. This corrected valuation renders Millennium balance sheet *solvent* by $209.8 million.

33.  I also note that the discount rates estimated by the Arrangers are consistent with the corrected WACC of 7.2%. **Exhibit 3** shows the WACCs estimated by the Arrangers and the average WACC of the Arrangers, which was 7.2%.[65]

---

[63] Austin Smith Report, ¶ 143. As discussed above, Ms. Austin Smith also acknowledges that FTI used a WACC of 14.0% in December 2015. Austin Smith Report, ¶ 143. In addition, Ms. Austin Smith performs her DCF analysis using a WACC of 9.8%, which is the lowest WACC for which she provides sensitivities. Austin Smith Report, Table 7. Similar to her 14.8% WACC, Ms. Austin Smith provides no basis or analysis, except for FN 285, in which she states that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%). However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk."

[64] Ms. Austin Smith only states that the WACC is 14.8%, referencing the 2014 VPA Solvency Analysis, and does not provide the components of the WACC. Austin Smith Report, ¶ 143. To correct Ms. Austin Smith's WACC, I relied on the WACC Underlying Materials.

[65] The average WACC of 7.2% does not include the BMO WACC as the WACC analysis BMO conducted is not made available to me. The average WACC is estimated as the average of each of the remaining Arranger's average WACC.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

        a)  The company-specific risk premium Ms. Austin Smith includes in the WACC has no basis in financial economics and is inappropriate

34.     Ms. Austin Smith's WACC incorporates a company-specific risk premium of 5%, an adjustment that has no basis in financial theory and the academic literature.  **Exhibit 4** shows the corrected WACC, taking out the company-specific risk premium from Ms. Austin Smith's WACC.

35.     A basic principle in finance is that investors earn a return that compensates them for the systematic or non-diversifiable risks they take.[66]  Company-specific risks are diversifiable because they can be diversified by investing in additional assets.  If an investor earns a return for holding a "diversifiable" risk, then they are overcompensated.  Hence, the WACC should not contain a company-specific risk premium because investors can diversify their holdings to offset company-specific risks.  Instead, in a DCF analysis, it is the projected cash flows that should reflect the expected performance of a company, including company-specific risks.[67]  In this context, "expected" performance in the cash flows does not mean an optimistic (or a pessimistic) view of the future that ignores (or exacerbates) opportunities, risks, and uncertainties.  Instead, expected performance reflects the average (or expected) outlook in a forecast, accounting for opportunities, risks, and uncertainties faced by a company.

36.     In fact, Ms. Austin Smith appears to acknowledge that the WACC should only reflect the non-diversifiable risk of the cash flows when she states that "[t]he projected free cash flows of the firm are discounted back to the date of valuation, using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows."[68]  In line with this, she appears to

---

[66] Brealey, R.A., Myers, S.C., and Allen, F., *Principles of Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2011 ("Brealey et al., *Principles of Corporate Finance*"), Chapter 1, p. 8.  According to the Capital Asset Pricing Model ("CAPM"), for a diversified investor, company specific risk (called 'idiosyncratic risk' or 'non-systematic risk') does not affect the value of the company.  Metrick and Yasuda, *Venture Capital*, Chapter 4, p. 58 ("The key idea of the CAPM is that beta reflects the covariance of an asset's returns with the returns on the overall market. The higher the beta, the higher the expected return. Beta risk is also called market risk, nondiversifiable risk, or systematic risk. The mathematics and intuition behind the CAPM implies that beta risk is the only kind of risk that affects the expected return of an asset."); Brealey et al., *Principles of Corporate Finance*, Chapter 8, pp. 185, 194; Damodaran, *Investment Valuation*, Chapter 4; Sharpe, W. (1964), "Capital Asset Prices: A Theory of Market Equilibrium Under Conditions of Risk," *Journal of Finance*, 19(3), pp. 425–442 ("Sharpe, 1964") at pp. 436–442.

[67] Damodaran, *Investment Valuation*, Chapter 4, pp. 9, 14–18; Sharpe, 1964, pp. 436–442; Brealey et al., *Principles of Corporate Finance*, Chapter 8, pp. 192–194; Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 330.

[68] Austin Smith Report, ¶ 41.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

exclude the company-specific risk premium from the 9.8% WACC when she states that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies *plus* the size premium adopted by Vantage Point (i.e., 10.0%)."[69]  Notwithstanding this acknowledgement, Ms. Austin Smith uses a WACC that incorporates a company-specific risk premium in her DCF analysis.

> b)  The small company risk premium Ms. Austin Smith includes in the WACC has no basis in financial economics and is inappropriate

37.     Ms. Austin Smith includes a premium of 1.9% in her WACC that she attributes to Millennium having a relatively small capital value.[70]  She provides no basis for including a small company risk premium in her report.  **Exhibit 4** shows the corrected WACC, taking out the small company risk premium from Ms. Austin Smith's WACC.

38.     The small company risk premium originates from the 1980s empirical finding that small stocks (those with lower market capitalizations) outperform, on average, large stocks (those with higher market capitalizations), implying that investors bear additional risks for investing in small companies.[71]  Subsequent studies however showed that the small company risk premium does not exist, i.e., investors do not earn higher returns for investing in small companies, this finding is dominated by a seasonal effect, and that the methods and studies documenting this effect are

---

[69] Austin Smith Report, FN 285 (emphasis in original).

[70] If a small company risk premium were to be used, the corrected discount rate would be 8.6% as demonstrated in **Appendix D**.  **Appendix E1** also shows the value impact on Millennium's equity value of modifying Ms. Austin Smith's adjustments alone, while maintaining all her other adjustments and assumptions, using the corrected WACC of 7.2% and the 8.6% WACC that includes a small company risk premium.  Even with a WACC of 8.6% (which includes a small company risk premium), Millennium would be balance sheet solvent if any single one of Ms. Austin Smith's adjustments pertaining to operating expenses, the purported impact of a DOJ settlement, elimination of "Emerging Opportunities," or specimen volume growth rate were to be removed.  **Appendix E2** shows the combined impact on Millennium's equity value of Ms. Austin Smith's adjustments as well as the impact of removing a portion of that combined impact.

[71] Banz, R. (1981), "The Relationship Between Return and Market Value of Common Stocks," *Journal of Financial Economics,* 9(1), pp. 3–18; Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 335.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

flawed.[72]  For example, Cochrane (2005) notes that "[t]he small-firm effect completely disappeared in 1980" and Ang (2014) states that "[s]ince the mid-1980s, however, there has been no size premium after adjusting for market risk."[73]  Horowitz et. al. (2000) find "no consistent relationship between size and realized returns."[74]  Hirshleifer (2001) notes that the "predictive power vanishes when size is measured by book value or other non-market measures."[75]  Brealey et al. (2011) note that "in the past 25 years small-firm stocks have underperformed just about as often as they have overperformed."[76]  The lack of a small company risk premium is consistent

---

[72] Blume, M.E., and Stambaugh, R.F. (1983), "Biases in Computed Returns: An Application to the Size Effect," *Journal of Financial Economics,* 12(3), pp. 387–404 at p. 388 ("Using daily returns for NYSE and AMEX stocks, we find that (1) the average size effect over the entire year is about 0.05 percent per day . . . and (2) virtually all of this full-year average is attributable to January."); Berk, J. (1995), "A Critique of Size-Related Anomalies," *Review of Financial Studies*, 8(2), pp. 275–286 at p. 284 ("We have shown that, even in an economy in which firm size and risk are unrelated, the logarithm of market value will be inversely related to expected return."); Kim, D. (1997), "A Re-Examination of Firm Size, Book-to-Market, and Earnings Price in the Cross-Section of Expected Stock Returns," *Journal of Financial and Quantitative Analysis,* 32(4), pp. 463–489 at p. 487 ("Firm size is barely significant using monthly returns, but no longer significant in explaining average stock returns using quarterly returns."); Dichev, I. (1998), "Is the Risk of Bankruptcy a Systematic Risk?" *Journal of Finance,* 53(3), pp. 1131–1147 at p. 1132 ("Third, this study finds that the size effect, strong in the 1960s and 1970s, has virtually disappeared since 1980"); Hirshleifer, D. (2001), "Investor Psychology and Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597 at pp. 1538–1539 ("The challenge for the mispricing theory is to explain how irrational investors can remain important while hemorrhaging a great deal of cash. The disappearance of the size effect in the mid-1980s and the inconsistency of the value effect in the last few years is suggestive."); Alquist, R., Israel, R., and Moskowitz, T. (2018), "Fact, Fiction, and the Size Effect," *Journal of Portfolio Management,* 45(1), pp. 1–30, pp. 3–4 ("The facts we present include the following: that the size effect diminished shortly after its discovery and publication; that it is dominated by a January seasonal effect; that it is not applicable or does not work for other asset classes outside of individual equities; that it can be made much stronger when looked at in conjunction with other factors (namely, defensive/quality factors); that the size premium mostly comes from microcap stocks and is difficult to implement in practice; and, finally, that the size effect continues to receive a disproportionate amount of attention relative to other factors with similar or stronger evidence behind them.").

[73] Cochrane, J., *Asset Pricing: Revised Edition*, Princeton University Press, 2005, Chapter 20, p. 452; Ang, A., *Asset Management: A Systematic Approach to Factor Investing*, Oxford University Press, 2014, Chapter 14, pp. 455–456.

[74] Horowitz, J.L., Loughran, T., and Savina, N.E. (2000), "Three Analyses of the Firm Size Premium," *Journal of Empirical Finance,* 7(2), pp. 143–153 at p. 143.

[75] Kent, D. D, Hirshleifer, D., and Subrahmanyam, A. (2001), "Overconfidence, Arbitrage, and Equilibrium Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597, p. 959.

[76] Brealey et al., *Principles of Corporate Finance*, Chapter 8, p. 198.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

with finance theory as there is no theoretical basis that explains why a company's size should affect estimates of its WACC.[77]

        c)  Ms. Austin Smith relies on a different set of comparable companies than the one she relies on in her comparable companies analysis to estimate her WACC

39.     In Ms. Austin Smith's comparable companies analysis, she identifies the following *five* comparable companies:  Alere, Inc. ("Alere"), Bio-Reference Laboratories, Inc. ("Bio-Reference"), Laboratory Corporation of America Holdings ("LabCorp"), Myriad Genetics, Inc. ("Myriad"), and Quest Diagnostics ("Quest").[78]  (Ms. Austin Smith later opines that her set of five comparable companies is "not sufficiently comparable to Millennium to provide a reliable estimate of value," which I address later in this report.[79])  Ms. Austin Smith's 14.8% WACC estimation, however, relies on a set of *eight* comparable companies—these five companies as well as three additional comparable companies (Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.).[80]  Ms. Austin Smith's inclusion of these three additional companies is therefore inconsistent with her comparable companies analysis.  In other words, if VPA's set of comparable companies is appropriate for the WACC estimation, Ms. Austin Smith fails to explain why she does not use that set in her comparable companies analysis.  Conversely, if VPA's set of comparable companies is "not sufficiently comparable" to Millennium, then Ms. Austin Smith does not explain how she relies on that set to estimate the WACC.

40.     This is a methodological inconsistency and had Ms. Austin Smith correctly used her set of comparable companies, the WACC would decrease.  Interestingly, Ms. Austin Smith appears to agree that the WACC must be "compiled" from her set of five comparable companies; in a footnote, she writes that "The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies . . . ."[81]— but suggests that she

---

[77] There are some studies that do find the existence of a small company risk premium, if one accounts for cash flow shocks.  Hou, K. and Dijk, M. (2019), "Resurrecting the Size Effect:  Firm Size, Profitability Shocks, and Expected Stock Returns," *The Review of Financial Studies*, 32(7), pp. 2850–2889.  This however implies that, if there is a company size effect, then the adjustment needs to be made on the expected cash flows and not the cost of equity through the inclusion of a small company risk premium.

[78] Austin Smith Report, ¶ 151.

[79] Austin Smith Report, ¶ 152.

[80] 2014 VPA Solvency Analysis at ML_DE_00263292.

[81] Austin Smith Report, FN 285.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

only does it for the 9.8% WACC.  **Exhibit 4** shows the comparable companies correction to Ms. Austin Smith's WACC.

41.     The assumption regarding the set of comparable companies affects Ms. Austin Smith's WACC estimation in two ways, through: (1) the assumption about the Company's market "beta," i.e., the exposure to the market risk,[82] and (2) Ms. Austin Smith's assumption that Millennium's target capital structure equals the industry (defined as the set of comparable companies) average.[83] **Appendix F** provides a detailed description.  Ms. Austin Smith provides no backup material for her analysis, so it is unclear what Ms. Austin Smith's methodology is and whether it is appropriate.

        d)  If Ms. Austin Smith corrected her WACC but held to her other opinions, she would conclude that Millennium was balance sheet solvent at the time of the 2014 Transaction

42.     Adjusting Ms. Austin Smith's WACC to correct her methodological flaws discussed above results in a WACC of 7.2%, substantially lower than the 14.8% WACC she uses.[84]  This implies an enterprise value of $1,970.8 million, without modifying any other adjustments and assumptions that Ms. Austin Smith makes, which renders Millennium balance sheet *solvent* by $209.1 million.  See **Exhibit 1**.

### 2.     Ms. Austin Smith's treatment of operating expenses is flawed

43.     Ms. Austin Smith projects substantially reduced revenue compared to those created by management.  In fact, Ms. Austin Smith's adjustments imply that Millennium's revenue would

---

[82] Beta is the "risk of an individual security relative to the market."  Holthausen and Zmijewski, *Corporate Valuation,* Chapter 8, p. 330.  VPA's comparable companies have an average un-levered beta of 0.77.  Ms. Austin Smith's comparable companies, on the other hand, have an average un-levered beta of 0.72.   Note that while VPA's average un-levered beta is 0.77, VPA uses an un-levered beta of 1 without any explanation.  The correction of WACC incorporates the correction of this error as well.  **Exhibit 4**, and **Appendix D** and **F** presents in detail the WACC corrections.  WACC Underlying Materials, tab "Beta."

[83] WACC Underlying Materials, tabs "Beta" and "WACC"; Austin Smith Report, ¶¶ 143, 151.

[84] While Ms. Austin Smith references FTI's WACC of 14.0%, she does not adjust it for her assumptions and opinions.  Austin Smith Report, ¶ 143.  FTI's WACC includes a company-specific risk premium ("unsystematic risk premium") of 6%, a small company premium of 2.15%, and it is based on a different set of comparable companies (FTI includes four additional companies—Opko Health, Inc., Psychemedics Corp., Sonic Health Limited, and Meridian Bioscience, Inc.— and it excludes Bio-Reference Laboratories).  FTI December 2015 Valuation at KPMG-ML-EA15WB-0000772–0773.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

decrease by approximately 15.3% in 2015 and 14.9% in 2016, and by 2018, Millennium would have just over half of the revenue originally projected by management.[85]  While Ms. Austin Smith substantially reduces Millennium's projected revenue, she projects operating expenses, as a proportion of revenue, to increase by more than 34% from 2014 to 2016 without providing a basis as to why management would maintain such levels of operating expenses if management indeed expected revenue to decline as substantially as she suggests it should have decreased.[86]  **Exhibit 5A** shows Millennium's historical operating expenses as a percentage of revenue, the Padres Projections, and Ms. Austin Smith's modified operating expenses.  Ms. Austin Smith projects not only increasing operating expenses as a proportion of revenue, but also operating expenses to be a substantially higher percentage of revenue compared to the average historical levels and the Padres Projections.  Ms. Austin Smith provides no basis for her assumptions in her report.

44.      Ms. Austin Smith classifies operating expenses driven by specimen volume as "variable" and those driven by a fixed growth rate as "fixed" operating expenses.[87]  She also has a hybrid category of operating expenses that are driven by specimen volume and a fixed growth rate.[88] While Ms. Austin Smith reduces Millennium's projected revenue substantially, she does not offer any basis for failing to adjust operating expenses in a manner consistent with her substantially lower expected revenue.  Specifically, for the period 2014–2016, Ms. Austin Smith decreases revenue by approximately 28% but increases "fixed" operating expenses by over 6%.[89] Ms. Austin Smith provides no assessment of why a major revenue reduction, such as the one she

---

[85] **Appendix H1A**.

[86] **Exhibit 5A**.  Ms. Austin Smith projects the operating expenses as percentage of revenue to increase from 38% in 2014 to 51% of revenue in 2016.  This is an increase of approximately 34% as a proportion of revenue.

[87] YAS Workpaper 1, tabs "Brattle Expense Build" and "Expenses Per Unit Costs."  While the fixed operating expenses do not change with specimen volume, they are not fixed in the sense of being constant—they grow based on a fixed growth rate that Ms. Austin Smith adopts from the Padres Projections.  For the variable operating expenses, she uses the same unit costs assumptions as in the Padres Projections and estimates operating expenses driven by specimen volume based on her modified projected specimen volume growth rates.  Austin Smith Report, ¶ 136 ("I use the same unit costs assumptions as the Padres Projections. Unit costs are calculated by dividing each expense by specimen volume. . . . To estimate expenses under the Modified Padres Projections, I multiplied the unit costs by the adjusted UDT and PGT volumes discussed above.").

[88] Austin Smith Report, ¶ 136; YAS Workpaper 1, tabs "Brattle Expense Build" and "Expenses Per Unit Costs."

[89] "Fixed" operating expenses in the Modified Padres Projections are approximately $119.5 million (18% of projected revenue) in 2014 and grow to approximately $126.9 million (26% of projected revenue) in 2016.  This corresponds to a 6% increase.  **Exhibit 5C**; YAS Workpaper 1, tabs "Detailed Income Statement" and "Brattle Expense Build."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

projects, would lead to an increase in "fixed" operating expenses, which include expenses such as fixed salaries and wages, education and marketing, or stock compensation expense.[90]  In addition, for 2014–2016, Ms. Austin Smith assumes that "variable" operating expenses decrease by approximately 12%, substantially less than the approximately 28% decrease in her projected revenue.[91]  Ms. Austin Smith again provides no analysis that would explain why variable operating expenses, which include expenses such as volume driven salaries and wages, billing, and variable commissions, should decrease less than projected revenue.

45.     As a result, Ms. Austin Smith's assumptions increase operating expenses from 38% of revenue in 2014 to 51% of revenue in 2016, a proportionate increase of about one-third.[92]  The Padres Projections assumed operating expenses to be 36% of revenue in 2014 and 34% in 2016. Millennium's actual operating expenses were 31% of revenue in 2013.[93]  Put differently, Ms. Austin Smith projects Millennium's operating expenses to increase faster than the Company's revenue.  **Exhibit 5A** shows Millennium's historical and projected, as well as Ms. Austin Smith's modified operating expenses as a percentage of revenue.  She provides no basis in her report as to why management would maintain such levels of operating expenses if management indeed expected the substantially reduced revenues she asserts.[94]  In fact, in July 2015, after the various adverse outcomes had materialized and revenue had declined, Millennium identified ways to cut

---

[90] YAS Workpaper 1, tab "Brattle Expense Build."

[91] "Variable" operating expenses in the Modified Padres Projections are approximately $111.2 million (16% of projected revenue) in 2014 and decline to approximately $98.0 million (20% of projected revenue) in 2016.  This corresponds to a 12% decrease.  **Exhibit 5C**; YAS Workpaper 1, tabs "Detailed Income Statement" and "Brattle Expense Build."

[92] **Exhibit 5C**.

[93] **Exhibit 5A**.

[94] Ms. Austin Smith's operating expenses assumptions result in substantially lower EBITDA margins—*lower* than any contemporaneous estimate and *lower* than many analyses performed around or after the time Millennium filed for bankruptcy, as demonstrated in **Exhibits 7C** and **8C**.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

its operating expenses by $35.7 million (or approximately 15%) per year.[95]  This further suggests

that Ms. Austin Smith's proportional increase in operating expenses is without a reliable basis.

46.      Modifying Ms. Austin Smith's operating expenses assumptions by keeping operating

expenses constant at her 2014 projected level of 38% of revenue, while using her inflated WACC

of 14.8% and without making any other modifications to her adjustments and assumptions, would

*increase* Millennium's enterprise value by $220.7 million to $1,023.6 million.[96]  **Exhibits 5B** and

**5C** show the modification to Ms. Austin Smith's operating expenses.  Making this modification

and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin

Smith's analysis), would *increase* her valuation by $645.3 million to $2,616.1 million.  See

**Exhibit 1**.

> **3.      Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact of a potential DOJ settlement**

47.      Ms. Austin Smith asserts that the Padres Projections "unreasonably failed to account" for

the "reputational impact" that would follow an "expected" settlement with the DOJ.[97]  To account

for the purported "reputational impact of an expected US DOJ Settlement," Ms. Austin Smith

uses certain volume declines that she says two other companies—Ameritox and Calloway—

experienced following their respective DOJ settlements (in 2010 and 2012), and reduces

---

[95] Management identified the following categories for potential operating expenses reductions: Headcount ("[c]ompany wide reduction in force," "[c]onsolidation of territories"), Commissions ("[e]limination of commissions on unpaid volume"), Consulting Expenses ("[e]limination of outsourced functions whenever possible," "[e]limination of professional fees related to revenue cycle"), and reductions in travel.  Alvarez & Marsal Presentation, "Presentation to the Department of Justice," July 22, 2015, ML_DE_00167434 at ML_DE_00167456 ("The largest contributors to savings will come from headcount and commissions savings that account for 65% of total run-rate savings.").

[96] I modify Ms. Austin Smith's operating expenses by making them constant at her 2014 projected level of 38% of revenue.  This is a conservative assumption as the modification could keep operating expenses constant at the 2013 level of 31% of revenue or the 2014 Padres Projections level of 36% of revenue.  Both modifications would increase Millennium's enterprise value by more than $221 million.  **Exhibit 5A**.

[97] Austin Smith Report, ¶¶ 131–132.  As I understand, on March 27, 2012, Millennium received a subpoena from the DOJ for production of documents in connection with an investigation into federal healthcare offenses.  Email from H. Appel to S. Karanikolaidis, Letter from the United States Attorney to Martin Price, "Re: Subpoena Regarding Millennium Laboratories, Inc.," March 27, 2012, JPMC-MIL-CORP-00214601, JPMC-MIL-CORP-00214602.  As I further understand, the DOJ informed Millennium in December 2014, nine months after the 2014 Transaction, that it would be pursuing claims against the Company.  Hardaway Declaration, ¶ 17.  Following the DOJ investigation, the Company entered into a settlement with the DOJ on May 20, 2015.  Hardaway Declaration, ¶ 27.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium's UDT and PGT specimen volume by 15% in 2015 and by another 15% in 2016.[98] Notably, she references an email dated April 3, 2015 ███████████████████████ ████████████████████████████████████[99] She also references a June 14, 2015 email by Millennium's then-CEO that stated ████████████████████████ ██████████████████████████████████████████ ███████████████[100] Ms. Austin Smith, however, provides no evidence corroborating the supposed volume declines at the two companies. Moreover, she provides no analysis in her report for what caused the revenue declines for these two companies, if they in fact occurred, or whether they were a result of these companies' settlements with the DOJ (due to reputational impact or otherwise). Ms. Austin Smith provides no explanation for why Millennium's management should have expected to experience a similar volume decline and no explanation as to how Millennium should have predicted this impact more than a year before the emails in question were sent.[101]

48.     Notably, in the same June 2015 email cited by Ms. Austin Smith, Millennium's then-CEO stated that ██████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████[102] Ms. Austin Smith has failed to explain how this email provides a basis, in April 2014, for the 30% adjustment that she applies across 2015 and 2016. In fact, more than a year after the 2014 Transaction, Millennium, with the assistance of Alvarez & Marsal, analyzed the impact of the DOJ investigations on

---

[98] Austin Smith Report, ¶¶ 86, 131–132.

[99] Email from T. Kennedy to B. Hardaway, et al., "RE: Privileged," April 3, 2015, ML_DE_00597259 at ML_DE_00597260.

[100] Austin Smith Report, ¶ 131; Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015, ML_DE_00559337 at ML_DE_00559338.

[101] Austin Smith Report, ¶¶ 131–132. Ms. Austin Smith models her adjustment of a purported reputational impact of a DOJ settlement as starting in January 2015. Ms. Austin Smith has failed to provide a basis for such an assumption in her report. Her adjustment affects specimen volume starting in 2015 in a permanent manner, as she effectively reduces the base of specimen volume that subsequent volume is based on. Had she assumed a later start date of a potential DOJ settlement, her adjustment would have been smaller.

[102] Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015 ML_DE_00559337 at ML_DE_00559338.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Ameritox and Calloway only to conclude that Millennium would model a decline of 5% starting in July 2015 and a further 10% the following year.[103]

49.     Importantly, Ms. Austin Smith has failed to show that the volume declines for Ameritox and Calloway were not instead the result of the termination of the practices investigated by the DOJ (or, indeed, any other factors), in whole or in part.  Moreover, Ms. Austin Smith separately adjusts the Padres Projections for the termination of the custom profiles and the POC Free Test Cup program, which, as I understand, were among the targets of the DOJ's investigation into Millennium.[104]  In other words, she has no basis for her assertion and provides no evidence in her report, that these volume declines were due to reputational impacts resulting from the DOJ settlements.

50.     Modifying the impact of this adjustment by restoring the UDT and PGT specimen volume declines of 15% in 2015 and 15% in 2016, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $383.8 million to $1,186.6 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $1,138.7 million to $3,109.5 million.  See **Exhibit 1**.

> **4.      Ms. Austin Smith provides no reliable basis for the elimination of the revenue from Millennium's "Emerging Opportunities"**

51.     The Padres Projections included anticipated future revenue from "Emerging Opportunities," which as I understand, included government contracts with the Department of Defense and Department of Veterans Affairs, and international opportunities.[105]  Ms. Austin Smith asserts that "Emerging Opportunities should not form part of the expected cash flows when assessing balance sheet solvency" because "[t]he revenue[] appear aspirational rather than

---

[103] Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015 ML_DE_00559337 at ML_DE_00559338.

[104] Austin Smith Report, ¶¶ 128, 133.

