# **EXHIBIT F**

RLF1 28568147v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |

| | |
|---|---|
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | **Re: Adv. D.I. 255, 256, 258** |
| Defendants. | |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE THE
TESTIMONY OF DEFENDANTS' PROPOSED EXPERT AMY HUTTON**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

*List of Counsel Continued on Next Page*

Adv. D.I. 282
Filed: 10/24/22

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7500

-and-

Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000

*Attorneys for JPMorgan Chase Bank, N.A.*

POLSINELLI PC
Christopher A. Ward (No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920

-and-

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone: (212) 318-3000

*Attorneys for BMO Harris Bank, N.A.*

Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000

*Attorneys for Citibank, N.A.*

MORRIS JAMES LLP
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6853

-and-

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2191

-and-

John C. Toro
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: (404) 572-2806

*Attorneys for SunTrust Bank*

October 24, 2022

**TABLE OF CONTENTS**

**Page**

NATURE AND STAGE OF PROCEEDINGS ...........................................................................1

SUMMARY OF ARGUMENT .............................................................................................1

BACKGROUND .............................................................................................................3

        A.      Plaintiff Inappropriately Uses His *Daubert* Motion to Advance an Unsubstantiated "Statement of Facts." ...................................................................3

        B.      Hutton's Rebuttal Opinion ..........................................................................5

LEGAL STANDARD.......................................................................................................6

ARGUMENT .................................................................................................................7

I.      EACH OF PLAINTIFF'S ARGUMENTS SUFFERS FROM ONE OR BOTH OF TWO FUNDAMENTAL ERRORS .................................................................................7

        A.      Plaintiff Misstates the Role of a Rebuttal Expert.............................................7

        B.      Plaintiff's Arguments Go to Weight, Not Admissibility .......................................9

II.     PLAINTIFF FAILS TO SHOW THAT ANY SPECIFIC OPINION OFFERED BY HUTTON IS UNRELIABLE.................................................................................10

        A.      Hutton's Criticism of Austin Smith's WACC Is Reliable ....................................10

                1.     Adjustment to the Cost of Equity.................................................11

                2.     "Rejection" of Vantage Point's Beta .............................................12

                3.     Company-Specific Risk Premium.................................................12

                4.     Small Company Risk Premium....................................................15

                5.     Defendants' Contemporaneous Analyses .......................................16

        B.      Hutton's Criticism of Austin Smith's Adjustments to Millennium's Operating Expenses Is Reliable ....................................................................16

                1.     Purportedly Unreliable Document.................................................17

                2.     Whether the Ability to Cut Expenses Was Known or Knowable..............18

**TABLE OF CONTENTS**
**(continued)**

**Page**

C.  Hutton's Criticism of Austin Smith's Adjustments to Millennium's Emerging Opportunities Revenue Is Reliable ..........................................................18

D.  Hutton's Criticism of Austin Smith's Adjustments to Millennium's Projected Growth Rates Is Reliable ..................................................................19

E.  Hutton's Criticism of Austin Smith's Adjustments for the Supposed Reputational Impact from the DOJ Settlement Is Reliable ...................................20

F.  Hutton's Criticism of Austin Smith's Adjustments Based on Medically Unlikely Edit Denials Is Reliable ........................................................................22

G.  Hutton's Criticism of Austin Smith's POC Test Cup Program Adjustment Is Reliable ........................................................................................................24

H.  Hutton's Criticism of Austin Smith's Adjustment for the Discontinuance of Custom Profiles Is Reliable ...........................................................................24

I.  Hutton's Criticism of Austin Smith's Application of the Ability to Pay Debts and Capital Adequacy Tests Is Reliable ......................................................25

CONCLUSION.............................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ameritox, Ltd.* v. *Millennium Labs., Inc.*,
803 F.3d 518 (11th Cir. 2015) ..................................................................................5

*APEX Fin. Options, LLC* v. *Gilbertson*,
2022 WL 613347 (D. Del. Mar. 1, 2022) ..................................................................8

*Aviva Sports Inc.* v. *Fingerhut Direct Mktg. Inc.*,
829 F. Supp. 2d 802 (D. Minn. 2011)......................................................................8, 9

*Bondach* v. *Faust*,
2011 WL 3816998 (E.D. Pa. Aug. 30, 2011) ..........................................................22

*Cede & Co.* v. *Technicolor, Inc.*,
2003 WL 23700218 (Del. Ch. Dec. 31, 2013).........................................................9

*Godreau-Rivera* v. *Coloplast Corp.*,
2022 WL 1120371 (D. Del. Apr. 14, 2022)..............................................................15

*Helios Software, LLC* v. *Awareness Techs., Inc.*,
2015 WL 12806482 (D. Del. Apr. 13, 2015).............................................................23

*Karlo* v. *Pittsburgh Glass Works, LLC*,
849 F.3d 61 (3d Cir. 2017)........................................................................................7

*Krys* v. *Aaron*,
112 F. Supp. 3d 181 (D.N.J. 2015) ..........................................................................20

*Leonard* v. *Stemtech Int'l Inc.*,
834 F.3d 376 (3d Cir. 2016)......................................................................................12

*MSKP Oak Grove, LLC* v. *Venuto*,
2016 WL 3566720 (D.N.J. June 29, 2016) ..............................................................10

*In re Orchard Enters. Inc.*,
2012 WL 2923305 (Del. Ch. July 18, 2012).............................................................14, 15

*Otsuka Pharm. Co.* v. *Zenara Pharma Priv. Ltd.*,
2022 WL 4365744 (D. Del. Sept. 21, 2022).............................................................26

*Padillas* v. *Stork-Gamco, Inc.*,
186 F.3d 412 (3d Cir. 1999)......................................................................................7

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)..................................................................................................7

*SL EC, LLC* v. *Ashley Energy, LLC*,
2021 WL 5112943 (E.D. Miss. Nov. 2, 2021)............................................................17, 18, 20

*Sun Pharma Global Fze* v. *Lupin Ltd.*,
2021 WL 856886 (D.N.J. Mar. 8, 2021)..............................................................................10

*In re TMI Litig.*,
193 F.3d 613 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000) ..................................6, 7

*Winn-Dixie Stores, Inc.* v. *E. Mushroom Mktg. Coop.*,
2021 WL 2352016 (E.D. Pa. June 9, 2021) ...........................................................................8

## Rules

Fed. R. Civ P. 26(a)(2)(D)(ii) ...............................................................................................8

Fed. R. Evid. 702 ................................................................................................................9

Del. Bankr. L.R. 7007-2(b)(i)(E) ..........................................................................................3

## NATURE AND STAGE OF PROCEEDINGS

Defendants submit this memorandum in opposition to Plaintiff's *Daubert* Motion to Exclude the Testimony of Defendants' Proposed Expert Amy Hutton ("Hutton MTE"), D.I. 255.[1]

## SUMMARY OF ARGUMENT

To prevail on his fraudulent transfer claim, Plaintiff must establish, among other things, that the $1.775-billion syndicated term loan extended to Millennium in April 2014 (the "2014 Transaction") rendered Millennium insolvent. Every analysis of Millennium's solvency at the time of the 2014 Transaction concluded, however, that Millennium would remain solvent following the transaction. To square this circle, Plaintiff's expert, Yvette Austin Smith, went to great lengths. First, she reduced the revenue projections created by Millennium's management in advance of the 2014 Transaction ("Management Projections") by more than $1 billion over five years. Then, she applied to those artificially deflated projections a 14.8% weighted average cost of capital ("WACC") that is nearly 60% higher than even the highest WACC used by any of the Defendants when they conducted their own contemporaneous analyses. Taken together, these extraordinary measures allowed Austin Smith to opine—in the face of substantial contrary evidence—that Millennium was rendered insolvent by the 2014 Transaction.

