# EXHIBIT H

RLF1 28568147v.1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | **Re: Adv. D.I. 282, 283** |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

**DECLARATION OF MARK A. POPOVSKY**
**IN SUPPORT OF DEFENDANTS' OPPOSITIONS TO**
**PLAINTIFF'S *DAUBERT* MOTIONS TO EXCLUDE THE TESTIMONY**
**OF DEFENDANTS' EXPERTS AMY HUTTON AND BRANKA MATEVICH**

MARK A. POPOVSKY hereby declares:

1. I am a member in good standing of the Bar of the State of New York and have been admitted *pro hac vice* to practice before this Court. I am a special counsel at the law firm of Sullivan & Cromwell LLP and am counsel to defendant J.P. Morgan Chase Bank, N.A. in the above-captioned adversary proceeding. I submit this declaration in opposition to (i) Plaintiff's *Daubert* Motion to Exclude the Testimony of Defendants' Expert Amy Hutton (D.I. 255) and (ii) Plaintiff's *Daubert* Motion to Exclude the Testimony of Defendants' Expert Branka Matevich (D.I. 253).

2.      Attached hereto as **Exhibit 1** are excerpts from a true and correct copy of the transcript of the deposition of Millennium's former President, Howard Appel, in this action, which took place on October 4, 2021 and October 13, 2021.

3.      Attached hereto as **Exhibit 2** are excerpts from a true and correct copy of the transcript of the deposition of Millennium's former General Counsel, Martin Price, in this action, which took place on April 12, 2021 and June 7, 2021.

4.      Attached hereto as **Exhibit 3** are excerpts from a true and correct copy of the transcript of the deposition of Dr. Amy Hutton in this action, which took place on May 5, 2022.

5.      Attached hereto as **Exhibit 4** is an excerpt of the tab titled "Brattle Expense Build" from a true and correct copy of Austin Smith Workpaper 1 prepared by Yvette Austin Smith in connection with the November 15, 2021 Rule 26(a) Report of Yvette R. Austin Smith and disclosed by Plaintiff in this action.

6.      Attached hereto as **Exhibit 5** are excerpts from a true and correct copy of the transcript of the deposition of Yvette Austin Smith in this action, which took place on May 2, 2022.

7.      Attached hereto as **Exhibit 6** are excerpts from a true and correct copy of the transcript of the deposition of Branka Matevich in this action, which took place on May 11, 2022 and May 13, 2022.

8.      Attached hereto as **Exhibit 7** are excerpts from a true and correct copy of the transcript of the deposition of Millennium's former VP of Financial Planning and Analysis, Daniel Pencak, in this action, which took place on July 1, 2021 and July 12, 2021.

9.      Attached hereto as **Exhibit 8** is an excerpt of the tab titled "Expense Build" from a true and correct copy of a document entitled "Padres Working Model_0412," dated April 12, 2014 and produced in this action in native format bearing production number ML_DE_00057999.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in New York, New York on October 24, 2022

*/s/ Mark A. Popovsky*
Mark A. Popovsky

3

# EXHIBIT 1

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


In re:                        )
                              )
MILLENNIUM LAB HOLDINGS II)   Chapter 11
LLC, et al.,                  )
                              ) Case No. 15-12284 (LSS)
             Debtors.         )
                              )
MARC S. KIRSCHNER solely  )
in his capacity as TRUSTEE)
OF THE MILLENNIUM         )    Jointly Administered
CORPORATE CLAIM TRUST,    )
                          )    Adv. Pro. No. 17-51840 (LSS)
             Plaintiff, )
                          )
        V.                )
                          )
JPMORGAN CHASE BANK, N.A.,)
CITIBANK, N.A., BMO HARRIS)
BANK, N.A., and SUNTRUST  )
BANK,                     )
                          )
        Defendants.       )
_____)


DEPOSITION OF:

                HOWARD APPEL, Volume I
                MONDAY, OCTOBER 4, 2021
                1:00 P.M.




Reported by:   GINA M. CLOUD
               CSR No. 6315

Page 38

A. I don't recall the specifics, but I know there was a lawsuit involving both companies.

Q. And the e-mail itself is something between Charles Root and you. It's from Charles Root to Howard Appel dated September 3, 2010. There was a father-and-son team of the Roots that were compliance auditors for Millennium; is that correct?

