# EXHIBIT I

RLF1 28568147v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| | |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | **Re: Adv. D.I. 250, 251, 252, 280, 281** |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

*List of Counsel Continued on Next Page*

Docket No. 300
Filed: 11/23/22

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7500


-and-


Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000


*Attorneys for JPMorgan Chase Bank, N.A.*

POLSINELLI PC
Christopher A. Ward (No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920


-and-


Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone: (212) 318-3000


*Attorneys for BMO Harris Bank, N.A.*


Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000


*Attorneys for Citibank, N.A.*

MORRIS JAMES LLP
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6853


-and-


J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2191


-and-


John C. Toro
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: (404) 572-2806


*Attorneys for SunTrust Bank*


November 23, 2022

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ...................................................................................1

ARGUMENT ...........................................................................................................2

I.  THE OPPOSITION RAISES NO GENUINE DISPUTE OF MATERIAL FACT
    REGARDING MILLENNIUM'S INTENT IN APRIL 2014 ............................2

    A.  Plaintiff Cannot Dispute the Evidence of a Widespread and Reasonable
        Belief that Millennium Would Remain Solvent Following the 2014
        Transaction...........................................................................................3

    B.  Plaintiff Cannot Salvage His Intentional Fraudulent Transfer Claim by
        Conflating Poor Business Judgment with Actual Intent to Defraud.......8

II. THE OPPOSITION CONFIRMS THAT DEFENDANTS ARE ENTITLED TO
    SUMMARY JUDGMENT ON PLAINTIFF'S CONSTRUCTIVE
    FRAUDULENT TRANSFER CLAIM ..........................................................11

    A.  Plaintiff Fails to Show a Genuine Dispute that Millennium Received
        Valuable Services from Defendants and Paid Market Rate Fees in
        Exchange.............................................................................................11

    B.  The Opposition Presents No Meaningful Justification for Applying the
        Equitable Collapsing Doctrine to Save Plaintiff's Claim .....................14

    C.  Plaintiff Lacks Any Cognizable Evidence of Insolvency .....................15

CONCLUSION.......................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson* v. *Boeing Co.*,
    2016 WL 9446648 (E.D. Pa. Aug. 30, 2016) ...................................................5

*Anderson-Strange* v. *Nat'l R.R. Passenger Corp.*,
    2019 WL 2438842 (D. Del. June 11, 2019).....................................................6

*Bray* v. *L.D. Caulk Dentsply Int'l*,
    2000 WL 1800527 (D. Del. July 31, 2000) ...................................................11

*In re DSI Rental Holdings, LLC*,
    574 B.R. 446 (Bankr. D. Del. 2017) ...............................................................8

*In re Elrod Holdings Corp.*,
    421 B.R. 700 (Bankr. D. Del. 2010) ...............................................................7

*In re Fedders N.A., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...............................................................9

*In re Fruehauf Trailer Corp.*,
    444 F.3d 203 (3d Cir. 2006).....................................................................12, 13

*GSC Partners CDO Fund* v. *Washington*,
    368 F.3d 228 (3d Cir. 2004).........................................................................10

*In re Hechinger Inv. Co. of Del.*,
    327 B.R. 537 (D. Del. 2005).....................................................................4, 15

*Jean W.* v. *DeFlaminis*,
    480 F.3d 259 (3d Cir. 2007).............................................................................4

*Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*,
    945 F.2d 635 (3d Cir. 1991).....................................................................11, 12

*Moody* v. *Sec. Pac. Bus. Credit, Inc.*,
    971 F.2d 1056 (3d Cir. 1992).........................................................................14

*In re Plassein Int'l Corp.*,
    405 B.R. 402 (Bankr. D. Del. 2009) ......................................................... 14-15

*In re R.M.L., Inc.*,
    92 F.3d 139 (3d Cir. 1996)...........................................................................11

*Subh* v. *Wal-Mart Stores E., LP*,
  2009 WL 866798 (D. Del. Mar. 31, 2009) ................................................................4

*In re Summit Place, LLC*,
  298 B.R. 62 (Bankr. W.D.N.C. 2002)................................................................9, 10

*In re Syntax-Brillian Corp.*,
  2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) ....................................................8

*In re Winstar Commc'ns, Inc.*,
  554 F.3d 382 (3d Cir. 2009)...................................................................................13

## SUMMARY OF ARGUMENT

Plaintiff's Opposition to Defendants' Motion for Summary Judgment (D.I. 280 ("Opp.")) confirms what the evidentiary record already shows:  after years of discovery, including unfettered access to Millennium's books and records, depositions of the key players from the 2014 Transaction, and extensive document productions, Plaintiff never developed the evidence needed to prevail on either his intentional or constructive fraudulent transfer claim.[1]

