# **EXHIBIT J**

RLF1 28568147v.1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |

| | |
|---|---|
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | **Re: Adv. D.I. 248, 249, 252, 284, 285** |
| Defendants. | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
THEIR MOTION TO STRIKE CERTAIN PORTIONS OF
THE RULE 26(a)(2) REPORT OF YVETTE AUSTIN SMITH**

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700

-and-

*List of Counsel Continued on Next Page*

Docket No. 301
Filed: 11/23/22

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7500


-and-


Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone: (212) 558-4000


*Attorneys for JPMorgan Chase Bank, N.A.*

POLSINELLI PC
Christopher A. Ward (No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920


-and-


Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Telephone: (212) 318-3000


*Attorneys for BMO Harris Bank, N.A.*


Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000


*Attorneys for Citibank, N.A.*

MORRIS JAMES LLP
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 888-6853


-and-


J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Telephone: (212) 556-2191


-and-


John C. Toro
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Telephone: (404) 572-2806


*Attorneys for SunTrust Bank*


November 23, 2022

**TABLE OF CONTENTS**

**Page**

SUMMARY OF ARGUMENT ..................................................................................................1

ARGUMENT ........................................................................................................................1

I.      PLAINTIFF FAILS TO SHOW THAT AUSTIN SMITH ADEQUATELY
        EXPLAINED WHY SHE RELIED ON VANTAGE POINT'S WACC BEFORE
        ADOPTING IT ..........................................................................................................1

        A.      Plaintiff's Assertion that Austin Smith Provided an Analysis of Her
                WACC Is Demonstrably False ...................................................................1

                1.      There Is No Mention of the Purported WACC Analysis in Her
                        Report ...............................................................................................2

                2.      Plaintiff's Description of Austin Smith's Purported Analysis
                        Contradicts the Record .....................................................................5

        B.      Plaintiff's Argument that Austin Smith's Deposition Testimony Merely
                "Elaborated" on Opinions in Her Report Is Wrong ..................................8

        C.      Once the Belated Descriptions of Austin Smith's Purported WACC
                Analysis Are Set Aside, Her Adoption of Vantage Point's WACC Must
                Be Excluded ..............................................................................................10

II.     PLAINTIFF FAILS TO SHOW THAT AUSTIN SMITH'S WACC IS
        RELIABLE ...............................................................................................................12

III.    PLAINTIFF FAILS TO SHOW THAT AUSTIN SMITH'S ABILITY TO PAY
        DEBTS AND CAPITAL ADEQUACY TESTS ARE RELIABLE ..................................14

CONCLUSION ......................................................................................................................15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Erecting & Dismantling Co.* v. *U.S. Steel Corp.*,
   2020 WL 4676351 (W.D. Pa. Aug. 12, 2020) .....................................................................11, 12

*Allonhill, LLC* v. *Stewart Lender Servs.*,
   2019 WL 1868610 (Bankr. D. Del. Apr. 25, 2019) ...................................................................13

*Allscripts Healthcare, LLC* v. *Andor Health, LLC*,
   2022 WL 3021560 (D. Del. July 29, 2022) ..........................................................................10, 11

*Bedell* v. *Long Reef Condo. Homeowners Ass'n*,
   2014 WL 1715441 (D.V.I. Apr. 30, 2014) .................................................................................8

*EMC Corp.* v. *Pure Storage, Inc.*,
   154 F. Supp. 3d 81 (D. Del. 2016).............................................................................................15

*Hamlett* v. *Carroll Fulmer Logistics Corp.*,
   176 F. Supp. 3d 1360 (S.D. Ga. 2016)........................................................................................9

*In re Orchard Enters. Inc.*,
   2012 WL 2923305 (Del. Ch. July 18, 2012)..............................................................................13

*In re SemCrude L.P.*,
   648 F. App'x 205 (3d Cir. 2016) ...............................................................................................11

*Insight Equity* v. *Transitions Optical, Inc.*,
   252 F. Supp. 3d 382 (D. Del. 2017)...........................................................................................10

*State Farm Mut. Auto. Ins. Co.* v. *Physiomatrix, Inc.*,
   2014 WL 10294798 (E.D. Mich. June 16, 2014)........................................................................8

*United States* v. *Ahmed*,
   2015 WL 1611947 (E.D.N.Y. Apr. 9, 2015) ..............................................................................3

**Other Authorities**

Fed. R. Civ. P. 26.......................................................................................................................8, 9

Fed. R. Civ. P. 37...........................................................................................................................9

Fed. R. Evid. 702 ...........................................................................................................................9

