# EXHIBIT K

RLF1 28568147v.1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>MILLENNIUM LAB HOLDINGS II, LLC, *et al.*,<br><br>                Debtors. | Chapter 11<br><br>Case No. 15-12284 (LSS)<br><br>Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST,<br><br>                Plaintiff,<br><br>                v.<br><br>J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK,<br><br>                Defendants. | Adv. Pro. No. 17-51840 (LSS)<br><br><br>**Re: Adv. D.I. 248, 249, 250, 251, 252, 280, 281, 284, 285** |

**DECLARATION OF MARK A. POPOVSKY IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE CERTAIN PORTIONS OF THE RULE 26(a)(2) REPORT OF YVETTE AUSTIN SMITH**

MARK A. POPOVSKY hereby declares:

1. I am a member in good standing of the Bar of the State of New York and have been admitted *pro hac vice* to practice before this Court. I am a special counsel at the law firm of Sullivan & Cromwell LLP and am counsel to defendant J.P. Morgan Chase Bank, N.A. ("JPMorgan") in the above-captioned adversary proceeding. I submit this declaration in support of Defendants' Motion for Summary Judgment (D.I. 250) and Defendants' Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette Austin Smith (D.I. 253).

2.      Attached hereto as **Exhibit 1** are excerpts from a true and correct copy of the transcript of the October 13, 2021 deposition of Howard Appel in this action.

3.      Attached hereto as **Exhibit 2** are excerpts from a true and correct copy of the transcript of the July 22, 2021 deposition of Ryan Griswold as the corporate representative of JPMorgan in this action.

4.      Attached hereto as **Exhibit 3** are excerpts from a true and correct copy of the script of the 1994 Quentin Tarantino film *Pulp Fiction*.

5.      Attached hereto as **Exhibit 4** are excerpts from a true and correct copy of the transcript of the July 28, 2021 deposition of Phillip Ho as the corporate representative of BMO Harris Bank, N.A., in this action.

6.      Attached hereto as **Exhibit 5** are excerpts from a true and correct copy of the transcript of the May 2, 2022 deposition of Yvette Austin Smith in this action.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of a document entitled "Millennium 4Q13," dated April 23, 2014 and produced in this action in native format, bearing production number TA_MLH-00090312.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in New York, New York on November 23, 2022

/s/ *Mark A. Popovsky*
Mark A. Popovsky

2

# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


In re:                          )
                                )
MILLENNIUM LAB HOLDINGS II) Chapter 11
LLC, et al.,                    )
                                ) Case No. 15-12284 (LSS)
              Debtors.    )
                                )
MARC S. KIRSCHNER solely  )
in his capacity as TRUSTEE)
OF THE MILLENNIUM         ) Jointly Administered
CORPORATE CLAIM TRUST,    )
                                ) Adv. Pro. No. 17-51840 (LSS)
              Plaintiff, )
                                )
        V.                )
                                )
JPMORGAN CHASE BANK, N.A.,)
CITIBANK, N.A., BMO HARRIS)
BANK, N.A., and SUNTRUST  )
BANK,                     )
                                )
        Defendants.       )
_____)


DEPOSITION OF:

                HOWARD APPEL, Volume I

                MONDAY, OCTOBER 4, 2021

                1:00 P.M.




Reported by:   GINA M. CLOUD

                CSR No. 6315

Page 229

MR. PREIS: Same objections.

THE WITNESS: I believe so, yes.

BY MR. POPOVSKY:

Q. And, again, at the time, April 2014 as the term loan was closing, by then, had you learned what the Department of Justice was investigating?

A. I don't remember, but the investigation on Millennium's side was handled by general counsel and outside counsel and possibly, you know, Jim Slattery and Brock Hardaway. I was not involved in the specifics.

Q. And, again, I'm asking around April 2014.

Was responding to the investigation requiring a lot of your attention as president?

A. No. I had very little involvement. It was all handled by others.

Q. Okay. And is it correct that Millennium engaged Skadden Arps as outside counsel to represent the company in the investigation?

A. I think so but then, again, you know, Millennium may have engaged a number of different attorneys and firms. But I wasn't involved in the handling of the investigation.

Q. And again -- around April 2014, sitting here today, do you remember if you had a view then as to

Page 230

how the investigation might end?

MR. PREIS: Same objections.

THE WITNESS: I don't believe I did at that time.

BY MR. POPOVSKY:

Q. And around April 2014, did you participate in any conversations about potential worst case scenarios, conclusions to the investigation, or other potential outcomes that would be bad for the company?

A. I don't remember.

Q. And in April 2014, did you believe Millennium had a strong legal compliance program?

MR. PREIS: Objection. Vague.

THE WITNESS: As I sit here today, yes, I believe that it did.

BY MR. POPOVSKY:

Q. Did you have any knowledge -- again, around April 2014, about the legal compliance programs at Millennium's primary competitors?

MR. PREIS: Objection. Vague.

THE WITNESS: I don't remember.

BY MR. POPOVSKY:

Q. As of April 2014, did you think there was a risk Millennium would have to settle the DOJ

Page 231

investigation for over $250 million?

A. No, I don't believe I knew that -- no, I did not.

Q. And do you remember when you first came to realize that Millennium's settlement with the Department of Justice would be something of that size, $250 million or more?

A. I believe at that point, I was retired, close to retirement, so I simply don't know. I was -- again, I was not involved in the discussions. I never spoke to the Justice Department, so, you know, it was handled by others, not me. So I think it was settled after I had already left the company.

Q. And then turning to the April 2014 term loan itself, did you remember at any point leading up to the closing of the deal having a concern about whether or not Millennium would be able to repay the $1.8 billion in debt through the term loan?

A. No. I don't recall having any concerns at that time, no.

Q. And do you recall anyone else at Millennium expressing concerns about Millennium's ability to repay the term loan before it closed?

