**EXHIBIT B**

Redacted Public Version of Plaintiff's Opening Brief in Support of its Daubert Motion to Exclude the Testimony of Defendants' Proposed Expert Amy Hutton [Adv. Docket No. 256]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| MILLENNIUM LAB HOLDINGS II, LLC, | § | Chapter 11 |
| *et al.*, | § | CASE NO. 15-12284 (LSS) |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

| | | |
|---|---|---|
| | § | |
| MARC S. KIRSCHNER solely in his | § | |
| capacity as TRUSTEE of the | § | |
| MILLENNIUM CORPORATE CLAIM | § | |
| TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | ADVERSARY NO. 17-51840 |
| | § | |
| v. | § | |
| | § | |
| J.P. MORGAN CHASE BANK, N.A., | § | |
| CITIBANK N.A., BMO HARRIS BANK, N.A., | § | |
| and SUNTRUST BANK, | § | |
| | § | |
| Defendants. | § | |

---

### PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF DEFENDANTS' PROPOSED EXPERT AMY HUTTON

MCKOOL SMITH, P.C.
Kyle A. Lonergan
Josh J. Newcomer
Grant L. Johnson
McKool Smith, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York, 10001-8603
Tel: (212) 402-9400
klonergan@mckoolsmith.com
jnewcomer@mckoolSmith.com
gjohnson@mckoolSmith.com

SEITZ, VAN OGTROP & GREEN, P.A
R. Karl Hill (No. 2747)
Jared T. Green (No. 5179)
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel: (302) 888-0600
khill@svglaw.com
jtgreen@svglaw.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................... 1

II.     SUMMARY OF ARGUMENT ............................................................................. 1

III.    STATEMENT OF FACTS ................................................................................... 5

        A.      Millennium's Unlawful Practices ................................................................. 5

        B.      Risks Develop ............................................................................................ 8

        C.      The 2014 Transaction ................................................................................. 9

        D.      Post-Transaction Events and Lawsuit .......................................................... 10

IV.     ARGUMENT .................................................................................................... 10

        A.      Hutton's Opinion Rests On Arbitrary And Ad Hoc Adjustments ........................ 11

                1.      Weighted Average Cost of Capital ......................................................... 12

                        a.      Hutton fails to determine the comparability of the public
                                companies she selects to derive the cost of equity ........................ 13

                        b.      Hutton improperly removes the Company Specific Risk
                                Premium. .................................................................................... 14

                        c.      Hutton improperly removes the small company risk
                                premium. ..................................................................................... 16

                        d.      Hutton fails to apply the other accepted approaches to
                                account for the lack of reliability of her selected public
                                companies. ................................................................................... 17

                        e.      Hutton improperly rejects VPA's selected beta. ............................ 17

                        f.      Hutton cannot save her conclusion by citing the analyses of
                                Arrangers that she does not review for reliability. ........................ 18

                i.      Hutton cherry-picks the third-party WACCs she cites. ......................... 18

                ii.     Hutton fails to assess the Arrangers' WACCs. ................................... 19

                2.      Hutton's ad hoc change to operating expenses is unsupported by
                        reliable fact. ......................................................................................... 19

                        a.      Hutton's speculative cuts to expenses are improperly based
                                on an unreliable document that Hutton did not investigate. .......... 20

                        b.      Hutton cites no evidence that her proposed cuts to expenses
                                were known or knowable as of the 2014 Transaction. .................. 21

       3.      Hutton's restoration of the "emerging opportunities" revenue in the Padres Projections is unreliable. ..................................................................21

       4.      Hutton's restoration of management's growth rates is unreliable. ............23

           a.      Hutton's criticisms are based on false premises. ...........................23

           b.      Hutton ignores the difference between Medicare and commercial payor specimen growth rates......................................24

       5.      Hutton's restoration of volume declines due to the reputational impact of a DOJ settlement is unreliable. ..................................................25

       6.      Hutton's restoration of revenue lost due to denials of Medicare reimbursement due to medically unlikely edits is unreliable......................26

       7.      Hutton's restoration of revenue driven by the POC Test Cup Program is unreliable. .............................................................................27

       8.      Hutton's restoration of revenue based on the assumption that Millennium would continue using custom profiles is unreliable...............28

    B.      Hutton's Ability to Pay and Capital Adequacy test criticisms are unreliable........29

V.      CONCLUSION.......................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allonhill, LLC v. Stewart Lender Servs.*,
2019 Bankr. LEXIS 1304 (Bankr. Del. April 25, 2019)..........................................................15

*Brill v. Marandola*,
540 F. Supp. 2d 563 (E.D. Pa. 2008) .......................................................................................27

*Buchwald v. Renco Grp., Inc.*,
2014 U.S. Dist. LEXIS 197328 (S.D.N.Y. 2014) ...............................................................15, 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..................................................................................................................11

*In re Iridium Operating LLC*,
373 B.R. 283 (Bankr. S.D.N.Y. 2007) ......................................................................................11

*In re Nellson Nutraceutical, Inc.*,
2007 Bankr. LEXIS 99 (Bankr. Del. Jan. 18, 2007).............................................................16, 17

*In re Nellson Nutraceutical, Inc.*,
356 B.R. 364 (Bankr. D. Del. 2006) .....................................................................................11, 27

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)........................................................................................................11

*In re Plassein Intern. Corp.*,
2008 Bankr. LEXIS 1473 (Bankr. D. Del. May 5, 2008) .........................................................20

*Jaasma v. Shell Oil Co.*,
412 F.3d 501 (3d Cir. 2015).....................................................................................................11

*Merion Capital, L.P. v. 3M Cogent, Inc.*,
2013 Del. Ch. LEXIS 172 (Del. Ch. July 8, 2013) .................................................................14

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
971 F.2d 1056 (3d Cir. 1992)....................................................................................................12

*Taylor v. Am. Specialty Retailing Group, Inc.*,
2003 Del. Ch. LEXIS 7 (Del. Ch. July 25, 2003) ....................................................................16

*U.S. Bank Nat'l Assoc. v. Wilm. Tr. Co.*,
426 B.R. 114 (Bankr. D. Del., Apr. 1, 2010).........................................................................15

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012)......................................................................................................21

**OTHER AUTHORITIES**

Federal Rule of Evidence 702.................................................................................................11

Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, LBOs, M&A, and IPO* (3d. ed. 2022) ...............................................................................................12, 13

J.B. Heaton, *Solvency Tests*, The Business Lawyer, ABA (May 2007). ......................................30

Plaintiff Marc S. Kirschner, solely in his capacity as Trustee of the Millennium Corporate Claim Trust (the "Trustee"), respectfully moves for an order excluding testimony by Amy Hutton, the rebuttal solvency expert of Defendants J.P. Morgan Chase Bank, N.A., Citibank N.A., BMO Harris Bank, N.A., and SunTrust Bank (the "Defendants").

## I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Millennium filed its voluntary bankruptcy petition on November 10, 2015[1] and the Debtors' restructuring plan was approved by the Court on December 14, 2015.[2] On November 7, 2017, the Trustee initiated this adversary proceeding against the Defendants, alleging that the Fees paid to the Defendants constituted actual and constructive fraudulent conveyances under Section 548.[3] Defendants filed their Motion to Dismiss the Complaint or to Stay Proceedings on December 13, 2017,[4] alleging that (1) the Trustee failed to plead the badges of fraud, intentional fraudulent transfer, lack of fair market value and reasonably equivalent value, and (2) the case should be stayed pending resolution of the Lender Trust Action.[5] On February 28, 2019, the Court denied Defendants' Motion to Dismiss in its entirety.[6]

## II.   SUMMARY OF ARGUMENT

This is a fraudulent transfer action arising from the bankruptcy of Millennium after it was rendered insolvent by a $1.7 billion syndicated loan in April 2014 that was orchestrated by Defendants and company insiders (the "2014 Transaction"). Millennium was a urine drug testing ("UDT") company in a highly competitive market, and to stay competitive it pushed its practices over the limit, violating various laws and regulations, including Stark and Anti-kickback laws. In

---

[1] 15-CV-12284, D.I. 1.
[2] 15-CV-12284, D.I. 195.
[3] D.I. 1.
[4] D.I. 11.
[5] D.I. 12.
[6] D.I. 52.

the years before the 2014 Transaction, Millennium's house of cards began to fall as it became subject to an investigation by the United States Department of Justice ("DOJ"), multiple lawsuits, and scrutiny by Medicare and commercial payors that severely curtailed reimbursement for its testing.

With the writing on the wall, Defendants and Millennium's insiders decided to cash out. Together, they structured the 2014 Transaction to pay off Millennium's existing debt obligations to Defendants, fund an exorbitant $1.2 billion dividend to insiders, and pay $35.3 million in fees to Defendants. Millennium obtained no value from the 2014 Transaction. To obtain the syndicated loan, Millennium had to generate projected financials that showed its ability to pay its obligations under the $1.7 billion loan. To do this, Millennium produced inflated projections that failed to account for the known constraints it faced (the "Padres Projections"). Millennium provided the Padres Projections to Vantage Point Advisors ("VPA") to provide a solvency opinion. VPA accepted the Padres Projection without confirming them, but independently calculated the company's weighted average cost of capital ("WACC"), which it calculated to be 14.8%.

The Trustee has retained Yvette Austin Smith to opine on Millennium's solvency at the time of the 2014 Transaction. Austin Smith earned an MBA from Columbia University and is a Principal and Chairman of The Brattle Group, an international economic and financial consulting firm. She co-leads the firm's M&A Litigation practice and previously led the firm's Bankruptcy and Restructuring practice. Austin Smith frequently provides subject matter expertise in valuation and credit and solvency analysis in the context of mergers and acquisitions, leveraged buyouts, recapitalization, debt recharacterization, and avoidance actions.[7]

---

[7] Ex. 1 (YAS Report) ¶¶1–5.

Austin Smith performed an independent review of the contemporaneous evidence and concluded that the Padres Projections made a number of unreasonable assumptions under applicable valuation standards. She made necessary adjustments to bring the Padres Projections into compliance with those standards. In her expert opinion, after those adjustments, Millennium was insolvent at the time of the 2014 Transaction under each of the three tests for insolvency.

In response, Defendants designate two experts, Amy Hutton and Branka Matevich. This Motion addresses Hutton's opinion. Hutton does not opine that Millennium was solvent or that the Padres Projections were correctly stated.[8] Instead, she opines that certain, but not all, of Austin Smith's analyses are unsupported and that VPA's WACC calculation was flawed. But, Hutton has virtually no experience performing ground-up valuation or solvency analyses outside of academia.[9] She has never performed an affirmative valuation as an expert in litigation and has only offered rebuttal opinions.[10] She has no experience, inside or outside of academia, analyzing companies in the healthcare industry.[11] She also has no experience valuing a company subject to a DOJ investigation.[12] Her academic orientation infects her opinions here—she is unable to adapt to the practical circumstances faced by valuation experts in the business world and refuses to employ the valuation industry's accepted methodologies to do so.

1.      Hutton challenges the WACC and certain of Austin Smith's adjustments to the Padres Projections. In so doing, Hutton fails to base her opinions on reliable methodology or sufficient facts. For example, Hutton recalculates the WACC and opines that VPA should have used a 7.2% WACC. But when pressed, Hutton refused to opine that 7.2% is the correct WACC.

---

[8] Ex. 3 (Tr. 45:6–51:23.)
[9] *Id*. at 26:20–27:15.
[10] *Id*. at 28:3–13.
[11] *Id.* at 44:4-12.
[12] *Id.* at 44:24–45:5.

Moreover, Hutton's methodology for calculating her 7.2% WACC is flawed. A WACC for a private company like Millennium is derived using the "betas" of comparable public companies that reflect market risk. To arrive at a beta, the expert selects comparable public companies and makes adjustments to account for any lack of comparability—adjustments that were made by VPA and confirmed by Austin Smith using widely accepted practices. Hutton fails to assess the comparability of the companies she uses, does not opine that they are reliably comparable, and makes no adjustment for the lack of comparability.

Valuation experts routinely apply two risk factors when calculating WACC—a small-company risk premium and a company-specific risk premium. Both premiums are widely accepted; and myriad courts have approved of their use by experts. Nevertheless, Hutton rejects both because she finds them "dissatisfying." And, she does not use any other methodology to account for the variance between her selected public companies and Millennium. In fact, Hutton even testifies that a sensitivity analysis is her preferred methodology for addressing such variance, but she fails to use one (unlike both VPA and Austin Smith). Thus, Hutton's WACC calculation and opinions are based on both insufficient fact and unreliable methodology.

Hutton's other criticisms are infected with similar flaws. For example, Hutton opines that Austin Smith should have arbitrarily reduced Millennium's projected expenses, but her proposed cuts were based on her own speculation and an unfounded management presentation made to DOJ well-after the 2014 Transaction. Similarly, she criticizes Austin Smith for excluding revenue from so-called "emerging opportunities" from her valuation, but Hutton conducts no investigation into whether those revenues were supportable and offers no analysis rebutting Austin Smith's conclusion that these revenues lacked any basis in fact.

Hutton also offers unreliable objections to Austin Smith's adjustments to the Padres Projections that accounted for the foreseeable impacts of the discontinuance of Millennium's custom profiles and POC Test Cup program, the reputational impact from a settlement with the DOJ, and the substantial Medicare Medically Unlikely Edits ("MUE's") claim denials Millennium experienced in 2014, along with the unrealistic specimen volume growth forecasts included in the Padres Projections. Hutton does not dispute that these impacts existed, but still decides to "restore" the original Padres Projections without independently verifying her restored data points; rather, she labels them "illustrative." They do not reflect her opinion on the value of Millennium. Thus, Hutton does not opine that her restored inputs are correct or that they result in a correct valuation of Millennium.

Ultimately, Hutton fails to address Millennium's real-world circumstances—its illegal practices, its declining growth, and the dramatically increasing pressures on its ability to obtain reimbursement for its tests—and fails to apply those known facts through accepted methodologies to arrive at a reliable opinion. As a result, Hutton's opinion should be excluded.

III.    STATEMENT OF FACTS

    A.    Millennium's Unlawful Practices

Millennium Laboratories, Inc. ("Millennium") was a urine drug testing ("UDT") company whose primary customers were clinicians using UDT to monitor drug usage by patients.[13] In particular, Millennium offered testing that was frequently used to confirm the results of a point-of-care test performed by a clinician.[14] Millennium also provided "specimen validity testing" to determine whether a urine sample had been adulterated.[15]

---

[13] Ex. 5 (Confidential Information Memorandum, pp. 16, 40.)
[14] Ex. 6 (Millennium Self-Disclosure Statement, p. 4.)
[15] Ex. 7 (Price Depo. Exs. 16 & 17, p. 9.)

In 2010, Millennium began engaging in a number of practices that resulted in a DOJ investigation and competitor and whistleblower lawsuits against it. First, Millennium violated Stark and anti-kickback laws by providing point-of-care testing cups to physicians (the "POC Test Cup" program). Millennium provided the cups, which had value, for free if physicians referred the specimens for follow-up testing to Millennium, thus increasing the number of specimens it tested.[16]

Second, Millennium coerced its prescribing physicians to submit "custom profiles" (pre-filled standing orders that included an excessive number of tests), without regard for the required patient-specific assessment of medical necessity for each test. These custom profiles improperly increased the number of tests Millennium performed per specimen. Millennium internally identified physicians who did not order sufficient tests as "Troubled Practices" and threatened to stop doing business with them unless they increased their orders for tests.[17]

Millennium had substantial warning that these practices violated the Anti-Kickback and Stark laws. "Standing Orders" had long been considered problematic in the industry.[18] And, as early as 2011, Millennium's compliance auditor advised Millennium to cease the POC Test Cup program and that "failure to do so will result in an unreasonable risk of civil, criminal, or administrative law liability."[19] Upon receiving this advice from its compliance auditor, Millennium tried to mitigate the damaging effects of it by telling the auditor not to finalize the report and then ceased using the auditor.[20] Millennium received the same warnings from other sources. For example, Millennium's General Counsel and other senior Millennium executives received a letter

---

[16] E.g., Ex. 8 (2/17/11 Email from Appel to Peacock); Ex. 9 (Specimen Cup Letter).

[17] Ex. 10 (4/8/14 Troubled Practices Presentation to USAO, p. 18); Ex. 11 (Email re Revised 'Why Confirm Every Sample' Document ("If an account does not want a Standing Order in place the 6 drugs . . .we do not want to do business with them.").)

[18] Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45081).

[19] Ex. 12 (11/24/10 Draft Annual 2010 Compliance Audit Report, p. 41.)

[20] Ex. 21 (Price Depo. 52:2–60:15); Ex. 42 (Price Depo. Ex. 6).

written by Millennium's former outside counsel

Millennium's

General Counsel also advised

[22]

The result of these illegal practices was that, in December 2013, Millennium was running approximately 23 tests on average on each specimen, an exceedingly high number.[23] The DOJ, Medicare and commercial payors were focused, among other things, on the impropriety of Millennium charging for confirmatory tests that were medically unnecessary. Commercial payors complained about Millennium's number of tests per specimen and its use of custom profiles, and placed limits on reimbursement for Millennium's testing.[24] The DOJ's investigation similarly focused on the medical necessity of such high volumes of testing, and Millennium's outside counsel included it at the top of its list of "key issues" raised by the DOJ.[25] And, Noridian, Millennium's Medicare Administrative Contractor ("MAC"), had specifically cautioned against the routine use of confirmatory testing as medically unnecessary.[26] For example, Millennium billed for approximately 900,000 tests for the drug PCP, despite the fact that PCP use is uncommon,

---

[21] Ex. 13 (Price Depo. Ex. 10); *see also* Ex. 14 (Price Depo. Ex. 7, p. 1 (". . .

").)

[22] Ex. 13 (Price Depo. Ex. 10, p. 1).

[23] Ex. 1 (YAS Report) ¶ 16.

[24] Ex. 15 (Pencak Depo. Ex. 141, p. 2); Ex. 17 (Tufts Health – Medical Necessity Guidelines at 2).

[25] Ex. 7 (Price Depo. Exs. 16 & 17, pp. 2-11); Ex. 16 (Price Depo. Ex. 18, p. 2).

[26] Ex. 18 (1/1/14 Noridian LCD, p. 3.)

Millennium's patient population was statistically less likely than average to use PCP, and false negatives from point of care testing are extremely rare and thus do not need to be confirmed.[27]

### B.      Risks Develop

By early 2014, Millennium's business was under threat from multiple sources. In 2011, one of Millennium's competitors, Ameritox, filed suit alleging that Millennium's POC Test Cup program violated Stark and anti-kickback laws.[28] By April 2014, the case was heading to trial.

Second, multiple whistleblowers had filed lawsuits against Millennium, detailing the company's illegal business activities from the inside, and in 2012, the DOJ began a criminal and civil investigation into Millennium's business.  By early 2014, Millennium had responded to many DOJ subpoenas; made presentations to the government on multiple occasions; and entered into a tolling agreement with the government for criminal and civil claims.[29] Millennium was aware that DOJ was investigating several of its business practices that resulted in medically unnecessary tests, including the POC Test Program and Millennium's use of custom profiles.[30]

Third, in mid-2013, consistent with increasing reimbursement scrutiny in the UDT industry, the Center for Medicare Services ("CMS") announced that it would be changing the methodology for processing claims relating to certain billing codes, the effect of which would be to make it more likely that claims submitted by Millennium would exceed the applicable limits and consequently be rejected in their entirety. Such rejected claims are known as "Medically Unlikely Edits" ("MUE's").[31] By at least early 2014, Millennium was aware that a significant

---

[27] Ex. 19 (DOJ Complaint) ¶ 133.

[28] Ex. 20 (*Ameritox, Ltd v. Millennium Laboratories, Inc*, April 8, 2011, 8:11-cv-775-T-24-TBM.)

[29] Ex. 22 (Price Deposition at 24:18–34:15, 132:8–136:6, 218:16–221:21); Ex. 7 (Price Depo. Exs. 16 & 17, pp. 5, 10); Ex. 22 (Tolling Agreement).

[30] *See generally* Ex. 7 (Price Depo. Exs. 16 & 17.)

[31] *See generally* Ex. 23 (DHHS-CMS Revised Modification to MUE Program); Ex. 1 (YAS Report) ¶¶ 111–14.

number of its claims were being rejected, and ultimately it had to write-off $27 million of MUEs from the first half of 2014.[32]

Fourth, in early 2014, Noridian, Millennium's MAC, issued a new draft "Local Coverage Determination" ("LCD") policy.[33] The new LCD reiterated that Millennium had to provide proof of "medical necessity" in order to receive reimbursement for its testing, and limited the types of testing that would be routinely reimbursed. This was inconsistent with the use of custom profiles.[34] Millennium was advised by Avalere, an industry consultant, that the new policy was likely to be adopted.[35] Internally, Millennium estimated a reduction of 18.3% to 33.3% of its Net Revenue Per Specimen ("NRPS").[36]

## C.    The 2014 Transaction

In the shadow of these known threats to Millennium's business, Millennium's insiders and the Defendants decided to cash out. To do so, they jointly put together the syndicated loan transaction, Defendants solicited outside investors to purchase Notes, and the loan proceeds were used to pay back loans previously provided to Millennium by Defendants and fund a special dividend of over $1 billion to Millennium's insiders, leaving nothing for Millennium. To support the transaction, Millennium created inflated financial projections (referred to as the "Padres Projections"). Millennium provided these financials to VPA, which performed a solvency analysis.[37] Pursuant to its engagement letter, VPA relied on the Padres Projections without any

---

[32] Ex. 24 ("2/14/14 "Re: Medicare" e-mail); Ex. 25 (2/21/14 "RE: Noridian" email); Ex. 26 (3/18/14 "Medicare MUE – update on denials" email).

[33] Ex. 18 (1/1/14 Noridian LCD.)

[34] *Id.* at 3.

[35] Ex. 27 (2/21/14 Draft Avalere Coding and Reimbursement Assessment at pp. 4 & 44.)

[36] Ex. 28 (2/5/14 Pencak email, p. 1); Ex. 29 (Pencak Depo. Ex. 165); Ex. 30 (2/3/14 Adams email).

[37] Ex. 32 (4/16/2014 VPA FMV Analysis, p. 3); Ex. 33 (4/30/14 VPA Solvency Analysis Presentation, p. 15).

9

independent verification of them.[38] As relevant to this motion, VPA's independent input into the solvency analysis was its calculation of the weighted average cost of capital ("WACC").[39]

Critically, the Padres Projections failed to account for the known and reasonably foreseeable impacts of the Ameritox Litigation, the DOJ Investigation, CMS's new MUE policy, the discontinuation of custom profiles, and the draft LCD policy. Backed by the inflated Padres Projections, Millennium and the Defendants closed the 2014 Transaction in April 2014.

### D.      Post-Transaction Events and Lawsuit

On June 16, 2014, a verdict was rendered against Millennium in the Ameritox trial, leading J.P. Morgan to conclude that Millennium's valuation had been reduced by $500 million. Millennium responded to the verdict by canceling its POC Test Cup program and submitting a Voluntary Self-Referral Disclosure to CMS showing more than $90 million in liability for this one program alone. The DOJ later intervened in False Claims Actions against Millennium, alleging violations of the Anti-Kickback and Stark laws based on the POC Test Cup program and the use of custom profiles. Millennium eventually settled these claims in October 2015 for $256 million. Following the settlement, Millennium filed a voluntary chapter 11 petition in this Court. The restructuring plan resulted in the creation of two litigation trusts. In his capacity as the Trustee of the Corporate Claim Trust, the Trustee initiated this adversary proceeding against the Defendants, alleging that the fees paid to the Defendants constituted fraudulent transfers.

### IV.   ARGUMENT

Hutton's opinion should be excluded because it is not based on sufficient facts and is not the product of the reliable application of the facts to accepted methodologies. Federal Rule of

---

[38] *Id.*

[39] Ex. 1 (YAS Report) ¶ 68 & n.122 (comparing Padres Projections and VPA analysis).)

Evidence 702 provides that a person qualified by "knowledge, skill, experience, training, or education" may provide expert opinion and testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Hutton fails to satisfy these threshold requirements.

### A.    Hutton's Opinion Rests On Arbitrary And Ad Hoc Adjustments

Hutton's opinions rest on unreliable methodologies and insufficient facts. "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."[40] An expert opinion must be based on "sufficient facts and data."[41] This Court has explained that "if the factual basis of an expert's opinion is so fundamentally unsupported because the expert fully relies on altered facts and speculation, or fails to consider relevant facts in reaching a conclusion, the expert's opinion can offer no assistance to the trier of fact."[42] Since testimony must be supported by "'good grounds', based on what is known,"[43] courts exclude experts from testifying when the "expert made no attempt to reconcile his view with a number of real world events and fails to acknowledge and account for these events."[44] This is particularly true of opinions about management projections, which tend to be optimistic.[45]

---

[40] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

[41] *See Jaasma v. Shell Oil Co.*, 412 F.3d 501, 513 (3d Cir. 2015).

[42] *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 373 (Bankr. D. Del. 2006).

[43] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993).

[44] *In re Iridium Operating LLC*, 373 B.R. 283, 350 (Bankr. S.D.N.Y. 2007).

[45] *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992) ("Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance.").

Hutton's opinion has multiple fatal shortcomings: (1) arbitrarily reducing the Weighted Average Cost of Capital (WACC); (2) incorporating speculative reductions in Millennium's operating expenses; (3) incorporating speculative revenues attributed to so-called "emerging opportunities"; (4) accepting improbable specimen growth rates that were inconsistent with Millennium's consistently declining growth trends; (5) disregarding the reputational impact Millennium would suffer as a result of a DOJ settlement; (6) failing to account for MUE denials; (7) assuming the POC Test Cup program would continue indefinitely; and (8) including revenue generated from custom profiles. These errors undermine Hutton's opinions concerning the Balance Sheet test, as well as her opinions regarding the Ability to Pay and Adequate Capital tests for solvency. Moreover, beyond these individual flaws, Hutton's opinion fails because she does not stand by it—she proffers numerous adjustments to the Padres Projections while insisting they are merely "illustrative."[46] Hutton's opinion should be excluded accordingly.

### 1.    Weighted Average Cost of Capital

Hutton's criticism of the WACC used by Austin Smith and VPA is based on insufficient facts and unreliable methodologies. When performing balance sheet solvency tests using a discounted cash flow ("DCF") model, it is an accepted industry standard practice to discount future cash flows by a weighted average cost of capital ("WACC") and to stress test the selected WACC using a sensitivity analysis.[47] Austin Smith follows VPA's contemporaneous, independent analysis in using these widely accepted methods to arrive at a WACC of 14.8%, and further confirms this

---

[46] *See, e.g.*, Ex. 3 (Tr. 286:25).

[47] Ex. 1 (YAS Report) ¶ 143; Ex. 2 (Hutton Report) Appendix F; Ex. 34 (Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, LBOs, M&A, and IPO*, 131, 145 (3d. ed. 2022)).

measure using other third-parties' contemporaneous analyses.[48] She also uses a sensitivity analysis to show Millennium's insolvency at various lower WACCs.[49]

Hutton rejects this measure and recalculates a far lower WACC of 7.2% without providing a sensitivity analysis.[50] But, when cross examined on whether 7.2% was the correct WACC for Millennium at the time of the 2014 Transaction, Hutton declined to say that it was.[51] Hutton derives her 7.2% WACC by making four changes to VPA's WACC calculation: (1) altering the companies used to estimate Millennium's "cost of equity"; (2) removing a "company specific risk premium" (CSRP); (3) removing a "small company risk premium"; and (4) directly reducing the "cost of equity" used by VPA.[52] These alterations are not based on sufficient facts or industry accepted valuation methodologies, rendering Hutton's WACC calculation unreliable.

### a. Hutton fails to determine the comparability of the public companies she selects to derive the cost of equity

Hutton's alteration to the "cost of equity" is arbitrary and unsupported. The "cost of equity" element of the WACC calculation is derived from a company's "beta." Hutton explained that the "beta" "indicates the stock's risk relative to the average risk of the stocks in a market index."[53] In the case of a private company—like Millennium, the experts agree that it is appropriate to look to comparable public companies to derive an appropriate beta.[54] But, it is incumbent on the expert to have a reliable basis for using the selected companies. Hutton fails to do so.

---

[48] *See* Ex. 1 (YAS Report) ¶ 143.
[49] *Id.* ¶ 148.
[50] Ex. 2 (Hutton Report) ¶¶ 32–42.
[51] Ex. 3 (Tr. 206:18-207:10 ("I did not derive from bottoms-up my own WACC")).
[52] Ex. 2 (Hutton Report) ¶¶ 32–42.
[53] *Id.* Appendix F ¶ 4 (internal quotation marks and brackets omitted).
[54] *Id.*; Ex. 41 (YAS Tr. 117:4–10); *see also* Ex. 34 (Joshua Rosenbaum and Joshua Pearl, *Investment Banking: Valuation, LBOs, M&A, and IPO*, 131, 145 (3d. ed. 2022)).

Hutton calculates a beta by looking at a subset of five of the eight companies selected by VPA.[55] Nobody—not Hutton, not VPA, not Austin Smith—opines that the five companies Hutton used were sufficiently comparable such that Millennium's WACC could be directly derived from their beta without adjustment. Yet, Hutton uses the beta of these five companies to calculate Millennium's WACC without making any adjustments to account for the lack of comparability. Hutton offers no explanation for her decision to use these companies—apart from pointing to the fact that they were identified by Austin Smith in a separate context (a Guidelines Public Company analysis) in which Austin Smith determined that those companies were not sufficiently comparable to directly derive a multiple for valuation purposes and were less risky than Millennium.[56] And Hutton admits that she did not independently assess or conclude that the companies were comparable to Millennium.[57] This renders her opinion unreliable.

### b.    Hutton improperly removes the Company Specific Risk Premium.

Despite the fact that Hutton does not opine that her identified public companies were comparable, she removes the CSRP that VPA, which partially accounts for the lack of comparability of the companies VPA selected. Hutton's decision to remove the CSRP conflicts with both accepted practice and Hutton's prior testimony. Because comparable companies are only helpful in deriving a beta to the extent they do, in fact, represent a comparable market risk,[58] practitioners apply a CSRP to account for the differences between the comparable public

---

[55] Ex. 2 (Hutton Report) Appendix F ¶ 9.

[56]  Ex. 1 (YAS Report) ¶ 44.

[57] Ex. 3 (Tr. 143:20–144:11 ("So I've not examined these eight companies in detail and I've not thought about how VPA came to the conclusion . . . .").)

[58] Delaware courts have declined to give weight to companies that are not sufficiently comparable. *See Merion Capital, L.P. v. 3M Cogent, Inc.*, 2013 Del. Ch. LEXIS 172, *18–24, 61–63 (Del. Ch. July 8, 2013).

companies used to derive market beta and the market of the target private company.[59] In this case, after reviewing the underlying companies, VPA used (and Austin Smith adopts) a CSRP of 5% because the comparable companies did not account for Millennium's market risk.[60]

Hutton acknowledges that lack of comparability can seriously impair the appropriateness of a beta derived from selected public companies.[61] But she justifies removing the CSRP on the ground that a WACC should *never* include a CSRP.[62] Hutton's blanket rejection of a CSRP is squarely at odds with widely accepted practice.[63] Hutton admits that practitioners frequently use a CSRP.[64] Courts, too, have frequently applied CSRPs.[65] Indeed, courts frequently weigh the appropriateness of competing experts' CSRPs because experts on both sides of valuations agree that they are necessary to arrive at a reliable WACC.[66] Hutton admitted that she did not understand why practitioners and courts use that approach.[67] Instead, she could only say that she rejected it because it was academically "dissatisfying" to her.[68]

Hutton's dissatisfaction, however, appears to be specific to this case. Hutton advocated for the application of a company-specific adjustment to WACC in a prior case. In that case, she opined:

---

[59] *Buchwald v. Renco Grp., Inc.*, 2014 U.S. Dist. LEXIS 197328, at *16–27 (S.D.N.Y. 2014).

[60] *See* Ex. 33 (4/30/14 VPA Solvency Presentation, p. 20); Ex. 2 (Hutton Report) Exhibit 4.

[61] Ex. 3 (Tr. 117:15–120:11.)

[62] Ex. 2 (Hutton Report) ¶ 36; *see also* Ex. 3 (Tr. 156:20-22 ("[T]here is no basis, theoretical basis, for using a company-specific risk premium.").)

[63] *Buchwald*, 2014 U.S. Dist. LEXIS 197328, at *18 (citing Israel Shaked & Robert Reilly, ABI, *A Practical Guide to Bankruptcy Valuation* 19 (2013) ("The CSRP is a component of each generally accepted cost of equity capital model.").

[64] Ex. 3 (Tr. 157:19–159:11, 198:17–198:20 ("So I am aware of the fact practitioners – we see it, right – practitioners had company-specific factors.").)

[65] *See Allonhill, LLC v. Stewart Lender Servs.*, 2019 Bankr. LEXIS 1304, *97–98 (Bankr. Del. April 25, 2019) (expert erred by failing to include a CSRP); *Buchwald*, 2014 U.S. Dist. LEXIS 197328, at *16–27 (accepting expert's use of a CSRP).

[66] *See, e.g., U.S. Bank Nat'l Assoc. v. Wilm. Tr. Co.*, 426 B.R. 114 (Bankr. D. Del., Apr. 1, 2010).

[67] Ex. 3 (Tr. 157:19–159:11, 198:17–212.)

[68] Ex. 3 (Tr. 211:10–14.)

"Given the riskiness of the projected cash flows of the ListHub Platform products, management's proposed WACC of 15.3% is not an appropriate discount rate . . . . Usually, a higher discount rate is applied to new, unproven investments."[69] In other words, Hutton was saying that the WACC needed to be adjusted to account for the company-specific risk profile of ListHub.[70] Both her departure from a methodology that she previously testified was sound and her willingness to change her opinions to suit this case shows that her testimony is unreliable.

<h3>c.      Hutton improperly removes the small company risk premium.</h3>

Hutton's removal of the small company risk premium is an arbitrary departure from a widely accepted methodology. The small company risk premium is applied by valuation experts to adjust the WACC to account for observed differences between returns on large and small cap stocks.[71] As with the company specific risk premium, Hutton justifies her decision by claiming that such a premium is *never* appropriate because it is unsupported in theory.[72]

Hutton's assertion squarely conflicts with established case law and the wide acceptance of size risk premiums by valuation experts.[73] Hutton admits that a small company risk premium is widely used by practitioners and subject to published metrics.[74] Indeed, published reference

---

[69] Ex. 35 (Decl. of Hutton, *Move, Inc. v. Zillow, Inc.*, No. 14-2-07669-0, at ¶ 42 (Wash. Sup. Ct. April 19, 2016) ("Hutton *Move* Declaration").)

[70] Under cross-examination, Hutton attempted to deflect this inconsistency by claiming that the adjustment she said was necessary in *Zillow* was really an adjustment to a "hurdle rate," not a WACC. Ex. 3 (Tr. 33:13–37:20.) But, in her Zillow opinion, she repeatedly identified it as a "WACC," and *nowhere* does she describe it as a "hurdle rate."

[71] *See Buchwald*, 2014 U.S. Dist. LEXIS 197328 at *27–31 ("[S]ize risk premiums are often added to CAPM models based on the 'empirical observation that companies of smaller size are associated with greater risk and, therefore, have greater cost of capital.'" (quoting Pratt & Grabowski, *Cost of Capital*, ch. 15 (2010)).

[72] Ex. 2 (Hutton Report) ¶ 26.

[73] *In re Nellson Nutraceutical, Inc.*, 2007 Bankr. LEXIS 99, at *107-09 (Bankr. Del. Jan. 18, 2007) (size risk premium); *Taylor v. Am. Specialty Retailing Group, Inc.*, 2003 Del. Ch. LEXIS 7, at *18–21 (Del. Ch. July 25, 2003) (same).

[74] *See, e.g.*, Ex. 3 (Tr. 203:19–21, 210:19.)

materials establish the appropriate small company risk premiums applied by company size.[75] Even a treatise cited by Hutton shows an example of the use of a small company risk premium.[76] Her decision to eliminate the small company risk premium because she believes it is never appropriate to use despite its wide acceptance by experts and the courts demonstrates that her opinion is not based on a reliable methodology.[77]

> ### d. Hutton fails to apply the other accepted approaches to account for the lack of reliability of her selected public companies.

When acknowledging the importance of accounting for a lack of comparable public companies, Hutton identified possible solutions, including sensitivity analyses or directly adjusting beta or cash flows. However, Hutton fails to apply any of these methodologies.[78] In *Move.com*, Hutton claimed that the "best approach" for selecting an appropriate discount rate is to conduct a "sensitivity analysis" and faulted another expert for failing to perform one.[79] Here, both Austin Smith and VPA performed sensitivity analyses.[80] Hutton did not.[81]

> ### e. Hutton improperly rejects VPA's selected beta.

Hutton adjusts VPA's beta on the supposed grounds that VPA did not use the exact median of the betas of the public companies it examined. Hutton offers no methodological reason why it

---

[75] *See In re Nellson Nutraceutical, Inc.*, 2007 Bankr. LEXIS 99, at *108 (noting existence of standardized sources).

[76] *See* Ex. 36 (Holthausen & Zmijewski, Corporate Valuation at 327.)

[77] Recognizing the problem with her categorical position, Hutton reverses herself and calculates an alternative discount rate that includes the small company risk premium. Ex. 2 (Hutton Report) ¶ 26 n.70. She attempts to justify this by saying that it would be within the range of a sensitivity analysis. Ex. 3 (Tr. 209:23–210:11.) But, she neither performs a sensitivity analysis nor is it methodologically sound to use an incorrect WACC on the assumption that it is within the sensitivity range created from a different WACC.

[78] Ex. 3 (Tr. 135:14–136:7); *see also* Ex. 3 (153:2–12, 157:16–18).

[79] Ex. 35 (Hutton *Move* Declaration at ¶ 42.)

[80] Ex. 1 (YAS Report) ¶ 148; Ex. 33 (4/30/14 VPA Solvency Presentation at 17).

[81] *See* Ex. 3 (Tr. 37:21–38:24, 40:2–42:24.)

is necessary to use the exact median (and in fact VPA lists a range of percentiles).[82] And, as noted above, Hutton testifies that directly adjusting the beta as VPA did is an acceptable way to account for a lack of comparable public companies. But, Hutton revises the beta in the wrong direction— she makes Millennium appear less risky, which is the exact opposite of what an expert should do when the company being valued is *more risky* than the selected comparable companies.[83]

At base, Hutton calculates an admittedly incorrect beta without adjustment from companies that nobody—including her—opined were sufficiently comparable to do so, and makes no attempt to apply accepted methodological adjustments to that unreliable and incorrect WACC.

### f. Hutton cannot save her conclusion by citing the analyses of Arrangers that she does not review for reliability.

Hutton attempts to buttress her WACC by citing to analyses performed by the Arrangers (the Defendants in this case).[84] But, her methodology is flawed.

### i. Hutton cherry-picks the third-party WACCs she cites.

Hutton's citation to the Arrangers' WACCs improperly excludes other analyses. For example, Hutton does not include the WACC calculated by VPA—whose job it was to value Millennium from a neutral perspective at the time of the 2014 Transaction. And, she ignores both the WACC calculated by Millennium's private equity investor, TA Associates, which applied a WACC of 24.3% (significantly higher than VPA's WACC), and the WACC calculated by FTI, which neutrally considered Millennium's risk and used a WACC of 14%, nearly identical to the WACC used by Austin Smith.[85] Hutton's selection bias renders her conclusion unreliable.

---

[82] Ex. 2 (Hutton Report) Appendix F ¶ 8; Ex. 33 (4/30/14 VPA Solvency Presentation at 17).

[83] Ex. 3 (Tr. 132:13-20 ("So if you don't think you've got comparables to estimate your beta, well, you should change your beta estimate . . . And in fact in the underlying materials, Ms. Austin Smith does adjust the beta.").)

[84] Ex. 2 (Hutton Report) ¶ 33 & Ex. 3.

[85] Ex. 33 (4/30/14 VPA Solvency Presentation at 20); Ex. 37 (TA Advisors Analysis, Tab 2); Ex. 38 (4/10/16 FTI Consulting Valuation at 7).

### ii.    Hutton fails to assess the Arrangers' WACCs.

Hutton admits that she did not assess the Arrangers' analyses or conclude that they were reliable.[86] Hutton was unaware of the comparable companies used by the Arrangers or how they were selected and performed no verification that the companies were comparable.[87] For example, Citibank used as a comparable company Catamaran Corporation, which was in the business of "pharmacy benefit management." When crossed on whether this is comparable to Millennium's business, Hutton admitted: "I have not analyzed the details of Catamaran's business relative to Millennium's business."[88] In another example, an Arranger used Advisory Board Company, a research and consulting business. When asked if she considers that company comparable to Millennium's business, she admitted, "I did not study these companies." This is true for each of the Arrangers and each of the comparable companies they selected: "So I did not analyze the comparable companies that are in these different reports …."[89] Hutton cannot save her opinion by selectively pointing to the work of others that she made no effort to assess or validate.

In sum, Hutton's proposed WACC of 7.2% is based on insufficient facts and an unreliable methodology. Her testimony should be excluded accordingly.

### 2.    Hutton's ad hoc change to operating expenses is unsupported by reliable fact.

Hutton also criticizes Austin Smith's projection of operating expenses.[90] Hutton's criticism is not based on sufficient facts or a reliable methodology. In the Padres Projections, management categorized operating expenses as fixed, variable, or mixed (a blend of fixed and variable).[91]

---

[86] Ex. 3 (Tr. 179:16-193:3.)
[87] *Id.*
[88] Ex. 3 (Tr. 185:19-21.)
[89] Ex. 3 (Tr. 192:20-193:3.)
[90] Ex. 2 (Hutton Report) ¶¶ 43–46.
[91] Ex. 1 (YAS Report) ¶ 136.

19

Austin Smith maintained this categorization, adjusted Millennium's projected variable expenses to correspond to the lower projected revenues and maintained Millennium's *unit* variable cost and fixed costs.[92] In response, Hutton arbitrarily sets Millennium's operating expenses at 38% of revenue.[93] Her adjustment is based on unreliable methodology and lacks a reasonable foundation.

> **a.** **Hutton's speculative cuts to expenses are improperly based on an unreliable document that Hutton did not investigate.**

Hutton postulates that Millennium at some unspecified time after the 2014 Transaction would have dramatically altered its business model by cutting its expenses.[94] Hutton's speculation is based on a presentation that Millennium made to the Department of Justice when negotiating the later settlement agreement.[95] Because this evidence is not tethered to—and is inconsistent with—the contemporaneous record, it is not a reliable basis for Hutton's opinion.[96]

To start, the document on which Hutton relies does not support her conclusion, and she does not independently verify its reliability. The document was a 2015 analysis by Alvarez & Marsal regarding whether Millennium could satisfy a potential monetary settlement with the DOJ. The document expressly stated that it "is not and does not purport to be a traditional business plan."[97] Hutton admitted that she had no familiarity with the context or use of the document.[98] She offered no grounds to suggest that it provided a reliable basis for her conclusion, as she did not analyze it "in detail."[99] Realizing how tenuous the basis of her opinion was, Hutton refused to

---

[92] *Id.*

[93] Ex. 2 (Hutton Report) ¶ 46.

[94] *Id.* ¶ 46.

[95] Ex. 2 (Hutton Report) ¶ 46 n.95; Ex. 3 (Tr. 217:6–218:19).

[96] *See In re Plassein Intern. Corp.*, 2008 Bankr. LEXIS 1473, *25–27 (Bankr. D. Del. May 5, 2008) (trustee's expert appropriately concluded that management's projection of lower expenses was unreasonable where the relevant agreements were not in place); *see* Ex. 2 (Hutton Report) ¶ 30.

[97] Ex. 39 (7/22/15 Alvarez & Marsal Presentation, p. 17.)

[98] Ex. 3 (Tr. 230:13–15 ("I don't know why this was created really or who uses it.").)

[99] Ex. 3 (Tr. 221:13.)

opine on whether the dramatic cuts actually could, or would, have been made.[100] Hutton's lack of familiarity with the document on which she opines makes her opinion unreliable.[101]

> **b.     Hutton cites no evidence that her proposed cuts to expenses were known or knowable as of the 2014 Transaction.**

There is no evidence contemporaneous with the 2014 Transaction on which to ground Hutton's dramatic cuts. Nowhere in management's forecasting as of the 2014 Transaction did management plan for those cuts, nor is there evidence showing that management could make such cuts. Hutton's proposed reductions are thus inconsistent with the facts knowable to management at the time of the 2014 Transaction. Historically, Millennium's operating expense ratio and margins fluctuated.[102] Hutton's fixed margin assumption ignores this fact. Furthermore, by fixing the margin, Hutton recharacterizes many of the costs that the Millennium identified as "fixed" to "variable"—without consideration of whether the costs were actually variable. Thus, Hutton's opinion has no basis in the record and is unreliable.

> **3.     Hutton's restoration of the "emerging opportunities" revenue in the Padres Projections is unreliable.**

Hutton criticizes Austin-Smith for declining to include revenue from speculative "emerging opportunities" in her valuation, and Hutton "restores" the revenue in her model.[103] Hutton's opinion is not based on sufficient facts or the application of facts to a reliable methodology.

In the Padres Projections, Millennium added a line item for emerging opportunities.[104] The emerging opportunities were not mentioned in later projections or described in the confidential

---

[100] Ex. 3 (Tr. 223:24–226:4.)

[101] *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292–93 (3d Cir. 2012) (precluding expert from testifying when he "lacked critical information" relating to business plan he relied on).

[102] Ex. 2 (Hutton Report) Exhibit 5A.

[103] Ex. 2 (Hutton Report) ¶¶ 51–54.

[104] Ex. 31 (Padres Projections, Emerging Opportunities Tab.)

information memorandum for the 2014 Transaction.[105]  Rather than being based on sufficient existing business developments, they were based on management's optimism that Millennium would later engage in additional activities that would allow it to succeed at some future point.[106] Applying standard valuation rules, Austin Smith concluded that this was an insufficient level of contemporaneous activity to justify the future speculation.[107]

Hutton criticizes Austin Smith's opinion. But Hutton's criticism has no reliable methodology or factual foundation. Hutton offers no meaningful standard that would allow such speculative revenue to be included in a company's valuation and is unaware of the facts.[108] She admits that she neither read nor knew the terms of the federal supply contract on which she based her conclusion; could not state Millennium's proposed revenue model for the "international opportunities" component of emerging opportunities; had not examined any business plan related to the supposed "emerging opportunities"; could not describe the team that was supposedly put together to pursue international opportunities; and did not even know the basics of how Millennium's proposed international business would operate (including, for example, whether it intended to send samples by mail or instead license its technology).[109] Her opinion reinstating emerging opportunities revenue into her "illustrative" projections thus is entirely divorced from any reliable basis in fact.[110] Hutton's opinion on this topic should be excluded.

---

[105] Ex. 1 (YAS Report) ¶ 67 (noting that "Emerging Opportunities" do not appear in the June 8, 2015 projections); Ex._(CIM (only referred to title of individual)). Although Hutton also criticizes Austin Smith for citing a later management projection as hindsight, that later projection dropped the emerging opportunities without any discussion of changed circumstances, evidencing the lack of support for the earlier inclusion by management at the time of the 2014 Transaction.

[106] *Id.*

[107] *Id.*; *see also* Ex. 41 (YAS Tr. 298:12–303:6).

[108] Ex. 3 (Tr. 250:20–251:6, 259:11–261:5.)

[109] Ex. 3 (Tr. 252:10–16, 254:18-23, 255:10–13, 263:16-17, 268:10-12, 268:18–269:14.)

[110] Ex. 3 (Tr. 250:15-16 ("So that's all that exhibit does, it's illustrative.").)

### 4.    Hutton's restoration of management's growth rates is unreliable.

Hutton also criticizes Austin Smith's growth rates and "restores" the Project Padres' growth rates. Hutton's opinion is not based on sufficient fact or a reliable methodology. Millennium experienced consistent annual declines in its growth rate, and as of Q1 2014—the immediately preceding quarter before the Transaction—Millennium's Medicare growth rate had turned negative.[111] Nevertheless, the Padre Projections assumed aspirational growth rates: 16.7% for commercial and 21% for Medicare in 2014, 9.3% in 2015, and 10% from 2016 to 2018.[112]

Concluding that specimen volume forecasts in the Padres Projections were unrealistic, Austin Smith applied standard valuation methodologies to account for the prior trend line and other factors in her estimates of future growth.[113] But, Austin Smith was conservative with her adjustments. Rather than set 2014's annual growth rate for Medicare in the negative as the first quarter results would suggest, she set it at zero—necessarily meaning she projected Millennium to experience positive growth for the rest of the year.[114] Thereafter, she projected Millennium's growth positively, consistent with long-term projections of established industry participants.[115]

Hutton opines that Austin Smith's "adjustments are unsupported and unreliable." Hutton's opinion lacks support and her criticism is unmoored from Austin Smith's actual analysis.

### a.    Hutton's criticisms are based on false premises.

Hutton's opinions are based on incorrect articulations of Austin Smith's report. Hutton accuses Austin Smith of "inappropriately rel[ying] *only* on historical data."[116] But, this criticism is based on a false premise. Austin Smith explained that her opinion was founded on a number of

---

[111] Ex. 1 (YAS Report) ¶ 78.
[112] Ex. 1 (YAS Report) ¶ 57; Ex. 40 (Pencak Depo. Ex. 171, p. 2).
[113] Ex. 1 (YAS Report) ¶¶107–09.
[114] *Id.* ¶ 109.
[115] *Id.*
[116] Ex. 2 (Hutton Report) ¶ 61; *see also id.* ¶ 59.

factors apart from Millennium's historic growth trends, including "Millennium's reasonably anticipated future trends," "contemporaneous trends," "and with broader UDT industry trends," and the context of the legal and regulatory headwinds faced by Millennium.[117]

Hutton also claims that "Austin Smith relies on *one* data point (change from 4Q2013 to 1Q2014) to extract expectations about Millennium's long-term performance."[118] This criticism again rests on a false premise. Austin Smith specifically based her opinion on multiple additional data points, including (1) "Medicare specimen volume increased modestly (+0.4%) between the first quarter of 2013 actuals when compared to the fourth quarter of 2012 actuals"; (2) "specimen volume growth rates had been declining *since 2009*";[119] (3) "the Padres Projections assumed the same growth rates for Medicare and commercial payors," which was "an unreasonable assumption"; and (4) "overall reimbursement trends for commercial payors followed reimbursement trends for Medicare" and "commercial growth rates would eventually follow the steeper declines represented by Medicare growth rates."[120] Hutton's verifiably incorrect assertions about Austin Smith's report show that her opinion is not based on sufficient fact.

### b.    Hutton ignores the difference between Medicare and commercial payor specimen growth rates.

Hutton's growth rate opinion is also based on an incorrect understanding of the facts. Hutton states that the "quarterly growth rate of 2.2% amounts to a growth rate of over 9% on an annualized basis" and observes that this "is closer to Millennium's projected average annual specimen growth rate of 8.2%."[121] Hutton cites no source for her 8.2% projected average annual

---

[117] Ex. 1 (YAS Report) ¶¶ 108–09; *see also id*. ¶¶ 53–59, 73–93.
[118] Ex. 2 (Hutton Report) ¶ 61.
[119] This statement contained typographical errors in the original version of Austin Smith's report. The quoted text reflects the text of the report as correct by the errata submitted on June 22, 2022.
[120] Ex. 1 (YAS Report) ¶ 109.
[121] Ex. 2 (Hutton Report) ¶ 63.

24

specimen growth rate. Regardless, her methodology is flawed. First, Millennium's growth rates had been trending down and the contemporaneous evidence showed that trend would continue, so annualizing this data point is not an appropriate methodology to estimate future growth rates. Second, Hutton fails to account for the differences in Medicare and commercial payor growth rates. Medicare volume—the largest component of specimen volume—had declined by a *negative* rate of 3.2%; whereas, commercial volume had increased by 4.4%. Thus, Hutton's criticism misstates Austin Smith's analysis and fails to account for the different growth rates.

In short, Hutton's opinion regarding Austin Smith's specimen volume growth forecast is unreliable because it misstates Austin Smith's opinion and is based on insufficient fact.

### 5. Hutton's restoration of volume declines due to the reputational impact of a DOJ settlement is unreliable.

Hutton claims Austin Smith "provide[s] no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact of a potential DOJ settlement,"[122] so Hutton "restores" those volumes. Hutton's opinion is not based on sufficient facts or a reliable methodology. As of the 2014 Transaction, Millennium's management knew its competitors had previously settled with the DOJ and experienced volume declines as physicians referred testing to other laboratories. Austin Smith thus opines that Millennium's specimen volumes were likely to decrease as a result of the reputational impacts of a DOJ settlement.[123]

According to Hutton, there was no adequate basis for projecting, at the time of the 2014 Transaction, that such declines would occur.[124] But, Hutton lacks knowledge of the DOJ investigation.[125] For example, Hutton did not know how far the DOJ investigation had proceeded

---

[122] Ex. 2 (Hutton Report) ¶¶ 47–50.
[123] Ex. 1 (YAS Report) ¶¶ 131–32; Ex. 40 (Pencak Depo. Ex. 171, p. 2).
[124] Ex. 2 (Hutton Report) ¶¶ 47–50.
[125] Ex. 3 (Tr. 64:6–75:12, 243).

at the time of the 2014 Transaction, the magnitude of Millennium's potential liability, and the impact a settlement with the DOJ investigation could have on Millennium's specimen volume. [126]

Hutton also admits that she did not review evidence that management was aware as of the 2014 Transaction of volume decreases that would result from a DOJ settlement based on the experiences of other UDT companies that settled with the DOJ.[127] Hutton apparently never even reviewed many of the key documents cited by Austin Smith, from which Austin Smith drew her conclusion that the drop in the specimen volumes of competitors were substantially due to the reputational impacts of a DOJ settlement and that this was knowable to Millennium's management at the time of the 2014 Transaction.[128] Having failed to review the contemporaneous evidence and having no experience in the industry, Hutton lacks sufficient basis for her criticism.

### 6. Hutton's restoration of revenue lost due to denials of Medicare reimbursement due to medically unlikely edits is unreliable.

Hutton's criticism of Austin Smith's estimation of the impact of MUE denials and restoration of management's projection are also not based on sufficient fact or a reliable methodology. By January 2014, Millennium had experienced material Medicare reimbursement denials due to changing Medicare reimbursement rules. But, management failed to include this impact in the Padres Projections. Austin Smith adjusted the Medicare net revenue per specimen (NPRS) to account for the impact of the MUEs *already occurring* as of the 2014 Transaction.[129]

Hutton claims that Austin Smith's analysis "reli[ed] on hindsight."[130] Yet, under cross-examination, Hutton admitted that she had no independent understanding of the MUEs and that she did not understand that Millennium's management was aware of the MUE denials as early as

---

[126] *Id*. at 64:6–75:12.
[127] *Id*. at 233:10–17, 235:14–16, 236:8–23, 245:19–246:8.
[128] Ex. 3 (Tr. 242:10–25, 243:8–245:18); Ex. 1 (YAS Report) ¶¶ 131–32 (citing evidence).
[129] Ex. 1 (YAS Report) ¶¶ 110–119.
[130] Ex. 2 (Hutton Report) V(A)(5)(b).

February 2014.[131] This ignorance of what Millennium knew and when it knew it shows Hutton cannot reliably opine on whether the developments were foreseeable as of the 2014 Transaction.[132]

### 7. Hutton's restoration of revenue driven by the POC Test Cup Program is unreliable.

Hutton's criticism of Austin Smith's adjustment for the discontinuation of the POC Test Cup Program and restoration of the Project Padres' specimen volumes are not based on sufficient fact. Millennium was on notice that its POC Test Cup Program, which drove its inflated specimen volumes, flouted laws, was being investigated by the DOJ, and was the subject of a lawsuit by Ameritox. Yet, management failed to account for this in the Padres Projections.

Hutton claims that Austin Smith's adjustments for the discontinuance of the POC Test Cup program depended on "hindsight."[133] Hutton fails to consider the evidence available to at the time, including advice that Millennium received from its compliance auditor that its POC Test Cup program should be discontinued; Millennium's knowledge that its prior outside counsel ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and the fact that Millennium had not been able to resolve the DOJ investigation or avoid trial in the Ameritox litigation.[134] This evidence was key to Austin Smith's conclusion that the discontinuation of the POC Test Cup program was knowable at the time of the 2014 Transaction. To offer reliable criticism, Hutton necessarily needed to consider the evidence

---

[131] Ex. 3 (Tr. 77:7–79:25.)

[132] *Brill v. Marandola*, 540 F. Supp. 2d 563, 568 (E.D. Pa. 2008) ("[E]xpert testimony that ignores existing data and is based on speculation is inadmissible."); *Nellson Nutraceutical*, 356 B.R. at 373 (same).

[133] Ex. 2 (Hutton Report) ¶¶ 68–69.

[134] Ex._(11/24/2010 Draft Annual 2010 Compliance Audit Report, p. 31); Ex. 3 (Tr. 101:5–103:7); Ex. 13 (Price Depo. Ex. 10, p. 1); Ex. 14 (Price Depo. Ex. 7); Ex. 7 (Price Depo. Exs. 16 & 17, p. 10).

on which Austin Smith relied and what was knowable by management at the time, which she did not do.[135] Hutton's opinion is thus based on insufficient facts and is unreliable.

>  **8.      Hutton's restoration of revenue based on the assumption that Millennium would continue using custom profiles is unreliable.**

Hutton claims that Austin Smith "provides no reliable basis" for incorporating the impact of the discontinuance of custom profiles into Millennium's projections and "restores" the revenue from custom profile use.[136] Hutton's conclusion is inconsistent with contemporaneous medical billing practices, and Hutton does not analyze the evidence cited by Austin Smith. For example, Hutton claims that Austin Smith fails to validate the assumption that Medicare billing was a relevant proxy for commercial billing because commercial payors followed Medicare billing trends.[137] But that is incorrect. Austin Smith explains the basis; Defendants' other expert, Branka Matevich, agrees with that conclusion; and Hutton does not have the experience to—and performs no analysis—to refute it.[138] Hutton's criticism is not methodological, but personal: "My opinion is that she has not provided evidence to convince me that that assumption is reliable."[139]

Hutton also engages in unsupported testimony when she decries Austin Smith for comparing Millennium's billing codes to Ameritox and Aegis to determine unnecessary medical billing by Millennium. Austin Smith observes that Ameritox and Aegis billed the quantity of tests, codes, reimbursement, and volumes per code most similar to Millennium and thus were the best proxies for estimating Millennium's medically unnecessary billing because UDT companies predominantly bill to a common set of codes.[140] On cross-examination, Hutton backtracked,

---

[135] Ex. 3 (Tr. 90:14–104:7.)
[136] Ex. 2 (Hutton Report) ¶ 70.
[137] Ex. 2 (Hutton Report) ¶ 71.
[138] Ex. 1 (YAS Report) ¶¶ 57–58; Ex. 4 (Matevich Tr. 51–53.)
[139] Ex. 3 (274:15–17.)
[140] Ex. 1 (YAS Report) ¶ 126.

testifying that she did not do any analysis to refute the assumption.[141] Having no experience in this area and having performed no analysis, Hutton is not qualified to offer her opinion and did not perform any reliable methodology to support her opinion.

### B.    Hutton's Ability to Pay and Capital Adequacy test criticisms are unreliable.

Hutton's critiques of Austin Smith's ability to pay and capital adequacy analyses are unreliable because they are not based on reliable principles or facts. Austin Smith applies each methodology to show Millennium's insolvency. Hutton does not reliably apply either test.

To measure capital adequacy, Austin Smith applies a downside scenario based on management's predictions that the adoption of the LCD would result in a 33.3% reduction in Medicare reimbursement and a DOJ settlement would result in a 50% reduction in specimen volumes.[142] That scenario showed that Millennium lacked adequate capital. Hutton does not have an opinion on that scenario.[143] Nor did Hutton perform her own downside scenario or any other methodology to determine the adequate capital for Millennium's business.[144] Rather, her calculation is based on her faulty 7.2% WACC, so her opinion on capital adequacy is unreliable.[145]

In addition, outside of academia, Hutton has never applied an ability to pay debts as they become due test for long term debt like the 2014 Transaction.[146] The last time she applied the test for any purpose was four decades ago as a junior analyst looking at short term debt.[147] Hutton's criticism appears to be that Austin Smith's analysis did not consider how certain rating agencies

---

[141] Ex. 3 (Tr. 280–281.)

[142] Ex 1 (YAS Report) ¶¶171–72.  It is accepted practice to test capital adequacy by applying a downside scenario. J.B. Heaton, *Solvency Tests*, The Business Lawyer, ABA, 996 (May 2007).

[143] Ex. 3 (Tr. 322:10–14.)

[144] Ex. 3 (Tr. 318:10–319:4.)

[145] Ex. 2 (Hutton Report) ¶ 101–104.

[146] Ex. 3 (Tr. 322:19–323:16.)

[147] *Id*.

assessed the 2014 Transaction.[148] But, Hutton makes no attempt to show—and does not opine—that the rating agencies opinions were based on reliable inputs.[149] Indeed, one of Defendants' employees labeled the presentation given by Millennium to the ratings agency "pulp fiction."[150] Hutton's superficial treatment of the facts and evidence she cites renders her opinion unreliable.

## V.    CONCLUSION

Hutton employs an unreliable methodology that fails to account for many of the key facts and events relevant to Millennium's solvency at the time of the 2014 transaction. The Trustee respectfully requests that she be precluded from testifying as an expert.

Dated: Wilmington, Delaware

August 22, 2022

Respectfully submitted,

By: /s/ *Jared T. Green*
R. Karl Hill (No. 2747)
Jared T. Green (No. 5179)
SEITZ, VAN OGTROP & GREEN, P.A
222 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
Tel: (302) 888-0600
khill@svglaw.com
jtgreen@svglaw.com

Kyle A. Lonergan
Josh J. Newcomer
Grant L. Johnson
MCKOOL SMITH, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York, 10001-8603
(212) 402-9400
klonergan@mckoolsmith.com
jnewcomer@mckoolSmith.com
gjohnson@mckoolSmith.com

---

[148] Ex. 2 (Hutton Report) ¶¶ 96–100.
[149] Ex. 44 (Rating Agency Presentation) (presentation to rating agencies containing no mention of the DOJ Investigation or Ameritox Litigation).
[150] Ex. 45 (3/16/14 Griswold Email.)

*Attorneys for Plaintiff*

# REDACTED EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | |
| MILLENNIUM LAB HOLDINGS II, LLC, et al., | Case No. 15-12284 (LSS) Jointly Administered |
| **Debtors.** | |
| ------------------------------------------------------------------------------ | |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE of THE MILLENNIUM CORPORATE CLAIM TRUST, | Adv. Pro. No. 17-51840 (LSS) |
| **Plaintiff(s)** | |
| **v.** | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A. and SUNTRUST BANK, | |
| **Defendant(s)** | |

EXPERT REPORT OF

# YVETTE R. AUSTIN SMITH

**NOVEMBER 15, 2021**

CONTENTS

**I.   Expert Qualifications** ..............................................................................................1

**II.  Assignment and Summary of Opinions** .............................................................2

**III. Basic Factual Overview** ..............................................................................................4

    A.  Overview of Millennium's Business ..............................................................4

    B.  Millennium's Competitors ..................................................................................6

    C.  Historical Financial Metrics of Millennium's Business .....................7

**IV.  2014 Financing Transaction** ......................................................................................15

**V.   Framework for Solvency Analysis** .............................................................................21

    A.  Balance Sheet Test ...............................................................................................23

    B.  Ability to Pay Debt Test .....................................................................................26

    C.  Adequate Capital Test .........................................................................................27

    D.  Summary of Millennium Solvency Analysis ...............................................28

**VI.  Millennium Financial Projections in connection with the 2014 Transaction** ..................29

    A.  Padres Projections ...............................................................................................29

    B.  Vantage Point Solvency Analysis Based On Padres Projections .................37

**VII. Solvency Analysis of Millennium Using the Correct Solvency Framework** ..................40

    A.  Millennium Business Trends as of 2014 Transaction ...............................40

    B.  Regulatory and Legal Environment as of 2014 Transaction ..................45

    C.  Post-Transaction Events Related to Known or Knowable Risks in April 2014 ..............55

        1.  Verdict in Ameritox 2011 Lawsuit ........................................................55

        2.  $90 Million Quantifiable Exposure Related to Free Specimen Cups ..........56

        3.  Escalating US DOJ Investigations .........................................................57

    D.  Millennium files for bankruptcy ....................................................................59

    E.  Modified Padres Projections ............................................................................60

        1.  UDT Revenue Projections ........................................................................61

        2.  PGT Revenue and RxAnte Projections ....................................................75

    F.  Expense Projections .............................................................................................75

    G.  Summary of Modified Padres Projections .................................................76

    H.  Balance Sheet Test ...............................................................................................79

        1.  Discounted Cash Flow Analysis ..............................................................79

        2.  Guideline Public Companies ...................................................................83

        3.  Precedent Transaction Analysis ..............................................................88

        4.  Balance Sheet Test Conclusion ...............................................................88

I.  Ability to Pay Debts Test ...........................................................................88

J.  Adequate Capital Test ...........................................................................92

K.  Solvency Conclusion ...........................................................................93

**Appendix A : Solvency Test Exhibits........................................................94**

A.1 Expected Case DCF Analysis.............................................................94

A.2 Expected Case EBIT Derivation .......................................................94

**Appendix B : Comparable Companies Analysis Exhibits.........................95**

B.1 Description of SIC Industry Codes.....................................................95

B.2 Description of Potential Comparable Companies .............................96

**Appendix C : Custom Profile Exhibit........................................................97**

**Appendix D : Sensitivity Analysis of Millennium's Equity Value..............98**

**Appendix E : Documents Relied Upon of Yvette Austin Smith..................99**

**Appendix F : Curriculum Vitae..................................................................104**

## I.   EXPERT QUALIFICATIONS

1.   My name is Yvette Austin Smith. I am a Principal and Chairman of The Brattle Group and co-lead the firm's Mergers & Acquisitions ("M&A") Litigation practice and previously led the firm's Bankruptcy and Restructuring practice.  I specialize in M&A and bankruptcy disputes with subject matter expertise in valuation and credit and solvency analysis. I regularly provide testifying and consulting expert services in litigation matters related to mergers and acquisitions, leveraged buyouts, recapitalization, debt recharacterization and avoidance actions. Prior to joining The Brattle Group, I provided M&A advisory services, including buy-side and sell-side advisory, fairness opinions, solvency opinions and commercially reasonable debt opinions.

2.   I hold a Master's Degree in Business Administration from Columbia University's Graduate School of Business and a Bachelor's degree from Harvard College in Philosophy and Government, with *cum laude* honors. I have completed additional graduate coursework in financial mathematics at the Courant Institute of Mathematical Sciences at New York University. I have been an instructor at Harvard University Extension School, teaching the graduate finance course, Business Analysis and Valuation.

3.   I have written a number of publications and presented on valuation and credit analysis for organizations including the American Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, Thomson Reuters, and Bloomberg Law. I am a contributing author to the Model Merger Agreement for the Acquisition of a Public Company, published by the ABA's Mergers and Acquisitions Committee, and a contributing researcher to The Standard & Poor's Guide to Fairness Opinions: A User's Guide for Fiduciaries. I am also Co-Chair of the American Bar Association Joint Task Force on M&A Litigation and the founder and former Co-Chair of the ABA Financial Advisor Task Force. I was a contributing researcher to *Estimating Future Claims – Case Studies from Mass Torts and Product Liability*.  I have also authored and presented multiple continuing legal education courses and other seminars on valuation, solvency and credit analysis.

4.   The Brattle Group is compensated for my work in this matter at my current billing rate of $800 per hour. In preparing this report, I have also been assisted by Brattle staff members working

under my direction. The Brattle Group is being compensated for their work in this matter at standard commercial rates ranging from $285 to $455 per hour. Neither the amount nor the payment of fees to me or The Brattle Group in connection with this matter is contingent upon the opinions expressed herein or the outcome of the above-captioned litigation (the "Litigation").[1]

5.  A list of documents I relied upon to form my opinions appears in Appendix E. My CV is attached as Appendix F. I reserve the right to express additional opinions, supplement or amend the opinions expressed herein, and to respond to opinions offered by Defendants' experts in this case.[2]

## II.      ASSIGNMENT AND SUMMARY OF OPINIONS

6.  I have been retained by Wollmuth Maher & Deutsch LLP, counsel for the Plaintiff Marc S. Kirschner, solely in his capacity as Trustee of the Millennium Corporate Claim Trust, to evaluate the solvency of Millennium as of April 16, 2014, the date on which Millennium closed on a $1.825 billion syndicated loan facility and the related credit agreements became effective (the "2014 Transaction").  For the purpose of the solvency analysis described herein, April 16, 2014 is the date of valuation.

7.  Based on the analyses below, my expert opinions are:

- Millennium created the "Padres Projections" to support the 2014 Transaction, and the projections were provided to both the underwriters and Vantage Point Advisors, Inc. ("Vantage Point"), the contemporaneous solvency advisor. However, the Padres Projections were significantly flawed in that they failed to reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction.

- At the time of the 2014 Transaction, several trends were impacting Millennium's business and were reasonably expected to further impact the business going forward. Taken together, these trends indicated that Millennium was facing significant reimbursement,

---

[1]   Throughout this report, I use the term "I" when describing who completed the analyses upon which my opinions are based.  This is for ease of writing and should be understood to mean me, personally, or other professionals at The Brattle Group working under my direction.

[2]   Throughout this report I cite to specific record evidence.  The cited evidence is intended to be representative but not exhaustive.  I reserve the right to rely on additional record evidence.

Expert Report of Yvette R. Austin Smith                                         Adv. Pro. No.17-51840 (LSS) | 2

legal, and regulatory risks and that the company was very likely to encounter slowing or negative growth and declining profitability. The Padres Projections failed to reasonably account for these risks.

- To accurately calculate value using a Discounted Cash Flow or "DCF" methodology, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation. This was not done at the time of the 2014 Transaction and a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction.

- Giving effect to the 2014 Transaction, Millennium's equity value was no greater than *negative* $958.9 million, before considering the company's significant contingent liabilities. In other words, the 2014 Transaction rendered Millennium balance sheet insolvent. Including a conservative estimate of the liabilities relating to the then pending litigation and government investigations, Millennium's equity value was no greater than *negative* $1,003.9 million.

- Due to the limited comparability of the identified public companies, I did not rely on the Guideline Public Company or "GPC" methodology. Nonetheless, I note that the *minimum* EBITDA multiple derived from the identified public companies is *above* the EBITDA multiple at which Millennium's financial advisors unsuccessfully attempted to sell the company just prior to the 2014 Transaction.

- Courts have found that unreasonably small capital is a financial condition *prior to* equitable insolvency. The results of the balance sheet test demonstrate that Millennium was equity insolvent.  Nonetheless, I also conducted a second analysis that shows that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with unreasonably small capital.

- The 2014 Transaction encumbered Millennium with debt beyond the company's ability to pay as that debt matured. Indeed, by 2018, Millennium would have had insufficient liquidity to meet interest payments required under the 2014 Transaction. Liquidity that may have otherwise been available via the company's revolving loan in 2018 was not projected to be available due to a projected covenant breach.

## III.   BASIC FACTUAL OVERVIEW

### A.   OVERVIEW OF MILLENNIUM'S BUSINESS

8.  Millennium Laboratories, Inc. ("Millennium" or the "Company")[3] was founded in San Diego, California in December 2007. The company received its first specimen for testing in March 2008 and completed its first full year of operation in 2009.[4] Millennium was founded as a company that exclusively provided urine drug testing ("UDT").[5] UDT is employed by clinicians to monitor prescription medication use and identify drugs of abuse.[6]

9.  The UDT industry focuses on identifying the presence of certain of types of drugs ("qualitative testing") and the more precise measurement of the specific drug and quantity of drugs in a urine specimen ("quantitative testing"). A qualitative test, such as immunoassay testing provided at the point-of-care, is able to detect the presence of certain drugs in a patient's urine, but cannot quantify the amount of any given drug present or distinguish between multiple substances in the same drug class.[7] These qualitative results are typically used in a physician's office to guide treatment discussions and initial prescribing decisions while the patient is still present in the office, and to inform physicians' judgment on the medical necessity, if any, of ordering and billing the patient or his/her insurer for additional confirmatory or quantitative testing.[8] Such quantitative testing is typically performed by a laboratory company via complex testing

---

[3]   Throughout its history, the Company experienced various changes in name and in corporate structure. For instance, Millennium Laboratories, Inc. was converted to an LLC prior to the closing date of the 2014 Transaction. *See* Millennium Laboratories Confidential Information Memorandum, p. 24 [ML_DE_00269115] ("Confidential Information Memorandum"). For the purposes of this report, I use the term "Millennium" to refer to the operating company that was the borrower in the 2014 Transaction regardless of time frame and the form of the Company at the time.

[4]   Confidential Information Memorandum, p. 40.

[5]   Confidential Information Memorandum, p. 40: "Millennium's first service offering was in the urine drug testing ("UDT") space where they set out to deliver fast, highly accurate results using LC-MS/MS technology driven by proprietary algorithms and customized methods."

[6]   Confidential Information Memorandum, p. 16.

[7]   Millennium Self-Disclosure Statement, p. 3 [ML_DE_00670668 at 0670]. According to Hogan Lovells US LLP (Millennium's legal counsel), the self-disclosure statement was made on behalf of Millennium "pursuant to the CMS Voluntary Self-Referral Disclosure Protocol to resolve a potential violation of the "Stark" physician self-referral (Section 1877 of the Social Security Act). This disclosure relates to Millennium's prior practice of providing point-of-care drug test cups at no charge to certain of its physician customers for use also as a specimen collection device." *See* Millennium Self-Disclosure Statement, p. 1 [ML_DE_00670668 at 0668].

[8]   Millennium Self-Disclosure Statement, p. 4 [ML_DE_00670668 at 0671].

---

technology to identify the specific drug type and quantify the precise amount in the specimen.[9] A laboratory may also perform "specimen validity testing" to determine whether the urine sample has been adulterated in some manner.[10]

10. Since its inception, Millennium focused on the pain management industry, an industry that prescribes drugs to relieve pain, including drugs that were susceptible to abuse.[11] Millennium's growth was influenced by the rapid increase in medical use and illicit abuse of opioid drugs, which were becoming a serious and growing health problem.[12] The UDT industry grew rapidly in the years leading up to the 2014 Transaction. From 1991 to 2010, U.S. opioid prescriptions (measuring only a portion of opioid use) grew by a 5.5% per annum compound annual growth rate ("CAGR").[13]

11. Clinicians who were customers of Millennium included pain practitioners, primary care physicians, addictionologists, orthopedic specialists, spine and sports medicine specialists and psychiatric specialists.[14] Millennium's customers were dispersed throughout the United States, with significant concentrations in Florida and the New England and Southwest regions.[15] Typically, urine samples were collected from the patient in a clinical setting and sent to a Millennium laboratory for analysis. Using Liquid Chromatography – Mass Spectrometry / Tandem Mass Spectrometry ("LC – MS/MS"), Millennium provided quantitative testing that detected the presence and precise level of drugs in a patient's urine.[16]

12. In June 2012, Millennium expanded its business operations to include pharmacogenetic testing ("PGT").[17] PGT detects genetic variations in enzymes associated with the metabolism of certain medications, which assists clinicians in identifying an appropriate drug therapy for a given

---

[9]   Millennium Self-Disclosure Statement, p. 4 [ML_DE_00670668 at 0671].
[10]  US DOJ Complaint [ML_DE_00595094 at footnote 2].
[11]  Confidential Information Memorandum, p. 40.
[12]  Confidential Information Memorandum, p. 40.
[13]  Confidential Information Memorandum, p. 62.
[14]  Confidential Information Memorandum, p. 17.
[15]  See Padres Projections (ML_DE_00057999), April 12 2014, tab "Volume".
[16]  Confidential Information Memorandum, p. 17.
[17]  Confidential Information Memorandum, p. 40.

patient.[18] In December 2013, Millennium acquired RxAnte. RxAnte intended to provide clinicians with data-driven analytics designed to improve the targeting of medication. Even after these business expansions, UDT remained Millennium's largest business segment. For the year ended December 31, 2013, for instance, UDT represented 98.1% of the Company's total revenue.[19]

### B.    MILLENNIUM'S COMPETITORS

13.  The UDT industry was highly competitive at the time of the 2014 Transaction. Barriers to entry were low, as witnessed by high growth of independent and physician-owned laboratories.[20] Millennium's primary competitors were private companies such as Ameritox, Aegis, and Calloway. Millennium claimed that its key competitive advantage was faster turnaround times than its competitors. The Company sought to report test results by the next business day, compared to 3-4 days (or longer) for its competitors.[21]

14.  To a lesser extent, Millennium also competed against larger clinical laboratory testing companies like Laboratory Corporation of America Holdings ("LabCorp") and Quest Diagnostics ("Quest"). LabCorp and Quest were significantly larger than Millennium and both provided other clinical diagnostic testing services in addition to UDT. Unlike Millennium, Quest and LabCorp developed their toxicology segments in 2012 and 2013 via acquisitions.[22] At the time of the 2014 Transaction, there was ongoing consolidation in the clinical laboratory testing business.[23] Larger companies such as LabCorp and Quest maintained a competitive advantage over smaller

---

[18]   Confidential Information Memorandum, p. 16.

[19]   *See* Padres Projections, April 12 2014, tab "Summary".

[20]   Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013 filed February 25, 2014 at p.5.

[21]   Confidential Information Memorandum, p. 80. Millennium further stated that it was the only operator to rely almost exclusively on liquid chromatography – mass spectrometry/tandem mass spectrometry ("LC-MS/MS") for testing. Confidential Information Memorandum, p. 17.

[22]   Quest Diagnostics Incorporated Form 10-K for the fiscal year ended December 31, 2013, filed February 18, 2014, at pp. 6 and 48; Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013, filed February 25, 2014, at F-13.

[23]   Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013, filed February 25, 2014, at p. 5.

companies like Millennium due to the cost efficiencies and large service networks.[24] A more efficient cost structure was particularly valuable in the face of expected reductions in reimbursement rates. Larger clinical laboratory testing companies represented a potential threat to Millennium as they began to expand further into the UDT industry.[25]

### C.   HISTORICAL FINANCIAL METRICS OF MILLENNIUM'S BUSINESS

15. Millennium generated the vast majority of its revenue from third-party payor arrangements. That is, Millennium was not paid directly by the patient in most instances.[26] Rather, a third-party entity reimbursed Millennium for the testing services. Third-party payors primarily consist of private health insurance, managed care organizations, workers compensation programs, and the government-sponsored programs of Medicare and Medicaid. Non-governmental third-party payors (*i.e.*, excluding Medicare and Medicaid and some workers compensation insurers), are commonly referred to generically as "commercial payors."

16. Millennium regularly conducted multiple tests on a single urine specimen. For example, as of December 2013, Millennium was conducting approximately 23 tests, on average, for each urine specimen.[27] After increasing the average number of tests per specimen at the end of 2011 and through the beginning of 2012, Millennium's average tests per specimen had remained fairly constant prior to the 2014 Transaction. *See* Figure 1. It is noteworthy that Millennium billed almost the same average number of tests per specimen to Medicare as to commercial payors,[28]

---

[24]   *Id.*

[25]   S&P credit rating report, dated March 28, 2014. ("While we believe Millennium holds the leading market position among its small niche competitors, its market share remains relatively small compared to the larger industry powerhouses Quest Diagnostics and Laboratory Corp. of America Holdings. Large competitors' presence in niche markets is currently small, but there is a potential threat that they might further expand into the field that exhibits relatively low barriers to entry.").

[26]   For the year-ended December 31, 2013, less than 0.7% of Millennium's revenue was identified as "self pay." *See* ML_DE_00732288 (Yearly 2009-2015M5 tab); 0.1% if all "patient" revenue is included; 0.7% if both "patient" and "client" revenue is included.

[27]   ML_DE_00732288 (Quarterly 2012-2015Q1 tab, cell CJ140)

[28]   For example, in 2013 Millennium billed an average 22.6 tests per specimen to Medicare, as compared with 23.6 tests on average across all payors. Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC. For the purposes of this analysis, I have defined these payors as the commercial payors. *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab).

despite Medicare's population likely skewing towards a much older age group.[29] As discussed further herein, government investigators alleged that Millennium maintained a regular practice of improperly billing Medicare for medically unnecessary tests, including tests for drugs that were not commonly abused by the older Medicare age cohort.[30] At the time of the 2014 Transaction, Millennium knew or should have known, from its own billing records, the risks of continuing to bill Medicare for medically unnecessary tests.   These risks included not only declining test-per-specimen levels in the future but also exposure to monetary damages or fines for past billings to Medicare.



**FIGURE 1: QUARTERLY TESTS PER SPECIMEN**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab), YAS Workpaper 4.

---

[29]   *See* Centers for Medicare & Medicaid Services, *Original Medicare Enrollment: Part A and/or Part B Enrollees by Demographic Characteristics, Calendar Year 2013* 1 (2020), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/2013/Downloads/MDCR_ENROLL_AB/CPS_MDCR_ENROLL_AB_11.pdf

[30]   US Complaint In Intervention, United States of America, et al v. Millennium Laboratories, Inc. at 5 ("US DOJ Complaint") [ML_DE_00595094 at 5096].  *See also* : Center for Behavioral Health Statistics and Quality, *Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings* 18, 21 (2012), https://www.samhsa.gov/data/sites/default/files/NSDUHresults2012/NSDUHresults2012.pdf  (showing that illicit drug use among those aged 60 to 64 was 3.6 percent in 2012, as compared to 7.0% among all adults aged 26 or older).

Expert Report of Yvette R. Austin Smith                                            Adv. Pro. No.17-51840 (LSS) | 8

17. The amount of revenue that Millennium generated per specimen (known as "net revenue per specimen" or "NRPS") was based not only on the number of tests per sample, but also the type of tests performed and the third-party payor providing reimbursement. Each test corresponded to a pre-identified code in a coding system commonly used in the healthcare industry. For commercial payors, the coding system was the Common Procedures Terminology ("CPT") developed by the American Medical Association. Medicare and Medicaid use a comparable coding system, the Healthcare Common Procedure Coding System ("HCPCS").[31] Millennium received payment (or "reimbursement") for each code it billed. For example, if Millennium conducted 23 separate tests on a single urine specimen, Millennium could receive up to 23 payments corresponding to that single specimen.[32] The actual amount of the reimbursement for a specific code was determined by individual reimbursement contracts between Millennium and the third-party payor. Medicare (under the fee for service model) provided reimbursement to Millennium through a similar fee schedule.

18. There was a wide diversion between individual reimbursement rates for separate codes. For instance, in 2014, Millennium received reimbursement from Medicare for quantitative tests for alcohol (82055) and acetaminophen (83516) at $14.74 and $12.66, respectively.[33] On the other hand, quantitative tests for hydromorphone (82649) and serotonin (84260) were reimbursed at the significantly higher rates of $35.07 and $42.26, respectively.[34] It is relevant to note that although commercial payors provided reimbursement at amounts that differed from Medicare (or, CMS more broadly), there is an established industry practice of commercial reimbursement rates following the trend of CMS reimbursement rates. For example, decreases in CMS

---

[31] Both HCPCS and CPT were developed to report medical procedures and services. HCPCS Level I codes are identical to CPT. However, HCPCS also includes Level II codes (non-physician services like ambulance rides, wheelchairs, walkers, other durable medical equipment, etc.) and HCPCS modifiers which differentiate it from CPT. *See* https://www.medicalbillingandcoding.org/hcpcs-codes/.

[32] These payments may be subject to caps and aggregations. For example, as of January 1, 2014, additional limitations were placed on the amount of tests that could be billed to certain codes for the same beneficiary for the same date of service. *See* Section VII.E.1.a.

[33] Millennium Health, 2014 Annual Physician Notice [ML_DE_00164030] at p. 4.

[34] Millennium Health, 2014 Annual Physician Notice [ML_DE_00164030] at p. 6.

reimbursement rates are frequently followed by decreases in commercial reimbursement rates. Millennium understood this practice at the time of the 2014 Transaction.[35]

19. Table 1 displays revenue and specimen volume figures for the top five payors in Millennium's UDT business for the year ended December 31, 2013, the last fiscal year prior to the 2014 Transaction.

**TABLE 1: TOP 5 PAYORS FOR UDT BUSINESS IN 2013: REVENUE AND SPECIMEN VOLUME**

| Rank | Payor | Revenue ($ millions) | % of Total Revenue |
|---|---|---|---|
| 1 | Medicare | 198.55 | 32.82% |
| 2 | Blue Cross Blue Shield | 84.89 | 14.03% |
| 3 | Medicaid - Contract | 51.23 | 8.47% |
| 4 | UHC | 50.32 | 8.32% |
| 5 | Managed Government | 49.75 | 8.22% |

| Rank | Payor | Specimen Volume (thousands) | % of Total Specimen Volume |
|---|---|---|---|
| 1 | Medicare | 428.56 | 18.62% |
| 2 | Blue Cross Blue Shield | 367.47 | 15.97% |
| 3 | Managed Government | 332.98 | 14.47% |
| 4 | Patient | 223.68 | 9.72% |
| 5 | UHC | 222.31 | 9.66% |

Source: ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab). "Other Payors" category excluded in ranking.[36]

---

[35]  Pencak Deposition 209:21 - 210:20 and Plaintiff Ex. 158 [ML_DE_00045459]:

"Q. This [Pl's Ex. 158] is an email from Kenneth Kirsch to Charles Haley at Noridian dated March 13, 2014, the subject is 'Noridian LCD response.' The attachment is a March 13, 2014, letter, to a Bernice Hecker at Noridian. I really want to draw your attention to the bottom of page 2. Millennium writes there, "It is widely known that 'as Medicare goes, so go the other payors, ' many of whom will likely be emboldened by an opportunity provided by the policies in the LCD to cut a growing source of cost to their plans." Do you see that?

A. Yes.

Q. Is that consistent with your understanding of Millennium's view at the time?

A. Yeah, as I mentioned earlier, I mean, it's generally, especially if it is a savings, then commercial payors would likely adopt it."

[36]  Throughout this report I refer to two different Padres Projections, being ML_DE_00044521 and ML_DE_00057999. These models are dated 3/14/2014 and 4/12/2014 respectively. The model dated 4/12/2014 is the most contemporaneous model to the 2014 Transaction. The total revenue from these two models is

20. As shown in Table 1, 18.62% of Millennium's 2013 total specimen volume related to patients covered by Medicare. However, because Medicare's reimbursement rates (for a given test) were significantly higher than commercial reimbursement rates, Medicare reimbursement accounted for an even higher percentage of Millennium's revenue - nearly 33% for 2013. This is consistent with published research at the time finding that Medicare paid between 18-30 percent more than commercial payors for the same laboratory tests.[37] In 2013, Millennium was the largest of *any* Medicare Part B biller by dollar amount.[38]

21. Members of the Blue Cross Blue Shield network and United Healthcare ("UHC") were Millennium's largest commercial payors. In aggregate, reimbursement payments from these payors equaled approximately 22% of Millennium's 2013 revenue. Reimbursement from *all* commercial payors equated to approximately 35% of Millennium's 2013 revenue.[39] Thus, Medicare, Blue Cross Blue Shield and UHC represented 55% of Millennium's 2013 revenue and Medicare and all commercial payors represented approximately 68% of Millennium's 2013 revenue. Also noted in Table 1, Managed Government comprised 14.5% of specimen volume but only 8.2% of revenue. Managed Government represents commercial payors approved by Medicare to administer Medicare coverage and add-on coverage for categories of care not always reimbursed by Medicare, such as dental and vision.[40] Notwithstanding that Millennium's Managed Government segment administered coverage under Medicare, the reimbursement rates for Managed Government were significantly lower than the reimbursement rates for "traditional" Medicare (also known as "fee for service"). As a result, Millennium's NRPS for Managed

---

identical, however the earlier model dated 3/14/2014 contains additional content (*e.g.*, more granular data by payor) that is useful for my analysis.

[37] Department of Health and Human Services, Office of Inspector General "Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings", June 2013, p. 9.

[38] Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.  *See also* Medicare Physician and Other Supplier PUF Methodology describing the dataset, p. 4 (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Medicare-Physician-and-Other-Supplier-PUF-Methodology.pdf) and US DOJ Complaint at ¶ 2. Medicare Part B covers a wide variety of outpatient services, of which laboratory testing services is only one component.

[39] *See* ML_DE_00732288 (Yearly 2009-2015M5 tab).

[40] *See* https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans. Also includes dual health plans where a patient qualifies for both Medicaid and Medicare. For example, *see* https://www.uhccommunityplan.com.

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 11

Government was almost three times lower than its Medicare NRPS, despite a similar number of tests per specimen.[41]

22. Similarly, there were large differences in reimbursement rates amongst commercial payors, as evidenced by significant differences in NRPS.[42] For example, Millennium's NRPS for Aetna was more than two times higher than that for UHC and Humana even though Millennium's average tests per specimen for these payors was broadly similar.[43] Millennium actively sought to reduce its exposure to payors with low reimbursement rates.[44]

23. Millennium received reimbursement from billing to dozens of codes in a given year. For example, in each of 2012 and 2013, Millennium received reimbursement from Medicare in connection with more than 25 codes.[45] However, in 2012 and 2013, Millennium generated a disproportionate percentage of its Medicare revenue from reimbursement for billings under two specific HCPCS codes, 83925 (opioids drugs measurements) and 82542 (chemical analysis using chromatography technique).

---

[41]   *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), column AI and AW, rows 129 and 132. In 2013, NRPS for Medicare and Managed Government was $467 and $144 respectively. In 2013, average tests per specimen for Medicare and Managed Government was 22.6 and 23.8 respectively.

[42]   Tests per specimen was relatively consistent across commercial payors. *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), column AW, rows 124-137.

[43]   *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), columns AJ and AX, rows 124 and 135. In 2014, average NRPS for Aetna and UHC was $449 and $203 respectively. In 2014, average tests per specimen for Aetna and UHC was 25.3 and 23.4 respectively.

[44]   Plaintiff Exhibit 17 to Price Deposition:

"Summer/Fall 2011: one troubled practice offered to 'double-up on its testing' and ML declined and terminated the relationship"

"Dr. O'Connell's practice ordered few tests/specimen and ML terminated the relationship 'because they did not think he was serious about quality UDT results'"

Pencak Deposition, Plaintiff Exhibit 135:

"They both seem to be newer practices so please make it a priority to follow up with the respective reps to make sure they are considering payor mix and tests per specimen when signing on new practices."

[45]   Code level reimbursement is not available for Millennium's other payor types. Codes billed to Medicare are assumed to represent a subset of the total codes billed by Millennium to all payor types.  Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. CMS data indicates Millennium billed 33 codes to CMS in 2012 and 30 codes in 2013.

24. As shown in Table 2, for the year ended December 31, 2013, Millennium generated approximately 33% of its Medicare revenue from these two codes alone. The amount of revenue Millennium generated from these codes reflected the facts that these codes were associated with a high volume of tests performed by Millennium *and* that the reimbursement rates for these two codes were among the highest Medicare reimbursement rates for codes billed by Millennium. As discussed below, these two codes also were the focus of important new (or newly implemented) Medicare coverage determinations, policies, and restrictions (*i.e.*, medically unlikely edits ("MUEs")[46] and local coverage determinations ("LCDs"))[47] at the time of the 2014 Transaction.

**TABLE 2: MEDICARE REIMBURSEMENT AND VOLUME FOR 83925 AND 82542**

| HCPCS Code Subject to MUE | % of Millennium's Total Medicare Reimbursement | | % of Millennium's Total Medicare Test Volume | |
|---|---|---|---|---|
| | 2012 | 2013 | 2012 | 2013 |
| 83925 | 25.22% | 23.49% | 20.12% | 19.58% |
| 82542 | 1.56% | 9.54% | 1.34% | 8.61% |
| **Total** | **26.77%** | **33.04%** | **21.46%** | **28.19%** |

Source: Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

25. Prior to the 2014 Transaction, Millennium was engaged in two specific business practices that the Company acknowledged significantly contributed to its growth and profitability: the use of "Custom Profiles" and the provision of free specimen testing cups to Millennium customers.[48]

---

[46] MUEs are used by Medicare Administrative Contractors ("MACs") to reduce improper payments for Part B claims. *See* Section VII.E.1.b for further explanation of MUEs and their impact on Millennium.

[47] An LCD is a determination by a fiscal intermediary (under Medicare Part B, a MAC) as to whether or not a particular item or service is eligible for reimbursement under Medicare. See Section VII.E.1.c for further explanation of LCDs and their impact on Millennium.

[48] *See*, *e.g.*, Exhibit 4 to the US DOJ Complaint. ("As you know, the standing order is critical to our confirmation and billing process") [ML_DE_00628896 at 8897]. Exhibit 5 to the US DOJ Complaint ("If an account does not want a Standing Order in place for the 6 drugs not covered by the [POC test], we do not want to do business

Early versions of both of these business practices had been implemented by the end of Millennium's first full year of operation. Millennium initiated the practice of Custom Profiles in 2008.[49] Custom Profiles were standing orders indicating a panel of tests to be performed on a specimen, and which remained in effect for the physician's practice until and unless changed.[50] Thus, the panel of tests indicated by a Custom Profile was not specific to an individual patient (or specimen). When submitting an individual patient urine specimen to Millennium for testing, a customer with a Custom Profile would typically select one of three options on the test requisition form: (i) use Custom Profile, (ii) use Custom Profile and add additional tests (as indicated) or (iii) do not use Custom Profile and perform certain tests (as indicated).[51] As of the 2014 Transaction, approximately 64% of Millennium's customers used Custom Profiles. As explained more fully below, Millennium began transitioning away from the use of Custom Profiles in March 2015, approximately one year after the 2014 Transaction.[52]

---

with them") [ML_DE_00628899 at 8900]. Exhibit 7 to the US DOJ Complaint ("WE DON'T WANT TESTING TO DECLINE BY UPDATING THE CP WITH LESS TESTS") (capitalization in original) [ML_DE_00628908] at 8911. Exhibit 12 to the US DOJ Complaint ("There are not enough tests on the CP and [Mr. Appel] *will not approve*") (emphasis added) [ML_DE_00628930 at 8931]. Exhibit 13 to the US DOJ Complaint ("If practice falls below ML profitability guidelines, cup agreement will be denied") [ML_DE_00628932 at 8934]. Exhibit 66 to the US DOJ Complaint ("This cup agreement is vital to our practice") [ML_DE_00629092 at 9094].

[49] *See* US DOJ Complaint at ¶ 210 [ML_DE_00595094 at 5149] (Tampa Pain Relief Center used a Standing Order since 2008).

[50] US DOJ Complaint at ¶¶ 89-90 [ML_DE_00595094 at 5117] (A Custom Profile was alternately referred to as a Standing Order or Test Protocol).

[51] Exhibit 55 to the US DOJ Complaint [ML_DE_00629045 at 9046].

[52]

26. Millennium initiated the use of free specimen testing cup agreements in late 2009.[53] Under these agreements, Millennium provided specimen collection cups with integrated test strips to its customers free of charge. The specimen cups and test strips provided by Millennium allowed healthcare providers to perform qualitative UDT at the point of care. The agreements stated that in exchange for receiving the specimen cups free of charge, physicians agreed to use the cups for "collecting and transporting specimens for testing by our [Millennium's] laboratory."[54] The agreement also stated that Millennium would invoice the physicians for "excess cups" which were sent to the physician's office and had not been sent back to Millennium for quantitative testing.[55] According to Millennium, as of the 2014 Transaction, approximately 10% of Millennium's customers had entered into the free specimen cup agreements, representing 16% to 17% of total specimen volume.[56] As explained further below, Millennium terminated the free specimen cup agreements in June 2014, approximately two months after the 2014 Transaction.[57]

## IV.   2014 FINANCING TRANSACTION

27. In mid-2013, Millennium began conversations with J.P. Morgan, its primary banker, to refinance the Company's existing debt. Millennium's existing debt consisted primarily of a $330 million term loan syndicated among a few banks and a large commercial finance provider in March, 2012 (the "2012 Transaction").[58] J.P. Morgan was the Administrative Agent and "left lead"

---

[53]   Millennium Self-Disclosure Statement at p. 4 [ML_DE_00670668 at 0671].

[54]   Exhibit 39 to US DOJ Complaint [ML_DE_00_629262 at 9263] (second emphasis added):

"To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory. While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that 1) you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups, 2) you will not bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups and 3) you will not resell or redistribute these cups. In addition, you agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing."

[55]   Exhibit 39 to US DOJ Complaint [ML_DE_00_629262 at 9263].

[56]   Millennium Self-Disclosure Statement at p.3 [ML_DE_00670668 at 0670]. This assumes that the disclosed percentage of customers is consistent with the percentage of customers at the time of the 2014 Transaction.

[57]   Millennium Self-Disclosure Statement at p.5 [ML_DE_00670668 at 0672].

[58]   Exhibit 116 to Deposition of J. Lee (J.P. Morgan), June 23, 2021 [JPMC-MIL-CORP-00183881].

bookrunner for the 2012 Transaction. Prior to the 2014 Transaction, J.P. Morgan held $75.9 million in credit exposure from the 2012 Transaction.[59]

28. A significant motivation for the 2014 Transaction appears to have been to provide liquidity to Millennium's equity holders,[60] following earlier and unsuccessful attempts to sell the Company over an approximately three year period. In 2011, the Company engaged UBS to explore a sale transaction. After marketing to up to 16 potential acquirers, the sale process was considered "unsuccessful"; only one bid emerged, and that bid was far below the valuation expectations of $1.5 billion.[61] Risks around reimbursement were identified as a key reason for the unsuccessful sales process.[62] A second motivation of the refinancing transaction appears to have been to reduce J.P. Morgan's credit exposure to Millennium.[63]

29. In 2013, Millennium attempted, for a second time, to sell the Company or otherwise provide liquidity to its equity holders. However, perceived reimbursement risks appear to have also

---

[59] J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]: "JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

[60] Exhibit 116 to Deposition of J. Lee (J.P. Morgan), June 23, 2021 [JPMC-MIL-CORP-00183881] (emphasis added):

"Attached please find our thoughts on a dividend recapitalization for Millennium. We have taken into consideration a number of factors:

- Avoid issuing public securities and stay in the loan market
- Keep the entire capital structure pre-payable without friction, in case there is a monetization event in the near to intermediate term
- Maintain modest leverage, given management's as well as TA's institutional perspective around pursuing the maximum available leverage

Take a look at the attached and let's have a call to walk you through it at your convenience. The markets remain strong and the Company has performed extremely well, allowing for a significant dividend, while keeping leverage at reasonable levels."

[61] Exhibit 14 to Price Deposition. [BMO-ML-00030001]:

"The process was unsuccessful, although did receive an offer from at least one party, which was far below valuation expectations (UBS indicated valuation would be closer to $1.5B in its pitch process)."

[62] Exhibit 14 to Price Deposition. [BMO-ML-00030001]:

"Buyer concerns were mostly related to reimbursement and that TA had just invested."

[63] J.P. Morgan Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]:

"**Transaction Rationale**

…

**Exposure Reduction**: JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

---

Expert Report of Yvette R. Austin Smith                                   Adv. Pro. No.17-51840 (LSS) | 16

thwarted this second sales process. In October 2013 Millennium signed an engagement letter with Citi to pursue various strategic alternatives including a sale, recapitalization, issuing additional equity and liquidation.[64] Millennium asked Citi to explore if there was an opportunity to sell to a private equity sponsor at a valuation of 6x to-7x EBITDA or else take the Company public.[65] Citi noted at the time that private equity sponsors "have been generally skeptical of the business and risk of reimbursement."[66] Nonetheless, Citi reached out to potential buyers and in January 2014 pitched the transaction to a potential strategic buyer in Australia.[67] This potential buyer was described as "know[ing] ML's business well" but declined to engage in the sales process citing concern that Millennium operated in a "highly competed" industry with "unsustainable margins." The buyer also cited "issues re reimbursement in ML's end-markets."[68] On the heels of these two failed sales processes, Millennium pursued the 2014 Transaction.

30. The 2014 Transaction was ultimately structured as a $50 million revolving loan and a $1.775 billion Term Loan.[69] It appears that the decision to pursue the 2014 Transaction in the leveraged loan market was at least partially motivated by a desire to monetize the investment made by TA Associates ("TA") ahead of any potential regulatory/the United States Department of Justice ("US DOJ") investigation issues, notwithstanding the loss of substantial tax advantages.[70]

---

[64] Letter from Citi Corporate and Investment Banking to Millennium, October 21, 2013, Exhibit 15 to Price Deposition [CITI-DE-00005790].

[65] Email from Sarin to Blake, Re: Millennium update, October 12, 2013, Exhibit 223 to Deposition of M. Tortora (Citi), July 15, 2021 [CITI-DE-00071523 at 1523].

[66] *Id.*

[67] Email from Ristevski to Phin and Sarin, Re: Sonic, January 12, 2014, Exhibit 233 to Deposition of M. Tortora (Citi) [CITI-DE-00052087]. The potential buyer is believed to be Sonic Healthcare, referred to as "Sonic" in the Citi emails.

[68] *Id.*

[69] The syndicated term loan facility was upsized from $1.765 to $1.775 billion to accommodate an additional original issue discount to attract lenders, and the revolving credit facility was $50 million, for a total of $1.825 billion. *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014.

[70] *See* email from James Hart of TA (Plaintiff Exhibit 198 TA Associates Deposition) [TA_MLH-00011849]:Email from Tony Marsh of TA (Plaintiff Exhibit 198 TA Associates Deposition) [TA MLH-00011849]:

"The implication of doing a debt recap there is massive from a tax structuring standpoint. We would blow the structure with the potential to lose the full step up at the next transaction that could be worth $100s of millions depending on the form of the exit."

*See also* Email from Kevin Landry of TA (Plaintiff Exhibit 194 TA Associates Deposition) [TA_MLH-00009903]:

Proceeds from the 2014 Transaction plus additional cash on Millennium's balance sheet were used to fully repay debt held by TA, fully repay the debt issued in connection with the 2012 Transaction, pay an approximately $1.3 billion dividend to shareholders and warrant holders in Millennium's parent companies and to fund transaction fees, including fees to underwriters. In addition, certain members of management received cash distributions at the time of the 2014 Transaction.[71] Table 3 shows estimated sources and uses of proceeds for the 2014 Transaction.

**TABLE 3: ESTIMATED SOURCES AND USES OF FUNDS: 2014 TRANSACTION ($ MILLIONS)**

| Sources | Amount ($M) | Uses | Amount ($M) |
|---|---|---|---|
| New Revolver ($50M) | - | Dividend to Shareholders | 1,269.6 |
| New Term Loan B | 1,775.0 | Refinance Term Loan A | 304.0 |
| Cash from Balance Sheet | 50.0 | Refinance TA Sub Debt | 196.0 |
| | | Estimated Fees and Expenses | 55.4 |
| **Total Sources** | **1,825.0** | **Total Uses** | **1,825.0** |

Source: Confidential Information Memorandum [ML_DE_00269115 at 9136], updated by Brattle to account for the final Original Issue Discount (*see* footnote 69).

31. The 2014 Transaction was underwritten by J.P. Morgan, Citi, Suntrust and Bank of Montreal ("BMO").[72] The underwriters agreed to take on minimal credit exposure to Millennium beyond

---

"Millennium is obviously a VERY important asset for TA. We discussed the real economic tradeoffs of doing another recap in the second half of 2013, but under the "bird in the hand v. two in the bush" theory, it might make sense to pursue a recap sooner rather than later, despite the tax costs. From conversations after the PC meeting, I understand we may all be in violent agreement, but wanted to reinforce that the Portfolio Committee agrees with the approach of pushing for additional liquidity as soon as possible, given the size of a potential recap, the importance of Millennium to TA, and potential regulatory issues."

*See also* email from Mark Carter of TA (Plaintiff Exhibit 195 TA Associates Deposition) [TA_MLH-00041365]:

"I know you are contemplating a recap versus the government inquiry but for what it is worth, you may want to explore the stretch senior market. Cov-lite probably up to 4.5x leverage L+350. The good news is there are no breakage costs so if you decide to redo the cap structure later after the government provides the all-clear, no problem. This may be an issue for senior management given the risks this presents but you could always provide a special bonus to them. The bonus would go against the strike price of their options so it isn't a double dip. I have used this mechanism recently so happy to discuss. You have done such a good job with Millennium that I am focused on de-risking this all important investment. I would ignore the hundreds of millions in tax benefits and blow it up."

[71] *See* email from Heidi Smith [ML_DE_00062278] and Excel attachment [ML_DE_00062280]; *see also* Martin Price Deposition Transcript, dated April 12, 2021, at 169:23-172:25.

[72] J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494]; Citi Millennium Labs Final Approval Memo, March 13, 2014 [CITI-DE-00017912]; BMO Loan Underwriting

---

the initial underwriting risk, committing to hold only the shorter tenor revolver (which contained lending covenants not provided to the term loan lenders) and entitling them to sell down 100% of the Term Loan to other investors.[73] In particular, notwithstanding its "strong relationship" with Millennium, J.P. Morgan appears to have been uncomfortable with assuming even the underwriting risk.[74] Indeed, J.P. Morgan internally expressed concern as to whether there was sufficient market demand to successfully syndicate the loan. In an email dated January 14, 2014, a J.P. Morgan employee noted that many banks had declined to be involved in the 2012 Transaction due to concerns about litigation risk, debt structure, and the use of proceeds.[75] The 2014 Transaction required new money, and it was noted that litigation risk and use of proceeds remained a hurdle for new lenders. During the course of the syndication, J.P. Morgan asked BMO to hold a portion of the Term Loan. The contemporaneous communications confirm that J.P. Morgan was having difficulty syndicating (*i.e.*, selling) the loan in the market.[76] Furthermore, following syndication, J.P. Morgan elected to reduce its credit exposure to

---

Committee Memorandum, March 11, 2014 [BMO-ML-00009109]; SunTrust DCC Memo, March 2014 [Suntrust_MIL-DE-00006771].

[73] The Master Consent to Assignment shows the initial allocation of the Term Loan amongst investors [ML_DE_00465366 at 5370-5371].

[74] TA Associates deposition, Exhibit 216 (emphasis from original): "One important point: to note: JPMorgan does NOT want the fact that this is an underwritten deal to get out in the marketplace with accounts. We should all be careful not to talk about this deal and the underwritten point, specifically." [TA_MLN-00013228].

[75] Exhibit 125 to Deposition of J. Lee (J.P. Morgan), June 23, 2021:

"Most likely suspects to revisit, all turned it down in 2012 over use of proceeds or litigation or TA debt structure-- Wells, BAM L, Sumitomo, US Bank, Union Bank, Raymond James, BBVA Compass, Bank of the West, BB&T, Cal Bank&Trust, Key, RBC, would/could check of bunch of others. Stating the obvious but use of proceeds and litigation will remain the hurdle for new guys. At the appropriate time, would make sense to screen existing guys early/pre launch for a reality check on capacity." [JPMC-MIL-CORP-00189654].

[76] Email from Phillip Ho, April 9, 2014 (Plaintiff's Exhibit 343 to Deposition of Phillip Ho) [ML00009325 at 326]:

"Can we have a call this morning? JP called last night. Management getting nervous; Howard's asked if BMO would consider holding some of the B. Ryan at JP and I both understood that's very unlikely given cov lite. But Suntrust saying they'd hold 40mm, which Ryan and I are very surprised about.

Books at just over $lbn. There are "some" limit orders at L400 and 99. Lot of guys still working. Ryan says JP very confident theVII be well inside of flex caps when deal gets flexed; not ready to do that yet since still more time before the deadline. JP won't hold B and he's not sure where Citi is on this.

I told Ryan we'd get back to Howard today, possibly this morning. Because I knew he'd call Howard last night, told him we'd try really hard but definitely no promises. CB for sure can't hold any. Maybe the BMO CLO could do 5mm??"

Millennium from $75.9 million to no more than $27.5 million of the revolver capacity.[77] The revolver was ultimately terminated on June 4, 2015, which allowed Millennium to avoid an event of default in the event of a breach of the leverage covenant (*i.e.*, the term loan did not contain the leverage covenant).[78] As discussed below, it was reasonable to expect that Millennium would breach the leverage covenant (contained only in the revolver agreement) by the third quarter of 2015.

32. The terms of the underwriting included the ability to "flex" (or modify) the loan terms to complete syndication of the loan. Market flex language is designed to partially mitigate the risk to underwriters that they cannot syndicate a loan, due to either changes in market conditions or negative sentiment towards a credit. Underwriters initially indicated to the market that the Term Loan would price at LIBOR plus 350-375 basis points with a 50 basis point original issue discount ("OID") to investors, however this was increased to 425 basis points and a 100 basis point OID to investors. The loan size was increased by $10 million to fund the additional OID. In addition, the excess cash flow sweep was increased, the cap on sweeps removed, and restrictions on other debt tightened.[79] The substantial revisions to the terms are consistent with a very difficult syndication. This is consistent with contemporaneous email communications from the lead syndicator for JP Morgan (Jenny Lee): "[W]e came within 37.5 bps of our cap and we had 175 bps of flex. Never worked so hard in my life on a deal."[80]

---

[77] J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]: "JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

[78] Termination Notice, June 24, 2015 [JPMC-MIL-CORP-00108741].
Email from Martin Price to Brock Hardaway, June 29, 2015 [ML_DE_00601573]:

J.P. Morgan had advised Millennium prior to the closing of the 2014 Transaction that it could cancel the revolver to avoid a declaration of an event of default thereunder that might lead to acceleration of the term loan. *See* email from Stathis Karanikolaidis to Brock Hardaway [ML_DE_00001946].

[79] *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014; Loanconnector, "Corrected: Millennium Labs launches $1.8B dividend recap loan", March 31, 2014.

[80] *See* email dated April 16, 2014 from Jenny Lee to Brian Dolan [JPMC-00031194].

---

## V.  FRAMEWORK FOR SOLVENCY ANALYSIS

33. Solvency is an economic concept, the definition of which is informed by law and legal precedent. Consequently, an economic analysis of solvency must consider these sources of authoritative guidance. Section 548 of the U.S. Bankruptcy Code describes two circumstances under which a pre-petition transaction may be avoided: actual fraud and constructive fraud.  The pre-petition transaction in question may be a transfer of value or the incurrence of an obligation. The first circumstance is if the transaction is undertaken "with actual intent to hinder, delay, or defraud" a creditor. This has been defined as "actual fraud."[81]

34. For a determination of actual fraud, courts have looked to several indicia, including so-called "badges of fraud." However, I note that in this Litigation, the Court has stated that "badges of fraud is just one substitute for direct evidence" and that "a court may consider factors other than badges of fraud in its analysis"[82] such as circumstantial evidence that the "natural consequence" of a debtor's action is "to hinder, delay or defraud creditors."[83]

35. The Uniform Voidable Transactions Act ("UVTA")[84] provides a non-exclusive list of the "badges of fraud". They are:

    **i.**       Whether the transfer or obligation was to an insider;

    **ii.**      Whether the transferor retained possession or control of the property after the transfer

    **iii.**     Whether the transfer or obligation was concealed or disclosed

---

[81] *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 210 (3d Cir. 2006) ("'Actual' fraud is prohibited by § 548(a)(1)(A), which allows a trustee to avoid a transfer made 'with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted.'").

[82] *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Memorandum, February 29, 2019, at p. 7.

[83] *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Memorandum, February 29, 2019, at p. 7.

[84] In July 2014, the UVTA replaced the Uniform Fraudulent Transfer Act, which (at that time) was in force in 43 states (all states except Alaska, Kentucky, Louisiana, Maryland, New York, South Carolina, and Virginia). Uniform Law Commission, *Fraudulent Transfer Act* [https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3]; Jones Day, *Uniform Voidable Transactions Act Approved by Uniform Law Commission to Replace UFTA*, September/October 2014, https://www.jonesday.com/en/insights/2014/10/uniform-voidable-transactions-act-approved-by-uniform-law-commission-to-replace-ufta.

**iv.** Whether, before the transfer was made or obligation was incurred, a creditor sued or threatened to sue the debtor

**v.** Whether the transfer was of substantially all the debtor's assets

**vi.** Whether the debtor had absconded

**vii.** Whether the debtor had removed or concealed assets

**viii.** Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred

**ix.** Whether the debtor was insolvent or became insolvent shortly after the transfer was made or obligation was incurred

**x.** Whether the transfer occurred shortly before or shortly after a substantial debt was incurred

**xi.** Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor

36. The second circumstance under which a transaction may be avoided, known as "constructive fraud," requires two elements:

   **i.** The first element is that the transferor "received less than a reasonably equivalent value in exchange for such transfer or obligation."

   **ii.** The second element is that he transferor must meet at least one of the following economic tests:

   a. was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation (often referred to as the "balance sheet test"); *or*

   b. was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital (often referred to as the "adequate capital" test); *or*

c.  intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured (often referred to as the "ability to pay debts" test).[85]

37.  Note that reasonably equivalent value and insolvency are implicated under both actual fraud and constructive fraud.

38.  Several standard economic analyses are used to assess the elements of constructive fraud and some of the indicia of actual fraud. These analyses are discussed in the following sections.

### A.  BALANCE SHEET TEST

39.  Under the balance sheet test, a company is considered insolvent if at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.[86]  Debt is defined broadly to include liabilities associated with an obligation whether or not that obligation "is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[87] Under the assumption that a company will continue as a going-concern, its business enterprise value ("BEV") is equivalent to the sum of all of the company's assets at fair valuation.[88]

40.  BEV refers to the value of a firm that is available to compensate all capital providers (i.e., both equity and debt) to the firm. The difference between a company's BEV and its total liabilities represents the company's equity value. Equity value is available to compensate the firm's equity holders. It represents the firm's residual value, after repaying the firm's debt and other liabilities. Thus, the balance sheet test determines if a company's equity value is positive or negative.[89] If

---

[85]  11 U.S.C. § 548 (a)(1)(B).

[86]  *See* UVTA, Section 2 and United States Code, Title 11, Chapter 1, Section 101.  Fair valuation is not defined in the UVTA or the Bankruptcy Code.  However, case law has defined it in a manner consistent with fair market value. *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 348 B.R. 234, 274 (Bankr. D. Del. 2005)("Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value.").

[87]  *See* 11 U.S.C. § 101.

[88]  BEV is intended to include the value of a company's non-operating assets (if any).

[89]  By definition, the sum of a company's assets is equal to the total sources of financing for those asset (*i.e.*, Assets = Debt + Equity). Re-arranging the equation, Assets − Debt = Equity.  Therefore, if Debt > Assets then Equity < 0 (*i.e.*, Equity is negative).

the fair value of a company's equity is negative, it indicates that the company is insolvent. The methodologies to calculate BEV can be categorized into three fundamental approaches: income, market and asset.

41. Income-based approaches calculate the value of a firm based on various measures of cash flow produced by the firm. The cash flow measures should be projected (or forward-looking) and should represent best estimates of expected cash flows. The most common income-based approach is the discounted cash flow ("DCF") methodology. DCF calculates the value of a firm using projected unlevered free cash flows, also referred to as "debt-free cash flows." In summary, free cash flows are calculated as revenue less cash operating expenses, taxes, investments in working capital and capital expenditures. Unlevered free cash flows do not reflect either debt service payments or distributions to equity holders (*e.g.*, dividends). The projected free cash flows of the firm are discounted back to the date of valuation, using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows. It is important to note that the DCF methodology utilizes future (projected) cash flows to ascertain the value of a company at as specific point in time (*i.e.*, the date of valuation). For valuation analysis in connection with constructive or actual fraud there are two relevant valuation dates: (i) immediately prior to the transaction subject to avoidance and (ii) immediately upon giving effect to the transaction subject to avoidance. To accurately calculate value using DCF, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation.[90]

42. Capitalization of earnings or cash flow is another, though less common, income-based valuation methodology. Capitalization may be used as an alternative to DCF if the income stream to be capitalized is anticipated to grow at a constant rate from the date of valuation into perpetuity.

43. Market-based approaches calculate the value of a firm based on market transactions involving the purchase or sale of comparable companies or ownership interests in those companies. Guideline Public Companies and Precedent Transaction methodologies are both market-based approaches. The Guideline Public Company ("GPC") methodology begins by identifying a

---

[90]   *See*: Fishman, Jay E., Pratt, Shannon P. and Morrison, William J.; *Standards of Value: Theory and Applications*, John Wiley & Sons, Inc. 2007, p. 61 (quoting from Bogdanski, Federal Tax Valuation, at 2.01[3][a].

cohort of publicly-traded companies that are reasonably comparable to the firm being valued. Comparability is established through identification of specific, relevant qualitative and quantitative factors. After identifying a cohort of comparable companies, valuation multiples are calculated for each comparable company by expressing an observable measure of the company's value as a function of an operating or financial metric for the company. Under the GPC methodology, the most common observable measure of enterprise value is the sum of (i) market capitalization and (ii) the face value of outstanding debt.[91] This sum may be reduced by the company's excess cash. The most common observable measure of equity value is market capitalization. Identical to DCF, market capitalization and the value of debt are measured as of the date(s) of valuation for the subject company. Enterprise value-to-EBITDA ("EV/EBITDA"), price-to-earnings ("P/E") and price-to-book value of equity ("P/B") are examples of valuation multiples. P/E and P/B multiples are calculated using observed measures of equity value. Due to differences in accounting policies among the comparable companies or non-recurring events that affect the financial or operational metrics of a comparable company, it may be necessary to adjust or "normalize" the valuation multiples for one or more of the comparable companies to ensure that the multiples are calculated on a consistent basis.

44. The valuation multiples derived from the cohort of comparable companies may be expressed as a range, an average or another point estimate derived from the cohort (*e.g.*, a quartile value). The range or point estimate of one or more valuation multiples is, then, applied to the relevant operating or financial metric of the firm being valued (the "subject company"). As an illustrative example, the average EV/EBITDA multiple derived from the cohort of comparable companies may be applied to the EBITDA of the subject company. In this way, one can calculate the BEV for the subject company.[92] In a typical circumstance, the metric used to derive the valuation multiples should be the same metric used to calculate the value of the subject company. For example, if the valuation multiple is based on 1-year projected EBITDA, the value of the subject

---

[91]   The observable measure of value may differ when the company's capital structure includes preferred equity or other classes of equity that are not publicly traded (the value of which may not be fully reflected in market capitalization). In addition, in some instances of valuation analysis (exclusive of solvency analysis), it may be appropriate to use the market value of debt instead of the face value of debt.

[92]   Some valuation multiples, such as P/E, derive an estimate of the *equity* value of the company instead of the *enterprise* value of the company.

company is determined by applying the valuation multiple to the subject company's 1-year projected EBITDA.

45. The Precedent Transaction methodology also relies on valuation multiples to calculate the value of a firm. However, the observable measure of value for the Precedent Transaction methodology differs from that of the GPC methodology. The measure of value for the Precedent Transaction methodology is the transaction price paid in a transaction in which the acquired company (also known as the "target company") is comparable to the firm being valued. The Precedent Transaction methodology derives an estimate of enterprise value and expresses that value as a function of an operating or financial metric for the target company.[93] By definition, this methodology relies on transactions that will have been priced and closed prior to the date of valuation for the subject company. Therefore, consideration must be given to the relationship between the market conditions at the time of the precedent transactions and the market conditions contemporaneous to the date of valuation.

46. Asset-based methodologies calculate the value of a firm as the sum of the value of the assets owned by the firm. Net asset value will typically represent the aggregate value of the assets less debt and other liabilities. Asset-based methodologies are typically limited to circumstances in which the value of a firm is not well-represented by a predictable measure of future cash flow and the firm's assets can be readily identified and accurately and discretely valued.

## B.    ABILITY TO PAY DEBT TEST

47. Under the ability to pay debt test a company is considered insolvent if, at the time of the transaction subject to avoidance, the company intended to incur, or believed that it would incur, debts that would be beyond the company's ability to pay as such debts matured. The definition of debt is identical to that under the balance sheet test. A company's ability to pay its debts is assessed by comparing the company's projected cash flows and cash reserves to the expected debt service requirements and a payoff or refinancing of the principal balance upon maturity. Debt service requirements are the cash flows and maintenance covenants required by the relevant

---

[93]  It is common to use a last twelve month (LTM) metric under the Precedent Transaction methodology, as projected data is often unavailable for the target company.

credit agreements. The most common cash flow requirements are interest and principal payments. In addition, credit agreements may require that the company maintain specified operating ratios. A common such ratio (referred to as a leverage ratio) is a limit on the amount of the company's debt relative to a company's EBITDA. Typically, if a company fails to comply with debt service requirements, such a failure is defined as an event of default under the relevant credit agreement. Furthermore, the occurrence of an event of default under a single credit agreement can give rise to additional events of default where the borrower is subject to cross-default provisions.

### C.     ADEQUATE CAPITAL TEST

48. The third test for constructive fraud is whether a company engaged (or was about to engage) in a "business or a transaction for which any property remaining with the debtor was an unreasonably small capital."[94]  Capital refers to how a company finances its business operations. Most companies rely significantly (if not, primarily) on internally generated cash to finance operations. However, when internally generated cash flows are insufficient to fully finance operations, companies will raise either debt or equity capital from outside investors.[95]   Thus, capital refers to the combination of internal cash flows, equity and debt. For the purpose of assessing the adequate capital test, courts have said that an adequately capitalized company has sufficient capital, including access to capital, to sustain operations.[96] Access to capital typically refers to the ability to raise equity, raise debt, reduce cash flow obligations or generate cash flows through the sale or other monetization of assets.

---

[94]   As of 2016: the UFTA (which currently is in force in 35 states, the District of Columbia, and the U.S. Virgin Islands) and the UVTA, which has been adopted by nine states, include the phrase "the remaining assets of the debtor were unreasonably small in relation to the business or transaction" in place of the corresponding language regarding "unreasonably small capital" in section 548(a)(1)(B)(ii)(II). *See* UFTA § 4(a)(2)(i); UVTA § 4(a)(2)(i). The older UFCA, which remains in effect only in New York and Maryland, tracks the "unreasonably small capital" language in section 548(a)(1)(B)(ii)(II). *See* N.Y. Debt. & Cred. L. § 274; *see also* https://www.jonesday.com/en/insights/2016/08/the-third-circuit-weighs-in-again-on-the-meaning-of-unreasonably-small-capital-in-constructively-fraudulent-transfer-avoidance-litigation.

[95]   For example, *see* Principles of Corporate Finance, Brealey, Myers, Allen, 10th edition, January 1, 2012 at pp. 341-342.

[96]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

49. Courts have indicated that the test for unreasonably small capital is "reasonable foreseeability"[97] as of the date of the challenged transaction. That is, a company has unreasonably small capital if it is reasonably foreseeable that the transaction will leave the company with capital insufficient to sustain operations. To assess reasonable foreseeability, "the critical question"[98] is whether the company's projections supporting the challenged transaction (which presumably showed that the company would be able to sustain operations) were reasonable when made. Reasonable projections do not merely rely on the company's historical operations. Rather, to be reasonable, the projections "must also account for difficulties that are likely to arise."[99] If the projections supporting the challenged transaction are found to be unreasonable, "it will follow that the debtor was left with an unreasonably small capital."[100] Finally, courts have found that unreasonably small capital is not synonymous with insolvency but, rather, "denotes a financial condition short of equitable insolvency."[101]

50. Multiple methodologies may be used to assess the adequacy of a company's capital. One set of methodologies considers the company's expected cash flows under a reasonable downside scenario. For example, is the company able to finance operations and maintain debt service under such a scenario? A second set of methodologies analyzes the company's leverage ratios (including expected leverage ratios). For example, is the company's leverage significantly in excess of leverage levels for comparable companies? The exact implementation of these methodologies will depend on the industry and/or other specific circumstances of the company in question.[102]

### D.   SUMMARY OF MILLENNIUM SOLVENCY ANALYSIS

51. To assess the solvency of Millennium as of the 2014 Transaction, I valued Millennium to determine if the value of the Company's assets exceeded the value of the Company's debt, including the debt incurred in the 2014 Transaction. I valued Millennium using a DCF analysis.

---

97   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
98   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
99   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
100  *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
101  *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
102  Collier on Bankruptcy ¶ 548.05[3][b] (16th ed. 2016).

As I demonstrate below, a proper DCF analysis shows that Millennium was balance sheet insolvent as a result of that transaction, with an equity value of no greater than *negative* $958.9 million, before accounting for contingent liabilities. I also sought to value Millennium using the GPC and Precedent Transaction methodologies. Due to the limited comparability of the identified public companies, I did not rely on the GPC methodology as my primary indication of value. Nonetheless, the most likely conclusion of value that results from the GPC methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital.  I was unable to identify sufficiently comparable precedent transactions.

52. Courts have found that unreasonably small capital is a financial condition prior to equitable insolvency.  Therefore, by definition, a balance sheet insolvent company is a company with unreasonably small capital.  Nonetheless, I also conducted a second analysis that shows that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with unreasonably small capital.  To address the third component of the solvency analysis, I also show below that the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay that debt as it matured.

## VI.  MILLENNIUM FINANCIAL PROJECTIONS IN CONNECTION WITH THE 2014 TRANSACTION

### A.  PADRES PROJECTIONS

53. Millennium created financial projections (the "Padres Projections") to support the 2014 Transaction, which were provided to both the underwriters and Vantage Point, the contemporaneous solvency advisor.  In the aggregate, the Padres Projections covered the period 2014 through 2020.  However, the Padres Projections reflected more detailed and monthly data from the first quarter of 2014 through the fourth quarter of 2018. For 2019 and 2020, the Padres Projections reflect less detailed and annual data.[103]

---

[103]  For example, the Padres Projections include payor-specific NRPS, on a quarterly basis, through the fourth quarter of 2018. Payor-specific NRPS is not available for the 2019 and 2020 projection years. *See* ML_DE_00044521 Padres Working Model_03-14.xlsx.

54. The Padres Projections were significantly flawed in that the projections failed to reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction. The primary risk factors were regulatory and administrative curtailment by Medicare in allowed testing and reductions in reimbursement rates, reductions in reimbursement rates by commercial payors, loss of Millennium business (*e.g.*, reductions in specimen volume and NRPS) and liabilities and costs associated with governmental investigations and litigation, and follow-on private party litigation. These risk factors were clearly known based on both historical trends that were evident leading up to the 2014 Transaction and on information that was either publicly available or told to Millennium by its outside legal, regulatory and financial advisors. In some instances, and as explained more fully below, these factors had been explicitly identified and/or modeled by Millennium prior to the 2014 Transaction, but were omitted from the Padres Projections. Further, in the weeks prior to the 2014 Transaction, Millennium's in-house and outside legal counsel met on multiple occasions with criminal and civil investigators from the U.S. Attorneys' Office in Boston and they were preparing for an unfair competition trial brought by a competitor (*see* Ameritox litigation, below).[104]   In this Section of the report, I describe the flaws in the Padres Projections. In Section E, I discuss how I modified the Padres Projections to correct these flaws prior to conducing the solvency analysis.

55. As a result of omitting or failing to reasonably account for these known or knowable risk factors, the Padres Projections significantly overstated Millennium's projected revenue as of the 2014 Transaction. In addition, the Padres Projections failed to take into account liabilities relating to the then pending litigation and government investigations. Had these risk factors and historical trends been reasonably taken into account, it would have been clear that the 2014 Transaction rendered Millennium balance sheet insolvent, with unreasonably small capital and an inability to pay its debts as those debts matured.

56. The following charts compare the Padres Projections to Millennium's then-recent historical results, based on three key statistics for the UDT business: specimen volume, NRPS, and payor mix. These are metrics that Millennium regularly reviewed in the operations of its business.[105] In

---

[104]   Martin Price Deposition Transcript at 134:5-136:6.

[105]   *See,* for example, the June 2014 Financial Summary [ML_DE_00034943].

each instance, the Padres Projections are unreasonable because they ignore historical trends and factors that were known or knowable as of the 2014 Transaction. Figure 2 compares historical and projected specimen volumes for Millennium's two largest payor groups: Medicare and commercial. The projected volumes are the Padres Projections.



**FIGURE 2: QUARTERLY SPECIMEN VOLUMES BY PAYOR GROUP**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 3.

57. As shown in Figure 2, the Padres Projections assumed strong continued growth in specimen volumes for Medicare and commercial payors. The Padres Projections assumed that Medicare and commercial specimen volumes would grow by 21.0% and 16.7% in 2014 respectively.[106] Afterwards, Medicare and commercial specimen volumes were <u>both</u> projected to grow by 9.3% in 2015 and by approximately 10% per annum from 2016 through 2018.[107] There are two

---

[106]   Refer to YAS Workpaper 3 for 2013-2014 growth rate to derive growth of actual volumes from 2013 and Padres projections.

[107]   *See* ML_DE_00044521 Padres Working Model_03-14.xlsx.  ("VolumeBuild – UDT" tab). Beyond 2018 the projections are not broken down to the payor level.

obvious flaws in these volume projections that render them unreasonable when made. First, the Padres Projections assume that specimen volume for Medicare and commercial payors will grow at the same rate, notwithstanding very different historical trends in specimen volumes for these two payor groups. Second, the strong projected growth trend ignores that growth had been slowing for *both* payor groups in the years leading up to the 2014 Transaction. Indeed, in an email addressing assumptions in the Padres Projections, Daniel Pencak, Head of Financial Planning and Analysis,[108] who oversaw Millennium's financial modelling, stated that the volume build-up was "rather arbitrary".[109]  In addition, no consideration was given to potential reductions in specimen volume from a settlement of the DOJ Investigation.  Millennium was aware of this risk prior the 2014 Transaction, as Millennium had previously acknowledged the decline in Ameritox's specimen volume following its governmental settlements in 2010.[110]

58. Table 4 shows the annual and first quarter 2014 growth rates in specimen volume for Medicare, commercial payor and Millennium's aggregate specimen volume (across all payor groups). In all years, from 2010 to 2014, Medicare specimen volume growth rates were lower than the rates for commercial payor specimen volume. Furthermore, the disparity in growth rates *increased* over this time period. Indeed, in first quarter of 2014, the quarter immediately prior to the 2014 Transaction, Millennium's Medicare specimen volume *contracted* by 3.2%,[111] whereas commercial specimen volume grew by 4.4%.[112] I have seen no support for the assumption that projected specimen volume growth rates for commercial and Medicare would be equal after the 2014 Transaction.

---

[108]   Pencak Deposition at 17:23 - 18:13.

[109]   Plaintiff Ex. 171 to Pencak Deposition:

   "As for volume, since the build-up was rather arbitrary, I think we will simply build the sensitivity analysis around a sliding scale of volume growth/decline vs. whatever pricing we show based on the various pricing assumptions (i.e. Medicare reimbursement changes, commercial contracts, traditional Medicaid changes, etc.)."

[110]   *See* Section B.

[111]   *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, growth percentage of cell K132 with respect to J132).

[112]   *See* ML_DE_00559340, tab 'Payor Stats – UDT'. ML_DE_00732288 (Quarterly 2012-2015Q1 tab, rows 124-126, 128 and 135). According to the management model dated June 8, 2015 ("Revised Management Model"), actual commercial specimen volume (comprising BCBS, UHC, Aetna, Cigna, Humana) in the first quarter of 2014 was 222,784, implying an actual commercial quarterly growth rate of 0.2% in the first quarter of 2014. Figure 2 shows the higher (4.4%) specimen volume growth for the first quarter of 2014, consistent with the more contemporaneous data source.

59. In addition, the Padres Projections do not adequately reflect the fact that the growth in Millennium's specimen volume had been slowing over time. The growth rate of Millennium's total specimen volume had been declining by approximately one-half, each year from 2010 to 2013. For example, the growth rate was 64.4% from 2011 to 2012 but only 30.5% from 2012 to 2013. The slowing growth trend was even more pronounced for Medicare specimen volume, decreasing to only 12.9% from 2012 to 2013 and *contracting* by 3.2% from the fourth quarter of 2013 to the first quarter of 2014. This is in contrast to the first quarter of 2013, during which Millennium's Medicare specimen volume increased by 0.4%, when compared to the fourth quarter of 2012.[113]

**TABLE 4: SPECIMEN VOLUME GROWTH 2009-2014**

|  |  | 2009 | 2010 | 2011 | 2012 | 2013 | 2013 Q4 | 2014 Q1 |
|---|---|---|---|---|---|---|---|---|
| Medicare | [1] | 45,835 | 119,599 | 250,691 | 379,051 | 428,009 | 111,203 | 107,685 |
| *Period-on-Period Growth* | [2] |  | 160.9% | 109.6% | 51.2% | 12.9% |  | -3.2% |
| Commercial | [3] | 55,195 | 155,040 | 348,521 | 607,323 | 810,881 | 222,344 | 232,225 |
| *Period-on-Period Growth* | [4] |  | 180.9% | 124.8% | 74.3% | 33.5% |  | 4.4% |
| Total Specimen Volume | [5] | 171,807 | 489,609 | 1,092,041 | 1,795,631 | 2,343,150 | 633,637 | 647,798 |
| *Period-on-Period Growth* | [6] |  | 185.0% | 123.0% | 64.4% | 30.5% |  | 2.2% |

Source: ML_DE_00732288 ('Yearly 2009-2015M5' and 'Quarterly 2012-2015Q1' tabs).
Commercial comprises BCBS, UHC, Aetna, Cigna, and Humana.

60. Figure 3 compares Millennium's historical and projected NRPS for Medicare and commercial payors.

---

[113]  Medicare quarterly specimen volumes for the fourth quarter of 2012 and the first quarter of 2013 are 101,788 and 102,229 respectively.

**FIGURE 3: QUARTERLY NET REVENUE PER SPECIMEN BY PAYOR GROUP**



Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 3.

61. As shown in Figure 3, in 2015 the Padres Projections assumed only a modest decline in NRPS for Medicare and commercial payors. From the start of the Padres forecast (first quarter of 2014) through the end of the more detailed projection through the fourth quarter of 2018, the Padres Projections assume a 20.6% and 26.2% reduction, respectively, in commercial and Medicare NRPS. From 2014 to 2020, the Padres Projections assumed an aggregate decrease of 26.5% in Millennium's UDT NRPS, across all payor groups. This is not consistent with contemporaneous efforts by both payor groups to significantly reduce reimbursement levels and tests per specimen, or the broader initiatives within the industry to reduce the incurrence of medically unnecessary tests.[114] Both of these trends were expected to play out over the shorter-term, and have a

---

[114]   *See*, for example, Special Fraud Alert: Laboratory Payments to Referring Physicians, Department of Health and Human Services Office of Inspector General, June 25, 2014. Hawk, PollyBeth, "Ready or Not: Hospital Value-Based Purchasing Poised to Transform Healthcare Reimbursement Model and Introduce New Fraud Targets Under the False Claims Act," Winter, 2013. Questionable Billing for Medicare Part B Clinical Laboratory

significantly larger impact than assumed in the Padres Projections. Indeed, in late February and early March 2014, it appears that Millennium modelled – outside the Padres Projections – a 30% reduction in Medicare NRPS beginning on July 1, 2014.[115]

62. Figure 4 compares Millennium's historical and projected payor mix, reflecting the payor contributions by Medicare, commercial and managed government. Payor contributions are measured by specimen volume.



**FIGURE 4: PAYOR MIX**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 3.

63. As shown in Figure 4, the Padres Projections assumed a relatively constant payor mix. However, the significantly different growth rates in payor group specimen volume, during the period

---

Services, Department of Health and Human Services Office of Inspector General, August 2014. A Strategy for Medicare Payment Reform, Center for American Progress, May 2015.

[115] *See* Plaintiff Exhibit 165 and 165A [ML DE 00058384] dated 2/28/2014 under "Net revenue per specimen (pricing):

"Assumed 30% reduction in Medicare reimbursement effective June 1, 2014"

*See also* email from Daniel Pencak to Brock Hardaway and Tim Kennedy dated 3/2/2014 [ML_DE_00068651]:

"Brock - see attached for the 2nd version that assumes a 30% reimbursement reduction in June 2014 related to Medicare"

---

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 35

leading up to the 2014 Transaction, completely undermines such an assumption.[116]  For example, as of the first quarter of 2012, specimen volume covered by Medicare reimbursement equaled 22.4% of Millennium's total specimen volume.  By the first quarter of 2014, Millennium's specimen volume covered by Medicare reimbursement had steadily declined to 16.6%. In contrast, the Padres Projections assumed that Medicare specimen volume would continue to equal 18.6% of Millennium's total specimen volume over the entire forecast period.  By overstating the proportion of Medicare specimen volume, the Padres Projections overstated Millennium's projected revenue (due to the higher Medicare NRPS relative to other payor groups).

64.  As shown in Figure 4, the Padres Projections assume growth in the contribution of Managed Government, consistent with the historical trend. This is projected to coincide with a large decline in "Patient" specimen volumes, which I understand represents revenue from self-pay patients.[117] This assumption has a significant impact on projected revenue, as Managed Government NRPS is significantly higher than Patient NRPS. For example, in March 2014, Managed Government NRPS was $168, whereas Patient NRPS was $2.

65.  The Padres Projections also assumed very high revenue growth rates for Millennium's non-UDT businesses. For the PGT business, the Padres Projections assumed that revenue would grow from $12 million in 2013 to $119.9 million in 2020, equating to an annual average growth rate (or CAGR) of 39%. The PGT business was expected to grow from 3.3% of Millennium's revenue in 2014 to 10.6% by 2020. Millennium's projected CAGR for the PGT business was more than three times that of the expected industry CAGR of 12.7%.[118]

---

[116]  In the Padres Projections, payor mix derived from the 'Payor Mix' tab remains constant for all payor groups throughout the forecasted period except for Managed Government, patient, and Medicaid Contract in certain periods. Managed Government is projected to increase from 14.5% in January 2015 to 19.3% in December 2018; patient pay is projected to decline from 9.8% to 2.0%; and Medicaid Contract is projected to increase from 7.7% to 10.3%.

[117]  For example, between March 2014 and December 2016, Management Government increases its contribution from 14.5% to 19.3%, whereas Patient declines from 9.8% to 2.0%. *See* ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab).

[118]  US Pharmocogentic Testing Market industry trend data. Refer to YAS Workpaper 1, tab 'US Report.' CAGR represents growth from 2015 to 2020.

66. Similarly, RxAnte's revenue was projected to grow from $12.8 million in 2014 to $87.8 million in 2020 (a CAGR of 38%). RxAnte's business share was expected to increase from 1.7% of Millennium's revenue in 2014 to 7.7% by 2020.

67. The Padres Projections further included a category of revenue labeled "Emerging Opportunities." For the following reasons, Emerging Opportunities should not form part of the expected cash flows when assessing balance sheet solvency:

   – The revenues appear aspirational rather than expected. According to the Padres Projections, there was no revenue associated with this category until 2015, around nine months following the 2014 Transaction.

   – The Confidential Information Memorandum contains limited discussion on the composition of Emerging Opportunities. Rather, discussion is limited to a description of the employment background of Elizabeth Peacock, the "Executive Vice President of Emerging Opportunities".

   – The Emerging Opportunities do not appear in the subsequent management model dated June 8, 2015 (the "Revised Management Model").[119]

### B.   VANTAGE POINT SOLVENCY ANALYSIS BASED ON PADRES PROJECTIONS

68. Millennium retained a financial advisor, Vantage Point, to conduct a solvency analysis in connection with the 2014 Transaction.[120] In its work, Vantage Point relied significantly on the flawed Padres Projections.[121] Vantage Point conducted its discounted cash flow analysis using the unmodified Padres Projections.[122] Given that the Padres Projections significantly overstated Millennium's projected revenue, it is unsurprising that Vantage Point's DCF analysis wrongly concluded that Millennium would be solvent immediately following the 2014 Transaction.

---

[119]   ML_DE_00559340.

[120]   Exhibit 56 to Smith Deposition [VP_ML_00014656]; Exhibit 59 to Smith Deposition [VP_ML_00015683].

[121]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.15, April 30, 2014 [ML_DE_00263273 at 3287].

[122]   I compared the management projections on page 15 of the Vantage Point report with the Padres Projections. *See* ML_DE_00263273 at 3287 and the projections in the April 12, 2014 model [ML_DE_00057999].

69. In addition, Vantage Point appears to have undertaken only a very limited analysis to understand whether it was reasonably foreseeable that the 2014 Transaction would result in Millennium being left with unreasonably small capital. Notwithstanding Vantage Point's inaccurate conclusion that Millennium was balance sheet solvent, a separate analysis of the adequacy of Millennium's capital was still necessary to determine if the 2014 Transaction constituted a fraudulent conveyance.

70. To assess Millennium's capital adequacy, Vantage Point "examin[ed] the cash flows of the Company [Millennium]" and "considered the debt ratios of comparable companies."[123]  For the cash flow analysis, Vantage Point performed what it called a "stress test" of the Company's cash flows. However, instead of estimating the declines in cash flows that could result from stress factors that were known or knowable as of April 2014, Vantage Point simply identified mathematical decreases in EBITDA that, in the opinion of Vantage Point, would "call into question" debt service payments. For example, Vantage Point concluded that a 19.9% decline in FY2015 EBITDA (relative to projected levels) would jeopardize debt service payments.[124] However, the Vantage Point presentation does not discuss the *probability* of Millennium encountering a 19.9% decline in EBITDA. I note, by way of high-level comparison, for the 12-month period ended December 31, 2013 to the 12-month period ended December 31, 2015, Millennium's actual EBITDA declined by 59%.[125]

71. In considering the debt ratios of comparable companies, Vantage Point relied on publicly-traded companies, notwithstanding that Millennium was most comparable to privately-held companies

---

[123]  Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.34, April 30, 2014 [ML_DE_00263273 at 3306].

[124]  Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.32, April 30, 2014 [ML_DE_00263273 at 3304].

[125]  Millennium filed for bankruptcy on November 10, 2015.

2013 EBITDA of $364.8 million based on 2013 financial statements [ML_DE_00187601 at 7606 and 7608]. Income from operations of $344.9 million, plus depreciation and amortization of $16.9 million, plus stock based comp of $3.0 million, equals $364.8 million.

2015 EBITDA of $148.0 million based on 2015 financial statements [KPMG-ML-EA15WB-0001528 at 1533 and 1535]. Income from operations of $120.9 million, plus depreciation and amortization of $27.1 million, equals $148.0 million.

According to the Confidential Information Memorandum [ML_DE_00269115 at 9201], EBITDA was $356.4 million in 2013. This would imply a reduction in EBITDA of 59%.

Expert Report of Yvette R. Austin Smith                                          Adv. Pro. No.17-51840 (LSS) | 38

such as Ameritox and Calloway. Furthermore, the Vantage Point presentation does not discuss whether the publicly-traded companies had a greater ability to maintain higher leverage. For example, Vantage Point identified Labcorp as a comparable company to Millennium.[126] In 2013, Labcorp offered a broad range of clinical laboratory tests across several countries. Unlike Millennium, Labcorp had experienced relatively steady growth of around 2% per annum over the prior two years. Labcorp reported that just 3% of its 2013 revenue related to drugs of abuse testing, and it was 9.2 times the size of Millennium by 2013 revenue.[127] As a larger and more diversified company with a more stable history of growth, Labcorp was less vulnerable to regulatory changes in any one clinical testing segment, much less the significant business, legal, and regulatory risks and exposure faced by Millennium in April 2014.

72. Notwithstanding the known business trends and significant risk factors facing Millennium in April 2014, Vantage Point's solvency presentation contains no mention of Millennium's declining Medicare revenue and declining NRPS, risks associated with Millennium's use of Custom Profiles or free specimen testing cups, impacts of MUEs or LCDs, or commercial payor reimbursement pressures. Vantage Point also appears to have ignored obvious litigation and regulatory risks, relying instead on highly questionable representations from Millennium.[128] At the time the Vantage Point solvency opinion was issued, Millennium had received multiple subpoenas from the US DOJ, was aware of multiple qui tam lawsuits, and was engaged in litigation with Ameritox. Although Vantage Point states that it did not have legal expertise,[129] it is customary market practice when providing a solvency opinion to seek out third-party expertise for the purpose of adequately assessing the risks to the company's solvency.[130]

---

[126] Vantage Point notes that "none of the selected companies were identical or directly comparable to the [Millennium]". *See* Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.15, April 30, 2014 [ML_DE_00263273 at 3292].

[127] Labcorp's 2013 revenue was $5,808 million (source: S&P CapIQ), whereas Millennium's 2013 revenue was $633 million *See* ML_DE_00044521 Padres Working Model_03-14.xlsx ("Summary" tab).

[128] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p. 9, April 30, 2014 [ML_DE_00263273 at 3281]; Exhibit 56 to Smith Deposition [VP_ML_00014656].

[129] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.7 and p.9, April 30, 2014 [ML_DE_00263273 at 3279, 3281].

[130] Based on my professional experience, including observing the practices of other financial advisors when providing solvency analyses.

## VII.   SOLVENCY ANALYSIS OF MILLENNIUM USING THE CORRECT SOLVENCY FRAMEWORK

### A.   MILLENNIUM BUSINESS TRENDS AS OF 2014 TRANSACTION

73.   At the time of the 2014 Transaction, the UDT industry, especially quantitative testing, was under significant pressure from government and commercial payors. Concerns were increasing about the expansive use of expensive urine drug tests without sufficient demonstration of medical necessity.[131]

74.   At the time of the 2014 Transaction, several trends, reflecting these same pressures, were impacting Millennium's business. Taken together, these trends indicated that Millennium was facing significant business, reimbursement, legal, and regulatory risks and exposures, and that the Company was very likely to encounter slowing or negative growth and declining profitability. The first trend was declining NRPS for Millennium's two largest payor groups: Medicare and commercial.[132] *See* Figure 5.

---

[131]   For example, *see* https://www.nytimes.com/2013/08/02/business/increase-in-urine-testing-raises-ethical-questions.html ("...urine-testing companies are aggressively marketing their services to physicians by trumpeting the big profits that await if they test their patients…"); *see also*: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782 ("Pain specialists order costly tests for illegal drugs such as cocaine and angel dust, which few seniors ever use").

[132]   As noted, Millennium reported billing data (including NRPS) for certain commercial payors, including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC.

Expert Report of Yvette R. Austin Smith                         Adv. Pro. No.17-51840 (LSS) | 40



**FIGURE 5: QUARTERLY NET REVENUE PER SPECIMEN**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 4.

75.  As shown in Figure 5, after peaking in the third quarter of 2012, NRPS for Millennium's Medicare business was trending down as of the 2014 Transaction. From the third quarter of 2012 to the first quarter of 2014, Medicare NRPS declined by 12.8%.[133] This decline is largely attributable to reductions in tests per specimen[134] and reductions in Medicare billing rates.[135,136]

---

[133]  Quarterly Medicare NRPS dropped from $518 in the third quarter of 2012 to $451 in the first quarter of 2014 (12.8% drop). *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, columns BE and BL, row 132).

[134]  ML_DE_00732288 (Quarterly 2012-2015Q1 tab). For Medicare, quarterly trends for Tests Per Specimen (columns CC to CO) appear consistent with quarterly trends for NRPS (columns BC to BO).

[135]  2012 Annual Physician Notice (Exhibit 3 to DOJ Complaint) [ML_DE_0628891], 2013 Annual Physician Notice [ML_DE_00134548], and 2014 Annual Physician Notice [ML_DE_00164030]. Comparison of each HCPCS codes' billing rates from 2012-2014 indicate an annual decline in billing rates for the majority of HCPCS codes.

[136]  According to KPMG work papers (see below), in an apparent effort to increase Medicare billings, Millennium changed its billing practices. In February 2014, Millennium increased billings to Medicare from 100% to 250% of the scheduled rate. As a result of this change, Millennium experienced a reduction in payments from "over 90%" of billed claims, to approximately 50% of billed claims. I have seen no evidence that such a strategy led to higher collections.

*See* KPMG 2014 work papers [KPMG-ML-EA14WB-0000347.xlsx, tab "2 - KPMG Look Back Analysis" (emphasis added):

---

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 41

76. NRPS for Millennium's commercial business also declined prior to the 2014 Transaction. Commercial NRPS declined by 14.3% from the second quarter of 2012 to the first quarter of 2014.[137] The observed decline was consistent with the contemporaneous negotiations between Millennium and multiple commercial payors. For example, effective in the first quarter of 2014, UHC, one of Millennium's largest commercial payors, reduced rates by 19%.[138] This followed discussions between Millennium and UHC in 2013, wherein UHC expressed concerns over inappropriate overutilization of UDT, the lack of value in quantitative testing, and over-testing due to custom profiles.[139] Other commercial payors were similarly seeking to reduce the number of reimbursable tests per year.[140] Furthermore, commercial NRPS was highly vulnerable to follow-on reductions linked to reductions in Medicare reimbursement rates. For example, during contract negotiations with UHC, Millennium agreed to a fee reduction equal to "42% of

---

"Per discussion with Rick Guzman, Sr. Director Revenue Cycle Management, the Company did not collect as expected from Medicare and Medicaid during the year due to multiple factors. **In February the Company began billing all payor groups including Medicare/Medicaid at 250% of the Medicare rate (previously billed at 100%).** Only the client payor group is billed at contractually agreed upon rates and have 100% expected collection rates. As a result of the increased billed claims, the Company saw a reduction of payments from Medicare from over 90% of billed claims to approximately 50%."

[137] Quarterly commercial NRPS dropped from $298 in the third quarter of 2012 to $255 in the first quarter of 2014 (14.3% drop). As noted, Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC. For the purposes of this analysis, I have defined these payors as the commercial payors. *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, sum of "Estimated Revenue" divided by "Priced Accession Volume" for commercial payors).

[138] Marbach email to Appel dated August, 9, 2013 [ML_DE_00061777]. Email indicates rate reductions would be effective Q4 2013, however, the Padres Projections indicate that the 19% reduction actually occurred in the first quarter of 2014. *See* ML_DE_00057999 Padres Working Model_04-12-14.xlsx ("Payor Mix" tab row 20, column AB).

[139] Plaintiff Exhibit 141 to Pencak Deposition [ML_DE_0008373]

"Issues Raised:

Inappropriate overutilization of UDT, the lack of value to the providers for quantification vs. offering qualitative results, providers chasing a number+ the ability of providers to understand the nuances of reported results.

...

"CP's continue to be of great concern, since their perception is that providers are lazy & take the easy road instead of evaluating each patient's need for specific drug monitoring. That leads to higher # of tests / specimen & $$$."

[140] Beginning January 1, 2014, Tufts health plan "will not compensate for qualitative drug screen when billed with any combination of more than twenty (20) units within 365 days per Member, as it exceeds clinical guidelines." Tufts Plan changes, [ML_DE_00305155 at 5156]. Martin Price's email circulating the updated reimbursement policy [ML_DE_00305151 at 5152] states that "[w]e expect the other payors in MA to adopt something similar."

---

Medicare for UHC commercial business."[141] In November 2014, Aetna also instituted a strict reimbursement policy.[142]

77. As shown in Figure 5, from the fourth quarter of 2012 to the first quarter of 2014, the only payor group for which Millennium saw an increase in NRPS was Managed Government. However, even with a slight increase, NRPS for Managed Government remained significantly below that for Medicare and commercial payors.

78. A second trend impacting Millennium's business prior to the 2014 Transaction was slowing growth in specimen volume. As shown in Figure 6, between the first quarter of 2012 and first quarter of 2014, quarterly specimen volume growth declined from 14.5% to 2.2%.

**FIGURE 6: QUARTERLY TOTAL SPECIMEN VOLUME GROWTH**



Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

---

[141] Marbach email to Appel August, 9, 2013 [ML_DE_00061777]. *See also* Roger Feldman, Bryan Dowd, and Robert Coulam, "Medicare's Role in Determining Prices throughout the Health Care System", October 2015.

[142] [ML_DE_00202842]:

"Aetna allows eight (8) qualitative drug test encounters per 12 month period. Aetna allows eight (8) quantitative drug tests per day and eight (8) quantitative drug test encounters per 12 month period."

79. A third trend impacting Millennium's business prior to the 2014 Transaction was a shift in Millennium's payor mix away from traditional Medicare. As shown in Figure 7, specimen volume growth for Medicare was modest from the first quarter of 2012 to the first quarter of 2014 relative to the significant growth in specimen volume for commercial, Managed Government and "other" payors. "Other" payors reflects workers compensation, patient self-pay, and Medicaid. As a result, the proportion of specimen volume for which Millennium received Medicare reimbursement decreased over time. *See* Figure 8. Due to the significant difference in NRPS between Medicare and other payors (as noted – *see* Figure 5), the financial result of this shift in payor mix away from Medicare was a significant decrease in Millennium's aggregate NRPS (*i.e.*, NRPS across all payor groups), even assuming reimbursement rates for a given payor group were held constant.

**FIGURE 7: QUARTERLY SPECIMEN VOLUMES BY PAYOR GROUP**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

**FIGURE 8: PAYOR MIX**



Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

## B.   REGULATORY AND LEGAL ENVIRONMENT AS OF 2014 TRANSACTION

80. Regulatory and legal scrutiny of the UDT industry had been increasing as of the 2014 Transaction. As early as 1998, the U.S. Department of Health and Human Services, Office of Inspector General ("HHS OIG") issued guidance to all clinical laboratories seeking reimbursement from Medicare and Medicaid. The HHS OIG guidance cautioned against the use of "standing orders" similar to Millennium's Custom Profile. Although the guidance did not prohibit this practice, it noted the propensity of standing orders to result in tests that were not reasonable and medically necessary. The guidance concluded that "as a result of the potential problems standing orders may cause, the use of standing orders is discouraged."[143]

---

[143]   Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45081:

"Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. Accordingly, the insurer may reject standing orders as evidence that a test is reasonable and necessary. Medicare contractors can and may require additional

81. The HHS OIG guidance also outlined methods by which laboratories could monitor whether unnecessary tests were occurring. This included hiring an external consultant to analyze patterns of utilization and determine the cause of any excessive growth in claims submitted to Medicare.[144] HHS OIG proposed that an annual increase in test utilization of 10% or greater would occasion additional scrutiny as potentially excessive growth. As discussed below, Millennium did hire such an external consultant (CodeMap), who concluded that Millennium faced significant legal and regulatory risk arising from the Company's business practices.[145]   As shown in Table 5, as part of my review of Millennium's billings to Medicare, I noted that test utilization increased by 10% or more for multiple test codes.[146] In an April 2015 letter from Millennium's legal counsel to HHS OIG, Millennium claimed that beginning in 2010 it identified practices with high tests per specimen and "asked these practices to review their

---

documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged."

*Id.* pp. 45079-45080:

"In addition to the general notices above, laboratories that continue to offer clients the opportunity to request customized profiles should provide annual written notices that: (1) Explain the Medicare reimbursement paid for each component of each such profile; (2) inform physicians that using a customized profile may result in the ordering of tests which are not covered, reasonable or necessary and that tests will not be billed; and (3) inform physicians that the OIG takes the position that an individual who knowingly causes a false claim to be submitted may be subject to sanctions or remedies available under civil, criminal and administrative law."

[144]  Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45080:

"There are many methods by which a laboratory may determine excessive utilization of laboratory services. One approach to self-monitoring is to hire an outside consultant to analyze the laboratory's patterns of utilization, and investigate any potential problems or aberrancies. Another approach is to analyze test utilization data by CPT or HCPCS code, for the top 30 tests performed each year. Laboratories could do this by keeping track of the number of tests performed by CPT or HCPCS code or of the number of claims submitted for each test. The laboratories would then compute the percentage growth in the number of tests or claims submitted for each of the top 30 tests from one year to the next. We believe that if a test's utilization grows more than 10 percent, the laboratory should undertake a reasonable inquiry to ascertain the cause of such growth. If the laboratory determines that the increase in test utilization occurred for a benign reason, such as the acquisition of a new laboratory facility, then the laboratory need not take any action. However, if the laboratory determines that the increase in utilization was caused by a misunderstanding or ignorance by the ordering physicians or other authorized individuals regarding the billing consequences of the tests they ordered or an action on the part of the facility, the laboratory should take any steps that it deems reasonably necessary to address the issue and to ensure misconduct is not occurring."

[145]  Draft Annual Compliance Audit Report by Greg Root/CodeMap (Exhibit 5-A to Price Deposition), 11/24/2010 [ML_DE_00511984 at 2026]; Martin Price Deposition at 52:2353:3. Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

[146]  Note that coding practices change over time, and changes in test utilization for a particular code may not always represent a change in testing practices.

ordering patterns and determine whether any changes were appropriate."[147] I have seen no evidence that there was any change in the behavior of practices with high tests per specimen. Indeed, the average number of tests per specimen in 2013 (23.6) was almost identical to that in 2010 (24.0).[148]

82. Seemingly contrary to OIG guidance, Millennium specifically targeted medical practices with low tests per specimen (the so-called "Troubled Practices Program"). Under the Troubled Practices Program, each practice with low tests per specimen was reviewed for potential "improvement." If the Custom Profiles for these Troubled Practices did not contain what Millennium considered a sufficient number of tests, or where Custom Profiles were not being utilized, Millennium threatened to remove the commissions paid to Millennium salespeople for these accounts unless they "improved."[149] According to Millennium, a major driver of increases in test per specimen in late 2011 was a focus on more "comprehensive testing", whereby Millennium would penalize underperforming practices, review Custom Profiles and/or require Lab Service Assistants or cup agreements.[150]

---

[147]   Letter from Martin Price to Andrea Berlin, April 30, 2015 [ML_DE_00594719].

[148]   The average number of tests per specimen was 24.0 in 2010, 17.6 in 2011, 23.8 in 2012, 23.6 in 2013 and 23.4 in 2014. *See* ML_DE_00732288 (Yearly 2009-2015 M5 tab, columns AT-AX, row 138).

[149]   For example, for Walter M. Kidwell, MD, it was stated under "status" in a document tracking the Troubled Practices Program that "The MA [medical assistant] was checking the DO NOT use custom profile incorrectly. They are now making sure to check Custom Profile – it has 9 tests plus validity", and that "Commissions suspended due to low tests. Reps need to ensure CP is being used." Other accounts noted that "Commissions to be paid based on updated CP." *See* Pencak Deposition, Plaintiff Exhibit 134 at p.2.

[150]   *See* Pencak Deposition, Plaintiff Exhibit 138. Millennium's commentary relates to an increase in tests per specimen from 16.4 in August 2011 to 20.1 in January 2012 (emphasis added):

   "We have experienced an increase of 3.7 tests since a low of 16.4 in Aug-11.

   The growth was due to the following:
   · New test introductions accounted for .97 of the 3.7 (26%) test growth.
   · Panel tests of opiates/barbs/TCA attributed 1.33 of the 3.7 (36%) test growth.
   · Remaining 38% due to increase in existing drug offerings - further focus on importance of comprehensive testing **(i.e. penalizing underperforming practices, reviewing initial custom profiles, requiring comprehensive testing for LSA [Lab Service Assistant] or cup agreement)."** (emphasis added).

**TABLE 5: MILLENNIUM'S CODES EXCEEDING CHANGE IN TEST VOLUME BY OVER 10%**
**(2012 - 2013)**

| HCPCS Code | Change in Volume 2012 v. 2013 |
|---|---|
| G0431 | 17.94% |
| 82649 | 14.21% |
| 82646 | 14.19% |
| 82542 | 614.74% |
| 80152 | 13.59% |
| 83805 | 13.89% |
| 80160 | 13.57% |
| 80174 | 13.57% |
| 83840 | 13.65% |
| 80182 | 13.86% |
| 82205 | 37.20% |
| 80184 | 27.01% |
| 82055 | 38.56% |
| 83516 | 56.55% |

Source: Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

83. Another indication of the increased regulatory and legal scrutiny of the UDT industry and medically unnecessary testing were multiple legal and regulatory actions taken against some of Millennium's key competitors: Ameritox Ltd. and Calloway Laboratories.

84. Ameritox was a privately-held UDT company based in Midland, Texas, before ceasing operations in May 2018.[151] At the time of the closure, Ameritox was in a dispute with a medical insurance company, Humana, over uncovered, unnecessary and duplicative testing.[152] Ameritox was identified by Millennium as one of its four key competitors.[153] In fact, 99.7% of Ameritox's

---

[151]   https://www.bizjournals.com/triad/news/2018/03/08/drug-testing-company-to-close-greensboro-facility.html
https://www.bizjournals.com/baltimore/news/2018/03/07/drug-testing-company-plans-to-close-columbia.html
[152]   *Id.*
[153]   Confidential Information Memorandum [ML_DE_00269115 at 9193].

2013 Medicare revenue derived from billing to reimbursement codes also billed by Millennium.[154]

85. In 2010, Ameritox entered into a settlement with the federal government and several state governments after being charged with various violations of the Anti-Kickback and Stark laws. As I understand, the Stark Law prohibits claims for services where the referring physician has a financial relationship with the service provider (in this case, a laboratory services company).[155] The settlement pertained to Ameritox business conduct over the years 2003 to 2010. The US DOJ charged Ameritox with providing customers benefits in exchange for the use of the companies' services that resulted in excessive, medically unnecessary UDT testing.[156] It was also alleged that Ameritox sent all urine screens automatically to a confirmation test without physician request, resulting in unnecessary testing, over testing, and overbilling.[157] As part of the settlement, Ameritox agreed to pay $16.3 million to the federal government and a number of states.[158] Ameritox also agreed to execute a corporate integrity agreement with the federal government, which required scrutiny of Ameritox's future business practices by HHS OIG.[159]

---

[154] Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. Ameritox had a slightly different distribution of its revenue by code. In particular, Ameritox derived 15.49% of 2013 Medicare revenue from qualitative tests (code G0431), relative to 0.42% for Millennium. Ameritox did not bill at all to certain codes, for example, codes related to tests for certain anti-depressants.

[155] US DOJ Complaint [ML_DE_00595094 at 5107], pp. 14-15:

"The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception."

[156] Second Amended Complaint – Maul et al v. Ameritox, LLC. at ¶ 13.

[157] Second Amended Complaint – Maul et al v. Ameritox, LLC. at ¶ 15. iii.ii. Ameritox was also alleged to have misbranded its patented RX Guardian urine-testing technology by telling doctors it was approved by the FDA when in fact it was not. *Id.*

[158] Medicare programs in various states received $814,000 of the total settlement, while plaintiff Debra Maul received $3.4 million from the total settlement. Norton, Christopher, "Ameritox to Pay $16M to Resolve Medicaid FCA Suit," November 17, 2010. Retrieved from Law360 (www.law360.com/articles/209926/ameritox-to-pay-16m-to-resolve-medicaid-fca-suit).

[159] *See* Christopher Norton, "Ameritox To Pay $16M To Resolve Medicaid FCA Suit", Law 360, November 17, 2010.

According to Millennium, following the US DOJ settlement, Ameritox's specimen volumes declined by 50% in the first year and 30% over two years.[160]

86. In 2012, another Millennium competitor, Calloway Laboratories,[161] a privately-held company based in Massachusetts, entered into the first of several government settlements regarding multiple violations of Anti-Kickback and Stark laws.[162] In March 2012, Calloway Labs agreed to pay $20 million to settle charges by the Commonwealth of Massachusetts that the company defrauded Medicaid of millions of dollars through an elaborate kickback scheme to managers of sober houses paid through straw companies. In return, managers required the tenants of the sober houses to undergo excessive urine screening.[163] Millennium estimated that Calloway experienced a 30% decline in annual specimen volume following the March 2012 settlement.[164] Calloway Labs was then acquired by Ampersand Capital Partners in late 2012 and it eventually ceased operations in October 2015.[165]

87. Prior to the 2014 Transaction, Millennium received specific advice regarding its business practices in light of the heightened legal and regulatory scrutiny of the UDT industry. In January 2011, three years prior to the 2014 Transaction, Millennium was notified by its outside compliance auditor (CodeMap) as part of Millennium's 2010 Annual Compliance Audit that its free specimen cup agreement entailed "substantial risk of violating the Stark Law."[166] CodeMap characterized the risk to Millennium in connection with its testing protocols and the provision of free cups a "1" level of risk.[167] This was the highest level of risk on a sliding scale of 1-4. For

---

[160]   Email from Martin Price to Kennedy and Hardaway, April 3, 2015 [ML_DE_00597259]; Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[161]   Similarly to Millennium, Calloway focused on UDT, although Calloway was smaller than Millennium and had a slightly different business profile. According to CMS data, 94.9% of Calloway's 2013 Medicare revenue came from the same HCPCS codes billed by Millennium. However, 55.0% of Calloway's 2013 Medicare revenue was derived from qualitative testing (G0431), compared to 0.42% for Millennium.

[162]   Patricia Wen, "Calloway Labs of Woburn agrees to $20 million settlement of Medicaid fraud case", March 30, 2012.

[163]   Id.

[164]   Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[165]   Boston Business Journal, "Woburn-based Calloway Labs, fined $20M in kickback scandal, to close and layoff 240 employees", October 8, 2015

[166]   Draft Annual 2010 Compliance Audit Report by Greg Root/CodeMap, 11/24/2010, p. 31 [ML_DE_00512026].

[167]   Id. at 41-42.

these 1-level risks, CodeMap's recommendation was to "strongly encourage Millennium to implement the recommendation, and that failure to do so will result in ***an unreasonable risk*** (emphasis added) of civil, criminal, or administrative law liability or adversely affect the effectiveness of Millennium's compliance program."[168]

88.  [169] In April 2012, Millennium's general counsel (Martin Price) received a copy of an April 2011 letter (addressed to a third party) in which the attorney from McDonald Hopkins (Jane Wood) [170]

---

[168]   *Id.* at 41.

[169]   Ronald Wisor states on 4/4/2012 that Greg Root provided the opinion "a few years back" that the cup program was a grey area and that Wisor had offered an opinion at the time that it was a gray area [ML_DE_00569414].

According to Wisor: "Having had a chance to look more closely at the Stark rules and commentary, as well as the Florida rules, I think there is a decent argument to be made the provision of InstaCups by drug testing labs should be considered lawful, although the issue certainly is not free from doubt." *See* Wisor email dated 11/18/2009, Exhibit 3 to Price Deposition, [ML_DE_00498951].



*See also*: Draft Annual Compliance Audit Report by Greg Root/CodeMap, 11/24/2010 [ML_DE_00512026]; Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

[170]   Jane Pine Wood letter April 2012, Exhibit 10 to Martin Price deposition [ML_DE_00512070]; *see also* Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

89. In April 2011, a few months after CodeMap issued its draft report, Millennium was named in a lawsuit filed by Ameritox alleging that Millennium's specimen cup agreement was a violation of Anti-Kickback and Stark laws.[171] The complaint alleged (among other claims) that Millennium "implemented a scheme of providing improper and unfair financial inducements to health care providers…that violate state and federal laws in an attempt to increase its market share."[172] It further stated that "Millennium's unfair and deceptive scheme of improper inducements and kickbacks involved, in part, an agreement with health care providers and patients not to collect payments, which Millennium is required by law to collect, in exchange for the referral of patients. The purpose of the scheme was to improperly induce, influence, and encourage health care providers to engage in business with Millennium by providing the health care providers and their patients with an improper financial benefit."[173] Millennium's outside counsel ██████████ ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.[174] Millennium's outside counsel ██████████████████████████████████████████████████████ ██████████████████[175]

90. As early as 2010, Millennium was aware that its use of Custom Profiles was contrary to the guidance from HHS OIG and that their use increased the risk of Millennium's being found liable for billing for medically unnecessary tests. ██████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████[176] In February 2012, Martin Price sent an email to Millennium representatives

---

171  Between 2011 and 2014, Ameritox brought claims against Millennium in at least eight separate forums, that included direct actions against Millennium, its employees and actions brought by third parties. *See* Millennium Voluntary Self-Referral Disclosure at p.2 [ML_DE_00670668 at 0669]

172  Ameritox, Ltd v. Millennium Laboratories, Inc, April 8, 2011, 8:11-cv-775-T-24-TBM (the "Ameritox Complaint) at ¶ 13.

173  Ameritox Complaint at ¶ 14.

174  *See* Email from Ronald Wisor to Martin Price, April 4, 2012 [ML_DE_00569414].

175  *See* Email from Ronald Wisor to Martin Price, April 4, 2012 [ML_DE_00569414].

176  According to a letter from Millennium's legal counsel on April 30, 2015:

██████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████████

informing them of Millennium's policies around Custom Profiles and noting the rationale for such policies. In this email, ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████ [177]

91. Since its inception, Millennium had been the target of at least eight qui tam lawsuits.[178] In a qui-tam lawsuit, also known as a "whistleblower" lawsuit, a private citizen brings a lawsuit against a

---



*See* letter from Skadden, Arps, Slate, Meagher & Flom LLP, April 30, 2015 (emphasis added) [ML_DE_00594736 at 4741].

[177]    *See* email from Martin Price to Millennium's sales representatives, dated February 10, 2012 (Exhibit 137 of Pencak Deposition) (emphasis added) [ML_DE_00236719 – 6720]:



[178]    Fred Schulte and Elizabeth Lucas, "Liquid Gold: Pain Doctors Soak Up Profits By Screening Urine for Drugs", November 6, 2017 (https://khn.org/news/liquid-gold-pain-doctors-soak-up-profits-by-screening-urine-for-drugs/). Qui tam lawsuits are typically filed under seal.

person or company who is believed to have violated the law in the performance of a contract with the government or in violation of a government regulation. Millennium's contracts with Medicare and Medicaid were the subject of the qui tam lawsuits. Federal or state governments occasionally intervene and become a party in a qui tam lawsuit. This is particularly true when the lawsuit is "based on significant violations which involve fraudulent or criminal acts and not technical violations and/or errors."[179] In fact, in December 2014 (eight months after the 2014 Transaction), the federal government did intervene in three qui tam lawsuits that had been filed against Millennium in January 2012, April 2012 and April 2013.[180]

92. Prior to November 2012, there had been at least five grand jury subpoenas seeking records on Millennium.[181] Four witnesses testified that Millennium was encouraging doctors to order unnecessary urine tests and was charging excessive fees to Medicare and private insurers.[182]

93. In addition to the qui tam law suits, by December 2012, Millennium was aware that the US DOJ was conducting a joint civil and criminal investigation of the Company. The conduct under investigation included (but was not limited to) health care fraud offenses and violation of the Anti-Kickback Act and False Claims Act in connection with billings of fraudulent claims to Federal healthcare programs and/or other payors, payment of remuneration to physicians and/or others to induce referrals of laboratory work to Millennium, and interference with witnesses and/or destruction of evidence.[183]

---

[179]   https://dictionary.law.com/default.aspx?selected=1709
[180]   US DOJ Complaint, March 19, 2015 [ML_DE_00629274].
[181]   Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation", November 16, 2012.
[182]   Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation", November 16, 2012.
[183]   Deposition of Daniel Pencak, July 1, 2021 ("Pencak Deposition) Exhibit 140; Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040 at 5043].

### C.   POST-TRANSACTION EVENTS RELATED TO KNOWN OR KNOWABLE RISKS IN APRIL 2014

### 1.   Verdict in Ameritox 2011 Lawsuit

94. Ameritox filed a complaint against Millennium on April 8, 2011 in Florida.[184] The complaint alleged that Millennium's specimen cup agreement was a violation of Anti-Kickback and Stark laws. Following trial, on June 16, 2014, a jury rendered its verdict that Millennium's provision of free POC cups to doctors who signed an agreement to not bill for the POC cups constituted "remuneration under the Stark Law" and "remuneration under the Anti-Kickback Statute."[185] Following the verdict, J.P. Morgan informed Millennium executives that they believed that the verdict would reduce Millennium's valuation by $500 million.[186] Consistent with an anticipated decrease in company value, Millennium ███████████████████████ ████████████████████████████████████████████[187] Shortly before the 2014 Transaction, Millennium's General Counsel informed J.P. Morgan's outside counsel that an adverse verdict in the then impending Ameritox trial would "fuel" the DOJ Investigation.[188]

---

[184]   Ameritox, Ltd v. Millennium Laboratories, Inc, April 8, 2011, 8:11-cv-775-T-24-TBM.

[185]   Jury Verdict, Ameritox, Ltd v. Millennium Laboratories, Inc, June 16, 2014, 8:11-cv-775-T-24-TBM [ML_DE_00080267]. Millennium later disclosed that it strongly disagreed with the verdict and that it requested the court to set it aside and / or order a new trial, ultimately appealing the decision. Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668 at 72].

[186]   Email from Martin Price, June 16, 2014 (Exhibit 106 to Price Deposition) [ML_DE_00669350]:



[187]   Email from Martin Price to Tim Kennedy, April 2, 2015 [ML_DE_00597259 at 7260]:



[188]   Exhibit 131 to the Lee Deposition [JPMC-MIL-CORP_00050228 at 0231].

### 2.     $90 Million Quantifiable Exposure Related to Free Specimen Cups

95.   As discussed above, prior to the 2014 Transaction Millennium was aware of the risks posed by its free specimen cup agreements. More specifically, notwithstanding that Millennium was in a position to quantify the financial impact of this risk ***prior to the 2014 Transaction***, in fact, Millennium did so only ***after*** the Ameritox verdict.

96.   On August 15, 2014, two months after the Ameritox verdict and pursuant to CMS's Voluntary Self-Referral Disclosure Protocol, Millennium's outside counsel submitted a letter to CMS ("Voluntary Self-Referral Disclosure") in order to "resolve [Millennium's] potential violation" of the "Stark" physician self-referral law.[189] By this time, Millennium had cancelled its free specimen cup program.

97.   In this disclosure, Millennium argued that its free specimen cup agreement did not create a "compensation arrangement" of the type that is prohibited by the Stark law, but nevertheless acknowledged (in Exhibit K to the submission) that, during the four years prior to the cancellation of the cup agreement in June 2014, it had received approximately $90 million from Medicare alone relating to physicians with cup agreements.[190] Deposition testimony by Martin Price, confirmed that the books and records necessary for Millennium to quantify this liability were available prior to the 2014 Transaction.[191]

---

[189]   Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668].

[190]   Exhibit K to Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00514819] shows "payments received from Medicare for testing services ordered by physicians during the period which they or their practice had a cup agreement in place with Millennium over the four-year period prior to Millennium's termination of all such agreements in June 2014…" *See* Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668 at 81].

[191]   Martin Price Deposition Transcript, dated April 12, 2021, at 323:23-324:16:

"Q. Now, this liability was eminently calculable not just as of August 2014 but also as of April 2014; correct? Just as a matter of the books and records of the company.

MR. POPOVSKY: Objection to form.

MR. WERNER: Objection to form.

A. Was it -- is the question could we have calculated our Medicare billings from those customers who had cup agreements in April of 2014 –

Q. Yes.

A. -- if we had -- if we had set out -- if someone had asked us to do that? I don't doubt the company could have generated that number. I don't know if that's your question…"

### 3.    Escalating US DOJ Investigations

98. As discussed above, by December 2012 (more than a year before the 2014 Transaction) Millennium was aware that the US DOJ was conducting a joint civil and criminal investigation of the Company. By August 2013, Millennium and its counsel were aware that former Millennium employee, Ryan Uehling, was at least one of the qui tam "relators."[192] In addition, Millennium made at least three presentations to representatives of the Boston U.S. Attorney's Office in March – April 2014, while the 2014 Transaction was in progress, concerning its business practices under investigation.[193] Only eight months after the 2014 Transaction, these known risks began to materialize.

99. On December 19, 2014, the US DOJ intervened in consolidated complaints filed by Mark McGuire, Ryan Uehling, and Omni Healthcare Inc. under the qui tam provisions of the False Claims Act.[194] According to the US DOJ and qui tam complaints, Millennium "knowingly submitted many thousands of false and fraudulent claims to Medicare and Florida Medicaid for excessive and unnecessary testing, and for testing referred in violation of the Stark Law and the Anti-Kickback Statute, and was improperly paid many millions of dollars in reimbursement for these claims."[195]

100. The United States alleged that Millennium systematically billed federal health care programs for excessive and unnecessary drug testing from January 1, 2008 through May 20, 2015.[196] The allegations stated that "Millennium caused physicians to order [urine drug tests] that were not reasonable and necessary,"[197] in part through Custom Profiles, leading to the over-billing of federal health care programs. The United States also alleged that Millennium "knowingly

---

[192] *See* email from M. Price [ML_DE_00672098].
[193] *See* Price Deposition at 132:8–136:6.
[194] US DOJ Complaint [ML_DE_00595094 at ¶¶12-15].
[195] US DOJ Complaint [ML_DE_00595094 at ¶ 8]. *See also United States of America ex rel Omni Healthcare Inc, and John Doe, v. Millennium Laboratories Inc.* at ¶¶ 2-3, *United States of America ex rel. Mark McGuire v. Millennium Laboratories, Inc.* at ¶ 2, and *United States of America ex rel. Ryan Uehling v. Millennium Laboratories, Inc.* at ¶ 2.
[196] US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.
[197] US DOJ Complaint [ML_DE_00595094 at §VA]

submitted claims to Medicare for UDT that was referred in violation of the Stark and Anti-Kickback Statue"[198] by providing physicians with free drug test cups on the condition that the physicians return the specimens to Millennium for "over $90 million"[199] dollars' worth of additional testing. Additional claims included the "dissemination of false and misleading statements about drug abuse rates and the value of its testing"[200] despite Millennium having been warned by "consultants, customers, competitors, insurers and regulators" that "its marketing schemes were illegal."[201]

101. On October 2015, Millennium entered multiple settlement agreements (together, the "US DOJ Settlement"). Millennium agreed to pay $256 million in the form of two False Claims Act settlements between Millennium and the US DOJ and an administrative settlement agreement between Millennium and the Department of Health and Human Services.[202] First, Millennium agreed to pay $227 million to resolve False Claims Act allegations that it systematically billed federal health care programs for excessive and unnecessary drug testing from January 1, 2008 through May 20, 2015.[203] Millennium also agreed to pay $10 million to resolve allegations that it submitted false claims to federal health care programs for medically unnecessary genetic testing that was performed on a routine and preemptive basis from January 1, 2012 through May 20, 2015.[204] Finally, Millennium agreed to pay a $19 million settlement to CMS to resolve administrative actions regarding Millennium's claims to Medicare for certain drug test billing codes. These claims were the subject of claim denials and an overpayment action initiated by CMS and its contractors.[205] The settlement payments established in October 2015 were in addition to earlier Medicare claim denials. For example, over the period July 2013 to July 2014,

---

[198]   US DOJ Complaint [ML_DE_00595094 at ¶ 178].

[199]   US DOJ Complaint [ML_DE_00595094 at ¶ 6].

[200]   US DOJ Complaint [ML_DE_00595094 at ¶ 3].

[201]   US DOJ Complaint at ¶ 7 [ML_DE_00595094].

[202]   US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[203]   *Id.*

[204]   *Id.*

[205]   *Id.*

approximately $27 million of Millennium's Medicare claims were rejected because they exceeded MUE limits.[206] The $27 million in claim denials is discussed in greater detail, below.

## D.   MILLENNIUM FILES FOR BANKRUPTCY

102.  As of the date of the US DOJ Settlement, Millennium lacked the cash on hand to satisfy the obligation to pay $256 million plus accrued interest.[207] After signing the term sheet with the US DOJ and several plaintiff states in May 2015, Millennium launched negotiations with prepetition lenders, including an ad hoc group that warned it might pursue claims and causes of actions related to the 2014 Transaction.[208] In July 2015, the Company informed the US DOJ that it would not be able to pay the settlement amount and its debt burden, and would need to restructure its balance sheet in order to do so; in response, the US DOJ set a mid-September deadline for the Company to present a payment plan.[209]

103.  In addition to the US DOJ Settlement, Millennium was burdened by the $1.75 billion of debt it had incurred from the 2014 Transaction. As of the Chapter 11 petition date, Millennium had $1.75 billion outstanding from the Term Loan and a $46.6 million outstanding "early commitment facility," the latter of which Millennium had entered into just prior to bankruptcy.[210] The Company attempted to restructure out-of-court, but could not garner the necessary support of 97% of its senior creditors.[211] Nevertheless, more than 93% by amount and value of its senior claims voted in favor of the proposed restructuring plan, and on November 10,

---

[206]   Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1.

[207]   KPMG-ML-EA15WB-0001034.

[208]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶¶ 28-29; *see also* Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[209]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶ 30.

[210]   Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[211]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶ 39.

2015, the Company filed voluntary prepackaged chapter 11 petitions in the U.S. Bankruptcy Court for the District of Delaware in order to implement the plan.[212]

104. The restructuring plan resulted in a reduction in the Company's debt by more than $1.15 billion, as the $1.75 billion senior facility was converted to $600 million of new term loans and the new term loan lenders received 100% of the equity in reorganized Millennium.  Total recovery under the $1.75 billion facility was estimated at 34%.[213] The restructuring plan also stipulated that Millennium and TA pay $325 million to the estate to pay the US DOJ Settlement and provide working capital, with $256 million plus $5.8 million of accrued interest to the US DOJ and the remainder to Millennium.[214]  In connection with these payments, Millennium executives and investors received certain releases.[215]

105. Lastly, the plan created two litigation trusts (one of which is the plaintiff in this Litigation) to prosecute and monetize legal claims and causes of action held by the debtor and prepetition lenders. The executed Confirmation Order Plan was filed on December 14, 2015, and Millennium emerged from its Chapter 11 reorganization on December 18, 2015.[216]

## E.   MODIFIED PADRES PROJECTIONS

106. The Padres Projections were significantly flawed in that the projections failed to reasonably reflect significant business, reimbursement, legal, and regulatory risks and exposures.  It was known or knowable as of the 2014 Transaction that, as a result of these risks, the Company was very likely to encounter slowing or negative growth and declining profitability.  Below I describe each of the adjustments I made to the Padres Projections to more accurately and reasonably

---

[212]  Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[213]  Debtwire, "Millennium Health opt-out lenders, US Trustee attack plan's forced third-party releases," December 8, 2015, https://www.debtwire.com/intelligence/view/prime-2142085.

[214]  KPMG audit work paper "4.5.5.11 Filing of Chapter 11 Bankruptcy" [KPMG-ML-EA15WB-0001034].

[215]  KPMG-ML-EA15WB-0001034; *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Exhibit 1 (Amended Plan) to Notice of (I) Entry Of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., and (II) Occurrence of Effective Date, December 14, 2015, at p. 35; *see also* pp. 58-62.

[216]  Debtwire, "Millennium Health completes financial restructuring, emerges from prepackaged Chapter 11" December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950.

reflect risk factors and historical trends that were known or knowable as of the 2014 Transaction. I refer to the revised projections as the "Modified Padres Projections."

### 1.    UDT Revenue Projections

#### a.    Adjustment to Projected Specimen Volume Growth Rates for Medicare and Commercial Payors

107.    I made specific adjustments to the Padres Projections to more accurately incorporate the known risks described above. Specifically, I adjusted the Padres Projections to reflect risks associated with: (i) Medically Unlikely Edits ("MUE"); (ii) Local Coverage Determination ("LCD"); (iii) discontinuance of Custom Profiles; (iv) the escalation of the DOJ investigation; and (v) discontinuance of the free specimen cup agreement. However, adjusting the Padres Projections for only these specific risks still does not result in a reasonable forecast for Millennium as of the 2014 Transaction. The MUE and LCD adjustments are one-time adjustments to Medicare NRPS. The discontinuance of Custom Profiles is a similar one-time adjustment to commercial payor NRPS. The adjustment for the escalation of the DOJ investigation decreases projected specimen volume over a two-year period. Finally, the discontinuance of the free specimen cup agreement represented a one-time decrease in UDT specimen volume.

108.    None of these adjustments adequately address the exaggerated specimen volume growth rates in the Padres Projections.[217] Even in the hypothetical absence of the known specific risks facing Millennium as of the 2014 Transaction, the specimen volume growth rates in the Padres Projections were significantly inconsistent with Millennium's historical trends, Millennium's reasonably anticipated future trends and with broader UDT industry trends.  Immediately below, I describe the adjustments I made to the specimen volume growth rates in the Padres Projections. In the next sections, I describe (in greater detail) the additional adjustments for each of the specific risk factors.

---

[217]    As an illustrative example: Assuming specimen volume was originally projected to be 100 in Year 1 and 125 in Year 2, representing a 25% growth rate from Year 1 to Year 2, a one-time adjustment to specimen volume might illustratively reduce the specimen volume in Year 1 to 75 (from 100). Applying the same growth rate (*i.e.*, 25%) would result in Year 2 specimen volume of 93.75. However, if the 25% growth rate was unreasonable, making the one-time adjustment to specimen volume would be insufficient to result in reasonable projections.

109. As discussed in Section A, the Padres Projections included specimen growth rate assumptions that were unreasonable because they were inconsistent with contemporaneous trends. Further, longer term projections were inconsistent with projected laboratory testing industry growth. In particular, the projected specimen CAGR of 9.8% from 2014 to 2018 for Medicare was unreasonably high given declining growth rates and *negative* growth of 3.4% in the first quarter of 2014 actuals when compared to the fourth quarter of 2013 actuals.[218] By comparison, Medicare specimen volume increased modestly (+0.4%) between the first quarter of 2013 actuals when compared to the fourth quarter of 2012 actuals. As shown in Table 9, specimen volumes had been declining since 2009. Further, the Padres Projections assumed the *same* growth rates for Medicare and commercial payors, an unreasonable assumption given different trends in growth rates at the time of the 2014 Transaction. A further reason to discredit this assumption is the known fact that overall reimbursement trends for commercial payors followed reimbursement trends for Medicare. Thus, there was a known risk that commercial growth rates would eventually follow the steeper declines represented by Medicare growth rates. Prior to making the specimen volume growth adjustments described below, I adjust these underlying specimen volume growth assumptions for Medicare to 0% in 2014, 2% in 2015 and 3% for 2016 onwards. A longer term growth rate of around 3% per annum is consistent with the projected growth rate for the broader industry, as represented by the larger publicly listed laboratory companies.[219] For commercial specimen volume growth, I assume significant underlying ongoing growth of 10% in 2014 (consistent with high but declining contemporaneous growth rates), reducing to 5% in 2015 and the long term industry growth rate of 3% in 2016 onwards. I

---

[218]  2013 actuals were derived from ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab), and 2014 actuals were derived from the 'Payor Stats – UDT' tab of the Revised Management Model [ML_DE_00559340].

[219]  Analyst reports projected an overall volume growth rate of 2.5% for LabCorp (Piper Jaffray report on LabCorp, March 10, 2014, at p. 1) and 4.60% for Quest for 2014E (Morgan Stanley report on Quest Diagnostics Inc., January 31, 2014, at p. 2).

Our long-term growth rate of 3% is consistent with broader laboratory industry median volume growth forecasts of 4.1% in 2014 and 2.6% in 2015 including growth from acquisitions (Maxim Group report on LabCorp, February 5, 2014; Piper Jaffray report on LabCorp, March 10, 2014; Morgan Stanley report on Quest, January 31, 2014; Deutsche Bank report, April 14, 2014; and Piper Jaffray report on Quest, January 30, 2014).

Moreover, 3% is conservative relative to the projected median laboratory industry organic volume growth rate of 1% in 2014 and 0.6% in 2015 (Maxim Group report on LabCorp, February 5, 2014; Piper Jaffray report on LabCorp, March 10, 2014; and Piper Jaffray report on Quest, January 30, 2014).

conservatively retain the Padres Projections' specimen volume growth assumptions for payor categories other than Medicare and commercial.

### b.      *Medically Unlikely Edits (MUEs)*

110.   The first adjustment I made to the Padres Projections was to restate Millennium's first quarter of 2014 financial results to account for the impact of MUEs, which are discussed further below, because the Padres Projections used *projected* financial results for the first quarter of 2014 as the starting point notwithstanding that the 2014 Transaction closed in April 2014. This adjustment involved two steps. As a first step, I modified the Padres Projections to reflect Millennium's actual (and lower) first quarter of 2014 results as a starting point. As a second step, as discussed below, I adjusted Millennium's *actual* first quarter of 2014 financial results to reflect the impact of MUE claim denials.

111.   MUEs are used by MACs to reduce improper payments for Medicare Part B claims.[220] Billings in excess of the units of service limits established by MUEs receive significant scrutiny from the MACs and may not be reimbursed by Medicare. This type of MUE claim denial is the focus of this portion of the analysis. In addition to denials of present claims, MUEs may also result in demands for recoupment of overpayments already made in excess of MUE limits.  As discussed further below, such recoupment represented an additional exposure for Millennium. MUEs may either be claim line edits or date of service ("DOS") edits.[221] If the MUE is a claim line edit, each line of a claim is adjudicated against the MUE limit for the HCPCS/CPT code on that claim line; if the units of service ("UOS") on the claim line exceeds the MUE limit, all UOS for that claim line are denied. If the MUE is a date of service MUE, all UOS for the HCPCS/CPT code reported by the same provider/supplier for the same beneficiary for the same date of service are aggregated. The aggregated value is compared to the MUE limit, and if the sum is greater than the MUE limit, *all* UOS for the code on the current claim are denied. Therefore, a date of service MUE creates the potential for a large disallowed claim amount as compared to a claim line MUE. Table 6 displays an illustrative example.

---

[220]   CMS website (https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE)

[221]   Letter from DLA Piper to Brock Hardaway, July 24, 2014 [ML_DE_00225152 at 5153]. *See also* CMS website, NCCI FAQs (https://www.cms.gov/medicare/national-correct-coding-initiative-edits/ncci-faqs).

**TABLE 6: ILLUSTRATIVE CLAIM EXAMPLE (SINGLE BENEFICIARY)**

| Date | Code | Units of Service | Adjudication if 83925 is: | |
|---|---|---|---|---|
| | | | If Claim Line Edit MUE (where MUE Limit = 6) | If Date of Service MUE (where MUE Limit = 6) |
| 1/1/2013 | 83925 | 8 | Denied (8 > 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |
| 1/1/2013 | 82542 | 12 | Approved | Approved |
| 1/1/2013 | 83925 | 2 | Approved (2 < 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |
| 1/1/2013 | 81242 | 16 | Approved | Approved |
| 1/1/2013 | 83925 | 1 | Approved (1 < 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |

112. As shown in Table 6, the movement to DOS MUE for code 83925 leads to denial of all claims (for the same patient and the same provider) for that date of service. Under the claim line MUE, claim lines for 1-2 tests are allowed, as the claims are below the maximum limit of 6 claims for that code. Under the DOS MUE, all the claims for that beneficiary on the same date of service are aggregated and denied, as total aggregated claims for that date exceeds the MUE limit of 6.

113. According to communication between Millennium and its counsel at the time, ██████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████.[222] As discussed above, for the year ended December 31, 2013, Millennium generated approximately 33% of its Medicare revenue, or approximately $70 million, from these two MUE codes alone. As Millennium was frequently billing in excess of DOS MUE limits, this change in the CMS MUE policy had an immediate and significant impact on Millennium's revenue.[223]  However, the reimbursement risk relating to DOS MUEs was known prior to January 1, 2014.

---

[222]   Letter from DLA Piper to Brock Hardaway, July 24, 2014 [ML_DE_00225152 at 5153, 5154]. ████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████

[223]   Prior to the 2014 Transaction, Millennium incurred significant denials under these codes. *See* "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 and ML_DE_00054258].

114. First, CMS announced on its website that effective April 1st, 2013, (*i.e.*, more than one year prior to the close of the 2014 Transaction), CMS would convert some claim line MUEs to DOS MUEs for certain CPT codes. CMS did not specify which codes would become DOS MUEs because of concerns about fraud and abuse.[224] This policy announcement also stated that if claim denials based on DOS edits were appealed, "MACs may pay UOS [units of service] in excess of the MUE value if there is adequate documentation of medical necessity of correctly reported units."[225] Second, according to Millennium's MAC, Noridian Healthcare Solutions ("Noridian"), CMS provided instructions in or around mid-2013 that "a quantity over [the MUE] limit must be denied in total (not just up to the limit [as Millennium] requested over and over again) and the need, once claims have been reviewed that _all_ aspects of medical necessity be present on reviewed claims (emphasis in original)."[226] Third, by as early as February 2014 Millennium was aware that its Medicare claims containing CPT codes 82542 and 83925, where units counts (per beneficiary, per day) exceeded the 6 and 4 limits, respectively were being denied at the rate of approximately $4 million per month, and Millennium continued to receive MUE denials under these two codes up until the time of the 2014 Transaction.[227]

115. Over the period July 2013 through July 2014,[228] approximately $27 million of Millennium's Medicare claims in connection with CPT codes 82542 and 83925 were rejected because they exceeded MUE limits for these codes.[229] This suggests that Millennium was billing above the

---

[224] Department of Health and Human Services Centers for Medicare & Medicaid Services Revised Modification to the Medically Unlikely Edit (MUE) Program [ML_DE_00206157].

[225] Department of Health and Human Services Centers for Medicare & Medicaid Services Revised Modification to the Medically Unlikely Edit (MUE) Program [ML_DE_00206157 at 6158].

[226] 2014-09-18 MUE Denial History Memo (18) [ML_DE_00206242]:
"Tim Kennedy, CFO, again brought up the issue of payment limits by MUEs and the difference in administration to these limits under Palmetto a year ago from Noridian once it assumed the contract. I then again went carefully through exactly what MUEs are, how they were developed, the role of specialty societies, the instructions from CMS about a year ago that a quantity over this limit must be denied in total (not just up to the limit as they requested over and over again) and the need, once claims have been reviewed that all aspects of medical necessity be present on reviewed claims."

[227] "Re: Medicare" e-mail dated February 14, 2014 [ML_DE_00060270], "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 at 8392 and ML_DE_00054258], "Medicare MUE – update on denials" email dated March 18, 2014 [ML_DE_00054044].

[228] KPMG-ML-EA14WB-0000347.xlsx ("1 – Summary Tab," cell B81, first paragraph).

[229] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584 at 585] at p. 1. *See also* Administrative Settlement Agreement [ML_DE_00101487].

existing MUE limits even prior to the conversion to DOS MUEs on January 1, 2014. However, of the $27 million in claim denials, at least $21.9 million (81%) pertained to billings between January and July 2014.[230] Thus, the conversion to DOS MUE significantly increased Millennium's claim denials under these two codes. In or about July 2015, Millennium revised its reported 2014 financial results to reflect a revenue write-off of approximately $27 million.[231]

116. Notwithstanding that MUE denials were known or knowable to Millennium as of the 2014 Transaction, the Company's recorded financial results (at that time) did not reflect the impact of – and subsequent revenue write-off from – such denials. Therefore, as a starting point for the Modified Padres Projections, I adjusted the Company's then-recorded first quarter of 2014 revenue to reflect the known reimbursement risk associated with MUEs.

117. Using the total MUE-impacted revenue in 2014 as of July 2014 ($21.9 million),[232] the number of months impacted (7 months),[233] and monthly Medicare UDT volumes from January to March 2014, I estimated the monthly NRPS decrease due to MUE claim denials for the 3-month period

---

[230] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1. Millennium wrote off $24.7 million in 2014 and $2.2 million in 2013 due to MUE. When making the adjustment to the Padres Projections for MUE, I conservatively assume that the 2014 write-off did not account for the $2.8 million in underpayments in Claims Universe A.

[231] *Id.*

See Administrative Settlement Agreement, October 16, 2015, pp. 1 and 2 [ML_DE_00101487 at 1488]:

"Millennium submitted to Medicare 322,588 claim lines for Current Procedural Terminology ("CPT") codes 83925 and 82542 with claims dates between December 1, 2013 and July 31, 2014 for which the number of units of CPT codes 83925 and 82542 exceeded the Medically Unlikely Edit (MUE) thresholds for those CPT codes (referred to herein as "Claim Universe A").

Medicare partially denied payment for services in Claims Universe A. An Appeal Process Agreement was signed and dated on December 12, 2014, between CMS's Part A/B Medicare Administrative Contractor (MAC), Noridian Healthcare Solutions, LLC ("Noridian") and Millennium, under which the parties agreed that Statistical Sampling and Extrapolation (SSOE) would be used to calculate the amount of Medicare overpayment and/or underpayment. Based on the SSOE, Noridian calculated a Medicare underpayment in the amount of $2,824,558.12 for services in Claims Universe A."

[232] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1. As noted, I conservatively deducted the Claims Universe A underpayments.

[233] Number of months corresponding to Jan - July 2014 period. From August 2014, Millennium only billed up to the MUE limit. *See* KPMG-ML-EA14WB-0000347.xlsx.

---

prior to the 2014 Transaction.[234] This initial analysis produced a monthly NRPS decrease between $83.5 and $89.9 for the first quarter of 2014 (January – March).[235]

118. I further adjusted this NRPS decrease to exclude potential overlapping NRPS impacts from other adjustments in our model, specifically the impact on NRPS of the proposed Medicare LCD policy (further explained in the following paragraphs). According to Millennium's analyses assessing the potential impacts of LCD, one of the CPT codes subject to the revised MUE limit, (82542 – quantitative tests for cannabinoids), would also be potentially impacted by LCD changes.[236] As a result, I quantified the monthly NRPS contributions from this test and adjusted our initial NRPS adjustment to exclude these contributions. Ultimately, I calculated a monthly Medicare NRPS decrease between $77.7 and $83.7 from January to March 2014 to reflect only allowed billing under MUE limits. As a result, the starting point for Medicare NRPS in the Modified Padres Projections is lower, reflecting the MUE adjusted NRPS in the first quarter of 2014.

119. In August 2014, a little more than three months after the close of the 2014 Transaction, Millennium, consistent with advice it had previously received from its MAC, began billing Medicare within the MUE limits for these two codes.[237]

### c.    Local Coverage Determination

120. An LCD is a determination by a fiscal intermediary (under Medicare Part B, a MAC) as to whether or not a particular item or service is eligible for reimbursement under Medicare.[238]

---

[234]  This implies a monthly impact of approximately $3.1 million ($21.9 million / 7). This is conservative relative to the internal estimate of $4 million per month made by Richard Guzman (Millennium Senior Director Revenue Cycle Management) on February 20, 2014. *See* "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 at 8392].

[235]  *See* YAS Workpaper 1.

[236]  Excel attachment to the email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[237]  KPMG-ML-EA14WB-0000347.xlsx ("1 – Summary Tab", cell B81, first paragraph).

[238]  *See* https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs, "What is an LCD?":

Local coverage determinations (LCDS) are defined in Section 1869(f)(2)(B) of the Social Security Act (the Act). This section states: "For purposes of this section, the term 'local coverage determination' means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A)."

Towards the end of January 2014, Millennium began reviewing its MAC's (Noridian) draft revised LCD policy.[239] Noridian's draft LCD policy was intended to address "distinctions between qualitative, confirmation and quantitative drug of abuse testing" and to "clearly indicate" that Medicare reimbursement was dependent on documentation of medical necessity.[240] Consistent with this purpose, Noridian's policy emphasized two key priorities, including the appropriate use of (i) quantitative testing to confirm qualitative (usually, point of care) testing, and (ii) specimen validity testing.

121. In February 2014 (two months prior to the 2014 Transaction), Millennium was advised by Avalere, a healthcare reimbursement consulting firm, that Noridian was likely to finalize its draft LCD largely in its current draft form, noting its similarity to another LCD policy that had just been finalized in January 2014 by another MAC.[241] Millennium began modeling scenarios for assessing the potential financial impact of Noridian's LCD policy on its Medicare NRPS. According to a February 3, 2014 analysis, Millennium estimated a 33.3% decline in Medicare NRPS due to the LCD.[242] Another analysis from February 5, 2014, shows two scenarios with declines in Medicare NRPS of 18.3% and 5.6% due to the LCD.[243] However, the scenario indicating a 5.6% decline assumed routine confirmation testing for illicit drugs,[244] which did not appear to be consistent with LCD guidance that required positive qualitative tests before confirmation testing for drugs of abuse.[245,246] I note that while the 18.3% decline assumes a

---

See https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs

[239] Email from Simmons to Hardaway, "Re: Noridian LCD", January 1, 2014 [ML_DE_00035507]. Noridian LCD draft was an attachment to the email. See [ML_DE_00035508]

[240] Noridian Healthcare Solutions, LLC, Draft Drugs of Abuse Testing Policy, p. 3. [2014-01-20 ML_DE_00035508_Noridian LCD Draft]

[241] Avalere Coding and Reimbursement Assessment for Drugs of Abuse Testing, February 21, 2014, at pp. 4 & 44.

[242] Excel attachment to the email from Adams to Pencak,"Subject: Order by drugs v3.xlsx", February 3, 2014 [ML_DE_00060308].

[243] Excel attachment to the email from Pencak to Hardaway, "Subject: LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[244] Email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320].

[245] Noridian Healthcare Solutions, LLC, Drugs of Abuse Testing at p. 25 [ML_DE_00035508 at 5532].

[246] The 18.3% scenario assumed that the reduction in quantitative testing is partially offset by a substantial increase in high-complexity qualitative tests (code CPT Code G0431). Specifically, the 18.3% scenario assumed that 57.5% of specimens would be subject to a high-complexity qualitative test (compared to 1.8% of specimens in December 2013). See Excel attachment to the email from Pencak to Hardaway, "Subject: LCD Impact", February 5, 2014 [ML_DE_00054320, 3421]. Code G0431 is defined as "Drug screen, qualitative: multiple

---

decrease in confirmatory quantitative testing and an elimination of specimen validity testing (reducing NRPS), the financial impact of these changes are significantly offset by an assumed significant increase in high complexity qualitative testing (G0431 – Drug Screen (per patient encounter)).[247] The assumed increase in billings under G0431 is modeled to increase Medicare NRPS by $40.74 (an offsetting increase of approximately 9%).[248]

122. A third Millennium analysis dated February 28, 2014 modeled a "30% reduction in Medicare reimbursement effective June 1, 2014."[249] In deposition testimony, Mr. Pencak agreed that the 30% reduction in Medicare NRPS effective June 2014 was "fairly close" to the impact he had modeled earlier in 2014 for the potential LCD impact,[250] and that a 30% reimbursement reduction for Medicare was within Millennium's contemplation as of March 2014.[251] A subsequent analysis that Millennium conducted after the 2014 Transaction was confirmatory of the LCD policy impact that Millennium envisioned prior to the 2014 Transaction—*i.e.*, a greater than 30% reduction in Medicare NRPS. Specifically, the June 2015 Revised Management Model projected Medicare NRPS declining from $383 in September 2015 to $248 in October 2015, or a reduction of 35%.[252] The modeled decline to $248 represented an ever greater decline when compared to Millennium's Medicare NRPS for the first quarter of 2014 (immediately prior to the 2014 Transaction). The Revised Management Model projected a *45% decline* in Medicare NRPS, as compared to the first quarter of 2014.[253]

---

drug classes by high complexity test method (e.g., immunoassay, enzyme assay)." For example, *see* https://www.cgsmedicare.com/partb/pubs/news/2012/0412/cope18723.html.

[247] Notes to the model suggest that this increase is explained in whole or in part by changing the billing for Synthetic Cannabinoids Quantification (or "Spice") from 82542 to G0431. As Pencak contemporaneously notes, the new billing code is modeled to increase the reimbursement amount from $24 to $97.

[248] If the modeled increase in billings under G0431 is eliminated, LCD is modeled to reduce Millennium's Medicare NRPS by 26.6% (versus 18.3%).

[249] Excel attachment to the email from Kennedy to Pencak, "Re:Leveraged Recap Summary" February 28, 2014 [ML_DE_00058384, 8385].

[250] Pencak Deposition at 251:13 – 23, Exhibit 165-A.

[251] Pencak Deposition at 255:12 – 24.

[252] ML_DE_00559340, decrease of NRPS derived from cells M8 to N8 from the "UDT Rev" tab.

[253] ML_DE_00732288 tab "Quarterly 2012-2015Q1" cell BK132 states NRPS of $451 in the first quarter of 2014 (calculation: 248/451-1 = -45%).

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 69

123. Based on the above, I conservatively modified the Padres Projections to reflect a Medicare NRPS reduction of 18.3%, effective as of October 2015, due to elimination of coverage for certain negative confirmation testing and specimen validity testing (as dictated by the LCD).[254] This is consistent with the lower end of Millennium's own pre-transaction analysis and far less than the impact (*i.e.*, 35% to 45%) that was modeled *after* the 2014 Transaction.

>*d.*     *Expected Impact Due to the Discontinuance of Custom Profiles*

124. Discontinuance of Millennium's Custom Profiles was expected to significantly reduce the number of tests per specimen, resulting in a reduction in NRPS. As discussed above, "standing orders" such as the Custom Profiles were known to increase the risk of medically unnecessary tests. Although the Padres Projections do reflect a decline in Millennium's commercial payor NRPS, there is no indication that this projected decline is intended to represent the impact of the likely discontinuance of Custom Profiles. Notwithstanding the known risks associated with the Custom Profiles, there is no indication that Millennium sought to model the impact of the elimination of Custom Profiles until the Revised Management Model prepared in June 2015.

125. The Revised Management Model incorporated only a 7% decline in commercial payor NRPS due to the discontinuance of Custom Profiles. The decline was modeled to occur in July 2015.[255] However, based on data available as of the 2014 Transaction, the impact of the anticipated discontinuance of Custom Profiles – and the resulting decline in medically unnecessary tests – should have reasonable been estimated to cause a much larger decline in commercial payor NRPS.

126. To estimate the anticipated impact on commercial NRPS due to the elimination of Custom Profiles, I used Millennium's Medicare billings as a proxy.[256] Specifically, I compared Millennium's Medicare reimbursements by code to that of its closest competitors, using 2013

---

[254]   Excel attachment to the email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[255]   ML_DE_00559340, tab 'UDT Rev.'

[256]   Comparable data was not available for Millennium's billings to commercial payors. However, given the similar reimbursement trends between Medicare and commercial payors, I believe this analysis provides a reasonable estimate for this purpose.

billing data. To identify Medicare reimbursements and Millennium's competitors, I used the 2013 CMS Physician and Other Supplier Public Use File ("Physician and Other Supplier PUF"), which contains information on all submitted Part B Medicare claims in 2013 including reimbursement, quantity of tests or services performed, HCPCS code, and the identification of the provider that submitted the claim via a National Provider Identifier ("NPI").[257] I confirmed the companies closest to Millennium by selecting the providers that billed the quantity of tests, codes, and reimbursement and volumes per code most similar to Millennium's in 2013; these competitors were Ameritox and Aegis.[258] Similar to Millennium, these two companies focus almost exclusively on UDT and were cited by Millennium as competitors.[259]

127. Next, I identified the HCPCS codes for which Millennium received reimbursement from Medicare but for which neither Ameritox nor Aegis received Medicare reimbursement. Of the 30 codes for which Millennium received Medicare reimbursement in 2013, there were 9 codes for which neither Ameritox nor Aegis received Medicare reimbursement. I then calculated the percentage of Millennium's 2013 Medicare NRPS derived from these 9 codes. In 2013, Millennium derived 21.8% of its Medicare NRPS from these codes.[260]

128. My analysis assumes that UDT companies predominantly bill to a common universe of billing codes. I also took into account the fact that by 2013, Ameritox had entered into a settlement with the federal government and several state governments related to excessive and medically unnecessary testing. Thus, it is possible that the universe of reimbursement codes used by Ameritox had contracted by 2013. Based on a public records search, I was unable to find any

---

[257]  Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[258]  *See* Appendix C: Custom Profile Revenue Impact Analysis. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[259]  Confidential Information Memorandum [ML_DE_00269115 at 9193].

[260]  *See* Appendix C: Custom Profile Revenue Impact Analysis. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

similar settlements involving Aegis with respect to excess or medically unnecessary testing.[261] Thus, it is probable that the universe of reimbursement codes used by Aegis was more consistent with medically necessary testing. Therefore, billing codes that were billed *only* by Millennium were more likely to represent medically unnecessary tests. For example, in 2013, Millennium received $4.8 million in reimbursement from Medicare for HCPCS/CPT code 80174. In 2013, neither Ameritox nor Aegis received reimbursement from Medicare for this code. This code is described as a test for tricyclic antidepressant (imipramine) and was highlighted in the US DOJ Complaint as a code associated with medically unnecessary testing.[262] Based on the foregoing analysis, I applied a 21.8% reduction in Millennium's commercial payor NRPS due to the elimination of Custom Profiles and the resulting reduction in medically unnecessary tests. In keeping with the Revised Management Model, I have assumed that this reduction occurs in July 2015.

129. However, it is important to note that this estimate may underestimate the quantity of medically unnecessary testing driven by Custom Profiles. The estimate of 21.8% does not take into account instances in which Millennium may have billed medically *unnecessary* tests to a code to which a competitor billed only medically *necessary* tests.

130. As confirmation of the likely impact of the discontinuance of Custom Profiles, I considered a second data point. Under the Modified Padres Projections, the combined impact of the revised MUE and new LCD policies is a 36.3% decline in Medicare NRPS.[263] As the revised MUE and new LCD policies focused significantly on the elimination of medically unnecessary tests, and given the history of commercial payors following the trend of Medicare reimbursement, I

---

[261] I searched Bloomberg Law and Lexis using the keywords Aegis (within 3 words of) insurance and Medicare. There were no cases related to Medicare billing practices or any other business practice that was filed under codes "375" False Claims Act or "376" Qui Tam statutes.

[262] US DOJ Complaint [ML_DE_00595094 at ¶134].

Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[263] ~36.3% decline in Medicare NRPS = 18.0% MUE related decline (adjusted for LCD) + 18.3% decline due to LCD. 18.0% MUE related decline is calculated as the average Medicare NRPS decline in the first quarter of 2014 due to adjustment for claim values over MUE threshold ($81.2) / average Medicare NRPS in the first quarter of 2014 ($451.3). 18.3% decline due to LCD changes based on the scenario ran by Millennium in February 2014 to assess impact of LCD.

considered the Medicare NRPS reduction to be a relevant proxy for Millennium's commercial NRPS reduction following the discontinuance of Custom Profiles. To avoid potential double counting due to the reduction in medically unnecessary tests, I do not explicitly model the impact of the elimination of Custom Profiles on Medicare claims.

> e.     *Expected Impact on Specimen Volume due to US DOJ Investigation and Settlement*

131.   At the time of the 2014 Transaction, Millennium knew that Ameritox had suffered significant customer attrition and specimen volume declines following its settlement with the DOJ.[264] Millennium unreasonably failed to account for this risk in the Padres Projections. An April 2015 email from Mr. Price (Millennium's general counsel) to Mr. Kennedy (Millennium's Chief Financial Officer)



[266] He further added ███████████████

---

[264]   *Ameritox, Ltd. v. Millennium Laboratories* [ML DE 00165024 at 165035], at A636, filed May 24, 2014 (emphasis added):

> "Finally, Ameritox responds that it is only fair to allow the introduction of evidence of this investigation if the Court allows Millennium to introduce evidence of the DOJ investigation of Ameritox and Ameritox's settlement of those allegations. The Court rejects this argument, **because the Court is only allowing evidence regarding the DOJ investigation and settlement to the extent that such evidence was made public, and that evidence is being used to prove Millennium's theory that customers left Ameritox because of such negative publicity**."

> *Ameritox, Ltd. v. Millennium Laboratories* [ML DE 00164789 at 165005], at A613, filed May 5, 2014 (emphasis added):

> *"Millennium also challenges the Composite Benchmark Model, arguing that Dr. Cantor makes erroneous assumptions regarding Millennium's growth and Ameritox's losses during this period, such as: (1) Dr. Cantor erroneously assumes that all of Millennium's growth in market share in each quarter after the first quarter of 2010 was solely due to the challenged conduct… **(6) she failed to consider alternative causal factors that occurred after the first quarter of 2010, such as…(d) Ameritox's $16.3 million payment to settle a healthcare fraud claim that received widespread press.**"

> In a report dated December 13, 2013, Millennium's own expert states that:

> "**Ameritox's sales volumes exhibited a significant flattening and subsequent decline during the period following the False Claims Act Settlement**, signing of the Corporate Integrity Agreement and the RxGuardian judgment. Dr. Cantor's analysis makes no mention of these issues and does not identify the potential impact of each of these issues on her damages calculations."

> *See* Rebuttal Expert Report of David S. Williams [ML DE 00495232 at 5248] at 16 (emphasis added).

[265]   Ameritox agreed to a US DOJ settlement in November 2010. *See* Tampa Bay Business Journal, "Ameritox agrees to $16.3M settlement", November 16, 2010. (https://www.bizjournals.com/tampabay/news/2010/11/16/ameritox-agrees-to-163m-settlement.html)

[266]   Email from Kennedy to Hardaway, "Re: Privileged", April 3, 2015 [ML_DE_00597259 at 7260].

---



[267] A June 2015 email from CEO Brock Hardaway noted that ████████████████████████████████████████████████████████████████████████████████████████████████████████ "[268]

132.   Based on the above, I have incorporated a 30% reduction (15% reduction each in 2015 and 2016) to the Padres Projections' total volumes assumptions across Millennium's UDT and PGT businesses to account for the reputational impact of an expected US DOJ Settlement.

> *f.*   *Expected Impact Due to the Discontinuance of the Free Specimen Cup Agreement*

133.   According to Millennium, "at its peak" approximately 10% of its customer accounts, representing 16%-17% of total specimen volume, had entered into the free specimen cup agreement.[269] As of the 2014 Transaction, the free specimen cup agreement was at significant risk of discontinuance. Millennium had received advice that the agreement violated anti-kickback statutes and Millennium was subject to an adverse ruling in the pending Ameritox litigation. I incorporated a 1.6% reduction in UDT volume in July 2014 using the analysis performed by Millennium on customers that cancelled their agreements in June 2014, the date of the Ameritox verdict (and only two month after the 2014 Transaction).[270] The 1.6% reduction in specimen volume is conservative, as it ignores customers that may have cancelled prior to (or after) June 2014, which is likely given that the Ameritox complaint against Millennium was filed in April 2011. I also note from the US DOJ Complaint that a number of customers discontinued their business with Millennium prior to 2014.[271] Furthermore, the 1.6% decline ignores any impact on future growth. As alleged in the Ameritox complaint, the specimen cup agreement facilitated higher growth rates for Millennium. It follows that future growth rates may have been lower following the discontinuance of the free specimen cup agreement.

---

[267]   Email from Kennedy to Hardaway, "Re: Privileged", April 3, 2015 [ML_DE_00597259 at 7260]
[268]   Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].
[269]   Millennium Self-Disclosure Statement at p.3 [ML_DE_00670668 at 0670].
[270]   Millennium Cancelled Cup Agreements [2014-10-13 ML_DE_00567499].
[271]   Exhibit 74 to the DOJ Complaint [ML_DE_00629123].

## 2.    PGT Revenue and RxAnte Projections

134. At the time of the 2014 Transaction, the DOJ investigation was expected to impact specimen volume for the PGT businesses. I modeled this impact similar to the impact modeled for Millennium's UDT business. Starting with the Padres Projections, I apply a 30% reduction in PGT specimen volume growth (15% reductions in January 2015 and 2016) to account for the DOJ investigation. This reduces the PGT specimen volume growth rate from 140% and 37.9% under the Padres Projections for 2015 and 2016 respectively, to 87.0% and 14.4% respectively under the Modified Padres Projections. After the impact of this adjustment, PGT revenue comprises 3.6% and 13.6% of total revenue in 2014 and 2020 respectively (compared to 3.3% and 10.6% respectively under the Padres Projections), a slight increase in the 2020 revenue percentage given the more optimistic UDT assumptions in the Padres Projections. I conservatively assume no other changes to PGT revenue projections in the Padres Projections.

135. I conservatively assume no changes from the underlying Padres Projections for RxAnte revenue (including no impact from the DOJ investigation). After the impact of the DOJ investigation on PGT and UDT revenue, RxAnte revenue comprises 1.9% and 15.2% of total revenue in 2014 and 2020 respectively.

## F.    EXPENSE PROJECTIONS

136. To complete the free cash flow analysis under the Modified Padres Projections, I use the same unit costs assumptions as the Padres Projections. Unit costs are calculated by dividing each expense by specimen volume. For example, to calculate the cost of goods sold ("COGS") unit costs, I divided COGS by specimen volume. I calculated unit costs for COGS, operating expenses (including salaries and benefits, insurance, information technology, research and development) and travel and entertainment. To estimate expenses under the Modified Padres Projections, I multiplied the unit costs by the adjusted UDT and PGT volumes discussed above. Similarly, I assume that all fixed costs in the Padres Projections do not change.

G.    SUMMARY OF MODIFIED PADRES PROJECTIONS

137. Figure 9 through Figure 11 show the collective impact of the revenue adjustments and the expense assumptions described above (*i.e.*, the Modified Padres Projections).

**FIGURE 9: MODIFIED PADRES PROJECTIONS - REVENUE**

Notes:  Modified Padres projection utilizes 2014 Q1 actuals in addition to projections for the rest of the year

138. As shown in Figure 9, the full impact of the modifications occurs by 2016. Thereafter, NRPS grows in line with the Padres Projections, however, revenue growth remains lower than the Padres Projections due to lower Medicare and commercial specimen volume growth. Under the Modified Padres Projections, 2015 revenue is 27% lower than the Padres Projections and 2016 revenue is 43% lower than the Padres Projections. By the end of the projection period, 2020 revenue is 49% lower than the Padres Projections.

Expert Report of Yvette R. Austin Smith                              Adv. Pro. No.17-51840 (LSS) | 76

**FIGURE 10: MODIFIED PADRES PROJECTIONS - EBITDA**



Notes: Modified Padres projection utilizes 2014 Q1 actuals in addition to projections for the rest of the year

139. Under the Modified Padres Projections shown in Figure 10, EBITDA immediately declines and by 2015 reaches $263 million, or 40% below the Padres Projections, and by 2016 dips to $176 million, or 62% below the Padres Projections. By 2020, projected EBITDA is 67% lower than the Padres Projections. The percentage decline in EBITDA by the end of the projection period is larger than the percentage decline in revenue, as certain fixed costs that must still be incurred by Millennium remain in place. As noted, I retain the same unit cost assumptions as the Padres Projections, and I make no adjustments to designated fixed costs.

140. Figure 11 below shows free cash flow projections. The free cash flow projections reflect the EBITDA projections above, as well as the Padres Projections for income tax rates, capital expenditure, working capital, and reductions in variable costs. For comparability purposes, in

Figure 11, I have used the same definition of free cash flow as the Padres Projections, which includes a deduction for debt amortization.[272]

**FIGURE 11: MODIFIED PADRES PROJECTIONS - FREE CASH FLOW**

Notes: Modified Padres projects free cash flow only reflects 3 quarters worth of data in 2014.

141. As shown in Figure 11, free cash flow under the Modified Padres Projections starts declining in 2016, following a small increase in 2015. In contrast, the Padres Projections projected a CAGR of approximately 16.8% per annum. In 2015 and 2016, respectively, free cash flow under the Modified Padres Projections equals $38.1 million and negative $15.5 million, as compared to $90.7 million and $95.0 million for the same periods under the Padres Projections.

---

[272] Free Cash Flow is defined under the Padres Projections as net income, plus (i) depreciation and amortization, and (ii) stock-based compensation, less (i) distributions for shareholder taxes, (ii) increase in working capital, (iii) capital expenditure, and (iv) debt amortization.

### H.   BALANCE SHEET TEST

#### 1.   Discounted Cash Flow Analysis

142. For the balance sheet test, I conduct a discounted cash flow ("DCF") analysis to value Millennium as of April 2014. Given the availability of the necessary data through the first quarter of 2014, I conduct the discounted cash flow analysis as of March 31, 2014. I am not aware of any significant change in the operations or financial condition of Millennium between March 31, 2014 and April 16, 2014 (the date the 2014 Transaction closed). As such, it is reasonable to assume that the valuation as of March 31, 2014 is a reliable indication of value as of April 16, 2014. The DCF analysis is based on the Modified Padres Projections to ensure that the resulting valuation reasonably reflects actual performance and trends, and the reasonably likely risks and difficulties that were known or knowable as of the valuation date —*i.e.*, risks related to: (i) medically unlikely edits (MUEs), (ii) local coverage determinations (LCDs), (iii) the elimination of Custom Profiles, (iv) the investigation by the DOJ, and (v) the elimination of the free specimen cup agreement. Consistent with the Padres Projections, the Modified Padres Projections reflect a seven-year discrete projection period from second quarter of 2014 to fourth quarter of 2020 and a terminal year.

143. Consistent with standard corporate finance methodology, I use the Modified Padres Projections to calculate Millennium's annual unlevered free cash flow as net operating profit after taxes, less investment in working capital and less capital expenditure, and after adding back non-cash charges (*i.e.*, depreciation and amortization). I then discount both the seven-year projected cash flows and the terminal value using a weighted average cost of capital ("WACC") (or discount rate) of 14.8%. The discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014.[273] I also note that FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%.[274] The calculation of Millennium's unlevered free cash flow is shown in 0.

---

[273]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at pp. 16 and 19, April 30, 2014 [ML_DE_00263273 at 3288 and 3291].

[274]   FTI Consulting, Millennium Health, LLC Enterprise Valuation As of December 18, 2015 at p.7, April 10, 2016 [KPMG-ML-EA15WB-0000743 at 772].

144. To calculate the terminal value, I relied upon the Gordon Growth (or Perpetuity Growth) model. I have projected a long-term growth rate for Millennium free cash flows of 3%, in line with projected longer-term growth of other laboratory companies. As of the end of 2013, U.S. real GDP was expected to grow between 2.7% to 3.4% annually for the period 2014 - 2018.[275] The assumed long-term growth is also broadly in line with the 30-year Treasury bond yield of 3.56% as of the Date of Valuation, a common benchmark for terminal growth rates.[276] The terminal value represents the value of all of Millennium's future unlevered free cash flows beyond the discrete seven-year projection period.

145. The discounted cash flow analysis demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction. The enterprise value (in this instance, equivalent to asset value) of Millennium was $802.9 million compared with $1,761.7 million of outstanding debt. Thus, the face value of Millennium's debt was greater than the value of Millennium's assets. In other words Millennium had a *negative* equity value of $958.9 million, giving effect to the 2014 Transaction (and before consideration of the liabilities relating to the then pending litigation and government investigations, discussed below).  As unreasonably small capital is a financial condition short of balance sheet insolvency, the DCF analysis also clearly demonstrates that the 2014 Transaction left Millennium with unreasonably small capital. In Appendix D, I sensitize the valuation to changes in key risk factors. Over a broad range of assumptions with respect to risks to Millennium, that were known or knowable as of the 2014 Transaction, Millennium is consistently shown to be balance sheet insolvent. Millennium's equity value as of the 2014 Transaction never exceeds *negative* $313 million, even under a significantly more optimistic (and unrealistic) view of the relevant risks.

146. In addition to the known business risks and historical trends that necessitate the cash flow adjustments discussed in Section VI.B, Millennium also faced liabilities relating to the then pending litigation and government investigations. These risks included but were not limited to:

---

[275]  Congressional Budget Office (CBO), The Budget and Economic Outlook 2014 to 2024, February 2014.

[276]  30-year treasury rate as of 3/31/2014. Daily yield curve data derived from US Department of the Treasury, available at https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView.aspx?data=yieldYear&year=2014

- Medicare recoupment related to free specimen cup agreements: In August 2014, Millennium estimated that it had received in excess of $90 million in Medicare reimbursement, during the four years prior to June 2014, in connection with customers using Millennium's free cup agreement.[277] The verdict in the Ameritox litigation confirmed that Millennium's free cup agreement violated both the Stark Law and the Anti-Kickback statute. In October 2015, Millennium agreed to resolve claims by the federal government and state Medicaid programs for $256 million.[278] This included Millennium's liability in connection with the Medicare reimbursement connected to the free specimen cups and other medically unnecessary testing.[279]

- Commercial payor litigation:  Millennium faced significant risk of "copy-cat" commercial payor litigations based on the Ameritox lawsuit and the DOJ investigation. In an April 2015 email, for example, Martin Price (Millennium's General Counsel)



[280]

- Legal fees:  [281]

- Claim B Universe:  Millennium had potential exposure relating to the repayment of Medicare overpayments it received from reimbursements for units of service billed above the MUE thresholds from January 2012 through December 2013.  This exposure was later quantified at $42 million, as "Claims Universe B", in Millennium's DOJ settlement.[282]

---

[277]   Exhibit K to Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00514819].

[278]   US DOJ Complaint ¶¶ 6, 150, 265 [ML_DE_00629274 at 9341]

[279]   US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[280]   Email from Price to Kennedy, Re: Privileged, April 3, 2015 [ML_DE_00604336].

[281]   *Id.*

[282]   *See* Administrative Settlement Agreement, October 16, 2015, p. 2 [ML_DE_00101487 at 1488]. Millennium was overpaid $42 million on claim lines at issue in Claims Universe B.

147. None of these amounts are included in the Padres Projections or the Modified Padres Projections. All of these risks — even if resolved for less than the total potential exposure as of the 2014 Transaction —further decreased Millennium's equity value and thus, exacerbated Millennium's balance sheet insolvency as of the 2014 Transaction.[283] For the purpose of the solvency analysis, I have been instructed by counsel to assume that aggregate dollar value of Millennium's exposure, reasonably anticipated as of the 2014 Transaction, was at least $45 million. As this represents only one-half of the billings to Medicare for companies with free specimen cup agreements – and does not include *any* of the other contingent liabilities – this is a conservative estimate of the contingent liabilities facing Millennium at the time of the 2014 Transaction. Based on this assumption, the value of Millennium's equity giving effect to the 2014 Transaction further decreases to *negative* $1,003.9 million.[284]

148. Millennium was balance sheet insolvent over a wide rage of WACCs. As shown in Table 7 below, sensitivity analysis for WACCs ranging from 9.8% to 14.8% shows Millennium had an equity value of *negative* $482.3 million to *negative* $958.9 million, even before accounting for its legal/regulatory exposure.[285]

---

[283] I noted that the consideration and quantification of contingent liabilities for a solvency analysis may differ from the recognition of those liabilities for accounting purposes. Further, I am instructed by counsel that under applicable case law (i) some or all of the above-referenced liabilities might be regarded as "disputed" rather than "contingent" for solvency purposes, (ii) a "disputed" liability is one where, although the amount might be subject to dispute, the facts giving rise to the liability have already occurred as of the time of the subject transfers, and (iii) for solvency purposes, it may be appropriate to value a disputed liability in the amount of its ultimate resolution.  Accordingly, this renders the estimate of Millennium's legal/regulatory liabilities discussed herein even more conservative.

[284] Negative $958.9 million less $45 million = negative $1,003.9 million.

[285] The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies *plus* the size premium adopted by Vantage Point (*i.e.*, 10.0%). However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk.  Thus, 9.8% underestimates an appropriate WACC for Millennium.

**TABLE 7: EXPECTED CASE SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE**

| | $ Millions | | | | |
|---|---|---|---|---|---|
| Discount Rate | Enterprise Value | Net Debt Value | Equity Value Before Contingent Liabilities and Fees | Contingent Liabilities | Equity Value After Contingent Liabilities and Fees |
|---|---|---|---|---|---|
| 9.8% | 1,279.4 | 1,761.7 | (482.3) | (45.0) | (527.3) |
| 10.8% | 1,135.6 | 1,761.7 | (626.2) | (45.0) | (671.2) |
| 11.8% | 1,024.3 | 1,761.7 | (737.5) | (45.0) | (782.5) |
| 12.8% | 935.5 | 1,761.7 | (826.2) | (45.0) | (871.2) |
| 13.8% | 863.1 | 1,761.7 | (898.6) | (45.0) | (943.6) |
| **14.8%** | 802.9 | 1,761.7 | **(958.9)** | (45.0) | **(1,003.9)** |

Notes and Sources:

Values derived from Table 11: Discounted Cash Flow Analysis (second quarter of 2014 through 2020) assuming different discount rates.

## 2.    Guideline Public Companies

149.  I used my standard methodology to attempt to identify comparable companies for use in the Guideline Public Company ("GPC") valuation of Millennium. First, I relied on industry knowledge gained from a combination of my professional experience, industry research and proprietary and non-proprietary industry information obtained by Brattle. Second, I relied on industry information obtained from documents produced in discovery and depositions. Third, I relied on electronically assisted searches using industry classification codes and other descriptive company data. From a combination of these efforts, I developed a list of possible guideline public companies.

150.  As part of this methodology I performed an independent analysis based on Standard Industrial Classification ("SIC") codes from the United States Department of Labor SIC Manual, including 8071 Medical Laboratories, 2835 In Vitro and In Vivo Diagnostic Substances, and 8734 Testing Laboratories. A description of these codes is contained in Appendix B. I limited my search to companies geographically located in the United States and Canada with publicly available financials and an enterprise value of at least $100 million. This method returned 30 unique potential GPC's. I also considered the comparable companies identified by Millennium and its financial advisors, which included Vantage Point, Lazard, and FTI Consulting. This method returned 17 unique potential guideline companies.

151. Combined, these two methods returned a list of 39 unique potential GPC's.[286] I reviewed each of these possible GPC's for comparability, focusing on diagnostic testing, whether the company conducted urinalyses and drugs-of-abuse testing, and the size of the company (as measured by enterprise value and revenue). After careful consideration, I arrived at five potential GPC's with at least a portion of their business that was somewhat similar to Millennium. These include Alere Inc. ("Alere"), Bio-Reference Laboratories Inc. ("Bio-Reference"), LabCorp, Myriad Genetics Inc. ("Myriad"), and Quest.[287]

152. However, for several reasons, these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value. Drugs of abuse UDT represents a relatively small portion of revenue for each of these five companies. Millennium identifies just two of these companies as competitors – LabCorp and Quest.  However, both LabCorp and Quest were significantly larger and more diversified than Millennium. LabCorp reported that just 3% of its 2013 revenue related to drugs of abuse testing and it was 11 times larger than Millennium.[288] Quest was similarly focussed on other types of laboratory testing[289] and was also approximately 11 times larger than Millennium.[290]

153. A third company, Alere, identified that 20% of its revenue came from toxicology, however this segment also included testing equipment and services. Alere had a significant focus on analytical software, and also performed diagnostic tests for infectious diseases, cardiology, diabetes, oncology, and women's health.[291]

---

[286]   Millennium's financial advisors returned 17 unique companies, while Brattle's independent analysis returned 30 unique companies. Eight companies appeared in both methodologies, resulting in 39 unique potential companies overall.

[287]   *See* Appendix B. Description of Potential Comparable Companies for a detailed description of these companies.

[288]   LabCorp's 2013 revenue was 9.2 times higher than Millennium. Source: S&P CapIQ.

[289]   The company's "Diagnostic Information Services" business group also include gene-based and esoteric testing and anatomic pathology services in addition to routine testing. Quest was further diversified with its "Diagnostic Solutions" business group, which provides risk assessment services for the life insurance industry and information technology solutions. Quest Diagnostics Incorporated Form 10-K filed for the fiscal year ended December 31, 2013 filed February 18, 2014 at p. 5.

[290]   Quests's 2013 revenue was 11.3 times higher than Millennium. Source: S&P CapIQ.

[291]   *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Alere.

154.  Bio-Reference was similar in size to Millennium in terms of revenue and focused on processing laboratory test requisitions. However, Bio-Reference largely focused on diagnosing diseases related to esoteric testing, molecular diagnostics, cancer pathology, genetics, women's health, anatomical pathology, etc. Although the Company's "Routine Testing" segment (40% of net revenues as of Jan. 2014) offered urinalyses and substance abuse tests, this business segment also tested for pregnancy, cholesterol level, and blood cell counts. The Company also had a Medical Information business segment (data analysis) that was unrelated to Millennium's product offerings.[292]

155.  Finally, I included Myriad as it operated a genetic testing business. However, unlike Millennium's PGT business, Myriad's focus was on testing for risk of disease, rather than how an individual would respond to medication. Moreover, as noted, PGT represented a very small portion of Millennium's business.[293]

156.  Notwithstanding very limited, and ultimately insufficient, comparability between Millennium and the GPCs, I computed valuation multiples based on multiples of enterprise value to EBITDA. For both sets of multiples, I computed the multiples as of the Date of Valuation on a Last Twelve Months ("LTM"), forecasted 2014, and forecasted 2015 basis. The latter two estimates are based on analyst consensus estimates made at the time of the Transaction. The valuation multiples are shown in Table 8.

---

[292]  *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Bio-Reference.

[293]  *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Myriad.

**TABLE 8: GUIDELINE PUBLIC COMPANY MULTIPLES**

| | LTM Q1 2014 Multiple | | | | | |
|---|---|---|---|---|---|---|
| | EV / EBITDA | EV / 2014 EBITDA Forecast | EV / 2015 EBITDA Forecast | EV / Revenue | EV / 2014 Revenue Forecast | EV/ 2015 Revenue Forecast |
| Alere | 12.6x | 10.2x | 9.7x | 2.8x | 2.3x | 2.1x |
| Bio-Reference Laboratories | 8.7x | 7.4x | 6.8x | 1.1x | 1.0x | 0.9x |
| Laboratory Corp. of America Holdings | 9.6x | 9.4x | 9.1x | 1.9x | 1.9x | 1.8x |
| Myriad Genetics | 6.7x | 7.1x | 8.6x | 2.6x | 2.7x | 2.7x |
| Quest Diagnostics | 8.3x | 8.0x | 7.8x | 1.6x | 1.6x | 1.6x |
| Minimum | 6.7x | 7.1x | 6.8x | 1.1x | 1.0x | 0.9x |
| Median | 8.7x | 8.0x | 8.6x | 1.9x | 1.9x | 1.8x |
| Mean | 9.2x | 8.4x | 8.4x | 2.0x | 1.9x | 1.8x |
| Maximum | 12.6x | 10.2x | 9.7x | 2.8x | 2.7x | 2.7x |

157. The resulting estimates of Millennium's enterprise value are shown in Table 9 below. However, given the lack of comparability between the GPC's and Millennium, I do not consider these multiples as a reliable measure of value. In its solvency analysis, Vantage Point identified eight comparable companies, which included the five GPCs I identified.[294] Vantage Point similarly noted that none of the companies they identified "were identical or directly comparable" to Millennium.[295]

158. In addition (and as noted above), just prior to the 2014 Transaction, Millennium's management was exploring whether there was an opportunity to sell to a private equity sponsor at a valuation of 6-7x EBITDA.[296] Notwithstanding that Millennium failed to sell the Company at these valuation levels, this would place Millennium at or below the minimum valuation multiples derived from the GPC analysis. This is indicative of the lack of comparability between the GPC companies and Millennium. As a result, I have given zero weight to the GPC analysis in my assessment of the solvency of Millennium.

159. Although I do not explicitly rely on the GPC for my solvency analysis of Millennium, I note that the most likely conclusion of value that results from the GPC methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital.

---

[294] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis [ML_DE_00263273 at 3292].
[295] *Id.*, p. 20.
[296] Email from Sarin to Blake, Re:Millennium update, October 12, 2013, Exhibit 223 [CITI-DE-00071523 at 1524]

Expert Report of Yvette R. Austin Smith                                      Adv. Pro. No.17-51840 (LSS) | 86

160. A primary assumption when applying market multiples is that the subject company financial metric, to which the multiple is applied, represents a steady state metric.[297] Given the substantial expected deviation in profitability of Millennium from historical results (due to known or knowable risk factors), references to valuations based on LTM or 2014 revenue or EBITDA should not be considered indicative of Millennium's valuation.  As the Revised Padres Projections demonstrate, the impact of the known or knowable risks were not anticipated to impact Millennium's cash flows until 2015 (and not on a full-year basis, until 2016).  Thus, indications of value derived from Millennium's 2015 financial results are a relatively more accurate estimate of Millennium's value (as compared to LTM or 2014 financial metrics). Table 9 shows that when applying the 2015 forecasted revenue and EBITDA multiples, Millennium's implied equity values are *negative* $1,238 million or only a modest value of $23 million, respectively.  As a company with debt of at least $1.775 billion and equity value of only $23 million, Millennium would have unreasonably small capital.

**TABLE 9: GUIDELINE PUBLIC COMPANY VALUATION ($ MILLIONS)**

| As of April 16th, 2014 | Brattle Model Value | Multiple | | Implied Enterprise Value | | Implied Equity Value | |
|---|---|---|---|---|---|---|---|
| | [A] | [B] | | [C] | | [D] | |
| Revenue | | Low | Median | Low | Median | Low | Median |
| LTM | 644.2 | 1.1x | 1.9x | 705 | 1,221 | (1,056) | (540) |
| 2014 | 676.9 | 1.0x | 1.9x | 680 | 1,259 | (1,081) | (503) |
| 2015 | 573.1 | 0.9x | 1.8x | 524 | 1,042 | (1,238) | (720) |
| EBITDA | | | | | | | |
| LTM | 371.9 | 6.7x | 8.7x | 2,494 | 3,218 | 733 | 1,456 |
| 2014 | 368.1 | 7.1x | 8.0x | 2,609 | 2,961 | 847 | 1,200 |
| 2015 | 262.6 | 6.8x | 8.6x | 1,785 | 2,253 | 23 | 491 |
| Net Debt | 1,761.7 | | | | | | |

Source and Notes:

[A]: LTM EBITDA figure contains Raven related revenues and costs to calculate EBITDA.

[B]: Retrieved from S&P CapIQ.

[C]: [A] × [B].

---

[297]  Steady state may refer to the nominal amount or to a nominal amount that is expected to grow at a steady growth rate.

[D]: [C] - [Net Debt]. Used Brattle Model Net Debt value of $1,761.7 million.

### 3.    Precedent Transaction Analysis

161.    I also attempted to estimate the enterprise value of Millennium based on the Precedent Transaction methodology. To develop the list of precedent transactions, I screened in Capital IQ for transactions using a keyword search and SIC code analysis. I used the keywords "urine drug," "urine testing," "drug testing," and "toxicology" and additionally searched for transactions that were classified under the same three SIC codes that were used in the Guideline Public Company analysis: 8734 (Testing Laboratories), 8071 (Medical Laboratories), and 2835 (In Vitro and In Vivo Diagnostic Substances). I limited the search results to transactions closed after 1/1/2010 and prior to the Date of Valuation. I further limited the results to transactions in which a majority stake was acquired in the target company, and a transaction value greater than $25 million.

162.    Based on this search criteria, I was unable to identify any precedent transactions for which the target companies were sufficiently comparable to Millennium to produce a reliable estimate of value.

### 4.    Balance Sheet Test Conclusion

163.    Based on the foregoing analysis I concluded that Millennium was rendered balance sheet insolvent and left with unreasonably small capital as a result of the 2014 Transaction.

## I.    ABILITY TO PAY DEBTS TEST

164.    As a second test of solvency, I analyzed Millennium's ability to pay its debt obligations as they became due. Giving effect to the 2014 Transaction, Millennium had total indebtedness of $1.812 billion.[298] Of this amount, $1.775 billion represented the outstanding principal balance of the Term Loan. The Revolver was undrawn as of the Date of Valuation. To assess Millennium's

---

[298]    Term Loan of $1.775 billion plus other debt of $36.7 million. *See* Table 3 and the Confidential Information Memorandum, p. 22.

ability to pay its debts I determined whether Millennium was anticipated to be able to pay the scheduled interest and principal payments on the Term Loan.

165. To project Millennium's unlevered cash flow through December 31, 2020, I relied upon the Modified Padres Projections. All cash flows are projected on a monthly basis. I identified required debt service payments from the Padres Projections. The Term Loan required interest payments of approximately $90 million in 2015, increasing over time in line with projected LIBOR rates, until the final payment at maturity in April 2021.[299] In addition, the Term Loan required an amortization payment of $17.75 million per annum (representing 1% of the beginning Term Loan balance).[300]

166. Beginning in 2016, Millennium starts generating negative free cash flow (*i.e.*, cash flow that is available to make interest payments is negative).[301] By 2018, Millennium has insufficient cash reserves to meet interest payments. In the event that Millennium retains access to the Revolver, the additional $50 million of liquidity allows Millennium to meet interest payments for an additional 12 months. However, by 2019, cash requirements exceed the amount of liquidity available under the Revolver. In total, by maturity in April 2021, Millennium requires $124 million of additional liquidity to meet interest payments.[302]

167. Notwithstanding that the Revolver did not provide sufficient liquidity to meet the projected cash shortfall, any dependence on the Revolver to meet its debt service requirements (even temporarily) is problematic. The credit agreement governing the Revolver required that Millennium be solvent as of the date of any draw down on the Revolver.[303] The definition of solvent in the credit agreement is inclusive of balance sheet solvency as measured in this

---

[299] The Term Loan paid interest at LIBOR plus a margin of 425 basis points. *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014, and the revolving credit facility was $50 million, for a total of $1.825 billion.

[300] *See* Padres Projections (ML_DE_00057999), April 12, 2014, tab "Leverage Model," cells Q-V 151.

[301] Free Cash Flow under the Padres Projections is defined as net income, plus (i) depreciation and amortization, and (ii) stock-based compensation, less (i) distributions for shareholder taxes, (ii) increase in working capital, (iii) capital expenditure, and (iv) debt amortization.

[302] The shortfall would be larger, as I have not considered interest payments under the Revolver.

[303] *See* Sections 4.22 and 5.2 of the 2014 Credit Agreement [ML_DE_00602906].

report.[304] In light of Millennium's balance sheet insolvency as of the Date of the Valuation, Millennium would not have retained access to the Revolver. In addition to a solvency requirement, the credit agreement also contained a maintenance covenant requiring that the "Consolidated Leverage Ratio" remain below certain levels.[305] Millennium's continuing failure to comply with these covenants would constitute a technical default for the Revolver under the credit agreement.

168. A review of Millennium's projected cash flow under the expected case indicates that Millennium was anticipated to be in violation of the Consolidated Leverage Ratio covenant starting in the third quarter of 2015 (*see* Figure 12). As a result, Millennium would have been unlikely to have had access to the Revolver. Alternatively, in the event that Millennium had drawn on the revolver prior to the covenant breach, Millennium would have been unable to repay and cancel the Revolver to avoid such covenant breach. Under any scenario, the Revolver would not have been available to meet Millennium's liquidity requirements once it exhausted its cash reserves in 2018.

---

[304] Solvent is defined as:

"Solvent": when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, ( c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured."

*See* 2014 Credit Agreement [ML_DE_00602906 at 941].

[305] *See* Section 7.1 of the 2014 Credit Agreement [ML_DE_00602906].

**FIGURE 12: LEVERAGE RATIO COVENANT**



Source and Notes:

Padres Projections leverage ratio derived from April 12, 2014 Padres Projections (ML_DE_00057999), 'Leverage Model' Tab. Expected case and reasonable downside case are as defined in prior sections.

169.   I further considered Millennium's prospects for refinancing the Term Loan at maturity in April 2021. Even under the expected case projections, the leverage ratio was 8.7 times at December 31, 2020. Under the reasonable downside projections, the leverage ratio was 19.8 times at December 31, 2020. As of December 2013, the median leverage ratio for 'Caa-C' credits was 8.3 times.[306] Moody's defines 'Caa' credits, the highest quality credits in the 'Caa-C' range as "speculative of poor standing and are subject to very high credit risk."[307] Thus, even under the expected case projections, Millennium was above the levels typically associated with Caa-C credits. There was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021.

---

[306]   Moody's Financial Metrics Key Ratios By Rating And Industry For North American Non-Financial Corporations: December 2013, tab "App-8". Available at www.moodys.com.

[307]   Credit rating definitions are available at www.moodys.com. 'C' credits are "typically in default, with little prospect for recovery of principal or interest."

Expert Report of Yvette R. Austin Smith                                   Adv. Pro. No.17-51840 (LSS) | 91

###### J.    ADEQUATE CAPITAL TEST

170. By definition, a balance sheet insolvent company is a company with unreasonably small capital. Millennium was rendered balance sheet insolvent by the 2014 Transaction. Nonetheless, I undertook a second analysis to assess the reasonableness of Millennium's capital, giving effect to the 2014 Transaction. Under this second analysis, I determined Millennium's financial condition under a reasonable downside scenario because the Padres Projections were not reasonable or prudent when made. If a company is left with unreasonably small capital under a reasonable downside scenario, it follows that the company's unreasonably small capital is reasonably foreseeable.

171. In my reasonable downside scenario, I made two adjustments to the Modified Padres Projections. Both adjustments are consistent with contemporaneous estimates made by Millennium. Specifically, I adjusted the Modified Padres Projections by:

    i.   Increasing the reduction in Medicare NRPS due to LCD from 18.3% to 33.3%, consistent with higher contemporaneous estimates prepared by Millennium.[308] The difference in the estimates are driven by two key assumptions. First, there is an assumed increase in the specimens that are subject to point of care ("POC") testing. Increased POC testing reduces the volume of quantitative testing (reducing NRPS). Second, there is no assumed increase in billings under G0431. Thus, the offset (*i.e.*, increase in NRPS) described above does not occur.

    ii.  Increasing the decline in UDT and PGT specimen volumes due to an expected settlement of the DOJ investigation from 30% to 50%. This is consistent with Millennium's higher estimate of Ameritox's specimen volume decline following its government settlement.[309]

172. As shown in Table 10 below, under a reasonable downside scenario, Millennium had an equity value of negative $1,048.8 million to negative $1,274.8 million at WACCs ranging from 9.8% to

---

[308]  Attachment to the email from Adams to Pencak, Re: Order by drugs v3.xlsx, February 3, 2014 [ML_DE_00060308] (forecasting a 33.3% drop in Medicare NRPS due to LCD impact).

[309]  Internal Millennium emails discussed volume declines ranging from 30% to 50%.
Email from Hardaway to Mulloy, Re: FW: Millennium financial model – version 2.
[ML_DE_00559337 at 9338] (In a June 8, 2015 email, Hardaway conceded that "our volume assumptions [i.e., 10% reduction] were aspirational" and noting that "Ameritox had a roughly 50% drop in volumes and Callaway [sic] had a roughly 30% drop after they each announced DOJ investigations/settlements.")

14.8%, without even taking into account Millennium's contingent liabilities. Under the reasonable downside scenario, the negative equity values confirm that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with capital insufficient to sustain operations. In other words, the 2014 Transaction left Millennium with unreasonably small capital.

**TABLE 10: DOWNSIDE CASE SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE**

| Discount Rate | $ Millions | | |
| --- | --- | --- | --- |
| | Enterprise Value | Net Debt Value | Equity Value Before Contingent Liabilities and Fees |
| 9.8% | 712.9 | 1,761.7 | (1,048.8) |
| 10.8% | 645.0 | 1,761.7 | (1,116.8) |
| 11.8% | 592.3 | 1,761.7 | (1,169.5) |
| 12.8% | 550.2 | 1,761.7 | (1,211.6) |
| 13.8% | 515.7 | 1,761.7 | (1,246.0) |
| **14.8%** | **487.0** | **1,761.7** | **(1,274.8)** |

Notes and Sources:

Values derived from YAS Workpaper 1 (second quarter of 2014 through 2020) assuming different discount rates.

## K.   SOLVENCY CONCLUSION

173. The foregoing analyses show that Millennium was rendered balance sheet insolvent by the 2014 Transaction. Thus, by definition, the 2014 Transaction left Millennium with unreasonably small capital.  The inadequacy of Millennium's capital is confirmed by examining the value of Millennium under a reasonable downside scenario. Finally, the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay as that debt matured.

November 15, 2021

_____
Yvette R. Austin Smith

_____
Date

## APPENDIX A: SOLVENCY TEST EXHIBITS

### A.1      EXPECTED CASE DCF ANALYSIS

#### TABLE 11: DISCOUNTED CASH FLOW ANALYSIS

|  | | Input | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | TV |
|---|---|---|---|---|---|---|---|---|---|---|
| Long-Term Industry Growth Rate | [1] | 3% | | | | | | | | |
| WACC | [2] | 14.8% | | | | | | | | |
| Valuation Date | [3] | 3/31/2014 | | | | | | | | |
| Income Tax Rate | [4] | 52.6% | | | | | | | | |
| | | | | | | | | | | |
| EBIT | [5] | | 251,513,148 | 227,713,042 | 152,354,557 | 159,655,306 | 160,355,671 | 166,487,811 | 172,154,148 | |
| Income Tax | [6] | | (132,295,916) | (119,777,060) | (80,138,497) | (83,978,691) | (84,347,083) | (87,572,589) | (90,553,082) | |
| D&A | [7] | | 16,992,365 | 20,960,697 | 19,335,544 | 18,909,765 | 18,704,370 | 22,756,358 | 22,722,173 | |
| Stock-based Comp | [8] | | 2,996,657 | 4,176,250 | 4,385,062 | 4,604,315 | 4,834,531 | 5,102,995 | 5,391,854 | |
| Increase in working capital | [9] | | (6,176,340) | 20,826,415 | 11,898,636 | (2,014,401) | (936,127) | (1,407,164) | (1,420,757) | |
| Capex | [10] | | (12,543,471) | (9,285,371) | (11,812,307) | (19,121,300) | (28,782,070) | (19,589,370) | (19,631,600) | |
| Unlevered Free Cash Flow | [11] | | 120,486,443 | 144,613,973 | 96,022,995 | 78,054,995 | 69,829,292 | 85,778,042 | 88,662,735 | 773,920,487 |
| | | | | | | | | | | |
| Discount Period in Years | [12] | | 0.25 | 1.25 | 2.25 | 3.25 | 4.25 | 5.25 | 6.25 | 6.25 |
| Discount Factor | [13] | | 0.97 | 0.84 | 0.73 | 0.64 | 0.56 | 0.48 | 0.42 | 0.42 |
| | | | | | | | | | | |
| PV of Free Cash Flow | [14] | | 116,410,932 | 121,709,353 | 70,395,850 | 49,846,035 | 38,844,154 | 41,564,472 | 37,423,584 | 326,663,491 |
| NPV of Free Cash Flow | [15] | 802,857,872 | | | | | | | | |
| | | | | | | | | | | |
| Net Debt Amount (March 2014) | [16] | 1,761,746,604 | | | | | | | | |
| | | | | | | | | | | |
| Initial Equity Value | [17] | -958,888,732 | | | | | | | | |

### A.2      EXPECTED CASE EBIT DERIVATION

#### TABLE 12: EBIT DERIVATION

|  | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| UDT Revenue | [1] | 485,969,878 | 503,348,741 | 393,916,554 | 400,753,903 | 403,309,079 | 407,100,185 | 410,926,926 |
| PGT Revenue | [2] | 20,236,066 | 45,203,209 | 50,847,042 | 60,873,211 | 68,207,474 | 73,095,944 | 78,319,614 |
| RxAnte Revenue | [3] | 9,569,000 | 24,527,167 | 42,893,995 | 56,164,117 | 69,382,853 | 79,790,281 | 87,769,309 |
| Total Revenue | [4] | 515,774,944 | 573,079,117 | 487,657,592 | 517,791,230 | 540,899,406 | 559,986,409 | 577,015,849 |
| | | | | | | | | |
| UDT Cost of Sales | [5] | 59,650,021 | 71,784,017 | 66,064,739 | 70,265,877 | 74,778,320 | 77,021,670 | 79,332,320 |
| PGT Cost of Sales | [6] | 9,628,539 | 20,085,426 | 22,885,192 | 27,581,585 | 31,366,631 | 33,761,472 | 36,896,574 |
| | | | | | | | | |
| Gross Profit | [7] | 446,496,384 | 481,209,673 | 398,707,660 | 419,943,768 | 434,754,454 | 449,203,267 | 460,786,956 |
| Operating Expenses | [8] | 195,358,046 | 253,996,631 | 246,853,103 | 260,788,461 | 274,898,783 | 283,215,456 | 289,132,808 |
| Operating Income | [9] | 251,138,338 | 227,213,042 | 151,854,557 | 159,155,306 | 159,855,671 | 165,987,811 | 171,654,148 |
| | | | | | | | | |
| Other Income | [10] | 374,810 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| | | | | | | | | |
| EBIT | [11] | 251,513,148 | 227,713,042 | 152,354,557 | 159,655,306 | 160,355,671 | 166,487,811 | 172,154,148 |

Expert Report of Yvette R. Austin Smith

## APPENDIX B: COMPARABLE COMPANIES ANALYSIS EXHIBITS

### B.1   DESCRIPTION OF SIC INDUSTRY CODES

| Code | | Description |
|---|---|---|
| 8071 Medical Laboratories | [1] | Establishments primarily engaged in providing professional analytic or diagnostic services to the medical profession, or to the patient on prescription of a physician. |
| 8734 Testing Laboratories | [2] | Establishments primarily engaged in providing testing services. Establishments primarily engaged in performing clinical laboratory testing for the medical profession are classified in Industry 8071. |
| 2835 In Vitro and In Vivo Diagnostic Substances | [3] | Establishments primarily engaged in manufacturing in vitro and in vivo diagnostic substances, whether or not packaged for retail sale. These materials are chemical, biological, or radioactive substances used in diagnosing or monitoring the state of human or veterinary health by identifying and measuring normal or abnormal constituents of body fluids or tissues. |

Sources and Notes:

[1]: SIC Industry Description," NAICS Association, accessed September 21, 2021,

https://www.naics.com/sic-industry-description/?code=8071.

[2]: SIC Industry Description," NAICS Association, accessed September 21, 2021,

https://www.naics.com/sic-industry-description/?code=8734.

[3]: SIC Industry Description," NAICS Association, accessed September 21, 2021,

https://www.naics.com/sic-industry-description/?code=2835.

B.2    DESCRIPTION OF POTENTIAL COMPARABLE COMPANIES

| Company | Description |
|---|---|
| Alere | Alere Inc. provides diagnostic tests for infectious disease, cardiometabolic disease, and toxicology in the United States and internationally. The company's infectious disease products/services include antibodies, assays, diagnostic products, and a line of automated instrumentation to process tests. The company's cardiometabolic products/services include rapid diagnostic test systems to detect various drugs of abuse, point-of-care analyzers, over-the-counter tests, diabetes products, rapid diagnostic tests, and data management systems for point-of-care testing. Lastly, the Company's toxicology products/services include various device and reagent platforms to detect the illicit and prescription drugs of abuse or alcohol. The company was founded in 1981 and is based in Waltham, Massachusetts. As of October 3, 2017, Alere Inc. operates as a subsidiary of Abbott Laboratories. |
| Bio-Reference Laboratories | Founded in 1981 and headquartered in Elmwood Park, New Jersey, Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in the United States. The company focuses on esoteric testing, molecular diagnostics, anatomical pathology, genetics, women's health, and correctional health care services. It offers chemical diagnostic tests, such as blood and urine analysis; blood chemistry; hematology services; serology; radio-immuno analysis; toxicology, including drug screening; pap smears; tissue pathology comprising biopsies; and other tissue analysis, as well as cancer cytogenetic testing, genetic testing, and cytology testing services. The company also operates a clinical knowledge management service unit and a Web-based connectivity portal solution for laboratories and physicians. It serves physicians, geneticists, hospitals, clinics, and correctional and other health facilities. |
| Laboratory Corp. of America Holdings | Laboratory Corporation of America Holdings operates as an independent clinical laboratory company worldwide. It operates in two segments, Labcorp Diagnostics (Dx) and Labcorp Drug Development (DD). It offers various tests, such as blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, hemoglobin A1C and vitamin D products, prostate-specific antigens, tests for sexually transmitted diseases, hepatitis C tests, microbiology cultures and procedures, and alcohol and other substance-abuse tests. In addition, it provides online and mobile applications and end-to-end drug development, medical device, and diagnostic development solutions. The company was founded in 1971 and is headquartered in Burlington, North Carolina. |
| Myriad Genetics | Myriad Genetics, Inc., a molecular diagnostic company, develops and markets predictive, personalized, and prognostic medicine tests in the United States and internationally. The company offers DNA sequencing tests for hereditary and breast and ovarian cancers, personalized medicine tools, DNA genotyping tests, protein quantification tests, prenatal and prenatal screening tests, RNA expression tests, biomarker discovery, and pharmaceutical and clinical services to the pharmaceutical, biotechnology, and medical research industries. Myriad Genetics, Inc. was founded in 1991 and is headquartered in Salt Lake City, Utah. |
| Quest Diagnostics | Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. The company develops and delivers diagnostic information services, such as routine testing, non-routine and advanced clinical testing, anatomic pathology testing, and other diagnostic information services. It offers diagnostic information services to patients, clinicians, hospitals, independent delivery networks, health plans, employers, direct contract entities, and accountable care organizations through a network of laboratories, patient service centers, phlebotomists in physician offices, call centers and mobile paramedics, nurses, and other health and wellness professionals. The company also provides risk assessment services for the life insurance industry; and healthcare organizations and clinicians robust information technology solutions. Quest Diagnostics Incorporated was founded in 1967 and is headquartered in Secaucus, New Jersey. |

Source: S&P CapIQ.

# APPENDIX C: CUSTOM PROFILE EXHIBIT

### TABLE 13: CUSTOM PROFILE REVENUE IMPACT ANALYSIS

| 2013 Millennium Code | Not Billed by Both Ameritox & Aegis | CMS Code Description | NRPS (as of Dec. 2013) |
|---|---|---|---|
| [A] | [B] | [C] | [D] |
| G0431 | | Drug screen, qualitative; multiple drug classes by high complexity test method (e.g., immunoassay, enzyme assay), per patient encounter | 1.71 |
| 82101 | X | Urine alkaloids level | 5.60 |
| 82649 | X | Dihydromorphinone (drug) level | 30.76 |
| 82646 | X | Dihydrocodeinone (drug) measurement | 24.71 |
| 83925 | | Opiates (drug) measurement | 109.72 |
| 80154 | | Benzodiazepines level | 21.60 |
| 82542 | | Chemical analysis using chromatography technique | 112.33 |
| 82544 | | Chemical analysis using chromatography technique | 0.00 |
| 80152 | | Amitriptyline (antidepressant) level | 12.67 |
| 83805 | | Meprobamate (sedative) level | 13.29 |
| 80160 | X | Desipramine level | 12.18 |
| 80174 | X | Imipramine level | 12.18 |
| 83840 | | Methadone level | 19.61 |
| 82145 | | Amphetamine or methamphetamine level | 17.75 |
| 82520 | | Cocaine (drug) level | 17.35 |
| 80173 | X | Haloperidol level | 0.18 |
| 83992 | | PCP drug level | 9.26 |
| 80182 | X | Nortriptyline level | 9.59 |
| 80102 | X | Drug confirmation test | 0.00 |
| 82205 | | Barbiturates level | 23.45 |
| 80184 | X | Phenobarbital level | 11.72 |
| 82055 | | Alcohol (ethanol) level | 2.89 |
| 83516 | | Analysis of substance using immunoassay technique | 0.84 |
| 84311 | | Chemical analysis using spectrophotometry (light) | 8.03 |
| 82570 | | Creatinine level to test for kidney function or muscle injury | 5.94 |
| 83986 | | Body fluid pH level | 4.11 |
| 81003 | | Automated urinalysis test | 2.57 |
| | | Revenue Impact | |
| | | Total NRPS of UDT Codes Not Billed by Both          [1] | 106.92 |
| | | *% Impact on 2013 Revenue*                          [2] | *21.81%* |

Sources and Notes:

NRPS contribution information unavailable for 3 codes that Millennium billed CMS in 2013: 83789, 81226, 81225. However, these codes were also billed by either Aegis or Ameritox, and therefore do not impact the analysis.

[A] - [C]: Centers for Medicare & Medicaid Services Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[D]: 2014-02-05 ML_DE-00054321.xlsx ("Sc. 1 (no - on ill)" tab). *See* column F.

[1]: Sum of [D] for UDT codes not billed by both parties.

[2]:[1] ÷ 490.27 (Total NRPS as of Dec. 2013). Figure retrieved from cell F70 of 2014-02-05 ML_DE_00054321.xlsx ("Sc. 1(no - on ill)" tab).

# APPENDIX D: SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE

## TABLE 14: SENSITIVITY ANALYSIS

|  |  | Low | Expected | High | Range | Range | Range | Range |
|---|---|---|---|---|---|---|---|---|
| MUE Medicare NRPS Adjustment | [1] | ON | ON | ON | ON | ON | ON | ON |
| LCD Medicare NRPS Reduction | [2] | ON | ON | ON | ON | ON | ON | |
| Elimination of Custom Profile | [3] | ON | ON | ON | ON | ON | | |
| DOJ Settlement Reputational Impact | [4] | ON | ON | ON | ON | | | |
| Cancellation of Free POC Cups | [5] | ON | ON | ON | | | | |
| Initial Equity Valuation | [6] | -833.3 | -958.9 | -1,074.9 | -818.0 to -1,056.1 | -489.7 to -614.6 | -381.0 to -441.1 | -313.2 to -340.0 |

Notes and Sources:

Initial equity valuation derived from YAS Workpaper 1.

All values in the table are after adjusting for Millennium's specimen volume growth assumptions (*see* Section E.1) and for first quarter 2014 actual results. Does not include contingent liabilities.

[1]: Low adjustment consists of lowering expected Medicare NRPS corrections by a multiple of 0.9x and high adjustment consists of increasing Medicare NRPS corrections by a multiple of 1.1x.

[2]: Low adjustment consists of lessening expected -18.3% NRPS impact to -14.3% and high adjustment consists of increasing NRPS impact to -22.3%.

[3]: Low adjustment consists of lessening expected -21.81% NRPS impact to -16.81% and high adjustment consists of increasing NRPS impact to -26.81%.

[4]: Low adjustment consists of lessening expected two-time -15% specimen volume impact to -12% and high adjustment consists of increasing two-time specimen volume impact to -18%.

[5]: Low adjustment consists of lowering expected -1.6% specimen volume impact by a multiple of 0.8x and high adjustment consists of increasing specimen volume impact by a multiple of 1.2x.

## APPENDIX E: DOCUMENTS RELIED UPON OF YVETTE AUSTIN SMITH

**Court Documents**

*Ameritox, Ltd. v. Millennium Laboratories* (Case 8:11-cv-775-T-24-TBM)

Complaint, April 8, 2011

Rebuttal Expert Report of David S. Williams, December 6, 2013

Jury Verdict, June 16, 2014

*In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS)

Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015

Exhibit 1 (Amended Plan) to Notice of (I) Entry Of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., and (II) Occurrence of Effective Date, December 14, 2015

Memorandum, February 29, 2019

*Maul et al v. Ameritox, LLC.,* (Case 8:07-cv-00953-RAL-EAJ)

Second Amended Complaint, October 19, 2009

*United States of America ex rel. Mark McGuire v. Millennium Laboratories, Inc.* (Case 1:12-cv-10132-NMG, No. 12cv1063 l-NMG, No. 13cv10825-NMG)

Complaint, January 26, 2012

Complaint, April 9, 2012

Complaint, April 10, 2013

United States' Complaint in Intervention, December 19, 2014

Exhibit 3

Exhibit 4

Exhibit 5

Exhibit 7

Exhibit 12

Exhibit 13

Exhibit 39

Exhibit 55

Exhibit 66

Exhibit 74

Administrative Settlement Agreement, October 16, 2015

**Depositions and Exhibits**

Daniel Pencak

Deposition of Daniel Pencak

Exhibit 134

Exhibit 135

Exhibit 137

Exhibit 138

Exhibit 140

Exhibit 141

Exhibit 158

Exhibit 165

Exhibit 165-A

Exhibit 179

Heidi Smith

Exhibit 56

Exhibit 59

Jennifer Mulloy

Exhibit 194

Exhibit 195

Exhibit 198

Exhibit 216

Jenny Lee

Exhibit 116

Exhibit 125

Exhibit 131

Martin Price

Deposition of Martin Price

Exhibit 3

Exhibit 5-A

Exhibit 9

Exhibit 10

Exhibit 13

Exhibit 14

Exhibit 15

Exhibit 106

Michael Tortora

Exhibit 223

Exhibit 233

Phillip Ho

Exhibit 343

**Millennium Documents**

BMO-ML-00009109

CITI-DE-00017912

JPMC-00031194

JPMC-MIL-CORP-00108741

JPMC-MIL-CORP-00159494

KPMG-ML-EA14WB-0000347

KPMG-ML-EA15WB-0000743

KPMG-ML-EA15WB-0001034

KPMG-ML-EA15WB-0001528

ML_DE_00001946

ML_DE_00034943

ML_DE_00035507

ML_DE_00035508

ML_DE_00044521

ML_DE_00054044

ML_DE_00054258

ML_DE_00054320

ML_DE_00054321

ML_DE_00057999

ML_DE_00058384

ML_DE_00058385

ML_DE_00058388

ML_DE_00060270

ML_DE_00060308

ML_DE_00061777

ML_DE_00068651

ML_DE_00079584

ML_DE_00083249

ML_DE_00134548

ML_DE_00164030

ML_DE_00187601

ML_DE_00202842

ML_DE_00206157
ML_DE_00206242
ML_DE_00225152
ML_DE_00263273
ML_DE_00269115
ML_DE_00305155
ML_DE_00308623
ML_DE_00465366
ML_DE_00514819
ML_DE_00559337
ML_DE_00559340
ML_DE_00567499
ML_DE_00569414
ML_DE_00594719
ML_DE_00594736
ML_DE_00597259
ML_DE_00601573
ML_DE_00602906
ML_DE_00604336
ML_DE_00670668
ML_DE_00672098
ML_DE_00732288
Suntrust_MIL-DE-00006771

**Publicly Available Documents**

*Analyst Reports*

Deutsche Bank, "Q1 Snap Preview: Weather is a Rear-View Mirror Issue," April 14, 2014.

Maxim Group,"Assuming Coverage Laboratory Corp. of America Holdings, Inc.," February 5, 2014.

Piper Jaffray, "Quest Diagnostics Maintain Neutral and Tweaking Estimates for Solstas Following Weak 2014 Outlook," January 30, 2014.

Piper Jaffray, "LabCorp of America Transferring Coverage with a Neutral Rating and $91 Price Target," March 10, 2014.

Morgan Stanley, "Quest Diagnostics Inc. Guidance Reflects Measured View of CY14 Challenges," January 31, 2014.

*Articles*

Barry Meier, "Increase in Urine Testing Raises Ethical Questions," August 1, 2013.

Boston Business Journal, "Woburn-based Calloway Labs, fined $20M in kickback scandal, to close and layoff 240 employees," October 8, 2015.

Christopher Norton, "Ameritox To Pay $16M To Resolve Medicaid FCA Suit," Law 360, November 17, 2010.

Christopher Weaver and Anna Mathews, "Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill; Pain specialists order costly tests for illegal drugs such as cocaine and angel dust, which few seniors ever use," The Wall Street Journal, November 10, 2014.

Debtwire, "Millennium Health completes financial restructuring, emerges from prepackaged Chapter 11," December 21, 2015.

Debtwire, "Millennium Health opt-out lenders, US Trustee attack plan's forced third-party releases," December 8, 2015.

Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015.

Fred Schulte and Elizabeth Lucas, "Liquid Gold: Pain Doctors Soak Up Profits By Screening Urine for Drugs," November 6, 2017.

Hawk, PollyBeth, "Ready or Not: Hospital Value-Based Purchasing Poised to Transform Healthcare Reimbursement Model and Introduce New Fraud Targets Under the False Claims Act," Winter, 2013.

Holden Wilen, "Drug Testing Company Plans to Close Columbia Headquarters, Lay Off 99 Employees," Baltimore Business Journal, March 7, 2018.

Jones Day, The Third Circuit Weighs In Again on the Meaning of "Unreasonably Small Capital" in Constructively Fraudulent Transfer Avoidance Litigation , July/August 2016.

Jones Day, Uniform Voidable Transactions Act Approved by Uniform Law Commission to Replace UFTA, September/October 2014,  https://www.jonesday.com/en/insights/2014/10/uniform-voidable-transactions-act-approved-by-uniform-law-commission-to-replace-ufta.

Loanconnector, "Corrected: Millennium Labs launches $1.8B dividend recap loan," March 31, 2014.

Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB," April 14, 2014.

Patricia Wen, "Calloway Labs of Woburn agrees to $20 million settlement of Medicaid fraud case," March 30, 2012.

Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation," November 16, 2012.

Roger Feldman, Bryan Dowd, and Robert Coulam, "Medicare's Role in Determining Prices throughout the Health Care System," October 2015.

Tampa Bay Business Journal, "Ameritox agrees to $16.3M settlement," November 16, 2010.

Todd Gardner, "Drug Testing Company to Close Greensboro Facility, Lay Off 113," Triad Business Journal, March 8, 2018.

US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians," October 19, 2015.

### Books

Collier on Bankruptcy, 16th edition, 2016.

Fishman, Jay E., Pratt, Shannon P. and Morrison, William J.; Standards of Value: Theory and Applications, John Wiley & Sons, Inc. 2007.

Principles of Corporate Finance, Brealey, Myers, Allen, 10th edition, January 1, 2012.

### Case Law

*Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056 (3d Cir. 1992).*

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.) , 444 F.3d 203, 210 (3d Cir. 2006)*

*Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.), 348 B.R. 234, 274 (Bankr. D. Del. 2005)*

### Financial Statements and Filings

Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013 filed February 25, 2014.

Quest Diagnostics Incorporated Form 10-K filed for the fiscal year ended December 31, 2013 filed February 18, 2014.

### Other Public Sources

A Strategy for Medicare Payment Reform, Center for American Progress, May 2015.

Center for Behavioral Health Statistics and Quality, Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings 18, 21 (2012), https://www.samhsa.gov/data/sites/default/files/NSDUHresults2012/NSDUHresults2012.pdf.

Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

Centers for Medicare & Medicaid Services, *Original Medicare Enrollment: Part A and/or Part B Enrollees by Demographic Characteristics, Calendar Year 2013* 1 (2020), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/2013/Downloads/MDCR_ENROLL_AB/CPS_MDCR_ENROLL_AB_11.pdf

Centers for Medicare & Medicaid Services, "What is an LCD?," https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs.

CGOS, https://www.cgsmedicare.com/partb/pubs/news/2012/0412/cope18723.html.

CMS website, https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE.

Congressional Budget Office (CBO), The Budget and Economic Outlook 2014 to 2024, February 2014.

Data Bridge Market Research US Pharmacogenetic Testing Market Industry Trend Report

Department of Health and Human Services Office of Inspector General, "Questionable Billing for Medicare Part B Clinical Laboratory Services," August 2014.

Department of Health and Human Services Office of Inspector General, "Special Fraud Alert: Laboratory Payments to Referring Physicians," June 25, 2014.

Department of Health and Human Services Office of Inspector General, "Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings," June 2013.

Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices.

MB&CC, HCPCS Codes, https://www.medicalbillingandcoding.org/hcpcs-codes/.

Medicare Physician and Other Supplier PUF Methodology (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Medicare-Physician-and-Other-Supplier-PUF-Methodology.pdf).

Medicare.gov, "Medicare Advantage Plans," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans.

Moody's Financial Metrics Key Ratios By Rating And Industry For North American Non-Financial Corporations: December 2013, tab "App-8". Available at www.moodys.com.

S&P CapIQ.

S&P credit rating report March 28, 2014.

SIC Industry Description," NAICS Association, accessed Sepember 21, 2021.

The People's Law Dictionary, *Qui Tam Action,* https://dictionary.law.com/default.aspx?selected=1709.

U.S. Department of The Treasury, Resource Center, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView.aspx?data=yieldYear&year=2014.

Uniform Law Commission, *Fraudulent Transfer Act,* https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3.

United Healthcare Community Plan, https://www.uhccommunityplan.com.

**APPENDIX F: CURRICULUM VITAE**

**Ms. Austin Smith** is Chairman of The Brattle Group and co-leads the firm's M&A Litigation Practice. She specializes in M&A and bankruptcy disputes with subject matter expertise in valuation and credit and solvency analysis.   She provides testifying and consulting expert services in litigation and disputes related to mergers and acquisitions, dissenting shareholder actions, leveraged buyouts, financing transactions/recapitalization, debt recharacterization and avoidance actions.  Yvette has also served as an expert in international trade subsidy disputes.  She has submitted expert oral and written testimony in multiple venues including state courts in Delaware and New York, U.S. federal bankruptcy and district courts, international courts in Canada and Australia and the World Trade Organization and other international arbitration forums.

In addition to opining on valuation, Yvette has also provided expert testimony on market practice and transaction structure in M&A disputes.  As representative bankruptcy engagements, Yvette has been retained as a solvency or valuation expert in connection with the bankruptcies of Lehman Brothers (on behalf of JPMorgan Chase), Caesars Entertainment Operating Company (on behalf of Apollo Global Management), Physiotherapy Associates Holdings (on behalf of a litigation trustee), U.S. Steel Canada (on behalf of United States Steel) and Purdue Pharma (on behalf of 58 U.S. states and territories).

Ms. Austin Smith has written a number of publications and presented on valuation and credit analysis, for organizations including the American  Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, the Delaware State Bar Association, Thomson Reuters, and Bloomberg Law. She is a contributing author to the Model Merger Agreement for the Acquisition of a Public Company, published by the ABA's Mergers and Acquisitions Committee, and a contributing researcher to The Standard & Poor's Guide to Fairness Opinions: A User's Guide for Fiduciaries.  She  is Co-Chair of the American Bar  Association Joint Task Force on M&A Litigation and is founder and former Co-Chair of the  ABA  Financial Advisor Task Force.

Ms. Austin Smith has also been a member of the teaching faculty of Harvard University Extension School,  where she taught a graduate finance course and a past  faculty member of the American Bar Association's  National Institute of Negotiating Business Acquisitions.

## Yvette Austin Smith

Ms. Austin Smith serves on the Board of Directors for The Brattle Group and was recently named Board Chair.  She is also the Vice-Chair of the Board of Directors for the Appalachian Mountain Club.

Prior to joining The Brattle Group, Yvette provided investment banking advisory services including mergers and acquisitions, fairness opinions, solvency opinions and commercially reasonable debt opinions.

### AREAS OF EXPERTISE

- Valuation
- M&A Litigation
- Bankruptcy Litigation
- Credit and Solvency Analysis

### EDUCATION

- M.B.A. (Finance) from Columbia University
- Graduate Studies in Mathematical Finance, Courant Institute of Mathematics, New York University
- A.B., Government and Philosophy, Harvard College

### PUBLICATIONS

- "Valuation Analysis of Related Party Transactions," ABI Journal, March 2018.
- "Snapshot of Delaware Public Company Appraisals Post-CKx," *Deal Points*, publication of the American  Bar Association's M&A Committee, Winter 2017.
- "Asset Value Trumps Discounted Cash Flow in Another Bankruptcy Valuation Dispute," Yvette R.  Austin Smith and Evan Cohen, *The Brattle Group: Critical Insights*, July 29, 2014.
- "Rural Metro Redefines Investment Banks' Role in M&A," Yvette R. Austin Smith and Torben Voetmann, *Law360*, March 28, 2014.
- "Solvency Analysis in the Context of Fraudulent Transfer after Eleventh Circuit's TOUSA Reversal," American Bankruptcy Institute's Business Reorganization Committee newsletter, (Volume 11/No. 3),  June 2012.
- "Recent M&A Litigation Provides Updated Guidance for Fairness Opinions," *Deal Points*, publication of  the American Bar Association's M&A Committee, Spring 2012.
- "Why Do Solvency Opinions Fail?"  Spring 2011.
- Contributing author to: *Model Public Company Acquisition Agreement with Commentary*; by The Mergers & Acquisitions Committee of the American Bar Association; Chicago: American Bar Association, August 2011. Authored chapter on determining stock exchange ratios in mergers and  acquisition transactions.
- Contributing author to: The Standard & Poor's Guide to Fairness Opinions: A User's Guide for



**Yvette Austin Smith**

Fiduciaries; by Phillip J. Clements and Philip Wisler; New York: McGraw Hill, 2005

## TESTIMONY EXPERIENCE

*Snow Phipps Group, LLC, and DecoPac Holdings Inc., Plaintiff, v. KCake Acquisition, Inc., et al., Defendants,* Court of Chancery of the State of Delaware, C.A. No. 2020-0282-KSJM (Deposition testimony, December 2020; Trial testimony, January 2021)

*GiGi Jordan, Plaintiff against Raymond A. Mirra, JR., et al., Defendants,* United States District Court for the District of Delaware, C.A. No. 14-01485-SLR-SRF  (Deposition testimony, December 2020)

*Falcon Distribuidora, Armazenamento e Transporte S.A. v. Hypera S.A.,* International Chamber of Commerce Arbitration No 23896/GSS (Hearing testimony, November 2020)

*In Re Comtech/Gilat Merger Litigation* Court of Chancery of the State of Delaware, C.A. No. 2020-0605-JRS (Deposition testimony, October 2020)

*Dillon Trust Company LLC, et al. v. United States,* Court of Federal Claims Nos. 17-1898T, 17-2022T, 17-2023T  (Deposition Testimony, September 2020)

*IC Power Asia Development Ltd. (Israel), Claimant v. Republic of Guatemala, Respondent,* Under the Arbitration Rules of the United Nations Commission on International Trade Law (Hearing testimony, July 2020)

*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. No. 13-50530.* (Deposition testimony January 2020)

*Canada – Measures Concerning Trade in Commercial Aircraft, World Trade Organization (DS522)* (Testimony at First Substantive Meeting, September 2019)

*Crown Resorts Limited v Commissioner of Taxation Federal Court of Australia Proceedings, No. VID 831, 833 - 837 & 1635 - 1637 of 2018.* (Trial testimony, June 2019)

*The Mangrove Partners Master Fund, Ltd., Petitioner, v. Calamos Asset Management, Inc., Respondent,* Court of Chancery of the State of Delaware, *C.A. No. 2017-0139-JTL.* (Deposition testimony, December 2018)

*Polar Multi-Strategy Master Fund v. The Stars Group Inc.,* Superior Court of Justice – Ontario, *CV-18-599612-00-CL,* (Hearing testimony, July 2018)

*In re: Physiotherapy Holdings, Inc. et al. in the matter PAH Litigation Trust, Plaintiff v. Water Street Healthcare Partners, L.P. et al., Defendants* (Case No. 13- 12965 (KG)).  United States District Court for the District of Delaware.  (Deposition testimony, May 2018)

*Domain Associates, L.L.C., v. Nimesh Shah,* Court of Chancery of the State of Delaware, *C.A. No. 12921-VCL.* (Deposition testimony, January 2018; Trial testimony, February 2018)

 THE **Brattle** GROUP

3

**Yvette Austin Smith**

*Charles Almond as Trustee for the Almond Family 2001 Trust, Almond Investment Fund, LLC, Charles Almond, and Andrew Franklin, Plaintiffs v Glenhill Advisors, LLC, et al., Defendants and Design Within Reach, Inc., Intervenor and Counterclaim Petitioner,* Court of Chancery of the State of Delaware, C.A. No. 10477-CB (Deposition testimony, October 2017; Trial testimony, November 2017)

*Blueblade Capital Opportunities LLC and Blueblade Capital Opportunities, Petitioners, v. Norcraft Companies, Inc., a Delaware Corporation, Respondent,* Court of Chancery of the State of Delaware, C.A. No. 11184-VCS (Deposition testimony, May 2017; Trial testimony, June 2017)

*In re: Caesars Entertainment Operating Company, Inc. et al.* United States Bankruptcy Court Northern District Of Illinois Eastern Division, Case No. 15-01145 ABG. (Expert declaration, December 2016).

*JD Holdings, LLC, et al. v. Jacqueline a. Dowdy, as Trustee of The Revocable Trust of John Q. Hammons, dated December 28, 1989, as Amended and Restated, et al.,* Court Of Chancery of The State of Delaware, Case No. 7480-VCL (Deposition testimony, June 2016).

*George L. Miller, Chapter 7 Trustee v. Sun Capital Partners, Inc. et al,* United States District Court for the District of Delaware, Case No. 13-CV-01996-RGA  (Deposition testimony, April 2016).

*In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended and in the Matter of A Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada Inc.* and *In the Matter of A Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada  Inc.* Superior Court of Justice - Ontario (Trial testimony, January 2016)

*Nathan Owen v. Energy Services Group et al,* Court of Chancery of the State of  Delaware, C.A. No. 8860-CB (Deposition testimony, August 2014; Trial testimony, November 2014)

*Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors of Lehman Brothers  Holdings Inc., v. JPMorgan Chase Bank N.A.,* Adversary Proceeding No 10-03266 (JPM), United States Bankruptcy Court for the Southern District of New York. (Deposition testimony, September 2014)

*Out Publishing Inc. v. Lipo Liquidating Corp., et al,* Index No. 07/601855 (Bransten), Supreme Court  of the State of New York County of New York Commercial Division. (Deposition testimony, February  2010)



# REDACTED
# EXHIBIT 2

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>MILLENNIUM LAB HOLDINGS II, LLC, et al.,<br><br>      Debtors.<br>------------------------------------------------------------------------<br><br>MARC S. KIRSCHNER solely in his capacity as TRUSTEE of THE MILLENNIUM CORPORATE CLAIM TRUST,<br><br>      Plaintiff,<br><br>   -against-<br><br>J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A. and SUNTRUST BANK,<br><br>      Defendants. | Chapter 11<br><br>Case No. 15-12284 (LSS)<br><br>Jointly Administered |

**EXPERT REPORT OF AMY HUTTON**

**February 14, 2022**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

I.      Qualifications, Compensation, and Materials Relied Upon .................................................. 4

     A.      Qualifications ....................................................................................................... 4

     B.      Compensation ...................................................................................................... 5

     C.      Materials Relied Upon ......................................................................................... 6

II.     Assignment .................................................................................................................... 6

III.    Summary of Opinions .................................................................................................... 6

IV.     Summary of Ms. Austin Smith's Solvency Analysis ..................................................... 13

     A.      Ms. Austin Smith's Modified Padres Projections ................................................. 15

     B.      Ms. Austin Smith's DCF and comparable companies analyses ............................ 18

     C.      Ms. Austin Smith's analysis of Millennium's ability to pay its debts and capital adequacy .............................................................................................. 20

V.      Ms. Austin Smith's Discounted Cash Flow Analysis is Flawed and Unreliable ............. 21

     A.      Ms. Austin Smith's findings depend on a number of assumptions and approaches that are unsupported, flawed, and unreliable ...................................... 24

          1.      Ms. Austin Smith's valuation depends on application of an incorrect and substantially inflated WACC ............................................... 24

          2.      Ms. Austin Smith's treatment of operating expenses is flawed ................ 29

          3.      Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact of a potential DOJ settlement .................................. 32

          4.      Ms. Austin Smith provides no reliable basis for the elimination of the revenue from Millennium's "Emerging Opportunities" ...................... 34

          5.      Ms. Austin Smith's other adjustments related to Millennium's business practices are unfounded, rely on hindsight, and are created based on an ad hoc and unreliable methodology ....................................... 36

     B.      Ms. Austin Smith's analysis is at odds with those completed by financial professionals in the period leading up to the 2014 Transaction ............................ 43

          1.      Millennium's management prepared financial projections based on its standard practice ............................................................................ 44

          2.      Ms. Austin Smith disregards the contemporaneous analyses by various third parties, which contradict her conclusion that Millennium was insolvent ....................................................................... 46

     C.      Ms. Austin Smith's Modified Padres Projections and her valuation estimate resemble most closely projections and valuations created around Millennium's bankruptcy ................................................................................... 52

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

VI.    Comparable Companies Analysis .................................................................... 54

      A.    Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent under her EBITDA multiples analysis.................................................................. 54

VII.    Ability to Pay Debt Test.................................................................................. 56

      A.    Ms. Austin Smith's conclusion that Millennium would be unable to pay its debts is unreliable .......................................................................... 57

      B.    Ms. Austin Smith fails to engage with the credit ratings for the 2014 Transaction ........................................................................................ 58

VIII.    Capital Adequacy Test .................................................................................... 60

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## I.    QUALIFICATIONS, COMPENSATION, AND MATERIALS RELIED UPON

### A.  Qualifications

1.    I am a Professor of Business Administration at Boston College's Carroll School of Management.  I joined the Carroll School's faculty in 2006 and was promoted to Full Professor in 2010.  Previously, I served as an Associate Professor at the Tuck School of Business at Dartmouth College, an Assistant and Associate Professor at Harvard Business School, and a visiting scholar at Stanford University's Graduate School of Business.

2.    I have a Ph.D. in Business Administration from the Simon Business School at the University of Rochester, with written qualifiers in Accounting, Finance, and Organizations & Markets.  Before obtaining my Ph.D., I worked for Chemical Bank in its investment banking group for one year.  During that year, I worked on several large transactions, mostly leveraged buyouts, in which Chemical Bank provided the bridge financing for the deals.

3.    In 2003, I was elected to the Board of Directors of Bandag, Inc. (NYSE, Fortune 1500 company), where I served on the Audit and Corporate Governance and Nominating Committees, and, in 2005, I was appointed chair of the Audit Committee.  As a board member, I actively participated in several merger negotiations, and was involved in reviewing the performance and approving the compensation of top executives.  When Bandag acquired a majority interest in Speedco, a privately held company, in 2004, I played an active role in the board's deliberations, including examining the implicit assumptions underlying our financial advisor's use of comparable multiples to value Speedco.  I was also actively engaged in the deliberations and analysis performed in connection with Bridgestone's 2007 acquisition of Bandag for just under $1 billion.

4.    While I have taught various courses over the years, my specialty is Financial Statement Analysis and Valuation ("FSAV"), a capstone case-method course that draws on my real-world experiences, as well as my research and study in the areas of Strategy, Financial Economics, and Accounting.  In my courses, I teach students and executives how to value investment ventures.  The FSAV course includes detailed analyses of merger and acquisition ("M&A") transactions.  I teach students how to conduct detailed M&A analyses from assessing the stand-alone value of the target prior to the merger talks to assessing the likely synergies and premium paid.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

5.      My research areas include: empirical assessments of valuation methods, methods for detecting "earnings management" (a term connoting exploitation of opportunities to make accounting decisions that change reported income), effective corporate disclosure strategies, policy changes in response to Regulation Fair Disclosure and the Sarbanes-Oxley Act of 2002, and the roles of capital market intermediaries and regulators in determining market values of company stocks.  In my academic research, I have used statistical techniques to examine how information is incorporated into securities prices, including event studies.

6.      Based on my research, I was named to the 2001 Congressional Review Board, opining on the Securities Industry Association's best practices for equity research.  My research was used in the development of the Global Analyst Research Settlement between the Securities and Exchange Commission and numerous Wall Street firms.[1]

7.      In 2010, I won the Distinguished Contribution to Accounting Literature Award for my "Groundbreaking Research" demonstrating how strong corporate governance combats earnings management.

8.      With over 30,000 Google Scholar citations, my work has appeared in publications such as the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Accounting Review*, *Contemporary Accounting Research*, the *Journal of Accounting Research*, the *Review of Accounting Studies*, the *Harvard Business Review,* and the *Journal of Applied Corporate Finance*. I served as an Editor for the *Accounting Review* from 2011 to 2014.  I also serve as a referee for the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, and *Contemporary Accounting Research*.

9.      A copy of my curriculum vitae is attached as **Appendix A.**  A list of my testimony over the last four years is attached as **Appendix B**.

     **B.   Compensation**

10.     I am being compensated at my standard billing rate of $990 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me

---

[1] "SEC Fact Sheet on Global Analyst Research Settlements," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/news/speech/factsheet.htm, accessed on February 7, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

### C.  Materials Relied Upon

11.     In preparing this report, I have relied upon my education and experience in accounting, corporate finance, valuation, and investments; documents produced in this matter; publicly available information, such as academic articles, analyst reports, and public press; and other materials.  **Appendix C** lists documents and other sources I have relied upon in forming my opinions in this matter.  My work on this matter is ongoing, and I reserve the right to modify or supplement my opinions in the event that I become aware of additional information regarding this matter.

## II.     ASSIGNMENT

12.     I have been retained by counsel for J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank N.A. ("Citi"), SunTrust Bank ("SunTrust"), and BMO Harris Bank, N.A. ("BMO") (together the "Arrangers") to respond to certain opinions set forth in the report of Yvette R. Austin Smith ("Austin Smith Report"), filed on November 15, 2021, which purports to assess whether Millennium Laboratories, LLC ("Millennium" or the "Company") was solvent on April 16, 2014, following the $1.825 billion syndicated term loan transaction ("2014 Transaction").[2]

## III.    SUMMARY OF OPINIONS

13.     In addressing the question of Millennium's solvency at the time of the 2014 Transaction, Ms. Austin Smith conducts several analyses.  My report assesses each of these.  First, Ms. Austin Smith conducts a solvency analysis using the discounted cash flow ("DCF") method and the comparable companies method (referred to as "Guideline Public Companies" in the Austin Smith

---

[2] "For the purpose of the solvency analysis described herein, April 16, 2014 is the date of valuation." Austin Smith Report, ¶ 6.  By entering into the 2014 Transaction, the Company borrowed $1.775 billion under a senior secured credit facility.  The 2014 Transaction "initially also provided for a revolving loan in a principal amount not to exceed $50 million, which was to terminate on April 16, 2019," but it was never utilized and terminated in full as of June 30, 2015. *In re Millennium Lab Holdings II, LLC, et al.*, "Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings," filed on November 10, 2015 ("Hardaway Declaration"), ¶ 9.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Report).  Then she considers Millennium's ability to pay its debts, and finally she addresses the question of the adequacy of Millennium's capital.

14.    Based on my experience and expertise, my review of the Austin Smith Report, her backup documents and files, and the analyses discussed in further detail below, I have reached the conclusion that Ms. Austin Smith's assertion that her DCF analysis "demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction" is based on flawed and unreliable analyses.[3]  As summarized immediately below and set forth in detail throughout this report, Ms. Austin Smith's analysis of Millennium's solvency and her conclusions rely on unsupported assumptions, suffer from hindsight bias, and reflect flawed applications of widely accepted valuation principles.

- ***Substantially Inflated Discount Rate***:  Ms. Austin Smith's analysis assumes that Millennium's weighted average cost of capital ("WACC") was 14.8%.[4]  But this WACC is inconsistent with other assumptions that she makes in her solvency analysis. For example, while her comparable companies analysis identifies a specific set of *five* comparable companies, her WACC of 14.8% uses a different set of *eight* comparable companies, thereby rendering her WACC estimation internally inconsistent with other opinions in the report.  She also inflates her WACC by improperly including a company-specific risk premium and a small company risk premium.  The inclusion of a company-specific risk premium has no basis in the field of financial economics because the WACC, even according to Ms. Austin Smith, should only include non-diversifiable risks.[5]  Similarly, the inclusion of a small company risk premium is without any theoretical basis; the practice arose from an empirical observation in the 1980s that was later shown to not hold.  Adjusting the WACC to correct these errors results in a WACC of 7.2%—less than half the 14.8% WACC Ms. Austin Smith uses. Using the corrected WACC of 7.2%—even while accepting Ms. Austin Smith's other assumptions and adjustments (which I do not)—implies an enterprise value of

---

[3] Austin Smith Report, ¶ 145.

[4] Austin Smith Report, ¶ 143.

[5] Austin Smith Report, ¶ 41.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

$1,970.8 million and an equity value of $209.1 million, rendering Millennium balance sheet *solvent*.[6]

- ***Unsupported and Unreliable Revenue and Operating Expenses Adjustments***: Ms. Austin Smith creates "modified projections" for her work in this litigation in which she substantially reduces revenue, by adjusting specimen volume and net revenue per specimen ("NRPS"), as compared to those created by management.[7] Specifically, as of early 2014, she assumes that Millennium's revenue would decline by approximately 28% in the following two years.[8]  By 2018, she assumes that the Company would have just over half of the revenue originally projected by management.[9]  Ms. Austin Smith's analysis, as I discuss below, is unsupported and unreliable, and among other things, it suffers from hindsight bias.  Ms. Austin Smith also asserts that her proposed adjustments are "one-time adjustments," but she fails to acknowledge that their impact affects all subsequent years creating a permanent effect that substantially reduces her estimate of Millennium's enterprise value.  **Exhibit 1** shows the value impact of each of Ms. Austin Smith's adjustments to management projections, while maintaining all her other adjustments and assumptions, using her WACC of 14.8% and the corrected WACC of 7.2%.

  (a)     ***Flawed Operating Expenses Adjustment***:  Ms. Austin Smith fails to offer a reliable basis for her estimate of Millennium's operating expenses.  Despite her substantially reduced projected revenue, she estimates that operating expenses would have increased as a proportion of revenue from 38% in 2014 to 51% of revenue in 2016, a proportionate increase of about one-third.  She provides no basis as to why management would maintain such levels of

---

[6] Ms. Austin Smith estimates the equity value by subtracting the $1,761.7 million of outstanding debt from the enterprise value.  Austin Smith Report, Table 7.

[7] Specimen volume refers to the specimen count and represents "the volume of specimen processed in the laboratory and submitted for payment in the billing system (i.e. excludes rejections and other non-billable specimen included in the specimen count)."  Millennium Laboratories, "Confidential Information Memorandum for Public Side Lenders," March 31, 2014, ML_DE_00269115 ("2014 Confidential Information Memorandum") at ML_DE_00269139.

[8] **Appendix H1A**.

[9] **Appendix H1A**.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

operating expenses if it indeed expected revenues to decline as substantially as she suggests. Ms. Austin Smith's unsupported assumptions regarding operating expenses imply substantial reductions to Millennium's EBITDA margins without a basis. Modifying her excess operating expenses alone—even while using her inflated WACC of 14.8%—would increase Millennium's enterprise value by approximately $220.7 million to $1,023.6 million. Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by approximately $645.3 million to $2,616.1 million.

(b)    ***Unsupported Specimen Volume Adjustment Related to a Potential Settlement with the Department of Justice***: Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact on specimen volume of a potential Department of Justice ("DOJ") settlement. To reach her estimate of the reputational impact on specimen volume, she uses the volume declines experienced by Ameritox, Ltd. ("Ameritox") and Calloway Laboratories, Inc. ("Calloway") following their respective settlements with the DOJ. She provides no explanation regarding the causes of the revenue declines for these two companies. Instead, she assumes without basis that the volume declines were due to reputational effects and does not consider whether they may have been the result of other unrelated factors. She also fails to explain why Millennium would experience a volume decline similar to those experienced by these two companies. Modifying this unsupported adjustment alone— even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $383.8 million to $1,186.6 million. Making this modification and using the corrected WACC

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $1,138.7 million to $3,109.47 million.

(c) ***Unsupported Elimination of Revenue from "Emerging Opportunities"***:  Ms. Austin Smith provides no reasonable basis for the elimination of the revenue from Millennium's "Emerging Opportunities."  She merely characterizes these revenue as "aspirational" and completely ignores Millennium's business actions related to the "Emerging Opportunities."  Ms. Austin Smith statement that she excludes the "Emerging Opportunities" because they did not appear in a subsequent management model—created more than 13 months later, in June 2015—is inconsistent with fundamental principles of DCF analysis and suffers from hindsight bias.  Eliminating this unsupported adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $192.8 million to $995.7 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $663.6 million to $2,643.5 million.

(d) ***Ad Hoc Specimen Volume Growth Rate Adjustments***:  Ms. Austin Smith's ad hoc specimen volume growth rate adjustments from 2014 are based on an improper extrapolation of trends from a small sample of quarterly historical data that are inconsistent with longer historical trends and stand at odds with expected growth trends both for Millennium and the industry.  Modifying this ad hoc adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $155.0 million to $957.9 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Smith's analysis) would increase Millennium's enterprise value by $499.0 million to $2,469.8 million.

(e)   ***Unfounded Specimen Volume and NRPS Adjustments Related to Millennium's Business Practices***:   Ms. Austin Smith adjusts management's projections for the impact of Medically Unlikely Edit ("MUE") denials, the discontinuance of the Point-of-Care ("POC") Free Test Cup program, and the elimination of the custom profiles practice.[10]   She does not provide a basis as to why her adjustments more reasonably incorporate the expected risks related to Millennium's business practices.   In her analyses of MUE denials and POC Free Test Cup program, Ms. Austin Smith relies on hindsight as she uses analyses that Millennium performed in July 2014 and does not establish whether the information was available prior to the 2014 Transaction.   Furthermore, her ad hoc and unsupported adjustment for the elimination of the custom profiles practice—a 21.8% reduction in commercial payors NRPS—is substantially higher than the one management implemented—a 7% reduction in commercial payors NRPS—in 2015, following Millennium's bankruptcy and after certain risks had already materialized and the custom profile practice was eliminated.   She fails to explain why her 21.8% is more appropriate, let alone why it should have been reasonably expected back in April 2014. Modifying each adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value between $17.4 million to $101.6 million, to between $820.2 million to $904.4 million.   Making these modifications and using the

---

[10] An MUE is "the maximum units of service that a provider would report under most circumstances for a single beneficiary on a single date of service." "Medically Unlikely Edits," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE, accessed on February 7, 2022. The POC Free Test Cup Program refers to Millennium's practice of "providing point-of-care drug test cups at no charge to certain of its physician customers for use also as a specimen collection device."   Millennium Laboratories, LLC - Voluntary Self-Referral Disclosure, August 15, 2014, ML_DE_00325457 ("Millennium Self-Referral Disclosure") at ML_DE_00325457.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value between $45.2 million to $303.8 million, to between $2,016.0 million to $2,274.6 million.

- *Outlier Results:*  Ms. Austin Smith's analysis is at odds with the contemporaneous analyses by various financial professionals, including: the Arrangers; TA Associates (Millennium's private equity sponsor); and Vantage Point Advisors ("VPA") (Millennium's contemporaneous solvency advisor).[11]  Notably, Ms. Austin Smith's enterprise value of $802.9 million is well below even the downside scenarios contained in available contemporaneous valuations.  In fact, her analysis resembles more closely those prepared around the time of Millennium's bankruptcy in November 2015 (19 months after the 2014 Transaction closed), or indeed after Millennium entered bankruptcy.  This includes a valuation conducted by FTI Consulting ("FTI") as of December 2015 that estimated Millennium's enterprise value at $979.5 million, approximately $177 million higher than Ms. Austin Smith's estimate.[12]  FTI's analysis was conducted after the adverse events that Ms. Austin Smith claims should have been accounted for had already materialized.

15.     Ms. Austin Smith also conducts but then disregards a comparable companies analysis, which shows that Millennium was balance sheet *solvent*, based on her EBITDA multiples

---

[11] J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)"); TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH-00090311, TA_MLH-00090312 ("TA Associates Model"); Vantage Point Advisors, "Millennium Lab Holdings II, LLC Solvency Analysis," April 30, 2014, ML_DE_00263273 ("2014 VPA Solvency Analysis").  Ms. Austin Smith notes that "[t]o accurately calculate value using a Discounted Cash Flow or 'DCF' methodology, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation.  This was not done at the time of the 2014 Transaction and a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction." Austin Smith Report, ¶ 7. However, she provides no analysis of other contemporaneous analyses or explanation as to why these contemporaneous analyses did not "reflect all relevant information that was known or knowable as of the date of valuation."

[12] FTI Consulting, "Millennium Health LLC:  Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743 ("FTI December 2015 Valuation") at KPMG-ML-EA15WB-0000767; Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

analysis. Specifically, Ms. Austin Smith finds that Millennium's implied equity value based on her EBITDA multiples ranges between *positive* $23 million and *positive* $1,456 million, which demonstrates that Millennium was balance sheet *solvent*.[13]

16.     Ms. Austin Smith's test of Millennium's ability to pay its debts is flawed because it relies on her unsupported revenue adjustments. Ms. Austin Smith has provided no reliable basis for her adjustments that substantially decrease Millennium's revenue and as a result, constrain its ability to pay its debt. Moreover, the contemporaneous credit rating agencies analyses, which Ms. Austin Smith disregards, concluded that Millennium's credit rating was *not* near default, with S&P noting that the Company had "the capacity to meet its financial commitments" following the 2014 Transaction.[14] Ms. Austin Smith's tests of Millennium's capital adequacy are similarly flawed, as they too rely on her unsupported adjustments.

## IV.     SUMMARY OF MS. AUSTIN SMITH'S SOLVENCY ANALYSIS

17.     In connection with the 2014 Transaction, Millennium put together financial projections ("Padres Projections") for the period 2014 through 2020, consistent with the maturity of the 2014 Transaction.[15] The Padres Projections contained quarterly projections for 2014 and 2015, and annual projections thereafter for Millennium's three lines of business: urine drug testing

---

[13] Austin Smith Report, Table 9.

[14] "Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014 ("S&P Rating"); "Research Update: Millennium Laboratories Inc. Assigned 'B+' Rating And Stable Outlook; $1.82 Billion FirstLien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014 ("S&P Rating Update"); "Moody's Assigns B1 CFR to Millennium Labs; Sr. Secured Credit Facilities Rated B1; Outlook Is Stable," *Moody's*, March 31, 2014 ("Moody's Rating"); "Global Ratings Definitions," *Standard & Poor's*, November 10, 2021, available at https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352, accessed on February 7, 2022, (S&P Global Ratings Definitions").

[15] Millennium Management Projections, April 12, 2014, ML_DE_00057999 ("Padres Projections").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

("UDT"),[16] pharmacogenetic testing ("PGT"), and predictive analytics ("RxAnte").[17]  In her solvency analysis, Ms. Austin Smith adjusts the Padres Projections for the purpose of this litigation ("Modified Padres Projections"), in what she claims to be "the correct solvency framework," in order to "reasonably reflect significant business, reimbursement, legal, and regulatory risks and exposures."[18]  She asserts that "[i]t was known or knowable as of the 2014 Transaction that, as a result of these risks, the Company was very likely to encounter slowing or negative growth and declining profitability."[19]

18.      Ms. Austin Smith then conducts a DCF analysis and a comparable companies analysis to "evaluate the solvency of Millennium as of April 16, 2014."[20]  Based on the DCF analysis Ms. Austin Smith concludes that Millennium "was rendered balance sheet insolvent by the 2014 Transaction."[21]  While her comparable companies analysis suggests that when focusing on EBITDA multiples, Millennium was balance sheet *solvent*, Ms. Austin Smith says that "[d]ue to the limited comparability of the identified public [comparable] companies" she does not rely on the comparable companies analysis to reach any solvency conclusions.[22]  Ms. Austin Smith also purports to examine Millennium's ability to pay its debts and to estimate the Company's capital adequacy.[23]  She concludes that Millennium had inadequate capital after examining a single

---

[16] Millennium also offered Oral Fluid Drug Testing ("ODT"), an alternative to UDT that allows for the testing of individuals that are unable to provide a urine sample.  2014 Confidential Information Memorandum at ML_DE_00269130; Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation") at JPMC-MIL-CORP-00170158.

[17] Following the 2014 Transaction, Millennium was the parent company of two subsidiaries, RxAnte, LLC, and Pain In The Air, LLC.  Millennium itself was a subsidiary of Millennium Lab Holdings II, LLC, which in turn was a subsidiary of Millennium Lab Holdings, Inc.  Pain In The Air, LLC, primarily owned aircrafts, which were leased to Millennium.  Concurrent to the 2014 Transaction, Millennium Lab Holdings, Inc. transferred a 45% ownership stake in Millennium Lab Holdings II, LLC, to TA Associates Holding Corp.  2014 VPA Solvency Analysis at ML_DE_00263276; Confidential Information Memorandum at ML_DE_00269138; Hardaway Declaration, p. 47.

[18] Austin Smith Report, ¶ 106.

[19] Austin Smith Report, ¶ 106.

[20] Austin Smith Report, ¶¶ 6, 142–148, 149–160.

[21] Austin Smith Report, ¶ 173.

[22] Austin Smith Report, ¶ 7.

[23] Austin Smith Report, ¶¶ 164–169, 170–172.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

"downside" scenario and that "the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay as that debt matured."[24]

### A.   Ms. Austin Smith's Modified Padres Projections

19.     Ms. Austin Smith starts by adjusting the Padres Projections for the first quarter of 2014 ("1Q2014") and uses the actual 1Q2014 financial results.[25]  Next:

- ***Operating Expenses Adjustment****:*  Ms. Austin Smith adjusts management's projected operating expenses.  She uses the unit cost assumptions of the Padres Projections and she multiplies the unit costs by the adjusted UDT and PGT specimen volume to estimate operating expenses.[26]  She assumes that all "fixed costs" in the Padres Projections remain unchanged.[27]

- ***Specimen Volume Adjustment Related to DOJ Settlement****:*  She reduces UDT and PGT specimen volume by 15% in 2015 and another 15% in 2016 (for a total of 30%) to account for the purported reputational impact of the DOJ settlement.[28]

- ***Elimination of Revenue from "Emerging Opportunities"****:*  Millennium's "Emerging Opportunities" included government contracts with the Department of Defense and

---

[24] Austin Smith Report, ¶ 173.

[25] Austin Smith Report, ¶ 110.  Ms. Austin Smith adjusts management's projected revenue by adjusting specimen volume and NRPS for Medicare and a set of commercial payors for UDT and PGT.  Austin Smith Report, ¶¶ 107–135.  "Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC.  For the purposes of this analysis, I have defined these payors as the commercial payors." Austin Smith Report, FN 28.  For the remaining payors and RxAnte, Ms. Austin Smith maintains the Padres Projections. Austin Smith Report, ¶ 135.  Millennium's payor mix comprised of government health plans (Medicare, Medicaid, commercially managed government plans, and workers' compensation programs), commercial payors, and self-pay patients. 2014 Confidential Information Memorandum at ML_DE_00269149.  Workers' compensation plans are programs that provide medical coverage for employment-related injuries and occupational diseases.  Self-pay refers to patients who do not have medical insurance and are otherwise not covered by government or commercial payors.  "Workers' Compensation Program," *U.S. Department of the Interior*, available at https://www.doi.gov/pmb/hr/workerscompensation, accessed on February 7, 2022; "Insurance vs. Self Pay," *Kittitas Valley Healthcare*, available at https://www.kvhealthcare.org/patients-and-visitors/billing/insurance-vs-self-pay, accessed on February 7, 2022.

[26] Austin Smith Report, ¶ 136.

[27] Austin Smith Report, ¶ 136.

[28] Austin Smith Report, ¶ 132.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Department of Veteran Affairs, and international opportunities.[29]  Ms. Austin Smith completely removes revenue from "Emerging Opportunities" claiming that they "appear aspirational rather than expected."[30]

- ***Specimen Volume Growth Rate Adjustments****:*  The Padres Projections assumed a compound annual growth rate ("CAGR") of 9.8% from 2014 through 2018 for Medicare UDT specimen volume growth rate and 9.8% for commercial payors.[31] Ms. Austin Smith decreases the Medicare UDT specimen volume growth rate to 0% in 2014, 2% in 2015, and 3% for 2016 onwards, and the commercial payors growth rate to 10% in 2014, 5% in 2015 and 3% from 2016 onwards.[32]

- ***Specimen Volume and NRPS Adjustments Related to Millennium's Business Practices****:*

  (a)   Ms. Austin Smith reduces UDT specimen volume by 1.6% in July 2014 following the verdict in the Ameritox litigation to account for the discontinuance of the POC Free Test Cup program.[33]

  (b)   Ms. Austin Smith reduces the monthly Medicare NRPS in the Padres Projections to between $77.7 to $83.7 from January to March 2014, in order to, as she claims, "reflect only allowed billing

---

[29] Lender Presentation at JPMC-MIL-CORP-00170164–0167; Millennium Laboratories, "Management Presentation," March 2014, ML_DE_00058283 ("Management Presentation") at ML_DE_00058293; Millennium Laboratories, "Lender Presentation Audio File," March 31, 2014, JPMC-00089412 ("Lender Presentation Audio") at minute 35:00 ("So we are now one of two companies nationwide that has a federal supply schedule meaning we actually have a ticket to get into the dance to talk to any VA hospital, any Department of Defense local lab service so basically you have to have a federal supply schedule contract in order to provide services to either the VA or to the Department of Defense.  So the opportunity for us we think going forward is significant.  We were awarded the contract in June as I said and in reality we think that market is well over 400 million dollars.")

[30] Austin Smith Report, ¶ 67.

[31] **Appendix H1B**.

[32] Austin Smith Report, ¶ 109.

[33] Austin Smith Report, ¶ 133.  In 2011, Ameritox filed a complaint against Millennium, claiming that Millennium had engaged in anticompetitive behavior, partly due to its POC Free Test Cup program.  A $14.8 million judgment against Millennium was announced in June 2014, two months after the 2014 Transaction closed.  Email from C. Liou to Project Chargers Whole Team, "Millennium v. Amertitox - loss," June 17, 2014, JPMC-MIL-CORP-00165260. The POC Free Test Cup program was discontinued in June 2014 after the Ameritox verdict.  Millennium Self-Referral Disclosure at ML_DE_00325461.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

under MUE limits."[34]  Specifically, Ms. Austin Smith decreases January, February, and March 2014 Medicare NRPS by $69.32, $74.97, and $73.06, respectively.[35]  These decreases correspond to 15.4%, 16.6%, and 16.2% of the 1Q2014 actual Medicare NRPS for each respective month.[36]

(c)     Ms. Austin Smith reduces Medicare NRPS by 18.3% effective as of October 2015, "due to elimination of coverage for certain negative confirmation testing and specimen validity testing" in light of Noridian Healthcare Solutions ("Noridian")'s *draft* local coverage determination ("LCD"), which, as I understand from counsel, was

---

[34] Austin Smith Report, ¶ 118.

[35] YAS Workpaper 1, tabs "MUE w LCD Adjustment," "UDT Revenue," and "Padres UDT NRPS."

[36] The 1Q2014 actual Medicare NRPS for January, February, and March 2014 is $451.6, $451.4, $451.1, respectively.  Hence, for January, Ms. Austin Smith's percentage decrease of Medicare NRPS is 15.4%, i.e., $69.32 over $451.6.2.  The same calculation applies for February and March, 2014.  YAS Workpaper 1, tab "Padres UDT NRPS."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

not implemented until more than a year after the 2014 Transaction.[37]

    (d)    Ms. Austin Smith reduces commercial payors NRPS by 21.8% starting in July 2015, "due to the elimination of Custom Profiles and the resulting reduction in medically unnecessary tests."[38]

20.    **Exhibits 2A**, **2B**, and **2C** show Millennium's actual and projected (from the Padres Projections), as well as Ms. Austin Smith's adjusted revenue, adjusted EBITDA, and adjusted EBITDA margins.[39]

### B.   Ms. Austin Smith's DCF and comparable companies analyses

21.    Ms. Austin Smith conducts a DCF analysis to value Millennium as of April 2014[40] and concludes that the Company had an enterprise value of $802.9 million and a negative equity value

---

[37] Austin Smith Report, ¶ 123. Noridian was the Medicare Administrative Contractor ("MAC") for the State of California starting from August 24, 2013 and hence, Millennium's MAC. From 2007 to August 24, 2013, Palmetto GBA ("Palmetto") was the MAC for the State of California. United States' Complaint in Intervention, filed on March 19, 2015, ML_DE_00629274 ("DOJ Complaint") at ML_DE_00629281. MACs are "multi-state, regional contractors responsible for administering both Medicare Part A and Medicare Part B claims." "What's a MAC," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC, accessed on February 7, 2022. LCDs are decisions made by a MAC whether to cover a particular item or service in a MAC's jurisdiction in accordance with section 1862(a)(1)(A) of the Social Security Act. "Local Coverage Determinations (LCD) challenge," *Medicare*, available at https://www.medicare.gov/claims-appeals/local-coverage-determinations-lcd-challenge, accessed on February 7, 2022. As I understand from counsel, the Noridian LCD in question was on "Drugs of Abuse Testing" and given a Document ID of CL34692, reflecting its draft status. Its revision history can be reviewed by inputting its Document ID into the search box on the Medicare Coverage Database Archive website, "MCD Archive," "Medicare Coverage Database Archive," *Centers for Medicare & Medicaid Services*, available at https://localcoverage.cms.gov/mcd_archive/search.aspx?clickon=search, accessed on February 7, 2022.

[38] Austin Smith Report, ¶ 128.

[39] EBITDA refers to "Earnings before Interest, Taxes, Depreciation, and Amortization." Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice,* 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*"), Chapter 1, p. 17. Within the Padres Projections, Adjusted EBITDA for Millennium is calculated as Operating Income plus the sum of Depreciation and Amortization, Stock-Based Compensation, Transaction Expenses, and Other Income. Padres Projections, tabs "LeverageModel" and "Quarterly IS". Ms. Austin Smith maintains this assumption.

[40] Ms. Austin Smith conducts the DCF analysis as of March 31, 2014 and claims that she is "not aware of any significant change in the operations or financial condition of Millennium between March 31, 2014 and April 16, 2014 (the date the 2014 Transaction closed). As such, it is reasonable to assume that the valuation as of March 31, 2014 is a reliable indication of value as of April 16, 2014." Austin Smith Report, ¶ 142.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

of $958.9 million.[41]  For her DCF analysis, Ms. Austin Smith relies on her Modified Padres Projections and uses a seven-year projection period extending from 2Q2014 through 4Q2020 and a terminal year.[42]  To discount the projected cash flows and terminal value, Ms. Austin Smith uses a WACC of 14.8%.[43]  In doing so, she references—without explanation—the WACC that VPA used in its April 2014 solvency analysis, but fails to explain in her report why it is appropriate to adopt.[44]  To estimate the terminal value, Ms. Austin Smith uses the Gordon Growth model (a standard valuation methodology) and assumes a terminal growth rate of 3%, the same that VPA assumed.[45]

22.    For the comparable companies analysis, Ms. Austin Smith identifies five potential comparable companies and uses this set of comparable companies to estimate multiples of

---

[41] Austin Smith Report, ¶¶ 142, 145.  The equity value is the value that remains for the shareholders after any debts have been paid off.  Ms. Austin Smith estimates the equity value of negative $958.9 million by subtracting the $1,761.7 million of outstanding debt from the enterprise value of $802.9 million.

[42] Austin Smith Report, ¶¶ 143–144.  YAS Workpaper 1, tab "DCF".  Ms. Austin Smith, similar to management, assumes that the terminal year is 2021.  The terminal year is the year when the valued company is assumed to reach a steady state.  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 6, p. 255 ("[A] steady state company is also a company that has evolved to the point of generating constant economic returns on its investments.").

[43] Austin Smith Report, ¶ 143 ("I then discount both the seven-year projected cash flows and the terminal value using [WACC] (or discount rate) of 14.8%.  The discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014.  I also note that FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%.").  As I understand, VPA conducted a solvency analysis for Millennium ahead of the 2014 Transaction.  2014 VPA Solvency Analysis.

[44] Ms. Austin Smith also provides results based on several sensitivities to her asserted WACC of 14.8%; for example, she considers a WACC of 9.8%, which is the lowest WACC for which she provides results.  Austin Smith Report, FN 285 ("The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%).  However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk.  Thus, 9.8% underestimates an appropriate WACC for Millennium.").

[45] Austin Smith Report, ¶ 144.  2014 VPA Solvency Analysis at ML_DE_00263288.  A "constant growth perpetuity valuation model for discounting dividends is called the Gordon growth model."  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 1, p. 12.  The "Gordon growth model relates the value of a stock to its expected dividends in the next time period, the cost of equity and the expected growth rate in dividends" and "can be used to value a firm that is in 'steady state' with dividends growing at a rate that can be sustained forever."  Damodaran, A., *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 2nd ed., Wiley, 2002 ("Damodaran, *Investment Valuation*"), Chapter 13, p. 2.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

revenue and EBITDA.[46]  Notably, Ms. Austin Smith's EBITDA multiples analysis yields an implied equity value for Millennium between *positive* $23 million and $1,456 million, i.e., it implies that Millennium was balance sheet *solvent*, which is starkly different from the conclusions in Ms. Austin Smith's own DCF analysis.[47]  Ms. Austin Smith ultimately discards her comparable companies analysis because in her words, "these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value."[48]

### C. Ms. Austin Smith's analysis of Millennium's ability to pay its debts and capital adequacy

23.     To perform the ability to pay debts test for Millennium, Ms. Austin Smith estimates the Company's unlevered free cash flows using her Modified Padres Projections and assumes the level of Millennium's indebtedness remains constant following the 2014 Transaction.[49] Ms. Austin Smith concludes that by 2018, Millennium would have insufficient cash reserves to meet interest payments.[50]  Ms. Austin Smith purports to consider "Millennium's prospects for refinancing the Term Loan at maturity in April 2021" and notes that "Millennium was above the levels typically associated with Caa-C credits."[51]

24.     To perform the capital adequacy test for Millennium, Ms. Austin Smith creates a single "downside" scenario in which she makes two adjustments to her already substantially negative Modified Padres Projections.  She increases the percentage reduction in Medicare NRPS due to

---

[46] Austin Smith Report, ¶¶ 151, 156.  Valuation multiples are a ratio of an observed measure of an asset's value (such as price) in the numerator to a financial metric of the firm, such as "earnings, book values, or sales" in the denominator.  In relative valuation, multiples are a method to "standardize the values" of an asset to allow for comparison to comparable companies in the market.  Damodaran, *Investment Valuation*, Chapter 17, pp. 1–2. Similarly, "[t]o form a valuation multiple we need both numerators and denominators.  The two numerators most often used in comparables analysis are enterprise value (EV) and equity market capitalization (= market cap or equity market value).  The former measures the market value of all the securities of the company, whereas the latter measures the market value of just the common stock.  Next, we need some denominators.  The most intuitive denominators are proxies for cash flow.  Indeed, all multiples have some deep connection to a cash flow ratio, even if the connection is not apparent."  Metrick, A., and Yasuda, A., *Venture Capital and the Finance of Innovation*, 3rd ed., Wiley, 2021, Kindle Edition ("Metrick and Yasuda, *Venture Capital*"), Chapter 12, p. 184.

[47] Austin Smith Report, Table 9.

[48] Austin Smith Report, ¶ 152.

[49] Austin Smith Report, ¶ 164.

[50] Austin Smith Report, ¶ 166.

[51] Austin Smith Report, ¶ 169.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Noridian's draft LCD from 18.3% to 33.3%.[52]  She also increases her ad hoc assessment of the decline in UDT and PGT specimen volume due to the purported reputational impact of an expected DOJ settlement from 30% to 50% (rather than a decline of 15% in 2015 and 2016, the decline is 25% in each year).[53]  She concludes that under this downside scenario, Millennium's equity value would range from negative $1,048.8 million to $1,274.8 million, leaving "Millennium with capital insufficient to sustain operations."[54]

## V.    MS. AUSTIN SMITH'S DISCOUNTED CASH FLOW ANALYSIS IS FLAWED AND UNRELIABLE

25.    Ms. Austin Smith asserts that her DCF analysis "demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction.  The enterprise value . . . of Millennium was $802.9 million compared with $1,761.7 million of outstanding debt. . . . In other words Millennium had a negative equity value of $958.9 million, giving effect to the 2014 Transaction."[55]  Ms. Austin Smith's DCF analysis is flawed and unreliable.

26.    Ms. Austin Smith opines without providing an explanation in her report that the proper discount rate for this exercise is a WACC of 14.8%.[56]  Ms. Austin Smith's WACC estimation is incorrect and without basis because of several errors.  Specifically,

- Ms. Austin Smith improperly includes a company-specific risk premium of 5%.

- Ms. Austin Smith incorrectly includes a small company risk premium of 1.9%.  The small company risk premium is inappropriate, does not have a theoretical basis, and is not supported by the academic literature.

- Ms. Austin Smith relies on a different set of comparable companies than the one she relies on in her comparable companies analysis.

---

[52] Austin Smith Report, ¶¶ 170–171.

[53] Austin Smith Report, ¶ 171.

[54] Austin Smith Report, ¶172; Table 10.

[55] Austin Smith Report, ¶ 145.

[56] Ms. Austin Smith does not provide a description of the basis for her estimate of the WACC.  She simply references the 2014 VPA Solvency Analysis.  In FN 285 in the Austin Smith Report, she claims that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%)."  The components of the WACC are provided in the VPA Solvency Analysis Underlying Materials, VP_ML_00002551 ("WACC Underlying Materials"), which as I understand is the underlying analysis of the 2014 VPA Solvency Analysis.  Ms. Austin Smith only references the 2014 VPA Solvency Analysis and not the WACC Underlying Materials.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

27.    Ms. Austin Smith's errors lead to a substantially inflated WACC.  As described below, correcting the above noted errors and inconsistencies in Ms. Austin Smith's WACC yields a corrected WACC of 7.2%, which implies an enterprise value of $1,970.8 million and a *positive* equity value of $209.1 million.  That is, using the corrected WACC, Millennium would be balance sheet *solvent* following the 2014 Transaction, even if one were to accept *all* of the other unsupported adjustments and assumptions Ms. Austin Smith created for this litigation (which I do not).

28.    Ms. Austin Smith's Modified Padres Projections project substantially reduced revenue. Given her revenue projections, Ms. Austin Smith does not offer a reliable basis for estimating Millennium's projected operating expenses.  While, Ms. Austin Smith projects a revenue decrease of 28% from 2014 to 2016, she projects operating expenses, as a percentage of revenue, to increase from 38% in 2014 to 51% in 2016, a proportionate increase of about one-third, without providing a basis as to why management would maintain such levels of operating expenses if management indeed had expected such substantially reduced revenues.[57]

29.    As detailed below, Ms. Austin Smith performs multiple adjustments to Millennium's specimen volume and NRPS, as well as projected revenue from "Emerging Opportunities," which are unsupported and lack a reliable basis.[58]  She also asserts that her proposed adjustments are "one-time adjustments," but she fails to acknowledge that their impact affects *all subsequent years* creating a *permanent* effect that substantially reduces her estimate of Millennium's enterprise value.[59]

30.    Notably, she relies on hindsight to justify certain of her adjustments.  It is well-settled in the academic literature and standard valuation textbooks that employing hindsight in valuations leads to unreliable results.  For example, a well-known academic paper states that "hindsight should not be used.  Rather, the stream of returns should be estimated using the information

---

[57] **Appendix H1A**; **Exhibit 5C**.

[58] Ms. Austin Smith makes several mechanical adjustments to the Padres Projections, not all of which are described in her report, in order to implement her adjustments.  These mechanical adjustments are apparent in her work-papers and I do not modify or alter several of them.  I modify only the ones I explicitly mention in my report and accompanying exhibits.

[59] Austin Smith Report, ¶ 107.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

available as of the [relevant] time [and] expectations as of that time are particularly relevant."[60] Similarly, a standard valuation textbook notes that dramatic financial reversals are often unanticipated and while "[w]ith the benefit of hindsight, the valuations of [certain companies that experienced dramatic drop in value] (and the analyst recommendations) made in 1992 can be criticized, . . . they were reasonable, given the information available at that time."[61]

31.     Ms. Austin Smith also fails to consider that management projections incorporated a 30% haircut to the NRPS forecasts to account for reimbursement risks.[62]  Ms. Austin Smith however, without support, purports to be able to provide a "better" or "more reasonable" expectation for each risk and ignores management's contemporaneous expectations and the resulting financial projections.

---

[60] Fisher, F.M. and Romaine, R.C. (1990), "Janis Joplin's Yearbook and the Theory of Damages," *Journal of Accounting, Auditing, and Finance*, 5(1), pp. 145–157 at 153.  In this paper, Fisher and Romaine provide an example to illustrate the problems with an approach that relies on hindsight, noting that if one was to lose a yearbook with Janis Joplin's signature prior to her becoming a superstar, that does not mean that one would be deprived of a yearbook containing the autograph of a rock star.  One would be deprived of a yearbook plainly worth as much as a yearbook that contained one or more signatures, i.e., a small amount.  Associated with that yearbook was uncertainty as to whether any of the autographs it contained would ever be worth anything.  The price of the yearbook included the value of the small probability that they would.  It also included the value of the rather more likely outcome that they would not.  A yearbook equally valued by the owner at the time could have been purchased for said small value, and the owner could have, in effect, mitigated the damage by purchasing a replacement and acquiring an essentially identical asset.

[61] Damodaran, *Investment Valuation,* Chapter 1, p. 5.

[62] Padres Projections, tab "Payor Mix"; Email from A. Christoforou to J. Lee, "ML Q&A Tracker," March 30, 2014, JPMC-MIL-CORP-00219684 ("Lender Question Tracker") at JPMC-MIL-CORP-00219685; Citi Model (April 2014).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> **A. Ms. Austin Smith's findings depend on a number of assumptions and approaches that are unsupported, flawed, and unreliable**

> **1. Ms. Austin Smith's valuation depends on application of an incorrect and substantially inflated WACC**

32.     Ms. Austin Smith discounts her modified projected cash flows using a WACC of 14.8%.[63] This WACC is obtained by reference to the WACC from the 2014 VPA Solvency Analysis but Ms. Austin Smith provides no other basis, documentation, or analysis for this figure in her report.[64] Ms. Austin Smith's WACC of 14.8% is incorrect and overstated.  Correcting certain errors in Ms. Austin Smith's WACC results in a WACC of 7.2%.  **Exhibit 4** shows the components of the WACC as asserted by Ms. Austin Smith and the corrections to Ms. Austin Smith's WACC that yield the corrected WACC of 7.2%.  Using this corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $1,168.0 million to $1,970.8 million.  This corrected valuation renders Millennium balance sheet *solvent* by $209.8 million.

33.     I also note that the discount rates estimated by the Arrangers are consistent with the corrected WACC of 7.2%.  **Exhibit 3** shows the WACCs estimated by the Arrangers and the average WACC of the Arrangers, which was 7.2%.[65]

---

[63] Austin Smith Report, ¶ 143.  As discussed above, Ms. Austin Smith also acknowledges that FTI used a WACC of 14.0% in December 2015.  Austin Smith Report, ¶ 143.  In addition, Ms. Austin Smith performs her DCF analysis using a WACC of 9.8%, which is the lowest WACC for which she provides sensitivities.  Austin Smith Report, Table 7.  Similar to her 14.8% WACC, Ms. Austin Smith provides no basis or analysis, except for FN 285, in which she states that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%).  However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk."

[64] Ms. Austin Smith only states that the WACC is 14.8%, referencing the 2014 VPA Solvency Analysis, and does not provide the components of the WACC.  Austin Smith Report, ¶ 143.  To correct Ms. Austin Smith's WACC, I relied on the WACC Underlying Materials.

[65] The average WACC of 7.2% does not include the BMO WACC as the WACC analysis BMO conducted is not made available to me.  The average WACC is estimated as the average of each of the remaining Arranger's average WACC.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> a) The company-specific risk premium Ms. Austin Smith includes in the WACC has no basis in financial economics and is inappropriate

34.     Ms. Austin Smith's WACC incorporates a company-specific risk premium of 5%, an adjustment that has no basis in financial theory and the academic literature. **Exhibit 4** shows the corrected WACC, taking out the company-specific risk premium from Ms. Austin Smith's WACC.

35.     A basic principle in finance is that investors earn a return that compensates them for the systematic or non-diversifiable risks they take.[66] Company-specific risks are diversifiable because they can be diversified by investing in additional assets. If an investor earns a return for holding a "diversifiable" risk, then they are overcompensated. Hence, the WACC should not contain a company-specific risk premium because investors can diversify their holdings to offset company-specific risks. Instead, in a DCF analysis, it is the projected cash flows that should reflect the expected performance of a company, including company-specific risks.[67] In this context, "expected" performance in the cash flows does not mean an optimistic (or a pessimistic) view of the future that ignores (or exacerbates) opportunities, risks, and uncertainties. Instead, expected performance reflects the average (or expected) outlook in a forecast, accounting for opportunities, risks, and uncertainties faced by a company.

36.     In fact, Ms. Austin Smith appears to acknowledge that the WACC should only reflect the non-diversifiable risk of the cash flows when she states that "[t]he projected free cash flows of the firm are discounted back to the date of valuation, using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows."[68] In line with this, she appears to

---

[66] Brealey, R.A., Myers, S.C., and Allen, F., *Principles of Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2011 ("Brealey et al., *Principles of Corporate Finance*"), Chapter 1, p. 8. According to the Capital Asset Pricing Model ("CAPM"), for a diversified investor, company specific risk (called 'idiosyncratic risk' or 'non-systematic risk') does not affect the value of the company. Metrick and Yasuda, *Venture Capital*, Chapter 4, p. 58 ("The key idea of the CAPM is that beta reflects the covariance of an asset's returns with the returns on the overall market. The higher the beta, the higher the expected return. Beta risk is also called market risk, nondiversifiable risk, or systematic risk. The mathematics and intuition behind the CAPM implies that beta risk is the only kind of risk that affects the expected return of an asset."); Brealey et al., *Principles of Corporate Finance*, Chapter 8, pp. 185, 194; Damodaran, *Investment Valuation*, Chapter 4; Sharpe, W. (1964), "Capital Asset Prices: A Theory of Market Equilibrium Under Conditions of Risk," *Journal of Finance*, 19(3), pp. 425–442 ("Sharpe, 1964") at pp. 436–442.

[67] Damodaran, *Investment Valuation*, Chapter 4, pp. 9, 14–18; Sharpe, 1964, pp. 436–442; Brealey et al., *Principles of Corporate Finance*, Chapter 8, pp. 192–194; Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 330.

[68] Austin Smith Report, ¶ 41.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

exclude the company-specific risk premium from the 9.8% WACC when she states that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies *plus* the size premium adopted by Vantage Point (i.e., 10.0%)."[69]  Notwithstanding this acknowledgement, Ms. Austin Smith uses a WACC that incorporates a company-specific risk premium in her DCF analysis.

      b)  The small company risk premium Ms. Austin Smith includes in the WACC has no basis in financial economics and is inappropriate

37.    Ms. Austin Smith includes a premium of 1.9% in her WACC that she attributes to Millennium having a relatively small capital value.[70]  She provides no basis for including a small company risk premium in her report.  **Exhibit 4** shows the corrected WACC, taking out the small company risk premium from Ms. Austin Smith's WACC.

38.    The small company risk premium originates from the 1980s empirical finding that small stocks (those with lower market capitalizations) outperform, on average, large stocks (those with higher market capitalizations), implying that investors bear additional risks for investing in small companies.[71]  Subsequent studies however showed that the small company risk premium does not exist, i.e., investors do not earn higher returns for investing in small companies, this finding is dominated by a seasonal effect, and that the methods and studies documenting this effect are

---

[69] Austin Smith Report, FN 285 (emphasis in original).

[70] If a small company risk premium were to be used, the corrected discount rate would be 8.6% as demonstrated in **Appendix D**.  **Appendix E1** also shows the value impact on Millennium's equity value of modifying Ms. Austin Smith's adjustments alone, while maintaining all her other adjustments and assumptions, using the corrected WACC of 7.2% and the 8.6% WACC that includes a small company risk premium.  Even with a WACC of 8.6% (which includes a small company risk premium), Millennium would be balance sheet solvent if any single one of Ms. Austin Smith's adjustments pertaining to operating expenses, the purported impact of a DOJ settlement, elimination of "Emerging Opportunities," or specimen volume growth rate were to be removed.  **Appendix E2** shows the combined impact on Millennium's equity value of Ms. Austin Smith's adjustments as well as the impact of removing a portion of that combined impact.

[71] Banz, R. (1981), "The Relationship Between Return and Market Value of Common Stocks," *Journal of Financial Economics,* 9(1), pp. 3–18; Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 335.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

flawed.[72]  For example, Cochrane (2005) notes that "[t]he small-firm effect completely disappeared in 1980" and Ang (2014) states that "[s]ince the mid-1980s, however, there has been no size premium after adjusting for market risk."[73]  Horowitz et. al. (2000) find "no consistent relationship between size and realized returns."[74]  Hirshleifer (2001) notes that the "predictive power vanishes when size is measured by book value or other non-market measures."[75]  Brealey et al. (2011) note that "in the past 25 years small-firm stocks have underperformed just about as often as they have overperformed."[76]  The lack of a small company risk premium is consistent

---

[72] Blume, M.E., and Stambaugh, R.F. (1983), "Biases in Computed Returns: An Application to the Size Effect," *Journal of Financial Economics,* 12(3), pp. 387–404 at p. 388 ("Using daily returns for NYSE and AMEX stocks, we find that (1) the average size effect over the entire year is about 0.05 percent per day . . . and (2) virtually all of this full-year average is attributable to January."); Berk, J. (1995), "A Critique of Size-Related Anomalies," *Review of Financial Studies*, 8(2), pp. 275–286 at p. 284 ("We have shown that, even in an economy in which firm size and risk are unrelated, the logarithm of market value will be inversely related to expected return."); Kim, D. (1997), "A Re-Examination of Firm Size, Book-to-Market, and Earnings Price in the Cross-Section of Expected Stock Returns," *Journal of Financial and Quantitative Analysis,* 32(4), pp. 463–489 at p. 487 ("Firm size is barely significant using monthly returns, but no longer significant in explaining average stock returns using quarterly returns."); Dichev, I. (1998), "Is the Risk of Bankruptcy a Systematic Risk?" *Journal of Finance,* 53(3), pp. 1131–1147 at p. 1132 ("Third, this study finds that the size effect, strong in the 1960s and 1970s, has virtually disappeared since 1980"); Hirshleifer, D. (2001), "Investor Psychology and Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597 at pp. 1538–1539 ("The challenge for the mispricing theory is to explain how irrational investors can remain important while hemorrhaging a great deal of cash. The disappearance of the size effect in the mid-1980s and the inconsistency of the value effect in the last few years is suggestive."); Alquist, R., Israel, R., and Moskowitz, T. (2018), "Fact, Fiction, and the Size Effect," *Journal of Portfolio Management,* 45(1), pp. 1–30, pp. 3–4 ("The facts we present include the following: that the size effect diminished shortly after its discovery and publication; that it is dominated by a January seasonal effect; that it is not applicable or does not work for other asset classes outside of individual equities; that it can be made much stronger when looked at in conjunction with other factors (namely, defensive/quality factors); that the size premium mostly comes from microcap stocks and is difficult to implement in practice; and, finally, that the size effect continues to receive a disproportionate amount of attention relative to other factors with similar or stronger evidence behind them.").

[73] Cochrane, J., *Asset Pricing: Revised Edition*, Princeton University Press, 2005, Chapter 20, p. 452; Ang, A., *Asset Management: A Systematic Approach to Factor Investing*, Oxford University Press, 2014, Chapter 14, pp. 455–456.

[74] Horowitz, J.L., Loughran, T., and Savina, N.E. (2000), "Three Analyses of the Firm Size Premium," *Journal of Empirical Finance,* 7(2), pp. 143–153 at p. 143.

[75] Kent, D. D, Hirshleifer, D., and Subrahmanyam, A. (2001), "Overconfidence, Arbitrage, and Equilibrium Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597, p. 959.

[76] Brealey et al., *Principles of Corporate Finance*, Chapter 8, p. 198.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

with finance theory as there is no theoretical basis that explains why a company's size should affect estimates of its WACC.[77]

        c)  Ms. Austin Smith relies on a different set of comparable companies than the one she relies on in her comparable companies analysis to estimate her WACC

39.     In Ms. Austin Smith's comparable companies analysis, she identifies the following *five* comparable companies:  Alere, Inc. ("Alere"), Bio-Reference Laboratories, Inc. ("Bio-Reference"), Laboratory Corporation of America Holdings ("LabCorp"), Myriad Genetics, Inc. ("Myriad"), and Quest Diagnostics ("Quest").[78]  (Ms. Austin Smith later opines that her set of five comparable companies is "not sufficiently comparable to Millennium to provide a reliable estimate of value," which I address later in this report.[79])  Ms. Austin Smith's 14.8% WACC estimation, however, relies on a set of *eight* comparable companies—these five companies as well as three additional comparable companies (Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.).[80]  Ms. Austin Smith's inclusion of these three additional companies is therefore inconsistent with her comparable companies analysis.  In other words, if VPA's set of comparable companies is appropriate for the WACC estimation, Ms. Austin Smith fails to explain why she does not use that set in her comparable companies analysis.  Conversely, if VPA's set of comparable companies is "not sufficiently comparable" to Millennium, then Ms. Austin Smith does not explain how she relies on that set to estimate the WACC.

40.     This is a methodological inconsistency and had Ms. Austin Smith correctly used her set of comparable companies, the WACC would decrease.  Interestingly, Ms. Austin Smith appears to agree that the WACC must be "compiled" from her set of five comparable companies; in a footnote, she writes that "The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies . . . ."[81]— but suggests that she

---

[77] There are some studies that do find the existence of a small company risk premium, if one accounts for cash flow shocks.  Hou, K. and Dijk, M. (2019), "Resurrecting the Size Effect:  Firm Size, Profitability Shocks, and Expected Stock Returns," *The Review of Financial Studies*, 32(7), pp. 2850–2889.  This however implies that, if there is a company size effect, then the adjustment needs to be made on the expected cash flows and not the cost of equity through the inclusion of a small company risk premium.

[78] Austin Smith Report, ¶ 151.

[79] Austin Smith Report, ¶ 152.

[80] 2014 VPA Solvency Analysis at ML_DE_00263292.

[81] Austin Smith Report, FN 285.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

only does it for the 9.8% WACC. **Exhibit 4** shows the comparable companies correction to Ms. Austin Smith's WACC.

41.    The assumption regarding the set of comparable companies affects Ms. Austin Smith's WACC estimation in two ways, through: (1) the assumption about the Company's market "beta," i.e., the exposure to the market risk,[82] and (2) Ms. Austin Smith's assumption that Millennium's target capital structure equals the industry (defined as the set of comparable companies) average.[83] **Appendix F** provides a detailed description. Ms. Austin Smith provides no backup material for her analysis, so it is unclear what Ms. Austin Smith's methodology is and whether it is appropriate.

> d)  If Ms. Austin Smith corrected her WACC but held to her other opinions, she would conclude that Millennium was balance sheet solvent at the time of the 2014 Transaction

42.    Adjusting Ms. Austin Smith's WACC to correct her methodological flaws discussed above results in a WACC of 7.2%, substantially lower than the 14.8% WACC she uses.[84] This implies an enterprise value of $1,970.8 million, without modifying any other adjustments and assumptions that Ms. Austin Smith makes, which renders Millennium balance sheet *solvent* by $209.1 million. See **Exhibit 1**.

### 2.    Ms. Austin Smith's treatment of operating expenses is flawed

43.    Ms. Austin Smith projects substantially reduced revenue compared to those created by management. In fact, Ms. Austin Smith's adjustments imply that Millennium's revenue would

---

[82] Beta is the "risk of an individual security relative to the market." Holthausen and Zmijewski, *Corporate Valuation,* Chapter 8, p. 330. VPA's comparable companies have an average un-levered beta of 0.77. Ms. Austin Smith's comparable companies, on the other hand, have an average un-levered beta of 0.72. Note that while VPA's average un-levered beta is 0.77, VPA uses an un-levered beta of 1 without any explanation. The correction of WACC incorporates the correction of this error as well. **Exhibit 4**, and **Appendix D** and **F** presents in detail the WACC corrections. WACC Underlying Materials, tab "Beta."

[83] WACC Underlying Materials, tabs "Beta" and "WACC"; Austin Smith Report, ¶¶ 143, 151.

[84] While Ms. Austin Smith references FTI's WACC of 14.0%, she does not adjust it for her assumptions and opinions. Austin Smith Report, ¶ 143. FTI's WACC includes a company-specific risk premium ("unsystematic risk premium") of 6%, a small company premium of 2.15%, and it is based on a different set of comparable companies (FTI includes four additional companies—Opko Health, Inc., Psychemedics Corp., Sonic Health Limited, and Meridian Bioscience, Inc.— and it excludes Bio-Reference Laboratories). FTI December 2015 Valuation at KPMG-ML-EA15WB-0000772–0773.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

decrease by approximately 15.3% in 2015 and 14.9% in 2016, and by 2018, Millennium would have just over half of the revenue originally projected by management.[85] While Ms. Austin Smith substantially reduces Millennium's projected revenue, she projects operating expenses, as a proportion of revenue, to increase by more than 34% from 2014 to 2016 without providing a basis as to why management would maintain such levels of operating expenses if management indeed expected revenue to decline as substantially as she suggests it should have decreased.[86] **Exhibit 5A** shows Millennium's historical operating expenses as a percentage of revenue, the Padres Projections, and Ms. Austin Smith's modified operating expenses. Ms. Austin Smith projects not only increasing operating expenses as a proportion of revenue, but also operating expenses to be a substantially higher percentage of revenue compared to the average historical levels and the Padres Projections. Ms. Austin Smith provides no basis for her assumptions in her report.

44.     Ms. Austin Smith classifies operating expenses driven by specimen volume as "variable" and those driven by a fixed growth rate as "fixed" operating expenses.[87] She also has a hybrid category of operating expenses that are driven by specimen volume and a fixed growth rate.[88] While Ms. Austin Smith reduces Millennium's projected revenue substantially, she does not offer any basis for failing to adjust operating expenses in a manner consistent with her substantially lower expected revenue. Specifically, for the period 2014–2016, Ms. Austin Smith decreases revenue by approximately 28% but increases "fixed" operating expenses by over 6%.[89] Ms. Austin Smith provides no assessment of why a major revenue reduction, such as the one she

---

[85] **Appendix H1A**.

[86] **Exhibit 5A**. Ms. Austin Smith projects the operating expenses as percentage of revenue to increase from 38% in 2014 to 51% of revenue in 2016. This is an increase of approximately 34% as a proportion of revenue.

[87] YAS Workpaper 1, tabs "Brattle Expense Build" and "Expenses Per Unit Costs." While the fixed operating expenses do not change with specimen volume, they are not fixed in the sense of being constant—they grow based on a fixed growth rate that Ms. Austin Smith adopts from the Padres Projections. For the variable operating expenses, she uses the same unit costs assumptions as in the Padres Projections and estimates operating expenses driven by specimen volume based on her modified projected specimen volume growth rates. Austin Smith Report, ¶ 136 ("I use the same unit costs assumptions as the Padres Projections. Unit costs are calculated by dividing each expense by specimen volume. . . . To estimate expenses under the Modified Padres Projections, I multiplied the unit costs by the adjusted UDT and PGT volumes discussed above.").

[88] Austin Smith Report, ¶ 136; YAS Workpaper 1, tabs "Brattle Expense Build" and "Expenses Per Unit Costs."

[89] "Fixed" operating expenses in the Modified Padres Projections are approximately $119.5 million (18% of projected revenue) in 2014 and grow to approximately $126.9 million (26% of projected revenue) in 2016. This corresponds to a 6% increase. **Exhibit 5C**; YAS Workpaper 1, tabs "Detailed Income Statement" and "Brattle Expense Build."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

projects, would lead to an increase in "fixed" operating expenses, which include expenses such as fixed salaries and wages, education and marketing, or stock compensation expense.[90]  In addition, for 2014–2016, Ms. Austin Smith assumes that "variable" operating expenses decrease by approximately 12%, substantially less than the approximately 28% decrease in her projected revenue.[91]  Ms. Austin Smith again provides no analysis that would explain why variable operating expenses, which include expenses such as volume driven salaries and wages, billing, and variable commissions, should decrease less than projected revenue.

45.      As a result, Ms. Austin Smith's assumptions increase operating expenses from 38% of revenue in 2014 to 51% of revenue in 2016, a proportionate increase of about one-third.[92]  The Padres Projections assumed operating expenses to be 36% of revenue in 2014 and 34% in 2016. Millennium's actual operating expenses were 31% of revenue in 2013.[93]  Put differently, Ms. Austin Smith projects Millennium's operating expenses to increase faster than the Company's revenue.  **Exhibit 5A** shows Millennium's historical and projected, as well as Ms. Austin Smith's modified operating expenses as a percentage of revenue.  She provides no basis in her report as to why management would maintain such levels of operating expenses if management indeed expected the substantially reduced revenues she asserts.[94]  In fact, in July 2015, after the various adverse outcomes had materialized and revenue had declined, Millennium identified ways to cut

---

[90] YAS Workpaper 1, tab "Brattle Expense Build."

[91] "Variable" operating expenses in the Modified Padres Projections are approximately $111.2 million (16% of projected revenue) in 2014 and decline to approximately $98.0 million (20% of projected revenue) in 2016.  This corresponds to a 12% decrease.  **Exhibit 5C**; YAS Workpaper 1, tabs "Detailed Income Statement" and "Brattle Expense Build."

[92] **Exhibit 5C**.

[93] **Exhibit 5A**.

[94] Ms. Austin Smith's operating expenses assumptions result in substantially lower EBITDA margins—*lower* than any contemporaneous estimate and *lower* than many analyses performed around or after the time Millennium filed for bankruptcy, as demonstrated in **Exhibits 7C** and **8C**.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

its operating expenses by $35.7 million (or approximately 15%) per year.[95]  This further suggests that Ms. Austin Smith's proportional increase in operating expenses is without a reliable basis.

46.     Modifying Ms. Austin Smith's operating expenses assumptions by keeping operating expenses constant at her 2014 projected level of 38% of revenue, while using her inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $220.7 million to $1,023.6 million.[96]  **Exhibits 5B** and **5C** show the modification to Ms. Austin Smith's operating expenses.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis), would *increase* her valuation by $645.3 million to $2,616.1 million.  See **Exhibit 1**.

> 3.     **Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact of a potential DOJ settlement**

47.     Ms. Austin Smith asserts that the Padres Projections "unreasonably failed to account" for the "reputational impact" that would follow an "expected" settlement with the DOJ.[97]  To account for the purported "reputational impact of an expected US DOJ Settlement," Ms. Austin Smith uses certain volume declines that she says two other companies—Ameritox and Calloway—experienced following their respective DOJ settlements (in 2010 and 2012), and reduces

---

[95] Management identified the following categories for potential operating expenses reductions: Headcount ("[c]ompany wide reduction in force," "[c]onsolidation of territories"), Commissions ("[e]limination of commissions on unpaid volume"), Consulting Expenses ("[e]limination of outsourced functions whenever possible," "[e]limination of professional fees related to revenue cycle"), and reductions in travel.  Alvarez & Marsal Presentation, "Presentation to the Department of Justice," July 22, 2015, ML_DE_00167434 at ML_DE_00167456 ("The largest contributors to savings will come from headcount and commissions savings that account for 65% of total run-rate savings.").

[96] I modify Ms. Austin Smith's operating expenses by making them constant at her 2014 projected level of 38% of revenue.  This is a conservative assumption as the modification could keep operating expenses constant at the 2013 level of 31% of revenue or the 2014 Padres Projections level of 36% of revenue.  Both modifications would increase Millennium's enterprise value by more than $221 million.  **Exhibit 5A**.

[97] Austin Smith Report, ¶¶ 131–132.  As I understand, on March 27, 2012, Millennium received a subpoena from the DOJ for production of documents in connection with an investigation into federal healthcare offenses.  Email from H. Appel to S. Karanikolaidis, Letter from the United States Attorney to Martin Price, "Re: Subpoena Regarding Millennium Laboratories, Inc.," March 27, 2012, JPMC-MIL-CORP-00214601, JPMC-MIL-CORP-00214602.  As I further understand, the DOJ informed Millennium in December 2014, nine months after the 2014 Transaction, that it would be pursuing claims against the Company.  Hardaway Declaration, ¶ 17.  Following the DOJ investigation, the Company entered into a settlement with the DOJ on May 20, 2015.  Hardaway Declaration, ¶ 27.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium's UDT and PGT specimen volume by 15% in 2015 and by another 15% in 2016.[98] Notably, she references an email dated April 3, 2015 ███████████████████████████ ██████████████████████████████████████████.[99] She also references a June 14, 2015 email by Millennium's then-CEO that stated ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████[100] Ms. Austin Smith, however, provides no evidence corroborating the supposed volume declines at the two companies. Moreover, she provides no analysis in her report for what caused the revenue declines for these two companies, if they in fact occurred, or whether they were a result of these companies' settlements with the DOJ (due to reputational impact or otherwise). Ms. Austin Smith provides no explanation for why Millennium's management should have expected to experience a similar volume decline and no explanation as to how Millennium should have predicted this impact more than a year before the emails in question were sent.[101]

48.    Notably, in the same June 2015 email cited by Ms. Austin Smith, Millennium's then-CEO stated that ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████[102] Ms. Austin Smith has failed to explain how this email provides a basis, in April 2014, for the 30% adjustment that she applies across 2015 and 2016. In fact, more than a year after the 2014 Transaction, Millennium, with the assistance of Alvarez & Marsal, analyzed the impact of the DOJ investigations on

---

[98] Austin Smith Report, ¶¶ 86, 131–132.

[99] Email from T. Kennedy to B. Hardaway, et al., "RE: Privileged," April 3, 2015, ML_DE_00597259 at ML_DE_00597260.

[100] Austin Smith Report, ¶ 131; Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015, ML_DE_00559337 at ML_DE_00559338.

[101] Austin Smith Report, ¶¶ 131–132. Ms. Austin Smith models her adjustment of a purported reputational impact of a DOJ settlement as starting in January 2015. Ms. Austin Smith has failed to provide a basis for such an assumption in her report. Her adjustment affects specimen volume starting in 2015 in a permanent manner, as she effectively reduces the base of specimen volume that subsequent volume is based on. Had she assumed a later start date of a potential DOJ settlement, her adjustment would have been smaller.

[102] Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015 ML_DE_00559337 at ML_DE_00559338.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Ameritox and Calloway only to conclude that Millennium would model a decline of 5% starting in July 2015 and a further 10% the following year.[103]

49.    Importantly, Ms. Austin Smith has failed to show that the volume declines for Ameritox and Calloway were not instead the result of the termination of the practices investigated by the DOJ (or, indeed, any other factors), in whole or in part.  Moreover, Ms. Austin Smith separately adjusts the Padres Projections for the termination of the custom profiles and the POC Free Test Cup program, which, as I understand, were among the targets of the DOJ's investigation into Millennium.[104]  In other words, she has no basis for her assertion and provides no evidence in her report, that these volume declines were due to reputational impacts resulting from the DOJ settlements.

50.    Modifying the impact of this adjustment by restoring the UDT and PGT specimen volume declines of 15% in 2015 and 15% in 2016, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $383.8 million to $1,186.6 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $1,138.7 million to $3,109.5 million.  See **Exhibit 1**.

   **4.    Ms. Austin Smith provides no reliable basis for the elimination of the revenue from Millennium's "Emerging Opportunities"**

51.    The Padres Projections included anticipated future revenue from "Emerging Opportunities," which as I understand, included government contracts with the Department of Defense and Department of Veterans Affairs, and international opportunities.[105]  Ms. Austin Smith asserts that "Emerging Opportunities should not form part of the expected cash flows when assessing balance sheet solvency" because "[t]he revenue[] appear aspirational rather than

---

[103] Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015 ML_DE_00559337 at ML_DE_00559338.

[104] Austin Smith Report, ¶¶ 128, 133.

[105] Lender Presentation at JPMC-MIL-CORP-00170167; Management Presentation at ML–DE–00058293; Lender Presentation Audio at minute 35:00.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

expected."[106]  Ms. Austin Smith disregards the actions the Company took in order to realize these opportunities and her characterization relies on the simple observation, which in turn relies on hindsight, that "[t]he Emerging Opportunities do not appear in the subsequent management model dated June 8, 2015."[107]

52.     Indeed, Ms. Austin Smith completely ignores Millennium's business actions related to "Emerging Opportunities," including the federal supply schedule contract that Millennium was awarded in June 2013 and the company internal infrastructure that Millennium had built to assist with the government contracts.[108]  Regarding the government contracts, Millennium stated that it had hired a former Walgreens professional who was experienced in government supply strategy.[109]  Regarding international opportunities, Millennium had a dedicated team and planned to partner with existing companies in emerging markets and license Millennium's technologies.[110]

53.     Moreover, Ms. Austin Smith's rationale is flawed as it is inconsistent with the broadly accepted principles of conducting a DCF analysis in which projected cash flows *should* reflect the *expected future* cash flows.[111]  In other words, Millennium had taken actions so that these "Emerging Opportunities" could materialize and prior to the 2014 Transaction, constituted expected future cash flows.  She does not explain why management should not have expected this revenue given the actions it had taken.

54.     Modifying the impact of this adjustment by restoring the revenue from "Emerging Opportunities," while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's

---

[106] Austin Smith Report, ¶ 67.

[107] Austin Smith Report, ¶ 67.  Ms. Austin Smith simply states that "[t]he Confidential Information Memorandum contains limited discussion on the composition of Emerging Opportunities.  Rather, discussion is limited to a description of the employment background of Elizabeth Peacock, the 'Executive Vice President of Emerging Opportunities.'"  Austin Smith Report, ¶ 67.

[108] Lender Presentation Audio at minutes 34:00–36:00.

[109] Lender Presentation at JPMC-MIL-CORP-00170167; Lender Presentation Audio File at minute 36:20 ("So we went out and hired Walgreens' top person that was running their Department of Defense governmental business and he joined us six weeks ago. . . . He built Walgreens' governmental program over the last several years, a multibillion dollar business.").

[110] Lender Presentation Audio at minutes 37:00–40:00.

[111] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 4, p. 156 ("A financial model is a set of assumptions (or forecast drivers) and relations (or formulas) that produces predictions regarding the future performance of a company.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

enterprise value by $192.8 million to $995.7 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $663.6 million to $2,634.5 million.  See **Exhibit 1**.

5.    **Ms. Austin Smith's other adjustments related to Millennium's business practices are unfounded, rely on hindsight, and are created based on an ad hoc and unreliable methodology**

55.    Ms. Austin Smith performs additional adjustments to specimen volume and NRPS to account for certain of Millennium's business practices.  Specifically, her adjustments include: reduction of specimen volume growth rates starting from 2014 to reflect her assumed historical and industry trends; reduction of Medicare NRPS to capture the MUE denials and reduction of specimen volume to capture the discontinuance of the POC Free Test Cup program; reduction of NRPS to capture the discontinuance of custom profiles, and the draft Noridian LCD.

56.    Ms. Austin Smith's adjustments to specimen volume growth rates are unsupported and unreliable.  Specifically, Ms. Austin Smith provides no reliable basis for her assertion that management's specimen volume projections were inconsistent with Millennium's historical trends, industry trends, and expected performance.  Without providing adequate basis, she extrapolates Millennium's future trends from a small sample of historical trends and in doing so, relies on a small set of historical data, and disregards without explanation additional available data that contradict her conclusions.  Notably, her assertions about the industry trends are incorrect based on publicly available sources.

57.    In performing her adjustments for the MUE denials and the POC Free Cup Test, Ms. Austin Smith relies on hindsight bias, which renders her analysis flawed and unreliable.  Finally, Ms. Austin Smith provides no reliable basis for the estimated impact of the custom profile elimination and her methodology is ad hoc.

a)  Ms. Austin Smith's ad hoc specimen volume growth rate adjustments are unsupported and unreliable

58.    Ms. Austin Smith asserts that the Padres Projections were "inconsistent with Millennium's historical trends, Millennium's reasonably anticipated future trends and with broader UDT

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

industry trends."[112]  Specifically, she claims that "the projected specimen CAGR of 9.8% from 2014 to 2018 for Medicare was unreasonably high given declining growth rates and negative growth of 3.4% in the first quarter of 2014 actuals when compared to the fourth quarter of 2013 actuals."[113]  To adjust for these supposed historical and industry trends, she reduces Medicare specimen volume growth rate to 0% in 2014, 2% in 2015, and 3% for 2016 and onwards, and commercial payors specimen volume growth rate to 10% in 2014, 5% in 2015 and 3% from 2016 onwards.[114]

59.    Ms. Austin Smith inappropriately uses Millennium's historical performance to extrapolate its future performance without considering other factors that could affect expectations about future performance.  Relying solely on (a narrow subset of) historical data is inappropriate when projecting future expectations.  When creating projections, one must consider all the factors that would affect future performance including the contemporaneous market conditions, industry conditions and expectations, and company-specific characteristics.[115]  While historical data are useful "in forecasting future growth, they have considerable noise associated with them," especially for young, growth companies, such as Millennium.[116]  Ms. Austin Smith disregards this fundamental principle and instead adjusts Millennium's specimen volume growth rates downwards by simply claiming that they were "inconsistent with contemporaneous trends."[117]

---

[112] Austin Smith Report, ¶ 108.

[113] Austin Smith Report, ¶ 109.

[114] Austin Smith Report, ¶ 109.

[115] Holthausen and Zmijewski. *Corporate Valuation*, Chapter 4, p. 157 ("We conduct a competitive analysis of the company's industry and assess the company's competitive advantage in order to help us identify and forecast the forecast drivers; to help assess the role that general economic, industry, and comparable company factors could have in developing a financial model; and to assess the reasonableness of the forecasts.").

[116] Damodaran, *Investment Valuation*, Chapter 11, p. 11; Damodaran, *Investment Valuation*, Chapter 1, p. 5 ("Mature firms tend to be easier to value than growth firms, and young start-up companies are more difficult to value than companies with established produces and markets.  The problems are not with the valuation models we use, though, but with the difficulties we run into in making estimates for the future.").  Damodaran, *Investment Valuation*, Chapter 1, p. 12 ("If past growth in earnings is not a reliable indicator of future growth at many firms, it becomes even less so at smaller firms.").  Damodaran, *Investment Valuation*, Chapter 1, p. 15 ("[R]apid changes that high growth firms go through over time make historical growth rates unreliable indicators of future growth for these firms.").  Millennium was founded in December 2007 and at the time, concentrated on urine drug testing services.  2014 Confidential Information Memorandum at ML_DE_00269130.

[117] Austin Smith Report, ¶ 109.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

60.      Notably, her specimen volume growth rates appear to be random as she provides no analysis that would show how she estimated them.  Specifically, Ms. Austin Smith's specimen volume growth rate adjustments of 0% in 2014, 2% in 2015, and 3% for 2016 and onwards for Medicare are without any basis.  These numbers are not derived from any empirical analysis; Ms. Austin Smith simply asserts these numbers.

61.      Interestingly, Ms. Austin Smith not only inappropriately relies *only* on historical data but she also considers *only* a subset of the available data.  Specifically, to infer Millennium's future trends, Ms. Austin Smith uses the Company's historical data on quarterly specimen volume from 1Q2012 to 1Q2014 and quarterly specimen volume growth rate from 2Q2012 to 1Q2014, as opposed to using Millennium's available data from 2009, i.e., she disregards three years of additional data (out of the six years for which Millennium has data).[118]  She also uses the specimen volume growth rate changes of only one quarter, between 4Q2013 and 1Q2014.[119]  In other words, Ms. Austin Smith relies on *one* data point (change from 4Q2013 to 1Q2014) to extract expectations about Millennium's long-term performance.  Even if one were to accept Ms. Austin Smith's methodology, which I do not, her reliance on a such a small sample when additional data is available renders her analysis unreliable.

62.      Notably, Ms. Austin Smith's conclusions contradict the available information.  First, she claims that "[a]s shown in Table 9, specimen volumes had been declining since 2009."[120]  Table 9 does not provide data on specimen volume,[121] but her own Table 4 shows that Millennium's specimen volume has been *increasing* every year.  Specifically, it *increased* by 185.0%, 123.0%, 64.4%, and 30.5% between 2009-2010, 2010-2011, 2011-2012, 2012-2013, respectively.[122] While indeed the *growth rate* for the specimen volume *increase* has been declining, Ms. Austin Smith fails to explain why that implies that specimen volume would reasonably be expected to

---

[118] Austin Smith Report, Figure 2; Figure 6; ¶ 109.

[119] Austin Smith Report, ¶¶ 58–59 ("Furthermore, the disparity in growth rates increased over this time period. Indeed, in first quarter of 2014, the quarter immediately prior to the 2014 Transaction, Millennium's Medicare specimen volume contracted by 3.2%, whereas commercial specimen volume grew by 4.4%. . . . The slowing growth trend was even more pronounced for Medicare specimen volume, decreasing to only 12.9% from 2012 to 2013 and contracting by 3.2% from the fourth quarter of 2013 to the first quarter of 2014.").

[120] Austin Smith Report, ¶ 109.

[121] Table 9 provides data on "Guideline Public Company Valuations."  Austin Smith Report, p. 87.

[122] Austin Smith Report, Table 4.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

decrease.  In fact, between 2009 and 2013, Millennium experienced rapid growth as shown by various performance measures.  Net revenue grew at a CAGR of 77%, with annual growth rates between 21% and 149%.[123]  Adjusted EBITDA grew at a CAGR of 74%, with annual growth rates between 7% and 147%.[124]  **Exhibits 2A**, **2B**, and **2C** show CAGRs for Millennium's revenue, EBITDA, and EBITDA margins, as well as the Padres Projections and Ms. Austin Smith's Modified Padres Projections.  Ms. Austin Smith's extrapolated trends are inconsistent with this information.

63.     Moreover, Ms. Austin Smith emphasizes the volume growth rate from a single quarter, 1Q2014.  For example, Ms. Austin Smith states that "between the first quarter of 2012 and first quarter of 2014, quarterly specimen volume growth declined from 14.5% to 2.2%."[125]  But a quarterly growth rate of 2.2% amounts to a growth rate of over 9% on an annualized basis, which is closer to Millennium's projected average annual specimen growth rate of 8.2%.[126]

64.     Ms. Austin Smith also claims that the Padres Projections were inconsistent with "contemporaneous trends" and "projected laboratory testing industry growth" as "the UDT industry, especially quantitative testing, was under significant pressure from government and commercial payors" but fails to provide any support for her assertion.[127]  Between 2007 and 2012, drugs-of-abuse testing, which includes UDT, was one of the three fastest growing clinical lab tests in terms of Medicare Part B spending between 2007 and 2012.[128]  In fact, as I understand, testing for opiates and cannabinoids were among the top 15 fastest growing lab tests in terms of Medicare Part B spending.[129]  By 2014, the U.S. market for pain management was approximately

---

[123] Lender Presentation at JPMC-MIL-CORP-00170161.

[124] Lender Presentation at JPMC-MIL-CORP-00170161.

[125] Austin Smith Report, ¶¶ 59, 78.

[126] To annualize the quarterly growth rate I use the following formula, $(1+2.2\%)^4-1$.

[127] Austin Smith Report, ¶¶ 73, 109.

[128] "Competitive Market Analysis for Laboratory Management Decision Makers," *Laboratory Economics*, 8(10), October 2013 ("Lab Econ Oct 2013"), p. 7.  Overall, Medicare Part B spending on the top 50 clinical lab tests increased by 5.2% per year from 2007 to 2012 (from $2.7 billion to $3.5 billion).  Lab Econ Oct 2013, pp. 7–9.

[129] Lab Econ Oct 2013, p. 7.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

$22.3 billion and was expected to reach $33.8 billion by 2017.[130]  Ms. Austin Smith provides no reliable basis for her adjustments that diverge substantially from these observed industry trends.

65.      Modifying the impact of this adjustment by restoring the specimen volume growth rate, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $155.0 million to $957.8 million.  Making this modification and using the corrected WACC of 7.2% without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $499.0 million to $2,469.8 million.  See **Exhibit 1**.

> b)  Ms. Austin Smith relies on hindsight to perform the adjustments for the MUE denials

66.      To adjust for the impact of MUE claim denials, Ms. Austin Smith calculates "monthly Medicare NRPS decrease between $77.7 and $83.7 from January to March 2014."[131]  To estimate this adjustment, she relies on hindsight as she uses "the total MUE-impacted revenue in 2014 as of July 2014 ($21.9 million)."[132]  Ms. Austin Smith fails to show whether these data were available to Millennium prior to the 2014 Transaction.

67.      Modifying the impact of MUE adjustment by restoring NRPS, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $87.9 million to $890.8 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $217.3 million to $2,188.1 million.  See **Exhibit 1**.

> c)  Ms. Austin Smith relies on hindsight to perform the adjustments for the discontinuance of the POC Free Test Cup Program

68.      Additionally, to estimate the impact of the discontinuance of the POC Free Test Cup program, which as I understand was at issue in the Ameritox litigation, Ms. Austin Smith incorporates "a 1.6% reduction in UDT volume in July 2014" and relies on an analysis that

---

[130] BMO Harris Bank, N.A., "Loan Underwriting Committee Memorandum," March 11, 2014, ML00008506 ("Loan Underwriting Committee Memorandum") at ML00008518.

[131] Austin Smith Report, ¶ 118.

[132] Austin Smith Report, ¶ 117.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium performed in July 2014, using data "on customers that cancelled their agreements in June 2014," following the Ameritox verdict in June 2014.[133]  Ms. Austin Smith fails to show whether these data were available to Millennium prior to the 2014 Transaction.  Moreover, Ms. Austin Smith disregards information that indicates that, at the time of the 2014 Transaction, management expected to prevail on the Ameritox litigation.[134]  Instead, Ms. Austin Smith relies on hindsight, concluding that Millennium should have accurately expected the eventual outcome of the Ameritox litigation.

69.     Modifying the impact of the POC Free Test Cup program adjustment by restoring the volume reduction, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $17.4 million to $820.3 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $45.2 million to $2,016.0 million.  See **Exhibit 1**.

           d)  Ms. Austin Smith's adjustment for the elimination of custom profiles is ad hoc

70.     Ms. Austin Smith assumes that the practice of using custom profiles would be eliminated and to adjust for this elimination she applies a 21.8% reduction in Millennium's commercial payors NRPS.[135]  She notes that "[a]lthough the Padres Projections do reflect a decline in Millennium's commercial payor NRPS, there is no indication that this projected decline is intended to represent the impact of the likely discontinuance of Custom Profiles."[136]  She also claims that "based on data available as of the 2014 Transaction, the impact of the anticipated

---

[133] Austin Smith Report, ¶ 133.

[134] Deposition of Martin Price, April 12, 2021 ("Price Deposition"), 254:21–25 ("Q: Why were you surprised by the Ameritox verdict? A: I was expecting to succeed on our affirmative claims and to also prevail on the claims brought by Ameritox against the company."); Price Deposition, 192:10–17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Deposition of William Brock Hardaway, July 20, 2021 ("Hardaway Deposition"), 288:21–289:8 (Q: "Do you remember learning about that verdict?  A: It seems like maybe I got a call from Martin, yeah, to give me the update.  Q: And do you remember your -- what your reaction was?  A: Not really, I don't really -- other than being disappointed, feeling like we -- because our counsel had led us to believe that, you know, we should win on virtually every issue.").

[135] Austin Smith Report, ¶ 128.

[136] Austin Smith Report, ¶ 124.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

discontinuance of Custom Profiles should have reasonabl[y] been estimated to cause a much larger decline in commercial payor NRPS."[137]  Ms. Austin Smith provides no reliable basis for her conclusions and the estimated impact of the custom profile elimination.

71.    Moreover, Ms. Austin Smith's methodology for estimating the potential impact of the custom profile elimination is ad hoc.  Specifically, to estimate Millennium's revenue from custom profiles for commercial payors, she analyzes Millennium's revenue from certain Medicare billing codes.[138]  She provides no support for her approach other than a claim that "given the history of commercial payors following the trend of Medicare reimbursement, I considered the Medicare NRPS reduction to be a relevant proxy for Millennium's commercial NRPS reduction following the discontinuance of Custom Profiles."[139]  Ms. Austin Smith does not cite to any source of support for this assumption.[140]  In addition, Ms. Austin Smith assumes that revenue received from these Medicare billing codes pertains to revenue from custom profiles because two other companies, Aegis Sciences Corporation ("Aegis") and Ameritox, did not receive any Medicare reimbursement from these codes.[141]  That is, she compares certain Medicare billing codes among Millennium, Aegis, and Ameritox, and argues that if a billing code is billed by Millennium but not billed by Aegis or Ameritox, then it means that, that billing code is likely "medically unnecessary testing" and hence tied to custom profiles.[142]  Ms. Austin Smith provides no other analysis to show that the billing codes in question were tied to custom profiles and does not explore alternative explanations for why Millennium might have used billing codes not used by Aegis and Ameritox.

72.    Modifying the impact of her adjustment for the discontinuance of custom profiles by restoring the NRPS reduction, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $101.6 million to $904.5 million.  Making this modification and

---

[137] Austin Smith Report, ¶ 125.

[138] Austin Smith Report, ¶ 126.

[139] Austin Smith Report, ¶ 130.

[140] Austin Smith Report, ¶ 130.

[141] Austin Smith Report, ¶¶ 126–127 ("Of the 30 codes for which Millennium received Medicare reimbursement in 2013, there were 9 codes for which neither Ameritox nor Aegis received Medicare reimbursement. . . . In 2013, Millennium derived 21.8% of its Medicare NRPS from these codes.").

[142] Austin Smith Report, ¶ 128.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $303.8 million to $2,274.6 million.  See **Exhibit 1**.

> **B.  Ms. Austin Smith's analysis is at odds with those completed by financial professionals in the period leading up to the 2014 Transaction**

73.     Millennium's management Padres Projections were based on management's standard approach for budgeting and forecasting analyses.[143]  As I understand, the Padres Projections were shared with VPA, the Arrangers, and TA Associates, who used these projections to perform their own valuation and sensitivity analyses.[144]  Certain elements of the Padres Projections were also shared with the credit rating agencies, S&P and Moody's, who performed the credit rating assessment of the 2014 Transaction.[145]  All of the available contemporaneous analyses concluded that Millennium was solvent.  Ms. Austin Smith completely disregards the contemporaneous analyses completed by these financial professionals leading up to the 2014 Transaction and develops, for purposes of this litigation, an analysis that is starkly at odds with these analyses.

74.     Indeed, Ms. Austin Smith's result resembles more closely the analyses prepared around the time of, or indeed after Millennium's bankruptcy in November 2015, including projections

---

[143] Padres Projections; Deposition of Tim Kennedy, September 30, 2021 ("Kennedy Deposition") at 244:7–22 (Q: "So going back to the first point you made, financial projections.  The financial projections that you did in connection with the 2014 transaction, was that largely what you just described over the last number of minutes in terms of process?  A: You mean for -- you mean the methodology that we'd go through?  Q: Correct.  So let me clarify myself. So the methodology that you used in connection with the 2014 transaction, financial projections, was that the same as the methodology that you just described as that which you generally used at Millennium? . . . THE WITNESS: Yes. I would say, generally speaking, it would be.").

[144] Millennium's $1.775 billion senior secured credit facility was rated by Moody's and S&P on March 31 and March 28, 2014, respectively.  TA Associates is a private equity firm that in 2010 invested $196 million in exchange for warrants and debentures. Deposition of Jennifer M. Mulloy, July 14, 2021 ("Mulloy Deposition") at 21:1-8.  The debentures and warrants were issued by Millennium Lab Holdings, Inc.  As part of the 2014 Transaction, Millennium Lab Holdings, Inc. transferred a 45% membership interest in Millennium to TA Associates "in exchange for the redemption of the outstanding TA warrants in [Millennium] Holdings and in satisfaction of the outstanding TA debentures." 2014 VPA Solvency Analysis at ML_DE_00263276; Mulloy Deposition, 17:20–18:6; Lender Question Tracker at JPMC-MIL-CORP-00219685.

[145] Millennium Laboratories, "Rating Agency Presentation," March 2014, JPMC-MIL-CORP-00011605.  On March 15, 2014, JPMC sent a projection model dated March 14, 2014 to the ratings agencies.  Email from A. Christoforou to D. Diaz, "Millennium Laboratories Meeting Materials," March 14, 2014 JPMC-00053824, JPMC-00053828; Email from A. Christoforou to G. Hessol, "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-MIL-CORP-00193320, JPMC-MIL-CORP-00193324.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

prepared by Millennium's management on June 8, 2015 ("June 2015 Management Projections") and a valuation conducted by FTI on April 2016 based on management projections as of December 2015.[146]  These analyses were conducted after the uncertainty regarding certain risks that existed at the time of the 2014 Transaction had resolved, including the Ameritox ruling, the settlement with the DOJ and the required post-settlement operational adjustments, changes in reimbursement trends, and additional regulatory pressures.[147]  The cumulative impact of these developments ultimately led to Millennium's bankruptcy on October 15, 2015.[148]  **Exhibit 6** shows all available contemporaneous valuation analyses and the FTI (post-bankruptcy) December 2015 valuation analysis.

        **1.**        **Millennium's management prepared financial projections based on its standard practice**

75.      Millennium's standard practice was to create a budget for the upcoming year and forecasts for subsequent (relevant) years.[149]  As I understand, both for the budgeting analysis and the forecasting analysis, management created projections for specimen volume, operating expenses, and reimbursement rates, i.e., NRPS.[150]  Specifically, to create the budget for the upcoming year, Millennium's sales representatives offered specimen volume projections that management analyzed.[151]  Following the specimen volume projections, management considered "operational

---

[146] June 2015 Management Projections; Austin Smith Report, ¶67; FTI December 2015 Valuation.

[147] Hardaway Declaration, ¶ 28.

[148] Hardaway Declaration, ¶ 28.

[149] Kennedy Deposition, 211:1–4 ("[B]udgeting is taking the current period in which is -- is coming up; for example, we are in 2021, I would do a budget for 2022 and a forecast for every year beyond that.").

[150] Kennedy Deposition, 219:14–223:15 (describing volume, reimbursement, and expense inputs into budget), 228:13-20 (describing forecast process as "very similar to the budget process").

[151] Kennedy Deposition, 219:14–24 ("Q: Okay.  So focusing on your time at Millennium, can you generally describe the process that Millennium employed for budgeting. A: Similar to what I described a little earlier.  You know, the sales force would basically provide volume projections, then . . . we would all get together and take a look at the sales force volume projections to make a determination as to whether or not it looked reasonable or not."); 229:2-9 (Management examined these projections by reviewing market data on "referral volumes . . . patterns, physicians . . . trends on physician ordering, number of tests per accession, what kind of new tests might be coming out of [the] R&D department, and what do we forecast the ordering capabilities of either your current referral base or even a new referral base . . . based on the type of test that you're coming out with.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

needs for equipment, people and space requirements,"[152] i.e., the operating expenses.  To create the forecast for the subsequent (relevant) years, management used the one-year budget and forecasted the long-term specimen volume growth rate of existing business based on a "run rate" model.[153]  Management also forecasted new business opportunities.[154]  Similar to budgeting, following the projections for long term specimen volume growth, management created the projections for the long term projected expenses.[155]  Finally, in forecasting reimbursement rates, management considered coverage policies for each payor, "how many times is a given test or CPT code ordered by a referring physician," and the mix of business by payor.[156]

76.     Ms. Austin Smith disregards how management created the Padres Projections, what information was available at the time, and how management accounted for the industry trends and

[152] Kennedy Deposition, 221:6–8; Deposition of Daniel Pencak, July 12, 2021, 342:13–20 ("Q: In describing the budgeting process, I think you just testified that among the things that you would do is to project costs, project rates and project volumes, is that correct? . . . A: As part of the budgeting process, yes.").

[153] Kennedy Deposition, 235:5–9.  I understand that the annualized "run rate" for each year was created based on the monthly number of physician referrals.  Kennedy Deposition, 234:22–236:2 ("In month one of a given year, you get one referral.  In month two, if you keep that one referral, you now have that referral, and in month two, you sell a second referral. . . . So now you have -- in month one, you have one, in month two, you have two.  In month three, you have three, et cetera, all the way through month 12. . . . By the time you get to month 12, you start the following year with 12. . . . And you build another 1, 2, 3, the following year.  So in the healthcare business, . . . you'd refer to it as the 'annuity model,' meaning you have a core book of business when you finish.  So I would say, for example, if you were exiting 2013, in order to project 2014, you would look at your run rate for '13 and you would annualize that run rate.  That would give you a starting point for the subsequent year.  Then in the current year, you look at the amount of sales reps you have, the amount of opportunity that you have in order to close new business, okay, in that current year, and you layer that new business volume on top of your base run rate for that year. . . . Typically gives you, you know, your volume.").

[154] Kennedy Deposition, 235:15-25 ("[I]n order to project [the next year], you would look at . . . the amount of opportunity that you have in order to close new business . . . .").

[155] Kennedy Deposition, 238:10–15 ("Q: Fair enough.  Now, in the budgeting process, you mentioned how volume drives the way that you think about expenses. Is that also true in the forecasting process? A: Absolutely. Your volume drives expenses."); 238:24 – 239:22 ("So as volume grows, you need more billing -- billers and collectors to bill more of that volume, whereas you don't need more CEOs, CFOs. . . . So there are certain individuals that remain static as time goes by, but others that grow. . . . It could be customer service individuals that would need to grow based on the quantity of, not necessarily the growth in the volume, but the growth in clients that you have.  So you need more customer service people. . . . And the volume that you have will drive the need for capital expenditures to acquire additional equipment.  So at Millennium, we -- our main equipment were mass specs and -- because, you know, we had many, many mass specs.  But if the volume got up to a high enough level, you would have to go out and buy another piece of equipment to accommodate that higher volume level.").

[156] Kennedy Deposition, 236:3–238:9 (noting that "you look at -- payer policy").  Current Procedural Terminology ("CPT") "is a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals.  These health care professionals use the CPT to identify services and procedures for which they bill public or private health insurance programs."  "HCPCS – General Information," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo, accessed on February 7, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

the "reimbursement, legal, and regulatory risks."[157]  Instead, she layers on top her different views regarding the trends and risks at the time of the 2014 Transaction, based on her own view seven years later with the benefit of hindsight and in the context of this litigation.

> **2.  Ms. Austin Smith disregards the contemporaneous analyses by various third parties, which contradict her conclusion that Millennium was insolvent**

77.    I understand that Millennium's Padres Projections were shared with VPA, the Arrangers, and TA Associates, who relied on these projections to perform analyses of Millennium's business. Millennium was solvent according to all available contemporaneous analyses.  Ms. Austin Smith disregards these analyses and instead, for the purpose of this litigation, produces results that are starkly at odds with the contemporaneous analyses.  In fact, Ms. Austin Smith, without any analysis or basis, claims that the contemporaneous analyses did not "reflect all relevant information that was known or knowable as of the date of valuation" as "a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction."[158]  **Exhibits 7A**, **7B**, and **7C** show Ms. Austin Smith's revenue, adjusted EBITDA, and adjusted EBITDA margin sensitivities and contemporaneous sensitivities and downside scenarios.

78.    The Arrangers considered various downside scenarios to the Padres Projections and performed sensitivity analyses as part of their due diligence process.[159]  Millennium was *solvent* according to all available contemporaneous analyses by the Arrangers. Specifically:

- As part of the due diligence process, JMPC's internal healthcare coverage team reviewed Millennium's projections and compared them to their available industry

---

[157] Austin Smith Report, ¶ 74.

[158] Austin Smith Report, ¶ 7.

[159] JPMC was the administrative agent and a joint lead arranger of the 2014 Transaction.  Citi was the other joint lead arranger of the 2014 Transaction. SunTrust and BMO were the co-managers for the 2014 Transaction. J.P Morgan Chase Bank, N.A., Credit Agreement Among Millennium Lab Holdings II, LLC, Millennium Laboratories, LLC, and J.P. Morgan Chase Bank, N.A., et al., April 16, 2014, ML_DE_00196568; 2014 Confidential Information Memorandum at ML_DE_00269136; As I understand, SunTrust underwrote 5% of the 2014 Transaction.  Deposition of David M. Felty, July 27, 2021 ("Felty Deposition"), 137:16–22 (Q: "SunTrust provided 5 percent? A: Yes."). As I understand, BMO underwrote 5% of the 2014 Transaction, approximately $90 million.  Deposition of Phillip Ho, July 28, 2021 ("Ho Deposition"), 22:17–19 ("We were . . . 5 percent underwriter of the transaction.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

information.[160]  JPMC also visited the Company's facilities.[161]  JPMC used the Padres Projections to perform a DCF analysis and estimated an enterprise value in the range of $3.9 billion to $4.9 billion.[162]  JPMC "stress test[ed] the [Padres] model" and considered a range of potential downside scenarios and their impact on the Company's ability to service its debt obligations.[163]  Under all of these scenarios, Millennium was projected to remain solvent following the 2014 Transaction.

- Citi performed a valuation analysis in which they "sensitized and pressure tested … all aspects of [Millennium's] model, including the revenue, including the margins,

---

[160] Deposition of Ryan Griswold, July 22, 2021 ("Griswold Deposition"), 159:21–161:9 ("Q: You're accepting the company's assumptions and then as part of your diligence you're testing those assumptions; is that accurate?  A: Testing and -- and sensitizing, yes.  You also have a number of, you know, industry experts that also have to overlay, you know, what they're seeing from, you know, competitors and if the assumptions are sort of wildly off and it doesn't pass the smell test you're doing, you know, very granular quantification or quantifying type sensitivity, but you're also doing the qualification, you know, with the industry knowledge to sort of say, you know, this feels right or this doesn't feel right based on industry knowledge. Q: What industry experts are you referring to? A: So the healthcare coverage folks who their job is to cover the industry, all the companies that make up that industry.  And if one company has wildly different assumptions than what the industry broadly is sort of saying that, you know, further, you know, raises things that we need to diligence and understand that much further.  So it's not as if somebody off the street with no industry knowledge would look at these assumptions saying, yeah, they look right.  It's people that have been doing this their entire career.  Q: And those are internal JPMorgan employees, correct?  A: That's right.").

[161] Griswold Deposition, 31:22–33:7 ("Everything from, you know, multiple . . . calls, site visits, expert -- expert help, you know.").

[162] JPMC Model (April 2014), tab "DCFcredit."  Griswold Deposition, 142:19–143:17, 153:11-154:7 ("[E]ven in that . . . model [there are] growth rates in the outer years [that] are half of what they were in historical periods, and there is very little margin expansion. . . . So the company had high margins.  We're actually assuming a little bit of erosion in those margins.  So it's already a very conservative model to start with, in our minds at the time.").

[163] Griswold Deposition, 141:23-142:3, 143:4-144:4 ("[W]e're all sort of working off of [the Padres Projections] and sensitizing . . . . [T]hen we take it a step further and we say, well, what happens if . . . we're wrong and margins are even lower?  Or revenue growth is slower?  Or the CapEx [capital expenditures] is higher or? Or . . . if they are under a lot of pressure and sensitivities and downsides, can they still service the debt obligation[?]").  As I understand, JPMC did not create downside scenario models.  Griswold Deposition, 149:2–9 ("Q: And I want to go back to I think a clarification that you made at the beginning of that answer and make sure that I understand.  Which is, these are downside scenarios but you did not create a downside model; is that correct? A: I think that's accurate.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

including the CapEx line."[164]  In particular, Citi performed a DCF analysis under three different scenarios:  management case, base case, and downside case.[165]  In the management case, Citi relied on the Padres Projections and estimated an enterprise value in the range of \$4.4 billion to \$5.4 billion.[166]  In the base case, Citi applied a haircut to management projections, which resulted in an enterprise value in the range of \$3.7 billion to \$4.5 billion.[167]  In the downside case, Citi applied an additional haircut to management projections, which resulted in an enterprise value in the range of \$1.9 billion to \$2.2 billion.[168]  In addition, Citi performed a comparable companies analysis, which resulted in an enterprise value in the range of \$3.9 billion to \$5.1 billion.[169]  Under all these scenarios, including in the most conservative downside scenario, Millennium was projected to remain solvent following the 2014 Transaction.

---

[164] Deposition of Michael Tortora, July 15, 2021 ("Tortora Deposition"), 82:17–23, 125:21–126:3 ("So the general process would be we would participate in and convene a Greenlight committee, which would include a relatively fulsome memo that listed out industry details, the transaction that was being contemplated by that company, the historical and financial performance of the company that we were looking to work with as well as any other benefits, considerations, et cetera of the transaction. We would hold a Greenlight meeting, educate our committee, look to -- looking to formulate an opinion as to whether we thought the transaction was viable and then formulate a plan as to additional diligence that would be needed to complete our analysis.  We would then hold various meetings and phone calls with the company, collect the due diligence material, process and analyze that material and then when that was done, we would convene a final approval meeting with our committee to go over the findings of the due diligence and followup [sic] from any Greenlight meeting we may have had and ultimately approve the transaction or not.").

[165] Citi Model (March 2014) at CITI-T-00000209–0215; Tortora Deposition, 76:11–77:15 ("In our approval process, and specifically in the final approval process and the Final Approval Memo, we generally present three model cases to our committee.  The first one is the management model, which comes directly from the management team . . . We'll then also run what we call the base case, which is a haircut to the management model, whether that's revenue, EBITDA, more CapEx or less CapEx, some type of sensitivity[.] [A]nd then we'll also run a third case, which we call the downside case, which is oftentimes a very Draconian scenario that one even has a hard time envisioning ever happening in real life, but we will run that in order to further sensitize and further make sure that we are comfortable with the cash flow profile of the company's ability, the ability of the business to – to pay its interest expense.").

[166] In the management case, Citi's revenue multiples were 6.4x – 7.8x, and its EBITDA multiples were 11.2x – 13.7x. Citi Model (March 2014) at CITI-T-00000215.

[167] Citi Model (March 2014) at CITI-T-00000211–0212, 215.  Citi decreased management's revenue and adjusted EBITDA CAGR from 7.3% to 5.3% and from 5.9% to 3.7%, respectively.

[168] Citi Model (March 2014) at CITI-T-00000214–0215.  Citi decreased management's revenue and adjusted EBITDA CAGR from 7.3% to 0.3% and from 5.9% to 2.1%, respectively.  Notably, Citi's downside scenario resembles Ms. Austin Smith's adjusted projections, although Citi assumed a lower terminal growth rate (0.0% to 1.0%) compared to Ms. Austin Smith's 3%.  Citi however used a lower WACC of 8.5% to 9.5%.  Austin Smith Report, ¶ 144.

[169] Citi Model (March 2014) at CITI-T-00000215.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

As part of the due diligence process, Citi's internal healthcare coverage team also considered the Company's growth potential based on industry information.[170]

- SunTrust, as part of its due diligence process, "[r]eviewed and analyzed [Millennium's] projected financial performance and sensitized model to develop SunTrust Base and Downside Cases."[171] The base case was developed by SunTrust based on management's projections and was "a more conservative view from what the company present[ed.]"[172] SunTrust estimated Millennium's enterprise value based on its base case to be in the range of $3.4 billion to $4.4 billion.[173] The downside case was meant "to show further stress on the company," and did not reflect "the most likely scenario."[174] SunTrust estimated Millennium's enterprise value based on its downside case to be greater than $2.5 billion.[175] Under all available analyses, Millennium was projected to remain solvent following the 2014 Transaction.[176]

---

[170] Tortora Deposition, 90:2–16 ("In the same way that we would have conducted our diligence in regards to reimbursement, we have industry bankers within healthcare that are experts in the healthcare field that spend all their time talking to different companies and participants within the healthcare industry. So we would have relied upon them and their knowledge and judgment to attempt to measure or quantify how much growth potential was in this – was in this . . . business from an industry perspective and that's what we would have -- we would have relied upon.").

[171] SunTrust Model (March 2014) at SunTrust_MIL-DE-00011781; Felty Deposition, 69:9–19 ("In general, we have a transaction that involves an extensive analysis of the borrower, its historical financial performance, its expected future financial performance given current industry trends, competitive dynamics, and then developing our, you know, different projection models based on different assumptions and determining the companies to -- determining the company's ability to repay the proposed investments, testing the creditworthiness of the borrower."), 70:15–71:2 ("And as part of our due diligence, we don't take those projections at face value and assume those are what we believe will happen, but we develop our own model based on our own analysis of the industry and the company. So that model, which is typically -- and I've only seen it to be more conservative than a management model. It typically, because more consecutive [sic] than a management model, is yet a further -- based on additional diligence beyond just what the company provides to us. So that is one projection alternative, if you will.").

[172] Felty Deposition, 89:23–24; SunTrust Model (March 2014) at SunTrust_MIL-DE-00011801; Felty Deposition, 87:18–24 ("The base case, as I said, is meant to represent what [SunTrust] believe is the most likely outcome, taking into consideration all the factors and information [SunTrust has] available at that time, which could include changes in volume, changes in reimbursement rates, changes in overall industry dynamic").

[173] SunTrust Model (March 2014) at SunTrust_MIL-DE-00011809–1810.

[174] Felty Deposition, 90:22–24; SunTrust Model (March 2014) at SunTrust_MIL-DE-00011807; Felty Deposition, 90:24–91:15 ("But these assumptions that are used for the downside case are not necessarily our view of the realistic risks of the company but a very conservative view. . . . It's simply meant to show unexpected things that might happen that are -- but not necessarily what we believe will happen. So the risks here in this downside case are not what we believed, we believed the company would experience.").

[175] SunTrust Model (March 2014) at SunTrust MIL-DE-00011810.

[176] SunTrust Model (March 2014) at SunTrust-MIL-DE-00011810.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- BMO performed a valuation analysis and considered three scenarios: management case, base case, and downsize case.[177]  As part of the bank's due diligence process, the transaction team "[p]articipated on a six hour due diligence session with management and other arrangers," "[p]articipated on a legal due diligence call," "[r]eviewed the Management Presentation delivered on March 5th regarding [the] potential transaction," "[r]eviewed [the] model provided by the company," "[r]eviewed quarterly compliance certificates," and "participated on quarterly conference calls with management to review actual quarterly financial performance and tracking versus budget," among other items.[178]

79.    As I understand, TA Associates, a private equity firm that invested in Millennium in 2010, adjusted the Padres Projections to reflect higher revenue growth rates and lower EBITDA margins compared to the Padres Projections.[179]  TA Associates performed an investment analysis using TA Associates' required internal rate of return of 25% as the discount rate, which resulted in an enterprise value of $1.7 billion.[180]  TA Associates also performed various sensitivity analyses for WACC and the terminal rate multiples, yielding an enterprise value in the range of $1.6 billion to $3.0 billion.[181]

---

[177] Ho Deposition, 134:17–135:7 ("[Y]ou can see we came up with our own base case.  We--– because we were waiting for the full model from the company. . . .  Q: Do you recall, and specifically with respect to the 2014 transaction, if you did compare BMO's base case to management's base case? . . . A: We would have. . . ."), 135:23–25 ("Q: And BMO also prepared a downside case; is that correct? A: Yes. Yeah. We did that standard."), 134:9–23 ("Well, the base case would have been what we think the most likely performance case projection for the company would be over a certain time period.  Typically, very typically, it's based upon what management and the private equity sponsors provide.  Sometimes we'll adjust it for things we think we want to include, we want to factor in. . . .  You can see we came up with our own base case.  We -- because we were waiting for the full model from the company.  So ours was probably a little bit more conservative in terms of growth, but it would have been very similar to what management provided probably").  I have not seen the analysis BMO conducted.

[178] Loan Underwriting Committee Memorandum at ML00008508.

[179] TA Associates assumed 16% CAGR for revenue and EBITDA margins approximately around 40%.  TA Associates Model, tab "2."  Taken together, these adjustments result in free cash flows that are similar to those in the Padres Projections.

[180] TA Associates Model.  An internal rate of return is a discount rate typically used by investment entities, such as private equity firms, to assess the return on their investment.  Using Ms. Austin Smith's WACC in TA Associates' analysis implies an enterprise value of $2,370.5 million.

[181] TA Associates Model, tab "2."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

80.      VPA, Millennium's solvency advisor, used the Padres Projections in providing its solvency analysis.[182]  In particular, VPA performed a DCF analysis and estimated Millennium's enterprise value to be in the range of $2.2 billion to $2.8 billion.[183]  This range was based on sensitivity analyses that VPA performed.  VPA also performed a comparable companies analysis and estimated Millennium's enterprise value to be in the range of $2.1 billion to $2.3 billion.[184] VPA's estimated enterprise value ranges imply that Millennium was balance sheet solvent. Furthermore, in performing its analyses, VPA noted that "[b]ased on historical performance and recent developments, Management projections indicate reasonable growth in revenue and reasonable EBITDA levels through the projection period."[185]

81.      Ms. Austin Smith fails to apply any of these contemporaneous analyses.  Instead, she creates her own set of projections for the purpose of this litigation, which are substantially lower than management's projections at the time and claims without basis that her projections "reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction."[186]  Based on these projections, she estimates an enterprise value of $802.9 million, which is well *below* even the downside scenarios contained in all of these contemporaneous estimates.  **Exhibit 6** shows the contemporaneous valuations analyses.

---

[182] 2014 VPA Solvency Analysis at ML_DE_00263287.

[183] 2014 VPA Solvency Analysis at ML_DE_00263288.  VPA used two different methods to perform the DCF analysis, the exit multiple method and the Gordon growth method.  Under the exit multiple method, VPA estimated an enterprise value in the range of $2.4 billion to $2.8 billion.  Under the Gordon Growth method, VPA estimated an enterprise value in the range of $2.2 billion to $2.7 billion.  2014 VPA Solvency Analysis at ML_DE_00263288.  In the DCF exit multiple method, VPA used an exit 2020 EBITDA multiple of 6.0x to estimate the terminal value.  2014 VPA Solvency Analysis at ML_DE_00263290.

[184] 2014 VPA Solvency Analysis at ML_DE_00263293.  VPA's comparable companies analysis used revenue and EBITDA multiples.  VPA also performed a guideline transaction analysis and estimated Millennium's enterprise value to be in the range of $2.5 billion to $2.7 billion but noted that "guideline transactions were used for comparison purposes" and that "none of the target companies were identical or directly comparable to the Company."  2014 VPA Solvency Analysis at ML_DE_00263296–3297.

[185] 2014 VPA Solvency Analysis at ML_DE_00263300.

[186] Austin Smith Report, ¶ 7.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

### C. Ms. Austin Smith's Modified Padres Projections and her valuation estimate resemble most closely projections and valuations created around Millennium's bankruptcy

82.     As I understand, on November 10, 2015, Millennium filed for bankruptcy.[187]  Various developments led to Millennium's bankruptcy, including reimbursement risks that materialized in a negative way, the proposed settlement with the DOJ and certain U.S. states, projected post-settlement operational adjustments required under a Corporate Integrity Agreement, and additional regulatory pressures.[188]  Notably, Ms. Austin Smith's Modified Padres Projections and valuation results most closely resemble the subsequent projections and valuation analyses created around the Company's bankruptcy and at a time when certain risks, contingent as of April 2014, had actually materialized.

83.     In late December 2014, nine months after the 2014 Transaction, the DOJ informed Millennium that it would pursue certain claims against the Company and filed a civil complaint on March 19, 2015.[189]  On February 9, 2015, Noridian also informed Millennium that as of March 11, 2015, the Company's Medicare billing privileges would be revoked due to "alleged administrative billing abuses relating to claims allegedly submitted by Millennium for services provided, after their dates of death, to 59 Medicare beneficiaries."[190]  On May 20, 2015, the DOJ entered into a settlement agreement with Millennium, which stipulated that the Company would pay $256 million to settle the DOJ and *qui tam* matters.[191]

84.     Following these events, on June 8, 2015, the Company prepared an updated five-year forecast, the June 2015 Management Projections.[192]  On July 22, 2015, the Company informed the DOJ that it was unable to pay the fine and a restructuring would be necessary to facilitate the

---

[187] Hardaway Declaration, p. 45.

[188] Hardaway Declaration, ¶ 28.

[189] Hardaway Declaration, ¶ 17.

[190] Hardaway Declaration, ¶ 18.  The Company received notice of additional basis for Medicare billing revocations in May 2015.  Hardaway Declaration, ¶ 22.

[191] Hardaway Declaration, ¶ 27; Term Sheet between Millennium Health, LLC and the Department of Justice, May 20, 2015, ML_DE_00201432.  The DOJ, along with certain U.S. States, were parties the settlement agreement with Millennium.  The settlement initially provided that the Company would pay $250 million but was later amended for a payment of $256 million.  Hardaway Declaration, FN 7.

[192] Hardaway Declaration, ¶ 28; June 2015 Management Projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

settlement payment.[193]  On July 29, 2015, management presented revised projections ("July 2015 Management Projections").[194]  On October 15, 2015, the Restructuring Support Agreement was signed.[195]  On November 10, 2015, more than 18 months after the 2014 Transaction, Millennium declared bankruptcy.  When Millennium filed its prepackaged plan of bankruptcy, it also filed updated projections in its disclosure statement dated November 10, 2015 ("November 2015 Management Projections"), which were subsequently updated resulting in the "December 2015 Management Projections."[196]  In April 2016, FTI performed a valuation analysis for the restructured Company using the December 2015 Management Projections, in which it estimated Millennium's enterprise value at $979.5 million.[197]  This is approximately $177 million *higher* than Ms. Austin Smith's estimate even though it was completed *after* the adverse events Ms. Austin Smith claims should have been accounted for had already materialized.[198]

85.	Ms. Austin Smith's Modified Padres Projections and valuation results most closely resemble these subsequent projections and valuation analyses.  **Exhibit 8A** compares the revenue projections of the June 2015 Management Projections, the July 2015 Management Projections, the November 2015 Management Projections, the December 2015 Management Projections, and Ms. Austin Smith's Modified Padres Projections.  Ms. Austin Smith's projected revenue are *below* the June 2015 Management Projections and only slightly above the July 2015, November 2015, and December 2015 Management Projections.  **Exhibit 8B** shows that similarly, Ms. Austin Smith's EBITDA projections are *below* the June 2015 Management Projections and only slightly above the July 2015, November 2015, and December 2015 Management Projections.  **Exhibit 8C**

---

[193] Hardaway Declaration, ¶ 30.

[194] Millennium Laboratories, "Financial Projections Overview to Lenders," July 29, 2015, ML_DE_00023852.  These projections appear to be similar to the management projections in FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("September 2015 Management Projections").

[195] Hardaway Declaration, ¶ 33.

[196] *In re Millennium Lab Holdings II, LLC, et al.,* "Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization," filed on November 10, 2015, Exhibit H, Financial Projections, p. 5; FTI December 2015 Valuation at KPMG-ML-EA15WB-0000764.

[197] FTI December 2015 Valuation at KPMG-ML-EA15WB-0000745.

[198] Ms. Austin Smith's valuation analysis includes projections for 2014 and 2015, unlike FTI's projection period, which starts in 2016.  YAS Workpaper 1; FTI December 2015 Valuation at KPMG-ML-EA15WB-0000768.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

shows that Ms. Austin Smith's EBITDA margin projections are *lower* than or almost equal to all 2015 management projections.

## VI.    COMPARABLE COMPANIES ANALYSIS

86.    Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent given her own EBITDA multiples analysis.[199] Ms. Austin Smith finds that, based on *EBITDA multiples* Millennium's implied equity value ranges between *positive* $23 million and *positive* $1.5 billion.[200]

> **A.    Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent under her EBITDA multiples analysis**

87.    Ms. Austin Smith identifies five companies as comparable:  Alere, Bio-Reference, LabCorp, Myriad, and Quest.[201]  While she asserts that "for several reasons, these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value," she proceeds to use them to estimate revenue and EBITDA multiples on the basis of the Last Twelve Months ("LTM"), forecasted 2014, and forecasted 2015.[202]  Based on these multiples, she performs a comparable companies analysis of Millennium.  Ms. Austin Smith then asserts that "the most likely conclusion of value that results from [her comparable companies] methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital."[203]

88.    Specifically, Ms. Austin Smith finds that, when using 2014 and 2015 *revenue multiples* and her substantially reduced forecast of 2014 and 2015 revenue, the implied equity value of

---

[199] Austin Smith Report, ¶¶ 149–160, Table 9.

[200] Austin Smith Report, Table 9.  Ms. Austin Smith also estimates revenue multiples, which yield an implied equity value of negative $1.2 billion to negative $503 million.

[201] Austin Smith Report, ¶ 151.  While Ms. Austin Smith identifies these five comparable companies, she uses a different set of companies as comparables in her various analyses.  For example, when she estimates the adjustment for the purported reputational impact of the DOJ investigation, she looks at Ameritox and Calloway, and when she estimates the impact of custom profile discontinuance, she looks at Ameritox and Aegis.  Austin Smith Report, ¶¶ 128, 131.

[202] Austin Smith Report, ¶¶ 152, 156.

[203] Austin Smith Report, ¶ 159.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium is between negative $503 million and negative $1.238 billion.[204]  However, Ms. Austin Smith fails to establish that revenue multiples are appropriate to value Millennium; it is likely that they are not.  Revenue multiples require that there be similar operating margins across the comparable companies and the company that is being valued.  If this is not the case, revenue multiples can end up "assigning high values to firms that are generating high revenue growth while losing significant amounts of money."[205]  Ms. Austin Smith fails to examine whether Millennium's operating margins were comparable to her set of comparable companies.

89.    By contrast, Ms. Austin Smith finds that, based on *EBITDA multiples*, Millennium's implied equity value ranges between *positive* $23 million and *positive* $1.5 billion.[206]  Ms. Austin Smith's own analysis using EBITDA multiples suggests that Millennium was balance sheet *solvent*, even when using her substantially downward revised EBITDA estimates in her Modified Padres Projections.  While a comparable companies analysis based on EBITDA multiples has various shortcomings, EBITDA multiples are better measures of company values than revenue multiples.[207]

90.    Ms. Austin Smith's comparable companies analysis yields these results even though it incorporates her substantial and inappropriate revenue and cost adjustments to the Padres

---

[204] Austin Smith Report, Table 9.

[205] Damodaran, *Investment Valuation*, Chapter 20, pp. 1–2 ("The biggest disadvantage of focusing on revenue is that it can lull you into assigning high values to firms that are generating high revenue growth while losing significant amounts of money.  Ultimately, a firm has to generate earnings and cash flows for it to have value.  While it is tempting to use price-sales multiples to value firms with negative earnings and book value, the failure to control for differences across firms in costs and profit margins can lead to misleading valuations."); Holthausen and Zmijewski, *Corporate Valuation*, Chapter 14, p. 710 ("Of course, if all a company's earnings-based numbers are negative, we can use revenue multiples, for revenue are never negative.  We know, however, that revenue multiples are more sensitive to differences in comparability – particularly differences in cost structures – than earnings-based multiples.").

[206] Austin Smith Report, Table 9.

[207] Damodaran, *Investment Valuation*, Chapter 18, p. 46 ("[T]he enterprise value to EBITDA multiple is a firm value multiple. In the last two decades, this multiple has acquired a number of adherents among analysts for a number of reasons.  First, there are far fewer firms with negative EBITDA than there are firms with negative earnings per share and thus fewer firms are lost from the analysis.  Second, differences in depreciation methods across different companies – some might use straight line while others use accelerated depreciation – can cause differences in operating income or net income but will not affect EBITDA.  Third, this multiple can be compared far more easily across firms with different financial leverage – the numerator is firm value and the denominator is a pre-debt earnings – than other earnings multiples.  For all of these reasons, this multiple is particularly useful for firms in sectors that require large investments in infrastructure with long gestation periods.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Projections.[208]  Correcting either of these sets of adjustments would further increase Millennium's projected EBITDA and revenue, thus increasing the value Ms. Austin Smith would estimate for Millennium using her comparable companies analysis.

## VII.    ABILITY TO PAY DEBT TEST

91.    Ms. Austin Smith also analyzes Millennium's ability to pay its debts as they became due.[209]  Ms. Austin Smith bases this analysis on whether Millennium was projected to have sufficient unlevered free cash flows or cash on hand to make the interest and principal payments required under the 2014 Transaction.[210]  Using her Modified Padres Projections, Ms. Austin Smith concludes that Millennium would not have sufficient unlevered free cash flow or cash on hand to make its required debt payments.[211]  However, as discussed above, Ms. Austin Smith's Modified Padres Projections are flawed and unreliable.  Consequently, her conclusion that Millennium would be unable to pay its debts as they become due is similarly unreliable and unsupported.

92.    Ms. Austin Smith also disregards the analysis and conclusions of the credit rating agencies (S&P and Moody's) that rated Millennium's 2014 Transaction, which included the $1.775 billion Term Loan B and the $50 million revolver.  Both credit rating agencies concluded that Millennium was *not* near default, with S&P noting that the Company had "the capacity to meet its financial commitments on the obligation."[212]

---

[208] Ms. Austin Smith states that "[g]iven the substantial expected deviation in profitability of Millennium from historical results (due to known or knowable risk factors), references to valuations based on LTM or 2014 revenue or EBITDA should not be considered indicative of Millennium's valuation.  As the Revised Padres Projections demonstrate, the impact of the known or knowable risks were not anticipated to impact Millennium's cash flows until 2015 (and not on a full-year basis, until 2016).  Thus, indications of value derived from Millennium's 2015 financial results are a relatively more accurate estimate of Millennium's value (as compared to LTM or 2014 financial metrics)."  Austin Smith Report, ¶ 160.

[209] Austin Smith Report, ¶ 164.

[210] Austin Smith Report, ¶¶ 164–166.

[211] Austin Smith Report, ¶¶ 165–166.

[212] S&P Rating Update; Moody's Rating; "Intro to Credit Ratings," *Standard & Poor's*, available at https://www.spglobal.com/ratings/en/about/intro-to-credit-ratings, accessed on February 9, 2022 ("S&P Intro to Credit Ratings"); "Rating Scale and Definitions," *Moody's*, available at https://www.moodys.com/sites/products/productattachments/ap075378_1_1408_ki.pdf, accessed on February 7, 2022 ("Moody's Rating Scale and Definitions").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

   A.   **Ms. Austin Smith's conclusion that Millennium would be unable to pay its debts is unreliable**

93.    Ms. Austin Smith concludes that Millennium would be unable to pay interest on its Term Loan B starting in 2018.[213]  Ms. Austin Smith's conclusion relies on using her unsupported Modified Padres Projections.  Removing her adjustments, however, shows that Millennium would be able to pay interest on the Term Loan B throughout the life of the loan.[214]  In fact, modifying only her adjustment to the Padres Projections for the purported reputational impact of the DOJ settlement implies that Millennium would have the ability to make interest payments on the Term Loan B throughout the life of the loan.[215]

94.    Ms. Austin Smith also considers Millennium's "prospects for refinancing the Term Loan at maturity in April 2021" and notes that "Millennium was above the levels typically associated with Caa-C credits."[216]  Specifically, she estimates that under her Modified Padres Projections, Millennium's leverage ratio would be 8.7 times EBITDA by December 31, 2020, which she claims to be near the median leverage ratio of Moody's "Caa-C" rated loans.[217]  Ms. Austin Smith also claims that "[u]nder the reasonable downside projections," Millennium's leverage ratio would be 19.8 times EBITDA by December 31, 2020.[218]  She then concludes that "[t]here was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021."[219]  Ms. Austin Smith provides no other analysis or support.

95.    Modifying her adjustments shows that Millennium's leverage would never exceed 4.7 times EBITDA and would be 1.4 times EBITDA as of December 31, 2020.[220]  In fact, modifying only her adjustment for the purported reputational impact of the DOJ settlement implies that

---

[213] Austin Smith Report, ¶ 166.

[214] **Appendix H2A**.

[215] **Appendix H2B**.

[216] Austin Smith Report, ¶ 169.

[217] Austin Smith Report, ¶ 169.

[218] Austin Smith Report, ¶ 169.

[219] Austin Smith Report, ¶ 169.

[220] **Appendix H3A**.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium's leverage would never exceed 5.3 times EBITDA, and would decline to 4.4 times EBITDA by December 31, 2020.[221]

### B. Ms. Austin Smith fails to engage with the credit ratings for the 2014 Transaction

96.     S&P and Moody's rated Millennium's 2014 Transaction, which included the $1.775 billion Term Loan B and the $50 million revolver, as B+ and B1, respectively.[222]   While S&P and Moody's rated the 2014 Transaction as below investment grade, cautioning about the considerable risks associated with it, they did not offer a rating near or at default.  As I discuss below, Ms. Austin Smith disregards these credit ratings, and the conclusions and analyses of the credit rating agencies.

97.     Credit ratings are an assessment of an issuer's ability to meet its financial obligations and reflect a relative ranking of risk.[223]  In Millennium's case, credit rating agencies assigned a rating that implied that the 2014 Transaction was "considered speculative" and "subject to high credit risk."[224]  The ratings *did not* reflect that the 2014 Transaction was "of poor standing," "near default," or "in default."[225]

98.     S&P assigned the 2014 Transaction a B+ rating.[226]  S&P's rating category B indicates that the issuer "has the capacity to meet its financial commitments on the obligation," but that "[a]dverse business, financial, or economic conditions will likely impair the [issuer's] capacity or

---

[221] **Appendix H3B**.

[222] S&P Rating; S&P Rating Update; Moody's Rating.  S&P and Moody's rated both Millennium and the 2014 Transaction, and each provided the same rating for both.  A typical credit rating scale has a top rating of 'AAA,' which reflects the highest category in the rankings, that is, an opinion on the lowest probability of default; and the lowest rating 'D,' which reflects default.  Credit rating agencies distinguish between investment-grade and below investment grade (or, "speculative" or "high yield"), where bonds rated as Baa3/BBB- and above are classified as investment grade, and bonds rated as Ba1/BB+ and below are classified below investment grade.  "Updated Investor Bulletin: The ABCs of Credit Ratings," *U.S. Securities and Exchange Commission*, October 12, 2017, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_creditratings, accessed on February 7, 2022 ("The ABCs of Credit Ratings"); S&P Intro to Credit Ratings; Moody's Rating Scale and Definitions.

[223] The ABCs of Credit Ratings.

[224] Moody's Rating Scale and Definitions.

[225] Moody's Rating Scale and Definitions.

[226] S&P Rating Update, p. 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

willingness to meet its financial commitments on the obligation."[227]  S&P noted that the rating reflected a "stable outlook" and a "meaningful (50%-70%) recovery in the event of a payment default."[228]  S&P's rating reflected the rating agency's expectation that Millennium's (1) revenue growth would "continue outperforming that of the broad laboratory services industry," as S&P forecasted "mid-teens revenue growth in 2014 driven by double-digit volume increases partially offset by single-digit reductions in reimbursement rates," and (2) adjusted EBITDA margin would "gradually contract by around 350 basis points (bps) over the next three years due to reimbursement rate cuts."[229]  In putting together these ratings, S&P considered Millennium's exposure to "industry and competitive developments" and "to Medicare and Medicaid reimbursement" risks, as well as the possibility of "reimbursement rate reductions from Millennium's commercial contracts."[230]  Thus, S&P based its ratings on then-known risks, including reimbursement risks, and cautioned that it could lower the rating in the event that Millennium's "operating performance falls meaningfully short of [its] expectations."[231]

99.      Similarly, Moody's assigned the 2014 Transaction a B1 rating,[232] which indicates that the issuance is "subject to high credit risk."[233]  Moody's rating reflected a "stable rating outlook" and the rating agency's expectation "of continued rapid growth -- which will be largely organic -- and

---

[227] S&P Global Ratings Definitions.

[228] S&P Rating, p. 1.  In fact, Ms. Austin Smith is incorrect when she states that the "[t]otal recovery under the $1.75 billion facility was estimated at 34%" as her estimation incorrectly ignores that, following Millennium's bankruptcy, the $1.75 billion credit facility was "converted into $600 million of new term loans and 100% of the beneficial ownership of Millennium."  Austin Smith Report ¶ 104; Hardaway Declaration, ¶ 38.

[229] S&P Rating Update, p. 2.

[230] S&P Rating Update, p. 2.

[231] S&P Rating Update, p. 3 ("We could lower the rating in the event that Millennium's operating performance falls meaningfully short of our expectations and results in 2014 debt to EBITDA significantly above 5.0x.  This scenario could encompass a single-digit revenue decline coupled with a 300 basis point (bp) EBITDA contraction and could materialize if one of Millennium's large competitors such as Laboratory Corp. or Quest Diagnostics strategically expanded into the pain management drug testing field and won significant market share from Millennium.  In addition, it could be induced by a substantial reimbursement rate cut resulting in lower revenue and compressed margins for Millennium.  Potential emergence of alternative pain management approaches and medications with lower propensity to cause addiction also could significantly curtail the demand for pain management drug testing and adversely affect the company's prospects.").

[232] Moody's Rating, p. 1.

[233] "What is a Credit Rating?," *Moody's*, available at https://ratings.moodys.io/ratings#:~:text=Moody's%20long%2Dterm%20ratings%20are,of%20one%20year%20or%20more.&text=Such%20ratings%20use%20Moody's%20Global,in%20the%20event%20of%20default, accessed on February 7, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

very strong margins" and that the Company's "increased scale and solid free cash flow [would] allow Millennium to quickly reduce leverage through a combination of EBITDA growth and debt repayment."[234]  Moody's considered "the high leverage the [Company would] initially have following the close of the dividend/recapitalization transaction," the fact that Millennium was "relatively small when compared to many other corporate issuers," and that the "majority of Millennium's revenue [would] continue to come from its core toxicology testing service line as the revenue contribution from new services [would] remain relatively modest in the near term."[235] Moody's also cautioned that the rating could be downgraded if Millennium "were to experience operating difficulty in its core business. . . ."[236]

100.    Without basis, Ms. Austin Smith fails to engage with these credit ratings that were created contemporaneously with the 2014 Transaction.

## VIII.    CAPITAL ADEQUACY TEST

101.    Ms. Austin Smith also concludes that Millennium had unreasonably small capital following the 2014 Transaction.[237]  To reach this conclusion she claims that "[i]f a company is left with unreasonably small capital under a reasonable downside scenario, it follows that the company's unreasonably small capital is reasonably foreseeable" and concludes that Millennium would be even more insolvent under what she purports to be a "reasonable downside scenario" than under the Modified Padres Projections.[238]

102.    In her "reasonable downside scenario" Ms. Austin Smith builds on her Modified Padres Projections by making two further adjustments:

---

[234] Moody's Rating, p. 1.

[235] Moody's Rating, p. 1.

[236] Moody's Rating, p. 1 ("Given Moody's expectation that leverage will decline following the debt financed distribution, a downgrade of the rating is not expected in the near term.  However, if the company were to experience operating difficulty in its core business or undertake a significant debt financed acquisition or shareholder initiative, the rating could be downgraded.  More specifically, the rating could be downgraded if debt to EBITDA is expected to be sustained above 5.0 times.").

[237] Austin Smith Report, ¶¶ 170, 172.

[238] Austin Smith Report, ¶¶ 170–172.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- She assumes that Medicare NRPS would drop by 33% as a result of the Noridian LCD rather than 18.3%.[239]
- She assumes that the purported reputational impact of the DOJ settlement would lead to a 50% decrease in specimen volume rather than 30%.[240]

103. The extension of the adjustment due to the purported reputational impact of the DOJ settlement to the Padres Projections is similarly unjustified. As discussed above, she provides no basis for her adoption of an ad hoc 50% decrease in specimen volume from the reputational consequences of the DOJ settlement. Ms. Austin Smith has failed to establish that this adjustment forms a "reasonable downside scenario," and it suffers from all the flaws of the Modified Padres Projections on which it is based.

104. In addition, Ms. Austin Smith's capital adequacy test relies on her incorrect and inflated WACC range of 9.8% – 14.8%.[241] Correcting Ms. Austin Smith's WACC to 7.2% and making no other adjustments to her Modified Padres Projections shows that Millennium was solvent and could have withstood a $209.1 million decrease in enterprise value before becoming insolvent. See **Exhibit 1**.

Signed: _____

Amy Hutton, Ph.D.

February 14, 2022

---

[239] Austin Smith Report, ¶ 171.

[240] Austin Smith Report, ¶ 171.

[241] Austin Smith Report, ¶ 172.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **EXHIBIT 1**

# *In Re Millennium Lab Holdings II, LLC*
# Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
## *($ millions)*

|  | Selected WACCs[3] | |
| --- | :---: | :---: |
|  | **14.8%** | **7.2%** |
| **Millennium's Enterprise Value Based on Ms. Austin Smith's Modified Padres Projections[4]** | $802.86 | $1,970.83 |
| **Millennium's Equity Value Based on Ms. Austin Smith's Modified Padres Projections[5]** | -$958.89 | $209.08 |
| **Marginal Impact on Millennium's Equity Value[6]** | **Marginal Increase** | |
| Modify Ms. Austin Smith's treatment of operating expenses[7] | $220.73 | $645.30 |
| Modify reduction of 15% in 2015 and 15% in 2016 to UDT and PGT specimen volume due to the purported reputational impact of the DOJ settlement[8] | $383.75 | $1,138.69 |
| Restore Emerging Opportunities[9] | $192.82 | $663.63 |
| Modify Medicare and Commercial Payors UDT specimen volume growth rate adjustments from 2014 through 2020[10] | $155.01 | $498.99 |
| Modify adjustment of 1Q2014 Medicare NRPS for MUE denials[11] | $87.93 | $217.28 |
| Modify 1.6% reduction in UDT specimen volume in July 2014 due to the discontinuance of the POC Free Test Cup Program | $17.36 | $45.20 |
| Modify 21.8% reduction in Commercial Payor's NRPS in July 2015 due to the discontinuance of custom profiles | $101.62 | $303.77 |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **EXHIBIT 1**

## *In Re Millennium Lab Holdings II, LLC*
## Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
### *($ millions)*

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:

[1] Equity value is calculated as the difference between Millennium's enterprise value and $1,761.7 million—the level of outstanding debt incurred by Millennium associated with the Term Loan B transaction.  Austin Smith Report, ¶ 145.  Marginal impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections from the equity value after applying each modification.

[2] I do not modify Ms. Austin Smith's Medicare net revenue per specimen ("NRPS") decrease attributable to the draft Noridian local coverage determination ("LCD"), Austin Smith Report, ¶¶ 120–123.  In addition, I do not modify various other changes in the Modified Padres Projections relative to the Padres Projections, such as the use of actual first quarter 2014 ("1Q2014") financial results as opposed to Padres projections for 1Q2014.  As I do not fully revert Ms. Austin Smith's mechanical changes to the Padres Projections, I refer to the changes described above as modifications to Ms. Austin Smith's adjustments.  Austin Smith Report, ¶ 110.

[3] WACC refers to the Weighted Average Cost of Capital.  14.8% reflects Ms. Austin Smith's WACC, Austin Smith Report, ¶ 143.  7.2% reflects Ms. Austin Smith's Corrected WACC (see Exhibit 4 for a detailed description).

[4] These figures show Millennium's enterprise value at the selected WACCs without any modifications to the Modified Padres Projections.

[5] These figures show Millennium's equity value at the selected WACCs without any modifications to the Modified Padres Projections.  A positive value implies that Millennium would be balance sheet solvent.

[6] A positive marginal impact on equity value associated with a modification means that the modification increases Millennium's equity value relative to the equity value based on the Modified Padres Projections at selected WACCs.

[7] This modification adjusts Ms. Austin Smith's operating expenses to a constant percentage of revenues (38%), which corresponds to Ms. Austin Smith's projected operating expenses as a percentage of revenues in 2014.  The marginal impact reflects the impact on unlevered free cash flow of the difference between Ms. Austin Smith's projected operating expenses in the Modified Padres Projections and operating expenses maintained at 38% of revenues.  (See Section V.A.2 and Exhibit 5C for a detailed description).

[8] UDT refers to Millennium's urine drug testing business.  PGT refers to Millennium's pharmacogenetics business.  DOJ refers to the U.S. Department of Justice.

[9] This modification restores the revenue and expenses associated with the Padres Projections' Emerging Opportunities.

[10] Reflects the impact of modification to Ms. Austin Smith's UDT volume growth rate adjustments for Medicare and Commercial payors.  Ms. Austin Smith reduces Medicare and Commercial Payor specimen volume growth rates to 0.0% in 2014, 2.0% in 2015, and 3.0% in 2016 and onwards, and to 10.0% in 2014, 5.0% in 2015, and 3.0% in 2016 and onwards respectively.  In this modification I restore the Padres Projections' specimen volume growth rates for Medicare and Commercial Payors.  Austin Smith Report, ¶ 109.

[11] MUEs refer to Medically Unlikely Edits.  This item reflects modifications to Ms. Austin Smith's modeling of an NRPS decrease for January, February, and March 2014 (1Q2014) by $77.7, $83.7, and $82.1, respectively.  Austin Smith Report, ¶ 118 and YAS Workpaper 1, "MUE w LCD Adjustment" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**      **EXHIBIT 2A**



## *In Re Millennium Lab Holdings II, LLC*
## Historical and Projected Revenues
### 2009 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note: Historical values are as reported in the Lender Presentation. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189).  The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189).  The fiscal year for Millennium corresponds to a calendar year.  The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows:  CAGR = (2013 revenue/2009 revenue) ^ (1/4) - 1.  The CAGR for the projection period is calculated as follows: CAGR = (2020 revenue/2013 revenue) ^ (1/7) - 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **EXHIBIT 2B**



## *In Re Millennium Lab Holdings II, LLC*
## Historical and Projected Adjusted EBITDA
## 2009 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note:  Historical values are as reported in the Lender Presentation.  The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation, and Amortization.  Adjusted EBITDA includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189).  The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189).  The fiscal year for Millennium corresponds to a calendar year.  The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows: CAGR = (2013 Adjusted EBITDA/2009 Adjusted EBITDA) ^ (1/4) - 1.  The CAGR  for the projection period is calculated as follows: CAGR = (2020 Adjusted EBITDA/2013 Adjusted EBITDA) ^ (1/7) - 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**　　　　　　　　　　　**EXHIBIT 2C**



## *In Re Millennium Lab Holdings II, LLC*
## Historical and Projected Adjusted EBITDA Margin
## 2009 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note: Historical values are as reported in the Lender Presentation.  The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation, and Amortization.  Adjusted EBITDA includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189).  The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189).  The fiscal year for Millennium corresponds to a calendar year. The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows: CAGR = (2013 Adjusted EBITDA margin/2009 Adjusted EBITDA Margin) ^ (1/4) - 1.  The CAGR for the projection period is calculated as follows: CAGR = (2020 Adjusted EBITDA Margin/2013 Adjusted EBITDA Margin) ^ (1/7) - 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**   **EXHIBIT 3**

## *In Re Millennium Lab Holdings II, LLC*
## WACCs Employed by Arrangers and Ms. Austin Smith[1]



Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)")

Note:
[1] WACC refers to the Weighted Average Cost of Capital.  Arrangers consist of J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank N.A. ("Citi"), BMO Harris Bank, N.A. ("BMO"), and SunTrust Bank ("SunTrust").  I have not seen the valuation analysis BMO conducted.
[2] JPMC conducted base case and downside case valuations.  The same WACC was employed in both of these valuations.
[3] The Average of Arrangers 7.2% is calculated as the average WACC of SunTrust, JPMC, and the midpoint of Citi (9.00%).
[4] Citi conducted base case, management case, and downside case valuations and employed the displayed WACC range (8.50% to 9.50%) across all three valuation scenarios.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                                                    **EXHIBIT 4**

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC
### Using Comparable Companies Identified in Ms. Austin Smith's
### Comparable Companies Analysis[1]

**Cost of Equity - Modified Capital Asset Pricing Model (CAPM)[2]**

| | Ms. Austin Smith's WACC | | | Ms. Austin Smith's Corrected WACC[3] | | |
|---|---|---|---|---|---|---|
| Risk-free rate | | | 3.2% | | | 3.2% |
| Market equity risk premium | | 6.2% | | | 6.2% | |
| Relevered beta[4] | x | 1.10 | | x | 0.85 | |
| Beta adjusted equity risk premium[5] | | | 6.8% | | | 5.2% |
| Size premium | | | 1.9% | | | 0.0% |
| Company-specific risk adjustment | | | 5.0% | | | 0.0% |
| **Estimated cost of equity** | | | **16.9%** | | | **8.5%** |

**Cost of Debt[6]**

| | Interest Rate | Weight | Weighted Cost | Interest Rate | Weight | Weighted Cost |
|---|---|---|---|---|---|---|
| Pre-tax cost of debt (pro forma) | | | | | | |
| Term Loan B | 5.3% | 97.0% | 5.1% | 5.3% | 97.0% | 5.1% |
| Weighted average pre-tax cost of debt[7] | | | 5.1% | | | 5.1% |
| Tax-effect on cost of debt | | 40.0% | -2.0% | | 40.0% | -2.0% |
| **Estimated after-tax cost of debt** | | | **3.1%** | | | **3.1%** |

| **Weighted Average Cost of Capital (WACC)** | Cost of Capital | | % in Capital Structure | Weighted Cost | Cost of Capital | | % in Capital Structure[8] | Weighted Cost |
|---|---|---|---|---|---|---|---|---|
| Debt | 3.1% | x | 14.6% | 0.4% | 3.1% | x | 23.4% | 0.7% |
| Equity | 16.9% | x | 85.4% | 14.4% | 8.5% | x | 76.6% | 6.5% |
| **Estimated WACC** | | | | **14.8%** | | | | **7.2%** |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER** <div align="right">**EXHIBIT 4**</div>

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC
### Using Comparable Companies Identified in Ms. Austin Smith's
### Comparable Companies Analysis[1]

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*")

Note:
[1] The corrected WACC of 7.2% is based on Ms. Austin Smith's *five* comparable companies from her comparable companies analysis, which are Alere Inc., Bio-Reference Laboratories Inc., Laboratory Corp. of America Holdings, Myriad Genetics Inc., and Quest Diagnostics Inc.  Austin Smith Report, ¶ 151. The WACC of 14.8% is estimated based on a different set of *eight* comparable companies than Ms. Austin Smith's set.  This different set includes three additional companies: Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.  WACC Underlying Materials, "Beta" tab.  For details, see Appendix F.
[2] CAPM refers to the Capital Asset Pricing Model.  According to Holthausen and Zmijewski, *Corporate Valuation*, "[t]he expected return of an individual security in the CAPM is equal to the return on the risk-free asset plus a risk premium. The risk premium is equal to the risk of the security relative to the risk in the market multiplied by the risk premium for holding the market portfolio."  Beta is the "risk of an individual security relative to the market."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.  "The cost of capital in the CAPM [...] is equal to the risk-free rate plus one risk premium."  Holthausen and Zmijewski, *Corporate Valuation*, p. 328.
[3] The WACC Underlying Materials employ a number of rounding conventions, while I use unrounded figures throughout my WACC calculations.  In particular, in the WACC underlying materials, levered betas are rounded to the nearest 0.05 (for example, a beta of 0.82 is rounded down to 0.80.  A beta of 0.83 is rounded up to 0.85).  These rounded values are used in subsequent steps in the WACC calculation.  Cost of equity and cost of debt (weighted by their respective share of capital structure), and the resulting WACC are each rounded to the nearest 0.1%.
[4] For the relevered beta, I use the average of the unlevered betas of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis, as calculated in the WACC Underlying Materials, relevered to the average capital structure of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis. See Appendix F for more details on the de- and re-levering process used to adjust the comparable companies' betas.  According to Holthausen and Zmijewski, *Corporate Valuation*, "we first measure the CAPM common equity betas of the comparable companies and potentially the company we are valuing (if it is publicly traded) and then unlever the common equity betas to measure the unlevered beta for the company we are valuing. Once we measure the unlevered beta for the company we are valuing ... we lever the unlevered beta to measure the equity beta of the company we are valuing."  Holthausen and Zmijewski, *Corporate Valuation*, p. 453.
[5] Beta adjusted equity risk premium is equal to the product of the relevered beta and the market equity risk premium.
[6] The cost of debt reflects lenders "required or expected rate of return, which is based on the timing, magnitude, and riskiness of the expected cash flows."  Holthausen and Zmijewski, *Corporate Valuation*, p. 395.
[7] Cost of debt is weighted by Term Loan B's share of Millennium's pro forma total debt as of March 31, 2014 (97%).  WACC Underlying Materials, "Sources&Uses" tab.
[8] The capital structure represents the capital structure of the comparable companies.  The corrected WACC of 7.2% is estimated using the average capital structure of the five comparable companies identified by Ms. Austin Smith. The 14.8% WACC is based on a different set of eight comparable companies compared to Ms. Austin Smith's five comparable companies.  WACC Underlying Materials, "Beta" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                    **EXHIBIT 5A**



*In Re Millennium Lab Holdings II, LLC*
**Historical and Projected Operating Expenses
as a Percentage of Revenue**
2009 – 2018

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, Inc. and Subsidiary, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2008 and 2009," JPMC-00001302; Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2010 and 2011," JPMC-MIL-CORP-00223784; Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2011 and 2012," JPMC-MILCORP-00191350; Millennium Lab Holdings II, LLC and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2013 and 2014," ML_DE_00024982

Note: Historical operating expenses as a percentage of revenue are calculated as: (Gross Profit Adjusted EBITDA + Depreciation and Amortization) / Net Revenue. Historical Gross Profit, Adjusted EBITDA, and Net Revenue are taken from the Lender Presentation. Historical Depreciation and Amortization is taken from Millennium's audited financials. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 5B**



## *In Re Millennium Lab Holdings II, LLC*
## Modified Padres Projections Incremental Operating Expenses

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections")

Note: The cumulative figure in each column represents the total operating expenses projected in the Modified Padres Projections. For instance, in 2015 Ms. Austin Smith projected the total operating expenses to be $254.00 million. The blue segments show what Ms. Austin Smith's operating expenses would have been had they remained constant at 38% of revenue, as Ms. Austin Smith's projected them to be in 2014. In 2014, Ms. Austin Smith projected operating expenses to be $258.93 million. The red segments from 2015 – 2018 show Ms. Austin Smith's "incremental operating expenses." That is, the operating expenses above those that would have represented 38% of revenue. In 2013, historical operating expenses constituted 31% of revenue. YAS Workpaper 1, "IS Detail" tab. In the Padres Projections, operating expenses were projected to constitute 36% of revenue in 2014. YAS Workpaper 1, "LeverageModel" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**    **EXHIBIT 5C**



## *In Re Millennium Lab Holdings II, LLC*
## Modified Padres Projections Operating Expenses
## as a Percentage of Revenue

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections")

Note: The blue line (38%) represents Ms. Austin Smith's 2014 projected operating expenses as a percentage of revenue.  The bars represent Ms. Austin Smith's projected operating expenses as a percentage of revenue in each year and are separated into their fixed and variable components. Green represents variable operating expenses, while red represents fixed operating expenses. Variable and fixed costs are classified as in the Austin Smith Report (YAS Workpaper 1). The blue columns represent operating expenses associated with RxAnte, which Ms. Austin Smith does not adjust relative to the Padres Projections.  The RxAnte operating expenses are not classified as fixed or variable.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**    **EXHIBIT 6**

## *In Re Millennium Lab Holdings II, LLC*
## Enterprise Value Ranges by Selected Parties[1]



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    **EXHIBIT 6**

## *In Re Millennium Lab Holdings II, LLC*
## Enterprise Value Ranges by Selected Parties[1]

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1; J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)"); TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH_00090311, TA_MLH-00090312 ("TA Associates Model"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); FTI Consulting, "Millennium Health LLC:  Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743 ("FTI December 2015 Valuation"); *In re Millennium Lab Holdings II, LLC, et al.*, Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, filed on November 10, 2015 ("Hardaway Declaration"); Millennium Management Projections, April 12, 2014, ML_DE_00057999

Note:
[1] Selected parties include J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank, N.A. ("Citi"), SunTrust Bank ("SunTrust"), and Vantage Point Advisors ("VPA") (Millennium's contemporaneous solvency advisor).  The investment analysis of TA Associates (Millennium's private equity sponsor), which ranges from $1,627 to $3,007, is excluded because they used their internal rate of return (24.3%) to discount the cash flows.  TA Associates Model, "2" tab.
[2] Citi conducted base case, management case, and downside case valuations. The enterprise value range for the base case was $3,718 – $4,517. The enterprise value range for the management case was $4,424 – $5,394.  The enterprise value range for the downside case was $1,861 – $2,242.  Citi Model (March 2014) at CITI-T-00000229–231.
[3] JPMC conducted base case and downside case valuations. The enterprise value range for the base case was $3,674 – $4,737. The enterprise value range for the downside case was $2,571 – $3,277.  JPMC Model (April 2014), "MAIN" and "DCFCredit" tabs.
[4] Following Millennium's bankruptcy in November 2015 (Hardaway Declaration, p. 45), FTI Consulting ("FTI") conducted a valuation of Millennium based on management projections as of December 2015.  FTI December 2015 Valuation.
[5] Austin Smith Report  ¶ 145.
[6] The solvency threshold is the value at which Millennium's enterprise value is equal its net outstanding debt.  Austin Smith Report, Table 7 and "LeverageModel" tab of the Padres Projections.  Values to the right of the solvency threshold imply that Millennium would be balance sheet solvent.
[7] Average of contemporaneous valuations is determined as the average of the averages for Citi, JPMC, SunTrust, and VPA Solvency Analysis.  The average of each selected third party is the average of the midpoints for each valuation scenario considered by that party.  The average does not include BMO because I have not seen the valuation analysis BMO conducted.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 7A**

# *In Re Millennium Lab Holdings II, LLC*
## Selected Contemporaneous Revenue Projection Sensitivities
### 2014 – 2020



Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **EXHIBIT 7B**



## *In Re Millennium Lab Holdings II, LLC*
### Selected Contemporaneous EBITDA Projection Sensitivities
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  The adjusted EBITDA figures in the Citi management case and the JPMC management case are consistent with what I have observed in the Padres Projections.  For the remaining projection sensitivites, I have not seen the materials detailing adjustments to EBITDA.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **EXHIBIT 7C**

## *In Re Millennium Lab Holdings II, LLC*
## Selected Contemporaneous EBITDA Margin Projection Sensitivities
### 2014 – 2020



Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  The adjusted EBITDA figures in the Citi management case and the JPMC management case are consistent with what I have observed in the Padres Projections.  For the remaining projection sensitivities, I have not seen the materials detailing adjustments to EBITDA.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**  **EXHIBIT 8A**



### *In Re Millennium Lab Holdings II, LLC*
### Selected Post-Transaction Revenue Projections
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"); *In re Millennium Lab Holdings II, LLC, et al.,* Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note:  In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015.  The September 2015 projections appear to be the same as the July 2015 projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER** **EXHIBIT 8B**



## *In Re Millennium Lab Holdings II, LLC*
## Selected Post-Transaction EBITDA Projections
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"); In re Millennium Lab Holdings II, LLC, et al., Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  For the remaining projections, I have not seen the materials detailing adjustments to EBITDA.  In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015.  The September 2015 projections appear to be the same as the July 2015 projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**    **EXHIBIT 8C**



### *In Re Millennium Lab Holdings II, LLC*
### Selected Post-Transaction EBITDA Margin Projections
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"); In re Millennium Lab Holdings II, LLC, et al., Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  For the remaining projections, I have not seen the materials detailing adjustments to EBITDA.  In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015.  The September 2015 projections appear to be the same as the July 2015 projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

# AMY HUTTON

550A Fulton Hall
Carroll School of Management
Boston College
140 Commonwealth Ave.
Chestnut Hill, MA 02467
(617) 320-1068
amy.hutton@bc.edu

## EDUCATION

| | |
|---|---|
| 1992 | Ph.D., Business Administration, The Simon Business School, University of Rochester. |
| 1986 | M.B.A., *beta gamma sigma*, Accounting, Finance, and Organizations & Markets, The Simon Business School, University of Rochester. |
| 1985 | B.A., *magna cum laude*, Political Science, University of Rochester. |

## FACULTY APPOINTMENTS

| | |
|---|---|
| 7/1/92-6/30/97 | Assistant Professor of Business Administration, Harvard Business School |
| 7/1/97-6/30/03 | Associate Professor of Business Administration, Harvard Business School |
| 7/1/02-12/31/02 | Visiting Associate Professor of Business Administration, Tuck School of Business at Dartmouth |
| 1/1/03-6/30/03 | Visiting Scholar, Graduate School of Business, Stanford University |
| 7/1/03-6/30/06 | Associate Professor of Business Administration, Tuck School of Business at Dartmouth |
| 7/1/06-6/30/10 | Associate Professor of Business Administration, Carroll School of Management, Boston College |
| 7/1/10-present | Professor of Business Administration, Carroll School of Management, Boston College |
| 7/1/20-present | Ph.D. Program Director, Accounting |

### Teaching Assignments

#### Harvard Business School

| | |
|---|---|
| 1991-1994 | Financial Reporting, Management Accounting and Control |
| 1995-2000 | Business Analysis and Valuation |
| 1998-2001 | Driving Corporate Performance, Executive Education |
| 2000-2001 | Financial Reporting and Control |

#### Tuck School of Business at Dartmouth

| | |
|---|---|
| 2002-2004 | Financial Measurement, Analysis and Reporting |
| Spring 2005 | Financial Reporting and Statement Analysis |
| 2002-2006 | Various Executive Education Programs |

#### Carroll School of Management at Boston College

| | |
|---|---|
| 2006-present | Financial Statement Analysis and Valuation |
| 2009-2011 | Intermediate Accounting II |
| 2018-present | Ph.D. research seminars – Empirical, financial accounting research |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER            APPENDIX A

## PUBLICATIONS

### A. Academic Articles[1]

1.  ** "Debt-Covenant Violations and Managers' Accounting Responses," *Journal of Accounting and Economics,* May 1994.

2.  ** "Detecting Earnings Management" (with Patricia M. Dechow and Richard G. Sloan), *Accounting Review*, April 1995.

3.  ** "Causes and Consequences of Earnings Management: An Analysis of Firms Subject to Enforcement Actions by the SEC" (Patricia M. Dechow and Richard G. Sloan), *Contemporary Accounting Research*, Spring 1996.

4.  "Economic Consequences of Accounting for Stock-based Compensation" (with Patricia M. Dechow and Richard G. Sloan), *Journal of Accounting Research*, Supplement 1996.

5.  "An Empirical Assessment of the Residual Income Valuation Model" (with Patricia M. Dechow and Richard G. Sloan), *Journal of Accounting and Economics*, January 1999.

6.  "Stock Performance and Intermediation Changes Surrounding Sustained Increases in Disclosure" (with Paul Healy and Krishna Palepu), *Contemporary Accounting Research,* Fall 1999.

7.  "The Relation Between Analysts' Long-Term Earnings Forecasts and Stock Price Performance Following Equity Offerings" (with Patricia M. Dechow and Richard G. Sloan), *Contemporary Accounting Research,* Spring 2000.

8.  "Short Sellers, Fundamental Analysis, and Stock Returns" (with Patricia M. Dechow, Lisa Meulbroek, and Richard G. Sloan), *Journal of Financial Economics*, July 2001.

9.  "The Role of Supplementary Statements with Management Earnings Forecasts" (with Greg Miller and Douglas Skinner), *Journal of Accounting Research,* December 2003.

10. "Analyst Earnings Forecast Revisions and the Pricing of Accruals" (with Mary Barth), *Review of Accounting Studies*, Spring 2004.

11. "Determinants of Managerial Earnings Guidance Prior to Regulation Fair Disclosure and Bias in Analysts' Earnings Forecasts," *Contemporary Accounting Research*, Winter 2005.

12. "A discussion of 'Corporate Disclosure by Family Firms' " *Journal of Accounting and Economics*, September 2007.

13. "Opaque Financial Reports, R-square, and Crash Risk" (with Alan Marcus and Hassan Tehranian), *Journal of Financial Economics*, October 2009.

14. "Detecting Earnings Management – A New Approach" (with Patricia Dechow, Jung Hoon Kim and Richard Sloan), *Journal of Accounting Research*, May 2012.

---

[1] ** published under the name *Amy Sweeney.*

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**         **APPENDIX A**

15. "Do Managers Always Know Better?  An Examination of the Relative Accuracy of Management and Analyst Forecasts" (with Lian Fen Lee and Susan Shu), *Journal of Accounting Research*, December 2012.

16. "The Role of Social Media in the Capital Market: Evidence from Consumer Product Recalls" (with Lian Fen Lee and Susan Shu), *Journal of Accounting Research*, May 2015.

17. A Discussion of "Aggregate Noise Trader Risk, Mispricing, and Accounting Fundamentals" *Contemporary Accounting Research*, May 2017.

18. "Prior Forecasting Accuracy and Investor Reaction to Management Earnings Forecasts" (with Phillip C. Stocken), *Journal of Financial Reporting*, April 2021.

19. "Regulatory Transparency and the Alignment of Private and Public Enforcement" (with Susan Shu and Xin Zheng), *Journal of Financial Economics*, 2021.

**B. Working Papers**

"The Costs and Benefits of Regulatory Transparency for Public Banks: Evidence from Disclosure of SEC Comment Letters" (with Y. Lin, S. Shu, I Yeung, X. Zheng).

**C. Practitioner Publications**

"Solving the New Equity Puzzle" (with Patricia M. Dechow and Richard G. Sloan), *The Financial Times: Mastering Finance Series,* Summer 1997.

"Best Practice: Four Rules for Taking Your Message to Wall Street," *Harvard Business Revi*ew, May 2001.

"Review of the Securities Industry Association's Best Practices for Research" completed for the House Financial Service Committee, Capital Markets Subcommittee, *Congressional Record*, August 2001.

"Beyond Financial Reporting—An Integrated Approach to Disclosure," *Journal of Applied Corporate Finance*, Fall 2004.

"Roundtable on Corporate Disclosure, National Corporate Finance Forum" (with Donald Chew), *Journal of Applied Corporate Finance*, Fall 2004.

"Bad News Rings True: Supplemental Information Can Enhance Earnings Forecast Credibility" (with Greg Miller and Douglas Skinner), *Investor Relations Quarterly* vol. 6 no. 2, 2004.

**D. Awards**

AAA's **Distinguished Contribution to Accounting Literature Award**, 2010.

Carroll School **Coughlin Distinguished Teaching Award**, 2020.

**E. Citations**    Google Scholar over 31,000   (over 11,600 since 2017)

**PROFESSIONAL ACTIVITIES**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

Cornerstone Research – Expert

Editor of the *Accounting Review*, June 2011 – June 2014

| | |
|---|---|
| Referee | *Contemporary Accounting Research, Journal of Accounting and Economics, Journal of Accounting Research, Review of Accounting Studies, Journal of Financial Economics*, *Journal of Finance*, *Review of Financial Studies*, American Accounting Association Annual Conferences |

Member of      American Accounting Association (AAA), 1991-present.
              Editorial Review Board of the *Accounting Review*, 1994-99, 2014-2017
              Research Advisory Committee AAA, 1997-2000.
              Faculty Development Committee, AAA, 1997-2000.
              Corporate Accounting Policy Committee, AAA 1999-2001, Chair 2001.
              Review Board for the House Financial Service Committee, Capital
                  Markets Subcommittee examining Securities Industry Association's
                  proposals governing the standards and practices of research analysts,
                  June 2001. s

Board of       National Industries for the Blind (NIB), 2002-2006
Advisors       Audit and Finance Committee, NIB, 2004-2006

Directorship   Bandag, Inc., member of audit and corporate governance and nominating
               committees, June 2003-June 2007; chair of the audit committee May
               2005-June 2007.  Bandag acquired by Bridgestone June 2007.

Service        University Research Committee, January 2007 – January 2010
at Boston      Accounting Department's Recruiting Committee, January 2007 – present
College        Faculty Guide for Freshmen, Class 2012
               Parent Action Committee for the Boston College Children's Center,
                   September 2007 – 2010, 2014-2016.
               Provost's Advisory Council, September 2009 – July 2011
               Promotion & Tenure Committee, July 2010 – July 2012
               Student Advisor

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER            APPENDIX A

**Invited presentations of working papers:**

Boston College, Columbia University, HBS – Harvard University,

MIT Sloan School of Business, New York University, Northwestern University, University of Pennsylvania – Wharton School of Business, Winter/Spring 1991

University of Michigan, January 1993 and March 2011

AAA Northeast Regional Conference, March 1993

Harvard Business School, September 1993, February 1996, May 2002, September 2007, and March 2012

University of Rochester, October 1993, May 2002 and May 2015

Southern Methodist University, April 1994

Financial Decision and Control Conference, Harvard University, July 1993, 1994, and 1998

AAA National Meetings, August 1994, 1995, 1997, 1998, 1999, 2000, 2001 and 2003

Cornell University, September 1994 and November 1997

Mitsui Life Symposium, University of Michigan, October 1994

Columbia University, January 1995 and December 2010

*Contemporary Accounting Research* Conference, April 1995 and 1998

University of Iowa, September 1995

Ohio State University, September 1995, June 2010

*Journal of Accounting Research* Conference, 1996, 2011, and 2014

Stanford University July 1996, May 2013 and December 2019

University of North Carolina, October 1996 and February 1999

Washington University, Fall 1996

University of Georgia, Fall 1996

University of Oregon, Winter 1997

University of Waterloo, April 1997

Michigan State University, September 1997

*Journal of Accounting and Economics* Conference, May 1998

Northwestern University, October 1998

Western AAA Conference, April 1999

University of Texas, Austin, October 1999

Prudential Securities Quantitative Research Conference, December 1999

*The Center for Investment Research,* Corporate Earnings Analysis Seminar, NYC, May 2001.

Tuck School of Business - Dartmouth, September 2001 and May 2005

National Investor Relations Institute (NIRI) Senior Roundtable Nov. 2001

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER           APPENDIX A

**Invited presentations of working papers (continued):**

> M.I.T., Sloan School of Management, May 2002 and May 2006
> London Business School, July 2002
> University of Washington, November 2002
> Emory University, November 2002
> Boston College, April 2005
> *Journal of Accounting and Economics* Conferences, Discussant 2005
> FEA Conference, University of North Carolina, Chapel Hill, Nov. 2005
> George Washington University, March 2006
> Carnegie Mellon University, January 2007
> University of Pennsylvania, Wharton School of Business, April 2007
> Boston University, May 2007, May 2013
> University of Wisconsin, Madison, Nov. 2007 & Nov. 2009
> INSEAD, May 2009
> Yale University, November 2014
> *Contemporary Accounting Research* Conference, Discussant 2014
> IMO Conference, Harvard Business School, Discussant 2016
> University of Southern Calf. Oct. 2020
> Baruch College Oct. 2020
> Wharton School of Business Nov. 2020

**Invited presentations:**

> AAA National Meetings, various years as a discussant and moderator
> AAA New Faculty Consortium as a panelist, February 1996
> The Conference Board, May 2001 (co-taught Lycos case study with CEO)
> SEC / NIRI (National Investor Relations Institute) Symposium on the Effects of Regulation Fair Disclosure, as a panelist May 2001
> Securities Industry Association (SIA), Research and Regulation: Analyst Objectivity and Related Issues, as a panelist April 2002
> NIRI 2002 Annual Conference: "Disclosure Tactics", June 2002
> National Association of Corporate Directors, Corporate Financial Reporting and Disclosure: "The Expanding Role of the Audit Committee", November 2002
> Forum on Corporate Finance Annual Meeting, "Earnings Guidance: Taking Back Control of the Disclosure Agenda", Stern School of Business New York University, May 2004
> 2005 Financial Services CEO Gathering, Panel Discussion: The Role of the CEO in Dealing with the External Environment, Morgan Stanley, May 2005.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

**Invited conferences (that I was able to attend):**

AAA Financial Reporting Conferences, 1991, 1992, 1994 & 1995

Trueblood Seminar Series, Deloitte & Touche, February 1993

AAA New Faculty Consortium, March 1993

Arthur Andersen Accounting Research Symposium, October 1993

Stanford Summer Camp July 1996, Discussant August 2021

AAA Corporate Accounting Polices (CAPs) 1994, 1999 & 2000
    Selected Chairman for the AAA CAPs Conference in 2001

AAA Financial Reporting Conference, The FASB, Dec. 1996 & 1997

*Journal of Accounting and Economics* Conferences, 1993, 2000 through
    2003;  2005 through 2011, 2013 through 2021

*Journal of Accounting Research* Conference, 1994, 2003, 2006, 2008
    through 2011

Financial Decision and Control Conference, Harvard Business School,
    July 1993 through 1998 & 2001

IMO Conference, Harvard Business School
    June 2006, 2007, 2009 through 2011, 2015 through 2019

Stanford Summer Camp, August 2021 (discussant)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX B**

# AMY HUTTON
## Depositions and Testimony

Deposition Testimony of Amy Hutton in *Move Inc. et al v. Zillow Inc.*, Kings County Superior Court, Washington, Case No. 14-2-07669-0 (April 9, 2016).

Deposition Testimony of Amy Hutton in *Growthquest Capital Inc. v. Volkswagen Aktiengesellschaft*, Ontario Superior Court of Justice, Case No. CV-16-566618-00CP (May 18, 2018).

Deposition Testimony of Amy Hutton in *In Re Banco Bradesco S.A. Securities Litigation*, U.S. District Court, Southern District of New York, Case No. 1:16-cv-04155 (GHW) (December 5, 2018).

Deposition Testimony of Amy Hutton in *In Re Perrigo Company plc Securities Litigation*, U.S. District Court, Southern District of New York, Civil Case No. 19-CV-70 (DLC) (February 24, 2021).

Deposition Testimony of Amy Hutton in *Huntsman International LLC v. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc.*, American Arbitration Association, Case No. 01-17-001-4588 (March 5, 2021).

Arbitration Testimony of Amy Hutton in *Huntsman International LLC v. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc.*, American Arbitration Association, Case No. 01-17-001-4588 (May 13, 2021).

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX C**

# Documents Relied Upon

### Legal Documents

- *In re Millennium Lab Holdings II, LLC, et al.*, "Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings," filed on November 10, 2015.
- *In re Millennium Lab Holdings II, LLC, et al.*, "Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization," filed on November 10, 2015.

### Expert Reports

- Expert Report and Backup Materials of Yvette R. Austin Smith, filed on November 15, 2021.

### Deposition Transcripts

- Deposition of Daniel Pencak, July 12, 2021.
- Deposition of David M. Felty, July 27, 2021.
- Deposition of Jennifer M. Mulloy, July 14, 2021.
- Deposition of Martin Price, April 12, 2021.
- Deposition of Michael Tortora, July 15, 2021.
- Deposition of Phillip Ho, July 28, 2021.
- Deposition of Ryan Griswold, July 22, 2021.
- Deposition of Tim Kennedy, September 30, 2021.
- Deposition of William Brock Hardaway, July 20, 2021.

### Bates Numbered Documents

- Millennium Management Projections, June 8, 2015, ML_DE_00559340
- BMO Harris Bank, N.A., "Loan Underwriting Committee Memorandum," March 11, 2014, ML00008506.
- BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990.
- Millennium Laboratories, "Lender Presentation Audio File," March 31, 2014, JPMC-00089412.
- J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076.
- Millennium Management Projections, April 12, 2014, ML_DE_00057999.
- TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH_00090311, TA_MLH-00090312.
- FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823.
- FTI Consulting, "Millennium Health LLC:  Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743.
- VPA Solvency Analysis Underlying Materials, VP_ML_00002551.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX C**

- Alvarez & Marsal Presentation, "Presentation to the Department of Justice," July 22, 2015, ML_DE_00167434.
- Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163.
- J.P. Morgan Chase Bank, N.A., "Credit Agreement Among Millennium Lab Holdings II, LLC, Millennium Laboratories, LLC, and J.P. Morgan Chase Bank, N.A.," April 16, 2014, ML_DE_00196568.
- Email from A. Christoforou to D. Diaz, "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-00053824, JPMC-00053828.
- Email from A. Christoforou to G. Hessol, et al., "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-MIL-CORP-00193320, JPMC-MIL-CORP-00193324.
- Email from A. Christoforou to J. Lee, "ML Q&A Tracker," March 30, 2014, JPMC-MIL-CORP-00219684.
- Millennium Laboratories, LLC - Voluntary Self-Referral Disclosure, August 15, 2014, ML_DE_00325457.
- Email from C. Liou to Project Chargers Whole Team, "Millennium v. Amertitox - loss," June 17, 2014, JPMC-MIL-CORP-00165260.
- Email from H. Appel to S. Karanikolaidis, Letter from the United States Attorney to Martin Price, "Re: Subpoena Regarding Millennium Laboratories, Inc.," March 27, 2012, JPMC-MIL-CORP-00214601, JPMC-MIL-CORP-00214602.
- Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model - version 2," June 14, 2015, ML_DE_00559337.
- Email from T. Kennedy to B. Hardaway, et al., "RE: Privileged," April 3, 2015, ML_DE_00597259.
- SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758.
- Millennium Laboratories, "Financial Projections Overview to Lenders," July 29, 2015, ML_DE_00023852.
- Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147.
- Millennium Laboratories, "Management Presentation," March 2014, ML_DE_00058283.
- Millennium Laboratories, "Rating Agency Presentation," March 2014, JPMC-MIL-CORP-00011605.
- Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984.
- Millennium Laboratories, "Confidential Information Memorandum for Public Side Lenders," March 31, 2014, ML_DE_00269115.
- Vantage Point Advisors, "Millennium Lab Holdings II, LLC Solvency Analysis," April 30, 2014, ML_DE_00263273.
- Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584.
- Term Sheet between Millennium Health, LLC and the Department of Justice, May 20, 2015, ML_DE_00201432.
- United States' Complaint in Intervention, filed on March 19, 2015, ML_DE_00629274.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX C**

## Financial Statements

- Millennium Lab Holdings II, LLC and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2013 and 2014," ML_DE_00024982.
- Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2010 and 2011," JPMC-MIL-CORP-00223784.
- Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2011 and 2012," JPMC-MIL-CORP-00191350.
- Millennium Laboratories, Inc. and Subsidiary, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2008 and 2009," JPMC-00001302.

## Academic Articles

- Alquist, R., Israel, R., and Moskowitz, T. (2018), "Fact, Fiction, and the Size Effect," *Journal of Portfolio Management,* 45(1), pp. 1–30.
- Banz, R. (1981), "The Relationship Between Return and Market Value of Common Stocks," *Journal of Financial Economics*, 9(1), pp. 3–18.
- Berk, J. (1995), "A Critique of Size-Related Anomalies," *Review of Financial Studies,* 8(2), pp. 275–286.
- Blume, M.E., and Stambaugh, R.F. (1983), "Biases in Computed Returns: An Application to the Size Effect," *Journal of Financial Economics,* 12(3), pp. 387–404.
- Dichev, I. (1998), "Is the Risk of Bankruptcy a Systematic Risk?" *Journal of Finance,* 53(3), pp. 1131–1147.
- Fisher, F.M., and Romaine, R.C. (1990), "Janis Joplin's Yearbook and the Theory of Damages," *Journal of Accounting, Auditing, and Finance*, 5(1), pp. 145–157.
- Hirshleifer, D. (2001), "Investor Psychology and Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597.
- Kent, D., Hirshleifer, D., and Subrahmanyam, A. (2001), "Overconfidence, Arbitrage, and Equilibrium Asset Pricing," *Journal of Finance,* 56(3), pp. 921–965.
- Kim, D. (1997), "A Re-Examination of Firm Size, Book-to-Market, and Earnings Price in the Cross-Section of Expected Stock Returns," *Journal of Financial and Quantitative Analysis,* 32(4), pp. 463–489.
- Horowitz, J.L., Loughran, T., and Savina, N.E. (2000), "Three Analyses of the Firm Size Premium," *Journal of Empirical Finance,* 7(2), pp. 143–153.
- Hou, K. and Dijk, M. (2019), "Resurrecting the Size Effect:  Firm Size, Profitability Shocks, and Expected Stock Returns," *The Review of Financial Studies*, 32(7), pp. 2850–2889.
- Sharpe, W. (1964), "Capital Asset Prices: A Theory of Market Equilibrium Under Conditions of Risk," *Journal of Finance*, 19(3), pp. 425–442.

## Books

- Ang, A., *Asset Management: A Systematic Approach to Factor Investing*, Oxford University Press, 2014.
- Brealey, R.A., Myers, S.C., and Allen, F., *Principles Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2011.
- Cochrane, J., *Asset Pricing: Revised Edition*, Princeton University Press, 2005.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX C**

- Damodaran, A., *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 2nd ed., Wiley, 2002.
- Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020.
- Metrick, A. and Yasuda, A., *Venture Capital and the Finance of Innovation*, 3rd ed., Wiley, 2021, Kindle Edition.

**Other Publicly Available Materials**

- "Competitive Market Analysis for Laboratory Management Decision Makers," *Laboratory Economics*, 8(10), October 2013.
- "Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014.
- "Moody's Assigns B1 CFR to Millennium Labs; Sr. Secured Credit Facilities Rated B1; Outlook Is Stable," *Moody's*, March 31, 2014.
- "Research Update: Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014.
- "HCPCS – General Information," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo, accessed on February 7, 2022.
- "Insurance vs. Self Pay," *Kittitas Valley Healthcare*, available at https://www.kvhealthcare.org/patients-and-visitors/billing/insurance-vs-self-pay, accessed on February 7, 2022.
- "Intro to Credit Ratings," *Standard & Poor's*, available at https://www.spglobal.com/ratings/en/about/intro-to-credit-ratings, accessed on February 9, 2022.
- "Local Coverage Determinations (LCD) challenge," *Medicare*, available at https://www.medicare.gov/claims-appeals/local-coverage-determinations-lcd-challenge, accessed on February 7, 2022.
- "Medically Unlikely Edits," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE, accessed on February 7, 2022.
- "Medicare Coverage Database Archive," *Centers for Medicare & Medicaid Services*, available at https://localcoverage.cms.gov/mcd_archive/search.aspx?clickon=search, accessed on February 7, 2022.
- "Rating Scale and Definitions," *Moody's*, available at https://www.moodys.com/sites/products/productattachments/ap075378_1_1408_ki.pdf, accessed on February 7, 2022.
- "SEC Fact Sheet on Global Analyst Research Settlements," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/news/speech/factsheet.htm, accessed on February 7, 2022.
- "Updated Investor Bulletin: The ABCs of Credit Ratings," *U.S. Securities and Exchange Commission*, October 12, 2017, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_creditratings, accessed on February 7, 2022.
- "What's a MAC," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC, accessed on February 7, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**            **APPENDIX C**

- "What is a Credit Rating?," *Moody's*, available at https://ratings.moodys.io/ratings#:~:text=Moody's%20long%2Dterm%20ratings%20are,of%20one%20year%20or%20more.&text=Such%20ratings%20use%20Moody's%20Global,in%20the%20event%20of%20default, accessed on February 7, 2022.
- "Workers' Compensation Program," *U.S. Department of the Interior*, available at https://www.doi.gov/pmb/hr/workerscompensation, accessed on February 7, 2022.
- "Global Ratings Definitions," *Standard & Poor's*, November 10, 2021, available at https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352, accessed on February 9, 2022.

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC with Small Company Premium
### Using Comparable Companies Identified in Ms. Austin Smith's Comparable Companies Analysis[1]

| Cost of Equity - Modified Capital Asset Pricing Model (CAPM)[2] | Ms. Austin Smith's Corrected WACC | | | Ms. Austin Smith's Corrected WACC with Small Company Premium | | |
|---|---|---|---|---|---|---|
| Risk-free rate | | | 3.2% | | | 3.2% |
| Market equity risk premium | | 6.2% | | | 6.2% | |
| Relevered beta[3] | x | 0.85 | | x | 0.85 | |
| Beta adjusted equity risk premium[4] | | | 5.2% | | | 5.2% |
| Size premium | | | 0.0% | | | 1.9% |
| Company-specific risk adjustment | | | 0.0% | | | 0.0% |
| **Estimated cost of equity** | | | **8.5%** | | | **10.3%** |

| Cost of Debt[5] | Interest Rate | Weight | Weighted Cost | Interest Rate | Weight | Weighted Cost |
|---|---|---|---|---|---|---|
| Pre-tax cost of debt (pro forma) | | | | | | |
| Term Loan B | 5.3% | 97.0% | 5.1% | 5.3% | 97.0% | 5.1% |
| Weighted average pre-tax cost of debt[6] | | | 5.1% | | | 5.1% |
| Tax-effect on cost of debt | | 40.0% | -2.0% | | 40.0% | -2.0% |
| **Estimated after-tax cost of debt** | | | **3.1%** | | | **3.1%** |

| Weighted Average Cost of Capital (WACC) | Cost of Capital | | % in Capital Structure | Weighted Cost | Cost of Capital | | % in Capital Structure[7] | Weighted Cost |
|---|---|---|---|---|---|---|---|---|
| Debt | 3.1% | x | 23.4% | 0.7% | 3.1% | x | 23.4% | 0.7% |
| Equity | 8.5% | x | 76.6% | 6.5% | 10.3% | x | 76.6% | 7.9% |
| **Estimated WACC** | | | | **7.2%** | | | | **8.6%** |

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC with Small Company Premium
### Using Comparable Companies Identified in Ms. Austin Smith's
### Comparable Companies Analysis[1]

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*")

Note:
[1] The corrected WACC of 7.2% is based on Ms. Austin Smith's *five* comparable companies from her comparable companies analysis, which are Alere Inc., Bio-Reference Laboratories Inc., Laboratory Corp. of America Holdings, Myriad Genetics Inc., and Quest Diagnostics Inc.  Austin Smith Report, ¶ 151. The WACC of 14.8% is estimated based on a different set of *eight* comparable companies than Ms. Austin Smith's set.  This different set includes three additional companies: Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.  WACC Underlying Materials, "Beta" tab.  For details, see Appendix F.
[2] CAPM refers to the Capital Asset Pricing Model.  According to Holthausen and Zmijewski, *Corporate Valuation*, "[t]he expected return of an individual security in the CAPM is equal to the return on the risk-free asset plus a risk premium. The risk premium is equal to the risk of the security relative to the risk in the market multiplied by the risk premium for holding the market portfolio."  Beta is the "risk of an individual security relative to the market."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.  "The cost of capital in the CAPM [...] is equal to the risk-free rate plus one risk premium."  Holthausen and Zmijewski, *Corporate Valuation*, p. 328.
[3] For the relevered beta, I use the average of the unlevered betas of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis, as calculated in the WACC Underlying Materials, relevered to the average capital structure of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis. See Appendix F for more details on the de- and re-levering process used to adjust the comparable companies' betas.  According to Holthausen and Zmijewski, *Corporate Valuation*, "we first measure the CAPM common equity betas of the comparable companies and potentially the company we are valuing (if it is publicly traded) and then unlever the common equity betas to measure the unlevered beta for the company we are valuing. Once we measure the unlevered beta for the company we are valuing ... we lever the unlevered beta to measure the equity beta of the company we are valuing."  Holthausen and Zmijewski, *Corporate Valuation*, p. 453.
[4] Beta adjusted equity risk premium is equal to the product of the relevered beta and the market equity risk premium.
[5] The cost of debt reflects lenders "required or expected rate of return, which is based on the timing, magnitude, and riskiness of the expected cash flows."  Holthausen and Zmijewski, *Corporate Valuation*, p. 395.
[6] Cost of debt is weighted by Term Loan B's share of Millennium's pro forma total debt as of March 31, 2014 (97%).  WACC Underlying Materials, "Sources&Uses" tab.
[7] The capital structure represents the capital structure of the comparable companies.  The corrected WACC of 7.2% is estimated using the average capital structure of the five comparable companies identified by Ms. Austin Smith. The 14.8% WACC is based on a different set of eight comparable companies compared to Ms. Austin Smith's five comparable companies.  WACC Underlying Materials, "Beta" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX E1**

## *In Re Millennium Lab Holdings II, LLC*
## Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
### *($ millions)*

|  | Selected WACCs[3] | | | |
|---|---|---|---|---|
|  | **14.8%** | **9.8%** | **8.6%** | **7.2%** |
| **Millennium's Enterprise Value Based on Ms. Austin Smith's Modified Padres Projections**[4] | $802.86 | $1,279.42 | $1,512.56 | $1,970.83 |
| **Millennium's Equity Value Based on Ms. Austin Smith's Modified Padres Projections**[5] | -$958.89 | -$482.32 | -$249.18 | $209.08 |
| **Marginal Impact on Millennium's Equity Value**[6] | **Marginal Increase** | | | |
| Modify Ms. Austin Smith's treatment of operating expenses[7] | $220.73 | $393.33 | $478.19 | $645.30 |
| Modify reduction of 15% in 2015 and 15% in 2016 to UDT and PGT specimen volume due to the purported reputational impact of the DOJ settlement[8] | $383.75 | $690.50 | $841.43 | $1,138.69 |
| Restore Emerging Opportunities[9] | $192.82 | $381.57 | $476.11 | $663.63 |
| Modify Medicare and Commercial Payors UDT specimen volume growth rate adjustments from 2014 through 2020[10] | $155.01 | $293.49 | $362.46 | $498.99 |
| Modify adjustment of 1Q2014 Medicare NRPS for MUE denials[11] | $87.93 | $140.78 | $166.59 | $217.28 |
| Modify 1.6% reduction in UDT specimen volume in July 2014 due to the discontinuance of the POC Free Test Cup Program | $17.36 | $28.74 | $34.30 | $45.20 |
| Modify 21.8% reduction in Commercial Payor's NRPS in July 2015 due to the discontinuance of custom profiles | $101.62 | $183.72 | $224.14 | $303.77 |

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                                    **APPENDIX E1**

## *In Re Millennium Lab Holdings II, LLC*
## Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
### *($ millions)*

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium
Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] Equity value is calculated as the difference between Millennium's enterprise value and $1,761.7 million—the level of outstanding debt incurred by Millennium associated with the Term Loan B transaction.
Austin Smith Report, ¶ 145.  Marginal impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections from the equity value after applying each modification.
[2] I do not modify Ms. Austin Smith's Medicare net revenue per specimen ("NRPS") decrease attributable to the draft Noridian local coverage determination ("LCD"), Austin Smith Report, ¶¶ 120–123.  In
addition, I do not modify various other changes in Ms. Austin Smith's Modified Padres Projections relative to the Padres Projections, such as the use of actual first quarter 2014 ("1Q2014") financial results
as opposed to Padres Projections for 1Q2014.  As I do not fully revert Ms. Austin Smith's mechanical changes to the Padres Projections, I refer to the changes described above as modifications to Ms.
Austin Smith's adjustments.  Austin Smith Report, ¶ 110.
[3] WACC refers to the Weighted Average Cost of Capital.  14.8% reflects Ms. Austin Smith's WACC, Austin Smith Report, ¶ 143.   See Appendix D for a description of the WACC values.
[4] These figures show Millennium's enterprise value at the selected WACCs without any modifications to Ms. Austin Smith's Modified Padres Projections.
[5] These figures show Millennium's equity value at the selected WACCs without any modifications to Ms. Austin Smith's Modified Padres Projections.  A positive value implies that Millennium would be
balance sheet solvent.
[6] A positive marginal impact on equity value associated with a modification means that the modification increases Millennium's equity value relative to the equity value based on the Modified Padres
Projections at selected WACCs.
[7] This modification adjusts Ms. Austin Smith's operating expenses to a constant percentage of revenues (38%), which corresponds to Ms. Austin Smith's projected operating expenses as a percentage of
revenues in 2014.  The marginal impact reflects the impact on unlevered free cash flow of the difference between Ms. Austin Smith's projected operating expenses in the Modified Padres Projections and
operating expenses maintained at 38% of revenues.  (See Section V.C.2 and Exhibit 6C for a detailed description.)
[8] UDT refers to Millennium's urine drug testing business.  PGT refers to Millennium's pharmacogenetics business.  DOJ refers to the U.S. Department of Justice.
[9] This modification restores the revenue and expenses associated with the Padres Projections' Emerging Opportunities.
[10] Reflects the impact of modification to Ms. Austin Smith's UDT volume growth rate adjustments for Medicare and Commercial payors.  Ms. Austin Smith reduces Medicare and Commercial Payor specimen
volume growth rates to 0.0% in 2014, 2.0% in 2015, and 3.0% in 2016 and onwards, and to 10.0% in 2014, 5.0% in 2015, and 3.0% in 2016 and onwards respectively.  In this modification I restore the
Padres Projections' specimen volume growth rates for Medicare and Commercial Payors.  Austin Smith Report, ¶ 109.
[11] MUEs refer to Medically Unlikely Edits.  This item reflects modifications to Ms. Austin Smith's modeling of an NRPS decrease for January, February, and March 2014 (1Q2014) by $77.7, $83.7, and $82.1,
respectively.  Austin Smith Report, ¶ 118 and YAS Workpaper 1, "MUE w LCD Adjustment" tab.

## *In Re Millennium Lab Holdings II, LLC*
### Combined Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments at a 8.6% WACC[1]

| Millennium Equity Value at a 8.6% WACC[2] | Combined Impact of Exhibit 1 Adjustments at a 8.6% WACC[3] | Percentage of Combined Impact Applied to Equity Value | Amount of Combined Impact Applied to Equity Value | Equity Value Adjusting for Combined Impact[4] |
|---|---|---|---|---|
| [A] | [B] | [C] | [D] = [B] x [C] | [E] = [A] + [D] |
| -$249.18 | $2,271.72 | 0% | $0.00 | -$249.18 |
| -$249.18 | $2,271.72 | 10% | $227.17 | -$22.01 |
| -$249.18 | $2,271.72 | 20% | $454.34 | $205.16 |
| -$249.18 | $2,271.72 | 30% | $681.51 | $432.33 |
| -$249.18 | $2,271.72 | 40% | $908.69 | $659.50 |
| -$249.18 | $2,271.72 | 50% | $1,135.86 | $886.67 |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] WACC refers to the Weighted Average Cost of Capital.  See Appendix D for a detailed derivation of the WACC figure.
[2] Reflects Millennium's equity value at a 8.6% WACC without any modifications to the Modified Padres projections.
[3] Combined impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections at a 8.6% WACC from the equity value after applying all modifications listed in Exhibit 1 at a 8.6% WACC.  Austin Smith Report, ¶ 145.
[4] Under a 0% modification, the figure reflects Millennium's equity value at a 8.6% WACC without any modifications to the Modified Padres Projections.  A positive value implies that Millennium would be balance sheet solvent following the relevant adjustment to the combined impact.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    APPENDIX F

# Appendix F: WACC Corrections

### A. Background and definition of the WACC

1.  WACC is the weighted average of the cost of all of a company's sources of capital.[1]  For a company with only debt and equity the WACC is calculated using this formula:

$$WACC = \frac{Debt}{(Debt + Equity)} * (After\ Tax\ Cost\ of\ Debt) + \frac{Equity}{(Debt + Equity)} * (Cost\ of\ Equity)$$

### B. Cost of Equity

2.  A company's cost of equity is commonly based on the Capital Asset Pricing Model ("CAPM").  In the CAPM, the cost of equity is calculated using the following equation:[2]

$$E(R_i) = R_F + \beta_i * (E(R_M) - R_F)$$

3.  Where $E(R_i)$ represents the expected return for company $i$, $R_F$ represents the risk-free rate, $\beta_i$ represents the company's beta (the covariance of the company's stock returns with the market's returns), and $E(R_M)$ represents the expected return of the market as a whole.  The term $(E(R_M) - R_F)$ is the market risk premium.

4.  A company's beta "indicates the stock's risk relative to the average risk of the stocks in [a] market index."[3]  In the case of a publicly traded company, beta can be directly estimated using the company's publicly available stock returns.[4]  However, it is not possible to directly estimate a beta for companies that are not publicly traded, such as Millennium.  One approach to estimating

---

[1] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 11, p. 485.

[2] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 329.

[3] The relation between beta and systematic risk can be described as: "For example, if a stock has price movements (as a percentage) that are generally the same as the market portfolio on average, then the stock should have a beta equal to 1.  If a stock has a beta of 1, we would expect it to earn a return of 5% above the risk-free return on a day the market earned 5% above the risk-free return.  We would expect it to earn 5% below the risk-free return on a day the market earned 5% below the risk-free return.  If another stock has a beta of 2, we would expect it to earn a return of 10% above the risk-free return on a day the market earned 5% above the risk-free return."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.

[4] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 338.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX F**

the cost of equity for privately held companies is to use the betas of publicly traded companies that are comparable to the target company.[5]  The WACC Underlying Materials adopt this approach to estimate Millennium's cost of equity.[6]

5.        To account for differences in capital structure when using the betas of comparable companies to estimate the beta of a privately held company it is necessary adjust each estimated beta for the capital structure of the comparable company.[7]  This process is known as de-levering the beta and involves reducing the estimated beta based on the fraction of debt in a company's capital structure to arrive at the company's "unlevered beta" which reflects "the risk of the unlevered assets of a firm."[8]  These unlevered betas form the basis for estimating the privately held company's unlevered beta.  After estimating the unlevered beta for the company, "[i]f we are using the weighted average cost of capital method to value the company, we lever the unlevered [beta] for the expected capital structure, often called the target capital structure, of the company we are valuing in order to measure the company's equity cost of capital."[9]

6.        The WACC Underlying Materials follow this practice and use the following formula to de-lever the estimated betas from the comparable companies:[10]

$$\beta_U = \frac{\beta_L}{1 + \left((1 - tax\ rate) * \left(Debt/_{Equity}\right)\right)}$$

7.        Where $\beta_U$ represents the unlevered Beta, $\beta_L$ represents the estimated levered beta, "Debt" refers to the percentage of the company's enterprise value composed of debt, and "Equity" refers

---

[5] Damodaran, *Investment Valuation*, Chapter. 24, p. 6.  Holthausen and Zmijewski, *Corporate Valuation*, p. 437.

[6] VPA Solvency Analysis, VP_ML_00002551, ("WACC Underlying Materials"), tab "Beta."  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 340 ("[A] company's equity beta, or systematic risk, has two sources of risk— financial risk and business risk or operating risk.  Financial risk is the risk that results from the fixed cost associated with financial leverage (interest payments or preferred stock dividends—payments with priority over distributions to equityholders).  Financial leverage results from fixed financing costs (interest on debt or preferred dividends).  A company with a higher degree of financial leverage will have a common stock with higher systematic risk, or a higher beta, relative to what its beta would be with lower levels of leverage. We refer to the beta of a company's operating or business risk as its unlevered beta or asset beta.").

[7] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, pp. 437–438.

[8] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 437.

[9] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 437.

[10] WACC Underlying Materials," "Beta" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX F**

to the percentage of the company's enterprise value composed of equity.[11]  To calculate the re-levered beta, the same formula can be used after the appropriate re-arrangement:

$$\beta_L = \beta_U * (1 + (1 - tax\ rate) * (^{Debt}/_{Equity}))$$

### C.  Corrections to Ms. Austin Smith's WACC

8.      In estimating Millennium's re-levered beta, the WACC Underlying Materials do not use the average unlevered beta of the comparable companies (which was 0.77), but instead use an unlevered beta of 1.[12]  Since the underlying materials present no support for using 1.0 for the unlevered beta (rather than 0.77),  I instead estimate Millennium's beta based on the average unlevered beta of the comparable companies, in line with the methodology described above.[13]

9.      Moreover, the underlying materials for the WACC estimation use a set of *eight* comparable companies to estimate beta and Millennium's target capital structure.[14]  In correcting Ms. Austin Smith's WACC, I instead use the subset of *five* comparable companies identified in Ms. Austin Smith's comparable companies analysis to estimate Millennium's beta and capital structure.[15]  Specifically, based on Ms. Austin Smith's five comparable companies and using the betas presented in the underlying materials, the average unlevered beta is 0.72 and the average capital structure is 23.4% debt and 76.6% equity and hence, Millennium's re-levered beta is 0.85. The results are shown in **Exhibit 4**.  I make no other corrections.  To avoid any inconsistency, I also use the capital structure based on Ms. Austin Smith's five comparable companies to weight the cost of equity and debt when calculating the WACC.  As shown in **Exhibit 4**, this results in a corrected WACC of 7.2%.

---

[11] See, for example, Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 452; Damodaran, *Investment Valuation* Chapter 8, p. 20.

[12] WACC Underlying Materials.

[13] I use the betas calculated in the WACC Underlying Materials throughout my analysis.

[14] The companies identified as comparable in the beta estimation of the VPA Solvency Analysis are Alere, Inc., Bio-Reference Laboratories Inc., Cepheid, Genomic Health Inc., Laboratory Corp. of America Holdings, Meridian Bioscience, Inc., Myriad Genetics Inc., and Quest Diagnostics, Inc, ("eight comparable companies"). VPA Solvency Analysis at ML_DE_00263292.

[15] Ms. Austin Smith identifies only a subset of five for her comparable companies analysis, namely, Alere, Bio-Reference Laboratories, Laboratory Corp. of America Holdings, Myriad Genetics, and Quest Diagnostics.  Austin Smith Report, Appendix B.2.

10.     In **Appendix D**, I provide the corrections to the WACC as shown in **Exhibit 4**, but do not remove the size premium in the cost of equity, despite the fact that it lacks academic support. When I include the size premium but otherwise make the same corrections as detailed in **Exhibit 4**, the WACC is 8.6%.  This 8.6% is well below the 10.0% Ms. Austin Smith claims in her report to calculate using her comparable companies with a size premium.[16]  Ms. Austin Smith provides no material or backup for her calculations.

---

[16] Austin Smith Report ¶ 148, FN 285.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**    **APPENDIX G**

## *In Re Millennium Lab Holdings II, LLC*
## Selected Fact Witness Depositions

| Witness | Entity | Title |
|---|---|---|
| Martin Price | Millennium Laboratories, LLC | General Counsel |
| William Brock Hardaway | Millennium Laboratories, LLC | Chief Executive Officer |
| Tim Kennedy | Millennium Laboratories, LLC | Chief Financial Officer |
| Jennifer M. Mulloy | TA Associates | Managing Director |
| Daniel Pencak | Millennium Laboratories, LLC | Vice President of Financial Planning and Analysis |
| Ryan Griswold | J.P. Morgan Chase | Vice President, Leveraged Finance |
| David M. Felty | SunTrust | Director |
| Michael Tortora | Citibank | Vice President, Leveraged Finance |
| Phillip Ho | BMO Harris | Director |

Source: Deposition of Martin Price, April 12, 2021; Deposition of William Brock Hardaway, July 20, 2021; Deposition of Tim Kennedy, September 30, 2021; Deposition of Jennifer M. Mulloy, July 14, 2021; Deposition of Daniel Pencak, July 12, 2021; Deposition of Ryan Griswold, July 22, 2021; Deposition of David M. Felty, July 27, 2021; Deposition of Michael Tortora, July 15, 2021; Deposition of Phillip Ho, July 28, 2021.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                              **APPENDIX H1A**

## *In Re Millennium Lab Holdings II, LLC*
## Padres and Modified Padres Revenue Projections
## *($ Millions)*

| Revenue Projections | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Padres | $733.28 | $788.76 | $853.08 | $933.01 | $1,008.08 | $1,070.62 | $1,134.68 |
| *Annual growth rate* | | 7.6% | 8.2% | 9.4% | 8.0% | 6.2% | 6.0% |
| *Cumulative growth rate since 2014* | | 7.6% | 16.3% | 27.2% | 37.5% | 46.0% | 54.7% |
| Modified Padres | $676.86 | $573.08 | $487.66 | $517.79 | $540.90 | $559.99 | $577.02 |
| *Annual Growth rate* | | -15.3% | -14.9% | 6.2% | 4.5% | 3.5% | 3.0% |
| *Cumulative growth rate since 2014* | | -15.3% | -28.0% | -23.5% | -20.1% | -17.3% | -14.8% |
| *Modified Padres Projections as a Percentage of Padres Projections* | 92.31% | 72.66% | 57.16% | 55.50% | 53.66% | 52.30% | 50.85% |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                                    **APPENDIX H1B**

## *In Re Millennium Lab Holdings II, LLC*
### Padres and Modified Padres UDT Specimen Volume Projections

| Projection Type | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Compound Annual Growth Rate[1] |
|---|---|---|---|---|---|---|---|---|
| **Combined Projections** | | | | | | | | |
| **Padres** | 2,787,261 | 3,046,046 | 3,350,651 | 3,685,713 | 4,054,287 | 4,257,003 | 4,469,856 | 8.2% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | 5.0% | 5.0% | |
| **Modified Padres** | 2,653,277 | 2,395,870 | 2,162,041 | 2,305,937 | 2,461,021 | 2,534,852 | 2,610,897 | -0.3% |
| *Growth rate* | | -9.7% | -9.8% | 6.7% | 6.7% | 3.0% | 3.0% | |
| **Projections by Payor[2]** | | | | | | | | |
| **Padres** | | | | | | | | |
| Medicare | 517,976 | 566,068 | 622,675 | 684,942 | 753,437 | - | - | 9.8% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | | | |
| Commercial Payors | 946,699 | 1,034,596 | 1,138,056 | 1,251,860 | 1,377,047 | - | - | 9.8% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | - | - | |
| **Modified Padres** | | | | | | | | |
| Medicare | 423,228 | 359,691 | 313,647 | 323,056 | 332,748 | - | - | -5.8% |
| *Growth rate* | | -15.0% | -12.8% | 3.0% | 3.0% | - | - | |
| Commercial Payors | 917,208 | 830,322 | 733,655 | 755,665 | 778,335 | - | - | -4.0% |
| *Growth rate* | | -9.5% | -11.6% | 3.0% | 3.0% | - | - | |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] Compound annual growth rate ("CAGR") is the annualized average growth rate between two time periods assuming that growth takes place at an exponentially compounded rate between those two time periods.  In this instance, CAGR is calculated as (Specimen Volume in 2020 / Specimen Volume in 2014)^(1/6)-1.
[2] By-payor breakdowns of specimen volume are not available in either the Padres Projections or the Modified Padres Projections between 2019–2020.  Commercial payors are those payors in the group consisting of Aetna, Blue Cross Blue Shield, Cigna, Humana, and United Healthcare.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**   **APPENDIX H2A**

## *In Re Millennium Lab Holdings II, LLC*
## Projected Cash Flows and Term Loan B Required Debt Service Payments
### Modifications to Ms. Austin Smith's Adjustments of the Padres Projections[1]
### *($ Millions)*

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance[2] | $50.00 | $62.29 | $85.07 | $106.85 | $181.81 | $260.28 | $367.88 |
| *Plus*: Unlevered Free Cash Flow[3] | $131.86 | $198.41 | $198.87 | $220.77 | $233.97 | $276.43 | $291.82 |
| Total Cash Available to Pay Debt | $181.86 | $260.70 | $283.94 | $327.62 | $415.79 | $536.71 | $659.70 |
| *Less*: Total Mandatory Debt Payments | $119.58 | $175.63 | $177.08 | $145.80 | $155.51 | $168.82 | $134.50 |
| Ending Cash Balance | $62.29 | $85.07 | $106.85 | $181.81 | $260.28 | $367.88 | $525.21 |

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections");
   Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015", July 27, 2015, ML_DE_00079584

Note:
[1] Reflects Millennium's projected ending cash balance following the application of the modifications described in Exhibit 1. Ending cash balance is defined as the beginning cash balance + Unlevered Free Cash Flow - (Term Loan B Interest Payments + Term Loan B Principal Amortization Payments + Term Loan B Cash Sweep - Non-Term Loan B Principal Amortization Payments). A positive ending cash balance indicates that Millennium had the ability to service the interest payments associated with the Term Loan B transaction.
[2] Millennium's minimum operating cash in each year is $50 million.
[3] Unlevered free cash flow for the purposes of this analysis is defined as the free cash flow available to Millennium in the absence of Term Loan B related interest expenses and amortization payments, i.e. Free Cash Flow + Term Loan B Interest Payments + Term Loan B Principal Amortization Payments.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**     **APPENDIX H2B**

## *In Re Millennium Lab Holdings II, LLC*
### Projected Cash Flows and Term Loan B Required Debt Service Payments
Modification to Ms. Austin Smith's Specimen Volume Adjustment Due to the Impact of the Department of Justice Settlement[1]
*($ Millions)*

|  | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance[2] | $50.00 | $58.68 | $72.55 | $79.66 | $84.73 | $86.07 | $89.76 |
| *Plus*: Unlevered Free Cash Flow[3] | $117.61 | $163.95 | $143.60 | $148.94 | $145.15 | $161.41 | $165.32 |
| Total Cash Available to Pay Debt | $167.61 | $222.63 | $216.15 | $228.61 | $229.88 | $247.48 | $255.08 |
| *Less*: Total Mandatory Debt Payments | $108.93 | $150.07 | $136.49 | $143.87 | $143.81 | $157.72 | $161.76 |
| Ending Cash Balance | $58.68 | $72.55 | $79.66 | $84.73 | $86.07 | $89.76 | $93.32 |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015", July 27, 2015, ML_DE_00079584

Note:

[1] Reflects Millennium's projected ending cash balance following modification to the adjustment of 15% in 2015 and 15% in 2016 Urinary Drug Testing and Pharmacogenetic specimen volume reduction due to the purported reputational impact of the Department of Justice settlement.  Ending cash balance is defined as the beginning cash balance + Unlevered Free Cash Flow - (Term Loan B Interest Payments + Term Loan B Principal Amortization Payments + Term Loan B Cash Sweep - Non-Term Loan B Principal Amortization Payments).  A positive ending cash balance indicates that Millennium had the ability to service the interest payments associated with the Term Loan B transaction.

[2] Millennium's minimum operating cash in each year is $50 million.

[3] Unlevered free cash flow for the purposes of this analysis is defined as the free cash flow available to Millennium in the absence of Term Loan B related interest expenses and amortization payments, i.e. Free Cash Flow + Term Loan B Interest Payments + Term Loan B Principal Amortization Payments.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX H3A**

### *In Re Millennium Lab Holdings LLC, II*
### Projected Leverage Ratios
Modifications to Ms. Austin Smith's Adjustments of the Padres Projections[1]
*($ Millions)*

| | 1Q2014 | 2Q2014 | 3Q2014 | 4Q2014 | 2014 | 1Q2015 | 2Q2015 | 3Q2015 | 4Q2015 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leverage Ratio**[1] | 4.66x | 4.48x | 4.33x | 4.04x | 4.04x | 3.81x | 3.71x | 3.68x | 3.61x | 3.61x | 3.28x | 2.73x | 2.30x | 1.83x | 1.44x |

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:

[1] Reflects Millennium's leverage ratio in each period following the implementation of the modifications made to the Modified Padres Projections as outlined in Exhibit 1.  Leverage ratio reflects net leverage including PNC notes and capital leases as defined in the Padres Projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**APPENDIX H3B**

### *In Re Millennium Lab Holdings LLC, II*
### Projected Leverage Ratios

Modification to Ms. Austin Smith's Specimen Volume Adjustment Due to the Impact of the Department of Justice Settlement[1]
*($ Millions)*

| | 1Q2014 | 2Q2014 | 3Q2014 | 4Q2014 | 2014 | 1Q2015 | 2Q2015 | 3Q2015 | 4Q2015 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leverage Ratio**[1] | 4.66x | 4.73x | 4.76x | 4.62x | 4.62x | 4.57x | 4.70x | 4.90x | 4.85x | 4.85x | 5.26x | 4.97x | 4.89x | 4.61x | 4.39x |

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] Reflects Millennium's leverage ratio in each period following the adjustment of 15% in 2015 and 15% in 2016 Urinary Drug Testing and Pharmacogenetic Testing specimen volume reduction due to the purported reputational impact of the Department of Justice settlement.  Leverage ratio reflects net leverage including PNC notes and capital leases as defined in the Padres Projections.

# REDACTED EXHIBIT 3

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
---------------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
          Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,
          Plaintiff,

     - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,
          Defendants.
---------------------------------------------X
                    May 5, 2022
                    10:04 a.m.


          CONFIDENTIAL TRANSCRIPT


          Remote video-teleconference
deposition via Zoom of AMY HUTTON,
pursuant to notice, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.

HUTTON - CONFIDENTIAL

kicked the tires on their analyses and made sure that I felt that they had done it well and to my high standards.

Q.     Those analyses I guess were presented to you as a member of the board?

A.     Yes.

Q.     And that's pretty standard for that type of large transaction, right, that you would show the board your work so they could kick the tires?

A.     Yes, I would say that I was more inquisitive perhaps than some of the other board members given my particular interest in valuation.

Q.     When you probed the model, did you probe things like the discount rate, the cash flows, all of those inputs?

A.     I did.

Q.     Either at Chemical Bank or at Bandag, did you ever perform a ground-up valuation where you put the now Professor Hutton stamp of approval on it?

MR. POPOVSKY:  Objection to form.

HUTTON - CONFIDENTIAL

A.        Well, I don't believe that I performed a ground-up valuation.

As a valuation expert, I think what I did was I assessed the quality of the valuation done by a third party.

Q.        Have you ever done a ground-up valuation of a private company for the purpose of making a business decision?

A.        For the purpose of making a business decision; only in the context of the cases that I teach.

So I don't think it's a business decision that had my skin in the game, for instance.

Q.        You mentioned your prior engagements with expert testimony, so I'm going to turn to that exhibit to your expert report here, it is Appendix B, I guess.

I want to be clear, this is the entirety of your prior testimony, right, there aren't old cases that have fallen off the list?

A.        No, this is the entirety of my

HUTTON - CONFIDENTIAL testimony.

Q.    In any of these either depositions or these cases, arbitrations, were you asked to build from the ground up a valuation of a company or were you always responding to some other expert's report?

A.    I believe, as I recall sitting here today, that I was responding to others' initial report ground-up valuations and I would critique the quality of those.

Q.    Let's look at the first one, Move, Inc., versus Zillow, Inc., do you recall that from 2016?

A.    I do.

MR. POPOVSKY:  Just before you ask her your next question, counsel, when you turn to the side the volume drops precipitously, at least where we're sitting, it is a little hard when you're not facing forward.

MR. NEWCOMER:  My apologies.

Q.    Dr. Hutton, if that ever

HUTTON - CONFIDENTIAL

some highlighting on the document, I don't know if that was on the original or if that's something you applied.

MR. NEWCOMER:  I actually don't know, but let's just assume the highlighting is something that me or one of my associates put on to draw your attention to where I'm looking.

Thank you, Mark.

Q.    Do you see paragraph 42?

A.    I do.

Q.    In this paragraph you opined that the company Move, Inc., required a higher WACC than was calculated from the guideline public companies, GPCs, because it was a riskier startup than the GPCs, right?

A.    No, that's not what I'm saying, let's read it carefully.

What I say here is they use a median unlevered beta of a set of publicly traded companies and I say here usually a higher discount rate is applied to a new unproven investment and what's important

HUTTON - CONFIDENTIAL

here, and this is as I recall, ListHub Platform is a small piece of Move, it's not Move, it's an investment they're choosing to make to build out this ListHub Platform, and when you're making an investment, you are usually using something like a hurdle rate and you are assessing that investment as what's the opportunity cost for me to make this investment.

And as an internal, within the firm, when you're making this decision, I even discussed this in my current report, if you're TA Associates and you're making a decision about an investment, you're going to use a hurdle rate and that's different than using a weighted average cost of capital.

The decision that you're making is actually a different decision.

Q.    You do say, you do use these words, "Given the riskiness of the projected cash flows of the ListHub Platform products, management's proposed

HUTTON - CONFIDENTIAL

WACC of 15.3 percent is not an appropriate discount rate," right?

A.      Correct.

Q.      And do you stand by that testimony?

A.      So you're taking that one statement out of the fuller richness of the context.

What I want to highlight here is that this is not a valuation exercise, this is an investment decision and when you are making an investment decision, what you're doing is you're asking yourself, I have capital, I have to make a decision about where to invest it, should I invest it in ListHub or not, take the capital and put it elsewhere.

So what I'm really focused on is what is my hurdle rate, what is the benchmark rate of return that is commensurate with the risk, similar to what TA Associates does as a private equity firm.

And when you are making those

HUTTON - CONFIDENTIAL

investments, you recognize that those investments, because you do not have the opportunity in that context to hold a well-diversified portfolio as an entity like Move, you're going to make just a few little investments in ListHub or something else, and TA Associates as a private equity firm, you're going to make a few capital investments, you're not talking about holding the whole market, so you're going to make a different decision and you're going to want to use the hurdle rate for that decision.

That's very different than the way you're characterizing it as the valuation cap rate.

Q.      I just want to be clear; what I asked was do you stand by that opinion, it is a pretty simple yes or no --

A.      I stand by the totality of what's in here, I don't stand by your way of phrasing it.

Q.      Why did you use the term WACC in this sentence?

HUTTON - CONFIDENTIAL

A.          Because I believe that's what management referred to it as.

And I should be clear that the WACC is a weighted average cost of capital, so it puts together the equity rate of return and the debt rate of return, so it builds into it an understanding of what the capital structure is for that entity that you're trying to value.

In the context of an investment decision, you can go back to Modigliani-Miller, and we know that capital structure doesn't matter as to how you think about investments and what you're interested in there is a cost of capital that reflects the riskiness of that investment, which is a different decision.

Q.          You go on to say, "Given how sensitive any DCF analysis is to the choice of discount rate, the best approach is to conduct a sensitivity analysis and to present DCF valuations for a range of

HUTTON - CONFIDENTIAL

discount rates, which Professor Cornell did not do," do you see that?

A.      I do.

Q.      I just want to be clear, in this case Ms. Austin Smith did present a sensitivity analysis for a range of her discounts, right?

MR. POPOVSKY:  Objection to form.

A.      Well, Ms. Austin Smith's WACC in this matter is dramatically overstated such that her range of sensitivity didn't quite reach the appropriate range.

Q.      You have not opined on the appropriate range of WACCs in this matter, have you?

A.      What I have done is I have opined on the errors and inconsistencies in Ms. Austin Smith's WACC, and when I correct those errors and inconsistencies I come up with a discount rate corrected for her that is 7.2 and I'm outside the range that she did her sensitivity analysis on.

Q.      I'd appreciate an answer to my

HUTTON - CONFIDENTIAL

Q.      I get that.

My question was about a range of sensitivities, I don't think you have provided a range of sensitivities around 7.2 that you, Professor Hutton, put your name behind, right?

A.      Well, I also provide in Appendix E --  no, Appendix F -- I provide an alternative WACC; if you include the small company risk premium and you add that back to the 7.2, in the analysis I did there I believe you get a WACC of 8.6.

Q.      You provided 8.6 and 7.2 and is that your sensitivity analysis you conducted here?

A.      Well, if you look at my Exhibit 1 closely, you'll see that I also provide for all of the adjustments that Ms. Austin Smith made and when I illustrate the effect of those, I provided both for the 7.2 and her 14.8.

And in addition, in a later appendix, I also provided for the 8.6.

Q.      Which appendix was that, do you

HUTTON - CONFIDENTIAL

recall?

A.      I believe it is Appendix F, I think that's where we did the adjustment.

Q.      Yes, Appendix F is sort of your narrative on how you got to the adjustment, which I'll cover later.

My question is, is there any WACC sensitivity analysis I can find anywhere in your report where I can understand the range of sensitivities that you applied in this case?

MR. POPOVSKY:  Objection to form.

Once again, continues to be asked and answered.

MR. NEWCOMER:  I have not gotten an answer at all.

Q.      Go ahead.

A.      So if you look at Appendix E-1 --

Q.      Yes, I see Appendix E-1, I see selected WACCs there at the top, right?

A.      Correct.

So there is a 14.8; 9.8, which

HUTTON - CONFIDENTIAL

comes from Ms. Austin Smith's footnote 285; 8.6, which is, as I explained, if you include the small company risk premium; and the 7.2, which is Ms. Austin Smith's WACC corrected for the errors and inconsistencies.

Q.      And so this is your, Professor Hutton's, sensitivity analysis here?

MR. POPOVSKY:  Objection to form.

A.      Again, what I do in my report is I respond to what Ms. Austin Smith did and I am demonstrating here for you the effects of the adjustments that she makes and I'm showing them to you using the various discount rates that show up in this context.

Q.      Is your testimony, it is a pretty easy yes or no question, is your testimony that the appropriate sensitivity ranges for the WACCs in this matter is 7.2 percent to 14.8 percent?

A.      No.

Q.      How would you describe

Page 44

HUTTON - CONFIDENTIAL

like Millennium.

A.        Yes, I am.

Q.        Have you ever held any role at a healthcare company?

A.        No, I have not.

Q.        Have you ever held any role at a urine drug testing company?

A.        No, I have not.

Q.        Have you ever analyzed a urine drug testing company outside of this case?

A.        No, I have not.

Q.        Have you ever analyzed Medicare or commercial billing codes to evaluate a medical business outside of this case?

A.        No, I have not.

Q.        Have you ever analyzed Medicare regulations outside of this case?

A.        No, I have not.

Q.        Have you ever dealt with medically unlikely edits outside of this case?

A.        No, I have not.

Q.        Have you ever valued a company subject to a criminal and civil

HUTTON - CONFIDENTIAL

investigation of their business practices by the Federal government outside of this case?

A.        I don't believe so, no.

Q.        I want to discuss your assignments in this matter and I am going to ask some general questions, but if you need to look, it's set out in paragraph 12 of your report.

You were retained in this case to respond to certain opinions by Ms. Austin Smith, right?

A.        That's correct.

Q.        You were not retained in this case to perform an independent sort of ground-up valuation of Millennium, right?

A.        My expertise in this matter as a valuation expert, I am applying that expertise within the framework that Ms. Austin Smith created in her analysis and I am responding to the opinions that she put forth, and in particular, the adjustments that she makes to the Padres projections and I am applying my expertise

HUTTON - CONFIDENTIAL

to highlight where the adjustments she is making are unsupported, because she uses assumptions that she's not validated, and where she's using hindsight, which is a no-no in valuation exercises, and where she is inappropriately applying well-accepted techniques in valuation.

And I want to highlight that techniques for valuation extend across industries and the general approach to how we conduct valuation is not, you know, it applies to all the different industries, including this industry.

Q.      I get that.

But my question was a little different, which is, you have not here performed an independent solvency analysis or valuation of Millennium where you said I, Dr. Hutton, based on my professional opinion, say that Millennium was worth X number to Y number at the time of the 2014 transaction, right?

A.      So what I have done, and one of the things I think is important that I've

HUTTON - CONFIDENTIAL

done, is I've demonstrated that even if you accept --  and I don't think they're correct --  but even if you accept all of the adjustments that Ms. Austin Smith made to the revenues and the expenses implicitly through her adjustments to the Padres projections to get to the modified Padres projections, if you look in Exhibit 1 in my report, what you see is if you simply correct the errors in her WACC, the errors and inconsistencies in her WACC, and use the corrected WACC of 7.2, it demonstrates in Exhibit 1 that in fact that Millennium would have been balance sheet solvent.

So that's a very important reality for Ms. Austin Smith's framework in her set of analyses.

Q.      I get that, but that wasn't my question, so I am going to try this again.

You have not performed an independent solvency analysis where you say I, Dr. Hutton, using standard solvency methods, have determined that Millennium

HUTTON - CONFIDENTIAL

was worth X, Y, or Z value, have you?

MR. POPOVSKY:  Objection to form, asked and answered.

A.    I have been retained by counsel to respond to certain opinions put forth in Ms. Austin Smith's report and that's what's in my report, that's what I have provided you with.

Q.    And is there anywhere in your report where you say I, Professor Amy Hutton, say, based on my professional opinion, that Millennium was worth X number based on my ground-up analysis, not just correcting some of whatever Ms. Austin Smith did, but where you say that, I, Amy Hutton?

MR. POPOVSKY:  Same objection to the same question.

A.    So throughout my report I allow Ms. Austin Smith her framework and I make the corrections and point out unsupported analysis that she presents and unreliable analysis that she presents in order to provide and highlight information that is

HUTTON - CONFIDENTIAL

relevant for assessing whether Millennium was balance sheet solvent at the time of the 2014 transaction.

Q.      You just mentioned balance sheet solvency (poor Internet connection) --

COURT REPORTER:  I'm sorry, you broke up.

Q.      I asked her if she did or didn't form an opinion about the other test for solvency, where you're saying if I correct Ms. Austin Smith's, whatever you think her errors are, that the company was in fact solvent, is that fair?

A.      No, if you look deep into my report, near the end of the report, I also provide analysis where I highlight and correct the errors that Ms. Austin Smith has in her adjustments.

And if you look at Exhibit H-1 and H-2 --  let me find the exact exhibit here --  H-2, in particular H-2-A and H-2-B and H-3-A and H-3-B, those exhibits are very useful for understanding that the

HUTTON - CONFIDENTIAL

conclusions that Ms. Austin Smith drew about Millennium's ability to service its debt were inaccurate and unreliable, and when you back out her inaccurate and unreliable adjustments, you in fact find that Millennium was able to service its debt.

Moreover, Ms. Austin Smith provides the opinion that they had inadequate capital and in Appendix H-3-A and H-3-B, I demonstrate that if you back out her unsupported adjustments, the leverage ratio remains moderate and within a bound that will allow them you can view as either capital adequate or have the ability to raise additional capital.

Q.    I get that and we're going to get to those exhibits in a little bit here.

What, in your opinion, was the value of Millennium as of April 2014?

MR. POPOVSKY:  Objection to form, outside the scope of the opinion.

A.    That was outside the scope of

HUTTON - CONFIDENTIAL

my opinion and what I do in my opinion is I provide you with the --

Q.      I get that, you just said it was outside the scope, so I'm going to move on.

MR. POPOVSKY:  Please let the witness finish her answer.

MR. NEWCOMER:  I think she did.

Q.      But if you have a number that as of April 2014 was the value of Millennium that you're opining on, tell me the number.

MR. POPOVSKY:  Objection to form.

Q.      Is that outside the scope of your opinion?

A.      I was not asked to come up with a number for the value of Millennium in April of 2014.

I was asked to assess certain opinions in Ms. Austin Smith's report and that's what I've done.

Q.      Were there any opinions in this matter that you were asked to provide that

Page 65

HUTTON - CONFIDENTIAL

A.      I'd have to look in the particular paragraph in my report to be sure, but those are the two that come to mind.

Q.      I guess if you discover that paragraph, please let me know as we go through the course of the day, I'm not sure which paragraph you're referring to there.

What was the stage, to your understanding, of the investigation in April of 2014?

MR. POPOVSKY:  Objection to form.

A.      I think it was --  the DOJ was investigating, but I don't know a lot more, other than I know that it had not been decided.

Q.      What had not been decided?

A.      The settlement had not been determined.

Q.      What type of investigation was it?

A.      What type of investigation?

HUTTON - CONFIDENTIAL

Q.      Yes.

MR. POPOVSKY:  Objection to form.

A.      So my understanding is that -- I don't have the legal language that you might be used to for understanding these kinds of things --

Q.      No, just say it in your own words, that's fine.

What type of investigation was it?

A.      So it was --  I don't have a detailed understanding of the investigation that was going on.

Q.      Which government entities were engaged in the investigation?

A.      I think the Department of Justice and perhaps there were other agencies, maybe state agencies, I don't recall.

Q.      Other than the DOJ and state agencies, anyone else or any other agencies?

A.      I'm sorry, I don't recall.

HUTTON - CONFIDENTIAL

Q.        What's your understanding of the penalties, and I don't mean that in the legal way, like what were the possibilities of what could happen to Millennium as a result of those investigations?

MR. POPOVSKY:  Is there a time period you're asking that question about specifically?

MR. NEWCOMER:  Yes, sorry if I wasn't clear, let me ask that again.

Q.        As of the time of the 2014 transaction, what were the penalties, outcomes, potentialities, of that investigation?

MR. POPOVSKY:  Objection to form.

A.        So my understanding is that Department of Justice was investigating and that there was a chance that things would --  that there would be a penalty imposed on Millennium, some kind of fine or fees that would be imposed.

It is also my understanding

HUTTON - CONFIDENTIAL

that Ms. Austin Smith in adjusting the Padres projections for an eventuality, she relied on some unvalidated assumptions in order to come up with the adjustments that she made and I talk about those in detail in my report and that's where I focused my efforts and understanding of what happened with the DOJ.

It's also very clear that the outcome was not determined as of April 2014 and that that outcome materialized much later.

Q.     Other than maybe a penalty or fine, whatever you mentioned in the first part of your answer there, are you aware of any other consequences for Millennium that could have resulted from that investigation?

A.     With the fact that Ms. Austin Smith's analysis, she focuses on what she calls a reputational effect of the DOJ settlement and she looks at Ameritox and Calloway as two companies in the same industry who had had settlements with the

HUTTON - CONFIDENTIAL

DOJ and she argues that the loss of business that they experienced, she makes an assumption that management should have expected a similar loss of reputation and loss of business if they had a negative outcome with respect to the DOJ.

I take issue with that assumption, as she provides no basis for it.

Moreover, she also doesn't validate the magnitude of their loss of business or why it happened.

So in my mind, Ms. Austin Smith conflates correlation with causation and does not provide a reliable basis for the adjustment that she makes.

Q.        I get that, but my question was about your understanding of the investigation, so I want to go back to that.

Based on your understanding of the DOJ investigation -- and just to be clear, I will get to your criticisms of Ms. Austin Smith's methodology later, but

HUTTON - CONFIDENTIAL

I want to understand what you know about the investigation.

Other than the fines and penalties you mentioned, what are your understandings of the potential consequences to the company of the investigation?

A.        That is the only sort of observable thing.

I am not sure I agree with Ms. Austin Smith's argument that there could be a reputational effect.

I also understand that one of the things she did not take into consideration is that I guess when there's a settlement like this, a company can have to change its business practices and it's quite possible that some of the loss of business at Ameritox or Calloway may have happened because they changed their business practices.

And if that happens here, I gather that the business practices at issue are the ones I've already mentioned.

HUTTON - CONFIDENTIAL

Q.        Again, are you understanding me okay, because I didn't ask you about Ms. Austin Smith, I was asking about your understanding, I just want to make sure I'm coming across clearly, because --

MR. POPOVSKY:  Counsel, you asked about the consequences of the investigation and she answered about her understanding regarding the consequences of the investigation.

MR. NEWCOMER:  That's okay, I appreciate the colloquy there.

Q.        Let me ask you this.

You mentioned the practices of Ameritox and Calloway that may have been the cause of their declines.

Let's start with Ameritox; what is your understanding of the business practices of Ameritox that were the subject of that investigation?

A.        That is something that Ms. Austin Smith should have provided an understanding of given that she was making the assumption that the decline in their

HUTTON - CONFIDENTIAL

business was driven by reputational effect and not by business effect, she didn't provide any of that, and what I did in my report of course is examine her report.

Q.      Do you sitting here today have any knowledge personally, you, Dr. Hutton, of the business practices at Ameritox that were the subject of the DOJ's investigation and settlement?

MR. POPOVSKY:  Objection, outside the scope.

A.      Because Ms. Austin Smith did not provide an analysis of those to ensure that the decline in the revenues that Ameritox experienced, I don't have knowledge of it.

Q.      How about Calloway, sitting here today do you, Dr. Hutton, have any knowledge of the business practices at Calloway that were the subject of the DOJ investigation or the resulting settlement?

A.      Again, Ms. Austin Smith did not provide in her report an analysis of the business practices that were under

HUTTON - CONFIDENTIAL

question by the DOJ at Calloway, and because she didn't examine those, she didn't have a reliable basis for assuming that the same reduction in business would occur at Millennium if the DOJ ruled against them in the way that it did at Calloway, she makes no reliable assumption there.

Q.      Who at Millennium was responsible for the business decisions that were the subject of the DOJ and other investigations against it?

A.      I don't know.

Q.      Who at Millennium was responsible for ensuring that whatever consequences might befall Millennium because of that investigation, they were adequately and accurately projected in the Padres projections?

A.      So what I do in my report is I assess what Ms. Austin Smith did and what Ms. Austin Smith did not do, she did not provide an analysis of how management incorporated these risks into the Padres

HUTTON - CONFIDENTIAL projections, including the DOJ settlements.

And since she did not provide an analysis for consideration as to how management did it, I did not opine on that.

Q.      As of April 2014, what were the possible outcomes of the DOJ investigation?

MR. POPOVSKY:  Objection to form.

Q.      To your knowledge?

A.      Ms. Austin Smith did not provide us with a sort of probability two-year something that put in the alternative outcomes that could have happened, so I don't have --  she didn't articulate the various ones.

Instead what she did was she merely assumed that because Calloway and Ameritox experienced a decline after the DOJ settlements, that she could take this correlation of a drop in revenues and assume it was caused by the DOJ settlement

HUTTON - CONFIDENTIAL

and attribute a similar sort of decline to Millennium and that's what I point out as being unjustified.

Q.       Did you do anything --  so I understand that Ms. Austin Smith didn't do it.

Is it beyond the scope of your opinion to have gone and personally investigated that issue?

A.       Yes, I'm responding to what Ms. Austin Smith did.

Had she provided more details as to how she could have built an analysis, I would have responded there, but she didn't, she made very simplifying assumptions that were unfounded and unsupported and I highlight that.

Q.       What are medically unlikely edits?

A.       So Ms. Austin Smith describes those in detail in her report, she has even some examples where she explains when they change the basis.

So my understanding is that

HUTTON - CONFIDENTIAL

appears to only be available after the transaction and then she uses it to prorate or extrapolate to what must have been the experience she assumes prior to the transaction.

And what I argue in my report is that she is relying on hindsight there in the sense that she is using information that she has not demonstrated was available to management at the time of the transaction.

Q.       Is it your opinion that management did not know of or could not know of the MUE denials to its billings prior to April 2014?

MR. POPOVSKY:  Objection to form, outside the scope.

A.       Now, what is my opinion here is that Ms. Austin Smith has not demonstrated that it was known or knowable and that she reaches forward in time and uses information --  for this one I get a little confused with all the dates, but I think it is in June or July of 2014,

HUTTON - CONFIDENTIAL

because she uses the full denials from January to July and then infers back and it's not clear that that information was available.

She has not demonstrated that that information was available.

Q.    My question was a little different, so I want to be clear.

Do you, Dr. Hutton, opine that that information about MUE denials was not available or reasonably available to management at the time of the April 2014 opinion, do you have knowledge of whether it was or was not?

A.    What I do is respond to Ms. Austin Smith's report and I highlight where her statements and her assumptions are unreliable and I highlight that she fails to provide us with evidence that this information was available to management at the time of the transaction.

Q.    But my question is different -- well, let me ask it this way.

As a matter of fact, by

HUTTON - CONFIDENTIAL

February 2014 had Millennium received MUE denials?

A.      So --

Q.      As a matter of fact.

A.      I am a rebuttal expert, I am not a fact witness, so I think that question is better answered by a fact witness; I am rebutting Ms. Austin Smith's report.

Q.      Okay.

And if a fact witness answered the question that, yes, MUE denials were known to Millennium by February of 2014, how would that change your opinion?

MR. POPOVSKY:  Objection to form, lacks foundation and calls for speculation.

A.      I would have to know a lot more about what the fact witness had to say, exactly what management knew, how much they knew, how big it was, there would be so many details that would be necessary for me to take into consideration, I can't speculate on that.

HUTTON - CONFIDENTIAL

A.       My opinion highlights the fact that management used its standard practice; I did not opine on the quality of their standard practice.

Q.       And that includes for MUE denials, right, very simple, are you opining on the quality of their practices related to MUE denials?

A.       I am opining on that they used their standard practice.

I am not opining on the quality of their standard practice.

Q.       What is your understanding of how the point-of-care free test cup program impacted management's projections for revenue?

A.       So Ms. Austin Smith highlights and makes modifications to the projections that management provided.

And, again, here she is using hindsight bias in making these; it is my understanding that this point of contact -- point-of-care free test cup program was at issue in the Ameritox

HUTTON - CONFIDENTIAL

litigation and it's my understanding that at the time of the transaction management believed they were going to prevail in the Ameritox litigation.

Nevertheless, Ms. Austin Smith reaches beyond the date of the transaction and uses information from July of 2014 to come up with her estimates of an appropriate adjustment to take into consideration the discontinuation of the point-of-care.

And my concern there is that she has not demonstrated to us that information was available to management; in fact we know that the Ameritox verdict didn't come out until June of 2014 and that in fact she's using information that was not available given that the Ameritox litigation hadn't been determined.

So that's what I highlight in my report.

Q.    Other than the fact that the Ameritox litigation was still pending, do you have any other knowledge about what

HUTTON - CONFIDENTIAL

management knew prior to April 2014 about the appropriateness of their free point-of-care test cups?

A.        I think the reason that they believed they were going to prevail must have something to do with that they had been using it for a long time and they thought it was okay to use.

Q.        Any other reasons?

A.        No, I just have what I have cited for you in my report, Mr. Price's deposition, I believe he is the general counsel, and he says he was expecting to prevail and I --

Q.        Is it your --  sorry, I thought --

A.        He just said more in here, that it advised Millennium that it did not violate the Stark and anti-kickback statutes and all that is in my footnote 134.

Q.        And you believe that a --  let me ask you this.

When you're valuing a company

HUTTON - CONFIDENTIAL

faced with litigation that could have a significant impact on its finances, what is the appropriate methodology for that company to take into account the potential outcomes of that litigation?

MR. POPOVSKY:  Objection to form.

A.    So that is a very general question and to apply it one needs to understand the facts and circumstances that are particular in nature here.

And Ms. Austin Smith approached this in a particular manner and what I do in my report is I rebut, I provide for you an understanding of what she did and how she relied on information in this particular situation that she has not demonstrated was available to management at the time of the transaction.

So that's what's relevant here.

Q.    In your opinion, was it appropriate for Millennium to use the point-of-care free test cup program to induce physician referrals?

HUTTON - CONFIDENTIAL

MR. POPOVSKY:  Objection to form, lacks foundation and outside the scope.

A.      I don't have an opinion on that.

Q.      You mentioned Martin Price's testimony, right?

A.      Yes, his deposition.

Q.      In his deposition, do you recall --  let me ask you this.

Did you review his deposition in full?

A.      I don't believe I reviewed it in full, I looked over it at a high level and I cite it here in footnote 134.

I was particularly interested in what was management's expectation regarding the Ameritox litigation at the time of the valuation and this part of his deposition highlighted what I was interested in understanding, which is that he and his colleagues expected to prevail.

Q.      How did you get that, did you tell someone, hey, this is what I'm

HUTTON - CONFIDENTIAL

interested in the deposition testimony, can you provide me with that testimony, or did somebody else provide you with testimony to cite, how did that work procedurally?

MR. POPOVSKY:  Objection to form.

A.        So, when Ms. Austin Smith presented her report, it was clear that she was using the Ameritox verdict from June of 2014 in a hindsight sort of way.

So what was important for me to understand was the expectation at the time of the valuation and the expectation is what I was interested in understanding and asked the team to --  what was the expectation at the time.

And so at some point, I think we talked about it soon afterwards, but at some point, once we had Ms. Austin Smith's report and Mr. Price's deposition, we could put the two and two together.

Q.        Mr. Price also testified that data on the point-of-care test cup program

HUTTON - CONFIDENTIAL

was available prior to the 2014 transaction and, if someone had asked, could have been used to calculate the same impact that Millennium calculated after the transaction.

Did anybody provide you with that testimony to review for your opinion?

MR. POPOVSKY:  Objection to form, mischaracterizes the testimony and lacks foundation.

If you want to ask about his testimony, you should show it.

MR. NEWCOMER:  I am asking her if she is familiar with that testimony; if I can't prove it at trial, we won't use this portion of the transcript, but he said what he said.

Q.        So my question is, assuming Martin Price testified that the data on the point-of-care free test cup program was available prior to the 2014 transaction and could have been used to calculate the same impact before the transaction, would that change your

HUTTON - CONFIDENTIAL

opinion?

MR. POPOVSKY:  Same objection holds.

A.      I don't understand how that's feasible.

When I read what's right here in black and white in my report, she relies on analysis that Millennium performed in July of 2014 using data on customers that canceled their agreements in June of 2014, so the cancellations themselves occurred after and that's what she's relying on, so how could there be information in April about cancellations that don't happen until June.

Q.      I get what you're saying there.

Did you investigate that, is my question though, and would that change your opinion if the data was available?

MR. POPOVSKY:  Objection to form, asked and answered, calls for speculation.

Q.      Obviously data in June wasn't available, but there was data available

HUTTON - CONFIDENTIAL

prior to June.

Did you do anything to investigate what data was available to management to calculate the impact of discontinuing the point-of-care free test cup program?

MR. POPOVSKY:  Objection, lacks foundation that there was data available.

A.       So Ms. Austin Smith does not provide any analysis of any data prior to June of 2014 and my role in this matter is to respond to certain opinions in Ms. Austin Smith's report.

Had she provided information that you're saying existed, I would have analyzed it, but she did not provide it so I did not analyze it.

Q.       I have another question for you.

You provided a list of materials considered in this matter, right?

A.       Yes.

Q.       Is everything that you

HUTTON - CONFIDENTIAL

considered in this matter only on Ms. Austin Smith's list?

A.        No --

MR. POPOVSKY:  Objection to form.

Q.        So you went outside the evidence provided by Ms. Austin Smith to provide your opinion in this matter, right?

MR. POPOVSKY:  Objection to form, including the characterization of documents as evidence, among other things.

A.        So the parts --  the way that I think of the parts that I relied on that are not in Ms. Austin Smith's are the parts --  they fall into a couple of categories, but one would be academic articles, that when she steps outside of using the well-established methods, I then bring to bear evidence of the well-established methods by citing some cases in just textbooks, but in other cases citing academic research.

So to point out the errors in

HUTTON - CONFIDENTIAL

her way of misusing valuation techniques, I bring in the necessary evidence.

In addition, when Ms. Austin Smith pointed to the 14 --

THE COURT REPORTER:  I'm sorry, you broke up.

A.      Ms. Austin Smith relied on WACC of 14.8, but she provided no calculation of that number, she just pointed to and provided a pdf that VPA had and there was no indication of what that calculation was.

I needed to understand how she arrived at or how VPA arrived at 14.8 and so we went looking for that.

Here Ms. Austin Smith is pointing to information that shows up after the valuation date and so that's all she relied on.

And I can very affirmatively say that's not appropriate information to use because it introduces hindsight bias and so that's what I did.

Q.      Did you read her explanation in

HUTTON - CONFIDENTIAL

her deposition of what she did here?

A.      I didn't get to that part of it, no.

Q.      Do you understand Millennium management received guidance that the free point-of-care test program violated anti-kickback statutes?

MR. POPOVSKY:  Objection to form, lacks foundation and mischaracterizes the documents.

A.      My footnote says --  I'd have to read the whole footnote here in detail, if you'd like me to, but it seems as if there was some indication that it did not.

Q.      What footnote are you looking at?

A.      Footnote 134.

(Witness perusing document.)

Q.      So your opinion here is that it did not receive --  sorry -- your opinion here is that Millennium received guidance that the program did not violate anti-kickback statutes?

A.      So I am not a fact witness; I

**HUTTON - CONFIDENTIAL**

am citing here in footnote 134 the record for you and the fact witnesses are saying, there is a question asked,



So that --

Q.   Did you review any contrary evidence in this matter?

A.   I don't recall, if there was anymore evidence I would have put it in this footnote.

Q.   So what you're relying on is what's in this footnote?

A.   So what I do in my report is to rebut Ms. Austin Smith.

To the extent that Ms. Austin Smith is adjusting for the POC free test cup program, I analyze the way that she

Page 103

HUTTON - CONFIDENTIAL

made the adjustment and the basis upon which she makes that adjustment and I highlight very simply that she uses hindsight bias here.

And that's the opinion that's in my report, that's my opinion.

Q.      Assume for me that management became aware of the risks related to the point-of-care free test cup program violating Stark and anti-kickback laws prior to April 2014.

In your opinion, what should management have done to address those risks when it was doing its projections?

MR. POPOVSKY:  Objection to form, lacks foundation, calls for speculation and outside the scope.

Q.      If it's outside the scope, just tell me; you're allowed to speculate though, you're an expert.

A.      I have no interest in attempting to speculate on something that I don't have the detailed facts and circumstances, that's not how I operate.

HUTTON - CONFIDENTIAL

I think very carefully, I make sure I have the facts and circumstances and I analyze; what I was asked to do in this matter was to assess and rebut certain opinions in Ms. Austin Smith's report --

Q.       Is this another one where the switch was an adjustment, yes or no, you turn the switch that Ms. Austin Smith made off and revert it to management's projections in full?

MR. POPOVSKY:  Objection to form, mischaracterizes the prior testimony.

A.       So Ms. Austin Smith's original document did provide a switch for the POC cups.

What I do in Exhibit 1 is I highlight the fact first that Ms. Austin Smith hasn't provided a reliable basis for the adjustment and I illustrate in Exhibit 1 the magnitude of the effect of the adjustment that she makes on the valuation of Millennium for both her incorrect and

HUTTON - CONFIDENTIAL

methodological choices that were made and I'm not taking issue with those.

Q.      Thank you for that.

Let's, as promised, I want to ask a little more about these.

Do you agree under the Capital Asset Pricing Model, one of the important inputs for the derivation of WACC is the beta?

A.      Yes, the beta of a company, which is important to recognize, it's a measure of the systematic risk, measure of systematic or market-wide risk.

Q.      Would you agree that the beta estimate or the estimate of beta is often derived from the betas of comparable companies?

A.      When a company is a private entity and not publicly-traded, and so when you don't have the returns to do the direct estimation of the beta, it is common practice to use comparable companies' betas of public entities to then estimate the beta of the private

HUTTON - CONFIDENTIAL

entity.

Q.      Why is it important to use those comparable companies or to identify companies that are comparable, I should say?

A.      Because one cannot directly estimate the beta of a private entity given that they are not publicly-traded, you don't see their returns, their value, on a day-to-day basis to understand how it correlates with the overall market.

Q.      Why do companies have to be comparable, why couldn't you just take, like, a broad range of the market, what is it about the comparability that matters?

A.      What you're trying to do when you are estimating the beta of a private entity is you're trying to replicate what you would do if you had a return you can actually measure --

Q.      Are you okay?

A.      Yeah, yeah, I'm fine, fine.

MR. NEWCOMER:  Did you all hear her cut out?

**Page 119**

HUTTON - CONFIDENTIAL

A.        Can you not hear me anymore?

Q.        No, it may have just been my screen cut out.

I want to make sure I've got your answer, if you don't mind.

Why is it important to identify companies that are actually comparable to the target company?

A.        Well, what you do when you identify the comparable companies is you then use their estimates of beta, and because they're publicly-traded you can directly estimate their beta with the regression of their return on the market return.

And you're going to use those, some summary measure of those comparable companies, usually an average or a median, and you're going to say this private entity is similar enough and we expect that the way that its value changes with the aggregate market is similar enough that I can take these betas on estimated, so summary measure of it, and

HUTTON - CONFIDENTIAL

apply it to this entity.

So what we're interested in with the beta, it's meant to measure the sensitivity of the company's returns to the aggregate market, right, that's what we're interested in measuring, that's what the Capital Asset Pricing Model focuses on as a measure of risk, it's called systematic risk, so that's what we're trying to do.

Q.    And so when you're looking to select comparable companies to perform this Capital Asset Pricing Model, what standards do you apply, how do you go about that?

A.    So it's very specific to the circumstances, the particular company that is private that you're trying to identify the set of matches for.

I think it's quite nuanced and it would differ depending on the particulars at hand.

Q.    What are the particulars that matter, like what company characteristics

HUTTON - CONFIDENTIAL

14.8, but she's using it to estimate the beta and the beta is all about systematic risk and what she said in her deposition was that these five companies weren't comparable because Millennium was riskier and so she's adding a company-specific risk factor.

So I did have to scratch my head; when you're trying to get to the beta, you're focused on systematic risk, not company idiosyncratic risk, right.

So if you don't think you've got comparables to estimate your beta, well, you should change your beta estimate, not add some other ad hoc measures of company-specific risk.

And in fact in the underlying materials, Ms. Austin Smith does adjust the beta; the mean of her five companies' beta, as I highlight in Exhibit 4 of my report, is five, yet the beta that she used in the VPA analysis is one, so she's already adjusted the beta.

And then on top of that she

HUTTON - CONFIDENTIAL

because her comparable companies weren't comparable enough and in fact she viewed them as lower risk, when relative to Millennium -- when she wasn't -- that kind of risk she's talking about, she's adding a company-specific risk factor, but she was talking about using those companies to estimate systematic risk, which is not company-specific, it's how you move with the market.

So it's completely nonsensible to me, I found it rather startling.

Q.      Let me ask you this.

You mentioned in that colloquy that one way to adjust for the perceived difference in riskiness between the comparable companies and the target company is to adjust the beta, right?

A.      What I said is if you are taking issue with the estimate of the beta -- keep in mind that the estimate of the beta is estimating systematic risk, and if you think that you've got comparable companies that do not provide

HUTTON - CONFIDENTIAL

comparability with respect to systematic risk, you would directly adjust the beta, you would not add a company-specific risk factor because that's a different kind of risk, that's exactly what the capital asset pricing model separates out for us.

It is important to understand the company-specific risk is not compensated for within the context of thinking about investors in the capital markets, because you hold a weld of diversified portfolio and any risk that is diversifiable, company-specific risk, is not  -- you don't get a return for that, you're not compensated for that.

Q.      So VPA, Vantage Point, what's your understanding of their role in this?

MR. POPOVSKY:  Objection to form.

A.      My understanding is that they were --  they provided Millennium with a solvency opinion prior to -- right after this transaction.

Q.      I'm sorry, could you clarify

HUTTON - CONFIDENTIAL

(Witness perusing document.)

Q.      Obviously if you need to read something else, read something else.

I am going to direct you to the last bullet point, after they list the eight guideline public companies they used or identified, Vantage Point Advisors says, "Although the above companies were used for comparison purposes, none of the selected companies involved were identical or directly comparable to the company."

Do you see that?

A.      I do.

Q.      So what do you, if you're standing in Vantage Point's shoes, do then?

MR. POPOVSKY:  Object to form, calls for speculation.

Q.      You're the expert here, what do you, the expert, do when you conclude none of the companies were identical or directly comparable?

A.      So I've not examined these eight companies in detail and I've not

HUTTON - CONFIDENTIAL

thought about how VPA came to the conclusion, obviously they're not identical, but to the conclusion they're not directly comparable or even what might be relevant, comparable, so I've not done that detailed work that I would need to do to understand and VPA hasn't provided me with more information here, so I can't really opine on what VPA should have or could have done differently.

Q.      If you turn back to pages, you should be able to see both, but let's go to page 18, please.

(Witness complying.)

A.      Yes, I'm on page 18.

Q.      Page 18, you can see the present value factor of 14.8 percent there on the table, right?

A.      Yes, I see that's the discount rate they're applying.

Q.      Yes.

And that's, to your understanding, the WACC they applied, right?

HUTTON - CONFIDENTIAL

And similar to what VPA did, they're adding a risk premium here and it's slightly different, but for the same reason I would take issue with it because when one is estimating the cost of equity capital, again, the way that you want to capture company-specific risk is in the expected cash flows, in what I would call the numerator of the calculation, not in the denominator, so the same thing would apply here.

Oh, and they also emphasize premium, which you should know from reading my report I take issue with --

Q.        We'll get to that in a second.

How about this; in arriving at beta, how does it impact it, I'm trying to unpack what the actual criticism --  if you're talking about systemic risk, right, there might be a modicum of change to the industry that has the systemic risk between April 2014 and December 2015, but when you, Amy, Professor Hutton, are calculating the betas after identifying

HUTTON - CONFIDENTIAL

A.        Because these are unlevered betas, so they're not sensitive to the capital structure, they're unlevered.

Q.        Got it.

So you would still use the same type of companies, right, to get to the unlevered beta, same businesses?

A.        I don't know if that's what they did, I don't know what companies they used.

Q.        Why would a company like FTI and a company like Vantage Point Advisors use a company-specific risk premium if, as in your words, it's so wrong, why do they do that?

A.        So that is --  I can't speculate on why VPA chose to do what they did or FTI chose to do what they did.

What I can tell you is that there is no basis, theoretical basis, for using a company-specific risk premium.

And what I can also tell you is that I don't know why VPA's is 5 and why FTI's is 6, there is no analytical

HUTTON - CONFIDENTIAL

methodology that I am aware of that allows you to come up with what is the company-specific risk factor that should be added which makes it ad hoc and unreliable.

And that is precisely what I highlight for you in my report, that when Ms. Austin Smith relies on VPA's analysis for the calculation of the WACC, she is providing us with an unreliable number, because there is no analytical methodology that allows us to understand why it's 5, why isn't it 2, why isn't it 3, where does 5 come from, why does FTI use 6.

And that the appropriate way instead is to adjust the numerator to adjust the expected cash flows.

Q.       You do understand that practitioners who are out doing this in the real world use company-specific risk premiums all the time, right?

MR. POPOVSKY:  Objection to form, lacks foundation.

A.       So I would just say this;

HUTTON - CONFIDENTIAL

practitioners are busy people and they sometimes use shortcuts, other ways of doing things that, you know, don't necessarily stack up to the standards that one would want to use when creating a report for the purposes here.

And so what I'm uncomfortable with is when an analysis -- where a number comes out of the air and it is ad hoc to me, there is no -- I can't replicate it, it's not something I can follow the analysis from start to finish to understand how it was arrived at.

So while in practice, the guts of people making decisions in practice may say I don't know how to do something so I'm going to wing it, you know, that's just not a standard that I try to teach my students to take or that I think anyone, including Ms. Austin Smith, should take in one of these reports.

Q.      I get that, but these aren't just done academically, right, Millennium hired FTI and it hired VPA to provide

HUTTON - CONFIDENTIAL

these analyses and it relied on these analyses, right?

A.      I don't know how, I don't have insights on how these analyses were relied upon, that's not something I analyzed, I can't speak to that.

I agree that they did these analyses, I've also highlighted that there are errors in these analyses and I've corrected for those.

Q.      Can you turn to Exhibit 3 in your report.

(Witness complying.)

Q.      So this is a chart you did of the WACCs employed by the arrangers and Ms. Austin Smith, right?

A.      Correct.

Q.      You don't include on here the WACCs used by FTI, do you?

A.      So this is the WACCs of the contemporaneous analyses and FTI's analysis was not contemporaneous, it was well after the transaction.

Q.      Okay.

HUTTON - CONFIDENTIAL

2:49 and we're going off the record.

This is end of Media Unit No. 3.

(Recess taken.)

THE VIDEO TECHNICIAN: The time is 3:02 and we're back on the record.

This is beginning of Media Unit No. 4.

BY MR. NEWCOMER:

Q.      Dr. Hutton, before we left off I asked you to turn to Exhibit 3 in your report, we had discussed this before.

Are you back to that exhibit?

A.      Yes.

Q.      So as you've discussed, this is a chart of the arrangers' WACCs, right?

A.      The ones on the left-hand side, yes.

Q.      So the arrangers went through the CAPM model, right, the CAPM process?

A.      I don't recall, you have to look at each of their models to see the derivation, it's been a while since I looked at those.

HUTTON - CONFIDENTIAL

Q.       Did you personally look at each of those?

A.       I think I did, but I don't recall.

I know that I -- the team helped pull these for me and I know that I have them.

It's certainly been a long time since I looked at them.

Q.       One of the companies is Citi, do you see that, one of the arrangers?

A.       Yes, they're here, they have got a high and a low listed in Exhibit 3.

Q.       Right.

And to create your average, you didn't include both of those data points, you averaged them together, right, to get to 1 point for Citi?

A.       I don't recall, I'm trying to read quickly here; I calculated the average, so it was calculated the average of -- it used the midpoint of those two, so it would have used 9 percent.

Q.       Do you recall the comparable

HUTTON - CONFIDENTIAL

companies that Citi used to arrive at its WACC?

A.      I don't.

Q.      Did you review the descriptions of those companies back when you went through this analysis?

A.      I don't recall.

Remember that I spent my time on Ms. Austin Smith's report and that the purpose of this exhibit and discussion that accompanies it in my report is to highlight that Ms. Austin Smith's analysis, while one that she didn't take into consideration, the analysis done by the contemporaneous analysis, and that hers was so different.

Q.      What vetting did you do of the arrangers' calculation of WACC?

MR. POPOVSKY:  Objection to form.

A.      So, again, my assignment here was to look at Ms. Austin Smith's report and respond to opinions that she had in there and one of the striking opinions is

Page 182

HUTTON - CONFIDENTIAL

this 4.8 WACC that she does not calculate and does not support other than pointing to the VPA number.

And so I wanted to understand it, we've already gone through a lot on that.

But part of it too was to bump it up against what were the contemporaneous valuations that were done by other financial professionals and what rates they were using.

And just to confirm the fact that hers was indeed extreme.

Q.      But my question wasn't about her.

You pointed out that she didn't look to the arrangers' WACCs.

You have now injected in this chart the arrangers' WACCs.

I want to know what you did, what analyses you performed, what comparisons you did to conclude that these are reliable data points to put on this chart.

Page 183

HUTTON - CONFIDENTIAL

MR. POPOVSKY:  Objection to form, asked and answered.

A.    So these are the discount rates that the financial professionals who provided contemporaneous valuations used and so I charted them here.

I do recall taking a look at these, but I just don't recall how each one of these were calculated --

THE COURT REPORTER:  There is a lot of background noise.

A.    I don't recall what was in these reports, but I'd be happy, if they are in these envelopes, we could look at them again.

Q.    I'm trying to figure out what you did when you drafted this, not some analysis you might want to do now.

And so I guess what I'm saying is when you drafted this, did you vet the comparable companies used by the arrangers, that's a very specific question, did you vet the arrangers' comparable companies?

Page 184

HUTTON - CONFIDENTIAL

MR. POPOVSKY:  Same objection to the same question.

A.      So I don't recall exactly how they calculated these, so I can't --  you know, you asked me specifically, for instance, did they use the capital asset pricing model, and I don't recall.

So to answer that question, I would need to look at the reports and to jog my memory as to level of vetting that I did, it would be helpful also to look at those reports.

But, sorry, I don't recall beyond that.

Q.      I'll get to that in a second.

Q.      I'll show this to you in a second, but one of the comparable companies relied on by Citi was a company called Catamaran Corporation.

Are you familiar with Cataraman Corporation?

A.      Not that I recall.

Q.      Do you know the nature of Catamaran Corporation's business?

HUTTON - CONFIDENTIAL

A.      Not that I recall.

Q.      The actual company description in Citi's report was "Catamaran provides pharmacy benefit management, PBM, services and healthcare information technology, HCIT, solutions to the healthcare benefits management industry."

Are you familiar with the pharmaceutical benefits management industry.

A.      Somewhat, but I am not an expert in that.

Q.      Do you consider that line of business comparable to Millennium's business?

MR. POPOVSKY:  Objection to form.

A.      So I have not analyzed the details of Catamaran's business relative to Millennium's business, those are not anything close to what was in Ms. Austin Smith's report and I spent all of my time on this assignment, you know, trying to understand what Ms. Austin Smith did and

HUTTON - CONFIDENTIAL

the bits and pieces, how they fell together.

So what you're asking me to think about now is something I've not had an opportunity to consider and so I can't opine on that.

MR. NEWCOMER:  Rob, can you pull up  -- sorry, I wasn't expecting that --  Rob, can you pull up tab 37 on the screen for us, thank you.

(Hutton Exhibit 6, Millennium Labs Final Approval Memo, was marked for identification, as of this date.)

IT CONCIERGE:  Exhibit 6 has been introduced.

Q.       Professor Hutton, do you recognize this document?

MR. POPOVSKY:  Take your time; can you access it?

THE WITNESS:  Yes, I think, Millennium Labs Final Approval Memo?

(Witness perusing document.)

Q.       My question was whether you recognize this document.

HUTTON - CONFIDENTIAL

A.        I think, yes, it appears to be the one that's referenced in this exhibit, the Millennium Labs Final Approval Memo, but the dates -- are the dates the same?

(Witness perusing document.)

A.        Yes, the dates are the same, March 13th, it seems to be that's the correct one.

Q.        Okay.

If you turn to page 61 of this document, sorry to do this, Rob, but if you scroll down to the Bates ending 0232 and if you scroll in on the right side a little bit, I just want to show you here, Professor Hutton, you see it references Catamaran Corporation?

A.        The second one down, yes, I see it.

Q.        Cost of equity related metrics and cost of debt related metrics, right.

We just discussed Catamaran, right?

A.        You did more discussing than I did, you told me a few things.

Page 188

HUTTON - CONFIDENTIAL

Q.      Yes.

How about the Advisory Board Company, what is your understanding of the nature of Advisory Board Company's business?

A.      I have not studied them.

Q.      Advisory Board Company provides research and consulting, they discuss or they provide best practices, research and insight, technology, consulting and management, as well as data-enabled services.

MR. POPOVSKY:  Are you reading from this document?

MR. NEWCOMER:  No, I am asking a question.

MR. POPOVSKY:  Okay.

Q.      Do you consider that comparable to Millennium's business?

MR. POPOVSKY:  Objection to form, lacks foundation, we don't know where any of that information just provided came from.

Q.      Go ahead.

HUTTON - CONFIDENTIAL

A.        So I did not study these companies.

What I did was in my report I respond to what Ms. Austin Smith did and the whole reason these are here in my Exhibit 3 is to show that Ms. Austin Smith's numbers, which --  let's be sure we're focused on the right thing here.

When it's all said and done and they get some betas here --  can we see...

(Witness perusing document.)

A.        I mean, when it's all said and done, the mean beta is .82 and the median is .81 for these set of comparable companies, which is not wholly different from Ms. Austin Smith's mean of .85 in the five companies that she looked at.

And I think if I understand why we're here, it's all leading to the same point of what is the way to think about estimating the beta.

So we're spending time looking at these companies, but I didn't spend a lot of time because it isn't profound in

HUTTON - CONFIDENTIAL

informing my assessment of Ms. Austin Smith.

Q.      I get that, but because you charted it I am allowed to probe your understanding --

A.      Sure.

Q.       -- of the comparable companies used here.

Let's look at another company, Athena, do you know the nature of Athena's business, Athenahealth, Inc., is actually the name, the third one down?

A.      I think I've heard of them before, but I've certainly not studied them.

Q.      Do you have an opinion as to whether Athena is comparable to Millennium's business?

A.      I've not analyzed the details of Athena's business to assess whether it is coverable to Millennium's business.

Q.      Why don't we turn back to Exhibit 3 -- actually, let me ask this.

For each of the companies on

HUTTON - CONFIDENTIAL

here, would that statement be true, that you haven't studied the businesses sufficiently to know whether they're comparable?

A.      So Ms. Austin Smith's report, she herself highlights that despite taking on the usual efforts of finding comparable companies, she struggled to find comparable companies, she identified five.

I am not even sure looking at these if there is much overlap with her five, so I've not spent time, this is outside the scope of what I was asked to do, to analyze the details of the comparable companies that Citibank chose.

So I've not done that.

Q.      Let's go back to Exhibit 3 of your report.

A.      Exhibit 3 or 4?

Q.      To your report, Exhibit 3, so that's the chart of arrangers we have been discussing.

A.      Yes.

(Witness complying.)

Page 192

HUTTON - CONFIDENTIAL

Q.        I don't want to belabor this point, but I can if you want.

You cite a document here for SunTrust Bank saying Millennium Laboratories, Inc., DCC memo, do you see that?

A.        Are you referring to one of my footnotes?

Q.        Yeah, under sources, there is a SunTrust Bank model for March 2014, right?

A.        Yes.

Q.        If we went through the same exercise with the comparable companies in the SunTrust model, would your answers be the same, that that's sort of beyond the scope of what you were asked to do here?

MR. POPOVSKY:  Objection to form.

A.        So I did not analyze the comparable companies that are in these different reports and assess whether they were more or less similar to Millennium than the five companies Ms. Austin Smith relied on in her comparables analysis or

HUTTON - CONFIDENTIAL

the eight companies Ms. Austin Smith relied on for her WACC of 14.8.

Q.        I think we can move on then.

I want to go back to a question and I don't know that I got a clear answer from you and I definitely have questions myself about it.

So as a valuation expert, what do you do, i.e., what do you teach your students to do when you are deriving a WACC for a private company and there are not public companies that are comparable to that private company?

A.        So usually when I'm teaching to my students we are working on a case and we have more circumstance and more context in which to answer that question.

You approach it in a similar fashion to what Ms. Austin Smith did, you would look at all the companies that are close in proximity to the entity, the private entity, you would be looking at public companies, but you would look at what's close in proximity, but, you know,

HUTTON - CONFIDENTIAL

VPA uses 5 and FTI uses 6, but Ms. Austin Smith provides us with no basis for why 5 versus 6 or why not 1 or 2.

I am not aware of any methodology that allows one to articulate and describe what the magnitude would be for a company-specific risk factor.

It appears to be ad hoc in nature, people just pluck these numbers out of thin air.

Q.      So I guess is the answer to my question, no, it's never appropriate to use company-specific risk premiums either in this case or anywhere else when calculating a WACC?

A.      So I am aware of the fact that practitioners --  we see it, right -- practitioners had company-specific risk factors.

I'm highlighting for you that when they do that, they're taking a shortcut, they're taking a shortcut because --  actually, I don't know why they're taking a shortcut, but they're

HUTTON - CONFIDENTIAL

taking a shortcut.

And what I have trouble with is that they're walking away from theory, as Ms. Austin Smith does when she says, well, the market is not efficient and so I need to deal with that, and so she wants to walk away from the theory.

The problem is that when you walk away from the Capital Asset Pricing Model and you walk away from the theory that we had and then you come up with a number, there is a big gap there between where we were based on theory and where you landed based on wanting to walk away from the theory and you don't fill that gap, she certainly doesn't fill that gap, with anything that I can replicate or follow or try and understand.

And in my mind that makes it unreliable and though practitioners may be comfortable behaving in that fashion in the context of the precision that they need and reliability they need, I don't feel that it's appropriate, as I said

HUTTON - CONFIDENTIAL

earlier, in the context where --  the

seriousness and purpose that we have here.

Q.      I guess I don't understand

that.

Is the litigation here more

serious than actually knowing whether

Millennium was solvent back as of April

2014, in your mind?

MR. POPOVSKY:  Objection to

form.

A.      No, I am suggesting that

Ms. Austin Smith, in coming up with 14.8

and not providing us with any

understanding of how she derived it, is

not providing us with a reliable analysis.

Q.      Have you ever used a

company-specific risk premium?

A.      No, I have never used a

company-specific risk premium.

Q.      Not even back when you were a

practitioner?

A.      I don't recall 30 some years

ago when I would have done things, but as

I think back to it, I can't think of a

HUTTON - CONFIDENTIAL

time when I would have used --  no, I don't recall ever using a company-specific risk factor.

Q.      What about a small company risk premium or small stock risk premium, have you ever used one of them in your career?

A.      So I think the small company risk premium is a mistake, I think it is an error, it lacks theoretical basis and it is an empirically driven factoid from the 1980s that doesn't even stand as of today, the vast literature disagrees with it.

I make my students aware of the fact that they will come across instances where folks will use, they will refer to the Ibbotson, find that number and they will add it and then I ask my students to explain as best they can if there is any logic or reason and after we debate for a while, we land on, no, there is no logic or reason.

So that is how I teach it and that is how I view it and that is how I

HUTTON - CONFIDENTIAL

articulate it in my report.

Q.        I will get into the factoids used a little more, but my question is have you ever applied it?

A.        Not that I recall.

In the context of doing a sensitivity analysis, usually the magnitude of the sensitivity analysis from the point estimate you come up with to the range that you provide would likely include the magnitude of the company-specific risk factor to the extent they're usually relatively small, certainly not in the range of the five and six --  sorry, that was the small company risk premium -- would be small and in the range of the sensitivity analysis.

I would do the sensitivity analysis because that's the right thing to do because of the lack of precision in the calculation of a discount factor.

But it's not because I'm thinking of it as a small company risk premium.

HUTTON - CONFIDENTIAL

Q.        And you showed an alternative here of the small company risk premium which gets you to 8.6 percent WACC, right?

A.        Correct.

Q.        If it is not academically founded, why don't you stick to your guns, why do you include an alternative analysis here at 8.6 percent?

MR. POPOVSKY:  Objection to form.

A.        I believe that --  let me look and see.

(Witness perusing document.)

A.        As I recall, because it's my understanding that sometimes the courts are willing to or do incorporate these risk factors.

Just, as I said, I make my students aware that sometimes people will incorporate them, I think it is important that --  I don't want my students to go out into the world and not know what it is and I didn't want the trier of facts, the decision-maker in this matter, not to know

HUTTON - CONFIDENTIAL

what the effect was if you added it.

So they didn't have to do all the calculations, I provide Appendix E-1, where I redo basically my Exhibit 1 using the 8.6 as well as the 7.2 as well as the 9.8 discussed in Ms. Austin Smith's footnote 285 and her 14.8.

So these are all her WACCs, just corrected for errors all the way, when you get to 7.2, and leaving in the small company risk premium at 8.2.

It's more to provide as much insight as I can to the decision-makers here.

Q.      Well, you keep labeling it her WACC.

Does Ms. Austin Smith anywhere say 7.2 percent is the correct WACC here?

A.      So as I highlight in my report, when you correct Ms. Austin Smith's 14.8 for errors and inconsistencies, the corrected WACC, which in my view is Ms. Austin Smith's corrected WACC, is 7.2.

Q.      Do you think it is misleading

HUTTON - CONFIDENTIAL

to label it Ms. Austin Smith's WACC as opposed to Dr. Amy Hutton's WACC?

MR. POPOVSKY:   Objection to form.

A.       I think it is more mislabeling to label it Ms. Amy Hutton's WACC, because it is Ms. Austin Smith's WACC when it has been corrected for errors and inconsistencies.

Q.       That's interesting.

So it's not your WACC, right, 7.2 percent is not the WACC that you say is the appropriate WACC to use by the valuator of Millennium as of April 2014, right, you're not saying that is the WACC?

A.       So what I do in my report is I respond to Ms. Austin Smith's report, right, and I stay within the framework that she has set up.

And if I look at what she's done and I say, okay, given my expertise as a financial economist with a focus on valuation, how can I improve upon, how can I fix the errors in what Ms. Austin Smith

HUTTON - CONFIDENTIAL

has done.

And I look at the WACC that she relies on and I see several errors and it's outlined for us I believe in Exhibit 4, where I go through and I correct each of those errors, and it gets you to 7.2.

So I'm leaving a lot of the methodological choices that Ms. Austin Smith paid in the context of this WACC being calculated, I'm leaving in place, for instance, the risk-free rate, the risk premium, right, I'm leaving those there, so I'm using her framework.

And in the context of the WACC in particular, I'm merely correcting the errors and inconsistencies.

Q.      Do you have an opinion of the correct WACC to value Millennium as of April 2014?

A.      My opinion is that the 7.8 -- sorry, the 7.2 number is more correct than the 14.8 number.

Q.      But how about we do it this way.

HUTTON - CONFIDENTIAL

Fill in the blank; what number do you testify to being the correct WACC to use for Millennium in April 2014?

MR. POPOVSKY:  Objection to form, outside the scope.

A.      So I did not derive from the bottoms-up my own WACC, so I did not say, okay, which risk-free rate do I want to use, what risk premium do I want to use.

Instead, where there was not an error and it would have been sort of splitting hairs to concern myself with the methodological choices, I went with the framework that Ms. Austin Smith put out there, so I used in the calculation in my Exhibit 4, I continue, I don't change the risk-free rate, I don't change the risk premium, I merely correct the errors and inconsistencies.

And when you do that you get 7.2.

Q.      You mentioned earlier that you understand courts sometimes apply the small company risk premium.

HUTTON - CONFIDENTIAL

How do you have that understanding?

A.      I don't recall if I cite anything here, I have to look through exactly if there is a particular reference to a particular --  I don't recall if I provide a particular reference to that.

(Witness perusing document.)

A.      It's something that I know they sometimes do.

Q.      Okay.

It's something that you're saying is the basis of your opinion.

Is the basis of that advice you were provided by counsel in this matter?

MR. POPOVSKY:  Objection to form, that mischaracterizes testimony, I don't know what the "that" is in your sentence, or the "something" is in the sentence and I certainly don't know that she testified what's the basis of her opinion.

MR. NEWCOMER:  Limit your speaking objection, Mark.

HUTTON - CONFIDENTIAL

Q.     Go ahead.

A.     I would need some time to find -- I always wish I could search my report, you know, we have all these electronic processes now, I could search my report --

Q.     I don't want to spend too much time on this.

Let me ask you this; do you have an understanding that courts also apply company-specific risk premiums when they are conducting solvency or valuation analyses?

MR. POPOVSKY:  Objection to form.

A.     I don't have any reference for that, I don't have any insight on that.

Q.     Would that information be helpful for you as you're trying to help the court and jury here calculate an appropriate WACC?

A.     No; as I pointed out to you, in Exhibit 3, one of the reasons that Ms. Austin Smith's WACC is way over here

Page 210

HUTTON - CONFIDENTIAL

compared to all the rest of them is

because of that company-specific risk

factor.

And what I've also said is that

when we do sensitivity analysis around the

estimate that we come up with, the

sensitivity analysis would often include a

range that would incorporate the small

company risk premium, because it's like 1,

2 percent, right.

These company-specific risk

factors are 5, 6 percent, much larger, and

in my mind there is no basis for that, as

we've already said, there's no analytical

way of coming up with it, it's ad hoc in

nature, I highly disagree with the small

company risk premium as, if you look at

Ibbotson's, I guess it's Phelps now, the

publisher, but it is an empirical factoid,

they're saying if we look at the returns,

two different levels of portfolio, sizes

and companies, we find this is the premium

return, realized return, they can't

measure expected, which is what they

HUTTON - CONFIDENTIAL

should be trying to measure, but they use realized returns, and it is a premium over what the Capital Asset Pricing Model says should be the return for these companies, so we're going to call that, we're going to label it a small company risk premium and we're going to tell you what it is based on these different portfolios.

It is an empirical -- I find it very dissatisfying because I'm a researcher and that's not how you do research, so I find that very dissatisfying.

But at least we can give them credit for having done something to show where the numbers come from.

Here, in the company-specific risk factors, nothing, nada, no analysis, ad hoc, comes out of the air, no idea where it's coming from, so that's even more dissatisfying.

So I understand that the courts sometimes include a small company risk premium.

HUTTON - CONFIDENTIAL

If the decider here thinks that that's what it should be, I didn't want them not to have numbers to go on so I gave it to them, but I, you know, it's a much bigger deal to ask me to think about adding something that is so ad hoc.

Q.      What is your understanding how management builds up operating expenses in the Padres model?

MR. POPOVSKY:  Objection form, outside scope.

A.      So what's interesting is the way that Ms. Austin Smith wrote about it.

I do have a whole section in my report on the way that Ms. Austin Smith comes up with her operating expenses and her modified Padres projections.

What she does is she identifies what she calls and labels variable cost, fixed cost and hybrid.

It is important to note that the fixed costs are actually a fixed growth rate.

And what Ms. Austin Smith does

HUTTON - CONFIDENTIAL

well, from 38 to 51 percent of revenues, where the fixed costs was 6 percent magnitude if they have expected revenues to fall so dramatically.

Q.      Did you see any contemporaneous evidence in the record where management projected reducing its fixed operating costs contemporaneous with the 2014 transaction?

A.      So paragraph 46 of my report, I highlight, the big question -- the question I think what I say asks about is could management, would management, and shouldn't Ms. Austin Smith have thought about how management would attempt to control costs if they in fact thought that revenues were going to decline by 30 percent relative to the Padres model, or 50 percent a few years out, and in paragraph 46 I highlight that there were ways in which management had thought about saving on the operating expenses.

Q.      You're citing here to I think it's footnote 95, is that right, and I

**Page 218**

HUTTON - CONFIDENTIAL

think you're actually in paragraph 45,

right?

A.     It could be paragraph 45, yes,

I didn't see the notes I was expecting.

Q.     And you're citing here to an

Alvarez & Marsal presentation from 2015,

right?

A.     What I'm citing to here is that

when the company faced a change in fortune

and faced declining performance,

management found ways, articulated ways,

and the sole purpose of this is to

highlight the fact, to answer the

question, were there ways that Millennium

could have, had they believed that their

management had expected revenues to fall,

are there ways that they could have

implemented savings.

And this really the point to

the fact that this is a company that had

the ability to do so.

Q.     These are ways that maybe they

could have brainstormed at some later date

when they were encountered with this

HUTTON - CONFIDENTIAL

but I don't -- one, I don't know if they managed to achieve it, and, two, I don't know how detailed it was, other than what is stated here, that they intended to reduce expenses through head count, through commissions, consulting expenses,.

Certainly if you're not making the revenues, you don't have to pay the commissions.

So much of that makes sort of just basic sense, common sense, but I've not spent the time analyzing in detail.

Certainly Ms. Austin Smith may have done so given she was making such large revenue cuts; when you do something like that, it would make sense to think carefully about, if you change the entire income statement from the top line, what else is happening in the income statement.

MR. NEWCOMER:  Rob, could you please mark as the next exhibit tab 22.

Q.      Dr. Hutton, that's going to be folder 22 for you.

(Hutton Exhibit 7, Alvarez &

HUTTON - CONFIDENTIAL

analysis done by Alvarez & Marsal?

A.      So the team brought it to me and showed me, as I recall, if I remember, going through this, but it's been a long time, it was a while ago for sure.

Q.      Do you have any recollection of that conversation, what they showed you, what you did because of it?

A.      I see here on page 23 is where the 35.7 comes from and the breakdown into head count, commissions, consulting, other.

So this is clearly where it's coming from.

Q.      Yes.

A.      I think what it was was my desire to understand if Millennium had the ability to cut costs if their revenues were so dramatically affected and, you know, understanding -- that I think is what motivated the search for something like this, some evidence that they could.

Q.      So to answer the question of your desire to understand if Millennium

HUTTON - CONFIDENTIAL

had the ability to cut costs, in your opinion, does this document show that Millennium actually had the ability to cut those costs as a result?

MR. POPOVSKY:  Objection to form.

A.        Again, this is in the context of Ms. Austin Smith's report and she introduces this large adjustment to revenues.

And when a management team is confronted with such a large downturn in their business, one would expect them to start to think about how to cut costs.

And it would naturally make sense that you wouldn't be paying commissions if your sales team isn't selling, right, and that eventually, and sadly this happens, right, when the business turns south you cut your head count.

So understanding that if, as I point out in my report, Ms. Austin Smith failed to provide us with an understanding

**Page 225**

HUTTON - CONFIDENTIAL

of why she assumes that management would not move into cost savings approach to the business if they were confronted with the kind of shortfall in revenue that she was suggesting, so I wanted to be sure or to just find some evidence in the record that suggested beyond the common sense notion that this was achievable.

Q.      So did this answer the question about whether, in your opinion, Millennium had the ability to cut costs if the revenues declined so dramatically?

A.      Again, I am pointing out that when confronted with a change in fortune, management identified several areas of potential SG&A reduction over these new projected periods.

And this is something that Ms. Austin Smith could have looked at and used to provide a basis in her report for her operating expenses that were to be matched to the revenues that she did, but she did not do that.

And so I'm merely putting out

**Page 226**

HUTTON - CONFIDENTIAL

that she didn't do something and there is reason here to believe that she should have and could have done something more.

Q.      If the company can't reduce costs when its revenues are dropping so precipitously, what is the consequence for the company?

A.      I don't understand the hypothetical, are we talking about Millennium, are we talking about particulars, this is not something I can speculate on, as to how management would respond.

I can merely point out that common sense would suggest that with such a large precipitous drop in revenues, that the management team would respond and Ms. Austin Smith doesn't do any analysis, she just assumes that they wouldn't respond.

Q.      Are commissions one of those fixed or variable expenses, operating expenses?

A.      There may be a bit of both

Page 230

HUTTON - CONFIDENTIAL

at the document, I said I think it's just an analysis to figure out how they're going to carry on and that's what it's saying, how are they going to manage, everything is going to be affected if they enter into a settlement with the DOJ.

So they're trying to --  it's very different than a traditional business plan where you don't have these external factors sort of disrupting what you're doing.

So, yeah, I mean, I don't know why this was created really or who uses it.

That's what it says it's for.

Q.    You can set that aside now.

MR. NEWCOMER:  I've totally lost track of time, let's go off the record for a second.

THE VIDEO TECHNICIAN: Time is 4:10, going off the record.

This is end of Media Unit No. 4.

(Recess taken.)

HUTTON - CONFIDENTIAL

but Ms. Austin Smith has failed to explain how this e-mail provides a basis for something in 2014 for her 30 percent decline in Millennium's volume.

So she is assuming without providing a basis that this analysis was known to management and she's not provided that basis.

Q.      Have you seen any other evidence in this case that volume declines were known to Millennium or were available to be known to Millennium as of April 2014?

A.      I don't believe so, I don't believe I've seen evidence to suggest that management was aware of this.

There is also another factor here, right, the decision for the Department of Justice wasn't made until after the transaction, so it's not yet clear what the outcome is going to be, right, so there's that piece as well.

Q.      And I'll get to that piece in a second.

HUTTON - CONFIDENTIAL

she's not demonstrated that the drop in the volume for these other two entities in fact was a result of a reputational impact.

Q.      What is your understanding of what management thought?

A.      What management?

Q.      Thought about the cause of the declines in Ameritox's volumes?

MR. POPOVSKY:  Objection to form.

A.      I am not sure I have a well-founded understanding of management's reasoning, I don't recall what they may have said about it.

Is there something in this e-mail that helps us understand what they thought?

Q.      Well, you tell me; have you formed an opinion in this matter about what management thought regarding the Ameritox and Calloway declines?

A.      My role in this matter was to review Ms. Austin Smith's report and what

HUTTON - CONFIDENTIAL

I highlight here is she makes an assumption that what happened to Ameritox and Calloway implies what will happen to Millennium and I point out that that's far from clear and she's not provided sufficient basis for that assumption.

Q.        It's a pretty big deal, right, I mean, based on your ability to analyze the healthcare industry, it's a pretty big deal to be accused of Stark and anti-kickback violations, right?

MR. POPOVSKY:  Objection to form.

A.        I don't have a way of thinking about that, it certainly seems the Department of Justice is active here, Ameritox and Calloway, I don't know if it's a big deal.

Q.        Do you understand --  sorry, go ahead.

A.        I haven't assessed how big a deal it is.

Q.        The causal mechanism that you got to earlier, do you understand that

HUTTON - CONFIDENTIAL

yes, talking about her theory of causation here.

(Witness perusing document.)

A.    Oh, I see, at the top of page 74, "a June 2015 e-mail from Mr. Hardaway."

(Witness perusing document.)

A.    I do see that.

Q.    How do you handle that, what is your opinion regarding their volume assumptions were aspirational?

MR. POPOVSKY:  Objection to form.

A.    I don't have an opinion on Mr. Hardaway's statement, I don't even know what volume assumptions he's talking about.

Q.    Did you research that when you were responding to the evidence Ms. Austin Smith cited?

A.    I don't recall if I --  I don't think that's one of the e-mails that I cite in this section of the report, my report.

HUTTON - CONFIDENTIAL

Q.    When was it that Millennium received notice that it was subject to the DOJ investigation?

A.    I don't recall the exact date, but I do recall that it was before the transaction.

Q.    In its 2014 litigation with Ameritox, another thing you don't cite in your report but that Ms. Austin Smith cites is the opinion provided by one of Millennium's experts in its litigation with Ameritox.

Are you familiar with that litigation and the opinions provided by that expert?

MR. POPOVSKY:  Objection to form.

Do you want to point us to the citation?

A.    Yes, please, if you would please remind me.

Q.    Yes, it is in that same paragraph, paragraph 131, do you see footnote 264, and there are at least

**Page 244**

HUTTON - CONFIDENTIAL

three, at least three citations to documents filed, so some of these are filed dates, not created dates, but documents filed in that litigation, do you see that?

A.    I see footnote 264, it will take me a few minutes to read through it.

Q.    Yes.

(Witness perusing document.)

Q.    Let's start at the bottom because that's the earliest one cited here and then I will get to another document.

Actually, before we do that, in response to Ms. Austin Smith's opinion, did you investigate Millennium's submissions in Ameritox to determine what they knew and what data they had related to the decline in volumes at Ameritox after its DOJ settlement?

MR. POPOVSKY:  Objection to form.

A.    So Ms. Austin Smith in her report highlights the drop that is cited in an e-mail that's dated from June, after

**Page 245**

HUTTON - CONFIDENTIAL

the transaction, and she does not validate those numbers in her report and she does not help us understand if those numbers are driven by changes in the business activities.

And so, you know, I point that out, but I do not independently, from the work that Ms. Austin Smith did, validate the information that was in the June footnote that she cites.

Q. Just to be clear, the footnote -- she cites that footnote.

I guess my question is you looked at the e-mails, right; did you look at these documents, because you don't cite them in your report?

A. I don't recall these documents.

Q. So moving on then, in paragraph 49 of your report, we discussed this earlier so I don't want to rehash old testimony, but you did not investigate what the practices at Ameritox and Calloway were to back out any duplication, right, for those companies, not for

HUTTON - CONFIDENTIAL

Millennium, but for those companies, right?

A.      I do not know what practices at Calloway and Ameritox were being investigated by the DOJ and what magnitude of their revenues were driven by those practices.

And Ms. Austin Smith, it would have been helpful had she analyzed that and provided some information on that to help us understand if some of the drop in their volume might have been driven by changes in these business practices as a result of the settlements.

Q.      Is it your opinion that there should be no modeling at all for a reputational impact to volumes based on a DOJ settlement, that that should not be a decline in the volumes?

MR. POPOVSKY:  Objection to form.

A.      No, it is not my opinion.

I just think if you're going to model it, you should provide reliable

HUTTON - CONFIDENTIAL

appropriate, you didn't do a sensitivity analysis around that particular element, right?

A.      From what management had said, I don't know if the 5 and 10 percent was because of a change in their business activities or if it was due to a reputational.

What I do in Exhibit 1 is I provide an illustration for the decision-makers as to what the magnitude is of the effect of Ms. Austin Smith's adjustment when you reverse it out.

So that's all that exhibit does, it's illustrative.

Q.      Let's talk about emerging opportunities now.

A.      Sure.

Q.      What standard do companies need to use when they are projecting future revenue from businesses that have not yet started?

MR. POPOVSKY:  Objection to form.

Page 251

HUTTON - CONFIDENTIAL

A.        So that's a very general question that I would need a lot more information about to answer, there is not sort of a general one-size-fits-all approach to it.

What's interesting here is that Ms. Austin Smith focuses on and refers to revenues that are expected by management to be aspirational and doesn't seem to take into account the fact that the company actually has contracts, signed contracts, associated with the emerging opportunities.

Q.        Right, signed contracts that were going to give them some amount of revenue?

A.        Well, signed contracts with the Department of Justice --  sorry, with the Department of Defense and the Department of Veteran Affairs, and they have some introductional opportunities as well.

Q.        Right.

So the Department of --  her error was that she should have counted the

HUTTON - CONFIDENTIAL

revenue, because clearly the contract was going to say how much -- allowed the company to project how much revenue they were going to get from that particular contract, right?

A.    In addition to the revenues, those expenses.

Q.    Of course, yes.

Have you read that contract?

A.    No, I have not read the contract.

Q.    Do you know what the contract does, what it says, what its terms were?

A.    No, I don't know the details of the contract.

Q.    At all; I mean, are you offering the opinion that that contract was not aspirational?

MR. POPOVSKY:  Objection to form.

MR. NEWCOMER:  Yes, that was a bad question, my apologies.

Q.    You don't know what's in the contract, right?

**Page 254**

HUTTON - CONFIDENTIAL

Q.        The Federal supply, I think you used the term contract, Federal supply schedule contract, paragraph 52.

A.        Yes.

Q.        What rights did that give Millennium?

MR. POPOVSKY:  Objection to form, asked and answered.

A.        As I highlighted already, so they have the signed contracts and they were awarded apparently, the date is June, I highlight that it's June 13th, but June of 2013, and the company had been building out the infrastructure necessary to fulfill the requirements of those contracts.

Q.        That's what I'm asking, what were the requirements of the contract, do you have any understanding of this Federal supply contract, Federal supply schedule contract?

A.        I've not read the contracts, no.

Q.        Is your testimony --  down

Page 255

HUTTON - CONFIDENTIAL

below, where it says "regarding international opportunities," you say, "Millennium had a dedicated team and planned to partner with existing companies in emerging markets and license Millennium's technologies," do you see that?

A.      I do.

Q.      What was the revenue model Millennium was going to have for these emerging opportunities?

A.      I don't recall.

So you'll notice that the parts that you're looking at I'm referencing in the footnotes to the lender's presentation of the audio portion that they provided and I'm highlighting those for you.

So these are facts that are in the record here.

Q.      Is it your testimony that one of the facts that you're relying on is that there was a dedicated international team?

MR. POPOVSKY:  Objection to

HUTTON - CONFIDENTIAL

A.        I can't speak to that.

What I can speak to is that management had expectations it had built into the Padres model.

Ms. Austin Smith removed those claiming they were aspirational and without providing us with a basis for why management should not have expected those as of April 2014.

Q.        What level of skepticism do you teach your students who are doing a valuation to apply to management reps about emerging opportunities?

MR. POPOVSKY:   Objection to form.

A.        That is so specific to the circumstances at hand, there is so much context that one would need to take into consideration in trying to assess the reliability of emerging opportunities.

I can't speak to that generally the way that you would like me to.

I can merely say that Ms. Austin Smith has not provided us with

HUTTON - CONFIDENTIAL

a  reliable basis for why management

should not have expected what they built

into the Padres models.

Q.        Do expected future cash flows

have to be reasonable to be included in

management projections, is there any

standard management has to use for their

projections?

A.        Well, expected, as I described

in paragraph 35 of my report, means that

it is what you expect to happen, it's not

inflated, it's not overly optimistic, it's

not overly pessimistic, but it is what you

actually expect to happen.

Q.        Is it subjective or is there

any objective component when you're doing

a valuation like this?

A.        There is definitely a lot of

subjectivity to an assessment of

expectations.

You know, what's important is

that management is projecting out and

reflecting and taking into consideration

all of the information they had at hand

HUTTON - CONFIDENTIAL

and that they're including risk as well as what they expect to happen.

But there is certainly some judgment involved.

What I'm concerned about here is that Ms. Austin Smith seems to disregard the idea of expectations when she removes what management was expecting and herself asserts that it was aspirational without providing evidence of such.

Q.    You cite -- sorry, give me one second here.

(Pause.)

Q.    Let's go to one of these lender presentations that you cite, I am not even going to try to do audio, but let's go to a lender presentation.

Why don't we go and mark as Exhibit tab 16, that's folder 16 for you, Dr. Hutton.

(Hutton Exhibit 9, Millennium Investor Presentation March 2014, was marked for identification, as of this

**Page 263**

HUTTON - CONFIDENTIAL

right?

A.        I don't know, I would have to take a few minutes here.

(Witness perusing document.)

A.        On this particular page there is not, but this is not the entirety of the record, right?

Q.        Well, let me ask you this.

Do you recall --  I mean, this is one of the things you cite, obviously there wouldn't be a business plan in the audio presentation --  have you ever seen a business plan related to either of these opportunities?

A.        I don't recall seeing a business plan, what I recall is what I cite here, is that management had undertaken business activities, including building up the infrastructure and hiring staff, in order to execute on these opportunities.

Q.        Let's take those one at a time.

What infrastructure did management build up, do you have any

HUTTON - CONFIDENTIAL

Q.      A dedicated team for the international opportunities, right?

A.      Yes, that they had a dedicated team that was to be involved in this planned partnering with existing companies.

Q.      You don't list here any numbers of people, right?

A.      No, I don't list any numbers of people here and I don't recall them mentioning the numbers.

Q.      Any evidence that the company actually looked into regulations relating to, I don't know, shipping blood samples -- sorry -- urine samples by mail --  I will start that over.

Do you have any understanding of whether Millennium investigated what it takes legally to send urine drug tests by mail or otherwise to get them from an international location to Millennium?

MR. POPOVSKY:  Objection to form, outside the scope.

A.      I don't even know that's what

Page 269

HUTTON - CONFIDENTIAL

they intended to do given they were going to license their technology.

Maybe the actual --

Q.   Got it.

So would a technology license -- how would that come in as revenue, would that result in like a specimen and net revenue per specimen number?

A.   I don't know how they would -- given they were still just planning, there's many ways, a licensing agreement can be drawn up, I can't speculate on what form it might have taken eventually.

Q.   And so you restore, after your criticisms of Ms. Austin Smith, you restore a hundred percent of the emerging opportunity revenue, right?

MR. POPOVSKY:   Objection to form.

A.   Again, what I do in Exhibit 1 is I provide an illustration for the deciders here, the decision-makers, as to what the effect is if one takes these revenues and these expenses that are

HUTTON - CONFIDENTIAL

So because she makes those two big assumptions without validating them, I find the work that she's done here to be unreliable.

Q.    In your opinion, is Medicare billing a relevant proxy for commercial billing?

A.    So in my opinion, Ms. Austin Smith needed to validate that assumption and she did not.

Q.    Okay.

Have you formed an opinion on whether that assumption is correct?

A.    My opinion is that she has not provided evidence to convince me that that assumption is reliable.

Q.    For the nine billing codes, I take it the nine billing codes where she, as you say, assumes a hundred percent of the tests would be medically unnecessary, I assume you also have not formed --  it is beyond the scope of your opinion regarding whether that is in fact an appropriate methodology, you're just

HUTTON - CONFIDENTIAL

predominantly bill to a common universe, so she is making another assumption, but she didn't provide validation.

I didn't look at all the assumptions she made and didn't validate, I picked on the ones that were, shall we say, most egregious and most objectionable.

I did not do a separate analysis to confirm her assumption that she didn't confirm, that UDT companies predominantly bill to a common universe.

Q.   Have you formed an opinion on that, yes or no, that UDT companies predominantly bill to a common universe of billing codes?

A.   Ms. Austin Smith makes that assumption and she does not validate it.

Q.   I asked you, I'll say it again, asking you, Professor Hutton, have you formed an opinion in this case whether UDT companies predominantly bill to a common universe of billing codes, yes or no?

A.   So what's relevant here is not

HUTTON - CONFIDENTIAL

simply yes or no, what's relevant here is that Ms. Austin Smith has an affirmative work to do and she's making assumptions that she's not validated and my job is to point out when she makes assumptions that are not validated.

And so what I'm doing is pointing out to you the assumptions that are really objectionable, like these nine codes, she can just assume they're medically not necessary.

Here she's made another assumption and she's not validated it, you pointed it out this time, I didn't take a great deal of objection to this, but I'm certainly not going to agree with it without having done the analysis and I'm not going to disagree with it without having done the analysis, that would be speculation.

Q.      That's all I was asking.

Are you aware of the Department of Justice's criticisms of Millennium's use of custom profiles?

Page 286

HUTTON - CONFIDENTIAL

in this exercise is I analyze Ms. Austin Smith's report and I was not asked to and I do not analyze anything beyond that, outside of that, I do not analyze whether custom profiles were --  it is not within my realm of expertise whether they were in line with laws or not.

And at the time that management was making the analysis, the judgment had not been made, so you're asking a question that I can't answer, I haven't considered and I haven't spent the time thinking about.

Q.    I appreciate --  I think that's good enough, I understand you're not going to testify about that.

Because you say she hasn't validated the assumption she made, you restored, as you put it --  hold on one second here, I'm sorry, I got lost in my train of thought.

Q.    You say you restored the NRPS reduction, right?

A.    Yes; again, as an illustrative

HUTTON - CONFIDENTIAL

MR. NEWCOMER:  You all froze, I cannot see you, off the record.

THE VIDEO TECHNICIAN: Time is 6:25, going off the record.

(Pause.)

THE VIDEO TECHNICIAN: Time is 6:26, we're back on the record.

BY MR. NEWCOMER:

Q.      I was asking you, I don't know if you heard it, in your opinion, is an implied equity value of $23 million adequate capital for Millennium under the adequacy of capital test?

MR. POPOVSKY:  Objection to form.

A.      So I did not analyze whether $23 million is adequate capital for Millennium, that would require a detailed analysis that I've not conducted.

Q.      Did you form any opinion that above X amount of capital, whatever it is, a hundred million, 200 million, $1 billion, was sufficient capital under the adequate capital test?

HUTTON - CONFIDENTIAL

A.        I did not come up with a level of required capital to declare that it was adequate.

What I do in this section of the report is I highlight the fact that Ms. Austin Smith relies on the same adjustments that she made, that I've already refuted, and then what she does is she brings forth a single downside scenario where she doubles the DOJ effects --  she gets them up to 50 percent instead of 30 percent and she increases the Medicare and RPS, she says it would drop to 33 percent and that the Noridian LCD would be 18.3, and she goes to this one downside scenario and with that she declares there is not sufficient aggregate capital.

And I take issue with the fact that all these things we've already talked about are kind of incorporated in there.

Q.        What is your --  when was the last time you applied a capital adequacy test?

HUTTON - CONFIDENTIAL

form.

A.      I have attempted in my report to provide the decision makers with an understanding of how, when I take my expertise and look at Ms. Austin Smith's report, of where I can highlight specific errors and assessments that she makes that are unreliable.

I cannot be sure that there is not an error in the LCD and in the way that she deals with it, I just did not opine on it, but there could be something wrong with it.

Q.      There could be something wrong with it, but you're not offering an opinion that there is, correct?

A.      Correct, yes.

Q.      When was the last time you performed an ability to pay debts as they became due test, outside of this context?

MR. POPOVSKY:  Objection to form.

A.      In the context of my teaching, we do that in the cases where we want to

HUTTON - CONFIDENTIAL

see can the company service the debt, in that context.

Q.      Have you ever done it in private practice, where your decision matters for an actual company?

A.      A long time ago, when I worked at the investment bank, yes, I provided bridge financing for LPO deals and I don't recall the specifics, but I know one of the things I would have had to do was make sure that we got paid back.

Q.      And those are short-term deals, bridge finance, right?

A.      Bridge financing, yes, generally they were fairly short term.

Q.      What is the methodology that you apply there, what do you teach your students about how to perform an ability to pay test?

MR. POPOVSKY:  Objection to form.

A.      So, you know, what Ms. Austin Smith did here is she provides the details that are in the Padres projections that

**C E R T I F I C A T I O N**

I, Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and a Notary Public, do hereby certify that the foregoing witness, AMY HUTTON, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

*Jineen Pavesi, RPR, RMR*

JINEEN PAVESI, RPR, RMR, CRR

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

### ERRATA FOR MAY 5, 2022 DEPOSITION OF AMY HUTTON

| Page | Line(s) | Original | Correction | Reason |
|---|---|---|---|---|
| 12 | 9 | John | Jon | Typographical error |
| 13 | 13 | John | Jon | Typographical error |
| 50 | 15 | that will allow them you can view as either | that you can view to be either | Clarification |
| 53 | 19 | with | for | Clarification |
| 59 | 18 | said | says | Transcription error |
| 62 | 7-8 | relied on it, legal documents. | relied on it. | Clarification |
| 67 | 19-20 | that Department | that the Department | Transcription error |
| 68 | 2 | Austin Smith in | Austin Smith, in | Punctuation error |
| 73 | 8 | Calloway, she | Calloway.  She | Punctuation error |
| 73 | 23 | do, she | do.  She | Punctuation error |

| Page | Line(s) | Original | Correction | Reason |
|---|---|---|---|---|
| 77 | 19 | Now | No | Transcription error |
| 99 | 22-23 | by citing some cases in just textbooks | by citing in some cases just textbooks | Clarification |
| 100 | 8 | on WACC | on a WACC | Transcription error |
| 109 | 16 | UTD | UDT | Typographical error |
| 119 | 24-25 | on estimated | and estimate it | Transcription error |
| 130 | 10 | use if | use them | Transcription error |
| 132 | 22 | five | .85 | Transcription error |
| 136 | 12-13 | weld of diversified | well-diversified | Transcription error |
| 145 | 19-20 | recall.  They are | recall whether they are | Clarification |
| 150 | 3 | derivation | the derivation | Transcription error |
| 150 | 9 | 14 percent | a 14 percent | Transcription error |
| 150 | 17 | and -- but | versus what | Clarification |
| 150 | 18 | analysis | analyses | Transcription error |
| 153 | 13 | emphasize | add a size | Transcription error |
| 155 | 2 | that | of | Transcription error |
| 155 | 4 | up, these | up.  These | Punctuation error |
| 164 | 4 | what this is | what is | Transcription error |
| 164 | 6 | invest, in | invest in, in | Transcription error |
| 164 | 12 | coverable | comparable | Transcription error |
| 165 | 2 | is | is not | Transcription error |
| 166 | 11-12 | not systematic risk, it includes | not only systematic risk, but also it includes | Transcription error |
| 167 | 8 | analysis | analyses | Transcription error |
| 167 | 14 | their | TA Associates' | Clarification |
| 175 | 16 | performs | performed | Transcription error |
| 175 | 17 | analysis | analyses | Transcription error |

| **Page** | **Line(s)** | **Original** | **Correction** | **Reason** |
|---|---|---|---|---|
| 175 | 18 | rates yielding enterprise value | rate multiples, yielding an enterprise value | Clarification |
| 181 | 14-15 | analysis, while one that she didn't take into consideration, the analysis done by the contemporaneous | analysis didn't take into consideration the contemporaneous | Transcription error |
| 182 | 2 | 4.8 | 14.8 | Transcription error |
| 190 | 22 | coverable | comparable | Transcription error |
| 196 | 17 | wouldn't | couldn't | Transcription error |
| 197 | 16 | professional | professionals | Transcription error |
| 200 | 3 | seriousness and purpose | seriousness of purpose | Transcription error |
| 202 | 13 | company-specific risk factor to the extent they're usually relatively small, | small company risk factor, as these are usually relatively small increments, | Clarification |
| 202 | 16 | small company | company specific | Clarification |
| 204 | 12 | 8.2 | 8.6 | Correction |
| 206 | 10 | paid | made | Transcription error |
| 216 | 19 | drop in the | drop in revenues in the | Clarification |
| 218 | 20 | this really the | this is really to | Transcription error |
| 221 | 7 | ,. | . | Typographical error |
| 225 | 3 | into cost | into a cost | Transcription error |
| 227 | 9 | fixed | variable | Clarification |
| 232 | 2 | value | volume | Transcription error |
| 232 | 22 | further | far | Clarification |
| 236 | 17-18 | here, Ameritox | here, with Ameritox | Clarification |
| 237 | 12 | experienced what they have arisen from changes in their | may have experienced changes in their | Clarification |
| 241 | 7 | on this matter | in this matter | Transcription error |

| Page | Line(s) | Original | Correction | Reason |
|---|---|---|---|---|
| 248 | 7 | service | specimen | Transcription error |
| 248 | 21 | service | care test cups | Clarification |
| 248 | 22 | topics of target of | topics of – target of – | Punctuation error |
| 251 | 22 | introductional | international | Typographical error |
| 271 | 13 | eliminates | makes | Clarification |
| 271 | 14 | payors of net | payors net | Clarification |
| 277 | 3 | is | are | Transcription error |
| 279 | 16 | elite | a leap | Transcription error |
| 281 | 3 | has an affirmative | has affirmative | Typographical error |
| 281 | 11 | can | can't | Transcription error |
| 282 | 9 | DOJ, | DOJ investigation, | Clarification |
| 285 | 3 | inclusion | conclusion | Transcription error |
| 290 | 7-9 | from the fourth quarter of 2014 to the first quarter of 20 – fourth quarter of 2013 | from the fourth quarter of 2013 | Clarification |
| 291 | 24 | from | for | Transcription error |
| 292 | 24 | rate that | rate – that | Punctuation error |
| 298 | 14 | i | I | Typographical error |
| 298 | 17-18 | and I'm providing you with raising | and I'm raising | Clarification |
| 302 | 25 | she took as expected in her | she took as the expected case in her | Clarification |
| 305 | 4 | for single quarter, for | from a single quarter, 1Q2014.  For | Transcription error |
| 316 | 17 | ebit | EBITDA | Transcription error |
| 316 | 22-23 | I don't think these companies are all that comparable, I don't rely on this, | "I don't think these companies are all that comparable, I don't rely on this," | Punctuation error |
| 319 | 14 | and RPS | NRPS | Transcription error |

| 323 | 9 | LPO | LBO | Transcription error |
| 333 | 12 | Ms. Austin Smith | Ms. Austin Smith's report | Clarification |

Amy P. Hutton

Subscribed and sworn to before me
this _8_ day of June, 2022

Notary Public

DESHANT ABIELE PAUL
Notary Public - State of New York
NO. 01PA6316886
Qualified in Kings County
My Commission Expires Dec 22, 2022

My Commission Expires: _December 22, 2022_

# EXHIBIT 4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
---------------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
            Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,
                    Plaintiff,

        - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,
                    Defendants.
---------------------------------------------X
                        May 11, 2022
                        10:03 a.m.

            CONFIDENTIAL TRANSCRIPT

            Remote video-teleconference
deposition via Zoom of BRANKA MATEVICH,
pursuant to notice, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.

MATEVICH - CONFIDENTIAL

Q.      It's generally understood in the industry that commercial payors follow Medicare's lead in coding and reimbursement rates, not exact matches, but they generally follow Medicare's trends, right?

MR. POPOVSKY:  Objection to form.

A.      Actually, that was part of the issue with drug testing, because different payors had different guidance, different recommendation, different recommendations in terms of what they would reimburse for and what they wouldn't.

And so that was part of the issue in the industry.

Q.      So is your answer that, no, commercial payors generally do not follow Medicare's lead in coding and reimbursement rates?

A.      No, that's not what I said.

Q.      Okay, so --

A.      There is complexities in the industry; without doing an assessment of

Page 52

MATEVICH - CONFIDENTIAL

that, which I was not asked to do, I can tell you that, yes, there are differences, but I can't speak to the generality because there are dependencies.

Q.     As an expert in the clinical lab industry, is it your general understanding that commercial payors follow Medicare's lead in coding and reimbursement, as a general matter, within your expertise?

MR. POPOVSKY:  Object to the form.

A.     Commercial payors will follow Medicare's recommendation in terms of coding in that they use similar coding, CPT codes.

Regarding reimbursement, it depends on the contractuals, it depends on who the payor is.

So that's what the answer is.

Q.     As a general matter, do commercial payors pay some factor less than Medicare for similar procedures?

A.     That would depend again on the

Page 53

MATEVICH - CONFIDENTIAL

contract.

In my experience, when Medicare had first come out with some of the pricing and everything, things -- actually, Medicare was the lowest payor when I was in the industry at first.

And through the years there has been an evolutionary process where, you know, at one point, to your statement, their -- contracts were set up as a percent of Medicare and in some cases you had contracts based on other --  looking at cost per life, looking at other things, so there is just complexities involved in that.

Q.        When you, and I will get into your experience doing projections a little more, but I want to sort of focus on this particular issue, if you were looking at a projection back in, let's say, 2012, 2013, 2014 time frame, and you saw a circumstance where Medicare took the lead and, say, was going to no longer cover certain types of codes or procedures, or

**Page 173**

C E R T I F I C A T I O N

I, Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and a Notary Public, do hereby certify that the foregoing witness, BRANKA MATEVICH, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

*Jineen Pavesi, RPR, RMR*

JINEEN PAVESI, RPR, RMR, CRR

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

**ERRATA FOR MAY 11 AND MAY 13, 2022 DEPOSITION OF BRANKA MATEVICH**

| Page | Line(s) | Original | Correction | Reason |
|------|---------|----------|------------|--------|
| 10 | 20 | Jan | Jon | Transcription error |
| 13 | 25 | and that I | and I | Transcription error |
| 15 | 25 | Fluer | Fluur | Transcription error |
| 16 | 4 | Fluer | Fluur | Transcription error |
| 16 | 5 | Fluer | Fluur | Transcription error |
| 16 | 13 | Fluer's | Fluur's | Transcription error |
| 21 | 24 | lab, | lab industry, | Clarification |
| 22 | 21-22 | one of the | what are the | Transcription error |
| 34 | 24 | was a | was at a | Transcription error |
| 39 | 21 | and very | and am very | Transcription error |

| **Page** | **Line(s)** | **Original** | **Correction** | **Reason** |
|---|---|---|---|---|
| 52 | 4 | the | that | Transcription error |
| 61 | 3 | Medicare data reimbursements | Medicare reimbursements data | Clarification |
| 62 | 24 | BRGs | DRGs | Transcription error |
| 77 | 24 | Hart | Heart | Transcription error |
| 80 | 23 | cull | call | Transcription error |
| 88 | 16 | lab. | lab industry. | Clarification |
| 90 | 14 | laboratory and | laboratory industry and | Clarification |
| 102 | 17 | and | if | Transcription error |
| 103 | 17 | cull | call | Transcription error |
| 106 | 16 | around | about | Transcription error |
| 110 | 23 | cull | call | Transcription error |
| 112 | 11 | culled | called | Transcription error |
| 124 | 20 | lab for | lab industry for | Clarification |
| 125 | 6 | max | MACs | Transcription error |
| 125 | 15 | lab and | lab industry and | Clarification |
| 138 | 14 | on | in | Transcription error |
| 204 | 11 | that, in quantity, submitted | in quantity that were submitted | Clarification |
| 209 | 22 | in | into | Transcription error |
| 213 | 14 | faced Millennium | Millennium faced | Transcription error |
| 218 | 6 | resubmit what | resubmit – what | Transcription error |
| 277 | 7 | weren't | were | Clarification |
| 282 | 16 | Noridian the LCD | the Noridian LCD | Transcription error |
| 303 | 7 | on | of | Transcription error |
| 311 | 23 | time, wouldn't | time, the test wouldn't | Clarification |
| 314 | 23-24 | Testing. "Should | Testing Should | Punctuation error |
| 321 | 2 | It's whether | Whether | Clarification |

| Page | Line(s) | Original | Correction | Reason |
|------|---------|----------|------------|--------|
| 335  | 13      | four     | one        | Clarification |

_Branka Matevich_

Branka Matevich

Subscribed and sworn to before me

this __6__ day of June, 2022

Notary Public

01ES6366503 - Kings County

My Commission Expires: 10/30/2025

# EXHIBIT 5
# FILED UNDER SEAL

# EXHIBIT 6



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
T  +1 202 637 5600
F  +1 202 637 5910
www.hoganlovells.com

August 15, 2014

**By Electronic Mail**

Division of Technical Payment Policy
ATTN:  Provider and Supplier Self-Disclosure
Centers for Medicare & Medicaid Services
7500 Security Boulevard
Mailstop C4-25-02
Baltimore, MD  21244-1850

**Re:       Millennium Laboratories, LLC – Voluntary Self-Referral Disclosure**

To Whom It May Concern:

On behalf of Millennium Laboratories, LLC ("Millennium" or the "Company"), we make this submission pursuant to the CMS Voluntary Self-Referral Disclosure Protocol to resolve a potential violation of the "Stark" physician self-referral law (Section 1877 of the Social Security Act). This disclosure relates to Millennium's prior practice of providing point-of-care drug test cups at no charge to certain of its physician customers for use as a specimen collection device.  Millennium believes – with support from a number of health care legal experts it has consulted on this issue over the past several years – that it provided the test cups in question under conditions that did not effectuate a "financial relationship" for purposes of the Stark law, and thus did not trigger the law's prohibitions. Specifically, the physicians who received test cups without charge (a) used them primarily to collect and transport specimens to Millennium's drug testing lab, and (b) agreed in writing not to bill third party payers or patients for the preliminary results generated by the cups (and, in fact, did not bill).

However, the Company's primary competitor, Ameritox, challenged Millennium's test cup agreements in a Lanham Act and state unfair competition action filed in the U.S. District Court for the Middle District of Florida.  On June 16, 2014, the jury in that case found that notwithstanding the agreement not to bill, Millennium's provision of no-charge test cups to physicians for specimen collection violated the Stark law.

Millennium has moved to set aside that verdict and, if necessary, intends to appeal.  But because of that verdict, and in recognition that a violation of the Stark law may have occurred, we submit this disclosure for the purpose of resolving any potential liability Millennium may have under the Stark law in connection with its provision of no-charge test cups to referring physicians for use as a specimen collection device.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante   Amsterdam   Baltimore   Beijing   Brussels   Caracas   Colorado Springs   Denver   Dubai   Dusseldorf   Frankfurt   Hamburg   Hanoi   Ho Chi Minh City   Hong Kong   Houston   Johannesburg   London   Los Angeles   Luxembourg   Madrid   Miami   Milan   Moscow   Munich   New York   Northern Virginia   Paris   Philadelphia   Prague   Rio de Janeiro   Rome   San Francisco   São Paulo   Shanghai   Silicon Valley   Singapore   Tokyo   Ulaanbaatar   Warsaw   Washington DC   Associated offices: Budapest   Jakarta   Jeddah   Riyadh   Zagreb.  For more information see www.hoganlovells.com

\\DC - 036365/000007 - 5750782 v5

## 1. Background Information

The past decade has seen a rapid rise in the use of powerful opioid medications in the treatment of chronic pain, as well as in the misuse and abuse of these drugs. Along with this increased drug utilization, and in order to ensure safe and effective patient care, the need arose for prescribing physicians to monitor their patients through periodic drug testing to assess treatment compliance, to identify potentially dangerous drug abuse and drug interaction issues, and to detect inappropriate drug seeking or drug diversion behavior.

In response to this clinical need, a number of established and new laboratory companies, including Millennium, have developed drug testing services specifically for the medication monitoring needs of physicians treating chronic pain patients. The testing performed by Millennium and these other laboratories typically is billed by the labs to third party payers, including Medicare and other federal health care programs. In this growing market, Millennium has been able to successfully distinguish itself through its leading-edge technology, its extensive testing menu, its rapid one-day results, its comprehensive reports, and its commitments to customer service, research, education, and the highest standards of ethical business practices.

As Millennium has grown over the past several years through its superior test offerings and customer service, it eventually displaced Ameritox as the nation's leading drug testing laboratory, which has led to a series of contentious litigation matters between the two companies. In fact, since 2011, Ameritox has brought claims against Millennium in at least eight separate forums, including direct actions by Ameritox against Millennium, actions by Ameritox against Millennium employees, and actions ostensibly brought by third parties that, in fact, have been paid for and directed by Ameritox. Until the recent test cup verdict, these repetitive actions have been largely unsuccessful. By contrast, in a Lanham Act case for false advertising brought against Ameritox by Millennium in the District of Maryland (Millennium Laboratories, Inc. v. Ameritox, Ltd., Case No. 1:10-cv-3327), a federal court ruled that Ameritox had falsely marketed one of its drug testing systems as having the ability to determine whether a patient is taking the correct dosage of a prescribed medication and entered a consent decree halting certain advertisements and requiring corrective action. In addition, in November 2010, Ameritox paid the government $16.3 million to resolve kickback and false claims allegations against the company. As a result of that settlement, Ameritox presently operates under a corporate integrity agreement (or "CIA") with the Office of Inspector General of the Department of Health and Human Services ("OIG").

In the action recently tried in the Middle District of Florida (Ameritox, Ltd. v. Millennium Laboratories, Inc., Case No. 8:11-cv-0775-T-24), Ameritox asserted a federal Lanham Act claim against Millennium, as well as a number of state unfair trade practices and common law claims. In one claim, Ameritox asserted that Millennium had improperly induced physicians by providing "free" point-of-care test cups in exchange for referrals.[1] Millennium disputed this allegation, asserting that its provision of the test cups, pursuant to a written agreement with each physician containing a promise that the physician would not submit a bill for the preliminary test results provided by the cups, was not "remuneration" and did not implicate the Stark law.

---

[1] In the interest of submitting a properly focused disclosure, we have not included a number of the pleadings, motions, and orders in the Ameritox, Ltd. v. Millennium Laboratories, Inc. case. We will, however, provide any such documents to CMS upon request.

\\DC - 036365/000007 - 5750782 v5

CMS Division of Technical Payment       - 3 -       August 15, 2014
Policy

Of all the issues litigated in the case, only three of Ameritox's claims, including the "free" test cup allegation, were presented to the jury.[2] All of Ameritox's other allegations were either dismissed by the court or abandoned at trial. And the court and the jury found for Ameritox only on the test cup issue, thus prompting this disclosure.

### 2. Provider Information

Millennium is a privately-held clinical laboratory company based in San Diego, California. The Company is not owned, controlled, or otherwise part of a health system or network. Its identifying information is as follows:

| Name | Address | NPI | CCN | Tax ID No. |
| --- | --- | --- | --- | --- |
| Millennium Laboratories, LLC | 16981 Via Tazon San Diego, CA 92127 | 1497933162 | 05D1078705 | 26-1565558 |

We are the Company's designated representatives for purposes of this disclosure.

### 3. Nature of Matter Being Disclosed

This disclosure involves the provision of point-of-care test cups to the small subset of Millennium's physician customers – approximately 10%[3] – who received such cups for specimen collection purposes without charge on the condition that they agree in writing not to seek payment from patients or third party payers for the qualitative measurements obtained through their use of the cups. More specifically, the potential violation relates to whether the provision of test cups under these conditions creates a "compensation arrangement," as defined in 42 C.F.R. § 411.354, for which there is no statutory or regulatory exception, so that the referral of clinical laboratory services[4] to Millennium by physicians who received no-charge cups was prohibited by the Stark law.

### A. Background Regarding Millennium's Provision of Test Cups

The cups in question function first and foremost as a specimen collection device for urine drug testing performed at Millennium. Secondarily, the cups also function as an immunoassay testing device at the point-of-care. The cups contain chemically activated strips that provide an instant qualitative test result for certain drug classes – that is, the cups are able to detect the presence of certain drugs in a patient's urine, but cannot quantify the amount of any given drug present or distinguish between different substances in a drug class (so, for example, the test cups can identify the presence of an opiate, but cannot indicate how much or tell the user whether it is codeine, morphine, or any of the other drugs or metabolites in the opiate class). The test cups also cannot detect the presence of drugs or metabolites at low or even moderate levels of concentration. Thus,

---

[2] The other two issues presented to, and rejected by, the jury in the Ameritox case were allegations that Millennium (a) facilitated below fair market value prices on analyzers and related supplies used by physicians to perform more sophisticated in-office testing, and (b) provided non-public billing, coding, and reimbursement advice at no charge.

[3] In terms of volume, requests for testing in connection with the test cups at issue here represented approximately 16 to 17% of Millennium's business, at its peak.

[4] Clinical laboratory services are the only Stark designated health services furnished by Millennium.

\\DC - 036365/000007 - 5750782 v5

Confidential       ML_DE_00670670

CMS Division of Technical Payment                    - 4 -                                    August 15, 2014
Policy

the standard FDA-approved labeling for all of these point-of-care test cups specifically advises users that the cups provide "only a preliminary analytical test result" and that a "more specific alternate chemical method must be used in order to obtain a confirmed analytical result." A picture and the package insert for one of the cups commonly furnished by Millennium (the Amedica™ Drug Test Cup) is attached as Exhibit A.

Despite their limitations, these test cups are useful in providing preliminary results at the "point-of-care," meaning in the treating physician's office or clinic. In particular, the results can be used to guide treatment discussions and initial prescribing decisions while the patient is still present in the office, as well as to inform physicians on whether to order additional confirmatory testing and what confirmatory tests to order. Confirmatory testing is performed on the same specimen, typically by an outside laboratory like Millennium (which receives the specimen in the point-of-care test cup), using more sophisticated quantitative testing technology, such as liquid chromatography/tandem mass spectrometry ("LC/MS-MS," which is the state-of-the art technology used by Millennium) or gas chromatography/mass spectrometry ("GC/MS").

Where physicians purchase point-of-care test cups, they are able to bill third party payers, including Medicare, for the initial drug screening performed using the cups. Medicare pays approximately $20 for these initial qualitative screens under HCPCS code G0434. Notably, some commercial insurers pay considerably more, in some cases in excess of $150 per screen. Point-of-care test cups can be purchased by physicians from a variety of sources for approximately $4 to $7 per cup, depending on the number of drug classes tested. Millennium sells point-of-care test cups to physicians at market rates through an affiliated company, Millennium Laboratories Clinical Supply ("MLCS").

This disclosure involves the small minority of Millennium's customers who do not seek to receive any reimbursement for point-of-care testing, but still would like to obtain the preliminary information available through the test cups as part of the urine drug testing process, including to inform them on what additional testing to order for their patients.

### B. Development of Millennium's Policy on the Provision of Test Cups

In late 2009, Millennium for the first time entered into a written "cup agreement" with a physician who elected not to bill for point-of-care testing, as a number of other drug testing labs were doing at the time. The Company's President consulted with Jane Pine Wood, a nationally-recognized legal expert on clinical laboratory regulatory issues, who advised that if the physician was willing to execute a legally binding agreement not to bill for point-of-care testing, so that the cups received from Millennium would not yield an economic benefit, Millennium could supply test cups to the physician at no charge without violating the Stark law (or the anti-kickback statue). In a declaration confirming this advice filed in the Ameritox litigation and attached as Exhibit B, Ms. Wood indicates she also "reviewed and approved" Millennium's initial form of cup agreement (which is included within Ms. Wood's declaration) and that "Millennium's cup agreement was consistent with the practices of other laboratories [she] was advising at the time."

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                                                    ML_DE_00670671

This firm, which also is recognized as having one of the nation's leading health care law practices,[5] also began advising Millennium in late 2009 and confirmed that the Stark law and the anti-kickback statute did not prohibit the Company from providing test cups at no charge to physicians who agreed not to bill for their use of the cups. Our advice to the Company included an October 6, 2010 letter (attached as Exhibit C), which was intended as a summary analysis for use in informing physicians of the relevant legal and regulatory considerations. We also advised Millennium on subsequent versions of its form cup agreement and, like Ms. Wood, were aware of a number of other drug testing labs that provided test cups to physicians consistent with Millennium's cup agreement. Indeed, we understood the provision of no-charge test cups for specimen collection to be a fairly common practice among urine drug testing laboratories.

It is worth noting that the Middle District of Florida rebuffed Ameritox's challenges to our legal advice concerning the test cups at issue in this disclosure. The 2010 Hogan Lovells letter at Exhibit C was the basis for Ameritox's Lanham Act false advertising claim against Millennium. In essence, Ameritox claimed that by circulating the letter, Millennium falsely advertised that its provision of test cups was lawful. The court rejected that claim and, in a summary judgment order, held that there was "no clear case law" or other authority demonstrating Millennium's cup program to be illegal.

As the Company grew over the past few years, its number of cup agreements grew proportionately and generally stayed at around 10% of its customer accounts. In addition, the Company implemented an increasing number of compliance measures aimed at ensuring physician adherence to the terms of its cup agreements. This, most notably, included purchasing billing data from independent sources to confirm that physicians with cup agreements were not seeking reimbursement from third party payers for point-of-care testing. Millennium's full cup agreement policy is attached as Exhibit D.

Millennium continued and vigorously defended its cup agreement arrangements throughout the Ameritox litigation, believing they were both legally appropriate and an important component of medication monitoring by physicians who agreed to forgo seeking reimbursement. The Company terminated these arrangements in June 2014, after receiving the jury's verdict. Millennium strongly disagrees with the verdict, has asked the court to set it aside and/or order a new trial, and intends to appeal if necessary.

### 4. Legal Analysis

#### A. Basic Legal Analysis

Based on the jury's recent decision in Ameritox, Ltd. v. Millennium Laboratories, Inc., Millennium acknowledges the potential that it had "financial relationships" with physicians receiving the point-of-care test cups at no charge (and agreeing not to bill for testing), to which no Stark law exception was applicable. The Company's policy regarding the provision of no-charge test cups was designed in anticipation that the cups would not be considered "remuneration," and that the Stark law thus would not apply.

---

[5] Specifically, for several years running, the Hogan Lovells Washington, D.C. health care practice has received the highest "Band 1" ranking from Chambers USA. The firm also is ranked "First Tier" for healthcare and life sciences in The Legal 500.

\\DC - 036365/000007 - 5750782 v5

Below, we explain in further detail the basis for Millennium's position that the test cups did not implicate the Stark law. In sum, Millennium asserts that (a) the primary use of the test cups was as a specimen collection and transport device for the lab, in compliance with a long-standing Stark law provision protecting items used for those purposes, and (b) the preliminary results generated by the cups were part and parcel of the lab's services and advanced patient care, so that the cups had no independent economic value to physicians who agreed not to bill and, thus, received no remuneration related to their use. As a result, under these circumstances, Millennium reasonably believed the cups were not remuneration that implicated the Stark law.

Importantly, Millennium's position on the provision of no-charge test cups was endorsed by two prominent legal experts who provided opinions in the Ameritox case that Millennium's cup agreement arrangements were consistent with the Stark law. Those experts were (a) Lewis Morris, Chief Counsel to the Inspector General of the U.S. Department of Health and Human Services ("HHS") from 2002 to 2012, and (b) John Brennan, Co-Chair of the Health Care Group at the Washington, D.C. law firm Crowell & Moring LLP. Their expert reports are attached as Exhibit E and Exhibit F, respectively. We note that among Mr. Brennan's credentials is that he served on the American Health Lawyers Association's "Stark Law Convener Panel," which in 2010 made specific recommendations for changes in the law that have since been adopted by CMS or Congress, thus making him one of the nation's foremost experts on the intricacies of the Stark law. Regrettably, Mr. Brennan did not have the opportunity to testify at trial in the Ameritox case after his testimony was challenged by Ameritox as being cumulative to that of Mr. Morris, so the jury did not have the benefit of his expert and thoughtful analysis. For that reason, we especially commend Mr. Brennan's report to CMS's attention in its assessment of this matter.

The various health care attorneys who have looked at this question on behalf of Millennium unanimously agree that a drug testing lab's provision of no-charge point-of-care test cups to physicians who agree not to bill for their use is permitted under the following analysis of the Stark law. To be clear, we provide this analysis for the purpose of assisting CMS as it assesses the basis for any potential violation of the Stark law, and especially to convey the reasons why Millennium, in good faith, believed its provision of no-charge test cups was lawful. This belief, of course, is highly relevant to any fair and just resolution of this matter, which is the purpose of this disclosure. We are not seeking an advisory opinion from CMS on the provision of no-charge test cups.

### B. The Test Cups Qualify for the Lab Supplies "Carve Out" to the Definition of Remuneration

Under the Stark statute and regulations, there are certain items that are not considered "remuneration" and thus, literally by definition, are expressly precluded from forming a "compensation arrangement" that would trigger application of the Stark law. Specifically, the provision of items, devices, or supplies "that are used solely to collect, transport, process, or store specimens" for a lab providing such supplies does not create, and is carved out from the definition of, "remuneration" that effectuates a compensation arrangement for purposes of the Stark law. *See* 42 C.F.R. § 411.351; *see also* 42 U.S.C. § 1395nn(h)(1). For ease of reference (and to distinguish from a Stark law exception, which it is not), we will refer to this as the "lab supplies carve out."

On the basis of guidance received from this firm and others, Millennium believed that when it provided test cups to physicians who agreed not to bill for their use, they fell within the ambit of this

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                                                                              ML_DE_00670673

lab supplies carve out to the definition of remuneration.  On this point, there is no question that the cups are used to collect and transport specimens for analysis at the laboratory.  Rather, the point of contention raised by Ameritox in its case against Millennium was whether the cups are used "solely" for that purpose.  On this issue, we look to the following guidance from CMS on interpreting the lab supplies carve out, which comes from the preamble to the Phase I final rule:

> Congress intended to include in this section items, supplies, and devices of <u>low value</u> ... that are <u>primarily</u> provided by laboratories to physicians to ensure proper collection of specimens for processing at the laboratory and that have <u>little, if any, independent</u> **economic** <u>value</u> to the physicians who receive them. In many cases, the cost of these items may already be included in the practice expense portion of the Medicare payment made to the physician.

66 Fed. Reg. 856, 947 (Jan. 4, 2001) (emphases added) (the "Phase I Rule").

As Mr. Brennan rightly notes in his expert report, this guidance – which Millennium reasonably and in good faith relied upon in implementing its test cup program – clarifies a few important points, in plain terms.

∞   First, "solely" is not interpreted by CMS in a rigid sense, but rather considers the <u>primary use</u> of the item, supply, or device.

∞   Second, "solely" refers only to whether the physician receives <u>economic</u> value from another use.

∞   Third, a small amount of economic value, even, does not change the analysis. The item instead must have <u>more than a "little" economic value</u>.

In the case where a physician agrees to forego billing, the test cup clearly does not represent any direct "economic value" because the physician does not receive any reimbursement for the preliminary test.  Nor is the physician relieved of any financial cost he otherwise would incur in the normal course of his practice, which was Ameritox's principal argument (that is, that the test cups represented a "cost savings" to the physicians).  In fact, there is no legal or regulatory requirement that physicians perform initial screens at the point-of-care.  Thus, the physician does not "save" any expense by receiving the test cup.  Rather, the test cups are most properly viewed as an integral part of the lab's testing process and service, and thus <u>a legitimate cost of the lab when not used by physicians to generate actual revenue</u>.  This is especially true given that the cups help inform the physicians on what testing to order from the lab, thus optimizing the lab's services for the patient.

Under that analysis, the benefit of the test cup to physicians, if any, is <u>incidental and non-economic</u>. A preliminary test result is produced, but the cup's <u>primary use</u> is for the collection and transport of specimens for definitive analysis by the lab.  In CMS's terms, physicians received <u>little, if any, independent economic value</u> from the Millennium cup agreement arrangement, which we believe brings it under the lab supplies carve out, as it has been interpreted by CMS.

\\DC - 036365/000007 - 5750782 v5

                                                                                     ML_DE_00670674

**C. Even if the Test Cups Do Not Qualify for the Lab Supplies Carve Out, They Were <u>Not</u> Furnished Under Circumstances that Constituted Remuneration for Stark Law Purposes**

It is important to emphasize that the lab supplies carve out is definitional – meaning it is not among the exceptions specified in 42 C.F.R. §§ 411.355-411.357 that must be strictly followed if a financial relationship exists, but instead defines a relatively narrow category of items that *per se* are not remuneration for Stark law purposes. That, of course, does not mean other items outside of this definitional carve out (because they are <u>not</u> used "solely to collect, transport, process, or store specimens") are necessarily remuneration. Rather, for the Stark law to apply, these other items still must be furnished under circumstances that constitute remuneration to referring physicians.

As noted in the expert reports of Mr. Morris and Mr. Brennan, there is any number of items and services analogous to point-of-care test cups that CMS has indicated do not constitute remuneration for Stark law purposes because they simply do not confer any <u>independent **economic** value</u> on physicians. Perhaps most notable of these for this matter are those items or services used by labs and other designated health service entities in the provision of their services. For example, in the Phase I Rule, CMS responded as follows to a comment asking whether a laboratory may provide medical waste disposal supplies and services to physicians free of charge:

> Section 1877(h)(1)(C)(ii) of the Act excludes from the definition of a compensation arrangement remuneration that consists "the provision of items, devices, or supplies that are used solely to – (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply * * *." The provision does not specifically allow laboratories to furnish physicians and group practices with medical waste disposal supplies and services at no charge. However, we believe that supplies and the disposal of items <u>used solely in connection with the collection of specimens</u> for this clinical laboratory are <u>part of the process the laboratory engages in when it collects, transports, and processes specimens</u>. If a laboratory can provide a needle for collection and it can take away the specimen, we believe that laboratory can also take away the needle and other items that are used in the process.

66 Fed. Reg. at 949 (emphasis added). Likewise, even if point-of-care test cups technically fall outside of the lab supplies carve out, they clearly are part of process a drug testing lab engages in when it collects and processes urine specimens. In particular, the test cups provide a preliminary result that, among other non-economic benefits, helps guide physicians in assessing whether to order additional confirmatory testing from the lab and what confirmatory tests to order. Under this analysis, the cups should be viewed as part and parcel of the lab's services, rather than as a source of independent remuneration.

CMS also has distinguished between items or services that confer a financial benefit from those that do not in the context of the electronic health records exception to the Stark law. Of particular significance, CMS noted that information about a patient's health status – including test results – generally would <u>not</u> be considered remuneration:

> Thus, when related to the care of individual patients, <u>information such as test results,</u> diagnosis codes, descriptions of symptoms, medical history, and prescription

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                                    ML_DE_00670675

information are part of the delivery of the health care services and would not have independent value to the recipient.

71 Fed. Reg. 45140, 45143 (Aug. 8. 2006) (emphasis added).

Moreover, in those cases where CMS has deemed lab supplies to constitute remuneration for Stark law purposes, such as with biopsy needles or other surgical devices, it appears to be because those items are used by physicians in performing billable health care services, and thus have independent economic value to the physicians.

∞   In CMS Advisory Opinion No. CMS-2013-02, for example, CMS found the provision of biopsy brushes for use in obtaining a biopsy of exocervical lesions to be remuneration because the device was routinely used in performing medical procedures "which are billed to the Medicare program" using CPT code 57454 (Colposcopy of the cervix).[6]

∞   Similarly, Advisory Opinion No. CMS-2010-01 found the provision of specula for use in collecting Pap smear specimens to be remuneration because (a) they are typically used not only to collect the specimen, but also in performing "extensive," and presumptively billable, gynecological exams, and (b) the requestor in that case had "no way to prevent the concurrent use of a speculum for the collection of a Pap smear specimen and the gynecological examination of the patient."

By contrast, Millennium did have an effective way to prevent physicians from using dual-purpose test cups to perform billable procedures – that is, the written cup agreement and its subsequent monitoring procedures. In this respect, test cups are readily distinguishable from dual-purpose surgical devices that are used by physicians in performing medical procedures and examinations that are core to their day-to-day practice. The function of the cups is far removed from the core of the physician's practice, making it a relatively straightforward proposition for a physician not to bill for their use. And in fact, there is no evidence, from the Ameritox case or elsewhere, that any physicians with Millennium cup agreements ever billed for their use of the cups. Thus, Millennium had good reason to believe that in the hands of such physicians, the cups had no independent economic value for purposes of the Stark law.

While we recognize the independent authorities of CMS and OIG, we add that in adopting this view of remuneration as not including items or services with no independent economic value, CMS has strived to define remuneration for purposes of the Stark law consistent with how the OIG has defined the same term for purposes of the anti-kickback statute.[7] With that in mind, we believe it is especially notable that the OIG explicitly has stated that an arrangement remarkably similar to the one at issue here – the provision of free testing for a physician's managed care plan patients – does not implicate the anti-kickback statute where the physician receives no financial benefit from the

---

[6] The full description of CPT code 57454 is "Colposcopy of the cervix including upper/adjacent vagina; with biopsy(s) of the cervix and endocervical curettage."

[7] In the preamble to the Phase I final rule, for example, CMS looked to the OIG's 1994 Special Fraud Alert on "Arrangements for the Provision of Clinical Laboratory Services" as "instructive" in concluding that a lab's placement of a phlebotomist in a physician's office is not remuneration "if the phlebotomist is purely performing laboratory functions." 66 Fed. Reg. at 948.

\\DC - 036365/000007 - 5750782 v5

                                                                                   ML_DE_00670676

- 10 -

arrangement.  More specifically, in its 1994 Special Fraud Alert on "Arrangements for the Provision of Clinical Laboratory Services,"[8] the OIG addressed the fairly common situation of a managed care plan having an exclusive arrangement with a particular lab and refusing to pay claims submitted by other "out-of-network" labs and whether, in such situations, an out-of-network lab may agree to perform the managed care work free of charge.  According to the OIG:

> The status of such agreements under the anti-kickback statute depends in part on the nature of the contractual relationship between the managed care plan and its providers. Under the terms of many managed care contracts, a provider receives a bonus or other payment if utilization of ancillary services, such as laboratory testing, is kept below a particular level.  Other managed care plans impose financial penalties if the provider's utilization of services exceeds pre-established levels. When the laboratory agrees to write off charges for the physician's managed care work, the physician may realize a financial benefit from the managed care plan created by the appearance that utilization of tests has been reduced.

> In cases where the provision of free services results in a benefit to the provider, the anti-kickback statute is implicated. (Emphasis added.)

In other words, free testing itself is not remuneration and does not implicate the anti-kickback statute unless it results in a **financial** benefit to the physician.

The 1994 Fraud Alert also makes clear that laboratories may provide physicians with other items and services that are directly related to the lab's testing services and, thus have no independent value that would implicate the anti-kickback statute, such as specimen collection and processing services, disposal of bio-hazardous waste, and the provision of computer equipment or fax machines for communicating laboratory test orders and results.

In all of these circumstances, the physician realizes some benefit. The same analysis applies to the provision of point-of-care test cups pursuant to Millennium's cup agreements.  As a result of the screening results generated by the cup, a physician can preliminarily assess whether a patient is likely to abuse a pain medication or is adhering to a prescribed course of medication, can modify the patient's prescription, and can determine whether additional testing is necessary and what testing to order.  But that does not constitute financial remuneration that implicates the Stark law unless the physician bills for that testing.

In his trial testimony, Mr. Morris offered the following analysis of this concept based on his nearly 30 years of government service:

> So when you start with a big term like remuneration, which seems like it encompasses everything, you then have to, if you peel back the onion and ask, "well, is this a financial arrangement, financial flow of monies that is in some way going to affect physician judgment, [is it] going to corrupt physician judgment?" And as I just have given you a couple of examples, CMS has concluded most importantly in the area of our case here that clinical lab information/patient information is not remuneration.

---

[8] The OIG's 1994 Special Fraud Alert is available at http://oig.hhs.gov/fraud/docs/alertsandbulletins/121994.html.

\\DC - 036365/000007 - 5750782 v5

Confidential                                              ML_DE_00670677

Mr. Morris also testified that "while [the cups] are something of value, they are not financial value. They promote patient care…" and that "…the information, the benefit that is going to doctors is not remuneration. It's not money. It's not financial. It's clinical information, which helps in treating patients. And CMS has said expressly that clinical information, like patient test results, is not remuneration."[9]

In sum, even if some non-economic benefit inures to the physician from the use of test cups furnished by Millennium without charge under a cup agreement, this benefit primarily consists of patient care information – namely, preliminary test results – that are part of the lab's process and not of the sort that should be considered remuneration for purposes of the Stark law.

### D. Recent OIG Guidance Seems to Confirm that There is No Remuneration When Free Test Cups are Not Used to Perform "Billable In-Office Testing"

Very recently – indeed, after the jury's verdict in the Ameritox case – the OIG issued a Special Fraud Alert that, by strong implication, further supports Millennium's cup agreement arrangements. In the June 25, 2014 Alert,[10] OIG identified as an arrangement that could implicate anti-kickback statute, the provision of "free or below-market point of care urine testing cups to health care providers who use the cups to perform **billable** in-office testing." (Emphasis added.) The Special Fraud Alert did not identify as problematic all arrangements for the provision of test cups to physicians, and specifically did not include the provision of test cups to physicians who do not perform billable in-office testing.

Millennium's cup arrangements, under which physicians were prohibited from billing and in fact did not bill, is consistent with the OIG's framework. And because the OIG and CMS generally have taken a consistent approach to what constitutes remuneration for purposes of the anti-kickback statute and the Stark law, the OIG's framework logically should extend to the Stark law as well.

### 5. Discovery and Response to the Matter

On the basis of the foregoing analysis, Millennium defended its cup agreements throughout the Ameritox litigation. Two developments in that case prompted this disclosure.

The first development was the following pre-trial order on the test cup issue, which was entered by the court on May 5, 2014:

> To the extent that the doctors could bill for the POC [point-of-care] testing [("POCT")] done using a POCT cup but decline to do so solely because they agreed to Millennium's requirement not to bill for the POC testing, the Court finds that a genuine issue of material fact exists regarding whether the provision of free POCT cups in this scenario constitutes remuneration. Instead, in such a situation, it appears that the doctors are giving up the ability to bill for POC testing, which is giving up the opportunity to net approximately $15 per specimen. Thus, whether the

---

[9] We can make the transcript of Mr. Morris' full trial testimony available upon request.

[10] Available at http://oig.hhs.gov/fraud/docs/alertsandbulletins/2014/OIG_SFA_Laboratory_Payments_06252014.pdf.

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                                      ML_DE_00670678

> free POCT cups constitute remuneration in this scenario must be determined by the jury.
>
> However, to the extent that the doctors could not bill for the POC testing done using a POCT cup for other reasons (such as, because they were using chemical analyzers to test the specimens [in their offices]), then Millennium's provision of free POCT cups did provide a valuable benefit to the doctors in the form of the free preliminary test results that the doctors could not have obtained without purchasing a POCT cup. In this situation, the doctors obtained a preliminary test result without having to pay for the POCT cup and without giving up the opportunity to bill for the POC testing done using a POCT cup. Therefore, in this situation, Millennium's provision of free POCT cups constitutes remuneration under the Stark Law.

The court's full order is attached as Exhibit G. For the reasons set forth above, we believe the court should have found there is no remuneration as a matter of law where the test cups are not used to perform billable in-office testing. Moreover, we believe the court's second finding – that there is remuneration as a matter of law when the physicians do not bill for their use of the cups for "other reasons," such as because they separately perform and bill for point-of-care testing done on an in-office analyzer – also was wrongly decided because, contrary to CMS's historical guidance outlined above, it makes the reason for not billing somehow determinative as to whether there is remuneration, rather than the physician's receipt of any independent economic value. In any case, this second ruling only affected approximately 20 Millennium accounts that performed analyzer testing and also received no-charge test cups from Millennium. In light of the court's order, Millennium decided to immediately terminate its cup agreements with those particular accounts.

The second, and more significant, development prompting this disclosure was the jury's verdict on June 16, 2014 that Millennium's provision of free test cups under cup agreements violated the Stark law.[11] While Millennium respects the proper role of the jury in our legal system, we do not believe this highly technical legal question – which the court had earlier held was a matter of first impression – should have been left in the hands of a lay jury, given the lack of any factual dispute as to whether any physician had ever used free cups to perform billable in-office testing. There is no indication that has ever happened.

Other seemingly prejudicial errors in the trial, some of which are the basis of pending post-trial motions and others that may be pursued on appeal, include:

∞   The court determining pre-trial that because point-of-care test cups provide a preliminary result, they fall outside of the lab supplies carve out to the definition of remuneration for items "that are used solely to collect, transport, process, or store specimens," thus precluding Millennium from presenting any information to the jury on that key issue. This included

---

[11] The jury awarded Ameritox $2.755 million in compensatory damages and $12 million in punitive damages for tortious interference and unfair competition under the state laws of Florida, Tennessee, and Texas; it did not find Millennium liable in other states where Ameritox made similar allegations. As mentioned, Millennium has moved to set aside that verdict and, if necessary, intends to appeal. Among other challenges, Millennium believes the punitive damages award was improperly influenced by passion and prejudice based on evidence and arguments presented by Ameritox completely unrelated to the test cup issue (such as allegations of mistreatment and supposed threats made to former employees, who also happened to be paid witnesses for Ameritox).

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                                          ML_DE_00670679

barring Millennium's legal experts from testifying as to their opinion that Millennium's provision of test cups was consistent with the lab supplies carve out, as it has been interpreted by CMS.

∞ Flawed jury instructions that did not advise the jury, consistent with the CMS and OIG guidance outlined above, that (a) the provision of items or services that are integrally related to a lab's services, and that have no independent economic value to the physician, is not remuneration, and (b) the provision of clinical information is not remuneration.

∞ The Company was precluded from introducing evidence to demonstrate that it repeatedly sought, obtained, and followed expert legal advice in implementing its cup agreement program, including the 2010 letter from this firm in support of the program.

∞ Ameritox's failure to adequately prove any damages specific to the test cup issue.

Despite its disagreement with the jury's verdict, Millennium has suspended its test cup arrangements while it awaits a ruling on its post-trial motions, considers an appeal, and addresses with CMS the potential violation of the Stark law through this disclosure.

## 6. Enforcement History

Millennium has no history of other Stark law violations or of any prior criminal, civil, or regulatory enforcement actions.

## 7. Compliance Program

Perhaps the best evidence of Millennium's commitment to compliance is the fact that it repeatedly sought, obtained, and followed expert legal advice in implementing its cup agreements with physicians. In responding to Ameritox's allegations, that prior advice was confirmed by two prominent legal experts, including the OIG's former Chief Counsel, Mr. Morris, who testified at trial that "Millennium undertook important steps, including consulting with experts at the time of the free cup agreements to insure that to the best of its ability the Company was complying with the law."

Mr. Morris also undertook a thorough review of Millennium's complete compliance program, and in his report at Exhibit H, concludes "that Millennium has had in place all of the necessary elements of a comprehensive compliance program and that its employees believe they work for a company with a culture of integrity." A more complete summary of Millennium's compliance efforts is included in Mr. Morris' report. A separate review of Millennium's compliance program conducted by Strategic Management Services LLC ("SMS") and overseen by former HHS Inspector General Richard Kusserow, similarly concluded that Millennium operated a compliance program in accordance with all the elements of the OIG's Compliance Program Guidance for Clinical Laboratories (see Exhibit I).

Further evidence of Millennium's good faith and its sincere commitment to compliance is reflected in its decision to immediately terminate the cup agreement program and to initiate this self-disclosure, even while it has post-trial motions pending and clear grounds for an eventual appeal.

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                                                       ML_DE_00670680

### 8. Notices to Other Government Agencies

Company counsel has discussed this matter with Assistant U.S. Attorney David Schumacher of the U.S. Attorney's Office for the District of Massachusetts, who is leading a pending Department of Justice inquiry of the Company. A copy of this submission is being submitted to Mr. Schumacher.

### 9. Pending Government Inquiries

As noted immediately above, the Company currently is the subject of a pending inquiry by the U.S. Attorney's Office for the District of Massachusetts. We understand this inquiry presently is focused on issues of medical necessity and promotion by the company of its quantitative testing services. At the government's request, in March 2014 Company counsel made a presentation to the U.S. Attorney's Office on Millennium's test cup arrangements. A copy of that presentation is provided at Exhibit J.

### 10. Financial Analysis

Exhibit K contains the Company's analysis of (a) payments received from Medicare for testing services ordered by physicians during the period which they or their practice had a cup agreement in place with Millennium over the four-year period prior to Millennium's termination of all such agreements in June 2014, and (b) the value of test cups received by such physicians during the same time period.

In evaluating this information, we urge you to give full and fair consideration to Millennium's extensive efforts to seek expert legal advice on the lawfulness of its test cup program, as well its substantial efforts to operate the program in accordance with the applicable legal requirements.

### 11. Additional Mitigating Considerations

We also believe it is notable that the Millennium test cup program was a significant cost saver for Medicare and for other government health care programs by providing important clinical information to physicians at no cost to the programs. This information also helped guide informed test ordering, thereby achieving additional cost savings from the avoidance of unnecessary and wasteful testing.

We believe a likely consequence of termination of the test cup arrangements by Millennium and other drug testing labs will be increased billings for point-of-care testing by physicians who may have been reluctant to bill in the past, but who will start billing now to offset the cost of acquiring test cups previously provided at no charge as part of Millennium's testing process. This cost-saving benefit of Millennium's former cup agreement program was not a consideration in Ameritox's decision to challenge the program, but we believe it is a highly relevant consideration for CMS. Those physicians who may choose, instead, not to collect specimens in test cups, will sacrifice some information that has the potential to improve medical decision making and thus benefit the patient, as well as the Medicare program, through more informed medication prescribing and test ordering.

### 12. Certification

A certification by the Company's Assistant General Counsel regarding the information contained in this submission is attached.

Confidential

CMS Division of Technical Payment                           - 15 -                              August 15, 2014
Policy

* * *

Thank you for your attention to this matter. If you have questions or need additional information regarding this disclosure, please contact us.

Sincerely yours,

Ronald L. Wisor Jr.

Partner
ron.wisor@hoganlovells.com
D +1 202 637 5658

David E. Thiess

Associate
david.thiess@hoganlovells.com
D +1 202 637 5773

Enclosures

cc:   Brian Fowler, Assistant General Counsel, Millennium Laboratories
      Martin Price, General Counsel, Millennium Laboratories
      Helen Trilling, Hogan Lovells US LLP
      Michael Loucks, Skadden, Arps, Slate, Meagher & Flom LLP
      David Schumacher, Assistant U.S. Attorney, District of Massachusetts

\\DC - 036365/000007 - 5750782 v5

Confidential                                                                              ML_DE_00670682

## CERTIFICATION

The undersigned, Brian Fowler, as an authorized representative of Millennium Laboratories, LLC, hereby certifies that to the best of my knowledge, the information provided in the foregoing submission is truthful and is based on a good faith effort to bring the matter described therein to CMS's attention for the purpose of resolving the disclosed potential liabilities relating to the "Stark" physician self-referral law.

August 15, 2014

Brian Fowler

Assistant General Counsel
Millennium Laboratories, LLC

ML_DE_00670683

CONFIDENTIAL
Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**
**Synthesis and Fair Market Value (FMV) Conclusion**
**Option-pricing Method to Allocation**
**Exhibit I-1**

| | Calculation of Enterprise Value | | 31-Oct-2010 |
|---|---|---|---|
| (1) | Enterprise Value - July 30, 2010 | $ | 400,000,000 |
| | multiplied by: | | |
| (2) | Internal Rate of Return | | 1.0656 |
| | equals: | | |
| | **Concluded Enterprise Value** | **$** | **426,240,000** |

| | FMV of the Subject Interest | | 31-Oct-2010 |
|---|---|---|---|
| (3) | Concluded Enterprise Value | $ | 426,240,000 |
| | yields: | | |
| | Option Value Attributable to Common Stock | $ | 183,388,348 |
| | add: | | |
| | Pro Rata Proceeds from the Exercise of Derivatives | $ | 51,010,000 |
| | equals: | | |
| | Aggregate FMV of Common Stock | $ | 234,398,348 |
| | divided by: | | |
| | Common Shares | | 300,495.97 |
| | equals: | | |
| | Per Share FMV of Common Stock, Marketable, Controlling Interest | $ | 780.04 |
| | less: | | |
| | Discount for Lack of Control - 20.0 percent | $ | (156.01) |
| | equals: | | |
| | Per Share FMV of Common Stock, Marketable, Minority Interest | $ | 624.03 |
| | less: | | |
| | Discount for Lack of Marketability - 20.0 percent | $ | (124.81) |
| | equals: | | |
| | Per Share FMV of Common Stock, Privately-held, Minority Interest | **$** | **499.22** |
| | Rounded | **$** | **500.00** |

Notes:

(1) See Exhibit V-1.

(2) Calculated using the discount rate presented in Exhibit V-1 for the period beginning July 30, 2010 through the Valuation Date.

(3) See Exhibit VIII-1.

MH00063458
ML_DE_00670684

# EXHIBIT 7
# FILED UNDER SEAL

# EXHIBIT 8

# Exhibit 38

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential

| From: | Howard Appel |
| Sent: | Thursday, February 17, 2011 9:06 AM |
| To: | Mary Rouse |
| Cc: | Elizabeth Peacock; Jessica Sullivan |
| Subject: | Collection Cup Agreement - revised |
| Attachments: | Contract. Specimen Collection Cups.021711.FINAL.DOC; image003.jpg |

Mary, here is the rev agreements for 6 and 11/12. Add this to the process along with the quarterly certification and lets review one last time before we announce to the team.

**Howard Appel**
President

16981 Via Tazon
San Diego, CA 92127
Phone (858) 451-3535
Fax (858) 451-3636



This communication contains information that is confidential, proprietary in nature, and may also be attorney-client privileged and/or work product privileged. It is for the exclusive use of the intended recipient(s). If you are not the intended recipient(s) or the person responsible for delivering it to the intended recipient(s), please note that any form of dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please immediately notify the sender and delete the original communication. Thank you for your cooperation.

1

**Highly Confidential**

**MLATOX-FL-0004116**

Case 17-51840-LSS Doc 341-2 Filed 02/10/23 Page 427 of 925



Date

Name
Address
Address

CLIA NUMBER: _____

> Re:  Specimen Collection Cups – 6 Panel

Dear Name:

I am writing on behalf of Millennium Laboratories, Inc. ("Millennium") regarding our agreement to provide your practice with specimen collection cups to be used to collect your patient specimens, which you will then submit to Millennium for additional testing and/or confirmations. The specimen collection cups Millennium will provide under this agreement are the Amedica 6 Panel Drug Test Cup.

To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory. While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups. Nor will you bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups. You also shall not resell or redistribute these cups. You further agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing.

If your practice wishes to bill for your own point-of-care testing services, then we can provide appropriate specimen collection cups or other testing kits to you at fair market value prices pursuant to a separate written agreement.

Either party may terminate this arrangement upon 15 days prior written notice to the other party.

Compliance with applicable laws and regulations is important to us, and we do not want to take any actions that would place either you or our laboratory in jeopardy. I ask that you sign the enclosed copy of this letter to indicate your acceptance of these terms. We look forward to a long, mutually beneficial relationship with your practice.

Very truly yours,

Howard Appel, President

The undersigned agrees to the terms outlined in this letter.

_____                   _____

**Highly Confidential**                                                        **MLATOX-FL-0004117**

Date                                              Name

MILLENNIUM
LABORATORIES

Date

Name
Address
Address

CLIA NUMBER: _____

         Re:        Specimen Collection Cups – 11/12 Panel

Dear Name:

         I am writing on behalf of Millennium Laboratories, Inc. ("Millennium") regarding our agreement to provide your practice with specimen collection cups to be used to collect your patient specimens, which you will then submit to Millennium for additional testing and/or confirmations. The specimen collection cups Millennium will provide under this agreement are the Amedica 6 Panel Drug Test Cup.

         To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory. While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups. Nor will you bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups. You also shall not resell or redistribute these cups. You further agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing.

         If your practice wishes to bill for your own point-of-care testing services, then we can provide appropriate specimen collection cups or other testing kits to you at fair market value prices pursuant to a separate written agreement.

         Either party may terminate this arrangement upon 15 days prior written notice to the other party.

         Compliance with applicable laws and regulations is important to us, and we do not want to take any actions that would place either you or our laboratory in jeopardy. I ask that you sign the enclosed copy of this letter to indicate your acceptance of these terms. We look forward to a long, mutually beneficial relationship with your practice.

                                                             Very truly yours,

                                                             Howard Appel, President

The undersigned agrees to the terms outlined in this letter.

**Highly Confidential**                                          **MLATOX-FL-0004118**

Confidential                                                          ML_DE_00629260

_____          _____
Date                                      Name

Highly Confidential                                       MLATOX-FL-0004119

Confidential                                              ML_DE_00629261

# EXHIBIT 9

# Exhibit 39

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential



Date

Name
Address
Address

CLIA NUMBER:_____

      **Re:**     **Specimen Collection Cups – 11/12 Panel**

Dear Name:

     I am writing on behalf of Millennium Laboratories, Inc. ("Millennium") regarding our agreement to provide your practice with specimen collection cups to be used to collect your patient specimens, which you will then submit to Millennium for additional testing and/or confirmations as you instruct. The specimen collection cups Millennium will provide under this agreement are the Amedica 11/12 Panel Drug Test Cup.

     <u>To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory</u>. While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that 1) you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups, 2) you will not bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups and 3) you will not resell or redistribute these cups. In addition, you agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing.

     Millennium will review your account activity monthly with respect to any collection cups Millennium has sent to you during the month versus the number of collection cups you sent to Millennium for testing. Any significant variances, taking into account your inventory of cups and any collection cups that may have been ruined in practice, will be analyzed and Millennium may contact you to determine the reasons for such variances. If, after this reconciliation, we agree that you used cups for which we did not receive patient specimens, Millennium shall invoice you for the excess cups at the applicable market rate. You agree to pay such invoices within 30 days.

     Please note that if you choose not to have Millennium conduct any testing with these collection cups - that is solely up to you to determine the need on a per patient basis - you are expected to pay for these cups when Millennium reconciles your account.

     If your practice wishes to bill for your own point-of-care testing services, then we can provide appropriate specimen collection cups or other testing kits to you at fair market value prices pursuant to a separate written agreement.

     Either party may terminate this arrangement upon 15 days prior written notice to the other party.

     Compliance with applicable laws and regulations is important to us, and we do not want to take any actions that would place either you or our laboratory in jeopardy. I ask that you sign the enclosed copy of this letter to indicate your acceptance of these terms. We look forward to a long, mutually beneficial relationship with your practice.

                      Very truly yours,

                      Howard Appel, President

The undersigned agrees to the terms outlined in this letter.

_____        _____

**CONFIDENTIAL OR TRADE SECRET**        **MIL00001780**

Confidential        ML_DE_00629263

# EXHIBIT 10
# FILED UNDER SEAL

# EXHIBIT 11

# Exhibit 4

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential

ML_DE_00504264

| From: | Renee Bryan |
|---|---|
| Sent: | Thursday, September 10, 2009 5:51 PM |
| To: | 'Scott Gehrke' |
| Cc: | 'Melissa Wicklund'; |
| | 'Howard Appel'; |
| Subject: | STATUS OF STANDING ORDER FORM |
| Attachments: | image003.png |

Dear Sales Team,

A decision was made to wait to release our new standing order form until we can collect your feedback on it next week in San Diego. Charles will review it with all of you, we will collect your feedback and revise the form while you are in house with us. We expect to send you home with the new form.

FOR NEW CUSTOMERS JUST GETTING STARTED WITH ML
You will use the new form.

FOR EXISTING CUSTOMERS
We are sending to you packages for delivery to your customer that will include a number of good news communications about ML, including reduced billing, New Report Form, example of EOB card and what the QC means on our POCT boxes.
A box of these packages will be sent to each of you this week, one package per account.
When you come to San Diego, you will each receive a stack of current standing orders for accounts in your territory.
We will ask you to confirm the account is yours and verify customer information for our records.
Upon your return home, the idea is to get around to customers with the new packages and new and old standing orders, and get the new standing orders filled out and signed. You might consider how soon a practice's current standing order is from expiration (or size/importance of account)in prioritizing your visits.

Thank you for your patience as we perfect this tool. As you know, the standing order is critical to our confirmation and billing process, so we want to get it right. We know your feedback will benefit the end result.

Thank you. We are ALL looking forward to seeing you in San Diego next week!
Regards,

Renee

In the event you will not be seeing your accounts for awhile, you may want to ensure they at least get the new Standing Order. We will be tracking each new standing order we receive until a new one is received for every account. The new Standing Order is attached for your convenience.

If you have any questions about this matter, please contact your Regional Manager, Liz or myself.

Thank you.

Renee T. Bryan
VP of Marketing & Strategic Planning
16981 Via Tazon

1

**Confidential or Trade Secret**

**MIL00063547**

Confidential

ML_DE_00504265

San Diego, CA 92127



(Full Email Disclaimer - http://www.millenniumlaboratories.com/emaildisclaimer.html)

2

**Confidential or Trade Secret**

**MIL00063548**

Confidential

ML_DE_00504266

# EXHIBIT 12

Draft Annual Compliance Audit Report

# Millennium Laboratories
# Annual Compliance Audit Report
# 11/24/2010
# Table of Contents

## I. Introduction and Summary of Audit Procedures       Tab 1

| | |
|---|---|
| Background | 3 |
| Description of Millennium Operations | 3 |
| Design and Purpose of Annual Compliance Audit | 3 |
| On-Site Interviews | 4 |
| Written Materials and Documents Review | 5 |
| Final Audit Report | 5 |
| Audit Recommendations Summary and Risk Rankings | 5 |

## II. Compliance Program Review       Tab 2

| | |
|---|---|
| Introduction | 7 |
| Chief Compliance Officer | 7 |
| Compliance Committee | 8 |
| Compliance Policies | 9 |
| Employee Standards of Conduct | 9 |
| Employee Certifications | 10 |
| Disclosure Program | 10 |
| Compliance Training | 11 |
| Employee Screening | 12 |
| Employee Disciplinary Actions | 13 |
| Annual Compliance Audit | 13 |
| Post Payment Review | 14 |

Draft Annual Compliance Audit Report

Annual Physician Notice                                                    15

MAC Inquiries                                                              15


**III. Operations and Billing Review**                              **Tab 3**

Confirmation Testing                                                       17

Third Party Billing Company                                               19

Direct Billing Program                                                     20


**IV. Marketing/Business Relations Review**                         **Tab 4**

Introduction                                                              22

The Sale of Point of Care Testing Supplies                               23

The Provision of Point of Care Testing Supplies                          27

New Client Registration                                                   29

Physician Speaker Program                                                 30

Test Drive Program                                                        32

Lab Assistant Program                                                     34


**V. CPT Coding Review**                                            **Tab 5**


**VI. Audit Recommendations Summary and Risk Rankings**             **Tab 6**


**Supporting Materials**                                          **Tabs A-I**

Confidential Attorney-Client Privileged Communication – Attorney Work Product

Draft Annual Compliance Audit Report

## I. Introduction and Summary of Audit Procedures

**Background:** On August 23, 2010, Millennium Laboratories, Inc. (Millennium) entered into a written agreement with CodeMap, LLC (CodeMap) for the performance of an Annual Compliance Audit.[1] CodeMap is an independent consulting firm and is in no way related to Millennium by ownership or control.

Previously, CodeMap performed an Initial Compliance Audit for Millennium in late 2009. CodeMap auditors, Gregory Root, Esq., and Charles Root, Ph.D., performed this Annual Compliance Audit for Millennium including interviews, subsequent analysis and research, and the preparation of this Audit Report.[2]

**Description of Millennium Operations:** Founded in 2007, Millennium is a specialty reference laboratory that provides drug testing of urine with biological monitoring and adulterant screening with or without auto-reflex confirmation by Liquid Chromatography /Mass spectrometry/Mass spectrometry (LC-MS/MS). Millennium's clients are primarily pain management physicians that use Millennium's services to monitor patient's prescription adherence, improve treatment outcomes, support assessment and diagnosis, identify use of undisclosed substances, and uncover medication diversion.

**Design and Purpose of the Compliance Audit:** The purpose of the Annual Compliance Audit is to follow the auditing and monitoring recommendations included in the OIG's Compliance Program Guidance for Clinical Laboratories, August 1998.[3] The Annual Compliance Audit assesses Millennium's compliance with the following:

- Civil False Claims Act  {31 U.S.C. § 3730(a)-(b)};
- Civil Monetary Penalties Law (42 U.S.C. § 1320a-7a);

---

[1] A copy of the written agreement providing that CodeMap perform a Compliance Audit for Millennium is attached to this report as Appendix A

[2] Biographical information concerning Gregory Root, Esq., and Charles Root, Ph.D., is attached to this report as Appendix B

[3] 63 Fed. Reg. at 45076; August 24, 1998.

Confidential Attorney-Client Privileged Communication – Attorney Work Product    3

Draft Annual Compliance Audit Report

- Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b);

- Stark II Self-Referral Prohibitions (42 U.S.C. § 1395nn);

- Procedure coding rules and policies (CPT/HCPCS);

- Medicare and Medicaid billing rules and policies;

- Diagnosis coding rules and policies (ICD-9-CM);

- Medicare/Medicaid claims development and submission rules and policies;

- Medicare/Medicaid reimbursement rules and policies;

- OIG guidance concerning the operation of an effective compliance program; and

- Any other rules and regulations governing participation in Medicare and other federally funded health care programs.

In addition, this audit assesses Millennium's compliance program and related activities, policies, and procedures. This report includes an evaluation of how well Millennium's program conforms to the OIG's standards of an effective compliance program.[4]

**On-Site Interviews:** Gregory B. Root, Esq., initiated the Annual Compliance Audit by visiting Millennium's corporate headquarters and laboratory facilities in San Diego, California, on September 8-9, 2010. On these dates, Gregory B. Root, Esq., toured Millennium's facilities and conducted on-site interviews of key personnel involved in Millennium's compliance, billing, coding, finance, operations, sales and marketing, and management. The following individuals participated in the on-site interviews:

- Howard Appel        President
- Faith Bratton        Billing Specialist
- Kimberly Keller        Billing/Customer Service Supervisor
- Dr. Charles Mikel        Vice President, Chief Scientific Officer
- Elizabeth Peacock        Vice President of Sales
- Dr. Amadeo Pesce        Laboratory Director

---

[4] A copy of the OIG's Compliance Guidance for Clinical Laboratories is attached to this report as Appendix C

Draft Annual Compliance Audit Report

- Penny Powell           HR Business Partner
- Katherine Richards      QA Document Coordinator
- Heidi (Smith) Switzer    Vice President of Finance
- Robert West            Chief Compliance Officer
- Melinda (Mindy) Wilson   Sales Support

**Written Materials and Document Review:** As part of the audit, CodeMap auditors collected written documents, policies, and other materials from Millennium prior to, during, and subsequent to the on-site interviews. CodeMap auditors reviewed these documents to substantiate any findings and conclusions drawn from the on-site interviews, and to ensure compliance with all applicable state and federal laws, regulations, and policies.  The Appendices to this report contain copies of many of the written materials that were reviewed as part of the Annual Compliance Audit.

**Final Audit Report:** This report is the final product of the Annual Compliance Audit. This audit report assesses Millennium's compliance with the federal and state laws, rules, and regulations that serve to protect the Medicare and Medicaid trust funds, as well as the health and well being of the beneficiaries of those programs. In addition, the report includes an evaluation of the efficacy of Millennium's compliance program. The report describes all potential compliance issues and recommended corrective actions identified by CodeMap.

This report is based on findings and observations derived from the on-site visit and interviews, written materials collected from Millennium's facilities in San Diego, California, and subsequent phone, fax, and email communications.

**Audit Recommendations Summary and Risk Rankings:** The Final Audit Report concludes with a complete list of audit recommendations. Each recommendation is accompanied by a brief description and ranked on a sliding scale from 1 – 4 based on how strongly CodeMap recommends implementing the change, as well as the degree of

Confidential Attorney-Client Privileged Communication – Attorney Work Product

Draft Annual Compliance Audit Report

risk/liability Millennium may be exposed to if the change is not implemented. A ranking of 1 indicates that we strongly encourage Millennium to implement the recommendation, and that failure to do so could result in an unreasonable risk of civil, criminal, or administrative law liability, or adversely affect the effectiveness of Millennium's compliance program. Conversely, a ranking of 4 indicates a recommendation of much lower priority and failure to implement will expose Millennium to a much lesser degree of liability.

The following conclusions depend on the accuracy and trustworthiness of the information provided by Millennium's employees, owners, and contractors. CodeMap and its auditors cannot be held responsible for findings based upon false or misleading information.

Gregory Root, Esq. prepared this final audit report.

_____          _____
Signature                                 Date

Draft Annual Compliance Audit Report

## II. Compliance Program Review

**Introduction**: At the time of Millennium's Initial Compliance Audit in 2009, Millennium had just begun the process of creating and maintaining a compliance program. The Initial Compliance Audit Report included numerous recommendations concerning Millennium's fledging program and the associated policies and procedures. Many of these recommendations directed Millennium to devote more time and resources, and reorganize its program so that it more closely resembled the package of policies and procedures that investigators/regulators would readily identify as an effective laboratory compliance program.

During the past year, Millennium has taken significant steps to create a much more robust compliance program, and implement the recommendations included in the last Compliance Audit Report. In particular, the appointment of a full-time, dedicated Chief Compliance Officer, the formation of a supporting Compliance Committee, and the adoption of a comprehensive set of compliance policies strengthens the effectiveness of Millennium's program, and demonstrates a good faith effort to diligently comply with all applicable laws, rules, and regulations.

As the following section will demonstrate, Millennium's compliance program has been vastly improved which should result in greater benefits and protections for Millennium.

**Chief Compliance Officer:** Mr. Robert West now serves full time as Millennium's Chief Compliance Officer and is responsible for the oversight and administration of the Compliance Program. Millennium reassigned Mr. West's other duties connected to his role as the administrative director of the laboratory, so that Mr. West could devote his full time and attention to the responsibilities of Chief Compliance Officer.

**Recommendations/Changes:** None. Previously, Mr. West's varied roles in the organization prevented him from effectively fulfilling all the duties of a Chief Compliance Officer. The recent reorganization of his duties greatly enhances the effectiveness of

Draft Annual Compliance Audit Report

Millennium's program. Any investigator/regulator would expect to see a laboratory of Millennium's size to employ a full time Chief Compliance Officer dedicated solely to the operation and maintenance of the organization's compliance program.

**Compliance Committee:** In response to a recommendation included in last year's compliance audit, Millennium formed a compliance committee to support its Chief Compliance Officer. That committee is composed of the following members:

- Perla Almazan      Director of Clinical Operations
- Howard Appel      President
- Kimberly Keller      Billing/Customer Service Supervisor
- Dr. Charles Mikel      Vice President, Chief Scientific Officer
- Elizabeth Peacock      Vice President of Sales
- Dr. Amadeo Pesce      Laboratory Director
- Heidi (Smith) Switzer      Vice President of Finance
- Robert West      Chief Compliance Officer

**Recommendations/Changes:** While OIG compliance guidance does not specifically recommend any particular job descriptions or titles of the members that serve on the compliance committee, it is my opinion that most committees benefit from the inclusion of personnel responsible for the management of sales/marketing. Each organization's culture and organization is unique and ultimately the company's circumstances will determine the best composition of a compliance committee. However, inclusion of a sales/marketing manager would allow the committee better access to those functions that often have the most interactions with referring clients and are in the riskiest of positions to implicate fraud and abuse provisions.

Appendix 10 of Millennium's Compliance Policy Manual presently lists Ms. Elizabeth Peacock, Vice President of Sales, as a member of the Compliance Committee. However, during the on-site interviews, Millennium personnel indicated that she was going to step

Draft Annual Compliance Audit Report

down from her position on the Compliance Committee. It is recommended that Ms. Peacock remain on the committee for the reasons stated above.

In addition, Millennium's compliance policy that governs the compliance committee should stipulate a regular meeting schedule. Millennium's Chief Compliance Officer should maintain on file minutes of all meetings of the compliance committee.

**Compliance Policies:** On August 17, 2010, Millennium's Chief Compliance Officer adopted a new set of compliance policies that sets forth the policies and procedures of Millennium's much improved compliance program. This newly enacted set of polices is much more comprehensive than the policies that were previously in place.[5]

**Recommendations/Changes:** None. Pursuant to a recommendation included in the previous Compliance Audit, Millennium has heavily reworked the policies that govern its compliance program. In addition, Millennium added many new policies that address the issues and risk areas discussed in the OIG's compliance program guidance for clinical laboratories. The newly enacted compliance policies are now organized in a manner that investigators/regulators would readily identify as the components of an effective laboratory compliance program. As long as Millennium adheres to these new policies and maintains the inherent procedures, Millennium should have little difficulty in reaping the benefits of an effective compliance program.

**Employee Standards of Conduct:** Millennium's compliance policy manual now includes an Employee Standards of Conduct[6] that requires each and every employee to:

- Understand how all applicable laws, rules, and regulations apply to his/her position.

---

[5] The Table of Contents of Millennium Laboratories' Medicare Compliance Policy Manual 2010 is attached to this report as Appendix D.
[6] Millennium's Employee Code of Conduct is attached to this report as Appendix E

Draft Annual Compliance Audit Report

- Act in a legal and ethical manner concerning all laws, rules, and regulations as well as Millennium Compliance Program Policy.
- Report all suspect policies and practices to a supervisor or by using Millennium's disclosure program.

**Recommendations/Changes:** None. Millennium's Employee Standards of Conduct satisfies the requirements of an effective compliance program as recommended by OIG compliance guidance.

**Employee Certifications:** Millennium requires all new employees to certify in writing that they have received, read, and understand the Employee Code of Conduct. Also, Millennium requires all existing employees to sign the same certification on an annual basis. The Millennium compliance policy manual contains a certification form that the laboratory uses to document all employee certifications.[7] Human Resources maintains on file all such employee certifications at Millennium's facilities in San Diego, California.

**Recommendations/Changes:** None. As long as Millennium adheres to its certification requirements as dictated by its newly enacted compliance policies, this process should only strengthen the compliance program. In addition, the certification process effectively communicates to all Millennium personnel their compliance-related duties and obligations, as well as reinforces the importance of all employees adhering to the standards of Millennium's code of conduct.

**Disclosure Program:** Millennium continues to maintain three mechanisms that allow its employees to report suspicious policies, procedures, and activities that may violate rules, regulations, and/or laws. First, its compliance policy instructs employees that they may call Dr. Robert West on his cell phone at any time to describe instances of noncompliance.[8] Second, the lab has installed a drop box, located outside the office door

---

[7] Millennium's Employee Certification Form is attached to this report as Appendix F.
[8] Millennium Compliance Policy, "Disclosure Hotline," is attached to this report as Appendix G

Draft Annual Compliance Audit Report

of Millennium's Chief Compliance Officer, that allows employees to anonymously report potential compliance issues in writing. Finally, Millennium maintains a dedicated email address, to which employees may communicate potential instances of non-compliance. No employee or contractor has communicated any compliance concerns via Millennium's disclosure program since the last compliance audit.

**Recommendations/Changes:** None. Millennium's three-prong disclosure program should satisfy the OIG's recommendation of an effective employee disclosure program. At least some of Millennium's disclosures mechanisms are available 24 hours/day and allow employees to report suspicious policies, procedures, or conduct anonymously if so desired.

Pursuant to recommendations included in the previous Compliance Audit, Millennium now communicates the existence of its disclosure program, along with instructions on how to utilized the program, via notices posted in common work areas.

On November 9, 2010, Gregory Root placed a test call to Millennium's disclosure hotline to ensure the disclosure program was working effectively. Millennium's Chief Compliance Officer answered the call indicating the hotline is operational.

**Compliance Training:** Millennium requires all employees to participate in compliance training on an annual basis. Millennium provides the annual compliance training via an online compliance training program operated by a third party, Healthcare Compliance Solutions, Inc. Each year, Millennium employees must complete the following courses:

- Medicare Employee Training
- HIPAA Security Employee Training
- HIPAA Privacy Employee Training

Confidential Attorney-Client Privileged Communication – Attorney Work Product

Draft Annual Compliance Audit Report

**Recommendations/Changes:** The online courses adequately convey their respective subject matter. As long as the online program sufficiently documents each employee's participation, Millennium's training protocol serves as effective basic compliance training.

However, pursuant to OIG compliance guidance, Millennium compliance policy, and recommendations included in the previous Compliance Audit, Millennium must also administer advanced compliance training concerning coding, claims submission, fraud and abuse provisions, and other applicable rules and regulations to employees serving in more sensitive positions such as billing, coding, customer service, sales, and marketing.

Millennium's compliance policy states that the organization will require certain members of management and all members of the Compliance Committee to participate in advanced training. Unfortunately, since the last audit only a limited number of these individuals have completed advanced compliance training.

Millennium must organize an advanced compliance training program, as described above, and require respective members of its management team to complete the applicable courses. Millennium's compliance program will not be judged truly effective until the organization fulfills this educational requirement.

**Employee Screening**: In the past year, Millennium revised its compliance policies concerning employee screening. Two policies, "Non-Employment of Sanctioned Individuals,[9]" and "Screening of New Employees,[10]" now dictate the policies and procedures used by Millennium to ensure its employees have never been criminally convicted, suspended, debarred or excluded from participation in a federal health care program.  These policies require Millennium to screen both prospective employees within sixty days of hire, and existing employees on an annual basis. Specifically these policies require:

---

[9] Millennium Compliance Policy, "Non-Employment of Sanctioned Individuals," is attached to this report as Appendix H

[10] Millennium Compliance Policy, "Screening of New Employees," is attached to this report as Appendix I

Draft Annual Compliance Audit Report

- All prospective employees to disclose to Millennium if they have been convicted of a health care related crime, or excluded from any federal health care programs;
- Millennium to conduct a reasonable and prudent background investigation including reference checks for all prospective employees;
- Millennium to query the General Services Administration's List of Parties Excluded from Federal Programs for all employees; and
- Millennium to query the HHS/OIG List of Excluded Individuals/Entities for prospective employees.

**Recommendations/Changes:** As long as Millennium adheres to the above named policies, the organization should fulfill the employee screening recommendations contained in the applicable OIG compliance guidance. Millennium's revised policies will ensure its workforce is free of any individuals who have ever been criminally convicted, suspended, debarred or excluded from participation in a federal health care program.

Millennium must continue to assign the requisite time and resources to complete all the requirements of its newly minted employee screening program. In addition, the organization must maintain thorough documentation of all queries and investigations, and respective outcomes, required by the applicable compliance policies.

**Employee Disciplinary Actions:** Since the inception of Millennium's compliance program, no employee has been disciplined for failure to adhere to federal/state laws, rules and regulations or Millennium compliance program policies.

**Recommendations/Changes:** None.

**Annual Compliance Audit:** As described previously in this Audit Report, Millennium contracted CodeMap to perform this Annual Compliance Audit. This report is the final product of the audit.

Draft Annual Compliance Audit Report

**Recommendations/Changes**: None.

**Post Payment Review:** Millennium compliance policy details a weekly audit protocol that requires Millennium to perform post payment review of five claims each week.[11] The weekly audit consists of a detailed review of five randomly picked claims from four weeks prior. Each week, designated Millennium personnel compile the following documentation concerning the randomly selected claims:

- test protocol;
- test requisition
- test results reported by laboratory;
- billing information sent to the third party billing company; and
- final bill rendered by the billing company.

Millennium personnel then compare and review the above to ensure proper coding, billing, claims submission, and compliance with all applicable rules and regulations. If any discrepancies occur, Millennium's Chief Compliance Officer determines the best course of action to remedy any problems including resubmitting claims, appealing claims, discussions with Millennium's billing company, and/or refunding any overpayments to payers and/or patients. Millennium has performed the above-described post payment review since June of 2009.

**Recommendations/Changes:** None. Millennium's post payment review processes are an effective way to ensure appropriate claims submissions. This type of ongoing auditing should benefit Millennium's compliance activities by detecting and remedying any billing issues before they accumulate into significant liabilities to either federally funded or private health plans.

---

[11] Millennium Compliance Policy, "Post Payment Review," is attached to this report as Appendix J

Draft Annual Compliance Audit Report

**Annual Physician Notice:** Pursuant to its compliance policy in May 2010, Millennium sent an Annual Physician Notice to all its physician, hospital, reference laboratory and other provider clients.[12] Millennium's Annual Physician Notice contains the following information:

1. Any Medicare coverage policies, either LCDs or NCDs, that apply to tests and procedures performed by Millennium;
2. A statement that Medicare will only reimburse claims for panels of tests when all components are medically necessary and reasonable to treat or diagnosis the patient;
3. The 2010 CPT codes and corresponding Medicare Laboratory Fee Schedule amounts for tests and procedures performed by Millennium;
4. A statement that Medicaid reimbursement will be equal or less than Medicare reimbursement;

**Recommendations/Changes:** Millennium's Annual Physician Notice fulfills most of the OIG's requirements concerning this type of communication. Millennium's notice clearly communicates to physicians the coding, coverage, and reimbursement implications of ordering Millennium testing. However, the notice is missing one piece of information recommended by the OIG, the name and phone number of Millennium's CLIA clinical consultant. In order to fully abide by the OIG's compliance guidance Millennium should add this information to its next Annual Physician Notice.

**MAC Inquiries**: In recent months, Millennium has received numerous inquiries from its MAC for further documentation of claims for services ordered by Millennium's customers and performed by Millennium. Typically, these inquiries request items such as test requisitions, medical records, and test result reports. Millennium has retained outside counsel to analyze and monitor these requests. Millennium has diligently complied with these requests and provided the MAC with all requested documentation.

---

[12] Millennium's 2010 Annual Notice to Physicians is attached to this Report as Appendix K

Confidential Attorney-Client Privileged Communication – Attorney Work Product                    15

Draft Annual Compliance Audit Report

**Recommendations/Changes:** At this time, Millennium must wait to see how the MAC uses the requested information. Millennium should continue to comply with the documentation requests and await further instructions from the contractor.

Draft Annual Compliance Audit Report

## III. Operations and Billing Review

**Confirmation Testing:** As explained in last year's audit report, Millennium follows two possible protocols for performing confirmation testing. These protocols depend on whether the ordering physician performed point of care drug testing in their offices or not. The confirmation protocols employed by Millennium are:

**Protocol I: Physicians who conduct point of care tests**

- Step 1: Confirm positive test results as reported by the physician on the requisition form using qualitative (immunoassay) methods.
- Step 2: Quantification of positive immunoassay results at lower limits using LC-MS/MS method (Note: TCA and Barbiturates are not quantified by LC-MS/MS).
- Step 3: Confirmation/Quantification at lower limits of negative point of care test results as reported by the physician on the requisition form using quantitative (LC-MS/MS) method. (Note: TCA and Barbiturates are not quantified by LC-MS/MS).

**Protocol II: Physicians who do not conduct point of care testing**

- Step 1: Conduct drug testing using qualitative (immunoassay) methods.
- Step 2: Quantification of positive immunoassay results at lower limits using quantitative LC-MS/MS method (Note: Barbiturates and Alcohol are not quantified by LC-MS/MS)

When Millennium employs Protocol I, for positive point of care test results, it reports two procedure codes to payers, 80102 and the appropriate quantitative chemistry code. For negative test results, it reports the appropriate quantitative chemistry code only.

Confidential Attorney-Client Privileged Communication – Attorney Work Product                    17

Draft Annual Compliance Audit Report

When Millennium employs Protocol II, it reports up to two procedure codes to payers, G0431 or 80101 for the initial testing using qualitative (immunoassay) method and the appropriate quantitative chemistry code for confirmation of positive results.

Beginning January 1, 2011, Millennium plans to modify its testing protocol for physicians that perform point of care testing. Next year, Millennium plans on making the following changes:  1) it will no longer use a qualitative (immunoassay) method to confirm positive test results resulting from point of care testing. For these tests, Millennium will only perform the quantification via the LC-MS/MS method.  2) it will offer, for all testing, quantification via the LC-MS/MS method without a qualitative (immunoassay) initial screen.

**Recommendations/Changes:** As stated in the previous audit report, Protocol I might be interpreted by payers as the provision of medically unnecessary services since Step 2 provides the same confirmation information as Step 1. In other words, a payer might say there is no need for an intermediate confirmation if the client has requested subsequent quantitative analysis of the same drug. Millennium should be prepared to defend the medical necessity of its confirmation testing by referring to industry standards, including Section XXXXXX of the Federal Register which support the inherent practices of the above-described protocol.

Protocol II, on the other hand, provides only the results requested and presumably necessary for treatment of the patient as determined by the ordering physician. However, if the physician orders quantitative confirmation of both positive and negative results, the same caution as stated above would apply since a payer could say that the initial screen is not necessary if all drugs are to be determined quantitatively regardless of the results of the initial EIA determination.

Millennium could substantially reduce the risk of a payer determining its confirmation testing represents repetitive and medically unnecessary services if the laboratory

implements the revised testing protocol described above. Millennium should follow-through with its January 1, 2011, proposal to no longer use a qualitative (immunoassay) method to confirm positive test results resulting from point of care testing and offers, for all testing, a single quantification test via LC-MS/MS method without a qualitative (immunoassay) initial screen.  Pursuant to Millennium's proposal, Millennium would 1) only be confirming the positive POC test results once quantitatively using LC-MS/MS and 2) offer a single quantification test via LC-MS/MS for drugs not tested at POC.   The proposed testing protocol represents a significantly reduced risk that any component of Millennium's services is medically unnecessary.

**Third Party Billing Company:** Presently, Millennium contracts with a third party, Rand Medical Billing, to perform all its billing and claims submittal functions. Unfortunately, the arrangement between Millennium and Rand prohibits Millennium from adequately performing several key aspects of its compliance program, most notably post-payment review, analysis of denials, and the ability to appeal adverse claims decisions. Despite Millennium's repeated and persistent inquiries concerning these activities, Millennium has had difficulty gathering adequate information to participate in these post payment functions.

**Recommendations/Changes:** Based on the shortcomings described above, as well as the growing size of Millennium's clinical laboratory operations, Millennium should strongly consider bringing its billing and claims submittal functions in-house. Most clinical laboratories outsource their billing functions when the organization is first established, however bring these functions in-house once the provider organization reaches a certain size. In addition to the compliance issues described below, clinical labs usually internalize these functions because billing for laboratory services is often not a focus or core strength of third party billing companies. Billing companies typically are much more familiar with the claims submittal processes of physician practices, and less familiar with the technical nature and complex billing rules associated with laboratory services.

Draft Annual Compliance Audit Report

As described earlier, a critical component of an effective compliance program is the laboratory's policies and procedures concerning post payment review. Millennium should continually monitor how both federally funded and private health plans process claims submitted by the laboratory. In addition, Millennium should vigorously appeal any denials that Millennium feels are in error or unjustified. By performing comprehensive and diligent post payment review, Millennium should be able to identify any billing or claims submittal problems early before they become significant liabilities.

**Direct Billing Program:** Presently, Millennium "direct bills" both federally funded and private payers for all tests and services performed by its laboratory. In other words, Millennium submits claims directly to the appropriate payer and never to the referring provider. In recent months, a limited number of hospital clients have asked Millennium to enter into "client bill" arrangements whereby Millennium would bill the hospital clients, and the hospital clients would in turn bill the appropriate payers. Millennium would like to accommodate these hospital clients, however management is concerned whether the proposed arrangements would comply with the applicable Medicare provisions that govern such payment arrangements.

**Recommendations/Changes:** When contemplating new payment arrangements, providers of Medicare services must consider Medicare's prohibition of reassignment. The prohibition dictates that only the provider that actually performs the Medicare covered test or service should bill the Medicare program for reimbursement. The prohibition, however, includes many exceptions that apply to providers of laboratory and pathology services.

One such exception is the "shell lab rule" which allows laboratories to bill Medicare for tests sent to outside laboratories if any of the following are true:

• The referring laboratory is located in, or is part of a rural hospital.
• Both the referring laboratory and the accepting laboratory are owned by the same entity.
• The referring lab performs at least 70% of its testing on site as opposed to sending the test or procedure to an outside laboratory.[13]

Confidential Attorney-Client Privileged Communication – Attorney Work Product                20

Draft Annual Compliance Audit Report

The above exception applies to both independent laboratories and hospital laboratories, however it does not allow physician office laboratories to bill Medicare for referred testing.[14] As such the shell lab rule would allow Millennium to client bill hospital customers, and the hospital customers to bill Medicare for Millennium's testing, as long as the hospital customers perform at least 70% of their testing on-site.

Another wrinkle to Medicare's prohibition of reassignment is the direct billing provisions that apply to hospital outpatients. The Medicare Claims Processing Manual states the following:

"When the hospital obtains laboratory tests for outpatients under arrangements with clinical laboratories or other hospital laboratories, only the hospital can bill for the arranged services.[15]"

The above manual provision requires Millennium's hospital customers to bill Medicare for referred testing performed for outpatients. Medicare defines outpatients as patients that are discharged before the end of the day and are seen/treated by hospital employees. Essentially, Millennium should already be client billing its hospital clients for testing performed for outpatients.

The outpatient rules, described above, do not apply to hospital nonpatients. Nonpatients are those patients that do not directly interact with hospital employees, such as those patients whose specimens are collected in a physician office and then sent to the hospital laboratory for testing. When hospitals perform testing for nonpatients, and the hospital is able to comply with the shell lab exception, the hospital has the option of billing Medicare directly, or allowing the outside laboratory to bill Medicare.

---

[13] Medicare Claims Processing Manual, Chapter 16, §40.1
[14] Id.
[15] Medicare Claims Processing Manual, Chapter 16, §40.3

Draft Annual Compliance Audit Report

In summary, Millennium should already be client-billing hospitals for testing performed for outpatients. Millennium may also client-bill hospitals for testing performed for nonpatients as long as the hospital is able to comply with the requirements of the shell lab

Draft Annual Compliance Audit Report

## IV. Marketing/Business Relations Review

**Introduction:** The majority of this section discusses arrangements that Millennium has created with its referring providers/customers, and whether those arrangements implicate federal fraud and abuse provisions. Millennium must be careful not to run afoul of either the Federal Anti-Kickback Statute[16] ("the Anti-Kickback Law"), or the Stark Self-Referral Prohibitions[17] ("the Stark Law").

Federal anti-kickback provisions prohibit anyone from either paying or being paid any form of remuneration in exchange for the referral of patients covered by federally funded health care programs, such as Medicare and Medicaid.[18] The broad language used in the legislation potentially implicates a wide array of relationships between providers of medical services and their referring customers. Violation of the Anti-Kickback Law constitutes a felony criminal offense. Sanctions, which apply equally to both parties, include imprisonment of up to five years, criminal fines up to $25,000, civil money penalties of $50,000 for each act, and exclusion from participation in the Medicare and Medicaid programs.

Federal cases interpreting the Anti-Kickback Law have broadly construed application of the statute. Even if only one purpose of the remuneration is to induce referrals of tests and services paid for by federally funded health care programs, the arrangement could implicate federal anti-kickback provisions.[19] Due to the broad application of the law, the OIG developed safe harbors that protect various financial arrangements between Medicare providers and their referral sources.[20] If an arrangement fulfills the numerous and strict requirements of a particular safe harbor, the arrangement is protected from prosecution.

---

[16] 42 U.S.C. § 1320a-7b
[17] 42 U.S.C. § 1395nn
[18] 42 U.S.C. § 1320a-7b
[19] United States v. Kats, 871 F. 2d 105 (9th Cir 1989)
[20] 42 CFR §1001.952

Confidential Attorney-Client Privileged Communication – Attorney Work Product          23

Draft Annual Compliance Audit Report

It is important to note that failure to comply with a safe harbor does not necessarily mean the arrangement is a violation of the Anti-Kickback Law. For this reason, if an arrangement does not fall squarely within the confines of a particular safe harbor, the parties to the arrangement should strive to model the arrangement as closely as possible to the applicable safe harbor.

The Stark Law provides that if a physician, or an immediate family member of a physician, has a financial relationship with an entity that provides certain designated health services, which include laboratory services, the physician may not refer a Medicare or Medicaid patient to the entity unless a specific exception to the self-referral provisions exists.[21] Sanctions for violation of the Stark Law, which apply to both the referring physician and the entity providing designated health services, include civil money penalties equal to $15,000 for each item billed as a result of a prohibited referral, assessments equal to three times the amount claimed, and exclusion from participation in the Medicare and Medicaid program.

**The Sale of Point of Care Testing Supplies**: The following arrangements were discussed in the previous compliance audit report, but are examined again this year for two reasons; one, Millennium continues to sell point of care supplies to some of its clients; and two, as will be described later in this report, Millennium now provides  specimen collection cups to some of its clients free of charge, under a written agreement which prohibits the client from billing using this collection device.

As mentioned in the introduction of this report, Millennium's primary business is the quantitative testing of drugs used in the treatment of chronic pain. Millennium's laboratory uses High Resolution Liquid Chromatography/Mass Spectrometry/Mass Spectrometry (LC/MS/MS) methods to determine the precise levels of drugs in a patient's urine. Many of Millennium's customers prefer to perform and bill for qualitative point-of-care (POC) drug screening tests in their practices utilizing in-office, CLIA waived

---

[21] 42 U.S.C. § 1395nn

Draft Annual Compliance Audit Report

devices. To assist Millennium in receiving a consistent POC test information which corresponds with its test requisition form as well as to ensure the integrity of the specimen (i.e. specimen leakage), Millennium sells POC supplies to some of its customers. Millennium charges these customers an amount equivalent to fair market value in exchange for the POC supplies. The POC supplies are CLIA waived procedures that perform multiple qualitative screenings for particular drugs. The POC supplies sold by Millennium are readily available from many other sources including manufacturers and distributors.

**Recommendations/Changes:** The key determination in whether Millennium's sale of POC supplies complies with anti-kickback provisions is whether the POC supplies represent improper remuneration. As long as Millennium charges its customers fair market value for these supplies, the practice should not implicate the Anti-Kickback Law. Millennium's customers can easily obtain the POC supplies from many other suppliers including distributors or direct from manufacturers. If Millennium's charges for the POC supplies are at fair market value and comparable to amounts charged by other manufacturers and suppliers, there is little risk that Millennium's sale of the POC supplies will be considered illegal remuneration.

In 2003, the OIG published a Special Advisory Bulletin concerning contractual joint ventures.[22] In that bulletin, the OIG warned of the compliance risks associated with questionable joint ventures in which the manager/supplier (in this case, the laboratory) allows the owner (in this case, the physician practice) to share in the revenue of tests and services normally performed by the manager/supplier.[23] The OIG fears that the manager/supplier may provide illegal remuneration to the owner in the form of an opportunity to share in the revenue of tests and procedures not normally available to the owner. The OIG states:

---

[22] 2003 OIG Special Advisory Bulletin "Contractual Joint Ventures"
[23] Id.

Confidential Attorney-Client Privileged Communication – Attorney Work Product                25

Case 17-51840-LSS    Doc 341-2    Filed 02/10/23    Page 464 of 925

Draft Annual Compliance Audit Report

"By agreeing effectively to provide services it could otherwise provide in its own right for less than the available reimbursement, the Manager/Supplier is providing the Owner with the opportunity to generate a fee and a profit.[24]"

Millennium's arrangements with its customers differ from the "joint ventures" contemplated by the OIG in two ways:

1. Millennium does not perform qualitative drug screens using readily available and simple to use POC devices.  This type of testing is not part of Millennium's primary business model. Millennium is a fully licensed and accredited laboratory, which uses LC/MS/MS methods to provide quantitative confirmatory results of patient's drug levels.

2. Millennium is not providing an opportunity to its customers, who bill for the qualitative drug screens, by providing the POC supplies, which is not already widely available to most physician practices. As previously stated, the CLIA-waived tests sold by Millennium are readily available for purchase from numerous other manufactures and distributors at prices comparable to those charged by Millennium.

The above stated differences between Millennium's arrangements and those described by the OIG significantly limit the risk that either Millennium or its customers will face liability for Anti-Kickback Law violations.

The safe harbor that most closely resembles Millennium's arrangement is the Equipment Rental Safe Harbor.[25]  That safe harbor includes numerous requirements, however, the most important factor to consider is the requirement that compensation for the equipment, (i.e. the POC supplies) is consistent with fair market value and is not determined in a manner that takes into account the volume or value of actual or anticipated referrals. By charging an amount for POC supplies that is comparable to other readily available

---

[24] Id.
[25] 42 CFR §1001.952(c)

Confidential Attorney-Client Privileged Communication – Attorney Work Product                26

Draft Annual Compliance Audit Report

sources, Millennium should easily satisfy the fair market value requirement. In addition, Millennium must not vary its charges based upon actual or anticipated referrals of testing from the physician customers.

If Millennium structures its POC supplies arrangements so that they fulfill as closely as possible the requirements of the above Safe Harbor, Millennium should further reduce its exposure to the risk of Anti-Kickback Law liability.

In order to comply with the Stark Law, Millennium has structured its POC supplies arrangements so that they also fulfill the requirements of the applicable Stark exception. The Fair Market Value Compensation exception[26] requires the following:

1. The arrangement is in writing, signed by the parties, and covers only identifiable items or services, all of which are specified in the agreement.
2. The writing specifies the timeframe for the arrangement, which can be for any period of time and contain a termination clause.
3. The compensation must be set in advance, consistent with fair market value, and not determined in a manner that takes into account the volume or value of referrals or other business generated by the referring physician.
4. The arrangement is commercially reasonable (taking into account the nature and scope of the transaction) and furthers the legitimate business purposes of the parties.
5. The arrangement does not violate the anti-kickback statute, or any federal or state law or regulation governing billing or claims submission.
6. The services to be performed under the arrangement do not involve the counseling or promotion of a business arrangement or other activity that violates a federal or state law.

---

[26] 42 CFR 411.357(l)

Draft Annual Compliance Audit Report

The requirements of the above Stark exception mirror many of the requirements of the Equipment Rental Safe Harbor discussed earlier. Once again, the most important consideration is that compensation is equivalent to fair market value and not dependent upon the volume or value of actual or anticipated referrals. Millennium should have little difficulty complying with the above requirements.

Finally, Millennium should draft and adopt compliance policy that governs the creation and maintenance of POC supplies arrangements with ordering clients.

**Provision of Point of Care Testing Supplies:** In addition to selling POC supplies to some of its clients, Millennium now also provides specimen collection cups to some of its clients free of charge, under a written agreement which prohibits the client from billing using this device.. In the latter arrangements, these specimen collection cups, which contain drug testing strips, are provided free of charge, as long as the customer signs an agreement stating that the practice will not bill Medicare, or any other payer, for POC testing performed with the specimen collection cups..

Millennium structured these provisions to include an agreement barring the customer from billing for POC testing in order to lessen potential liability pursuant to the Anti-Kickback Law and the Stark Law.  Prior to initiating this arrangement, Millennium's outside healthcare counsel Hogan Lovells US LLP, opined that the provision of the POC supplies free of charge does not implicate either the Anti-Kickback Law or the Stark Law as long as the receiving practices agree not to bill any payers for the POC testing.[27]

However, it is the opinion of this auditor that prohibiting the practices from billing any payer for testing performed with the POC supplies does not completely remove the risk of Anti-Kickback Law liability. While it is true that Millennium's prohibition of billing for POC testing significantly reduces the value of the collection cups, it does not entirely

---

[27] Letter from Ronald L. Wisor Jr. of Hogan Lovells US LLP, dated October 6, 2010, is attached to this report as Appendix L.

Draft Annual Compliance Audit Report

eliminate the remuneration received by Millennium's customers in these arrangements. The practices receiving these supplies are still able to conduct an initial qualitative drug screen using the collection cup  and as such could represent a risk of violating federal anti-kickback provisions.

The Stark regulations, expressly state the following will not be considered remuneration,

"The furnishing of items, devices, or supplies (not including surgical items, devices, or supplies) that are used solely to collect, transport, process, or store specimens for the entity furnishing the items, devices, or supplies or are used solely to order or communicate the results of tests or procedures for the entity.[28]"

In addition, in 2001, CMS stated the following in the introductory comments to the Stark regulations,

"Rather we believe that the Congress intended to include in this section items, supplies, and devices of low value, such as single use needles, vials, and specimen cups, that are primarily provided by laboratories to physicians to ensure proper collection of specimens for processing at the laboratory and that have little, if any, independent economic value to the physicians who receive them.[29]

As stated before, the test strips possess value to the practices that receive them because these practices can receive a preliminary qualitative drug screen.. Millennium's Supplies Contract Letter Agreement even states, "our specimen cups provide certain preliminary information that you may find useful to the management of your patients.[30]"

---

[28] 42 CFR §411.351
[29] 66 Fed. Reg. at 947; January 4, 2001.
[30] Millennium's Supplies Contract Letter Agreement is attached to this report as Appendix M

Confidential Attorney-Client Privileged Communication – Attorney Work Product                29

Draft Annual Compliance Audit Report

If the testing strips represent remuneration, the only way Millennium can provide them to referring clients without implicating the Stark Law is to structure the arrangements so that they fulfill the requirements of an applicable Stark Law exception. All applicable exceptions require that Millennium charge the client fair market value for the testing strips. If Millennium does not charge fair market value for the testing strips, Millennium will be unable to comply with requirements of any Stark exception. Please remember that if the arrangement does not fulfill all the requirements of an applicable exception, the arrangement is a violation of the self-referral prohibitions.

In summary, Millennium should reconsider offering its clients collection cups free of charge. Also, Millennium should develop strict compliance policy that governs how the organization may distribute POC supplies to referring customers. That policy should require that Millennium always charges fair market value for these supplies.

**New Client Registration:** Millennium has developed a standardized process to register new clients. Every time Millennium establishes a new arrangement with an ordering customer, a member of Millennium's Sales Support Team follows a strict protocol to create the new account and allow the new customer to seamlessly begin ordering tests from Millennium. The protocol includes a checklist to ensure all necessary functions are performed.[31] In addition to collecting essential information for test ordering, billing, and communications purposes, the protocol also requires Millennium personnel to perform the following tasks:

- Screen the new client using the OIG database of excluded individuals;
- Test the new client's fax numbers and email addresses;
- Follow all protocols for the establishment of custom panels including crucial disclosure of panel compositions; and
- Ensure the client possesses a CLIA license if the client will be purchasing POC supplies.

---

[31] Millennium's New Client Registration and Test Protocol Checklist is attached to this report as Appendix N

Draft Annual Compliance Audit Report

**Recommendations/Changes:** None. The robust and standardized client registration program established by Millennium serves a number of valuable compliance related functions including:

- Ensuring Millennium does not create financial arrangements with individuals or groups that are ineligible to participate in federally funded health care programs. If Millennium did create such arrangements it could be liable for significant civil monetary penalties.
- Protecting the private health information of patients in compliance with HIPAA. Testing fax numbers and email addresses reduces the chances of inadvertent disclosures.
- Ensuring clients do not order medically unnecessary testing as result of not knowing or understanding the component tests included in custom panels. Appropriate custom panel notices reduce the likelihood of violations of the Civil False Claims Act by either Millennium or its customers.
- Helping clients to avoid violating CLIA provisions by ensuring these clients are properly licensed before performing POC testing.

For the above stated reasons, Millennium should continue to devote the necessary time and resources necessary to effectively perform the client registration process.

**Physician Speaker Program:** In order to educate potential customers, Millennium contracts with knowledgeable physician speakers to present scientific, clinical and related professional information at local and regional meetings, local and/or regional symposia, and national meetings.  The speakers' topics include pain management, patient care, good clinical practice, substance abuse, government regulations, and when appropriate, the clinical efficacy and other aspects of Millennium's testing and services.

Confidential Attorney-Client Privileged Communication – Attorney Work Product

Draft Annual Compliance Audit Report

Millennium uses a standardized agreement to memorialize and govern arrangements with physician speakers.[32] Physician speakers may or may not refer testing to Millennium for the care of beneficiaries of federally funded health care programs.

**Recommendations/Changes:** The following recommendations were also included in last year's compliance audit report. The recommendations are repeated, because while Millennium appears to effectively manage the physician speaker program so that it complies with the Anti-Kickback and Stark Laws, Millennium has yet to draft and implement corresponding compliance policy formalizing the safeguards its has created. Because at least some of the physician speakers may also be referral sources for Millennium, Millennium must take care to structure the arrangements so that they do not implicate the Anti-Kickback Law. To protect itself from such liability, Millennium has structured these arrangements so that they comply with the Personal Services and Management Contracts Safe Harbor.[33] That safe harbor requires the following:

- The personal services or management contract must be in writing and signed by the parties.
- The contract must specify the services to be provided.
- The term of the written contract must be for at least one year.
- Compensation for the services must be set in advance.
- Compensation for the services must be consistent with fair market value.
- Compensation for the services must not depend on the value or volume of Medicare or Medicaid referrals made between the parties.
- The arrangement must not involve the counseling or promotion of any activity that is a violation of state or federal law.
- The agreement does not require either party to provide or accept more services than are reasonable for the legitimate business purpose of the arrangement.[34]

---

[32] Millennium's standardized Speaker Engagement agreement is attached to this report as Appendix O
[33] 42 CFR §1001.952(d)
[34] Id.

Draft Annual Compliance Audit Report

Review of Millennium's standard agreement indicates that Millennium's speaker engagements do achieve safe harbor protection as long as the compensation paid to the referral sources is equivalent to fair market value. While I agree with Millennium that the compensation enumerated in the standardized agreement appears to be equivalent to fair market value, I do not hold myself out as an expert in such valuations. In addition, Millennium must remember that fair market value determinations are open to interpretation, and while I believe its assessments are reasonable, an investigator or regulator might draw different conclusions.

Millennium should draft and implement compliance policy to govern creating and maintaining arrangements with physician speakers. The compliance policy should include provisions concerning the following:

- Consistent use of the standardized agreement;
- A minimum number of attendees at each speaking event to ensure legitimate marketing and educational value;
- Millennium's Chief Compliance Officer or other qualified member of Millennium management should personally review, and at his/her discretion approve or disapprove, each and every request for a new arrangement;
- How physician speakers are selected and retained;
- How fair market value compensation is determined.

**Test Drive Program:** In order to allow prospective customers to assess the clinical efficacy and other advantages of Millennium's testing services versus other laboratories, Millennium created the Test Drive Program. Through this program, Millennium provides collection cups and all related test requisition forms and supplies, to the prospective client which enables the practice to send ten specimens to Millennium for testing.  The POC collection cups include testing strips that allow the prospective client to also perform preliminary qualitative drug screens at POC. Millennium then performs its testing on the

Draft Annual Compliance Audit Report

specimens, reports the results to the practice, and finally a Sales Representative performs follow-up in an effort to convert the practice to a Millennium customer.  Millennium does not charge any practice participating in the Test Drive Program either for the POC supplies or the testing performed by Millennium. Additionally Millennium does not bill Medicare or other third party payers for testes it conducts pursuant to the Test Drive Program and further, Millennium prohibits the participating practice from billing any payer or patient for tests or services performed pursuant to the Test Drive Program.

Greg, is there a provision for "nominal value"  (< $ 50 I believe)

**Recommendations/Changes:** Many laboratories provide limited numbers of free tests to prospective clients so that they may assess the value of the lab's services. Other laboratories refer to this type of marketing as comparison testing, validation testing, or other similar terms. As long as the number of tests is limited to a reasonable number needed to achieve the desired comparison, this marketing program should comply with the Anti-Kickback Law and the Stark Law.

However, such programs must be closely monitored to ensure the provision of free testing is truly for marketing and evaluation purposes, and not inappropriate remuneration resulting in potential liability pursuant to applicable fraud and abuse provisions. Examples of practices that will implicate the Anti-Kickback Law and the Stark Law, include:

- Providing more free testing than is necessary to reasonably evaluate the lab's tests and services;
- Providing free testing to employees of the prospective practice, or members of the referring physicians' families; and
- Offering free testing even after the prospective client has become an ordering customer of the laboratory.
- Allowing the participating practice to bill any payer or patient for tests or services performed pursuant to the Test Drive Program.

Confidential Attorney-Client Privileged Communication – Attorney Work Product                34

Draft Annual Compliance Audit Report

As long as Millennium's Test Drive Program is limited to appropriate amounts of comparison testing, the marketing program should not represent an unreasonable amount of risk. To ensure Millennium's program does not create an unreasonable risk of liability pursuant to the applicable fraud and abuse provisions, Millennium should:

- Create safeguards that ensure only reasonable amounts of free testing are provided commensurate with the evaluation purposes of the marketing program; and
- Draft and implement compliance policy that governs the Test Drive Program to ensure adequate monitoring and control.
- Continue to prohibit participating practices from billing any payer or patient for tests or services performed pursuant to the Test Drive Program.

However, as explained earlier, provision of collection cups which include test strips free of charge does possess inherent risks of violating both the Anti-Kickback Law and the Stark Law.   Millennium's outside healthcare counsel Hogan Lovells US LLP, opined that Millennium's Test Drive Program does not implicate either the Anti-Kickback Law or the Stark Law.

As stated earlier in this report, Millennium should strongly reconsider any marketing and/or financial arrangements with prospective and/or existing clients that result in the provision of free POC testing supplies.**Millennium Trial Evaluation Program**

**Lab Assistant Program:** Millennium has developed a marketing program that involves the placement of Lab Assistants in the practices of ordering physicians. Lab Assistants collect and ship specimens, check and order supplies, gather insurance information, and retrieve test results when necessary. Lab Assistants are Millennium employees and the practices where these employees reside do not compensate Millennium for Lab Assistant services. Due to state regulatory constraints, Millennium does not place Lab Assistants in the following states, California, Florida, New York, and Pennsylvania.

Draft Annual Compliance Audit Report

**Changes/Recommendations:** The OIG has repeatedly warned, through guidance and fraud alerts, that the placement of laboratory employees, onsite at referring physician practices, represents a substantial risk of violating federal anti-kickback and self-referral provisions.[35] The OIG's primary concern is that the placement of a laboratory employee in a physician practice will represent illegal remuneration to the practice if the laboratory employee performs any services that defray the expenses of the referring practice. A 1994 OIG Fraud Alert states the following:

"While the mere placement of a laboratory employee in the physician's office would not necessarily serve as an inducement prohibited by the anti-kickback statute, the statute is implicated when the phlebotomist performs additional tasks that are normally the responsibility of the physician's office staff. These tasks can include taking vital signs or other nursing functions, testing for the physician's office laboratory, or performing clerical services.[36]"

Millennium must implement numerous safeguards to ensure the placement of Lab Assistants does not run afoul of federal fraud and abuse provisions. Specifically, the safeguards must ensure that the Lab Assistants will not perform any services while at physician practices that represent illegal remuneration to the referring practices. These controls or safeguards will require significant time and resources commitments from both Millennium and its referral sources. At a minimum, Millennium should implement the following safeguards:

- Any physician practice, where a Lab Assistant is placed, must sign a Letter of Agreement that governs the relationship between Millennium and the physician practice.
- Lab Assistants are permitted to only perform services directly related to collecting, processing, handling, and shipping of specimens sent to Millennium for testing.

---

[35] OIG Special Fraud Alert (December 19, 1994)
[36] Id.

Confidential Attorney-Client Privileged Communication – Attorney Work Product    36

Draft Annual Compliance Audit Report

Lab Assistants may not, under any circumstances, perform services that are the responsibility of employees, contractors, and/or members of the physician practice.

▪ Millennium should require each Lab Assistant to sign an agreement stating exactly the services the Lab Assistant is permitted to perform while on-site at a physician practice. In addition, the agreement should strictly stipulate the limitations of the Lab Assistant's placement and prohibit the Lab Assistant from performing any services that are the responsibility of employees, contractors, and/or members of the physician practice.

▪ If a Lab Assistant performs services other those described above, Millennium will immediately terminate the employment of the Lab Assistant.

▪ If a physician practice requests a Lab Assistant to perform services other those described above, Millennium will immediately remove the Lab Assistant from the practice.

Even if Millennium is willing to commit the time and resources to effectively managing the above-described arrangements, the placement of laboratory employees in referring practices still represents a significant degree of inherent risk. Because the OIG has specifically identified similar arrangements in fraud alerts and guidance, Millennium should know the OIG is aware of the practice and concerned about the associated compliance implications.

Also, be aware that not only Millennium, but also the practices where the Lab Assistants reside, may be exposed to liability. If the OIG, or any other regulator or inspector, determines that the placement of Lab Assistants represents prohibited remuneration pursuant to either anti-kickback or self-referral provisions, both parties to the arrangement could be liable for significant administrative, civil, and/or criminal sanctions. Millennium must remember that both the Anti-Kickback Law and the Stark Law apply equally to the entity providing the remuneration and the referral source.

Millennium should not, under any circumstances, place Lab Assistants in practices located in states, which have enacted legislation and regulations that prohibit laboratories from

Draft Annual Compliance Audit Report

placing employees on-site at referring practices. Before placing Lab Assistants in other states, Millennium should research the legislation and accompanying regulations of each state to ensure the placement will not violate state provisions and subject Millennium to significant liability.

Draft Annual Compliance Audit Report

## V. CPT Coding Review

Millennium provided an Excel file containing its chargemaster for review. Millennium's chargemaster lists all procedure codes it uses to report drug-testing procedures to Medicare, Medicaid, and private payers.[37]

All existing codes are accurate and appropriate, however, Medicare changes to coding for qualitative drug testing will require new codes for Millennium's qualitative drug panels starting January 1, 2011.

The following codes will apply to qualitative drug tests performed for Medicare/Medicaid beneficiaries, coding for quantitative drug tests will remain the same.

*G0434 Drug screen, other than chromatographic; any number of drug classes, by CLIA waived test or moderate complexity test, <u>per patient encounter</u>*

*G0431 Drug screen, qualitative; multiple drug classes by high complexity test method (e.g., immunoassay, enzyme assay), <u>per patient encounter</u>*

The above codes may be submitted only one time per patient encounter (i.e. specimen received). Thus, if not otherwise indicated in further guidance, G0431 or G0431 would be reported once for each of Millennium's qualitative (EIA) panels, based on either the CLIA classification of the test or the type of CLIA Certificate held by the laboratory. Additional guidance has been promised by CMS on these issues.

**Recommendations:**  Continue to monitor Medicare Medlearn articles for promised guidance on use of new qualitative drug testing codes and implement changes as appropriate as of January 1, 2011.

---

[37] Millennium's Chargemaster is attached to this report as Appendix P

Confidential Attorney-Client Privileged Communication – Attorney Work Product                    39

Draft Annual Compliance Audit Report

## VI. Audit Recommendations Summary and Risk Rankings

Each and every audit recommendation included in this report is listed below. Each recommendation is accompanied by a brief description and ranked on a sliding scale from 1 – 4 based on how strongly CodeMap recommends implementing the change, as well as the degree of risk/liability Millennium may be exposed to if the change is not implemented. A ranking of 1 indicates that we strongly encourage Millennium to implement the recommendation, and that failure to do so will result in an unreasonable risk of civil, criminal, or administrative law liability or adversely affect the effectiveness of Millennium's compliance program. Conversely, a ranking of 4 indicates a recommendation of much lower priority and failure to implement will expose Millennium to a much lesser degree of liability.

| Recommendation | Ranking |
|---|---|
| Retain the Vice President of Sales on the Compliance Committee | 2 |
| Develop and administer advanced compliance training | 2 |
| Add the name and phone number of Millennium's CLIA clinical consultant to the Annual Physician Notice | 3 |
| Closely monitor any further inquiries from MAC concerning past claims | 2 |
| Carefully consider implications of confirmation testing protocols and consider proposal for January 1, 2011 implementation | 1 |
| Bring billing functions in-house, discontinue use of third party billing company | 2 |
| Charge fair market value for provision of POC supplies and ensure these arrangements achieve Safe Harbor Protection | 1 |
| Reconsider any arrangements whereby Millennium provides collection cups free of charge to its referring customers | 1 |
| Draft/adopt compliance policy that governs POC supplies arrangements | 2 |
| Draft/adopt compliance policy that governs physicians speaker arrangements | 2 |

Draft Annual Compliance Audit Report

| Recommendation | Ranking |
|---|---|
| Create safeguards that ensure only reasonable amounts of testing are provided pursuant to the Test Drive Program | 1 |
| Draft/adopt compliance policy that governs Test Drive Program | 2 |
| Create, and vigorously maintain and enforce recommended safeguards concerning the placement of Lab Assistants | 1 |
| Draft/adopt compliance policy that governs Lab Assistants | 2 |
| Closely monitor new CMS guidance concerning new drug screening codes | 1 |

Confidential Attorney-Client Privileged Communication – Attorney Work Product

Draft Annual Compliance Audit Report

# Supporting Materials

## Table of Contents

**Appendix A: Agreement to Perform Compliance Audit between Millennium, Inc. and CodeMap, LLC.**                                    **Tab A**

**Appendix B: Biographical Information Concerning Gregory B. Root, Esq., and Charles B. Root, Ph.D.**                               **Tab B**

**Appendix C: OIG's Compliance Program Guidance for Clinical Laboratories, August 1998**                                          **Tab C**

**Appendix D: Table of Contents of Millennium Laboratories' Medicare Compliance Policy Manual 2010**                              **Tab D**

**Appendix E: Millennium's Employee Code of Conduct**                **Tab E**

**Appendix F: Millennium's Employee Certification Form**             **Tab F**

**Appendix G: Millennium Compliance Policy: Disclosure Hotline**     **Tab G**

**Appendix H: Millennium Compliance Policy: Non-Employment of Sanctioned Individuals**                                            **Tab H**

**Appendix I: Millennium Compliance Policy: Screening of New Employees**   **Tab I**

**Appendix J: Millennium Compliance Policy: Post Payment Review**    **Tab J**

**Appendix K: Millennium's 2010 Annual Notice to Physicians**       **Tab K**

**Appendix L: Letter from Ronald L. Wisor Jr. of Hogan Lovells US LLP, dated October 6, 2010**                                    **Tab L**

**Appendix M: Letter from Ronald L. Wisor Jr. of Hogan Lovells US LLP, dated September 3, 2010**                                  **Tab M**

**Appendix N: Millennium's Supplies Contract Letter Agreement**     **Tab N**

**Appendix O: Millennium's New Client Registration and Test Protocol Checklist**                                                  **Tab O**

**Appendix P: Millennium's Standardized Speaker Engagement Agreement**   **Tab P**

Confidential Attorney-Client Privileged Communication – Attorney Work Product                **42**

Draft Annual Compliance Audit Report

**Appendix Q: Millennium's Chargemaster** **Tab Q**

# EXHIBIT 13
# FILED UNDER SEAL

# EXHIBIT 14
# FILED UNDER SEAL

# EXHIBIT 15
# FILED UNDER SEAL

# EXHIBIT 16
# FILED UNDER SEAL

# EXHIBIT 17

TUFTS ⊞ Health Plan

# Medical Necessity Guidelines:
# Urine Drug Testing

*Effective: January 1, 2014*

| Clinical Documentation and Prior Authorization Required | N/A | Type of Review – Care Management | |
|---|---|---|---|
| Not Covered | | Type of Review – Precertification Department Fax: 617-972-9409 | |
| Coverage Guideline | √ | Administrative Process (internal use only) | N/A |

## OVERVIEW

Urine drug testing is performed to detect the use of prescription medications and illegal substances of concern for the purpose of medical treatment. Confirmatory testing is an additional test completed to verify the results of the urine drug test. Urine drug testing should not routinely include a panel of all drugs of abuse. The test should be focused on the detection of specific drugs. The frequency of testing should be at the lowest level to detect the presence of drugs.

## COVERAGE GUIDELINES

Tufts Health Plan may cover urine drug testing when medically necessary.

**PRIOR AUTHORIZATION IS NOT REQUIRED**

- Documentation Requirements:
  - All documentation must be maintained in the Member's medical record and available to Tufts Health Plan upon request.
  - Every page of the record must be legible and include appropriate Member identification information [e.g., complete name, dates of service(s)]. The record must include the identity of the physician or non-physician practitioner responsible for and providing the care of the Member.
  - If requested for review, the submitted medical record should support the use of the selected ICD-9-CM code(s). The submitted CPT/HCPCS code should describe the service performed. Documentation maintained by the ordering provider/treating provider must indicate the medical necessity for performing a qualitative drug test. All tests must be ordered in writing by the treating provider and all drugs/drug classes to be tested must be indicated in the order. Orders which include statements such as "conduct additional testing as needed or custom profile" will not be accepted by Tufts Health Plan.
  - Medical record documentation (e.g., history and physical, progress notes) maintained by the ordering provider/treating provider must indicate the medical necessity for performing a qualitative drug test. All tests must be ordered in writing by the treating provider and all drugs/drug classes to be tested must be indicated in the order.
  - If the provider of the service is other than the ordering/referring provider, that provider must maintain printed copy documentation of the lab results, along with printed copies of the ordering/referring provider's order for the qualitative drug test. The provider must include the clinical indication/medical necessity in the order for the qualitative drug test.
- A full panel screen should only be considered for initial testing when appropriate or when the Member's behavior suggests the use of drugs not identified on the original screening. Medical documentation must support the justification for conducting a full panel screening. Subsequent testing should only be conducted for those substances identified on the Member's initial profile.
- The preferred method of urine drug testing for a Member with a history of poly-substance abuse during the monitoring period is by utilization of a multi-drug screening kit (qualitative analysis by multiplex method for 2-15 drugs or drug classes).
- Confirmatory Testing:
  Drug confirmation (80102) by a second method is indicated when either of the following has occurred:
  - The result of the screen is positive.
  - The result is negative and the negative finding is inconsistent with the patient's medical history.
  For coverage of confirmatory testing, the test results must be necessary for treatment planning and be requested by the ordering provider. Written orders are required.

Confidential

ML_DE_00305155

- Tufts Health Plan may cover urine drug testing for medical conditions, such as those listed below, when medical necessity is demonstrated and when treatment planning by the requesting provider is dependent upon the test results.
  - Altered mental status
  - Medical or psychiatric condition where drug toxicity may be a contributing factor
  - Fetal withdrawal syndrome
  - Possible exposure of the fetus to illicit drugs taken by the mother
  - To assess and treat Members with substance abuse disorders
  - To assess adherence to prescribed medications
- All urine drug testing should be performed at an appropriate frequency based on clinical needs. Substance abuse treatment adherence is often best measured through random testing rather than frequent scheduled testing.

## LIMITATIONS

- Tufts Health Plan will not compensate for qualitative drug screen when billed with any combination of more than twenty (20) units within 365 days per Member, as it exceeds clinical guidelines.
- Quantitative tests in lieu of drug screening services or as a routine supplement to drug screens.
- Tufts Health Plan does not cover urine drug testing in any of the following circumstances:
  - Testing ordered by third parties, such as school, courts, or employers or requested by a provider for the sole purpose of meeting the requirements of a third party.
  - Testing for residential monitoring.
  - Routine urinalysis for confirmation of specimen integrity.

**NOTE:** Use of non-contracting labs may have the unintended consequence of subjecting the Member to unnecessary services not ordered by you as the treating provider or other unreasonable financial exposure. In such circumstances, Tufts Health Plan may hold you accountable for any inappropriate behavior on the part of the non-participating lab that you selected.

For information regarding billing and compensation, refer to the Laboratory Payment Policy on our website.

## CODES

**Table 1: Covered CPT and HCPCS Codes**

| CPT/HCPCS Code | Description |
| --- | --- |
| 80102 | Drug confirmation, each procedure |
| G0431 | Drug screen, qualitative; multiple drug classes by high complexity test method (e.g., immunoassay, enzyme assay), per patient encounter |
| G0434 | Drug screen, other than chromatographic; any number of drug classes, by CLIA waived test or moderate complexity test, per patient encounter |

**Table 2: Noncovered CPT Codes**

| CPT Code | Description |
| --- | --- |
| 80100 | Drug screen, qualitative; multiple drug classes chromatographic method, each procedure |
| 80101 | Drug screen, qualitative; multiple drug classes chromatographic method, single drug class method (e.g., immunoassay, enzyme assay), each drug class |
| 80104 | Drug screen, qualitative; multiple drug classes chromatographic method, multiple drug classes other than chromatographic method, each procedure |

## REFERENCES

1. Center for Medicare & Medicaid Services. Local Coverage Determination 32450. Qualitative drug testing. Accessed on June 7, 2013 at http://downloads.cms.gov/medicare-coverage-database/lcd_attachments/324501/L32450_PATH035060112.pdf.
2. Commonwealth of Massachusetts. MassHealth Independent Clinical Laboratory. Bulletin 9. February 2013.

## APPROVAL HISTORY

June 18, 2013: Reviewed and approved by Integrated Medical Policy Advisory Committee (IMPAC) for a January 1, 2014 effective date.

Medical Necessity Guidelines:
Urine Drug Testing

Confidential

## BACKGROUND, PRODUCT AND DISCLAIMER INFORMATION

Medical Necessity Guidelines are developed to determine coverage for Tufts Health Plan benefits, and are published to provide a better understanding of the basis upon which coverage decisions are made. Tufts Health Plan makes coverage decisions using these guidelines, along with the Member's benefit document, and in coordination with the Member's provider(s) on a case-by-case basis considering the individual Member's health care needs.

Medical Necessity Guidelines are developed for selected therapeutic or diagnostic services found to be safe, but proven effective in a limited, defined population of patients or clinical circumstances. They include concise clinical coverage criteria based on current literature review, consultation with practicing providers in the Tufts Health Plan service area who are medical experts in the particular field, FDA and other government agency policies, and standards adopted by national accreditation organizations. Tufts Health Plan revises and updates Medical Necessity Guidelines annually, or more frequently if new evidence becomes available that suggests needed revisions.

Medical Necessity Guidelines apply to all fully insured Tufts Health Plan products unless otherwise noted in this guideline or the Member's benefit document. This guideline does not apply to Tufts Health Plan Medicare Preferred or to certain delegated service arrangements. For self-insured plans, coverage may vary depending on the terms of the benefit document. If a discrepancy exists between a Medical Necessity Guideline and a self-insured Member's benefit document, the provisions of the benefit document will govern. Applicable state or federal mandates will take precedence. Providers in the New Hampshire service area are subject to Cigna's provider agreements with respect to CareLink$^{SM}$ members.

Treating providers are solely responsible for the medical advice and treatment of Members. The use of this guideline is not a guarantee of payment or a final prediction of how specific claim(s) will be adjudicated. Claims payment is subject to eligibility and benefits on the date of service, coordination of benefits, referral/authorization, utilization management guidelines when applicable, and adherence to plan policies, plan procedures, and claims editing logic.

Provider Services

3

Medical Necessity Guidelines:
Urine Drug Testing

Confidential

# EXHIBIT 18

Message

| | |
|---|---|
| **From:** | Matt Simmons [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MATT SIMMONS] |
| **Sent:** | 1/20/2014 6:40:01 PM |
| **To:** | Brock Hardaway [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Brock Hardaway9d9]; Howard Appel [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Howard Appelbdc13407] |
| **Subject:** | Noridian LCD |
| **Attachments:** | NoridianLCD.Drugs of Abuse Testing.pdf |

Lastly, here's the Noridian draft LCD.

As mentioned, with the exception of five new citations, it is identical to Palmetto's.

Matt Simmons
Director of Government Affairs
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534
Fax: 858-451-3636
msimmons@millenniumlabs.com



(Full Email Disclaimer – http://millenniumlabs.com/emaildisclaimer/)

Confidential                                                                ML_DE_00035507

# Drugs of Abuse Testing

## Noridian Healthcare Solutions, LLC



**Please note: This is a Draft policy.**
Proposed/Draft LCDs are works in progress that are available on the Medicare Coverage Database site for public review. Proposed/Draft LCDs are not necessarily a reflection of the current policies or practices of the contractor.

| Contractor Information | | |
|---|---|---|
| **Contractor Name** | ↑ | Noridian Healthcare Solutions, LLC |
| **Contract Number** | ↑ | 01112 |
| **Contract Type** | ↑ | MAC - Part B |
| **Associated Contract Numbers** | ↑ | (MAC - Part B - 01182) Noridian Healthcare Solutions, LLC, (MAC - Part B - 01212) Noridian Healthcare Solutions, LLC, (MAC - Part B - 01312) Noridian Healthcare Solutions, LLC |
| **Proposed/Draft LCD Information** | | |

1

Confidential

ML_DE_00035508

## Contractor Information

**Draft**

| | | |
|---|---|---|
| **Source LCD ID** | ↑ | N/A |
| **Proposed LCD ID** | ↑ | DL34692 |
| **Proposed LCD Version Number** | ↑ | 2 |
| **Proposed LCD Title** | ↑ | Drugs of Abuse Testing |
| **AMA CPT / ADA CDT Copyright Statement** | ↑ | CPT only copyright 2002-2013 American Medical Association. All rights reserved. CPT is a registered trademark of the American Medical Association. Applicable FARS/DFARS Apply to Government Use. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein. The Code on Dental Procedures and Nomenclature (Code) is published in Current Dental Terminology (CDT). Copyright (c) American Dental Association. All rights reserved. CDT and CDT-2010 are trademarks of the American Dental Association. |
| **CMS National Coverage Policy** | ↑ | Title XVIII of the Social Security Act, §1862(a)(1)(A). Allows coverage and payment for only those services that are considered to be reasonable and necessary.<br><br>Title XVIII of the Social Security Act, §1833(e). Prohibits Medicare payment for any claim which lacks the necessary information to process the claim.<br><br>42 CFR 410.32(a). Order diagnostic tests.<br><br>42 CFR 411.15(k)(1). Particular Services excluded from coverage.<br><br>CMS On-Line Manual, Publication 100-02, Medicare Benefit Policy Manual,Chapter 15, §§80.0, 80.1.1, 80.2. Clinical Laboratory services. |
| **Jurisdiction** | ↑ | |

## Coverage Guidance

2

Confidential

## Contractor Information

| Coverage Indications, Limitations and/or Medical Necessity |  This policy provides an overview of distinctions between qualitative, confirmation and quantitative drugs of abuse testing, and clearly indicates that coverage is dependent on proper documentation of clinical decision-making and test orders that are tailored to the individual patient's medical needs. This policy addresses drugs of abuse testing for Medicare patients. It does not address neonatal testing for suspected prenatal drug exposure.

Drugs of Abuse testing may be useful in the clinical setting because it may provide objective information to assist the provider in diagnosing and making treatment decisions. Clinicians use qualitative and quantitative drugs of abuse testing to look for the presence (or absence) of drugs in the body. In general, drug testing can be helpful in the medical disciplines of emergency medical care for drug-drug interactions and, to some degree, drug overdose, the treatment of neonates, addiction medicine and the medical management of patients using chronic opioid therapy (COT). However, the nature of drugs of abuse testing for each of these groups is somewhat different because treatment goals and timelines generally vary.

By way of definition and as used in this document, the following terminology relates to the basic forms of drugs of abuse testing: |

| Term | General Purpose in Clinical Drugs of Abuse Testing |
|---|---|
| Qualitative Drug Testing | Generally used to determine the presence or absence of drug or drug metabolite in the sample. The test result is expressed in non-numerical terms, with a negative or positive result. |
| Quantitative Drug Testing | Generally used when it is medically necessary to determine the specific quantity of drug or drug metabolite present in the sample. The test result is expressed in numerical terms. |
| Confirmation Testing | Generally used to evaluate initial qualitative screening results to minimize the potential of a clinician relying on a false negative or positive result. Confirmation testing is often recommended when initial screening involves a CLIA-waived or moderate immunoassay screening, but is not medically necessary in all patient cases. A confirmation test order must be medically necessary and reasonable and patient self-report may, in some cases, reduce the need for confirmation of screen results.

Confirmation tests may be expressed in qualitative (CPT 80102) or quantitative (codes within the Therapeutic or Chemistry sections of the CPT) values. |

3

ML_DE_00035510

| Contractor Information | | |
|---|---|---|
| | | The use of qualitative versus quantitative confirmation testing depends upon the individual patient's case and medical necessity therefore. |

More detailed information about medical necessity for test orders, indications and exclusions is set forth below:

**Specific Test Methods**

Clinical laboratories of all types use a variety of test methods to perform qualitative drug analysis, including enzyme immunoassays (EIA and IA), thin-layer chromatography, and spectrometry. In-office and onsite testing generally involves chemical "spot" tests, including dipstick, cassettes and cup methods (generally classified as CLIA-waived), and bench-top chemistry analyzers (classified under CLIA as moderately complex). In either case, EIA and IA drug screening are limited in several ways because:

- they generally screen for drug classes rather than specific drugs;

- they cannot provide information on many specialty drugs; and

- these methods may produce false positives and cross-react with other drug analytes.

These drug screen methods are also unable to identify specific drugs within many drug classes, including the amphetamines, barbiturates, benzodiazepines, and opiate/opioids. Due to these limitations, confirmatory testing with a more specific method such as GC-MS, LC-MS/MS may be medically necessary and reasonable within the confines of the clinical criteria and coverage indications set forth below. However, confirmatory testing should ONLY be ordered and performed on a patient/drug specific basis, within the parameters outlined in this policy, and documented in the patient record.

Confirmatory tests either verify or refute the result of the screening assay. With recent improvements in technology, some laboratories may bypass screening tests and submit all specimens for analysis by

4

ML_DE_00035511

| Contractor Information | | |
|---|---|---|
| | | what have traditionally been referred to as confirmatory test methods, such as gas or liquid chromatography, mass spectrometry. Confirmatory tests use a more specific, and usually more sensitive, method than do screening tests and are usually performed in an independent laboratory.<br><br>Confirmatory tests usually:<br><br>• Provide quantitative concentrations (e.g., ng/mL) of specific substances or their metabolites in the specimen;<br><br>• Have high specificity and sensitivity;<br><br>• Require a trained technician to perform the test and interpret the results;<br><br>• Can identify specific drugs within drug classes<br><br>In clinical situations, confirmation is not always necessary and should be based on provider choice to allow for the proper evaluation of medical necessity. Clinical correlation is appropriate. For example, if the patient or a family member affirms that drug use occurred, a confirmation drug test is not usually needed.<br><br>The terms "drug screening" and "drug testing" are somewhat misleading because they may be interpreted that all drugs will be identified by ordered test panels. In reality, the drug or drug metabolites detected by a test depend on the testing method and the device or test method cutoff concentrations. In the clinical care of patients, the need for testing each drug ordered must be documented and the connection between the test order and clinical decision-making following test results must be reasonable and medically necessary to the ongoing care of the patient.<br><br>**Drug Test Panels**<br><br>A drug test panel is a list (or menu) of drugs or drug classes that can be tested for in a specimen. These can be ordered to identify drugs of abuse or in pain management. No single drug panel is suitable for all clinical uses, and test options should be adapted to clinical needs |

5

ML_DE_00035512

# EXHIBIT 19



Confidential

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, *et al., ex rel.*
MARK McGUIRE *et al.*,

     Plaintiffs,

     v.

MILLENNIUM LABORATORIES, INC., and
MILLENNIUM HEALTH, LLC,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 12cv10132-NMG
No. 12cv10631-NMG
No. 13cv10825-NMG

FILED
IN CLERKS OFFICE
U.S. DISTRICT COURT
DISTRICT OF MASS.
2015 MAR 19  PM 4 40

## UNITED STATES' COMPLAINT IN INTERVENTION

By notice to the Court on December 19, 2014, the United States of America partially intervened in the above-captioned cases. The United States alleges as follows:

### I. INTRODUCTION

1. The United States of America ("United States") brings this action against Defendants pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), seeking treble damages and civil penalties, and also under common law theories of recovery.

2. Millennium Laboratories, Inc., now Millennium Health, LLC ("Millennium," the "Defendant" or the "Company"), was founded in 2007 and grew to be the largest Medicare Part B biller in the country, receiving over $630 million from Medicare for laboratory-based drug testing through 2014.   Millennium performs urine drug testing ("UDT"), which, used appropriately, informs physicians of the amount of a particular substance (be it a prescription drug such as oxycodone or an illicit substance such as heroin) in a patient's system.   Since its founding, Millennium has knowingly submitted many millions of dollars' worth of false claims to the Medicare program for urine drug tests that were not reasonable and necessary or that were

furnished pursuant to prohibited referrals that resulted from Millennium's improper financial relationships with physicians, in violation of the physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law"), and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

3.      Millennium used a variety of schemes to cause physicians, including many of its biggest referrers, to routinely order excessive amounts of UDT for all patients (including Medicare and Medicaid patients) regardless of individual patient assessment or need. Millennium's abusive practices included the use of physician standing order forms (called "Custom Profiles") to encourage routine, excessive UDT, and the dissemination of false and misleading statements about drug abuse rates and the value of its testing. Millennium also provided many services and benefits to physician customers (including free supplies, as discussed below) contingent on referrals of certain amounts of tests to Millennium.

4.      As Millennium knew, Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, based on his or her medical condition. 42 U.S.C. § 1395y(a)(1)(A). The need for *each test* for *each patient* must be individually assessed and documented in the patient's medical chart. 42 C.F.R. §§ 410.32(a), (d)(2). Many patients, including those with chronic pain, do not need extensive laboratory-based UDT. Millennium nonetheless sought to, and did, cause many physicians to routinely order extensive and expensive UDT for all of their patients in order to make more money. Millennium then billed Medicare for each drug or drug class tested—averaging more than seventeen procedure codes (many with multiple units) per urine sample—including tests for drugs that patients were not suspected of taking, and for "confirmatory" quantitative tests of expected in-office screening test results.

2

ML_DE_00595095

5.      For example, Millennium billed and received from Medicare more than $15 million for laboratory UDT for phencyclidine ("PCP" or "angel dust"), abuse of which is virtually non-existent in the Medicare patient population. Millennium also billed and received from Medicare more than $55 million for laboratory drug tests for tricyclic antidepressants ("TCAs"), which also are not commonly abused. Most of Millennium's tests for PCP and TCAs were follow-up testing on in-office test results that were negative and consistent with clinical expectations ("expected negatives"), offering very little, if any, clinical value at great expense to Medicare.

6.      Millennium also paid illegal kickbacks to physicians in the form of free point-of-care ("POC") drug test cups to induce physicians to make referrals to Millennium. These POC test cups cost about $5-6 each and Millennium gave physicians more than one million of them in exchange for referrals. As a condition for providing free POC test cups, Millennium explicitly required physicians to refer additional testing to Millennium or pay back the cost of the "free" test cup. Millennium's provision of the free cups was tied to its excessive testing scheme: its executives required that, to be eligible to receive free POC test cups, physicians have Custom Profiles (i.e., standing orders) with at least twelve drug tests. Millennium's provision of free POC test cups generated more than 200,000 referrals for Medicare patients, which resulted in Millennium receiving over $90 million in tainted Medicare reimbursements.

7.      Millennium was warned by consultants, customers, competitors, insurers and regulators that its marketing schemes were illegal. Millennium nonetheless pressured its employees into participating in these schemes by fostering a culture of greed, intimidation, and intense sales pressure.

<div align="center">3</div>

ML_DE_00595096

8. Through its practices, Millennium knowingly submitted many thousands of false and fraudulent claims to Medicare and Florida Medicaid for excessive and unnecessary testing, and for testing referred in violation of the Stark Law and the Anti-Kickback Statute, and was improperly paid many millions of dollars in reimbursement for these claims.

## II.    JURISDICTION, VENUE, PARTIES

9. This action arises under the FCA, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact and unjust enrichment. This Court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

10. Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

11. This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) and because Defendant resides and transacts business in this District.

12. Plaintiff, the United States of America, brings this action on behalf of the Department of Health and Human Services ("HHS"), and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS").

13. Relator Mark McGuire is an individual who resides in Boston, Massachusetts. Mr. McGuire is the Administrative Director of Laboratory Services at MetroWest Medical Center.

14. Relator Ryan Uehling is an individual who resides in the state of California. Mr. Uehling began working with Millennium in 2007 and was the Regional Director for Millennium's Western Division until 2011.

15. Relator Omni Healthcare, Inc. ("Omni") is a professional medical company primarily based in Brevard County, Florida. Omni is a multi-specialty physician group with

4

Confidential

physicians specializing in family practice, internal medicine, pediatrics, and surgery. Relator John Doe is Dr. Craig Deligdish, a principal of Omni and a practicing physician in the Melbourne, Florida area.

16.     Defendant Millennium Health, LLC, formerly Millennium Laboratories, Inc. (also known as Millennium Laboratories of California, Inc.), is a private corporation incorporated in the State of California in 2007 with its principal place of business in San Diego, California. Millennium conducts business nationwide.

17.     Defendant was founded in 2007 by James Slattery ("Slattery"), who now serves as Chairman of the Board. Slattery previously served as the Chief Executive Officer ("CEO") until 2013, when he was replaced by current CEO Brock Hardaway. Howard Appel ("Appel") is the President of Millennium, and previously served as the Chief Financial Officer ("CFO") until 2013, when he was replaced by current CFO Timothy Kennedy. Elizabeth Peacock ("Peacock") is Millennium's Executive Vice President of Emerging Opportunities, and previously held the titles of Vice President of Sales and Executive Vice President of Sales.

## III.    LAW

### A.    The Federal False Claims Act

18.     The FCA provides, in pertinent part, that a person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains . . . .

5

Confidential

31 U.S.C. § 3729(a)(1).[1]   For purposes of the FCA,

(1) the terms "knowing" and "knowingly"—

(A) mean that a person, with respect to information—
(i)     has     actual     knowledge     of     the     information;
(ii)     acts in deliberate ignorance of the truth or falsity of the information; or
(iii)     acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

### B.        The Medicare and Medicaid Programs

### 1.        The Medicare Program

19.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program.   Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1.  CMS administers the Medicare program.   At all times relevant to this complaint, CMS contracted with private contractors, referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers.  42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.  The Medicare program consists of four parts:  A, B, C, and D.  Millennium billed Medicare under Part B, which covers certain medical services, such as clinical laboratory test services, furnished by physicians and other providers and suppliers.  42 U.S.C. § 1395k(a)(2)(B).

---

[1]  The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  Sections 3729(a)(1) of the prior statute applies to conduct that occurred before FERA was enacted, and Section 3729(a)(1)(A) of the revised statute applies to conduct after FERA was enacted.  Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA.

Confidential

ML_DE_00595099

20. To participate in the Medicare program as a new enrollee, clinical laboratories, such as Millennium, must submit a Medicare Enrollment Application, CMS Form-855B. Laboratories also complete Form CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment.

21. Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

22. An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

23. Authorized officials for Millennium signed the certification statement in Section 15 of Form CMS-855B, indicating that they understood that the laboratory was required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

24. The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers. All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

25. To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form. Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which

7

ML_DE_00595100

reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

26.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

27.     From 2007 to August 24, 2013, Palmetto GBA was responsible for processing Medicare Part B claims in the State of California.  From August 24, 2013 to the present, Noridian Healthcare Solutions, LLC, has been responsible for processing Medicare Part B claims in the State of California.  As Millennium performed all of its tests at facilities in California, it submitted all claims to these Medicare contractors.

### 2.    The Florida Medicaid Program

28.     The Florida Medicaid Program is authorized by Title XIX of the Social Security Act.  42 U.S.C. §§ 1396 *et seq.*  Medicaid is a joint federal-state program that provides health care benefits, including laboratory services coverage, for certain groups including the poor and disabled.  The Florida Medicaid program is required to implement a "State Plan" containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures. 42 U.S.C. § 1396a.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d (b).  The Florida Medicaid Program is authorized by § 409.902 Fla. Stat., and Chapter 59G, Florida Administrative Code ("F.A.C.").  Section 409.919, Fla. Stat., directs the Florida Agency for Health Care Administration ("AHCA") to "adopt any rules necessary to comply with or administer §§ 409.901-409.920 and all rules necessary to comply with federal requirements."

8

ML_DE_00595101

29.     Medicaid handbooks (e.g., the "Florida Medicaid Provider General Handbook") are issued for the purpose of furnishing Medicaid providers with the policies and procedures needed to receive reimbursement for covered services provided to eligible Florida Medicaid recipients.  The handbooks are incorporated by reference in Chapter 59G-4, F.A.C.

30.     Physicians and laboratories certify in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.  Florida's "Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for services provided to Medicaid recipients.  Under Section VII of the Application, in order to be eligible to receive direct or indirect payments for services rendered to Florida Medicaid Program recipients, a provider must certify that the provider understands "that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws."  Florida Medicaid Provider Enrollment Application, Section VII Certification, at 9.

31.     The Florida Medicaid Provider General Handbook contains the following language, in Chapter 5 at page 5-4:

> **Provider Responsibility**  When presenting a claim for payment under the Medicaid program, a provider has an affirmative duty to supervise the provision of, and be responsible for, goods and services claimed to have been provided, to supervise and be responsible for preparation and submission of the claim, and to present a claim that is true and accurate and that is for goods and services that . . . [a]re provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state and local law. . . .

Chapter 59G of the F.A.C., section 5.020, entitled Provider Requirements, requires that enrolled Medicaid providers must comply with the Florida Medicaid Provider General Handbook.

9

Confidential                                                                                                        ML_DE_00595102

32.    Under Chapter 2 of the <u>Florida Medicaid Provider General Handbook</u>, laboratory providers are required to fill out the Florida Medicaid Provider Enrollment Application and Non-Institutional Medicaid Provider Agreement.  The applicable <u>Medicaid Provider Agreement for Laboratory Services Providers</u> requires that providers agree to comply with "with local, state, and federal laws, as well as rules, regulations, and statements of policy applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by AHCA," and refund any moneys received in error within ninety days.

33.    Every time they submit an electronic claim to the Florida Medicaid program, physicians and laboratories also certify that they are complying with state and federal laws applicable to the Medicaid program.  According to the <u>Electronic Claims Submission Agreement</u>, all providers must abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid program.  The agreement also requires providers to certify that each claim is in compliance with all federal and state laws and the conditions on the claim form, including that "the services . . . were medically indicated and necessary to the health of this patient" and that the provider understands "that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

### 3.    Regulations Regarding Coverage for Laboratory Tests

34.    Medicare and Florida Medicaid regulations both make clear that laboratory tests must be ordered by the physician treating the patient for the treatment of a specific illness or injury, that laboratory test orders that are not individualized to patient need (or for which the need is not documented in the patient chart) are not covered services, and that claims for such services must be denied.

10

### a.    Medicare Coverage for Laboratory Tests

35.    Laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

36.    Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory.    42 C.F.R. § 410.32(d)(v).    "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition."    Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1, available at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf (visited March 15, 2014).

37.    Medicare Part B only covers services, including diagnostic laboratory services, that are reasonable and necessary for the diagnosis or treatment of an illness.    See 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]")

38.    Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.    Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."    The MPBM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . .

11

Confidential

. [T]he physician must clearly document, in the medical record his or her intent that the test be performed." MPBM, Ch. 15, Section 80.6.1.

39.    Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary.  42 C.F.R. § 410.32(a).  Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a).  MPBM, Ch. 15, § 80.1.

40.    In order to assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation) . . . .").

41.    Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary.  42 C.F.R. § 410.32(d)(3)

42.    CMS regulations further empower laboratories to request documentation from physicians regarding medical necessity:

> *(iii) Medical necessity.* The entity submitting the claim may request additional diagnostic and other medical information from the ordering physician or nonphysician practitioner to document that the services it bills are reasonable and necessary.

12

ML_DE_00595105

42 C.F.R. § 410.32(d)(3).

43.    The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has published Compliance Program Guidance for Clinical Laboratories in the Federal Register.   63 Fed Reg. 45076 (Aug. 24, 1998), available at https://oig.hhs.gov/authorities/docs/cpglab.pdf (visited March 15, 2015).   Among other things, the HHS-OIG guidance clarifies that laboratory order forms should emphasize the need for a justification and assessment of each test ordered and that Medicare does not pay for tests for screening purposes:

> Therefore, Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient.
> . . .
> a. Requisition design: While HCFA [(CMS)] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals.  The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill. . . . **The form should contain a statement indicating that Medicare generally does not cover routine screening tests.**
> . . .
> 4. Reliance on Standing Orders
> Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. . . . Medicare contractors can and may require additional documentation to support the medical necessity of the test. **As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.**

Id. at 45079, 45081 (emphasis added).

13

Confidential                                                                                    ML_DE_00595106

44.     As Millennium explained to its sales force in 2011, "the [HHS-]OIG consistently and fervently insists on the demonstration of medical necessity for all diagnostic testing." Exhibit 1.

**b.      Florida Medicaid Coverage for Laboratory Tests**

45.     Florida Medicaid also requires that testing be individualized to the medical needs of patients.  As stated in 59G-1.010(166) of the Florida Administrative Code, "Medically necessary" or "medical necessity" means:

> [T]hat the medical or allied care, goods, or services furnished or ordered must: . . .
>
>> Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain; [and]
>>
>> Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs; . . .

It further clarifies:

> The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in itself, make such care, goods or services medically necessary or a medical necessity or a covered service.

46.     Florida Statute § 409.905 also states:

> 409.905 Mandatory Medicaid services. . . .  Any service under this section shall be provided only when medically necessary and in accordance with state and federal law.

**C.      Self-Referral and Anti-Kickback Prohibitions**

**1.      The Stark Law**

47.     The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if

14

ML_DE_00595107

such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception. 42 U.S.C. §§ 1395nn; *see also* 42 C.F.R. §§ 411.351 *et seq.*

48.    Compliance with the Stark Law is a condition of payment by the Medicare program. Medicare may not pay for any DHS provided in violation of the Stark Law. *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

49.    The regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ." 42 C.F.R. § 411.353(d).

50.    A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

51.    Effective October 1, 2008, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if -- (A) The only intervening entity between the physician and the entity furnishing [DHS] is his or her physician organization; and (B) The physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).

52.    Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [is the] entity that has presented a claim to Medicare for the [DHS] . . . ." 42 C.F.R. § 411.351.

53.    A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] for which payment may be made under Medicare Part B . . . ." 42 C.F.R. § 411.351.

15

ML_DE_00595108

54.     The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements.  The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity."  42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R. § 411.351.

### 2.     The Anti-Kickback Statute

55.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to patients.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.  The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

56.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.  In pertinent part, the statute provides:

16

(b)   Illegal remunerations . . .

    (2)    whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

        (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b.

57.     Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare program.  42 U.S.C. § 1320a-7(b)(7).

## IV.     BACKGROUND:  TYPES OF UDT, GUIDELINES, AND REIMBURSEMENTS

### A.     Types of Urine Drug Tests

58.     Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system.  Drug testing can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte).  Different testing methodologies have different capabilities and limitations.

59.     Drug testing is performed in a number of contexts.  Some workplaces have mandatory drug testing requirements, in some instances required by federal regulations.  In the clinical health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

17

ML_DE_00595110

60.     Urine is the most common medium used for drug testing, and is the predominant medium for testing used by Millennium.

61.     There are different types of drug testing, generally based on the location of the test (in-office or at a laboratory), which have different associated costs.

62.     "Point of care" or "POC" testing—at a physician's office or clinic—is generally performed by "immunoassay" methodologies, which generally provide a qualitative result indicating the presence or absence of a drug or drug class above pre-set "cut-off" or concentration levels.  In-office testing is often performed with POC drug test cups that have a number of built-in drug test strips, each of which tests for a specific drug or drug class.  In-office testing can also be performed on immunoassay analyzer machines, known as "desktop" or "benchtop" analyzers, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

63.     Under CLIA, CMS oversees all laboratory testing services.  UDT performed using POC drug test strips and test cups is generally "CLIA-waived."  CLIA-waived tests are categorized as simple laboratory examinations and procedures that have an insignificant risk of an erroneous result or pose no risk of harm to the patient if the test is performed incorrectly.  43 C.F.R. § 493.15(b).  To perform CLIA-waived tests, physicians need to enroll in CLIA and obtain a waiver.  42 C.F.R. § 493.35.  To operate a benchtop or desktop analyzer, physician practices are generally required to obtain CLIA certification to perform moderate- or high-complexity laboratory tests.

64.     As discussed in the next section, since April 2010, Medicare generally only reimburses one unit of POC testing per patient encounter, based on the methodology used (analyzer versus POC test cup with embedded test strips).  As of January 1, 2011, the Medicare

18

ML_DE_00595111

reimbursement for POC tests is determined by the complexity of the test under CLIA (HCPCS billing code "G0434" for CLIA-waived tests and "G0431" for high-complexity analyzer tests).

65. POC drug testing, including use of POC test cups, is the standard of practice for drug testing in pain management. Most patients need only limited, if any, laboratory testing, based on their POC test results, drug abuse history, and clinical presentation.

66. Testing at laboratories is generally performed by more precise methodologies, such as column chromatography in combination with mass spectrometry. Such methods include gas chromatography with mass spectrometry ("GCMS") and liquid chromatography with mass spectrometry ("LCMS"). These testing methodologies can provide quantitative results, identifying the *concentration* of a drug or metabolite in a sample. Quantitative tests are often billed for each drug or drug class tested, using CPT codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those CPT codes. Quantitative tests can be used to "confirm" POC test results, as they use a second, more accurate methodology.

67. Millennium performed UDT by liquid chromatography with tandem mass spectrometry ("LC-MS/MS").

68. Millennium's LC-MS/MS technology enabled it to test urine specimens for numerous drugs and metabolites during a single run of an aliquot of a urine sample through the LC-MS/MS machine.

**B.      Expected Versus Unexpected POC Test Results**

69. The clinical value of Millennium's "confirmatory" or "quantitative" laboratory testing depends on a patient's medical condition. The clinical utility of a "confirmation" or "quantitation" of POC test results depends in part on whether the POC test result is expected or unexpected, and the patient's drug abuse history and clinical presentation.

19

ML_DE_00595112

70. For example, if a patient is prescribed a certain drug, such as Xanax, a positive POC test result for benzodiazepines (of which Xanax is one) would be expected. If the test result is negative for benzodiazepines, however, and the patient insists that she is taking her Xanax as prescribed, a quantitative laboratory test to "confirm" whether this unexpected negative result may be reasonable and necessary.

71. Similarly, if a patient's POC test yielded a positive result for a non-prescribed or illicit drug, then a quantitative laboratory test to evaluate (i.e., "confirm") this unexpected positive result may be reasonable and necessary.

72. In some instances, laboratory testing of an expected POC test result or for a substance not available on a POC test may also be warranted. For example, aberrant patient behavior, unexpected clinical presentation, or a history of drug abuse may justify specific laboratory tests. The clinical value of such tests, however, depends on the presentation and physician assessment of each individual patient and that patient's need for each such test. If a POC test is negative for an illicit drug or drug not prescribed, and there is nothing in the patient's presentation or drug abuse history to indicate abuse of that drug, then a quantitative laboratory test for that drug is not reasonable and necessary for the treatment and diagnosis of that patient, and therefore not covered by Medicare.

## C.    Guidelines on Urine Drug Testing

73. Several organizations have published guidelines regarding UDT in the clinical setting, including UDT for chronic pain patients prescribed opioids. According to the Substance Abuse and Mental Health Services Administration ("SAMSHA"), the development of UDT guidelines in the clinical setting draws on the experience of workplace drug testing, including the

20

ML_DE_00595113

Federal Drug-Free Workplace Program and its guidelines ("Federal Workplace Guidelines"). 73 Fed. Reg. 71858 (Nov. 25, 2008).

74.     Under the Federal Workplace Guidelines, a "Negative Result" includes results reported by certified laboratories when a valid specimen "contains no drug or the concentration of the drug is less than the cutoff concentration for that drug or drug class." *Id.* at 71878 (Sec. 1.5). Laboratories may report a valid specimen as "negative" when "each initial drug test is negative[.]" *Id.* at 71894. Under the Federal Workplace Guidelines, a negative result on these initial immunoassay tests do not require confirmation testing by another method. *See id.*

75.     Millennium is well aware that entities have published guidelines regarding the use of UDT in clinical pain management and, in fact, Millennium compiled excerpts of guidelines into a document it entitled "Urine Drug Testing Guidelines by Leading Industry Organizations." Exhibit 2. The guidelines Millennium cites include those issued by the American Pain Society, the American Society of Interventional Pain Physicians ("ASIPP"), the Department of Veterans Affairs, the State of Utah, the Federation of State Medical Boards, and the Washington State Agency Medical Directors Group.

76.     As Millennium knew, none of these guidelines recommended the routine use of quantitative laboratory testing, such as the LC-MS/MS testing that Millennium performs, to "confirm" expected negative immunoassay results.

77.     Instead, when these guidelines addressed the need for confirmatory/quantitative laboratory testing, they generally recommended a UDT protocol whereby an immunoassay test is administered first and then only *unexpected* results are referred for laboratory-based confirmatory testing via a quantitative method such as LC-MS/MS.

21

Confidential

ML_DE_00595114

78.    For example, the Washington State Agency Medical Directors Group Interagency Guideline on Opioid Dosing for Chronic Non-Cancer Pain ("Washington State Guidelines") states that the purpose of the immunoassay test is to provide rapid results that should help avoid further, unnecessary laboratory confirmation testing of expected results: "The advantages of immunoassays are their ability to concurrently test for multiple drug classes, provide rapid results and guide appropriate utilization of confirmatory testing." Washington State Agency Medical Directors' Group, *Interagency Guideline on Opioid Dosing for Chronic Non-cancer Pain*, 2010 update, available at http://www.agencymeddirectors.wa.gov/Files/OpioidGdline.pdf (visited March 15, 2014).

79.    The Washington State Guidelines recommend such confirmation testing only for positive results:  "When the immunoassay result is unexpected and the patient does not acknowledge or credibly explain the result, a confirmatory test using either GC/MS or LC/MS/MS should be ordered."  Similar recommendations are made by other authoritative entities, including the ASIPP and SAMSHA. *See* Manchikanti L, Abdi S, *et al.*, *Pain Physician 2012*; 15:S67-S116, ISSN 1533-3159, ASIPP Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain; Substance Abuse and Mental Health Services Administration, *Clinical Drug Testing in Primary Care*, Technical Assistance Publication (TAP) 32, HHS Publication No. (SMA) 12-4668.

**D.    Reimbursements for Laboratory Tests**

80.    Different types of urine drug tests have different costs.

81.    Since January 2011, POC test cup tests have been billed to Medicare using HCPCS code G0434 and reimbursed at a fixed rate of approximately $20-25 per patient encounter—regardless of the number of substances tested.  Also since January 2011, POC high-

22

ML_DE_00595115

complexity immunoassay tests have been billed to Medicare using HCPCS code G0431 and reimbursed at a fixed rate of approximately $100 per patient encounter—again, regardless of the number of substances tested.

82.     Millennium listed the HCPCS and CPT billing codes it used in its "Annual Physician Notices." *See, e.g.,* Exhibit 3 ("2012 Physician Notice")); Millennium Health Annual Physician Notice ("2014 Physician Notice"), available at http://www.millenniumhealth.com/wp-content/uploads/2014/08/MLI-ADF11001_Annual-Physician-Notice-2014-August-D3.pdf (visited March 17, 2015).  Millennium generally billed LC-MS/MS test results using individual CPT codes for each drug or drug class it tested.

83.     Millennium routinely billed multiple different CPT codes for some drug classes—such as TCAs, for which Millennium billed four separate CPT codes.

84.     Millennium also routinely billed multiple units of the same CPT codes—such as 83925 for opiates—suggesting that it had performed multiple procedures to test for opiates.

## V.     DEFENDANT'S FRAUDULENT SCHEMES

85.     Millennium knowingly submitted and caused to be submitted false claims to Medicare and Florida Medicaid for non-covered drug testing that was not reasonable and necessary.  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 410.32(a); MBPM, Ch. 15, Section 80.6.1.

86.     Millennium increased physician testing per sample by causing physicians to order large numbers of LC-MS/MS tests on a routine basis for their patients pursuant to practice-wide standing order forms—without an individualized assessment of which drug tests were necessary for a given patient.  This practice resulted in testing that was not reasonable and necessary.  Millennium also made false and misleading statements about the need for and value of its drug testing services to encourage such testing, and paid physicians remuneration in the form of free

23

ML_DE_00595116

supplies—tied to physician referrals—to secure their referrals and get them to agree to high levels of testing.

87.    Physicians, with Millennium's knowledge and encouragement, routinely ordered dozens of individual tests, each costing Medicare about $25, for all of their patients.  In 2012 and 2013, Millennium billed Medicare for an *average* of more than twenty laboratory tests at an *average* cost of more than $450 for each urine sample.  In these two years alone, Millennium billed and was paid more than $400 million by Medicare.

**A.    Millennium Caused Physicians to Order UDT That Was Not Reasonable and Necessary, in Violation of Medicare Requirements**

88.    A core element of Millennium's business model was the use of physician standing order forms.  Millennium created these forms as part of its plan to direct physicians to establish protocols for laboratory testing to be performed on all of their patients—usually, at minimum, a dozen or more drug tests—regardless of each patient's individualized need and condition.

**1.    Millennium Required Physician Use of Standing Orders**

89.    Millennium enabled, required and enforced the use of physician standing orders. These forms were alternately called "Standing Order," "Test Protocol" and "Custom Profile" forms.  While the name of Millennium's standing order form changed, the function remained the same.

90.    These forms worked substantially as follows, with some modifications over time: a physician filled out a Custom Profile (or Standing Order or Test Protocol) form that was kept on file with Millennium and remained in effect for the physician's practice until and unless changed.  When a urine sample was sent in for testing, the physician, a staff member, or even a Millennium-employed laboratory assistant or third-party specimen collector filled out an order

24

                                                                                                    ML_DE_00595117

(or "Requisition") form for the specimen and checked a box in "Section A" of the order form labeled "Use Custom Profile." This caused Millennium to perform and bill to insurers, like Medicare, all of the tests on the Custom Profile.

91.    Millennium's 2014 Annual Physician Notice explained:

Physician Custom Profiles:   Millennium offers physicians the option of establishing a Custom Profile to serve as general instructions on how they would like their patients tested.   In constructing a Custom Profile, each drug the physician would like tested must be selected individually on the Custom Profile form.   When ordering tests, a physician must select a testing option in Section A of the test requisition form by marking either a) USE Custom Profile, and perform additional tests if ordered, or b) DO NOT USE Custom Profile, and perform only those tests ordered on that requisition form.

92.    Millennium sales representatives and executives expected and encouraged physicians to use their standing order (potentially including additional tests for a given patient—but not fewer) for all or most of the patients in their practices.

93.    The importance of and emphasis on standing orders permeated Millennium's sales and marketing.  For example, on September 10, 2009, Millennium's Vice President of Marketing sent an email to all sales representatives entitled "STATUS OF STANDING ORDER FORM" and stated:   "As you know, the standing order is critical to our confirmation and billing process . . . ." Exhibit 4.

94.    Millennium's management required physicians to have a Custom Profile on file with the Company.  As stated by Millennium's customer support staff to a member of the sales force, copying Millennium's President: "STANDING ORDER MUST BE RECEIVED BEFORE SPECIMENS CAN BE SENT IN TO LAB OR PROCESSED." An April 2011 email by Mary Rouse, Millennium's Director of Sales Operation, stated:  "If we do not receive updated custom

Confidential                                                                                                       ML_DE_00595118

profiles, we will discontinue processing specimens for these accounts until an updated profile is received."

95.     Millennium expected not only that physicians would have a Standing Order or Custom Profile, but also required certain testing thresholds, so that Millennium could make more money.  Millennium refused to do business with accounts that failed to meet these thresholds.

96.     Early Millennium training documents, reviewed by Millennium Chief Executive Officer James Slattery, made this clear:

> Attached is a revised and even better 'Why Confirm Every Sample' document. This information should be used on the first call and every subsequent call to establish the expectation that all samples get sent to our lab for confirmation. This also lays the groundwork for a complete Standing Order to be put in place. **If an account does not want a Standing Order in place for the 6 drugs not covered by the [POC test], we do not want to do business with them.**

Exhibit 5 (emphasis added).

97.     Millennium executed this strategy by pushing for standing orders that included as many tests as possible.  As stated by Elizabeth Peacock, Vice President of Sales, with respect to one customer's Custom Profile in August 2011: "I'm after a one-two punch.  Layer on a couple more tests now, then push a couple of new ones as well."  Exhibit 6.  Or, as stated by Millennium's President regarding updated forms in September 2011: "WE DON'T WANT TESTING TO DECLINE BY UPDATING THE CP [Custom Profile] WITH LESS TESTS[.]" Exhibit 7 (capitalization in original).

98.     Millennium employees routinely submitted completed Custom Profile forms to headquarters for processing, *see* Exhibit 8, and often filled out information on the Custom Profile forms themselves.

26

ML_DE_00595119

99.     Millennium even processed specimens under customers' Custom Profiles in instances where the "Use Custom Profile" box in Section A of the requisition form was left blank. *See, e.g.,* Exhibit 9.

### 2.     Millennium Set—and Enforced—Testing Thresholds for Physician Standing Orders

100.     Millennium executives and sales managers set requirements for the amount of testing sales representatives had to obtain from physicians for their Custom Profiles.

101.     Millennium required that physicians agree to Custom Profiles with at least twelve tests in several contexts, including approval as a Millennium customer, removal from "troubled" (unprofitable) account lists, and as a condition for receiving free POC test cups.

102.     Millennium sales managers spread the message to their sales teams that Custom Profiles needed to have twelve or more tests.  For example, in September 2011, the Regional Sales Manager for New England directed his sales team, while circulating new Custom Profile forms, as follows:  "As we discussed on our conference call, the minimum for each account going forward is 12 test[s] + 4 Validity test[s]. . . . good selling!" Exhibit 10.[2]  Similarly, the Regional Sales Manager for Florida wrote in August 2011:  "Strive for at least 15 plus validity. You can take one of 2 approaches – we are losing money every month and/or the clinical necessity." Exhibit 11.

103.     Millennium executives were deeply involved in monitoring and even rejecting Custom Profiles that did not meet these standards.  For example, Millennium's sales support team sent an email to a sales manager in September 2011, copying Millennium's President, Mr. Appel, with the subject "cp issues – not enough tests," stating:  "The attached new client

---

[2] Millennium offered and performed "specimen validity testing" to determine whether a urine sample had been tampered with.

27

paperwork . . . does not have enough tests on the [Custom Profile] to enter.  Once they are updated with more tests, sales support will process the paperwork."

104.    Another communication from the sales support department to a sales manager made clear that Mr. Appel himself rejected "Custom Profiles" that did not have "enough" tests: "There are not enough tests on the CP and [Mr. Appel] *will not approve. . . .* If [the sales representative] can get more tests added and send the CP back today, we can overnight the supplies."  Exhibit 12.  The sales manager forwarded this message to the sales representative stating, "we need more tests on this CP.  Sell them on the clinical value of a more comprehensive testing menu." *Id.*

105.    Millennium also made provision of resources (including millions of dollars' worth of free POC test cups) contingent on robust standing orders.  To be approved for free POC test cups, Millennium required new practices to have at least twelve tests (plus four specimen validity tests) on their Custom Profiles.  Exhibit 13.  For existing customers, Millennium sales personnel were directed to "[v]erify profitability with VP of Business Analytics . . . .  If practice falls below ML profitability guidelines, cup agreement will be denied." *Id.*

106.    Millennium executives monitored the profitability of its physician customers ("accounts"), and referred to accounts that failed to meet profitability and test-per-specimen thresholds as "troubled" or "at risk."

107.    If sales representatives failed to increase testing by a "troubled" account, Millennium stopped accepting samples from the account, withheld commissions for samples sent in for testing by that account, or both.

108.    Millennium executives reinforced to sales representatives the need to drive up the number of tests on their customers' standing orders.  For example, in a September 2011

28

ML_DE_00595121

communication to a sales manager, Millennium's President wrote: "[A]ttached are CPs we received as a follow up to the August Trouble [*sic*] Practices lists. These are still not adequate. These need to be resolved immediately." Exhibit 14.

109. Millennium executives discussed a standard for acceptable tests per specimen for "troubled accounts" in an August 2011 email chain entitled "Troubled practices." Exhibit 15. Millennium's Vice President of Analytics, Daniel Pencak, wrote that "[a]fter a few sales reps have called me, it's clear there needs to be some education to the field [on] what the minimum number of tests are required to break-even[.]" *Id*. Millennium's Vice President of Sales responded by asking "So, what's the magic number?" She suggested twelve tests per specimen. Mr. Pencak agreed that twelve was a "reasonable number." *Id*.

110. Accordingly, Millennium told sales representatives that they had to increase revenue per specimen from so-called "troubled practices" or "troubled accounts"—or it would suspend sales representatives' commissions on these accounts and/or terminate them as customers. As a Senior Financial Analyst wrote to Mr. Pencak in March 2012 regarding one such "troubled" account: "The Practice is eligible for cancelation [*sic*] as a Troubled Practice and the primary driver for its poor performance is low tests per specimen. My logic is that if they could update the custom profile to include additional tests, then it would increase tests/specimen."

111. Lists of "troubled accounts," prepared by Mr. Pencak, were circulated to sales teams with instructions to make the accounts more profitable by increasing the number of tests on their Custom Profiles. One sales manager directed her team to immediately photograph updated Custom Profiles and send the images to Millennium's Vice President of Business Analytics. Exhibit 16; Exhibit 17.

<div align="center">29</div>

ML_DE_00595122

112.   Millennium's employees executed these instructions successfully, repeatedly causing physicians to increase the testing on their standing orders and bragging about it. For example, in August 2011 a sales manager submitted to Ms. Peacock a "Plan of action for troubled accounts" in his region, with responses from sales representatives. Exhibit 18. One sales representative wrote: "I spoke with the office yesterday and they have modified their protocol effective immediately to include 4 additional confirmations of negative tests . . . ." *Id.* Another stated he set up a meeting to "convince [the account] to add more confirmations to their standing protocol." *Id.* Another wrote: "We will go in and get [the doctor] to increase confirm [*sic*] negatives. . . . He will make changes and add more confirm negative [*sic*] with some convincing." *Id.* Another wrote "we are meeting with these doctors to increase their testing of negatives." *Id.* The proposed marketing plans to increase testing do not reference a clinical justification for the additional tests. *Id.*

113.   Millennium executives rewarded such success and agreed not to suspend sales commissions on "troubled" accounts that ordered additional testing. For example, the Regional Sales Manager for New England argued in a January 2012 email that one sales representative had made substantial progress "in increasing [an] account[']s revenue through test per specimen" and, for another account made "many strides . . . to increase profitability and protocol." Exhibit 19. For the latter account, the manager explained that the sales representative had secured a "[n]ew CP consisting of 14 test[s] per specimen," and that the practice had "[a]greed to use CP every time (Section A)." *Id.* Ms. Peacock wrote back that profitability had sufficiently increased and that commissions would not be suspended. The Sales Manager responded: "What a turn of events! Big win, I'll let [the rep] know, thanks for all the follow up!" *Id.* The email chain did not reference any clinical justification for the increased testing.

30

ML_DE_00595123

**3.    Millennium Promoted the Routine "Confirmation" of Negative POC Test Results and Made False and Misleading Statements to Further Encourage This Testing**

114.    To increase laboratory testing, Millennium trained its sales representatives to (1) "Emphasize the need to confirm every sample" and (2) "strongly suggest to our customers that negative POC results should be confirmed . . . ." Exhibit 20.

115.    Millennium sales training documents emphasized that "confirmations" of POC test results were key to Millennium's revenue (and sales representatives' compensation).  For example, one training presentation entitled "Sales Focus and Positioning" contained slides entitled "Make it routine" and "Emphasize the need to confirm."  The "Make it routine" slide instructed sales representatives "to help practices establish a testing protocol" to prevent testing volumes from declining over time.  The "Emphasize the need to confirm" slide noted that when "[p]hysicians consider point of care adequate and confirmation numbers are low" it "doesn't help our revenues—or yours!"  The slide suggested a "goal" for physicians to confirm every sample. Exhibit 21.

116.    Millennium paid its sales representatives commissions of $6, $8, $10, and even $12 per sample sent into Millennium for testing.  These commissions were significant—some sales representatives made hundreds of thousands of dollars per year in commissions.  Some Regional Managers made upwards of $1,000,000 per year in commissions.  Millennium only paid commissions for samples sent in from accounts Company executives deemed sufficiently profitable.

117.    Millennium trained its sales representatives to emphasize to physicians that they should not individually assess their patients, but rather extensively test all patients—with separate, expensive laboratory tests—pursuant to pre-determined Custom Profiles.  Millennium

31

ML_DE_00595124

offered various reasons for this blanket approach to testing, including that "profiling" patients (i.e., taking a patient-specific approach to testing) "doesn't sit well" with the Drug Enforcement Agency. *See* Exhibit 21.

118.    Millennium suggested to physicians that they could be subject to regulatory action if they did not order more tests from Millennium.  In an April 2009 email, an area Sales Director wrote, "if they do not confirm every sample, they are in violation of the CLIA program.  This could result in Medicare asking for all the money that they have billed for for [*sic*] the first half of the test, plus huge fines." Exhibit 22.

119.    Millennium also promoted the simplicity of "confirming" all POC test results. For example, Millennium's Chief Scientific Officer wrote to a sales representative in December 2009, copying Ms. Peacock:  "In fact, we recommend to practices that they confirm all POCT results (positive and negative) that way they don't fail to order the correct test for a given drug because they end up getting all the results anyways." Exhibit 23.

120.    Millennium made numerous false and misleading statements regarding "false negative" rates for POC tests in order to cause physicians to increase testing for the confirmation of expected negative POC test results on their Custom Profiles.

121.    Millennium falsely claimed POC tests had very high "false negative" rates. Instead of using the proper definition of "false negatives"—negative test results that should have been positive—Millennium calculated and marketed a different, misleading statistic (the percentage of positive samples missed on POC tests) and called it the "false negative" rate. Millennium did this to create an inflated sense of uncertainty surrounding POC drug tests, undermine physician confidence in POC tests, and promote the routine use of quantitative UDT for drugs that patients were not suspected of taking.

32

ML_DE_00595125

122.    For example, Millennium compiled data from the second quarter of 2012 suggesting that, for every one hundred pain patients tested, approximately four were positive for cocaine on LC-MS/MS tests, and that, of these four, POC tests revealed two of them and missed two.  Exhibit 24.  Negative POC tests results were thus correct 98% of the time (yielding a false negative rate of approximately 2%), yet Millennium encouraged its sales representatives to say that POC tests for cocaine had a "false negative" rate of nearly 50%.  *Id.*  Millennium internal talking points from April of 2010 stated:  "Cocaine was found to return a false negative rate in about 50% of the 2840 samples in which confirmation results vs. immunoassay were studied.  Followed by 30% for propoxyphene, 28% for benzo's, etc.  ***KEY TAKEAWAY:  Doctors should confirm all negatives*** . . . ."  Exhibit 25 (emphasis in original).

123.    Millennium's own data showed that the false negative rate for POC tests was actually very low for most drugs (4% or less for methadone, amphetamines, barbiturates, TCAs, MDMA, cocaine, marijuana, and PCP).  *See, e.g.*, Exhibit 26.  The likelihood that a negative POC test result is "false" for a given patient is also affected by that individual patient's presentation, prescribed medications, and drug abuse history, if any.

124.    Millennium nonetheless consistently directed its sales representatives to promote false and misleading "false negative" rates, including through a Company marketing document entitled "Empirical Evidence to Consider when Formulating your UDT Program" that was distributed to all sales representatives for use with physicians.  Exhibit 27 at 3.  As stated by a Regional Sales Manager to his team in an August 2011 email:  "Use it to explain the reasons for false positive/false negatives on the POC cups.  This will also be helpful in securing more test requests/specimen on the Custom Profiles."  Exhibit 28.  Millennium's Chief Scientific Officer wrote to another Regional Sales Manager in July 2011: "If you are looking to demonstrate the

33

ML_DE_00595126

importance of confirming negative POCT results, then I would recommend the document entitled 'Empirical data to consider when formulating your UDT program.'" Exhibit 29.

125.   The Company's false statements convinced physicians to order more tests from Millennium. One Millennium sales representative wrote to Millennium's VP of Sales and other sales managers in March 2011: "I really wish we could take the Empirical data info and make it into a tri-fold presentation piece or flip chart!!  It has been such a beneficial tool at sales calls." Exhibit 30.

126.   Millennium also told physicians that they were risking legal liability if they relied on POC test results—despite a lack of support for routine quantitative testing in drug testing guidelines and Medicare coverage requirements that each test for each patient be reasonable and necessary.

127.   For example, in June and July of 2011, Millennium's Florida sales team recycled the false statement regarding "false negative" rates into talking points for use with physicians that stated: "Our data shows huge %'s of false negatives from the POC cups . . . Cocaine-false negatives on POC occur up to 50% of the time.  To risk medical license on a $6 cup is ___.  You can fill in the blank :)." Exhibit 31.

128.   Millennium also claimed that the alleged lack of reliability of POC tests put physicians' practices as risk: "You may not have many high risk patients, but it only takes one overdose to put your practice on the line." *Id.*

129.   Millennium used unsupported threats of third-party legal actions to cause physicians to "confirm" POC drug test results.

34

ML_DE_00595127

130.   In September 2011, a Millennium Regional Vice President sent an email to all sales managers describing how to respond to complaints about "HUGE BILLS." He suggested they distribute a news article entitled "Another little old lady arrested for pushing drugs":

> Hand this print out to the physician and tell them, 'don't let this patient creep up and surprise you in your practice, **set the protocol to cover most of the drugs we can test** and we will make sure your patients aren't exploited and feel over charged. Once you start cherry picking who gets tested for this and that, you miss one like this. There are hundreds of patients dying in every state every month because of overdose, drug interaction, etc. so make sure none of them come from this practice[.]'

Exhibit 32 (emphasis added). Millennium's Vice President of Sales responded "Great advice Nick."

**4.      Millennium's Conduct Generated Unnecessary Testing—Including "Confirmations" of Expected POC Test Results for Rarely Abused Drugs**

131.   Millennium's use and promotion of standing orders caused testing that was not reasonable and necessary and for which the need was not assessed or documented.

132.   Routine quantitative testing under Custom Profiles led to millions of dollars in drug testing for Medicare patients that was not reasonable and necessary—including for substances that are rarely abused and diverted in the general population, much less in the Medicare population.

133.   For example, Millennium billed Medicare for more than 900,000 laboratory tests for phencyclidine or PCP (CPT Code 83992), at a cost of more than $16 million. PCP is not a commonly abused drug. According to Millennium's own data, the incidence of true positives for PCP is extraordinarily low. In addition, POC tests for PCP have very low false negative rates. For example, Millennium's own data revealed that, for a quarter in 2012, Millennium identified

35

ML_DE_00595128

only 24 false negatives out of 174,960 LC-MS/MS tests following negative POC test results for PCP—or 0.01 percent.  Exhibit 24.

134.   Millennium also billed Medicare more than $55 million dollars for laboratory testing of four types of TCAs—approximately 660,000 drug tests each for amitriptyline (CPT Code 80152), desipramine (CPT Code 80160), imipramine (CPT Code 80174), and nortriptyline (CPT Code 80182).  Millennium billed Medicare for each of these four tests nearly every time testing for TCAs was ordered.

135.   TCAs have been on the market since the 1960s.  TCAs present a low risk of abuse and diversion, in part because of side effects for users.  TCAs are not even listed in the schedules of controlled substances under the Controlled Substances Act.  21 U.S.C. § 812.

136.   While POC tests for TCAs have a somewhat higher risk of false negatives than PCP (around 3%, according to Millennium's 2012 data), the need for that testing is tempered by the low abuse potential for TCAs and lack of abuse history for the vast majority of patients.

137.   Millennium knew many customers ordered TCA testing.  In one email, Ms. Peacock asked Mr. Pencak, "What percent of customers order TCA confirmations?"  Mr. Pencak responded: "About 49%."  Exhibit 33.

138.   Millennium routinely analyzed and summarized data on test ordering patterns, in "Practice Profiles" and "Regional Profiles" (summarizing tests ordered by entire states), that showed ordering patterns indicating frequent use of Custom Profiles and the ordering of unnecessary "confirmations" of expected POC test results.  *See, e.g.* Exhibit 34 at 5.

36

ML_DE_00595129

**5.      Millennium Knowingly Submitted Claims to Medicare for Tests That Were Not Reasonable and Necessary**

139.    Millennium knew that, as a laboratory and Medicare supplier, it had an obligation to submit claims to Medicare only for tests that were reasonable and necessary for the diagnosis or treatment of individual patients.

140.    For example, Millennium's 2012 Annual Physician notice stated:

Medicare will only pay for tests that meet the Medicare coverage criteria and are medically necessary for the diagnosis or treatment of the individual patient. **Tests used for routine screening of patients without regard to their individual need are not usually covered by the Medicare program, and therefore are not reimbursed.** As a participating provider in the Medicare Program, the laboratory has a responsibility to make a good faith effort to ensure all tests requested are performed and billed in a manner consistent with all federal and state law regulations.

Exhibit 3 (emphasis added).

141.    Millennium knew that its emphasis on Custom Profiles put it at high risk that these conditions would not be met.

142.    In pursuing its practices, Millennium ignored and misled its compliance consultants. For example, its compliance consultant CodeMap repeatedly warned Millennium that all testing had to be patient-specific. In 2009 guidance provided to Millennium, CodeMap explained that Medicare does not pay for "preventative" or "screening" urine drug tests, stating:

> The original Medicare law did not cover any preventive or "screening" services. Medicare defines any test or procedure performed in the absence of signs or symptoms of illness, injury, or a malformed body part as a "screening" service. However, Congress has subsequently passed legislation that allows Medicare to cover a number of screening tests under specific conditions.

Congress has not passed legislation regarding Medicare coverage for urine drug tests in the absence of signs or symptoms of illness or injury.

37

Confidential

143.    CodeMap advised Millennium multiple times that testing had to be based on the needs and condition of an individual patient.  In a July 2010 audio presentation to Millennium, CodeMap's founder, Charles Root, emphasized that confirmatory tests must be supported by an individualized determination of medical necessity.  *See* Exhibit 35 ("Dr. Root did not answer an important question very favorably.").  Mr. Root reiterated this principle again in September 2010, when an independent compliance consultant was upset by Millennium's marketing messages promoting confirmation testing that was not reasonable and necessary.  Millennium asked Mr. Root to speak with her.  Mr. Root wrote to Millennium's President:  "I spoke with [her] yesterday and believe everyone is now on the same page - her issue was confirmation of ALL tests regardless of result or patient needs, I gave her the same advice that we have discussed regarding medical necessity documentation etc. and the need to tailor confirmations to patient needs."  Exhibit 36.  Millennium's President responded "Thanks. We agree too."  *Id.*  This representation was not consistent with Millennium's practices.

144.    Millennium knew it was submitting claims to Medicare for UDT that failed key coverage requirements.  Millennium's sales personnel knew what tests physicians were ordering, what was on their Custom Profiles, and how often they tested their patients.  Millennium routinely tracked how many specimens were referred, and how many tests were ordered per sample.

145.    Millennium, through its executives and employees, knowingly submitted claims to Medicare for UDT that was not reasonable and necessary.

38

Confidential

ML_DE_00595131

**B.      Millennium Gave $5 Million Worth of Free POC Test Cups to Physicians in Exchange for Referrals in Violation of the Stark Law and Anti-Kickback Statute.**

**1.      Millennium Distributed Free POC Test Cups in Exchange for Referrals**

146.    Millennium provided more than 1,000,000 POC test cups to physician-customers throughout the country for free, explicitly in exchange for laboratory UDT referrals.

147.    Millennium primarily distributed these POC test cups under contractual agreements ("Free Cup Agreements").  The Free Cup Agreements required that physicians agree to refer additional testing to Millennium on the cup specimens and agree not to bill insurers for the POC test cups.  *See* Exhibit 37; Exhibit 38.  Under the Free Cup Agreements, physicians had to pay for any of the "free" POC test cups that did not generate referrals to Millennium.  Exhibit 39.  Millennium's President reviewed, approved, and signed Free Cup Agreements.

148.    Millennium monitored the number of free POC test cups it shipped to customers and referrals it received back under the Free Cup Agreements, to ensure that physicians were sending the cup specimens in to Millennium for additional testing.  *Id.*

149.    As Millennium attested to federal regulators, over 220,000 of the "free" POC test cups were used on Medicare patients.

150.    Millennium attested to federal regulators that (1) the cost of these "free" POC test cups was approximately $6.25 per cup from June 2010 through December 2012 and $4.90 per cup from January 2013 through June 2014, (2) the value of the free POC test cups used for Medicare patients exceeded $1,200,000, and (3) that Millennium received more than $90,000,000 in payments from Medicare for testing referred by physicians who received free POC test cups.

Confidential                                                                                      ML_DE_00595132

**2.  Millennium Knew that Free POC Test Cups Were Items of Value to Physicians**

151.  POC test cups are specimen collection cups with test strips embedded in them:



Standard
Specimen Cup

POC Test Strips

P
OC Test Cup

152.  Millennium knew that the test strips contained in the POC test cups made the test cups more valuable to doctors than clear collection cups—and they were significantly more expensive.  Millennium knew the free POC test cups were clinical supplies that physicians normally had to purchase, as well as tools used for evaluation and management of patients.

153.  CMS changed the reimbursement structure for POC test cups, effective April 2010.  The new reimbursement rate applicable to POC cup tests after these changes was approximately $20-25—much less than some physicians previously had been billing.  Specifically, many physicians, with Millennium's encouragement, had been billing multiple units of the applicable CPT code—one for each test strip contained within the POC test cup—obtaining reimbursements of more than $180 per test cup.

154.  Once physicians could only seek approximately $20-25 in reimbursement for a POC cup test, the POC test cups were no longer a source of significant reimbursement revenue for physicians.  The clinical information the POC test cups provided, however, was still valuable

40

ML_DE_00595133

in the evaluation and management of patients, and the ability to get them for free presented substantial cost savings to physicians.

155.   Millennium's Free Cup program grew dramatically after CMS's rate reduction, and the number of Free Cup Agreements and the number of free POC test cups Millennium distributed increased significantly.

156.   Many physicians did not want to deal with the costs and administrative burdens associated with billing and seeking reimbursement for tests performed using POC test cups. Exhibit 40.  Some insurers also would not reimburse for tests performed using POC test cups. For example, under Medicare, customers that used in-office immunoassay analyzers could not bill for both a POC test cup test result and a POC analyzer test result for the same patient. Because the analyzers results were reimbursed at a higher rate, physicians chose to seek reimbursement for that test; however, practices still wanted the immediate results from POC test cups for patient management and evaluation.  In addition, various state Medicaid programs also did not reimburse for tests performed using POC test cups.  Some physicians in these states wanted free POC test cups in order to be able to clinically assess their Medicaid patients (and bill for the office visit)—even though the expense would have come out of pocket absent "free" POC test cups from Millennium.

157.   Millennium knew that POC test cups (and the tests results they produced) had financial value.  For example, Elizabeth Peacock, Millennium's VP of Sales, wrote in March 2010:  "Let's really emphasize the $$ value of the instant test cups . . . . This is unique.  No other labs offering.  Should be very valuable for [the physician] since they have . . . no way to get that instant preliminary read.  That would cost them AT LEAST $5 per patient additional if they don't go with [Millennium] for confirmations." Exhibit 41.

41

ML_DE_00595134

158.    Millennium's President, Howard Appel, agreed that free POC test cups should be used by the sales force as a marketing tool.  Exhibit 42.

### 3.    Millennium Knew That Providing Free Test Strips Violated the Stark Law and Anti-Kickback Statute

159.    Millennium knew that the test strips in the free POC test cups had value to physicians and that they were not used solely (or at all) to collect, transport, process, or store specimens for Millennium.

160.    Millennium did not use the POC test strips or results in conducting its LC-MS/MS testing or in reporting the results of its LC-MS/MS testing.  As stated by one Regional Vice President: "I could care less what cup they use.  I don't care if they send it to me in a Ziploc bag. I want their urine[.]"

161.    Millennium knew that providing free drug test strips—outside of cups—to physicians violated the Stark law and Anti-Kickback Statute.

162.    On one occasion, Ms. Peacock circulated an internal company memo acknowledging that Millennium could not provide free test strips:  "Millennium can not [sic] provide other CLIA Waived POC devices like single strips at no cost because the strips have no relationship to the specimen collection and federal regulations say that non-collection items can not [sic] be provided without charge."  The same document acknowledges that the POC test cup—due to the test strips—"serves as a test vehicle for the practice."

163.    Despite Millennium's knowledge that providing test strips for free was illegal, it provided millions of free test strips within the POC test cups it distributed to physicians.

164.    Millennium also knew that absent an applicable statutory exception POC test cups had to be sold at "fair market value" to comply with the Stark Law and Anti-Kickback Statute.

42

ML_DE_00595135

165.   Millennium's outside health care consulting firm, CodeMap LLC, advised the Company in August 2009 that point-of-care drug testing supplies provided to physicians who referred laboratory testing to Millennium must be *sold* to them at fair market value, stating: "As long as Millennium charges its customers fair market value for [point of care testing] supplies, the practice should not implicate the Anti-Kickback Law." Regarding the Stark Law, CodeMap stated that Millennium's price must meet the "Fair Market Value Compensation exception," which requires that "the compensation must be . . . consistent with fair market value, and not determined in a manner that takes into account the volume or value of referrals or other business generated by the referring physician." Exhibit 43.

166.   Millennium received concerns from customers, prior to the initiation of the Free Cup Agreement program, that it was selling POC test cups for too low a price, in violation of the Stark Law and Anti-Kickback Statute.   Exhibit 44.   Millennium's president, Mr. Appel, responded to these concerns stating that the pricing was legal because "the most important factor to consider" is that price is "consistent with fair market value and is not determined in a manner that takes into account the volume or value of actual or anticipated referrals." *Id.*   But Millennium determined who qualified for free POC test cups based upon actual and anticipated referrals:  the Cup Agreements required referrals to Millennium and the Company's "Approval Guidelines" mandated that customers must have "12 tests + validity" on a Custom Profile to be approved for a Free Cup Agreement.

167.   Millennium received warnings that the provision of free POC test cups violated the Stark Law.  In September 2010, Charles Root, a compliance consultant at CodeMap, wrote an email to Millennium's President advising him that the provision of free POC test cups would violate the Stark Law, in part because they provided value to physicians beyond plain specimen

43

ML_DE_00595136

collection cups: "[M]y assumption was that you provided specimen transport cups, not test cups . . . provision of a test cup rather than a simple specimen collection device *gives the physician something of value not associated with specimen collection.*" Exhibit 45 (emphasis added).

168.   Despite this advice, Millennium continued to distribute free POC test cups—which contained free test strips—in exchange for referrals under the Free Cup Agreement.

169.   Millennium did not disclose to sales representatives or customers CodeMap's advice that free POC test cups have value and that providing them would violate the Stark Law. In late 2010, Millennium stopped using CodeMap as a compliance auditor after Millennium refused to accept and sign the findings of CodeMap's "Annual Compliance Audit."

170.   Millennium also received warnings—from customers and employees—that the provision of free POC test cups in exchange for referrals was a "blatant" and "clear" Stark Law and Anti-Kickback Statute violation.

171.   In an internal January 2010 email, Millennium's Laboratory Director noted that "providing POCT test kits free as an inducement to use our lab for confirmations would be a clear Stark violation." Exhibit 46.

172.   In November 2010, a customer in New England wrote to a Millennium sales representative that "After reviewing the [Free Cup Agreement] . . . I suggest we avoid receiving [POC test] cups unless we plan to pay for them. *It seems like a blatant stark/kickback concern.* The cups are $6 each.  I suggest for both parties we stay clear [of] receiving this product for no charge.  If we want some cups we should pay for them." Exhibit 47 (emphasis added).  The sales representative forwarded this email to Millennium's President, Howard Appel.  Mr. Appel responded directly to the customer, but did not mention that Millennium's own consultant, CodeMap, shared the customer's view that the provision of free POC test cups was illegal.  The

44

ML_DE_00595137

customer raised a further concern in a response email that the Free Cup Agreement was inaccurate because it contained language that the POC test "supplies are used solely for collecting and transporting specimens for testing" to Millennium, and noted that "is simply not the case" for his practice. The POC test cups were not solely collection and transportation devices for Millennium; they contained drug test strips that were used by physicians as POC testing devices.

173. Millennium also knew that Florida's AHCA had specifically found that the provision of free POC test cups was illegal on July 8, 2008. Florida's AHCA issued a Declaratory Statement and Final Order that the provision of free POC test cups would violate Florida Administrative Code, Rule 59A-7.020, which mirrors the Stark Law, explaining:

> Specifically, Rule 59A-7.020(15), Florida Administrative Code, allows a laboratory to provide specimen cups to physicians free of charge *only* for the collection, transportation, processing and storing of laboratory specimens; transmitting laboratory information to the laboratory; or ordering or communicating laboratory tests or results and other patient information between the physician, surgeon, organization, agency, or person and the laboratory. Further, Rule 59A-7.020(15)(f), Florida Administrative Code, prohibits laboratories from providing free "test kits" to physicians. The Petitioner's proposal to provide physicians free specimen cups that, in addition to serving as collection devices, perform either waived tests or moderately complex tests on-site for the physicians would violate these rules. Consequently, the Agency declares that Petitioner would be subject to licensure sanctions for violating Rule 59A-7.020, Florida Administrative Code, if it were to engage in the free specimen cups arrangement proposed in the Petition.

*In Re: Petition for Declaratory Statement of Dominion Diagnostics, LLC*, FRAES No. 2008008228, July 8, 2008, at 5. AHCA specifically found a deficiency with respect to Millennium's provision of free POC test cups in June 2012 and sent a notice of this deficiency to Millennium. Nonetheless, Millennium continued distributing free POC test cups to physicians under its Free Cup Agreements.

45

ML_DE_00595138

174.    Competitors also raised concerns that the Free Cup Agreements were illegal.  For example, on October 4, 2010, a Millennium sales manager, Brandon Worley, emailed Ms. Peacock stating that potential customers "wanted documentation stating that it is legal to provide them with free cups if they don't bill for them.  We think one of the other labs is telling them that it is a Stark violation."  Two days later, on October 6, 2010, Ms. Peacock wrote Millennium's President, Mr. Appel, and all of Millennium's sales representatives that some "prospective and current customers have received visits from competitors who are scaring them into believing that furnishing test cups at no charge is illegal and a violation of Stark Laws."

175.    A competitor of Millennium's also sued the Company in federal district court in 2011, alleging that the distribution of free POC test cups violated both the Stark Law and the Anti-Kickback Statute. *Ameritox. Ltd. v. Millennium Laboratories*, Case No. 8:11-cv-0775-T-24 (M.D. Fla) (A jury in that case ultimately found that Millennium's provision of the POC test cups violated the Stark Law and Anti-Kickback Statute, and Millennium has appealed).

**4.    Millennium Knowingly Submitted Claims for Tests Referred
in Violation of the Stark Law and Anti-Kickback Statute**

176.    Millennium knew that compliance with the Stark Law and Anti-Kickback Statute was a condition of payment by Medicare.  Millennium explicitly certified that, as a Medicare supplier, it would comply with all Medicare laws and regulations, including the Stark Law and Anti-Kickback Statute, on Form CMS-855B and CMS-1500 claims forms.

177.    Millennium knowingly compensated physicians with millions of dollars in free POC test cups in exchange for referrals, in violation of the Stark Law and Anti-Kickback Statute. Millennium paid the kickbacks expressly to obtain referrals, to increase the number of tests referred, and to prevent customers from affiliating with competitors.  In doing so, Millennium

46

ML_DE_00595139

ignored numerous, specific warnings from its employees, consultants, customers, competitors and even a government agency. Millennium submitted tens of millions of dollars of claims to Medicare for services it performed resulting from these referrals, and knew these claims were false because they were submitted in violation of the Stark Law and Anti-Kickback Statute.

178.    Millennium, through its executives and employees, knowingly submitted claims to Medicare for UDT that was referred in violation of the Stark Law and Anti-Kickback Statute.

### C.    Millennium Fostered a Culture of Non-Compliance and Greed

179.    Millennium fostered a culture of greed and intimidation in its sales force. Sales representative compensation was tied directly to the number of specimens sent in for testing— and obtaining Custom Profiles that met internal testing thresholds. Sales representatives were compensated handsomely when they successfully obtained increased testing and subjected to relentless pressure when they did not.

180.    The message of sales as a means to riches came from the top of the Company. For example, at its 2012 National Sales Meeting, Millennium's CEO, Mr. James Slattery, gave a presentation to approximately 250 sales representatives where $2,000,000 worth of gold coins were brought out and placed on stage. Some of those in attendance interpreted these gold coins as a message that sales representatives should aspire to more wealth; *see* Exhibit 48, others interpreted it as a threat that Millennium was willing to use its resources against perceived threats.

181.    Millennium's General Counsel gave a presentation, nominally on "compliance" entitled "Taking Over." During the presentation, Millennium's General Counsel showed an animated slide of a former employee whom Millennium had sued. The former employee's face

47

ML_DE_00595140

was shown on a target range being shot repeatedly, and another slide depicted Millennium's competitors and the former employee in body bags:





182.    Speaker notes emphasized the implied threat to employees who did not toe the Company line:

> Don't be a weasel. . . . I don't want to be on the other side of litigation from any of you.   I hope you don't want to be on the other side of litigation with Millennium.  There is no amount of time or resources we won't spend to hold our employees accountable. . . . [W]e will protect this company . . . .

183.    Millennium also made it clear it did not want any documentation of potential violations of law.  In a letter to the sales team dated November 28, 2011, Millennium's President

48

Confidential

ML_DE_00595141

described a violation of Millennium's "e-mail communication policies" where "a sales rep wrote an email to a client of a competitor and listed 25 separate reasons why the account should switch to Millennium, including 'free cups.'" His first proposed rule in response to this and other compliance violations identified in writing was to say "DO NOT WRITE ANY EMAILS LONGER THAN TWO SENTENCES." Exhibit 49.

184. Notes from a "Managers Meeting" in August 2011 state: "Company policy is to delete text messages 10 days or older." Exhibit 50. Similarly, notes from an October 2011 regional team meeting state: "Every two weeks delete your text messages. As we have litigation with our competitors they will want to see your phone." Exhibit 51.

185. In another instance of email deletion, Ms. Peacock, Millennium's VP of Sales, instructed sales representatives to delete all emails from a chain entitled, "4600 today," in which a Regional Vice President challenged members of the sales force to increase drug testing on Fridays and Mondays, and in which other members of Millennium's management offered cash incentives for increased testing.

186. Millennium's sales representatives responded to the Regional Vice President's "4600" email, with encouragement from management, in a manner showing a disregard for professionalism and an emphasis on sales and greed that permeated the Company's culture. For example: "GET. THAT. PEE!!"; "The Friday pee badgers [']we take what we want![']"; "Pick up the liquid GOLD before liquid goldschlager on Fridays!"; "GOLD RUSH FRIDAYS"; "Merry Pissmas!!!"; "Pick up the PISS"; "TGIP/Gold Rush Fridays"; "I LOVE everyone's emails. The common theme is the personal commitment to domination."

187. Many additional emails demonstrate an emphasis on sales without regard for medical necessity or compliance: "[G]et these doctors addicted to Millennium so [] they're

49

ML_DE_00595142

PISSED that they're 'not allowed' to send to us"; "We want MORE piss"; "Keep pushing the PISS"; "The purpose of every call is to get more PISS to the house"; "Trying to make it rain liquid gold baby!"

188.   The emphasis on sales came from the top.  Millennium's VP of Sales wrote an email to all Millennium sales representatives in November 2011 that stated: **"let's not forget our primary mission - to sell, sell, sell."** Exhibit 52 (emphasis in original).

189.   A Regional Sales Manager described the pressure: "they basically wanted the reps to wake up in the morning fearing their jobs. Not feeling good about themselves, thinking they were going to get fired."

190.   Millennium further promoted its services to physicians with an emphasis on ways that the physicians could make money—from speaking fees, free POC test cups, reimbursements on POC test cup and analyzer test results (with Millennium assistance)—that further placed money over medical necessity.

191.   For example, a Regional Vice President took credit for making Dr. Robert Windsor, Millennium's largest referrer, money in a November 2010 email: "You along with many other physicians made hundreds of thousands of dollars if not more from OUR risk."

192.   Millennium emphasized profits above compliance and intimidated sales representatives to engage in marketing tactics designed to generate UDT orders that were not patient-specific and not reasonable and necessary for patient diagnosis or treatment.  This caused Millennium's submission of claims to Medicare for services it performed resulting from these orders that were not reasonable, necessary, or patient-specific.

50

ML_DE_00595143

**D.    Examples of Physician Practices that Referred Millions of Dollars in False and Fraudulent Testing to Millennium for Medicare and Florida Medicaid Patients**

**1.    National Pain Care – Dr. Robert E. Windsor**

193.    Millennium's top-referring physician provider was Dr. Robert E. Windsor, who owns pain management clinics in Georgia, Kentucky, Florida, and Ohio, all operating under the corporate umbrella of National Pain Care, Inc. ("NPC"). Medicare has paid Millennium approximately $35 million in UDT ordered by NPC clinicians. Millennium identified Dr. Windsor, who personally saw patients only infrequently, as the "referring provider" for UDT that has generated nearly $18,000,000 in Medicare payments to Millennium. A large portion of these payments to Millennium were for prohibited claims and unnecessary tests.

194.    Dr. Windsor used Millennium as a test laboratory for his Georgia practice beginning in mid-2010. In August 2010, he indicated he wanted to use Millennium for his clinics in Kentucky. Elizabeth Peacock wrote to Jarrett Smith, at the time a Millennium Regional Manager, "OK, let's . . . maximize the confirmations from these accounts." Mr. Smith replied, "They have already committed to sending everything in. We will make sure they blow it out." Exhibit 53. By this, Mr. Smith meant that Dr. Windsor had told him that Dr. Windsor's practices would be ordering confirmations for all his patients for all drugs tested at the POC, plus some that were not.

195.    Beginning in May and June 2011, Dr. Windsor began using Millennium for most of his clinics, including the ones in Kentucky and his newly purchased clinic in Dayton, Ohio. Dr. Windsor authorized Custom Profiles that were substantively the same across all his clinics. *See, e.g.,* Exhibit 54.

51

Confidential

196.   Beginning in approximately May 2011, Millennium provided Dr. Windsor with "Laboratory Service Assistants" ("LSAs")—Millennium employees who were hired to process urine specimens for shipment to Millennium—at no charge to the physician. These LSAs were aware of NPC's UDT protocols, and several of them did work for NPC beyond their permitted tasks—for example, operating NPC's POC analyzer machines. Millennium also gave Dr. Windsor free POC test cups to use at his Georgia clinics.

197.   Dr. Windsor established uniform UDT practices throughout his pain management clinics. For example, a patient prescribed narcotics for pain relief was given a thirty-day prescription, and, to receive a refill, the patient was required to return to the clinic for a follow-up visit and undergo UDT. Thus, virtually all NPC patients prescribed narcotics (as most were) had their urine tested every thirty days. When the patient produced a specimen, NPC performed a POC test (either with a POC test cup or a chemical analyzer), so that the clinician could have immediate preliminary drug test results to help decide whether to initiate or renew a prescription. Whether NPC sent a specimen to Millennium for further testing typically depended on the patient's insurance: if an insurer would not pay, NPC discarded the specimen; otherwise NPC automatically sent the specimen to Millennium for quantitative testing.

198.   Until at least March 2014, virtually all specimens NPC sent to Millennium from any given NPC clinic were subject to essentially the same quantitative UDT panel, regardless of the patient's presentation, demographic profile, medical history, or history of drug or alcohol abuse. In approximately March 2014, after learning he was a subject of government investigation, Dr. Windsor purported to modify his UDT policy to require an assessment of a patient's risk of abusing drugs.

52

ML_DE_00595145

199.   Most NPC clinicians treating patients had little or no input into the UDT performed on their patients.  Indeed, until approximately December 2012, the NPC clinicians did not fill out Millennium requisition forms; rather, Millennium employees—the LSAs hired by Millennium to process the specimens—carried out this task.  The LSAs were instructed by their supervisors at Millennium to fill out the requisition forms and always check the "Use Custom Profile" box, contained in Section A on the form.

200.   After Millennium told its LSAs in late 2012 that a NPC employee should be the one to check the "Use Custom Profile" box of the requisition forms, NPC medical assistants took over this specific task.  The process varied, but one NPC medical assistant, for example, gathered 200 or so requisition forms at a time, and filled out certain information on all of the forms in advance, including checking off "Use Custom Profile."  Later, when an individual patient delivered a urine specimen, the medical assistant would add the patient's name and other patient-specific information to the Requisition form.

201.   Millennium sales employees knew about Dr. Windsor's UDT protocols.  For example, Millennium sales representatives Joey Bilyeu and Megan Mason knew that the Georgia Pain Physician clinics (owned by NPC) always checked the box for "Use Custom Profile" on the Millennium requisition form.  The Millennium Regional Director for the Mid-South Region, Jarrett Smith, believed all of the Dr. Windsor/NPC Custom Profiles—for the Georgia, Kentucky, and Ohio practices—were the same, and he understood that the clinics used the Custom Profile as the basis for quantitative UDT virtually all of the time.

202.   Millennium also knew that Dr. Windsor's clinics were ordering tests for drugs that were virtually never encountered in their patient populations.  For example, through about mid-2013, Dr. Windsor's Custom Profiles called for Millennium to conduct quantitative testing

53

ML_DE_00595146

for PCP, MDMA, and heroin. Yet a "Practice Profile" prepared by Millennium for Dr. Windsor, which summarized tests on 10,499 specimens from Dr. Windsor's Kentucky Pain Physicians clinic in Pikeville, Kentucky from January 1, 2013 to August 1, 2013, showed that not a single patient had tested positive for these drugs, and that Millennium's own average positive rate for these drugs (from a sample of approximately 80,000 specimens submitted by other physicians) was 0.3%, 0.0%, and 1.2%, respectively.

203.    By way of example, a patient at Dr. Windsor's Georgia Pain Physicians clinic in Calhoun, Georgia, referred to herein as "Patient FA," was a Medicare patient who was seventy-eight years old at the time of his first visit to the clinic in 2011 for treatment for chronic pain. He had no history of alcohol or drug abuse. Yet, every month, NPC tested his urine with an immunoassay point-of-care screen, and then sent the urine sample to Millennium for a battery of quantitative UDT under a Custom Profile that called for testing for methadone, amphetamine, cocaine, marijuana/THC, MDMA, PCP, and specimen validity testing (creatinine, oxidant, pH, and specific gravity).

204.    On October 11, 2011, Patient FA was seen at the Calhoun clinic by Dr. Adithya Reddy for a routine follow-up visit. Consistent with his past history, the POC drug test that NPC performed that day yielded negative results for amphetamine, barbiturates, benzodiazepines, cocaine, methadone, methamphetamine, PCP, TCAs, and marijuana. NPC then sent his specimen to Millennium with a Requisition form that had the boxes, "Use Custom Profile," and "Perform Specimen Validity Testing," checked off. Exhibit 55. Dr. Windsor's name was on the Requisition form as the requesting physician, even though he did not see Patient FA on that date. In accordance with the operative Custom Profile, Millennium conducted quantitative testing for Patient FA's prescribed medication, plus oxycodone, noroxycodone, oxymorphone, methadone,

54

EDDP (methadone metabolite), alpha-hydroxyprazolam, 7-amino-clonazepam, lorazepam, temazepam, oxazepam, amphetamine, methamphetamine, cocaine metabolite, cTHC (marijuana metabolite), MDMA, and PCP. Exhibit 56. Like all the earlier Millennium test results for this patient, the test results and specimen validity testing were consistent with the patient's prescribed medication and revealed no suggestion of abuse. Millennium submitted two claims to Medicare for this testing and was paid more than $217. Exhibit 57.

205.    Many of the Millennium tests, including but not limited to the tests for methadone, EDDP (methadone metabolite), benzodiazepines (alpha-hydroxyalprazolam, 7-amino-clonazepam, lorazepam, nordiazepam, oxazepam), cocaine metabolite, amphetamines, methamphetamines, THC, MDMA, and PCP, were not reasonable and necessary and the clinicians treating the patient did not assess the medical need, if any, for these tests. Millennium's claims to Medicare were false claims. *See* Exhibit 57.

206.    On or about April 24, 2012, Dr. Windsor updated his Custom Profiles, including for the Georgia Pain Physicians clinics, by adding approximately thirteen more drugs to the list of drugs for which to test. Exhibit 58. Patient FA was seen again at the NPC Calhoun Clinic for a routine follow-up visit, this time by Dr. Olalekan Ajibowo, on May 15, 2012. Although Patient FA's medical history still indicated no risk factors for drug abuse, and no reason to increase the amount of quantitative UDT, a Millennium LSA filled out the Requisition form with "Use Custom Profile" checked off (just as all the other Requisitions were filled out). This time, Millennium conducted testing on the sample for the drugs referenced in paragraph 205 above (with the exception of amphetamine, methamphetamine, and MDMA), plus propoxyphene, norporpoxyphene, tapentadol, meperidine, normeperidine, methylphedidate, ritalinic acid, ketamine, norketamine, crisoprodol, meprobamate, pehobarbital, secobarbital, butalbital,

55

ML_DE_00595148

amitriptyline, nortiptyline, imipramine, desipramine, cyclobenzaprine, ethyl glucuronide, ethyl sulfate, JWH-018(n-valeric acid)), JWH-073(N-(n-butyric acid), JWH-018(N-(n-petanol)), JWH-073(N-(n-butanol)), MDPV, methylone, mephedrone, and 6-MAM (heroin metabolite). Exhibit 59. None of the Millennium tests for these additional substances was reasonable and necessary and the clinicians who treated the patient did not assess the medical need for these tests, if any.

207.    Millennium submitted claims to Medicare for this testing and was paid $678.65 for it. Exhibit 60. Millennium knew these claims for tests that were not reasonable and necessary, and not ordered by the physician treating the patient, were false. Millennium also knew that these practices occurred across NPC.

### 2.    Tampa Pain Relief Center

208.    Tampa Pain Relief Center ("Tampa Pain") is a pain management practice in Florida with clinics in Brandon, Tampa, Oldsmar, and Miami, Florida. Tampa Pain is owned by Surgery Partners, which owns a large number of medical facilities throughout the United States. Tampa Pain employs a number of physicians who work at its clinics.

209.    Tampa Pain began using Millennium in 2008, and ceased using Millennium in early 2012. From 2008 through 2012, referrals from Tampa Pain to Millennium resulted in almost $5,000,000 in Medicare payments to Millennium.

210.    Like NPC, Tampa Pain used common testing protocols for all patients who were prescribed narcotics, without regard to the individual circumstances of the patient. In 2008, Tampa Pain's "Standing Order" included confirmation of all POC test results (both positive and negative results), and also quantitative testing for methadone, fentanyl, and alcohol (ETOH).

211.    In early 2011, Tampa Pain physicians began using Custom Profiles that covered multiple physicians and multiple locations. Exhibit 61. For patients who were prescribed

56

ML_DE_00595149

narcotics, Tampa Pain physicians almost always used the Custom Profile to order testing from Millennium, without an assessment of each patient's history, demographic information, or risk of abuse.

212.   Millennium sales personnel knew that all Tampa Pain patients were receiving essentially the same extensive UDT, regardless of the individual patient's need, condition or history.  *See* Exhibit 62.  As one Millennium employee wrote to another in July 2011 (and as forwarded to others):  "The selection in box A [of the requisition/order form] should be to use the custom profile.  Any specimen coming from a Tampa pain location should all be marked to use the custom profile." Exhibit 63.

213.   An example of false claims submitted by Millennium to Medicare from this conduct is the drug testing for Patient RR, a middle-aged male with a history of chronic pain who was also being treated elsewhere for depression.  Patient RR's medical records show no discernible history of drug or alcohol abuse, and, throughout his treatment at Tampa Pain, he did not exhibit abberant behavior or present other indications that he was at a high risk for drug diversion or abuse.  Yet, from April 12, 2011 through March 27, 2012, Tampa Pain referred eleven urine specimens of Patient RR to Millennium for testing, and each time the only instruction Tampa Pain gave to Millennium was to "Use Custom Profile."

214.   On November 28, 2011, Patient RR was seen at the Tampa Pain clinic on North Habana Avenue, Tampa, Florida, for a routine follow-up visit and prescription refill.  A urine drug screen was performed at the clinic, and the specimen tested positive for classes of drugs that the patient had been prescribed (methadone, opiates/morphone, and oxycodone), and negative for everything else (amphetamines, barbiturates, benzodiazepines, marijuana/THC, cocaine, alcohol, ecstacy, and PCP).  Nonetheless, Tampa Pain sent the specimen to Millennium with an unsigned

57

Requisition form stating, "Use Custom Profile," and Millennium performed, and billed Medicare for, quantitative UDT for substances including benzodiazepines, cocaine, heroin, amphetamines, MDMA, methamphetamine, PCP, and marijuana/THC. Exhibit 64. The Millennium test results were consistent with the urine drug screen testing done by Tampa Pain and consistent with the patient's medical condition and history. Millennium billed Medicare $266.90 for these tests and Medicare paid Millennium that amount. *Id.* Millennium's claims to Medicare for these tests were not reasonable and necessary. Millennium's claims to Medicare for these tests were false claims..

215.    Tampa Pain was a high profile account within Millennium. In proposed feedback to a sales representative, one manager wrote: "If you do not have an objective to get more pee to the lab and at every visit to bring value, the visit is useless. . . . Tampa Pain has a massive presence wtihin Millennium as a whole . . . ." Exhibit 65.

216.    Millennium also provided free POC test cups to Tampa Pain. From April 2011 through June 2012, Millennium gave approximately 5,275 free POC test cups to Tampa Pain for use at its Habana, Fletcher, Oldsmar, and Brandon locations.

217.    Millennium sales personnel also gave gifts to Tampa Pain employees, including watches, jewelry, gift cards, and electronics. These gifts were in violation of Millennium's own compliance policies.

### 3.    Coastal Spine and Pain

218.    Coastal Spine and Pain Center ("CSP") is a pain management practice with several locations in Florida, including in Jacksonville, Orange Park, Fernandina Beach, Hilliard and Middleburg. CSP has several physicians who work at its clinics, and who also own a share of the practice.

58

ML_DE_00595151

219.    CSP physicians began using Millennium for UDT in June 2009.  CSP physicians ordered testing from Millennium pursuant to Custom Profiles.

220.    From August 2010 through May 2014, Millennium provided CSP with more than 67,000 free POC test cups—a value of more than $325,000.  Millennium and CSP knew the value of the cups Millennium provided to CSP.

221.    In an August 12, 2010, email, the Practice Administrator of CSP, who was partly responsible for laboratory selection for CSP, told Millennium's President that a Free Cup Agreement "is vital to our practice."  Exhibit 66.  In her plea for free cups, she explained that CSP physicians "are constant advocates in our area for Millennium Laboratories" and that "Every urine [sample] collected in my facilities is . . . sent for confirmation to Millennium.  *Id.* Millennium agreed to provide the free POC test cups, and Millennium's President responded to a thank you note from CSP by stating "You are very welcome[.]" *Id.*

222.    Millennium paid the Practice Administrator and CSP physicians who referred UDT to Millennium, tens of thousands of dollars for speaking engagements and consulting services.  For example, CSP's Practice Administrator—a non-physician—had an agreement with Millennium for consulting services that paid her a $24,000 annual retainer.

223.    CSP physicians almost always used Custom Profiles as standing orders for UDT for patients who were prescribed narcotics.  A CSP physician testified, "we decided on what we were going to screen for . . . and put that in the [custom] profile to send to Millennium."

224.    The determination of what tests Millennium performed on a particular patient's specimen was not based on the patient's history, demographic information, or risk of abuse, but rather the Custom Profile in effect at that time.

59

ML_DE_00595152

225.    From 2009 through 2014, while CSP had prohibited financial relationships with Millennium under the Stark Law and the Anti-Kickback Statute as a result of its receipt of hundreds of thousands of dollars' worth of supplies in the form of POC test cups, CSP physicians referred more than $10,000,000 in UDT to Millennium for Medicare patients, the majority of which CSP referred pursuant to Custom Profiles, without assessments of individual patient needs.

226.    For example, CSP ordered and Millennium performed, billed and Medicare paid for, testing that was not reasonable and necessary for Patient LE, a 70 year-old male with a history of chronic back pain.  This patient had no discernible history of drug diversion, illicit drug or alcohol abuse, and throughout his treatment at CSP, he never exhibited aberrant behavior nor did he give any other indication that he presented a high risk for drug diversion or abuse. Patient LE was first seen at CSP in May 2011.  From this point on UDTs were ordered for Patient LE at every visit (except for one in September 2011).  Patient LE was seen on a monthly basis for the first five months he was a patient at CSP and then was stable enough to have follow-up visits every three months from October 2011 onward.  From May 23, 2011 through January 17, 2014, CSP referred fourteen of LE's urine specimens to Millennium for testing, and each time Millennium performed testing pursuant to a CSP Custom Profile.  Throughout this time period, Patient LE's urine test results were consistent with his medical and prescription histories.

227.    By way of example, on January 23, 2012, Patient LE was seen at the CSP Fernadina Beach facility, for a routine follow-up visit and prescription refill.  At the time he was taking tramadol and hydrocodone for pain management.  CSP performed a urine drug screen at the clinic, and LE's specimen tested positive for opiates—as would be expected given his

60

ML_DE_00595153

prescriptions—and negative for cocaine, amphetamines, methamphetamine, phencyclidine, MDMA (ecstacy), barbiturates, benzodiazepines, methadone, tricyclic antidepressants (TCA), and oxycodone. Exhibit 67. CSP sent the specimen to Millennium with a Requisition form indicating, "Use Custom Profile," and Millennium proceeded to conduct LC-MS/MS testing for codeine, morphine, hydrocodone, norhydrocodone, hydromorphone, oxycodone, noroxycodone, oxymorphone, buprenorphine, norbuprenorphine, fentanyl, norfentanyl, methadone, EDDP (methadone metabolie), alpha-hydroxylprazolam (xanax), 7-amino-clonazepam (klonopin), lorazepam (ativan), nordiazepam (valium), temazepam, oxazepam, amphetamine, carisoprodol, meprobamate, phenobarbital, secobarbital, butalbital, methamphetamine, cocaine metabolite, and MDMA, as well as four specimen validity tests. Exhibit 68. The Millennium test results were appropriately positive for hydrocodone (which Patient LE was prescribed) and its metabolite norhydrocodone, and negative for everything else.

228.   Millennium billed Medicare $387.23 for its tests, and Medicare paid Millennium $354.79, after denying two units of UDT totaling $32.44. Millennium's claims to Medicare for its testing, including but not limited to the tests it performed for codeine, morphine, oxycodone, noroxycodone, oxymorphone, buprenorphine, norbuprenorphine, fentanyl, norfentanyl, methadone, EDDP (methadone metabolite), alpha-hydroxyalprazolam, 7-amino-clonazepam, lorazepam, nordiazepam, temazepam, oxazepam, amphetamine, carisoprodol, meprobamate, phenobarbital, secobarbital, butalbital, methamphetamine, cocaine metabolite, and MDMA, were not reasonable and necessary. Millennium's claims to Medicare for these tests were false claims.

### 4.   Frank Li

229.   Dr. Frank Li is a physician in Washington state who owns Seattle Pain Center.

61

ML_DE_00595154

230.    In 2012, Dr. Li ordered more than $2,100,000 in UDT to Millennium for Medicare beneficiaries at an average cost of more than $500 per beneficiary sample.    In 2013, Dr. Li ordered another $1,500,000 in UDT to Millennium from Medicare.  Dr. Li stopped using Millennium in 2013.

231.    Dr. Li ordered his UDT from Millennium under Custom Profiles that were almost always applied to urine samples from his practice.

232.    Millennium-employed LSAs, stationed at Dr. Li's offices, often filled out Dr. Li's test orders, using these blanket testing protocols.  For example, an internal Millennium email from February 2012 noted, "we already have LSA's filling out the requisition forms."  Exhibit 69.

233.    Dr. Li agreed to the Custom Profiles in part because Millennium told him it cost Millennium the same amount to do the testing regardless of how many tests he ordered:  "They said that it costs them the same amount to do the testing so why not do all of them?"

234.    Dr. Li's UDT orders were inconsistent with the recommendations of the Washington State Guidelines.

235.    Dr. Li's Custom Profile increased drastically in 2011 in response to sales pressure from Millennium.

236.    Millennium's VP for Sales, Ms. Peacock, wrote to the Company's regional sales manager regarding Dr. Li, threatening to terminate the account: "Are you and Monet [the Millennium sales representative assigned to Dr. Li's account] able to sucessfully discuss our empirical data on the negatives and obtain additional medically necessary tests?  Need to strive for 5 more to make this business viable."  Exhibit 70.  Although Ms. Peacock used the phrase

62

Confidential

ML_DE_00595155

"medically necessary" in her email, she had no clinical basis to know that any of Dr. Li's patients actually needed more tests.

237.    Dr. Li increased his testing to Millennium in exchange for resources.    For example, Millennium offered to provide an electronic medical record (EMR) interface if he would increase his UDT orders.    In April 2011, a Millennium sales manager wrote: "If necessary, I think Dr Li would be amenable to confirming all positives & all negatives on the POC cup in order to have the results on his EMR [Electronic Medical Record].    Then we can run all tests on all specimens regardless of the cup results." Exhibit 71.

238.    Millennium sales representatives strongly promoted the confirmation of expected negative POC test results to Dr. Li, as stated in a May 2011 email: "we are making a strong case to confirm negatives on Cocaine, Opiates, Meth."

239.    Shortly after that email exchange, in June 2011, Dr. Li filled out a new Custom Profile that called for automatic confirmation testing of all POC test results for certain drugs, including cocaine, opiates, and amphetamines.

240.    In January 2012, Dr. Li filled out another Custom Profile for his practice with an even higher level of testing—including confirmation of all POC test drug results, including PCP and TCAs—regardless of POC test results or patient condition.  Exhibit 72.  This testing protocol also called for a number of other drug tests not on the POC test cup to be performed on all patients, regardless of medical condition and patient presentation or history.

241.    Dr. Li also received money as a paid speaker for Millennium; but, only while he was referring UDT to Millennium.

242.    Millennium executives, LSAs, and sales personnel knew that Dr. Li routinely ordered testing based on Custom Profiles regardless of patient need and without an individual

63

ML_DE_00595156

assessment of the need for each test for each patient—and that Millennium submitted claims to Medicare for this testing, in violation of Medicare claims submission rules (by submitting claims for services that were not covered) and the FCA.

### 5.  Massachusetts Sober-Home Related Testing

243.  Millennium had a strategy in Massachusetts of targeting sober homes for business.  From approximately 2011 through 2013, Millennium billed Medicare more than $1,400,000 for UDT for residents of sober homes in Massachusetts, many of whom received a set of twenty or more drug tests, multiple times per week, without any documentation or justification as to what tests were actually needed.

244.  Sober homes are alcohol- and drug-free living environments for persons seeking to overcome substance addiction or abuse problems.  Residents of sober homes in Massachusetts for whom Millennium submitted claims to Medicare were required by the sober homes to undergo routine quantitative UDT as a condition of residency.  The UDT Millennium performed on sober home residents in Massachusetts was not for the purposes of medical diagnosis or treatment and thus did not qualify for reimbursement by Medicare.

245.  Millennium, through sales representative Mark Cullinan, recruited Massachusetts physicians, including Dr. Jeanne Mase, to act as "medical directors" for sober homes or ordering physicians for UDT of sober home residents.

246.  Millennium performed all UDT for Massachusetts sober home residents (whether under Dr. Mase's NPI or another physician's) pursuant to test Requisition forms that had the box "Use Custom Profile" checked off.

247.  The Custom Profiles put into place at these sober homes often called for quantitative testing for more than twenty separate separate tests. *See, e.g.*, Exhibit 73.  Residents

64

ML_DE_00595157

were tested under these Custom Profiles multiple times per week, regardless of the individual resident's treatment status.

248.    The Requisition forms were not filled out by Dr. Mase or her medical staff, but rather by non-medical staff at the sober homes, or by employees of "specimen collection" companies, which Millennium paid per sample.

249.    Dr. Mase rarely saw the patients at the sober homes, did not provide medical treatment for the sober home residents, and did not regularly review the results of the UDT Millennium performed and billed to Medicare.

250.    Millennium engaged two separate courier/"specimen collection" companies to oversee the UDT process for sober home residents.  Millennium paid New England Express LLC ("NEE"), owned by Nicholas Chuckran, $31 per specimen to fill out the resident's demographic information, mark "Use Custom Profile" on the resident's Requisition form, and drop the sample off with UPS for shipping to Millennium's laboratory in San Diego, California.

251.    Millennium sales representative Marc Cullinan made clear to Chuckran that NEE's specimen collectors were to check off "Use Custom Profile" on the Requisition forms and that Millennium would not pay for any sample that was accompanied by a Requisition form that did not have "Use Custom Profile" checked off.

252.    Similar to NEE, Millennium also paid another courier company, Cape Test LLC ("Cape Test"), $32 per specimen to fill out sober home residents' demographic information and mark "Use Custom Profile" on their Requisition forms.

253.    In early 2013, after Dr. Mase was audited by private insurer Harvard Pilgrim Healthcare ("Harvard Pilgrim") for UDT billed by Millennium to Harvard Pilgrim, Dr. Mase

65

Confidential

informed Cullinan that she would no longer be associated with Millennium for UDT for sober home residents.

254.    Medicare paid approximately $1,200,000 to Millennium for UDT of sober home residents, ordered under Dr. Mase's NPI, that was not reasonable or necessary.

255.    For example, in January 2013, Millennium submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Mase's NPI for a Medicare beneficiary on January 2, 4, 7, 9, 11, 14, 16, 18, 21, 23, 25, 28, and 30.  For those thirteen separate dates of service in January 2013, Medicare paid approximately $12,619.88 to Millennium for tests that were not reasonable and necessary for the diagnosis or treatment of that patient's illness or injury, if any.

256.    Upon learning that Dr. Mase would no longer allow her NPI to be associated with UDT for sober home residents, Cullinan informed NEE that all sober home testing should cease until a new "medical director" for sober home UDT could be located.  Thereafter, Millennium attempted to work with two new physicians—Dr. Bahige Asaker (through NEE) and Dr. Joseph Sullivan—to continue Millennium's Massachusetts sober home scheme.

257.    Dr. Asaker did not knowingly order UDT from Millennium for sober home residents, yet Millennium submitted tens of thousands of dollars in claims to Medicare for UDT purportedly ordered under his NPI that were not reasonable and necessary for the diangosis or treatment of patients.   These tests were not properly ordered by a physician treating the beneficiary, as required by Medicare.

258.    By way of example, in July 2013, Millennium submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Asaker's NPI for a specific Medicare beneficiary on July 1, 3, 5, 8, 10, 12, 15, 17, and 19.  For those nine dates of service in July 2013,

66

ML_DE_00595159

Medicare paid approximately $5,744.25 to Millennium for that one Medicare beneficiary. These tests were not reasonable and necessary for the treatment or diagnosis of that patient's illness or injury, if any.

259.    Dr. Sullivan only ordered a very small amount of UDT from Millennium, yet Millennium submitted approximately $40,000 in claims to Medicare for drug tests allegedly ordered under his NPI that were not reasonable and necessary for the diagnosis or treatment of patients. The majority of these tests were not properly ordered by a physician treating the beneficiary, as required by Medicare.

260.    By way of example, in July 2013, Millennium also submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Sullivan's NPI for a specific Medicare beneficiary on July 1, 5, 8, 10, 12, 15, 19, 22, 24, 26, and 29. For those eleven dates of service in July 2013, Medicare paid approximately $7,501.23 to Millennium for that one Medicare beneficiary. These tests were not reasonable and necessary for the treatment or diagnosis of that patient's illness or injury, if any.

## VI.    THE UNITED STATES WAS HARMED BY MILLENNIUM'S CONDUCT

261.    As a result of Defendant's conduct, the Medicare program paid Millennium many millions of dollars for many thousands of false and/or fraudulent claims for non-covered drug tests.

262.    Medicare was directly affected by Millennium's fraudulent schemes. For example, in a 2011 presentation to potential lenders, Millennium represented that 23.7% of its specimens came from Medicare patients, but that Medicare represented 40.0% of revenue— likely because Millennium took advantage of Medicare's practice of promptly paying claims on the assumption that the supplier has complied with its legal obligations.

67

ML_DE_00595160

263. Medicare was particularly susceptible to Millennium's fraudulent schemes because it does not require a patient co-payment on laboratory services. Because Medicare patients were not required to pay out-of-pocket for Millennium's services, they had no reason to inquire into the charges to Medicare associated with Millennium's UDT. In addition, many Medicare beneficiaries are over sixty-five years old, and seniors are generally at lower risk of illicit drug use.

264. Exhibit 74 to the Complaint is a list of physicians and physician practices who made drug test referrals to Millennium in violation of the Stark Law and/or the Anti-Kickback Statute and the dates during which each such physician had an improper financial relationship with Millennium with respect to the free testing supplies. Exhibit 74.

265. The United States' damages arising from the Millennium's submission of claims to Medicare and Florida Medicaid referred by these physicians in violation of Stark Law and Anti-Kickback Statute exceeds $90,000,000.

266. The United States' damages arising from Millennium's submission of claims to Medicare and Florida Medicaid for UDT that was not reasonable and necessary for the diagnosis or treatment of patients, and for which the need was not assessed or documented for individual patients, including the claims referenced in Section V.E above, likely exceeds $100,000,000.

### FIRST CAUSE OF ACTION
#### (False Claims Act: Presentation of False Claims)
#### (31 U.S.C. § 3729(a)(1) and (a)(1)(A))

267. Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

268. Defendant knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States and Florida Medicaid, including those

68

ML_DE_00595161

claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

269.   Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## SECOND CAUSE OF ACTION
### (False Claims Act: False Statements Material to False Claims)
### (31 U.S.C. § 3729(a)(1)(B))

270.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

271.   Defendant knowingly made, used, and caused to be made or used, false records or statements — i.e., false statements regarding compliance and coverage for its services and false statements on forms CMS-855B, 837P and CMS-1500—to get false or fraudulent claims paid and approved by the United States.

272.   Defendant's false certifications and representations were made for the purpose of inducing physicians to order its services and getting false or fraudulent claims paid, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendant's statements and actions.

273.   The false certifications and representations made and caused to be made by Defendant were material to the United States' and Florida Medicaid's payment of the false claims.

274.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

69

ML_DE_00595162

**THIRD CAUSE OF ACTION**
**(Payment by Mistake)**

275.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

276.    This is a claim for the recovery of monies paid by the United States to Millennium as a result of mistaken understandings of fact.

277.    The United States paid Millennium for services that were not reasonable and necessary for the diagnosis or treatment of individual patients as required under Medicare coverage rules, and that were furnished pursuant to prohibited referrals from physicians who were in financial relationships that did not comply with the Stark Law and/or the Anti-Kickback Statute, without knowledge of material facts and under the mistaken belief that Millennium was entitled to receive payment for such claims when it was not. The United States' mistaken belief was material to its decision to pay Millennium for such claims. Accordingly, Millennium is liable to make restitution to the United States of the amounts of the payments made in error to it by the United States.

**FOURTH CAUSE OF ACTION**
**(Unjust Enrichment)**

278.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

279.    This is a claim for the recovery of monies by which Defendant has been unjustly enriched.

280.    By directly or indirectly obtaining government funds to which it was not entitled, Defendant was unjustly enriched, and is liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

70

ML_DE_00595163

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendant as follows:

I.        On the First and Second Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II.       On the Third and Fourth Counts for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which Defendant was unjustly enriched or was paid by mistake, or by which Defendant retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

71

ML_DE_00595164

Respectfully submitted,

BENJAMIN C. MIZER
Acting Assistant Attorney General

CARMEN M. ORTIZ
United States Attorney

By: _____

ABRAHAM R. GEORGE
GEORGE B. HENDERSON, II
Assistant U.S. Attorneys
John J. Moakley U.S. Courthouse
Suite 9200
1 Courthouse Way
Boston, MA 02210
(617) 748-3152
(617) 748-3272
*abraham.george@usdoj.gov*
*george.henderson2@usdoj.gov*

MICHAEL D. GRANSTON
ALAN KLEINBURD
DOUGLAS J. ROSENTHAL
AUGUSTINE M. RIPA
US Department of Justice
Civil Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 305-2073
(202) 305-4033

Dated: March 19, 2015

72

Confidential

ML_DE_00595165

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing document was served via electronic mail (by agreement) on:

J. Marc Vezina
Monica P. Navarro
Michelle D. Bayer
280 N. Old Woodward Ave., Suite LL20
Birmingham, MI 48009
jmv@vezinalaw.com
mnavarro@vezinalaw.com

Joel M. Androphy
Sarah M. Frazier
Noelle C. Letteri
Berg & Androphy
3704 Travis Street
Houston, TX 77002
JAndrophy@bafirm.com
SFrazier@bafirm.com
AGargour@bafirm.com

Thomas M. Greene
Michael Tabb
Greene LLP
One Liberty Square, Suite 1200
Boston MA 02109
tgreen@greenellp.com
matabb@greenellp.com

Michael E. Mone
Patricia L. Kelly
C. William Barrett
Catherine A. Ryan
Esdaile, Barrett & Esdaile
75 Federal Street
Boston MA 02110
MMone@ebelaw.com
PKelly@ebelaw.com
BBarrett@ebelaw.com
CRyan@ebelaw.com

Suzanne E. Durrell
DURRELL LAW OFFICE
180 Williams Avenue
Milton, MA 02186
Suzanne.durrell@verizon.net

Robert M. Thomas, Jr.
THOMAS & ASSOCIATES
280 Summer Street, 5th Floor
Boston, MA 02210-1131
rmt@thomasandassoc.net

Richard D. King, Jr.
Nathan A. Tilden
Jacquelyn A. McEttrick
SMITH & BRINK P.C.
350 Granite St., Suite 2303
Braintree, MA 02184
RKing@smithbrink.com
NTilden@smithbrink.com
jmcettrick@smithbrink.com

73

Confidential

**Pursuant to 31 U.S.C. § 3730(b)(2), no service was made upon the Defendant because this case is still under seal.**

Dated: March 19, 2015

_____
Abraham R. George
Assistant U.S. Attorney

74

# EXHIBIT 20

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

AMERITOX, LTD., a Texas limited
partnership,

        Plaintiff,

v.

                            CASE NO.:

MILLENNIUM LABORATORIES, INC., a
California corporation,

        Defendant.

---

## COMPLAINT FOR
## <u>INJUNCTIVE RELIEF, DECLARATORY RELIEF AND DAMAGES</u>

Plaintiff Ameritox, Ltd. ("Ameritox") for its complaint against Defendant Millennium

Laboratories, Inc. ("Millennium"), seeking damages, injunctive relief and other relief for false

advertising, unfair competition, and unfair trade practices alleges as follows:

### <u>NATURE OF ACTION</u>

1.     This is an action for injunctive relief, declaratory judgment and damages against

Millennium for violations of the Lanham Act (15 U.S.C. § 1125, *et seq.*); Florida Common Law

Unfair Competition, and Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201,

*et seq.* ("FDUTPA").

### <u>PARTIES</u>

2.     Ameritox is a limited partnership organized under the laws of Texas with its

principal place of business at 300 East Lombard Street, Suite 1610, Baltimore, MD. Ameritox is

a clinical laboratory in the business of testing specimens and monitoring results for health care

providers who prescribe medications used to treat patients for chronic pain and addiction.

{TP698230;1}CI-9198149 v1

3. Upon information and belief, Millennium is a corporation organized under the laws of California with its principal place of business at 16981 Via Tazon, San Diego, California. Millennium a competitor of Ameritox in the business of testing specimens and monitoring the results for health care providers.

<u>**JURISDICTION AND VENUE**</u>

4. This court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a) and (b), and has supplemental jurisdiction over the common law and state law claims asserted herein because they are so related to the claims in this action that arise under federal law as to constitute part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

5. Personal jurisdiction is proper before this Court because Defendant's actions place it within the reach of Florida's long arm statute. Specifically, pursuant to Fla. Stat. §§ 48.193(1)(a) and (b), Defendant operates, conducts, engages in and carries on business in Florida, and it has committed some of the tortious acts described below in the state of Florida.

6. Further, upon information and belief, personal jurisdiction is proper before this Court pursuant to Fla. Stat. § 48.193(2), in that Defendant engages in substantial and not isolated activity within Florida.

7. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the actions that form the basis of Ameritox's claims against Defendant occurred in this district. Venue is also proper in this judicial district because Defendant is subject to personal jurisdiction in this district and thus is deemed a resident hereof pursuant to 28 U.S.C. §§ 1391(b) and (c).

## GENERAL ALLEGATIONS

8.      Ameritox and Millennium both test specimens and monitor results for health care providers, in Florida and elsewhere, who prescribe medications to treat patients for chronic pain and/or addiction.  Because these drugs are susceptible to abuse by the patient or third parties, providers contract with companies such as Ameritox or Millennium to monitor drug levels in a patient.  Monitoring drug levels in patients includes tracking test results over a period of time and sending periodic reports to providers.  Providers typically refer specimens to the same laboratory over a period of time to benefit from the monitoring services provided by laboratories such as Ameritox and Millennium.

9.      Ameritox and Millennium directly compete for market share in the urine drug testing and medication monitoring market in Florida and elsewhere.

10.     Millennium, as a laboratory service provider, provides urine drug testing at the request of health care providers, including physicians.  The success of Millennium's business model depends, at least in part, upon referrals from health care providers.

11.     Upon information and belief, Millennium formed a business plan to increase its market share, revenue, and profits through an improper and illegal scheme.

12.     Federal and Florida law prohibit companies such as Millennium from providing financial inducements and kickbacks to health care providers in order to induce the referral of business.  These laws not only prohibit direct payments to health care providers as an inducement for the referral of business, but they also prohibit other forms of kickbacks, such as the provision of equipment, supplies, tests, services, and other benefits to the health care provider at no cost or at below fair market value.

13. Millennium has implemented a scheme of providing improper and unfair financial inducements to health care providers (described below in detail) that violate state and federal laws in an attempt to increase its market share. This scheme is intentionally misleading, fraudulent, deceptive, unfair and unconscionable.

14. Millennium's unfair and deceptive scheme of improper inducements and kickbacks involved, in part, an agreement with health care providers and patients not to collect payments, which Millennium is required by law to collect, in exchange for the referral of patients. The purpose of the scheme was to improperly induce, influence, and encourage health care providers to engage in business with Millennium by providing the health care providers and their patients with an improper financial benefit.

15. Millennium has developed corporate policies to provide incentives to patients and health care providers. Millennium's sales agents explicitly communicate that patients do not need to pay their deductibles and copayments if Millennium performs the patients' laboratory work.

16. In other words, Millennium bills Medicare, Medicaid or health insurance companies its full charges. However, unknown to Medicare, Medicaid or the patient's health insurance company, Millennium explicitly represents to patients that "provided that you send this [insurance] check to Millennium PROMPTLY, we will accept this payment as full and complete settlement of your account. **You will not be responsible for any additional charges, including co-pay and/or deductible amounts described on the [explanation of benefits].**" (emphasis added). *See* Exhibit A.

17. Millennium's scheme provides health care providers with a direct and improper financial inducement to use Millennium's services, and is contrary to Federal and Florida law.

18. Millennium has billed higher prices to health care insurers, the Medicare program, and the State of Florida's Medicaid program. Millennium knowingly waives deductibles and copayments from the patients and accepts a below-market price for its services.

19. Millennium's scheme constitutes a false claim and, as such, is an unfair method of competition or unfair or deceptive act or practice under the Unfair Insurance Trade Practices Act, Section 626.9541(u), Florida Statutes.

20. Millennium also engages in unfair competition and deceptive practices by providing health care providers with items and services for free or below the fair market value of such items and services to influence and induce the referrals of lab specimens to Millennium. The provision of items or services at no cost or below their fair market value constitutes a kickback in violation of Florida law, including, but not limited to, the Florida Clinical Laboratory Law, Chapter 483, Part I, Florida Statutes.

21. In its efforts to increase market share through the provision of improper financial inducements to health care providers, Millennium offers health care providers unfair and deceptive remuneration in the form of in-office chemical analyzers and supplies provided by a third party at no cost or below fair market value.

22. The in-office chemical analyzer and supplies allow a health care provider to perform and bill for certain specified testing of specimens in the health care provider's office. Thus, the health care provider profits from the analyzer and supplies provided by Millennium. The remaining tests on the specimens and all monitoring are performed by Millennium. Thus, Millennium profits from the tests referred by the health care providers receiving inducements.

23. Millennium offers health care providers in-office chemical analyzers with no capital outlay required from the health care provider.

24. Additionally, because a health care provider is not permitted to bill for tests performed with an in-office chemical analyzer unless or until the provider has obtained laboratory certification, Millennium offers health care providers a free laboratory certification course along with the use of consultant services at no cost or below their fair market value.

25. In exchange for its arrangement with the health care providers, Millennium expects (and communicated to its customers/health care providers) that all tests that cannot be performed in-office on the chemical analyzers will be sent to Millennium for testing and analysis.

26. Upon information and belief, Millennium knowingly engaged in the wrongful conduct with the purpose of providing improper and unfair financial inducements to health care providers.

27. As a direct and proximate result of the conduct of Millennium and its agents, Ameritox has been damaged in an amount to be determined at trial.

28. All conditions precedent to filing this action have occurred, been satisfied, waived or excused.

29. Plaintiff has retained undersigned counsel to bring this lawsuit and has agreed to pay it reasonable attorneys' fees and costs.

## COUNT I
### (FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT, 15 U.S.C. § 1125(A) *ET SEQ.*)

30. Ameritox hereby incorporates the allegations contained in Paragraphs 1 through 29 as if fully set forth herein.

31. Millennium has made false or misleading statements in commercial advertisements for its services in violation of the Lanham Act, 15 U.S.C. § 1125.

{TP698230;1}                                         - 6 -

32.     Millennium's statements are literally false and/or likely to deceive customers about the true nature, characteristics, and qualities of its services.

33.     Millennium's false or misleading statements have already, and will continue, to influence purchasing decisions to the extent that customers choose Millennium's services instead of those offered by Ameritox.

34.     Millennium's services are offered, advertised, and sold to customers throughout the country; therefore, the misrepresented services affect interstate commerce.

35.     As a proximate and direct result of the wrongful and intentional actions of Millennium, Ameritox has been damaged in an amount to be proven at trial.

## COUNT II
### (FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT –INJUNCTIVE RELIEF)

36.     Ameritox hereby incorporates the allegations contained in Paragraphs 1 through 29 as if fully set forth herein.

37.     Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.* ("FDUTPA"), prohibits "unfair methods of competition," "unconscionable acts or practices," and "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204.

38.     The stated purpose of FDUTPA is to protect persons from "those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202.

39.     As set forth in more detail above, Millennium engages in a pattern and practice of offering and providing inducements, kickbacks and other improper financial inducements to health care providers and health care consumers in exchange for the referral of business, in violation of Federal and Florida law.

{TP698230;1}                                    - 7 -

40.    Millennium implements these practices in Florida.  Millennium, directly and through its agents, executes the scheme in Florida.

41.    Through these practices, Millennium engages in unconscionable, deceptive or unfair acts or practices in the conduct of commerce.  Millennium engages in these acts to retain a benefit for its dishonest conduct and to wrongfully disrupt Ameritox's business practices within the same market.

42.    Ameritox has been aggrieved by the wrongful and intentional actions of Millennium.

## COUNT III
### (FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT –DAMAGES)

43.    Ameritox hereby incorporates the allegations contained in Paragraphs 1 through 29 as if fully set forth herein.

44.    FDUTPA prohibits "unfair methods of competition," "unconscionable acts or practices," and "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.204.

45.    The stated purpose of FDUTPA is to protect persons from "those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202.

46.    As set forth in more detail above, Millennium engages in a pattern and practice of soliciting and providing kickbacks and other improper financial inducements to health care providers and health care consumers in exchange for the referral of business, in violation of Federal and Florida law.

47.    Millennium implements these practices in Florida.  Millennium, directly and through its agents, executed the scheme in Florida.

48.     Through these practices, Millennium engages in unconscionable, deceptive or unfair acts or practices in the conduct of commerce.  Millennium engages in these acts to retain a benefit for its dishonest conduct and to wrongfully disrupt Ameritox's business practices within the same market.

49.     As a proximate and direct result of the wrongful and intentional actions of Millennium, Ameritox has been damaged in an amount to be proven at trial.

## COUNT IV
### (COMMON LAW UNFAIR COMPETITION)

50.     Ameritox hereby incorporates the allegations contained in Paragraphs 1 through 29 as if fully set forth herein.

51.     Millennium has made false or misleading statements in commercial advertisements that constitute unfair competition in violation of Florida law.

52.     Millennium's false or misleading statements have already influenced, and will continue to influence purchasing decisions to the extent customers choose Millennium's services instead of those offered by Ameritox.

53.     As a proximate and direct result of the wrongful and intentional actions of Millennium, Ameritox has been damaged in an amount to be determined at trial.

## RELIEF REQUESTED

**WHEREFORE**, Ameritox respectfully requests that this Court

(a)     Award judgment in its favor and against Millennium on all its Counts;

(b)     Award damages in its favor and against Millennium;

(c)     Enter declaratory and injunctive relief in its favor and against Millennium;

(d)     Award Ameritox all profits derived by Defendant's wrongful acts complained of herein;

(e)     Award Ameritox all damages sustained by reason of the wrongful acts complained of herein in an amount not less than $75,000;

(f)     Award Ameritox treble the amount of Defendant's profits or actual damages suffered by Ameritox;

(g)     Award Ameritox punitive and exemplary damages against Defendant and in favor of Ameritox in an amount sufficient to deter and punish Defendant for its willful and wrongful acts;

(h)     Award Ameritox's costs incurred in this action;

(i)     Award Ameritox reasonable attorney fees pursuant to 15 U.S.C. § 1117(a) or, Fla. Stat. §501.2105;

(j)     Such other and further relief, in law or in equity, as this Court deems just and proper.

**JURY TRIAL DEMANDED ON ALL CLAIMS SO TRIABLE.**

Dated: April 8, 2011

Margaret D. Mathews
Florida Bar No.:  348430
Richard H. Martin
Florida Bar No.:  579831
**AKERMAN SENTERFITT**
401 E. Jackson Street, Suite 1700
Tampa, Florida  33602
(813) 223-7333 Telephone
(813) 223-2837 Facsimile
margaret.mathews@akerman.com
richard.martin@akerman.com
*Attorneys for Plaintiff*

and

Of Counsel:
Michael R. Osterhoff
**K&L GATES LLP**
70 W. Madison St., Ste. 3100
Chicago, IL 60602-4207
(312) 807-4205 telephone
(312) 827-8190 facsimile
michael.osterhoff@klgates.com

Peter B. Bensinger, Jr.
**Bartlit Beck, Herman Palencha & Scott, LLP**
54 West Hubbard Street, Suite 300
Chicago, IL 60654
(312) 494-4426 Telephone
(312) 494-4440 Facsimile
peter.bensinger@bartlit-beck.com

# EXHIBIT A

# MILLENNIUM LABORATORIES' INSURANCE BILLING FOR URINE DRUG TESTS: WHAT DOES IT MEAN TO ME?

Dear Patient:

Millennium Laboratories will be conducting a laboratory test at the request of your physician. This test is designed to assist your doctor in managing your medications and to ensure you are receiving optimal therapy and dosages to treat your pain symptoms. We'd like to share our billing process with you.

**HERE'S HOW THE BILLING WORKS:**

☐ Millennium Laboratories will bill your insurance company OR Medicare directly. Once this has been done, you will then receive an Explanation of Benefits (EOB) from your insurer. **THE EOB IS NOT A BILL**; it's simply a statement that shows how much Millennium is being paid for its services. **Please be reassured that you are not responsible for any additional charges, including co-pay and/or deductible amounts described on the EOB.**

If you have any questions we are always happy to help you. Please call Millennium toll free @ 877-451-3534. **Please do NOT call your Doctor's office with questions related to the EOB**. The billing procedure takes place between Millennium and your insurance company. Your doctor is NOT involved in this process.

**What to do if you receive a check from your insurance company for Millennium's services:**

Your insurance company **may** send **YOU** a check directly as payment for Millennium's services (this is common). When you receive the check, you are legally responsible to endorse the check to Millennium Laboratories and mail the check to Millennium's account at Bank of America. Simply write on the back of the check "Pay to Millennium Laboratories" and sign your name using your usual signature. Then, mail the check to us at the address below:

> Millennium Laboratories
> C/o Bank of America
> P.O. Box 841773
> Dallas, TX 75284-1773

Provided that you send this check to Millennium PROMPTLY, we will accept this payment as full and complete settlement of your account. **You will not be responsible for any additional charges, including co-pay and/or deductible amounts described on the EOB.** If you have any questions, please call Millennium toll free @ 877-451-3534.

**IF YOU DO NOT HAVE MEDICAL INSURANCE**, please contact Millennium toll free at 877-451-3534 to discuss payment arrangements.

◎JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

AMERITOX, LTD, a Texas limited partnership

## DEFENDANTS

MILLENNIUM LABORATORIES, INC. a California Corporation

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Margaret D. Mathews and Richard H. Martin, Akerman Senterfitt, 401 E. Jackson St. #1700, Tampa, FL 33602 (813)223-7333

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☒ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C Section 1125

Brief description of cause:
Action under Lanham Act, Fla. Common Law Unfair competition and Florida Deceptive and Unfair

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 04/08/2011

SIGNATURE OF ATTORNEY OF RECORD *Margaret D. Mathews*

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# EXHIBIT 21

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------x

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                              Debtors.

MARC S. KIRSCHNER solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                              Plaintiff,

 -against-

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                              Defendants.

Case No. 15-12284 (LSS)

------------------------------------------ x

                    April 12, 2021

                    9:02 a.m.


    VIDEO-RECORDED DEPOSITION of MARTIN PRICE,

taken pursuant to Notice, held virtually via

Zoom, before Fran Insley, a Notary Public of

the States of New York and New Jersey.

Price

to a "BS."  That would be Bill Sheehan of Simpson Thacher, likely?

A.    I saw Bill's name on the prior e-mail.  But for that I wouldn't have been able to make that -- draw that conclusion, but it makes sense.

Q.    And if you go to the page that's Bates marked ending in 012, towards the bottom of the page there's a reference to an "M" either "Stern" or "Stein."  I can't make that out myself.  Is that name familiar to you or either of those names?

A.    That's not a name I'm familiar with. It's not a counsel who we would have, I recall, retaining or an employee of the company at the time.

Q.    If you would go back to the first page of the exhibit.  It says at the top, "Conference Call Re: Millennium 3/27/12," and then I'll try to read into the record some of the notes that Ms. Neuner made.  First it says, "Came in a couple of hours ago.  Prevalent in our industry.  Not that different from first CID.  Hard to know what they are looking for."

Page 25

Price

Do you see that?

A.    I do.

Q.    Is it fair to say that she's taking down some intro remarks by you about the subpoena that was received?

MR. WERNER:  Object to the form.

A.    Yeah, I don't know what she's -- you know, this strikes me as a, you know, accurate narrative of the introduction to the call.  I can't speak to whether that was me or Ron or someone else.  It could have well been me.

Q.    And the reference to a CID, Millennium had received a Civil Investigatory Demand from the federal government in 2011; is that correct?

A.    That's correct.

Q.    And further down on this first page there's a reference to a 1 and a 2, "Use of custom profile/standing orders," and 2 is "Confirmation testing of negative tests/screen results."  Do you think I read that correctly?

A.    Yes.

Q.    Is it your best recollection that you were explaining to the Simpson lawyers what

Price

the issues you believed the subpoena related to?

MR. WERNER:  Object to the form.

A.    I mean, I don't have a subpoena in front of me.  I haven't looked at that in quite some time.  My recollection was it was a broad, very broad subpoena in the first instance that was narrowed down before we began responding over the course of several months.  And as I recall, this was our -- if I may elaborate briefly, this was my first call with -- it may have been my first call with Lynn and the Simpson team and wanted to give them a little bit of background perspective to, you know, our business in the prior engagements with U.S. Attorney's Office in Boston.

Q.    And "custom profile" was a term that Millennium used for a business practice, correct?

A.    Custom profile's a document.

Q.    Yes.  And it was a document that -- was a term that was used in Millennium's ordinary course of business, correct?

A.    Yeah, it's a ubiquitous term in the

Page 27

Price

lab industry, but we all -- we used it, yes.

Q.    And "confirmation testing" is another term in the industry.  It refers to a laboratory confirming a result that might be obtained at the point of care where a physician would administer a test.  Is that correct?

A.    There's a technical definition for it, but that's about right.

Q.    And you further on in this first page, you say, or somebody wrote, "2009, Hogan started working on these issues."  Is it a fact that in 2009 Millennium retained Hogan & Hartson for regulatory advice on its business practices involving custom profiles, standing orders, confirmation testing of negative results?

A.    I don't recall whether in 2009 that was within the scope of the engagement, but at some point Hogan certainly looked at the Millennium test requisition documents and ordering process.

Q.    And the custom profile was part of the ordering process, correct?

A.    Yes.

Price

Q.   When Millennium first engaged Hogan, you were part of the outside counsel team; is that correct?

A.   Yes, I was -- I would say I was the relationship partner.

Q.   If you go to the last page of the notes that's Bates stamped 013, at the bottom there is a reference to the CID in 2011.  It says, "We were panic stricken.  Ron & Helen helped.  This is part of your business."  The reference to "Helen," that was Helen Trilling, correct?

A.   Yes.

Q.   And above that there's a reference to a "Steve Immelt."  Do you see that?

A.   Yes.

Q.   And he was the CEO of Hogan at this time?

MR. WERNER:  Object to the form.

A.   I don't believe he was at that time.

Q.   Was he head of litigation?

A.   I don't know what role Steve played other than he was -- you know, he had an administrative role in the litigation

Price

department and was one of our leading white collar attorneys.

Q.    Did he ultimately become the chief executive officer of the firm?

MR. WERNER:  Object to the form.

A.    I believe that was after I left. That is correct, I believe.

Bear with me.  I'm just going to shuffle my desk because even I can see that glare coming in the window.

Q.    Okay.  Are you good?

A.    Yup, I'm good.  It's good.

Q.    If you go back to the first page and just sort of flip through the document, I just ask whether this is a general description of what were the custom profiles and the confirmation testing, the business of Millennium that you were informing the bank's lawyers?

A.    I see the notes.  I'm sorry, what was the question, Lyndon?

Q.    What you were explaining is the business practices that you thought might be at issue in the subpoena?

Page 30

Price

MR. WERNER:   Object to the form.

A.      Yeah, I'm explaining what a custom profile is.

Q.      And the reason you are doing so is because you think this might be the kind of information that the government is interested in?

MR. WERNER:   Object to the form.

A.      Yeah, at that point I'm giving a background primer to the folks at Simpson Thacher.  Again, I'm not looking at that.  I haven't looked at that subpoena, you know, in almost ten years.  But, you know, it appears that that was -- from these notes, that was one of the items we speculated was a general focus of the HIPAA subpoena and I'm giving some background on what those concepts are within the lab industry.

Q.      And then if you go to page Bates number 11, you'll see under "RW," it says, "Two main and ordinary topics: a) excessive testing? b) kickbacks to doctor to get the testing."  Do you see that?

A.      Yes.

Price

Q.   And do you recall those being issues that you thought the government might be examining with respect to Millennium's business practices?

A.   I mean, sitting here today, I sus -- my -- I don't recall that specifically.  I think this was -- I've heard -- I heard Ron say this several times and -- which is this is -- this is the general focus of 99 percent of the healthcare enforcement actions from the U.S. Attorney's Office.

Q.   And the excessive testing implicates a regulatory requirement of medical necessity for testing; is that not correct?

A.   That's correct.

Q.   And if you go to page 9, in the middle of the page, where it says, "What was the potential problem with bundling?"  It says, "CMS wants to ensure that each test is medically necessary and unique to that patient."  Do you see that?

A.   Yes.

Q.   And that was, the requirement of medical necessity, a formal regulation as part

Page 32

Price of Medicare; is that correct?

A.    It has been for a long time.

Q.    And if we go back to page 11, when we're talking about the kickbacks to doctors to get the testing, there are two primary laws that involve kickbacks:  One is an Anti-Kickback Statute, and the other is the Stark Law, which involves improper remuneration to physicians; is that correct?

MS. CASSADY:  I object to the form.

A.    I'm not sure I see where you're looking on page 11, but what you said was correct.

Q.    Just for the record, under "RW," where it says "kickbacks to doctors," I was asking about what the laws -- what your knowledge of the regulations that were or the names of the regulations or laws that applied to kickbacks.

A.    Correct.

Q.    And then further down on page 11, you see something called "Confirmation testing of neg. results."  Do you see that?

A.    Yes.

Page 33

Price

Q.   And below that there's a reference to "Doctor's office - specimen in $5 cup."

A.   I see that.

Q.   Have you heard of that specimen cup being referred to as a point of care test cup?

A.   I know what a point of care test cup is, yes.

Q.   And was it charged around $5 a fair market value at around that time?

MR. WERNER:  Object to the form.

A.   I mean, I don't recall specifically, but, generally speaking, that sounds about right.  There's a wide range.  You go into CVS, it could be $40, but $5 is about the price that Millennium would have charged.

Q.   And then below that it says, "amino assay strips put in," and then an arrow to "result."  Is it your recollection that when Millennium provided these kinds of cups, they had some sort of test strip in them?

MS. CASSADY:  Object to the form.

A.   Yeah.  I mean, generally speaking, that's right.

Q.   And under something called the cup

Price

program, Millennium provided specimen cups with test strips free of charge to doctors so long as they sent the specimen back to the lab for confirmatory testing; is that correct?

A.   Well, there are two conditions on -- as I recall, perhaps more, but the two -- the primary condition, as I recall from the cup agreement program, was that the physician not bill for in-office testing.  I think in terms of -- I believe returning the cups used or unused to the lab was another element to the program.  There may have been more.  Again, it's been a long time since I've looked at the cup program.

Q.   Millennium had outside counsel besides Hogan and compliance officer -- or an outside compliance consultants who said that this cup program presented both kickback and medical necessity issues, correct?

MR. WERNER:  Object to form.

A.   I can't answer the question the way you phrased it.

Q.   Did Millennium seek advice from outside counsel and compliance experts on

Page 52

Price

Q.    All I was asking you is do you recall the episode where it was brought to your attention that CodeMap during the course of its audit disagreed with the October 2010 letter of Hogan?

MR. WERNER:  Object to form.

MS. CASSADY:  Object to form.

A.    I recall generally what I just described to you.  Specifically I don't recall this e-mail exchange from January 2011.

Q.    Why don't you go to pages 28 and 29 of the attachment, which are Bates numbers ending in 2013 and 2014.

A.    Okay.

Q.    You'll see there is a section called, "Provision of Point of Care Testing Supplies"?

A.    I see that.

Q.    And there's a lot of what I'll call redlining?

A.    Yes.

Q.    And if you go to the cover e-mail to the document, those reflect Mr. Appel's edits to the CodeMap report, correct?

Page 53

Price

MR. WERNER:   Object to the form.

A.   That's what it says, yes.

Q.   And does this refresh your recollection that the Root report disagreed with the Hogan advice in the letter that's exhibited to the report?

A.   No.

MS. CASSADY:   Object to form.

Q.   If you would go to page 41 of the document which is ending in 2026 Bates number.

A.   Okay.

Q.   And you read in the recommendation section, the original recommendation of the Roots was to "cease providing the cups."  Do you see that?  That's stricken?

A.   I -- well, I see that it's stricken in this version, yes.

Q.   And Mr. Appel put in an insert of "reconsider"?  Do you see that?

MS. CASSADY:   Object to the form.

A.   I see what's in the document here, yes.

Q.   And is it your understanding from the way redlining works, that that's an

Price

insertion?

A.    Yes.

Q.    And if you look across there is a ranking of the issues, although this one appears at the bottom of the box.  Do you see that?

A.    I see that, yes.

Q.    And the Roots ranked this as number one, correct?

MR. WERNER:  Object to the form.

A.    Yes.

Q.    If you go just above the recommendation box, it says, "A ranking of 1 indicates that we strongly encourage Millennium to implement the recommendation, and that failure to do so will result in an unreasonable risk of civil, criminal, or administrative law liability or adversely affect the effectiveness of Millennium's compliance program."  Do you see that?

A.    I see that, yes.

Q.    And the decision was made to terminate this -- instead of implement to terminate this recommendation -- to terminate

Page 55

Price

CodeMap, correct?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to the form.

A.    No, I believe we continued to work with CodeMap.

Q.    As an auditor, as a compliance auditor.

MS. CASSADY:  Object to the form.

A.    Sitting here today, I can't recall specifically what the function is that they were retained to do.  I know they did not perform our annual compliance audit after a certain point.  The timing around that I just can't recall that now.

Q.    Do you have any basis to disagree with the top of the document which says, "Draft Annual Compliance Audit Report," that that was their engagement at the time?

MR. WERNER:  Object to the form.

A.    I just don't know.  I didn't engage them.  I don't know what it was.

Q.    Was this the first time that you had heard of the Roots' disagreement with Hogan's advice on the cups?

Page 56

Price

MS. CASSADY:  Object to the form.

A.    I don't recall.

MR. TRETTER:  If the concierge would mark the next exhibit as 5B.  It's just a series of e-mails.

(Whereupon Plaintiff's Exhibit 5B was marked for identification.)

THE CONCIERGE:  What is the Bates number?

MR. TRETTER:  It ends in 165 to 166.

Q.    These look to be a series of e-mails in January of 2011 regarding this draft Root report.  And if you look at on the first page, four e-mails down, the one from Helen Trilling to Howard Appel and you and Ron Wisor, she says in the second line, "One question is why Root would be addressing issues on which we have opined at all."  Do you see that?

A.    I do.

Q.    Did Mr. Appel ever tell you that in fact the Roots had written their opinion first and that he had solicited Hogan's October 2010 letter after the Roots?

MR. WERNER:  Object to the form.

Page 57

Price

MS. CASSADY:  Object to the form.

A.    I don't recall that one way or another.

Q.    Did you ever learn that yourself once you became general counsel of Millennium?

MR. WERNER:  Object to the form.

A.    I don't recall that one way or another, no.

Q.    At the top of that exhibit you write, "OK," and this is just to your then partners, Ms. Trilling and Mr. Wisor.  It looks like Mr. Appel had been dropped from the chain. You say, "I know Howard is anxious on this." You knew he was anxious because they intended to go forward with the cups notwithstanding this conflict of advice, correct?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to the form.

A.    I know Howard is very conservative by nature and wanted to resolve what was a -- well, I don't want to speculate here.  I don't recall specifically other than general comments I could make about Howard's overall approach towards compliance and the regard in which he

Page 58

Price

held Howard -- Ron and Helen's opinions.

Q.    Do you recall that you and Millennium were concerned that the Root document as well as -- sorry, the Root document, the draft would be discoverable by the Department of Justice because it was part of a business compliance audit rather than something that was covered by privilege?

MS. CASSADY:  Object to the form.

MR. WERNER:  Object to the form.

A.    Sitting here today, I don't recall that specifically, no.

Q.    Do you recall that Hogan advised Mr. Appel against having the Roots complete the audit?

A.    That sounds generally right.  I don't recall that specifically, but generally that sounds right.

Q.    Maybe the next exhibit will refresh your recollection.

MR. TRETTER:  If we could go to tab 6.  Let's wait for the concierge.

(Whereupon Plaintiff's Exhibit 6 was marked for identification.)

Page 59

Price

Q.    We have now Plaintiff's Exhibit 6, which is a series of e-mails also in January of 2011.  These appear to be between Mr. Appel and somebody named Andrew Hefty on behalf of Millennium and you and others at Hogan.  Who was Andrew Hefty?

A.    Andrew Hefty was the general counsel at Millennium at one point.

Q.    The domain we see for his e-mail is something called, in one word, "becausepainmatters.com."  What was because pain matters?

A.    That was the e-mail handle for Millennium probably until 2011, and some people continued to use it when I left.

Q.    Does this document refresh your recollection that you and others at Hogan advised Millennium to instruct CodeMap not to complete the audit?

A.    I don't see that specifically in here.  If you can point me to that.  This confirms my general recollection in response to your earlier question.

Q.    Well, in your e-mail of January 19

Page 60

Price

to Mr. Hefty you write, "My view is that unless there is some imperative to paper this (and if choosing to do so, I would include the comments Helen suggested about handling compliance issues with outside counsel, etc.), we are better off communicating this orally."  And the "this" was to stop the audit, correct?

MR. WERNER:  Objection to form.

MS. CASSADY:  Objection to form.

A.    Well, I mean, I'm just reading what's in the document below, which was we decide to bet your draft report will suffice and that there's therefore no need for you to finalize the report.

Q.    And that's what happened, correct?

A.    That's my recollection sitting here today, yes.

MR. TRETTER:  Perhaps we can go to the next one, then, tab 7 as Exhibit 7.

(Whereupon Plaintiff's Exhibit 7 was marked for identification.)

MR. TRETTER:  Thank you.

Q.    So this looks to be a series of e-mails between and among you while you were

Price

Q.    And he continued to assist Skadden on its work in defending the company in the DOJ investigation, correct?

MS. CASSADY:  Object to form.

A.    Correct.  Substantively, Steve is a white collar lawyer.

Q.    And when he mentions in his responsive e-mail to you, "I enjoyed seeing some of the data in the USAO slides and we will be discussing with Mike tomorrow."  During this time period the company was making presentations to the U.S. Attorney's Office and there were PowerPoint slides that Mr. Immelt was commenting on?

MS. CASSADY:  Object to form.

A.    That appears to be what he's -- yes, I believe that's what he's commenting on.

Q.    First I guess I should break it up. Do you recall a series of presentations by Millennium and its counsel to the Boston U.S. Attorney's Office in or around March and April of 2014 at the same time that the company was considering this leveraged debt recapitalization?

Price

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to the form.

A.    Yes, I do.  There was -- if I may expand -- well, yes, I recall we were making presentations at that time.

Q.    Well, there had been a changeover in some of the attorneys from the U.S. Attorney's Office in early 2014, correct?

A.    There was a wholesale turnover on the case.  The criminal lead, Susan Winkler, had left the office.  A new criminal lead, David Schumacher, had come on.  Prior to that there had been no civil office engagement. Bunker Henderson and the civil team, as I recall, came on the scene in early 2014.  They did not have access to any of the documents, presentations, witness interviews or any history of the case at all.  And, you know, the case had been going on for a couple of years at that point, and so to sort of bring them up to speed on, you know, where the evolution of the investigation from our perspective to date and try to frame the issues and push towards, you know, a successful resolution, we engaged

Page 134

Price

proactively with the office, the civil side, to bring them up to speed.  That was following the declination from the criminal side.

Q.    Well, I think may be the time frame's a little bit muddled, but here we're talking about early 2014.  The declination I'll tell you --

A.    You're right, you're right.  Yep, you're right.  The declination came after the notice of intervention, right.

Q.    And so these early meetings involved both the criminal and the civil offices of the U.S Attorney's Office, did they not?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to form.

A.    I recall them being directed towards the civil.  I have a specific recollection that, one, that there was a representative from criminal that came for 30 minutes and then departed or so.  I don't remember specifically all of them.  I know Schumacher and some of his colleagues were at one of them, but my recollection, generally we were focused on the civil side at that point.

Price

Q.    Just quickly, do you recall that there had been a presentation to the original group of prosecutors in 2013 that was reprised for the new group of prosecutors?

MS. CASSADY:  Object to form.

A.    I don't recall specifically -- I recall generally repackaging some of what we had used to orient Susan Winkler's team when a new team came on board, yes.

Q.    And then another presentation was made to the U.S. Attorney's Office about the POCT, the point of care test cups in particular.  That was also done in March of 2014?

MR. WERNER:  Object to the form.

A.    I don't recall specifically, but I know we did a couple of presentations for the new team, and I'm sure the cups were -- the cup program was one of them.  I'd be shocked if it was not.

Q.    And you did another presentation to the U.S. Attorney's Office on the troubled practices program?

MS. CASSADY:  Object to form.

Page 136

Price

MR. WERNER:  Object to form.

A.    I don't recall that specifically, but again, it would not -- I suspect we did. That wouldn't surprise me at all if that was one of our early presentations.

MR. TRETTER:  Let's mark our next exhibit, tab 24 as Exhibit 23.

(Whereupon Plaintiff's Exhibit 23 was marked for identification.)

MR. TRETTER:  While the concierge is doing that, I'm just going to try to change the mind set a little bit.  I don't want to talk about the DOJ matter.  I'm going to talk a little bit more about regulatory and reimbursement stuff.  We'll see some documents about the LCDs or local coverage determinations.

Thank you, Mr. Concierge.

Q.    Mr. Price, this looks like a series of e-mails around the same time, February, end of February of 2014, but it involves something called LCD.  Am I right that that's an abbreviation for local coverage determination?

A.    That's correct.

Page 218

Price

A.    It was reassuring.  And they had validated -- it validated what Helen and Ron had been telling us and the decision by the company to -- I know because -- the decision by the company to take its legal work to Hogan.

MS. CASSADY:  I think we've been going a little over an hour now.  Do you mind if we take a quick ten-minute break?

THE WITNESS:  That's fine.

THE VIDEOGRAPHER:  Off the record, 15:14.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record at 15:25.

Q.    Mr. Price, I'm going to switch topics now and talk about the 2012 time period.  And I'll refer you back to Plaintiff's Exhibit 1, which is tab 1 in your binder.  This is the March 27, 2012 e-mail chain between you, Lynn Neuner, Bill Sheehan and Donald Conklin about the DOJ subpoena.

A.    Okay.

Q.    And if you refer down, you write to Ms. Neuner, "Hogan, as you know, helped us

Price

implement various policies in late 2009 in anticipation that Government would ultimately look into these issues."  Does this reflect your understanding that Hogan began looking into Millennium's policies in late 2009?

A.    Yes.

Q.    And this would have been before the draft audit report by CodeMap in 2010?

A.    Yes.

Q.    You also make a statement about "So they offer the regulatory perspective on what the DOJ seemed focused on and how ML is positioned relative to the field."  Do you understanding at the time of how Millennium was positioned relative to the field?

A.    As I mentioned before, you know, in some -- you know, we had brought on Hogan, our business was scaling.  We understood that as a large provider of diagnostic services we would have a target on us and began through the engagement of Hogan to validate our and where necessary adjust our policies and programs to comply with the law in an environment -- in a competitive environment where most of our

Page 220

Price competitors had not done so.

Q.    I'm going to refer you now to Plaintiff's Exhibit number 2, which is tab 2 in your binder.  Again these are notes prepared by Lynn Neuner titled, "Conference Call Re Millennium, dated 3/27/12."  And you previously testified, I believe, that you understand these to be the notes from the call that we just referred to?

A.    These look to be notes from a call that I participated in with the folks at Simpson Thacher, yes.

Q.    And on the first page, which is ending 0008, again Ms. Neuner writes, "Came in a couple of hours ago, prevalent in our industry, not that different from first CID."  You testified, I believe, that this refers to the 2012 DOJ subpoena; is that correct?

A.    Yes.

Q.    Do you agree with the statement and the notes that this type of subpoena was prevalent in our industry?

A.    Yes.

Q.    Is it also consistent with your

Page 221

Price

recollection that it was not that different from the first CID?

A.    Yes.

Q.    The CID refers to the CID issued in connection with the Cunningham qui tam complaint that we discussed earlier?

A.    Correct.

Q.    And you believe the 2012 subpoena raised similar issues as the first CID?

A.    Yes.  I believe they were overlapping issues.

Q.    And further down on the page by the numbers 1 and 2, 1. "use of custom profiles, standing orders, 2. confirmation testing of negative tests/screen results CMS was concerned about.  In 2009 Hogan started working on these issues."  Does this refresh your recollection that in 2009 Hogan started working on the custom profile policy issues in addition to the POC cup agreement?

A.    Yeah, Helen specifically worked closely with Howard to revamp our test requisition forms.  I remember that well.  I was not deeply involved in that, but that would

**Page 273**

C E R T I F I C A T E

I, FRAN INSLEY, hereby certify that the Deposition of MARTIN PRICE was held before me on the 12th day of April, 2021; that said witness was duly sworn before the commencement of testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Deposition of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of April, 2021.

_____

FRAN INSLEY

# EXHIBIT 22



U.S. Department of Justice

*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                    *United States Courthouse, Suite 9200*
                                                     *1 Courthouse Way*
                                                     *Boston, Massachusetts 02210*

May 14, 2013

By e-mail

William H. Kettlewell, Esq.
Kathy Weinman
Collora, LLP
100 High Street
Boston, MA 02110-2321

Re:   Millennium Laboratories, Inc. - Statute of Limitations Tolling Agreement

Dear Counsel:

This letter confirms and sets forth an agreement between the Office of the United States Attorney for the District of Massachusetts and your client, Millennium Laboratories, Inc., and all successors and assigns (hereinafter "Millennium"). The terms of the agreement are as follows:

1.      As you are aware, this Office is presently conducting a joint criminal and civil investigation of your client, Millennium, and its officers, employees and agents. That conduct includes, without limitation, allegations that Millennium and certain of its officers, employees and agents, may have violated various federal criminal statutes, including but not limited to 18 U.S.C. §371 (conspiracy to defraud the United States), 18 U.S.C. § 287 (submission of false, fictitious or fraudulent claims to the United States), health care fraud offenses (e.g. 18 U.S.C. §§ 669, 1347, and 1035), mail fraud and/or wire fraud (18 U.S.C. §§ 1341, 1343), the Anti-Kickback Act (42 U.S.C. § 1320a-7b); certain civil statutes including but not limited to 31 U.S.C. § 3729 (civil False Claims Act); and certain administrative statutes such as 42 U.S.C. § 1320a-7 (exclusion) and 42 U.S.C. § 1320a-7a (civil monetary penalties) in connection with billing false or fraudulent claims to federal health care programs and/or other payors; payment of remuneration to physicians and/or others to induce referrals of laboratory work to Millennium; and interference with witnesses and/or destruction of evidence.

2.      In the course of our discussions, this Office has expressed its intention to afford you and your client the fullest opportunity to provide information to this Office which you deem

relevant to matters relating to that investigation. In response, you have advised us that you intend to provide certain information to this Office, and that you wish such information be considered prior to a prosecution decision concerning potential criminal charges resulting from that investigation. You have advised this Office that you and members of your firm will require a further time period to prepare any materials and gather information for presentation to this Office, and to consider and evaluate further information as may be provided by this Office. As a result, this Office and your client have agreed, as more fully set forth below, to toll the applicable statutes of limitations for the offenses described in paragraph one for the time period December 11, 2012 through January 3, 2014 for that conduct described in paragraph one.

3. This Office and your client, Millennium, hereby agree that your client will not at any time interpose a statute of limitations defense or any constitutional claim based upon pre-indictment delay to any indictment or count thereof, or to any civil complaint or count thereof, or to any administrative action, which charges or alleges that your client committed any federal offense or violation related to the conduct described in paragraph one, that includes the time period December 11, 2012 to January 3, 2014 in the calculation of the limitations period. Nothing herein shall affect, or be construed as any waiver of, any applicable statute of limitations defenses that Millennium may have with respect to the time period prior to and including December 11, 2012, and your client expressly reserves its right to raise any such defense, any provisions of this agreement notwithstanding.

4. Your client, Millennium, enters into this agreement knowingly and voluntarily. Millennium acknowledges that the statute of limitations and United States Constitution regarding prejudicial pre-indictment delay confers benefits on it, and it is not required to waive those benefits, and that Millennium is doing so after consulting with you because Millennium believes it is in its best interest to do so. Millennium also acknowledges its understanding that it may be charged with the foregoing criminal offenses and civil and administrative violations and/or any other offenses or violations at any time prior to and including January 3, 2014. Millennium further acknowledges its understanding that it may be charged with any offenses or violations not specifically described above, at any time during the relevant statute of limitations period.

5. This agreement relates only to the allegations described in Paragraph one above and any charges or claims based on those allegations. This writing contains the entire agreement between this Office and your client and can be modified or supplemented only by means of a writing signed by this Office and your client.

/
/
/
/
/
/

If your client is willing to enter into this agreement on the terms set forth above, Millennium should indicate the same by signing on the spaces provided below and by initialing each page of this agreement. Please return an executed original to the undersigned by May 31, 2013.

Very truly yours,

CARMEN M. ORTIZ
United States Attorney

By:

Susan G. Winkler
Assistant U.S. Attorney

Dated: 6/14/13

William H. Kettlewell
Collora, LLP
Attorney for Millennium Laboratories, Inc.

Dated: 6/14/13

Name: MARTIN PRICE
Position: GENERAL COUNSEL
Millennium Laboratories, Inc.

# EXHIBIT 23



## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Centers for Medicare & Medicaid Services



Official Information Health Care Professionals Can Trust



REVISED products from the MLN
- "**Medicare Learning Network® (MLN) Suite of Products & Resources for Billers and Coders**", Educational Tool, ICN 904183, Downloadable only

| | |
|---|---|
| **MLN Matters® Number: MM8853** | **Related Change Request (CR) #: CR 8853** |
| **Related CR Release Date: August 15, 2014** | **Effective Date: January 1, 2015** |
| **Related CR Transmittal #: R1421OTN** | **Implementation Date: January 5, 2015** |

# Revised Modification to the Medically Unlikely Edit (MUE) Program

## Provider Types Affected

This MLN Matters® Article is intended for physicians, other providers, and suppliers submitting claims to Medicare Administrative Contractors (MACs), including Durable Medical Equipment MACs for services provided to Medicare beneficiaries.

## Provider Action Needed

Change Request (CR) 8853 informs MACs about additional modifications being updated in the Medically Unlikely Edit (MUE) Program. The updates include clarifications, general processing instructions, and detailed explanations of MUE requirements and specifications. Make sure that your billing staffs are aware of these changes.

## Background

The Centers for Medicare & Medicaid Services (CMS) implemented the Medically Unlikely Edit (MUE) program on January 1, 2007, to reduce the Medicare Part B paid claims error rate. At the onset or implementation of the MUE Program, regarding the adjudication process, the MUE value for a Healthcare Common Procedure Coding System (HCPCS) code was only adjudicated against the units of service (UOS) reported on each line of a claim. On April 1, 2013, CMS modified the MUE program so that some MUE values would

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents. CPT only copyright 2013 American Medical Association.

Confidential

ML_DE_00206157

be date of service edits rather than claim line edits. At that time, CMS introduced a new data field to the MUE edit table termed "MUE adjudication indicator" or "MAI". CMS is currently assigning a MAI to each HCPCS code. CR8853 contains current and updated background information for these modifications, including general processing instructions.

### MUEs for HCPCS codes with a MAI of "1"

MUEs for HCPCS codes with a MAI of "1" will continue to be adjudicated as a claim line edit.

### MUEs for HCPCS codes with a MAI of "2"

MUEs for HCPCS codes with a MAI of "2" are absolute date of service edit. These are "per day edits based on policy". HCPCS codes with an MAI of "2" have been rigorously reviewed and vetted within CMS and obtain this MAI designation because UOS on the same date of service (DOS) in excess of the MUE value would be considered impossible because it was contrary to statute, regulation, or subregulatory guidance. This subregulatory guidance includes clear correct coding policy that is binding on both providers and the MACs.

Limitations created by anatomical or coding limitations are incorporated in correct coding policy, both in the Health Insurance Portability & Accountability Act of 1996 (HIPAA) mandated coding descriptors and CMS approved coding guidance as well as specific guidance in CMS and National Correct Coding Initiatives (NCCI) manuals. For example, it would be contrary to correct coding policy to report more than one unit of service for Current Procedural Terminology (CPT) 94002 "ventilation assist and management . . . initial day" because such usage could not accurately describe two initial days of management occurring on the same DOS as would be required by the code descriptor.

> **Note:** Although the Qualified Independent Contractors (QICs) and the Administrative Law Judges (ALJs) are not bound by sub-regulatory guidance, they do give deference to it and are being made aware that CMS considers all edits with an MAI of 2 to be firm limits based on subregulatory guidance, while some MUE edits with an MAI "2" may be based directly on regulation or statute.



### MUEs for HCPCS codes with a MAI of "3"

MUEs for HCPCS codes with a MAI of "3" are date of service edits. These are "per day edits based on clinical benchmarks". If claim denials based on these edits are appealed, MACs may pay UOS in excess of the MUE value if there is adequate documentation of medical necessity of correctly reported units. If MACs have pre-payment evidence (e.g. medical review) that UOS in excess of the MUE value were actually provided, were correctly coded, and were medically necessary, the MACs may bypass the MUE for a

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents. CPT only copyright 2013 American Medical Association.

Confidential   ML_DE_00206158

HCPCS code with an MAI of "3" during claim processing, reopening, or redetermination, or in response to effectuation instructions from a reconsideration or higher level appeal.

**General Processing Instructions**

- Since ambulatory surgical center (ASC) providers (specialty code 49) cannot report modifier 50, the MUE value used for editing will be doubled for HCPCS codes with an MAI of "2" or "3" if the bilateral surgery indicator for the HCPCS code is "1".
- CMS will continue to set the units of service for each MUE high enough to allow for medically likely daily frequencies of services provided in most settings. Because MUEs are based on current coding instructions and practices, MUEs are prospective edits applicable to the time period for which the edit is effective. A change in an MUE is not retroactive and has no bearing on prior services unless specifically updated with a retroactive effective date. In the unusual case of a retroactive MUE change, MACs are not expected to identify claims but should reopen impacted claims that you bring to their attention.
- Since MUEs are auto-deny edits, denials may be appealed. Appeals shall be submitted to your MAC not the NCCI/MUE contractor. MACs adjudicating an appeal for a claim denial for a HCPCS code with an MAI of "1" or "3" may pay correctly coded correctly counted medically necessary UOS in excess of the MUE value.
- Finally, a denial of services due to an MUE is a coding denial, not a medical necessity denial. The presence of an Advance Beneficiary Notice (ABN) shall not shift liability to the beneficiary for UOS denied based on an MUE. If during reopening or redetermination medical records are provided with respect to an MUE denial for an edit with an MAI of "3", MACs will review the records to determine if the provider actually furnished units in excess of the MUE, if the codes were used correctly, and whether the services were medically reasonable and necessary. If the units were actually provided but one of the other conditions is not met, a change in denial reason may be warranted (for example, a change from the MUE denial based on incorrect coding to a determination that the item/service is not reasonable and necessary under section 1862(a)(1)). This may also be true for certain edits with an MAI of "1." CMS interprets the notice delivery requirements under Section 1879 of the Social Security Act (the Act) as applying to situations in which a provider expects the initial claim determination to be a reasonable and necessary denial. Consistent with NCCI guidance, denials resulting from MUEs are not based on any of the statutory provisions that give liability protection to beneficiaries under section 1879 of the Social Security Act. Thus, ABN issuance based on an MUE is NOT appropriate.
- CMS reminds providers to report bilateral surgical procedures on a single claim line with modifier 50 and one (1) UOS. When modifier -50 is required by manual or coding instructions, claims submitted with two lines or two units and anatomic modifiers will be denied for incorrect coding. MACs may reopen or allow

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents. CPT only copyright 2013 American Medical Association.

Confidential      ML_DE_00206159

resubmission of those claims in accordance with their policies and with the policy in Chapter 34, Section 10.1, of the "Medicare Claims Processing Manual" at **http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Down loads/clm104c34.pdf** on the CMS website. Clerical errors (which includes minor errors and omissions) may be treated as reopenings.

- CMS encourages providers to change and resubmit their own claims where possible and to change their coding practices, but during reopening MACs may, when necessary, correct the claim to modifier -50 from an equivalent 2 units of bilateral anatomic modifiers. The original submitted version of the claim is retained in the Medicare IDR.

- CMS also reminds providers to use anatomic modifiers (e.g. RT, LT, FA, F1-F9, TA, T1-T9, E1-E4) and report procedures with differing modifiers on individual claim lines when appropriate. Many MUEs are based on the assumption that correct modifiers are used.

- On your Remittance Advice, MACs will continue to use Group Code CO (contractual obligation), and remark codes N362 and MA01 for claims that fail the MUE edits, when the UOS on the claim exceed the MUE value, and deny the entire claim line(s) for the relevant HCPCS code.

## Additional Information

The official instruction, CR 8853 issued to your MAC regarding this change is available at **http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1421OTN.pdf** on the CMS website.

If you have any questions, please contact your MAC at their toll-free number. That number is available at **http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Net work-MLN/MLNMattersArticles/index.html** under - How Does It Work.

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents. CPT only copyright 2013 American Medical Association.

Confidential                                                                 ML_DE_00206160

# EXHIBIT 24

Message
_____

**From:**     Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
              (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL PENCAK]
**Sent:**     2/14/2014 10:47:46 PM
**To:**       Richard Guzman [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
              (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Richard Guzman]
**Subject:**  Re: Medicare

What do you mean by "re-adjudicate"

Daniel Pencak, CPA, CGMA
Vice President - Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

On Feb 14, 2014, at 2:40 PM, "Richard Guzman" <Richard.Guzman@millenniumlabs.com> wrote:

We've been doing it that way for 82542 since August and not had a problem.  83925 is 4 to a line.  But yes, if billing 2 or less on line, they are paying first time.

I'm a little less concerned about this than I was earlier.  Noridian says they're not applying a new policy, so this must have been in error and we may have to change our consolidation rules.  They have denied ~$5m initially, but have re-adjudicated, so we are now down to about $1.3m in short payments.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Daniel Pencak
**Sent:** Friday, February 14, 2014 1:48 PM
**To:** Richard Guzman
**Subject:** Re: Medicare

Why are we billing six on a single line...shouldn't it be two? Do you see any denials with his two on a line?

Daniel Pencak, CPA, CGMA
Vice President - Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

Confidential

On Feb 14, 2014, at 11:58 AM, "Richard Guzman" <Richard.Guzman@millenniumlabs.com> wrote:

Still not 100% clear on what's going on.  However, after reviewing additional data, it appears that Noridian is denying the codes due to MUE, but some have been re-adjudicated and paid subsequently.  Some of the $5m that I mentioned being denied has been paid subsequent to the denial, but just need to confirm that they are fixing all of the denials or if we need to resubmit claims or appeal.  Attached is an example of a recent payment where 83925 and 82542 were denied.  I have provided Medicare some examples and they are researching.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
16981 Via Tazon
San Diego, CA 92127
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com

(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)


<MCCA AA4010124.pdf>

Confidential                                                                              ML_DE_00060271

# EXHIBIT 25

Message

| | |
|---|---|
| **From:** | Tim Kennedy [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TIM KENNEDY3D8] |
| **Sent:** | 2/21/2014 3:59:19 PM |
| **To:** | Carol Stoyla [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Carol Stoyla] |
| **Subject:** | RE: Noridian |

Thanks Carol.


Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Carol Stoyla
**Sent:** Friday, February 21, 2014 7:56 AM
**To:** Tim Kennedy
**Subject:** RE: Noridian

Tim,
We have not yet reached out to our assigned Medicare Reps....I have their names and contact info and will forward to Susan/Rick to make a call for their take on this.
Carol


Carol Stoyla
VP of Payor Strategy and Relations
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1410
Fax: (858) 217-0332
Carol.Stoyla@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 5:02 PM
**To:** Carol Stoyla
**Subject:** FW: Noridian

FYI –


Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

ML_DE_00058388

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 5:02 PM
**To:** Richard Guzman; Susan Ahl; Jennifer Hood; Daniel Pencak
**Subject:** RE: Noridian

I like all of the ideas and thinking out of the box.
Let's all have a brief meeting on this tomorrow and decide which direction we want to take.


Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)


**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 4:54 PM
**To:** Susan Ahl; Tim Kennedy; Jennifer Hood; Daniel Pencak
**Subject:** RE: Noridian

We should try to circumvent the edit first.  Noridian updated their list of modifiers and they no longer list modifier 59 (which is what we are using).  Not sure if this is an error or if we should be using a different modifier.
https://med.noridianmedicare.com/web/jeb/topics/modifiers

If that doesn't work, we should appeal the denials.  The policy indicates that these denials are appealable, and we may just need to show the distinction in the drug classifications (by the radar report).


Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)


**From:** Susan Ahl
**Sent:** Thursday, February 20, 2014 4:42 PM
**To:** Tim Kennedy; Richard Guzman; Jennifer Hood; Daniel Pencak
**Subject:** FW: Noridian

FYI


Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1205
Fax: (858) 217-8519

Confidential

Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Carol Stoyla
**Sent:** Thursday, February 20, 2014 4:40 PM
**To:** Susan Ahl
**Subject:** RE: Noridian

Susan,
I spoke with another lab who is experiencing the same issue as us and what they did (they also use XIFIN), is to create a consolidation rule that caps the billed units at what the MUE states. Medicare will not pay for more than what the MUE states, so they found that by billing up to the max (where appropriate), medicare pays all of the units and does not deny.
Carol

Carol Stoyla
VP of Payor Strategy and Relations
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1410
Fax: (858) 217-0332
Carol.Stoyla@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Susan Ahl
**Sent:** Thursday, February 20, 2014 4:26 PM
**To:** Carol Stoyla
**Subject:** FW: Noridian

Do you have any suggestions

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 4:22 PM
**To:** Susan Ahl; Tim Kennedy; Daniel Pencak; Jennifer Hood
**Subject:** RE: Noridian

The rule below is what we are currently doing and those claims are being denied.  The new policy (excerpt from the email below) states that even if we separate the lines and use the modifier, Medicare will still not pay.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592

Confidential

ML_DE_00058390

Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Susan Ahl
**Sent:** Thursday, February 20, 2014 4:11 PM
**To:** Tim Kennedy; Richard Guzman; Daniel Pencak; Jennifer Hood
**Subject:** RE: Noridian

Tim

This is a response from XIFIN related to Consolidation Rule Modifications.  Rick and Jennifer, what do you think?

The rule is of course driven by the MUE by payor so it will vary based on procedure code and payor.  But, as an example, if 83925 has a DOS unit edit of 4 then the rule would be set up to bill 4 units on one line with an 83925 (no modifier) and the remaining additional units over and above the MUE units on a second claim line with 83925 and a 91 or 59 modifier.  Note that the use of the 91 or 59 modifier should be confirmed with your certified coder(s).

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 4:08 PM
**To:** Richard Guzman; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Thanks Rick for the clarification.

Is there not a way to bill for the units in excess of the MUE with a modifier or some other code?
Has XIFIN weighed in on alternatives yet?

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 3:39 PM
**To:** Tim Kennedy; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

ML_DE_00058391

The $2.5m that has been denied is not a complete picture for the month because not all January claims have been adjudicated. If we apply the current behavior across all billings for January, I would expect denied amounts to grow to approx. $4m (this is the amount that we bill for those codes in which the unit limit was exceeded).

So the math would look like this using round numbers:

$4.0m total monthly denials
$2.8m portion of the $4m that could be recouped if we resubmit claims not to exceed the caps
$1.2m is monthly amount that we may not be able to recover because it exceeds the MUE for date of service = $14.4m per year

Hope this makes more sense?


Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 3:12 PM
**To:** Richard Guzman; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Rick,

Just making sure I understand correctly (if not, please correct my interpretation presented below):

　　　　$2.50M  (Total monthly denials)
Less: $1.25M  (ML could bill at the MUE level and get paid)
　　　　$1.25M  (total at risk)
Less: $1.17M  (ML could bill units above the MUE level and potentially get paid at ~93% of billed)
　　　　$0.08M  (Remainder not paid = $80,000 per month or $960,000 per year)

Questions:
* 　　Is the above directionally correct?
* 　　Is this what XIFIN recommends to deal with this issue?

Thanks, Tim


Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

Confidential

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 2:22 PM
**To:** Tim Kennedy; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

We are still getting denied on 83925 and 82542 if units billed are in excess of the MUE. So far, the amount being denied due to MUE is approx. $2.5m. (starting 1/1/14 dates of service for all adjudications to date).

|  | MUE | % of Claims in excess of MUE | Avg. # of Units beyond the MUE |
|---|---|---|---|
| 83925 | 4 | 48% | 1.89 |
| 82542 | 6 | 15% | 3.04 |

If we were to bill those codes for units NOT TO EXCEED the limit, then the amount of monthly billed charges at risk is approx. $1.25m. We typically collect 93% of billed charges, so the monthly revenue loss would be slightly less.

|  | Monthly Avg. Units billed | Units billed with modifier (in excess of MUE) | Medicare Rate | Amount of Billed |
|---|---|---|---|---|
| 83925 | 153,657 | 33,693 | $26.54 | 894,212 |
| 82542 | 162,670 | 14,924 | $24.14 | 360,265 |
|  |  |  |  | 1,254,478 |

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Tuesday, February 18, 2014 3:45 PM
**To:** Daniel Pencak; Susan Ahl; Richard Guzman
**Subject:** RE: Noridian

All,

Let's dig a bit more on this whole issue and have some answers to the questions likely to be asked and have answers for them:

* Find out what Xifin has to say about this and if others are experiencing payment issues
* Of the $2.5M indicated below – what is the real at risk amount above the unit edit of 4 for 83925 and unit edit of 6 for 82542 (if we resubmit at the MUE level, we expect that we'll get paid, correct?)
* Let's decide with Lale and Terri of Xifin if item #5 is the best procedure for ML to start with

In the meantime, I'll make Howard aware of the issue but tell him we're still gathering all our facts.

Thanks, Tim

Confidential

ML_DE_00058393

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Daniel Pencak
**Sent:** Tuesday, February 18, 2014 1:17 PM
**To:** Susan Ahl; Tim Kennedy; Richard Guzman
**Subject:** FW: Noridian

I recommend we meet briefly to discuss this. We should also include Howard.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

---

**From:** Richard Guzman
**Sent:** Tuesday, February 18, 2014 1:14 PM
**To:** Susan Ahl; Daniel Pencak; Cheryl Stokes
**Cc:** LuAnn Merrill; Colm Driscoll
**Subject:** RE: Noridian

I had Veronica call Noridian earlier today (the hold time was almost an hour) regarding our call on Friday.

1.      They are referring us to the bulletin below relating to MUEs.  Basically, it appears that Noridian is applying the CMS MUE's and asking us to file reconsiderations if we want to get paid.
2.      83925 has a DOS unit edit of 4 and 82542 is unpublished but we have determined to be 6.  Starting on 1/1/14 DOS, they are denying all line items with CO96 (non-covered) if we bill in excess of the MUE. (For example, on 83925, if we bill 4, they pay 4.  If we bill 5, they pay 0.)
3.      82205 has an edit of 1 unit per DOS, but excess units are still being paid.
4.      On many of these denials, they have re-adjudicated the claim and subsequently paid the code without us doing anything.  However, $2.5m of billed charges remains outstanding of underpayments (where the claim has been paid, but these units were denied).
5.      I've asked LuAnn to work with Jenn Hood to test the claim submissions by setting up alternate consolidation rules.  (2 per one line, 1 per one line, etc.)
6.      Although the announcement below indicates that this process would be effective on April 1, 2013. It appears all excess units were being paid right up until 12/31/2013.


Effective April 1, 2013, CMS is converting some claim line MUEs to date of service (DOS) MUEs.  The total units of service (UOS) from all claim lines for a HCPCS/CPT code with the same date of service will be summed and compared to the MUE value.  Claims denied based on DOS MUEs may be appealed using similar processes to claim line MUE denials.  DOS MUEs are based on criteria including, but not limited to, anatomic considerations, CPT code descriptors or instructions, and nature of equipment or service.  CMS does not publish which codes have DOS MUEs.  Since all UOS for a HCPCS/CPT

ML_DE_00058394

code on all claim lines with the same date of service are summed, reporting additional UOS on separate claim lines with a HCPCS/CPT modifier will not result in payment of UOS in excess of the MUE value.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Susan Ahl
**Sent:** Tuesday, February 18, 2014 9:30 AM
**To:** Richard Guzman; Daniel Pencak; Cheryl Stokes
**Subject:** Noridian

Rick

Are you calling Noridian today – Let's schedule some time and/or please pass your contact information and I will call them with the team.

Thank You

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA 92127
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com

(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

ML_DE_00058395

Message
_____

**From:**    Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL PENCAK]
**Sent:**    2/21/2014 12:49:18 AM
**To:**      Richard Guzman [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Richard Guzman]; Susan Ahl [/O=MILLENNIUM
             LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Susan Ahlc25];
             Tim Kennedy [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tim Kennedy3d8]; Jennifer Hood [/O=MILLENNIUM
             LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jennifer
             Hood85a]
**Subject:** RE: Noridian


For $1.4 million a month, I'd like to hear from XIFIN that ALL customers are losing this revenue before we update the consolidation rules to limit our units being billed.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 4:22 PM
**To:** Susan Ahl; Tim Kennedy; Daniel Pencak; Jennifer Hood
**Subject:** RE: Noridian


The rule below is what we are currently doing and those claims are being denied.  The new policy (excerpt from the email below) states that even if we separate the lines and use the modifier, Medicare will still not pay.


Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Susan Ahl
**Sent:** Thursday, February 20, 2014 4:11 PM
**To:** Tim Kennedy; Richard Guzman; Daniel Pencak; Jennifer Hood
**Subject:** RE: Noridian


Tim


This is a response from XIFIN related to Consolidation Rule Modifications.  Rick and Jennifer, what do you think?

Confidential                                                                    ML_DE_00054258

The rule is of course driven by the MUE by payor so it will vary based on procedure code and payor.  But, as an example, if 83925 has a DOS unit edit of 4 then the rule would be set up to bill 4 units on one line with an 83925 (no modifier) and the remaining additional units over and above the MUE units on a second claim line with 83925 and a 91 or 59 modifier.  Note that the use of the 91 or 59 modifier should be confirmed with your certified coder(s).


Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 4:08 PM
**To:** Richard Guzman; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Thanks Rick for the clarification.

Is there not a way to bill for the units in excess of the MUE with a modifier or some other code?
Has XIFIN weighed in on alternatives yet?


Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 3:39 PM
**To:** Tim Kennedy; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

The $2.5m that has been denied is not a complete picture for the month because not all January claims have been adjudicated.  If we apply the current behavior across all billings for January, I would expect denied amounts to grow to approx. $4m (this is the amount that we bill for those codes in which the unit limit was exceeded).

So the math would look like this using round numbers:

$4.0m total monthly denials
$2.8m portion of the $4m that could be recouped if we resubmit claims not to exceed the caps
$1.2m is monthly amount that we may not be able to recover because it exceeds the MUE for date of service = $14.4m per year

Hope this makes more sense?

Confidential

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 3:12 PM
**To:** Richard Guzman; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Rick,

Just making sure I understand correctly (if not, please correct my interpretation presented below):

$2.50M  (Total monthly denials)
Less: $1.25M  (ML could bill at the MUE level and get paid)
$1.25M  (total at risk)
Less: $1.17M  (ML could bill units above the MUE level and potentially get paid at ~93% of billed)
$0.08M  (Remainder not paid = $80,000 per month or $960,000 per year)

Questions:
* Is the above directionally correct?
* Is this what XIFIN recommends to deal with this issue?

Thanks, Tim

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 2:22 PM
**To:** Tim Kennedy; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

We are still getting denied on 83925 and 82542 if units billed are in excess of the MUE.  So far, the amount being denied due to MUE is approx. $2.5m. (starting 1/1/14 dates of service for all adjudications to date).

| | MUE | % of Claims in excess of MUE | Avg. # of Units beyond the MUE |
|---|---|---|---|
| 83925 | 4 | 48% | 1.89 |
| 82542 | 6 | 15% | 3.04 |

Confidential

ML_DE_00054260

If we were to bill those codes for units NOT TO EXCEED the limit, then the amount of monthly billed charges at risk is approx. $1.25m.  We typically collect 93% of billed charges, so the monthly revenue loss would be slightly less.

| | Monthly Avg. Units billed | Units billed with modifier (in excess of MUE) | Medicare Rate | Amount of Billed |
|---|---|---|---|---|
| 83925 | 153,657 | 33,693 | $26.54 | 894,212 |
| 82542 | 162,670 | 14,924 | $24.14 | 360,265 |
| | | | | 1,254,478 |

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Tuesday, February 18, 2014 3:45 PM
**To:** Daniel Pencak; Susan Ahl; Richard Guzman
**Subject:** RE: Noridian

All,

Let's dig a bit more on this whole issue and have some answers to the questions likely to be asked and have answers for them:

* Find out what Xifin has to say about this and if others are experiencing payment issues
* Of the $2.5M indicated below – what is the real at risk amount above the unit edit of 4 for 83925 and unit edit of 6 for 82542 (if we resubmit at the MUE level, we expect that we'll get paid, correct?)
* Let's decide with Lale and Terri of Xifin if item #5 is the best procedure for ML to start with

In the meantime, I'll make Howard aware of the issue but tell him we're still gathering all our facts.

Thanks, Tim

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Daniel Pencak
**Sent:** Tuesday, February 18, 2014 1:17 PM
**To:** Susan Ahl; Tim Kennedy; Richard Guzman
**Subject:** FW: Noridian

Confidential

I recommend we meet briefly to discuss this. We should also include Howard.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

---

**From:** Richard Guzman
**Sent:** Tuesday, February 18, 2014 1:14 PM
**To:** Susan Ahl; Daniel Pencak; Cheryl Stokes
**Cc:** LuAnn Merrill; Colm Driscoll
**Subject:** RE: Noridian

I had Veronica call Noridian earlier today (the hold time was almost an hour) regarding our call on Friday.

1.      They are referring us to the bulletin below relating to MUEs.  Basically, it appears that Noridian is applying the CMS MUE's and asking us to file reconsiderations if we want to get paid.
2.      83925 has a DOS unit edit of 4 and 82542 is unpublished but we have determined to be 6.  Starting on 1/1/14 DOS, they are denying all line items with CO96 (non-covered) if we bill in excess of the MUE. (For example, on 83925, if we bill 4, they pay 4.  If we bill 5, they pay 0.)
3.      82205 has an edit of 1 unit per DOS, but excess units are still being paid.
4.      On many of these denials, they have re-adjudicated the claim and subsequently paid the code without us doing anything.  However, $2.5m of billed charges remains outstanding of underpayments (where the claim has been paid, but these units were denied).
5.      I've asked LuAnn to work with Jenn Hood to test the claim submissions by setting up alternate consolidation rules.  (2 per one line, 1 per one line, etc.)
6.      Although the announcement below indicates that this process would be effective on April 1, 2013. It appears all excess units were being paid right up until 12/31/2013.


Effective April 1, 2013, CMS is converting some claim line MUEs to date of service (DOS) MUEs.  The total units of service (UOS) from all claim lines for a HCPCS/CPT code with the same date of service will be summed and compared to the MUE value.  Claims denied based on DOS MUEs may be appealed using similar processes to claim line MUE denials.  DOS MUEs are based on criteria including, but not limited to, anatomic considerations, CPT code descriptors or instructions, and nature of equipment or service.  CMS does not publish which codes have DOS MUEs.  Since all UOS for a HCPCS/CPT code on all claim lines with the same date of service are summed, reporting additional UOS on separate claim lines with a HCPCS/CPT modifier will not result in payment of UOS in excess of the MUE value.


Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

Confidential

**From:** Susan Ahl
**Sent:** Tuesday, February 18, 2014 9:30 AM
**To:** Richard Guzman; Daniel Pencak; Cheryl Stokes
**Subject:** Noridian

Rick

Are you calling Noridian today – Let's schedule some time and/or please pass your contact information and I will call them with the team.

Thank You

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA 92127
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com



(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

Confidential

# EXHIBIT 26

Message

| | |
|---|---|
| **From:** | Susan Ahl [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SUSAN AHLC25] |
| **Sent:** | 3/19/2014 12:23:01 AM |
| **To:** | Tim Kennedy [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tim Kennedy3d8] |
| **CC:** | LuAnn Merrill [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LuAnn Merrill3b5]; Colm Driscoll [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Colm Driscoll]; Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Daniel Pencak]; Richard Guzman [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Richard Guzman] |
| **Subject:** | RE: Medicare MUE - update on denials |

Thank you

Tim, we continue to receive denials on a few of the scenarios that were recently billed to Medicare.  Not all have been returned so we continue to review daily, along with those that were appealed which will take a much longer time.  This is a variance report so that you can see the difference if we just bill out the max allowed by Medicare and forfeit the remainder.

We would forfeit the $2.1M at this point, and recover the $4.3M if billed within allowed.

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x2007
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Tuesday, March 18, 2014 4:11 PM
**To:** Susan Ahl
**Cc:** LuAnn Merrill; Colm Driscoll; Daniel Pencak; Tim Kennedy
**Subject:** Medicare MUE - update on denials

Susan – here is an update on denials that we have received related to the MUE issue.

To date, a total of $6.5m (Medicare rate expect) has been denied – $4.4m of which we could resubmit with cap on MUE.  The other $2.1m represents the portion of the CPTs billed with a modifier (exceed the edit limit) and is questionable.  See table below.  February has not yet been fully adjudicated, so I expect the totals to resemble January's once all payments are in.

| DOS Mo | Max units | Units over Max | Total |
|---|---|---|---|
| Dec-13 | 714,352 | 379,649 | 1,094,001 |
| Jan-14 | 2,342,063 | 1,124,359 | 3,466,421 |
| Feb-14 | 1,334,631 | 654,521 | 1,989,152 |
| | 4,391,045 | 2,158,529 | 6,549,574 |

Confidential

A bit of good news...we received a payment from Medicare today of $2.3m, which is about 5x their recent average payment.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
16981 Via Tazon
San Diego, CA 92127
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com

(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

ML_DE_00054045

# EXHIBIT 27

Confidential

ML_DE_00689868





# Coding and Reimbursement Assessment for Drugs of Abuse Testing

Prepared for Millennium Laboratories

**DRAFT**

February 21, 2014

avalerehealth.net

CONFIDENTIAL: This report contains non-public information regarding AMA's October 2013 CPT editorial panel meeting

The information presented in this document should not be construed as legal, tax, accounting, investment, or regulatory advice. Avalere assumes no responsibility or liability for any business or investment decisions by any party based upon the information contained herein.

# Project Objective

- Millennium Laboratories ("Millennium") asked Avalere Health to conduct an assessment of coverage and reimbursement for drugs of abuse testing

- The focus of this project was on the impact of the changes proposed by the Quantitative Drug Testing Workgroup of the American Medical Association (AMA) Current Procedural Terminology (CPT®) Editorial Panel

- Key questions investigated include:

  - How will Millennium's current codes map to the new drug testing CPT codes?

  - How might the Centers for Medicare & Medicaid Services (CMS) choose to approach pricing these new CPT codes under Medicare?

  - If CMS crosswalks the codes using existing codes and payment rates, what could the new Medicare payment rates look like?

- Avalere also assessed other potential coverage and reimbursement changes, including:

  - The upcoming Medicare Clinical Laboratory Fee Schedule (CLFS) review

  - The draft Local Coverage Decision (LCD) related to Drugs of Abuse testing currently proposed by Noridian Healthcare Solutions (Millennium's Medicare Administrative Contractor)



Avalere | 2

Confidential

ML_DE_00689869

# Executive Summary

Confidential

- CMS will hold a public meeting in July of 2014 to allow for comments on crosswalking or gap-filling the **new AMA drug testing CPT codes**

    - Preliminary and final decisions from CMS will be published in September and November, respectively

- If CMS decides to crosswalk these codes, it would likely look at Medicare claims data to inform its analysis; Avalere used a similar approach in our payment estimating exercise

- Under our model, Medicare payments would:

    - Remain the same for the majority of drug tests

    - Increase 7% to 33% for 11 drug tests, depending on the test/drug class

    - Decline -6% to -30% for 2 drug tests, depending on the test/drug class

    - These three categories represent 58%, 29% and 13%, respectively, of Millennium's total testing volume; however, Millennium's Medicare mix may differ from its total mix

- These changes in Medicare reimbursement are not generalizable to other payers; other insurers may incorporate CMS' changes or instead choose to set payments in a different manner

- There are several important limitations to our approach, which we outline starting on page 20

- The new drug testing codes are being implemented at a time when underlying values of existing CLFS codes are being reviewed by CMS; as a result, this review may also impact payment for the new AMA drug testing CPT codes, especially if crosswalking is the methodology used

AMA = American Medical Association; CLFS = Clinical Laboratory Fee Schedule; CMS = Centers for Medicare & Medicaid Services; CPT = Current Procedural Terminology



Avalere | 3

ML_DE_00689870

Confidential

# Executive Summary (continued)

- CMS' **CLFS review** will also directly affect 7 of Millennium's codes (14% of total volume) that are not impacted by the new AMA drug testing codes

  - Payment changes for these codes are likely to be implemented over the next two years; directionally, these codes are likely to see reductions, although the magnitude remains uncertain

- Noridian's **draft LCD** concerning coverage of drugs of abuse testing is, in our opinion, likely to be finalized largely in its current form, given its similarity to the recently-finalized CGS draft LCD

  - CGS finalized its proposal in January, 2014 without significant changes to the draft

- The draft LCD would require all orders for quantitative drug testing for patients being treated for substance use or abuse to be preceded by a qualitative screen, and allow only for those drugs classes with a positive screen to be tested quantitatively

CLFS = Clinical Laboratory Fee Schedule; CMS = Centers for Medicare & Medicaid Services;
LCD = Local Coverage Decision

 Avalere | 4

ML_DE_0068871

Confidential

# Table of Contents

- Code Mapping to Proposed Presumptive and Definitive CPT Codes – p. 6

- Payment Scenarios for New CPT Codes – p. 15

- Assessment of Medicare Clinical Lab Fee Schedule (CLFS) Revaluation – p. 37

- Draft Drugs of Abuse Local Coverage Determination (LCD) – p. 43

ML_DE_0068972



Code Mapping to Proposed Presumptive and Definitive CPT Codes

Avalere

Confidential

# Overview of AMA-Accepted Changes to Drugs of Abuse Testing CPT Codes

Confidential

- The AMA's changes to the CPT coding for drug testing represent an effort to better define the purpose and use of various testing modalities

- According to the minutes from the AMA's October 2013 CPT Editorial Panel meeting[1], drug testing procedures will be divided into three subsections:

  1. **Presumptive** – procedures used to identify the possible use or non-use of a drug or drug class that may be followed by a definitive test in order to identify specific drugs or metabolites

  2. **Definitive** – procedures that are qualitative or quantitative and are used to identify specific drugs and associated metabolites

  3. **Therapeutic Drug Monitoring** – assays performed to monitor the clinical response to a prescribed medication

     - Therapeutic Drug Monitoring codes will be limited only to whole blood, serum or plasma samples, and are not relevant to Millennium's current lines of business

- The new presumptive testing codes are not specific to any particular drug but are divided into two drug classes:

  Drug Class A – drugs commonly assayed by presumptive procedures where the result can typically be read by direct optical observation (e.g. dipsticks, cups, cards, etc.)

  Drug Class B – drugs commonly assayed by presumptive procedures that typically require more resources than Drug Class A (e.g. ELISA)

- The new definitive drug testing code series is drug class-specific (e.g. alcohol(s), amphetamines, benzodiazepines, etc.), with some classes divided into frequency bands based on the number of drugs tested

[1] Non-public minutes from the AMA meeting were provided to Avalere by Millennium Laboratories.

ML_DE_00689874



Avalere | 7

Confidential

Case 17-51840-LSS   Doc 341-2   Filed 02/10/23   Page 657 of 925

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| 83516 | NA | Acetaminophen | Drug screen, presumptive, single drug class from Drug Class List B | 801XX4A | NA | NA |
| 82055 | NA | Alcohol testing as an enzyme assay only | Alcohol(s) | 801XX2A | 801XY1 | NA |
| G0431/80101 | 80154 | Alprazolam; clonazepam; lorazepam; nordazepam; temazepam; oxazepam | Benzodiazepines | 801XX2A | 801XY5, 801XY6 | 801XY5; 1-12 801XY6; 12+ |
| NA | 80152 | Amitriptyline | Antidepressants, Tricyclic and other cyclicals | NA | 801XY25-801XY27 | 801XY25; 1-2 801XY26; 3-5 801XY27; 6+ |
| G0431/80101 | 82145 | Amphetamine, Methamphetamine | Amphetamines | 801XX2A | 801XY18-801XY20 | 801XY18; 1-2 801XY19; 3-4 801XY20; 5+ |
| NA | 82542 | Aripiprazole; clozapine; olanzapine; quetiapine; risperidone | Antipsychotics | NA | 801XY31-801XY33 | 801XY31; 1-3 801XY32; 4-6 801XY33; 7+ |
| G0431/80101 | 83925 | Buprenorphine | Buprenorphine | 801XX2A | 801XY12 | NA |
| NA | 82542 | Bupropion; venlafaxine | Antidepressants, not otherwise specified | NA | 801XY27A | NA |
| G0431/80101 | 82205 | Butalbital | Barbiturates | 801XX2A | 801XY4 | NA |
| NA | 82542 | Cannabinoids, synthetic | Cannabinoids, synthetic | NA | 801XY38-801XY40 | 801XY38; 1-3 801XY39; 4-6 801XY40; 7+ |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

ML_DE_00689875

Avalere | 8

Confidential

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| G0431 | 83805 | Carisoprodol | Skeletal muscle relaxants | 801XX4A | 801XY14-801XY14A | 801XY14; 1-2 801XY14a; 3+ |
| NA | 82542 | Cathinones | Stimulants, synthetic | NA | 801XY41 | NA |
| NA | 82542 | Citalopram; duloxetine; fluoxetine; paroxetine | Antidepressants, serotonergic class | NA | 801XY22-801XY24 | 801XY22; 1-2 801XY23; 3-5 801XY24; 6+ |
| G0431/80101 | 82520 | Cocaine | Cocaine | 801XX2A | 801XY43 | NA |
| G0431/80101 | 83925 | Codeine; morphine | Opiates | 801XX2A | 801XY7 | NA |
| NA | 82542 | Cyclobenzaprine | Skeletal muscle relaxants | NA | 801XY14-801XY14A | 801XY14; 1-2 801XY14a; 3+ |
| NA | 80160 | Desipramine | Antidepressants, Tricyclic and other cyclicals | NA | 801XY25-801XY27 | 801XY25; 1-2 801XY26; 3-5 801XY27; 6+ |
| NA | 82542 | Dextromethorphan; naltrexone | Opioids and opiate analogs | NA | 801XY15-801XY17 | 801XY15; 1-2 801XY6; 3-4 801XY17; 5+ |
| G0431/80101 | 82542 | Ethyl glucuronide | Alcohol Biomarkers | 801XX4A | 801XY2-801XY3 | 801XY2; 1-2 801XY3; 3 + |
| G0431/80101 | 83925 | Fentanyl | Fentanyls | 801XX4A | 801XY13 | NA |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

Avalere | 9

Case 17-51840-LSS    Doc 341-2    Filed 02/10/23    Page 658 of 925

ML_DE_00689876

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| NA | 82542 | Gabapentin | Gabapentin, non-blood | NA | 801XY13B | NA |
| NA | 80173 | Haloperidol | Antipsychotics | NA | 801XY31-801XY33 | 801XY31; 1-3 801XY32; 4-6 801XY33; 7+ |
| G0431/80101 | 83925 | Heroin | Heroin metabolite | 801XX2A | 801XY9 | NA |
| G0431/80101 | 82646 | Hydrocodone | Opiates | 801XX2A | 801XY7 | NA |
| G0431/80101 | 82649 | Hydromorphone | Opiates | 801XX2A | 801XY7 | NA |
| NA | 80174 | Imipramine | Antidepressants, Tricyclic and other cyclicals | NA | 801XY25-801XY27 | 801XY25; 1-2 801XY26; 3-5 801XY27; 6+ |
| NA | 82542 | Ketamine | Ketamine and Norketamine | NA | 801XY9A | NA |
| G0431/80101 | 82145 | MDMA | Methylenedioxyamphetamines | 801XX2A | 801XY17B | NA |
| G0431/80101 | 83925 | Meperidine | Opioids and opiate analogs | 801XX4A | 801XY15-801XY17 | 801XY15; 1-2 801XY6; 3-4 801XY17; 5+ |
| NA | 83840 | Methadone | Methadone | 801XX2A | 801XY10 | NA |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

Confidential

ML_DE_00689877

Avalere | 10

Confidential

# CPT Code Mapping to New AMA Drug Testing Codes

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| NA | 82542 | Methylphenidate | Methylphenidate | NA | 801XY17C | NA |
| NA | 82101 | Mitragynine (Kratom) | Alkaloids, not otherwise specified | NA | 801XY44 | NA |
| G0431/80101 | NA | Nicotine | Drug screen, presumptive, single drug class from Drug Class List B | 801XX4A | NA | NA |
| NA | 80182 | Nortripyline | Antidepressants, Tricyclic and other cyclicals | NA | 801XY25-801XY27 | 801XY25; 1-2 801XY26; 3-5 801XY27; 6+ |
| G0431/80101 | 83925 | Oxycodone; oxymorphone | Oxycodone | 801XX2A | 801XY8 | NA |
| G0431/80101 | 83992 | Phencyclidine | Phencyclidine | 801XX2A | 801XY21 or 83992[2] | NA |
| G0431/80101 | 80184 | Phenobarbital | Barbiturates | 801XX2A | 801XY4 | NA |
| NA | 85242 | Phentermine | Amphetamines | NA | 801XY18-801XY20 | 801XY18; 1-2 801XY19; 3-4 801XY20: 5+ |
| NA | 82542 | Pregabalin | Pregabalin | NA | 801XY13A | NA |
| G0431/80101 | 83925 | Propoxyphene | Propoxyphene | 801XX2A | 801XY7A | NA |
| G0431/80101 | 82205 | Secobarbital | Barbiturates | 801XX2A | 801XY4 | NA |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set
[2] The AMA minutes show a new code number for definitive phencyclidine in one place (801XY21), and the existing code number in another (83992). CPT will need to reconcile prior to publishing, but we list both codes in the table above

Avalere | 11

Case 17-51840-LSS   Doc 341-2   Filed 02/10/23   Page 660 of 925

ML_DE_00689878

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| NA | 83925 | Tapentadol | Tapentadol | NA | 801XY42 | NA |
| G0431/80101 | 82542 | THC | Cannabinoids, natural | 801XX2A | 801XY37 | NA |
| NA | 82542 | Tramadol | Tramadol | NA | 801XY48 | NA |
| G0431/80101 | 82542 | Zolpidem | Sedative Hypnotics | 801XX4A | 801XY7B | NA |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set



Avalere | 12

Confidential

Case 17-51840-LSS   Doc 341-2   Filed 02/10/23   Page 661 of 925

ML_DE_00689879

# Drugs Not Currently Tested by Millennium

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| NA | NA | NA | Anabolic steroids | NA | 801XY44A-801XY44B | 801XY44A; 1-2 801XY44B; 3+ |
| NA | NA | NA | Analgesics, non-opioid | NA | 801XY28-801XY30 | 801XY28; 1-2 801XY29; 3-5 801XY30; 6+ |
| NA | NA | NA | Antiepileptics | NA | 801XY34-801XY36 | 801XY34; 1-3 801XY35; 4-6 801XY36; 7+ |
| NA | NA | NA | Hypnotics, sedative (non-benzodiazepines) | NA | 801XY7B | NA |
| NA | NA | NA | Non-Benzodiazepines – see Hypnotics, sedative | NA | 801XY7B | NA |
| NA | NA | NA | Norketamine – see Ketamine | NA | 801XY9A | NA |
| NA | NA | NA | Not Otherwise Specified | NA | 801XY45-47 | 801xy45; 1-3 801xy46; 4-6 801xy47; 7+ |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

 Avalere | 13

Confidential

ML_DE_00689880

Confidential

# Additional Codes (Direct Observation, TLC, and Other)

| New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|
| Drug screen, any number of drug classes from Drug Class List A; any number of non-TLC devices or procedures, (eg, immunoassay) capable of being read by direct optical observation including instrumented-assisted when performed (eg, dipsticks, cups, cards, cartridges), per date of service. | 801XXX1 | NA | NA |
| Drug screen, any number of drug classes from Drug Class List A or B, presumptive, single or multiple drug class method; thin layer chromatography procedure(s) (TLC)(eg, acid, neutral, alkaloid plate), per date of service; | 801XXX6 | NA | NA |
| Not otherwise specified presumptive procedure (eg, TOF, MALDI, LDTD, DESI, DART), each procedure | 801XXX7 | NA | NA |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

Avalere | 14

ML_DE_00689881

# Payment Scenarios for New CPT Codes



Avalere

Confidential

# There are Several Approaches CMS May Take to Address the New Drug Testing CPT Codes

- CMS typically uses one of two methodologies to determine payment rates for new codes:

  - **Crosswalking** – The new code is assigned the current local fee schedule and National Limitation Amount (NLA) as a comparable, existing test or multiple existing tests

  - **Gap-filling** – Local Medicare contractors each price the test based on charges, costs, and other factors. The local payment rates are used to establish the NLA for the new test

- For this task, Avalere assumes CMS will use a national crosswalk methodology, i.e., that CMS will map predicate codes to newly created codes and assign payment based in part on existing payment rates

- Using an alternative methodology could lead CMS to develop different payment rates for the codes from those we estimated, and further, could delay timing of the implementation of the new rates

Source: CMS Innovators' Guide to Navigating Medicare, pg. 47. Link.

 Avalere | 16

Confidential

ML_DE_00689883

# Likelihood of Various Approaches to Addressing New Drug Testing CPT Codes

| Scenario | Likelihood |
|---|---|
| CMS uses a national crosswalk methodology to determine prices for the new CPT codes using existing payment rates or revised rates from the CLFS valuation review | MODERATE |
| CMS uses a "gap-fill" methodology, allowing individual MACs to determine pricing for one year and then 'gap-filling' to a national fee schedule | MODERATE |
| CMS chooses to replace the existing quantitative drug testing chemistry codes with definitive codes, while continuing to use existing G-codes G0431 and G0434 (revised or not) for presumptive testing | LOW |
| CMS chooses not to implement any of the AMA panel's recommendations and instead continues to utilize the existing screening G-codes and confirmation codes, regardless of class or drug tested | LOW |

Confidential

ML_DE_00689884



Avalere | 17

# Methodology

Avalere's approach to crosswalk payments to new CPT drug testing codes depends on the *type* of new CPT code:

1. For new CPT codes that encompass a *single* drug test and where there is a single payment rate

    - Example: buprenorphine (801XY12) is currently tested and billed once using 83925 (assay of opiates)

    - We estimate payment will be based on one unit of the previously billed code

2. For new CPT codes that encompass *multiple* drug tests and where there is a single payment rate

    - Example: Methylenedioxyamphetamines (801XY17B) covers tests for MDA, MDMA, and MDEA, and is currently billed by Millennium once using 82145 (assay of amphetamines)

    - We estimate payment will be based on the weighted average of the number of times the code is billed per claim per day within the industry[1]

3. For new CPT codes that encompass multiple drug tests and where payment is based on the number of drugs tested (i.e., 1-2, 3-5, 6+)

    - Example: antidepressants, serotonergic class (801XY22-24) includes Millennium's tests for citalopram, duloxetine, fluoxetine, paroxetine, as well as 3 additional drugs for which Millennium is not currently billing

    - We estimate payment will be based on the weighted average of the number of times the code is billed per claim per day within the industry[1], within each of the frequency categories (1-2, 3-4, 6+)

For each code, we state our assumptions and rationale for our estimated payment amounts. For some crosswalks, we make additional clarifying assumptions which are noted as well.

---

[1] Industry refers to the Medicare fee-for-service population.

 Avalere | 18

Confidential

ML_DE_00689885

# Medicare Frequency of CPT Codes Per Claim Per Day

Confidential

**Percent of Time CPT Code is Billed Per Claim Per Day, Medicare FFS**

| CPT | Description | 1x | 2x | 3x | 4x | 5x | 6x | 7x | 8x | 9x | 10x | >10x |
|-----|-------------|------|------|------|------|------|------|-----|------|------|------|------|
| 82542 | Column chromatography | 41.1% | 20.3% | 12.4% | 12.1% | 4.3% | 5.3% | 1.0% | 0.4% | 0.9% | 0.2% | 2.0% |
| 82101 | Assay of urine alkaloids | 99.6 | 0.2 | | | | 0.2 | | | | | |
| 82145 | Assay of amphetamines | 83.0 | 15.7 | 1.1 | 0.1 | 0.1 | | | | | | |
| 80152 | Assay of amitriptyline | 99.9 | 0.1 | | | | | | | | | |
| 80160 | Assay of desipramine | 100.0 | | | | | | | | | | |
| 80174 | Assay of imipramine | 100.0 | | | | | | | | | | |
| 80182 | Assay of nortriptyline | 100.0 | | | | | | | | | | |
| 80173 | Assay of haloperidol | 100.0 | | | | | | | | | | |
| 80184 | Assay of phenobarbital | 99.6 | 0.4 | | | | | | | | | |
| 82205 | Assay of barbiturates | 72.5 | 27.3 | 0.1 | 0.1 | | | | | | | |
| 80154 | Assay of benzodiazepines | 87.7 | 11.0 | 0.3 | 0.1 | 0.1 | 0.5 | | 0.1 | 0.1 | | 0.1 |
| 83925 | Assay of opiates | 27.6 | 16.7 | 17.2 | 21.9 | 6.2 | 6.1 | 3.0 | 0.9 | 0.2 | 0.1 | 0.1 |
| 82520 | Assay of cocaine | 97.9 | 2.0 | | | | | | | | | |
| 83840 | Assay of methadone | 76.2 | 23.8 | | | | | | | | | |
| 82646 | Assay of dihydrocodeinone | 100.0 | 0.0 | | | | | | | | | |
| 82649 | Assay of dihydromorphinone | 99.9 | 0.1 | | | | | | | | | |
| 83992 | Assay for phencyclidine | 99.8 | 0.2 | | | | | | | | | |
| 83805 | Assay of meprobamate | 98.6 | 1.4 | | 0.1 | | | | | | | |
| 82055 | Assay of ethanol | 97.5 | 2.4 | 0.1 | | | | | | | | |
| G0431 | Drug screen multiple class | 96.4 | 0.7 | 0.1 | 0.2 | 0.6 | 0.3 | 0.4 | 0.5 | 0.2 | 0.4 | 0.3 |
| 83516 | Immunoassay nonantibody | 63.3 | 22.1 | 6.5 | 6.3 | 0.4 | 0.3 | 0.1 | 0.5 | 0.2 | | 0.2 |

Note: blank cells indicate no testing occurred at the given frequency, or that the frequency was less than 0.1%;
Values in rows may not add to 100% due to rounding.
Source: Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

ML_DE_00689886

Avalere | 19

# Assumptions and Limitations

Avalere made a number of assumptions as part of this payment estimation exercise, and recognizes there are limitations to the approach:

- This analysis assumes that CMS will crosswalk payment rates for the new drug testing codes from existing CPT codes; CMS could instead opt to gap-fill these codes, in which case payment rates would be determined by each Medicare Administrative Contractors (MAC)

- In many instances, we assumed that Millennium is representative of the entire industry in its billing patterns; furthermore, we incorporated only those codes used by Millennium into our pricing estimates

  - If other labs are billing for similar tests using different codes, the discrepancy could skew the results of the analysis; for example, other labs may be using mass spectrometry instead of chromatography, whereas we excluded the mass spectrometry codes from our analysis

  - In addition, we assume that Millennium's testing practices within a specific drug class are representative of the rest of the industry (e.g. 801XY41 encompasses 15+ synthetic stimulants and we assume that laboratories are only testing for one synthetic stimulant)

- Presumptive drug testing codes and drugs for which Millennium is not currently testing were excluded from this analysis

- This analysis ignores any potential payment changes due to the Clinical Lab Fee Schedule (CLFS) revaluation

- CMS could decide to survey the industry to collect data which, in turn, could result in different payment rates

- Estimated changes in Medicare rates cannot be applied to total Millennium test volume, as Millennium's Medicare mix may differ from its total mix

Confidential

ML_DE_00689887



Avalere | 20

Confidential

# Limitations – Estimates Using Method-based Codes

- A major limitation to our approach is that method-based codes (specifically, 82542 – column chromatography) are used to bill for a wide variety of tests

- We are unable to determine from the Medicare claims data which specific drugs are tested when a lab bills 82542 (column chromatography)

  - As a result, the industry frequencies related to these codes, and used in our analysis, likely overstate the actual frequency of each individual test

  - CMS would face a similar limitation when crosswalking these codes, as they would look at the same claims data when considering new payment rates

- This limitation may affect our pricing estimates for the following classes of drugs, which represent 8% of Millennium's current total testing volume[1]

  - Antidepressants, Serotonergic Class (801XY22-24)

  - Antidepressants, Not Otherwise Specified (801XY27A)

  - Cannabinoids, Synthetic (801XY38-40)

  - Opioids and Opiate Analogs (801XY15-17)

  - Skeletal Muscle Relaxants (801XY14-14A)

[1] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 21

ML_DE_00689888

Confidential

# Summary of Projected Medicare Payment Changes

| Drug Class | % of Millennium Total Volume[1] | Est. % Change in Millennium's Medicare Payment[2] | Key Driver / Assumption[3] |
|---|---|---|---|
| Barbiturates | 8.9% | -24% | Millennium tests *more* frequently than Medicare FFS |
| Skeletal muscle relaxants | 4.5% | -6 to -30% | Millennium tests *more* frequently than Medicare FFS |
| Amphetamines | 3.7% | 12% | Millennium tests *less* frequently than Medicare FFS |
| Benzodiazepines | 3.7% | 18% | Millennium tests *less* frequently than Medicare FFS |
| Cocaine | 3.7% | 2% | Millennium tests *less* frequently than Medicare FFS |
| Methadone | 3.7% | 24% | Millennium tests *less* frequently than Medicare FFS |
| Alcohol Biomarkers | 2.3% | 33% | Millennium tests *less* frequently than Medicare FFS |
| Cannabinoids, synthetic | 2.0% | 33% | Millennium tests *less* frequently than Medicare FFS |
| Methylenedioxyamphetamines | <0.1% | 19% | Millennium tests *less* frequently than Medicare FFS |
| Opioids and opiate analogs | 1.4% | 12 to 25% | Millennium tests less frequently than Medicare FFS within each new frequency band (e.g., 1-2, 3-5, 6+) |
| Antidepressants, serotonergic class | 0.5% | 7% | Millennium tests less frequently than Medicare FFS within each new frequency band (e.g., 1-2, 3-5, 6+) |
| Antipsychotics | <0.1% | 26% | Millennium tests less frequently than Medicare FFS within each new frequency band (e.g., 1-2, 3-5, 6+) |

FFS = Fee For Service
[1] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[2] These changes exclude the potential impact of the CLFS revaluation.
[3] Please refer to individual slides in this report for complete details related to assumptions and methodology.

ML_DE_00689889



Avalere | 22

# Simple Drug Crosswalks with No Est. Change in Payment

Confidential

| Drug / Class | Old Code | Ordered Test Ratio[1] | Old Description | New Code | Current NLA | Est. New Payment | Diff from NLA |
|---|---|---|---|---|---|---|---|
| Phencyclidine | 83992 | 56.4% | Assay for phencyclidine | 801XY21 | $20.05 | $20.05 | 0.0% |
| Buprenorphine | 83925 | 64.9 | Assay of opiates | 801XY12 | 26.54 | 26.54 | 0.0 |
| Fentanyls | 83925 | 62.7 | Assay of opiates | 801XY13 | 26.54 | 26.54 | 0.0 |
| Heroin metabolite | 83925 | 69.5 | Assay of opiates | 801XY9 | 26.54 | 26.54 | 0.0 |
| Oxycodone | 83925 | 91.3 | Assay of opiates | 801XY8 | 26.54 | 26.54 | 0.0 |
| Propoxyphene | 83925 | 9.3 | Assay of opiates | 801XY7A | 26.54 | 26.54 | 0.0 |
| Tapentadol | 83925 | 27.9 | Assay of opiates | 801XY42 | 26.54 | 26.54 | 0.0 |
| Alkaloids, not specified | 82101 | 6.3 | Assay of urine alkaloids | 801XY44 | 40.95 | 40.95 | 0.0 |
| Cannabinoids, natural | 82542 | 79.3 | Column chromatography | 801XY37 | 24.63 | 24.63 | 0.0 |
| Ketamine / Norketamine | 82542 | 14.3 | Column chromatography | 801XY9A | 24.63 | 24.63 | 0.0 |
| Methylphenidate | 82542 | 26.1 | Column chromatography | 801XY17C | 24.63 | 24.63 | 0.0 |
| Pregabalin | 82542 | 9.4 | Column chromatography | 801XY13A | 24.63 | 24.63 | 0.0 |
| Stimulants, synthetic | 82542 | 36.6 | Column chromatography | 801XY41 | 24.63 | 24.63 | 0.0 |
| Tramadol | 82542 | 46.7 | Column chromatography | 801XY48 | 24.63 | 24.63 | 0.0 |
| Gabapentin, non-blood | 82542 | 14.8 | Column chromatography | 801XY13B | 24.63 | 24.63 | 0.0 |
| Sedative Hypnotics | 82542 | 22.9 | Column chromatography | 801XY7B | 24.63 | 24.63 | 0.0 |

**Rationale:**

The new classes under this section each encompass testing for a single drug. As a result, Avalere assumes payment for the new code will be equal to that of one unit of the old code. For example, previously a single test for Phencyclidine would have been billed once using 83992. We assume that the new code for Phencyclidine, 801XY21, will be paid at the same rate as 83992.

NLA = National Limitation Amount
[1] Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

ML_DE_00689890

 Avalere | 23

Confidential

# Simple Drug Crosswalks with Changes in Est. Payment

| Drug / Class | Old Code | Old Description | New Code | Current NLA | Medicare Avg. Units/Claim[1] | Est. New Payment | Diff from NLA |
|---|---|---|---|---|---|---|---|
| Methylenedioxy-amphetamines | 82145 | Assay of amphetamines | 801XY17B | $21.20 | 1.186 | $25.14 | +18.6% |
| Cocaine | 82520 | Assay of cocaine | 801XY43 | $20.68 | 1.021 | $21.12 | +2.1% |
| Methadone | 83840 | Assay of methadone | 801XY10 | $22.28 | 1.239 | $27.61 | +23.9% |

**Rationale:**

The new classes under this section each encompass tests for *multiple* drugs within a class. Labs may have billed the old codes more than once per day to account for multiple tests performed on the same patient/day. Because these multiple tests are now being mapped to a single code, we used the average Medicare frequency to estimate the new payment rate.

For example, previously a lab may have tested for MDMA and MDA, and subsequently billed 82145 x 2 (assay of amphetamines). Under the new coding scheme, a lab would bill the new code, 801XY17B, once for these two tests. We estimate the new payment rate would reflect the frequency with which the industry was billing for the tests that fall under the new code.

Note: Current Millennium Ordered Test Ratios: Cocaine (89%), Amphetamines (88.6%), Methadone (88.2%) – does not include oral fluid quantification ordered test ratios; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.



Avalere | 24

ML_DE_00689891

# Alcohol Biomarkers (801XY2-3)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82542 | Column chromatography | Ethyl Glucuronide | $24.63 | 2.747 | NA |

**Rationale:**

Millennium currently bills for ethyl glucuronide tests under 82542. For each category of frequency under the new code (1-2, 3+), we used the weighted average payment rate for that frequency as the basis for payment.

| Drug Class | New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|---|
| Ethyl Glucuronide | 801XY2 | 1-2 | 1.330 | $32.77 | 1 | 100% | $24.63 | +33% |
| | | | | | 2 | NA | NA | NA |
| | 801XY3 | 3+ | 4.997 | $123.08 | 3+ | NA | NA | NA |

Note: The industry average units per claim for 82542 is higher than Millennium's frequency (which is once per day per claim). Therefore, the new payment amount could represent an increase relative to Millennium's current billing.
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
Current Millennium Ordered Test Ratio: Ethyl Glucuronide (55.8%) ; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"



Avalere | 25

Confidential

ML_DE_00689892

Confidential

# Amphetamines (801XY18-20)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82145 | Assay of Amphetamines | Amphetamine / methamphetamine | $21.20 | 1.186 | 2 |
| 82542 | Column chromatography | Phentermine | $24.63 | 2.747 | NA |

**Rationale:**

We assume that Millennium is representative of the industry, in that Phentermine (82542) is seldom tested[2]. Therefore, we excluded 82542 from our payment calculations and used only 82145 in calculating payment rates. We used average Medicare units per claim for 82145 within each frequency (1-2, 3-4, 5+) as the basis for our payment estimations.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY18 | 1-2 | 1.159 | $24.58 | 1 | 97% | $21.20 | 15.9% |
|  |  |  |  | 2 | 3% | $45.83 | -46.4% |
| 801XY19 | 3-4 | 3.057 | $64.81 | 3 | NA | NA | NA |
|  |  |  |  | 4 | NA | NA | NA |
| 801XY20 | 5+ | 5.860 | $124.22 | 5 | NA | NA | NA |

[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[2] Millennium data show Phentermine has an ordered test ratio of 0.3%, compared to Amphetamines which has an ordered test ratio of 88.6%; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 26

ML_DE_00689893

# Antidepressants, Serotonergic Class (801XY22-24)

| Old Codes | Description | Millennium Drugs Tested | Current NLA | Average Medicare Units Per Claim[2] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82542[1] | Column chromatography | Duloxetine (Cymbalta)<br>Fluoxetine (Prozac)<br>Paroxetine (Paxol)<br>Citalopram (Celexa) | $24.63 | 2.747 | NA |

**Rationale:**
The new code series for Antidepressants, serotonergic class is based upon the frequency with which it is billed. Avalere used Medicare claims data to determine the average units per claim for 82542 when 1-2, 3-5, and 6+ units are billed per claim. The resulting payment rate is a weighted average of these figures.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency[3] | Current Payment[3] | Est. % Change from Current Practice[3] |
|---|---|---|---|---|---|---|---|
| 801XY22 | 1-2 | 1.330 | $32.77 | 1 | 56% | $24.63 | 33.0% |
| | | | | 2 | 9% | $49.26 | -33.5% |
| 801XY23 | 3-5 | 3.718 | $86.03 | 3 | 20% | $73.89 | 16.4% |
| | | | | 4 | 15% | $98.52 | -14.5% |
| | | | | 5 | NA | NA | NA |
| 801XY24 | 6+ | 8.721 | $187.01 | 6 | NA | NA | NA |

[1] 82542 – Column chromatography is a method code that is not specific to drug testing. Therefore, the industry frequency of units per claim (2.747) may not be representative of the drug testing space.
[2] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[3] Millennium current bills 82542 once each for 3 drugs within this class (Duloxetine, Fluoxetine, Paroxetine, and Citalopram, with ordered test ratios of 5.5%, 3.8%, 3.3%, and 0.2% respectively). Millennium also bills 82542 for cyclobenzaprine, however this drug will be billed as a skeletal muscle relaxant under the new AMA code mappings. Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx".



Confidential

# Antidepressants, Tricyclic and Other Cyclicals (801XY25-27)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 80152 | Assay of amitriptyline | Amitriptyline | $24.42 | 1.003 | 2 | $24.48 |
| 80160 | Assay of desipramine | Desipramine | $23.48 | 1.000 | 2 | $23.48 |
| 80174 | Assay of imipramine | Imipramine | $23.48 | 1.000 | 2 | $23.48 |
| 80182 | Assay of nortriptyline | Nortripyline | $18.49 | 1.000 | 2 | $18.50 |

**Rationale:**
Millennium's testing data suggests that all 4 of these drugs are tested concurrently; we make the same assumption for the industry. Note that the new code incorporates up to 11 different types of tricyclic antidepressants. To estimate payment for the new codes, we took the average of the four NLAs for the drugs above ($22.47) and multiplied it by the median of each frequency category (e.g., 1.5 for 1-2, 4 for 3-5, and 8.5 for 6+, given there are 11 possible drugs for which to test under this class). We were unable to use the average Medicare units/claim for each frequency to calculate payment because we do not know how often the industry bills these four codes together.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency[2] | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY25 | 1-2 | NA | $33.70 | 1 | NA | NA | NA |
| | | | | 2 | NA | NA | NA |
| 801XY26 | 3-5 | NA | $89.87 | 3 | NA | NA | NA |
| | | | | 4 | 100% | $89.87 | 0% |
| | | | | 5 | NA | NA | NA |
| 801XY27 | 6+ | NA | $190.97 | 6 | NA | NA | NA |

Notes: Current Millennium Ordered Test Ratios: Desipramine (49%), Nortriptyline (49%), Imipramine (49%), Amitriptyline (49%).
Source: 'Average orders per specimen by drug Dec-12 to Nov-13.xlsx'
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[2] Cannot calculate a combined average Medicare units per claim statistic for the four codes given overlap between the codes.

Confidential

# Antidepressants, Not Otherwise Specified (801XY27A)

| Old Codes | Description | Millennium Drugs Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82542 | Column chromatography | Bupropion | $24.63 | 2.747 | NA |
| 82542 | Column chromatography | Venlafaxine | $24.63 | 2.747 | NA |

**Rationale:**

There are 9 possible antidepressants that fall under this drug class. Millennium currently tests for 2 of the 9 possible drugs, and we assume that other labs may be testing for additional antidepressants.

If we used the industry frequency from 82542 to estimate the payment rate for the code for this class (801XY27A), it would result in a new payment rate of $67.66. We feel that this estimate is high, and that the industry frequency for antidepressants is likely lower than that of the 82542 code.

As a result, we assume Millennium is representative of the industry, and use Millennium's average frequency, 1.243, to derive a new payment rate of $30.60.

| New Code | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|
| 801XY27A | $30.60 | 1 | 76% | $24.63 | 24.2% |
|  |  | 2 | 24% | $49.26 | -37.9% |

[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
Notes: Current Millennium Ordered Test Ratios: Venlafaxine (3.3%), Bupropion (0.2%) ; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 29

ML_DE_00689896

Confidential

# Antipsychotics (801XY31-33)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 82542 | Column chromatography | Aripiprazole | $24.63 | 2.75 | NA | $67.66 |
| 82542 | Column chromatography | Clozapine | $24.63 | 2.75 | NA | $67.66 |
| 80173 | Assay of haloperidol | Haloperidol | $19.87 | 1.00 | 2 | $19.87 |
| 82542 | Column chromatography | Olanzapine | $24.63 | 2.75 | NA | $67.66 |
| 82542 | Column chromatography | Quetiapine | $24.63 | 2.75 | NA | $67.66 |
| 82542 | Column chromatography | Risperidone | $24.63 | 2.75 | NA | $67.66 |

**Rationale:**
Most drugs under the antipsychotics class are billed today under 82542. The exception, haloperidol, is billed under 80173. The Medicare volume for the haloperidol test is low – fewer than ~2,000 units annually – and thus we ignored its payment rate in estimating the payment rate for the new code. For each category of frequency under the new code (1-2, 3-5, 6+), we used the weighted average payment rate for that frequency as the basis for payment.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment[2] | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY31 | 1-2 | 1.330 | $32.77 | 1 | 45% | $23.84 | 37.5% |
| | | | | 2 | 12% | $47.67 | -31.3% |
| 801XY32 | 3-5 | 3.718 | $91.58 | 3 | 7% | $71.51 | 28.1% |
| | | | | 4 | 7% | $95.35 | -4.0% |
| | | | | 5 | 7% | $119.18 | -23.2% |
| 801XY33 | 6+ | 8.721 | $214.80 | 6 | 23% | $143.02 | 50.2% |

Notes. Current Millennium Ordered Test Ratios: Quetiapine (0.2%), Olanzapine (0.2%), Risperidone (0.2%), Apriprazole (0.2%), Haloperidol (0.2%), Clozapine (0.1%); Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[2] Current payment is based on the weighted average of tests performed by Millennium, calculated based on data provided by Millennium

Avalere | 30

ML_DE_00689897

Confidential

# Barbiturates (801XY4)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 80184 | Assay of phenobarbital | Phenobarbital | $15.62 | 1.004 | 2 | $15.68 |
| 82205 | Assay of barbiturates | Secobarbital | $15.62 | 1.279 | 2 | $19.97 |
| 82205 | Assay of barbiturates | Butalbital | $15.62 | 1.279 | 2 | $19.97 |

**Rationale:**

Millennium currently bills 82205 x 2 to code for secobarbital and butalbital and 80184 x 1 to test for phenobarbital. Avalere assumes that the industry practice is to not always test for both secobarbital and butalbital simultaneously. Therefore, we estimate the new payment for 801XY4 will be based on the sum of the average Medicare payment per claim for 80184 and 82205.

| New Code | Est. New Payment | Current Payment[1] | | Est. % Change from Current Practice |
|---|---|---|---|---|
| 801XY4 | $35.65 | Phenobarbital | $15.62 | -23.9% |
| | | Secobarbital | $15.62  — $46.86 | |
| | | Butalbital | $15.62 | |

Note: The industry average units per claim for 82205 is lower than Millennium's frequency, therefore, the payment rate for the new code may represent a decline in reimbursement for Barbiturate testing for Millennium.

[1] Current Millennium Ordered Test Ratios: Phenobarbital (71.2%), Butalbital (71.1%), Secobarbital (71.0%) ; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 31

ML_DE_00689898

Confidential

# Benzodiazepines (801XY5-6)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 80154 | Assay of benzodiazepines | Alprazolam, clonazepam, lorazepam, nordazepam, temazepam, oxazepam | $25.23 | 1.181 | 2 | $29.79 |

**Rationale:**

Millennium currently tests for 6 analytes (alprazolam, clonazepam, lorazepam, nordazepam, temazepam, oxazepam) and bills for these once under a single code, 80154. The Medicare average frequency for 80154 is 1.176 billed units per claim, which we use as our assumption for estimating the new payment rate for 801XY5 (the 1-2 frequency code). The estimated payment rate for 801XY6 is $498.29, and is also based on the Medicare average frequency for 12+ billed units per claim.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY5 | 1-12 | 1.176 | $29.66 | 1-12 | 100% | $25.23 | +17.6% |
| 801XY6 | 12+ | 19.750 | $498.29 | 12+ | NA | NA | NA |

Note: Current Millennium Ordered Test Ratio: Benzodiazepine (88.9%) – does not include oral fluid quantification ordered test ratio;
Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

Avalere | 32

ML_DE_00689899

Confidential

# Cannabinoids, Synthetic (801XY38-40)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82542 | Column chromatography | Cannabinoids, synthetic | $24.63 | 2.747 | NA |

**Rationale:**

Millennium currently bills for synthetic cannabinoid tests under 82542. For each category of frequency under the new code (1-2, 3-5, 6+), we used the weighted average payment rate for that frequency as the basis for payment.

| Drug Class | New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|---|
| Cannabinoids, synthetic | 801XY38 | 1-2 | 1.330 | $32.77 | 1 | 100% | $24.63 | +33% |
| | | | | | 2 | NA | NA | NA |
| Cannabinoids, synthetic | 801XY39 | 3-5 | 3.718 | $91.58 | 3 | NA | NA | NA |
| | | | | | 4 | NA | NA | NA |
| | | | | | 5 | NA | NA | NA |
| Cannabinoids, synthetic | 801XY40 | 6+ | 8.721 | $214.80 | 6 | NA | NA | NA |

Note: The industry average units per claim for 82542 is higher than Millennium's frequency (which is once per day per claim). Therefore, the new payment amount could represent an increase relative to Millennium's current billing.

[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

Current Millennium Ordered Test Ratio: Synthetic Cannabinoids (47.3%); Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 33

ML_DE_00689900

# Opiates (801XY7)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 83925 | Assay of opiates | Codeine / Morphine | 26.54 | 3.004 | 4 | $79.74 |
| 82646 | Assay of dihydrocodeinone | Hydrocodone | 28.17 | 1.001 | 1 | $28.19 |
| 82649 | Assay of dihydromorphinone | Hydromorphone | 35.07 | 1.001 | 1 | $35.12 |

**Rationale:**

Millennium currently tests for codeine/morphine, hydrocodone, and hydromorphone together, but bills each separately under 83925, 82646, and 82649 respectively. We assume the industry bills using a similar pattern. Therefore we estimate the new payment rate will be the sum of the single payment rate for 83925, 82646, and 82649.

| New Code | Est. New Payment | Current Payment[2] | | | Est. % Change from Current Practice |
|---|---|---|---|---|---|
| 801XY7 | $89.78 | Codeine / Morphine | $26.54 | | 0.0% |
| | | Hydrocodone | $28.17 | $89.78 | |
| | | Hydromorphone | $35.07 | | |

Note: Current Millennium Ordered Test Ratios: Codeine/Morphine (92.2%), Hydrocodone (91.3%), Hydromorphone (91.3%) – does not include oral fluid quantification ordered test ratios; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

[2] Current payment refers to the total payment received when testing for codeine/morphine, hydrocodone, and hydromorphone together, and billing each separately under 83925, 82646, and 82649.



Avalere | 34

ML_DE_00689901

Confidential

# Opioids and Opiate Analogs (801XY15-17)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 82542 | Column chromatography | Dextromethorphan | $24.63 | 2.747 | NA | $67.66 |
| 82542 | Column chromatography | Naltrexone | $24.63 | 2.747 | NA | $67.66 |
| 83925 | Assay of opiates | Meperidine | $26.54 | 3.004 | 4 | $79.74 |

**Rationale:**
Millennium currently bills for three opiates, dextromethorphan, naltrexone, and meperidine, and bills 82542 x2 and 83925 per claim, respectively. Payment rates and Medicare frequencies for these two codes are similar, but slightly different. For the new opioids and opiate analogs codes, we calculated a range of payment rates based on the industry frequencies.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment Range | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY15 | 1-2 | 1.330 (for 82542) | $32.77 to $36.54 | 1 | 82% | $25.27 | 30% to 45% |
|  |  | 1.377 (for 83925) |  | 2 | 15% | $50.53 | -35% to -28% |
| 801XY16 | 3-5 | 3.718 (for 82542) | $86.03 to $94.47 | 3 | 3% | $75.80 | 13% to 25% |
|  |  | 3.758 (for 83925) |  | 4 | NA | NA | NA |
|  |  |  |  | 5 | NA | NA | NA |
| 801XY17 | 6+ | 8.721 (for 82542) | $159.70 to $187.01 | 6 | NA | NA | NA |
|  |  | 6.627 (for 83925) |  |  |  |  |  |

Note: Current Millennium Ordered Test Ratios: Meperidine (24%), Naltrexone (7.3%), Dextromethorphan (2.2%) – does not include oral fluid quantification ordered test ratios; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

Avalere | 35

ML_DE_00689902

# Skeletal Muscle Relaxants (801XY14-14A)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 82542 | Column chromatography | Cyclobenzaprine | $24.63 | 2.747 | NA | $67.66 |
| 83805 | Assay of meprobamate | Carisoprodol | $24.04 | 1.02 | 2 | $24.41 |

**Rationale:**

Millennium currently tests for two skeletal muscle relaxants, cyclobenzprine and carisoprodol. The new codes, 801XY14 and 801XY14A, include 7 different analytes, and will be used to bill for 1-2 or 3+ tests at a time. For these codes, we estimate a range of new payment rates based on the Medicare frequencies of 1-2 and 3+ for the two existing codes, 82542 and 83805. Note that the Medicare frequencies for 3+ include providers that bill for more than 7 tests on a single day. Thus, these payment rate estimates may overstate payments for the new 3+ code, 801XY14A.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY14 | 1-2 | 1.330 (for 82542) | $24.37 to $32.77 | 1 | 57% | $24.31 | 0% to 35% |
| | | 1.014 (for 83805) | | 2 | 43% | $48.67 | -50% to -33% |
| 801XY14A | 3+ | 4.997 (for 82542) | $96.16 to $123.06 | 3 | NA | NA | NA |
| | | 4.000 (for 83805) | | | | | |

Note: Current Millennium Ordered Test Ratios: Carisoprodol (57.8%), Cyclobenzaprine (49.3%) – does not include oral fluid quantification ordered test ratios. Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

Avalere | 36

ML_DE_00689903



# Assessment of Medicare Clinical Lab Fee Schedule (CLFS) Revaluation

Avalere

Confidential

ML_DE_00689904

Confidential

# Executive Summary – CLFS Revaluation

- CMS plans to review all codes on the CLFS over the next 5 years, with payment changes beginning in 2015; this review will potentially impact all codes, including those that CMS may use to crosswalk to the new AMA drug testing codes

- This review will directly impact 7 of Millennium's codes that are not being replaced by new codes
  - These 7 codes comprise 14% of Millennium's UDT testing volume[1], and are likely to be reviewed within the first two years of CMS' multi-year CLFS revaluation process[2]

- Avalere examined 2007 - 2012 Medicare utilization and payment data for these 7 codes

- We also estimated the likely timing of revaluation using the criteria outlined by CMS

- CMS noted in its 2014 Medicare Physician Fee Schedule Final Rule that payments may increase or decrease after the review process, however, it expects most payment rates to decrease given that technological change tends to drive efficiencies over time

[1] Based on Millennium supplied data, previous 12 months as of November 2013
[2] Based, in part, on Avalere's assessment of the 2007 to 2012 Medicare Physician/Supplier Procedure Summary File

ML_DE_00689905

Avalere | 38

# Clinical Lab Fee Schedule (CLFS) Reevaluation Process

Confidential

- In 2013, CMS established a process by which it will review payment rates for codes on the Medicare Clinical Lab Fee Schedule (CLFS) to account for changes in technology over time

- Previously, there has been no process for CMS to revalue CLFS codes; instead, codes have historically received a simple annual inflationary update

- CMS will begin reviewing codes in 2014, with the first payment changes effective beginning CY15



- CMS will review all CLFS codes, using the following criteria to prioritize its review:
  - Oldest codes
  - High volume tests
  - Codes with high total expenditures
  - Codes that have experienced rapid spending growth

- CMS will accept public nomination for codes to be reviewed in subsequent years

- Clinically and/or technologically similar codes to those under review may also be reviewed concurrently

- CMS will review all data from any source (private insurers, federal insurers, and CMS contractors) to determine appropriate reimbursement rates for CLFS services being reviewed

Source: 2014 Medicare Revisions to the Clinical Lab Fee Schedule, CY14. Link.

Avalere | 39

Case 17-51840-LSS    Doc 341-2    Filed 02/10/23    Page 688 of 925

ML_DE_00689906

Confidential

# Select Codes are Likely to be Re-evaluated this Year

| Code | Percent of Millennium's Volume[1] | Description | Likely Year Reevaluated | Affecting Payment In |
|---|---|---|---|---|
| 83925 | 19.3% | Assay of opiates | Scheduled for Redefinition | |
| 82542[2] | 18.1% | Column chromatography quant | 2014 | 2015 |
| 82205 | 5.9% | Assay of barbiturates | Scheduled for Redefinition | |
| 82646 | 4.0% | Assay of dihydrocodeinone | Scheduled for Redefinition | |
| 82649 | 4.0% | Assay of dihydromorphinone | Scheduled for Redefinition | |
| 82520 | 3.9% | Assay of cocaine | Scheduled for Redefinition | |
| 80154 | 3.9% | Assay of benzodiazepines | Scheduled for Redefinition | |
| 82145 | 3.9% | Assay of amphetamines | Scheduled for Redefinition | |
| 83840 | 3.9% | Assay of methadone | Scheduled for Redefinition | |
| 81003 | 3.6% | Urinalysis auto w/o scope | 2014 | 2015 |
| 82570 | 3.6% | Assay of urine creatinine | 2014 | 2015 |
| 83986 | 3.6% | Assay ph body fluid nos | 2014 | 2015 |
| 84311 | 3.6% | Spectrophotometry | 2014 | 2015 |
| 80184 | 3.0% | Assay of phenobarbital | Scheduled for Redefinition | |
| 82101 | 2.6% | Assay of urine alkaloids | Scheduled for Redefinition | |
| 83805[2] | 2.5% | Assay of meprobamate | 2014 | 2015 |
| 83992[2] | 2.5% | Assay for phencyclidine | 2014 | 2015 |

[1] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[2] These codes are not scheduled for deletion, but Millennium will not bill to them as of next year

Case 17-51840-LSS    Doc 341-2    Filed 02/10/23    Page 689 of 925

ML_DE_00689907

Avalere | 40

# Select Codes are Likely to be Re-evaluated this Year  2 of 2

| Code | Percent of Millennium's Volume[1] | Description | Likely Year Reevaluated | Affecting Payment In |
|---|---|---|---|---|
| 80160 | 2.0% | Assay of desipramine | Scheduled for Redefinition | |
| 80174 | 2.0% | Assay of imipramine | Scheduled for Redefinition | |
| 80182 | 2.0% | Assay of nortriptyline | Scheduled for Redefinition | |
| 80152 | 2.0% | Assay of amitriptyline | Scheduled for Redefinition | |
| 83789 | 1.4% | Mass spectrometry quant | Millennium discontinued use as of 9/2013 | |
| 82055 | <0.1% | Assay of ethanol | Scheduled for Redefinition | |
| 83516[2] | <0.1% | Immunoassay nonantibody | 2014 | 2015 |
| 80101 | <0.1% | Drug screen, single | Scheduled for Redefinition | |
| 80102 | <0.1% | Drug confirmation | Scheduled for Redefinition | |
| G0431 | <0.1% | Drug screen multiple class | Scheduled for Redefinition | |
| 83497 | <0.1% | Assay of 5-hiaa | 2015 | 2016 |
| 82384 | <0.1% | Assay three catecholamines | 2015 | 2016 |
| 99001 | <0.1% | Specimen handling pt-lab | Not on CLFS | |
| 80173[2] | <0.1% | Assay of haloperidol | 2016 | 2017 |
| 82544 | <0.1% | Column chromotograph/isotope | 2014 | 2015 |
| 80299 | <0.1% | Quantitative assay drug | Millennium discontinued use as of 9/2013 | |

[1] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[2] These codes are not scheduled for deletion, but Millennium will not bill to them as of next year

Avalere | 41

Case 17-51840-LSS   Doc 341-2   Filed 02/10/23   Page 690 of 925

ML_DE_00689908

Confidential

# Likely Timing of Re-evaluation for Millennium's CPT Codes

| Code | Short Descriptor | Created | | Growth 07-12[1] | Total 2012[1] | Rank 2012[1] | Percentile[1] | Percent of Millennium Volume[2] | Likely Timing of Any Payment Changes |
|---|---|---|---|---|---|---|---|---|---|
| 81003 | Urinalysis auto w/o scope | 1993 | Spending | 49% | $30.9M | 50 | 96th | 3.6% | 2015 |
| | | | Volume | 45% | 8.9M | 13 | 99th | | |
| 82570 | Assay of urine creatinine | 1994 | Spending | 83% | $50.8M | 30 | 97th | 3.6% | 2015 |
| | | | Volume | 81% | 6.9M | 20 | 98th | | |
| 83986 | Assay ph body fluid nos | 1990 | Spending | 590% | $5.6M | 199 | 82nd | 3.6% | 2015 |
| | | | Volume | 591% | 1.2M | 100 | 91st | | |
| 84311 | Spectrophotometry | 1993 | Spending | 848% | $9.9M | 133 | 88th | 3.6% | 2015 |
| | | | Volume | 838% | 1M | 105 | 91st | | |
| 83497 | Assay of 5-hiaa | 1993 | Spending | 34% | $0.6M | 431 | 62nd | <0.1% | 2016 |
| | | | Volume | 30% | <0.1M | 434 | 61st | | |
| 82384 | Assay three catecholamines | Before 1990 | Spending | -17% | $1.2M | 337 | 70th | <0.1% | 2016 |
| | | | Volume | -19.4% | <0.1M | 425 | 62nd | | |
| 82544 | Column chromotograph/ isotope | 1999 | Spending | 95,373% | $9.9M | 134 | 88th | <0.1% | 2015 |
| | | | Volume | 98,385% | 0.4M | 171 | 85th | | |

[1] Source: 2012 Physician/Supplier Procedure Summary File; Rank refers to the code relative to the roughly 1,100 codes that existed in 2007-2012

[2] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 42

Case 17-51840-LSS   Doc 341-2   Filed 02/10/23   Page 691 of 925

ML_DE_00689909



# Draft Drugs of Abuse Local Coverage Determination (LCD)

Avalere

ML_DE_00689910

# Executive Summary – Draft LCD on Drugs of Abuse Testing

- Half of the Medicare Administrative Contractors (MACs) have either instituted or are considering instituting an LCD to specifically govern coverage of testing for common drugs of abuse

- Noridian, the MAC with jurisdiction over Millennium in California, has proposed a draft LCD concerning coverage of drugs of abuse testing

  - The draft LCD is, in our opinion, likely to be finalized largely in its current form, given its similarity to the recently-finalized CGS draft LCD

  - CGS finalized its proposal in January, 2014 without significant changes compared to the draft

- The draft LCD contains several provisions that could impact coverage and reimbursement for Millennium's services

  - Most notably, the draft LCD would require all orders for quantitative drug testing for patients being treated for substance use or abuse to be preceded by a qualitative screen, and allow only for those drugs classes with a positive screen to be tested quantitatively

Confidential

ML_DE_00689911



Avalere | 44

Confidential

# Most MACs Have or are Drafting LCDs that Pertain to Drugs of Abuse Testing

- Currently, there are no National Coverage Decisions (NCDs) in place for drug abuse testing

    - Coverage policies are addressed through a patchwork of LCDs handled by local MACs

    - It is possible that the genesis of the LCDs was due to the perception that certain providers are over-prescribing presumptive drug tests

- Millennium's administrator, Noridian, has issued a draft LCD on drugs of abuse testing that would limit the way in which Millennium's tests are covered and ordered; other MACs have either instituted or are currently considering similar draft LCDs

- This is in line with efforts by CMS and the MACs to establish more uniformity across LCDs

    - A recent report[1] found that there was significant variation in access to items and services for beneficiaries due to the variation in coverage policies amongst the various MACs

    - The increased focus on uniformity implies that more MACs will move in tandem with coverage policies in the future

- An individual MAC has the discretion to modify its LCD to reflect what is most appropriate for its beneficiaries

    - If significant differences in coverage exist geographically, CMS could choose to issue a National Coverage Analysis (NCA) to address the discrepancies

        - This is unlikely to happen for drug abuse testing as CMS has other competing priorities

[1] Source: Office of the Inspector General Report: OEI-01-11-00500. Link.

Avalere | 45

ML_DE_00689912

# Draft Noridian Coverage Policy Would Restrict Coverage of Millennium's Services

- Covered indications includes testing for symptomatic patients who are suspected of having ingested abused drugs, testing related to substance abuse treatment, and testing to monitor patients receiving opioid therapy for chronic pain management
- The policy applies to almost all of Millennium's currently-billed codes
- Excludes from coverage specimen validity testing and forensic / legal drug testing
- Does not cover two different specimens collected for a single patient on the same date of service
- Urges provider caution in prescribing testing that isn't tailored to an individual patient's needs and history
  - Warns that existing test panels marketed by independent clinical laboratories may result in medically unnecessary and unreasonable testing and may result in denied coverage
- Requires that testing as part of chronic opioid therapy be titrated to an individual patient's potential for abuse
  - Considers confirmatory and/or quantitative drug testing reasonable and necessary when the results of a qualitative screen are presumptive positive drug(s) on a drug screen
    - Also allows for confirmatory testing when there is a negative screen, provided that the negative finding is inconsistent with the patient's medical history or current documented chronic pain medication list
- For patients being monitored for substance abuse treatment, the policy covers confirmation testing (80102) only after a positive screening test, and covers only the drug class for which the screening was positive
  - The policy limits quantitative drug testing to 3 procedures per 30 days, unless medical necessity is documented
  - The policy states that qualitative immunoassays are usually sufficient as part of a treatment plan for substance abusers, and that quantitative confirmation testing is not usually required

MAC = Medicare Administrative Contractor
Source: Noridian proposed Local Coverage Determination. Link.



Avalere | 46

Confidential

ML_DE_0068913

Confidential

# Noridian's Draft LCD is Unlikely to be Materially Revised in the Next 3-5 Years If Enacted

- Noridian's final LCD will likely be substantively similar to the draft version

- The LCD is unlikely to be modified significantly within the next 3-5 years, with some possible exceptions:

  - Any perceived changes in the technologies used to test for drugs could serve as a trigger for additional review / revision

  - The LCDs could be revised at a later date to reflect the newly-defined CPT codes for drug testing

  - If CMS accepts the AMA's proposed changes to accept terminology related to "presumptive" and "definitive", the LCDs could be revised to reflect such a change

- LCDs are frequently revised; however most changes are technical and do not substantively affect coverage

  - For example, the 'Qualitative Drug Screening' LCD used by National Government Services has been revised 19 times since its inception in July, 2008

    - Most of the revisions reflect changes in the MACs jurisdiction, or changes in the short descriptors of the relevant CPT codes

- The most likely catalyst for a near-term review of Noridian's draft LCD would be a perceived technological change

  - If CMS identifies newer, diffuse technologies during the CLFS revaluation process, it could lead to a revision of the coverage policy for drug abuse testing

  - Millennium's current testing methods are already recognized and accounted for by Noridian's draft LCD

  - It is unlikely that a new technology would be introduced and proliferate in the next three to five years to such a degree that would warrant a revision to coverage by the MACs

ML_DE_00689914

# EXHIBIT 28

Message
___

**From:**     Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL PENCAK]
**Sent:**     2/5/2014 1:03:30 AM
**To:**      Brock Hardaway [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Brock Hardaway9d9]
**CC:**      Howard Appel [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Howard Appelbdc13407]; Tim Kennedy [/O=MILLENNIUM
LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tim
Kennedy3d8]
**Subject:**   LCD impact
**Attachments:** LCD analysis 2.4.2014 V2.xlsx

Hi Brock – as discussed, I've attached our analysis on the potential LCD impact. Please keep in mind there are a lot of
moving parts and a lot of assumptions. Actually since we spoke, the impact actually changed as a result of an assumption
update (initially had 87% of our specimens having POC, but based on actual data, we adjusted down to 80%). Below I've
summarized the key assumptions and the approximate impact from each scenario:

**Scenario 1:** Medicare reimbursement cut of ~18.3% (~$3.2 million monthly impact) / 4.5% of reduction due to validity
or 24% of total reduction
**Key assumptions:**
- Spice moves to G0431 as screen (Billing from $24 to $97)
- MDMA is billed as a separate test
- Validity is not reimbursed
- POC assumptions are applied only to specimens with POC
- For those included as Positive POC, confirmation testing is only performed when + POC result

**Scenario 2:** Medicare reimbursement cut of ~5.6% (~$1.0 million monthly impact) / 4.5% of reduction due to validity or
79% of total reduction
**Key assumptions:**
- Spice moves to G0431 as screen (Billing from $24 to $97)
- MDMA is tested separately
- Validity is not reimbursed
- POC assumptions are applied only to specimens with POC
- For those included as Positive POC, confirmation testing is only performed when + POC result
- Confirm negatives on illicits regardless of POC result

Please call me if you have any questions or concerns and I'm sure we'll have updates as we learn more about the
potential impacts.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

Confidential                                                                      ML_DE_00054320

Document Produced In Native Format

Confidential

ML_DE_00054321

| | | |
|---|---|---|
| Approximate monthly volume lost to POLs | | 24,867 |
| Estimated contribution margin | $ | 205.00 |
| Potential gains at 80% volume returns: | | 4,078,259 |
| Potential gains at 60% volume returns: | | 3,058,694 |
| Potential gains at 40% volume returns: | | 2,039,129 |
| Potential gains at 20% volume returns: | | 1,019,565 |

Assumption on % of POC:          80.0%

| CPT Description | CPT Code | Ordered Test Ratio Dec -13 | Medicare Rate at 98% | Current Billed | POC Status | Confirm Positive? | % Positive POC | Revised % tested | POC cutoff | New Billed |
|---|---|---|---|---|---|---|---|---|---|---|
| Cocaine Quantification | 82520 | 0.86 | 20.27 | 17.35 | POC | Include | 1.5% | 18.1% | 300 | 3.68 |
| Amphetamines Quantification | 82145 | 0.85 | 20.78 | 17.75 | POC | Include | 3.3% | 19.3% | 1,000 | 4.01 |
| MDMA | 82145 | 0.85 | 20.78 | | POC | Include | 3.3% | 19.3% | 1,000 | 4.01 |
| Methadone Quantification | 83840 | 0.90 | 21.83 | 19.61 | POC | Include | 4.5% | 21.2% | 300 | 4.62 |
| Cannabinnoids Quantification*** | 82542 | 0.79 | 24.14 | 19.19 | POC | Include | 10.3% | 22.5% | 50 | 5.42 |
| PHENOBARBITAL (Barbs) Quantification | 80184 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 16.5% | 300 | 2.53 |
| Secobarbital Quantification | 82205 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 16.5% | 300 | 2.53 |
| Phencyclidine Quantification | 83992 | 0.50 | 18.66 | 9.26 | POC | Include | 1.4% | 10.5% | 25 | 1.95 |
| DESIPRAMINE (TCA) Quantification | 80160 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 16.5% | 800 | 3.80 |
| IMIPRAMINE (TCA) Quantification | 80174 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 16.5% | 1,000 | 3.80 |
| NORTRIPTYLINE (TCA) Quantification | 80182 | 0.53 | 18.12 | 9.59 | POC | Include | 14.0% | 16.5% | 1,000 | 2.99 |
| AMITRIPTYLINE (TCA) Quantification | 80152 | 0.53 | 23.93 | 12.67 | POC | Include | 14.0% | 16.5% | 1,000 | 3.95 |
| Hydrocodone Quantification (Opiates) | 82646 | 0.89 | 27.61 | 24.71 | POC | Exclude | | 89.5% | | 24.71 |
| Hydromorphone Quantification (Opiates) | 82649 | 0.89 | 34.37 | 30.76 | POC | Exclude | | 89.5% | | 30.76 |
| Codeine / Morphine Quantification | 83925 | 0.90 | 26.01 | 23.29 | POC | Exclude | | 89.5% | | 23.29 |
| Oxycodone Quantification | 83925 | 0.89 | 26.01 | 23.13 | POC | Exclude | | 88.9% | | 23.13 |
| Benzodiazepine Quantification | 80154 | 0.87 | 24.73 | 21.60 | POC | Exclude | | 87.4% | | 21.60 |
| Buprenorphine Quantification | 83925 | 0.63 | 26.01 | 16.48 | POC | Exclude | | 63.3% | | 16.48 |
| | | | | | | | | | | |
| CREATININE (validity) | 82570 | 0.86 | 6.92 | 5.94 | Non-POC | | | | | 0.00 |
| SPECTROPHOTOMETRY (validity) | 84311 | 0.86 | 9.35 | 8.03 | Non-POC | | | | | 0.00 |
| PH (validity) | 83986 | 0.86 | 4.78 | 4.11 | Non-POC | | | | | 0.00 |
| URNLS DIP STICK/TABLET RGNT (validity) | 81003 | 0.86 | 3.00 | 2.57 | Non-POC | | | | | 0.00 |
| | | | | | | | | | | |
| Butalbital Quantification | 82205 | 0.77 | 15.31 | 11.73 | Move to Non-POC | | | 76.6% | 3,000 | 11.73 |
| Drug screen (per patient encounter) | G0431 | 0.02 | 97.22 | 1.71 | | | | 57.5% | | 55.91 |
| Synthetic Cannabinoids Quantification (spice)*** | 82542 | 0.56 | 24.14 | 13.46 | Move to screen (G0431) | | | 0.0% | | 0.00 |
| Cyclobenzaprine Quantification*** | 82542 | 0.53 | 24.14 | 12.77 | Move to Non-POC | | | 52.9% | 3,000 | 12.77 |
| | | | | | | | | | | |
| Tapentadol Quantification | 83925 | 0.24 | 26.01 | 6.20 | Non-POC | | | | | 6.20 |
| Tramadol Quantification | 82542 | 0.45 | 24.14 | 10.93 | Non-POC | | | | | 10.93 |
| Kratom Alkaloids | 82101 | 0.14 | 40.13 | 5.60 | Non-POC | | | | | 5.60 |
| Heroin Quantification | 83925 | 0.69 | 26.01 | 17.95 | Non-POC | | | | | 17.95 |
| Fentanyl Quantification | 83925 | 0.59 | 26.01 | 15.38 | Non-POC | | | | | 15.38 |
| Carisoprodol Quantification | 83805 | 0.56 | 23.56 | 13.29 | Non-POC | | | | | 13.29 |
| Ethyl Glucuronide Quantification*** | 82542 | 0.60 | 24.14 | 14.44 | Non-POC | | | | | 14.44 |
| MDPV / Cathinones Quantification (Bath Salts)*** | 82542 | 0.44 | 24.14 | 10.60 | Non-POC | | | | | 10.60 |
| Methylphenidate Quantification*** | 82542 | 0.31 | 24.14 | 7.45 | Non-POC | | | | | 7.45 |
| Meperidine Quantification | 83925 | 0.22 | 26.01 | 5.63 | Non-POC | | | | | 5.63 |
| Zolpidem Quantification*** | 82542 | 0.24 | 24.14 | 5.80 | Non-POC | | | | | 5.80 |
| Ketamine Quantification*** | 82542 | 0.14 | 24.14 | 3.30 | Non-POC | | | | | 3.30 |
| Gabapentin Quantification*** | 82542 | 0.14 | 24.14 | 3.33 | Non-POC | | | | | 3.33 |
| Propoxyphene Quantification | 83925 | 0.06 | 26.01 | 1.67 | Non-POC | | | | | 1.67 |
| Pregablin Quantification*** | 82542 | 0.08 | 24.14 | 1.92 | Non-POC | | | | | 1.92 |
| Naltrexone Quantification*** | 82542 | 0.07 | 24.14 | 1.72 | Non-POC | | | | | 1.72 |
| Duloxetine Quantification (Cymbalta)*** | 82542 | 0.05 | 24.14 | 1.10 | Non-POC | | | | | 1.10 |
| Fluoxetine Quantification (Prozac)*** | 82542 | 0.03 | 24.14 | 0.75 | Non-POC | | | | | 0.75 |
| Venlafaxine Quantification*** | 82542 | 0.03 | 24.14 | 0.69 | Non-POC | | | | | 0.69 |
| Paroxetine Quantification (Paxol)*** | 82542 | 0.03 | 24.14 | 0.65 | Non-POC | | | | | 0.65 |
| Alcohol Any Spec Except BRTH | 82055 | 0.20 | 14.45 | 2.89 | Non-POC | | | | | 2.89 |
| Phentermine  (Psych Panel) | 82542 | 0.02 | 24.14 | 0.51 | Non-POC | | | | | 0.51 |
| Risperidone  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.25 | Non-POC | | | | | 0.25 |
| Quetiapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.24 | Non-POC | | | | | 0.24 |
| Citalopram (Psych Panel) | 82542 | 0.01 | 24.14 | 0.28 | Non-POC | | | | | 0.28 |
| Bupropion (Psych Panel) | 82542 | 0.01 | 24.14 | 0.29 | Non-POC | | | | | 0.29 |
| Olanzapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.21 | Non-POC | | | | | 0.21 |
| Aripiprazole  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.27 | Non-POC | | | | | 0.27 |
| Haloperidol (Psych Panel) | 80173 | 0.01 | 19.47 | 0.18 | Non-POC | | | | | 0.18 |
| Clozapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.22 | Non-POC | | | | | 0.22 |
| Dextromethorphan (DXM)  (Psych Panel) | 82542 | 0.08 | 24.14 | 1.99 | Non-POC | | | | | 1.99 |
| Acetaminophen | 83516 | 0.07 | 12.41 | 0.84 | Non-POC | | | | | 0.84 |
| HYDROXYINDOLACETIC ACID 5 (OURSOURCED - Af | 83497 | 0.00 | 17.24 | 0.08 | Non-POC | | | | | 0.08 |
| CATECHOLAMINES FRACTIONATED (OUTSOURCED | 82384 | 0.00 | 33.76 | 0.16 | Non-POC | | | | | 0.16 |
| COL-CHR/MS STABLE ISOTOPE DIL MLT ANALYTES | 82544 | - | 24.14 | - | Non-POC | | | | | 0.00 |
| DRUG CONFIRMATION EA PX | 80102 | - | 17.71 | - | Non-POC | | | | | 0.00 |
| Non-POC | | 6.65 | | 136.79 | | | | | | 136.79 |
| **Total** | | **24.35** | | **490.27** | | | | | | **400.45** |

| | | | |
|---|---|---|---|
| NRPS w/validity | 462.82 | | 378.02 |
| Variance | | | -18.3% |
| SVT effect | 20.64 | | 0.00 |
| Variance | | | -4.5% |

**Key assumptions:**
- Spice moves to G0431 as screen
- MDMA is tested separately
- Validity is not reimbursed
- POC assumptions are applied only to specimens with POC
- For those included as Positive POC, confirmation testing is only performed when + POC result

| Revenue impact: | Current: | 17,200,000 |
|---|---|---|
| | Proposed: | 14,048,715 |
| | **Difference:** | **3,151,285** |

Assumption on % of POC:          80.0%

| CPT Description | CPT Code | Ordered Test Ratio Dec -13 | Medicare Rate at 98% | Current Billed | POC Status | Confirm Positive? | % Positive POC | Revised % tested | POC cutoff | New Billed |
|---|---|---|---|---|---|---|---|---|---|---|
| Cocaine Quantification | 82520 | 0.86 | 20.27 | 17.35 | POC | Exclude | 1.5% | 85.6% | 300 | 17.35 |
| Amphetamines Quantification | 82145 | 0.85 | 20.78 | 17.75 | POC | Exclude | 3.3% | 85.4% | 1,000 | 17.75 |
| MDMA | 82145 | 0.85 | 20.78 | | POC | Exclude | 3.3% | 85.4% | 1,000 | 17.75 |
| Methadone Quantification | 83840 | 0.90 | 21.83 | 19.61 | POC | Include | 4.5% | 21.2% | 300 | 4.62 |
| Cannabinnoids Quantification*** | 82542 | 0.79 | 24.14 | 19.19 | POC | Exclude | 10.3% | 79.5% | 50 | 19.19 |
| PHENOBARBITAL (Barbs) Quantification | 80184 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 16.5% | 300 | 2.53 |
| Secobarbital Quantification | 82205 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 16.5% | 300 | 2.53 |
| Phencyclidine Quantification | 83992 | 0.50 | 18.66 | 9.26 | POC | Exclude | 1.4% | 49.6% | 25 | 9.26 |
| DESIPRAMINE (TCA) Quantification | 80160 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 16.5% | 800 | 3.80 |
| IMIPRAMINE (TCA) Quantification | 80174 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 16.5% | 1,000 | 3.80 |
| NORTRIPTYLINE (TCA) Quantification | 80182 | 0.53 | 18.12 | 9.59 | POC | Include | 14.0% | 16.5% | 1,000 | 2.99 |
| AMITRIPTYLINE (TCA) Quantification | 80152 | 0.53 | 23.93 | 12.67 | POC | Include | 14.0% | 16.5% | 1,000 | 3.95 |
| Hydrocodone Quantification (Opiates) | 82646 | 0.89 | 27.61 | 24.71 | POC | Exclude | | 89.5% | | 24.71 |
| Hydromorphone Quantification (Opiates) | 82649 | 0.89 | 34.37 | 30.76 | POC | Exclude | | 89.5% | | 30.76 |
| Codeine / Morphine Quantification | 83925 | 0.90 | 26.01 | 23.29 | POC | Exclude | | 89.5% | | 23.29 |
| Oxycodone Quantification | 83925 | 0.89 | 26.01 | 23.13 | POC | Exclude | | 88.9% | | 23.13 |
| Benzodiazepine Quantification | 80154 | 0.87 | 24.73 | 21.60 | POC | Exclude | | 87.4% | | 21.60 |
| Buprenorphine Quantification | 83925 | 0.63 | 26.01 | 16.48 | POC | Exclude | | 63.3% | | 16.48 |
| | | | | | | | | | | |
| CREATININE (validity) | 82570 | 0.86 | 6.92 | 5.94 | Non-POC | | | | | 0.00 |
| SPECTROPHOTOMETRY (validity) | 84311 | 0.86 | 9.35 | 8.03 | Non-POC | | | | | 0.00 |
| PH (validity) | 83986 | 0.86 | 4.78 | 4.11 | Non-POC | | | | | 0.00 |
| URNLS DIP STICK/TABLET RGNT (validity) | 81003 | 0.86 | 3.00 | 2.57 | Non-POC | | | | | 0.00 |
| | | | | | | | | | | |
| Butalbital Quantification | 82205 | 0.77 | 15.31 | 11.73 | Move to Non-POC | | | 76.6% | 3,000 | 11.73 |
| Drug screen (per patient encounter) | G0431 | 0.02 | 97.22 | 1.71 | | | | 57.5% | | 55.91 |
| Synthetic Cannabinoids Quantification (spice)*** | 82542 | 0.56 | 24.14 | 13.46 | Move to screen (G0431) | | | 0.0% | | 0.00 |
| Cyclobenzaprine Quantification*** | 82542 | 0.53 | 24.14 | 12.77 | Move to Non-POC | | | 52.9% | 3,000 | 12.77 |
| | | | | | | | | | | |
| Tapentadol Quantification | 83925 | 0.24 | 26.01 | 6.20 | Non-POC | | | | | 6.20 |
| Tramadol Quantification | 82542 | 0.45 | 24.14 | 10.93 | Non-POC | | | | | 10.93 |
| Kratom Alkaloids | 82101 | 0.14 | 40.13 | 5.60 | Non-POC | | | | | 5.60 |
| Heroin Quantification | 83925 | 0.69 | 26.01 | 17.95 | Non-POC | | | | | 17.95 |
| Fentanyl Quantification | 83925 | 0.59 | 26.01 | 15.38 | Non-POC | | | | | 15.38 |
| Carisoprodol Quantification | 83805 | 0.56 | 23.56 | 13.29 | Non-POC | | | | | 13.29 |
| Ethyl Glucuronide Quantification*** | 82542 | 0.60 | 24.14 | 14.44 | Non-POC | | | | | 14.44 |
| MDPV / Cathinones Quantification (Bath Salts)*** | 82542 | 0.44 | 24.14 | 10.60 | Non-POC | | | | | 10.60 |
| Methylphenidate Quantification*** | 82542 | 0.31 | 24.14 | 7.45 | Non-POC | | | | | 7.45 |
| Meperidine Quantification | 83925 | 0.22 | 26.01 | 5.63 | Non-POC | | | | | 5.63 |
| Zolpidem Quantification*** | 82542 | 0.24 | 24.14 | 5.80 | Non-POC | | | | | 5.80 |
| Ketamine Quantification*** | 82542 | 0.14 | 24.14 | 3.30 | Non-POC | | | | | 3.30 |
| Gabapentin Quantification*** | 82542 | 0.14 | 24.14 | 3.33 | Non-POC | | | | | 3.33 |
| Propoxyphene Quantification | 83925 | 0.06 | 26.01 | 1.67 | Non-POC | | | | | 1.67 |
| Pregablin Quantification*** | 82542 | 0.08 | 24.14 | 1.92 | Non-POC | | | | | 1.92 |
| Naltrexone Quantification*** | 82542 | 0.07 | 24.14 | 1.72 | Non-POC | | | | | 1.72 |
| Duloxetine Quantification (Cymbalta)*** | 82542 | 0.05 | 24.14 | 1.10 | Non-POC | | | | | 1.10 |
| Fluoxetine Quantification (Prozac)*** | 82542 | 0.03 | 24.14 | 0.75 | Non-POC | | | | | 0.75 |
| Venlafaxine Quantification*** | 82542 | 0.03 | 24.14 | 0.69 | Non-POC | | | | | 0.69 |
| Paroxetine Quantification (Paxol)*** | 82542 | 0.03 | 24.14 | 0.65 | Non-POC | | | | | 0.65 |
| Alcohol Any Spec Except BRTH | 82055 | 0.20 | 14.45 | 2.89 | Non-POC | | | | | 2.89 |
| Phentermine  (Psych Panel) | 82542 | 0.02 | 24.14 | 0.51 | Non-POC | | | | | 0.51 |
| Risperidone  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.25 | Non-POC | | | | | 0.25 |
| Quetiapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.24 | Non-POC | | | | | 0.24 |
| Citalopram (Psych Panel) | 82542 | 0.01 | 24.14 | 0.28 | Non-POC | | | | | 0.28 |
| Bupropion (Psych Panel) | 82542 | 0.01 | 24.14 | 0.29 | Non-POC | | | | | 0.29 |
| Olanzapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.21 | Non-POC | | | | | 0.21 |
| Aripiprazole  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.27 | Non-POC | | | | | 0.27 |
| Haloperidol (Psych Panel) | 80173 | 0.01 | 19.47 | 0.18 | Non-POC | | | | | 0.18 |
| Clozapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.22 | Non-POC | | | | | 0.22 |
| Dextromethorphan (DXM)  (Psych Panel) | 82542 | 0.08 | 24.14 | 1.99 | Non-POC | | | | | 1.99 |
| Acetaminophen | 83516 | 0.07 | 12.41 | 0.84 | Non-POC | | | | | 0.84 |
| HYDROXYINDOLACETIC ACID 5 (OURSOURCED - AR | 83497 | 0.00 | 17.24 | 0.08 | Non-POC | | | | | 0.08 |
| CATECHOLAMINES FRACTIONATED (OUTSOURCED | 82384 | 0.00 | 33.76 | 0.16 | Non-POC | | | | | 0.16 |
| COL-CHR/MS STABLE ISOTOPE DIL MLT ANALYTES | 82544 | - | 24.14 | - | Non-POC | | | | | 0.00 |
| DRUG CONFIRMATION EA PX | 80102 | - | 17.71 | - | Non-POC | | | | | 0.00 |
| Non-POC | | 6.65 | | 136.79 | | | | | | 136.79 |
| **Total** | | **24.35** | | **490.27** | | | | | | **462.67** |

| | | | |
|---|---|---|---|
| **NRPS** | 462.82 | | **436.76** |
| **Variance** | | | **-5.6%** |
| **SVT effect** | 20.64 | | **0.00** |
| **Variance** | | | **-4.5%** |

**Key assumptions:**
- Spice moves to G0431 as screen
- MDMA is tested separately
- Validity is not reimbursed
- POC assumptions are applied only to specimens with POC
- For those included as Positive POC, confirmation testing is only performed when + POC result
- Confirm negatives on illicits regardless of POC result

| | | |
|---|---|---|
| Revenue impact: | Current: | 17,200,000 |
| | Proposed: | 16,231,454 |
| | **Difference:** | **968,546** |

# EXHIBIT 29
# FILED UNDER SEAL

# EXHIBIT 30

**To:**        Daniel Pencak[Daniel.Pencak@millenniumhealth.com]
**From:**    Frank Adams[/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FRANK ADAMS782]
**Sent:**     Mon 2/3/2014 9:49:46 PM (UTC)
**Subject:**  Orders by drug v3.xlsx
Orders by drug v3.xlsx

Updated

Frank Adams
Sr. Financial Analyst
Millennium Laboratories
16981 Via Tazon, Building 3
San Diego, CA 92127
Office: (858) 451-3535
Fax: (858) 451-3636
Frank.Adams@millenniumlabs.com
.

(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

Document Produced In Native Format

Confidential                                                                ML_DE_00060309

| CPT Description | CPT Code | Ordered Test Ratio Dec -13 | Medicare Rate at 98% | Current Billed | POC Status | Confirm Positive? | % Positive POC | POC cutoff | New Billed |
|---|---|---|---|---|---|---|---|---|---|
| Cocaine Quantification | 82520 | 0.86 | 20.27 | 17.35 | POC | Include | 1.5% | 300 | 0.26 |
| Amphetamines Quantification | 82145 | 0.85 | 20.78 | 17.75 | POC | Include | 3.3% | 1,000 | 0.58 |
| Methadone Quantification | 83840 | 0.90 | 21.83 | 19.61 | POC | Include | 4.5% | 300 | 0.87 |
| Cannabinnoids Quantification*** | 82542 | 0.79 | 24.14 | 19.19 | POC | Include | 10.3% | 50 | 1.98 |
| PHENOBARBITAL (Barbs) Quantification | 80184 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 300 | 0.23 |
| Secobarbital Quantification | 82205 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 300 | 0.23 |
| Phencyclidine Quantification | 83992 | 0.50 | 18.66 | 9.26 | POC | Include | 1.4% | 25 | 0.13 |
| DESIPRAMINE (TCA) Quantification | 80160 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 800 | 1.70 |
| IMIPRAMINE (TCA) Quantification | 80174 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 1,000 | 1.70 |
| NORTRIPTYLINE (TCA) Quantification | 80182 | 0.53 | 18.12 | 9.59 | POC | Include | 14.0% | 1,000 | 1.34 |
| AMITRIPTYLINE (TCA) Quantification | 80152 | 0.53 | 23.93 | 12.67 | POC | Include | 14.0% | 1,000 | 1.77 |
| Hydrocodone Quantification (Opiates) | 82646 | 0.89 | 27.61 | 24.71 | POC | Exclude | | | 24.71 |
| Hydromorphone Quantification (Opiates) | 82649 | 0.89 | 34.37 | 30.76 | POC | Exclude | | | 30.76 |
| Codeine / Morphine Quantification | 83925 | 0.90 | 26.01 | 23.29 | POC | Exclude | | | 23.29 |
| Oxycodone Quantification | 83925 | 0.89 | 26.01 | 23.13 | POC | Exclude | | | 23.13 |
| Benzodiazepine Quantification | 80154 | 0.87 | 24.73 | 21.60 | POC | Exclude | | | 21.60 |
| Buprenorphine Quantification | 83925 | 0.63 | 26.01 | 16.48 | POC | Exclude | | | 16.48 |
| | | | | | | | | | |
| CREATININE (validity) | 82570 | 0.86 | 6.92 | 5.94 | Non-POC | | | | 0.00 |
| SPECTROPHOTOMETRY (validity) | 84311 | 0.86 | 9.35 | 8.03 | Non-POC | | | | 0.00 |
| PH (validity) | 83986 | 0.86 | 4.78 | 4.11 | Non-POC | | | | 0.00 |
| URNLS DIP STICK/TABLET RGNT (validity) | 81003 | 0.86 | 3.00 | 2.57 | Non-POC | | | | 0.00 |
| | | | | | | | | | |
| Butalbital Quantification | 82205 | 0.77 | 15.31 | 11.73 | Move to Non-POC | | 2.0% | 3,000 | 11.73 |
| Cyclobenzaprine Quantification*** | 82542 | 0.53 | 24.14 | 12.77 | Move to Non-POC | | 14.0% | 3,000 | 12.77 |
| | | | | | | | | | |
| Synthetic Cannabinoids Quantification (spice)*** | 82542 | 0.56 | 24.14 | 13.46 | Non-POC | | | | 13.46 |
| Tapentadol Quantification | 83925 | 0.24 | 26.01 | 6.20 | Non-POC | | | | 6.20 |
| Tramadol Quantification | 82542 | 0.45 | 24.14 | 10.93 | Non-POC | | | | 10.93 |
| Kratom Alkaloids | 82101 | 0.14 | 40.13 | 5.60 | Non-POC | | | | 5.60 |
| Heroin Quantification | 83925 | 0.69 | 26.01 | 17.95 | Non-POC | | | | 17.95 |
| Fentanyl Quantification | 83925 | 0.59 | 26.01 | 15.38 | Non-POC | | | | 15.38 |
| Carisoprodol Quantification | 83805 | 0.56 | 23.56 | 13.29 | Non-POC | | | | 13.29 |
| Ethyl Glucuronide Quantification*** | 82542 | 0.60 | 24.14 | 14.44 | Non-POC | | | | 14.44 |
| MDPV / Cathinones Quantification (Bath Salts)*** | 82542 | 0.44 | 24.14 | 10.60 | Non-POC | | | | 10.60 |
| Methylphenidate Quantification*** | 82542 | 0.31 | 24.14 | 7.45 | Non-POC | | | | 7.45 |
| Meperidine Quantification | 83925 | 0.22 | 26.01 | 5.63 | Non-POC | | | | 5.63 |
| Zolpidem Quantification*** | 82542 | 0.24 | 24.14 | 5.80 | Non-POC | | | | 5.80 |
| Ketamine Quantification*** | 82542 | 0.14 | 24.14 | 3.30 | Non-POC | | | | 3.30 |
| Gabapentin Quantification*** | 82542 | 0.14 | 24.14 | 3.33 | Non-POC | | | | 3.33 |
| Propoxyphene Quantification | 83925 | 0.06 | 26.01 | 1.67 | Non-POC | | | | 1.67 |
| Pregablin Quantification*** | 82542 | 0.08 | 24.14 | 1.92 | Non-POC | | | | 1.92 |
| Naltrexone Quantification*** | 82542 | 0.07 | 24.14 | 1.72 | Non-POC | | | | 1.72 |
| Duloxetine Quantification (Cymbalta)*** | 82542 | 0.05 | 24.14 | 1.10 | Non-POC | | | | 1.10 |
| Fluoxetine Quantification (Prozac)*** | 82542 | 0.03 | 24.14 | 0.75 | Non-POC | | | | 0.75 |
| Venlafaxine Quantification*** | 82542 | 0.03 | 24.14 | 0.69 | Non-POC | | | | 0.69 |
| Paroxetine Quantification (Paxol)*** | 82542 | 0.03 | 24.14 | 0.65 | Non-POC | | | | 0.65 |
| Alcohol Any Spec Except BRTH | 82055 | 0.20 | 14.45 | 2.89 | Non-POC | | | | 2.89 |
| Phentermine  (Psych Panel) | 82542 | 0.02 | 24.14 | 0.51 | Non-POC | | | | 0.51 |
| Risperidone  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.25 | Non-POC | | | | 0.25 |
| Quetiapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.24 | Non-POC | | | | 0.24 |
| Citalopram (Psych Panel) | 82542 | 0.01 | 24.14 | 0.28 | Non-POC | | | | 0.28 |
| Bupropion (Psych Panel) | 82542 | 0.01 | 24.14 | 0.29 | Non-POC | | | | 0.29 |
| Olanzapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.21 | Non-POC | | | | 0.21 |
| Aripiprazole  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.27 | Non-POC | | | | 0.27 |
| Haloperidol (Psych Panel) | 80173 | 0.01 | 19.47 | 0.18 | Non-POC | | | | 0.18 |
| Clozapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.22 | Non-POC | | | | 0.22 |
| Dextromethorphan (DXM)  (Psych Panel) | 82542 | 0.08 | 24.14 | 1.99 | Non-POC | | | | 1.99 |
| Acetaminophen | 83516 | 0.07 | 12.41 | 0.84 | Non-POC | | | | 0.84 |
| Drug screen (per patient encounter) | G0431 | 0.02 | 97.22 | 1.71 | Non-POC | | | | 1.71 |
| HYDROXYINDOLACETIC ACID 5 (OURSOURCED - AR | 83497 | 0.00 | 17.24 | 0.08 | Non-POC | | | | 0.08 |
| CATECHOLAMINES FRACTIONATED (OUTSOURCED | 82384 | 0.00 | 33.76 | 0.16 | Non-POC | | | | 0.16 |
| COL-CHR/MS STABLE ISOTOPE DIL MLT ANALYTES | 82544 | - | 24.14 | - | Non-POC | | | | 0.00 |
| DRUG CONFIRMATION EA PX | 80102 | - | 17.71 | - | Non-POC | | | | 0.00 |
| Non-POC | | 6.14 | | 151.96 | | | | | 151.96 |
| **Total** | | **23.50** | | **490.27** | | | | | **327.22** |

| | | | |
|---|---|---|---|
| **NRPS** | **462.82** | | **308.89** |
| **Variance** | | | **-33.3%** |

# EXHIBIT 31
# FILED UNDER SEAL

# EXHIBIT 32

Message
_____

| | |
|---|---|
| **From:** | Rich Barth [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=79F2D52FDD0B41718A2F84D78D289784-RICH BARTH] |
| **Sent:** | 2/6/2015 1:06:46 AM |
| **To:** | Heidi Smith [Heidi.Smith@millenniumhealth.com] |
| **Subject:** | RE: April 16 Fair Value Narrative |
| **Attachments:** | MLH Inc and Sub 409A Report_FINAL_04 16 14 - 2 5 2015.pdf |

No worries – I found a break and put it together. Here you go. Rich

Rich Barth
Vantage Point Advisors

M 310-883-5188
D 310-469-5114
D 949-525-9339

_____

**From:** Heidi Smith [mailto:Heidi.Smith@millenniumhealth.com]
**Sent:** Thursday, February 05, 2015 4:55 PM
**To:** Rich Barth
**Subject:** RE: April 16 Fair Value Narrative

Thank you. I think I never responded to your last email. So many moving parts back then!

Have a nice night.
Best regards,

Heidi Smith
VP Finance
Millennium Health
Office: (858) 451-3535
Fax: (858) 217-2748
Heidi.Smith@millenniumhealth.com
(Full Email Disclaimer - http://millenniumhealth.com/emaildisclaimer/)

**From:** Rich Barth [mailto:rbarth@vpadvisors.com]
**Sent:** Thursday, February 05, 2015 4:45 PM
**To:** Heidi Smith
**Subject:** RE: April 16 Fair Value Narrative

Hi Heidi, I am doing well thanks; hope you are too!

I have checked and it looks like this never got finalized – I will do that first thing tomorrow. Rich

Rich Barth
Vantage Point Advisors

M 310-883-5188
D 310-469-5114
D 949-525-9339

_____

**From:** Heidi Smith [mailto:Heidi.Smith@millenniumhealth.com]
**Sent:** Thursday, February 05, 2015 3:45 PM

Confidential                                                                                VP_ML_00015683

**To:** Rich Barth
**Subject:** FW: April 16 Fair Value Narrative

Hi Rich,
I hope you are doing well. I thought I had the final copy but I've gone through my files and can't find it. Can you please send it over?  Also Jack is going to reach out for the final version of the other valuation.
Thank you


Heidi Smith
VP Finance
Millennium Health
Office: (858) 451-3535
Fax: (858) 217-2748
Heidi.Smith@millenniumhealth.com
(Full Email Disclaimer - http://millenniumhealth.com/emaildisclaimer/)

**From:** Rich Barth [mailto:rbarth@vpadvisors.com]
**Sent:** Thursday, September 04, 2014 8:57 AM
**To:** Heidi Smith
**Subject:** FW: April 16 Fair Value Narrative

Hi Heidi, just checking in to see whether you had any comments on this. Thanks, Rich




**From:** Rich Barth
**Sent:** Wednesday, August 13, 2014 2:46 PM
**To:** Heidi Smith (Heidi.Smith@millenniumlabs.com)
**Cc:** Todd Poling; Han Van Le
**Subject:** April 16 Fair Value Narrative

Hi Heidi, please find the draft narrative attached. Rich

Rich Barth, Director
Vantage Point Advisors
**San Diego | Los Angeles | Orange County**
1875 Century Park E, Suite 1000, Los Angeles, CA 90067

M 310-883-5188
D 949-525-9339
D 310-469-5114

**IRS Circular 230 Disclosure**
To ensure compliance with the requirements imposed on by IRS Circular 230 (31 C.F.R. 10.33 - 10.37, et. seq.), we must inform you that any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding tax-related penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein.

Confidential                                                                              VP_ML_00015684



# VANTAGE POINT ADVISORS



Corporate Valuation
Financial Advisory Services

## Millennium Lab Holdings, Inc. and Subsidiaries
## ASC 718 and IRC 409A
## As of April 16, 2014

February 5, 2015



Vantage Point Advisors, Inc.
12636 High Bluff Drive, Suite 120
San Diego, CA 92130
858-509-7545
www.vpadvisors.com

Confidential

February 5, 2015

Mr. Howard Appel
President
Millennium Lab Holdings, Inc. and Subsidiaries
16981 Via Tazon
San Diego, CA 92127

Dear Mr. Appel:

At your request, Vantage Point Advisors, Inc. performed a fair value analysis of the common stock in Millennium Lab Holdings, Inc. and Subsidiaries ("MLH" or the "Company") for financial reporting purposes as outlined under U.S. GAAP Codification of Accounting Standards Codification Topic 718: Compensation – Stock Compensation and Internal Revenue Code Section 409A ("IRC 409A") in relation to the valuation of privately-held equity securities issued as compensation.

Our analysis provides an estimate of the fair value of the common stock in MLH. The valuation analysis was performed as of April 16, 2014 (the "Valuation Date") in connection with an anticipated recapitalization of the Company (the "Recapitalization"). The valuation analysis gave effect to the Recapitalization, which implied that the previously outstanding common stock and common stock options represented a 55.0 percent interest in MLH.  Pursuant to the Recapitalization, MLH transferred a 45.0 percent interest in Millennium Lab Holdings II, LLC ("MLH II") to TA Associates, L.P. ("TA" or the "TA Funds") in exchange for the redemption of the outstanding warrants of TA Funds in MLH and in satisfaction of the outstanding debentures of MLH held by TA Funds. The valuation was performed assuming  MLH II had become the direct 100 percent parent of Millennium Laboratories, LLC ("Labs LLC"), formerly Millennium Laboratories, Inc. ("Labs"), and the indirect 100 percent parent of the subsidiaries of Labs, Pain in the Air, LLC (formerly Pain in the Air, Inc.) and RxAnte, LLC (formerly RxAnte, Inc.).



2

VANTAGE POINT ADVISORS

The following is a conclusion of the estimated fair value per share of common stock:

| Summary of Value | Apr-16-2014 |
|---|---|
| Estimated fair value of 55.0 percent of equity value | $1,148,250 |
| Number of common shares | 332,414 |
| Value per share of common, nonmarketable | $3.454 |
| **Estimated fair value per share of common stock, nonmarketable (rounded) (USD)** | **$3,460.0** |

We based our estimation of value on historical and financial data provided by the Company's management ("Management"). We did not independently investigate or otherwise verify the data provided, and we do not express an opinion or offer any form of assurance regarding its accuracy or completeness. Management understands that omissions or misstatements may materially affect our conclusions.

We appreciate the opportunity to have provided valuation services to you. Our analysis is subject to the attached Terms and Conditions. Please contact Todd Poling at (858) 876-3168 or Rich Barth (310) 469-5114 should you have any questions or if we may be of further assistance.

Very truly yours,

Vantage Point Advisors, Inc.



3                    VANTAGE POINT ADVISORS



# Table of Contents

**ENGAGEMENT OVERVIEW**..........................................................................................**6**

PURPOSE AND USE .......................................................................................... 6
DEFINITION OF FAIR VALUE AND FAIR MARKET VALUE............................................ 7
SCOPE OF SERVICES ....................................................................................... 7
SOURCES OF INFORMATION ............................................................................... 8

**COMPANY OVERVIEW**................................................................................**9**

**ECONOMIC OUTLOOK**............................................................................**15**

CONCLUSION................................................................................................. 17

**INDUSTRY OUTLOOK**.............................................................................**18**

DIAGNOSTIC AND MEDICAL LABORATORIES IN THE U.S. ....................................... 18

**VALUATION METHODOLOGY**...............................................................**25**

APPROACHES TO VALUE .................................................................................. 25
METHODS APPLIED.......................................................................................... 25
METHOD NOT SELECTED .................................................................................. 26

**VALUATION ANALYSIS**.........................................................................**27**

DCF METHOD ............................................................................................... 27
GUIDELINE PUBLIC COMPANY METHOD ............................................................. 29
GUIDELINE TRANSACTION METHOD .................................................................. 30

**RECONCILIATION**..................................................................................**31**

**ALLOCATION OF EQUITY**......................................................................**32**



4

VANTAGE POINT ADVISORS

VP_ML_00015688



# Table of Contents

METHODOLOGIES ........................................................................................................... 32

ADJUSTMENTS TO FAIR VALUE .................................................................................34

VALUATION CONCLUSION............................................................................................37

TERMS AND CONDITIONS............................................................................................38

APPRAISAL CERTIFICATION .......................................................................................40

SUPPLEMENT I: DLOM STUDIES..................................... ERROR! BOOKMARK NOT DEFINED.

SUPPLEMENT II: OWNERSHIP CHARACTERISTICS..... ERROR! BOOKMARK NOT DEFINED.

EXHIBITS ........................................................................................................................41



Confidential

VP_ML_00015689

# Engagement Overview

## Purpose and Use

Millennium Lab Holdings, Inc. and Subsidiaries ("MLH," the "Company," or "Client") requested Vantage Point Advisors, Inc. to perform valuation services (the "Services") for financial reporting requirements as outlined under U.S. GAAP Codification of Accounting Standards Codification Topic 718: Compensation-Stock Compensation and Internal Revenue Code Section 409A ("IRC 409A") in relation to the valuation of privately-held equity securities issued as compensation. No other use is intended or inferred.

Our analysis provides an estimate of the fair value of the common stock in MLH. The valuation analysis was performed as of April 16, 2014 (the "Valuation Date") in connection with an anticipated recapitalization of the Company (the "Recapitalization"). The valuation analysis gave effect to the Recapitalization, which implied that the previously outstanding common stock and common stock options represented a 55.0 percent interest in MLH. Pursuant to the Recapitalization, MLH transferred a 45.0 percent interest in Millennium Lab Holdings II, LLC ("MLH II") to TA Associates, L.P. ("TA" or the "TA Funds") in exchange for the redemption of the outstanding warrants of TA Funds in MLH and in satisfaction of the outstanding debentures of MLH held by TA Funds. The valuation was performed assuming MLH II had become the direct 100 percent parent of Millennium Laboratories, LLC ("Labs LLC"), formerly Millennium Laboratories, Inc. ("Labs"), and the indirect 100 percent parent of the subsidiaries of Labs, Pain in the Air, LLC (formerly Pain in the Air, Inc.) and RxAnte, LLC (formerly RxAnte, Inc.).

We prepared this report in conformance with Standards 9 and 10 of the Uniform Standards of Professional Appraisal Practice ("USPAP") and the Statement on Standards for Valuation Services ("SSVS") as set forth by the American Institute of Certified Public Accountants ("AICPA"). In addition, our analysis considers guidance provided by the AICPA Accounting and Valuation Guide for the Valuation of Privately-Held-Company Equity Securities Issued as Compensation (the "AICPA Accounting Guide").



6

VANTAGE POINT ADVISORS

# Definition of Fair Value and Fair Market Value

The Financial Accounting Standards Board ("FASB") defines fair value[1] as:

> *"The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."*

According to Revenue Ruling 59-60[2], fair market value is:

> *"The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."*

# Scope of Services

Our analysis relied, in part, upon certain information provided by Management. With respect to this assignment, we did not independently investigate or otherwise verify the data provided by Management, and we do not express an opinion or other form of assurance regarding its accuracy or completeness.

The principal procedures in formulating our estimates of fair value include, without limitation, the following:

- Discussions with Management concerning the nature of and business operations of the Company, including historical performance.

- Reviews of financial statements of the Company.

- Analyses of the economy and industry within which the Company operates.

- Evaluation of management-prepared forecast for the years ending December 31, 2014 through December 31, 2020.

- Estimation of the Company's cost of capital.

---

[1] Accounting Standards Codification 820 – *Fair Value Measurements and Disclosures.*
[2] Treasury Regulation 20.2031-1(b); Revenue Ruling 59-60, 1959-1 C.B. 237.



7

VANTAGE POINT ADVISORS

VP_ML_00015691

- Estimation of fair value using valuation approaches and methodologies.

It is our understanding that there has been no material change in the existing financial condition (except for the Recapitalization as referred to in the forecasts referenced below) or business prospects of the Company since the date of the most recent financial statements obtained.

Management reported that it is not aware of any litigation, threatened or pending, or any other contingent or off balance sheet liabilities that could have an impact on the valuation.

## Sources of Information

Key documents reviewed and or considered were:

- Audited balance sheets of Millennium Laboratories, Inc. and Subsidiary as of December 31, 2009 and of Millennium Lab Holdings, Inc. and Subsidiaries as of December 31, 2010 through December 31, 2013;

- Management-prepared balance sheets of MLH and its subsidiaries, including Labs, as of March 31, 2014;

- Audited income statements of Millennium Laboratories, Inc. and Subsidiary for the year ended December 31, 2009 and of Millennium Lab Holdings, Inc. and Subsidiaries for the years ended December 31, 2010 through December 31, 2013;

- Management-prepared income statements of MLH and its subsidiaries, including Labs, for the 12-month period ended March 31, 2014;

- Certain Management-prepared financial information relating to the Recapitalization;

- Management-prepared forecast of the Company and its direct and indirect subsidiaries, including Labs, for the years ending December 31, 2014 through December 31, 2020; and

- Certificate of Formation and the AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF MILLENNIUM LAB HOLDINGS II, LLC, a Delaware limited liability company.



8

VANTAGE POINT ADVISORS

# Company Overview

## *Description*

Founded in December of 2007 in San Diego, California, Labs provides health care professionals with pharmacogenetic testing, medication monitoring and drug detection services, clinical tools, scientific data and education in order to enhance clinical outcomes and patient safety. Millennium offers two core services: Millennium Urine Drug Testing ("UDT$^{SM}$") and Millennium Pharmacogenetic Testing ("PGT$^{SM}$"). Millennium UDT$^{SM}$ results in a safe and effective management of prescription medication by identifying medication and other substances present in, or absent from, the patient's body. Millennium PGT$^{SM}$ allows health care professionals to assess a number of key drug metabolism enzymes; identify the underlying genetic characteristics that impact the metabolism of medications; simplify specimen collection with patient-friendly, noninvasive, saliva-based exams; predict a patient's responses to medications; understand a patient's lower than expected clinical response; and explain a patient's higher than expected incidence of adverse effects.

As part of MLH's business strategy, it has relationships with Millennium Research Institute ("MRI") and Millennium Laboratories Clinical Supply, Inc. MRI is a non-profit research and teaching center for pain management. It collaborates with universities, researchers, government and industry partners to design and execute programs related to pain which train scientists and researchers. Millennium Laboratories Clinical Supply, Inc. provides Clinical Laboratory Improvement Amendments ("CLIA")-waived in-office urine drug testing devices and medication monitoring supplies.

The Company's sole purpose is to act as a holding company for Labs, and indirectly for the subsidiaries of Labs.

## *Senior Management Team*

The Company is led by its founder and Chairman of the Board, James Slattery. Prior to founding Labs in December 2007, Mr. Slattery achieved success in broadcast communications and real estate development. Among his many entrepreneurial accomplishments, Mr. Slattery created the first satellite network in the United States, which he later sold to a Fortune 50 broadcast company. Mr. Slattery holds a Bachelor's degree from the University of Massachusetts. Mr. Slattery received the Ernst & Young Entrepreneur of the Year® 2011 San Diego Award in the Life Sciences category. The Ernst & Young award recognizes entrepreneurs who demonstrate excellence and extraordinary success in such areas as innovation, financial performance and personal commitment to their businesses and communities.



9

VANTAGE POINT ADVISORS

Chief Executive Officer Brock Hardaway joined Labs in 2013 where he provides strategic leadership for the Company's long-term growth. Mr. Hardaway's two decades of leadership experience in the healthcare industry helps the Company focus on growing the Company's product and service offerings, increasing brand recognition, and maximizing earnings potential. Prior to joining Labs, he served as executive vice president of operations for Kindred Healthcare.

Howard Appel serves as the Company's and Labs' President. Prior to his promotion to President, he was Labs' Chief Financial Officer. Leveraging on more than twenty years of experience as a Certified Public Accountant and CFO, Mr. Appel takes on the role of President to provide oversight of the Company's and Labs' daily operations and implement its annual growth initiatives.  He also directs the Company's and Labs' strategic initiatives and long term planning.

*Competition*

The clinical laboratory business is intensely competitive. Two major national independent clinical laboratories, Laboratory Corporation of America Holdings ("LabCorp") and Quest Diagnostics Incorporated ("Quest") had approximately $13.0 billion in revenue from clinical laboratory testing in 2013. Two other noteworthy clinical laboratory testing services competitors are Genzyme Corporation and Bio-Reference Laboratories, Inc. In terms of industry size, LabCorp believes that, in 2012, the entire United States clinical laboratory testing industry generated revenues of approximately $60.0 billion (up from $55.0 billion in 2010) based on the Washington G-2 reports.

Other competitors include specialized laboratories in specific areas of cancer such as Genoptix, Inc. (leukemia/lymphoma), Bostwick Laboratories, Inc. (prostate cancer), NeoGenomics, Inc. (breast cancer and leukemia/lymphoma), Caris Life Sciences, Inc. (colon cancer), and Clarient, Inc. (oncology diagnostic).

The testing performed in the United States is completed by hospitals and regional, specialty, and physicians laboratories. In addition to the leading competition from Quest and LabCorp and specialized laboratories, the Company also competes with smaller independent clinical and anatomical laboratories as well as laboratories owned by hospitals and physicians.

Healthcare providers often use the following factors in selecting a laboratory: accuracy, timeliness and consistency in reporting test results; reputation of the laboratory in the medical community or field of specialty; contractual relationships with managed care companies; service capability and convenience offered by the laboratory; number and types of tests performed; connectivity solutions offered; and pricing of the laboratory's services.



10   VANTAGE POINT ADVISORS

## Competitive Strengths

Despite a significant pool of competitors within the industry, Labs has several competitive strengths that allow it to continue to grow and further penetrate the market.

### Market Share Leader

Labs is the market share leader and has a national presence in the UDT market. Labs continues to make strides in the PGT space and the recently added advanced analytics platform ("RxAnte") should help drive growth.

### Diverse and Loyal Customer Base

Labs serves over 6,700 physician practices with 200 network contracts covering over 168 million lives. Labs has an attractive payor mix with approximately 63.0 percent of volume under contract in 2013.

### 24-Hour Turnaround Time

Through the single focus of establishing efficient and accurate testing methodologies, MLH has developed proprietary methodologies that provide the fastest reliable UDT confirmations in the nation. Other regional labs have turnaround time ranging between 3-5 days while national labs' turnaround times are up to 10 days.

### Superior Testing Accuracy and Results

MLH is the only major Urine Testing Laboratory exclusively utilizing the latest technology LC-MS/MS. Its LC-MS/MS highly scalable and automated technology provides valid and accurate results on first pass. MLH proprietary laboratory information system ("MLIS") enables rapid compiling, processing, and reporting of patients' health records.

### Ease of Consultation Access

In addition to its industry-leading test accuracy, Labs also provides clinical decision support through its 12-hour daily customer support hotline.

### Strategic Relationship with Millennium Research Institute

Labs collaborates with MRI, a leading voice in education and research in toxicology, pharmacology, pain management and practice management. This relationship allows Labs to illustrate the clinical benefits and potential cost savings of UDT to national and regional health plans and government insurers.



11                                           VANTAGE POINT ADVISORS

VP_ML_00015695

*Accreditation*

As a national lab operating in all 50 states, Labs maintains full licensing and accreditations including CLIA certification. The College of American Pathologists ("CAP"), an entity requiring the highest proficiency testing standards in the industry, also provided accreditation to the Company. Other company-accreditations come from the Commission on Office Laboratory Accreditation ("COLA") and the Joint Commission. They also adhere to all applicable federal and state laws, rules, and regulations.

## Business Risks

There are several risks that could negatively influence Labs' business prospects and profitability.

*Increased Competition*

Increased competition could have material adverse impact on MLH's net revenue and profitability. The clinical laboratory industry is undergoing significant consolidation, and larger clinical laboratory providers are able to increase cost efficiencies driven by large-scale automated testing. This consolidation results in greater price competition and could lead to a reduction in profit margins if prices are forced to remain flat. Labs may also be forced to enter into agreements with large insurance companies to capture a larger customer base, which may result in lower unit prices.

*Changes in Regulations*

Changes in federal, state, local and third-party payer regulations or policies, insurance regulation or approvals or changes in other laws, regulations or policies may adversely affect governmental and third-party coverage and reimbursement for clinical laboratory testing and could have a material effect upon Labs' business.  These regulations cover areas including: billing and reimbursement of clinical tests; certification or licensure of clinical laboratories; the anti-self-referral and anti-kickback laws and regulations; the laws and regulations administered by the U.S. Food and Drug Administration; the corporate practice of medicine;  operational, personnel and quality requirements intended to ensure that clinical testing services are accurate, reliable and timely; physician fee splitting; relationships with physicians and hospitals; safety and health of laboratory employees; and handling, transportation and disposal of medical specimens.

*Violation of Government Regulation*

Labs is subject to extensive government regulation at the federal, state and local levels. MLH's failure to meet governmental requirements under these regulations could lead to civil and criminal penalties, exclusion from participation in Medicare and Medicaid and possible prohibitions or restrictions on the use of its laboratories.



12

VANTAGE POINT ADVISORS

VP_ML_00015696

*Technology*

Failure to develop, acquire or license new or improved testing technologies, or a move by Labs' customers to use new technologies to perform their own tests, could limit Labs' ability to remain competitive.

*Economic Environment*

Since Labs' operations are dependent upon the ongoing demand for diagnostic testing services by patients, physicians, hospitals, and others, a significant deterioration in the economy could negatively impact testing volumes, cash collections, and the availability of credit.

## Financial Overview

The Company provided audited financials for Labs and its subsidiary for the fiscal year ended December 31, 2009 and for Millennium Lab Holdings, Inc. and Subsidiaries for the fiscal years ended December 31, 2010 through December 31, 2013 (the "Review Period"). Such historical financial statements are presented as **Appendix A** and **Appendix B**.

During 2011, Labs established in-network status with several national payors. Since Labs' payor mix remained diverse, new contracts had minimal impact on the Labs' overall net revenue per specimen. Meanwhile Labs leveraged its available equipment and lab personnel capacity and increased its gross margins. Cost of goods sold includes reagents, lab supplies, and shipping which are directly tied to revenue volume.

In 2012, Labs' key development included its launch of several new products, penetration of new markets, and agreements with new customers (i.e., insurance companies). Revenue reached $632.6 million in 2013 with growth driven primarily by volume increases as Labs reached a milestone with specimens tested exceeding six million. A decline in reimbursement rates had a slight drag on revenues but growth was still strong at approximately 21.2 percent.

MLH acquired RxAnte, Inc. on December 23, 2013, which reported run rate revenues of $4.7 million and EBITDA of negative $2.5 million (adjusted purchase price of approximately $70.4 million). In addition to growing its core pain management business, Labs expects to see growth from increased treatment center volume and penetration into the cardiac, psychiatric, and primary physician markets.

Actual reported 2011 EBITDA margin was lower than adjusted EBITDA due to a reported one-time expense related to the TA transaction funded expenditures and related performance bonuses. These costs were not capitalized and were funded by debenture proceeds. 2011 EBITDA increased, but was below expectations, as Labs made significant investments in infrastructure through strategic hiring, office space expansion, and adoption of new technology. 2012 EBITDA further



13   VANTAGE POINT ADVISORS

VP_ML_00015697

increased as Labs achieved greater efficiency in its billing process and also generated higher test volume. Adjusted EBITDA in 2013 increased to $378.1 million, but margins were affected by competitive forces.

*Ownership*

Giving effect to the Recapitalization, the Company's 300,495.94 common shares and 31,918 common stock options had a claim on 55.0 percent of the remaining equity.



14

VANTAGE POINT ADVISORS

VP_ML_00015698

# Economic Outlook[3]

## *Gross Domestic Product ("GDP")*

The Bureau of Economic Analysis reported that the nation's economy—as indicated by GDP—grew at an annual rate of 3.2 percent in the fourth quarter of 2013. This matched forecasts, as the result of a survey conducted by Bloomberg found that the median forecast of economists was a 3.2 percent rate. GDP is the total market value of all goods and services that are produced in the U.S. economy; it is generally considered the most comprehensive measure of economic growth. The Bureau of Economic Analysis revised the third-quarter GDP rate upward to 4.1 percent from a previously reported 2.8 percent. GDP grew 1.9 percent in 2013, a deceleration from 2.8 percent in 2012.

Consensus Economics Inc., publisher of *Consensus Forecasts—USA*, reports that the consensus of U.S. forecasters is that real GDP will increase at a seasonally adjusted annual rate of 2.5 percent in the first quarter of 2014 and 2.8 percent in the second quarter. Every month, Consensus Economics surveys a panel of 30 prominent U.S. economic and financial forecasters for their predictions on a range of variables, including future growth, inflation, current account and budget balances, and interest rates. The forecasters expect GDP to grow 2.6 percent in 2014, 3.1 percent in 2015, and 3.0 percent in 2016.

## *Interest Rates*

The Federal Open Market Committee ("FOMC") met twice during the fourth quarter of 2013, issuing two statements on its target for the federal funds rate. As expected, the FOMC continued its pledge to keep its target for the federal funds rate near zero. The federal funds rate is the interest rate at which a commercial bank lends immediately available funds in balances at the Federal Reserve to another commercial bank. The FOMC establishes a target rate and expands or contracts the money supply with the aim that the federal funds rate, a market rate, will approximate the target rate.

During the fourth quarter of 2013, the Board of Governors of the Federal Reserve left the discount rate unchanged, at 0.75 percent. The discount rate is the interest rate a commercial bank is charged to borrow funds, typically for a short period, directly from a Federal Reserve Bank. The board of directors of each Reserve Bank establishes the discount rate every 14 days, subject to the approval of the Board of Governors.

---

[3] Economic Outlook Update™ Q4 2013 published by Business Valuation Resources, LLC, © 2014, reprinted with permission.


MILLENNIUM LABORATORIES

15

VANTAGE POINT ADVISORS

Confidential

## Unemployment

The U.S. Department of Labor reported that the pace of payroll growth slowed in December. There were 74,000 jobs created in December, well below the median forecast of 197,000 jobs in a Bloomberg survey of economists and below the 241,000 jobs created in November. The December employment report showed that job gains in November were revised upward, while jobs gains in October were unchanged. With those revisions, employment gains in November and October combined were 38,000 higher than previously reported. The December figure brings the three-month payroll growth average to 172,000 jobs per month and the twelve-month payroll growth average to 182,000 jobs per month. The White House Council of Economic Advisors noted that the economy has now added private-sector jobs for 46 consecutive months, with private-sector employment increasing by more than 8.2 million over that period. Over the last twelve months, 2.19 million jobs have been added across all sectors.

The unemployment rate (also known as the U3 unemployment rate) fell to 6.7 percent in December, or approximately 10.4 million unemployed, from 7.0 percent in November. This was the lowest unemployment rate since October 2008.

## Consumer Prices

The Conference Board's Consumer Confidence Index rose to 78.1 in December from a reading of 72.0 in November. The December rise broke a three-month consecutive decline. The December reading was above economists' forecasts, as the consensus forecast of economists surveyed by Bloomberg was 76.0. Sentiments toward current conditions increased to a five-and-a-half-year high, as consumers viewed both economic and labor market conditions more favorably. Looking ahead, consumers expressed increasing confidence in future economic and job prospects but were less optimistic about their earnings prospects. The report noted that consumers were more optimistic overall at the end of 2013 than when the year began.

The Forecasters believe consumer prices will rise at a rate of 1.7 percent in the first quarter of 2014 and 1.8 percent in the second quarter of 2014. They also expect consumer prices to increase 1.7 percent in 2014 and 2.1 percent in 2015.

## Government Spending

Total government spending fell at a rate of 4.9 percent in the fourth quarter, compared with an increasing rate of 0.4 percent in the third quarter. Total government spending has declined in 12 of the previous 16 quarters. This quarter's decline in government spending subtracted 0.93 percentage point from the fourth-quarter GDP rate. Total government spending decreased 2.2 percent in 2013 and 1.0 percent in 2012.



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015700

Federal national defense spending decreased at a rate of 14.0 percent in the fourth quarter. This came after declining at rates of 0.5 percent and 0.6 percent in the third and second quarters, respectively. Federal national defense spending declined 7.0 percent in 2013 and 3.2 percent in 2012.

# Conclusion

U.S. economic growth decelerated in the fourth quarter of 2013 and matched economists' predictions (3.2 percent). The third-quarter GDP rate was significantly revised upward by 1.3 percentage point. Fourth quarter consumer spending rose at its quickest rate in three years, contributing a sizable 2.26 percentage points to the fourth-quarter GDP rate—its largest contribution in three years.

The table to the right shows the consensus economic forecasts for real GDP growth and consumer price growth (inflation) of 2.5 percent and 2.3 percent, respectively. The sum of real GDP growth and consumer price index growth represents nominal GDP growth, or 4.8 percent, for the period 2019 through 2023.

| | HISTORICAL DATA | | | CONSENSUS FORECASTS** | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019-2023 |
| Real GDP* | 1.8 | 2.8 | 1.9 | 2.6 | 3.1 | 3.0 | 2.8 | 2.8 | 2.5 |
| Industrial production* | 3.4 | 3.6 | 2.6 | 3.0 | 3.7 | 3.3 | 2.9 | 2.7 | 2.7 |
| Personal consumption* | 2.5 | 2.2 | 2.0 | 2.5 | 2.8 | 2.7 | 2.6 | 2.5 | 2.5 |
| Real disposable personal income* | 2.4 | 2.0 | 0.7 | 2.7 | 3.2 | 3.1 | 3.0 | 2.8 | 2.7 |
| Nonresidential fixed investment* | 7.6 | 7.3 | 2.6 | 4.5 | 5.0 | 5.0 | 4.4 | 4.1 | 3.8 |
| Nominal pretax corp. profits* | 7.9 | 7.0 | 4.1 | 4.6 | 5.6 | 6.3 | 4.1 | 5.4 | 4.4 |
| Total government spending* | -3.2 | -1.0 | -2.2 | -0.1 | NA | NA | NA | NA | NA |
| Consumer prices* | 3.2 | 2.1 | 1.5 | 1.7 | 2.1 | 2.3 | 2.3 | 2.3 | 2.3 |
| 3-month Treasury bill rate | 0.05 | 0.09 | 0.06 | 0.1 | 0.9 | 2.3 | 3.4 | 3.8 | 3.8 |
| 10-year Treasury bond yield | 2.78 | 1.80 | 2.35 | 3.4 | 3.8 | 4.5 | 5.0 | 5.0 | 5.0 |
| Unemployment rate | 8.9 | 8.1 | 7.4 | 6.9 | NA | NA | NA | NA | NA |
| Housing starts (*millions*) | 0.609 | 0.781 | 0.923 | 1.120 | NA | NA | NA | NA | NA |

*Source of historical data: U.S. Department of Commerce, U.S. Department of Labor, U.S. Census Bureau, and The Federal Reserve Board.*
*Source of forecasts: Consensus Forecasts - USA, December 2013.*

*Notes:*
*\*Numbers are based on percent change from preceding period. Consumer prices are the percent change between annual averages. Historic unemployment rate, 3-month Treasury rate, and 10-year Treasury yield are the annual averages.*
*\*\*Forecast numbers are based on percent change from preceding period (excludes unemployment rate, housing starts, 3-month Treasury rate, and 10-year Treasury yield). Consumer Price Index information is the percent change between annual averages. The 2014 through 2018 forecasts for the 3-month Treasury rate and 10-year Treasury yield are for the end of each period. Forecasts for 2019-2023 signify the average for that period.*


MILLENNIUM LABORATORIES

17

VANTAGE POINT ADVISORS

# Industry Outlook

## Diagnostic and Medical Laboratories in the U.S.[4]

*Industry Overview*

Diagnostic and medical laboratories provide analytic services to identify or determine the nature and cause of a disease or injury, through the evaluation of a patient's history, examination and data. These services are provided to healthcare providers or patients upon referral from health practitioners.

Operators in the industry are an integral part of medical evaluation and treatment. Operators in this industry provide healthcare practitioners with information concerning the onset, severity and cause of patients' physical ailments. While the industry has long been an essential component of healthcare, the aging population and ongoing progress toward preventive care has further boosted revenue over the past five years. Consequently, during the five years to 2013, revenue is expected to have increased at an annualized rate of 2.5 percent to $49.6 billion, which includes growth of 2.1 percent in 2013, due to favorable increases in federal funding for Medicare and Medicaid. Profit is also anticipated to have risen, from 11.3 percent of revenue in 2008 to 11.8 percent in 2013, bolstered by increasing demand for high-margin genetic testing and esoteric tests. Additionally, consolidation will also bolster industry revenue, as a result of cost synergies lowering research and development expenses and enabling large players to secure large-scale contracts with hospitals.

While the aging population strengthened demand, it has also challenged the industry. That is to say, laboratories are facing a shortage of skilled labor as baby boomers, which constitute a significant portion of the industry workforce, retire, and fewer individuals pursue healthcare professions. However, the number of industry employees has slightly increased at an annualized rate of 0.7 percent to 251,382 workers over the five years to 2013. To mitigate the shortage of skilled labor, many operators have increased salaries as a way to entice workers into the field, while retaining current employees. Although the rising use of automation and standardization in laboratories has somewhat lowered demand for employees, highly skilled workers are still required to examine laboratory results, keeping wage costs high.

---

[4] IBISWorld Industry Report "Diagnostic and Medical Laboratories in the U.S." Sarah Turk. December 2013.



18   VANTAGE POINT ADVISORS

Confidential

During the five years to 2018, revenue is forecast to grow at an annualized rate of 3.6 percent to $59.1 billion. Scientific advances will continue to yield new and improved service capabilities, and the aging U.S. population will require more laboratory testing and diagnostic imaging services. Additionally, the healthcare reform legislation of 2010 will continue to be implemented during the next five years, which will benefit the industry. As healthcare reform encourages more individuals to become insured, out-of-pocket costs for laboratory services are expected to decline, which will increase demand for industry services.

## Key External Drivers

### Number of People with Private Health Insurance

Health insurance reduces patients' out-of-pocket costs for healthcare, consequently encouraging individuals to visit their physicians. Payments from private insurance make up 43.5 percent of industry revenue; however, healthcare insurers have taken steps to control pricing, dampening demand for healthcare services. The number of people with private health insurance is expected to increase during 2014.

### Total Health Expenditure

Health expenditure relevant to this industry includes the cost of physician visits and prescriptions that require a laboratory test, prior to being written. Physicians rely on diagnostic testing to help identify the risk for a disease, and aid in the choice of therapeutic procedures. Moreover, many drug therapies do require a lab test before a prescription can be written. As the level of spending on healthcare in the U.S. increases, this will positively affect expenditure on industry services. Total health expenditure is expected to increase during 2014, representing a potential opportunity for the industry.

### Number of Adults Aged 50 and Older

The aging population drives demand for the industry because the need for industry services increases considerably with age. Many chronic diseases such as diabetes, congestive heart failure, chronic obstructive pulmonary disease and arthritis, are more common in older populations thus, the need for diagnostics will continue to increase as the population matures. The number of adults aged 50 and older is expected to increase slowly during 2014.

## Current Industry Performance

Healthcare has been shifting from curative care to detection, prevention and personalized care over the past five years, which has benefited the diagnostic and medical laboratories industry. More physicians and payers, such as Medicare, recognize the vital role diagnostic testing and disease prevention play in improving patient health and reducing healthcare



19  VANTAGE POINT ADVISORS

costs. As such, the trend of preventive care stimulates demand for industry services, as more physicians monitor patients' blood and tissue, and test for health ailments with technology like MRI scans.

The recession caused fewer individuals to have employer mandated health insurance and greatly limited industry revenue growth over the period. Nevertheless, growth in the elderly population, which requires industry services to monitor high rates of chronic illness, prompted revenue growth. During the five years to 2013, revenue is anticipated to have grown at an annualized rate of 2.5 percent to $49.6 billion, which includes growth of 2.1 percent in 2013, bolstered by the increase in federal funding for Medicare and Medicaid. Profit is also expected to have risen slightly, from about 11.3 percent in 2008 to 11.8 percent in 2013, due to industry consolidation and declining operational costs. This is because many large laboratories and diagnostic centers acquired small players to compete with other operators that test their laboratory samples in-house.

## Products and Services

Analytic or diagnostic services, including body fluid analysis (pathology) and diagnostic imaging, not only help physicians diagnose patients' ailments, but also form a critical part of the full continuum of healthcare delivery: prevention, diagnosis, treatment and monitoring. Scientific advancements in testing capabilities and the age profile of the population influence the extent to which specific types of analytic or diagnostic tests are used. Older people are more likely to suffer from heart disease, liver disease or cancer, which stimulates demand for the elderly to receive testing for these ailments.

The U.S. market in gene-based testing is in excess of $2.5 billion per year and is growing by more than 10.0 percent per year. The unveiling of the human genome has promoted growth in genomic testing. The discovery of new genes and the linkages of these genes with disease will result in more complex and thorough predictive, diagnostic and therapeutic testing.

## Major Market

### Independent Physicians, Physician Groups and Hospitals

Diagnostic and medical laboratories provide services that are used by hospitals, physicians, other healthcare providers and commercial clients. The tests assist in the diagnosis, evaluation, detection, therapy selection, monitoring and treatment of diseases and other medical conditions through the examination of substances in the blood, tissues and other specimens. These customer groups often enter into agreements with laboratories and centers to provide services, generally at discounted rates. Other customers that use tests include dental practices, veterinary clinics, pharmaceutical companies (e.g. for pathology clinical research on new drugs) and government entities. During the five years to 2013,



<div align="center">20</div>

<div align="right">VANTAGE POINT ADVISORS</div>

there were no significant changes in the industry's market segmentation; heightened demand for healthcare services has sustained the growth for services provided by hospitals, physicians and other healthcare providers.

Physicians that require testing for their patients are one of the industry's primary sources of testing services. Physicians determine which laboratory to recommend or use based on a variety of factors. Physicians also purchase and use industry point-of-care tests, such as gene-based testing, which helps doctors to diagnose and predict diseases and improve their ability to analyze the effectiveness of treatments.

The industry provides hospitals with services ranging from routine and specialty testing to contract management services. Hospitals generally maintain an on-site laboratory to perform patients' tests that are needed immediately. However, hospitals also refer less time-sensitive procedures, less frequently needed procedures and highly specialized procedures to outside facilities, including independent clinical laboratories and larger medical centers.

*Payment Sources*

In most cases, the customer who orders the testing is not responsible for the service payments. Depending on the billing arrangement and applicable law, the payer may be a third party responsible for providing health insurance coverage to patients, such as a health insurance plan, self-insured employer benefit fund or Medicare or Medicaid. Payment methods for laboratory tests vary by the type of provider venue (e.g. inpatient, outpatient or ambulatory care) and type of test (e.g. clinical or anatomical pathology). For most inpatient care, public and private payers apply prospective payment systems, wherein rates are based on the patient's diagnosis. Most other federal payers and many private payers use Medicare's diagnosis-related group ("DRG") codes with assigning their own payment rates.

Medicare's implementation of DRGs and other prospective payment systems in the 1980s transformed hospital laboratories from profit centers to cost centers. DRGs created incentives to reduce the number of tests ordered and to shift inpatient care to hospital outpatient and ambulatory care settings. This increased the number of patients that independent laboratories serviced. Rising healthcare costs and efforts to control them, however, have prompted payers to bundle hospital outpatient services under "outpatient prospective payment systems." Under Medicare, this move has created an administrative and financial burden for some independent laboratories because they must bill hospitals directly for the technical aspect of testing and bill Medicare directly for pathologist fees. Medicare payments account for about 15.5 percent of industry revenue, and Medicaid payments account for about 4.0 percent of industry revenue.

Most federal payers and the majority of commercial payers base their reimbursement rates for laboratory services on those paid by Medicare; consequently, its payment policies are notably influential on industry performance.



21                                    VANTAGE POINT ADVISORS

Reimbursement rates from Medicare have been following a downward trend during most of the five years to 2013 on an inflation-adjusted basis.

*Outlook*

During the next five years, the diagnostic and medical laboratories industry is expected to benefit from healthcare reform. As healthcare overhaul increases the number of insured individuals, demand for industry services will grow in line with lower out-of-pocket costs for laboratory testing. Moreover, the aging U.S. population will stimulate demand for industry services, due to the high prevalence of chronic illness in this demographic.

During the five years to 2018, revenue is anticipated to grow at an annualized rate of 3.6 percent to $59.1 billion, due to an increased number of insured individuals using healthcare services, including MRI and CT scans. Profit is also expected to increase, from 11.8 percent of revenue in 2013 to 13.0 percent of revenue in 2018, as a result of consolidation. As many laboratories consolidate, operators will increasingly compete on the basis of price with hospitals that provide industry services in-house. In particular, large laboratories are acquiring smaller labs that provide either routine or specialized services, such as biomarkers. Also, as more patients seek an individually tailored healthcare plan, demand for high-margin molecular testing, such as genetic testing, will cause industry profit to increase.

*Healthcare Reform Helps the Industry*

The Patient Protection and Affordable Care Act ("PPACA"), signed into law in 2010, will continue to affect the industry over the next five years. The PPACA's focus on disease prevention and its inclusion of laboratory services as part of the basic coverage for those currently uninsured will increase the number of patients with access to industry services. Under the PPACA, Medicare will cover the entire cost of preventive services such as screening tests. In addition, all private health plans must also provide coverage for preventive services without cost sharing.

Conversely, the PPACA also includes cuts to the consumer price index ("CPI") of about 1.75 percent, which will affect the lab fee schedule update through 2015, further reducing industry profitability. In addition, the law also establishes a permanent productivity adjustment to the fee schedule update, which is another type of reimbursement reduction. Nonetheless, the expected rise in coverage over the next five years will result in an increase in laboratory testing, helping to mitigate these cutbacks.


MILLENNIUM LABORATORIES

22

VANTAGE POINT ADVISORS

VP_ML_00015706

*Further Medicare Pressures*

The Congressional Budget Office and the National Commission on Fiscal Responsibility and Reform have proposed a cost-sharing structure for Medicare beneficiaries, which include the addition of a 20.0 percent coinsurance for laboratory services. This option would cut Medicare reimbursement for clinical laboratory services and require laboratories to collect the coinsurance from beneficiaries. A variation of this option has surfaced in connection with the debt ceiling extension negotiations, which would impose a $1.00 to $2.00 flat copayment per laboratory test.

The coinsurance or co-pay proposals could severely reduce profitability for many smaller laboratories that operate as the sole provider of laboratory services to Medicare's most vulnerable beneficiaries, that is to say those in nursing homes and other such settings. Co-pay collection is a considerable expense that small operators will struggle to cover.

*Medical Advances Drive Growth and Competition*

Medical advancements will allow for more accurate and timelier diagnoses and treatments. In particular, research in genomics will result in the development of more specialized diagnostic tests. Physicians will increasingly order gene-based and other esoteric tests to assist them in the diagnostic process, establish prognoses and choose therapeutic regimens. Esoteric tests include procedures in molecular diagnostics, protein chemistry, cellular immunology and advanced microbiology. Esoteric tests typically require hands-on attention from highly skilled technical personnel and sophisticated technology, equipment or materials. They can also be performed less frequently than routine tests. Consequently, esoteric tests are generally reimbursed at higher levels than routine tests.

## Conclusion

MLH, through its direct and indirect subsidiaries, including Labs, occupies a strong position in the diagnostics industry in the U.S. by virtue of its unique urine testing laboratory that utilizes the latest available technology. It has the available technology and capable management team necessary to continue development and increase its market share.

Although the drug testing laboratories have thus far greatly benefited from the DEA's efforts to control drug abuse, the industry has grown rapidly as medical knowledge has expanded. Certain laboratories, such as MLH, still depend on payment rates set by third-party payers like Medicare, Medicaid, MCOs, and other health insurers. The Company continues to see changes in Medicare reimbursement policies for qualitative drug screens, which directly impacted its net revenue per specimen.



23

VANTAGE POINT ADVISORS

Confidential

Medical laboratories fared well during the recession due to the necessary nature of their services and the rapidly aging U.S. population, which has a greater need for medical testing. The industry can expect much of the same in the coming years. With more people receiving health insurance after the healthcare reformed enacted in 2010, demand for medical testing should increase. MLH is well positioned to capitalize on increased demand for laboratory services.

The clinical testing business is a fragmented and highly competitive industry. The Company is facing an increase in competitive pressure from physician offices and hospital outreach programs. Hospitals generally maintain onsite laboratories to perform testing on their patients (inpatient or outpatient). Most physicians have admitting privileges with hospitals as part of their medical practice and hospitals leverage their relationships with community physicians and encourage them to send their outreach testing to the hospital's laboratory. In addition, hospitals that own physician practices generally require the physicians to refer tests to the hospital's laboratory.

The Company's future earnings continue to be sensitive to the success of its customer maintenance and business development activities. The Company faces risk from its revenue concentration in Urine Drug Testing and growth could be dependent on growing its Pharmacogenetic Testing business. Any delay or negative developments with these efforts could impede the Company's growth trajectory and profitability levels.



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015708

# Valuation Methodology

## Approaches to Value

To estimate the value of a company, three different approaches may be employed: (1) the income, (2) market and (3) cost approaches. These three approaches are summarized as follows:

- **Income Approach:** Under the income approach, value is measured as the present worth of anticipated future net cash flows generated by a business. In a multi-period model, net cash flows attributable to a business are forecast for an appropriate period and then discounted to present value using an appropriate discount rate. In a single-period model, net cash flow or earnings for a normalized period are capitalized to reach a determination of present value.

- **Market Approach:** The market approach is a technique used to estimate value from an analysis of actual transactions or offerings for economically comparable assets available as of the measurement date. The process is essentially that of comparison and correlation between the subject asset and similar assets recently sold or are offered for sale in the market. The transaction or offering prices of the comparable assets are adjusted for dissimilarities in characteristics including location, age, time of sale, size, and utility, among others. The adjusted prices of the comparable assets provide an indication of value for the subject asset.

- **Cost Approach:** In applying this approach, an analysis of the subject company's assets and liabilities is performed. The estimated fair market value of all existing and potential liabilities is deducted from the derived aggregate fair market value of a company's assets, resulting in an indication of stockholders' equity value.

## Methods Applied

The three approaches to value provide general overviews that govern valuation methods. Valuation methods provide detailed estimations of value. We applied the following methods:

- **Discounted Cash Flow ("DCF") Method:** The discounted cash flow method is based on the premise that the value of an asset is equal to the present value of the future economic benefits that accrue to its owners, using an appropriate discount rate that adequately considers the risk related to an investment in the business. Generally, application of the discounted cash flow method involves first forecasting revenues, operating expenses, capital



25                                    VANTAGE POINT ADVISORS

expenditures, and incremental working capital requirements for a discrete forecast period. Based on these forecasts, the net cash flow to be generated by the business is determined and discounted to present value. Next, the value of the business at the end of the projection period is determined and discounted to present value. The sum of the present value of the net cash flows during the projection period and the present value of the business at the end of the projection period represents the fair market value of the business.

- **Guideline Public Company ("GPC") Method:** Under the guideline public company method, value is estimated by comparing the subject company to similar companies with publicly traded ownership interests. Guideline companies are selected based on comparability to a subject company, and valuation multiples are calculated and applied to the subject company's operating data.

- **Guideline Transaction Method:** This method is part of the market approach. This method is similar to the GPC method, but the valuation data comes from mergers and acquisitions. Value derived is predicated on the valuation multiples of transactions involving companies with similar characteristics.

## Method Not Selected

We elected not to perform the following method:

- **Cost Approach:** We elected not to perform the cost approach. We believe the value of the Company's assets on a going-concern basis is directly related to the ability to generate a fair rate of return on invested capital. This factor is not adequately considered in the cost approach.



26                                    VANTAGE POINT ADVISORS

# Valuation Analysis

## DCF Method

We estimated MLH's range of business enterprise value ("BEV") under the DCF method at approximately $2.4 to $2.8 billion. The details of the DCF method are presented on **Page 2 of Exhibit 2**.

- **Management Forecast:** Management's forecast covers the years ending December 31, 2014 through December 31, 2020. Actual revenue reported in 2013 missed Management's prior forecast by 0.4 percent. After adjusting for non-recurring expenses, adjusted EBITDA for 2013 missed Management's prior forecast by approximately 1.3 percent. The lower-than-expected revenue and EBITDA are attributed to lower reimbursement rates and greater competition in the market.

- **Revenue Forecast:** Management expects slower growth for MLH as the Company reaches a more stable stage of development. Management forecasts revenue increasing from approximately $632.6 million for the trailing twelve months ("TTM") ended December 31, 2013 to approximately $733.3 million for the following twelve months ending December 31, 2014. In the next three years, Management forecasts revenue growth of 7.6 percent, 8.2 percent, and 9.4 percent. By the TTM ending December 31, 2020, the Company expects to generate $1.1 billion in revenue.

- **Operating Earnings Forecast:** Management forecasts an adjusted EBITDA level of approximately $417.9 million for the TTM ending December 31, 2014, which translates to an operating margin of 57.0 percent. This is a slight decrease from the EBITDA margin of 59.8 percent for the TTM ended December 31, 2013. Management expects EBITDA margins to steadily decrease to 52.4 percent by December 31, 2020. After achieving margin improvement in 2013 through leveraging the infrastructure buildup which occurred during fiscal 2011, Management expects pressure on gross margins as well as higher selling, general, and administration costs, which has tempered profitability expectations. Since the Company's technology is scalable and automated, the Company experienced high operating margins over the past few years; however, Management expects margins to decrease through the forecast period due to increased competition.

- **Tax:** We applied a statutory tax rate of 40.0 percent to the Company. This reflects the combined effects of federal and state income tax payments.



27

VANTAGE POINT ADVISORS

- **Depreciation and Capital Expenditures:**  We relied on Management's forecast of depreciation expense and capital expenditures.

- **Incremental Working Capital:** Incremental changes in debt-free net working capital were estimated by Management.

- **Discount Rate: Page 3 of Exhibit 2** presents the selected discount rate.  The "Discount Rate" section below describes our assumptions used.

- **Terminal Value:**  In estimating the Company value into perpetuity we relied on the Exit Multiple Method. Under the Exit Multiple Method, we applied multiples to fiscal 2020 metrics. We selected revenue and EBITDA multiples based on discussions with Management and an analyses of the Company and industry.

## *Discount Rate*

We used the Company's weighted average cost of capital ("WACC") as the applicable discount rate. The WACC represents the required return that a company must earn to satisfy its creditors, owners, and other providers of capital.

**Page 4 of Exhibit 2** shows our estimation of the Company's WACC. The WACC is a weighted average of the Company's cost of equity ($K_e$) and the cost of debt ($K_d$).  The weight of equity ($W_e$) and weight of debt ($W_d$) are determined by the capital structure.  Applying a tax rate (t) yields an after-tax cost of debt.  The formula for the WACC is arithmetically expressed by the following equation:

$$WACC = [K_e \times W_e] + [K_d \times W_d \times (1 - t)]$$

We calculated $K_e$ using a modification of the capital asset pricing model ("CAPM"). The general idea behind the CAPM is that investors need to be compensated for both time value of money and risk. The time value of money is represented by the risk-free rate ($R_f$) and compensates the investors for placing money in any investment over a period of time. The other component of the formula represents risk and calculates the amount of compensation the investor needs for taking on additional risk as an equity holder. This is accounted for by taking a risk measure, represented by beta ($\beta$), that compares the returns of the asset to the market over a period of time and to the market equity risk premium ($R_m$). Other risk factors include a size premium ($R_s$) and a company-specific risk premium, alpha ($\alpha$).



28

VANTAGE POINT ADVISORS

The modified CAPM is expressed arithmetically by the following equation:

$$K_e = R_f + (\beta \times R_m) + R_s + \alpha$$

- **Risk-Free Rate ($R_f$):** We used a risk-free rate of 3.2 percent based on yields of 20-year U.S. Treasuries as of the Valuation Date.

- **Beta ($\beta$):** Page 5 of **Exhibit 2** shows that we selected an unlevered beta of 1.00 based on a value near the maximum of the GPC betas observed, which was then relevered to 1.10.

- **Market Equity Risk Premium ($R_m$):** We selected a market equity risk premium of 6.2 percent based on the long-horizon equity risk premium (supply side) for the period 1926 – 2013 found in the *2014 Valuation Handbook - Guide to Cost of Capital* published by Duff & Phelps.

- **Size Premium ($R_s$):** We selected a size premium of 1.9 percent based on the 6th decile of companies shown in the *2014 Valuation Handbook - Guide to Cost of Capital* published by Duff & Phelps. The 6th decile spans equity premiums of companies ranging in size from a market capitalization value of $1.6 billion to $2.4 billion.

- **Company-Specific Risk Premium ($\alpha$):** We selected a specific risk premium of 5.0 percent. This risk reflects the additional risk of the market participant achieving the projections in light of the potential margin compression, due to regulatory changes, competition and forecast risks.

## Guideline Public Company Method

We estimated MLH's range of BEV under the GPC method at approximately $2.1 to $2.3 billion. The details of the GPC method are presented in **Exhibit 3**.

- **Guideline Public Companies:** We selected eight guideline public companies reasonably similar to MLH in size, operations, and industry, as shown on **Page 1 of Appendix D**.

- **Multiples Selection:** We selected low and high revenue and EBITDA multiples based on the BEV to operating metrics including the last twelve months ("LTM"), 1-year forward, and 2-year forward periods. In selecting revenue multiples, primary consideration was given to the Company's high margins. In selecting EBITDA multiples, the primary consideration was the risk of margin compression in the future.



29

VANTAGE POINT ADVISORS

## Guideline Transaction Method

We estimated MLH's range of BEV under the guideline transaction method at approximately $2.5 to $2.7 billion. The details of the guideline transaction method are presented in **Exhibit 4**.

- **Similar Transactions:**  We observed twenty-five transactions that have closed in the past three and one-half years involving target companies reasonably similar to MLH in size, operations, and industry.

- **Multiples Selection:**  We selected low and high BEV/LTM revenue multiples based on the Company's high historic and forecast EBITDA margins. We only considered the Company's BEV implied by the BEV/LTM revenue multiples after observing that positive EBITDA was reported for only 10 out of the 25 guideline transactions. Furthermore, the calculated BEV/EBITDA multiples from the available marketplace data showed a wide range with elevated variance. As such, data points on BEV/EBITDA multiples were deemed insufficient to estimate BEV.



30

## VANTAGE POINT ADVISORS

# Reconciliation

We estimated the Company's BEV as a weighted average of the high and low indications of the selected methods, with more weight being placed on the income approach. This yielded an estimate of BEV ranging from approximately $2.3 to $2.7 billion.

The fair value of equity was estimated after subtracting the proforma JP Morgan debt, current portion of debt and capital leases, PNC debt, and long-term capital leases from the estimated BEV range, and adding cash and proceeds from the exercise of common stock options to the estimated BEV range.

The fair value of equity was estimated as follows (values are in thousands):

| | | |
|---|---|---|
| **Income Approach** | | |
| Discounted cash flow method | $2,438,000 – | $2,845,000 |
| | | |
| **Market Approach** | | |
| Guideline public company method | $2,087,000 – | $2,287,000 |
| Guideline transaction method | $2,490,000 – | $2,651,000 |
| | | |
| **Estimated business enterprise value** | **$2,338,000** – | **$2,658,000** |
| *less:* 2014 JPM debt | ($1,775,000) | ($1,775,000) |
| *less:* Current portion of debt and capital leases | ($18,841) | ($18,841) |
| *less:* PNC debt | ($12,804) | ($12,804) |
| *less:* Long term capital leases | ($9,005) | ($9,005) |
| *add:* Cash | $72,418 | $72,418 |
| *add:* Proceeds from options | $45,029 | $45,029 |
| **Value of equity** | **$639,796** | **$959,796** |



31                                        VANTAGE POINT ADVISORS

# Allocation of Equity

## Methodologies

Once total equity value is estimated, it must be allocated to the various equity classes comprising the Company's capitalization. This process ultimately results in creating a final estimate of value for the subject company's underlying equity interests.

While there are many different value allocation methods, these various methods can be grouped into three general categories as defined by the AICPA Accounting and Valuation Guide for the Valuation of Privately-Held-Company Equity Securities issued as Compensation (the "AICPA Accounting Guide"):

- **Probability-Weighted Expected Return Method ("PWERM").** The value of the common stock is estimated based upon an analysis of future enterprise value assuming several possible outcomes. Each discrete outcome is probability weighted and discounted to present value to arrive at a weighted-average value for the common stock. The key strength of this method is its conceptual framework. However, it is very difficult to apply in practice, especially in the case of companies where an exit event is not imminent.

- **The Option-pricing Method ("OPM").** The common stock and preferred stock are treated as call options on the subject company's enterprise value. A series of call options is modeled, with exercise prices determined in connection with the liquidation preference and various valuation 'break' points specific to the capital structure of the subject company. The key strength of this method is that it provides a dynamic analysis of the common stock value and quantifies the benefit of the potentially unlimited 'valuation upside' enjoyed by common stockholders. The primary disadvantage of this method is that it tends to overstate the value of the common stock in early stage companies where a successful exit remains speculative and there is a significant risk that the common stock may have little if any value.

- **The Current Value Method.** The enterprise value is allocated to the various classes of stock based on liquidation and conversion features, with any residual value being allocated to the common stock. The key strength of this method is it simplicity. The primary disadvantage of this method is that it will tend to understate the value of the common stock in situations where the subject company has moved beyond the development stage and has begun to accumulate significant value in the underlying common stock.

 MILLENNIUM LABORATORIES

32

VANTAGE POINT ADVISORS

VP_ML_00015716

Given the Recapitalization, we elected to apply the current value method to allocate 55.0 percent of the estimated nonmarketable equity value and 55.0 percent of the $1.415 billion in distributions issued in connection with the Recapitalization.



33

VANTAGE POINT ADVISORS

Confidential

# Adjustments to Fair Value

## Discount for Lack of Marketability

The concept of marketability deals with the liquidity of an ownership interest in a company; that is, how quickly and certainly it can be converted to cash at the owner's discretion. In valuing a minority interest in a privately-held entity or a thinly-traded public entity, recognition must be given to the lack of liquidity in the equity since the interest cannot meet the liquidity that interests in actively-traded public stock can achieve. Typically, a minority holder of private equity or thinly-traded public equity securities does not have immediate access to a market (i.e., a willing buyer); as opposed to a minority holder of actively-traded public equity securities who has the option to sell his/her shares on the open market at any time.

Because MLH is private, its shares are subject to a discount for lack of marketability ("DLOM") due to the lack of a liquid market for the shares. Our selection of the DLOM was based on a thorough review of the FMV Restricted Stock Study™ and application of the Average (Asian) Put Option and the Protective Put Option pricing models.

### FMV Restricted Stock Study™

We reviewed quantitative results and observed the median and average indicated discounts based on factors including: (a) offering amount; (b) net income; (c) market value of equity; (d) revenue; and (e) total assets for the Company.

Then we reviewed qualitative factors that affect the marketability of the preferred stock in the Company. The qualitative factors include: (a) expected growth rate in value and prospects for the industry; (b) expected dividend/distribution yield and dividend history; (c) ability to sell interests and restrictive transfer provisions; (d) prospects for liquidation of the company; (e) put rights of minority owners; (f) potential buyers of interests; (g) information access and reliability; (h) investment objectives and degree of professional management; (i) holding period until sale of underlying assets with distribution to shareholders, and (j) swing vote and non-voting rights.  See **Page 4 of Appendix C.**

### Average (Asian) Put Option

An average, or "Asian," put option conveys the right to sell at the average price attained by the subject shares during the life of the option. The model is more appropriate than traditional put options because it assumes that investors have no special ability to time the market. If investors cannot time the market, the restriction has the effect of depriving them of average (not maximum) trading profits.



34

VANTAGE POINT ADVISORS

VP_ML_00015718

The Asian put option relies on assumptions on expected time to liquidity and expected volatility over the time to liquidity. We estimated the time to liquidity based on discussions with Management and relied on historical price volatility of the GPCs.

Based on an estimated time to liquidity of three years and expected volatility of 43.0 percent, the Asian put option indicates a DLOM of 17.0 percent. See **Page 1 of Appendix C** for the average put option analysis.

*Finnerty Put Option*

In 2001, John Finnerty proposed a model that assumes the investor does not possess special market timing ability and would be equally likely to exercise the hypothetical liquid security at any given point of time. The value of marketability is modeled as the present value of cash flows, similar to an average-strike put option. The Finnerty method addresses the issue of assuming perfect market timing and the issue of assuming protection on the downside while still realizing appreciation on the upside in the protective put method. Mr. Finnerty also performed a regression analysis to restricted stock studies, adjusting to remove other significant factors, such as concentration of ownership and information effects, and found that after isolating the marketability-related factors, the discounts predicted by his method are consistent with empirical data.

The Finnerty put option relies on the same assumptions as the Asian put option with respect to expected time to liquidity and expected volatility over the time to liquidity.

Using the same assumptions applied in the Asian put option analysis, the Finnerty put option indicated a DLOM of 18.0 percent. See **Page 2 of Appendix C** for the Finnerty put option analysis.

*Conclusion*

Based on our DLOM analyses, it is our opinion that a 15.0 percent discount for lack of marketability should be applied to the 55.0 percent interest in the estimated equity value in MLH, excluding the $1.415 billion distribution associated with the Recapitalization. The application of the DLOM is shown below:



35

VANTAGE POINT ADVISORS

| | | | | |
|---|---|---|---|---|
| **Fair value of equity** | | **$639,796** | | **$959,796** |
| Estimated value of 55.0 percent marketable interest | 55.0% | $351,888 | – | $527,888 |
| *less:* Discount for lack of marketability | 15.0% | ($52,783) | – | ($79,183) |
| **Estimated fair value of 55.0 percent nonmarketable interest** | | **$299,105** | | **$448,705** |
| Estimated fair value of 55.0 percent nonmarketable interest (Point Estimate) | | | | $370,000 |
| *add:* 55.0 percent distribution of $1,415,000 | 55.0% | | | $778,250 |
| **Estimated fair value of 55.0 percent of equity value** | | | | **$1,148,250** |



36    VANTAGE POINT ADVISORS

# Valuation Conclusion

Based on the assumptions and analyses outlined in this report, we estimated the fair value per share of common stock in MLH as of April 16, 2014 as follows:

| Summary of Value | Apr-16-2014 |
| --- | --- |
| Estimated fair value of 55.0 percent of equity value | $1,148,250 |
| Number of common shares | 332,414 |
| Value per share of common, nonmarketable | $3.454 |
| **Estimated fair value per share of common stock, nonmarketable (rounded) (USD)** | **$3,460.0** |

We are independent of the Company, and have no current or prospective interest in the Company. Our fee for this appraisal was in no way influenced by the results of our analyses.

The terms and conditions that follow are an integral part of this valuation opinion.



37

VANTAGE POINT ADVISORS

# Terms and Conditions

This value opinion report has been prepared pursuant to the following general assumptions and general limiting conditions:

1) We assume no responsibility for the legal description of real property or matters including legal or title considerations. For real property included in this appraisal, we were not furnished legal descriptions or other detailed site and improvement drawings. Title to the subject assets, properties or business interests is assumed to be good and marketable unless otherwise stated.

2) The subject assets, properties or business interests are appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3) We assume responsible ownership and competent management with respect to the subject assets, properties or business interests.

4) The information furnished by Management is believed to be reliable. However, we issue no warranty or other form of assurance regarding its accuracy.

5) We assume that there is full compliance with all applicable federal, state and local regulations and laws unless non-compliance is stated, defined and considered in the appraisal report.

6) We assume that all required licenses, certificates of occupancy, consents or legislative or administrative authority from any local, state or national government, private entity or organization have been or can be obtained or renewed for any use on which the valuation opinion contained in this report is based.

7) Possession of this valuation report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without our written consent and, in any event, only with proper written qualifications and only in its entirety.

8) We, by reason of this valuation, are not required to give testimony or to be in attendance in court with reference to the assets, properties or business interests in question unless arrangements have been previously made.

9) This valuation report has been prepared in conformity with, and is subject to, the requirements of the code of professional ethics and standards of professional conduct of the professional appraisal organizations of which we are members.



38

VANTAGE POINT ADVISORS

10) Disclosure of the contents of this valuation report is governed by the bylaws and regulations of the CFA Institute and the American Society of Appraisers.

11) No part of the contents of this report, especially any conclusions of value, the identity of the appraisers or the firm with which the appraisers are associated, shall be disseminated to the public through advertising, public relations, news, sales or other media without our prior written consent and approval.

12) We assume no responsibility for any financial reporting judgments that are appropriately those of Management. Management accepts the responsibility for any related financial reporting with respect to the assets, properties or business interests encompassed by this appraisal.



39                                                        VANTAGE POINT ADVISORS

Confidential

# Appraisal Certification

I certify that, to the best of my knowledge and belief:

1) The statements of fact contained in this report are true and correct.

2) The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3) I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

4) Within the three-year period immediately preceding acceptance of this assignment, we provided a valuation of equity interests of the business as of December 31, 2011; March 29 and December 31, 2012; and December 31, 2013.

5) I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6) My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7) My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the Company, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8) My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice and the Statement on Standards for Valuation Services.

9) Han Le, an analyst at Vantage Point Advisors, Inc., provided significant business and/or intangible asset appraisal assistance to the individuals signing this certification.

Todd G. Poling
**President**
**Vantage Point Advisors, Inc.**

Rich Barth
**Director**
**Vantage Point Advisors, Inc.**

MILLENNIUM
LABORATORIES

40

VANTAGE POINT ADVISORS

Confidential

# Exhibits

Summary and Reconciliation_____Exhibit 1
Income Approach - Discounted Cash Flow Method_____Exhibit 2
Market Approach - Guideline Public Company Method_____Exhibit 3
Market Approach - Guideline Transaction Method_____Exhibit 4


Historical Balance Sheets_____Appendix A
Historical and Adjusted Income Statements_____Appendix B
Discount for Lack of Marketability_____Appendix C
Guideline Public Company Data_____Appendix D



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015725

**Millennium Lab Holdings, Inc. and Subsidiaries**                                              **Exhibit 1, Page 1**

Summary

(USD thousands) except Fair Value Per Share                                     Valuation as of April 16, 2014

| **Summary of Value** | **Apr-16-2014** |
|---|---|
| (1) Estimated fair value of 55.0 percent of equity value | $1,148,250 |
| (2) Number of common shares | 332,414 |
| Value per share of common, nonmarketable | $3.454 |
| **Estimated fair value per share of common stock, nonmarketable (rounded) (USD)** | **$3,460.0** |

Notes:

(1) See Exhibit 1, Page 2 for the derivation of equity value.

(2) The sum of 300,495.94 shares of common stock and 31,917.82 in-the-money common stock options.

Confidential                                                                                          VP_ML_00015726

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Exhibit 1, Page 2**

Reconciliation

(USD thousands)                                                        Valuation as of April 16, 2014

| Business Enterprise Value ("BEV") from Operations | | Estimated Range of Value | | |
|---|---|---|---|---|
| | | | | |
| **Income Approach** | | | | |
| (1) | Discounted cash flow method | $2,438,000 | -- | $2,845,000 |
| | | | | |
| **Market Approach** | | | | |
| (2) | Guideline public company method | $2,087,000 | -- | $2,287,000 |
| (3) | Guideline transaction method | $2,490,000 | -- | $2,651,000 |
| | | | | |
| (4) | **Estimated business enterprise value** | **$2,338,000** | -- | **$2,658,000** |
| (5) | *less:* 2014 JPM debt | ($1,775,000) | | ($1,775,000) |
| (5) | *less:* Current portion of debt and capital leases | ($18,841) | | ($18,841) |
| (5) | *less:* PNC debt | ($12,804) | | ($12,804) |
| (5) | *less:* Long term capital leases | ($9,005) | | ($9,005) |
| (5) | *add:* Cash | $72,418 | | $72,418 |
| (6) | *add:* Proceeds from options | $45,029 | | $45,029 |
| | **Value of equity** | **$639,796** | | **$959,796** |
| | | | | |
| | Estimated value of 55.0 percent marketable interest `55.0%` | $351,888 | -- | $527,888 |
| | | | | |
| (7) | *less:* Discount for lack of marketability `15.0%` | ($52,783) | -- | ($79,183) |
| | | | | |
| | **Estimated fair value of 55.0 percent nonmarketable interest** | **$299,105** | | **$448,705** |
| | | | | |
| | Estimated fair value of 55.0 percent nonmarketable interest (Point Estimate) | | | $370,000 |
| (5) | *add:* 55.0 percent distribution of $1,415,000 `55.0%` | | | $778,250 |
| | **Estimated fair value of 55.0 percent of equity value** | | | **$1,148,250** |

Notes:

(1) See Exhibit 2, Page 1.

(2) See Exhibit 3, Page 1.

(3) See Exhibit 4, Page 1.

(4) Weighted average of the income approach and the market approach, where more weight is placed on the income approach.

(5) Per Management. Assumes proforma recapitalization figures.

(6) The proceeds from the exercise of options is estimated as follows:

| Shares | Strike Price (USD) | Cash Proceeds (USD) |
|---|---|---|
| 10,358 | $500 | $5,178,830 |
| 4,652 | $690 | $3,209,639 |
| 11,547 | $2,167 | $25,023,129 |
| 2,921 | $2,167 | $6,329,070 |
| 1,534 | $2,167 | $3,323,463 |
| 657 | $2,167 | $1,423,329 |
| 250 | $2,167 | $541,750 |
| 31,918 | | $45,029,210 |

(7) See Appendix C.

Confidential                                                        VP_ML_00015727

## Income Approach - Discounted Cash Flow Method



Confidential

# Millennium Lab Holdings, Inc. and Subsidiaries

**Exhibit 2, Page 1**

Discounted Cash Flow Method Summary

(USD thousands)

Valuation as of April 16, 2014

| Summary of Discounted Cash Flow Method | Estimated Ranges of Value | | |
|---|---|---|---|
| Exit multiple method | $2,438,319 | -- | $2,844,883 |
| **Estimated business enterprise value range** | **$2,438,000** | -- | **$2,845,000** |

(1) **WACC vs Exit EV / EBITDA Multiple**

BEV / EBITDA Exit Multiple

| | | 5.50 x | 6.00 x | 6.50 x |
|---|---|---|---|---|
| | 15.8% | $2,488,814 | $2,544,351 | $2,599,887 |
| WACC | 14.8% | $2,600,884 | $2,659,747 | $2,718,611 |
| | 13.8% | $2,720,040 | $2,782,462 | $2,844,883 |

WACC vs Exit EV / Revenue Multiple

BEV/ Revenue Exit Multiple

| | | 3.00 x | 3.50 x | 4.00 x |
|---|---|---|---|---|
| | 15.8% | $2,438,319 | $2,438,319 | $2,544,351 |
| WACC | 14.8% | $2,547,363 | $2,547,363 | $2,659,747 |
| | 13.8% | $2,663,284 | $2,663,284 | $2,782,462 |

Notes:

(1) See Exhibit 2, Page 2.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**    **Exhibit 2, Page 2**
Discounted Cash Flow Method - Exit Multiple
(USD thousands)    Valuation as of April 16, 2014

(1) **Discounted Cash Flow Analysis**

| | Historical (2) Dec-31-2013 | Fiscal years ending: Dec-31-2014 | Dec-31-2015 | Dec-31-2016 | Dec-31-2017 | Dec-31-2018 | Dec-31-2019 | Dec-31-2020 |
|---|---|---|---|---|---|---|---|---|
| Net sales | $632,632 | $733,282 | $788,757 | $853,081 | $933,009 | $1,008,084 | $1,070,618 | $1,134,684 |
| *Annual growth* | *21.2%* | *15.9%* | *7.6%* | *8.2%* | *9.4%* | *8.0%* | *6.2%* | *6.0%* |
| Cost of sales | $75,256 | $93,805 | $114,200 | $131,573 | $148,542 | $165,618 | $178,351 | $192,811 |
| *% of revenue* | *11.9%* | *12.8%* | *14.5%* | *15.4%* | *15.9%* | *16.4%* | *16.7%* | *17.0%* |
| Gross profit | $557,376 | $639,477 | $674,557 | $721,508 | $784,467 | $842,466 | $892,268 | $941,873 |
| Operating expenses (excl. D&A and other adj.) | $179,255 | $221,604 | $238,794 | $262,474 | $286,432 | $310,312 | $327,826 | $347,558 |
| (3) EBITDA | $378,121 | $417,873 | $435,763 | $459,034 | $498,035 | $532,154 | $564,442 | $594,315 |
| *% of revenue* | *59.8%* | *57.0%* | *55.2%* | *53.8%* | *53.4%* | *52.8%* | *52.7%* | *52.4%* |
| (4) *less:* Depreciation and amortization | $16,905 | $22,730 | $23,238 | $22,095 | $20,892 | $20,455 | $23,248 | $22,480 |
| *less:* Amortization of transaction expenses | - | $4,864 | $6,486 | $6,486 | $6,486 | $6,486 | $6,486 | $6,486 |
| (5) *less:* Other adjustments | $25,466 | $18,465 | $14,443 | $4,885 | $5,104 | $5,335 | $5,603 | $5,892 |
| *less:* One-time deductible expense | - | $11,750 | - | - | - | - | - | - |
| EBIT | $335,750 | $360,064 | $391,596 | $425,569 | $465,553 | $499,878 | $529,105 | $559,458 |
| (6) Income tax expense [40.0%] | | $144,025 | $156,639 | $170,227 | $186,221 | $199,951 | $211,642 | $223,783 |
| Debt-free net income | | $216,038 | $234,958 | $255,341 | $279,332 | $299,927 | $317,463 | $335,675 |
| Cash flow adjustments | | | | | | | | |
| Amortization of transaction expenses | | $4,864 | $6,486 | $6,486 | $6,486 | $6,486 | $6,486 | $6,486 |
| (4) Depreciation and amortization | | $22,730 | $23,238 | $22,095 | $20,892 | $20,455 | $23,248 | $22,480 |
| (4) Capital expenditures | | ($23,886) | ($15,474) | ($19,286) | ($24,505) | ($34,644) | ($24,205) | ($24,690) |
| Stock-based compensation | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| (7) Incremental debt-free net working capital | | ($17,564) | ($3,140) | ($7,101) | ($7,834) | ($6,906) | ($5,683) | ($6,075) |
| Debt-free net cash flow (DFNCF) | | $202,183 | $246,067 | $257,535 | $274,370 | $285,318 | $317,310 | $333,876 |
| Partial period adjustment | | 0.7083 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Discount period (mid-period convention) | | 0.3542 | 1.2083 | 2.2083 | 3.2083 | 4.2083 | 5.2083 | 6.2083 |
| (8) Present value (PV) factor [14.8%] | | 0.9523 | 0.8464 | 0.7373 | 0.6422 | 0.5594 | 0.4873 | 0.4245 |
| PV of DFNCF | | $136,380 | $208,269 | $189,873 | $176,207 | $159,615 | $154,627 | $141,725 |

| Terminal Value: Exit Multiple Method | Revenue | EBITDA |
|---|---|---|
| Financial Metrics 2020 | $1,134,684 | $594,315 |
| Exit EBITDA multiple | 3.5x | 6.0x |
| BEV | $3,971,394 | $3,565,889 |
| Weight | 50.0% | 50.0% |
| Weighted BEV | $1,985,697 | $1,782,945 |
| Terminal value, 2020 | | $3,768,642 |
| Discount period | | 6.7083 |
| PV factor | | 0.3962 |
| Terminal value | | $1,493,051 |

| | | |
|---|---|---|
| Net PV of interim period DFNCF | $1,166,696 | |
| (9) Terminal value | $1,493,051 | |
| Business enterprise value | $2,659,747 | |

(10) **Estimated BEV range, marketable (rounded)**    **$2,438,300**    **to**    **$2,844,900**

Notes:
Source: Management-prepared forecast.
(1) Management-prepared forecasts for the years ending December 31, 2014 through December 31, 2017. We extended the forecast to taper revenue growth and normalize operating margins.
(2) See Appendix B, Page 1.
(3) EBITDA margins for the year ending December 31, 2018 was estimated based on margins observed from guideline public companies. See Appendix D, Page 3.
(4) Management-provided estimation of depreciation expense and capital expenditures.
(5) Other adjustments includes stock-based compensation, RxAnte transaction costs, and revenue sharing.
(6) Estimated effective tax rate for the subject company which reflects the combined effects of federal and state income tax payments.
(7) Management-provided estimation of debt-free net working capital.
(8) See Exhibit 2, Page 3.
(9) We used the Exit Multiple Method to estimate the value into perpetuity. See Exhibit 3, Page 3 for the guideline public company multiples considered in the exit assumption.
(10) See Exhibit 2, Page 1.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**
Weighted Average Cost of Capital
(Values as presented)

**Exhibit 2, Page 3**

Valuation as of April 16, 2014

| Weighted Average Cost of Capital (WACC) | Cost of Capital | % in Capital Structure | Weighted Cost |
|---|---|---|---|
| (1) Debt | 2.7% | 14.6% | 0.4% |
| Equity | 16.9% | 85.4% | 14.4% |
| Weighted average cost of capital | | | 14.8% |
| **Estimated WACC (rounded)** | | | **14.8%** |

**Cost of Equity - Modified Capital Asset Pricing Model (CAPM)**

| | | | |
|---|---|---|---|
| (2) Risk-free rate | | | 3.2% |
| (3)    Market equity risk premium | | 6.2% | |
| (4)    Relevered beta | x | 1.10 | |
| Beta adjusted equity risk premium | | | 6.8% |
| (5) Size premium | | | 1.9% |
| (6) Company-specific risk adjustment | | | 5.0% |
| **Estimated cost of equity** | | | **16.9%** |

**Cost of Debt**

| | |
|---|---|
| (7) Pre-tax cost of debt | 4.5% |
| Income tax rate | 40.0% |
| **Estimated after-tax cost of debt** | **2.7%** |

Notes:

(1) Based on the Company's target capital structure.

(2) Based on the nominal 20-year U.S. Treasury bond as of April 16, 2014.  Source:  The Federal Reserve Board.

(3) Source:  2014 Valuation Handbook - Guide to Cost of Capital. Duff & Phelps LLC.  Reflects long-horizon equity risk premium (supply side) for the period 1926 - 2013.

(4) See Exhibit 2, Page 4 for the estimation of beta.

(5) Source:  2014 Valuation Handbook - Guide to Cost of Capital. Duff & Phelps LLC.  Size premium (return in excess of CAPM) for companies in size decile 6 from 1926 to 2013. Decile 6 includes companies with market capitalizations of $1,626.386 to $2,431.229 million.

(6) Represents risk specific to the Company and includes additional risk and variance in the forecast as well as risks related to regulatory changes and pressures.

(7) The Company's cost of borrowing was estimated using the Moody's Seasoned Baa Corporate Bond Yield as of the Valuation Date.

VP_ML_00015731

**Millennium Lab Holdings, Inc. and Subsidiaries**

**Exhibit 2, Page 4**

Weighted Average Cost of Capital - Beta

(Values as presented)

Valuation as of April 16, 2014

| Guideline Company | Ticker Symbol | Levered Beta (1) | Interest-bearing Debt ($mil) | Market Capitalization ($mil) | Market Value of Invested Capital ($mil) | Debt | Equity | Unlevered Beta (2) |
|---|---|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | 1.921 | $3,843.2 | $2,933.9 | $6,777.0 | 56.7% | 43.3% | 1.076 |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | 0.950 | $52.6 | $759.2 | $811.8 | 6.5% | 93.5% | 0.912 |
| Cepheid | NasdaqGS:CPHD | 1.096 | $1.7 | $3,312.2 | $3,313.9 | 0.1% | 99.9% | 1.095 |
| Genomic Health Inc. | NasdaqGS:GHDX | 0.371 | $0.0 | $836.7 | $836.7 | 0.0% | 100.0% | 0.371 |
| Laboratory Corp. of America Holdings | NYSE:LH | 0.575 | $3,000.4 | $8,667.6 | $11,668.0 | 25.7% | 74.3% | 0.476 |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | 1.133 | $0.0 | $892.5 | $892.5 | 0.0% | 100.0% | 1.133 |
| Myriad Genetics Inc. | NasdaqGS:MYGN | 0.589 | $0.0 | $2,797.1 | $2,797.1 | 0.0% | 100.0% | 0.589 |
| Quest Diagnostics Inc. | NYSE:DGX | 0.653 | $3,366.0 | $8,652.9 | $12,018.9 | 28.0% | 72.0% | 0.529 |
| **Minimum:** | | 0.371 | $0.0 | $759.2 | $811.8 | 0.0% | 43.3% | 0.371 |
| **Lower (First) Quartile:** | | 0.586 | $0.0 | $878.6 | $878.6 | 0.0% | 73.7% | 0.516 |
| **Median:** | | 0.802 | $27.2 | $2,865.5 | $3,055.5 | 3.3% | 96.7% | 0.751 |
| **Average:** | | 0.911 | $1,283.0 | $3,606.5 | $4,889.5 | 14.6% | 85.4% | 0.773 |
| **Upper (Third) Quartile:** | | 1.105 | $3,091.8 | $4,647.4 | $7,999.8 | 26.3% | 100.0% | 1.081 |
| **Maximum:** | | 1.921 | $3,843.2 | $8,667.6 | $12,018.9 | 56.7% | 100.0% | 1.133 |

**Selected unlevered beta:** **1.00**

| Subject Company | Unlevered Beta | Target Cap Structure Debt | Target Cap Structure Equity | Relevered Beta (2) |
|---|---|---|---|---|
| Millennium Lab Holdings, Inc. and Su | 1.00 | 14.6% | 85.4% | 1.10 |

**Concluded relevered beta:** **1.10**

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(x) Denotes company excluded from the descriptive statistics. We excluded any companies with negative beta values.

(1) Beta values obtained through a linear regression of the total returns of the guideline public companies against the market's total returns. The S&P 500 Index was used as the measure for market returns. Monthly historical stock price data with a look-back period of 60 months, when applicable.

(2) $BU = BL \div [1+(1-T) \times (Wd \div We)]$;  $BL = BU \times [1+(1-T) \times (Wd \div We)]$.

Definitions:

BU = Beta unlevered;

BL = Beta levered;

T = Estimated tax rate of 40.0 percent;

Wd = Percentage of debt capital in the capital structure; debt capital is comprised of interest-bearing debt; and

We = Percentage of equity capital in the capital structure; equity capital is comprised of the market value of common equity.

Confidential

VP_ML_00015732

## Market Approach - Guideline Public Company Method



Confidential

# Millennium Lab Holdings, Inc. and Subsidiaries

**Exhibit 3, Page 1**

Guideline Public Company Method - Summary

(USD thousands)

Valuation as of April 16, 2014

| | Financial Metric | (1) | Selected Multiple | | | Indicated BEV | | |
|---|---|---|---|---|---|---|---|---|
| | | | Low | | High | Low | | High |
| **Last Twelve Months ("LTM")** | | | | | | | | |
| (2) Revenue | $645,351 | | 3.00 x | -- | 3.50 x | $1,936,054 | -- | $2,258,730 |
| (2) Adjusted EBITDA | $380,868 | | 5.50 x | -- | 6.00 x | $2,094,776 | -- | $2,285,210 |
| **1-Year Forward ("FY+1")** | | | | | | | | |
| (2) Revenue, *excluding RxAnte* | $720,523 | | 2.75 x | -- | 3.00 x | $1,981,439 | -- | $2,161,570 |
| (2) EBITDA, *excluding RxAnte* | $419,378 | | 5.25 x | -- | 5.75 x | $2,201,732 | -- | $2,411,421 |
| **2-Year Forward ("FY+2")** | | | | | | | | |
| (2) Revenue, *excluding RxAnte* | $764,230 | | 2.50 x | -- | 2.75 x | $1,910,575 | -- | $2,101,632 |
| (2) EBITDA, *excluding RxAnte* | $429,462 | | 4.75 x | -- | 5.00 x | $2,039,943 | -- | $2,147,308 |

| | Low | High |
|---|---|---|
| **Lower quartile business enterprise value** | **$1,947,400** | **$2,150,874** |
| **Median business enterprise value** | **$2,010,691** | **$2,210,150** |
| **Average business enterprise value** | **$2,027,420** | **$2,227,645** |
| **Upper quartile business enterprise value** | **$2,081,067** | **$2,278,590** |

| | Low | | High |
|---|---|---|---|
| (3) Estimated BEV range | $2,016,645 | -- | $2,216,815 |
| (4) *Adjustment for acquisition of RxAnte, Inc.* | *$70,419* | -- | *$70,419* |
| Estimated BEV, *including RxAnte, Inc.* | $2,087,063 | -- | $2,287,233 |
| **Estimated BEV range (rounded)** | **$2,087,000** | **to** | **$2,287,000** |

Notes:

(1) See Exhibit 3, Page 2 and Exhibit 3, Page 3 for the market multiples.

(2) See Appendix B, Page 1 for the historical income statements.

(3) Estimated as the average conclusion of the summary statistics.

(4) Represents the adjusted purchase price paid for RxAnte, Inc. on December 23, 2013. The Company's financials are not retroactively consolidated with RxAnte.

VP_ML_00015734

**Millennium Lab Holdings, Inc. and Subsidiaries**                                **Exhibit 3, Page 2**

Guideline Public Company Method - BEV / Revenue Multiples

(Values as presented)                                                Valuation as of April 16, 2014

| Guideline Company | BEV / Revenue (1) | | | |
| --- | --- | --- | --- | --- |
| | | | Forward | |
| | LTM | LFY | 1 Year | 2 Year |
| Alere Inc. | 2.32x | 2.32x | 2.16x | 2.08x |
| Bio-Reference Laboratories Inc. | 1.08x | 1.11x | 0.98x | N/A |
| Cepheid | 8.07x | 8.07x | 6.08x | 5.17x |
| Genomic Health Inc. | 2.80x | 2.80x | 2.27x | 1.80x |
| Laboratory Corp. of America Holdings | 1.94x | 1.94x | 1.86x | 1.82x |
| Meridian Bioscience, Inc. | 4.51x | 4.50x | 4.14x | 3.86x |
| Myriad Genetics Inc. | 3.31x | 3.99x | 3.16x | 3.02x |
| Quest Diagnostics Inc. | 1.66x | 1.66x | 1.59x | 1.57x |
| Minimum: | 1.08x | 1.11x | 0.98x | 1.57x |
| Lower (First) Quartile: | 1.87x | 1.87x | 1.79x | 1.81x |
| Median: | 2.56x | 2.56x | 2.21x | 2.08x |
| Average: | 3.21x | 3.30x | 2.78x | 2.76x |
| Upper (Third) Quartile: | 3.61x | 4.11x | 3.41x | 3.44x |
| Maximum: | 8.07x | 8.07x | 6.08x | 5.17x |
| (3) Coefficient of Variation: | 0.7 | 0.7 | 0.6 | 0.5 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(x) represents that an outlier was excluded from one of the summarizing statistics.

*N/A represents not available or not applicable.

(1) See Exhibit 3, Page 4 and Appendix D, Page 2 for the BEV and revenue data, respectively.

(2) Coefficient of variation measures the variability of the multiples data. It is calculated by dividing the standard deviation by the mean. A lower coefficient of variation indicates lower variability relative to the size of the mean and suggests a more statistically relevant data set.

# Millennium Lab Holdings, Inc. and Subsidiaries

**Exhibit 3, Page 3**

Guideline Public Company Method - BEV / EBITDA Multiples

(Values as presented)

Valuation as of April 16, 2014

| | BEV / EBITDA (1) | | | |
| | | | Forward | |
| Guideline Company | LTM | LFY | 1 Year | 2 Year |
|---|---|---|---|---|
| Alere Inc. | 11.47x | 11.47x | 9.83x | 9.16x |
| Bio-Reference Laboratories Inc. | 8.57x | 7.84x | 7.24x | N/A |
| (x) Cepheid | 382.09x | 382.09x | 75.92x | 41.05x |
| Genomic Health Inc. | NMF | NMF | NMF | NMF |
| Laboratory Corp. of America Holdings | 9.38x | 9.38x | 9.23x | 8.76x |
| Meridian Bioscience, Inc. | 13.80x | 13.49x | 11.79x | 10.61x |
| Myriad Genetics Inc. | 8.13x | 10.25x | 8.95x | 9.45x |
| Quest Diagnostics Inc. | 8.24x | 8.24x | 7.93x | 7.70x |
| | | | | |
| Minimum: | 8.13x | 7.84x | 7.24x | 7.70x |
| Lower (First) Quartile: | 8.32x | 8.52x | 8.18x | 8.76x |
| Median: | 8.97x | 9.81x | 9.09x | 9.16x |
| Average: | 9.93x | 10.11x | 9.16x | 9.14x |
| Upper (Third) Quartile: | 10.95x | 11.17x | 9.68x | 9.45x |
| Maximum: | 13.80x | 13.49x | 11.79x | 10.61x |
| | | | | |
| (3) Coefficient of Variation: | 2.2 | 2.2 | 1.4 | 0.9 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(x) represents that an outlier was excluded from one of the summarizing statistics.

*N/A represents not available or not applicable; NMF represents not meaningful.

(1) See Exhibit 3, Page 4 and Appendix D, Page 2 for the BEV and EBITDA data, respectively.

(2) Coefficient of variation measures the variability of the multiples data. It is calculated by dividing the standard deviation by the mean. A lower coefficient of variation indicates lower variability relative to the size of the mean and suggests a more statistically relevant data set.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**
**Exhibit 3, Page 4**

Guideline Public Company Method - Business Enterprise Value

(USD millions) excluding trading and price data
Valuation as of April 16, 2014

| Guideline Company | Ticker | Shares Outstanding (mil) | Closing Price Apr-16-2014 | Daily Trade Volume | 52-Week Low | 52-Week High |
|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | 82.51 | $35.56 | 716,350 | $24.00 | $39.90 |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | 27.72 | $27.39 | 269,720 | $23.50 | $37.97 |
| Cepheid | NasdaqGS:CPHD | 69.60 | $47.59 | 774,940 | $30.95 | $55.89 |
| Genomic Health Inc. | NasdaqGS:GHDX | 31.18 | $26.83 | 268,000 | $25.50 | $38.99 |
| Laboratory Corp. of America Holdings | NYSE:LH | 85.02 | $101.95 | 788,800 | $87.01 | $108.00 |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | 41.55 | $21.48 | 203,630 | $19.15 | $27.72 |
| Myriad Genetics Inc. | NasdaqGS:MYGN | 72.97 | $38.33 | 1,751,580 | $20.02 | $42.50 |
| Quest Diagnostics Inc. | NYSE:DGX | 144.26 | $59.98 | 2,225,720 | $50.46 | $64.10 |

| Guideline Company | Last Fiscal Year End (LFY) | Latest Filing Period Date (1) | Market Capitalization | Net Debt (2) | Preferred Stock | Minority Interest | Business Enterprise Value |
|---|---|---|---|---|---|---|---|
| Alere Inc. | 12/31/2013 | 12/31/2013 | $2,933.9 | $3,480.4 | $606.5 | $4.9 | $7,025.6 |
| Bio-Reference Laboratories Inc. | 10/31/2013 | 1/31/2014 | $759.2 | $38.1 | N/A | N/A | $797.3 |
| Cepheid | 12/31/2013 | 12/31/2013 | $3,312.2 | ($73.2) | N/A | N/A | $3,239.0 |
| Genomic Health Inc. | 12/31/2013 | 12/31/2013 | $836.7 | ($105.4) | N/A | N/A | $731.3 |
| Laboratory Corp. of America Holdings | 12/31/2013 | 12/31/2013 | $8,667.6 | $2,596.4 | N/A | $19.4 | $11,283.4 |
| Meridian Bioscience, Inc. | 9/30/2013 | 12/31/2013 | $892.5 | ($43.7) | N/A | N/A | $848.8 |
| Myriad Genetics Inc. | 6/30/2013 | 12/31/2013 | $2,797.1 | ($353.6) | N/A | N/A | $2,443.5 |
| Quest Diagnostics Inc. | 12/31/2013 | 12/31/2013 | $8,652.9 | $3,179.0 | N/A | $25.0 | $11,856.9 |

| | |
|---|---|
| Minimum: | $731.3 |
| Lower (First) Quartile: | $835.9 |
| Median: | $2,841.2 |
| Upper (Third) Quartile: | $8,090.1 |
| Maximum: | $11,856.9 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(1) Guideline company data is taken from the most recent quarterly or annual report filed nearest the Valuation Date.

(2) Net debt is equal to total debt minus total cash and short-term investments.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                         **Exhibit 3, Page 5**

Guideline Public Company Method - Comparative Analysis of Revenue and Profitability

(USD millions)                                                                                        Valuation as of April 16, 2014

### LTM Revenue

| Rank | Company | Revenue ($ mil) |
|---|---|---|
| 1 | Quest Diagnostics Inc. | $7,146.0 |
| 2 | Laboratory Corp. of America Holdings | $5,808.3 |
| 3 | Alere Inc. | $3,029.4 |
| 4 | Myriad Genetics Inc. | $737.1 |
| 5 | Bio-Reference Laboratories Inc. | $735.4 |
| 6 | Millennium Lab Holdings, Inc. and Su | $645.4 |
| 7 | Cepheid | $401.3 |
| 8 | Genomic Health Inc. | $261.6 |
| 9 | Meridian Bioscience, Inc. | $188.1 |

| Median (excl. Millennium Lab Holdings, Inc. an | $736.2 |
|---|---|

### LTM EBITDA

| Rank | Company | EBITDA ($ mil) |
|---|---|---|
| 1 | Quest Diagnostics Inc. | $1,439.0 |
| 2 | Laboratory Corp. of America Holdings | $1,203.5 |
| 3 | Alere Inc. | $612.3 |
| 4 | Millennium Lab Holdings, Inc. and Su | $380.9 |
| 5 | Myriad Genetics Inc. | $300.5 |
| 6 | Bio-Reference Laboratories Inc. | $93.1 |
| 7 | Meridian Bioscience, Inc. | $61.5 |
| 8 | Cepheid | $8.5 |
| 9 | Genomic Health Inc. | ($5.5) |

| Median (excl. Millennium Lab Holdings, Inc. an | $196.8 |
|---|---|

### LTM EBIT

| Rank | Company | EBIT ($ mil) |
|---|---|---|
| 1 | Quest Diagnostics Inc. | $1,156.0 |
| 2 | Laboratory Corp. of America Holdings | $1,012.7 |
| 3 | Millennium Lab Holdings, Inc. and Su | $361.2 |
| 4 | Myriad Genetics Inc. | $291.2 |
| 5 | Alere Inc. | $172.8 |
| 6 | Bio-Reference Laboratories Inc. | $72.1 |
| 7 | Meridian Bioscience, Inc. | $55.8 |
| 8 | Genomic Health Inc. | ($11.8) |
| 9 | Cepheid | ($14.7) |

| Median (excl. Millennium Lab Holdings, Inc. an | $122.5 |
|---|---|

### LTM Net Income

| Rank | Company | Net Income ($ mil) |
|---|---|---|
| 1 | Quest Diagnostics Inc. | $849.0 |
| 2 | Laboratory Corp. of America Holdings | $573.8 |
| 3 | Millennium Lab Holdings, Inc. and Su | $254.2 |
| 4 | Myriad Genetics Inc. | $187.8 |
| 5 | Bio-Reference Laboratories Inc. | $40.1 |
| 6 | Meridian Bioscience, Inc. | $37.0 |
| 7 | Genomic Health Inc. | ($12.8) |
| 8 | Cepheid | ($18.0) |
| 9 | Alere Inc. | ($71.3) |

| Median (excl. Millennium Lab Holdings, Inc. an | $38.5 |
|---|---|

### LTM Gross Margin

| Rank | Company | Gross Margin |
|---|---|---|
| 1 | Millennium Lab Holdings, Inc. and Su | 88.1% |
| 2 | Myriad Genetics Inc. | 87.2% |
| 3 | Genomic Health Inc. | 79.1% |
| 4 | Meridian Bioscience, Inc. | 63.9% |
| 5 | Alere Inc. | 49.9% |
| 6 | Cepheid | 48.5% |
| 7 | Bio-Reference Laboratories Inc. | 46.3% |
| 8 | Quest Diagnostics Inc. | 40.1% |
| 9 | Laboratory Corp. of America Holdings | 38.3% |

| Median (excl. Millennium Lab Holdings, Inc. an | 49.2% |
|---|---|

### LTM EBITDA Margin

| Rank | Company | EBITDA Margin |
|---|---|---|
| 1 | Millennium Lab Holdings, Inc. and Su | 59.0% |
| 2 | Myriad Genetics Inc. | 40.8% |
| 3 | Meridian Bioscience, Inc. | 32.7% |
| 4 | Laboratory Corp. of America Holdings | 20.7% |
| 5 | Alere Inc. | 20.2% |
| 6 | Quest Diagnostics Inc. | 20.1% |
| 7 | Bio-Reference Laboratories Inc. | 12.7% |
| 8 | Cepheid | 2.1% |
| 9 | Genomic Health Inc. | -2.1% |

| Median (excl. Millennium Lab Holdings, Inc. an | 20.2% |
|---|---|

### LTM EBIT Margin

| Rank | Company | EBIT Margin |
|---|---|---|
| 1 | Millennium Lab Holdings, Inc. and Su | 56.0% |
| 2 | Myriad Genetics Inc. | 39.5% |
| 3 | Meridian Bioscience, Inc. | 29.7% |
| 4 | Laboratory Corp. of America Holdings | 17.4% |
| 5 | Quest Diagnostics Inc. | 16.2% |
| 6 | Bio-Reference Laboratories Inc. | 9.8% |
| 7 | Alere Inc. | 5.7% |
| 8 | Cepheid | -3.7% |
| 9 | Genomic Health Inc. | -4.5% |

| Median (excl. Millennium Lab Holdings, Inc. an | 13.0% |
|---|---|

### LTM Net Income Margin

| Rank | Company | Net Income Margin |
|---|---|---|
| 1 | Millennium Lab Holdings, Inc. and Su | 39.4% |
| 2 | Myriad Genetics Inc. | 25.5% |
| 3 | Meridian Bioscience, Inc. | 19.7% |
| 4 | Quest Diagnostics Inc. | 11.9% |
| 5 | Laboratory Corp. of America Holdings | 9.9% |
| 6 | Bio-Reference Laboratories Inc. | 5.5% |
| 7 | Alere Inc. | -2.4% |
| 8 | Cepheid | -4.5% |
| 9 | Genomic Health Inc. | -4.9% |

| Median (excl. Millennium Lab Holdings, Inc. an | 7.7% |
|---|---|

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                                                    **Exhibit 3, Page 6**

Guideline Public Company Method - Comparative Analysis of Historical Cash Flow and Working Capital and Historical and Forecast Growth

(Values as presented)                                                                                                              Valuation as of April 16, 2014

### 3-Year Historical Average Cap Ex-to-Revenue

| Rank | Company | Cap Ex / Revenue |
|---|---|---|
| 1 | Cepheid | 8.5% |
| 2 | Alere Inc. | 4.8% |
| 3 | Genomic Health Inc. | 3.8% |
| 4 | Meridian Bioscience, Inc. | 3.2% |
| 5 | **Millennium Lab Holdings, Inc. and Sub** | 3.1% |
| 6 | Laboratory Corp. of America Holdings | 3.1% |
| 7 | Bio-Reference Laboratories Inc. | 2.9% |
| 8 | Quest Diagnostics Inc. | 2.6% |
| 9 | Myriad Genetics Inc. | 1.6% |

Median (excl. Millennium Lab Holdings, Inc. an  3.1%

### 3-Year Historical Average Depreciation-to-Revenue

| Rank | Company | Depreciation / Revenue |
|---|---|---|
| 1 | Alere Inc. | 15.7% |
| 2 | Cepheid | 5.8% |
| 3 | Quest Diagnostics Inc. | 3.8% |
| 4 | Laboratory Corp. of America Holdings | 3.4% |
| 5 | Meridian Bioscience, Inc. | 3.3% |
| 6 | Bio-Reference Laboratories Inc. | 2.8% |
| 7 | Genomic Health Inc. | 2.8% |
| 8 | **Millennium Lab Holdings, Inc. and Sub** | 2.4% |
| 9 | Myriad Genetics Inc. | 1.7% |

Median (excl. Millennium Lab Holdings, Inc. an  3.3%

### 3-Year Historical Average Working Cap-to-Revenue

| Rank | Company | WC / Revenue |
|---|---|---|
| 1 | Myriad Genetics Inc. | 72.6% |
| 2 | Genomic Health Inc. | 46.2% |
| 3 | Meridian Bioscience, Inc. | 45.5% |
| 4 | Cepheid | 44.9% |
| 5 | Alere Inc. | 27.1% |
| 6 | **Millennium Lab Holdings, Inc. and Sub** | 24.5% |
| 7 | Bio-Reference Laboratories Inc. | 23.7% |
| 8 | Laboratory Corp. of America Holdings | 8.1% |
| 9 | Quest Diagnostics Inc. | 2.8% |

Median (excl. Millennium Lab Holdings, Inc. an  36.0%

### 3-Year Historical Average DFNWC-to-Revenue

| Rank | Company | DFNWC / Revenue |
|---|---|---|
| 1 | Meridian Bioscience, Inc. | 26.1% |
| 2 | Bio-Reference Laboratories Inc. | 23.2% |
| 3 | Alere Inc. | 17.5% |
| 4 | Cepheid | 15.3% |
| 5 | **Millennium Lab Holdings, Inc. and Sub** | 11.3% |
| 6 | Myriad Genetics Inc. | 8.3% |
| 7 | Laboratory Corp. of America Holdings | 6.4% |
| 8 | Quest Diagnostics Inc. | 3.8% |
| 9 | Genomic Health Inc. | 2.5% |

Median (excl. Millennium Lab Holdings, Inc. an  11.8%

### 1-Year Trailing Revenue Growth

| Rank | Company | Revenue Growth |
|---|---|---|
| 1 | Myriad Genetics Inc. | 35.2% |
| 2 | Cepheid | 21.2% |
| 3 | **Millennium Lab Holdings, Inc. and Sub** | 21.2% |
| 4 | Bio-Reference Laboratories Inc. | 15.5% |
| 5 | Genomic Health Inc. | 11.2% |
| 6 | Alere Inc. | 7.5% |
| 7 | Meridian Bioscience, Inc. | 5.7% |
| 8 | Laboratory Corp. of America Holdings | 2.4% |
| 9 | Quest Diagnostics Inc. | -3.2% |

Median (excl. Millennium Lab Holdings, Inc. an  9.4%

### 3-Year Trailing Revenue Growth

| Rank | Company | Revenue Growth |
|---|---|---|
| 1 | **Millennium Lab Holdings, Inc. and Sub** | 57.9% |
| 2 | Myriad Genetics Inc. | 25.0% |
| 3 | Cepheid | 23.6% |
| 4 | Bio-Reference Laboratories Inc. | 15.2% |
| 5 | Genomic Health Inc. | 13.7% |
| 6 | Alere Inc. | 12.0% |
| 7 | Meridian Bioscience, Inc. | 10.9% |
| 8 | Laboratory Corp. of America Holdings | 5.1% |
| 9 | Quest Diagnostics Inc. | -0.5% |

Median (excl. Millennium Lab Holdings, Inc. an  12.8%

### 1-Year Trailing EBITDA Growth

| Rank | Company | EBITDA Growth |
|---|---|---|
| 1 | Myriad Genetics Inc. | 45.4% |
| 2 | **Millennium Lab Holdings, Inc. and Sub** | 12.0% |
| 3 | Meridian Bioscience, Inc. | 4.6% |
| 4 | Alere Inc. | 3.1% |
| 5 | Bio-Reference Laboratories Inc. | -2.9% |
| 6 | Laboratory Corp. of America Holdings | -4.0% |
| 7 | Quest Diagnostics Inc. | -9.8% |
| 8 | Cepheid | -37.7% |

Median (excl. Millennium Lab Holdings, Inc. an  -2.9%

### 3-Year Trailing EBITDA Growth

| Rank | Company | EBITDA Growth |
|---|---|---|
| 1 | **Millennium Lab Holdings, Inc. and Sub** | 182.8% |
| 2 | Myriad Genetics Inc. | 25.5% |
| 3 | Bio-Reference Laboratories Inc. | 14.3% |
| 4 | Meridian Bioscience, Inc. | 12.7% |
| 5 | Alere Inc. | 10.5% |
| 6 | Laboratory Corp. of America Holdings | 0.4% |
| 7 | Quest Diagnostics Inc. | -2.4% |
| 8 | Cepheid | -8.2% |

Median (excl. Millennium Lab Holdings, Inc. an  10.5%

### 1-Year Forward Revenue Growth

| Rank | Company | Revenue Growth |
|---|---|---|
| 1 | Cepheid | 32.7% |
| 2 | Genomic Health Inc. | 23.4% |
| 3 | **Millennium Lab Holdings, Inc. and Sub** | 15.9% |
| 4 | Bio-Reference Laboratories Inc. | 10.7% |
| 5 | Meridian Bioscience, Inc. | 9.1% |
| 6 | Alere Inc. | 7.3% |
| 7 | Myriad Genetics Inc. | 4.8% |
| 8 | Laboratory Corp. of America Holdings | 4.4% |
| 9 | Quest Diagnostics Inc. | 4.1% |

Median (excl. Millennium Lab Holdings, Inc. an  8.2%

### 2-Year Forward Revenue Growth

| Rank | Company | Revenue Growth |
|---|---|---|
| 1 | Cepheid | 25.0% |
| 2 | Genomic Health Inc. | 24.6% |
| 3 | **Millennium Lab Holdings, Inc. and Sub** | 11.7% |
| 4 | Meridian Bioscience, Inc. | 8.1% |
| 5 | Alere Inc. | 5.5% |
| 6 | Myriad Genetics Inc. | 4.7% |
| 7 | Laboratory Corp. of America Holdings | 3.2% |
| 8 | Quest Diagnostics Inc. | 2.9% |

Median (excl. Millennium Lab Holdings, Inc. an  5.5%

### 1-Year Forward EBITDA Growth

| Rank | Company | EBITDA Growth |
|---|---|---|
| 1 | Cepheid | 403.3% |
| 2 | Bio-Reference Laboratories Inc. | 18.3% |
| 3 | Meridian Bioscience, Inc. | 17.1% |
| 4 | Alere Inc. | 16.8% |
| 5 | **Millennium Lab Holdings, Inc. and Sub** | 10.5% |
| 6 | Quest Diagnostics Inc. | 4.0% |
| 7 | Laboratory Corp. of America Holdings | 1.6% |
| 8 | Myriad Genetics Inc. | -9.2% |

Median (excl. Millennium Lab Holdings, Inc. an  16.8%

### 2-Year Forward EBITDA Growth

| Rank | Company | EBITDA Growth |
|---|---|---|
| 1 | Cepheid | 205.1% |
| 2 | Meridian Bioscience, Inc. | 14.0% |
| 3 | Alere Inc. | 11.9% |
| 4 | **Millennium Lab Holdings, Inc. and Sub** | 7.4% |
| 5 | Quest Diagnostics Inc. | 3.5% |
| 6 | Laboratory Corp. of America Holdings | 3.4% |
| 7 | Myriad Genetics Inc. | -7.2% |

Median (excl. Millennium Lab Holdings, Inc. an  7.7%

Confidential                                                                                          VP_ML_00015739

## Market Approach - Guideline Transaction Method



Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                              **Exhibit 4, Page 1**

Guideline Transaction Method - Summary

(USD thousands)                                                    Valuation as of April 16, 2014

| | Financial Metric | (1) | Selected Multiple | | Indicated BEV Range | | |
|---|---|---|---|---|---|---|---|
| | | | Low | High | Low | | High |
| **Last Twelve Months ("LTM")** | | | | | | | |
| (2) Revenue | $645,351 | | 3.75 x | -- 4.00 x | $2,420,067 | -- | $2,581,405 |
| (3) Estimated weighted BEV range | | | | | $2,420,000 | -- | $2,581,000 |
| *Adjustment for acquisition of RxAnte, Inc.* | | | | | *$70,419* | -- | *$70,419* |
| **Estimated BEV range (rounded)** | | | | | **$2,490,000** | **to** | **$2,651,000** |

Notes:

(1) See Exhibit 4, Page 2.

(2) See Appendix B, Page 1.

(3) We did not add back the value of RxAnte to the value indicated by this method as there was insufficient information on the transactions.

Confidential                                                         VP_ML_00015741

**Millennium Lab Holdings, Inc. and Subsidiaries**

**Exhibit 4, Page 2**

Guideline Transaction Method - Transaction Data

(USD millions)

Valuation as of April 16, 2014

| Announced Date | Effective Date | SIC Code | Buyer Company | Target Company | Revenue | EBITDA | EBITDA Margin | BEV | BEV / Revenue | BEV / EBITDA |
|---|---|---|---|---|---|---|---|---|---|---|
| Mar-12-2014 | Mar-12-2014 | N/A | EKF Diagnostics Holdings plc | Separation Technology Inc. | $4.0 | $0.5 | 12.5% | $4.0 | 1.00x | 8.00x |
| Jan-1-2014 | Jan-1-2014 | N/A | Apredica, LLC (nka:Cyprotex US, LLC) | CeeTox, Inc. | $3.8 | N/A | N/A | $6.1 | 1.62x | N/A |
| Oct-22-2013 | Oct-22-2013 | 8011 | Miraca Life Sciences, Inc. | PLUS Diagnostics, Inc. | $75.4 | N/A | N/A | $83.1 | 1.10x | N/A |
| Aug-26-2013 | Aug-26-2013 | N/A | Vansen Pharma Inc. | Merus Labs International Inc., Factive Product | $1.1 | N/A | N/A | $3.4 | 3.06x | N/A |
| Jul-26-2013 | Jul-26-2013 | 3231 | Trinity Biotech plc | Immco Diagnostics, Inc. | $12.5 | N/A | N/A | $32.8 | 2.62x | N/A |
| Sep-15-2012 | Mar-14-2013 | 8731 | BGI | Complete Genomics, Inc. | $19.2 | ($64.8) | -336.8% | $90.2 | 4.68x | -1.39x |
| Jan-5-2013 | Jan-31-2013 | 3841 | Natus Medical Inc. | Grass Technologies Corporation | $18.5 | N/A | N/A | $18.6 | 1.01x | N/A |
| Apr-29-2012 | Aug-1-2012 | 2835 | Hologic Inc. | Gen-Probe Incorporated | $586.6 | $183.5 | 31.3% | $3,890.9 | 6.63x | 21.20x |
| Jun-3-2012 | Jul-31-2012 | 8071 | Laboratory Corp. of America Holdings | MEDTOX Scientific Inc. | $111.6 | $14.5 | 13.0% | $241.2 | 2.16x | 16.61x |
| Apr-5-2011 | Dec-15-2011 | 8071 | Laboratory Corp. of America Holdings | Orchid Cellmark Inc. | $66.2 | $1.5 | 2.3% | $66.7 | 1.01x | 43.98x |
| May-23-2011 | Aug-31-2011 | N/A | N/A | Pacific Biomarkers, Inc. (lab and biomarker services) | $9.7 | N/A | N/A | $2.3 | 0.24x | N/A |
| Jul-2-2011 | Aug-18-2011 | 2835 | TPG Capital, L.P.; TPG Partners VI, L.P. | Immucor, Inc. | $333.1 | $148.1 | 44.5% | $1,642.5 | 4.93x | 11.09x |
| Jul-25-2011 | Jul-25-2011 | N/A | Brooks Automation, Inc. | NEXUS Biosystems, Inc | $32.2 | $5.2 | 16.2% | $85.0 | 2.64x | 16.32x |
| Feb-6-2011 | Jun-29-2011 | 3826 | Danaher Corp. | Beckman Coulter, Inc. | $3,663.4 | $796.6 | 21.7% | $6,852.8 | 1.87x | 8.60x |
| Dec-12-2010 | May-13-2011 | 3823 | Thermo Fisher Scientific, Inc. | Dionex Corp. | $431.8 | $103.3 | 23.9% | $2,129.2 | 4.93x | 20.61x |
| Mar-17-2011 | May-10-2011 | N/A | Quest Diagnostics Inc. | Celera Corporation | $128.2 | ($21.1) | -16.4% | $330.4 | 2.58x | -15.69x |
| Feb-24-2011 | Apr-4-2011 | 8071 | Quest Diagnostics Inc. | Athena Diagnostics, Inc. | $110.0 | N/A | N/A | $740.0 | 6.73x | N/A |
| Jan-24-2011 | Mar-4-2011 | 8071 | Novartis Finance Corporation | Genoptix, Inc. | $196.9 | $47.0 | 23.9% | $310.9 | 1.58x | 6.61x |
| Feb-11-2011 | Feb-11-2011 | N/A | Crosstex International, Inc. | ConFirm Monitoring Systems, Inc. | $4.0 | N/A | N/A | $8.5 | 2.13x | N/A |
| Feb-7-2011 | Feb-7-2011 | 8071 | Physician's Automated Laboratory, Inc. | Central Coast Pathology Consultants, Inc. | $20.0 | N/A | N/A | $28.0 | 1.40x | N/A |
| Nov-18-2010 | Feb-1-2011 | 3841 | Sekisui Medical CO., Ltd. | Genzyme Diagnostics, Inc. | $167.0 | N/A | N/A | $265.0 | 1.59x | N/A |
| Jan-14-2011 | Jan-14-2011 | N/A | Seattle Reproductive Medicine, Inc. | Northwest Center for Reproductive Sciences LLC | $5.0 | N/A | N/A | $2.4 | 0.48x | N/A |
| Oct-22-2010 | Dec-21-2010 | 8734 | GE Healthcare Ltd. | Clarient, Inc. | $110.1 | $6.6 | 6.0% | $585.1 | 5.32x | 88.88x |
| Nov-8-2010 | Dec-2-2010 | 8734 | Sonic Healthcare Limited | CBLPath, Inc. | $80.0 | N/A | N/A | $123.5 | 1.54x | N/A |
| Sep-13-2010 | Nov-30-2010 | 8731 | Laboratory Corp. of America Holdings | Esoterix Genetic Laboratories, LLC | $371.0 | N/A | N/A | $925.2 | 2.49x | N/A |

| | Revenue | EBITDA | EBITDA Margin | | | |
|---|---|---|---|---|---|---|
| Millennium Lab Holdings, Inc. and Subsidiaries | $645.4 | $380.9 | 59.0% | | | |

| | Revenue | EBITDA | EBITDA Margin | BEV | BEV / Revenue | BEV / EBITDA |
|---|---|---|---|---|---|---|
| Minimum: | $1.1 | ($64.8) | -336.8% | $2.3 | 0.24x | -15.69x |
| Lower (First) Quartile: | $12.5 | $1.3 | 5.1% | $18.6 | 1.40x | 7.65x |
| Median: | $75.4 | $10.6 | 14.6% | $90.2 | 2.13x | 13.70x |
| Upper (Third) Quartile: | $167.0 | $114.5 | 23.9% | $585.1 | 3.06x | 20.76x |
| Maximum: | $3,663.4 | $796.6 | 44.5% | $6,852.8 | 6.73x | 88.88x |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*
(x) represents that an outlier was excluded from one of the summarizing statistics.

*N/A represents not available or not applicable.

** --- represents transactions occurring in the past twelve months

Confidential

VP_ML_00015742

**Millennium Lab Holdings, Inc. and Subsidiaries**
Guideline Transaction Method - Target Company Business Descriptions

**Exhibit 4, Page 3**

Valuation as of April 16, 2014

| Target Company | Business Description |
|---|---|
| Separation Technology Inc. | Separation Technology Inc. provides centrifugation solutions to the laboratory marketplace. |
| CeeTox, Inc. | As of January 1, 2014, CeeTox, Inc. was acquired by Apredica, Inc.. |
| PLUS Diagnostics, Inc. | PLUS Diagnostics, Inc. is a cytology, histology, and molecular pathology laboratory. |
| Merus Labs International Inc., Factive Product | As of August 26, 2013, Factive Product of Merus Labs International Inc. was acquired by Okana Ventures Inc. Merus Labs International Inc., North American Rights of Factive Drug comprises North American product rights for Factive (Gemifloxacin Mesylate) tablets including trademark and patent, inventory on hand, various contingent liabilities, and certain related intellectual property and other information and materials required to market the brand in the North American market. |
| Immco Diagnostics, Inc. | Immco Diagnostics, Inc. develops, manufactures, and distributes diagnostic kits and laboratory supplies for hospitals, clinical laboratories, and research institutions for rapid diagnostic tests, drugs of abuse, fertility, infectious diseases, autoimmunity, serology, microbiology, interlab electrophoresis, laboratory instrumentation, infectious diseases, UPT urine transport vials, chromsystems HPLC and LC-MS/MS, and urinalysis. |
| Complete Genomics, Inc. | Complete Genomics, Inc., a life sciences company, develops and commercializes a DNA sequencing platform for human genome sequencing and analysis. |
| Grass Technologies Corporation | Grass Technologies Corporation manufactures neurophysiological monitoring instruments for research and clinical applications, such as sleep monitoring and analysis, long-term monitoring, electroencephalograph (EEG) monitoring, and neurophysiological research studies. |
| Gen-Probe Incorporated | Gen-Probe Incorporated engages in the development, manufacture, and marketing of molecular diagnostic products and services that are used primarily to diagnose human diseases and screen donated human blood. |
| MEDTOX Scientific Inc. | MEDTOX Scientific, Inc., through its subsidiaries, provides forensic and clinical laboratory services, and diagnostic devices and other similar products. |
| Orchid Cellmark Inc. | Orchid Cellmark Inc. provides identity DNA testing services to law enforcement agencies, government crime laboratories, and private clients. |
| Pacific Biomarkers, Inc. (lab and biomarker services) | Pacific Biomarkers, Inc. specialty reference laboratory services and clinical biomarker services offer specialty reference laboratory and clinical biomarker services. |
| Immucor, Inc. | Immucor, Inc. develops, manufactures, and sells transfusion and transplantation diagnostics products worldwide. |
| NEXUS Biosystems, Inc | NEXUS Biosystems, Inc. provides automated sample management systems and technologies for pharmaceutical, biotech, biorepository, agrochemical, forensic, and related research institutions worldwide. |
| Beckman Coulter, Inc. | Beckman Coulter, Inc. develops, manufactures, and markets diagnostic systems that automate complex biomedical testing. |
| Dionex Corp. | Dionex Corporation designs, manufactures, markets, and services analytical instrumentation and related accessories, and chemicals. |
| Celera Corporation | Celera Corporation develops and manufactures molecular diagnostic products for hospitals and clinical laboratories to detect, characterize, monitor, and select treatments for diseases. |
| Athena Diagnostics, Inc. | Athena Diagnostics, Inc. offers diagnostic testing for neurological diseases, and tests for Alzheimer's disease, endocrine, renal conditions, muscular dystrophy, and other neuromuscular and developmental disorders. |
| Genoptix, Inc. | Genoptix, Inc. develops and commercializes evidence-driven diagnostic tests to improve physicians' ability to optimize patient outcomes. |
| ConFirm Monitoring Systems, Inc. | ConFirm Monitoring Systems, Inc. provides laboratory services and infection control products for healthcare professionals in North America. |
| Central Coast Pathology Consultants, Inc. | Central Coast Pathology Consultants, Inc. provides clinical and anatomic pathology laboratory services. |
| Genzyme Diagnostics, Inc. | Sekisui Diagnostics, LLC. manufactures and supplies intermediates for diagnostic manufacturers and clinical laboratories worldwide. |
| Northwest Center for Reproductive Sciences LLC | As of January 14, 2011, Northwest Center for Reproductive Sciences LLC was acquired by Seattle Reproductive Medicine, Inc. Northwest Center for Reproductive Sciences LLC is an infertility clinic in Washington. |
| Clarient, Inc. | Clarient, Inc. provides oncology testing and diagnostic services in the United States. |
| CBLPath, Inc. | CBLPath, Inc., a specialty lab, provides sub-specialized anatomic pathology and molecular diagnostic laboratory services. |
| Esoterix Genetic Laboratories, LLC | Esoterix Genetic Laboratories, LLC provides pathology, oncology, reproductive, and genetic medicine testing services for physicians and their patients in the United States. |

Notes:
*Source: Capital IQ, a division of Standard & Poor's.*

Confidential

**Appendices**



Confidential

VP_ML_00015744

**Millennium Lab Holdings, Inc. and Subsidiaries**  **Appendix A, Page 1**
Balance Sheets
(USD thousands)  Valuation as of April 16, 2014

**Balance Sheets**

| | Dec-31-2008 | Dec-31-2009 | Dec-31-2010 | Dec-31-2011 | Dec-31-2012 | Dec-31-2013 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents | $3,064 | $13,175 | $14,872 | $30,088 | $143,796 | $196,328 |
| Accounts receivable | $5,883 | $18,230 | $38,615 | $44,087 | $65,051 | $81,188 |
| Prepaid expenses and other | $5 | $382 | $3,310 | $9,273 | $31,716 | $14,957 |
| Total current assets | $8,952 | $31,786 | $56,796 | $83,448 | $240,563 | $292,473 |
| Property and equipment | | | | | | |
| Property and equipment | $2,553 | $9,873 | $36,156 | $53,790 | $90,516 | $139,803 |
| Accumulated depreciation and amortization | ($247) | ($1,000) | ($2,860) | ($8,327) | ($17,625) | ($33,899) |
| Net property and equipment | $2,306 | $8,873 | $33,296 | $45,463 | $72,891 | $105,904 |
| Other assets | | | | | | |
| Other assets | $244 | $349 | $3,231 | $4,475 | $13,362 | $14,768 |
| Intangible assets | $0 | $0 | $0 | $0 | $0 | $22,530 |
| Goodwill | $0 | $0 | $0 | $0 | $0 | $30,941 |
| Total other assets | $244 | $349 | $3,231 | $4,475 | $13,362 | $68,239 |
| Total assets | $11,501 | $41,009 | $93,323 | $133,386 | $326,816 | $466,616 |
| **Liabilities and stockholders' equity** | | | | | | |
| Liabilities | | | | | | |
| Current liabilities | | | | | | |
| Current portion of long-term debt | $0 | $932 | $711 | $790 | $26,868 | $48,984 |
| Current portion of capital lease obligations | $0 | $292 | $685 | $3,659 | $11,032 | $14,570 |
| Accounts payable | $699 | $1,896 | $2,000 | $2,467 | $4,082 | $3,388 |
| Accrued expenses and other current liabilities | $584 | $2,194 | $6,475 | $15,043 | $24,925 | $44,026 |
| Dividends payable | $1,000 | $283 | $12,995 | $14,558 | $0 | $0 |
| Deferred tax liabilities | $0 | $0 | $810 | $918 | $635 | $699 |
| Due to shareholders | $2,002 | $302 | $0 | $0 | $0 | $0 |
| Due to related party | $0 | $0 | $0 | $0 | $0 | $0 |
| Total current liabilities | $4,285 | $5,899 | $23,682 | $37,435 | $67,542 | $111,667 |
| Long-term liabilities | | | | | | |
| Long-term debt, net of current portion | $1,900 | $3,919 | $200,725 | $201,779 | $469,962 | $473,519 |
| Capital lease obligations, net of current portion | $0 | $774 | $3,193 | $8,055 | $17,430 | $30,452 |
| Stock purchase warrants liability | $0 | $0 | $14,943 | $96,270 | $493,194 | $527,889 |
| Contingent consideration | $0 | $0 | $0 | $0 | $0 | $3,367 |
| Other liabilities | $149 | $382 | $0 | $0 | $3,652 | $1,565 |
| Total long-term liabilities | $2,049 | $5,075 | $218,861 | $306,104 | $984,238 | $1,036,792 |
| Total liabilities | $6,334 | $10,974 | $242,542 | $343,539 | $1,051,780 | $1,148,459 |
| Stockholders' equity | | | | | | |
| Common stock | $119 | $503 | $19,075 | $19,287 | $19,660 | $22,708 |
| Retained earnings (deficit) | $5,048 | $29,532 | ($15,646) | ($76,792) | ($591,976) | ($551,903) |
| Treasury stock | $0 | $0 | ($152,648) | ($152,648) | ($152,648) | ($152,648) |
| Stockholders' equity (deficit) | $5,167 | $30,035 | ($149,219) | ($210,153) | ($724,964) | ($681,843) |
| Total liabilities and stockholders' equity | $11,501 | $41,009 | $93,323 | $133,386 | $326,816 | $466,616 |

Notes:
*Source: Management-provided balance sheets as of December 31, 2008 through 2013.*

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                    **Appendix A, Page 2**
Balance Sheets - Common Size
(Values as presented)                                                                    Valuation as of April 16, 2014

**Common Size Balance Sheets**

| | Dec-31-2008 | Dec-31-2009 | Dec-31-2010 | Dec-31-2011 | Dec-31-2012 | Dec-31-2013 |
|---|---|---|---|---|---|---|
| Assets | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents | 26.6% | 32.1% | 15.9% | 22.6% | 44.0% | 42.1% |
| Accounts receivable | 51.2% | 44.5% | 41.4% | 33.1% | 19.9% | 17.4% |
| Prepaid expenses and other | 0.0% | 0.9% | 3.5% | 7.0% | 9.7% | 3.2% |
| Total current assets | 77.8% | 77.5% | 60.9% | 62.6% | 73.6% | 62.7% |
| Property and equipment | | | | | | |
| Property and equipment | 22.2% | 24.1% | 38.7% | 40.3% | 27.7% | 30.0% |
| Accumulated depreciation and amortization | -2.1% | -2.4% | -3.1% | -6.2% | -5.4% | -7.3% |
| Net property and equipment | 20.0% | 21.6% | 35.7% | 34.1% | 22.3% | 22.7% |
| Other assets | | | | | | |
| Other assets | 2.1% | 0.9% | 3.5% | 3.4% | 4.1% | 3.2% |
| Intangible assets | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 4.8% |
| Goodwill | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 6.6% |
| Total other assets | 2.1% | 0.9% | 3.5% | 3.4% | 4.1% | 14.6% |
| Total assets | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Liabilities and stockholders' equity | | | | | | |
| Liabilities | | | | | | |
| Current liabilities | | | | | | |
| Current portion of long-term debt | 0.0% | 2.3% | 0.8% | 0.6% | 8.2% | 10.5% |
| Current portion of capital lease obligations | 0.0% | 0.7% | 0.7% | 2.7% | 3.4% | 3.1% |
| Accounts payable | 6.1% | 4.6% | 2.1% | 1.8% | 1.2% | 0.7% |
| Accrued expenses and other current liabilities | 5.1% | 5.4% | 6.9% | 11.3% | 7.6% | 9.4% |
| Dividends payable | 8.7% | 0.7% | 13.9% | 10.9% | 0.0% | 0.0% |
| Deferred tax liabilities | 0.0% | 0.0% | 0.9% | 0.7% | 0.2% | 0.1% |
| Due to shareholders | 17.4% | 0.7% | 0.0% | 0.0% | 0.0% | 0.0% |
| Due to related party | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Total current liabilities | 37.3% | 14.4% | 25.4% | 28.1% | 20.7% | 23.9% |
| Long-term liabilities | | | | | | |
| Long-term debt, net of current portion | 16.5% | 9.6% | 215.1% | 151.3% | 143.8% | 101.5% |
| Capital lease obligations, net of current portion | 0.0% | 1.9% | 3.4% | 6.0% | 5.3% | 6.5% |
| Stock purchase warrants liability | 0.0% | 0.0% | 16.0% | 72.2% | 150.9% | 113.1% |
| Contingent consideration | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% |
| Other liabilities | 1.3% | 0.9% | 0.0% | 0.0% | 1.1% | 0.3% |
| Total long-term liabilities | 17.8% | 12.4% | 234.5% | 229.5% | 301.2% | 222.2% |
| Total liabilities | 55.1% | 26.8% | 259.9% | 257.6% | 321.8% | 246.1% |
| Stockholders' equity | | | | | | |
| Common stock | 1.0% | 1.2% | 20.4% | 14.5% | 6.0% | 4.9% |
| Retained earnings (deficit) | 43.9% | 72.0% | -16.8% | -57.6% | -181.1% | -118.3% |
| Treasury stock | 0.0% | 0.0% | -163.6% | -114.4% | -46.7% | -32.7% |
| Stockholders' equity (deficit) | 44.9% | 73.2% | -159.9% | -157.6% | -221.8% | -146.1% |
| Total liabilities and stockholders' equity | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Notes:
*Source: Management-provided balance sheets as of December 31, 2008 through 2013.*

Confidential                                                                                    VP_ML_00015746

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Appendix B, Page 1**

Income Statements

(USD thousands)                                                      Valuation as of April 16, 2014

**Income Statements**

| | Fiscal years ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Dec-31-2008** | **Dec-31-2009** | **Dec-31-2010** | **Dec-31-2011** | **Dec-31-2012** | **Dec-31-2013** |
| Net sales | $11,875 | $64,463 | $160,681 | $232,619 | $522,164 | $632,632 |
| Cost of sales | $0 | $0 | $25,704 | $37,029 | $54,943 | $75,256 |
| Gross profit | $11,875 | $64,463 | $134,977 | $195,590 | $467,221 | $557,376 |
| Operating expenses | | | | | | |
| Selling, general, and administrative expenses | $5,279 | $23,892 | $118,250 | $93,137 | $156,684 | $212,439 |
| Total operating expense | $5,279 | $23,892 | $118,250 | $93,137 | $156,684 | $212,439 |
| Operating income | $6,596 | $40,571 | $16,727 | $102,453 | $310,537 | $344,937 |
| | | | | | | |
| Other income / (expense) | | | | | | |
| Interest expense | ($129) | ($252) | ($13,847) | ($32,408) | ($42,186) | ($44,400) |
| Interest income | $1 | $1 | $163 | $13 | $41 | $163 |
| Change in fair value of interest rate cap | $0 | $0 | $0 | $0 | ($1,102) | ($180) |
| Loss on extinguishment of debt | $0 | $0 | $0 | $0 | ($88,651) | $0 |
| Change in fair value of stock purchase warrants | $0 | $0 | ($3,881) | ($81,327) | ($469,568) | ($34,695) |
| Other income (expense) | $6 | $12 | $4,940 | $781 | $284 | ($9,186) |
| Net other income / (expense) | ($123) | ($239) | ($12,625) | ($112,941) | ($601,182) | ($88,298) |
| Pretax income | $6,473 | $40,332 | $4,102 | ($10,488) | ($290,645) | $256,639 |
| Income tax expense / (benefit) | $13 | $836 | $269 | $1,806 | $1,630 | $2,401 |
| **Net income** | **$6,460** | **$39,496** | **$3,833** | **($12,294)** | **($292,275)** | **$254,238** |

Notes:

*Source:  Management-provided income statements for the  December 31, 2008 through December 31, 2013.*

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                    **Appendix B, Page 2**

Income Statements - Common Size

(Values as presented)                                                                   Valuation as of April 16, 2014

**Common Size Income Statements**

| | Fiscal years ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Dec-31-2008 | Dec-31-2009 | Dec-31-2010 | Dec-31-2011 | Dec-31-2012 | Dec-31-2013 |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of sales | 0.0% | 0.0% | 16.0% | 15.9% | 10.5% | 11.9% |
| Gross profit | 100.0% | 100.0% | 84.0% | 84.1% | 89.5% | 88.1% |
| Operating expenses | | | | | | |
| Selling, general, and administrative expenses | 44.5% | 37.1% | 73.6% | 40.0% | 30.0% | 33.6% |
| Total operating expense | 44.5% | 37.1% | 73.6% | 40.0% | 30.0% | 33.6% |
| Operating income | 55.5% | 62.9% | 10.4% | 44.0% | 59.5% | 54.5% |
| | | | | | | |
| Other income / (expense) | | | | | | |
| Interest expense | -1.1% | -0.4% | -8.6% | -13.9% | -8.1% | -7.0% |
| Interest income | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% |
| Change in fair value of interest rate cap | 0.0% | 0.0% | 0.0% | 0.0% | -0.2% | 0.0% |
| Loss on extinguishment of debt | 0.0% | 0.0% | 0.0% | 0.0% | -17.0% | 0.0% |
| Change in fair value of stock purchase warrants | 0.0% | 0.0% | -2.4% | -35.0% | -89.9% | -5.5% |
| Other income (expense) | 0.0% | 0.0% | 3.1% | 0.3% | 0.1% | -1.5% |
| Net other income / (expense) | -1.0% | -0.4% | -7.9% | -48.6% | -115.1% | -14.0% |
| Pretax income | 54.5% | 62.6% | 2.6% | -4.5% | -55.7% | 40.6% |
| Income tax expense / (benefit) | 0.1% | 1.3% | 0.2% | 0.8% | 0.3% | 0.4% |
| **Net income** | **54.4%** | **61.3%** | **2.4%** | **-5.3%** | **-56.0%** | **40.2%** |

Notes:

*Source: Management-provided income statements for the December 31, 2008 through December 31, 2013.*

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Appendix B, Page 3**
Adjusted Income Statements
(USD thousands)                                                                Valuation as of April 16, 2014

**Adjusted Income Statements**

| | 3-Year | Fiscal years ended | | | | Forecast | |
|---|---|---|---|---|---|---|---|
| | Average | Dec-31-2011 | Dec-31-2012 | Dec-31-2013 | Apr-16-2014 | Dec-31-2014 | Dec-31-2015 |
| **Revenue** | | $232,619 | $522,164 | $632,632 | $645,351 | **$733,282** | **$788,757** |
| Cost of sales | | $37,029 | $54,943 | $75,256 | N/A | $93,805 | $114,200 |
| Gross profit | | $195,590 | $467,221 | $557,376 | N/A | $639,477 | $674,557 |
| Operating expenses | | | | | | | |
| less:  Selling, general, and administrative expenses | | ($93,137) | ($156,684) | ($212,439) | N/A | ($249,199) | ($268,518) |
| add:  Depreciation and amortization | | $5,832 | $10,542 | $16,905 | N/A | $27,595 | $29,724 |
| add:  Adjustments | | $7,753 | $16,516 | $25,466 | N/A | N/A | N/A |
| **Adjusted EBITDA** | $277,251 | **$116,038** | **$337,595** | **$378,121** | **$380,868** | **$417,873** | **$435,763** |
| less:  Depreciation and amortization | | ($5,832) | ($10,542) | ($16,905) | N/A | ($27,595) | ($29,724) |
| **Adjusted EBIT** | $266,158 | **$110,206** | **$327,053** | **$361,216** | **N/A** | **$390,279** | **$406,039** |

**Adjustments**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **EBITDA adjustments** | | | | | | | |
| Stock-based Compensation | | $212 | $373 | $3,048 | N/A | N/A | N/A |
| Transaction Expenses | | $0 | $8,114 | $657 | N/A | N/A | N/A |
| Other Adjustments | | $6,759 | $7,746 | $0 | N/A | N/A | N/A |
| Executive Payout | | N/A | N/A | $10,542 | N/A | N/A | N/A |
| Pathways | | $781 | $284 | $10,755 | N/A | N/A | N/A |
| Loss on disposal of assets | | N/A | N/A | $464 | N/A | N/A | N/A |
| **Total adjustments to EBITDA** | | **$7,753** | **$16,516** | **$25,466** | **N/A** | **N/A** | **N/A** |

Notes:
(1) See Appendix B, Page 1 for the historical income statements.
(2) See Exhibit 2, Page 2 for the forecast income statements.

Confidential                                                                    VP_ML_00015749

**Millennium Lab Holdings, Inc. and Subsidiaries**      **Appendix C, Page 1**

Discount for Lack of Marketability - Asian Put

(Values as presented)                                   Valuation as of April 16, 2014

### Discount for Lack of Marketability ("DLOM") - Asian Put Option Analysis

| | | |
|---|---|---:|
| (1) | Time to expiration (years) | 3.00 |
| | Current price | $1.00 |
| | Strike price | $1.00 |
| | Dividend yield | 0.0% |
| (2) | Volatility | 43.0% |
| | $v^2_T$ | 0.194 |
| | $v_T$ | 0.440 |
| (3) | Asian put value | 0.174 |
| | Implied DLOM on 3.0-year holding period | 17.4% |

| | |
|---|---:|
| **Estimated DLOM** | **17.0%** |

Notes:

(1) Estimated based on discussions with Management regarding expectations of a future liquidity or exit event.

(2) See Exhibit 6, Page 1 for the implied volatility of common stock.

(3) We used an average price, or "Asian," put option where the payoff depends on the average price of the underlying asset during the life of the option.  Traditional put option models can overstate marketability given that the combination of a restricted stock and a put option provides 100.0 percent downside protection and 100.0 percent upside participation; however, the owner of a marketable security does not have 100.0 percent downside protection.

Confidential                                                         VP_ML_00015750

# Millennium Lab Holdings, Inc. and Subsidiaries      Appendix C, Page 2

Discount for Lack of Marketability - Finnerty Put

(Values as presented)                                    Valuation as of April 16, 2014

---

### Discount for Lack of Marketability ("DLOM") - Finnerty Put Option Analysis

| | |
|---|---:|
| (1) Risk-free rate | 0.87% |
| (2) Time to expiration (years) | 3.00 |
| (3) Volatility | 43.0% |
| Dividend yield | 0.0% |
| v | 0.410 |
| A | 0.269 |
| B | (0.141) |
| Finnerty put value | 0.178 |
| (4) Implied DLOM on 3.0-year holding period | 17.8% |

| | |
|---|---:|
| **Concluded discount for lack of marketability** | **18.0%** |

Notes:

(1) U.S. Treasury with term comparable to the estimated time to expiration.  Source:  Capital IQ, a division of Standard & Poor's.

(2) Estimated based on discussions with Management regarding expectations of a future liquidity or exit event.

(3) Historical volatility of the guideline companies. See Appendix C, Page 3.

(4) Finnerty Put Option Analysis based on John D. Finnerty, "The Impact of Transfer Restrictions on Stock Prices." October 2009.

Confidential                                                                                    VP_ML_00015751

**Millennium Lab Holdings, Inc. and Subsidiaries**

Volatility

(Values as presented)

Appendix C, Page 3

Valuation as of April 16, 2014

| | (1) Ticker | (2) Capital Structure (in $mil) | | Black-Scholes Inputs | | | | Black-Scholes Outputs | | | | Equity Call Value | (4) Asset Volatility Ratio | Asset Volatility |
| Guideline Company | | Market Cap | Total Debt | Dividend Yield | Days to Expiration | (3) Equity Volatility | Risk-free Rate | D1 | D2 | N(D1) | N(D2) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | $2,933.88 | $3,843.16 | N/A | 1,096 | 36.0% | 0.87% | 1.262 | 0.638 | 0.897 | 0.738 | $3,311.90 | 0.545 | 19.6% |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | $759.17 | $52.63 | N/A | 1,096 | 41.8% | 0.87% | 4.176 | 3.452 | 1.000 | 1.000 | $760.52 | 0.937 | 39.2% |
| Cepheid | NasdaqGS:CPHD | $3,312.22 | $1.67 | N/A | 1,096 | 44.7% | 0.87% | 10.219 | 9.444 | 1.000 | 1.000 | $3,312.26 | 1.000 | 44.7% |
| Genomic Health Inc. | NasdaqGS:GHDX | $836.67 | $0.00 | N/A | 1,096 | 40.4% | 0.87% | N/A | N/A | 1.000 | 1.000 | $836.67 | 1.000 | 40.4% |
| Laboratory Corp. of America Holdings | NYSE:LH | $8,667.59 | $3,000.40 | N/A | 1,096 | 20.5% | 0.87% | 4.072 | 3.717 | 1.000 | 1.000 | $8,744.65 | 0.749 | 15.4% |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | $892.52 | $0.00 | 3.7% | 1,096 | 31.6% | 0.87% | N/A | N/A | 1.000 | 1.000 | $892.52 | 1.000 | 31.6% |
| Myriad Genetics Inc. | NasdaqGS:MYGN | $2,797.09 | $0.00 | N/A | 1,096 | 39.0% | 0.87% | N/A | N/A | 1.000 | 1.000 | $2,797.09 | 1.000 | 39.0% |
| Quest Diagnostics Inc. | NYSE:DGX | $8,652.89 | $3,366.00 | 2.2% | 1,096 | 21.8% | 0.87% | 3.628 | 3.250 | 1.000 | 0.999 | $8,739.49 | 0.727 | 15.8% |

| | |
|---|---|
| Minimum: | 15.4% |
| Lower (First) Quartile: | 18.7% |
| Median: | 35.3% |
| Average: | 30.7% |
| Upper (Third) Quartile: | 39.5% |
| Maximum: | 44.7% |

(5) **Selected asset volatility:**  **39.0%**

| | (2) Capital Structure (in $mil) | | Black-Scholes Inputs | | | | Black-Scholes Outputs | | | | Equity Call Value | Asset Volatility Ratio | Asset Volatility |
| Subject Company | (6) Equity Value | (7) Total Debt | Dividend Yield | Days to Expiration | Equity Volatility | Risk-free Rate | D1 | D2 | N(D1) | N(D2) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Millennium Lab Holdings, Inc. and Subsidiaries | $17.13 | $1.77 | 0.0% | 1,096 | 42.9% | 0.87% | 3.596 | 2.853 | 1.000 | 0.998 | $17.17 | 0.909 | 39.0% |

(8) **Estimated equity volatility**   **43.0%**

Notes:

Source: Capital IQ, a division of Standard & Poor's.

(1) See Appendix D, Page 1 for descriptions of the selected guideline public companies.

(2) Market data of guideline companies was based on the latest reported financials available as of the Valuation Date.

(3) Equity volatility was calculated using daily price changes over a 3.00-year lookback from April 16, 2014.

(4) Asset volatility as a percentage of equity volatility. Calculation based on equity call value as a percentage of enterprise value divided by N(D1) from Black-Scholes equity call value calculation.

(5) We selected a volatility near the average of the market data.

(6) See Exhibit 6, Page 1.

(7) See Appendix A, Page 1.

(8) Concluded equity volatility was based on the selected asset volatility from the guideline company data and the Company's capital structure.

**Millennium Lab Holdings, Inc. and Subsidiaries**

**Appendix C, Page 4**

Discount For Lack of Marketability ("DLOM")

(USD thousands)

Valuation as of April 16, 2014

**Summary Results from Application of the FMV Restricted Stock Study™**

Comparative Analysis with Respect to Financial and Market Risk

(USD thousands)

| Factor | Subject Company Values | Indicated Median Discount | Indicated Average Discount |
|---|---|---|---|
| (1) **Offering amount** | $439,888 | 13.0% | 16.0% |
| **Net income** | $254,238 | 14.0% | 17.0% |
| **Market value of equity** | $799,796 | 11.0% | 14.0% |
| **Revenue** | $645,351 | 14.0% | 16.0% |
| **Total assets** | $466,616 | 11.0% | 14.0% |
| Overall average: | | 12.6% | 15.4% |
| **Restricted Stock Equivalent Discount** | | | **14.0%** |

Comparative Analysis with Respect to Overall Market Volatility

| VIX Range | | Multiplicative Volatility Adjustment Factor |
|---|---|---|
| Low | High | |
| 11.2% | 23.2% | 1.00 |
| 23.2% | 26.0% | 1.16 |
| 26.0% | 32.9% | 1.23 |
| 32.9% | 40.0% | 1.37 |
| 40.0% | 50.0% | 1.54 |
| 50.0% | 60.0% | 1.75 |

| | | |
|---|---|---|
| Restricted Stock Equivalent Discount | | 14.0% |
| (2) *multiply:* Volatility Adjustment Factor | 14.3% | 1.00 |
| **Preliminary Discount (ARSED)** | | **14.0%** |

**Summary Results from Analysis of Subjective Factors Affecting Marketability**

| Qualitative Factors | Issue for Subject Interest | Discount Relative to FMV Study |
|---|---|---|
| **Expected Growth Rate in Value; Prospects for the Industry; Economic Cycle** | The Company has strong growth prospects in an expanding industry space. It is also competitively well-positioned within its industry. | Lower |
| **Expected Dividend/Distribution Yield and Dividend History** | The Company is required to make Tax Distributions annually. For this analysis, we have assumed no other dividends. | Neutral |
| **Ability to Sell Interests and Restrictive Transfer Provisions** | The Class A members cannot transfer all or any portion of their Units without prior written consent of the Class B Majority, except as otherwise permitted per Section 8.1 and 8.2. | Higher |
| **Prospects for Liquidation** | There are no imminent prospects for a liquidation. | Higher |
| **Holding Period Until the Sale of the Underlying Assets with a Distribution to the Partners** | There are currently no plans for an imminent liquidity event, and the expected holding period is approximately three years. | Higher |
| **Potential Buyers of Minority Interests and Prior Transactions** | As of the Valuation Date, there are no offers to buy any minority interests. | Higher |
| **Information Access and Reliability** | The Company is required to deliver financial statements to each TA Member; however, the financial statements are not available to the investing public. | Higher |
| **Investment Objectives; Degree of Professional Management; Risk** | Investment objective is for long-term investment. | Higher |

(3) **Estimated discount for lack of marketability** — **15.0%**

Notes:

(1) Based on the subject interest's percentage of ownership.

(2) Represents the trailing sixth-month average of the CBOE Volatility Index (VIX) as of the Valuation Date.

(3) We selected a discount rate after considering both the quantitative and qualitative factors of the subject interest.

VP_ML_00015753

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Appendix C, Page 5**

Discount for Lack of Marketability - Summary of Restricted Stock Case Studies

(Values as presented)                                                      Valuation date as of April 16, 2014

**Restricted Stock Case Studies**

| Years Studied | Source | Number of Transactions | Average | Median |
|---|---|---|---|---|
| 1991-1997 | Houlihan Lokey (transactions prior to 4/29/97) | 121 | 21.0% | 17.0% |
| 1996-1998 | Columbia Financial (4/29/97 to 12/31/98) | 15 | 13.0% | 9.0% |
| 1996-1997 | Columbia Financial (transactions prior to 4/29/97) | 23 | 21.0% | 14.0% |
| 1980-1996 | Management Planning, Inc. | 53 | 27.0% | 25.0% |
| 1991-1995 | Munroe, Park & Johnson | 72 | 20.0% | N/A |
| 1979-1992 | FMV Opinions (Hall/Polacek) | 100+ | 23.0% | N/A |
| 1980-1991 | UCLA | 44 | 25.0% | 24.0% |
| 1981-1988 | Sibler Research Consultants | 69 | 34.0% | N/A |
| 1981-1984 | Williamette | 33 | N/A | 31.0% |
| 1978-1982 | Standard Research (Stryker/Pittock) | 28 | N/A | 45.0% |
| 1969-1972 | Maher | 34 | 35.0% | 33.0% |
| 1968-1972 | Moroney | 146 | 36.0% | 33.0% |
| 1968-1972 | Trout | 60 | 33.0% | N/A |
| 1968-1970 | Gelmar | 89 | 33.0% | 33.0% |
| 1966-1969 | Institutional Investor (SEC) | 398 | 26.0% | 26.0% |
| | **Median:** | | 26.0% | 26.0% |
| | **Average:** | | 26.7% | 26.4% |

Notes:

Confidential                                                                          VP_ML_00015754

**Millennium Lab Holdings, Inc. and Subsidiaries**
Guideline Public Company Data - Business Descriptions

**Appendix D, Page 1**

Valuation as of April 16, 2014

| Guideline Company | Ticker | Description |
|---|---|---|
| Alere Inc. | NYSE:ALR | Alere Inc. provides diagnostics and services for cardiology, infectious disease, toxicology, and diabetes in the United States and internationally. |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in New Jersey, New York, Maryland, Massachusetts, Texas, and Ohio. |
| Cepheid | NasdaqGS:CPHD | Cepheid, a molecular diagnostics company, develops, manufactures, and markets integrated systems for testing in the clinical and non-clinical markets; and for application in legacy non-clinical market. |
| Genomic Health Inc. | NasdaqGS:GHDX | Genomic Health, Inc., a healthcare company, provides actionable genomic information to personalize cancer treatment decisions in the United States and internationally. |
| Laboratory Corp. of America Holdings | NYSE:LH | Laboratory Corporation of America Holdings operates as an independent clinical laboratory company worldwide. |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | Meridian Bioscience, Inc., a life science company, develops, manufactures, sells, and distributes diagnostic test kits primarily for gastrointestinal, viral, respiratory, and parasitic infectious diseases. |
| Myriad Genetics Inc. | NasdaqGS:MYGN | Myriad Genetics, Inc., a molecular diagnostic company, focuses on the development and marketing of predictive medicine, personalized medicine, and prognostic medicine tests primarily in the United States. |
| Quest Diagnostics Inc. | NYSE:DGX | Quest Diagnostics Incorporated provides diagnostic testing information services in the United States and internationally. |

*Source: Capital IQ, a division of Standard & Poor's.*

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                                                          **Appendix D, Page 2**

Guideline Public Company Data - Operating Metrics

(USD millions)                                                                                                                    Valuation as of April 16, 2014

| Guideline Company | Last Fiscal Year (LFY) End | Revenue | | | | EBITDA | | | | EBIT | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LTM | LFY | 1-Year Forward | 2-Year Forward | LTM | LFY | 1-Year Forward | 2-Year Forward | LTM | LFY |
| Alere Inc. | Dec-31-2013 | $3,029.4 | $3,029.4 | $3,251.0 | $3,371.9 | $612.3 | $612.3 | $714.8 | $767.2 | $172.8 | $172.8 |
| Bio-Reference Laboratories Inc. | Oct-31-2013 | $735.4 | $715.4 | $814.4 | N/A | $93.1 | $101.7 | $110.1 | N/A | $72.1 | $82.0 |
| Cepheid | Dec-31-2013 | $401.3 | $401.3 | $532.7 | $627.0 | $8.5 | $8.5 | $42.7 | $78.9 | ($14.7) | ($14.7) |
| Genomic Health Inc. | Dec-31-2013 | $261.6 | $261.6 | $322.9 | $406.1 | ($5.5) | ($5.5) | ($4.2) | ($3.8) | ($11.8) | ($11.8) |
| Laboratory Corp. of America Holdings | Dec-31-2013 | $5,808.3 | $5,808.3 | $6,062.5 | $6,187.0 | $1,203.5 | $1,203.5 | $1,222.3 | $1,287.8 | $1,012.7 | $1,012.7 |
| Meridian Bioscience, Inc. | Sep-30-2013 | $188.1 | $188.7 | $205.2 | $220.0 | $61.5 | $62.9 | $72.0 | $80.0 | $55.8 | $57.3 |
| Myriad Genetics Inc. | Jun-30-2013 | $737.1 | $613.2 | $772.7 | $808.8 | $300.5 | $238.4 | $272.9 | $258.6 | $291.2 | $229.5 |
| Quest Diagnostics Inc. | Dec-31-2013 | $7,146.0 | $7,146.0 | $7,436.2 | $7,564.5 | $1,439.0 | $1,439.0 | $1,495.9 | $1,540.1 | $1,156.0 | $1,156.0 |
| | | | | | | | | | | | |
| Minimum: | | $188.1 | $188.7 | $205.2 | $220.0 | ($5.5) | ($5.5) | ($4.2) | ($3.8) | ($14.7) | ($14.7) |
| Lower (First) Quartile: | | $366.4 | $366.4 | $480.2 | $516.5 | $48.2 | $49.3 | $64.7 | $79.4 | $38.9 | $40.0 |
| Median: | | $736.2 | $664.3 | $793.6 | $808.8 | $196.8 | $170.0 | $191.5 | $258.6 | $122.5 | $127.4 |
| Upper (Third) Quartile: | | $3,724.2 | $3,724.2 | $3,953.9 | $4,779.5 | $760.1 | $760.1 | $841.7 | $1,027.5 | $471.6 | $425.3 |
| Maximum: | | $7,146.0 | $7,146.0 | $7,436.2 | $7,564.5 | $1,439.0 | $1,439.0 | $1,495.9 | $1,540.1 | $1,156.0 | $1,156.0 |
| | | | | | | | | | | | |
| Millennium Lab Holdings, Inc. and Subsidiaries | | $645.35 | $632.63 | $733.28 | $788.76 | $380.87 | $378.12 | $417.87 | $435.76 | N/A | $361.22 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

Confidential                                                                                                                    VP_ML_00015756

# Millennium Lab Holdings, Inc. and Subsidiaries

**Appendix D, Page 3**

Guideline Public Company Data - Operating Margins

(Values as presented)

Valuation as of April 16, 2014

| Guideline Company | EBITDA | | | | EBIT | |
|---|---|---|---|---|---|---|
| | LTM | LFY | 1-Year Forward | 2-Year Forward | LTM | LFY |
| Alere Inc. | 20.2% | 20.2% | 22.0% | 22.8% | 5.7% | 5.7% |
| Bio-Reference Laboratories Inc. | 12.7% | 14.2% | 13.5% | N/A | 9.8% | 11.5% |
| Cepheid | 2.1% | 2.1% | 8.0% | 12.6% | -3.7% | -3.7% |
| Genomic Health Inc. | -2.1% | -2.1% | -1.3% | -0.9% | -4.5% | -4.5% |
| Laboratory Corp. of America Holdings | 20.7% | 20.7% | 20.2% | 20.8% | 17.4% | 17.4% |
| Meridian Bioscience, Inc. | 32.7% | 33.4% | 35.1% | 36.4% | 29.7% | 30.4% |
| Myriad Genetics Inc. | 40.8% | 38.9% | 35.3% | 32.0% | 39.5% | 37.4% |
| Quest Diagnostics Inc. | 20.1% | 20.1% | 20.1% | 20.4% | 16.2% | 16.2% |
| **Minimum:** | -2.1% | -2.1% | -1.3% | -0.9% | -4.5% | -4.5% |
| **Lower (First) Quartile:** | 10.0% | 11.2% | 12.1% | 16.5% | 3.4% | 3.4% |
| **Median:** | 20.2% | 20.2% | 20.1% | 20.8% | 13.0% | 13.8% |
| **Upper (Third) Quartile:** | 23.7% | 23.9% | 25.3% | 27.4% | 20.5% | 20.7% |
| **Maximum:** | 40.8% | 38.9% | 35.3% | 36.4% | 39.5% | 37.4% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 59.0% | 59.8% | 57.0% | 55.2% | N/A | 57.1% |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

Confidential

# Millennium Lab Holdings, Inc. and Subsidiaries

**Appendix D, Page 4**

Guideline Public Company Data - Revenue Growth

(Values as presented)

Valuation as of April 16, 2014

| Guideline Company | Historical Revenue CAGR | | | Forecast Revenue CAGR | |
|---|---|---|---|---|---|
| | 1 Year | 2 Year | 3 Year | 1 Year | 2 Year |
| Alere Inc. | 7.5% | 12.7% | 12.0% | 7.3% | 5.5% |
| Bio-Reference Laboratories Inc. | 15.5% | 13.0% | 15.2% | 10.7% | N/A |
| Cepheid | 21.2% | 20.2% | 23.6% | 32.7% | 25.0% |
| Genomic Health Inc. | 11.2% | 12.7% | 13.7% | 23.4% | 24.6% |
| Laboratory Corp. of America Holdings | 2.4% | 2.4% | 5.1% | 4.4% | 3.2% |
| Meridian Bioscience, Inc. | 5.7% | 7.6% | 10.9% | 9.1% | 8.1% |
| Myriad Genetics Inc. | 35.2% | 29.0% | 25.0% | 4.8% | 4.7% |
| Quest Diagnostics Inc. | -3.2% | -1.7% | -0.5% | 4.1% | 2.9% |
| **Minimum:** | -3.2% | -1.7% | -0.5% | 4.1% | 2.9% |
| **Lower (First) Quartile:** | 4.9% | 6.3% | 9.5% | 4.7% | 4.0% |
| **Median:** | 9.4% | 12.7% | 12.8% | 8.2% | 5.5% |
| **Upper (Third) Quartile:** | 16.9% | 14.8% | 17.3% | 13.9% | 16.4% |
| **Maximum:** | 35.2% | 29.0% | 25.0% | 32.7% | 25.0% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 21.2% | 64.9% | 57.9% | 15.9% | 11.7% |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Appendix D, Page 5**

Guideline Public Company Data - EBITDA Growth

(Values as presented)                                                      Valuation as of April 16, 2014

| Guideline Company | Historical EBITDA CAGR | | | Forecast EBITDA CAGR | |
|---|---|---|---|---|---|
| | 1 Year | 2 Year | 3 Year | 1 Year | 2 Year |
| Alere Inc. | 3.1% | 5.1% | 10.5% | 16.8% | 11.9% |
| Bio-Reference Laboratories Inc. | -2.9% | 8.1% | 14.3% | 18.3% | N/A |
| Cepheid | -37.7% | -42.9% | -8.2% | 403.3% | 205.1% |
| Genomic Health Inc. | N/A | N/A | N/A | N/A | N/A |
| Laboratory Corp. of America Holdings | -4.0% | -2.3% | 0.4% | 1.6% | 3.4% |
| Meridian Bioscience, Inc. | 4.6% | 11.2% | 12.7% | 17.1% | 14.0% |
| Myriad Genetics Inc. | 45.4% | 29.7% | 25.5% | -9.2% | -7.2% |
| Quest Diagnostics Inc. | -9.8% | -4.3% | -2.4% | 4.0% | 3.5% |
| **Minimum:** | -37.7% | -42.9% | -8.2% | -9.2% | -7.2% |
| **Lower (First) Quartile:** | -6.9% | -3.3% | -1.0% | 2.8% | 3.4% |
| **Median:** | -2.9% | 5.1% | 10.5% | 16.8% | 7.7% |
| **Upper (Third) Quartile:** | 3.8% | 9.6% | 13.5% | 17.7% | 13.5% |
| **Maximum:** | 45.4% | 29.7% | 25.5% | 403.3% | 205.1% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 12.0% | 80.5% | 182.8% | 10.5% | 7.4% |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

Confidential                                                                     VP_ML_00015759

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                                    **Appendix D, Page 6**

Guideline Public Company Data - Working Capital Levels

(Values as presented)                                                                                                Valuation as of April 16, 2014

| Guideline Company | Working Capital / Revenue | | | | | Debt-Free Net Working Capital / Revenue | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 3-Yr. Avg. | LTM | 2011 | 2012 | 2013 | 3-Yr. Avg. | LTM |
| Alere Inc. | 28.0% | 26.9% | 26.4% | 27.1% | 26.4% | 18.5% | 17.6% | 16.3% | 17.5% | 16.3% |
| Bio-Reference Laboratories Inc. | 23.8% | 24.7% | 22.5% | 23.7% | 22.2% | 24.0% | 21.3% | 24.5% | 23.2% | 25.1% |
| Cepheid | 53.4% | 44.4% | 37.0% | 44.9% | 37.0% | 11.9% | 15.5% | 18.4% | 15.3% | 18.4% |
| Genomic Health Inc. | 49.9% | 44.6% | 44.0% | 46.2% | 44.0% | 1.2% | 2.5% | 3.8% | 2.5% | 3.8% |
| Laboratory Corp. of America Holdings | 5.9% | 6.4% | 12.0% | 8.1% | 12.0% | 5.5% | 6.6% | 7.0% | 6.4% | 7.0% |
| Meridian Bioscience, Inc. | 44.8% | 41.8% | 49.8% | 45.5% | 49.8% | 28.7% | 23.1% | 26.6% | 26.1% | 26.6% |
| Myriad Genetics Inc. | 89.7% | 75.5% | 52.5% | 72.6% | 52.5% | 10.6% | 9.8% | 4.5% | 8.3% | 4.5% |
| Quest Diagnostics Inc. | -2.2% | 6.9% | 3.5% | 2.8% | 3.5% | 4.5% | 3.1% | 3.9% | 3.8% | 3.9% |
| **Minimum:** | -2.2% | 6.4% | 3.5% | 2.8% | 3.5% | 1.2% | 2.5% | 3.8% | 2.5% | 3.8% |
| **Lower (First) Quartile:** | 19.3% | 20.3% | 19.9% | 19.8% | 19.6% | 5.2% | 5.7% | 4.4% | 5.7% | 4.4% |
| **Median:** | 36.4% | 34.3% | 31.7% | 36.0% | 31.7% | 11.2% | 12.7% | 11.6% | 11.8% | 11.6% |
| **Upper (Third) Quartile:** | 50.8% | 44.5% | 45.5% | 45.6% | 45.5% | 19.9% | 18.5% | 19.9% | 18.9% | 20.1% |
| **Maximum:** | 89.7% | 75.5% | 52.5% | 72.6% | 52.5% | 28.7% | 23.1% | 26.6% | 26.1% | 26.6% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 20.6% | 19.8% | 33.1% | 24.5% | 28.6% | 12.2% | 8.8% | 12.9% | 11.3% | 7.6% |

Notes:

*Source:  Capital IQ, a division of Standard & Poor's.*

Confidential                                                                                    VP_ML_00015760

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                **Appendix D, Page 7**

Guideline Public Company Data - Depreciation and Capital Expenditures

(Values as presented)                                                                Valuation as of April 16, 2014

| Guideline Company | Depreciation & Amortization / Revenue | | | | | Capital Expenditures / Revenue | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 3-Yr. Avg. | LTM | 2011 | 2012 | 2013 | 3-Yr. Avg. | LTM |
| Alere Inc. | 16.4% | 16.2% | 14.5% | 15.7% | 14.4% | 5.6% | 4.9% | 4.0% | 4.8% | 3.8% |
| Bio-Reference Laboratories Inc. | 2.9% | 2.7% | 2.8% | 2.8% | 2.9% | 2.7% | 2.6% | 3.5% | 2.9% | 3.1% |
| Cepheid | 6.1% | 5.6% | 5.8% | 5.8% | 5.7% | 6.8% | 7.0% | 11.8% | 8.5% | 11.4% |
| Genomic Health Inc. | 3.5% | 2.3% | 2.4% | 2.8% | 2.5% | 3.0% | 4.2% | 4.2% | 3.8% | 3.7% |
| Laboratory Corp. of America Holdings | 3.6% | 3.3% | 3.3% | 3.4% | 3.4% | 2.6% | 3.1% | 3.5% | 3.1% | 3.7% |
| Meridian Bioscience, Inc. | 3.6% | 3.3% | 3.0% | 3.3% | 2.9% | 5.8% | 2.0% | 1.7% | 3.2% | 2.3% |
| Myriad Genetics Inc. | 1.8% | 1.8% | 1.4% | 1.7% | 1.4% | 0.9% | 1.9% | 1.9% | 1.6% | 1.6% |
| Quest Diagnostics Inc. | 3.7% | 3.8% | 4.0% | 3.8% | 4.1% | 2.2% | 2.5% | 3.2% | 2.6% | 3.5% |
| **Minimum:** | 1.8% | 1.8% | 1.4% | 1.7% | 1.4% | 0.9% | 1.9% | 1.7% | 1.6% | 1.6% |
| **Lower (First) Quartile:** | 3.4% | 2.6% | 2.7% | 2.8% | 2.8% | 2.5% | 2.4% | 2.9% | 2.8% | 2.9% |
| **Median:** | 3.6% | 3.3% | 3.1% | 3.3% | 3.2% | 2.9% | 2.8% | 3.5% | 3.1% | 3.6% |
| **Upper (Third) Quartile:** | 4.3% | 4.2% | 4.4% | 4.3% | 4.5% | 5.6% | 4.4% | 4.1% | 4.1% | 3.8% |
| **Maximum:** | 16.4% | 16.2% | 14.5% | 15.7% | 14.4% | 6.8% | 7.0% | 11.8% | 8.5% | 11.4% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 2.5% | 2.0% | 2.7% | 2.4% | N/A | 4.1% | 2.1% | N/A | 3.1% | N/A |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                     **Appendix D, Page 8**

Guideline Public Company Data - Balance Sheet Ratios

(Values as presented)                                                                   Valuation as of April 16, 2014

| Guideline Company | Cash and Equiv. (mil) | Cash / Revenue (1) | Current Ratio (2) | A/R Days (3) | Inventory Days (4) | A/P Days (5) | Debt / EBITDA | Debt / Mkt. Cap | Debt / BEV | Interest Coverage (6) |
|---|---|---|---|---|---|---|---|---|---|---|
| Alere Inc. | $361.9 | 11.9% | 2.19 | 65.8 | 84.4 | 42.2 | 6.28 | 1.31 | 0.55 | 2.39 |
| Bio-Reference Laboratories Inc. | $14.5 | 2.0% | 2.20 | 94.1 | 17.5 | 48.6 | 0.57 | 0.07 | 0.07 | 48.60 |
| Cepheid | $66.1 | 16.5% | 2.56 | 43.8 | 153.7 | 65.5 | 0.20 | 0.00 | 0.00 | 61.88 |
| Genomic Health Inc. | $33.3 | 12.7% | 4.86 | 36.1 | N/A | 33.5 | N/A | N/A | N/A | N/A |
| Laboratory Corp. of America Holdings | $404.0 | 7.0% | 1.95 | 47.2 | 13.1 | 27.4 | 2.49 | 0.35 | 0.27 | 12.47 |
| Meridian Bioscience, Inc. | $43.7 | 23.2% | 6.36 | 44.9 | 182.7 | 25.6 | N/A | N/A | N/A | N/A |
| Myriad Genetics Inc. | $71.6 | 9.7% | 6.74 | 39.5 | N/A | N/A | N/A | N/A | N/A | N/A |
| Quest Diagnostics Inc. | $187.0 | 2.6% | 1.22 | 43.9 | 7.8 | 19.7 | 2.34 | 0.39 | 0.28 | 8.88 |
| **Minimum:** | $14.5 | 1.98% | 1.22 | 36.07 | 7.84 | 19.70 | 0.20 | 0.00 | 0.00 | 2.39 |
| **Lower (First) Quartile:** | $41.1 | 5.87% | 2.13 | 42.70 | 14.21 | 26.53 | 0.57 | 0.07 | 0.07 | 8.88 |
| **Median:** | $68.8 | 10.83% | 2.38 | 44.40 | 50.93 | 33.48 | 2.34 | 0.35 | 0.27 | 12.47 |
| **Average:** | $147.8 | 10.70% | 3.51 | 51.91 | 76.52 | 37.51 | 2.37 | 0.42 | 0.23 | 26.85 |
| **Upper (Third) Quartile:** | $230.7 | 13.66% | 5.24 | 51.87 | 136.33 | 45.42 | 2.49 | 0.39 | 0.28 | 48.60 |
| **Maximum:** | $404.0 | 23.24% | 6.74 | 94.07 | 182.69 | 65.53 | 6.28 | 1.31 | 0.55 | 61.88 |
| Millennium Lab Holdings, Inc. and Subsidiaries | $0.20 | 31.03% | 2.62 | 42.19 | N/A | 18.12 | 4.63 | 2.21 | 0.71 | 0.22 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

(1) Cash divided by LTM revenue.

(2) Current assets divided by current liabilities.

(3) Average accounts receivable multiplied by 365, divided by revenue.

(4) Average inventory multiplied by 365, divided by COGS.

(5) Average accounts payable multiplied by 365, divided by (COGS + change in inventory).

(6) EBITDA divided by interest expense.

VP_ML_00015762

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                          **Appendix D, Page 9**

Guideline Public Company Method - *Size Adjusted* BEV / EBITDA Multiples

(Values as presented)                                                                          Valuation as of April 16, 2014

| Guideline Company | Unadjusted BEV / EBITDA (1) | | | | Multiply: Size Adjustment (2) | Size-Adjusted BEV / EBITDA | | | |
|---|---|---|---|---|---|---|---|---|---|
| | LTM | LFY | Forward Year | 2 Year | | LTM | LFY | Forward Year | 2 Year |
| Alere Inc. | 11.47x | 11.47x | 9.83x | 9.16x | -32.8% | 7.71x | 7.71x | 6.61x | 6.16x |
| Bio-Reference Laboratories Inc. | 8.57x | 7.84x | 7.24x | N/A | -28.1% | 6.16x | 5.64x | 5.21x | N/A |
| Cepheid | 382.09x | 382.09x | 75.92x | 41.05x | -32.8% | NMF | NMF | NMF | 27.60x |
| Genomic Health Inc. | NMF | NMF | NMF | NMF | -28.1% | NMF | NMF | NMF | NMF |
| Laboratory Corp. of America Holdings | 9.38x | 9.38x | 9.23x | 8.76x | -39.7% | 5.66x | 5.66x | 5.57x | 5.29x |
| Meridian Bioscience, Inc. | 13.80x | 13.49x | 11.79x | 10.61x | -28.1% | 9.93x | 9.70x | 8.48x | 7.63x |
| Myriad Genetics Inc. | 8.13x | 10.25x | 8.95x | 9.45x | -32.8% | 5.47x | 6.89x | 6.02x | 6.35x |
| Quest Diagnostics Inc. | 8.24x | 8.24x | 7.93x | 7.70x | -39.7% | 4.97x | 4.97x | 4.78x | 4.65x |
| **Minimum:** | 8.13x | 7.84x | 7.24x | 7.70x | | 4.97x | 4.97x | 4.78x | 4.65x |
| **Lower (First) Quartile:** | 8.40x | 8.81x | 8.44x | 8.86x | | 5.51x | 5.64x | 5.30x | 5.50x |
| **Median:** | 9.38x | 10.25x | 9.23x | 9.30x | | 5.91x | 6.27x | 5.80x | 6.25x |
| **Upper (Third) Quartile:** | 12.64x | 12.48x | 10.81x | 10.32x | | 7.33x | 7.51x | 6.46x | 7.31x |
| **Maximum:** | 382.09x | 382.09x | 75.92x | 41.05x | | 9.93x | 9.70x | 8.48x | 27.60x |
| (3) **Coefficient of Variation:** | 2.2 | 2.2 | 1.4 | 0.9 | | 0.3 | 0.3 | 0.2 | 0.9 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(x) represents that an outlier was excluded from one of the summarizing statistics.

*N/A represents not available or not applicable; NMF represents not meaningful.

(1) See Exhibit 3, Page 4 and Appendix D, Page 2 for the BEV and EBITDA data, respectively.

(2) See Appendix D, Page 10 for the size adjustment calculations.

(3) Coefficient of variation measures the variability of the multiples data. It is calculated by dividing the standard deviation by the mean. A lower coefficient of variation indicates lower variability relative to the size of the mean and suggests a more statistically relevant data set.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                                                  **Appendix D, Page 10**
Guideline Public Company Method - Size Adjustment Calculations
(Values as presented)                                                                                                  Valuation as of April 16, 2014

| Guideline Company | Ticker | Size Premium (1) | Cost of Equity (2) | Debt (3) | Size-Adjusted WACC (4) | Long-term Growth Rate | Implied Capitalization Multiple | Size Adjustment (5) |
|---|---|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | 1.8% | 11.7% | 2.7% | 10.4% | 3.0% | 13.47x | -32.8% |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | 2.4% | 12.4% | 2.7% | 10.9% | 3.0% | 12.59x | -28.1% |
| Cepheid | NasdaqGS:CPHD | 1.8% | 11.7% | 2.7% | 10.4% | 3.0% | 13.47x | -32.8% |
| Genomic Health Inc. | NasdaqGS:GHDX | 2.4% | 12.4% | 2.7% | 10.9% | 3.0% | 12.59x | -28.1% |
| Laboratory Corp. of America Holdings | NYSE:LH | 0.9% | 10.9% | 2.7% | 9.7% | 3.0% | 15.00x | -39.7% |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | 2.4% | 12.4% | 2.7% | 10.9% | 3.0% | 12.59x | -28.1% |
| Myriad Genetics Inc. | NasdaqGS:MYGN | 1.8% | 11.7% | 2.7% | 10.4% | 3.0% | 13.47x | -32.8% |
| Quest Diagnostics Inc. | NYSE:DGX | 0.9% | 10.9% | 2.7% | 9.7% | 3.0% | 15.00x | -39.7% |
| | | | | | | | | |
| Millennium Lab Holdings, Inc. and Subsidiaries | | 6.0% | 16.0% | 2.7% | 14.0% | 3.0% | 9.05x | N/A |

Notes:

(1) Source: 2014 Valuation Handbook - Guide to Cost of Capital. Duff & Phelps LLC.

(2) Cost of equity is the aggregate of size premium and cost of equity per capital asset pricing model (CAPM).  The cost of equity per the capital asset pricing model is as follows:

| | Cost of equity per CAPM |
|---|---|
| Risk free rate | 3.2% |
| Beta adjusted equity risk premium | 6.8% |
| | 10.0% |

(3) To isolate the size premium, cost of debt is assumed to be the same as the subject company.

(4) The weighted average cost of capital calculated according to a split of 14.6 percent debt and 85.4 percent equity.

(5) Adjustment calculated relative to the subject Company's capitalization multiple.

Confidential                                                                                                                    VP_ML_00015764

# EXHIBIT 33
# FILED UNDER SEAL

# EXHIBIT 34

## STEP III. CALCULATE WEIGHTED AVERAGE COST OF CAPITAL

WACC is a broadly accepted standard for use as the discount rate to calculate the present value of a company's projected FCF and terminal value. It represents the weighted average of the required return on the invested capital (customarily debt and equity) in a given company. As debt and equity components have different risk profiles and tax ramifications, WACC is dependent on a company's "target" capital structure.

WACC can also be thought of as an opportunity cost of capital or what an investor would expect to earn in an alternative investment with a similar risk profile. Companies with diverse business segments may have different costs of capital for their various businesses. In these instances, it may be advisable to conduct a DCF using a "sum of the parts" approach in which a separate DCF analysis is performed for each distinct business segment, each with its own WACC. The values for each business segment are then summed to arrive at an implied enterprise valuation for the entire company.

The formula for the calculation of WACC is shown in Exhibit 3.12.

**EXHIBIT 3.12**   Calculation of WACC



where:  $r_d$ = cost of debt
$r_e$ = cost of equity
$t$  = marginal tax rate
$D$ = market value of debt
$E$  = market value of equity

A company's capital structure or total capitalization is comprised of two main components, debt and equity (as represented by D + E). The rates—$r_d$ (return on debt) and $r_e$ (return on equity)—represent the company's market cost of debt and equity, respectively. As its name connotes, the ensuing weighted average cost of capital is simply a weighted average of the company's cost of debt (tax-effected) and cost of equity based on an assumed or "target" capital structure.

Copyright © 2022. Wiley. All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

Copyright © 2022. Wiley. All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

Many investment banks have a firm-wide policy governing market risk premium in order to ensure consistency in valuation work across various projects and departments. The equity risk premium employed on Wall Street typically ranges from approximately 5% to 8%. Consequently, it is important to consult with senior colleagues and firm-specific practices for guidance on the appropriate market risk premium to use in the CAPM formula.

**Beta (β)**   Beta is a measure of the covariance between the rate of return on a company's stock and the overall market return (systematic risk), with the S&P 500 traditionally used as a proxy for the market. As the S&P 500 has a beta of 1.0, a stock with a beta of 1.0 should have an expected return equal to that of the market. A stock with a beta of less than 1.0 has lower systematic risk than the market, and a stock with a beta greater than 1.0 has higher systematic risk. Mathematically, this is captured in the CAPM, with a higher beta stock exhibiting a higher cost of equity; and vice versa for lower beta stocks.

A public company's historical beta may be sourced from financial information resources such as Bloomberg,[23] FactSet, or Thomson Reuters. Recent historical equity returns (i.e., over the previous two to five years), however, may not be a reliable indicator of future returns. Therefore, many bankers prefer to use a predicted beta (e.g., provided by MSCI Barra[24]) whenever possible as it is meant to be forward-looking.

The exercise of calculating WACC for a private company involves deriving beta from a group of publicly traded peer companies that may or may not have similar capital structures to one another or the target. To neutralize the effects of different capital structures (i.e., remove the influence of leverage), the banker must *unlever* the beta for each company in the peer group to achieve the *asset beta* ("unlevered beta").

The formula for unlevering beta is shown in Exhibit 3.16.

**EXHIBIT 3.16**    Unlevering Beta

$$\beta_U = \frac{\beta_L}{\left(1 + \dfrac{D}{E} \times (1 - t)\right)}$$

where:    $\beta_U$ = unlevered beta
           $\beta_L$ = levered beta
        D/E = debt-to-equity[26] ratio
          t = marginal tax rate

---

[23]Bloomberg function: Ticker symbol <Equity> BETA <GO>.

[24]MSCI Barra is a leading provider of investment decision support tools and supplies predicted betas for most public companies among other products and services. MSCI Barra uses a proprietary multifactor risk model, known as the Multiple-Horizon U.S. Equity Model™, which relies on market information, fundamental data, regressions, historical daily returns, and other risk analyses to predict beta. MSCI Barra betas can be obtained from Alacra, among other financial information services.

Copyright © 2022. Wiley. All rights reserved. May not be reproduced in any form without permission from the publisher, except fair uses permitted under U.S. or applicable copyright law.

*Discounted Cash Flow Analysis*                                                          **145**

## Perform Sensitivity Analysis

The DCF incorporates numerous assumptions, each of which can have a sizable impact on valuation. As a result, the DCF output is viewed in terms of a valuation range based on a series of key input assumptions, rather than as a single value. The exercise of deriving a valuation range by varying key inputs is called sensitivity analysis.

Sensitivity analysis is a testament to the notion that valuation is as much an art as a science. Key valuation drivers such as WACC, exit multiple, and perpetuity growth rate are the most commonly sensitized inputs in a DCF. Additional sensitivity analysis is also commonly performed on key financial performance drivers, such as sales growth rates and profit margins (e.g., EBITDA or EBIT). The valuation output produced by sensitivity analysis is typically displayed in a data table, such as that shown in Exhibit 3.32.

The center shaded portion of the sensitivity table in Exhibit 3.32 displays an enterprise value range of $5,627 million to $6,406 million assuming a WACC range of 10.5% to 11.5% and an exit multiple range of 7x to 8x. As the exit multiple increases, enterprise value increases accordingly; conversely, as the discount rate increases, enterprise value decreases.

**EXHIBIT 3.32**   Sensitivity Analysis



Linked to the model output for enterprise value (cell containing $6,009 value in DCF model)

| Enterprise Value | | | | |
| --- | --- | --- | --- | --- |
| Exit Multiple | | | | |
| 6.5x | 7.0x | 7.5x | 8.0x | 8.5x |

| WACC | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x |
| --- | --- | --- | --- | --- | --- |
| 10.0% | 5,665 | 5,953 | 6,242 | 6,530 | 6,819 |
| 10.5% | 5,560 | 5,842 | 6,124 | 6,406 | 6,688 |
| 11.0% | 5,457 | 5,733 | **$6,009** | 6,284 | 6,560 |
| 11.5% | 5,357 | 5,627 | 5,897 | 6,166 | 6,436 |
| 12.0% | 5,260 | 5,524 | 5,787 | 6,051 | 6,315 |



Table

Row input cell:   7 5x

Column input cell:   11.0%

OK     Cancel

The sensitivity analysis above can be performed in MS Excel (2016) using the following process:
- create an output table similar to the format above
- input the WACC and exit multiple ranges
- link the top left corner (shaded orange for presentation purposes) to the model output for enterprise value (cell containing $6,009 value in DCF model)
- highlight entire data table
- select Data from top bar, What-if Analysis drop down, and Data Table from the menu: the input box to the left will appear
- link the " Row input cell:" to the cell containing the exit multiple driver of 7.5x in the DCF model
- link the " Column input cell:" to the cell containing the WACC driver of 11.0% in the DCF model
- click the "OK" button and the data table will populate

# EXHIBIT 35

FILED

16 APR 19 PM 1:56

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 14-2-07669-0 SEA

THE HONORABLE SEAN O'DONNELL
Noted for Consideration: April 22, 2016
With Oral Argument

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

MOVE, INC., et al.,

                Plaintiffs,

    v.

ZILLOW, INC., et al.,

                Defendants.

No. 14-2-07669-0 SEA

DECLARATION OF DR. AMY HUTTON IN
SUPPORT OF ZILLOW INC.'S MOTION TO
EXCLUDE TESTIMONY OF DAMAGES
EXPERT BRADFORD CORNELL
RELATING TO THE TRULIA MERGER and
MOTION FOR PARTIAL SUMMARY
JUDGMENT

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 1

LEGAL130348993.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF CONTENTS

I.  ASSIGNMENT ........................................................................... 1

II.  QUALIFICATIONS .................................................................. 2

III.  SUMMARY OF OPINIONS ..................................................... 3

IV.  PROFESSOR CORNELL'S APPLICATION OF THE DCF
METHODOLOGY FOR DETERMINING STANDALONE MOVE AND
TRULIA VALUES IS UNRELIABLE ........................................ 6

    A.  Professor Cornell builds his valuation analyses on unsubstantiated,
overly optimistic projections of revenue and costs for Move and Trulia .............. 6

    B.  Professor Cornell improperly calculates the standalone values for
Move and Trulia ...................................................................... 10

    C.  Excessive terminal valuations ................................................ 14

    D.  Professor Cornell fails to use alternative valuation methods to home in
on intrinsic values ................................................................... 15

V.  PROFESSOR CORNELL EMPLOYS AN UNRELIABLE
METHODOLOGY FOR DETERMINING THE ALLEGED IMPACT OF
SYNERGIES ARISING FROM THE ZILLOW/TRULIA MERGER ....... 16

    A.  Professor Cornell uses differing standalone values of Trulia across his
two merger analyses ................................................................ 18

VI.  PROFESSOR CORNELL'S APPROACH IS UNRELIABLE FOR
ASSESSING LOSS TO MOVE RELATED TO LISTHUB AND THE
LISTHUB PLATFORM ............................................................. 18

    A.  Professor Cornell's calculation of damages to ListHub is internally
inconsistent and incorrectly calculated ...................................... 18

    B.  Professor Cornell's calculation of the value of the ListHub Platform is
unreliable, highly speculative, and divorced from reality .............. 19

VII.  PROFESSOR CORNELL'S ANALYSIS OF DAMAGES ASSOCIATED
WITH INCREMENTAL PAGE VIEWS ON REALTOR.COM IS FLAWED ..... 26

VIII.  MOVE'S PUBLIC DISCLOSURES DO NOT DISCLOSE HARM AND
SUGGEST THAT MOVE SUFFERED NO HARM AT ALL; PROFESSOR
CORNELL'S FAILURE TO TAKE THE DISCLOSURES INTO
ACCOUNT RENDERS HIS ANALYSES UNRELIABLE ..................... 26

    A.  Background on disclosure requirements for publicly-traded companies ..... 26

        1)  Item 2.06 - Material Impairments .................................... 27

        2)  Item 8.01 – Other Events .............................................. 27

    B.  No disclosure of harm by Move, Inc. ...................................... 28

        1)  Samuelson's Departure from Move .................................. 29

        2)  Beardsley's Departure from Move .................................. 29

        3)  Retsly Acquisition ...................................................... 29

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – I

LEGAL130348993.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**TABLE OF CONTENTS**
(continued)

4)   Trulia Acquisition ............................................................29

5)   ListHub Termination .......................................................31

6)   News Corp. Acquisition....................................................31

IX.   ANALYSIS OF MOVE'S OPERATING PERFORMANCE.............................35

X.   CONCLUSION.........................................................................36

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – ii
LEGAL130348993.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

I, Amy Hutton, declare that I am competent to testify to the following factual statements based on my personal knowledge and review of the depositions and documents from this case or those relevant to the issues in this case:

## I.    ASSIGNMENT

1.      I have been asked by counsel to evaluate, from an accounting perspective, the methodology Professor Bradford Cornell employed in his calculation of damages, as presented in Plaintiffs' Superseding Response and Objections to Defendant Zillow's First Interrogatories (Interrogatory Number 3) dated February 15, 2016, and the accompanying Cornell exhibits. In particular, I have been asked to assess: (1) whether Professor Cornell's analyses comport with commonly accepted methodologies among accounting professionals and (2) whether his estimated damages are reasonable and non-speculative.

2.      I am being compensated for my work on this matter at a rate of $550 per hour. Individuals working at my direction charge rates of $195 to $450 per hour. My compensation is not contingent upon my testimony or on the result of this proceeding.

3.      The opinions and information contained in this report are based on my knowledge and understanding of the record and my knowledge and experience in the accounting profession.[1]  My opinions are based on my understanding of Professor Cornell's analysis as included in Plaintiffs' Superseding Response and Objections to Defendant Zillow's First Interrogatories (Interrogatory Number 3) dated February 15, 2016 and the accompanying Cornell exhibits.  However, I reserve the right to amend my report to the extent Plaintiffs clarify, supplement, or otherwise modify the disclosure of the alleged trade secrets at issue in the litigation and resulting damages (including, but not limited to, through

---

[1] The citations in my report reference information that I have considered and relied on in forming my opinions. I have also considered and relied on deposition testimony, exhibits and other documents produced in this case, a list of which will be provided with the document production that includes the references in this report.

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 1
LEGAL130348993.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

ListHub's growth occurs in a vacuum, abstracted from any competitive response. Lacking the grounding in economic reasoning and the context of the industry's competitive dynamics, these projections appear to be overly-speculative and fail to comport with business realities as noted in Move's own 10-K filings:

*Our Software and Services products, including Top Producer®, TigerLead® and ListHubTM, face competition from Market Leader (owned and operated by Trulia, Inc.), CoreLogic's Residential Real Estate productivity tools, Real Estate Digital ("RED"), ALa Mode, Inc. and Fidelity National Information Solutions, Inc., which offer competing solutions to real estate professionals. Top Producer® also competes with horizontal customer relationship management offerings such as Microsoft Corporation's Outlook solution, Best Software Inc.'s ACT! solution, FrontRange Solution, Inc.'s Goldmine product, and Salesforce.com. TigerLead® also competes with lead generation and management product offerings such as BoomTown!, Zurple, Inc., Commissions Inc., and IDX Broker. Certain online media companies such as Classified Ventures, LLC and Market Leader, Inc. are providing drip marketing solutions that incorporate aspects of lead management, which over time could pose a competitive threat to Top Producer® or TigerLead®.*[56]

40.    The competitive responses to the ListHub Platform that already exist (Upstream, Broker Public Portal, FBS Sparks, and other alternatives) suggest that there are various states of the world that Professor Cornell ought to have considered in his DCF analysis. It is commonly accepted that valuation analysis should account for various probable scenarios including competitive responses.[57] An analysis that accounted for competitive responses would provide detailed projections under various states of the world (e.g., worst case, best case and most likely case), taking the resulting valuations multiplied by the

---

[56] Move 2013 10-K, p. 7 (DX 1260, DFS_EXPERT001468).
[57] Paul Healy and Krishna Palepu, *Business Analysis and Valuation Using Financial Statements*, 4th Edition, Cengage Learning, 2007, p. 6-18.

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 24

LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

associated probability of each state of the world, and creating an expected value. Importantly, a significant portion of the various scenarios in such an analysis would likely result in a zero or negative value for a startup such as the ListHub Platform.[58] Given that Professor Cornell has assumed what appears to be the very best case scenario (with 100% certainty), incorporating additional states of the world into a detailed analysis would drastically reduce the derived value of the ListHub Platform.[59]

41.    As discussed, highly regarded textbooks highlight that the best approach to forecasting and valuation captures the majority of the value creation during the forecast horizon (i.e., the forecast horizon captures the period over which ROE is substantially higher than cost of equity capital), leaving the terminal value as a sustainable steady state with a minimal difference between ROE and cost of equity capital. Otherwise, the terminal value assumes a sustained competitive advantage for eternity, which is clearly unrealistic.[60] Allowing ROEs in the terminal year to deviate dramatically from the cost of equity capital requires anyone using the valuation analysis to lay a large bet on un-vetted, speculative numbers forecast far into the future.

42.    Most startups fail. Move's own disclosures highlighted the many risk factors.[61] Recent reports suggest a 7% startup success rate.[62] Given the riskiness of the projected cash flows of the ListHub Platform products, management's proposed WACC of 15.3% is not an appropriate discount rate. This discount rate is derived based on the median unlevered beta of a set of publicly-traded companies: Zillow, Trulia, Move, CoreLogix, CoStar Group, Reis and

---

[58] See the discussion of the abandonment option in Russell Lundholm and Richard Sloan, *Equity Valuation and Analysis w/eVal*, 3rd Edition, McGraw-Hill, 2012, pp. 268-272.

[59] While accounting for multiple states of the world would make Professor Cornell's analysis more complete, it would not mitigate the speculative nature of his valuation of the non-existent segments of the ListHub Platform.

[60] For a detailed discussion, see, for example, Russell Lundholm and Richard Sloan, *Equity Valuation and Analysis w/eVal*, 3rd Edition, McGraw-Hill/Irwin, 2012, pp. 171-175.

[61] Move 2013 10-K, pp. 7-8 and 10-20 (DX 1260, DFS_EXPERT001468).

[62] Steve Tobak, "Lies, Damn Lies and Statistics About Entrepreneurs," *Entrepreneur*, October 23, 2014, available at www.entrepreneur.com/article/238800.

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 25

LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

RealPage. Usually, a higher discount rate is applied to new, unproven investments.[63] Moreover, given how sensitive any DCF analysis is to the choice of discount rate, the best approach is to conduct a sensitivity analysis and to present DCF valuations for a range of discount rates, which Professor Cornell did not do.[64]

## VII.   PROFESSOR CORNELL'S ANALYSIS OF DAMAGES ASSOCIATED WITH INCREMENTAL PAGE VIEWS ON REALTOR.COM IS FLAWED[65]

43.   Professor Cornell unrealistically assumes that the incremental page views associated with increasing revenues have 100% margins, as he attributes no cost to the additional sales activity needed to monetize these page views. Professor Cornell has testified that including costs associated with sales activity in his analysis would decrease his estimate of damages.[66]

## VIII.   MOVE'S PUBLIC DISCLOSURES DO NOT DISCLOSE HARM AND SUGGEST THAT MOVE SUFFERED NO HARM AT ALL; PROFESSOR CORNELL'S FAILURE TO TAKE THE DISCLOSURES INTO ACCOUNT RENDERS HIS ANALYSES UNRELIABLE

A.   Background on disclosure requirements for publicly-traded companies

44.   "In addition to filing annual reports on Form 10-K and quarterly reports on Form 10-Q, public companies must report certain material corporate events on a more current basis. Form 8-K is the 'current report' companies must file with the SEC to announce major

---

[63] "[F]inancial managers demand a higher rate of return from risky projects … and will set a higher discount rate for… new investment opportunities… Each project should be evaluated at its *own* opportunity cost of capital" (David Brealey and Stewart Myers, *Principles of Corporate Finance*, 6th Edition, McGraw-Hill, 1999, p. 221).

[64] Professor Cornell's own book highlights the need to "[e]mploy sensitivity analysis to isolate those assumptions that have the largest impact on the cash flow forecasts. The rationale for those key assumptions should then be double-checked" (Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, McGraw-Hill, 1993, p. 129).

[65] From an accounting perspective, the fundamental problem with Professor Cornell's Realtor.com damages estimate is his omission of marginal costs associated with sales. I understand that Dr. Athey's report will focus on other errors in Professor Cornell's assessment of damages associated with Realtor.com.

[66] "If there were marginal costs that were meaningful and were not deducted that would inflate the value indicator." (Deposition of Bradford Cornell, February 17, 2016, p. 334).

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 26
LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

events that shareholders should know about."[67] If and when Move's management determined that the departure of its key executives materially affected the operating performance of the company, they should have disclosed this fact to the public under one of the two following items:

### 1)     Item 2.06 - Material Impairments

*A company must disclose certain material write-downs (also called impairments) in an 8-K. (If the company determines the impairment when routinely preparing its financial statements for its periodic report, the company may make the disclosure in the periodic report rather than in an 8-K.) A writedown may occur when a company significantly lowers its estimate of the value of certain assets, such as the value of its brand or of a business it has acquired. The write-down hits the financial statements in two places—as a decrease in assets on the balance sheet and as an expense on the income statement.*[68]

### 2)     Item 8.01 – Other Events

*This is the place where companies may report anything that they believe is important but is not specifically required elsewhere in the 8-K.*[69]

45.     Additionally, under the Sarbanes-Oxley Act of 2002, Section 409, Real Time Issuer Disclosures, issuers are required to disclose to the public, on an urgent basis, information on material changes in their financial condition or operations:

*Section 13 of the Securities Exchange Act of 1934 (15 U.S.C. 78m), as amended by this Act, is amended by adding at the end the following:*

---

[67] "Fast Answers: Form 8-K," U.S. Securities and Exchange Commission, available at www.sec.gov/answers/form8k.htm.
[68] "Investor Bulletin: How to Read an 8-K," U.S. Securities and Exchange Commission, pp. 2-3, available at www.sec.gov/investor/pubs/readan8k.pdf.
[69] "Investor Bulletin: How to Read an 8-K," U.S. Securities and Exchange Commission, p. 5, available at www.sec.gov/investor/pubs/readan8k.pdf.

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 27
LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# EXHIBIT 36

Second Edition

# Corporate Valuation

## Theory, Evidence & Practice

**ROBERT W. HOLTHAUSEN**

The Wharton School, University of Pennsylvania

**MARK E. ZMIJEWSKI**

The University of Chicago Booth School of Business



Cambridge
BUSINESS PUBLISHERS

To my sons Mike, Matt, and Jeff, and especially to my wife, Tina, for her support and encouragement throughout the writing of this book.
— RWH

To my patient and understanding wife, Jennifer, my parents, my sister Betty, my children Jason, Kimberly, Kate, and Phillip, and my many wonderful grandchildren.
— MEZ

*Editor-in-Chief:* George Werthman
*Vice President, Brand Management:* Marnee Fieldman
*Managing Editor:* Katie Jones-Aiello
*Development Editor:* Jocelyn Mousel
*Product Developer:* Jill Sternard
*Digital Marketing Manager:* Dana Vinyard
*Compositor:* T&D Graphics

**Photo Credits**
Chapter 1: © Getty Images
Chapter 2: © iStock Photo
Chapter 3: © iStock Photo
Chapter 4: © iStock Photo
Chapter 5: © iStock Photo
Chapter 6: © iStock Photo
Chapter 7: © iStock Photo
Chapter 8: © Getty Images
Chapter 9: © iStock Photo
Chapter 10: © Getty Images
Chapter 11: © iStock Photo
Chapter 12: © Getty Images
Chapter 13: © iStock Photo
Chapter 14: © iStock Photo
Chapter 15: © iStock Photo
Chapter 16: © iStock Photo
Chapter 17: © Getty Images

**Cambridge Business Publishers, LLC**

CORPORATE VALUATION, Second Edition, by Robert W. Holthausen and Mark E. Zmijewski.

COPYRIGHT © 2020 by Cambridge Business Publishers, LLC. Published by Cambridge Business Publishers, LLC. Exclusive rights by Cambridge Business Publishers, LLC for manufacture and export.

ALL RIGHTS RESERVED. No part of this publication may be reproduced, distributed, or stored in a database or retrieval system in any form or by any means, without prior written consent of Cambridge Business Publishers, LLC, including, but not limited to, in any network or other electronic storage or transmission, or broadcast for distance learning.

**STUDENT EDITION ISBN: 978-1-61853-324-1**

Printed in the United States of America.
10 9 8 7 6 5 4 3 2

# Brief Contents

**Chapter 1** Introduction to Valuation ........................................... 3

**Chapter 2** Financial Statement Analysis ..................................... 39

**Chapter 3** Measuring Free Cash Flows ...................................... 91

**Chapter 4** Creating a Financial Model ...................................... 155

**Chapter 5** The Adjusted Present Value and Weighted Average Cost of Capital
Discounted Cash Flow Valuation Methods .......................... 201

**Chapter 6** Measuring Continuing Value Using the
Constant-Growth Perpetuity Model .............................. 251

**Chapter 7** The Excess Earnings (Residual Income) Valuation Method ............. 291

**Chapter 8** Estimating the Equity Cost of Capital ................................ 327

**Chapter 9** Measuring the Cost of Capital for Debt and Preferred Securities ........ 381

**Chapter 10** Levering and Unlevering the Cost of Capital and Beta ................ 435

**Chapter 11** Measuring the Weighted Average Cost of Capital and Related
Valuation Issues. ........................................... 483

**Chapter 12** The Effects of Stock-Based Compensation and Other Equity-Linked
Securities on Discounted Cash Flow Valuations. ..................... 555

**Chapter 13** Introduction to Market Multiple Valuation Methods ................... 611

**Chapter 14** Market Multiple Measurement and Implementation ................... 657

**Chapter 15** Leveraged Buyout Transactions ................................... 737

**Chapter 16** Mergers and Acquisitions ........................................ 793

**Chapter 17** Valuing Businesses Across Borders ............................... 855

Index ..................................................... 914

xvi



# Estimating the Equity Cost of Capital

## CHAPTER 8

In its fairness opinion, delivered to the Board of Directors of Berna Biotech SA, regarding the fairness, from a financial viewpoint, of Crucell N.V.'s tender offer for Berna Biotech SA's publicly traded shares, PricewaterhouseCoopers explained how it estimated the company's equity cost of capital as follows.[1]

## THE BERNA BIOTECH SA FAIRNESS OPINION

The cost of equity is composed of three components: the risk-free interest rate, the equity premium, and a premium for small capitalizations. The equity premium relies on the Capital Asset Pricing Model (CAPM), whereby the company specific risk premium is the product of the "levered" beta and the market risk premium. The "levered" beta is a measure for the specific risk of a company as compared to the market risk and hinges among other things on its capital structure. . . .

- **Risk-free interest rate**

  The risk-free interest rate is derived from the yield of 30-year [government] bonds. This was determined to be 2.55%

- **Market risk premium**

  . . . assumes a market risk premium of 4.77%. This represents the difference between the average return of the Swiss stock market and government bonds, since 1926.

- **. . . Beta**

  The "unlevered" beta leading to the "levered" beta by taking into account the capital structure has been derived from the "unlevered" betas of public companies in the vaccines industry. A value of 1.03 thus corresponds to the average "unlevered" beta from comparable midsize vaccines companies. . . .

- **Premium for small capitalizations**

  The premium for small capitalizations corresponds to the higher risk-return expectations related with an investment in small and mid-caps. It is obtained by the difference between the long-term return of small capitalizations observed and the return estimated by means of the CAPM (Capital Asset Pricing Model). . . . The applied premium of 2.4% has been obtained from an annual study . . .

In this chapter, we discuss how to estimate the cost of equity capital using several commonly used alternative techniques.

---

[1] PricewaterhouseCoopers' Fairness Opinion delivered to the Board of Directors of Berna Biotech SA, available on May 30, 2018 at www.uebernahme.ch/documentprovider/contentelements/nr/933/lang/3.

# EXHIBIT 37

**Millennium Laboratories**

*DCF Analysis*
*Figures in $ millions*

| | 2010A | 2011A | 2012A | 2013A | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | Terminal EBITDA [6] | '13-'18 CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | $161.8 | $232.6 | $522.2 | $632.6 | $740.2 | $866.0 | $1,013.2 | $1,165.2 | $1,340.0 | $1,541.0 | | 15.8% |
| *% growth* | | 43.8% | 124.5% | 21.2% | 17.0% | 17.0% | 17.0% | 15.0% | 15.0% | 15.0% | | |
| **EBITDA** | $104.4 | $114.6 | $329.8 | $356.7 | $417.3 | $389.7 | $405.3 | $466.1 | $536.0 | $616.4 | $536.00 | 8.1% |
| *% margin* | 64.5% | 49.3% | 63.2% | 56.4% | 56.4% | 45.0% | 40.0% | 40.0% | 40.0% | 40.0% | | |
| Less: D&A | - | - | - | - | (7.4) | (8.7) | (10.1) | (11.7) | (13.4) | (15.4) | | |
| Unlevered Pre-tax Income | - | - | - | - | $409.9 | $381.0 | $395.2 | $454.4 | $522.6 | $601.0 | | |
| Less: Taxes | - | - | - | - | (153.7) | (142.9) | (148.2) | (170.4) | (196.0) | (225.4) | | |
| Plus: D&A | - | - | - | - | 7.4 | 8.7 | 10.1 | 11.7 | 13.4 | 15.4 | | |
| Less: CapEx | - | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| Less: Increase in Net Working Capital | - | - | - | - | (55.5) | (65.0) | (76.0) | (87.4) | (100.5) | (115.6) | | |
| **Unlevered Free Cash Flow** | - | - | - | - | $208.1 | $181.9 | $181.1 | $208.3 | $239.5 | $275.5 | 5-Yr | |

| | | | | | **12 ME** | **<-- Indicates Fractional Period -->** | | | | **0 ME** | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Unlevered Free Cash Flow (5-Yr Period Ending Q4: 2018) | | | | | $208.1 | $181.9 | $181.1 | $208.3 | $239.5 | $0.0 | $1,018.9 |
| Discounted Unlevered Free Cash Flow (5-Yr Period Ending Q4: 2018) | | | | | 186.6 | 131.2 | 105.1 | 97.2 | 89.9 | 0.0 | 610.0 |

| PV Periods - > | 0.500 | 1.500 | 2.500 | 3.500 | 4.500 | 4.500 |
|---|---|---|---|---|---|---|
| 16.0% | 193.2 | 145.6 | 125.0 | 123.9 | 122.8 | 0.0 |
| 18.0% | 191.6 | 141.9 | 119.7 | 116.7 | 113.7 | 0.0 |
| 20.0% | 189.9 | 138.3 | 114.8 | 110.0 | 105.4 | 0.0 |
| 22.0% | 188.4 | 135.0 | 110.2 | 103.8 | 97.9 | 0.0 |

**WACC Calculation**

| Capital | Amount | % of Total Cap | Sub Debt Coupon | Cost of Capital Pre-tax | Post-tax |
|---|---|---|---|---|---|
| Equity | $1,585 | 97.0% | | 25.0% | 25.0% |
| Non-TA Debt 1 | 43 | 2.7% | | 4.0% | 2.5% |
| Non-TA Debt 2 | 5 | 0.3% | | 0.0% | 0.0% |
| TA Sub Debt | 0 | 0.0% | 12.0% | 18.0% | 13.5% |
| | | | | WACC--> | 24.3% |
| Tax Rate | 37.5% | | | | |

**Current Credit Yields**

| Leveraged Loans [1] | | High Yield Bonds [2] | |
|---|---|---|---|
| Ba3/BB- | 3.7% | BB | 4.8% |
| B1/B+ | 3.6% | B | 5.6% |
| B2/B | 4.6% | CCC | 8.6% |
| B3/B- | 5.7% | | |
| Caa1/CCC+ | 6.9% | | |
| Unrated - <$50M EBITDA [3] | 5.7% | | |
| Unrated - >$50M EBITDA [4] | 4.0% | | |

**Valuation Sensitivity**

| | | Terminal Multiple | | | | |
|---|---|---|---|---|---|---|
| | | 5.0x | 6.0x | 7.0x | 8.0x | 9.0x |
| WACC | 16.0% | $1,986.4 | $2,241.6 | $2,496.8 | $2,752.0 | $3,007.2 |
| | 18.0% | 1,855.1 | 2,089.3 | 2,323.6 | 2,557.9 | 2,792.2 |
| | 20.0% | 1,735.6 | 1,951.0 | 2,166.4 | 2,381.8 | 2,597.2 |
| | 22.0% | 1,626.8 | 1,825.2 | 2,023.5 | 2,221.8 | 2,420.1 |

**Valuation**

**Free Cash Flows:**

| | |
|---|---|
| 5-Yr Free Cash Flow | $1,018.9 |
| PV of 5-Yr Free Cash Flow [5] | 610.0 |

**Terminal Value:**

| | |
|---|---|
| Terminal TTM EBITDA Mult. | 6.1x |
| Mult by: Terminal EBITDA [6] | 536.0 |
| Terminal Value | 3,276.0 |
| PV of Terminal Value | 1,102.9 |

**Total Enterprise Value (TEV):**

| | |
|---|---|
| PV of Free Cash Flow | $610.0 |
| PV of Terminal Value | 1,102.9 |
| **TEV** | **$1,712.9** |

DCF Terminal TTM EBITDA Multiple Rationale:

(1) Standard & Poor's Leveraged Commentary & Data (LCD) as of December 31, 2008
(2) Credit Suisse High Yield Index as of December 31, 2008
(3) Based on average spreads for average institutional spreads for issuers with <$50M EBITDA
(4) Based on average spreads for average institutional spreads for issuers with >$50M EBITDA.
(5) Discounted using mid-year cash flow convention.
(6) Projected TTM EBITDA as of Q4: 2018

*-Portfolio Company Valuation Analysis-*
*(Confidential)*

2

TA_MLH-00090312

# EXHIBIT 38
# FILED UNDER SEAL

# EXHIBIT 39
# FILED UNDER SEAL

# EXHIBIT 40

Message
_____

**From:**      Martin Price [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MARTIN PRICE]
**Sent:**      6/14/2015 5:17:42 AM
**To:**        Lance.Etcheverry@skadden.com
**Subject:**   Fwd: Millennium financial model - version 2
**Attachments:** AM Millennium_6 8 15 v4.xlsx; ATT00001.htm; MH Proposed Tax Restructuring (2015-06-07).pdf; ATT00002.htm

Martin Price
General Counsel
Millennium Health
Office: (858) 451-3535
Fax: (858) 217-8531
Martin.Price@millenniumhealth.com
(Full Email Disclaimer - http://millenniumhealth.com/emaildisclaimer/)

Begin forwarded message:

**From:** "Martin Price" <Martin.Price@millenniumhealth.com>
**To:** "Mr. Slattery" <jslattery92@gmail.com>
**Subject:FW: Millennium financial model - version 2**

Jim.  Please see attached and below and share with the Board.  Thank you.


Martin Price
General Counsel
Millennium Health
Office: (858) 451-3535
Fax: (858) 217-8531
Martin.Price@millenniumhealth.com<mailto:Martin.Price@millenniumhealth.com>
(Full Email Disclaimer -
http://millenniumhealth.com/emaildisclaimer/)<http://millenniumhealth.com/emaildisclaimer/>
From: Brock Hardaway
Sent: Monday, June 8, 2015 8:02 PM
To: Jennifer Mulloy (jmulloy@ta.com); (jchambers@ta.com); Jeff Hadden (jhadden@TA.com)
Cc: Martin Price
Subject: FW: Millennium financial model - version 2

All, attached is the updated model as we have been discussing.  You will also see a summary of the proposed
tax structure outlined by our team.  The tax structure outlined here creates a substantial amount of incremental
cash flow for the company over the model period and beyond (15 years actually) and as you know, is something
the lenders have been demanding.  It should be noted that our team is still evaluating options that might even
create more tax efficiency for the company while achieving the fundamental goals of the restructuring (ESOP in
particular – this is still be evaluated by our advisors but would be net positive to the plan proposed here).  You
will see that the initiatives we are laying out (equity/commission piece, tax plan, and SG&A savings) are
absolutely necessary to achieve the fundamental goals : 1. Pay the lenders back 2. Pay the DOJ settlement 3.
Minimize the risk to current shareholders, and 4. Keep the company alive.  Absent our initiatives, the company

will likely be in serious trouble by Q2 16.

You will note of course, that the model we are presenting now has changed from the model we provided to TA most recently. While we have a bridge provided in the model, the biggest difference is volume. After digging into the details with A&M last week, we came to the conclusion that our volume assumptions were aspirational. In particular, we had previously assumed a 10% reduction in volumes related to some big issues (DOJ settlement news and transition away from custom profiles – CP) starting in second half of 2015 and into 16, but then assumed an increase in 2017 and after. After looking closely at the impact on volume of companies in our space that have had DOJ settlements, we have decided it is much more defensible and realistic to make some changes to our volume assumptions. Specifically, Ameritox had a roughly 50% drop in volumes and Callaway had a roughly 30% drop after they each announced DOJ investigations/settlements. We are now projecting a 5% drop in volumes starting in July 2015 and then reduce that another 10% starting in January 2016 for a total of 15% off the current run rate. After the news of the DOJ shakes out, we expect to see some growth again starting in 2017, but modest growth compared to our history (and compared to our prior version growth rate). Fundamental to our assumption here however is really a payor mix change over the next several years. We are making the bet that we will be able to drop poor quality mix volume and replace it with higher quality payor mix. The details of this are outlined in the model attached.

Also included in the model is a tab labeled Equity. You have asked several times why we feel we need 100% of the equity in order to make this work. The analyses we have done in this tab is a big part of answering your question in an empirical way. Of course, you can look immediately at the EBITDA we are projecting over the next 3-5 years in the model and quickly see that creating enterprise value above the debt is going to be challenging at best using any reasonable exit valuation multiple. But the Equity tab provides an analyses that is based on the fundamental assumption that our management team and others will be forgoing short-term cash incentives at MH that we/they would be able to get at any other company really. As I have shared with you before and will remind you of again, virtually none of the management (including me, martin or any of my executive team) or staff at MH have any short-term performance based incentives other than base salary. This is very unusual for executive, management, or even lower level staff total compensation. Virtually all of our folks thinking about leaving MH will be offered some kind of short term incentive as part of their overall compensation. With the sales team, the math is even more direct as we are going to be asking the sales teams to take a big cut in their actual (and historical) take home cash and in doing so trade equity/future value creation. The analyses we are doing here is pretty simple but pretty clear – the amount people will be forgoing by staying at MH is significant and over the 5 year period has to be made up…that is the simple calculation of how much equity is needed to just break even to the amount of short-term incentive. The picture here is pretty bleak even with 100% of the equity. To be honest, the only way we create enterprise value is by building something that we don't have today….and of course there is always execution risk (in operational performance and achieving an exit).

There is lot of detail here (the model, the tax plan, and the underlying assumptions, etc). I think it would be helpful if we schedule an all hands call in the next day or two to go through this in detail. We will have A&M, Hogan, etc. on the call to walk through all the details of the model as well as covering the tax plan in detail. I think you guys understand the seriousness of the situation here and the need to get our plan buttoned up so we can take the next steps with the lenders. I hope we can get on the phone soon and spend as much time as necessary to move this forward. As we have discussed over the past week, I fear that the impact to the company of not taking actions quickly could be substantial.

Thanks,
Brock

Brock Hardaway
CEO
Millennium Health
Office: (858) 451-3535
Fax: (858) 451-3636
Brock.Hardaway@millenniumhealth.com<mailto:Brock.Hardaway@millenniumhealth.com>
(Full Email Disclaimer -
http://millenniumhealth.com/emaildisclaimer/)<http://millenniumhealth.com/emaildisclaimer/>
From: Pomerantz, Elizabeth [mailto:epomerantz@alvarezandmarsal.com]
Sent: Monday, June 08, 2015 6:39 PM
To: Brock Hardaway
Cc: Tim Kennedy; Daniel Pencak; Ben Chiarelli; Pillari, George; Zazulia, Joshua; Urbanowicz, Peter
Subject: Millennium financial model - version 2

Brock,

Attached please find version 2 of the Millennium financial model. This version includes the equity
compensation comparison that Ben sent over earlier. Also attached please find the description of the proposed
tax structure.

Please let us know if you'd like to see a pdf version as well, or if you have any questions.

Best,
Elizabeth




Elizabeth A. Pomerantz
Senior Associate
Alvarez & Marsal Healthcare Industry Group, LLC
Los Angeles | San Francisco | Seattle
Mobile:  917.635.5472
epomerantz@alvarezandmarsal.com<mailto:epomerantz@alvarezandmarsal.com>
www.alvarezandmarsal.com<http://www.alvarezandmarsal.com/>


*************************************************************************************
This message is intended only for the use of the addressee(s) and may contain information
that is PRIVILEGED and CONFIDENTIAL. If you are not the intended recipient(s), you are
hereby notified that any dissemination of this communication is strictly prohibited.
If you have received this communication in error, please erase all copies of the
message and its attachments and notify us immediately.

This email has been scanned by the Symantec Email Security.cloud service.
*************************************************************************************

ML_DE_00559339

# EXHIBIT 41

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------x

MARC S. KIRSCHNER, solely in his

capacity as TRUSTEE OF THE

MILLENNIUM CORPORATE CLAIM TRUST,

      Plaintiffs,

  vs.    Adv. Pro. No. 17-51840(LSS)

JPMORGAN CHASE BANK, N.A.,

CITIBANK N.A., BMO HARRIS BANK,

N.A., and SUNTRUST BANK,

      Defendants.

----------------------------------x

     VIDEOTAPE DEPOSITION OF

      YVETTE AUSTIN SMITH

    VIA ZOOM VIDEOCONFERENCE

      May 2, 2022

      9:00 a.m.

Reported by:

Maureen Ratto, RPR, CCR

YVETTE AUSTIN SMITH

A.      Yes.

Q.      Why is that?

A.      So it starts with a, which I describe in my report, the way in which one typically develops a weighted average cost of capital is by reference to observed discount rates and more specifically, observed betas for comparable companies.

So here, which is my typical methodology or typical practice, I sought to first understand whether there were publicly traded companies that were reasonably comparable to Millennium. And although I ultimately identified five companies, as I describe in my report for a variety of reasons, determined those companies were not sufficiently comparable to provide a reasonable estimate of beta and, therefore, a reasonable estimate of weighted cost of capital and that those companies were less risky than Millennium. And the reason why risk matters is because that's

YVETTE AUSTIN SMITH

are included in my five companies.

So all of the data points do use slightly different configurations of companies as a starting point, but all reached exactly the same conclusion, which is that the observed -- the WACC that can be observed or can be calculated from the observed beta is insufficient to account for the risk of Millennium's cash flows.

Q.    Another adjustment in your report relates to emerging opportunities discussed in a few places in your report but I'm looking right now in paragraph 67, you have some they're not quite bullets, they're dashes, in the last one -- well, I guess from the beginning you say, "The Padres Projections further included a category of revenue labeled 'emerging opportunities'."  And then, "For the following reasons the emerging opportunity should not form part of the expected cash flows in assessing balance sheet solvency."  Actually, I should just

YVETTE AUSTIN SMITH

read a little further, "The revenues appear aspirational rather than expected, according to the Padres Projection no revenue associated with this category until 2015, around nine months following the 2014 transaction." And then it goes on. I don't need to read it all into the record, although, obviously you should read whatever you need to answer my questions.

Am I correct that one of the emerging opportunities included in the projections were Federal contracts with the Department of Defense and the Department of Veteran Affairs?

A.    I believe based on the call transcript that has been produced they weren't contracts, they were the right to bid on contracts.

Q.    And what were those contracts for?

A.    I only know the detail that's in that call, that's the only reference to a description of the emerging

Page 300

YVETTE AUSTIN SMITH

opportunities. So I believe that call describes them as the right to bid on contracts for Department of Defense and Department of Veteran Affairs, I believe.

Q.    Okay. So do I understand correctly, you didn't do any independent analysis of, well, of those particular emerging opportunities related to the government contracts or right to bid on government contracts?

MR. LONERGAN:   Objection to form.

A.    There was nothing in the record that even allowed me to undertake any kind of an analysis. There was just no description of what those emerging opportunities were supposed to be. So there was no way to come to an assessment other than the text that was included in that call transcript.

Q.    Okay. And you also state in the section, I guess this is now the third of those bullets or dashes in paragraph 67, "The emerging opportunities

Page 301

YVETTE AUSTIN SMITH

do not appear in the subsequent

management model dated June 8th, 2015."

Would the June 2015 model have

been available to Millennium's management

at the time of the April 2014

transaction?

A.    Respectfully, that's sort of

the wrong question.

So the question of whether to

include the emerging opportunities

doesn't turn on whether the June 2015

model would have been available at April

2014, rather, it turns on the question of

what does the June 2015 model tell you

about what existed at April 2014.

So the reference to that model

is not because that specific model was

available, but what does it tell you

about what existed as of the date of

valuation.

Q.    And what did it tell you about

what existed as of the date of the

valuation?

A.    That the emerging

YVETTE AUSTIN SMITH

opportunities, as of April 2014, were highly speculative. If these were opportunities -- and for a number of reasons but I'll confine my answer right now to the June 2015 model, that's what you asked me about. But as it relates to the June '15 model, it would be unusual that the company was making specific investments to generate specific revenue and cash flow in April of 2014.  And by the time you get just to June 2015, so about a year later, there is simply no discussion at all, not only not a discussion of continuing whatever these emerging opportunities were, but no discussion of ending whatever investments that were supposed to be made into growing these emerging opportunities.

So I would either expect to see; this is how we're going to continue these emerging opportunities, we're going to shut down the emerging opportunities and these are the costs that we're going to incur to shut it down or something,

Page 303

YVETTE AUSTIN SMITH

there is simply no discussion at all. So to me, along with some other information that I cite to here, it supports that the emerging opportunities were quite speculative.

Q.    Jumping ahead now, I want to direct you to paragraph 171 of your report.

A.    Yes. I have it in front of me.

Q.    Okay. And so this is, the top of the page the section is entitled Adequate Capital Test.

Am I correct that as part of your performing an adequate capital test you created a reasonable downside scenario?

A.    That's correct.

Q.    What adjustments did you make to create that reasonable downside scenario?

A.    So they're listed here on paragraph 171. So I, instead of modeling in the impact of the local coverage determination at 18.3, I modeled in at

C E R T I F I C A T E

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, YVETTE AUSTIN SMITH was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

**MAUREEN M. RATTO, RPR**

License No. 817125

Page 313

J U R A T

I do hereby certify that I have read the foregoing transcript of my deposition.

_____
YVETTE AUSTIN SMITH

Sworn and subscribed before me this 22nd day of June, 2022

_____
a Notary Public of the State of TEXAS

**Page 314**

**ERRATA SHEET**

**I WISH TO MAKE THE FOLLOWING CHANGES:**

| Page | Line | From | To |
|------|------|------|-----|
| 29 | 7 | "inhouse" | "now" |
| 38 | 18 | "seven" | "several" |
| 73 | 11 | "blow" | "below" |
| 151 | 7 | "inefficiency" | "insufficiency" |
| 238 | 22 | "once" | "one" |

# EXHIBIT 42
# FILED UNDER SEAL

# EXHIBIT 43

# THE BUSINESS LAWYER

Section of Business Law • American Bar Association

## ARTICLES

Going Private at the Intersection of the Market and the Law
*Faith Stevelman*

The Origin, Application, Validity, and Potential Misuse of Rule 10b5-1
*Allan Horwich*

Meeting *Daubert* Standards in Calculating Damages for Shareholder
Class Action Litigation
*Linda Allen*

Tontine or Takeback: Reversion Provisions in Class Action
Settlement Agreements
*Ralph C. Ferrara and Riva Khoshaba Parker*

Solvency Tests
*J.B. Heaton*

Pandora's Ballot Box, Or a Proxy with Moxie? Majority Voting,
Corporate Ballot Access, and the Legend of Martin Lipton
Re-Examined
*J.W. Verret*

Summary of Mendes Hershman Student Writing Contest Prize Essay:
Difficult, Duplicative and Wasteful?: The NASD's Prohibition of Class
Action Arbitration in the Post-*Bazzle* Era
*Matthew Eisler*

## REPORT

Changes in the Model Business Corporation Act—Amendments
Relating to Chapters 8 and 13
*Committee on Corporate Laws, ABA Section of Business Law*

## SURVEY—FEDERAL REGULATION OF SECURITIES

Annual Review of Federal Securities Regulation
*Subcommittee on Annual Review, Committee on Federal Regulation of Securities,
ABA Section of Business Law*

May 2007 • Volume 62 • Number 3

# Solvency Tests

*By J.B. Heaton\**

*This Article explains the basic economic function of solvency tests and the relations among the three solvency tests applied in bankruptcy and corporate law. It also explains why solvency diagnoses can differ, depending on the test that is applied. Although one of these tests—the ability-to-pay test—is probably best, it may suffer from significant measurement error in practice. Multiple solvency tests ultimately make sense because the costs of failing to detect insolvency when it exists exceed the costs of detecting insolvency when it does not exist.*

## INTRODUCTION

Three solvency tests appear in bankruptcy and corporate law:

- a test of whether a firm[1] reasonably can be expected to pay its debts as they come due (the *ability-to-pay solvency test,* sometimes referred to as *cash-flow solvency* or *equitable solvency*),[2]
- a test of whether the fair value of a firm's assets exceed the face value of its liabilities (the *balance-sheet solvency test,* performed on either a *going-concern* or *liquidation* basis),[3] and
- a much less well defined test of whether a firm has adequate capital (the *capital-adequacy solvency test*).[4]

It is easy to identify these tests but hard to apply them in practice.[5] This is nothing new. Commentators in a 1929 *Columbia Law Review* article lamented that "courts have not yet developed any clear-cut principles or rules" for solvency

---

\* Partner, Bartlit Beck Herman Palenchar & Scott LLP (Chicago). Please address correspondence to Heaton at Bartlit Beck Herman Palenchar & Scott LLP, 54 West Hubbard Street, Chicago, Illinois 60610, phone 312-494-4425, email: jb.heaton@bartlit-beck.com. The opinions expressed here are the author's own and do not reflect the position of Bartlit Beck Herman Palenchar & Scott LLP, its attorneys or clients. For helpful comments I thank John Byars, Chris Culp, David Evans, Renee McMahon, Adam Mortara, David Parker, Jordan Siev, Joe Smith, Cindy Sobel, and Jamie Sprayregan.

1. References are made to "firm" throughout but nothing prevents the application of this Article's ideas to natural persons.

2. *See infra* notes 25–31 and accompanying text.

3. *See infra* notes 32–48 and accompanying text.

4. *See infra* notes 49–54 and accompanying text.

5. *See, e.g., In re* WorldCom, Inc., No. 02-13533 (AJG), 2003 Bankr. LEXIS 1401, *120 (Bankr. S.D.N.Y. Oct. 31, 2003) ("There are various tests used to determine insolvency under the [New York Debtor and Creditor Law], none of which is generally accepted as the correct test.") (citation omitted); *cf.* United States v. Whitehead, 176 F.3d 1030, 1040 (8th Cir. 1999) (reversing conviction where

testing.[6] Seventy-five years later, Delaware's Court of Chancery complained that "it is not always easy to determine whether a company even meets the test for solvency."[7] Practitioners often complain that uncertainty about the application of solvency tests makes it difficult to advise on corporate restructuring.[8] Those involved in high stakes financial litigation spend as much time litigating *how* to determine insolvency as they do litigating *whether* a given firm is insolvent. As the leading bankruptcy treatise notes, litigation on the meaning of insolvency "generates a formidable and, on the surface, not always consistent stream of adjudications."[9]

This Article begins by explaining the basic economic function of solvency tests in bankruptcy and corporate law. Limitations on a firm's activities based on solvency tests—embedded in laws such as fraudulent transfer law, preference law, and the law of fiduciary duties—allow a borrower to increase its debt capacity *ex ante* by protecting creditors *ex post* from actions that make it less likely that the firm will pay its debts. Creditors who know that such limits are in place are willing to lend more money to the firm in the first place. Firms would have little or no debt capacity if there were no controls on their power to intentionally reduce their ability to pay debts after they have borrowed money.[10]

The Article turns next to the real challenge in understanding solvency tests: sorting out the relations among the three solvency tests used in bankruptcy and corporate law. Most of the confusion in the application of these tests traces to the fact that diagnoses of solvency (or insolvency) can differ depending on the solvency test that is applied. Solvency under the ability-to-pay test, for example, does not imply balance-sheet solvency, and *vice versa;* while solvency of neither type implies capital adequacy. It is impossible to gain a good grasp of solvency tests without cataloging the ways that different solvency tests can yield different diagnoses of solvency or insolvency. In general, the three tests measure different things and the indications they give of solvency or insolvency need not agree with each other. Understanding how and why these differences occur is the key to understanding solvency tests and reducing confusion about their application in practice.

The inconsistency that different solvency tests generate compels one to ask an obvious question: is there a best or optimal solvency test among the three that

---

district court failed to instruct jury on definition of "insolvent" because "the term 'insolvent' encompasses distinctly different meanings in the law"); Parkway/Lamar Partners, L.P. v. Tom Thumb Stores, Inc., 877 S.W.2d 848, 849 (Tex. App. 1994) ("The meaning of 'insolvency' is not definitely fixed and it is not always used in the same sense, but its definition depends rather on the business or fact situation to which the term applies.").

6. James C. Bonbright & Charles Pickett, *Valuation to Determine Solvency Under the Bankruptcy Act,* 29 COLUM. L. REV. 582, 620 (1929).

7. Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 790 (Del. Ch. 2004).

8. *See, e.g.,* Richard M. Cieri, Lyle G. Ganske & Heather Lennox, *Breaking Up Is Hard To Do: Avoiding the Solvency-Related Pitfalls In Spinoff Transactions,* 54 BUS. LAW. 533 (1999).

9. 2-101 COLLIER ON BANKRUPTCY ¶ 101.32 [4] (15th rev. ed. 2007).

10. For a technical economic treatment of the role that fraudulent conveyance law plays in increasing debt capacity, see J.B. Heaton, *Incomplete Financial Contracts and Non-Contractual Legal Rules: The Case of Debt Capacity and Fraudulent Conveyance Law,* 9 J. FIN. INTERMEDIATION 169 (2000) (demonstrating how fraudulent conveyance law increases debt capacity *ex ante* by protecting creditors *ex post*).

could apply, exclusively, in all cases? From a theoretical perspective the answer is yes. If the right assumptions are made, then it is easy to conclude that the ability-to-pay solvency test is the optimal solvency test. It best captures what creditors care most about—the match between their matured obligations and the firm's cash flow at the contracted payment date—and it does not generate complications that may cause the other tests to indicate insolvency when the firm can, in fact, reasonably expect to pay its debts as they come due, or, the other way around, to indicate solvency when the firm cannot, in fact, reasonably expect to pay its debts as they come due.

The problem, if the other tests are abandoned, is that one needs to be very sure there is an ability to measure the likelihood and amount of future cash flows that may be quite distant. Predicting the future is never easy, and predicting distant future cash flows is no exception. Future cash flows do not sit cooperatively for sampling and inspection. They are notoriously difficult to estimate. By measuring other things that might be correlated with the presence of the inability to pay debts as they come due, like low going concern and liquidation values, other solvency tests add useful information about solvency despite the confusion that multiple, sometimes inconsistent, solvency tests cause. Liquidation-based solvency tests that look to observable market values rather than projected cash flows might be much easier to apply.

One way to think about this question is to view the solvency test for what it really is: a diagnosis of a condition that creditors care about. From the creditors' perspective, insolvency is like a cancer. The cancer is harmful because it will prevent the creditor from being repaid according to its terms. When the cancer is present, the creditor wants the firm to get treatment, especially the "treatment" of avoiding gratuitous asset transfers. Each of the solvency tests is a test for the cancer but the going-concern and liquidation balance-sheet tests are quite crude. They do not so much identify the inability to pay debts as they come due as they identify conditions that are often, but not always, associated with that condition. The ability-to-pay solvency test, to carry the analogy further, is like the actual biopsy that puts cells under a microscope. Because the "biopsy" of the ability-to-pay test is just as easy and no more invasive than the other tests—unlike the real world of cancer diagnosis—why not just skip to the best test? The answer is that the "microscope" of the ability-to-pay solvency test is sometimes just not that good. Also, as with many diseases, the costs to debt capacity of failing to detect insolvency greatly exceed the costs of detecting insolvency when it does not exist. Multiple solvency tests are beneficial even though they may indicate insolvency for a firm diagnosed as solvent under the ability-to-pay solvency test. The cure of avoiding gratuitous asset transfers is never that harmful for firms whose solvency is in doubt and may lead to large increases in *ex ante* debt capacity.

## I. What Solvency Tests Do

Practically since the advent of credit, borrowers have been attracted to illicit actions that might relieve them of their debt burden. English debtors of the Middle

Ages escaped their creditors by hiding in their houses with goods bought on credit, a practice called *keeping house:* English law did not allow creditors to violate the sanctity of a debtor's home for the mere pursuit of debt satisfaction. Debtors could also flee the realm (taking their personal property with them) to places where the King's law could not follow. Some could use legal process and government favors to escape imprisonment for fraudulent asset transfers, or reside with their fortunes in one of the numerous sanctuaries, some as large as cities, where the King's law could not reach.[11]

In modern times, borrowers may try to strip the firm of its assets through mechanisms such as gifts,[12] dividends, or exorbitant salaries and benefits,[13] conducting a leveraged buyout of the borrower's equity in excess of its value,[14] causing the borrower to provide nonrecourse financing to a third party for an overvalued purchase of some asset from the borrower's insiders,[15] causing the borrower to make concessionary personal loans to the borrower's insiders,[16] causing the firm to make loans to shell corporations owned by the borrower's insiders or third parties who share the proceeds with the insiders,[17] or exchanging assets at exaggerated prices benefiting the borrower's insiders.[18]

Generally speaking, solvency tests form parts of laws that increase a borrower's debt capacity *ex ante* by protecting creditors *ex post* from such creditor-harming activities. For example, federal and state fraudulent transfer statutes prohibit asset transfers from insolvent debtors for less than "reasonably equivalent value" or "fair consideration."[19] Insolvent firms may not favor some similarly situated creditors over others.[20] Corporate law prevents an insolvent corporation from paying

---

11. *See generally* Israel Treiman, *Escaping the creditor in the middle ages,* 43 Law Quart. Rev. 230 (1927).

12. *See, e.g.,* French v. Liebmann *(In re French),* 440 F.3d 145 (4th Cir.), *cert. denied,* 127 S.Ct. 72 (2006) (fraudulent transfer of Bahamian property on the eve of bankruptcy).

13. *See, e.g.,* Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 *(In re Freuhauf Trailor Corp.),* 444 F.3d 203 (3d Cir. 2006) (large pension benefit conferred on executives on the eve of bankruptcy was a fraudulent transfer).

14. *See, e.g.,* Wieboldt Stores, Inc. v. Schottenstein, 131 B.R. 655 (N.D. Ill. 1991) (payments made to selling shareholders in leveraged buyout could constitute fraudulent transfers).

15. *Cf.* Kendall v. Sorani *(In re Richmond Produce Co.),* 195 B.R. 455 (N.D. Cal. 1996) (bankruptcy trustee could recover, as fraudulent transfer, amount that company provided to secure letter of credit allowing new buyer to purchase stock from company's former owners).

16. *See, e.g.,* Acequia, Inc. v. Clinton *(In re Acequia, Inc.),* 34 F.3d 800 (9th Cir. 1994) (amounts that corporate founder claimed were personal loans or reimbursements were avoidable fraudulent transfers made by corporation).

17. *Cf.* RTC Mortg. Trust 1995-S/N1 v. Sopher, 171 F. Supp. 2d 192 (S.D.N.Y. 2001) (insolvent company transferred its assets to newly formed company in exchange for stock in the new company that was then distributed to the shareholders of the insolvent company).

18. *See, e.g.,* Breeden v. L.I. Bridge Fund, LLC *(In re Bennett Funding Group, Inc.),* 232 B.R. 565 (Bankr. N.D.N.Y. 1999) (sale of stock warrants to longtime affiliate of debtor at much lower price than value of underlying stock was fraudulent transfer).

19. *See, e.g.,* 11 U.S.C.A. § 548 (West 2004 & Supp. 2007); Uniform Fraudulent Conveyance Act, 7A Pt. II U.L.A. 245 (2006) (promulgated in 1918); Uniform Fraudulent Transfer Act, 7A Pt. II U.L.A. 1 (2006) (promulgated in 1984).

20. *See* 11 U.S.C.A. § 547(b) (West 2004 & Supp. 2007); Freedom Group, Inc. v. Lapham-Hickey Steel Corp. *(In re Freedom Group),* 50 F.3d 408, 411 (7th Cir. 1995) ("The statute reduces the debtor's

dividends or redeeming its stock.[21] Some states, including Delaware, give creditors of an insolvent firm standing to enforce fiduciary duties that a corporation's directors and officers owe to the corporation.[22]

One of the reasons these laws provide such powerful protections to creditors is that they typically do not require the creditor to prove reliance on any particular representation of the debtor. Instead of creditor belief or reliance on anything the debtor says or does, the objective condition of insolvency (or near insolvency) plays the critical role, dividing permissible from impermissible gratuitous transfers. Put simply, there are things a solvent firm may do—such as pay dividends— that an insolvent firm may not, and this restriction on an insolvent firm's activity increases debt capacity dramatically. Testing solvency is key to finding the dividing line.

Given the acknowledged difficulty of solvency testing, why not simply prohibit all potentially credit-harming actions all of the time rather than only when the firm is insolvent? One answer is that a total ban on gratuitous asset transfers would probably lead to much costly fighting between the firm and its creditors about what business decisions amounted to gratuitous asset transfers. It is easy to identify a gift, a dividend, or a share repurchase as a gratuitous asset transfer, but what about an investment in a highly speculative new business?

Alternatively, consider the problem of dealing with contingent claimants, e.g., tort claimants the debtor has wronged and must eventually compensate in or out of court. It can be very hard—and essentially impossible outside a class action settlement—to pay off all tort creditors with any kind of certainty because it is hard to know what possible tort claims may be lurking.[23] If a debtor could make gratuitous

---

ability to play favorites, and hence the anxiety of creditors, and hence the costly melee that such anxiety can engender, by telling the favored creditor that if the debtor goes broke within ninety days after the transfer, the transfer will be undone and the favored creditor tossed back in the pool with the rest of the creditors."); Cent. Va. Cmty. Coll. v. Katz, 126 S. Ct. 990, 1002 (2006) (stating that authority to recover preferences "has been a core aspect of the administration of bankrupt estates since at least the 18th century.").

21. *See, e.g.,* DEL. CODE ANN. tit. 8, §§ 160 and 174(a) (2001) (prohibiting payment of dividends while the corporation is insolvent or which will render it insolvent); N.Y. BUS. CORP. LAW § 510(a) (McKinney 2003) ("A corporation may declare and pay dividends or make other distributions in cash or its bonds or its property, including the shares or bonds of other corporations, on its outstanding shares, except when currently the corporation is insolvent or would thereby be made insolvent...."); CAL. CORP. CODE § 501 (West 1990) ("Neither a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders (Section 166) if the corporation or the subsidiary making the distribution is, or as a result thereof would be, likely to be unable to meet its liabilities (except those whose payment is otherwise adequately provided for) as they mature."); ABA MODEL BUS. CORP. ACT § 6.40(c) (2005) ("No distribution may be made if, after giving it effect: (1) the corporation would not be able to pay its debts as they become due in the usual course of business; or (2) the corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.").

22. *See generally* Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772 (Del. Ch. 2004).

23. *See e.g.,* Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. & Cryovac, Inc. (*In re* W.R. Grace & Co.), 281 B.R. 852, 867–68 (Bankr. D. Del. 2002) (holding that tort claims as they actually existed must be used for purposes of calculating insolvency, even though evidence

asset transfers—including dividends or other distributions—only after it was sure its creditors were paid, it might be nearly impossible for a corporation to reach that kind of certainty about contingent creditors even if it had no other debt.

Thus, while prohibiting all gratuitous transfers would increase debt capacity by better protecting creditors, it probably would reduce firm value, decrease entrepreneurial incentives, and unnecessarily constrain other forms of capital raising, including outside equity. Solvency tests balance the benefits of laws protecting creditors by preventing some gratuitous asset transfers from the firm with the costs of preventing all gratuitous asset transfers or potentially creditor-harming activities.

## II. Solvency Tests in Bankruptcy and Corporate Law

Courts variously describe solvency as a question of fact or a mixed question of fact and law.[24] Whatever the case, all solvency tests ask, one way or another, whether a particular firm can pay its debts. As will be shown, however, the link between the firm's cash flow or assets and the debts to be repaid from them is often quite different, and therein lie the seeds of confusion. Three different solvency tests appear in bankruptcy and corporate law: the *ability-to-pay solvency test*, the *balance-sheet solvency test*, performed on either a *going concern* or *liquidation* basis, and the *capital-adequacy solvency test*, defined in terms of the other tests.

### A. The Ability-to-Pay Solvency Test

The ability-to-pay solvency test asks if the firm can reasonably expect to pay its debts as they come due. In the federal fraudulent conveyance statute, for example, the question is whether the firm "intended to incur, or believed that [it] would incur, debts that would be beyond [its] ability to pay as such debts matured."[25] The Uniform Fraudulent Transfer Act states the test similarly, whether the transferor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[26] The Uniform Fraudulent Conveyance Act, still the law in the very important jurisdiction of New York, asks whether the debtor "intends or believes that he will incur debts beyond his ability to pay as they mature."[27] The Uniform Commercial Code

---

of the actual level of tort claims was not available at the time of the allegedly fraudulent transfer of company's most profitable division and contemporaneous reasonable estimates supported the inference of solvency.).

24. *See, e.g.*, Lawson v. Ford Motor Co. (*In re* Roblin Indus., Inc.), 78 F.3d 30, 35 (2d Cir. 1996) (insolvency is a question of fact); Brown v. Shell Can. Ltd. (*In re* Tennessee Chem. Co.), 112 F.3d 234, 236 (6th Cir. 1997) (same); Plankinton Bldg. Co. v. Grossman (*In re* Plankinton Bldg. Co.), 148 F.2d 119, 125 (7th Cir.), *cert. denied*, 326 U.S. 729 (1945) (same); Merkel v. Comm'r of Internal Revenue, 192 F.3d 844, 852 (9th Cir. 1999) (same); Cavanaugh v. Comm'r of Internal Revenue, No. 92-9004,1993 U.S. App. LEXIS 2186, *2 (10th Cir. Feb. 9, 1993) (same). Occasionally, courts describe solvency testing as a mixed question of fact and law, see, e.g., Consove v. Cohen (*In re* Roco Corp.), 701 F.2d 978, 981 (1st Cir. 1983); Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1063 (3d Cir. 1992).

25. 11 U.S.C.A. §548(a)(1)(B)(III) (West 2004 & Supp. 2007).

26. Unif. Fraudulent Transfer Act, *supra* note 19, § 4(a)(i).

27. Unif. Fraudulent Conveyance Act, *supra* note 19, § 6.

defines "insolvent" to include both "having generally ceased to pay debts in the ordinary course of business other than as a result of *bona fide* dispute" and "being unable to pay debts as they become due."[28] Sometimes referred to as the "cash flow" solvency test or the "equitable" solvency test, this test asks whether the firm will be able to match its cash sources to its maturing obligations. As one court explains, "[a] broader concept, originating with merchants or traders, is equitable insolvency, or the inability to pay debts as they become due in the ordinary course of business."[29] It is a forward-looking test. It is not enough to be able to meet current obligations; the firm must be able to meet its future obligations as well.[30]

If the ability-to-pay solvency test sounds simple in theory, it is quite difficult to apply in practice. If a firm's cash flows and debt were not subject to any uncertainty at all, then it would be an easy task to verify if the stream of cash flows that will occur through time can be matched to the firm's maturing debt obligations. Standing at any single point in time, one could look ahead to any date and ask whether the cash that the firm will have on hand at that date (that is, cash that it has retained after making prior debt payments) will be sufficient when combined with other cash that the firm can generate at that date to pay its debt obligations at the time. If the answer is yes regardless of what future time is chosen, then the firm can be expected to pay its debts as they mature.

The problem is that neither cash flows (sources of assets) nor debt obligations (liabilities) are certain. A firm's future cash flows normally will be subject to some (usually considerable) uncertainty and the firm may have contingent

---

28. U.C.C. § 1-201(b)(23)(A) and (B) (2006). Subparagraph (C) adds "being insolvent within the meaning of federal bankruptcy law," the balance-sheet test discussed below.

29. *Cellar Lumber Co. v. Holley*, 224 N.E.2d 360, 363 (Ohio Ct. App. 1967).

30. In *Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005), *cert. denied*, 126 S.Ct. 2286 (2006), the Second Circuit Court of Appeals seems recently to have made the mistake of reading the ability-to-pay test as dependent on meeting only *current* obligations. The court rejected a finding of insolvency that rested on the debtor's inability to meet its *future* debt repayment obligations and stated:

> The Cash Flow test does not accord exactly with either Delaware definition. The Cash Flow test projects into the future to determine whether capital will remain adequate over time while the Delaware test looks solely at whether the corporation has been paying bills on a timely basis and/ or whether its liabilities exceed its assets. Therefore, the Cash Flow test cannot assist a trier of fact in determining whether a corporation is insolvent under the applicable Delaware law.

*Id.* at 343. This is surely an incorrect reading of Delaware law. The court's reasoning eventually traces to a dictionary definition of insolvency that the Delaware Court of Chancery cited in *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del. Ch. 1992) ("An entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business. Webster's Ninth New Collegiate Dictionary 626 (1988)."). Nothing in that definition limits the definition of insolvency to the current payment of bills. This is unsurprising because an ability-to-pay test that looked at only the entity's historical rather than prospective ability to pay its debts has little value in deterring credit-harming activities before they happen. Corporations may be balance-sheet insolvent but liquid enough to pay creditors for quite some time. *Cf.* Angelo, Gordon & Co. L.P. v. Allied Riser Commc'ns Corp., 805 A.2d 221 (Del. Ch. 2002) (corporation had sold off all its assets, and although balance-sheet insolvent, had sufficient cash to pay its currently maturing obligations); Harry DeAngelo, Linda DeAngelo & Karen H. Wruck, *Asset Liquidity, Debt Covenants, and Managerial Discretion In Financial Distress: The Collapse of L.A. Gear*, 64 J. FIN. ECON. 3 (April 2002) (high asset liquidity may temporarily give insolvent firms the ability to continue operations by paying current obligations).

liabilities (e.g., related to corporate guarantees, pending lawsuits, letters of credit, etc.). When future cash flows and liabilities are uncertain, what does it mean to have debts beyond the firm's "ability to pay"?

One thing is sure: "Ability to pay" cannot mean simply that the firm's *expected* cash flow—the sum of its possible cash flows rated by their respective probabilities—exceeds its debts in a given period of time, because a firm can have a very large expected cash flow even when it is almost certain *not* to pay its debts as they come due.

Consider, for example, a firm that owes a debt requiring a near-term payment of $100 but has no assets or cash on hand to make that payment. Further, assume that before the payment is due the firm either will receive $1000 with a 15% probability, or will receive $0 with an 85% probability. Clearly, there is an 85% probability that the firm will not pay its debt when it comes due; there is an 85% probability that firm will have $0 next period when its $100 debt is due. In this example, there is only a 15% probability that the firm will pay its debts when they come due. If the 15% likelihood comes to pass, and the firm receives $1000, then it will pay off the $100 debt leaving $900 for the firm's owners. The expected cash flow, nevertheless, is $150 because 15% of $1000 plus 85% of $0 equals $150. The example shows that a firm can have an expected cash flow that is higher than its debt even when it is almost sure (in the example, 85% sure) to be unable to pay its debt when it comes due. Ability-to-pay solvency cannot depend on expected cash flows in a probabilistic sense.

If ability-to-pay solvency is not determined by expected cash flows, what measure of ability to pay does make sense? Surely, "ability to pay" does not mean ability to pay with absolute certainty. Nearly any corporation with debt has *some* chance of defaulting on that debt depending on what happens to it in the future. Some default risk is par for the course for virtually any debtor (leaving aside governments that may pay their obligations using their own printable currency). One can conclude that "ability to pay" means something less than an ability to pay with absolute certainty, but surely it means something more than a very low probability, such as 15% noted in the example.

Unfortunately, the case law provides no guidance in this regard. A natural starting place, perhaps, is to consider a firm to have the ability to pay its debts as they come due if there is at least a 50% probability that it will be able to pay all of its debts as they mature. That is, such a firm is "more likely than not" to be able to pay its debts as they mature. A "more likely than not" approach to the ability to pay is not quite as lenient as it might at first sound. If a firm has a 10% probability of defaulting in any one year, for example, and those probabilities are independent through time, then there is a greater than 50% chance that the firm will default on its debt within seven years.[31] Such a firm would be insolvent under an ability-to-pay solvency test with a 50% probability threshold.

---

31. The probability of defaulting is 1 minus the probability of not defaulting: $1 - 0.90^7 = 1 - 0.48 = 0.52$.

## B. THE BALANCE-SHEET SOLVENCY TEST

The balance-sheet solvency test asks a different question: Are this firm's assets greater than its liabilities? When the United States Bankruptcy Code defines the word "insolvent" it calls it the "financial condition such that the sum of such entity's debts is greater than all such entity's property, at a fair valuation."[32] Debts are valued at face value for purposes of the balance-sheet solvency test,[33] contingent liabilities are discounted for their probability of occurrence,[34] and neither a positive book balance[35] nor a positive equity trading price[36] implies solvency.

In applying the balance-sheet solvency test, courts struggle with how to value assets and, in particular, whether to value the firm's assets as if the firm continues as a *going concern* (i.e., to assume the firm will continue in operation and generate cash flow from its business) or in *liquidation* (i.e., as if the firm has ceased or will cease doing business and will dispose of its corporate property).[37] The standard

---

32. *See* 11 U.S.C.A. § 101(32)(A) (West 2004 & Supp. 2007); Briden v. Foley, 776 F.2d 379, 382 (1st Cir. 1985) (bankruptcy code definition of insolvency applied in preference case is a "balance-sheet test" that "focuses on the fair market value of the debtor's assets and liabilities within a reasonable time of the transfers"); Orix Credit Alliance, Inc. v. Harvey *ex rel.* Lamar Haddox Contractor, Inc. (*In re* Lamar Haddox Contractor, Inc.), 40 F.3d 118, 121 (5th Cir. 1994) ("Courts often refer to this test as a balance-sheet test, and then engage in the 'fair valuation' of the debts and property shown on the balance-sheet, as required by the statute."). This is the same definition of balance-sheet insolvency used in the Uniform Fraudulent Transfer Act, *supra* note 26. *See* Paragon Health Servs., Inc. v. Cent. Palm Beach Cmty. Mental Health Ctr., Inc., 859 So. 2d 1233, 1236–37 (Fla. Dist. Ct. App. 2003) ("The Uniform Fraudulent Transfer Action defines insolvency as follows: 'A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.' This is referred to as the 'balance sheet' test.") (citations omitted).

33. *See, e.g.,* Hanna v. Crenshaw (*In re* ORBCOMM Global L.P.), Adv. No. 02-1914 (MFW), 2003 Bankr. LEXIS 759, *8 (Bankr. D. Del. June 12, 2003) (holding that "for purposes of determining whether a debtor is insolvent under section 547, the liabilities of the debtor must be valued at face value.").

34. *In re* Xonics Photochemical, Inc., 841 F.2d 198, 200–01 (7th Cir. 1988); Covey v. Commercial Nat'l Bank of Peoria, 960 F.2d 657, 660 (7th Cir. 1992).

35. *See, e.g.,* DeRosa v. Buildex Inc. (*In re* F & S Cent. Mfg. Corp.), 53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985) (" 'Asset values carried on a balance sheet, even if derived in accordance with 'generally accepted accounting principles,' do not necessarily reflect fair value: 'Generally accepted accounting principles' are not synonymous with any specific [valuation] policy.'"); *In re Lamar Haddox Contractor,* 40 F.3d at 121 ("Needless to say, a fair valuation may not be equivalent to the values assigned on a balance sheet. Financial statements reflect the book value of assets, ordinarily the cost of the property reduced by accumulated depreciation. The rate of depreciation is usually the maximum allowed by income tax regulations."); *but cf.* Zeta Consumer Prods. Corp. v. Equistar Chem. L.P. (*In re* Zeta Consumer Prods. Corp.), 291 B.R. 336, 347 (Bankr. D.N.J. 2003) ("Nevertheless, while book value may understate or fail to reflect the fair value of a debtor's assets, it provides some competent evidence as to insolvency and forms a starting point for purposes of the insolvency analysis."); Indus.,Commercial Elec.,Inc. v. Babineau (*In re* Indus. Commercial Elec. Inc.), Adv. No. 02-4591-JBR, 2004 Bankr. LEXIS 438, *22 (Bankr. D. Mass. April 8, 2004) ("In making factual determinations of solvency, it is appropriate to adjust the asset values shown on the most contemporaneous balance sheet available to reflect 'the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.'").

36. *See, e.g., Covey v. Commercial Nat'l Bank of Peoria,* 960 F.2d at 661 (Easterbrook, J.) ("A stumble-bum would pay 1 cent for the most hopelessly insolvent firm, as the deal puts none of the bum's nonexistent assets at risk and could pay off if the debtor unexpectedly strikes it rich.").

37. *See, e.g.,* Chaim J. Fortgang & Thomas Moers Mayer, *Valuation in Bankruptcy,* 32 UCLA L. Rev. 1061, 1063 (1985) ("The choice between 'liquidation values' and 'going concern values' lies at the

approach is to determine first whether, in fact, the debtor was a "going concern" or was "on its deathbed" at a relevant date and then to value the assets according to that finding.[38] The choice is typically difficult, however, because most litigated solvency tests involve an entity that was, at the test date, "midway between a prosperous going concern and a dead enterprise."[39] The choice of going concern or deathbed valuation determines whether the firm is assumed to be sold as a going concern or by piecemeal liquidation.

The cases create an interesting anomaly. By demanding going concern valuation except where a company is about to close its doors, the courts force litigants to construct going concern valuations even where liquidation was the optimal course of conduct on the valuation date. As one court has noted in discussing the fiduciary duties of directors of a distressed firm:

> The maximization of the economic value of the firm might, in circumstances of insolvency, require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying. In other words, the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced in order to meet the legitimate claims of its creditors.[40]

It may seem strange to require a going concern assumption even when reasonable projections demonstrate that the business was doomed to eventual failure. Under such circumstances, the going-concern valuation standard is somewhat absurd in the sense that no real buyer would do what the valuation requires: continue to operate the business.[41] The solution to the conundrum can be found in

---

heart of most disputes over asset valuation in bankruptcy."); *In re* PWS Holding Corp., 228 F.3d 224, 233 (3d Cir. 2000) ("The test of solvency is whether, at the time of the recapitalization, the company's assets exceeded its liabilities. There are two basic approaches to this evaluation: asset by asset evaluation, which ascribes value to each asset and determines solvency by comparing the sum of those assets to total liabilities, and enterprise valuation, which values the business as a going concern and includes intangibles such as relationships with customers and suppliers, and the name, profile, and reputation of the business. The Examiner concluded that it was likely (i.e., that there was a 60–80% chance) that a court would apply the business enterprise analysis.").

38. Sherman v. FSC Realty LLC *(In re* Brentwood-Lexford Partners, LLC*)*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing *In re* DAK Indus. Inc., 170 F.3d 1197, 1199–1200 (9th Cir. 1999) and *In re* Taxman Clothing Co., Inc., 905 F.2d 166, 169–70 (7th Cir. 1990)).

39. Bonbright & Pickett, *supra* note 6, at 582. Generally, where a firm is operating at the valuation date and generally paying its bills, courts appear to adopt a going concern standard. *In re DAK Indus. Inc.*, 170 F.3d at 1200 ("In this case, the bankruptcy court determined that DAK was a going concern during the preference period, relying primarily on the fact that DAK continued to conduct business under Chapter 11 protection for two and one-half years. In light of the amount of business transacted by DAK during the preference period and the years that followed, as well as DAK's ability to pay its operating expensing during the same period, this finding was not erroneous."); Diamond v. Osborne, 102 Fed. Appx. 544, 548 (9th Cir. 2004) (company was to be evaluated as a going concern in a preference case where corporation "continued to operate for twenty months after the first transfer in January 1996, and for five months after the last transfer on September 3, 1996; and that during the transfer period ADF had substantial cash flow and over one hundred employees").

40. Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 791 n.60 (Del Ch. 2004).

41. The timeless words of one judge state the situation well:

> The effort [in such valuations] is to find out not what a real buyer and a real seller, under the conditions actually surrounding them, do, but what a purely imaginary buyer will pay a make

the purpose of the solvency test: to prevent gratuitous asset transfers by firms that are to the detriment of creditors. Where a firm actually is operating, it does not make sense to let a going concern insolvent firm make gratuitous asset transfers simply because the firm is liquidation solvent. That is, if liquidation is optimal—in the sense that the firm might even be solvent if liquidated but insolvent if allowed to continue—but the firm chooses not to liquidate, it does not make sense to credit the firm with a higher liquidation value it chooses not to seize for the benefit of its creditors.

If the entity's condition on the test date warrants a liquidation assumption, then that same condition will define the *speed* with which such a hypothetical liquidation takes place. Because the sales price of an asset generally increases when additional time is spent marketing the asset,[42] courts usually avoid assuming that assets are liquidated in fire sale auctions presumably on the assumption that they are never value-maximizing.[43] In *In re Trans World Airlines, Inc.*,[44] for example, the Third Circuit Court of Appeals upheld the finding that 12 to 18 months was a "reasonable" time period over which to assume the sale of an airline's assets:

> The reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. [The 12 to 18 month time frame for TWA's assets] satisfies the requirement of a fair valuation because it identifies, as best it can, the equilibrium point between the two competing concerns of creditors: the desire to maximize the dollar figure from the assets to be sold, and the desire to have the assets sold off quickly to satisfy creditors' claims sooner rather than later.[45]

> believe seller, under conditions which do not exist. You are forced to wonder what would have happened if everything had been different from what it was. It is not easy to guess what will take place in Wonderland, as other people than Lewis Carroll's heroine have found out.

McGill v. Commercial Credit Co., 243 Fed. 637, 647 (D. Md. 1917).

42. *See* generally Steven A. Lippman & John J. McCall, *An Operational Measure of Liquidity*, 76 Am. Econ. Rev. 43 (Mar. 1986). Of course, courts tend to use the language of lawyers, not economists. *See In re F & S Cent. Mfg. Corp.*, 53 B.R. at 849 ("Fair value is determined by estimating what the debtor's assets would realize if sold in a *prudent* manner in current market conditions.") (emphasis added); *Briden v. Foley*, 776 F.2d at 382 (asset valuation need not be exact but should be reduced by value of assets not readily susceptible to liquidation and payment of debts).

43. *In re Taxman Clothing Co., Inc.* 905 F.2d 166 (7th Cir. 1990) presents a leading example (and explanation) of this approach. The primary issue involved the proper valuation of a clothing company's inventory. The inventory was liquidated at auction for $110,000, but evidence suggested that its going concern value net of selling expenses was $215,000. Choosing the latter value for solvency purposes, the court found that the proper value of the inventory was the profit that could be obtained through sale in the usual course of business. *Id.* at 170–71.

44. Travellers Int'l AG v. Trans World Airlines, Inc. (*In re* Trans World Airlines, Inc.), 134 F.3d 188 (3d Cir.), *cert. denied*, 523 U.S. 1138 (1998).

45. *Id.* at 195. Courts sometimes go to considerable lengths to justify the going concern assumption. Atlanta Knitting Mills v. Nathanson Bros. Co. (*In re* Nathanson Bros. Co.), 64 F.2d 912 (6th Cir. 1933) provides a particularly vivid illustration of the lengths to which a court will go to maintain the going concern assumption:

> The evidence clearly establishes, we think, that prior to the appointment of the receiver [Nathanson Bros.] was confronted with a practical collapse of its lines of credit necessary for the operation

Where circumstances dictate, however, courts will allow the assumption of a fairly quick and harsh liquidation.[46]

> It is well-settled that if a company is only nominally extant, to treat it as a going concern would be misleading and would fictionalize the company's true financial condition. 'Liquidation value is appropriate if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic.'[47]

Interestingly, however, the value of the firm's assets are defined by some measure of the *present value* of its future cash flows while the firm's debts are valued at *face value*. Debts must be valued at face value for the solvency test to have any meaning at all:

> If holders of claims are fully informed of the debtor's affairs and the asset values are less than the face amount of the claims, they would never value their claims at more than the value of the assets. Likewise, the fully informed debtor would never be willing to pay claimants more than claimants would be willing to take. Thus, the value of the claims would never exceed the value of the assets and insolvency could never occur. If [debts were valued at market value], insolvency could never occur, which is an absurd result.[48]

It is possible that the firm's expected cash flows will be enough to pay the firm's maturing debt obligations but the *present value* of those cash flows is less than the undiscounted *face amount* of the debt. Consider the following example: a firm that will be in business one year. It has $100 face amount of debt that must be repaid

---

> of the business. Like many other companies during the same period, it could not borrow except on the assignment of accounts receivable and trade acceptances at ruinous rates of discount. However, the business had not been discontinued, and the receiver was authorized to continue it.... We do not think that the financial outlook of the debtor corporation, or the intention of its stockholders and directors to continue business or to liquidate at an early date, is determinative of the question. If the business is in fact being conducted at the time of alleged bankruptcy, then the items of property constituting its assets must receive a fair valuation, not as isolated articles separated from the whole, but as parts of the whole and as useful in that relationship. This is all that is meant by going concern value.

*Id.* at 913.

46. Schwinn Plan Committee v. AFS Cycle & Co., Ltd. (*In re* Schwinn Bicycle Co.), 192 B.R. 477, 487 (Bankr. N.D. Ill. 1996) (finding that Schwinn "was not financially viable, was in severe financial distress and was on its 'deathbed' when it filed for bankruptcy and during the prior ninety days"); WRT Creditors Liquidation Trust v. WRT Bankruptcy Litig. Master File (*In re* WRT Energy Corp.), 282 B.R. 343, 369 (Bankr. W.D. La. 2001) ("A liquidation analysis is used to determine 'fair valuation' of assets where the debtor is 'financially dead or mortally wounded.' Liquidation or scrap value of assets must be used because, if the entity is not a going concern at the time of the transfer, 'it would not be proper for the assets to be valued at a going concern value.'") (quoting Langham, Langston & Burnett v. Blanchard, 246 F.2d 529, 532–33 (5th Cir. 1957)).

47. Gillman v. Scientific Research Prods. Inc. of Delaware (*In re* Mama D'Angelo, Inc.), 55 F.3d 552, 555–56 (10th Cir. 1995) (quoting *In re* Vadnais Supply, Inc., 100 B.R. 127, 131 (Bankr. D. Mass. 1989)) (citations omitted).

48. Hanna v. Crenshaw (*In re* ORBCOMM Global L.P.), Adv. No. 02-1914 (MFW), 2003 Bankr. LEXIS 759, *8 (Bankr. D. Del. June 12, 2003) (quoting *In re* Transworld Airlines, Inc., 134 F.3d 188, 197 n.7 (3d Cir. 1998)).

at the end of the year along with $5 of interest. It has no cash or other assets on hand except a project that will generate end of year, one-time, and certain cash flow of $108. After repaying its debt, the firm will pay a dividend of $3 and close its doors. The firm is solvent under the ability-to-pay test. However, suppose that the interest rate necessary to reflect the time value of money is 10%. Then the discount factor—1 divided by 1.10—is approximately 0.91. The present value of $108 (the amount available to pay the debt before the dividend payment is made) is therefore $108 x 0.91 = $98.28, which is less than the $100 face value of debt meaning the firm is balance-sheet insolvent even though it has the ability to pay its debts as they come due.

How can this be? The problem is that there is an important difference between the amount of future cash flows and their present value. Present value must take into account the time value of money and discounts for risk. Here, the future cash flow is high enough to pay the debt at the maturity date but the discount rate makes that future cash flow worth less than the undiscounted face amount of the debt today. There are two disconnects between the value of assets and the face amount of debt. The first disconnect is time. Comparing the present value of anything to the future value of anything else is bound to lead to trouble; it is an apples to oranges comparison. The second disconnect is the possible additional discounting for risk. Firms pay their debts with actual cash flows, not cash flows discounted to reflect their present value given the time to their occurrence and the possible risk that the cash flow will not be realized. The balance-sheet test, while perhaps the most intuitive of solvency tests, is thus plainly imperfect.

## C. The Capital-Adequacy Solvency Test

A capital-adequacy solvency test, while less precisely defined in the law, essentially asks whether the firm is *unlikely* to become insolvent—under the balance-sheet test or the ability-to-pay test. Courts sometimes describe capital inadequacy as something connoting "a condition of financial debility short of insolvency (in either the bankruptcy or equity sense) but which makes insolvency reasonably foreseeable. In other words, a transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency...."[49] Inadequate capital "encompasses difficulties which are short of

---

49. Brandt v. Hicks, Muse & Co., Inc. (*In re* Healthco Intern., Inc.), 208 B.R. 288, 302 (Bankr. D. Mass. 1997) (citing Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1073 (3d Cir. 1992)); *Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d at 1070 ("Viewed in this light, an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency."); *see also* Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind. L. Rev. 469 (1988).

insolvency in any sense but are likely to lead to insolvency at some time in the future."[50]

Financial projections are especially important in evaluating capital adequacy.[51] The financial projections should demonstrate that the firm has an ability to withstand a reasonable range of business and economic fluctuations.[52] "Moreover, the test for unreasonably small 'capital' should include...all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period."[53] However, "[w]hile a company must be adequately capitalized, it does not need resources sufficient to withstand any and all setbacks."[54] Unfortunately, there is no clear answer to the question, "how much 'capital' is enough"? The question requires a normative judgment regarding the probability of insolvency that a given entity (and its creditors) should be forced to bear. This judgment in turn may depend on several factors including the degree of information asymmetry between debtor and lender or regulatory goals.

Capital adequacy can be defined in terms of either the ability-to-pay test or the balance-sheet test, and for the balance-sheet test in either going-concern or liquidation terms. This simply requires us to add a measure of the variability of key items like future cash flows and liquidation values and to set some level of excessive risk. In that case, the firm has adequate capital if it can withstand enough variability to the bad side and still remain solvent. Capital-adequacy tests ask simply whether a firm can withstand some perturbation to the bad side and still remain solvent.

---

50. Vadnais Lumber Supply, Inc. v. Byrne *(In re* Vadnais Lumber Supply, Inc.), 100 B.R. 127, 137 (Bankr. D. Mass. 1989) (citations omitted); *see also* Salisbury v. Tex. Commerce Bank-Houston, N.A. *(In re* WCC Holding Corp.), 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994) ("Unreasonably small assets signifies an inability to generate enough cash flow from operations and the sale of assets to remain financially stable."); Murphy v. Meritor Sav. Bank *(In re* O'Day Corp.), 126 B.R. 370, 407 (Bankr. D. Mass. 1991) ("Unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency. . . .") (internal quotations omitted).

51. *See, e.g.,* MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("In order to determine the adequacy of capital, a court will look to such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue.") (citations omitted); *In re WRT Energy Corp.,* 282 B.R. at 411 ("In determining unreasonably small capital, courts generally examine cash flow, focusing on whether the debtor was left in a position in which it was unable after the transfer to generate sufficient profits to sustain operations. The test is whether the unreasonably small capital condition and consequent cash flow problems were reasonably foreseeable when viewed objectively at the time of the transaction at issue.") (citation omitted); Garrick A. Hollander, *Defining 'Unreasonably Small Capital' in Fraudulent Conveyance Cases: Ratio Analysis May Provide An Answer,* 49 Bus. Law. 1185 (1994).

52. *See, e.g.,* Moody, 971 F.2d at 1073 ("To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.").

53. *Id.* at 1072 n.24. *See also id.* at 1073 ("Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses. . . ."). On the optimism of managerial perceptions of the firm's prospects, see J.B. Heaton, *Managerial Optimism and Corporate Finance,* 31 Fin. Mgmt. 33 (Summer 2002).

54. MFS/*Sun Life,* 910 F. Supp. at 944 (citations and quotations omitted).

### III. The Relation Among Ability-to-Pay Solvency, Balance-Sheet Solvency (Going-Concern and Liquidation), and Capital Adequacy

By far the most confusing thing about solvency tests is the fact that different solvency tests can indicate that the same firm is both solvent and insolvent. Most of this confusion goes away when it is acknowledged that ability-to-pay and balance-sheet solvency tests measure different things about the firm.[55] Getting comfortable with these potential inconsistencies is the key to a better understanding of solvency tests as applied in bankruptcy and corporate law.

#### A. Ability-to-Pay Solvency Does Not Imply Going-Concern Balance-Sheet Solvency, Liquidation Balance-Sheet Solvency, or Any Form of Capital Adequacy

##### 1. Ability-to-Pay Solvency Does Not Imply Going-Concern Balance-Sheet Solvency

In general, the ability to pay debts as they come due does not imply that the firm is solvent based upon a going-concern balance-sheet approach. The ability-to-pay solvency test asks simply whether cash flow can be matched to the face value of the maturing debt obligations *in the period that the debt obligation matures*. There is, in essence, no impact of the time value of money, nor are cash flows in a given period reduced in value because of the risk characteristics that investors might attach to them. The test simply is whether cash is likely (where the likelihood necessary to pass the test is of course open to debate) to be sufficient to pay the face value of the debts when they mature.

By contrast, the going-concern balance-sheet test involves *valuation*. Valuation requires both that future cash flows be discounted to present value to reflect a time value of money and that future cash flows be reduced to reflect the value that these risky cash flows have to an investor who might otherwise invest in a risk-free asset. Thus the value of the firm as a going concern reflects future cash flows that are reduced for both the time value of money and risk.[56] It is obvious, then, that the cash flow of a firm which might in *future periods* match maturing debt obligations could nevertheless be reduced to a sufficient degree (to reflect the time value of money and risk) such that the value of the firm will be below the face value of its debt.

Thus, a firm that has the ability to pay its debts in all future periods under the ability-to-pay solvency test may still be deemed insolvent under the going-concern

---

55. Even leading cases seem to miss this point, suggesting instead that different solvency tests measure the same thing. *See, e.g.,* Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 789 (Del. Ch. 1992) ("An entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business. Webster's Ninth New Collegiate Dictionary 626 (1988). That is, an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held."). "That is" suggested that the ability-to-pay test and the balance-sheet test are equivalent. As we shall see below, they are not.

56. *See generally* Tom Copeland, Tim Koller & Jack Murrin, Valuation: Measuring and Managing the Value of Companies (3d ed. 2000).

balance-sheet test. This highlights a little understood problem with going-concern balance-sheet solvency tests. The going-concern balance-sheet solvency test mixes the ability of a firm to pay its debt obligations—the paramount concern of a solvency test—with the value that a particular firm has at a particular point in time given the current price of risk and the time value of money. There may be no good reason to prevent a firm from taking an action that might gratuitously make it going-concern balance-sheet insolvent, provided that it remains able to pay its debts as they come due under the ability-to-pay solvency test.

### 2. Ability-to-Pay Solvency Does Not Imply Liquidation Balance-Sheet Solvency

Perhaps more obviously than with going-concern balance-sheet solvency, ability-to-pay solvency does not imply liquidation balance-sheet solvency. First, of course, one possible liquidation value for the firm's assets is its going-concern value. As has just been shown, the going-concern value of the firm's assets can be below the face value of its debts even when the firm has the ability to pay its debts as they mature. To the extent that liquidation value may be equivalent to going-concern value, ability-to-pay solvency does not imply liquidation balance-sheet solvency either.

Second, liquidation values in particular industries may be low during times when firms are temporarily cash constrained. That is, because the highest valuing buyers of the firm's assets in liquidation may be other firms in its industry, and because industries may experience downturns or credit constraints at the same time, liquidation values may be temporarily low even for a firm that may otherwise expect to pay its debts as they come due. When industries are in recession, large potential gains are available to those who would purchase those assets at distressed prices and sell them when the industry recovers. This effect should drive prices up, but those in a position to detect and/or exploit such bargains are those with the specialized industry knowledge who are, by definition, in a poor position to purchase the assets because of the industry downturn. Thus, prices can remain low in equilibrium, because those with money to buy lack the knowledge to detect the (existing) good buying opportunities. Indeed, any sale-based solvency test will bias toward insolvency if assets are already in the hands of their highest valuing users.[57] Any restriction on the marketability of the firm's assets can also have a large effect on liquidation value.[58]

### 3. Ability-to-Pay Solvency Does Not Imply Capital Adequacy Under Any Test

Because ability-to-pay solvency does not imply either going-concern balance-sheet solvency or liquidation balance-sheet solvency, ability-to-pay solvency nec-

---

57. *See* Andrei Shleifer & Robert W. Vishny, *Liquidation Values and Debt Capacity: A Market Equilibrium Approach*, 47 J. Fin. 1343 (Sept. 1992).

58. *See, e.g.,* Francis A. Longstaff, *How Much Can Marketability Affect Security Values?*, 50 J. Fin. 1767 (Dec. 1995).

essarily cannot imply capital adequacy whether the capital adequacy is for ability-to-pay or balance-sheet solvency. Capital adequacy is a *stricter* test, whether framed in going-concern balance-sheet or liquidation balance-sheet terms. Similarly, ability-to-pay solvency does not imply capital adequacy under the ability-to-pay capital-adequacy test. A firm might have the ability to pay debts as they come due but only barely so. Such a firm can have inadequate capital—judged from the perspective of the ability-to-pay solvency test—even though it is ability-to-pay solvent.[59]

## B.  GOING-CONCERN BALANCE-SHEET SOLVENCY DOES NOT IMPLY ABILITY-TO-PAY SOLVENCY, LIQUIDATION BALANCE-SHEET SOLVENCY, OR CAPITAL ADEQUACY UNDER ANY TEST

### 1.  Going-Concern Balance-Sheet Solvency Does Not Imply Ability-to-Pay Solvency

Ability-to-pay solvency requires that the firm be able to match cash in a particular period with the amount of debt maturing in that period. A going-concern balance-sheet solvency test, however, requires only that the *discounted sum of future expected cash flows exceed the sum or total amount of debt at face value.* For example, a firm that requires heavy investment in its early-to-intermediate term but which generates cash flows in only the long-term (consider, for example, biotechnology companies that must invest in research and development for long periods of time looking for marketable products) might have a substantial going concern value but no ability to pay debts as they come due.

Put simply, a going-concern balance-sheet solvency test does not concern itself with the possible mismatch between cash flows that make up the discounted sum and cash flows that must be paid to meet maturing debt obligations. This can hide a liquidity problem. That is, a firm may be going-concern balance-sheet solvent but still unable to turn its going concern value into cash as needed at particular points in time to pay a particular debts as they mature. Here again is a problem with going-concern balance-sheet solvency. It can be disconnected from what creditors care most about: getting their debts paid at the contracted amounts on the contracted dates. A firm that was allowed to make a gratuitous asset transfer that left it with a solvent going-concern balance sheet but was then unable to pay its debts as they came due would clearly make creditors even worse off. This will be discussed in detail later, but for now the important thing is to realize the going-concern balance-sheet solvency test does not imply ability-to-pay solvency if the going concern value is illiquid.[60]

---

59. *See* Lee B. Shepard, Note, *Beyond* Moody: *A Re-Examination of Unreasonably Small Capital,* 57 HASTINGS L.J. 891, 895 (2006) ("[I]f a company's projected future cash flow were just enough to pay its debts as they came due and no more, it would be equitably solvent and pass the cash flow test. In either case, the company's creditors would be exposed to a high, and arguably unreasonable, degree of risk. Although some companies left in this condition may prosper and pay its creditors, most will be 'doomed to failure.' Involuntary creditors of such companies are unprotected against the slightest adverse development, foreseen or unforeseen.").

60. For an interesting case study in the interaction between balance-sheet solvency and ability-to-pay insolvency, see Harry DeAngelo, Linda DeAngelo & Stuart C. Gilson, *The Collapse of First Executive*

### 2. Going-Concern Balance-Sheet Solvency Does Not Imply Liquidation Balance-Sheet Solvency

As has been demonstrated, in discussing the ability-to-pay solvency test, going-concern balance-sheet solvency does not necessarily imply liquidation balance-sheet solvency.[61] When asset values are depressed in a particular industry, it may be impossible to sell the going concern value of a firm because the highest valuing users of the firm's assets are likely to be those in the firm's same industry who are unable to pay for the assets because their own fortunes have been affected as well. Of course, this circumstance need not be the case. Vast amounts of money are invested by private equity firms and similar investment funds willing to buy and hold depressed assets, waiting to sell the assets when industry fortunes improve.[62] In general, however, a firm may have a high going-concern balance-sheet value because it has high discounted expected cash flows even while it would be unable to find a buyer for that going-concern value. Indeed, if the firm is already managed by its highest capability manager who might not continue managing were the firm purchased, liquidation value may remain strictly below the current going-concern value simply because the going-concern value in the hands of the purchaser will necessarily be lower than going-concern value in the hands of the current owner, the highest valuing user.

### 3. Going-Concern Balance-Sheet Solvency Does Not Imply Capital Adequacy Under Any Test

Going-concern balance-sheet solvency does not imply capital adequacy under any capital-adequacy test. A firm may be going-concern balance-sheet solvent but only barely so,[63] and thus will not have capital adequacy under a going-concern balance-sheet based capital-adequacy test. Further, because going-concern balance-sheet solvency does not imply ability-to-pay solvency, it immediately follows that going-concern balance-sheet solvency does not imply the stricter condition of ability-to-pay based capital adequacy. The same is true for capital adequacy based on liquidation balance-sheet solvency. Going-concern balance-sheet solvency does not imply liquidation balance-sheet solvency, and therefore cannot imply the stricter condition of liquidation balance-sheet based capital adequacy.

---

*Corporation: Junk Bonds, Adverse Publicity, and the "Run On the Bank" Phenomenon,* 36 J. Fin. Econ. 287 (1994).

61. *See supra* notes 55–60 and accompanying text.

62. *See, e.g.,* Karen Richardson and Serena Ng, *Why Flush Financiers Court Unloved Businesses,* Wall St. J., April 9, 2007, at C1 ("While financiers are betting they can outsmart the public markets by taking on their rejects, the success of these long-shot turnarounds relies on revived interest by public shareholders.").

63. *See* Shepard, *supra* note 59, at 894–95 ("Fraudulent conveyance laws would not be effective if they only applied to debtors rendered insolvent by asset transfers. If so, a company could transfer just enough assets to leave it barely solvent. For example, if a company's assets exceeded its liabilities by $1.00, it would be deemed balance sheet solvent and pass the balance sheet test.").

C. Liquidation Balance-Sheet Solvency Does Not Imply Ability-to-Pay Solvency, Going-Concern Balance-Sheet Solvency, or Capital Adequacy Under Any Test

### 1. Liquidation Balance-Sheet Solvency Does Not imply Ability-to-Pay Solvency

In general, liquidation balance-sheet solvency does not imply ability-to-pay solvency. But it is useful to consider a special case where it does. Consider the case where all the firm's obligations have zero interest rates so that the face value on the firm's balance sheet captures the full value of the firm's future debt obligations. In that particular case liquidation balance-sheet solvency implies ability-to-pay solvency. If the firm's assets can be converted to cash in an amount today that exceeds the face value of its debt, then it follows that the firm can pay those debts as they come due, because at a minimum the firm could simply sell the assets, hold the cash, and pay the face amount of debt as it matures.

Of course, a simplifying fact has been assumed, i.e., that the contracted rate of interest is also a debt obligation and matures on the date interest is due and which may not (and under current accounting rules, will not) appear on the balance sheet as debt. If interest payments on the firm's debt obligations are high enough, then it is possible that the liquidation value of the firm's assets will exceed the face value of debt but the firm will be unable to cover both the face amount of the debt and the large interest payments.[64]

In general, however, the problem is that unless the firm actually does seize on the high liquidation value and hold the cash proceeds to pay off debts as they come due, the implied ability-to-pay solvency may be fleeting. Liquidation values change through time. A firm may have the ability to liquidate its assets today for an amount that would be sufficient to pay its debts as they came due in the future, that does not seize on high liquidation values today it may no longer have that opportunity tomorrow.

Because the ability-to-pay solvency test requires that one look ahead to future time periods, variations in future liquidation values must be simultaneously considered. Unless the liquidation value will be sufficiently high in every period to allow the firm to liquidate its assets and pay off its remaining debts, then liquidation balance-sheet solvency will not imply ability-to-pay solvency. This consideration may explain why the law requires going concern valuation until the firm is on its deathbed; it is unwise to give a firm the benefit of a (potentially temporarily) high liquidation value where the firm does not, in fact, seize that value through liquidation.

### 2. Liquidation Balance-Sheet Solvency Does Not Imply Going-Concern Balance-Sheet Solvency

Liquidation values are typically viewed as being less than going concern values. But liquidation values need not be lower than going concern values. Any

---

64. This, of course, also requires that the firm cannot "call" the debt.

firm whose assets are worth more if owned and operated by other users is a firm whose liquidation value will exceed its going concern value. A going-concern balance-sheet test values assets based on some measure of cash flow to their current user. These two valuations need not lead to the same answer and therefore a firm that is liquidation balance-sheet solvent may be going-concern balance-sheet insolvent.

### 3. Liquidation Balance-Sheet Solvency Does Not Imply Capital Adequacy

For similar reasons as described above, liquidation balance-sheet solvency does not imply capital adequacy under any capital-adequacy test. First, of course, the firm may be liquidation balance-sheet solvent but only barely so, and thus could not withstand even a small perturbation of liquidation value. This means that the firm may be liquidation balance-sheet solvent and not solvent under a liquidation balance-sheet-based capital-adequacy solvency test.

Second, because a firm may be liquidation balance-sheet solvent but insolvent under either a going-concern balance-sheet solvency test or an ability-to-pay solvency test, it necessarily follows that the firm may be liquidation balance-sheet solvent but insolvent under either a going-concern balance-sheet-based capital-adequacy test or ability-to-pay-based capital-adequacy test.

### D. Capital Adequacy Implies Solvency Under the Test on Which It Is Based But Does Not Imply Solvency or Capital Adequacy Under Any Other Test

Capital adequacy under the test on which it is based will always imply solvency under that particular solvency test, because capital adequacy is simply a requirement that the firm be a little more than solvent under that particular test. For the reasons described above, however, capital adequacy under that particular test will not imply solvency or capital adequacy of any other sort. For example, if a firm has adequate capital under an ability-to-pay-based capital-adequacy test, then that implies ability-to-pay solvency because capital adequacy is a stricter test. That is, the firm must be more than solvent under the ability-to-pay solvency test to have adequate capital under an ability-to-pay-based capital-adequacy test.

However, because solvency under one test does not imply solvency under another (and so necessarily does not imply capital adequacy under a capital-adequacy test based on that solvency test), capital adequacy based on that test also does not imply solvency or capital adequacy under any other test. For example, because ability-to-pay solvency does not imply solvency under any other test, and necessarily does not imply capital adequacy under a capital-adequacy test based on that other solvency test, it is also true that ability-to-pay-based capital adequacy does not imply solvency or capital adequacy under either a going-concern or liquidation balance-sheet-based test.

## IV. The Optimal Solvency Test (and Its Limitations)

### A. Ability-to-Pay Solvency Matters Most to Creditors

This Article has demonstrated that there are many ways that solvency tests may give inconsistent diagnoses of solvency. This circumstance is troubling, because laws invoking solvency tests nearly always invoke more than one version. For example, both federal and state fraudulent conveyance laws invoke all three solvency tests and consider the firm to be insolvent for purposes of the fraudulent transfer when it fails any one of them.[65] Even where the law uses only a balance-sheet test—as is the case in federal preference law[66]—there have been two versions of that test the going-concern and liquidation balance-sheet tests, that can give different indications of solvency.[67] Is there a better way to test for solvency? Is it necessary to have this many solvency tests to address the problem that solvency testing seems generally designed to solve: preventing value destroying behavior by those in control of the firm's assets to the detriment of the firm's creditors where the possibility of such behavior will destroy debt capacity?

When one looks at the individual solvency tests—the ability-to-pay solvency test, the going-concern balance-sheet solvency test, the liquidation balance-sheet solvency test, and the various capital-adequacy tests—the answer appears almost obvious, at least from the perspective of maximizing debt capacity. The ability-to-pay solvency test is the "best" or "optimal" solvency test. The ability-to-pay solvency test addresses head on what creditors care most about: the likelihood that the firm will have the cash available to pay debts as they mature at the contracted dates in the contracted amounts. The ability-to-pay capital-adequacy test is, of course, almost the fraternal twin of the ability-to-pay solvency test: a little more severe, not quite identical, but essentially the same test with a slightly higher hurdle.

The remaining tests are suboptimal compared to the ability-to-pay solvency test because they lose information that is important to a creditor while replacing it with information that is less important. Consider first how the other solvency tests lose information that is important to a creditor. A creditor cares most that the firm will have the cash it owes at the time and in the amounts that it has contracted for repayment. This is the simple beauty of the ability-to-pay solvency test which asks only if there is a sufficiently high likelihood that the firm will be able to generate that cash on the dates and the amounts that it has promised to pay.

But whether one looks at the going-concern balance-sheet solvency test or the liquidation balance-sheet solvency test, that information is lost. As has been demonstrated, a firm may be going-concern balance-sheet solvent when it does not have the ability to pay debts as they come due. Recall that this situation may occur

---

65. *See supra* notes 24–54 and accompanying text.

66. *See, e.g.,* 11 U.S.C.A. § 547(b) (West 2004 & Supp. 2007) (employing bankruptcy code's definition of "insolvent," defined in 11 U.S.C.A. § 101(32) (West 2004 & Supp. 2007) to be the "condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation").

67. *See supra* notes 37–48 and accompanying text.

when the firm has cash flows that are mismatched with maturing debt obligations and where the firm does not have the ability to turn going-concern solvency into cash at the times it needs to pay its debts, that is, the going-concern solvency margin is not sufficiently liquid to allow the firm to pay its debts as they mature. But the liquidity of the going-concern solvency margin is a *critical* piece of information for a creditor. A creditor cares primarily about the firm's ability to match cash flows and maturing debt obligations in a time consistent manner that matches cash flows to the creditor's expectations of repayment.

The same information is lost in a liquidation balance-sheet solvency test. For example, a firm may be insolvent under a liquidation balance-sheet solvency test simply because liquidation values are temporarily depressed in the firm's industry. At the same time, however, the firm may still be reasonably expected to generate sufficient cash flow with a sufficiently high likelihood that the firm has the ability to pay its debts as they come due. Again, it is the latter and not the former about which the creditor cares most. The liquidation balance-sheet solvency test may indicate insolvency, but it does so by abstracting from the firm's ability to generate cash flow when that cash is needed to pay the firm's debt obligations, the information that the creditor cares most about. The same is obviously true for both capital-adequacy tests (that is, the going-concern balance-sheet-based and liquidation balance-sheet-based capital-adequacy tests) for the same reasons.

Consider next the lower relevance of the information that the going-concern balance-sheet test and liquidation balance-sheet test give to the creditor in exchange for taking away information about the time consistency of cash flows and maturing debt obligations. A firm may be going-concern balance-sheet insolvent because the necessary adjustments for time value of money and risk reduce the present value of the firm's future cash flows to an amount that is below the face value of its debt. But again this information does not tell the creditor what it needs to know: regardless of the time value and risk-adjusted "present value" of those cash flows, are those cash flows nonetheless sufficiently high with sufficiently high likelihood to meet the firm's obligations under the debt contract? That is, information about valuation (given the current prices of time value and risk in the financial markets) is far less relevant to a creditor than the basic information (unavailable in a going-concern balance-sheet test alone) of whether the firm can match cash flows to maturing debt obligations when it has the obligation to do so.

The same problems apply to the liquidation balance-sheet solvency test. A high current liquidation value is of no solace to a creditor if the firm does not intend to liquidate at the present liquidation value and otherwise is not reasonably expected to pay its debts as they come due. In general, liquidation values will vary over time. Holding constant the firm's inability to pay its debts as they come due, a decline in liquidation value will leave the creditor no better off and probably worse. Here again the liquidation balance-sheet solvency test gives a creditor information that is far less relevant to it than information about the firm's ability to pay its debts as they come due. Liquidation balance-sheet solvency is of little comfort to a creditor with no power to force liquidation (and debt repayment) and who otherwise cannot expect the firm to pay its debts as they come due.

## B. The Value of Multiple Solvency Tests

As has been shown, there are good reasons to deemphasize balance-sheet solvency tests (and corresponding balance-sheet-based capital-adequacy tests) in favor of a much stronger emphasis on the ability-to-pay solvency test. Nevertheless, solvency-test-invoking laws such as fraudulent transfer law essentially deem the firm insolvent any time it fails any one of the tests. How can the overabundance of applied solvency tests be justified when there are good arguments for the use of a single solvency test—the ability-to-pay solvency test—and a single capital-adequacy test—an ability-to-pay solvency-based capital-adequacy test?

Consider what is assumed when one confidently asserts that a creditor could make do with the ability-to-pay solvency test. First, it is implicitly assumed that it is not too difficult to discern the likelihood of future cash flows, even if those cash flows are quite distant in time from the solvency determination date. In fact, however, cash flow projection can be difficult at best and speculative at worst. Empirical evidence on the accuracy of cash flow projections in contexts relevant for solvency testing is not encouraging.[68]

Second, it is assumed that a creditor gains little useful information from a diagnosis of balance-sheet insolvency (whether going-concern or liquidation-based). In fact, there may be considerable useful information in a diagnosis of balance-sheet insolvency even apart from knowledge of ability-to-pay insolvency. Liquidation balance-sheet insolvency has a particular advantage over ability-to-pay solvency tests and going-concern balance-sheet solvency tests when it is based on current market information about liquidation values that is less dependent on particular projections of distant cash flows than are the ability-to-pay solvency test and a going-concern balance-sheet solvency test. To the extent that tools for solvency testing are crude and potentially inaccurate, there may be little confidence in resulting solvency diagnoses.[69] Given the difficulty of cash flow projection, the availability of market prices can be incrementally informative.

Of course, because of measurement error (misestimating cash flows, discount factors, and liquidation values), any of the three non-capital-adequacy solvency tests can give an incorrect diagnosis of insolvency, that is, a given solvency test might correctly classify a firm as solvent when it is in fact solvent, or insolvent when it is in fact insolvent, but it may also give an incorrect measurement: indicating insolvency

---

68. Evidence of upward biased cash flow forecasts abounds in contexts important for solvency testing. Steven N. Kaplan and Richard S. Ruback, *The Valuation of Cash Flow Forecasts: An Empirical Analysis,* 50 J. Fin. 1059 (Sept. 1995) (finding statistically significant upward bias of both operating income and operating margins in connection with leveraged buyouts and recapitalizations); Steven N. Kaplan, *The Effects of Management Buyouts on Operating Performance and Value,* 24 J. Fin. Econ. 217 (1989) (same); Edith Shwalb Hotchkiss, *Postbankruptcy Performance and Management Turnover,* 50 J. Fin. 3 (Mar.1995) (finding statistically significant upward bias of forecasts for the performance of firms exiting bankruptcy).

69. *See, e.g.,* Stuart Gilson, Edith S. Hotchkiss & Richard S. Ruback, *Valuation of Bankrupt Firms,* 13 Rev. Fin. Stud. 43 (2000) (finding very large valuation errors in their study of discounted cash flow methods in bankruptcy); Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573, 577 (1st Cir. 1980) ("The determination of the 'fair valuation' of the debtor's assets at a specific time is at best an inexact science, and may often be impossible.").

when the firm is in fact solvent (a false positive for insolvency) or solvency when the firm is insolvent (a false negative for insolvency).

It is much better, in terms of maximizing debt capacity, to mistakenly conclude that a firm is insolvent than to mistakenly conclude that a firm is solvent. If multiple solvency tests are available that are less than perfectly correlated in their measurement error, then it is better to use multiple solvency tests and to pronounce a firm insolvent when any one of those tests indicates insolvency. The costs of preventing gratuitous asset transfers are low for firms that are nearly insolvent (as firms are likely to be those which fail any one of the tests), because they likely have less asset value to waste in the first place. By adding the plausible assumption that the probability of false positives decreases across all candidate tests the further from insolvency the firm is, an interesting result emerges: It may be best to employ several, potentially conflicting solvency tests (including capital-adequacy tests, which are essentially just "perturbations" of other solvency tests), and to prevent gratuitous asset transfers when *any* of these tests is violated.

## CONCLUSION

This Article sorts out some of the confusion that surrounds solvency tests. It explains the basic economic function of solvency tests in bankruptcy and corporate law, the relations among the three dominant solvency tests—the ability-to-pay test, the balance-sheet test, and the capital-adequacy test—and explains why the diagnosis of insolvency can differ depending upon the solvency test that is applied. Although one of these tests—the ability-to-pay test—appears superior, it may suffer from significant measurement error in practice. Because the costs of failing to detect insolvency when it exists exceed the costs of detecting insolvency when it does not exist, applying multiple solvency tests might be beneficial even though they may give conflicting indications of insolvency.

# EXHIBIT 44

CONFIDENTIAL



# Rating Agency Presentation

March 2014

STRICTLY PRIVATE AND CONFIDENTIAL

CITI-DE-0001793

CONFIDENTIAL

Disclaimer

# SPECIAL NOTICE REGARDING MATERIAL NON-PUBLIC INFORMATION

**THIS DOCUMENT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE TARGET OR THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.**

**BY ACCEPTING THIS DOCUMENT, THE RECIPIENT AGREES TO USE AND MAINTAIN ANY SUCH INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE POLICIES, CONTRACTUAL OBLIGATIONS AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

## DISCLAIMER

J.P. Morgan is a marketing name for investment banking businesses of JPMorgan Chase & Co. and its subsidiaries worldwide. Securities, syndicated loan arranging, financial advisory and other investment banking activities are performed by J.P. Morgan Securities LLC and its securities affiliates, and lending, derivatives and other commercial banking activities are performed by JPMorgan Chase Bank and its banking affiliates.  J.P. Morgan deal team members may be employees of any of the foregoing entities.

CITI-DE-00019794



CONFIDENTIAL

# Presenters

| Presenters | Title | Company |
|---|---|---|
| Brock Hardaway | Chief Executive Officer | MILLENNIUM LABORATORIES |
| Howard Appel | President | MILLENNIUM LABORATORIES |
| Tim Kennedy | Chief Financial Officer | MILLENNIUM LABORATORIES |
| Daniel Pencak | VP of FP&A | MILLENNIUM LABORATORIES |
| Stathis Karanikolaidis | Managing Director | J.P.Morgan |
| Ryan Griswold | Vice President | J.P.Morgan |
| Alessandro Ferrara | Executive Director | J.P.Morgan |


MILLENNIUM LABORATORIES

CITI-DE-0001979S

CONFIDENTIAL | 2

CONFIDENTIAL

# Transaction overview

- Millennium Laboratories, Inc. ("Millennium" or the "Company") is the leader in medication monitoring and drug detection for clinicians, payors and patients

- The Company has achieved strong growth and demonstrated exceptional financial performance with Adjusted EBITDA growing at a 74% CAGR from 2009 to 2013

- Millennium is seeking to enter into a new Credit Facility to:
  - Refinance existing $304 million Term Loan A
  - Convert / take out $196 million TA debentures
  - Pay distribution to shareholders
  - Pay transaction related fees and expenses

- This transaction will include:

  - New $50 million Revolving Credit facility due in 2019

  - New $1,765 million Term Loan B facility due 2021

- At close, pro forma net senior secured leverage will be 4.54x and net total leverage will be 4.63x, based on 12/31/13 FY Adjusted EBITDA of $378.1 million

- The Company is requesting corporate and facility ratings by March 28th, 2014



# Transaction details

## Sources and Uses

| Sources | Amount ($mm) | Uses | Amount ($mm) |
|---|---|---|---|
| New R/C facility | $ - | Distribution to shareholders | $1,269.6 |
| New Term Loan B | 1,765.0 | Refinance Term Loan A | 304.0 |
| Balance sheet cash | 50.0 | Convert / take out TA debentures | 196.0 |
| | | Fees and expenses[1] | 45.4 |
| **Total** | **$1,815.0** | **Total** | **$1,815.0** |

## Pro Forma Capitalization

| ($mm) | Pro forma | xEBITDA[1] |
|---|---|---|
| Cash | $50.0 | |
| | | |
| $50mm R/C facility due 2019 | - | |
| New Term Loan B due 2021 | 1,765.0 | |
| **Total secured debt** | **$1,765.0** | **4.67x** |
| **Net secured debt** | **$1,715.0** | **4.54x** |
| Other debt [2] | 36.7 | |
| **Total debt** | **$1,801.7** | **4.77x** |
| **Net debt** | **$1,751.7** | **4.63x** |
| Adjusted EBITDA / Interest expense | | 8.55x |
| (EBITDA-capex) / Interest expense | | 8.10x |

[1] Based on FY13 12/31/2013 Adjusted EBITDA of $378.1mm
[2] Excludes ~$18mm related to company's facilities


MILLENNIUM LABORATORIES

CONFIDENTIAL | 4

CONFIDENTIAL

# Indicative terms – Sr. secured credit facilities

## Summary terms and conditions

| | |
|---|---|
| **Borrower:** | Millennium Laboratories, Inc. (the "Company" or "Borrower") |
| **Guarantors:** | Holdings and all material domestic subsidiaries |
| **Purpose:** | Refinance all existing indebtedness, convert / take out TA debentures, dividend distribution, and pay fees and expenses |
| **Facility size:** | • $50mm RC<br>• $1,765 mm TLB |
| **Tenor:** | • RC: 5 years<br>• TLB: 7 years |
| **Security:** | First lien on all tangible and intangible assets and stock of the Borrower and its domestic subsidiaries; 2/3 of the stock of foreign subsidiaries |
| **Covenants:** | • RC: total leverage covenant<br>• TLB: covenant-lite |
| **Incremental:** | • $175mm plus unlimited amounts as long as the pro forma Leverage Ratio does not exceed 4.50x |
| **Negative covenants:** | • Usual and customary for transactions of this type, including:<br>  – Limitations on indebtedness<br>  – Limitations on restricted payments and investments<br>  – Limitations on liens<br>  – Limitations on transaction with affiliates<br>  – Limitations on asset sales, mergers and consolidations and other fundamental changes<br>  – Limitations on restrictions on subsidiary dividends and other restrictive agreements<br>  – Restricted payments and investments covenants |
| **Mandatory prepayments:** | • Subject to customary curve out and baskets:<br>  – 100% of net cash proceeds from any non-ordinary course sales or distribution of assets<br>  – 100% of the net cash proceeds from issuance of debt by Holdings and its subsidiaries<br>  – 50% (with step downs to 25% and 0%) of annual Excess Cash Flow |



MILLENNIUM LABORATORIES

CITI-DE-00019798

# Timeline

| March 2014 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
|  |  |  |  |  |  | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | **18** | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | **28** | 29 |
| 30 | **31** |  |  |  |  |  |

| April 2014 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
|  |  | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | **10** | 11 | 12 |
| 13 | 14 | **15** | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |  |  |  |

▨ - denotes key transaction dates

| Date: | Event |
|---|---|
| March 18th | Meetings with Rating Agencies |
| March 28th | Receive ratings |
| March 31st | Lender meeting |
| April 10th | Commitments due |
| April 15th | Close and fund |



MILLENNIUM LABORATORIES

CONFIDENTIAL

CITI-DE-00019799

CONFIDENTIAL

# Agenda

| Section | Presenter |
| --- | --- |
| Executive summary | **Brock Hardaway,** Chief Executive Officer |
| Industry and company overview | **Brock Hardaway,** Chief Executive Officer |
| Key credit strengths | **Howard Appel,** President |
| Financial overview | **Timothy Kennedy,** Chief Financial Officer |
| Appendix | |



MILLENNIUM
LABORATORIES

CONFIDENTIAL | 7

CITI-DE-00019800

CONFIDENTIAL

# EXECUTIVE SUMMARY

CITI-DE-00019801

CONFIDENTIAL

# Improving the lives of people suffering from pain, addiction and other disorders

**Who we are**

The leader in the science of toxicology and pharmacogenetics

**What we do**

Transforming the way health care professionals monitor and manage their patients' medication therapy

**How we do it**

Advanced technology and analytic solutions supported by people, research, and education

**Enable personalized treatment to improve clinical outcomes and patient safety**


MILLENNIUM LABORATORIES

CITI-DE-00019802

# Company snapshot

**Business highlights**

- Leading market share with national presence in UDT space
- One of the leading PGT labs in the U.S.
- Analyzed/tested over 6.4 million specimens since 2008; Tested ~2.4 million specimens in 2013
- Recently added advanced analytics platform with RxAnte
- Volume, Revenue and EBITDA CAGRs of over 74% from 2009 to 2013

**Key offerings**

- Urine Drug Testing ("UDT") – testing for patient medication monitoring and adherence
- Oral Fluid Testing ("OFT") – testing for individuals unable to provide a urine sample
- Pharmacogenetic Testing ("PGT") – testing to determine how an individual will respond to a particular drug therapy which increases safety and efficacy for truly personalized medicine
- RxAnte - suite of advanced analytic tools & decision support

**Customers and Payors**

- Currently serve over 6,700 physician practices and growing
- 197 network contracts covering over 168 million lives
- Attractive payor mix
  - ~63% of volume is contracted (including Medicare, Medicaid and commercial plans)
- Over 8 million lives under management for RxAnte platform

**Organization and operations**

- Headquarters: San Diego, CA
- 207,000 square feet (7 buildings) campus with current lab with significant excess capacity
- 1,379 employees including a sales and service team of 550+ employees and 100+ scientists, PhDs and PharmDs
- Incredible culture and family atmosphere


MILLENNIUM LABORATORIES

CONFIDENTIAL

# Company history and milestones



**Quarterly Average Specimens Per Day**

10,537 (YTD-Feb)

**Aug 2008**
Millennium turns
EBITDA positive

**Jul 2010**
Millennium secures investment capital from TA Associates

**Apr 2011**
Millennium begins selling to addiction treatment centers

**Jun 2012**
Launch of pharmacogenetic testing

**Dec 2013**
6,000,000 specimen tested since inception

**Dec 2007**
Millennium founded by James Slattery

**Jul 2009**
Millennium expands sales force creating national footprint

**Sep 2011**
18 New drug tests are introduced between Sep-11 and Jan-12

**Mar 2012**
Launch of new proprietary Lab Information System

**Dec 2013**
Acquired RxAnte

**2008–2011**

- Massive prescription drug/opioid problem in the U.S. results in high demand for ML services
- ML has market leading turnaround time, sensitivity, specificity and accuracy
- ML has broad testing menu and ability to rapidly respond to market needs
- Incredible culture in San Diego and in the field

**2012–2013**

- Pharmacogenetic (PGT) testing has the potential to be a game changer for medicine
  – Predict how an individual will respond to a particular drug therapy
- Introduced expanded psychiatry panel for UDT and PGT
- Renewed focus on PGT business line
  – Business line leader named
  – Dedicated sales team
- RxAnte acquisition

MILLENNIUM LABORATORIES

CITI-DE-00019804

CONFIDENTIAL

# Our end-to-end, personalized solution
*High growth, synergistic business lines coming together*



TRULY **PERSONALIZED** & TARGETED

RxAnte + PGT + UDT + = MEDICATION SOLUTIONS

**RxANTE ADVANCED ANALYTICS**

to risk stratify populations

**MILLENNIUM PGT**

to establish precise medication therapies

**MILLENNIUM UDT**

to drive adherence to targeted medications through regular monitoring

Other interventions partnerships and initiatives

We provide relevant, clinically actionable information to that is valuable to with industry leading speed and accuracy for the benefit of the

MILLENNIUM LABORATORIES

CITI-DE-00019805

CONFIDENTIAL

# Our end-to-end, personalized solution

## High growth, synergistic business lines coming together

**TRULY PERSONALIZED & TARGETED**

RxAnte   +   PGT   +   UDT   +   =

**MEDICATION SOLUTIONS**

| RxANTE ADVANCED ANALYTICS | MILLENNIUM PGT | MILLENNIUM UDT | Other interventions |
|---|---|---|---|
| to risk stratify populations | to establish precise medication therapies | to drive adherence to targeted medications through regular monitoring | partnerships and initiatives |

**Revenue ($m)**

| 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| 5 | 13 | 25 | 43 | 56 |

**Revenue ($m)**

| 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| 12 | 24 | 55 | 75 | 91 |

**Revenue ($m)**

| 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| 621 | 697 | 709 | 735 | 786 |

**Total Revenue ($m)**

| 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| 633 | 733 | 789 | 853 | 933 |



CITI-DE-00019806

CONFIDENTIAL

# Overview of Millennium's services

| MILLENNIUM UDT | MILLENNIUM PGT | RxANTE |
|---|---|---|
| **What** | | |
| • Medication monitoring and drug detection used to evaluate patient treatment plans and improve clinical outcomes and patient safety | • Predict a patient's genetic predisposition to metabolizing medications | • Analytical platform that uses volumes of ordinary healthcare claims data to improve the use of medications |
| **How** | | |
| • Millennium is the leader in UDT<br>• State-of-the-art technology platform allows for industry leading turnaround time, sensitivity, specificity and accuracy<br>• Exclusive LC-MS technology platform<br>• Proprietary LIS | • Millennium helps clinicians develop a tailored treatment regimen based on these results<br>• Improved safety and drug effectiveness<br>• PGT Consult Mobile App | • Provides an advanced analytics platform that drives targeted, tailored drug therapy management programs<br>• Population medication management solution that is proven to help clients achieve better adherence, lower costs and improved patient outcomes |
| **Status** | | |
| • National presence covering all 50 states and Puerto Rico<br>• Currently serve over 6,400 physician practices with contracts covering over 168 million lives<br>• Tested over 6.4 million specimens to date with approximately 2.4 million of those tested in 2013 | • PGT launched in Q3 2012<br>• PGT specimen volume since launch has been over 78,000<br>• Processed 57,000 specimens in 2013 and over 18,000 YTD 2014 with records in March (record day, record week, record month) | • 8 million covered lives and adherence scores collected for over 90 million patients<br>• "Advanced analytics to risk-stratify populations"<br>• Contract with national Medicare Advantage Plans, PBMs, and Commercial Health Plans |


MILLENNIUM LABORATORIES

CITI-DE-00019807

# Summary of financial results

## Specimens tested



| Growth rate | | 180.2% | 125.4% | 61.8% | 32.0% |
|---|---|---|---|---|---|

## Net revenue



| Growth rate | | 149.3% | 44.8% | 124.5% | 21.0% |
|---|---|---|---|---|---|

## Gross profit



| Growth rate | | 145.5% | 45.2% | 138.3% | 19.3% |
|---|---|---|---|---|---|

## Adjusted EBITDA



| Growth rate | | 148.8% | 6.9% | 202.8% | 14.5% |
|---|---|---|---|---|---|
| Margin | 64.1% | 63.4% | 46.8% | 63.2% | 59.8% |



CONFIDENTIAL | 15

CONFIDENTIAL

# INDUSTRY OVERVIEW AND OPPORTUNITIES

CITI-DE-0001809

CONFIDENTIAL

**MILLENNIUM UDT**

**$13bn**

MILLENNIUM PGT

RxANTE



CITI-DE-00019810

# Abuse of pain and other prescription medications is a national epidemic



## The problem

- Opioid prescriptions grew 176% from 1991-2010 (5.5% CAGR during this period)

- Approximately 100 million Americans suffer from chronic pain

- 1 in 20 people in the US reported using prescription pain relievers for non-medical reasons in the past year

- Emergency department visits due to abuse of prescription drugs has increased by 115% in six years

- More than $323bn in annual costs associated with unintended consequences including lost productivity, emotional and physical stress



**Total Number of Opioid Prescriptions Dispensed by U.S Retail Pharmacies 1991–2010**

Legend: Number of Opioid Rxs; Hydrocodone; Oxycodone

Values: 76, 78, 80, 86, 91, 96, 100, 109, 120, 131, 139, 144, 151, 158, 169, 180, 192, 201, 202, 210

Years: 91 92 93 94 95 96 97 98 99 00 01 02 03 04 05 06 07 08 09 10

Source: National Institute on Drug Abuse (NIDA) research report series: Prescription Drugs: Abuse and Addiction



MILLENNIUM LABORATORIES

CONFIDENTIAL

CITI-DE-00019811

# Industry overview and outlook

## Key factors driving industry growth

- Rapid growth in drugs of abuse testing / monitoring space

  - Opioid use / abuse problem has been well documented and is clearly a national/global epidemic

  - Industry still relatively small and not well organized or understood

- Rapid growth of monitoring industry has essentially mirrored drug use/abuse trends

- Pain medication prescriptions jumped from 30 million in 1990 to 180 million in 2010[1]

- Aging population

- Expanded coverage under the Affordable Care Act

- Approximately 30% of Americans suffer from chronic pain

[1] National Institute on Drug Abuse 2011

## Americans have chronic pain



Source: American Association of Physicians in Medicine (AAPM)



10 Treatment admissions for abuse

32 Emergency department visits

1 Death

130 People who Misuse/abuse

825 Non-medical users

## For every tragic life-ending story, there are hundreds of additional patients suffering


MILLENNIUM LABORATORIES



# The UDT market is a large, growing and underpenetrated

## Key growth drivers

- Per IMS data, the US pain management pharmaceutical market was an estimated $18.2 billion in 2012 and growing
  - Rapidly aging population
  - Growth in chronic pain conditions
- As awareness increases, more patients in the "untapped market" will be tested
- More states are endorsing UDT testing as the standard of care and publishing guidelines
  - More than 20 states have issued guidelines around drugs of abuse testing
  - National Governor's Association (NGA) launched special panel to address opioid problem in seven states
- UDT is also used for adherence and compliance purposes in adjacent markets

Note: "Other competitors" include: hospital labs, specialty labs and general labs
[1] Cooperative Center of Health Services published 01/19/2010
[2] Millennium Management

## Estimated share of addressable pain management market [1,2]



Millennium ~16%

Untapped Addressable Market ~50%

Other Competitors ~34%

### Potential market opportunity of ~6.0 million Specimens
~6.0 addressable market (1.3 million chronic pain patients in the US receiving opioids, 4 specimens per patient annually; $340 per specimen; 70% of market in adjacent markets)

## Estimated size of current and adjacent addressable markets[2]



($B)

| | Chronic Pain | Psychiatric / Behavioral Health | Surgical / Perioperative | Concierge Medicine |
|---|---|---|---|---|
| | $4.2B | $6.3B | $1.4B | $0.9B |



MILLENNIUM
LABORATORIES

CONFIDENTIAL | 20



# Large opportunity for expansion in Primary Care

**Number of chronic pain patients prescribed opioids in the U.S. (2012) – by specialty**

**Significant opportunity for expansion in Primary Care**

Left chart ('000s of patients, by Medical Specialty):
- PCP: 3,970
- Pain: 1,918
- NP/PA: 799
- Other: 453
- Behavioral Health: 42
- OB/GYN: 39
- Other: 2

**% of total**

| | PCP | Pain | NP/PA | Other | Behavioral Health | OB/GYN | Other |
|---|---|---|---|---|---|---|---|
| | 55.0% | 26.6% | 11.1% | 6.3% | 0.6% | 0.5% | 0.0% |

Source: IMS

Right chart (Estimated number of Millennium patients ('000s), ▨ Pain management, ▨ PCPs):
- 2011A: 413 / 128
- 2012A: 560 / 308
- 2013A: 570 / 499
- 2014E: 587 / 600
- 2015E: 604 / 687
- 2016E: 628 / 787

**% of total**

| | 2011A | 2012A | 2013A | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|---|
| Pain mgmt. | 76.3% | 64.6% | 53.3% | 49.4% | 46.8% | 44.4% |
| PCP | 15.9% | 20.0% | 20.7% | 23.3% | 25.7% | 28.2% |
| Other[1] | 7.8% | 15.4% | 26.0% | 27.2% | 27.5% | 27.4% |

[1]Other consists of treatment center, behavioral health, OBGYN and other specialties



CONFIDENTIAL | 21

# The new VA and DoD relationship provides for a large and immediate growth channel

## History

- In June 2013, Millennium was awarded a Federal Supply Schedule (FSS) government contracting vehicle to provide comprehensive drug testing services administered by the Department of Veterans Affairs

- Contract number V797D-30178

  - Contract period June 2013 – 2023

  - Approved: comprehensive UDT panel

  - Includes 80+ drugs and metabolites

## Opportunity

- Estimated market size of over $400 million[1]

- Veterans Administration (VA) is America's largest integrated health care system providing care to almost 9 million enrollees

- Defense Health Program ("DHP") provides care to approximately 1.7 million active duty personnel with the majority of care provided directly in DHP facilities

- 50% of Veterans enrolled and receiving care at VA are affected by chronic pain[2]

- In Q1 2014, Millennium hired business leader that formerly led the multi-billion dollar government strategy at Walgreens

[1] Based on market sizing analysis performed by Sigma Health Consulting
[2] Veteran Affairs testimony to the U.S. House of Representatives



CONFIDENTIAL

# International opportunity



## Spending by Therapy Area in 2017

| Top 20 Classes 71% | Others 29% | | Top 20 Classes 45% | Others 55% |
|---|---|---|---|---|

| Developed markets | Sales in 2017 (LC$) | | Pharmerging markets[1] | (LC$) |
|---|---|---|---|---|
| Oncology | $74-84Bn | | Pain | $22-25Bn |
| Diabetes | $34-39Bn | | Other CNS Drugs | $20-23Bn |
| Anti-INFs | $32-37Bn | | Antibiotics | $18-21Bn |
| Pain | $31-36Bn | | Oncology | $17-20Bn |
| Asthma/COPD | $31-36Bn | | Hypertension | $14-17Bn |
| Other CNS drugs | $26-31Bn | | Diabetes | $10-12Bn |
| Hypertension | $23-26Bn | | Dermatology | $10-12Bn |
| Immunostimulants | $22-25Bn | | Antiulcerants | $9-11Bn |
| HIV Antivirus | $22-25Bn | | Cholestrol | $6-8Bn |
| Dermatology | $22-25Bn | | Asthma/COPD | $3-5Bn |
| Antibiotics | $18-21Bn | | AntiEpileptics | $3-5Bn |
| Cholestrol | $16-19Bn | | Antivirals excluding HIV | $3-5Bn |
| Anti-Epileptics | $15-18Bn | | Immunosuppresants | $3-5Bn |
| Immunosuppressants | $15-18Bn | | Allery | $3-5Bn |
| Antipyschotics | $13-16Bn | | Antidepressants | $3-5Bn |
| Antiulcerants | $12-14Bn | | Antiplatelet | $3-5Bn |
| Antidepressants | $10-21Bn | | Antipsychotics | $2-31Bn |
| Antivirals excluding HIV | $8-10Bn | | Heparins | $1-2Bn |
| ADHD | $7-9Bn | | Erectile Dysfunction | $1-2Bn |
| Interferons | $6-8Bn | | Immunostimulants | $1-2Bn |

▓ Specialty    ▒ Traditional

Source: IMS Health Thought Leadership September 2013

## By 2017, pain is projected to be the highest spend therapy area in Pharmerging Markets



MILLENNIUM
LABORATORIES

CITI-DE-00019816

CONFIDENTIAL

MILLENNIUMUDT

$10bn

**MILLENNIUM PGT**

**$8bn**

RxANTE



CITI-DE-00019817



# Pharmacogenetics (PGT)

*Defined as the study of how genetic variability affects an individual's response to medications*

## Goals of pharmacogenetic testing

- To predict a patient's genetic predisposition to metabolizing medications
- To develop a tailored or personalized treatment regimen to maximize safety and efficacy
- Technology will allow us to identify the most appropriate drug(s) based on the metabolism of each patient
  - Clarify or validate UDT results



Patient Group

Drug Efficacious and Toxic

Drug Effective and Not Toxic

Same Diagnosis
Same Medications

Drug NOT Effective and Not Toxic

Drug NOT Effective and Toxic

**Metabolism profile**

| | | | |
|---|---|---|---|
| • Significantly increased enzyme activity<br>• Metabolizes certain medication at a significantly higher rate than normal | • Normal enzyme activity<br>• Metabolizes certain medication at a normal rate | • Reduced enzyme activity<br>• Metabolizes certain medications at a somewhat lower rate than expected | • No enzyme activity<br>• Metabolizes certain medications at a significantly lower rate than normal |

   

**Phenotype**

| **Ultra-rapid** | **Extensive** | **Intermediate** | **Poor** |
|---|---|---|---|

**Potential clinical impact**

| | | | |
|---|---|---|---|
| • Unexpected therapeutic response<br>• Increased risk for adverse effects<br>• Increased risk for medical interactions<br>• Need for dose adjustment<br>• Need for medication change | • Likely to have expected response to medications | • Minimal effect on therapeutic response and risk for adverse events | • Unexpected therapeutic response<br>• Increased risk for adverse effects<br>• Increased risk for medication interactions<br>• Need for dose adjustment<br>• Need for medication change |



MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019818

CONFIDENTIAL

# PGT is a largely untapped market

## Key growth drivers

* Increased focus on personalized medicine and outcomes through "right drug / dosage, right patient" model

* As awareness increases, more patients in the "untapped market" will be tested

* High potential for cost savings by preventing and reducing adverse drug effects (safety) and starting patients on a targeted drug therapy (efficacy)

* More payors recognizing the clinical / economic value of PGT

* PGT could lead to improved patient adherence
  - Number one reason people are not adherent is because they do not believe their therapy will work

## Estimated share of current addressable market - pain management [1,2]



Potential market opportunity of 6.2 million Specimens $1.5bn addressable market (~8 million chronic pain patients in the US receiving opioids, 1.1 specimens per patient, $250 per specimen, 70% of market is addressable)

## Estimated size of current and adjacent addressable markets [2]



Note: "Other competitors" include: hospital labs, specialty labs and general labs
[1] Cooperative Center of Health Services published 01/19/2010
[2] Millennium Management



MILLENNIUM
LABORATORIES

CITI-DE-00019819

# Accessing the PGT opportunity

**Accessing Millennium's current population**

- Millennium will process approximately 2,800,000 UDT specimens for approximately 1.1 million patients in 2014
- Will process approximately 105,000 PGT samples in 2014
- Leveraging our current network, we estimate that approximately 75% of our patient population could clinically benefit from PGT
- 1.1 million total patients * 75% * $250 reimbursement of PGT = $206mm opportunity based on 2014 projected patient population

**Leveraging Millennium's network and infrastructure to expand into new markets**

- Chronic pain, psychiatry and other adjacent markets represent $5.7B of opportunity
- Millennium currently serves over 2,100 pain practices, 2,600 primary care physician practices, and 370 behavioral health facilities / practices
- Attractive reimbursement for pain management and psychiatric PGT testing (average Medicare reimbursement is currently >$700 per specimen)

**Exploring platform discussions to broaden gene offering**

- Expect pain management and psychiatric markets to be significant focus for short-term (<1 year)
- Exploring options to expand gene/drug/therapeutic offering
- Expect to be able to systematically launch additional genes / drugs in future periods



CONFIDENTIAL



CITI-DE-00019821



# RxAnte overview

*Advanced analytical platform drives targeted, tailored drug therapy management programs to improve outcomes and lower costs*

CONFIDENTIAL

## Company history

- Founded in 2011
- Founder & President: Josh Benner, PharmD, ScD
- Locations: McLean, VA & Portland, ME
- Venture-backed In 2012: Aberdare Ventures & West Health Investment Fund

## Revenue growth



- 2011A: $0.3M
- 2012A: $2.4M
- 2013A: $5.0M

## Key metrics

- 8 million lives under management
- Over 90 million adherence scores
- 42 FTEs
- Strong EBITDA growth
  - 2015 $6.3m
  - 2016 $20.9m
  - 2017 $30.8m
- ~$10 billion addressable market

## Representative customers





CITI-DE-00019822

CONFIDENTIAL

# The RxAnte system

- The patent-pending RxAnte System uses advanced analytics, decision analytics, and evaluation analytics to improve outcomes and lower costs

- Improving medication use is one of the biggest opportunities to improve health outcomes and lower the cost of care

- RxAnte's mission is to be the most effective solution for improving the quality and outcomes of medication use

- RxAnte is the population medication management platform that uses advanced analytics to improve the quality and outcomes of drug therapy

- It works. RxAnte has helped our clients achieve better adherence and lower the cost of creating adherent patients





CITI-DE-00019823



# Our first "synergy" offering

*Addressing the epidemic of opioid abuse*

**Overuse of opioid pain meds is a major public health problem, and risk of overuse / abuse can be identified using RxAnte's advanced analytics**

* **The optimal approach for managing opioid use has two prongs:**
    - Address likely abuse at the patient, provider, and pharmacy levels
    - Prevent abuse in those at-risk, as early as their first fill

* **RxAnte and Millennium are developing:**
    - A profiling tool that identifies members, pharmacies, and prescribers who are likely over-users of opioid pain medications
    - A risk score that identifies members at-risk of abuse, at the time of their initial fill

**RxAnte's solution is an unique, market leading tool to address this epidemic**

## Cost of prescription drug abuse on the U.S. Economy (2006)



Total cost 2006
$53.4 billion

Lost Productivity
$42 billion

| Increased Criminal Justice Costs | Medical Complications |
|---|---|
| **$2.2 billion** | **$944 million** |

Source: Trust for America's Health – Prescription Drug Abuse 2013



MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019824

CONFIDENTIAL

# KEY CREDIT STRENGTHS

CITI-DE-0001825

CONFIDENTIAL

# Key credit strengths

Large, expanding and underpenetrated market opportunities – domestic and globally

Strong competitive position

Barriers to entry including national sales force, operational processes and proprietary algorithms

Highly efficient platform with potential for significant operational leverage

Diversified and growing customer base with strong payor relationships that include national contracts

Leading voice in the clinical research and academic communities

Industry leading margin profile with high Free Cash Flow

Execution-oriented management team with strategic vision and significant experience complimented by a renowned advisory board



CITI-DE-00019826

CONFIDENTIAL

# Millennium opportunity

## MILLENNIUM UDT

- Department of Defense / VA
- Primary care
- Psychiatric and behavioral health
- Surgical / preoperative
- Expanded therapeutic offering
  - Example: Starfire drugs
- International expansion

**$13+ billion opportunity**

## MILLENNIUM PGT

- Cross-selling within existing UDT customer base
- Primary care
- Psychiatric, behavioral health and addiction
- Department of Defense / VA
- Market share growth in pain management
- Surgical / preoperative
- Expanded therapeutic offering
  - Example: Starfire drugs / genes plus other genes / other drugs with clinical utility
- Consumer approach

**$8+ billion opportunity**

## RxAnte

- Cross selling within existing payors relationships
- Strong value proposition with Medicare Advantage plans for Star Ratings improvement
- Risk / Gain sharing model for Star Ratings improvement
- Medical cost savings model with commercial / Medicaid plans
- Integrated solutions for personalized drug therapy platform
- International medication adherence solutions

**$10+ billion opportunity**

**Current addressable domestic markets represent a $31+ billion opportunity**



CITI-DE-00019827

# Strong competitive positioning

## Millennium is the lab of choice as a result of multiple customer-centric attributes

| | ML 2007 San Diego, CA | Aegis 1986 Nashville, TN | Ameritox 1996 Baltimore, MD | LabCorp 1996 Burlington, NC | Quest Diagnostics 1967 Madison, NJ |
|---|---|---|---|---|---|
| **Sales model** | Sales Rep supported by Customer Support Rep, & in certain states a Laboratory Service Assistant | Limited Sales Representatives, primarily lab personnel in physician offices; customer lease agreements | Sales Representative & Laboratory Service Assistants | Sales Representative Not-specialized | Sales Representative some specialization |
| **Toxicologist Availability** | 12 Hours every business day | 9 Hours every business day | 12 Hours every business day | Dedicated Phone Line, no posted hours | 12 Hours every business day |
| **Clinical & PharmD Availability** | 9 PhD and PharmD field educators providing national support | Limited, 2 educators | Limited, 2 educators | Not known | Not known |
| **Health plan Contracts** | 197 contracts, 168 million lives covered | Limited | Limited | Numerous National and State Contracts | Numerous National and State Contracts |
| **Turnaround Time** | "Generally 24 hours after receipt at Lab" | 4-6 days | 3-8 days | Documented 6 - 14 days | Documented 2-11 days |
| **Service Offerings** | UDT, ODT, PGT RxAnte | UDT, ODT, Hormone, Sports & Forensic testing | UDT, ODT PGT (Outsourced) | Broad Test Menu, not specialized to core markets; Many tests not available w/UDT | Broad Test Menu, not specialized to core markets; Many tests not available w/UDT |
| **Customer Testing Selections** | Physician choice; selection of tests by individual drug and test method | Lab Determined Panels | Lab Determined Panels | Lab Determined Panels | Lab Determined Panels |
| **Technology Platform** | LC-MS, EIA limited | EIA, GC/MS, LC-MS | EIA, GC/MS, LC-MS | EIA, GC/MS, LC-MS/MS | EIA, GC/MS, LC-MS |
| **Advanced Predictive Analytics** | RxAnte | N/A | N/A | N/A | N/A |
| **UDT Volume Requirements** | <2 mL | 6 mL | 25 mL (when testing via GC/MS) | 15-30 mL | 15-30 mL |

Source: Management



CONFIDENTIAL

# Millennium's offering is highly differentiated with significant barriers to entry

**Clinical and economic benefits**

* Manage patients' disease state leading to more successful outcomes
* Manage clinician risk by proactively understanding appropriate medications
* Provide substantial savings in the overall cost of treatment

**Unique technology platform**

* Effective exclusive use of Liquid Chromatography/Mass Spectrometry (LC-MS)
* Equipment powered by highly scalable proprietary Laboratory Information System (LIS) allows for increased throughput, reduced turnaround time, and accuracy of results
* LIS expandable to accommodate new technologies and geographies

**Differentiated offering with industry leading customer service**

* Industry leader in test offerings with some of the lowest level of detections
* Test forms designed provide physicians choice of specific drug / medication and test type
* Leveragable national sales and service team

**Leading voice in the clinical, research and academic communities**

* Develop, translate and disseminate cutting edge information to internal colleagues and external customers
* Millennium is dedicated to advancing clinical best practices and care outcomes through scientific research and education
* 18 full time employees dedicated to this effort

**Seven years and a total investment of over $200mm in infrastructure, technology, and people**


MILLENNIUM
LABORATORIES

CITI-DE-00019829

# Value proposition and differentiation

**Millennium's testing services provide valuable information to Clinicians and Payors with evidence based offerings, industry leading speed and accuracy to improve patient outcomes**

**Clinicians**

* Providing clinicians with tools allowing them to more effectively prescribe and manage patients' disease state leading to more successful outcomes
* Improve safety and efficacy of prescribing and prevent potential complications
* Help clinicians meet regulatory requirements and adhere to national guidelines
* Provide objective tools and clinical resources that enable clinicians to optimize patient outcomes

**Payors**

* May reduce overall healthcare utilization and yield substantial savings in the overall cost of treatment
* Guidance to assist clinicians in identifying individualized drug & dosage to reduce adverse outcomes
* Ensure proper monitoring to help improve outcomes and reduce adverse events
* Reduce risk of medication misuse and non-adherence
* Results in better patient adherence and quality of care

**Patients**

* Provide important information to improve patient safety
* Increased quality of care and reduced adverse drug reactions and reduced drug-drug interaction
* Extensive contracted business reduces out of pocket costs patient costs
* Improved lives


MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019830

CONFIDENTIAL

# Cutting-edge scientific technology

## Summary comparison of an 18-drug panel

| LC-MS and Proprietary Algorithm | | GC-MS | |
|---|---|---|---|
| Number of steps to injection | 14 | Number of steps to injection | 495 |
| Instrumentation | 2 per 160 samples | Instrumentation | 34 per 160 samples |
| Machine time | 12.5 minutes per specimen | Machine time | 34-78 minutes per specimen |
| Sample requirements | <2mL urine | Sample requirements | 20+ mL urine |
| Sample preparation time | 10-90 minutes per batch | Sample preparation time | 120-240 minutes per batch |
| Upfront equipment cost | $250K - $450K | Upfront equipment cost | $150K - $200K |



MILLENNIUM LABORATORIES

CONFIDENTIAL | 38

CITI-DE-00019831

# State-of-the-art infrastructure offers significant operating leverage

## Ability to leverage current assets

| Asset | Current capacity (specimens / day) | Projected capacity (specimens / day) |
|---|---|---|
| Labor | 12,000 | 14,400 w/o additional labor |
| Equipment | | |
| Hamilton | 13,400 | 16,000 w/o additional units |
| Olympus | 14,000 | 18,000 w/o additional units |
| LC-MS | 12,000 | 14,400 w/o additional units |
| Facilities | 14,000 | 16,800 w/o additional sqft |

## Operational excellence
### $20mm in quantifiable cost savings

### Commenced lean production initiative

* 10 active work-streams across "order fulfillment"
* Cycle-time reduction
  - Improved on-time delivery
  - 20% increase in capacity to absorb growth and leverage assets

### Six Sigma

* Initiative will begin in Q3 2014

## Process flow



Point of service / sample submission

Transport to Millennium Labs

Reception at Millennium Labs

Patient record management

Sample preparation

Clinical data acquisition

Clinical data analysis

Clinical data review and release



MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019832

CONFIDENTIAL

# High touch, national sales organization

## Commentary

- Composition of sales force
  - Regional VP's: 3
  - Regional Directors: 7
  - Regional Managers: 12
  - Sales Representatives: 101
  - Customer Service Support: 117
  - Genetic Sales Specials: 11
  - Laboratory Service Assistants: 300

- A majority of sales representatives promoted from CSSs

- Commitment to customers throughout ongoing education and training of sales and service team

- Commitment to compliance with dedicated Chief Compliance Officer and in-house legal team; compliance program modeled around OIG Model Compliance Plan for Clinical Laboratories

## Geographical diversity across all 50 states and Puerto Rico

- ○ LSA
- ○ CSS
- ○ Rep
- ○ Manager

| Volume by region | |
|---|---|
| West | 22% |
| Central | 19% |
| Midsouth | 15% |
| Midwest | 15% |
| Big East | 29% |


MILLENNIUM
LABORATORIES

CONFIDENTIAL | 40

CITI-DE-00019833

# Customer and specimen growth history

**Millennium continues to acquire new customers and deepen penetration of its existing customers**



**Millennium is focused on expanding volume with existing customers and maximizing productivity from its sales force**

- Over 680% growth in number of practices from Q1 2010 to Q4 2013

- Existing customer growth of 39.5% from 2011-2013

- Ability to leverage active accounts and existing relationships to drive PGT Volume

- All organic growth



CONFIDENTIAL

# Payor strategy and key contracts

## Managed care strategy / contract overview

- Millennium has established a 9 member Managed Markets team with a national coverage
- Proactively pursue network agreements to drive sales growth and maintain competitive advantage
- By utilizing clinical data and MRI research to educate national and regional health plans and government insurers, Millennium is able to illustrate the clinical benefits and potential cost savings
- Millennium has long-term contracts with key managed care companies, providing significant forward revenue visibility and stability
- 197 Network contracts covering 168 million lives
- 63% of business contracted (including Medicare, Medicaid, and commercial plans)
- Shared payor relationships with RxAnte

## Selected commercial contracts

- Key Agreements include:

 UnitedHealth Group

 Anthem

 WellCare

HUMANA.

 Amerigroup RealSolutions

 WELLPOINT
BlueCross BlueShield

Covering 24 states

## Contracted volume mix¹



Out of Network**, 13.0%

Note: excluding self-pay

Out of Network, 24.0%

In-Network, 63.0%

** Opportunity: Out of network volume from payors with little to no reimbursement

¹ Contract status as of 03/01/2014

## Workers' compensation referral program

- Comprehensive approach to managing injured workers in collaboration with national carriers and PBMs
- Drives additional core business through directed introduction by carriers
- Launched April 2013
- 1,500+ specimens through direct referral program
- 60 new Millennium customers
- 7,000+ additional specimens through new and returning customer relationships
- Key agreements include:

 AIG    Liberty Mutual    NEW MEXICO MUTUAL

   

 MILLENNIUM LABORATORIES

CITI-DE-00019835

CONFIDENTIAL

# Diverse customer and payor mix
## As of Q4 2013

### Broad customer base limits concentration

| Customer | Specimen Volume | % of Total |
|---|---|---|
| Practice A | 5,115 | 0.8% |
| Practice B | 4,519 | 0.7% |
| Practice C | 4,430 | 0.7% |
| Practice D | 4,238 | 0.6% |
| Practice E | 4,188 | 0.6% |
| Practice F | 3,933 | 0.6% |
| Practice G | 3,906 | 0.6% |
| Practice H | 3,761 | 0.6% |
| Practice I | 3,516 | 0.5% |
| Practice J | 3,284 | 0.5% |
| Top 10 | 40,890 | 6.2% |
| Remaining | 614,111 | 93.8% |
| Total | 655,001 | 100.0% |

### Payor volume mix



WC, 4.0%   Other, 1.0%
Medicaid, 9.0%
Medicare, 18.0%
Self-pay, 10.0%
Commercial, 58.0%

### Multiple specialty penetration and diversification



Volume: 10%, 19%, 27%, 44%
Customers: 17%, 40%, 11%, 32%

Volume          Customers

Other                    PCP

Treatment and addiction    Pain management[1]

[1] Includes behavioral health, OBGYN and other specialties



MILLENNIUM
LABORATORIES

CITI-DE-00019836

# Millennium is a leading voice in toxicology and pharmacogenetics

CONFIDENTIAL

## Initiatives focused on the key stakeholders

### Clinical

#### Internal

- Provide clinical input and strategic direction related to current and expanding products
- Develop and deliver sales training
- Contribute to development of clinical content for reports (UDT & PGT)
- Provide clinical expertise for and ensure accuracy of all ML created resources, presentations, publications, posters and marketing resources

#### External

- Identify knowledge gaps and facilitate solutions
- Provide managed markets, work comp, payor and policy group education
- Represent ML and provide education at Regional and National conferences
- Deliver 1:1 as well as small group support for customers
- Develop KOLs
- Lead speaker development and training

### Research

#### Research Strategic Areas for PGT & UDT

- Focus on Outcomes by clinicians, patients, and health plans
- Health Economic Outcomes
- Advancing Scientific Testing

#### Interdisciplinary Research Team

- Toxicologists / Scientists
- Physicians
- Psychologists
- Clinical Pharmacists
- Health Economists
- Nurses

#### Publication Strategy

- Over 40 original peer-reviewed journal articles published
- Over 70 research posters presented at state & national conferences

### Education

#### Nat'l healthcare professionals education

- ~ 13,000 educated in 2012
- ~ 21,000 educated in 2013

#### Over 120 faculty experts educating on

- Safely Prescribing Controlled Substances
- Clinical value of medication monitoring
- Risk Management in Care of Chronic Pain Patients
- Substance Use Disorders
- Crossroads of Pain and Addiction
- Clinical Value of Pharmacogenetic Testing
- Research Updates on Pain, Addiction, Medication Monitoring, Pharmacogenetics

#### Educated via

- Live trainings
- Online courses
- Clinical resources
- Publications
- Conferences
- Sponsored CME



MILLENNIUM LABORATORIES

CITI-DE-00019837

CONFIDENTIAL

# Industry leading margin profile with high free cash flow

## Adjusted EBITDA Margin



## Free Cash Flow



Note: FCF is defined as EBITDA less capital expenditures

## Sustainability of margins

- Efficiency of our dedicated LC-MS technology platform and proprietary methods

- Expansive test offering and rapid response to market demand

- Overall go to market strategy

  – Results-oriented sales team

  – Clinical education team

## Sustainability of cash generated over time

- Predictive / Analytic and decision support capabilities are in demand by health plans and difficult to replicate

- Operational excellence initiatives recently implemented

- Continued strong volume growth to leverage fixed overhead

- RxAnte margins on stand alone basis quickly grow from 26% in 2015 to mid to upper 50% range by 2018



MILLENNIUM LABORATORIES

CONFIDENTIAL | 45

CITI-DE-00019838

# Execution – oriented management team with significant experience and strategic vision

CONFIDENTIAL

| Executive | Experience |
|---|---|
| **James Slattery**<br>*Founder and Chairman* | • Ernst & Young Entrepreneur of the Year Award in 2011 in the San Diego region<br>• Achieved success in real estate development and broadcast communications, creating the first satellite radio network in the United States which he later sold to a Fortune 500 broadcast company |
| **Brock Hardaway**<br>*Chief Executive Officer* | • Served as executive VP of operations for Kindred Healthcare (NYSE: KND), which operates approximately 225 nursing and rehabilitation centers and 120 long-term acute care hospitals in 26 states; Oversaw day-to-day operations of 47 inpatient hospitals with approximately 11,000 employees, the largest region of the largest business unit within Kindred<br>• Retained by Kindred post acquisition of RehabCare, and served as EVP and hospital division President, reporting directly to the CEO<br>• President and chief operating officer of Triumph HealthCare, prior to its acquisition by RehabCare. Led the company through an unprecedented period of growth, and played a key role in the sale of the company to RehabCare Group |
| **Howard Appel**<br>*President* | • Prior to his promotion to President, he served Millennium as the company's CFO.  Was one of the first Millennium employees and has led many initiatives and operations during the company's extraordinary period of growth<br>• Previously the CFO of Laffer Associates for 17 years; held various securities licenses and Certified Public Accountant |
| **Mark Winham**<br>*Chief Operating Officer* | • Mr. Winham was the VP of global manufacturing at Life Technologies, responsible for the operations of 30+ sites world-wide with 2,500+ manufacturing professionals<br>• 25+ years of industry experience, of which 14 years in the laboratory at Johnson & Johnson, Sanofi-Aventis, and the UK National Health Service |
| **Tim Kennedy**<br>*Chief Financial Officer* | • Mr. Kennedy served as the CFO and GM of PLUS Diagnostics where he developed the infrastructure to support rapid growth, executed process improvements that maximized profit margins, increased product offerings, and enabled expansion to become a national service provider<br>• Previously served as owner and CFO of Diagnostic Imaging Management for 10+ years and prior at LabCorp as the VP of finance and the corporate controller where he led more than 50 acquisitions, adding to significant growth in revenue and was integral in the merger to form LabCorp |
| **Josh Benner, PhD**<br>*President – RxAnte* | • Founder and CEO of RxAnte prior to the recent acquisition<br>• As one of one of the leading voices on medication adherence in the country, Dr. Benner is a pharmacist and Harvard prepared health researcher that has led multiple companies through tremendous growth in the health IT sector |
| **Martin Price**<br>*General Counsel* | • Most recently, Mr. Price acted as outside counsel to the company while a Partner with the international law firm Hogan Lovells US LLP.<br>• Previously he was an associate with the international law firm Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates and a law clerk to the Honorable W. Curtis Sewell (ret.) of the U.S. District Court for the Eastern District of Virginia |

**Management has over 150 years of combined experience**



CITI-DE-00019839

CONFIDENTIAL

# Strategic advisory board

**Millennium has assembled an advisory board composed of thought leaders, political leaders, and healthcare industry executives all in an effort to provide the company with sound advice and strategic direction**

   

| Former Senator Tom Daschle | Mark McClellan, MD | John Short, PhD | Robert Pfotenhauer |
|---|---|---|---|
| • Senior policy advisor in DLA Piper's Government Affairs practice<br><br>• Former Majority Leader and distinguished healthcare authority | • Senior Fellow and Director of the Health Care Innovation and Value Initiative at the Brookings Institute<br><br>• Former Administrator of CMS and Former Commission of FDA | • Principal of Short Consulting LLC and most recently CEO of RehabCare<br><br>• Serves on several healthcare company boards including Kindred Healthcare, WellPoint, and CareMore | • Retired from executive management with United Health Group<br><br>• Played a key role in building the nation's leading Part D Prescription Drug company of United Health Group |



MILLENNIUM LABORATORIES

CONFIDENTIAL | 47

CITI-DE-00019840

CONFIDENTIAL

# FINANCIAL OVERVIEW

CITI-DE-0001841

CONFIDENTIAL

# Summary of financial results

### Specimens tested



| Growth rate | | 180.2% | 125.4% | 61.8% | 32.0% |
|---|---|---|---|---|---|

### Net revenue



| Growth rate | | 149.3% | 44.8% | 124.5% | 21.0% |
|---|---|---|---|---|---|

### Gross profit



| Growth rate | | 145.5% | 45.2% | 138.3% | 19.3% |
|---|---|---|---|---|---|

### Adjusted EBITDA



| Growth rate | | 148.8% | 6.9% | 202.8% | 14.5% |
|---|---|---|---|---|---|
| Margin | 64.1% | 63.4% | 46.8% | 63.2% | 59.8% |



CONFIDENTIAL | 49

CITI-DE-00019842

CONFIDENTIAL

# Reimbursement trends: FY 2011 to FY 2013



| Even with rate pressure, Millennium has several ways to combat these head winds | Prior to going "in-network" Millennium conducts an economic review | When payors move from out-of-network to in-network several things typically happen |
|---|---|---|
| ◦ High initial margins vs. competitors<br>◦ End-to-end solutions based approach<br>◦ Rapid turnaround times with best in class customer service<br>◦ Dedicated established relationships<br>◦ Operational leverage with proven ability to efficiently scale and improve profitability<br>◦ Expense reduction initiative plans | ◦ Ability to redirect out-of-network business<br>◦ Impact of the proposed rates on short-term revenue<br>◦ Break-even volume<br>◦ Market share analysis of the health plan in specific territories/regions<br>◦ Reduction in out-of-pocket expenses for patients | ◦ Volumes increase due to redirection<br>◦ Partnership to navigate industry dynamics<br>◦ Greater sharing of information to improve patient outcomes<br>◦ Health plan redirects payments from patients to Millennium |

**Millennium has successfully navigated this environment since inception**



MILLENNIUM
LABORATORIES

CITI-DE-00019843

CONFIDENTIAL

# Net revenue per specimen: FY2012 to FY2013

## Commentary

- **Product positioning**: End-to-end solutions based approach

- **Experience**: Quickly adapting to a changing reimbursement environment
  - Rate cuts of over 8% from 2012 to 2013 and yet EBITDA grew 15% during same period

## Summary



Waterfall chart:

| | Value |
|---|---|
| NRPS, FY 2012 | $289 |
| Test / specimen impact | ($2.51) |
| Payor mix shift | ($7.99) |
| Medicare rate cut | ($6.09) |
| Payor changes | ($7.14) |
| NRPS, FY 2013 | $265 |

(8.3)% NRPS

CITI-DE-00019844

MILLENNIUM LABORATORIES

CONFIDENTIAL

# EBITDA Bridge: FY 2011 to FY 2013

## Commentary

- Pricing is primarily driven by payor mix, tests ordered per specimen, test mix, and fee schedule pricing (i.e. the Medicare Clinical Lab Fee Schedule)

- Despite pricing pressures and building infrastructure for future growth, EBITDA continued to grow

## EBITDA Bridge



CITI-DE-00019845

CONFIDENTIAL

# Overview of projection assumptions

| | |
|---|---|
| **UDT** | • Volume: 2014 volume growth rate of 19.0%, 2015 growth rate of 9.3%, and 2013-2020 CAGR of 9.7%<br><br>• NRPS: Reduction to NRPS of 5.7% and 8.4% in 2014 and 2015, respectively; 2013-2020 cumulative reduction of 30.9%<br><br>• COS per Specimen: 2013-2020 CAGR of (1.2%) as a result of operating leverage |
| **PGT** | • Volume: 2014 volume growth rate of 108.1%, 2015 growth rate of 125.4%, and 2013-2020 CAGR of 40.2%<br><br>• NRPS: Reduction to NRPS of 4.1% and 1.8% in 2014 and 2015, respectively; 2013-2020 cumulative reduction of 14.5%<br><br>• COS per Specimen: 2013-2020 CAGR of (2.6%) as a result of operating leverage |
| **RxAnte** | • Projected to grow from $12.8M of revenue to $87.8M of revenue by 2020<br><br>• EBITDA margins scale rapidly from 25.7% in 2015 to >50% by 2017 |
| **Operating expenses** | • Expenses were identified as fixed (capacity-based) or variable (volume-driven) and projected accordingly |
| **Key balance sheet assumptions** | • DSO remains in the range of 49 to 51 days |



MILLENNIUM
LABORATORIES

CONFIDENTIAL    |    53

CONFIDENTIAL

# Financial forecasts











MILLENNIUM
LABORATORIES

CITI-DE-00019847

CONFIDENTIAL

# Financial forecasts (cont.)

## Capital expenditures



## FCF[1]



[1] Net income plus D&A and stock-based compensation less tax distributions to shareholders, increase in working capital, capital expenditures, debt related amortization, and capital lease amortization
[2] 2014 FCF excludes Q1 2014

## Total leverage[3]





[3] Total Leverage (including PNC notes & capital leases)

## Interest coverage[4]



[4] EBIT / Net Interest Expense



MILLENNIUM LABORATORIES

CONFIDENTIAL   |   55

CITI-DE-00019848

CONFIDENTIAL

# Key credit strengths

Large, expanding and underpenetrated market opportunities – domestic and globally

Strong competitive position

Barriers to entry including national sales force, operational processes and proprietary algorithms

Highly efficient platform with potential for significant operational leverage

Diversified and growing customer base with strong payor relationships that include national contracts

Leading voice in the clinical research and academic communities

Industry leading margin profile with high Free Cash Flow

Execution-oriented management team with strategic vision and significant experience complimented by a renowned advisory board



MILLENNIUM
LABORATORIES

CITI-DE-00019849

CONFIDENTIAL

# APPENDIX



CITI-DE-00019850

# EBITDA reconciliation

## Historical and projected EBITDA reconciliation

| ($mm) | Audited 2012 | Unaudited 2013 | Projected 2014 |
|---|---|---|---|
| Net income | ($292.28) | $178.90 | $297.22 |
| Plus: Interest expense | 3.89 | 5.82 | 38.62[1] |
| Plus: TA debenture interest | 29.40 | 29.40 | – |
| Plus: JPM interest expense | 8.90 | 9.18 | – |
| Plus: Non-deductible interest expense | – | – | 37.96 |
| Less: Interest income | (0.04) | (0.16) | – |
| Plus: Federal, state, and local income taxes | 1.63 | 2.40 | 3.39 |
| Plus: D&A | 10.54 | 16.90 | 22.73 |
| Plus: Non-cash compensation expenses | 0.37 | 3.05 | 3.98 |
| Plus: RxAnte transaction expenses | 8.11 | 0.66 | 13.99 |
| Plus: Change in fair value of stock purchase warrants | 469.57 | 110.00 | – |
| Plus: Change in fair value of interest rate swap | 1.10 | 0.18 | – |
| Plus: Loss on extinguishment of debt | 88.65 | – | – |
| **EBITDA** | **$329.85** | **$356.36** | **$417.87** |
| **Adjustments** | | | |
| Non-recurring compensation | – | 10.54 | – |
| Pathway expenses | – | 10.75 | – |
| Non-cash loss on disposal of assets | – | 0.46 | – |
| **Adjusted EBITDA** | **$329.85** | **$378.12** | **$417.87** |

Note:  Numbers may not foot due to rounding
[1] Includes TA, JPM, and other interest expenses



CONFIDENTIAL

CITI-DE-00019851

CONFIDENTIAL

# Compliance and legal update

- Established Medicare Compliance Program (December 2008) and appointed Chief Compliance Officer

- First UDT Lab to embrace OIG Model Compliance Plan for Clinical Laboratories and publicly post Compliance plan on website. (March 2012)

- Announced "Clinical Laboratory Responsibility Pledge" – a commitment to ethical and responsible business practices, and to never offer a service that would place the patient, healthcare professional or practice at risk (March 2012)

- Initiator and sole funder of unrestricted grant to Duke University for the purpose of convening industry stakeholders to develop elements of a voluntary code of ethical business practices (September 2012)

- Engaged Strategic Management, a nationally-recognized healthcare compliance organization directed by Inspector General Dick Kusserow to validate that ML's compliance program satisfied the seven elements of OIG's Model Compliance Plan for Clinical Laboratories. (October 2013)

- Chief Compliance Officer previously held senior compliance positions with Johnson & Johnson, Millennium Pharmaceuticals and AssureRx

CITI-DE-00019852



CONFIDENTIAL  |  59

CONFIDENTIAL

# Legal entity overview



* Millennium Laboratories, LLC: operating company including drug testing clinical laboratory.
* RxAnte, LLC: provides data-driven analytical platform to compliment testing services.
* Pain in the Air, LLC: primarily owns aircraft, which are leased to Millennium Laboratories, LLC.



Guarantor

Borrower

Notes:
[1] Pain in the Air, LLC owns aircraft
[2] Affiliated entity
[3] Millennium Laboratories, Inc. to be converted to an LL prior to the closing date for the Senior Secured Facilities
[4] New passive holdings to be incorporated prior to the closing date for the Senior Credit Facilities for purpose of pledging the stock of the Borrower

* Non-profit research and state-of-the-art teaching center for pain management

* Collaborates with universities, researchers, government and industry partners to design and execute new educational programs related to pain that train scientists and researchers

* Provides physicians and payors a unique source of published research on pain and access to thought leaders from the industry

* Provides CLIA-waived in-office urine drug testing devices and medication monitoring supplies



MILLENNIUM
LABORATORIES

CITI-DE-00019853

# Millennium's UDT and PGT offerings
## Millennium offers one of the broadest test menus in the industry

### UDT

#### Synthetic Opioids
- Fentanyl
- Norfentanyl
- Methadone
- EDDP-(methadone metabolite)
- Propoxyphene
- Norpropoxyphene
- Tramadol
- O-desmethyl-tramadol
- N-desmethyl-tramadol
- Meperidine
- Normeperidine
- Tapentadol

#### Natural/Semi Syn. Opioids
- Codeine
- Morphine
- Hydrocodone
- Norhydrocodone
- Hydromorphone
- Xycodone
- Noroxycodone
- Oxymorphone
- Buprenorphine
- Norbuprenorphine
- Buprenorphine–Transdermal (Butrans®)
- Norbuprenorphine Transdermal (Butrans®)

#### Other Substances
- Alcohol
- Ethyl Glucuronide
- Ethyl Sulfate
- Nicotine Metabolite

#### Benzodiazepines
- Alpha-hydroxyalprazolam
- 7-Amino-clonazepam
- Lorazepam
- Nordiazepam
- Oxazepam
- Temazepam
- Alprazolam
- Clonazepam
- Diazepam

#### Illicit Substances
- Cocaine
- Benzoylecgonine (cocaine metabolite)
- Heroin
- 6-MAM (heroin metabolite)
- MDMA (ecstasy)
- Methamphetamine
- Methamphetamine (D&L isomers)
- Phencyclidine (PCP)
- Marijuana
- cTHC (marijuana metabolite)

#### Antipsychotics
- Aripiprazole
- Dehydroaripiprazole
- Clozapine
- N-Desmethylclozapine
- Haloperidol
- Haloperidol metabolite
- Olanzapine
- Quetiapine
- Norquetiapine
- Risperidone
- Hydroxyrisperidone

#### Serotonin Uptake Inhibitors
- Citalopram/Escitalopram
- N-Desmethylcitalopram
- Hydroxybupropion
- Duloxetine
- Fluoxetine/Norfluoxetine
- Paroxetine
- Venlafaxine
- Desmethylvenlafaxine

#### Barbiturates
- Phenobarbital
- Secobarbital
- Butalbital

#### Synthetic Cannabinoids
- AM2201 metabolite
- MAM2201 metabolite
- JWH018 metabolite
- JWH073 metabolite
- JWH081 metabolite
- JWH122 metabolite
- JWH210 metabolite
- JWH250 metabolite
- RCS4 metabolite
- RCS4 metabolite #9
- XLR11/UR144 metabolite

#### Cathinones (Bath salts)
- MDPV
- Mephedrone
- Methylone

#### Other
- Amphetamine
- Acetominophen
- Methylphenidate
- Ritalinic Acid
- Gabapentin
- Pregabalin
- Ketamine
- Norketamine
- Naltrexone
- Naltrexol (naltrexone etabolite)
- Zolpidem (zolpidem metabolite)
- Nurzolpidem
- Carisoprodol
- Meprobamate
- Cyclobenzaprine
- Desipramine
- Imipramine
- Amitriptyline
- Nortriptyline
- Dextromethorphan
- Dextrorphan (Dextromethorphan metabolite)
- Phentermine
- Epinephrine
- Norepinephrine
- Dopamine
- Catecholamines
- 5-HIAA urine
- Mitragynine
- 7-OH Mitragynine

### PGT

#### Antidepressants / SSRI SNRI
- Citalopram
- Escitalopram
- Paroxetine
- Sertraline
- Venlafaxine

#### Antidepressants / tricyclic
- Amitriptyline
- Clomipramine
- Desipramine
- Doxepin
- Imipramine
- Nortriptyline

#### Antipsychotics
- Aripiprazole
- Haloperidol
- Risperidone

#### Atomoxetine
- Atomoxetine

#### Benzodiazepines
- Diazepam
- Lorazepam
- Ozazepam

#### Methadone
- Methadone

#### Muscle Relaxants
- Carisoprodol

#### Opioids
- Codeine
- Hydrocodone
- Oxycodone
- Tramadol



CONFIDENTIAL

CITI-DE-00019854

CONFIDENTIAL

# 70% of PGT customers are also UDT customers

**Millennium is leveraging current UDT customers to cross-sell PGT, maximizing sales force ROI per call**

## PGT customers and volumes growing



Legend:
- PGT customers
- Specimens

## Approximately 70% of PGT customers order both UDT and PGT



Legend:
- % of PGT customers that are UDT too
- # PGT Customers
- # PGT + UDT Customers

**Ability to leverage active accounts and existing relationships to drive PGT Volume**


MILLENNIUM LABORATORIES

CITI-DE-00019855

CONFIDENTIAL

# National coverage

## Customers in most major cities



City with a customer within last 6 months

CITI-DE-00019856

CONFIDENTIAL



CITI-DE-00019857

# EXHIBIT 45

**From:** Griswold, Ryan P <ryan.p.griswold@jpmorgan.com>
**To:** Karanikolaidis, Stathis <Stathis.Karanikolaidis@jpmorgan.com>
**Sent:** 3/16/2014 3:16:01 AM
**Subject:** FW: ML | RAP (3-15-2014 @ 10:00PM)


Pulp fiction....



Ryan P. Griswold | Vice President | Leveraged Finance | J.P. Morgan | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

Alternate contact: Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

-----Original Message-----
**From:** Brock Hardaway [Brock.Hardaway@millenniumlabs.com]
**Sent:** Saturday, March 15, 2014 11:13 PM Eastern Standard Time
**To:** Yeh, Hank
**Cc:** Howard Appel; Tim Kennedy; Daniel Pencak; Chiarelli, Benjamin R; Griswold, Ryan P; Liou, Calvin O; Christoforou, Alla
**Subject:** Re: ML | RAP (3-15-2014 @ 10:00PM)


JPM team, you all did incredible work on this . i know it has been a lot of back and forth and many long hours but the final product is going to be outstanding.  i am very proud of what we have created at Millennium and our story -- you guys should be very proud of how you are helping us tell the story ... very, very, very well done!

Sent from my iPad

On Mar 15, 2014, at 7:24 PM, "Yeh, Hank" wrote:

> All,
>
> Please find attached the latest version of the RAP incorporating the additional footnote on the 2014 FCF.
>
> Thank you,
> Hank
>
> Hank Yeh | Associate | Investment Banking | Healthcare | J.P. Morgan |
> 383 Madison Avenue, 37th Floor, New York, NY 10179 |
> T: 212-622-2365 | F: 917-464-9059 | M: 267-825-3664 | hank.yeh@jpmorgan.com<mailto:hank.yeh@jpmorgan.com>
>
>
> This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.
>

CONFIDENTIAL