## EXHIBIT C

Redacted Public Version of Plaintiff's Memorandum of Law in Opposition to
Defendants' Motion for Summary Judgment [Adv. Docket No. 280]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| MILLENNIUM LAB HOLDINGS II, LLC, | § | Chapter 11 |
| *et al.*, | § | CASE NO. 15-12284 (LSS) |
| | § | |
| Debtors. | § | Jointly Administered |

| | | |
|---|---|---|
| MARC S. KIRSCHNER solely in his | § | |
| capacity as TRUSTEE of the | § | |
| MILLENNIUM CORPORATE CLAIM | § | |
| TRUST, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | ADVERSARY NO. 17-51840 (LSS) |
| | § | |
| J.P. MORGAN CHASE BANK, N.A., | § | Re: Adv. D.I. 250 |
| CITIBANK N.A., BMO HARRIS BANK, N.A., | § | |
| and SUNTRUST BANK, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S MEMORANDUM OF LAW IN
## OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McKool Smith, P.C.
Kyle A. Lonergan (admitted *pro hac vice*)
Joshua J. Newcomer (admitted *pro hac vice*)
Grant L. Johnson (admitted *pro hac vice*)
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York, 10001-8603
Tel: (212) 402-9400
klonergan@mckoolsmith.com
jnewcomer@mckoolSmith.com
gjohnson@mckoolSmith.com

Cole Schotz P.C.
G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Tel: (302) 651-2012
ddean@coleschotz.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

I.      STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING......................1

II.     SUMMARY OF ARGUMENT ...............................................................................................1

III.    STATEMENT OF FACTS ......................................................................................................2

        A.    Millennium Engaged In Unlawful Business Practices.............................................3

        1.    Free Cup Program .....................................................................................................3

        2.    Unlawful Billing for Medically Unnecessary Testing .............................................6

        B.    Millennium's Regulatory And Reimbursement Environment Closed In On It. ......8

        C.    Millennium Faced Significant Litigation Risks.......................................................9

        D.    Millennium's Insiders and Defendants Saw the Writing on the Wall and Acted to
              Protect Themselves at the Expense of Millennium................................................11

        1.    Millennium and Defendants shielded the known risks from scrutiny. ..................12

        2.    The syndication closes for the benefit of Insiders and Defendants. ......................14

        E.    Millennium's House of Cards Fell As Its Legal Liabilities Came Due.................14

IV.     LEGAL STANDARD............................................................................................................15

V.      ARGUMENT.........................................................................................................................15

        A.    There Are Genuine Disputes Of Material Fact Regarding Intent To Defraud. .....16

        1.    Millennium's entire business model was based on unlawful practices. ................18

        2.    Millennium's business was challenged on several fronts.....................................19

        3.    The illegality of Millennium's business model meant that Millennium's
              revenues were overstated. .....................................................................................20

        4.    Millennium failed to disclose its challenges to Investors and others....................20

        5.    The Insiders focused on a huge institutional financing that took out
              Defendants' existing debt and paid a $1.2 billion dividend, leaving no funds
              for working capital.................................................................................................21

        6.    The purpose of the 2014 Transaction was personal enrichment of Millennium's
              Insiders, not increased working capital for Millennium. ......................................21

ii

7.      The 2014 Transaction left Millennium unable to satisfy its obligations and the claims asserted against it...................................................................................22

B.      There Are Genuine Issues Regarding Lack Of Reasonably Equivalent Value. ....22

1.      Millennium did not receive any value. ...................................................................23

2.      Millennium did not receive reasonably equivalent value. ....................................24

3.      If necessary, the collapsing doctrine treats the 2014 Transaction as a single transaction. ............................................................................................................27

C.      There is a Genuine Dispute Regarding Millennium's Insolvency.........................30

VI.     CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ameritox, Ltd. v. Millennium Labs.*,
   803 F.3d 518 (11th Cir. 2015) ....................................................................................6, 9

*Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*,
   602 B.R. 256 (Bankr. D. Del. 2019) ................................................................................18

*Dobin v. Hill (In re Hill)*,
   342 B.R. 183 (Bankr. D. N.J. 2006) ................................................................................16

*Dupuis v. Carnival Corp.*,
   2022 U.S. Dist. LEXIS 184718 (S.D. Fla. July 22, 2022) ..............................................19

*Elway Co. v. Miller (In re Elrod Holdings)*,
   421 B.R. 700 (Bankr. D. Del. 2010) ............................................................................16, 18

*Goodrich v. Clinton Cnty. Prison*,
   214 F. App'x 105 (3d Cir. 2007) ......................................................................................16

*HBE Leasing Corp. v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ...............................................................................................28

*In re DSI Rental Holdings, LLC*,
   574 B.R. 446 (Bankr. D. Del. 2017) ................................................................................16

*In re Exide Techs., Inc.*,
   299 B.R. 732 (Bankr. D. Del. 2003) ................................................................................26

*In re Foxmeyer Corp.*,
   286 B.R. 546 (Bankr. D. Del. 2002) ................................................................................26

*In re Fruehauf Trailer Corp.*,
   444 F.3d 203 (3d Cir. 2006)................................................................................25, 26, 30

*In re Hechinger Inv. Co.*,
   327 B.R. 537 (D. Del. 2005)..............................................................................................30

*In re Jevic Holding Corp.*,
   Adv. No. 08-51903, 2011 WL 4345204 (Bankr. D. Del. Sept. 15, 2011) ..............................28

*In re Old CarCo LLC*,
   435 B.R. 169 (Bankr. S.D.N.Y. 2010)..............................................................................21

*In re Route 70 & Mass., L.L.C.*,
   2011 WL 1883856 (Bankr. D.N.J. May 17, 2011) ............................................................29

*Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.)*,
    641 B.R. 467 (Bankr. D. Del. 2022) ...................................................................24

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
    945 F.2d 635 (3d Cir. 1991)..........................................................................24, 25

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*,
    92 F.3d 139 (3d Cir. 1996)..................................................................................24

*Mervyn's, LLC v. Lubert-Adler Grp. IV, LLC*,
    426 B.R. 488 (Bankr. D. Del. 2010) ...................................................................28

*Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*,
    2019 Bankr. LEXIS 2906 (Bankr. D. Del. Sep. 16, 2019) .............................18, 21

*Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am.)*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...................................................................18

*Orr v. Kinderhill Corp.*,
    991 F.2d 31 (2d Cir. 1993)..................................................................................28

*Pleaugh v. A.W. Chesterton Co.*,
    2012 U.S. Dist. LEXIS 88593 (E.D. Pa. Apr. 26, 2012) .......................................18

*U.S. ex rel. McQuire v. Millennium Labs, Inc.*,
    No. 12-cv-10132-NMG (D. Mass.).........................................................................9

*U.S. v. Tabor Court Realty Corp.*,
    803 F.2d 1288 (3d Cir. 1986).........................................................................16, 28

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ................................................................................................15

Federal Rule of Bankruptcy Procedure 7056...............................................................1

Federal Rule of Civil Procedure 56 ............................................................................1

Bankruptcy Code Section 548 ........................................................................1, 18, 29

Pursuant to Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056, Plaintiff Marc S. Kirschner, solely in his capacity as Trustee of the Millennium Corporate Claim Trust, respectfully files this Opposition to Defendants' Motion for Summary Judgment (D.I. 250) ("Motion"), and in support thereof shows as follows:

## I.   STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Millennium filed for bankruptcy on November 10, 2015, and the Court approved its restructuring plan on December 14, 2015. On November 7, 2017, Plaintiff initiated this adversary proceeding, alleging that the below-described $35.3 million in fees (the "Fees") that they received from Millennium constituted fraudulent transfers under Section 548. (D.I. 1). In response, Defendants filed a Motion to Dismiss the Complaint ("Motion to Dismiss"). (D.I. 11). On February 28, 2019, the Court denied the Motion to Dismiss. (D.I. 52). On August 22, 2022, Defendants filed the Motion to which this Opposition responds, along with a Motion to Strike Certain Portions of the Rule 28(a)(2) Report of Yvette R. Austin Smith ("Motion to Strike"). (D.I. 250).

## II.   SUMMARY OF ARGUMENT

The Court should deny the three grounds for summary judgment in Defendants' Motion. *First*, Defendants claim that Plaintiff has no evidence of fraudulent intent for his actual fraudulent transfer claim under Section 548(a)(1). But, Defendants' "Statement of Facts" is rife with contested facts and improper inferences that Defendants ask the Court to draw in their favor. The record shows that Plaintiff has developed substantial evidence supporting each of the seven allegations of intent that the Court deemed sufficient when denying Defendants' motion to dismiss. Specifically, the evidence supports the following allegations: (1) Millennium's business model was based on illegal practices; (2) the legality of Millennium's business was being challenged on several fronts and in multiple courts; (3) the illegality of the business model meant that Millennium's revenues were inflated; (4) Millennium was aware that the information disseminated

1

to investors and ratings agencies in connection with the 2014 Transaction (defined below) was untruthful and did not disclose its illegal business practices; (5) the focus of Millennium's equity-holders, managers, and officers ("Insiders") was on the 2014 Transaction that would pay off Defendants' loan and provide a $1.2 billion dividend ("Dividend") to themselves, leaving no funds for working capital; (6) the Insiders were as focused on their personal fortunes and those of their families as on the effect of the 2014 Transaction on the company and its creditors; and (7) the 2014 Transaction, including the Dividend, left Millennium unable to satisfy the claims asserted against it by the government and others and to pay the obligations incurred in the 2014 Transaction. As relevant to this motion, the evidence supporting these allegations, at a minimum, creates a genuine dispute of material fact concerning Millennium's intent to defraud.