[105] Lender Presentation at JPMC-MIL-CORP-00170167; Management Presentation at ML–DE–00058293; Lender Presentation Audio at minute 35:00.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

expected."[106]  Ms. Austin Smith disregards the actions the Company took in order to realize these opportunities and her characterization relies on the simple observation, which in turn relies on hindsight, that "[t]he Emerging Opportunities do not appear in the subsequent management model dated June 8, 2015."[107]

52.     Indeed, Ms. Austin Smith completely ignores Millennium's business actions related to "Emerging Opportunities," including the federal supply schedule contract that Millennium was awarded in June 2013 and the company internal infrastructure that Millennium had built to assist with the government contracts.[108]  Regarding the government contracts, Millennium stated that it had hired a former Walgreens professional who was experienced in government supply strategy.[109]  Regarding international opportunities, Millennium had a dedicated team and planned to partner with existing companies in emerging markets and license Millennium's technologies.[110]

53.     Moreover, Ms. Austin Smith's rationale is flawed as it is inconsistent with the broadly accepted principles of conducting a DCF analysis in which projected cash flows *should* reflect the *expected future* cash flows.[111]  In other words, Millennium had taken actions so that these "Emerging Opportunities" could materialize and prior to the 2014 Transaction, constituted expected future cash flows.  She does not explain why management should not have expected this revenue given the actions it had taken.

54.     Modifying the impact of this adjustment by restoring the revenue from "Emerging Opportunities," while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's

---

[106] Austin Smith Report, ¶ 67.

[107] Austin Smith Report, ¶ 67.  Ms. Austin Smith simply states that "[t]he Confidential Information Memorandum contains limited discussion on the composition of Emerging Opportunities.  Rather, discussion is limited to a description of the employment background of Elizabeth Peacock, the 'Executive Vice President of Emerging Opportunities.'"  Austin Smith Report, ¶ 67.

[108] Lender Presentation Audio at minutes 34:00–36:00.

[109] Lender Presentation at JPMC-MIL-CORP-00170167; Lender Presentation Audio File at minute 36:20 ("So we went out and hired Walgreens' top person that was running their Department of Defense governmental business and he joined us six weeks ago. . . . He built Walgreens' governmental program over the last several years, a multibillion dollar business.").

[110] Lender Presentation Audio at minutes 37:00–40:00.

[111] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 4, p. 156 ("A financial model is a set of assumptions (or forecast drivers) and relations (or formulas) that produces predictions regarding the future performance of a company.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

enterprise value by $192.8 million to $995.7 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $663.6 million to $2,634.5 million.  See **Exhibit 1**.

> **5.      Ms. Austin Smith's other adjustments related to Millennium's business practices are unfounded, rely on hindsight, and are created based on an ad hoc and unreliable methodology**

55.      Ms. Austin Smith performs additional adjustments to specimen volume and NRPS to account for certain of Millennium's business practices.  Specifically, her adjustments include: reduction of specimen volume growth rates starting from 2014 to reflect her assumed historical and industry trends; reduction of Medicare NRPS to capture the MUE denials and reduction of specimen volume to capture the discontinuance of the POC Free Test Cup program; reduction of NRPS to capture the discontinuance of custom profiles, and the draft Noridian LCD.

56.      Ms. Austin Smith's adjustments to specimen volume growth rates are unsupported and unreliable.  Specifically, Ms. Austin Smith provides no reliable basis for her assertion that management's specimen volume projections were inconsistent with Millennium's historical trends, industry trends, and expected performance.  Without providing adequate basis, she extrapolates Millennium's future trends from a small sample of historical trends and in doing so, relies on a small set of historical data, and disregards without explanation additional available data that contradict her conclusions.  Notably, her assertions about the industry trends are incorrect based on publicly available sources.

57.      In performing her adjustments for the MUE denials and the POC Free Cup Test, Ms. Austin Smith relies on hindsight bias, which renders her analysis flawed and unreliable.  Finally, Ms. Austin Smith provides no reliable basis for the estimated impact of the custom profile elimination and her methodology is ad hoc.

> a)  Ms. Austin Smith's ad hoc specimen volume growth rate adjustments are unsupported and unreliable

58.      Ms. Austin Smith asserts that the Padres Projections were "inconsistent with Millennium's historical trends, Millennium's reasonably anticipated future trends and with broader UDT

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

industry trends."[112]  Specifically, she claims that "the projected specimen CAGR of 9.8% from 2014 to 2018 for Medicare was unreasonably high given declining growth rates and negative growth of 3.4% in the first quarter of 2014 actuals when compared to the fourth quarter of 2013 actuals."[113]  To adjust for these supposed historical and industry trends, she reduces Medicare specimen volume growth rate to 0% in 2014, 2% in 2015, and 3% for 2016 and onwards, and commercial payors specimen volume growth rate to 10% in 2014, 5% in 2015 and 3% from 2016 onwards.[114]

59.     Ms. Austin Smith inappropriately uses Millennium's historical performance to extrapolate its future performance without considering other factors that could affect expectations about future performance.  Relying solely on (a narrow subset of) historical data is inappropriate when projecting future expectations.  When creating projections, one must consider all the factors that would affect future performance including the contemporaneous market conditions, industry conditions and expectations, and company-specific characteristics.[115]  While historical data are useful "in forecasting future growth, they have considerable noise associated with them," especially for young, growth companies, such as Millennium.[116]  Ms. Austin Smith disregards this fundamental principle and instead adjusts Millennium's specimen volume growth rates downwards by simply claiming that they were "inconsistent with contemporaneous trends."[117]

---

[112] Austin Smith Report, ¶ 108.

[113] Austin Smith Report, ¶ 109.

[114] Austin Smith Report, ¶ 109.

[115] Holthausen and Zmijewski. *Corporate Valuation*, Chapter 4, p. 157 ("We conduct a competitive analysis of the company's industry and assess the company's competitive advantage in order to help us identify and forecast the forecast drivers; to help assess the role that general economic, industry, and comparable company factors could have in developing a financial model; and to assess the reasonableness of the forecasts.").

[116] Damodaran, *Investment Valuation*, Chapter 11, p. 11; Damodaran, *Investment Valuation*, Chapter 1, p. 5 ("Mature firms tend to be easier to value than growth firms, and young start-up companies are more difficult to value than companies with established produces and markets.  The problems are not with the valuation models we use, though, but with the difficulties we run into in making estimates for the future.").  Damodaran, *Investment Valuation*, Chapter 1, p. 12 ("If past growth in earnings is not a reliable indicator of future growth at many firms, it becomes even less so at smaller firms.").  Damodaran, *Investment Valuation*, Chapter 1, p. 15 ("[R]apid changes that high growth firms go through over time make historical growth rates unreliable indicators of future growth for these firms.").  Millennium was founded in December 2007 and at the time, concentrated on urine drug testing services.  2014 Confidential Information Memorandum at ML_DE_00269130.

[117] Austin Smith Report, ¶ 109.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

60.      Notably, her specimen volume growth rates appear to be random as she provides no analysis that would show how she estimated them.  Specifically, Ms. Austin Smith's specimen volume growth rate adjustments of 0% in 2014, 2% in 2015, and 3% for 2016 and onwards for Medicare are without any basis.  These numbers are not derived from any empirical analysis; Ms. Austin Smith simply asserts these numbers.

61.      Interestingly, Ms. Austin Smith not only inappropriately relies *only* on historical data but she also considers *only* a subset of the available data.  Specifically, to infer Millennium's future trends, Ms. Austin Smith uses the Company's historical data on quarterly specimen volume from 1Q2012 to 1Q2014 and quarterly specimen volume growth rate from 2Q2012 to 1Q2014, as opposed to using Millennium's available data from 2009, i.e., she disregards three years of additional data (out of the six years for which Millennium has data).[118]  She also uses the specimen volume growth rate changes of only one quarter, between 4Q2013 and 1Q2014.[119]  In other words, Ms. Austin Smith relies on *one* data point (change from 4Q2013 to 1Q2014) to extract expectations about Millennium's long-term performance.  Even if one were to accept Ms. Austin Smith's methodology, which I do not, her reliance on a such a small sample when additional data is available renders her analysis unreliable.

62.      Notably, Ms. Austin Smith's conclusions contradict the available information.  First, she claims that "[a]s shown in Table 9, specimen volumes had been declining since 2009."[120]  Table 9 does not provide data on specimen volume,[121] but her own Table 4 shows that Millennium's specimen volume has been *increasing* every year.  Specifically, it *increased* by 185.0%, 123.0%, 64.4%, and 30.5% between 2009-2010, 2010-2011, 2011-2012, 2012-2013, respectively.[122]  While indeed the *growth rate* for the specimen volume *increase* has been declining, Ms. Austin Smith fails to explain why that implies that specimen volume would reasonably be expected to

---

[118] Austin Smith Report, Figure 2; Figure 6; ¶ 109.

[119] Austin Smith Report, ¶¶ 58–59 ("Furthermore, the disparity in growth rates increased over this time period. Indeed, in first quarter of 2014, the quarter immediately prior to the 2014 Transaction, Millennium's Medicare specimen volume contracted by 3.2%, whereas commercial specimen volume grew by 4.4%. . . . The slowing growth trend was even more pronounced for Medicare specimen volume, decreasing to only 12.9% from 2012 to 2013 and contracting by 3.2% from the fourth quarter of 2013 to the first quarter of 2014.").

[120] Austin Smith Report, ¶ 109.

[121] Table 9 provides data on "Guideline Public Company Valuations."  Austin Smith Report, p. 87.

[122] Austin Smith Report, Table 4.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

decrease. In fact, between 2009 and 2013, Millennium experienced rapid growth as shown by various performance measures. Net revenue grew at a CAGR of 77%, with annual growth rates between 21% and 149%.[123] Adjusted EBITDA grew at a CAGR of 74%, with annual growth rates between 7% and 147%.[124] **Exhibits 2A**, **2B**, and **2C** show CAGRs for Millennium's revenue, EBITDA, and EBITDA margins, as well as the Padres Projections and Ms. Austin Smith's Modified Padres Projections. Ms. Austin Smith's extrapolated trends are inconsistent with this information.

63.    Moreover, Ms. Austin Smith emphasizes the volume growth rate from a single quarter, 1Q2014. For example, Ms. Austin Smith states that "between the first quarter of 2012 and first quarter of 2014, quarterly specimen volume growth declined from 14.5% to 2.2%."[125] But a quarterly growth rate of 2.2% amounts to a growth rate of over 9% on an annualized basis, which is closer to Millennium's projected average annual specimen growth rate of 8.2%.[126]

64.    Ms. Austin Smith also claims that the Padres Projections were inconsistent with "contemporaneous trends" and "projected laboratory testing industry growth" as "the UDT industry, especially quantitative testing, was under significant pressure from government and commercial payors" but fails to provide any support for her assertion.[127] Between 2007 and 2012, drugs-of-abuse testing, which includes UDT, was one of the three fastest growing clinical lab tests in terms of Medicare Part B spending between 2007 and 2012.[128] In fact, as I understand, testing for opiates and cannabinoids were among the top 15 fastest growing lab tests in terms of Medicare Part B spending.[129] By 2014, the U.S. market for pain management was approximately

---

[123] Lender Presentation at JPMC-MIL-CORP-00170161.

[124] Lender Presentation at JPMC-MIL-CORP-00170161.

[125] Austin Smith Report, ¶¶ 59, 78.

[126] To annualize the quarterly growth rate I use the following formula, $(1+2.2\%)^4-1$.

[127] Austin Smith Report, ¶¶ 73, 109.

[128] "Competitive Market Analysis for Laboratory Management Decision Makers," *Laboratory Economics*, 8(10), October 2013 ("Lab Econ Oct 2013"), p. 7. Overall, Medicare Part B spending on the top 50 clinical lab tests increased by 5.2% per year from 2007 to 2012 (from $2.7 billion to $3.5 billion). Lab Econ Oct 2013, pp. 7–9.

[129] Lab Econ Oct 2013, p. 7.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

$22.3 billion and was expected to reach $33.8 billion by 2017.[130]  Ms. Austin Smith provides no reliable basis for her adjustments that diverge substantially from these observed industry trends.

65.     Modifying the impact of this adjustment by restoring the specimen volume growth rate, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $155.0 million to $957.8 million.  Making this modification and using the corrected WACC of 7.2% without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $499.0 million to $2,469.8 million.  See **Exhibit 1**.

> b)  Ms. Austin Smith relies on hindsight to perform the adjustments for the MUE denials

66.     To adjust for the impact of MUE claim denials, Ms. Austin Smith calculates "monthly Medicare NRPS decrease between $77.7 and $83.7 from January to March 2014."[131]  To estimate this adjustment, she relies on hindsight as she uses "the total MUE-impacted revenue in 2014 as of July 2014 ($21.9 million)."[132]  Ms. Austin Smith fails to show whether these data were available to Millennium prior to the 2014 Transaction.

67.     Modifying the impact of MUE adjustment by restoring NRPS, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $87.9 million to $890.8 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $217.3 million to $2,188.1 million.  See **Exhibit 1**.

> c)  Ms. Austin Smith relies on hindsight to perform the adjustments for the discontinuance of the POC Free Test Cup Program

68.     Additionally, to estimate the impact of the discontinuance of the POC Free Test Cup program, which as I understand was at issue in the Ameritox litigation, Ms. Austin Smith incorporates "a 1.6% reduction in UDT volume in July 2014" and relies on an analysis that

---

[130] BMO Harris Bank, N.A., "Loan Underwriting Committee Memorandum," March 11, 2014, ML00008506 ("Loan Underwriting Committee Memorandum") at ML00008518.

[131] Austin Smith Report, ¶ 118.

[132] Austin Smith Report, ¶ 117.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium performed in July 2014, using data "on customers that cancelled their agreements in June 2014," following the Ameritox verdict in June 2014.[133]  Ms. Austin Smith fails to show whether these data were available to Millennium prior to the 2014 Transaction.  Moreover, Ms. Austin Smith disregards information that indicates that, at the time of the 2014 Transaction, management expected to prevail on the Ameritox litigation.[134]  Instead, Ms. Austin Smith relies on hindsight, concluding that Millennium should have accurately expected the eventual outcome of the Ameritox litigation.

69.     Modifying the impact of the POC Free Test Cup program adjustment by restoring the volume reduction, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $17.4 million to $820.3 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $45.2 million to $2,016.0 million.  See **Exhibit 1**.

         d)  Ms. Austin Smith's adjustment for the elimination of custom profiles is ad hoc

70.     Ms. Austin Smith assumes that the practice of using custom profiles would be eliminated and to adjust for this elimination she applies a 21.8% reduction in Millennium's commercial payors NRPS.[135]  She notes that "[a]lthough the Padres Projections do reflect a decline in Millennium's commercial payor NRPS, there is no indication that this projected decline is intended to represent the impact of the likely discontinuance of Custom Profiles."[136]  She also claims that "based on data available as of the 2014 Transaction, the impact of the anticipated

---

[133] Austin Smith Report, ¶ 133.

[134] Deposition of Martin Price, April 12, 2021 ("Price Deposition"), 254:21–25 ("Q: Why were you surprised by the Ameritox verdict? A: I was expecting to succeed on our affirmative claims and to also prevail on the claims brought by Ameritox against the company."); Price Deposition, 192:10–17 ("Q: ███████████████████████████████████████████████████████████████████████████ ; Deposition of William Brock Hardaway, July 20, 2021 ("Hardaway Deposition"), 288:21–289:8 (Q: "Do you remember learning about that verdict?  A: It seems like maybe I got a call from Martin, yeah, to give me the update.  Q: And do you remember your -- what your reaction was?  A: Not really, I don't really -- other than being disappointed, feeling like we -- because our counsel had led us to believe that, you know, we should win on virtually every issue.").

[135] Austin Smith Report, ¶ 128.

[136] Austin Smith Report, ¶ 124.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

discontinuance of Custom Profiles should have reasonabl[y] been estimated to cause a much larger decline in commercial payor NRPS."[137]  Ms. Austin Smith provides no reliable basis for her conclusions and the estimated impact of the custom profile elimination.

71.     Moreover, Ms. Austin Smith's methodology for estimating the potential impact of the custom profile elimination is ad hoc.  Specifically, to estimate Millennium's revenue from custom profiles for commercial payors, she analyzes Millennium's revenue from certain Medicare billing codes.[138]  She provides no support for her approach other than a claim that "given the history of commercial payors following the trend of Medicare reimbursement, I considered the Medicare NRPS reduction to be a relevant proxy for Millennium's commercial NRPS reduction following the discontinuance of Custom Profiles."[139]  Ms. Austin Smith does not cite to any source of support for this assumption.[140]  In addition, Ms. Austin Smith assumes that revenue received from these Medicare billing codes pertains to revenue from custom profiles because two other companies, Aegis Sciences Corporation ("Aegis") and Ameritox, did not receive any Medicare reimbursement from these codes.[141]  That is, she compares certain Medicare billing codes among Millennium, Aegis, and Ameritox, and argues that if a billing code is billed by Millennium but not billed by Aegis or Ameritox, then it means that, that billing code is likely "medically unnecessary testing" and hence tied to custom profiles.[142]  Ms. Austin Smith provides no other analysis to show that the billing codes in question were tied to custom profiles and does not explore alternative explanations for why Millennium might have used billing codes not used by Aegis and Ameritox.

72.     Modifying the impact of her adjustment for the discontinuance of custom profiles by restoring the NRPS reduction, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $101.6 million to $904.5 million.  Making this modification and

---

[137] Austin Smith Report, ¶ 125.

[138] Austin Smith Report, ¶ 126.

[139] Austin Smith Report, ¶ 130.

[140] Austin Smith Report, ¶ 130.

[141] Austin Smith Report, ¶¶ 126–127 ("Of the 30 codes for which Millennium received Medicare reimbursement in 2013, there were 9 codes for which neither Ameritox nor Aegis received Medicare reimbursement. . . . In 2013, Millennium derived 21.8% of its Medicare NRPS from these codes.").

[142] Austin Smith Report, ¶ 128.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $303.8 million to $2,274.6 million.  See **Exhibit 1**.

### B. Ms. Austin Smith's analysis is at odds with those completed by financial professionals in the period leading up to the 2014 Transaction

73.     Millennium's management Padres Projections were based on management's standard approach for budgeting and forecasting analyses.[143]  As I understand, the Padres Projections were shared with VPA, the Arrangers, and TA Associates, who used these projections to perform their own valuation and sensitivity analyses.[144]  Certain elements of the Padres Projections were also shared with the credit rating agencies, S&P and Moody's, who performed the credit rating assessment of the 2014 Transaction.[145]  All of the available contemporaneous analyses concluded that Millennium was solvent.  Ms. Austin Smith completely disregards the contemporaneous analyses completed by these financial professionals leading up to the 2014 Transaction and develops, for purposes of this litigation, an analysis that is starkly at odds with these analyses.

74.     Indeed, Ms. Austin Smith's result resembles more closely the analyses prepared around the time of, or indeed after Millennium's bankruptcy in November 2015, including projections

---

[143] Padres Projections; Deposition of Tim Kennedy, September 30, 2021 ("Kennedy Deposition") at 244:7–22 (Q: "So going back to the first point you made, financial projections.  The financial projections that you did in connection with the 2014 transaction, was that largely what you just described over the last number of minutes in terms of process?  A: You mean for -- you mean the methodology that we'd go through?  Q: Correct.  So let me clarify myself.  So the methodology that you used in connection with the 2014 transaction, financial projections, was that the same as the methodology that you just described as that which you generally used at Millennium? . . . THE WITNESS: Yes. I would say, generally speaking, it would be.").

[144] Millennium's $1.775 billion senior secured credit facility was rated by Moody's and S&P on March 31 and March 28, 2014, respectively.  TA Associates is a private equity firm that in 2010 invested $196 million in exchange for warrants and debentures. Deposition of Jennifer M. Mulloy, July 14, 2021 ("Mulloy Deposition") at 21:1-8.  The debentures and warrants were issued by Millennium Lab Holdings, Inc.  As part of the 2014 Transaction, Millennium Lab Holdings, Inc. transferred a 45% membership interest in Millennium to TA Associates "in exchange for the redemption of the outstanding TA warrants in [Millennium] Holdings and in satisfaction of the outstanding TA debentures." 2014 VPA Solvency Analysis at ML_DE_00263276; Mulloy Deposition, 17:20–18:6; Lender Question Tracker at JPMC-MIL-CORP-00219685.

[145] Millennium Laboratories, "Rating Agency Presentation," March 2014, JPMC-MIL-CORP-00011605.  On March 15, 2014, JPMC sent a projection model dated March 14, 2014 to the ratings agencies.  Email from A. Christoforou to D. Diaz, "Millennium Laboratories Meeting Materials," March 14, 2014 JPMC-00053824, JPMC-00053828; Email from A. Christoforou to G. Hessol, "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-MIL-CORP-00193320, JPMC-MIL-CORP-00193324.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

prepared by Millennium's management on June 8, 2015 ("June 2015 Management Projections") and a valuation conducted by FTI on April 2016 based on management projections as of December 2015.[146]  These analyses were conducted after the uncertainty regarding certain risks that existed at the time of the 2014 Transaction had resolved, including the Ameritox ruling, the settlement with the DOJ and the required post-settlement operational adjustments, changes in reimbursement trends, and additional regulatory pressures.[147]  The cumulative impact of these developments ultimately led to Millennium's bankruptcy on October 15, 2015.[148]  **Exhibit 6** shows all available contemporaneous valuation analyses and the FTI (post-bankruptcy) December 2015 valuation analysis.

> **1.   Millennium's management prepared financial projections based on its standard practice**

75.    Millennium's standard practice was to create a budget for the upcoming year and forecasts for subsequent (relevant) years.[149]  As I understand, both for the budgeting analysis and the forecasting analysis, management created projections for specimen volume, operating expenses, and reimbursement rates, i.e., NRPS.[150]  Specifically, to create the budget for the upcoming year, Millennium's sales representatives offered specimen volume projections that management analyzed.[151]  Following the specimen volume projections, management considered "operational

---

[146] June 2015 Management Projections; Austin Smith Report, ¶67; FTI December 2015 Valuation.

[147] Hardaway Declaration, ¶ 28.

[148] Hardaway Declaration, ¶ 28.

[149] Kennedy Deposition, 211:1–4 ("[B]udgeting is taking the current period in which is -- is coming up; for example, we are in 2021, I would do a budget for 2022 and a forecast for every year beyond that.").

[150] Kennedy Deposition, 219:14–223:15 (describing volume, reimbursement, and expense inputs into budget), 228:13-20 (describing forecast process as "very similar to the budget process").

[151] Kennedy Deposition, 219:14–24 ("Q: Okay.  So focusing on your time at Millennium, can you generally describe the process that Millennium employed for budgeting. A: Similar to what I described a little earlier.  You know, the sales force would basically provide volume projections, then . . . we would all get together and take a look at the sales force volume projections to make a determination as to whether or not it looked reasonable or not."); 229:2-9 (Management examined these projections by reviewing market data on "referral volumes . . . patterns, physicians . . . trends on physician ordering, number of tests per accession, what kind of new tests might be coming out of [the] R&D department, and what do we forecast the ordering capabilities of either your current referral base or even a new referral base . . . based on the type of test that you're coming out with.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

needs for equipment, people and space requirements,"[152] i.e., the operating expenses.  To create the forecast for the subsequent (relevant) years, management used the one-year budget and forecasted the long-term specimen volume growth rate of existing business based on a "run rate" model.[153]  Management also forecasted new business opportunities.[154]  Similar to budgeting, following the projections for long term specimen volume growth, management created the projections for the long term projected expenses.[155]  Finally, in forecasting reimbursement rates, management considered coverage policies for each payor, "how many times is a given test or CPT code ordered by a referring physician," and the mix of business by payor.[156]

76.     Ms. Austin Smith disregards how management created the Padres Projections, what information was available at the time, and how management accounted for the industry trends and

---

[152] Kennedy Deposition, 221:6–8; Deposition of Daniel Pencak, July 12, 2021, 342:13–20 ("Q: In describing the budgeting process, I think you just testified that among the things that you would do is to project costs, project rates and project volumes, is that correct? . . . A: As part of the budgeting process, yes.").

[153] Kennedy Deposition, 235:5–9.  I understand that the annualized "run rate" for each year was created based on the monthly number of physician referrals.  Kennedy Deposition, 234:22–236:2 ("In month one of a given year, you get one referral.  In month two, if you keep that one referral, you now have that referral, and in month two, you sell a second referral. . . . So now you have -- in month one, you have one, in month two, you have two.  In month three, you have three, et cetera, all the way through month 12. . . . By the time you get to month 12, you start the following year with 12. . . . And you build another 1, 2, 3, the following year.  So in the healthcare business, . . . you'd refer to it as the 'annuity model,' meaning you have a core book of business when you finish.  So I would say, for example, if you were exiting 2013, in order to project 2014, you would look at your run rate for '13 and you would annualize that run rate.  That would give you a starting point for the subsequent year.  Then in the current year, you look at the amount of sales reps you have, the amount of opportunity that you have in order to close new business, okay, in that current year, and you layer that new business volume on top of your base run rate for that year. . . . Typically gives you, you know, your volume.").

[154] Kennedy Deposition, 235:15-25 ("[I]n order to project [the next year], you would look at . . . the amount of opportunity that you have in order to close new business . . . .").

[155] Kennedy Deposition, 238:10–15 ("Q: Fair enough.  Now, in the budgeting process, you mentioned how volume drives the way that you think about expenses. Is that also true in the forecasting process? A: Absolutely. Your volume drives expenses."); 238:24 – 239:22 ("So as volume grows, you need more billing -- billers and collectors to bill more of that volume, whereas you don't need more CEOs, CFOs. . . . So there are certain individuals that remain static as time goes by, but others that grow. . . . It could be customer service individuals that would need to grow based on the quantity of, not necessarily the growth in the volume, but the growth in clients that you have.  So you need more customer service people. . . . And the volume that you have will drive the need for capital expenditures to acquire additional equipment.  So at Millennium, we -- our main equipment were mass specs and -- because, you know, we had many, many mass specs.  But if the volume got up to a high enough level, you would have to go out and buy another piece of equipment to accommodate that higher volume level.").

[156] Kennedy Deposition, 236:3–238:9 (noting that "you look at -- payer policy").  Current Procedural Terminology ("CPT") "is a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals.  These health care professionals use the CPT to identify services and procedures for which they bill public or private health insurance programs."  "HCPCS – General Information," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo, accessed on February 7, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

the "reimbursement, legal, and regulatory risks."[157]  Instead, she layers on top her different views regarding the trends and risks at the time of the 2014 Transaction, based on her own view seven years later with the benefit of hindsight and in the context of this litigation.