Defendants' rebuttal expert, Dr. Amy Hutton, relied on her experience as a professor of accounting and finance to critique Austin Smith's methodologies and assumptions. With respect to the WACC, Hutton located the underlying calculations—Austin Smith could not confirm that she had even reviewed them (*see* Defs.' MTS at 6)—and criticized key aspects of the

---

[1]    Further information regarding the nature and stage of these proceedings can be found in the *Memorandum of Law in Support of Defendants' Motion for Summary Judgment* ("Defendants' Summary Judgment Motion" or "Defs.' SJ Mot."), D.I. 251, and *Defendants' Memorandum of Law in Support of Their Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette Austin Smith* ("Defendants' Motion to Strike" or "Defs.' MTS"), D.I. 249.

methodologies applied by Austin Smith.  With respect to the adjustments to the Management

Projections, Hutton critiqued Austin Smith's bases for deviating from management's

contemporaneous views, and pointed out where Austin Smith applied methodologies or made

assumptions in a manner inconsistent with widely accepted practices for valuing a company.

Notwithstanding Hutton's well-founded criticisms of Austin Smith's analysis, Plaintiff

argues that every opinion Hutton offered is unreliable.  Plaintiff's arguments fall into two buckets.

*First*, Plaintiff attempts to recast Hutton's criticisms of Austin Smith's work as affirmative

opinions about Millennium's solvency.  But Hutton is a rebuttal expert.  As she explained: "I am

responding to the opinions that [Austin Smith] put forth . . . and I am applying my expertise to

highlight where the adjustments she is making are unsupported."  (D.I. 256-3 (Hutton Dep. Tr.)

at 45:18-46:8.)[2]  Hutton never claimed to be conducting her own valuation, and in her role as a

rebuttal expert Hutton properly explained how Austin Smith misapplied, contorted, or ignored

fundamental valuation principles.  *Second*, Plaintiff disagrees with many of Hutton's opinions, and

argues that the Court should credit Austin Smith's contrary opinions instead.  In that sense, the

Hutton MTE functions as little more than an impermissible reply expert report.  The proper forum

for the parties to argue how much weight the trier of fact should afford to Hutton's opinion is at

trial (should one ever be necessary), not in a motion to exclude.  For these reasons, the Court

should deny the Hutton MTE.

---

[2]    Citations in the format "Ex. [_]" refer to the exhibits to the Declaration of Mark A. Popovsky in Support of Defendants' Opposition to Plaintiff's Motions to Exclude the Testimony of Amy Hutton and Branka Matevich, filed contemporaneously herewith.

## BACKGROUND

A.    **Plaintiff Inappropriately Uses His _Daubert_ Motion to Advance an Unsubstantiated "Statement of Facts."**

Plaintiff inserts into the Hutton MTE (at 5-10) a "statement of facts" that is neither proper nor credible.[3]  Rather than draft a "concise" recitation of the "facts that should be known in order to determine the points in controversy" as the Local Rules instruct, Del. Bankr. L.R. 7007-2(b)(i)(E), Plaintiff spends nearly six pages recounting a litany of allegations with no relevance to his motion.  Indeed, Plaintiff's "statement of facts" is little more than a recitation of the sweeping allegations in his complaint, without any acknowledgement that the extensive discovery in this case has failed to support many of those allegations.  The Court need not consider any of this to resolve Plaintiff's two _Daubert_ motions, so Defendants highlight just a few of Plaintiff's most egregious misstatements below.

***Millennium's Use of CodeMap.***  Plaintiff's statement of facts asserts that "Millennium's compliance auditor advised Millennium to cease the POC Test Cup Program," and that "[u]pon receiving this advice from its compliance auditor, Millennium tried to mitigate the damaging effects of it by telling the auditor not to finalize the report and then ceased using the auditor." (Hutton MTE at 6.)  But CodeMap—the so-called "compliance auditor" to which Plaintiff refers— was actually a "coding specialist" whose expertise was in Medicare billing codes.  (Ex. 1 (Appel Dep. Tr.) at 38:9-11; Ex. 2 (Price Dep. Tr.) at 212:21-213:8.)  Plaintiff fails to mention that Millennium obtained its legal advice concerning regulatory compliance not from a coding specialist but from experienced counsel at the Hogan Lovells law firm, which had advised

---

3    Plaintiff included a virtually identical statement of facts in his motion to exclude the testimony of Defendants' other rebuttal expert, Branka Matevich (D.I. 254 at 5-10); Defendants are contemporaneously filing a separate opposition to that motion.

Millennium at the time that its POC Test Cup Program was legally compliant. (*See* D.I. 252-30 (Appel Dep. Tr.) at 197:23-199:18; D.I. 252-31 (Wisor Oct. 2010 opinion).) Further, none of the witnesses Plaintiff cites testified that Millennium "tried to mitigate the damaging effects" of the draft report by telling CodeMap not to complete it and then ceased using CodeMap. To the contrary, Martin Price, Millennium's then General Counsel, specifically testified that Millennium "*continued using* CodeMap" for billing services, which was actually "within" the scope of "their expertise." (Ex. 2 (Price Dep. Tr.) at 212:25-213:8 (emphasis added).)

***Defendants Decided to "Cash Out."*** Plaintiff continues to ascribe to Defendants the puzzling (and unsupported) motivation that they sought to "cash out" by using the 2014 Transaction proceeds to "pay back loans previously provided to Millennium by Defendants." (Hutton MTE at 9.) Not only does this accusation fail to acknowledge that Citi was not a participant in (and thus had no exposure to) Millennium's 2012 loan, Plaintiff ignores that Defendants fully underwrote the 2014 Transaction—that is, Defendants were obligated to extend to Millennium the entirety of the $1.775 billion. (*See* D.I. 252-6 (JPMorgan 30(b)(6) Dep. Tr.) at 21:21-22:14.) Far from "cashing out," Defendants agreed to a transaction that would *increase* their exposure to the company many times over. (*See id.* at 21:21-22:14 (in an underwritten transaction, "the bank actually commits to . . . providing the loan in the event the market falls away due to market conditions").) Moreover, in discovery, Plaintiff obtained each Defendant's internal communications about the transaction and records documenting the factors that Defendants considered in determining whether or not to extend the loan. Plaintiff cannot cite to a single sentence anywhere in this extensive record to corroborate the baseless suggestion that any Defendant's actual motivation to enter into the 2014 Transaction was to reduce its exposure to the 2012 loan.

***$500 Million Valuation Impact.*** Plaintiff also repeats the baseless allegation from his complaint that JPMorgan "conclude[d] that Millennium's valuation had been reduced by $500 million" following the *Ameritox* verdict.[4] (Hutton MTE at 10.) Plaintiff cites no evidence to support this assertion because none exists. Plaintiff undertook substantial efforts in discovery to develop evidence in support of this allegation, but not a single JPMorgan document indicates that any such "valuation" was done, nor did any witness testify that JPMorgan relayed the results of this purported valuation to Millennium. In fact, Price testified that he was "pretty confident" that such a conversation had not taken place. (Ex. 2 (Price Dep. Tr.) at 358:16-359:10.)