MR. POPOVSKY: Objection to form.

THE WITNESS: My recollection is Charles Root was a coding specialist and the company did engage him at some point to audit.

BY MR. TRETTER:

Q. And in this, you recall we talked a little bit about the Cup Program, and he writes: "Regarding your statement in the last e-mail, we provide free cups under the agreement, which Greg contributed, provided the docs do not bill. Assume this doesn't matter from the CMS perspective."

Do you see that?

A. I see that's what the e-mail says, yes.

Q. And Greg is a reference to Greg Root?

A. I'll assume that it is.

Q. And CMS were the centers for Medicare and Medicaid centers. That was Millennium's regulator; is that correct?

Page 39

MR. PREIS: Same objection.

You can respond.

THE WITNESS: Yes.

BY MR. TRETTER:

Q. Charles Root goes on: "My assumption was that you provided specimen transport cups, not test cups."

Do you understand the difference between a specimen transport cup and a test cup?

A. Yes.

Q. And a specimen transport cup doesn't have any strips to give a diagnosis; it's just purely for transport purposes, correct?

(Cross-talk.)

A. I believe so.

Q. And a test cup would have some sort of chemical reactant that would tell at the point of care, or gives some indication at a point of care whether a certain metabolite was in the urine or not?

MR. PREIS: Same.

THE WITNESS: Yes.

BY MR. TRETTER:

Q. Mr. Charles Root goes on to say: "Provision of a test cup rather than a simple

Page 40

specimen collection device gives the physician something of value not associated with the specimen collection. You need to clarify this with Greg when he visits next week."

There was a time, was there not, where there was some discussion of whether the Millennium Test Cup Agreement was legal, correct?

MR. PREIS: Objection, vague, calls for speculation.

You can respond.

THE WITNESS: I don't remember that.

BY MR. TRETTER:

Q. You testified that you had outside counsel involved in deciding what the agreement -- or in discussions about the business practice; is that correct?

MR. PREIS: Objection, vague.

THE WITNESS: What I said was we had outside counsel helping us in a variety of matters regarding policies of the company.

BY MR. TRETTER:

Q. Isn't it a fact that ultimately the company paid $90 million to the federal government for violations of the Stark Law and the Anti-Kickback Law in connection with the Cup Program?

Page 41

MR. PREIS: Objection.

You can respond.

THE WITNESS: I was already gone from the company when the company settled with the government, so I can't tell you, confirm specifics, or not. I'm sure you have that information.

BY MR. TRETTER:

Q. You left the company in July of 2015, correct?

A. I started phasing out in early 2015; left in July, yes, that's correct.

Q. Do you recall that you self-reported in August 2014 to the OIG that after you lost the Ameritox verdict, there was a potential for a $90 million liability to the government?

MR. POPOVSKY: Objection to form.

MR. PREIS: Same objections.

THE WITNESS: Read the question back, please.

(Record read.)

THE WITNESS: Who self appointed? I don't recall self appointing.

BY MR. TRETTER:

Q. Do you recall the Ameritox verdict -- you went to trial in the Ameritox case, correct?

11 (Pages 38 - 41)

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                         Debtors.

MARC S. KIRSCHNER solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                         Plaintiff,

 -against-

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                         Defendants.

Case No. 15-12284 (LSS)

---------------------------------------------X

                         April 12, 2021

                         9:02 a.m.


        ***CONTAINS CONFIDENTIAL PORTIONS***


        VIDEO-RECORDED DEPOSITION of MARTIN

PRICE, taken pursuant to Notice, held virtually

via Zoom, before Fran Insley, a Notary Public

of the States of New York and New Jersey.

Page 210

PRICE

independent expert by Millennium in the Callaway and Ameritox litigations?

A. Yes.

Q. And do you generally recall what Mr. Morris's opinions were with respect to those reports that he submitted?

A. Yes.

Q. And what were those?

A. My recollection is that Lew found that the Millennium programs were compliant with federal healthcare laws and regulations. I think he also provides some opinions around our competitors' business practices and found some of them to be suspect.