To prove intentional fraud, Plaintiff must show that Millennium acted with actual intent to hinder, delay, or defraud its creditors when it paid fees to Defendants.  But as Defendants explained, every single Millennium witness steadfastly denied having any intent to defraud creditors during the course of the 2014 Transaction.  Overwhelming documentary evidence— including contemporaneous accounts of Millennium's understanding of the risks posed by the DOJ investigation—corroborates that testimony.  The Opposition offers no evidence that calls these facts into question.  Instead, Plaintiff resorts to the flawed theory that he can prove actual intent simply by showing that Millennium made a poor business decision.  Plaintiff tries to create the illusion of disputed material facts by pointing to evidence that Millennium supposedly knew in April 2014 that it faced risks and misjudged those risks when it decided to proceed with the 2014 Transaction.  But this is nothing more than Plaintiff second-guessing Millennium's assessment with the benefit of hindsight, and does not create a genuine dispute of material fact about Millennium's intent at the time of the 2014 Transaction.

As for Plaintiff's constructive fraudulent transfer claim, the Opposition consists of little more than conclusory rhetoric claiming, without any evidence, that Millennium did not receive

---

[1]    All defined terms in this Reply Memorandum shall have the meanings ascribed to them in Defendants' Memorandum of Law in Support of the Motion for Summary Judgment, D.I. 251 ("Defendants' Memorandum" or "Defs.' Mem.").

reasonably equivalent value in exchange for the fees paid to Defendants.  Defendants committed to fund the entirety of a $1.775 billion loan to Millennium in exchange for a negotiated fee, and Plaintiff seeks to have the Court look past the undisputed evidence that the fee was consistent with (if not more competitive than) fees for similar transactions and negotiated at arm's length.  Plaintiff invokes the collapsing doctrine, falling back on the refrain that no work performed in connection with the 2014 Transaction could possibly have value because of the dividend paid to Millennium shareholders, but he never meaningfully addresses Defendants' explanation as to why the equitable collapsing doctrine has no place here.

Plaintiff's Opposition makes plain that his claims still rest on nothing more than conjecture and hindsight and, accordingly, Defendants' motion for summary judgment should be granted.

## ARGUMENT

### I.    THE OPPOSITION RAISES NO GENUINE DISPUTE OF MATERIAL FACT REGARDING MILLENNIUM'S INTENT IN APRIL 2014.

The record in this case demonstrates that:  (i) every single witness involved in the 2014 Transaction—from Millennium, TA Associates, and the arranging banks—testified that he or she did not believe that the 2014 Transaction would render Millennium insolvent (*see* Defs.' Mem. at 18 & n.7); (ii) Millennium was advised by experienced outside counsel that its practices were legally compliant and that the DOJ's investigation would not have a material impact on Millennium (*see id.* at 11-12); and (iii) Millennium employees confirmed in their testimony exactly what they had expressed in contemporaneous emails—that they believed this legal advice to be reliable and relied on it (*see id.* at 11-12, 14).  Faced with this evidence—and a conspicuous lack of evidence suggesting anything to the contrary—Plaintiff tries to brush aside the overwhelming and undisputed testimony as "self-serving."  (*See* Opp. at 18.)  Third Circuit law does not allow

for such a casual dismissal.  And the few supposed indicia of fraudulent intent that Plaintiff identifies, attenuated as they are, reflect gross mischaracterizations of the evidence.

**A.      Plaintiff Cannot Dispute the Evidence of a Widespread and Reasonable Belief that Millennium Would Remain Solvent Following the 2014 Transaction.**

Plaintiff had the opportunity to depose every single member of Millennium management directly involved in the 2014 Transaction.  Each of these witnesses confirmed what the documentary record makes clear:  no one at Millennium believed that the 2014 Transaction would render Millennium insolvent and unable to pay its creditors.  (*See* Defs.' Mem. at 18 & n.7.)

Millennium's President, Howard Appel, did not have "any concerns at [the] time" that "Millennium would be able to repay the $1.8 billion in debt," and "nobody expressed [such a concern] to [him]."  (Ex. 1 (Appel Dep. Tr.) at 231:16-24.)[2]  Millennium's CEO, Brock Hardaway, believed "that [Millennium] could service the debt and that it gave [Millennium] access to people . . . and to the capital markets that [Millennium] previously did not have access to." (D.I. 252-38 (Hardaway Dep. Tr.) at 300:5-16.)  And when Millennium's founder, Jim Slattery, was asked if he was aware of anyone at Millennium who believed in April 2014 that the ongoing investigation of Millennium "might result in Millennium becoming insolvent," he responded "of course not," "[n]one of us had any knowledge of what ended up happening."  (D.I. 252-61 (Slattery Dep. Tr.) at 184:16-185:5.)   Every other Millennium witness agreed, as did Millennium's experienced private equity sponsor, TA Associates.  (*See* Defs.' Mem. at 18 n.7.)