## SUMMARY OF ARGUMENT

In her report, Austin Smith explicitly borrowed her WACC from a third party: "The discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014." (D.I. 252-64 (Austin Smith Rep.) ¶ 143.)[1] The report does not provide even a cursory explanation for this adoption of Vantage Point's 14.8% WACC. Recognizing that this one sentence is an insufficient basis upon which to support an expert opinion, Plaintiff tries to use his Opposition, D.I. 284, as a "do-over" for Austin Smith's incomplete report. But Plaintiff cannot rewrite the record: no matter how many times he asserts that Austin Smith included this analysis in her report, she did not. Austin Smith's inattention to the WACC calculation is particularly troublesome given that the WACC is a foundational element of her solvency analysis (on which Plaintiff's constructive fraudulent transfer claim rests); even the slightest of WACC adjustments can drastically impact valuation. Plaintiff's slipshod efforts to retroactively fill in the gaps in Austin Smith's opinion show just how far short that opinion falls of the standard for admissibility.

## ARGUMENT

I. **PLAINTIFF FAILS TO SHOW THAT AUSTIN SMITH ADEQUATELY EXPLAINED WHY SHE RELIED ON VANTAGE POINT'S WACC BEFORE ADOPTING IT.**

    A. **Plaintiff's Assertion that Austin Smith Provided an Analysis of Her WACC Is Demonstrably False.**

Plaintiff dedicates six pages of the Opposition to a "Statement of Facts" that, among other things, purports to describe the analysis that Austin Smith performed to determine that 14.8% was the correct WACC to use to value Millennium. (Opp. at 6-12.) None of this was in Austin Smith's

---

[1] All defined terms in this Reply Memorandum shall have the meanings ascribed to them in Defendants' Memorandum of Law in Support of Their Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette Austin Smith, D.I. 249 ("Defendants' Memorandum" or "Defs.' Mem").

report (which, even as Plaintiff describes it in the Opposition, is deficient), and Plaintiff's description of the analysis is riddled with inconsistencies that confirm the analysis was created *post hoc*.

### 1.  **There Is No Mention of the Purported WACC Analysis in Her Report.**

Plaintiff claims that Austin Smith relied on Exhibit 59 to the deposition of Heidi Smith for her analysis of what WACC to use for her valuation of Millennium.  (Opp. at 2, 9.)  Not only was this purported reliance not disclosed in her report, it is belied by it.  Exhibit 59 reflects an analysis under Section 409A of the Internal Revenue Code (the "VPA 409A Analysis") that is (seemingly mistakenly) cited exactly once in Austin Smith's report, *42 pages, 75 paragraphs, or over 150 footnotes away from Austin Smith's single-sentence discussion of her WACC*.  (*Compare* D.I. 252-64 (Austin Smith Rep.) ¶ 68 n.120 *with id.* ¶ 143.)  That citation—to an 82-page document with no pin cite—is cited only for the proposition that "Millennium retained a financial advisor, Vantage Point, to conduct a solvency analysis in connection with the 2014 Transaction," which is entirely unrelated to the VPA 409A Analysis.  The VPA 409A Analysis is never quoted or cited again, and there is no indication in Austin Smith's report that any aspect of that analysis played any role in her determination of the correct WACC (or anything else).[2]

Given this void in her report, Defendants asked Austin Smith during her deposition "why" it was her "opinion that 14.8% is the appropriate WACC to use in this valuation analysis."  (Ex. 5

---

[2]    The VPA 409A Analysis is a "valuation of privately-held equity securities issued as compensation" for purposes of complying with federal tax law.  (D.I. 285-6 (VPA 409A Analysis) at -5686.)  Austin Smith's single citation to that analysis appears to be a mistake, as the proposition that "Millennium retained a financial advisor, Vantage Point, to conduct a solvency analysis in connection with the 2014 Transaction" should have been supported by a citation to Vantage Point's actual—and entirely separate—solvency analysis, which Austin Smith cited to throughout her report.  (*See* D.I. 252-67 (VPA Solvency Analysis).)

(Austin Smith Dep. Tr.) at 116:23-117:3.)[3]   Austin Smith's response extended uninterrupted for three transcript pages (*id.* at 117:4-120:2), but she never once referred to the VPA 409A Analysis, which now, supposedly, is the very document that she "relied on" to understand "[Vantage Point]'s methodology" (Opp. at 14).   In short, there is no evidence in the record to support Plaintiff's *post hoc* argument that Austin Smith relied on the VPA 409A Analysis at all.   Even if the Court were to credit Plaintiff's contention—made for the first time in Plaintiff's Opposition—that the VPA 409A Analysis forms the basis for Austin Smith's adoption of Vantage Point's WACC, a single footnote to an 82-page document with no accompanying explanation provides no information as to why Austin Smith believes that Vantage Point's methodology for determining a WACC was sufficiently reliable for her to adopt it as her own.   *See United States* v. *Ahmed*, 2015 WL 1611947, at *1 (E.D.N.Y. Apr. 9, 2015) ("[P]roviding the [opposing party] with a list of sources from which the experts drew their opinions but not specify[ing] which sources the expert used to reach the different opinions identified is insufficient.") (internal quotation marks omitted) (final alternation in original); (*see also* Defs.' Mem. at 10-12).