A. Nobody expressed it to me, if they did.

Q. I'm sorry. I cut you off.

Page 232

A. If there were those that had concern about it, I don't know. They didn't express it to me. I know I didn't have any concerns.

Q. Okay. What was your role, if any, in Millennium's decision to ultimately take the 2014 term loan?

MR. PREIS: Objection. Vague.

THE WITNESS: At this point in time, when Brock Hardaway was brought in, built his own management team, and I was essentially pushed aside, so I didn't have much involvement at that level on any aspect of the offering, other than attending some presentations on occasion, being on phone calls with Brock and some of the investment bankers, but it's a handful of times.

BY MR. POPOVSKY:

Q. Okay. And you described, to use your words, of being "pushed aside" when Mr. Hardaway came in.

Was that on all issues throughout the company, or were you referring specifically to being pushed aside in connection with the term loan, but not so with respect to other responsibilities you had?

A. The term loan, yes. The financial modeling, yes. I had -- as it progressed, I had much less

17 (Pages 229 - 232)

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

---------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

     Debtors.

MARC S. KIRSCHNER, solely in his

capacity as TRUSTEE OF THE

MILLENNIUM CORPORATE CLAIM TRUST,

      Plaintiffs,

  vs.

JPMORGAN CHASE BANK, N.A.,

CITIBANK N.A., BMO HARRIS BANK,

N.A., and SUNTRUST BANK,

      Defendants.

---------------------------------------X


     "HIGHLY CONFIDENTIAL"

  VIDEOTAPE 30(b)(6) DEPOSITION OF

       RYAN GRISWOLD

    VIA ZOOM VIDEOCONFERENCE

      July 22, 2021

       9:00 a.m.


Reported by:

Maureen Ratto, RPR, CCR

Page 126

GRISWOLD - HIGHLY CONFIDENTIAL

clients. So, you know, we don't look at any -- anything we do as just a transaction.

MR. DeLANGE: If I can get tab 30 marked as Exhibit 292, please?

(Plaintiff Exhibit 292, email dated March 16, 2014, Bates JPMC-00054929 was received and marked on this date for identification.)

CONCIERGE: Introducing 292.

Q. Exhibit 292 is a single page document with two emails Bates numbered JPMC-00054929.

Mr. Griswold, have you seen Exhibit 292 before?

A. I have.

Q. This is an email from you to Mr. Karanikolaidis forwarding an email from Brock Hardaway, correct?

A. Correct.

Q. What part of Millennium's story was Pulp Fiction?

A. None of Millennium's story was

Page 127

GRISWOLD - HIGHLY CONFIDENTIAL

Pulp Fiction. If you want I'll explain it.

So if -- so this was an email where Brock Hardaway, you know, is congratulating us for going to the agencies and helping them with the rating agency presentation.

As Jennifer outlined in her email in your other exhibit, right, there is a ton more work to do, right? You got to go and do lender presentation, you do pre-marketing, pre-marketing lender presentation, a lot of Q and A with investors, just a lot more word ahead.

So I forwarded it to my boss, I wish I hadn't but I did, with -- and we were referring to a line which we commonly refer to in the movie. I can explain it to you in a second. But it was merely a reference to, let's not congratulate ourselves before the whole entire body of work is done and -- and the loan is -- is syndicated.

An agency step is the first

Page 128

GRISWOLD - HIGHLY CONFIDENTIAL

step but we shouldn't be too congratulatory just yet because there is a ton of work to do. So the line in the movie is -- it's really graphic and I don't like repeating it, but it's basically; don't congratulate yourself before the work is done.

Q. And this is based on ongoing discussion you had with your boss regarding the Pulp Fiction movie?

A. Yes.

MR. DeLANGE: Can I have tab 65A marked, please. It will be Exhibit 293.

(Plaintiff Exhibit 293, email dated March 27, 2014, Bates JPMC-MIL-CORP-00045573 was received and marked on this date for identification.)

CONCIERGE: There is 265A's here. Do you want the one that ends in 536?

MR. DeLANGE: Give me one second. I'm sorry. Let me check it

Page 129

GRISWOLD - HIGHLY CONFIDENTIAL

should be 65a that is 4573.

CONCIERGE: Got it.

MS. OSTRAGER: Give us a second.

MR. DeLANGE: Thank you. So it should be, Annie, 65a, it's March 27, 2014 email. Exhibit 293 bears JPMC-MIL-CORP-00045573 through 575. Sorry. That may not have been in the hardcopy.

MS. OSTRAGER: No problem. I think we're set now.

Q. Mr. Griswold, do you have Exhibit 293 in front of you?

A. I do.

Q. Do you recognize this document?

A. Yes. I see that I'm on it, and yes.

Q. Do you recall the attachment which is the highlighted risk factors?

A. Yes.

Q. What do you recall about the highlighted risk factors?

33 (Pages 126 - 129)

# EXHIBIT 3

# PULP FICTION

## by

## Quentin Tarantino & Roger Avary

                        VINCENT
          I got a threshold, Jules. I got a
          threshold for the abuse I'll take. And
          you're crossin' it. I'm a race car and you
          got me in the red. Redline 7000, that's
          where you are. Just know, it's fuckin'
          dangerous to be drivin' a race car when
          it's in the red. It could blow.

                        JULES
          You're gettin' ready to blow? I'm a
          mushroom-cloud-layin' motherfucker! Every
          time my fingers touch brain I'm "SUPERFLY
          T.N.T," I'm the "GUNS OF NAVARONE." I'm
          what Jimmie Walker usta talk about. In
          fact, what the fuck am I doin' in the
          back? You're the motherfucker should be on
          brain detail. We're tradin'. I'm washin'
          windows and you're pickin' up this
          nigger's skull.


INT. CHEVY NOVA - MORNING

The interior of the car has been cleaned and lined with bedspreads
and quilts. Believe it or not, what looked like a portable
slaughterhouse can actually pass for a non-descript vehicle.