*Second*, Defendants claim that Plaintiff has no evidence of lack of reasonably equivalent value because Defendants were paid market rates for their services. But, Millennium received nothing of value from the 2014 Transaction, meaning the Fees were paid in exchange for nothing of value, and certainly not anything of reasonably equivalent value. The evidence shows that the 2014 Transaction was one transaction. But, even if not, the evidence shows that each of the relevant components of the "collapsing doctrine" is met, which Defendants do not contest in their Motion. Defendants only claim that the collapsing doctrine is limited to leveraged buyouts, but there is no legal support for such a limitation on the doctrine.

*Third*, Defendants assert that Plaintiff has no evidence of insolvency if the Court grants Defendants' Motion to Strike. For the reasons set forth in Plaintiff's opposition to the Motion to Strike, this ground likewise fails.

## III.    STATEMENT OF FACTS

Defendants, Millennium, and its Insiders executed the 2014 Transaction in April 2014. At the time, Millennium and Defendants knew that the legal, regulatory, and reimbursement pressures

arising from Millennium's unlawful business practices threatened Millennium's solvency. Prior to the 2014 Transaction, Defendants had significant exposure to Millennium because of a $300 million loan they provided to Millennium in 2012. Defendants closely monitored the U.S. Department of Justice's ("DOJ") investigation of Millennium and were aware of the illegal practices that the DOJ was scrutinizing. Wanting to eliminate Defendants' exposure, Defendant JPMorgan proposed the $1.775 billion syndicated term loan (the "Loan"), through which the Insiders received the $1.27 billion Dividend and Defendants eliminated their credit exposure and received the $35.3 million in Fees (the "2014 Transaction").[1] Meanwhile, Millennium took on $1.775 billion in debt in exchange for no value.

### A. Millennium Engaged In Unlawful Business Practices.

Millennium's primary business was urine drug testing ("UDT"), and its customers were clinicians using UDT to monitor drug usage by patients.[2] Millennium was warned that its business was based on practices that violated the Stark Law ("Stark"), the federal Anti-Kickback Statute ("AKS"), regulations, and Medicare's and other payors' reimbursement policies. These practices included, *inter alia*, Millennium's point-of-care free test cup program ("Free Cup Program"), custom profiles, "Troubled Practices" list, and billing for medically unnecessary testing.

#### 1. Free Cup Program

Millennium's unlawful conduct included its Free Cup Program, which provided free test cups with embedded strips that allowed physicians to make immediate clinical determinations, but *only if* they referred the specimens for follow-up testing to Millennium.[3] Millennium was warned that the Program was unlawful. For example, in 2010, Millennium hired consultant Greg Root at

---

[1] Ex. 1, (Commitment Letter, § 1, A-2); Ex. 2, (CIM, -9136); Ex. 3, (Credit Agreement); Ex. 4, (Fee Letter, § 1).
[2] Ex. 2, (CIM, -9130, -9154-56).
[3] Ex. 5, (Specimen Cup Letter, -9263); Ex. 6, (2/15/2011 Email); Ex. 7, (2/17/11 Email, -9259).

CodeMap to perform a compliance audit.[4] In his 2011 draft report, Root advised Millennium to stop the Free Cup Program and that the Program presented "an unreasonable risk of civil, criminal, or administrative law liability" because, *inter alia*, it provided improper value to physicians in exchange for referrals.[5] Rather than heeding Root's advice, Millennium buried his findings— telling Root not to finalize the report and terminating the audit[6]—and resolved not to discuss Root's findings any more over email.[7] Millennium's outside counsel in the DOJ's criminal and civil investigation of Millennium (the "DOJ Investigation"), Skadden, would later describe ███ ███████████████████████████████████████████████████████████████████ ████████████████████████████████[8]

Defendants fail to address those facts at all. Instead, they argue that Millennium's other outside counsel, Jane Pine Wood and Hogan Lovells ("Hogan"), advised ████████████ ███████████.[9] However, in 2012, Millennium received a detailed letter by the very same *Jane Pine Wood* explaining why a program like the Free Cup Program was unlawful.[10] The letter was so concerning to Millennium's General Counsel, Martin Price, that he ████████████ ███████████████████████████████████████████████

---

[4] *See* Ex. 9, (11/24/10 Draft Report, -9760); Ex. 8, (2/13/2013 ML Chron of Advice, -2028).

[5] Ex. 9, (11/24/10 Draft Report, -9797); Ex. 8, (2/13/2013 ML Chron of Advice, -2028).

[6] Ex. 10, (1/20/2011 Email from Price); Ex. 8, (2/13/2013 ML Chron of Advice, pp. -2047-48) (Root explaining he was instructed not to further amend the report and that the engagement was terminated); *see* Ex. 84 (Price Tr. 52:2–60:18).

[7] Ex. 10, (1/20/2011 Email from Price, -3896); ███████████████████████████ ████████████████████████ ████████████████ Ex. 8, (2/13/2013 ML Chron of Advice, -2047).

[8] Ex. 13, (2/10/2015 Email, -5042-43).

[9] Defendants do not attach Wood's contemporaneous advice; rather, they attribute to Wood a quote from a 2014 letter from Hogan to the Centers for Medicare & Medicaid Services ("CMS"), the purpose of which was, in effect, to admit that the Free Cup Program **violated the law**, and Wood's declaration from the Ameritox litigation that does not say that the Program was lawful.

[10] Ex. 11, (4/11/2012 Email, -2070-72). This letter came over two years after the 2009 letter from Jane Pine Woods on which Defendants rely and prior to the 2014 Transaction.

4

███████████████████████████████████████████████████████

████████████ [11] Millennium did neither.[12]

Similarly, after Millennium received the compliance report from Root (which Hogan viewed as ███████████████████████████████),[13] Howard Appel, Millennium's President, instructed Price (while an attorney at Hogan) that he needed "a solution, not a no."[14] Price and other attorneys at Hogan discussed ███████████████████████████. One attorney stated that ████████████████████████████████████████████████

███████████████████████████████████████████████████████

████ Nonetheless, Hogan provided the "solution" Millennium's President sought (*i.e.*, a new draft Free Cup Agreement).[16] Price did not lose his knowledge of these events when he joined Millennium as its General Counsel.

Later, Michael Loucks of Skadden, Millennium's lead counsel on the DOJ Investigation,

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████[17] Undertaking an exhaustive review of the evidence from Root, Wood, and Hogan, Loucks concluded with a ██████████████

████████████████████████████████████████████████

---

[11] Ex. 11, (4/11/2012 Email, -2070).

[12] Ex. 13, (2/10/2015 Email, -5043) ("No advisory opinion, from either CMS or OIG, was sought."); *see also* Ex. 84, (Price Tr. at 79:17-82:2).

[13] Ex. 12, (2/10/2011 Email, -2062).

[14] Ex. 14, (1/28/2011 Email); Ex. 13, (2/10/2015 Email, -5042-43).

[15] Ex. 12, (2/10/2011 Email, -2062); Ex. 15, (10/19/2010 Email, -8908) (Price (at Hogan) ██████████████████████████████████████████████████████████████████████████████ ").

[16] Ex. 13, (2/10/2015 Email, -5043).

[17] Ex. 13, (2/10/2015 Email, -5042-43). If Defendants try to dismiss the comments as hypothetical or from the viewpoint of the government, that is a fact dispute (and one that is dispelled by a reading of the email).

[REDACTED]

## 2.    Unlawful Billing for Medically Unnecessary Testing

For Millennium to be reimbursed, its testing had to be medically necessary,[19] but its practices were designed to increase revenue without consideration of medical necessity. For example, there is typically no reason to confirm a negative POC test result. Yet Millennium pushed physicians to confirm the results of negative POC tests, going so far as to warn physicians that they could face legal liability for failing to do so,[20] and to submit "custom profiles," which are pre-filled standing orders that included an excessive number of tests.[21] Standing orders had long been considered problematic in the industry, and Defendants' industry expert in this case explained that the industry at the time was discontinuing their use due to regulatory risks.[22] Nonetheless, Millennium treated custom profiles as a means to increase profitability, alarming Medicare

---

[18] Ex. 13, (2/10/2015 Email, -5042-43).  Defendants also present excerpts of a report by Millennium's expert, Lew Morris, in the Ameritox litigation. (D.I. 251 at 9); *see also* Def. Ex. 27. This litigation document merely evidences a material dispute because Morris was *responding* to an Ameritox expert who opined that the Free Cup Program was unlawful. The result of the trial on this issue was a verdict against Millennium.  While Defendants point out that the Eleventh Circuit vacated the judgment, it only did so on jurisdictional grounds, noting: "we express no opinion whatsoever as to whether [the Free Cup agreements] violate Stark, AKS, or some other state law." *Ameritox, Ltd. v. Millennium Labs.*, 803 F.3d 518, 541 (11th Cir. 2015).