> **2.     Ms. Austin Smith disregards the contemporaneous analyses by various third parties, which contradict her conclusion that Millennium was insolvent**

77.     I understand that Millennium's Padres Projections were shared with VPA, the Arrangers, and TA Associates, who relied on these projections to perform analyses of Millennium's business. Millennium was solvent according to all available contemporaneous analyses.  Ms. Austin Smith disregards these analyses and instead, for the purpose of this litigation, produces results that are starkly at odds with the contemporaneous analyses.  In fact, Ms. Austin Smith, without any analysis or basis, claims that the contemporaneous analyses did not "reflect all relevant information that was known or knowable as of the date of valuation" as "a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction."[158]  **Exhibits 7A**, **7B**, and **7C** show Ms. Austin Smith's revenue, adjusted EBITDA, and adjusted EBITDA margin sensitivities and contemporaneous sensitivities and downside scenarios.

78.     The Arrangers considered various downside scenarios to the Padres Projections and performed sensitivity analyses as part of their due diligence process.[159]  Millennium was *solvent* according to all available contemporaneous analyses by the Arrangers. Specifically:

- As part of the due diligence process, JMPC's internal healthcare coverage team reviewed Millennium's projections and compared them to their available industry

---

[157] Austin Smith Report, ¶ 74.

[158] Austin Smith Report, ¶ 7.

[159] JPMC was the administrative agent and a joint lead arranger of the 2014 Transaction.  Citi was the other joint lead arranger of the 2014 Transaction. SunTrust and BMO were the co-managers for the 2014 Transaction. J.P Morgan Chase Bank, N.A., Credit Agreement Among Millennium Lab Holdings II, LLC, Millennium Laboratories, LLC, and J.P. Morgan Chase Bank, N.A., et al., April 16, 2014, ML_DE_00196568; 2014 Confidential Information Memorandum at ML_DE_00269136; As I understand, SunTrust underwrote 5% of the 2014 Transaction.  Deposition of David M. Felty, July 27, 2021 ("Felty Deposition"), 137:16–22 (Q: "SunTrust provided 5 percent? A: Yes.").  As I understand, BMO underwrote 5% of the 2014 Transaction, approximately $90 million.  Deposition of Phillip Ho, July 28, 2021 ("Ho Deposition"), 22:17–19 ("We were . . . 5 percent underwriter of the transaction.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

information.[160]  JPMC also visited the Company's facilities.[161]  JPMC used the Padres Projections to perform a DCF analysis and estimated an enterprise value in the range of $3.9 billion to $4.9 billion.[162]  JPMC "stress test[ed] the [Padres] model" and considered a range of potential downside scenarios and their impact on the Company's ability to service its debt obligations.[163]  Under all of these scenarios, Millennium was projected to remain solvent following the 2014 Transaction.

- Citi performed a valuation analysis in which they "sensitized and pressure tested … all aspects of [Millennium's] model, including the revenue, including the margins,

---

[160] Deposition of Ryan Griswold, July 22, 2021 ("Griswold Deposition"), 159:21–161:9 ("Q: You're accepting the company's assumptions and then as part of your diligence you're testing those assumptions; is that accurate?  A: Testing and -- and sensitizing, yes.  You also have a number of, you know, industry experts that also have to overlay, you know, what they're seeing from, you know, competitors and if the assumptions are sort of wildly off and it doesn't pass the smell test you're doing, you know, very granular quantification or quantifying type sensitivity, but you're also doing the qualification, you know, with the industry knowledge to sort of say, you know, this feels right or this doesn't feel right based on industry knowledge. Q: What industry experts are you referring to?  A: So the healthcare coverage folks who their job is to cover the industry, all the companies that make up that industry.  And if one company has wildly different assumptions than what the industry broadly is sort of saying that, you know, further, you know, raises things that we need to diligence and understand that much further.  So it's not as if somebody off the street with no industry knowledge would look at these assumptions saying, yeah, they look right.  It's people that have been doing this their entire career.  Q: And those are internal JPMorgan employees, correct?  A: That's right.").

[161] Griswold Deposition, 31:22–33:7 ("Everything from, you know, multiple . . . calls, site visits, expert -- expert help, you know.").

[162] JPMC Model (April 2014), tab "DCFcredit."  Griswold Deposition, 142:19–143:17, 153:11-154:7 ("[E]ven in that . . . model [there are] growth rates in the outer years [that] are half of what they were in historical periods, and there is very little margin expansion. . . . So the company had high margins.  We're actually assuming a little bit of erosion in those margins.  So it's already a very conservative model to start with, in our minds at the time.").

[163] Griswold Deposition, 141:23-142:3, 143:4-144:4 ("[W]e're all sort of working off of [the Padres Projections] and sensitizing . . . . [T]hen we take it a step further and we say, well, what happens if . . . we're wrong and margins are even lower?  Or revenue growth is slower?  Or the CapEx [capital expenditures] is higher or? Or . . . if they are under a lot of pressure and sensitivities and downsides, can they still service the debt obligation[?]").  As I understand, JPMC did not create downside scenario models.  Griswold Deposition, 149:2–9 ("Q: And I want to go back to I think a clarification that you made at the beginning of that answer and make sure that I understand.  Which is, these are downside scenarios but you did not create a downside model; is that correct? A: I think that's accurate.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

including the CapEx line."[164]  In particular, Citi performed a DCF analysis under three different scenarios:  management case, base case, and downside case.[165]  In the management case, Citi relied on the Padres Projections and estimated an enterprise value in the range of $4.4 billion to $5.4 billion.[166]  In the base case, Citi applied a haircut to management projections, which resulted in an enterprise value in the range of $3.7 billion to $4.5 billion.[167]  In the downside case, Citi applied an additional haircut to management projections, which resulted in an enterprise value in the range of $1.9 billion to $2.2 billion.[168]  In addition, Citi performed a comparable companies analysis, which resulted in an enterprise value in the range of $3.9 billion to $5.1 billion.[169]  Under all these scenarios, including in the most conservative downside scenario, Millennium was projected to remain solvent following the 2014 Transaction.

---

[164] Deposition of Michael Tortora, July 15, 2021 ("Tortora Deposition"), 82:17–23, 125:21–126:3 ("So the general process would be we would participate in and convene a Greenlight committee, which would include a relatively fulsome memo that listed out industry details, the transaction that was being contemplated by that company, the historical and financial performance of the company that we were looking to work with as well as any other benefits, considerations, et cetera of the transaction.  We would hold a Greenlight meeting, educate our committee, look to -- looking to formulate an opinion as to whether we thought the transaction was viable and then formulate a plan as to additional diligence that would be needed to complete our analysis.  We would then hold various meetings and phone calls with the company, collect the due diligence material, process and analyze that material and then when that was done, we would convene a final approval meeting with our committee to go over the findings of the due diligence and followup [sic] from any Greenlight meeting we may have had and ultimately approve the transaction or not.").

[165] Citi Model (March 2014) at CITI-T-00000209–0215; Tortora Deposition, 76:11–77:15 ("In our approval process, and specifically in the final approval process and the Final Approval Memo, we generally present three model cases to our committee.  The first one is the management model, which comes directly from the management team . . . We'll then also run what we call the base case, which is a haircut to the management model, whether that's revenue, EBITDA, more CapEx or less CapEx, some type of sensitivity[.] [A]nd then we'll also run a third case, which we call the downside case, which is oftentimes a very Draconian scenario that one even has a hard time envisioning ever happening in real life, but we will run that in order to further sensitize and further make sure that we are comfortable with the cash flow profile of the company's ability, the ability of the business to – to pay its interest expense.").

[166] In the management case, Citi's revenue multiples were 6.4x – 7.8x, and its EBITDA multiples were 11.2x – 13.7x. Citi Model (March 2014) at CITI-T-00000215.

[167] Citi Model (March 2014) at CITI-T-00000211–0212, 215.  Citi decreased management's revenue and adjusted EBITDA CAGR from 7.3% to 5.3% and from 5.9% to 3.7%, respectively.

[168] Citi Model (March 2014) at CITI-T-00000214–0215.  Citi decreased management's revenue and adjusted EBITDA CAGR from 7.3% to 0.3% and from 5.9% to 2.1%, respectively.  Notably, Citi's downside scenario resembles Ms. Austin Smith's adjusted projections, although Citi assumed a lower terminal growth rate (0.0% to 1.0%) compared to Ms. Austin Smith's 3%.  Citi however used a lower WACC of 8.5% to 9.5%.  Austin Smith Report, ¶ 144.

[169] Citi Model (March 2014) at CITI-T-00000215.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

As part of the due diligence process, Citi's internal healthcare coverage team also considered the Company's growth potential based on industry information.[170]

- SunTrust, as part of its due diligence process, "[r]eviewed and analyzed [Millennium's] projected financial performance and sensitized model to develop SunTrust Base and Downside Cases."[171]  The base case was developed by SunTrust based on management's projections and was "a more conservative view from what the company present[ed.]"[172]  SunTrust estimated Millennium's enterprise value based on its base case to be in the range of $3.4 billion to $4.4 billion.[173]  The downside case was meant "to show further stress on the company," and did not reflect "the most likely scenario."[174]  SunTrust estimated Millennium's enterprise value based on its downside case to be greater than $2.5 billion.[175]  Under all available analyses, Millennium was projected to remain solvent following the 2014 Transaction.[176]

---

[170] Tortora Deposition, 90:2–16 ("In the same way that we would have conducted our diligence in regards to reimbursement, we have industry bankers within healthcare that are experts in the healthcare field that spend all their time talking to different companies and participants within the healthcare industry.  So we would have relied upon them and their knowledge and judgment to attempt to measure or quantify how much growth potential was in this – was in this . . . business from an industry perspective and that's what we would have -- we would have relied upon.").

[171] SunTrust Model (March 2014) at SunTrust_MIL-DE-00011781; Felty Deposition, 69:9–19 ("In general, we have a transaction that involves an extensive analysis of the borrower, its historical financial performance, its expected future financial performance given current industry trends, competitive dynamics, and then developing our, you know, different projection models based on different assumptions and determining the companies to -- determining the company's ability to repay the proposed investments, testing the creditworthiness of the borrower."), 70:15–71:2 ("And as part of our due diligence, we don't take those projections at face value and assume those are what we believe will happen, but we develop our own model based on our own analysis of the industry and the company.  So that model, which is typically -- and I've only seen it to be more conservative than a management model.  It typically, because more consecutive [sic] than a management model, is yet a further -- based on additional diligence beyond just what the company provides to us. So that is one projection alternative, if you will.").

[172] Felty Deposition, 89:23–24; SunTrust Model (March 2014) at SunTrust_MIL-DE-00011801; Felty Deposition, 87:18–24 ("The base case, as I said, is meant to represent what [SunTrust] believe is the most likely outcome, taking into consideration all the factors and information [SunTrust has] available at that time, which could include changes in volume, changes in reimbursement rates, changes in overall industry dynamic").

[173] SunTrust Model (March 2014) at SunTrust_MIL-DE-00011809–1810.

[174] Felty Deposition, 90:22–24; SunTrust Model (March 2014) at SunTrust_MIL-DE-00011807; Felty Deposition, 90:24–91:15 ("But these assumptions that are used for the downside case are not necessarily our view of the realistic risks of the company but a very conservative view. . . . It's simply meant to show unexpected things that might happen that are -- but not necessarily what we believe will happen.  So the risks here in this downside case are not what we believed, we believed the company would experience.").

[175] SunTrust Model (March 2014) at SunTrust MIL-DE-00011810.

[176] SunTrust Model (March 2014) at SunTrust-MIL-DE-00011810.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- BMO performed a valuation analysis and considered three scenarios: management case, base case, and downsize case.[177] As part of the bank's due diligence process, the transaction team "[p]articipated on a six hour due diligence session with management and other arrangers," "[p]articipated on a legal due diligence call," "[r]eviewed the Management Presentation delivered on March 5th regarding [the] potential transaction," "[r]eviewed [the] model provided by the company," "[r]eviewed quarterly compliance certificates," and "participated on quarterly conference calls with management to review actual quarterly financial performance and tracking versus budget," among other items.[178]

79.    As I understand, TA Associates, a private equity firm that invested in Millennium in 2010, adjusted the Padres Projections to reflect higher revenue growth rates and lower EBITDA margins compared to the Padres Projections.[179] TA Associates performed an investment analysis using TA Associates' required internal rate of return of 25% as the discount rate, which resulted in an enterprise value of $1.7 billion.[180] TA Associates also performed various sensitivity analyses for WACC and the terminal rate multiples, yielding an enterprise value in the range of $1.6 billion to $3.0 billion.[181]

---

[177] Ho Deposition, 134:17–135:7 ("[Y]ou can see we came up with our own base case. We--– because we were waiting for the full model from the company. . . . Q: Do you recall, and specifically with respect to the 2014 transaction, if you did compare BMO's base case to management's base case? . . . A: We would have. . . ."), 135:23–25 ("Q: And BMO also prepared a downside case; is that correct? A: Yes. Yeah. We did that standard."), 134:9–23 ("Well, the base case would have been what we think the most likely performance case projection for the company would be over a certain time period. Typically, very typically, it's based upon what management and the private equity sponsors provide. Sometimes we'll adjust it for things we think we want to include, we want to factor in. . . . You can see we came up with our own base case. We -- because we were waiting for the full model from the company. So ours was probably a little bit more conservative in terms of growth, but it would have been very similar to what management provided probably"). I have not seen the analysis BMO conducted.

[178] Loan Underwriting Committee Memorandum at ML00008508.

[179] TA Associates assumed 16% CAGR for revenue and EBITDA margins approximately around 40%. TA Associates Model, tab "2." Taken together, these adjustments result in free cash flows that are similar to those in the Padres Projections.

[180] TA Associates Model. An internal rate of return is a discount rate typically used by investment entities, such as private equity firms, to assess the return on their investment. Using Ms. Austin Smith's WACC in TA Associates' analysis implies an enterprise value of $2,370.5 million.

[181] TA Associates Model, tab "2."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

80.     VPA, Millennium's solvency advisor, used the Padres Projections in providing its solvency analysis.[182]  In particular, VPA performed a DCF analysis and estimated Millennium's enterprise value to be in the range of $2.2 billion to $2.8 billion.[183]  This range was based on sensitivity analyses that VPA performed.  VPA also performed a comparable companies analysis and estimated Millennium's enterprise value to be in the range of $2.1 billion to $2.3 billion.[184] VPA's estimated enterprise value ranges imply that Millennium was balance sheet solvent. Furthermore, in performing its analyses, VPA noted that "[b]ased on historical performance and recent developments, Management projections indicate reasonable growth in revenue and reasonable EBITDA levels through the projection period."[185]

81.     Ms. Austin Smith fails to apply any of these contemporaneous analyses.  Instead, she creates her own set of projections for the purpose of this litigation, which are substantially lower than management's projections at the time and claims without basis that her projections "reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction."[186]  Based on these projections, she estimates an enterprise value of $802.9 million, which is well *below* even the downside scenarios contained in all of these contemporaneous estimates.  **Exhibit 6** shows the contemporaneous valuations analyses.

---

[182] 2014 VPA Solvency Analysis at ML_DE_00263287.

[183] 2014 VPA Solvency Analysis at ML_DE_00263288.  VPA used two different methods to perform the DCF analysis, the exit multiple method and the Gordon growth method.  Under the exit multiple method, VPA estimated an enterprise value in the range of $2.4 billion to $2.8 billion.  Under the Gordon Growth method, VPA estimated an enterprise value in the range of $2.2 billion to $2.7 billion.  2014 VPA Solvency Analysis at ML_DE_00263288.  In the DCF exit multiple method, VPA used an exit 2020 EBITDA multiple of 6.0x to estimate the terminal value.  2014 VPA Solvency Analysis at ML_DE_00263290.

[184] 2014 VPA Solvency Analysis at ML_DE_00263293.  VPA's comparable companies analysis used revenue and EBITDA multiples.  VPA also performed a guideline transaction analysis and estimated Millennium's enterprise value to be in the range of $2.5 billion to $2.7 billion but noted that "guideline transactions were used for comparison purposes" and that "none of the target companies were identical or directly comparable to the Company."  2014 VPA Solvency Analysis at ML_DE_00263296–3297.

[185] 2014 VPA Solvency Analysis at ML_DE_00263300.

[186] Austin Smith Report, ¶ 7.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

### C. Ms. Austin Smith's Modified Padres Projections and her valuation estimate resemble most closely projections and valuations created around Millennium's bankruptcy

82.     As I understand, on November 10, 2015, Millennium filed for bankruptcy.[187]  Various developments led to Millennium's bankruptcy, including reimbursement risks that materialized in a negative way, the proposed settlement with the DOJ and certain U.S. states, projected post-settlement operational adjustments required under a Corporate Integrity Agreement, and additional regulatory pressures.[188]  Notably, Ms. Austin Smith's Modified Padres Projections and valuation results most closely resemble the subsequent projections and valuation analyses created around the Company's bankruptcy and at a time when certain risks, contingent as of April 2014, had actually materialized.

83.     In late December 2014, nine months after the 2014 Transaction, the DOJ informed Millennium that it would pursue certain claims against the Company and filed a civil complaint on March 19, 2015.[189]  On February 9, 2015, Noridian also informed Millennium that as of March 11, 2015, the Company's Medicare billing privileges would be revoked due to "alleged administrative billing abuses relating to claims allegedly submitted by Millennium for services provided, after their dates of death, to 59 Medicare beneficiaries."[190]  On May 20, 2015, the DOJ entered into a settlement agreement with Millennium, which stipulated that the Company would pay $256 million to settle the DOJ and *qui tam* matters.[191]

84.     Following these events, on June 8, 2015, the Company prepared an updated five-year forecast, the June 2015 Management Projections.[192]  On July 22, 2015, the Company informed the DOJ that it was unable to pay the fine and a restructuring would be necessary to facilitate the

---

[187] Hardaway Declaration, p. 45.

[188] Hardaway Declaration, ¶ 28.

[189] Hardaway Declaration, ¶ 17.

[190] Hardaway Declaration, ¶ 18.  The Company received notice of additional basis for Medicare billing revocations in May 2015.  Hardaway Declaration, ¶ 22.

[191] Hardaway Declaration, ¶ 27; Term Sheet between Millennium Health, LLC and the Department of Justice, May 20, 2015, ML_DE_00201432.  The DOJ, along with certain U.S. States, were parties the settlement agreement with Millennium.  The settlement initially provided that the Company would pay $250 million but was later amended for a payment of $256 million.  Hardaway Declaration, FN 7.

[192] Hardaway Declaration, ¶ 28; June 2015 Management Projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

settlement payment.[193]  On July 29, 2015, management presented revised projections ("July 2015 Management Projections").[194]  On October 15, 2015, the Restructuring Support Agreement was signed.[195]  On November 10, 2015, more than 18 months after the 2014 Transaction, Millennium declared bankruptcy.  When Millennium filed its prepackaged plan of bankruptcy, it also filed updated projections in its disclosure statement dated November 10, 2015 ("November 2015 Management Projections"), which were subsequently updated resulting in the "December 2015 Management Projections."[196]  In April 2016, FTI performed a valuation analysis for the restructured Company using the December 2015 Management Projections, in which it estimated Millennium's enterprise value at $979.5 million.[197]  This is approximately $177 million *higher* than Ms. Austin Smith's estimate even though it was completed *after* the adverse events Ms. Austin Smith claims should have been accounted for had already materialized.[198]

85.     Ms. Austin Smith's Modified Padres Projections and valuation results most closely resemble these subsequent projections and valuation analyses.  **Exhibit 8A** compares the revenue projections of the June 2015 Management Projections, the July 2015 Management Projections, the November 2015 Management Projections, the December 2015 Management Projections, and Ms. Austin Smith's Modified Padres Projections.  Ms. Austin Smith's projected revenue are *below* the June 2015 Management Projections and only slightly above the July 2015, November 2015, and December 2015 Management Projections.  **Exhibit 8B** shows that similarly, Ms. Austin Smith's EBITDA projections are *below* the June 2015 Management Projections and only slightly above the July 2015, November 2015, and December 2015 Management Projections.  **Exhibit 8C**

---

[193] Hardaway Declaration, ¶ 30.

[194] Millennium Laboratories, "Financial Projections Overview to Lenders," July 29, 2015, ML_DE_00023852.  These projections appear to be similar to the management projections in FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("September 2015 Management Projections").

[195] Hardaway Declaration, ¶ 33.

[196] *In re Millennium Lab Holdings II, LLC, et al.,* "Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization," filed on November 10, 2015, Exhibit H, Financial Projections, p. 5; FTI December 2015 Valuation at KPMG-ML-EA15WB-0000764.

[197] FTI December 2015 Valuation at KPMG-ML-EA15WB-0000745.

[198] Ms. Austin Smith's valuation analysis includes projections for 2014 and 2015, unlike FTI's projection period, which starts in 2016.  YAS Workpaper 1; FTI December 2015 Valuation at KPMG-ML-EA15WB-0000768.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

shows that Ms. Austin Smith's EBITDA margin projections are *lower* than or almost equal to all 2015 management projections.

## VI.   COMPARABLE COMPANIES ANALYSIS

86.     Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent given her own EBITDA multiples analysis.[199] Ms. Austin Smith finds that, based on *EBITDA multiples* Millennium's implied equity value ranges between *positive* $23 million and *positive* $1.5 billion.[200]

> ### A.   Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent under her EBITDA multiples analysis

87.     Ms. Austin Smith identifies five companies as comparable:  Alere, Bio-Reference, LabCorp, Myriad, and Quest.[201]  While she asserts that "for several reasons, these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value," she proceeds to use them to estimate revenue and EBITDA multiples on the basis of the Last Twelve Months ("LTM"), forecasted 2014, and forecasted 2015.[202]  Based on these multiples, she performs a comparable companies analysis of Millennium.  Ms. Austin Smith then asserts that "the most likely conclusion of value that results from [her comparable companies] methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital."[203]

88.     Specifically, Ms. Austin Smith finds that, when using 2014 and 2015 *revenue multiples* and her substantially reduced forecast of 2014 and 2015 revenue, the implied equity value of

---

[199] Austin Smith Report, ¶¶ 149–160, Table 9.

[200] Austin Smith Report, Table 9.  Ms. Austin Smith also estimates revenue multiples, which yield an implied equity value of negative $1.2 billion to negative $503 million.

[201] Austin Smith Report, ¶ 151.  While Ms. Austin Smith identifies these five comparable companies, she uses a different set of companies as comparables in her various analyses.  For example, when she estimates the adjustment for the purported reputational impact of the DOJ investigation, she looks at Ameritox and Calloway, and when she estimates the impact of custom profile discontinuance, she looks at Ameritox and Aegis.  Austin Smith Report, ¶¶ 128, 131.

[202] Austin Smith Report, ¶¶ 152, 156.

[203] Austin Smith Report, ¶ 159.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium is between negative $503 million and negative $1.238 billion.[204]  However, Ms. Austin Smith fails to establish that revenue multiples are appropriate to value Millennium; it is likely that they are not.  Revenue multiples require that there be similar operating margins across the comparable companies and the company that is being valued.  If this is not the case, revenue multiples can end up "assigning high values to firms that are generating high revenue growth while losing significant amounts of money."[205]  Ms. Austin Smith fails to examine whether Millennium's operating margins were comparable to her set of comparable companies.

89.     By contrast, Ms. Austin Smith finds that, based on *EBITDA multiples*, Millennium's implied equity value ranges between *positive* $23 million and *positive* $1.5 billion.[206]  Ms. Austin Smith's own analysis using EBITDA multiples suggests that Millennium was balance sheet *solvent*, even when using her substantially downward revised EBITDA estimates in her Modified Padres Projections.  While a comparable companies analysis based on EBITDA multiples has various shortcomings, EBITDA multiples are better measures of company values than revenue multiples.[207]

90.     Ms. Austin Smith's comparable companies analysis yields these results even though it incorporates her substantial and inappropriate revenue and cost adjustments to the Padres

---

[204] Austin Smith Report, Table 9.

[205] Damodaran, *Investment Valuation*, Chapter 20, pp. 1–2 ("The biggest disadvantage of focusing on revenue is that it can lull you into assigning high values to firms that are generating high revenue growth while losing significant amounts of money.  Ultimately, a firm has to generate earnings and cash flows for it to have value.  While it is tempting to use price-sales multiples to value firms with negative earnings and book value, the failure to control for differences across firms in costs and profit margins can lead to misleading valuations."); Holthausen and Zmijewski, *Corporate Valuation*, Chapter 14, p. 710 ("Of course, if all a company's earnings-based numbers are negative, we can use revenue multiples, for revenue are never negative.  We know, however, that revenue multiples are more sensitive to differences in comparability – particularly differences in cost structures – than earnings-based multiples.").

[206] Austin Smith Report, Table 9.

[207] Damodaran, *Investment Valuation*, Chapter 18, p. 46 ("[T]he enterprise value to EBITDA multiple is a firm value multiple. In the last two decades, this multiple has acquired a number of adherents among analysts for a number of reasons.  First, there are far fewer firms with negative EBITDA than there are firms with negative earnings per share and thus fewer firms are lost from the analysis.  Second, differences in depreciation methods across different companies – some might use straight line while others use accelerated depreciation – can cause differences in operating income or net income but will not affect EBITDA.  Third, this multiple can be compared far more easily across firms with different financial leverage – the numerator is firm value and the denominator is a pre-debt earnings – than other earnings multiples.  For all of these reasons, this multiple is particularly useful for firms in sectors that require large investments in infrastructure with long gestation periods.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Projections.[208]  Correcting either of these sets of adjustments would further increase Millennium's projected EBITDA and revenue, thus increasing the value Ms. Austin Smith would estimate for Millennium using her comparable companies analysis.

## VII.    ABILITY TO PAY DEBT TEST

91.    Ms. Austin Smith also analyzes Millennium's ability to pay its debts as they became due.[209]  Ms. Austin Smith bases this analysis on whether Millennium was projected to have sufficient unlevered free cash flows or cash on hand to make the interest and principal payments required under the 2014 Transaction.[210]  Using her Modified Padres Projections, Ms. Austin Smith concludes that Millennium would not have sufficient unlevered free cash flow or cash on hand to make its required debt payments.[211]  However, as discussed above, Ms. Austin Smith's Modified Padres Projections are flawed and unreliable.  Consequently, her conclusion that Millennium would be unable to pay its debts as they become due is similarly unreliable and unsupported.