## B.    Hutton's Rebuttal Opinion

The facts actually necessary for the Court to decide the Hutton MTE are simple. On November 15, 2021, Plaintiff served the Rule 26(a)(2) Report of Yvette R. Austin Smith (D.I. 252-64). In that report, Austin Smith, Principal and Chairman of The Brattle Group, a litigation consulting firm, modified the Management Projections to, in her words, "more accurately and reasonably reflect risk factors and historical trends that were known or knowable as of the 2014 Transaction" (the "Modified Projections"). (*Id*. ¶ 106.) In the aggregate, these modifications reduced Millennium's value by an improbable $1 billion. Austin Smith then discounted these projections and the terminal value of the company using a WACC of 14.8% (*id*. ¶ 143)—a WACC that is unsupported by any analysis and demonstrably wrong.[5] (Plaintiff's repeated assertions that this WACC is "independent" because it was created by Vantage Point does nothing to address its

---

[4]    The Eleventh Circuit later vacated the *Ameritox* verdict, opining that Ameritox had "advanced outlandish [state law] legal theories" over which the district court should not have exercised supplemental jurisdiction, and that the verdict was "patently unsupported by actual law." *Ameritox, Ltd.* v. *Millennium Labs., Inc.*, 803 F.3d 518, 539 (11th Cir. 2015).

[5]    The absence of any reliable basis for Austin Smith's 14.8% WACC is the subject of Defendants' Motion to Strike.

flawed assumptions and calculations.)  Based on the Modified Projections and the 14.8% WACC,

Austin Smith concluded that Millennium was insolvent as a result of the 2014 Transaction.[6]

In response, Defendants offered Hutton, a Professor of Business Administration at the

Carroll School of Management at Boston College, as their rebuttal expert.  Hutton rebutted Austin

Smith's opinion by showing how Austin Smith used improper methods and committed other

fundamental errors when conducting her valuation.  Hutton explained:

> My expertise in this matter [is] as a valuation expert, I am applying
> that expertise within the framework that Ms. Austin Smith created
> in her analysis and I am responding to the opinions that she put forth,
> and in particular, the adjustments that she makes to the
> [management] projections and I am applying my expertise to
> highlight where the adjustments she is making are unsupported,
> because she uses assumptions that she's not validated, and where
> she's using hindsight, which is a no-no in valuation exercises, and
> where she is inappropriately applying well-accepted techniques in
> valuation.

(D.I. 256-3 (Hutton Dep. Tr.) at 45:18-46:8.)  Hutton explained her criticisms of Austin Smith's

work in detail in her report.  The Hutton MTE seeks to exclude Hutton's testimony in its entirety.

## LEGAL STANDARD

When determining the admissibility of an expert's testimony, courts in this Circuit are

directed to focus on "principles and methodology, not on the conclusions generated by the

principles and methodology."  *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended*,

199 F.3d 158 (3d Cir. 2000).  "The test of admissibility is not whether a particular [expert] opinion

has the best foundation, or even whether the opinion is supported by the best methodology or

---

[6]      Millennium is only insolvent under Austin Smith's analysis if *both* of these measures are
applied.  If the WACC she used is incorrect or flawed, Millennium is solvent applying the corrected
WACC, even accepting all of her adjustments to the Management Projections; if all of her
adjustments to the Management Projections are incorrect or flawed, Millennium is solvent even
applying a 14.8% WACC.

unassailable research.  Rather, the test is whether the 'particular opinion is based on valid reasoning and reliable methodology.'"  *Id.* (quoting *Kannankeril* v. *Terminix Int'l Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  The proponent of the expert testimony bears the burden to establish admissibility by a preponderance of the evidence, *Padillas* v. *Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999), but "they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*[;] they only have to demonstrate by a preponderance of evidence that their opinions are reliable."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).  A "merits standard of correctness," is "a higher bar than what [Federal Rule of Evidence] 702 demands" for expert testimony to be admissible.  *Karlo* v. *Pittsburgh Glass Works, LLC*, 849 F.3d 61, 83 (3d Cir. 2017) (internal quotation marks omitted).

**ARGUMENT**

**I.     EACH OF PLAINTIFF'S ARGUMENTS SUFFERS FROM ONE OR BOTH OF TWO FUNDAMENTAL ERRORS.**

Every argument advanced by Plaintiff falls into the following two categories—neither of which provide a basis to exclude Hutton's opinions.

**A.     Plaintiff Misstates the Role of a Rebuttal Expert.**

Many of Plaintiff's arguments rely on his creation of a strawman version of Hutton's opinion in which Hutton supposedly offered affirmative opinions about the correct "WACC calculation" (Hutton MTE at 4) and the adequacy of the "original [Management] Projections" (*id.* at 5).  Plaintiff then attacks this fabricated version of Hutton's opinions by claiming that Hutton's purported WACC calculation was "based on both insufficient fact and unreliable methodology" (*id.* at 4, 12-13) and by accusing Hutton of not "verifying her restored data points" (the Management Projections) (*id.* at 5).  In so doing, Plaintiff ignores both the role of a rebuttal expert and Hutton's clear statement that her opinion was limited to showing "where the adjustments

-7-

[Austin Smith] is making are unsupported . . . where [Austin Smith is] using hindsight . . . and where [Austin Smith] is inappropriately applying well-accepted techniques in valuation." (D.I. 256-3 (Hutton Dep. Tr.) at 45:18-46:8.)

As a rebuttal expert, Hutton's role is "solely to contradict or rebut evidence" offered by Austin Smith. Fed. R. Civ P. 26(a)(2)(D)(ii). Accordingly, Hutton has a "less demanding task" than Austin Smith since Defendants "have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts." *Winn-Dixie Stores, Inc.* v. *E. Mushroom Mktg. Coop.*, 2021 WL 2352016, at *14 (E.D. Pa. June 9, 2021); *see also APEX Fin. Options, LLC* v. *Gilbertson*, 2022 WL 613347, at *3 (D. Del. Mar. 1, 2022) ("Because [he] is a rebuttal expert . . . he was not required to offer a competing . . . analysis, but was entitled simply to 'explain, repel, counteract or disprove evidence of the adverse party.'"); *Aviva Sports Inc.* v. *Fingerhut Direct Mktg. Inc.*, 829 F. Supp. 2d 802, 834-35 (D. Minn. 2011) (collecting cases). A rebuttal expert's role is to "criticize[]" the opposing expert's "theories and calculations," but she need not "offer[] alternatives." *Winn-Dixie Stores*, 2021 WL 23520116, at *14.

To push the 2014 solvency opinion performed by Vantage Point Advisors ("Vantage Point") over the line from solvency to insolvency, Austin Smith lowered Millennium management's contemporaneous revenue projections by more than $1 billion over five years and then applied a 14.8% WACC to those adjusted projections. Hutton did not affirmatively "opine that Millennium was solvent or that the [Management] Projections were correctly stated" (Hutton MTE at 3), nor did she opine "that 7.2% is the correct WACC" (*id.*). Instead, Hutton's report provided an in-depth analysis as to why Austin Smith's WACC and Modified Projections did not reflect a sound methodology. For example, Hutton opined that a company-specific risk premium and small company risk premium, both of which are included in the 14.8% WACC, are

unsupported by finance theory and academic literature.  (*See* D.I. 252-65 (Hutton Report) ¶¶ 26, 34.)  Additionally, Hutton pointed out where Austin Smith did not provide any basis or support for her Modified Projections.  (*See*, *e.g.*, *id.* ¶ 60 ("[Austin Smith's] specimen volume growth rates appear to be random as she provides no analysis that would show how she estimated them.  . . . These numbers are not derived from any empirical analysis; Ms. Austin Smith simply asserts these numbers.").)  Where Hutton determined that Austin Smith's adjustments were not adequately supported, she properly demonstrated what Austin Smith's analysis would look like *without* those deviations from the Management Projections.  *See*, *e.g.*, *Cede & Co.* v. *Technicolor, Inc.*, 2003 WL 23700218, at *7 (Del. Ch. Dec. 31, 2013) ("When management projections are made in the ordinary course of business, they are generally deemed reliable.  Experts who then vary from management forecasts should proffer legitimate reasons for such variance.").