Q. And do you recall Mr. Morris opining on the POC cup program specifically?

A. Yes.

Q. And how about the custom profile policy?

A. I don't recall that specifically, but it would not surprise me if he did.

Q. Did Millennium engage Mr. Morris to consult on compliance work outside of the civil litigations?

Page 211

PRICE

A. Yes.

Q. Do you recall what type of work Mr. Morris did in that capacity?

A. I remember that we had developed a relationship with Lew through his engagement as an independent -- as an outside expert in some of our civil matters. Lew's reputation, you know, was exceedingly strong and we weren't -- I recall not being sure whether he was in the business of advising clinical labs on a regular basis like ours, but if we could get someone like him to help to work with us, I recall thinking that would be very helpful, and I recall he agreed to do that.

Q. Do you recall generally whether Millennium implemented the advice of Strategic Management and Mr. Morris with respect to compliance issues?

A. I don't recall specifically, but I can't think of any instance where we did not.

Q. I'm going to refer back to what I believe was marked Plaintiff's Exhibit 6. So it should be in your binder. Let's look at 5B. This relates to the draft 2010 audit that was

Page 212

PRICE

conducted by CodeMap. Is it correct that Millennium sought the advice from outside counsel on whether to move forward with the audit report?

A. Yes.

Q. And in this e-mail that Mr. Tretter pointed you to before, Helen Trilling of Hogan asks, "One question is why Root would be addressing issues in which we have opined at all." And by "we," did she mean Hogan?

MR. WERNER: Object to the form.

A. That's how I would read the e-mail.

Q. Do you have a view on the scope of the audit report and Root's engagement?

MR. TRETTER: Objection.

A. No. I shared Helen and Ron's view or I would say questioning around why Root was providing legal and compliance advice given his background and expertise.

Q. You viewed this draft audit report as going outside of the scope of Root's expertise?

A. Yes.

Q. And I believe you testified that

Page 213

PRICE

Millennium continued using CodeMap and Root for other services, such as billing; is that correct?

A. Yes.

Q. Is that because you viewed that area as within their expertise?

A. Yes.

Q. I would like to ask some questions now about the civil litigations that you referred to earlier. It's correct that Millennium was involved in several civil litigations during the 2010 to 2014 time period, right?

A. Yes.

Q. Was it common for competitors to sue each other in this industry?

A. Yeah, that practice was pretty rife before Millennium ever came to being. You don't have to spend a lot of time on Pacer to find lawsuits between companies in the toxicology space before Millennium even came into existence, and that continued, you know, the first couple of years as we began to carve out market share.

54 (Pages 210 - 213)

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - -x

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                              Debtors.

MARC S. KIRSCHNER solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                              Plaintiff,

      -against-

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                              Defendants.

Case No. 15-12284 (LSS)

- - - - - - - - - - - - - - - - - - - - -x

                    June 7, 2021

                    1:31 p.m.

              CONTINUED VIDEO-RECORDED

DEPOSITION of MARTIN PRICE, taken

pursuant to Notice, held virtually via

Zoom, before Sharon Pearce, RMR, CRR,

CRC, NYRCR, a Registered Merit Reporter,

Certified Realtime Reporter, and Notary

Public of the State of New York.

Page 355

PRICE

honest, I don't recall much from the April deposition, but -- so I'll answer and say no, I don't recall that specific testimony. But if you told me, I'll pull it up and I'll review it.

Q. Well, you were asked a question -- or let's go maybe to page 251 of your transcript and see if that refreshes your recollection.

Okay. Let's scroll down. Starting perhaps at line 19, "Why were you surprised by the Ameritox verdict?"

A. Okay. I see that.

Q. And you can read this, or maybe we can get to the next page.

A. It looks like they're asking me a question from an email, that I'm corroborating what's in an email.

Q. Okay. And now I want to show you something in my exhibit book. Tab 37, which I think we have to mark as Exhibit 106.

Page 356

PRICE

(Plaintiff's Exhibit 106, An email chain dated June 16, 2014, Bates ML_DE_00669350, was hereby marked for identification, as of this date.)