Plaintiff asks the Court to disregard this testimony because it supposedly is "self-serving." (Opp. at 18.)  This misstates the facts and the law.  None of the former Millennium employees who testified is a party with a stake in this case, and each received a release from claims relating

---

[2]      Citations in the format "Ex. __" refer to exhibits to the Declaration of Mark A. Popovsky, filed concurrently herewith ("Popovsky Decl.").

to the DOJ investigation or the 2014 Transaction.  *See In re Millennium Lab Holdings II, LLC*, No. 15-bk-12284 (Bankr. D. Del.), D.I. 14 (Reorganization Plan) § I.B.1.142-43 ("Released Claims" and "Released Parties"); § V.J (reserved claims); § X.D-I (scope of releases).  On the law, this Circuit has held that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible, . . . *even if* the testimony is that of an interested witness." *Jean W.* v. *DeFlaminis*, 480 F.3d 259, 271-72 (3d Cir. 2007) (emphasis added) (affirming finding that defendant school district lacked "retaliatory intent" based on testimony from district employees); *see also Subh* v. *Wal-Mart Stores E., LP*, 2009 WL 866798, at *17-18 (D. Del. Mar. 31, 2009) (granting summary judgment for defendant Wal-Mart based on "affidavits from Wal-Mart employees").[3]   The uncontroverted testimony that everyone believed that Millennium was well-positioned to service its debt from the 2014 Transaction is thus enough to grant summary judgment.  *See In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 551 (D. Del. 2005) (granting summary judgment on intentional fraudulent transfer claim where "record demonstrates that these defendants believed the Transaction would create a viable company").

Plaintiff also argues that the uniform testimony of everyone involved is somehow "contradict[ed]" by documentary evidence (Opp. at 18), but in the few instances where Plaintiff actually cites a document that he claims shows intent to defraud, he mischaracterizes it.  This

---

[3]     Plaintiff's cases do not suggest otherwise.  In *Pleaugh* v. *A.W. Chesterton Co.*, far from involving uncontroverted testimony, various witnesses directly contradicted each other regarding whether a particular building material allegedly containing asbestos was "purchased . . . from one or both of [the] suppliers."  2012 WL 2914250, at *1 n.1, 6 (E.D. Pa. Apr. 27, 2012).  In *Dupuis* v. *Carnival Corp.*, the plaintiff and her husband testified that they saw "holes" in a metal threshold that she had tripped over, and plaintiff argued that this testimony proved that the defendant "had previously tried to screw [the threshold] down."  2022 WL 4594120, at *2 (S.D. Fla. July 22, 2022).  The court held that the testimony did "not constitute undisputed evidence" because "more than one inference could be construed" from the existence of the holes.  *Id.*  Here, to the contrary, no inference is needed; the witnesses expressly denied acting with any fraudulent intent.

"distortion of record evidence cannot create a genuine dispute of fact." *Anderson* v. *Boeing Co.*, 2016 WL 9446648, at *7 n.9 (E.D. Pa. Aug. 30, 2016). For example, Plaintiff continues to claim that Millennium "was advised by multiple reliable sources, including its *own counsel and auditor*," that the POC Cup Program was illegal, and that Millennium "buried his findings." (Opp. at 4, 19 (emphasis added).) But, as Defendants explained, this purported "auditor" was actually a *coding* specialist offering an unsolicited view—not an advisor engaged to offer a legal opinion concerning Millennium's POC Cup Program's compliance with federal law. (D.I. 282 at 3-4.)[4] Millennium's actual healthcare compliance counsel at Hogan Lovells advised that the program was compliant, and multiple Millennium employees testified that they relied on that advice. (*See* Defs.' Mem. at 8-9, 21 & n.8.)[5] Millennium's decision in 2011 to follow the advice of its dedicated healthcare compliance counsel over the differing view of a coding specialist is not evidence of fraud, let alone evidence of fraudulent intent to engage in an unrelated transaction three years later.

Plaintiff cites repeatedly to a February 2015 email from Michael Loucks, Millennium's outside counsel leading the response to the DOJ investigation, and claims that Loucks "'███████

███████████████████████████████████████████

---

[4]    Plaintiff also claims without support that Millennium "resolved not to discuss Root's findings any more over email." (Opp. at 4.) But that mischaracterizes the two cited documents. Rather, in discussing how to share with Root that he need not proceed with his unsolicited audit, Price wrote that Millennium was "better off communicating . . . orally" to Root that he need not proceed because "Root and [Millennium's President, Appel] have a long relationship and [a] terse email/letter may be ill-received." (D.I. 281 (Pl.'s Ex. 10) at -3896.)