Plaintiff insists that "Austin Smith explained . . . in her report" that she "examined and verified [Vantage Point]'s WACC calculations."  (Opp. at 16; *see also id.* at 3, 5, 15, 20, 21, 23.) But Plaintiff points to nothing in support of this assertion.   The portion of the Opposition's Statement of Facts where Plaintiff specifically describes Austin Smith's purported WACC analysis (Opp. at 8-11) contains only three citations to Austin Smith's report:

- *Paragraph 143* (Opp. at 8 n.14, 10 n.22), which states in relevant part that "[t]he discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014.  I also

---

[3]      Citations in the format "Ex. __" refer to exhibits to the Declaration of Mark A. Popovsky, filed concurrently herewith ("Popovsky Decl.").

note that FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%."[4]

- ***Table 7*** (Opp. at 11 n.28), which sets forth possible WACCs ranging from 9.8% to 14.8% in 1% intervals with no explanation as to how those figures were determined or why those specific figures or increments were used.

- ***Footnote 285*** (Opp. at 8 n.16, 11 n.28), which states that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies *plus* the size premium adopted by Vantage Point (*i.e.*, 10.0%). However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparably to Millennium and underestimate Millennium's business risk. Thus, 9.8% underestimates an appropriate WACC for Millennium."[5]

None of these citations comes close to showing that the Opposition's pages-long, after-the-fact explanation of Austin Smith's alleged analysis was included in her report.[6]

Plaintiff's several attempts to characterize Austin Smith's "sensitivity analysis" as somehow offering insight into the underlying WACC calculations miss the mark. The "sensitivity analysis" Plaintiff refers to is Table 7, a chart that shows different valuation ranges based on WACCs from 9.8% to 14.8% in 1% intervals. (D.I. 252-64 (Austin Smith Rep.) Tbl. 7.) There is

---

[4]    Even Plaintiff does not seem to know *who* exactly calculated the WACC. (*Compare* Opp. at 8 (asserting that "Austin Smith calculated a WACC" and "determined that the correct WACC for Millennium at the time of the 2014 Transaction was 14.8%" by "appl[ying] the widely accepted [capital asset pricing model]" (a method of calculating a WACC)), *with* Opp. at 9 (stating that Austin Smith adopted the WACC that "VPA independently calculated").)

[5]    There is no further detail as to how Austin Smith supposedly calculated this 10% WACC.

[6]    Additional citations elsewhere in the Opposition do not help fill the gap. For example, Plaintiff states that "Austin Smith also disclosed that her five selected companies were not sufficiently comparable to Millennium and underestimated its risk, requiring adjustments to be made to account for Millennium's risk." (Opp. at 3.) But the only citation for this proposition not listed above is to a financial model prepared by Millennium's management in June 2015. (D.I. 252-64 (Austin Smith Rep.) at ¶ 122 n.252.) And when Plaintiff asserts that Austin Smith "compar[ed] her calculated WACC with [Vantage Point]'s WACC without the CSRP," he directs the reader to Austin Smith's citation to the VPA 409A Analysis, which of course does not show that Austin Smith conducted such a comparison—much less an analysis of why the results from the purported comparison support her contention that 14.8% is the correct WACC to use. (Opp. at 15 n.45).

4

no accompanying rationale for why Austin Smith chose these WACCs or why this range of WACCs is appropriate. She could have presented the same table had the WACC been 12%, 28%, or any other number, and it would have been equally meaningless.

In an effort to make the "sensitivity analysis" seem more scientific, the Opposition states that the lowest WACC in the table "corresponds . . . to . . . the [Vantage Point] WACC of 14.8% with the CSRP of 5% challenged by Defendants removed." (Opp. at 11.) This is wrong. Putting aside the threshold issue that "the inclusion of a company-specific risk premium has no basis in the field of financial economics" (*see* D.I. 252-65 (Hutton Rep.) ¶ 14), the 5% company-specific risk premium that was included in Vantage Point's WACC cannot simply be added to or subtracted from a final calculated WACC. Rather, according to the very VPA 409A Analysis that Austin Smith purportedly relied on, the company-specific risk premium is part of a company's cost of equity, which itself is an input into the WACC. (*See* D.I. 285-6 (VPA 409A Analysis) at -5731.) In other words, the company-specific risk premium there is an input into an input for the WACC, and does not just get added wholesale to an otherwise fully calculated WACC as Plaintiff erroneously suggests in an attempt to give the "sensitivity analysis" some semblance of meaning.