The Wolf circles the car examining it.

Jules and Vincent stand aside, their clothes are literally a
bloody mess, but they do have a sense of pride in what a good job
they've done.

                        THE WOLF
          Fine job, gentlemen. We may get out of
          this yet.

                        JIMMIE
          I can't believe that's the same car.

                        THE WOLF
          Well, let's not start suckin' each other's
          dicks quite yet. Phase one is complete,
          clean the car, which moves us right along
          to phase two, clean you two.


EXT. JIMMIE'S BACKYARD - MORNING

Jules and Vincent stand side by side in their black suits, covered
in blood, in Jimmie's backyard. Jimmie holds a plastic Hefty trash
bag, while The Wolf holds a garden hose with one of those guns
nossles attached.

                        THE WOLF
          Strip.

                        VINCENT
          All the way?

# EXHIBIT 4

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

------------------------------------------*

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                    Debtors.

MARC S. KIRSCHNER, solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                    Plaintiffs,

        vs.

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                    Defendants.

------------------------------------------*

            STENOGRAPHIC AND VIDEO-RECORDED

        REMOTE VIRTUAL 30(b)(6) DEPOSITION OF

                    PHILLIP HO

                Wednesday, July 28, 2021

                    9:06 a.m.

Reported by:

Josephine H. Fassett, RPR, CCR

Page 58

HO - BMO Harris

Q. Is this the first time that this dividend recap option was discussed?

A. Well, between us and them, yes. But others might have very likely would have presented it as well to them. So this -- that's a standard. A dividend recap is a very standard transaction involving a private equity sponsored company. Private equity sponsor-owned company. It happens with frequency every year. So it would have been wrong of BMO not to have followed it. It would have been sloppy to not have considered it because it was so prevalent in the leveraged loan market.

Q. And you said others would have discussed it with Millennium?

A. Yeah. I would imagine JPMorgan or --

MR. DOLLAR: Objection. Form.

A. -- JPMorgan or Citi or SunTrust would have, you know, certainly put the idea in front of the company as well.

Q. Okay. And towards the bottom of that bullet you write that this option has appeal because of the tax issue Tom G. discussed. Is Tom G. referring to Tom Glover?

A. Yes.

Page 59

HO - BMO Harris

Q. And what's the --

A. Yes, talking about, I don't remember what the tax issue was specifically, quite frankly.

Q. Okay.

MS. CLARK: Concierge, can you please introduce document 9.

(Presentation titled Millennium Laboratories Strategic Alternatives Follow-Up Discussion, Bates BMO-ML-00015522 to BMO-ML-00015575, marked as Exhibit 321, as of this date.)

BY MS. CLARK:

Q. So Exhibit 321 should be in your exhibit folder. And this is a document beginning Bates BMO-ML-00015522.

And this is another large document, so if you want to take your time to review, my first question will just be: Do you recognize this document?

A. I am reviewing it, but I do recognize it, yes.

Q. Just let me know when you're done reviewing.

Page 60

HO - BMO Harris

A. Okay.

Q. So like the last document or presentation we looked at, there's a list of employees on page 2. Are these the people who would have created this presentation?

A. Yes. Yes, it would have been.

Q. Okay. And then if you could just turn to page 5 titled Situation Overview.

A. Yes.

Q. On that page, the third section is called Additional Management Concerns. Do you see that?

A. Yes.

Q. I'm sorry -- okay. And the second bullet in that section is, "Potential estate planning issues need to be addressed."

What's your understanding of the estate planning issues that are being referenced?

MR. DOLLAR: Objection. Form.

A. I assume it's Jim Slattery's estate.

Q. Had there been discussions of his estate planning issues with -- among BMO?

A. I think it might have come up in the earlier meeting with the Millennium team, but

Page 61

HO - BMO Harris

BMO's not an estate planner or a tax planner, so we would not have been able to provide any assistance there. It was just something to keep in mind.

Q. So I want to turn to page 21 next. And that's titled Transaction Considerations: Dividend Recap.

A. Hold on one second. It's slow.

Yeah, okay.

Q. And this discusses a dividend recap option that BMO wanted to propose to Millennium?

MR. DOLLAR: Objection. Form.

A. Yes.

Q. And below the title there's a dark box on the left-hand side that says Key Transaction Considerations, correct?

A. Yeah.

Q. And the third bullet in that section says, "Institutional investors will require explanation of the Millennium story." Why was this a key consideration?

A. Oh, just the -- this is very typical, right, that you need to sell your -- you need to tell your, your story. How did you get -- where'd

16 (Pages 58 - 61)

# EXHIBIT 5

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


-------------------------------x

MARC S. KIRSCHNER, solely in his

capacity as TRUSTEE OF THE

MILLENNIUM CORPORATE CLAIM TRUST,

         Plaintiffs,

   vs.      Adv. Pro. No. 17-51840(LSS)

JPMORGAN CHASE BANK, N.A.,

CITIBANK N.A., BMO HARRIS BANK,

N.A., and SUNTRUST BANK,

         Defendants.

-------------------------------x



         VIDEOTAPE DEPOSITION OF

          YVETTE AUSTIN SMITH

        VIA ZOOM VIDEOCONFERENCE

             May 2, 2022

              9:00 a.m.




Reported by:

Maureen Ratto, RPR, CCR

CONFIDENTIAL

Page 114

YVETTE AUSTIN SMITH

in which what might be considered "best" is different. But in the mass majority of instances the Capital Asset Pricing Model is the model that is used to develop -- excuse me. The Capital Asset Pricing Model is the methodology that's used to develop the discount rate.

Q. And you mention there are other methodologies that one might use in other circumstances; is that correct?

A. Correct.

Q. What are they?

A. Much less frequently used, two of them are the Fama French Model and the other one is the Arbitrage Pricing -- I forget what the last letter is for. But there are a few other methods that are used in a minority of circumstances. Arbitrage Pricing Theory. Pardon me.