[19] Ex. 16, (Noridian Draft LCD, -5509-10); Ex. 17, (OIG Comp. Program, -3574).

[20] Ex. 18, (6/5/2011 Email, -4407-09) (telling practices to confirm negative results: "To risk medical license on a $6 cup is ___. You can fill in the blank :).") Similarly, testing for specimen tampering (specimen validity testing) is a quality control measure, not medically necessary, yet Millennium billed for this testing too. Ex. 16, (Noridian Draft LCD, -5530); Ex. 19, (Draft Key Issues List, -9172-73); Ex. 20, (10/3/2013 Email) ([REDACTED].

[21] Ex. 22, (4/4/2009 Email); Ex. 21, (4/8/14 Troubled Practices Presentation, -0163, -0173, -0178, -0180); Ex. 23, (9/10/2009 Email); Ex. 43, (DOJ Complaint, at ¶¶ 89-90) (custom profile is the same as standing order).

[22] Ex. 85, (Matevich Tr. at 154:1–156:7).

payors.[23] Millennium pushed its sales force to get physicians to complete custom profiles,[24] with a Millennium Sales Director declaring: "If an account does not want a Standing Order in place … we do not want to do business with them."[25] Millennium's President, Howard Appel, even denied a request for supplies from a physician because his custom profile did not have enough tests.[26]

Millennium knew its custom profiles exposed it to significant liability and reimbursement obstacles.[27] By 2012, the Insiders knew the OIG believed custom profiles resulted in physicians not considering medical necessity.[28] ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

Millennium also identified physicians who did not order sufficient tests as "Troubled Practices," and the list included one in twenty physician clients.[30] Millennium threatened to stop doing business with the Troubled Practices unless they increased orders for tests and even

---

[23] *See, e.g.,* Ex. 21, (4/8/14 Troubled Practices Presentation, at -0163) ("We talked a lot about customer profitability and it all starts with the CP … So the number of tests on the CP needs to be sufficient to be profitable ... We have assumed this to be 12 tests plus validity."); Ex. 25, (5/23/2013 Email, -3740-41) ("CP's continue to be of great concern, since [United Healthcare's] perception is that providers are lazy & take the easy road instead of evaluating each patient's need for specific drug monitoring. This leads to higher # of tests / specimen & $$$.").

[24] Ex. 21, (4/8/14 Troubled Practices Presentation, -0171, -0173).

[25] Ex. 22, (4/4/2009 Email).

[26] Ex. 26, (10/7/2011 Email) ("There are not enough tests on the [custom profile] and [Mr. Appel] will not approve … If [the sales rep] can get more tests added and send the [custom profile] back today, we can overnight the supplies.").

[27] Millennium also tried to cover its tracks. *See* Ex. 21, (4/8/14 Troubled Practices Presentation, -0167) ("tell Chance that the CP is based on their needs, not ours[.] Please do this in writing.").

[28] Ex. 27, (2/10/2012 Email from M. Price to H. Appel, -6719) ████████████████
████████████████████████████████████████████████████████████████████████████████

[29] Ex. 28, (1/24/2012 Email, -2232) (emphasis in original).

[30] Ex. 21, (4/8/14 Troubled Practices Presentation, -0151).

suspended compensation to Millennium's own salespersons until testing increased.[31] To get off the Troubled Practices list, Millennium pressed the practice to, among other things, adopt a new custom profile or increase the number of tests on an existing custom profile.[32]

**B.      Millennium's Regulatory And Reimbursement Environment Closed In On It.**

As a result of these illegal practices, by December 2013, Millennium was running an excessive number of approximately 23 tests on average on each specimen,[33] significantly higher than its 2011 target.[34] These excess billings, which were under intense scrutiny, meant that Millennium faced significant hurdles to maintaining its revenue levels.

Medicare and commercial payors soon instituted limitations that reduced Millennium's billings.[35] CMS announced that it would be changing the methodology for processing claims relating to certain billing codes, the effect of which was that claims submitted by Millennium exceeded the limits and were rejected in their entirety. Such rejected claims are known as "Medically Unlikely Edits" ("MUE's").[36] By early 2014, Millennium knew that a significant number of its claims were being rejected and that there was no solution to maintain its prior reimbursement levels; ultimately, it wrote off $27 million of MUEs.[37]

On top of those changes, Millennium's Medicare Administrative Contractor ("MAC"), Noridian, issued a draft Local Coverage Determination ("LCD") in early 2014 stating that testing

---

[31] Ex. 21, (4/8/14 Troubled Practices Presentation, at -0163, -0166, -0173, -0183 ("**Commissions will not be paid (and lost)** to any members of the sales team until such time practices are off the troubled list.") (emphasis in original)); Ex. 22, (4/4/2009 Email).

[32] *See* Ex. 26, (10/7/2011 Email).

[33] Ex. 29, (YAS Report, ¶ 16); Ex. 75 (FTI Consulting Financials, -0250).

[34] Ex. 21, (4/8/14 Troubled Practices Presentation, at -0163) (Millennium targeted 12 tests plus validity and refused to set up accounts for practices with less than 12 tests per custom profile).

[35] *See* Ex. 25, (5/23/2013 Email, -3740, -3743-45); Ex. 30, (Tufts Medical Necessity Guidelines).

[36] *See* Ex. 31, (DHHS-CMS Modification to Program); Ex. 29, (YAS Report, ¶¶ 142, 111-14).

[37] *See* Ex. 29, (YAS Report, ¶¶ 111-15); Ex. 32, (2/21/14 "RE: Noridian" email); Ex. 33, (2/14/14 "Re: Medicare" email, p. 3); Ex. 34 (3/19/14 Email re: "Medicare MUE – update on denials").

for confirmations of negatives and for specimen validity testing would not be paid by Medicare.[38]

It also limited the types, volumes, and frequency of testing that would be reimbursed.[39] Avalere,

an industry consultant, advised Millennium that the policy was likely to be adopted.[40] Internally,

Millennium estimated a reduction of 18.3% to 33.3% of its net revenue per specimen.[41]

    **C.**    **Millennium Faced Significant Litigation Risks.**

As a result of its unlawful practices, Millennium's legal troubles mounted before the 2014

Transaction. In 2011, Ameritox sued Millennium for unfair competition, claiming that the Free

Cup Program and other conduct violated Stark and AKS.[42] Millennium retained Skadden to defend

the Ameritox Litigation[43] and ███████████████████████████████████████

████████████████████[44]

The DOJ Investigation was also active at the time of the 2014 Transaction. On March 27,

2012, the DOJ served a subpoena probing offenses in connection with one of several *qui tam*

actions filed against Millennium in 2012 and 2013 in which the federal government ultimately

intervened.[45] Millennium was aware that its former employees and whistleblowers were aiding the

DOJ Investigation.[46] Shortly after Millennium became aware of the DOJ Investigation, the Insiders

expressed an urgent desire to "make some choices relatively quickly" and to sell Millennium

---

[38] Ex. 16, (Noridian Draft LCD, -5521-22); *see also* Ex. 81, (1/20/2014 Email).

[39] *See generally* Ex. 16, (Noridian Draft LCD, -5509, -5511, -5521-22, -5528-30, -5532-34).

[40] Ex. 35 (2/21/14 Avalere Assessment, -9871, -9911). Another MAC, Palmetto, issued an LCD at this time that Insiders believed Noridian would follow and "would have the $25-50m impact" to EBITDA. Ex. 36, (2/6/2014 Email); Ex. 37, (1/20/2014 Email) ("it is identical to Palmetto's").

[41] Ex. 38 (2/5/14 Email, -4321, -4320); Ex. 39, (2/28/2014 Email) (assuming "30% reduction in Medicare reimbursement); Ex. 40 (2/3/14 Email, -0309); Ex. 29 (YAS Report, ¶¶ 111-15).

[42] Ex. 41, (3/17/2014 Litigation Overview, -0810); *see Ameritox, Ltd. v. Millennium Labs*, 803 F.3d 518, 523-24 (11th Cir. 2015)

[43] Ex. 88, (9/20/2013 Email); Ex. 84, (Price Tr. 93:6-9).

[44] Ex. 41, (3/17/2014 Litigation Overview, -0810).

[45] Ex. 42, DOJ Subpoena; *U.S. ex rel. McQuire v. Millennium Labs, Inc.*, No. 12-cv-10132-NMG (D. Mass.); Ex. 43, (DOJ Complaint (citing cases)).

[46] Ex. 41, (3/17/2014 Litigation Overview, -0809).