92.    Ms. Austin Smith also disregards the analysis and conclusions of the credit rating agencies (S&P and Moody's) that rated Millennium's 2014 Transaction, which included the $1.775 billion Term Loan B and the $50 million revolver.  Both credit rating agencies concluded that Millennium was *not* near default, with S&P noting that the Company had "the capacity to meet its financial commitments on the obligation."[212]

---

[208] Ms. Austin Smith states that "[g]iven the substantial expected deviation in profitability of Millennium from historical results (due to known or knowable risk factors), references to valuations based on LTM or 2014 revenue or EBITDA should not be considered indicative of Millennium's valuation.  As the Revised Padres Projections demonstrate, the impact of the known or knowable risks were not anticipated to impact Millennium's cash flows until 2015 (and not on a full-year basis, until 2016).  Thus, indications of value derived from Millennium's 2015 financial results are a relatively more accurate estimate of Millennium's value (as compared to LTM or 2014 financial metrics)."  Austin Smith Report, ¶ 160.

[209] Austin Smith Report, ¶ 164.

[210] Austin Smith Report, ¶¶ 164–166.

[211] Austin Smith Report, ¶¶ 165–166.

[212] S&P Rating Update; Moody's Rating; "Intro to Credit Ratings," *Standard & Poor's*, available at https://www.spglobal.com/ratings/en/about/intro-to-credit-ratings, accessed on February 9, 2022 ("S&P Intro to Credit Ratings"); "Rating Scale and Definitions," *Moody's*, available at https://www.moodys.com/sites/products/productattachments/ap075378_1_1408_ki.pdf, accessed on February 7, 2022 ("Moody's Rating Scale and Definitions").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> **A. Ms. Austin Smith's conclusion that Millennium would be unable to pay its debts is unreliable**

93.    Ms. Austin Smith concludes that Millennium would be unable to pay interest on its Term Loan B starting in 2018.[213]  Ms. Austin Smith's conclusion relies on using her unsupported Modified Padres Projections.  Removing her adjustments, however, shows that Millennium would be able to pay interest on the Term Loan B throughout the life of the loan.[214]  In fact, modifying only her adjustment to the Padres Projections for the purported reputational impact of the DOJ settlement implies that Millennium would have the ability to make interest payments on the Term Loan B throughout the life of the loan.[215]

94.    Ms. Austin Smith also considers Millennium's "prospects for refinancing the Term Loan at maturity in April 2021" and notes that "Millennium was above the levels typically associated with Caa-C credits."[216]  Specifically, she estimates that under her Modified Padres Projections, Millennium's leverage ratio would be 8.7 times EBITDA by December 31, 2020, which she claims to be near the median leverage ratio of Moody's "Caa-C" rated loans.[217]  Ms. Austin Smith also claims that "[u]nder the reasonable downside projections," Millennium's leverage ratio would be 19.8 times EBITDA by December 31, 2020.[218]  She then concludes that "[t]here was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021."[219]  Ms. Austin Smith provides no other analysis or support.

95.    Modifying her adjustments shows that Millennium's leverage would never exceed 4.7 times EBITDA and would be 1.4 times EBITDA as of December 31, 2020.[220]  In fact, modifying only her adjustment for the purported reputational impact of the DOJ settlement implies that

---

[213] Austin Smith Report, ¶ 166.

[214] **Appendix H2A**.

[215] **Appendix H2B**.

[216] Austin Smith Report, ¶ 169.

[217] Austin Smith Report, ¶ 169.

[218] Austin Smith Report, ¶ 169.

[219] Austin Smith Report, ¶ 169.

[220] **Appendix H3A**.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium's leverage would never exceed 5.3 times EBITDA, and would decline to 4.4 times EBITDA by December 31, 2020.[221]

### B. Ms. Austin Smith fails to engage with the credit ratings for the 2014 Transaction

96.     S&P and Moody's rated Millennium's 2014 Transaction, which included the $1.775 billion Term Loan B and the $50 million revolver, as B+ and B1, respectively.[222]   While S&P and Moody's rated the 2014 Transaction as below investment grade, cautioning about the considerable risks associated with it, they did not offer a rating near or at default.  As I discuss below, Ms. Austin Smith disregards these credit ratings, and the conclusions and analyses of the credit rating agencies.

97.     Credit ratings are an assessment of an issuer's ability to meet its financial obligations and reflect a relative ranking of risk.[223]  In Millennium's case, credit rating agencies assigned a rating that implied that the 2014 Transaction was "considered speculative" and "subject to high credit risk."[224]  The ratings *did not* reflect that the 2014 Transaction was "of poor standing," "near default," or "in default."[225]

98.     S&P assigned the 2014 Transaction a B+ rating.[226]  S&P's rating category B indicates that the issuer "has the capacity to meet its financial commitments on the obligation," but that "[a]dverse business, financial, or economic conditions will likely impair the [issuer's] capacity or

---

[221] **Appendix H3B**.

[222] S&P Rating; S&P Rating Update; Moody's Rating.  S&P and Moody's rated both Millennium and the 2014 Transaction, and each provided the same rating for both.  A typical credit rating scale has a top rating of 'AAA,' which reflects the highest category in the rankings, that is, an opinion on the lowest probability of default; and the lowest rating 'D,' which reflects default.  Credit rating agencies distinguish between investment-grade and below investment grade (or, "speculative" or "high yield"), where bonds rated as Baa3/BBB- and above are classified as investment grade, and bonds rated as Ba1/BB+ and below are classified below investment grade.  "Updated Investor Bulletin: The ABCs of Credit Ratings," *U.S. Securities and Exchange Commission*, October 12, 2017, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_creditratings, accessed on February 7, 2022 ("The ABCs of Credit Ratings"); S&P Intro to Credit Ratings; Moody's Rating Scale and Definitions.

[223] The ABCs of Credit Ratings.

[224] Moody's Rating Scale and Definitions.

[225] Moody's Rating Scale and Definitions.

[226] S&P Rating Update, p. 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

willingness to meet its financial commitments on the obligation."[227]  S&P noted that the rating reflected a "stable outlook" and a "meaningful (50%-70%) recovery in the event of a payment default."[228]  S&P's rating reflected the rating agency's expectation that Millennium's (1) revenue growth would "continue outperforming that of the broad laboratory services industry," as S&P forecasted "mid-teens revenue growth in 2014 driven by double-digit volume increases partially offset by single-digit reductions in reimbursement rates," and (2) adjusted EBITDA margin would "gradually contract by around 350 basis points (bps) over the next three years due to reimbursement rate cuts."[229]  In putting together these ratings, S&P considered Millennium's exposure to "industry and competitive developments" and "to Medicare and Medicaid reimbursement" risks, as well as the possibility of "reimbursement rate reductions from Millennium's commercial contracts."[230]  Thus, S&P based its ratings on then-known risks, including reimbursement risks, and cautioned that it could lower the rating in the event that Millennium's "operating performance falls meaningfully short of [its] expectations."[231]

99.    Similarly, Moody's assigned the 2014 Transaction a B1 rating,[232] which indicates that the issuance is "subject to high credit risk."[233]  Moody's rating reflected a "stable rating outlook" and the rating agency's expectation "of continued rapid growth -- which will be largely organic -- and

---

[227] S&P Global Ratings Definitions.

[228] S&P Rating, p. 1.  In fact, Ms. Austin Smith is incorrect when she states that the "[t]otal recovery under the $1.75 billion facility was estimated at 34%" as her estimation incorrectly ignores that, following Millennium's bankruptcy, the $1.75 billion credit facility was "converted into $600 million of new term loans and 100% of the beneficial ownership of Millennium."  Austin Smith Report ¶ 104; Hardaway Declaration, ¶ 38.

[229] S&P Rating Update, p. 2.

[230] S&P Rating Update, p. 2.

[231] S&P Rating Update, p. 3 ("We could lower the rating in the event that Millennium's operating performance falls meaningfully short of our expectations and results in 2014 debt to EBITDA significantly above 5.0x.  This scenario could encompass a single-digit revenue decline coupled with a 300 basis point (bp) EBITDA contraction and could materialize if one of Millennium's large competitors such as Laboratory Corp. or Quest Diagnostics strategically expanded into the pain management drug testing field and won significant market share from Millennium.  In addition, it could be induced by a substantial reimbursement rate cut resulting in lower revenue and compressed margins for Millennium.  Potential emergence of alternative pain management approaches and medications with lower propensity to cause addiction also could significantly curtail the demand for pain management drug testing and adversely affect the company's prospects.").

[232] Moody's Rating, p. 1.

[233] "What is a Credit Rating?," *Moody's*, available at https://ratings.moodys.io/ratings#:~:text=Moody's%20long%2Dterm%20ratings%20are,of%20one%20year%20or%2 0more.&text=Such%20ratings%20use%20Moody's%20Global,in%20the%20event%20of%20default, accessed on February 7, 2022.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

very strong margins" and that the Company's "increased scale and solid free cash flow [would] allow Millennium to quickly reduce leverage through a combination of EBITDA growth and debt repayment."[234]  Moody's considered "the high leverage the [Company would] initially have following the close of the dividend/recapitalization transaction," the fact that Millennium was "relatively small when compared to many other corporate issuers," and that the "majority of Millennium's revenue [would] continue to come from its core toxicology testing service line as the revenue contribution from new services [would] remain relatively modest in the near term."[235] Moody's also cautioned that the rating could be downgraded if Millennium "were to experience operating difficulty in its core business. . . ."[236]

100.    Without basis, Ms. Austin Smith fails to engage with these credit ratings that were created contemporaneously with the 2014 Transaction.

## VIII.   CAPITAL ADEQUACY TEST

101.    Ms. Austin Smith also concludes that Millennium had unreasonably small capital following the 2014 Transaction.[237]  To reach this conclusion she claims that "[i]f a company is left with unreasonably small capital under a reasonable downside scenario, it follows that the company's unreasonably small capital is reasonably foreseeable" and concludes that Millennium would be even more insolvent under what she purports to be a "reasonable downside scenario" than under the Modified Padres Projections.[238]

102.    In her "reasonable downside scenario" Ms. Austin Smith builds on her Modified Padres Projections by making two further adjustments:

---

[234] Moody's Rating, p. 1.

[235] Moody's Rating, p. 1.

[236] Moody's Rating, p. 1 ("Given Moody's expectation that leverage will decline following the debt financed distribution, a downgrade of the rating is not expected in the near term.  However, if the company were to experience operating difficulty in its core business or undertake a significant debt financed acquisition or shareholder initiative, the rating could be downgraded.  More specifically, the rating could be downgraded if debt to EBITDA is expected to be sustained above 5.0 times.").

[237] Austin Smith Report, ¶¶ 170, 172.

[238] Austin Smith Report, ¶¶ 170–172.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- She assumes that Medicare NRPS would drop by 33% as a result of the Noridian LCD rather than 18.3%.[239]

- She assumes that the purported reputational impact of the DOJ settlement would lead to a 50% decrease in specimen volume rather than 30%.[240]

103.    The extension of the adjustment due to the purported reputational impact of the DOJ settlement to the Padres Projections is similarly unjustified.  As discussed above, she provides no basis for her adoption of an ad hoc 50% decrease in specimen volume from the reputational consequences of the DOJ settlement.  Ms. Austin Smith has failed to establish that this adjustment forms a "reasonable downside scenario," and it suffers from all the flaws of the Modified Padres Projections on which it is based.

104.    In addition, Ms. Austin Smith's capital adequacy test relies on her incorrect and inflated WACC range of 9.8% – 14.8%.[241]  Correcting Ms. Austin Smith's WACC to 7.2% and making no other adjustments to her Modified Padres Projections shows that Millennium was solvent and could have withstood a $209.1 million decrease in enterprise value before becoming insolvent. See **Exhibit 1**.

Signed: _____

Amy Hutton, Ph.D.

February 14, 2022

---

[239] Austin Smith Report, ¶ 171.

[240] Austin Smith Report, ¶ 171.

[241] Austin Smith Report, ¶ 172.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                     **EXHIBIT 1**

# *In Re Millennium Lab Holdings II, LLC*
# Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
## *($ millions)*

|  | Selected WACCs[3] | |
| --- | --- | --- |
|  | **14.8%** | **7.2%** |
| **Millennium's Enterprise Value Based on Ms. Austin Smith's Modified Padres Projections[4]** | $802.86 | $1,970.83 |
| **Millennium's Equity Value Based on Ms. Austin Smith's Modified Padres Projections[5]** | -$958.89 | $209.08 |
| **Marginal Impact on Millennium's Equity Value[6]** | **Marginal Increase** | |
| Modify Ms. Austin Smith's treatment of operating expenses[7] | $220.73 | $645.30 |
| Modify reduction of 15% in 2015 and 15% in 2016 to UDT and PGT specimen volume due to the purported reputational impact of the DOJ settlement[8] | $383.75 | $1,138.69 |
| Restore Emerging Opportunities[9] | $192.82 | $663.63 |
| Modify Medicare and Commercial Payors UDT specimen volume growth rate adjustments from 2014 through 2020[10] | $155.01 | $498.99 |
| Modify adjustment of 1Q2014 Medicare NRPS for MUE denials[11] | $87.93 | $217.28 |
| Modify 1.6% reduction in UDT specimen volume in July 2014 due to the discontinuance of the POC Free Test Cup Program | $17.36 | $45.20 |
| Modify 21.8% reduction in Commercial Payor's NRPS in July 2015 due to the discontinuance of custom profiles | $101.62 | $303.77 |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **EXHIBIT 1**

# *In Re Millennium Lab Holdings II, LLC*
# Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
## *($ millions)*

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:

[1] Equity value is calculated as the difference between Millennium's enterprise value and $1,761.7 million—the level of outstanding debt incurred by Millennium associated with the Term Loan B transaction.  Austin Smith Report, ¶ 145.  Marginal impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections from the equity value after applying each modification.

[2] I do not modify Ms. Austin Smith's Medicare net revenue per specimen ("NRPS") decrease attributable to the draft Noridian local coverage determination ("LCD"), Austin Smith Report, ¶¶ 120–123.  In addition, I do not modify various other changes in the Modified Padres Projections relative to the Padres Projections, such as the use of actual first quarter 2014 ("1Q2014") financial results as opposed to Padres projections for 1Q2014.  As I do not fully revert Ms. Austin Smith's mechanical changes to the Padres Projections, I refer to the changes described above as modifications to Ms. Austin Smith's adjustments.  Austin Smith Report, ¶ 110.

[3] WACC refers to the Weighted Average Cost of Capital.  14.8% reflects Ms. Austin Smith's WACC, Austin Smith Report, ¶ 143.  7.2% reflects Ms. Austin Smith's Corrected WACC (see Exhibit 4 for a detailed description).

[4] These figures show Millennium's enterprise value at the selected WACCs without any modifications to the Modified Padres Projections.

[5] These figures show Millennium's equity value at the selected WACCs without any modifications to the Modified Padres Projections.  A positive value implies that Millennium would be balance sheet solvent.

[6] A positive marginal impact on equity value associated with a modification means that the modification increases Millennium's equity value relative to the equity value based on the Modified Padres Projections at selected WACCs.

[7] This modification adjusts Ms. Austin Smith's operating expenses to a constant percentage of revenues (38%), which corresponds to Ms. Austin Smith's projected operating expenses as a percentage of revenues in 2014.  The marginal impact reflects the impact on unleveraged free cash flow of the difference between Ms. Austin Smith's projected operating expenses in the Modified Padres Projections and operating expenses maintained at 38% of revenues.  (See Section V.A.2 and Exhibit 5C for a detailed description).

[8] UDT refers to Millennium's urine drug testing business.  PGT refers to Millennium's pharmacogenetics business.  DOJ refers to the U.S. Department of Justice.

[9] This modification restores the revenue and expenses associated with the Padres Projections' Emerging Opportunities.

[10] Reflects the impact of modification to Ms. Austin Smith's UDT volume growth rate adjustments for Medicare and Commercial payors.  Ms. Austin Smith reduces Medicare and Commercial Payor specimen volume growth rates to 0.0% in 2014, 2.0% in 2015, and 3.0% in 2016 and onwards, and to 10.0% in 2014, 5.0% in 2015, and 3.0% in 2016 and onwards respectively.  In this modification I restore the Padres Projections' specimen volume growth rates for Medicare and Commercial Payors.  Austin Smith Report, ¶ 109.

[11] MUEs refer to Medically Unlikely Edits.  This item reflects modifications to Ms. Austin Smith's modeling of an NRPS decrease for January, February, and March 2014 (1Q2014) by $77.7, $83.7, and $82.1, respectively.  Austin Smith Report, ¶ 118 and YAS Workpaper 1, "MUE w LCD Adjustment" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**      **EXHIBIT 2A**



*In Re Millennium Lab Holdings II, LLC*
**Historical and Projected Revenues**
2009 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note: Historical values are as reported in the Lender Presentation. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189).  The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189).  The fiscal year for Millennium corresponds to a calendar year.  The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows:  CAGR = (2013 revenue/2009 revenue) ^ (1/4) - 1.  The CAGR for the projection period is calculated as follows: CAGR = (2020 revenue/2013 revenue) ^ (1/7) - 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**    **EXHIBIT 2B**



### *In Re Millennium Lab Holdings II, LLC*
### Historical and Projected Adjusted EBITDA
### 2009 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note:  Historical values are as reported in the Lender Presentation.  The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation, and Amortization.  Adjusted EBITDA includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189).  The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189).  The fiscal year for Millennium corresponds to a calendar year. The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows: CAGR = (2013 Adjusted EBITDA/2009 Adjusted EBITDA) ^ (1/4) - 1.  The CAGR  for the projection period is calculated as follows: CAGR = (2020 Adjusted EBITDA/2013 Adjusted EBITDA) ^ (1/7) - 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                **EXHIBIT 2C**



### *In Re Millennium Lab Holdings II, LLC*
### Historical and Projected Adjusted EBITDA Margin
### 2009 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note: Historical values are as reported in the Lender Presentation. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1. EBITDA refers to Earnings Before Interest, Taxes, Depreciation, and Amortization. Adjusted EBITDA includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income. In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189). The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189). The fiscal year for Millennium corresponds to a calendar year. The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows: CAGR = (2013 Adjusted EBITDA margin/2009 Adjusted EBITDA Margin) ^ (1/4) - 1. The CAGR for the projection period is calculated as follows: CAGR = (2020 Adjusted EBITDA Margin/2013 Adjusted EBITDA Margin) ^ (1/7) - 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**　　　　　**EXHIBIT 3**



# *In Re Millennium Lab Holdings II, LLC*
## WACCs Employed by Arrangers and Ms. Austin Smith[1]

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)")

Note:
[1] WACC refers to the Weighted Average Cost of Capital.  Arrangers consist of J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank N.A. ("Citi"), BMO Harris Bank, N.A. ("BMO"), and SunTrust Bank ("SunTrust").  I have not seen the valuation analysis BMO conducted.
[2] JPMC conducted base case and downside case valuations.  The same WACC was employed in both of these valuations.
[3] The Average of Arrangers 7.2% is calculated as the average WACC of SunTrust, JPMC, and the midpoint of Citi (9.00%).
[4] Citi conducted base case, management case, and downside case valuations and employed the displayed WACC range (8.50% to 9.50%) across all three valuation scenarios.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                    **EXHIBIT 4**

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC
### Using Comparable Companies Identified in Ms. Austin Smith's
### Comparable Companies Analysis[1]

**Cost of Equity - Modified Capital Asset**

| Pricing Model (CAPM)[2] | Ms. Austin Smith's WACC | | | Ms. Austin Smith's Corrected WACC[3] | | |
|---|---|---|---|---|---|---|
| Risk-free rate | | | 3.2% | | | 3.2% |
| Market equity risk premium | | 6.2% | | | 6.2% | |
| Relevered beta[4] | x | 1.10 | | x | 0.85 | |
| Beta adjusted equity risk premium[5] | | | 6.8% | | | 5.2% |
| Size premium | | | 1.9% | | | 0.0% |
| Company-specific risk adjustment | | | 5.0% | | | 0.0% |
| **Estimated cost of equity** | | | **16.9%** | | | **8.5%** |

**Cost of Debt[6]**

| | Interest Rate | Weight | Weighted Cost | Interest Rate | Weight | Weighted Cost |
|---|---|---|---|---|---|---|
| Pre-tax cost of debt (pro forma) | | | | | | |
| Term Loan B | 5.3% | 97.0% | 5.1% | 5.3% | 97.0% | 5.1% |
| Weighted average pre-tax cost of debt[7] | | | 5.1% | | | 5.1% |
| Tax-effect on cost of debt | | 40.0% | -2.0% | | 40.0% | -2.0% |
| **Estimated after-tax cost of debt** | | | **3.1%** | | | **3.1%** |

| Weighted Average Cost of Capital (WACC) | Cost of Capital | | % in Capital Structure | Weighted Cost | Cost of Capital | | % in Capital Structure[8] | Weighted Cost |
|---|---|---|---|---|---|---|---|---|
| Debt | 3.1% | x | 14.6% | 0.4% | 3.1% | x | 23.4% | 0.7% |
| Equity | 16.9% | x | 85.4% | 14.4% | 8.5% | x | 76.6% | 6.5% |
| **Estimated WACC** | | | | **14.8%** | | | | **7.2%** |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**           **EXHIBIT 4**

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC
## Using Comparable Companies Identified in Ms. Austin Smith's
## Comparable Companies Analysis[1]

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*")

Note:
[1] The corrected WACC of 7.2% is based on Ms. Austin Smith's *five* comparable companies from her comparable companies analysis, which are Alere Inc., Bio-Reference Laboratories Inc., Laboratory Corp. of America Holdings, Myriad Genetics Inc., and Quest Diagnostics Inc.  Austin Smith Report, ¶ 151. The WACC of 14.8% is estimated based on a different set of *eight* comparable companies than Ms. Austin Smith's set.  This different set includes three additional companies: Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.  WACC Underlying Materials, "Beta" tab.  For details, see Appendix F.

[2] CAPM refers to the Capital Asset Pricing Model.  According to Holthausen and Zmijewski, *Corporate Valuation*, "[t]he expected return of an individual security in the CAPM is equal to the return on the risk-free asset plus a risk premium. The risk premium is equal to the risk of the security relative to the risk in the market multiplied by the risk premium for holding the market portfolio."  Beta is the "risk of an individual security relative to the market."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.  "The cost of capital in the CAPM [...] is equal to the risk-free rate plus one risk premium."  Holthausen and Zmijewski, *Corporate Valuation*, p. 328.

[3] The WACC Underlying Materials employ a number of rounding conventions, while I use unrounded figures throughout my WACC calculations.  In particular, in the WACC underlying materials, levered betas are rounded to the nearest 0.05 (for example, a beta of 0.82 is rounded down to 0.80.  A beta of 0.83 is rounded up to 0.85).  These rounded values are used in subsequent steps in the WACC calculation.  Cost of equity and cost of debt (weighted by their respective share of capital structure), and the resulting WACC are each rounded to the nearest 0.1%.

[4] For the relevered beta, I use the average of the unlevered betas of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis, as calculated in the WACC Underlying Materials, relevered to the average capital structure of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis. See Appendix F for more details on the de- and re-levering process used to adjust the comparable companies' betas.  According to Holthausen and Zmijewski, *Corporate Valuation*, "we first measure the CAPM common equity betas of the comparable companies and potentially the company we are valuing (if it is publicly traded) and then unlever the common equity betas to measure the unlevered beta for the company we are valuing. Once we measure the unlevered beta for the company we are valuing ... we lever the unlevered beta to measure the equity beta of the company we are valuing."  Holthausen and Zmijewski, *Corporate Valuation*, p. 453.

[5] Beta adjusted equity risk premium is equal to the product of the relevered beta and the market equity risk premium.

[6] The cost of debt reflects lenders "required or expected rate of return, which is based on the timing, magnitude, and riskiness of the expected cash flows."  Holthausen and Zmijewski, *Corporate Valuation*, p. 395.

[7] Cost of debt is weighted by Term Loan B's share of Millennium's pro forma total debt as of March 31, 2014 (97%).  WACC Underlying Materials, "Sources&Uses" tab.