This is exactly what Hutton is supposed to do as a rebuttal expert—point out the flaws in Plaintiff's expert's proffered opinion so that the Court can either exclude it as unreliable or the trier of fact can sort out the weight to be afforded it in determining whether Plaintiff met his burden of proof.  Plaintiff's argument that Hutton's adherence to the permissible bounds of a rebuttal expert somehow provides a basis to strike her opinion fails as a matter of law.  *See*, *e.g.*, *Aviva Sports*, 829 F. Supp. 2d at 835 (denying motion to exclude testimony from rebuttal experts where those experts "sufficiently applied their expertise to the facts and methodologies used by [the opposing parties'] experts in forming their conclusions" because such testimony "will be helpful for the jury to weigh the evidence presented at trial").

**B.    Plaintiff's Arguments Go to Weight, Not Admissibility.**

Most of Plaintiff's arguments also suffer from a second flaw.  While Plaintiff parrots the legal standard for admissibility under Federal Rule of Evidence 702 (Hutton MTE at 10-11), he never directly applies it.  Instead, Plaintiff does no more than contrast Hutton's opinions with

Austin Smith's and argue that Austin Smith's opinions are more deserving of the Court's credit. But one expert's disagreement with another expert's opinion does not render the opinion unreliable; rather, "[c]ompeting expert opinions present the 'classic battle of the experts' and it is up to a factfinder to evaluate what weight and credibility each expert opinion deserves." *Sun Pharma Global Fze* v. *Lupin Ltd.*, 2021 WL 856886, at *7 (D.N.J. Mar. 8, 2021) (quoting *Phillips* v. *Cohen*, 400 F.3d 388, 400 (6th Cir. 2005)) (cleaned up).  Plaintiff's critiques of Hutton's opinion raise issues for *trial*—not a motion to exclude.  *See*, *e.g.*, *MSKP Oak Grove, LLC* v. *Venuto*, 2016 WL 3566720, at *8 (D.N.J. June 29, 2016) (denying motion to exclude testimony of valuation expert because "[i]t is up to a jury . . . to resolve the weight due to [the] opinions in a report which, by necessity, relies so heavily on assumptions").

## II.    PLAINTIFF FAILS TO SHOW THAT ANY SPECIFIC OPINION OFFERED BY HUTTON IS UNRELIABLE.

### A.    Hutton's Criticism of Austin Smith's WACC Is Reliable.

By asserting (incorrectly) that Hutton "opine[d] that [Vantage Point] should have used a 7.2% WACC," Plaintiff manufactures an opinion that Hutton never offered and then calls her credibility into question by contending that she refused to stand by this opinion when asked about it during her deposition.  (Hutton MTE at 3.)  But Hutton was crystal clear in her report that 7.2% represents "Austin Smith's WACC" once "methodological flaws" have been "correct[ed]." (Hutton Report ¶ 42.)  Hutton then reiterated multiple times during her deposition that she was not opining that 7.2% was the appropriate WACC to use to value Millennium, but rather that the 7.2% WACC referenced is "Austin Smith's WACC when it has been corrected for errors and inconsistencies."  (Ex. 3 (Hutton Dep. Tr.) at 205:6-10; *see also*, *e.g.*, *id*. at 204:16-24, 205:11-206:17.)

-10-

Notwithstanding this, Plaintiff ticks through what he labels as Hutton's "changes" and "alterations" to "[Vantage Point's] WACC," and argues that each is unreliable.  (Hutton MTE at 13.)  Of course, Hutton did not "change" or "alter[]" any WACC; Hutton only pointed out methodological flaws in the WACC that Austin Smith adopted and demonstrated how correcting for those flaws would affect Austin Smith's conclusions.  Regardless, each of Plaintiff's assertions is flawed and does not support the contention that Hutton's opinion is unreliable.

**1.      Adjustment to the Cost of Equity**

Plaintiff argues that "Hutton's alteration to the 'cost of equity'" (or "beta")—a component of the WACC—"is arbitrary and unsupported" because the figure was derived from a set of companies that "nobody . . . opine[d] . . . were sufficiently comparable such that Millennium's WACC could be directly derived from their beta without adjustment."  (Hutton MTE at 13-14.)  But Hutton did not affirmatively opine that a beta derived from those five companies was appropriate or correct.  Rather, Hutton explained that Austin Smith was being inconsistent by adopting a WACC that incorporated a beta derived from *eight* companies, but elsewhere in her report identifying only *five* of those companies as comparable to Millennium (and Austin Smith ultimately dismissed even those five companies as "not sufficiently comparable").  (*See* Hutton Report ¶ 39.)   Hutton's opinion was that this aspect of Austin Smith's opinion reflects "a methodological inconsistency" (*id.* ¶ 40), and Hutton corrected for this error by calculating the beta of the five companies Austin Smith herself identified in her analysis.  Hutton, therefore, had no obligation to "independently assess or conclude that the companies were comparable to Millennium" (Hutton MTE at 14) because Hutton did not identify them—Austin Smith did.  If Plaintiff wishes to argue to the trier of fact that Hutton erred in correcting for this error, he is free to do so at trial.  *See Leonard* v. *Stemtech Int'l Inc.*, 834 F.3d 376, 391 (3d Cir. 2016) (objection

that inputs from comparable sources are not sufficiently comparable for use in a valuation "goes to the weight given to [the expert's] testimony, rather than admissibility").

### 2.    "Rejection" of Vantage Point's Beta

Plaintiff asserts that "Hutton adjusts [Vantage Point's] beta on the supposed grounds that [Vantage Point] did not use the exact median of the betas of the public companies it examined," but that she "offers no methodological reason why it is necessary to use the exact median." (Hutton MTE at 17-18.)  In fact, Hutton pointed out that "the underlying materials present no support for using" a number that *is not* the average beta (Hutton Report, App'x F ¶ 8) and demonstrated how correcting this error would affect Austin Smith's WACC.  In Hutton's words, "[i]f you're going to walk away from the mean or the median, I think it's important that you provide an analytical justification for the modification that you make, otherwise it appears very ad hoc and it's not replicable by others and that makes it[,] at least[,] more or less unreliable."  (Ex. 3 (Hutton Dep. Tr.) at 140:5-12.)  Nothing about this critique of Austin Smith's methodology requires Hutton to "offer[] [some] methodological reason why it is necessary to use the exact median" (Hutton MTE at 17-18)—the burden for explaining the basis for any specific beta was on Austin Smith.[7]

### 3.    Company-Specific Risk Premium

Plaintiff also disagrees with Hutton's opinion that a company-specific risk premium "has no basis in the field of financial economics" (Hutton Report ¶ 14), and argues that this "conflicts with both accepted practice and Hutton's prior testimony."  (Hutton MTE at 14.)  Not so.

---

[7]    Plaintiff later complains that while Hutton "identified" "sensitivity analyses or directly adjusting the beta or cash flows" as "possible solutions" to the "lack of comparable public companies," Hutton did not herself "apply any of these methodologies." (Hutton MTE at 17.)  As a rebuttal witness, Hutton's assignment was to assess *Austin Smith's* WACC (and other opinions), and point out Austin Smith's methodological flaws.  That is exactly what Hutton did.  She never opined that 7.2% was the correct WACC—or that *any* WACC was the correct WACC—and thus she had no obligation to apply any methodologies in support of one.