Q. Okay. Do you have that, Mr. Price?

A. I do.

Q. It's a couple of emails between you and Lance -- I may say his last name wrong -- Etcheverry of Skadden.

A. I see that, yeah.

Q. And you're discussing some of the fallout from the Ameritox verdict; correct?

Do you see that?

MR. POPOVSKY: Objection to form.

A. I'm discussing the Ameritox verdict. That's correct.

Q. And at that time, JPMorgan was trying to sell the company or trying to assist you in selling the company to a third party? Do you recall that?

MR. POPOVSKY: Objection to

Page 357

PRICE

form.

A. I don't recall that specifically. But I know that that was, you know -- within that timeframe and after the recap, that was sort of Phase 2. So I'm sure that was occurring at that time --

Q. And --

A. -- at some level.

Q. And so Mr. Etcheverry wrote to you at the bottom of the first page of this exhibit, "I just spoke to Peter," who is another Skadden attorney; is that correct?

A. Peter, yes.

Q. "Sorry, man. This is not what I was expecting based on the way that the evidence came in. Please let me know if there's anything I can do to help with your reporting up the chain."

Did I read that correctly?

A. You did.

Q. And then you responded to Mr. Etcheverry, "Unless you can positively

Page 358

PRICE

spin what JPM already told them, that this will have a $500 million impact on valuation, them" -- probably should be "then" -- there is little more to add. Even if JPM is overstating it, the leverage is now in their hands, and a sale becomes far more unlikely and significantly less valuable. Could not have fathomed a worse outcome."

Were those your words at the time?

A. Boy, I was venting that day. Yeah. Those were -- that's an email I sent.

Q. All right. And did you ever hear from your management who at JPM had told them about that $500 million impact?

MR. POPOVSKY: Objection to form.

A. No. And, you know, to be honest -- well, I am near certain, sitting here today, that this was my hyperbolic reaction to a Skadden counsel after losing an emotional trial and being pretty darn

21 (Pages 355 - 358)

Page 359

PRICE

ticked off at the cost of the trial and the outcome. And whether this frankly relates to an actual conversation with someone on my chain or anything else in here, I don't think so. It may have been, but I have no recollection in mind.

Q. Well, rather than --

A. I'm pretty confident I was just laying it to Lance right there.

Q. You're lying in this email? You're saying you're lying -- you're making up a conversation that JPM had with your management just to yank Skadden's chain?

MR. POPOVSKY: Objection.

MR. WERNER: Object to the form.

Q. I mean, I think this is important only because this will give the Court some idea of your creditability, Mr. Price.

A. Sure.

MR. WERNER: Object to the form.

Q. Can you tell me --

A. I don't have any specific --

Page 360

PRICE

Q. Let me ask the question.

MR. WERNER: If you want to ask a question, Lyndon, ask a question.

A. You made a statement. Do you want me respond to it or not?

Q. I want to know, to the best of your recollection, whether you have any recollection of whether you really heard those words or not at the time.

A. I have no recollection, sitting here today, of having heard those words.

Q. Okay. Do you dispute that it ever happened?

MR. WERNER: Object to the form.

A. I don't dispute it or affirm it. This is from seven years ago. So what conversations I was a part of, hundreds of them, I can't attest to right here.

Q. All right. We've already seen -- one thing we do know is that a couple of months later, you self-reported to CMS based on that Ameritox verdict; correct?

MR. WERNER: Objection to the

Page 361

PRICE

form.

A. Based on the Ameritox verdict. That's a correct statement.

Q. And you're familiar with a lawyer as the concept of res judicata and collateral estoppel if a jury finds that you have violated the Stark Law and the anti-kickback law, that that could be used by others besides Ameritox?

MR. POPOVSKY: Objection to form.

MR. WERNER: Object to the form.

A. Yeah. I am also aware that that verdict was overturned on -- I am aware of res judicata and collateral estoppel. I don't think it's relevant in this discussion, to be honest with you.

Q. Okay. You mentioned that the verdict was overturned. Just so the record is clear, the verdict was overturned for lack of federal subject matter jurisdiction; correct?