[5]    Plaintiff also cites to a 2011 letter from Jane Pine Wood, an attorney who had previously advised Millennium, that was addressed to *another company*. (*See* Opp. at 4 & n.10.) Pine Wood wrote her letter to that other company several years after she stopped advising Millennium, and she did not purport to analyze Millennium's POC Cup Program in that letter. (D.I. 254-13 (4/11/2012 email from M. Price).) The advice that she provided to the other company also was contradicted by advice Millennium received from Hogan Lovells in 2010 that Millennium's test cup program was compliant. (*See* D.I. 252-31 (Wisor Oct. 2010 opinion) at -2989.) Hogan Lovells reaffirmed that advice in 2011 (*see* D.I. 252-32 (Wisor Jan. 2011 opinion) at -9523), and again in 2012 (*see* D.I. 252-33 (3/19/12 Wisor email)).

██████████████████████████████████████." (Opp. at 5 & nn.12, 16-18 (citing D.I. 281 (Pl.'s Ex. 13) at -5041).)  Plaintiff omits from his selective quotation that Loucks actually said he ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ (D.I. 281 (Pl.'s Ex. 13) at -5041-42 (emphasis added).)  Plaintiff cannot manufacture a dispute by misrepresenting the document's contents.  *See Anderson-Strange v. Nat'l R.R. Passenger Corp.*, 2019 WL 2438842, at *7-8 (D. Del. June 11, 2019) (plaintiff's "mischaracteriz[ation] [of] the email" does not "create a material dispute of fact").

Moreover, Loucks's email is from February 2015, ten months *after* the 2014 Transaction, and thus does not bear on what Loucks (or Millennium) believed about the risks posed by the DOJ investigation in April 2014.  Crucially, Plaintiff *does not dispute* that Loucks—relying on his experience, including as the former head of the healthcare fraud unit at the U.S. Attorney's Office conducting the investigation—advised Millennium in March 2014 that the investigation would "not have a 'material result.'" (*See* Opp. at 10, 13; Defs.' Mem. at 11-12.)  Plaintiff instead claims, without citing any evidence, that Defendants and Millennium were deceptively "reassuring" potential lenders that Loucks held this view when he did not. (Opp. at 13.)  Plaintiff's insinuation that Loucks was insincere in his assessment of the risks posed by the DOJ investigation or that Millennium did not believe Loucks is illogical and lacks any evidentiary support.  Even though the investigation was live and the DOJ had been making inquiries leading up to the 2014 Transaction, Loucks explained his view to Millennium and Defendants and the reasons for it. (D.I. 252-44 (attorney notes) at -0023, -0035-36; *see also* D.I. 252-27 (Price Dep. Tr.) at 249:5-20 ("Do you recall Mr. Loucks making this statement?  A: I do.").)  And the record confirms that Millennium believed in and shared Loucks's assessment. (D.I. 252-27 (Price Dep. Tr.) at 250:3-

14.)  Indeed, the evidence shows that Millennium and Loucks continued to hold the view that the DOJ investigation would not have a material result for Millennium as late as January 2015, when Millennium learned for the first time how the DOJ viewed a potential settlement, and CMS threatened revocation of Millennium's billing privileges.  (Defs.' Mem. at 14-15.)

Lacking any conceivable evidence of Millennium's fraudulent intent, Plaintiff recycles an allegation from his complaint and cites three times to a JPMorgan email referencing the 1994 film *Pulp Fiction*.  (Opp. at 13, 20, 27 (quoting D.I. 281 (Pl.'s Ex. 64) at -4929); *see also* D.I. 1 (Complaint) ¶ 50.)  Plaintiff asserts that in that email, a JPMorgan employee called Millennium's rating agency presentation a "Pulp fiction."  (Opp. at 13.)  But Plaintiff must establish *the debtor's* intent to hinder, delay, or defraud its creditors, not that Defendants acted with such intent.  *See In re Elrod Holdings Corp.*, 421 B.R. 700, 709 (Bankr. D. Del. 2010).[6]  This internal email between two *JPMorgan* employees does not provide any evidence of *Millennium's* intent.  And even if this internal JPMorgan email mattered, Plaintiff leaves out that he asked the email's author what the email meant at his deposition.  The witness explained, contrary to Plaintiff's assertion, that he was "referring to a line which [certain JPMorgan employees] commonly refer to in the movie" that means "let's not congratulate ourselves before the whole entire body of work is done."  (Ex. 2 (JPMorgan Dep. Tr.) at 126:12-128:12.)  He added that the line is "graphic and [he does not] like repeating it."  (*Id.* at 128:5-6.)  In cleaned up terms, the line reads:  "Well, let's not start [celebrating] quite yet."  (Ex. 3 (*Pulp Fiction* Script) at 109.)  In other words, "let's not get ahead of ourselves because the transaction is not yet done."  Plaintiff's repeated reliance on this email to

---

[6]  Given Plaintiff's attempt to muddle Millennium's and Defendants' intent, it bears repeating that Defendants' witnesses all testified that they never would have staked their reputations or taken on significant risk by underwriting the 2014 Transaction if they doubted that Millennium would be able to repay the loan.  (*See* Defs.' Mem. at 7 n.3, 23.)

suggest that anyone at JPMorgan believed that the ratings agency presentation was "fiction" is disingenuous, and only further highlights the lack of any actual evidence of fraudulent intent.