2. **Plaintiff's Description of Austin Smith's Purported Analysis Contradicts the Record.**

The Opposition's description of Austin Smith's supposed analysis of the WACC is belied by the record in several meaningful ways.

*First*, Vantage Point's stated basis in the VPA 409A Analysis for using a 5% company-specific risk premium undermines the vast majority of Austin Smith's adjustments to Millennium's Management Projections. Notwithstanding Plaintiff's assertion, the VPA 409A Analysis shows that Vantage Point did not use a company-specific risk premium in its WACC to "account for the lack of comparability of the selected companies." (Opp. at 9.) Vantage Point states expressly that

5

its "eight guideline public companies" were "reasonably similar to [Millennium] in size, operations, and industry." (D.I. 285-6 (VPA 409A Analysis) at -5713.) Rather, Vantage Point used the company-specific risk premium to "reflect[] the additional risk of [Millennium] achieving the projections in light of the potential margin compression, due to regulatory changes, competition and forecast risks." (*Id.*) These are, of course, the exact risks that Austin Smith stated in her report that Millennium failed to account for and thus justified her more than $1 billion in downward adjustments to Millennium's revenue projections over five years.[7] It strains credulity to say that Austin Smith "relied" on a document that explicitly states that it inflated the WACC to account for certain risks, while she elsewhere asserts that those very same risks had not been considered, and thus justified her substantial reductions of management's projections. Had Austin Smith relied on the VPA 409A Analysis when she prepared her report, she would have needed to explain, justify, or—at an absolute minimum—acknowledge this blatant double-counting of the purported risks facing Millennium at the time.

*Second*, Plaintiff's assertion that Austin Smith relied on the VPA 409A Analysis to "confirm[] . . . that the comparable companies that [Vantage Point] selected comported with her own independent comparable company analysis" (Opp. at 9) contradicts how Austin Smith described her analysis of Vantage Point's identified comparable companies in her report.[8] There,

---

[7]     (*See* D.I. 252-64 (Austin Smith Rep.) ¶ 7 ("At the time of the 2014 Transaction . . . trends indicated that Millennium was facing significant reimbursement, legal, and regulatory risks and that the company was very likely to encounter slowing or negative growth and declining profitability. The [Management] Projections failed to reasonably account for these risks.").)

[8]     It is also at odds with how Plaintiff has described this "analysis" elsewhere. In the Opposition, Plaintiff asserts that in "[a]pplying CAPM[.] . . . Austin Smith first searched for public companies that were comparable to Millennium from which she could directly derive a beta" and that "Austin Smith identified five." (Opp. at 8.) But in his Opening Brief in Support of its *Daubert* Motion to Exclude the Testimony of Defendants' Proposed Expert Amy Hutton, Plaintiff argued that these five companies "were identified by Austin Smith in a separate context" from the derivation of the beta. (D.I. 256 at 14.)

Austin Smith states (without any mention of the VPA 409A Analysis) that she "considered the comparable companies identified by . . . Vantage Point," "reviewed each of these possible [companies] for comparability" and, "[a]fter careful consideration," "arrived at five potential [comparable companies]."  (D.I. 252-64 (Austin Smith Rep.) ¶¶ 150-51.)  These comparable companies include five of the companies used by Vantage Point, but exclude the other three.  (*Compare id.* ¶ 151 *with* D.I. 252-67 (VPA Solvency Analysis).)  Thus, it cannot be that Austin Smith both excluded certain of Vantage Point's comparable companies from her analysis "[a]fter careful consideration" (D.I. 252-64 (Austin Smith Rep.) ¶ 151) (according to the report) and also "confirmed that the comparable companies that VPA selected comported with her own independent comparable company analysis" (Opp. at 9) (according to the Opposition).

*Third*, Plaintiff references TA Associates' supposed WACC in an effort to bolster the reliability of Austin Smith's 14.8% WACC (Opp. at 10), but Austin Smith did not rely on—or even look at—TA Associates' hurdle rate until after she received Hutton's report.[9]  Plaintiff's further attempt to legitimize Austin Smith's use of the WACC by asserting that "[t]he starting point for TA Associates' analysis was a set of four comparable companies, three of which were included in the five comparable companies Ms. Austin Smith independently identified" (Opp. at 10) cannot be credited, because it is not true.  TA Associates did not use any comparable companies for its "WACC" analysis because its WACC is not a CAPM WACC; it is a hurdle rate-based WACC that reflects "TA's expected equity investment returns." (Ex. 6 (TA Analysis) at 3); *see also* Defs.' Mem. at 7 n.7.)  Rather, TA Associates used its comparable companies in connection with its altogether different multiples analysis.  (*See* Ex. 6 (TA Analysis) at 2.)