Q. Have you ever, in any valuations you've conducted, have you ever used any of those alternate methods?

A. I don't recall, I know there was a -- I think there was a report some

Page 115

YVETTE AUSTIN SMITH

time ago in which I discussed why I wasn't using Fama French, although there may have been some reason to at least consider it. I don't believe I have used it in a -- certainly in a litigation matter I don't think I've used Arbitrage Pricing Theory. I've used it in my academic -- in an academic setting.

Q. Okay. I think we've both used the term in this discussion, discount rate. Is that the same as a WACC which I understand to be an acronym for weighted average cost of capital? Are those synonymous or are those differences?

A. In this context they're synonymous but in a pure definition they are not synonymous.

So you might use a discount rate to calculate the present values from a financial -- excuse me -- to calculate the present value of cash flows from a financial instrument. That discount rate would not be developed or would not be synonymous with a weighted average cost

Page 116

YVETTE AUSTIN SMITH

of capital. Weighted average cost of capital tends to be a discount rate that is specifically used to value the cash flows of a business enterprise.

Q. And I'd like you to turn to page 79, paragraph 143 of your report, which, again, is Exhibit 1.

A. Yes. I have it in front of me.

Q. I'm going to read from the middle of paragraph 143, but as always you should read whatever is necessary before or after for you to answer the question.

In the middle paragraph 143 you write, "I then discount both the seven year projected cash flows and the terminal value using a weighted average cost of capital (WACC or discount rate) of 14.8%. The discount rate is calculated by Vantage Point for the solvency analysis dated April 30th, 2014."

Is it your opinion that 14.8% is the appropriate WACC to use in this valuation analysis?

Page 117

YVETTE AUSTIN SMITH

A. Yes.

Q. Why is that?

A. So it starts with a, which I describe in my report, the way in which one typically develops a weighted average cost of capital is by reference to observed discount rates and more specifically, observed betas for comparable companies.

So here, which is my typical methodology or typical practice, I sought to first understand whether there were publicly traded companies that were reasonably comparable to Millennium. And although I ultimately identified five companies, as I describe in my report for a variety of reasons, determined those companies were not sufficiently comparable to provide a reasonable estimate of beta and, therefore, a reasonable estimate of weighted cost of capital and that those companies were less risky than Millennium. And the reason why risk matters is because that's

30 (Pages 114 - 117)

CONFIDENTIAL

Page 118

YVETTE AUSTIN SMITH

the factor that most impacts beta.

So I've developed a set of companies, I understood what the implied or observed weighted average cost of capital would be for those companies based on their observed beta and determined that observed weighted average cost of capital was too low.

So then I sought to look at what additional market evidence existed with respect to measuring a more appropriate and accurate weighted average cost of capital for Millennium.

So I do note in the report that management, itself, relied upon a 14.8% WACC in conducting the solvency analysis upon which the April 2004 transaction was based. I then looked at additional market evidence, which was the weighted average cost of capital that FTI derived which, as I say here, was actually quite similar and given that it was for the fresh start accounting directionally it was consistent with my

Page 119

YVETTE AUSTIN SMITH

expectation, which is that the weighted average cost of capital may have actually decreased from the April 2014 date. And then lastly, a document that I reviewed actually after I received I believe it was the report of Ms. Hutton, I looked at a TA Associates analysis and, in fact, they derived a very similar weighted average cost of capital for Millennium.

So understanding the empirical analysis that I had undertaken, developing an opinion based on the facts that are described in the report as to why that observed weighted average cost of capital would be too low, and then looking to at least three market data points that support an upward adjustment to the directly observed WACC and, again, kind of concluding with the fact that the company, itself, relied on that weighted average cost of capital for the solvency opinion, I was very -- I'm quite confident that 14.8 is a quite reasonable estimate for the weighted average cost of

Page 120

YVETTE AUSTIN SMITH

capital for Millennium.

Q. Okay. And you referred toward the end of that answer to three data points. I just want to make sure I have them right.

Those three data points are the Vantage Point number 14.8%, the FTI number, and then something that is not in your report but you subsequently looked at from TA Associates. Were those the three data points you were referencing?

A. That's correct.

Q. And you said -- just one clarification in your answer, at least once maybe twice I think you said management relied on the 14.8% number.

Now, in your report you say that the rate is calculated by Vantage Point. So I just want to make sure I understand this correctly.

You're saying Vantage Point created the number but then management relied on it?

A. That's correct.

Page 121

YVETTE AUSTIN SMITH

Q. Okay. Did they -- when you say "relied on it", are you referencing exclusively the solvency opinion or did they rely on it for any other purposes?

A. Well, they also relied on the 14% developed by FTI for the fresh start accounting.

Q. Right. But the 14.8% that Vantage Point used, I just want to make sure I understand what you mean when you say management relied on it and what I really want to understand is if you are talking about the solvency analysis or if management used that number for any other purposes?