"today," stating that they would even take a discount over Millennium's IPO value to do so.[47] On November 30, 2012, Millennium told Defendant BMO that a possible outcome of the DOJ investigation was that "systemic abuse is found and severe penalties and fines result …."[48] By February 2013, the matter was so serious that Millennium added to its defense Michael Loucks of Skadden, a former high-ranking prosecutor in the Boston office of the U.S. Attorney's office that was investigating Millennium.[49] By early 2014, Millennium responded to many DOJ subpoenas; made multiple presentations to the DOJ; and entered into a tolling agreement for criminal and civil claims.[50] Loucks developed an extensive list of "key issues" being investigated by the DOJ, ██████

████████████████████████████████████████████████████████████ [51]

Defendants mischaracterize the DOJ Investigation as dormant by the 2014 Transaction, (D.I. 251 at 11), and argue that Millennium relied on Loucks' claim that the DOJ Investigation would not have a material result, (D.I. 251 at 21). But, on March 11, 2014, Loucks ████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ██ Three days later, Millennium informed Defendants that Price, Millennium's GC, had attended a meeting with the DOJ the previous day and another meeting was scheduled in two weeks.[53] Notes from the call show the troubling nature of the DOJ Investigation—including questions by the DOJ such as "Why approp to test 73-yr old [female] for cocaine?" and "does [use of custom profiles] encourage Drs.

---

[47] Ex. 44, (6/14/2012 Call Report, -0002).
[48] Ex. 83, (11/30/2012 Email).
[49] Ex. 45, (9/20/2013 Email from Price to Loucks).
[50] Ex. 84, (Price Tr. 132:8–136:6, 218:16–221:21); Ex. 49, (3/14/14 Call Notes, -0004-07); Ex. 46, (3/27/12 Call Notes); Ex. 21, (4/8/14 Presentation); Ex. 47, (Tolling Agreement).
[51] *See generally* Ex. 19, (Draft Key Issues List).
[52] Ex. 48, (3/11/2014 Email from Loucks, -8323-24).
[53] Ex. 49, (3/14/14 Call Notes, -0004); Ex. 84, (Price Tr. 337:11–348:15) (explaining that JPMorgan was informed of hostile questioning by the DOJ regarding Millennium's practices).

to do unnecessary tests?"[54] On March 17, 2014, Millennium told Defendants that if the jury in the Ameritox Litigation found that the Free Cup Program violated federal law, it would fuel the DOJ Investigation.[55] By April 2014, JPMorgan understood the potential for a "fairly massive" DOJ settlement, and discussed the troubling amounts involved in the Ameritox litigation and "potentail [sic] spike in levergae [sic] as a result and strain on liquidity."[56]

### D. Millennium's Insiders and Defendants Saw the Writing on the Wall and Acted to Protect Themselves at the Expense of Millennium.

Realizing the risks Millennium faced, Defendants looked to exit their exposure to Millennium, and the Insiders looked to cash out. JPMorgan made a presentation to Millennium touting the benefits of a leveraged loan, which would fund a huge dividend to the Insiders, take out Defendants' existing loan to Millennium, and pay Defendants' Fees.[57] The Insiders jumped at JPMorgan's suggestion and pushed to maximize the Dividend: it exceeded $1.27 billion.[58]

The Insiders were concerned primarily with maximizing their personal benefits,[59] and knew that they needed to cover their tracks. Brock Hardaway sent an email to other Insiders instructing them on their messaging about the 2014 Transaction[60]: ███████████████████

████████████████████████████████████████████

---

[54] Ex. 49, (3/14/14 Call Notes, -0004-07); Ex. 84, (Price Tr. 337:11–348:15).

[55] Ex. 41, (3/17/2014 Litigation Overview, -0811).

[56] Ex. 50, (4/12/2014 Email); Ex. 86, (Lee Tr. at 113:18-114:3;126:8-20) (explaining that Oaktree's concerns in Ex. 50 reflected what JPMorgan's counsel told Oaktree about Millennium's risk).

[57] See Ex. 51, (5/31/2013 Email, -3885-86, -3888, -3896).

[58] See Ex. 52, (2/13/2014 Email).

[59] See, e.g., Ex. 56, (4/7/2014 Email re: Palladium Card) (requesting special credit cards for Insiders); Ex. 87, (Slattery Tr. at 119:25-120:18) (money earmarked for Slattery's children); Ex. 53, (Martin Price Option Cancellation Agreement); Ex. 54, (Martin Price Closing Compensation and Bonus Agreement); Ex. 55, (TA Associates Distribution, Exchange and Redemption Agreement).

[60] Ex. 57, (3/21/2014 "Messaging" Email from Hardaway).

███████████████████████████████████████████[61] This was not true. The 2014 Transaction was not intended to provide capital to grow the company. Daniel Pencak, a VP at Millennium, admitted in an internal email: ████████████████████████████████████

███████ ███████████████████████████████████████████████

### 1.    Millennium and Defendants shielded the known risks from scrutiny.

Defendants' claims that Millennium "provided lenders with every opportunity to investigate Millennium's business" is false and, at a minimum, disputed. (D.I. 251 at 22.) Millennium *and* Defendants hid material facts from Investors, generated projections that failed to account for known risks, and furnished the misleading Confidential Information Memorandum ("CIM"), Investor Presentations, answers to Investor questions, and Ratings Agency Presentation ("RAP"), all of which omitted critical information regarding Millennium's exposure.

As explained in the expert report of Yvette Austin Smith, Millennium presented inflated "Padres Projections" that failed to account for the known and reasonably foreseeable consequences of the DOJ Investigation, Ameritox Litigation, and reimbursement challenges to Millennium.[64] And, pursuant to its engagement letter, Millennium's solvency analyst, VPA, performed no independent verification of the Padres Projections.[65]

JPMorgan and Citi controlled the RAP, which omitted critical information about the DOJ Investigation and Ameritox Litigation, and scripted responses to likely questions from investors.[66] While Millennium's CEO congratulated JPMorgan on a job well done, JPMorgan knew the

---

[61] *Id.*
[62] Ex. 58, (4/11/2014 Email).
[63] *Id.*
[64] *See* Ex. 29, (YAS Report, ¶¶ 7, 55, 110, 131, 134); *see also* Ex. 88, (YAS Tr. at 243:21-246:13).
[65] Ex. 60, (4/16/2014 VPA Analysis, -5687); Ex. 59, (4/30/14 VPA Solvency Presentation, -3286).
[66] Ex. 61, (RAP); Ex. 64, (3/16/2014 Email re: ML RAP); *see also, e.g.,* Ex. 62, (3/29/2014 Email re: Lender Presentation "Dry Run"); Ex. 63, (1/14/2014 Email).

projections in the RAP were false: one senior banker forwarded the CEO's email with a comment that the RAP was "Pulp fiction."[67]

Defendants also prepared the CIM, as well as a series of PowerPoint slides called an Investor Presentation.[68] Both omitted discussion of Millennium's risks and misrepresented its practices by, for example, stressing non-existent "strict compliance policies" and not disclosing that compliance consultants and outside counsel had repeatedly warned Millennium of its unlawful practices.[69] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

While Defendants argue that Investors were informed of Millennium's legal exposure, (D.I. 251 at 13), none of their cited documents describe the extent of Millennium's liabilities.[71] In fact, Defendants and Millennium downplayed the liability Millennium faced by, for example, reassuring Investors that Loucks believed the DOJ Investigation would not have a "material result."[72] In fact, they had information that they did *not* share with Investors. ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ ████████████████████████████████████████████

---

[67] Ex. 64, (3/16/2014 Email re: ML RAP).

[68] Ex. 57, (3/21/2014 "Messaging" Email from Hardaway) ("we expect to also receive the draft [CIM] today from JPM"); Ex. 62, (3/29/2014 Email) -6783 (JPMorgan sending Millennium draft of the Investor Presentation), -6782 (JPMorgan will script investor questions during presentation).

[69] Ex. 2, (CIM, -9170); *see also* Ex. 65, (Investor Presentation, -3991, -4009).

[70] Ex. 66, (3/27/2014 Email) ██████████████████████████
██████████

[71] *See* Def. Ex. 50 at -5566-67; Def. Ex. 51; Def. Ex. 54.

[72] Def. Ex. 54 at -0810; Def. Ex. 44 at -0036. In the same notes, Loucks stressed that the Government would base its decisions on the individual conduct of the subject company. Def. Ex. 44 at -0036.

[73] *See, e.g.,* Ex. 21, (Troubled Practices Presentation).