[8] The capital structure represents the capital structure of the comparable companies.  The corrected WACC of 7.2% is estimated using the average capital structure of the five comparable companies identified by Ms. Austin Smith. The 14.8% WACC is based on a different set of eight comparable companies compared to Ms. Austin Smith's five comparable companies.  WACC Underlying Materials, "Beta" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 5A**



### *In Re Millennium Lab Holdings II, LLC*
### Historical and Projected Operating Expenses
### as a Percentage of Revenue
### 2009 – 2018

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, Inc. and Subsidiary, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2008 and 2009," JPMC-00001302; Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2010 and 2011," JPMC-MIL-CORP-00223784; Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2011 and 2012," JPMC-MILCORP-00191350; Millennium Lab Holdings II, LLC and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2013 and 2014," ML_DE_00024982

Note: Historical operating expenses as a percentage of revenue are calculated as: (Gross Profit Adjusted EBITDA + Depreciation and Amortization) / Net Revenue. Historical Gross Profit, Adjusted EBITDA, and Net Revenue are taken from the Lender Presentation. Historical Depreciation and Amortization is taken from Millennium's audited financials. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**    **EXHIBIT 5B**

## *In Re Millennium Lab Holdings II, LLC*
## Modified Padres Projections Incremental Operating Expenses



(Millions)

■ Austin Smith Modified Padres Projections Incremental Operating Expenses
■ Operating Expenses Holding the Operating Expense Percentage of Revenue Constant at Ms. Austin Smith's 2014 Level, 38%

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections")

Note: The cumulative figure in each column represents the total operating expenses projected in the Modified Padres Projections. For instance, in 2015 Ms. Austin Smith projected the total operating expenses to be $254.00 million. The blue segments show what Ms. Austin Smith's operating expenses would have been had they remained constant at 38% of revenue, as Ms. Austin Smith's projected them to be in 2014.  In 2014, Ms. Austin Smith projected operating expenses to be $258.93 million.  The red segments from 2015 – 2018 show Ms. Austin Smith's "incremental operating expenses." That is, the operating expenses above those that would have represented 38% of revenue. In 2013, historical operating expenses constituted 31% of revenue. YAS Workpaper 1, "IS Detail" tab. In the Padres Projections, operating expenses were projected to constitute 36% of revenue in 2014. YAS Workpaper 1, "LeverageModel" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 5C**



### *In Re Millennium Lab Holdings II, LLC*
### Modified Padres Projections Operating Expenses
### as a Percentage of Revenue

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections")

Note: The blue line (38%) represents Ms. Austin Smith's 2014 projected operating expenses as a percentage of revenue. The bars represent Ms. Austin Smith's projected operating expenses as a percentage of revenue in each year and are separated into their fixed and variable components. Green represents variable operating expenses, while red represents fixed operating expenses. Variable and fixed costs are classified as in the Austin Smith Report (YAS Workpaper 1). The blue columns represent operating expenses associated with RxAnte, which Ms. Austin Smith does not adjust relative to the Padres Projections. The RxAnte operating expenses are not classified as fixed or variable.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **EXHIBIT 6**

## *In Re Millennium Lab Holdings II, LLC*
## Enterprise Value Ranges by Selected Parties[1]



**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                    **EXHIBIT 6**

# *In Re Millennium Lab Holdings II, LLC*
## Enterprise Value Ranges by Selected Parties[1]

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1; J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)"); TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH_00090311, TA_MLH-00090312 ("TA Associates Model"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); FTI Consulting, "Millennium Health LLC:  Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743 ("FTI December 2015 Valuation"); *In re Millennium Lab Holdings II, LLC, et al.*, Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, filed on November 10, 2015 ("Hardaway Declaration"); Millennium Management Projections, April 12, 2014, ML_DE_00057999

Note:
[1] Selected parties include J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank, N.A. ("Citi"), SunTrust Bank ("SunTrust"), and Vantage Point Advisors ("VPA") (Millennium's contemporaneous solvency advisor).  The investment analysis of TA Associates (Millennium's private equity sponsor), which ranges from $1,627 to $3,007, is excluded because they used their internal rate of return (24.3%) to discount the cash flows.  TA Associates Model, "2" tab.
[2] Citi conducted base case, management case, and downside case valuations. The enterprise value range for the base case was $3,718 – $4,517. The enterprise value range for the management case was $4,424 – $5,394.  The enterprise value range for the downside case was $1,861 – $2,242.  Citi Model (March 2014) at CITI-T-00000229–231.
[3] JPMC conducted base case and downside case valuations. The enterprise value range for the base case was $3,674 – $4,737. The enterprise value range for the downside case was $2,571 – $3,277.  JPMC Model (April 2014), "MAIN" and "DCFCredit" tabs.
[4] Following Millennium's bankruptcy in November 2015 (Hardaway Declaration, p. 45), FTI Consulting ("FTI") conducted a valuation of Millennium based on management projections as of December 2015.  FTI December 2015 Valuation.
[5] Austin Smith Report  ¶ 145.
[6] The solvency threshold is the value at which Millennium's enterprise value is equal its net outstanding debt.  Austin Smith Report, Table 7 and "LeverageModel" tab of the Padres Projections.  Values to the right of the solvency threshold imply that Millennium would be balance sheet solvent.
[7] Average of contemporaneous valuations is determined as the average of the averages for Citi, JPMC, SunTrust, and VPA Solvency Analysis.  The average of each selected third party is the average of the midpoints for each valuation scenario considered by that party.  The average does not include BMO because I have not seen the valuation analysis BMO conducted.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**    **EXHIBIT 7A**



### *In Re Millennium Lab Holdings II, LLC*
### Selected Contemporaneous Revenue Projection Sensitivities
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **EXHIBIT 7B**



## *In Re Millennium Lab Holdings II, LLC*
## Selected Contemporaneous EBITDA Projection Sensitivities
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  The adjusted EBITDA figures in the Citi management case and the JPMC management case are consistent with what I have observed in the Padres Projections.  For the remaining projection sensitivites, I have not seen the materials detailing adjustments to EBITDA.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **EXHIBIT 7C**

## *In Re Millennium Lab Holdings II, LLC*
## Selected Contemporaneous EBITDA Margin Projection Sensitivities
### 2014 – 2020



Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  The adjusted EBITDA figures in the Citi management case and the JPMC management case are consistent with what I have observed in the Padres Projections.  For the remaining projection sensitivities, I have not seen the materials detailing adjustments to EBITDA.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **EXHIBIT 8A**



### *In Re Millennium Lab Holdings II, LLC*
### Selected Post-Transaction Revenue Projections
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"); *In re Millennium Lab Holdings II, LLC, et al.,* Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note:  In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015.  The September 2015 projections appear to be the same as the July 2015 projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 8B**



### *In Re Millennium Lab Holdings II, LLC*
### Selected Post-Transaction EBITDA Projections
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"); In re Millennium Lab Holdings II, LLC, et al., Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  For the remaining projections, I have not seen the materials detailing adjustments to EBITDA.  In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015.  The September 2015 projections appear to be the same as the July 2015 projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**　　　　　　　　　**EXHIBIT 8C**



## *In Re Millennium Lab Holdings II, LLC*
## Selected Post-Transaction EBITDA Margin Projections
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"); In re Millennium Lab Holdings II, LLC, et al., Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  For the remaining projections, I have not seen the materials detailing adjustments to EBITDA.  In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015.  The September 2015 projections appear to be the same as the July 2015 projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

# AMY HUTTON

550A Fulton Hall
Carroll School of Management
Boston College
140 Commonwealth Ave.
Chestnut Hill, MA 02467
(617) 320-1068
amy.hutton@bc.edu

## EDUCATION

| | |
|---|---|
| 1992 | Ph.D., Business Administration, The Simon Business School, University of Rochester. |
| 1986 | M.B.A., *beta gamma sigma*, Accounting, Finance, and Organizations & Markets, The Simon Business School, University of Rochester. |
| 1985 | B.A., *magna cum laude*, Political Science, University of Rochester. |

## FACULTY APPOINTMENTS

| | |
|---|---|
| 7/1/92-6/30/97 | Assistant Professor of Business Administration, Harvard Business School |
| 7/1/97-6/30/03 | Associate Professor of Business Administration, Harvard Business School |
| 7/1/02-12/31/02 | Visiting Associate Professor of Business Administration, Tuck School of Business at Dartmouth |
| 1/1/03-6/30/03 | Visiting Scholar, Graduate School of Business, Stanford University |
| 7/1/03-6/30/06 | Associate Professor of Business Administration, Tuck School of Business at Dartmouth |
| 7/1/06-6/30/10 | Associate Professor of Business Administration, Carroll School of Management, Boston College |
| 7/1/10-present | Professor of Business Administration, Carroll School of Management, Boston College |
| 7/1/20-present | Ph.D. Program Director, Accounting |

### Teaching Assignments

#### Harvard Business School

| | |
|---|---|
| 1991-1994 | Financial Reporting, Management Accounting and Control |
| 1995-2000 | Business Analysis and Valuation |
| 1998-2001 | Driving Corporate Performance, Executive Education |
| 2000-2001 | Financial Reporting and Control |

#### Tuck School of Business at Dartmouth

| | |
|---|---|
| 2002-2004 | Financial Measurement, Analysis and Reporting |
| Spring 2005 | Financial Reporting and Statement Analysis |
| 2002-2006 | Various Executive Education Programs |

#### Carroll School of Management at Boston College

| | |
|---|---|
| 2006-present | Financial Statement Analysis and Valuation |
| 2009-2011 | Intermediate Accounting II |
| 2018-present | Ph.D. research seminars – Empirical, financial accounting research |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER        APPENDIX A

## PUBLICATIONS

### A. Academic Articles[1]

1. ** "Debt-Covenant Violations and Managers' Accounting Responses," *Journal of Accounting and Economics,* May 1994.

2. ** "Detecting Earnings Management" (with Patricia M. Dechow and Richard G. Sloan), *Accounting Review*, April 1995.

3. ** "Causes and Consequences of Earnings Management: An Analysis of Firms Subject to Enforcement Actions by the SEC" (Patricia M. Dechow and Richard G. Sloan), *Contemporary Accounting Research*, Spring 1996.

4. "Economic Consequences of Accounting for Stock-based Compensation" (with Patricia M. Dechow and Richard G. Sloan), *Journal of Accounting Research*, Supplement 1996.

5. "An Empirical Assessment of the Residual Income Valuation Model" (with Patricia M. Dechow and Richard G. Sloan), *Journal of Accounting and Economics*, January 1999.

6. "Stock Performance and Intermediation Changes Surrounding Sustained Increases in Disclosure" (with Paul Healy and Krishna Palepu), *Contemporary Accounting Research,* Fall 1999.

7. "The Relation Between Analysts' Long-Term Earnings Forecasts and Stock Price Performance Following Equity Offerings" (with Patricia M. Dechow and Richard G. Sloan), *Contemporary Accounting Research,* Spring 2000.

8. "Short Sellers, Fundamental Analysis, and Stock Returns" (with Patricia M. Dechow, Lisa Meulbroek, and Richard G. Sloan), *Journal of Financial Economics*, July 2001.

9. "The Role of Supplementary Statements with Management Earnings Forecasts" (with Greg Miller and Douglas Skinner), *Journal of Accounting Research,* December 2003.

10. "Analyst Earnings Forecast Revisions and the Pricing of Accruals" (with Mary Barth), *Review of Accounting Studies*, Spring 2004.

11. "Determinants of Managerial Earnings Guidance Prior to Regulation Fair Disclosure and Bias in Analysts' Earnings Forecasts," *Contemporary Accounting Research*, Winter 2005.

12. "A discussion of 'Corporate Disclosure by Family Firms' " *Journal of Accounting and Economics*, September 2007.

13. "Opaque Financial Reports, R-square, and Crash Risk" (with Alan Marcus and Hassan Tehranian), *Journal of Financial Economics*, October 2009.

14. "Detecting Earnings Management – A New Approach" (with Patricia Dechow, Jung Hoon Kim and Richard Sloan), *Journal of Accounting Research*, May 2012.

---

[1] ** published under the name *Amy Sweeney*.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          APPENDIX A

15. "Do Managers Always Know Better?  An Examination of the Relative Accuracy of Management and Analyst Forecasts" (with Lian Fen Lee and Susan Shu), *Journal of Accounting Research*, December 2012.

16. "The Role of Social Media in the Capital Market: Evidence from Consumer Product Recalls" (with Lian Fen Lee and Susan Shu), *Journal of Accounting Research*, May 2015.

17. A Discussion of "Aggregate Noise Trader Risk, Mispricing, and Accounting Fundamentals" *Contemporary Accounting Research*, May 2017.

18. "Prior Forecasting Accuracy and Investor Reaction to Management Earnings Forecasts" (with Phillip C. Stocken), *Journal of Financial Reporting*, April 2021.

19. "Regulatory Transparency and the Alignment of Private and Public Enforcement" (with Susan Shu and Xin Zheng), *Journal of Financial Economics*, 2021.

## B. Working Papers

"The Costs and Benefits of Regulatory Transparency for Public Banks: Evidence from Disclosure of SEC Comment Letters" (with Y. Lin, S. Shu, I Yeung, X. Zheng).

## C. Practitioner Publications

"Solving the New Equity Puzzle" (with Patricia M. Dechow and Richard G. Sloan), *The Financial Times: Mastering Finance Series,* Summer 1997.

"Best Practice: Four Rules for Taking Your Message to Wall Street," *Harvard Business Revi*ew, May 2001.

"Review of the Securities Industry Association's Best Practices for Research" completed for the House Financial Service Committee, Capital Markets Subcommittee, *Congressional Record*, August 2001.

"Beyond Financial Reporting—An Integrated Approach to Disclosure," *Journal of Applied Corporate Finance*, Fall 2004.

"Roundtable on Corporate Disclosure, National Corporate Finance Forum" (with Donald Chew), *Journal of Applied Corporate Finance*, Fall 2004.

"Bad News Rings True: Supplemental Information Can Enhance Earnings Forecast Credibility" (with Greg Miller and Douglas Skinner), *Investor Relations Quarterly* vol. 6 no. 2, 2004.

## D. Awards

AAA's **Distinguished Contribution to Accounting Literature Award**, 2010.

Carroll School **Coughlin Distinguished Teaching Award**, 2020.


**E. Citations**    Google Scholar over 31,000   (over 11,600 since 2017)

**PROFESSIONAL ACTIVITIES**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

Cornerstone Research – Expert

Editor of the *Accounting Review*, June 2011 – June 2014

| | |
|---|---|
| Referee | *Contemporary Accounting Research, Journal of Accounting and Economics, Journal of Accounting Research, Review of Accounting Studies, Journal of Financial Economics*, *Journal of Finance*, *Review of Financial Studies*, American Accounting Association Annual Conferences |

Member of          American Accounting Association (AAA), 1991-present.
Editorial Review Board of the *Accounting Review*, 1994-99, 2014-2017
Research Advisory Committee AAA, 1997-2000.
Faculty Development Committee, AAA, 1997-2000.
Corporate Accounting Policy Committee, AAA 1999-2001, Chair 2001.
Review Board for the House Financial Service Committee, Capital Markets Subcommittee examining Securities Industry Association's proposals governing the standards and practices of research analysts, June 2001. s

Board of          National Industries for the Blind (NIB), 2002-2006
Advisors          Audit and Finance Committee, NIB, 2004-2006

Directorship          Bandag, Inc., member of audit and corporate governance and nominating committees, June 2003-June 2007; chair of the audit committee May 2005-June 2007.  Bandag acquired by Bridgestone June 2007.

Service          University Research Committee, January 2007 – January 2010
at Boston          Accounting Department's Recruiting Committee, January 2007 – present
College          Faculty Guide for Freshmen, Class 2012
Parent Action Committee for the Boston College Children's Center, September 2007 – 2010, 2014-2016.
Provost's Advisory Council, September 2009 – July 2011
Promotion & Tenure Committee, July 2010 – July 2012
Student Advisor

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**       **APPENDIX A**

**Invited presentations of working papers:**

Boston College, Columbia University, HBS – Harvard University,

MIT Sloan School of Business, New York University, Northwestern University, University of Pennsylvania – Wharton School of Business, Winter/Spring 1991

University of Michigan, January 1993 and March 2011

AAA Northeast Regional Conference, March 1993

Harvard Business School, September 1993, February 1996, May 2002, September 2007, and March 2012

University of Rochester, October 1993, May 2002 and May 2015

Southern Methodist University, April 1994

Financial Decision and Control Conference, Harvard University, July 1993, 1994, and 1998

AAA National Meetings, August 1994, 1995, 1997, 1998, 1999, 2000, 2001 and 2003

Cornell University, September 1994 and November 1997

Mitsui Life Symposium, University of Michigan, October 1994

Columbia University, January 1995 and December 2010

*Contemporary Accounting Research* Conference, April 1995 and 1998

University of Iowa, September 1995

Ohio State University, September 1995, June 2010

*Journal of Accounting Research* Conference, 1996, 2011, and 2014

Stanford University July 1996, May 2013 and December 2019

University of North Carolina, October 1996 and February 1999

Washington University, Fall 1996

University of Georgia, Fall 1996

University of Oregon, Winter 1997

University of Waterloo, April 1997

Michigan State University, September 1997

*Journal of Accounting and Economics* Conference, May 1998

Northwestern University, October 1998

Western AAA Conference, April 1999

University of Texas, Austin, October 1999

Prudential Securities Quantitative Research Conference, December 1999

*The Center for Investment Research,* Corporate Earnings Analysis Seminar, NYC, May 2001.

Tuck School of Business - Dartmouth, September 2001 and May 2005

National Investor Relations Institute (NIRI) Senior Roundtable Nov. 2001

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          APPENDIX A

**Invited presentations of working papers (continued):**

M.I.T., Sloan School of Management, May 2002 and May 2006

London Business School, July 2002

University of Washington, November 2002

Emory University, November 2002

Boston College, April 2005

*Journal of Accounting and Economics* Conferences, Discussant 2005

FEA Conference, University of North Carolina, Chapel Hill, Nov. 2005

George Washington University, March 2006

Carnegie Mellon University, January 2007

University of Pennsylvania, Wharton School of Business, April 2007

Boston University, May 2007, May 2013

University of Wisconsin, Madison, Nov. 2007 & Nov. 2009

INSEAD, May 2009

Yale University, November 2014

*Contemporary Accounting Research* Conference, Discussant 2014

IMO Conference, Harvard Business School, Discussant 2016

University of Southern Calf. Oct. 2020

Baruch College Oct. 2020

Wharton School of Business Nov. 2020

**Invited presentations:**

AAA National Meetings, various years as a discussant and moderator

AAA New Faculty Consortium as a panelist, February 1996

The Conference Board, May 2001 (co-taught Lycos case study with CEO)

SEC / NIRI (National Investor Relations Institute) Symposium on the Effects of Regulation Fair Disclosure, as a panelist May 2001

Securities Industry Association (SIA), Research and Regulation: Analyst Objectivity and Related Issues, as a panelist April 2002

NIRI 2002 Annual Conference: "Disclosure Tactics", June 2002

National Association of Corporate Directors, Corporate Financial Reporting and Disclosure: "The Expanding Role of the Audit Committee", November 2002

Forum on Corporate Finance Annual Meeting, "Earnings Guidance: Taking Back Control of the Disclosure Agenda", Stern School of Business New York University, May 2004

2005 Financial Services CEO Gathering, Panel Discussion: The Role of the CEO in Dealing with the External Environment, Morgan Stanley, May 2005.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

**Invited conferences (that I was able to attend):**

>AAA Financial Reporting Conferences, 1991, 1992, 1994 & 1995
>
>Trueblood Seminar Series, Deloitte & Touche, February 1993
>
>AAA New Faculty Consortium, March 1993
>
>Arthur Andersen Accounting Research Symposium, October 1993
>
>Stanford Summer Camp July 1996, Discussant August 2021
>
>AAA Corporate Accounting Polices (CAPs) 1994, 1999 & 2000
>    Selected Chairman for the AAA CAPs Conference in 2001
>
>AAA Financial Reporting Conference, The FASB, Dec. 1996 & 1997
>
>*Journal of Accounting and Economics* Conferences, 1993, 2000 through 2003;  2005 through 2011, 2013 through 2021
>
>*Journal of Accounting Research* Conference, 1994, 2003, 2006, 2008 through 2011
>
>Financial Decision and Control Conference, Harvard Business School, July 1993 through 1998 & 2001
>
>IMO Conference, Harvard Business School
>    June 2006, 2007, 2009 through 2011, 2015 through 2019
>
>Stanford Summer Camp, August 2021 (discussant)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX B**

# AMY HUTTON
## Depositions and Testimony

Deposition Testimony of Amy Hutton in *Move Inc. et al v. Zillow Inc.*, Kings County Superior Court, Washington, Case No. 14-2-07669-0 (April 9, 2016).

Deposition Testimony of Amy Hutton in *Growthquest Capital Inc. v. Volkswagen Aktiengesellschaft*, Ontario Superior Court of Justice, Case No. CV-16-566618-00CP (May 18, 2018).

Deposition Testimony of Amy Hutton in *In Re Banco Bradesco S.A. Securities Litigation*, U.S. District Court, Southern District of New York, Case No. 1:16-cv-04155 (GHW) (December 5, 2018).

Deposition Testimony of Amy Hutton in *In Re Perrigo Company plc Securities Litigation*, U.S. District Court, Southern District of New York, Civil Case No. 19-CV-70 (DLC) (February 24, 2021).

Deposition Testimony of Amy Hutton in *Huntsman International LLC v. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc.*, American Arbitration Association, Case No. 01-17-001-4588 (March 5, 2021).

Arbitration Testimony of Amy Hutton in *Huntsman International LLC v. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc.*, American Arbitration Association, Case No. 01-17-001-4588 (May 13, 2021).

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX C**

# Documents Relied Upon

**Legal Documents**

- *In re Millennium Lab Holdings II, LLC, et al.*, "Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings," filed on November 10, 2015.
- *In re Millennium Lab Holdings II, LLC, et al.*, "Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization," filed on November 10, 2015.

**Expert Reports**

- Expert Report and Backup Materials of Yvette R. Austin Smith, filed on November 15, 2021.

**Deposition Transcripts**

- Deposition of Daniel Pencak, July 12, 2021.
- Deposition of David M. Felty, July 27, 2021.
- Deposition of Jennifer M. Mulloy, July 14, 2021.
- Deposition of Martin Price, April 12, 2021.
- Deposition of Michael Tortora, July 15, 2021.
- Deposition of Phillip Ho, July 28, 2021.
- Deposition of Ryan Griswold, July 22, 2021.
- Deposition of Tim Kennedy, September 30, 2021.
- Deposition of William Brock Hardaway, July 20, 2021.

**Bates Numbered Documents**

- Millennium Management Projections, June 8, 2015, ML_DE_00559340
- BMO Harris Bank, N.A., "Loan Underwriting Committee Memorandum," March 11, 2014, ML00008506.
- BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990.
- Millennium Laboratories, "Lender Presentation Audio File," March 31, 2014, JPMC-00089412.
- J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076.
- Millennium Management Projections, April 12, 2014, ML_DE_00057999.
- TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH_00090311, TA_MLH-00090312.
- FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823.
- FTI Consulting, "Millennium Health LLC:  Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743.
- VPA Solvency Analysis Underlying Materials, VP_ML_00002551.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                      **APPENDIX C**

- Alvarez & Marsal Presentation, "Presentation to the Department of Justice," July 22, 2015, ML_DE_00167434.
- Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163.
- J.P. Morgan Chase Bank, N.A., "Credit Agreement Among Millennium Lab Holdings II, LLC, Millennium Laboratories, LLC, and J.P. Morgan Chase Bank, N.A.," April 16, 2014, ML_DE_00196568.
- Email from A. Christoforou to D. Diaz, "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-00053824, JPMC-00053828.
- Email from A. Christoforou to G. Hessol, et al., "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-MIL-CORP-00193320, JPMC-MIL-CORP-00193324.
- Email from A. Christoforou to J. Lee, "ML Q&A Tracker," March 30, 2014, JPMC-MIL-CORP-00219684.
- Millennium Laboratories, LLC - Voluntary Self-Referral Disclosure, August 15, 2014, ML_DE_00325457.
- Email from C. Liou to Project Chargers Whole Team, "Millennium v. Amertitox - loss," June 17, 2014, JPMC-MIL-CORP-00165260.
- Email from H. Appel to S. Karanikolaidis, Letter from the United States Attorney to Martin Price, "Re: Subpoena Regarding Millennium Laboratories, Inc.," March 27, 2012, JPMC-MIL-CORP-00214601, JPMC-MIL-CORP-00214602.
- Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model - version 2," June 14, 2015, ML_DE_00559337.
- Email from T. Kennedy to B. Hardaway, et al., "RE: Privileged," April 3, 2015, ML_DE_00597259.
- SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758.
- Millennium Laboratories, "Financial Projections Overview to Lenders," July 29, 2015, ML_DE_00023852.
- Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147.
- Millennium Laboratories, "Management Presentation," March 2014, ML_DE_00058283.
- Millennium Laboratories, "Rating Agency Presentation," March 2014, JPMC-MIL-CORP-00011605.
- Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984.
- Millennium Laboratories, "Confidential Information Memorandum for Public Side Lenders," March 31, 2014, ML_DE_00269115.
- Vantage Point Advisors, "Millennium Lab Holdings II, LLC Solvency Analysis," April 30, 2014, ML_DE_00263273.
- Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584.
- Term Sheet between Millennium Health, LLC and the Department of Justice, May 20, 2015, ML_DE_00201432.
- United States' Complaint in Intervention, filed on March 19, 2015, ML_DE_00629274.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX C**

**Financial Statements**

- Millennium Lab Holdings II, LLC and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2013 and 2014," ML_DE_00024982.
- Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2010 and 2011," JPMC-MIL-CORP-00223784.
- Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2011 and 2012," JPMC-MIL-CORP-00191350.
- Millennium Laboratories, Inc. and Subsidiary, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2008 and 2009," JPMC-00001302.

**Academic Articles**

- Alquist, R., Israel, R., and Moskowitz, T. (2018), "Fact, Fiction, and the Size Effect," *Journal of Portfolio Management,* 45(1), pp. 1–30.
- Banz, R. (1981), "The Relationship Between Return and Market Value of Common Stocks," *Journal of Financial Economics*, 9(1), pp. 3–18.
- Berk, J. (1995), "A Critique of Size-Related Anomalies," *Review of Financial Studies,* 8(2), pp. 275–286.
- Blume, M.E., and Stambaugh, R.F. (1983), "Biases in Computed Returns: An Application to the Size Effect," *Journal of Financial Economics,* 12(3), pp. 387–404.
- Dichev, I. (1998), "Is the Risk of Bankruptcy a Systematic Risk?" *Journal of Finance,* 53(3), pp. 1131–1147.
- Fisher, F.M., and Romaine, R.C. (1990), "Janis Joplin's Yearbook and the Theory of Damages," *Journal of Accounting, Auditing, and Finance*, 5(1), pp. 145–157.
- Hirshleifer, D. (2001), "Investor Psychology and Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597.
- Kent, D., Hirshleifer, D., and Subrahmanyam, A. (2001), "Overconfidence, Arbitrage, and Equilibrium Asset Pricing," *Journal of Finance,* 56(3), pp. 921–965.
- Kim, D. (1997), "A Re-Examination of Firm Size, Book-to-Market, and Earnings Price in the Cross-Section of Expected Stock Returns," *Journal of Financial and Quantitative Analysis,* 32(4), pp. 463–489.
- Horowitz, J.L., Loughran, T., and Savina, N.E. (2000), "Three Analyses of the Firm Size Premium," *Journal of Empirical Finance,* 7(2), pp. 143–153.
- Hou, K. and Dijk, M. (2019), "Resurrecting the Size Effect:  Firm Size, Profitability Shocks, and Expected Stock Returns," *The Review of Financial Studies*, 32(7), pp. 2850–2889.
- Sharpe, W. (1964), "Capital Asset Prices: A Theory of Market Equilibrium Under Conditions of Risk," *Journal of Finance*, 19(3), pp. 425–442.

**Books**

- Ang, A., *Asset Management: A Systematic Approach to Factor Investing*, Oxford University Press, 2014.
- Brealey, R.A., Myers, S.C., and Allen, F., *Principles Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2011.
- Cochrane, J., *Asset Pricing: Revised Edition*, Princeton University Press, 2005.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX C**

- Damodaran, A., *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 2nd ed., Wiley, 2002.
- Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020.
- Metrick, A. and Yasuda, A., *Venture Capital and the Finance of Innovation*, 3rd ed., Wiley, 2021, Kindle Edition.