A company-specific risk premium is, by definition, company-specific, and therefore reflects *diversifiable* risks because an investor can diversify the risk of their portfolio by investing in other assets.  (*See* Hutton Report ¶ 35.)  But, as both Hutton and Austin Smith agreed, "the WACC should only reflect . . . non-diversifiable risk."  (*id*. ¶ 26; *compare* D.I. 252-64 (Austin Smith Report) ¶ 41 ("The projected free cash flows of the firm are discounted back to the date of valuation, using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows.").)  While Hutton acknowledged that practitioners occasionally use company-specific risk premiums, she opined that "practitioners are busy people and they sometimes use shortcuts, other ways of doing things that, you know, don't necessarily stack up to the standards that one would want to use when creating a report for the purposes here."  (D.I. 256-3 (Hutton Dep. Tr.) at 157:25-158:7.)[8]

Moreover, the fact that practitioners sometimes use company-specific risk premiums does not render Hutton's criticism of Austin Smith's use of such a premium here "unreliable."  (Hutton MTE at 16.)  Indeed, many courts have questioned experts' use of company-specific risk premiums in valuation exercises (*see* Defs.' MTS at 14-16), and the Delaware Chancery Court has acknowledged that "[a] company-specific risk premium is not an addition to the [capital asset

---

[8]    Plaintiff's statement that Hutton "could only say that she rejected [the company-specific risk premium] because it was academically 'dissatisfying'" (Hutton MTE at 15) is wrong.  Hutton stated that it is dissatisfying *because* it is based on "nothing, nada, no analysis"; because it is "ad hoc" and "comes out of thin air"; and because one has "no idea where it is coming from."  (D.I. 256-3 (Hutton Dep. Tr.) at 211:18-22.)  And she is right:  neither Austin Smith nor anything in the record provides any explanation for why the company-specific risk premium used by Vantage Point is 5%, rather than 4%, 6%, or any other number.

-13-

pricing model] that is accepted by corporate finance scholars." *In re Orchard Enters. Inc.*, 2012 WL 2923305, at \*19 (Del. Ch. July 18, 2012).[9]

In his Motion, Plaintiff contends that the company-specific risk premium was used to "partially account[] for the lack of comparability of the companies [Vantage Point] selected" (Hutton MTE at 14)—a contention that Austin Smith never mentioned in her report.[10]  Hutton explained that "if you are taking issue with the estimate of the beta [derived from comparable companies] . . . you would directly adjust the beta, you would not add a company-specific risk factor because that's a different kind of risk."  (D.I. 256-3 (Hutton Dep. Tr.) at 135:20-136:7.)  Notably, the WACC used by Austin Smith *already* adjusted the beta upwards from 0.77, the averaged unlevered beta of the comparable companies, to one.  (*See* Hutton Report, App'x F ¶ 8.)  To the extent that Vantage Point actually used a company-specific risk premium to account for unsystematic risk (rather than systematic risk, which is addressed by the beta), Hutton opined that that risk should be addressed in the cash flow projections which, of course, Austin Smith adjusted as well.  (*See* D.I. 256-3 (Hutton Dep. Tr.) at 153:2-12 ("[T]he way that you want to capture company-specific risk is in the expected cash flows."); *see also Orchard Enters.*, 2012 WL 2923305, at \*20 ("If there are concerns about projection risk . . . it would be better for the expert to directly express his skepticism by adjusting the available projections directly in some way.").

---

[9]    The cases Plaintiff cites (Hutton MTE at 15) do not help his argument.  Plaintiff asserts, for example, that the court in *In re Allonhill, LLC* determined that an "expert erred by failing to include a" company-specific risk premium, but in that case, the court found it unreliable that the expert did not adjust his valuation *at all* to account for financial distress.  2019 WL 1868610, at \*31 (Bankr. D. Del. Apr. 25, 2019).

[10]    Plaintiff cites nothing in support of this contention, because he cannot.  There is no evidence in the Vantage Point solvency opinion (or anywhere else in the record) explaining why Vantage Point used a beta of one rather than the average or median beta of the comparable companies it selected.  For all anyone knows, the beta—a key input into the WACC used by Austin Smith, on which her conclusion that Millennium was insolvent relies—was a typo.

-14-

Hutton properly pointed out that Austin Smith's use of a company-specific risk premium *on top of* an upward beta adjustment *and* a downward adjustment to expected cash flows was "completely improper." (D.I. 252-66 (Hutton Dep. Tr.) at 131:7-133:24.)

Finally, Plaintiff's accusation that "Hutton advocated for the application of a company-specific adjustment to WACC in a prior case" (Hutton MTE at 15) is baseless. As Hutton explained, that opinion concerned an "investment decision"—not a valuation exercise—and the premium was a component of the "hurdle rate," not a WACC. (D.I. 256-3 (Hutton Dep. Tr.) at 35:10-36:17.) Plaintiff's insistence that Hutton "repeatedly identified it as a 'WACC'" rather than a hurdle rate in the opinion in the prior case (Hutton MTE at 16 n.70) is meaningless; Hutton's use of the shorthand "WACC" to refer to a hurdle rate in an entirely different context does not rebut her fundamental point here.

### 4.     Small Company Risk Premium

Plaintiff disagrees with Hutton's opinion that it was not appropriate for Austin Smith to apply a small company risk premium, and describes it as "an arbitrary departure from a widely accepted methodology." (Hutton MTE at 16.) Not so. Hutton's opinion in this case regarding the small company risk premium rests on the solid underpinning in finance theory and the field's academic literature that Hutton cited in her report. (*See*, *e.g.*, Hutton Report ¶ 38.) In opposition, Plaintiff cites two cases that show only that the inclusion of a small company risk premium is not always unreliable. (*See* Hutton MTE at 16 & 16 n.73.) Plaintiff's arguments go to weight. *See Godreau-Rivera* v. *Coloplast Corp.*, 2022 WL 1120371, at *10 (D. Del. Apr. 14, 2022) (contention that an expert's opinion may be contradicted by other research in the field "is certainly fertile ground for cross-examination" but "does not provide a basis for excluding [the] opinion[]") (citation omitted).

5.      **Defendants' Contemporaneous Analyses**

Plaintiff's assertion that "Hutton attempts to buttress her WACC by citing to analyses performed by the [Defendants]" is inaccurate.  Setting aside that, as discussed, 7.2% is not "[Hutton's] WACC" (*see supra* at 10), Hutton never "attempted to buttress" the 7.2% WACC by citing to Defendants' analyses.  Rather, Hutton simply noted that when the WACC Austin Smith used is corrected for the errors she identified, it is more in line with the WACCs used by certain Defendants in their contemporaneous analyses—none of which Austin Smith addressed in her report.[11]  (Hutton Report ¶ 33.)  Hutton had no obligation to "assess" those WACCs or the underlying calculations in order to point out that Austin Smith's failure to consider them was improper.[12]

B.      **Hutton's Criticism of Austin Smith's Adjustments to Millennium's Operating Expenses Is Reliable.**

Plaintiff asserts that "Hutton arbitrarily sets Millennium's operating expenses at 38% of revenue."  (Hutton MTE at 20.)  Once again, Plaintiff misrepresents Hutton's opinion.[13]  It is Austin Smith—not Hutton—who projected that Millennium's operating expenses would be 38%

---

[11]     The "WACC" that Plaintiff cites as being applied by TA Associates is not, in fact, a capital asset pricing model WACC, and Hutton's purported failure to consider it is of no moment.  (*See* Ex. 3 (Hutton Dep. Tr.) at 162:16-24 ("TA Associates is a private equity firm and they are not calculating a WACC, they're interested in understanding a hurdle rate and whether the investment that they're making is going to supersede that hurdle rate or not.").)  FTI Consulting's WACC was two years after the 2014 Transaction and thus not "contemporaneous." (*See* D.I. 256-38.)