A. The verdict was overturned. I haven't read the opinion in a while. But

Page 362

PRICE

as you recall also from the verdict, there were -- it was a highly conflicted verdict where, in some states, there were -- the program was illegal. In some states, it was not. In some states, there were damages. In some states, there were not. But if there's anything can be extrapolated from the verdict, I don't agree with you.

Q. You do agree as a lawyer -- and I'm not asking you for an expert opinion, but you are a litigator -- that if a jury finds something, a factual finding that is binding, it could be used by other parties.

MR. POPOVSKY: Objection to form.

MR. WERNER: Objection. Asked and answered.

A. Yeah. You'd have to get someone who's a little sharper on their civil procedure to answer that one.

Q. Okay.

A. I'm aware of the general

22 (Pages 359 - 362)

# EXHIBIT 3
## (Filed Under Seal)

# EXHIBIT 4
# (Filed Under Seal)

# EXHIBIT 5
## (Filed Under Seal)

# EXHIBIT 6
# (Filed Under Seal)

# EXHIBIT 7

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
-------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
        Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,
                    Plaintiff,

     - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,
                    Defendants.
-------------------------------------X
                    July 1, 2021
                    10:32 a.m.

        Remote video-teleconference
deposition via Zoom of DANIEL PENCAK,
pursuant to notice, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.

Page 118

PENCAK

necessity, you have nothing to stand on."

Q.    Do you see that?

A.    I do.

Q.    Did you discuss this strategy of leaving medical necessity out of the MUE discussion with anyone at Millennium at the time?

A.    I don't recall.

Q.    Does this refresh your recollection at all about Millennium wanting to avoid discussion of medical necessity issues in connection with an MUE appeal?

A.    It doesn't make me recall anything, no.

Q.    This e-mail indicates to you that Millennium wanted to avoid the medical necessity issue not because of irrelevance, but as a tactical approach, right?

MS. BUCHWALD:  Objection to form.

A.    No, that doesn't seem to be the case.

Page 119

PENCAK

Q.    You'd agree that Millennium is expressing here no confidence that claims could be supported on medical necessity grounds, isn't that correct?

A.    No.

MS. BUCHWALD:  Objection to form.

Q.    You don't recall any of this discussion?

A.    I mean, it says here that it would be difficult to rely on physician records.

Q.    Tim Kennedy responds, "I want the best minds on this issue to get it approved, both inside and out, as well as external expertise.  We only have one shot at this," do you see that?

A.    I do.

Q.    And you don't recall discussing with Mr. Kennedy this issue that the company only had one shot at, do you?

A.    I don't recall -- I mean, I recall kind of -- let me make it clear.

I recall this issue happening,

Page 120

PENCAK

but I don't recall it as being that profound and I don't recall having specific discussions on it and I don't recall Tim coming to me and discussing it.

I do recall that there were discussions around this issue, I just don't recall the specifics around it, and like I said, I don't recall it being as profound and I definitely don't recall making projections around this specific issue, so if that makes sense.

Q.    Understood.

Do you remember the issue ever ballooning to a more significant degree than we've seen in these e-mails here?

A.    That's what I'm saying, I don't recall it ballooning, I think that's a good way of saying it, I don't recall it being a bigger issue.

I see the e-mails, but, you know, we were a 4 million EBITDA company, so there is dollars involved, I just don't recall it being that significant of an issue.

Page 121

PENCAK

Q.    Fair enough, we will get to the EBITDA figure that you know and what is and what may not be an issue in that regard.

But for now, why don't we pull up tab 78.

( Exhibit 146, one-page letter July 31, 2014, was marked for identification, as of this date.)

IT CONCIERGE:  Tab 78 has been introduced as Exhibit 146.

Please refresh your marked exhibits folder for access.

Q.    You see a one-page letter with the date July 31, 2014 at the top?

A.    I do.

Q.    And this is on Millennium Laboratories letterhead, it is signed by Tim Kennedy, chief financial officer, addressed to CMS, it regards payment denial, bunch of codes, MUE allowance, do you see that there?

A.    Yes, I do.

Q.    Mr. Kennedy writes, "Dear CMS,

# EXHIBIT 8
# (Filed Under Seal)