> **B.      Plaintiff Cannot Salvage His Intentional Fraudulent Transfer Claim by Conflating Poor Business Judgment with Actual Intent to Defraud.**

The remainder of Plaintiff's purported evidence of actual fraudulent intent boils down to the following:  Millennium knew that it faced litigation and reimbursement risks, and, in hindsight, it misjudged those risks when it decided to pursue the 2014 Transaction.  These unremarkable facts are insufficient to prove actual intent to hinder, delay, or defraud, especially in the face of the overwhelming evidence to the contrary.

Plaintiff's argument also rests on a fundamental misunderstanding of the law.  Plaintiff contends that intent to defraud can be inferred when a debtor incurs a liability with knowledge that "it will *likely* not be repayable"—*i.e.*, that there is a risk that the company may become insolvent. (Opp. at 16 (emphasis added).)  But as the very case that Plaintiff cites makes clear, a plaintiff must show that the debtor knew or believed that its creditors "*will be* hindered or delayed."  *In re DSI Rental Holdings, LLC*, 574 B.R. 446, 467 (Bankr. D. Del. 2017) (emphasis added).  Plaintiff thus must establish that Millennium believed, in April 2014 when it paid the fees to Defendants, that Millennium was "substantially certain" that it would be unable to repay the debt. *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *6 (Bankr. D. Del. Feb. 8, 2016) (delay "substantially certain" where debtor already had "negative operating income" and affiliate employees had created "fake credit memos" and "fake invoices").  Plaintiff has failed to adduce evidence that Millennium was "substantially certain" that it would be unable to service the debt from the 2014 Transaction.

Relying on his misstated standard, Plaintiff clings to the categories of allegations that the Court identified in its motion-to-dismiss opinion to claim that he can establish sufficient evidence of fraudulent intent to defeat summary judgment.  (Opp. at 16-17.)  But Plaintiff fails to

acknowledge that the Court's determination that these categories of allegations were collectively sufficient to state a claim for intentional fraud was just that—an opinion based only on *allegations*, many of which have proven unsupported or even disproven by the record.  (*See supra* pp. 3-7; Defs.' Mem. at 20-23.)  Plaintiff must grapple with the actual record here, not the record that he believed might exist when he drafted his Complaint.

For example, Plaintiff claims that Millennium's "entire business model was based on unlawful practices" and that the "legality of Millennium's business was being challenged on several fronts." (Opp. at 17-20.)  At most, the record demonstrates that Millennium knew that not everyone in the industry agreed with the opinions of its healthcare regulatory counsel, and that Millennium knew that the DOJ investigation and ongoing litigation posed risks.  That it turns out, with the benefit of hindsight, Millennium misjudged these risks does not establish that Millennium *knew* or was substantially certain that the 2014 Transaction would render the company insolvent. *See In re Summit Place, LLC*, 298 B.R. 62, 71 (Bankr. W.D.N.C. 2002) (claim that "transaction was imprudent," "based largely on hindsight and . . . events that occurred after the transfer took place," insufficient to show "fraudulent intent"); *In re Fedders N.A., Inc.*, 405 B.R. 527, 541 (Bankr. D. Del. 2009) ("mere fact that a strategy turned out poorly is in itself insufficient to create an inference" of bad faith).  This is particularly so in the face of uncontradicted evidence that Millennium was advised by experienced outside counsel that its practices were compliant and the risk posed by the DOJ investigation was "not material" (*see* Defs.' Mem. at 8-9, 11)—evidence that this Court explained could "*disprove* Plaintiff's case." (D.I. 52 at 9 (emphasis added).)

Plaintiff also claims that he can demonstrate fraudulent intent because Millennium's "revenues were overstated" and other "information disseminated in connection with the loan . . . was untruthful."  (Opp. at 17, 20-21.)  But the purported evidence that Millennium

*intentionally distorted* this information never materialized in discovery. As noted, Plaintiff's key piece of "evidence" in support of this assertion is an internal JPMorgan email referencing the film *Pulp Fiction*, (*id.* at 13, 20), not some suggestion that Millennium thought that the projections were fictional (*see supra* p. 7). In fact, Plaintiff cites to no record evidence that Millennium believed its projections to be fraudulent (of which there is none), but simply points to the opinion of Plaintiff's solvency expert that Millennium should have calculated those projections differently. (Opp. at 12, 20.) Proving actual fraudulent intent requires more than showing that the transferor got it wrong. *See Summit Place*, 298 B.R. at 71.