---

[9]     (*See* D.I. 252-60 (Austin Smith Dep. Tr.) at 119:4-10 (referring to TA Associates' analysis as "a document that I reviewed actually after I received I believe it was the report of Ms. Hutton").)

7

The inescapable conclusion is that Austin Smith did not rely on the VPA 409A Analysis to determine the WACC, as Plaintiff belatedly claims.

> **B.**     **Plaintiff's Argument that Austin Smith's Deposition Testimony Merely "Elaborated" on Opinions in Her Report Is Wrong.**

Federal Rule of Civil Procedure 26(a)(2) requires an expert to submit a "complete statement of all opinions" and the "reasons for them."  This statement must "disclose[] not only the expert's opinion on a subject, but also 'how' and 'why' the expert reached a particular result." *State Farm Mut. Auto. Ins. Co.* v. *Physiomatrix, Inc.*, 2014 WL 10294798, at *2 (E.D. Mich. June 16, 2014) (internal quotation marks omitted).  And, because "'[t]he purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify,'" the Rule "'does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony.'"  *Bedell* v. *Long Reef Condo. Homeowners Ass'n*, 2014 WL 1715441, at *6 (D.V.I. Apr. 30, 2014) (quoting *Ciomber* v. *Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008)).

Plaintiff's attempts to recast Austin Smith's deposition testimony as a "reasonable synthesis" of her report (Opp. at 19, 20-22) are not credible.  The sum total of Austin Smith's discussion of the WACC in her report is that "[t]he discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014."  (D.I. 252-64 (Austin Smith Rep.) ¶ 143.)  This kind of "one-line ipse dixit conclusion" fails to satisfy Rule 26's requirements because the "report does nothing to provide any link whatsoever between her conclusion and the pieces of evidence and law that she purportedly reviewed." *State Farm*, 2014 WL 10294798, at *3.  It was only at her deposition that Austin Smith stated for the first time that she supposedly performed any analysis *at all* with respect to the WACC, and it was only in Plaintiff's Opposition that Defendants learned on what document that undisclosed analysis supposedly relied.

Plaintiff's contention that the omissions from Austin Smith's report were harmless is easily dismissed. Defendants need not show harm because they have not moved to exclude Austin Smith's opinion pursuant to Rule 37, as Plaintiff suggests (*see* Opp. at 19). Rather, Defendants have moved to strike Austin Smith's use of the 14.8% WACC as *unreliable* pursuant to Federal Rule of Evidence 702, which requires no showing of harm. Defendants do not contend that Austin Smith's WACC analysis must be excluded because it was not contained in her report and therefore her attempts to explain it at her deposition violate Rule 26; rather, Austin Smith's description of her supposed WACC analysis at her deposition should not be considered *because the analysis did not happen*. This is not a procedural argument, but one that goes to the heart of reliability.[10]

In any event, Defendants are prejudiced by Plaintiff's ever-changing story regarding the supposed WACC analysis. Defendants had one sentence to work with when preparing to depose Austin Smith on a key, determinative input in her solvency analysis. They were confronted at her deposition with a vague, evasive, and previously undisclosed explanation to which Defendants' expert was not able to respond. The Opposition is the first time Plaintiff identified the VPA 409 Analysis as the "basis" for Austin Smith's adoption of Vantage Point's WACC, and the underlying calculations therein are different from those Defendants' expert reviewed and critiqued. And the

---

[10] Plaintiff's argument that Defendants cannot possibly have been harmed because they asked Austin Smith questions about the WACC during her deposition (Opp. at 19) is not supported by the law. "To permit procrastinators to point to deposition questions as proof of no prejudice is to neuter the rule and deny adversaries the full benefit of pre-deposition, question-preparation time." *Hamlett* v. *Carroll Fulmer Logistics Corp.*, 176 F. Supp. 3d 1360, 1365 (S.D. Ga. 2016) (concluding that "it is unacceptable to make a party wait, and thus be surprised, at a deposition," and thus "defendants were prejudiced because they were denied, prior to the deposition, the full opportunity to digest [the expert's] information and formulate their deposition questions based on the same"); *Hill*, 2009 WL 3246630, at *3 (noting that the purpose of Rule 26(a) is to "allow[] the opposing party to have all the relevant information in a timely fashion so that the opposing party may prepare to cross-examine the expert during his or her deposition. . . . [I]t is not proper federal practice to assume that one can submit an incomplete expert report only to provide new opinions and/or new information during deposition").