A. I was talking about the solvency analysis.

Q. Okay. Did you independently estimate the WACC to use?

A. I came to an independent conclusion that the directly observed WACC from the -- I'm going to put in quotes, if you will, "comparable companies", because I describe that I

31 (Pages 118 - 121)

# EXHIBIT 6

**<u>Select Directions:</u>**

**1**  Directions for Capital IQ (PLEASE DON'T IGNORE THESE):

 A  <span style="color:blue">Download Capital IQ Excel Plug-in (if you haven't already).  Within Capital IQ home page go to My Capital IQ -> Downloads -> and select Download Excel Plug-in (www.capitaliq.com/ciqdotnet/downloads/downloads.aspx).  Be sure save the plug-in to your DESKTOP when downloading.  Once the plug-in is downloaded a Capital IQ menu bar will appear in your excel workbook</span>

 B  Adjust the following Capital IQ settings in Excel by going to *Capital IQ -> Settings,* which will produce a menu box titled *Capital IQ Excel Plug-in Options & Settings* :

  B1  Select *Default Value* under *Formulas* in the left hand column of the *Capital IQ Excel Plug-in Options & Settings* menu box and change the figure in the white field to "-"

  B2  Select *Currency* under *Formulas* in the left hand column of the *Capital IQ Excel Plug-in Options & Settings* menu box and select *USD US Dollar* in the top white field

 C  To update financial data in Excel for *Public Company Trading Comparables Analysis* go to *Capital IQ -> Refresh Data*

**2**  When modifying roster of trading comps in the *Public Company Trading Comparables Analysis* (see rows 16-30 on worksheet 1) please ensure the same modifications are made to the 3-year historical mean trading multiple calculation (see rows 31-52 on worksheet 1)

**3**  Please take note of directions provided in the RED COMMENT BOXES located in certain cells of various worksheets

**4**  Before submitting quarter end valuations please hard code cells that pull data from Capital IQ.  This involves highlighting the cells, hitting CTRL+C, and then hitting ALT+E+S+V to paste the values. The cells that need to be converted are rows 23-51 in Tab 1.

# Millennium Laboratories

## *Public Company Trading Comparables Analysis*
*Figures in $ millions*

**Summary Information:**

| | |
|---|---|
| Company Name | **Millennium Laboratories** |
| TA Cost - Equity [1] | **$196.0** |
| TA Cost - TEV [1] | **$400.0** |
| Industry | **Specialty Laboratory** |
| SIC Code | |
| Valuation Date | **31-Dec-13** |
| Latest Filing Date | **31-Dec-13** |
| Date of Last Q Close | **31-Dec-13** |

**System:** Any multiples above this figure are considered not meaningful and

**50.0x**  EBITDA Multiple Limit

**Public Trading Comparables:** [2]

**System:** Re-link or hardcode as appropriate when updating.

**System:** Re-link or hardcode as appropriate when updating.

**System:** Re-link or hardcode as appropriate when updating.

| | Trailing Twelve Months (TTM) Metrics | | | | | Market Value | | TEV / TTM Revs | | | TEV / TTM EBITDA [3] [4] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Y/Y | Gross | EBITDA | | | | 3-yr | % Prem. / | | 3-yr | % Prem. / |
| Company | Revs | EBITDA [4] | Revs (%) | Margin | Margin | Equity | TEV | Current | Mean | (Disc.) [5] | Current | Mean | (Disc.) [5] |
| **Millennium Laboratories** | **$632.6** | **$356.7** | **21.2%** | | **56.4%** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| Laboratory Corp. of America Holdings | $5,776.6 | $1,308.6 | 2.6% | 38.7% | 22.7% | $7,985.7 | $10,495.5 | 1.8x | 2.0x | (8.0%) | 8.0x | 8.4x | (4.4%) |
| Quest Diagnostics Inc. | 7,163.3 | 1,456.3 | (2.8%) | 40.2% | 20.3% | 7,786.2 | 11,050.7 | 1.5x | 1.7x | (9.2%) | 7.6x | 7.7x | (1.7%) |
| Bio-Reference Laboratories Inc. | 715.4 | 100.9 | 8.1% | 45.1% | 14.1% | 706.8 | 739.2 | 1.0x | 1.2x | (10.2%) | 7.3x | 8.3x | (12.1%) |
| Mean: | - | - | 2.6% | 41.3% | 19.0% | - | - | 1.5x | 1.6x | (9.1%) | 7.6x | 8.1x | (6.1%) |
| Median: | - | - | 2.6% | 40.2% | 20.3% | - | - | 1.5x | 1.7x | (9.2%) | 7.6x | 8.3x | (4.4%) |

**Quarterly Financial Momentum (Latest Historical Fiscal Year & Projected Fiscal Year):**

**System:** Re-link when updating.

| | Quarter Ended | | | | | | | | Fiscal Year Ended | | | | | Run-Rate | | Run-Rate |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mar-12A | Jun-12A | Sep-12A | Dec-12A | Mar-13A | Jun-13A | Sep-13A | Dec-13A | Dec-09A | Dec-10A | Dec-11A | Dec-12A | Dec-13A | Dec-13A | | Dec-12A |
| Revenue | $82.3 | $139.8 | $136.9 | $163.2 | $155.8 | $148.3 | $162.2 | $166.4 | $66.3 | $161.8 | $232.6 | $522.2 | $632.6 | $665.6 | | $653.0 |
| % Y/Y Growth | 69.2% | 149.4% | 123.8% | 144.3% | 89.4% | 6.0% | 18.5% | 1.9% | 712.4% | 143.9% | 43.8% | 124.5% | 21.2% | 1.9% | | - |
| EBITDA [4] | $39.5 | $92.3 | $86.6 | $111.5 | $83.9 | $84.4 | $98.1 | $90.4 | $43.2 | $104.4 | $114.6 | $329.8 | $356.7 | $361.4 | | $445.80 |
| % Y/Y Growth | 65.9% | 226.8% | 183.2% | 248.1% | 112.5% | (8.6%) | 13.2% | (18.9%) | 710.7% | 141.4% | 9.8% | 187.7% | 8.1% | (18.9%) | | - |
| % Margin | 48.0% | 66.0% | 63.3% | 68.3% | 53.8% | 56.9% | 60.5% | 54.3% | 65.2% | 64.5% | 49.3% | 63.2% | 56.4% | 54.3% | | 68% |

**System:** Re-link when updating.

**System:** Re-link when updating.

**Differences to Comps (Size, Customers - fewer broader):**

**Differences in Business Model:**
Millennium focuses on urine drug testing for the pain management market.

**Balance Sheet:**

**Pricing Risk if Different than Industry:**

**System:** Re-link when updating.

**System:** Re-link when updating.

**Additional Data Points (e.g. offers, equity financings, stock option prices)**
N/A.

**Location**
San Diego, CA

**Conclusion**

**System:** Re-link when updating.

**System:** Re-link when updating.

Public comps have decreased from 8.2x to 7.6x TTM EBITDA. We would recommend valuing at a 25% discount. Further, Millennium closed an acquisition in Q4 for ~$50m, but that there are no earnings in TTM EBITDA from this acquisition. Therefore, from a valuation standpoint, we valued the earnings (at 5.7x, or 25% discount to comps) and then added back the $50m acquisition purchase price to enterprise value to capture the value of the acquisition.