13

████████████████████████████ JPMorgan scripted misleading responses to topics Investors might bring up to "dispel … fear" about reimbursement pressure and litigation.[75] When asked what reimbursement risk Millennium faced, Millennium responded that changes "could be 1-2% positive and [at] most 5-6% negative,"[76] but Millennium had already suffered millions in losses from MUE denials, estimated reductions from 18.3% to 33.3% due to the new LCD, and modeled a "30% reduction in Medicare reimbursement effective June 1, 2014."[77]

### 2. The syndication closes for the benefit of Insiders and Defendants.

The 2014 Transaction closed on April 16, 2014, when Defendants received the Fees and the Insiders received the Dividend, and the Loan was fully syndicated to Investors.[78] Millennium's President thanked JPMorgan for facilitating the Dividend to the Insiders—stating "more than getting [the 2014 Transaction] done; you've changed our personal lives for generations."[79]

### E. Millennium's House of Cards Fell As Its Legal Liabilities Came Due.

Millennium's legal and regulatory exposure materialized two months later, when a verdict was rendered against Millennium in the Ameritox trial. JPMorgan concluded that Millennium's valuation had been instantly reduced by $500 million.[80] Millennium responded to the verdict by canceling its Free Cup Program and submitting a Voluntary Self-Referral Disclosure to CMS showing more than $90 million in liability to Medicare.[81]

In early 2015, the DOJ intervened in the *qui tam* actions against Millennium, alleging

---

[74] Ex. 48, (3/11/2014 Email from Loucks, -8324).

[75] Ex. 62, (3/29/2014 Email re: Lender Presentation – "Dry Run") ("Dispel that the fear that their sales force is encouraging docs to over-test/over bill to drive volumes.").

[76] Ex. 67, (3/14/2014 Investor Q&A, p. -9689)

[77] Ex. 38 (2/5/14 Email, -4321, -4320); Ex. 40 (2/3/14 Email, -0309); Ex. 39, (2/28/2014 Email); *see also* Ex. 24, (Pencak Tr. 198:4-199:5; 204:9-206:7).

[78] *See* Ex. 3, (Credit Agreement).

[79] Ex. 68, (4/17/2014 Email re: Congratulations).

[80] Ex. 69, (6/16/2014 Email) ("… this will have a $500m impact on valuation ….").

[81] *See* Ex. 70, (8/15/2014 Email and attached Self-Referral, pdf p. 22).

violations of Stark and AKS based on the Free Cup Program, the use of custom profiles, and solicitation of medically unnecessary testing.[82] Millennium eventually settled these claims in October 2015 for $256 million.[83] At the time of settlement, Millennium knew the debt from the 2014 Transaction meant it could not satisfy the settlement—it hired Alvarez & Marsal to give a presentation to the DOJ asking for a multi-year repayment plan.[84] Therein, Millennium cited its debt from the 2014 Transaction as the key reason for its inability to pay.[85]

Following the settlement, Millennium filed a voluntary chapter 11 petition.[86] The restructuring plan provided for releases from liability for the Insiders for their conduct in exchange for the repayment of $178.75 million, which was funded through Millennium.[87] The plan also created two litigation trusts.[88] In his capacity as the Trustee of the Corporate Claim Trust, Plaintiff initiated this adversary proceeding against the Defendants to recover the Fees. (D.I. 1.)

## IV.   LEGAL STANDARD

Summary judgment is proper if a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "resolve[s] all ambiguities and draw all reasonable inferences in favor of the non-moving party." *Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 110 (3d Cir. 2007).

## V.   ARGUMENT

The Court should deny Defendants' Motion. Defendants move for summary judgment on three grounds: Plaintiff has no evidence of (1) intent to defraud; (2) lack of reasonably equivalent

---

[82] Ex. 43, (DOJ Complaint).
[83] (Case No. 15-12284, D.I. 15 at 19-20).
[84] *See generally* Ex. 71, (7/22/2015 Draft Presentation to the DOJ).
[85] *See id*. at -4063, -4065, -4070.
[86] Ex. 72, (Millennium Bankruptcy Petition).
[87] Ex. 73, (Plan of Reorganization at 24-25, 29-30, Restructuring Term Sheet at 2-4.)
[88] *See* Ex. 74, (Trust Agreements).

value; and (3) Millennium's insolvency if the Court were to grant the Motion to Strike. In their Motion, Defendants retread grounds already rejected by the Court. (D.I. 52 at 15.) Defendants' Motion effectively ignores the Court's ruling and all of the evidence developed by Plaintiff during discovery to support the allegations that were the basis for the Court's Motion to Dismiss ruling.

### A.     There Are Genuine Disputes Of Material Fact Regarding Intent To Defraud.

Defendants claim there is no evidence of intent to defraud. (D.I. 251 at 20.) Yet, the record supports the exact allegations that the Court ruled sufficient in denying Defendants' Motion to Dismiss. At a minimum, there exists a genuine dispute of material fact regarding intent to defraud.

Intent to defraud can be inferred when parties incur liability knowing that it will likely not be repayable.[89] As the Court held when ruling on Defendants' Motion to Dismiss, "[a]ctual intent is usually not susceptible to direct evidence; courts therefore may rely on circumstantial evidence to infer such intent." (D.I. 52 at 7.)[90] The Court surveyed the applicable precedent, and determined that while "[t]he circumstantial evidence often takes the form of badges of fraud," they are "just one substitute for direct evidence," and "[a] court may consider [other] factors."[91] For example, "if the natural consequence of a debtor's action is to hinder, delay or defraud creditors, a court may infer an intentional fraudulent conveyance."[92] The Court reviewed the Complaint and held that a number of Plaintiff's alleged facts were sufficient to allege an intent to defraud, including:[93]

    1.   "Millennium's entire business model was based on practices that violated the

---

[89] See In re DSI Rental Holdings, LLC, 574 B.R. 446, 467 (Bankr. D. Del. 2017) ("[I]f one acts with knowledge that creditors will be hindered or delayed by a transfer but then intentionally enters the transaction in disregard of this fact, he acts with actual intent to hinder and delay them." (citation omitted)); U.S. v. Tabor Court Realty Corp., 803 F.2d 1288, 1304 (3d Cir. 1986).

[90] This makes sense, as "individuals are rarely willing to admit such an intent[.]" Dobin v. Hill (In re Hill), 342 B.R. 183, 198 (Bankr. D. N.J. 2006); see Elway Co. v. Miller (In re Elrod Holdings), 421 B.R. 700, 710 (Bankr. D. Del. 2010) ("fraudulent intent is found on the basis of circumstantial evidence because fraudulent intent is not susceptible to direct proof" (quotations omitted)).

[91] (D.I. 52 at 7) (citing In re Tribune, 464 B.R. 126, 162 (Bankr. D. Del. 2011).

[92] (D.I. 52 at 7) (citing In re Tribune, 464 B.R. at 162).

[93] (D.I. 52 at 7-8.)

Stark Law and the Anti-Kickback Statute."

2. "The legality of Millennium's business was being challenged on several fronts and in multiple courts, including the United States Department of Justice, various qui tam relators, and a competitor, Ameritox, Ltd."

3. "The illegality of the business model meant that Millennium's revenues were overstated."

4. "Millennium was aware that its Rating Agency Presentation, necessary to obtain and/or syndicate the $1.775 billion term loan, did not disclose the above challenges to Millennium's business model and that information disseminated in connection with the loan, generally and to investors, was untruthful."

5. "Notwithstanding the challenges to Millennium's business model, the focus of the [Insiders] in February 2014 was on a huge institutional financing that would take out the $304 million existing debt and leave $1.2 billion for a distribution to themselves, leaving no funds for working capital."

6. "The Insiders were as focused on the improvement of their personal fortunes and those of their families as on the effect of the 2014 Transaction on the company and its creditors."[94]

7. "The consummation of the 2014 Transaction, including the concurrent siphoning of most of the loan proceeds away from Millennium and into the hands of the [Insiders], left Millennium unable to satisfy the claims asserted against it by the government and others and to pay the obligations incurred in the 2014 Transaction."

Defendants ignore the evidence supporting these allegations and again focus on the "badges of fraud." Not only is Defendants' focus improper in light of the Court's prior ruling, but, as set forth herein, Plaintiff can show at least four of the badges:[95] (1) a close relationship between the parties,[96] (2) inadequacy of consideration,[97] (3) the transferor's knowledge of the creditor's

---

[94] As the Court observed: "Seeking to maximize amounts paid to the Controlling Persons to improve their personal fortunes may evidence an intent to hinder, delay or defraud creditors and may show motivation to engage Defendants (and thus incur the obligation to pay the Fee) in order to obtain the term loan proceeds to award the Dividend." *Id*. at 9.

[95] *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 710 (Bankr. D. Del. 2010).

[96] *See* Sections III(D) and V(B)(II) (explaining the relationship between Millennium and Defendants, Defendants' role in suggesting the 2014 Transaction, and Defendants' loan exposure to Millennium throughout the relevant period).

[97] *See* Sections III(D) and V(B) (explaining that Millennium received nothing via the payment of fees or the 2014 Transaction).

claim and the transferor's inability to pay it,[98] and (4) insolvency or indebtedness of the debtors.[99] Considering that "the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent," these four badges render even more meaningful the other factors identified by the Court.[100] Defendants' reliance on the badges of fraud is thus misplaced.