**Other Publicly Available Materials**

- "Competitive Market Analysis for Laboratory Management Decision Makers," *Laboratory Economics*, 8(10), October 2013.
- "Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014.
- "Moody's Assigns B1 CFR to Millennium Labs; Sr. Secured Credit Facilities Rated B1; Outlook Is Stable," *Moody's*, March 31, 2014.
- "Research Update: Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014.
- "HCPCS – General Information," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo, accessed on February 7, 2022.
- "Insurance vs. Self Pay," *Kittitas Valley Healthcare*, available at https://www.kvhealthcare.org/patients-and-visitors/billing/insurance-vs-self-pay, accessed on February 7, 2022.
- "Intro to Credit Ratings," *Standard & Poor's*, available at https://www.spglobal.com/ratings/en/about/intro-to-credit-ratings, accessed on February 9, 2022.
- "Local Coverage Determinations (LCD) challenge," *Medicare*, available at https://www.medicare.gov/claims-appeals/local-coverage-determinations-lcd-challenge, accessed on February 7, 2022.
- "Medically Unlikely Edits," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE, accessed on February 7, 2022.
- "Medicare Coverage Database Archive," *Centers for Medicare & Medicaid Services*, available at https://localcoverage.cms.gov/mcd_archive/search.aspx?clickon=search, accessed on February 7, 2022.
- "Rating Scale and Definitions," *Moody's*, available at https://www.moodys.com/sites/products/productattachments/ap075378_1_1408_ki.pdf, accessed on February 7, 2022.
- "SEC Fact Sheet on Global Analyst Research Settlements," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/news/speech/factsheet.htm, accessed on February 7, 2022.
- "Updated Investor Bulletin: The ABCs of Credit Ratings," *U.S. Securities and Exchange Commission*, October 12, 2017, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_creditratings, accessed on February 7, 2022.
- "What's a MAC," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC, accessed on February 7, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX C**

- "What is a Credit Rating?," *Moody's*, available at https://ratings.moodys.io/ratings#:~:text=Moody's%20long%2Dterm%20ratings%20are,of%20one%20year%20or%20more.&text=Such%20ratings%20use%20Moody's%20Global,in%20the%20event%20of%20default, accessed on February 7, 2022.
- "Workers' Compensation Program," *U.S. Department of the Interior*, available at https://www.doi.gov/pmb/hr/workerscompensation, accessed on February 7, 2022.
- "Global Ratings Definitions," *Standard & Poor's*, November 10, 2021, available at https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352, accessed on February 9, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**  **APPENDIX D**

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC with Small Company Premium
Using Comparable Companies Identified in Ms. Austin Smith's
Comparable Companies Analysis[1]

| Cost of Equity - Modified Capital Asset Pricing Model (CAPM)[2] | Ms. Austin Smith's Corrected WACC | | | Ms. Austin Smith's Corrected WACC with Small Company Premium | | |
|---|---|---|---|---|---|---|
| Risk-free rate | | | 3.2% | | | 3.2% |
| Market equity risk premium | | 6.2% | | | 6.2% | |
| Relevered beta[3] | x | 0.85 | | x | 0.85 | |
| Beta adjusted equity risk premium[4] | | | 5.2% | | | 5.2% |
| Size premium | | | 0.0% | | | 1.9% |
| Company-specific risk adjustment | | | 0.0% | | | 0.0% |
| **Estimated cost of equity** | | | **8.5%** | | | **10.3%** |

**Cost of Debt[5]**

| Pre-tax cost of debt (pro forma) | Interest Rate | Weight | Weighted Cost | Interest Rate | Weight | Weighted Cost |
|---|---|---|---|---|---|---|
| Term Loan B | 5.3% | 97.0% | 5.1% | 5.3% | 97.0% | 5.1% |
| Weighted average pre-tax cost of debt[6] | | | 5.1% | | | 5.1% |
| Tax-effect on cost of debt | | 40.0% | -2.0% | | 40.0% | -2.0% |
| **Estimated after-tax cost of debt** | | | **3.1%** | | | **3.1%** |

| Weighted Average Cost of Capital (WACC) | Cost of Capital | | % in Capital Structure | Weighted Cost | Cost of Capital | | % in Capital Structure[7] | Weighted Cost |
|---|---|---|---|---|---|---|---|---|
| Debt | 3.1% | x | 23.4% | 0.7% | 3.1% | x | 23.4% | 0.7% |
| Equity | 8.5% | x | 76.6% | 6.5% | 10.3% | x | 76.6% | 7.9% |
| **Estimated WACC** | | | | **7.2%** | | | | **8.6%** |

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC with Small Company Premium
### Using Comparable Companies Identified in Ms. Austin Smith's
### Comparable Companies Analysis[1]

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*")

Note:
[1] The corrected WACC of 7.2% is based on Ms. Austin Smith's *five* comparable companies from her comparable companies analysis, which are Alere Inc., Bio-Reference Laboratories Inc., Laboratory Corp. of America Holdings, Myriad Genetics Inc., and Quest Diagnostics Inc.  Austin Smith Report, ¶ 151. The WACC of 14.8% is estimated based on a different set of *eight* comparable companies than Ms. Austin Smith's set.  This different set includes three additional companies: Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.  WACC Underlying Materials, "Beta" tab.  For details, see Appendix F.
[2] CAPM refers to the Capital Asset Pricing Model.  According to Holthausen and Zmijewski, *Corporate Valuation*, "[t]he expected return of an individual security in the CAPM is equal to the return on the risk-free asset plus a risk premium. The risk premium is equal to the risk of the security relative to the risk in the market multiplied by the risk premium for holding the market portfolio."  Beta is the "risk of an individual security relative to the market."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.  "The cost of capital in the CAPM [...] is equal to the risk-free rate plus one risk premium."  Holthausen and Zmijewski, *Corporate Valuation*, p. 328.
[3] For the relevered beta, I use the average of the unlevered betas of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis, as calculated in the WACC Underlying Materials, relevered to the average capital structure of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis. See Appendix F for more details on the de- and re-levering process used to adjust the comparable companies' betas.  According to Holthausen and Zmijewski, *Corporate Valuation*, "we first measure the CAPM common equity betas of the comparable companies and potentially the company we are valuing (if it is publicly traded) and then unlever the common equity betas to measure the unlevered beta for the company we are valuing. Once we measure the unlevered beta for the company we are valuing ... we lever the unlevered beta to measure the equity beta of the company we are valuing."  Holthausen and Zmijewski, *Corporate Valuation*, p. 453.
[4] Beta adjusted equity risk premium is equal to the product of the relevered beta and the market equity risk premium.
[5] The cost of debt reflects lenders "required or expected rate of return, which is based on the timing, magnitude, and riskiness of the expected cash flows."  Holthausen and Zmijewski, *Corporate Valuation*, p. 395.
[6] Cost of debt is weighted by Term Loan B's share of Millennium's pro forma total debt as of March 31, 2014 (97%).  WACC Underlying Materials, "Sources&Uses" tab.
[7] The capital structure represents the capital structure of the comparable companies.  The corrected WACC of 7.2% is estimated using the average capital structure of the five comparable companies identified by Ms. Austin Smith. The 14.8% WACC is based on a different set of eight comparable companies compared to Ms. Austin Smith's five comparable companies.  WACC Underlying Materials, "Beta" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                                    **APPENDIX E1**

## *In Re Millennium Lab Holdings II, LLC*
## Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
### *($ millions)*

| | Selected WACCs[3] | | | |
|---|---|---|---|---|
| | **14.8%** | **9.8%** | **8.6%** | **7.2%** |
| **Millennium's Enterprise Value Based on Ms. Austin Smith's Modified Padres Projections[4]** | $802.86 | $1,279.42 | $1,512.56 | $1,970.83 |
| **Millennium's Equity Value Based on Ms. Austin Smith's Modified Padres Projections[5]** | -$958.89 | -$482.32 | -$249.18 | $209.08 |
| **Marginal Impact on Millennium's Equity Value[6]** | | **Marginal Increase** | | |
| Modify Ms. Austin Smith's treatment of operating expenses[7] | $220.73 | $393.33 | $478.19 | $645.30 |
| Modify reduction of 15% in 2015 and 15% in 2016 to UDT and PGT specimen volume due to the purported reputational impact of the DOJ settlement[8] | $383.75 | $690.50 | $841.43 | $1,138.69 |
| Restore Emerging Opportunities[9] | $192.82 | $381.57 | $476.11 | $663.63 |
| Modify Medicare and Commercial Payors UDT specimen volume growth rate adjustments from 2014 through 2020[10] | $155.01 | $293.49 | $362.46 | $498.99 |
| Modify adjustment of 1Q2014 Medicare NRPS for MUE denials[11] | $87.93 | $140.78 | $166.59 | $217.28 |
| Modify 1.6% reduction in UDT specimen volume in July 2014 due to the discontinuance of the POC Free Test Cup Program | $17.36 | $28.74 | $34.30 | $45.20 |
| Modify 21.8% reduction in Commercial Payor's NRPS in July 2015 due to the discontinuance of custom profiles | $101.62 | $183.72 | $224.14 | $303.77 |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX E1**

## *In Re Millennium Lab Holdings II, LLC*
## Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
### *($ millions)*

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium
Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] Equity value is calculated as the difference between Millennium's enterprise value and $1,761.7 million—the level of outstanding debt incurred by Millennium associated with the Term Loan B transaction.
Austin Smith Report, ¶ 145.  Marginal impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections from the equity value after applying each modification.
[2] I do not modify Ms. Austin Smith's Medicare net revenue per specimen ("NRPS") decrease attributable to the draft Noridian local coverage determination ("LCD"), Austin Smith Report, ¶¶ 120–123.  In
addition, I do not modify various other changes in Ms. Austin Smith's Modified Padres Projections relative to the Padres Projections, such as the use of actual first quarter 2014 ("1Q2014") financial results
as opposed to Padres Projections for 1Q2014.  As I do not fully revert Ms. Austin Smith's mechanical changes to the Padres Projections, I refer to the changes described above as modifications to Ms.
Austin Smith's adjustments.  Austin Smith Report, ¶ 110.
[3] WACC refers to the Weighted Average Cost of Capital.  14.8% reflects Ms. Austin Smith's WACC, Austin Smith Report, ¶ 143.   See Appendix D for a description of the WACC values.
[4] These figures show Millennium's enterprise value at the selected WACCs without any modifications to Ms. Austin Smith's Modified Padres Projections.
[5] These figures show Millennium's equity value at the selected WACCs without any modifications to Ms. Austin Smith's Modified Padres Projections.  A positive value implies that Millennium would be
balance sheet solvent.
[6] A positive marginal impact on equity value associated with a modification means that the modification increases Millennium's equity value relative to the equity value based on the Modified Padres
Projections at selected WACCs.
[7] This modification adjusts Ms. Austin Smith's operating expenses to a constant percentage of revenues (38%), which corresponds to Ms. Austin Smith's projected operating expenses as a percentage of
revenues in 2014.  The marginal impact reflects the impact on unlevered free cash flow of the difference between Ms. Austin Smith's projected operating expenses in the Modified Padres Projections and
operating expenses maintained at 38% of revenues.  (See Section V.C.2 and Exhibit 6C for a detailed description.)
[8] UDT refers to Millennium's urine drug testing business.  PGT refers to Millennium's pharmacogenetics business.  DOJ refers to the U.S. Department of Justice.
[9] This modification restores the revenue and expenses associated with the Padres Projections' Emerging Opportunities.
[10] Reflects the impact of modification to Ms. Austin Smith's UDT volume growth rate adjustments for Medicare and Commercial payors.  Ms. Austin Smith reduces Medicare and Commercial Payor specimen
volume growth rates to 0.0% in 2014, 2.0% in 2015, and 3.0% in 2016 and onwards, and to 10.0% in 2014, 5.0% in 2015, and 3.0% in 2016 and onwards respectively.  In this modification I restore the
Padres Projections' specimen volume growth rates for Medicare and Commercial Payors.  Austin Smith Report, ¶ 109.
[11] MUEs refer to Medically Unlikely Edits.  This item reflects modifications to Ms. Austin Smith's modeling of an NRPS decrease for January, February, and March 2014 (1Q2014) by $77.7, $83.7, and $82.1,
respectively.  Austin Smith Report, ¶ 118 and YAS Workpaper 1, "MUE w LCD Adjustment" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                         **APPENDIX E2**

## *In Re Millennium Lab Holdings II, LLC*
### Combined Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments at a 8.6% WACC[1]

| Millennium Equity Value at a 8.6% WACC[2] | Combined Impact of Exhibit 1 Adjustments at a 8.6% WACC[3] | Percentage of Combined Impact Applied to Equity Value | Amount of Combined Impact Applied to Equity Value | Equity Value Adjusting for Combined Impact[4] |
|---|---|---|---|---|
| [A] | [B] | [C] | [D] = [B] x [C] | [E] = [A] + [D] |
| -$249.18 | $2,271.72 | 0% | $0.00 | -$249.18 |
| -$249.18 | $2,271.72 | 10% | $227.17 | -$22.01 |
| -$249.18 | $2,271.72 | 20% | $454.34 | $205.16 |
| -$249.18 | $2,271.72 | 30% | $681.51 | $432.33 |
| -$249.18 | $2,271.72 | 40% | $908.69 | $659.50 |
| -$249.18 | $2,271.72 | 50% | $1,135.86 | $886.67 |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] WACC refers to the Weighted Average Cost of Capital.  See Appendix D for a detailed derivation of the WACC figure.
[2] Reflects Millennium's equity value at a 8.6% WACC without any modifications to the Modified Padres projections.
[3] Combined impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections at a 8.6% WACC from the equity value after applying all modifications listed in Exhibit 1 at a 8.6% WACC.  Austin Smith Report, ¶ 145.
[4] Under a 0% modification, the figure reflects Millennium's equity value at a 8.6% WACC without any modifications to the Modified Padres Projections.  A positive value implies that Millennium would be balance sheet solvent following the relevant adjustment to the combined impact.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX F**

# Appendix F: WACC Corrections

### A.  Background and definition of the WACC

1.      WACC is the weighted average of the cost of all of a company's sources of capital.[1]  For a company with only debt and equity the WACC is calculated using this formula:

$$WACC = \frac{Debt}{(Debt + Equity)} * (After\ Tax\ Cost\ of\ Debt) + \frac{Equity}{(Debt + Equity)} * (Cost\ of\ Equity)$$

### B.  Cost of Equity

2.      A company's cost of equity is commonly based on the Capital Asset Pricing Model ("CAPM").  In the CAPM, the cost of equity is calculated using the following equation:[2]

$$E(R_i) = R_F + \beta_i * (E(R_M) - R_F)$$

3.      Where $E(R_i)$ represents the expected return for company $i$, $R_F$ represents the risk-free rate, $\beta_i$ represents the company's beta (the covariance of the company's stock returns with the market's returns), and $E(R_M)$ represents the expected return of the market as a whole.  The term $(E(R_M) - R_F)$ is the market risk premium.

4.      A company's beta "indicates the stock's risk relative to the average risk of the stocks in [a] market index."[3]  In the case of a publicly traded company, beta can be directly estimated using the company's publicly available stock returns.[4]  However, it is not possible to directly estimate a beta for companies that are not publicly traded, such as Millennium.  One approach to estimating

---

[1] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 11, p. 485.

[2] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 329.

[3] The relation between beta and systematic risk can be described as: "For example, if a stock has price movements (as a percentage) that are generally the same as the market portfolio on average, then the stock should have a beta equal to 1.  If a stock has a beta of 1, we would expect it to earn a return of 5% above the risk-free return on a day the market earned 5% above the risk-free return.  We would expect it to earn 5% below the risk-free return on a day the market earned 5% below the risk-free return.  If another stock has a beta of 2, we would expect it to earn a return of 10% above the risk-free return on a day the market earned 5% above the risk-free return."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.

[4] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 338.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER** **APPENDIX F**

the cost of equity for privately held companies is to use the betas of publicly traded companies that are comparable to the target company.[5]  The WACC Underlying Materials adopt this approach to estimate Millennium's cost of equity.[6]

5.     To account for differences in capital structure when using the betas of comparable companies to estimate the beta of a privately held company it is necessary adjust each estimated beta for the capital structure of the comparable company.[7]  This process is known as de-levering the beta and involves reducing the estimated beta based on the fraction of debt in a company's capital structure to arrive at the company's "unlevered beta" which reflects "the risk of the unlevered assets of a firm."[8]  These unlevered betas form the basis for estimating the privately held company's unlevered beta.  After estimating the unlevered beta for the company, "[i]f we are using the weighted average cost of capital method to value the company, we lever the unlevered [beta] for the expected capital structure, often called the target capital structure, of the company we are valuing in order to measure the company's equity cost of capital."[9]

6.     The WACC Underlying Materials follow this practice and use the following formula to de-lever the estimated betas from the comparable companies:[10]

$$\beta_U = \frac{\beta_L}{1 + ((1 - tax\ rate) * \left(Debt / Equity\right))}$$

7.     Where $\beta_U$ represents the unlevered Beta, $\beta_L$ represents the estimated levered beta, "Debt" refers to the percentage of the company's enterprise value composed of debt, and "Equity" refers

---

[5] Damodaran, *Investment Valuation*, Chapter. 24, p. 6.  Holthausen and Zmijewski, *Corporate Valuation*, p. 437.

[6] VPA Solvency Analysis, VP_ML_00002551, ("WACC Underlying Materials"), tab "Beta."  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 340 ("[A] company's equity beta, or systematic risk, has two sources of risk— financial risk and business risk or operating risk.  Financial risk is the risk that results from the fixed cost associated with financial leverage (interest payments or preferred stock dividends—payments with priority over distributions to equityholders).  Financial leverage results from fixed financing costs (interest on debt or preferred dividends).  A company with a higher degree of financial leverage will have a common stock with higher systematic risk, or a higher beta, relative to what its beta would be with lower levels of leverage. We refer to the beta of a company's operating or business risk as its unlevered beta or asset beta.").

[7] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, pp. 437–438.

[8] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 437.

[9] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 437.

[10] WACC Underlying Materials," "Beta" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                    **APPENDIX F**

to the percentage of the company's enterprise value composed of equity.[11]  To calculate the re-levered beta, the same formula can be used after the appropriate re-arrangement:

$$\beta_L = \beta_U * (1 + (1 - tax\ rate) * (^{Debt}/_{Equity}))$$

### C.   Corrections to Ms. Austin Smith's WACC

8.       In estimating Millennium's re-levered beta, the WACC Underlying Materials do not use the average unlevered beta of the comparable companies (which was 0.77), but instead use an unlevered beta of 1.[12]  Since the underlying materials present no support for using 1.0 for the unlevered beta (rather than 0.77),  I instead estimate Millennium's beta based on the average unlevered beta of the comparable companies, in line with the methodology described above.[13]

9.       Moreover, the underlying materials for the WACC estimation use a set of *eight* comparable companies to estimate beta and Millennium's target capital structure.[14]  In correcting Ms. Austin Smith's WACC, I instead use the subset of *five* comparable companies identified in Ms. Austin Smith's comparable companies analysis to estimate Millennium's beta and capital structure.[15]  Specifically, based on Ms. Austin Smith's five comparable companies and using the betas presented in the underlying materials, the average unlevered beta is 0.72 and the average capital structure is 23.4% debt and 76.6% equity and hence, Millennium's re-levered beta is 0.85. The results are shown in **Exhibit 4**.  I make no other corrections.  To avoid any inconsistency, I also use the capital structure based on Ms. Austin Smith's five comparable companies to weight the cost of equity and debt when calculating the WACC.  As shown in **Exhibit 4**, this results in a corrected WACC of 7.2%.

---

[11] See, for example, Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 452; Damodaran, *Investment Valuation* Chapter 8, p. 20.

[12] WACC Underlying Materials.

[13] I use the betas calculated in the WACC Underlying Materials throughout my analysis.

[14] The companies identified as comparable in the beta estimation of the VPA Solvency Analysis are Alere, Inc., Bio-Reference Laboratories Inc., Cepheid, Genomic Health Inc., Laboratory Corp. of America Holdings, Meridian Bioscience, Inc., Myriad Genetics Inc., and Quest Diagnostics, Inc, ("eight comparable companies"). VPA Solvency Analysis at ML_DE_00263292.

[15] Ms. Austin Smith identifies only a subset of five for her comparable companies analysis, namely, Alere, Bio-Reference Laboratories, Laboratory Corp. of America Holdings, Myriad Genetics, and Quest Diagnostics.  Austin Smith Report, Appendix B.2.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER** **APPENDIX F**

10.     In **Appendix D**, I provide the corrections to the WACC as shown in **Exhibit 4**, but do not remove the size premium in the cost of equity, despite the fact that it lacks academic support. When I include the size premium but otherwise make the same corrections as detailed in **Exhibit 4**, the WACC is 8.6%.  This 8.6% is well below the 10.0% Ms. Austin Smith claims in her report to calculate using her comparable companies with a size premium.[16]  Ms. Austin Smith provides no material or backup for her calculations.

---

[16] Austin Smith Report ¶ 148, FN 285.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**    **APPENDIX G**

## *In Re Millennium Lab Holdings II, LLC*
## Selected Fact Witness Depositions

| Witness | Entity | Title |
| --- | --- | --- |
| Martin Price | Millennium Laboratories, LLC | General Counsel |
| William Brock Hardaway | Millennium Laboratories, LLC | Chief Executive Officer |
| Tim Kennedy | Millennium Laboratories, LLC | Chief Financial Officer |
| Jennifer M. Mulloy | TA Associates | Managing Director |
| Daniel Pencak | Millennium Laboratories, LLC | Vice President of Financial Planning and Analysis |
| Ryan Griswold | J.P. Morgan Chase | Vice President, Leveraged Finance |
| David M. Felty | SunTrust | Director |
| Michael Tortora | Citibank | Vice President, Leveraged Finance |
| Phillip Ho | BMO Harris | Director |

Source: Deposition of Martin Price, April 12, 2021; Deposition of William Brock Hardaway, July 20, 2021; Deposition of Tim Kennedy, September 30, 2021; Deposition of Jennifer M. Mulloy, July 14, 2021; Deposition of Daniel Pencak, July 12, 2021; Deposition of Ryan Griswold, July 22, 2021; Deposition of David M. Felty, July 27, 2021; Deposition of Michael Tortora, July 15, 2021; Deposition of Phillip Ho, July 28, 2021.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                **APPENDIX H1A**

# *In Re Millennium Lab Holdings II, LLC*
## Padres and Modified Padres Revenue Projections
## *($ Millions)*

| Revenue Projections | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Padres | $733.28 | $788.76 | $853.08 | $933.01 | $1,008.08 | $1,070.62 | $1,134.68 |
| *Annual growth rate* | | *7.6%* | *8.2%* | *9.4%* | *8.0%* | *6.2%* | *6.0%* |
| *Cumulative growth rate since 2014* | | *7.6%* | *16.3%* | *27.2%* | *37.5%* | *46.0%* | *54.7%* |
| Modified Padres | $676.86 | $573.08 | $487.66 | $517.79 | $540.90 | $559.99 | $577.02 |
| *Annual Growth rate* | | *-15.3%* | *-14.9%* | *6.2%* | *4.5%* | *3.5%* | *3.0%* |
| *Cumulative growth rate since 2014* | | *-15.3%* | *-28.0%* | *-23.5%* | *-20.1%* | *-17.3%* | *-14.8%* |
| *Modified Padres Projections as a Percentage of Padres Projections* | 92.31% | 72.66% | 57.16% | 55.50% | 53.66% | 52.30% | 50.85% |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX H1B**

## *In Re Millennium Lab Holdings II, LLC*
### Padres and Modified Padres UDT Specimen Volume Projections

| Projection Type | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Compound Annual Growth Rate[1] |
|---|---|---|---|---|---|---|---|---|
| **Combined Projections** | | | | | | | | |
| **Padres** | 2,787,261 | 3,046,046 | 3,350,651 | 3,685,713 | 4,054,287 | 4,257,003 | 4,469,856 | 8.2% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | 5.0% | 5.0% | |
| **Modified Padres** | 2,653,277 | 2,395,870 | 2,162,041 | 2,305,937 | 2,461,021 | 2,534,852 | 2,610,897 | -0.3% |
| *Growth rate* | | -9.7% | -9.8% | 6.7% | 6.7% | 3.0% | 3.0% | |
| **Projections by Payor[2]** | | | | | | | | |
| **Padres** | | | | | | | | |
| Medicare | 517,976 | 566,068 | 622,675 | 684,942 | 753,437 | - | - | 9.8% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | | | |
| Commercial Payors | 946,699 | 1,034,596 | 1,138,056 | 1,251,860 | 1,377,047 | - | - | 9.8% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | - | - | |
| **Modified Padres** | | | | | | | | |
| Medicare | 423,228 | 359,691 | 313,647 | 323,056 | 332,748 | - | - | -5.8% |
| *Growth rate* | | -15.0% | -12.8% | 3.0% | 3.0% | - | - | |
| Commercial Payors | 917,208 | 830,322 | 733,655 | 755,665 | 778,335 | - | - | -4.0% |
| *Growth rate* | | -9.5% | -11.6% | 3.0% | 3.0% | - | - | |

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] Compound annual growth rate ("CAGR") is the annualized average growth rate between two time periods assuming that growth takes place at an exponentially compounded rate between those two time periods. In this instance, CAGR is calculated as (Specimen Volume in 2020 / Specimen Volume in 2014)^(1/6)-1.
[2] By-payor breakdowns of specimen volume are not available in either the Padres Projections or the Modified Padres Projections between 2019–2020. Commercial payors are those payors in the group consisting of Aetna, Blue Cross Blue Shield, Cigna, Humana, and United Healthcare.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**   **APPENDIX H2A**

### *In Re Millennium Lab Holdings II, LLC*
### **Projected Cash Flows and Term Loan B Required Debt Service Payments**
### Modifications to Ms. Austin Smith's Adjustments of the Padres Projections[1]
### *($ Millions)*

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance[2] | $50.00 | $62.29 | $85.07 | $106.85 | $181.81 | $260.28 | $367.88 |
| *Plus*: Unlevered Free Cash Flow[3] | $131.86 | $198.41 | $198.87 | $220.77 | $233.97 | $276.43 | $291.82 |
| Total Cash Available to Pay Debt | $181.86 | $260.70 | $283.94 | $327.62 | $415.79 | $536.71 | $659.70 |
| *Less*: Total Mandatory Debt Payments | $119.58 | $175.63 | $177.08 | $145.80 | $155.51 | $168.82 | $134.50 |
| Ending Cash Balance | $62.29 | $85.07 | $106.85 | $181.81 | $260.28 | $367.88 | $525.21 |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections");
        Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015", July 27, 2015, ML_DE_00079584