[12]     To the extent that Plaintiff argues that failure to assess a WACC renders the use of such a WACC unreliable, Defendants agree.  As set forth in Defendants' Motion to Strike, Austin Smith adopted Vantage Point's WACC without performing any analysis of it whatsoever.

[13]     Plaintiff also misrepresents *Austin Smith's opinion*.  Plaintiff states that "[i]n the [Management] Projections, management categorized operating expenses as fixed, variable, or mixed" and that "Austin Smith maintained this categorization," including "maintain[ing] Millennium's unit variable cost and fixed costs." (Hutton MTE at 19-20 (emphasis omitted).)  But Austin Smith did not maintain Millennium's unit fixed costs.  Rather, she kept the fixed costs unchanged and divided them by her own, lower volume numbers, thus artificially increasing the fixed cost per unit. (*Compare* Ex. 4 (Austin Smith Workpaper 1) *with* Ex. 8 (Padres Projections).)

-16-

of revenues in 2014.  (*See* Austin Smith Report, App'x A.2, Table 12.)  Hutton pointed out that Austin Smith then increased operating expenses dramatically as a proportion of revenue without providing any "basis as to why management would maintain such levels of operating expenses if management indeed expected revenues to decline as substantially as [Austin Smith] suggests." (Hutton Report ¶ 14.)  Since Austin Smith's Modified Projections assumed that Millennium's revenue would decline, any reliable adjustment to Millennium's operating expenses should have considered whether Millennium's management would or could have responded to such declines by adjusting operating expenses.  Hutton properly pointed out that Austin Smith did not do that. *See SL EC, LLC* v. *Ashley Energy, LLC*, 2021 WL 5112943, at *3 (E.D. Miss. Nov. 2, 2021) ("It is entirely appropriate and helpful to the jury for a rebuttal expert to identify factors which the opposing party's expert failed to consider.").

### 1.      Purportedly Unreliable Document

Plaintiff takes issue with Hutton's criticism of Austin Smith's treatment of operating expenses because Hutton cited to a presentation from July 2015 in which Millennium and its advisors identified ways to cut expenses by approximately 15% per year.  (Hutton MTE at 20 (citing Hutton Report ¶ 45).)  According to Plaintiff, this document "does not support [Hutton's] conclusion" because it "is not and does not purport to be a traditional business plan." (*Id.*)  But Plaintiff cites no authority for the proposition that a document must be a "traditional business plan" in order for a rebuttal expert to suggest that an opposing expert should have considered it. Plaintiff's contention that Hutton "d[id] not independently verify" (*id.*) the presentation's reliability is similarly misplaced:  Hutton need not have verified its reliability because she did not opine that the proposed reductions discussed in the presentation were certain—or even likely—to occur.  Rather, Hutton opined that it was methodologically improper for Austin Smith to have raised operating expenses as a percentage of revenue so dramatically without even considering

whether management would have taken steps to reduce them in the face of the substantially lower revenues Austin Smith projected. (Hutton Report ¶ 45.) This opinion stands regardless of the validity (or even the existence) of the July 2015 presentation.

### 2. Whether the Ability to Cut Expenses Was Known or Knowable

Plaintiff next argues that Millennium's ability to make potential cuts to operating expenses was not known or knowable as of the 2014 Transaction because "[n]owhere in management's forecasting as of the 2014 Transaction did management plan for those cuts." (Hutton MTE at 21.) No amount of logical gymnastics renders this sensible. The only reason Hutton discussed potential cuts to operating expenses at all was because Austin Smith drastically reduced Millennium's projected revenues, but failed to make corresponding adjustments to operating expenses. (Hutton Report ¶ 44.) In April of 2014, based on the revenues in the Management Projections, there was no reason to have "forecasted" cuts in operating expenses.

### C. Hutton's Criticism of Austin Smith's Adjustments to Millennium's Emerging Opportunities Revenue Is Reliable.

Next, Plaintiff takes issue with Hutton's opinion regarding Austin Smith's treatment of "emerging opportunities." Once again, Plaintiff's argument boils down to a protest that Hutton failed to support an opinion she never offered. Plaintiff argues that "Hutton criticize[d] Austin Smith for declining to include revenue from speculative 'emerging opportunities' in her valuation" without "offer[ing] [any] meaningful standard that would allow such speculative revenue to be included in a company's valuation." (Hutton MTE at 21-22.) Hutton, of course, never opined that management's projections of emerging opportunities revenues were correct, and thus she had no reason to offer an opinion on the appropriate standards for including such projections in a valuation. It was Austin Smith who decried these projections from Millennium management's contemporaneous forecasts as "aspirational" and struck them. (Austin Smith Report ¶ 67.)

Hutton's actual opinion is that Austin Smith "provide[d] no reasonable basis for the elimination of" this projected revenue from Millennium's forecasts and that Austin Smith's provided justification—the exclusion of emerging opportunities in a model 13 months *after* the 2014 Transaction—was "inconsistent with fundamental principles of DCF analysis." (Hutton Report ¶ 14.) Hutton then demonstrated what Austin Smith's analysis would look like if her arbitrary elimination of that revenue were corrected. (*Id*. ¶¶ 14, 51-54.)

### D. Hutton's Criticism of Austin Smith's Adjustments to Millennium's Projected Growth Rates Is Reliable.

Plaintiff's assertion that Hutton's "restoration" of Millennium management's specimen volume growth rates is unreliable also fails. (Hutton MTE at 23.) Hutton did not opine that management's projected specimen volume growth rates were correct, and had no obligation to support those projections. Rather, Hutton opined that Austin Smith's substantial adjustments to specimen volume growth were "unsupported and unreliable" because they used a subset of historical performance data to assert a path of future performance and were not derived from any empirical analysis. (Hutton Report ¶¶ 55-65.) Hutton then demonstrated what Austin Smith's analysis would have looked like if these unsupported adjustments were omitted. (*Id*. ¶ 65.)

Plaintiff further argues that "Hutton's opinions are based on incorrect articulations of Austin Smith's report" because Hutton observed that Austin Smith's adjustments relied exclusively on historical data. (Hutton MTE at 23.) According to Plaintiff, Austin Smith's opinion also relied on "'Millennium's reasonably anticipated future trends,' 'contemporaneous trends,' 'and with broader UDT industry trends,' and the context of the legal and regulatory headwinds faced by Millennium." (*Id*. at 24.) But whether Hutton's or Austin Smith's characterization of the adjustment is accurate, and what weight the evidence should be afforded as a result, is an issue for the finder of fact at trial, not a basis to exclude Hutton's opinion. *See Krys* v. *Aaron*, 112

F. Supp. 3d 181, 199 (D.N.J. 2015) ("challenges to the underlying bases" for an expert's report "go to the weight, not the admissibility").

Plaintiff also takes issue with Hutton's calculations of Millennium's projected average annual specimen growth rate. Hutton opined that the "quarterly growth rate of 2.2%" amounts to 9% on an annualized basis, which is "closer to Millennium's projected average annual specimen growth rate of 8.2%." (Hutton Report ¶ 63.) Plaintiff attacks this opinion on the basis that Hutton supposedly "cites no source for" the 8.2%. (Hutton MTE at 24.) But this is not true: Appendix H1B to Hutton's report shows Hutton's calculations to reach a compound annual growth rate of 8.2% for Millennium based on the Management Projections. (Hutton Report, App'x H1B.)