The remaining two categories of allegations on which Plaintiff relies, put into the context of the fully developed record, can be described as follows: (1) the 2014 Transaction was structured as a dividend recapitalization, a "very standard transaction" that "happens with frequency every year" to benefit equity investors (Ex. 4 (BMO Dep. Tr.) at 58:6-10); and (2) Millennium's expectations about its ability to service the debt proved incorrect when it filed for bankruptcy over a year later. (Opp. at 21-22.) But the fact that Millennium's founders and initial investors stood to financially benefit from the 2014 Transaction, and even that they expressed gratitude for those benefits (*id.* at 14), is not evidence of actual fraudulent intent. *See GSC Partners CDO Fund* v. *Washington*, 368 F.3d 228, 237 (3d Cir. 2004) ("In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction."). Further, as discussed above, the fact that Millennium's expectations about its ability to service the debt, in hindsight, turned out to be wrong does not show fraudulent intent. *Summit Place*, 298 B.R. at 71. These facts, which would be present in nearly every dividend recapitalization that later proves imprudent, do not show that Millennium acted with actual intent to hinder, delay, or defraud its creditors.

-10-

After receiving all of Millennium's records, deposing every member of Millennium management involved in the 2014 Transaction, and taking discovery from Defendants and non-parties, Plaintiff's intentional fraudulent transfer claim rests entirely on unsupported conjecture and hindsight. The "mere existence of some evidence in support of [Plaintiff's claim] will not be sufficient for denial of [Defendant's] motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for [Plaintiff]." *Bray* v. *L.D. Caulk Dentsply Int'l*, 2000 WL 1800527, at *3 (D. Del. July 31, 2000). Plaintiff cannot point to such evidence here.

## II.    THE OPPOSITION CONFIRMS THAT DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONSTRUCTIVE FRAUDULENT TRANSFER CLAIM.

### A.    Plaintiff Fails to Show a Genuine Dispute that Millennium Received Valuable Services from Defendants and Paid Market Rate Fees in Exchange.

Plaintiff's claim that there is evidence in the record sufficient for a reasonable fact-finder to conclude that "Millennium received no value" for the fees (Opp. at 23) is baseless. Under the Third Circuit's two-part test to establish lack of reasonably equivalent value, the Court must determine whether (1) the debtor received "any value" for the transferred property, and, if so, (2) whether the value was "reasonably equivalent" to the transferred property. *In re R.M.L., Inc.*, 92 F.3d 139, 152 (3d Cir. 1996). Plaintiff fails to identify a triable issue of fact as to either prong.

It is undisputed that Defendants provided services to Millennium, including underwriting the entire term loan in exchange for the fees, and that, as a result, Millennium was able to borrow $1.775 billion. (*See* Defs.' Mem. at 5-6, 25.) This Circuit has made clear that the "ability to borrow money" "has considerable value in the commercial world." *Mellon Bank, N.A.* v. *Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991). Plaintiff tries to distinguish *Mellon* by claiming that typical benefits that result from access to credit never materialized. (Opp. at 24.) But Plaintiff does not identify any evidence supporting this assertion, and the evidence is actually to the

contrary. (*See* Defs.' Mem. at 23; D.I. 252-6 (JPMorgan Dep. Tr.) at 122:4-123:15 (Millennium exposed "to a much broader, deeper capital market").) In any event, it is the "*ability* to borrow money" that provides value, *Mellon*, 945 F.2d at 647 (emphasis added), and Plaintiff cannot avoid that conclusion because he dislikes what Millennium did with the money that it borrowed.

Plaintiff also appears to misunderstand the nature of an underwritten loan when he claims that "Defendants had no exposure when Millennium's unlawful conduct drove it to bankruptcy." (Opp. at 24 n.116.) Defendants signed a commitment letter to fund the full amount of the term loan. (*See* D.I. 252-13 (Commitment Letter) at -5397.) In doing so, Defendants guaranteed that they would provide Millennium $1.775 billion, regardless of whether other lenders opted to join the syndicate. (*See* Defs.' Mem. at 5.) It was that guarantee—which placed a "heightened risk" on Defendants because they "essentially backstopp[ed] the transaction" (D.I. 252-6 (JPMorgan Dep. Tr.) at 21:21-22:14)—that Millennium received in exchange for the fees.