VPA 409A Analysis offers an entirely different explanation for its use of the company-specific risk premium than the one Austin Smith provided in her report (*see supra* pp. 6-7), calling into question the reliability of the rest of Austin Smith's adjustments to the Management Projections.

### C.    Once the Belated Descriptions of Austin Smith's Purported WACC Analysis Are Set Aside, Her Adoption of Vantage Point's WACC Must Be Excluded.

Without the belated attempts to give the impression that Austin Smith conducted some analysis that she did not, all that Plaintiff can point to in support of the reliability of Austin Smith's adoption of the Vantage Point WACC is one sentence in her report. This is plainly insufficient to establish reliability under *ZF Meritor* (*see* Defs.' Mem. at 10-12), and Plaintiff's assertions to the contrary are unconvincing.

As an initial matter, Plaintiff misstates the legal standard for whether reliance on another's estimates is unreliable. Plaintiff's assertion that "'[w]hether the expert relied on the best data in forming his opinions is a question for the jury'" (Opp. at 13 (quoting *Allscripts Healthcare, LLC* v. *Andor Health, LLC*, 2022 WL 3021560, at *15 (D. Del. July 29, 2022))) skips a step. The question is not whether Vantage Point's WACC was correct, but whether Austin Smith adequately "explain[ed] why [s]he relied on such [data] and . . . demonstrate[d] why [s]he believed the estimates were reliable." *Allscripts*, 2022 WL 3021560, at *15. She did not. (*See* Defs.' Mem. at 10-12.)

Plaintiff points to *Insight Equity* v. *Transitions Optical, Inc.* and *Allscripts* as examples where experts adequately explained their justification for relying on the calculations of others in their expert opinions. (Opp. at 15-16.) But these cases are easily distinguished. Unlike here, in *Insight Equity*, the expert relied on a "highly detailed" model created by Plaintiff and explained in his report why he was relying on it. 252 F. Supp. 3d 382, 396 (D. Del. 2017). And in *Allscripts*, the expert *actually conducted an analysis* and discussed the data with the company's management.

2022 WL 3021560, at *17.  That is fundamentally different from this case, where, when asked how Vantage Point's "WACC [would] have changed" if it used different inputs, Austin Smith replied:  "You would have to ask Vantage Point."  (D.I. 252-60 (Austin Smith Dep. Tr.) at 305:10-19.)  Austin Smith relied on Vantage Point's WACC without any understanding of the methodology underlying the calculation.

Plaintiff's contention that *In re SemCrude L.P.* "alone should settle the matter" because, in that case, "the Third Circuit held that an expert was entitled to rely on the contemporaneous valuation performed by a market participant" (Opp. at 16), distorts the holding.  In *SemCrude*, the expert relied on a valuation report prepared by Goldman Sachs to opine that a company was solvent at the time of an equity distribution.  648 F. App'x 205, 213 (3d Cir. 2016).  The court held that *ZF Meritor* did not require exclusion of the expert's opinion for three reasons:  (i) the valuation the expert relied on was prepared contemporaneously and not in anticipation of litigation, (ii) the expert previously worked for Goldman Sachs, and (iii) the expert "did not simply adopt the . . . evaluation as his own," but "used his own analysis and judgment to adjust the [report]."  *Id.* at 213-14.  Despite Plaintiff's assertion, these bases do not mean that an expert is entitled to rely without explanation on a "contemporaneous valuation performed by a market participant."

Plaintiff attempts to distinguish *MOSAID Technologies Inc.*, *Chemipal Ltd.*, and *Jacked Up* by claiming that, in those cases, "experts . . . made no effort to understand the data they relied upon."  (Opp. at 17.)  As Defendants have demonstrated, Austin Smith herself did not show that she made any effort to understand how Vantage Point calculated its WACC, let alone explain why that WACC was calculated correctly.  And Plaintiff's suggestion that *Allied Erecting & Dismantling Co.* v. *United States Steel Corp.* is helpful because, there, "the court rejected an attempt to exclude an expert for supposedly failing to verify data gathered by others" (*id*.)

(emphasis omitted) likewise fails.  In that case, the defendant argued that the testimony of an expert who calculated damages based on the company's own data should be excluded because he failed to independently verify the data.  2020 WL 4676351, at *4 (W.D. Pa. Aug. 12, 2020).  The court declined to exclude the testimony not only because the expert's report showed that he "undertook significant due diligence in formulating his underlying assumptions," but also because the expert had "been directly involved with [the company's] financial matters as their certified public accountant for over forty years."  *Id.*  Neither is true for Austin Smith.