(1) At time of transaction.
(2) Data for publicly-traded comparable companies per *Capital IQ*.
(3) EBITDA multiples that are negative or greater than 50.0x considered not meaningful (NM).
(4) Based on EBITDA excluding stock-based compensation expense.
(5) Current multiple as a % premium / (discount) to 3-year mean multiple.

## Millennium Laboratories

### DCF Analysis
*Figures in $ millions*

| | 2010A | 2011A | 2012A | 2013A | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | Terminal EBITDA [6] | '13-'18 CAGR | Stub 0 ME Q4: 2013 | | Quarter Toggle |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | 0 = | Q4: 2013 |
| Revenues | $161.8 | $232.6 | $522.2 | $632.6 | $740.2 | $866.0 | $1,013.2 | $1,165.2 | $1,340.0 | $1,541.0 | | 15.8% | $162.2 | 1 = | Q1: 2014 |
| % growth | | 43.8% | 124.5% | 21.2% | 17.0% | 17.0% | 17.0% | 15.0% | 15.0% | 15.0% | | | | 2 = | Q2: 2014 |
| | | | | | | | | | | | | | | 3 = | Q3: 2014 |
| EBITDA | $104.4 | $114.6 | $329.8 | $356.7 | $417.3 | $389.7 | $405.3 | $466.1 | $536.0 | $616.4 | $536.00 | 8.1% | $98.1 | | |
| % margin | 64.5% | 49.3% | 63.2% | 56.4% | 56.4% | 45.0% | 40.0% | 40.0% | 40.0% | 40.0% | | | | | |
| Less:  D&A | - | - | - | - | (7.4) | (8.7) | (10.1) | (11.7) | (13.4) | (15.4) | | | (1.6) | | 1.0% |
| Unlevered Pre-tax Income | - | - | - | - | 409.9 | 381.0 | 395.2 | 454.4 | 522.6 | 601.0 | | | $96.4 | | |
| Less: Taxes | - | - | - | - | (153.7) | (142.9) | (148.2) | (170.4) | (196.0) | (225.4) | | | (36.2) | | |
| Plus: D&A | - | - | - | - | 7.4 | 8.7 | 10.1 | 11.7 | 13.4 | 15.4 | | | 1.6 | | |
| Less: CapEx | - | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | | 0.0 | | 0.0% |
| Less: Increase in Net Working Capital | - | - | - | - | (55.5) | (65.0) | (76.0) | (87.4) | (100.5) | (115.6) | | | (12.2) | | 7.5% |
| Unlevered Free Cash Flow | - | - | - | - | $208.1 | $181.9 | $181.1 | $208.3 | $239.5 | $275.5 | 5-Yr | | $49.7 | | |

| | | 12 ME | <-- Indicates Fractional Period --> | | | | 0 ME | Total |
|---|---|---|---|---|---|---|---|---|
| Unlevered Free Cash Flow (5-Yr Period Ending Q4: 2018) | | $208.1 | $181.9 | $181.1 | $208.3 | $239.5 | $0.0 | $1,018.9 |
| Discounted Unlevered Free Cash Flow (5-Yr Period Ending Q4: 2018) | | 186.6 | 131.2 | 105.1 | 97.2 | 89.9 | 0.0 | 610.0 |

| PV Periods - > | 0.500 | 1.500 | 2.500 | 3.500 | 4.500 | 4.500 |
|---|---|---|---|---|---|---|
| 16.0% | 193.2 | 145.6 | 125.0 | 123.9 | 122.8 | 0.0 |
| 18.0% | 191.6 | 141.9 | 119.6 | 116.7 | 113.7 | 0.0 |
| 20.0% | 189.9 | 138.3 | 114.8 | 110.0 | 105.4 | 0.0 |
| 22.0% | 188.4 | 135.0 | 110.2 | 103.8 | 97.9 | 0.0 |

System: "Stub" = total of all current fiscal year quarters completed to date. So when we get to Q3: 2010, the financials below will represent a 9 month period

System: Input applicable quarter based on options

### WACC Calculation

| Capital | Amount | % of Total Cap | Sub Debt Coupon | Cost of Capital Pre-tax | Post-tax |
|---|---|---|---|---|---|
| Equity | $1,585 | 97.0% | | 25.0% | 25.0% |
| Non-TA Debt 1 | 43 | 2.7% | | 4.0% | 2.5% |
| Non-TA Debt 2 | 5 | 0.3% | | 0.0% | 0.0% |
| TA Sub Debt | 0 | 0.0% | 12.0% | 18.0% | 13.5% |
| | | | WACC--> | | 24.3% |
| Tax Rate | 37.5% | | | | |

### Current Credit Yields

| Leveraged Loans [1] | | High Yield Bonds [2] | |
|---|---|---|---|
| Ba3/BB- | 3.7% | BB | 4.8% |
| B1/B+ | 3.6% | B | 5.6% |
| B2/B | 4.6% | CCC | 8.6% |
| B3/B- | 5.7% | | |
| Caa1/CCC+ | 6.9% | | |
| Unrated - <$50M EBITDA [3] | 5.7% | | |
| Unrated - >$50M EBITDA [4] | 4.0% | | |