Defendants also contend that the Insiders could not have had fraudulent intent because they did not admit it in their depositions. (D.I. 251 at 18.) That is not the standard on a motion for summary judgment or under section 548. The after-the-fact, self-serving Insiders' testimony on which Defendants rely contradicts the documentary evidence and raises factual disputes improper for resolution on summary judgement.[101]

Because direct proof of fraudulent intent is rarely available, courts find intent on the basis of circumstantial evidence, including the following facts and evidence supporting the seven allegations that the Court identified in denying the Motion to Dismiss.[102]

### 1.    Millennium's entire business model was based on unlawful practices.

---

[98] *See* Sections III(A) (explaining Millenniums unlawful conduct), III(A)-(C) (explaining that Millennium knew its unlawful conduct was going to impact its revenue and value significantly), V(A)(1) (same); V(B)(II) (explaining that Defendants also knew of Millennium's unlawful conduct and thus its likely inability to repay its debts).

[99] *See* Ex. 29, (YAS Report, ¶ 173). This Court recognized "Insolvency or indebtedness of the debtors" as a badge of fraud in the recent opinion in *Beskrone v. Opengate Capital Grp., LLC (In re Pennysaver USA Publ'g, LLC)*, 602 B.R. 256, 271 (Bankr. D. Del. 2019).

[100] *Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am.)*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) ("Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides <u>conclusive evidence</u> of an actual intent to defraud." (emphasis added) (citation omitted)); *see Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, 2019 Bankr. LEXIS 2906, at *23 (Bankr. D. Del. Sep. 16, 2019) (holding that three badges constituted a "confluence").

[101] *See Pleaugh v. A.W. Chesterton Co.*, 2012 U.S. Dist. LEXIS 88593, at *2 n.1 (E.D. Pa. Apr. 26, 2012) ("Defendant's evidence conflicts with Plaintiff's testimony such that there is a factual issue."); *Dupuis v. Carnival Corp.*, 2022 U.S. Dist. LEXIS 184718, at *4 (S.D. Fla. July 22, 2022) (movant "does not meet [the summary judgment] burden by relying on her self-serving testimony" that contradicted other evidence).

[102] (D.I. 52 at 7)

As explained in Section III(A)(1), Millennium was advised by multiple reliable sources, including its own counsel and auditor, that the Free Cup Program presented "an unreasonable risk of civil, criminal, or administrative law liability,"[103] yet Millennium employed the Program, which provided unlawful remuneration to physicians, in order to *require* physicians to send their specimens for testing by Millennium, increasing the samples for which it earned revenue.

As explained in Sections III(A) and (B), Millennium also knew its practices to increase testing ran afoul of regulations requiring medical necessity. Yet, Millennium pushed its prescribing physicians to confirm the results of negative point-of-care tests and order validity testing, neither of which was medically necessary. Millennium also emphasized to its sales force the need for physicians to use custom profiles with high numbers of tests without regard to medical necessity, and threatened "Troubled Practices" with termination of their relationship and suspended compensation to Millennium's own salespersons unless they increased their orders, in disregard for the requirement of medical necessity for each test. Millennium thus knew its business was based on practices that violated Stark and AKS. *See* (D.I. 52 at 7-8).

### 2. Millennium's business was challenged on several fronts.

As described in Section III(C), at the time of the 2014 Transaction, Millennium's business faced multiple challenges. On the legal front: multiple *qui tam* lawsuits had been filed in 2012 and 2013, the Ameritox litigation was nearing trial, and the DOJ Investigation was active. Although Defendants attempt to downplay the DOJ Investigation, it was particularly alarming to Millennium, whose internal and external counsel were actively meeting with the DOJ and responding to pointed questions by the DOJ. As explained in Sections III(A)-(C), Millennium knew the practices being investigated by the DOJ were illegal.

---

[103] Ex. 9, (11/24/10 Draft Report, -9797).

As described in Sections III(A)(2) and (B), Millennium also faced significant pressure from CMS and commercial payors. By early 2014, Millennium knew that a significant number of its claims were being rejected under CMS's new rules, and estimated significant reductions to its net revenue per specimen as a result of the changes to Noridian's draft LCD policy. The evidence clearly shows that Millennium's business was being challenged on several fronts at the time of the 2014 Transaction. *See* (D.I. 52 at 8).

### 3. The illegality of Millennium's business model meant that Millennium's revenues were overstated.

The Trustee's expert, Yvette Austin Smith, considered the challenges to Millennium's business and concluded that Millennium's Padres Projections were overstated by hundreds of millions. Ex. 29, (YAS Report, ¶¶ 74-141). Defendants do not seek to exclude those opinions in their Motion to Strike. Her conclusions are backed by the contemporaneous evidence showing that Millennium's improper conduct was propping up revenues and that bringing it into compliance would severely curtail Millennium's business.[104] Thus, the evidence shows that the illegality of Millennium's business model meant that Millennium's revenues were overstated. (D.I. 52 at 8).

### 4. Millennium failed to disclose its challenges to Investors and others.

As explained in Section III(D), Defendants and Millennium Insiders committed a series of material misrepresentations and omissions to get the 2014 Transaction rated and to induce the Investors into participating. Defendants wrote the RAP (which JPMorgan considered a "Pulp fiction"),[105] scripted responses to questions that management was likely to be asked, and drafted the CIM and Investor Presentation, all of which omitted critical information concerning the risks

---

[104] *Id.*; see also Sections III(A)-(C).
[105] Ex. 64, (3/16/2014 Email re: ML RAP).

faced by Millennium.[106] ███████████████████████████████████

███████████████████████████████████████

Accordingly, the evidence supports Plaintiff's claim that Millennium knew the documents provided to Investors did not disclose the challenges to Millennium's business model and that information given to Investors was untruthful and misleading. *See* (D.I. 52 at 8).

> **5.    The Insiders focused on a huge institutional financing that took out Defendants' existing debt and paid a $1.2 billion dividend, leaving no funds for working capital.**

It is undisputed that the Insiders and Defendants pursued and closed the 2014 Transaction, which burdened Millennium with a huge debt obligation, eliminated Defendants' exposure to Millennium, and paid an enormous dividend to the Insiders, but did not result in any additional working capital for Millennium.[108]

> **6.    The purpose of the 2014 Transaction was personal enrichment of Millennium's Insiders, not increased working capital for Millennium.**

---

[106] Defendants claim that the fact the investors were "sophisticated" should sterilize Plaintiff's position on fraudulent intent. There is of course no rule of law that sophisticated entities cannot be defrauded, *see Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, 2019 Bankr. LEXIS 2906, at *23 (Bankr. D. Del. Sep. 16, 2019) (allowing fraudulent transfer claim to proceed where defendant alleged "[t]ransaction was the product of arm's length negotiations between sophisticated parties"), and the non-binding opinion they cite, *In re Old CarCo LLC*, 435 B.R. 169 (Bankr. S.D.N.Y. 2010), caveated its own holding for this issue, stating that there was no support for intent to defraud "inasmuch as [the investors] were privy to the same financial information as Daimler." Here, Investors were deliberately not made privy to the same scope of information as Defendants or Millennium. Their "sophistication" is thus irrelevant. Defendants also emphasize that certain details of the Ameritox litigation and DOJ Investigation were publicly reported, but this is irrelevant. As explained in Sections III(D) and V(B)(2), Millennium hid critical information regarding its own conduct, potential liability for such conduct, and changes in reimbursement that it knew would impact its business significantly.

[107] Ex. 66, (3/27/2014 Email).

[108] *See* Ex. 58, (4/11/2014 Email) (████████████████████████ ████████████████████████████████ ; Ex. 80 (████████████████ ████████████████████████); Ex. 76, (8/3/2015 Email with Flow of Funds, pdf p. 4) (showing that after the 2014 Transaction, Millennium had less cash than before).

21

As shown in Section III(D), the main purpose of the 2014 Transaction was the enrichment of Insiders and the elimination of Defendants' exposure to Millennium. The transaction structure was selected specifically because it maximized the amount to be received by Insiders, who were paid over $1.27 billion of the proceeds, and their families, and the Insiders leveraged the transaction to gain access to private credit offerings, which was potential business for JPMorgan.

Millennium entered into the 2014 Transaction in the face of likely catastrophic legal challenges and distributed all of the Loan proceeds out of the company, leaving no additional working capital for Millennium despite more than a billion dollars of new debt. These facts show the transfer was meant to enrich the Insiders and repay the Defendants before legal and regulatory challenges rendered Millennium unable to do so. Thus, the record supports Plaintiff's claim that the Insiders were focused on the improvement of their personal fortunes. *See* (D.I. 52 at 8).

7. **The 2014 Transaction left Millennium unable to satisfy its obligations and the claims asserted against it.**

It is undisputed that the debt from the 2014 Transaction prevented Millennium from being able to satisfy the DOJ settlement. (Case No. 15-12284, D.I. 15 at 16-17, 19). And as described by Austin Smith, the 2014 Transaction left Millennium insolvent, Ex. 29, (YAS Report, ¶¶ 164-69), and Defendants' experts do not opine that Millennium was actually solvent at that time. As shown in Sections III(C) and (E), the evidence shows JPMorgan knew about potential strains on Millennium's liquidity of a large DOJ settlement. Accordingly, the record supports Plaintiff's claim that the 2014 Transaction left Millennium unable to satisfy the claims asserted against it. *See* (D.I. 52 at 8).