Note:
[1] Reflects Millennium's projected ending cash balance following the application of the modifications described in Exhibit 1.  Ending cash balance is defined as the beginning cash balance +
    Unlevered Free Cash Flow - (Term Loan B Interest Payments + Term Loan B Principal Amortization Payments + Term Loan B Cash Sweep - Non-Term Loan B Principal Amortization Payments).
    A positive ending cash balance indicates that Millennium had the ability to service the interest payments associated with the Term Loan B transaction.
[2] Millennium's minimum operating cash in each year is $50 million.
[3] Unlevered free cash flow for the purposes of this analysis is defined as the free cash flow available to Millennium in the absence of Term Loan B related interest expenses and amortization
    payments, i.e. Free Cash Flow + Term Loan B Interest Payments + Term Loan B Principal Amortization Payments.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## *In Re Millennium Lab Holdings II, LLC*
## Projected Cash Flows and Term Loan B Required Debt Service Payments
### Modification to Ms. Austin Smith's Specimen Volume Adjustment Due to the Impact of the Department of Justice Settlement[1]
### *($ Millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance[2] | $50.00 | $58.68 | $72.55 | $79.66 | $84.73 | $86.07 | $89.76 |
| *Plus*: Unlevered Free Cash Flow[3] | $117.61 | $163.95 | $143.60 | $148.94 | $145.15 | $161.41 | $165.32 |
| Total Cash Available to Pay Debt | $167.61 | $222.63 | $216.15 | $228.61 | $229.88 | $247.48 | $255.08 |
| *Less*: Total Mandatory Debt Payments | $108.93 | $150.07 | $136.49 | $143.87 | $143.81 | $157.72 | $161.76 |
| Ending Cash Balance | $58.68 | $72.55 | $79.66 | $84.73 | $86.07 | $89.76 | $93.32 |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015", July 27, 2015, ML_DE_00079584

Note:
[1] Reflects Millennium's projected ending cash balance following modification to the adjustment of 15% in 2015 and 15% in 2016 Urinary Drug Testing and Pharmacogenetic specimen volume reduction due to the purported reputational impact of the Department of Justice settlement.  Ending cash balance is defined as the beginning cash balance + Unlevered Free Cash Flow - (Term Loan B Interest Payments + Term Loan B Principal Amortization Payments + Term Loan B Cash Sweep - Non-Term Loan B Principal Amortization Payments).  A positive ending cash balance indicates that Millennium had the ability to service the interest payments associated with the Term Loan B transaction.
[2] Millennium's minimum operating cash in each year is $50 million.
[3] Unlevered free cash flow for the purposes of this analysis is defined as the free cash flow available to Millennium in the absence of Term Loan B related interest expenses and amortization payments, i.e. Free Cash Flow + Term Loan B Interest Payments + Term Loan B Principal Amortization Payments.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                    **APPENDIX H3A**

## *In Re Millennium Lab Holdings LLC, II*
### Projected Leverage Ratios
Modifications to Ms. Austin Smith's Adjustments of the Padres Projections[1]
*($ Millions)*

| | 1Q2014 | 2Q2014 | 3Q2014 | 4Q2014 | 2014 | 1Q2015 | 2Q2015 | 3Q2015 | 4Q2015 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leverage Ratio**[1] | 4.66x | 4.48x | 4.33x | 4.04x | 4.04x | 3.81x | 3.71x | 3.68x | 3.61x | 3.61x | 3.28x | 2.73x | 2.30x | 1.83x | 1.44x |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584
Note:
[1] Reflects Millennium's leverage ratio in each period following the implementation of the modifications made to the Modified Padres Projections as outlined in Exhibit 1.  Leverage ratio reflects net leverage including PNC notes and capital leases as defined in the Padres Projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                      **APPENDIX H3B**

### *In Re Millennium Lab Holdings LLC, II*
### Projected Leverage Ratios

Modification to Ms. Austin Smith's Specimen Volume Adjustment Due to the Impact of the Department of Justice Settlement[1]
*($ Millions)*

| | 1Q2014 | 2Q2014 | 3Q2014 | 4Q2014 | 2014 | 1Q2015 | 2Q2015 | 3Q2015 | 4Q2015 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leverage Ratio**[1] | 4.66x | 4.73x | 4.76x | 4.62x | 4.62x | 4.57x | 4.70x | 4.90x | 4.85x | 4.85x | 5.26x | 4.97x | 4.89x | 4.61x | 4.39x |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:

[1] Reflects Millennium's leverage ratio in each period following the adjustment of 15% in 2015 and 15% in 2016 Urinary Drug Testing and Pharmacogenetic Testing specimen volume reduction due to the purported reputational impact of the Department of Justice settlement.  Leverage ratio reflects net leverage including PNC notes and capital leases as defined in the Padres Projections.

# EXHIBIT 66

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
-------------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
        Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,
        Plaintiff,

    - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,
        Defendants.
-------------------------------------------X
                May 5, 2022
                10:04 a.m.


        CONFIDENTIAL TRANSCRIPT


        Remote video-teleconference
deposition via Zoom of AMY HUTTON,
pursuant to notice, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.

Page 34

HUTTON - CONFIDENTIAL

here, and this is as I recall, ListHub Platform is a small piece of Move, it's not Move, it's an investment they're choosing to make to build out this ListHub Platform, and when you're making an investment, you are usually using something like a hurdle rate and you are assessing that investment as what's the opportunity cost for me to make this investment.

And as an internal, within the firm, when you're making this decision, I even discussed this in my current report, if you're TA Associates and you're making a decision about an investment, you're going to use a hurdle rate and that's different than using a weighted average cost of capital.

The decision that you're making is actually a different decision.

Q.    You do say, you do use these words, "Given the riskiness of the projected cash flows of the ListHub Platform products, management's proposed

Page 35

HUTTON - CONFIDENTIAL

WACC of 15.3 percent is not an appropriate discount rate," right?

A.    Correct.

Q.    And do you stand by that testimony?

A.    So you're taking that one statement out of the fuller richness of the context.

What I want to highlight here is that this is not a valuation exercise, this is an investment decision and when you are making an investment decision, what you're doing is you're asking yourself, I have capital, I have to make a decision about where to invest it, should I invest it in ListHub or not, take the capital and put it elsewhere.

So what I'm really focused on is what is my hurdle rate, what is the benchmark rate of return that is commensurate with the risk, similar to what TA Associates does as a private equity firm.

And when you are making those

Page 36

HUTTON - CONFIDENTIAL

investments, you recognize that those investments, because you do not have the opportunity in that context to hold a well-diversified portfolio as an entity like Move, you're going to make just a few little investments in ListHub or something else, and TA Associates as a private equity firm, you're going to make a few capital investments, you're not talking about holding the whole market, so you're going to make a different decision and you're going to want to use the hurdle rate for that decision.

That's very different than the way you're characterizing it as the valuation cap rate.

Q.    I just want to be clear; what I asked was do you stand by that opinion, it is a pretty simple yes or no --

A.    I stand by the totality of what's in here, I don't stand by your way of phrasing it.

Q.    Why did you use the term WACC in this sentence?

Page 37

HUTTON - CONFIDENTIAL

A.    Because I believe that's what management referred to it as.

And I should be clear that the WACC is a weighted average cost of capital, so it puts together the equity rate of return and the debt rate of return, so it builds into it an understanding of what the capital structure is for that entity that you're trying to value.

In the context of an investment decision, you can go back to Modigliani-Miller, and we know that capital structure doesn't matter as to how you think about investments and what you're interested in there is a cost of capital that reflects the riskiness of that investment, which is a different decision.

Q.    You go on to say, "Given how sensitive any DCF analysis is to the choice of discount rate, the best approach is to conduct a sensitivity analysis and to present DCF valuations for a range of

10 (Pages 34 - 37)

Page 38

HUTTON - CONFIDENTIAL

discount rates, which Professor Cornell did not do," do you see that?

A. I do.

Q. I just want to be clear, in this case Ms. Austin Smith did present a sensitivity analysis for a range of her discounts, right?

MR. POPOVSKY: Objection to form.

A. Well, Ms. Austin Smith's WACC in this matter is dramatically overstated such that her range of sensitivity didn't quite reach the appropriate range.

Q. You have not opined on the appropriate range of WACCs in this matter, have you?

A. What I have done is I have opined on the errors and inconsistencies in Ms. Austin Smith's WACC, and when I correct those errors and inconsistencies I come up with a discount rate corrected for her that is 7.2 and I'm outside the range that she did her sensitivity analysis on.

Q. I'd appreciate an answer to my

Page 39

HUTTON - CONFIDENTIAL

question, though, which is, you did not provide a range of sensitivities that you, Professor Hutton, ascribed to in this matter, correct?

MR. POPOVSKY: Objection to form, asked and answered.

A. So what I do in my report is I respond to certain opinions that Ms. Austin Smith provides in her report.

She provided a WACC of 14.8; I carefully assessed that WACC, despite the fact that she provided no information to support the magnitude that she selected, simply pointing to VPA's analysis, so me and my team went and found the backup to the VPA numbers, we looked at the backup, which Ms. Austin Smith apparently did not do, and we found that there were significant errors and some inconsistencies and so we corrected those.

And when we correct Ms. Austin Smith's WACC for those errors and inconsistencies, her corrected WACC is 7.2.

Page 40

HUTTON - CONFIDENTIAL

Q. I get that.

My question was about a range of sensitivities, I don't think you have provided a range of sensitivities around 7.2 that you, Professor Hutton, put your name behind, right?

A. Well, I also provide in Appendix E -- no, Appendix F -- I provide an alternative WACC; if you include the small company risk premium and you add that back to the 7.2, in the analysis I did there I believe you get a WACC of 8.6.

Q. You provided 8.6 and 7.2 and is that your sensitivity analysis you conducted here?

A. Well, if you look at my Exhibit 1 closely, you'll see that I also provide for all of the adjustments that Ms. Austin Smith made and when I illustrate the effect of those, I provided both for the 7.2 and her 14.8.

And in addition, in a later appendix, I also provided for the 8.6.

Q. Which appendix was that, do you

Page 41

HUTTON - CONFIDENTIAL

recall?

A. I believe it is Appendix F, I think that's where we did the adjustment.

Q. Yes, Appendix F is sort of your narrative on how you got to the adjustment, which I'll cover later.

My question is, is there any WACC sensitivity analysis I can find anywhere in your report where I can understand the range of sensitivities that you applied in this case?

MR. POPOVSKY: Objection to form.

Once again, continues to be asked and answered.

MR. NEWCOMER: I have not gotten an answer at all.

Q. Go ahead.

A. So if you look at Appendix E-1 --

Q. Yes, I see Appendix E-1, I see selected WACCs there at the top, right?

A. Correct.

So there is a 14.8; 9.8, which

11 (Pages 38 - 41)

Page 130

HUTTON - CONFIDENTIAL

times when they're not good enough, and she's inconsistent, so I highlight that.

Q. I'm sorry, with that last point, you think she at some point said these companies are good enough?

A. Well, they are a subset of the eight that are used in the VPA analysis to come up with the WACC and, you know, you use if not only to assess the beta in the calculation of the WACC, but you also use those companies to identify what the appropriate capital structure is so that you can actually calculate the WACC.

And so she relies on those eight companies in those two places.

And then of course in footnote 285 she recalculates the WACC, although I'm not exactly sure how she does it because she doesn't provide me with the details, but the footnote seems to imply that she's using her five companies from her comparable companies analysis.

Q. You just talked about the eight, I'm talking about the five that she

Page 131

HUTTON - CONFIDENTIAL

identified.

Do you hear her testimony in her deposition regarding her view of those five comparable companies?

MR. POPOVSKY: Object to form.

A. When I had a chance to look over the rough transcript at a very high level, one of the things I was interested in was what she might say about the WACC given that she said so little about it in her report.

And so I did search for the term WACC in her deposition and I did read around it and I found it quite interesting, fascinating actually, that she makes an argument in her deposition that these five companies are not comparable enough and so she adds the company specific risk premium to the WACC, and I found that fascinating, because it's just -- it's wrong, it's super wrong.

She's using the five companies in the calculation of the WACC in her footnote 285, or the eight if you do the

Page 132

HUTTON - CONFIDENTIAL

14.8, but she's using it to estimate the beta and the beta is all about systematic risk and what she said in her deposition was that these five companies weren't comparable because Millennium was riskier and so she's adding a company-specific risk factor.

So I did have to scratch my head; when you're trying to get to the beta, you're focused on systematic risk, not company idiosyncratic risk, right.

So if you don't think you've got comparables to estimate your beta, well, you should change your beta estimate, not add some other ad hoc measures of company-specific risk.

And in fact in the underlying materials, Ms. Austin Smith does adjust the beta; the mean of her five companies' beta, as I highlight in Exhibit 4 of my report, is five, yet the beta that she used in the VPA analysis is one, so she's already adjusted the beta.

And then on top of that she

Page 133

HUTTON - CONFIDENTIAL

adds a company-specific risk premium because she says the comparable companies aren't as risky as Millennium, and as I point out in paragraph 35 of my report, the appropriate way to incorporate company-specific risk is not in the discount rate but is in the expected cash flows, which of course Ms. Austin Smith also adjusts, all these adjustments we have been talking about she makes.

So she is adjusting for company-specific risk, these risks that she hasn't described as to how management dealt with them, so she's imposed and layered on top her own adjustments for the risk in the numerator, right, and then on top of that she has made adjustment to the beta from .85 to 1 and then has added a company-specific risk factor.

What I can say as a valuation expert is it is completely improper to do what she has done, to add all of those different pieces in, it is nonsensible.

Q. I want to be clear on the facts

34 (Pages 130 - 133)

Page 134

HUTTON - CONFIDENTIAL

here, because I think the underlying analysis you're talking about is VPA's analysis, right, not Ms. Austin Smith's analysis; I know she has the same 14.8 percent, but you label it her analysis.

Is it your understanding that Ms. Austin Smith was the one responsible for VPA's analysis?

A.    The fact that she relies on VPA's analysis and that I can see how VPA calculated it, she is, from my perspective, relying on that calculation and I go through some efforts in my Exhibit 4 to correct for the errors and inconsistencies, getting the incorrect and inflated WACC from 14.8 to the corrected WACC of 7.2.

And what I'm highlighting for you is that I was startled maybe by what I read in her deposition as to her now justification for the company-specific risk factor.

She described it as something she did or permitted for the VPA analysis

Page 135

HUTTON - CONFIDENTIAL

because her comparable companies weren't comparable enough and in fact she viewed them as lower risk, when relative to Millennium -- when she wasn't -- that kind of risk she's talking about, she's adding a company-specific risk factor, but she was talking about using those companies to estimate systematic risk, which is not company-specific, it's how you move with the market.

So it's completely nonsensible to me, I found it rather startling.

Q.    Let me ask you this.

You mentioned in that colloquy that one way to adjust for the perceived difference in riskiness between the comparable companies and the target company is to adjust the beta, right?

A.    What I said is if you are taking issue with the estimate of the beta -- keep in mind that the estimate of the beta is estimating systematic risk, and if you think that you've got comparable companies that do not provide

Page 136

HUTTON - CONFIDENTIAL

comparability with respect to systematic risk, you would directly adjust the beta, you would not add a company-specific risk factor because that's a different kind of risk, that's exactly what the capital asset pricing model separates out for us.

It is important to understand the company-specific risk is not compensated for within the context of thinking about investors in the capital markets, because you hold a weld of diversified portfolio and any risk that is diversifiable, company-specific risk, is not -- you don't get a return for that, you're not compensated for that.

Q.    So VPA, Vantage Point, what's your understanding of their role in this?

MR. POPOVSKY:  Objection to form.

A.    My understanding is that they were -- they provided Millennium with a solvency opinion prior to -- right after this transaction.

Q.    I'm sorry, could you clarify

Page 137

HUTTON - CONFIDENTIAL

that, they provided a solvency opinion, right?

A.    Yes.

Q.    What was the purpose of that solvency opinion?

A.    My understanding is that it was provided to the -- I suppose the board of directors.

Q.    For what purpose --

A.    Whatever they're called in a private entity.

Sorry?

Q.    For what purpose was it provided?

A.    I am not sure, I guess to give assurance that the entity was solvent after the -- after what would be the effects of the transaction.

Q.    I think you're clear that Vantage Point used a 14.8 percent weighted average cost of capital, right?

A.    They did, yes, in their solvency opinion.

Q.    And they selected eight

35 (Pages 134 - 137)

Page 162

HUTTON - CONFIDENTIAL

that in any way the basis of your opinion?

MR. POPOVSKY: Objection to form.

A. What it does is it gives more credence to the corrections that I've made in that they're here for a reason, these different points, to show you that when you correct Ms. Austin Smith's WACC for the errors and inconsistency, it comes back in line with the WACCs of the other contemporaneous financial professionals.

Q. Another contemporaneous financial professional was TA Associates, right?

A. But TA Associates is a private equity firm and they are not calculating a WACC, they're interested in understanding a hurdle rate and whether the investment that they're making is going to supersede that hurdle rate or not.

So TA Associates is not here because they're not doing a valuation, their analysis is entirely different.

Q. So TA Associates wasn't doing a

Page 163

HUTTON - CONFIDENTIAL

valuation and did not calculate WACC and that's why you kept them off this table?

A. So TA Associates is a private equity firm and they use a required rate of return of 25 percent in their assessments that they did and I would highlight for you that that is not a WACC, it is a required rate of return, and it's done differently and it's an entirely different question they're asking and trying to answer for themselves.

As a private equity firm, they do not have the benefit of being a well-diversified investor holding a well-diversified portfolio and so when they look at their investments, they're very interested in holding a hurdle rate where, you can think of it as an opportunity cost of capital, because they have a limited amount of capital and they're going to choose where to invest it and how to invest it.

So given they're not going to have a well-diversified portfolio, they're

Page 164

HUTTON - CONFIDENTIAL

saying we have to make this much, in this case 25 percent return, in order to -- we have to think that that's what this is achievable in order for it to make sense for us to invest, in this case Millennium, versus taking capital and putting it elsewhere; that's different than a valuation analysis.

So their way of thinking and their discount rate they're using is not coverable and does not belong in Exhibit 3.

Q. If they did calculate a WACC, would that belong in Exhibit 3, in your mind?

MR. POPOVSKY: Objection to form.

A. So they did calculate a WACC in the sense that they put the 25 percent in as the cost of equity and then they had some calculations that they did to come up with something they called a WACC.

But that's not a WACC in the same sense as these are, because it's not

Page 165

HUTTON - CONFIDENTIAL

using a cost of equity capital, it is a function of a well-diversified portfolio as a function of pricing model and all those things, it is for a private equity firm who is thinking about a hurdle rate and opportunity cost.

So they can call it whatever they want, but it was a different analysis that they were doing.

Q. Did they perform a CAPM?

A. No, their 25 percent is not coming from a CAPM.

Q. What's it coming from?

A. As I said, it is coming from their view of the opportunity cost of their capital.

Q. So when you say opportunity cost, it's what they could make if they invested the money somewhere else?

A. They have a goal and it comes from the fact that they're not going to hold a well-diversified portfolio and, generally speaking, private equity firms are aware of the fact that when they pull

42 (Pages 162 - 165)

Page 166

HUTTON - CONFIDENTIAL

a portfolio together of the companies they are going to be investing in, which is limited, there's going to be variation in the outcomes and it's not going to be well-diversified, so they hold themselves to a standard, a hurdle rate, an opportunity cost, in order to try and achieve levels of profitability that make sense given the risk that they're taking, that includes not systematic risk, it includes idiosyncratic risk, because they're not well-diversified.

Q.   So the key difference in your mind between TA Associates and these banks that you include on this chart is that the banks were assuming a completely diversified portfolio and TA Associates by definition does not do that?

MR. POPOVSKY:  Objection to form, mischaracterizes the testimony.

A.   So it's not uncommon in the context of doing valuations for -- I did this with my students, I want them to understand how companies like TA or an LBO

Page 167

HUTTON - CONFIDENTIAL

shop will look at a valuation differently than will -- when we're thinking about regular investors, investors who are trading in their capital markets and things like that.

So it's not uncommon to have both of these kinds of analysis done and to have people think about how they come at the problem differently.

But they are asking different questions and I think it's very important to understand that they're asking different questions and so their analysis is not -- does not belong with this other group and that's why I didn't put it in here.

Q.   Are you aware whether TA Associates did a valuation sensitivity of weighted average cost of capital between 16 percent and 22 percent?

A.   I do recall that they looked at weighted average cost of capitals.

Keep in mind I don't think of those as weighted average cost of capitals

Page 168

HUTTON - CONFIDENTIAL

in the sense that they don't have a classic cost of equity, they have their internal rate of return in the calculation, they have their 25 percent in there.

So they may call it a WACC, but it's not comparable to any of these, including Ms. Austin Smith's.

MR. NEWCOMER:  I am having technical difficulties with my Exhibit Share here.

I will ask one question and then we will go off, I will finish up with a line and come back to that.

Q.   How did you know that TA did a different valuation than the banks and VPA?

MR. POPOVSKY:  Objection to form.

A.   How did I know --

Q.   How do you know that they actually did something different, is that from their analysis?

A.   So as I highlight in my report,

Page 169

HUTTON - CONFIDENTIAL

they are a private equity firm and so the question that they're interested in answering is about their rate of return and about assessing their investment and trying to figure out if this is a good investment for them.

So that's how I know that it's not very -- as I was saying, I teach this to my students, to think about how a private equity firm would view a deal or how a leverage buyout firm would view a deal and how they would view it differently than the average investors, investors in the capital markets that are well-diversified.

Q.   So other than -- any other reason other than the fact that it was private equity?

MR. POPOVSKY:  Objection to form.

A.   I'm not sure.

I remember taking a look at some of the materials, but I don't remember beyond that what they may have

43 (Pages 166 - 169)

# EXHIBIT 67

# Millennium Lab Holdings, Inc.

Solvency Opinion
Valuation Date as of April 16, 2014

*DRAFT SCHEDULES (for discussions purposes only)*

*Prepared by:*

**Vantage Point Advisors, Inc. ("VPA")**

**Prepared on: June 2, 2015**



**Take aim.**

**12636 High Bluff Drive, Suite 120**

**San Diego, CA 92130**

**Phone: (858) 509-7545**

**www.vpadvisors.com**

**San Diego I Orange County I Los Angeles**

**Millennium Lab Holdings, Inc.**

Case 17-51840-LSS    Doc 340-3    Filed 02/10/23    Page 607 of 612

**Exhibit 2, Page 5**

Weighted Average Cost of Capital

**DRAFT**

(USD '000)

Valuation as of April 16, 2014

| **Weighted Average Cost of Capital (WACC)** | **Cost of Capital** | **% in Capital Structure** | **Weighted Cost** |
|---|---|---|---|
| (1) Debt | 3.05% | 14.6% | 0.4% |
| Equity | 16.89% | 85.4% | 14.4% |
| Weighted average cost of capital | | | 14.8% |
| **Estimated WACC (rounded)** | | | **14.8%** |

**Cost of Equity - Modified Capital Asset Pricing Model (CAPM)**

| | | | |
|---|---|---|---|
| (2) Risk-free rate | | | 3.2% |
| (3) Market equity risk premium | | 6.18% | |
| (4) Relevered beta | x | 1.10 | |
| Beta adjusted equity risk premium | | | 6.8% |
| (5) Size premium | | | 1.9% |
| (6) Company-specific risk adjustment | | | 5.0% |
| **Estimated cost of equity** | | | **16.9%** |

**Cost of Debt**

| (7) Pre-tax cost of debt (pro forma) | Interest rate | Weight | Weighted Cost |
|---|---|---|---|
| Term Loan B | 5.25% | 97.0% | 5.092% |
| Weighted average pre-tax cost of debt | | | 5.09% |
| Tax-effect on cost of debt | | 40.0% | -2.04% |
| **Estimated after-tax cost of debt** | | | **3.05%** |

Notes:

(1) Based on Company's market target capital structure.

(2) Based on the 20-year U.S. Treasury bond as of April 16, 2014.  Source:  The Federal Reserve Board.

(3) Source:  Duff & Phelps 2014 Valuation Handbook - Guide to Cost of Capital. Long-horizon expected equity risk premium.

(4) See Exhibit 2, Page 6.

(5) Source:  Duff & Phelps 2014 Valuation Handbook - Guide to Cost of Capital.  Size premium (return in excess of CAPM) for the 7th decile companies from 1926 to 2013.  The seventh decile includes companies with a market capitalization of $1,056.204 - $1,621.792 million.

(6) Represents risk specific to the Company and includes additional risk and variance in the forecast as well as risks related to regulatory changes and pressures.

(7) The cost of debt is based on the Company's pro forma debt levels as of the Valuation Date.

# Millennium Lab Holdings, Inc.

**Exhibit 2, Page 6**

Weighted Average Cost of Capital - Beta

**DRAFT**

(USD '000)

Valuation as of April 16, 2014

| Guideline Company | Ticker Symbol | Levered Beta (1) | Interest-bearing Debt ($mil) | Market Capitalization ($mil) | Market Value of Invested Capital ($mil) | Debt | Equity | Unlevered Beta (2) |
|---|---|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | 1.921 | $3,843.2 | $2,933.9 | $6,777.0 | 56.7% | 43.3% | 1.076 |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | 0.950 | $52.6 | $759.2 | $811.8 | 6.5% | 93.5% | 0.912 |
| Cepheid | NasdaqGS:CPHD | 1.096 | $1.7 | $3,312.2 | $3,313.9 | 0.1% | 99.9% | 1.095 |
| Genomic Health Inc. | NasdaqGS:GHDX | 0.371 | $0.0 | $836.7 | $836.7 | 0.0% | 100.0% | 0.371 |
| Laboratory Corp. of America Holdings | NYSE:LH | 0.575 | $3,000.4 | $8,667.6 | $11,668.0 | 25.7% | 74.3% | 0.476 |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | 1.133 | $0.0 | $892.5 | $892.5 | 0.0% | 100.0% | 1.133 |
| Myriad Genetics Inc. | NasdaqGS:MYGN | 0.589 | $0.0 | $2,797.1 | $2,797.1 | 0.0% | 100.0% | 0.589 |
| Quest Diagnostics Inc. | NYSE:DGX | 0.653 | $3,366.0 | $8,652.9 | $12,018.9 | 28.0% | 72.0% | 0.529 |
| **Minimum:** | | 0.371 | $0.0 | $759.2 | $811.8 | 0.0% | 43.3% | 0.371 |
| **Lower (First) Quartile:** | | 0.586 | $0.0 | $878.6 | $878.6 | 0.0% | 73.7% | 0.516 |
| **Median:** | | 0.802 | $27.2 | $2,865.5 | $3,055.5 | 3.3% | 96.7% | 0.751 |
| **Average:** | | 0.911 | $1,283.0 | $3,606.5 | $4,889.5 | 14.6% | 85.4% # | 0.773 |
| **Upper (Third) Quartile:** | | 1.105 | $3,091.8 | $4,647.4 | $7,999.8 | 26.3% | 100.0% | 1.081 |
| **Maximum:** | | 1.921 | $3,843.2 | $8,667.6 | $12,018.9 | 56.7% | 100.0% | 1.133 |

**Selected unlevered beta:**    **1.00**

| Subject Company | Unlevered Beta | Target Cap Structure Debt | Equity | Relevered Beta (2) |
|---|---|---|---|---|
| Millennium Lab Holdings, Inc. | 1.00 | 14.6% | 85.4% | 1.10 |

**Concluded relevered beta:**    **1.10**

Notes:

Source: Capital IQ, a division of Standard & Poor's.