Plaintiff's remaining arguments are similarly misplaced. Plaintiff argues that annualizing a particular quarterly data point "is not an appropriate methodology to estimate future growth." (Hutton MTE at 25.) But Hutton did not estimate future growth; she criticized Austin Smith's estimate of future growth. (*See* Hutton Report ¶ 60 ("Notably, [Austin Smith's] specimen volume growth rates appear to be random as she provides no analysis that would show how she estimated them.").) Plaintiff also argues that "Hutton fails to account for the differences in Medicare and commercial payor growth rates" because her report—which removed Austin Smith's adjustment to two different growth rates—projected one growth rate for both payors. (Hutton MTE at 25.) Yet again, Hutton did not opine that there is no difference between Medicare and commercial payor growth rates; Hutton opined that Austin Smith's deviations from management's projections, which projected one rate, were not adequately supported. (Hutton Report ¶ 60.)

### E.    Hutton's Criticism of Austin Smith's Adjustments for the Supposed Reputational Impact from the DOJ Settlement Is Reliable.

Austin Smith adjusted the Management Projections downward, decreasing Millennium's value by nearly $400 million (assuming a 14.8% WACC) to account for the supposed impact to

Millennium's reputation resulting from the DOJ settlement.  (Austin Smith Report ¶ 132.)  This adjustment was based on two emails from 2015 among members of Millennium management speculating that competitors' revenues had decreased following settlements with the DOJ, and Millennium's arguments in litigation that its competitor Ameritox's revenue declines could have been due to negative publicity following a settlement with the DOJ.  (*Id.* ¶¶ 131-132.)  Hutton opined that Austin Smith did not corroborate these figures or perform any independent analysis regarding what drove them:

> Ms. Austin Smith . . . provides no evidence corroborating the supposed volume declines . . . [or any] analysis in her report for what caused the revenue declines for these two companies, if they in fact occurred, or whether they were a result of these companies' settlements with the DOJ (due to reputational impact or otherwise).  Ms. Austin Smith provides no explanation for why Millennium's management should have expected to experience a similar volume decline and no explanation as to how Millennium should have predicted this impact more than a year before the emails in question were sent.

(Hutton Report ¶ 47.)  Austin Smith conceded this at her deposition.  (Ex. 5 (Austin Smith Dep. Tr.) at 267:25-268:2 ("I did not go beyond the scope of this report.").)

Among other things, Hutton pointed out that Austin Smith did not consider that the purported drop in revenues could have been due to termination of the practices under investigation by the DOJ—factors that Austin Smith already separately adjusted for.  (Hutton Report ¶ 49.) Plaintiff contends that Hutton's opinion is "not based on sufficient facts or a reliable methodology" because Hutton purportedly "lack[ed] knowledge of the DOJ investigation."  (Hutton MTE at 25.) But Hutton need not be familiar with "how far the DOJ investigation had proceeded" or "the magnitude of Millennium's potential liability" to opine that Austin Smith failed to consider other potential causes of the competitors' drops in revenue, or confirm whether they in fact occurred. (*Id.* at 25-26.)  Nor does Hutton's opinion require "experience in the industry" (*id.*at 26); Hutton's critique of Austin Smith's ad hoc methodology requires nothing more than the economic and

valuation expertise that Hutton possesses.

Moreover, the evidence does not support Plaintiff's contention about what Millennium supposedly knew in April 2014 regarding the consequences, or likelihood, of a settlement with DOJ in June 2015. (*See* D.I. 251 (Defs.' SJ Mot.) at 10-12 (among other things, setting forth evidence in the record that Millennium's counsel advised that the DOJ investigation would not lead to a "material result").) Where an expert "base[s]" an "opinion on a particular version of disputed facts," "the weight to be afforded to that opinion is for the jury," and is not a ground for excluding the testimony. *Bondach* v. *Faust*, 2011 WL 3816998, at \*3 (E.D. Pa. Aug. 30, 2011) (quoting *Walker* v. *Gordon*, 46 F. App'x 691, 696 (3d Cir. 2002)).

### F. Hutton's Criticism of Austin Smith's Adjustments Based on Medically Unlikely Edit Denials Is Reliable.

Plaintiff argues that "Hutton claims that Austin Smith's analysis 'reli[ed] on hindsight'" for her adjustments based on medically unlikely edit ("MUE") denials, but that "under cross-examination, Hutton admitted that she had no independent understanding of the MUEs and that she did not understand that Millennium's management was aware of the MUE denials as early as February 2014." (Hutton MTE at 26-27.) Hutton made no such admission. The relevant part of the exchange Plaintiff cites (but does not quote) in support of this contention reads:

> Q: As a matter of fact, by February 2014 had Millennium received MUE denials?
>
> A: So –
>
> Q: As a matter of fact.
>
> A: I am a rebuttal expert, I am not a fact witness, so I think that question is better answered by a fact witness; I am rebutting Austin Smith's report. . . .
>
> Q: Did you undertake any independent investigation here to find out those facts?
>
> A: So that was not my role in this matter; my role was to examine Ms. Austin Smith's report and understand and highlight where she

> has made assumptions that are unfounded and unreliable in the process of making adjustments to the [Management] [P]rojections and that's what I do.

(Ex. 3 (Hutton Dep. Tr.) 78:25-80:11.)  Hutton never admitted that she lacked "an independent understanding of the MUEs."  Plaintiff's counsel was trying to turn Hutton into a fact witness, an opportunity she appropriately declined.

In any event, whether or not Hutton has an independent understanding of MUEs—or Millennium's knowledge about those MUEs—is irrelevant to her opinion that Austin Smith's analysis is infected by hindsight bias.  Austin Smith expressly relied on data "as of July 2014"—three months after the 2014 Transaction closed—that was contained in a presentation from July 2015—over one year after the 2014 Transaction closed—to support her adjustments related to MUEs.  (Austin Smith Report ¶ 117 & n.232.)  Hutton opined that it was inappropriate for Austin Smith to rely on this data without showing that it was "available to Millennium prior to the 2014 Transaction."  (Hutton Report ¶ 66.)  This is a question of proper valuation methodology, not MUE-specific industry knowledge.   And if Plaintiff believes that Hutton lacks important knowledge regarding MUEs and that provides a basis for the trier of fact to disregard this aspect of Hutton's opinion, Plaintiff has raised an issue of weight, not admissibility.  *See*, *e.g.*, *Helios Software, LLC* v. *Awareness Techs., Inc.*, 2015 WL 12806482, at *2 (D. Del. Apr. 13, 2015) ("an expert's knowledge of specific facts regarding" the subject of the expert's testimony "—or lack thereof—goes to the weight accorded to that expert's report and testimony, rather than its admissibility") (citation omitted and cleaned up).[14]

---

[14]   Plaintiff's statement that "Millennium's management was aware of the MUE denials as early as February 2014" (Hutton MTE at 26-27) lacks critical further context that is set out more fully in the Expert Report of Branka Matevich (D.I. 254-3 at ¶¶ 58-68).

**G.    Hutton's Criticism of Austin Smith's POC Test Cup Program Adjustment Is Reliable.**

Similarly, Plaintiff asserts that, in criticizing Austin Smith's adjustment for the discontinuation of the POC Test Cup Program, "Hutton fail[ed] to consider the evidence available at the time," including advice that Millennium purportedly received from its supposed "compliance auditor."  (Hutton MTE at 27.)   This mischaracterizes the record—Millennium had received opinions from its experienced healthcare regulatory counsel that the POC Test Cup Program was lawful (*see* Defs.' SJ Mot. at 8-9).   In any event, Hutton's opinion was that Austin Smith's adjustments improperly relied on hindsight, because Austin Smith used July 2014 data to make projections as of April 2014, without establishing that such data was available to Millennium in April 2014.  (*See* Hutton Report ¶ 68 (citing Austin Smith Report ¶ 133).)  Hutton's opinion, once again, concerned Austin Smith's flawed methodology for conducting her valuation and did not require any analysis of evidence about the advice Millennium supposedly received from various sources.