Plaintiff also fails to present a triable issue of fact as to whether Millennium received "reasonably equivalent value" for the fees under this Circuit's three-factor standard. *See In re Fruehauf Trailer Corp.*, 444 F.3d 203, 213 (3d Cir. 2006). *First*, Plaintiff cites no evidence in his Opposition suggesting that the fees were not "market rate" (*see* Opp. at 25), nor does he dispute the uncontroverted testimony and documents showing that they were, in fact, market rate (*see* Defs.' Mem. at 5, 26). Plaintiff erroneously asserts that the Court "already rejected Defendants' argument" (Opp. at 25), but the Court merely explained that Plaintiff's "failure to plead that the Fee was not market value" was "not case-dispositive" for purposes of a motion to dismiss (D.I. 52 at 11). The Court recognized that facts developed in discovery, including the nature of "the fee letter and the commitment letter," could undermine Plaintiff's claim. (*Id.*) And that is what happened: the record shows that Millennium paid Defendants market-rate fees for their

commitment to guarantee the full loan amount, regardless of the outcome of the syndication. Plaintiff presents *zero* evidence in his Opposition to show a genuine dispute as to these facts.

*Second*, Plaintiff fails to present any evidence in his Opposition that the fees were not the result of an arm's-length negotiation between Millennium and Defendants.  Plaintiff tries to analogize to *Fruehauf*, arguing that the payment of the fees could not have been at arm's length because the "benefits" of the 2014 Transaction "inured substantially to corporate insiders."  (Opp. at 25 (quoting 444 F.3d at 216).)  But in *Fruehauf*, the plaintiff sought to avoid a transfer from the debtor's pension plans to the debtor's own executives pursuant to a compensation package that those top executives themselves approved.  444 F.3d at 207, 215-16.  The transfer here—payment of fees, at a negotiated, competitive rate, to third-party banks (*see* Defs.' Mem. at 5, 26)—is hardly comparable.  To demonstrate that the fees were not the product of an arm's-length transaction, Plaintiff must do more than assert that Defendants stood to benefit from the 2014 Transaction; Plaintiff must demonstrate a "sufficient[] close[ness]" between the Defendant banks and Millennium or that the fee payment was so "one-sided" that the transaction was not "in good faith in the ordinary course of business by parties with independent interests."  *In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 397, 399 (3d Cir. 2009).  Plaintiff has failed to do so.

*Third*, Plaintiff fails to raise a material dispute of fact that Defendants accepted the fees in good faith.  Plaintiff claims, without citing case law, that "the fact that Defendants had so much loan exposure to a failing company and orchestrated the 2014 Transaction is enough."  (Opp. at 26.)  If that were the case, a party's good faith would be called into question any time it stood to benefit from a transaction.  Otherwise, Plaintiff repeats his specious reliance on the *Pulp Fiction* email and conflates awareness of risks with evidence of bad faith.  (*See supra* pp. 8-10.)  Plaintiff fails to show a genuine dispute of material fact on any element of reasonably equivalent value.

**B.    The Opposition Presents No Meaningful Justification for Applying the Equitable Collapsing Doctrine to Save Plaintiff's Claim.**

Because he cannot show that Millennium received less than reasonably equivalent value in exchange for the fees, Plaintiff, as expected, falls back on the collapsing doctrine.  But Plaintiff never meaningfully engages with Defendants' explanations for why the doctrine is inappropriate here, where the transfer at issue is a payment of transaction fees, and the doctrine would not serve the purpose for which it was created:  to protect unsuspecting unsecured creditors.[7]

Rather than explaining why the equitable purposes of the doctrine would be served here, Plaintiff responds that (i) as Trustee for the Corporate Claim Trust, he does not represent secured creditors, and (ii) Defendants' cases are not comparable.  (Opp. at 29.)  Plaintiff's insistence that he does not represent secured creditors misses the point.  The doctrine does not apply here because Plaintiff does not represent the interests of those whom the doctrine seeks to protect:  *unsecured* creditors "who will most likely not be paid in the event of insolvency."  *Moody* v. *Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1065 (3d Cir. 1992).  Plaintiff also *does* represent secured creditors.  He fails to mention that the secured creditors from the 2014 Transaction received equity in reorganized Millennium and thus are (or were, prior to selling their interest) beneficiaries of the trust that he represents here.  *See In re Millennium*, 15-bk-12284, D.I. 14 § III.C(ii).

Plaintiff also fails meaningfully to distinguish the cases cited by Defendants in which courts have not applied the doctrine.  Despite Plaintiff's insistence that the doctrine must be mechanically applied every time that three prerequisite factors are met (Opp. at 28), he does not dispute that those same factors were present in *Plassein*, and yet neither the plaintiff nor the court

---

[7]    Contrary to Plaintiff's assertion, Defendants never asserted that the doctrine is "inapplicable . . . outside the context of leveraged buyouts ('LBOs')."  (Opp. at 29.)  Rather, Defendants explained that the development of the doctrine in the context of failed LBO transactions illustrates the doctrine's equitable purposes.  (*See* Defs.' Mem. at 28-29.)

contended that applying the doctrine and collapsing the fee payment and the LBO transactions would be appropriate.  (*See* Opp. at 29 (citing *In re Plassein Int'l Corp.*, 405 B.R. 402 (Bankr. D. Del. 2009)).)  As for *Hechinger*, the portion of the opinion that Plaintiff cites is discussing a *different transfer*—the debtor's transfer of assets to the merged entity—not the "fees paid" to the investment firm.  (*See id.* at 29 (citing *In re Hechinger*, 327 B.R. at 553).)  When the court examined whether reasonably equivalent value was received for those service-related fees, despite having "collapsed" the various transactions, the court looked specifically to the "work performed" and "industry standards." *Hechinger*, 327 B.R. at 546, 553.