## II.    PLAINTIFF FAILS TO SHOW THAT AUSTIN SMITH'S WACC IS RELIABLE.

As Defendants demonstrated in their opening brief, the 14.8% WACC is unreliable for the independent reasons that it uses a company-specific risk premium and is inconsistent with Austin Smith's opinion regarding comparable companies.  (*See* Defs.' Mem. at 14-16.)  The Opposition fails to rebut this.  Plaintiff asserts that Vantage Point, FTI, and TA Associates' inclusion of a company-specific risk premium "(or equivalent risk premiums) to account for the increased risk of Millennium as compared to those companies" is "strong evidence of the reliability of Austin Smith's inclusion of a CSRP."  (Opp. at 24-25.)  Not so.

*First*, Austin Smith did not *herself* include a company-specific risk premium in the 14.8% WACC; she adopted Vantage Point's WACC that included one.  (*See id.* at 26 (Austin Smith "relied on [the company-specific risk premium] contemporaneously calculated by VPA.").)  Plaintiff's argument, therefore, is a tautology:  Vantage Point's company-specific risk premium was "strong evidence of the reliability" of Vantage Point's company-specific risk premium.  *Second*, FTI used a *different* company-specific risk premium than Vantage Point.  (D.I. 285-8 (FTI Analysis) at -0756.)  Neither Austin Smith nor Plaintiff has offered any explanation for why Vantage Point's company-specific risk premium deserves more credit that FTI's company-specific risk premium—or, for that matter, *any other arbitrary company-specific risk premium*.  And *third*,

12

contrary to Plaintiff's assertion, TA Associates did not use any company-specific risk premium or "equivalent risk premium" in its analysis, which in any event was to calculate a hurdle rate-based WACC and not a CAPM WACC. (Ex. 6 (TA Analysis) at 3.)

Plaintiff also tries to defend the use of a WACC incorporating a company-specific risk premium by arguing that it is "widely accepted by practitioners and courts." (Opp. at 25.) But, as Hutton testified, the use by practitioners is a "shortcut" that has no "theoretical basis" and does not "stack up to the standards that one would want to use when creating a report for the purposes here." (D.I. 256-3 (Hutton Dep. Tr.) at 156:20-158:7.) And while Plaintiff asserts that "Delaware courts have found that use of a CSRP is often appropriate," Plaintiff inaccurately describes the only Delaware case that he cites. (Opp. at 25). Plaintiff states that "in *Allonhill, LLC* v. *Stewart Lender Services*, the court held that an expert erred by failing to include a CSRP." (*Id.*) The court actually determined that it was unreliable that the expert did not adjust his valuation *at all* to account for financial distress, and that a company-specific risk premium was one way to do this. 2019 WL 1868610, at *31 (Bankr. D. Del. Apr. 25, 2019).

Plaintiff's attempt to distinguish the extensive case law disfavoring the use of company-specific risk premiums (Opp. at 25-26) is unpersuasive. For example, Plaintiff asserts that the court in *In re Orchard Enterprises, Inc.* "did not strike the expert's opinion." (Opp. at 26.) But that is because that case was post-trial; the court was not deciding a motion to strike. *See* 2012 WL 2923305, at *1, 21 (Del. Ch. July 18, 2012). Plaintiff's contention that the court "distinguished the situation in that case, where the expert had been directly involved in preparing the management projections, from one in which the 'expert is given management-prepared projections that he believes are inaccurate,' such as occurred here" (Opp. at 26), is both contradictory and meaningless. Here, according to the Opposition's repeated assertions, Austin Smith *did not* use a

WACC with a company-specific risk premium to account for her belief that the management projections were inaccurate—she used it to account for the lack of comparable companies (*see* Opp. at 5, 9, 27). And, of course, Austin Smith separately and substantially adjusts the Management Projections to account for her belief that they are inaccurate (*see supra* p. 6).

With respect to Austin Smith's inconsistent use of comparable companies, Plaintiff's arguments fare no better. Plaintiff states that Austin Smith never opined that her five companies could be used to compute the WACC without adjustment, and that she "validated" Vantage Point's WACC because her five companies were included in its comparable companies. (Opp. at 27-28.) But Defendants' point is that Austin Smith never explained why it was reasonable for her to expressly reject as incomparable three of the companies Vantage Point relied upon for its analysis, yet adopt its WACC. Plaintiff can identify nothing.