### Valuation Sensitivity

| | | Terminal Multiple | | | | |
|---|---|---|---|---|---|---|
| | | 5.0x | 6.0x | 7.0x | 8.0x | 9.0x |
| WACC | 16.0% | $1,986.4 | $2,241.6 | $2,496.8 | $2,752.0 | $3,007.2 |
| | 18.0% | 1,855.1 | 2,089.3 | 2,323.6 | 2,557.9 | 2,792.2 |
| | 20.0% | 1,735.6 | 1,951.0 | 2,166.4 | 2,381.8 | 2,597.2 |
| | 22.0% | 1,626.8 | 1,825.2 | 2,023.5 | 2,221.8 | 2,420.1 |

### Valuation

**Free Cash Flows:**

| | |
|---|---|
| 5-Yr Free Cash Flow | $1,018.9 |
| PV of 5-Yr Free Cash Flow [5] | 610.0 |

**Terminal Value:**

| | |
|---|---|
| Terminal TTM EBITDA Mult. | 6.1x |
| Mult by: Terminal EBITDA [6] | 536.0 |
| Terminal Value | 3,276.0 |
| PV of Terminal Value | 1,102.9 |

**Total Enterprise Value (TEV):**

| | |
|---|---|
| PV of Free Cash Flow | $610.0 |
| PV of Terminal Value | 1,102.9 |
| **TEV** | **$1,712.9** |

**DCF Terminal TTM EBITDA Multiple Rationale:**

Hodgkins, Tucker: For unrated loans where portfolio company has >$50M EBITDA

Hodgkins, Tucker: For unrated loans where portfolio company has <$50M EBITDA

System: Based on current market yields for associated rating (refer to Current Credit Yields table)

System: Based on estimated value of equity. Yes, this makes the analysis circular.

System: Based on current market yields for associated rating (refer to Current Credit Yields table)

System: = TA's expected equity investment returns. Do not change.

System: = TA's expected subordinated debt investment returns. Do not change.

(1) Standard & Poor's Leveraged Commentary & Data (LCD) as of December 31, 2008
(2) Credit Suisse High Yield Index as of December 31, 2008
(3) Based on average spreads for average institutional spreads for issuers with <$50M EBITDA
(4) Based on average spreads for average institutional spreads for issuers with >$50M EBITDA.
(5) Discounted using mid-year cash flow convention.
(6) Projected TTM EBITDA as of Q4: 2018

## Millennium Laboratories

### Valuation Summary

*Figures in $*

| | Methodology | |
| --- | --- | --- |
| | **Comps** | **DCF** |
| TTM EBITDA (as of 31-Dec-13) | $356,671,552 | $356,671,552 |
| | | |
| Mean Multiple of Public Trading Comparables [1] | 7.6x | |
| Discount Factor | 25% | |
| Valuation Multiple | 5.7x | 6.1x |
| | | |
| Total Enterprise Value (TEV) ex acquisition [2] | $2,044,959,296 | $1,712,948,051 |
| Q4 Acquisition not reflected in TTM EBITDA | $50,000,000 | $50,000,000 |
| Adjusted Enterprise Value (TEV) | $2,094,959,296 | $1,762,948,051 |
| Less: (Debt) (as of 31-Dec-13) | (371,524,652) | (371,524,652) |
| Plus: Cash (as of 31-Dec-13) | 193,084,932 | 193,084,932 |
| Equity Value | $1,916,519,576 | $1,584,508,331 |
| | | |
| Total Equity Equivalents outstanding (Including Warrants): | 584,132 | 584,132 |
| Value Per Share | $3,280.97 | $2,712.59 |
| | | |
| Total Share Count (Treasury Method) | 570,573 | 570,573 |
| Value Per Share (Treasury Method) | $3,358.94 | $2,777.05 |
| | | |
| TA Equity Funds Shares | 245,860 | 245,860 |
| | | |
| **TA Equity Funds Total Value (Fully Diluted)** | $825,828,949 | $682,765,189 |
| | | |
| Total TA Equity Funds Cost | $196,000,000 | $196,000,000 |
| | | |
| Total TA Equity Funds Value as Mult. of Cost | 4.21x | 3.48x |
| | | |
| Shares Underlying TA Sub Debt Warrants | 0 | 0 |
| | | |
| **TA Sub Debt Warrants Value (Pre-exercise Price)** | $0 | $0 |
| **TA Subordinated Debt Value** | 0 | 0 |
| **Total TA Sub Debt Funds Value** | $0 | $0 |
| | | |
| Total TA Sub Debt Funds Cost | $0 | $0 |
| | | |
| Total TA Sub Debt Funds Value as Mult. of Cost | NA | NA |
| | | |
| TA Shares | 245,860 | 245,860 |
| Total Equity Equivalents outstanding | 584,132 | 584,132 |
| % TA Ownership | 42.1% | 42.1% |
| | | |
| **TA Equity Cushion** | | |
| Net Debt / TTM EBITDA | 0.5x | 0.5x |
| TA Preference Equity / TTM EBITDA | NM | NM |
| Non-TA Junior Equity ("Cushion") / TTM EBITDA | NM | NM |
| TEV / TTM EBITDA | 5.7x | 6.1x |
| | | |
| *Cushion (as % of TEV)* | NM | NM |

| Forecast vs. Sponsor YE Review (Circle one) | | Forecast vs. Previous forecast (Circle one) | |
| --- | --- | --- | --- |
| EBITDA: | Revenues: | EBITDA: | Revenues: |
| > | > | > | > |
| = | = | = | = |
| < | < | < | < |
| If below provide details: | | If below provide details: | |

(1) Multiple for trading comparables methodology based on mean TEV / TTM EBITDA multiple of outlined publicly-traded comparable companies  as of December 31, 2013.  Multiple for DCF methodology based on historical 3-year mean TEV / TTM EBITDA multiple of publicly-traded comparable companies  as of December 31, 2013.