All of the above presents, at a minimum, a genuine dispute of material fact as to Millennium's intent to defraud, and a strong inference supporting such intent.

B. **There Are Genuine Issues Regarding Lack Of Reasonably Equivalent Value.**

22

Defendants argue that Plaintiff cannot establish a triable issue regarding reasonably equivalent value. But, their Motion fails to account for the evidence that the 2014 Transaction resulted in **no** value to Millennium and was undertaken arm-in-arm by Millennium and Defendants, who were not operating in good faith. Defendants also effectively concede that, if the collapsing doctrine is necessary, the 2014 Transaction satisfies the elements of the test, and Defendants identify no legal reason to set aside that precedent. (D.I. 251 at 27-28.)

### 1.    Millennium did not receive any value.

As the Court previously held, the Bankruptcy Code does not define the term "reasonably equivalent value,"[109] but a "party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave."[110] "To determine if Millennium received reasonably equivalent value, courts do a two-part inquiry: (i) whether the debtor received any value [for the transfer] at all, and (ii) if so, whether that value was reasonably equivalent to the value of the transfer."[111] This is a fact-specific inquiry generally not appropriate for summary judgment.[112]

Defendants argue that Plaintiff has no evidence that Millennium did not receive reasonably equivalent value.[113] This is plainly untrue: Millennium received no value.[114] Millennium paid the Fees as part of a $1.775 billion syndication, the proceeds of which were used to fund a $1.27 billion dividend to the Insiders, repay $300 million of preexisting debt to Defendants, pay $196 million

---

[109] (D.I. 52 at 10).

[110] *Id.* (citing *Charys Liquidating Trust v. Hades Advisors, LLC (In re Charys Holding Co.)*, No. 08-10289, Adv. No. 10-50211, 2010 WL 2788152, at *7 (Bankr. D. Del. July 14, 2010)).

[111] *Id.* (citing *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149, 152 (3d Cir. 1996) (internal quotations omitted).

[112] *See Maxus Liquidating Tr. v. YPF S.A. (In re Maxus Energy Corp.)*, 641 B.R. 467, 525 (Bankr. D. Del. 2022) ("the Court has already found reasonably equivalent value … as [a] fact intensive issue[] reserved for trial.").

[113] *Id.* at 25.

[114] Courts must first decide if the debtor received "any value." *In re R.M.L., Inc.*, 92 F.3d 139, 152 (3d Cir. 1996). If the debtor received at least some value, courts must *then* determine whether the debtor received reasonably equivalent value. *Id.*

to Insider TA Associates, and pay the Fees to Defendants. Nothing was left for Millennium.[115]

Accordingly, Millennium paid the Fees to facilitate a transaction pursuant to which it received no

value, as both the Insiders and Defendants knew would be the case.

Defendants cite *Mellon Bank* for the proposition that Millennium was provided value in

the form of "the ability to borrow money."[116] However, the *Mellon Bank* court identified as

valuable the ability of the debtor to obtain substantial additional credit due to its new association

with the merged corporate group arising out of a leveraged buyout and the synergy expected to

result from the combination, which contributed to working capital and improved quality of

production.[117] Here, the evidence shows that Millennium received no such benefit: no additional

working capital, no synergies, and no growth opportunities. Thus, Defendants' contention that

Millennium received some value in the ability to borrow money or access to markets is

unsupported, would have been illusory, and is no basis for granting summary judgment.

### 2.    Millennium did not receive reasonably equivalent value.

Defendants argue that Millennium received reasonably equivalent value because (i) the

Fees charged a fair market value for Defendants' arrangement of the 2014 Transaction, (ii) the

Fees were negotiated at arms-length, and (iii) Defendants accepted the Fees in good faith.[118] The

---

[115] Ex. 58, (4/11/2014 Email) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). In fact, after the 2014 Transaction, Millennium had less cash than it had to start. Ex. 76, (8/3/2015 Email with Flow of Funds, pdf p. 4).

[116] *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991). Defendants also seem to argue that because Defendants took on risk attendant to the Loan, Millennium received value. (D.I. 251 at 25). This is a red-herring. As Defendants expected and specifically negotiated for, *see* Ex. 1, (Commitment Letter, § 3); Ex. 58, (4/11/2014 Email) (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), the entirety of the loan was syndicated to the Investors (as was Defendants' contractual right) and thus Defendants had no exposure when Millennium's unlawful conduct drove it to bankruptcy.

[117] *Mellon Bank*, 945 F.2d at 647-49.

[118] (D.I. 251 at 26) (citing *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210-11 (3d Cir. 2006)).

totality of the circumstances show that Millennium did not receive reasonably equivalent value.[119]

As to fair market value, this Court has already rejected Defendants' argument. In their Motion to Dismiss, Defendants argued that what mattered was not that Millennium received nothing from the 2014 Transaction but instead that Millennium paid market rates for the Defendants' "professional services." (D.I. 12 at 24-25.) The Court considered Defendants' argument in light of the Third Circuit's *R.M.L.* precedent, concluding that "it is possible, based on the specific circumstances, that the existence of market-based fees is not case dispositive." (D.I. 52 at 11). Because such circumstances had been alleged—that Millennium received nothing from the 2014 Transaction, as intended by the parties—the Court denied Defendants' Motion. That conclusion is now supported by the record facts—what Millennium received from the 2014 Transaction (nothing) was not reasonably equivalent to the Fees.[120]

This was also not an arms-length transaction either. The lack of an arms-length relationship between a transferor and transferee weighs in favor of finding a lack of reasonably equivalent value.[121] In *Fruehauf*, the court held that the fact that "the benefits inured substantially to corporate insiders . . . suggest that the transaction was not conducted at arm's length." 444 F.3d at 216. Here, the evidence shows that Defendants and Millennium acted arm-and-arm to take out Millennium's outstanding debt to Defendants under the 2012 Agreement. To do so, Defendants conspired with the Insiders by offering them an extraordinary dividend and then controlled Millennium's

---

[119] *Fruehauf*, 444 F.3d at 213 (Courts "look to the 'totality of the circumstances,' including (1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between the debtor and the transferee,' and (3) the transferee's good faith).

[120] *See* Ex. 58, (4/11/2014 Email) █████████████████████████████████ ; (8/3/2015 Email - Flow of Funds, pdf pp. 3-4).

[121] *E.g., In re Exide Techs., Inc.*, 299 B.R. 732, 748 (Bankr. D. Del. 2003).

disclosures to Investors to ensure its completion.[122] The 2014 Transaction was not arms-length.

The evidence also refutes Defendants' claim that they accepted the Fees in good faith. (D.I. 251 at 26-27). Lack of good faith by the recipient of a transfer is evidence of lack of reasonably equivalent value; although, it is not a required showing.[123] Just the fact that Defendants had so much loan exposure to a failing company and orchestrated the 2014 Transaction is enough to give rise to a genuine dispute. Yet, as Defendants admit, their knowledge of Millennium's unlawful practices, the potential for a large DOJ settlement, and the inability to service its debt demonstrates a lack of good faith.[124] These facts are present here. *First*, Defendants knew about Millennium's unlawful practices. They monitored the various investigations and lawsuits against Millennium and received regular updates from Millennium.[125] As explained in Section III(C), leading up to the 2014 Transaction, Millennium conveyed to Defendants the contentious nature of its meetings with the DOJ, including its questioning of Millennium's billing practices, Troubled Practices program, and use of custom profiles.[126] *Second*, Defendants knew of Millennium's potentially large exposure in the DOJ Investigation, and discussed the troubling amounts involved in the Ameritox

---

[122] *See* Sections III(D), V(A)(3)-(4); Ex. 51, (5/31/2013 Email, p. 5); *see also* Ex. 77, (2/12/2012 Email, -0407) (thanking Millennium for 2012 transaction and the "first step in a relationship" and "a continuation of a long-term relationship with … TA."); Ex. 82, (3/27/2014 Email).

[123] *Fruehauf*, 444 F.3d at 213; *In re Foxmeyer Corp.*, 286 B.R. 546, 579-81 (Bankr. D. Del. 2002) (actual or constructive knowledge of debtor's fraudulent scheme is sufficient to negate good faith).

[124] (D.I. 251 at 26-27) (defining bad faith as "believing that Millennium's business practices were illegal, that a historically large settlement with the DOJ was coming, or that Millennium would be unable to service the debt").

[125] *See* Ex. 84, (Price Tr. at 19:5-8, 20:16-20); Ex. 78, (2/7/2013 Email and chain) p. 5 (JPMorgan's counsel scheduling a call with Millennium and Millennium counsel to discuss the DOJ subpoena), p. 3 (JPMorgan's counsel requesting an update on the DOJ Investigation and scheduling discussions with Millennium and Millennium counsel); Ex. 79, (3/14/2014 Email) (JPMorgan's counsel requesting an update on Millennium's litigations).