(x) Denotes company excluded from the descriptive statistics. We excluded any companies with negative beta values.

(1) Beta values obtained through a linear regression of the total returns of the guideline public companies against the market's total returns. The S&P 500 Index was used as the measure for market returns. Monthly historical stock price data with a look-back period of 60 months, when applicable.

(2) $BU = BL \div [1+(1-T) \times (Wd \div We)]$;  $BL = BU \times [1+(1-T) \times (Wd \div We)]$.

Definitions:

BU = Beta unlevered;

BL = Beta levered;

T = Estimated tax rate of 40.0 percent;

Wd = Percentage of debt capital in the capital structure; debt capital is comprised of interest-bearing debt; and

We = Percentage of equity capital in the capital structure; equity capital is comprised of the market value of common equity.

# EXHIBIT 68

## 270 Model /  Project name

**August 2022**

STRICTLY PRIVATE AND CONFIDENTIAL

J.P.Morgan

x

**Project name**

*Discounted Cash Flow Analysis*

---

| DEAL SHEET - UNPRINTED |
|---|

| Time Period of DCF (years): | 10 |
|---|---|

| | | | **Valuation Metrics/Methodology** | | **Metric Range** | | | **Do not touch (timing calcs)** | |
|---|---|---|---|---|---|---|---|---|---|
| Time to discount back to (deal closing) | | | | | Low | Medium | High | % of yr (not incl.) | 25.0% |
| Date of Valuation: | 03/31/14 | | DCF 1 | FCF Perpetuity Growth Method | (0.5%) | 0.0% | 0.5% | % of yr (incl.) | 75.0% |
| Fiscal Year End: | 12/31/13 | | DCF 2 | EBITDA | 7.0x | 8.0x | 9.0x | | |
| | | | | | | | | Mid-point factor | 0.5 |
| **Mid-Year Convention:** | **2** | | **Firm Value at WACC = 6.7%** | | Low | Medium | High | Timing factor | 0.38 |
| 1 Don't use Mid-Year Convention | | | DCF 1 | FCF Perpetuity Growth Method | $2,753.2 | $2,872.7 | $3,011.7 | | |
| 2. Use Mid-Year Convention | | | DCF 2 | EBITDA | 2,920.2 | 3,156.4 | 3,392.5 | Full Year EBITDA | 369 |
| | | | | | | | | | |
| | | | | Discount Rate (Midpoint) | 6.7% | | | | |
| | | | | Percentage Interval (/-) | 0.25% | | | | |

BE SURE TO CHECK THE FINANCIAL INPUTS BELOW:

x

| DCF VALUATION  (Valuation date as of March 31,2014) |
|---|

| | | | | | *Projected FYE December 31:* | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ($mm,except per share data) | **2014 Stub** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** |
| EBITDA | $276.5 | $370.3 | $374.8 | $389.1 | $400.0 | $411.8 | $421.2 | $429.9 | $436.3 | $442.9 | $442.9 |
| Less: Depreciation & Amortization | (15.9) | (20.9) | (19.1) | (17.3) | (16.3) | (18.0) | (16.9) | (16.7) | (16.9) | (17.2) | (17.2) |
| EBIT | $260.7 | $349.4 | $355.7 | $371.8 | $383.7 | $393.8 | $404.3 | $413.2 | $419.4 | $425.7 | $425.7 |
| Less: Taxes (at the marginal Tax rate) | (137.1) | (183.8) | (187.1) | (195.5) | (201.8) | (207.2) | (212.7) | (217.4) | (220.6) | (223.9) | (223.9) |
| Tax-Effected EBIT | $123.5 | $165.6 | $168.6 | $176.2 | $181.9 | $186.7 | $191.6 | $195.9 | $198.8 | $201.8 | $201.8 |
| Plus: Depreciation & Amortization | 15.9 | 20.9 | 19.1 | 17.3 | 16.3 | 18.0 | 16.9 | 16.7 | 16.9 | 17.2 | 17.2 |
| Less: Capital Expenditures | (12.5) | (13.9) | (16.7) | (20.3) | (27.6) | (18.7) | (18.6) | (19.1) | (19.4) | (19.7) | (19.7) |
| +/-: Changes in net working capital | (2.0) | (3.1) | (7.1) | (7.8) | (6.9) | (5.7) | (6.1) | (5.0) | (5.0) | (5.0) | (5.0) |
| UNLEVERED FREE CASH FLOW | $124.9 | $169.5 | $163.9 | $165.4 | $163.6 | $180.2 | $183.9 | $188.4 | $191.3 | $194.3 | $194.3 |
| ADJ. UNLEVERED FREE CASH FLOW FOR DISCOUNTING | $124.9 | $169.5 | $163.9 | $165.4 | $163.6 | $180.2 | $183.9 | $188.4 | $191.3 | $194.3 | $194.3 |

x

| DCF VALUATION  - SUMMARY |
|---|

**Perpetuity Growth Method**    Valuation date as of March 31,2014

| | A | + | B | = | C | | |
|---|---|---|---|---|---|---|---|

| | **Discounted Cash Flows** | **PV of Terminal Value at perpetuity growth rate of:** | | | **Firm Value** | | | **TEV as multiple of 2014 EBITDA** | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Discount Rate** | **(2014 Stub-2023)** | **-0.50%** | **0.00%** | **0.50%** | **-0.50%** | **0.00%** | **0.50%** | **-0.50%** | **0.00%** | **0.50%** |
| 6.2% | 1,294.6 | $1,668.4 | $1,812.8 | $1,982.7 | $2,963.0 | $3,107.5 | $3,277.4 | 8.0x | 8.4x | 8.9x |
| 6.4% | 1,280.8 | 1,573.5 | 1,704.7 | 1,858.0 | 2,854.3 | 2,985.5 | 3,138.9 | 7.7 | 8.1 | 8.5 |
| 6.7% | 1,267.3 | 1,485.9 | 1,605.5 | 1,744.4 | 2,753.2 | 2,872.7 | 3,011.7 | 7.5 | 7.8 | 8.2 |
| 6.9% | 1,253.9 | 1,405.1 | 1,514.3 | 1,640.5 | 2,659.0 | 2,768.2 | 2,894.4 | 7.2 | 7.5 | 7.9 |
| 7.2% | 1,240.8 | 1,330.2 | 1,430.2 | 1,545.2 | 2,571.0 | 2,671.0 | 2,786.0 | 7.0 | 7.2 | 7.6 |

| | **Sen sec debt / TEV** | | | **TEV / Sen sec debt** | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Discount Rate** | **-0.50%** | **0.00%** | **0.50%** | **-0.50%** | **0.00%** | **0.50%** | | | |
| 6.2% | 63.45% | 60.50% | 57.36% | 1.6x | 1.7x | 1.7x | | | $1,880.0 |
| 6.4% | 65.86% | 62.97% | 59.89% | 1.5 | 1.6 | 1.7 | | | Note: assumes fully drawn revolver |
| 6.7% | 68.28% | 65.44% | 62.42% | 1.5 | 1.5 | 1.6 | | | |
| 6.9% | 70.70% | 67.91% | 64.95% | 1.4 | 1.5 | 1.5 | | | |
| 7.2% | 73.12% | 70.38% | 67.48% | 1.4 | 1.4 | 1.5 | | | |

x

| DCF VALUATION - WACC |
|---|

**Select a Capital Structure to use for your DCF:**   3

| **ASSUMPTIONS:** | | | | | |
|---|---|---|---|---|---|
| Unleveraged Beta | 0.7 | Cost of Debt (pre Tax) | 4.5% | | |
| Leveraged Beta | 0.9 | Cost of Debt (after Tax) | 2.1% | | |
| Risk Free Rate | 2.71% | Cost of Preferred | 0.0% | | |
| Risk Premium | 6.71% | Cost of Equity | 8.6% | | |
| Perpetuity Growth Rate | 0.0% | | | | WACC Override |
| Tax Rate | 52.6% | WACC | 6.66% | | 0.00% |

| **DCF CAPITAL STRUCTURE:** | **Alternate Capital Structure:** |
|---|---|
| % Non-Conv. Debt | 30.0% |
| % Non-Conv. Preferred | 0.0% |
| % Market Equity | 70.0% |
| Total Preferred/Market Equity | 0.0% |
| Total Debt/Market Equity | 42.9% |

*Beta = Barra's predicted betas,average calculation from comparable cos*
*Risk Free Rate = Current 10 Yr Treasury (as of 4/7/14)*
*Risk Premium = Expected return on market less the risk free rate (per M&A website)*
*Perpetuity Rate = Credit guidance is 0%*
*Cost of Equity = Risk Free Rate + (Risk Premium x Leveraged Beta)*

| **Industry Average Capital Structure:** | | **Opening Balance Sheet Capital Structure:** | | **Alternate Capital Structure:** | |
|---|---|---|---|---|---|
| % Non-Conv. Debt | 25.7% | % Non-Conv. Debt | 50.0% | % Non-Conv. Debt | 30.0% |
| % Non-Conv. Preferred | 0.0% | % Non-Conv. Preferred | 0.0% | % Non-Conv. Preferred | 0.0% |
| % Market Equity | 74.3% | % Market Equity | 50.0% | % Market Equity | 70.0% |
| Total Preferred/Market Equity | 0.0% | Total Preferred/Market Equity | 0.0% | Total Preferred/Market Equity | 0.0% |
| Total Debt/Market Equity | 34.7% | Total Debt/Market Equity | 100.0% | Total Debt/Market Equity | 42.9% |

x

| DCF VALUATION - COST OF CAPITAL ANALYSIS |
|---|

| **Macroeconomic Assumptions** | |
|---|---|
| Estimated Risk Free Rate(1) | 4.73% |
| Estimated Market Risk Premium(2) | 4.40% |
| 30 year government bond | 5.00% |

x

| **Industry Beta Analysis** | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **COMPARABLE COMPANIES:** | **Ticker** | **Predicted Levered Beta(3)** | **Total Debt** | **Total Shares** | **Share Price** | **Mkt. Cap.** | **Debt/ Equity** | **Marg. Tax Rate** | **Unlev. Beta(4)** | **Lev. Cost of Equity** | **Unlev. Cost of Equity** | **Debt/ Cap.** | **Rev.** | **EBITDA** | **Cash** | **FV/ EBITDA** |
| #NAME? | BRLI | 0.8 | $52.6 | 27.7 | $27.39 | 759.3 | 0.1 | 40.0% | 0.7 | 8.1% | 8.0% | 0.1 | | | | |
| #NAME? | LH | 0.6 | $3,000.4 | 144.3 | $58.78 | 8,479.8 | 0.4 | 40.0% | 0.5 | 7.4% | 6.9% | 0.3 | | | | |
| #NAME? | DGX | 0.5 | $3,366.0 | 85.0 | $99.34 | 8,445.7 | 0.4 | 40.0% | 0.4 | 7.1% | 6.6% | 0.3 | | | | |
| #NAME? | GHDX | 1.3 | $0.0 | 31.2 | $26.78 | 835.1 | 0.0 | 40.0% | 1.3 | 10.2% | 10.2% | 0.0 | | | | |
| AVERAGE OF THE COST OF CAPITAL GROUP | | 0.79 | $1,604.8 | 72.05 | $53.07 | $4,630.0 | 0.35 | 0.40 | 0.73 | 0.08 | 0.08 | 0.26 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |

x

| **Target WACC Calculation** | | | | | | |
|---|---|---|---|---|---|---|
| **Optimal Debt/ Capitalization** | **Optimal Debt/ Equity** | **Spread to 30-Yr Treasuries (bp)** | **Pre-Tax Long Term Cost of Debt** | **Levered Beta Assuming Unlevered Beta of 0.73** | **Cost of Levered Equity** | **Target WACC** |
| 0.0% | 0.0% | 50 | 5.5% | 0.73 | 7.9% | 7.9% |
| 10.0% | 11.1% | 75 | 5.8% | 0.78 | 8.2% | 7.7% |
| 20.0% | 25.0% | 100 | 6.0% | 0.84 | 8.4% | 7.5% |
| 30.0% | 42.9% | 125 | 6.3% | 0.92 | 8.8% | 7.3% |
| 40.0% | 66.7% | 150 | 6.5% | 1.02 | 9.2% | 7.1% |
| 50.0% | 100.0% | 250 | 7.5% | 1.17 | 9.9% | 7.2% |
| 60.0% | 150.0% | 350 | 8.5% | 1.39 | 10.8% | 7.4% |
| 70.0% | 233.3% | 450 | 9.5% | 1.75 | 12.4% | 7.7% |
| 80.0% | 400.0% | 550 | 10.5% | 2.48 | 15.6% | 8.2% |
| 90.0% | 900.0% | 650 | 11.5% | 4.67 | 25.3% | 8.7% |

*Notes*
*(1) Risk-Free Rate = Ten Year Treasury bond yield,as of 3/7/06*
*(2) Source: JPMorgan M&A Research (See M&A Website: http://investmentbank.ny.jpmorgan.com/ma/info/default.htm)*
*(3) Source: BARRA's U.S. Equity Beta (See OTF MDS or Bloomberg)*
*(4) Unlevered beta equals Levered Beta/ (1 + (Total Debt/ Market Value of Equity) * (1 - Tax Rate)).  Assumes beta of debt equals zero.*

x   END

x **Project name**
*Discounted Cash Flow Analysis*

| DEAL SHEET - UNPRINTED |
|---|

| Time Period of DCF (years): | 10 | | Valuation Metrics/Methodology | | | | Do not touch (timing calcs) | |
|---|---|---|---|---|---|---|---|---|

**Metric Range**

| | | | | | Low | Medium | High | | |
|---|---|---|---|---|---|---|---|---|---|
| Time to discount back to (deal closing) | | | | | | | | % of yr (not incl.) | 25.0% |
| Date of Valuation: | 03/31/14 | | DCF 1 | FCF Perpetuity Growth Method | (0.5%) | 0.0% | 0.5% | % of yr (incl.) | 75.0% |
| Fiscal Year End: | 12/31/13 | | DCF 2 | EBITDA | 7.0x | 8.0x | 9.0x | | |
| | | | | | | | | Mid-point factor | 0.5 |
| **Mid-Year Convention:** | 2 | | Firm Value at WACC = 6.7% | | Low | Medium | High | Timing factor | 0.38 |
| 1 Don't use Mid-Year Convention | | | DCF 1 | FCF Perpetuity Growth Method | $3,946.9 | $4,127.8 | $4,338.0 | | |
| 2. Use Mid-Year Convention | | | DCF 2 | EBITDA | 4,170.7 | 4,523.9 | 4,877.1 | Full Year EBITDA | 418 |
| | | | | Discount Rate (Midpoint) | 6.7% | | | | |
| | | | | Percentage Interval (/-) | 0.25% | | | | |

BE SURE TO CHECK THE FINANCIAL INPUTS BELOW:

| DCF VALUATION  (Valuation date as of March 31,2014) |
|---|

*Projected FYE December 31:*

| ($mm,except per share data) | 2014 Stub | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| EBITDA | $313.4 | $435.8 | $459.0 | $498.0 | $532.2 | $564.4 | $594.3 | $624.4 | $643.1 | $662.4 | $662.4 |
| Less: Depreciation & Amortization | (17.0) | (23.2) | (22.1) | (20.9) | (20.5) | (23.2) | (22.5) | (22.8) | (23.5) | (24.2) | (24.2) |
| EBIT | $296.4 | $412.5 | $436.9 | $477.1 | $511.7 | $541.2 | $571.8 | $601.6 | $619.6 | $638.2 | $638.2 |
| Less: Taxes (at the marginal Tax rate) | (155.9) | (217.0) | (229.8) | (251.0) | (269.2) | (284.7) | (300.8) | (316.4) | (325.9) | (335.7) | (335.7) |
| Tax-Effected EBIT | $140.5 | $195.5 | $207.1 | $226.2 | $242.5 | $256.5 | $271.0 | $285.1 | $293.7 | $302.5 | $302.5 |
| Plus: Depreciation & Amortization | 17.0 | 23.2 | 22.1 | 20.9 | 20.5 | 23.2 | 22.5 | 22.8 | 23.5 | 24.2 | 24.2 |
| Less: Capital Expenditures | (12.5) | (15.5) | (19.3) | (24.5) | (34.6) | (24.2) | (24.7) | (26.2) | (26.9) | (27.7) | (27.7) |
| +/-: Changes in net working capital | (2.0) | (3.1) | (7.1) | (7.8) | (6.9) | (5.7) | (6.1) | (5.0) | (5.0) | (5.0) | (5.0) |
| UNLEVERED FREE CASH FLOW | $143.0 | $200.2 | $202.8 | $214.7 | $221.4 | $249.9 | $262.8 | $276.8 | $285.2 | $293.9 | $293.9 |
| ADJ. UNLEVERED FREE CASH FLOW FOR DISCOUNTING | $143.0 | $200.2 | $202.8 | $214.7 | $221.4 | $249.9 | $262.8 | $276.8 | $285.2 | $293.9 | $293.9 |

| DCF VALUATION  - SUMMARY |
|---|

**Perpetuity Growth Method** — Valuation date as of March 31,2014

| | A | + | B | = | C | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | Discounted Cash Flows | PV of Terminal Value at perpetuity growth rate of: | | | Firm Value | | | TEV as multiple of 2014 EBITDA | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Discount Rate | (2014 Stub-2023) | -0.50% | 0.00% | 0.50% | -0.50% | 0.00% | 0.50% | -0.50% | 0.00% | 0.50% |
| 6.2% | 1,737.3 | $2,524.5 | $2,743.0 | $3,000.1 | $4,261.8 | $4,480.3 | $4,737.4 | 10.2x | 10.7x | 11.3x |
| 6.4% | 1,717.8 | 2,380.8 | 2,579.3 | 2,811.4 | 4,098.6 | 4,297.1 | 4,529.2 | 9.8 | 10.3 | 10.8 |
| 6.7% | 1,698.6 | 2,248.4 | 2,429.2 | 2,639.4 | 3,946.9 | 4,127.8 | 4,338.0 | 9.4 | 9.9 | 10.4 |
| 6.9% | 1,679.7 | 2,126.0 | 2,291.2 | 2,482.2 | 3,805.7 | 3,970.9 | 4,161.9 | 9.1 | 9.5 | 10.0 |
| 7.2% | 1,661.1 | 2,012.7 | 2,164.0 | 2,338.0 | 3,673.8 | 3,825.1 | 3,999.1 | 8.8 | 9.2 | 9.6 |

| | Sen sec debt / TEV | | | TEV / Sen sec debt | | | |
|---|---|---|---|---|---|---|
| Discount Rate | -0.50% | 0.00% | 0.50% | -0.50% | 0.00% | 0.50% |
| 6.2% | 44.11% | 41.96% | 39.68% | 2.3x | 2.4x | 2.5x |
| 6.4% | 45.87% | 43.75% | 41.51% | 2.2 | 2.3 | 2.4 |
| 6.7% | 47.63% | 45.54% | 43.34% | 2.1 | 2.2 | 2.3 |
| 6.9% | 49.40% | 47.34% | 45.17% | 2.0 | 2.1 | 2.2 |
| 7.2% | 51.17% | 49.15% | 47.01% | 2.0 | 2.0 | 2.1 |

$1,880.0
Note: assumes fully drawn revolver

| DCF VALUATION - WACC |
|---|

x **Select a Capital Structure to use for your DCF:**
3

**ASSUMPTIONS:**

| | | | | |
|---|---|---|---|---|
| Unleveraged Beta | 0.7 | Cost of Debt (pre Tax) | 4.5% | |
| Leveraged Beta | 0.9 | Cost of Debt (after Tax) | 2.1% | |
| Risk Free Rate | 2.71% | Cost of Preferred | 0.0% | |
| Risk Premium | 6.71% | Cost of Equity | 8.6% | |
| Perpetuity Growth Rate | 0.0% | | | WACC Override |
| Tax Rate | 52.6% | WACC | 6.66% | 0.00% |

| DCF CAPITAL STRUCTURE: | | Alternate Capital Structure: |
|---|---|---|
| % Non-Conv. Debt | | 30.0% |
| % Non-Conv. Preferred | | 0.0% |
| % Market Equity | | 70.0% |
| Total Preferred/Market Equity | | 0.0% |
| Total Debt/Market Equity | | 42.9% |

*Beta = Barra's predicted betas,average calculation from comparable cos*
*Risk Free Rate = Current 10 Yr Treasury (as of 4/7/14)*
*Risk Premium = Expected return on market less the risk free rate (per M&A website)*
*Perpetuity Rate = Credit guidance is 0%*
*Cost of Equity = Risk Free Rate + (Risk Premium x Leveraged Beta)*

| Industry Average Capital Structure: | | Opening Balance Sheet Capital Structure: | | Alternate Capital Structure: | |
|---|---|---|---|---|---|
| % Non-Conv. Debt | 25.7% | % Non-Conv. Debt | 50.0% | % Non-Conv. Debt | 30.0% |
| % Non-Conv. Preferred | 0.0% | % Non-Conv. Preferred | 0.0% | % Non-Conv. Preferred | 0.0% |
| % Market Equity | 74.3% | % Market Equity | 50.0% | % Market Equity | 70.0% |
| Total Preferred/Market Equity | 0.0% | Total Preferred/Market Equity | 0.0% | Total Preferred/Market Equity | 0.0% |
| Total Debt/Market Equity | 34.7% | Total Debt/Market Equity | 100.0% | Total Debt/Market Equity | 42.9% |

| DCF VALUATION - COST OF CAPITAL ANALYSIS |
|---|

| Macroeconomic Assumptions | |
|---|---|
| Estimated Risk Free Rate(1) | 4.73% |
| Estimated Market Risk Premium(2) | 4.40% |
| 30 year government bond | 5.00% |

| Industry Beta Analysis | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| COMPARABLE COMPANIES: | Ticker | Predicted Levered Beta(3) | Total Debt | Total Shares | Share Price | Mkt. Cap. | Debt/ Equity | Marg. Tax Rate | Unlev. Beta(4) | Lev. Cost of Equity | Unlev. Cost of Equity | Debt/ Cap. | Rev. | EBITDA | Cash | FV/ EBITDA |
| #NAME? | BRLI | 0.8 | $52.6 | 27.7 | $27.39 | 759.3 | 0.1 | 40.0% | 0.7 | 8.1% | 8.0% | 0.1 | | | | |
| #NAME? | LH | 0.6 | $3,000.4 | 144.3 | $58.78 | 8,479.8 | 0.4 | 40.0% | 0.5 | 7.4% | 6.9% | 0.3 | | | | |
| #NAME? | DGX | 0.5 | $3,366.0 | 85.0 | $99.34 | 8,445.7 | 0.4 | 40.0% | 0.4 | 7.1% | 6.6% | 0.3 | | | | |
| #NAME? | GHDX | 1.3 | $0.0 | 31.2 | $26.78 | 835.1 | 0.0 | 40.0% | 1.3 | 10.2% | 10.2% | 0.0 | | | | |
| AVERAGE OF THE COST OF CAPITAL GROUP | | 0.79 | $1,604.8 | 72.05 | $53.07 | $4,630.0 | 0.35 | 0.40 | 0.73 | 0.08 | 0.08 | 0.26 | #DIV/0! | #DIV/0! | #DIV/0! | #DIV/0! |

| Target WACC Calculation | | | | | | | |
|---|---|---|---|---|---|---|---|
| Optimal Debt/ Capitalization | Optimal Debt/ Equity | Spread to 30-Yr Treasuries (bp) | Pre-Tax Long Term Cost of Debt | | Levered Beta Assuming Unlevered Beta of 0.73 | Cost of Levered Equity | Target WACC |
| 0.0% | 0.0% | 50 | 5.5% | | 0.73 | 7.9% | 7.9% |
| 10.0% | 11.1% | 75 | 5.8% | | 0.78 | 8.2% | 7.7% |
| 20.0% | 25.0% | 100 | 6.0% | | 0.84 | 8.4% | 7.5% |
| 30.0% | 42.9% | 125 | 6.3% | | 0.92 | 8.8% | 7.3% |
| 40.0% | 66.7% | 150 | 6.5% | | 1.02 | 9.2% | 7.1% |
| 50.0% | 100.0% | 250 | 7.5% | | 1.17 | 9.9% | 7.2% |
| 60.0% | 150.0% | 350 | 8.5% | | 1.39 | 10.8% | 7.4% |
| 70.0% | 233.3% | 450 | 9.5% | | 1.75 | 12.4% | 7.7% |
| 80.0% | 400.0% | 550 | 10.5% | | 2.48 | 15.6% | 8.2% |
| 90.0% | 900.0% | 650 | 11.5% | | 4.67 | 25.3% | 8.7% |

*Notes*
*(1) Risk-Free Rate = Ten Year Treasury bond yield,as of 3/7/06*
*(2) Source: JPMorgan M&A Research (See M&A Website: http://investmentbank.ny.jpmorgan.com/ma/info/default.htm)*
*(3) Source: BARRA's U.S. Equity Beta (See OTF MDS or Bloomberg)*
*(4) Unlevered beta equals Levered Beta/ (1 + (Total Debt/ Market Value of Equity) * (1 - Tax Rate)).  Assumes beta of debt equals zero.*

x END