**H.    Hutton's Criticism of Austin Smith's Adjustment for the Discontinuance of Custom Profiles Is Reliable.**

Regarding custom profiles, Plaintiff first asserts that "Hutton [did] not analyze the evidence cited by Austin Smith" in support of Austin Smith's assumption that "Medicare billing was a relevant proxy for commercial billing."  (Hutton MTE at 28.)  But Austin Smith does not offer any evidence for Hutton to analyze.  Despite Plaintiff's assertion that "Austin Smith explains the basis" for her adjustments, Plaintiff can cite to only two paragraphs—both located in an entirely different section of Austin Smith's report—and they concern specimen volume growth (and note that in that

area there is a *divergence* between Medicare and commercial trends); they do not concern reimbursement or billing. (*Id.* (citing Austin Smith Report ¶¶ 57-58).)[15]

Plaintiff also argues that "Hutton engages in unsupported testimony when she decries Austin Smith for comparing Millennium's billing codes to Ameritox and Aegis to determine unnecessary medical billing by Millennium." (Hutton MTE at 28.) Not so. Austin Smith "compare[d] certain Medicare billing codes among Millennium, Aegis, and Ameritox, and argue[d] that if a billing code is billed by Millennium but not billed by Aegis or Ameritox, then it means that, that billing code is likely 'medically unnecessary testing' and hence tied to custom profiles." (Hutton Report ¶ 71.) Hutton opined that, as a valuation methodology, this is unscientific because "Austin Smith provides no other analysis to show that the billing codes in question were tied to custom profiles and does not explore alternative explanations for why Millennium might have used billing codes not used by Aegis and Ameritox." (*Id.*) Hutton need not have performed her own "analysis," as Plaintiff suggests, to offer an opinion that Austin Smith's analysis is unreliable.

## I. Hutton's Criticism of Austin Smith's Application of the Ability to Pay Debts and Capital Adequacy Tests Is Reliable.

Plaintiff's argument that "Hutton does not reliably apply either" the ability to pay debts or capital adequacy tests (Hutton MTE at 29) can readily be dismissed, because Hutton did not in fact apply either test—nor did she need to in order to identify flaws in Austin Smith's application of

---

[15]    Plaintiff also asserts that Defendants' industry expert, Branka Matevich, "agrees with that conclusion." (Hutton MTE at 28.) Plaintiff tellingly does not quote the passage he cites. During Matevich's deposition, Plaintiff's counsel asked: "As an expert in the clinical lab industry, is it your general understanding that commercial payors follow Medicare's lead in coding and reimbursement . . . ?" (D.I. 256-4 (Matevich Dep. Tr.) at 52:6-10.) Matevich responded: "Regarding reimbursement, it depends on the contractuals, it depends on who the payor is." (*Id.* at 52:18-20.)

those tests.  With respect to capital adequacy, Hutton opined that Austin Smith's purportedly "reasonable downside scenario" was not supported, and that Austin Smith's application of the test itself was flawed because the WACC Austin Smith used was flawed.  (Hutton Report ¶¶ 101-104.)[16]  This critique of Austin Smith's valuation methodology does not require Hutton to have performed her own capital adequacy test.

Plaintiff's argument regarding the ability to pay debts test is similarly unconvincing.  Plaintiff suggests that Hutton's criticism of Austin Smith's test must be unreliable because she has "never applied" an ability to pay debts test "outside of academia."  (Hutton MTE at 29.)  Of course, Plaintiff cites no authority supporting the proposition that a valuation conducted by someone whose expertise is derived from her research and experience as a professor of accounting and finance is inadmissible.  If Plaintiff wishes to argue that Hutton's experience in academia renders her opinion less deserving of weight than Austin Smith's, Plaintiff should do so through cross-examination at trial; this is not an issue of admissibility.  *See Otsuka Pharm. Co.* v. *Zenara Pharma Priv. Ltd.*, 2022 WL 4365744, at *2 (D. Del. Sept. 21, 2022) ("Plaintiffs are free to question [defendant's expert] about his qualifications, and may argue that they are not as good as others',"  but plaintiffs' challenges regarding the sufficiency of those qualifications "go to the weight that might be accorded to [the expert's] opinions and not to their admissibility.").

Additionally, Plaintiff's assertion that "Hutton's criticism appears to be that Austin Smith's analysis did not consider how certain rating agencies assessed the 2014 Transaction" misconstrues her report.  (Hutton MTE at 29-30.)  Hutton's criticism of Austin Smith's application of the ability

---

[16]     Plaintiff's statement that "Hutton does not have an opinion on" the assumptions in the downside scenario (Hutton MTE at 29) is particularly puzzling because Hutton clearly opined that extending Austin Smith's adjustment for the purported reputational impact from the DOJ settlement from 30% to 50% was "unjustified."  (Hutton Report ¶ 103.)

to pay debts test is that "Austin Smith's conclusion relies on using her unsupported" adjustments to management's projections, and "[r]emoving [those] adjustments . . . shows that Millennium would be able to pay interest on the Term Loan B throughout the life of the loan." (Hutton Report ¶ 93.)   Hutton's separate observation that Austin Smith also failed to consider the contemporaneous analyses of credit agency ratings does not require having shown "that the rating agencies['] opinions were based on reliable inputs," as Plaintiff asserts. (Hutton MTE at 30.)

*          *          *

When examined, each of Plaintiff's arguments that Hutton's opinions are unreliable is revealed to be nothing more than a mischaracterization of Hutton's opinions or an issue of weight.

## CONCLUSION

For the foregoing reasons, the Court should deny the Hutton MTE and grant such other and further relief as is just and proper.

Dated: October 24, 2022
         Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

By:    /s/ Jason M. Madron
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
          stearn@rlf.com
          madron@rlf.com

-and-

RICHARDS, LAYTON & FINGER, P.A.

By:    /s/ Jason M. Madron
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
          stearn@rlf.com
          madron@rlf.com

-and-

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Tel:    (202) 956-7500
Fax:    (202) 293-6330
Email:  viapianoc@sullcrom.com
        engebretsono@sullcrom.com
        petifordj@sullcrom.com


                    -and-


Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel:    (212) 558-4000
Fax:    (212) 558-3588
Email:  ostragerae@sullcrom.com
        popovskym@sullcrom.com

*Attorneys for JPMorgan Chase Bank, N.A.*

 POLSINELLI PC


By:    */s/ Christopher A. Ward*
 Christopher A. Ward (No. 3877)
 222 Delaware Avenue, Suite 1101
 Wilmington, Delaware 19801
 Tel:    (302) 252-0920
 Fax:    (302) 252-0921
 Email:  cward@polsinelli.com


                    -and-

Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:    (212) 450-4000
Fax:    (212) 701-5351
Email: ben.kaminetzky@davispolk.com
        lara.buchwald@davispolk.com
        tina.joe@davispolk.com


*Attorneys for Citibank, N.A.*


MORRIS JAMES LLP



By:    */s/ Stephen M. Miller*
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel:    (302) 888-6853
Fax:    (302) 571-1750
Email: smiller@morrisjames.com


                    -and-


J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Tel:    (212) 556-2191
Fax:    (212) 556-2222
Email: jemurphy@kslaw.com


                    -and-

-29-

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Tel:    (212) 318-3000
Fax:    (212) 318-3400
Email: steve.dollar@nortonrosefulbright.com

 *Attorneys for BMO Harris Bank, N.A.*

John C. Toro
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Tel:    (404) 572-2806
Fax:    (404) 572-5100
Email: jtoro@kslaw.com
        pclifton@kslaw.com

 *Attorneys for SunTrust Bank*