### C.    Plaintiff Lacks Any Cognizable Evidence of Insolvency.

Plaintiff's constructive fraudulent transfer claim fails for the additional reason that he cannot meet his burden to demonstrate insolvency.  Plaintiff's sole theory of insolvency depends on his unwarranted extension of the collapsing doctrine.  (Defs.' Mem. at 29.)  As explained, Plaintiff makes no meaningful effort to defend the application of that doctrine here.

But even if the impact of the loan and the subsequent dividend were relevant to Plaintiff's attempt to clawback the fees, Plaintiff's purported evidence of insolvency—the opinion of Plaintiff's expert—is inadmissible.  Indeed, Plaintiff's Opposition to Defendants' Motion to Strike (D.I. 284) confirms the unreliability of her opinion.  As Defendants explain in their reply brief, when presented with a fundamental gap in Austin Smith's analysis, Plaintiff has manufactured a post-hoc explanation that appears nowhere in, and is in fact contradicted by, Austin Smith's report. (MTE Reply at 1-5.)  Austin Smith's solvency opinion is unreliable, her testimony should not be admitted, and Plaintiff cannot satisfy his burden to establish the elements of his claim.

### CONCLUSION

For the foregoing reasons, together with those set forth in Defendants' Memorandum, Defendants' Summary Judgment Motion should be granted.

Dated: November 23, 2022
       Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.          RICHARDS, LAYTON & FINGER, P.A.


By:    */s/ Jason M. Madron*                    By:    */s/ Jason M. Madron*
Mark D. Collins (No. 2981)                  Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)            Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)                  Jason M. Madron (No. 4431)
One Rodney Square                           One Rodney Square
920 North King Street                       920 North King Street
Wilmington, Delaware 19801                  Wilmington, Delaware 19801
Tel:    (302) 651-7700                      Tel:    (302) 651-7700
Fax:    (302) 651-7701                      Fax:    (302) 651-7701
Email: collins@rlf.com                      Email: collins@rlf.com
      stearn@rlf.com                               stearn@rlf.com
      madron@rlf.com                               madron@rlf.com


        -and-                                          -and-


Christopher Michael Viapiano              Benjamin S. Kaminetzky
Oliver W. Engebretson-Schooley            Lara Samet Buchwald
Julie G. Petiford                         Tina Hwa Joe
SULLIVAN & CROMWELL LLP                    DAVIS POLK & WARDWELL LLP
1700 New York Avenue, N.W., Suite 700      450 Lexington Avenue
Washington, D.C. 20006-5215                New York, New York 10017
Tel:    (202) 956-7500                     Tel:    (212) 450-4000
Fax:    (202) 293-6330                     Fax:    (212) 701-5351
Email: viapianoc@sullcrom.com              Email: ben.kaminetzky@davispolk.com
      engebretsono@sullcrom.com                        lara.buchwald@davispolk.com
      petifordj@sullcrom.com                           tina.joe@davispolk.com


        -and-                                  *Attorneys for Citibank, N.A.*


Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel:    (212) 558-4000
Fax:    (212) 558-3588
Email: ostragerae@sullcrom.com
      popovskym@sullcrom.com


*Attorneys for JPMorgan Chase Bank, N.A.*

POLSINELLI PC

By:  ___/s/ Christopher A. Ward___
Christopher A. Ward (No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Tel:    (302) 252-0920
Fax:    (302) 252-0921
Email:  cward@polsinelli.com


-and-

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Tel:    (212) 318-3000
Fax:    (212) 318-3400
Email: steve.dollar@nortonrosefulbright.com

*Attorneys for BMO Harris Bank, N.A.*

MORRIS JAMES LLP

By:  ___/s/ Stephen M. Miller___
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel:    (302) 888-6853
Fax:    (302) 571-1750
Email: smiller@morrisjames.com


-and-

J. Emmett Murphy (admitted *pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Tel:    (212) 556-2191
Fax:    (212) 556-2222
Email: jemurphy@kslaw.com


-and-

John C. Toro (admitted *pro hac vice*)
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Tel:    (404) 572-2806
Fax:    (404) 572-5100
Email: jtoro@kslaw.com
          pclifton@kslaw.com

*Attorneys for SunTrust Bank*

-17-