## III.    PLAINTIFF FAILS TO SHOW THAT AUSTIN SMITH'S ABILITY TO PAY DEBTS AND CAPITAL ADEQUACY TESTS ARE RELIABLE.

Defendants showed that Austin Smith's ability to pay debts and capital adequacy tests were unreliable because she failed to conclude an essential element: that Millennium could not have refinanced its debt or raised additional capital. (*See* Defs.' Mem. at 18-19.) Plaintiff's attempts to salvage these fatally flawed tests (Opp. at 28-29) are not supported by Austin Smith's actual opinion. Plaintiff states that Austin Smith did make these conclusions because her report states that she did consider the refinancing prospects, and argues that "[t]here [would be] no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021." (*Id.* at 28.) But while Austin Smith includes this language, there is no support in her report for how or why she reached this conclusion, or what she considered in coming to it. All she says is that, under her manufactured scenario where Millennium's revenues are substantially lower than management actually projected, Millennium's leverage ratio would be similar to that of "Caa-C" credits.

14

(D.I. 252-64 (Austin Smith Rep.) ¶ 169.)  There is no explanation as to why this matters, or why it follows from this that Millennium would be unable to repay the loan at maturity.  And there is no mention *at all* of whether Millennium could raise additional capital by other means, including external sources of funding or capital contributions from shareholders.[11]  Plaintiff's argument that her ultimate conclusion means that she "necessarily concluded" that Millennium could not raise additional capital is insufficient.  *See*, *e.g.*, *EMC Corp.* v. *Pure Storage, Inc.*, 154 F. Supp. 3d 81, 92 (D. Del. 2016) ("The expert must explain how and why he or she has reached the conclusion being proffered.").  Plaintiff's complaint that "Defendants' counsel did not ask a single question about" Austin Smith's conclusory assertion that "Millennium would not be able to repay the term loan at maturity" is telling.  (Opp. at 6.)  Recognizing that Austin Smith's report failed to provide the underlying analysis for this conclusion, Plaintiff is apparently aggrieved that Defendants did not give Austin Smith a second chance to fix this fatal error during her deposition.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Defendants' Memorandum, the Court should strike Austin Smith's use of the 14.8% WACC, all aspects of her opinion that rely on it, and the conclusions of her balance sheet, ability to pay debts, and capital adequacy tests.

---

[11]     Plaintiff's statement that Austin Smith "explained that Millennium could not have raised capital through operating cash flows or an alternative credit facility" (Opp. at 29) is false.  The paragraphs cited in support of this statement explain Austin Smith's determination that Millennium would not have retained access to the revolver under her scenario, but do not mention any analysis regarding whether Millennium could have "raised capital through operating cash flows or an alternative credit facility." (*Id.*)

Dated: November 23, 2022
        Wilmington, Delaware

RICHARDS, LAYTON & FINGER, P.A.

By:    /s/ Jason M. Madron
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
       stearn@rlf.com
       madron@rlf.com

-and-

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215
Tel:    (202) 956-7500
Fax:    (202) 293-6330
Email: viapianoc@sullcrom.com
       engebretsono@sullcrom.com
       petifordj@sullcrom.com

-and-

Ann-Elizabeth Ostrager
Mark A. Popovsky
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Tel:    (212) 558-4000
Fax:    (212) 558-3588
Email: ostragerae@sullcrom.com
       popovskym@sullcrom.com

*Attorneys for JPMorgan Chase Bank, N.A.*

RICHARDS, LAYTON & FINGER, P.A.

By:    /s/ Jason M. Madron
Mark D. Collins (No. 2981)
Robert J. Stearn, Jr. (No. 2915)
Jason M. Madron (No. 4431)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Tel:    (302) 651-7700
Fax:    (302) 651-7701
Email: collins@rlf.com
       stearn@rlf.com
       madron@rlf.com

-and-

Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel:    (212) 450-4000
Fax:    (212) 701-5351
Email: ben.kaminetzky@davispolk.com
       lara.buchwald@davispolk.com
       tina.joe@davispolk.com

*Attorneys for Citibank, N.A.*

16

POLSINELLI PC

By:  ___/s/ Christopher A. Ward_____
Christopher A. Ward (No. 3877)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Tel:    (302) 252-0920
Fax:    (302) 252-0921
Email:  cward@polsinelli.com

-and-

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, New York 10019-6022
Tel:    (212) 318-3000
Fax:    (212) 318-3400
Email: steve.dollar@nortonrosefulbright.com

*Attorneys for BMO Harris Bank, N.A.*

MORRIS JAMES LLP

By:  ___/s/ Stephen M. Miller_____
Stephen M. Miller (No. 2610)
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel:    (302) 888-6853
Fax:    (302) 571-1750
Email: smiller@morrisjames.com

-and-

J. Emmett Murphy (admitted *pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York 10036
Tel:    (212) 556-2191
Fax:    (212) 556-2222
Email: jemurphy@kslaw.com

-and-

John C. Toro (admitted *pro hac vice*)
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Tel:    (404) 572-2806
Fax:    (404) 572-5100
Email: jtoro@kslaw.com
        pclifton@kslaw.com

*Attorneys for SunTrust Bank*

17