(2) See DCF Analysis page for calculation of figure for DCF methodology.

3                                                                                                                4

## Millennium Laboratories
### *Public Company Trading Comparables Descriptions*

**Laboratory Corp. of America Holdings**

Laboratory Corporation of America Holdings, together with its subsidiaries, operates as an independent clinical laboratory company in the United States. The company offers a range of testing services used by the medical profession in routine testing, patient diagnosis, and in the monitoring and treatment of disease, as well as specialty testing services. Its routine tests include blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, HIV tests, microbiology cultures and procedures, and alcohol and other substance-abuse tests. The company's specialty tests and related services comprise viral load measurements, genotyping and phenotyping, and host genetic factors for infectious diseases; cytogenetic, molecular cytogenetic, biochemical, and molecular genetic tests for diagnostic genetics; oncology testing; clinical trials testing for pharmaceutical companies, which conducts clinical research trials on new drugs or diagnostic assays; forensic identity testing used in criminal proceedings and parentage evaluation services; allergy testing; and occupational testing for the detection of drug and alcohol abuse. Its customers comprise independent physicians and physician groups, hospitals, managed care organizations, governmental agencies, employers, pharmaceutical

**Quest Diagnostics Inc.**

Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. It offers access to diagnostic testing services through its network of laboratories and patient service centers; and interpretive consultation to patients and physicians. The company provides commercial clinical testing services, including routine clinical testing for blood chemistries, complete blood cell counts, urinalyses, pregnancy and other prenatal tests, microbiology testing, alcohol and other substance-abuse tests, and allergy tests; cancer diagnostics, such as anatomic pathology services; and gene-based and other esoteric testing, as well as various risk assessment services for insurance companies. It also provides central laboratory testing in connection with clinical research trials on new drugs, vaccines, and certain medical devices; and clinical testing to employers for the detection of employee use of drugs-of-abuse. In addition, Quest Diagnostics develops and manufactures products that enable healthcare professionals to make healthcare diagnoses, including HerpeSelect ELISA tests that detect patient antibodies to certain types of Herpes Simplex virus, and sells to academic medical centers, hospitals, and commercial laboratories; White Blood

**Bio-Reference Laboratories Inc.**

Bio-Reference Laboratories, Inc. provides clinical laboratory testing services primarily in the greater New York metropolitan area. It offers various chemical diagnostic tests, including blood and urine analysis, blood chemistry, hematology services, serology, radioimmuno analysis, toxicology, pap smears, tissue pathology, and other tissue analysis. The company also operates a clinical knowledge management service unit, which uses customer data from laboratory results, pharmaceutical data, claims data, and other data sources to provide administrative and clinical decision support systems. In addition, it operates a Web-based connectivity portal solution for laboratories and physicians. Bio-Reference Laboratories provides its services directly to physicians, geneticists, hospitals, clinics, and correctional and other health facilities. The company was founded in 1981 and is headquartered in Elmwood Park, New Jersey.

**MEDTOX Scientific Inc.**

MEDTOX Scientific, Inc. and its subsidiaries provide forensic and clinical laboratory services. The company also manufactures and distributes diagnostic and related devices. Its Laboratory Services segment offers drugs-of-abuse testing services. It also provides clinical and other laboratory services, including clinical toxicology, clinical testing for occupational health clinics, clinical testing for physician offices, pediatric lead testing, and analysis of heavy and trace metal. In addition, this segment offers services in the area of logistical support, data management, and program management; and pain management products. Further, it provides clinical trial services comprising central laboratory, assay (test) development, bio-analytical, bio-equivalence, and pharmacokinetic testing services for pharmaceutical and biotech companies, clinical research organizations, research organizations, investigators with trial management, and patient recruitment/enrollment and site management organizations. The company's Product Sales segment offers point-of-collection testing (POCT) products for drugs-of-abuse. It primarily provides diagnostic drug screening products, such as PROFILE-II ER and PROFILE-III ER, and PROFILE-IV to hospital markets for drug detection in patients; MEDTOXScan, an electronic reader for use with PROFILE-V device in hospital laboratories and emergency rooms; and VERDICT-II and SURE-SCREEN diagnostic drug screening products for criminal justice and drug rehabilitation markets. This segment also offers coagulation/blood clotting market controls; and distributes diagnostic tests for the detection of alcohol with the EZ-SCREEN Breath Alcohol Test. The company serves public and private companies, drug treatment counseling centers, criminal justice facilities, occupational health clinics, third party administrators, and hospitals. MEDTOX Scientific, Inc. was founded in 1983 and is based in St. Paul, Minnesota.

| Option Holder | Plan | Exercise Price | # of Options | Option Proceeds |
|---|---|---|---|---|
| Jason Bristol | 2010 | 500 | 1550.55 | $775,275 |
| Nick DePriest | 2010 | 500 | 1550.55 | 775,275 |
| Brandon Worley | 2010 | 500 | 1550.55 | 775,275 |
| Elizabeth Peacock | 2010 | 500 | 1550.55 | 775,275 |
| Martin Price | 2010 | 500 | 2046.72 | 1,023,360 |
| Martin Price | 2010 | 500 | 2108.74 | 1,054,370 |
| Tim Scott | 2010 | 690 | 1550.55 | 1,069,880 |
| Heidi Smith | 2010 | 690 | 1550.55 | 1,069,880 |
| Lynn Willis | 2010 | 690 | 1550.55 | 1,069,880 |
| William Brock Harda | 2010 | 2167 | 11547.36 | 25,023,129 |
| Mark Minham | 2010 | 2167 | 2920.66 | 6,329,070 |
| Tim Kennedy | 2010 | 2167 | 1533.67 | 3,323,463 |
| Tim Kennedy | 2013 | 2167 | 656.82 | 1,423,329 |
| | | **Total** | | **$44,487,460** |