[126] Ex. 49, (3/14/14 Call Notes, -0004); Ex. 84, (Price Tr. 337:11–348:15); Ex. 41, (3/17/2014 Litigation Overview, pp. 1-3).

litigation and "potential [sic] spike in levergae [sic] as a result and strain on liquidity."[127] *Third*, as set out in Section III(D)(1), Defendants hid these facts from Investors so they could remove their debt exposure and have Investors take on the risk that Millennium would be unable to repay an even larger debt. Defendants prepared the CIM, Investor Presentation, and RAP, and scripted responses to Investors, in order to control the disclosures of the company.[128] Though Defendants argue that they did not know about the severity of Millennium's liabilities (based on self-serving deposition testimony), the record shows that Defendants knew that the rosy picture they were painting was, in their own words, "Pulp fiction."[129] ████████████████████████

████████████████████████████████.[130]

### 3.   If necessary, the collapsing doctrine treats the 2014 Transaction as a single transaction.

As noted above, the Fees, Loan, Dividend, and other terms of the 2014 Transaction were part of a single deal. Defendants present no evidence to treat them as separate, but if they were, Defendants argue that the collapsing doctrine is inapplicable. (D.I. 251 at 27.) This argument fails because the 2014 Transaction presents the precise context for which the collapsing doctrine was established.[131] When "a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications." *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (quotations omitted). That is the case here. As the Court held when denying the Motion to Dismiss,

---

[127] Ex. 50, (4/12/2014 Email); Ex. 86, (Lee Tr. at 113:18-114:3;126:8-20) (discussing Ex. 50).
[128] *See* Ex. 64, (3/16/2014 Email re: ML RAP); Ex. 63, (1/14/2014 Email); Ex. 57, (3/21/2014 Email) (receiving the CIM from JPM"); Ex. 62, (3/29/2014 Email) -6783 (JPMorgan sending the Investor Presentation), -6782 (JPMorgan will script investor questions during presentation).
[129] Ex. 64, (3/16/2014 Email re: ML RAP).
[130] Ex. 66, (3/27/2014 Email).
[131] *HBE Leasing Corp. v. Frank,* 48 F.3d 623, 635 (2d Cir. 1995) (describing the "paradigmatic scheme" of collapsing as one where: "one transferee gives fair value to the debtor in exchange for the debtor's property, and the debtor then gratuitously transfers the proceeds of the first exchange to a second transferee. The first transferee thereby receives the debtor's property, and the second transferee receives the consideration, while the debtor retains nothing").

"[t]he Third Circuit has recognized the collapsing doctrine in the context of assessing a defendant's liability on a fraudulent transfer claim."[132] In *U.S. v. Tabor Court Realty Corp.,* the Third Circuit explained that, where a series of transactions were "part of one integrated transaction," the court should look "beyond the exchange of funds" in one transaction and instead consider "the *aggregate* transaction."[133] To determine whether a series of transactions should be "collapsed," courts focus on the substance rather than the form of the transactions and consider: (i) whether all parties involved in the individual transactions had knowledge of the other transactions, (ii) the extent to which each component to be collapsed could stand alone, and (iii) the degree to which the components were dependent/conditioned on the occurrence of one another.[134] The Court considered these elements and held:

> Assuming the need to use the collapsing doctrine, Trustee has pled sufficient facts to demonstrate that incurring the obligation to pay and/or payment of the Fees may be a proper transfer to collapse with the loan of funds and payment of the Dividend … Defendants' counsel appears to concede that the factors for the application of the collapsing doctrine have been met or that this is simply one transaction.

(D.I. 52 at 13.) Now, Defendants again concede these elements. (D.I. 251 at 27-29). *First*, Millennium and Defendants were aware of the deal structure. *Second*, the Fees do not stand apart from the 2014 Transaction—the 2014 Transaction was effectuated by the payment of Fees and the repayment of Millennium's debt to Defendants. *Third*, the payment of Fees and the 2014 Transaction are interdependent; one could not occur without the other.[135]

---

[132] (D.I. 52 at 12) (citing *In re Jevic Holding Corp.*, Adv. No. 08-51903, 2011 WL 4345204, at *16 (Bankr. D. Del. Sept. 15, 2011).

[133] 803 F.2d 1288, 1301-03 (3d Cir. 1986) (emphasis in original).

[134] *Mervyn's, LLC v. Lubert-Adler Grp. IV, LLC*, 426 B.R. 488, 497 (Bankr. D. Del. 2010); *In re Jevic Holding Corp.*, No. 08-11006 BLS, 2011 WL 4345204, at *5 (Bankr. D. Del. Sept. 15, 2011).

[135] The Commitment Letter conditions the Initial Lenders' commitment to lend on payment of all fees and expenses to the Defendants. Ex. 1, (Commitment Letter at A-8-9, B-2). The Credit Agreement states the Fees would be paid out of the Loan. Ex. 3, Credit Agreement, ¶ 5.1(h).

Instead of contesting the elements of the collapsing doctrine, Defendants claim the doctrine is inapplicable (a) outside the context of leveraged buyouts ("LBOs"), (b) to secured creditors, or (c) to transaction fees. These arguments find no support in the law; indeed, Defendants' cited case law shows that the doctrine applies in a variety of circumstances. To start, while Defendants claim only that it is "most commonly applied to leveraged buyouts," there is no precedent limiting the collapsing doctrine to LBOs (as is plain from Defendants' phrasing).[136] As to the second point, Defendants are incorrect to say that the Trustee "represents secured creditors," (D.I. 251 at 28), because the Trustee is asserting claims as Trustee of the Corporate Claim Trust under 548, not claims transferred to the Trust by the secured creditors. Regardless, Defendants cite *no* authority for the proposition that the doctrine does not apply on behalf of secured creditors. As to the third point, Defendants contend that courts have not applied the collapsing doctrine to assess reasonably equivalent value for transaction-service fees, but their cases are inapposite.[137] The *Plassein* court did not consider any claim that the collapsing doctrine applied to transaction fees, nor did the trustee there present any evidence of the elements. Likewise, the *Hechinger* Court did not hold that the collapsing doctrine was inapplicable to fees as a matter of law, but that the trustee presented no evidence "relevan[t] to valuing the assets either received or lost through the Transaction." 327 B.R. at 553. Here, as explained above, Plaintiff has unquestionably presented evidence supporting collapsing and the lack of reasonably equivalent value under the collapsed transaction.

---

[136] Defendants cite only the unpublished district court opinion, *In re Route 70 & Mass., L.L.C.*, 2011 WL 1883856, at *5 (Bankr. D.N.J. May 17, 2011). (D.I. 251 at 28.) That court did not hold the doctrine was limited to LBOs and relied on cases applying the collapsing doctrine *outside* of LBOs. *See* 2011 WL 1883856, at *5 (*citing HBE Leasing Corp. v. Frank,* 48 F.3d 623 (2d Cir. 1995) (collapsing mortgages and attorney's fees-related transactions) (*citing Orr*, 991 F.2d at 32 (collapsing transfer of property and stock to a wholly-owned subsidiary that then sought financing using the already-transferred mortgages as security)).

[137] (D.I. 251 at 28-29) (citing *In re Plassein Int'l Corp.*, 405 B.R. 402 (Bankr. D. Del. 2009); *In re Hechinger Inv. Co.*, 327 B.R. 537 (D. Del. 2005)).

**C.      There is a Genuine Dispute Regarding Millennium's Insolvency.**

Defendants finally argue that the Court should grant its Motion to Strike and thus that Plaintiff cannot satisfy the insolvency requirement of its constructive fraudulent transfer claim.[138] (D.I. 251 at 24-25.) As discussed in Sections III(B)-(C), there is substantial evidence to infer Millennium's insolvency in light of the liabilities it faced. Regardless, Defendants' argument fails for the reasons specified in Plaintiff's Opposition to the Motion to Strike.

**VI.      CONCLUSION**

For the above reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion.

Dated: October 24, 2022

Respectfully submitted,

By: */s/ G. David Dean*
G. David Dean (No. 6403)
COLE SCHOTZ P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Tel: (302) 651-2012
ddean@coleschotz.com

Kyle A. Lonergan (admitted *pro hac vice*)
Joshua J. Newcomer (admitted *pro hac vice*)
Grant L. Johnson (admitted *pro hac vice*)
MCKOOL SMITH, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York, 10001-8603
Tel: (212) 402-9400
klonergan@mckoolsmith.com
jnewcomer@mckoolSmith.com
gjohnson@mckoolSmith.com

***Attorneys for Plaintiff***

---

[138] Defendants also argue that the Fees did not render Millennium insolvent, (D.I. 251 at 29), but this is irrelevant. Insolvency need not result from the challenged transaction, but only occur "at the time of the transfer." *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210-11 (3d Cir. 2006).

30