**EXHIBIT D**

Redacted Public Version of Declaration of Grant L. Johnson in Opposition to
Defendants' Motion for Summary Judgment [Adv. Docket No. 281]

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:<br>MILLENNIUM LAB HOLDINGS II, LLC,<br>*et al.*,<br><br>   Debtors. | §<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br>CASE NO. 15-12284 (LSS)<br><br>Jointly Administered |
| MARC S. KIRSCHNER solely in his<br>capacity as TRUSTEE of the<br>MILLENNIUM CORPORATE CLAIM<br>TRUST,<br><br>   Plaintiff,<br><br>v.<br><br>J.P. MORGAN CHASE BANK, N.A.,<br>CITIBANK N.A., BMO HARRIS BANK, N.A.,<br>and SUNTRUST BANK,<br><br>   Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | ADVERSARY NO. 17-51840 (LSS) |

## DECLARATION OF GRANT L. JOHNSON
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Grant Lawrence Johnson, pursuant to 28 U.S.C. § 1746, declare as follows:

I am an attorney with the law firm of McKool Smith, P.C., counsel to Marc S. Kirschner in his role as Trustee of the Millennium Corporate Claims Trust. I am admitted *pro hac vice* before the Court in this action. I submit this declaration in Opposition to Defendants' Motion for Summary Judgment.

65203/0001-44002773v1

1.      Attached hereto as Exhibit 1 is a true and correct copy of a document entitled "$1,765 million Term Loan Facility $50 million Revolving Facility Commitment Letter," Case no. 17-51840-LSS, D.I. 13-3.

2.      Attached hereto as Exhibit 2 is a true and correct copy of a document entitled "Millennium Laboratories Confidential Information Memorandum," bearing Bates number ML_DE_00269115.

3.      Attached hereto as Exhibit 3 is a document entitled "$1,825,000,000 CREDIT AGREEMENT among MILLENNIUM LAB HOLDINGS II, LLC, as Holdings, MILLENNIUM LABORATORIES, LLC, as Borrower, The Several Lenders from Time to Time Parties Hereto, and JPMORGAN CHASE BANK, N.A., as Administrative Agent, Dated as of April 16, 2014," Case no. 17-51840-LSS, D.I. 13-4.

4.      Attached hereto as Exhibit 4 is a document entitled "$1,765 million Term Loan Facility $50 million Revolving Facility Fee Letter," bearing Bates number CITI-DE-00110378.

5.      Attached hereto as Exhibit 5 is a true and correct copy of a document entitled "Re: Specimen Collection Cups – 11/12 Panel," bearing Bates number ML_DE_00629262.

6.      Attached hereto as Exhibit 6 is a true and correct copy of a February 15, 2011 email from Martin Price to Howard Appel, bearing Bates number ML_DE_00512171.

7.      Attached hereto as Exhibit 7 is a true and correct copy of a February 17, 2011 email with attachments from Howard Appel to Mary Rouse, bearing Bates number ML_DE_0062958.

8.      Attached hereto as Exhibit 8 is a true and correct copy of a document entitled "Millennium Laboratories, Inc. Chronology – Legal Advice Revision – February 13, 2013," bearing Bates number ML_DE_00291992.

65203/0001-44002773v1

9.      Attached hereto as Exhibit 9 is a true and correct copy of a document entitled "Millennium Laboratories Annual Compliance Audit Report 11/24/2010," bearing Bates number ML_DE_00499758.

10.     Attached hereto as Exhibit 10 is a true and correct copy of a January 20, 2011 email from Howard Appel to Andrew Hefty, bearing Bates number ML_DE_00323894.

11.     Attached hereto as Exhibit 11 is a true and correct copy of an April 11, 2012 email and attachment from Martin Price to ron.wisor@hoganlovells.com, bearing Bates number ML_DE_00512070.

12.     Attached hereto as Exhibit 12 is a true and correct copy of a February 10, 2011 email from Helen R. Trilling to Martin A. Price, bearing Bates number ML_DE_00512060.

13.     Attached hereto as Exhibit 13 is a true and correct copy of a February 10, 2015 email from Martin Price to Michael K. Loucks, bearing Bates number ML_DE_00565040.

14.     Attached hereto as Exhibit 14 is a true and correct copy of a January 28, 2011 email from Howard Appel to Martin A. Price, bearing Bates number ML_DE_00323908.

15.     Attached hereto as Exhibit 15 is a true and correct copy of an October 19, 2010 email from Martin A. Price to Howard Appel, bearing Bates number MLHS0000408908.

16.     Attached hereto as Exhibit 16 is a true and correct copy of a document entitled "Drugs of Abuse Testing Noridian Healthcare Solutions, LLC Draft," bearing Bates number ML_DE_00035508.

17.     Attached hereto as Exhibit 17 is a true and correct copy of a document entitled "Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices", bearing Bates number ML_DE_00083573.

18.    Attached hereto as Exhibit 18 is a true and correct copy of a July 5, 2011 email with attachment from Nicole Moberg to Amanda Moorer and others, bearing Bates number ML_DE_00504406.

19.    Attached hereto as Exhibit 19 is a true and correct copy of an October 15, 2013 email with attachment from Michael K. Loucks to Martin Price, bearing Bates number ML_DE_00499143.

20.    Attached hereto as Exhibit 20 is a true and correct copy of an October 3, 2013 email from Matthew R. Simmons to Jennifer Strickland and others, bearing Bates number ML_DE_00093625.

21.    Attached hereto as Exhibit 21 is a true and correct copy of a document entitled "Troubled Practices Millennium Laboratories Presentation To the United States Attorney's Office District of Massachusetts April 8, 2014, bearing Bates number ML_DE_00670133.

22.    Attached hereto as Exhibit 22 is a true and correct copy of an April 4, 2009 email from gayleesales@aol.com to elizabeth@millenniumlaboratories.com, bearing Bates number ML_DE_00628900.

23.    Attached hereto as Exhibit 23 is a true and correct copy of a September 10, 2009 email from Renee Bryan to 'Scott Gehrke' and others, bearing Bates number ML_DE_00504265.

24.    Attached hereto as Exhibit 24 are excerpts of a true and correct copy of the transcript of the July 1, 2021 deposition of Daniel Pencak.

25.    Attached hereto as Exhibit 25 is a true and correct copy of a May 23, 2013 email with attachment from Howard Appel to Daniel Pencak, bearing Bates number ML_DE_00083739.

4

26.     Attached hereto as Exhibit 26 is a true and correct copy of an October 7, 2011 email from Eric McClurg to Kimberly Keller, bearing Bates number ML_DE_00628931.

27.     Attached hereto as Exhibit 27 is a true and correct copy of a February 10, 2012 email from Martin Price to ML Reps, bearing Bates number ML_DE_00236719.

28.     Attached hereto as Exhibit 28 is a true and correct copy of a January 24, 2012 email from Ronald Wisor to Martin Price, bearing Bates number ML_DE_00612232.

29.     Attached hereto as Exhibit 29 is a true and correct copy of the Expert Report of Yvette R. Austin Smith, dated November 15, 2021.

30.     Attached hereto as Exhibit 30 is a true and correct copy of a document entitled "Tufts Health Plan Medical Necessity Guidelines: Urine Drug Testing *Effective*: January 1, 2014," bearing Bates number ML_DE_00305155.

31.     Attached hereto as Exhibit 31 is a true and correct copy of a document entitled "MLN Matters REVISED products from the MLN · 'Medicare Learning Network® (MLN) Suite of Products & Resources for Billers and Coders', Educational Tool, ICN 904183, Downloadable only Revised Modification to the Medically Unlikely Edit (MUE) Program," bearing Bates number ML_DE_00206157.

32.     Attached hereto as Exhibit 32 is a true and correct copy of a February 21, 2014 email from Tim Kennedy to Carol Stoyla, bearing Bates number ML_DE_00058388.

33.     Attached hereto as Exhibit 33 is a true and correct copy of a February 14, 2014 email from Daniel Pencak to Richard Guzman, bearing Bates number ML_DE_00060270.

34.     Attached hereto as Exhibit 34 is a true and correct copy of a March 19, 2014 email from Susan Ahl to Tim Kennedy, bearing Bates number ML_DE_00054044.

65203/0001-44002773v1

35.     Attached hereto as Exhibit 35 is a true and correct copy of a document entitled "Coding and Reimbursement Assessment for Drugs of Abuse Testing Prepared for Millennium Laboratories Draft February 21, 2014 avalerehealth.net," bearing Bates number ML_DE_00689868.

36.     Attached hereto as Exhibit 36 is a true and correct copy of a February 6, 2014 email from Benjamin Carpenter to Barry Blake and others, bearing Bates number CITI-DE-00063792.

37.     Attached hereto as Exhibit 37 is a true and correct copy of a January 20, 2014 email with attachment from Matt Simmons to Brock Hardaway, bearing Bates number ML_DE_00035507.

38.     Attached hereto as Exhibit 38 is a true and correct copy of a February 5, 2014 email and attachment from Daniel Pencak to Brock Hardaway, bearing Bates number ML_DE_00054320.

39.     Attached hereto as Exhibit 39 is a true and correct copy of a February 28, 2014 email from Tim Kennedy to Daniel Pencak, bearing Bates number ML_DE_00058384.

40.     Attached hereto as Exhibit 40 is a true and correct copy of a February 3, 2014 email from Frank Adams to Daniel Pencak, bearing Bates number ML_DE_00060308.

41.     Attached hereto as Exhibit 41 is a true and correct copy of a document entitled "Overview Of Pending Litigation Involving Millennium Laboratories," dated March 17, 2014, bearing Bates number ML_DE_00030809.

42.     Attached hereto as Exhibit 42 is a true and correct copy of a document entitled "United States of America Department of Justice Subpoena Duces Tecum," bearing Bates number ML_DE_00288150.

65203/0001-44002773v1

43.    Attached hereto as Exhibit 43 is a true and correct copy of a document entitled "United States' Complaint in Intervention," date-stamped March 19, 2015, bearing Bates number ML_DE_00595094.

44.    Attached hereto as Exhibit 44 is a true and correct copy of a document entitled "Call Report", dated June 14, 2012, bearing Bates number BMO-ML-00030001.

45.    Attached hereto as Exhibit 45 is a true and correct copy of a September 20, 2013 email from Martin Price to Michael K Loucks, bearing Bates number ML_DE_00672095.

46.    Attached hereto as Exhibit 46 is a true and correct copy of a handwritten document entitled 'Call re: Millennium 3/27/12," bearing Bates number STB_ML-00000008.

47.    Attached hereto as Exhibit 47 is a true and correct copy of a document entitled "Re: Millennium Laboratories, Inc. – Statute of Limitations Tolling Agreement," dated May 14, 2013, bearing Bates number ML_DE_00682994.

48.    Attached hereto as Exhibit 48 is a true and correct copy of a March 11, 2014 email from Michael K Loucks to Martin Price, bearing Bates number ML_DE_00488323.

49.    Attached hereto as Exhibit 49 is a true and correct copy of a handwritten document entitled "Call w/ M. Price R. Wisor L. Neuner R. Arnay Isaac Gruber 3/14/14," bearing Bates number STB_ML-00000001.

50.    Attached hereto as Exhibit 50 is a true and correct copy of an April 12, 2014 email from Ryan P Griswold to Alla Christoforou, bearing Bates number JPMC-MIL-CORP-00050699.

51.    Attached hereto as Exhibit 51 is a true and correct copy of a May 31, 2013 email from Stathis Karanikolaidis to jmulloy@ta.com, bearing Bates number JPMC-MIL-CORP-00183881.

7

52.     Attached hereto as Exhibit 52 is a true and correct copy of a February 13, 2014 email from Stathis Karanikolaidis to Dawn LeeLum, bearing Bates number JPMC-00028567.

53.     Attached hereto as Exhibit 53 is a true and correct copy of a document entitled "Option Cancellation Agreement," dated April 16, 2014, bearing Bates number ML_DE_00100745.

54.     Attached hereto as Exhibit 54 is a true and correct copy of a document entitled "Closing Compensation and Bonus Agreement," dated April 16, 2014, bearing Bates number ML_DE_00100811.

55.     Attached hereto as Exhibit 55 is a true and correct copy of a document entitled "Distribution, Exchange and Redemption Agreement," dated April 16, 2014, bearing Bates number ML_DE_00115994.

56.     Attached hereto as Exhibit 56 is a true and correct copy of an April 7, 2014 email with attachments from Benjamin R Chiarelli to Willa B. Baynard and others, bearing Bates number JPMC-00025839.

57.     Attached hereto as Exhibit 57 is a true and correct copy of a March 21, 2014 email from Brock Hardaway to Howard Appel and others, bearing Bates number ML_DE_00384916.

58.     Attached hereto as Exhibit 58 is a true and correct copy of an April 11, 2014 email from Daniel Pencak to Martin Price, bearing Bates number ML_DE_00083071.

59.     Attached hereto as Exhibit 59 is a true and correct copy of a document entitled "Millennium Lab Holdings II, LLC Solvency Analysis," bearing Bates number ML_DE_00263273.

8

60.     Attached hereto as Exhibit 60 is a true and correct copy of a February 6, 2015 email and attachment from Rich Barth to Heidi Smith, bearing Bates number VP_ML_00015683.

61.     Attached hereto as Exhibit 61 is a true and correct copy of a document entitled "Rating Agency Presentation" dated March 2014, bearing Bates number CITI-DE-00019793.

62.     Attached hereto as Exhibit 62 is a true and correct copy of a March 29, 2014 email from Stathis Karanikolaidis to Jenny Y Lee and others, bearing Bates number JPMC-MIL-CORP-00046782.

63.     Attached hereto as Exhibit 63 is a true and correct copy of a January 14, 2014 email from Michael T Guttilla to Ryan P Griswold, bearing Bates number JPMC-MIL-CORP-00189654.

64.     Attached hereto as Exhibit 64 is a true and correct copy of a March 16, 2014 email from Ryan P Griswold to Stathis Karanikolaidis, bearing Bates number JPMC-00054929.

65.     Attached hereto as Exhibit 65 is a true and correct copy of a document entitled "Millennium Laboratories Investor Presentation March 2014," bearing Bates number ML_DE_00013955.

66.     Attached hereto as Exhibit 66 is a true and correct copy of a March 27, 2014 email from Martin Price to Martin Price, bearing Bates number ML_DE_00486045.

67.     Attached hereto as Exhibit 67 is a true and correct copy of a document entitled "Millennium Laboratories Investor Q&A March-14," bearing Bates number JPMC-MIL-CORP-00219685.

68.     Attached hereto as Exhibit 68 is a true and correct copy of an April 17, 2014 email from Jenny Y. Lee to Gerry Murray, bearing Bates number JPMC-MIL-CORP-00055405.

69.     Attached hereto as Exhibit 69 is a true and correct copy of a June 16, 2014 email from Lance A Etcheverry to Martin Price, bearing Bates number ML_DE_00669350.

70.     Attached hereto as Exhibit 70 is a true and correct copy of an October 8, 2014 email from Jeanette Zuleger to Martin Price with attachment, bearing Bates number ML_DE_00325455.

71.     Attached hereto as Exhibit 71 is a true and correct copy of a document entitled "Millennium Health Presentation to the Department of Justice by Alvarez & Marsal Healthcare Industry Group, LLC," dated July 22, 2015, bearing Bates number ML_DE_00074058.

72.     Attached hereto as Exhibit 72 is a true and correct copy of the Voluntary Petition of Millennium Lab Holdings II, LLC, Case no. 15-12284-LSS, D.I. 1.

73.     Attached hereto as Exhibit 73 is a true and correct copy of the Notice of Filing of Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., Case no. 15-12284-LSS, D.I. 182.

74.     Attached hereto as Exhibit 74 is a true and correct copy of the Notice of Filing of Third Plan Supplement for the Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., Case no. 15-12284-LSS, D.I. 179.

75.     Attached hereto as Exhibit 75 is a true and correct copy of a document entitled "Millennium Health," dated September 10, 2015, bearing Bates number ML_DE_00230225.

76.     Attached hereto as Exhibit 76 is a true and correct copy of an August 3, 2015 email from Heidi Smith to Tim Kennedy with attachment, bearing Bates number ML_DE_00064954.

77.     Attached hereto as Exhibit 77 is a true and correct copy of a February 12, 2012 email from Ryan P Griswold to Howard Appel, bearing Bates number ML_DE_00720405.

65203/0001-44002773v1

78.     Attached hereto as Exhibit 78 is a true and correct copy of a February 7, 2013 email from Martin Price to Lynn Neuner, bearing Bates number ML_DE_00679020.

79.     Attached hereto as Exhibit 79 is a true and correct copy of a March 14, 2014 email from Martin Price to Lynn Neuner, bearing Bates number JPMC-MIL-CORP-00192012.

80.     Attached hereto as Exhibit 80 is a true and correct copy of a March 24, 2014 email from Heidi Smith to Tim Kennedy, bearing Bates number ML_DE_00384780.

81.     Attached hereto as Exhibit 81 is a true and correct copy of a January 20, 2014 email from Matt Simmons to Brock Hardaway, bearing Bates number ML_DE_00035507.

82.     Attached hereto as Exhibit 82 is a true and correct copy of a March 27, 2014 email with attachment from Ryan P. Griswold to Stathis Karanikolaidis, bearing Bates number JPMC-MIL-CORP-00045573.

83.     Attached hereto as Exhibit 83 is a true and correct copy of a November 30, 2012 email from Phillip Ho to Brett Skolnik, bearing Bates number BMO-ML-00044849.

84.     Attached hereto as Exhibit 84 are excerpts of true and correct copies of the transcripts of the April 12, 2021 and June 7, 2021 depositions of Martin Price.

85.     Attached hereto as Exhibit 85 is an excerpt of a true and correct copy of the transcript of the May 11, 2022 deposition of Branka Matavich.

86.     Attached hereto as Exhibit 86 are excerpts of a true and correct copy of the transcript of the June 23, 2021 deposition of Jenny Lee.

87.     Attached hereto as Exhibit 87 is an excerpt of a true and correct copy of the transcript of the June 3, 2021 deposition of James M. Slattery.

88.     Attached hereto as Exhibit 88 is an excerpt of a true and correct copy of the transcript of the May 2, 2022 deposition of Yvette Austin Smith.

11

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 24, 2022.                    _____*/s/ Grant L. Johnson*_____
New York, New York                                              Grant L. Johnson

65203/0001-44002773v1

# EXHIBIT 1

# Exhibit 2

| J.P. MORGAN SECURITIES LLC | CITIGROUP GLOBAL MARKETS INC. | SUNTRUST ROBINSON HUMPHREY, INC. | BMO CAPITAL MARKETS CORP. |
|---|---|---|---|
| JPMORGAN CHASE BANK, N.A. | 390 Greenwich Street New York, New York 10013 | SUNTRUST BANK | |
| 383 Madison Avenue New York, New York 10179 | | 3333 Peachtree Road Atlanta, Georgia 30326 | BANK OF MONTREAL 115 South LaSalle Street Chicago, Illinois 60603 |

March 16, 2014

Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA 92127
Attention: Howard Appel, President

$1,765 million Term Loan Facility
$50 million Revolving Facility
Commitment Letter

Ladies and Gentlemen:

You have advised JPMorgan Chase Bank, N.A. ("JPMorgan Chase Bank"),  J.P. Morgan Securities LLC ("JPMorgan"), Citi (as defined below) ("Citi"), BMO Capital Markets Corp. ("BMO Capital"), Bank of Montreal ("Bank of Montreal"), SunTrust Robinson Humphrey, Inc. ("STRH") and SunTrust Bank ("SunTrust Bank" and, together with JPMorgan Chase Bank, JPMorgan, Citi, BMO Capital, Bank of Montreal and STRH, the "Commitment Parties", "us" or "we") that Millennium Laboratories, Inc. ("you" or the "Borrower") intends to enter into the Senior Secured Facilities described on the Exhibits attached hereto (which shall include the Term Loan Facility and the Revolving Facility as described thereon) for an aggregate principal amount of $1,815 million.  Capitalized terms used but not defined herein are used with the meanings assigned to them on the Exhibits attached hereto (such Exhibits, together with this letter, collectively, the "Commitment Letter").  For purposes of this Commitment Letter, "Citi" shall mean Citigroup Global Markets Inc., Citibank, N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as Citi shall determine to be appropriate to provide the services contemplated herein.

1.  Commitment

JPMorgan Chase Bank is pleased to advise you of its several, but not joint, commitment to provide an amount of 55% of the aggregate principal amount of the Senior Secured Facilities, (b) Citi is pleased to advise you of its several, but not joint, commitment to provide an amount of 35% of the aggregate principal amount of the Senior Secured Facilities, (c) Bank of Montreal is pleased to advise you of its several, but not joint, commitment to provide an amount of 5% of the aggregate principal amount of the Senior Secured Facilities and (d) SunTrust Bank is pleased to advise you of its several, but not joint, commitment to provide an amount of 5% of the aggregate principal amount of the Senior Secured Facilities, in each case, upon the terms and subject to the conditions set forth in this Commitment Letter

and Exhibits A and B hereto (collectively, the "Term Sheets"). JPMorgan, Citi, Bank of Montreal and SunTrust Bank are referred to in this Commitment Letter collectively as the "Initial Lenders".

2.  Titles and Roles

It is agreed that (a) JPMorgan and Citi will act as joint lead arrangers and joint bookrunners for the Senior Secured Facilities (acting in such capacities , the "Lead Arrangers"); (b) JPMorgan will have "left" placement and Citi will have "right" placement in any marketing materials or other documentation used in connection with the Senior Secured Facilities; (c) Citi will act as syndication agent for the Senior Secured Facilities; (d) BMO Capital and SunTrust Bank will act as co-managers and co-documentation agents for the Senior Secured Facilities; and (e) JPMorgan Chase Bank will act as sole administrative agent for the Senior Secured Facilities.

You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Term Sheets and the Fee Letters referred to below) will be paid in connection with the Senior Secured Facilities unless you and the Lead Arrangers shall so reasonably agree (it being understood and agreed that no other agent, co-agent, arranger, co-arranger, bookrunner, co-bookrunner, manager or co-manager shall be entitled to greater economics in respect of the Senior Secured Facilities than any Commitment Party).

3.  Syndication

We intend to syndicate the Senior Secured Facilities to a group of lenders identified by the Lead Arrangers in consultation with you (together with the Initial Lenders, the "Lenders"), provided, however, that notwithstanding anything to the contrary contained in this Commitment Letter or the Fee Letters, it is understood that neither the commencement nor completion of the syndication of any Initial Lenders' commitments hereunder shall constitute a condition to the availability of the Senior Secured Facilities on the Closing Date or at any time thereafter. The Lead Arrangers shall commence the syndication of the Senior Secured Facilities (including, in our discretion, all or part of the Commitment Parties' commitments hereunder) promptly, and you agree actively to assist the Lead Arrangers in completing a syndication satisfactory to you and the Lead Arrangers.  Such assistance shall include (A) your using commercially reasonable efforts to ensure that the syndication efforts benefit from your and your affiliates' existing banking relationships, (B) direct contact between your senior management and advisors and the proposed Lenders, (C) your preparing and providing to the Lead Arrangers all information with respect to you and your subsidiaries, including all financial information and Projections (as defined below), as the Lead Arrangers may reasonably request in connection with the arrangement and syndication of the Senior Secured Facilities and your assistance in the preparation of one or more confidential information memoranda (each, a "Confidential Information Memorandum") and other customary marketing materials to be used in connection with the syndication of the Senior Secured Facilities (all such information, memoranda and material, "Information Materials"), (D) your hosting, with the Lead Arrangers, of one or more meetings of prospective Lenders at times and locations to be mutually agreed, (E) your ensuring that there is no competing offering, placement, arrangement or syndication of any debt securities or bank financing (other than the Senior Secured Facilities and capital lease and equipment financings in the ordinary course of business, and any amendments, renewals or extensions of the foregoing) or announcement thereof by or on behalf of you or your subsidiaries and (F) your using commercially reasonable efforts to obtain (x) corporate credit and/or corporate family ratings for the Borrower and (y) ratings for the Senior Secured Facilities, in each case from each of Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Financial Services LLC ("S&P") as soon as practicable and in any event prior to the Closing Date.  Upon the request of the Lead Arrangers, you will furnish to the Commitment Parties, for no fee, an electronic version of your relevant trademarks, service

509265-1664-11227-Active.15459523.20

marks and corporate logo for use until the earlier of the Closing Date or the Expiration Date in marketing materials for the purpose of facilitating the syndication of the Senior Secured Facilities (the "License"); provided, however, that the License shall be non-exclusive and revocable upon the earlier of (x) the termination of this Commitment Letter and (y) the closing and funding of the Senior Secured Facilities, and shall be used solely for the purpose described above and may not be assigned or transferred.  Without limiting the foregoing, the Commitment Parties agree not to syndicate the Senior Secured Credit Facilities to the banks, financial institutions and other institutional lenders and investors and the competitors of the Borrower set forth on Exhibit C (as such list may be updated by you from time to time to include additional competitors of the Borrower,  collectively, the "Disqualified Lenders").

The Lead Arrangers will manage, in consultation with you, all aspects of the syndication, including decisions as to the selection of institutions to be approached (which will exclude Disqualified Lenders) and when they will be approached, when commitments will be accepted, which institutions will participate, the allocation of the commitments among the Lenders and the amount and distribution of fees among the Lenders. You hereby acknowledge and agree that the Commitment Parties will have no responsibility other than to fund their commitments as set forth herein on the terms and subject to the conditions set forth herein and in no event shall the Commitment Parties be subject to any fiduciary or other implied duties in connection with the transactions contemplated hereby.

At the request of the Lead Arrangers, you agree to assist in the preparation of a version of each Confidential Information Memorandum or other Information Material (a "Public Version") consisting exclusively of information with respect to you and your affiliates that is either publicly available or not material with respect to you and your affiliates, any of your or their respective securities for purposes of United States federal and state securities laws for use with a wholly private company (such information, "Non-MNPI").  Such Public Versions, together with any other information prepared by you or your affiliates or representatives and conspicuously marked "Public" (collectively, the "Public Information"), which at a minimum means that the word "Public" will appear prominently on the first page of any such information, may be distributed by us to prospective Lenders who have advised us that they wish to receive only Non-MNPI ("Public Side Lenders").  You acknowledge and agree that, in addition to Public Information and unless you promptly notify the Lead Arrangers otherwise (and provided that you have been given a reasonable opportunity to review such documentation), (a) drafts and final definitive documentation with respect to the Senior Secured Facilities (but excluding any Fee Letters and other materials as mutually agreed), (b) administrative materials prepared by the Lead Arrangers for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda) and (c) notifications of changes in the terms of the Senior Secured Facilities (other than any Fee Letters and other materials as mutually agreed) may be distributed to Public Side Lenders.  You acknowledge that any Commitment Party public-side employees and representatives who are publishing debt analysts may participate in any meetings held pursuant to clause (D) of the second preceding paragraph; provided that such analysts shall not publish any information obtained from such meetings (i) until the syndication of the Senior Secured Facilities has been completed upon the making of allocations by the Lead Arrangers and the Lead Arrangers freeing the Senior Secured Facilities to trade or (ii) in violation of any confidentiality agreement between you and the relevant Commitment Party.

In connection with our distribution to prospective Lenders of any Confidential Information Memorandum and, upon our request, any other Information Materials, you will execute and deliver to us a customary authorization letter authorizing such distribution and, in the case of any Public Version thereof or other Public Information, representing that it only contains Non-MNPI.  Each Confidential Information Memorandum will be accompanied by a disclaimer exculpating you and us with respect to any use thereof and of any related Information Materials by the recipients thereof.

3

4.  Information

You hereby represent and warrant that (a) all written information (including all written Information Materials), other than the Projections and information of a general economic or industry specific nature (the "Information"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto) and (b) the financial projections and other forward-looking information (the "Projections") that have been or will be made available to us in writing by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished to us (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material).  You agree that if, at any time prior to the Successful Syndication (as defined in the Fee Letter among you and us), you become aware that any of the representations in the preceding sentence would be incorrect if the same was remade, in any material respect, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances.  You understand that in arranging and syndicating the Senior Secured Facilities we may use and rely on the Information and Projections without independent verification thereof.

5.  Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the nonrefundable fees described in the Fee Letters dated the date hereof and delivered herewith (the "Fee Letters") on the terms and subject to the conditions set forth therein.

6.  Conditions

Each Commitment Party's commitments and agreements hereunder are subject solely to the conditions set forth in this Section 6 and in Exhibit A under the heading "CERTAIN CONDITIONS – Initial Conditions" and Exhibit B under the heading "Conditions" (as applicable), it being understood that there are no other conditions to the availability of the Senior Secured Facilities on the Closing Date than those that are expressly stated herein and therein.

4

Each Commitment Party's commitments and agreements hereunder are further subject to (a) since December 31, 2012, there not having been any change, development or event that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the business, financial condition or results of operations of the Borrower and its subsidiaries, taken as a whole (provided that changes, developments or events that result from economic, political, industry or market changes generally shall not be taken into account in determining whether a "material adverse effect" has occurred or would reasonably expected to occur unless such changes, developments or events adversely affect the Borrower and its subsidiaries in a materially disproportionate manner relative to other participants in the industries in which the Borrower and its subsidiaries operate) and (b) your performance in all material respects of all your obligations hereunder and under the Fee Letters.

7.  Indemnification and Expenses

You agree to indemnify and hold harmless the Commitment Parties, their affiliates and their and their affiliates' respective directors, officers, employees, advisors, agents and other representatives (each, a "Lender Indemnified Person") from and against any and all losses, claims, damages and liabilities (collectively, "Losses") to which any such Lender Indemnified Person may become subject arising out of or in connection with this Commitment Letter, the Fee Letters, the Senior Secured Facilities, the use of the proceeds thereof or any claim, litigation, investigation or proceeding (a "Proceeding") relating to any of the foregoing, regardless of whether any Lender Indemnified Person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each Lender Indemnified Person upon demand for any reasonable and documented out-of-pocket legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (but limited, in the case of legal fees and expenses, to one counsel to all Lender Indemnified Persons taken as a whole and, solely in the case of a conflict of interest, one additional counsel to all affected Lender Indemnified Persons, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected Lender Indemnified Persons taken as a whole); provided that the foregoing indemnity will not, as to any Lender Indemnified Person, apply to losses, claims, damages, liabilities or related expenses arising from (i) any failure of a Commitment Party to fund its portion of the Term Loan Facility if the conditions precedent thereto set forth in the Senior Secured Credit Documentation have been satisfied or waived or any other material breach of this Commitment Letter, the Fee Letters or the Senior Secured Credit Documentation by such Commitment Party, (ii) the willful misconduct, gross negligence or bad faith of such Lender Indemnified Person or its control affiliates, directors, officers or employees (collectively, the "Related Parties") to the extent found by a final, non-appealable judgment of a court of competent jurisdiction or (iii) disputes solely among Lender Indemnified Persons (other than in connection with any Commitment Party acting in its capacity as a Lead Arranger, syndication agent, Administrative Agent or any other agent or co-agent (if any) designated by the Lead Arrangers, in each case in their respective capacities as such, or any Commitment Party solely in connection with its applicable syndication activities as contemplated hereunder), and not arising out of or in connection with any act or omission of the Borrower or its subsidiaries.

Notwithstanding the foregoing, any Lender Indemnified Person shall have the right to settle any such claim or action without your consent; provided that you shall not be liable for any settlement of any Proceeding (or expenses related thereto) effected without your consent (which consent shall not be unreasonably withheld or delayed).

You also agree to reimburse each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses (including reasonable and documented out-of-pocket due diligence expenses, syndication expenses, travel expenses, and the reasonable fees, charges and disbursements of Simpson Thacher & Bartlett LLP, as counsel to the Commitment Parties) incurred in connection with the

5

negotiation, documentation and closing of the Senior Secured Facilities and any related documentation (including this Commitment Letter and the definitive financing documentation), regardless of whether the Closing Date occurs; provided, however, that the Borrower shall not be responsible for any fees, charges or disbursements of counsel to the Commitment Parties incurred in connection with the negotiation, documentation and closing of the Senior Secured Facilities in an aggregate amount in excess of $1,000,000.

It is agreed that the Commitment Parties shall only have liability to you (as opposed to any other person) and that each Commitment Party shall be liable solely in respect of its own commitment to the Senior Secured Facilities on a several, and not joint, basis with any other Commitment Party. No Lender Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the willful misconduct, gross negligence, bad faith, or material breach of this Commitment Letter, the Fee Letters or the Senior Secured Credit Documentation of or by such Lender Indemnified Person (or any of its Related Parties). None of the Lender Indemnified Persons or you or any of your subsidiaries or the respective directors, officers, employees, advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letters, the Senior Secured Facilities or the transactions contemplated hereby; provided that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 7.

8.   Sharing of Information, Absence of Fiduciary Relationship, Affiliate Activities

You acknowledge that each Commitment Party (or an affiliate) is a full service securities firm and such person may from time to time effect transactions, for its own or its affiliates' account or the account of customers, and hold positions in loans, securities or options on loans or securities of you or your affiliates and of other companies that may be the subject of the transactions contemplated by this Commitment Letter. Each Commitment Party and its affiliates will not use confidential information obtained from you or your affiliates or on your or their behalf by virtue of the transactions contemplated hereby in connection with the performance by such Commitment Party and its affiliates of services for other companies or persons and each Commitment Party and its affiliates will not furnish any such information to any of their other customers. You acknowledge that the Commitment Parties and their respective affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or persons.

You further acknowledge and agree that (a) no fiduciary, advisory or agency relationship between you and the Commitment Parties is intended to be or has been created in respect of any of the transactions contemplated by this Commitment Letter, irrespective of whether the Commitment Parties have advised or are advising you on other matters, (b) the Commitment Parties, on the one hand, and you, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty to you or your affiliates on the part of the Commitment Parties, (c) you are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated by this Commitment Letter, (d) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment Parties have no obligation to disclose such interests and transactions to you, (e) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, (f) each Commitment Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (g) none of the Commitment Parties has any obligation to you or your affiliates

6

with respect to the transactions contemplated hereby except those obligations expressly set forth herein or in any other express writing executed and delivered by such Commitment Party and you or any such affiliate.

9.   Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor the Fee Letters nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person except (a) you, TA Associates, L.P. and your and their respective officers, directors, employees, affiliates, members, partners, stockholders, option holders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent practicable under the circumstances and to the extent permitted by applicable law, to inform us promptly thereof),  (c) in connection with the exercise of any remedy or enforcement of any right under this Commitment Letter and/or the Fee Letters, (d) upon notice to the Commitment Parties, this Commitment Letter and the existence and contents hereof (but not the Fee Letters or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed in any syndication or other marketing material in connection with the Senior Secured Facilities or in connection with any public filing requirement, and (e) the Term Sheets may be disclosed to potential Lenders in connection with the Senior Secured Facilities and to existing lessors and secured lenders to the Borrower and its subsidiaries.  The foregoing restrictions shall cease to apply in respect of the existence and contents of this Commitment Letter (but not in respect of the Fee Letters and the contents thereof) three years following the date of this Commitment Letter.

The Commitment Parties shall use all nonpublic information received by them in connection with the Senior Secured Facilities solely for the purposes of providing the services that are the subject of this Commitment Letter and shall maintain as confidential all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to any Lenders or participants or prospective Lenders or participants, (b) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (c) upon the request or demand of any regulatory authority having jurisdiction over such Commitment Party or its affiliates, (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "Representatives") on a need-to-know basis who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its respective affiliates on a need-to-know basis (provided that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its affiliates' compliance with this paragraph) and (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in breach of this Commitment Letter; provided that the disclosure of any such information to any Lenders or participants or prospective Lenders or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Commitment Party or customary market standards for dissemination of such type of information and subject to the agreement of such Lender or prospective Lender or participant or prospective participant to be bound by the terms of this paragraph (or language substantially similar to this paragraph).  The provisions of this paragraph shall automatically terminate three years following the date of this

509265-1664-11227-Active.15459523.20

Commitment Letter (unless superseded by the Senior Secured Credit Documentation as set forth in Section 10).

10. Miscellaneous

This Commitment Letter shall not be assignable by any party hereto without the prior written consent of you and the Commitment Parties (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the Lender Indemnified Persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the Lender Indemnified Persons to the extent expressly set forth herein.  The Commitment Parties reserve the right to employ the services of their affiliates in providing services contemplated hereby and to allocate, in whole or in part, to their affiliates certain fees payable to the Commitment Parties in such manner as the Commitment Parties and their affiliates may agree in their sole discretion.  This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Commitment Parties.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.  This Commitment Letter and the Fee Letters are the only agreements that have been entered into among us and you with respect to the Senior Secured Facilities and set forth the entire understanding of the parties with respect thereto.  This Commitment Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of any state or Federal court sitting in the Borough of Manhattan in the City of New York over any suit, action or proceeding arising out of or relating to the Senior Secured Facilities or any other transactions contemplated hereby, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder.  You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court.  You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum.  You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Senior Secured Facilities, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder.

The Commitment Parties hereby notify you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "PATRIOT Act"), they are required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow each Lender to identify the Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

With your prior consent, each Commitment Party shall be permitted to use information related to the syndication and arrangement of the Senior Secured  Facilities in connection with marketing, press releases or other transactional announcements or updates provided to investor or trade publications, including, without limitation, the placement of "tombstone" advertisements in publications of its choice at its own expense.

509265-1664-11227-Active.15459523.20

Subject to the following paragraph, you may terminate this Commitment Letter and the related Fee Letters at any time in your discretion, provided that you shall pay all accrued expenses incurred by us through the date of termination to the extent reimbursable pursuant to (and subject to the limitations set forth in) Section 7 of this Commitment Letter.

The indemnification, fee, expense, jurisdiction and confidentiality provisions contained herein and in the Fee Letters shall remain in full force and effect regardless of whether definitive financing documentation shall be executed and delivered and notwithstanding the termination of this Commitment Letter; provided that (a) your obligations under this Commitment Letter (other than your obligations with respect to (a) assistance to be provided in connection with the syndication thereof (including as to the provision of information and representations with respect thereto) and (b) confidentiality) shall automatically terminate and be superseded by the comparable provisions of the Senior Secured Credit Documentation upon the funding thereunder, and you shall automatically be released from all liability in connection therewith at such time and (b) the Commitment Parties' confidentiality obligations under this Commitment Letter shall automatically terminate and be superseded, to the extent comparable, by the provisions of the Senior Secured Credit Documentation upon the funding thereunder.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letters by returning to us executed counterparts of this Commitment Letter and the Fee Letters not later than 5:00 p.m., New York City time, on March 17, 2014. This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence. In the event that the borrowing under the Senior Secured Facilities does not occur on or before the Expiration Date, then this Commitment Letter shall automatically terminate unless we shall, in our discretion, agree to an extension. "Expiration Date" means the date that is 45 days after the date hereof.

509265-1664-11227-Active.15459523.20

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
　　Name:
　　Title:　　Dawn L. LeeLum
　　　　　　　Executive Director

J.P. MORGAN SECURITIES LLC

By: _____
　　Name:
　　Title:

*Commitment Letter Signature Page*

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
Name:
Title:

J.P. MORGAN SECURITIES LLC

By: _____
Name: Ryan Griswold
Title: Vice President

*Commitment Letter Signature Page*

CITIGROUP GLOBAL MARKETS INC.

By: _____

Name:

Title:     Stuart G. Dickson
           Managing Director

*Commitment Letter Signature Page*

BMO CAPITAL MARKETS CORP.

By: _____

      Name:  Michael Hsieh
      Title:   Director


BANK OF MONTREAL


By: _____

      Name:  Phillip Ho
      Title:   Director

*Commitment Letter Signature Page*

BMO CAPITAL MARKETS CORP.

By: _____
        Name:
        Title:

BANK OF MONTREAL

By: _____
        Name:
        Title:        **Phillip Ho**
                      **Director**

*Commitment Letter Signature Page*

SUNTRUST ROBINSON HUMPHREY, INC.

By: _____

    Name:  William Monroe
    Title:   Director


SUNTRUST BANK

By: _____

    Name:  David M. Felty
    Title:   Director

*Commitment Letter Signature Page*

Accepted and agreed to as of the date first written above:

MILLENNIUM LABORATORIES, INC.


By: _____
     Name:  Howard Appel
     Title:  President

EXHIBIT A

$1,815 million
Senior Secured Facilities
Summary of Terms and Conditions

Set forth below is a summary of the principal terms and conditions for the Senior Secured Facilities. Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this Exhibit A is attached and in Exhibit B attached thereto.

1. PARTIES

Borrower: Millennium Laboratories, Inc., a California corporation (the "Borrower"), it being understood that the Borrower may change its corporate status to a limited liability company on or prior to the Closing Date.

Guarantors: The direct parent holding company of Borrower ("Holdings"), and each of the Borrower's direct and indirect, existing and future, domestic subsidiaries (other than Pain In The Air, Inc. (and its successors) and other excluded subsidiaries to be agreed, and with appropriate exclusions from guarantees of swap obligations for any entity that is not an "eligible contract participant" under the Commodity Exchange Act) (the "Guarantors"; together with the Borrower, the "Loan Parties").

Joint Lead Arrangers
and Joint Bookrunners: J.P. Morgan Securities LLC and Citigroup Global Markets Inc. (in such capacities, the "Lead Arrangers").

Administrative Agent: JPMorgan Chase Bank, N.A. (in such capacity, the "Administrative Agent").

Syndication Agent: Citigroup Global Markets Inc.

Co-Managers and
Documentation Agents: BMO Capital Markets Corp. and SunTrust Bank.

Lenders: A syndicate of banks and financial institutions arranged by the Lead Arrangers (collectively, the "Lenders").

2. TYPES AND AMOUNTS OF SENIOR SECURED FACILITIES

A. Term Loan Facility

Type and Amount: A seven-year term loan facility (the "Term Loan Facility") in the amount of $1,765 million (the loans thereunder, the "Term Loans").

Maturity and

| | |
|---|---|
| Amortization: | The Term Loans will mature on the date that is seven years after the Closing Date (the "Term Maturity Date").

The Term Loans shall be repayable in equal quarterly installments in an aggregate annual amount equal to 1% of the original amount of the Term Loan Facility, commencing at the end of the first complete fiscal quarter after the Closing Date. The balance of the Term Loans will be repayable on the Term Maturity Date. |
| Availability: | The Term Loans shall be made in a single drawing on the Closing Date. Repayments and prepayments of the Term Loans may not be reborrowed. |
| Use of Proceeds: | The proceeds of the Term Loans will be used (i) to make certain distributions, redemption and/or other compensation payments to shareholders, warrant holders and option holders, (ii) to repay all amounts outstanding under the amended and restated credit agreement dated December 12, 2013, entered among the Borrower, JPMorgan Chase Bank, N.A, as administrative agent, and the other lenders and financial institutions from time to time party thereto (the "Existing Credit Agreement") and (iii) to pay the fees and expenses incurred in connection with the foregoing transactions. |

B. Revolving Facility:

| | |
|---|---|
| Type and Amount: | A five-year revolving facility (the "Revolving Facility"; the commitments thereunder, the "Revolving Commitments") in the amount of $50 million (the loans thereunder, together with (unless the context otherwise requires) the Swingline Loans referred to below, the "Revolving Loans"; and together with the Term Loans, the "Loans"). |
| Availability and Maturity: | The Revolving Facility shall be available on a revolving basis during the period commencing on the Closing Date and ending on the date that is five years after the Closing Date (the "Revolving Termination Date"). The Revolving Commitments will expire, and the Revolving Loans will mature, on the Revolving Termination Date. No Revolving Loans shall be drawn on the Closing Date. |
| Letters of Credit: | A portion of the Revolving Facility not in excess of $10 million shall be available for the issuance of letters of credit (the "Letters of Credit") by the Administrative Agent or other Lenders reasonably satisfactory to the Borrower who agree to issue Letters of Credit (in such capacity, the "Issuing Lender"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance unless consented to by the Issuing Lender and (b) five business days prior to the Revolving |

A-2

Termination Date, unless fully cash collateralized to the satisfaction of the Issuing Lender, provided that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above unless fully cash collateralized to the satisfaction of the Issuing Lender).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Revolving Loans) within one business day following notice to the Borrower. To the extent that the Borrower does not so reimburse the Issuing Lender, (a) the Lenders under the Revolving Facility shall be irrevocably and unconditionally obligated to fund participations in the reimbursement obligations on a pro rata basis and (b) so long as no default has occurred and is continuing, and to the extent of the then-unutilized Revolving Commitments, the unreimbursed amount shall automatically convert into a borrowing of Revolving Loans based on ABR.

Swingline Loans:      A portion of the Revolving Facility not in excess of $5 million shall be available for swingline loans (the "Swingline Loans") from the Administrative Agent on same-day notice. Any Swingline Loans will reduce availability under the Revolving Facility on a dollar-for-dollar basis. Each Lender under the Revolving Facility shall be irrevocably and unconditionally required to purchase, under certain circumstances, a participation in each Swingline Loan on a pro rata basis.

Use of Proceeds:      The proceeds of the Revolving Loans shall be used to finance the working capital needs and general corporate purposes of the Borrower and its subsidiaries, including permitted acquisitions, investments and distributions.

C. Incremental Facilities:      The Senior Secured Credit Documentation will permit the Borrower to add one or more incremental term loan facilities to the Senior Secured Facilities (each, an "Incremental Term Facility") and/or increase commitments under the Revolving Facility (any such increase, an "Incremental Revolving Facility"; together with any Incremental Term Facilities, the "Incremental Facilities") in an aggregate principal amount of (A) up to $175 million plus (B) an unlimited amount so long as after giving pro forma effect to the incurrence of such additional amount (assuming, in the case of an Incremental Revolving Facility, the full drawing thereunder and after giving effect to other permitted pro forma adjustment events and any permanent repayment of indebtedness after the beginning of the relevant determination period but prior to or simultaneously with such borrowing) the Leverage Ratio is equal to or less than 4.50 to 1.0; provided that (i) no Lender will be required to participate in any such Incremental Facility, (ii) no event of default or default exists or would exist after giving effect thereto (subject to "certain funds"

A-3

provisions in connection with permitted acquisitions to be financed with the proceeds of such Incremental Facility), (iii) on a pro forma basis after giving effect to the incurrence of any such Incremental Facility (assuming, solely in connection with the incurrence of an Incremental Revolving Facility, the full drawing thereunder and after giving effect to other permitted pro forma adjustment events and any permanent repayment of indebtedness after the beginning of the relevant determination period but prior to or simultaneous with such borrowing), the Borrower is in compliance with the financial covenant in the Senior Secured Credit Documentation recomputed as of the last day of the most recently ended fiscal quarter of the Borrower for which financial statements are available, (iv) the representations and warranties in the Senior Secured Credit Documentation shall be true and correct in all material respects immediately prior to, and after giving effect to, the incurrence of such Incremental Facility (provided that only "specified representations" to be agreed shall be required to be accurate as condition of the availability of the Incremental Facility in connection with permitted acquisitions to be financed with the proceeds of such Incremental Facility), (v) the maturity date and weighted average life to maturity of any such Incremental Term Facility shall be no earlier than the maturity date and weighted average life to maturity, respectively, of the Term Loan Facility, (vi) the all-in yield (determined by taking into account interest rate margins, original issue discount, upfront fees or LIBOR/ABR floors but excluding arrangement, structuring, underwriting, commitment or other similar fees) applicable to any Incremental Term Facility will not be more than 0.50% higher than the corresponding all-in yield (calculated in the same manner as in the previous parenthetical phrase) for the existing Term Loan Facility, unless the interest rate margins with respect to the existing Term Loan Facility are increased by an amount equal to the difference between the all-in yield with respect to the Incremental Term Facility and the corresponding all-in yield on the existing Term Loan Facility minus 0.50% (it being agreed that any increase in yield in the existing Term Loan Facility required due to the application of LIBOR/ABR floors on the Incremental Term Facility shall be effected solely through an increase in any LIBOR/ABR floors applicable to such existing Term Loan Facility) and (vii) any Incremental Revolving Facility shall be on terms and pursuant to documentation applicable to the Revolving Facility (including the maturity date in respect thereof) and any Incremental Term Facility shall be on terms and pursuant to documentation to be determined, provided that, to the extent such terms and documentation are not consistent with, in the case of an Incremental Term Facility the Term Loan Facility (except to the extent permitted by clause (v) or (vi) above), they shall be reasonably satisfactory to the Administrative Agent.  The proceeds of the Incremental Facilities shall be used for general corporate purposes of the

A-4

509265-1664-11227-Active.15459523.20

|  | Borrower and its subsidiaries, including acquisitions, investments and distribution to shareholders. |
|---|---|
| D. Replacement Term Loans | The Senior Secured Credit Documentation shall permit the amendment (or amendment and restatement) thereof to provide for loans refinancing all or a portion of outstanding Term Loans ("Replacement Facilities"), subject to customary limitations to be agreed, with the consent of the Administrative Agent, the Borrower and the Lenders providing such replacement term loans; provided that (i) none of the Replacement Facilities shall mature prior to the maturity date of the Term Loans being refinanced and (ii) the other terms and conditions of the Replacement Facility (excluding pricing and optional prepayment) are substantially identical to, or less favorable to investors providing the Replacement Facility, than those applicable to the Term Loans being refinanced (except for covenants or other terms applicable only to periods after the latest final maturity date of the Term Loans existing at the time of such refinancing). |

## 3.  CERTAIN PAYMENT PROVISIONS

| Fees and Interest Rates: | As set forth on Annex I. |
|---|---|
| Optional Prepayments and Commitment Reductions: | The Loans may be prepaid and Revolving Commitments may be reduced or terminated, in whole or in part without premium or penalty (subject to the prepayment fee set forth below with respect to the Term Loan Facility), in minimum amounts to be agreed, at the option of the Borrower at any time upon one day's (or, in the case of a prepayment of Eurodollar Loans (as defined in Annex I hereto), three days') prior notice, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Eurodollar Loans prior to the last day of the relevant interest period and, if any Letter of Credit remains outstanding, the cash collateralization of such Letter of Credit to the satisfaction of the Issuing Lender.  Optional prepayments of the Term Loans shall be applied as directed by the Borrower. |
|  | Any (a) voluntary prepayment of the Term Loans using proceeds of indebtedness incurred by the Borrower from a substantially concurrent incurrence of syndicated term loans or other indebtedness for which the all-in yield (which shall be determined by including interest rate margins, original issue discount, upfront fees or LIBOR/ABR floors, but excluding arrangement, structuring, underwriting commitment or other similar) is lower than the all-in yield (determined on the same basis as provided in the preceding parenthetical) than that of Term Loans, incurred with the primary purpose of refinancing the Term Loans with a lower interest rate, and (b) repricing of the Term Loans pursuant to an amendment to the Senior Secured |

A-5

Credit Documentation (as defined below) resulting in a reduction of the all-in yield (determined on the same basis as provided in the in clause (a) directly above) applicable to all or a portion of the initial Term Loans (any of the foregoing in clause (a) or (b), a "Repricing Event"), shall be accompanied by a prepayment fee equal to 1.0% of the aggregate principal amount of such prepayment (or, in the case of clause (b) above, of the aggregate amount of Term Loans outstanding immediately prior to such amendment) if such Repricing Event occurs on or prior to the six-month anniversary of the Closing Date; provided that, in no event, shall any prepayment or repayment in connection with an acquisition related financing or by reason of a change of control constitute a Repricing Event.

| | |
|---|---|
| Mandatory Prepayments: | Mandatory prepayments of Term Loans shall be required from: |

(a)     100% of the net cash proceeds from any non-ordinary course sale or other disposition of assets (including as a result of casualty or condemnation) by the Borrower and the Guarantors (subject to exceptions and thresholds to be agreed), subject to the right of the Borrower and the Guarantors, absent there being an event of default, to reinvest 100% of such net cash proceeds if such proceeds are reinvested (or committed to be reinvested) within 12 months and, if so committed to be reinvested, so long as such reinvestment is actually completed within 6 months thereafter;

(b)     100% of the net cash proceeds from issuances or incurrences of debt by the Borrower and the Guarantors (other than certain indebtedness permitted by the Senior Secured Facilities to be agreed and after application to permitted indebtedness, if any, refinanced by the new debt); and

(c)     50% (with stepdowns to 25% and 0% if the Leverage Ratio (as defined below) is (i) less than or equal to 3.75 to 1:00 but greater than 2.75 to 1:00 or (ii) less than or equal to 2.75 to 1:00, respectively) of annual Excess Cash Flow (to be defined in a manner to be agreed, and which will permit tax distributions to be made to the Borrower's shareholders/members prior to the calculation of Excess Cash Flow and will provide for payments and reserves for payment of tax "true ups" and other taxes with respect to the relevant fiscal year) of Holdings and its subsidiaries commencing with the fiscal year ending December 31, 2014 (it being understood that (i) Excess Cash Flow for fiscal year 2014 shall be required only in relation to the last two quarters of that fiscal year and (ii) amortization payments in 2014 and Excess Cash Flow prepayments in respect of fiscal year 2014 shall not in the aggregate exceed $35 million, and amortization payments in 2015 and Excess Cash Flow prepayments in respect of fiscal year 2015 shall not in the aggregate exceed $45 million); provided that voluntary

A-6

prepayments of Term Loans shall reduce excess cash flow payments on a dollar-for-dollar basis; and provided, further, that commencing with the fiscal year 2015, the Borrower shall have the option to calculate and make payments with respect to Excess Cash Flow on a quarterly basis (and any such quarterly excess cash flow payments shall reduce the applicable annual Excess Cash Flow payment on a dollar-for-dollar basis).

All mandatory prepayments of Term Loans will be applied, without premium or penalty, first, to accrued interest and breakage fees (in the event of early termination of Eurodollar Loans (as defined in Annex I)) due on the amount of the prepayment, second, to scheduled installments thereof occurring within the next 24 months in direct order of maturity and, third, ratably to the remaining respective installments thereof (other than the installment due at final maturity, unless no installments prior to the final installment remain outstanding).  Mandatory prepayments of the Term Loans may not be reborrowed.

Any Lender may elect not to accept its pro rata portion of any mandatory prepayment (each, a "Declining Lender").  Any prepayment amount declined by a Declining Lender may be retained by the Borrower.

## 4.  COLLATERAL

Collateral:

Subject to exclusions and limitations to be agreed, the obligations of each of the Borrower and the Guarantors in respect of the Senior Secured Facilities and any swap agreements and cash management arrangements provided by any Lender (or any affiliate of a Lender) shall be secured by a perfected first priority security interest in all of its tangible and intangible assets (including, without limitation, intellectual property, licenses, real property and all of the capital stock of its direct subsidiaries, including the Borrower (limited, in the case of non-U.S. subsidiaries, to 65% of the capital stock thereof), except for those assets as to which the Administrative Agent shall determine in its sole discretion, in consultation with the Borrower, that the cost of obtaining a security interest therein is excessive in relation to the value of the security to be afforded thereby.

Notwithstanding anything to the contrary, the collateral shall exclude the following: (i) (A) any present or future fee owned real property with a value of less than an amount to be agreed, (B) any assets subject to seller financing, purchase money security interest or similar arrangement permitted by the Senior Secured Credit Documentation, (C) all present and future leased assets, including, without limitation, assets leased pursuant to the Banc of America Leasing & Capital, LLC financing (the "BALC Financing") and all rights as lessor or lessee under leases, and

A-7

(C) all other leasehold interests (including requirements to deliver landlord lien waivers, estoppels and collateral access letters) other than the headquarters of the Borrower currently subject to leasehold deeds of trust in favor of JPMorgan Chase Bank, N.A., (ii) motor vehicles and other assets subject to certificates of title, letter of credit rights and commercial tort claims with a value of less than an amount to be agreed, (iii) all other assets over which the granting of security interests in such assets would be prohibited by contract, applicable law or regulation or the organizational documents of any non-wholly owned subsidiary (in each case, after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code, other than proceeds and receivables thereof, the assignment of which is expressly deemed effective under the Uniform Commercial Code notwithstanding such prohibitions), or to the extent that such security interests would result in material adverse tax consequences as reasonably determined by the Borrower, (iv) equity interests in any person other than wholly owned subsidiaries to the extent not permitted by the terms of such subsidiary's organizational or, if applicable, joint venture documents (except to the extent such prohibition is deemed ineffective under the Uniform Commercial Code), (v) equity interests in excess of 65% of the voting capital stock of (A) any non-U.S. subsidiaries, (B) any U.S. subsidiary that has no material assets other than the capital stock of one or more subsidiaries not organized under the laws of the U.S. or (C) any U.S. subsidiary that is a disregarded entity and owns no material assets other than the equity of non-U.S. subsidiaries, (vi) any of the capital stock of (A) indirect non-U.S. subsidiaries (other than, for the avoidance of doubt, first-tier foreign subsidiaries subject to the restrictions in clause (v) above) or (B) any direct or indirect U.S. subsidiary of a non-U.S. subsidiary, (vii) any governmental licenses or state or local franchises, charters and authorizations, to the extent security interests in such licenses, franchises, charters or authorizations are prohibited or restricted thereby after giving effect to the applicable anti-assignment provisions of the Uniform Commercial Code, and (viii) all aircraft from time to time owned by the Borrower or its subsidiaries. In addition, in no event shall any of the following be required: (w) control agreements or control or similar arrangements with respect to deposit, securities or commodities accounts, (x) any security agreements or pledge agreements governed under foreign law, (y) Federal Assignment of Claims Act notices or (z) acknowledgments of warehousemen, bailees or consignees, or landlord access agreements in relation to personal property or fixtures.

5. CERTAIN CONDITIONS

Initial Conditions:                         The availability of the Senior Secured Facilities on the date of initial funding (the "Closing Date") will be subject only to (a)

A-8

the satisfaction of the conditions precedent set forth in Exhibit B, (b) the accuracy in all material respects (and in all respects if qualified by materiality) of the representations and warranties (including, without limitation, the no material adverse change representation) in the Senior Secured Credit Documentation (as defined below), except that representations and warranties that specifically refer to a prior date shall be true and correct in all material respects (and in all respects if qualified by materiality) only as of such prior date (provided that changes, developments or events that result from economic, political, industry or market changes generally shall not be taken into account in determining whether a "material adverse effect" or a "material adverse change" has occurred or would reasonably expected to occur unless such changes, developments or events adversely affect the Borrower and its subsidiaries in a materially disproportionate manner relative to other participants in the industries in which the Borrower and its subsidiaries operate) and (c) there being no default or event of default in existence at the time of, or after giving effect to, the extension of credit on the Closing Date.

On-Going Conditions:   After the Closing Date and the funding of the initial Loans, the making of each Revolving Loan or Swingline Loan and the issuance of each Letter of Credit shall be conditioned only upon (a) the accuracy in all material respects (and in all respects if qualified by materiality) of all representations and warranties (including, without limitation, the no material adverse change representation) in the Senior Secured Credit Documentation, except that representations and warranties that specifically refer to a prior date shall be true and correct in all material respects (and in all respects if qualified by materiality) only as of such prior date and (b) there being no default or event of default in existence at the time of, or after giving effect to, such extension of credit.

## 6. DOCUMENTATION

Senior Secured Credit
Documentation:   The definitive documentation for the Senior Secured Facilities (the "Senior Secured Credit Documentation") shall contain the terms set forth herein and, with respect to terms not addressed herein, those terms and conditions usual for syndicated senior secured facilities on "top-tier sponsor terms" as may be reasonably agreed in good faith negotiations between the Lead Arrangers and the Borrower, shall be usual and customary for similarly situated facilities of this type, will take into account current market conditions, and will give due regard to the operational requirements, financial reporting and business practices of the Loan Parties in light of their size, industry, practices, the Projections, the leverage profile and projected free cash flow generation of Holdings and its subsidiaries.

A-9

| Financial Covenants: | For the Term Loan Facility: None. |

For the Revolving Facility: A maximum  total leverage ratio (the "Leverage Ratio"), defined as the ratio of total indebtedness to Adjusted EBITDA (in each case defined in a manner to be agreed), tested on the last day of each fiscal quarter, as follows:

| Fiscal Quarter Ending | Leverage Ratio |
| --- | --- |
| September 30, 2014 | 6.50 to 1.00 |
| December 31, 2014 | 6.25 to 1.00 |
| March 31, 2015 | 6.00 to 1.00 |
| June 30, 2015 | 5.75 to 1.00 |
| September 30, 2015 | 5.75 to 1.00 |
| December 31, 2015 | 5.50 to 1.00 |
| December 31, 2016 | 5.00 to 1.00 |
| December 31, 2017 and thereafter | 4.50 to 1.00 |

 Notwithstanding the foregoing, all leases of the Borrower and its subsidiaries that are treated as operating leases for purposes of GAAP on the date hereof shall continue to be accounted for as operating leases for purposes of the defined financial terms under the Senior Secured Credit Documentation regardless of any change to GAAP following such date which would otherwise require such leases to be treated as capital leases, provided that financial reporting shall not be affected hereby. All real estate leases with a related party of the Borrower that are required to be capitalized under GAAP will be excluded from indebtedness.

For purposes of determining compliance with the financial covenant, any cash equity issuance (which equity shall be common equity or other equity on terms and conditions reasonably acceptable to the Administrative Agent) made by Holdings during the relevant fiscal quarter and on or prior to the day that is ten days after the day on which financial statements are required to be delivered for such fiscal quarter will, at the request of the Borrower and provided that the proceeds thereof have been contributed to the Borrower as cash common equity, be included in the calculation of EBITDA for the purposes of determining compliance with such financial covenant at the end of such fiscal quarter and applicable subsequent periods (any such equity contribution so included in the calculation of EBITDA, a "Specified Equity Contribution"); provided that (a) in each four fiscal quarter period there shall be a period of at least two consecutive fiscal quarters in which no Specified Equity Contribution is made, (b) no more than four Specified Equity Contributions will be made in the aggregate, (c) the amount of any Specified Equity Contribution with respect to the financial covenant shall be no greater than the amount required to cause the Borrower to be in compliance with the financial

A-10

509265-1664-11227-Active.15459523.20

covenant and (d) all Specified Equity Contributions shall be disregarded for all purposes other than determining compliance with the financial covenant.

Upon the termination of the Revolving Commitments, the financial covenant will cease to apply.

**Representations and Warranties:** Financial statements (including pro forma financial statements); absence of undisclosed liabilities; no material adverse change; existence; compliance with law; power and authority; enforceability of Senior Secured Credit Documentation; no conflict with law or material contractual obligations; no material litigation; no default; ownership of property; liens; intellectual property; taxes; Federal Reserve margin regulations; labor matters; ERISA; Investment Company Act and other regulations; subsidiaries; use of proceeds; environmental matters; accuracy of disclosure; creation and perfection of security interests; solvency; status of Senior Secured Facilities as senior debt; and compliance with OFAC, anti-corruption and other anti-terrorism laws; in the case of each of the foregoing representations and warranties, subject to qualifications, exceptions and limitations for materiality and knowledge customary for senior secured financings.

**Affirmative Covenants:** Limited to: Delivery of financial statements, reports, final accountants' letters, projections, officers' certificates and other information requested by the Lenders via the Administrative Agent; payment of taxes; continuation of business and maintenance of existence and material rights and privileges; compliance with laws and material contractual obligations; maintenance of property and insurance (including, without limitation, as applicable, flood insurance and other documents required by applicable flood regulations); maintenance of books and records; right of the Administrative Agent (and, at their expense, any other Lenders) to inspect property and books and records; notices of defaults, litigation and other material events; compliance with environmental laws; ERISA; further assurances (including, without limitation, with respect to security interests in after-acquired property and guaranties by new subsidiaries); quarterly conference calls with Lenders; and maintenance of credit ratings. The foregoing affirmative covenants shall be subject to qualifications, exceptions and limitations for materiality customary for senior secured financings.

**Negative Covenants:** Limited to limitations (in each case with customary exceptions, qualifications and baskets to be agreed) on: indebtedness (including guarantee obligations, but permitting the incurrence of unsecured debt owed to members of Holdings on arm's length basis (or more favorable terms for the Borrower) in an aggregate amount to be agreed and subject to limitations to be agreed (the "Members Debt"), provided that such Members Debt (i) shall not

A-11

be subject to the mandatory prepayment for incurrence of debt under the Senior Secured Credit Documentation, (ii) shall not be deemed a "restricted payment" under the Senior Secured Credit Documentation, and (iii) shall not be required to be subordinated to the Loans); liens; mergers, consolidations, liquidations and dissolutions; sales of assets; dividends and other payments in respect of capital stock (exceptions will include, without limitation, all distributions by subsidiaries of the Borrower to the Borrower; all distributions necessary to consummate the capital restructuring on or about the Closing Date, and including certain additional tax distributions relating to such restructuring; quarterly tax distributions to members of the Borrower and Holdings, on a pro rata basis in proportion to their respective percentage interests in Holdings, in amounts necessary to cause each member of Holdings to receive a minimum amount of tax distributions sufficient to pay such member's U.S. federal and state income, Medicare and employment tax liability attributable to its interests in Holdings and Borrower for that quarter; distributions to members of the Borrower of cash on hand immediately prior to the funding of the initial Loan (which for the avoidance of doubt shall not include any proceeds from the incurrence of indebtedness) on the Closing Date in excess of $50 million; distributions made after the Closing Date and prior to June 30, 2014 to option holders of Holdings of cash on hand (which for the avoidance of doubt shall not include any proceeds from the incurrence of indebtedness) in an approximate aggregate amount of $30 million (net of taxes) in connection with the redemption of option rights; distributions in an amount equal to 50% of Excess Cash Flow (with step-ups to 75% and 100% if the Leverage Ratio is (i) less than or equal to 3.75 to 1:00 but greater than 2.75 to 1:00 or (ii) less than or equal to 2.75 to 1:00, respectively (it being understood that commencing with the fiscal year 2015, the Borrower shall have the option to calculate Excess Cash Flow on a quarterly basis so long as the corresponding Excess Cash Flow payments of Term Loans are made for such quarter); and additional distributions not to exceed an amount to be agreed, in each case in a manner and subject to qualifications to be agreed); acquisitions (with permitted acquisitions to be defined), investments, loans and advances; prepayments and modifications of subordinated debt instruments; transactions with affiliates; sale-leasebacks; changes in fiscal year; negative pledge clauses; hedging agreements; clauses restricting subsidiary distributions; changes in lines of business; and use of proceeds.

Events of Default:    Limited to:  Nonpayment of principal when due; nonpayment of interest, fees or other amounts after a grace period to be agreed; material inaccuracy of a representation or warranty when made; violation of a covenant (subject, in the case of the violation of the covenant regarding the delivery of financial statements and certain other affirmative covenants, to a cure period of 30 days);

A-12

cross-default to material indebtedness; bankruptcy events; certain ERISA events; material judgments; actual or asserted invalidity of any guarantee, security document or subordination provisions or non-perfection of any security interest; changes in the passive holding company status of Holdings; and a change of control (the definition of which and relevant exclusions from which are to be agreed, and in any event will include pre-IPO and post-IPO definitions), provided that a breach of the financial covenant will not constitute an event of default for purposes of the Term Loan Facility or any other facility other than the Revolving Facility, and the Lenders under the Term Loan Facility (or any other facility other than the Revolving Facility) will not be permitted to exercise any remedies with respect to an uncured breach of the financial covenant until the date, if any, on which the Revolving Commitments have been terminated by the Revolving Lenders and the Revolving Loans have been accelerated as a result of such breach,  if the Borrower has failed to pay the Revolving Loans, terminate the Revolving Commitments and cash collateralize any outstanding Letters of Credit on or prior to such date.  In addition, until such date, Lenders under the Term Loan Facility (or any other facility other than the Revolving Facility) will not be permitted to exercise any remedies with respect to an uncured breach of the financial covenant by reason of cross-defaults and other technical defaults arising from such breach, unless other creditors whose agreements give rise to such cross-defaults or other technical defaults have actually accelerated their loans based on such breach. The foregoing defaults shall be subject to exceptions, materiality thresholds and notice and grace periods to be agreed.

Voting:                    Amendments and waivers with respect to the Senior Secured Credit Documentation shall require the approval of Lenders holding more than 50% of the aggregate amount of the Term Loans and Revolving Commitments voting as a single class (the "Required Lenders"), except that (a) the consent of each Lender directly affected thereby shall be required with respect to (i) reductions in the amount or extensions of the scheduled date of any amortization or final maturity of any Loan, (ii) reductions in the rate of interest (other than default interest) or any fee due to that Lender or extensions of any due date thereof and (iii) increases in the amount or extensions of the expiry date of any Lender's commitment, (b) the consent of 100% of the Lenders shall be required with respect to (i) reductions of any of the voting percentages, (ii) releases of all or substantially all the collateral and (iii) releases of all or substantially all of the Guarantors, (c) the amendment or waiver of the financial covenant (and the financial definitions thereof) shall only require the approval of Lenders holding more than 50% of the aggregate Revolving Commitments voting as a single class and (d) the Administrative Agent may approve amendments and

A-13

waivers that resolve any obvious error in the Senior Secured Credit Documentation.

The Senior Secured Credit Documentation shall contain customary provisions for replacing non-consenting Lenders in connection with amendments and waivers requiring the consent of all Lenders or of all Lenders directly affected thereby so long as the Required Lenders shall have consented thereto.

Assignments and
Participations:

The Lenders shall be permitted to assign all or a portion of their Loans and commitments with the consent, not to be unreasonably withheld, of (a) the Borrower, unless (i) the assignee is a Lender, an affiliate of a Lender or an approved fund or (ii) a payment or bankruptcy event of default has occurred and is continuing, provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 business days after having received notice thereof, (b) the Administrative Agent, unless a Term Loan is being assigned to a Lender, an affiliate of a Lender or an approved fund, and (c) any Issuing Lender with significant exposure, unless a Term Loan is being assigned. In the case of a partial assignment (other than to another Lender, an affiliate of a Lender or an approved fund), the minimum assignment amount shall be $1,000,000 (in the case of the Term Facility) and $5,000,000 (in the case of the Revolving Facility), in each case unless otherwise agreed by the Borrower and the Administrative Agent. The Administrative Agent shall receive a processing and recordation fee of $3,500 (payable by the assignee or the assignor) in connection with each assignment. The Lenders shall also be permitted to sell participations in their Loans. Participants shall have the same benefits as the applicable selling Lender with respect to yield protection and increased cost provisions, subject to customary limitations (including delivery of tax forms). Voting rights of a participant shall be limited to those matters set forth in clause (a) of the preceding paragraph with respect to which the affirmative vote of the Lender from which it purchased its participation would be required. Pledges of Loans in accordance with applicable law shall be permitted without restriction.

The Senior Secured Credit Documentation shall provide that so long as no default or event of default has occurred and is continuing, Term Loans may be purchased by and assigned to Holdings or any of its subsidiaries in any offer to purchase or take by assignment any loans from all Term Loan Lenders in accordance with customary Dutch auction procedures to be agreed and subject to conditions to be agreed; provided that any such Term Loans shall immediately be cancelled; and provided,

A-14

509265-1664-11227-Active.15459523.20

further, that no such purchase shall be effected using proceeds from borrowings under the Revolving Facility.

The Senior Secured Credit Documentation shall prohibit the assignment of Loans or commitments (or participations therein) to any Disqualified Lender (the list of which shall be disclosed in writing by the Borrower to the Lenders) or, except as provided in the preceding paragraph, to Holdings or any of its subsidiaries or to any natural person.

Yield Protection:    The Senior Secured Credit Documentation shall contain customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in law relating to reserve, tax, capital adequacy and other requirements of law (provided that the Dodd-Frank Wall Street Reform and Consumer Protection Act and Basel III and all requests, rules, guidelines or directives thereunder or issued in connection therewith shall be deemed to be a change in requirements of law, regardless of the date enacted, adopted or issued) and from the imposition of or changes in withholding or other taxes, subject to customary exceptions and mitigation requirements (but solely to the extent the applicable Lender is imposing such charges on borrowers it considers to be similarly situated); and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a Eurodollar Loan (as defined in Annex I) on a day other than the last day of an interest period with respect thereto.

The Senior Secured Credit Documentation shall contain provisions regarding the timing for asserting a claim under these provisions and permitting the Borrower to replace a Lender who asserts such claim without premium or penalty (but subject to payment of amounts owing in respect of such claim).

Defaulting Lenders:    The Senior Secured Credit Documentation shall contain provisions relating to "defaulting" Lenders (including provisions relating to reallocation of participations in, or the Borrower providing cash collateral to support, Swingline Loans or Letters of Credit, to the suspension of voting rights and rights to receive certain fees, and to termination or assignment of the Revolving Commitments or Loans of such Lenders).

Expenses and Indemnification:    The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Commitment Parties associated with the syndication of the Senior Secured Facilities and the preparation, execution, delivery and administration of the Senior Secured Credit Documentation and any amendment or waiver with respect thereto (including the reasonable and documented out-of-pocket fees, disbursements

A-15

and other charges of one counsel for such persons collectively, taken as a whole and, solely in the case of a conflict of interest, one additional counsel to all affected persons, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected persons taken as a whole)) and (b) all reasonable and documented out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable and documented out-of-pocket fees, disbursements and other charges of (i) one counsel to the Administrative Agent (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to the Administrative Agent) and (ii) of one counsel to the Lenders, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected persons taken as a whole)) in connection with the enforcement of the Senior Secured Credit Documentation.

The Administrative Agent, the Commitment Parties and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or reasonable and documented out-of-pocket expenses (including the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel for such persons collectively and, solely in the case of a conflict of interest, one additional counsel to all affected persons, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected persons taken as a whole)) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from (i) the gross negligence, willful misconduct, bad faith or material breach of the Senior Secured Credit Documentation of or by the relevant indemnified person or (ii) disputes solely among indemnified persons (or their related persons) (other than in connection with any person acting in its capacity as a Lead Arranger or Administrative Agent or any other agent or co-agent (if any), in each case in their respective capacities as such), and not arising out of or in connection with any act or omission of the Borrower or its subsidiaries.

None of the Administrative Agent, the Commitment Parties, the Lenders, the Borrower, the Borrower's subsidiaries, any Guarantors or their respective directors, officers, employees,

A-16

A-17

advisors, and agents of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with the Senior Secured Facilities or the transactions contemplated thereby; _provided_ that nothing contained in this sentence shall limit the Borrower's, the Borrower's subsidiaries' or any Guarantors' indemnity obligations to the extent set forth in the immediately preceding paragraph.

Governing Law and Forum:       New York.

Counsel to the Administrative
Agent:                          Simpson Thacher & Bartlett LLP.

A-17

**INTEREST AND CERTAIN FEES**

Interest Rate Options:

The Borrower may elect that the Loans comprising each borrowing bear interest at a rate per annum equal to (a) the ABR plus the Applicable Margin or (b) the Eurodollar Rate, plus the Applicable Margin; provided that all Swingline Loans shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

As used herein:

"ABR" means the highest of (i) the rate of interest publicly announced by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the "Prime Rate"), (ii) the federal funds effective rate from time to time plus 0.50% and (iii) the Eurodollar Rate applicable for an interest period of one month plus 1.00%, provided that, with respect to the Term Loan Facility, in no event will the ABR be less than 2.00%.

"Eurodollar Rate" means the rate (adjusted for statutory reserve requirements for eurocurrency liabilities) for eurodollar deposits for a period equal to one, two, three or six months (as selected by the Borrower) appearing on LIBOR01 or LIBOR02 Page published by Reuters, provided that with respect to the Term Loan Facility, in no event will the Eurodollar Rate be less than 1.00%.

"Applicable Margin" means, (A) with respect to the Term Loan Facility, 2.00% in the case of ABR Loans and 3.00% in the case of Eurodollar Loans and (B) with respect to the Revolving Facility, (a) initially, 2.00% in the case of ABR Loans and 3.00% in the case of Eurodollar Loans, and (b) thereafter, a percentage determined in accordance with the following pricing grid based on the Borrower's Leverage Ratio:

| Leverage Ratio | Eurodollar Rate Revolving Loans | ABR Revolving Loans |
|---|---|---|
| Greater than 3.75 to 1:00 | 3.00% | 2.00% |
| Less than or equal to 3.75 to 1:00 but greater than 2.75 to 1.00 | 2.75% | 1.75% |
| Less than or equal to 2.75 to 1:00 | 2.50% | 1.50% |

"ABR Loans" means Loans bearing interest based upon the ABR.

"Eurodollar Loans" means Loans bearing interest based upon the Eurodollar Rate.

| | |
|---|---|
| Interest Payment Dates: | In the case of ABR Loans, quarterly in arrears. |
| | In the case of Eurodollar Loans, on the last day of each relevant interest period and, in the case of any interest period longer than three months, on each successive date three months after the first day of such interest period. |
| Commitment Fees: | The Borrower shall pay a commitment fee calculated at a rate per annum equal to 0.50% (with stepdown to 0.375 if the Leverage Ratio is less or equal to 3.75 to 1:00) on the average daily unused portion of the Revolving Facility, payable quarterly in arrears after the Closing Date commencing at the end of the first complete fiscal quarter after the Closing Date. Swingline Loans shall, for purposes of the commitment fee calculations only, not be deemed to be a utilization of the Revolving Facility, but issued Letters of Credit shall be deemed to be a utilization of the Revolving Facility. |
| Letter of Credit Fees: | The Borrower shall pay a fee on the face amount of each Letter of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Revolving Facility. Such fee shall be shared ratably among the Lenders participating in the Revolving Facility and shall be payable quarterly in arrears. |
| | A fronting fee in an amount equal to 0.125% per annum on the face amount of each Letter of Credit shall be payable quarterly in arrears to the Issuing Lender for its own account. In addition, customary administrative, issuance, amendment, payment and negotiation charges shall be payable to the Issuing Lender for its own account. |
| Default Rate: | At any time when the Borrower is in default in the payment of any amount under the Senior Secured Facilities, after giving effect to any applicable grace period, such overdue amounts shall bear interest at 2.00% per annum above the rate otherwise applicable thereto (or, in the event there is no applicable rate, 2.00% per annum in excess of the rate otherwise applicable to Revolving Loans maintained as ABR Loans from time to time). |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest |

A-I-2

A-I-3

rate payable on which is then based on the Prime Rate) for actual days elapsed.

A-I-3

<u>EXHIBIT B</u>

<u>Conditions</u>

The availability of the Senior Secured Facilities on the Closing Date shall be subject to the satisfaction of the following conditions. Capitalized terms used but not defined herein have the meanings set forth in the Commitment Letter to which this Exhibit B is attached and in Exhibit A thereto.

1. Each party thereto shall have executed and delivered the Senior Secured Credit Documentation on terms consistent with the Commitment Letter and otherwise reasonably satisfactory to the Loan Parties, the Commitment Parties and the Lenders, and the Commitment Parties and the Lenders shall have received:

    a. customary closing certificates and legal opinions; and

    b. a certificate from the chief financial officer of the Borrower, in form and substance reasonably acceptable to the Administrative Agent, certifying that the Borrower and its subsidiaries, on a consolidated basis after giving effect to the Senior Secured Facilities, are solvent.

2. On the Closing Date, after giving effect to the Senior Secured Facilities, neither the Borrower nor any of its subsidiaries shall have any material indebtedness for borrowed money (which term in any event shall not include obligations in relation to the redemption of employee stock options) other than (a) the Senior Secured Facilities, (b) the BALC Financing in an aggregate principal amount not to exceed $30 million, (c) the Thermo Fisher Financial Services, Siemens Financial Services, De Lage Landen, and TimePayment Corporation financing in aggregate principal amount not to exceed $3 million and (d) indebtedness incurred in connection with the Borrower's and its subsidiaries' aircraft.

3. On the Closing Date, the Administrative Agent and the Commitment Parties shall be reasonably satisfied that substantially simultaneously with the initial borrowing under the Senior Secured Facilities, the Borrower shall have paid all amounts outstanding under the Existing Credit Agreement and all liens in connection therewith shall have been terminated.

4. On the Closing Date, the Administrative Agent and the Commitment Parties shall be reasonably satisfied that substantially simultaneously with the initial borrowing under the Senior Secured Facilities, the Borrower shall have redeemed by exchange all debentures of Millennium Lab Holdings, Inc. ("<u>Millennium Holdings</u>") issued on July 30, 2010 (as amended and restated pursuant to the Amended and Restated Debenture Purchase and Stock Redemption Agreement dated as of March 29, 2012, the "<u>TA Debentures</u>") and all warrants issued by Millennium Holdings, and all amounts outstanding thereunder shall have been converted or exchanged for common equity of the Borrower.

5. The closing of the Senior Secured Facilities shall have occurred on or before the Expiration Date.

6. The Lenders shall have received (a) audited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries, for the fiscal years ended December 31, 2013, December 31, 2012 and December 31, 2011 and (b) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its subsidiaries, for each subsequent fiscal quarter ended at least 45 days before the Closing Date.

7.     The Lenders shall have received a pro forma consolidated balance sheet and related pro forma consolidated statement of income of the Borrower and its subsidiaries as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 45 days prior to the Closing Date, prepared after giving effect to the Senior Secured Facilities as if the Senior Secured Facilities had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such statement of income).

8.     The Lenders shall have received the Projections through December 31, 2021 (which Projections shall be on a quarterly basis for fiscal years 2014 and 2015 and on an annual basis thereafter). The Commitment Parties acknowledge that they have received all such projections on the date hereof.

9.     The Lead Arrangers (a) shall have received one or more customary confidential information memorandum and other marketing material customarily used for the syndication of the Senior Secured Facilities and (b) shall have been afforded a reasonable period of time to syndicate the Senior Secured Facilities, which in no event shall be less than 15 consecutive business days from the date of delivery of the Confidential Information Memorandum to the Commitment Parties.

10.     To the extent requested by any Lender within 7 days prior to the Closing Date, the Administrative Agent shall have received, at least 5 days prior to the Closing Date, all documentation and other information requested by the Administrative Agent or any Lender and required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

11.     All fees and expenses due to the Commitment Parties and the Lenders shall have been paid or shall have been authorized to be deducted from the proceeds of the initial funding under the Senior Secured Facilities.

12.     All actions necessary to establish that the Administrative Agent will have a perfected first priority security interest (subject to liens permitted under the Senior Secured Credit Documentation) in the collateral under the Senior Secured Facilities shall have been taken (subject to the exceptions contemplated by hereby), it being understood that, to the extent any collateral (including the grant or perfection of any security interest) is not or cannot be provided on the Closing Date (other than the grant and perfection of security interests (i) in assets with respect to which a lien may be perfected solely by the filing of a financing statement under the Uniform Commercial Code or (ii) in equity interests that are certificated securities and of all debt instruments that are promissory notes or other instruments in a face amount in excess of $5 million to which a lien may be perfected by delivery) after your use of commercially reasonable efforts to do so without undue burden or expense, then the provision of such collateral shall not constitute a condition precedent to the availability of the Senior Secured Facilities on the Closing Date, but may instead be provided after the Closing Date pursuant to arrangements to be mutually agreed.

13.     The Administrative Agent shall have received "life of loan" flood zone determinations with respect to any real estate collateral that shall be subject to a mortgage and, as applicable, evidence of flood insurance.

B-2

EXHIBIT C

CONFIDENTIAL

Disqualified Lenders

Aurora Resurgence; Bain Capital (it being understood that Sankaty Advisors shall not be a Disqualified Lender); Cerberus Capital and Affiliates; D.E. Shaw; Platinum Equity; Tennenbaum Capital; Wayzata Investment Partners; Aegis; AIT; Alere; Ameritox; Dominion Diagnostics; MedTox; Metalmark Capital; Sterling; Sequoia; Ampersand; PBI Bank; Riverside Partners; LabCorp; Quest Diagnostic; Ableco Finance; Appaloosa Management; Fortress; Greywolf Capital Management; Harbinger Capital Partners; and Wells Fargo Bank, N.A.; and any entities that are affiliates of the foregoing to the extent they are known to the Commitment Parties to be affiliates of the foregoing (without any obligation by the Commitment Parties to do specific diligence or discovery).

C-1

# EXHIBIT 2
# FILED UNDER SEAL

# EXHIBIT 3

EXECUTION VERSION

$1,825,000,000

CREDIT AGREEMENT

among

MILLENNIUM LAB HOLDINGS II, LLC,

as Holdings,

MILLENNIUM LABORATORIES, LLC,

as Borrower,

The Several Lenders from Time to Time Parties Hereto,

and

JPMORGAN CHASE BANK, N.A.,

as Administrative Agent

Dated as of April 16, 2014

J.P. MORGAN SECURITIES LLC

and

CITIBANK GLOBAL MARKETS INC.,

as Joint Lead Arrangers and Joint Bookrunners

CITIBANK GLOBAL MARKETS INC., as Syndication Agent

BMO CAPITAL MARKETS CORP. and SUNTRUST BANK,

as Co-Managers and Co-Documentation Agents

TABLE OF CONTENTS

Page

SECTION 1.   DEFINITIONS ................................................................................................. 1
   1.1   Defined Terms ................................................................................ 1
   1.2   Other Definitional Provisions ...................................................... 34

SECTION 2.   AMOUNT AND TERMS OF COMMITMENTS ............................. 35
   2.1   Tranche B Term Commitments ................................................... 35
   2.2   Procedure for Tranche B Term Loan Borrowing ....................... 35
   2.3   Repayment of Term Loans ........................................................... 36
   2.4   Revolving Commitments ............................................................. 37
   2.5   Procedure for Revolving Loan Borrowing ................................. 37
   2.6   Swingline Commitment ............................................................... 37
   2.7   Procedure for Swingline Borrowing; Refunding of Swingline Loans ............................ 38
   2.8   Commitment Fees, etc. ................................................................ 39
   2.9   Termination or Reduction of Revolving Commitments .............. 39
   2.10   Optional Prepayments ................................................................. 40
   2.11   Mandatory Prepayments .............................................................. 40
   2.12   Conversion and Continuation Options ........................................ 41
   2.13   Limitations on Eurodollar Tranches ........................................... 42
   2.14   Interest Rates and Payment Dates ............................................... 42
   2.15   Computation of Interest and Fees ............................................... 43
   2.16   Inability to Determine Interest Rate ............................................ 43
   2.17   Pro Rata Treatment and Payments .............................................. 43
   2.18   Requirements of Law .................................................................. 45
   2.19   Taxes ........................................................................................... 46
   2.20   Indemnity .................................................................................... 50
   2.21   Change of Lending Office ........................................................... 50
   2.22   Replacement of Lenders .............................................................. 50
   2.23   Defaulting Lenders ...................................................................... 51
   2.24   Incremental Facilities .................................................................. 53

SECTION 3.   LETTERS OF CREDIT ....................................................................... 54
   3.1   L/C Commitment ......................................................................... 54
   3.2   Procedure for Issuance of Letter of Credit ................................. 55
   3.3   Fees and Other Charges .............................................................. 55
   3.4   L/C Participations ........................................................................ 55
   3.5   Reimbursement Obligation of the Borrower ............................... 56
   3.6   Obligations Absolute ................................................................... 57
   3.7   Letter of Credit Payments ........................................................... 57
   3.8   Applications ................................................................................ 57

SECTION 4.   REPRESENTATIONS AND WARRANTIES ................................... 57
   4.1   Financial Condition ..................................................................... 57
   4.2   No Change ................................................................................... 58
   4.3   Existence; Compliance with Law ................................................ 58
   4.4   Power; Authorization; Enforceable Obligations ........................ 58
   4.5   No Legal Bar ............................................................................... 59
   4.6   Litigation .................................................................................... 59

i

| | | |
|---|---|---:|
| 4.7 | No Default | 59 |
| 4.8 | Ownership of Property; Liens | 59 |
| 4.9 | Intellectual Property | 59 |
| 4.10 | Taxes | 60 |
| 4.11 | Federal Regulations | 60 |
| 4.12 | Labor Matters | 60 |
| 4.13 | ERISA | 60 |
| 4.14 | Investment Company Act; Other Regulations | 60 |
| 4.15 | Subsidiaries | 61 |
| 4.16 | Use of Proceeds | 61 |
| 4.17 | Environmental Matters | 61 |
| 4.18 | Forward-Looking Statements | 62 |
| 4.19 | Accuracy of Information | 62 |
| 4.20 | Security Documents | 63 |
| 4.21 | [Intentionally Omitted] | 63 |
| 4.22 | Solvency | 63 |
| 4.23 | OFAC Compliance; Anti-Corruption Laws | 63 |
| 4.24 | Anti-Terrorism Laws | 63 |
| | | |
| SECTION 5. | CONDITIONS PRECEDENT | 64 |
| 5.1 | Conditions to Extension of Credit on the Closing Date | 64 |
| 5.2 | Conditions to Each Extension of Credit | 66 |
| | | |
| SECTION 6. | AFFIRMATIVE COVENANTS | 67 |
| 6.1 | Financial Statements | 67 |
| 6.2 | Certificates; Other Information | 67 |
| 6.3 | Maintenance of Existence; Compliance | 69 |
| 6.4 | Maintenance of Property; Insurance | 69 |
| 6.5 | Inspection of Property; Books and Records; Discussions | 69 |
| 6.6 | Notices | 69 |
| 6.7 | Environmental Laws | 70 |
| 6.8 | [Intentionally Omitted] | 70 |
| 6.9 | Additional Collateral | 70 |
| 6.10 | Ratings | 72 |
| 6.11 | Quarterly Conference Calls | 72 |
| 6.12 | Conditions Subsequent | 72 |
| 6.13 | Designation of Subsidiaries | 73 |
| | | |
| SECTION 7. | NEGATIVE COVENANTS | 73 |
| 7.1 | Consolidated Leverage Ratio | 73 |
| 7.2 | Indebtedness | 73 |
| 7.3 | Liens | 76 |
| 7.4 | Fundamental Changes | 79 |
| 7.5 | Disposition of Property | 80 |
| 7.6 | Restricted Payments | 81 |
| 7.7 | [Intentionally Omitted] | 84 |
| 7.8 | Investments | 84 |
| 7.9 | Payments and Modifications of Subordinated Indebtedness, Members Debt or the Special Members Loan | 85 |
| 7.10 | Transactions with Affiliates | 86 |
| 7.11 | Sales and Leasebacks | 87 |

ii

7.12    Swap Agreements ............................................................................................ 87
7.13    Changes in Fiscal Periods .............................................................................. 87
7.14    Negative Pledge Clauses................................................................................. 87
7.15    Clauses Restricting Subsidiary Distributions.................................................. 88
7.16    Lines of Business ........................................................................................... 88
7.17    Use of Proceeds ............................................................................................. 89

SECTION 8.    EVENTS OF DEFAULT................................................................................. 89
8.1    Events of Default ............................................................................................. 89
8.2    Right to Cure.................................................................................................... 92

SECTION 9.    THE AGENTS............................................................................................... 92
9.1    Appointment ................................................................................................... 92
9.2    Delegation of Duties ....................................................................................... 93
9.3    Exculpatory Provisions ................................................................................... 93
9.4    Reliance by Administrative Agent.................................................................... 93
9.5    Notice of Default ............................................................................................. 93
9.6    Non-Reliance on Agents and Other Lenders .................................................... 94
9.7    Indemnification............................................................................................... 94
9.8    Agent in Its Individual Capacity ..................................................................... 95
9.9    Successor Administrative Agent ...................................................................... 95
9.10   Arrangers, Documentation Agents, Managers and Syndication Agent ............ 95

SECTION 10.    MISCELLANEOUS....................................................................................... 95
10.1    Amendments and Waivers .............................................................................. 95
10.2    Notices ........................................................................................................... 97
10.3    No Waiver; Cumulative Remedies ................................................................. 99
10.4    Survival of Representations and Warranties.................................................... 99
10.5    Payment of Expenses and Taxes..................................................................... 99
10.6    Successors and Assigns; Participations and Assignments ............................. 101
10.7    Adjustments; Set-off ..................................................................................... 105
10.8    Counterparts.................................................................................................. 106
10.9    Severability ................................................................................................... 106
10.10   Integration.................................................................................................... 106
10.11   GOVERNING LAW ..................................................................................... 106
10.12   Submission to Jurisdiction; Waivers............................................................. 106
10.13   Acknowledgements....................................................................................... 107
10.14   Releases of Guarantees and Liens................................................................. 107
10.15   Confidentiality ............................................................................................. 108
10.16   WAIVERS OF JURY TRIAL ....................................................................... 109
10.17   USA Patriot Act ........................................................................................... 109
10.18   Usury............................................................................................................ 109

iii

509265-1664-11227-Active.15480116.26

SCHEDULES:

1.1A     Commitments
1.1B     Mortgaged Property
1.1C     Disqualified Lenders
1.1D     Permitted Investors
4.4      Consents, Authorizations, Filings and Notices
4.15     Subsidiaries
4.20(a)  UCC Filing Jurisdictions
4.20(b)  Mortgage Filing Jurisdictions
7.2(d)   Existing Indebtedness
7.3(f)   Existing Liens

EXHIBITS:

A        Form of Guarantee and Collateral Agreement
B        Form of Compliance Certificate
C        Form of Closing Certificate
D-1      Form of Assignment and Assumption
D-2      Form of Affiliated Lender Assignment and Assumption
E        Form of Legal Opinion of Hogan Lovells US LLP
F        Form of Prepayment Option Notice
G-1      Form of U.S. Tax Compliance Certificate—For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes
G-2      Form of U.S. Tax Compliance Certificate—For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes
G-3      Form of U.S. Tax Compliance Certificate—For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes
G-4      Form of U.S. Tax Compliance Certificate— For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes
H-1      Form of Increased Facility Activation Notice—Incremental Term Loans
H-2      Form of Increased Facility Activation Notice—Incremental Revolving Commitments
H-3      Form of New Lender Supplement

509265-1664-11227-Active.15480116.26

CREDIT AGREEMENT (this "Agreement"), dated as of April 16, 2014, among MILLENNIUM LAB HOLDINGS II, LLC, a Delaware limited liability company ("Holdings"), MILLENNIUM LABORATORIES, LLC, a California limited liability company (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders") and JPMORGAN CHASE BANK, N.A., as Administrative Agent.

The parties hereto hereby agree as follows:

SECTION 1.   DEFINITIONS

1.1     Defined Terms. As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate that would be calculated as of such day (or, if such day is not a Business Day, as of the next preceding Business Day) in respect of a proposed Eurodollar Loan with a one-month Interest Period plus 1.0%; provided that the ABR shall be at all times not less than 2.0% with respect to the Tranche B Term Loans. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"Adjustment Date":  as defined in the Applicable Pricing Grid.

"Administrative Agent":  JPMorgan Chase Bank, N.A., together with its affiliates, as the arranger of the Commitments and as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly to direct or cause the direction of the management and policies of such Person, whether by contract, ownership of voting securities or otherwise.

"Affiliated Lender Assignment and Assumption": an Affiliated Lender Assignment and Assumption, substantially in the form of Exhibit D-2.

"Agents":  the collective reference to the Administrative Agent and any other agent identified on the cover page of this Agreement.

"Aggregate Exposure":  with respect to any Lender at any time, an amount equal to the sum of (i) the aggregate then unpaid principal amount of such Lender's Term Loans and (ii) the amount of such Lender's Revolving Commitment then in effect or, if the Revolving Commitments have been terminated, the amount of such Lender's Revolving Extensions of Credit then outstanding.

"Aggregate Exposure Percentage":  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"Agreement":  as defined in the preamble hereto.

"Aircraft":  the Pilatus Aircraft, the Falcon Aircraft, the Gulfstream Aircraft and each other aircraft from time to time owned by the Borrower or its Subsidiaries, in each case, together with all related property.

"Anti-Corruption Laws": all laws, rules, and regulations of any jurisdiction applicable to the Borrower, its Affiliates or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Applicable Margin":

(a)     for each Type of Loan other than the Incremental Term Loans, the rate per annum set forth under the relevant column heading below:

|  | ABR Loans | Eurodollar Loans |
|---|---|---|
| Revolving Loans and Swingline Loans | 2.00% | 3.00% |
| Tranche B Term Loans | 3.25% | 4.25% |

; provided, that on and after the first Adjustment Date occurring after the completion of the first full fiscal quarter of Holdings after the Closing Date, the Applicable Margin with respect to the Revolving Loans and Swingline Loans will be determined pursuant to the Applicable Pricing Grid; and

(b)     for the Incremental Term Loans, such the rates per annum as shall be agreed to by the Borrower and the Incremental Term Lenders as shown on the applicable Increased Facility Activation Notice.

"Applicable Pricing Grid":  the table set forth below:

| Consolidated Leverage Ratio | Applicable Margin for Eurodollar Loans | Applicable Margin for ABR Loans | Commitment Fee Rate |
|---|---|---|---|
| Greater than 3.75 to 1.00 | 3.00% | 2.00% | 0.50% |
| Less than or equal to 3.75 to 1.00 but greater than 2.75 to 1.00 | 2.75% | 1.75% | 0.375% |
| Less than or equal to 2.75 to 1.00 | 2.50% | 1.50% | 0.375% |

For the purposes of the Applicable Pricing Grid, changes in the Applicable Margin resulting from changes in the Consolidated Leverage Ratio shall become effective on the date (the "Adjustment Date") that is one Business Day after the date on which financial statements are delivered to the Lenders pursuant to Section 6.1 and shall remain in effect until the next change to be effected pursuant to this paragraph.  At all times while an Event of Default shall have occurred and be continuing, the highest rate set forth in each column of the Applicable Pricing Grid shall apply unless otherwise agreed to by the Administrative Agent or the Required Lenders; provided, that immediately upon any cure (or waiver in accordance with this Agreement) of such Event of Default, the Applicable Margin shall automatically be that which is determined pursuant to this definition without regard to any Event of Default.

509265-1664-11227-Active.15480116.26

"<u>Application</u>":  an application, in such form as the Issuing Lender may specify from time to time, requesting the Issuing Lender to open a Letter of Credit.

"<u>Approved Fund</u>":  as defined in Section 10.6(b).

"<u>Arrangers</u>":  the Joint Lead Arrangers and Joint Bookrunners, as identified on the cover page of this Agreement.

"<u>Asset Sale</u>":  any Disposition of property or series of related Dispositions of property (excluding any such Disposition permitted by clause (a), (b), (c), (d), (e), (g), (h), (i), (j), (k) and (l) of Section 7.5) that yields gross proceeds to any Group Member (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $5,000,000.

"<u>Assignee</u>":  as defined in Section 10.6(b).

"<u>Assignment and Assumption</u>":  an Assignment and Assumption, substantially in the form of Exhibit D-1.

"<u>Available ECF Amount</u>":  at any time (the "<u>Reference Time</u>"), an amount equal to (a) the sum, without duplication, of (i) the Borrower's ECF Percentage of Excess Cash Flow (calculated on a cumulative basis and, with respect to each Calculation Period relating to the fiscal year of Holdings, without duplication of, or giving effect to, any such amounts with respect to any Calculation Period occurring during the first three fiscal quarters of such fiscal year), plus (ii) the amount of any cash or Cash Equivalents received by Borrower or Holdings (other than from a Person that is not a Subsidiary Guarantor thereof) from and including the Business Day immediately following the Closing Date through and including the Reference Time from the issuance and sale of its Specified Equity (other than any Specified Equity Contribution or any Specified Equity issued to a Subsidiary of Holdings) and contributed to the Borrower as cash common equity, plus (iii) the amount of any distribution in cash or Cash Equivalents received by any Loan Party or received by any Loan Party upon any Disposition, in each case, in respect of any Investment made by such Person in reliance on Section 7.8(h) (not to exceed the original amount of such Investment), plus (iv) any Declined Prepayment Amount, minus (b) the sum, without duplication, of (i) the aggregate amount paid by Holdings under Section 7.6(e) prior to the Reference Time, and (ii) the aggregate amount of Investments made in reliance on Section 7.8(h) prior to the Reference Time. For the avoidance of doubt, it is understood and agreed that "Available ECF Amount" for any Calculation Period shall not be a negative number.

"<u>Available Revolving Commitment</u>":  as to any Revolving Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Commitment then in effect <u>over</u> (b) such Lender's Revolving Extensions of Credit then outstanding; <u>provided</u>, that in calculating any Lender's Revolving Extensions of Credit for the purpose of determining such Lender's Available Revolving Commitment pursuant to Section 2.8(a), the aggregate principal amount of Swingline Loans then outstanding shall be deemed to be zero.

"<u>BALC</u>":  as defined in the term "Master Lease Agreement".

"<u>Bankruptcy Event</u>":  with respect to any Person, such Person becomes the subject of a voluntary bankruptcy or insolvency proceeding, or becomes the subject of an involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in

furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, <u>provided</u> that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof; <u>provided</u>, <u>further</u>, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benefitted Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors":  as to any Person, the board of directors or other governing body of such Person, or if such Person is managed by a single entity, the board of directors or other governing body of such entity.

"Borrower":  as defined in the preamble hereto.

"Borrower's ECF Percentage":  25%; provided, that, with respect to each Calculation Period, the Borrower's ECF Percentage shall be increased to (i) 75% if the Consolidated Leverage Ratio as of the last day of such Calculation Period is less than or equal to 3.75 to 1.0 but greater than 2.75 to 1.0 or (ii) 100% if the Consolidated Leverage Ratio as of the last day of such Calculation Period is not greater than 2.75 to 1.0.

"Borrowing Date":  any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Business":  as defined in Section 4.17(b).

"Business Day":  a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"Calculation Period": (a) each fiscal year of Holdings ended on or after December 31, 2015 and (b) if elected by the Borrower at the time of delivery of the quarterly financial statements set forth in Section 6.1(b) for any fiscal quarter ended after December 31, 2014, such relevant fiscal quarter of Holdings. For purposes of calculating Excess Cash Flow for the fiscal quarters ended September 30, 2014 and December 31, 2014, the six-month period beginning June 30, 2014 and ending December 31, 2014 shall also be deemed a "Calculation Period".

"Capital Expenditures":  for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Restricted Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP, other than to the extent arising under real estate leases described in Section 7.10, as the same may be renewed, amended or replaced from time to time, on a consolidated balance sheet of such Person and its Restricted Subsidiaries, and other than expenditures made in connection with, or as part of, Investments or Permitted Acquisitions.

5

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property (other than to the extent arising under real estate leases described in Section 7.10(c), (d), (e) and (f), as the same may be renewed, amended or replaced from time to time, or a combination thereof, and any other real estate leases with a related party of the Borrower that are required to be capitalized under GAAP), which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock":  any and all shares, interests, participations, units or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a limited liability company or other Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"Capitalized Earn-Out Obligations":  any Earn-Out Obligations that are required to be classified as and accounted for as liabilities on a balance sheet of a Group Member under GAAP.

"Cash Collateralize": to pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Lender, as collateral for the L/C Obligations, cash or deposit account balances or, if the Administrative Agent and the Issuing Lender shall agree in their sole discretion, other credit support, in each case pursuant to customary documentation in form and substance reasonably satisfactory to the Administrative Agent and the Issuing Lender. "Cash Collateral" shall have a meaning correlative to the foregoing and shall include the proceeds of such cash collateral and other credit support.

"Cash Equivalents":  (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition; or (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AA by S&P and Aa2 by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Cash Management Arrangement": any arrangement for treasury, depositary, purchasing card, credit card or cash management services, including, without limitation, in connection with any automated clearing house transfers of funds or any similar transactions.

"Change in Control": (i) at any time prior to a Qualified IPO, (A) the Permitted Investors and the Investors as of the Closing Date collectively shall cease to have the power directly or indirectly to vote or direct the voting of securities having a majority of the ordinary voting power for the election of the Board of Directors of Holdings (determined on a fully diluted basis); or (B) the Board of Directors of Holdings shall cease to consist of a majority of Continuing Directors; (ii) at any time on or after the consummation of a Qualified IPO, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), excluding the Permitted Investors, shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than 35% of the outstanding common equity of Holdings; (iii) the Board of Directors of Holdings shall cease to consist of a majority of Continuing Directors; or (iv) Holdings shall cease to own and control, of record and beneficially, directly, 100% of each class of outstanding Capital Stock of the Borrower free and clear of all Liens (except Liens created by the Guarantee and Collateral Agreement). The parties agree that neither the Corporate Restructuring nor a Qualified IPO shall, in and of itself, constitute a Change in Control.

"Closing Date": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied, which date is April 16, 2014.

"Code": the Internal Revenue Code of 1986, as amended.

"Collateral": all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, but in any event excluding the Excluded Property.

"Commitment": as to any Lender, the sum of the Tranche B Term Commitment and the Revolving Commitment of such Lender.

"Commitment Fee Rate": 0.50% per annum; provided that on and after the first Adjustment Date occurring after the completion of the first full fiscal quarter of Holdings after the Closing Date, the Commitment Fee Rate will be determined pursuant to the Applicable Pricing Grid.

"Commodity Exchange Act": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate": a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B.

"Confidential Information Memorandum": the Confidential Information Memorandum dated March 31, 2014 and furnished to certain Lenders.

"Connection Income Taxes": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Current Assets": at any date, all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets"

(or any like caption) on a consolidated balance sheet of Holdings and its Restricted Subsidiaries at such date.

"Consolidated Current Liabilities":  at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of Holdings and its Restricted Subsidiaries at such date, but excluding (a) the current portion of any Funded Debt of Holdings and its Restricted Subsidiaries and (b) without duplication of clause (a) above, all Indebtedness consisting of Revolving Loans or Swingline Loans to the extent otherwise included therein, provided that Consolidated Current Liabilities shall not include any amounts under real estate leases described in Section 7.10(c), (d), (e) and (f), as the same may be renewed, amended or replaced from time to time, or a combination thereof, or any other real estate lease with a related party of the Borrower, even if required to be capitalized under GAAP.

"Consolidated EBITDA":  for any period, Consolidated Net Income for such period,

plus

(a)    without duplication and to the extent deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    consolidated interest expense, amortization or writeoff of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including letters of credit) (but excluding interest expense, amortization, write-off of debt discount and debt issuance costs, commissions, discounts, fees and charges in relation to Indebtedness that is excluded from Consolidated Total Debt);

(ii)    provision for Federal, foreign or state Taxes based on income, profits or capital, including franchise Taxes and similar Taxes paid or accrued during such period (including in respect of repatriated funds), any expenses resulting from a dispute with a Governmental Authority with respect to any such Taxes, and distributions for Taxes permitted pursuant to Section 7.6(d);

(iii)    depreciation expense and amortization expense;

(iv)    amortization or write-down of intangibles (including, but not limited to, goodwill) and organization costs;

(v)    extraordinary, unusual or non-recurring costs, charges or expenses;

(vi)    non-cash charges (including, without limitation, non-cash costs and/or expenses incurred pursuant to any management equity plan, stock option plan or any other stock subscription or shareholder agreement), losses or expenses;

(vii)    restructuring charges, costs or expenses (including restructuring costs related to acquisitions after the Closing Date and new reserves or adjustments to existing reserves), severance costs, relocation costs, integration costs, other business optimization expenses or reserves, signing costs, retention or completion bonuses, Expensed Earn-Out Obligations, payments made during the applicable period related to the redemption of employee options of Millennium Holdings related to the Transactions on or after the Closing Date, transition costs, costs related to closure/consolidation of facilities and

curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities); <u>provided</u> that (A) any amounts added back pursuant to this clause (a)(vii) for the applicable period, together with any amounts added back pursuant to clause (a)(xii) below for such period shall not exceed 10% of Consolidated EBITDA for such period (calculated prior to giving effect to any increase pursuant to this clause (a)(vii));

(viii)    in the case of any period that includes the Closing Date, costs or expenses (which may include Taxes arising in connection with the Transactions) including, without limitation, costs and expenses that are paid from cash and Cash Equivalents or from the proceeds of the initial funding of the Tranche B Term Loans, provided that after giving pro forma effect to those payments, Holdings and its Restricted Subsidiaries shall have not less than $50,000,000 in the aggregate of unrestricted (other than Liens in favor of the Administrative Agent or the Lenders) cash and Cash Equivalents;

(ix)    in the case of any period (A) that includes the date on which a Permitted Acquisition or an Investment that is permitted under this Agreement closes, reasonable transaction costs related to such Permitted Acquisition or Investment, and (B) that includes amortized transaction costs related to the RX Ante Acquisition or a Permitted Acquisition as reflected on the audited financial statements of Holdings and its consolidated Subsidiaries, reasonable transaction costs related to the RX Ante Acquisition or such Permitted Acquisition; and in the case of any period, transaction costs  and expenses associated with proposed, but not consummated, acquisitions and Investments that would have been permitted under this Agreement;

(x)    losses on asset sales, disposals or abandonments;

(xi)    expenses, charges or losses to the extent indemnified or insured by a third party (excluding Borrower and its Subsidiaries), including those covered by indemnification provisions in connection with the RX Ante Acquisition or Permitted Acquisitions, to the extent (i) the Borrower has determined that there is a reasonable basis for such coverage, (ii) coverage has not been denied and (iii) such amounts are actually reimbursed by such third party in cash within 90 days after the related amount is first added back to Consolidated EBITDA pursuant to this clause (x) (and if not so reimbursed within such 90 day period, such amount shall be deducted from Consolidated EBITDA during the applicable future period); and

(xii)    in connection with a Permitted Acquisition, without duplication, the amount of net cost savings and synergies projected by the Borrower in good faith to be realized as a result of specified actions taken or expected to be taken and calculated on a pro forma basis as though such cost savings and synergies had been realized on the first day of such period, net of the amount of actual benefits realized from such actions; <u>provided</u> that the chief financial officer of the Borrower shall have certified to the Administrative Agent that (x) such cost savings and synergies are reasonably identifiable and factually supportable, reasonably attributable to the actions specified and reasonably anticipated to result from such actions, (y) such actions have been taken, initiated or are reasonably expected to be taken and (z) the benefits resulting therefrom are anticipated by the Borrower to be realized within 18 months after the date of such Permitted Acquisition; and <u>provided</u>, <u>further</u>, that any amounts added back pursuant to this clause (a)(xii) for the applicable period, together with any amounts added back pursuant to

clause (a)(vii) above for such period, shall not exceed 10% of Consolidated EBITDA for such period (calculated prior to giving effect to any increase pursuant to this clause (a)(xii));

(xiii)    in the case of any period that includes the Closing Date, the fees and expenses payable to all rating agencies in connection with the rating of the Borrower and the Loans on or around the Closing Date;

minus

(b)    without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    extraordinary, unusual or non-recurring gains;

(ii)    interest income;

(iii)    non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period);

(iv)    gains on asset sales, disposals or abandonments; and

(v)    all payments and reversals that reduce any reserve that was accrued in a prior period (but only to the extent amounts in respect of such accrual were added back in determining Consolidated EBITDA pursuant to clause (a) above during such period);

in each case, as determined on a consolidated basis for the Borrower and its Subsidiaries; provided that, to the extent included in Consolidated Net Income,

(I)    there shall be included in determining Consolidated EBITDA for any period, without duplication, the Acquired EBITDA for such period of any entity acquired in a Permitted Acquisition (an "Acquired Entity") during such period to the extent not subsequently sold, transferred or otherwise disposed of in or prior to such period determined on a historical pro forma basis, and

(II)    there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA for such period of any person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations by the Borrower or any Subsidiary during such period (each such person, property, business or asset so sold, transferred or otherwise disposed of, closed or classified, a "Sold Entity") determined on a historical pro forma basis.  For these purposes:

"Acquired EBITDA":  with respect to any Acquired Entity, Consolidated EBITDA of such Acquired Entity for the applicable period (determined as if references to the Borrower and its Subsidiaries in the definition of Consolidated EBITDA were references to such Acquired Entity and its Subsidiaries) but excluding the Consolidated EBITDA of any related person, property, business or asset to the extent not so acquired, all as determined on a consolidated basis for such Acquired Entity.

"Disposed EBITDA": with respect to any Sold Entity, the amount of Consolidated EBITDA of such Sold Entity for the applicable period, as applicable (determined as if references to the Borrower and its Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity and its Subsidiaries) but excluding the Consolidated EBITDA of any related person, property, business or asset to the extent not so sold, transferred, or otherwise disposed of, closed or classified as discontinued, all as determined on a consolidated basis for such Sold Entity.

"Consolidated Leverage Ratio": as at the last day of any period, the ratio of (a) Consolidated Total Debt on such day to (b) Consolidated EBITDA for such period.

"Consolidated Net Income": for any period, the consolidated net income (or loss) of Holdings and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Restricted Subsidiaries, (b) the income (or deficit) of any Person (other than a Restricted Subsidiary of Holdings) in which Holdings or any of its Restricted Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Holdings or such Restricted Subsidiary in the form of dividends or similar distributions, and (c) the undistributed earnings of any Restricted Subsidiary of Holdings to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other than under any Loan Document) or Requirement of Law applicable to such Restricted Subsidiary.

"Consolidated Total Debt": at any date, the sum of (a) the aggregate principal amount, without duplication, of all Indebtedness described in clauses (a), (b), (c), (e), (f) and (h) (other than, in the case of clause (f) and (h), contingent obligations in respect thereof) of the definition of "Indebtedness" and all Guarantee Obligations thereof of Holdings and its Restricted Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP, minus (b) the aggregate amount of unrestricted cash and Cash Equivalents of the Loan Parties as at such date (provided that such cash and Cash Equivalents are free and clear of all Liens, other than Liens in favor of the Administrative Agent; it being understood, for the avoidance of doubt, that cash and Cash Equivalents of the Loan Parties received from the proceeds of any Indebtedness incurred on such date shall not be netted pursuant to this clause (b) for purposes of calculating the Consolidated Total Debt on such date); provided that (x) only for purposes of calculating the Consolidated Leverage Ratio under Section 7.1, Capitalized Earn-Out Obligations in respect of the Rx Ante Acquisition shall not be included in the calculation of Consolidated Total Debt and (y) the Special Members Loan shall not be included in the calculation of Consolidated Total Debt at any time.

"Consolidated Working Capital": at any date, the excess of Consolidated Current Assets on such date over Consolidated Current Liabilities on such date.

"Continuing Directors": the managers of Holdings on the Closing Date and each other manager or director, if, in each case, such other manager or director's nomination for election to the Board of Directors of Holdings is recommended by a majority of the then Continuing Directors or such other manager or director receives the vote of a majority of the Permitted Investors in his or her election by the members of Holdings.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

509265-1664-11227-Active.15480116.26

11

"Corporate Restructuring": the collective reference to (i) the conversion of the corporate status of the Borrower and such Subsidiaries as the Borrower may select to a limited liability company, (ii) the exchange or redemption of all amounts outstanding under the TA Debentures and all TA Warrants for common membership interests of Holdings (iii) the creation of Holdings as an intermediary company holding 100% of the Capital Stock of the Borrower, (iv) the other distributions and/or compensation payments to members and option holders of Millennium Holdings with the cash and Cash Equivalents in excess of $50,000,000 or with the proceeds of the initial funding of the Tranche B Term Loans and other sources permitted by Section 7.6(f), and (v) the borrowing by the Borrower from Millennium Holdings of the Special Members Loan.

"Credit Party":  the Administrative Agent, the Issuing Lender, the Swingline Lender or any other Lender.

"Debenture Holders":  as defined in the term "TA Debenture Agreement".

"Default":  any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender":  any Lender that (a) has failed, within two Business Days of the date required to be funded or paid, to (i) fund any portion of its Loans, (ii) fund any portion of its participations in Letters of Credit or Swingline Loans or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a loan under this Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three Business Days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations) to fund prospective Loans and participations in then outstanding Letters of Credit and Swingline Loans under this Agreement; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Administrative Agent, or (d) has become the subject of a Bankruptcy Event.

"Disposition":  with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Lender": those Persons set forth on Schedule 1.1C (as such list may be supplemented after the Closing Date by the Borrower in writing to the Lenders to reflect additional competitors of the Borrower or any Subsidiary thereof).

"Disregarded Subsidiary":  any direct or indirect Subsidiary of a Foreign Subsidiary.

"DL":  shall mean DeLage Landen Financial Services.

12

"Documentation Agents":  the Co-Documentation Agents identified on the cover page of this Agreement.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Domestic Subsidiary":  any Subsidiary of Holdings organized under the laws of any jurisdiction within the United States.

"Dutch Auction": an auction of Tranche B Term Loans conducted pursuant to Section 10.6(e) to allow a Purchasing Borrower Party to prepay Tranche B Term Loans at a discount to par value and on a non pro rata basis, in each case in accordance with the applicable Dutch Auction Procedures.

"Dutch Auction Procedures": with respect to a purchase of Tranche B Term Loans by a Purchasing Borrower Party pursuant to Section 10.6(e), Dutch Auction procedures as reasonably agreed upon by such Purchasing Borrower Party and the Administrative Agent.

"Earn-Out Obligations": those payments and payment obligations of the Borrower and its Restricted Subsidiaries to former owners of assets or businesses which were incurred by the Borrower or one of its Restricted Subsidiaries in connection with the RX Ante Acquisition or a Permitted Acquisition that are in the nature of deferred purchase price, earnouts, holdbacks, or compensation, retention payments, severance payments and bonuses.

"ECF Percentage":  75%; provided, that, with respect to each Calculation Period, the ECF Percentage shall be reduced to (i) 25% for such Calculation Period only if the Consolidated Leverage Ratio as of the last day of such Calculation Period is less than or equal to 3.75 to 1.0 but greater than 2.75 to 1.0 or (ii) 0% for such Calculation Period only if the Consolidated Leverage Ratio as of the last day of such Calculation Period is not greater than 2.75 to 1.0.

"Enforceability Exceptions":  as defined in Section 4.4.

"Environmental Laws":  any and all applicable material foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate":  (a) any entity, whether or not incorporated, that is under common control with a Group Member within the meaning of Section 4001(a)(14) of ERISA; (b) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which a Group Member is a member; (c) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which a Group Member is a member; and (d) with respect to any Group Member, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Group Member, any corporation described in clause (b) above or any trade or business described in clause (c) above is a member.

"ERISA Event":  (a) the failure of any Plan to comply with any material provisions of ERISA and/or the Code (and applicable regulations under either) or with the material terms of such Plan;

509265-1664-11227-Active.15480116.26

(b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any Reportable Event; (d) the failure of any Group Member or ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (e) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (f) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (g) the occurrence of any event or condition which would reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or the incurrence by any Group Member or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (h) the receipt by any Group Member or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (i) the failure by any Group Member or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan pursuant to Sections 431 or 432 of the Code; (j) the incurrence by any Group Member or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (k) the receipt by any Group Member or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Group Member or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA); or (l) the failure by any Group Member or any of its ERISA Affiliates to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period, as displayed on the Reuters Screen LIBOR01 Page or LIBOR02 Page (or, in the event such rate does not appear on any of such Reuters pages, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time, as selected by the Administrative Agent in its reasonable discretion; in each case, the "Screen Rate") as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that the Screen Rate shall not be available at such time for such Interest Period with respect to Dollars, then the "Eurodollar Base Rate" shall be the Interpolated Rate at such time.  The Eurodollar Base Rate shall be at all times not less than 1.00% with respect to the Tranche B Term Loans.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

509265-1664-11227-Active.15480116.26

14

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Tranche":  the collective reference to Eurodollar Loans under a particular Facility the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default":  any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow":  for any Calculation Period, the difference between:

(a) the sum, without duplication, of

(i) Consolidated Net Income for such Calculation Period,

(ii) the amount of all non-cash charges (without limitation depreciation and amortization, amortization of original issue discount, non-cash compensation and those other items more specifically described in clauses (a)(iii), (iv), (v), (vi) and (vii) of the definition of Consolidated EBITDA) deducted in arriving at such Consolidated Net Income,

(iii) decreases in Consolidated Working Capital for such Calculation Period,

(iv) the aggregate net amount of non-cash loss on the Disposition of property by Holdings and its Restricted Subsidiaries during such Calculation Period (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income, and

(v) increases in deferred Taxes to the extent deducted in arriving at such Consolidated Net Income, and

(vi) Expensed Earn-Out Obligations, minus

(b) the sum, without duplication, of

(i) interest expense and interest paid on all Indebtedness permitted under this Agreement;

(ii) the amount of all non-cash credits included in arriving at such Consolidated Net Income,

(iii) the aggregate amount actually paid (or committed to be paid pursuant to a binding contract within six months of such Calculation Period end) by Holdings and its Restricted Subsidiaries in cash during such Calculation Period on account of Capital Expenditures (excluding the principal amount of Indebtedness incurred in connection with such expenditures and any such expenditures financed with the proceeds of any Reinvestment Deferred Amount),

(iv) the aggregate amount of all repayments and prepayments of Revolving Loans and Swingline Loans and Cash Collateralization of Letters of Credit during such Calculation Period to the extent accompanying permanent optional reductions of the Revolving Commitments,

(v) the aggregate amount of all regularly scheduled principal payments of Funded Debt (including the Tranche B Term Loans) of Holdings and its Restricted Subsidiaries made during such Calculation Period (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder),

(vi) increases in Consolidated Working Capital for such Calculation Period,

(vii) the aggregate net amount of non-cash gain on the Disposition of property by Holdings and its Restricted Subsidiaries during such Calculation Period (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such Consolidated Net Income,

(viii) the aggregate amount actually paid, whether to members of Holdings or otherwise, or reserved by Holdings during such Calculation Period, on account of Taxes (including as permitted under Section 7.6(d)),

(ix) decreases in deferred Taxes to the extent included in arriving at such Consolidated Net Income,

(x) cash consideration actually paid in respect of any Permitted Acquisition permitted by Section 7.8(g) during such Calculation Period,

(xi) payments made and reserves taken during such Calculation Period for indemnities and warranties in connection with Dispositions and Investments (including, without limitation, Permitted Acquisitions) permitted under this Agreement, and

(xii) payments to option holders in respect of unvested option plans to the extent recorded as an expense in accordance with GAAP.

For the avoidance of doubt, it is understood and agreed that "Excess Cash Flow" for any Calculation Period may be a negative number, which would reduce the Available ECF Amount for such Calculation Period.

"Excess Cash Flow Application Date":  as defined in Section 2.11(c).

"Excluded Actions": making, entering into or obtaining any of the following (i) deposit account control agreements or similar control agreements with respect to deposit, securities or commodities accounts; (ii) any security agreements, pledge agreements or other security documents under laws outside the United States of America; (iii) the filing of any notices to or obtaining of any acknowledgments or consents from any government agency under the Federal Assignment of Claims Act, applicable Medicare statutes or regulations or other comparable laws or regulations; (iv) acknowledgements of warehousemen, bailees or consignees, or landlord lien waivers, estoppels or collateral access agreements in relation to personal property or fixtures; (v) control agreements or other steps for perfection in relation to investment property (or Investments constituting general intangibles) of with the issuer is not a direct or indirect Subsidiary of Holdings; or (vi) any other actions as to which the Administrative Agent shall determine in its sole discretion, in consultation with the Borrower, that the cost of obtaining or perfecting a security interest therein is excessive in relation to the value of the security to be afforded thereby.

"Excluded Collateral":

(a)    all Aircraft and all related assets;

(b)	the assets of the Excluded Domestic Subsidiary, any Excluded Foreign Subsidiary or any Unrestricted Subsidiary, and the Capital Stock of the Excluded Domestic Subsidiary or any Unrestricted Subsidiary;

(c)	all property leased from time to time (including, without limitation, all property leased from BALC under the Master Lease Agreement and all property leased from TFS, SDFC and DL);

(d)	all property subject to seller financing, purchase money security interest or similar arrangement permitted by the Loan Documents;

(g)	all rights as lessor or lessee under leases;

(h)	all leasehold interests other than the leasehold interests referred to in the definition of Mortgaged Properties;

(i)	all motor vehicles and other assets subject to certificates of title;

(j)	letter of credit rights;

(k)	commercial tort claims with a value of less than $3,000,000 (determined by the Borrower in good faith);

(l)	all real property, fixtures and related assets subject to a mortgage or deed of trust in favor of a third party as permitted under this Agreement;

(m)	all contracts, agreements, licenses (including, without limitation, any governmental licenses or state or local franchises, charters and authorizations), rights and privileges and other assets over which, in each case, the granting of security interests would be prohibited by the terms of such contract, agreement, license, right, privilege or other asset, by a Requirement of Law or by the organizational documents of any non-Wholly-Owned Subsidiary (in each case, after giving effect to the applicable anti "anti-assignment" provisions of the Uniform Commercial Code, other than the proceeds thereof, to the extent that the assignment thereof is deemed effective under the applicable Uniform Commercial Code notwithstanding such prohibitions), except to the extent such Requirement of Law or provision in the organizational documents is ineffective under applicable law or to the extent that the granting of a security interest therein would result in material adverse tax consequences as reasonably determined by the Borrower;

(n)	all present and future fee owned real property with a value of less than $2,500,000;

(o)	equity interests in any Person other than Wholly-Owned Subsidiaries to the extent not permitted by the terms of such Person's organizational or, if applicable, joint venture documents (except to the extent such prohibition is deemed ineffective under the Uniform Commercial Code);

(p)	equity interests in excess of 65% of the voting Capital Stock of (A) any Excluded Foreign Subsidiary, or (B) any Domestic Subsidiary that has no material assets other than the Capital Stock of one or more Foreign Subsidiaries;

(q)	any of the Capital Stock of (A) indirect Foreign Subsidiaries (other than, for the avoidance of doubt, first-tier Foreign Subsidiaries subject to the restrictions in clause (b) or (p) above) or (B) any direct or indirect Domestic Subsidiary of a Foreign Subsidiary;

(r)	all property subject to a Lien as permitted under Section 7.3(l);

(s)	any deposit account or securities account used primarily for payroll, employee benefit payments or other payments to employees; and

(t)	all other assets as to which the Administrative Agent shall determine in its sole discretion, in consultation with the Borrower, that the cost of obtaining a security interest therein is excessive in relation to the value of the security to be afforded thereby.

"Excluded Domestic Subsidiary":  Pain in the Air (and its successors).

"Excluded Foreign Subsidiary":  any Foreign Subsidiary and any FSHCO in respect of which either (i) the pledge of all of the Capital Stock of such Subsidiary as Collateral or (ii) the guaranteeing by such Subsidiary of the Obligations, would, in the good faith judgment of the Borrower, result in material adverse tax consequences to Holdings, the Borrower or any other Group Member. "Excluded Foreign Subsidiary" in any event shall include all Disregarded Subsidiaries.

"Excluded Property":  as defined in the Guarantee and Collateral Agreement, and including, without limitation, the Excluded Collateral.

"Excluded Swap Obligation":  with respect to any Guarantor, any Swap Obligation if, and to the extent that, and only for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes": any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.22) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.19, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Credit Party's failure to comply with Section 2.19(f) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"Existing Credit Agreement": that certain Amended and Restated Credit Agreement, dated as of December 12, 2013, among Millennium Holdings, the Borrower, the several banks and other financial institutions or entities parties thereto, JPMorgan Chase Bank, N.A., as administrative agent, and the other agents parties thereto, as in effect immediately prior to the Closing Date.

"Expensed Earn-Out Obligations": as to any period, any Earn-Out Obligations to the extent that they are required to be reported as expenses, depreciation, amortization or other deductions from revenue in arriving at Consolidated Net Income on the financial statements of any Group Member under GAAP in such period.

"Facility": each of (a) the Tranche B Term Commitments and the Tranche B Term Loans made thereunder (the "Tranche B Term Facility"), (b) the Revolving Commitments and the extensions of credit made thereunder (the "Revolving Facility") and (c) the Incremental Term Loans (the "Incremental Facility").

"Falcon Aircraft": the DASSAULT Aviation Falcon 900EX aircraft bearing manufacturer's serial number 46 and FAA Registration Number N40ML.

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by JPMorgan Chase Bank, N.A. from three federal funds brokers of recognized standing selected by it.

"Fee Payment Date": the third Business Day following the last day of each March, June, September and December, except that the final Fee Payment Date shall occur on the last day of the Revolving Commitment Period.

"FSHCO": any Domestic Subsidiary substantially all of whose assets are Capital Stock (or Capital Stock and Indebtedness) of one or more Foreign Subsidiaries or other FSHCOs, and cash or Cash Equivalents incidental to the ownership of such Capital Stock and Indebtedness.

"Foreign Subsidiary": any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Foreign Benefit Arrangement": any employee benefit arrangement mandated by non-US law that is maintained or contributed to by any Group Member or any ERISA Affiliate.

"Foreign Plan": each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to US law and is maintained or contributed to by any Group Member or any ERISA Affiliate.

"Foreign Plan Event": with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable

regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Benefit Arrangement or Foreign Plan.

"Funded Debt":  as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation and, in the case of the Borrower, Indebtedness in respect of the Loans.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.  In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then Holdings, the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating Holdings' financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  Until such time as such an amendment shall have been executed and delivered by Holdings, the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.  "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members":  the collective reference to Holdings, the Borrower and their respective Restricted Subsidiaries.

"Guarantee and Collateral Agreement":  the Guarantee and Collateral Agreement to be executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit A.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any

property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantors":  the collective reference to Holdings and the Subsidiary Guarantors.

"Gulfstream Aircraft":  the Gulfstream G-IV Aircraft bearing manufacturer's serial number 1062 and FAA registration number N619ML.

"Holdings":  as defined in the preamble hereto.

"Increased Facility Activation Date":  any Business Day on which any Lender shall execute and deliver to the Administrative Agents an Increased Facility Activation Notice pursuant to Section 2.24(a).

"Increased Facility Activation Notice":  a notice substantially in the form of Exhibit H-1 or H-2, as applicable.

"Increased Facility Closing Date":  any Business Day designated as such in an Increased Facility Activation Notice.

"Incremental Facility":  as defined in the definition of "Facility".

"Incremental Revolving Commitments":  any Revolving Commitments made pursuant to Section 2.24(a).

"Incremental Term Lenders":  (a) on any Increased Facility Activation Date relating to Incremental Term Loans, the Lenders signatory to the relevant Increased Facility Activation Notice and (b) thereafter, each Lender that is a holder of an Incremental Term Loan.

"Incremental Term Loans":  any term loans made pursuant to Section 2.24(a).

"Incremental Term Maturity Date":  with respect to the Incremental Term Loans to be made pursuant to any Increased Facility Activation Notice, the maturity date specified in such Increased Facility Activation Notice, which date shall not be earlier than the final maturity of the Tranche B Maturity Date.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of

property or services (other than current trade and operating payables incurred in the ordinary course of such Person's business and, for the avoidance of doubt, obligations for compensation of employees or redemption of employee stock options shall not be considered "Indebtedness"), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all reimbursement obligations of such Person in respect of drawings or payments made under letters of credit, acceptances, surety bonds and similar arrangements that are not satisfied or converted into indebtedness for borrowing money within two Business Days (or such longer period as shall be provided for in the agreements pursuant to which the same arise) following the date of receipt by such Person of a notice of such drawing or payment, (g) the liquidation value of all mandatorily redeemable preferred Capital Stock issued and outstanding of such Person, (h) Capitalized Earn-Out Obligations, (i) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (j) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, and (k) for the purposes of Section 8.1(e) only, all net obligations of such Person in respect of Swap Agreements; provided that "Indebtedness" of any Person shall not include (1) payments to optionees with respect to the redemption of options of Millennium Holdings permitted under Section 7.6(f)(iii), (2) Expensed Earn-Out Obligations and (3) obligations under real estate leases described in Section 7.10(c), (d), (e) and (f), as the same may be renewed, amended or replaced from time to time, or a combination thereof, or any other real estate lease with a related party of the Borrower, whether or not required to be capitalized under GAAP. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Taxes":  (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"Insolvent":  with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Interest Payment Date":  (a) as to any ABR Loan (other than any Swingline Loan), the last day of each March, June, September and December (or, if an Event of Default is in existence, the last day of each calendar month) to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period, (d) as to any Loan (other than any Revolving Loan that is an ABR Loan and

any Swingline Loan), the date of any repayment or prepayment made in respect thereof and (e) as to any Swingline Loan, the day that such Loan is required to be repaid.

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii) the Borrower may not select an Interest Period under a particular Facility that would extend beyond the Revolving Termination Date or beyond the date final payment is due on the relevant Tranche B Term Loans, as the case may be;

(iii) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(iv) the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"Interpolated Rate" means, at any time, for any Interest Period, the rate per annum (rounded upward to the same number of  decimal places as the Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which Screen Rate is available in Dollars) that is shorter than the Interest Period for which the Screen Rate is not available and (b) the Screen Rate for the shortest period (for which Screen Rate is available in Dollars) that exceeds the Interest Period for which the Screen Rate is not available, in each case, as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period.

"Investments":  as defined in Section 7.8.

"Investors": TA Associates, L.P., funds advised by TA Associates, L.P., and Affiliates of TA Associates, L.P., and their respective successors by merger so long as TA Associates, L.P., the relevant fund advised by TA Associates, L.P. or the relevant Affiliate of TA Associates, L.P. is the surviving entity of such merger.

"IRS":  the United States Internal Revenue Service.

"Issuing Lender":  each of JPMorgan Chase Bank, N.A. and any other Revolving Lender approved by the Administrative Agent and the Borrower that has agreed in its sole discretion to act as an "Issuing Lender" hereunder, or any of their respective affiliates, in each case in its capacity as issuer of

any Letter of Credit.  Each reference herein to "the Issuing Lender" shall be deemed to be a reference to the relevant Issuing Lender.

"L/C Commitment":  $10,000,000.

"L/C Exposure":  at any time, the total L/C Obligations.  The L/C Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the total L/C Exposure at such time.

"L/C Obligations":  at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants":  the collective reference to all the Revolving Lenders other than the Issuing Lender.

"Lender Parent":   with respect to any Lender, any Person as to which such Lender is, directly or indirectly, a Subsidiary.

"Lenders":  as defined in the preamble hereto.

"Letters of Credit":  as defined in Section 3.1(a).

"Lien":  any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan":  any loan made by any Lender pursuant to this Agreement.

"Loan Documents":  this Agreement, the Security Documents, the Notes and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties":  each Group Member that is a party to a Loan Document.

"Majority Facility Lenders":  with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans, or the Total Revolving Extensions of Credit, as the case may be, outstanding under such relevant Facility (or, in the case of the Revolving Facility, prior to any termination of the Revolving Commitments, the holders of more than 50% of the Total Revolving Commitments).

"Managers":  the Co-Managers identified on the cover page of this Agreement.

"Master Lease Agreement":  the Master Lease Agreement, dated as of July 13, 2011, between Banc of America Leasing & Capital, LLC, a Delaware limited liability company ("BALC"), as lessor, and the Borrower, as lessee, as amended through the Closing Date.

"Material Adverse Effect":  a material adverse effect on (a) the business, property, financial condition or results of operations of Holdings and its Subsidiaries taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

24

"Material Subsidiary": at any date of determination, a Subsidiary of Holdings (a) whose total assets at the date of the most recent consolidated balance sheet included in the financial statements delivered pursuant to Section 5.1(d) or Section 6.01 were equal to or greater than 5% of the consolidated total assets of Holdings and its Subsidiaries at such date or (b) whose gross revenues for the most recent fiscal period covered in the consolidated statement of income included in the financial statements delivered pursuant to Section 5.1(d) or Section 6.1 were equal to or greater than 5% of the consolidated gross revenues of Holdings and its Subsidiaries for such period, in each case determined in accordance with GAAP.

"Materials of Environmental Concern":  regulated quantities of any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Members Debt": as defined in Section 7.2(o).

"Millennium Holdings": Millennium Lab Holdings, Inc., a Delaware corporation.

"MNPI": any information regarding the Borrower, its Subsidiaries or its Affiliates, or the Borrower's assets, its ability to perform its Obligations or any other matter that would reasonably be expected to be material to a decision by any Lender to participate in any Dutch Auction or assign or acquire any Tranche B Term Loans or to enter into any of the transactions contemplated thereby and that has not previously been disclosed to the Administrative Agent and the Lenders.

"Moody's": Moody's Investors Service, Inc. or any successor thereto.

"Mortgaged Properties":  the leasehold interests in real property listed on Schedule 1.1B, and any real property which is required to be subject to Mortgage pursuant to Section 6.9(b).

"Mortgages":  each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Lenders, in form and substance reasonably acceptable to the Administrative Agent.

"Multiemployer Plan":  a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received in cash or Cash Equivalents), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien not prohibited hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"New Lender":  as defined in Section 2.24(b).

25

"New Lender Supplement": as defined in Section 2.24(b).

"No MNPI Representation": by a Person, a representation that such Person is not in possession of any MNPI that has not been disclosed to Lenders generally (other than those Lenders who have elected to not receive any non-public information with respect to the Group Members).

"Non-U.S. Lender": (a) if the Borrower is a U.S. Person, a Lender, with respect to the Borrower, that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender, with respect to the Borrower, that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"Notes": the collective reference to any promissory note evidencing Loans.

"Obligations": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender (or, in the case of Specified Swap Agreements and Specified Cash Management Agreements, any affiliate of any Lender), whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit, any Specified Swap Agreement, any Specified Cash Management Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"Other Connection Taxes": with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes": all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.22).

"Pain in the Air": Pain In The Air, Inc., a California corporation and Wholly Owned Subsidiary of the Borrower.

"Participant": as defined in Section 10.6(c).

"Participant Register": as defined in Section 10.6(c).

"Patriot Act": as defined in Section 10.17.

509265-1664-11227-Active.15480116.26

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA or any successor entity performing similar functions.

"Pension Plan": any Plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA.

"Permitted Acquisition": any acquisition (including, without limitation, by way of merger or consolidation) by the Borrower or a Subsidiary Guarantor of all or substantially all the assets of, or all the Capital Stock in, a Person or a business unit, division or line of business of a Person, other than such acquisition of, or of the assets or Capital Stock of, any Loan Party, if (a) such acquisition was not effected pursuant to a hostile offer, (b) such acquired Person, division or line of business of a Person is, or is engaged in, any business or business activity conducted by the Borrower and its Subsidiaries on the Closing Date, any business or business activities incidental or related thereto, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto, (c) other than in the case of the Excluded Domestic Subsidiary, an Excluded Foreign Subsidiary or an Unrestricted Subsidiary, and except as permitted by Section 7.5(f), within 30 days after the consummation of such acquisition, all property, assets and business (other than Excluded Property) acquired in such acquisition shall constitute Collateral and any newly created or acquired Subsidiary shall become a Subsidiary Guarantor pursuant to and to the extent required by Section 6.9, and (d) immediately before and immediately after giving effect thereto: (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom; (ii) all transactions related thereto shall be consummated in accordance in all material respects with applicable laws; and (iii) (A) Holdings shall be in pro forma compliance, immediately after giving effect to such acquisition, with the covenant contained in Section 7.1 (or, if such covenant shall no longer apply at such time, the Consolidated Leverage Ratio of Holdings and its Restricted Subsidiaries shall not be greater, calculated on a pro forma basis, than 6.0 to 1.0), in each case recomputed as at the last day of the most recently ended fiscal quarter of Holdings, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, together with all relevant financial information for such acquisition, and (B) any acquired or newly formed Restricted Subsidiary of the Borrower shall not be liable for any Indebtedness (except for Indebtedness permitted by Section 7.2).

"Permitted Investors": the Persons identified on Schedule 1.1D, and, as to any such Person: (a) any entity or trust in which the Person holds at least fifty-one percent (51%) of the voting or beneficial ownership interests or controls the management of that entity, (b) any Family Member of a Person who is an individual, (c) any entity or trust in which the Family Member of a Person holds at least fifty-one percent (51%) of the voting or beneficial ownership interests in that entity or controls the management of that entity, (d) in the case of a Person that is an entity or a trust, any individual (or Family Member of an individual) who holds at least fifty-one percent (51%) of the voting or beneficial ownership interests in that entity or controls the management of that Person, (e) any trust of which any Person or any Family Member of a Person is a primary beneficiary or (f) in the case of a Person that is a trust, any trustor or beneficiary of the trust, and any such Person's successors and assigns. "Family Member" means a natural Person's spouse, lineal ancestors or descendants by birth or adoption, and trusts for the benefit of that Person or any of the foregoing Persons.

"Permitted Second Priority Indebtedness": any secured Indebtedness incurred by the Borrower or any Loan Party in the form of one or more series of junior lien secured notes or junior lien secured loans; provided that (i) such Indebtedness is secured by the Collateral on a junior basis with the Obligations and is not secured by any property or assets of Holdings or any Restricted Subsidiary other than the Collateral, (ii) such Indebtedness does not have scheduled amortization or mandatory redemption or prepayment features (other than customary asset sale, Recovery Event, change of control provisions and events of default) that could result in the redemptions, amortization or prepayments of such

509265-1664-11227-Active.15480116.26

Indebtedness prior to the latest maturity of the Term Loans, (iii) the collateral agent or other similar representative of the holders of such Indebtedness shall have become party to an intercreditor agreement (the "Second Lien Intercreditor Agreement") with the Administrative Agent in form and substance satisfactory to the Administrative Agent, and (iv) immediately before and immediately after giving effect to such incurrence: (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom and (B) the Consolidated Leverage Ratio of Holdings and its Restricted Subsidiaries, calculated on a pro forma basis, shall not be greater than 5.0 to 1.0 recomputed as at the last day of the most recently ended fiscal quarter of Holdings, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, together with the relevant financial information for such incurrence.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Pilatus Aircraft":  the 2012 Pilatus Aircraft Ltd PC-12/47E aircraft bearing manufacturer's serial number 1357 and FAA registration number N357NG.

"Plan":  any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA but excluding any Multiemployer Plan), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which any Group Member or any ERISA Affiliate is (or, if such Plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in section 3(5) of ERISA or to which any Group Member or ERISA Affiliate has any actual or contingent liability.

"PNC Equipment Finance":  PNC Equipment Finance, LLC.

"Prime Rate":  the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to debtors).

"Pro Forma Balance Sheet":  as defined in Section 4.1(a).

"Pro Forma Financial Statements":  as defined in Section 4.1(a).

"Pro Forma Income Statement":  as defined in Section 4.1(a).

"Prohibited Transaction":  as defined in Section 406 of ERISA and Section 4975(c) of the Code.

"Projections":  as defined in Section 6.2(c).

"Properties":  as defined in Section 4.17(a).

"Purchasing Borrower Party":  Holdings or any Subsidiary of Holdings that becomes an Assignee pursuant to Section 10.6.

"Qualified IPO": means the first issuance by Holdings (or any direct or indirect parent company of Holdings) of its common equity in an underwritten primary public offering (other than a

public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering), as a result of which such common equity is listed on a nationally-recognized stock exchange in the United States.

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member.

"Refinancing Amendment": as defined in Section 10.1.

"Refunded Letter of Credit": as defined in Section 3.5.

"Refunded Swingline Loans":  as defined in Section 2.7.

"Register":  as defined in Section 10.6(b).

"Regulation T":  Regulation T of the Board as in effect from time to time.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reimbursement Obligation":  the obligation of the Borrower to reimburse the Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit.

"Reinvestment Deferred Amount":  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Group Member in connection therewith that are not applied to prepay the Term Loans or reduce the Revolving Commitments pursuant to Section 2.11(b) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event":  any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice":  a written notice executed by a Responsible Officer stating that no Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to acquire or repair assets useful in its business.

"Reinvestment Prepayment Amount":  with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the Borrower's business.

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (a) (i) the date occurring twelve months after such Reinvestment Event or (ii) with respect to any Net Cash Proceeds attributable to such Reinvestment Event which have been committed pursuant to a binding contract to acquire or repair assets useful in the Borrower's business by the date set forth in clause (a)(i), the date occurring eighteen months after such Reinvestment Event and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the Borrower's business with all or any portion of the relevant Reinvestment Deferred Amount.

"Relevant Four Fiscal Quarter Period": as defined in Section 8.2.

509265-1664-11227-Active.15480116.26

"Reorganization": with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Replaced Term Loans": as defined in Section 10.1.

"Replacement Term Loans": as defined in Section 10.1.

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than those events as to which notice is waived pursuant to DOL Reg. Section 4043 as in effect on the Closing Date (no matter how such notice requirement may be changed in the future).

"Repricing Event": in connection with a voluntary prepayment of the Tranche B Term Loans the primary purpose of which is to prepay, refinance, substitute or replace the Tranche B Term Loans or to amend this Agreement to reduce the interest rate on the Tranche B Term Loans, (a) the prepayment, refinancing, substitution or replacement of all or a portion of the Tranche B Term Loans with the incurrence of any syndicated term loans or other Indebtedness by Holdings or its Subsidiaries having an "all-in yield" at the time of incurrence thereof (which shall be determined by including interest rate margins, original issue discount, upfront fees and interest rate floors, but excluding arrangement, structuring, underwriting, commitment or other similar fees) that is less than the "all-in-yield" (as determined on the same basis as provided in the preceding parenthetical) of such Tranche B Term Loans at the time of incurrence thereof and (b) any amendment to this Agreement resulting in a reduction of the "all-in-yield" (as determined on the same basis as provided in the preceding clause (a)) applicable to all or a portion of the Tranche B Term Loans; provided that in no event shall any repayment or prepayment in connection with an acquisition-related financing or by reason of a Change in Control constitute a Repricing Event.

"Required Lenders": at any time, the holders of more than 50% of (a) until the Closing Date, the Commitments then in effect and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the Term Loans then outstanding and (ii) the Total Revolving Commitments then in effect or, if the Revolving Commitments have been terminated, the Total Revolving Extensions of Credit then outstanding.

"Requirement of Law": as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer": the chief executive officer, president or chief financial officer of the Borrower, but in any event, with respect to financial matters, the chief financial officer of the Borrower.

"Restricted Payments": as defined in Section 7.6.

"Restricted Subsidiary": any Subsidiary of the Borrower that is not an Unrestricted Subsidiary.

"Revolving Commitment": as to any Lender, the obligation of such Lender, if any, to make Revolving Loans and participate in Swingline Loans and Letters of Credit in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Commitment" opposite such Lender's name on Schedule 1.1A or in the Assignment and Assumption pursuant to which

such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The amount of the Total Revolving Commitments as of the Closing Date is $50,000,000.

"Revolving Commitment Period": the period from and including the Closing Date to the Revolving Termination Date.

"Revolving Extensions of Credit": as to any Revolving Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Loans held by such Lender then outstanding, (b) such Lender's Revolving Percentage of the L/C Obligations then outstanding and (c) such Lender's Revolving Percentage of the aggregate principal amount of Swingline Loans then outstanding; provided that for purposes of Section 2.9 there shall be disregarded any L/C Obligations that have been Cash Collateralized.

"Revolving Facility: as defined in the definition of "Facility".

"Revolving Lender": each Lender that has a Revolving Commitment or that holds Revolving Loans.

"Revolving Loans": as defined in Section 2.4(a).

"Revolving Percentage": as to any Revolving Lender at any time, the percentage which such Lender's Revolving Commitment then constitutes of the Total Revolving Commitments or, at any time after the Revolving Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Revolving Loans then outstanding constitutes of the aggregate principal amount of the Revolving Loans then outstanding, provided, that, in the event that the Revolving Loans are paid in full prior to the reduction to zero of the Total Revolving Extensions of Credit, the Revolving Percentages shall be determined in a manner designed to ensure that the other outstanding Revolving Extensions of Credit shall be held by the Revolving Lenders on a comparable basis. Notwithstanding the foregoing, in the case of Section 2.23 when a Defaulting Lender shall exist, Revolving Percentages shall be determined without regard to any Defaulting Lender's Revolving Commitment.

"Revolving Termination Date": April 16, 2019.

"RX Ante Acquisition": the acquisition of 100% of the Capital Stock of RX Ante, Inc., which occurred on December 23, 2013.

"S&P": Standard & Poor's Financial Services LLC or any successor thereto.

"Sanctioned Country": at any time, a country or territory which is the subject or target of any Sanctions.

"Sanctioned Person": at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person controlled by any such Person.

"Sanctions": economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State.

31

"Screen Rate":  as defined in the definition of Eurodollar Base Rate.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Second Lien Intercreditor Agreement": as defined in the definition of Permitted Second Priority Indebtedness.

"Securities Act": means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Documents":  the collective reference to the Guarantee and Collateral Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"SDFC":  Siemens Diagnostic Finance Co. LLC.

"Solvent":  when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature.  For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"Special Members Loan":  as defined in Section 7.2(u).

"Specified Equity" means any equity security (which term shall include limited liability company membership interests and partnership interests, whether or not constituting a "security" under the Uniform Commercial Code) (i) having no mandatory redemption, repurchase or similar requirements (including at the option of the holders thereof, and including pursuant to a sinking fund obligation or otherwise) prior to 91 days after the latest maturity of the Term Loans (as in effect at the time of the issuance of such equity security) (unless such equity security by its terms provides that such equity security shall not be required to be repurchased unless permitted by this Agreement or unless the Term Loans and Revolving Loans have been repaid in full at least 91 days prior to the date of such required repurchase), (ii) upon which all dividends or distributions (if any) required to be paid shall, prior to 91 days after the latest maturity date of the Term Loans be payable solely in additional shares of such equity security (or other equity securities meeting the conditions specified in clauses (i), (ii) and (iii)) and (iii) which cannot, at the option of the holder thereof, be converted or exchanged for Indebtedness or other equity security not meeting the conditions of Specified Equity prior to 91 days after the latest maturity date of the Term Loans (as in effect at the time of the issuance of such equity security).

32

"Specified Cash Management Agreement":  any agreement providing for Cash Management Arrangements between the Borrower or any Guarantor and any Lender or affiliate thereof.

"Specified Representations": (a) in relation to Holdings and its Restricted Subsidiaries, the representations and warranties of the Borrower set forth in Sections 4.2 (but subject to the limitations set forth therein), 4.3, 4.4, 4.5, 4.11, 4.14, 4.22, 4.23 and 4.24, and compliance with the applicable requirements for such Permitted Acquisition set forth in Section 7.8, and (b) in relation to the target company or assets of any Permitted Acquisition, such of the representations and warranties made by or on behalf of such target company in the related purchase and sale or other acquisition agreement as are material to the interests of the Lenders, but only to the extent that the Borrower or its Affiliate has the right to terminate its obligations under such acquisition agreement (or decline to consummate the Permitted Acquisition) as a result of a breach of such representations in such acquisition agreement.

"Specified Swap Agreement":  any Swap Agreement in respect of interest rates, currency exchange rates or commodity prices entered into by the Borrower or any Guarantor and any Person that is a Lender or an affiliate of a Lender at the time such Swap Agreement is entered into.

"Subordinated Indebtedness":  means Indebtedness the payment of which is subordinated to the payment of the Obligations.  In no event shall the Special Members Loan or any Members Debt be included in the term "Subordinated Indebtedness".

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor":  each Restricted Subsidiary of the Borrower other than any Excluded Foreign Subsidiary, the Excluded Domestic Subsidiary and any Unrestricted Subsidiary.

"Swap": any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(27) of the Commodity Exchange Act.

"Swap Agreement":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or any of its Subsidiaries shall be a "Swap Agreement".

"Swap Obligation": with respect to any Person, any obligation to pay or perform under any Swap.

"Swingline Commitment":  the obligation of the Swingline Lender to make Swingline Loans pursuant to Section 2.6 in an aggregate principal amount at any one time outstanding not to exceed $5,000,000.

"Swingline Exposure":  at any time, the sum of the aggregate amount of all outstanding Swingline Loans at such time.  The Swingline Exposure of any Revolving Lender at any time shall be its Revolving Percentage of the total Swingline Exposure at such time.

"Swingline Lender":  JPMorgan Chase Bank, N.A., in its capacity as the lender of Swingline Loans.

"Swingline Loans":  as defined in Section 2.6.

"Swingline Participation Amount":  as defined in Section 2.7.

"Syndication Agent":  the Syndication Agent identified on the cover page of this Agreement.

"TA Debenture Agreement":  the Amended and Restated Debenture Purchase and Stock Redemption Agreement dated as of March 29, 2012, among the lenders party thereto (the "Debenture Holders"), TA Associates, L.P., as representative of the Debenture Holders, Millennium Holdings, the Borrower, the guarantors named therein and the selling stockholders named therein, as in effect immediately prior to the Closing Date.

"TA Debentures":  the debentures of Millennium Holdings issued on July 30, 2010, as amended and restated pursuant to the TA Debenture Agreement.

"TA Warrants": the warrants issued pursuant to the Warrant Purchase Agreement.

"Taxes": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Lenders": the collective reference to the Tranche B Term Lenders and the Incremental Term Lenders.

"Term Loan Standstill Period": as defined in Section 8.2.

"Term Loans": the collective reference to the Tranche B Term Loans and the Incremental Term Loans.

"Term Percentage":  as to any Term Lender at any time, the percentage which the aggregate principal amount of such Lender's Term Loans under the relevant Facility then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding under the relevant Facility.

"TFS": Thermo Fisher Scientific.

"Total Revolving Commitments":  at any time, the aggregate amount of the Revolving Commitments then in effect.

"Total Revolving Extensions of Credit":  at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Lenders outstanding at such time.

"Tranche B Maturity Date":  April 16, 2021.

34

"Tranche B Term Commitment": as to any Lender, the obligation of such Lender, if any, to make a Tranche B Term Loan to the Borrower in a principal amount not to exceed the amount set forth under the heading "Tranche B Term Commitment" opposite such Lender's name on Schedule 1.1A. The aggregate amount of the Tranche B Term Commitments on the Closing Date is $1,775,000,000.

"Tranche B Term Facility": as defined in the definition of "Facility".

"Tranche B Term Lender": each Lender that has a Tranche B Term Commitment or that holds a Tranche B Term Loan.

"Tranche B Term Loans": as defined in Section 2.1.

"Transactions": collectively, (a) the execution and delivery of the Loan Documents, the creation of Liens pursuant to the Security Documents and the initial borrowing of Loans hereunder, (b) the payment of all amounts outstanding under the Existing Credit Agreement and the termination of all Liens in connection with the Existing Credit Agreement, (c) the consummation of the Corporate Restructuring and (d) the payment of fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"Transferee": any Assignee or Participant.

"Type": as to any Loan, its nature as an ABR Loan or a Eurodollar Loan as of a particular time.

"United States": the United States of America.

"Unrestricted Subsidiary": any Subsidiary of the Borrower that (i) is not a Material Subsidiary and (ii) has been designated by the Board of Directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.13 subsequent to the Closing Date.

"U.S. Person": a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate": as defined in Section 2.19(f)(ii)(B)(3).

"Warrant Purchase Agreement": the Amended and Restated Warrant Purchase Agreement, dated as of March 29, 2012, among Millennium Holdings, as issuer, the Borrower, the selling stockholders named therein, the investors from time to time parties thereto and TA Associates, L.P., as representative of the Investors, as in effect on the Closing Date.

"Wholly Owned Subsidiary": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Wholly Owned Subsidiary Guarantor": any Subsidiary Guarantor that is a Wholly Owned Subsidiary of the Borrower.

"Withdrawal Liability": any liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

1.2    Other Definitional Provisions.

35

(a)        Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)        As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP  (provided that (x) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Holdings or any Subsidiary at "fair value", as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof and (y) all leases of Holdings and its Subsidiaries that are treated as operating leases for purposes of GAAP as in effect on the Closing Date shall continue to be accounted for as operating leases for purposes of the defined financial terms under this Agreement regardless of any change to GAAP following the Closing Date which would otherwise require such leases to be treated as capital leases (it being understood that this clause (y) shall not affect Holdings and its Subsidiaries' financial reporting)), (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)        The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)        The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

SECTION 2.    AMOUNT AND TERMS OF COMMITMENTS

2.1        Tranche B Term Commitments.  Subject to the terms and conditions hereof, each Tranche B Term Lender severally agrees to make a term loan (a "Tranche B Term Loan") to the Borrower on the Closing Date in an amount not to exceed the amount of the Tranche B Term Commitment of such Lender.  The Tranche B Term Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.12.

2.2        Procedure for Tranche B Term Loan Borrowing.  The Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent

36

prior to 10:00 A.M., New York City time, one Business Day prior to the anticipated Closing Date) requesting that the Tranche B Term Lenders make the Tranche B Term Loans on the Closing Date and specifying the amount to be borrowed.  The Tranche B Term Loans made on the Closing Date shall initially be ABR Loans.  Upon receipt of such notice the Administrative Agent shall promptly notify each Tranche B Term Lender thereof.  Not later than 12:00 Noon, New York City time, on the Closing Date each Tranche B Term Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Tranche B Term Loans to be made by such Lender. The Administrative Agent shall credit the account of the Borrower on the books of such office of the Administrative Agent with the aggregate of the amounts made available to the Administrative Agent by the Tranche B Term Lenders in immediately available funds.

2.3     Repayment of Term Loans.  The Tranche B Term Loan of each Tranche B Term Lender shall mature in consecutive quarterly installments payable by the Borrower on the last day of March, June, September and December of each year, commencing on September 30, 2014, each of which shall be in an amount equal to such Tranche B Term Lender's Term Percentage multiplied by the amount set forth below opposite such installment:

| Installment | Principal Amount |
| --- | --- |
| September 30, 2014 | $4,437,500 |
| December 31, 2014 | $4,437,500 |
| March 31, 2015 | $4,437,500 |
| June 30, 2015 | $4,437,500 |
| September 30, 2015 | $4,437,500 |
| December 31, 2015 | $4,437,500 |
| March 31, 2016 | $4,437,500 |
| June 30, 2016 | $4,437,500 |
| September 30, 2016 | $4,437,500 |
| December 31, 2016 | $4,437,500 |
| March 31, 2017 | $4,437,500 |
| June 30, 2017 | $4,437,500 |
| September 30, 2017 | $4,437,500 |
| December 31, 2017 | $4,437,500 |
| March 31, 2018 | $4,437,500 |
| June 30, 2018 | $4,437,500 |
| September 30, 2018 | $4,437,500 |
| December 31, 2018 | $4,437,500 |
| March 31, 2019 | $4,437,500 |
| June 30, 2019 | $4,437,500 |
| September 30, 2019 | $4,437,500 |
| December 31, 2019 | $4,437,500 |
| March 31, 2020 | $4,437,500 |
| June 30, 2020 | $4,437,500 |
| September 30, 2020 | $4,437,500 |
| December 31, 2020 | $4,437,500 |
| March 31, 2021 | $4,437,500 |
| Tranche B Maturity Date | Aggregate principal amount of Tranche B Term |

Loans outstanding

2.4     Revolving Commitments.

(a)     Subject to the terms and conditions hereof, each Revolving Lender severally agrees to make revolving credit loans ("Revolving Loans") to the Borrower from time to time during the Revolving Commitment Period in an aggregate principal amount at any one time outstanding which, when added to such Lender's Revolving Percentage of the sum of (i) the L/C Obligations then outstanding and (ii) the aggregate principal amount of the Swingline Loans then outstanding, does not exceed the amount of such Lender's Revolving Commitment.  During the Revolving Commitment Period the Borrower may use the Revolving Commitments by borrowing, prepaying the Revolving Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.  The Revolving Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.12.

(b)     The Borrower shall repay all outstanding Revolving Loans on the Revolving Termination Date.

(c)     Notwithstanding anything to the contrary in this Agreement, no Revolving Loans shall be borrowed by the Borrower on the Closing Date.

2.5     Procedure for Revolving Loan Borrowing.  The Borrower may borrow under the Revolving Commitments during the Revolving Commitment Period on any Business Day (other than the Closing Date), provided that the Borrower shall give the Administrative Agent irrevocable notice (which notice must be received by the Administrative Agent prior to 11:00 A.M., New York City time, (a) three Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans, or (b) one Business Day prior to the requested Borrowing Date, in the case of ABR Loans) (provided that any such notice of a borrowing by the Issuing Lender on behalf of the Borrower of ABR Loans under the Revolving Facility to finance payments required by Section 3.5 may be given not later than 12:00 Noon, New York City time, on the date of the proposed borrowing), specifying (i) the amount and Type of Revolving Loans to be borrowed, (ii) the requested Borrowing Date and (iii) in the case of Eurodollar Loans, the respective amounts of each such Type of Loan and the respective lengths of the initial Interest Period therefor.  Each borrowing under the Revolving Commitments shall be in an amount equal to (x) in the case of ABR Loans, $1,000,000 or a whole multiple thereof (or, if the then aggregate Available Revolving Commitments are less than $1,000,000, such lesser amount) and (y) in the case of Eurodollar Loans, $5,000,000 or a whole multiple of $1,000,000 in excess thereof; provided, that the Swingline Lender may request, on behalf of the Borrower, borrowings under the Revolving Commitments that are ABR Loans in other amounts pursuant to Section 2.7.  Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Lender thereof.  Each Revolving Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the Funding Office prior to 12:00 Noon, New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent (provided that any borrowing requested by the Issuing Lender on behalf of the Borrower under Section 3.5 shall be funded by the Revolving Lenders not later than 2:00 P.M., New York City time).  Such borrowing will then be made available to the Borrower by the Administrative Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Administrative Agent by the Revolving Lenders and in like funds as received by the Administrative Agent.

2.6     Swingline Commitment.

(a)    Subject to the terms and conditions hereof, the Swingline Lender agrees to make a portion of the credit otherwise available to the Borrower under the Revolving Commitments from time to time during the Revolving Commitment Period (other than the Closing Date) by making swing line loans ("Swingline Loans") to the Borrower; provided that (i) the aggregate principal amount of Swingline Loans outstanding at any time shall not exceed the Swingline Commitment then in effect (notwithstanding that the Swingline Loans outstanding at any time, when aggregated with the Swingline Lender's other outstanding Revolving Loans, may exceed the Swingline Commitment then in effect) and (ii) the Borrower shall not request, and the Swingline Lender shall not make, any Swingline Loan if, after giving effect to the making of such Swingline Loan, the aggregate amount of the Available Revolving Commitments would be less than zero.  During the Revolving Commitment Period, the Borrower may use the Swingline Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof.  Swingline Loans shall be ABR Loans only.

(b)    The Borrower shall repay to the Swingline Lender the then unpaid principal amount of each Swingline Loan on the earlier of the Revolving Termination Date and the first date after such Swingline Loan is made that is the 15th or last day of a calendar month and is at least two Business Days after such Swingline Loan is made; provided that on each date that a Revolving Loan is borrowed, the Borrower shall repay all Swingline Loans then outstanding.

2.7    Procedure for Swingline Borrowing; Refunding of Swingline Loans.

(a)    Whenever the Borrower desires that the Swingline Lender make Swingline Loans it shall give the Swingline Lender irrevocable telephonic notice confirmed promptly in writing (which telephonic notice must be received by the Swingline Lender not later than 1:00 P.M., New York City time, on the proposed Borrowing Date), specifying (i) the amount to be borrowed and (ii) the requested Borrowing Date (which shall be a Business Day during the Revolving Commitment Period).  Each borrowing under the Swingline Commitment shall be in an amount equal to $500,000 or a whole multiple of $100,000 in excess thereof.  Not later than 3:00 P.M., New York City time, on the Borrowing Date specified in a notice in respect of Swingline Loans, the Swingline Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the amount of the Swingline Loan to be made by the Swingline Lender.  The Administrative Agent shall make the proceeds of such Swingline Loan available to the Borrower on such Borrowing Date by depositing such proceeds in the account of the Borrower with the Administrative Agent on such Borrowing Date in immediately available funds.

(b)    The Swingline Lender, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrower (which hereby irrevocably directs the Swingline Lender to act on its behalf), on one Business Day's notice given by the Swingline Lender no later than 12:00 Noon, New York City time, request each Revolving Lender to make, and each Revolving Lender hereby agrees to make, a Revolving Loan, in an amount equal to such Revolving Lender's Revolving Percentage of the aggregate amount of the Swingline Loans (the "Refunded Swingline Loans") outstanding on the date of such notice, to repay the Swingline Lender.  Each Revolving Lender shall make the amount of such Revolving Loan available to the Administrative Agent at the Funding Office in immediately available funds, not later than 10:00 A.M., New York City time, one Business Day after the date of such notice. The proceeds of such Revolving Loans shall be immediately made available by the Administrative Agent to the Swingline Lender for application by the Swingline Lender to the repayment of the Refunded Swingline Loans.

(c)    If prior to the time a Revolving Loan would have otherwise been made pursuant to Section 2.7(b), one of the events described in Section 8.1(f) shall have occurred and be continuing with respect to the Borrower or if for any other reason, as determined by the Swingline Lender in its sole

discretion, Revolving Loans may not be made as contemplated by Section 2.7(b), each Revolving Lender shall, on the date such Revolving Loan was to have been made pursuant to the notice referred to in Section 2.7(b), purchase for cash an undivided participating interest in the then outstanding Swingline Loans by paying to the Swingline Lender an amount (the "Swingline Participation Amount") equal to (i) such Revolving Lender's Revolving Percentage times (ii) the sum of the aggregate principal amount of Swingline Loans then outstanding that were to have been repaid with such Revolving Loans.

(d)      Whenever, at any time after the Swingline Lender has received from any Revolving Lender such Lender's Swingline Participation Amount, the Swingline Lender receives any payment on account of the Swingline Loans, the Swingline Lender will distribute to such Lender its Swingline Participation Amount (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swingline Loans then due); provided, however, that in the event that such payment received by the Swingline Lender is required to be returned, such Revolving Lender will return to the Swingline Lender any portion thereof previously distributed to it by the Swingline Lender.

(e)      Each Revolving Lender's obligation to make the Loans referred to in Section 2.7(b) and to purchase participating interests pursuant to Section 2.7(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such Revolving Lender or the Borrower may have against the Swingline Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other Revolving Lender or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

2.8      Commitment Fees, etc.

(a)      The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Lender a commitment fee for the period from and including the Closing Date to the last day of the Revolving Commitment Period, computed at the Commitment Fee Rate on the average daily amount of the Available Revolving Commitment of such Lender during the period for which payment is made, payable quarterly in arrears on each Fee Payment Date, commencing on the first such date to occur after the Closing Date.

(b)      The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements executed on or prior to the Closing Date with the Administrative Agent and to perform any other obligations contained therein.

2.9      Termination or Reduction of Revolving Commitments.  The Borrower shall have the right, upon not less than three Business Days' irrevocable (or if consented to by the Administrative Agent, revocable) notice to the Administrative Agent, to terminate the Revolving Commitments or, from time to time, to reduce the amount of the Revolving Commitments; provided that no such termination or reduction of Revolving Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Loans and Swingline Loans and Cash Collateralization of Letters of Credit made on the effective date thereof, the Total Revolving Extensions of Credit would exceed the Total Revolving Commitments.  Any such reduction of less than the full outstanding Revolving Commitments

509265-1664-11227-Active.15480116.26

shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Revolving Commitments then in effect.

2.10    Optional Prepayments.

(a)    The Borrower may at any time and from time to time prepay the Loans (the Loans and Type to be prepaid may be selected by the Borrower in its sole and subjective discretion), in whole or in part, without premium or penalty other than as set forth in Section 2.10(b) with respect to the Tranche B Term Loans, upon irrevocable (or if consented to by the Administrative Agent, revocable) notice delivered to the Administrative Agent no later than 11:00 A.M., New York City time, three Business Days prior thereto, in the case of Eurodollar Loans, and no later than 11:00 A.M., New York City time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; provided, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.20.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Revolving Loans that are ABR Loans and Swingline Loans) accrued interest to such date on the amount prepaid.  Partial prepayments of Term Loans and Revolving Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof, except that if the balance of the Term Loans or Revolving Loans is less than $1,000,000, then prepayment of such lesser amount shall be permitted.  Partial prepayments of Swingline Loans shall be in an aggregate principal amount of $100,000 or a whole multiple thereof, except that if the balance of the Swingline Loans is less than $100,000, then prepayment of such lesser amount shall be permitted.

(b)    If the Borrower (i) prepays, refinances, substitutes or replaces any Tranche B Term Loans in connection with a Repricing Event or (ii) effects any amendment of this Agreement resulting in a Repricing Event, in each case, on or prior to the twelve-month anniversary of the Closing Date, the Borrower shall pay to the Administrative Agent, for the ratable account of each of the Lenders holding Tranche B Term Loans immediately prior to the consummation of such Repricing Event (including each Lender holding Tranche B Term Loans immediately prior to the consummation of such Repricing Event that withholds its consent to such Repricing Event and is replaced pursuant to Section 2.22), (A) in the case of clause (i), a prepayment premium equal to 1.0% of the aggregate principal amount of the Tranche B Term Loans so prepaid, refinanced, substituted or replaced and (B) in the case of clause (ii), a fee equal to 1.0% of the aggregate principal amount of the applicable Tranche B Term Loans outstanding immediately prior to such amendment.  Such amounts shall be due and payable on the date of effectiveness of the applicable Repricing Event; provided that the Borrower shall not be subject to the requirements of this Section 2.10(b) with respect to any Repricing Event occurring after the twelve-month anniversary of the Closing Date.

2.11    Mandatory Prepayments.

(a)    If any Indebtedness shall be issued or incurred by the Borrower or any Guarantor (excluding any Indebtedness incurred in accordance with Section 7.2), an amount equal to 100% of the Net Cash Proceeds (after application to the outstanding principal amount of any Indebtedness permitted by Section 7.2 that is being refinanced with any such Indebtedness) thereof shall be applied on the date of such issuance or incurrence toward the prepayment of the Term Loans as set forth in Section 2.11(d).

(b)    If on any date the Borrower or any Guarantor shall receive Net Cash Proceeds from any Asset Sale or Recovery Event then, unless a Reinvestment Notice shall be delivered in respect thereof, such Net Cash Proceeds shall be applied on such date toward the prepayment of the Term Loans

as set forth in Section 2.11(d); provided, that, notwithstanding the foregoing, on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Term Loans as set forth in Section 2.11(d).

(c)      If, for any Calculation Period, there shall be Excess Cash Flow, the Borrower shall, on the relevant Excess Cash Flow Application Date, apply the excess of (i) the ECF Percentage of such Excess Cash Flow over (ii) the sum of (A) all voluntary prepayments of Term Loans during such Calculation Period and (B) with respect to each Calculation Period relating to the fiscal year of Holdings, the aggregate amount of all prior prepayments of Term Loans required by this Section 2.11(c) that have been made by the Borrower with respect to the first three fiscal quarters of such fiscal year for such Calculation Period, toward the prepayment of the Term Loans as set forth in Section 2.11(d).  Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than five days after the earlier of (i) the date 30 days after the date on which the financial statements of Holdings referred to in Section 6.1 for the Calculation Period with respect to which such prepayment is made, are required to be delivered to the Lenders and (ii) the date such financial statements are actually delivered. There shall be no prepayment pursuant to this Section 2.11(c) for any period prior to July 1, 2014.

(d)      Amounts to be applied in connection with prepayments made pursuant to Section 2.11 shall be applied to the prepayment of the Term Loans in accordance with Section 2.17(b).  Unless the Borrower and the Administrative Agent agree otherwise, and except as otherwise expressly provided above to the contrary, the application of any prepayment pursuant to Section 2.11 shall be made, first, to ABR Loans and, second, to Eurodollar Loans.  Each prepayment of the Term Loans under Section 2.11 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(e)      Notwithstanding anything to the contrary in Section 2.11(c), 2.11(d) or 2.17, the Borrower may, in lieu of applying the amounts referred to above in this Section 2.11 (the "Term Loan Prepayment Amount") to the prepayment of Term Loans as provided in paragraph (d) above, on the date specified in Section 2.11 for such prepayment, give the Administrative Agent telephonic notice (promptly confirmed in writing) requesting that the Administrative Agent prepare and provide to each Term Lender a notice (each, a "Prepayment Option Notice") as described below.  As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Term Lender a Prepayment Option Notice, which shall be in the form of Exhibit F, and shall include an offer by the Borrower to prepay on the date (each a "Mandatory Prepayment Date") that is 10 Business Days after the date of the Prepayment Option Notice, the relevant Term Loans of such Lender by an amount equal to the portion of the Term Loan Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Term Loans and the option to such Lender to decline such prepayment. On the Mandatory Prepayment Date, (i) the Borrower shall pay to each Term Lender who has not declined such prepayment the aggregate amount necessary to prepay the outstanding relevant Term Loans of such Term Lender in an amount equal to such Lender's Term Loan Prepayment Amount and (ii) the Borrower shall be entitled to retain the portion of the Term Loan Prepayment Amount declined by the relevant Term Lenders (such amount, the "Declined Prepayment Amount").

(f)      Notwithstanding anything to the contrary in this Agreement, so long as no Default or Event of Default has occurred and is continuing, the Borrower may request that any Term Loan Prepayment Amount be paid to the Administrative Agent but not applied to any Loans until such prepayment can be made at a time and in a manner that will avoid any breakage costs that would be required to be reimbursed by the Borrower pursuant to Section 2.20.

2.12      Conversion and Continuation Options.

42

(a)     The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto.  The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), provided that no ABR Loan under a particular Facility may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such conversions.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)     Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan under a particular Facility may be continued as such (i) when any Event of Default has occurred and is continuing and the Administrative Agent has or the Majority Facility Lenders in respect of such Facility have determined in its or their sole discretion not to permit such continuations or (ii) if an Event of Default specified in clause (i) or (ii) of Section 8.1(f) with respect to the Borrower is in existence, and provided, further, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.13     Limitations on Eurodollar Tranches.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and (b) no more than ten Eurodollar Tranches shall be outstanding at any one time.

2.14     Interest Rates and Payment Dates.

(a)     Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)     Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)     (i) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to (x) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or (y) in the case of Reimbursement Obligations, the rate applicable to ABR Loans under the Revolving Facility plus 2%, and (ii) if all or a portion of any interest payable on any Loan or Reimbursement Obligation or any commitment fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal

to the rate then applicable to ABR Loans under the relevant Facility plus 2% (or, in the case of any such other amounts that do not relate to a particular Facility, the rate then applicable to ABR Loans under the Revolving Facility plus 2%), in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (as well after as before judgment).

(d) Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.15 Computation of Interest and Fees.

(a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b) Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.14(a).

2.16 Inability to Determine Interest Rate. If prior to the first day of any Interest Period:

(a) the Administrative Agent shall have reasonably determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b) the Administrative Agent shall have received notice from the Majority Facility Lenders in respect of the relevant Facility that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders absent manifest error or bad faith) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans under the relevant Facility requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans under the relevant Facility that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans under the relevant Facility shall be converted, on the last day of the then-current Interest Period, to ABR Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Facility shall be made or continued as such, nor shall the Borrower have the right to convert Loans under the relevant Facility to Eurodollar Loans.

2.17 Pro Rata Treatment and Payments.

44

(a)     Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee and any reduction of the Commitments of the Lenders shall be made pro rata according to the respective Term Percentages or Revolving Percentages, as the case may be, of the relevant Lenders.

(b)     Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Term Loans shall be made ratably among the relevant Facilities for the Term Loans pro rata according to the respective outstanding principal amounts of the Term Loans then held by the Term Lenders under the relevant Facility (except as otherwise provided in Sections 2.11(e) and 2.25). The amount of each optional prepayment of Term Loans made pursuant to Section 2.10 shall be applied to the scheduled installments thereof as directed by the Borrower. The amount of each mandatory prepayment of the Term Loans made pursuant to Section 2.11 shall be applied ratably among the relevant Facilities for the Term Loans, first, to accrued interest and any amounts owing pursuant to Section 2.20, if any, with respect to such prepayment, second, to scheduled installments thereof occurring within the next 24 months in direct order of maturity and third, ratably to the then remaining installments thereof (other than the installment due at the Tranche B Maturity Date or the relevant maturity date of the other applicable Term Loans), unless no installments prior to the final installment remain outstanding). Amounts prepaid on account of the Term Loans may not be reborrowed.

(c)     Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Revolving Loans shall be made pro rata according to the respective outstanding principal amounts of the Revolving Loans then held by the Revolving Lenders.

(d)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds. The Administrative Agent shall distribute such payments to each relevant Lender promptly upon receipt in like funds as received, net of any amounts owing by such Lender pursuant to Section 9.7 (which reduction shall not affect the deemed satisfaction of the payment made by the Borrower). If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day. If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such

borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Facility, on demand, from the Borrower.

(f)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate.  Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(g)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.7(b), 2.7(c), 2.17(e), 2.17(f), 2.19(e), 3.4(a) or 9.7, then the Administrative Agent may, in its discretion and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent, the Swingline Lender or the Issuing Lender to satisfy such Lender's obligations to it under such Sections until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion.

2.18     Requirements of Law.

(a)     If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the Closing Date:

(i)     shall subject any Credit Party to any Taxes (other than (A) Indemnified Taxes and (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit (or participations therein) by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)     shall impose on such Lender any other condition (other than Taxes);

and the result of any of the foregoing is to increase the cost to such Lender or such other Credit Party, by an amount that such Lender or other Credit Party deems to be material, of making, converting into, continuing or maintaining Loans or issuing or participating in Letters of Credit, or to reduce any amount

46

receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender or such other Credit Party, upon its demand, any additional amounts necessary to compensate such Lender or such other Credit Party for such increased cost or reduced amount receivable.  If any Lender or such other Credit Party becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled (but only to the extent that the applicable Lender is imposing such charges or additional amounts on other borrowers which such Lender considers to be similarly situated to the Borrower).

(b)     If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital or liquidity requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy or liquidity) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction (but only to the extent that the applicable Lender is imposing such charges or additional amounts on other borrowers such Lender considers to be similarly situated to the Borrower).

(c)     Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented; provided that to the extent any charge or additional amount is requested by a Lender after the Closing Date under Section 2.18(a) or (b) as a result of any requests, rules, guidelines or directives promulgated under by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, or pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, then such Lender shall be compensated only if such Lender is imposing such charges or additional amounts on other borrowers such Lender considers to be similarly situated to the Borrower.

(d)     A certificate setting forth the basis thereof as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section, the Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than nine months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.19     Taxes.

47

(a)      Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.19), the amounts received with respect to this agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)      The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)      As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.19, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)      The Loan Parties shall jointly and severally  indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Taxes and without limiting the obligation of the Loan Parties to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate

of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.19(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)        Without limiting the generality of the foregoing, in the event that the Borrower (together with Holdings) is a U.S. Person for U.S. Federal tax purposes,

(A)        any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)        any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)        in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN (or applicable successor form) establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or applicable successor form) establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)        executed originals of IRS Form W-8ECI;

(3)        in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower or Holdings within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN (or applicable successor form); or

(4)        to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or applicable successor form), a U.S. Tax

Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C) any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or provide a successor form or certification, as appropriate, or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. For the avoidance of doubt, the parties agree that for a non-U.S. entity the final IRS Form W-8BEN-E is a successor form to IRS Form W-8BEN.

(g) If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.19 (including by the payment of additional amounts pursuant to this Section 2.19), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the

indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Each party's obligations under this Section 2.19 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under the Loan Documents.

(i)     For purposes of this Section 2.19, the term "Lender" includes the Issuing Lender and the Swingline Lender and the term "applicable law" includes FATCA.

2.20    Indemnity.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender sustains or incurs as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest (less the Applicable Margin included therein, if any) that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans (less the Applicable Margin included therein, if any) provided for herein over (ii) the amount of interest (as reasonably determined by such Lender) (less the Applicable Margin included therein, if any) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender, which sets forth the basis therefor, shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.21    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.18 or 2.19(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole judgment exercised in good faith of such Lender, cause such Lender and its lending offices to suffer no economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.18 or 2.19(a).

2.22    Replacement of Lenders.  The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.16(b), 2.18 or 2.19(a), (b) becomes a Defaulting Lender, or (c) does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that

requires the consent of each of the Lenders or each of the Lenders affected thereby (so long as the consent of the Required Lenders has been obtained), with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.21 so as to eliminate the continued need for payment of amounts owing pursuant to Section 2.16(b), 2.18 or 2.19(a), (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under Section 2.20 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) until such time as such replacement shall be consummated, the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.16(b), 2.18 or 2.19(a), as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.  Each party hereto agrees that an assignment  required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrower, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

2.23    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    fees shall cease to accrue on the unfunded portion of the Revolving Commitment of such Defaulting Lender pursuant to Section 2.8(a);

(b)    the Revolving Commitment and Revolving Extensions of Credit of such Defaulting Lender shall not be included in determining whether the Required Lenders or Majority Facility Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 10.1); provided, that this clause (b) shall not apply to the vote of a Defaulting Lender in the case of an amendment, waiver or other modification requiring the consent of such Lender or each Lender affected thereby;

(c)    if any Swingline Exposure or L/C Exposure exists at the time such Lender becomes a Defaulting Lender then:

(i)    all or any part of the Swingline Exposure and L/C Exposure of such Defaulting Lender shall be reallocated among the non-Defaulting Lenders in accordance with their respective Revolving Percentages but only to the extent the sum of all non-Defaulting Lenders' Revolving Extensions of Credit plus such Defaulting Lender's Swingline Exposure and L/C Exposure does not exceed the total of all non-Defaulting Lenders' Revolving Commitments;

(ii)    if the reallocation described in clause (i) above cannot, or can only partially, be effected, the Borrower shall within one Business Day following notice by the Administrative Agent (x) first, prepay such Swingline Exposure and (y) second, Cash Collateralize for the benefit of the Issuing Lender only the Borrower's obligations corresponding to such Defaulting Lender's L/C Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) in accordance with the procedures set forth in Section 8.1 for so long as such L/C Exposure is outstanding;

(iii)     if the Borrower Cash Collateralizes any portion of such Defaulting Lender's L/C Exposure pursuant to clause (ii) above, the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 3.3(a) with respect to such Defaulting Lender's L/C Exposure during the period such Defaulting Lender's L/C Exposure is cash collateralized;

(iv)     if the L/C Exposure of the non-Defaulting Lenders is reallocated pursuant to clause (i) above, then the fees payable to the Lenders pursuant to Section 2.8(a) and Section 3.3(a) shall be adjusted in accordance with such non-Defaulting Lenders' Revolving Percentages; and

(v)     if all or any portion of such Defaulting Lender's L/C Exposure is neither reallocated nor Cash Collateralized pursuant to clause (i) or (ii) above, then, without prejudice to any rights or remedies of the Issuing Lender or any other Lender hereunder, all fees payable under Section 3.3(a) with respect to such Defaulting Lender's L/C Exposure shall be payable to the Issuing Lender until and to the extent that such L/C Exposure is reallocated and/or cash collateralized; and

(d)     so long as such Lender is a Defaulting Lender, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Lender shall not be required to issue, amend or increase any Letter of Credit, except to the extent it is satisfied that the Swingline Exposure and L/C Exposure of such Defaulting Lender shall be covered by the Revolving Commitments of the non-Defaulting Lenders.  The Defaulting Lender's then outstanding Swingline Exposure and L/C Exposure will automatically be allocated among the non-Defaulting Lenders in accordance with their respective Revolving Percentages but only to the extent the sum of all non-Defaulting Lenders' Revolving Extensions of Credit plus such Defaulting Lender's Swingline Exposure and L/C Exposure does not exceed the total of all non-Defaulting Lenders' Revolving Commitments. To the extent that such reallocation cannot or can only be partially be effected, the Borrower shall have the option either to reduce the Revolving Commitments to remove the Defaulting Lender or to provide Cash Collateral for the Defaulting Lender's Swingline Exposure and L/C Exposure in accordance with Section 2.23(c).

(e)     If (i) a Bankruptcy Event with respect to a Lender Parent of any Lender shall occur following the Closing Date and for so long as such event shall continue or (ii) the Swingline Lender or the Issuing Lender has a good faith belief that any Lender has defaulted in fulfilling its obligations under one or more other agreements in which such Lender commits to extend credit, the Swingline Lender shall not be required to fund any Swingline Loan and the Issuing Lender shall not be required to issue, amend or increase any Letter of Credit, except to the extent it is satisfied that the Swingline Exposure and L/C Exposure of such affected Lender shall be covered by the Revolving Commitments of the non-affected Lenders.  The affected Lender's then outstanding Swingline Exposure and L/C Exposure will automatically be allocated among the non-affected Lenders in accordance with their respective Revolving Percentages but only to the extent the sum of all non-affected Lenders' Revolving Extensions of Credit plus such affected Lender's Swingline Exposure and L/C Exposure does not exceed the total of all non-affected Lenders' Revolving Commitments. To the extent that such reallocation cannot or can only be partially be effected, the Borrower shall have the option either to reduce the Revolving Commitments to remove such affected Lender or to provide Cash Collateral for the affected Lender's Swingline Exposure and L/C Exposure in accordance with Section 2.23(c).

In the event that the Administrative Agent, the Borrower, the Swingline Lender and the Issuing Lender each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Swingline Exposure and L/C Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Commitment and on such date such Lender

shall purchase at par such of the Loans of the other Lenders (other than Swingline Loans) as the Administrative Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its Revolving Percentage.

2.24    Incremental Facilities.

(a)    The Borrower and any one or more Lenders (including New Lenders) may from time to time agree that such Lenders shall make, obtain or increase the amount of their Incremental Term Loans or Revolving Commitments, as applicable, by executing and delivering to the Administrative Agents an Increased Facility Activation Notice specifying (i) the amount of such increase and the Facility or Facilities involved, (ii) the applicable Increased Facility Closing Date and (iii) in the case of Incremental Term Loans, (w) the applicable Incremental Term Maturity Date, (x) the amortization schedule for such Incremental Term Loans, which shall comply with Section 2.3(b), (y) the Applicable Margin for such Incremental Term Loans and (z) any other terms applicable to the Incremental Term Loans; provided that (i) No Default or Event of Default shall exist on the Increased Facility Closing Date and immediately after giving effect to the incurrence of such Incremental Term Loans or Incremental Revolving Commitments (provided that if the proceeds of such Incremental Facility are, substantially concurrently with the receipt thereof, to be used by the Borrower to finance, in whole or in part, a Permitted Acquisition, then the foregoing shall be limited to customary "specified events of default" as agreed by the Administrative Agent and the Borrower in light of prevailing "certain funds" conditions, (ii) Holdings shall be in pro forma compliance, immediately after giving effect to the incurrence of such Incremental Term Loans or Incremental Revolving Commitments (assuming, in the case of Incremental Revolving Commitments, the full drawing thereunder and after giving effect to other permitted pro forma adjustment events and any permanent repayment of indebtedness after the beginning of the relevant determination period but prior to or simultaneously with such borrowing), with the covenant contained in Section 7.1, in each case recomputed as at the last day of the most recently ended fiscal quarter of Holdings, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, (iii) the representations and warranties in Section 4 shall be true and correct in all material respects immediately prior to, and after giving effect to, the incurrence of such Incremental Term Loans or Incremental Revolving Commitments (provided that if the proceeds of such Incremental Facility are, substantially concurrently with the receipt thereof, to be used by the Borrower to finance, in whole or in part, a Permitted Acquisition, then the foregoing shall be limited to the Specified Representations), (iv) the Incremental Term Maturity Date and weighted average life to maturity of any Incremental Term Loans shall not be earlier than the maturity date and weighted average life to maturity, respectively, of the Tranche B Term Loans, and (v) if the all-in yield (determined by taking into account interest rate margins, original issue discount, upfront fees and interest rate floors, but excluding arrangement, structuring, underwriting, commitment or other similar fees) exceeds by more than 0.50% the all-in yield for the Tranche B Term Loans (calculated in the same manner as the previous parenthetical phrase), the Applicable Margin for the Tranche B Term Loans shall be increased so that the all-in yield in respect of such Incremental Term loans is no higher than 0.50% above the all-in yield for the Tranche B Term Loans (it being agreed that any increase in yield in the Tranche B Term Loans required due to the application of interest rate floors on the Incremental Term Loans shall be effected solely through an increase in any interest rate floors applicable to the Tranche B Term Loans).  Any other terms of the Incremental Term Loans shall be reasonably satisfactory to the Administrative Agent to the extent that they are not consistent with the terms of the existing Tranche B Term Loans.  From and after the Increased Facility Closing Date with respect to the Revolving Facility, the associated Incremental Revolving Commitments shall thereafter be Revolving Commitments.

(b)    Notwithstanding the foregoing, (i) without the consent of the Required Lenders, (x) the aggregate amount of borrowings of Incremental Term Loans and the aggregate amount of Incremental Revolving Commitments obtained after the Closing Date pursuant to this paragraph (A) shall

not exceed $125,000,000 plus (B) an unlimited amount if the Consolidated Leverage Ratio is less than or equal to 4.25 to 1.00 on a pro forma basis immediately after giving effect to the incurrence of such Incremental Term Loans or the commencement of such Incremental Revolving Commitments (assuming, in the case of Incremental Revolving Commitments, the full drawing of such Incremental Revolving Commitments after giving effect to other permitted pro forma adjustment events and any permanent repayment of indebtedness after the beginning of the relevant determination period but prior to or simultaneously with such borrowing) and (ii) without the consent of the Administrative Agent, each increase effected pursuant to this paragraph shall be in a minimum amount of at least $5,000,000. No Lender shall have any obligation to participate in any increase described in this paragraph unless it agrees to do so in its sole discretion.

(c)     Any additional bank, financial institution or other entity which, with the consent of the Borrower and the Administrative Agent (which consent shall not be unreasonably withheld), elects to become a "Lender" under this Agreement in connection with any transaction described in Section 2.24(a) shall execute a New Lender Supplement (each, a "New Lender Supplement"), substantially in the form of Exhibit H-3, whereupon such bank, financial institution or other entity (a "New Lender") shall become a Lender for all purposes and to the same extent as if originally a party hereto and shall be bound by the obligations, and entitled to the benefits, of this Agreement.

(d)     Unless otherwise agreed by the Administrative Agent, on each Increased Facility Closing Date with respect to the Revolving Facility, the Borrower shall borrow (to the extent Revolving Loans are outstanding immediately prior to such Increased Facility Closing Date) Revolving Loans under the relevant Incremental Revolving Commitments from each Lender participating in the relevant increase in an amount determined by reference to the amount of each Type of Loan (and, in the case of Eurodollar Loans, of each Eurodollar Tranche) which would then have been outstanding from such Lender if (i) each such Type or Eurodollar Tranche had been borrowed or effected on such Increased Facility Closing Date and (ii) the aggregate amount of each such Type or Eurodollar Tranche requested to be so borrowed or effected had been proportionately increased. The Eurodollar Rate applicable to any Eurodollar Loan borrowed pursuant to the preceding sentence shall equal the Eurodollar Base Rate then applicable to the Eurodollar Loans of the other Lenders in the same Eurodollar Tranche (or, until the expiration of the then-current Interest Period, such other rate as shall be agreed upon between the Borrower and the relevant Lender).

(e)     Notwithstanding anything to the contrary in this Agreement, each of the parties hereto hereby agrees that, on each Increased Facility Activation Date, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Incremental Term Loans evidenced thereby. Any such deemed amendment may be effected in writing by the Administrative Agent with the Borrower's consent (not to be unreasonably withheld) and furnished to the other parties hereto.

SECTION 3.    LETTERS OF CREDIT

3.1    L/C Commitment.

(a)     Subject to the terms and conditions hereof, the Issuing Lender, in reliance on the agreements of the other Revolving Lenders set forth in Section 3.4(a), agrees to issue letters of credit ("Letters of Credit") for the account of the Borrower on any Business Day during the Revolving Commitment Period in such form as may be approved from time to time by the Issuing Lender; provided that the Issuing Lender shall have no obligation to issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment or (ii) the aggregate amount of the Available Revolving Commitments would be less than zero. Each Letter of Credit shall (i) be

denominated in Dollars and (ii) unless otherwise consented to by the Issuing Lender expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date that is five Business Days prior to the Revolving Termination Date, unless, in the case of a Letter of Credit that would expire on a date past the date referred to in clause (y), such Letter of Credit has been Cash Collateralized (in which case such Letter of Credit may expire on any date), provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above unless such Letter of Credit has been Cash Collateralized).

(b) The Issuing Lender shall not at any time be obligated to issue any Letter of Credit if such issuance would conflict with, or cause the Issuing Lender or any L/C Participant to exceed any limits imposed by, any applicable Requirement of Law.

3.2 Procedure for Issuance of Letter of Credit. The Borrower may from time to time request that the Issuing Lender issue a Letter of Credit by delivering to the Issuing Lender at its address for notices specified herein an Application therefor, completed to the satisfaction of the Issuing Lender, and such other certificates, documents and other papers and information as the Issuing Lender may request. Upon receipt of any Application, the Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby (but in no event shall the Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto) by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by the Issuing Lender and the Borrower. The Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower promptly following the issuance thereof. The Issuing Lender shall promptly furnish to the Administrative Agent, which shall in turn promptly furnish to the Lenders, notice of the issuance of each Letter of Credit (including the amount thereof).

3.3 Fees and Other Charges.

(a) The Borrower will pay a fee on all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Revolving Facility, shared ratably among the Revolving Lenders and payable quarterly in arrears on each Fee Payment Date after the issuance date. In addition, the Borrower shall pay to the Issuing Lender for its own account a fronting fee of 0.125% per annum on the undrawn and unexpired amount of each Letter of Credit, payable quarterly in arrears on each Fee Payment Date after the issuance date.

(b) In addition to the foregoing fees, the Borrower shall pay or reimburse the Issuing Lender for such normal and customary costs and expenses as are incurred or charged by the Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

3.4 L/C Participations.

(a) The Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce the Issuing Lender to issue Letters of Credit, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from the Issuing Lender, on the terms and conditions set forth below, for such L/C Participant's own account and risk an undivided interest equal to such L/C Participant's Revolving Percentage in the Issuing Lender's obligations and rights under and in respect of each Letter of Credit and the amount of each draft paid by the Issuing Lender thereunder. Each L/C Participant agrees with the Issuing Lender that, if a draft is paid under any Letter of

Credit for which the Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement (or in the event that any reimbursement received by the Issuing Lender shall be required to be returned by it at any time), such L/C Participant shall pay to the Issuing Lender upon demand at the Issuing Lender's address for notices specified herein an amount equal to such L/C Participant's Revolving Percentage of the amount that is not so reimbursed (or is so returned).  Each L/C Participant's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such L/C Participant may have against the Issuing Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other L/C Participant or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b)     If any amount required to be paid by any L/C Participant to the Issuing Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by the Issuing Lender under any Letter of Credit is paid to the Issuing Lender within three Business Days after the date such payment is due, such L/C Participant shall pay to the Issuing Lender on demand an amount equal to the product of (i) such amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to the Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360.  If any such amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Issuing Lender by such L/C Participant within three Business Days after the date such payment is due, the Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such amount with interest thereon calculated from such due date at the rate per annum applicable to ABR Loans under the Revolving Facility.  A certificate of the Issuing Lender submitted to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)     Whenever, at any time after the Issuing Lender has made payment under any Letter of Credit and has received from any L/C Participant its pro rata share of such payment in accordance with Section 3.4(a), the Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by the Issuing Lender), or any payment of interest on account thereof, the Issuing Lender will distribute to such L/C Participant its pro rata share thereof; provided, however, that in the event that any such payment received by the Issuing Lender shall be required to be returned by the Issuing Lender, such L/C Participant shall return to the Issuing Lender the portion thereof previously distributed by the Issuing Lender to it.

3.5     Reimbursement Obligation of the Borrower.  If any draft is paid under any Letter of Credit, the Borrower shall reimburse the Issuing Lender for the amount of (a) the draft so paid and (b) any taxes, fees, charges or other costs or expenses incurred by the Issuing Lender in connection with such payment, not later than 12:00 Noon, New York City time, on the Business Day immediately following the day that the Borrower receives such notice; provided that, so long as no Default or Event of Default has occurred and is continuing, and unless the Borrower has notified the Administrative Agent that it does not wish to effect a borrowing of Revolving Loans, the Issuing Lender shall, on behalf of the Borrower (which hereby irrevocably directs the Issuing Lender to act on its behalf), no later than 12:00 Noon, New York City time, on such Business Day immediately following the day that the Borrower receives notice of such payment of a Letter of Credit by the Issuing Lender, request each Revolving Lender to make, and each Revolving Lender hereby agrees to make, an ABR Revolving Loan, in an amount equal to such Revolving Lender's Revolving Percentage in the Issuing Lender's obligations and rights under and in

57

respect of such Letter of Credit and the amount of each draft paid by the Issuing Lender thereunder (the "Refunded Letter of Credit"), to repay the Issuing Lender. Each Revolving Lender shall make the amount of such Revolving Loan available to the Administrative Agent at the Funding Office in immediately available funds, not later than 2:00 P.M., New York City time, one Business Day immediately following the day that the Borrower receives such notice. The proceeds of such Revolving Loans shall be immediately made available by the Administrative Agent to the Issuing Lender for application by the Issuing Lender to the repayment of the Refunded Letter of Credit. Each such payment shall be made to the Issuing Lender at its address for notices referred to herein in Dollars and in immediately available funds. Interest shall be payable on any such amounts from the date on which the relevant draft is paid until payment in full at the rate set forth in (x) until the Business Day next succeeding the date of the relevant notice, Section 2.14(b) and (y) thereafter, Section 2.14(c).

3.6     Obligations Absolute. The Borrower's obligations under this Section 3 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against the Issuing Lender, any beneficiary of a Letter of Credit or any other Person. The Borrower also agrees with the Issuing Lender that the Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee. The Issuing Lender shall not be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Issuing Lender. The Borrower agrees that any action taken or omitted by the Issuing Lender under or in connection with any Letter of Credit or the related drafts or documents, if done in the absence of gross negligence or willful misconduct, shall be binding on the Borrower and shall not result in any liability of the Issuing Lender to the Borrower.

3.7     Letter of Credit Payments. If any draft shall be presented for payment under any Letter of Credit, the Issuing Lender shall promptly notify the Borrower of the date and amount thereof. The responsibility of the Issuing Lender to the Borrower in connection with any draft presented for payment under any Letter of Credit shall, in addition to any payment obligation expressly provided for in such Letter of Credit, be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment are substantially in conformity with such Letter of Credit.

3.8     Applications. To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 3, the provisions of this Section 3 shall apply.

SECTION 4.    REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, Holdings and the Borrower hereby jointly and severally represent and warrant to the Administrative Agent and each Lender that:

4.1     Financial Condition.

(a)     The unaudited pro forma forecasted consolidated balance sheet of Millennium Holdings and its consolidated Subsidiaries as at March 31, 2014 (including notes thereto) (the "Pro Forma Balance Sheet"), copies of which have heretofore been furnished to each Lender, has been prepared giving effect (as if such events had occurred on such date) to the Transactions.  The Pro Forma Balance Sheet has been prepared based on the information reasonably available to Holdings as of the date of delivery thereof, and presents fairly in the good faith belief of Holdings on a pro forma basis the estimated financial position of Holdings and its consolidated Subsidiaries as at March 31, 2014, assuming that the events specified in the preceding sentence actually occurred at such date.

(b)     The audited consolidated balance sheets of Millennium Holdings and its consolidated Subsidiaries as at December 31, 2011, December 31, 2012 and December 31, 2013, and the related consolidated statements of income and of cash flows for the fiscal years ended on such dates, reported on by and accompanied by an unqualified report from KPMG LLP present fairly the consolidated financial condition of Millennium Holdings and its consolidated Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended.  All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein).  As of the Closing Date, no Group Member has any material Guarantee Obligations, contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph to the extent that GAAP would require that disclosure.  During the period from December 31, 2013 to and including the Closing Date there has been no Disposition by any Group Member of any material part of its business or property.

4.2     No Change.  Since December 31, 2013, there has been no development or event that has had or would reasonably be expected to have a Material Adverse Effect.  Notwithstanding the foregoing, solely for purposes of determining the satisfaction of the conditions precedent for the initial funding of the Tranche B Term Loans on the Closing Date and for purposes of determining the satisfaction of conditions precedent to the funding of any Incremental Facility that would be used for financing a Permitted Acquisition (but not for determining the satisfaction of such conditions precedent at any other time), changes, developments or events that result from economic, political, industry or market changes generally shall not be taken into account in determining whether a Material Adverse Effect or a material adverse change has occurred or would reasonably expected to occur unless such changes, developments or events adversely affect Holdings, the Borrower and its Subsidiaries in a materially disproportionate manner relative to other participants in the industries in which the Borrower and its Subsidiaries operate.

4.3     Existence; Compliance with Law.  Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4     Power; Authorization; Enforceable Obligations.  Each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan

Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement.  No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) consents, authorizations, filings and notices described in Schedule 4.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect and (ii) the filings referred to in Section 4.20.  Each Loan Document has been duly executed and delivered on behalf of each Loan Party a party thereto.  This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles or public policy (whether enforcement is sought by proceedings in equity or at law) (collectively, the "Enforceability Exceptions").

4.5     No Legal Bar.  The execution, delivery and performance of this Agreement and the other Loan Documents, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate in any material respect any Requirement of Law or any material Contractual Obligation of any Group Member and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such material Contractual Obligation (other than the Liens created by the Security Documents).  No Requirement of Law or Contractual Obligation applicable to the Borrower or any of its Subsidiaries would reasonably be expected to have a Material Adverse Effect.

4.6     Litigation.  No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the actual knowledge of Holdings or the Borrower, threatened by or against any Group Member or against any of their respective properties or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that would reasonably be expected to have a Material Adverse Effect.

4.7     No Default.  No Group Member is in default under or with respect to any of its Contractual Obligations in any respect that would reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

4.8     Ownership of Property; Liens.  Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold or license interest in, all its other property, and none of such property is subject to any Lien except as permitted by Section 7.3.

4.9     Intellectual Property.  (a) Each Group Member owns, or is licensed to use, or otherwise has valid rights to use,  all Intellectual Property necessary for the conduct of its business as currently conducted, except to the extent to which such failure would not reasonably be expected to have a Material Adverse Effect; (b) no material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, other than the claims by Ameritox, Ltd., which are subject to pending litigation in the U.S. Federal District Court for the Northern District of Wisconsin, nor does Holdings or the Borrower have actual knowledge (without a duty of inquiry) of, any valid basis for any such claim, which, if adjudicated adversely to Holdings or the Borrower or any Group Member, would reasonably be expected to have a Material Adverse Effect; and (c) the use of any Intellectual Property by each Group Member does not infringe on the Intellectual Property rights of any Person, except to the extent to which such infringement would not reasonably be expected to have a Material Adverse Effect.

4.10    Taxes.  Each Group Member has filed or caused to be filed all material Federal, state and other material Tax returns that are required to be filed and has paid all Taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other material Taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member); no Tax Lien has been filed, and, to the actual knowledge of Holdings and the Borrower, no claim is being asserted, with respect to any such Tax, fee or other charge.

4.11    Federal Regulations.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for buying or carrying any margin stock (within the meaning of Regulation T, U or X of the Board), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.  No more than 25% of the assets of the Group Members consist of "margin stock" as so defined.  If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

4.12    Labor Matters.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Group Member pending or, to the actual knowledge of Holdings or the Borrower, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

4.13    ERISA.  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (a) each Group Member and each of their respective ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Plans and the regulations and published interpretations thereunder; (b) no ERISA Event or Foreign Plan Event has occurred or is reasonably expected to occur; and (c) all amounts required by applicable law with respect to, or by the terms of, any retiree welfare benefit arrangement maintained by any Group Member or any ERISA Affiliate or to which any Group Member or any ERISA Affiliate has an obligation to contribute have been accrued in accordance with Accounting Standards Codification Topic No. 715-60.  The present value of all accumulated benefit obligations under each Pension Plan (based on the assumptions used for purposes of Accounting Standards Codification No. 715-30) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than an immaterial amount the fair market value of the assets of such Pension Plan allocable to such accrued benefits, and the present value of all accumulated benefit obligations of all underfunded Pension Plans (based on the assumptions used for purposes of Accounting Standards Codification No. 715-30 did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than an immaterial amount the fair market value of the assets of all such underfunded Pension Plans.

4.14    Investment Company Act; Other Regulations.  No Loan Party is required to register as an "investment company", nor is any Loan Party a company "controlled" by a Person required to register as an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to regulation under any material Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

4.15    <u>Subsidiaries</u>.  Except as disclosed to the Administrative Agent by the Borrower in writing from time to time after the Closing Date, (a) Schedule 4.15 sets forth the name and jurisdiction of incorporation or formation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and whether or not such Subsidiary is a Restricted Subsidiary and (b) there are no outstanding subscriptions, options, warrants (other than the TA Warrants to be redeemed by Millennium Holdings on or substantially concurrently with the Closing Date), calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Restricted Subsidiary, except as created by the Loan Documents.

4.16    <u>Use of Proceeds</u>.  The proceeds of the Tranche B Term Loans shall be used (i) to make certain distributions, redemption and/or other compensation payments to shareholders, warrant holders and option holders of Holdings or the Borrower, including, without limitation, to the extent not funded with cash and Cash Equivalents, to make those payments and distributions referenced in Section 7.6(f), (ii) to repay all amounts outstanding under the Existing Credit Agreement, and (iii) to pay the fees and expenses incurred in connection with the foregoing transactions.  The proceeds of the Revolving Loans and the Swingline Loans, and the Letters of Credit, shall be used for working capital needs and general corporate purposes of the Borrower and its Subsidiaries, including the Permitted Acquisitions and other Investments and distributions. The proceeds of Incremental Facilities shall be used, in the Borrower's discretion, (i) to finance acquisitions, investments and distribution to shareholders not prohibited hereunder and (ii) for other general corporate purposes of the Borrower and its Subsidiaries.

4.17    <u>Environmental Matters</u>.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:

(a)    the facilities and properties owned, leased or operated by any Group Member (the "<u>Properties</u>") do not contain any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or would give rise to liability under, any Environmental Law;

(b)    no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "<u>Business</u>"), nor does Holdings or the Borrower have actual knowledge or reason to believe that any such notice will be received or is being threatened;

(c)    Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that would give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that would give rise to liability under, any applicable Environmental Law;

(d)    no judicial proceeding or governmental or administrative action is pending or, to the actual knowledge of Holdings and the Borrower, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e)    there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Group Member in

connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that would give rise to liability under Environmental Laws;

(f) the Properties and all operations at the Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(g) no Group Member has assumed any liability of any other Person under Environmental Laws.

4.18    Forward-Looking Statements.  The Pro Forma Balance Sheet and other materials produced by the Borrower may include certain forward looking statements and projections provided by the Borrower.  Any such statements and projections reflect various estimates and assumptions by the Borrower concerning anticipated results.  No representations or warranties are made by Borrower or any of its affiliates as to the accuracy of any such anticipated results.  Whether or not any such forward looking statements or projections are in fact achieved will depend upon future events some of which are not within the control of the Borrower.  Accordingly, actual results may vary from the projected results, and such variations may be material.

4.19    Accuracy of Information.  No written statement or information contained in this Agreement, any other Loan Document, the Confidential Information Memorandum or any other document, certificate or statement furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, taken as a whole, contained as of the date such statement, information, document or certificate was so furnished (or, in the case of the Confidential Information Memorandum, as of the date of this Agreement) (and in any event given prevailing effect to more recent written statements or information to the extent of any conflict or inconsistency with any previous written statements or information), any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements thereto).  The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.  There is no fact known to any Loan Party that would reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents, in the Confidential Information Memorandum or in any other documents, certificates and statements furnished to the Administrative Agent and the Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.  Notwithstanding the foregoing, solely for purposes of determining the satisfaction of the conditions precedent for the initial funding of the Tranche B Term Loans on the Closing Date and for purposes of determining the satisfaction of conditions precedent to the funding of any Incremental Facility that would be used for financing a Permitted Acquisition (but not for determining the satisfaction of such conditions precedent at any other time), changes, developments or events that result from economic, political, industry or market changes generally shall not be taken into account in determining whether a Material Adverse Effect or a material adverse change has occurred or would reasonably expected to occur unless such changes, developments or events adversely affect Holdings, the Borrower and its Subsidiaries in a materially disproportionate manner relative to other participants in the industries in which the Borrower and its Subsidiaries operate.

63

4.20    Security Documents.

(a)    The Guarantee and Collateral Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof, subject to the Enforceability Exceptions.  In the case of the Pledged Stock and Pledged Notes described in the Guarantee and Collateral Agreement constituting certificated securities, when stock certificates representing such Pledged Stock are delivered to the Administrative Agent (together with a properly completed and signed stock power or endorsement), and in the case of the other Collateral described in the Guarantee and Collateral Agreement, when financing statements and other filings specified on Schedule 4.20(a) in appropriate form are filed in the offices specified on Schedule 4.20(a), the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (to the extent capable of perfection by such delivery and such filings) and the proceeds thereof, as security for the Obligations (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (except Liens permitted by Section 7.3).

(b)    Each of the Mortgages is effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable Lien on the Mortgaged Properties described therein and proceeds thereof, subject to the Enforceability Exceptions, and when the Mortgages are filed in the offices specified on Schedule 4.20(b), each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person.  Schedule 1.1B lists, as of the Closing Date, each parcel of owned real property and each leasehold interest in real property located in the United States and held by the Borrower or any of its Restricted Subsidiaries.

4.21    [Intentionally Omitted].

4.22    Solvency.  Each Loan Party is, and after giving effect to the Transactions and the incurrence of all Indebtedness and obligations being incurred in connection herewith and therewith will be and will continue to be, Solvent.

4.23    OFAC Compliance; Anti-Corruption Laws.  No Group Member or any Affiliate of a Group Member are in violation of and shall not violate any of the country or list based economic and trade sanctions administered and enforced by OFAC that are described or referenced at http://www.ustreas.gov/offices/enforcement/ofac/ or as otherwise published from time to time.  "OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.  The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Affiliates, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Affiliates, its Subsidiaries and their respective officers and employees and, to the knowledge of the Borrower, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Borrower, any Affiliate or any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Affiliate that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  Neither the making of any Loan, any Swingline Loan or Letter of Credit, the use of the proceeds thereof or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

4.24    Anti-Terrorism Laws.  Neither any Loan Party nor any of its Subsidiaries is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 *et seq.*), as amended.  Neither any Loan Party nor any

64

or its Subsidiaries is in violation of (a) the Trading with the Enemy Act, as amended, (b) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (c) the Patriot Act. None of the Loan Parties (i) is a blocked person described in Section 1 of the Executive Order Number 13224 (Anti-Terrorism Order) or (ii) to the actual knowledge of any Responsible Officer, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

SECTION 5.    CONDITIONS PRECEDENT

5.1     Conditions to Extension of Credit on the Closing Date.  The agreement of each Lender to make the extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)     Credit Agreement; Guarantee and Collateral Agreement.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, Holdings, the Borrower and each Person listed on Schedule 1.1A and (ii) the Guarantee and Collateral Agreement, executed and delivered by Holdings, the Borrower and each Subsidiary Guarantor.

(b)     Repayment of Existing Indebtedness.  The Administrative Agent shall have received evidence reasonably satisfactory to it that (i) all principal, interest, fees and other amounts owing or accrued and unpaid under the Existing Credit Agreement have been paid, or substantially concurrently with the closing of the Transactions shall have been paid and (ii) all Liens granted in favor of lenders under the Existing Credit Agreement shall have been released, or substantially concurrently with the initial funding of the Loans will be released. The Administrative Agent shall have received evidence reasonably satisfactory to it that substantially concurrently with the initial funding of the Loans hereunder Holdings and its Subsidiaries shall not have (or the Administrative Agent shall be reasonably satisfied that all necessary actions have been taken so that Holdings and its Subsidiaries promptly after the initial funding of the Loans shall not have) any material Indebtedness for borrowed money (which term shall not include obligations in relation to the redemption of employee stock options) other than (it being agreed that inclusion in this list does not signify a determination as to whether or not the relevant Indebtedness is material): (1) Indebtedness outstanding under this Agreement, (2) Indebtedness owed to BALC under the Master Lease Agreement in an aggregate principal amount not to exceed $30,000,000, (3) Indebtedness owed to TFS or to DL or to SDFC or to TimePayment Corporation Financing in an aggregate principal amount not to exceed $3,000,000, (4) Indebtedness outstanding in relation to any of the Aircraft, and (5) the Special Members Loan.

(c)     TA Debentures; TA Warrants. The Administrative Agent shall be reasonably satisfied that substantially concurrently with the initial funding of the Loans, Millennium Holdings shall have redeemed by exchange all TA Debentures and all TA Warrants, and all amounts outstanding thereunder shall have been converted or exchanged for common equity of Millennium Holdings (or the Administrative Agent shall be reasonably satisfied that all necessary actions have been taken so that such conversion or exchange occurs promptly after the initial funding of the Loans).

(d)     Pro Forma Financial Statements; Financial Statements.  The Lenders shall have received (i) the Pro Forma Financial Statements and (ii) audited consolidated financial statements of Millennium Holding and its consolidated Subsidiaries for the 2011, 2012 and 2013 fiscal years.

(e)     Projections.  The Lenders shall have received projections through December 31, 2021 (which projections shall be on a quarterly basis for the 2014 and 2015 fiscal years and on an annual basis thereafter).

(f)  Approvals.  All governmental and third party approvals necessary in connection with the continuing operations of the Group Members and, as to the Group Members, the transactions contemplated hereby shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the financing contemplated hereby.

(g)  Lien Searches.  The Administrative Agent shall have received the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 7.3 or discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Administrative Agent.

(h)  Fees.  The Lenders, the Arrangers and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date.  All such amounts will be paid with proceeds of Loans made on the Closing Date or with cash and Cash Equivalents and will be reflected in the funding instructions given by the Borrower to the Administrative Agent on or before the Closing Date.

(i)  Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments, including the certificate of incorporation of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(j)  Legal Opinions.  The Administrative Agent shall have received the following executed legal opinions:

(i)  the legal opinion of Hogan Lovells US LLP, New York counsel to Holdings, the Borrower and the Subsidiary Guarantors, substantially in the form of Exhibit E; and

(ii)  the legal opinion of such other special and local counsel as may be required by the Administrative Agent.

Each such legal opinion shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require.

(k)  Pledged Stock; Stock Powers; Pledged Notes.  The Administrative Agent shall have received or shall continue to hold (i) the certificates representing the shares of Capital Stock pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Administrative Agent pursuant to the Guarantee and Collateral Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(l)  Filings, Registrations and Recordings.  The Administrative Agent shall be satisfied that each document (including any Uniform Commercial Code financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Lenders, a perfected Lien on the Collateral described therein, prior and superior in right to any other

Person (other than with respect to Liens expressly permitted by Section 7.3 and other than documents, filings, registrations and recordings that the Administrative Agent has agreed may be effected at a later date), shall be in proper form for filing, registration or recordation.

(m)    Flood Hazards.  With respect to each Mortgaged Property listed on Schedule 1.1B, the Administrative Agent shall have received (i) a life of loan standard flood hazard determination, (ii) a policy of flood insurance that (1) covers any parcel of such Mortgaged Property that is improved real property that is located in a "special flood hazard area", (2) is written in an amount, and is in form and substance that is reasonably satisfactory to the Administrative Agent, and (3) has a term ending not later than the maturity of the Indebtedness secured by such Mortgage and (iii) if such Mortgaged Property has any improvements that are located in a special flood hazard area, confirmation that the Borrower has received the notice required pursuant to Section 208.25(i) of Regulation H of the Board.

(n)    Solvency Certificate.  The Administrative Agent shall have received a certificate, dated the Closing Date and signed by the chief financial officer of Holdings, stating that the Loan Parties on a consolidated basis before and after giving effect to the Transactions on the Closing Date, are Solvent.

(o)    Insurance.  The Administrative Agent shall have received insurance certificates satisfying the requirements of Section 5.2(b) of the Guarantee and Collateral Agreement.

(p)    Patriot Act.  The Administrative Agent shall have received all documentation and other information about the Loan Parties at least five (5) Business Days prior to the Closing Date as shall have been requested by the Administrative Agent (either on its behalf or on behalf of any Lender) that the Administrative Agent or any Lender shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act; provided that all such documentation and other information has been requested within seven (7) days prior to the Closing Date.

For the purpose of determining compliance with the conditions specified in this Section 5.1, each Lender that has signed this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 5.1 unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

5.2    Conditions to Each Extension of Credit.  The agreement of each Lender to make any extension of credit requested to be made by it on any date (including its initial extension of credit and under any Incremental Facility) is subject to the satisfaction of the following conditions precedent:

(a)    Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date; provided that any representation or warranty that is qualified as "materiality," "Material Adverse Effect" or similar language will be required to be true and correct in all respects (after giving effect to any such qualification therein); provided, further, that solely for purposes of determining the satisfaction of the conditions precedent for the initial funding of the Tranche B Term Loans on the Closing Date (but not for determining the satisfaction of such conditions precedent at any other time after the Closing Date), changes, developments or events that result from economic, political, industry or market changes generally shall not be taken into account in determining whether a Material Adverse Effect or a material adverse change has occurred or would reasonably expected to occur unless such changes, developments or events adversely affect Holdings, the Borrower and its Subsidiaries in a materially disproportionate manner relative to other participants in the industries in which the Borrower and its Subsidiaries operate.

(b)      No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

Each borrowing by and issuance of a Letter of Credit on behalf of the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this Section 5.2 have been satisfied.

SECTION 6.     AFFIRMATIVE COVENANTS

Holdings and the Borrower hereby jointly and severally agree that, so long as the Commitments remain in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, each of Holdings and the Borrower shall and shall cause each of its Restricted Subsidiaries to:

6.1      Financial Statements.  Furnish to the Administrative Agent and each Lender:

(a)      as soon as available, but in any event within 90 days after the end of each fiscal year of Holdings, a copy of the audited consolidated balance sheet of Holdings and its consolidated Subsidiaries, including the Borrower, as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by KPMG LLP or other independent certified public accountants of nationally recognized standing; and

(b)      as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of Holdings, the unaudited consolidated balance sheet of Holdings and its consolidated Subsidiaries, including the Borrower, as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, reviewed pursuant to agreed-upon procedures to be agreed among KPMG LLP, the Borrower, Holdings and the Administrative Agent by KPMG LLP or other independent certified public accountants of nationally recognized standing and certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year end audit adjustments).

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as noted above) (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods.

6.2      Certificates; Other Information.  Furnish to the Administrative Agent for delivery to each Lender:

(a)      concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Event of Default pursuant to Section 7.1, except as specified in such certificate;

(b)      concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer stating that, as of the date of such certificate and to the knowledge of such Responsible Officer, each Loan Party during the period covered by such certificate has

observed or performed all of its covenants and other agreements, and has satisfied every condition to be satisfied for such period as of such date contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has no actual knowledge of any Default or Event of Default except as specified in such certificate and (ii) in the case of financial statements with respect to a Calculation Period, (x) a Compliance Certificate containing all information and calculations, including calculations setting forth the amount of Excess Cash Flow for such Calculation Period and the Available ECF Amount as of such Calculation Period end and the amount of the applicable prepayment required pursuant to Section 2.11(c), necessary for determining compliance by each Group Member with the provisions of this Agreement referred to therein as of the last day of the Calculation Period, as the case may be, and (y) to the extent not previously disclosed to the Administrative Agent, (1) a description of any change in the jurisdiction of organization of any Loan Party, (2) a list of any Intellectual Property applications or registrations issued to or acquired by any Group Member and any written license by which any Group Member becomes an exclusive licensee of any U.S. Intellectual Property application or registration and (3) a description of any Person that has become a Group Member, in each case since the date of the most recent report delivered pursuant to this clause (y) (or, in the case of the first such report so delivered, since the Closing Date);

(c)     as soon as available, and in any event no later than 90 days after the end of each fiscal year of Holdings, a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet of Holdings and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a description of the underlying assumptions applicable thereto), and, as soon as available, significant revisions, if any, of such budget and quarterly projections with respect to such fiscal year (collectively, the "Projections"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections are based on reasonable estimates, information and assumptions which the Responsible Officer believes to be reasonable at the time when made, and that such Responsible Officer has no reason to believe that such Projections are incorrect or misleading in any material respect;

(d)     within 45 days (or 90 days, in the case of the fourth fiscal quarter of each fiscal year) after the end of each fiscal quarter of Holdings, a narrative discussion and analysis of the financial condition and results of operations of Holdings and its Restricted Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the portion of the Projections covering such periods and to the comparable periods of the previous year;

(e)     within five days after the same are sent, copies of all financial statements and reports that Holdings or the Borrower sends to the holders of any class of its debt securities and, within five days after the same are filed, copies of all financial statements and reports that Holdings or the Borrower may make to, or file with, the SEC;

(f)     promptly following receipt thereof, copies of (i) any documents described in Section 101(k) or 101(l) of ERISA that any Group Member or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the relevant Group Members or ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent, such Group Member or the ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(g)     a report of a reputable insurance broker with respect to the insurance required to be maintained by Section 5.2 of the Guarantee and Collateral Agreement substantially concurrently with

69

the delivery of any financial statements pursuant to Section 6.1, and such supplemental reports with respect thereto as the Administrative Agent may from time to time reasonably request; and

(h)        promptly, such additional financial and other information as any Lender may from time to time reasonably request; <u>provided</u> that such Lender shall make all such requests through the Administrative Agent which shall forward such requests and the responses thereto to the Borrower and such Lender, respectively.

6.3       <u>Maintenance of Existence; Compliance</u>.  (a)(i)  Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case in clause (i) or (ii), as otherwise permitted by Section 7.4, Section 7.5 or Section 7.8, and except, in the case of clause (i)(other than with respect to a Loan Party) or (ii) above, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (c) maintain in effect and use reasonable efforts to enforce policies and procedures designed to ensure compliance by the Borrower, its Affiliates, its Subsidiaries and their respective directors, officers, employees and agents with  Anti-Corruption Laws and applicable Sanctions.

6.4       <u>Maintenance of Property; Insurance</u>.  (a)  Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted and (b) maintain with financially sound and reputable insurance companies insurance policies, including flood insurance policies with respect to any improved real property which is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business.

6.5       <u>Inspection of Property; Books and Records; Discussions</u>.  (a)  Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants; <u>provided</u> that any visit, inspection or examination by a Lender (as opposed to the Administrative Agent) shall be at such Lender's expense so long as no Default or Event of Default has occurred and is continuing; and <u>provided</u>, <u>further</u>, that any visit, inspection or examination by the Administrative Agent beyond the first visit, inspection or examination in any twelve-month period shall be at the Administrative Agent's sole expense so long as no Default or Event of Default has occurred and is continuing.

6.6       <u>Notices</u>.  Promptly upon a Responsible Officer obtaining knowledge thereof, give notice to the Administrative Agent and each Lender of:

(a)        the occurrence of any Default or Event of Default;

70

(b)      any litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that if adversely determined would reasonably be expected to have a Material Adverse Effect;

(c)      any litigation or proceeding affecting any Group Member (i) in which the amount involved is $15,000,000 or more and not fully covered by insurance (other than applicable deductibles and co-insurance amounts), (ii) in which injunctive or similar relief is sought which, if granted, could reasonably be expected to have a Material Adverse Effect or (iii) which relates directly to any Loan Document;

(d)      the occurrence of any ERISA Event or Foreign Plan Event that, alone or together with any other ERISA Events and/or Foreign Plan Events that have occurred, would reasonably be expected to result in liability of any Group Member or any ERISA Affiliate in an aggregate amount exceeding a material amount, as soon as possible and in any event within 10 days after the Borrower knows or has reason to know thereof;

(e)      any development or event that has had or would reasonably be expected to have a Material Adverse Effect; and

(f)      any Lien (other than Liens permitted by the Loan Documents) on any of the Collateral which would materially adversely affect the ability of the Administrative Agent to exercise any of its remedies under the Security Documents.

Each notice pursuant to this Section 6.6 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto, if known at the time of that representation.

6.7      Environmental Laws.  i)  Comply in all material respects with, and use commercially reasonable efforts to assure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, in each case except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(a)      Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, in each case except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.8      [Intentionally Omitted].

6.9      Additional Collateral.

(a)      With respect to any property acquired after the Closing Date by any Group Member (other than (x) any property of the type described in paragraph (b), (c) or (d) below, (y) property acquired by the Excluded Domestic Subsidiary, any Excluded Foreign Subsidiary or any Unrestricted Subsidiary and (z) any Excluded Property) required to be pledged as Collateral pursuant to the terms of the Security Documents as to which the Administrative Agent, for the benefit of the Lenders, does not have a perfected Lien, within thirty (30) days after the date of acquisition thereof (or such later date

acceptable to the Administrative Agent in its sole discretion in writing) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent.

(b)     With respect to any fee interest in any real property in the United States having a value (together with improvements thereof) of at least $2,500,000 acquired after the Closing Date by any Group Member (other than any real property acquired by the Excluded Domestic Subsidiary, any Excluded Foreign Subsidiary or any Unrestricted Subsidiary and other than any real property that is the subject of any mortgage or similar financing permitted under Section 7.3(bb)), within 90 days after the date of acquisition thereof (or such later date acceptable to the Administrative Agent in its sole discretion in writing) (i) execute and deliver a first priority Mortgage, in favor of the Administrative Agent, for the benefit of the Lenders, covering such real property, (ii) if requested by the Administrative Agent, provide the Lenders with (x) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent, (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent, and (iv) the Administrative Agent shall have received (A) a life of loan standard flood hazard determination covering such property, (B) a policy of flood insurance that (1) covers any parcel of such Mortgaged Property that is improved real property that is located in a "special flood hazard area", (2) is written in an amount, and is in form and substance  that is reasonably satisfactory to the Administrative Agent, and (3) has a term ending not later than the maturity of the Indebtedness secured by such Mortgage and (C) if such Mortgaged Property has any improvements that are located in a special flood hazard area, confirmation that the Borrower has received the notice required pursuant to Section 208.25(i) of Regulation H of the Board.

(c)     With respect to any new Subsidiary (other than (i) the Excluded Domestic Subsidiary, (ii) an Excluded Foreign Subsidiary, (iii) an Unrestricted Subsidiary, (iv) a Subsidiary formed or acquired by the Borrower or any Restricted Subsidiary that will be dissolved or merged into the Borrower or another Restricted Subsidiary within 90 days after the formation or acquisition thereof (provided that such Subsidiary shall comply with the requirements of this Section 6.9(c) immediately to the extent not dissolved or merged with the Borrower or any Restricted Subsidiary within such 90-day period), and (v) a Subsidiary formed or acquired as part of a Permitted Acquisition financed by Indebtedness permitted by Section 7.2(h) created or acquired after the Closing Date by any Group Member (which, for the purposes of this paragraph (c), shall include any existing Subsidiary that ceases to be an Excluded Domestic Subsidiary, an Excluded Foreign Subsidiary or an Unrestricted Subsidiary), within thirty (30) days after such event (or such later date acceptable to the Administrative Agent in its sole discretion in writing) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any Group Member, (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, (iii)

cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement, (B) to take such actions necessary or advisable to grant to the Administrative Agent for the benefit of the Lenders a perfected first priority security interest in the Collateral described in the Guarantee and Collateral Agreement with respect to such new Subsidiary, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent and (C) to deliver to the Administrative Agent a certificate of such new Subsidiary, substantially in the form of Exhibit C, with appropriate insertions and attachments, and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent; provided that the Capital Stock of any direct or indirect non-Wholly Owned Subsidiary of the Borrower shall not be required to be pledged if and to the extent such pledge would be prohibited (except to the extent such prohibition would be deemed ineffective under the Uniform Commercial Code) by such non-Wholly Owned Subsidiary's organizational or governing documents or material joint venture documents; and provided, further, that the Capital Stock of any Disregarded Subsidiary shall not be required to be pledged.

(d)     With respect to any new Excluded Foreign Subsidiary that is a Restricted Subsidiary created or acquired after the Closing Date by any Group Member (other than by any Group Member that is an Excluded Foreign Subsidiary), promptly (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any such Group Member (provided that in no event shall more than 65% of the total outstanding voting Capital Stock of any such new Subsidiary be required to be so pledged), (ii) deliver to the Administrative Agent the certificates, if any, representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, and take such other action as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the Administrative Agent's security interest therein, and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(e)     Anything in this Agreement or the other Loan Documents to the contrary notwithstanding, in no event shall any Group Member be required to grant any Lien on Excluded Collateral or to take any of the Excluded Actions.

6.10    Ratings. The Borrower will use commercially reasonable efforts to maintain with Moody's and S&P a corporate rating for the Borrower and a credit rating for the Loans.

6.11    Quarterly Conference Calls. Host a conference call each fiscal quarter (at times agreed with the Administrative Agent) with the Lenders and senior members of management of the Borrower (with a question and answer period).

6.12    Conditions Subsequent. The Borrower shall provide to the Administrative Agent, within 90 days of the Closing Date (or such later date acceptable to the Administrative Agent in its sole discretion in writing), with respect to each Mortgaged Property existing on the Closing Date and listed in Schedule 1.1B all those deliverables referred to in Section 6.9(b) (other than clause (iv) thereof) for real estate property, together with a landlord waiver and consent with respect to each such Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent.

6.13    Designation of Subsidiaries. Holdings may at any time designate any Restricted Subsidiary that has been formed or acquired after the Closing Date as an Unrestricted Subsidiary, or any Unrestricted Subsidiary as a Restricted Subsidiary, provided that (i) the Borrower may not designate a Subsidiary as an Unrestricted Subsidiary if such Subsidiary is a Material Subsidiary, and (ii) immediately before and immediately after such designation, no Default or Event of Default shall have occurred and be continuing.  The designation of any Restricted Subsidiary as an Unrestricted Subsidiary pursuant to the terms hereof shall constitute an Investment by the applicable Loan Party therein in an amount equal to the fair market value of the Borrower's or the applicable Subsidiary's (as applicable) Investment therein at the date of such designation to the extent not previously counted as an Investment for purposes of any of compliance with the subclauses of Section 7.8.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of such designation of any Indebtedness or Liens of such Subsidiary existing at the time of such designation. Each designation or redesignation must be evidenced by a resolution of the Board of Directors of Holdings, a certified copy of which shall be delivered to Administrative Agent together with a certificate of a Responsible Officer of Holdings certifying that such designation or redesignation, as applicable, complies with the foregoing conditions.

## SECTION 7.    NEGATIVE COVENANTS

Holdings and the Borrower hereby jointly and severally agree that, so long as the Commitments remain in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, each of Holdings and the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly:

7.1    Consolidated Leverage Ratio.  As long as any Revolving Commitment remains in effect, permit the Consolidated Leverage Ratio as at the last day of any period of four consecutive fiscal quarters of Holdings ending with any fiscal quarter set forth below, to exceed the ratio set forth below opposite such fiscal quarter, without the consent of the Majority Facility Lenders under the Revolving Facility:

| Fiscal Quarter Ending | Consolidated Leverage Ratio |
|---|---|
| September 30, 2014 | 6.50 to 1.00 |
| December 31, 2014 | 6.25 to 1.00 |
| March 31, 2015 | 6.00 to 1.00 |
| June 30, 2015 | 5.75 to 1.00 |
| September 30, 2015 | 5.75 to 1.00 |
| December 31, 2015 | 5.50 to 1.00 |
| December 31, 2016 | 5.00 to 1.00 |
| December 31, 2017 and thereafter | 4.50 to 1.00 |

7.2    Indebtedness.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)    Indebtedness of any Loan Party pursuant to any Loan Document;

(b)    Indebtedness of the Borrower to any Restricted Subsidiary and of any Subsidiary Guarantor to the Borrower or any other Restricted Subsidiary;

(c)    Guarantee Obligations incurred by the Borrower or any of its Restricted Subsidiaries in respect of Indebtedness of the Borrower or any Subsidiary Guarantor otherwise permitted hereunder;

(d)      Indebtedness outstanding on the Closing Date and listed on Schedule 7.2(d), and any refinancings, refundings, renewals or extensions thereof (without increasing the principal other than capitalizing interest and fees due, or shortening the maturity thereof);

(e)      Indebtedness (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 7.3(g) in each case in an aggregate principal amount not to exceed $125,000,000 at any one time outstanding;

(f)      unsecured senior Indebtedness or unsecured Subordinated Indebtedness; provided that, immediately before and immediately after giving effect to such incurrence: (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom; (ii) Holdings shall be in pro forma compliance, immediately after giving effect to such incurrence, with the covenant contained in Section 7.1 (or, if such covenant shall no longer apply at such time, the Consolidated Leverage Ratio of Holdings and its Restricted Subsidiaries, calculated on a pro forma basis, shall not be greater than 6.0 to 1.0) recomputed as at the last day of the most recently ended fiscal quarter of Holdings, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, together with the relevant financial information for such incurrence; (iii) such Indebtedness shall not mature or have scheduled amortization or payments of principal and shall not be subject to mandatory redemption, repurchase, prepayment or sinking fund obligations (except customary asset sale or change of control provisions) prior to the date that is at least ninety-one (91) days after the latest maturity of the Term Loans at the time such Indebtedness is incurred; (iv) such Indebtedness shall have terms and conditions (other than pricing, rate floors, discounts, fees, premiums and optional prepayment or redemption provisions) that in the good faith determination of the Borrower are not materially less favorable (when taken as a whole) to the Borrower than the terms and conditions of the Loan Documents (when taken as a whole) and shall not have any financial covenants; and (v) if such Indebtedness is Subordinated Indebtedness, the subordination provisions thereof shall be on customary terms;

(g)      Indebtedness of Pain in the Air in connection with the financing of any Aircraft in an aggregate principal amount not to exceed $15,000,000 at any one time outstanding;

(h)      Indebtedness (i) incurred to finance any Permitted Acquisition or (ii) assumed in connection with any Permitted Acquisition, in either of clause (i) or (ii), in an unlimited amount; provided that, immediately before and immediately after giving effect thereto:  (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom; and (B) Holdings shall be in pro forma compliance, immediately after giving effect to such incurrence, with the covenant contained in Section 7.1 (or, if such covenant shall no longer apply at such time, the Consolidated Leverage Ratio of Holding and its Restricted Subsidiaries, calculated on a pro forma basis, shall not be greater than 6.0 to 1.0), in each case recomputed as at the last day of the most recently ended fiscal quarter of Holdings, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, together with all relevant financial information for such acquisition;

(i)      additional Indebtedness of the Borrower or any of its Restricted Subsidiaries in an aggregate principal amount (for the Borrower and all Restricted Subsidiaries) not to exceed $50,000,000 at any one time outstanding;

(j)      Capital Lease Obligations in an aggregate principal amount not to exceed $25,000,000 at any one time outstanding (for the avoidance of doubt, such permitted Indebtedness is in addition to any other Indebtedness permitted under this Section 7.2 );

(k)      Capitalized Earn-Out Obligations in an amount not to exceed $30,000,000 appearing on the consolidated balance sheet of Holdings and its consolidated Restricted Subsidiaries at any one time;

(l)      netting services, overdraft protection arrangements and other Indebtedness owed to banks, securities intermediaries, other financial institutions, in connection with deposit accounts, securities accounts or Cash Management Arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments in the ordinary course of business;

(m)      Indebtedness owed to sureties and other accommodation parties in connection with the issuance of performance bonds, surety bonds and other similar instruments, in each case in the ordinary course of business;

(n)      Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(o)      unsecured Indebtedness of the Borrower to any direct or indirect holder of Capital Stock of Holdings, or any Affiliates of any such Persons or funds managed by such Persons, in an aggregate principal amount not to exceed $50,000,000 at any one time outstanding (collectively, the "Members Debt"), so long as (i) all Revolving Commitments shall have been terminated and no Letters of Credit shall be outstanding or such Letters of Credit shall have been Cash Collateralized to the satisfaction of the Issuing Bank, (ii) immediately after giving effect thereto, no Default or Event of Default arising solely under Section 8.1(a) shall have occurred and be continuing or would result therefrom, and (iii) the terms and conditions of such Members Debt shall be upon fair and reasonable terms that are reasonably believed by the Board of Directors of Holdings or the Borrower in good faith to be no less favorable to the Borrower than it would reasonably be able to obtain in a comparable arm's length transaction with a Person that is not an Affiliate (provided that to the extent that such comparable arm's length transaction with a Person that is not an Affiliate is not then available, the Members Debt shall be subject to interest rate and other pricing provisions that are not greater than, and have other provisions not materially less favorable to the Borrower and its Restricted Subsidiaries than, those applicable to the Revolving Facility as in effect immediately prior to its termination); it being understood that (A) payments of principal and interest by the Borrower with respect to such Members Debt shall not be deemed a Restricted Payment and shall not be required to be subordinated in right of payment to the Loans in any respect and (B) such Members Debt may be repaid or prepaid at any time subject only to compliance with Section 7.9; and (C) all Members Debt shall be disregarded for purposes of determining whether a Default or Event of Default under Section 8.1(e) has occurred or is continuing;

(p)      indemnification and warranty obligations and purchase price adjustments (other than Capitalized Earn-Out Obligations) incurred in connection with Dispositions and Investments (including, without limitation, Permitted Acquisitions) permitted under this Agreement;

(q)      Permitted Second Priority Indebtedness;

(r)      Indebtedness consisting of obligations under deferred compensation or other similar arrangements, or in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, or other reimbursement-type obligations regarding workers compensation claims, in each case incurred in the ordinary course of business;

(s)      Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business, or the financing of insurance premiums in the ordinary course of business;

(t)      Indebtedness incurred to finance the acquisition or holding of real property, or that was applicable to such real property at the time of acquisition thereof, in an aggregate principal amount not to exceed $25,000,000 at any one time outstanding;

(u)      unsecured Indebtedness of the Borrower to Millennium Holdings (the "Special Members Loan") incurred on or substantially concurrently with the Closing Date in an amount equal to the aggregate distributions made by Holdings, the Borrower and its Restricted Subsidiaries under Section 7.6(h), so long as (i) the terms and conditions of such Special Members Loan shall be upon fair and reasonable terms that are reasonably believed by the Board of Directors of Holdings or the Borrower in good faith to be no less favorable to the Borrower than it would reasonably be able to obtain in a comparable arm's length transaction with a Person that is not an Affiliate; it being understood that (A) payments of principal and interest by the Borrower with respect to such Special Members Loan shall not be deemed a Restricted Payment and shall not be required to be subordinated in right of payment to the Loans in any respect, (B) such Special Members Loan may be repaid or prepaid at any time subject only to the compliance of Section 7.9 and (C) such Special Members Loan shall be disregarded for purposes of determining whether an Event of Default under Section 8.1(e) shall have occurred;

(v)      unsecured senior Indebtedness or unsecured Subordinated Indebtedness in an aggregate principal amount not to exceed $5,000,000 in connection with overdraft, Cash Management Arrangements and working capital facilities; provided that, immediately before and immediately after giving effect to such incurrence: (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom; and (ii) if such Indebtedness is Subordinated Indebtedness, the subordination provisions thereof shall be on customary terms;

(w)      all premiums (if any), interest (including, without limitation, post-petition interest),  fees, expenses, charges and additional or contingent obligations in respect of Indebtedness described in any other provision of this Section 7.2.

7.3      Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)      Liens for Taxes not yet due or are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of Holdings or its Restricted Subsidiaries, as the case may be, in conformity with and to the extent required by GAAP;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings, or if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens, provided that adequate reserves with respect thereto are maintained on the books of Holdings or its Restricted Subsidiaries;

(c)      pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)      deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)      easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Restricted Subsidiaries;

(f)      Liens in existence on the Closing Date listed on Schedule 7.3(f), securing Indebtedness permitted by Section 7.2(d), provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)      Liens securing Indebtedness of the Borrower or any Restricted Subsidiary incurred pursuant to Section 7.2(e) or Section 7.2(j) to finance the acquisition of assets in the ordinary course of business (excluding, for the avoidance of doubt, any Permitted Acquisition or similar acquisition), including, without limitation, any interest or title of BALC under the Master Lease Agreement and of TFS or SDFC or DL under any equipment financing agreement existing on the Closing Date or thereafter; provided that (i) such Liens shall be created substantially simultaneously or within 270 days after the acquisition of such assets, and (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness (and substitutions, replacements and proceeds thereof);

(h)      Liens created pursuant to the Security Documents;

(i)      any interest or title of a lessor or licensor under any lease, sublease, license or sublicense entered into by the Borrower or any Restricted Subsidiary in the ordinary course of its business and covering only the assets so leased; and any security deposits, escrows and other similar arrangements in connection therewith in the ordinary course of business;

(j)      (i) licenses, leases and subleases of the Aircraft granted to the Borrower by Pain in the Air and (ii) Liens on the Aircraft and all related assets, in each case, securing Indebtedness of Pain in the Air incurred pursuant to Section 7.2(g);

(k)      Liens on property or shares of Capital Stock of a Person at the time such Person becomes a Restricted Subsidiary, in each case after the Closing Date; provided that (i) such Liens are not created, incurred or assumed in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary, (ii) any such Lien may not extend to any other property owned by Holdings, the Borrower or any Restricted Subsidiary of the Borrower (other than the proceeds or products thereof, and other than after-acquired property subject to a Lien securing Indebtedness or other obligations incurred prior to such time that require pursuant to their terms at such time a pledge of after-acquired property) and (iii) the Indebtedness secured thereby is permitted under Section 7.2;

(l)      Liens securing Indebtedness permitted under Section 7.2(h)(i) incurred to finance any Permitted Acquisition; provided that (i) such Liens shall be created substantially simultaneously with the Permitted Acquisition, (ii) such Liens do not at any time encumber any property other than the property acquired in such Permitted Acquisition and (iii) the amount of Indebtedness secured thereby is not increased by reason of such Permitted Acquisition;

(m)      leases, subleases, licenses and sublicenses in the ordinary course of business, that do not interfere in any material respect with the business of the Group Members taken as a whole; and

security deposits, escrows and other similar arrangements in connection therewith in the ordinary course of business;

        (n)     Liens securing or otherwise arising from judgments for the payment of money not constituting an Event of Default under Section 8.1(h);

        (o)     Liens on goods the purchase of which is financed or supported by a documentary letter of credit, and on bills of lading, drafts and other documents of title arising by operation of law or pursuant to standard terms of agreements in the ordinary course of business;

        (p)     rights of set-off, bankers lien, netting agreements and other Liens arising by operation of law or by the terms of documents of banks and other financial institutions in relation to the maintenance or administration of deposit accounts, securities accounts, Cash Management Arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

        (q)     Liens arising from precautionary Uniform Commercial Code financing statement filings or similar filings made in connection with operating leases entered into by Group Members;

        (r)     Liens in favor of customs or revenue authorities arising as a matter of law to secure the payment of customs duties in relation to the importation of goods in the ordinary course of business;

        (s)     Liens of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection;

        (t)     Liens on cash advances or escrow deposits in favor of any seller or lessor of any property to be acquired in an Investment permitted by Section 7.8 or other purchase of assets permitted by this Agreement, to be applied against the purchase price for such Investment or asset, solely to the extent that such Investment or such purchase would have been permitted on the date of the creation of such Lien;

        (u)     (i) Liens consisting of or contained in an agreement to Dispose of property in a Disposition permitted by Section 7.5 (whether or not consummated), either restraining the Disposition thereof to Persons other than the proposed purchaser or providing for funds or other property to be applied against the sale price for such Disposition, solely to the extent that such Disposition would have been permitted on the date of the creation of such Lien and (ii) to the extent constituting a Lien, a Disposition that is permitted by Section 7.5 (other than Section 7.5(k));

        (v)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods in the ordinary course of business permitted by this Agreement;

        (w)     Liens on cash or Cash Equivalents securing Swap Agreements permitted under this Agreement entered by the Borrower or any Restricted Subsidiary and any Person that is a Lender or an Affiliate of a Lender at the time such Swap Agreement is entered to;

        (x)     Liens on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto, provided that such Liens are limited to the applicable unearned insurance premiums;

        (y)     Liens on assets of the Excluded Domestic Subsidiary or any Excluded Foreign Subsidiaries;

(z)       Liens not otherwise permitted by this Section so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to the Borrower and all Subsidiaries) $50,000,000 at any one time outstanding;

(aa)      Liens on the Collateral securing Permitted Second Priority Indebtedness, so long as such Liens rank junior to the Liens in favor of the Administrative Agent pursuant to the terms of the Second Lien Intercreditor Agreement;

(bb)      Liens securing Indebtedness permitted under Section 7.2(t) to finance the acquisition or holding of real property, provided that such Liens do not at any time encumber any property other than the real property financed by such Indebtedness (other than fixtures, assignment of rents and other personal property related to such real property pursuant to the customary terms of mortgages or deeds of trust in the relevant market); and

(cc)      the modification, replacement, renewal or extension of any Lien permitted by clauses (f), (g), (i), (j), (k), (l), (v), (y), (aa) and (bb), provided that (i) the Lien does not extend to any additional property and (ii) the modification, replacement, renewal or extension of the Indebtedness secured or benefited from such Lien is permitted by this Agreement.

7.4    Fundamental Changes.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)       any Restricted Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving entity) or with or into any Restricted Subsidiary (provided that if any Loan Party is party to such merger or consolidation, such Loan Party shall be the continuing or surviving entity);

(b)       any Restricted Subsidiary of the Borrower may Dispose of any or all of its assets (i) to the Borrower or any other Restricted Subsidiary (upon voluntary liquidation or otherwise; provided, that if the Restricted Subsidiary effecting the Disposition is a Loan Party, the assets so Disposed shall be received by another Loan Party; and provided, further, that if the Restricted Subsidiary effecting the Disposition is a Wholly-Owned Subsidiary Guarantor, the assets so Disposed shall be received by another Wholly-Owned Subsidiary Guarantor) or (ii) pursuant to a Disposition permitted by Section 7.5;

(c)       any Investment expressly permitted by Section 7.8 may be structured as a merger, consolidation or amalgamation; provided that in all circumstances, the surviving Person of such merger, consolidation or amalgamation shall be the Borrower or a Restricted Subsidiary;

(d)       any Permitted Acquisition expressly permitted by Section 7.8 may be structured as a merger, consolidation or amalgamation; provided that in all circumstances, the surviving Person of such merger, consolidation or amalgamation shall be the Borrower or a Restricted Subsidiary;

(e)       dormant or inactive Restricted Subsidiaries and Excluded Foreign Subsidiaries may be liquidated, wound up, merged with any Person or otherwise Disposed of if (x) the Borrower determines in good faith that such action is in the best interest of Holdings and its Restricted Subsidiaries and if not materially disadvantageous to the Lenders and (y) to the extent such Restricted Subsidiary is a Loan Party, any assets or business not otherwise disposed of or transferred in accordance with Sections 7.5 shall be transferred to otherwise owned or conducted by another Loan Party after giving effect to such liquidation, dissolution or merger;

(f)      so long as no Default or Event of Default exists or would result therefrom, the Borrower may merge or consolidate with or into any other Person (any such Person, the "Successor Company"); provided (i) the Successor Company shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (ii) the Successor Company shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (iii) each Guarantor, unless it is the other party to such merger or consolidation, shall have confirmed that its guarantee under the Guarantee and Collateral Agreement shall apply to the Successor Company's obligations under the Loan Documents, (iv) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the applicable Security Documents confirmed that its obligations thereunder shall apply to the Successor Company's obligations under the Loan Documents, (v) if requested by the Administrative Agent, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Administrative Agent) confirmed that its obligations thereunder shall apply to the Successor Company's obligations under the Loan Documents, and (vi) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Security Document preserves the enforceability of this Agreement and the Security Documents and the perfection of the Liens under the Security Documents;

(g)      Pain in the Air may Dispose of the Aircraft to the extent permitted by Section 7.5(d);

(h)      the Group Members may consummate the Corporate Restructuring; and

(i)      a Qualified IPO may be consummated.

7.5      Disposition of Property.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary, issue or sell any shares of such Restricted Subsidiary's Capital Stock to any Person, except:

(a)      the Disposition of obsolete or worn out property in the ordinary course of business; and Dispositions of equipment and other property to the extent promptly replaced with property of at least comparable usefulness;

(b)      the sale of inventory in the ordinary course of business;

(c)      the sale or issuance of any Subsidiary's Capital Stock to the Borrower or any Wholly Owned Subsidiary Guarantor;

(d)      the sale or Disposition of any Aircraft by Pain in the Air at fair market value, including any such disposition executed by means of the sale or Disposition of the Capital Stock of any Subsidiary of the Borrower owning such Aircraft; provided that at the time of any such sale or Disposition such Subsidiary shall not own any material assets or conduct any business other than owning, leasing or operating Aircraft;

(e)      Dispositions of Cash Equivalents;

(f)      Dispositions of business lines and other assets (including shares of Capital Stock) (i) acquired in connection with a Permitted Acquisition or other Investment permitted hereunder, which

assets are not anticipated to be useful to the core or principal business of the Group Members or (ii) made to obtain the approval of any applicable antitrust or other regulatory authority in connection with a Permitted Acquisition;

(g) endorsement, discounting or other Dispositions of instruments, accounts receivable, payment intangibles or other similar items for deposit, collection, enforcement or settlement, in each case in the ordinary course of business;

(h) leases, subleases, licenses and sublicenses in the ordinary course of business, that do not interfere in any material respect with the business of the Group Members taken as a whole;

(i) Dispositions of property that has been the subject of a casualty or other Recovery Event to an insurer upon or in anticipation of the receipt of the Net Cash Proceeds of such Recovery Event; and Dispositions of condemned property as a result of the exercise of eminent domain or similar power to the respective Governmental Authority;

(j) Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between the joint venture partners;

(k) to the extent constituting Dispositions, transactions permitted by Section 7.3 (other than Section 7.3(u)(ii)), Section 7.4 (other than Section 7.4(b)(ii)), Section 7.6 (other than Section 7.6(i)), Section 7.8 (other than Section 7.8(n)) and 7.10, in each case permitted other than by reference to this Section 7.5(k);

(l) to the extent constituting Dispositions, the Transactions; and

(m) the Disposition of other property having a fair market value not to exceed $50,000,000 in the aggregate for any fiscal year of Holdings.

7.6     Restricted Payments.  Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof (including funding trusts or similar vehicles for the purpose of tax payments), either directly or indirectly, whether in cash or property or in obligations of any Group Member (but in each of the foregoing cases, other than any of the foregoing payable solely in Specified Equity of the Person making such dividend, purchase, redemption, defeasance, retirement or distribution) (collectively, "Restricted Payments", which term in no event shall include payments in respect of the Special Members Loan or any Members Debt), except that:

(a) any Restricted Subsidiary may make Restricted Payments to the Borrower or any Wholly Owned Subsidiary Guarantor;

(b)     so long as no Default or Event of Default shall have occurred and be continuing, the Borrower may pay dividends to Holdings to permit Holdings to purchase Holdings' Capital Stock from present or former officers or employees of any Group Member upon the death, disability, retirement or termination of employment of any such Person or pursuant to any employee or director equity plan, stock option plan or other similar benefit plan, provided, that the amount of payments under this clause (b) (net of any proceeds received by Holdings and contributed to the Borrower after the Closing Date in connection with resales of any membership interest or equity options so purchased) shall not exceed in the aggregate 2.5% of Consolidated EBITDA for each fiscal year of Holdings (based on the most recent

financial statements of Holdings and its Restricted Subsidiaries for the prior fiscal year that have been delivered pursuant to Section 5.1(d) or Section 6.1(a));

(c)　　the Borrower may pay dividends to Holdings to permit Holdings to pay corporate overhead expenses incurred in the ordinary course of business to the extent such overhead expenses would otherwise have been payable by the Borrower and other expenses of Holdings incurred in the ordinary course of business in amounts not to exceed $3,000,000 for any fiscal year of Holdings;

(d)　　each Group Member may make Restricted Payments in an amount sufficient to allow Holdings to distribute cash to its direct or indirect equity owners (pro rata based on relative ownership) (but only for so long as (i) Holdings is a partnership for U.S. federal income tax purposes and (ii) the Borrower is disregarded as an entity separate from Holdings, within the meaning of section 301.7701-3(b) of United States Treasury Regulations) in an amount equal to the product of (i) the net income and/or gain (if any) of Holdings for U.S. federal and state income tax purposes for any taxable period (including estimated quarterly tax periods), and which results from ownership of 100% of the equity interests in Borrower (and for such purpose, any benefit attributable to the tax basis step up achieved in connection with the Corporate Restructuring (including any amortization) shall be ignored and any interest expense relating to the Loans or any other indebtedness of Holdings, Borrower, or their Subsidiaries shall be taken into account, only to the extent reflected as a business interest deduction on the Holdings income tax returns) and (ii) the then-current combined maximum federal and state income, Medicare, and employment tax rates applicable to individuals living in California taking into account the character of income and loss allocated by Millennium Holdings to each equity owner, as such rates may be adjusted from time to time (the "Tax Rate"); provided, that an annual reconciliation will be made following the end of each tax year such that, following the reconciliation, the distributions made under this Section 7.6(d) for such tax year in question equal the product of (y) the net income and/or gain of Holdings (as calculated above) resulting from its ownership of 100% of the equity interests in Borrower for such tax year (if any, and taking into account adjustments or allocations required by the Code) and (z) the Tax Rate; and provided that Holdings and/or the Borrower will provide to the Administrative Agent calculations supporting the amount of any Restricted Payments made pursuant to this Section 7.6(d); provided further, that notwithstanding anything to the contrary in this Section 7.6(d), in no event shall the additional amount of distributions permitted pursuant to this Section 7.6(d) as a result of disregarding the tax basis step up achieved in connection with the Corporate Restructuring (including any amortization) exceed the taxes incurred by the Investors, Millennium Holdings and its Subsidiaries, and the owners of the Capital Stock of Millennium Holdings in the Corporate Restructuring which give rise to such tax basis step up;

(e)　　the Borrower and its Restricted Subsidiaries may pay dividends to Holdings to permit Holdings to make distributions to the owners of its Capital Stock or to make interest payments on obligations of Holdings under Holdings' operating agreement (which, for purposes of clarity, may be used to fund a trust or similar vehicle for the purpose of tax payments) in an aggregate amount not to exceed the Available ECF Amount; provided that both before and immediately after giving effect to any such payment, (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom, (B) any amounts required to be applied to prepay Tranche B Term Loans pursuant to Section 2.11(c) shall have been so applied and (C) the Borrower and its Restricted Subsidiaries shall have not less than $20,000,000 in the aggregate of unrestricted (other than Liens in favor of the Administrative Agent or the Lenders) cash and Cash Equivalents plus Available Revolving Commitments; provided, further, that Holdings shall have delivered the financial statements, if any, then required by Section 6.1 together with a Compliance Certificate setting forth the calculation of the Available ECF Amount to the Administrative Agent prior to making any such payment;

(f)       Holdings and the Borrower may make the following Restricted Payments related to the Corporate Restructuring on or substantially concurrently with the Closing Date (except as expressly provided in clause (iii)): (i) the Borrower may pay dividends to Holdings to permit Holdings to make distributions to the owners of its Capital Stock of the Borrower's cash and Cash Equivalents; (ii) Holdings and the Borrower may make distributions to the owners of its Capital Stock of the proceeds of the Tranche B Term Loans; and (iii) the Borrower may pay dividends to Holdings, to make payments on behalf of Holdings or Millennium Holdings to permit Millennium Holdings to redeem outstanding option rights after the Closing Date but prior to June 30, 2014, of the Borrower's cash in hand in an aggregate amount not to exceed $30,000,000 (net of the income tax benefit arising from the deduction relating to such payments); provided that, in each case, both before and immediately after giving pro forma effect to the distributions set forth in clauses (i), (ii) and (iii) and the additional distributions set forth in Section 7.6(h), (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom; (B) no Revolving Loans shall remain outstanding; and (C) the Borrower and its Subsidiaries shall have not less than $50,000,000 in the aggregate of unrestricted (other than Liens in favor of the Administrative Agent or the Lenders) cash and Cash Equivalents (which for the avoidance of doubt shall not include any proceeds of the Loans or other incurrence of Indebtedness);

(g)       Holdings, the Borrower and its Subsidiaries may make additional distributions or may make interest payments on obligations of Holdings under Holdings' operating agreement in an aggregate amount not to exceed $25,000,000 (which, for purposes of clarity, may be used to fund a trust or similar vehicle for the purpose of tax payments); provided that both before and immediately after giving effect to any such distribution, (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom, (B) any amounts required to be applied to prepay Term Loans pursuant to Section 2.11(c) for the previous Calculation Period shall have been so applied and (C) the Borrower and its Restricted Subsidiaries shall have not less than $20,000,000 in the aggregate of unrestricted (other than Liens in favor of the Administrative Agent or the Lenders) cash and Cash Equivalents plus Available Revolving Commitments at the time of such payment;

provided that the permitted payments described in clauses (d) and (g) of this Section 7.6 shall not permit any Group Member to make any such Restricted Payments as a result of any Taxes incurred prior to the Corporate Restructuring attributable to: (i) the failure of Millennium Holdings, at any point before the consummation of the Corporate Restructuring, to qualify as an "S Corporation" under Subchapter S of the Code and any corresponding provisions of applicable state and local law; (ii) the failure of Borrower, at any point before the consummation of the Corporate Restructuring, to qualify as either an "S Corporation" or a "qualified subchapter S Subsidiary," in either case, under Subchapter S of the Code and any corresponding provisions of applicable state and local law; or (iii) the failure of Pain in the Air, at any point before the consummation of the Corporate Restructuring, to qualify as a "qualified subchapter S Subsidiary" under Subchapter S of the Code and any corresponding provisions of applicable state and local law;

(h)       Holdings, the Borrower and its Restricted Subsidiaries may make additional distributions on or substantially concurrently with the Closing Date in an aggregate amount not to exceed $50,000,000 for purposes of funding the following special tax distributions to Holdings' members related to the Corporate Restructuring: (i) the additional tax liabilities that will be incurred by the Millennium Holdings shareholders attributable to a portion of the gain that will be recognized relating to the Corporate Restructuring being taxed at ordinary income tax rates, rather than long term capital gain rates; (ii) incremental state income taxes of Millennium Holdings' shareholders relating to the Corporate Restructuring, as compared to the state income taxes that they would have paid if such shareholders had capital gain on their Millennium Holdings' shares equal to the gain allocated to them from the Restructuring; (iii) Millennium Holdings' incremental state income taxes attributable to the Corporate Restructuring; and (iv) Millennium Holdings' federal and state income taxes under Section 1374 of the

Code (and any similar state tax laws) relating to recognized built-in-gain arising from the Corporate Restructuring; provided that, in each case, both before and immediately after giving pro forma effect to the distributions set forth in clauses (i), (ii) and (iii) and (iv), and the additional distributions set forth in Section 7.6(f), (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom; (B) no Revolving Loans shall remain outstanding; and (C) the Borrower and its Restricted Subsidiaries shall (after the making of the Special Members Loan) have not less than $50,000,000 in the aggregate of unrestricted (other than Liens in favor of the Administrative Agent or the Lenders) cash and Cash Equivalents (which for the avoidance of doubt shall not include any proceeds of the Loans or other incurrence of Indebtedness other than the Special Members Loan);

(i)      to the extent constituting Restricted Payments, the transactions permitted by Section 7.4, Section 7.5 (other than Section 7.5(k)), Section 7.8 (other than Section 7.8(n)) or Section 7.10, in each case other than permitted solely by reference to this Section 7.6(i); and

(j)      after the consummation of a Qualified IPO, payment in cash for the value of fractional shares that otherwise would be issued to holders of the equity of Holdings.

It is agreed that to the extent the Restricted Payments set forth in Sections 7.6(f) and (h) are not made on or substantially concurrently with the Closing Date, the Borrower may, on or substantially concurrently with the Closing Date, deposit an amount not to exceed the aggregate amount of the Restricted Payments permitted to be made by such Sections 7.6(f) and (h) in a segregated deposit account of the Borrower, maintained separate and distinct from all other operating deposit accounts and other assets of the Borrower and its Restricted Subsidiaries (the "Deposit Account"), and that the Borrower shall be authorized to distribute all the amounts so deposited in the Deposit Account for purposes of making the distributions set forth in Sections 7.6(f) and (h) after the Closing Date, provided that the requirements set forth in each of the provisos to such Sections 7.6(f) and (h) are satisfied at the time of the deposit of such aggregate amounts in the Deposit Account on or substantially concurrently with the Closing Date.

7.7      [Intentionally Omitted].

7.8      Investments.  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any Person (all of the foregoing, "Investments", it being agreed that the acquisition of real property, equipment or Intellectual Property shall not be deemed an Investment solely as a result of the structuring of such acquisition as a purchase of Capital Stock of the Person that holds only such single asset being acquired, or solely as a result of such single asset that is acquired representing all or substantially all of the assets of such Person selling such asset), except:

(a)      extensions of trade and operating credit in the ordinary course of business;

(b)      Investments in Cash Equivalents and other Cash Management Arrangements;

(c)      Guarantee Obligations permitted by Section 7.2;

(d)      loans and advances to employees of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $5,000,000 at any one time outstanding;

(e)      Investments in assets useful in the business of the Borrower and its Subsidiaries made by the Borrower or any of its Subsidiaries with the proceeds of any Reinvestment Deferred Amount;

(f)      intercompany Investments by any Group Member in the Borrower or any Person that, prior to such investment, is a Subsidiary Guarantor or substantially simultaneously therewith will become a Subsidiary Guarantor;

(g)      Permitted Acquisitions by the Borrower or any Subsidiary Guarantor in an unlimited amount;

(h)      in addition to Investments otherwise expressly permitted by this Section, Investments by the Borrower or any of its Subsidiaries in an aggregate amount (valued at cost) not to exceed $200,000,000 during the term of this Agreement (which aggregate amount shall be net of returns on such Investments received by the Borrower or any of its Subsidiaries); provided that no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(i)      Investments consisting of prepayments to suppliers and other extensions of trade credit in the ordinary course of business;

(j)      to the extent constituting an Investment, the Transactions;

(k)      advances of payroll payments to employees in the ordinary course of business;

(l)      Investments received in connection with settlements of litigation or other disputes with, or the bankruptcy or reorganization of, suppliers, customers or other third parties, or from financially troubled account debtors or upon exercise of remedies with respect to any secured Investment;

(m)      Loans and advances to Holdings or any other Affiliate not in excess of the amount (without duplication and after giving effect to any other loans, advances and Restricted Payments) of Restricted Payments permitted to be made to such Person pursuant to Section 7.6(c), (d), (e) and (g);

(n)      Swap Agreements permitted under Section 7.12; and

(o)      to the extent constituting Investments, the transactions permitted by Section 7.2 (other than Section 7.2(c), but including prepayments or redemptions in connection with refinancings permitted thereunder), 7.3 (other than Section 7.3(t)), 7.4 (other than Section 7.4(c) or (d)), Section 7.5 (other than Section 7.5(k)), Section 7.6 and Section 7.10, permitted other than solely by reference to this Section 7.8(o).

7.9      Payments and Modifications of Subordinated Indebtedness, Members Debt or the Special Members Loan.  (a) Make any payment, prepayment, repurchase or redemption of, or otherwise defease or segregate funds with respect to, any Subordinated Indebtedness or any Members Debt or the Special Members Loan, other than (i) with respect to any Subordinated Indebtedness, (x) regularly scheduled interest and principal payments and (y) prepayments or redemptions in connection with refinancings permitted by Section 7.2, in each case so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom and (ii) with respect to any Members Debt or the Special Members Loan, any payment or prepayment so long as, no Default or Event of Default pursuant to Section 8.1(a) shall have occurred and be continuing or would result therefrom; (b) amend, modify, waive or otherwise change, or consent or agree to any amendment, waiver or modification or other change to any of the terms of any Subordinated Indebtedness or any Members Debt or the Special

Members Loan (other than such amendment, modification, waiver or other change that is not adverse in any material respects to the Lenders or, in the case of Members Debt or the Special Members Loan, that does not violate the terms of Section 7.2(o) or Section 7.2(u), as applicable); or (c) enter into any Subordinated Indebtedness unless the obligations of the Loan Parties pursuant to the Loan Documents are designated as "Senior Indebtedness" (or any other defined term having a similar purpose) for the purposes of such Subordinated Indebtedness.

7.10    Transactions with Affiliates.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than Holdings, the Borrower or any Wholly Owned Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the relevant Group Member, and (c) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.  For the avoidance of doubt, the following relationships, agreements and transactions, and amendments, restatements, and renewals of such relationships, agreements and transactions, are acknowledged to be in the ordinary course of business of the relevant Group Member, upon fair and reasonable terms, and accordingly permitted under this Section 7.10:

(a)    all transactions between the Group Members, on one hand, and Millennium Laboratories Clinical Supply, Inc. ("MLCS"), on the other, to the extent such transactions are on an arms' length basis for a valid business purpose and no amounts are advanced by the Group Members to MLCS, provided that any costs (which shall be on market terms) may be shared and paid by MLCS to the Borrower or its Subsidiaries pursuant to commercially reasonable expense sharing and employee leasing agreements;

(b)    the Group Members may donate or contribute, or lend money to, or purchase services from Millennium Research Institute (the "Institute"), provided that any costs (which shall be on market terms) may be shared and paid by the Institute to the Group Members pursuant to the commercially reasonable expense sharing and employee leasing agreements, and provided, further, that all transactions between the parties shall be conducted on an arms-length basis and for a valid business purpose;

(c)    the Group Members may pay base rent and other amounts to Pain in San Diego, LLC, with respect to the Borrower's lease of 16981 Via Tazon, Building 1, San Diego, California 92127, in an aggregate amount not to exceed the amounts payable under the current lease agreement (as amended through the Closing Date) with respect to such property, including by giving effect to the rent escalation clauses set forth therein, during any twelve-month period;

(d)    the Group Members may, in the aggregate, pay base rent and other amounts to Pain in San Diego, LLC, with respect to the Borrower's lease of 16981 Via Tazon, Building 2, San Diego, CA 92127, in an aggregate amount not to exceed the amounts payable under the current lease agreement (as amended through the Closing Date) with respect to such property, including by giving effect to the rent escalation clauses set forth therein, during any twelve-month period;

(e)    the Group Members may, in the aggregate, pay base rent and other amounts to Pain in San Diego, LLC, with respect to the Borrower's sublease (or lease) of 16980 Via Tazon, San Diego, CA 92127, in an aggregate amount not to exceed the amounts payable under the current lease agreement (as amended through the Closing Date) with respect to such property, including by giving effect to the rent escalation clauses set forth therein, during any twelve-month period;

87

(f)     the Group Members may, in the aggregate, pay base rent and other amounts to Pain In San Diego, LLC, with respect to the Borrower's lease of 15330 Avenue of Science, San Diego, CA, in an aggregate amount not to exceed the amounts payable under the current lease agreement (as amended through the Closing Date) with respect to such property, including by giving effect to the rent escalation clauses set forth therein, during any twelve-month period;

(g)     Pain in the Air and the Borrower may fulfill their respective obligations under any hangar lease agreements, aircraft management agreements, and other related agreements as are in effect on the Closing Date or which are entered into on commercially reasonable terms with any Affiliates of James M. Slattery after the Closing Date;

(h)     with respect to the Aircraft, James M. Slattery (or any of his Affiliates) may purchase (i) the Aircraft upon commercially reasonable terms and (ii) the capital stock of Pain in the Air, or enter into any such other transactions which in substance transfer ownership of the Aircraft to James M. Slattery (or his Affiliates), so long as the purchase price of such capital stock is not less than the fair market value of the Aircraft;

(i)     Pain in the Air and the Borrower may fulfill their respective obligations under (i) the Exclusive Aircraft Dry Lease Agreement, dated as of December 21, 2010, pertaining to the Falcon Aircraft; (ii) the Exclusive Aircraft Dry Lease Agreement, dated as of November 28, 2012, pertaining to the Pilatus Aircraft; and (iii) the Exclusive Aircraft Dry Lease Agreement, dated as of December 3, 2013, pertaining to the Gulfstream Aircraft;

(j)     transactions otherwise permitted under Section 7.4; and

(k)     the Group Members may consummate the Corporate Restructuring.

7.11    Sales and Leasebacks.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member, except to the extent that such transaction would be permitted as secured Indebtedness under Section 7.2(e) or Section 7.3(g).

7.12    Swap Agreements.  Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Capital Stock) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

7.13    Changes in Fiscal Periods.  Permit the fiscal year of Holdings to end on a day other than December 31 or change Holdings' method of determining fiscal quarters.

7.14    Negative Pledge Clauses.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than:

(a)     this Agreement and the other Loan Documents;

(b)      any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby;

(c)      customary provisions in leases, licenses and other contracts restricting the assignment thereof entered in the ordinary course of business;

(d)      customary provisions in agreements and instruments for Indebtedness permitted under Section 7.2 to the extent such prohibition or limitation apply only to the assets financed by such Indebtedness;

(e)      restrictions and conditions contained in agreements relating to the sale of a Subsidiary or business or on any other assets pending sale, in each case provided that (i) such Disposition is permitted by this Agreement and (ii) such restrictions relate solely to the Capital Stock or assets of such Subsidiary subject to such Disposition;

(f)      restrictions or conditions set forth in any agreement (including, without limitation, Indebtedness) in effect at any time any Person becomes a Restricted Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided that such restriction or condition shall be limited to such Person and such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary; and provided, further, that this clause (f) shall not apply to restrictions or conditions applicable to a Person that becomes a Restricted Subsidiary pursuant to Section 6.13.

(g)      restrictions on cash or Cash Equivalents or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Liens permitted under Section 7.3 and limited to such cash or Cash Equivalents);

(h)      customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under this Agreement and applicable solely to such joint ventures; and

(i)      customary net worth maintenance requirements in real property leases entered into by Group Members in the ordinary course of business, so long as the Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrower and its Restricted Subsidiaries to meet their ongoing obligations.

7.15    Clauses Restricting Subsidiary Distributions.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary of the Borrower to (a) make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Restricted Subsidiary of the Borrower, (b) make loans or advances to, or other Investments in, the Borrower or any other Restricted Subsidiary of the Borrower or (c) transfer any of its assets to the Borrower or any other Restricted Subsidiary of the Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents and (ii) any restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary.

7.16    Lines of Business.  Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrower and its Restricted Subsidiaries are engaged on the date of this Agreement or that are incidental or related thereto, or that is reasonably

similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto, including without limitation laboratory services (whether involving urine testing, saliva testing, blood testing or otherwise, and whether related to drug testing, genetic testing or otherwise), and other health and medical services.

7.17    Use of Proceeds.  The Borrower shall not request any Loan or Letter of Credit, and the Company shall not use, and shall procure that its Affiliates and its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, or (C) in any manner that would result in the violation of  any Sanctions applicable to any party hereto.

SECTION 8.    EVENTS OF DEFAULT

8.1    Events of Default.  If any of the following events shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Loan or Reimbursement Obligation when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable hereunder or under any other Loan Document, within five days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)    any Loan Party shall default in the observance or performance of any agreement contained in clause (i) of Section 6.3(a) (with respect to Holdings and the Borrower only), Section 6.6(a) or Section 7 of this Agreement or Section 5.5 of the Guarantee and Collateral Agreement; provided, that (1) a breach of Section 7.1 shall not constitute a Default or an Event of Default with respect to any Term Facility or any Term Loans unless and until the Majority Facility Lenders under the Revolving Facility shall have terminated their Revolving Commitments and declared all amounts under the Revolving Facility to be due and payable (such period commencing with the date of a default under Section 7.1 and ending on the date on which the Majority Facility Lenders with respect to the Revolving Facility terminate and accelerate the Revolving Facility, the "Term Loan Standstill Period"); and (2) a termination of the Revolving Commitments with the prepayment of all Revolving Loans, Swingline Loans and Cash Collateralization of all outstanding Letters of Credit shall automatically be deemed to have cured any breach of Section 7.1; or

(d)    any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days after notice to the Borrower from the Administrative Agent or the Required Lenders; or

(e)    any Group Member shall (x) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto; or (y) default in making any payment of any interest on any such

Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (z) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (x), (y) or (z) of this paragraph (e)(i) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (x), (y) and (z) of this paragraph (e)(i) shall have occurred and be continuing with respect to Indebtedness the aggregate outstanding principal amount of which is $35,000,000 or more; provided, further, that all Members Debt and the Special Members Loan shall be disregarded for purposes of determining whether a Default or Event of Default has occurred or is continuing under this paragraph (e); or

(f) (i) any Group Member shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; or (ii) there shall be commenced against any Group Member any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed or undischarged for a period of 60 days; or (iii) there shall be commenced against any Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) any Group Member shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) any Group Member shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or (vi) or any Group Member shall make a general assignment for the benefit of its creditors; or

(g) (i) an ERISA Event and or a Foreign Plan Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan; (iii) the PBGC shall institute proceedings to terminate any Pension Plan; (iv) any Group Member or any of their respective ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; or (v) any other event or condition shall occur or exist with respect to a Plan, a Foreign Benefit Arrangement, or a Foreign Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, would, in the sole judgment of the Required Lenders, reasonably be expected to result in a Material Adverse Effect; or

(h) one or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $35,000,000 or more, and all such judgments or decrees shall not have been satisfied, discharged, stayed or appealed (and bonded pending appeal to the extent required by the applicable court) within 30 days from the entry thereof; or

(i)      any of the Security Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents that cover a material portion of the Collateral shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(j)      the guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(k)      a Change in Control shall have occurred; or

(l)      Holdings shall (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than those incidental to its ownership of the Capital Stock of the Borrower, (ii) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (x) nonconsensual obligations imposed by operation of law, (y) obligations pursuant to the Loan Documents to which it is a party and (z) obligations with respect to its Capital Stock, or (iii) own, lease, manage or otherwise operate any properties or assets (including cash (other than cash received in connection with dividends made by the Borrower in accordance with Section 7.6 pending application in the manner contemplated by said Section) and cash equivalents) other than the ownership of shares of Capital Stock of the Borrower;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) shall immediately become due and payable, (B) if such event is any other Event of Default other than an Event of Default arising from a breach of Section 7.1, either or both of the following actions may be taken:  (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Revolving Commitments to be terminated forthwith, whereupon the Revolving Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable and (C) if such event is an Event of Default arising from a breach of Section 7.1, (X) the Administrative Agent, at the request of the Majority Facility Lenders under the Revolving Facility, shall, by notice to the Borrower, declare the Revolving Commitments to be terminated forthwith, whereupon the Revolving Commitments shall immediately terminate and declare the Revolving Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents with respect to the Revolving Facility (including all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable and (Y) subject to the proviso in paragraph (c) above and the expiration of the Term Loan Standstill Period (if applicable), the Administrative Agent, at the request of the Majority Facility Lenders under the Tranche B Term Facility, shall, by notice to the Borrower, declare the Tranche B Term Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents with respect to the Tranche B Term Facility to be due and payable forthwith, whereupon the same shall immediately become due and payable.

It is understood that prior to the expiration of the Term Loan Standstill Period, no Lender under the Term Facilities will be permitted to request the Administrative Agent to declare the Term Loans or any other amounts owing under this Agreement and the other Loan Documents with respect to any Term Facility to be due and payable by reason of an Event of Default under Section 8.1(e) (or any other provision of this Agreement) resulting solely from a breach of Section 7.1. triggering a default under Indebtedness referred to in such Section 8.1(e), unless such default has caused such Indebtedness referred to in such Section 8.1(e) to become due prior to its stated maturity.

With respect to all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this Section 8.1, the Borrower shall at such time Cash Collateralized an amount equal to the aggregate then undrawn and unexpired amount of such Letters of Credit. Amounts held in Cash Collateral shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and unused portion thereof after all such Letters of Credit have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder and the other Loan Documents. After all such Letters of Credit shall have been expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Borrower hereunder and under the other Loan Documents shall have been paid in full, the balance, if any, in such Cash Collateral shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto). Except as expressly provided above in this Section 8.1, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

8.2    Right to Cure.  Notwithstanding anything to the contrary contained in Section 8.1, for purposes of determining whether an Event of Default has occurred under the financial covenant set forth in Section 7.1, any cash equity issuance (in the form of common equity or other equity having terms reasonably acceptable to Administrative Agent) made by Holdings during the relevant fiscal quarter and on or prior to the day that is 10 days after the day on which financial statements are required to be delivered for that fiscal quarter under Section 6.1 will, at the request of Borrower and provided that the proceeds thereof have been contributed to the Borrower as cash common equity, be included in the calculation of Consolidated EBITDA solely for the purposes of determining compliance with the financial covenant at the end of such fiscal quarter and any subsequent period that includes such fiscal quarter (any such equity contribution, a "Specified Equity Contribution"); provided that (a) Borrower shall not be permitted to so request that a Specified Equity Contribution be included in the calculation of Consolidated EBITDA with respect to any fiscal quarter unless, after giving effect to such requested Specified Equity Contribution, there will be a period of at least two consecutive fiscal quarters in the Relevant Four Fiscal Quarter Period in which no Specified Equity Contribution has been made, (b) no more than four Specified Equity Contributions will be made in the aggregate, (c) the amount of any Specified Equity Contribution and the use of proceeds therefrom will be no greater than the amount required to cause Borrower to be in compliance with the financial covenant and (d) all Specified Equity Contributions and the use of proceeds therefrom will be disregarded for all other purposes under the Loan Documents (including calculating Consolidated EBITDA for purposes of determining basket levels, Applicable Margin and other items governed by reference to Consolidated EBITDA and calculating Excess Cash Flow).  For purposes of this paragraph, the term "Relevant Four Fiscal Quarter Period" shall mean, with respect to any requested Specified Equity Contribution, the four fiscal quarter period ending on (and including) the fiscal quarter in which Consolidated Adjusted EBITDA will be increased as a result of such Specified Equity Contribution.

SECTION 9.    THE AGENTS

9.1    Appointment.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such

action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.   Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

9.2     Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in-fact selected by it with reasonable care.

9.3     Exculpatory Provisions.  Neither any Agent nor any of their respective officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

9.4     Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to Holdings or the Borrower), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5     Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent

has received notice from a Lender, Holdings or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders) or the Majority Facility Lenders under the applicable Facility; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6     Non-Reliance on Agents and Other Lenders.  Each Lender expressly acknowledges that neither the Agents nor any of their respective officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender.  Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates.

9.7     Indemnification.  The Lenders agree to indemnify each Agent and its officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an "Agent Indemnitee") (to the extent not reimbursed by Holdings or the Borrower and without limiting the obligation of Holdings or the Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

95

9.8     Agent in Its Individual Capacity.  Each Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent.  With respect to its Loans made or renewed by it and with respect to any Letter of Credit issued or participated in by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9     Successor Administrative Agent.  The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders and the Borrower.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default under Section 8.1(a) or Section 8.2(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor agent has accepted appointment as Administrative Agent by the date that is 30 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 9 and of Section 10.5 shall continue to inure to its benefit.

9.10     Arrangers, Documentation Agents, Managers and Syndication Agent.  Neither the Arrangers, the Documentation Agents nor the Syndication Agent shall have any duties or responsibilities hereunder in their respective capacities as such.

SECTION 10.   MISCELLANEOUS

10.1     Amendments and Waivers.  Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1 and Section 2.24(e).  The Required Lenders and each Loan Party a party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party a party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) forgive the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date of any amortization payment in respect of any Term Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Majority Facility Lenders of each adversely affected Facility) and (y) that any amendment or modification of defined terms used in the financial covenant in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)), (ii) extend the scheduled date of any payment thereof, or increase the amount or extend

the expiration date of any Lender's Revolving Commitment without the written consent of each Lender directly affected thereby; (iii) eliminate or reduce the voting rights of any Lender under this Section 10.1 without the written consent of such Lender; (iv) reduce any percentage specified in the definition of Required Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release any material Subsidiary Guarantor or all or substantially all of the Subsidiary Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders; (v) reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility; (vi) amend, modify or waive any provision of Section 9 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent; (vii) amend, modify or waive any provision of Section 2.6 or 2.7 without the written consent of the Swingline Lender; or (viii) amend, modify or waive any provision of Section 3 without the written consent of the Issuing Lender; provided, further, that notwithstanding anything to the contrary contained herein, any amendment, modification or waiver of any provision of Section 7.1 (and any defined terms solely as used therein) or any other provision to any Loan Document that has been added solely for the benefit of the Revolving Facility (as may be agreed between the Majority Facility Lenders under the Revolving Facility and the Borrower) shall require the written consent of the Majority Facility Lenders under the Revolving Facility (and only such Majority Facility Lenders) and the Borrower; and provided, further, that notwithstanding anything to the contrary contained herein, any amendment, modification or waiver of this Agreement that by its terms directly affects only the rights or duties under this Agreement of Lenders holding Loans or Commitments of a particular Facility (or Facilities) and do not directly affect Lenders under any other Facility shall require the written consent of the requisite percentage interest of the Lenders of the affected Facility (or Facilities), without the consent of the Required Lenders.  For the avoidance of doubt, it is understood and agreed that the Required Lenders may not, nor shall the consent of any other Lender other than the Majority Facility Lenders under the Revolving Facility be needed to, amend, modify or waive any provision of Section 7.1 (or any defined term solely as used therein) or any other provision to any Loan Document that has been added solely for the benefit of the Revolving Facility (as may be agreed between the Majority Facility Lenders under the Revolving Facility and the Borrower). Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share in the benefits of this Agreement and the other Loan Documents with the Term Loans and Revolving Extensions of Credit and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and Majority Facility Lenders.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the relevant Replacement Term Loans (as defined below) (such amendment, a "Refinancing Amendment") to permit the refinancing, replacement or modification of one or more tranches of Term Loans ("Replaced Term Loans") with a replacement term loan tranche hereunder ("Replacement Term Loans"), provided that (i)

509265-1664-11227-Active.15480116.26

all terms applicable to such Replacement Term Loans (except as to interest rates, fees, final maturity date, premiums and optional prepayment provisions, provided that with respect to any Replacement Term Loans that refinance, replace or modify one or more tranches of Incremental Term Loans without refinancing, replacing or modifying at the same time all outstanding Tranche B Term Loans, if the all-in yield (determined by taking into account interest rate margins, original issue discount, upfront fees and interest rate floors, but excluding arrangement, structuring, underwriting, commitment or other similar fees) of such Replacement Term Loans exceeds by more than 0.50% the all-in yield for the Tranche B Term Loans (calculated in the same manner as the previous parenthetical phrase), the Applicable Margin for the Tranche B Term Loans shall be increased so that the all-in yield in respect of such Replacement Term Loans is no higher than 0.50% above the all-in yield for the Tranche B Term Loans (it being agreed that any increase in yield in the Tranche B Term Loans required due to the application of interest rate floors on the Replacement Term Loans shall be effected solely through an increase in any interest rate floors applicable to the Tranche B Term Loans) shall be customary market terms for term loans at the time of the issuance of such Replacement Term Loans and shall be substantially identical to, or, taken as a whole, materially less favorable to the lenders providing such Replacement Term Loans than, those applicable to such Replaced Term Loans (save for any terms that apply solely after the latest maturity date of the Term Loans hereunder prior to giving effect to such Replacement Term Loans), (ii) the final maturity date of any Replacement Term Loans shall be no earlier than the then latest maturity date of the Term Loans hereunder prior to giving effect to such Replacement Term Loans, (iii) such Replacement Term Loans will rank *pari passu* or junior in right of payment with the other Loans and Commitments hereunder and (iv) all documentation in respect of such Replacement Term Loans shall be consistent with the foregoing. On the effective date of a Refinancing Amendment on which Replacement Term Loans are effected, subject to the satisfaction of the foregoing terms and conditions, each Replacement Term Loan shall be deemed for all purposes a Term Loan and each Lender providing such Replacement Term Loans shall become a Lender with respect to such Replacement Term Loans and all matters relating thereto. For the avoidance of doubt, no Lender shall be required to provide any Replacement Term Loans.

Furthermore, notwithstanding the foregoing, the Administrative Agent, with the consent of the Borrower, may amend, modify or supplement any Loan Document without the consent of any Lender or the Required Lenders in order to correct, amend or cure any obvious error in any Loan Document.

10.2    Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or five Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of Holdings, the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

Holdings:                           16981 Via Tazon
                                    San Diego, CA 92127
                                    Attention: Howard Appel,
                                    President

                                    And

                                    Attention: Martin Price, General
                                    Counsel

                                    Telecopy: 858-217-8502

Telephone: 858-451-3535

With a copy (which copy shall
not constitute notice) to:

Jack N. Rudel, Esq.
Jennings, Strouss & Salmon,
PLC
One E. Washington St., Ste. 1900
Phoenix, AZ 85004
Telecopy: 602-495-2680
Telephone: 602-252-5951

and:

Russell DaSilva
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
Telecopy: 212-918-3100
Telephone: 212-909-0668

Borrower:                        16981 Via Tazon
San Diego, CA 92127
Attention: Howard Appel,
President

And

Attention: Martin Price, General
Counsel

Telecopy: 858-217-8502
Telephone: 858-451-3535

With a copy (which copy shall
not constitute notice) to:

Jack N. Rudel, Esq.
Jennings, Strouss & Salmon,
PLC
One E. Washington St., Ste. 1900
Phoenix, AZ 85004
Telecopy: 602-495-2680
Telephone: 602-252-5951

and:

Russell DaSilva
Hogan Lovells US LLP

99

                875 Third Avenue
                New York, NY 10022
                Telecopy: 212-918-3100
                Telephone: 212-909-0668

Administrative Agent:        500 Stanton Christiana Road, Ops 2, Floor 03
                Newark, DE, 19713-2107
                Attention: Tesfaye Anteneh
                Telecopy: 302-634-1417
                Telephone: 302-634-4812

                With a copy (which copy shall
                not constitute notice) to:

                383 Madison Avenue
                New York, NY 10179
                Attention:  Dawn LeeLum
                Telecopy: 212-270-3279

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

10.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Payment of Expenses and Taxes.  The Borrower agrees (a) to pay or reimburse the Administrative Agent and the Arrangers for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith (provided that the Borrower shall not be responsible for any fees, charges or disbursements for counsel to the Administrative Agent and the Arrangers incurred in connection with the development, preparation and execution of this Agreement on the Closing Date in an aggregate amount in excess of  $1,000,000), and the consummation and

administration of the transactions contemplated hereby and thereby, including the reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel for such Persons collectively, taken as a whole and, solely in the case of a conflict of interest, one additional counsel to all affected Persons, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such Persons, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected Persons, taken as a whole) and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower at least one Business Day prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a quarterly basis or such other periodic basis as the Administrative Agent shall deem appropriate, (b) to pay or reimburse each Lender, the Issuing Lender, the Swingline Lender and the Administrative Agent for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of (i) one counsel to the Administrative Agent (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to the Administrative Agent) and (ii) one counsel to the Lenders, including the Issuing Lender and the Swingline Lender, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such Lenders, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected Lenders, taken as a whole), (c) to pay, indemnify, and hold each Lender, the Issuing Lender, the Swingline Lender and the Administrative Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other Taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Lender, each Arranger, the Issuing Lender, the Swingline Lender and the Administrative Agent, their respective affiliates, and their respective officers, directors, employees, agents, advisors, partners and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any claim, litigation, investigation or proceeding regardless of whether any Indemnitee is a party thereto and whether or not the same are brought by the Borrower, its equity holders, affiliates or creditors or any other Person, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable and documented out-of-pocket fees and expenses of one legal counsel for such Indemnitees collectively and, solely in the case of a conflict of interest, one additional counsel to all affected Indemnitees, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such Indemnitees, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected Indemnitees, taken as a whole) in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent  such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from (i) the gross negligence, willful misconduct, bad faith or material breach by such Indemnitee of this Agreement or the other Loan Documents or (ii) disputes solely among Indemnitees (or their related persons) (other than in connection with any Indemnitee acting in its capacity as an Arranger or as Administrative Agent or any other agent or co-agent (if any), in each case in their respective capacities as such), and not arising out of or in connection with any act or omission of the Borrower or its Subsidiaries, and provided, further, that this Section 10.5(d) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.  Without limiting the foregoing, and to the extent permitted by

applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. No Indemnitee shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence, willful misconduct, bad faith or material breach of this Agreement or the other Loan Documents by such Indemnitee. No Indemnitee shall be liable for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby. None of the Borrower, the Borrower's Subsidiaries, any Guarantors or their respective directors, officers, employees, advisors and agents of the foregoing shall be liable for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that nothing contained in this sentence shall limit the Borrower's, the Borrower's Subsidiaries' or the Guarantors' indemnification obligations pursuant to this Section 10.5. All amounts due under this Section 10.5 shall be payable not later than 10 days after written demand therefor. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to Howard Appel, President (Telephone No. (858) 451-3535) (Telecopy No. (858) 451-3636), at the address of the Borrower set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 10.5 shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder.

10.6    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any affiliate of the Issuing Lender that issues any Letter of Credit), except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than a natural person, any Disqualified Lender, Holdings or any of its Subsidiaries (other than as provided in Section 10.6(e)) (each, an "Assignee"), all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent of:

(A)    the Borrower (such consent not to be unreasonably withheld, conditioned or delayed), provided that no consent of the Borrower shall be required for an assignment to a Lender, an affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default under Section 8.1(a) or 8.1(f) has occurred and is continuing, any other Person, and provided, further, that the Borrower shall be deemed to have consented to any such assignment unless the Borrower shall object thereto by written notice to the Administrative Agent within five Business Days after having received telecopy or electronic written notice thereof; and

509265-1664-11227-Active.15480116.26

(B)     the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender, an affiliate of a Lender or an Approved Fund; and

(C)     any Issuing Lender with exposure in excess of $1,000,000; provided that no consent of any Issuing Lender shall be required for an assignment of all or any portion of a Term Loan.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or Loans under any Facility, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 in the case of the Tranche B Term Facility or the Incremental Term Facility and $5,000,000 in the case of the Revolving Facility, unless each of the Borrower and the Administrative Agent otherwise consent, provided that (1) no such consent of the Borrower shall be required if an Event of Default under Section 8.1(a) or 8.1(f) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its affiliates or Approved Funds, if any;

(B)     (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 (payable by the assigning Lender or the Assignee), provided that contemporaneous assignments by a Lender to two or more of its Approved Funds shall be treated as a single assignment for purposes of the payment of such recordation fee and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; and

(C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person or a Disqualified Lender) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this

Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 10.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)      The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans and L/C Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent, the Issuing Lender and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.

(v)      Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph. No Group Member shall be responsible to pay or reimburse any transfer, processing or recordation fees, costs or expenses arising in connection with an assignment (other than an assignment pursuant to paragraph (e) below).

(c)      Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (other than to a natural person, to Holdings or any of its Subsidiaries or to any Disqualified Lender) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent, the Issuing Lender and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (i) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (ii) directly affects such Participant. Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 2.22 with respect to any Participant. The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.18, 2.19 and 2.20 (subject to the requirements and limitations therein, including the requirements under Section 2.19(f) (it being understood that the documentation required under Section 2.19(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (i) agrees

to be subject to the provisions of Sections 2.18 and 2.19 as if it were an assignee under paragraph (b) of this Section and (ii) shall not be entitled to receive any greater payment under Sections 2.18 or 2.19, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from an adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the Closing Date that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided such Participant shall be subject to Section 10.7(a) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.  The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in this paragraph (d).

(e)    Notwithstanding anything else to the contrary contained in this Agreement, any Lender may assign all or a portion of its Term Loans to any Purchasing Borrower Party in accordance with Section 10.6(b); provided that:

(i)    the assigning Lender and the Purchasing Borrower Party purchasing such Lender's Term Loans, as applicable, shall execute and deliver to the Administrative Agent an Affiliated Lender Assignment and Assumption in lieu of an Assignment and Assumption;

(ii)    such assignment shall be made pursuant to a Dutch Auction open to all Lenders on a pro rata basis;

(iii)    any Loans assigned to any Purchasing Borrower Party shall be automatically and permanently cancelled upon the effectiveness of such assignment and will thereafter no longer be outstanding for any purpose hereunder;

(iv)    both immediately before and immediately after giving effect to any such purchase, no Default or Event of Default shall exist;

(v)      no assignment pursuant to this paragraph (e) shall be effected using proceeds from borrowings under the Revolving Facility;

(vi)      any gain from any such purchase shall not increase Consolidated EBITDA;

(vii)      the applicable Purchasing Borrower Party shall at the commencement of such Dutch Auction and at the time of such assignment affirm the No MNPI Representation; and(viii) the aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Term Loans purchased pursuant to this Section 10.6(e) and each principal repayment installment with respect to the Term Loans shall be reduced pro rata by the aggregate principal amount of Term Loans purchased.

10.7      Adjustments; Set-off.

(a)      Except to the extent that this Agreement or a court order expressly provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefitted Lender") shall receive any payment of all or part of the Obligations owing to it (other than in connection with an assignment made pursuant to Section 10.6), or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8.1(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest; provided further, that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation", no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

(b)      In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any Obligations becoming due and payable by the Borrower (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Borrower; provided that if any Defaulting Lender shall exercise any such right of setoff, (i) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Issuing Lender, the Swingline Lender and the Lenders and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such application made by such Lender, provided that the failure to give such notice shall not affect the validity of such application.

106

10.8     Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9     Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10     Integration.  This Agreement and the other Loan Documents represent the entire agreement of Holdings, the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11     GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

10.12     Submission to Jurisdiction; Waivers.  Each of Holdings and the Borrower, and the Administrative Agent and each of the Lenders, hereby irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof; provided, that nothing contained herein or in any other Loan Document will prevent any Lender or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to Holdings, the Borrower, the Administrative Agent or any Lender, as the case may be, each at the address provided in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

509265-1664-11227-Active.15480116.26

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any indirect, special, exemplary, punitive or consequential damages; provided that nothing contained in this clause (e) shall limit the Borrower's, the Borrower's Subsidiaries' or the Guarantors' indemnification obligations pursuant to Section 10.5.

10.13    Acknowledgements.  Each of Holdings and the Borrower hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Credit Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Credit Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Credit Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Credit Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Credit Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Credit Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Credit Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan Documents, (f) each Credit Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Credit Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Credit Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Credit Parties or among the Loan Parties and the Credit Parties.

10.14    Releases of Guarantees and Liens.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.1) to take any action requested by the Borrower having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 10.1 or (ii) under the circumstances described in paragraphs (a), (b) and (c) below.  In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to the Borrower (or to such third party as the Borrower may reasonably designate), and file, register and record, at the Borrower's expense, all documents and to such further acts as the Borrower shall reasonably request to evidence such termination or release.

(a)    At such time as the Loans, the Reimbursement Obligations and the other obligations under the Loan Documents (other than obligations under or in respect of Specified Swap Agreements or Specified Cash Management Agreements) shall have been paid in full, the Commitments have been terminated and either (x) no Letters of Credit shall be outstanding or (y) all Letters of Credit have been Cash Collateralized to the satisfaction of the Issuing Bank, all Collateral shall automatically be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) and Liens created by the

108

Security Documents shall automatically be released, in each case without delivery of any document or performance of any further act by any Person.

(b)    A Subsidiary Guarantor shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Loan Party shall be automatically released upon the consummation of any transaction permitted by this Agreement as a result of which such Subsidiary Guarantor ceases to be a Restricted Subsidiary (including pursuant to a merger with a Subsidiary that is not a Subsidiary Guarantor or a designation or conversion as an Excluded Foreign Subsidiary or Unrestricted Subsidiary, in each case in a transaction permitted by, and pursuant to, this Agreement).

(c)    Upon (i) any sale or other transfer by the Borrower or any Subsidiary Guarantor (other than to Holdings, the Borrower or any other Subsidiary Guarantor) of any Collateral in a transaction permitted under the Loan Documents, or (ii) the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral or the release of any Subsidiary Guarantor from its guarantee under the Guarantee and Collateral Agreement pursuant to the Loan Documents, the security interests in such Collateral created by the Security Documents or such guarantee, as applicable, shall be automatically released.

10.15    Confidentiality.  Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement, and further not to use any such non-public information other than in connection with the making and administration of the Loans; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information in any of the following respects, provided, however that no such information shall be provided by any Lender to any Disqualified Lender, (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, agents, partners, attorneys, accountants and other professional advisors or those of any of its affiliates, (d) upon the request or demand of any Governmental Authority (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process), or in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (e) if requested or required to do so in connection with any litigation or similar proceeding; provided, however, that prior to any such disclosure the Administrative Agent or Lender, as applicable, shall, to the extent allowable by law, provide the Borrower with prompt prior written notice of such requirement, and the Borrower may seek a protective order or other appropriate remedy to protect the non-public information, (f) that has been publicly disclosed (other than as a result of a breach of this Section 10.15), (g) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (h) in connection with the exercise of any remedy hereunder or under any other Loan Document; provided, however, that any such disclosure or use of the non-public information shall be limited to only that non-public information which is required to be disclosed in connection therewith, and shall be limited to only those persons who need to know such information, (i) to a regulatory or self-regulatory authority, bank examiner or auditor in connection with a routine audit or examination by, or a blanket document request from, such regulatory or self-regulatory authority, bank examiner or auditor, or (j) if agreed by the Borrower by prior written consent, in its sole discretion, to any other Person.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its

Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

10.16    WAIVERS OF JURY TRIAL.  HOLDINGS, THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.17    USA Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

10.18    Usury.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excessive interest shall be applied to the principal of the Obligations or, if it exceeds the unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged or received by the Administrative Agent or any Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Requirements of Law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate and spread, in equal or unequal parts, the total amount of interest throughout the contemplated term of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

MILLENNIUM LAB HOLDINGS II, LLC

By:_____

    Name: William Brock Hardaway
    Title:  Chief Executive Officer

MILLENNIUM LABORATORIES, LLC

By_____

    Name:  William Brock Hardaway
    Title:   Chief Executive Officer

JPMORGAN CHASE BANK, N.A., as Administrative
Agent and as a Lender

By: _____
    Name: Dawn LeeLum
    Title: Executive Director

*[Signature Page to Credit Agreement]*

CITIBANK, N.A.,
as Lender

By: _____
   Name: Marcus Villanueva
   Title: Vice President

[*Signature Page to Credit Agreement*]

BANK OF MONTREAL,
as Lender

By: _____

Name:

Title:   **Phillip Ho**
         **Director**

*[Signature Page to Credit Agreement]*

SUNTRUST BANK,
as Lender

By: _____
Name: David M. Felty
Title: Director

[*Signature Page to Credit Agreement*]

# EXHIBIT 4

| J.P. MORGAN SECURITIES LLC<br><br>JPMORGAN CHASE BANK, N.A.<br>383 Madison Avenue<br>New York, New York 10179 | CITIGROUP GLOBAL MARKETS INC.<br>390 Greenwich Street<br>New York, New York 10013 | SUNTRUST ROBINSON HUMPHREY, INC.<br><br>SUNTRUST BANK<br>3333 Peachtree Road<br>Atlanta, Georgia 30326 | BMO CAPITAL MARKETS CORP.<br><br>BANK OF MONTREAL<br>115 South LaSalle Street<br>Chicago, Illinois 60603 |

March 16, 2014

$1,765 million Term Loan Facility
$50 million Revolving Facility
Fee Letter

Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA 92127
Attention: Howard Appel, President

Ladies and Gentlemen:

Reference is made to the Commitment Letter dated the date hereof (the "Commitment Letter") among you and us.  Capitalized terms used but not defined herein are used with the meanings assigned to them in the Commitment Letter.  This letter agreement is one of the Fee Letters referred to in the Commitment Letter.

1.    Fees

As consideration for the commitments and agreements of the Commitment Parties under the Commitment Letter, you agree to pay or cause to be paid the following fees:

(i)    To each Initial Lender, for its own account (or for allocation in whole or in part to any of its affiliates), an underwriting fee (the "Underwriting Fee"),  in an amount equal to 2.00% of its ratable share of the aggregate principal amount of the commitments in respect of the Senior Secured Facilities as of the Closing Date (without giving effect to any syndication or assignment), payable on the Closing Date;

(ii)    To JPMorgan Chase Bank (for the account of the Lenders), upfront fees (the "Upfront Fees") (calculated as a percentage of each Lender's allocated commitments to the Revolving Facility and the Term Loans) in an amount equal to 0.5% with respect to the Revolving Facility and the Term Loans as of the Closing Date, which may take the form of Original Issue Discount ("OID"), payable on the Closing Date.

2.    Alternate Transaction

509265-1664-11227-Active.15460088.12

Exhibit
0109

                                            CITI-DE-00110378

In the event that during the period commencing on the date hereof and ending on the earlier of the date twelve months hereafter or the Closing Date, you or any of your subsidiaries consummate any non-affiliate senior secured credit financing transaction (other than the Senior Secured Facilities) the proceeds of which are used to finance a payment in excess of $50 million in respect of outstanding capital stock, stock options, warrants or debentures issued by you (and not an acquisition financing, trade financing, receivables financing, securitization or working capital or general corporate financing) (any such non-excluded transaction, an "Alternate Transaction"), you agree that unless we have otherwise terminated the Commitment Letter with respect to the Senior Secured Facilities, you will pay to the Commitment Parties (other than any such Commitment Parties that have breached their obligations to provide the Senior Secured Facilities on the terms and conditions of the Commitment Letter) at the time of funding of such Alternate Transaction an amount equal to 50% of the fee contemplated by clause (i) above in Section 1; provided that such amount shall not be payable to any Commitment Party that was offered an opportunity to participate in such Alternate Transaction (on the same terms and conditions as other lenders who have proposed to provide such Alternate Transaction and acting in the roles specified in the Commitment Letter and with not less than the percentage of compensatory economics applicable to us as specified in the Commitment Letter) and declined to do so.

3.      Market Flex

With respect to the Term Loan Facility, the Lead Arrangers shall be entitled, without your consent, at any time on or prior to the earlier of a Successful Syndication (as defined below) and the date that is 30 days after the Closing Date, to make the following changes to the terms of the Term Loan Facility if the Lead Arrangers reasonably determine (i) that such changes are necessary or advisable to ensure a Successful Syndication or (ii) that a Successful Syndication cannot be consummated during the syndication period:

(i)      increase the yield on the Term Loan Facility through an increase in the interest rate margins thereunder by an amount not to exceed 175 basis points; provided that the interest rate margins may be increased by an additional 25 basis points if the Borrower's corporate family rating by Moody's or corporate credit rating by S&P is lower than B1 (stable outlook) or lower than B+ (stable outlook), it being understood that the increase in the interest rate margins pursuant to this paragraph (i) may be implemented by use of upfront fees, OID (based on an assumed four-year average life and without any present value discount (e.g., 25 basis points of margin so utilized equals 100 basis points in upfront fees)) or an increased Eurodollar Rate floor; provided that the aggregate amount of OID or upfront fees increased pursuant to this paragraph (i) shall not exceed 1.75%;

(ii)      replace the "soft call" prepayment premium payable upon voluntary prepayment of the Term Loan Facility with (A) a "hard call" prohibiting any optional or mandatory prepayment of the Term Loans during the first year after the Closing Date unless the Make-Whole Premium (as defined below) is paid (but permitting payments during that first year after the Closing Date for (i) scheduled amortization, Excess Cash Flow payments and mandatory prepayments as a result of an asset sale and (ii) prepayments as a result of a change of control of the Borrower (in which case such prepayment shall be subject to a prepayment premium of 2% of the prepaid Term Loans as a result of such change of control) and (B) a "soft call" prepayment premium payable upon a voluntary prepayment as a result of a repricing of the Term Loan Facility made during the second and the third years after the Closing Date, so long as such prepayment premium does not exceed (i) 2% prior to the second anniversary of the Closing Date, and (ii) 1% on or after the second anniversary of the Closing Date but before the third anniversary of the Closing Date.

509265-1664-11227-Active.15460088.12

CONFIDENTIAL                                                                                     CITI-DE-00110379

3

"Make-Whole Premium" means, with respect to any principal amount of Term Loans prepaid during the period commencing on the Closing Date through the date that is the first anniversary of the Closing Date (the "Make-Whole Termination Date"), the sum of (i) the present value on the date of such prepayment, computed using a discount rate equal to the Treasury Rate plus 50 basis points, on all interest that would accrue on the applicable repaid Term Loans from the date of prepayment to the Make-Whole Termination Date and (ii) a prepayment premium of 2% of the prepaid Term Loans;

(iii)    change the initial "excess cash flow sweep" percentage applicable to the Term Loan Facility to 75%, provided that (i) Excess Cash Flow for fiscal year 2014 shall only be required in relation to the last two quarters of that fiscal year and (ii) amortization payments and Excess Cash Flow payments in respect of fiscal year 2014 shall not in the aggregate exceed $35 million, and amortization payments and Excess Cash Flow payments in respect of fiscal year 2015 shall not in the aggregate exceed $45 million;

(iv)    reduce the Leverage Ratio required to be satisfied in connection with the availability of an unlimited principal amount of the Incremental Facilities to 4.25 to 1.0; and

(v)    reduce the Term Maturity Date to six years after the Closing Date.

The term "Successful Syndication" shall mean that the Initial Lenders and their respective affiliates shall hold commitments with respect to, or loans under, the Term Loan Facility of not more than $0.

4.    Miscellaneous

You agree that, once paid, the fees or any part thereof payable hereunder and under the Commitment Letter shall not be refundable under any circumstances. All fees payable hereunder and under the Commitment Letter shall be paid in immediately available funds and shall be in addition to reimbursement of our out-of-pocket expenses to the extent reimbursable pursuant to the Commitment Letter. You agree that we may, in our sole discretion, share all or a portion of any of the fees payable pursuant to this Fee Letter with any of the other Lenders.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any obligation to provide any financing. Such obligation, if any, shall be set forth and be subject to the terms and conditions set forth in the Commitment Letter. This Fee Letter may not be amended or waived except by an instrument in writing signed by each of us and you. This Fee Letter shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York. This Fee Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Fee Letter by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

You agree that this Fee Letter and its contents are subject to the confidentiality provisions of the Commitment Letter.

509265-1664-11227-Active.15460088.12

CONFIDENTIAL                                                                      CITI-DE-00110380

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____

Name:    Dawn L. LeeLum
Title:    Executive Director

J.P. MORGAN SECURITIES LLC

By: _____

Name:
Title:

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL                                                    CITI-DE-00110381

Please confirm that the foregoing is our mutual understanding by signing and returning to us an executed counterpart of this Fee Letter.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
     Name:
     Title:

J.P. MORGAN SECURITIES LLC

By: _____
     Name: Ryan Griswold
     Title: Vice President

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

CITI-DE-00110382

CITIGROUP GLOBAL MARKETS INC.

By: _____

Name:

Title:        Stuart G. Dickson
              Managing Director

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

BMO CAPITAL MARKETS CORP.

By: _____

Name:  Michael Hsieh
Title:  Director


BANK OF MONTREAL

By: _____

Name:  Phillip Ho
Title:  Director


*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

CITI-DE-00110384

BMO CAPITAL MARKETS CORP.

By: _____
     Name:
     Title:

BANK OF MONTREAL

By: _____
     Name:
     Title:
          **Phillip Ho**
           Director

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

CITI-DE-00110385

SUNTRUST ROBINSON HUMPHREY, INC.

By: _____

Name:  William Monroe
Title:  Director


SUNTRUST BANK

By: _____

Name:  David M. Felty
Title:  Director


*Signature Page to Arranger Fee Letter*

CITI-DE-00110386

Accepted and agreed to as of
the date first written above by:

MILLENNIUM LABORATORIES, INC.

By: _____
    Name: Howard Appel
    Title: President

*Signature Page to Arranger Fee Letter*

CONFIDENTIAL

CITI-DE-00110387

# EXHIBIT 5

# Exhibit 39

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential



Date

Name
Address
Address

CLIA NUMBER:_____

**Re:**      **Specimen Collection Cups – 11/12 Panel**

Dear Name:

I am writing on behalf of Millennium Laboratories, Inc. ("Millennium") regarding our agreement to provide your practice with specimen collection cups to be used to collect your patient specimens, which you will then submit to Millennium for additional testing and/or confirmations as you instruct. The specimen collection cups Millennium will provide under this agreement are the Amedica 11/12 Panel Drug Test Cup.

<u>To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory.</u>  While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that 1) you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups, 2) you will not bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups and 3) you will not resell or redistribute these cups.  In addition, you agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing.

Millennium will review your account activity monthly with respect to any collection cups Millennium has sent to you during the month versus the number of collection cups you sent to Millennium for testing.   Any significant variances, taking into account your inventory of cups and any collection cups that may have been ruined in practice, will be analyzed and Millennium may contact you to determine the reasons for such variances. If, after this reconciliation, we agree that you used cups for which we did not receive patient specimens, Millennium shall invoice you for the excess cups at the applicable market rate.  You agree to pay such invoices within 30 days.

Please note that if you choose not to have Millennium conduct any testing with these collection cups - that is solely up to you to determine the need on a per patient basis - you are expected to pay for these cups when Millennium reconciles your account.

If your practice wishes to bill for your own point-of-care testing services, then we can provide appropriate specimen collection cups or other testing kits to you at fair market value prices pursuant to a separate written agreement.

Either party may terminate this arrangement upon 15 days prior written notice to the other party.

Compliance with applicable laws and regulations is important to us, and we do not want to take any actions that would place either you or our laboratory in jeopardy.  I ask that you sign the enclosed copy of this letter to indicate your acceptance of these terms.  We look forward to a long, mutually beneficial relationship with your practice.

Very truly yours,

Howard Appel, President

The undersigned agrees to the terms outlined in this letter.

_____          _____

**CONFIDENTIAL OR TRADE SECRET**                                                    **MIL00001780**

Confidential                                                                                                ML_DE_00629263

# EXHIBIT 6
# FILED UNDER SEAL

# EXHIBIT 7

# Exhibit 38

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential

ML_DE_00629257

| From: | Howard Appel |
|---|---|
| Sent: | Thursday, February 17, 2011 9:06 AM |
| To: | Mary Rouse |
| Cc: | Elizabeth Peacock; Jessica Sullivan |
| Subject: | Collection Cup Agreement - revised |
| Attachments: | Contract. Specimen Collection Cups.021711.FINAL.DOC; image003.jpg |

Mary, here is the rev agreements for 6 and 11/12. Add this to the process along with the quarterly certification and lets review one last time before we announce to the team.

**Howard Appel**
President

16981 Via Tazon
San Diego, CA 92127
Phone (858) 451-3535
Fax (858) 451-3636



This communication contains information that is confidential, proprietary in nature, and may also be attorney-client privileged and/or work product privileged. It is for the exclusive use of the intended recipient(s). If you are not the intended recipient(s) or the person responsible for delivering it to the intended recipient(s), please note that any form of dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please immediately notify the sender and delete the original communication. Thank you for your cooperation.

**Highly Confidential**

MLATOX-FL-0004116

Confidential

ML_DE_00629258



Case 17-51840-LSS Doc 341-4 Filed 02/10/23 Page 194 of 847

Date

Name
Address
Address

CLIA NUMBER: _____

> Re:      Specimen Collection Cups – 6 Panel

Dear Name:

I am writing on behalf of Millennium Laboratories, Inc. ("Millennium") regarding our agreement to provide your practice with specimen collection cups to be used to collect your patient specimens, which you will then submit to Millennium for additional testing and/or confirmations. The specimen collection cups Millennium will provide under this agreement are the Amedica 6 Panel Drug Test Cup.

<u>To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory.</u>   While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups.  Nor will you bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups.  You also shall not resell or redistribute these cups.  You further agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing.

If your practice wishes to bill for your own point-of-care testing services, then we can provide appropriate specimen collection cups or other testing kits to you at fair market value prices pursuant to a separate written agreement.

Either party may terminate this arrangement upon 15 days prior written notice to the other party.

Compliance with applicable laws and regulations is important to us, and we do not want to take any actions that would place either you or our laboratory in jeopardy.  I ask that you sign the enclosed copy of this letter to indicate your acceptance of these terms.  We look forward to a long, mutually beneficial relationship with your practice.

Very truly yours,


Howard Appel, President


The undersigned agrees to the terms outlined in this letter.


_____          _____


**Highly Confidential**                                                    **MLATOX-FL-0004117**

Confidential                                                                                    ML_DE_00629259

Case 17-51840-LSS Doc 341-4 Filed 02/10/23 Page 195 of 847

Date                                                    Name

**ML**

MILLENNIUM
LABORATORIES
because pain matters

                                                        Date

Name
Address
Address

CLIA NUMBER: _____

        Re:        Specimen Collection Cups – 11/12 Panel

Dear Name:

        I am writing on behalf of Millennium Laboratories, Inc. ("Millennium") regarding our agreement to provide your practice with specimen collection cups to be used to collect your patient specimens, which you will then submit to Millennium for additional testing and/or confirmations. The specimen collection cups Millennium will provide under this agreement are the Amedica 6 Panel Drug Test Cup.

        To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory.  While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups.  Nor will you bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups.  You also shall not resell or redistribute these cups.  You further agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing.

        If your practice wishes to bill for your own point-of-care testing services, then we can provide appropriate specimen collection cups or other testing kits to you at fair market value prices pursuant to a separate written agreement.

        Either party may terminate this arrangement upon 15 days prior written notice to the other party.

        Compliance with applicable laws and regulations is important to us, and we do not want to take any actions that would place either you or our laboratory in jeopardy.  I ask that you sign the enclosed copy of this letter to indicate your acceptance of these terms.  We look forward to a long, mutually beneficial relationship with your practice.

                                        Very truly yours,




                                        Howard Appel, President


The undersigned agrees to the terms outlined in this letter.



**Highly Confidential**                                 **MLATOX-FL-0004118**

Confidential                                          ML_DE_00629260

Case 17-51840-LSS   Doc 241-30   Filed 02/10/23   Page 196 of 347

Date _____          Name _____

Highly Confidential

MLATOX-FL-0004119

Confidential

ML_DE_00629261

# EXHIBIT 8
# FILED UNDER SEAL

# EXHIBIT 9

Draft Annual Compliance Audit Report

# Millennium Laboratories

# Annual Compliance Audit Report

# 11/24/2010

# Table of Contents

## I. Introduction and Summary of Audit Procedures     Tab 1

| | |
|---|---|
| Background | 3 |
| Description of Millennium Operations | 3 |
| Design and Purpose of Annual Compliance Audit | 3 |
| On-Site Interviews | 4 |
| Written Materials and Documents Review | 5 |
| Final Audit Report | 5 |
| Audit Recommendations Summary and Risk Rankings | 5 |

## II. Compliance Program Review     Tab 2

| | |
|---|---|
| Introduction | 7 |
| Chief Compliance Officer | 7 |
| Compliance Committee | 8 |
| Compliance Policies | 9 |
| Employee Standards of Conduct | 9 |
| Employee Certifications | 10 |
| Disclosure Program | 10 |
| Compliance Training | 11 |
| Employee Screening | 12 |
| Employee Disciplinary Actions | 13 |
| Annual Compliance Audit | 13 |
| Post Payment Review | 14 |

Confidential Attorney-Client Privileged Communication – Attorney Work Product     [ PAGE ]

Draft Annual Compliance Audit Report

Annual Physician Notice                                    15

MAC Inquiries                                              15


**III. Operations and Billing Review**                    **Tab 3**

Confirmation Testing                                      17

Third Party Billing Company                               19

Direct Billing Program                                    20


**IV. Marketing/Business Relations Review**               **Tab 4**

Introduction                                              22

The Sale of Point of Care Testing Supplies                23

The Provision of Point of Care Testing Supplies           27

New Client Registration                                   29

Physician Speaker Program                                 30

Test Drive Program                                        32

Lab Assistant Program                                     34


**V. CPT Coding Review**                                  **Tab 5**


**VI. Audit Recommendations Summary and Risk Rankings**   **Tab 6**


**Supporting Materials**                                  **Tabs A-I**

Confidential Attorney-Client Privileged Communication – Attorney Work Product       [ PAGE ]

Draft Annual Compliance Audit Report

# I. Introduction and Summary of Audit Procedures

**Background:** On August 23, 2010, Millennium Laboratories, Inc. (Millennium) entered into a written agreement with CodeMap, LLC (CodeMap) for the performance of an Annual Compliance Audit.[1] CodeMap is an independent consulting firm and is in no way related to Millennium by ownership or control.

Previously, CodeMap performed an Initial Compliance Audit for Millennium in late 2009. CodeMap auditors, Gregory Root, Esq., and Charles Root, Ph.D., performed this Annual Compliance Audit for Millennium including interviews, subsequent analysis and research, and the preparation of this Audit Report.[2]

**Description of Millennium Operations:** Founded in 2007, Millennium is a specialty reference laboratory that provides drug testing of urine with biological monitoring and adulterant screening with or without auto-reflex confirmation by Liquid Chromatography /Mass spectrometry/Mass spectrometry (LC-MS/MS). Millennium's clients are primarily pain management physicians that use Millennium's services to monitor patient's prescription adherence, improve treatment outcomes, support assessment and diagnosis, identify use of undisclosed substances, and uncover medication diversion.

**Design and Purpose of the Compliance Audit:** The purpose of the Annual Compliance Audit is to follow the auditing and monitoring recommendations included in the OIG's Compliance Program Guidance for Clinical Laboratories, August 1998.[3] The Annual Compliance Audit assesses Millennium's compliance with the following:

- Civil False Claims Act  {31 U.S.C. § 3730(a)-(b)};
- Civil Monetary Penalties Law (42 U.S.C. § 1320a-7a);

---

[1] A copy of the written agreement providing that CodeMap perform a Compliance Audit for Millennium is attached to this report as Appendix A

[2] Biographical information concerning Gregory Root, Esq., and Charles Root, Ph.D., is attached to this report as Appendix B

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

- Federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b);

- Stark II Self-Referral Prohibitions (42 U.S.C. § 1395nn);

- Procedure coding rules and policies (CPT/HCPCS);

- Medicare and Medicaid billing rules and policies;

- Diagnosis coding rules and policies (ICD-9-CM);

- Medicare/Medicaid claims development and submission rules and policies;

- Medicare/Medicaid reimbursement rules and policies;

- OIG guidance concerning the operation of an effective compliance program; and

- Any other rules and regulations governing participation in Medicare and other federally funded health care programs.

In addition, this audit assesses Millennium's compliance program and related activities, policies, and procedures. This report includes an evaluation of how well Millennium's program conforms to the OIG's standards of an effective compliance program.[4]

**On-Site Interviews:** Gregory B. Root, Esq., initiated the Annual Compliance Audit by visiting Millennium's corporate headquarters and laboratory facilities in San Diego, California, on September 8-9, 2010. On these dates, Gregory B. Root, Esq., toured Millennium's facilities and conducted on-site interviews of key personnel involved in Millennium's compliance, billing, coding, finance, operations, sales and marketing, and management. The following individuals participated in the on-site interviews:

- Howard Appel          President
- Faith Bratton         Billing Specialist
- Kimberly Keller       Billing/Customer Service Supervisor
- Dr. Charles Mikel     Vice President, Chief Scientific Officer
- Elizabeth Peacock     Vice President of Sales

---

[3] 63 Fed. Reg. at 45076; August 24, 1998.
[4] A copy of the OIG's Compliance Guidance for Clinical Laboratories is attached to this report as Appendix C

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

- Dr. Amadeo Pesce          Laboratory Director
- Penny Powell              HR Business Partner
- Katherine Richards        QA Document Coordinator
- Heidi (Smith) Switzer     Vice President of Finance
- Robert West              Chief Compliance Officer
- Melinda (Mindy) Wilson    Sales Support

**Written Materials and Document Review:** As part of the audit, CodeMap auditors collected written documents, policies, and other materials from Millennium prior to, during, and subsequent to the on-site interviews. CodeMap auditors reviewed these documents to substantiate any findings and conclusions drawn from the on-site interviews, and to ensure compliance with all applicable state and federal laws, regulations, and policies. The Appendices to this report contain copies of many of the written materials that were reviewed as part of the Annual Compliance Audit.

**Final Audit Report:** This report is the final product of the Annual Compliance Audit. This audit report assesses Millennium's compliance with the federal and state laws, rules, and regulations that serve to protect the Medicare and Medicaid trust funds, as well as the health and well being of the beneficiaries of those programs. In addition, the report includes an evaluation of the efficacy of Millennium's compliance program. The report describes all potential compliance issues and recommended corrective actions identified by CodeMap.

This report is based on findings and observations derived from the on-site visit and interviews, written materials collected from Millennium's facilities in San Diego, California, and subsequent phone, fax, and email communications.

**Audit Recommendations Summary and Risk Rankings:** The Final Audit Report concludes with a complete list of audit recommendations. Each recommendation is accompanied by a brief description and ranked on a sliding scale from 1 – 4 based on how strongly CodeMap recommends implementing the change, as well as the degree of

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

risk/liability Millennium may be exposed to if the change is not implemented. A ranking of 1 indicates that we strongly encourage Millennium to implement the recommendation, and that failure to do so could result in an unreasonable risk of civil, criminal, or administrative law liability, or adversely affect the effectiveness of Millennium's compliance program. Conversely, a ranking of 4 indicates a recommendation of much lower priority and failure to implement will expose Millennium to a much lesser degree of liability.

The following conclusions depend on the accuracy and trustworthiness of the information provided by Millennium's employees, owners, and contractors. CodeMap and its auditors cannot be held responsible for findings based upon false or misleading information.

Gregory Root, Esq. prepared this final audit report.

_____          _____
Signature                                         Date

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

## II. Compliance Program Review

**Introduction**: At the time of Millennium's Initial Compliance Audit in 2009, Millennium had just begun the process of creating and maintaining a compliance program. The Initial Compliance Audit Report included numerous recommendations concerning Millennium's fledging program and the associated policies and procedures. Many of these recommendations directed Millennium to devote more time and resources, and reorganize its program so that it more closely resembled the package of policies and procedures that investigators/regulators would readily identify as an effective laboratory compliance program.

During the past year, Millennium has taken significant steps to create a much more robust compliance program, and implement the recommendations included in the last Compliance Audit Report. In particular, the appointment of a full-time, dedicated Chief Compliance Officer, the formation of a supporting Compliance Committee, and the adoption of a comprehensive set of compliance policies strengthens the effectiveness of Millennium's program, and demonstrates a good faith effort to diligently comply with all applicable laws, rules, and regulations.

As the following section will demonstrate, Millennium's compliance program has been vastly improved which should result in greater benefits and protections for Millennium.

**Chief Compliance Officer:** Mr. Robert West now serves full time as Millennium's Chief Compliance Officer and is responsible for the oversight and administration of the Compliance Program. Millennium reassigned Mr. West's other duties connected to his role as the administrative director of the laboratory, so that Mr. West could devote his full time and attention to the responsibilities of Chief Compliance Officer.

**Recommendations/Changes:** None. Previously, Mr. West's varied roles in the organization prevented him from effectively fulfilling all the duties of a Chief Compliance Officer. The recent reorganization of his duties greatly enhances the effectiveness of

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Confidential                                                                 ML_DE_00499764

Draft Annual Compliance Audit Report

Millennium's program. Any investigator/regulator would expect to see a laboratory of Millennium's size to employ a full time Chief Compliance Officer dedicated solely to the operation and maintenance of the organization's compliance program.

**Compliance Committee:** In response to a recommendation included in last year's compliance audit, Millennium formed a compliance committee to support its Chief Compliance Officer. That committee is composed of the following members:

- Perla Almazan                  Director of Clinical Operations
- Howard Appel                   President
- Kimberly Keller                Billing/Customer Service Supervisor
- Dr. Charles Mikel              Vice President, Chief Scientific Officer
- Elizabeth Peacock              Vice President of Sales
- Dr. Amadeo Pesce               Laboratory Director
- Heidi (Smith) Switzer          Vice President of Finance
- Robert West                    Chief Compliance Officer

**Recommendations/Changes:** While OIG compliance guidance does not specifically recommend any particular job descriptions or titles of the members that serve on the compliance committee, it is my opinion that most committees benefit from the inclusion of personnel responsible for the management of sales/marketing. Each organization's culture and organization is unique and ultimately the company's circumstances will determine the best composition of a compliance committee. However, inclusion of a sales/marketing manager would allow the committee better access to those functions that often have the most interactions with referring clients and are in the riskiest of positions to implicate fraud and abuse provisions.

Appendix 10 of Millennium's Compliance Policy Manual presently lists Ms. Elizabeth Peacock, Vice President of Sales, as a member of the Compliance Committee. However, during the on-site interviews, Millennium personnel indicated that she was going to step

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

down from her position on the Compliance Committee. It is recommended that Ms. Peacock remain on the committee for the reasons stated above.

In addition, Millennium's compliance policy that governs the compliance committee should stipulate a regular meeting schedule. Millennium's Chief Compliance Officer should maintain on file minutes of all meetings of the compliance committee.

**Compliance Policies:** On August 17, 2010, Millennium's Chief Compliance Officer adopted a new set of compliance policies that sets forth the policies and procedures of Millennium's much improved compliance program. This newly enacted set of polices is much more comprehensive than the policies that were previously in place.[5]

**Recommendations/Changes:** None. Pursuant to a recommendation included in the previous Compliance Audit, Millennium has heavily reworked the policies that govern its compliance program. In addition, Millennium added many new policies that address the issues and risk areas discussed in the OIG's compliance program guidance for clinical laboratories. The newly enacted compliance policies are now organized in a manner that investigators/regulators would readily identify as the components of an effective laboratory compliance program. As long as Millennium adheres to these new policies and maintains the inherent procedures, Millennium should have little difficulty in reaping the benefits of an effective compliance program.

**Employee Standards of Conduct:** Millennium's compliance policy manual now includes an Employee Standards of Conduct[6] that requires each and every employee to:

- Understand how all applicable laws, rules, and regulations apply to his/her position.

---

[5] The Table of Contents of Millennium Laboratories' Medicare Compliance Policy Manual 2010 is attached to this report as Appendix D.
[6] Millennium's Employee Code of Conduct is attached to this report as Appendix E

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

- Act in a legal and ethical manner concerning all laws, rules, and regulations as well as Millennium Compliance Program Policy.
- Report all suspect policies and practices to a supervisor or by using Millennium's disclosure program.

**Recommendations/Changes:** None. Millennium's Employee Standards of Conduct satisfies the requirements of an effective compliance program as recommended by OIG compliance guidance.

**Employee Certifications:** Millennium requires all new employees to certify in writing that they have received, read, and understand the Employee Code of Conduct. Also, Millennium requires all existing employees to sign the same certification on an annual basis. The Millennium compliance policy manual contains a certification form that the laboratory uses to document all employee certifications.[7] Human Resources maintains on file all such employee certifications at Millennium's facilities in San Diego, California.

**Recommendations/Changes:** None. As long as Millennium adheres to its certification requirements as dictated by its newly enacted compliance policies, this process should only strengthen the compliance program. In addition, the certification process effectively communicates to all Millennium personnel their compliance-related duties and obligations, as well as reinforces the importance of all employees adhering to the standards of Millennium's code of conduct.

**Disclosure Program:** Millennium continues to maintain three mechanisms that allow its employees to report suspicious policies, procedures, and activities that may violate rules, regulations, and/or laws. First, its compliance policy instructs employees that they may call Dr. Robert West on his cell phone at any time to describe instances of noncompliance.[8] Second, the lab has installed a drop box, located outside the office door

---

[7] Millennium's Employee Certification Form is attached to this report as Appendix F.
[8] Millennium Compliance Policy, "Disclosure Hotline," is attached to this report as Appendix G

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

ML_DE_00499767

of Millennium's Chief Compliance Officer, that allows employees to anonymously report potential compliance issues in writing. Finally, Millennium maintains a dedicated email address, to which employees may communicate potential instances of non-compliance. No employee or contractor has communicated any compliance concerns via Millennium's disclosure program since the last compliance audit.

**Recommendations/Changes:** None. Millennium's three-prong disclosure program should satisfy the OIG's recommendation of an effective employee disclosure program. At least some of Millennium's disclosures mechanisms are available 24 hours/day and allow employees to report suspicious policies, procedures, or conduct anonymously if so desired.

Pursuant to recommendations included in the previous Compliance Audit, Millennium now communicates the existence of its disclosure program, along with instructions on how to utilized the program, via notices posted in common work areas.

On November 9, 2010, Gregory Root placed a test call to Millennium's disclosure hotline to ensure the disclosure program was working effectively. Millennium's Chief Compliance Officer answered the call indicating the hotline is operational.

**Compliance Training:** Millennium requires all employees to participate in compliance training on an annual basis. Millennium provides the annual compliance training via an online compliance training program operated by a third party, Healthcare Compliance Solutions, Inc. Each year, Millennium employees must complete the following courses:

- Medicare Employee Training
- HIPAA Security Employee Training
- HIPAA Privacy Employee Training

Confidential    ML_DE_00499768

Draft Annual Compliance Audit Report

**Recommendations/Changes:** The online courses adequately convey their respective subject matter. As long as the online program sufficiently documents each employee's participation, Millennium's training protocol serves as effective basic compliance training.

However, pursuant to OIG compliance guidance, Millennium compliance policy, and recommendations included in the previous Compliance Audit, Millennium must also administer advanced compliance training concerning coding, claims submission, fraud and abuse provisions, and other applicable rules and regulations to employees serving in more sensitive positions such as billing, coding, customer service, sales, and marketing.

Millennium's compliance policy states that the organization will require certain members of management and all members of the Compliance Committee to participate in advanced training. Unfortunately, since the last audit only a limited number of these individuals have completed advanced compliance training.

Millennium must organize an advanced compliance training program, as described above, and require respective members of its management team to complete the applicable courses. Millennium's compliance program will not be judged truly effective until the organization fulfills this educational requirement.

**Employee Screening**: In the past year, Millennium revised its compliance policies concerning employee screening. Two policies, "Non-Employment of Sanctioned Individuals,[9]" and "Screening of New Employees,[10]" now dictate the policies and procedures used by Millennium to ensure its employees have never been criminally convicted, suspended, debarred or excluded from participation in a federal health care program. These policies require Millennium to screen both prospective employees within sixty days of hire, and existing employees on an annual basis. Specifically these policies require:

_____

[9] Millennium Compliance Policy, "Non-Employment of Sanctioned Individuals," is attached to this report as Appendix H

[10] Millennium Compliance Policy, "Screening of New Employees," is attached to this report as Appendix I

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

- All prospective employees to disclose to Millennium if they have been convicted of a health care related crime, or excluded from any federal health care programs;
- Millennium to conduct a reasonable and prudent background investigation including reference checks for all prospective employees;
- Millennium to query the General Services Administration's List of Parties Excluded from Federal Programs for all employees; and
- Millennium to query the HHS/OIG List of Excluded Individuals/Entities for prospective employees.

**Recommendations/Changes:** As long as Millennium adheres to the above named policies, the organization should fulfill the employee screening recommendations contained in the applicable OIG compliance guidance. Millennium's revised policies will ensure its workforce is free of any individuals who have ever been criminally convicted, suspended, debarred or excluded from participation in a federal health care program.

Millennium must continue to assign the requisite time and resources to complete all the requirements of its newly minted employee screening program. In addition, the organization must maintain thorough documentation of all queries and investigations, and respective outcomes, required by the applicable compliance policies.

**Employee Disciplinary Actions:** Since the inception of Millennium's compliance program, no employee has been disciplined for failure to adhere to federal/state laws, rules and regulations or Millennium compliance program policies.

**Recommendations/Changes:** None.

**Annual Compliance Audit:** As described previously in this Audit Report, Millennium contracted CodeMap to perform this Annual Compliance Audit. This report is the final product of the audit.

Confidential                                                                                  ML_DE_00499770

Draft Annual Compliance Audit Report

**Recommendations/Changes**: None.

**Post Payment Review:** Millennium compliance policy details a weekly audit protocol that requires Millennium to perform post payment review of five claims each week.[11] The weekly audit consists of a detailed review of five randomly picked claims from four weeks prior. Each week, designated Millennium personnel compile the following documentation concerning the randomly selected claims:

- test protocol;
- test requisition
- test results reported by laboratory;
- billing information sent to the third party billing company; and
- final bill rendered by the billing company.

Millennium personnel then compare and review the above to ensure proper coding, billing, claims submission, and compliance with all applicable rules and regulations. If any discrepancies occur, Millennium's Chief Compliance Officer determines the best course of action to remedy any problems including resubmitting claims, appealing claims, discussions with Millennium's billing company, and/or refunding any overpayments to payers and/or patients. Millennium has performed the above-described post payment review since June of 2009.

**Recommendations/Changes:** None. Millennium's post payment review processes are an effective way to ensure appropriate claims submissions. This type of ongoing auditing should benefit Millennium's compliance activities by detecting and remedying any billing issues before they accumulate into significant liabilities to either federally funded or private health plans.

---

[11] Millennium Compliance Policy, "Post Payment Review," is attached to this report as Appendix J

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Draft Annual Compliance Audit Report

**Annual Physician Notice:** Pursuant to its compliance policy in May 2010, Millennium sent an Annual Physician Notice to all its physician, hospital, reference laboratory and other provider clients.[12] Millennium's Annual Physician Notice contains the following information:

1. Any Medicare coverage policies, either LCDs or NCDs, that apply to tests and procedures performed by Millennium;

2. A statement that Medicare will only reimburse claims for panels of tests when all components are medically necessary and reasonable to treat or diagnosis the patient;

3. The 2010 CPT codes and corresponding Medicare Laboratory Fee Schedule amounts for tests and procedures performed by Millennium;

4. A statement that Medicaid reimbursement will be equal or less than Medicare reimbursement;

**Recommendations/Changes:** Millennium's Annual Physician Notice fulfills most of the OIG's requirements concerning this type of communication. Millennium's notice clearly communicates to physicians the coding, coverage, and reimbursement implications of ordering Millennium testing. However, the notice is missing one piece of information recommended by the OIG, the name and phone number of Millennium's CLIA clinical consultant. In order to fully abide by the OIG's compliance guidance Millennium should add this information to its next Annual Physician Notice.

**MAC Inquiries**: In recent months, Millennium has received numerous inquiries from its MAC for further documentation of claims for services ordered by Millennium's customers and performed by Millennium. Typically, these inquiries request items such as test requisitions, medical records, and test result reports. Millennium has retained outside counsel to analyze and monitor these requests. Millennium has diligently complied with these requests and provided the MAC with all requested documentation.

---

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Draft Annual Compliance Audit Report

**Recommendations/Changes:** At this time, Millennium must wait to see how the MAC uses the requested information. Millennium should continue to comply with the documentation requests and await further instructions from the contractor.

---

[12] Millennium's 2010 Annual Notice to Physicians is attached to this Report as Appendix K

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Confidential                                                                                    ML_DE_00499773

Draft Annual Compliance Audit Report

## III. Operations and Billing Review

**Confirmation Testing:** As explained in last year's audit report, Millennium follows two possible protocols for performing confirmation testing. These protocols depend on whether the ordering physician performed point of care drug testing in their offices or not. The confirmation protocols employed by Millennium are:

**Protocol I: Physicians who conduct point of care tests**

- Step 1: Confirm positive test results as reported by the physician on the requisition form using qualitative (immunoassay) methods.
- Step 2: Quantification of positive immunoassay results at lower limits using LC-MS/MS method (Note: TCA and Barbiturates are not quantified by LC-MS/MS).
- Step 3: Confirmation/Quantification at lower limits of negative point of care test results as reported by the physician on the requisition form using quantitative (LC-MS/MS) method. (Note: TCA and Barbiturates are not quantified by LC-MS/MS).

**Protocol II: Physicians who do not conduct point of care testing**

- Step 1: Conduct drug testing using qualitative (immunoassay) methods.
- Step 2: Quantification of positive immunoassay results at lower limits using quantitative LC-MS/MS method (Note: Barbiturates and Alcohol are not quantified by LC-MS/MS)

When Millennium employs Protocol I, for positive point of care test results, it reports two procedure codes to payers, 80102 and the appropriate quantitative chemistry code. For negative test results, it reports the appropriate quantitative chemistry code only.

Confidential Attorney-Client Privileged Communication – Attorney Work Product     [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

When Millennium employs Protocol II, it reports up to two procedure codes to payers, G0431 or 80101 for the initial testing using qualitative (immunoassay) method and the appropriate quantitative chemistry code for confirmation of positive results.

Beginning January 1, 2011, Millennium plans to modify its testing protocol for physicians that perform point of care testing. Next year, Millennium plans on making the following changes:  1) it will no longer use a qualitative (immunoassay) method to confirm positive test results resulting from point of care testing. For these tests, Millennium will only perform the quantification via the LC-MS/MS method.  2) it will offer, for all testing, quantification via the LC-MS/MS method without a qualitative (immunoassay) initial screen.

**Recommendations/Changes:** As stated in the previous audit report, Protocol I might be interpreted by payers as the provision of medically unnecessary services since Step 2 provides the same confirmation information as Step 1. In other words, a payer might say there is no need for an intermediate confirmation if the client has requested subsequent quantitative analysis of the same drug. Millennium should be prepared to defend the medical necessity of its confirmation testing by referring to industry standards, including Section XXXXXX of the Federal Register which support the inherent practices of the above-described protocol.

Protocol II, on the other hand, provides only the results requested and presumably necessary for treatment of the patient as determined by the ordering physician. However, if the physician orders quantitative confirmation of both positive and negative results, the same caution as stated above would apply since a payer could say that the initial screen is not necessary if all drugs are to be determined quantitatively regardless of the results of the initial EIA determination.

Millennium could substantially reduce the risk of a payer determining its confirmation testing represents repetitive and medically unnecessary services if the laboratory

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

implements the revised testing protocol described above. Millennium should follow-through with its January 1, 2011, proposal to no longer use a qualitative (immunoassay) method to confirm positive test results resulting from point of care testing and offers, for all testing, a single quantification test via LC-MS/MS method without a qualitative (immunoassay) initial screen. Pursuant to Millennium's proposal, Millennium would 1) only be confirming the positive POC test results once quantitatively using LC-MS/MS and 2) offer a single quantification test via LC-MS/MS for drugs not tested at POC. The proposed testing protocol represents a significantly reduced risk that any component of Millennium's services is medically unnecessary.

**Third Party Billing Company:** Presently, Millennium contracts with a third party, Rand Medical Billing, to perform all its billing and claims submittal functions. Unfortunately, the arrangement between Millennium and Rand prohibits Millennium from adequately performing several key aspects of its compliance program, most notably post-payment review, analysis of denials, and the ability to appeal adverse claims decisions. Despite Millennium's repeated and persistent inquiries concerning these activities, Millennium has had difficulty gathering adequate information to participate in these post payment functions.

**Recommendations/Changes:** Based on the shortcomings described above, as well as the growing size of Millennium's clinical laboratory operations, Millennium should strongly consider bringing its billing and claims submittal functions in-house. Most clinical laboratories outsource their billing functions when the organization is first established, however bring these functions in-house once the provider organization reaches a certain size. In addition to the compliance issues described below, clinical labs usually internalize these functions because billing for laboratory services is often not a focus or core strength of third party billing companies. Billing companies typically are much more familiar with the claims submittal processes of physician practices, and less familiar with the technical nature and complex billing rules associated with laboratory services.

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

As described earlier, a critical component of an effective compliance program is the laboratory's policies and procedures concerning post payment review. Millennium should continually monitor how both federally funded and private health plans process claims submitted by the laboratory. In addition, Millennium should vigorously appeal any denials that Millennium feels are in error or unjustified. By performing comprehensive and diligent post payment review, Millennium should be able to identify any billing or claims submittal problems early before they become significant liabilities.

**Direct Billing Program:** Presently, Millennium "direct bills" both federally funded and private payers for all tests and services performed by its laboratory. In other words, Millennium submits claims directly to the appropriate payer and never to the referring provider. In recent months, a limited number of hospital clients have asked Millennium to enter into "client bill" arrangements whereby Millennium would bill the hospital clients, and the hospital clients would in turn bill the appropriate payers. Millennium would like to accommodate these hospital clients, however management is concerned whether the proposed arrangements would comply with the applicable Medicare provisions that govern such payment arrangements.

**Recommendations/Changes:** When contemplating new payment arrangements, providers of Medicare services must consider Medicare's prohibition of reassignment. The prohibition dictates that only the provider that actually performs the Medicare covered test or service should bill the Medicare program for reimbursement. The prohibition, however, includes many exceptions that apply to providers of laboratory and pathology services.

One such exception is the "shell lab rule" which allows laboratories to bill Medicare for tests sent to outside laboratories if any of the following are true:

- The referring laboratory is located in, or is part of a rural hospital.
- Both the referring laboratory and the accepting laboratory are owned by the same entity.
- The referring lab performs at least 70% of its testing on site as opposed to sending the

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Draft Annual Compliance Audit Report

test or procedure to an outside laboratory.[13]

The above exception applies to both independent laboratories and hospital laboratories, however it does not allow physician office laboratories to bill Medicare for referred testing.[14] As such the shell lab rule would allow Millennium to client bill hospital customers, and the hospital customers to bill Medicare for Millennium's testing, as long as the hospital customers perform at least 70% of their testing on-site.

Another wrinkle to Medicare's prohibition of reassignment is the direct billing provisions that apply to hospital outpatients. The Medicare Claims Processing Manual states the following:

"When the hospital obtains laboratory tests for outpatients under arrangements with clinical laboratories or other hospital laboratories, only the hospital can bill for the arranged services.[15]"

The above manual provision requires Millennium's hospital customers to bill Medicare for referred testing performed for outpatients. Medicare defines outpatients as patients that are discharged before the end of the day and are seen/treated by hospital employees. Essentially, Millennium should already be client billing its hospital clients for testing performed for outpatients.

The outpatient rules, described above, do not apply to hospital nonpatients. Nonpatients are those patients that do not directly interact with hospital employees, such as those patients whose specimens are collected in a physician office and then sent to the hospital laboratory for testing. When hospitals perform testing for nonpatients, and the hospital is able to comply with the shell lab exception, the hospital has the option of billing Medicare directly, or allowing the outside laboratory to bill Medicare.

---

[13] Medicare Claims Processing Manual, Chapter 16, §40.1
[14] Id.
[15] Medicare Claims Processing Manual, Chapter 16, §40.3

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

In summary, Millennium should already be client-billing hospitals for testing performed for outpatients. Millennium may also client-bill hospitals for testing performed for nonpatients as long as the hospital is able to comply with the requirements of the shell lab exception to Medicare's direct billing rules.

Confidential                                                                    ML_DE_00499779

Draft Annual Compliance Audit Report

## IV. Marketing/Business Relations Review

**Introduction:** The majority of this section discusses arrangements that Millennium has created with its referring providers/customers, and whether those arrangements implicate federal fraud and abuse provisions. Millennium must be careful not to run afoul of either the Federal Anti-Kickback Statute[16] ("the Anti-Kickback Law"), or the Stark Self-Referral Prohibitions[17] ("the Stark Law").

Federal anti-kickback provisions prohibit anyone from either paying or being paid any form of remuneration in exchange for the referral of patients covered by federally funded health care programs, such as Medicare and Medicaid.[18] The broad language used in the legislation potentially implicates a wide array of relationships between providers of medical services and their referring customers. Violation of the Anti-Kickback Law constitutes a felony criminal offense. Sanctions, which apply equally to both parties, include imprisonment of up to five years, criminal fines up to $25,000, civil money penalties of $50,000 for each act, and exclusion from participation in the Medicare and Medicaid programs.

Federal cases interpreting the Anti-Kickback Law have broadly construed application of the statute. Even if only one purpose of the remuneration is to induce referrals of tests and services paid for by federally funded health care programs, the arrangement could implicate federal anti-kickback provisions.[19] Due to the broad application of the law, the OIG developed safe harbors that protect various financial arrangements between Medicare providers and their referral sources.[20] If an arrangement fulfills the numerous and strict requirements of a particular safe harbor, the arrangement is protected from prosecution.

---

[16] 42 U.S.C. § 1320a-7b
[17] 42 U.S.C. § 1395nn
[18] 42 U.S.C. § 1320a-7b
[19] United States v. Kats, 871 F. 2d 105 (9th Cir 1989)
[20] 42 CFR §1001.952

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

It is important to note that failure to comply with a safe harbor does not necessarily mean the arrangement is a violation of the Anti-Kickback Law. For this reason, if an arrangement does not fall squarely within the confines of a particular safe harbor, the parties to the arrangement should strive to model the arrangement as closely as possible to the applicable safe harbor.

The Stark Law provides that if a physician, or an immediate family member of a physician, has a financial relationship with an entity that provides certain designated health services, which include laboratory services, the physician may not refer a Medicare or Medicaid patient to the entity unless a specific exception to the self-referral provisions exists.[21] Sanctions for violation of the Stark Law, which apply to both the referring physician and the entity providing designated health services, include civil money penalties equal to $15,000 for each item billed as a result of a prohibited referral, assessments equal to three times the amount claimed, and exclusion from participation in the Medicare and Medicaid program.

**The Sale of Point of Care Testing Supplies**: The following arrangements were discussed in the previous compliance audit report, but are examined again this year for two reasons; one, Millennium continues to sell point of care supplies to some of its clients; and two, as will be described later in this report, Millennium now provides  specimen collection cups to some of its clients free of charge, under a written agreement which prohibits the client from billing using this collection device.

As mentioned in the introduction of this report, Millennium's primary business is the quantitative testing of drugs used in the treatment of chronic pain. Millennium's laboratory uses High Resolution Liquid Chromatography/Mass Spectrometry/Mass Spectrometry (LC/MS/MS) methods to determine the precise levels of drugs in a patient's urine. Many of Millennium's customers prefer to perform and bill for qualitative point-of-care (POC) drug screening tests in their practices utilizing in-office, CLIA waived

---

[21] 42 U.S.C. § 1395nn

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

devices. To assist Millennium in receiving a consistent POC test information which corresponds with its test requisition form as well as to ensure the integrity of the specimen (i.e. specimen leakage), Millennium sells POC supplies to some of its customers. Millennium charges these customers an amount equivalent to fair market value in exchange for the POC supplies. The POC supplies are CLIA waived procedures that perform multiple qualitative screenings for particular drugs. The POC supplies sold by Millennium are readily available from many other sources including manufacturers and distributors.

**Recommendations/Changes:** The key determination in whether Millennium's sale of POC supplies complies with anti-kickback provisions is whether the POC supplies represent improper remuneration. As long as Millennium charges its customers fair market value for these supplies, the practice should not implicate the Anti-Kickback Law. Millennium's customers can easily obtain the POC supplies from many other suppliers including distributors or direct from manufacturers. If Millennium's charges for the POC supplies are at fair market value and comparable to amounts charged by other manufacturers and suppliers, there is little risk that Millennium's sale of the POC supplies will be considered illegal remuneration.

In 2003, the OIG published a Special Advisory Bulletin concerning contractual joint ventures.[22] In that bulletin, the OIG warned of the compliance risks associated with questionable joint ventures in which the manager/supplier (in this case, the laboratory) allows the owner (in this case, the physician practice) to share in the revenue of tests and services normally performed by the manager/supplier.[23] The OIG fears that the manager/supplier may provide illegal remuneration to the owner in the form of an opportunity to share in the revenue of tests and procedures not normally available to the owner. The OIG states:

---

[22] 2003 OIG Special Advisory Bulletin "Contractual Joint Ventures"
[23] Id.

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

"By agreeing effectively to provide services it could otherwise provide in its own right for less than the available reimbursement, the Manager/Supplier is providing the Owner with the opportunity to generate a fee and a profit.[24]"

Millennium's arrangements with its customers differ from the "joint ventures" contemplated by the OIG in two ways:

1.  Millennium does not perform qualitative drug screens using readily available and simple to use POC devices.  This type of testing is not part of Millennium's primary business model. Millennium is a fully licensed and accredited laboratory, which uses LC/MS/MS methods to provide quantitative confirmatory results of patient's drug levels.

2.  Millennium is not providing an opportunity to its customers, who bill for the qualitative drug screens, by providing the POC supplies, which is not already widely available to most physician practices. As previously stated, the CLIA-waived tests sold by Millennium are readily available for purchase from numerous other manufactures and distributors at prices comparable to those charged by Millennium.

The above stated differences between Millennium's arrangements and those described by the OIG significantly limit the risk that either Millennium or its customers will face liability for Anti-Kickback Law violations.

The safe harbor that most closely resembles Millennium's arrangement is the Equipment Rental Safe Harbor.[25]  That safe harbor includes numerous requirements, however, the most important factor to consider is the requirement that compensation for the equipment, (i.e. the POC supplies) is consistent with fair market value and is not determined in a manner that takes into account the volume or value of actual or anticipated referrals. By charging an amount for POC supplies that is comparable to other readily available

---

[24] Id.

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

ML_DE_00499783

Draft Annual Compliance Audit Report

sources, Millennium should easily satisfy the fair market value requirement. In addition, Millennium must not vary its charges based upon actual or anticipated referrals of testing from the physician customers.

If Millennium structures its POC supplies arrangements so that they fulfill as closely as possible the requirements of the above Safe Harbor, Millennium should further reduce its exposure to the risk of Anti-Kickback Law liability.

In order to comply with the Stark Law, Millennium has structured its POC supplies arrangements so that they also fulfill the requirements of the applicable Stark exception. The Fair Market Value Compensation exception[26] requires the following:

1. The arrangement is in writing, signed by the parties, and covers only identifiable items or services, all of which are specified in the agreement.
2. The writing specifies the timeframe for the arrangement, which can be for any period of time and contain a termination clause.
3. The compensation must be set in advance, consistent with fair market value, and not determined in a manner that takes into account the volume or value of referrals or other business generated by the referring physician.
4. The arrangement is commercially reasonable (taking into account the nature and scope of the transaction) and furthers the legitimate business purposes of the parties.
5. The arrangement does not violate the anti-kickback statute, or any federal or state law or regulation governing billing or claims submission.
6. The services to be performed under the arrangement do not involve the counseling or promotion of a business arrangement or other activity that violates a federal or state law.

---

[25] 42 CFR §1001.952(c)
[26] 42 CFR 411.357(l)

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Confidential

The requirements of the above Stark exception mirror many of the requirements of the Equipment Rental Safe Harbor discussed earlier. Once again, the most important consideration is that compensation is equivalent to fair market value and not dependent upon the volume or value of actual or anticipated referrals. Millennium should have little difficulty complying with the above requirements.

Finally, Millennium should draft and adopt compliance policy that governs the creation and maintenance of POC supplies arrangements with ordering clients.

**Provision of Point of Care Testing Supplies:** In addition to selling POC supplies to some of its clients, Millennium now also provides specimen collection cups to some of its clients free of charge, under a written agreement which prohibits the client from billing using this device.. In the latter arrangements, these specimen collection cups, which contain drug testing strips, are provided free of charge, as long as the customer signs an agreement stating that the practice will not bill Medicare, or any other payer, for POC testing performed with the specimen collection cups..

Millennium structured these provisions to include an agreement barring the customer from billing for POC testing in order to lessen potential liability pursuant to the Anti-Kickback Law and the Stark Law.  Prior to initiating this arrangement, Millennium's outside healthcare counsel Hogan Lovells US LLP, opined that the provision of the POC supplies free of charge does not implicate either the Anti-Kickback Law or the Stark Law as long as the receiving practices agree not to bill any payers for the POC testing.[27]

However, it is the opinion of this auditor that prohibiting the practices from billing any payer for testing performed with the POC supplies does not completely remove the risk of Anti-Kickback Law liability. While it is true that Millennium's prohibition of billing for POC testing significantly reduces the value of the collection cups, it does not entirely eliminate the remuneration received by Millennium's customers in these arrangements.

Confidential

Draft Annual Compliance Audit Report

The practices receiving these supplies are still able to conduct an initial qualitative drug screen using the collection cup  and as such could represent a risk of violating federal anti-kickback provisions.

The Stark regulations, expressly state the following will not be considered remuneration,

"The furnishing of items, devices, or supplies (not including surgical items, devices, or supplies) that are used solely to collect, transport, process, or store specimens for the entity furnishing the items, devices, or supplies or are used solely to order or communicate the results of tests or procedures for the entity.[28]"

In addition, in 2001, CMS stated the following in the introductory comments to the Stark regulations,

"Rather we believe that the Congress intended to include in this section items, supplies, and devices of low value, such as single use needles, vials, and specimen cups, that are primarily provided by laboratories to physicians to ensure proper collection of specimens for processing at the laboratory and that have little, if any, independent economic value to the physicians who receive them.[29]

As stated before, the test strips possess value to the practices that receive them because these practices can receive a preliminary qualitative drug screen.. Millennium's Supplies Contract Letter Agreement even states, "our specimen cups provide certain preliminary information that you may find useful to the management of your patients.[30]"

---

[27] Letter from Ronald L. Wisor Jr. of Hogan Lovells US LLP, dated October 6, 2010, is attached to this report as Appendix L.
[28] 42 CFR §411.351
[29] 66 Fed. Reg. at 947; January 4, 2001.
[30] Millennium's Supplies Contract Letter Agreement is attached to this report as Appendix M

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

If the testing strips represent remuneration, the only way Millennium can provide them to referring clients without implicating the Stark Law is to structure the arrangements so that they fulfill the requirements of an applicable Stark Law exception. All applicable exceptions require that Millennium charge the client fair market value for the testing strips. If Millennium does not charge fair market value for the testing strips, Millennium will be unable to comply with requirements of any Stark exception. Please remember that if the arrangement does not fulfill all the requirements of an applicable exception, the arrangement is a violation of the self-referral prohibitions.

In summary, Millennium should reconsider offering its clients collection cups free of charge. Also, Millennium should develop strict compliance policy that governs how the organization may distribute POC supplies to referring customers. That policy should require that Millennium always charges fair market value for these supplies.

**New Client Registration:** Millennium has developed a standardized process to register new clients. Every time Millennium establishes a new arrangement with an ordering customer, a member of Millennium's Sales Support Team follows a strict protocol to create the new account and allow the new customer to seamlessly begin ordering tests from Millennium. The protocol includes a checklist to ensure all necessary functions are performed.[31] In addition to collecting essential information for test ordering, billing, and communications purposes, the protocol also requires Millennium personnel to perform the following tasks:

- Screen the new client using the OIG database of excluded individuals;
- Test the new client's fax numbers and email addresses;
- Follow all protocols for the establishment of custom panels including crucial disclosure of panel compositions; and

---

[31] Millennium's New Client Registration and Test Protocol Checklist is attached to this report as Appendix N

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

- Ensure the client possesses a CLIA license if the client will be purchasing POC supplies.

**Recommendations/Changes:** None. The robust and standardized client registration program established by Millennium serves a number of valuable compliance related functions including:

- Ensuring Millennium does not create financial arrangements with individuals or groups that are ineligible to participate in federally funded health care programs. If Millennium did create such arrangements it could be liable for significant civil monetary penalties.
- Protecting the private health information of patients in compliance with HIPAA. Testing fax numbers and email addresses reduces the chances of inadvertent disclosures.
- Ensuring clients do not order medically unnecessary testing as result of not knowing or understanding the component tests included in custom panels. Appropriate custom panel notices reduce the likelihood of violations of the Civil False Claims Act by either Millennium or its customers.
- Helping clients to avoid violating CLIA provisions by ensuring these clients are properly licensed before performing POC testing.

For the above stated reasons, Millennium should continue to devote the necessary time and resources necessary to effectively perform the client registration process.

**Physician Speaker Program:** In order to educate potential customers, Millennium contracts with knowledgeable physician speakers to present scientific, clinical and related professional information at local and regional meetings, local and/or regional symposia, and national meetings.  The speakers' topics include pain management, patient care, good clinical practice, substance abuse, government regulations, and when appropriate, the clinical efficacy and other aspects of Millennium's testing and services.

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Draft Annual Compliance Audit Report

Millennium uses a standardized agreement to memorialize and govern arrangements with physician speakers.[32] Physician speakers may or may not refer testing to Millennium for the care of beneficiaries of federally funded health care programs.

**Recommendations/Changes:** The following recommendations were also included in last year's compliance audit report. The recommendations are repeated, because while Millennium appears to effectively manage the physician speaker program so that it complies with the Anti-Kickback and Stark Laws, Millennium has yet to draft and implement corresponding compliance policy formalizing the safeguards its has created. Because at least some of the physician speakers may also be referral sources for Millennium, Millennium must take care to structure the arrangements so that they do not implicate the Anti-Kickback Law. To protect itself from such liability, Millennium has structured these arrangements so that they comply with the Personal Services and Management Contracts Safe Harbor.[33] That safe harbor requires the following:

- The personal services or management contract must be in writing and signed by the parties.
- The contract must specify the services to be provided.
- The term of the written contract must be for at least one year.
- Compensation for the services must be set in advance.
- Compensation for the services must be consistent with fair market value.
- Compensation for the services must not depend on the value or volume of Medicare or Medicaid referrals made between the parties.
- The arrangement must not involve the counseling or promotion of any activity that is a violation of state or federal law.

---

[32] Millennium's standardized Speaker Engagement agreement is attached to this report as Appendix O
[33] 42 CFR §1001.952(d)

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

- The agreement does not require either party to provide or accept more services than are reasonable for the legitimate business purpose of the arrangement.[34]

Review of Millennium's standard agreement indicates that Millennium's speaker engagements do achieve safe harbor protection as long as the compensation paid to the referral sources is equivalent to fair market value. While I agree with Millennium that the compensation enumerated in the standardized agreement appears to be equivalent to fair market value, I do not hold myself out as an expert in such valuations. In addition, Millennium must remember that fair market value determinations are open to interpretation, and while I believe its assessments are reasonable, an investigator or regulator might draw different conclusions.

Millennium should draft and implement compliance policy to govern creating and maintaining arrangements with physician speakers. The compliance policy should include provisions concerning the following:

- Consistent use of the standardized agreement;
- A minimum number of attendees at each speaking event to ensure legitimate marketing and educational value;
- Millennium's Chief Compliance Officer or other qualified member of Millennium management should personally review, and at his/her discretion approve or disapprove, each and every request for a new arrangement;
- How physician speakers are selected and retained;
- How fair market value compensation is determined.

**Test Drive Program:** In order to allow prospective customers to assess the clinical efficacy and other advantages of Millennium's testing services versus other laboratories, Millennium created the Test Drive Program. Through this program, Millennium provides collection cups and all related test requisition forms and supplies, to the prospective client

---

[34] Id.

Confidential Attorney-Client Privileged Communication – Attorney Work Product         [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

which enables the practice to send ten specimens to Millennium for testing. The POC collection cups include testing strips that allow the prospective client to also perform preliminary qualitative drug screens at POC. Millennium then performs its testing on the specimens, reports the results to the practice, and finally a Sales Representative performs follow-up in an effort to convert the practice to a Millennium customer. Millennium <u>does not</u> charge any practice participating in the Test Drive Program either for the POC supplies or the testing performed by Millennium. Additionally Millennium does not bill Medicare or other third party payers for testes it conducts pursuant to the Test Drive Program and further, Millennium prohibits the participating practice from billing any payer or patient for tests or services performed pursuant to the Test Drive Program.

Greg, is there a provision for "nominal value" (< $ 50 I believe)

**Recommendations/Changes:** Many laboratories provide limited numbers of free tests to prospective clients so that they may assess the value of the lab's services. Other laboratories refer to this type of marketing as comparison testing, validation testing, or other similar terms. As long as the number of tests is limited to a reasonable number needed to achieve the desired comparison, this marketing program should comply with the Anti-Kickback Law and the Stark Law.

However, such programs must be closely monitored to ensure the provision of free testing is truly for marketing and evaluation purposes, and not inappropriate remuneration resulting in potential liability pursuant to applicable fraud and abuse provisions. Examples of practices that will implicate the Anti-Kickback Law and the Stark Law, include:

- Providing more free testing than is necessary to reasonably evaluate the lab's tests and services;
- Providing free testing to employees of the prospective practice, or members of the referring physicians' families; and

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

- Offering free testing even after the prospective client has become an ordering customer of the laboratory.
- Allowing the participating practice to bill any payer or patient for tests or services performed pursuant to the Test Drive Program.

As long as Millennium's Test Drive Program is limited to appropriate amounts of comparison testing, the marketing program should not represent an unreasonable amount of risk. To ensure Millennium's program does not create an unreasonable risk of liability pursuant to the applicable fraud and abuse provisions, Millennium should:

- Create safeguards that ensure only reasonable amounts of free testing are provided commensurate with the evaluation purposes of the marketing program; and
- Draft and implement compliance policy that governs the Test Drive Program to ensure adequate monitoring and control.
- Continue to prohibit participating practices from billing any payer or patient for tests or services performed pursuant to the Test Drive Program.

However, as explained earlier, provision of collection cups which include test strips free of charge does possess inherent risks of violating both the Anti-Kickback Law and the Stark Law.   Millennium's outside healthcare counsel Hogan Lovells US LLP, opined that Millennium's Test Drive Program does not implicate either the Anti-Kickback Law or the Stark Law.

As stated earlier in this report, Millennium should strongly reconsider any marketing and/or financial arrangements with prospective and/or existing clients that result in the provision of free POC testing supplies.**Millennium Trial Evaluation Program**

**Lab Assistant Program:** Millennium has developed a marketing program that involves the placement of Lab Assistants in the practices of ordering physicians. Lab Assistants collect and ship specimens, check and order supplies, gather insurance information, and

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

retrieve test results when necessary. Lab Assistants are Millennium employees and the practices where these employees reside do not compensate Millennium for Lab Assistant services. Due to state regulatory constraints, Millennium does not place Lab Assistants in the following states, California, Florida, New York, and Pennsylvania.

**Changes/Recommendations:** The OIG has repeatedly warned, through guidance and fraud alerts, that the placement of laboratory employees, onsite at referring physician practices, represents a substantial risk of violating federal anti-kickback and self-referral provisions.[35] The OIG's primary concern is that the placement of a laboratory employee in a physician practice will represent illegal remuneration to the practice if the laboratory employee performs any services that defray the expenses of the referring practice. A 1994 OIG Fraud Alert states the following:

"While the mere placement of a laboratory employee in the physician's office would not necessarily serve as an inducement prohibited by the anti-kickback statute, the statute is implicated when the phlebotomist performs additional tasks that are normally the responsibility of the physician's office staff. These tasks can include taking vital signs or other nursing functions, testing for the physician's office laboratory, or performing clerical services.[36]"

Millennium must implement numerous safeguards to ensure the placement of Lab Assistants does not run afoul of federal fraud and abuse provisions. Specifically, the safeguards must ensure that the Lab Assistants will not perform any services while at physician practices that represent illegal remuneration to the referring practices. These controls or safeguards will require significant time and resources commitments from both Millennium and its referral sources. At a minimum, Millennium should implement the following safeguards:

---

[35] OIG Special Fraud Alert (December 19, 1994)
[36] Id.

Confidential Attorney-Client Privileged Communication – Attorney Work Product          [ PAGE ]

Draft Annual Compliance Audit Report

- Any physician practice, where a Lab Assistant is placed, must sign a Letter of Agreement that governs the relationship between Millennium and the physician practice.
- Lab Assistants are permitted to only perform services directly related to collecting, processing, handling, and shipping of specimens sent to Millennium for testing. Lab Assistants may not, under any circumstances, perform services that are the responsibility of employees, contractors, and/or members of the physician practice.
- Millennium should require each Lab Assistant to sign an agreement stating exactly the services the Lab Assistant is permitted to perform while on-site at a physician practice. In addition, the agreement should strictly stipulate the limitations of the Lab Assistant's placement and prohibit the Lab Assistant from performing any services that are the responsibility of employees, contractors, and/or members of the physician practice.
- If a Lab Assistant performs services other those described above, Millennium will immediately terminate the employment of the Lab Assistant.
- If a physician practice requests a Lab Assistant to perform services other those described above, Millennium will immediately remove the Lab Assistant from the practice.

Even if Millennium is willing to commit the time and resources to effectively managing the above-described arrangements, the placement of laboratory employees in referring practices still represents a significant degree of inherent risk. Because the OIG has specifically identified similar arrangements in fraud alerts and guidance, Millennium should know the OIG is aware of the practice and concerned about the associated compliance implications.

Also, be aware that not only Millennium, but also the practices where the Lab Assistants reside, may be exposed to liability. If the OIG, or any other regulator or inspector, determines that the placement of Lab Assistants represents prohibited remuneration pursuant to either anti-kickback or self-referral provisions, both parties to the arrangement could be liable for significant administrative, civil, and/or criminal sanctions. Millennium

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

must remember that both the Anti-Kickback Law and the Stark Law apply equally to the entity providing the remuneration and the referral source.

Millennium should not, under any circumstances, place Lab Assistants in practices located in states, which have enacted legislation and regulations that prohibit laboratories from placing employees on-site at referring practices. Before placing Lab Assistants in other states, Millennium should research the legislation and accompanying regulations of each state to ensure the placement will not violate state provisions and subject Millennium to significant liability.

Confidential Attorney-Client Privileged Communication – Attorney Work Product       [ PAGE ]

Confidential

ML_DE_00499795

Draft Annual Compliance Audit Report

## V. CPT Coding Review

Millennium provided an Excel file containing its chargemaster for review. Millennium's chargemaster lists all procedure codes it uses to report drug-testing procedures to Medicare, Medicaid, and private payers.[37]

All existing codes are accurate and appropriate, however, Medicare changes to coding for qualitative drug testing will require new codes for Millennium's qualitative drug panels starting January 1, 2011.

The following codes will apply to qualitative drug tests performed for Medicare/Medicaid beneficiaries, coding for quantitative drug tests will remain the same.

*G0434 Drug screen, other than chromatographic; any number of drug classes, by CLIA waived test or moderate complexity test, per patient encounter*

*G0431 Drug screen, qualitative; multiple drug classes by high complexity test method (e.g., immunoassay, enzyme assay), per patient encounter*

The above codes may be submitted only one time per patient encounter (i.e. specimen received). Thus, if not otherwise indicated in further guidance, G0431 or G0431 would be reported once for each of Millennium's qualitative (EIA) panels, based on either the CLIA classification of the test or the type of CLIA Certificate held by the laboratory. Additional guidance has been promised by CMS on these issues.

**Recommendations:** Continue to monitor Medicare Medlearn articles for promised guidance on use of new qualitative drug testing codes and implement changes as appropriate as of January 1, 2011.

---

[37] Millennium's Chargemaster is attached to this report as Appendix P

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Draft Annual Compliance Audit Report

## VI. Audit Recommendations Summary and Risk Rankings

Each and every audit recommendation included in this report is listed below. Each recommendation is accompanied by a brief description and ranked on a sliding scale from 1 – 4 based on how strongly CodeMap recommends implementing the change, as well as the degree of risk/liability Millennium may be exposed to if the change is not implemented. A ranking of 1 indicates that we strongly encourage Millennium to implement the recommendation, and that failure to do so will result in an unreasonable risk of civil, criminal, or administrative law liability or adversely affect the effectiveness of Millennium's compliance program. Conversely, a ranking of 4 indicates a recommendation of much lower priority and failure to implement will expose Millennium to a much lesser degree of liability.

| Recommendation | Ranking |
|---|---|
| Retain the Vice President of Sales on the Compliance Committee | 2 |
| Develop and administer advanced compliance training | 2 |
| Add the name and phone number of Millennium's CLIA clinical consultant to the Annual Physician Notice | 3 |
| Closely monitor any further inquiries from MAC concerning past claims | 2 |
| Carefully consider implications of confirmation testing protocols and consider proposal for January 1, 2011 implementation | 1 |
| Bring billing functions in-house, discontinue use of third party billing company | 2 |
| Charge fair market value for provision of POC supplies and ensure these arrangements achieve Safe Harbor Protection | 1 |
| Reconsider any arrangements whereby Millennium provides collection cups free of charge to its referring customers | 1 |
| Draft/adopt compliance policy that governs POC supplies arrangements | 2 |
| Draft/adopt compliance policy that governs physicians speaker arrangements | 2 |

Confidential Attorney-Client Privileged Communication – Attorney Work Product        [ PAGE ]

Confidential

Draft Annual Compliance Audit Report

| Recommendation | Ranking |
|---|---|
| Create safeguards that ensure only reasonable amounts of testing are provided pursuant to the Test Drive Program | 1 |
| Draft/adopt compliance policy that governs Test Drive Program | 2 |
| Create, and vigorously maintain and enforce recommended safeguards concerning the placement of Lab Assistants | 1 |
| Draft/adopt compliance policy that governs Lab Assistants | 2 |
| Closely monitor new CMS guidance concerning new drug screening codes | 1 |

Confidential Attorney-Client Privileged Communication – Attorney Work Product     [ PAGE ]

Confidential     ML_DE_00499798

Draft Annual Compliance Audit Report

# Supporting Materials

## Table of Contents

**Appendix A: Agreement to Perform Compliance Audit between Millennium, Inc. and CodeMap, LLC.**                                    **Tab A**

**Appendix B: Biographical Information Concerning Gregory B. Root, Esq., and Charles B. Root, Ph.D.**                               **Tab B**

**Appendix C: OIG's Compliance Program Guidance for Clinical Laboratories, August 1998**                                           **Tab C**

**Appendix D: Table of Contents of Millennium Laboratories' Medicare Compliance Policy Manual 2010**                               **Tab D**

**Appendix E: Millennium's Employee Code of Conduct**              **Tab E**

**Appendix F: Millennium's Employee Certification Form**           **Tab F**

**Appendix G: Millennium Compliance Policy: Disclosure Hotline**   **Tab G**

**Appendix H: Millennium Compliance Policy: Non-Employment of Sanctioned Individuals**                                             **Tab H**

**Appendix I: Millennium Compliance Policy: Screening of New Employees**   **Tab I**

**Appendix J: Millennium Compliance Policy: Post Payment Review**   **Tab J**

**Appendix K: Millennium's 2010 Annual Notice to Physicians**      **Tab K**

**Appendix L: Letter from Ronald L. Wisor Jr. of Hogan Lovells US LLP, dated October 6, 2010**                                     **Tab L**

**Appendix M: Letter from Ronald L. Wisor Jr. of Hogan Lovells US LLP, dated September 3, 2010**                                   **Tab M**

**Appendix N: Millennium's Supplies Contract Letter Agreement**    **Tab N**

**Appendix O: Millennium's New Client Registration and Test Protocol Checklist**                                                   **Tab O**

**Appendix P: Millennium's Standardized Speaker Engagement Agreement**   **Tab P**

Confidential Attorney-Client Privileged Communication – Attorney Work Product      [ PAGE ]

Draft Annual Compliance Audit Report

**Appendix Q: Millennium's Chargemaster**                                    **Tab Q**

Confidential                                                                    ML_DE_00499800

# EXHIBIT 10
# FILED UNDER SEAL

# EXHIBIT 11
# FILED UNDER SEAL

# EXHIBIT 12
# FILED UNDER SEAL

# EXHIBIT 13
# FILED UNDER SEAL

# EXHIBIT 14
# FILED UNDER SEAL

# EXHIBIT 15
# FILED UNDER SEAL

# EXHIBIT 16

# Drugs of Abuse Testing

## Noridian Healthcare Solutions, LLC



Please note: **This is a Draft policy.**
Proposed/Draft LCDs are works in progress that are available on the Medicare Coverage Database site for public review. Proposed/Draft LCDs are not necessarily a reflection of the current policies or practices of the contractor.

### Contractor Information

| | | |
|---|---|---|
| **Contractor Name** | ↑ | Noridian Healthcare Solutions, LLC |
| **Contract Number** | ↑ | 01112 |
| **Contract Type** | ↑ | MAC - Part B |
| **Associated Contract Numbers** | ↑ | (MAC - Part B - 01182) Noridian Healthcare Solutions, LLC, (MAC - Part B - 01212) Noridian Healthcare Solutions, LLC, (MAC - Part B - 01312) Noridian Healthcare Solutions, LLC |

### Proposed/Draft LCD Information

1

ML_DE_00035508

## Contractor Information

**Draft**

| | | |
|---|---|---|
| **Source LCD ID** | ↑ | N/A |
| **Proposed LCD ID** | ↑ | DL34692 |
| **Proposed LCD Version Number** | ↑ | 2 |
| **Proposed LCD Title** | ↑ | Drugs of Abuse Testing |
| **AMA CPT / ADA CDT Copyright Statement** | ↑ | CPT only copyright 2002-2013 American Medical Association. All rights reserved. CPT is a registered trademark of the American Medical Association. Applicable FARS/DFARS Apply to Government Use. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein. The Code on Dental Procedures and Nomenclature (Code) is published in Current Dental Terminology (CDT). Copyright (c) American Dental Association. All rights reserved. CDT and CDT-2010 are trademarks of the American Dental Association. |
| **CMS National Coverage Policy** | ↑ | Title XVIII of the Social Security Act, §1862(a)(1)(A). Allows coverage and payment for only those services that are considered to be reasonable and necessary.

Title XVIII of the Social Security Act, §1833(e). Prohibits Medicare payment for any claim which lacks the necessary information to process the claim.

42 CFR 410.32(a). Order diagnostic tests.

42 CFR 411.15(k)(1). Particular Services excluded from coverage.

CMS On-Line Manual, Publication 100-02, Medicare Benefit Policy Manual,Chapter 15, §§80.0, 80.1.1, 80.2. Clinical Laboratory services. |
| **Jurisdiction** | ↑ | |

## Coverage Guidance

2

Confidential

## Contractor Information

| Coverage Indications, Limitations and/or Medical Necessity |  This policy provides an overview of distinctions between qualitative, confirmation and quantitative drugs of abuse testing, and clearly indicates that coverage is dependent on proper documentation of clinical decision-making and test orders that are tailored to the individual patient's medical needs. This policy addresses drugs of abuse testing for Medicare patients. It does not address neonatal testing for suspected prenatal drug exposure. |
|---|---|

Drugs of Abuse testing may be useful in the clinical setting because it may provide objective information to assist the provider in diagnosing and making treatment decisions. Clinicians use qualitative and quantitative drugs of abuse testing to look for the presence (or absence) of drugs in the body. In general, drug testing can be helpful in the medical disciplines of emergency medical care for drug-drug interactions and, to some degree, drug overdose, the treatment of neonates, addiction medicine and the medical management of patients using chronic opioid therapy (COT). However, the nature of drugs of abuse testing for each of these groups is somewhat different because treatment goals and timelines generally vary.

By way of definition and as used in this document, the following terminology relates to the basic forms of drugs of abuse testing:

| Term | General Purpose in Clinical Drugs of Abuse Testing |
|---|---|
| Qualitative Drug Testing | Generally used to determine the presence or absence of drug or drug metabolite in the sample. The test result is expressed in non-numerical terms, with a negative or positive result. |
| Quantitative Drug Testing | Generally used when it is medically necessary to determine the specific quantity of drug or drug metabolite present in the sample. The test result is expressed in numerical terms. |
| Confirmation Testing | Generally used to evaluate initial qualitative screening results to minimize the potential of a clinician relying on a false negative or positive result. Confirmation testing is often recommended when initial screening involves a CLIA-waived or moderate immunoassay screening, but is not medically necessary in all patient cases. A confirmation test order must be medically necessary and reasonable and patient self-report may, in some cases, reduce the need for confirmation of screen results.<br><br>Confirmation tests may be expressed in qualitative (CPT 80102) or quantitative (codes within the Therapeutic or Chemistry sections of the CPT) values. |

3

ML_DE_00035510

## Contractor Information

> The use of qualitative versus quantitative confirmation testing depends upon the individual patient's case and medical necessity therefore.

More detailed information about medical necessity for test orders, indications and exclusions is set forth below:

**Specific Test Methods**

Clinical laboratories of all types use a variety of test methods to perform qualitative drug analysis, including enzyme immunoassays (EIA and IA), thin-layer chromatography, and spectrometry. In-office and onsite testing generally involves chemical "spot" tests, including dipstick, cassettes and cup methods (generally classified as CLIA-waived), and bench-top chemistry analyzers (classified under CLIA as moderately complex). In either case, EIA and IA drug screening are limited in several ways because:

- they generally screen for drug classes rather than specific drugs;

- they cannot provide information on many specialty drugs; and

- these methods may produce false positives and cross-react with other drug analytes.

These drug screen methods are also unable to identify specific drugs within many drug classes, including the amphetamines, barbiturates, benzodiazepines, and opiate/opioids. Due to these limitations, confirmatory testing with a more specific method such as GC-MS, LC-MS/MS may be medically necessary and reasonable within the confines of the clinical criteria and coverage indications set forth below. However, confirmatory testing should ONLY be ordered and performed on a patient/drug specific basis, within the parameters outlined in this policy, and documented in the patient record.

Confirmatory tests either verify or refute the result of the screening assay. With recent improvements in technology, some laboratories may bypass screening tests and submit all specimens for analysis by

4

Confidential

| Contractor Information | | |
|---|---|---|
| | | what have traditionally been referred to as confirmatory test methods, such as gas or liquid chromatography, mass spectrometry. Confirmatory tests use a more specific, and usually more sensitive, method than do screening tests and are usually performed in an independent laboratory.<br><br>Confirmatory tests usually:<br><br>• Provide quantitative concentrations (e.g., ng/mL) of specific substances or their metabolites in the specimen;<br><br>• Have high specificity and sensitivity;<br><br>• Require a trained technician to perform the test and interpret the results;<br><br>• Can identify specific drugs within drug classes<br><br>In clinical situations, confirmation is not always necessary and should be based on provider choice to allow for the proper evaluation of medical necessity. Clinical correlation is appropriate. For example, if the patient or a family member affirms that drug use occurred, a confirmation drug test is not usually needed.<br><br>The terms "drug screening" and "drug testing" are somewhat misleading because they may be interpreted that all drugs will be identified by ordered test panels. In reality, the drug or drug metabolites detected by a test depend on the testing method and the device or test method cutoff concentrations. In the clinical care of patients, the need for testing each drug ordered must be documented and the connection between the test order and clinical decision-making following test results must be reasonable and medically necessary to the ongoing care of the patient.<br><br>**Drug Test Panels**<br><br>A drug test panel is a list (or menu) of drugs or drug classes that can be tested for in a specimen. These can be ordered to identify drugs of abuse or in pain management. No single drug panel is suitable for all clinical uses, and test options should be adapted to clinical needs |

5

ML_DE_00035512

## Contractor Information

through proper exercise of clinical decision-making. Panels must be related to the individual patient's medical history and treatment needs. Existing test panels in POCT devices and as marketed by independent clinical laboratories may result in medically unnecessary and unreasonable testing and should be carefully evaluated by the ordering practitioner.

### Specimen Type

Urine may be the preferred biologic specimen for testing because of its ease of collection and storage, and cost-effectiveness. Urine is also believed to be the best source for broad qualitative drugs of abuse testing because blood is relatively insensitive for common drugs such as psychotropic agents, opioids, and stimulants. However, there may be clinical value in the limited use of other specimen types, such as saliva and serum, so long as clinical rationale therefore is clearly stated as described below. NOTE: Medicare excludes from coverage the testing of two different specimen types from the same patient on the same date of service.

### Drugs of Abuse – Commonly Assayed Drugs/Drug Classes

The chart below provides insight into the more common drugs of abuse. Not all drugs of abuse are listed. This policy makes clear that clinicians must have choice in selecting which drugs to test and when, and all testing should be tailored to the individual patient under consideration and involve other documented clinical criteria as set forth below for each specific group. Thus, sometimes testing will be more basic than others depending on the patient, the demographics of drugs abused in a particular geographic area, and the relationship of the drugs tested to the ongoing care of the patient, whether by treatment in an emergency department, neonate unit, substance abuse treatment facility or physician's office where patients are managed with chronic opioid therapy. Medicare expects provider orders to reflect careful consideration of the drugs/drug classes to be tested. Routine testing for all of the drugs/drug classes listed in the chart below is excluded and reimbursement may be denied.

Parent Drugs and Metabolite Chart (Basic Drugs of Abuse*)

| Drug Class/Drugs | Common Names | General Monitoring Possibilities Subject to Medical Necessity |
|---|---|---|
| **Alcohol/Alcohol Metabolites** Ethyl Alcohol EtG EtS | Ethyl Alcohol | Ethyl Alcohol* Ethyl Glucuronide Ethy Sulfate |

6

Confidential

ML_DE_00035513

## Contractor Information

| | | | |
|---|---|---|---|
| | **Barbiturates**<br>Amobarbital<br>Butabarbital<br>Butalbital<br>Pentobarbital<br>Phenobarbital<br>Secobarbital | Amytal Sodium®<br>Butisol Sodium®,<br>Butibel<br>Fiorinal®,<br>Fioricet®<br>Nembutal®<br>Belladona,<br>Luminal®<br>Seconal® | Amobarbital<br>Butabarbital<br>Butalbital<br>Pentobarbital<br>Phenobarbital<br>Secobarbital |
| | **Benzodiazepines**<br>Alprazolam<br><br>Chlordiazepoxide<br><br>Clonazepam<br><br>Clorazepate<br><br>Diazepam<br><br><br>Lorazepam<br>Oxazepam<br>Temazepam | Xanax®,<br>Niravam®,<br>Xanor<br>Librax®,<br>Libritabs<br><br>Klonopin®<br><br>Tranxene®<br><br>Valium®<br><br>Ativan®,<br>Lorax<br><br>A dumbran,<br>Alepam,<br>Murelax,<br>Serax,<br>Serepax<br>Restoril®,<br>Tenox,<br>Euhypnos | <br><br><br>Alprazolam, Alpha-hydroxyalprazolam<br><br>Nordiazepam, Oxazepam<br><br>7-Aminoclonazepam<br><br>Nordiazepam, Oxazepam<br><br>Diazepam, Nordiazepam, Temazepam, Oxazepam<br><br>Lorazepam<br>Oxazepam<br>Temazepam, Oxazepam |
| | **Illicit Drugs**<br>Cocaine<br>Heroin<br>Marijuana<br><br>MDA<br>MDMA<br><br><br>Methamphetamine | Blow, Coke,<br>Crack, Snow<br>Black Tar,<br>Brown Sugar,<br>Dragon, H,<br>Horse, Tar<br>Marinol, Pot,<br>Reefer, Weed<br>Ecstasy, X<br>Ecstasy, X | Benzoylecgonine<br>6-MAM, Morphine<br>THC-COOH<br><br>Methylenedioxyamphetamine<br>Methylenedioxymethamphetamine,<br>Methylenedioxyamphetamine<br><br>Methamphetamine, Amphetamine |

7

Confidential

## Contractor Information

| | | | |
|---|---|---|---|
| | Phencylclidine (PCP) | Crank, Crystal Meth, Didrex®, Eldepryl®, Ice<br><br>Angel Dust | Phencyclidine |
| | **Muscle Relaxants**<br>Carisoprodol<br>Meprobamate | Soma®, Soprodoal Equinal, Miltown®, Meprospan | Carisoprodol, Meprobamate<br>Meprobamate |
| | **Opiates**<br>Codeine<br>Hydrocodone<br><br>Hydromorphone<br><br>Morphine<br><br>Oxycodone<br><br><br>Oxymorphone | Tylenol® 3 Hycodan®, Lorcet®, Lortab®, Norco® Vicodin®, Vicoprofen®<br><br>Dilaudid®, Exalgo®, Hymorphan<br><br>Avinza®, Kadian®, MS Contin®, MSER, MSIR, Roxanol OxyContin®, OxyIR®, Percocet®, Percodan®, Roxicodone®, Tylox®<br><br>Numorphan®, Opana® ER, Opana® | Codeine, Morphine Hydrocodone, Hydromorphone, Norhydrocodone<br><br>Hydromorphone<br><br>Morphine<br><br>Oxycodone, Oxymorphone, Noroxycodone<br><br><br>Oxymorphone |
| | **Opioids**<br>Buprenorphine<br><br>Fentanyl | Buprenex®, Butrans®, Suboxone®, Subutex® Actiq®, Duragesic®, | Buprenorphine, Norbuprenorphine<br><br>Fentanyl, Norfentanyl<br><br>Meperidine, Normeperidine |

8

Confidential

## Contractor Information

| | | |
|---|---|---|
| Meperidine<br><br>Methadone<br><br>Propoxyphene<br><br>Tapentadol<br><br>Tramadol | Fentora®, Onsolis® Sublimaze<br><br>Demerol®, Mepergan®<br><br>Dolophine®, Methadose®<br><br>Darvocet®, Darvon®<br><br>Nucynta®<br><br>Ryzolt®, Ultracet®, Ultram®, Tramadol | Methadone, EDDP<br><br>Propoxyphene, Norpropoxyphene<br><br>Tapentadol, N-Desmethyltapentadol<br><br>Tramadol, O-Desmethyltramadol |
| **Stimulants**<br>Amphetamine<br><br>Methylphenidate<br>Nicotine | Adderall®, Benzedrine, Dexedrine®, Vyvanse® Concerta®, Focalin®, Methylin®, Ritalin® Nicoderm®, Nicorette® | Amphetamine<br><br>Methylphenidate, Ritalinic Acid<br>Cotinine |

**TABLE NOTES: 6-MAM**= 6-monoacetylmorphine; **EDDP**= 2-ethylidene-1,5-dimethyl-3,3-diphenylpyrrolidine; **EtG**=ethyl glucuronide; **EtS**= ethyl sulfate; **MDS**= methylenedioxyamphetamine; **MDMA**= methylenedioxymethamphetamine; **THC-COOH** = 11-nor-9-carboxy-delta-9-tetrahydrocannabinol

**Covered Indications**

Medicare has divided covered indications into the following four broad groups (A-C) and provides more detailed information on when qualitative drug testing is reasonable and medically necessary for each category:

**Group A – Symptomatic patients, multiple drug ingestion and/or unreliable history**

A qualitative drug screen is performed as part of the evaluation and treatment of a patient who presents (usually to an emergency

9

Confidential

| Contractor Information | | |
|---|---|---|
| | | department) with any one of the following: <br><br> • Unexplained coma <br><br> • Unexplained altered mental status in the absence of a clinically defined toxic syndrome or toxidrome <br><br> • Severe or unexplained cardiovascular instability (cardiotoxicity) <br><br> • Unexplained metabolic or respiratory acidosis in the absence of a clinically defined toxic syndrome or toxidrome <br><br> • Seizures with an undetermined history <br><br> • To provide antagonist to specific drug; <br><br> **Group B – Monitoring patient adherence and compliance during active treatment for substance abuse or dependence** <br><br> This section and description of clinical criteria relates only to laboratory testing used in the initial assessment and ongoing monitoring of drug and alcohol treatment compliance. The assessment of continued drug use should be based on treatment interactions, behavioral observations as well as mental status and history and physical evaluation. Confrontation of findings consistent with drug use in many cases results in self-disclosure of ongoing substance use. However, the validity of patient's self-reported substance use is not always reliable and may require testing verification. <br><br> Ambulatory laboratory testing for drugs of abuse is a medically necessary and useful component of chemical dependency treatment. Drug test results are of importance in treatment programs and in outpatient chemical dependency treatment. The drug screen result can influence treatment and level of care decisions. It is important that ordered tests match treatment needs, the documented history and |

10

Confidential

| Contractor Information | | |
|---|---|---|
| | | Diagnostic and Statistical Manual of Mental Disorders (DSM IV TR) or most current DSM diagnosis.

When using drug tests to screen a patient for substance use disorders, the practitioner should test for a broad range of commonly abused drugs. However, decisions about which substances to screen for should be well documented, and based on and tailored to:

- The patient, including his/her history, the results of any physical examination, and previous laboratory findings, if any;

- The substance suspected of being misused;

- Local information about substances commonly abused and misused, considering input from the Substance Abuse and Mental Health Services Administration's [SAMHSA's] Drug Abuse Warning Network compiles prevalence data on drug-related emergency department visits and deaths (available at http://www.samhsa.gov/data/DAWN.aspx) or similar information;

- The substances commonly abused/misused in the practitioner's patient population; and

- Substances that may present high risk for additive or synergistic interactions with prescribed medication (e.g., benzodiazepines, alcohol).

When making decisions about specific drug test panels and criteria therefore, it may be helpful to consult the forthcoming American Society of Addiction Medicine Clinical Guidelines, due out in late 2013 (www.asam.org) and the Federation of State Medical Boards' Model Policy for the Office Based Treatment of Opioid Addiction (www.fsmb.org). |
| | **Criteria for** | |

11

Confidential

ML_DE_00035518

## Contractor Information

| | | Testing | 1. The patient has been evaluated by a licensed clinician, who has documented appropriate symptomology to support the need for a test and the test panel ordered. |
| | | | 2. The tests ordered are within the scope of the ordering clinician's authority. |
| | | | 3. The rationale for the tests ordered is clearly documented and includes a statement of reasons for the drugs/drug classes to be screened with specific reference to any specialty tests ordered (those not available in CLIA-waived, moderate in-office immunoassay tests). |
| | | | 4. The test results are used in the management of the patient and documented in the treatment plan. |
| | | Qualitative Screening Indications | A new patient screening immunoassay with confirmation or quantitative testing typically involves the following drugs/drug classes: <br><br> • Alcohol <br><br> • Amphetamines/Methamphetamine/MDMA (AMP, MAMP, MDMA) <br><br> • Barbiturates (BAR) |

12

Confidential

## Contractor Information

- Benzodiazepines (BZO)

- Cannabinoids (THC)

- Cocaine (COC without BE or CE)

- Methadone (MTD)

- Opiates (OPI)

- Oxycodone (OXY)

Depending on the patient's specific history regarding substances abused, specialty screening or direct to chromatography quantitative analysis for expanded benzodiazepines and opioid panels to determine the specific drugs in the patient's system may be necessary. Coverage depends upon the proper documentation of this history and rationale for such test orders.

Additional discussion of Confirmation and Specialty testing is found below.

*Ongoing patient monitoring with a screening immunoassay without confirmation or quantitative testing is typically sufficient in this patient population.* Once again, specialty testing may be necessary but requires specific documentation of clinical rationale for the same and should be tied to appropriate symptomology.

1. Post initial facility admission screenings are

13

Confidential

## Contractor Information

|  |  |  | expected and may be approved at a frequency not to exceed three (3) every thirty (30) days. |
|  |  |  | 2. Screening at a frequency greater than three (3) times in thirty (30) days requires rationale documented in medical record and must meet medical necessity. Routine testing at the upper end of these limits may result in audit and overpayment demands, or other intervention as provided for by Medicare regulations. |
|  |  |  | 3. Onsite CLIA-waived testing is preferred as results can rapidly be integrated into treatment decisions and clinical assessment. |
|  |  | **Specimen Validity Testing** | Specimen validity testing is considered to be a quality control issue with urine drug testing only and should not be separately billed. Most basic urine immunoassays have specimen validity checks built into the screening process, and allow for a basic determination of potential urine sample tampering (dilution, substituted specimen, etc.). **Specimen validity testing is excluded from coverage.** |
|  |  | **Confirmation, Quantitative and Specialty Testing** | Most positive screening results are confirmed by the patient's self-disclosed admission of substance use.<br><br>All orders for confirmation testing (qualitative result, CPT 80102) require a positive screening test and shall be performed only for the drug class represented by the positive screening. Example: A patient is screened at admission and the sample is positive for cocaine; negative for all other drug classes. A proper confirmation order would be to confirm the cocaine only if the patient does not admit use of this drug.<br><br>All orders for quantitative testing of drugs of abuse require a positive screening test and shall be performed only for the drug class represented by the positive screening. |

14

Confidential

| Contractor Information | | | |
|---|---|---|---|
| | | | 1. Documentation of medical necessity for quantitative testing is required in the medical record.<br><br>2. Quantitative testing exceeding three (3) procedure codes or drug classes every thirty (30) days requires rationale documented in the medical record and must meet medical necessity. Once again, routine testing at the upper end of these limits may result in audit and/or overpayment demands, among other available regulatory action. |
| | | Exclusions | Any of the following is sufficient criteria for exclusion:<br><br>1. Confirmation or Quantitative testing is excluded from coverage if performed for forensic or legal purposes.<br><br>2. Qualitative and Quantitative testing of blood and urine, saliva and blood or urine, or any multiple source specimens on the same date of service is excluded.<br><br>3. Quantitative testing requires a positive screening test and shall be performed only for the drug class represented by the positive screening.<br><br>4. Quantitative testing for negative screening results is excluded without written documentation of medical necessity. |

15

Confidential

ML_DE_00035522

**Contractor Information**

**Group C - Chronic pain management drug testing for patients on chronic opioid therapy (COT).** AMP = Amphetamine; MAMP = Methamphetamine; MDMA = methylenedioxymethamphetamine

This section and description of clinical criteria relates only to laboratory testing used in the monitoring of patients on chronic (more than 90 consecutive days) opioid therapy. Testing for drugs of abuse and adherence to the treatment plan is a recognized as a "best-practices" component of proper pain management when chronic opioid therapy is involved. The table below provides basic information on the role of drug testing in the medical management of patients using COT. However, clinical guidelines and major pain regulatory policy is unsettled as to the frequency of testing and nature of drugs/drug classes to be tested. Therefore, provider decisions regarding drugs of abuse and adherence monitoring testing for patients on COT should be based on documented treatment interactions, behavioral observations as well as mental status and history and physical evaluation. Providers should also consider the relevance and value of discussing the findings of drug test results with the patient and whether and when the discussion and the patient's self-disclosures obviate the medical need for additional testing. While it is fair to say that the validity of patient's self-reported substance use is not always reliable and testing verification may be required, Medicare expects providers to carefully evaluate what they know about the patient in addition to the patient's self-disclosure when considering test orders. In the long run, well-documented patient evaluations and clinical judgment trumps non-legal recommendations for drug testing frequency.

**Role of Drug Testing in the Clinical Management of Patients on COT**

- May detect the absence of prescribed medication and potential for abuse, misuse, and diversion

- May detect the use of undisclosed substances, such as alcohol, unsanctioned prescription medication, or illicit substances

- May detect the use of substances that contribute to adverse events or drug-drug interactions

16

Confidential

## Contractor Information

- May provide objectivity to the treatment plan

- May reinforce therapeutic compliance with the patient

- May provide additional documentation demonstrating compliance with patient evaluation and monitoring

*In all cases, drug tests must be based on medical necessity and must be reasonable in the treatment of the patient based on their individual circumstances.*

**Additional Medical Necessity Guidance**

Clinical literature and State regulatory pain management policies are not uniform in the recommendations associated with drug testing. What can be gleaned from this literature is the trend toward the use of clinical drug testing of new patients (to assess the presence or absence of drugs in the patient system before initiating opioid therapy), as well as random follow-up testing used to monitor the patient's adherence to/compliance with the treatment plan. For these reasons, it is imperative that the ordering clinician must have freedom of choice in ordering laboratory tests and carefully assess an individual patient's situation and need for drug testing (drug classes and frequency of testing); this information must, according to this policy, be documented in the medical record so that medical necessity may be properly evaluated by the Medicare program. Appropriate documentation must follow current clinical guidelines and State pain regulations or policies governing the initial assessment of the patient and medical need for the use of controlled medications to treat pain, as well as a validated risk assessment process (interview or questionnaire), proper risk stratification, and patient monitoring, which should include use of prescription drug monitoring database information where available.

Prior to ordering a drug screen, the clinician should consider the following patient-specific elements:

- History

17

Confidential

## Contractor Information

- Current treatment plan and medication prescribed,

- Risk potential for abuse, misuse, and diversion, including a review of prescription drug monitoring data (if available) or pharmacy profile, and

- Use of a validated risk assessment interview or questionnaire tool, with appropriate risk stratification and monitoring protocols.

Prior to ordering a confirmation of drug screen results, the clinician should consider the following patient-specific elements:

- Whether the screen results show the presence or absence of an illicit drug. If the screen is positive for an illicit substance, then the clinician may consider ordering a qualitative confirmation (CPT 80102) prior to making a final treatment decision associated with the patient's ongoing treatment plan or termination of care, as appropriate to the individual patient circumstances. Of note here a quantitative test result may be necessary to support the patient's ongoing discontinuation of marijuana (THC) to support ongoing treatment with controlled substances. It is generally not appropriate to order confirmation testing of a drug screen result that is negative for an illicit substance. Any such orders must be accompanied by specific documentation of the clinician's rationale for ordering confirmation of negative drug screen results involving illicit substances (AMP, MAMP, COC, THC, PCP, MDMA etc.).

- Whether the screen results show the presence or absence of a prescribed drug class, in which case either result may warrant confirmation testing to identify the specific analyte causing the positive result or to ensure the specimen is truly negative given the differences in the cut-off values used for point of care screening and quantitative confirmation testing via chromatography.

18

Confidential

ML_DE_00035525

## Contractor Information

- Prior to ordering specialty testing for drugs/drug classes for which there presently is no commercially available qualitative screening assay, the clinician should consider patient-specific elements as cited above and throughout this policy document. Orders for drugs/drug classes lacking commercially available qualitative in-office/onsite screening assays should be carefully documented and supported by specific reference to the patient's history and other relevant factors, including whether (a) the patient is currently being prescribed the specific drug (or was recently converted to another drug from it), and/or (b) the clinician is in possession of information suggesting the potential for the abuse of a particular drug/drug class.

- In general, national pain organizations and the Federation of State Medical Boards recommend a practical approach to drug testing for patients in this group, and to not advocate a routine or wholesale approach to drugs of abuse testing. Further, these organizations tend to tie the frequency of testing beyond the baseline drug screen to individual patient medical needs and documented provider choice and discretion.

Additional clinical criteria, indications, special issues, and exclusions for the ordering of qualitative, confirmation, quantitative, and specialty testing for patients on COT are as follows:

| | |
|---|---|
| **Baseline Testing** | When appropriate, the patient should undergo a baseline drug test. Some state professional licensing boards require baseline drug testing and recommend that the baseline test include the following drugs/drug classes: AMP, BAR, BZO, COC, MAMP, MTD, OPI, OXY, and THC<br><br>Baseline testing should be used to: A. Identify the presence of illicit substances prior to initiating treatment involving controlled medications, and B. Confirm the presence or absence of the prescribed drug/drug class where possible and in accordance with the patient's documented treatment history. |
| **Periodic** | Monitoring of compliance is a critical aspect of |

19

ML_DE_00035526

## Contractor Information

| | | | Monitoring and Testing Frequency | chronic opioid prescribing, using such tools as random urine drug screening among others. The frequency of the testing should be based on medical necessity and a complete clinical assessment of the individual patient's risk potential for abuse and diversion using a validated risk assessment interview or questionnaire.<br><br>Periodic monitoring contemplates random drug testing. Periodic monitoring should be performed on a random basis, meaning drug testing should be ordered in a way that minimizes the patient's ability to prepare for the test.<br><br>The drugs/drug classes tested for in the monitoring phase of patient drug testing should be tailored to the individual patient and include those drugs that are prescribed and common drugs of abuse. If testing for other drugs/drug classes is ordered, the provider must document the clinical rationale for such test orders.<br><br>Periodic monitoring is used to address proper monitoring of the following risk potentials:<br><br>   o  Abuse and diversion of controlled medications<br><br>   o  Abuse of illicit drugs or drugs not prescribed as part of the treatment plan and obtained from an undisclosed/unsanctioned source.<br><br>The frequency of drug testing should be based in part on the validated risk assessment process and the potential that the patient will engage in medication-aberrant behavior (or illicit drug use behavior). Patients assessed at a higher risk for medication misuse and illicit drug use may require more frequent testing than those assessed at a lower risk for such behavior. *In* |

20

ML_DE_00035527

## Contractor Information

| | | | | |
|---|---|---|---|---|
| | | | | *the absence of specific symptoms of medication aberrant behavior or misuse, qualitative drug testing is only reasonable and necessary when titrated to patient risk potential.* |
| | | | **Targeted Testing** | Targeted and select testing of limited drugs of abuse may be medically necessary and reasonable in response to specific information related to the clinician regarding patient behavior; Clinical rationale for targeted testing must be clearly documented and may include suspicious behaviors, such as self-escalation of dose, doctor-shopping, indications/symptoms of illegal drug use, evidence of diversion, or other documented change in affect or behavioral pattern. |
| | | | **Confirmation and Quantitative Testing** | Medicare considers confirmatory and/or quantitative drug testing reasonable and necessary when the results of a qualitative screen are:<br><br>**Presumptive positive drug(s) on a drug screen**<br>**Example:** A patient has been prescribed oxycodone. The point-of-care drug screen is negative. Quantitative confirmation of the parent drug and metabolite(s) should be ordered. Significant lower levels of parent drug and metabolite(s) levels can be ascertained by quantitative testing compared to screening methodologies.<br><br>**Exception 1:** Medicare considers the need for cocaine confirmation to be rare but appropriate to identify the patient is a chronic cocaine user.<br><br>**Exception 2:** Medicare considers the need for THC confirmation to be rare but appropriate to document that the patient is discontinuing THC use according to the treatment plan.<br><br>**Presumptive positive for stimulant (amphetamine), barbiturate and benzodiazepine class of drugs.** |

21

Confidential

| Contractor Information | | | |
|---|---|---|---|
| | | | Point-of-care drug testing cannot differentiate all the drugs in the stimulant (amphetamine), barbiturate and benzodiazepine class of drugs. A positive qualitative screen may require confirmation in the absence of reliable validation (patient self-report, prescription drug monitoring data, pharmacy profile, communication from prescribing clinician).<br><br>**Negative screen, and the negative finding is inconsistent with the patient's medical history or current documented chronic pain medication list.**<br><br>**Example:** Drugs such as Fentanyl and Meperdine are not identified by point-of-care testing. It may be reasonable for the physician to order a separate initial drug test for one or both of these drugs and their metabolites at baseline or to address risk issues. These orders are subject to the criteria and indications in this document. Automatic confirmatory testing for Fentanyl and Meperdine are not reasonable and necessary without patient specific indications.<br><br>**Note:** When the initial screen is negative, Medicare would not expect to see claims for confirmatory testing on COC, THC, AMP and methamphetamine except in rare, documented situations, i.e. when a patient is receiving a prescription for AMP for attention deficit (ADD) or other documented medical condition. Exceptions should be documented with the physician's rational for the confirmation testing order in the medical record.<br><br>**When the coverage criteria of this policy are met AND there is no qualitative test available (locally or commercially).**<br><br>**Example:** Selected synthetic or semi-synthetic opioids. |
| | | **Specimen Validity** | Urine for clinical drug testing is the specimen of choice because of its high drug concentrations and well-established testing |

22

ML_DE_00035529

## Contractor Information

procedures. Nevertheless, urine is one of the easiest specimens to adulterate. Urine samples can be diluted, swapped for another individual's, or tampered with using commercially available (or homemade) products that change the chemical profile of the urine. If the clinician suspects that a sample has been adulterated, substituted, swapped, or otherwise altered in attempt to defeat evaluation and monitoring, the clinician may choose to evaluate specimen validity using built-in validity tests such as temperature, creatinine, and pH readings. However, as a general rule specimen validity testing is considered to be a quality control issue and should not be separately billed. Most basic urine immunoassays have specimen validity checks built into the screening process, and allow for a basic determination of potential urine sample tampering (dilution, substituted specimen, etc.).

In general, clinical laboratories do not conduct the same validity testing as is required for Federal workplace testing. Pain management laboratories may have specimen validity testing protocols that involve creatinine with reflexive specific gravity, pH, and/or oxidants in place. Once again, these are deemed quality control measures.

If the physician believes the patient has produced adulterated or substituted urine, and no alternative matrix sampling is available (ie., blood or saliva), the treating provider should consider witnessed urine collection.

Standardized Quality Control Measures in Urine
Characteristic/Property

- Temperature

Confidential

ML_DE_00035530

## Contractor Information

|  |  |
| --- | --- |
|  | o  pH<br><br>o  Creatinine<br><br>o  Specific Gravity<br><br>**Specimen validity testing is excluded from coverage.** |
| **Exclusions** | SEE BELOW UNDER NON-COVERED INDICATIONS. |

Sample Testing Frequency Based on Validated Risk Assessment and Stratification*

| Risk Group | Baseline | Risk Level | Target Testing |
| --- | --- | --- | --- |
| **Low Risk** | Prior to Initiation of COT | Randomly every six months to a year (depending on state licensing board requirements) for Rx Compliance and Commonly Abuse Illicit Drugs (AMP, COC, MAMP, THC) | On documented evidence or one or more of the behaviors listed for this category. |
| **Moderate Risk** | Prior to Initiation of COT | Randomly at least every 6 months (depending on state licensing board requirements) for Rx Compliance and Commonly Abused Illicit and Other Prescribed Drugs based on | On documented evidence of one or more of the behaviors listed for this category. |

24

Confidential

## Contractor Information

| | | | |
|---|---|---|---|
| | | the Individual Patient's Case | |
| **High Risk** | Prior to Initiation of COT | Randomly but not necessarily at each scheduled office visit and not necessarily the same drug panel for each testing event. | On documented evidence of one or more of the behaviors listed for this category. |

**Confirmatory and/or Quantitative Drug Testing Note: Limitations of Coverage:**

In all cases, drugs or drug classes for which testing is performed, should reflect only those likely to be present, based on the patient's medical history, current clinical presentation, and illicit drugs that are in common use. In other words, it is NOT medically necessary or reasonable to routinely test for substances (licit or illicit), which are not used in the patient treatment population or, in the instance of illicit drugs, in the community at large. The ordering/referring provider must issue a written order for all drugs to be tested.

Focused drug screens, most commonly for illicit drug use may be more useful for immediate or temporary clinical decision making to support continuation or discontinuation of a treatment plan. In addition routine confirmation (quantitative) of drug screens with negative results are not deemed medically necessary and are not covered by Medicare. Confirmatory testing is covered for a negative drug/drug class screen when the negative finding is inconsistent with the patient's medical history or current documented chronic pain medication list.

**Non-Covered**

Routine nonspecific or wholesale orders for drug screening (qualitative), confirmation, and quantitative drugs of abuse testing.

Test for the same drug(s) using a blood and a urine specimen at the same time on the same date of service.

Drug screening for medico-legal purposes (e.g., court-ordered drug screening) and for employment purposes (e.g., as a prerequisite for employment or as a requirement for continuation of employment)

Unvalidated specimen sources.

25

Confidential

## Contractor Information

Specimen Validity testing

**Documentation**

A signed and dated physician order for clinical drug screening and/or testing is a key element the medical record and the clinical decision-making based thereon. Documentation is important to the billing and claims for reimbursement of clinical laboratory services. Copies of the test results alone without a proper clinician order for the test are not sufficient documentation to support a claim for the testing services.

The physician order must specifically match the number, level, and complexity of the testing panel components performed. Orders for "custom profiles", "standing orders" or "orders to conduct additional testing as needed" are typically not sufficiently detailed and thus cannot be used to verify the medical necessity for the specific tests the ordering clinician intended to be performed.

From a post drug testing payment review prospective, an order from a non-qualified person (i.e. lab technician, front office personnel, sales rep), or one lacking the documentation required to verify that the billed tests were specifically ordered and medical necessary and reasonable may result in overpayment.

All documentation must be maintained in the patient's medical record and available to the contractor upon request. The following additional documentation requirements apply:

7. Every page of the record must be legible and include appropriate patient identification information (e.g., complete name, dates of service(s)). The record must include the identity of the physician or non-physician practitioner responsible for and providing the care of the patient

8. The submitted medical record should support the use of the selected ICD-9-CM/ICD-10-CM code(s). The submitted CPT/HCPCS code should accurately describe the service performed.

26

Confidential

| Contractor Information | | |
|---|---|---|
| | | 9. Medical record documentation (e.g., history and physical, progress notes) maintained by the ordering physician/treating physician must indicate the medical necessity for performing a qualitative drug test. |
| | | 10. The treating provider must reduce all testing orders to written form and must indicate all drugs/drug classes to be tested in the test order. |
| | |    • The treatment agreement (sometimes called a "contract") notifying the patient of his or her responsibility to provide urine/serum samples upon request is not sufficient by itself to support medical necessity. |
| | |    • The treating provider performing in-office/onsite POCT should use a CLIA-waived device or CLIA-approved test (FDA cleared/approved) containing specimen validity components to measure pH, specific gravity and temperature. Results of the drug test must be read according to the manufacturer's instructions. Specimen validity is not a covered service and should be used as a quality control measure to ensure a valid specimen. If the treating provider has a concern about the validity of the specimen, the provider should document these concerns and take steps to obtain a valid specimen for testing. Inability to obtain a valid specimen should be factored into the ongoing management of the patient. |
| | |    • Patient drug testing should be conducted and reviewed prior to the initial issuance or dispensing of a controlled substance prescription. |
| | | 11. Clinicians should exercise caution when relying on |

27

Confidential

ML_DE_00035534

## Contractor Information

customized test panels and standing orders and ensure that medical necessity exists for the testing of all drugs/drug classes within the panel. Failure to back up customized test panels with medical necessity information for each individual patient and for each of the drug test panels ordered will be considered "routine test orders" and are excluded from coverage, resulting in the denial of the claim, audit, and/or overpayment request, among other program means for enforcing this policy.

12. Multiple ICD-9/ICD-10 codes should be assigned according to the individual patient case and used to justify the ordered testing. If the provider of the service is other than the ordering/referring physician, that provider must maintain hard copy documentation of the lab results, along with copies of the ordering/referring physician's order for the drug test. The ordering/referring physician must include the clinical indication/medical necessity in the order for the drug test.

## Proposed/Draft Process Information

| | | |
|---|---|---|
| **Associated Information** |  | |
| **Sources of Information and Basis for Decision** |  | 1. Federation of State Medical Boards (FSMB), Model Policy for the Use of Opioid Analgesics for the Treatment of Chronic Pain, July 2013, available online at http://www.fsmb.org/pdf/pain_policy_july2013.pdf.<br><br>2. American Academy of Pain Medicine, Guideline Statement, Use of Opioids for the Treatment of Chronic Pain, March 2013, available online at http://www.painmed.org/files/use-of-opioids-for-the-treatment-of-chronic-pain.pdf.<br><br>3. US Food & Drug Administration, Goal of Labeling Changes: Better Prescribing, Safer Use of Opioids, Sept. 2013, available online at http://www.fda.gov/ForConsumers/ConsumerUpdates/ucm367660.htm.<br><br>4. University of Washington, Division of Pain Medicine, Urine Drug |

28

ML_DE_00035535

| Contractor Information | | |
| --- | --- | --- |
| | | Testing Interpretive Algorithm for Monitoring Opioid Treatment (adapted from the Washington Agency Medical Directors Group Opioid Treatment Guidelines 2010), available online at http://depts.washington.edu/anesth/education/forms/pain/UW-UDTinterpretationAlgorithm.pdf

5. SAMHSA, Clinical Drug Testing in Primary Care, Rockville, MD: SAMHSA; 2012. Technical Assistance Publication (TAP) 32, HHS publication (SMA) 12-4668, available online at http://store.samhsa.gov/product/TAP-32-Clinical-Drug-Testing-in-Primary-Care/SMA12-4668.

6. AMA Report 2 of the Council on Science and Public Health (I-08): Improving Medical Practice and Patient/Family Education to Reverse the Epidemic of Nonmedical Prescription Drug Use and Addiction. http://www.ama-assn.org/resources/doc/csaph/csaph2i08.pdf

7. Bolen J., Survey of Drug Testing Policy in the Management of Chronic Pain, forthcoming Q4, J. Opioid Management, 2013: _____ (in review).

8. Centers for Disease Control: Policy Impact: Prescription Painkiller Overdose Deaths. July 2013. Available online at http://www.cdc.gov/HomeandRecreationalSafety/pdf/PolicyImpact-PrescriptionPainkillerOD.pdf.

9. Centers for Disease Control and Prevention. Unintentional Drug Poisoning in the United States. July 2010. http://www.cdc.gov/HomeandRecreationalSafety/pdf/poison-issue-brief.pdf

10. Chou R, Fanciullo GJ. Opioid Treatment Guidelines; Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain. J Pain. 2009; 10(2): 113-130.

11. Department of Health and Human Services. Morbidity and Mortality Weekly Report. Overdose deaths involving prescription opioids among enrollees. Washington, 2004-2007. http://www/cdc/gov/mmwr.

12. Gourlay DL, Caplan YH. Urine Drug testing in Clinical Practice. http://www.familydocs.org/files/UDTMonograph_for_web.pdf.

13. Interagency Guideline on Opioid Dosing for Chronic Non-cancer Pain: An educational aid to improve care and safety with opioid therapy 2010 Update; http://www.agencymeddirectors.wa.gov/Files/OpioidGdline.pdf.

14. Institute for Clinical Systems Improvement (ICSI). Guideline for the assessment and management of chronic pain. November 2011. http://www.icsi.org/pain chronic |

29

Confidential

ML_DE_00035536

## Contractor Information

assessment_and_management_of_14399
/pain chronic assessment_and_management_of guideline_.html

15. Jackman RP, Purvis JM. Chronic Nonmalignant Pain in Primary Care. American Family Physician. 2008; 78(10):1155-1162.

16. Jamison RN, Ross EL, Michna E, Chen LQ, Holcomb C, Wasan AD. Substance misuse treatment for high-risk chronic pain patients on opioid therapy: a randomized trial. Pain. 2010; 150(3):390-400.

17. Jones T, McCoy D, Moore TM, Browder, JH, and Daffron S (2010). "Urine Drug Testing as an Evaluation of Risk Management Strategies," Practical Pain Management. Vol. 10, Issue 5, pages 26-30

18. Jones T, Moore T, et al. A comparison of various risk screening methods in predicting discharge from opioid treatment. Clin J Pain. 2012;28(2):93-100.

19. Jones T and Moore TM (2013) Preliminary Data on a New Risk Assessment Tool: The Brief Risk Interview. Journal of Opioid Management. Vol. 9, No 1, pages 19-27.

20. Jones T, Moore TM, Levy J, Browder JH, Daffron S, and Passik SD (2012). "A Comparison of Various Risk Screening Methods for Patients Receiving Opioids for Chronic Pain Management." Clinical Journal of Pain. Vol. 28, Issue 2, pages 93-100.

21. Jones T and Passik SD (2011). "A Comparison of Methods of Administering the Opioid Risk Tool." Journal of Opioid Management. Vol. 7, No 5, pages 347-352.

22. Mallya A., Purnell AL, Svrakic DM, et al. Witnesses versus unwitnessed random urine tests in the treatment of opioid dependence. Am J Addict. 2013; 22(2):175-177.

23. Melanson Stacy EF, Baskin LB. Interpretation and utility of drug of abuse immunoassays: lessons from laboratory drug testing surveys. Arch Pathol Lab Med. 2010;134:736-739.

24. Michna, E. et al. Urine toxicology screening among chronic pain patients of opioid therapy: frequency and predictability of abnormal findings. Clin J Pain 2007;23(2):173-179

25. Moore TM, Jones T, et al. A comparison of common screening methods for predicting aberrant drug-related behavior among patients receiving opioids for chronic pain management. Pain Med. 2009;10:1426-1433.

30

Confidential

## Contractor Information

26. Moore TM, Jones T, Browder JH, Daffron S, and Passik SD (2009). A Comparison of Common Screening Methods for Predicting Aberrant Drug-Related Behavior Among Patients Receiving Opioids of Chronic Pain Management. Pain Medicine. Vol. 10, Issue 8, pages 1426-1433.

27. Nafziger AN, Bertino JS. Utility and application of urine drug testing in chronic pain management with opioids. Clin J Pain 2009;25(1)73-79.

28. Nicholson B, Passik S. Management of chronic non-cancer pain in the primary care setting. SMJ 2007;100(10):1028-1034.

29. Passik S and Jones T (2013). "Risk Assessment 2.0." PainWeek Journal.
No. 1, Q 3, pages 5-9

30. Passik SD. Issues in long-term opioid therapy: unmet needs, risks, and solutions. Mayo Clinic Proceedings. 2009;84(7):593-601.

31. Passik SD, Kirsh KL, Casper D. Addiction-related assessment tools and pain management: instruments for screening, treatment planning and monitoring compliance. Pain Med 2008;9:S145-S166.

32. Reisfield GM, Wasan AD, Jamison RN. The prevalence and significance of cannabis uses in patients prescribed chronic opioid therapy: a review of the extant literature. Pain Med. 2009; 10(8):1434-1441.

33. Schneider J, Miller A. Urine drug tests in a private chronic pain practice. PPM. January/February 2008.
http://www.tuft.edu/data/41/528854.pdf.

34. Standridge JB, Adams SM. Urine drug screening: a valuable office procedure. American Family Physician. 2010;81(5):635-640.

35. Starrels JL, Becker WC, Alford DP, Kapoor A, Williams AR, Turner BJ. Systematic review: treatment agreements and urine drug testing to reduce opioid misuse in patients with chronic pain. Ann Intern Med. 2010; 152(11):712-720.

36. Trescot AM, Standiford H. Opioids in the management of chronic non-cancer pain: an update on American Society of the Interventional Pain Physicians' (ASIPP) guidelines. AFP 2008;11:S5-S61.

| Carrier Advisory Committee (CAC) Meetings |  | Meeting Date | Meeting Information |
|---|---|---|---|
| | | | |

Confidential

ML_DE_00035538

## Contractor Information

| Comment Period Start Date | ↑ | 01/07/2014 |
|---|---|---|
| Comment Period End Date | ↑ | 03/14/2014 |
| Released to Final LCD Date | ↑ | Not yet released. |
| Reason for Proposed LCD | ↑ | Provider Education/Guidance |
| Proposed LCD Contact | ↑ | General User<br>PLEASE SELECT A VALID CONTACT FOR YOUR DRAFT LCD, VA 00000<br>lmrp@nerdvana.fu.com |

## Coding Information

| Bill Type Codes | ↑ | |
|---|---|---|
| Revenue Codes | ↑ | |
| CPT/HCPCS Codes | ↑ | **Group 1: Paragraph**<br><br>**Group 1: Codes**<br>80102  DRUG CONFIRMATION, EACH PROCEDURE<br><br>80154  BENZODIAZEPINES<br><br>80299  QUANTITATION OF DRUG, NOT ELSEWHERE SPECIFIED<br><br>82055  ALCOHOL (ETHANOL); ANY SPECIMEN EXCEPT BREATH |

32

Confidential

## Contractor Information

| | | |
|---|---|---|
| | | 82145  AMPHETAMINE OR METHAMPHETAMINE |
| | | 82205  BARBITURATES, NOT ELSEWHERE SPECIFIED |
| | | 82520  COCAINE OR METABOLITE |
| | | 82542  COLUMN CHROMATOGRAPHY/MASS SPECTROMETRY (EG, GC/MS, OR HPLC/ MS), ANALYTE NOT ELSEWHERE SPECIFIED; QUANTITATIVE, SINGLE STATIONARY AND MOBILE PHASE |
| | | 82646  DIHYDROCODEINONE |
| | | 82649  DIHYDROMORPHINONE |
| | | 83840  METHADONE |
| | | 83925  OPIATE(S), DRUG AND METABOLITES, EACH PROCEDURE |
| | | 83992  PHENCYCLIDINE (PCP) |
| | | G0431  DRUG SCREEN, QUALITATIVE; MULTIPLE DRUG CLASSES BY HIGH COMPLEXITY TEST METHOD (E.G., IMMUNOASSAY, ENZYME ASSAY), PER PATIENT ENCOUNTER |
| | | G0434  DRUG SCREEN, OTHER THAN CHROMATOGRAPHIC; ANY NUMBER OF DRUG CLASSES, BY CLIA WAIVED TEST OR MODERATE COMPLEXITY TEST, PER PATIENT ENCOUNTER |
| | | **Group 2: Paragraph** <br> The following CPT codes are Non-Covered by Medicare |
| | | **Group 2: Codes** <br> 80100  DRUG SCREEN, QUALITATIVE; MULTIPLE DRUG CLASSES CHROMATOGRAPHIC METHOD, EACH PROCEDURE |
| | | 80101  DRUG SCREEN, QUALITATIVE; SINGLE DRUG CLASS METHOD (EG, IMMUNOASSAY, ENZYME ASSAY), EACH DRUG CLASS |
| **Does the CPT 30% Coding Rule Apply?** | ⬆ | No |
| **ICD-9 Codes that Support Medical Necessity** | ⬆ | **Group 1: Paragraph** <br><br> **Group 1: Codes** <br> 276.2        ACIDOSIS <br> 295.00 -   SIMPLE TYPE SCHIZOPHRENIA UNSPECIFIED STATE - |

33

Confidential

ML_DE_00035540

## Contractor Information

| | | |
|---|---|---|
| 295.30 | PARANOID TYPE SCHIZOPHRENIA UNSPECIFIED STATE |
| 304.01 | OPIOID TYPE DEPENDENCE CONTINUOUS USE |
| 304.90 | UNSPECIFIED DRUG DEPENDENCE UNSPECIFIED USE |
| 305.90 | OTHER MIXED OR UNSPECIFIED DRUG ABUSE UNSPECIFIED USE |
| 345.10 - 345.11 | GENERALIZED CONVULSIVE EPILEPSY WITHOUT INTRACTABLE EPILEPSY - GENERALIZED CONVULSIVE EPILEPSY WITH INTRACTABLE EPILEPSY |
| 345.3 | GRAND MAL STATUS EPILEPTIC |
| 345.90 - 345.91 | EPILEPSY UNSPECIFIED WITHOUT INTRACTABLE EPILEPSY - EPILEPSY UNSPECIFIED WITH INTRACTABLE EPILEPSY |
| 426.10 - 426.13 | ATRIOVENTRICULAR BLOCK UNSPECIFIED - OTHER SECOND DEGREE ATRIOVENTRICULAR BLOCK |
| 426.82 | LONG QT SYNDROME |
| 427.0 - 427.1 | PAROXYSMAL SUPRAVENTRICULAR TACHYCARDIA - PAROXYSMAL VENTRICULAR TACHYCARDIA |
| 780.01 | COMA |
| 780.09 | ALTERATION OF CONSCIOUSNESS OTHER |
| 780.1 | HALLUCINATIONS |
| 780.39 | OTHER CONVULSIONS |
| 963.0 | POISONING BY ANTIALLERGIC AND ANTIEMETIC DRUGS |
| 965.00 - 965.09 | POISONING BY OPIUM (ALKALOIDS) UNSPECIFIED - POISONING BY OTHER OPIATES AND RELATED NARCOTICS |
| 965.1 | POISONING BY SALICYLATES |
| 965.4 | POISONING BY AROMATIC ANALGESICS NOT ELSEWHERE CLASSIFIED |
| 965.5 | POISONING BY PYRAZOLE DERIVATIVES |
| 965.61 | POISONING BY PROPIONIC ACID DERIVATIVES |
| 966.1 | POISONING BY HYDANTOIN DERIVATIVES |
| 967.0 - 967.9 | POISONING BY BARBITURATES - POISONING BY UNSPECIFIED SEDATIVE OR HYPNOTIC |

34

Confidential

## Contractor Information

| | | |
|---|---|---|
| | 969.00 - 969.9 | POISONING BY ANTIDEPRESSANT, UNSPECIFIED - POISONING BY UNSPECIFIED PSYCHOTROPIC AGENT |
| | 972.1 | POISONING BY CARDIOTONIC GLYCOSIDES AND DRUGS OF SIMILAR ACTION |
| | 977.9 | POISONING BY UNSPECIFIED DRUG OR MEDICINAL SUBSTANCE |
| | V15.81 | PERSONAL HISTORY OF NONCOMPLIANCE WITH MEDICAL TREATMENT PRESENTING HAZARDS TO HEALTH |
| | V58.69 | LONG-TERM (CURRENT) USE OF OTHER MEDICATIONS |
| | V71.09* | OBSERVATION OF OTHER SUSPECTED MENTAL CONDITION |

**Group 1: Asterisk**
*For monitoring of patient compliance in a drug treatment program, use ICD-9-CM code V71.09 as the primary diagnosis and the specific drug dependence diagnosis as the secondary diagnosis. For the monitoring of patients on methadone maintenance and chronic pain patients with opioid dependence, suspected of abusing other illicit drugs, use code V58.69.

Physicians are to select the most appropriate diagnosis code. Labs are not to pre-populate requisition forms with diagnosis codes.

| | | |
|---|---|---|
| **ICD-9 Codes that DO NOT Support Medical Necessity** | ↑ | |

## Associated Documents

| | | |
|---|---|---|
| **Attachments** | ↑ | There are no attachments for this LCD |
| **Related Local Coverage Documents** | ↑ | This LCD version has no Related Local Coverage Documents. |
| **Related National Coverage Documents** | ↑ | This LCD version has no Related National Coverage Documents. |
| **All Versions** | ↑ | Version 2 - Updated on 12/12/2013 15:59:07 with effective dates N/A |

35

Confidential

ML_DE_00035542

| Contractor Information | | |
|---|---|---|
| | | - N/A.<br>Version 1 - Updated on 12/12/2013 15:56:33, by Roxanne Laughlin, with effective dates N/A - N/A. |

**THIS IS A PROPOSED/DRAFT LCD**

This website is an official service of the Centers for Medicare & Medicaid Services.

36

ML_DE_00035543

# EXHIBIT 17

Written comments and recommendations concerning the proposed information collection should be sent within 30 days of this notice to: Laura Oliven, Human Resources and Housing Branch, Office of Management and Budget, New Executive Office Building, Room 10235, Washington, D.C. 20503.

Dated: August 17, 1998.

**Jane Harrison,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 98–22575 Filed 8–21–98; 8:45 am]

BILLING CODE 4160–15–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Health Resources and Services Administration**

**Advisory Council; Notice of Meeting**

In accordance with section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463), announcement is made of the following National Advisory body scheduled to meet during the month of September 1998.

*Name:* National Advisory Council on the National Health Service Corps (NHSC).

*Date and Time:* September 9, 1998; 6:00 p.m.–9:00 p.m.; September 10–12, 1998; 9:00 a.m.–5:00 p.m.; September 13, 1998; 8:00 a.m.–11:00 a.m.

*Place:* Sheraton National Hotel, 900 South Orme Street, Arlington, VA 22204, (703) 521–1900.

The meeting is open to the public.

*Agenda:* Items will include, but not be limited to: In preparation for the year 2000 reauthorization the National Advisory Council has developed a draft position paper, "The National Health Service Corps for the 21st Century." Reactions, suggestions and criticisms to this paper will be heard from public and private partners and other interested organizations on September 10–12. Copies of the draft paper will be available at the meeting. Other agenda items include updates on the NHSC program.

For further information, call Ms. Eve Morrow at (301) 594–4144.

Agenda items are subject to change as priorities dictate.

Dated: August 17, 1998.

**Jane M. Harrison,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 98–22574 Filed 8–21–98; 8:45 am]

BILLING CODE 4160–15–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Health Resources and Services Administration**

**Advisory Council; Notice of Meeting**

In accordance with section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92–463), announcement is made of the following National Advisory body scheduled to meet during the month of September 1998.

*Name:* National Advisory Committee on Rural Health.

*Date and Time:* September 13, 1998; 5:00 p.m.–6:30 p.m.; September 14–15, 1998; 8:30 a.m.–5:00 p.m.; September 16, 1998; 8:30 p.m.–11:30 a.m.

*Place:* Holiday Inn, Georgetown, 2101 Wisconsin Avenue, Washington, DC 20007, Phone: (202) 338–4600, FAX: (202) 333–6113.

The meeting is open to the public.

*Agenda:* A special session will be conducted on Sunday, September 13, for orientation of new members who were just appointed. Monday will include a panel discussion of "Rural Researchers' Access to National Health Survey Data," a presentation and discussion of the new guidelines for designating HPSAs, and a report on "Critical Access Hospitals." Tuesday will include legislative, telehealth, and regulatory updates. A presentation and discussion on the "National Bipartisan Commission on the Future of Medicare" will be followed by a discussion of Department interests and priorities for FY 1999. Agenda items are subject to change as priorities dictate.

Anyone requiring information regarding the subject Committee should contact Ms. Arlene A. Granderson, Office, or Rural Health Policy, Health Resources and Services Administration, Room 9–05, Parklawn Building, Rockville, Maryland 20857; telephone (301) 443–0835, FAX (301) 443–2803. Persons interested in attending any portion of the meeting or having questions regarding the meeting should contact Ms. Arlene Granderson or Ms. Lilly Smetana, Office of Rural Health Policy, Health Resources and Services Administration, telephone (301) 443–0835.

Dated: August 17, 1998.

**Jane M. Harrison,**

*Director, Division of Policy Review and Coordination.*

[FR Doc. 98–22576 Filed 8–21–98; 8:45 am]

BILLING CODE 4160–15–P

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

**Office of Inspector General**

**Publication of OIG Compliance Program Guidance for Clinical Laboratories**

**AGENCY:** Office of Inspector General (OIG), HHS.

**ACTION:** Notice.

**SUMMARY:** This **Federal Register** notice sets forth the OIG's recently-issued Compliance Program Guidance for Clinical Laboratories. The OIG had previously developed and published a model compliance plan for the clinical laboratory industry on March 3, 1997. This Compliance Program Guidance for Clinical Laboratories is intended to be more consistent with compliance program guidances issued by the OIG with respect to the hospital industry and to home health agencies, and serves to clarify various aspects of the original model plan. As with previously-issued compliance program guidances, we believe that the development of this guidance for clinical laboratories will continue as a positive step towards promoting a higher level of ethical and lawful conduct throughout the entire health care community.

**FOR FURTHER INFORMATION CONTACT:** Christine Saxonis, Office of Counsel to the Inspector General, (202) 619–2078.

**SUPPLEMENTARY INFORMATION:** As part of a major initiative to engage the private health care community in combating fraud and abuse, the OIG developed and published in the **Federal Register** a model compliance plan for the clinical laboratories (62 FR 9435; March 3, 1997). The compliance plan was intended to provide clear guidance to that aspect of the clinical laboratory industry that was interested in reducing fraud and abuse within their organizations. Since that issuance, the OIG has developed and issued specific compliance program guidance for the hospital industry and for home health agencies.

This compliance program guidance is intended to refine and build on the original model guidance plan for clinical laboratories. In developing an effective compliance program, the OIG has identified 7 fundamental elements. They are:

∞ Implementing written policies, procedures and standards of conduct;

∞ Designing a compliance officer and compliance committee;

∞ Conducting effective training and education;

∞ Developing effective lines of communication;

∞ Enforcing standards through well-publicized disciplinary guidelines;

∞ Conducting internal monitoring and auditing; and

∞ Responding promptly to detected offenses and developing corrective action.

The development of this new Compliance Program Guidance for Clinical Laboratories has been enhanced

Confidential

based upon changes in Health Care Financing Administration (HCFA) policy, private industry's comments on the original model plan and additional comments submitted by HCFA and the Department of Justice.

While the key components of the original plan are still included, this Compliance Program Guidance sets forth a number of clarifying elements. Specifically, the compliance guidance:

∞ Focuses on the fact that while physicians can order any tests they believe are appropriate, Medicare will only pay for those tests which are covered, reasonable and necessary;

∞ Recognizes that individuals other than physicians may be authorized to order tests in some States;

∞ Recognizes additional claim information, such as requesting the diagnosis information contained in the medical record, can be obtained from an authorized person rather than directly from the physician;

∞ Notes that physicians are required to submit diagnostic information to the laboratory when ordering many— although not all—laboratory tests;

∞ Emphasizes the need for the tests performed in accordance with standing orders to be reasonable and necessary; and

∞ Clarifies laboratories should not charge physicians a price below fair market value for non-federal health program tests in order to include their Federal health care business.

In addition, while the original model laboratory compliance plan focused on the billing of automated multichannel chemistry tests, the American Medical Association has since deleted these codes from the 1998 CPT coding handbook, and HCFA no longer recognizes these as billable or reimbursable codes. As a result, physicians now must individually order tests that once compromised a chemistry profile. This guidance specifically reflects this policy change.

A reprint of the OIG's Compliance Program Guidance for Clinical Laboratories follows.

**OIG Compliance Program Guidance for Clinical Laboratories**

*Introduction*

The Office of Inspector General (OIG) of the Department of Health and Human Services (HHS) continues in its efforts to promote voluntarily developed and implemented compliance programs for the health care industry. The following compliance program guidance is intended to assist clinical laboratories in developing effective internal controls that promote adherence to applicable

Federal and State law, and the program requirements of Federal, State, and private health plans.[1] The adoption and implementation of voluntary compliance programs significantly advance the prevention of fraud, abuse, and waste in the clinical laboratory industry while at the same time further the fundamental mission of all health care providers, which is to provide quality services and care to patients.

Within this document, the OIG intends to provide first, its general views on the value and fundamental principles of clinical laboratory compliance programs, and second, specific elements that each clinical laboratory should consider when developing and implementing an effective compliance program. While this document presents basic procedural and structural guidance for designing a compliance program, it is not in itself a compliance program. Rather, it is a set of guidelines for consideration by a clinical laboratory interested in implementing a compliance program. The recommendations and guidelines provided in this document must be considered depending upon their applicability to each particular clinical laboratory.

Fundamentally, compliance efforts are designed to establish a culture within a clinical laboratory that promotes prevention, detection and resolution of instances of conduct that do not conform to Federal and State law, and Federal, State and private payor health care program requirements, as well as the clinical laboratory's ethical and business policies. In practice, the compliance program should effectively articulate and demonstrate the organization's commitment to the compliance process. The existence of benchmarks that demonstrate implementation and achievements are essential to any effective compliance program.

Eventually, a compliance program should become part of the fabric of routine clinical laboratory operations.

Specifically, compliance programs guide a clinical laboratory's governing body (e.g., Board of Directors), Chief Executive Officer (CEO), managers, technicians, billing personnel, and other employees in the efficient management and operation of a clinical laboratory. These employees are especially critical

[1] This guidance is a republication of the model clinical laboratory compliance plan issued by the OIG on February 27, 1997. This guidance has been amended to reflect HCFA policy changes and to be consistent with the OIG's Compliance Program Guidance for Hospitals. See 63 FR 8987 (February 23, 1998) and the OIG's web site at http://www.dhhs.gov/progorg/oig.

as an internal control in the reimbursement and payment areas, where claims and billing operations are often the source of fraud and abuse and, therefore, historically have been the focus of Government regulation, scrutiny and sanctions.

It is incumbent upon a clinical laboratory's corporate officers and managers to provide ethical leadership to the organization and to assure that adequate systems are in place to facilitate ethical and legal conduct. Indeed, many clinical laboratories and clinical laboratory organizations have adopted mission statements articulating their commitment to high ethical standards. A formal compliance program, as an additional element in this process, offers a clinical laboratory a further concrete method that may improve quality of services and reduce waste. Compliance programs also provide a central coordinating mechanism for furnishing and disseminating information and guidance on applicable statutes, regulations and other requirements of Federal, State and private health plans.

Adopting and implementing an effective compliance program requires a substantial commitment of time, energy and resources by senior management and the clinical laboratory's governing body.[2] Programs hastily constructed and implemented without appropriate ongoing monitoring will likely be ineffective. While it may require significant additional resources or reallocation of existing resources to implement an effective compliance program, the OIG believes that the long term benefits of implementing the program outweigh the costs.

*A. Benefits of a Compliance Program*

In addition to fulfilling its legal duty to ensure that it is not submitting false or incorrect claims to Government and private payors, a clinical laboratory may gain numerous additional benefits by implementing an effective compliance program. Such programs make good business sense in that they help a clinical laboratory fulfill its fundamental mission of providing quality services as well as assisting clinical laboratories in identifying weaknesses in internal systems and management. Other important potential benefits include the ability to:

[2] Indeed, recent case law suggests that the failure of a corporate Director to attempt in good faith to institute a compliance program in certain situations may be a breach of a Director's fiduciary obligation. See, e.g., *In re Caremark International Inc. Derivative Litigation,* 698 A.2d 959 (Ct. Chanc. Del. 1996).

Confidential

∞ Concretely demonstrate to employees and the community at large the clinical laboratory's strong commitment to honest and responsible corporate conduct;

∞ Provide a more accurate view of employee behavior relating to fraud and abuse;

∞ Identify and prevent criminal and unethical conduct;

∞ Improve the quality, efficiency and consistency of services;

∞ Create a centralized source for distributing information on health care statutes, regulations and other program directives related to fraud and abuse and related issues;

∞ Develop a methodology that encourages employees to report potential problems;

∞ Develop procedures that allow the prompt, thorough investigation of alleged misconduct by corporate officers, managers and other employees;

∞ Initiate immediate, appropriate, and decisive corrective action; and

∞ Through early detection and reporting, minimize the loss to the Government from false claims, and thereby reduce the clinical laboratory's exposure to civil damages and penalties, criminal sanctions, and administrative remedies, such as program exclusion.[3]

Overall, the OIG believes that an effective compliance program is a sound investment on the part of a clinical laboratory.

The OIG recognizes that the implementation of a compliance program may not entirely eliminate fraud, abuse and waste from the clinical laboratory system. However, a sincere effort by clinical laboratories to comply with applicable Federal and State standards, as well as the requirements of private health care programs, through the establishment of an effective compliance program, significantly reduces the risk of unlawful or improper conduct.

*B. Application of Compliance Program Guidance*

There is no single "best" clinical laboratory compliance program, given the diversity of laboratories within the industry. The OIG understands the variances and complexities within the clinical laboratory industry and is sensitive to the differences among large and small clinical laboratories. However, elements of this guidance can be used by all clinical laboratories, regardless of size, location or corporate structure, to establish an effective compliance program. We recognize that some clinical laboratories may not be able to adopt certain elements to the same comprehensive degree that others with more extensive resources may achieve. This guidance represents the OIG's suggestions on how a clinical laboratory can best establish internal controls and monitoring to correct and prevent fraudulent activities. By no means should the contents of this guidance be viewed as an exclusive discussion of the advisable elements of a compliance program.

In drafting this guidance, we took into consideration the Model Compliance Plan for Clinical Laboratories issued by the OIG in February 1997, the clinical laboratory industry's comments on that plan, changes in HCFA policy and the OIG's Compliance Program Guidance for Hospitals.

As appropriate, this guidance may be further modified and expanded as more information and knowledge is obtained by the OIG, and as changes in the rules, policies and procedures of the Federal, State and private health plans occur. We recognize that clinical laboratories are already accountable for complying with an extensive set of statutory and other legal requirements, far more specific and complex than what we have referenced in this document. We also recognize that the development and implementation of compliance programs in clinical laboratories often raise sensitive and complex legal and managerial issues.[4] However, the OIG wishes to offer what it believes is critical guidance for providers who are sincerely attempting to comply with the relevant health care statutes, regulations and other requirements of Federal, State and private health plans.

**Compliance Program Elements**

The elements proposed by these guidelines are similar to those of the compliance program guidance for hospitals that was published by the OIG in February 1998 and of our corporate integrity agreements.[5] The elements represent a guide—a process that can be used by clinical laboratories, whether an independent national laboratory, a hospital laboratory, or a small, regional laboratory. Moreover, the elements can be incorporated into the managerial structure of the clinical laboratory. As we stated in our compliance program guidance for hospitals, these suggested guidelines can be tailored to fit the needs and financial realities of a particular laboratory. The OIG is cognizant that with regard to compliance programs, one model is not suitable to every clinical laboratory. Nonetheless, the OIG believes that every clinical laboratory, regardless of size or structure, can benefit from the principles espoused in this guidance.

The OIG believes that every effective compliance program must begin with a formal commitment by the clinical laboratory's governing body to include *all* of the applicable elements listed below. These elements are based on the seven steps of the Federal Sentencing Guidelines.[6] We recognize that full implementation of all elements may not be immediately feasible for all clinical laboratories. However, as a first step, a good faith and meaningful commitment on the part of the clinical laboratory will substantially contribute to a program's successful implementation.

At a minimum, comprehensive compliance programs should include the following 7 elements:

(1) The development and distribution of written standards of conduct, as well as written policies and procedures that promote the clinical laboratory's commitment to compliance (e.g., by including adherence to compliance as an element in evaluating managers and employees) and that address specific areas of potential fraud, such as marketing schemes, CPT/HCPCs coding issues, improper ICD–9 coding, and improper claims submission;

(2) The designation of a chief compliance officer and other appropriate bodies (e.g., a corporate compliance committee) charged with the responsibility of operating and monitoring the compliance program, and who report directly to the CEO and the governing body;

(3) The development and implementation of regular, effective education and training programs for all affected employees;

(4) The maintenance of a process, such as a hotline, to receive complaints, and the adoption of procedures to protect the anonymity of complainants

---

[3] The OIG, for example, will consider the existence of an *effective* compliance program that pre-dated any governmental investigation when addressing the appropriateness of administrative penalties. Further, the False Claims Act, 31 U.S.C. 3729–3733, provides that a person who has violated the Act, but who voluntarily discloses the violation to the Government, in certain circumstances will be subject to not less than double, as opposed to treble, damages. See 31 U.S.C. 3729(a).

[4] Nothing stated herein should be substituted for, or used in lieu of, competent legal advice from counsel.

[5] Corporate integrity agreements are executed as part of a civil settlement agreement between the health care provider and the Government to resolve a case based on allegations of health care fraud or abuse. These OIG-imposed programs are in effect for a period of 3 to 5 years and require many of the elements included in this compliance program guidance.

[6] See United States Sentencing Commission Guidelines, *Guidelines Manual*, 8A1.2 comment. (n.3(k)).

Confidential

and to protect whistleblowers from retaliation;

(5) The development of a system to respond to allegations of improper/illegal activities and the enforcement of appropriate disciplinary action against employees who have violated internal compliance policies, applicable statutes, regulations or requirements of Federal, State or private health plans;

(6) The use of audits and/or other evaluation techniques to monitor compliance and assist in the reduction of identified problem areas; and

(7) The investigation and remediation of identified systemic problems and the development of policies addressing the non-employment or retention of sanctioned individuals.

*A. Written Procedures and Policies*

Laboratory compliance programs should require the development and distribution of written compliance policies. These policies should be developed under the supervision and direction of the chief compliance officer or the equivalent and should, at a minimum, be provided to all individuals who are affected by the specific policy at issue. One convenient method of achieving this goal is to create a three-ring compliance policy notebook. This format permits the filing of new and amended or revised compliance policies and ensures that affected individuals have easy access to the laboratory's written policies. A master index should show when policies are changed.

1. Standards of Conduct

Laboratories should develop standards of conduct for all employees that clearly delineate the policies of the laboratory with regard to fraud, waste and abuse and adherence to all statutes, regulations and other program requirements governing Federal, State and private health benefit plans. These standards should be made available to all employees; translated, interpreted (e.g., may be signed for hard of hearing or deaf employees) or put into Braille as necessary, and regularly updated as the policies and regulations are modified.

When an employee first begins working for the clinical laboratory, and each time new standards of conduct are issued, employees should be asked to sign a statement certifying that they have received, read, and understood the standards of conduct. All employee certifications should be retained by the laboratory.

2. Medical Necessity

Laboratory compliance programs, to be effective, should communicate to

physicians that claims submitted for services will only be paid if the service is covered, reasonable, and necessary for the beneficiary, given his or her clinical condition. Laboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable and necessary.[7] Upon request, a laboratory should be able to produce or obtain from the treating physician (test ordering), authorized person on the physician's staff or other individual authorized by law to order tests the documentation to support the medical necessity of the service the laboratory has provided and billed to a Federal or private health care program. We recognize that laboratories do not and cannot treat patients or make medical necessity determinations. However, there are steps that such facilities can take to assure compliance with the applicable statutes, regulations and the requirements of Federal, State and private health plans.

As a preliminary matter, the OIG recognizes that physicians or other authorized individuals must be able to order any tests that they believe are appropriate for the treatment of their patients. However, we believe that physicians must be made aware by the billing laboratory that Medicare will only pay for tests that meet the Medicare coverage criteria and are reasonable and necessary to treat or diagnose an individual patient. Section 1862(a)(1)(A) of the Social Security Act states, "no payment may be made under Part A or Part B for any expenses incurred for items or services which * * * are not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member." Therefore, Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient.

---

[7] In limited instances, HCFA does allow laboratories to submit claims when the lab believes the test may be denied. Such instances include, but are not limited to: when the beneficiary has signed an Advance Beneficiary Notice (ABN) (See *Medicare Carriers Manual* § 7300.5) (Part D in this section further addresses ABN issues) and when the beneficiary requests the provider submit the claim (See *Medicare Carriers Manual* § 3043). In the first instance the lab should include modifier GA on the claim which indicates the beneficiary has signed an ABN and in the latter instance the lab should note on the claim their belief that the service is noncovered and that it is being submitted at the beneficiary's insistence.

Laboratories can and should advise their clients that tests submitted for Medicare reimbursement must meet program requirements[8] or the claim may be denied.

Laboratories may implement the following steps through their compliance programs or some other appropriate mechanism to ensure that the claims they submit to Federal or private health care programs meet the appropriate program requirements:

*a. Requisition design:* While HCFA does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals. The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill. Laboratories should encourage physicians or other authorized individuals to submit diagnosis information for all tests ordered, as documentation of the medical necessity of the service. The form should contain a statement indicating that Medicare generally does not cover routine screening tests.

*b. Notices to physicians:* While HCFA does not impose educational requirements upon the laboratories, labs are in a unique position to educate their physician clients. Therefore, laboratories should provide all of their physician clients with annual written notices that set forth: (1) The Medicare national policy and Medicare contractor local medical review policy for lab tests; (2) that organ or disease related panels will only be paid and will only be billed when all components are medically necessary; and (3) the Medicare laboratory fee schedule and a statement informing the physician that the Medicaid reimbursement amount will be equal to or less than the amount of Medicare reimbursement. The notice must also provide the phone number of the clinical consultant. The clinical consultant is required under the Clinical Laboratory Improvement Amendment (CLIA) certification (42 CFR 493.1453).

In addition to the general notices above, laboratories that continue to offer clients the opportunity to request customized profiles should provide annual written notices that: (1) Explain the Medicare reimbursement paid for each component of each such profile; (2) inform physicians that using a

---

[8] See fn. 7.

Confidential

ML_DE_00083576

**45080**    **Federal Register**/Vol. 63, No. 163/Monday, August 24, 1998/Notices

customized profile may result in the ordering of tests which are not covered, reasonable or necessary and that tests will not be billed;[9] and (3) inform physicians that the OIG takes the position that an individual who knowingly causes a false claim to be submitted may be subject to sanctions or remedies available under civil, criminal and administrative law.

*c. Physician acknowledgments:* Although HCFA does not require physicians to sign acknowledgments, laboratories should have the physician sign an acknowledgment stating he or she understands the potential implications of ordering customized profiles.

*d. Use of Advance Beneficiary Notices:* Advance Beneficiary Notices (ABNs) are used when there is a likelihood that an ordered service will not be paid. Before the service is furnished, the beneficiary should be notified, in writing, of the likelihood that the specific service will be denied. After being so informed the beneficiary has the choice to either (1) decide to receive the service and sign the agreement to pay on the ABN or (2) decide not to receive the service and therefore does not sign the ABN. Beneficiaries should not be asked to sign blank ABNs.

As the entity furnishing and billing for services, it is ultimately the laboratory's responsibility to produce the ABN, upon request. In many cases, it is difficult for the laboratories to directly obtain an ABN from the beneficiary. Therefore, laboratories may wish to educate physicians on the appropriate use of ABNs.

The notice must be in writing, must clearly identify a particular service, must state that payment for the particular service likely will be denied and must give the reason(s) for the belief that payment is likely to be denied.

Routine notices to beneficiaries which do no more than state that denial of payment is possible or that they never know whether payment will be denied are not considered acceptable evidence of advance notice. Notices should not be given to beneficiaries unless there is some genuine doubt regarding the likelihood of payment as evidenced by the reasons stated on the ABN. Giving notice for all claims or services is not an acceptable practice.

*e. Test utilization monitoring:* The OIG believes that laboratories can and should take the steps described in this compliance guidance to help ensure appropriate billing of lab tests. We also believe that there are steps laboratories

can take to determine whether physicians or other individuals authorized to order tests are being encouraged to order medically unnecessary tests. More importantly, if the laboratory discovers that it has in some way contributed to the ordering of unnecessary tests, the OIG believes the laboratory has a duty to modify its practices, as well as notify the physician(s) or other authorized individual(s) of its concerns and recommend corrective action.

There are many methods by which a laboratory may determine excessive utilization of laboratory services. One approach to self-monitoring is to hire an outside consultant to analyze the laboratory's patterns of utilization, and investigate any potential problems or aberrancies.

Another approach is to analyze test utilization data by CPT or HCPCS code, for the top 30 tests performed each year. Laboratories could do this by keeping track of the number of tests performed by CPT or HCPCS code or of the number of claims submitted for each test. The laboratories would then compute the percentage growth in the number of tests or claims submitted for each of the top 30 tests from one year to the next. We believe that if a test's utilization grows more than 10 percent, the laboratory should undertake a reasonable inquiry to ascertain the cause of such growth. If the laboratory determines that the increase in test utilization occurred for a benign reason, such as the acquisition of a new laboratory facility, then the laboratory need not take any action. However, if the laboratory determines that the increase in utilization was caused by a misunderstanding or ignorance by the ordering physicians or other authorized individuals regarding the billing consequences of the tests they ordered or an action on the part of the facility, the laboratory should take any steps that it deems reasonably necessary to address the issue and to ensure misconduct is not occurring.

3. Billing

Laboratory compliance policies should ensure that all claims for testing services submitted to Medicare or other Federal health care programs correctly identify the services ordered by the physician or other authorized individual and performed by the laboratory.

*a. Selection of CPT or HCPCS Codes:* Laboratory compliance policies should ensure that the CPT or HCPCS code that is used to bill, accurately describes the service that was ordered and performed. Laboratories cannot alter the physician's

order in any way either increasing or decreasing the number of services performed without the express consent of the ordering physician or other authorized individual. To ensure code accuracy, laboratories should require that individuals with technical expertise in laboratory testing review the appropriateness of the codes before the claims are submitted. Intentional or knowing upcoding (i.e., the selection of a code to maximize reimbursement when such code is not the most appropriate descriptor of the service) could violate the False Claims Act and/ or other civil laws, and criminal law.

*b. Selection of ICD±9±CM codes:* Medicare carriers and fiscal intermediaries have the authority to develop and implement Local Medical Review Policy (LMRP) which specify when, and under what circumstances, a service will be considered covered, reasonable and necessary and what documentation will support the need for the service. In some cases, LMRPs may limit coverage for specified laboratory tests to specific medical diagnoses. Laboratory compliance policies should ensure that the lab can support tests billed to Medicare with documentation obtained from the physician ordering the test, an authorized person on the physician's staff or other individual authorized by law to order tests. Laboratories should not: (1) Use information provided by the physician or other authorized individual from earlier dates of service (other than standing orders, as discussed below at paragraph 4); (2) create diagnosis information that has triggered reimbursement in the past; (3) use computer programs that automatically insert diagnosis codes without receipt of diagnostic information from the ordering physician or other authorized individual; or (4) make up information for claim submission purposes. Laboratories should: (1) Contact the ordering physician, authorized person on the physician's staff or other individual authorized to order tests to obtain information in the event that such information was not provided; and (2) accurately translate narrative diagnoses obtained from the physician or other authorized individual to ICD– 9–CM codes. Where medical documentation is obtained from a physician or other authorized individual after receipt of the specimen and the requisition form, it should be maintained.

*c. Tests covered by claims for reimbursement:* Only those tests that are ordered by an authorized individual or physician, are performed and meet Medicare's conditions of coverage are

---

[9] See fn. 7.

Confidential

reimbursable by Medicare. If a laboratory receives a specimen without a valid test order or with a test order which is ambiguous, the laboratory must verify the tests which the physician wants and perform them before submitting a claim for reimbursement to Medicare. In this way, if the physician or other authorized individual did not order the test, the laboratory will not erroneously bill for it.

Similarly, if a laboratory did not perform an ordered test due to, for example, a laboratory accident or insufficient quantities of specimen, the laboratory should not submit a claim to Medicare. Medicare payment is made for tests that are ordered, performed, and covered. The submission of a claim for tests that were either not ordered or were not performed could subject a provider to sanctions under administrative, civil or criminal law.

d. Billing of calculations: Consistent with Medicare coverage rules, laboratory compliance policies should ensure that the laboratory does not bill both for calculations (e.g., calculated LDLs, T7s, and indices) and the tests that are performed to derive such calculations. In many situations, physicians are not offered a choice about whether to receive such calculations, nor are they aware of the practice of some laboratories to bill Medicare for such calculations in addition to the underlying tests. The fact that a separate CPT code exists does not mean that Medicare separately reimburses for the service assigned to the code. Billing both for the calculations and the underlying tests constitutes double billing, which may subject a laboratory to sanctions and other remedies available under civil, criminal, and administrative law.

e. Reflex testing: Reflex testing occurs when initial test results are positive or outside normal parameters and indicate that a second related test is medically appropriate. In order to avoid performing unnecessary reflex tests, labs may want to design their requisition form in such a way which would only allow for the reflex test when necessary. Therefore, the condition under which the reflex test will be performed should be clearly indicated on the requisition form. Laboratories may wish to adopt a similar policy for confirmation testing which may be mandatory.

4. Reliance on Standing Orders

Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves

are not usually acceptable documentation that tests are reasonable and necessary. Accordingly, the insurer may reject standing orders as evidence that a test is reasonable and necessary. Medicare contractors can and may require additional documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.

Thus, while laboratory compliance programs may permit the use of standing orders executed in connection with an extended course of treatment, the compliance program should require the laboratory to periodically monitor standing orders. Standing orders should have a fixed term of validity and must be renewed at their expiration. We suggest that, consistent with State law requirements, a laboratory should contact all nursing homes from which the laboratory has received such standing orders and request that they confirm in writing the validity of all current standing orders. In addition, in accordance with State law, laboratories should verify standing orders relied upon at draw stations with the physician, authorized person on the physician's staff, or other authorized individual who has provided the standing orders to the laboratory. With respect to patients with End Stage Renal Disease (ESRD), at least once annually laboratories should contact each ESRD facility or unit to request confirmation in writing of the continued validity of all existing standing orders.

5. Compliance With Applicable HHS Fraud Alerts

The OIG and HCFA periodically issue fraud alerts [10] setting forth activities believed to raise legal and enforcement issues. Laboratory compliance programs should require that any and all fraud alerts issued by OIG and HCFA are carefully considered by the legal staff, chief compliance officer, or other appropriate personnel. Moreover, the compliance programs should require that a laboratory cease and correct any conduct criticized in such a fraud alert, if applicable to laboratories, and take reasonable action to prevent such conduct from reoccurring in the future. If appropriate, a laboratory should take the steps described in Section G regarding investigations, reporting and correction of identified problems.

---

[10] Both OIG and HCFA fraud alerts can be located on the internet. The OIG web site address is: http://www.dhhs.gov/progorg/oig. The HCFA web site address is: http://www.hcfa.gov.

6. Marketing

Laboratory compliance programs should require honest, straightforward, fully informative and non-deceptive marketing. It is in the best interests of patients, physicians, laboratories, the Government and private health plans that physicians and other individuals authorized to order tests fully understand the services offered by the laboratory, the services that will be provided when tests are ordered, and the financial consequences for Medicare, as well as other payors, when tests are billed. Accordingly, laboratories that market their services should ensure that their marketing information is clear, correct, non-deceptive and fully informative.

7. Prices Charged to Physicians

Laboratories are paid for their services by a variety of payors in addition to Medicare and other Federal health care programs. Such payors often include private health insurers, other health care providers, and physicians. We believe it is essential that the physician take into account the patient's best interest when deciding where to refer the patient's specimen.

The prices that laboratories charge physicians for certain laboratory services raise issues that should be addressed in a laboratory's written compliance policies. These policies should ensure that laboratories are not providing any inducements to gain a physician's business,[11] including charging physicians a price below fair market value for their non-Federal health care program tests. Laboratories that charge physicians a price below fair market value to induce them to refer their Federal health care program business may be risking anti-kickback enforcement and false claims actions.

8. Retention of Records

Compliance programs should ensure that all records required either by Federal or State law or by the compliance program are created and maintained. Adequate documentation of compliance efforts are essential in the event that a laboratory comes under Government scrutiny.

9. Compliance as an Element of a Performance Plan

Clinical laboratories should make the promotion of and adherence to

---

[11] The OIG has published "Special Fraud Alert: Arrangements for the Provision of Clinical Lab Services" that addresses how the anti-kickback statute relates to arrangements for the provision of clinical lab services. See 59 FR 65377 (December 19, 1994); OIG's web site at http://www.dhhs.gov/progorg/oig.

Confidential

**45082**    **Federal Register**/Vol. 63, No. 163/Monday, August 24, 1998/Notices

compliance an element in evaluating the performance of managers, supervisors and all other employees. They, along with other employees, should be periodically trained in new compliance policies and procedures. In addition, all managers and supervisors involved in the sale, marketing, or billing of laboratory services, and those who oversee phlebotomists should (1) discuss with all supervised employees the compliance policies and legal requirements applicable to their function; (2) inform all supervised personnel that strict compliance with these policies and requirements is a condition of employment; and (3) disclose to all supervised personnel that the laboratory will take disciplinary action up to and including termination for violation of these policies or requirements. In addition to making performance of these duties an element in evaluations, the compliance officer or laboratory management may also choose to include in the laboratory's compliance program a policy that managers and supervisors may be sanctioned for failure to adequately instruct their subordinates or for failing to detect non-compliance with applicable policies and legal requirements, where reasonable diligence on the part of the manager or supervisor would have led to the discovery of any problems or violations and given the laboratory the opportunity to correct them earlier.

*B. Designation of a Compliance Officer and a Compliance Committee*

1. Compliance Officer

Every clinical laboratory should designate a compliance officer to serve as the focal point for compliance activities. This responsibility may be the individual's sole duty or added to other management responsibilities, depending upon the size and resources of the clinical laboratory and the complexity of the task. Designating a compliance officer with the appropriate authority is critical to the success of the program, necessitating the appointment of a high-level official in the organization with direct access to the governing body and the CEO.[12] The officer should have

---

[12] The OIG believes that it is not advisable for the compliance function to be subordinate to the clinical laboratory's general counsel, or comptroller or similar officer. Free standing compliance functions help to ensure independent and objective legal reviews and financial analyses of the institution's compliance efforts and activities. By separating the compliance function from the key management positions of general counsel or chief financial officer (where the size and structure of the clinical laboratory make this a feasible option), a system of checks and balances is established to

sufficient funding and staff to perform his or her responsibilities fully. Coordination and communication are the key functions of the compliance officer with regard to planning, implementing, and monitoring the compliance program.

The compliance officer's primary responsibilities should include:

∞ Overseeing and monitoring the implementation of the compliance program;[13]

∞ Reporting on a regular basis to the clinical laboratory's governing body, CEO and compliance committee on the progress of implementation, and assisting these components in establishing methods to improve the clinical laboratory's efficiency and quality of services, and to reduce the clinical laboratory's vulnerability to fraud, abuse and waste;

∞ Developing and distributing to all affected employees all written compliance policies and procedures. These policies and procedures should be readily understandable by all employees (e.g., translated into other languages, interpreted in sign language, and/or put into Braille as necessary);

∞ Periodically revising the program in light of changes in the needs of the organization, and in the law, policies and procedures of Government and private payor health plans;

∞ Developing, coordinating, and participating in a multifaceted educational and training program that focuses on the elements of the compliance program, and seeks to ensure that all appropriate employees and management are knowledgeable of, and comply with, pertinent Federal, State and private payor standards;

∞ Ensuring that physicians who order services from the clinical laboratory are informed of the clinical laboratory's compliance program standards with respect to coding, billing, and marketing, among other things;

∞ Assisting the clinical laboratory's financial management in coordinating internal compliance review and monitoring activities, including annual or periodic reviews of policies;

∞ Independently investigating and acting on matters related to compliance, including the flexibility to design and coordinate internal investigations (e.g., responding to reports of problems or suspected violations) and any resulting corrective action; and

---

more effectively achieve the goals of the compliance program.

[13] For clinical laboratory chains, the OIG encourages coordination with each affiliate owned by the company through the use of a headquarter's compliance officer, communicating with the designated compliance officers in each facility, or regional office, as appropriate.

∞ Developing policies and programs that encourage managers and employees to report suspected fraud and other improprieties without fear of retaliation.

The compliance officer must have the authority to review all documents and other information that are relevant to compliance activities, including, but not limited to, requisition forms, billing information, claim information, and records concerning the marketing efforts of the clinical laboratory and its arrangements with its clients. This policy enables the compliance officer to review contracts and obligations (seeking the advice of legal counsel, where appropriate) that may contain referral and payment issues that could violate the anti-kickback statute, as well as the physician self-referral prohibition and other legal or regulatory requirements.

2. Compliance Committee

The OIG recommends that a compliance committee be established to advise the compliance officer and assist in the implementation of the compliance program.[14] The committee's functions should include:

∞ Analyzing the organization's regulatory environment, the legal requirements with which it must comply, and specific risk areas;

∞ Assessing existing policies and procedures that address these areas for possible incorporation into the compliance program;

∞ Working within the clinical laboratory to develop standards of conduct and policies and procedures to promote compliance;

∞ Recommending and monitoring the development of internal systems and controls to implement the clinical laboratory's standards, policies and procedures as part of its daily operations;

∞ Determining the appropriate strategy/approach to promote compliance with the program and detection of any potential violations, such as through hotlines and other fraud reporting mechanisms; and

∞ Developing a system to solicit, evaluate and respond to complaints and problems.

The committee may also assume other functions as the compliance concept becomes part of the overall clinical laboratory operating structure and daily routine.

---

[14] The OIG recommends the compliance committee consist of individuals with varying perspectives and responsibilities in the organization.

Confidential

## C. Conducting Effective Training and Education

The proper education, training and retraining of corporate officers, managers, and all other employees are significant elements of an effective compliance program. As part of its compliance program, a clinical laboratory should require all affected employees to attend specific training when they are first hired and on a periodic basis thereafter, including appropriate training in Federal and State statutes, regulations, program requirements, the policies of private payors, and corporate ethics. The training should emphasize the organization's commitment to compliance with these legal requirements and policies.

These training programs should include sessions highlighting the organization's compliance program, summarizing fraud and abuse laws, and discussing coding requirements, claim development and claim submission process and marketing practices that reflect current legal and program standards. The clinical laboratory must take steps to communicate effectively its standards and procedures to all affected employees ( e.g., by requiring participation in training programs and disseminating publications that explain in a practical manner specific requirements).[15] Managers of specific departments can assist in identifying areas that require training and in carrying out such training. Training instructors may come from outside or inside the organization. New employees should be targeted for training early in their employment.[16] The compliance officer should document the attendees, the subjects covered, and the material distributed at the training sessions sponsored by the clinical laboratory as part of the compliance program.

A variety of teaching methods, such as interactive training, and training in several different languages, particularly where a clinical laboratory has a culturally diverse staff, should be implemented so that all affected employees are knowledgeable of the

[15] Some publications, such as the OIG's Special Fraud Alerts, audit and inspection reports, and advisory opinions are readily available from the OIG and could be the basis for standards and educational courses for appropriate clinical laboratory employees. These documents can be found on the OIG's web site at http://www.dhhs.gov/progorg/oig.

[16] Certain positions, such as those involving the coding of medical services, create a greater organizational legal exposure, and therefore require specialized training. One recommendation would be for a clinical laboratory to attempt to fill such positions with individuals who have the appropriate educational background and training.

clinical laboratory's standards of conduct and procedures for alerting senior management to problems and concerns. Targeted training should be provided to corporate officers, managers and other employees whose actions affect the accuracy of the claims submitted to Government and private payors, such as employees involved in the coding, billing, and marketing processes. For example, for certain employees involved in the billing and coding functions, periodic training in proper CPT/HCPCs and ICD–9 coding and documentation should be required. In addition to specific training in the areas identified in section II.A, above, basic training for appropriate corporate officers, managers and other employees should include such topics as:

∞ Government and private payor reimbursement principles;

∞ General prohibitions on paying or receiving remuneration to induce referrals;

∞ Proper translation of narrative diagnoses;

∞ Only billing for services ordered, performed and reported;

∞ Physician approved amendments to requisition forms;

∞ Proper documentation or confirmation of services rendered; and

∞ Duty to report misconduct.

Clarifying and emphasizing these areas of concern through training and educational programs are particularly relevant to a clinical laboratory's marketing representatives, in that the pressure to meet business goals may render these employees vulnerable to engaging in prohibited practices.

The OIG suggests that all affected employees be made part of the clinical laboratory's various educational and training programs. Employees should be required to have a minimum number of educational hours per year, as appropriate, as part of their employment responsibilities.[17] In departments with high employee turnover, periodic training updates are critical.

The OIG recommends that attendance and participation in training programs be made a condition of continued employment and that failure to comply with training requirements should result in disciplinary action, including possible termination, when such failure is serious. Adherence to the provisions of the compliance program, such as training requirements, should be a factor in the annual evaluation of each employee. The clinical laboratory

[17] In its corporate integrity agreements, the OIG usually requires a minimum number of hours annually for basic training in compliance areas. More hours are required for specialty fields such as billing and coding.

should retain adequate records of its training of employees, including attendance logs and material distributed at training sessions.

## D. Developing Effective Lines of Communications

### 1. Access to the Compliance Officer

An open line of communication between the compliance officer and clinical laboratory employees is equally important to the successful implementation of a compliance program and the reduction of any potential for fraud, abuse and waste. Written confidentiality and non-retaliation policies should be developed and distributed to all employees to encourage communication and the reporting of incidents of potential misconduct.[18] The compliance committee should also develop several independent reporting paths for an employee to report fraud, waste or abuse so that such reports cannot be diverted by supervisors or other personnel.

The OIG encourages the establishment of a procedure so that clinical laboratory employees may seek clarification from the compliance officer or members of the compliance committee in the event of any confusion or question with regard to a laboratory policy or procedure. Questions and responses should be documented and dated and, if appropriate, shared with other staff so that standards, policies and procedures can be updated and improved to reflect any necessary changes or clarifications. The compliance officer may want to solicit employee input in developing these communication and reporting systems.

### 2. Hotlines and Other Forms of Communication

The OIG encourages the use of hotlines (including anonymous hotlines), e-mails, written memoranda, newsletters, and other forms of information exchange to maintain these open lines of communication. If the clinical laboratory establishes a hotline, the telephone number should be made readily available to all employees possibly by conspicuously posting the telephone number in common work areas.[19] Employees should be permitted

[18] The OIG believes that whistleblowers should be protected against retaliation, a concept embodied in the provisions of the False Claims Act. In many cases, employees sue their employers under the False Claims Act's *qui tam* provisions out of frustration because of the company's failure to take action when a questionable, fraudulent or abusive situation was brought to the attention of senior corporate officials.

[19] Clinical laboratories should also post in a prominent, available area the HHS–OIG Hotline
                                                    Continued

Confidential                                                    ML_DE_00083580

to report matters on an anonymous basis. Matters reported through the hotline or other communication sources that suggest substantial violations of compliance policies, regulations, statutes or program requirements of Federal, State and private insurers should be documented and investigated promptly to determine their veracity. A log should be maintained by the compliance officer that records such calls, including the nature of any investigation and its results. Such information should be included in reports to the governing body, the CEO and compliance committee. Further, while the clinical laboratory should always strive to maintain the confidentiality of an employee's identity, it should also explicitly communicate that there may be a point where the individual's identity may become known or may have to be revealed in certain instances when governmental authorities become involved.

The OIG recognizes that assertions of fraud and abuse by employees who may have participated in illegal conduct or committed other malfeasance raise numerous complex legal and management issues that should be examined on a case-by-case basis. The compliance officer should work closely with legal counsel, who can provide guidance regarding such issues.

*E. Enforcing Standards Through Well-Publicized Disciplinary Guidelines*

1. Discipline Policy and Actions

An effective compliance program should include guidance regarding disciplinary action for corporate officers, managers, and other employees who have failed to comply with the clinical laboratory's standards of conduct, policies and procedures, or Federal and State laws, or those who have otherwise engaged in wrongdoing, which have the potential to impair the clinical laboratory's status as a reliable, honest and trustworthy health care provider.

The OIG believes that the compliance program should include a written policy statement setting forth the degrees of disciplinary actions that may be imposed upon corporate officers, managers, and other employees for failing to comply with the clinical laboratory's standards and policies and applicable statutes and regulations. Intentional or reckless noncompliance should subject transgressors to significant sanctions. Such sanctions

could range from oral warnings to suspension or termination. The written standards of conduct should elaborate on the procedures for handling disciplinary problems and those who will be responsible for taking appropriate action. Some disciplinary actions can be handled by department managers, while others may have to be resolved by a senior manager. Disciplinary action may be appropriate where a responsible employee's failure to detect a violation is attributable to his or her negligence or reckless conduct. Employees should be advised by the clinical laboratory that disciplinary action will be taken on a fair and equitable basis. Managers and supervisors should be made aware that they have a responsibility to discipline employees in an appropriate and consistent manner.

It is vital to publish and disseminate the range of disciplinary standards for improper conduct and to educate corporate officers, managers and other employees regarding these standards. The consequences of noncompliance should be consistently applied and enforced, in order for the disciplinary policy to have the required deterrent effect. All levels of employees should be subject to the same disciplinary action for the commission of similar offenses. The commitment to compliance applies to all personnel levels within a clinical laboratory. The OIG believes that corporate officers, managers, and other employees should be held accountable for failing to comply with, or for the foreseeable failure of their subordinates to adhere to, the applicable standards, laws, and procedures.

2. New Employee Policy

For all new employees who have discretionary authority to make decisions that may involve compliance with the law or compliance oversight, clinical laboratories should conduct a reasonable and prudent background investigation, including a reference check, as part of every such employment application.[20] The application should specifically require the applicant to disclose any criminal

conviction, as defined by 42 U.S.C. 1320a–7(i), or exclusion action. Pursuant to the compliance program, clinical laboratory policies should prohibit the employment of individuals who have been recently convicted of a criminal offense related to health care or who are listed as debarred, excluded or otherwise ineligible for participation in Federal health care programs (as defined in 42 U.S.C. 1320a–7b(f)).[21] In addition, pending the resolution of any criminal charges or proposed debarment or exclusion, the OIG recommends that such individuals should be removed from direct responsibility for or involvement in any Federal health care program.[22] With regard to current employees, physicians or other individuals authorized to order tests, if resolution of the matter results in conviction, debarment or exclusion, the clinical laboratory should terminate its employment or other contract arrangement with the individual or physician.

*F. Auditing and Monitoring*

An ongoing evaluation process involving thorough monitoring and regular reporting to the clinical laboratory's corporate officers is critical to a successful compliance program. Compliance reports created by this ongoing monitoring, including reports of suspected noncompliance, should be maintained by the compliance officer and shared with the clinical laboratory's corporate officers and the compliance committee.

Although many monitoring techniques are available, one effective tool to promote and ensure compliance is the performance of regular compliance audits by internal or external auditors who have expertise in Federal and State health care statutes, regulations and the program requirements of Federal, State and private insurers. At a minimum, these audits should be designed to address the clinical laboratory's compliance with laws governing kickback arrangements, the physician self-referral prohibition, CPT/HCPCS coding and billing, ICD–9 coding, claim development and submission, reimbursement, marketing, reporting and record keeping. In

---

telephone number, 1–800–HHS–TIPS (447–8477), in addition to any company hotline number that may be posted.

[20] The Cumulative Sanction Report is an OIG-produced report available on the Internet at http://www.dhhs.gov/progorg/oig. It is updated on a regular basis to reflect the status of health care providers who have been excluded from participation in the Medicare and Medicaid programs. In addition, the General Services Administration maintains a monthly listing of debarred contractors on the Internet at http://www.arnet.gov/epls. Also, once the data base established by the Health Care Fraud and Abuse Data Collection Act of 1996 is fully operational, the hospital should regularly request information from this data bank as part of its employee screening process.

[21] Likewise, clinical laboratory compliance programs should establish standards prohibiting the execution of contracts with physicians or other individual authorized to order tests that have been recently convicted of a criminal offense related to health care or that are listed by a Federal agency as debarred, excluded, or otherwise ineligible for participation in Federal health care programs.
[22] Prospective employees who have been officially reinstated into the Medicare and Medicaid programs by the OIG may be considered for employment upon proof of such reinstatement.

Confidential      ML_DE_00083581

addition, the audits and reviews should inquire into the clinical laboratory's compliance with specific rules and policies that have been the focus of particular attention on the part of the Medicare fiscal intermediaries or carriers, and law enforcement, as evidenced by OIG Special Fraud Alerts, OIG audits and evaluations, and publically announced law enforcement initiatives and also should focus on any areas of concern that have been identified by any entity, (i.e., Federal, State, or internally) specific to the individual clinical laboratory.

Monitoring techniques may include sampling protocols that permit the compliance officer to identify and review variations from an established baseline.[23] Significant variations from the baseline should trigger a reasonable inquiry to determine the cause of the deviation. If the inquiry determines that the deviation occurred for legitimate, explainable reasons, the compliance officer, corporate officer or manager may want to limit any corrective action or take no action. If it is determined that the deviation was caused by improper procedures, misunderstanding of rules, including fraud and systemic problems, the clinical laboratory should take prompt steps to correct the problem. If potential fraud or violations of the False Claims Act are involved, the laboratory should report the potential violation to the OIG or the Department of Justice (see discussion in Section G.2, below). Any repayment of an overpayment which results from such a violation should be made as part of the discussion with law enforcement.

When making any overpayment, the clinical laboratory should inform the payor of the following information (1) the refund is being made pursuant to a voluntary compliance program; (2) a description of the complete circumstances surrounding the overpayment; (3) the methodology by which the overpayment was determined; (4) any claim-specific information used to determine the

overpayment and; (5) the amount of the overpayment.

The OIG believes that the compliance officer needs to be made aware of these overpayment patterns, violations or deviations and look for trends that may demonstrate a systemic problem.

An effective compliance program should also incorporate periodic (at least annual) reviews of whether the program's compliance elements have been satisfied, e.g., whether there has been appropriate; (1) dissemination of the program's standards; (2) training; (3) ongoing educational programs; and (4) disciplinary actions, among others. This process will verify actual conformance with the compliance program. The review also should look into whether appropriate records have been created and maintained to document the implementation of an effective program. However, when monitoring discloses that deviations were not detected in a timely manner due to program deficiencies, appropriate modifications must be implemented. Such evaluations, when developed with the support of management, can help ensure compliance with the clinical laboratory's policies and procedures.

As part of the review process, the compliance officer or reviewers should consider techniques such as:

∞ On-site visits;

∞ Interviews with personnel involved in management, marketing/sales, operations, coding/billing, claim development and submission, and other related activities;

∞ Questionnaires developed to solicit impressions of a broad cross-section of the clinical laboratory's employees and referring clients;

∞ Review of requisition forms and other documents that support claims for reimbursement;

∞ Review of written materials and documentation produced by the laboratory and used by physicians and other individuals authorized to order tests; and

∞ Trend analyses, or longitudinal studies, that seek deviations in billing or ordering patterns over a given period.

The reviewers should:

∞ Be independent of line management;

∞ Have access to existing audit resources, relevant personnel and all relevant areas of operation;

∞ Present written evaluative reports on compliance activities to the CEO, governing body and members of the compliance committee on a regular basis, but no less than annually; and

∞ Specifically identify areas where corrective actions are needed.

With these reports, the clinical laboratory management can take whatever steps are necessary to correct past problems and prevent them from recurring. In certain cases, subsequent reviews or studies would be advisable to ensure that the recommended corrective actions have been implemented successfully.

The clinical laboratory should document its efforts to comply with applicable statutes, regulations and the program requirements of Federal, State and private payors. For example, where a clinical laboratory, in its efforts to comply with a particular statute, regulation or program requirement, requests advice from a Government agency (including a Medicare fiscal intermediary or carrier) charged with administering a Federal health care program, the clinical laboratory should document and retain a record of the request and any written or oral response. This step is particularly important if the clinical laboratory intends to rely on that response. The laboratory should memorialize its determination as to whether reliance on any such advice is reasonable, and its efforts to develop procedures based upon such advice.

*G. Responding to Detected Offenses and Developing Corrective Action Initiatives*

1. Violations and Investigations

Violations of a clinical laboratory's compliance program, failures to comply with applicable Federal or State law, and other requirements of Government and private health plans, and other types of misconduct threaten a clinical laboratory's status as a reliable, honest and trustworthy provider capable of participating in Federal health care programs. Detected but uncorrected misconduct can seriously endanger the mission, reputation, and legal status of the clinical laboratory. Consequently, upon reports or reasonable indications of suspected noncompliance, it is important that the chief compliance officer or other management officials initiate prompt steps to investigate the conduct in question to determine whether a material violation of applicable law or the requirements of the compliance program has occurred, and if so, take steps to correct the problem.[24] As appropriate, such steps

---

[23] The OIG recommends that when a compliance program is established in a clinical laboratory, the compliance officer, with the assistance of corporate officers, should take a "snapshot" of their operations from a compliance perspective. This assessment can be undertaken by outside consultants, law or accounting firms, or internal staff, with authoritative knowledge of health care compliance requirements. This "snapshot," often used as part of benchmarking analyses, becomes a baseline for the compliance officer and other corporate officers to judge the clinical laboratory's progress in reducing or eliminating potential areas of vulnerability. For example, it has been suggested that a baseline level include the frequency and percentile levels of each CPT code in relation to the clinical laboratory's overall billing.

[24] Instances of non-compliance must be determined on a case-by-case basis. The existence, or amount, of a monetary loss to a health care program is not solely determinative of whether or not the conduct should be investigated and reported to governmental authorities. In fact, there may be instances where there is no monetary loss at all, but corrective action and reporting are still necessary to

Continued

Confidential

may include an immediate referral to criminal and/or civil law enforcement authorities, a corrective action plan,[25] a report to the Government,[26] and the submission of any overpayments, if applicable.

Depending upon the nature of the alleged violations, an internal investigation will probably include interviews and a review of relevant documents. Some clinical laboratories should consider engaging outside counsel, auditors, or health care experts to assist in an investigation. Records of the investigation should contain documentation of the alleged violation, a description of the investigative process, copies of interview notes and key documents, a log of the witnesses interviewed and the documents reviewed, the results of the investigation, e.g., any disciplinary action taken, and the corrective action implemented. While any action taken as the result of an investigation will necessarily vary depending upon the clinical laboratory and the situation, clinical laboratories should strive for some consistency by utilizing sound practices and disciplinary protocols. Further, after a reasonable period, the compliance officer should review the circumstances that formed the basis for the investigation to determine whether similar problems have since been uncovered.

If an investigation of an alleged violation is undertaken and the compliance officer believes the integrity of the investigation may be at stake because of the presence of employees under investigation, those subjects should be removed from their current work activity until the investigation is completed (unless otherwise requested by law enforcement). In addition, the compliance officer should take

appropriate steps to secure or prevent the destruction of documents or other evidence relevant to the investigation. If the clinical laboratory determines that disciplinary action is warranted, it should be prompt and imposed in accordance with the clinical laboratory's written standards of disciplinary action.

2. Reporting

If the compliance officer, compliance committee or management official discovers credible evidence of misconduct from any source and, after a reasonable inquiry, has reason to believe that the misconduct may violate criminal, civil or administrative law, then the clinical laboratory promptly should report the matter to the appropriate governmental authority [27] within a reasonable period, but not more than 60 days [28] after determining that there is credible evidence of a violation.[29] Prompt reporting will demonstrate the clinical laboratory's good faith and willingness to work with governmental authorities to correct and remedy the problem. In addition, reporting such conduct will be considered a mitigating factor by the OIG in determining administrative sanctions (e.g., penalties, assessments, and exclusion), if the reporting provider becomes the target of an OIG investigation.[30]

When reporting misconduct to the Government, a clinical laboratory should provide all evidence relevant to the potential violation of applicable Federal or State law(s) and potential cost impact. The compliance officer,

under advice of counsel, and with guidance from the governmental authorities, could be requested to continue to investigate the reported violation. Once the investigation is completed, the compliance officer should be required to notify the appropriate governmental authority of the outcome of the investigation, including a description of the impact of the alleged violation on the operation of the applicable health care programs or their beneficiaries. If the investigation ultimately indicates that criminal or civil violations may have occurred, the appropriate Federal and State officials [31] should be notified immediately.

As previously stated, the clinical laboratory should take appropriate corrective action, including the imposition of proper disciplinary action, and prompt identification and restitution of any overpayment to the affected payor. In cases where potential fraud or violations of the False Claims Act are involved payment should be made as part of discussions with law enforcement. Failure to repay overpayments within a reasonable period of time could be interpreted as an intentional attempt to conceal the overpayment from the Government, thereby establishing an independent basis for a criminal violation with respect to the clinical laboratory, as well as any individuals who may have been involved.[32] For this reason, clinical laboratory compliance programs should emphasize that overpayments obtained from Medicare or other Federal health care programs should be promptly returned to the payor that made the erroneous payment. Section F details the information which should be provided to the contractor when making a repayment.

**Conclusion**

Through this document, the OIG has attempted to provide a foundation for development of an effective and cost-efficient clinical laboratory compliance program. As previously stated, however, each program must be tailored to fit the needs and resources of an individual clinical laboratory, depending upon its

---

protect the integrity of the applicable program and its beneficiaries.

[25] Advice from the clinical laboratory's in-house counsel or an outside law firm may be sought to determine the extent of the clinical laboratory's liability and to plan the appropriate course of action.

[26] The OIG currently maintains a voluntary disclosure program that encourages providers to report suspected fraud. The concept of voluntary self-disclosure is premised on a recognition that the Government alone cannot protect the integrity of the Medicare and other Federal health care programs. Health care providers must be willing to police themselves, correct underlying problems and work with the Government to resolve these matters. The OIG's voluntary self-disclosure program has four prerequisites (1) the disclosure must be on behalf of an entity and not an individual; (2) the disclosure must be truly voluntary (i.e., no pending proceeding or investigation); (3) the entity must disclose the nature of the wrongdoing and the harm to the Federal programs; and (4) the entity must not be the subject of a bankruptcy proceeding before or after the self-disclosure.

[27] I.e., Federal and/or State law enforcement having jurisdiction over such matter. Such governmental authority would include DOJ and OIG with respect to Medicare and Medicaid violations giving rise to causes of actions under various criminal, civil and administrative false claims statutes.

[28] To qualify for the "not less than double damages" provision of the False Claims Act, the report must be provided to the Government within thirty days after the date when the laboratory first obtained the information. 31 U.S.C. 3729(a).

[29] The OIG believes that some violations may be so serious that they warrant immediate notification to governmental authorities, prior to, or simultaneous with, commencing an internal investigation, e.g., if the conduct (1) is a clear violation of criminal law; (2) has a significant adverse effect on the quality of care provided to program beneficiaries (in addition to any other legal obligations regarding quality of care); or (3) indicates evidence of a systemic failure to comply with applicable laws, an existing corporate integrity agreement, or other standards of conduct, regardless of the financial impact on Federal health care programs.

[30] The OIG has published criteria setting forth those factors that the OIG takes into consideration in determining whether it is appropriate to exclude a health care provider from program participation pursuant to 42 U.S.C. 1320a–7(b)(7) for violations of various fraud and abuse laws. See 62 FR 67392 (12/24/97).

[31] Appropriate Federal and State authorities include the Criminal and Civil Divisions of the Department of Justice, the U.S. Attorney in the clinical laboratory's district, and the investigative arms for the agencies administering the affected Federal or State health care programs, such as the State Medicaid Fraud Control Unit, the Defense Criminal Investigative Service, and the Offices of Inspector General of the Department of Health and Human Services, the Department of Veterans Affairs and the Office of Personnel Management (which administers the Federal Employee Health Benefits Program).

[32] See 42 U.S.C. 1320a–7b(a)(3).

Confidential

particular corporate structure, mission, size and employee composition. The statutes, regulations and guidelines of the Federal and State health insurance programs, as well as the policies and procedures of the private health plans, should be integrated into every clinical laboratory's compliance program.

The OIG recognizes that the health care industry in this country, which reaches millions of beneficiaries and expends about a trillion dollars annually, is constantly evolving. As stated throughout this guidance, compliance is a dynamic process that helps to ensure that clinical laboratories and other health care providers are better able to fulfill their commitment to ethical behavior, as well as meet the changes and challenges being imposed upon them by Congress and private insurers. Ultimately, it is OIG's hope that a voluntarily created compliance program will enable clinical laboratories to meet their goals, improve the quality of services and control of claims submission, and substantially reduce fraud, waste and abuse, as well as the cost of health care to Federal, State and private health insurers.

Dated: August 14, 1998.

**June Gibbs Brown,**

*Inspector General.*

[FR Doc. 98–22559 Filed 8–21–98; 8:45 am]

BILLING CODE 4150–04–P

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Substance Abuse and Mental Health Services Administration

### Center for Mental Health Services; Notice of Meeting

Pursuant to Pub. L. 92–463, notice is hereby given of a teleconference meeting of the Center for Mental Health Services (CMHS) National Advisory Council on August 24, 1998.

The meeting will include the review, discussion, and evaluation of individual grant applications and contract proposals. Therefore, the meeting will be closed to the public as determined by the Administrator, SAMHSA, in accordance with Title 5 U.S.C. 552b(c) (3), (4) and (6) and 5 U.S.C. App. 2, Section 10(d).

An agenda and a roster of Council members may be obtained from Ms. Patricia Gratton, Committee Management Officer, CMHS, Room 11C–26, Parklawn Building, Rockville, Maryland 20857, Telephone (301) 443–7987.

Substantive program information may be obtained from the contact whose name and telephone number is listed below.

*Committee Name:* CMHS National Advisory Council.

*Meeting date:* August 24, 1998.

*Place:* CMHS Conference Room 5600 Fishers Lane, Room 15–94, Rockville, MD 20857.

*Closed:* August 24, 1998, 12:00 p.m.– 1:30 p.m.

*Contact:* Anne Mathews-Younes, Ed.D., Executive Secretary, Room 18C–05, Parklawn Building, Telephone: (301) 443–0554 and FAX (301) 443–7912.

This notice is being published less than 15 days prior to the meeting due to the urgent need to meet timing limitations imposed by the review and funding cycle.

Dated: August 18, 1998.

**Dee Herman,**

*Committee Management Officer, Substance Abuse and Mental Health Services Administration.*

[FR Doc. 98–22573 Filed 8–21–98; 8:45 am]

BILLING CODE 4162–20–P

---

## DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

**[Docket No. FR–4211–FA–03]**

### Lead-Based Paint Hazard Control in Privately Owned Housing: Fiscal Year 1997: Announcement of Funding Awards

**AGENCY:** Office of the Secretary—Office of Lead Hazard Control.

**ACTION:** Announcement of funding awards.

---

**SUMMARY:** In accordance with section 102(a)(4)(C) of the Department of Housing and Urban Development Reform Act of 1989, this announcement notifies the public of funding decisions made by the Department in a competition for funding under the NOFA for Lead-Based Paint Hazard Control in Privately Owned Housing. This announcement contains the names and addresses of the award recipients and the amounts of awards.

**FOR FURTHER INFORMATION CONTACT:** Ellis G. Goldman, Department of Housing and Urban Development, 451 Seventh Street, SW, Washington, DC 20410, telephone (202) 755–1785, ext 112. Hearing-and speech-impaired persons may access the number above via TTY by calling the toll free Federal Information Relay Service at 1–800–877–8339.

**SUPPLEMENTARY INFORMATION:** The purpose of the competition was to award grant funding for $50,000,000 for the grant program for lead-based paint hazard control in low income private housing.

The 1997 awards announced in this Notice were selected for funding in a competition announced in a **Federal Register** notice published on June 6, 1997 (62 FR 30380). Applications were scored and selected on the basis of selection criteria contained in that Notice.

A total of $50,000,000 has been awarded to twenty-five grantees. In accordance with section 102(a)(4)(C) of the Department of Housing and Urban Development Reform Act of 1989 (103 Stat. 1987, 42 U.S.C. 3545), Department is publishing the names, addresses, and amounts of those awards as follows.

**Category A Grants**

City of Phoenix

Lead Hazard Control Program, 200 West Washington, Phoenix, AZ 85003, $2,000,000

City of Long Beach

Department of Health & Human Services, 2525 Grand Avenue, Long Beach, CA 90815–1765, $2,000,000

City of Los Angeles

Los Angeles Housing Department, 400 Main St., Los Angeles, CA 90013, $2,900,000

City of Richmond

Richmond Redevelopment Agency, 330 25th St., Richmond, CA 94804, $2,300,000

Town of Manchester

Manchester Lead Abatement Project, 63 East Center St., Suite 2A, Manchester, CT 06040, $2,000,000

District of Columbia

Department of Health, 800 9th St., SW., Washington, DC 20024, $2,200,000

City of Lawrence

Community Development Department, 225 Essex St., Lawrence, MA 01840, $2,900,000

City of Springfield

Office of Housing, 81 State Street, Springfield, MA 01103, $1,800,000

City of Baltimore

Baltimore City Health Department, 210 Guilford Ave., Baltimore, MD 21044, $2,000,000

City of Portland

Portland Lead-Safe Housing Program, 389 Congress St., Portland, ME 04101, $1,400,000

ML_DE_00083584

# EXHIBIT 18

# Exhibit 31

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential

| | |
|---|---|
| **From:** | Nicole Moberg |
| **Sent:** | Tuesday, July 05, 2011 12:35 PM |
| **To:** | Amanda Moorer; Beth Pabst; Caroline Kelly; Dara Goldfarb; Gelissa Bernal; Jason Bristol; Kendall Wulff; Kristen Baker; Melissa Gambin; Nicole Moberg; Norell Garrett; ReJeana Findlay; Ryan Chu; Shari Jones; Sharon Holmes; Tyler Wilson |
| **Subject:** | Confirming False Negatives |
| **Attachments:** | False Negatives Final.docx |

Gold Members,

Attached is the list we made as a team. I had Jennifer look at it to confirm everything. There were a couple of minor changes and additions, see latest copy attached.

Hopefully it helps when you approach accounts that could be confirming more as it ended up becoming more of a "Why Confirm" list.

Nicole

1

**Confidential or Trade Secret**

Confidential

**MIL00068167**

ML_DE_00504406

## Gold Members-FI

**Overall, confirmation allows drug specific and metabolite specific identification and allows objective and accurate results to be used in clinical decision making.**

**Why Confirm Negatives?**

- **POC cut off levels are much higher than LC/MS-MS. Usually 5-10x higher**

- **Our data shows huge %'s of false negatives from the POC cups; ex. @50% cocaine's are missed and 43% of benzo's (refer to Practice Profile if have one for that time period)**

- **Confirmation allows *specific identification of drugs and metabolites.* In-office screening will not provide specific identification. In fact, many times a "class-specific" screen will be negative (but positive on LC/MS-MS because the sensitivity for a specific drug is low (example: oxycodone).**

- **There are audit triggers. For example, if patient was in a car accident and tested positive for alcohol and has rx for oxycotin. This info is placed in a database that law enforcement can pull. If a doc or pratice is associated with patient, it is much more likely practice will be audited. It's better they have a confirmation that patient was negative for something when they saw that doc. Better to have that result and never need it than to risk it.**

**Not on Cup:**

2) Alcohol can only be detected in the urine for up to 24 hours; Ethyl Glucuronide (EtG) and Ethyl Sulfate (EtS) are metabolites of alcohol and are formed when alcohol passes through the liver. EtG can be detected for up to 80 hours after the last alcohol ingestion. Alcohol detection via EIA is notorious for false positives with hand sanitizer, mouthwash, etc. The ability to detect ethyl sulfate (EtS) further improves the sensitivity and accuracy in detecting alcohol use.

3) Heroin-stats show that heroin use is increasing across USA. Patient could have rx for morphine but diverting heroin or abusing heroin and morphine. Only way to differentiate is LC/MS to identify 6-MAM.

4) Buprenorphine-This is a must to confirm if in suboxone clinic. Doc needs to know if they are taking it since it's part of treatment!

5) Fentanyl-nationally recognized for abuse and diversion potential

**More Reasons to Confirm Negatives:**

Confidential or Trade Secret

MIL00068168

1) Cocaine-false negatives on POC occur up to 50% of the times. To risk medical license on a $6 cup is _____. You can fill in the blank :).

2) Opioids-Physicians should confirm negatives per medical necessity. Sensitivity for morphine and codeine only 300 ng/ml. Doc can not have half the story to be effective! He/she should be 100% sure, no exceptions.

3) Benzos-Should always confirm per medical necessity. If physician is prescribing vicodin and patient abusing Xanax, lethal combo.

4) Methadone-often missed yet dangerous with other opioids. Will not be positive on opioid screen; positive opiate screen indicative of other opioid use

5) CLIA application and offices says you must follow manufacturers instructions

6) POC devices suggest that you must/should confirm in their package inserts

7) POC devices are subjective and open to human error reading a faint line

8) POC devices are subject to faulty manufacturing

9) Team of toxicologists -----stand behind science and licensed professionals running the machines.

Some Specific Examples From the FL Team:

- Patients can google and find out many ways to beat a poc test. We had one practice where a patient removed the strips from the cup, ran it under water and put it back (it just happened to be crooked when they put it back). This resulted in all negatives when in fact the patient was on a number of illicit substances when the report came back. The MA realized the cup had been tampered with and sent it off for confirmation in that case. Good reason to always confirm - Norell

- There are a 100 ways to pass a POC drug test, Google how to pass a POC drug test and you will see! -Challenge them, some examples include bleach and visine. This is why it is SO important to confirm. -Kendall

- "The hardest part, collecting the specimen, is already done. You might as well toss it in a UPS bag so that we can provide you with better info to make medical decisions. You may not have many high risk patients, but it only takes one overdose to put your practice on the line." -Ryan

Confidential or Trade Secret

Confidential

- **Nicotine testing which is not on the cups can help a physician in many ways. First, people who smoke demonstrate addictive behavior which often leads to both abuse of illicit and prescription drugs. Also, many spine surgeons do not want their patients smoking as it impedes the healing process. Smoking is actually known to increase risk of opioid misuse/abuse-Shari**

- **Cup only shows drug class, not parent drug**

  **It's become the standard of care and government agencies and insurance are looking for practices to confirm when screening (it shows that practice is doing their due diligence to monitor patients, not just screen for money).-Tyler**

- **The POC is a very limited test , it only allows you to see results for drug classes and does not give you drug specifics as metabolites in most cases.**

- **The opiate strip on the point of care is designed specifically to pick up codeine and morphine (greatest sensitivity to detect morphine and heroin and significantly less to other opioids), you will be missing other opiates. Gelissa**

- **A reason to confirm is the strong correlation of Ritalin (methylphenidate) and cocaine usage, especially amongst kids.  To test for Ritalin, an office has to send it to the lab. -Rae**

- **Typically - tough medical decisions are based off of negatives that should be positives. ----- always confirm these negatives before making these harsh decisions on a patient. They may have the molecule in their system but at a lower level that the POC device will detect. Millennium has very low cut off levels as to detect trace amounts of a given molecule. Also, only a quantification will give the breakdown of the metabolites for the molecule.-Beth**

- **The reading of these tests is extremely subjective...what one person may read as positive another person may read as negative. To make sure you get the most accurate results you must confirm with a lab-Caroline**

Confidential or Trade Secret

MIL00068170

Confidential

ML_DE_00504409

# EXHIBIT 19
# FILED UNDER SEAL

# EXHIBIT 20
# FILED UNDER SEAL

# EXHIBIT 21
# FILED UNDER SEAL

# EXHIBIT 22

# Exhibit 5

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential

| | |
|---|---|
| **From:** | gayleesales@aol.com |
| **Sent:** | Saturday, April 04, 2009 10:58 PM |
| **To:** | elizabeth@milleniumlaboratories.com |
| **Cc:** | jim@milleniumlaboratories.com; howard@milleniumlaboratories.com |
| **Subject:** | Fwd: Revised "Why Confirm Every Sample" Document |

FYI

Gay R. Lee
818-648-1174-Mobile

-----Original Message-----
From: Stephen Johnson <bigjohnson3@mac.com>
To: Joel Bramer <jmbramer@sbcglobal.net>; Gary Huffman <ghuffy4@aol.com>; Don Carlson <Doncarlcarlson@aol.com>; Tony Chill <res0wo0l@verizon.net>; Dana Dalcher Carter <dana.dalcher@comcast.net>; Marcella Avery <marcella.ipm@gmail.com>; Ed Zicari <edzicari@yahoo.com>; Joe Brumley <jbrumleyjr@yahoo.com>; Grace Gonzales <ggonzales@southwoodhealthcare.com>; Gay Lee <gayleesales@aol.com>; David White <dewhitebusiness@hotmail.com>; Stephanie Kieffer <integrimed@gmail.com>; Michelle White <whiteml2003@yahoo.com>; Scott M. Tover <smtover@yahoo.com>; Jennifer Vairo <jhvairo@gmail.com>; Kerry Miller <kmillerk@prodigy.net>
Cc: Tim Amundsen <TJAMMO@aol.com>; Brian Slattery <bslatter57@gmail.com>
Sent: Wed, 24 Sep 2008 8:54 am
Subject: Revised "Why Confirm Every Sample" Document

To all:

Attached is a revised and even better "Why Confirm Every Sample" document. This information should be used on the first call and every subsequent call to establish the expectation that all samples get sent to our lab for confirmation. This also lays the groundwork for a complete Standing Order to be put in place.

If an account does not want a Standing Order in place for the 6 drugs not covered by the iCassette, we do not want to do business with them.

http://homepage.mac.com/bigjohnson3/filechute/Why%20confirm%20every%20sample_.zip

Thank you,

Steve

Steve Johnson
Area Sales Director - West
Millenium Laboratories of California
16981 Via Tazon, Suite F San Diego, CA 92127
(415) 250-7428 (Mobile)
(415) 435-5176 (Fax)
stevej@milleniumlaboratories.com

This communication contains information that is confidential, proprietary in nature, and may also be attorney-client privileged and/or work product privileged. It is for the exclusive use of the intended recipient(s). If you are not the intended recipient(s) or the person responsible for delivering it to the intended recipient(s), please note that any form of dissemination, distribution or copying of this communication is strictly prohibited and may be unlawful. If you have received this communication in error, please immediately notify the sender and delete the original communication. Thank you for your cooperation.

1

**Confidential or Trade Secret**

**MIL00156619**

Please be advised that neither Millenium Laboratories of California, Inc., its affiliates, its employees or agents accept liability for any errors, omissions or damages caused by delays of receipt or by any virus infection in this message or its attachments, or which may otherwise arise as a result of this e-mail transmission.

=

---

**The Average US Credit Score is 692. <u>See Yours in Just 2 Easy Steps!</u>**

2

**Confidential or Trade Secret**

**MIL00156620**

Confidential

ML_DE_00628901

# EXHIBIT 23

# Exhibit 4

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential

| From: | Renee Bryan |
|---|---|
| Sent: | Thursday, September 10, 2009 5:51 PM |
| To: | 'Scott Gehrke' |
| Cc: | 'Melissa Wicklund'; |
| | 'Howard Appel'; |
| Subject: | STATUS OF STANDING ORDER FORM |
| Attachments: | image003.png |

Dear Sales Team,

A decision was made to wait to release our new standing order form until we can collect your feedback on it next week in San Diego. Charles will review it with all of you, we will collect your feedback and revise the form while you are in house with us. We expect to send you home with the new form.

FOR NEW CUSTOMERS JUST GETTING STARTED WITH ML
You will use the new form.

FOR EXISTING CUSTOMERS
We are sending to you packages for delivery to your customer that will include a number of good news communications about ML, including reduced billing, New Report Form, example of EOB card and what the QC means on our POCT boxes.
A box of these packages will be sent to each of you this week, one package per account.
When you come to San Diego, you will each receive a stack of current standing orders for accounts in your territory.
We will ask you to confirm the account is yours and verify customer information for our records.
Upon your return home, the idea is to get around to customers with the new packages and new and old standing orders, and get the new standing orders filled out and signed. You might consider how soon a practice's current standing order is from expiration (or size/importance of account)in prioritizing your visits.

Thank you for your patience as we perfect this tool. As you know, the standing order is critical to our confirmation and billing process, so we want to get it right. We know your feedback will benefit the end result.

Thank you. We are ALL looking forward to seeing you in San Diego next week!
Regards,

Renee


In the event you will not be seeing your accounts for awhile, you may want to ensure they at least get the new Standing Order. We will be tracking each new standing order we receive until a new one is received for every account. The new Standing Order is attached for your convenience.

If you have any questions about this matter, please contact your Regional Manager, Liz or myself.

Thank you.


Renee T. Bryan
VP of Marketing & Strategic Planning
16981 Via Tazon

1

**Confidential or Trade Secret**

**MIL00063547**

Confidential

ML_DE_00504265

San Diego, CA 92127





(Full Email Disclaimer - http://www.millenniumlaboratories.com/emaildisclaimer.html)

2

**Confidential or Trade Secret**                                                          **MIL00063548**

Confidential                                                                                ML_DE_00504266

# EXHIBIT 24

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
------------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
          Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,

                        Plaintiff,

      - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,

                        Defendants.
------------------------------------------X
                        July 1, 2021
                        10:32 a.m.

          Remote video-teleconference
deposition via Zoom of DANIEL PENCAK,
pursuant to notice, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.

PENCAK

then it discusses here the key assumptions.

And we saw in Exhibit 154 a variance of negative 33.3 percent, right?

A.      Right.

Q.      And that lines up with what we see in your e-mail to Howard Appel, correct?

A.      Yeah, that's right.

Q.      Do you understand Exhibit 154 to represent your analysis of a potential reduction in Medicare reimbursement?

A.      Yeah, that's right.

Q.      So now if we look at the assumptions, among them you have, item 4, assumed zero dollars reimbursement for validity, correct?

A.      Yes.

Q.      And we saw in the LCDs we just went through validity testing being excluded from coverage, correct?

A.      That's right.

Q.      Does this spreadsheet in Exhibit 154 represent your effort to

**Page 199**

PENCAK

evaluate the potential impact of the Noridian LCD?

A.      Yeah, I would say that that makes sense to me.

Q.      If you take a look in sort of the second grouping of CPT descriptions, it starts with creatinine, and you say a parenthetical description for each of those four items, validity, do you see that?

A.      Yes.

Q.      And under current billed, you've got various amounts from 594, 803, et cetera, and under the new billed you've got a bunch of zeros, correct?

A.      Correct.

Q.      So you're modeling here a world in which Medicare is not reimbursing for specimen validity testing, correct?

A.      That's right.

Q.      And you also have above, there is a column that says "confirmed positive," another one that says "percentage positive POC," and you'll

PENCAK

( Exhibit 156, e-mail from Mr. Pencak to Brock Hardaway, cc'ing Howard Appel, Tim Kennedy, February 5, 2014, was marked for identification, as of this date.)

IT CONCIERGE:  Tab 17 has been introduced as Exhibit 156.

Q.       Do you have that in front of you?

A.       I do.

Q.       Do you recognize this as an e-mail from you to Brock Hardaway, cc'ing Howard Appel, Tim Kennedy, dated February 5, 2014, subject is "LCD impact."

Do you see that, you write, "Hi Brock, as discussed, I've attached our analysis on the potential LCD impact. Please keep in mind there are a lot of moving parts and a lot of assumptions. Actually since we spoke, the impact actually changed as a result of an assumption update (initially had 87 percent of our specimens having POC, but based on actual data, we adjusted down to

PENCAK

80 percent.)  Below I have summarized the key assumptions and the approximate impact from each scenario."

Before I go further on this e-mail, do you recall any reaction you received from Howard Appel or Brock Hardaway or others in response to your prior analysis that showed a 33.3 percent potential reduction?

A.    I don't recall any response or reaction, no.

Q.    Did anyone tell you to come up with a more positive scenario?

A.    No.

The analysis was the analysis, no one had told me to massage it or anything like that.

Q.    So under this one, you've got scenario 1, Medicare reimbursement cut of approximately 18.3 percent, and you have scenario 2, Medicare reimbursement cut of approximately 5.6 percent, right?

A.    Correct.

Q.    And if you flip over to the

PENCAK

attachments, you again have, it says SC1 at the top of the page and then SC2, indicating the two scenarios, you again see zero dollars under the new billed column for the validity testing, right?

A.    Correct.

Q.    And under --  you still have that confirmed positive column and for the CPT descriptions that correspond to those that are included, you have a reduced new billed amount, as we've seen before, but it looks like these amounts are higher than in the prior scenario where you had a 33.3 percent reduction, correct?

A.    Yeah, that's what it looks like.

Q.    Can you help me out in understanding what changed here, if you're able to tell from the cover e-mail.

A.    I don't --  I think it is something to do with the bottom part here, it is based on the math here, but I don't remember the context of any of those items.

PENCAK

MR. COVIELLO:  Thanks everyone.

THE VIDEO TECHNICIAN: We're off the record at 6:54 p.m., this is the end of today's testimony given by Daniel Pencak.

Total number of media units used was six and will be retained by Veritext New York.

(Time noted: 6:54 p.m.)

_____

DANIEL PENCAK

Subscribed and sworn to before me this _____ day of _____, 2021.

_____

Notary Public

**Page 299**

C E R T I F I C A T I O N

I, Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and a Notary Public, do hereby certify that the foregoing witness, DANIEL PENCAK, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

JINEEN PAVESI, RPR, RMR, CRR

**Page 310**

**\*\* ERRATA SHEET \*\***

CASE: KIRSCHNER vs. J.P. MORGAN CHASE

DEPOSITION DATE: 7/1/2021

DEPONENT: DANIEL PENCAK

PAGE LINE(S)    CHANGE            REASON

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

____|_____|_____|_____

                    _____

                    DANIEL PENCAK

SUBSCRIBED AND SWORN TO BEFORE ME

THIS _____ DAY OF _____, 20___.

_____        _____

(NOTARY PUBLIC)            MY COMMISSION EXPIRES:

# EXHIBIT 25
# FILED UNDER SEAL

# EXHIBIT 26

# Exhibit 12

To

United States' Complaint In Intervention

No. 12cv10132-NMG

No. 12cv10631-NMG

No. 13cv10825-NMG

Confidential

## Kimberly Keller

| | |
|---|---|
| **From:** | Eric McClurg |
| **Sent:** | Friday, October 07, 2011 6:22 AM |
| **To:** | Kimberly Keller |
| **Cc:** | Matthew Roberts; Brandon Worley |
| **Subject:** | RE: cp issue- not enough tests |
| **Attachments:** | Simon Feng MD.pdf |

Good Morning Kim,
Please see the attached profile for Family Physicians of Johnson County dba Simon Feng MD. Let me know if there is anything else you need from us. Can we overnight the supplies for Monday morning?

Regards,
Eric

---

**From:** Brandon Worley
**Sent:** Thursday, October 06, 2011 11:36 AM
**To:** Matthew Roberts; Eric McClurg
**Subject:** Fwd: cp issue- not enough tests

MR:

See below, we need more tests on this CP. Sell them on the clinical value of a more comprehensive testing menu.

Call me with any questions.


B



Begin forwarded message:

> **From:** "Kimberly Keller" <KKeller@becausepainmatters.com>
> **To:** "Brandon Worley" <BWorley@becausepainmatters.com>
> **Subject: cp issue- not enough tests**
>
> Good Morning Brandon,
>
> Attached is new client paperwork for practice Family Physicians... in Indiana, one of Matt Robert's new accounts. There are not enough tests on the CP and Howard will not approve. Matt requested a two day delivery yesterday for supplies. If he can get more tests added and send the CP back today, we can overnight the supplies.
>
> Thanks!
>
> Kim
> -----Original Message-----

1

**Confidential or Trade Secret**                                    **MIL00023299**

# EXHIBIT 27
# FILED UNDER SEAL

# EXHIBIT 28
# FILED UNDER SEAL

# REDACTED EXHIBIT 29

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No. 15-12284 (LSS) |
| MILLENNIUM LAB HOLDINGS II, LLC, et al., | Jointly Administered |
| **Debtors.** | |
| ------------------------------------------------------------------------ | |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE of THE MILLENNIUM CORPORATE CLAIM TRUST, | Adv. Pro. No. 17-51840 (LSS) |
| **Plaintiff(s)** | |
| **v.** | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A. and SUNTRUST BANK, | |
| **Defendant(s)** | |

EXPERT REPORT OF

# YVETTE R. AUSTIN SMITH

**NOVEMBER 15, 2021**

CONTENTS

**I. Expert Qualifications**.................................................................................................1

**II. Assignment and Summary of Opinions** ...................................................................2

**III. Basic Factual Overview** .........................................................................................4
    A.  Overview of Millennium's Business ...............................................................4
    B.  Millennium's Competitors...............................................................................6
    C.  Historical Financial Metrics of Millennium's Business ..................................7

**IV. 2014 Financing Transaction**..................................................................................15

**V. Framework for Solvency Analysis** ......................................................................21
    A.  Balance Sheet Test ........................................................................................23
    B.  Ability to Pay Debt Test .................................................................................26
    C.  Adequate Capital Test ....................................................................................27
    D.  Summary of Millennium Solvency Analysis .................................................28

**VI. Millennium Financial Projections in connection with the 2014 Transaction**...................29
    A.  Padres Projections .........................................................................................29
    B.  Vantage Point Solvency Analysis Based On Padres Projections ...................37

**VII. Solvency Analysis of Millennium Using the Correct Solvency Framework**...................40
    A.  Millennium Business Trends as of 2014 Transaction ....................................40
    B.  Regulatory and Legal Environment as of 2014 Transaction .........................45
    C.  Post-Transaction Events Related to Known or Knowable Risks in April 2014.............55
        1.  Verdict in Ameritox 2011 Lawsuit....................................................55
        2.  $90 Million Quantifiable Exposure Related to Free Specimen Cups .......56
        3.  Escalating US DOJ Investigations .....................................................57
    D.  Millennium files for bankruptcy....................................................................59
    E.  Modified Padres Projections..........................................................................60
        1.  UDT Revenue Projections...................................................................61
        2.  PGT Revenue and RxAnte Projections ...............................................75
    F.  Expense Projections.......................................................................................75
    G.  Summary of Modified Padres Projections.....................................................76
    H.  Balance Sheet Test .........................................................................................79
        1.  Discounted Cash Flow Analysis .........................................................79
        2.  Guideline Public Companies...............................................................83
        3.  Precedent Transaction Analysis ..........................................................88
        4.  Balance Sheet Test Conclusion...........................................................88

I.   Ability to Pay Debts Test .................................................................................88

J.   Adequate Capital Test ....................................................................................92

K.   Solvency Conclusion .....................................................................................93

**Appendix A : Solvency Test Exhibits**....................................................................**94**

A.1 Expected Case DCF Analysis.......................................................................94

A.2 Expected Case EBIT Derivation ..................................................................94

**Appendix B : Comparable Companies Analysis Exhibits**.....................................**95**

B.1 Description of SIC Industry Codes...............................................................95

B.2 Description of Potential Comparable Companies .........................................96

**Appendix C : Custom Profile Exhibit**....................................................................**97**

**Appendix D : Sensitivity Analysis of Millennium's Equity Value**........................**98**

**Appendix E : Documents Relied Upon of Yvette Austin Smith**............................**99**

**Appendix F : Curriculum Vitae**..............................................................................**104**

## I.      EXPERT QUALIFICATIONS

1. My name is Yvette Austin Smith. I am a Principal and Chairman of The Brattle Group and co-lead the firm's Mergers & Acquisitions ("M&A") Litigation practice and previously led the firm's Bankruptcy and Restructuring practice.  I specialize in M&A and bankruptcy disputes with subject matter expertise in valuation and credit and solvency analysis. I regularly provide testifying and consulting expert services in litigation matters related to mergers and acquisitions, leveraged buyouts, recapitalization, debt recharacterization and avoidance actions. Prior to joining The Brattle Group, I provided M&A advisory services, including buy-side and sell-side advisory, fairness opinions, solvency opinions and commercially reasonable debt opinions.

2. I hold a Master's Degree in Business Administration from Columbia University's Graduate School of Business and a Bachelor's degree from Harvard College in Philosophy and Government, with *cum laude* honors. I have completed additional graduate coursework in financial mathematics at the Courant Institute of Mathematical Sciences at New York University. I have been an instructor at Harvard University Extension School, teaching the graduate finance course, Business Analysis and Valuation.

3. I have written a number of publications and presented on valuation and credit analysis for organizations including the American Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, Thomson Reuters, and Bloomberg Law. I am a contributing author to the Model Merger Agreement for the Acquisition of a Public Company, published by the ABA's Mergers and Acquisitions Committee, and a contributing researcher to The Standard & Poor's Guide to Fairness Opinions: A User's Guide for Fiduciaries. I am also Co-Chair of the American Bar Association Joint Task Force on M&A Litigation and the founder and former Co-Chair of the ABA Financial Advisor Task Force. I was a contributing researcher to *Estimating Future Claims – Case Studies from Mass Torts and Product Liability*.  I have also authored and presented multiple continuing legal education courses and other seminars on valuation, solvency and credit analysis.

4. The Brattle Group is compensated for my work in this matter at my current billing rate of $800 per hour. In preparing this report, I have also been assisted by Brattle staff members working

Expert Report of Yvette R. Austin Smith                                                    Adv. Pro. No.17-51840 (LSS) | 1

under my direction. The Brattle Group is being compensated for their work in this matter at standard commercial rates ranging from $285 to $455 per hour. Neither the amount nor the payment of fees to me or The Brattle Group in connection with this matter is contingent upon the opinions expressed herein or the outcome of the above-captioned litigation (the "Litigation").[1]

5. A list of documents I relied upon to form my opinions appears in Appendix E. My CV is attached as Appendix F. I reserve the right to express additional opinions, supplement or amend the opinions expressed herein, and to respond to opinions offered by Defendants' experts in this case.[2]

## II.    ASSIGNMENT AND SUMMARY OF OPINIONS

6. I have been retained by Wollmuth Maher & Deutsch LLP, counsel for the Plaintiff Marc S. Kirschner, solely in his capacity as Trustee of the Millennium Corporate Claim Trust, to evaluate the solvency of Millennium as of April 16, 2014, the date on which Millennium closed on a $1.825 billion syndicated loan facility and the related credit agreements became effective (the "2014 Transaction").  For the purpose of the solvency analysis described herein, April 16, 2014 is the date of valuation.

7. Based on the analyses below, my expert opinions are:

- Millennium created the "Padres Projections" to support the 2014 Transaction, and the projections were provided to both the underwriters and Vantage Point Advisors, Inc. ("Vantage Point"), the contemporaneous solvency advisor. However, the Padres Projections were significantly flawed in that they failed to reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction.

- At the time of the 2014 Transaction, several trends were impacting Millennium's business and were reasonably expected to further impact the business going forward. Taken together, these trends indicated that Millennium was facing significant reimbursement,

---

[1] Throughout this report, I use the term "I" when describing who completed the analyses upon which my opinions are based.  This is for ease of writing and should be understood to mean me, personally, or other professionals at The Brattle Group working under my direction.

[2] Throughout this report I cite to specific record evidence.  The cited evidence is intended to be representative but not exhaustive.  I reserve the right to rely on additional record evidence.

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 2

legal, and regulatory risks and that the company was very likely to encounter slowing or negative growth and declining profitability. The Padres Projections failed to reasonably account for these risks.

- To accurately calculate value using a Discounted Cash Flow or "DCF" methodology, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation. This was not done at the time of the 2014 Transaction and a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction.

- Giving effect to the 2014 Transaction, Millennium's equity value was no greater than *negative* $958.9 million, before considering the company's significant contingent liabilities. In other words, the 2014 Transaction rendered Millennium balance sheet insolvent. Including a conservative estimate of the liabilities relating to the then pending litigation and government investigations, Millennium's equity value was no greater than *negative* $1,003.9 million.

- Due to the limited comparability of the identified public companies, I did not rely on the Guideline Public Company or "GPC" methodology. Nonetheless, I note that the *minimum* EBITDA multiple derived from the identified public companies is *above* the EBITDA multiple at which Millennium's financial advisors unsuccessfully attempted to sell the company just prior to the 2014 Transaction.

- Courts have found that unreasonably small capital is a financial condition *prior to* equitable insolvency. The results of the balance sheet test demonstrate that Millennium was equity insolvent. Nonetheless, I also conducted a second analysis that shows that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with unreasonably small capital.

- The 2014 Transaction encumbered Millennium with debt beyond the company's ability to pay as that debt matured. Indeed, by 2018, Millennium would have had insufficient liquidity to meet interest payments required under the 2014 Transaction. Liquidity that may have otherwise been available via the company's revolving loan in 2018 was not projected to be available due to a projected covenant breach.

## III.   BASIC FACTUAL OVERVIEW

### A.   OVERVIEW OF MILLENNIUM'S BUSINESS

8. Millennium Laboratories, Inc. ("Millennium" or the "Company")[3] was founded in San Diego, California in December 2007. The company received its first specimen for testing in March 2008 and completed its first full year of operation in 2009.[4] Millennium was founded as a company that exclusively provided urine drug testing ("UDT").[5] UDT is employed by clinicians to monitor prescription medication use and identify drugs of abuse.[6]

9. The UDT industry focuses on identifying the presence of certain of types of drugs ("qualitative testing") and the more precise measurement of the specific drug and quantity of drugs in a urine specimen ("quantitative testing"). A qualitative test, such as immunoassay testing provided at the point-of-care, is able to detect the presence of certain drugs in a patient's urine, but cannot quantify the amount of any given drug present or distinguish between multiple substances in the same drug class.[7] These qualitative results are typically used in a physician's office to guide treatment discussions and initial prescribing decisions while the patient is still present in the office, and to inform physicians' judgment on the medical necessity, if any, of ordering and billing the patient or his/her insurer for additional confirmatory or quantitative testing.[8] Such quantitative testing is typically performed by a laboratory company via complex testing

---

[3] Throughout its history, the Company experienced various changes in name and in corporate structure. For instance, Millennium Laboratories, Inc. was converted to an LLC prior to the closing date of the 2014 Transaction. *See* Millennium Laboratories Confidential Information Memorandum, p. 24 [ML_DE_00269115] ("Confidential Information Memorandum"). For the purposes of this report, I use the term "Millennium" to refer to the operating company that was the borrower in the 2014 Transaction regardless of time frame and the form of the Company at the time.

[4] Confidential Information Memorandum, p. 40.

[5] Confidential Information Memorandum, p. 40: "Millennium's first service offering was in the urine drug testing ("UDT") space where they set out to deliver fast, highly accurate results using LC-MS/MS technology driven by proprietary algorithms and customized methods."

[6] Confidential Information Memorandum, p. 16.

[7] Millennium Self-Disclosure Statement, p. 3 [ML_DE_00670668 at 0670]. According to Hogan Lovells US LLP (Millennium's legal counsel), the self-disclosure statement was made on behalf of Millennium "pursuant to the CMS Voluntary Self-Referral Disclosure Protocol to resolve a potential violation of the "Stark" physician self-referral (Section 1877 of the Social Security Act). This disclosure relates to Millennium's prior practice of providing point-of-care drug test cups at no charge to certain of its physician customers for use also as a specimen collection device." *See* Millennium Self-Disclosure Statement, p. 1 [ML_DE_00670668 at 0668].

[8] Millennium Self-Disclosure Statement, p. 4 [ML_DE_00670668 at 0671].

---

technology to identify the specific drug type and quantify the precise amount in the specimen.[9] A laboratory may also perform "specimen validity testing" to determine whether the urine sample has been adulterated in some manner.[10]

10. Since its inception, Millennium focused on the pain management industry, an industry that prescribes drugs to relieve pain, including drugs that were susceptible to abuse.[11] Millennium's growth was influenced by the rapid increase in medical use and illicit abuse of opioid drugs, which were becoming a serious and growing health problem.[12] The UDT industry grew rapidly in the years leading up to the 2014 Transaction. From 1991 to 2010, U.S. opioid prescriptions (measuring only a portion of opioid use) grew by a 5.5% per annum compound annual growth rate ("CAGR").[13]

11. Clinicians who were customers of Millennium included pain practitioners, primary care physicians, addictionologists, orthopedic specialists, spine and sports medicine specialists and psychiatric specialists.[14] Millennium's customers were dispersed throughout the United States, with significant concentrations in Florida and the New England and Southwest regions.[15] Typically, urine samples were collected from the patient in a clinical setting and sent to a Millennium laboratory for analysis. Using Liquid Chromatography – Mass Spectrometry / Tandem Mass Spectrometry ("LC – MS/MS"), Millennium provided quantitative testing that detected the presence and precise level of drugs in a patient's urine.[16]

12. In June 2012, Millennium expanded its business operations to include pharmacogenetic testing ("PGT").[17] PGT detects genetic variations in enzymes associated with the metabolism of certain medications, which assists clinicians in identifying an appropriate drug therapy for a given

---

[9]  Millennium Self-Disclosure Statement, p. 4 [ML_DE_00670668 at 0671].
[10]  US DOJ Complaint [ML_DE_00595094 at footnote 2].
[11]  Confidential Information Memorandum, p. 40.
[12]  Confidential Information Memorandum, p. 40.
[13]  Confidential Information Memorandum, p. 62.
[14]  Confidential Information Memorandum, p. 17.
[15]  *See* Padres Projections (ML_DE_00057999), April 12 2014, tab "Volume".
[16]  Confidential Information Memorandum, p. 17.
[17]  Confidential Information Memorandum, p. 40.

patient.[18] In December 2013, Millennium acquired RxAnte. RxAnte intended to provide clinicians with data-driven analytics designed to improve the targeting of medication. Even after these business expansions, UDT remained Millennium's largest business segment. For the year ended December 31, 2013, for instance, UDT represented 98.1% of the Company's total revenue.[19]

## B.   MILLENNIUM'S COMPETITORS

13. The UDT industry was highly competitive at the time of the 2014 Transaction. Barriers to entry were low, as witnessed by high growth of independent and physician-owned laboratories.[20] Millennium's primary competitors were private companies such as Ameritox, Aegis, and Calloway. Millennium claimed that its key competitive advantage was faster turnaround times than its competitors. The Company sought to report test results by the next business day, compared to 3-4 days (or longer) for its competitors.[21]

14. To a lesser extent, Millennium also competed against larger clinical laboratory testing companies like Laboratory Corporation of America Holdings ("LabCorp") and Quest Diagnostics ("Quest"). LabCorp and Quest were significantly larger than Millennium and both provided other clinical diagnostic testing services in addition to UDT. Unlike Millennium, Quest and LabCorp developed their toxicology segments in 2012 and 2013 via acquisitions.[22] At the time of the 2014 Transaction, there was ongoing consolidation in the clinical laboratory testing business.[23] Larger companies such as LabCorp and Quest maintained a competitive advantage over smaller

---

[18]   Confidential Information Memorandum, p. 16.

[19]   *See* Padres Projections, April 12 2014, tab "Summary".

[20]   Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013 filed February 25, 2014 at p.5.

[21]   Confidential Information Memorandum, p. 80. Millennium further stated that it was the only operator to rely almost exclusively on liquid chromatography – mass spectrometry/tandem mass spectrometry ("LC-MS/MS") for testing. Confidential Information Memorandum, p. 17.

[22]   Quest Diagnostics Incorporated Form 10-K for the fiscal year ended December 31, 2013, filed February 18, 2014, at pp. 6 and 48; Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013, filed February 25, 2014, at F-13.

[23]   Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013, filed February 25, 2014, at p. 5.

companies like Millennium due to the cost efficiencies and large service networks.[24] A more efficient cost structure was particularly valuable in the face of expected reductions in reimbursement rates. Larger clinical laboratory testing companies represented a potential threat to Millennium as they began to expand further into the UDT industry.[25]

### C.    HISTORICAL FINANCIAL METRICS OF MILLENNIUM'S BUSINESS

15. Millennium generated the vast majority of its revenue from third-party payor arrangements. That is, Millennium was not paid directly by the patient in most instances.[26] Rather, a third-party entity reimbursed Millennium for the testing services. Third-party payors primarily consist of private health insurance, managed care organizations, workers compensation programs, and the government-sponsored programs of Medicare and Medicaid. Non-governmental third-party payors (*i.e.*, excluding Medicare and Medicaid and some workers compensation insurers), are commonly referred to generically as "commercial payors."

16. Millennium regularly conducted multiple tests on a single urine specimen. For example, as of December 2013, Millennium was conducting approximately 23 tests, on average, for each urine specimen.[27] After increasing the average number of tests per specimen at the end of 2011 and through the beginning of 2012, Millennium's average tests per specimen had remained fairly constant prior to the 2014 Transaction. *See* Figure 1. It is noteworthy that Millennium billed almost the same average number of tests per specimen to Medicare as to commercial payors,[28]

---

[24]    *Id.*

[25]    S&P credit rating report, dated March 28, 2014. ("While we believe Millennium holds the leading market position among its small niche competitors, its market share remains relatively small compared to the larger industry powerhouses Quest Diagnostics and Laboratory Corp. of America Holdings. Large competitors' presence in niche markets is currently small, but there is a potential threat that they might further expand into the field that exhibits relatively low barriers to entry.").

[26]    For the year-ended December 31, 2013, less than 0.7% of Millennium's revenue was identified as "self pay." *See* ML_DE_00732288 (Yearly 2009-2015M5 tab); 0.1% if all "patient" revenue is included; 0.7% if both "patient" and "client" revenue is included.

[27]    ML_DE_00732288 (Quarterly 2012-2015Q1 tab, cell CJ140)

[28]    For example, in 2013 Millennium billed an average 22.6 tests per specimen to Medicare, as compared with 23.6 tests on average across all payors. Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC. For the purposes of this analysis, I have defined these payors as the commercial payors. *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab).

despite Medicare's population likely skewing towards a much older age group.[29] As discussed further herein, government investigators alleged that Millennium maintained a regular practice of improperly billing Medicare for medically unnecessary tests, including tests for drugs that were not commonly abused by the older Medicare age cohort.[30]  At the time of the 2014 Transaction, Millennium knew or should have known, from its own billing records, the risks of continuing to bill Medicare for medically unnecessary tests.   These risks included not only declining test-per-specimen levels in the future but also exposure to monetary damages or fines for past billings to Medicare.



**FIGURE 1: QUARTERLY TESTS PER SPECIMEN**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab), YAS Workpaper 4.

---

[29]   *See* Centers for Medicare & Medicaid Services, *Original Medicare Enrollment: Part A and/or Part B Enrollees by Demographic Characteristics, Calendar Year 2013* 1 (2020), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/2013/Downloads/MDCR_ENROLL_AB/CPS_MDCR_ENROLL_AB_11.pdf

[30]   US Complaint In Intervention, United States of America, et al v. Millennium Laboratories, Inc. at 5 ("US DOJ Complaint") [ML_DE_00595094 at 5096].  *See also* : Center for Behavioral Health Statistics and Quality, *Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings* 18, 21 (2012), https://www.samhsa.gov/data/sites/default/files/NSDUHresults2012/NSDUHresults2012.pdf  (showing that illicit drug use among those aged 60 to 64 was 3.6 percent in 2012, as compared to 7.0% among all adults aged 26 or older).

17. The amount of revenue that Millennium generated per specimen (known as "net revenue per specimen" or "NRPS") was based not only on the number of tests per sample, but also the type of tests performed and the third-party payor providing reimbursement. Each test corresponded to a pre-identified code in a coding system commonly used in the healthcare industry. For commercial payors, the coding system was the Common Procedures Terminology ("CPT") developed by the American Medical Association. Medicare and Medicaid use a comparable coding system, the Healthcare Common Procedure Coding System ("HCPCS").[31] Millennium received payment (or "reimbursement") for each code it billed. For example, if Millennium conducted 23 separate tests on a single urine specimen, Millennium could receive up to 23 payments corresponding to that single specimen.[32] The actual amount of the reimbursement for a specific code was determined by individual reimbursement contracts between Millennium and the third-party payor. Medicare (under the fee for service model) provided reimbursement to Millennium through a similar fee schedule.

18. There was a wide diversion between individual reimbursement rates for separate codes. For instance, in 2014, Millennium received reimbursement from Medicare for quantitative tests for alcohol (82055) and acetaminophen (83516) at $14.74 and $12.66, respectively.[33] On the other hand, quantitative tests for hydromorphone (82649) and serotonin (84260) were reimbursed at the significantly higher rates of $35.07 and $42.26, respectively.[34] It is relevant to note that although commercial payors provided reimbursement at amounts that differed from Medicare (or, CMS more broadly), there is an established industry practice of commercial reimbursement rates following the trend of CMS reimbursement rates. For example, decreases in CMS

---

[31] Both HCPCS and CPT were developed to report medical procedures and services. HCPCS Level I codes are identical to CPT. However, HCPCS also includes Level II codes (non-physician services like ambulance rides, wheelchairs, walkers, other durable medical equipment, etc.) and HCPCS modifiers which differentiate it from CPT. *See* https://www.medicalbillingandcoding.org/hcpcs-codes/.

[32] These payments may be subject to caps and aggregations. For example, as of January 1, 2014, additional limitations were placed on the amount of tests that could be billed to certain codes for the same beneficiary for the same date of service. *See* Section VII.E.1.a.

[33] Millennium Health, 2014 Annual Physician Notice [ML_DE_00164030] at p. 4.

[34] Millennium Health, 2014 Annual Physician Notice [ML_DE_00164030] at p. 6.

reimbursement rates are frequently followed by decreases in commercial reimbursement rates. Millennium understood this practice at the time of the 2014 Transaction.[35]

19. Table 1 displays revenue and specimen volume figures for the top five payors in Millennium's UDT business for the year ended December 31, 2013, the last fiscal year prior to the 2014 Transaction.

**TABLE 1: TOP 5 PAYORS FOR UDT BUSINESS IN 2013: REVENUE AND SPECIMEN VOLUME**

| Rank | Payor | Revenue ($ millions) | % of Total Revenue |
|---|---|---|---|
| 1 | Medicare | 198.55 | 32.82% |
| 2 | Blue Cross Blue Shield | 84.89 | 14.03% |
| 3 | Medicaid - Contract | 51.23 | 8.47% |
| 4 | UHC | 50.32 | 8.32% |
| 5 | Managed Government | 49.75 | 8.22% |

| Rank | Payor | Specimen Volume (thousands) | % of Total Specimen Volume |
|---|---|---|---|
| 1 | Medicare | 428.56 | 18.62% |
| 2 | Blue Cross Blue Shield | 367.47 | 15.97% |
| 3 | Managed Government | 332.98 | 14.47% |
| 4 | Patient | 223.68 | 9.72% |
| 5 | UHC | 222.31 | 9.66% |

Source: ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab). "Other Payors" category excluded in ranking.[36]

---

[35] Pencak Deposition 209:21 - 210:20 and Plaintiff Ex. 158 [ML_DE_00045459]:

"Q. This [Pl's Ex. 158] is an email from Kenneth Kirsch to Charles Haley at Noridian dated March 13, 2014, the subject is 'Noridian LCD response.' The attachment is a March 13, 2014, letter, to a Bernice Hecker at Noridian. I really want to draw your attention to the bottom of page 2. Millennium writes there, "It is widely known that 'as Medicare goes, so go the other payors, ' many of whom will likely be emboldened by an opportunity provided by the policies in the LCD to cut a growing source of cost to their plans." Do you see that?

A. Yes.

Q. Is that consistent with your understanding of Millennium's view at the time?

A. Yeah, as I mentioned earlier, I mean, it's generally, especially if it is a savings, then commercial payors would likely adopt it."

[36] Throughout this report I refer to two different Padres Projections, being ML_DE_00044521 and ML_DE_00057999. These models are dated 3/14/2014 and 4/12/2014 respectively. The model dated 4/12/2014 is the most contemporaneous model to the 2014 Transaction. The total revenue from these two models is

20. As shown in Table 1, 18.62% of Millennium's 2013 total specimen volume related to patients covered by Medicare. However, because Medicare's reimbursement rates (for a given test) were significantly higher than commercial reimbursement rates, Medicare reimbursement accounted for an even higher percentage of Millennium's revenue - nearly 33% for 2013. This is consistent with published research at the time finding that Medicare paid between 18-30 percent more than commercial payors for the same laboratory tests.[37] In 2013, Millennium was the largest of *any* Medicare Part B biller by dollar amount.[38]

21. Members of the Blue Cross Blue Shield network and United Healthcare ("UHC") were Millennium's largest commercial payors. In aggregate, reimbursement payments from these payors equaled approximately 22% of Millennium's 2013 revenue. Reimbursement from *all* commercial payors equated to approximately 35% of Millennium's 2013 revenue.[39] Thus, Medicare, Blue Cross Blue Shield and UHC represented 55% of Millennium's 2013 revenue and Medicare and all commercial payors represented approximately 68% of Millennium's 2013 revenue. Also noted in Table 1, Managed Government comprised 14.5% of specimen volume but only 8.2% of revenue. Managed Government represents commercial payors approved by Medicare to administer Medicare coverage and add-on coverage for categories of care not always reimbursed by Medicare, such as dental and vision.[40] Notwithstanding that Millennium's Managed Government segment administered coverage under Medicare, the reimbursement rates for Managed Government were significantly lower than the reimbursement rates for "traditional" Medicare (also known as "fee for service"). As a result, Millennium's NRPS for Managed

---

identical, however the earlier model dated 3/14/2014 contains additional content (*e.g.*, more granular data by payor) that is useful for my analysis.

[37]   Department of Health and Human Services, Office of Inspector General "Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings", June 2013, p. 9.

[38]   Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.  *See also* Medicare Physician and Other Supplier PUF Methodology describing the dataset, p. 4 (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Medicare-Physician-and-Other-Supplier-PUF-Methodology.pdf) and US DOJ Complaint at ¶ 2. Medicare Part B covers a wide variety of outpatient services, of which laboratory testing services is only one component.

[39]   *See* ML_DE_00732288 (Yearly 2009-2015M5 tab).

[40]   *See* https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans. Also includes dual health plans where a patient qualifies for both Medicaid and Medicare. For example, *see* https://www.uhccommunityplan.com.

---

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 11

Government was almost three times lower than its Medicare NRPS, despite a similar number of tests per specimen.[41]

22. Similarly, there were large differences in reimbursement rates amongst commercial payors, as evidenced by significant differences in NRPS.[42] For example, Millennium's NRPS for Aetna was more than two times higher than that for UHC and Humana even though Millennium's average tests per specimen for these payors was broadly similar.[43] Millennium actively sought to reduce its exposure to payors with low reimbursement rates.[44]

23. Millennium received reimbursement from billing to dozens of codes in a given year. For example, in each of 2012 and 2013, Millennium received reimbursement from Medicare in connection with more than 25 codes.[45] However, in 2012 and 2013, Millennium generated a disproportionate percentage of its Medicare revenue from reimbursement for billings under two specific HCPCS codes, 83925 (opioids drugs measurements) and 82542 (chemical analysis using chromatography technique).

---

[41] *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), column AI and AW, rows 129 and 132. In 2013, NRPS for Medicare and Managed Government was $467 and $144 respectively. In 2013, average tests per specimen for Medicare and Managed Government was 22.6 and 23.8 respectively.

[42] Tests per specimen was relatively consistent across commercial payors. *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), column AW, rows 124-137.

[43] *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), columns AJ and AX, rows 124 and 135. In 2014, average NRPS for Aetna and UHC was $449 and $203 respectively. In 2014, average tests per specimen for Aetna and UHC was 25.3 and 23.4 respectively.

[44] Plaintiff Exhibit 17 to Price Deposition:

"Summer/Fall 2011: one troubled practice offered to 'double-up on its testing' and ML declined and terminated the relationship"

"Dr. O'Connell's practice ordered few tests/specimen and ML terminated the relationship 'because they did not think he was serious about quality UDT results'"

Pencak Deposition, Plaintiff Exhibit 135:

"They both seem to be newer practices so please make it a priority to follow up with the respective reps to make sure they are considering payor mix and tests per specimen when signing on new practices."

[45] Code level reimbursement is not available for Millennium's other payor types. Codes billed to Medicare are assumed to represent a subset of the total codes billed by Millennium to all payor types.  Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. CMS data indicates Millennium billed 33 codes to CMS in 2012 and 30 codes in 2013.

24. As shown in Table 2, for the year ended December 31, 2013, Millennium generated approximately 33% of its Medicare revenue from these two codes alone. The amount of revenue Millennium generated from these codes reflected the facts that these codes were associated with a high volume of tests performed by Millennium *and* that the reimbursement rates for these two codes were among the highest Medicare reimbursement rates for codes billed by Millennium. As discussed below, these two codes also were the focus of important new (or newly implemented) Medicare coverage determinations, policies, and restrictions (*i.e.*, medically unlikely edits ("MUEs")[46] and local coverage determinations ("LCDs"))[47] at the time of the 2014 Transaction.

**TABLE 2: MEDICARE REIMBURSEMENT AND VOLUME FOR 83925 AND 82542**

| HCPCS Code Subject to MUE | % of Millennium's Total Medicare Reimbursement | | % of Millennium's Total Medicare Test Volume | |
| --- | --- | --- | --- | --- |
| | 2012 | 2013 | 2012 | 2013 |
| 83925 | 25.22% | 23.49% | 20.12% | 19.58% |
| 82542 | 1.56% | 9.54% | 1.34% | 8.61% |
| **Total** | **26.77%** | **33.04%** | **21.46%** | **28.19%** |

Source: Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

25. Prior to the 2014 Transaction, Millennium was engaged in two specific business practices that the Company acknowledged significantly contributed to its growth and profitability: the use of "Custom Profiles" and the provision of free specimen testing cups to Millennium customers.[48]

---

[46] MUEs are used by Medicare Administrative Contractors ("MACs") to reduce improper payments for Part B claims. *See* Section VII.E.1.b for further explanation of MUEs and their impact on Millennium.

[47] An LCD is a determination by a fiscal intermediary (under Medicare Part B, a MAC) as to whether or not a particular item or service is eligible for reimbursement under Medicare. See Section VII.E.1.c for further explanation of LCDs and their impact on Millennium.

[48] *See*, *e.g.*, Exhibit 4 to the US DOJ Complaint. ("As you know, the standing order is critical to our confirmation and billing process") [ML_DE_00628896 at 8897]. Exhibit 5 to the US DOJ Complaint ("If an account does not want a Standing Order in place for the 6 drugs not covered by the [POC test], we do not want to do business

Early versions of both of these business practices had been implemented by the end of Millennium's first full year of operation. Millennium initiated the practice of Custom Profiles in 2008.[49] Custom Profiles were standing orders indicating a panel of tests to be performed on a specimen, and which remained in effect for the physician's practice until and unless changed.[50] Thus, the panel of tests indicated by a Custom Profile was not specific to an individual patient (or specimen). When submitting an individual patient urine specimen to Millennium for testing, a customer with a Custom Profile would typically select one of three options on the test requisition form: (i) use Custom Profile, (ii) use Custom Profile and add additional tests (as indicated) or (iii) do not use Custom Profile and perform certain tests (as indicated).[51] As of the 2014 Transaction, approximately 64% of Millennium's customers used Custom Profiles. As explained more fully below, Millennium began transitioning away from the use of Custom Profiles in March 2015, approximately one year after the 2014 Transaction.[52]

---

with them") [ML_DE_00628899 at 8900]. Exhibit 7 to the US DOJ Complaint ("WE DON'T WANT TESTING TO DECLINE BY UPDATING THE CP WITH LESS TESTS") (capitalization in original) [ML_DE_00628908] at 8911. Exhibit 12 to the US DOJ Complaint ("There are not enough tests on the CP and [Mr. Appel] *will not approve*") (emphasis added) [ML_DE_00628930 at 8931]. Exhibit 13 to the US DOJ Complaint ("If practice falls below ML profitability guidelines, cup agreement will be denied") [ML_DE_00628932 at 8934]. Exhibit 66 to the US DOJ Complaint ("This cup agreement is vital to our practice") [ML_DE_00629092 at 9094].

[49]  *See* US DOJ Complaint at ¶ 210 [ML_DE_00595094 at 5149] (Tampa Pain Relief Center used a Standing Order since 2008).

[50]  US DOJ Complaint at ¶¶ 89-90 [ML_DE_00595094 at 5117] (A Custom Profile was alternately referred to as a Standing Order or Test Protocol).

[51]  Exhibit 55 to the US DOJ Complaint [ML_DE_00629045 at 9046].

[52]

26. Millennium initiated the use of free specimen testing cup agreements in late 2009.[53] Under these agreements, Millennium provided specimen collection cups with integrated test strips to its customers free of charge. The specimen cups and test strips provided by Millennium allowed healthcare providers to perform qualitative UDT at the point of care. The agreements stated that in exchange for receiving the specimen cups free of charge, physicians agreed to use the cups for "collecting and transporting specimens for testing by our [Millennium's] laboratory."[54] The agreement also stated that Millennium would invoice the physicians for "excess cups" which were sent to the physician's office and had not been sent back to Millennium for quantitative testing.[55] According to Millennium, as of the 2014 Transaction, approximately 10% of Millennium's customers had entered into the free specimen cup agreements, representing 16% to 17% of total specimen volume.[56] As explained further below, Millennium terminated the free specimen cup agreements in June 2014, approximately two months after the 2014 Transaction.[57]

## IV.    2014 FINANCING TRANSACTION

27. In mid-2013, Millennium began conversations with J.P. Morgan, its primary banker, to refinance the Company's existing debt. Millennium's existing debt consisted primarily of a $330 million term loan syndicated among a few banks and a large commercial finance provider in March, 2012 (the "2012 Transaction").[58] J.P. Morgan was the Administrative Agent and "left lead"

---

[53]   Millennium Self-Disclosure Statement at p. 4 [ML_DE_00670668 at 0671].

[54]   Exhibit 39 to US DOJ Complaint [ML_DE_00_629262 at 9263] (second emphasis added):

"To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory. While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that 1) you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups, 2) you will not bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups and 3) you will not resell or redistribute these cups. In addition, you agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing."

[55]   Exhibit 39 to US DOJ Complaint [ML_DE_00_629262 at 9263].

[56]   Millennium Self-Disclosure Statement at p.3 [ML_DE_00670668 at 0670]. This assumes that the disclosed percentage of customers is consistent with the percentage of customers at the time of the 2014 Transaction.

[57]   Millennium Self-Disclosure Statement at p.5 [ML_DE_00670668 at 0672].

[58]   Exhibit 116 to Deposition of J. Lee (J.P. Morgan), June 23, 2021 [JPMC-MIL-CORP-00183881].

bookrunner for the 2012 Transaction. Prior to the 2014 Transaction, J.P. Morgan held $75.9 million in credit exposure from the 2012 Transaction.[59]

28. A significant motivation for the 2014 Transaction appears to have been to provide liquidity to Millennium's equity holders,[60] following earlier and unsuccessful attempts to sell the Company over an approximately three year period. In 2011, the Company engaged UBS to explore a sale transaction. After marketing to up to 16 potential acquirers, the sale process was considered "unsuccessful"; only one bid emerged, and that bid was far below the valuation expectations of $1.5 billion.[61] Risks around reimbursement were identified as a key reason for the unsuccessful sales process.[62] A second motivation of the refinancing transaction appears to have been to reduce J.P. Morgan's credit exposure to Millennium.[63]

29. In 2013, Millennium attempted, for a second time, to sell the Company or otherwise provide liquidity to its equity holders. However, perceived reimbursement risks appear to have also

---

[59] J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]: "JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

[60] Exhibit 116 to Deposition of J. Lee (J.P. Morgan), June 23, 2021 [JPMC-MIL-CORP-00183881] (emphasis added):

"Attached please find our thoughts on a dividend recapitalization for Millennium. We have taken into consideration a number of factors:

- Avoid issuing public securities and stay in the loan market
- Keep the entire capital structure pre-payable without friction, in case there is a monetization event in the near to intermediate term
- Maintain modest leverage, given management's as well as TA's institutional perspective around pursuing the maximum available leverage

Take a look at the attached and let's have a call to walk you through it at your convenience. The markets remain strong and the Company has performed extremely well, allowing for a significant dividend, while keeping leverage at reasonable levels."

[61] Exhibit 14 to Price Deposition. [BMO-ML-00030001]:

"The process was unsuccessful, although did receive an offer from at least one party, which was far below valuation expectations (UBS indicated valuation would be closer to $1.5B in its pitch process)."

[62] Exhibit 14 to Price Deposition. [BMO-ML-00030001]:

"Buyer concerns were mostly related to reimbursement and that TA had just invested."

[63] J.P. Morgan Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]:

"**Transaction Rationale**

…

**Exposure Reduction**: JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

---

thwarted this second sales process. In October 2013 Millennium signed an engagement letter with Citi to pursue various strategic alternatives including a sale, recapitalization, issuing additional equity and liquidation.[64] Millennium asked Citi to explore if there was an opportunity to sell to a private equity sponsor at a valuation of 6x to-7x EBITDA or else take the Company public.[65] Citi noted at the time that private equity sponsors "have been generally skeptical of the business and risk of reimbursement."[66] Nonetheless, Citi reached out to potential buyers and in January 2014 pitched the transaction to a potential strategic buyer in Australia.[67] This potential buyer was described as "know[ing] ML's business well" but declined to engage in the sales process citing concern that Millennium operated in a "highly competed" industry with "unsustainable margins." The buyer also cited "issues re reimbursement in ML's end-markets."[68] On the heels of these two failed sales processes, Millennium pursued the 2014 Transaction.

30. The 2014 Transaction was ultimately structured as a $50 million revolving loan and a $1.775 billion Term Loan.[69] It appears that the decision to pursue the 2014 Transaction in the leveraged loan market was at least partially motivated by a desire to monetize the investment made by TA Associates ("TA") ahead of any potential regulatory/the United States Department of Justice ("US DOJ") investigation issues, notwithstanding the loss of substantial tax advantages.[70]

---

[64] Letter from Citi Corporate and Investment Banking to Millennium, October 21, 2013, Exhibit 15 to Price Deposition [CITI-DE-00005790].

[65] Email from Sarin to Blake, Re: Millennium update, October 12, 2013, Exhibit 223 to Deposition of M. Tortora (Citi), July 15, 2021 [CITI-DE-00071523 at 1523].

[66] *Id.*

[67] Email from Ristevski to Phin and Sarin, Re: Sonic, January 12, 2014, Exhibit 233 to Deposition of M. Tortora (Citi) [CITI-DE-00052087]. The potential buyer is believed to be Sonic Healthcare, referred to as "Sonic" in the Citi emails.

[68] *Id.*

[69] The syndicated term loan facility was upsized from $1.765 to $1.775 billion to accommodate an additional original issue discount to attract lenders, and the revolving credit facility was $50 million, for a total of $1.825 billion. *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014.

[70] *See* email from James Hart of TA (Plaintiff Exhibit 198 TA Associates Deposition) [TA_MLH-00011849]:Email from Tony Marsh of TA (Plaintiff Exhibit 198 TA Associates Deposition) [TA MLH-00011849]:

"The implication of doing a debt recap there is massive from a tax structuring standpoint. We would blow the structure with the potential to lose the full step up at the next transaction that could be worth $100s of millions depending on the form of the exit."

*See also* Email from Kevin Landry of TA (Plaintiff Exhibit 194 TA Associates Deposition) [TA_MLH-00009903]:

Proceeds from the 2014 Transaction plus additional cash on Millennium's balance sheet were used to fully repay debt held by TA, fully repay the debt issued in connection with the 2012 Transaction, pay an approximately $1.3 billion dividend to shareholders and warrant holders in Millennium's parent companies and to fund transaction fees, including fees to underwriters. In addition, certain members of management received cash distributions at the time of the 2014 Transaction.[71] Table 3 shows estimated sources and uses of proceeds for the 2014 Transaction.

**TABLE 3: ESTIMATED SOURCES AND USES OF FUNDS: 2014 TRANSACTION ($ MILLIONS)**

| Sources | Amount ($M) | Uses | Amount ($M) |
|---|---|---|---|
| New Revolver ($50M) | - | Dividend to Shareholders | 1,269.6 |
| New Term Loan B | 1,775.0 | Refinance Term Loan A | 304.0 |
| Cash from Balance Sheet | 50.0 | Refinance TA Sub Debt | 196.0 |
| | | Estimated Fees and Expenses | 55.4 |
| **Total Sources** | **1,825.0** | **Total Uses** | **1,825.0** |

Source: Confidential Information Memorandum [ML_DE_00269115 at 9136], updated by Brattle to account for the final Original Issue Discount (*see* footnote 69).

31. The 2014 Transaction was underwritten by J.P. Morgan, Citi, Suntrust and Bank of Montreal ("BMO").[72] The underwriters agreed to take on minimal credit exposure to Millennium beyond

---

"Millennium is obviously a VERY important asset for TA. We discussed the real economic tradeoffs of doing another recap in the second half of 2013, but under the "bird in the hand v. two in the bush" theory, it might make sense to pursue a recap sooner rather than later, despite the tax costs. From conversations after the PC meeting, I understand we may all be in violent agreement, but wanted to reinforce that the Portfolio Committee agrees with the approach of pushing for additional liquidity as soon as possible, given the size of a potential recap, the importance of Millennium to TA, and potential regulatory issues."

*See also* email from Mark Carter of  TA (Plaintiff Exhibit 195 TA Associates Deposition) [TA_MLH-00041365]:

"I know you are contemplating a recap versus the government inquiry but for what it is worth, you may want to explore the stretch senior market. Cov-lite probably up to 4.5x leverage L+350. The good news is there are no breakage costs so if you decide to redo the cap structure later after the government provides the all-clear, no problem. This may be an issue for senior management given the risks this presents but you could always provide a special bonus to them. The bonus would go against the strike price of their options so it isn't a double dip. I have used this mechanism recently so happy to discuss. You have done such a good job with Millennium that I am focused on de-risking this all important investment. I would ignore the hundreds of millions in tax benefits and blow it up."

[71]  *See* email from Heidi Smith [ML_DE_00062278] and Excel attachment [ML_DE_00062280]; *see also* Martin Price Deposition Transcript, dated April 12, 2021, at 169:23-172:25.

[72]  J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494]; Citi Millennium Labs Final Approval Memo, March 13, 2014 [CITI-DE-00017912]; BMO Loan Underwriting

---

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 18

the initial underwriting risk, committing to hold only the shorter tenor revolver (which contained lending covenants not provided to the term loan lenders) and entitling them to sell down 100% of the Term Loan to other investors.[73] In particular, notwithstanding its "strong relationship" with Millennium, J.P. Morgan appears to have been uncomfortable with assuming even the underwriting risk.[74] Indeed, J.P. Morgan internally expressed concern as to whether there was sufficient market demand to successfully syndicate the loan. In an email dated January 14, 2014, a J.P. Morgan employee noted that many banks had declined to be involved in the 2012 Transaction due to concerns about litigation risk, debt structure, and the use of proceeds.[75] The 2014 Transaction required new money, and it was noted that litigation risk and use of proceeds remained a hurdle for new lenders. During the course of the syndication, J.P. Morgan asked BMO to hold a portion of the Term Loan. The contemporaneous communications confirm that J.P. Morgan was having difficulty syndicating (*i.e.*, selling) the loan in the market.[76] Furthermore, following syndication, J.P. Morgan elected to reduce its credit exposure to

---

Committee Memorandum, March 11, 2014 [BMO-ML-00009109]; SunTrust DCC Memo, March 2014 [Suntrust_MIL-DE-00006771].

[73] The Master Consent to Assignment shows the initial allocation of the Term Loan amongst investors [ML_DE_00465366 at 5370-5371].

[74] TA Associates deposition, Exhibit 216 (emphasis from original): "One important point: to note: JPMorgan does NOT want the fact that this is an underwritten deal to get out in the marketplace with accounts. We should all be careful not to talk about this deal and the underwritten point, specifically." [TA_MLN-00013228].

[75] Exhibit 125 to Deposition of J. Lee (J.P. Morgan), June 23, 2021:

"Most likely suspects to revisit, all turned it down in 2012 over use of proceeds or litigation or TA debt structure-- Wells, BAM L, Sumitomo, US Bank, Union Bank, Raymond James, BBVA Compass, Bank of the West, BB&T, Cal Bank&Trust, Key, RBC, would/could check of bunch of others. Stating the obvious but use of proceeds and litigation will remain the hurdle for new guys. At the appropriate time, would make sense to screen existing guys early/pre launch for a reality check on capacity." [JPMC-MIL-CORP-00189654].

[76] Email from Phillip Ho, April 9, 2014 (Plaintiff's Exhibit 343 to Deposition of Phillip Ho) [ML00009325 at 326]:

"Can we have a call this morning? JP called last night. Management getting nervous; Howard's asked if BMO would consider holding some of the B. Ryan at JP and I both understood that's very unlikely given cov lite. But Suntrust saying they'd hold 40mm, which Ryan and I are very surprised about.

Books at just over $lbn. There are "some" limit orders at L400 and 99. Lot of guys still working. Ryan says JP very confident theVII be well inside of flex caps when deal gets flexed; not ready to do that yet since still more time before the deadline. JP won't hold B and he's not sure where Citi is on this.

I told Ryan we'd get back to Howard today, possibly this morning. Because I knew he'd call Howard last night, told him we'd try really hard but definitely no promises. CB for sure can't hold any. Maybe the BMO CLO could do 5mm??"

---

Millennium from $75.9 million to no more than $27.5 million of the revolver capacity.[77] The revolver was ultimately terminated on June 4, 2015, which allowed Millennium to avoid an event of default in the event of a breach of the leverage covenant (*i.e.*, the term loan did not contain the leverage covenant).[78] As discussed below, it was reasonable to expect that Millennium would breach the leverage covenant (contained only in the revolver agreement) by the third quarter of 2015.

32. The terms of the underwriting included the ability to "flex" (or modify) the loan terms to complete syndication of the loan. Market flex language is designed to partially mitigate the risk to underwriters that they cannot syndicate a loan, due to either changes in market conditions or negative sentiment towards a credit. Underwriters initially indicated to the market that the Term Loan would price at LIBOR plus 350-375 basis points with a 50 basis point original issue discount ("OID") to investors, however this was increased to 425 basis points and a 100 basis point OID to investors. The loan size was increased by $10 million to fund the additional OID. In addition, the excess cash flow sweep was increased, the cap on sweeps removed, and restrictions on other debt tightened.[79] The substantial revisions to the terms are consistent with a very difficult syndication. This is consistent with contemporaneous email communications from the lead syndicator for JP Morgan (Jenny Lee): "[W]e came within 37.5 bps of our cap and we had 175 bps of flex. Never worked so hard in my life on a deal."[80]

---

[77] J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]: "JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

[78] Termination Notice, June 24, 2015 [JPMC-MIL-CORP-00108741].
Email from Martin Price to Brock Hardaway, June 29, 2015 [ML_DE_00601573]:

J.P. Morgan had advised Millennium prior to the closing of the 2014 Transaction that it could cancel the revolver to avoid a declaration of an event of default thereunder that might lead to acceleration of the term loan. *See* email from Stathis Karanikolaidis to Brock Hardaway [ML_DE_00001946].

[79] *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014; Loanconnector, "Corrected: Millennium Labs launches $1.8B dividend recap loan", March 31, 2014.

[80] *See* email dated April 16, 2014 from Jenny Lee to Brian Dolan [JPMC-00031194].

## V.      FRAMEWORK FOR SOLVENCY ANALYSIS

33. Solvency is an economic concept, the definition of which is informed by law and legal precedent. Consequently, an economic analysis of solvency must consider these sources of authoritative guidance. Section 548 of the U.S. Bankruptcy Code describes two circumstances under which a pre-petition transaction may be avoided: actual fraud and constructive fraud. The pre-petition transaction in question may be a transfer of value or the incurrence of an obligation. The first circumstance is if the transaction is undertaken "with actual intent to hinder, delay, or defraud" a creditor. This has been defined as "actual fraud."[81]

34. For a determination of actual fraud, courts have looked to several indicia, including so-called "badges of fraud." However, I note that in this Litigation, the Court has stated that "badges of fraud is just one substitute for direct evidence" and that "a court may consider factors other than badges of fraud in its analysis"[82] such as circumstantial evidence that the "natural consequence" of a debtor's action is "to hinder, delay or defraud creditors."[83]

35. The Uniform Voidable Transactions Act ("UVTA")[84] provides a non-exclusive list of the "badges of fraud". They are:

    i.       Whether the transfer or obligation was to an insider;

    ii.      Whether the transferor retained possession or control of the property after the transfer

    iii.     Whether the transfer or obligation was concealed or disclosed

---

[81]   *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 210 (3d Cir. 2006) ("'Actual' fraud is prohibited by § 548(a)(1)(A), which allows a trustee to avoid a transfer made 'with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted.'").

[82]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Memorandum, February 29, 2019, at p. 7.

[83]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Memorandum, February 29, 2019, at p. 7.

[84]   In July 2014, the UVTA replaced the Uniform Fraudulent Transfer Act, which (at that time) was in force in 43 states (all states except Alaska, Kentucky, Louisiana, Maryland, New York, South Carolina, and Virginia). Uniform Law Commission, *Fraudulent Transfer Act* [https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3]; Jones Day, *Uniform Voidable Transactions Act Approved by Uniform Law Commission to Replace UFTA*, September/October 2014, https://www.jonesday.com/en/insights/2014/10/uniform-voidable-transactions-act-approved-by-uniform-law-commission-to-replace-ufta.

Expert Report of Yvette R. Austin Smith                            Adv. Pro. No.17-51840 (LSS) | 21

iv.    Whether, before the transfer was made or obligation was incurred, a creditor sued or threatened to sue the debtor

v.    Whether the transfer was of substantially all the debtor's assets

vi.    Whether the debtor had absconded

vii.    Whether the debtor had removed or concealed assets

viii.    Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred

ix.    Whether the debtor was insolvent or became insolvent shortly after the transfer was made or obligation was incurred

x.    Whether the transfer occurred shortly before or shortly after a substantial debt was incurred

xi.    Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor

36. The second circumstance under which a transaction may be avoided, known as "constructive fraud," requires two elements:

i.    The first element is that the transferor "received less than a reasonably equivalent value in exchange for such transfer or obligation."

ii.    The second element is that he transferor must meet at least one of the following economic tests:

a.    was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation (often referred to as the "balance sheet test"); *or*

b.    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital (often referred to as the "adequate capital" test); *or*

    c.   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured (often referred to as the "ability to pay debts" test).[85]

37. Note that reasonably equivalent value and insolvency are implicated under both actual fraud and constructive fraud.

38. Several standard economic analyses are used to assess the elements of constructive fraud and some of the indicia of actual fraud. These analyses are discussed in the following sections.

### A.    BALANCE SHEET TEST

39. Under the balance sheet test, a company is considered insolvent if at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.[86] Debt is defined broadly to include liabilities associated with an obligation whether or not that obligation "is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[87] Under the assumption that a company will continue as a going-concern, its business enterprise value ("BEV") is equivalent to the sum of all of the company's assets at fair valuation.[88]

40. BEV refers to the value of a firm that is available to compensate all capital providers (i.e., both equity and debt) to the firm. The difference between a company's BEV and its total liabilities represents the company's equity value. Equity value is available to compensate the firm's equity holders. It represents the firm's residual value, after repaying the firm's debt and other liabilities. Thus, the balance sheet test determines if a company's equity value is positive or negative.[89] If

---

[85]   11 U.S.C. § 548 (a)(1)(B).

[86]   *See* UVTA, Section 2 and United States Code, Title 11, Chapter 1, Section 101.  Fair valuation is not defined in the UVTA or the Bankruptcy Code.  However, case law has defined it in a manner consistent with fair market value. *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 348 B.R. 234, 274 (Bankr. D. Del. 2005)("Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value.").

[87]   *See* 11 U.S.C. § 101.

[88]   BEV is intended to include the value of a company's non-operating assets (if any).

[89]   By definition, the sum of a company's assets is equal to the total sources of financing for those asset (*i.e.*, Assets = Debt + Equity). Re-arranging the equation, Assets – Debt = Equity.  Therefore, if Debt > Assets then Equity < 0 (*i.e.*, Equity is negative).

the fair value of a company's equity is negative, it indicates that the company is insolvent. The methodologies to calculate BEV can be categorized into three fundamental approaches: income, market and asset.

41. Income-based approaches calculate the value of a firm based on various measures of cash flow produced by the firm. The cash flow measures should be projected (or forward-looking) and should represent best estimates of expected cash flows. The most common income-based approach is the discounted cash flow ("DCF") methodology. DCF calculates the value of a firm using projected unlevered free cash flows, also referred to as "debt-free cash flows." In summary, free cash flows are calculated as revenue less cash operating expenses, taxes, investments in working capital and capital expenditures. Unlevered free cash flows do not reflect either debt service payments or distributions to equity holders (*e.g.*, dividends). The projected free cash flows of the firm are discounted back to the date of valuation, using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows. It is important to note that the DCF methodology utilizes future (projected) cash flows to ascertain the value of a company at as specific point in time (*i.e.*, the date of valuation). For valuation analysis in connection with constructive or actual fraud there are two relevant valuation dates: (i) immediately prior to the transaction subject to avoidance and (ii) immediately upon giving effect to the transaction subject to avoidance. To accurately calculate value using DCF, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation.[90]

42. Capitalization of earnings or cash flow is another, though less common, income-based valuation methodology. Capitalization may be used as an alternative to DCF if the income stream to be capitalized is anticipated to grow at a constant rate from the date of valuation into perpetuity.

43. Market-based approaches calculate the value of a firm based on market transactions involving the purchase or sale of comparable companies or ownership interests in those companies. Guideline Public Companies and Precedent Transaction methodologies are both market-based approaches. The Guideline Public Company ("GPC") methodology begins by identifying a

---

[90] *See*: Fishman, Jay E., Pratt, Shannon P. and Morrison, William J.; *Standards of Value: Theory and Applications*, John Wiley & Sons, Inc. 2007, p. 61 (quoting from Bogdanski, Federal Tax Valuation, at 2.01[3][a].

cohort of publicly-traded companies that are reasonably comparable to the firm being valued. Comparability is established through identification of specific, relevant qualitative and quantitative factors. After identifying a cohort of comparable companies, valuation multiples are calculated for each comparable company by expressing an observable measure of the company's value as a function of an operating or financial metric for the company. Under the GPC methodology, the most common observable measure of enterprise value is the sum of (i) market capitalization and (ii) the face value of outstanding debt.[91] This sum may be reduced by the company's excess cash. The most common observable measure of equity value is market capitalization. Identical to DCF, market capitalization and the value of debt are measured as of the date(s) of valuation for the subject company. Enterprise value-to-EBITDA ("EV/EBITDA"), price-to-earnings ("P/E") and price-to-book value of equity ("P/B") are examples of valuation multiples. P/E and P/B multiples are calculated using observed measures of equity value. Due to differences in accounting policies among the comparable companies or non-recurring events that affect the financial or operational metrics of a comparable company, it may be necessary to adjust or "normalize" the valuation multiples for one or more of the comparable companies to ensure that the multiples are calculated on a consistent basis.

44. The valuation multiples derived from the cohort of comparable companies may be expressed as a range, an average or another point estimate derived from the cohort (*e.g.*, a quartile value). The range or point estimate of one or more valuation multiples is, then, applied to the relevant operating or financial metric of the firm being valued (the "subject company"). As an illustrative example, the average EV/EBITDA multiple derived from the cohort of comparable companies may be applied to the EBITDA of the subject company. In this way, one can calculate the BEV for the subject company.[92] In a typical circumstance, the metric used to derive the valuation multiples should be the same metric used to calculate the value of the subject company. For example, if the valuation multiple is based on 1-year projected EBITDA, the value of the subject

---

[91] The observable measure of value may differ when the company's capital structure includes preferred equity or other classes of equity that are not publicly traded (the value of which may not be fully reflected in market capitalization). In addition, in some instances of valuation analysis (exclusive of solvency analysis), it may be appropriate to use the market value of debt instead of the face value of debt.

[92] Some valuation multiples, such as P/E, derive an estimate of the *equity* value of the company instead of the *enterprise* value of the company.

company is determined by applying the valuation multiple to the subject company's 1-year projected EBITDA.

45. The Precedent Transaction methodology also relies on valuation multiples to calculate the value of a firm. However, the observable measure of value for the Precedent Transaction methodology differs from that of the GPC methodology. The measure of value for the Precedent Transaction methodology is the transaction price paid in a transaction in which the acquired company (also known as the "target company") is comparable to the firm being valued. The Precedent Transaction methodology derives an estimate of enterprise value and expresses that value as a function of an operating or financial metric for the target company.[93] By definition, this methodology relies on transactions that will have been priced and closed prior to the date of valuation for the subject company. Therefore, consideration must be given to the relationship between the market conditions at the time of the precedent transactions and the market conditions contemporaneous to the date of valuation.

46. Asset-based methodologies calculate the value of a firm as the sum of the value of the assets owned by the firm. Net asset value will typically represent the aggregate value of the assets less debt and other liabilities. Asset-based methodologies are typically limited to circumstances in which the value of a firm is not well-represented by a predictable measure of future cash flow and the firm's assets can be readily identified and accurately and discretely valued.

### B.   ABILITY TO PAY DEBT TEST

47. Under the ability to pay debt test a company is considered insolvent if, at the time of the transaction subject to avoidance, the company intended to incur, or believed that it would incur, debts that would be beyond the company's ability to pay as such debts matured. The definition of debt is identical to that under the balance sheet test. A company's ability to pay its debts is assessed by comparing the company's projected cash flows and cash reserves to the expected debt service requirements and a payoff or refinancing of the principal balance upon maturity. Debt service requirements are the cash flows and maintenance covenants required by the relevant

---

[93]   It is common to use a last twelve month (LTM) metric under the Precedent Transaction methodology, as projected data is often unavailable for the target company.

credit agreements. The most common cash flow requirements are interest and principal payments. In addition, credit agreements may require that the company maintain specified operating ratios. A common such ratio (referred to as a leverage ratio) is a limit on the amount of the company's debt relative to a company's EBITDA. Typically, if a company fails to comply with debt service requirements, such a failure is defined as an event of default under the relevant credit agreement. Furthermore, the occurrence of an event of default under a single credit agreement can give rise to additional events of default where the borrower is subject to cross-default provisions.

### C.    ADEQUATE CAPITAL TEST

48. The third test for constructive fraud is whether a company engaged (or was about to engage) in a "business or a transaction for which any property remaining with the debtor was an unreasonably small capital."[94]  Capital refers to how a company finances its business operations. Most companies rely significantly (if not, primarily) on internally generated cash to finance operations. However, when internally generated cash flows are insufficient to fully finance operations, companies will raise either debt or equity capital from outside investors.[95]  Thus, capital refers to the combination of internal cash flows, equity and debt. For the purpose of assessing the adequate capital test, courts have said that an adequately capitalized company has sufficient capital, including access to capital, to sustain operations.[96] Access to capital typically refers to the ability to raise equity, raise debt, reduce cash flow obligations or generate cash flows through the sale or other monetization of assets.

---

[94]  As of 2016: the UFTA (which currently is in force in 35 states, the District of Columbia, and the U.S. Virgin Islands) and the UVTA, which has been adopted by nine states, include the phrase "the remaining assets of the debtor were unreasonably small in relation to the business or transaction" in place of the corresponding language regarding "unreasonably small capital" in section 548(a)(1)(B)(ii)(II). *See* UFTA § 4(a)(2)(i); UVTA § 4(a)(2)(i). The older UFCA, which remains in effect only in New York and Maryland, tracks the "unreasonably small capital" language in section 548(a)(1)(B)(ii)(II). *See* N.Y. Debt. & Cred. L. § 274; *see also* https://www.jonesday.com/en/insights/2016/08/the-third-circuit-weighs-in-again-on-the-meaning-of-unreasonably-small-capital-in-constructively-fraudulent-transfer-avoidance-litigation.

[95]  For example, *see* Principles of Corporate Finance, Brealey, Myers, Allen, 10th edition, January 1, 2012 at pp. 341-342.

[96]  *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

49. Courts have indicated that the test for unreasonably small capital is "reasonable foreseeability"[97] as of the date of the challenged transaction. That is, a company has unreasonably small capital if it is reasonably foreseeable that the transaction will leave the company with capital insufficient to sustain operations. To assess reasonable foreseeability, "the critical question"[98] is whether the company's projections supporting the challenged transaction (which presumably showed that the company would be able to sustain operations) were reasonable when made. Reasonable projections do not merely rely on the company's historical operations. Rather, to be reasonable, the projections "must also account for difficulties that are likely to arise."[99] If the projections supporting the challenged transaction are found to be unreasonable, "it will follow that the debtor was left with an unreasonably small capital."[100] Finally, courts have found that unreasonably small capital is not synonymous with insolvency but, rather, "denotes a financial condition short of equitable insolvency."[101]

50. Multiple methodologies may be used to assess the adequacy of a company's capital. One set of methodologies considers the company's expected cash flows under a reasonable downside scenario. For example, is the company able to finance operations and maintain debt service under such a scenario? A second set of methodologies analyzes the company's leverage ratios (including expected leverage ratios). For example, is the company's leverage significantly in excess of leverage levels for comparable companies? The exact implementation of these methodologies will depend on the industry and/or other specific circumstances of the company in question.[102]

### D.   SUMMARY OF MILLENNIUM SOLVENCY ANALYSIS

51. To assess the solvency of Millennium as of the 2014 Transaction, I valued Millennium to determine if the value of the Company's assets exceeded the value of the Company's debt, including the debt incurred in the 2014 Transaction. I valued Millennium using a DCF analysis.

---

[97]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[98]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[99]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[100]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[101]   *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

[102]   Collier on Bankruptcy ¶ 548.05[3][b] (16th ed. 2016).

As I demonstrate below, a proper DCF analysis shows that Millennium was balance sheet insolvent as a result of that transaction, with an equity value of no greater than *negative* $958.9 million, before accounting for contingent liabilities. I also sought to value Millennium using the GPC and Precedent Transaction methodologies. Due to the limited comparability of the identified public companies, I did not rely on the GPC methodology as my primary indication of value. Nonetheless, the most likely conclusion of value that results from the GPC methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital. I was unable to identify sufficiently comparable precedent transactions.

52. Courts have found that unreasonably small capital is a financial condition prior to equitable insolvency. Therefore, by definition, a balance sheet insolvent company is a company with unreasonably small capital. Nonetheless, I also conducted a second analysis that shows that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with unreasonably small capital. To address the third component of the solvency analysis, I also show below that the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay that debt as it matured.

## VI.    MILLENNIUM FINANCIAL PROJECTIONS IN CONNECTION WITH THE 2014 TRANSACTION

### A.    PADRES PROJECTIONS

53. Millennium created financial projections (the "Padres Projections") to support the 2014 Transaction, which were provided to both the underwriters and Vantage Point, the contemporaneous solvency advisor. In the aggregate, the Padres Projections covered the period 2014 through 2020. However, the Padres Projections reflected more detailed and monthly data from the first quarter of 2014 through the fourth quarter of 2018. For 2019 and 2020, the Padres Projections reflect less detailed and annual data.[103]

---

[103]   For example, the Padres Projections include payor-specific NRPS, on a quarterly basis, through the fourth quarter of 2018. Payor-specific NRPS is not available for the 2019 and 2020 projection years. *See* ML_DE_00044521 Padres Working Model_03-14.xlsx.

Expert Report of Yvette R. Austin Smith                                          Adv. Pro. No.17-51840 (LSS) | 29

54. The Padres Projections were significantly flawed in that the projections failed to reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction. The primary risk factors were regulatory and administrative curtailment by Medicare in allowed testing and reductions in reimbursement rates, reductions in reimbursement rates by commercial payors, loss of Millennium business (*e.g.*, reductions in specimen volume and NRPS) and liabilities and costs associated with governmental investigations and litigation, and follow-on private party litigation. These risk factors were clearly known based on both historical trends that were evident leading up to the 2014 Transaction and on information that was either publicly available or told to Millennium by its outside legal, regulatory and financial advisors. In some instances, and as explained more fully below, these factors had been explicitly identified and/or modeled by Millennium prior to the 2014 Transaction, but were omitted from the Padres Projections. Further, in the weeks prior to the 2014 Transaction, Millennium's in-house and outside legal counsel met on multiple occasions with criminal and civil investigators from the U.S. Attorneys' Office in Boston and they were preparing for an unfair competition trial brought by a competitor (*see* Ameritox litigation, below).[104]  In this Section of the report, I describe the flaws in the Padres Projections. In Section E, I discuss how I modified the Padres Projections to correct these flaws prior to conducing the solvency analysis.

55. As a result of omitting or failing to reasonably account for these known or knowable risk factors, the Padres Projections significantly overstated Millennium's projected revenue as of the 2014 Transaction. In addition, the Padres Projections failed to take into account liabilities relating to the then pending litigation and government investigations. Had these risk factors and historical trends been reasonably taken into account, it would have been clear that the 2014 Transaction rendered Millennium balance sheet insolvent, with unreasonably small capital and an inability to pay its debts as those debts matured.

56. The following charts compare the Padres Projections to Millennium's then-recent historical results, based on three key statistics for the UDT business: specimen volume, NRPS, and payor mix. These are metrics that Millennium regularly reviewed in the operations of its business.[105] In

---

[104]   Martin Price Deposition Transcript at 134:5-136:6.

[105]   *See,* for example, the June 2014 Financial Summary [ML_DE_00034943].

each instance, the Padres Projections are unreasonable because they ignore historical trends and factors that were known or knowable as of the 2014 Transaction. Figure 2 compares historical and projected specimen volumes for Millennium's two largest payor groups: Medicare and commercial. The projected volumes are the Padres Projections.



**FIGURE 2: QUARTERLY SPECIMEN VOLUMES BY PAYOR GROUP**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 3.

57. As shown in Figure 2, the Padres Projections assumed strong continued growth in specimen volumes for Medicare and commercial payors. The Padres Projections assumed that Medicare and commercial specimen volumes would grow by 21.0% and 16.7% in 2014 respectively.[106] Afterwards, Medicare and commercial specimen volumes were both projected to grow by 9.3% in 2015 and by approximately 10% per annum from 2016 through 2018.[107] There are two

---

[106]   Refer to YAS Workpaper 3 for 2013-2014 growth rate to derive growth of actual volumes from 2013 and Padres projections.

[107]   *See* ML_DE_00044521 Padres Working Model_03-14.xlsx.  ("VolumeBuild – UDT" tab). Beyond 2018 the projections are not broken down to the payor level.

obvious flaws in these volume projections that render them unreasonable when made. First, the Padres Projections assume that specimen volume for Medicare and commercial payors will grow at the same rate, notwithstanding very different historical trends in specimen volumes for these two payor groups. Second, the strong projected growth trend ignores that growth had been slowing for *both* payor groups in the years leading up to the 2014 Transaction. Indeed, in an email addressing assumptions in the Padres Projections, Daniel Pencak, Head of Financial Planning and Analysis,[108] who oversaw Millennium's financial modelling, stated that the volume build-up was "rather arbitrary".[109]  In addition, no consideration was given to potential reductions in specimen volume from a settlement of the DOJ Investigation.  Millennium was aware of this risk prior the 2014 Transaction, as Millennium had previously acknowledged the decline in Ameritox's specimen volume following its governmental settlements in 2010.[110]

58.  Table 4 shows the annual and first quarter 2014 growth rates in specimen volume for Medicare, commercial payor and Millennium's aggregate specimen volume (across all payor groups). In all years, from 2010 to 2014, Medicare specimen volume growth rates were lower than the rates for commercial payor specimen volume. Furthermore, the disparity in growth rates *increased* over this time period. Indeed, in first quarter of 2014, the quarter immediately prior to the 2014 Transaction, Millennium's Medicare specimen volume *contracted* by 3.2%,[111] whereas commercial specimen volume grew by 4.4%.[112] I have seen no support for the assumption that projected specimen volume growth rates for commercial and Medicare would be equal after the 2014 Transaction.

---

[108]  Pencak Deposition at 17:23 - 18:13.

[109]  Plaintiff Ex. 171 to Pencak Deposition:

"As for volume, since the build-up was rather arbitrary, I think we will simply build the sensitivity analysis around a sliding scale of volume growth/decline vs. whatever pricing we show based on the various pricing assumptions (i.e. Medicare reimbursement changes, commercial contracts, traditional Medicaid changes, etc.)."

[110]  *See* Section B.

[111]  *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, growth percentage of cell K132 with respect to J132).

[112]  *See* ML_DE_00559340, tab 'Payor Stats – UDT'. ML_DE_00732288 (Quarterly 2012-2015Q1 tab, rows 124-126, 128 and 135). According to the management model dated June 8, 2015 ("Revised Management Model"), actual commercial specimen volume (comprising BCBS, UHC, Aetna, Cigna, Humana) in the first quarter of 2014 was 222,784, implying an actual commercial quarterly growth rate of 0.2% in the first quarter of 2014. Figure 2 shows the higher (4.4%) specimen volume growth for the first quarter of 2014, consistent with the more contemporaneous data source.

59. In addition, the Padres Projections do not adequately reflect the fact that the growth in Millennium's specimen volume had been slowing over time. The growth rate of Millennium's total specimen volume had been declining by approximately one-half, each year from 2010 to 2013. For example, the growth rate was 64.4% from 2011 to 2012 but only 30.5% from 2012 to 2013. The slowing growth trend was even more pronounced for Medicare specimen volume, decreasing to only 12.9% from 2012 to 2013 and *contracting* by 3.2% from the fourth quarter of 2013 to the first quarter of 2014. This is in contrast to the first quarter of 2013, during which Millennium's Medicare specimen volume increased by 0.4%, when compared to the fourth quarter of 2012.[113]

#### TABLE 4: SPECIMEN VOLUME GROWTH 2009-2014

|  |  | 2009 | 2010 | 2011 | 2012 | 2013 | 2013 Q4 | 2014 Q1 |
|---|---|---|---|---|---|---|---|---|
| Medicare | [1] | 45,835 | 119,599 | 250,691 | 379,051 | 428,009 | 111,203 | 107,685 |
| *Period-on-Period Growth* | [2] |  | 160.9% | 109.6% | 51.2% | 12.9% |  | -3.2% |
| Commercial | [3] | 55,195 | 155,040 | 348,521 | 607,323 | 810,881 | 222,344 | 232,225 |
| *Period-on-Period Growth* | [4] |  | 180.9% | 124.8% | 74.3% | 33.5% |  | 4.4% |
| Total Specimen Volume | [5] | 171,807 | 489,609 | 1,092,041 | 1,795,631 | 2,343,150 | 633,637 | 647,798 |
| *Period-on-Period Growth* | [6] |  | 185.0% | 123.0% | 64.4% | 30.5% |  | 2.2% |

Source: ML_DE_00732288 ('Yearly 2009-2015M5' and 'Quarterly 2012-2015Q1' tabs).

Commercial comprises BCBS, UHC, Aetna, Cigna, and Humana.

60. Figure 3 compares Millennium's historical and projected NRPS for Medicare and commercial payors.

---

[113]  Medicare quarterly specimen volumes for the fourth quarter of 2012 and the first quarter of 2013 are 101,788 and 102,229 respectively.

**FIGURE 3: QUARTERLY NET REVENUE PER SPECIMEN BY PAYOR GROUP**



Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 3.

61. As shown in Figure 3, in 2015 the Padres Projections assumed only a modest decline in NRPS for Medicare and commercial payors. From the start of the Padres forecast (first quarter of 2014) through the end of the more detailed projection through the fourth quarter of 2018, the Padres Projections assume a 20.6% and 26.2% reduction, respectively, in commercial and Medicare NRPS. From 2014 to 2020, the Padres Projections assumed an aggregate decrease of 26.5% in Millennium's UDT NRPS, across all payor groups. This is not consistent with contemporaneous efforts by both payor groups to significantly reduce reimbursement levels and tests per specimen, or the broader initiatives within the industry to reduce the incurrence of medically unnecessary tests.[114] Both of these trends were expected to play out over the shorter-term, and have a

---

[114]    *See*, for example, Special Fraud Alert: Laboratory Payments to Referring Physicians, Department of Health and Human Services Office of Inspector General, June 25, 2014. Hawk, PollyBeth, "Ready or Not: Hospital Value-Based Purchasing Poised to Transform Healthcare Reimbursement Model and Introduce New Fraud Targets Under the False Claims Act," Winter, 2013. Questionable Billing for Medicare Part B Clinical Laboratory

significantly larger impact than assumed in the Padres Projections. Indeed, in late February and early March 2014, it appears that Millennium modelled – outside the Padres Projections – a 30% reduction in Medicare NRPS beginning on July 1, 2014.[115]

62. Figure 4 compares Millennium's historical and projected payor mix, reflecting the payor contributions by Medicare, commercial and managed government. Payor contributions are measured by specimen volume.



**FIGURE 4: PAYOR MIX**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 3.

63. As shown in Figure 4, the Padres Projections assumed a relatively constant payor mix. However, the significantly different growth rates in payor group specimen volume, during the period

---

Services, Department of Health and Human Services Office of Inspector General, August 2014. A Strategy for Medicare Payment Reform, Center for American Progress, May 2015.

[115] *See* Plaintiff Exhibit 165 and 165A [ML DE 00058384] dated 2/28/2014 under "Net revenue per specimen (pricing):

"Assumed 30% reduction in Medicare reimbursement effective June 1, 2014"

*See also* email from Daniel Pencak to Brock Hardaway and Tim Kennedy dated 3/2/2014 [ML_DE_00068651]:

"Brock - see attached for the 2nd version that assumes a 30% reimbursement reduction in June 2014 related to Medicare"

leading up to the 2014 Transaction, completely undermines such an assumption.[116]  For example, as of the first quarter of 2012, specimen volume covered by Medicare reimbursement equaled 22.4% of Millennium's total specimen volume.  By the first quarter of 2014, Millennium's specimen volume covered by Medicare reimbursement had steadily declined to 16.6%. In contrast, the Padres Projections assumed that Medicare specimen volume would continue to equal 18.6% of Millennium's total specimen volume over the entire forecast period.  By overstating the proportion of Medicare specimen volume, the Padres Projections overstated Millennium's projected revenue (due to the higher Medicare NRPS relative to other payor groups).

64. As shown in Figure 4, the Padres Projections assume growth in the contribution of Managed Government, consistent with the historical trend. This is projected to coincide with a large decline in "Patient" specimen volumes, which I understand represents revenue from self-pay patients.[117] This assumption has a significant impact on projected revenue, as Managed Government NRPS is significantly higher than Patient NRPS. For example, in March 2014, Managed Government NRPS was $168, whereas Patient NRPS was $2.

65. The Padres Projections also assumed very high revenue growth rates for Millennium's non-UDT businesses. For the PGT business, the Padres Projections assumed that revenue would grow from $12 million in 2013 to $119.9 million in 2020, equating to an annual average growth rate (or CAGR) of 39%. The PGT business was expected to grow from 3.3% of Millennium's revenue in 2014 to 10.6% by 2020. Millennium's projected CAGR for the PGT business was more than three times that of the expected industry CAGR of 12.7%.[118]

---

[116]   In the Padres Projections, payor mix derived from the 'Payor Mix' tab remains constant for all payor groups throughout the forecasted period except for Managed Government, patient, and Medicaid Contract in certain periods. Managed Government is projected to increase from 14.5% in January 2015 to 19.3% in December 2018; patient pay is projected to decline from 9.8% to 2.0%; and Medicaid Contract is projected to increase from 7.7% to 10.3%.

[117]   For example, between March 2014 and December 2016, Management Government increases its contribution from 14.5% to 19.3%, whereas Patient declines from 9.8% to 2.0%. *See* ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab).

[118]   US Pharmocogentic Testing Market industry trend data. Refer to YAS Workpaper 1, tab 'US Report.' CAGR represents growth from 2015 to 2020.

66. Similarly, RxAnte's revenue was projected to grow from $12.8 million in 2014 to $87.8 million in 2020 (a CAGR of 38%). RxAnte's business share was expected to increase from 1.7% of Millennium's revenue in 2014 to 7.7% by 2020.

67. The Padres Projections further included a category of revenue labeled "Emerging Opportunities." For the following reasons, Emerging Opportunities should not form part of the expected cash flows when assessing balance sheet solvency:

- The revenues appear aspirational rather than expected. According to the Padres Projections, there was no revenue associated with this category until 2015, around nine months following the 2014 Transaction.

- The Confidential Information Memorandum contains limited discussion on the composition of Emerging Opportunities. Rather, discussion is limited to a description of the employment background of Elizabeth Peacock, the "Executive Vice President of Emerging Opportunities".

- The Emerging Opportunities do not appear in the subsequent management model dated June 8, 2015 (the "Revised Management Model").[119]

### B.   VANTAGE POINT SOLVENCY ANALYSIS BASED ON PADRES PROJECTIONS

68. Millennium retained a financial advisor, Vantage Point, to conduct a solvency analysis in connection with the 2014 Transaction.[120] In its work, Vantage Point relied significantly on the flawed Padres Projections.[121] Vantage Point conducted its discounted cash flow analysis using the unmodified Padres Projections.[122] Given that the Padres Projections significantly overstated Millennium's projected revenue, it is unsurprising that Vantage Point's DCF analysis wrongly concluded that Millennium would be solvent immediately following the 2014 Transaction.

---

[119]   ML_DE_00559340.

[120]   Exhibit 56 to Smith Deposition [VP_ML_00014656]; Exhibit 59 to Smith Deposition [VP_ML_00015683].

[121]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.15, April 30, 2014 [ML_DE_00263273 at 3287].

[122]   I compared the management projections on page 15 of the Vantage Point report with the Padres Projections. *See* ML_DE_00263273 at 3287 and the projections in the April 12, 2014 model [ML_DE_00057999].

69. In addition, Vantage Point appears to have undertaken only a very limited analysis to understand whether it was reasonably foreseeable that the 2014 Transaction would result in Millennium being left with unreasonably small capital. Notwithstanding Vantage Point's inaccurate conclusion that Millennium was balance sheet solvent, a separate analysis of the adequacy of Millennium's capital was still necessary to determine if the 2014 Transaction constituted a fraudulent conveyance.

70. To assess Millennium's capital adequacy, Vantage Point "examin[ed] the cash flows of the Company [Millennium]" and "considered the debt ratios of comparable companies."[123]  For the cash flow analysis, Vantage Point performed what it called a "stress test" of the Company's cash flows. However, instead of estimating the declines in cash flows that could result from stress factors that were known or knowable as of April 2014, Vantage Point simply identified mathematical decreases in EBITDA that, in the opinion of Vantage Point, would "call into question" debt service payments. For example, Vantage Point concluded that a 19.9% decline in FY2015 EBITDA (relative to projected levels) would jeopardize debt service payments.[124] However, the Vantage Point presentation does not discuss the *probability* of Millennium encountering a 19.9% decline in EBITDA. I note, by way of high-level comparison, for the 12-month period ended December 31, 2013 to the 12-month period ended December 31, 2015, Millennium's actual EBITDA declined by 59%.[125]

71. In considering the debt ratios of comparable companies, Vantage Point relied on publicly-traded companies, notwithstanding that Millennium was most comparable to privately-held companies

---

[123]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.34, April 30, 2014 [ML_DE_00263273 at 3306].

[124]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.32, April 30, 2014 [ML_DE_00263273 at 3304].

[125]   Millennium filed for bankruptcy on November 10, 2015.

2013 EBITDA of $364.8 million based on 2013 financial statements [ML_DE_00187601 at 7606 and 7608]. Income from operations of $344.9 million, plus depreciation and amortization of $16.9 million, plus stock based comp of $3.0 million, equals $364.8 million.

2015 EBITDA of $148.0 million based on 2015 financial statements [KPMG-ML-EA15WB-0001528 at 1533 and 1535]. Income from operations of $120.9 million, plus depreciation and amortization of $27.1 million, equals $148.0 million.

According to the Confidential Information Memorandum [ML_DE_00269115 at 9201], EBITDA was $356.4 million in 2013. This would imply a reduction in EBITDA of 59%.

---

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 38

such as Ameritox and Calloway. Furthermore, the Vantage Point presentation does not discuss whether the publicly-traded companies had a greater ability to maintain higher leverage. For example, Vantage Point identified Labcorp as a comparable company to Millennium.[126] In 2013, Labcorp offered a broad range of clinical laboratory tests across several countries. Unlike Millennium, Labcorp had experienced relatively steady growth of around 2% per annum over the prior two years. Labcorp reported that just 3% of its 2013 revenue related to drugs of abuse testing, and it was 9.2 times the size of Millennium by 2013 revenue.[127] As a larger and more diversified company with a more stable history of growth, Labcorp was less vulnerable to regulatory changes in any one clinical testing segment, much less the significant business, legal, and regulatory risks and exposure faced by Millennium in April 2014.

72. Notwithstanding the known business trends and significant risk factors facing Millennium in April 2014, Vantage Point's solvency presentation contains no mention of Millennium's declining Medicare revenue and declining NRPS, risks associated with Millennium's use of Custom Profiles or free specimen testing cups, impacts of MUEs or LCDs, or commercial payor reimbursement pressures. Vantage Point also appears to have ignored obvious litigation and regulatory risks, relying instead on highly questionable representations from Millennium.[128] At the time the Vantage Point solvency opinion was issued, Millennium had received multiple subpoenas from the US DOJ, was aware of multiple qui tam lawsuits, and was engaged in litigation with Ameritox. Although Vantage Point states that it did not have legal expertise,[129] it is customary market practice when providing a solvency opinion to seek out third-party expertise for the purpose of adequately assessing the risks to the company's solvency.[130]

---

[126] Vantage Point notes that "none of the selected companies were identical or directly comparable to the [Millennium]". *See* Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.15, April 30, 2014 [ML_DE_00263273 at 3292].

[127] Labcorp's 2013 revenue was $5,808 million (source: S&P CapIQ), whereas Millennium's 2013 revenue was $633 million *See* ML_DE_00044521 Padres Working Model_03-14.xlsx ("Summary" tab).

[128] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p. 9, April 30, 2014 [ML_DE_00263273 at 3281]; Exhibit 56 to Smith Deposition [VP_ML_00014656].

[129] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.7 and p.9, April 30, 2014 [ML_DE_00263273 at 3279, 3281].

[130] Based on my professional experience, including observing the practices of other financial advisors when providing solvency analyses.

## VII.   SOLVENCY ANALYSIS OF MILLENNIUM USING THE CORRECT SOLVENCY FRAMEWORK

### A.   MILLENNIUM BUSINESS TRENDS AS OF 2014 TRANSACTION

73. At the time of the 2014 Transaction, the UDT industry, especially quantitative testing, was under significant pressure from government and commercial payors. Concerns were increasing about the expansive use of expensive urine drug tests without sufficient demonstration of medical necessity.[131]

74. At the time of the 2014 Transaction, several trends, reflecting these same pressures, were impacting Millennium's business. Taken together, these trends indicated that Millennium was facing significant business, reimbursement, legal, and regulatory risks and exposures, and that the Company was very likely to encounter slowing or negative growth and declining profitability. The first trend was declining NRPS for Millennium's two largest payor groups: Medicare and commercial.[132] *See* Figure 5.

---

[131]   For example, *see* https://www.nytimes.com/2013/08/02/business/increase-in-urine-testing-raises-ethical-questions.html ("...urine-testing companies are aggressively marketing their services to physicians by trumpeting the big profits that await if they test their patients…"); *see also*: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782 ("Pain specialists order costly tests for illegal drugs such as cocaine and angel dust, which few seniors ever use").

[132]   As noted, Millennium reported billing data (including NRPS) for certain commercial payors, including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC.

Expert Report of Yvette R. Austin Smith                                           Adv. Pro. No.17-51840 (LSS) | 40



**FIGURE 5: QUARTERLY NET REVENUE PER SPECIMEN**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 4.

75. As shown in Figure 5, after peaking in the third quarter of 2012, NRPS for Millennium's Medicare business was trending down as of the 2014 Transaction. From the third quarter of 2012 to the first quarter of 2014, Medicare NRPS declined by 12.8%.[133] This decline is largely attributable to reductions in tests per specimen[134] and reductions in Medicare billing rates.[135,136]

---

[133] Quarterly Medicare NRPS dropped from $518 in the third quarter of 2012 to $451 in the first quarter of 2014 (12.8% drop). *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, columns BE and BL, row 132).

[134] ML_DE_00732288 (Quarterly 2012-2015Q1 tab). For Medicare, quarterly trends for Tests Per Specimen (columns CC to CO) appear consistent with quarterly trends for NRPS (columns BC to BO).

[135] 2012 Annual Physician Notice (Exhibit 3 to DOJ Complaint) [ML_DE_0628891], 2013 Annual Physician Notice [ML_DE_00134548], and 2014 Annual Physician Notice [ML_DE_00164030]. Comparison of each HCPCS codes' billing rates from 2012-2014 indicate an annual decline in billing rates for the majority of HCPCS codes.

[136] According to KPMG work papers (see below), in an apparent effort to increase Medicare billings, Millennium changed its billing practices. In February 2014, Millennium increased billings to Medicare from 100% to 250% of the scheduled rate. As a result of this change, Millennium experienced a reduction in payments from "over 90%" of billed claims, to approximately 50% of billed claims. I have seen no evidence that such a strategy led to higher collections.

*See* KPMG 2014 work papers [KPMG-ML-EA14WB-0000347.xlsx, tab "2 - KPMG Look Back Analysis" (emphasis added):

76. NRPS for Millennium's commercial business also declined prior to the 2014 Transaction. Commercial NRPS declined by 14.3% from the second quarter of 2012 to the first quarter of 2014.[137] The observed decline was consistent with the contemporaneous negotiations between Millennium and multiple commercial payors. For example, effective in the first quarter of 2014, UHC, one of Millennium's largest commercial payors, reduced rates by 19%.[138] This followed discussions between Millennium and UHC in 2013, wherein UHC expressed concerns over inappropriate overutilization of UDT, the lack of value in quantitative testing, and over-testing due to custom profiles.[139] Other commercial payors were similarly seeking to reduce the number of reimbursable tests per year.[140] Furthermore, commercial NRPS was highly vulnerable to follow-on reductions linked to reductions in Medicare reimbursement rates. For example, during contract negotiations with UHC, Millennium agreed to a fee reduction equal to "42% of

---

"Per discussion with Rick Guzman, Sr. Director Revenue Cycle Management, the Company did not collect as expected from Medicare and Medicaid during the year due to multiple factors. **In February the Company began billing all payor groups including Medicare/Medicaid at 250% of the Medicare rate (previously billed at 100%).** Only the client payor group is billed at contractually agreed upon rates and have 100% expected collection rates. As a result of the increased billed claims, the Company saw a reduction of payments from Medicare from over 90% of billed claims to approximately 50%."

[137] Quarterly commercial NRPS dropped from $298 in the third quarter of 2012 to $255 in the first quarter of 2014 (14.3% drop). As noted, Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC. For the purposes of this analysis, I have defined these payors as the commercial payors. *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, sum of "Estimated Revenue" divided by "Priced Accession Volume" for commercial payors).

[138] Marbach email to Appel dated August, 9, 2013 [ML_DE_00061777]. Email indicates rate reductions would be effective Q4 2013, however, the Padres Projections indicate that the 19% reduction actually occurred in the first quarter of 2014. *See* ML_DE_00057999 Padres Working Model_04-12-14.xlsx ("Payor Mix" tab row 20, column AB).

[139] Plaintiff Exhibit 141 to Pencak Deposition [ML_DE_0008373]

"Issues Raised:

Inappropriate overutilization of UDT, the lack of value to the providers for quantification vs. offering qualitative results, providers chasing a number+ the ability of providers to understand the nuances of reported results.

...

"CP's continue to be of great concern, since their perception is that providers are lazy & take the easy road instead of evaluating each patient's need for specific drug monitoring. That leads to higher # of tests / specimen & $$$."

[140] Beginning January 1, 2014, Tufts health plan "will not compensate for qualitative drug screen when billed with any combination of more than twenty (20) units within 365 days per Member, as it exceeds clinical guidelines." Tufts Plan changes, [ML_DE_00305155 at 5156]. Martin Price's email circulating the updated reimbursement policy [ML_DE_00305151 at 5152] states that "[w]e expect the other payors in MA to adopt something similar."

Medicare for UHC commercial business."[141] In November 2014, Aetna also instituted a strict reimbursement policy.[142]

77. As shown in Figure 5, from the fourth quarter of 2012 to the first quarter of 2014, the only payor group for which Millennium saw an increase in NRPS was Managed Government. However, even with a slight increase, NRPS for Managed Government remained significantly below that for Medicare and commercial payors.

78. A second trend impacting Millennium's business prior to the 2014 Transaction was slowing growth in specimen volume. As shown in Figure 6, between the first quarter of 2012 and first quarter of 2014, quarterly specimen volume growth declined from 14.5% to 2.2%.

**FIGURE 6: QUARTERLY TOTAL SPECIMEN VOLUME GROWTH**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

---

[141]  Marbach email to Appel August, 9, 2013 [ML_DE_00061777].  *See also* Roger Feldman, Bryan Dowd, and Robert Coulam, "Medicare's Role in Determining Prices throughout the Health Care System", October 2015.

[142]  [ML_DE_00202842]:

"Aetna allows eight (8) qualitative drug test encounters per 12 month period. Aetna allows eight (8) quantitative drug tests per day and eight (8) quantitative drug test encounters per 12 month period."

79. A third trend impacting Millennium's business prior to the 2014 Transaction was a shift in Millennium's payor mix away from traditional Medicare. As shown in Figure 7, specimen volume growth for Medicare was modest from the first quarter of 2012 to the first quarter of 2014 relative to the significant growth in specimen volume for commercial, Managed Government and "other" payors. "Other" payors reflects workers compensation, patient self-pay, and Medicaid. As a result, the proportion of specimen volume for which Millennium received Medicare reimbursement decreased over time. *See* Figure 8. Due to the significant difference in NRPS between Medicare and other payors (as noted – *see* Figure 5), the financial result of this shift in payor mix away from Medicare was a significant decrease in Millennium's aggregate NRPS (*i.e.*, NRPS across all payor groups), even assuming reimbursement rates for a given payor group were held constant.

**FIGURE 7: QUARTERLY SPECIMEN VOLUMES BY PAYOR GROUP**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.



**FIGURE 8: PAYOR MIX**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

## B.    REGULATORY AND LEGAL ENVIRONMENT AS OF 2014 TRANSACTION

80. Regulatory and legal scrutiny of the UDT industry had been increasing as of the 2014 Transaction. As early as 1998, the U.S. Department of Health and Human Services, Office of Inspector General ("HHS OIG") issued guidance to all clinical laboratories seeking reimbursement from Medicare and Medicaid. The HHS OIG guidance cautioned against the use of "standing orders" similar to Millennium's Custom Profile. Although the guidance did not prohibit this practice, it noted the propensity of standing orders to result in tests that were not reasonable and medically necessary. The guidance concluded that "as a result of the potential problems standing orders may cause, the use of standing orders is discouraged."[143]

---

[143]    Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45081:

"Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. Accordingly, the insurer may reject standing orders as evidence that a test is reasonable and necessary. Medicare contractors can and may require additional

81. The HHS OIG guidance also outlined methods by which laboratories could monitor whether unnecessary tests were occurring. This included hiring an external consultant to analyze patterns of utilization and determine the cause of any excessive growth in claims submitted to Medicare.[144] HHS OIG proposed that an annual increase in test utilization of 10% or greater would occasion additional scrutiny as potentially excessive growth. As discussed below, Millennium did hire such an external consultant (CodeMap), who concluded that Millennium faced significant legal and regulatory risk arising from the Company's business practices.[145]   As shown in Table 5, as part of my review of Millennium's billings to Medicare, I noted that test utilization increased by 10% or more for multiple test codes.[146] In an April 2015 letter from Millennium's legal counsel to HHS OIG, Millennium claimed that beginning in 2010 it identified practices with high tests per specimen and "asked these practices to review their

---

documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged."

*Id.* pp. 45079-45080:

"In addition to the general notices above, laboratories that continue to offer clients the opportunity to request customized profiles should provide annual written notices that: (1) Explain the Medicare reimbursement paid for each component of each such profile; (2) inform physicians that using a customized profile may result in the ordering of tests which are not covered, reasonable or necessary and that tests will not be billed; and (3) inform physicians that the OIG takes the position that an individual who knowingly causes a false claim to be submitted may be subject to sanctions or remedies available under civil, criminal and administrative law."

[144]   Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45080:

"There are many methods by which a laboratory may determine excessive utilization of laboratory services. One approach to self-monitoring is to hire an outside consultant to analyze the laboratory's patterns of utilization, and investigate any potential problems or aberrancies. Another approach is to analyze test utilization data by CPT or HCPCS code, for the top 30 tests performed each year. Laboratories could do this by keeping track of the number of tests performed by CPT or HCPCS code or of the number of claims submitted for each test. The laboratories would then compute the percentage growth in the number of tests or claims submitted for each of the top 30 tests from one year to the next. We believe that if a test's utilization grows more than 10 percent, the laboratory should undertake a reasonable inquiry to ascertain the cause of such growth. If the laboratory determines that the increase in test utilization occurred for a benign reason, such as the acquisition of a new laboratory facility, then the laboratory need not take any action. However, if the laboratory determines that the increase in utilization was caused by a misunderstanding or ignorance by the ordering physicians or other authorized individuals regarding the billing consequences of the tests they ordered or an action on the part of the facility, the laboratory should take any steps that it deems reasonably necessary to address the issue and to ensure misconduct is not occurring."

[145]   Draft Annual Compliance Audit Report by Greg Root/CodeMap (Exhibit 5-A to Price Deposition), 11/24/2010 [ML_DE_00511984 at 2026]; Martin Price Deposition at 52:2353:3. Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

[146]   Note that coding practices change over time, and changes in test utilization for a particular code may not always represent a change in testing practices.

---

ordering patterns and determine whether any changes were appropriate."[147] I have seen no evidence that there was any change in the behavior of practices with high tests per specimen. Indeed, the average number of tests per specimen in 2013 (23.6) was almost identical to that in 2010 (24.0).[148]

82. Seemingly contrary to OIG guidance, Millennium specifically targeted medical practices with low tests per specimen (the so-called "Troubled Practices Program"). Under the Troubled Practices Program, each practice with low tests per specimen was reviewed for potential "improvement." If the Custom Profiles for these Troubled Practices did not contain what Millennium considered a sufficient number of tests, or where Custom Profiles were not being utilized, Millennium threatened to remove the commissions paid to Millennium salespeople for these accounts unless they "improved."[149] According to Millennium, a major driver of increases in test per specimen in late 2011 was a focus on more "comprehensive testing", whereby Millennium would penalize underperforming practices, review Custom Profiles and/or require Lab Service Assistants or cup agreements.[150]

---

[147] Letter from Martin Price to Andrea Berlin, April 30, 2015 [ML_DE_00594719].

[148] The average number of tests per specimen was 24.0 in 2010, 17.6 in 2011, 23.8 in 2012, 23.6 in 2013 and 23.4 in 2014. *See* ML_DE_00732288 (Yearly 2009-2015 M5 tab, columns AT-AX, row 138).

[149] For example, for Walter M. Kidwell, MD, it was stated under "status" in a document tracking the Troubled Practices Program that "The MA [medical assistant] was checking the DO NOT use custom profile incorrectly. They are now making sure to check Custom Profile – it has 9 tests plus validity", and that "Commissions suspended due to low tests. Reps need to ensure CP is being used." Other accounts noted that "Commissions to be paid based on updated CP." *See* Pencak Deposition, Plaintiff Exhibit 134 at p.2.

[150] *See* Pencak Deposition, Plaintiff Exhibit 138. Millennium's commentary relates to an increase in tests per specimen from 16.4 in August 2011 to 20.1 in January 2012 (emphasis added):

"We have experienced an increase of 3.7 tests since a low of 16.4 in Aug-11.

The growth was due to the following:

· New test introductions accounted for .97 of the 3.7 (26%) test growth.

· Panel tests of opiates/barbs/TCA attributed 1.33 of the 3.7 (36%) test growth.

· Remaining 38% due to increase in existing drug offerings - further focus on importance of comprehensive testing **(i.e. penalizing underperforming practices, reviewing initial custom profiles, requiring comprehensive testing for LSA [Lab Service Assistant] or cup agreement)."** (emphasis added).

**TABLE 5: MILLENNIUM'S CODES EXCEEDING CHANGE IN TEST VOLUME BY OVER 10%
(2012 - 2013)**

| HCPCS Code | Change in Volume 2012 v. 2013 |
|---|---|
| G0431 | 17.94% |
| 82649 | 14.21% |
| 82646 | 14.19% |
| 82542 | 614.74% |
| 80152 | 13.59% |
| 83805 | 13.89% |
| 80160 | 13.57% |
| 80174 | 13.57% |
| 83840 | 13.65% |
| 80182 | 13.86% |
| 82205 | 37.20% |
| 80184 | 27.01% |
| 82055 | 38.56% |
| 83516 | 56.55% |

Source: Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

83. Another indication of the increased regulatory and legal scrutiny of the UDT industry and medically unnecessary testing were multiple legal and regulatory actions taken against some of Millennium's key competitors: Ameritox Ltd. and Calloway Laboratories.

84. Ameritox was a privately-held UDT company based in Midland, Texas, before ceasing operations in May 2018.[151] At the time of the closure, Ameritox was in a dispute with a medical insurance company, Humana, over uncovered, unnecessary and duplicative testing.[152] Ameritox was identified by Millennium as one of its four key competitors.[153] In fact, 99.7% of Ameritox's

---

[151] https://www.bizjournals.com/triad/news/2018/03/08/drug-testing-company-to-close-greensboro-facility.html
https://www.bizjournals.com/baltimore/news/2018/03/07/drug-testing-company-plans-to-close-columbia.html

[152] *Id.*

[153] Confidential Information Memorandum [ML_DE_00269115 at 9193].

2013 Medicare revenue derived from billing to reimbursement codes also billed by Millennium.[154]

85. In 2010, Ameritox entered into a settlement with the federal government and several state governments after being charged with various violations of the Anti-Kickback and Stark laws. As I understand, the Stark Law prohibits claims for services where the referring physician has a financial relationship with the service provider (in this case, a laboratory services company).[155] The settlement pertained to Ameritox business conduct over the years 2003 to 2010. The US DOJ charged Ameritox with providing customers benefits in exchange for the use of the companies' services that resulted in excessive, medically unnecessary UDT testing.[156] It was also alleged that Ameritox sent all urine screens automatically to a confirmation test without physician request, resulting in unnecessary testing, over testing, and overbilling.[157] As part of the settlement, Ameritox agreed to pay $16.3 million to the federal government and a number of states.[158] Ameritox also agreed to execute a corporate integrity agreement with the federal government, which required scrutiny of Ameritox's future business practices by HHS OIG.[159]

---

[154] Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. Ameritox had a slightly different distribution of its revenue by code. In particular, Ameritox derived 15.49% of 2013 Medicare revenue from qualitative tests (code G0431), relative to 0.42% for Millennium. Ameritox did not bill at all to certain codes, for example, codes related to tests for certain anti-depressants.

[155] US DOJ Complaint [ML_DE_00595094 at 5107], pp. 14-15:

> "The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception."

[156] Second Amended Complaint – Maul et al v. Ameritox, LLC. at ¶ 13.

[157] Second Amended Complaint – Maul et al v. Ameritox, LLC. at ¶ 15. iii.ii. Ameritox was also alleged to have misbranded its patented RX Guardian urine-testing technology by telling doctors it was approved by the FDA when in fact it was not. *Id.*

[158] Medicare programs in various states received $814,000 of the total settlement, while plaintiff Debra Maul received $3.4 million from the total settlement. Norton, Christopher, "Ameritox to Pay $16M to Resolve Medicaid FCA Suit," November 17, 2010. Retrieved from Law360 (www.law360.com/articles/209926/ameritox-to-pay-16m-to-resolve-medicaid-fca-suit).

[159] *See* Christopher Norton, "Ameritox To Pay $16M To Resolve Medicaid FCA Suit", Law 360, November 17, 2010.

According to Millennium, following the US DOJ settlement, Ameritox's specimen volumes declined by 50% in the first year and 30% over two years.[160]

86.   In 2012, another Millennium competitor, Calloway Laboratories,[161] a privately-held company based in Massachusetts, entered into the first of several government settlements regarding multiple violations of Anti-Kickback and Stark laws.[162] In March 2012, Calloway Labs agreed to pay $20 million to settle charges by the Commonwealth of Massachusetts that the company defrauded Medicaid of millions of dollars through an elaborate kickback scheme to managers of sober houses paid through straw companies. In return, managers required the tenants of the sober houses to undergo excessive urine screening.[163] Millennium estimated that Calloway experienced a 30% decline in annual specimen volume following the March 2012 settlement.[164] Calloway Labs was then acquired by Ampersand Capital Partners in late 2012 and it eventually ceased operations in October 2015.[165]

87.   Prior to the 2014 Transaction, Millennium received specific advice regarding its business practices in light of the heightened legal and regulatory scrutiny of the UDT industry. In January 2011, three years prior to the 2014 Transaction, Millennium was notified by its outside compliance auditor (CodeMap) as part of Millennium's 2010 Annual Compliance Audit that its free specimen cup agreement entailed "substantial risk of violating the Stark Law."[166] CodeMap characterized the risk to Millennium in connection with its testing protocols and the provision of free cups a "1" level of risk.[167] This was the highest level of risk on a sliding scale of 1-4. For

---

[160]   Email from Martin Price to Kennedy and Hardaway, April 3, 2015 [ML_DE_00597259]; Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[161]   Similarly to Millennium, Calloway focused on UDT, although Calloway was smaller than Millennium and had a slightly different business profile. According to CMS data, 94.9% of Calloway's 2013 Medicare revenue came from the same HCPCS codes billed by Millennium. However, 55.0% of Calloway's 2013 Medicare revenue was derived from qualitative testing (G0431), compared to 0.42% for Millennium.

[162]   Patricia Wen, "Calloway Labs of Woburn agrees to $20 million settlement of Medicaid fraud case", March 30, 2012.

[163]   Id.

[164]   Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[165]   Boston Business Journal, "Woburn-based Calloway Labs, fined $20M in kickback scandal, to close and layoff 240 employees", October 8, 2015

[166]   Draft Annual 2010 Compliance Audit Report by Greg Root/CodeMap, 11/24/2010, p. 31 [ML_DE_00512026].

[167]   Id. at 41-42.

these 1-level risks, CodeMap's recommendation was to "strongly encourage Millennium to implement the recommendation, and that failure to do so will result in ***an unreasonable risk*** (emphasis added) of civil, criminal, or administrative law liability or adversely affect the effectiveness of Millennium's compliance program."[168]

88. ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████[169] In April 2012, Millennium's general counsel (Martin Price) received a copy of an April 2011 letter (addressed to a third party) in which the attorney from McDonald Hopkins (Jane Wood) ██████████████████████████████

██████████████████████████████████████████████████

████████████████████████████[170]

---

[168]    *Id.* at 41.

[169]    Ronald Wisor states on 4/4/2012 that Greg Root provided the opinion "a few years back" that the cup program was a grey area and that Wisor had offered an opinion at the time that it was a gray area [ML_DE_00569414].

According to Wisor: "Having had a chance to look more closely at the Stark rules and commentary, as well as the Florida rules, I think there is a decent argument to be made the provision of InstaCups by drug testing labs should be considered lawful, although the issue certainly is not free from doubt." *See* Wisor email dated 11/18/2009, Exhibit 3 to Price Deposition, [ML_DE_00498951].



*See also*: Draft Annual Compliance Audit Report by Greg Root/CodeMap, 11/24/2010 [ML_DE_00512026]; Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

[170]    Jane Pine Wood letter April 2012, Exhibit 10 to Martin Price deposition [ML_DE_00512070]; *see also* Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

89. In April 2011, a few months after CodeMap issued its draft report, Millennium was named in a lawsuit filed by Ameritox alleging that Millennium's specimen cup agreement was a violation of Anti-Kickback and Stark laws.[171] The complaint alleged (among other claims) that Millennium "implemented a scheme of providing improper and unfair financial inducements to health care providers…that violate state and federal laws in an attempt to increase its market share."[172] It further stated that "Millennium's unfair and deceptive scheme of improper inducements and kickbacks involved, in part, an agreement with health care providers and patients not to collect payments, which Millennium is required by law to collect, in exchange for the referral of patients. The purpose of the scheme was to improperly induce, influence, and encourage health care providers to engage in business with Millennium by providing the health care providers and their patients with an improper financial benefit."[173] Millennium's outside counsel ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████.[174] Millennium's

outside counsel ███████████████████████████████████████

████████████████[175]

90. As early as 2010, Millennium was aware that its use of Custom Profiles was contrary to the guidance from HHS OIG and that their use increased the risk of Millennium's being found liable for billing for medically unnecessary tests. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████[176] In February 2012, Martin Price sent an email to Millennium representatives

---

171   Between 2011 and 2014, Ameritox brought claims against Millennium in at least eight separate forums, that included direct actions against Millennium, its employees and actions brought by third parties. *See* Millennium Voluntary Self-Referral Disclosure at p.2 [ML_DE_00670668 at 0669]

172   Ameritox, Ltd v. Millennium Laboratories, Inc, April 8, 2011, 8:11-cv-775-T-24-TBM (the "Ameritox Complaint) at ¶ 13.

173   Ameritox Complaint at ¶ 14.

174   *See* Email from Ronald Wisor to Martin Price, April 4, 2012 [ML_DE_00569414].

175   *See* Email from Ronald Wisor to Martin Price, April 4, 2012 [ML_DE_00569414].

176   According to a letter from Millennium's legal counsel on April 30, 2015:

████████████████████████████████████████████████████

████████████████████████████████████████████████████

informing them of Millennium's policies around Custom Profiles and noting the rationale for such policies. In this email, ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████ [177]

91.  Since its inception, Millennium had been the target of at least eight qui tam lawsuits.[178] In a qui-tam lawsuit, also known as a "whistleblower" lawsuit, a private citizen brings a lawsuit against a



*See* letter from Skadden, Arps, Slate, Meagher & Flom LLP, April 30, 2015 (emphasis added) [ML_DE_00594736 at 4741].

[177]  *See* email from Martin Price to Millennium's sales representatives, dated February 10, 2012 (Exhibit 137 of Pencak Deposition) (emphasis added) [ML_DE_00236719 – 6720]:



[178]  Fred Schulte and Elizabeth Lucas, "Liquid Gold: Pain Doctors Soak Up Profits By Screening Urine for Drugs", November 6, 2017 (https://khn.org/news/liquid-gold-pain-doctors-soak-up-profits-by-screening-urine-for-drugs/). Qui tam lawsuits are typically filed under seal.

person or company who is believed to have violated the law in the performance of a contract with the government or in violation of a government regulation. Millennium's contracts with Medicare and Medicaid were the subject of the qui tam lawsuits. Federal or state governments occasionally intervene and become a party in a qui tam lawsuit. This is particularly true when the lawsuit is "based on significant violations which involve fraudulent or criminal acts and not technical violations and/or errors."[179] In fact, in December 2014 (eight months after the 2014 Transaction), the federal government did intervene in three qui tam lawsuits that had been filed against Millennium in January 2012, April 2012 and April 2013.[180]

92. Prior to November 2012, there had been at least five grand jury subpoenas seeking records on Millennium.[181] Four witnesses testified that Millennium was encouraging doctors to order unnecessary urine tests and was charging excessive fees to Medicare and private insurers.[182]

93. In addition to the qui tam law suits, by December 2012, Millennium was aware that the US DOJ was conducting a joint civil and criminal investigation of the Company. The conduct under investigation included (but was not limited to) health care fraud offenses and violation of the Anti-Kickback Act and False Claims Act in connection with billings of fraudulent claims to Federal healthcare programs and/or other payors, payment of remuneration to physicians and/or others to induce referrals of laboratory work to Millennium, and interference with witnesses and/or destruction of evidence.[183]

---

[179]   https://dictionary.law.com/default.aspx?selected=1709
[180]   US DOJ Complaint, March 19, 2015 [ML_DE_00629274].
[181]   Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation", November 16, 2012.
[182]   Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation", November 16, 2012.
[183]   Deposition of Daniel Pencak, July 1, 2021 ("Pencak Deposition) Exhibit 140; Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040 at 5043].

### C.   POST-TRANSACTION EVENTS RELATED TO KNOWN OR KNOWABLE RISKS IN APRIL 2014

### 1.   Verdict in Ameritox 2011 Lawsuit

94. Ameritox filed a complaint against Millennium on April 8, 2011 in Florida.[184] The complaint alleged that Millennium's specimen cup agreement was a violation of Anti-Kickback and Stark laws. Following trial, on June 16, 2014, a jury rendered its verdict that Millennium's provision of free POC cups to doctors who signed an agreement to not bill for the POC cups constituted "remuneration under the Stark Law" and "remuneration under the Anti-Kickback Statute."[185] Following the verdict, J.P. Morgan informed Millennium executives that they believed that the verdict would reduce Millennium's valuation by $500 million.[186] Consistent with an anticipated decrease in company value, Millennium ████████████████████ ████████████████████████████████████████[187] Shortly before the 2014 Transaction, Millennium's General Counsel informed J.P. Morgan's outside counsel that an adverse verdict in the then impending Ameritox trial would "fuel" the DOJ Investigation.[188]

---

[184]   Ameritox, Ltd v. Millennium Laboratories, Inc, April 8, 2011, 8:11-cv-775-T-24-TBM.

[185]   Jury Verdict, Ameritox, Ltd v. Millennium Laboratories, Inc, June 16, 2014, 8:11-cv-775-T-24-TBM [ML_DE_00080267]. Millennium later disclosed that it strongly disagreed with the verdict and that it requested the court to set it aside and / or order a new trial, ultimately appealing the decision. Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668 at 72].

[186]   Email from Martin Price, June 16, 2014 (Exhibit 106 to Price Deposition) [ML_DE_00669350]:



[187]   Email from Martin Price to Tim Kennedy, April 2, 2015 [ML_DE_00597259 at 7260]:



[188]   Exhibit 131 to the Lee Deposition [JPMC-MIL-CORP_00050228 at 0231].

### 2.   $90 Million Quantifiable Exposure Related to Free Specimen Cups

95.  As discussed above, prior to the 2014 Transaction Millennium was aware of the risks posed by its free specimen cup agreements. More specifically, notwithstanding that Millennium was in a position to quantify the financial impact of this risk *prior to the 2014 Transaction*, in fact, Millennium did so only *after* the Ameritox verdict.

96.  On August 15, 2014, two months after the Ameritox verdict and pursuant to CMS's Voluntary Self-Referral Disclosure Protocol, Millennium's outside counsel submitted a letter to CMS ("Voluntary Self-Referral Disclosure") in order to "resolve [Millennium's] potential violation" of the "Stark" physician self-referral law.[189] By this time, Millennium had cancelled its free specimen cup program.

97.  In this disclosure, Millennium argued that its free specimen cup agreement did not create a "compensation arrangement" of the type that is prohibited by the Stark law, but nevertheless acknowledged (in Exhibit K to the submission) that, during the four years prior to the cancellation of the cup agreement in June 2014, it had received approximately $90 million from Medicare alone relating to physicians with cup agreements.[190] Deposition testimony by Martin Price, confirmed that the books and records necessary for Millennium to quantify this liability were available prior to the 2014 Transaction.[191]

---

[189]   Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668].

[190]   Exhibit K to Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00514819] shows "payments received from Medicare for testing services ordered by physicians during the period which they or their practice had a cup agreement in place with Millennium over the four-year period prior to Millennium's termination of all such agreements in June 2014…" *See* Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668 at 81].

[191]   Martin Price Deposition Transcript, dated April 12, 2021, at 323:23-324:16:

"Q. Now, this liability was eminently calculable not just as of August 2014 but also as of April 2014; correct? Just as a matter of the books and records of the company.

MR. POPOVSKY: Objection to form.

MR. WERNER: Objection to form.

A. Was it -- is the question could we have calculated our Medicare billings from those customers who had cup agreements in April of 2014 –

Q. Yes.

A. -- if we had -- if we had set out -- if someone had asked us to do that? I don't doubt the company could have generated that number. I don't know if that's your question…"

### 3.    Escalating US DOJ Investigations

98. As discussed above, by December 2012 (more than a year before the 2014 Transaction) Millennium was aware that the US DOJ was conducting a joint civil and criminal investigation of the Company. By August 2013, Millennium and its counsel were aware that former Millennium employee, Ryan Uehling, was at least one of the qui tam "relators."[192] In addition, Millennium made at least three presentations to representatives of the Boston U.S. Attorney's Office in March – April 2014, while the 2014 Transaction was in progress, concerning its business practices under investigation.[193] Only eight months after the 2014 Transaction, these known risks began to materialize.

99. On December 19, 2014, the US DOJ intervened in consolidated complaints filed by Mark McGuire, Ryan Uehling, and Omni Healthcare Inc. under the qui tam provisions of the False Claims Act.[194] According to the US DOJ and qui tam complaints, Millennium "knowingly submitted many thousands of false and fraudulent claims to Medicare and Florida Medicaid for excessive and unnecessary testing, and for testing referred in violation of the Stark Law and the Anti-Kickback Statute, and was improperly paid many millions of dollars in reimbursement for these claims."[195]

100. The United States alleged that Millennium systematically billed federal health care programs for excessive and unnecessary drug testing from January 1, 2008 through May 20, 2015.[196] The allegations stated that "Millennium caused physicians to order [urine drug tests] that were not reasonable and necessary,"[197] in part through Custom Profiles, leading to the over-billing of federal health care programs. The United States also alleged that Millennium "knowingly

---

[192]  *See* email from M. Price [ML_DE_00672098].

[193]  *See* Price Deposition at 132:8–136:6.

[194]  US DOJ Complaint [ML_DE_00595094 at ¶¶12-15].

[195]  US DOJ Complaint [ML_DE_00595094 at ¶ 8]. *See also United States of America ex rel Omni Healthcare Inc*, and *John Doe, v. Millennium Laboratories Inc.* at ¶¶ 2-3, *United States of America ex rel. Mark McGuire v. Millennium Laboratories, Inc.* at ¶ 2, and *United States of America ex rel. Ryan Uehling v. Millennium Laboratories, Inc.* at ¶ 2.

[196]  US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[197]  US DOJ Complaint [ML_DE_00595094 at §VA]

submitted claims to Medicare for UDT that was referred in violation of the Stark and Anti-Kickback Statue"[198] by providing physicians with free drug test cups on the condition that the physicians return the specimens to Millennium for "over $90 million"[199] dollars' worth of additional testing. Additional claims included the "dissemination of false and misleading statements about drug abuse rates and the value of its testing"[200] despite Millennium having been warned by "consultants, customers, competitors, insurers and regulators" that "its marketing schemes were illegal."[201]

101.  On October 2015, Millennium entered multiple settlement agreements (together, the "US DOJ Settlement"). Millennium agreed to pay $256 million in the form of two False Claims Act settlements between Millennium and the US DOJ and an administrative settlement agreement between Millennium and the Department of Health and Human Services.[202] First, Millennium agreed to pay $227 million to resolve False Claims Act allegations that it systematically billed federal health care programs for excessive and unnecessary drug testing from January 1, 2008 through May 20, 2015.[203] Millennium also agreed to pay $10 million to resolve allegations that it submitted false claims to federal health care programs for medically unnecessary genetic testing that was performed on a routine and preemptive basis from January 1, 2012 through May 20, 2015.[204] Finally, Millennium agreed to pay a $19 million settlement to CMS to resolve administrative actions regarding Millennium's claims to Medicare for certain drug test billing codes. These claims were the subject of claim denials and an overpayment action initiated by CMS and its contractors.[205] The settlement payments established in October 2015 were in addition to earlier Medicare claim denials. For example, over the period July 2013 to July 2014,

---

[198]  US DOJ Complaint [ML_DE_00595094 at ¶ 178].

[199]  US DOJ Complaint [ML_DE_00595094 at ¶ 6].

[200]  US DOJ Complaint [ML_DE_00595094 at ¶ 3].

[201]  US DOJ Complaint at ¶ 7 [ML_DE_00595094].

[202]  US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[203]  *Id.*

[204]  *Id.*

[205]  *Id.*

approximately $27 million of Millennium's Medicare claims were rejected because they exceeded MUE limits.[206] The $27 million in claim denials is discussed in greater detail, below.

### D.   MILLENNIUM FILES FOR BANKRUPTCY

102.   As of the date of the US DOJ Settlement, Millennium lacked the cash on hand to satisfy the obligation to pay $256 million plus accrued interest.[207] After signing the term sheet with the US DOJ and several plaintiff states in May 2015, Millennium launched negotiations with prepetition lenders, including an ad hoc group that warned it might pursue claims and causes of actions related to the 2014 Transaction.[208] In July 2015, the Company informed the US DOJ that it would not be able to pay the settlement amount and its debt burden, and would need to restructure its balance sheet in order to do so; in response, the US DOJ set a mid-September deadline for the Company to present a payment plan.[209]

103.   In addition to the US DOJ Settlement, Millennium was burdened by the $1.75 billion of debt it had incurred from the 2014 Transaction. As of the Chapter 11 petition date, Millennium had $1.75 billion outstanding from the Term Loan and a $46.6 million outstanding "early commitment facility," the latter of which Millennium had entered into just prior to bankruptcy.[210] The Company attempted to restructure out-of-court, but could not garner the necessary support of 97% of its senior creditors.[211] Nevertheless, more than 93% by amount and value of its senior claims voted in favor of the proposed restructuring plan, and on November 10,

---

[206]   Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1.

[207]   KPMG-ML-EA15WB-0001034.

[208]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶¶ 28-29; *see also* Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[209]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶ 30.

[210]   Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[211]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶ 39.

2015, the Company filed voluntary prepackaged chapter 11 petitions in the U.S. Bankruptcy Court for the District of Delaware in order to implement the plan.[212]

104. The restructuring plan resulted in a reduction in the Company's debt by more than $1.15 billion, as the $1.75 billion senior facility was converted to $600 million of new term loans and the new term loan lenders received 100% of the equity in reorganized Millennium. Total recovery under the $1.75 billion facility was estimated at 34%.[213] The restructuring plan also stipulated that Millennium and TA pay $325 million to the estate to pay the US DOJ Settlement and provide working capital, with $256 million plus $5.8 million of accrued interest to the US DOJ and the remainder to Millennium.[214] In connection with these payments, Millennium executives and investors received certain releases.[215]

105. Lastly, the plan created two litigation trusts (one of which is the plaintiff in this Litigation) to prosecute and monetize legal claims and causes of action held by the debtor and prepetition lenders. The executed Confirmation Order Plan was filed on December 14, 2015, and Millennium emerged from its Chapter 11 reorganization on December 18, 2015.[216]

## E.    MODIFIED PADRES PROJECTIONS

106. The Padres Projections were significantly flawed in that the projections failed to reasonably reflect significant business, reimbursement, legal, and regulatory risks and exposures. It was known or knowable as of the 2014 Transaction that, as a result of these risks, the Company was very likely to encounter slowing or negative growth and declining profitability. Below I describe each of the adjustments I made to the Padres Projections to more accurately and reasonably

---

[212]    Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[213]    Debtwire, "Millennium Health opt-out lenders, US Trustee attack plan's forced third-party releases," December 8, 2015, https://www.debtwire.com/intelligence/view/prime-2142085.

[214]    KPMG audit work paper "4.5.5.11 Filing of Chapter 11 Bankruptcy" [KPMG-ML-EA15WB-0001034].

[215]    KPMG-ML-EA15WB-0001034; *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Exhibit 1 (Amended Plan) to Notice of (I) Entry Of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., and (II) Occurrence of Effective Date, December 14, 2015, at p. 35; *see also* pp. 58-62.

[216]    Debtwire, "Millennium Health completes financial restructuring, emerges from prepackaged Chapter 11" December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950.

reflect risk factors and historical trends that were known or knowable as of the 2014 Transaction. I refer to the revised projections as the "Modified Padres Projections."

### 1.  UDT Revenue Projections

#### a.  *Adjustment to Projected Specimen Volume Growth Rates for Medicare and Commercial Payors*

107.  I made specific adjustments to the Padres Projections to more accurately incorporate the known risks described above. Specifically, I adjusted the Padres Projections to reflect risks associated with: (i) Medically Unlikely Edits ("MUE"); (ii) Local Coverage Determination ("LCD"); (iii) discontinuance of Custom Profiles; (iv) the escalation of the DOJ investigation; and (v) discontinuance of the free specimen cup agreement. However, adjusting the Padres Projections for only these specific risks still does not result in a reasonable forecast for Millennium as of the 2014 Transaction. The MUE and LCD adjustments are one-time adjustments to Medicare NRPS. The discontinuance of Custom Profiles is a similar one-time adjustment to commercial payor NRPS. The adjustment for the escalation of the DOJ investigation decreases projected specimen volume over a two-year period. Finally, the discontinuance of the free specimen cup agreement represented a one-time decrease in UDT specimen volume.

108.  None of these adjustments adequately address the exaggerated specimen volume growth rates in the Padres Projections.[217] Even in the hypothetical absence of the known specific risks facing Millennium as of the 2014 Transaction, the specimen volume growth rates in the Padres Projections were significantly inconsistent with Millennium's historical trends, Millennium's reasonably anticipated future trends and with broader UDT industry trends.  Immediately below, I describe the adjustments I made to the specimen volume growth rates in the Padres Projections. In the next sections, I describe (in greater detail) the additional adjustments for each of the specific risk factors.

---

[217]  As an illustrative example: Assuming specimen volume was originally projected to be 100 in Year 1 and 125 in Year 2, representing a 25% growth rate from Year 1 to Year 2, a one-time adjustment to specimen volume might illustratively reduce the specimen volume in Year 1 to 75 (from 100). Applying the same growth rate (*i.e.*, 25%) would result in Year 2 specimen volume of 93.75. However, if the 25% growth rate was unreasonable, making the one-time adjustment to specimen volume would be insufficient to result in reasonable projections.

109. As discussed in Section A, the Padres Projections included specimen growth rate assumptions that were unreasonable because they were inconsistent with contemporaneous trends. Further, longer term projections were inconsistent with projected laboratory testing industry growth. In particular, the projected specimen CAGR of 9.8% from 2014 to 2018 for Medicare was unreasonably high given declining growth rates and *negative* growth of 3.4% in the first quarter of 2014 actuals when compared to the fourth quarter of 2013 actuals.[218] By comparison, Medicare specimen volume increased modestly (+0.4%) between the first quarter of 2013 actuals when compared to the fourth quarter of 2012 actuals. As shown in Table 9, specimen volumes had been declining since 2009. Further, the Padres Projections assumed the *same* growth rates for Medicare and commercial payors, an unreasonable assumption given different trends in growth rates at the time of the 2014 Transaction. A further reason to discredit this assumption is the known fact that overall reimbursement trends for commercial payors followed reimbursement trends for Medicare. Thus, there was a known risk that commercial growth rates would eventually follow the steeper declines represented by Medicare growth rates. Prior to making the specimen volume growth adjustments described below, I adjust these underlying specimen volume growth assumptions for Medicare to 0% in 2014, 2% in 2015 and 3% for 2016 onwards. A longer term growth rate of around 3% per annum is consistent with the projected growth rate for the broader industry, as represented by the larger publicly listed laboratory companies.[219] For commercial specimen volume growth, I assume significant underlying ongoing growth of 10% in 2014 (consistent with high but declining contemporaneous growth rates), reducing to 5% in 2015 and the long term industry growth rate of 3% in 2016 onwards. I

---

[218] 2013 actuals were derived from ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab), and 2014 actuals were derived from the 'Payor Stats – UDT' tab of the Revised Management Model [ML_DE_00559340].

[219] Analyst reports projected an overall volume growth rate of 2.5% for LabCorp (Piper Jaffray report on LabCorp, March 10, 2014, at p. 1) and 4.60% for Quest for 2014E (Morgan Stanley report on Quest Diagnostics Inc., January 31, 2014, at p. 2).

Our long-term growth rate of 3% is consistent with broader laboratory industry median volume growth forecasts of 4.1% in 2014 and 2.6% in 2015 including growth from acquisitions (Maxim Group report on LabCorp, February 5, 2014; Piper Jaffray report on LabCorp, March 10, 2014; Morgan Stanley report on Quest, January 31, 2014; Deutsche Bank report, April 14, 2014; and Piper Jaffray report on Quest, January 30, 2014).

Moreover, 3% is conservative relative to the projected median laboratory industry organic volume growth rate of 1% in 2014 and 0.6% in 2015 (Maxim Group report on LabCorp, February 5, 2014; Piper Jaffray report on LabCorp, March 10, 2014; and Piper Jaffray report on Quest, January 30, 2014).

conservatively retain the Padres Projections' specimen volume growth assumptions for payor categories other than Medicare and commercial.

### b.      Medically Unlikely Edits (MUEs)

110. The first adjustment I made to the Padres Projections was to restate Millennium's first quarter of 2014 financial results to account for the impact of MUEs, which are discussed further below, because the Padres Projections used *projected* financial results for the first quarter of 2014 as the starting point notwithstanding that the 2014 Transaction closed in April 2014. This adjustment involved two steps. As a first step, I modified the Padres Projections to reflect Millennium's actual (and lower) first quarter of 2014 results as a starting point. As a second step, as discussed below, I adjusted Millennium's *actual* first quarter of 2014 financial results to reflect the impact of MUE claim denials.

111. MUEs are used by MACs to reduce improper payments for Medicare Part B claims.[220] Billings in excess of the units of service limits established by MUEs receive significant scrutiny from the MACs and may not be reimbursed by Medicare. This type of MUE claim denial is the focus of this portion of the analysis. In addition to denials of present claims, MUEs may also result in demands for recoupment of overpayments already made in excess of MUE limits.  As discussed further below, such recoupment represented an additional exposure for Millennium. MUEs may either be claim line edits or date of service ("DOS") edits.[221] If the MUE is a claim line edit, each line of a claim is adjudicated against the MUE limit for the HCPCS/CPT code on that claim line; if the units of service ("UOS") on the claim line exceeds the MUE limit, all UOS for that claim line are denied. If the MUE is a date of service MUE, all UOS for the HCPCS/CPT code reported by the same provider/supplier for the same beneficiary for the same date of service are aggregated. The aggregated value is compared to the MUE limit, and if the sum is greater than the MUE limit, *all* UOS for the code on the current claim are denied. Therefore, a date of service MUE creates the potential for a large disallowed claim amount as compared to a claim line MUE. Table 6 displays an illustrative example.

---

[220]   CMS website (https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE)

[221]   Letter from DLA Piper to Brock Hardaway, July 24, 2014 [ML_DE_00225152 at 5153]. *See also* CMS website, NCCI FAQs (https://www.cms.gov/medicare/national-correct-coding-initiative-edits/ncci-faqs).

**TABLE 6: ILLUSTRATIVE CLAIM EXAMPLE (SINGLE BENEFICIARY)**

| | | | Adjudication if 83925 is: | |
|---|---|---|---|---|
| Date | Code | Units of Service | If Claim Line Edit MUE (where MUE Limit = 6) | If Date of Service MUE (where MUE Limit = 6) |
| 1/1/2013 | 83925 | 8 | Denied (8 > 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |
| 1/1/2013 | 82542 | 12 | Approved | Approved |
| 1/1/2013 | 83925 | 2 | Approved (2 < 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |
| 1/1/2013 | 81242 | 16 | Approved | Approved |
| 1/1/2013 | 83925 | 1 | Approved (1 < 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |

112. As shown in Table 6, the movement to DOS MUE for code 83925 leads to denial of all claims (for the same patient and the same provider) for that date of service. Under the claim line MUE, claim lines for 1-2 tests are allowed, as the claims are below the maximum limit of 6 claims for that code. Under the DOS MUE, all the claims for that beneficiary on the same date of service are aggregated and denied, as total aggregated claims for that date exceeds the MUE limit of 6.

113. According to communication between Millennium and its counsel at the time, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.[222] As discussed above, for the year ended December 31, 2013, Millennium generated approximately 33% of its Medicare revenue, or approximately $70 million, from these two MUE codes alone. As Millennium was frequently billing in excess of DOS MUE limits, this change in the CMS MUE policy had an immediate and significant impact on Millennium's revenue.[223]  However, the reimbursement risk relating to DOS MUEs was known prior to January 1, 2014.

---

[222]   Letter from DLA Piper to Brock Hardaway, July 24, 2014 [ML_DE_00225152 at 5153, 5154]. ▮▮▮▮▮▮


[223]   Prior to the 2014 Transaction, Millennium incurred significant denials under these codes. *See* "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 and ML_DE_00054258].

114. First, CMS announced on its website that effective April 1st, 2013, (*i.e.*, more than one year prior to the close of the 2014 Transaction), CMS would convert some claim line MUEs to DOS MUEs for certain CPT codes. CMS did not specify which codes would become DOS MUEs because of concerns about fraud and abuse.[224] This policy announcement also stated that if claim denials based on DOS edits were appealed, "MACs may pay UOS [units of service] in excess of the MUE value if there is adequate documentation of medical necessity of correctly reported units."[225] Second, according to Millennium's MAC, Noridian Healthcare Solutions ("Noridian"), CMS provided instructions in or around mid-2013 that "a quantity over [the MUE] limit must be denied in total (not just up to the limit [as Millennium] requested over and over again) and the need, once claims have been reviewed that *all* aspects of medical necessity be present on reviewed claims (emphasis in original)."[226] Third, by as early as February 2014 Millennium was aware that its Medicare claims containing CPT codes 82542 and 83925, where units counts (per beneficiary, per day) exceeded the 6 and 4 limits, respectively were being denied at the rate of approximately $4 million per month, and Millennium continued to receive MUE denials under these two codes up until the time of the 2014 Transaction.[227]

115. Over the period July 2013 through July 2014,[228] approximately $27 million of Millennium's Medicare claims in connection with CPT codes 82542 and 83925 were rejected because they exceeded MUE limits for these codes.[229] This suggests that Millennium was billing above the

---

[224]  Department of Health and Human Services Centers for Medicare & Medicaid Services Revised Modification to the Medically Unlikely Edit (MUE) Program [ML_DE_00206157].

[225]  Department of Health and Human Services Centers for Medicare & Medicaid Services Revised Modification to the Medically Unlikely Edit (MUE) Program [ML_DE_00206157 at 6158].

[226]  2014-09-18 MUE Denial History Memo (18) [ML_DE_00206242]:

"Tim Kennedy, CFO, again brought up the issue of payment limits by MUEs and the difference in administration to these limits under Palmetto a year ago from Noridian once it assumed the contract. I then again went carefully through exactly what MUEs are, how they were developed, the role of specialty societies, the instructions from CMS about a year ago that a quantity over this limit must be denied in total (not just up to the limit as they requested over and over again) and the need, once claims have been reviewed that all aspects of medical necessity be present on reviewed claims."

[227]  "Re: Medicare" e-mail dated February 14, 2014 [ML_DE_00060270], "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 at 8392 and ML_DE_00054258], "Medicare MUE – update on denials" email dated March 18, 2014 [ML_DE_00054044].

[228]  KPMG-ML-EA14WB-0000347.xlsx ("1 – Summary Tab," cell B81, first paragraph).

[229]  Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584 at 585] at p. 1. *See also* Administrative Settlement Agreement [ML_DE_00101487].

existing MUE limits even prior to the conversion to DOS MUEs on January 1, 2014. However, of the $27 million in claim denials, at least $21.9 million (81%) pertained to billings between January and July 2014.[230] Thus, the conversion to DOS MUE significantly increased Millennium's claim denials under these two codes. In or about July 2015, Millennium revised its reported 2014 financial results to reflect a revenue write-off of approximately $27 million.[231]

116. Notwithstanding that MUE denials were known or knowable to Millennium as of the 2014 Transaction, the Company's recorded financial results (at that time) did not reflect the impact of – and subsequent revenue write-off from – such denials. Therefore, as a starting point for the Modified Padres Projections, I adjusted the Company's then-recorded first quarter of 2014 revenue to reflect the known reimbursement risk associated with MUEs.

117. Using the total MUE-impacted revenue in 2014 as of July 2014 ($21.9 million),[232] the number of months impacted (7 months),[233] and monthly Medicare UDT volumes from January to March 2014, I estimated the monthly NRPS decrease due to MUE claim denials for the 3-month period

---

[230] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1. Millennium wrote off $24.7 million in 2014 and $2.2 million in 2013 due to MUE. When making the adjustment to the Padres Projections for MUE, I conservatively assume that the 2014 write-off did not account for the $2.8 million in underpayments in Claims Universe A.

[231] *Id.*

See Administrative Settlement Agreement, October 16, 2015, pp. 1 and 2 [ML_DE_00101487 at 1488]:

"Millennium submitted to Medicare 322,588 claim lines for Current Procedural Terminology ("CPT") codes 83925 and 82542 with claims dates between December 1, 2013 and July 31, 2014 for which the number of units of CPT codes 83925 and 82542 exceeded the Medically Unlikely Edit (MUE) thresholds for those CPT codes (referred to herein as "Claim Universe A").

Medicare partially denied payment for services in Claims Universe A. An Appeal Process Agreement was signed and dated on December 12, 2014, between CMS's Part A/B Medicare Administrative Contractor (MAC), Noridian Healthcare Solutions, LLC ("Noridian") and Millennium, under which the parties agreed that Statistical Sampling and Extrapolation (SSOE) would be used to calculate the amount of Medicare overpayment and/or underpayment. Based on the SSOE, Noridian calculated a Medicare underpayment in the amount of $2,824,558.12 for services in Claims Universe A."

[232] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1. As noted, I conservatively deducted the Claims Universe A underpayments.

[233] Number of months corresponding to Jan - July 2014 period. From August 2014, Millennium only billed up to the MUE limit. *See* KPMG-ML-EA14WB-0000347.xlsx.

---

prior to the 2014 Transaction.[234] This initial analysis produced a monthly NRPS decrease between $83.5 and $89.9 for the first quarter of 2014 (January – March).[235]

118. I further adjusted this NRPS decrease to exclude potential overlapping NRPS impacts from other adjustments in our model, specifically the impact on NRPS of the proposed Medicare LCD policy (further explained in the following paragraphs). According to Millennium's analyses assessing the potential impacts of LCD, one of the CPT codes subject to the revised MUE limit, (82542 – quantitative tests for cannabinoids), would also be potentially impacted by LCD changes.[236] As a result, I quantified the monthly NRPS contributions from this test and adjusted our initial NRPS adjustment to exclude these contributions. Ultimately, I calculated a monthly Medicare NRPS decrease between $77.7 and $83.7 from January to March 2014 to reflect only allowed billing under MUE limits. As a result, the starting point for Medicare NRPS in the Modified Padres Projections is lower, reflecting the MUE adjusted NRPS in the first quarter of 2014.

119. In August 2014, a little more than three months after the close of the 2014 Transaction, Millennium, consistent with advice it had previously received from its MAC, began billing Medicare within the MUE limits for these two codes.[237]

### c.   Local Coverage Determination

120. An LCD is a determination by a fiscal intermediary (under Medicare Part B, a MAC) as to whether or not a particular item or service is eligible for reimbursement under Medicare.[238]

---

[234] This implies a monthly impact of approximately $3.1 million ($21.9 million / 7). This is conservative relative to the internal estimate of $4 million per month made by Richard Guzman (Millennium Senior Director Revenue Cycle Management) on February 20, 2014. *See* "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 at 8392].

[235] *See* YAS Workpaper 1.

[236] Excel attachment to the email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[237] KPMG-ML-EA14WB-0000347.xlsx ("1 – Summary Tab", cell B81, first paragraph).

[238] *See* https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs, "What is an LCD?":

Local coverage determinations (LCDS) are defined in Section 1869(f)(2)(B) of the Social Security Act (the Act). This section states: "For purposes of this section, the term 'local coverage determination' means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A)."

Towards the end of January 2014, Millennium began reviewing its MAC's (Noridian) draft revised LCD policy.[239] Noridian's draft LCD policy was intended to address "distinctions between qualitative, confirmation and quantitative drug of abuse testing" and to "clearly indicate" that Medicare reimbursement was dependent on documentation of medical necessity.[240] Consistent with this purpose, Noridian's policy emphasized two key priorities, including the appropriate use of (i) quantitative testing to confirm qualitative (usually, point of care) testing, and (ii) specimen validity testing.

121. In February 2014 (two months prior to the 2014 Transaction), Millennium was advised by Avalere, a healthcare reimbursement consulting firm, that Noridian was likely to finalize its draft LCD largely in its current draft form, noting its similarity to another LCD policy that had just been finalized in January 2014 by another MAC.[241] Millennium began modeling scenarios for assessing the potential financial impact of Noridian's LCD policy on its Medicare NRPS. According to a February 3, 2014 analysis, Millennium estimated a 33.3% decline in Medicare NRPS due to the LCD.[242] Another analysis from February 5, 2014, shows two scenarios with declines in Medicare NRPS of 18.3% and 5.6% due to the LCD.[243] However, the scenario indicating a 5.6% decline assumed routine confirmation testing for illicit drugs,[244] which did not appear to be consistent with LCD guidance that required positive qualitative tests before confirmation testing for drugs of abuse.[245,246] I note that while the 18.3% decline assumes a

---

*See* https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs

[239] Email from Simmons to Hardaway, "Re: Noridian LCD", January 1, 2014 [ML_DE_00035507]. Noridian LCD draft was an attachment to the email. *See* [ML_DE_00035508]

[240] Noridian Healthcare Solutions, LLC, Draft Drugs of Abuse Testing Policy, p. 3. [2014-01-20 ML_DE_00035508_Noridian LCD Draft]

[241] Avalere Coding and Reimbursement Assessment for Drugs of Abuse Testing, February 21, 2014, at pp. 4 & 44.

[242] Excel attachment to the email from Adams to Pencak,"Subject: Order by drugs v3.xlsx", February 3, 2014 [ML_DE_00060308].

[243] Excel attachment to the email from Pencak to Hardaway, "Subject: LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[244] Email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320].

[245] Noridian Healthcare Solutions, LLC, Drugs of Abuse Testing at p. 25 [ML_DE_00035508 at 5532].

[246] The 18.3% scenario assumed that the reduction in quantitative testing is partially offset by a substantial increase in high-complexity qualitative tests (code CPT Code G0431). Specifically, the 18.3% scenario assumed that 57.5% of specimens would be subject to a high-complexity qualitative test (compared to 1.8% of specimens in December 2013). *See* Excel attachment to the email from Pencak to Hardaway, "Subject: LCD Impact", February 5, 2014 [ML_DE_00054320, 3421]. Code G0431 is defined as "Drug screen, qualitative: multiple

---

decrease in confirmatory quantitative testing and an elimination of specimen validity testing (reducing NRPS), the financial impact of these changes are significantly offset by an assumed significant increase in high complexity qualitative testing (G0431 – Drug Screen (per patient encounter)).[247] The assumed increase in billings under G0431 is modeled to increase Medicare NRPS by $40.74 (an offsetting increase of approximately 9%).[248]

122.    A third Millennium analysis dated February 28, 2014 modeled a "30% reduction in Medicare reimbursement effective June 1, 2014."[249] In deposition testimony, Mr. Pencak agreed that the 30% reduction in Medicare NRPS effective June 2014 was "fairly close" to the impact he had modeled earlier in 2014 for the potential LCD impact,[250] and that a 30% reimbursement reduction for Medicare was within Millennium's contemplation as of March 2014.[251] A subsequent analysis that Millennium conducted after the 2014 Transaction was confirmatory of the LCD policy impact that Millennium envisioned prior to the 2014 Transaction—*i.e.*, a greater than 30% reduction in Medicare NRPS. Specifically, the June 2015 Revised Management Model projected Medicare NRPS declining from $383 in September 2015 to $248 in October 2015, or a reduction of 35%.[252] The modeled decline to $248 represented an ever greater decline when compared to Millennium's Medicare NRPS for the first quarter of 2014 (immediately prior to the 2014 Transaction). The Revised Management Model projected a *45% decline* in Medicare NRPS, as compared to the first quarter of 2014.[253]

---

drug classes by high complexity test method (e.g., immunoassay, enzyme assay)." For example, *see* https://www.cgsmedicare.com/partb/pubs/news/2012/0412/cope18723.html.

[247]    Notes to the model suggest that this increase is explained in whole or in part by changing the billing for Synthetic Cannabinoids Quantification (or "Spice") from 82542 to G0431. As Pencak contemporaneously notes, the new billing code is modeled to increase the reimbursement amount from $24 to $97.

[248]    If the modeled increase in billings under G0431 is eliminated, LCD is modeled to reduce Millennium's Medicare NRPS by 26.6% (versus 18.3%).

[249]    Excel attachment to the email from Kennedy to Pencak, "Re:Leveraged Recap Summary" February 28, 2014 [ML_DE_00058384, 8385].

[250]    Pencak Deposition at 251:13 – 23, Exhibit 165-A.

[251]    Pencak Deposition at 255:12 – 24.

[252]    ML_DE_00559340, decrease of NRPS derived from cells M8 to N8 from the "UDT Rev" tab.

[253]    ML_DE_00732288 tab "Quarterly 2012-2015Q1" cell BK132 states NRPS of $451 in the first quarter of 2014 (calculation: 248/451-1 = -45%).

123. Based on the above, I conservatively modified the Padres Projections to reflect a Medicare NRPS reduction of 18.3%, effective as of October 2015, due to elimination of coverage for certain negative confirmation testing and specimen validity testing (as dictated by the LCD).[254] This is consistent with the lower end of Millennium's own pre-transaction analysis and far less than the impact (*i.e.*, 35% to 45%) that was modeled *after* the 2014 Transaction.

> d.    *Expected Impact Due to the Discontinuance of Custom Profiles*

124. Discontinuance of Millennium's Custom Profiles was expected to significantly reduce the number of tests per specimen, resulting in a reduction in NRPS. As discussed above, "standing orders" such as the Custom Profiles were known to increase the risk of medically unnecessary tests. Although the Padres Projections do reflect a decline in Millennium's commercial payor NRPS, there is no indication that this projected decline is intended to represent the impact of the likely discontinuance of Custom Profiles. Notwithstanding the known risks associated with the Custom Profiles, there is no indication that Millennium sought to model the impact of the elimination of Custom Profiles until the Revised Management Model prepared in June 2015.

125. The Revised Management Model incorporated only a 7% decline in commercial payor NRPS due to the discontinuance of Custom Profiles. The decline was modeled to occur in July 2015.[255] However, based on data available as of the 2014 Transaction, the impact of the anticipated discontinuance of Custom Profiles – and the resulting decline in medically unnecessary tests – should have reasonable been estimated to cause a much larger decline in commercial payor NRPS.

126. To estimate the anticipated impact on commercial NRPS due to the elimination of Custom Profiles, I used Millennium's Medicare billings as a proxy.[256] Specifically, I compared Millennium's Medicare reimbursements by code to that of its closest competitors, using 2013

---

[254]  Excel attachment to the email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[255]  ML_DE_00559340, tab 'UDT Rev.'

[256]  Comparable data was not available for Millennium's billings to commercial payors. However, given the similar reimbursement trends between Medicare and commercial payors, I believe this analysis provides a reasonable estimate for this purpose.

billing data. To identify Medicare reimbursements and Millennium's competitors, I used the 2013 CMS Physician and Other Supplier Public Use File ("Physician and Other Supplier PUF"), which contains information on all submitted Part B Medicare claims in 2013 including reimbursement, quantity of tests or services performed, HCPCS code, and the identification of the provider that submitted the claim via a National Provider Identifier ("NPI").[257] I confirmed the companies closest to Millennium by selecting the providers that billed the quantity of tests, codes, and reimbursement and volumes per code most similar to Millennium's in 2013; these competitors were Ameritox and Aegis.[258] Similar to Millennium, these two companies focus almost exclusively on UDT and were cited by Millennium as competitors.[259]

127. Next, I identified the HCPCS codes for which Millennium received reimbursement from Medicare but for which neither Ameritox nor Aegis received Medicare reimbursement. Of the 30 codes for which Millennium received Medicare reimbursement in 2013, there were 9 codes for which neither Ameritox nor Aegis received Medicare reimbursement. I then calculated the percentage of Millennium's 2013 Medicare NRPS derived from these 9 codes. In 2013, Millennium derived 21.8% of its Medicare NRPS from these codes.[260]

128. My analysis assumes that UDT companies predominantly bill to a common universe of billing codes. I also took into account the fact that by 2013, Ameritox had entered into a settlement with the federal government and several state governments related to excessive and medically unnecessary testing. Thus, it is possible that the universe of reimbursement codes used by Ameritox had contracted by 2013. Based on a public records search, I was unable to find any

---

[257]   Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[258]   *See* Appendix C: Custom Profile Revenue Impact Analysis. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[259]   Confidential Information Memorandum [ML_DE_00269115 at 9193].

[260]   *See* Appendix C: Custom Profile Revenue Impact Analysis. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

similar settlements involving Aegis with respect to excess or medically unnecessary testing.[261] Thus, it is probable that the universe of reimbursement codes used by Aegis was more consistent with medically necessary testing. Therefore, billing codes that were billed *only* by Millennium were more likely to represent medically unnecessary tests. For example, in 2013, Millennium received $4.8 million in reimbursement from Medicare for HCPCS/CPT code 80174. In 2013, neither Ameritox nor Aegis received reimbursement from Medicare for this code. This code is described as a test for tricyclic antidepressant (imipramine) and was highlighted in the US DOJ Complaint as a code associated with medically unnecessary testing.[262] Based on the foregoing analysis, I applied a 21.8% reduction in Millennium's commercial payor NRPS due to the elimination of Custom Profiles and the resulting reduction in medically unnecessary tests. In keeping with the Revised Management Model, I have assumed that this reduction occurs in July 2015.

129.   However, it is important to note that this estimate may underestimate the quantity of medically unnecessary testing driven by Custom Profiles. The estimate of 21.8% does not take into account instances in which Millennium may have billed medically *unnecessary* tests to a code to which a competitor billed only medically *necessary* tests.

130.   As confirmation of the likely impact of the discontinuance of Custom Profiles, I considered a second data point. Under the Modified Padres Projections, the combined impact of the revised MUE and new LCD policies is a 36.3% decline in Medicare NRPS.[263] As the revised MUE and new LCD policies focused significantly on the elimination of medically unnecessary tests, and given the history of commercial payors following the trend of Medicare reimbursement, I

---

[261]   I searched Bloomberg Law and Lexis using the keywords Aegis (within 3 words of) insurance and Medicare. There were no cases related to Medicare billing practices or any other business practice that was filed under codes "375" False Claims Act or "376" Qui Tam statutes.

[262]   US DOJ Complaint [ML_DE_00595094 at ¶134].

   Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[263]   ~36.3% decline in Medicare NRPS = 18.0% MUE related decline (adjusted for LCD) + 18.3% decline due to LCD. 18.0% MUE related decline is calculated as the average Medicare NRPS decline in the first quarter of 2014 due to adjustment for claim values over MUE threshold ($81.2) / average Medicare NRPS in the first quarter of 2014 ($451.3). 18.3% decline due to LCD changes based on the scenario ran by Millennium in February 2014 to assess impact of LCD.

considered the Medicare NRPS reduction to be a relevant proxy for Millennium's commercial NRPS reduction following the discontinuance of Custom Profiles. To avoid potential double counting due to the reduction in medically unnecessary tests, I do not explicitly model the impact of the elimination of Custom Profiles on Medicare claims.

e.   *Expected Impact on Specimen Volume due to US DOJ Investigation and Settlement*

131.   At the time of the 2014 Transaction, Millennium knew that Ameritox had suffered significant customer attrition and specimen volume declines following its settlement with the DOJ.[264] Millennium unreasonably failed to account for this risk in the Padres Projections. An April 2015 email from Mr. Price (Millennium's general counsel) to Mr. Kennedy (Millennium's Chief Financial Officer) ███████████████████████████████████████████████

████████████████████████████████████ ██ ████████████████

███████████████████████ [266] He further added ███████████████████████████

---

[264]   *Ameritox, Ltd. v. Millennium Laboratories* [ML DE 00165024 at 165035], at A636, filed May 24, 2014 (emphasis added):

> "Finally, Ameritox responds that it is only fair to allow the introduction of evidence of this investigation if the Court allows Millennium to introduce evidence of the DOJ investigation of Ameritox and Ameritox's settlement of those allegations. The Court rejects this argument, **because the Court is only allowing evidence regarding the DOJ investigation and settlement to the extent that such evidence was made public, and that evidence is being used to prove Millennium's theory that customers left Ameritox because of such negative publicity**."

> *Ameritox, Ltd. v. Millennium Laboratories* [ML DE 00164789 at 165005], at A613, filed May 5, 2014 (emphasis added):

> "Millennium also challenges the Composite Benchmark Model, arguing that Dr. Cantor makes erroneous assumptions regarding Millennium's growth and Ameritox's losses during this period, such as: (1) Dr. Cantor erroneously assumes that all of Millennium's growth in market share in each quarter after the first quarter of 2010 was solely due to the challenged conduct… **(6) she failed to consider alternative causal factors that occurred after the first quarter of 2010, such as…(d) Ameritox's $16.3 million payment to settle a healthcare fraud claim that received widespread press.**"

> In a report dated December 13, 2013, Millennium's own expert states that:

> "**Ameritox's sales volumes exhibited a significant flattening and subsequent decline during the period following the False Claims Act Settlement**, signing of the Corporate Integrity Agreement and the RxGuardian judgment. Dr. Cantor's analysis makes no mention of these issues and does not identify the potential impact of each of these issues on her damages calculations."

> *See* Rebuttal Expert Report of David S. Williams [ML DE 00495232 at 5248] at 16 (emphasis added).

[265]   Ameritox agreed to a US DOJ settlement in November 2010. *See* Tampa Bay Business Journal, "Ameritox agrees to $16.3M settlement", November 16, 2010. (https://www.bizjournals.com/tampabay/news/2010/11/16/ameritox-agrees-to-163m-settlement.html)

[266]   Email from Kennedy to Hardaway, "Re: Privileged", April 3, 2015 [ML_DE_00597259 at 7260].

---



[267] A

June 2015 email from CEO Brock Hardaway noted that [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]"[268]

132.    Based on the above, I have incorporated a 30% reduction (15% reduction each in 2015 and 2016) to the Padres Projections' total volumes assumptions across Millennium's UDT and PGT businesses to account for the reputational impact of an expected US DOJ Settlement.

> f.    *Expected Impact Due to the Discontinuance of the Free Specimen Cup Agreement*

133.    According to Millennium, "at its peak" approximately 10% of its customer accounts, representing 16%-17% of total specimen volume, had entered into the free specimen cup agreement.[269] As of the 2014 Transaction, the free specimen cup agreement was at significant risk of discontinuance. Millennium had received advice that the agreement violated anti-kickback statutes and Millennium was subject to an adverse ruling in the pending Ameritox litigation. I incorporated a 1.6% reduction in UDT volume in July 2014 using the analysis performed by Millennium on customers that cancelled their agreements in June 2014, the date of the Ameritox verdict (and only two month after the 2014 Transaction).[270] The 1.6% reduction in specimen volume is conservative, as it ignores customers that may have cancelled prior to (or after) June 2014, which is likely given that the Ameritox complaint against Millennium was filed in April 2011. I also note from the US DOJ Complaint that a number of customers discontinued their business with Millennium prior to 2014.[271] Furthermore, the 1.6% decline ignores any impact on future growth. As alleged in the Ameritox complaint, the specimen cup agreement facilitated higher growth rates for Millennium. It follows that future growth rates may have been lower following the discontinuance of the free specimen cup agreement.

---

[267]    Email from Kennedy to Hardaway, "Re: Privileged", April 3, 2015 [ML_DE_00597259 at 7260]

[268]    Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[269]    Millennium Self-Disclosure Statement at p.3 [ML_DE_00670668 at 0670].

[270]    Millennium Cancelled Cup Agreements [2014-10-13 ML_DE_00567499].

[271]    Exhibit 74 to the DOJ Complaint [ML_DE_00629123].

## 2.    PGT Revenue and RxAnte Projections

134.  At the time of the 2014 Transaction, the DOJ investigation was expected to impact specimen volume for the PGT businesses. I modeled this impact similar to the impact modeled for Millennium's UDT business. Starting with the Padres Projections, I apply a 30% reduction in PGT specimen volume growth (15% reductions in January 2015 and 2016) to account for the DOJ investigation. This reduces the PGT specimen volume growth rate from 140% and 37.9% under the Padres Projections for 2015 and 2016 respectively, to 87.0% and 14.4% respectively under the Modified Padres Projections. After the impact of this adjustment, PGT revenue comprises 3.6% and 13.6% of total revenue in 2014 and 2020 respectively (compared to 3.3% and 10.6% respectively under the Padres Projections), a slight increase in the 2020 revenue percentage given the more optimistic UDT assumptions in the Padres Projections. I conservatively assume no other changes to PGT revenue projections in the Padres Projections.

135.  I conservatively assume no changes from the underlying Padres Projections for RxAnte revenue (including no impact from the DOJ investigation). After the impact of the DOJ investigation on PGT and UDT revenue, RxAnte revenue comprises 1.9% and 15.2% of total revenue in 2014 and 2020 respectively.

## F.    EXPENSE PROJECTIONS

136.  To complete the free cash flow analysis under the Modified Padres Projections, I use the same unit costs assumptions as the Padres Projections. Unit costs are calculated by dividing each expense by specimen volume. For example, to calculate the cost of goods sold ("COGS") unit costs, I divided COGS by specimen volume. I calculated unit costs for COGS, operating expenses (including salaries and benefits, insurance, information technology, research and development) and travel and entertainment. To estimate expenses under the Modified Padres Projections, I multiplied the unit costs by the adjusted UDT and PGT volumes discussed above. Similarly, I assume that all fixed costs in the Padres Projections do not change.

## G.    SUMMARY OF MODIFIED PADRES PROJECTIONS

137. Figure 9 through Figure 11 show the collective impact of the revenue adjustments and the expense assumptions described above (*i.e.*, the Modified Padres Projections).

**FIGURE 9: MODIFIED PADRES PROJECTIONS - REVENUE**

Notes:  Modified Padres projection utilizes 2014 Q1 actuals in addition to projections for the rest of the year

138. As shown in Figure 9, the full impact of the modifications occurs by 2016. Thereafter, NRPS grows in line with the Padres Projections, however, revenue growth remains lower than the Padres Projections due to lower Medicare and commercial specimen volume growth. Under the Modified Padres Projections, 2015 revenue is 27% lower than the Padres Projections and 2016 revenue is 43% lower than the Padres Projections. By the end of the projection period, 2020 revenue is 49% lower than the Padres Projections.

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 76



**FIGURE 10: MODIFIED PADRES PROJECTIONS - EBITDA**

Notes: Modified Padres projection utilizes 2014 Q1 actuals in addition to projections for the rest of the year

139. Under the Modified Padres Projections shown in Figure 10, EBITDA immediately declines and by 2015 reaches $263 million, or 40% below the Padres Projections, and by 2016 dips to $176 million, or 62% below the Padres Projections. By 2020, projected EBITDA is 67% lower than the Padres Projections. The percentage decline in EBITDA by the end of the projection period is larger than the percentage decline in revenue, as certain fixed costs that must still be incurred by Millennium remain in place. As noted, I retain the same unit cost assumptions as the Padres Projections, and I make no adjustments to designated fixed costs.

140. Figure 11 below shows free cash flow projections. The free cash flow projections reflect the EBITDA projections above, as well as the Padres Projections for income tax rates, capital expenditure, working capital, and reductions in variable costs. For comparability purposes, in

Figure 11, I have used the same definition of free cash flow as the Padres Projections, which includes a deduction for debt amortization.[272]

**FIGURE 11: MODIFIED PADRES PROJECTIONS - FREE CASH FLOW**

Notes:  Modified Padres projects free cash flow only reflects 3 quarters worth of data in 2014.

141. As shown in Figure 11, free cash flow under the Modified Padres Projections starts declining in 2016, following a small increase in 2015. In contrast, the Padres Projections projected a CAGR of approximately 16.8% per annum. In 2015 and 2016, respectively, free cash flow under the Modified Padres Projections equals $38.1 million and negative $15.5 million, as compared to $90.7 million and $95.0 million for the same periods under the Padres Projections.

---

[272]   Free Cash Flow is defined under the Padres Projections as net income, plus (i) depreciation and amortization, and (ii) stock-based compensation, less (i) distributions for shareholder taxes, (ii) increase in working capital, (iii) capital expenditure, and (iv) debt amortization.

### H.   BALANCE SHEET TEST

#### 1.   Discounted Cash Flow Analysis

142. For the balance sheet test, I conduct a discounted cash flow ("DCF") analysis to value Millennium as of April 2014. Given the availability of the necessary data through the first quarter of 2014, I conduct the discounted cash flow analysis as of March 31, 2014. I am not aware of any significant change in the operations or financial condition of Millennium between March 31, 2014 and April 16, 2014 (the date the 2014 Transaction closed). As such, it is reasonable to assume that the valuation as of March 31, 2014 is a reliable indication of value as of April 16, 2014. The DCF analysis is based on the Modified Padres Projections to ensure that the resulting valuation reasonably reflects actual performance and trends, and the reasonably likely risks and difficulties that were known or knowable as of the valuation date —*i.e.*, risks related to: (i) medically unlikely edits (MUEs), (ii) local coverage determinations (LCDs), (iii) the elimination of Custom Profiles, (iv) the investigation by the DOJ, and (v) the elimination of the free specimen cup agreement. Consistent with the Padres Projections, the Modified Padres Projections reflect a seven-year discrete projection period from second quarter of 2014 to fourth quarter of 2020 and a terminal year.

143. Consistent with standard corporate finance methodology, I use the Modified Padres Projections to calculate Millennium's annual unlevered free cash flow as net operating profit after taxes, less investment in working capital and less capital expenditure, and after adding back non-cash charges (*i.e.*, depreciation and amortization). I then discount both the seven-year projected cash flows and the terminal value using a weighted average cost of capital ("WACC") (or discount rate) of 14.8%. The discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014.[273] I also note that FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%.[274] The calculation of Millennium's unlevered free cash flow is shown in 0.

---

[273] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at pp. 16 and 19, April 30, 2014 [ML_DE_00263273 at 3288 and 3291].

[274] FTI Consulting, Millennium Health, LLC Enterprise Valuation As of December 18, 2015 at p.7, April 10, 2016 [KPMG-ML-EA15WB-0000743 at 772].

144. To calculate the terminal value, I relied upon the Gordon Growth (or Perpetuity Growth) model. I have projected a long-term growth rate for Millennium free cash flows of 3%, in line with projected longer-term growth of other laboratory companies. As of the end of 2013, U.S. real GDP was expected to grow between 2.7% to 3.4% annually for the period 2014 - 2018.[275] The assumed long-term growth is also broadly in line with the 30-year Treasury bond yield of 3.56% as of the Date of Valuation, a common benchmark for terminal growth rates.[276] The terminal value represents the value of all of Millennium's future unlevered free cash flows beyond the discrete seven-year projection period.

145. The discounted cash flow analysis demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction. The enterprise value (in this instance, equivalent to asset value) of Millennium was $802.9 million compared with $1,761.7 million of outstanding debt. Thus, the face value of Millennium's debt was greater than the value of Millennium's assets. In other words Millennium had a *negative* equity value of $958.9 million, giving effect to the 2014 Transaction (and before consideration of the liabilities relating to the then pending litigation and government investigations, discussed below).  As unreasonably small capital is a financial condition short of balance sheet insolvency, the DCF analysis also clearly demonstrates that the 2014 Transaction left Millennium with unreasonably small capital. In Appendix D, I sensitize the valuation to changes in key risk factors. Over a broad range of assumptions with respect to risks to Millennium, that were known or knowable as of the 2014 Transaction, Millennium is consistently shown to be balance sheet insolvent. Millennium's equity value as of the 2014 Transaction never exceeds *negative* $313 million, even under a significantly more optimistic (and unrealistic) view of the relevant risks.

146. In addition to the known business risks and historical trends that necessitate the cash flow adjustments discussed in Section VI.B, Millennium also faced liabilities relating to the then pending litigation and government investigations. These risks included but were not limited to:

---

[275]   Congressional Budget Office (CBO), The Budget and Economic Outlook 2014 to 2024, February 2014.

[276]   30-year treasury rate as of 3/31/2014. Daily yield curve data derived from US Department of the Treasury, available at https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView.aspx?data=yieldYear&year=2014

- Medicare recoupment related to free specimen cup agreements: In August 2014, Millennium estimated that it had received in excess of $90 million in Medicare reimbursement, during the four years prior to June 2014, in connection with customers using Millennium's free cup agreement.[277] The verdict in the Ameritox litigation confirmed that Millennium's free cup agreement violated both the Stark Law and the Anti-Kickback statute. In October 2015, Millennium agreed to resolve claims by the federal government and state Medicaid programs for $256 million.[278] This included Millennium's liability in connection with the Medicare reimbursement connected to the free specimen cups and other medically unnecessary testing.[279]

- Commercial payor litigation: Millennium faced significant risk of "copy-cat" commercial payor litigations based on the Ameritox lawsuit and the DOJ investigation. In an April 2015 email, for example, Martin Price (Millennium's General Counsel)



[280]

- Legal fees:

[281]

- Claim B Universe: Millennium had potential exposure relating to the repayment of Medicare overpayments it received from reimbursements for units of service billed above the MUE thresholds from January 2012 through December 2013. This exposure was later quantified at $42 million, as "Claims Universe B", in Millennium's DOJ settlement.[282]

---

[277] Exhibit K to Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00514819].

[278] US DOJ Complaint ¶¶ 6, 150, 265 [ML_DE_00629274 at 9341]

[279] US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[280] Email from Price to Kennedy, Re: Privileged, April 3, 2015 [ML_DE_00604336].

[281] *Id.*

[282] *See* Administrative Settlement Agreement, October 16, 2015, p. 2 [ML_DE_00101487 at 1488]. Millennium was overpaid $42 million on claim lines at issue in Claims Universe B.

147. None of these amounts are included in the Padres Projections or the Modified Padres Projections. All of these risks — even if resolved for less than the total potential exposure as of the 2014 Transaction —further decreased Millennium's equity value and thus, exacerbated Millennium's balance sheet insolvency as of the 2014 Transaction.[283] For the purpose of the solvency analysis, I have been instructed by counsel to assume that aggregate dollar value of Millennium's exposure, reasonably anticipated as of the 2014 Transaction, was at least $45 million. As this represents only one-half of the billings to Medicare for companies with free specimen cup agreements – and does not include *any* of the other contingent liabilities – this is a conservative estimate of the contingent liabilities facing Millennium at the time of the 2014 Transaction. Based on this assumption, the value of Millennium's equity giving effect to the 2014 Transaction further decreases to *negative* $1,003.9 million.[284]

148. Millennium was balance sheet insolvent over a wide rage of WACCs. As shown in Table 7 below, sensitivity analysis for WACCs ranging from 9.8% to 14.8% shows Millennium had an equity value of *negative* $482.3 million to *negative* $958.9 million, even before accounting for its legal/regulatory exposure.[285]

---

[283] I noted that the consideration and quantification of contingent liabilities for a solvency analysis may differ from the recognition of those liabilities for accounting purposes. Further, I am instructed by counsel that under applicable case law (i) some or all of the above-referenced liabilities might be regarded as "disputed" rather than "contingent" for solvency purposes, (ii) a "disputed" liability is one where, although the amount might be subject to dispute, the facts giving rise to the liability have already occurred as of the time of the subject transfers, and (iii) for solvency purposes, it may be appropriate to value a disputed liability in the amount of its ultimate resolution. Accordingly, this renders the estimate of Millennium's legal/regulatory liabilities discussed herein even more conservative.

[284] Negative $958.9 million less $45 million = negative $1,003.9 million.

[285] The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies *plus* the size premium adopted by Vantage Point (*i.e.*, 10.0%). However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk. Thus, 9.8% underestimates an appropriate WACC for Millennium.

**TABLE 7: EXPECTED CASE SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE**

| | | | $ Millions | | |
|---|---|---|---|---|---|
| Discount Rate | Enterprise Value | Net Debt Value | Equity Value Before Contingent Liabilities and Fees | Contingent Liabilities | Equity Value After Contingent Liabilities and Fees |
| 9.8% | 1,279.4 | 1,761.7 | (482.3) | (45.0) | (527.3) |
| 10.8% | 1,135.6 | 1,761.7 | (626.2) | (45.0) | (671.2) |
| 11.8% | 1,024.3 | 1,761.7 | (737.5) | (45.0) | (782.5) |
| 12.8% | 935.5 | 1,761.7 | (826.2) | (45.0) | (871.2) |
| 13.8% | 863.1 | 1,761.7 | (898.6) | (45.0) | (943.6) |
| **14.8%** | 802.9 | 1,761.7 | **(958.9)** | (45.0) | **(1,003.9)** |

Notes and Sources:

Values derived from Table 11: Discounted Cash Flow Analysis (second quarter of 2014 through 2020) assuming different discount rates.

## 2.    Guideline Public Companies

149. I used my standard methodology to attempt to identify comparable companies for use in the Guideline Public Company ("GPC") valuation of Millennium. First, I relied on industry knowledge gained from a combination of my professional experience, industry research and proprietary and non-proprietary industry information obtained by Brattle. Second, I relied on industry information obtained from documents produced in discovery and depositions. Third, I relied on electronically assisted searches using industry classification codes and other descriptive company data. From a combination of these efforts, I developed a list of possible guideline public companies.

150. As part of this methodology I performed an independent analysis based on Standard Industrial Classification ("SIC") codes from the United States Department of Labor SIC Manual, including 8071 Medical Laboratories, 2835 In Vitro and In Vivo Diagnostic Substances, and 8734 Testing Laboratories. A description of these codes is contained in Appendix B. I limited my search to companies geographically located in the United States and Canada with publicly available financials and an enterprise value of at least $100 million. This method returned 30 unique potential GPC's. I also considered the comparable companies identified by Millennium and its financial advisors, which included Vantage Point, Lazard, and FTI Consulting. This method returned 17 unique potential guideline companies.

151. Combined, these two methods returned a list of 39 unique potential GPC's.[286] I reviewed each of these possible GPC's for comparability, focusing on diagnostic testing, whether the company conducted urinalyses and drugs-of-abuse testing, and the size of the company (as measured by enterprise value and revenue). After careful consideration, I arrived at five potential GPC's with at least a portion of their business that was somewhat similar to Millennium. These include Alere Inc. ("Alere"), Bio-Reference Laboratories Inc. ("Bio-Reference"), LabCorp, Myriad Genetics Inc. ("Myriad"), and Quest.[287]

152. However, for several reasons, these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value. Drugs of abuse UDT represents a relatively small portion of revenue for each of these five companies. Millennium identifies just two of these companies as competitors – LabCorp and Quest.  However, both LabCorp and Quest were significantly larger and more diversified than Millennium. LabCorp reported that just 3% of its 2013 revenue related to drugs of abuse testing and it was 11 times larger than Millennium.[288] Quest was similarly focussed on other types of laboratory testing[289] and was also approximately 11 times larger than Millennium.[290]

153. A third company, Alere, identified that 20% of its revenue came from toxicology, however this segment also included testing equipment and services. Alere had a significant focus on analytical software, and also performed diagnostic tests for infectious diseases, cardiology, diabetes, oncology, and women's health.[291]

---

[286] Millennium's financial advisors returned 17 unique companies, while Brattle's independent analysis returned 30 unique companies. Eight companies appeared in both methodologies, resulting in 39 unique potential companies overall.

[287] *See* Appendix B. Description of Potential Comparable Companies for a detailed description of these companies.

[288] LabCorp's 2013 revenue was 9.2 times higher than Millennium. Source: S&P CapIQ.

[289] The company's "Diagnostic Information Services" business group also include gene-based and esoteric testing and anatomic pathology services in addition to routine testing. Quest was further diversified with its "Diagnostic Solutions" business group, which provides risk assessment services for the life insurance industry and information technology solutions. Quest Diagnostics Incorporated Form 10-K filed for the fiscal year ended December 31, 2013 filed February 18, 2014 at p. 5.

[290] Quests's 2013 revenue was 11.3 times higher than Millennium. Source: S&P CapIQ.

[291] *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Alere.

154. Bio-Reference was similar in size to Millennium in terms of revenue and focused on processing laboratory test requisitions. However, Bio-Reference largely focused on diagnosing diseases related to esoteric testing, molecular diagnostics, cancer pathology, genetics, women's health, anatomical pathology, etc. Although the Company's "Routine Testing" segment (40% of net revenues as of Jan. 2014) offered urinalyses and substance abuse tests, this business segment also tested for pregnancy, cholesterol level, and blood cell counts. The Company also had a Medical Information business segment (data analysis) that was unrelated to Millennium's product offerings.[292]

155. Finally, I included Myriad as it operated a genetic testing business. However, unlike Millennium's PGT business, Myriad's focus was on testing for risk of disease, rather than how an individual would respond to medication. Moreover, as noted, PGT represented a very small portion of Millennium's business.[293]

156. Notwithstanding very limited, and ultimately insufficient, comparability between Millennium and the GPCs, I computed valuation multiples based on multiples of enterprise value to EBITDA. For both sets of multiples, I computed the multiples as of the Date of Valuation on a Last Twelve Months ("LTM"), forecasted 2014, and forecasted 2015 basis. The latter two estimates are based on analyst consensus estimates made at the time of the Transaction. The valuation multiples are shown in Table 8.

---

[292]   *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Bio-Reference.

[293]   *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Myriad.

**TABLE 8: GUIDELINE PUBLIC COMPANY MULTIPLES**

| | LTM Q1 2014 Multiple | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | EV / EBITDA | EV / 2014 EBITDA Forecast | EV / 2015 EBITDA Forecast | EV / Revenue | EV / 2014 Revenue Forecast | EV/ 2015 Revenue Forecast |
| Alere | 12.6x | 10.2x | 9.7x | 2.8x | 2.3x | 2.1x |
| Bio-Reference Laboratories | 8.7x | 7.4x | 6.8x | 1.1x | 1.0x | 0.9x |
| Laboratory Corp. of America Holdings | 9.6x | 9.4x | 9.1x | 1.9x | 1.9x | 1.8x |
| Myriad Genetics | 6.7x | 7.1x | 8.6x | 2.6x | 2.7x | 2.7x |
| Quest Diagnostics | 8.3x | 8.0x | 7.8x | 1.6x | 1.6x | 1.6x |
| Minimum | 6.7x | 7.1x | 6.8x | 1.1x | 1.0x | 0.9x |
| Median | 8.7x | 8.0x | 8.6x | 1.9x | 1.9x | 1.8x |
| Mean | 9.2x | 8.4x | 8.4x | 2.0x | 1.9x | 1.8x |
| Maximum | 12.6x | 10.2x | 9.7x | 2.8x | 2.7x | 2.7x |

157. The resulting estimates of Millennium's enterprise value are shown in Table 9 below. However, given the lack of comparability between the GPC's and Millennium, I do not consider these multiples as a reliable measure of value. In its solvency analysis, Vantage Point identified eight comparable companies, which included the five GPCs I identified.[294] Vantage Point similarly noted that none of the companies they identified "were identical or directly comparable" to Millennium.[295]

158. In addition (and as noted above), just prior to the 2014 Transaction, Millennium's management was exploring whether there was an opportunity to sell to a private equity sponsor at a valuation of 6-7x EBITDA.[296] Notwithstanding that Millennium failed to sell the Company at these valuation levels, this would place Millennium at or below the minimum valuation multiples derived from the GPC analysis. This is indicative of the lack of comparability between the GPC companies and Millennium. As a result, I have given zero weight to the GPC analysis in my assessment of the solvency of Millennium.

159. Although I do not explicitly rely on the GPC for my solvency analysis of Millennium, I note that the most likely conclusion of value that results from the GPC methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital.

---

[294]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis [ML_DE_00263273 at 3292].
[295]   *Id.*, p. 20.
[296]   Email from Sarin to Blake, Re:Millennium update, October 12, 2013, Exhibit 223 [CITI-DE-00071523 at 1524]

160. A primary assumption when applying market multiples is that the subject company financial metric, to which the multiple is applied, represents a steady state metric.[297] Given the substantial expected deviation in profitability of Millennium from historical results (due to known or knowable risk factors), references to valuations based on LTM or 2014 revenue or EBITDA should not be considered indicative of Millennium's valuation.  As the Revised Padres Projections demonstrate, the impact of the known or knowable risks were not anticipated to impact Millennium's cash flows until 2015 (and not on a full-year basis, until 2016).  Thus, indications of value derived from Millennium's 2015 financial results are a relatively more accurate estimate of Millennium's value (as compared to LTM or 2014 financial metrics). Table 9 shows that when applying the 2015 forecasted revenue and EBITDA multiples, Millennium's implied equity values are *negative* $1,238 million or only a modest value of $23 million, respectively.  As a company with debt of at least $1.775 billion and equity value of only $23 million, Millennium would have unreasonably small capital.

**TABLE 9: GUIDELINE PUBLIC COMPANY VALUATION ($ MILLIONS)**

| As of April 16th, 2014 | Brattle Model Value | Multiple | | Implied Enterprise Value | | Implied Equity Value | |
|---|---|---|---|---|---|---|---|
| | [A] | [B] | | [C] | | [D] | |
| Revenue | | Low | Median | Low | Median | Low | Median |
| LTM | 644.2 | 1.1x | 1.9x | 705 | 1,221 | (1,056) | (540) |
| 2014 | 676.9 | 1.0x | 1.9x | 680 | 1,259 | (1,081) | (503) |
| 2015 | 573.1 | 0.9x | 1.8x | 524 | 1,042 | (1,238) | (720) |
| EBITDA | | | | | | | |
| LTM | 371.9 | 6.7x | 8.7x | 2,494 | 3,218 | 733 | 1,456 |
| 2014 | 368.1 | 7.1x | 8.0x | 2,609 | 2,961 | 847 | 1,200 |
| 2015 | 262.6 | 6.8x | 8.6x | 1,785 | 2,253 | 23 | 491 |
| Net Debt | 1,761.7 | | | | | | |

Source and Notes:

[A]: LTM EBITDA figure contains Raven related revenues and costs to calculate EBITDA.

[B]: Retrieved from S&P CapIQ.

[C]: [A] × [B].

---

[297]   Steady state may refer to the nominal amount or to a nominal amount that is expected to grow at a steady growth rate.

[D]: [C] - [Net Debt]. Used Brattle Model Net Debt value of $1,761.7 million.

### 3.   Precedent Transaction Analysis

161.   I also attempted to estimate the enterprise value of Millennium based on the Precedent Transaction methodology. To develop the list of precedent transactions, I screened in Capital IQ for transactions using a keyword search and SIC code analysis. I used the keywords "urine drug," "urine testing," "drug testing," and "toxicology" and additionally searched for transactions that were classified under the same three SIC codes that were used in the Guideline Public Company analysis: 8734 (Testing Laboratories), 8071 (Medical Laboratories), and 2835 (In Vitro and In Vivo Diagnostic Substances). I limited the search results to transactions closed after 1/1/2010 and prior to the Date of Valuation. I further limited the results to transactions in which a majority stake was acquired in the target company, and a transaction value greater than $25 million.

162.   Based on this search criteria, I was unable to identify any precedent transactions for which the target companies were sufficiently comparable to Millennium to produce a reliable estimate of value.

### 4.   Balance Sheet Test Conclusion

163.   Based on the foregoing analysis I concluded that Millennium was rendered balance sheet insolvent and left with unreasonably small capital as a result of the 2014 Transaction.

### I.   ABILITY TO PAY DEBTS TEST

164.   As a second test of solvency, I analyzed Millennium's ability to pay its debt obligations as they became due. Giving effect to the 2014 Transaction, Millennium had total indebtedness of $1.812 billion.[298] Of this amount, $1.775 billion represented the outstanding principal balance of the Term Loan. The Revolver was undrawn as of the Date of Valuation. To assess Millennium's

---

[298]   Term Loan of $1.775 billion plus other debt of $36.7 million. *See* Table 3 and the Confidential Information Memorandum, p. 22.

ability to pay its debts I determined whether Millennium was anticipated to be able to pay the scheduled interest and principal payments on the Term Loan.

165. To project Millennium's unlevered cash flow through December 31, 2020, I relied upon the Modified Padres Projections. All cash flows are projected on a monthly basis. I identified required debt service payments from the Padres Projections. The Term Loan required interest payments of approximately $90 million in 2015, increasing over time in line with projected LIBOR rates, until the final payment at maturity in April 2021.[299] In addition, the Term Loan required an amortization payment of $17.75 million per annum (representing 1% of the beginning Term Loan balance).[300]

166. Beginning in 2016, Millennium starts generating negative free cash flow (*i.e.*, cash flow that is available to make interest payments is negative).[301] By 2018, Millennium has insufficient cash reserves to meet interest payments. In the event that Millennium retains access to the Revolver, the additional $50 million of liquidity allows Millennium to meet interest payments for an additional 12 months. However, by 2019, cash requirements exceed the amount of liquidity available under the Revolver. In total, by maturity in April 2021, Millennium requires $124 million of additional liquidity to meet interest payments.[302]

167. Notwithstanding that the Revolver did not provide sufficient liquidity to meet the projected cash shortfall, any dependence on the Revolver to meet its debt service requirements (even temporarily) is problematic. The credit agreement governing the Revolver required that Millennium be solvent as of the date of any draw down on the Revolver.[303] The definition of solvent in the credit agreement is inclusive of balance sheet solvency as measured in this

---

[299]   The Term Loan paid interest at LIBOR plus a margin of 425 basis points. *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014, and the revolving credit facility was $50 million, for a total of $1.825 billion.

[300]   *See* Padres Projections (ML_DE_00057999), April 12, 2014, tab "Leverage Model," cells Q-V 151.

[301]   Free Cash Flow under the Padres Projections is defined as net income, plus (i) depreciation and amortization, and (ii) stock-based compensation, less (i) distributions for shareholder taxes, (ii) increase in working capital, (iii) capital expenditure, and (iv) debt amortization.

[302]   The shortfall would be larger, as I have not considered interest payments under the Revolver.

[303]   *See* Sections 4.22 and 5.2 of the 2014 Credit Agreement [ML_DE_00602906].

report.[304] In light of Millennium's balance sheet insolvency as of the Date of the Valuation, Millennium would not have retained access to the Revolver. In addition to a solvency requirement, the credit agreement also contained a maintenance covenant requiring that the "Consolidated Leverage Ratio" remain below certain levels.[305] Millennium's continuing failure to comply with these covenants would constitute a technical default for the Revolver under the credit agreement.

168. A review of Millennium's projected cash flow under the expected case indicates that Millennium was anticipated to be in violation of the Consolidated Leverage Ratio covenant starting in the third quarter of 2015 (*see* Figure 12). As a result, Millennium would have been unlikely to have had access to the Revolver. Alternatively, in the event that Millennium had drawn on the revolver prior to the covenant breach, Millennium would have been unable to repay and cancel the Revolver to avoid such covenant breach. Under any scenario, the Revolver would not have been available to meet Millennium's liquidity requirements once it exhausted its cash reserves in 2018.

---

[304] Solvent is defined as:

"Solvent": when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, ( c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured."

*See* 2014 Credit Agreement [ML_DE_00602906 at 941].

[305] *See* Section 7.1 of the 2014 Credit Agreement [ML_DE_00602906].

**FIGURE 12: LEVERAGE RATIO COVENANT**



Source and Notes:

Padres Projections leverage ratio derived from April 12, 2014 Padres Projections (ML_DE_00057999), 'Leverage Model' Tab. Expected case and reasonable downside case are as defined in prior sections.

169.  I further considered Millennium's prospects for refinancing the Term Loan at maturity in April 2021. Even under the expected case projections, the leverage ratio was 8.7 times at December 31, 2020. Under the reasonable downside projections, the leverage ratio was 19.8 times at December 31, 2020. As of December 2013, the median leverage ratio for 'Caa-C' credits was 8.3 times.[306] Moody's defines 'Caa' credits, the highest quality credits in the 'Caa-C' range as "speculative of poor standing and are subject to very high credit risk."[307] Thus, even under the expected case projections, Millennium was above the levels typically associated with Caa-C credits. There was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021.

---

[306]  Moody's Financial Metrics Key Ratios By Rating And Industry For North American Non-Financial Corporations: December 2013, tab "App-8". Available at www.moodys.com.

[307]  Credit rating definitions are available at www.moodys.com. 'C' credits are "typically in default, with little prospect for recovery of principal or interest."

### J.    ADEQUATE CAPITAL TEST

170. By definition, a balance sheet insolvent company is a company with unreasonably small capital. Millennium was rendered balance sheet insolvent by the 2014 Transaction. Nonetheless, I undertook a second analysis to assess the reasonableness of Millennium's capital, giving effect to the 2014 Transaction. Under this second analysis, I determined Millennium's financial condition under a reasonable downside scenario because the Padres Projections were not reasonable or prudent when made. If a company is left with unreasonably small capital under a reasonable downside scenario, it follows that the company's unreasonably small capital is reasonably foreseeable.

171. In my reasonable downside scenario, I made two adjustments to the Modified Padres Projections. Both adjustments are consistent with contemporaneous estimates made by Millennium. Specifically, I adjusted the Modified Padres Projections by:

    i.   Increasing the reduction in Medicare NRPS due to LCD from 18.3% to 33.3%, consistent with higher contemporaneous estimates prepared by Millennium.[308] The difference in the estimates are driven by two key assumptions. First, there is an assumed increase in the specimens that are subject to point of care ("POC") testing. Increased POC testing reduces the volume of quantitative testing (reducing NRPS). Second, there is no assumed increase in billings under G0431. Thus, the offset (*i.e.*, increase in NRPS) described above does not occur.

    ii.  Increasing the decline in UDT and PGT specimen volumes due to an expected settlement of the DOJ investigation from 30% to 50%. This is consistent with Millennium's higher estimate of Ameritox's specimen volume decline following its government settlement.[309]

172. As shown in Table 10 below, under a reasonable downside scenario, Millennium had an equity value of negative $1,048.8 million to negative $1,274.8 million at WACCs ranging from 9.8% to

---

[308]  Attachment to the email from Adams to Pencak, Re: Order by drugs v3.xlsx, February 3, 2014 [ML_DE_00060308] (forecasting a 33.3% drop in Medicare NRPS due to LCD impact).

[309]  Internal Millennium emails discussed volume declines ranging from 30% to 50%.
Email from Hardaway to Mulloy, Re: FW: Millennium financial model – version 2.
[ML_DE_00559337 at 9338] (In a June 8, 2015 email, Hardaway conceded that "our volume assumptions [i.e., 10% reduction] were aspirational" and noting that "Ameritox had a roughly 50% drop in volumes and Callaway [sic] had a roughly 30% drop after they each announced DOJ investigations/settlements.")

14.8%, without even taking into account Millennium's contingent liabilities. Under the reasonable downside scenario, the negative equity values confirm that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with capital insufficient to sustain operations. In other words, the 2014 Transaction left Millennium with unreasonably small capital.

**TABLE 10: DOWNSIDE CASE SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE**

| Discount Rate | $ Millions | | |
| | Enterprise Value | Net Debt Value | Equity Value Before Contingent Liabilities and Fees |
|---|---|---|---|
| 9.8% | 712.9 | 1,761.7 | (1,048.8) |
| 10.8% | 645.0 | 1,761.7 | (1,116.8) |
| 11.8% | 592.3 | 1,761.7 | (1,169.5) |
| 12.8% | 550.2 | 1,761.7 | (1,211.6) |
| 13.8% | 515.7 | 1,761.7 | (1,246.0) |
| **14.8%** | **487.0** | **1,761.7** | **(1,274.8)** |

Notes and Sources:

Values derived from YAS Workpaper 1 (second quarter of 2014 through 2020) assuming different discount rates.

## K.    SOLVENCY CONCLUSION

173. The foregoing analyses show that Millennium was rendered balance sheet insolvent by the 2014 Transaction. Thus, by definition, the 2014 Transaction left Millennium with unreasonably small capital.  The inadequacy of Millennium's capital is confirmed by examining the value of Millennium under a reasonable downside scenario. Finally, the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay as that debt matured.

November 15, 2021

_____          _____
Yvette R. Austin Smith                              Date

# APPENDIX A: SOLVENCY TEST EXHIBITS

## A.1     EXPECTED CASE DCF ANALYSIS

### TABLE 11: DISCOUNTED CASH FLOW ANALYSIS

|  | | Input | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | TV |
|---|---|---|---|---|---|---|---|---|---|---|
| Long-Term Industry Growth Rate | [1] | 3% | | | | | | | | |
| WACC | [2] | 14.8% | | | | | | | | |
| Valuation Date | [3] | 3/31/2014 | | | | | | | | |
| Income Tax Rate | [4] | 52.6% | | | | | | | | |
| | | | | | | | | | | |
| EBIT | [5] | | 251,513,148 | 227,713,042 | 152,354,557 | 159,655,306 | 160,355,671 | 166,487,811 | 172,154,148 | |
| Income Tax | [6] | | (132,295,916) | (119,777,060) | (80,138,497) | (83,978,691) | (84,347,083) | (87,572,589) | (90,553,082) | |
| D&A | [7] | | 16,992,365 | 20,960,697 | 19,335,544 | 18,909,765 | 18,704,370 | 22,756,358 | 22,722,173 | |
| Stock-based Comp | [8] | | 2,996,657 | 4,176,250 | 4,385,062 | 4,604,315 | 4,834,531 | 5,102,995 | 5,391,854 | |
| Increase in working capital | [9] | | (6,176,340) | 20,826,415 | 11,898,636 | (2,014,401) | (936,127) | (1,407,164) | (1,420,757) | |
| Capex | [10] | | (12,543,471) | (9,285,371) | (11,812,307) | (19,121,300) | (28,782,070) | (19,589,370) | (19,631,600) | |
| Unlevered Free Cash Flow | [11] | | 120,486,443 | 144,613,973 | 96,022,995 | 78,054,995 | 69,829,292 | 85,778,042 | 88,662,735 | 773,920,487 |
| | | | | | | | | | | |
| Discount Period in Years | [12] | | 0.25 | 1.25 | 2.25 | 3.25 | 4.25 | 5.25 | 6.25 | 6.25 |
| Discount Factor | [13] | | 0.97 | 0.84 | 0.73 | 0.64 | 0.56 | 0.48 | 0.42 | 0.42 |
| | | | | | | | | | | |
| PV of Free Cash Flow | [14] | | 116,410,932 | 121,709,353 | 70,395,850 | 49,846,035 | 38,844,154 | 41,564,472 | 37,423,584 | 326,663,491 |
| NPV of Free Cash Flow | [15] | 802,857,872 | | | | | | | | |
| | | | | | | | | | | |
| Net Debt Amount (March 2014) | [16] | 1,761,746,604 | | | | | | | | |
| | | | | | | | | | | |
| Initial Equity Value | [17] | -958,888,732 | | | | | | | | |

## A.2     EXPECTED CASE EBIT DERIVATION

### TABLE 12: EBIT DERIVATION

|  | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| UDT Revenue | [1] | 485,969,878 | 503,348,741 | 393,916,554 | 400,753,903 | 403,309,079 | 407,100,185 | 410,926,926 |
| PGT Revenue | [2] | 20,236,066 | 45,203,209 | 50,847,042 | 60,873,211 | 68,207,474 | 73,095,944 | 78,319,614 |
| RxAnte Revenue | [3] | 9,569,000 | 24,527,167 | 42,893,995 | 56,164,117 | 69,382,853 | 79,790,281 | 87,769,309 |
| Total Revenue | [4] | 515,774,944 | 573,079,117 | 487,657,592 | 517,791,230 | 540,899,406 | 559,986,409 | 577,015,849 |
| | | | | | | | | |
| UDT Cost of Sales | [5] | 59,650,021 | 71,784,017 | 66,064,739 | 70,265,877 | 74,778,320 | 77,021,670 | 79,332,320 |
| PGT Cost of Sales | [6] | 9,628,539 | 20,085,426 | 22,885,192 | 27,581,585 | 31,366,631 | 33,761,472 | 36,896,574 |
| | | | | | | | | |
| Gross Profit | [7] | 446,496,384 | 481,209,673 | 398,707,660 | 419,943,768 | 434,754,454 | 449,203,267 | 460,786,956 |
| Operating Expenses | [8] | 195,358,046 | 253,996,631 | 246,853,103 | 260,788,461 | 274,898,783 | 283,215,456 | 289,132,808 |
| Operating Income | [9] | 251,138,338 | 227,213,042 | 151,854,557 | 159,155,306 | 159,855,671 | 165,987,811 | 171,654,148 |
| | | | | | | | | |
| Other Income | [10] | 374,810 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| | | | | | | | | |
| EBIT | [11] | 251,513,148 | 227,713,042 | 152,354,557 | 159,655,306 | 160,355,671 | 166,487,811 | 172,154,148 |

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 94

## APPENDIX B: COMPARABLE COMPANIES ANALYSIS EXHIBITS

### B.1    DESCRIPTION OF SIC INDUSTRY CODES

| Code | | Description |
|---|---|---|
| 8071 Medical Laboratories | [1] | Establishments primarily engaged in providing professional analytic or diagnostic services to the medical profession, or to the patient on prescription of a physician. |
| 8734 Testing Laboratories | [2] | Establishments primarily engaged in providing testing services. Establishments primarily engaged in performing clinical laboratory testing for the medical profession are classified in Industry 8071. |
| 2835 In Vitro and In Vivo Diagnostic Substances | [3] | Establishments primarily engaged in manufacturing in vitro and in vivo diagnostic substances, whether or not packaged for retail sale. These materials are chemical, biological, or radioactive substances used in diagnosing or monitoring the state of human or veterinary health by identifying and measuring normal or abnormal constituents of body fluids or tissues. |

Sources and Notes:

[1]: SIC Industry Description," NAICS Association, accessed September 21, 2021, https://www.naics.com/sic-industry-description/?code=8071.

[2]: SIC Industry Description," NAICS Association, accessed September 21, 2021, https://www.naics.com/sic-industry-description/?code=8734.

[3]: SIC Industry Description," NAICS Association, accessed September 21, 2021, https://www.naics.com/sic-industry-description/?code=2835.

## B.2    DESCRIPTION OF POTENTIAL COMPARABLE COMPANIES

| Company | Description |
|---|---|
| Alere | Alere Inc. provides diagnostic tests for infectious disease, cardiometabolic disease, and toxicology in the United States and internationally. The company's infectious disease products/services include antibodies, assays, diagnostic products, and a line of automated instrumentation to process tests. The company's cardiometabolic products/services include rapid diagnostic test systems to detect various drugs of abuse, point-of-care analyzers, over-the-counter tests, diabetes products, rapid diagnostic tests, and data management systems for point-of-care testing. Lastly, the Company's toxicology products/services include various device and reagent platforms to detect the illicit and prescription drugs of abuse or alcohol. The company was founded in 1981 and is based in Waltham, Massachusetts. As of October 3, 2017, Alere Inc. operates as a subsidiary of Abbott Laboratories. |
| Bio-Reference Laboratories | Founded in 1981 and headquartered in Elmwood Park, New Jersey, Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in the United States. The company focuses on esoteric testing, molecular diagnostics, anatomical pathology, genetics, women's health, and correctional health care services. It offers chemical diagnostic tests, such as blood and urine analysis; blood chemistry; hematology services; serology; radio-immuno analysis; toxicology, including drug screening; pap smears; tissue pathology comprising biopsies; and other tissue analysis, as well as cancer cytogenetic testing, genetic testing, and cytology testing services. The company also operates a clinical knowledge management service unit and a Web-based connectivity portal solution for laboratories and physicians. It serves physicians, geneticists, hospitals, clinics, and correctional and other health facilities. |
| Laboratory Corp. of America Holdings | Laboratory Corporation of America Holdings operates as an independent clinical laboratory company worldwide. It operates in two segments, Labcorp Diagnostics (Dx) and Labcorp Drug Development (DD). It offers various tests, such as blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, hemoglobin A1C and vitamin D products, prostate-specific antigens, tests for sexually transmitted diseases, hepatitis C tests, microbiology cultures and procedures, and alcohol and other substance-abuse tests. In addition, it provides online and mobile applications and end-to-end drug development, medical device, and diagnostic development solutions. The company was founded in 1971 and is headquartered in Burlington, North Carolina. |
| Myriad Genetics | Myriad Genetics, Inc., a molecular diagnostic company, develops and markets predictive, personalized, and prognostic medicine tests in the United States and internationally. The company offers DNA sequencing tests for hereditary and breast and ovarian cancers, personalized medicine tools, DNA genotyping tests, protein quantification tests, prenatal and prenatal screening tests, RNA expression tests, biomarker discovery, and pharmaceutical and clinical services to the pharmaceutical, biotechnology, and medical research industries. Myriad Genetics, Inc. was founded in 1991 and is headquartered in Salt Lake City, Utah. |
| Quest Diagnostics | Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. The company develops and delivers diagnostic information services, such as routine testing, non-routine and advanced clinical testing, anatomic pathology testing, and other diagnostic information services. It offers diagnostic information services to patients, clinicians, hospitals, independent delivery networks, health plans, employers, direct contract entities, and accountable care organizations through a network of laboratories, patient service centers, phlebotomists in physician offices, call centers and mobile paramedics, nurses, and other health and wellness professionals. The company also provides risk assessment services for the life insurance industry; and healthcare organizations and clinicians robust information technology solutions. Quest Diagnostics Incorporated was founded in 1967 and is headquartered in Secaucus, New Jersey. |

Source: S&P CapIQ.

## APPENDIX C: CUSTOM PROFILE EXHIBIT

### TABLE 13: CUSTOM PROFILE REVENUE IMPACT ANALYSIS

| 2013 Millennium Code | Not Billed by Both Ameritox & Aegis | CMS Code Description | NRPS (as of Dec. 2013) |
|---|---|---|---|
| [A] | [B] | [C] | [D] |
| G0431 | | Drug screen, qualitative; multiple drug classes by high complexity test method (e.g., immunoassay, enzyme assay), per patient encounter | 1.71 |
| 82101 | X | Urine alkaloids level | 5.60 |
| 82649 | X | Dihydromorphinone (drug) level | 30.76 |
| 82646 | X | Dihydrocodeinone (drug) measurement | 24.71 |
| 83925 | | Opiates (drug) measurement | 109.72 |
| 80154 | | Benzodiazepines level | 21.60 |
| 82542 | | Chemical analysis using chromatography technique | 112.33 |
| 82544 | | Chemical analysis using chromatography technique | 0.00 |
| 80152 | | Amitriptyline (antidepressant) level | 12.67 |
| 83805 | | Meprobamate (sedative) level | 13.29 |
| 80160 | X | Desipramine level | 12.18 |
| 80174 | X | Imipramine level | 12.18 |
| 83840 | | Methadone level | 19.61 |
| 82145 | | Amphetamine or methamphetamine level | 17.75 |
| 82520 | | Cocaine (drug) level | 17.35 |
| 80173 | X | Haloperidol level | 0.18 |
| 83992 | | PCP drug level | 9.26 |
| 80182 | X | Nortriptyline level | 9.59 |
| 80102 | X | Drug confirmation test | 0.00 |
| 82205 | | Barbiturates level | 23.45 |
| 80184 | X | Phenobarbital level | 11.72 |
| 82055 | | Alcohol (ethanol) level | 2.89 |
| 83516 | | Analysis of substance using immunoassay technique | 0.84 |
| 84311 | | Chemical analysis using spectrophotometry (light) | 8.03 |
| 82570 | | Creatinine level to test for kidney function or muscle injury | 5.94 |
| 83986 | | Body fluid pH level | 4.11 |
| 81003 | | Automated urinalysis test | 2.57 |

| Revenue Impact | | |
|---|---|---|
| Total NRPS of UDT Codes Not Billed by Both | [1] | 106.92 |
| *% Impact on 2013 Revenue* | [2] | *21.81%* |

Sources and Notes:

NRPS contribution information unavailable for 3 codes that Millennium billed CMS in 2013: 83789, 81226, 81225. However, these codes were also billed by either Aegis or Ameritox, and therefore do not impact the analysis.

[A] - [C]: Centers for Medicare & Medicaid Services Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[D]: 2014-02-05 ML_DE-00054321.xlsx ("Sc. 1 (no - on ill)" tab). *See* column F.

[1]: Sum of [D] for UDT codes not billed by both parties.

[2]:[1] ÷ 490.27 (Total NRPS as of Dec. 2013). Figure retrieved from cell F70 of 2014-02-05 ML_DE_00054321.xlsx ("Sc. 1(no - on ill)" tab).

## APPENDIX D: SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE

### TABLE 14: SENSITIVITY ANALYSIS

| | | Low | Expected | High | Range | Range | Range | Range |
|---|---|---|---|---|---|---|---|---|
| MUE Medicare NRPS Adjustment | [1] | ON | ON | ON | ON | ON | ON | ON |
| LCD Medicare NRPS Reduction | [2] | ON | ON | ON | ON | ON | ON | |
| Elimination of Custom Profile | [3] | ON | ON | ON | ON | ON | | |
| DOJ Settlement Reputational Impact | [4] | ON | ON | ON | ON | | | |
| Cancellation of Free POC Cups | [5] | ON | ON | ON | | | | |
| Initial Equity Valuation | [6] | -833.3 | -958.9 | -1,074.9 | -818.0 to -1,056.1 | -489.7 to -614.6 | -381.0 to -441.1 | -313.2 to -340.0 |

Notes and Sources:

Initial equity valuation derived from YAS Workpaper 1.

All values in the table are after adjusting for Millennium's specimen volume growth assumptions (*see* Section E.1) and for first quarter 2014 actual results. Does not include contingent liabilities.

[1]: Low adjustment consists of lowering expected Medicare NRPS corrections by a multiple of 0.9x and high adjustment consists of increasing Medicare NRPS corrections by a multiple of 1.1x.

[2]: Low adjustment consists of lessening expected -18.3% NRPS impact to -14.3% and high adjustment consists of increasing NRPS impact to -22.3%.

[3]: Low adjustment consists of lessening expected -21.81% NRPS impact to -16.81% and high adjustment consists of increasing NRPS impact to -26.81%.

[4]: Low adjustment consists of lessening expected two-time -15% specimen volume impact to -12% and high adjustment consists of increasing two-time specimen volume impact to -18%.

[5]: Low adjustment consists of lowering expected -1.6% specimen volume impact by a multiple of 0.8x and high adjustment consists of increasing specimen volume impact by a multiple of 1.2x.

## APPENDIX E: DOCUMENTS RELIED UPON OF YVETTE AUSTIN SMITH

**Court Documents**

*Ameritox, Ltd. v. Millennium Laboratories*  (Case 8:11-cv-775-T-24-TBM)

Complaint, April 8, 2011

Rebuttal Expert Report of David S. Williams, December 6, 2013

Jury Verdict, June 16, 2014

*In re: Millennium Lab Holdings II, LLC, et al.,*  (Case 15-12284-LSS)

Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015

Exhibit 1 (Amended Plan) to Notice of (I) Entry Of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., and (II) Occurrence of Effective Date, December 14, 2015

Memorandum, February 29, 2019

*Maul et al v. Ameritox, LLC.,*  (Case 8:07-cv-00953-RAL-EAJ)

Second Amended Complaint, October 19, 2009

*United States of America ex rel. Mark McGuire v. Millennium Laboratories, Inc.*  (Case 1:12-cv-10132-NMG, No. 12cv1063 l-NMG, No. 13cv10825-NMG)

Complaint, January 26, 2012

Complaint, April 9, 2012

Complaint, April 10, 2013

United States' Complaint in Intervention, December 19, 2014

Exhibit 3

Exhibit 4

Exhibit 5

Exhibit 7

Exhibit 12

Exhibit 13

Exhibit 39

Exhibit 55

Exhibit 66

Exhibit 74

Administrative Settlement Agreement, October 16, 2015

**Depositions and Exhibits**

Daniel Pencak

Deposition of Daniel Pencak

Exhibit 134

Exhibit 135

Exhibit 137

Exhibit 138

Exhibit 140

Exhibit 141

Exhibit 158

Exhibit 165

Exhibit 165-A

Exhibit 179

Heidi Smith

Exhibit 56

Exhibit 59

Jennifer Mulloy

Exhibit 194

Exhibit 195

Exhibit 198

Exhibit 216

Jenny Lee
  Exhibit 116
  Exhibit 125
  Exhibit 131

Martin Price
  Deposition of Martin Price
  Exhibit 3
  Exhibit 5-A
  Exhibit 9
  Exhibit 10
  Exhibit 13
  Exhibit 14
  Exhibit 15
  Exhibit 106

Michael Tortora
  Exhibit 223
  Exhibit 233

Phillip Ho
  Exhibit 343

**Millennium Documents**

BMO-ML-00009109
CITI-DE-00017912
JPMC-00031194
JPMC-MIL-CORP-00108741
JPMC-MIL-CORP-00159494
KPMG-ML-EA14WB-0000347
KPMG-ML-EA15WB-0000743
KPMG-ML-EA15WB-0001034
KPMG-ML-EA15WB-0001528
ML_DE_00001946
ML_DE_00034943
ML_DE_00035507
ML_DE_00035508
ML_DE_00044521
ML_DE_00054044
ML_DE_00054258
ML_DE_00054320
ML_DE_00054321
ML_DE_00057999
ML_DE_00058384
ML_DE_00058385
ML_DE_00058388
ML_DE_00060270
ML_DE_00060308
ML_DE_00061777
ML_DE_00068651
ML_DE_00079584
ML_DE_00083249
ML_DE_00134548
ML_DE_00164030
ML_DE_00187601
ML_DE_00202842

| |
|---|
| ML_DE_00206157 |
| ML_DE_00206242 |
| ML_DE_00225152 |
| ML_DE_00263273 |
| ML_DE_00269115 |
| ML_DE_00305155 |
| ML_DE_00308623 |
| ML_DE_00465366 |
| ML_DE_00514819 |
| ML_DE_00559337 |
| ML_DE_00559340 |
| ML_DE_00567499 |
| ML_DE_00569414 |
| ML_DE_00594719 |
| ML_DE_00594736 |
| ML_DE_00597259 |
| ML_DE_00601573 |
| ML_DE_00602906 |
| ML_DE_00604336 |
| ML_DE_00670668 |
| ML_DE_00672098 |
| ML_DE_00732288 |
| Suntrust_MIL-DE-00006771 |

**Publicly Available Documents**

*Analyst Reports*

Deutsche Bank, "Q1 Snap Preview: Weather is a Rear-View Mirror Issue," April 14, 2014.

Maxim Group,"Assuming Coverage Laboratory Corp. of America Holdings, Inc.," February 5, 2014.

Piper Jaffray, "Quest Diagnostics Maintain Neutral and Tweaking Estimates for Solstas Following Weak 2014 Outlook," January 30, 2014.

Piper Jaffray, "LabCorp of America Transferring Coverage with a Neutral Rating and $91 Price Target," March 10, 2014.

Morgan Stanley, "Quest Diagnostics Inc. Guidance Reflects Measured View of CY14 Challenges," January 31, 2014.

*Articles*

Barry Meier, "Increase in Urine Testing Raises Ethical Questions," August 1, 2013.

Boston Business Journal, "Woburn-based Calloway Labs, fined $20M in kickback scandal, to close and layoff 240 employees," October 8, 2015.

Christopher Norton, "Ameritox To Pay $16M To Resolve Medicaid FCA Suit," Law 360, November 17, 2010.

Christopher Weaver and Anna Mathews, "Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill; Pain specialists order costly tests for illegal drugs such as cocaine and angel dust, which few seniors ever use," The Wall Street Journal, November 10, 2014.

Debtwire, "Millennium Health completes financial restructuring, emerges from prepackaged Chapter 11," December 21, 2015.

Debtwire, "Millennium Health opt-out lenders, US Trustee attack plan's forced third-party releases," December 8, 2015.

Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015.

Fred Schulte and Elizabeth Lucas, "Liquid Gold: Pain Doctors Soak Up Profits By Screening Urine for Drugs," November 6, 2017.

Hawk, PollyBeth, "Ready or Not: Hospital Value-Based Purchasing Poised to Transform Healthcare Reimbursement Model and Introduce New Fraud Targets Under the False Claims Act," Winter, 2013.

Holden Wilen, "Drug Testing Company Plans to Close Columbia Headquarters, Lay Off 99 Employees," Baltimore Business Journal, March 7, 2018.

Jones Day, The Third Circuit Weighs In Again on the Meaning of "Unreasonably Small Capital" in Constructively Fraudulent Transfer Avoidance Litigation , July/August 2016.

Jones Day, Uniform Voidable Transactions Act Approved by Uniform Law Commission to Replace UFTA, September/October 2014,  https://www.jonesday.com/en/insights/2014/10/uniform-voidable-transactions-act-approved-by-uniform-law-commission-to-replace-ufta.

Loanconnector, "Corrected: Millennium Labs launches $1.8B dividend recap loan," March 31, 2014.

Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB," April 14, 2014.

Patricia Wen, "Calloway Labs of Woburn agrees to $20 million settlement of Medicaid fraud case," March 30, 2012.

Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation," November 16, 2012.

Roger Feldman, Bryan Dowd, and Robert Coulam, "Medicare's Role in Determining Prices throughout the Health Care System," October 2015.

Tampa Bay Business Journal, "Ameritox agrees to $16.3M settlement," November 16, 2010.

Todd Gardner, "Drug Testing Company to Close Greensboro Facility, Lay Off 113," Triad Business Journal, March 8, 2018.

US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians," October 19, 2015.

### Books

Collier on Bankruptcy, 16th edition, 2016.

Fishman, Jay E., Pratt, Shannon P. and Morrison, William J.; Standards of Value: Theory and Applications, John Wiley & Sons, Inc. 2007.

Principles of Corporate Finance, Brealey, Myers, Allen, 10th edition, January 1, 2012.

### Case Law

*Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056 (3d Cir. 1992).*

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.) , 444 F.3d 203, 210 (3d Cir. 2006)*

*Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.), 348 B.R. 234, 274 (Bankr. D. Del. 2005)*

### Financial Statements and Filings

Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013 filed February 25, 2014.

Quest Diagnostics Incorporated Form 10-K filed for the fiscal year ended December 31, 2013 filed February 18, 2014.

### Other Public Sources

A Strategy for Medicare Payment Reform, Center for American Progress, May 2015.

Center for Behavioral Health Statistics and Quality, Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings 18, 21 (2012), https://www.samhsa.gov/data/sites/default/files/NSDUHresults2012/NSDUHresults2012.pdf.

Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

Centers for Medicare & Medicaid Services, *Original Medicare Enrollment: Part A and/or Part B Enrollees by Demographic Characteristics, Calendar Year 2013* 1 (2020), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/2013/Downloads/MDCR_ENROLL_AB/CPS_MDCR_ENROLL_AB_11.pdf

Centers for Medicare & Medicaid Services, "What is an LCD?," https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs.

CGOS, https://www.cgsmedicare.com/partb/pubs/news/2012/0412/cope18723.html.

CMS website, https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE.

Congressional Budget Office (CBO), The Budget and Economic Outlook 2014 to 2024, February 2014.

Data Bridge Market Research US Pharmacogenetic Testing Market Industry Trend Report

Department of Health and Human Services Office of Inspector General, "Questionable Billing for Medicare Part B Clinical Laboratory Services," August 2014.

Department of Health and Human Services Office of Inspector General, "Special Fraud Alert: Laboratory Payments to Referring Physicians," June 25, 2014.

Department of Health and Human Services Office of Inspector General, "Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings," June 2013.

Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices.

MB&CC, HCPCS Codes, https://www.medicalbillingandcoding.org/hcpcs-codes/.

Medicare Physician and Other Supplier PUF Methodology (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Medicare-Physician-and-Other-Supplier-PUF-Methodology.pdf).

Medicare.gov, "Medicare Advantage Plans," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans.

Moody's Financial Metrics Key Ratios By Rating And Industry For North American Non-Financial Corporations: December 2013, tab "App-8". Available at www.moodys.com.

S&P CapIQ.

S&P credit rating report March 28, 2014.

SIC Industry Description," NAICS Association, accessed Sepember 21, 2021.

The People's Law Dictionary, *Qui Tam Action,* https://dictionary.law.com/default.aspx?selected=1709.

U.S. Department of The Treasury, Resource Center, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView.aspx?data=yieldYear&year=2014.

Uniform Law Commission, *Fraudulent Transfer Act,* https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3.

United Healthcare Community Plan, https://www.uhccommunityplan.com.

## APPENDIX F: CURRICULUM VITAE

**Ms. Austin Smith** is Chairman of The Brattle Group and co-leads the firm's M&A Litigation Practice. She specializes in M&A and bankruptcy disputes with subject matter expertise in valuation and credit and solvency analysis.   She provides testifying and consulting expert services in litigation and disputes related to mergers and acquisitions, dissenting shareholder actions, leveraged buyouts, financing transactions/recapitalization, debt recharacterization and avoidance actions.  Yvette has also served as an expert in international trade subsidy disputes.  She has submitted expert oral and written testimony in multiple venues including state courts in Delaware and New York, U.S. federal bankruptcy and district courts, international courts in Canada and Australia and the World Trade Organization and other international arbitration forums.

In addition to opining on valuation, Yvette has also provided expert testimony on market practice and transaction structure in M&A disputes.  As representative bankruptcy engagements, Yvette has been retained as a solvency or valuation expert in connection with the bankruptcies of Lehman Brothers (on behalf of JPMorgan Chase), Caesars Entertainment Operating Company (on behalf of Apollo Global Management), Physiotherapy Associates Holdings (on behalf of a litigation trustee), U.S. Steel Canada (on behalf of United States Steel) and Purdue Pharma (on behalf of 58 U.S. states and territories).

Ms. Austin Smith has written a number of publications and presented on valuation and credit analysis, for organizations including the American  Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, the Delaware State Bar Association, Thomson Reuters, and Bloomberg Law. She is a contributing author to the Model Merger Agreement for the Acquisition of a Public Company, published by the ABA's Mergers and Acquisitions Committee, and a contributing researcher to The Standard & Poor's Guide to Fairness Opinions: A User's Guide for Fiduciaries. She  is Co-Chair of the American Bar  Association Joint Task Force on M&A Litigation and is founder and former  Co-Chair  of  the  ABA  Financial Advisor Task Force.

Ms. Austin Smith has also been a member of the teaching faculty of Harvard University Extension School,  where  she taught  a graduate finance course and a past faculty member of the American Bar Association's  National Institute of Negotiating Business Acquisitions.

# Yvette Austin Smith

Ms. Austin Smith serves on the Board of Directors for The Brattle Group and was recently named Board Chair.  She is also the Vice-Chair of the Board of Directors for the Appalachian Mountain Club.

Prior to joining The Brattle Group, Yvette provided investment banking advisory services including mergers and acquisitions, fairness opinions, solvency opinions and commercially reasonable debt opinions.

## AREAS OF EXPERTISE

- Valuation
- M&A Litigation
- Bankruptcy Litigation
- Credit and Solvency Analysis

## EDUCATION

- M.B.A. (Finance) from Columbia University
- Graduate Studies in Mathematical Finance, Courant Institute of Mathematics, New York University
- A.B., Government and Philosophy, Harvard College

## PUBLICATIONS

- "Valuation Analysis of Related Party Transactions," ABI Journal, March 2018.
- "Snapshot of Delaware Public Company Appraisals Post-CKx," *Deal Points*, publication of the American  Bar Association's M&A Committee, Winter 2017.
- "Asset Value Trumps Discounted Cash Flow in Another Bankruptcy Valuation Dispute," Yvette R.  Austin Smith and Evan Cohen, *The Brattle Group: Critical Insights*, July 29, 2014.
- "Rural Metro Redefines Investment Banks' Role in M&A," Yvette R. Austin Smith and Torben Voetmann, *Law360*, March 28, 2014.
- "Solvency Analysis in the Context of Fraudulent Transfer after Eleventh Circuit's TOUSA Reversal," American Bankruptcy Institute's Business Reorganization Committee newsletter, (Volume  11/No. 3),  June 2012.
- "Recent M&A Litigation Provides Updated Guidance for Fairness Opinions," *Deal Points*, publication of  the American Bar Association's M&A Committee, Spring 2012.
- "Why Do Solvency Opinions Fail?"  Spring 2011.
- Contributing author to: *Model Public Company Acquisition Agreement with Commentary*; by The Mergers & Acquisitions Committee of the American Bar Association; Chicago: American Bar Association, August 2011. Authored chapter on determining stock exchange ratios in mergers and  acquisition transactions.
- Contributing author to: The Standard & Poor's Guide to Fairness Opinions: A User's Guide for



**Yvette Austin Smith**

Fiduciaries; by Phillip J. Clements and Philip Wisler; New York: McGraw Hill, 2005

## TESTIMONY EXPERIENCE

*Snow Phipps Group, LLC, and DecoPac Holdings Inc., Plaintiff, v. KCake Acquisition, Inc., et al., Defendants,* Court of Chancery of the State of Delaware, C.A. No. 2020-0282-KSJM (Deposition testimony, December 2020; Trial testimony, January 2021)

*GiGi Jordan, Plaintiff against Raymond A. Mirra, JR., et al., Defendants,* United States District Court for the District of Delaware, C.A. No. 14-01485-SLR-SRF  (Deposition testimony, December 2020)

*Falcon Distribuidora, Armazenamento e Transporte S.A. v. Hypera S.A.,* International Chamber of Commerce Arbitration No 23896/GSS (Hearing testimony, November 2020)

*In Re Comtech/Gilat Merger Litigation* Court of Chancery of the State of Delaware, C.A. No. 2020-0605-JRS (Deposition testimony, October 2020)

*Dillon Trust Company LLC, et al. v. United States,* Court of Federal Claims Nos. 17-1898T, 17-2022T, 17-2023T  (Deposition Testimony, September 2020)

*IC Power Asia Development Ltd. (Israel), Claimant v. Republic of Guatemala, Respondent,* Under the Arbitration Rules of the United Nations Commission on International Trade Law (Hearing testimony, July 2020)

*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. No. 13-50530.* (Deposition testimony January 2020)

*Canada – Measures Concerning Trade in Commercial Aircraft, World Trade Organization (DS522)* (Testimony at First Substantive Meeting, September 2019)

*Crown Resorts Limited v Commissioner of Taxation Federal Court of Australia Proceedings, No. VID 831, 833 - 837 & 1635 - 1637 of 2018.* (Trial testimony, June 2019)

*The Mangrove Partners Master Fund, Ltd., Petitioner, v. Calamos Asset Management, Inc., Respondent,* Court of Chancery of the State of Delaware, *C.A. No. 2017-0139-JTL.* (Deposition testimony, December 2018)

*Polar Multi-Strategy Master Fund v. The Stars Group Inc.,* Superior Court of Justice – Ontario, *CV-18-599612-00-CL,*  (Hearing testimony, July 2018)

*In re: Physiotherapy Holdings, Inc. et al. in the matter PAH Litigation Trust, Plaintiff v. Water Street Healthcare Partners, L.P. et al., Defendants* (Case No. 13- 12965 (KG)).  United States District Court for the District of Delaware.  (Deposition testimony, May 2018)

*Domain Associates, L.L.C., v. Nimesh Shah,* Court of Chancery of the State of Delaware, *C.A. No. 12921-VCL.* (Deposition testimony, January 2018; Trial testimony, February 2018)



*Charles Almond as Trustee for the Almond Family 2001 Trust, Almond Investment Fund, LLC, Charles Almond, and Andrew Franklin, Plaintiffs v Glenhill Advisors, LLC, et al., Defendants and Design Within Reach, Inc., Intervenor and Counterclaim Petitioner,* Court of Chancery of the State of Delaware, C.A. No. 10477-CB (Deposition testimony, October 2017; Trial testimony, November 2017)

*Blueblade Capital Opportunities LLC and Blueblade Capital Opportunities, Petitioners, v. Norcraft Companies, Inc., a Delaware Corporation, Respondent,* Court of Chancery of the State of Delaware, C.A. No. 11184-VCS (Deposition testimony, May 2017; Trial testimony, June 2017)

*In re: Caesars Entertainment Operating Company, Inc. et al.* United States Bankruptcy Court Northern District Of Illinois Eastern Division, Case No. 15-01145 ABG. (Expert declaration, December 2016).

*JD Holdings, LLC, et al. v. Jacqueline a. Dowdy, as Trustee of The Revocable Trust of John Q. Hammons, dated December 28, 1989, as Amended and Restated, et al.,* Court Of Chancery of The State of Delaware, Case No. 7480-VCL (Deposition testimony, June 2016).

*George L. Miller, Chapter 7 Trustee v. Sun Capital Partners, Inc. et al,* United States District Court for the District of Delaware, Case No. 13-CV-01996-RGA (Deposition testimony, April 2016).

*In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended and in the Matter of A Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada Inc.* and *In the Matter of A Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada Inc.* Superior Court of Justice - Ontario (Trial testimony, January 2016)

*Nathan Owen v. Energy Services Group et al,* Court of Chancery of the State of Delaware, C.A. No. 8860-CB (Deposition testimony, August 2014; Trial testimony, November 2014)

*Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., v. JPMorgan Chase Bank N.A.,* Adversary Proceeding No 10-03266 (JPM), United States Bankruptcy Court for the Southern District of New York. (Deposition testimony, September 2014)

*Out Publishing Inc. v. Lipo Liquidating Corp., et al,* Index No. 07/601855 (Bransten), Supreme Court of the State of New York County of New York Commercial Division. (Deposition testimony, February 2010)



# EXHIBIT 30

# TUFTS ⊞ Health Plan

# Medical Necessity Guidelines:
# Urine Drug Testing

*Effective: January 1, 2014*

| Clinical Documentation and Prior Authorization Required | N/A | Type of Review – Care Management | |
|---|---|---|---|
| Not Covered | | Type of Review – Precertification Department Fax: 617-972-9409 | |
| Coverage Guideline | √ | Administrative Process (internal use only) | N/A |

## OVERVIEW

Urine drug testing is performed to detect the use of prescription medications and illegal substances of concern for the purpose of medical treatment. Confirmatory testing is an additional test completed to verify the results of the urine drug test. Urine drug testing should not routinely include a panel of all drugs of abuse. The test should be focused on the detection of specific drugs. The frequency of testing should be at the lowest level to detect the presence of drugs.

## COVERAGE GUIDELINES

Tufts Health Plan may cover urine drug testing when medically necessary.

**PRIOR AUTHORIZATION IS NOT REQUIRED**

- Documentation Requirements:
  - All documentation must be maintained in the Member's medical record and available to Tufts Health Plan upon request.
  - Every page of the record must be legible and include appropriate Member identification information [e.g., complete name, dates of service(s)]. The record must include the identity of the physician or non-physician practitioner responsible for and providing the care of the Member.
  - If requested for review, the submitted medical record should support the use of the selected ICD-9-CM code(s). The submitted CPT/HCPCS code should describe the service performed. Documentation maintained by the ordering provider/treating provider must indicate the medical necessity for performing a qualitative drug test. All tests must be ordered in writing by the treating provider and all drugs/drug classes to be tested must be indicated in the order. Orders which include statements such as "conduct additional testing as needed or custom profile" will not be accepted by Tufts Health Plan.
  - Medical record documentation (e.g., history and physical, progress notes) maintained by the ordering provider/treating provider must indicate the medical necessity for performing a qualitative drug test. All tests must be ordered in writing by the treating provider and all drugs/drug classes to be tested must be indicated in the order.
  - If the provider of the service is other than the ordering/referring provider, that provider must maintain printed copy documentation of the lab results, along with printed copies of the ordering/referring provider's order for the qualitative drug test. The provider must include the clinical indication/medical necessity in the order for the qualitative drug test.
- A full panel screen should only be considered for initial testing when appropriate or when the Member's behavior suggests the use of drugs not identified on the original screening. Medical documentation must support the justification for conducting a full panel screening. Subsequent testing should only be conducted for those substances identified on the Member's initial profile.
- The preferred method of urine drug testing for a Member with a history of poly-substance abuse during the monitoring period is by utilization of a multi-drug screening kit (qualitative analysis by multiplex method for 2-15 drugs or drug classes).
- Confirmatory Testing:
  Drug confirmation (80102) by a second method is indicated when either of the following has occurred:
  - The result of the screen is positive.
  - The result is negative and the negative finding is inconsistent with the patient's medical history.
  For coverage of confirmatory testing, the test results must be necessary for treatment planning and be requested by the ordering provider. Written orders are required.

Confidential                                                                          ML_DE_00305155

- Tufts Health Plan may cover urine drug testing for medical conditions, such as those listed below, when medical necessity is demonstrated and when treatment planning by the requesting provider is dependent upon the test results.
  - Altered mental status
  - Medical or psychiatric condition where drug toxicity may be a contributing factor
  - Fetal withdrawal syndrome
  - Possible exposure of the fetus to illicit drugs taken by the mother
  - To assess and treat Members with substance abuse disorders
  - To assess adherence to prescribed medications
- All urine drug testing should be performed at an appropriate frequency based on clinical needs. Substance abuse treatment adherence is often best measured through random testing rather than frequent scheduled testing.

## LIMITATIONS
- Tufts Health Plan will not compensate for qualitative drug screen when billed with any combination of more than twenty (20) units within 365 days per Member, as it exceeds clinical guidelines.
- Quantitative tests in lieu of drug screening services or as a routine supplement to drug screens.
- Tufts Health Plan does not cover urine drug testing in any of the following circumstances:
  - Testing ordered by third parties, such as school, courts, or employers or requested by a provider for the sole purpose of meeting the requirements of a third party.
  - Testing for residential monitoring.
  - Routine urinalysis for confirmation of specimen integrity.

NOTE: Use of non-contracting labs may have the unintended consequence of subjecting the Member to unnecessary services not ordered by you as the treating provider or other unreasonable financial exposure. In such circumstances, Tufts Health Plan may hold you accountable for any inappropriate behavior on the part of the non-participating lab that you selected.

For information regarding billing and compensation, refer to the Laboratory Payment Policy on our website.

## CODES

**Table 1: Covered CPT and HCPCS Codes**

| CPT/HCPCS Code | Description |
|---|---|
| 80102 | Drug confirmation, each procedure |
| G0431 | Drug screen, qualitative; multiple drug classes by high complexity test method (e.g., immunoassay, enzyme assay), per patient encounter |
| G0434 | Drug screen, other than chromatographic; any number of drug classes, by CLIA waived test or moderate complexity test, per patient encounter |

**Table 2: Noncovered CPT Codes**

| CPT Code | Description |
|---|---|
| 80100 | Drug screen, qualitative; multiple drug classes chromatographic method, each procedure |
| 80101 | Drug screen, qualitative; multiple drug classes chromatographic method, single drug class method (e.g., immunoassay, enzyme assay), each drug class |
| 80104 | Drug screen, qualitative; multiple drug classes chromatographic method, multiple drug classes other than chromatographic method, each procedure |

## REFERENCES
1. Center for Medicare & Medicaid Services. Local Coverage Determination 32450. Qualitative drug testing. Accessed on June 7, 2013 at http://downloads.cms.gov/medicare-coverage-database/lcd_attachments/324501/L32450_PATH035060112.pdf.
2. Commonwealth of Massachusetts. MassHealth Independent Clinical Laboratory. Bulletin 9. February 2013.

## APPROVAL HISTORY
June 18, 2013: Reviewed and approved by Integrated Medical Policy Advisory Committee (IMPAC) for a January 1, 2014 effective date.

Medical Necessity Guidelines:
Urine Drug Testing

Confidential

## BACKGROUND, PRODUCT AND DISCLAIMER INFORMATION

Medical Necessity Guidelines are developed to determine coverage for Tufts Health Plan benefits, and are published to provide a better understanding of the basis upon which coverage decisions are made. Tufts Health Plan makes coverage decisions using these guidelines, along with the Member's benefit document, and in coordination with the Member's provider(s) on a case-by-case basis considering the individual Member's health care needs.

Medical Necessity Guidelines are developed for selected therapeutic or diagnostic services found to be safe, but proven effective in a limited, defined population of patients or clinical circumstances. They include concise clinical coverage criteria based on current literature review, consultation with practicing providers in the Tufts Health Plan service area who are medical experts in the particular field, FDA and other government agency policies, and standards adopted by national accreditation organizations. Tufts Health Plan revises and updates Medical Necessity Guidelines annually, or more frequently if new evidence becomes available that suggests needed revisions.

Medical Necessity Guidelines apply to all fully insured Tufts Health Plan products unless otherwise noted in this guideline or the Member's benefit document. This guideline does not apply to Tufts Health Plan Medicare Preferred or to certain delegated service arrangements. For self-insured plans, coverage may vary depending on the terms of the benefit document. If a discrepancy exists between a Medical Necessity Guideline and a self-insured Member's benefit document, the provisions of the benefit document will govern. Applicable state or federal mandates will take precedence. Providers in the New Hampshire service area are subject to Cigna's provider agreements with respect to CareLink<sup>SM</sup> members.

Treating providers are solely responsible for the medical advice and treatment of Members. The use of this guideline is not a guarantee of payment or a final prediction of how specific claim(s) will be adjudicated. Claims payment is subject to eligibility and benefits on the date of service, coordination of benefits, referral/authorization, utilization management guidelines when applicable, and adherence to plan policies, plan procedures, and claims editing logic.

Confidential

# EXHIBIT 31



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Medicare & Medicaid Services**



*Official Information Health Care Professionals Can Trust*



REVISED products from the MLN
- "**Medicare Learning Network® (MLN) Suite of Products & Resources for Billers and Coders**", Educational Tool, ICN 904183, Downloadable only

| | |
|---|---|
| **MLN Matters® Number: MM8853** | **Related Change Request (CR) #: CR 8853** |
| **Related CR Release Date: August 15, 2014** | **Effective Date: January 1, 2015** |
| **Related CR Transmittal #: R1421OTN** | **Implementation Date: January 5, 2015** |

# Revised Modification to the Medically Unlikely Edit (MUE) Program

## Provider Types Affected

This MLN Matters® Article is intended for physicians, other providers, and suppliers submitting claims to Medicare Administrative Contractors (MACs), including Durable Medical Equipment MACs for services provided to Medicare beneficiaries.

## Provider Action Needed

Change Request (CR) 8853 informs MACs about additional modifications being updated in the Medically Unlikely Edit (MUE) Program. The updates include clarifications, general processing instructions, and detailed explanations of MUE requirements and specifications. Make sure that your billing staffs are aware of these changes.

## Background

The Centers for Medicare & Medicaid Services (CMS) implemented the Medically Unlikely Edit (MUE) program on January 1, 2007, to reduce the Medicare Part B paid claims error rate. At the onset or implementation of the MUE Program, regarding the adjudication process, the MUE value for a Healthcare Common Procedure Coding System (HCPCS) code was only adjudicated against the units of service (UOS) reported on each line of a claim. On April 1, 2013, CMS modified the MUE program so that some MUE values would

Disclaimer

This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents. CPT only copyright 2013 American Medical Association.

Confidential

| MLN Matters® Number: MM8853 | Related Change Request Number: 8853 |
|---|---|

be date of service edits rather than claim line edits. At that time, CMS introduced a new data field to the MUE edit table termed "MUE adjudication indicator" or "MAI". CMS is currently assigning a MAI to each HCPCS code. CR8853 contains current and updated background information for these modifications, including general processing instructions.

### MUEs for HCPCS codes with a MAI of "1"

MUEs for HCPCS codes with a MAI of "1" will continue to be adjudicated as a claim line edit.

### MUEs for HCPCS codes with a MAI of "2"

MUEs for HCPCS codes with a MAI of "2" are absolute date of service edit. These are "per day edits based on policy". HCPCS codes with an MAI of "2" have been rigorously reviewed and vetted within CMS and obtain this MAI designation because UOS on the same date of service (DOS) in excess of the MUE value would be considered impossible because it was contrary to statute, regulation, or subregulatory guidance. This subregulatory guidance includes clear correct coding policy that is binding on both providers and the MACs.

Limitations created by anatomical or coding limitations are incorporated in correct coding policy, both in the Health Insurance Portability & Accountability Act of 1996 (HIPAA) mandated coding descriptors and CMS approved coding guidance as well as specific guidance in CMS and National Correct Coding Initiatives (NCCI) manuals. For example, it would be contrary to correct coding policy to report more than one unit of service for Current Procedural Terminology (CPT) 94002 "ventilation assist and management . . . initial day" because such usage could not accurately describe two initial days of management occurring on the same DOS as would be required by the code descriptor.

> **Note:** Although the Qualified Independent Contractors (QICs) and the Administrative Law Judges (ALJs) are not bound by sub-regulatory guidance, they do give deference to it and are being made aware that CMS considers all edits with an MAI of 2 to be firm limits based on subregulatory guidance, while some MUE edits with an MAI "2" may be based directly on regulation or statute.



### MUEs for HCPCS codes with a MAI of "3"

MUEs for HCPCS codes with a MAI of "3" are date of service edits. These are "per day edits based on clinical benchmarks". If claim denials based on these edits are appealed, MACs may pay UOS in excess of the MUE value if there is adequate documentation of medical necessity of correctly reported units. If MACs have pre-payment evidence (e.g. medical review) that UOS in excess of the MUE value were actually provided, were correctly coded, and were medically necessary, the MACs may bypass the MUE for a

**Disclaimer**
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents. CPT only copyright 2013 American Medical Association.

Confidential

ML_DE_00206158

HCPCS code with an MAI of "3" during claim processing, reopening, or redetermination, or in response to effectuation instructions from a reconsideration or higher level appeal.

**General Processing Instructions**

- Since ambulatory surgical center (ASC) providers (specialty code 49) cannot report modifier 50, the MUE value used for editing will be doubled for HCPCS codes with an MAI of "2" or "3" if the bilateral surgery indicator for the HCPCS code is "1".
- CMS will continue to set the units of service for each MUE high enough to allow for medically likely daily frequencies of services provided in most settings. Because MUEs are based on current coding instructions and practices, MUEs are prospective edits applicable to the time period for which the edit is effective. A change in an MUE is not retroactive and has no bearing on prior services unless specifically updated with a retroactive effective date. In the unusual case of a retroactive MUE change, MACs are not expected to identify claims but should reopen impacted claims that you bring to their attention.
- Since MUEs are auto-deny edits, denials may be appealed. Appeals shall be submitted to your MAC not the NCCI/MUE contractor. MACs adjudicating an appeal for a claim denial for a HCPCS code with an MAI of "1" or "3" may pay correctly coded correctly counted medically necessary UOS in excess of the MUE value.
- Finally, a denial of services due to an MUE is a coding denial, not a medical necessity denial. The presence of an Advance Beneficiary Notice (ABN) shall not shift liability to the beneficiary for UOS denied based on an MUE. If during reopening or redetermination medical records are provided with respect to an MUE denial for an edit with an MAI of "3", MACs will review the records to determine if the provider actually furnished units in excess of the MUE, if the codes were used correctly, and whether the services were medically reasonable and necessary. If the units were actually provided but one of the other conditions is not met, a change in denial reason may be warranted (for example, a change from the MUE denial based on incorrect coding to a determination that the item/service is not reasonable and necessary under section 1862(a)(1)). This may also be true for certain edits with an MAI of "1." CMS interprets the notice delivery requirements under Section1879 of the Social Security Act (the Act) as applying to situations in which a provider expects the initial claim determination to be a reasonable and necessary denial. Consistent with NCCI guidance, denials resulting from MUEs are not based on any of the statutory provisions that give liability protection to beneficiaries under section 1879 of the Social Security Act. Thus, ABN issuance based on an MUE is NOT appropriate.
- CMS reminds providers to report bilateral surgical procedures on a single claim line with modifier 50 and one (1) UOS. When modifier -50 is required by manual or coding instructions, claims submitted with two lines or two units and anatomic modifiers will be denied for incorrect coding. MACs may reopen or allow

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents. CPT only copyright 2013 American Medical Association.

Confidential                                    ML_DE_00206159

resubmission of those claims in accordance with their policies and with the policy in Chapter 34, Section 10.1, of the "Medicare Claims Processing Manual" at **http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Down loads/clm104c34.pdf** on the CMS website. Clerical errors (which includes minor errors and omissions) may be treated as reopenings.

- CMS encourages providers to change and resubmit their own claims where possible and to change their coding practices, but during reopening MACs may, when necessary, correct the claim to modifier -50 from an equivalent 2 units of bilateral anatomic modifiers.  The original submitted version of the claim is retained in the Medicare IDR.

- CMS also reminds providers to use anatomic modifiers (e.g. RT, LT, FA, F1-F9, TA, T1-T9, E1-E4) and report procedures with differing modifiers on individual claim lines when appropriate.  Many MUEs are based on the assumption that correct modifiers are used.

- On your Remittance Advice, MACs will continue to use Group Code CO (contractual obligation), and remark codes N362 and MA01 for claims that fail the MUE edits, when the UOS on the claim exceed the MUE value, and deny the entire claim line(s) for the relevant HCPCS code.

## Additional Information

The official instruction, CR 8853 issued to your MAC regarding this change is available at **http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R1421OTN.pdf** on the CMS website.

If you have any questions, please contact your MAC at their toll-free number. That number is available at **http://www.cms.gov/Outreach-and-Education/Medicare-Learning-Net work-MLN/MLNMattersArticles/index.html** under - How Does It Work.

Disclaimer
This article was prepared as a service to the public and is not intended to grant rights or impose obligations. This article may contain references or links to statutes, regulations, or other policy materials. The information provided is only intended to be a general summary. It is not intended to take the place of either the written law or regulations. We encourage readers to review the specific statutes, regulations and other interpretive materials for a full and accurate statement of their contents. CPT only copyright 2013 American Medical Association.

Confidential                                                    ML_DE_00206160

# EXHIBIT 32

Message

| | |
|---|---|
| **From:** | Tim Kennedy [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=TIM KENNEDY3D8] |
| **Sent:** | 2/21/2014 3:59:19 PM |
| **To:** | Carol Stoyla [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Carol Stoyla] |
| **Subject:** | RE: Noridian |

Thanks Carol.

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Carol Stoyla
**Sent:** Friday, February 21, 2014 7:56 AM
**To:** Tim Kennedy
**Subject:** RE: Noridian

Tim,
We have not yet reached out to our assigned Medicare Reps....I have their names and contact info and will forward to Susan/Rick to make a call for their take on this.
Carol

Carol Stoyla
VP of Payor Strategy and Relations
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1410
Fax: (858) 217-0332
Carol.Stoyla@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 5:02 PM
**To:** Carol Stoyla
**Subject:** FW: Noridian

FYI –

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

Confidential

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 5:02 PM
**To:** Richard Guzman; Susan Ahl; Jennifer Hood; Daniel Pencak
**Subject:** RE: Noridian

I like all of the ideas and thinking out of the box.
Let's all have a brief meeting on this tomorrow and decide which direction we want to take.

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 4:54 PM
**To:** Susan Ahl; Tim Kennedy; Jennifer Hood; Daniel Pencak
**Subject:** RE: Noridian

We should try to circumvent the edit first. Noridian updated their list of modifiers and they no longer list modifier 59 (which is what we are using). Not sure if this is an error or if we should be using a different modifier.
https://med.noridianmedicare.com/web/jeb/topics/modifiers

If that doesn't work, we should appeal the denials. The policy indicates that these denials are appealable, and we may just need to show the distinction in the drug classifications (by the radar report).

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

**From:** Susan Ahl
**Sent:** Thursday, February 20, 2014 4:42 PM
**To:** Tim Kennedy; Richard Guzman; Jennifer Hood; Daniel Pencak
**Subject:** FW: Noridian

FYI

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1205
Fax: (858) 217-8519

Confidential

Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Carol Stoyla
**Sent:** Thursday, February 20, 2014 4:40 PM
**To:** Susan Ahl
**Subject:** RE: Noridian

Susan,
I spoke with another lab who is experiencing the same issue as us and what they did (they also use XIFIN), is to create a consolidation rule that caps the billed units at what the MUE states. Medicare will not pay for more than what the MUE states, so they found that by billing up to the max (where appropriate), medicare pays all of the units and does not deny.
Carol

Carol Stoyla
VP of Payor Strategy and Relations
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1410
Fax: (858) 217-0332
Carol.Stoyla@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Susan Ahl
**Sent:** Thursday, February 20, 2014 4:26 PM
**To:** Carol Stoyla
**Subject:** FW: Noridian

Do you have any suggestions

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 4:22 PM
**To:** Susan Ahl; Tim Kennedy; Daniel Pencak; Jennifer Hood
**Subject:** RE: Noridian

The rule below is what we are currently doing and those claims are being denied.  The new policy (excerpt from the email below) states that even if we separate the lines and use the modifier, Medicare will still not pay.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592

Confidential

ML_DE_00058390

Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Susan Ahl
**Sent:** Thursday, February 20, 2014 4:11 PM
**To:** Tim Kennedy; Richard Guzman; Daniel Pencak; Jennifer Hood
**Subject:** RE: Noridian

Tim

This is a response from XIFIN related to Consolidation Rule Modifications.  Rick and Jennifer, what do you think?

The rule is of course driven by the MUE by payor so it will vary based on procedure code and payor.  But, as an example, if 83925 has a DOS unit edit of 4 then the rule would be set up to bill 4 units on one line with an 83925 (no modifier) and the remaining additional units over and above the MUE units on a second claim line with 83925 and a 91 or 59 modifier.  Note that the use of the 91 or 59 modifier should be confirmed with your certified coder(s).

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 4:08 PM
**To:** Richard Guzman; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Thanks Rick for the clarification.

Is there not a way to bill for the units in excess of the MUE with a modifier or some other code?
Has XIFIN weighed in on alternatives yet?

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 3:39 PM
**To:** Tim Kennedy; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Confidential

The $2.5m that has been denied is not a complete picture for the month because not all January claims have been adjudicated.  If we apply the current behavior across all billings for January, I would expect denied amounts to grow to approx. $4m (this is the amount that we bill for those codes in which the unit limit was exceeded).

So the math would look like this using round numbers:

$4.0m total monthly denials
$2.8m portion of the $4m that could be recouped if we resubmit claims not to exceed the caps
$1.2m is monthly amount that we may not be able to recover because it exceeds the MUE for date of service = $14.4m per year

Hope this makes more sense?



Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 3:12 PM
**To:** Richard Guzman; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Rick,

Just making sure I understand correctly (if not, please correct my interpretation presented below):

        $2.50M  (Total monthly denials)
Less: $1.25M  (ML could bill at the MUE level and get paid)
        $1.25M  (total at risk)
Less: $1.17M  (ML could bill units above the MUE level and potentially get paid at ~93% of billed)
        $0.08M  (Remainder not paid = $80,000 per month or $960,000 per year)

Questions:
* Is the above directionally correct?
* Is this what XIFIN recommends to deal with this issue?

Thanks, Tim

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

Confidential

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 2:22 PM
**To:** Tim Kennedy; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

We are still getting denied on 83925 and 82542 if units billed are in excess of the MUE. So far, the amount being denied due to MUE is approx. $2.5m. (starting 1/1/14 dates of service for all adjudications to date).

|  | MUE | % of Claims in excess of MUE | Avg. # of Units beyond the MUE |
|---|---|---|---|
| 83925 | 4 | 48% | 1.89 |
| 82542 | 6 | 15% | 3.04 |

If we were to bill those codes for units NOT TO EXCEED the limit, then the amount of monthly billed charges at risk is approx. $1.25m. We typically collect 93% of billed charges, so the monthly revenue loss would be slightly less.

|  | Monthly Avg. Units billed | Units billed with modifier (in excess of MUE) | Medicare Rate | Amount of Billed |
|---|---|---|---|---|
| 83925 | 153,657 | 33,693 | $26.54 | 894,212 |
| 82542 | 162,670 | 14,924 | $24.14 | 360,265 |
|  |  |  |  | 1,254,478 |

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

**From:** Tim Kennedy
**Sent:** Tuesday, February 18, 2014 3:45 PM
**To:** Daniel Pencak; Susan Ahl; Richard Guzman
**Subject:** RE: Noridian

All,

Let's dig a bit more on this whole issue and have some answers to the questions likely to be asked and have answers for them:

* Find out what Xifin has to say about this and if others are experiencing payment issues
* Of the $2.5M indicated below – what is the real at risk amount above the unit edit of 4 for 83925 and unit edit of 6 for 82542 (if we resubmit at the MUE level, we expect that we'll get paid, correct?)
* Let's decide with Lale and Terri of Xifin if item #5 is the best procedure for ML to start with

In the meantime, I'll make Howard aware of the issue but tell him we're still gathering all our facts.

Thanks, Tim

Confidential

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Daniel Pencak
**Sent:** Tuesday, February 18, 2014 1:17 PM
**To:** Susan Ahl; Tim Kennedy; Richard Guzman
**Subject:** FW: Noridian

I recommend we meet briefly to discuss this. We should also include Howard.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

---

**From:** Richard Guzman
**Sent:** Tuesday, February 18, 2014 1:14 PM
**To:** Susan Ahl; Daniel Pencak; Cheryl Stokes
**Cc:** LuAnn Merrill; Colm Driscoll
**Subject:** RE: Noridian

I had Veronica call Noridian earlier today (the hold time was almost an hour) regarding our call on Friday.

1.      They are referring us to the bulletin below relating to MUEs.  Basically, it appears that Noridian is applying the CMS MUE's and asking us to file reconsiderations if we want to get paid.
2.      83925 has a DOS unit edit of 4 and 82542 is unpublished but we have determined to be 6.  Starting on 1/1/14 DOS, they are denying all line items with CO96 (non-covered) if we bill in excess of the MUE. (For example, on 83925, if we bill 4, they pay 4.  If we bill 5, they pay 0.)
3.      82205 has an edit of 1 unit per DOS, but excess units are still being paid.
4.      On many of these denials, they have re-adjudicated the claim and subsequently paid the code without us doing anything.  However, $2.5m of billed charges remains outstanding of underpayments (where the claim has been paid, but these units were denied).
5.      I've asked LuAnn to work with Jenn Hood to test the claim submissions by setting up alternate consolidation rules.  (2 per one line, 1 per one line, etc.)
6.      Although the announcement below indicates that this process would be effective on April 1, 2013. It appears all excess units were being paid right up until 12/31/2013.

Effective April 1, 2013, CMS is converting some claim line MUEs to date of service (DOS) MUEs.  The total units of service (UOS) from all claim lines for a HCPCS/CPT code with the same date of service will be summed and compared to the MUE value.  Claims denied based on DOS MUEs may be appealed using similar processes to claim line MUE denials.  DOS MUEs are based on criteria including, but not limited to, anatomic considerations, CPT code descriptors or instructions, and nature of equipment or service.  CMS does not publish which codes have DOS MUEs.  Since all UOS for a HCPCS/CPT

ML_DE_00058394

code on all claim lines with the same date of service are summed, reporting additional UOS on separate claim lines with a HCPCS/CPT modifier will not result in payment of UOS in excess of the MUE value.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Susan Ahl
**Sent:** Tuesday, February 18, 2014 9:30 AM
**To:** Richard Guzman; Daniel Pencak; Cheryl Stokes
**Subject:** Noridian

Rick

Are you calling Noridian today – Let's schedule some time and/or please pass your contact information and I will call them with the team.

Thank You

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA 92127
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com

(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

ML_DE_00058395

Message
_____

**From:** Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL PENCAK]

**Sent:** 2/21/2014 12:49:18 AM

**To:** Richard Guzman [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Richard Guzman]; Susan Ahl [/O=MILLENNIUM
LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Susan Ahlc25];
Tim Kennedy [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tim Kennedy3d8]; Jennifer Hood [/O=MILLENNIUM
LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Jennifer
Hood85a]

**Subject:** RE: Noridian

For $1.4 million a month, I'd like to hear from XIFIN that ALL customers are losing this revenue before we update the consolidation rules to limit our units being billed.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

_____

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 4:22 PM
**To:** Susan Ahl; Tim Kennedy; Daniel Pencak; Jennifer Hood
**Subject:** RE: Noridian

The rule below is what we are currently doing and those claims are being denied.  The new policy (excerpt from the email below) states that even if we separate the lines and use the modifier, Medicare will still not pay.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

_____

**From:** Susan Ahl
**Sent:** Thursday, February 20, 2014 4:11 PM
**To:** Tim Kennedy; Richard Guzman; Daniel Pencak; Jennifer Hood
**Subject:** RE: Noridian

Tim

This is a response from XIFIN related to Consolidation Rule Modifications.  Rick and Jennifer, what do you think?

Confidential                                                    ML_DE_00054258

The rule is of course driven by the MUE by payor so it will vary based on procedure code and payor. But, as an example, if 83925 has a DOS unit edit of 4 then the rule would be set up to bill 4 units on one line with an 83925 (no modifier) and the remaining additional units over and above the MUE units on a second claim line with 83925 and a 91 or 59 modifier. Note that the use of the 91 or 59 modifier should be confirmed with your certified coder(s).


Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 4:08 PM
**To:** Richard Guzman; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Thanks Rick for the clarification.

Is there not a way to bill for the units in excess of the MUE with a modifier or some other code?
Has XIFIN weighed in on alternatives yet?


Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 3:39 PM
**To:** Tim Kennedy; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

The $2.5m that has been denied is not a complete picture for the month because not all January claims have been adjudicated. If we apply the current behavior across all billings for January, I would expect denied amounts to grow to approx. $4m (this is the amount that we bill for those codes in which the unit limit was exceeded).

So the math would look like this using round numbers:

$4.0m total monthly denials
$2.8m portion of the $4m that could be recouped if we resubmit claims not to exceed the caps
$1.2m is monthly amount that we may not be able to recover because it exceeds the MUE for date of service = $14.4m per year

Hope this makes more sense?

ML_DE_00054259

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Thursday, February 20, 2014 3:12 PM
**To:** Richard Guzman; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

Rick,

Just making sure I understand correctly (if not, please correct my interpretation presented below):

$2.50M  (Total monthly denials)
Less: $1.25M  (ML could bill at the MUE level and get paid)
$1.25M  (total at risk)
Less: $1.17M  (ML could bill units above the MUE level and potentially get paid at ~93% of billed)
$0.08M  (Remainder not paid = $80,000 per month or $960,000 per year)

Questions:
* Is the above directionally correct?
* Is this what XIFIN recommends to deal with this issue?

Thanks, Tim

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Thursday, February 20, 2014 2:22 PM
**To:** Tim Kennedy; Daniel Pencak; Susan Ahl
**Subject:** RE: Noridian

We are still getting denied on 83925 and 82542 if units billed are in excess of the MUE.  So far, the amount being denied due to MUE is approx. $2.5m.  (starting 1/1/14 dates of service for all adjudications to date).

|  | MUE | % of Claims in excess of MUE | Avg. # of Units beyond the MUE |
|---|---|---|---|
| 83925 | 4 | 48% | 1.89 |
| 82542 | 6 | 15% | 3.04 |

Confidential

ML_DE_00054260

If we were to bill those codes for units NOT TO EXCEED the limit, then the amount of monthly billed charges at risk is approx. $1.25m.  We typically collect 93% of billed charges, so the monthly revenue loss would be slightly less.

|  | Monthly Avg. Units billed | Units billed with modifier (in excess of MUE) | Medicare Rate | Amount of Billed |
|---|---|---|---|---|
| 83925 | 153,657 | 33,693 | $26.54 | 894,212 |
| 82542 | 162,670 | 14,924 | $24.14 | 360,265 |
|  |  |  |  | 1,254,478 |

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Tim Kennedy
**Sent:** Tuesday, February 18, 2014 3:45 PM
**To:** Daniel Pencak; Susan Ahl; Richard Guzman
**Subject:** RE: Noridian

All,

Let's dig a bit more on this whole issue and have some answers to the questions likely to be asked and have answers for them:

* Find out what Xifin has to say about this and if others are experiencing payment issues
* Of the $2.5M indicated below – what is the real at risk amount above the unit edit of 4 for 83925 and unit edit of 6 for 82542 (if we resubmit at the MUE level, we expect that we'll get paid, correct?)
* Let's decide with Lale and Terri of Xifin if item #5 is the best procedure for ML to start with

In the meantime, I'll make Howard aware of the issue but tell him we're still gathering all our facts.

Thanks, Tim

Tim Kennedy
Chief Financial Officer
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 451-3636
Tim.Kennedy@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Daniel Pencak
**Sent:** Tuesday, February 18, 2014 1:17 PM
**To:** Susan Ahl; Tim Kennedy; Richard Guzman
**Subject:** FW: Noridian

Confidential

I recommend we meet briefly to discuss this. We should also include Howard.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

---

**From:** Richard Guzman
**Sent:** Tuesday, February 18, 2014 1:14 PM
**To:** Susan Ahl; Daniel Pencak; Cheryl Stokes
**Cc:** LuAnn Merrill; Colm Driscoll
**Subject:** RE: Noridian

I had Veronica call Noridian earlier today (the hold time was almost an hour) regarding our call on Friday.

1.      They are referring us to the bulletin below relating to MUEs.  Basically, it appears that Noridian is applying the CMS MUE's and asking us to file reconsiderations if we want to get paid.
2.      83925 has a DOS unit edit of 4 and 82542 is unpublished but we have determined to be 6.  Starting on 1/1/14 DOS, they are denying all line items with CO96 (non-covered) if we bill in excess of the MUE. (For example, on 83925, if we bill 4, they pay 4.  If we bill 5, they pay 0.)
3.      82205 has an edit of 1 unit per DOS, but excess units are still being paid.
4.      On many of these denials, they have re-adjudicated the claim and subsequently paid the code without us doing anything.  However, $2.5m of billed charges remains outstanding of underpayments (where the claim has been paid, but these units were denied).
5.      I've asked LuAnn to work with Jenn Hood to test the claim submissions by setting up alternate consolidation rules.  (2 per one line, 1 per one line, etc.)
6.      Although the announcement below indicates that this process would be effective on April 1, 2013. It appears all excess units were being paid right up until 12/31/2013.

Effective April 1, 2013, CMS is converting some claim line MUEs to date of service (DOS) MUEs.  The total units of service (UOS) from all claim lines for a HCPCS/CPT code with the same date of service will be summed and compared to the MUE value.  Claims denied based on DOS MUEs may be appealed using similar processes to claim line MUE denials.  DOS MUEs are based on criteria including, but not limited to, anatomic considerations, CPT code descriptors or instructions, and nature of equipment or service.  CMS does not publish which codes have DOS MUEs.  Since all UOS for a HCPCS/CPT code on all claim lines with the same date of service are summed, reporting additional UOS on separate claim lines with a HCPCS/CPT modifier will not result in payment of UOS in excess of the MUE value.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

ML_DE_00054262

**From:** Susan Ahl
**Sent:** Tuesday, February 18, 2014 9:30 AM
**To:** Richard Guzman; Daniel Pencak; Cheryl Stokes
**Subject:** Noridian

Rick

Are you calling Noridian today – Let's schedule some time and/or please pass your contact information and I will call them with the team.

Thank You

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
16981 Via Tazon
San Diego, CA 92127
Office: (858) 451-3535 x1205
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com



(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

Confidential

ML_DE_00054263

# EXHIBIT 33

Message

| | |
|---|---|
| **From:** | Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL PENCAK] |
| **Sent:** | 2/14/2014 10:47:46 PM |
| **To:** | Richard Guzman [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Richard Guzman] |
| **Subject:** | Re: Medicare |

What do you mean by "re-adjudicate"

Daniel Pencak, CPA, CGMA
Vice President - Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

On Feb 14, 2014, at 2:40 PM, "Richard Guzman" <Richard.Guzman@millenniumlabs.com> wrote:

We've been doing it that way for 82542 since August and not had a problem.  83925 is 4 to a line.  But yes, if billing 2 or less on line, they are paying first time.

I'm a little less concerned about this than I was earlier.  Noridian says they're not applying a new policy, so this must have been in error and we may have to change our consolidation rules.  They have denied ~$5m initially, but have re-adjudicated, so we are now down to about $1.3m in short payments.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

**From:** Daniel Pencak
**Sent:** Friday, February 14, 2014 1:48 PM
**To:** Richard Guzman
**Subject:** Re: Medicare

Why are we billing six on a single line...shouldn't it be two? Do you see any denials with his two on a line?

Daniel Pencak, CPA, CGMA
Vice President - Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

Confidential

On Feb 14, 2014, at 11:58 AM, "Richard Guzman" <Richard.Guzman@millenniumlabs.com> wrote:

Still not 100% clear on what's going on.  However, after reviewing additional data, it appears that Noridian is denying the codes due to MUE, but some have been re-adjudicated and paid subsequently.  Some of the $5m that I mentioned being denied has been paid subsequent to the denial, but just need to confirm that they are fixing all of the denials or if we need to resubmit claims or appeal.  Attached is an example of a recent payment where 83925 and 82542 were denied.  I have provided Medicare some examples and they are researching.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
16981 Via Tazon
San Diego, CA 92127
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com

(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)


<MCCA AA4010124.pdf>

Confidential

# EXHIBIT 34

Message
_____

| | |
|---|---|
| **From:** | Susan Ahl [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=SUSAN AHLC25] |
| **Sent:** | 3/19/2014 12:23:01 AM |
| **To:** | Tim Kennedy [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tim Kennedy3d8] |
| **CC:** | LuAnn Merrill [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=LuAnn Merrill3b5]; Colm Driscoll [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Colm Driscoll]; Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Daniel Pencak]; Richard Guzman [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Richard Guzman] |
| **Subject:** | RE: Medicare MUE - update on denials |

Thank you

Tim, we continue to receive denials on a few of the scenarios that were recently billed to Medicare.  Not all have been returned so we continue to review daily, along with those that were appealed which will take a much longer time.  This is a variance report so that you can see the difference if we just bill out the max allowed by Medicare and forfeit the remainder.

We would forfeit the $2.1M at this point, and recover the $4.3M if billed within allowed.

Susan Ahl
VP, Revenue and Billing Management
Millennium Laboratories, Inc.
Office: (858) 451-3535 x2007
Fax: (858) 217-8519
Susan.Ahl@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Richard Guzman
**Sent:** Tuesday, March 18, 2014 4:11 PM
**To:** Susan Ahl
**Cc:** LuAnn Merrill; Colm Driscoll; Daniel Pencak; Tim Kennedy
**Subject:** Medicare MUE - update on denials

Susan – here is an update on denials that we have received related to the MUE issue.

To date, a total of $6.5m (Medicare rate expect) has been denied – $4.4m of which we could resubmit with cap on MUE.  The other $2.1m represents the portion of the CPTs billed with a modifier (exceed the edit limit) and is questionable.  See table below.  February has not yet been fully adjudicated, so I expect the totals to resemble January's once all payments are in.

| DOS Mo | Max units | Units over Max | Total |
|---|---|---|---|
| Dec-13 | 714,352 | 379,649 | 1,094,001 |
| Jan-14 | 2,342,063 | 1,124,359 | 3,466,421 |
| Feb-14 | 1,334,631 | 654,521 | 1,989,152 |
| | 4,391,045 | 2,158,529 | 6,549,574 |

ML_DE_00054044

A bit of good news...we received a payment from Medicare today of $2.3m, which is about 5x their recent average payment.

Richard Guzman
Senior Director Revenue Cycle Management
Millennium Laboratories
16981 Via Tazon
San Diego, CA 92127
Office: (858) 451-3535 x1225
Fax: (858) 408-3592
Richard.Guzman@millenniumlabs.com

(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

Confidential

# EXHIBIT 35

Confidential



# Coding and Reimbursement Assessment for Drugs of Abuse Testing

Prepared for Millennium Laboratories

**DRAFT**

February 21, 2014

avalerehealth.net

CONFIDENTIAL: This report contains non-public information regarding AMA's October 2013 CPT editorial panel meeting

The information presented in this document should not be construed as legal, tax, accounting, investment, or regulatory advice. Avalere assumes no responsibility or liability for any business or investment decisions by any party based upon the information contained herein.

ML_DE_00689868

# Project Objective

Confidential

- Millennium Laboratories ("Millennium") asked Avalere Health to conduct an assessment of coverage and reimbursement for drugs of abuse testing

- The focus of this project was on the impact of the changes proposed by the Quantitative Drug Testing Workgroup of the American Medical Association (AMA) Current Procedural Terminology (CPT®) Editorial Panel

- Key questions investigated include:
  - How will Millennium's current codes map to the new drug testing CPT codes?
  - How might the Centers for Medicare & Medicaid Services (CMS) choose to approach pricing these new CPT codes under Medicare?
  - If CMS crosswalks the codes using existing codes and payment rates, what could the new Medicare payment rates look like?

- Avalere also assessed other potential coverage and reimbursement changes, including:
  - The upcoming Medicare Clinical Laboratory Fee Schedule (CLFS) review
  - The draft Local Coverage Decision (LCD) related to Drugs of Abuse testing currently proposed by Noridian Healthcare Solutions (Millennium's Medicare Administrative Contractor)

ML_DE_00689869



Avalere | 2

Confidential

# Executive Summary

- CMS will hold a public meeting in July of 2014 to allow for comments on crosswalking or gap-filling the **new AMA drug testing CPT codes**

  - Preliminary and final decisions from CMS will be published in September and November, respectively

- If CMS decides to crosswalk these codes, it would likely look at Medicare claims data to inform its analysis; Avalere used a similar approach in our payment estimating exercise

- Under our model, Medicare payments would:

  - Remain the same for the majority of drug tests

  - Increase 7% to 33% for 11 drug tests, depending on the test/drug class

  - Decline -6% to -30% for 2 drug tests, depending on the test/drug class

  - These three categories represent 58%, 29% and 13%, respectively, of Millennium's total testing volume; however, Millennium's Medicare mix may differ from its total mix

- These changes in Medicare reimbursement are not generalizable to other payers; other insurers may incorporate CMS' changes or instead choose to set payments in a different manner

- There are several important limitations to our approach, which we outline starting on page 20

- The new drug testing codes are being implemented at a time when underlying values of existing CLFS codes are being reviewed by CMS; as a result, this review may also impact payment for the new AMA drug testing CPT codes, especially if crosswalking is the methodology used

AMA = American Medical Association; CLFS = Clinical Laboratory Fee Schedule; CMS = Centers for Medicare & Medicaid Services; CPT = Current Procedural Terminology

Avalere | 3

ML_DE_00689870

Confidential

# Executive Summary (continued)

- CMS' **CLFS review** will also directly affect 7 of Millennium's codes (14% of total volume) that are not impacted by the new AMA drug testing codes

  - Payment changes for these codes are likely to be implemented over the next two years; directionally, these codes are likely to see reductions, although the magnitude remains uncertain

- Noridian's **draft LCD** concerning coverage of drugs of abuse testing is, in our opinion, likely to be finalized largely in its current form, given its similarity to the recently-finalized CGS draft LCD

  - CGS finalized its proposal in January, 2014 without significant changes to the draft

- The draft LCD would require all orders for quantitative drug testing for patients being treated for substance use or abuse to be preceded by a qualitative screen, and allow only for those drugs classes with a positive screen to be tested quantitatively

CLFS = Clinical Laboratory Fee Schedule; CMS = Centers for Medicare & Medicaid Services; LCD = Local Coverage Decision



Avalere | 4

ML_DE_00689871

Confidential

# Table of Contents

- Code Mapping to Proposed Presumptive and Definitive CPT Codes – p. 6

- Payment Scenarios for New CPT Codes – p. 15

- Assessment of Medicare Clinical Lab Fee Schedule (CLFS) Revaluation – p. 37

- Draft Drugs of Abuse Local Coverage Determination (LCD) – p. 43

Case 17-51840-LSS    Doc 341-4    Filed 02/10/23    Page 477 of 847

ML_DE_00689872

Avalere | 5



Code Mapping to Proposed Presumptive and Definitive CPT Codes

Avalere

Confidential

# Overview of AMA-Accepted Changes to Drugs of Abuse Testing CPT Codes

Confidential

- The AMA's changes to the CPT coding for drug testing represent an effort to better define the purpose and use of various testing modalities

- According to the minutes from the AMA's October 2013 CPT Editorial Panel meeting[1], drug testing procedures will be divided into three subsections:

  1. **Presumptive** – procedures used to identify the possible use or non-use of a drug or drug class that may be followed by a definitive test in order to identify specific drugs or metabolites

  2. **Definitive** – procedures that are qualitative or quantitative and are used to identify specific drugs and associated metabolites

  3. **Therapeutic Drug Monitoring** – assays performed to monitor the clinical response to a prescribed medication

     - Therapeutic Drug Monitoring codes will be limited only to whole blood, serum or plasma samples, and are not relevant to Millennium's current lines of business

- The new presumptive testing codes are not specific to any particular drug but are divided into two drug classes:

    Drug Class A – drugs commonly assayed by presumptive procedures where the result can typically be read by direct optical observation (e.g. dipsticks, cups, cards, etc.)

    Drug Class B – drugs commonly assayed by presumptive procedures that typically require more resources than Drug Class A (e.g. ELISA)

- The new definitive drug testing code series is drug class-specific (e.g. alcohol(s), amphetamines, benzodiazepines, etc.), with some classes divided into frequency bands based on the number of drugs tested

[1] Non-public minutes from the AMA meeting were provided to Avalere by Millennium Laboratories.



Avalere | 7

Confidential

ML_DE_00689875

# CPT Code Mapping to New AMA Drug Testing Codes

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| 83516 | NA | Acetaminophen | Drug screen, presumptive, single drug class from Drug Class List B | 801XX4A | NA | NA |
| 82055 | NA | Alcohol testing as an enzyme assay only | Alcohol(s) | 801XX2A | 801XY1 | NA |
| G0431/80101 | 80154 | Alprazolam; clonazepam; lorazepam; nordazepam; temazepam; oxazepam | Benzodiazepines | 801XX2A | 801XY5, 801XY6 | 801XY5; 1-12 801XY6; 12+ |
| NA | 80152 | Amitriptyline | Antidepressants, Tricyclic and other cyclicals | NA | 801XY25-801XY27 | 801XY25; 1-2 801XY26; 3-5 801XY27; 6+ |
| G0431/80101 | 82145 | Amphetamine, Methamphetamine | Amphetamines | 801XX2A | 801XY18-801XY20 | 801XY18; 1-2 801XY19; 3-4 801XY20; 5+ |
| NA | 82542 | Aripiprazole; clozapine; olanzapine; quetiapine; risperidone | Antipsychotics | NA | 801XY31-801XY33 | 801XY31; 1-3 801XY32; 4-6 801XY33; 7+ |
| G0431/80101 | 83925 | Buprenorphine | Buprenorphine | 801XX2A | 801XY12 | NA |
| NA | 82542 | Bupropion; venlafaxine | Antidepressants, not otherwise specified | NA | 801XY27A | NA |
| G0431/80101 | 82205 | Butalbital | Barbiturates | 801XX2A | 801XY4 | NA |
| NA | 82542 | Cannabinoids, synthetic | Cannabinoids, synthetic | NA | 801XY38-801XY40 | 801XY38; 1-3 801XY39; 4-6 801XY40; 7+ |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

Confidential

# CPT Code Mapping to New AMA Drug Testing Codes

Case 17-51840-LSS    Doc 341-4    Filed 02/10/23    Page 481 of 847

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| G0431 | 83805 | Carisoprodol | Skeletal muscle relaxants | 801XX4A | 801XY14-801XY14A | 801XY14; 1-2 801XY14a; 3+ |
| NA | 82542 | Cathinones | Stimulants, synthetic | NA | 801XY41 | NA |
| NA | 82542 | Citalopram; duloxetine; fluoxetine; paroxetine | Antidepressants, serotonergic class | NA | 801XY22-801XY24 | 801XY22; 1-2 801XY23; 3-5 801XY24; 6+ |
| G0431/80101 | 82520 | Cocaine | Cocaine | 801XX2A | 801XY43 | NA |
| G0431/80101 | 83925 | Codeine; morphine | Opiates | 801XX2A | 801XY7 | NA |
| NA | 82542 | Cyclobenzaprine | Skeletal muscle relaxants | NA | 801XY14-801XY14A | 801XY14; 1-2 801XY14a; 3+ |
| NA | 80160 | Desipramine | Antidepressants, Tricyclic and other cyclicals | NA | 801XY25-801XY27 | 801XY25; 1-2 801XY26; 3-5 801XY27; 6+ |
| NA | 82542 | Dextromethorphan; naltrexone | Opioids and opiate analogs | NA | 801XY15-801XY17 | 801XY15; 1-2 801XY6; 3-4 801XY17; 5+ |
| G0431/80101 | 82542 | Ethyl glucuronide | Alcohol Biomarkers | 801XX4A | 801XY2-801XY3 | 801XY2; 1-2 801XY3; 3 + |
| G0431/80101 | 83925 | Fentanyl | Fentanyls | 801XX4A | 801XY13 | NA |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

Avalere | 9

ML_DE_00689876

Confidential

# CPT Code Mapping to New AMA Drug Testing Codes

Case 17-51840-LSS   Doc 341-4   Filed 02/10/23   Page 482 of 847

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| NA | 82542 | Gabapentin | Gabapentin, non-blood | NA | 801XY13B | NA |
| NA | 80173 | Haloperidol | Antipsychotics | NA | 801XY31-801XY33 | 801XY31; 1-3<br>801XY32; 4-6<br>801XY33; 7+ |
| G0431/80101 | 83925 | Heroin | Heroin metabolite | 801XX2A | 801XY9 | NA |
| G0431/80101 | 82646 | Hydrocodone | Opiates | 801XX2A | 801XY7 | NA |
| G0431/80101 | 82649 | Hydromorphone | Opiates | 801XX2A | 801XY7 | NA |
| NA | 80174 | Imipramine | Antidepressants, Tricyclic and other cyclicals | NA | 801XY25-801XY27 | 801XY25; 1-2<br>801XY26; 3-5<br>801XY27; 6+ |
| NA | 82542 | Ketamine | Ketamine and Norketamine | NA | 801XY9A | NA |
| G0431/80101 | 82145 | MDMA | Methylenedioxyamphetamines | 801XX2A | 801XY17B | NA |
| G0431/80101 | 83925 | Meperidine | Opioids and opiate analogs | 801XX4A | 801XY15-801XY17 | 801XY15; 1-2<br>801XY6, 3-4<br>801XY17; 5+ |
| NA | 83840 | Methadone | Methadone | 801XX2A | 801XY10 | NA |

NA  Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the  publication of the 2015 CPT code set

Avalere | 10

ML_DE_00689877

Confidential

# CPT Code Mapping to New AMA Drug Testing Codes

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| NA | 82542 | Methylphenidate | Methylphenidate | NA | 801XY17C | NA |
| NA | 82101 | Mitragynine (Kratom) | Alkaloids, not otherwise specified | NA | 801XY44 | NA |
| G0431/80101 | NA | Nicotine | Drug screen, presumptive, single drug class from Drug Class List B | 801XX4A | NA | NA |
| NA | 80182 | Nortripyline | Antidepressants, Tricyclic and other cyclicals | NA | 801XY25-801XY27 | 801XY25: 1-2 801XY26: 3-5 801XY27: 6+ |
| G0431/80101 | 83925 | Oxycodone; oxymorphone | Oxycodone | 801XX2A | 801XY8 | NA |
| G0431/80101 | 83992 | Phencyclidine | Phencyclidine | 801XX2A | 801XY21 or 83992[2] | NA |
| G0431/80101 | 80184 | Phenobarbital | Barbiturates | 801XX2A | 801XY4 | NA |
| NA | 85242 | Phentermine | Amphetamines | NA | 801XY18-801XY20 | 801XY18: 1-2 801XY19: 3-4 801XY20: 5+ |
| NA | 82542 | Pregabalin | Pregabalin | NA | 801XY13A | NA |
| G0431/80101 | 83925 | Propoxyphene | Propoxyphene | 801XX2A | 801XY7A | NA |
| G0431/80101 | 82205 | Secobarbital | Barbiturates | 801XX2A | 801XY4 | NA |

NA: Not Applicable to this particular code

Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories

[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

[2] The AMA minutes show a new code number for definitive phencyclidine in one place (801XY21), and the existing code number in another (83992). CPT will need to reconcile prior to publishing, but we list both codes in the table above

Avalere | 11

ML_DE_00689878

Confidential

# CPT Code Mapping to New AMA Drug Testing Codes

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| NA | 83925 | Tapentadol | Tapentadol | NA | 801XY42 | NA |
| G0431/80101 | 82542 | THC | Cannabinoids, natural | 801XX2A | 801XY37 | NA |
| NA | 82542 | Tramadol | Tramadol | NA | 801XY48 | NA |
| G0431/80101 | 82542 | Zolpidem | Sedative Hypnotics | 801XX4A | 801XY7B | NA |

NA: Not Applicable to this particular code

Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories

[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

Avalere | 12

Case 17-51840-LSS   Doc 341-4   Filed 02/10/23   Page 484 of 847

ML_DE_00689879

# Drugs Not Currently Tested by Millennium

Confidential

| Current Qualitative / Screening Code | Current Quantitative / Chemistry Code | Millennium Drugs Tested | New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|---|---|---|
| NA | NA | NA | Anabolic steroids | NA | 801XY44A-801XY44B | 801XY44A; 1-2 801XY44B; 3+ |
| NA | NA | NA | Analgesics, non-opioid | NA | 801XY28-801XY30 | 801XY28; 1-2 801XY29; 3-5 801XY30; 6+ |
| NA | NA | NA | Antiepileptics | NA | 801XY34-801XY36 | 801XY34; 1-3 801XY35; 4-6 801XY36; 7+ |
| NA | NA | NA | Hypnotics, sedative (non-benzodiazepines) | NA | 801XY7B | NA |
| NA | NA | NA | Non-Benzodiazepines – see Hypnotics, sedative | NA | 801XY7B | NA |
| NA | NA | NA | Norketamine – see Ketamine | NA | 801XY9A | NA |
| NA | NA | NA | Not Otherwise Specified | NA | 801XY45-47 | 801xy45; 1-3 801xy46; 4-6 801xy47; 7+ |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set



Avalere | 13

Confidential

# Additional Codes (Direct Observation, TLC, and Other)

| New Class | New Code(s) Presumptive (e.g., Immunoassay)[1] | New Code(s) Definitive (e.g., LC-MS/MS)[1] | Separated by # of Drugs Tested |
|---|---|---|---|
| Drug screen, any number of drug classes from Drug Class List A; any number of non-TLC devices or procedures, (eg, immunoassay) capable of being read by direct optical observation including instrumented-assisted when performed (eg, dipsticks, cups, cards, cartridges), per date of service. | 801XXX1 | NA | NA |
| Drug screen, any number of drug classes from Drug Class List A or B, presumptive, single or multiple drug class method; thin layer chromatography procedure(s) (TLC)(eg, acid, neutral, alkaloid plate), per date of service. | 801XXX6 | NA | NA |
| Not otherwise specified presumptive procedure (eg, TOF, MALDI, LDTD, DESI, DART), each procedure | 801XXX7 | NA | NA |

NA: Not Applicable to this particular code
Note: some of the content of this slide is based on requisition forms provided by Millennium Laboratories
[1] These are placeholder code numbers. Final code numbers will be released with the publication of the 2015 CPT code set

ML_DE_00689881



# Payment Scenarios for New CPT Codes

Avalere

Confidential

# There are Several Approaches CMS May Take to Address the New Drug Testing CPT Codes

- CMS typically uses one of two methodologies to determine payment rates for new codes:

  - **Crosswalking** – The new code is assigned the current local fee schedule and National Limitation Amount (NLA) as a comparable, existing test or multiple existing tests

  - **Gap-filling** – Local Medicare contractors each price the test based on charges, costs, and other factors. The local payment rates are used to establish the NLA for the new test

- For this task, Avalere assumes CMS will use a national crosswalk methodology, i.e., that CMS will map predicate codes to newly created codes and assign payment based in part on existing payment rates

- Using an alternative methodology could lead CMS to develop different payment rates for the codes from those we estimated, and further, could delay timing of the implementation of the new rates

Source: CMS Innovators' Guide to Navigating Medicare, pg. 47. Link.

 Avalere | 16

Confidential

ML_DE_0068983

Confidential

# Likelihood of Various Approaches to Addressing New Drug Testing CPT Codes

Case 17-51840-LSS   Doc 341-4   Filed 02/10/23   Page 489 of 847

| Scenario | Likelihood |
|---|---|
| CMS uses a national crosswalk methodology to determine prices for the new CPT codes using existing payment rates or revised rates from the CLFS valuation review | MODERATE |
| CMS uses a "gap-fill" methodology, allowing individual MACs to determine pricing for one year and then 'gap-filling' to a national fee schedule | MODERATE |
| CMS chooses to replace the existing quantitative drug testing chemistry codes with definitive codes, while continuing to use existing G-codes G0431 and G0434 (revised or not) for presumptive testing | LOW |
| CMS chooses not to implement any of the AMA panel's recommendations and instead continues to utilize the existing screening G-codes and confirmation codes, regardless of class or drug tested | LOW |

ML_DE_00689884

Confidential

# Methodology

Avalere's approach to crosswalk payments to new CPT drug testing codes depends on the *type* of new CPT code:

1. For new CPT codes that encompass a *single* drug test and where there is a single payment rate
   - Example: buprenorphine (801XY12) is currently tested and billed once using 83925 (assay of opiates)
   - We estimate payment will be based on one unit of the previously billed code

2. For new CPT codes that encompass *multiple* drug tests and where there is a single payment rate
   - Example: Methylenedioxyamphetamines (801XY17B) covers tests for MDA, MDMA, and MDEA, and is currently billed by Millennium once using 82145 (assay of amphetamines)
   - We estimate payment will be based on the weighted average of the number of times the code is billed per claim per day within the industry[1]

3. For new CPT codes that encompass multiple drug tests and where payment is based on the number of drugs tested (i.e., 1-2, 3-5, 6+)
   - Example: antidepressants, serotonergic class (801XY22-24) includes Millennium's tests for citalopram, duloxetine, fluoxetine, paroxetine, as well as 3 additional drugs for which Millennium is not currently billing
   - We estimate payment will be based on the weighted average of the number of times the code is billed per claim per day within the industry[1], within each of the frequency categories (1-2, 3-4, 6+)

For each code, we state our assumptions and rationale for our estimated payment amounts. For some crosswalks, we make additional clarifying assumptions which are noted as well.

[1] Industry refers to the Medicare fee-for-service population.



Avalere | 18

ML_DE_00689885

Confidential

# Medicare Frequency of CPT Codes Per Claim Per Day

**Percent of Time CPT Code is Billed Per Claim Per Day, Medicare FFS**

| CPT | Description | 1x | 2x | 3x | 4x | 5x | 6x | 7x | 8x | 9x | 10x | >10x |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 82542 | Column chromatography | 41.1% | 20.3% | 12.4% | 12.1% | 4.3% | 5.3% | 1.0% | 0.4% | 0.9% | 0.2% | 2.0% |
| 82101 | Assay of urine alkaloids | 99.6 | 0.2 | | | | 0.2 | | | | | |
| 82145 | Assay of amphetamines | 83.0 | 15.7 | 1.1 | 0.1 | 0.1 | | | | | | |
| 80152 | Assay of amitriptyline | 99.9 | 0.1 | | | | | | | | | |
| 80160 | Assay of desipramine | 100.0 | | | | | | | | | | |
| 80174 | Assay of imipramine | 100.0 | | | | | | | | | | |
| 80182 | Assay of nortriptyline | 100.0 | | | | | | | | | | |
| 80173 | Assay of haloperidol | 100.0 | | | | | | | | | | |
| 80184 | Assay of phenobarbital | 99.6 | 0.4 | | | | | | | | | |
| 82205 | Assay of barbiturates | 72.5 | 27.3 | 0.1 | 0.1 | | | | | | | |
| 80154 | Assay of benzodiazepines | 87.7 | 11.0 | 0.3 | 0.1 | 0.1 | 0.5 | | 0.1 | 0.1 | | 0.1 |
| 83925 | Assay of opiates | 27.6 | 16.7 | 17.2 | 21.9 | 6.2 | 6.1 | 3.0 | 0.9 | 0.2 | 0.1 | 0.1 |
| 82520 | Assay of cocaine | 97.9 | 2.0 | | | | | | | | | |
| 83840 | Assay of methadone | 76.2 | 23.8 | | | | | | | | | |
| 82646 | Assay of dihydrocodeinone | 100.0 | 0.0 | | | | | | | | | |
| 82649 | Assay of dihydromorphinone | 99.9 | 0.1 | | | | | | | | | |
| 83992 | Assay for phencyclidine | 99.8 | 0.2 | | | | | | | | | |
| 83805 | Assay of meprobamate | 98.6 | 1.4 | | 0.1 | | | | | | | |
| 82055 | Assay of ethanol | 97.5 | 2.4 | 0.1 | | | | | | | | |
| G0431 | Drug screen multiple class | 96.4 | 0.7 | 0.1 | 0.2 | 0.6 | 0.3 | 0.4 | 0.5 | 0.2 | 0.4 | 0.3 |
| 83516 | Immunoassay nonantibody | 63.3 | 22.1 | 6.5 | 6.3 | 0.4 | 0.3 | 0.1 | 0.5 | 0.2 | | 0.2 |

Note: blank cells indicate no testing occurred at the given frequency, or that the frequency was less than 0.1%.
Values in rows may not add to 100% due to rounding.
Source: Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

Avalere | 19

ML_DE_00689886

Confidential

# Assumptions and Limitations

Avalere made a number of assumptions as part of this payment estimation exercise, and recognizes there are limitations to the approach:

- This analysis assumes that CMS will crosswalk payment rates for the new drug testing codes from existing CPT codes; CMS could instead opt to gap-fill these codes, in which case payment rates would be determined by each Medicare Administrative Contractors (MAC)

- In many instances, we assumed that Millennium is representative of the entire industry in its billing patterns; furthermore, we incorporated only those codes used by Millennium into our pricing estimates
    - If other labs are billing for similar tests using different codes, the discrepancy could skew the results of the analysis;  for example, other labs may be using mass spectrometry instead of chromatography, whereas we excluded the mass spectrometry codes from our analysis
    - In addition, we assume that Millennium's testing practices within a specific drug class are representative of the rest of the industry (e.g. 801XY41 encompasses 15+ synthetic stimulants and we assume that laboratories are only testing for one synthetic stimulant)

- Presumptive drug testing codes and drugs for which Millennium is not currently testing were excluded from this analysis

- This analysis ignores any potential payment changes due to the Clinical Lab Fee Schedule (CLFS) revaluation

- CMS could decide to survey the industry to collect data which, in turn, could result in different payment rates

- Estimated changes in Medicare rates cannot be applied to total Millennium test volume, as Millennium's Medicare mix may differ from its total mix

ML_DE_00689887



Avalere | 20

Confidential

# Limitations – Estimates Using Method-based Codes

- A major limitation to our approach is that method-based codes (specifically, 82542 – column chromatography) are used to bill for a wide variety of tests

- We are unable to determine from the Medicare claims data which specific drugs are tested when a lab bills 82542 (column chromatography)

  - As a result, the industry frequencies related to these codes, and used in our analysis, likely overstate the actual frequency of each individual test

  - CMS would face a similar limitation when crosswalking these codes, as they would look at the same claims data when considering new payment rates

- This limitation may affect our pricing estimates for the following classes of drugs, which represent 8% of Millennium's current total testing volume[1]

  - Antidepressants, Serotonergic Class (801XY22-24)

  - Antidepressants, Not Otherwise Specified (801XY27A)

  - Cannabinoids, Synthetic (801XY38-40)

  - Opioids and Opiate Analogs (801XY15-17)

  - Skeletal Muscle Relaxants (801XY14-14A)

[1] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 21

ML_DE_00689888

# Summary of Projected Medicare Payment Changes

Confidential

| Drug Class | % of Millennium Total Volume[1] | Est. % Change in Millennium's Medicare Payment[2] | Key Driver / Assumption[3] |
|---|---|---|---|
| Barbiturates | 8.9% | -24% | Millennium tests *more* frequently than Medicare FFS |
| Skeletal muscle relaxants | 4.5% | -6 to -30% | Millennium tests *more* frequently than Medicare FFS |
| Amphetamines | 3.7% | 12% | Millennium tests *less* frequently than Medicare FFS |
| Benzodiazepines | 3.7% | 18% | Millennium tests *less* frequently than Medicare FFS |
| Cocaine | 3.7% | 2% | Millennium tests *less* frequently than Medicare FFS |
| Methadone | 3.7% | 24% | Millennium tests *less* frequently than Medicare FFS |
| Alcohol Biomarkers | 2.3% | 33% | Millennium tests *less* frequently than Medicare FFS |
| Cannabinoids, synthetic | 2.0% | 33% | Millennium tests *less* frequently than Medicare FFS |
| Methylenedioxyamphetamines | <0.1% | 19% | Millennium tests *less* frequently than Medicare FFS |
| Opioids and opiate analogs | 1.4% | 12 to 25% | Millennium tests less frequently than Medicare FFS within each new frequency band (e.g., 1-2, 3-5, 6+) |
| Antidepressants, serotonergic class | 0.5% | 7% | Millennium tests less frequently than Medicare FFS within each new frequency band (e.g., 1-2, 3-5, 6+) |
| Antipsychotics | <0.1% | 26% | Millennium tests less frequently than Medicare FFS within each new frequency band (e.g., 1-2, 3-5, 6+) |

FFS = Fee For Service

[1] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

[2] These changes exclude the potential impact of the CLFS revaluation.

[3] Please refer to individual slides in this report for complete details related to assumptions and methodology.

ML_DE_00689889

 Avalere | 22

# Simple Drug Crosswalks with No Est. Change in Payment

| Drug / Class | Old Code | Ordered Test Ratio[1] | Old Description | New Code | Current NLA | Est. New Payment | Diff from NLA |
|---|---|---|---|---|---|---|---|
| Phencyclidine | 83992 | 56.4% | Assay for phencyclidine | 801XY21 | $20.05 | $20.05 | 0.0% |
| Buprenorphine | 83925 | 64.9 | Assay of opiates | 801XY12 | 26.54 | 26.54 | 0.0 |
| Fentanyls | 83925 | 62.7 | Assay of opiates | 801XY13 | 26.54 | 26.54 | 0.0 |
| Heroin metabolite | 83925 | 69.5 | Assay of opiates | 801XY9 | 26.54 | 26.54 | 0.0 |
| Oxycodone | 83925 | 91.3 | Assay of opiates | 801XY8 | 26.54 | 26.54 | 0.0 |
| Propoxyphene | 83925 | 9.3 | Assay of opiates | 801XY7A | 26.54 | 26.54 | 0.0 |
| Tapentadol | 83925 | 27.9 | Assay of opiates | 801XY42 | 26.54 | 26.54 | 0.0 |
| Alkaloids, not specified | 82101 | 6.3 | Assay of urine alkaloids | 801XY44 | 40.95 | 40.95 | 0.0 |
| Cannabinoids, natural | 82542 | 79.3 | Column chromatography | 801XY37 | 24.63 | 24.63 | 0.0 |
| Ketamine / Norketamine | 82542 | 14.3 | Column chromatography | 801XY9A | 24.63 | 24.63 | 0.0 |
| Methylphenidate | 82542 | 26.1 | Column chromatography | 801XY17C | 24.63 | 24.63 | 0.0 |
| Pregabalin | 82542 | 9.4 | Column chromatography | 801XY13A | 24.63 | 24.63 | 0.0 |
| Stimulants, synthetic | 82542 | 36.6 | Column chromatography | 801XY41 | 24.63 | 24.63 | 0.0 |
| Tramadol | 82542 | 46.7 | Column chromatography | 801XY48 | 24.63 | 24.63 | 0.0 |
| Gabapentin, non-blood | 82542 | 14.8 | Column chromatography | 801XY13B | 24.63 | 24.63 | 0.0 |
| Sedative Hypnotics | 82542 | 22.9 | Column chromatography | 801XY7B | 24.63 | 24.63 | 0.0 |

**Rationale:**

The new classes under this section each encompass testing for a single drug. As a result, Avalere assumes payment for the new code will be equal to that of one unit of the old code. For example, previously a single test for Phencyclidine would have been billed once using 83992. We assume that the new code for Phencyclidine, 801XY21, will be paid at the same rate as 83992.

NLA = National Limitation Amount
[1] Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"



Avalere | 23

Confidential

Case 17-51840-LSS    Doc 341-4    Filed 02/10/23    Page 495 of 847

ML_DE_00689890

# Simple Drug Crosswalks with Changes in Est. Payment

| Drug / Class | Old Code | Old Description | New Code | Current NLA | Medicare Avg. Units/Claim[1] | Est. New Payment | Diff from NLA |
|---|---|---|---|---|---|---|---|
| Methylenedioxy-amphetamines | 82145 | Assay of amphetamines | 801XY17B | $21.20 | 1.186 | $25.14 | +18.6% |
| Cocaine | 82520 | Assay of cocaine | 801XY43 | $20.68 | 1.021 | $21.12 | +2.1% |
| Methadone | 83840 | Assay of methadone | 801XY10 | $22.28 | 1.239 | $27.61 | +23.9% |

**Rationale:**

The new classes under this section each encompass tests for *multiple* drugs within a class. Labs may have billed the old codes more than once per day to account for multiple tests performed on the same patient/day. Because these multiple tests are now being mapped to a single code, we used the average Medicare frequency to estimate the new payment rate.

For example, previously a lab may have tested for MDMA and MDA, and subsequently billed 82145 x 2 (assay of amphetamines). Under the new coding scheme, a lab would bill the new code, 801XY17B, once for these two tests. We estimate the new payment rate would reflect the frequency with which the industry was billing for the tests that fall under the new code.

Note: Current Millennium Ordered Test Ratios: Cocaine (89%), Amphetamines (88.6%), Methadone (88.2%) – does not include oral fluid quantification ordered test ratios. Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

Confidential

ML_DE_00689891



Avalere | 24

# Alcohol Biomarkers (801XY2-3)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82542 | Column chromatography | Ethyl Glucuronide | $24.63 | 2.747 | NA |

**Rationale:**

Millennium currently bills for ethyl glucuronide tests under 82542. For each category of frequency under the new code (1-2, 3+), we used the weighted average payment rate for that frequency as the basis for payment.

| Drug Class | New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|---|
| Ethyl Glucuronide | 801XY2 | 1-2 | 1.330 | $32.77 | 1 | 100% | $24.63 | +33% |
| | | | | | 2 | NA | NA | NA |
| | 801XY3 | 3+ | 4.997 | $123.08 | 3+ | NA | NA | NA |

Note: The industry average units per claim for 82542 is higher than Millennium's frequency (which is once per day per claim). Therefore, the new payment amount could represent an increase relative to Millennium's current billing.
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
Current Millennium Ordered Test Ratio: Ethyl Glucuronide (55.8%) ; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"



Avalere | 25

Confidential

ML_DE_00689892

Confidential

# Amphetamines (801XY18-20)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82145 | Assay of Amphetamines | Amphetamine / methamphetamine | $21.20 | 1.186 | 2 |
| 82542 | Column chromatography | Phentermine | $24.63 | 2.747 | NA |

**Rationale:**

We assume that Millennium is representative of the industry, in that Phentermine (82542) is seldom tested[2]. Therefore, we excluded 82542 from our payment calculations and used only 82145 in calculating payment rates. We used average Medicare units per claim for 82145 within each frequency (1-2, 3-4, 5+) as the basis for our payment estimations.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY18 | 1-2 | 1.159 | $24.58 | 1 | 97% | $21.20 | 15.9% |
|  |  |  |  | 2 | 3% | $45.83 | -46.4% |
| 801XY19 | 3-4 | 3.057 | $64.81 | 3 | NA | NA | NA |
|  |  |  |  | 4 | NA | NA | NA |
| 801XY20 | 5+ | 5.860 | $124.22 | 5 | NA | NA | NA |

[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[2] Millennium data show Phentermine has an ordered test ratio of 0.3%, compared to Amphetamines which has an ordered test ratio of 88.6%. Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 26

ML_DE_00689893

Confidential

# Antidepressants, Serotonergic Class (801XY22-24)

| Old Codes | Description | Millennium Drugs Tested | Current NLA | Average Medicare Units Per Claim[2] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82542[1] | Column chromatography | Duloxetine (Cymbalta) Fluoxetine (Prozac) Paroxetine (Paxol) Citalopram (Celexa) | $24.63 | 2.747 | NA |

**Rationale:**

The new code series for Antidepressants, serotonergic class is based upon the frequency with which it is billed. Avalere used Medicare claims data to determine the average units per claim for 82542 when 1-2, 3-5, and 6+ units are billed per claim. The resulting payment rate is a weighted average of these figures.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency[3] | Current Payment[3] | Est. % Change from Current Practice[3] |
|---|---|---|---|---|---|---|---|
| 801XY22 | 1-2 | 1.330 | $32.77 | 1 | 56% | $24.63 | 33.0% |
| | | | | 2 | 9% | $49.26 | -33.5% |
| 801XY23 | 3-5 | 3.718 | $86.03 | 3 | 20% | $73.89 | 16.4% |
| | | | | 4 | 15% | $98.52 | -14.5% |
| | | | | 5 | NA | NA | NA |
| 801XY24 | 6+ | 8.721 | $187.01 | 6 | NA | NA | NA |

[1] 82542.– Column chromatography is a method code that is not specific to drug testing. Therefore, the industry frequency of units per claim (2.747) may not be representative of the drug testing space.
[2] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[3] Millennium current bills 82542 once each for 3 drugs within this class (Duloxetine, Fluoxetine, Paroxetine, and Citalopram, with ordered test ratios of 5.5%, 3.8%, 3.3%, and 0.2% respectively). Millennium also bills 82542 for cyclobenzaprine, however this drug will be billed as a skeletal muscle relaxant under the new AMA code mappings. Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx".

Avalere | 27

ML_DE_00689894

Confidential

# Antidepressants, Tricyclic and Other Cyclicals (801XY25-27)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 80152 | Assay of amitriptyline | Amitriptyline | $24.42 | 1.003 | 2 | $24.48 |
| 80160 | Assay of desipramine | Desipramine | $23.48 | 1.000 | 2 | $23.48 |
| 80174 | Assay of imipramine | Imipramine | $23.48 | 1.000 | 2 | $23.48 |
| 80182 | Assay of nortriptyline | Nortripyline | $18.49 | 1.000 | 2 | $18.50 |

**Rationale:**

Millennium's testing data suggests that all 4 of these drugs are tested concurrently; we make the same assumption for the industry. Note that the new code incorporates up to 11 different types of tricyclic antidepressants. To estimate payment for the new codes, we took the average of the four NLAs for the drugs above ($22.47) and multiplied it by the median of each frequency category (e.g., 1.5 for 1-2, 4 for 3-5, and 8.5 for 6+, given there are 11 possible drugs for which to test under this class). We were unable to use the average Medicare units/claim for each frequency to calculate payment because we do not know how often the industry bills these four codes together.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency[2] | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY25 | 1-2 | NA | $33.70 | 1 | NA | NA | NA |
| | | | | 2 | NA | NA | NA |
| 801XY26 | 3-5 | NA | $89.87 | 3 | NA | NA | NA |
| | | | | 4 | 100% | $89.87 | 0% |
| | | | | 5 | NA | NA | NA |
| 801XY27 | 6+ | NA | $190.97 | 6 | NA | NA | NA |

Notes: Current Millennium Ordered Test Ratios: Desipramine (49%), Nortriptyline (49%), Imipramine (49%), Amitriptyline (49%).
Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx".
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[2] Cannot calculate a combined average Medicare units per claim statistic for the four codes given overlap between the codes.

Avalere | 28

ML_DE_00689895

# Antidepressants, Not Otherwise Specified (801XY27A)

| Old Codes | Description | Millennium Drugs Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82542 | Column chromatography | Bupropion | $24.63 | 2.747 | NA |
| 82542 | Column chromatography | Venlafaxine | $24.63 | 2.747 | NA |

**Rationale:**

There are 9 possible antidepressants that fall under this drug class. Millennium currently tests for 2 of the 9 possible drugs, and we assume that other labs may be testing for additional antidepressants.

If we used the industry frequency from 82542 to estimate the payment rate for the code for this class (801XY27A), it would result in a new payment rate of $67.66. We feel that this estimate is high, and that the industry frequency for antidepressants is likely lower than that of the 82542 code.

As a result, we assume Millennium is representative of the industry, and use Millennium's average frequency, 1.243, to derive a new payment rate of $30.60.

| New Code | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|
| 801XY27A | $30.60 | 1 | 76% | $24.63 | 24.2% |
|  |  | 2 | 24% | $49.26 | -37.9% |

[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
Notes: Current Millennium Ordered Test Ratios: Venlafaxine (3.3%), Bupropion (0.2%)., Source "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"



Avalere | 29

Confidential

ML_DE_00689896

Confidential

# Antipsychotics (801XY31-33)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 82542 | Column chromatography | Aripiprazole | $24.63 | 2.75 | NA | $67.66 |
| 82542 | Column chromatography | Clozapine | $24.63 | 2.75 | NA | $67.66 |
| 80173 | Assay of haloperidol | Haloperidol | $19.87 | 1.00 | 2 | $19.87 |
| 82542 | Column chromatography | Olanzapine | $24.63 | 2.75 | NA | $67.66 |
| 82542 | Column chromatography | Quetiapine | $24.63 | 2.75 | NA | $67.66 |
| 82542 | Column chromatography | Risperidone | $24.63 | 2.75 | NA | $67.66 |

**Rationale:**

Most drugs under the antipsychotics class are billed today under 82542. The exception, haloperidol, is billed under 80173. The Medicare volume for the haloperidol test is low – fewer than ~2,000 units annually – and thus we ignored its payment rate in estimating the payment rate for the new code. For each category of frequency under the new code (1-2, 3-5, 6+), we used the weighted average payment rate for that frequency as the basis for payment.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment[2] | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY31 | 1-2 | 1.330 | $32.77 | 1 | 45% | $23.84 | 37.5% |
|  |  |  |  | 2 | 12% | $47.67 | -31.3% |
| 801XY32 | 3-5 | 3.718 | $91.58 | 3 | 7% | $71.51 | 28.1% |
|  |  |  |  | 4 | 7% | $95.35 | -4.0% |
|  |  |  |  | 5 | 7% | $119.18 | -23.2% |
| 801XY33 | 6+ | 8.721 | $214.80 | 6 | 23% | $143.02 | 50.2% |

Notes: Current Millennium Ordered Test Ratios: Quetiapine (0.2%), Olanzapine (0.2%), Risperidone (0.2%), Apriprazole (0.2%), Haloperidol (0.2%), Clozapine (0.1%); Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[2] Current payment is based on the weighted average of tests performed by Millennium; calculated based on data provided by Millennium

Avalere | 30

ML_DE_00689897

# Barbiturates (801XY4)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 80184 | Assay of phenobarbital | Phenobarbital | $15.62 | 1,004 | 2 | $15.68 |
| 82205 | Assay of barbiturates | Secobarbital | $15.62 | 1,279 | 2 | $19.97 |
| 82205 | Assay of barbiturates | Butalbital | $15.62 | 1,279 | 2 | $19.97 |

**Rationale:**
Millennium currently bills 82205 x 2 to code for secobarbital and butalbital and 80184 x 1 to test for phenobarbital. Avalere assumes that the industry practice is to not always test for both secobarbital and butalbital simultaneously. Therefore, we estimate the new payment for 801XY4 will be based on the sum of the average Medicare payment per claim for 80184 and 82205.

| New Code | Est. New Payment | | Current Payment[1] | Est. % Change from Current Practice |
|---|---|---|---|---|
| 801XY4 | $35.65 | Phenobarbital | $15.62 | -23.9% |
| | | Secobarbital | $15.62 — $46.86 | |
| | | Butalbital | $15.62 | |

Note: The industry average units per claim for 82205 is lower than Millennium's frequency; therefore, the payment rate for the new code may represent a decline in reimbursement for Barbiturate testing for Millennium.
[1] Current Millennium Ordered Test Ratios: Phenobarbital (71.2%), Butalbital (71.1%), Secobarbital (71.0%). Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"



Avalere | 31

Confidential

ML_DE_00689898

# Benzodiazepines (801XY5-6)

Confidential

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 80154 | Assay of benzodiazepines | Alprazolam, clonazepam, lorazepam, nordazepam, temazepam, oxazepam | $25.23 | 1.181 | 2 | $29.79 |

**Rationale:**

Millennium currently tests for 6 analytes (alprazolam, clonazepam,  lorazepam, nordazepam, temazepam, oxazepam) and bills for these once under a single code, 80154.  The Medicare average frequency for 80154 is 1.176 billed units per claim, which we use as our assumption for estimating the new payment rate for 801XY5 (the 1-2 frequency code).  The estimated payment rate for 801XY6 is $498.29, and is also based on the Medicare average frequency for 12+ billed units per claim.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY5 | 1-12 | 1.176 | $29.66 | 1-12 | 100% | $25.23 | +17.6% |
| 801XY6 | 12+ | 19.750 | $498.29 | 12+ | NA | NA | NA |

Note: Current Millennium Ordered Test Ratio: Benzodiazepine (88.9%) – does not include oral fluid quantification ordered test ratio;
Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

Avalere | 32

ML_DE_00689899

Confidential

# Cannabinoids, Synthetic (801XY38-40)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) |
|---|---|---|---|---|---|
| 82542 | Column chromatography | Cannabinoids, synthetic | $24.63 | 2.747 | NA |

**Rationale:**
Millennium currently bills for synthetic cannabinoid tests under 82542. For each category of frequency under the new code (1-2, 3-5, 6+), we used the weighted average payment rate for that frequency as the basis for payment.

| Drug Class | New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|---|
| Cannabinoids, synthetic | 801XY38 | 1-2 | 1.330 | $32.77 | 1 | 100% | $24.63 | +33% |
| | | | | | 2 | NA | NA | NA |
| Cannabinoids, synthetic | 801XY39 | 3-5 | 3.718 | $91.58 | 3 | NA | NA | NA |
| | | | | | 4 | NA | NA | NA |
| | | | | | 5 | NA | NA | NA |
| Cannabinoids, synthetic | 801XY40 | 6+ | 8.721 | $214.80 | 6 | NA | NA | NA |

Note: The industry average units per claim for 82542 is higher than Millennium's frequency (which is once per day per claim). Therefore, the new payment amount could represent an increase relative to Millennium's current billing.

[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data

Current Millennium Ordered Test Ratio: Synthetic Cannabinoids (47.3%); Source "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 33

ML_DE_00689900

# Opiates (801XY7)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 83925 | Assay of opiates | Codeine / Morphine | 26.54 | 3.004 | 4 | $79.74 |
| 82646 | Assay of dihydrocodeinone | Hydrocodone | 28.17 | 1.001 | 1 | $28.19 |
| 82649 | Assay of dihydromorphinone | Hydromorphone | 35.07 | 1.001 | 1 | $35.12 |

**Rationale:**

Millennium currently tests for codeine/morphine, hydrocodone, and hydromorphone together, but bills each separately under 83925, 82646, and 82649 respectively. We assume the industry bills using a similar pattern. Therefore we estimate the new payment rate will be the sum of the single payment rate for 83925, 82646, and 82649.

| New Code | Est. New Payment | Current Payment[2] | | Est. % Change from Current Practice |
|---|---|---|---|---|
| 801XY7 | $89.78 | Codeine / Morphine | $26.54 | 0.0% |
| | | Hydrocodone | $28.17  — $89.78 | |
| | | Hydromorphone | $35.07 | |

Note: Current Millennium Ordered Test Ratios: Codeine/Morphine (92.2%), Hydrocodone (91.3%), Hydromorphone (91.3%) – does not include oral fluid quantification ordered test ratios, Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.
[2] Current payment refers to the total payment received when testing for codeine/morphine, hydrocodone, and hydromorphone together, and billing each separately under 83925, 82646, and 82649.

Confidential

ML_DE_00689901



Avalere | 34

Confidential

ML_DE_00689902

# Opioids and Opiate Analogs (801XY15-17)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 82542 | Column chromatography | Dextromethorphan | $24.63 | 2.747 | NA | $67.66 |
| 82542 | Column chromatography | Naltrexone | $24.63 | 2.747 | NA | $67.66 |
| 83925 | Assay of opiates | Meperidine | $26.54 | 3.004 | 4 | $79.74 |

**Rationale:**

Millennium currently bills for three opiates, dextromethorphan, naltrexone, and meperidine, and bills 82542 x2 and 83925 per claim, respectively. Payment rates and Medicare frequencies for these two codes are similar, but slightly different. For the new opioids and opiate analogs codes, we calculated a range of payment rates based on the industry frequencies.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment Range | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY15 | 1-2 | 1.330 (for 82542) | $32.77 to $36.54 | 1 | 82% | $25.27 | 30% to 45% |
|  |  | 1.377 (for 83925) |  | 2 | 15% | $50.53 | -35% to -28% |
| 801XY16 | 3-5 | 3.718 (for 82542) | $86.03 to $94.47 | 3 | 3% | $75.80 | 13% to 25% |
|  |  | 3.758 (for 83925) |  | 4 | NA | NA | NA |
|  |  |  |  | 5 | NA | NA | NA |
| 801XY17 | 6+ | 8.721 (for 82542) | $159.70 to $187.01 | 6 | NA | NA | NA |
|  |  | 6.627 (for 83925) |  |  |  |  |  |

Note: Current Millennium Ordered Test Ratios: Meperidine (24%), Naltrexone (7.3%), Dextromethorphan (2.2%) – does not include oral fluid quantification ordered test ratios; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.



Avalere | 35

Confidential

# Skeletal Muscle Relaxants (801XY14-14A)

| Old Codes | Description | Millennium Drug Tested | Current NLA | Average Medicare Units Per Claim[1] | MUEs (if applicable) | Average Medicare Payment Per Claim |
|---|---|---|---|---|---|---|
| 82542 | Column chromatography | Cyclobenzaprine | $24.63 | 2.747 | NA | $67.66 |
| 83805 | Assay of meprobamate | Carisoprodol | $24.04 | 1.02 | 2 | $24.41 |

**Rationale:**

Millennium currently tests for two skeletal muscle relaxants, cyclobenzprine and carisoprodol. The new codes, 801XY14 and 801XY14A, include 7 different analytes, and will be used to bill for 1-2 or 3+ tests at a time. For these codes, we estimate a range of new payment rates based on the Medicare frequencies of 1-2 and 3+ for the two existing codes, 82542 and 83805. Note that the Medicare frequencies for 3+ include providers that bill for more than 7 tests on a single day. Thus, these payment rate estimates may overstate payments for the new 3+ code, 801XY14A.

| New Code | Frequency | Avg. Medicare Units/Claim for Frequency | Est. New Payment | Frequency | Millennium Frequency | Current Payment | Est. % Change from Current Practice |
|---|---|---|---|---|---|---|---|
| 801XY14 | 1-2 | 1.330 (for 82542) | $24.37 to $32.77 | 1 | 57% | $24.31 | 0% to 35% |
| | | 1.014 (for 83805) | | 2 | 43% | $48.67 | -50% to -33% |
| 801XY14A | 3+ | 4.997 (for 82542) | $96.16 to $123.06 | 3 | NA | NA | NA |
| | | 4.000 (for 83805) | | | | | |

Note: Current Millennium Ordered Test Ratios: Carisoprodol (57.8%), Cyclobenzaprine (49.3%) – does not include oral fluid quantification ordered test ratios; Source: "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[1] Avalere analysis of 2012 Medicare fee-for-service outpatient hospital and physician office claims data.

Avalere | 36

ML_DE_0068903



# Assessment of Medicare Clinical Lab Fee Schedule (CLFS) Revaluation

Avalere

Confidential

Confidential

# Executive Summary – CLFS Revaluation

- CMS plans to review all codes on the CLFS over the next 5 years, with payment changes beginning in 2015; this review will potentially impact all codes, including those that CMS may use to crosswalk to the new AMA drug testing codes

- This review will directly impact 7 of Millennium's codes that are not being replaced by new codes
  - These 7 codes comprise 14% of Millennium's UDT testing volume[1], and are likely to be reviewed within the first two years of CMS' multi-year CLFS revaluation process[2]

- Avalere examined 2007 - 2012 Medicare utilization and payment data for these 7 codes

- We also estimated the likely timing of revaluation using the criteria outlined by CMS

- CMS noted in its 2014 Medicare Physician Fee Schedule Final Rule that payments may increase or decrease after the review process, however, it expects most payment rates to decrease given that technological change tends to drive efficiencies over time

[1] Based on Millennium supplied data, previous 12 months as of November 2013
[2] Based, in part, on Avalere's assessment of the 2007 to 2012 Medicare Physician/Supplier Procedure Summary File

Avalere | 38

Case 17-51840-LSS    Doc 341-4    Filed 02/10/23    Page 510 of 847

ML_DE_00689905

Confidential

# Clinical Lab Fee Schedule (CLFS) Reevaluation Process

- In 2013, CMS established a process by which it will review payment rates for codes on the Medicare Clinical Lab Fee Schedule (CLFS) to account for changes in technology over time

- Previously, there has been no process for CMS to revalue CLFS codes; instead, codes have historically received a simple annual inflationary update

- CMS will begin reviewing codes in 2014, with the first payment changes effective beginning CY15



- CMS will review all CLFS codes, using the following criteria to prioritize its review:
    - Oldest codes
    - High volume tests
    - Codes with high total expenditures
    - Codes that have experienced rapid spending growth

- CMS will accept public nomination for codes to be reviewed in subsequent years

- Clinically and/or technologically similar codes to those under review may also be reviewed concurrently

- CMS will review all data from any source (private insurers, federal insurers, and CMS contractors) to determine appropriate reimbursement rates for CLFS services being reviewed

Source: 2014 Medicare Revisions to the Clinical Lab Fee Schedule, CY14. Link.

 | 39

Case 17-51840-LSS    Doc 341-4    Filed 02/10/23    Page 511 of 847

ML_DE_0068906

| Code | Percent of Millennium's Volume[1] | Description | Likely Year Reevaluated | Affecting Payment In |
|------|------|------|------|------|
| 83925 | 19.3% | Assay of opiates | Scheduled for Redefinition | |
| 82542[2] | 18.1% | Column chromatography quant | 2014 | 2015 |
| 82205 | 5.9% | Assay of barbiturates | Scheduled for Redefinition | |
| 82646 | 4.0% | Assay of dihydrocodeinone | Scheduled for Redefinition | |
| 82649 | 4.0% | Assay of dihydromorphinone | Scheduled for Redefinition | |
| 82520 | 3.9% | Assay of cocaine | Scheduled for Redefinition | |
| 80154 | 3.9% | Assay of benzodiazepines | Scheduled for Redefinition | |
| 82145 | 3.9% | Assay of amphetamines | Scheduled for Redefinition | |
| 83840 | 3.9% | Assay of methadone | Scheduled for Redefinition | |
| 81003 | 3.6% | Urinalysis auto w/o scope | 2014 | 2015 |
| 82570 | 3.6% | Assay of urine creatinine | 2014 | 2015 |
| 83986 | 3.6% | Assay ph body fluid nos | 2014 | 2015 |
| 84311 | 3.6% | Spectrophotometry | 2014 | 2015 |
| 80184 | 3.0% | Assay of phenobarbital | Scheduled for Redefinition | |
| 82101 | 2.6% | Assay of urine alkaloids | Scheduled for Redefinition | |
| 83805[2] | 2.5% | Assay of meprobamate | 2014 | 2015 |
| 83992[2] | 2.5% | Assay for phencyclidine | 2014 | 2015 |

[1] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[2] These codes are not scheduled for deletion, but Millennium will not bill to them as of next year

Avalere | 40

Confidential

Case 17-51840-LSS    Doc 341-4    Filed 02/10/23    Page 512 of 847

ML_DE_00689907

Confidential

# Select Codes are Likely to be Re-evaluated this Year

| Code | Percent of Millennium's Volume[1] | Description | Likely Year Reevaluated | Affecting Payment In |
|---|---|---|---|---|
| 80160 | 2.0% | Assay of desipramine | Scheduled for Redefinition | |
| 80174 | 2.0% | Assay of imipramine | Scheduled for Redefinition | |
| 80182 | 2.0% | Assay of nortriptyline | Scheduled for Redefinition | |
| 80152 | 2.0% | Assay of amitriptyline | Scheduled for Redefinition | |
| 83789 | 1.4% | Mass spectrometry quant | Millennium discontinued use as of 9/2013 | |
| 82055 | <0.1% | Assay of ethanol | Scheduled for Redefinition | |
| 83516[2] | <0.1% | Immunoassay nonantibody | 2014 | 2015 |
| 80101 | <0.1% | Drug screen, single | Scheduled for Redefinition | |
| 80102 | <0.1% | Drug confirmation | Scheduled for Redefinition | |
| G0431 | <0.1% | Drug screen multiple class | Scheduled for Redefinition | |
| 83497 | <0.1% | Assay of 5-hiaa | 2015 | 2016 |
| 82384 | <0.1% | Assay three catecholamines | 2015 | 2016 |
| 99001 | <0.1% | Specimen handling pt-lab | Not on CLFS | |
| 80173[2] | <0.1% | Assay of haloperidol | 2016 | 2017 |
| 82544 | <0.1% | Column chromotograph/isotope | 2014 | 2015 |
| 80299 | <0.1% | Quantitative assay drug | Millennium discontinued use as of 9/2013 | |

[1] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"
[2] These codes are not scheduled for deletion, but Millennium will not bill to them as of next year

Avalere | 41

Case 17-51840-LSS   Doc 341-4   Filed 02/10/23   Page 513 of 847

ML_DE_00689908

Confidential

# Likely Timing of Re-evaluation for Millennium's CPT Codes

| Code | Short Descriptor | Created | | Growth 07-12[1] | Total 2012[1] | Rank 2012[1] | Percentile[1] | Percent of Millennium Volume[2] | Likely Timing of Any Payment Changes |
|------|------------------|---------|---------|------|------|------|------|------|------|
| 81003 | Urinalysis auto w/o scope | 1993 | Spending | 49% | $30.9M | 50 | 96th | 3.6% | 2015 |
| | | | Volume | 45% | 8.9M | 13 | 99th | | |
| 82570 | Assay of urine creatinine | 1994 | Spending | 83% | $50.8M | 30 | 97th | 3.6% | 2015 |
| | | | Volume | 81% | 6.9M | 20 | 98th | | |
| 83986 | Assay ph body fluid nos | 1990 | Spending | 590% | $5.6M | 199 | 82nd | 3.6% | 2015 |
| | | | Volume | 591% | 1.2M | 100 | 91st | | |
| 84311 | Spectrophotometry | 1993 | Spending | 848% | $9.9M | 133 | 88th | 3.6% | 2015 |
| | | | Volume | 838% | 1M | 105 | 91st | | |
| 83497 | Assay of 5-hiaa | 1993 | Spending | 34% | $0.6M | 431 | 62nd | <0.1% | 2016 |
| | | | Volume | 30% | <0.1M | 434 | 61st | | |
| 82384 | Assay three catecholamines | Before 1990 | Spending | -17% | $1.2M | 337 | 70th | <0.1% | 2016 |
| | | | Volume | -19.4% | <0.1M | 425 | 62nd | | |
| 82544 | Column chromotograph/ isotope | 1999 | Spending | 95,373% | $9.9M | 134 | 88th | <0.1% | 2015 |
| | | | Volume | 98,385% | 0.4M | 171 | 85th | | |

[1] Source: 2012 Physician/Supplier Procedure Summary File; Rank refers to the code relative to the roughly 1,100 codes that existed in 2007-2012

[2] Based on Millennium data. TTM ending November 2013. "Payor group summary metrics LTM Nov-13.xlsx" and "Average orders per specimen by drug Dec-12 to Nov-13.xlsx"

Avalere | 42

Case 17-51840-LSS    Doc 341-4    Filed 02/10/23    Page 514 of 847

ML_DE_00689909



# Draft Drugs of Abuse Local Coverage Determination (LCD)

Avalere

Confidential

# Executive Summary – Draft LCD on Drugs of Abuse Testing

Confidential

- Half of the Medicare Administrative Contractors (MACs) have either instituted or are considering instituting an LCD to specifically govern coverage of testing for common drugs of abuse

- Noridian, the MAC with jurisdiction over Millennium in California, has proposed a draft LCD concerning coverage of drugs of abuse testing

  - The draft LCD is, in our opinion, likely to be finalized largely in its current form, given its similarity to the recently-finalized CGS draft LCD

  - CGS finalized its proposal in January, 2014 without significant changes compared to the draft

- The draft LCD contains several provisions that could impact coverage and reimbursement for Millennium's services

  - Most notably, the draft LCD would require all orders for quantitative drug testing for patients being treated for substance use or abuse to be preceded by a qualitative screen, and allow only for those drugs classes with a positive screen to be tested quantitatively



Avalere | 44

ML_DE_00689911

Confidential

# Most MACs Have or are Drafting LCDs that Pertain to Drugs of Abuse Testing

- Currently, there are no National Coverage Decisions (NCDs) in place for drug abuse testing
  - Coverage policies are addressed through a patchwork of LCDs handled by local MACs
  - It is possible that the genesis of the LCDs was due to the perception that certain providers are over-prescribing presumptive drug tests
- Millennium's administrator, Noridian, has issued a draft LCD on drugs of abuse testing that would limit the way in which Millennium's tests are covered and ordered; other MACs have either instituted or are currently considering similar draft LCDs
- This is in line with efforts by CMS and the MACs to establish more uniformity across LCDs
  - A recent report[1] found that there was significant variation in access to items and services for beneficiaries due to the variation in coverage policies amongst the various MACs
  - The increased focus on uniformity implies that more MACs will move in tandem with coverage policies in the future
- An individual MAC has the discretion to modify its LCD to reflect what is most appropriate for its beneficiaries
  - If significant differences in coverage exist geographically, CMS could choose to issue a National Coverage Analysis (NCA) to address the discrepancies
    - This is unlikely to happen for drug abuse testing as CMS has other competing priorities

[1] Source: Office of the Inspector General Report: OEI-01-11-00500, Link

Avalere | 45

ML_DE_0068912

Confidential

# Draft Noridian Coverage Policy Would Restrict Coverage of Millennium's Services

- Covered indications includes testing for symptomatic patients who are suspected of having ingested abused drugs, testing related to substance abuse treatment, and testing to monitor patients receiving opioid therapy for chronic pain management

- The policy applies to almost all of Millennium's currently-billed codes

- Excludes from coverage specimen validity testing and forensic / legal drug testing

- Does not cover two different specimens collected for a single patient on the same date of service

- Urges provider caution in prescribing testing that isn't tailored to an individual patient's needs and history

  - Warns that existing test panels marketed by independent clinical laboratories may result in medically unnecessary and unreasonable testing and may result in denied coverage

- Requires that testing as part of chronic opioid therapy be titrated to an individual patient's potential for abuse

  - Considers confirmatory and/or quantitative drug testing reasonable and necessary when the results of a qualitative screen are presumptive positive drug(s) on a drug screen

    - Also allows for confirmatory testing when there is a negative screen, provided that the negative finding is inconsistent with the patient's medical history or current documented chronic pain medication list

- For patients being monitored for substance abuse treatment, the policy covers confirmation testing (80102) only after a positive screening test, and covers only the drug class for which the screening was positive

  - The policy limits quantitative drug testing to 3 procedures per 30 days, unless medical necessity is documented

  - The policy states that qualitative immunoassays are usually sufficient as part of a treatment plan for substance abusers, and that quantitative confirmation testing is not usually required

MAC = Medicare Administrative Contractor
Source: Noridian proposed Local Coverage Determination. Link.

Avalere | 46

Case 17-51840-LSS   Doc 341-4   Filed 02/10/23   Page 518 of 847

ML_DE_0068991

# Noridian's Draft LCD is Unlikely to be Materially Revised in the Next 3-5 Years If Enacted

Confidential

- Noridian's final LCD will likely be substantively similar to the draft version

- The LCD is unlikely to be modified significantly within the next 3-5 years, with some possible exceptions:

    - Any perceived changes in the technologies used to test for drugs could serve as a trigger for additional review / revision

    - The LCDs could be revised at a later date to reflect the newly-defined CPT codes for drug testing

    - If CMS accepts the AMA's proposed changes to accept terminology related to "presumptive" and "definitive", the LCDs could be revised to reflect such a change

- LCDs are frequently revised; however most changes are technical and do not substantively affect coverage

    - For example, the 'Qualitative Drug Screening' LCD used by National Government Services has been revised 19 times since its inception in July, 2008

        - Most of the revisions reflect changes in the MACs jurisdiction, or changes in the short descriptors of the relevant CPT codes

- The most likely catalyst for a near-term review of Noridian's draft LCD would be a perceived technological change

    - If CMS identifies newer, diffuse technologies during the CLFS revaluation process, it could lead to a revision of the coverage policy for drug abuse testing

    - Millennium's current testing methods are already recognized and accounted for by Noridian's draft LCD

    - It is unlikely that a new technology would be introduced and proliferate in the next three to five years to such a degree that would warrant a revision to coverage by the MACs

ML_DE_0068914



Avalere | 47

# EXHIBIT 36

**From:** Carpenter, Benjamin [ICG-CIB] <bc72336@imcnam.ssmb.com>
**Sent:** Thursday, February 06, 2014 9:51 AM
**To:** Blake, Barry [ICG-CIB]; Sarin, Aradhana [ICG-CIB]
**Cc:** Boyd, Philip [ICG-CIB]; West, Emily [ICG-CIB]; Kensil, Sean [ICG-CIB]
**Subject:** Re: 2 ML items

I had done some work on that years ago, let me dust it off. We'll speak with E&Y as well.

---

**From:** Blake, Barry [ICG-CIB]
**Sent:** Thursday, February 06, 2014 08:52 AM Eastern Standard Time
**To:** Carpenter, Benjamin [ICG-CIB]; Sarin, Aradhana [ICG-CIB]
**Cc:** Boyd, Philip [ICG-CIB]; West, Emily [ICG-CIB]; Kensil, Sean [ICG-CIB]
**Subject:** RE: 2 ML items

On the S-Corp question.....might it be the case—as would be the case with a partnership I think—that, since an S-Corp is a "flow-through" entity for tax purposes, an acquisition of the S-Corp is treated for tax purposes like an asset deal.....ie, that you step up the assets to FMV and get tax deductible goodwill on an purchase price in excess of FMV of net assets?

---

**From:** Carpenter, Benjamin [ICG-CIB]
**Sent:** Thursday, February 06, 2014 12:47 AM
**To:** Sarin, Aradhana [ICG-CIB]; Blake, Barry [ICG-CIB]
**Cc:** Boyd, Philip [ICG-CIB]; West, Emily [ICG-CIB]; Kensil, Sean [ICG-CIB]
**Subject:** 2 ML items

Aradhana/Barry,

Item 1:  Brock mentioned today that there is about to be announced a Local Coverage Determination (LCD) by a Medicare Administrative Contractor (MAC) that could have a negative $25-$50m EBITDA impact on the business.

This MAC (Palmetto) does not cover ML's territory, but ML's MAC (Noridian) is likely to follow Palmetto's lead and make a similar change that would have the $25-50m impact.

Palmetto's LCD will be effective in June and is effectively a 10% cut to reimbursement rates.

There are cost saving and revenue opportunities that Brock thinks will substantially offset this negative impact. We will be walking through their projections tomorrow so will have more visibility on this.

On Friday's update call, he's interested in our thoughts on how buyers might view this:  a) somewhat of a positive, because the downside risk has been quantified and can be built into people's models, and the uncertainty of a draconian rate cut is removed (at least for the next few years); or b) a negative, because it highlights that these cuts may happen repeatedly over time.

My view is better to know this now and build it into our base case models, rather than have it come out halfway through the process and we have to downwardly revise everything.  The facts are what they are and we will have to position it as (a) above.

Item 2:  Barry, they said you mentioned a tax benefit associated with moving from an S corp to a C corp that might accrue to a buyer. Do you have any more color on that?

Happy to discuss further, will be at ML's offices tomorrow.

Ben

**Exhibit 250**

CONFIDENTIAL                                    CITI-DE-00063792

# EXHIBIT 37

Message

| | |
|---|---|
| **From**: | Matt Simmons [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MATT SIMMONS] |
| **Sent**: | 1/20/2014 6:40:01 PM |
| **To**: | Brock Hardaway [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Brock Hardaway9d9]; Howard Appel [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Howard Appelbdc13407] |
| **Subject**: | Noridian LCD |
| **Attachments**: | NoridianLCD.Drugs of Abuse Testing.pdf |

Lastly, here's the Noridian draft LCD.

As mentioned, with the exception of five new citations, it is identical to Palmetto's.

Matt Simmons
Director of Government Affairs
16981 Via Tazon
San Diego, CA 92127
Phone: 877-451-3534
Fax: 858-451-3636
msimmons@millenniumlabs.com



(Full Email Disclaimer – http://millenniumlabs.com/emaildisclaimer/)

Confidential

# Drugs of Abuse Testing

## Noridian Healthcare Solutions, LLC



Please note: **This is a Draft policy.**
Proposed/Draft LCDs are works in progress that are available on the Medicare Coverage Database site for public review. Proposed/Draft LCDs are not necessarily a reflection of the current policies or practices of the contractor.

### Contractor Information

| | | |
|---|---|---|
| **Contractor Name** | ↑ | Noridian Healthcare Solutions, LLC |
| **Contract Number** | ↑ | 01112 |
| **Contract Type** | ↑ | MAC - Part B |
| **Associated Contract Numbers** | ↑ | (MAC - Part B - 01182) Noridian Healthcare Solutions, LLC, (MAC - Part B - 01212) Noridian Healthcare Solutions, LLC, (MAC - Part B - 01312) Noridian Healthcare Solutions, LLC |

### Proposed/Draft LCD Information

1

Confidential

ML_DE_00035508

| Contractor Information | | |
|---|---|---|
| | Draft | |
| **Source LCD ID** | ↑ | N/A |
| **Proposed LCD ID** | ↑ | DL34692 |
| **Proposed LCD Version Number** | ↑ | 2 |
| **Proposed LCD Title** | ↑ | Drugs of Abuse Testing |
| **AMA CPT / ADA CDT Copyright Statement** | ↑ | CPT only copyright 2002-2013 American Medical Association. All rights reserved. CPT is a registered trademark of the American Medical Association. Applicable FARS/DFARS Apply to Government Use. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein. The Code on Dental Procedures and Nomenclature (Code) is published in Current Dental Terminology (CDT). Copyright (c) American Dental Association. All rights reserved. CDT and CDT-2010 are trademarks of the American Dental Association. |
| **CMS National Coverage Policy** | ↑ | Title XVIII of the Social Security Act, §1862(a)(1)(A). Allows coverage and payment for only those services that are considered to be reasonable and necessary. Title XVIII of the Social Security Act, §1833(e). Prohibits Medicare payment for any claim which lacks the necessary information to process the claim. 42 CFR 410.32(a). Order diagnostic tests. 42 CFR 411.15(k)(1). Particular Services excluded from coverage. CMS On-Line Manual, Publication 100-02, Medicare Benefit Policy Manual,Chapter 15, §§80.0, 80.1.1, 80.2. Clinical Laboratory services. |
| **Jurisdiction** | ↑ | |
| Coverage Guidance | | |

2

Confidential

## Contractor Information

| | | |
|---|---|---|
| **Coverage Indications, Limitations and/or Medical Necessity** |  | This policy provides an overview of distinctions between qualitative, confirmation and quantitative drugs of abuse testing, and clearly indicates that coverage is dependent on proper documentation of clinical decision-making and test orders that are tailored to the individual patient's medical needs. This policy addresses drugs of abuse testing for Medicare patients. It does not address neonatal testing for suspected prenatal drug exposure.

Drugs of Abuse testing may be useful in the clinical setting because it may provide objective information to assist the provider in diagnosing and making treatment decisions. Clinicians use qualitative and quantitative drugs of abuse testing to look for the presence (or absence) of drugs in the body. In general, drug testing can be helpful in the medical disciplines of emergency medical care for drug-drug interactions and, to some degree, drug overdose, the treatment of neonates, addiction medicine and the medical management of patients using chronic opioid therapy (COT). However, the nature of drugs of abuse testing for each of these groups is somewhat different because treatment goals and timelines generally vary.

By way of definition and as used in this document, the following terminology relates to the basic forms of drugs of abuse testing: |

| Term | General Purpose in Clinical Drugs of Abuse Testing |
|---|---|
| Qualitative Drug Testing | Generally used to determine the presence or absence of drug or drug metabolite in the sample. The test result is expressed in non-numerical terms, with a negative or positive result. |
| Quantitative Drug Testing | Generally used when it is medically necessary to determine the specific quantity of drug or drug metabolite present in the sample. The test result is expressed in numerical terms. |
| Confirmation Testing | Generally used to evaluate initial qualitative screening results to minimize the potential of a clinician relying on a false negative or positive result. Confirmation testing is often recommended when initial screening involves a CLIA-waived or moderate immunoassay screening, but is not medically necessary in all patient cases. A confirmation test order must be medically necessary and reasonable and patient self-report may, in some cases, reduce the need for confirmation of screen results.

Confirmation tests may be expressed in qualitative (CPT 80102) or quantitative (codes within the Therapeutic or Chemistry sections of the CPT) values. |

3

Confidential

ML_DE_00035510

## Contractor Information

> The use of qualitative versus quantitative confirmation testing depends upon the individual patient's case and medical necessity therefore.

More detailed information about medical necessity for test orders, indications and exclusions is set forth below:

**Specific Test Methods**

Clinical laboratories of all types use a variety of test methods to perform qualitative drug analysis, including enzyme immunoassays (EIA and IA), thin-layer chromatography, and spectrometry. In-office and onsite testing generally involves chemical "spot" tests, including dipstick, cassettes and cup methods (generally classified as CLIA-waived), and bench-top chemistry analyzers (classified under CLIA as moderately complex). In either case, EIA and IA drug screening are limited in several ways because:

- they generally screen for drug classes rather than specific drugs;

- they cannot provide information on many specialty drugs; and

- these methods may produce false positives and cross-react with other drug analytes.

These drug screen methods are also unable to identify specific drugs within many drug classes, including the amphetamines, barbiturates, benzodiazepines, and opiate/opioids. Due to these limitations, confirmatory testing with a more specific method such as GC-MS, LC-MS/MS may be medically necessary and reasonable within the confines of the clinical criteria and coverage indications set forth below. However, confirmatory testing should ONLY be ordered and performed on a patient/drug specific basis, within the parameters outlined in this policy, and documented in the patient record.

Confirmatory tests either verify or refute the result of the screening assay. With recent improvements in technology, some laboratories may bypass screening tests and submit all specimens for analysis by

4

Confidential

| Contractor Information | |
|---|---|
| | what have traditionally been referred to as confirmatory test methods, such as gas or liquid chromatography, mass spectrometry. Confirmatory tests use a more specific, and usually more sensitive, method than do screening tests and are usually performed in an independent laboratory.<br><br>Confirmatory tests usually:<br><br>• Provide quantitative concentrations (e.g., ng/mL) of specific substances or their metabolites in the specimen;<br><br>• Have high specificity and sensitivity;<br><br>• Require a trained technician to perform the test and interpret the results;<br><br>• Can identify specific drugs within drug classes<br><br>In clinical situations, confirmation is not always necessary and should be based on provider choice to allow for the proper evaluation of medical necessity. Clinical correlation is appropriate. For example, if the patient or a family member affirms that drug use occurred, a confirmation drug test is not usually needed.<br><br>The terms "drug screening" and "drug testing" are somewhat misleading because they may be interpreted that all drugs will be identified by ordered test panels. In reality, the drug or drug metabolites detected by a test depend on the testing method and the device or test method cutoff concentrations. In the clinical care of patients, the need for testing each drug ordered must be documented and the connection between the test order and clinical decision-making following test results must be reasonable and medically necessary to the ongoing care of the patient.<br><br>**Drug Test Panels**<br><br>A drug test panel is a list (or menu) of drugs or drug classes that can be tested for in a specimen. These can be ordered to identify drugs of abuse or in pain management. No single drug panel is suitable for all clinical uses, and test options should be adapted to clinical needs |

5

Confidential

# EXHIBIT 38

Message

| | |
|---|---|
| **From:** | Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL PENCAK] |
| **Sent:** | 2/5/2014 1:03:30 AM |
| **To:** | Brock Hardaway [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Brock Hardaway9d9] |
| **CC:** | Howard Appel [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Howard Appelbdc13407]; Tim Kennedy [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Tim Kennedy3d8] |
| **Subject:** | LCD impact |
| **Attachments:** | LCD analysis 2.4.2014 V2.xlsx |

Hi Brock – as discussed, I've attached our analysis on the potential LCD impact. Please keep in mind there are a lot of moving parts and a lot of assumptions. Actually since we spoke, the impact actually changed as a result of an assumption update (initially had 87% of our specimens having POC, but based on actual data, we adjusted down to 80%). Below I've summarized the key assumptions and the approximate impact from each scenario:

**Scenario 1:** Medicare reimbursement cut of ~18.3% (~$3.2 million monthly impact) / 4.5% of reduction due to validity or 24% of total reduction

**Key assumptions:**
- Spice moves to G0431 as screen (Billing from $24 to $97)
- MDMA is billed as a separate test
- Validity is not reimbursed
- POC assumptions are applied only to specimens with POC
- For those included as Positive POC, confirmation testing is only performed when + POC result

**Scenario 2:** Medicare reimbursement cut of ~5.6% (~$1.0 million monthly impact) / 4.5% of reduction due to validity or 79% of total reduction

**Key assumptions:**
- Spice moves to G0431 as screen (Billing from $24 to $97)
- MDMA is tested separately
- Validity is not reimbursed
- POC assumptions are applied only to specimens with POC
- For those included as Positive POC, confirmation testing is only performed when + POC result
- Confirm negatives on illicits regardless of POC result

Please call me if you have any questions or concerns and I'm sure we'll have updates as we learn more about the potential impacts.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax: 858-451-3636
dpencak@millenniumlabs.com

Confidential

Document Produced In Native Format

Confidential

ML_DE_00054321

Approximate monthly volume lost to POLs                 24,867

Estimated contribution margin                    $       205.00

Potential gains at 80% volume returns:              4,078,259
Potential gains at 60% volume returns:              3,058,694
Potential gains at 40% volume returns:              2,039,129
Potential gains at 20% volume returns:              1,019,565

Assumption on % of POC:          80.0%

| CPT Description | CPT Code | Ordered Test Ratio Dec -13 | Medicare Rate at 98% | Current Billed | POC Status | Confirm Positive? | % Positive POC | Revised % tested | POC cutoff | New Billed |
|---|---|---|---|---|---|---|---|---|---|---|
| Cocaine Quantification | 82520 | 0.86 | 20.27 | 17.35 | POC | Include | 1.5% | 18.1% | 300 | 3.68 |
| Amphetamines Quantification | 82145 | 0.85 | 20.78 | 17.75 | POC | Include | 3.3% | 19.3% | 1,000 | 4.01 |
| MDMA | 82145 | 0.85 | 20.78 | | POC | Include | 3.3% | 19.3% | 1,000 | 4.01 |
| Methadone Quantification | 83840 | 0.90 | 21.83 | 19.61 | POC | Include | 4.5% | 21.2% | 300 | 4.62 |
| Cannabinnoids Quantification*** | 82542 | 0.79 | 24.14 | 19.19 | POC | Include | 10.3% | 22.5% | 50 | 5.42 |
| PHENOBARBITAL (Barbs) Quantification | 80184 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 16.5% | 300 | 2.53 |
| Secobarbital Quantification | 82205 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 16.5% | 300 | 2.53 |
| Phencyclidine Quantification | 83992 | 0.50 | 18.66 | 9.26 | POC | Include | 1.4% | 10.5% | 25 | 1.95 |
| DESIPRAMINE (TCA) Quantification | 80160 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 16.5% | 800 | 3.80 |
| IMIPRAMINE (TCA) Quantification | 80174 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 16.5% | 1,000 | 3.80 |
| NORTRIPTYLINE (TCA) Quantification | 80182 | 0.53 | 18.12 | 9.59 | POC | Include | 14.0% | 16.5% | 1,000 | 2.99 |
| AMITRIPTYLINE (TCA) Quantification | 80152 | 0.53 | 23.93 | 12.67 | POC | Include | 14.0% | 16.5% | 1,000 | 3.95 |
| Hydrocodone Quantification (Opiates) | 82646 | 0.89 | 27.61 | 24.71 | POC | Exclude | | 89.5% | | 24.71 |
| Hydromorphone Quantification (Opiates) | 82649 | 0.89 | 34.37 | 30.76 | POC | Exclude | | 89.5% | | 30.76 |
| Codeine / Morphine Quantification | 83925 | 0.90 | 26.01 | 23.29 | POC | Exclude | | 89.5% | | 23.29 |
| Oxycodone Quantification | 83925 | 0.89 | 26.01 | 23.13 | POC | Exclude | | 88.9% | | 23.13 |
| Benzodiazepine Quantification | 80154 | 0.87 | 24.73 | 21.60 | POC | Exclude | | 87.4% | | 21.60 |
| Buprenorphine Quantification | 83925 | 0.63 | 26.01 | 16.48 | POC | Exclude | | 63.3% | | 16.48 |
| | | | | | | | | | | |
| CREATININE (validity) | 82570 | 0.86 | 6.92 | 5.94 | Non-POC | | | | | 0.00 |
| SPECTROPHOTOMETRY (validity) | 84311 | 0.86 | 9.35 | 8.03 | Non-POC | | | | | 0.00 |
| PH (validity) | 83986 | 0.86 | 4.78 | 4.11 | Non-POC | | | | | 0.00 |
| URNLS DIP STICK/TABLET RGNT (validity) | 81003 | 0.86 | 3.00 | 2.57 | Non-POC | | | | | 0.00 |
| | | | | | | | | | | |
| Butalbital Quantification | 82205 | 0.77 | 15.31 | 11.73 | Move to Non-POC | | | 76.6% | 3,000 | 11.73 |
| Drug screen (per patient encounter) | G0431 | 0.02 | 97.22 | 1.71 | | | | 57.5% | | 55.91 |
| Synthetic Cannabinoids Quantification (spice)*** | 82542 | 0.56 | 24.14 | 13.46 | Move to screen (G0431) | | | 0.0% | | 0.00 |
| Cyclobenzaprine Quantification*** | 82542 | 0.53 | 24.14 | 12.77 | Move to Non-POC | | | 52.9% | 3,000 | 12.77 |
| | | | | | | | | | | |
| Tapentadol Quantification | 83925 | 0.24 | 26.01 | 6.20 | Non-POC | | | | | 6.20 |
| Tramadol Quantification | 82542 | 0.45 | 24.14 | 10.93 | Non-POC | | | | | 10.93 |
| Kratom Alkaloids | 82101 | 0.14 | 40.13 | 5.60 | Non-POC | | | | | 5.60 |
| Heroin Quantification | 83925 | 0.69 | 26.01 | 17.95 | Non-POC | | | | | 17.95 |
| Fentanyl Quantification | 83925 | 0.59 | 26.01 | 15.38 | Non-POC | | | | | 15.38 |
| Carisoprodol Quantification | 83805 | 0.56 | 23.56 | 13.29 | Non-POC | | | | | 13.29 |
| Ethyl Glucuronide Quantification*** | 82542 | 0.60 | 24.14 | 14.44 | Non-POC | | | | | 14.44 |
| MDPV / Cathinones Quantification (Bath Salts)*** | 82542 | 0.44 | 24.14 | 10.60 | Non-POC | | | | | 10.60 |
| Methylphenidate Quantification*** | 82542 | 0.31 | 24.14 | 7.45 | Non-POC | | | | | 7.45 |
| Meperidine Quantification | 83925 | 0.22 | 26.01 | 5.63 | Non-POC | | | | | 5.63 |
| Zolpidem Quantification*** | 82542 | 0.24 | 24.14 | 5.80 | Non-POC | | | | | 5.80 |
| Ketamine Quantification*** | 82542 | 0.14 | 24.14 | 3.30 | Non-POC | | | | | 3.30 |
| Gabapentin Quantification*** | 82542 | 0.14 | 24.14 | 3.33 | Non-POC | | | | | 3.33 |
| Propoxyphene Quantification | 83925 | 0.06 | 26.01 | 1.67 | Non-POC | | | | | 1.67 |
| Pregablin Quantification*** | 82542 | 0.08 | 24.14 | 1.92 | Non-POC | | | | | 1.92 |
| Naltrexone Quantification*** | 82542 | 0.07 | 24.14 | 1.72 | Non-POC | | | | | 1.72 |
| Duloxetine Quantification (Cymbalta)*** | 82542 | 0.05 | 24.14 | 1.10 | Non-POC | | | | | 1.10 |
| Fluoxetine Quantification (Prozac)*** | 82542 | 0.03 | 24.14 | 0.75 | Non-POC | | | | | 0.75 |
| Venlafaxine Quantification*** | 82542 | 0.03 | 24.14 | 0.69 | Non-POC | | | | | 0.69 |
| Paroxetine Quantification (Paxol)*** | 82542 | 0.03 | 24.14 | 0.65 | Non-POC | | | | | 0.65 |
| Alcohol Any Spec Except BRTH | 82055 | 0.20 | 14.45 | 2.89 | Non-POC | | | | | 2.89 |
| Phentermine  (Psych Panel) | 82542 | 0.02 | 24.14 | 0.51 | Non-POC | | | | | 0.51 |
| Risperidone  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.25 | Non-POC | | | | | 0.25 |
| Quetiapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.24 | Non-POC | | | | | 0.24 |
| Citalopram (Psych Panel) | 82542 | 0.01 | 24.14 | 0.28 | Non-POC | | | | | 0.28 |
| Bupropion (Psych Panel) | 82542 | 0.01 | 24.14 | 0.29 | Non-POC | | | | | 0.29 |
| Olanzapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.21 | Non-POC | | | | | 0.21 |
| Aripiprazole  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.27 | Non-POC | | | | | 0.27 |
| Haloperidol (Psych Panel) | 80173 | 0.01 | 19.47 | 0.18 | Non-POC | | | | | 0.18 |
| Clozapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.22 | Non-POC | | | | | 0.22 |
| Dextromethorphan (DXM)  (Psych Panel) | 82542 | 0.08 | 24.14 | 1.99 | Non-POC | | | | | 1.99 |
| Acetaminophen | 83516 | 0.07 | 12.41 | 0.84 | Non-POC | | | | | 0.84 |
| HYDROXYINDOLACETIC ACID 5 (OURSOURCED - AF | 83497 | 0.00 | 17.24 | 0.08 | Non-POC | | | | | 0.08 |
| CATECHOLAMINES FRACTIONATED (OUTSOURCED | 82384 | 0.00 | 33.76 | 0.16 | Non-POC | | | | | 0.16 |
| COL-CHR/MS STABLE ISOTOPE DIL MLT ANALYTES | 82544 | - | 24.14 | - | Non-POC | | | | | 0.00 |
| DRUG CONFIRMATION EA PX | 80102 | - | 17.71 | - | Non-POC | | | | | 0.00 |
| Non-POC | | 6.65 | | 136.79 | | | | | | 136.79 |
| **Total** | | **24.35** | | **490.27** | | | | | | **400.45** |

| | | |
|---|---|---|
| NRPS w/validity | 462.82 | 378.02 |
| Variance | | -18.3% |
| SVT effect | 20.64 | 0.00 |
| Variance | | -4.5% |

**Key assumptions:**
- Spice moves to G0431 as screen
- MDMA is tested separately
- Validity is not reimbursed
- POC assumptions are applied only to specimens with POC
- For those included as Positive POC, confirmation testing is only performed when + POC result

| Revenue impact: | | |
|---|---|---|
| Current: | 17,200,000 |
| Proposed: | 14,048,715 |
| Difference: | 3,151,285 |

Assumption on % of POC:  80.0%

| CPT Description | CPT Code | Ordered Test Ratio Dec -13 | Medicare Rate at 98% | Current Billed | POC Status | Confirm Positive? | % Positive POC | Revised % tested | POC cutoff | New Billed |
|---|---|---|---|---|---|---|---|---|---|---|
| Cocaine Quantification | 82520 | 0.86 | 20.27 | 17.35 | POC | Exclude | 1.5% | 85.6% | 300 | 17.35 |
| Amphetamines Quantification | 82145 | 0.85 | 20.78 | 17.75 | POC | Exclude | 3.3% | 85.4% | 1,000 | 17.75 |
| MDMA | 82145 | 0.85 | 20.78 | | POC | Exclude | 3.3% | 85.4% | 1,000 | 17.75 |
| Methadone Quantification | 83840 | 0.90 | 21.83 | 19.61 | POC | Include | 4.5% | 21.2% | 300 | 4.62 |
| Cannabinnoids Quantification*** | 82542 | 0.79 | 24.14 | 19.19 | POC | Exclude | 10.3% | 79.5% | 50 | 19.19 |
| PHENOBARBITAL (Barbs) Quantification | 80184 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 16.5% | 300 | 2.53 |
| Secobarbital Quantification | 82205 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 16.5% | 300 | 2.53 |
| Phencyclidine Quantification | 83992 | 0.50 | 18.66 | 9.26 | POC | Exclude | 1.4% | 49.6% | 25 | 9.26 |
| DESIPRAMINE (TCA) Quantification | 80160 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 16.5% | 800 | 3.80 |
| IMIPRAMINE (TCA) Quantification | 80174 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 16.5% | 1,000 | 3.80 |
| NORTRIPTYLINE (TCA) Quantification | 80182 | 0.53 | 18.12 | 9.59 | POC | Include | 14.0% | 16.5% | 1,000 | 2.99 |
| AMITRIPTYLINE (TCA) Quantification | 80152 | 0.53 | 23.93 | 12.67 | POC | Include | 14.0% | 16.5% | 1,000 | 3.95 |
| Hydrocodone Quantification (Opiates) | 82646 | 0.89 | 27.61 | 24.71 | POC | Exclude | | 89.5% | | 24.71 |
| Hydromorphone Quantification (Opiates) | 82649 | 0.89 | 34.37 | 30.76 | POC | Exclude | | 89.5% | | 30.76 |
| Codeine / Morphine Quantification | 83925 | 0.90 | 26.01 | 23.29 | POC | Exclude | | 89.5% | | 23.29 |
| Oxycodone Quantification | 83925 | 0.89 | 26.01 | 23.13 | POC | Exclude | | 88.9% | | 23.13 |
| Benzodiazepine Quantification | 80154 | 0.87 | 24.73 | 21.60 | POC | Exclude | | 87.4% | | 21.60 |
| Buprenorphine Quantification | 83925 | 0.63 | 26.01 | 16.48 | POC | Exclude | | 63.3% | | 16.48 |
| | | | | | | | | | | |
| CREATININE (validity) | 82570 | 0.86 | 6.92 | 5.94 | Non-POC | | | | | 0.00 |
| SPECTROPHOTOMETRY (validity) | 84311 | 0.86 | 9.35 | 8.03 | Non-POC | | | | | 0.00 |
| PH (validity) | 83986 | 0.86 | 4.78 | 4.11 | Non-POC | | | | | 0.00 |
| URNLS DIP STICK/TABLET RGNT (validity) | 81003 | 0.86 | 3.00 | 2.57 | Non-POC | | | | | 0.00 |
| | | | | | | | | | | |
| Butalbital Quantification | 82205 | 0.77 | 15.31 | 11.73 | Move to Non-POC | | | 76.6% | 3,000 | 11.73 |
| Drug screen (per patient encounter) | G0431 | 0.02 | 97.22 | 1.71 | | | | 57.5% | | 55.91 |
| Synthetic Cannabinoids Quantification (spice)*** | 82542 | 0.56 | 24.14 | 13.46 | Move to screen (G0431) | | | 0.0% | | 0.00 |
| Cyclobenzaprine Quantification*** | 82542 | 0.53 | 24.14 | 12.77 | Move to Non-POC | | | 52.9% | 3,000 | 12.77 |
| | | | | | | | | | | |
| Tapentadol Quantification | 83925 | 0.24 | 26.01 | 6.20 | Non-POC | | | | | 6.20 |
| Tramadol Quantification | 82542 | 0.45 | 24.14 | 10.93 | Non-POC | | | | | 10.93 |
| Kratom Alkaloids | 82101 | 0.14 | 40.13 | 5.60 | Non-POC | | | | | 5.60 |
| Heroin Quantification | 83925 | 0.69 | 26.01 | 17.95 | Non-POC | | | | | 17.95 |
| Fentanyl Quantification | 83925 | 0.59 | 26.01 | 15.38 | Non-POC | | | | | 15.38 |
| Carisoprodol Quantification | 83805 | 0.56 | 23.56 | 13.29 | Non-POC | | | | | 13.29 |
| Ethyl Glucuronide Quantification*** | 82542 | 0.60 | 24.14 | 14.44 | Non-POC | | | | | 14.44 |
| MDPV / Cathinones Quantification (Bath Salts)*** | 82542 | 0.44 | 24.14 | 10.60 | Non-POC | | | | | 10.60 |
| Methylphenidate Quantification*** | 82542 | 0.31 | 24.14 | 7.45 | Non-POC | | | | | 7.45 |
| Meperidine Quantification | 83925 | 0.22 | 26.01 | 5.63 | Non-POC | | | | | 5.63 |
| Zolpidem Quantification*** | 82542 | 0.24 | 24.14 | 5.80 | Non-POC | | | | | 5.80 |
| Ketamine Quantification*** | 82542 | 0.14 | 24.14 | 3.30 | Non-POC | | | | | 3.30 |
| Gabapentin Quantification*** | 82542 | 0.14 | 24.14 | 3.33 | Non-POC | | | | | 3.33 |
| Propoxyphene Quantification | 83925 | 0.06 | 26.01 | 1.67 | Non-POC | | | | | 1.67 |
| Pregablin Quantification*** | 82542 | 0.08 | 24.14 | 1.92 | Non-POC | | | | | 1.92 |
| Naltrexone Quantification*** | 82542 | 0.07 | 24.14 | 1.72 | Non-POC | | | | | 1.72 |
| Duloxetine Quantification (Cymbalta)*** | 82542 | 0.05 | 24.14 | 1.10 | Non-POC | | | | | 1.10 |
| Fluoxetine Quantification (Prozac)*** | 82542 | 0.03 | 24.14 | 0.75 | Non-POC | | | | | 0.75 |
| Venlafaxine Quantification*** | 82542 | 0.03 | 24.14 | 0.69 | Non-POC | | | | | 0.69 |
| Paroxetine Quantification (Paxol)*** | 82542 | 0.03 | 24.14 | 0.65 | Non-POC | | | | | 0.65 |
| Alcohol Any Spec Except BRTH | 82055 | 0.20 | 14.45 | 2.89 | Non-POC | | | | | 2.89 |
| Phentermine  (Psych Panel) | 82542 | 0.02 | 24.14 | 0.51 | Non-POC | | | | | 0.51 |
| Risperidone  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.25 | Non-POC | | | | | 0.25 |
| Quetiapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.24 | Non-POC | | | | | 0.24 |
| Citalopram (Psych Panel) | 82542 | 0.01 | 24.14 | 0.28 | Non-POC | | | | | 0.28 |
| Bupropion (Psych Panel) | 82542 | 0.01 | 24.14 | 0.29 | Non-POC | | | | | 0.29 |
| Olanzapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.21 | Non-POC | | | | | 0.21 |
| Aripiprazole  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.27 | Non-POC | | | | | 0.27 |
| Haloperidol (Psych Panel) | 80173 | 0.01 | 19.47 | 0.18 | Non-POC | | | | | 0.18 |
| Clozapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.22 | Non-POC | | | | | 0.22 |
| Dextromethorphan (DXM)  (Psych Panel) | 82542 | 0.08 | 24.14 | 1.99 | Non-POC | | | | | 1.99 |
| Acetaminophen | 83516 | 0.07 | 12.41 | 0.84 | Non-POC | | | | | 0.84 |
| HYDROXYINDOLACETIC ACID 5 (OURSOURCED - AR | 83497 | 0.00 | 17.24 | 0.08 | Non-POC | | | | | 0.08 |
| CATECHOLAMINES FRACTIONATED (OUTSOURCED | 82384 | 0.00 | 33.76 | 0.16 | Non-POC | | | | | 0.16 |
| COL-CHR/MS STABLE ISOTOPE DIL MLT ANALYTES | 82544 | - | 24.14 | - | Non-POC | | | | | 0.00 |
| DRUG CONFIRMATION EA PX | 80102 | - | 17.71 | - | Non-POC | | | | | 0.00 |
| Non-POC | | 6.65 | | 136.79 | | | | | | 136.79 |
| **Total** | | **24.35** | | **490.27** | | | | | | **462.67** |

| | | | | |
|---|---|---|---|---|
| **NRPS** | 462.82 | | | **436.76** |
| **Variance** | | | | **-5.6%** |
| **SVT effect** | 20.64 | | | **0.00** |
| **Variance** | | | | **-4.5%** |

Key assumptions:
- Spice moves to G0431 as screen
- MDMA is tested separately
- Validity is not reimbursed
- POC assumptions are applied only to specimens with POC
- For those included as Positive POC, confirmation testing is only performed when + POC result
- Confirm negatives on illicits regardless of POC result

| | Revenue impact: Current: | 17,200,000 |
|---|---|---|
| | Proposed: | 16,231,454 |
| | **Difference:** | **968,546** |

# EXHIBIT 39
# FILED UNDER SEAL

# EXHIBIT 40

Message
_____

**From:** Frank Adams [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=FRANK ADAMS782]

**Sent:** 2/3/2014 9:49:46 PM

**To:** Daniel Pencak [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Daniel Pencak]

**Subject:** Orders by drug v3.xlsx

**Attachments:** Orders by drug v3.xlsx


Updated

Frank Adams
Sr. Financial Analyst
Millennium Laboratories
16981 Via Tazon, Building 3
San Diego, CA 92127
Office: (858) 451-3535
Fax: (858) 451-3636
Frank.Adams@millenniumlabs.com

(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

ML_DE_00060308

Document Produced In Native Format

Confidential

| CPT Description | CPT Code | Ordered Test Ratio Dec -13 | Medicare Rate at 98% | Current Billed | POC Status | Confirm Positive? | % Positive POC | POC cutoff | New Billed |
|---|---|---|---|---|---|---|---|---|---|
| Cocaine Quantification | 82520 | 0.86 | 20.27 | 17.35 | POC | Include | 1.5% | 300 | 0.26 |
| Amphetamines Quantification | 82145 | 0.85 | 20.78 | 17.75 | POC | Include | 3.3% | 1,000 | 0.58 |
| Methadone Quantification | 83840 | 0.90 | 21.83 | 19.61 | POC | Include | 4.5% | 300 | 0.87 |
| Cannabinnoids Quantification*** | 82542 | 0.79 | 24.14 | 19.19 | POC | Include | 10.3% | 50 | 1.98 |
| PHENOBARBITAL (Barbs) Quantification | 80184 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 300 | 0.23 |
| Secobarbital Quantification | 82205 | 0.77 | 15.31 | 11.72 | POC | Include | 2.0% | 300 | 0.23 |
| Phencyclidine Quantification | 83992 | 0.50 | 18.66 | 9.26 | POC | Include | 1.4% | 25 | 0.13 |
| DESIPRAMINE (TCA) Quantification | 80160 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 800 | 1.70 |
| IMIPRAMINE (TCA) Quantification | 80174 | 0.53 | 23.01 | 12.18 | POC | Include | 14.0% | 1,000 | 1.70 |
| NORTRIPTYLINE (TCA) Quantification | 80182 | 0.53 | 18.12 | 9.59 | POC | Include | 14.0% | 1,000 | 1.34 |
| AMITRIPTYLINE (TCA) Quantification | 80152 | 0.53 | 23.93 | 12.67 | POC | Include | 14.0% | 1,000 | 1.77 |
| Hydrocodone Quantification (Opiates) | 82646 | 0.89 | 27.61 | 24.71 | POC | Exclude | | | 24.71 |
| Hydromorphone Quantification (Opiates) | 82649 | 0.89 | 34.37 | 30.76 | POC | Exclude | | | 30.76 |
| Codeine / Morphine Quantification | 83925 | 0.90 | 26.01 | 23.29 | POC | Exclude | | | 23.29 |
| Oxycodone Quantification | 83925 | 0.89 | 26.01 | 23.13 | POC | Exclude | | | 23.13 |
| Benzodiazepine Quantification | 80154 | 0.87 | 24.73 | 21.60 | POC | Exclude | | | 21.60 |
| Buprenorphine Quantification | 83925 | 0.63 | 26.01 | 16.48 | POC | Exclude | | | 16.48 |
| | | | | | | | | | |
| CREATININE (validity) | 82570 | 0.86 | 6.92 | 5.94 | Non-POC | | | | 0.00 |
| SPECTROPHOTOMETRY (validity) | 84311 | 0.86 | 9.35 | 8.03 | Non-POC | | | | 0.00 |
| PH (validity) | 83986 | 0.86 | 4.78 | 4.11 | Non-POC | | | | 0.00 |
| URNLS DIP STICK/TABLET RGNT (validity) | 81003 | 0.86 | 3.00 | 2.57 | Non-POC | | | | 0.00 |
| | | | | | | | | | |
| Butalbital Quantification | 82205 | 0.77 | 15.31 | 11.73 | Move to Non-POC | | 2.0% | 3,000 | 11.73 |
| Cyclobenzaprine Quantification*** | 82542 | 0.53 | 24.14 | 12.77 | Move to Non-POC | | 14.0% | 3,000 | 12.77 |
| | | | | | | | | | |
| Synthetic Cannabinoids Quantification (spice)*** | 82542 | 0.56 | 24.14 | 13.46 | Non-POC | | | | 13.46 |
| Tapentadol Quantification | 83925 | 0.24 | 26.01 | 6.20 | Non-POC | | | | 6.20 |
| Tramadol Quantification | 82542 | 0.45 | 24.14 | 10.93 | Non-POC | | | | 10.93 |
| Kratom Alkaloids | 82101 | 0.14 | 40.13 | 5.60 | Non-POC | | | | 5.60 |
| Heroin Quantification | 83925 | 0.69 | 26.01 | 17.95 | Non-POC | | | | 17.95 |
| Fentanyl Quantification | 83925 | 0.59 | 26.01 | 15.38 | Non-POC | | | | 15.38 |
| Carisoprodol Quantification | 83805 | 0.56 | 23.56 | 13.29 | Non-POC | | | | 13.29 |
| Ethyl Glucuronide Quantification*** | 82542 | 0.60 | 24.14 | 14.44 | Non-POC | | | | 14.44 |
| MDPV / Cathinones Quantification (Bath Salts)*** | 82542 | 0.44 | 24.14 | 10.60 | Non-POC | | | | 10.60 |
| Methylphenidate Quantification*** | 82542 | 0.31 | 24.14 | 7.45 | Non-POC | | | | 7.45 |
| Meperidine Quantification | 83925 | 0.22 | 26.01 | 5.63 | Non-POC | | | | 5.63 |
| Zolpidem Quantification*** | 82542 | 0.24 | 24.14 | 5.80 | Non-POC | | | | 5.80 |
| Ketamine Quantification*** | 82542 | 0.14 | 24.14 | 3.30 | Non-POC | | | | 3.30 |
| Gabapentin Quantification*** | 82542 | 0.14 | 24.14 | 3.33 | Non-POC | | | | 3.33 |
| Propoxyphene Quantification | 83925 | 0.06 | 26.01 | 1.67 | Non-POC | | | | 1.67 |
| Pregablin Quantification*** | 82542 | 0.08 | 24.14 | 1.92 | Non-POC | | | | 1.92 |
| Naltrexone Quantification*** | 82542 | 0.07 | 24.14 | 1.72 | Non-POC | | | | 1.72 |
| Duloxetine Quantification (Cymbalta)*** | 82542 | 0.05 | 24.14 | 1.10 | Non-POC | | | | 1.10 |
| Fluoxetine Quantification (Prozac)*** | 82542 | 0.03 | 24.14 | 0.75 | Non-POC | | | | 0.75 |
| Venlafaxine Quantification*** | 82542 | 0.03 | 24.14 | 0.69 | Non-POC | | | | 0.69 |
| Paroxetine Quantification (Paxol)*** | 82542 | 0.03 | 24.14 | 0.65 | Non-POC | | | | 0.65 |
| Alcohol Any Spec Except BRTH | 82055 | 0.20 | 14.45 | 2.89 | Non-POC | | | | 2.89 |
| Phentermine  (Psych Panel) | 82542 | 0.02 | 24.14 | 0.51 | Non-POC | | | | 0.51 |
| Risperidone  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.25 | Non-POC | | | | 0.25 |
| Quetiapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.24 | Non-POC | | | | 0.24 |
| Citalopram (Psych Panel) | 82542 | 0.01 | 24.14 | 0.28 | Non-POC | | | | 0.28 |
| Bupropion (Psych Panel) | 82542 | 0.01 | 24.14 | 0.29 | Non-POC | | | | 0.29 |
| Olanzapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.21 | Non-POC | | | | 0.21 |
| Aripiprazole  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.27 | Non-POC | | | | 0.27 |
| Haloperidol (Psych Panel) | 80173 | 0.01 | 19.47 | 0.18 | Non-POC | | | | 0.18 |
| Clozapine  (Psych Panel) | 82542 | 0.01 | 24.14 | 0.22 | Non-POC | | | | 0.22 |
| Dextromethorphan (DXM)  (Psych Panel) | 82542 | 0.08 | 24.14 | 1.99 | Non-POC | | | | 1.99 |
| Acetaminophen | 83516 | 0.07 | 12.41 | 0.84 | Non-POC | | | | 0.84 |
| Drug screen (per patient encounter) | G0431 | 0.02 | 97.22 | 1.71 | Non-POC | | | | 1.71 |
| HYDROXYINDOLACETIC ACID 5 (OURSOURCED - AR | 83497 | 0.00 | 17.24 | 0.08 | Non-POC | | | | 0.08 |
| CATECHOLAMINES FRACTIONATED (OUTSOURCED | 82384 | 0.00 | 33.76 | 0.16 | Non-POC | | | | 0.16 |
| COL-CHR/MS STABLE ISOTOPE DIL MLT ANALYTES | 82544 | - | 24.14 | - | Non-POC | | | | 0.00 |
| DRUG CONFIRMATION EA PX | 80102 | - | 17.71 | - | Non-POC | | | | 0.00 |
| Non-POC | | 6.14 | | 151.96 | | | | | 151.96 |
| **Total** | | **23.50** | | **490.27** | | | | | **327.22** |

| | | | | |
|---|---|---|---|---|
| **NRPS** | 462.82 | | | **308.89** |
| **Variance** | | | | **-33.3%** |

# EXHIBIT 41

Privileged & Confidential                                    Date: March 17, 2014
Attorney-Client Communication

### OVERVIEW OF PENDING LITIGATION INVOLVING MILLENNIUM LABORATORIES

**I.    *Boston U.S. Attorney's Office Investigation***

Grand Jury and Focus of Investigation: Millennium disclosed that the Government empaneled a grand jury as part of its investigation.  Millennium believes four to six former employees (who also filed wrongful termination suits against Millennium) have testified before the grand jury. Millennium believes that Ameritox has been pressing the Government to investigate the allegations it has raised in its civil litigation.  Millennium also has "strong suspicions" that a False Claims Act whistleblower may be driving the inquiry.  Millennium does not know whether the grand jury is investigating any other companies.  From Millennium's perspective, the focus of the Government's investigation is still a "moving target."  Millennium made two presentations to the Government lawyers in the last few weeks, which it believes have been positive.  A new team of lawyers has taken over the Government's case (both civil and criminal), so these meetings have largely involved Millennium educating the lawyers on Millennium's business practices and the urine testing industry more broadly.  In the meetings, the Government was particularly interested in Millennium's "custom profile" and urine cup program, among other things.  The Government has also asked for information about Millennium's "troubled accounts" program, whereby the company advised certain doctors that it would end the parties' relationship because the doctors' accounts were not profitable.  Millennium believes that each of its practices was defensible and that it utilized higher standards than its competitors.  Millennium does not believe that its positive financial results have made the Government suspicious of Millennium's practices.

Timeframe for Investigation: Millennium could not predict a "time horizon" for the investigation.  Millennium believes both the staffing turnover and tighter restrictions on granting witness immunity have slowed the pace of the investigation.  For example, Susan Winkler, the previous lead criminal prosecutor, was replaced by David Schumacher, who has a reputation for being "slow but thorough."  Millennium believes the new lawyers are trying to figure out if there is a case to pursue, which Millennium finds encouraging.  Millennium is meeting with the Government again the week of March 17.

Production of Information: Although Millennium indicated in our February 12, 2013 call that the Government had asked to meet with a handful of Millennium employees, those interviews never occurred.  Millennium believes this is because of the new witness-immunity policy, which makes it more difficult for the Government to grant individuals immunity for witness interviews. Millennium does not expect any movement on the interviews while the policy remains in effect. Millennium completed its document production in the summer of 2013 and is not aware of any follow-up document requests from the Government.  However, Millennium asked the Government to issue a subpoena for documents Millennium received in civil discovery showing that Ameritox has been paying the legal fees of the ex-employees suing Millennium for wrongful termination (and who have also testified before the grand jury).

Witness Intimidation / Obstruction Allegations: We asked Martin Price about the allegations lodged by the civil litigants that Millennium engaged in witness intimidation when Martin made a January 2012 internal presentation that used images of body bags to depict former employees

1

**Exhibit 0103**

Privileged & Confidential                                    Date:  March 17, 2014
Attorney-Client Communication

Millennium was litigating against (such as Ed Zicari).  Martin stated that the presentation was
"facetious" and was generally received that way, except by the wrongful-termination civil
litigants and Ameritox.  Upon request, Millennium provided the presentation to the Government
(after waiving privilege) in 2012, and it was reportedly shown to the grand jurors.  The
Government lawyers have not brought the issue up recently with Millennium or Martin.  We also
asked about the allegations that Millennium destroyed documents.  Martin explained that
Millennium did not destroy any documents and that, in fact, Millennium has provided unredacted
copies of a voluminous amount of documents to the Government.  Martin did acknowledge that
Ameritox has been pushing these allegations with the Government, although the Government has
not focused on the topic with Millennium.

Potential Exposure: Millennium does not yet know whether the ultimate resolution will be civil
or criminal, but stated that it is common for these inquiries to begin as both criminal and civil but
to end with a civil-only resolution.  Millennium believes that if the investigation is resolved
civilly, the outcome would likely be a monetary penalty.  Millennium could not offer a specific
figure but supplied two recent settlements for comparison.  First, Calloway settled with
Massachusetts state prosecutors for $20 million after the company and several executives were
indicted.  Calloway also entered into a civil settlement with the Boston U.S. Attorney's Office
for $7.7 million.  Second, Ameritox settled with Florida federal prosecutors for $16 million.
Michael Loucks of Skadden, Millennium's outside counsel, characterized the conduct in both the
Calloway and Ameritox cases as more "egregious" than the allegations against Millennium.
When asked if Millennium's exposure was, accordingly, capped at around $20 million, Loucks
acknowledged the force of this reasoning and stated that he does not believe there will be a
"material result" in terms of the company's finances.  Although these examples were relayed for
comparison, Millennium stated its views that the Government determines monetary payments
through financial analysis of damages, rather than meting out "rough justice" by comparing the
current case to past cases.  In addition to a monetary penalty, the Government might also impose
a Corporate Integrity Agreement, although such agreements are apparently less frequent now
because of the compliance costs involved.  Martin does not believe a Corporate Integrity
Agreement, if imposed, would have much of an impact on Millennium because he believes
Millennium's practices are stronger than those typically required in such agreements.

## II.  Litigation Involving Ameritox

Florida Case: Millennium has pending litigation with Ameritox in Florida federal court, which
was consolidated with the federal case in San Diego.  Ameritox alleges that Millennium falsely
advertised its services; Millennium counterclaims that Ameritox engaged in similar unfair
business practices.  Discovery is closed and summary judgment motions are fully briefed.  A trial
is set for June 2014.  Ameritox seeks damages in the range of $190 million to $210 million,
based on a claim for the disgorgement of Millennium's profits.  (Ameritox is not seeking "lost
profits" because it cannot show that Millennium's conduct caused Ameritox to lose business.)
Roughly 80% to 90% of Ameritox's damages claim relates to the urine cup program.  According
to Millennium, the key legal issue is whether or not the urine cup program is "unambiguously
illegal."  Millennium believes that it can show that the program is *not* unambiguously illegal
because several healthcare experts have opined that the program is legal.  (We note that these
experts, such as Ron Wisor and Lew Morris, are retained by Millennium and may not be viewed

CONFIDENTIAL                                                                                    JPMC-00030810

Privileged & Confidential
Attorney-Client Communication                               Date:  March 17, 2014

by the court as independent.)  Millennium indicated that if the court does not award damages to Ameritox, it might nonetheless provide injunctive relief, such as requiring Millennium to issue corrective advertising.  Martin acknowledged that one risk of the lawsuit is that if the judge or jury finds that Millennium's business practices are illegal, this may fuel the U.S. Attorney's Office investigation.  Martin stated that the issue of the legality of the program "would not be a fight that would go quietly."  Millennium believes it has a strong case, and its strategy is to "plow ahead."

Wisconsin Case: Millennium has pending litigation with Ameritox in Wisconsin federal court (which was originally filed in Maryland federal court), in which Ameritox claims that Millennium's use of a bell curve in its RADAR report infringes two patents registered to the Marshfield Clinic and for which Ameritox has exclusive licensing rights.  Millennium initiated proceedings with the U.S. Patent and Trademark Office, which concluded with the U.S.P.T.O. declaring the patents invalid.  Ameritox is appealing that ruling.  Ameritox also recently filed an amended complaint to add the  Marshfield Clinic as a party to the lawsuit.  The case has a March 2015 discovery deadline and an April 2015 trial date.  Discovery has yet to begin.  In terms of exposure, Martin explained that there are two types of damages Ameritox could seek: (1) payment of a licensing fee; and (2) lost profits.  Regarding the licensing fee, Millennium estimated its highest exposure would be a figure "well south of $5 million" paid out over three years.  Regarding lost profits, Martin stated that Ameritox's case is weak because in the Florida case, Ameritox has already tied 80% to 90% of its damages to the urine cup issue, not the patent issue.  Accordingly, one could estimate that the exposure on the lost-profits issue in the patent case is about $20 million, though there have been no expert reports issued in the case.

## III.   Litigation Involving Calloway

Federal Case: Millennium achieved a favorable result in the lawsuit brought by Calloway's former compliance officer in 2009 (but effectively pursued by Calloway), which alleged that various Millennium billing and testing practices violated the False Claims Act and similar state statutes.  In April 2013, the First Circuit largely affirmed the district court's dismissal of Calloway's claims but remanded the case for the determination of a few issues.  In January 2014, the district court dismissed the remainder of the case, denied Calloway's motion for leave to amend its complaint, and entered judgment for Millennium.  Although Calloway has moved to alter the district court's judgment, Martin believes Calloway's argument is weak.  Millennium is considering seeking reimbursement of its legal fees because it believes the lawsuit was initiated for competitive reasons, not out of a genuine belief in False Claims Act violations.

State Cases: In 2013, Millennium reached an out-of-court settlement with Calloway to globally resolve the parties' direct lawsuits in state court.  In these lawsuits in Massachusetts and New York state courts, Millennium alleged that Calloway "engaged in a misinformation campaign" about Millennium's practices and orchestrated the False Claims Act case; Ameritox's claims involved allegations similar to those in the False Claims Act case.  The resolution involved an agreement by each side to drop all pending claims.

3

CONFIDENTIAL                                                                          JPMC-00030811

Privileged & Confidential                                          Date: March 17, 2014
Attorney-Client Communication

## IV.    *Litigation Involving Former Employees*

Millennium has several cases in which former employees allege they were wrongfully terminated for refusing to participate in Millennium's illegal business practices. From an exposure standpoint, each case is essentially cabined by the employee's earnings. Martin estimates that each case presents exposure of, at most, the hundreds-of-thousands range. Martin acknowledged that although the cases have low exposure amounts, they can nonetheless be "ugly" in terms of the accusations that are leveled. The U.S. Attorney's Office is apparently following the proceedings in these cases.

Kelly Nelson (Arizona federal and state court): In October 2013, the federal court dismissed the majority of Nelson's 20 claims. Nelson's remaining claims involve allegations that Nelson refused to provide free testing services. The parties briefed summary judgment motions in January 2014, which are pending. Millennium moved for sanctions on two grounds: (1) Nelson's sharing of confidential information with Ameritox; and (2) Ameritox's payment of Nelson's legal fees. In April 2013, Millennium sued Nelson in state court. In August 2013, Nelson filed counterclaims that are "identical" to her claims in the federal case. Millennium is looking for a favorable outcome in the federal case to use as *res judicata* in the state case. Martin stated that Nelson had been working since she was fired and believes her damages would be a couple hundred thousand.

Jodie Strain (Texas state court): Summary judgment motions have been fully briefed and a trial is set for May 2014. As with the other suits, Ameritox is paying all of Strain's legal fees. Strain's claim for damages is around $480,000.

Ed Zicari (Texas state court): Summary judgment motions have been fully briefed, and a trial is set for October 2014. Millennium also filed a motion for sanctions regarding Zicari's discovery responses, which falsely denied that Ameritox is paying Zicari's legal fees. Zicari has not submitted a report on his alleged damages yet.

Joshua Hugo (Tennessee federal court): In January 2014, the court granted Millennium's motion for summary judgment. Hugo is now pursuing an appeal in the Sixth Circuit.

NicSyd Enterprises (Arbitration): Millennium has one outstanding arbitration with a former employee, Steve Johnson, who helped Millennium set up its sales force in 2008 and 2009. He claims unpaid commissions for a four-month period in 2009 after he was terminated. The case has been largely inactive; for example, no discovery has proceeded. Martin finds the case "hard to gauge," but any damages exposure would be low (could be less than $100,000).

## V.    **Review of Closed Cases**

Millennium was previously engaged in litigation with others in the industry, including Aegis Sciences Corporation, American Clinical Solutions, Universal Oral Fluid Laboratories, and eLab Consulting. All of these lawsuits have been resolved favorably, with nothing now pending.

4

CONFIDENTIAL                                                                    JPMC-00030812

Case 17-51840-LSS    Doc 341-4    Filed 02/10/23    Page 545 of 847

# EXHIBIT 42

# UNITED STATES OF AMERICA
## DEPARTMENT OF JUSTICE

### SUBPOENA DUCES TECUM

**TO:** Millennium Laboratories, Inc., 16981 Via Tazon, San Diego, CA 92127

*YOU ARE HEREBY COMMANDED TO APPEAR BEFORE* _____
*Assistant United States Attorney Susan Winkler*
*an official of the U.S. Department of Justice, and you are hereby required to bring with you and produce the following:  See attached*

*which are necessary in the performance of the responsibility of the U.S. Department of Justice to investigate Federal health care offenses,  defined in 18 U.S.C. § 24(a) to mean violations of, or conspiracies to violate: 18 U.S.C. §§669, 1035, 1347, or 1518; and 18 U.S.C. §§ 287, 371, 664, 666, 1001, 1027, 1341, 1343, or 1954 if the violation or conspiracy relates to a health care benefit program (defined in 18 U.S.C. § 24(b)).*

**PLACE AND TIME FOR APPEARANCE:**
United States Attorney's Office, One Courthouse Way, Suite 9200, Boston, MA 02210, on April 1, 2013 at 10 o'clock A.M, or at your option, the documents may be mailed to the Assistant U.S. Attorney listed at:

> AUSA Susan Winkler
> U.S. Attorney's Office, 5th Floor
> 408 Atlantic Avenue (John Williams Coastguard Building)
> Boston, MA 02110

if received prior to the date and time for appearance.

---

Failure to comply with the requirements of this subpoena will render you liable to proceedings in the district court of the United States to enforce obedience to the requirements of this subpoena, and to punish default or disobedience.

---

Issued under authority of Sec. 248 of the Health Insurance
Portability & Accountability Act of 1996, Public Law No. 104-91
(18 U.S.C. § 3486)

*IN TESTIMONY WHEREOF*

*K. Nathaniel Yeager,  Health Care Fraud Chief, USAO Massachusetts, the undersigned official of the U.S. DEPARTMENT OF JUSTICE, has hereunto set her hand this 28th day of February 2013.*

_____
(SIGNATURE)

FORM CRM-180
MAR. 97

Confidential

Specifications

1.  Mirror images of all laptops and desktop computers obtained by the Company.

2.  Billing records for all consultants and attorneys from 2009 to present.

3.  All contracts and communications with consultants from 2009 to present. This specification includes but is not limited to Charles Root and Jennifer Bolen.

4.  All e-mail communications with and regarding Company customers.

5.  All queries run on the MLIS database by or on behalf of Dr. Pesce, Dr. Mikel, or Rodney Suggs. This specification includes but is not limited to the queries run with regard to particular practices and/or insurers.

6.  All policies, procedures, and manuals regarding audits of the lab or billing systems.

7.  All documents regarding audits performed on the Quicklab billing system.

8.  All documents regarding all audits performed on the XIFIN billing system. The specification includes but is not limited to an audit of validity testing in or about May 2012, and any follow-up documentation and/or changes to the audit reports that may have been made.

9.  The spreadsheet reflecting all audits performed on the MLIS system.

10.  A data dictionary sufficient to identify the test codes, billing codes, and CPT codes as they are mapped within the Company systems. Please note this request includes documents sufficient to show all instances where multiple codes are "rolled up" within the MLIS system, and "exploded out" within the XIFIN system.

11.  The release log for the MLIS system.

12.  Copies of the requirements (functional specifications) prepared by the business system analysts from 2009 to the present.

13.  By customer, all documents in the customer files including but not limited to all standing orders (custom profiles/test profiles/or any other name), contracts, letters, memoranda, notes, and all other material contained in the customer file at headquarters.

Confidential

Confidential

RETURN OF SERVICE

I, being a person over 18 years of age, hereby certify that a copy of this subpoena was duly served on the person named herein by means of --

UNITED STATES OF AMERICA
DEPARTMENT OF JUSTICE

1.  personal delivery to an individual, to wit:

_____
*(Name)*

_____
*(Title)*

_____
*(Address)*

**SUBPOENA DUCES TECUM**

2.  personal delivery to an address, to wit:

_____
*(Description of premises)*

_____
*(Address)*

_____

3.  registered or certified mailing to:

*Upon contumacy or refusal to obey, this subpoena shall be enforceable by order of the appropriate United States District Court.*

_____
*(Name)*

_____
*Address)*

_____

( ) a.m.
at ____ ( ) p.m. on _____

_____
*(Signature)*

_____
*(Title)*

ML_DE_00288152

# EXHIBIT 43



FILED
IN CLERKS OFFICE
2015 MAR 19 PM 4 40
U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *et al., ex rel.* MARK McGUIRE *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MILLENNIUM LABORATORIES, INC., and MILLENNIUM HEALTH, LLC, <br><br> Defendants. | No. 12cv10132-NMG <br> No. 12cv10631-NMG <br> No. 13cv10825-NMG |

## UNITED STATES' COMPLAINT IN INTERVENTION

By notice to the Court on December 19, 2014, the United States of America partially intervened in the above-captioned cases. The United States alleges as follows:

## I.    INTRODUCTION

1.    The United States of America ("United States") brings this action against Defendants pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733 ("FCA"), seeking treble damages and civil penalties, and also under common law theories of recovery.

2.    Millennium Laboratories, Inc., now Millennium Health, LLC ("Millennium," the "Defendant" or the "Company"), was founded in 2007 and grew to be the largest Medicare Part B biller in the country, receiving over $630 million from Medicare for laboratory-based drug testing through 2014.    Millennium performs urine drug testing ("UDT"), which, used appropriately, informs physicians of the amount of a particular substance (be it a prescription drug such as oxycodone or an illicit substance such as heroin) in a patient's system.    Since its founding, Millennium has knowingly submitted many millions of dollars' worth of false claims to the Medicare program for urine drug tests that were not reasonable and necessary or that were

ML_DE_00595094

furnished pursuant to prohibited referrals that resulted from Millennium's improper financial relationships with physicians, in violation of the physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law"), and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

3.      Millennium used a variety of schemes to cause physicians, including many of its biggest referrers, to routinely order excessive amounts of UDT for all patients (including Medicare and Medicaid patients) regardless of individual patient assessment or need. Millennium's abusive practices included the use of physician standing order forms (called "Custom Profiles") to encourage routine, excessive UDT, and the dissemination of false and misleading statements about drug abuse rates and the value of its testing. Millennium also provided many services and benefits to physician customers (including free supplies, as discussed below) contingent on referrals of certain amounts of tests to Millennium.

4.      As Millennium knew, Medicare only covers tests that are reasonable and necessary for the treatment or diagnosis of an individual patient's illness or injury, based on his or her medical condition. 42 U.S.C. § 1395y(a)(1)(A). The need for *each test* for *each patient* must be individually assessed and documented in the patient's medical chart. 42 C.F.R. §§ 410.32(a), (d)(2). Many patients, including those with chronic pain, do not need extensive laboratory-based UDT. Millennium nonetheless sought to, and did, cause many physicians to routinely order extensive and expensive UDT for all of their patients in order to make more money. Millennium then billed Medicare for each drug or drug class tested—averaging more than seventeen procedure codes (many with multiple units) per urine sample—including tests for drugs that patients were not suspected of taking, and for "confirmatory" quantitative tests of expected in-office screening test results.

2

ML_DE_00595095

5.     For example, Millennium billed and received from Medicare more than $15 million for laboratory UDT for phencyclidine ("PCP" or "angel dust"), abuse of which is virtually non-existent in the Medicare patient population. Millennium also billed and received from Medicare more than $55 million for laboratory drug tests for tricyclic antidepressants ("TCAs"), which also are not commonly abused. Most of Millennium's tests for PCP and TCAs were follow-up testing on in-office test results that were negative and consistent with clinical expectations ("expected negatives"), offering very little, if any, clinical value at great expense to Medicare.

6.     Millennium also paid illegal kickbacks to physicians in the form of free point-of-care ("POC") drug test cups to induce physicians to make referrals to Millennium. These POC test cups cost about $5-6 each and Millennium gave physicians more than one million of them in exchange for referrals. As a condition for providing free POC test cups, Millennium explicitly required physicians to refer additional testing to Millennium or pay back the cost of the "free" test cup. Millennium's provision of the free cups was tied to its excessive testing scheme: its executives required that, to be eligible to receive free POC test cups, physicians have Custom Profiles (i.e., standing orders) with at least twelve drug tests. Millennium's provision of free POC test cups generated more than 200,000 referrals for Medicare patients, which resulted in Millennium receiving over $90 million in tainted Medicare reimbursements.

7.     Millennium was warned by consultants, customers, competitors, insurers and regulators that its marketing schemes were illegal. Millennium nonetheless pressured its employees into participating in these schemes by fostering a culture of greed, intimidation, and intense sales pressure.

3

Confidential

8.     Through its practices, Millennium knowingly submitted many thousands of false and fraudulent claims to Medicare and Florida Medicaid for excessive and unnecessary testing, and for testing referred in violation of the Stark Law and the Anti-Kickback Statute, and was improperly paid many millions of dollars in reimbursement for these claims.

## II.   JURISDICTION, VENUE, PARTIES

9.     This action arises under the FCA, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact and unjust enrichment.  This Court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

10.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

11.     This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) and because Defendant resides and transacts business in this District.

12.     Plaintiff, the United States of America, brings this action on behalf of the Department of Health and Human Services ("HHS"), and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS").

13.     Relator Mark McGuire is an individual who resides in Boston, Massachusetts. Mr. McGuire is the Administrative Director of Laboratory Services at MetroWest Medical Center.

14.     Relator Ryan Uehling is an individual who resides in the state of California.  Mr. Uehling began working with Millennium in 2007 and was the Regional Director for Millennium's Western Division until 2011.

15.     Relator Omni Healthcare, Inc. ("Omni") is a professional medical company primarily based in Brevard County, Florida.  Omni is a multi-specialty physician group with

4

ML_DE_00595097

physicians specializing in family practice, internal medicine, pediatrics, and surgery. Relator John Doe is Dr. Craig Deligdish, a principal of Omni and a practicing physician in the Melbourne, Florida area.

16.     Defendant Millennium Health, LLC, formerly Millennium Laboratories, Inc. (also known as Millennium Laboratories of California, Inc.), is a private corporation incorporated in the State of California in 2007 with its principal place of business in San Diego, California. Millennium conducts business nationwide.

17.     Defendant was founded in 2007 by James Slattery ("Slattery"), who now serves as Chairman of the Board. Slattery previously served as the Chief Executive Officer ("CEO") until 2013, when he was replaced by current CEO Brock Hardaway. Howard Appel ("Appel") is the President of Millennium, and previously served as the Chief Financial Officer ("CFO") until 2013, when he was replaced by current CFO Timothy Kennedy. Elizabeth Peacock ("Peacock") is Millennium's Executive Vice President of Emerging Opportunities, and previously held the titles of Vice President of Sales and Executive Vice President of Sales.

## III.    LAW

### A.     The Federal False Claims Act

18.     The FCA provides, in pertinent part, that a person who:

> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains . . . .

5

Confidential

31 U.S.C. § 3729(a)(1).[1]   For purposes of the FCA,

> (1) the terms "knowing" and "knowingly"—
>
> (A) mean that a person, with respect to information—
>
> > (i)   has   actual   knowledge   of   the   information;
> > (ii)   acts in deliberate ignorance of the truth or falsity of the information; or
> > (iii)   acts in reckless disregard of the truth or falsity of the information; and
>
> (B) require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b)(1).

## B.        The Medicare and Medicaid Programs

### 1.        The Medicare Program

19.     In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program.   Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1.  CMS administers the Medicare program.   At all times relevant to this complaint, CMS contracted with private contractors, referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers.  42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.   The Medicare program consists of four parts:  A, B, C, and D.   Millennium billed Medicare under Part B, which covers certain medical services, such as clinical laboratory test services, furnished by physicians and other providers and suppliers.  42 U.S.C. § 1395k(a)(2)(B).

---

[1] The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009.  Sections 3729(a)(1) of the prior statute applies to conduct that occurred before FERA was enacted, and Section 3729(a)(1)(A) of the revised statute applies to conduct after FERA was enacted.  Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA.

6

ML_DE_00595099

20.   To participate in the Medicare program as a new enrollee, clinical laboratories, such as Millennium, must submit a Medicare Enrollment Application, CMS Form-855B. Laboratories also complete Form CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment.

21.   Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations.   42 C.F.R. § 424.516(a)(1).

22.   An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

23.   Authorized officials for Millennium signed the certification statement in Section 15 of Form CMS-855B, indicating that they understood that the laboratory was required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Stark Law and the Anti-Kickback Statute.

24.   The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers.  All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

25.   To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form.  Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which

7

ML_DE_00595100

reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

26. The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

27. From 2007 to August 24, 2013, Palmetto GBA was responsible for processing Medicare Part B claims in the State of California. From August 24, 2013 to the present, Noridian Healthcare Solutions, LLC, has been responsible for processing Medicare Part B claims in the State of California. As Millennium performed all of its tests at facilities in California, it submitted all claims to these Medicare contractors.

### 2. The Florida Medicaid Program

28. The Florida Medicaid Program is authorized by Title XIX of the Social Security Act. 42 U.S.C. §§ 1396 *et seq.* Medicaid is a joint federal-state program that provides health care benefits, including laboratory services coverage, for certain groups including the poor and disabled. The Florida Medicaid program is required to implement a "State Plan" containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures. 42 U.S.C. § 1396a. The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d (b). The Florida Medicaid Program is authorized by § 409.902 Fla. Stat., and Chapter 59G, Florida Administrative Code ("F.A.C."). Section 409.919, Fla. Stat., directs the Florida Agency for Health Care Administration ("AHCA") to "adopt any rules necessary to comply with or administer §§ 409.901-409.920 and all rules necessary to comply with federal requirements."

8

29. Medicaid handbooks (e.g., the "Florida Medicaid Provider General Handbook") are issued for the purpose of furnishing Medicaid providers with the policies and procedures needed to receive reimbursement for covered services provided to eligible Florida Medicaid recipients. The handbooks are incorporated by reference in Chapter 59G-4, F.A.C.

30. Physicians and laboratories certify in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. Florida's "Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for services provided to Medicaid recipients. Under Section VII of the Application, in order to be eligible to receive direct or indirect payments for services rendered to Florida Medicaid Program recipients, a provider must certify that the provider understands "that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws." Florida Medicaid Provider Enrollment Application, Section VII Certification, at 9.

31. The Florida Medicaid Provider General Handbook contains the following language, in Chapter 5 at page 5-4:

> **Provider Responsibility** When presenting a claim for payment under the Medicaid program, a provider has an affirmative duty to supervise the provision of, and be responsible for, goods and services claimed to have been provided, to supervise and be responsible for preparation and submission of the claim, and to present a claim that is true and accurate and that is for goods and services that . . . [a]re provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state and local law. . . .

Chapter 59G of the F.A.C., section 5.020, entitled Provider Requirements, requires that enrolled Medicaid providers must comply with the Florida Medicaid Provider General Handbook.

9

Confidential                                                          ML_DE_00595102

32.     Under Chapter 2 of the <u>Florida Medicaid Provider General Handbook</u>, laboratory providers are required to fill out the Florida Medicaid Provider Enrollment Application and Non-Institutional Medicaid Provider Agreement.  The applicable <u>Medicaid Provider Agreement for Laboratory Services Providers</u> requires that providers agree to comply with "with local, state, and federal laws, as well as rules, regulations, and statements of policy applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by AHCA," and refund any moneys received in error within ninety days.

33.     Every time they submit an electronic claim to the Florida Medicaid program, physicians and laboratories also certify that they are complying with state and federal laws applicable to the Medicaid program.  According to the <u>Electronic Claims Submission Agreement</u>, all providers must abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid program.  The agreement also requires providers to certify that each claim is in compliance with all federal and state laws and the conditions on the claim form, including that "the services . . . were medically indicated and necessary to the health of this patient" and that the provider understands "that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

### 3.     Regulations Regarding Coverage for Laboratory Tests

34.     Medicare and Florida Medicaid regulations both make clear that laboratory tests must be ordered by the physician treating the patient for the treatment of a specific illness or injury, that laboratory test orders that are not individualized to patient need (or for which the need is not documented in the patient chart) are not covered services, and that claims for such services must be denied.

10

ML_DE_00595103

### a.   Medicare Coverage for Laboratory Tests

35.   Laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

36.   Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory.   42 C.F.R. § 410.32(d)(v).   "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition."   Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1, available at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf (visited March 15, 2014).

37.   Medicare Part B only covers services, including diagnostic laboratory services, that are reasonable and necessary for the diagnosis or treatment of an illness.   See 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]")

38.   Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem.   Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."   The MPBM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary . . .

11

Confidential

. [T]he physician must clearly document, in the medical record his or her intent that the test be performed." MPBM, Ch. 15, Section 80.6.1.

39.     Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary.  42 C.F.R. § 410.32(a).  Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a).  MPBM, Ch. 15, § 80.1.

40.     In order to assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation) . . . .").

41.     Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary.  42 C.F.R. § 410.32(d)(3)

42.     CMS regulations further empower laboratories to request documentation from physicians regarding medical necessity:

> *(iii) Medical necessity.* The entity submitting the claim may request additional diagnostic and other medical information from the ordering physician or nonphysician practitioner to document that the services it bills are reasonable and necessary.

12

42 C.F.R. § 410.32(d)(3).

43.    The Department of Health and Human Services, Office of Inspector General ("HHS-OIG") has published <u>Compliance Program Guidance for Clinical Laboratories</u> in the Federal Register.    63 Fed Reg. 45076 (Aug. 24, 1998), available at https://oig.hhs.gov/authorities/docs/cpglab.pdf (visited March 15, 2015).    Among other things, the HHS-OIG guidance clarifies that laboratory order forms should emphasize the need for a justification and assessment of each test ordered and that Medicare does not pay for tests for screening purposes:

> Therefore, Medicare may deny payment for a test that the physician believes is appropriate, but which does not meet the Medicare coverage criteria (e.g., done for screening purposes) or where documentation in the entire patient record, including that maintained in the physician's records, does not support that the tests were reasonable and necessary for a given patient.
> . . .
> a. Requisition design: While HCFA [(CMS)] does not design or approve requisition forms, laboratories should construct the requisition form to capture the correct program information as required by Federal or private health care programs and to promote the conscious ordering of tests by physicians or other authorized individuals.    The laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill. . . .  **The form should contain a statement indicating that Medicare generally does not cover routine screening tests.**
> . . .
> 4. Reliance on Standing Orders
> Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. . . . Medicare contractors can and may require additional documentation to support the medical necessity of the test. **As a result of the potential problems standing orders may cause, the use of standing orders is discouraged.**

*Id.* at 45079, 45081 (emphasis added).

13

Confidential

ML_DE_00595106

44.     As Millennium explained to its sales force in 2011, "the [HHS-]OIG consistently and fervently insists on the demonstration of medical necessity for all diagnostic testing." Exhibit 1.

### b.      Florida Medicaid Coverage for Laboratory Tests

45.     Florida Medicaid also requires that testing be individualized to the medical needs of patients.   As stated in 59G-1.010(166) of the Florida Administrative Code, "Medically necessary" or "medical necessity" means:

> [T]hat the medical or allied care, goods, or services furnished or ordered must: . . .
>
>> Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain; [and]
>>
>> Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs; . . .

It further clarifies:

> The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in itself, make such care, goods or services medically necessary or a medical necessity or a covered service.

46.     Florida Statute § 409.905 also states:

> 409.905 Mandatory Medicaid services. . . .   Any service under this section shall be provided only when medically necessary and in accordance with state and federal law.

### C.      Self-Referral and Anti-Kickback Prohibitions

#### 1.      The Stark Law

47.     The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if

14

such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception. 42 U.S.C. §§ 1395nn; *see also* 42 C.F.R. §§ 411.351 *et seq.*

48.   Compliance with the Stark Law is a condition of payment by the Medicare program. Medicare may not pay for any DHS provided in violation of the Stark Law. *See* 42 U.S.C. §§ 1395nn(a)(1), (g)(1).

49.   The regulations interpreting the Stark Law require that "[a]n entity that collects payment for a designated health service that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis . . . ." 42 C.F.R. § 411.353(d).

50.   A "financial relationship" includes a "compensation arrangement," which means any arrangement involving any "remuneration" paid to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind" by the entity furnishing the DHS. *See* 42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

51.   Effective October 1, 2008, "a physician is deemed to 'stand in the shoes' of his or her physician organization and have a direct compensation arrangement with an entity furnishing DHS if -- (A) The only intervening entity between the physician and the entity furnishing [DHS] is his or her physician organization; and (B) The physician has an ownership or investment interest in the physician organization." 42 C.F.R. § 411.354(c)(1)(ii).

52.   Under the Stark Law, an "entity is considered to be furnishing DHS if it . . . [is the] entity that has presented a claim to Medicare for the [DHS] . . . ." 42 C.F.R. § 411.351.

53.   A "referral" includes "the request by a physician for, or ordering of, or the certifying or recertifying of the need for, any [DHS] for which payment may be made under Medicare Part B . . . ." 42 C.F.R. § 411.351.

15

ML_DE_00595108

54.     The Stark Law and its interpretive regulations contain exceptions for certain compensation arrangements.  The statute and regulations also exempt certain items from the definition of "remuneration," including items "used solely to (I) collect, transport, process, or store specimens for the entity providing the item, device, or supply, or (II) order or communicate the result of tests or procedures for such entity."  42 U.S.C. § 1395nn(h)(1)(C)(ii); 42 C.F.R. § 411.351.

### 2.     The Anti-Kickback Statute

55.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to patients.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.  The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach.  *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

56.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs.  In pertinent part, the statute provides:

16

ML_DE_00595109

(b)  Illegal remunerations . . .

    (2)    whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

        (A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

        (B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b.

57.    Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare program.  42 U.S.C. § 1320a-7(b)(7).

## IV.    BACKGROUND:  TYPES OF UDT, GUIDELINES, AND REIMBURSEMENTS

### A.    Types of Urine Drug Tests

58.    Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system.  Drug testing can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte).  Different testing methodologies have different capabilities and limitations.

59.    Drug testing is performed in a number of contexts.  Some workplaces have mandatory drug testing requirements, in some instances required by federal regulations.  In the clinical health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

17

ML_DE_00595110

60. Urine is the most common medium used for drug testing, and is the predominant medium for testing used by Millennium.

61. There are different types of drug testing, generally based on the location of the test (in-office or at a laboratory), which have different associated costs.

62. "Point of care" or "POC" testing—at a physician's office or clinic—is generally performed by "immunoassay" methodologies, which generally provide a qualitative result indicating the presence or absence of a drug or drug class above pre-set "cut-off" or concentration levels. In-office testing is often performed with POC drug test cups that have a number of built-in drug test strips, each of which tests for a specific drug or drug class. In-office testing can also be performed on immunoassay analyzer machines, known as "desktop" or "benchtop" analyzers, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

63. Under CLIA, CMS oversees all laboratory testing services. UDT performed using POC drug test strips and test cups is generally "CLIA-waived." CLIA-waived tests are categorized as simple laboratory examinations and procedures that have an insignificant risk of an erroneous result or pose no risk of harm to the patient if the test is performed incorrectly. 43 C.F.R. § 493.15(b). To perform CLIA-waived tests, physicians need to enroll in CLIA and obtain a waiver. 42 C.F.R. § 493.35. To operate a benchtop or desktop analyzer, physician practices are generally required to obtain CLIA certification to perform moderate- or high-complexity laboratory tests.

64. As discussed in the next section, since April 2010, Medicare generally only reimburses one unit of POC testing per patient encounter, based on the methodology used (analyzer versus POC test cup with embedded test strips). As of January 1, 2011, the Medicare

18

ML_DE_00595111

reimbursement for POC tests is determined by the complexity of the test under CLIA (HCPCS billing code "G0434" for CLIA-waived tests and "G0431" for high-complexity analyzer tests).

65.    POC drug testing, including use of POC test cups, is the standard of practice for drug testing in pain management.  Most patients need only limited, if any, laboratory testing, based on their POC test results, drug abuse history, and clinical presentation.

66.    Testing at laboratories is generally performed by more precise methodologies, such as column chromatography in combination with mass spectrometry.  Such methods include gas chromatography with mass spectrometry ("GCMS") and liquid chromatography with mass spectrometry ("LCMS").  These testing methodologies can provide quantitative results, identifying the *concentration* of a drug or metabolite in a sample.  Quantitative tests are often billed for each drug or drug class tested, using CPT codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those CPT codes.  Quantitative tests can be used to "confirm" POC test results, as they use a second, more accurate methodology.

67.    Millennium performed UDT by liquid chromatography with tandem mass spectrometry ("LC-MS/MS").

68.    Millennium's LC-MS/MS technology enabled it to test urine specimens for numerous drugs and metabolites during a single run of an aliquot of a urine sample through the LC-MS/MS machine.

**B.    Expected Versus Unexpected POC Test Results**

69.    The clinical value of Millennium's "confirmatory" or "quantitative" laboratory testing depends on a patient's medical condition.  The clinical utility of a "confirmation" or "quantitation" of POC test results depends in part on whether the POC test result is expected or unexpected, and the patient's drug abuse history and clinical presentation.

19

70.     For example, if a patient is prescribed a certain drug, such as Xanax, a positive POC test result for benzodiazepines (of which Xanax is one) would be expected. If the test result is negative for benzodiazepines, however, and the patient insists that she is taking her Xanax as prescribed, a quantitative laboratory test to "confirm" whether this unexpected negative result may be reasonable and necessary.

71.     Similarly, if a patient's POC test yielded a positive result for a non-prescribed or illicit drug, then a quantitative laboratory test to evaluate (i.e., "confirm") this unexpected positive result may be reasonable and necessary.

72.     In some instances, laboratory testing of an expected POC test result or for a substance not available on a POC test may also be warranted. For example, aberrant patient behavior, unexpected clinical presentation, or a history of drug abuse may justify specific laboratory tests. The clinical value of such tests, however, depends on the presentation and physician assessment of each individual patient and that patient's need for each such test. If a POC test is negative for an illicit drug or drug not prescribed, and there is nothing in the patient's presentation or drug abuse history to indicate abuse of that drug, then a quantitative laboratory test for that drug is not reasonable and necessary for the treatment and diagnosis of that patient, and therefore not covered by Medicare.

### C.     Guidelines on Urine Drug Testing

73.     Several organizations have published guidelines regarding UDT in the clinical setting, including UDT for chronic pain patients prescribed opioids. According to the Substance Abuse and Mental Health Services Administration ("SAMSHA"), the development of UDT guidelines in the clinical setting draws on the experience of workplace drug testing, including the

20

Federal Drug-Free Workplace Program and its guidelines ("Federal Workplace Guidelines"). 73 Fed. Reg. 71858 (Nov. 25, 2008).

74.    Under the Federal Workplace Guidelines, a "Negative Result" includes results reported by certified laboratories when a valid specimen "contains no drug or the concentration of the drug is less than the cutoff concentration for that drug or drug class." *Id*. at 71878 (Sec. 1.5). Laboratories may report a valid specimen as "negative" when "each initial drug test is negative[.]" *Id*. at 71894. Under the Federal Workplace Guidelines, a negative result on these initial immunoassay tests do not require confirmation testing by another method. *See id*.

75.    Millennium is well aware that entities have published guidelines regarding the use of UDT in clinical pain management and, in fact, Millennium compiled excerpts of guidelines into a document it entitled "Urine Drug Testing Guidelines by Leading Industry Organizations." Exhibit 2. The guidelines Millennium cites include those issued by the American Pain Society, the American Society of Interventional Pain Physicians ("ASIPP"), the Department of Veterans Affairs, the State of Utah, the Federation of State Medical Boards, and the Washington State Agency Medical Directors Group.

76.    As Millennium knew, none of these guidelines recommended the routine use of quantitative laboratory testing, such as the LC-MS/MS testing that Millennium performs, to "confirm" expected negative immunoassay results.

77.    Instead, when these guidelines addressed the need for confirmatory/quantitative laboratory testing, they generally recommended a UDT protocol whereby an immunoassay test is administered first and then only *unexpected* results are referred for laboratory-based confirmatory testing via a quantitative method such as LC-MS/MS.

21

Confidential

78.     For example, the Washington State Agency Medical Directors Group Interagency Guideline on Opioid Dosing for Chronic Non-Cancer Pain ("Washington State Guidelines") states that the purpose of the immunoassay test is to provide rapid results that should help avoid further, unnecessary laboratory confirmation testing of expected results: "The advantages of immunoassays are their ability to concurrently test for multiple drug classes, provide rapid results and guide appropriate utilization of confirmatory testing." Washington State Agency Medical Directors' Group, *Interagency Guideline on Opioid Dosing for Chronic Non-cancer Pain,* 2010 update, available at http://www.agencymeddirectors.wa.gov/Files/OpioidGdline.pdf (visited March 15, 2014).

79.     The Washington State Guidelines recommend such confirmation testing only for positive results:  "When the immunoassay result is unexpected and the patient does not acknowledge or credibly explain the result, a confirmatory test using either GC/MS or LC/MS/MS should be ordered."  Similar recommendations are made by other authoritative entities, including the ASIPP and SAMSHA.  *See* Manchikanti L, Abdi S, *et al., Pain Physician 2012*; 15:S67-S116, ISSN 1533-3159, ASIPP Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer Pain; Substance Abuse and Mental Health Services Administration, *Clinical Drug Testing in Primary Care,* Technical Assistance Publication (TAP) 32, HHS Publication No. (SMA) 12-4668.

### D.     Reimbursements for Laboratory Tests

80.     Different types of urine drug tests have different costs.

81.     Since January 2011, POC test cup tests have been billed to Medicare using HCPCS code G0434 and reimbursed at a fixed rate of approximately $20-25 per patient encounter—regardless of the number of substances tested.  Also since January 2011, POC high-

22

complexity immunoassay tests have been billed to Medicare using HCPCS code G0431 and reimbursed at a fixed rate of approximately $100 per patient encounter—again, regardless of the number of substances tested.

82.     Millennium listed the HCPCS and CPT billing codes it used in its "Annual Physician Notices." *See, e.g.,* Exhibit 3 ("2012 Physician Notice")); Millennium Health Annual Physician Notice ("2014 Physician Notice"), available at http://www.millenniumhealth.com/wp-content/uploads/2014/08/MLI-ADF11001_Annual-Physician-Notice-2014-August-D3.pdf (visited March 17, 2015).  Millennium generally billed LC-MS/MS test results using individual CPT codes for each drug or drug class it tested.

83.     Millennium routinely billed multiple different CPT codes for some drug classes— such as TCAs, for which Millennium billed four separate CPT codes.

84.     Millennium also routinely billed multiple units of the same CPT codes—such as 83925 for opiates—suggesting that it had performed multiple procedures to test for opiates.

## V.     DEFENDANT'S FRAUDULENT SCHEMES

85.     Millennium knowingly submitted and caused to be submitted false claims to Medicare and Florida Medicaid for non-covered drug testing that was not reasonable and necessary.  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 410.32(a); MBPM, Ch. 15, Section 80.6.1.

86.     Millennium increased physician testing per sample by causing physicians to order large numbers of LC-MS/MS tests on a routine basis for their patients pursuant to practice-wide standing order forms—without an individualized assessment of which drug tests were necessary for a given patient.  This practice resulted in testing that was not reasonable and necessary. Millennium also made false and misleading statements about the need for and value of its drug testing services to encourage such testing, and paid physicians remuneration in the form of free

23

ML_DE_00595116

supplies—tied to physician referrals—to secure their referrals and get them to agree to high levels of testing.

87.     Physicians, with Millennium's knowledge and encouragement, routinely ordered dozens of individual tests, each costing Medicare about $25, for all of their patients.  In 2012 and 2013, Millennium billed Medicare for an *average* of more than twenty laboratory tests at an *average* cost of more than $450 for each urine sample.  In these two years alone, Millennium billed and was paid more than $400 million by Medicare.

**A.      Millennium Caused Physicians to Order UDT That Was Not Reasonable and Necessary, in Violation of Medicare Requirements**

88.     A core element of Millennium's business model was the use of physician standing order forms.  Millennium created these forms as part of its plan to direct physicians to establish protocols for laboratory testing to be performed on all of their patients—usually, at minimum, a dozen or more drug tests—regardless of each patient's individualized need and condition.

**1.      Millennium Required Physician Use of Standing Orders**

89.     Millennium enabled, required and enforced the use of physician standing orders. These forms were alternately called "Standing Order," "Test Protocol" and "Custom Profile" forms.  While the name of Millennium's standing order form changed, the function remained the same.

90.     These forms worked substantially as follows, with some modifications over time: a physician filled out a Custom Profile (or Standing Order or Test Protocol) form that was kept on file with Millennium and remained in effect for the physician's practice until and unless changed.  When a urine sample was sent in for testing, the physician, a staff member, or even a Millennium-employed laboratory assistant or third-party specimen collector filled out an order

24

ML_DE_00595117

(or "Requisition") form for the specimen and checked a box in "Section A" of the order form labeled "Use Custom Profile." This caused Millennium to perform and bill to insurers, like Medicare, all of the tests on the Custom Profile.

91.     Millennium's 2014 Annual Physician Notice explained:

Physician Custom Profiles:   Millennium offers physicians the option of establishing a Custom Profile to serve as general instructions on how they would like their patients tested.   In constructing a Custom Profile, each drug the physician would like tested must be selected individually on the Custom Profile form.   When ordering tests, a physician must select a testing option in Section A of the test requisition form by marking either a) USE Custom Profile, and perform additional tests if ordered, or b) DO NOT USE Custom Profile, and perform only those tests ordered on that requisition form.

92.     Millennium sales representatives and executives expected and encouraged physicians to use their standing order (potentially including additional tests for a given patient— but not fewer) for all or most of the patients in their practices.

93.     The importance of and emphasis on standing orders permeated Millennium's sales and marketing.  For example, on September 10, 2009, Millennium's Vice President of Marketing sent an email to all sales representatives entitled "STATUS OF STANDING ORDER FORM" and stated:   "As you know, the standing order is critical to our confirmation and billing process . . . ." Exhibit 4.

94.     Millennium's management required physicians to have a Custom Profile on file with the Company.  As stated by Millennium's customer support staff to a member of the sales force, copying Millennium's President: "STANDING ORDER MUST BE RECEIVED BEFORE SPECIMENS CAN BE SENT IN TO LAB OR PROCESSED." An April 2011 email by Mary Rouse, Millennium's Director of Sales Operation, stated:  "If we do not receive updated custom

25

profiles, we will discontinue processing specimens for these accounts until an updated profile is received."

95.    Millennium expected not only that physicians would have a Standing Order or Custom Profile, but also required certain testing thresholds, so that Millennium could make more money. Millennium refused to do business with accounts that failed to meet these thresholds.

96.    Early Millennium training documents, reviewed by Millennium Chief Executive Officer James Slattery, made this clear:

> Attached is a revised and even better 'Why Confirm Every Sample' document. This information should be used on the first call and every subsequent call to establish the expectation that all samples get sent to our lab for confirmation. This also lays the groundwork for a complete Standing Order to be put in place. **If an account does not want a Standing Order in place for the 6 drugs not covered by the [POC test], we do not want to do business with them.**

Exhibit 5 (emphasis added).

97.    Millennium executed this strategy by pushing for standing orders that included as many tests as possible. As stated by Elizabeth Peacock, Vice President of Sales, with respect to one customer's Custom Profile in August 2011: "I'm after a one-two punch. Layer on a couple more tests now, then push a couple of new ones as well." Exhibit 6. Or, as stated by Millennium's President regarding updated forms in September 2011: "WE DON'T WANT TESTING TO DECLINE BY UPDATING THE CP [Custom Profile] WITH LESS TESTS[.]" Exhibit 7 (capitalization in original).

98.    Millennium employees routinely submitted completed Custom Profile forms to headquarters for processing, *see* Exhibit 8, and often filled out information on the Custom Profile forms themselves.

26

Confidential

ML_DE_00595119

99.   Millennium even processed specimens under customers' Custom Profiles in instances where the "Use Custom Profile" box in Section A of the requisition form was left blank. *See, e.g.,* Exhibit 9.

**2.   Millennium Set—and Enforced—Testing Thresholds for Physician Standing Orders**

100.   Millennium executives and sales managers set requirements for the amount of testing sales representatives had to obtain from physicians for their Custom Profiles.

101.   Millennium required that physicians agree to Custom Profiles with at least twelve tests in several contexts, including approval as a Millennium customer, removal from "troubled" (unprofitable) account lists, and as a condition for receiving free POC test cups.

102.   Millennium sales managers spread the message to their sales teams that Custom Profiles needed to have twelve or more tests.  For example, in September 2011, the Regional Sales Manager for New England directed his sales team, while circulating new Custom Profile forms, as follows:  "As we discussed on our conference call, the minimum for each account going forward is 12 test[s] + 4 Validity test[s]. . . . good selling!" Exhibit 10.[2]  Similarly, the Regional Sales Manager for Florida wrote in August 2011:  "Strive for at least 15 plus validity. You can take one of 2 approaches – we are losing money every month and/or the clinical necessity." Exhibit 11.

103.   Millennium executives were deeply involved in monitoring and even rejecting Custom Profiles that did not meet these standards.  For example, Millennium's sales support team sent an email to a sales manager in September 2011, copying Millennium's President, Mr. Appel, with the subject "cp issues – not enough tests," stating:  "The attached new client

---

[2] Millennium offered and performed "specimen validity testing" to determine whether a urine sample had been tampered with.

27

ML_DE_00595120

paperwork . . . does not have enough tests on the [Custom Profile] to enter. Once they are updated with more tests, sales support will process the paperwork."

104. Another communication from the sales support department to a sales manager made clear that Mr. Appel himself rejected "Custom Profiles" that did not have "enough" tests: "There are not enough tests on the CP and [Mr. Appel] *will not approve. . . .* If [the sales representative] can get more tests added and send the CP back today, we can overnight the supplies." Exhibit 12. The sales manager forwarded this message to the sales representative stating, "we need more tests on this CP. Sell them on the clinical value of a more comprehensive testing menu." *Id.*

105. Millennium also made provision of resources (including millions of dollars' worth of free POC test cups) contingent on robust standing orders. To be approved for free POC test cups, Millennium required new practices to have at least twelve tests (plus four specimen validity tests) on their Custom Profiles. Exhibit 13. For existing customers, Millennium sales personnel were directed to "[v]erify profitability with VP of Business Analytics . . . . If practice falls below ML profitability guidelines, cup agreement will be denied." *Id.*

106. Millennium executives monitored the profitability of its physician customers ("accounts"), and referred to accounts that failed to meet profitability and test-per-specimen thresholds as "troubled" or "at risk."

107. If sales representatives failed to increase testing by a "troubled" account, Millennium stopped accepting samples from the account, withheld commissions for samples sent in for testing by that account, or both.

108. Millennium executives reinforced to sales representatives the need to drive up the number of tests on their customers' standing orders. For example, in a September 2011

28

ML_DE_00595121

communication to a sales manager, Millennium's President wrote: "[A]ttached are CPs we received as a follow up to the August Trouble [*sic*] Practices lists. These are still not adequate. These need to be resolved immediately." Exhibit 14.

109.    Millennium executives discussed a standard for acceptable tests per specimen for "troubled accounts" in an August 2011 email chain entitled "Troubled practices." Exhibit 15. Millennium's Vice President of Analytics, Daniel Pencak, wrote that "[a]fter a few sales reps have called me, it's clear there needs to be some education to the field [on] what the minimum number of tests are required to break-even[.]" *Id.* Millennium's Vice President of Sales responded by asking "So, what's the magic number?" She suggested twelve tests per specimen. Mr. Pencak agreed that twelve was a "reasonable number." *Id.*

110.    Accordingly, Millennium told sales representatives that they had to increase revenue per specimen from so-called "troubled practices" or "troubled accounts"—or it would suspend sales representatives' commissions on these accounts and/or terminate them as customers. As a Senior Financial Analyst wrote to Mr. Pencak in March 2012 regarding one such "troubled" account: "The Practice is eligible for cancelation [*sic*] as a Troubled Practice and the primary driver for its poor performance is low tests per specimen. My logic is that if they could update the custom profile to include additional tests, then it would increase tests/specimen."

111.    Lists of "troubled accounts," prepared by Mr. Pencak, were circulated to sales teams with instructions to make the accounts more profitable by increasing the number of tests on their Custom Profiles. One sales manager directed her team to immediately photograph updated Custom Profiles and send the images to Millennium's Vice President of Business Analytics. Exhibit 16; Exhibit 17.

29

112. Millennium's employees executed these instructions successfully, repeatedly causing physicians to increase the testing on their standing orders and bragging about it. For example, in August 2011 a sales manager submitted to Ms. Peacock a "Plan of action for troubled accounts" in his region, with responses from sales representatives. Exhibit 18. One sales representative wrote: "I spoke with the office yesterday and they have modified their protocol effective immediately to include 4 additional confirmations of negative tests . . . ." *Id.* Another stated he set up a meeting to "convince [the account] to add more confirmations to their standing protocol." *Id.* Another wrote: "We will go in and get [the doctor] to increase confirm [*sic*] negatives. . . . He will make changes and add more confirm negative [*sic*] with some convincing." *Id.* Another wrote "we are meeting with these doctors to increase their testing of negatives." *Id.* The proposed marketing plans to increase testing do not reference a clinical justification for the additional tests. *Id.*

113. Millennium executives rewarded such success and agreed not to suspend sales commissions on "troubled" accounts that ordered additional testing. For example, the Regional Sales Manager for New England argued in a January 2012 email that one sales representative had made substantial progress "in increasing [an] account[']s revenue through test per specimen" and, for another account made "many strides . . . to increase profitability and protocol." Exhibit 19. For the latter account, the manager explained that the sales representative had secured a "[n]ew CP consisting of 14 test[s] per specimen," and that the practice had "[a]greed to use CP every time (Section A)." *Id.* Ms. Peacock wrote back that profitability had sufficiently increased and that commissions would not be suspended. The Sales Manager responded: "What a turn of events! Big win, I'll let [the rep] know, thanks for all the follow up!" *Id.* The email chain did not reference any clinical justification for the increased testing.

30

ML_DE_00595123

**3.    Millennium Promoted the Routine "Confirmation" of Negative POC Test Results and Made False and Misleading Statements to Further Encourage This Testing**

114.    To increase laboratory testing, Millennium trained its sales representatives to (1) "Emphasize the need to confirm every sample" and (2) "strongly suggest to our customers that negative POC results should be confirmed . . . ." Exhibit 20.

115.    Millennium sales training documents emphasized that "confirmations" of POC test results were key to Millennium's revenue (and sales representatives' compensation).  For example, one training presentation entitled "Sales Focus and Positioning" contained slides entitled "Make it routine" and "Emphasize the need to confirm."  The "Make it routine" slide instructed sales representatives "to help practices establish a testing protocol" to prevent testing volumes from declining over time.  The "Emphasize the need to confirm" slide noted that when "[p]hysicians consider point of care adequate and confirmation numbers are low" it "doesn't help our revenues—or yours!"  The slide suggested a "goal" for physicians to confirm every sample. Exhibit 21.

116.    Millennium paid its sales representatives commissions of $6, $8, $10, and even $12 per sample sent into Millennium for testing.  These commissions were significant—some sales representatives made hundreds of thousands of dollars per year in commissions.  Some Regional Managers made upwards of $1,000,000 per year in commissions.  Millennium only paid commissions for samples sent in from accounts Company executives deemed sufficiently profitable.

117.    Millennium trained its sales representatives to emphasize to physicians that they should not individually assess their patients, but rather extensively test all patients—with separate, expensive laboratory tests—pursuant to pre-determined Custom Profiles.  Millennium

31

ML_DE_00595124

offered various reasons for this blanket approach to testing, including that "profiling" patients (i.e., taking a patient-specific approach to testing) "doesn't sit well" with the Drug Enforcement Agency. *See* Exhibit 21.

118.    Millennium suggested to physicians that they could be subject to regulatory action if they did not order more tests from Millennium. In an April 2009 email, an area Sales Director wrote, "if they do not confirm every sample, they are in violation of the CLIA program. This could result in Medicare asking for all the money that they have billed for for [*sic*] the first half of the test, plus huge fines." Exhibit 22.

119.    Millennium also promoted the simplicity of "confirming" all POC test results. For example, Millennium's Chief Scientific Officer wrote to a sales representative in December 2009, copying Ms. Peacock: "In fact, we recommend to practices that they confirm all POCT results (positive and negative) that way they don't fail to order the correct test for a given drug because they end up getting all the results anyways." Exhibit 23.

120.    Millennium made numerous false and misleading statements regarding "false negative" rates for POC tests in order to cause physicians to increase testing for the confirmation of expected negative POC test results on their Custom Profiles.

121.    Millennium falsely claimed POC tests had very high "false negative" rates. Instead of using the proper definition of "false negatives"—negative test results that should have been positive—Millennium calculated and marketed a different, misleading statistic (the percentage of positive samples missed on POC tests) and called it the "false negative" rate. Millennium did this to create an inflated sense of uncertainty surrounding POC drug tests, undermine physician confidence in POC tests, and promote the routine use of quantitative UDT for drugs that patients were not suspected of taking.

32

ML_DE_00595125

122.   For example, Millennium compiled data from the second quarter of 2012 suggesting that, for every one hundred pain patients tested, approximately four were positive for cocaine on LC-MS/MS tests, and that, of these four, POC tests revealed two of them and missed two. Exhibit 24. Negative POC tests results were thus correct 98% of the time (yielding a false negative rate of approximately 2%), yet Millennium encouraged its sales representatives to say that POC tests for cocaine had a "false negative" rate of nearly 50%. *Id.* Millennium internal talking points from April of 2010 stated: "Cocaine was found to return a false negative rate in about 50% of the 2840 samples in which confirmation results vs. immunoassay were studied. Followed by 30% for propoxyphene, 28% for benzo's, etc. ***KEY TAKEAWAY: Doctors should confirm all negatives*** . . . ." Exhibit 25 (emphasis in original).

123.   Millennium's own data showed that the false negative rate for POC tests was actually very low for most drugs (4% or less for methadone, amphetamines, barbiturates, TCAs, MDMA, cocaine, marijuana, and PCP). *See, e.g.*, Exhibit 26.   The likelihood that a negative POC test result is "false" for a given patient is also affected by that individual patient's presentation, prescribed medications, and drug abuse history, if any.

124.   Millennium nonetheless consistently directed its sales representatives to promote false and misleading "false negative" rates, including through a Company marketing document entitled "Empirical Evidence to Consider when Formulating your UDT Program" that was distributed to all sales representatives for use with physicians. Exhibit 27 at 3.   As stated by a Regional Sales Manager to his team in an August 2011 email: "Use it to explain the reasons for false positive/false negatives on the POC cups.   This will also be helpful in securing more test requests/specimen on the Custom Profiles." Exhibit 28.   Millennium's Chief Scientific Officer wrote to another Regional Sales Manager in July 2011: "If you are looking to demonstrate the

33

ML_DE_00595126

importance of confirming negative POCT results, then I would recommend the document entitled 'Empirical data to consider when formulating your UDT program.'" Exhibit 29.

125.    The Company's false statements convinced physicians to order more tests from Millennium.  One Millennium sales representative wrote to Millennium's VP of Sales and other sales managers in March 2011: "I really wish we could take the Empirical data info and make it into a tri-fold presentation piece or flip chart!!  It has been such a beneficial tool at sales calls." Exhibit 30.

126.    Millennium also told physicians that they were risking legal liability if they relied on POC test results—despite a lack of support for routine quantitative testing in drug testing guidelines and Medicare coverage requirements that each test for each patient be reasonable and necessary.

127.    For example, in June and July of 2011, Millennium's Florida sales team recycled the false statement regarding "false negative" rates into talking points for use with physicians that stated: "Our data shows huge %'s of false negatives from the POC cups . . . Cocaine-false negatives on POC occur up to 50% of the time.  To risk medical license on a $6 cup is ___. You can fill in the blank :)." Exhibit 31.

128.    Millennium also claimed that the alleged lack of reliability of POC tests put physicians' practices as risk: "You may not have many high risk patients, but it only takes one overdose to put your practice on the line." *Id.*

129.    Millennium used unsupported threats of third-party legal actions to cause physicians to "confirm" POC drug test results.

34

ML_DE_00595127

130.    In September 2011, a Millennium Regional Vice President sent an email to all sales managers describing how to respond to complaints about "HUGE BILLS." He suggested they distribute a news article entitled "Another little old lady arrested for pushing drugs":

> Hand this print out to the physician and tell them, 'don't let this patient creep up and surprise you in your practice, **set the protocol to cover most of the drugs we can test** and we will make sure your patients aren't exploited and feel over charged. Once you start cherry picking who gets tested for this and that, you miss one like this. There are hundreds of patients dying in every state every month because of overdose, drug interaction, etc. so make sure none of them come from this practice[.]'

Exhibit 32 (emphasis added). Millennium's Vice President of Sales responded "Great advice Nick."

### 4.    Millennium's Conduct Generated Unnecessary Testing—Including "Confirmations" of Expected POC Test Results for Rarely Abused Drugs

131.    Millennium's use and promotion of standing orders caused testing that was not reasonable and necessary and for which the need was not assessed or documented.

132.    Routine quantitative testing under Custom Profiles led to millions of dollars in drug testing for Medicare patients that was not reasonable and necessary—including for substances that are rarely abused and diverted in the general population, much less in the Medicare population.

133.    For example, Millennium billed Medicare for more than 900,000 laboratory tests for phencyclidine or PCP (CPT Code 83992), at a cost of more than $16 million. PCP is not a commonly abused drug. According to Millennium's own data, the incidence of true positives for PCP is extraordinarily low. In addition, POC tests for PCP have very low false negative rates. For example, Millennium's own data revealed that, for a quarter in 2012, Millennium identified

35

ML_DE_00595128

only 24 false negatives out of 174,960 LC-MS/MS tests following negative POC test results for PCP—or 0.01 percent.  Exhibit 24.

134.  Millennium also billed Medicare more than $55 million dollars for laboratory testing of four types of TCAs—approximately 660,000 drug tests each for amitriptyline (CPT Code 80152), desipramine (CPT Code 80160), imipramine (CPT Code 80174), and nortriptyline (CPT Code 80182).  Millennium billed Medicare for each of these four tests nearly every time testing for TCAs was ordered.

135.  TCAs have been on the market since the 1960s.  TCAs present a low risk of abuse and diversion, in part because of side effects for users.  TCAs are not even listed in the schedules of controlled substances under the Controlled Substances Act.  21 U.S.C. § 812.

136.  While POC tests for TCAs have a somewhat higher risk of false negatives than PCP (around 3%, according to Millennium's 2012 data), the need for that testing is tempered by the low abuse potential for TCAs and lack of abuse history for the vast majority of patients.

137.  Millennium knew many customers ordered TCA testing.  In one email, Ms. Peacock asked Mr. Pencak, "What percent of customers order TCA confirmations?"  Mr. Pencak responded: "About 49%."  Exhibit 33.

138.  Millennium routinely analyzed and summarized data on test ordering patterns, in "Practice Profiles" and "Regional Profiles" (summarizing tests ordered by entire states), that showed ordering patterns indicating frequent use of Custom Profiles and the ordering of unnecessary "confirmations" of expected POC test results.  *See, e.g.* Exhibit 34 at 5.

36

ML_DE_00595129

**5.      Millennium Knowingly Submitted Claims to Medicare for Tests That Were Not Reasonable and Necessary**

139.    Millennium knew that, as a laboratory and Medicare supplier, it had an obligation to submit claims to Medicare only for tests that were reasonable and necessary for the diagnosis or treatment of individual patients.

140.    For example, Millennium's 2012 Annual Physician notice stated:

Medicare will only pay for tests that meet the Medicare coverage criteria and are medically necessary for the diagnosis or treatment of the individual patient. **Tests used for routine screening of patients without regard to their individual need are not usually covered by the Medicare program, and therefore are not reimbursed.** As a participating provider in the Medicare Program, the laboratory has a responsibility to make a good faith effort to ensure all tests requested are performed and billed in a manner consistent with all federal and state law regulations.

Exhibit 3 (emphasis added).

141.    Millennium knew that its emphasis on Custom Profiles put it at high risk that these conditions would not be met.

142.    In pursuing its practices, Millennium ignored and misled its compliance consultants. For example, its compliance consultant CodeMap repeatedly warned Millennium that all testing had to be patient-specific. In 2009 guidance provided to Millennium, CodeMap explained that Medicare does not pay for "preventative" or "screening" urine drug tests, stating:

The original Medicare law did not cover any preventive or "screening" services. Medicare defines any test or procedure performed in the absence of signs or symptoms of illness, injury, or a malformed body part as a "screening" service. However, Congress has subsequently passed legislation that allows Medicare to cover a number of screening tests under specific conditions.

Congress has not passed legislation regarding Medicare coverage for urine drug tests in the absence of signs or symptoms of illness or injury.

37

143.   CodeMap advised Millennium multiple times that testing had to be based on the needs and condition of an individual patient.  In a July 2010 audio presentation to Millennium, CodeMap's founder, Charles Root, emphasized that confirmatory tests must be supported by an individualized determination of medical necessity.  *See* Exhibit 35 ("Dr. Root did not answer an important question very favorably.").  Mr. Root reiterated this principle again in September 2010, when an independent compliance consultant was upset by Millennium's marketing messages promoting confirmation testing that was not reasonable and necessary.  Millennium asked Mr. Root to speak with her.  Mr. Root wrote to Millennium's President:  "I spoke with [her] yesterday and believe everyone is now on the same page - her issue was confirmation of ALL tests regardless of result or patient needs, I gave her the same advice that we have discussed regarding medical necessity documentation etc. and the need to tailor confirmations to patient needs."  Exhibit 36.  Millennium's President responded "Thanks. We agree too."  *Id.*  This representation was not consistent with Millennium's practices.

144.   Millennium knew it was submitting claims to Medicare for UDT that failed key coverage requirements.  Millennium's sales personnel knew what tests physicians were ordering, what was on their Custom Profiles, and how often they tested their patients.  Millennium routinely tracked how many specimens were referred, and how many tests were ordered per sample.

145.   Millennium, through its executives and employees, knowingly submitted claims to Medicare for UDT that was not reasonable and necessary.

38

ML_DE_00595131

**B.    Millennium Gave $5 Million Worth of Free POC Test Cups to Physicians in Exchange for Referrals in Violation of the Stark Law and Anti-Kickback Statute.**

**1.    Millennium Distributed Free POC Test Cups in Exchange for Referrals**

146.    Millennium provided more than 1,000,000 POC test cups to physician-customers throughout the country for free, explicitly in exchange for laboratory UDT referrals.

147.    Millennium primarily distributed these POC test cups under contractual agreements ("Free Cup Agreements"). The Free Cup Agreements required that physicians agree to refer additional testing to Millennium on the cup specimens and agree not to bill insurers for the POC test cups. *See* Exhibit 37; Exhibit 38. Under the Free Cup Agreements, physicians had to pay for any of the "free" POC test cups that did not generate referrals to Millennium. Exhibit 39. Millennium's President reviewed, approved, and signed Free Cup Agreements.

148.    Millennium monitored the number of free POC test cups it shipped to customers and referrals it received back under the Free Cup Agreements, to ensure that physicians were sending the cup specimens in to Millennium for additional testing. *Id.*

149.    As Millennium attested to federal regulators, over 220,000 of the "free" POC test cups were used on Medicare patients.

150.    Millennium attested to federal regulators that (1) the cost of these "free" POC test cups was approximately $6.25 per cup from June 2010 through December 2012 and $4.90 per cup from January 2013 through June 2014, (2) the value of the free POC test cups used for Medicare patients exceeded $1,200,000, and (3) that Millennium received more than $90,000,000 in payments from Medicare for testing referred by physicians who received free POC test cups.

39

Confidential

### 2. Millennium Knew that Free POC Test Cups Were Items of Value to Physicians

151.    POC test cups are specimen collection cups with test strips embedded in them:



Standard

Specimen Cup

POC Test Strips

P
OC Test Cup

152.    Millennium knew that the test strips contained in the POC test cups made the test cups more valuable to doctors than clear collection cups—and they were significantly more expensive.   Millennium knew the free POC test cups were clinical supplies that physicians normally had to purchase, as well as tools used for evaluation and management of patients.

153.    CMS changed the reimbursement structure for POC test cups, effective April 2010.   The new reimbursement rate applicable to POC cup tests after these changes was approximately $20-25—much less than some physicians previously had been billing. Specifically, many physicians, with Millennium's encouragement, had been billing multiple units of the applicable CPT code—one for each test strip contained within the POC test cup— obtaining reimbursements of more than $180 per test cup.

154.    Once physicians could only seek approximately $20-25 in reimbursement for a POC cup test, the POC test cups were no longer a source of significant reimbursement revenue for physicians.  The clinical information the POC test cups provided, however, was still valuable

40

ML_DE_00595133

in the evaluation and management of patients, and the ability to get them for free presented substantial cost savings to physicians.

155.   Millennium's Free Cup program grew dramatically after CMS's rate reduction, and the number of Free Cup Agreements and the number of free POC test cups Millennium distributed increased significantly.

156.   Many physicians did not want to deal with the costs and administrative burdens associated with billing and seeking reimbursement for tests performed using POC test cups. Exhibit 40.   Some insurers also would not reimburse for tests performed using POC test cups. For example, under Medicare, customers that used in-office immunoassay analyzers could not bill for both a POC test cup test result and a POC analyzer test result for the same patient. Because the analyzers results were reimbursed at a higher rate, physicians chose to seek reimbursement for that test; however, practices still wanted the immediate results from POC test cups for patient management and evaluation.   In addition, various state Medicaid programs also did not reimburse for tests performed using POC test cups.   Some physicians in these states wanted free POC test cups in order to be able to clinically assess their Medicaid patients (and bill for the office visit)—even though the expense would have come out of pocket absent "free" POC test cups from Millennium.

157.   Millennium knew that POC test cups (and the tests results they produced) had financial value.   For example, Elizabeth Peacock, Millennium's VP of Sales, wrote in March 2010:   "Let's really emphasize the $$ value of the instant test cups . . . . This is unique.   No other labs offering.   Should be very valuable for [the physician] since they have . . . no way to get that instant preliminary read.   That would cost them AT LEAST $5 per patient additional if they don't go with [Millennium] for confirmations." Exhibit 41.

41

158. Millennium's President, Howard Appel, agreed that free POC test cups should be used by the sales force as a marketing tool. Exhibit 42.

### 3. Millennium Knew That Providing Free Test Strips Violated the Stark Law and Anti-Kickback Statute

159. Millennium knew that the test strips in the free POC test cups had value to physicians and that they were not used solely (or at all) to collect, transport, process, or store specimens for Millennium.

160. Millennium did not use the POC test strips or results in conducting its LC-MS/MS testing or in reporting the results of its LC-MS/MS testing. As stated by one Regional Vice President: "I could care less what cup they use. I don't care if they send it to me in a Ziploc bag. I want their urine[.]"

161. Millennium knew that providing free drug test strips—outside of cups—to physicians violated the Stark law and Anti-Kickback Statute.

162. On one occasion, Ms. Peacock circulated an internal company memo acknowledging that Millennium could not provide free test strips: "Millennium can not [sic] provide other CLIA Waived POC devices like single strips at no cost because the strips have no relationship to the specimen collection and federal regulations say that non-collection items can not [sic] be provided without charge." The same document acknowledges that the POC test cup—due to the test strips—"serves as a test vehicle for the practice."

163. Despite Millennium's knowledge that providing test strips for free was illegal, it provided millions of free test strips within the POC test cups it distributed to physicians.

164. Millennium also knew that absent an applicable statutory exception POC test cups had to be sold at "fair market value" to comply with the Stark Law and Anti-Kickback Statute.

42

ML_DE_00595135

165.    Millennium's outside health care consulting firm, CodeMap LLC, advised the Company in August 2009 that point-of-care drug testing supplies provided to physicians who referred laboratory testing to Millennium must be *sold* to them at fair market value, stating: "As long as Millennium charges its customers fair market value for [point of care testing] supplies, the practice should not implicate the Anti-Kickback Law." Regarding the Stark Law, CodeMap stated that Millennium's price must meet the "Fair Market Value Compensation exception," which requires that "the compensation must be . . . consistent with fair market value, and not determined in a manner that takes into account the volume or value of referrals or other business generated by the referring physician." Exhibit 43.

166.    Millennium received concerns from customers, prior to the initiation of the Free Cup Agreement program, that it was selling POC test cups for too low a price, in violation of the Stark Law and Anti-Kickback Statute.   Exhibit 44.   Millennium's president, Mr. Appel, responded to these concerns stating that the pricing was legal because "the most important factor to consider" is that price is "consistent with fair market value and is not determined in a manner that takes into account the volume or value of actual or anticipated referrals." *Id.* But Millennium determined who qualified for free POC test cups based upon actual and anticipated referrals:  the Cup Agreements required referrals to Millennium and the Company's "Approval Guidelines" mandated that customers must have "12 tests + validity" on a Custom Profile to be approved for a Free Cup Agreement.

167.    Millennium received warnings that the provision of free POC test cups violated the Stark Law.  In September 2010, Charles Root, a compliance consultant at CodeMap, wrote an email to Millennium's President advising him that the provision of free POC test cups would violate the Stark Law, in part because they provided value to physicians beyond plain specimen

43

ML_DE_00595136

collection cups: "[M]y assumption was that you provided specimen transport cups, not test cups . . . provision of a test cup rather than a simple specimen collection device *gives the physician something of value not associated with specimen collection.*" Exhibit 45 (emphasis added).

168. Despite this advice, Millennium continued to distribute free POC test cups—which contained free test strips—in exchange for referrals under the Free Cup Agreement.

169. Millennium did not disclose to sales representatives or customers CodeMap's advice that free POC test cups have value and that providing them would violate the Stark Law. In late 2010, Millennium stopped using CodeMap as a compliance auditor after Millennium refused to accept and sign the findings of CodeMap's "Annual Compliance Audit."

170. Millennium also received warnings—from customers and employees—that the provision of free POC test cups in exchange for referrals was a "blatant" and "clear" Stark Law and Anti-Kickback Statute violation.

171. In an internal January 2010 email, Millennium's Laboratory Director noted that "providing POCT test kits free as an inducement to use our lab for confirmations would be a clear Stark violation." Exhibit 46.

172. In November 2010, a customer in New England wrote to a Millennium sales representative that "After reviewing the [Free Cup Agreement] . . . I suggest we avoid receiving [POC test] cups unless we plan to pay for them. *It seems like a blatant stark/kickback concern.* The cups are $6 each. I suggest for both parties we stay clear [of] receiving this product for no charge. If we want some cups we should pay for them." Exhibit 47 (emphasis added). The sales representative forwarded this email to Millennium's President, Howard Appel. Mr. Appel responded directly to the customer, but did not mention that Millennium's own consultant, CodeMap, shared the customer's view that the provision of free POC test cups was illegal. The

44

ML_DE_00595137

customer raised a further concern in a response email that the Free Cup Agreement was inaccurate because it contained language that the POC test "supplies are used solely for collecting and transporting specimens for testing" to Millennium, and noted that "is simply not the case" for his practice.   The POC test cups were not solely collection and transportation devices for Millennium; they contained drug test strips that were used by physicians as POC testing devices.

173.    Millennium also knew that Florida's AHCA had specifically found that the provision of free POC test cups was illegal on July 8, 2008.   Florida's AHCA issued a Declaratory Statement and Final Order that the provision of free POC test cups would violate Florida Administrative Code, Rule 59A-7.020, which mirrors the Stark Law, explaining:

> Specifically, Rule 59A-7.020(15), Florida Administrative Code, allows a laboratory to provide specimen cups to physicians free of charge *only* for the collection, transportation, processing and storing of laboratory specimens; transmitting laboratory information to the laboratory; or ordering or communicating laboratory tests or results and other patient information between the physician, surgeon, organization, agency, or person and the laboratory. Further, Rule 59A-7.020(15)(f), Florida Administrative Code, prohibits laboratories from providing free "test kits" to physicians.   The Petitioner's proposal to provide physicians free specimen cups that, in addition to serving as collection devices, perform either waived tests or moderately complex tests on-site for the physicians would violate these rules.   Consequently, the Agency declares that Petitioner would be subject to licensure sanctions for violating Rule 59A-7.020, Florida Administrative Code, if it were to engage in the free specimen cups arrangement proposed in the Petition.

*In Re: Petition for Declaratory Statement of Dominion Diagnostics, LLC*, FRAES No. 2008008228, July 8, 2008, at 5.   AHCA specifically found a deficiency with respect to Millennium's provision of free POC test cups in June 2012 and sent a notice of this deficiency to Millennium.   Nonetheless, Millennium continued distributing free POC test cups to physicians under its Free Cup Agreements.

45

174.   Competitors also raised concerns that the Free Cup Agreements were illegal.  For example, on October 4, 2010, a Millennium sales manager, Brandon Worley, emailed Ms. Peacock stating that potential customers "wanted documentation stating that it is legal to provide them with free cups if they don't bill for them.  We think one of the other labs is telling them that it is a Stark violation."  Two days later, on October 6, 2010, Ms. Peacock wrote Millennium's President, Mr. Appel, and all of Millennium's sales representatives that some "prospective and current customers have received visits from competitors who are scaring them into believing that furnishing test cups at no charge is illegal and a violation of Stark Laws."

175.   A competitor of Millennium's also sued the Company in federal district court in 2011, alleging that the distribution of free POC test cups violated both the Stark Law and the Anti-Kickback Statute. *Ameritox. Ltd. v. Millennium Laboratories*, Case No. 8:11-cv-0775-T-24 (M.D. Fla) (A jury in that case ultimately found that Millennium's provision of the POC test cups violated the Stark Law and Anti-Kickback Statute, and Millennium has appealed).

**4.    Millennium Knowingly Submitted Claims for Tests Referred in Violation of the Stark Law and Anti-Kickback Statute**

176.   Millennium knew that compliance with the Stark Law and Anti-Kickback Statute was a condition of payment by Medicare.  Millennium explicitly certified that, as a Medicare supplier, it would comply with all Medicare laws and regulations, including the Stark Law and Anti-Kickback Statute, on Form CMS-855B and CMS-1500 claims forms.

177.   Millennium knowingly compensated physicians with millions of dollars in free POC test cups in exchange for referrals, in violation of the Stark Law and Anti-Kickback Statute. Millennium paid the kickbacks expressly to obtain referrals, to increase the number of tests referred, and to prevent customers from affiliating with competitors.  In doing so, Millennium

46

ML_DE_00595139

ignored numerous, specific warnings from its employees, consultants, customers, competitors and even a government agency.  Millennium submitted tens of millions of dollars of claims to Medicare for services it performed resulting from these referrals, and knew these claims were false because they were submitted in violation of the Stark Law and Anti-Kickback Statute.

178.    Millennium, through its executives and employees, knowingly submitted claims to Medicare for UDT that was referred in violation of the Stark Law and Anti-Kickback Statute.

**C.    Millennium Fostered a Culture of Non-Compliance and Greed**

179.    Millennium fostered a culture of greed and intimidation in its sales force.  Sales representative compensation was tied directly to the number of specimens sent in for testing— and obtaining Custom Profiles that met internal testing thresholds.  Sales representatives were compensated handsomely when they successfully obtained increased testing and subjected to relentless pressure when they did not.

180.    The message of sales as a means to riches came from the top of the Company.  For example, at its 2012 National Sales Meeting, Millennium's CEO, Mr. James Slattery, gave a presentation to approximately 250 sales representatives where $2,000,000 worth of gold coins were brought out and placed on stage.  Some of those in attendance interpreted these gold coins as a message that sales representatives should aspire to more wealth; *see* Exhibit 48, others interpreted it as a threat that Millennium was willing to use its resources against perceived threats.

181.    Millennium's General Counsel gave a presentation, nominally on "compliance" entitled "Taking Over."  During the presentation, Millennium's General Counsel showed an animated slide of a former employee whom Millennium had sued.  The former employee's face

47

ML_DE_00595140

was shown on a target range being shot repeatedly, and another slide depicted Millennium's competitors and the former employee in body bags:





182. Speaker notes emphasized the implied threat to employees who did not toe the Company line:

> Don't be a weasel. . . . I don't want to be on the other side of litigation from any of you. I hope you don't want to be on the other side of litigation with Millennium. There is no amount of time or resources we won't spend to hold our employees accountable. . . . [W]e will protect this company . . . .

183. Millennium also made it clear it did not want any documentation of potential violations of law. In a letter to the sales team dated November 28, 2011, Millennium's President

48

described a violation of Millennium's "e-mail communication policies" where "a sales rep wrote an email to a client of a competitor and listed 25 separate reasons why the account should switch to Millennium, including 'free cups.'" His first proposed rule in response to this and other compliance violations identified in writing was to say "DO NOT WRITE ANY EMAILS LONGER THAN TWO SENTENCES." Exhibit 49.

184.    Notes from a "Managers Meeting" in August 2011 state: "Company policy is to delete text messages 10 days or older." Exhibit 50. Similarly, notes from an October 2011 regional team meeting state: "Every two weeks delete your text messages. As we have litigation with our competitors they will want to see your phone." Exhibit 51.

185.    In another instance of email deletion, Ms. Peacock, Millennium's VP of Sales, instructed sales representatives to delete all emails from a chain entitled, "4600 today," in which a Regional Vice President challenged members of the sales force to increase drug testing on Fridays and Mondays, and in which other members of Millennium's management offered cash incentives for increased testing.

186.    Millennium's sales representatives responded to the Regional Vice President's "4600" email, with encouragement from management, in a manner showing a disregard for professionalism and an emphasis on sales and greed that permeated the Company's culture. For example: "GET. THAT. PEE!!"; "The Friday pee badgers [']we take what we want![']"; "Pick up the liquid GOLD before liquid goldschlager on Fridays!"; "GOLD RUSH FRIDAYS"; "Merry Pissmas!!!"; "Pick up the PISS"; "TGIP/Gold Rush Fridays"; "I LOVE everyone's emails. The common theme is the personal commitment to domination."

187.    Many additional emails demonstrate an emphasis on sales without regard for medical necessity or compliance: "[G]et these doctors addicted to Millennium so [] they're

49

ML_DE_00595142

PISSED that they're 'not allowed' to send to us"; "We want MORE piss"; "Keep pushing the PISS"; "The purpose of every call is to get more PISS to the house"; "Trying to make it rain liquid gold baby!"

188.   The emphasis on sales came from the top. Millennium's VP of Sales wrote an email to all Millennium sales representatives in November 2011 that stated: "**let's not forget our primary mission - to sell, sell, sell.**" Exhibit 52 (emphasis in original).

189.   A Regional Sales Manager described the pressure: "they basically wanted the reps to wake up in the morning fearing their jobs. Not feeling good about themselves, thinking they were going to get fired."

190.   Millennium further promoted its services to physicians with an emphasis on ways that the physicians could make money—from speaking fees, free POC test cups, reimbursements on POC test cup and analyzer test results (with Millennium assistance)—that further placed money over medical necessity.

191.   For example, a Regional Vice President took credit for making Dr. Robert Windsor, Millennium's largest referrer, money in a November 2010 email: "You along with many other physicians made hundreds of thousands of dollars if not more from OUR risk."

192.   Millennium emphasized profits above compliance and intimidated sales representatives to engage in marketing tactics designed to generate UDT orders that were not patient-specific and not reasonable and necessary for patient diagnosis or treatment. This caused Millennium's submission of claims to Medicare for services it performed resulting from these orders that were not reasonable, necessary, or patient-specific.

50

**D.    Examples of Physician Practices that Referred Millions of Dollars in False and Fraudulent Testing to Millennium for Medicare and Florida Medicaid Patients**

**1.    National Pain Care – Dr. Robert E. Windsor**

193.    Millennium's top-referring physician provider was Dr. Robert E. Windsor, who owns pain management clinics in Georgia, Kentucky, Florida, and Ohio, all operating under the corporate umbrella of National Pain Care, Inc. ("NPC").    Medicare has paid Millennium approximately $35 million in UDT ordered by NPC clinicians.    Millennium identified Dr. Windsor, who personally saw patients only infrequently, as the "referring provider" for UDT that has generated nearly $18,000,000 in Medicare payments to Millennium.    A large portion of these payments to Millennium were for prohibited claims and unnecessary tests.

194.    Dr. Windsor used Millennium as a test laboratory for his Georgia practice beginning in mid-2010.    In August 2010, he indicated he wanted to use Millennium for his clinics in Kentucky.    Elizabeth Peacock wrote to Jarrett Smith, at the time a Millennium Regional Manager, "OK, let's . . . maximize the confirmations from these accounts."    Mr. Smith replied, "They have already committed to sending everything in.    We will make sure they blow it out."    Exhibit 53.    By this, Mr. Smith meant that Dr. Windsor had told him that Dr. Windsor's practices would be ordering confirmations for all his patients for all drugs tested at the POC, plus some that were not.

195.    Beginning in May and June 2011, Dr. Windsor began using Millennium for most of his clinics, including the ones in Kentucky and his newly purchased clinic in Dayton, Ohio.    Dr. Windsor authorized Custom Profiles that were substantively the same across all his clinics.    *See, e.g.,* Exhibit 54.

51

    ML_DE_00595144

196.   Beginning in approximately May 2011, Millennium provided Dr. Windsor with "Laboratory Service Assistants" ("LSAs")—Millennium employees who were hired to process urine specimens for shipment to Millennium—at no charge to the physician.  These LSAs were aware of NPC's UDT protocols, and several of them did work for NPC beyond their permitted tasks—for example, operating NPC's POC analyzer machines.  Millennium also gave Dr. Windsor free POC test cups to use at his Georgia clinics.

197.   Dr. Windsor established uniform UDT practices throughout his pain management clinics.  For example, a patient prescribed narcotics for pain relief was given a thirty-day prescription, and, to receive a refill, the patient was required to return to the clinic for a follow-up visit and undergo UDT.  Thus, virtually all NPC patients prescribed narcotics (as most were) had their urine tested every thirty days.  When the patient produced a specimen, NPC performed a POC test (either with a POC test cup or a chemical analyzer), so that the clinician could have immediate preliminary drug test results to help decide whether to initiate or renew a prescription.  Whether NPC sent a specimen to Millennium for further testing typically depended on the patient's insurance: if an insurer would not pay, NPC discarded the specimen; otherwise NPC automatically sent the specimen to Millennium for quantitative testing.

198.   Until at least March 2014, virtually all specimens NPC sent to Millennium from any given NPC clinic were subject to essentially the same quantitative UDT panel, regardless of the patient's presentation, demographic profile, medical history, or history of drug or alcohol abuse.  In approximately March 2014, after learning he was a subject of government investigation, Dr. Windsor purported to modify his UDT policy to require an assessment of a patient's risk of abusing drugs.

52

ML_DE_00595145

199.   Most NPC clinicians treating patients had little or no input into the UDT performed on their patients.  Indeed, until approximately December 2012, the NPC clinicians did not fill out Millennium requisition forms; rather, Millennium employees—the LSAs hired by Millennium to process the specimens—carried out this task.  The LSAs were instructed by their supervisors at Millennium to fill out the requisition forms and always check the "Use Custom Profile" box, contained in Section A on the form.

200.   After Millennium told its LSAs in late 2012 that a NPC employee should be the one to check the "Use Custom Profile" box of the requisition forms, NPC medical assistants took over this specific task.  The process varied, but one NPC medical assistant, for example, gathered 200 or so requisition forms at a time, and filled out certain information on all of the forms in advance, including checking off "Use Custom Profile."  Later, when an individual patient delivered a urine specimen, the medical assistant would add the patient's name and other patient-specific information to the Requisition form.

201.   Millennium sales employees knew about Dr. Windsor's UDT protocols.  For example, Millennium sales representatives Joey Bilyeu and Megan Mason knew that the Georgia Pain Physician clinics (owned by NPC) always checked the box for "Use Custom Profile" on the Millennium requisition form.  The Millennium Regional Director for the Mid-South Region, Jarrett Smith, believed all of the Dr. Windsor/NPC Custom Profiles—for the Georgia, Kentucky, and Ohio practices—were the same, and he understood that the clinics used the Custom Profile as the basis for quantitative UDT virtually all of the time.

202.   Millennium also knew that Dr. Windsor's clinics were ordering tests for drugs that were virtually never encountered in their patient populations.  For example, through about mid-2013, Dr. Windsor's Custom Profiles called for Millennium to conduct quantitative testing

53

ML_DE_00595146

for PCP, MDMA, and heroin. Yet a "Practice Profile" prepared by Millennium for Dr. Windsor, which summarized tests on 10,499 specimens from Dr. Windsor's Kentucky Pain Physicians clinic in Pikeville, Kentucky from January 1, 2013 to August 1, 2013, showed that not a single patient had tested positive for these drugs, and that Millennium's own average positive rate for these drugs (from a sample of approximately 80,000 specimens submitted by other physicians) was 0.3%, 0.0%, and 1.2%, respectively.

203.    By way of example, a patient at Dr. Windsor's Georgia Pain Physicians clinic in Calhoun, Georgia, referred to herein as "Patient FA," was a Medicare patient who was seventy-eight years old at the time of his first visit to the clinic in 2011 for treatment for chronic pain. He had no history of alcohol or drug abuse. Yet, every month, NPC tested his urine with an immunoassay point-of-care screen, and then sent the urine sample to Millennium for a battery of quantitative UDT under a Custom Profile that called for testing for methadone, amphetamine, cocaine, marijuana/THC, MDMA, PCP, and specimen validity testing (creatinine, oxidant, pH, and specific gravity).

204.    On October 11, 2011, Patient FA was seen at the Calhoun clinic by Dr. Adithya Reddy for a routine follow-up visit. Consistent with his past history, the POC drug test that NPC performed that day yielded negative results for amphetamine, barbiturates, benzodiazepines, cocaine, methadone, methamphetamine, PCP, TCAs, and marijuana. NPC then sent his specimen to Millennium with a Requisition form that had the boxes, "Use Custom Profile," and "Perform Specimen Validity Testing," checked off. Exhibit 55. Dr. Windsor's name was on the Requisition form as the requesting physician, even though he did not see Patient FA on that date. In accordance with the operative Custom Profile, Millennium conducted quantitative testing for Patient FA's prescribed medication, plus oxycodone, noroxycodone, oxymorphone, methadone,

54

ML_DE_00595147

EDDP (methadone metabolite), alpha-hydroxyprazolam, 7-amino-clonazepam, lorazepam, temazepam, oxazepam, amphetamine, methamphetamine, cocaine metabolite, cTHC (marijuana metabolite), MDMA, and PCP. Exhibit 56. Like all the earlier Millennium test results for this patient, the test results and specimen validity testing were consistent with the patient's prescribed medication and revealed no suggestion of abuse. Millennium submitted two claims to Medicare for this testing and was paid more than $217. Exhibit 57.

205.    Many of the Millennium tests, including but not limited to the tests for methadone, EDDP (methadone metabolite), benzodiazepines (alpha-hydroxyalprazolam, 7-amino-clonazepam, lorazepam, nordiazepam, oxazepam), cocaine metabolite, amphetamines, methamphetamines, THC, MDMA, and PCP, were not reasonable and necessary and the clinicians treating the patient did not assess the medical need, if any, for these tests. Millennium's claims to Medicare were false claims. *See* Exhibit 57.

206.    On or about April 24, 2012, Dr. Windsor updated his Custom Profiles, including for the Georgia Pain Physicians clinics, by adding approximately thirteen more drugs to the list of drugs for which to test. Exhibit 58. Patient FA was seen again at the NPC Calhoun Clinic for a routine follow-up visit, this time by Dr. Olalekan Ajibowo, on May 15, 2012. Although Patient FA's medical history still indicated no risk factors for drug abuse, and no reason to increase the amount of quantitative UDT, a Millennium LSA filled out the Requisition form with "Use Custom Profile" checked off (just as all the other Requisitions were filled out). This time, Millennium conducted testing on the sample for the drugs referenced in paragraph 205 above (with the exception of amphetamine, methamphetamine, and MDMA), plus propoxyphene, norporpoxyphene, tapentadol, meperidine, normeperidine, methylphedidate, ritalinic acid, ketamine, norketamine, crisoprodol, meprobamate, pehobarbital, secobarbital, butalbital,

55

ML_DE_00595148

amitriptyline, nortiptyline, imipramine, desipramine, cyclobenzaprine, ethyl glucuronide, ethyl sulfate, JWH-018(n-valeric acid)), JWH-073(N-(n-butyric acid), JWH-018(N-(n-petanol)), JWH-073(N-(n-butanol)), MDPV, methylone, mephedrone, and 6-MAM (heroin metabolite). Exhibit 59. None of the Millennium tests for these additional substances was reasonable and necessary and the clinicians who treated the patient did not assess the medical need for these tests, if any.

207.   Millennium submitted claims to Medicare for this testing and was paid $678.65 for it. Exhibit 60. Millennium knew these claims for tests that were not reasonable and necessary, and not ordered by the physician treating the patient, were false. Millennium also knew that these practices occurred across NPC.

### 2.   Tampa Pain Relief Center

208.   Tampa Pain Relief Center ("Tampa Pain") is a pain management practice in Florida with clinics in Brandon, Tampa, Oldsmar, and Miami, Florida. Tampa Pain is owned by Surgery Partners, which owns a large number of medical facilities throughout the United States. Tampa Pain employs a number of physicians who work at its clinics.

209.   Tampa Pain began using Millennium in 2008, and ceased using Millennium in early 2012. From 2008 through 2012, referrals from Tampa Pain to Millennium resulted in almost $5,000,000 in Medicare payments to Millennium.

210.   Like NPC, Tampa Pain used common testing protocols for all patients who were prescribed narcotics, without regard to the individual circumstances of the patient. In 2008, Tampa Pain's "Standing Order" included confirmation of all POC test results (both positive and negative results), and also quantitative testing for methadone, fentanyl, and alcohol (ETOH).

211.   In early 2011, Tampa Pain physicians began using Custom Profiles that covered multiple physicians and multiple locations. Exhibit 61. For patients who were prescribed

56

ML_DE_00595149

narcotics, Tampa Pain physicians almost always used the Custom Profile to order testing from Millennium, without an assessment of each patient's history, demographic information, or risk of abuse.

212.    Millennium sales personnel knew that all Tampa Pain patients were receiving essentially the same extensive UDT, regardless of the individual patient's need, condition or history. *See* Exhibit 62. As one Millennium employee wrote to another in July 2011 (and as forwarded to others): "The selection in box A [of the requisition/order form] should be to use the custom profile. Any specimen coming from a Tampa pain location should all be marked to use the custom profile." Exhibit 63.

213.    An example of false claims submitted by Millennium to Medicare from this conduct is the drug testing for Patient RR, a middle-aged male with a history of chronic pain who was also being treated elsewhere for depression. Patient RR's medical records show no discernible history of drug or alcohol abuse, and, throughout his treatment at Tampa Pain, he did not exhibit abberant behavior or present other indications that he was at a high risk for drug diversion or abuse. Yet, from April 12, 2011 through March 27, 2012, Tampa Pain referred eleven urine specimens of Patient RR to Millennium for testing, and each time the only instruction Tampa Pain gave to Millennium was to "Use Custom Profile."

214.    On November 28, 2011, Patient RR was seen at the Tampa Pain clinic on North Habana Avenue, Tampa, Florida, for a routine follow-up visit and prescription refill. A urine drug screen was performed at the clinic, and the specimen tested positive for classes of drugs that the patient had been prescribed (methadone, opiates/morphone, and oxycodone), and negative for everything else (amphetamines, barbiturates, benzodiazepines, marijuana/THC, cocaine, alcohol, ecstacy, and PCP). Nonetheless, Tampa Pain sent the specimen to Millennium with an unsigned

57

ML_DE_00595150

Requisition form stating, "Use Custom Profile," and Millennium performed, and billed Medicare for, quantitative UDT for substances including benzodiazepines, cocaine, heroin, amphetamines, MDMA, methamphetamine, PCP, and marijuana/THC. Exhibit 64. The Millennium test results were consistent with the urine drug screen testing done by Tampa Pain and consistent with the patient's medical condition and history. Millennium billed Medicare $266.90 for these tests and Medicare paid Millennium that amount. *Id*. Millennium's claims to Medicare for these tests were not reasonable and necessary. Millennium's claims to Medicare for these tests were false claims..

215. Tampa Pain was a high profile account within Millennium. In proposed feedback to a sales representative, one manager wrote: "If you do not have an objective to get more pee to the lab and at every visit to bring value, the visit is useless. . . . Tampa Pain has a massive presence wtihin Millennium as a whole . . . ." Exhibit 65.

216. Millennium also provided free POC test cups to Tampa Pain. From April 2011 through June 2012, Millennium gave approximately 5,275 free POC test cups to Tampa Pain for use at its Habana, Fletcher, Oldsmar, and Brandon locations.

217. Millennium sales personnel also gave gifts to Tampa Pain employees, including watches, jewelry, gift cards, and electronics. These gifts were in violation of Millennium's own compliance policies.

### 3.    Coastal Spine and Pain

218. Coastal Spine and Pain Center ("CSP") is a pain management practice with several locations in Florida, including in Jacksonville, Orange Park, Fernandina Beach, Hilliard and Middleburg. CSP has several physicians who work at its clinics, and who also own a share of the practice.

58

    ML_DE_00595151

219.    CSP physicians began using Millennium for UDT in June 2009.  CSP physicians ordered testing from Millennium pursuant to Custom Profiles.

220.    From August 2010 through May 2014, Millennium provided CSP with more than 67,000 free POC test cups—a value of more than $325,000.  Millennium and CSP knew the value of the cups Millennium provided to CSP.

221.    In an August 12, 2010, email, the Practice Administrator of CSP, who was partly responsible for laboratory selection for CSP, told Millennium's President that a Free Cup Agreement "is vital to our practice."  Exhibit 66.  In her plea for free cups, she explained that CSP physicians "are constant advocates in our area for Millennium Laboratories" and that "Every urine [sample] collected in my facilities is . . . sent for confirmation to Millennium.  *Id.* Millennium agreed to provide the free POC test cups, and Millennium's President responded to a thank you note from CSP by stating "You are very welcome[.]" *Id.*

222.    Millennium paid the Practice Administrator and CSP physicians who referred UDT to Millennium, tens of thousands of dollars for speaking engagements and consulting services.  For example, CSP's Practice Administrator—a non-physician—had an agreement with Millennium for consulting services that paid her a $24,000 annual retainer.

223.    CSP physicians almost always used Custom Profiles as standing orders for UDT for patients who were prescribed narcotics.  A CSP physician testified, "we decided on what we were going to screen for . . . and put that in the [custom] profile to send to Millennium."

224.    The determination of what tests Millennium performed on a particular patient's specimen was not based on the patient's history, demographic information, or risk of abuse, but rather the Custom Profile in effect at that time.

59

ML_DE_00595152

225.   From 2009 through 2014, while CSP had prohibited financial relationships with Millennium under the Stark Law and the Anti-Kickback Statute as a result of its receipt of hundreds of thousands of dollars' worth of supplies in the form of POC test cups, CSP physicians referred more than $10,000,000 in UDT to Millennium for Medicare patients, the majority of which CSP referred pursuant to Custom Profiles, without assessments of individual patient needs.

226.   For example, CSP ordered and Millennium performed, billed and Medicare paid for, testing that was not reasonable and necessary for Patient LE, a 70 year-old male with a history of chronic back pain.  This patient had no discernible history of drug diversion, illicit drug or alcohol abuse, and throughout his treatment at CSP, he never exhibited aberrant behavior nor did he give any other indication that he presented a high risk for drug diversion or abuse. Patient LE was first seen at CSP in May 2011.  From this point on UDTs were ordered for Patient LE at every visit (except for one in September 2011).  Patient LE was seen on a monthly basis for the first five months he was a patient at CSP and then was stable enough to have follow-up visits every three months from October 2011 onward.  From May 23, 2011 through January 17, 2014, CSP referred fourteen of LE's urine specimens to Millennium for testing, and each time Millennium performed testing pursuant to a CSP Custom Profile.  Throughout this time period, Patient LE's urine test results were consistent with his medical and prescription histories.

227.   By way of example, on January 23, 2012, Patient LE was seen at the CSP Fernadina Beach facility, for a routine follow-up visit and prescription refill.  At the time he was taking tramadol and hydrocodone for pain management.  CSP performed a urine drug screen at the clinic, and LE's specimen tested positive for opiates—as would be expected given his

60

ML_DE_00595153

prescriptions—and negative for cocaine, amphetamines, methamphetamine, phencyclidine, MDMA (ecstacy), barbiturates, benzodiazepines, methadone, tricyclic antidepressants (TCA), and oxycodone. Exhibit 67. CSP sent the specimen to Millennium with a Requisition form indicating, "Use Custom Profile," and Millennium proceeded to conduct LC-MS/MS testing for codeine, morphine, hydrocodone, norhydrocodone, hydromorphone, oxycodone, noroxycodone, oxymorphone, buprenorphine, norbuprenorphine, fentanyl, norfentanyl, methadone, EDDP (methadone metabolie), alpha-hydroxylprazolam (xanax), 7-amino-clonazepam (klonopin), lorazepam (ativan), nordiazepam (valium), temazepam, oxazepam, amphetamine, carisoprodol, meprobamate, phenobarbital, secobarbital, butalbital, methamphetamine, cocaine metabolite, and MDMA, as well as four specimen validity tests. Exhibit 68. The Millennium test results were appropriately positive for hydrocodone (which Patient LE was prescribed) and its metabolite norhydrocodone, and negative for everything else.

228. Millennium billed Medicare $387.23 for its tests, and Medicare paid Millennium $354.79, after denying two units of UDT totaling $32.44. Millennium's claims to Medicare for its testing, including but not limited to the tests it performed for codeine, morphine, oxycodone, noroxycodone, oxymorphone, buprenorphine, norbuprenorphine, fentanyl, norfentanyl, methadone, EDDP (methadone metabolite), alpha-hydroxyalprazolam, 7-amino-clonazepam, lorazepam, nordiazepam, temazepam, oxazepam, amphetamine, carisoprodol, meprobamate, phenobarbital, secobarbital, butalbital, methamphetamine, cocaine metabolite, and MDMA, were not reasonable and necessary. Millennium's claims to Medicare for these tests were false claims.

### 4.   Frank Li

229. Dr. Frank Li is a physician in Washington state who owns Seattle Pain Center.

61

Confidential

230.   In 2012, Dr. Li ordered more than $2,100,000 in UDT to Millennium for Medicare beneficiaries at an average cost of more than $500 per beneficiary sample.   In 2013, Dr. Li ordered another $1,500,000 in UDT to Millennium from Medicare.   Dr. Li stopped using Millennium in 2013.

231.   Dr. Li ordered his UDT from Millennium under Custom Profiles that were almost always applied to urine samples from his practice.

232.   Millennium-employed LSAs, stationed at Dr. Li's offices, often filled out Dr. Li's test orders, using these blanket testing protocols.   For example, an internal Millennium email from February 2012 noted, "we already have LSA's filling out the requisition forms."   Exhibit 69.

233.   Dr. Li agreed to the Custom Profiles in part because Millennium told him it cost Millennium the same amount to do the testing regardless of how many tests he ordered:   "They said that it costs them the same amount to do the testing so why not do all of them?"

234.   Dr. Li's UDT orders were inconsistent with the recommendations of the Washington State Guidelines.

235.   Dr. Li's Custom Profile increased drastically in 2011 in response to sales pressure from Millennium.

236.   Millennium's VP for Sales, Ms. Peacock, wrote to the Company's regional sales manager regarding Dr. Li, threatening to terminate the account: "Are you and Monet [the Millennium sales representative assigned to Dr. Li's account] able to sucessfully discuss our empirical data on the negatives and obtain additional medically necessary tests?   Need to strive for 5 more to make this business viable."   Exhibit 70.   Although Ms. Peacock used the phrase

62

ML_DE_00595155

"medically necessary" in her email, she had no clinical basis to know that any of Dr. Li's patients actually needed more tests.

237. Dr. Li increased his testing to Millennium in exchange for resources. For example, Millennium offered to provide an electronic medical record (EMR) interface if he would increase his UDT orders. In April 2011, a Millennium sales manager wrote: "If necessary, I think Dr Li would be amenable to confirming all positives & all negatives on the POC cup in order to have the results on his EMR [Electronic Medical Record]. Then we can run all tests on all specimens regardless of the cup results." Exhibit 71.

238. Millennium sales representatives strongly promoted the confirmation of expected negative POC test results to Dr. Li, as stated in a May 2011 email: "we are making a strong case to confirm negatives on Cocaine, Opiates, Meth."

239. Shortly after that email exchange, in June 2011, Dr. Li filled out a new Custom Profile that called for automatic confirmation testing of all POC test results for certain drugs, including cocaine, opiates, and amphetamines.

240. In January 2012, Dr. Li filled out another Custom Profile for his practice with an even higher level of testing—including confirmation of all POC test drug results, including PCP and TCAs—regardless of POC test results or patient condition. Exhibit 72. This testing protocol also called for a number of other drug tests not on the POC test cup to be performed on all patients, regardless of medical condition and patient presentation or history.

241. Dr. Li also received money as a paid speaker for Millennium; but, only while he was referring UDT to Millennium.

242. Millennium executives, LSAs, and sales personnel knew that Dr. Li routinely ordered testing based on Custom Profiles regardless of patient need and without an individual

Confidential

ML_DE_00595156

assessment of the need for each test for each patient—and that Millennium submitted claims to Medicare for this testing, in violation of Medicare claims submission rules (by submitting claims for services that were not covered) and the FCA.

### 5.     Massachusetts Sober-Home Related Testing

243.     Millennium had a strategy in Massachusetts of targeting sober homes for business.  From approximately 2011 through 2013, Millennium billed Medicare more than $1,400,000 for UDT for residents of sober homes in Massachusetts, many of whom received a set of twenty or more drug tests, multiple times per week, without any documentation or justification as to what tests were actually needed.

244.     Sober homes are alcohol- and drug-free living environments for persons seeking to overcome substance addiction or abuse problems.  Residents of sober homes in Massachusetts for whom Millennium submitted claims to Medicare were required by the sober homes to undergo routine quantitative UDT as a condition of residency.  The UDT Millennium performed on sober home residents in Massachusetts was not for the purposes of medical diagnosis or treatment and thus did not qualify for reimbursement by Medicare.

245.     Millennium, through sales representative Mark Cullinan, recruited Massachusetts physicians, including Dr. Jeanne Mase, to act as "medical directors" for sober homes or ordering physicians for UDT of sober home residents.

246.     Millennium performed all UDT for Massachusetts sober home residents (whether under Dr. Mase's NPI or another physician's) pursuant to test Requisition forms that had the box "Use Custom Profile" checked off.

247.     The Custom Profiles put into place at these sober homes often called for quantitative testing for more than twenty separate separate tests. *See, e.g.*, Exhibit 73.  Residents

64

ML_DE_00595157

were tested under these Custom Profiles multiple times per week, regardless of the individual resident's treatment status.

248.    The Requisition forms were not filled out by Dr. Mase or her medical staff, but rather by non-medical staff at the sober homes, or by employees of "specimen collection" companies, which Millennium paid per sample.

249.    Dr. Mase rarely saw the patients at the sober homes, did not provide medical treatment for the sober home residents, and did not regularly review the results of the UDT Millennium performed and billed to Medicare.

250.    Millennium engaged two separate courier/"specimen collection" companies to oversee the UDT process for sober home residents.  Millennium paid New England Express LLC ("NEE"), owned by Nicholas Chuckran, $31 per specimen to fill out the resident's demographic information, mark "Use Custom Profile" on the resident's Requisition form, and drop the sample off with UPS for shipping to Millennium's laboratory in San Diego, California.

251.    Millennium sales representative Marc Cullinan made clear to Chuckran that NEE's specimen collectors were to check off "Use Custom Profile" on the Requisition forms and that Millennium would not pay for any sample that was accompanied by a Requisition form that did not have "Use Custom Profile" checked off.

252.    Similar to NEE, Millennium also paid another courier company, Cape Test LLC ("Cape Test"), $32 per specimen to fill out sober home residents' demographic information and mark "Use Custom Profile" on their Requisition forms.

253.    In early 2013, after Dr. Mase was audited by private insurer Harvard Pilgrim Healthcare ("Harvard Pilgrim") for UDT billed by Millennium to Harvard Pilgrim, Dr. Mase

65

Confidential                                                                      ML_DE_00595158

informed Cullinan that she would no longer be associated with Millennium for UDT for sober home residents.

254.    Medicare paid approximately $1,200,000 to Millennium for UDT of sober home residents, ordered under Dr. Mase's NPI, that was not reasonable or necessary.

255.    For example, in January 2013, Millennium submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Mase's NPI for a Medicare beneficiary on January 2, 4, 7, 9, 11, 14, 16, 18, 21, 23, 25, 28, and 30.  For those thirteen separate dates of service in January 2013, Medicare paid approximately $12,619.88 to Millennium for tests that were not reasonable and necessary for the diagnosis or treatment of that patient's illness or injury, if any.

256.    Upon learning that Dr. Mase would no longer allow her NPI to be associated with UDT for sober home residents, Cullinan informed NEE that all sober home testing should cease until a new "medical director" for sober home UDT could be located.  Thereafter, Millennium attempted to work with two new physicians—Dr. Bahige Asaker (through NEE) and Dr. Joseph Sullivan—to continue Millennium's Massachusetts sober home scheme.

257.    Dr. Asaker did not knowingly order UDT from Millennium for sober home residents, yet Millennium submitted tens of thousands of dollars in claims to Medicare for UDT purportedly ordered under his NPI that were not reasonable and necessary for the diangosis or treatment of patients.  These tests were not properly ordered by a physician treating the beneficiary, as required by Medicare.

258.    By way of example, in July 2013, Millennium submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Asaker's NPI for a specific Medicare beneficiary on July 1, 3, 5, 8, 10, 12, 15, 17, and 19.  For those nine dates of service in July 2013,

66

ML_DE_00595159

Medicare paid approximately $5,744.25 to Millennium for that one Medicare beneficiary. These tests were not reasonable and necessary for the treatment or diagnosis of that patient's illness or injury, if any.

259. Dr. Sullivan only ordered a very small amount of UDT from Millennium, yet Millennium submitted approximately $40,000 in claims to Medicare for drug tests allegedly ordered under his NPI that were not reasonable and necessary for the diagnosis or treatment of patients. The majority of these tests were not properly ordered by a physician treating the beneficiary, as required by Medicare.

260. By way of example, in July 2013, Millennium also submitted to Medicare claims for reimbursement for UDT services ordered under Dr. Sullivan's NPI for a specific Medicare beneficiary on July 1, 5, 8, 10, 12, 15, 19, 22, 24, 26, and 29. For those eleven dates of service in July 2013, Medicare paid approximately $7,501.23 to Millennium for that one Medicare beneficiary. These tests were not reasonable and necessary for the treatment or diagnosis of that patient's illness or injury, if any.

## VI.    THE UNITED STATES WAS HARMED BY MILLENNIUM'S CONDUCT

261. As a result of Defendant's conduct, the Medicare program paid Millennium many millions of dollars for many thousands of false and/or fraudulent claims for non-covered drug tests.

262. Medicare was directly affected by Millennium's fraudulent schemes. For example, in a 2011 presentation to potential lenders, Millennium represented that 23.7% of its specimens came from Medicare patients, but that Medicare represented 40.0% of revenue— likely because Millennium took advantage of Medicare's practice of promptly paying claims on the assumption that the supplier has complied with its legal obligations.

67

ML_DE_00595160

263.   Medicare was particularly susceptible to Millennium's fraudulent schemes because it does not require a patient co-payment on laboratory services.  Because Medicare patients were not required to pay out-of-pocket for Millennium's services, they had no reason to inquire into the charges to Medicare associated with Millennium's UDT.  In addition, many Medicare beneficiaries are over sixty-five years old, and seniors are generally at lower risk of illicit drug use.

264.   Exhibit 74 to the Complaint is a list of physicians and physician practices who made drug test referrals to Millennium in violation of the Stark Law and/or the Anti-Kickback Statute and the dates during which each such physician had an improper financial relationship with Millennium with respect to the free testing supplies.  Exhibit 74.

265.   The United States' damages arising from the Millennium's submission of claims to Medicare and Florida Medicaid referred by these physicians in violation of Stark Law and Anti-Kickback Statute exceeds $90,000,000.

266.   The United States' damages arising from Millennium's submission of claims to Medicare and Florida Medicaid for UDT that was not reasonable and necessary for the diagnosis or treatment of patients, and for which the need was not assessed or documented for individual patients, including the claims referenced in Section V.E above, likely exceeds $100,000,000.

**FIRST CAUSE OF ACTION**
**(False Claims Act: Presentation of False Claims)**
**(31 U.S.C. § 3729(a)(1) and (a)(1)(A))**

267.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

268.   Defendant knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States and Florida Medicaid, including those

Confidential   ML_DE_00595161

claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

269.   Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## SECOND CAUSE OF ACTION
### (False Claims Act: False Statements Material to False Claims)
### (31 U.S.C. § 3729(a)(1)(B))

270.   Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

271.   Defendant knowingly made, used, and caused to be made or used, false records or statements — i.e., false statements regarding compliance and coverage for its services and false statements on forms CMS-855B, 837P and CMS-1500—to get false or fraudulent claims paid and approved by the United States.

272.   Defendant's false certifications and representations were made for the purpose of inducing physicians to order its services and getting false or fraudulent claims paid, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendant's statements and actions.

273.   The false certifications and representations made and caused to be made by Defendant were material to the United States' and Florida Medicaid's payment of the false claims.

274.   Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

69

ML_DE_00595162

## THIRD CAUSE OF ACTION
### (Payment by Mistake)

275. Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

276. This is a claim for the recovery of monies paid by the United States to Millennium as a result of mistaken understandings of fact.

277. The United States paid Millennium for services that were not reasonable and necessary for the diagnosis or treatment of individual patients as required under Medicare coverage rules, and that were furnished pursuant to prohibited referrals from physicians who were in financial relationships that did not comply with the Stark Law and/or the Anti-Kickback Statute, without knowledge of material facts and under the mistaken belief that Millennium was entitled to receive payment for such claims when it was not. The United States' mistaken belief was material to its decision to pay Millennium for such claims. Accordingly, Millennium is liable to make restitution to the United States of the amounts of the payments made in error to it by the United States.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

278. Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

279. This is a claim for the recovery of monies by which Defendant has been unjustly enriched.

280. By directly or indirectly obtaining government funds to which it was not entitled, Defendant was unjustly enriched, and is liable to account for and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

70

ML_DE_00595163

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendant as follows:

I.　　On the First and Second Counts under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

II.　　On the Third and Fourth Counts for payment by mistake and unjust enrichment, for the damages sustained and/or amounts by which Defendant was unjustly enriched or was paid by mistake, or by which Defendant retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

The United States demands a jury trial in this case.

71

Confidential

ML_DE_00595164

Respectfully submitted,

BENJAMIN C. MIZER
Acting Assistant Attorney General

CARMEN M. ORTIZ
United States Attorney

By: _____
ABRAHAM R. GEORGE
GEORGE B. HENDERSON, II
Assistant U.S. Attorneys
John J. Moakley U.S. Courthouse
Suite 9200
1 Courthouse Way
Boston, MA 02210
(617) 748-3152
(617) 748-3272
*abraham.george@usdoj.gov*
*george.henderson2@usdoj.gov*

MICHAEL D. GRANSTON
ALAN KLEINBURD
DOUGLAS J. ROSENTHAL
AUGUSTINE M. RIPA
US Department of Justice
Civil Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
(202) 305-2073
(202) 305-4033

Dated: March 19, 2015

72

Confidential

ML_DE_00595165

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing document was served via electronic mail (by agreement) on:

J. Marc Vezina
Monica P. Navarro
Michelle D. Bayer
280 N. Old Woodward Ave., Suite LL20
Birmingham, MI 48009
jmv@vezinalaw.com
mnavarro@vezinalaw.com

Joel M. Androphy
Sarah M. Frazier
Noelle C. Letteri
Berg & Androphy
3704 Travis Street
Houston, TX 77002
JAndrophy@bafirm.com
SFrazier@bafirm.com
AGargour@bafirm.com

Thomas M. Greene
Michael Tabb
Greene LLP
One Liberty Square, Suite 1200
Boston MA 02109
tgreen@greenellp.com
matabb@greenellp.com

Michael E. Mone
Patricia L. Kelly
C. William Barrett
Catherine A. Ryan
Esdaile, Barrett & Esdaile
75 Federal Street
Boston MA 02110
MMone@ebelaw.com
PKelly@ebelaw.com
BBarrett@ebelaw.com
CRyan@ebelaw.com

Suzanne E. Durrell
DURRELL LAW OFFICE
180 Williams Avenue
Milton, MA 02186
Suzanne.durrell@verizon.net

Robert M. Thomas, Jr.
THOMAS & ASSOCIATES
280 Summer Street, 5th Floor
Boston, MA 02210-1131
rmt@thomasandassoc.net

Richard D. King, Jr.
Nathan A. Tilden
Jacquelyn A. McEttrick
SMITH & BRINK P.C.
350 Granite St., Suite 2303
Braintree, MA 02184
RKing@smithbrink.com
NTilden@smithbrink.com
jmcettrick@smithbrink.com

73

Confidential

ML_DE_00595166

**Pursuant to 31 U.S.C. § 3730(b)(2), no service was made upon the Defendant because this case is still under seal.**

Dated: March 19, 2015

_____
Abraham R. George
Assistant U.S. Attorney

74

# EXHIBIT 44

 **BMO Capital Markets**

# Call Report

### Millennium Laboratories Inc.

**Call Date:** 06/14/2012
**Primary Discussion Type:** 01- M+A
**Secondary Discussion Type:** M+A, ECM

**Author:** Kristen Morse
**Call Type:** General Meeting

**Project Name:**
**Description:** Intro
**IB Fees:**
**Sponsor Relationship:** TA Associates

## Summary of Discussion

Met with Howard and David to introduce the IB team. ML went through a sale process last year with UBS, which included 3-4 strategics & 10-12 financials. The process was unsuccessful, although did receive an offer from at least one party, which was far below valuation expectations (UBS indicated valuation would be closer to $1.5B in its pitch process). Buyer concerns were mostly related to reimbursement and that TA had just invested. As a result of the process, mgmt is sensitive and would not want to run a broad process, which could hinder the company's growth and strategy but would consider a smaller, targeted process, with the right advisor. There is a very good relationship with TA so would like to keep TA as an investor and would not want another PE firm to come in and reset time horizon. ML management is likely to be interested in finding a new partner (likely PE) to take ML to the next level, bringing in additional management, allowing current owners to get some liquidity, and position ML for an exit in a few years. ML will be introducing new testing services for genomics (initially for pain drugs) and a blood platform (initial focus on hormones and Vitamin D) to diversify the business. ML is interested in product and geographical diversification and looking at acquisitions.

## Follow-up Required

Set up meeting in next few weeks to continue dialogue and discuss strategic alternatives.

## Company Participants

| Name | Company | Title | Email Address | Phone |
|------|---------|-------|---------------|-------|
| Howard Appel | Millennium Laboratories Inc. | President | happel@becausepainmatters.com | (858) 451-3535 |
| David Cohen | Millennium Laboratories Inc. | COO | dcohen@becausepainmatters.com | (858) 451-3535 |

## BMO Participants

| Name | Participant | Title | Email Address | Phone |
|------|-------------|-------|---------------|-------|
| Tom Glover | Y | Managing Director | tom.glover@bmo.com | (212) 702-1880 |
| Phillip Ho | Y | Director | phillip.ho@bmo.com | (212) 702-1194 |
| Tomasz Milewski | Y | Associate | tomasz.milewski@bmo.com | (312) 461-4042 |
| Kristen Morse | Y | Director | kristen.morse@bmo.com | (617) 960-2372 |
| Brett Skolnik | Y | Managing Director | brett.skolnik@bmo.com | (212) 702-1159 |
| Steven Tuch | Y | Managing Director | steven.tuch@bmo.com | (212) 885-4122 |

**Class:** 1- Gold
**Lending Role:**
**UEN:** 35094184
**GTM Class:**

**Primary RM:** Brett Skolnik

**Exhibit 014**

CONFIDENTIAL

BMO-ML-00030001

 **BMO** **Capital Markets**

# Call Report

| Millennium Laboratories Inc. | **Call Date:** 08/14/2012<br>**Primary Discussion Type:** 01- M+A<br>**Secondary Discussion Type:** M+A, ECM, LF | **Author:** Tom Glover<br>**Call Type:** General Meeting |
| --- | --- | --- |

**Project Name:**
**Description:** Millennium Labs / TA Associates
**IB Fees:**
**Sponsor Relationship:** TA Associates

## Summary of Discussion

On 8/13, Cippoletti, Tuch, Skolnik, Morse, Hsieh and Glover met with Howard Appel (Pres) and David Cohen (COO) in San Diego.  Here are points from the discussion:


Strategic Decision Process

- Need a blueprint

- Need to make some choices relatively quickly

- Hired search firm to identify 'public company' CEO and CFO

- Been talking a lot about steps to take

- Further conference call with TA tomorrow

- Jim Slattery and Howard don't need to or want to take the last $ off the table.  Would sell today and would take a discount over IPO value to achieve simple, clean exit


Buyside M&A / Organic Growth Discussion

- Would only buy another similar lab to achieve risk diversification

    - Otherwise can steal competitors' customers anyway

- In discussions with AIT (highly confidential)

    - Provides a fail-over site

    - Has technology to accelerate some initiatives

    - Could move ML's Medicare out of Palmetto Region, reducing restrictions

- Slowly moving into the hormone and Vitamin D channel

- Accelerating into psych channel through genetics initiative

- International acquisition would accelerate learning curve vs. greenfield

- Brazil

    - Tax rate on employees high and reimbursement rates are all over the place

    - But 13,000 labs and most are profitable, despite most doing everything for everyone

    - Diagnostico Brasil a top player but even so, has relatively primitive lab

    - Brazil is geographically central to South America, making it a good hub for sample transport

    - Would want to buy a lab

    - A large lab (didn't understand name) is represented by Rothschild

    - Could see value of ML having a buyside advisor

- China

    - Convos really heating up

    - Long relationships really matter there

- Wants to penetrate US govt market

    - Very close to DICAP certification and will be only US lab that has it

    - Very important to DOD/ VA

    - Quest and Ameritox currently grandfathered from DICAP requirement but DOD doesn't like Ameritox, so a potentially big opportunity for ML to replace Ameritox (and perhaps Quest)

- Forensic labs - don't make a lot of money

- Would probably not buy an oncology lab as don't have the science and doctors within ML to evaluate / operate

- Likes vet labs

- Entering drug treatment market and seeing some of the latest street DOAs as a result.  One of the first to develop tests for them

- Buying US company creates integration risk, whereas an international acquisition doesnt have to be integrated as much

- Testing companies - would buy a unique device, but not interested in lab services

CONFIDENTIAL          BMO-ML-00030002

 **BMO** **Capital Markets**

# Call Report

- Buyside acquisition prioritization:

    - Makes money

    - Easy to do

    - Can protect IP

- Next step: spend couple of hours on buyside ideas

    - "Need buyside advisor"

- Key growth drivers are volume of specimens, number of tests per specimen, revenue per specimen

- ML volume growing from share gains, new markets, new drugs of abuse (bath salts, THC, Kraton)

- 2012 could see $240mm EBITDA

- For 2Q, auditors discussing a $20mm positive adjustment

- Focusing a lot on workers comp opportunity

    - Ameritox has lost major contracts

    - ML competing for #1,2 and 4 workers comp contracts

    - Thinks is close to signing Liberty Mutual, the #1

- Has been at lab capacity, but only takes a few months to expand within existing facility


Sale Process Discussion

- David not entirely sure why UBS process failed.  Views UBS as very rigid thinkers (vs BMO)

- Interested in non-process discussions and has heard about the strategy before, but doesn't want to be like Ameritox, where has been rumored for two years

    - Wants deniability

- Suggested maybe we start fireside chats with Canadian pension funds

- TA must roll equity if mgmt/founder must roll

- Alere should not be a relevant buyer as struggling with their AV acquisition

- Don't see Labcorp as a buyer

- May be too big for Quest

- Generally skeptical of success of a sale process given failure of last process

- JPM told them they should hire Bain Consulting - David hears they walk on water.  Not clear whether assignment would be to evaluate reimbursement risk, valuation or strategic work

- Reimbursement risk

    - Mitigated to an extent by winning more in-network contracts

    - Consider extending those contracts to 3-5 years

- Summit was first in to look at ML and went down to wire, bailing out over reimbursement risk

- ML not looking for 10-11x multiple

- ML is fine with risk sharing on reimbursement risk


Dividend recap discussion

- Prefers $500mm refi with club rather than $700mm with broad marketing process

- Would discuss with TA whether TA would make their mezz more senior friendly

- ML doesn't see TA wanting $30mm annual yield to go away in return for an extra $100mm dividend on its equity today (would be the case if TA's debenture retired)

- Need to also consider acquisition-related debt capacity impact (how big is AIT?)

- Expanding TLA and doing a dividend is "creative / ideal"

- Slattery's estate planning is nearly complete.  Started two years ago (with TA investment?)

- "One more tranche takes care of Jim"

- Has done two GRATS

- Two years ago, company would have had to be sold to cover estate taxes

- Life insurance policy on Jim's wife covers estate tax bill

- David and Howard haven't done much tax planning

- Someone from MyCFO failed miserably.  Not any energy around meeting them


ECM Discussion

CONFIDENTIAL

BMO-ML-00030003

 **BMO Capital Markets**

# Call Report

- An S Corp

- Shareholders get dividends to cover tax payments

- In addition, Slattery gets $32m a yr.

- Have had no substantive IPO convo with JPM

- ML asked what our biggest IPO was, potential split between primary and secondary, all secondary IPO, IPO size, importance of public company CEO / CFO

- More interested in 2Q or 3Q13 IPO than 4Q13

- Open to equity recap.  Finds private nature appealing.  Complex with Slattery payments and TA debenture

- Mentioned Apax, Carlyle, TPG as interesting partners


ML Suggested Next Steps

- ML has call with TA tomorrow

- Have BMO call Wed to discuss next steps

- "Have to meet with a few other people (other stakeholders? Or is ML meeting IB competitors)


TG Thoughts on BMO Next Steps

- TG to check in with TA today

- Create blueprint

> - div recap
>
> - IPO
>
> - Non-process process
>
> - Buyside work
>
> - Timeline for all
>
> - How would potential dual track be designed
>
> - CEO / CFO recommendations – Cippoletti, Skolnik, poll HC team for further ideas?
>
> - Thoughts on value of a top consulting for to look at any of the following: reimbursement risk, diversification strategy, other

- Due diligence meeting          - serves ECM, M&A and LF purposes

> - Agenda, list of questions
>
> - Need model.  Can offer to help build one if that is a challenge for mgmt

- Potentially meet with TA to sell BMO capabilities




- TA's investment now entirely out


**Follow-up Required**




**Company Participants**

| Name | Company | Title | Email Address | Phone |
|---|---|---|---|---|
| Howard Appel | Millennium Laboratories Inc. | President | happel@becausepainmatters.com | (858) 451-3535 |
| David Cohen | Millennium Laboratories Inc. | COO | dcohen@becausepainmatters.com | (858) 451-3535 |

**BMO Participants**

| Name | Participant | Title | Email Address | Phone |
|---|---|---|---|---|

CONFIDENTIAL

BMO-ML-00030004

 **BMO Capital Markets**

# Call Report

## BMO Participants

| Name | Participant | Title | Email Address | Phone |
|------|-------------|-------|---------------|-------|
| Michael Cippoletti | Y | Managing Director, Head of ECM US | michael.cippoletti@bmo.com | (212) 885-4047 |
| Tom Glover | Y | Managing Director | tom.glover@bmo.com | (212) 702-1880 |
| Michael Hsieh | Y | Director | michael.hsieh@bmo.com | (212) 702-1879 |
| Kristen Morse | Y | Director | kristen.morse@bmo.com | (617) 960-2372 |
| Brett Skolnik | Y | Managing Director | brett.skolnik@bmo.com | (212) 702-1159 |
| Steven Tuch | Y | Managing Director | steven.tuch@bmo.com | (212) 885-4122 |

**Class:** 1- Gold
**Lending Role:**
**UEN:** 35094184
**GTM Class:**

**Primary RM:** Brett Skolnik

CONFIDENTIAL

BMO-ML-00030005

 **Capital Markets**

# Call Report

| **Millennium Laboratories Inc.** |
|---|

**Call Date:** 12/05/2012
**Primary Discussion Type:** 01- M+A
**Secondary Discussion Type:** M+A, Other

**Author:** Brett Skolnik
**Call Type:** General Meeting

**Project Name:**
**Description:**
**IB Fees:**
**Sponsor Relationship:** TA Associates

## Summary of Discussion

met with Howard Appel and david Cohen at the company.  Business continues to perform and they seem pretty pleased with the continued progress.  New CFO starts jan 2 .  I believe he is ex Beckman coulter, Apria.  New CMO starts soon as well.  Down to 2 candidates for CEO and expect to have that completed in q1.

They look forward to the additions as they continue to be stretched very thin.  Want to spend time on other new initiatives, m&a, etc, but find it a challenge now.  I also think they feel more comfortable considering acquisitions with other executives that have a HC background.  They say they would consider acquisitions now, but it doesn't seem like they have the ability unless it was right in their area of focus.

We discussed a number of m&a ideas.  They had looked at poplar, so pathology could be of interest.  It really would depend on customer synergies.  We discussed the recent reimbursement changes and how now might be a good time to look at assets in this area.  At this pt, companies in toxicology would only be interesting if they had a unique technology.  Wouldn't do to add customers as it would be cheaper to grow on their own.  They looked at dominion a while back and didn't think much of them.

Discussed lawsuit as well.  He reiterated nothing new here, but lenders have followed up with some additional questions.  Basically, disgruntled employees who were fired and selling customer lists to competitors.

Thinks iPo over sale is more likely given size, but would be open if someone stepped forward with a proposal.

## Follow-up Required

Next steps-  resend winintervention invites.  Meet again in late jan/early feb after new hires are on board.

## Company Participants

| Name | Company | Title | Email Address | Phone |
|---|---|---|---|---|
| Howard Appel | Millennium Laboratories Inc. | President | happel@becausepainmatters.com | (858) 451-3535 |
| David Cohen | Millennium Laboratories Inc. | COO | dcohen@becausepainmatters.com | (858) 451-3535 |

## BMO Participants

| Name | Participant | Title | Email Address | Phone |
|---|---|---|---|---|
| Brett Skolnik | Y | Managing Director | brett.skolnik@bmo.com | (212) 702-1159 |

**Class:** 1- Gold
**Lending Role:**
**UEN:** 35094184
**GTM Class:**

**Primary RM:** Brett Skolnik

CONFIDENTIAL

BMO-ML-00030006

# EXHIBIT 45
# FILED UNDER SEAL

# EXHIBIT 46

Conf Call re: Millennium                                    3/27/12

Came in a couple hours ago.

prevalent in our industry

not that different from 1st CID
hard to know what they're looking for

Seems
1.) use of custom profiles / standing orders
2.) confirmation testing of negative tests / screen results.

CMS was concerned about.

2009, Hogan started working on these issues

Custom profile
   labs forcing testing onto doctors.
      no choice
      Panel testing — here's the 30 tests we offer
            you choose that panel.
      there's v. little disclosure
      Some competitors do this.

**Exhibit 002**

next, is custom order.
  dr. selects it at the outset
  but avoids choice at every pt. stage
  this is where most competitors land

starting in 2009, we started to require customization for
  ē pt. ē time they order
    on our reg. form, they have to
      use the custom profile & add
                              as is
    or, no use it

What was the potential prob. ul bundling?
  CMS - wants to ensure that each test is medically
          necessary & unique to that pt.
  the concern sounds more regulatory, not criminal

  Our lawsuit ag. Aventor
    they do bundle - they only offer "pan panel"
    we think that's a false claims act issue.
  Ron - these are not crim matters.
      Susan Winkler — Civil Atty - FCA
      this is a civil case

[ Centers for Medicare & Medicaid Services ]

Ron: give full disclosure & choice

STB_ML-00000009

HIPPA Subpoena
  ) DOJ had to go thru HHS OIG.

  ) 1996 - Gave DOJ the ability to subpoena records.

  ( cld lead to civil → FCA
                or criminal

              RW: yes, in theory, but typically it's for FCA


2011: issued a CID & provided info
        led to dismissal of complaint

this may be an industry-wide inquiry


HA: our testing is similar to others.
RW: our forms are better than competitors

BS: how can you tell subpoena is interested in bundling
MP: it's not clear
        we'll reach out to them & ask what
              you're looking for
        for CID, we got them docs. they cared
        about in a few weeks & then it went away

CONFIDENTIAL                                                    STB_ML-00000010

Most is boilerplate = all marketing
all sales

retesting of neg. amino assay tests.
custom profile question

RW: 2 main & ordinary topics
a. excessive testing?

b. kickbacks to doctors to get the testing?

Standing Orders →
Custom Profile → what ML does; indiv. by physician
Panel Testing → you will test these 40 things every time
for every dr.

MP: We are the lab of choice.

                                                        coarse

Confirmation testing of neg. results.
raised by CID last Jan.
Dr's office - specimen in "5 oup.
amino assay strips put in → result
but need to get confirmation → send to lab

CONFIDENTIAL                                              STB_ML-00000011

we perform 2nd amino array test on the specimen
Dr. can also order drug-specific tests.

So, DOJ old focus on 2nd-level amino array test

when Dr. did point-of-care test & it was neg.
we always confirmed thru a single method
we've never done the ~~general~~ 2nd qualitative
amino array test on point of care results

they may be focused on
limit when labs can perform confirmation testing
on any Point-of-Care tests

MAC - Payor is Palmetto
↓

no confirm testing of neg result
to get confirm testing, Dr. needs to first
indicia of non-compliance for the pt.

M. Sten: You feel good on these 2 issues.
Do you think it's industry-wide?
Howard: We're very confident ab. our practices.
We're happy to go head-to-head w/
our competitors.
in early days, these are the issues we
worked on for 8 mths before adopting them in 2009

CONFIDENTIAL

STB_ML-00000012

We believe we'll be fine.

We are not <u>certain</u> it's industry-wide

CID went to 5 diff labs in our space.

We have teed these up for our competitors in our civil litigation.

Steve Immelt — in-person meeting w/ S. Winkler. on Friday

CID — 2011 — we were panic-stricken Ron & Helen helped — this is part of your business.

CONFIDENTIAL

STB_ML-00000013

# EXHIBIT 47



U.S. Department of Justice

*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*                    *United States Courthouse, Suite 9200*
                                                     *1 Courthouse Way*
                                                     *Boston, Massachusetts 02210*

May 14, 2013

By e-mail

William H. Kettlewell, Esq.
Kathy Weinman
Collora, LLP
100 High Street
Boston, MA 02110-2321

Re:    Millennium Laboratories, Inc. - Statute of Limitations Tolling Agreement

Dear Counsel:

This letter confirms and sets forth an agreement between the Office of the United States Attorney for the District of Massachusetts and your client, Millennium Laboratories, Inc., and all successors and assigns (hereinafter "Millennium"). The terms of the agreement are as follows:

1.     As you are aware, this Office is presently conducting a joint criminal and civil investigation of your client, Millennium, and its officers, employees and agents. That conduct includes, without limitation, allegations that Millennium and certain of its officers, employees and agents, may have violated various federal criminal statutes, including but not limited to 18 U.S.C. §371 (conspiracy to defraud the United States), 18 U.S.C. § 287 (submission of false, fictitious or fraudulent claims to the United States), health care fraud offenses (e.g. 18 U.S.C. §§ 669, 1347, and 1035), mail fraud and/or wire fraud (18 U.S.C. §§ 1341, 1343), the Anti-Kickback Act (42 U.S.C. § 1320a-7b); certain civil statutes including but not limited to 31 U.S.C. § 3729 (civil False Claims Act); and certain administrative statutes such as 42 U.S.C. § 1320a-7 (exclusion) and 42 U.S.C. § 1320a-7a (civil monetary penalties) in connection with billing false or fraudulent claims to federal health care programs and/or other payors; payment of remuneration to physicians and/or others to induce referrals of laboratory work to Millennium; and interference with witnesses and/or destruction of evidence.

2.     In the course of our discussions, this Office has expressed its intention to afford you and your client the fullest opportunity to provide information to this Office which you deem

Confidential

relevant to matters relating to that investigation. In response, you have advised us that you intend to provide certain information to this Office, and that you wish such information be considered prior to a prosecution decision concerning potential criminal charges resulting from that investigation. You have advised this Office that you and members of your firm will require a further time period to prepare any materials and gather information for presentation to this Office, and to consider and evaluate further information as may be provided by this Office. As a result, this Office and your client have agreed, as more fully set forth below, to toll the applicable statutes of limitations for the offenses described in paragraph one for the time period December 11, 2012 through January 3, 2014 for that conduct described in paragraph one.

3.      This Office and your client, Millennium, hereby agree that your client will not at any time interpose a statute of limitations defense or any constitutional claim based upon pre-indictment delay to any indictment or count thereof, or to any civil complaint or count thereof, or to any administrative action, which charges or alleges that your client committed any federal offense or violation related to the conduct described in paragraph one, that includes the time period December 11, 2012 to January 3, 2014 in the calculation of the limitations period. Nothing herein shall affect, or be construed as any waiver of, any applicable statute of limitations defenses that Millennium may have with respect to the time period prior to and including December 11, 2012, and your client expressly reserves its right to raise any such defense, any provisions of this agreement notwithstanding.

4.      Your client, Millennium, enters into this agreement knowingly and voluntarily. Millennium acknowledges that the statute of limitations and United States Constitution regarding prejudicial pre-indictment delay confers benefits on it, and it is not required to waive those benefits, and that Millennium is doing so after consulting with you because Millennium believes it is in its best interest to do so. Millennium also acknowledges its understanding that it may be charged with the foregoing criminal offenses and civil and administrative violations and/or any other offenses or violations at any time prior to and including January 3, 2014. Millennium further acknowledges its understanding that it may be charged with any offenses or violations not specifically described above, at any time during the relevant statute of limitations period.

5.      This agreement relates only to the allegations described in Paragraph one above and any charges or claims based on those allegations. This writing contains the entire agreement between this Office and your client and can be modified or supplemented only by means of a writing signed by this Office and your client.

/
/
/
/
/
/

If your client is willing to enter into this agreement on the terms set forth above, Millennium should indicate the same by signing on the spaces provided below and by initialing each page of this agreement. Please return an executed original to the undersigned by May 31, 2013.

Very truly yours,

CARMEN M. ORTIZ
United States Attorney

By:

Susan G. Winkler
Assistant U.S. Attorney

William H. Kettlewell          Dated: 6/14/13
Collora, LLP
Attorney for Millennium Laboratories, Inc.

Name: MARTIN PRICE          Dated: 6/14/13
Position: GENERAL COUNSEL
Millennium Laboratories, Inc.

Confidential

# EXHIBIT 48
# FILED UNDER SEAL

# EXHIBIT 49

Call w/ M. Price        R. Arway
       R. Wisin      Isaac Gruber
       L. Neuner                           3/14/14

1. Aegis: Settled; done

2. American Clinical ; Settled; done

3. Cunningham : Waiting on R. 59 motion

4. Calloway – NY
       MTD –                              wrapped up together

       Mass. St. ct.

5. Amentox.
       Patent case.                                    from Florida
           worst case?
               damages reports ~ Cantor's Report
                   license fee:
                   lost profit: # under $190m - $200m
                       → 90% attrib to cup report

       Marshfield – license K – Amentox              $20m
           if we had to pay
           over 3 year period
           well south of $5m

Exhibit
0104

CONFIDENTIAL                                    STB_ML-00000001

<u>Fla trial</u>

Trial June 2014.

Disgorgement — Lanham Act.

State common law

$190m — $210 m

No causation case. —→ so no damages.

SJ on Lanham Act to knock this out

they lost bus. to us on cup program

Falsely advertised that our cup program is legal.

MTD — Cont Op — must be unambiguously illegal.

TT must prove it's unamb. <u>illegal</u>

otherwise it's opinion

We have multiple experts. saying it's <u>legal</u>

Lew Morris

Cornell Mooring

Only 2 witnesses: Kelly Nelson

Jody Strawn.

they retained 3 consultants. to evaluate loss of bus.

<u>only</u> Bari

analyzed loss of bus.

J. Buchalter: good judge

Bad. if she said it's illegal ; $200m verdict.

CONFIDENTIAL

6. E-labs
   done

7. Employment

   a. Jody Stein — $486K — SJ pending
                              Trial in May 2014.

   b. Nelson — working ever since she was fired
               couple hundred thousand.

   c. Zicari — 2 cases — 1. Prior one was released/settled
                        — 2. SJ on release → pending

      Emotional distress = unlikely in TX

   d. Nic-Syd.
      Steve Johnson's Arbitration
            deadline — May 2014.
         K: 6/2008 → 6/2009
            fired him in 2/2009 → we paid him 4 months
      Damages: → wants commissions for 4 months
                           in 2009.
            May possibly claim renewals in

                  $450K.

CONFIDENTIAL                                          STB_ML-00000003

3/13/14 Meeting w/ USAO
    M. Price was there at meeting
    new team in Jan at USAO

    Conv. reflect their lack of knowl.
    Teach them ab our bus.

    6-7 hrs over last 2 weeks.

    we were telling them info.

    they ask questions
        why approp to test 73-yr old ♀ for cocaine?

    ?: Custom Profile → does this encourage Drs. to do
          unneces tests
      Other: cos. do panel test.

    Going back in 2 weeks; another session

    Yesterday's meeting: cup agreement
        we said this is not a criminal issue
          2009 Op
          2010 Op.
          Morris Op.
      So, it's not a crim issue
      we also think it's not civil.

CONFIDENTIAL

STB_ML-00000004

Next issue: Troubled Practice Program
 200 accounts were highly unprofitable
  terrible payment or insurer out of network
if we can't improve payor mix,
 Drs. will send some samples to M
    & other samples to Other
We said we lost $ → so no False Claim

Forced Drs. to order more tests or fired them
 200 had a payor mix issue
 if rep can fix it, good
 if not, we'll transition them to
   another lab
letter went to 5 Drs → you need to go elsewhere

M. Price — obstr. of justice

 not been an issue that's raised in the case
  for awhile
 2012 - they asked for Power Point
  we waived priv & provided
 not brought up recently

I've met w/ USAO several times

CONFIDENTIAL
STB_ML-00000005

Amentox — focused on obstr.

destruction of evidence — sanctions action
<u>denied</u>.

Amentox — upset ab redaction
U.S. Govt — no redactions

Susan Winkler — why off?
wanted to get out of unit for awhile
transferred to Drug Task Force
all of her cases reassigned

she needed to recuse herself
she had interviewed outside of DOJ related to
Leon Morris                         our case
`Clare LeRyan

Leon Morris expert report.

STB_ML-00000006

8. Ameritox / Calloway   Prior Settlements.

$16.3m                    $7.7m Fed
                         $26m in St Ct

   Damages
        what's the conduct.
        what were the billings assoc. w/ that conduct

   Calloway — indicted
        worked around it w/ diff entity perhaps.

CONFIDENTIAL                                    STB_ML-00000007

# EXHIBIT 50

**From:**       "Griswold, Ryan P" <ryan.p.griswold@jpmorgan.com>
**To:**         "Christoforou, Alla" <alla.christoforou@jpmorgan.com>
**Cc:**         "Guttilla, Michael T" <michael.t.guttilla@jpmorgan.com>
**Subject:**    RE: ML Oaktree
**Received(Date):**     Sat, 12 Apr 2014 00:24:31 +0000

Agreed. Can you set that up?

Ryan P. Griswold | Vice President | Leveraged Finance | J.P. Morgan | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

Alternate contact: Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

-----Original Message-----
**From:** Christoforou, Alla
**Sent:** Friday, April 11, 2014 08:16 PM Eastern Standard Time
**To:** Griswold, Ryan P
**Cc:** Guttilla, Michael T
**Subject:** RE: ML Oaktree

She was definitely troubled, I think she wants to model in this $200mm settlement + $20mm + potential DOJ (I believe she wasn't to see what happens if this case become a criminal matter – Lynn mentioned to her that if that happens, a settlement will become fairly massive).

I think it make sense to put her in touch with Martin, she seemed very concerned about this potential cash outflow, potentail spike in levergae as a result and strain on liquidity. I think Lynn didn't have a lot of time to spend with her and  didn't go in depth.

Alla Christoforou | Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY  10179 | T: 212.270.3932 | F: 917.464.2378 | alla.christoforou@jpmorgan.com | jpmorgan.com

**From:** Griswold, Ryan P
**Sent:** Friday, April 11, 2014 8:10 PM
**To:** Christoforou, Alla
**Cc:** Guttilla, Michael T
**Subject:** RE: ML Oaktree

> **Exhibit 0132**

We know the doj answer. It's 15 - 20 based on the ameritox and Calloway settlements.

The number on the other one is high but it's a lawyer being massively conservative. We may have to connect her with Martin over the weekend or Monday.

Was she troubled by this? All other accounts that have talked to Lynn have been ok.

                                                        JPMC-MIL-CORP-00050699

Ryan P. Griswold | Vice President | Leveraged Finance | J.P. Morgan | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

Alternate contact: Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

-----Original Message-----
**From:** Christoforou, Alla
**Sent:** Friday, April 11, 2014 08:00 PM Eastern Standard Time
**To:** Griswold, Ryan P
**Cc:** Guttilla, Michael T
**Subject:** ML Oaktree


Ryan,


Just got a call from Narmeen from Oaktree and Lynn told her that there are 2 investigations outstanding with Ameritox, one of which is related to unfair business practices and the other one patent infringement (related to bell curve). Lynn indicated worst case scenario liability of the first one as **$200mm** and **$20mm** on the second one. This is the first time I'm hearing such a high number **($200mm)** and I wanted to check in with you to see if I might have missed it on one of the call. So Narmeen wants to get a sense if this liability will have to be paid as a lump sum or via installments over time.


Also on the DOJ side she wants to dig in to understand some potential worst case scenario precedents.


I wanted to connect with Lynn to get the answers to these questions but I don't seem to have her number, do you have it by any chance? I can also shoot her a note if you think that makes more sense.


Thanks,

Alla


---

Alla Christoforou | Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3932 | F: 917.464.2378 | alla.christoforou@jpmorgan.com | jpmorgan.com

CONFIDENTIAL                                                                                     JPMC-MIL-CORP-00050700

# EXHIBIT 51

| From: | Karanikolaidis, Stathis |
|---|---|
| To: | 'jmulloy@ta.com' |
| CC: | Rapkin, Cory; Mainelli, Matthew; Chiarelli, Benjamin R; Griswold, Ryan P; Guttilla, Michael T; Lee, Jenny Y.; Griffin, Patrick T |
| Sent: | 5/31/2013 9:54:21 PM |
| Subject: | Fw: |
| Attachments: | Millennium Labs Discussion Materials 5 31 2013 vF.pdf |

Jennifer:

Attached please find our thoughts on a dividend recapitalization for Millennium. We have taken into consideration a number of factors:
- Avoid issuing public securities and stay in the loan market
- Keep the entire capital structure pre-payable without friction. in case there is a monetization event in the near to intermediate term
- Maintain modest leverage. given management's as well as TA's institutional perspective around pursuing the maximum available leverage

Take a look at the attached and let's have a call to walk you through it at your convenience. The markets remain strong and the Company has performed extremely well. allowing for a significant dividend. while keeping leverage at reasonable levels.

Let us know if we should also send to Howard.

Have a nice weekend,
Stathis

Stathis Karanikolaidis
Managing Director
Leveraged Finance
J.P. Morgan Securities LLC
Office: 212-270-7374
Cell: 917-406-8907

---

**From**: Guttilla. Michael T
**Sent**: Friday. May 31, 2013 05:31 PM
**To**: Karanikolaidis, Stathis
**Subject**:

**Exhibit
0116**

CONFIDENTIAL

JPMC-MIL-CORP-00183881

# DISCUSSION MATERIALS

May 31, 2013

STRICTLY PRIVATE AND CONFIDENTIAL



J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00183882

This presentation was prepared exclusively for the benefit and internal use of the J.P. Morgan client to whom it is directly addressed and delivered (including such client's subsidiaries, the "Company") in order to assist the Company in evaluating, on a preliminary basis, the feasibility of a possible transaction or transactions and does not carry any right of publication or disclosure, in whole or in part, to any other party. This presentation is for discussion purposes only and is incomplete without reference to, and should be viewed solely in conjunction with, the oral briefing provided by J.P. Morgan. Neither this presentation nor any of its contents may be disclosed or used for any other purpose without the prior written consent of J.P. Morgan.

The information in this presentation is based upon any management forecasts supplied to us and reflects prevailing conditions and our views as of this date, all of which are accordingly subject to change. J.P. Morgan's opinions and estimates constitute J.P. Morgan's judgment and should be regarded as indicative, preliminary and for illustrative purposes only. In preparing this presentation, we have relied upon and assumed, without independent verification, the accuracy and completeness of all information available from public sources or which was provided to us by or on behalf of the Company or which was otherwise reviewed by us. In addition, our analyses are not and do not purport to be appraisals of the assets, stock, or business of the Company or any other entity. J.P. Morgan makes no representations as to the actual value which may be received in connection with a transaction nor the legal, tax or accounting effects of consummating a transaction. Unless expressly contemplated hereby, the information in this presentation does not take into account the effects of a possible transaction or transactions involving an actual or potential change of control, which may have significant valuation and other effects.

Notwithstanding anything herein to the contrary, the Company and each of its employees, representatives or other agents may disclose to any and all persons, without limitation of any kind, the U.S. federal and state income tax treatment and the U.S. federal and state income tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Company relating to such tax treatment and tax structure insofar as such treatment and/or structure relates to a U.S. federal or state income tax strategy provided to the Company by J.P. Morgan. J.P. Morgan's policies on data privacy can be found at http://www.jpmorgan.com/pages/privacy.

J.P. Morgan's policies prohibit employees from offering, directly or indirectly, a favorable research rating or specific price target, or offering to change a rating or price target, to a subject company as consideration or inducement for the receipt of business or for compensation. J.P. Morgan also prohibits its research analysts from being compensated for involvement in investment banking transactions except to the extent that such participation is intended to benefit investors.

**IRS Circular 230 Disclosure:  JPMorgan Chase & Co. and its affiliates do not provide tax advice. Accordingly, any discussion of U.S. tax matters included herein (including any attachments) is not intended or written to be used, and cannot be used, in connection with the promotion, marketing or recommendation by anyone not affiliated with JPMorgan Chase & Co. of any of the matters addressed herein or for the purpose of avoiding U.S. tax-related penalties.**

J.P. Morgan is a marketing name for investment banking businesses of JPMorgan Chase & Co. and its subsidiaries worldwide. Securities, syndicated loan arranging, financial advisory and other investment banking activities are performed by a combination of J.P. Morgan Securities LLC, J.P. Morgan Limited, J.P. Morgan Securities Ltd. and the appropriately licensed subsidiaries of JPMorgan Chase & Co. in EMEA and Asia-Pacific, and lending, derivatives and other commercial banking activities are performed by JPMorgan Chase Bank, N.A. J.P. Morgan deal team members may be employees of any of the foregoing entities.

This presentation does not constitute a commitment by any J.P. Morgan entity to underwrite, subscribe for or place any securities or to extend or arrange credit or to provide any other services.

DISCUSSION MATERIALS

MILLENNIUM LABORATORIES

J.P.Morgan

JPMC-MIL-CORP-00183883

# Agenda

| | Page |
|---|---|
| **Financing discussion** | **1** |
| Leveraged finance market update | 7 |
| Appendix | 12 |

DISCUSSION MATERIALS

MILLENNIUM LABORATORIES

1

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00183884

# Executive summary

- Conditions in the leveraged pro rata and institutional loan markets remain at record levels

  - New issue activity continues to be dominated by opportunistic business, primarily refinancing and repricing activity

    - In the pro rata market, volume totaled $596bn in 2012 compared to $525bn in 2011, up 14% after a surging 3rd quarter. The positive tone has carried over into 2013 as leverage pro rata volume totaled $95bn through 1Q2013

    - The institutional term loan market remains as strong as it has ever been, driven by strong cash flows which continue to pour into the asset class. For context, each of the past seventeen inflows have paced, matched or exceeded $800mm and six of these are the largest ever recorded. This past week's inflow also marked the 49th consecutive inflow, bringing year-to-date inflows to a new record $25.3bn

- In an effort to assist Millennium Laboratories take advantage of the unprecedented market conditions and its continued strong performance, J.P. Morgan has assessed various opportunities to provide a substantial distribution to shareholders

  1. Use cash on hand to provide a dividend to shareholders

     - Given the Company's current Restricted Payments capacity for a distribution, J.P. Morgan will assist in obtaining an amendment from existing lenders to allow for the dividend

     - In conjunction with the amendment to the Restricted Payments, Millennium can seek to reprice its Credit Facilities and/or push out the maturity by 1 year

  2. Syndicate a new Term Loan A and use cash on hand to fund a distribution to shareholders

     - Given the Company's performance, the Term Loan A can be increased to ~$500mm by upsizing existing lenders' commitments and approaching active lenders in the market, including: Wells Fargo, Sumitomo, USBank, RBC, Union Bank, Raymond James, HSBC, BBVA Compass, Comerica, and Bank of the West

     - Fees for this transaction will be tightened from the 2012 transaction's levels

  3. Syndicate a new Term Loan A and Term Loan B in the institutional term loan market, and use cash on hand to pay a distribution to shareholders

     - The Company will gain access to a broader lender base which can be leveraged for future capital markets transactions as it continues to grow

     - A Term Loan B transaction will require ratings, which J.P. Morgan believes will be in the high-B to low-BB range

FINANCING DISCUSSION

MILLENNIUM LABORATORIES

2

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00183885

# Millennium Laboratories overview

## Capitalization at transaction close (as of 12/31/2011)

| | Amount ($mm) | % of total senior debt | xEBITDA |
|---|---|---|---|
| Cash and cash equivalents | $22.0 | | |
| $20mm R/C facility due 2017 | 0.0 | 0.0% | |
| Term Loan A due 2017 | 310.0 | 93.1% | |
| **Senior secured debt** | **$310.0** | **93.1%** | **2.7x** |
| Other long term senior debt | 23.0 | 6.9% | |
| **Total senior debt** | **$333.0** | **100.0%** | **2.9x** |
| | | | |
| EBITDA (12/31/2011) | $114.3 | | |

## Current capitalization (as of 3/31/2013)

| | Amount ($mm) | % of total senior debt | xEBITDA |
|---|---|---|---|
| Cash and cash equivalents | $128.2 | | |
| $20mm R/C facility due 2017 | 0.0 | 0.0% | |
| Term Loan A due 2017 | 282.3 | 86.7% | |
| **Senior secured debt** | **$282.3** | **86.7%** | **0.8x** |
| Other long term senior debt | 43.2 | 13.3% | |
| **Total senior debt** | **$325.5** | **100.0%** | **0.9x** |
| | | | |
| Current EBITDA (3/31/2013) | $374.3 | | |

## Pricing grid

| Consolidated Leverage Ratio | Drawn | Undrawn |
|---|---|---|
| >2.00x | L+350 | 50.0 bps |
| >1.50x but ≤2.00x | L+325 | 37.5 bps |
| ≤1.50x | L+300 | 25.0 bps |

## Leverage covenant summary

| Period | Consolidated leverage ratio |
|---|---|
| 6/30/12 - 9/29/12 | 3.25x |
| 9/30/12 - 12/31/12 | 3.00x |
| 1/1/2013 - 3/30/13 | 2.75x |
| **3/31/13 - 6/29/13** | **2.50x** |
| 6/30/13 - 9/29/13 | 2.25x |
| 9/30/13 - 12/31/13 | 2.00x |
| 3/31/14 - 12/31/14 | 1.75x |
| Thereafter | 1.50x |

## Interest coverage covenant summary

| Period | Interest coverage ratio |
|---|---|
| 6/30/12 - 12/31/14 | 2.25x |
| Thereafter | 2.00x |

FINANCING DISCUSSION

MILLENNIUM LABORATORIES

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00183886

# Summary of existing lenders

**Existing lenders and commitments to R/C and Term Loan A facilities (as of May 31, 2013)**

| Parent Investor | R/C commit | % total | Cumulative % total | TLA commit | % total | Cumulative % total | Total commit | % total | Cumulative % total |
|---|---|---|---|---|---|---|---|---|---|
| J.P. Morgan | 4,545,455 | 22.7% | 22.7% | 64,163,096 | 22.7% | 22.7% | 68,708,551 | 22.7% | 22.7% |
| Suntrust Bank | 4,545,455 | 22.7% | 45.5% | 64,163,096 | 22.7% | 45.5% | 68,708,551 | 22.7% | 45.5% |
| Bank of Montreal | 3,030,303 | 15.2% | 60.6% | 42,775,398 | 15.2% | 60.6% | 45,805,701 | 15.2% | 60.6% |
| Fifth Third Bank | 3,030,303 | 15.2% | 75.8% | 42,775,398 | 15.2% | 75.8% | 45,805,701 | 15.2% | 75.8% |
| GE Capital Bank | 3,030,303 | 15.2% | 90.9% | 42,775,398 | 15.2% | 90.9% | 45,805,701 | 15.2% | 90.9% |
| Regions Bank | 1,212,121 | 6.1% | 97.0% | 17,110,159 | 6.1% | 97.0% | 18,322,280 | 6.1% | 97.0% |
| Brown Brothers Harriman & Co | 606,060 | 3.0% | 100.0% | 8,555,080 | 3.0% | 100.0% | 9,161,140 | 3.0% | 100.0% |
| TOTAL | 20,000,000 | 100.0% | | 282,317,624 | 100.0% | | 302,317,624 | 100.0% | |

MILLENNIUM LABORATORIES

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00183887

# Overview of illustrative financing alternatives

## Option 1

- Use only cash to pay dividend to shareholders
- Per the Credit Agreement, the Company has a $20mm general RP basket plus Borrower's portion of ECF which will need to be amended to allow for this distribution
- In conjunction with the distribution, Millennium can seek to reprice its Credit Facilities and/or push out the maturity by 1 year
- Lenders would be paid 7.5bps – 10bps for the dividend, or 17.5bps – 20.0bps if maturity is extended by 1 year in conjunction with the dividend

### Sources and uses ($ millions)

| Sources | Amt ($) | Uses | Amt ($) |
|---|---|---|---|
| Cash from B/S | 122.0 | Distribution to shareholders | 120.0 |
| | | Fees and expenses | 2.0 |
| Total Sources | 122.0 | Total Uses | 122.0 |

### Pro forma capitalization ($ millions)

| Facility | Amount | xEBITDA | Pricing |
|---|---|---|---|
| Cash and cash equivalents | $6.1 | | |
| $20mm RC facility due '17/'18 | 0.0 | | L+200 – 225/25bps |
| Term Loan A due '17/'18 | 282.3 | | L+200 – 225 |
| Senior secured debt | $282.3 | 0.8x | |
| Other long term senior debt | 43.2 | | |
| Total senior debt | $325.5 | 0.9x | |
| Annual interest expense | $6.8 | | |

### Considerations

- Minimizes costs to execute the distribution to shareholders
- If executed in conjunction with a reprice, reduces interest burden by $2.5mm per year and can extend maturity by 1 year
- Maintains low leverage and incremental debt capacity
- This transaction will not require ratings
- Meaningfully reduces liquidity

## Option 2

- Syndicate a new Term Loan A and use cash on hand to fund a distribution to shareholders
- Fees and expenses would be lightened from the 2012 transaction's levels:
    - 25bps upfront for existing dollar commitments
    - 50bps – 62.5bps upfront for "new money" commitments

### Sources and uses ($ millions)

| Sources | Amt ($) | Uses | Amt ($) |
|---|---|---|---|
| New TLA | 450.0 | Refinance TLA | 282.3 |
| Cash from B/S | 103.1 | Distribution to shareholders | 264.7 |
| | | Fees and expenses | 6.1 |
| Total Sources | 553.1 | Total Uses | 553.1 |

### Pro forma capitalization ($ millions)

| Facility | Amount | xEBITDA | Pricing |
|---|---|---|---|
| Cash and cash equivalents | $25.0 | | |
| $20mm RC facility due '18 | 0.0 | | L+225 – 250/25bps |
| Term Loan A due '18 | 450.0 | | L+225 – 250 |
| Senior secured debt | $450.0 | 1.2x | |
| Other long term senior debt | 43.2 | | |
| Total senior debt | $493.2 | 1.3x | |
| Annual interest expense | $12.0 | | |

### Considerations

- Allows for a substantial distribution, while maintaining decent liquidity
- Lower leverage than 2012 recapitalization
- This transaction does not require ratings
- Likely requires new lenders

## Option 3

- Syndicate a new Term Loan A (similar to Option 2) and syndicate a new Term Loan B in the institutional market to refinance the existing Term Loan A and fund, with cash on hand, a distribution to shareholders
- Fees to the market will be as follows:
    - TLA fees will be in line with fees in Option 2
    - TLB lenders will receive 50bps – 100bps (OID)

### Sources and uses ($ millions)

| Sources | Amt ($) | Uses | Amt ($) |
|---|---|---|---|
| New Term Loan A | 200.0 | Refinance TLA | 282.3 |
| New Term Loan B | 1,075.0 | Distribution to shareholders | 1,074.3 |
| Cash from B/S | 103.2 | Fees and expenses | 21.6 |
| Total Sources | 1,378.2 | Total Uses | 1,378.2 |

### Pro forma capitalization ($ millions)

| Facility | Amount | xEBITDA | Pricing |
|---|---|---|---|
| Cash and cash equivalents | $25.0 | | |
| $20mm RC facility due '18 | 0.0 | | L+250 – 275/25bps |
| Term Loan A due '18 | 200.0 | | L+250 – 275 |
| New Term Loan B due '20 | 1,075.0 | | L+300 – 325, 1% floor |
| Senior secured debt | 1,275.0 | 3.4x | |
| Other long term senior debt | 43.2 | | |
| Total senior debt | 1,318.2 | 3.5x | |
| Annual interest expense | $47.5 | | |

### Considerations

- Provides the largest distribution of the three options, while maintaining sufficient liquidity
- Company gains access and exposure to the broader institutional term loan market
- Higher fees and expenses
- Higher interest rate
- Ratings are required for a Term Loan B transaction

FINANCING DISCUSSION

MILLENNIUM LABORATORIES

5

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00183888

# Illustrative syndication strategy

| Illustrative syndication strategy | | | | | |
|---|---|---|---|---|---|
| | Existing Commit | Invite | Average upfront fees (bps) | Likely Commit | New money raised |
| JPM | 68.7 | 75.0 | 27 bps | 75.0 | 6.3 |
| Suntrust Bank | 68.7 | 75.0 | 27 bps | 75.0 | 6.3 |
| Bank of Montreal | 45.8 | 55.0 | 29 bps | 55.0 | 9.2 |
| Fifth Third Bank | 45.8 | 55.0 | 29 bps | 55.0 | 9.2 |
| GE Capital Bank | 45.8 | 55.0 | 29 bps | 55.0 | 9.2 |
| Regions Bank | 18.3 | 30.0 | 27 bps | 20.0 | 1.7 |
| Brown Brothers Harriman & Co. | 9.2 | 15.0 | 35 bps | 15.0 | 5.8 |
| **Total existing** | **$302.3** | **$360.0** | | **$350.0** | **$47.7** |
| | | | | | |
| Wells Fargo | | 30.0 | 50 bps | 30.0 | 30.0 |
| Sumitomo | | 30.0 | 50 bps | 30.0 | 30.0 |
| USBank | | 30.0 | 50 bps | 30.0 | 30.0 |
| RBC | | 30.0 | 50 bps | 30.0 | 30.0 |
| Union | | 30.0 | | | |
| Raymond James | | 30.0 | | | |
| HSBC | | 30.0 | | | |
| BBVA Compass | | 30.0 | | | |
| Comerica | | 30.0 | | | |
| Bank of the West | | 30.0 | | | |
| **Total** | | **$660.0** | | **$470.0** | **$167.7** |

FINANCING DISCUSSION

CONFIDENTIAL                                                                                   JPMC-MIL-CORP-00183889

# Agenda

|  | Page |
|---|---|
| Financing discussion | 1 |
| Leveraged finance market update | 7 |
| Appendix | 12 |

DISCUSSION MATERIALS

CONFIDENTIAL

JPMC-MIL-CORP-00183890

# The pro rata market was solid throughout 2012 and has remained strong in 2013

### Commentary

- Banks continue to migrate down the credit spectrum in an effort to deploy their assets
  - Leveraged pro rata volume totaled $596bn in 2012 compared to $525bn in 2011, up 14% after a surging 3rd quarter
  - Through 1Q 2013, leveraged pro rata volume totaled $95bn
  - Lender participation levels has strongly rebounded
- Spreads have tightened to an average of L+175-200bps for a pro rata only transaction, which carries no LIBOR floor and average upfront fees of 50 bps
- Transactions continue to be multi-year, with 70% of volume representing 4-year or 5-year tenors

### Volume ($bn)



Source: Dealogic; S&P LCD

### Investor hit rates



Source: Thomson Reuters LPC; J.P. Morgan
Note: Based on investment grade data

### # of leveraged pro rata lenders



Source: S&P LCD
Note: Defined as 10 or more participations

### Average pricing



Source: Thomson Reuters LPC; J.P. Morgan

MILLENNIUM LABORATORIES

J.P.Morgan

JPMC-MIL-CORP-00183891

# Snapshot of the pro rata market today

## Commentary

### Capacity

- Market capacity is strong as banks continue to seek new assets
  - Term loans are most desirable while funded revolver structures have also generated interest
  - Most lenders will have interest in ancillary business discussions with clients that have unfunded Revolver needs
- Leveraged pro rata volume totaled $596bn in 2012 compared to $525bn in 2011 up 14% after surging in the third quarter
- As overall spreads have tightened and the pro rata market's appetite for new paper has grown, existing lenders have been increasingly willing to participate in lower-rated credits

### Key terms

- While most lenders remain credit-focused, well-capitalized, low-levered borrowers are increasingly seeking and obtaining flexibility
  - 5-year transactions
  - Reduced amortization on term loans in the first several years
  - Increased flexibility around negative covenants with appropriate operating metrics

### Pricing

- Spreads have tightened to an average of L+175-200bps for a pro rata only transaction which carries no LIBOR floor and with average upfront fees

## Notable pro rata deals

| Borrower | Close Date | Corp Rating | Facility | Pro Rata ($ mm) | Spread | Arrangers |
|---|---|---|---|---|---|---|
| Ford | Mar-13 | Baa3/BB+ | RC | $10,270 | 165.0 | JPM/BNP/BAML/Bar/Citi/CA/DB/GS/HSBC/MS/RBC/RBS/SMBC |
| Sprint | Mar-13 | B1/B+ | RC | $2,800 | 300.0 | JPM/Citi |
| QVC | Mar-13 | Ba1/BB+ | RC | $2,000 | 150.0 | JPM/Wells/BNP/CA/RBS/BAML/Bar/MS/Scotia/Mizuho |
| Delphi | Mar-13 | Ba1/BB+ | RC/TLA | $2,075 | 150.0 | JPM/BAML/DB |
| Freeport McMoran | Feb-13 | Baa3/BBB | RC/TLA | $7,000 | 150.0 | JPM/BAML/BNP/Citi/HSBC/Mizuho/BTMU/SMBC/Scotia |
| Lear | Jan-13 | Ba2/BB+ | RC | $1,000 | 150.0 | JPM/Citi/Bar |
| MedAssets | Dec-12 | B1/B+ | RC/TLA | $750 | 250.0 | JPM/Bar/DB/BAML/MS/ST |
| SiriusXM | Dec-12 | B1/BB | RC | $1,250 | 200.0 | JPM/BAML/Bar/BNP/Citi/CA/DB/MUFG/RBC/RBS/ST/WF |
| GaPu | Dec-12 | NR | RC/TLA | $170 | 250.0 | JPM/Citi/Bar/Silicon Valley |
| Interactive Corp | Dec-12 | Ba1/BB+ | RC | $300 | 150.0 | JPM/GS/BAML/BNP |
| Team Health | Nov-12 | Ba3/BB | RC/TLA | $525 | 175.0 | JPM/BAML/Bar/Citi/GS |
| General Motors | Nov-12 | Ba1/BB+ | RC | $10,000 | 225.0 | JPM/Citi/ICBC/Lloyds/TD/Brasil/Bradesco/Bar/BNP/CS/DB/GS/BAML/MS/RBC/RBS/UBS |
| Burger King | Sep-12 | B2/B+ | RC/TLA | $1,180 | 225.0 | JPM/Barc/BAML |
| DaVita Healthcare | Aug-12 | Ba3/BB- | TLA | $1,350 | L+250 | JPM/BAML/Wells/Bar/CS/GS/MS/ST |
| Petsmp | Jul-12 | B1/BB+ | RC/TLA | $1,300 | L+300 | GS/JPM/Citi |

MILLENNIUM LABORATORIES

9

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00183892

# Institutional loan market conditions

## Commentary

- The leveraged loan market held its ground last week despite volatility in the broader capital markets triggered by fear of rising interest rates after the Fed signaled the potential to scale back on its asset purchase program

- Technical factors continue to be favorable, with the market having experienced significantly positive inflows
  - Inflows this past week equaled $1.24bn, which is the 49th consecutive weekly inflow and compares to the $871mm inflow last week. Each of the past seventeen inflows have paced, matched or exceeded $800mm and six of these are the largest ever recorded
  - Inflows stand at $25.3bn YTD, surpassing all FY2012 inflows and representing the largest on record, compared to the previous record of $17.9bn set in 2010
  - Meanwhile for CLO issuance, no new deals priced last week, following five new deals totaling $2.2bn the prior week, and leaving YTD volumes unchanged at $36.3bn, compared with $14.4bn over the same period last year. While CLO issuance has been a large part of the undersupply of new loans YTD, it has slowed in the second quarter from its rampant pace in 1Q

- New issue activity continues to be dominated by opportunistic business, primarily refinancing and repricing activity

- The LCD-100 stands at 98.69 yielding 5.41% compared to 96.35 yielding 6.05% at the beginning of the year
  - For reference, in 2012, the index reached its wide on January 3rd at 91.10, yielding 7.27% and subsequently hit its tight on September 24th at 96.35, yielding 5.80%
  - BB spreads stand at L+373, yielding 4.80% compared to the start of the year at L+412, yielding 5.01%. B spreads stand at L+475, yielding 5.82% compared to the start of the year at L+532, yielding 6.20%
  - Loans have returned 3.11% so far in 2013
  - Defaults stand at 1.51% on the year compared to 1.36% for 2012

### Avg. secondary loan bid (LCD-100)



Source: S&P LCD (as of 05/24/13)

### Institutional loan yields



Source: S&P LCD (as of 05/24/13)

### Weighted avg. loan spreads (bps)



Source: S&P LCD (as of 05/24/13)

### Loan mutual fund flows ($mm)



Source: Lipper FMI

LEVERAGED FINANCE MARKET UPDATE

CONFIDENTIAL

JPMC-MIL-CORP-00183893

# Recent ratings-based comparable term loan B transactions

## Priced institutional calendar

| Close Date | Borrower (Sponsor) | Corp. Ratings[1] | Industry | UoP | Facility | Size ($mm) | Tenor | Coupon (bps) | LIBOR floor | At issue Price | At issue Simple Yld |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 05/29/13 | NRG Energy | Ba3 / BB- | Utilities | Reprice | TLB | 2,022 | 5.1 yr | 200-225 | 0.75% | 100.00 | TBD |
| 05/28/13 | Aeroflex | B1 / B+ | Technology | Reprice | TL (Cov-lite) | 612 | 6.5 yr | 350 | 1.00% | 99.75 | 4.56% |
| 05/23/13 | Lord & Taylor | B1 / B+ | Retail | Ref | TLB | 300 | 5.0 yr | 450 | 1.25% | NA | NA |
| 05/23/13 | Avis Budget Car Rental | B1 / B+ | Services | Reprice | TLB | 1,000 | 5.8 yr | 225 | 0.75% | 100.00 | 3.00% |
| 05/23/13 | Mediacom Broadband | B1 / B+ | Radio, Cable & TV Broadcasting | Ref | TLB | 800 | 7.5 yr | 250 | 0.75% | 100.00 | 3.25% |
| 05/23/13 | Kindred Healthcare | B1 / B+ | Healthcare | Reprice | TLB | 788 | 5.1 yr | 325 | 1.00% | 100.00 | 4.25% |
| 05/22/13 | Pratt Group | Ba3 / B+ | Paper & Packaging | Dividend Ref | TL (Cov-lite) | 385 | 7.0 yr | 275 | 1.00% | 99.50 | 3.88% |
| 05/22/13 | Scientific Games | Ba3 / BB | Technology | Acq | TL (Cov-lite) | 2,300 | 7.0 yr | 325 | 1.00% | 99.50 | 4.38% |
| 05/22/13 | Hawaiian Telecom | B1 / B | Telecom | Reprice | 1st Lien TL | 300 | 6.0 yr | 400 | 1.00% | 99.50 | 5.13% |
| 05/22/13 | Atlantic Broadband | B1 / BB- | Radio, Cable & TV Broadcasting | Reprice | TLB | 419 | 6.8 yr | 250 | 0.75% | 100.00 | 3.25% |
| 05/20/13 | Alpha Natural Resources | B1 / B+ | Metals & Mining | Ref | TL (Cov-lite) | 625 | 7.0 yr | 275 | 0.75% | 99.50 | 3.63% |
| 05/16/13 | CNO Financial | Ba3 / BB- | Finance & Insurance | Reprice | TLB-1 | 238 | 3.4 yr | 225 | 0.75% | 100.00 | 3.00% |
| 05/16/13 | CNO Financial | Ba3 / BB- | Finance & Insurance | Reprice | TLB-2 | 424 | 5.4 yr | 275 | 1.00% | 100.00 | 3.75% |
| 05/16/13 | Atlantic Aviation | Ba3 / BB- | Aerospace & Defense | Ref | TL (Cov-lite) | 465 | 7.0 yr | 250 | 1.00% | 99.00 | 3.75% |
| 05/15/13 | Select Medical | B1 / B+ | Healthcare | Reprice | TLB | 720 | 6.0 yr | 300 | 1.00% | 100.00 | 4.00% |
| 05/14/13 | Ofter Products | B1 / B+ | Consumer | Acq | TLB | 400 | 6.0 yr | 425 | 1.00% | 98.50 | 5.63% |
| 05/14/13 | Seaworld Parks & Entertainment | B1 / B+ | Amusement and Leisure | Ref | TLB | 1,405 | 7.0 yr | 225 | 0.75% | 99.75 | 3.08% |
| 05/10/13 | Tempur-Pedic International | B1 / BB- | Consumer | Reprice | TLB | 743 | 6.6 yr | 275 | 0.75% | 100.00 | 3.50% |
| 05/08/13 | Seminole Hard Rock Entertainment | B1 / BB | Amusement and Leisure | Ref, acq | TL (Cov-lite) | 390 | 7.0 yr | 275 | 0.75% | 99.50 | 3.62% |
| 05/07/13 | Key Safety Systems | B1 / B+ | Automotive | Ref | 1st Lien TL | 400 | 5.0 yr | 375 | 1.00% | 99.50 | 4.88% |
| 05/07/13 | Warner Music | B1 / B+ | Diversified | Acq | TL (Cov-lite) | 492 | 7.0 yr | 275 | 1.00% | 99.75 | 3.81% |
| 05/07/13 | Warner Music | B1 / B+ | Diversified | Acq | DD (Cov-lite) | 820 | 7.0 yr | 325 | 1.00% | 99.75 | 4.31% |
| 05/03/13 | Allscripts Solutions | B1 / B+ | Finance & Insurance | GCP | Add-on TL (Cov-lite) | 200 | 5.6 yr | 450 | 1.25% | 100.50 | 5.63% |
| 05/02/13 | MMI International | Ba3 / B+ | Technology | Ref | TL (Cov-lite) | 180 | 5.5 yr | 600 | 1.25% | 97.00 | 8.00% |
| 05/02/13 | SS&C Technologies | Ba3 / BB- | Technology | Reprice | TLB | 700 | 6.0 yr | 275 | 0.75% | 100.00 | 3.50% |
| 05/02/13 | Calpine Construction Finance Co | B1 / B+ | Utilities | Ref | TL (Cov-lite) | 300 | 7.0 yr | 225 | 0.75% | 99.75 | 3.06% |
| 05/02/13 | Calpine Construction Finance Co | B1 / B+ | Utilities | Ref | TL (Cov-lite) | 300 | 6.5 yr | 250 | 0.75% | 99.75 | 3.31% |
| 05/02/13 | Greif Holdings | B1 / B+ | Metals & Mining | Ref | TLB | 316 | 5.0 yr | 350 | 1.00% | 100.00 | 4.50% |
| 04/30/13 | HCA | B1 / B+ | Healthcare | Reprice | TLB-5 | 2,000 | 5.8 yr | 275 | 0.00% | 100.00 | 2.75% |
| 04/30/13 | National CineMedia | Ba3 / BB- | Amusement and Leisure | Reprice | TLB | 270 | 6.6 yr | 275 | 0.00% | 100.00 | 2.75% |
| 04/29/13 | Charter Communications | Ba3 / BB- | Radio, Cable & TV Broadcasting | Ref | TLB | 1,200 | 7.7 yr | 225 | 0.75% | 99.75 | 3.08% |
| 04/25/13 | Wabash National | B1 / B+ | Manufacturing | Reprice | TLB | 298 | 6.1 yr | 350 | 1.00% | 100.00 | 4.50% |
| 04/23/13 | HCA | B1 / B+ | Healthcare | Reprice | TLB-4 | 2,375 | 5.0 yr | 275 | 0.00% | 100.00 | 2.75% |
| 04/18/13 | Capital Automotive | Ba3 / B+ | Real Estate | Ref | 2nd Lien TL | 325 | 7.0 yr | 550 | 1.00% | 99.50 | 6.63% |
| 04/18/13 | UPC Holding | Ba3 / B+ | Radio, Cable & TV Broadcasting | Ref | TL | 1,305 | 8.0 yr | 250 | 0.75% | 99.75 | 3.31% |
| 04/17/13 | Regal Entertainment | B1 / B+ | Amusement and Leisure | Reprice | TL (Cov-lite) | 988 | 4.6 yr | 250 | 0.00% | 100.00 | 2.50% |
| 04/16/13 | Pinnacle Foods | B1 / B+ | Food & Beverage | Ref | TLB | 1,630 | 7.0 yr | 250 | 0.75% | 99.75 | 3.31% |
| 04/15/13 | Waupaca Foundry | B1 / B+ | Metals & Mining | Reprice | TLB | 417 | 4.2 yr | 350 | 1.00% | 100.00 | 4.50% |
| 04/12/13 | Cequel Communications | B1 / B+ | Radio, Cable & TV Broadcasting | Reprice | TLB | 3,476 | 5.8 yr | 275 | 0.75% | 100.00 | 3.50% |
| 04/12/13 | Worldpay | Ba3 / B+ | Technology | Ref, dividend | Add-on TLC | 479 | 6.6 yr | 360 | 1.25% | 99.50 | 4.86% |
| 04/12/13 | Worldpay | Ba3 / B+ | Technology | Ref, dividend | Add-on TLC | 308 | 6.6 yr | 450 | 1.25% | 99.50 | 5.38% |
| 04/12/13 | Worldpay | Ba3 / B+ | Technology | Ref, dividend | Add-on TLC | 368 | 6.6 yr | 400 | 1.25% | 99.50 | 5.38% |
| 04/11/13 | Evertec | B1 / B+ | Technology | Ref | TL (Cov-lite) | 400 | 7.0 yr | 275 | 0.75% | 100.00 | 3.08% |
| 04/10/13 | First Data | B1 / B+ | Technology | Reprice | TLB | 1,008 | 5.6 yr | 400 | 0.00% | 99.38 | 4.18% |
| 04/09/13 | Belfor USA Group | B1 / BB- | Services | Reprice, ref | TLB | 300 | 6.0 yr | 375 | 1.00% | 99.50 | 4.32% |
| 04/08/13 | Sinclair Television Group | Ba3 / BB- | Radio, Cable & TV Broadcasting | Ref, acq | TLB | 480 | 7.0 yr | 225 | 0.75% | 100.00 | 3.00% |
| 04/08/13 | Ren Solutions | Ba3 / BB- | Technology | Reprice | TLB | 540 | 6.0 yr | 275 | 0.75% | 99.75 | 2.68% |
| 04/05/13 | TW Telecom | Ba3 / BB- | Telecom | Ref | TL (Cov-lite) | 470 | 7.0 yr | 250 | 0.00% | 99.50 | 2.63% |
| 04/05/13 | ABC Supply | B1 / BB- | Construction & Building Materials | Equity purchase, ref | TL (Cov-lite) | 1,250 | 7.0 yr | 275 | 0.75% | 100.00 | 3.60% |
| 04/05/13 | Capital Automotive | Ba3 / B+ | Finance & Insurance | Reprice | TLB | 1,500 | 6.0 yr | 325 | 1.00% | 99.75 | 4.31% |
| 04/04/13 | SRAM | B1 / B+ | Consumer | Ref | 1st Lien Cov-lite TL | 715 | 7.0 yr | 300 | 1.00% | 99.50 | 4.18% |
| 04/04/13 | Hertz | B1 / B- | Automotive | Reprice | TL (Cov-lite) | 1,376 | 5.0 yr | 225 | 0.75% | 100.00 | 3.00% |
| 04/03/13 | Philadelphia Energy Solutions | B1 / B+ | Oil & Gas | Dividend | TL (Cov-lite) | 350 | 5.0 yr | 500 | 1.25% | 98.50 | 6.63% |

MILLENNIUM LABORATORIES

11

J.P.Morgan

LEVERAGED FINANCE MARKET UPDATE

# Agenda

| | Page |
|---|---|
| Financing discussion | 1 |
| Leveraged finance market update | 7 |
| Appendix | 12 |

DISCUSSION MATERIALS

MILLENNIUM LABORATORIES

12

J.P.Morgan

CONFIDENTIAL

JPMC-MIL-CORP-00183895

# J.P. Morgan has unparalleled pro-rata and institutional distribution capabilities

### Market Leadership

- Long-standing new issue leadership in the investment and non-investment grade loan market has built unmatched relationships with buyside accounts
  - #1 Arranger in the U.S. high grade loan market since 1993 with 36.0% left lead market share in 2012, representing total volume of $288.6 billion
  - #1 Arranger in the U.S. leveraged loan market with 20.7% left lead market share in 2012, representing total volume of $183.9 billion

- Integrated pro-rata loan and institutional term loan distribution platform
  - 7-person pro-rata sales force, covering approximately 150 commercial banks for both investment grade and non-investment grade transactions
    - Incredibly important as commercial banks increase their appetite for non-investment grade credit exposure
  - 22-person institutional sales force with average relationship tenor over 10 years
    - Given longstanding relationships, J.P. Morgan sales coverage serves as the "core advisor" to their accounts in sales, trading, research and capital markets

- With our fortress balance sheet, we are the counterparty of choice during volatile market conditions



| $2,800mm RC | $2,000mm RC | $1,500mm RC $575mm TLA | $3,000mm RC $4,000mm TLA |
| --- | --- | --- | --- |
| Sprint | | DELPHI | FREEPORT-McMoRan COPPER & GOLD |
| March 2013 Lead-left bookrunner | March 2013 Lead-left bookrunner | March 2013 Lead-left bookrunner | February 2013 Lead-left bookrunner |

CONFIDENTIAL

JPMC-MIL-CORP-00183896

# J.P. Morgan remains the global bookrunner of choice for syndicated loans

- J.P. Morgan has been the #1 arranger in syndicated loans for 21 consecutive years

## Global loan bookrunner rankings (FY'12)

| Rank | Bank | Volume ($bn) | FY'11 | FY'10 | FY'09 | FY'08 | FY'07 | FY'91 |
|------|------|--------------|-------|-------|-------|-------|-------|-------|
| 1 | J.P.Morgan | 329.4 | #1 | #1 | #1 | #1 | #1 | #1 |
| 2 | Bank of America | 287.8 | | | | | | |
| 3 | Citi | 188.0 | | | | | | |
| 4 | Mizuho | 175.4 | | | | | | |
| 5 | Wells Fargo Securities | 159.5 | | | | | | |
| 6 | Mitsubishi UFJ | 118.0 | | | | | | |
| 7 | Sumitomo Mitsui | 93.7 | | | | | | |
| 8 | Barclays Capital | 93.3 | | | | | | |
| 9 | Deutsche Bank | 84.4 | | | | | | |
| 10 | RBC Capital Markets | 74.5 | | | | | | |

Source: Dealogic/J.P. Morgan (12/31/12)

## IFR awards

2012 Global Loan House

*"For pushing hard in cross-border lending, showing commitment to the loan product by boosting the bank's platform at a time when others were pulling back, and keeping its head when all others were losing theirs, JP Morgan is IFR's Loan House of the Year."*

December 2012
IFR Review of the Year 2012

## Notable transactions

| March 2013 | April 2013 | April 2013 | April 2013 | March 2013 | March 2013 |
|------------|------------|------------|------------|------------|------------|
| $11,500,000,000 | $770,000,000 | $1,400,000,000 eq. | $800,000,000 | € 1,600,000,000 eq. | $900,000,000 |
| Heinz | AFFINIA | DONCASTERS | EVERTEC | SCHAEFFLER | TI Automotive |
| Lead left bookrunner | Lead left bookrunner | Joint bookrunner | Lead left bookrunner | Joint bookrunner | Lead left bookrunner |

MILLENNIUM LABORATORIES

14

J.P.Morgan

JPMC-MIL-CORP-00183897

# EXHIBIT 52

**From:** Karanikolaidis, Stathis <Stathis.Karanikolaidis@jpmorgan.com>
**To:** LeeLum, Dawn <DAWN.LEELUM@jpmorgan.com>
**Sent:** 2/13/2014 3:16:01 PM
**Subject:** FW: Millennium Discussion
**Attachments:** Millennium Labs Discussion Materials 1.21.2014 vF.PDF

Howard called.  Looks like they want to proceed with scenario 3.  Please give me a call to discuss.  Thanks.

Stathis Karanikolaidis
Managing Director
Leveraged Finance
J.P. Morgan Securities LLC
Office: 212-270-7374
Cell: 917-406-8907

**From:** Griswold, Ryan P
**Sent:** Thursday, February 13, 2014 8:42 AM
**To:** Howard Appel
**Cc:** Karanikolaidis, Stathis
**Subject:** Millennium Discussion

**Ryan P. Griswold** | Vice President | Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY  10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

**Alternate contact:** Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

**Exhibit
95**
James Slattery

CONFIDENTIAL

# DISCUSSION MATERIALS

January 21, 2014

STRICTLY PRIVATE AND CONFIDENTIAL



J.P.Morgan

CONFIDENTIAL

JPMC-00028568

This presentation was prepared exclusively for the benefit and internal use of the J.P. Morgan client to whom it is directly addressed and delivered (including such client's subsidiaries, the "Company") in order to assist the Company in evaluating, on a preliminary basis, the feasibility of a possible transaction or transactions and does not carry any right of publication or disclosure, in whole or in part, to any other party.  This presentation is for discussion purposes only and is incomplete without reference to, and should be viewed solely in conjunction with, the oral briefing provided by J.P. Morgan.  Neither this presentation nor any of its contents may be disclosed or used for any other purpose without the prior written consent of J.P. Morgan.

The information in this presentation is based upon any management forecasts supplied to us and reflects prevailing conditions and our views as of this date, all of which are accordingly subject to change.  J.P. Morgan's opinions and estimates constitute J.P. Morgan's judgment and should be regarded as indicative, preliminary and for illustrative purposes only.  In preparing this presentation, we have relied upon and assumed, without independent verification, the accuracy and completeness of all information available from public sources or which was provided to us by or on behalf of the Company or which was otherwise reviewed by us.  In addition, our analyses are not and do not purport to be appraisals of the assets, stock, or business of the Company or any other entity.  J.P. Morgan makes no representations as to the actual value which may be received in connection with a transaction nor the legal, tax or accounting effects of consummating a transaction.  Unless expressly contemplated hereby, the information in this presentation does not take into account the effects of a possible transaction or transactions involving an actual or potential change of control, which may have significant valuation and other effects.

Notwithstanding anything herein to the contrary, the Company and each of its employees, representatives or other agents may disclose to any and all persons, without limitation of any kind, the U.S. federal and state income tax treatment and the U.S. federal and state income tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Company relating to such tax treatment and tax structure insofar as such treatment and/or structure relates to a U.S. federal or state income tax strategy provided to the Company by J.P. Morgan. J.P. Morgan's policies on data privacy can be found at http://www.jpmorgan.com/pages/privacy.

J.P. Morgan's policies prohibit employees from offering, directly or indirectly, a favorable research rating or specific price target, or offering to change a rating or price target, to a subject company as consideration or inducement for the receipt of business or for compensation.  J.P. Morgan also prohibits its research analysts from being compensated for involvement in investment banking transactions except to the extent that such participation is intended to benefit investors.

**IRS Circular 230 Disclosure:  JPMorgan Chase & Co. and its affiliates do not provide tax advice.  Accordingly, any discussion of U.S. tax matters included herein (including any attachments) is not intended or written to be used, and cannot be used, in connection with the promotion, marketing or recommendation by anyone not affiliated with JPMorgan Chase & Co. of any of the matters addressed herein or for the purpose of avoiding U.S. tax-related penalties.**

J.P. Morgan is a marketing name for investment banking businesses of JPMorgan Chase & Co. and its subsidiaries worldwide. Securities, syndicated loan arranging, financial advisory and other investment banking activities are performed by a combination of J.P. Morgan Securities LLC, J.P. Morgan Limited, J.P. Morgan Securities plc and the appropriately licensed subsidiaries of JPMorgan Chase & Co. in EMEA and Asia-Pacific, and lending, derivatives and other commercial banking activities are performed by JPMorgan Chase Bank, N.A.  J.P. Morgan deal team members may be employees of any of the foregoing entities.

This presentation does not constitute a commitment by any J.P. Morgan entity to underwrite, subscribe for or place any securities or to extend or arrange credit or to provide any other services.

DISCUSSION MATERIALS

MILLENNIUM LABORATORIES

J.P.Morgan

# Agenda

|                                    | Page |
|------------------------------------|------|
| **Financing overview**             | 1    |
| Leveraged finance market update    | 5    |

DISCUSSION MATERIALS

MILLENNIUM LABORATORIES

1

J.P.Morgan

CONFIDENTIAL

JPMC-00028570

# Millennium Laboratories overview

## Capitalization as of 9/30/2013

|  | Amount ($mm) | % of total senior debt | x EBITDA |
|---|---|---|---|
| Cash and cash equivalents | $157.1 | | |
| $20mm R/C facility due 2017 | 0.0 | 0.0% | |
| Term Loan A due 2017 | 267.5 | 50.9% | |
| **Senior secured debt** | **$267.5** | **50.9%** | **0.7x** |
| Other long term senior debt | 61.7 | 11.7% | |
| **Total senior debt** | **$329.2** | **62.7%** | **0.9x** |
| TA Debentures | 196.0 | **37.3%** | |
| **Total debt** | **$525.2** | **100.0%** | **1.4x** |
| **Total net debt** | **$368.1** | | **1.0x** |
| LTM EBITDA (9/30/2013) | $377.1 | | |

## Pro-forma capitalization (as of 12/31/13)

|  | Amount ($mm) | % of total senior debt | x EBITDA |
|---|---|---|---|
| Cash and cash equivalents | $199.5 | | |
| $30mm R/C facility due 2017 | 0.0 | 0.0% | |
| Term Loan A due 2017 | 312.6 | 55.2% | |
| **Senior secured debt** | **$312.6** | **55.2%** | **0.9x** |
| Other long term senior debt | 57.9 | 10.2% | |
| **Total senior debt** | **$370.5** | **65.4%** | **1.0x** |
| TA Debentures | 196.0 | **34.6%** | |
| **Total debt** | **$566.5** | **100.0%** | **1.6x** |
| **Total net debt** | **$367.0** | | **1.0x** |
| FYE EBITDA (12/31/13) | $361.2 | | |

## Pricing grid

|  | Pricing |
|---|---|
| Revoling Credit Facility | L + 200 bps, undrawn 25bps |
| Term Loan A | L + 200 bps |

## Leverage covenant summary

| Period | Consolidated leverage ratio |
|---|---|
| 6/30/12 - 9/29/12 | 3.25x |
| 9/30/12 - 12/31/12 | 3.00x |
| 1/1/2013 - 3/30/13 | 2.75x |
| **3/31/13 - 6/29/13** | **2.50x** |
| 9/30/13 - 12/31/13 | 2.00x |
| 3/31/14 - 12/31/14 | 1.75x |
| Thereafter | 1.50x |

## Interest coverage covenant summary[1]

| Period | Interest coverage ratio |
|---|---|
| **6/30/12 - 06/30/13** | **2.25x** |
| 9/30/13 - 12/30/13 | 1.50x |
| 12/31/13 - 3/31/14 | 1.30x |
| Thereafter | 1.50x |

## Restricted Payments summary

- General basket: $50mm
- 50% of ECF growing to 75% when sr. secured leverage ≤2.00x and 100% if sr. secured leverage ≤1.50x

## Historical financial performance (as of 12/31/2013)

|  | FYE 2009 | FYE 2010 | FYE 2011 | FYE 2012 | FYE 2013 |
|---|---|---|---|---|---|
| **Revenues** | **$64.5** | **$160.7** | **$232.6** | **$522.2** | **$631.3** |
| % growth | 442.8% | 149.1% | 44.7% | 124.5% | 20.9% |
| **Adjusted EBITDA** | **$41.3** | **$102.2** | **$114.3** | **$329.8** | **$361.2** |
| % margin | 64.0% | 63.6% | 49.1% | 63.2% | 57.2% |
| % growth | | 147.5% | 11.8% | 188.5% | 9.5% |

[1] Based on the levels restated in Amendment 2

FINANCING OVERVIEW

CONFIDENTIAL

# Summary of existing lenders

## Existing lenders and commitments to R/C and Term Loan A facilities (as of January 21st, 2014)

| Parent Investor | R/C commit | % total | Cumulative % total | TLA commit | % total | Cumulative % total | Total commit | % total | Cumulative % total |
|---|---|---|---|---|---|---|---|---|---|
| JP Morgan | 7,521,110 | 25.1% | 25.1% | 70,352,162 | 22.5% | 22.5% | 77,873,272 | 22.7% | 22.7% |
| SunTrust Bank | 6,818,182 | 22.7% | 47.8% | 71,038,770 | 22.7% | 45.2% | 77,856,952 | 22.7% | 45.5% |
| BMO Harris Bank | 4,633,231 | 15.4% | 63.2% | 48,273,727 | 15.4% | 60.7% | 52,906,958 | 15.4% | 60.9% |
| Fifth Third Bank | 4,545,455 | 15.2% | 78.4% | 47,359,180 | 15.2% | 75.8% | 51,904,635 | 15.2% | 76.1% |
| General Electric Capital Corporation | 3,030,303 | 10.1% | 88.5% | 39,583,217 | 12.7% | 88.5% | 42,613,520 | 12.4% | 88.5% |
| Regions Bank | 1,933,645 | 6.4% | 94.9% | 20,146,681 | 6.4% | 94.9% | 22,080,326 | 6.4% | 94.9% |
| Brown Brothers Harriman & Co | 1,089,503 | 3.6% | 98.6% | 11,351,557 | 3.6% | 98.6% | 12,441,060 | 3.6% | 98.6% |
| Citibank | 428,571 | 1.4% | 100.0% | 4,465,294 | 1.4% | 100.0% | 4,893,866 | 1.4% | 100.0% |
| **TOTAL** | **30,000,000** | **100.0%** | | **312,570,589** | **100.0%** | | **342,570,589** | **100.0%** | |

FINANCING OVERVIEW

MILLENNIUM LABORATORIES

3

J.P.Morgan

CONFIDENTIAL

JPMC-00028572

# Summary of financing alternatives

## 1  Option 1: Max pro rata

### Sources & uses and pro forma capitalization ($mm)

| Sources | Amount | Uses | Amount |
|---|---|---|---|
| Incremental TLA | $517.5 | Distribution | $509.0 |
| | | Fees and expenses | 8.5 |
| **Total sources** | **$517.5** | **Total uses** | **$517.5** |

| ($mm) | Pro forma | xEBITDA [1] |
|---|---|---|
| Cash | $199.5 | |
| $30mm R/C facility | 0.0 | |
| Term Loan A | 830.0 | |
| **Total secured debt** | **$830.0** | **2.30x** |
| Other debt | 57.9 | |
| TA debt | 196.0 | |
| **Total debt** | **$1,083.9** | **3.00x** |
| Annual interest expense | $22.7 | |
| Weighted average cost of debt | 2.74% | |

[1] Based on LTM 12/31/13 Adj. EBITDA of $361.2mm

### Scenario overview

- Revolver size remains $30mm : L+250bps (drawn) / 25bps (undrawn); 20bps "amendment fee" on existing dollars
- $517.5mm Incremental Term Loan A: L+250bps; 40 – 50bps upfront fees on "new money"
  - Total pro forma TLA amount of $830mm
- Use of proceeds will be to provide a distribution of ~$509mm and pay transaction related fees and expenses
  - Represents a distribution of ~$250mm to TA
- Pro forma weighted average cost of debt: 2.74%
- Pro forma annual interest expense: $22.7mm
- Terms of the Credit Agreement will remain generally unchanged

### Key considerations

- ✓ Ease of execution given target market's knowledge of the Company
- ✓ Lowest pro forma interest rate
- ✓ No need for ratings
- ✗ Current lender group may be stretched on commitments, requiring additional new lenders
- ✗ Provides lowest dividend

## 2  Option 2: Max 1st lien term loan

### Sources & uses and pro forma capitalization ($mm)

| Sources | Amount | Uses | Amount |
|---|---|---|---|
| New TLB | $1,445.0 | Distribution | $1,103.2 |
| | | Paydown TLA | 312.5 |
| | | Fees and expenses | 29.3 |
| **Total sources** | **$1,445.0** | **Total uses** | **$1,445.0** |

| ($mm) | Pro forma | xEBITDA [1] |
|---|---|---|
| Cash | $199.5 | |
| $30mm R/C facility | 0.0 | |
| New 1st lien TLB | 1,445.0 | |
| **Total secured debt** | **$1,445.0** | **4.00x** |
| Other debt | 57.9 | |
| TA debt | 196.0 | |
| **Total debt** | **$1,698.9** | **4.70x** |
| Annual interest expense | $66.8 | |
| Weighted average cost of debt | 4.63% | |

[1] Based on LTM 12/31/13 Adj. EBITDA of $361.2mm

### Scenario overview

- Revolver size remains $30mm : L+350bps (drawn) / 25bps (undrawn)
- New $1,445mm Term Loan B:  L+350 – L+375 / 1.00% LIBOR floor / 99.50 OID
- Use of proceeds will be to provide a distribution of ~$1,107mm , payout the existing TLA, and pay transaction related fees and expenses
  - Represents a distribution of ~$541mm to TA
- Pro forma weighted average cost of debt:  4.63%
- Pro forma annual interest expense:  $66.8mm
- Term loan will be distributed to the institutional market
- Key terms include:
  - Incurrence-based financial covenants only
  - 1% amortization per year
  - 101% soft-call protection for 6 months

### Key considerations

- ✓ Provides sizeable distribution at a moderate interest rate
- ✓ Company gains access to a new, broader investment base for future capital needs
- ✓ Amortization becomes less onerous than current schedule
- ✓ Incurrence-based financial covenants under Term Loan
- ✗ Increase in interest expense
- ✗ Moderately higher upfront costs compared to Option 1
- ✗ Public ratings required

## 3  Option 3: Max dividend

### Sources & uses and pro forma capitalization ($mm)

| Sources | Amount | Uses | Amount |
|---|---|---|---|
| New 1 st lien TL | $1,445.0 | Distribution | $1,539.7 |
| New 2 nd lien TL | 450.0 | Paydown TLA | 312.5 |
| | | Fees and expenses | 42.8 |
| **Total sources** | **$1,895.0** | **Total uses** | **$1,895.0** |

| ($mm) | Pro forma | xEBITDA [1] |
|---|---|---|
| Cash | $199.5 | |
| $30mm R/C facility | 0.0 | |
| New 1st lien TL | 1,445.0 | |
| New 2nd lien TL | 450.0 | |
| **Total secured debt** | **$1,895.0** | **5.25x** |
| Other debt | 57.9 | |
| TA debt | 196.0 | |
| **Total debt** | **$2,148.9** | **5.95x** |
| Annual interest expense | $109.3 | |
| Weighted average cost of debt | 5.77% | |

[1] Based on LTM 12/31/13 Adj. EBITDA of $361.2mm

### Scenario overview

- Revolver size remains $30mm : L+375bps (drawn) / 25bps (undrawn)
- New $1,445mm 1st lien Term Loan:  L+375– L+400 / 1.00% LIBOR floor / 99.50 OID
- New $450mm 2nd lien Term Loan:  L+750 – L+775 / 1.00% LIBOR floor / 99.00 OID
- Use of proceeds will be to provide a distribution of ~$1,542mm, payout the existing TLA, and pay transaction related fees and expenses
  - Represents a distribution of ~$755mm to TA
- Pro forma weighted average cost of debt:  5.77%
- Pro forma annual interest expense:  $109.3mm
- Term loans will be distributed to the institutional market
- Key terms include:
  - Incurrence-based financial covenants only for both TLs
  - 1% amortization per year for both TLs
  - 101% soft-call protection for 6 months for 1st lien / 102% in year 1 and 101% in year 2 for 2nd lien

### Key considerations

- ✓ Provides larger distribution than first 2 options
- ✓ Company gains access to a new, broader investment base
- ✓ Access to certain institutional funds seeking higher returns via 2nd lien term loan
- ✓ Provides prepayment flexibility
- ✗ Increased annual interest expense
- ✗ Higher upfront costs than first 2 options
- ✗ Relatively higher breakage in first 2 years of 2nd lien term loan

FINANCING OVERVIEW

CONFIDENTIAL

JPMC-00028573

# Agenda

|  | Page |
|---|---|
| Financing overview | 1 |
| Leveraged finance market update | 5 |

DISCUSSION MATERIALS

MILLENNIUM LABORATORIES

5

J.P.Morgan

CONFIDENTIAL

JPMC-00028574

# 2013 Leveraged finance market overview

## 2013 Highlights

- **Record volume:** $1.07tn Globally across leveraged finance making it the busiest year ever
  - Institutional loans: $694bn Globally and $669bn in the U.S.
  - High yield: $377bn Globally and $312bn in the U.S. (breaking last year's Global record of $368bn and falling short of the $325bn U.S. record)
- **Supply / Demand imbalance:** Despite record issuance, there was an insatiable demand for paper throughout the year
  - **Fund flows:** Record for loans with $63bn of inflows
  - **CLO Issuance:** $87bn vs. just off the all-time record high of $93bn in 2006
- **Proceeds:** Remained heavily refinancing focused, with 57% high yield proceeds and 68% of institutional loan proceeds being used for refinancing
  - **Repricings** accounted for $274bn / 41% of loan issuance
- **Record low rates:** High Yield Index hit a record low of 5.24% in May and closed the year at 5.99%, while the loan index hit a record low 5.23% in May and closed the year at 6.06%
  - **Tight pricing in high yield:** 46% of deals priced with a 6% coupon or below; 24% of deals with a 5% coupon or below
    - 30% at 6% or below in 2012; just 16 deals sub 6% in 2011
- **Covenant-lite issuance record**: $377bn, almost four times the previous records set in 2007 and 2012
- **Record size financings – all JPM led:** Sprint $6.5bn – largest high yield deal in history; Heinz $9.5bn – largest syndicated TLB in history; Fieldwood $1.7bn – largest 2nd lien TL since the crisis; Verizon $49bn – largest corporate bond in history
- **The case for leveraged credit:** High yield bonds and leveraged loans sharply outperformed all fixed income peers and were the best performing credit investment class

## Leveraged finance market by the numbers

| U.S. Volumes ($bn) | 2011 | 2012 | 2013 | '13-'12 YoY Δ |
|---|---|---|---|---|
| Total LF volume | $1,045 | $1,215 | $1,546 | $331 |
| High Yield | $223 | $325 | $312 | ($13) |
| Leveraged Loans | $822 | $890 | $1,234 | $344 |
| Institutional | $232 | $294 | $669 | $375 |
| Pro Rata | $590 | $596 | $565 | ($31) |

| Indices Yield | 2011 | 2012 | 2013 | '13-'12 YoY Δ |
|---|---|---|---|---|
| High Yield Bonds | 8.44% | 6.32% | 5.99% | (33)bps |
| HY BB | 6.55% | 4.72% | 5.07% | 35bps |
| HY CCC | 14.27% | 10.46% | 8.94% | (152)bps |
| Leveraged Loans | 7.17% | 6.02% | 6.06% | 4bps |
| LL BB | 5.70% | 4.19% | 5.40% | 121bps |
| LL B | 7.51% | 6.18% | 6.62% | 44bps |
| 10 Year Treasury | 1.87% | 1.84% | 3.03% | 119bps |

| Fund flows ($bn) | 2011 | 2012 | 2013 | '13-'12 YoY Δ |
|---|---|---|---|---|
| High Yield | $15.6 | $28.8 | ($4.8) | ($33.6) |
| LL Prime Funds | $13.9 | $12.1 | $62.7 | $50.6 |
| CLO Issuance | $13.5 | $55.7 | $87.1 | $31.4 |

### Secondary yields hit all-time record lows



### Notable J.P. Morgan-led transactions



LEVERAGED FINANCE MARKET UPDATE

MILLENNIUM LABORATORIES

6

**J.P.Morgan**

# Institutional loan volume set a new record in 2013 as the average loan size reached a record high and covenant-lite volume reached a new high

## 2013 leveraged loan issuance highlights

### Commentary

- Institutional loan volume in 2013 totaled $669.4bn, driven heavily by repricing volume totaling $273.9bn, and up 128% from the $294bn in 2012
  - Volume in 2013 surpassed 2012's total in May as robust market conditions and record low rates created a window of opportunity for issuers to come to market to refinance and reprice existing loans. 2013 was a record year for issuance in the leveraged loan market.
  - Record covenant-lite volume totaling $377.8bn, up from $98bn in 2012, $59bn in 2011 and $8bn in 2010
  - First quarter volume totaled $214bn, representing 73% of 2012 total institutional loan issuance and an all time high
- Volume is projected to be about $400bn in 2014

### Institutional loan new issue volume ($bn)



Source: J.P. Morgan; S&P LCD

### Aggregate institutional loan stats ($mm)



Source: J.P. Morgan; S&P LCD, excludes exits/DIPs

### Covenant-lite volume ($bn)



Source: J.P. Morgan; S&P LCD

LEVERAGED FINANCE MARKET UPDATE

CONFIDENTIAL

JPMC-00028576

# Leveraged finance market technicals remained healthy in 2013 providing a strong backdrop going into 2014



Source: J.P. Morgan Credit Strategy; S&P LCD

Source: J.P. Morgan Credit Strategy; S&P LCD

LEVERAGED FINANCE MARKET UPDATE

MILLENNIUM LABORATORIES

8

J.P.Morgan

CONFIDENTIAL

JPMC-00028577

# 2014 Leveraged finance market outlook

*Where do we stand?*

## The current macro environment

**The Fed**

- The Fed announced the beginning of "tapering", cutting monthly asset purchases to $75bn
  - The plan is to linearly reduce purchases throughout 2014 which would result in a full wind down by November
- The Fed restated its commitment to ZIRP with the first rate hike not expected until 2015 at the earliest
- Both of these policies will remain highly dependent on economic data reports as investors continue to anticipate the movement of rates

**U.S. GDP is forecasted to grow over the next year**

- GDP is forecasted to accelerate from 1.5% to 3.0% by 4Q14. The fiscal drag will be less burdensome and increased business investment will help to lift growth
- The impact of higher taxes and sequestered government spending will be less of a headwind in 2014

**Risks ahead**

- There will be volatility with plenty of opportunities for data surprises between the initiation of tapering, and the wind down of asset purchases
- Similar to 2013, any economic reports potentially leading to unexpected adjustments to the rate and timing of Fed tapering can have a significant impact on the market
- Interest rate risk: assuming continued economic recovery, the Fed has begun the march to higher rates
- As always what are the unknowns?

## Leveraged debt remains an attractive asset class

**Healthy Corporate balance sheets**

- Business behavior has remained conservative, maintaining an emphasis on deleveraging versus re-leveraging

**Default rates low**

- High yield and leveraged loan default rates ended the year at 0.66% and 1.67% respectively, and are expected to finish 2013 below 2.0%, which is nearly half the long term historical averages of 4% and 3.5%

**Attractive risk reward**

- High yield has had only 4 down years since 1980
- Over the last 25yrs, high-yield bonds (and loans over the past 15yrs) have provided similar average annual returns to equities with only half the volatility
- Leveraged credit sharply outperformed all fixed income peers in 2013

**Spreads remain attractive**

- Historically wide spreads relative to default risk will again allow high yield bonds and loans to outperform the majority of fixed income
- High yield bond spreads are expected to absorb 50% of the forecasted rise in rates

**Leveraged loans and high yield bonds remain in favor**

- Investors continue to view the loan market as a hedge against interest rate risk with 81 consecutive weeks of inflows
- The hunt for yield will continue and high yield is the only asset class where investors can earn 6-8% returns with less than 2% default rate

*The high yield and leveraged loan markets remain as issuer friendly as they have ever been, however 2014 will likely be another year highlighted by "windows of opportunity"*

Source: J.P. Morgan Credit Strategy 2014 Forecast and Outlook

LEVERAGED FINANCE MARKET UPDATE

J.P.Morgan

CONFIDENTIAL

JPMC-00028578

# J.P. Morgan consistently has the #1 platform on Wall Street

## THE WALL STREET JOURNAL.

### 2011 league tables

Leading stock-and-bond underwriters, by volume, 2011

| Market sector | #1 ranked manager | 2011 market share (%) | Change from 2010 (pct. points) |
|---|---|---|---|
| **Stocks and Bonds** | | | |
| Global Debt, Equity & Equity-related | J.P. Morgan | 6.8 | (0.5) |
| Global Fees[1] | J.P. Morgan | 7.3 | (0.3) |
| U.S. Debt, Equity & Equity-related | J.P. Morgan | 11.1 | 0.0 |
| U.S. Fees[1] | J.P. Morgan | 11.7 | 0.5 |
| **Bonds[2]** | | | |
| Global Debt | J.P. Morgan | 6.7 | (0.5) |
| Global High Yield Debt | J.P. Morgan | 11.0 | (1.9) |
| Global Investment Grade Debt | J.P. Morgan | 7.0 | (0.3) |
| U.S. Debt | J.P. Morgan | 11.2 | 0.3 |
| U.S. Investment Grade Debt | J.P. Morgan | 14.6 | |
| U.S. High Yield Debt | J.P. Morgan | 12.5 | (1.7) |
| U.S. Financial Institutions | J.P. Morgan | 14.1 | (1.2) |
| U.S. Asset-backed Securities | Bank of America Merrill Lynch | 15.3 | (1.8) |
| **Syndicated Loans** | | | |
| Global Syndicated Loans | J.P. Morgan | 11.0 | 2.5 |
| U.S. Syndicated Loans | J.P. Morgan | 21.6 | 2.4 |

Source: Dealogic
[1] When fees are not disclosed Dealogic uses proprietary analytics to calculate them
[2] Includes government guaranteed debt issuance

*Tuesday, January 3, 2012*

### 2012 league tables

Leading stock-and-bond underwriters, by volume, 2012

| Market sector | #1 ranked manager | 2012 market share (%) | Change from 2011 (pct. points) |
|---|---|---|---|
| **Stocks and Bonds** | | | |
| Global Debt, Equity & Equity-related | J.P. Morgan | 7.2 | 0.5 |
| Global Fees[1] | J.P. Morgan | 7.9 | 0.6 |
| U.S. Debt, Equity & Equity-related | J.P. Morgan | 11.6 | 0.5 |
| U.S. Fees[1] | J.P. Morgan | 11.2 | (0.5) |
| **Bonds[2]** | | | |
| Global Debt | J.P. Morgan | 7.2 | 0.5 |
| Global High Yield Debt | J.P. Morgan | 10.9 | (0.1) |
| Global Investment Grade Debt | J.P. Morgan | 7.4 | 0.4 |
| U.S. Debt | J.P. Morgan | 11.6 | 0.4 |
| U.S. Investment Grade Debt | J.P. Morgan | 14.6 | 0.0 |
| U.S. High Yield Debt | J.P. Morgan | 11.8 | (0.6) |
| U.S. Financial Institutions | J.P. Morgan | 13.8 | (0.3) |
| U.S. Asset-backed Securities | Bank of America Merrill Lynch | 17.4 | 4.7 |
| **Syndicated Loans** | | | |
| Global Syndicated Loans | J.P. Morgan | 11.6 | (1.1) |
| U.S. Syndicated Loans | J.P. Morgan | 18.2 | (3.4) |

Source: Dealogic
[1] When fees are not disclosed Dealogic uses proprietary analytics to calculate them
[2] Includes government guaranteed debt issuance

*Monday, December 31, 2012*

### 2013 league tables

Leading stock-and-bond underwriters, by volume, 2013

| Market sector | #1 ranked manager | 2013 market share (%) | Change from 2012 (pct. points) |
|---|---|---|---|
| **Stocks and Bonds** | | | |
| Global Debt, Equity & Equity-related | J.P. Morgan | 7.3 | 0.1 |
| Global Fees[1] | J.P. Morgan | 8.6 | 0.7 |
| U.S. Debt, Equity & Equity-related | J.P. Morgan | 11.8 | (0.2) |
| U.S. Fees[1] | J.P. Morgan | 11.7 | 0.5 |
| **Bonds[2]** | | | |
| Global Debt | J.P. Morgan | 7.2 | Unchanged |
| Global High Yield Debt | J.P. Morgan | 10.6 | (0.3) |
| Global Investment Grade Debt | J.P. Morgan | 7.6 | 0.2 |
| U.S. Debt | J.P. Morgan | 11.7 | 0.1 |
| U.S. Investment Grade Debt* | J.P. Morgan | 13.3 | (1.3) |
| U.S. High Yield Debt* | J.P. Morgan | 11.7 | (0.1) |
| U.S. Financial Institutions | J.P. Morgan | 12.6 | (1.2) |
| U.S. Asset-backed Securities | Citi | 17.6 | 4.7 |
| **Syndicated Loans** | | | |
| Global Syndicated Loans | J.P. Morgan | 11.7 | 0.1 |
| U.S. Syndicated Loans | J.P. Morgan | 17.8 | (0.4) |

Source: Dealogic
[1] When fees are not disclosed Dealogic uses proprietary analytics to calculate them
[2] Includes government guaranteed debt issuance

*Tuesday, December 31, 2013*

*WSJ Online*

LEVERAGED FINANCE MARKET UPDATE

MILLENNIUM LABORATORIES

J.P.Morgan

CONFIDENTIAL

JPMC-00028579

# J.P. Morgan has been the #1 arranger in syndicated loans for 22 consecutive years

## U.S. loan lead-left bookrunner rankings (FY'13)

| Rank | Bank | Volume ($bn) | Market share | Historical Rankings | | | | | |
| | | | | FY'12 | FY'11 | FY'10 | FY'09 | FY'08 | FY'07 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | J.P.Morgan | $704.2 | 31.9% | #1 | #1 | #1 | #1 | #1 | #1 |
| 2 | Bank of America | 397.0 | 18.0 | | | | | | |
| 3 | Citi | 234.0 | 10.6 | | | | | | |
| 4 | Wells Fargo | 196.1 | 8.9 | | | | | | |
| 5 | Credit Suisse | 118.9 | 5.4 | | | | | | |
| 6 | Deutsche Bank | 102.8 | 4.7 | | | | | | |
| 7 | Barclays | 53.5 | 2.4 | | | | | | |
| 8 | Goldman Sachs | 42.7 | 1.9 | | | | | | |
| 9 | BNP Paribas | 42.0 | 1.9 | | | | | | |
| 10 | Morgan Stanley | 39.9 | 1.8 | | | | | | |

Source: Dealogic (12/31/2013)

## IFR awards

2013 US Loan: Verizon

2012 Global Loan House | 2011 U.S. Loan House | 2010 U.S. Loan House | 2009 Global Loan House | 2008 U.S. Loan House

## Notable transactions

| March 2013 | April 2013 | August 2013 | August 2013 | October 2013 | November 2013 |
|---|---|---|---|---|---|
| **$9,500,000,000** | **$5,000,000,000** | **$1,600,000,000** | **$950,000,000** | **$61,000,000,000** | **$3,773,000,000** |
| TLB | TLA | TLB | TLB | **Bridge loan** | TLB |
| Heinz | ThermoFisher SCIENTIFIC | PINNACLE ENTERTAINMENT | LIVE NATION | verizon | TRIBUNE |
| Lead left bookrunner | Lead left bookrunner | Lead left bookrunner | Lead left bookrunner | Lead left bookrunner | Lead left bookrunner |

LEVERAGED FINANCE MARKET UPDATE

MILLENNIUM LABORATORIES    11    J.P.Morgan

CONFIDENTIAL

JPMC-00028580

# EXHIBIT 53
# FILED UNDER SEAL

# EXHIBIT 54
# FILED UNDER SEAL

# EXHIBIT 55
# FILED UNDER SEAL

# EXHIBIT 56

**From:**       "Chiarelli, Benjamin R" <benjamin.r.chiarelli@jpmorgan.com>
**To:**         "Baynard, Willa B." <willa.baynard@jpmorgan.com>, "Puhalla, Cassandra M"<cassandra.m.puhalla@jpmorgan.com>
**Subject:**    FW: Quick Question - Palladium Card
**Received(Date):**        Mon, 7 Apr 2014 22:56:56 +0000
image003.jpg
image004.jpg
image005.png

Guys - I understand you are focused on Jim but NO WAY you get him if Howard isn't thrilled with how he is treated - he was employee number 10 and Jim's right hand.

Someone needs to fix this - he wants to talk to me about it, and I will do what I can, but clearly he is not happy. He is asking for a credit card w no limit for 10-15mm + he gave us his companies 401k business... I don't see why this would be an issue

Let me know how I can help - want to help you sign Jim as well!


-----Original Message-----
**From:** Howard Appel [Howard@milleniumlaboratories.com]
**Sent:** Monday, April 07, 2014 06:50 PM Eastern Standard Time
**To:** Chiarelli, Benjamin R
**Subject:** RE: Quick Question - Palladium Card


Ben, as a FYI this is been a very frustrating experience with your wealth management team; I can share my thoughts when we talk.




Howard Appel

President




**From:** Checketts, Paul [mailto:paul.checketts@jpmorgan.com]
**Sent:** Monday, April 07, 2014 7:01 AM
**To:** Howard Appel
**Cc:** Graziano, Bob
**Subject:** RE: Quick Question - Palladium Card


Hi Howard,

Thank you very much for forwarding us your additional financials.

CONFIDENTIAL

> **Exhibit 80**
> James Slattery

I have a call with the team this morning and will come right back to you.

Speak to you shortly.

Kind regards,

Paul

**From:** Howard Appel [mailto:Howard@milleniumlaboratories.com]
**Sent:** Monday, April 07, 2014 4:23 AM
**To:** Checketts, Paul
**Subject:** RE: Quick Question - Palladium Card

Paul, please find attached the financials to support my credit application. While my initial response was no, upon reflection and given my relationships are with your senior members of JOM's leveraged finance and equity teams, I have attached some additional information. That said however, my expectations remain the same. Thanks and hope you had a nice weekend.

Warmest

Howard Appel

President

MILLENNIUM
LABORATORIES

**From:** Checketts, Paul [mailto:paul.checketts@jpmorgan.com]
**Sent:** Friday, April 04, 2014 10:09 AM
**To:** Howard Appel

CONFIDENTIAL

JPMC-00025840

**Subject:** Quick Question - Palladium Card

Hi Howard,

Can you give me a quick call back? 310-860-7161

One quick question and we might be able to get the card delivered on Tuesday.

Thanks very much!

Paul

**Paul S. Checketts**

Executive Director

J.P. Morgan Private Bank

2029 Century Park East, 39th Floor

Los Angeles, CA  90067

T: 310-860-7161

M: 310-270-5784

F: 310-860-7028

**paul.checketts@jpmorgan.com**



CONFIDENTIAL

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

CONFIDENTIAL

JPMC-00025842

# EXHIBIT 57
# FILED UNDER SEAL

# EXHIBIT 58
# FILED UNDER SEAL

# EXHIBIT 59
# FILED UNDER SEAL

# EXHIBIT 60

Message

| | |
|---|---|
| **From:** | Rich Barth [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=79F2D52FDD0B41718A2F84D78D289784-RICH BARTH] |
| **Sent:** | 2/6/2015 1:06:46 AM |
| **To:** | Heidi Smith [Heidi.Smith@millenniumhealth.com] |
| **Subject:** | RE: April 16 Fair Value Narrative |
| **Attachments:** | MLH Inc and Sub 409A Report_FINAL_04 16 14 - 2 5 2015.pdf |

No worries – I found a break and put it together. Here you go. Rich

Rich Barth
Vantage Point Advisors

M 310-883-5188
D 310-469-5114
D 949-525-9339

---

**From:** Heidi Smith [mailto:Heidi.Smith@millenniumhealth.com]
**Sent:** Thursday, February 05, 2015 4:55 PM
**To:** Rich Barth
**Subject:** RE: April 16 Fair Value Narrative

Thank you. I think I never responded to your last email. So many moving parts back then!

Have a nice night.
Best regards,

Heidi Smith
VP Finance
Millennium Health
Office: (858) 451-3535
Fax: (858) 217-2748
Heidi.Smith@millenniumhealth.com
(Full Email Disclaimer - http://millenniumhealth.com/emaildisclaimer/)

**From:** Rich Barth [mailto:rbarth@vpadvisors.com]
**Sent:** Thursday, February 05, 2015 4:45 PM
**To:** Heidi Smith
**Subject:** RE: April 16 Fair Value Narrative

Hi Heidi, I am doing well thanks; hope you are too!

I have checked and it looks like this never got finalized – I will do that first thing tomorrow. Rich

Rich Barth
Vantage Point Advisors

M 310-883-5188
D 310-469-5114
D 949-525-9339

---

**From:** Heidi Smith [mailto:Heidi.Smith@millenniumhealth.com]
**Sent:** Thursday, February 05, 2015 3:45 PM

Confidential

**To:** Rich Barth
**Subject:** FW: April 16 Fair Value Narrative

Hi Rich,
I hope you are doing well. I thought I had the final copy but I've gone through my files and can't find it. Can you please send it over?  Also Jack is going to reach out for the final version of the other valuation.
Thank you


Heidi Smith
VP Finance
Millennium Health
Office: (858) 451-3535
Fax: (858) 217-2748
Heidi.Smith@millenniumhealth.com
(Full Email Disclaimer - http://millenniumhealth.com/emaildisclaimer/)

**From:** Rich Barth [mailto:rbarth@vpadvisors.com]
**Sent:** Thursday, September 04, 2014 8:57 AM
**To:** Heidi Smith
**Subject:** FW: April 16 Fair Value Narrative

Hi Heidi, just checking in to see whether you had any comments on this. Thanks, Rich


**From:** Rich Barth
**Sent:** Wednesday, August 13, 2014 2:46 PM
**To:** Heidi Smith (Heidi.Smith@millenniumlabs.com)
**Cc:** Todd Poling; Han Van Le
**Subject:** April 16 Fair Value Narrative

Hi Heidi, please find the draft narrative attached. Rich

Rich Barth, Director
Vantage Point Advisors
**San Diego | Los Angeles | Orange County**
1875 Century Park E, Suite 1000, Los Angeles, CA 90067

M 310-883-5188
D 949-525-9339
D 310-469-5114

**IRS Circular 230 Disclosure**
To ensure compliance with the requirements imposed on by IRS Circular 230 (31 C.F.R. 10.33 - 10.37, et. seq.), we must inform you that any tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (1) avoiding tax-related penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any tax-related matter(s) addressed herein.

VP_ML_00015684



# VANTAGE POINT ADVISORS



*Corporate Valuation*
*Financial Advisory Services*

## Millennium Lab Holdings, Inc. and Subsidiaries
## ASC 718 and IRC 409A
## As of April 16, 2014

February 5, 2015



Vantage Point Advisors, Inc.
12636 High Bluff Drive, Suite 120
San Diego, CA 92130
858-509-7545
www.vpadvisors.com

Confidential

February 5, 2015

Mr. Howard Appel
President
Millennium Lab Holdings, Inc. and Subsidiaries
16981 Via Tazon
San Diego, CA 92127

Dear Mr. Appel:

At your request, Vantage Point Advisors, Inc. performed a fair value analysis of the common stock in Millennium Lab Holdings, Inc. and Subsidiaries ("MLH" or the "Company") for financial reporting purposes as outlined under U.S. GAAP Codification of Accounting Standards Codification Topic 718: Compensation – Stock Compensation and Internal Revenue Code Section 409A ("IRC 409A") in relation to the valuation of privately-held equity securities issued as compensation.

Our analysis provides an estimate of the fair value of the common stock in MLH. The valuation analysis was performed as of April 16, 2014 (the "Valuation Date") in connection with an anticipated recapitalization of the Company (the "Recapitalization"). The valuation analysis gave effect to the Recapitalization, which implied that the previously outstanding common stock and common stock options represented a 55.0 percent interest in MLH.  Pursuant to the Recapitalization, MLH transferred a 45.0 percent interest in Millennium Lab Holdings II, LLC ("MLH II") to TA Associates, L.P. ("TA" or the "TA Funds") in exchange for the redemption of the outstanding warrants of TA Funds in MLH and in satisfaction of the outstanding debentures of MLH held by TA Funds. The valuation was performed assuming  MLH II had become the direct 100 percent parent of Millennium Laboratories, LLC ("Labs LLC"), formerly Millennium Laboratories, Inc. ("Labs"), and the indirect 100 percent parent of the subsidiaries of Labs, Pain in the Air, LLC (formerly Pain in the Air, Inc.) and RxAnte, LLC (formerly RxAnte, Inc.).



2

VANTAGE POINT ADVISORS

The following is a conclusion of the estimated fair value per share of common stock:

| Summary of Value | Apr-16-2014 |
|---|---|
| Estimated fair value of 55.0 percent of equity value | $1,148,250 |
| Number of common shares | 332,414 |
| Value per share of common, nonmarketable | $3.454 |
| **Estimated fair value per share of common stock, nonmarketable (rounded) (USD)** | **$3,460.0** |

We based our estimation of value on historical and financial data provided by the Company's management ("Management"). We did not independently investigate or otherwise verify the data provided, and we do not express an opinion or offer any form of assurance regarding its accuracy or completeness. Management understands that omissions or misstatements may materially affect our conclusions.

We appreciate the opportunity to have provided valuation services to you. Our analysis is subject to the attached Terms and Conditions. Please contact Todd Poling at (858) 876-3168 or Rich Barth (310) 469-5114 should you have any questions or if we may be of further assistance.

Very truly yours,

Vantage Point Advisors, Inc.



MILLENNIUM LABORATORIES

3

VANTAGE POINT ADVISORS

Confidential



# Table of Contents

ENGAGEMENT OVERVIEW................................................................................6

    PURPOSE AND USE ...........................................................................................6
    DEFINITION OF FAIR VALUE AND FAIR MARKET VALUE...........................................7
    SCOPE OF SERVICES.........................................................................................7
    SOURCES OF INFORMATION ...............................................................................8

COMPANY OVERVIEW.......................................................................................9

ECONOMIC OUTLOOK.....................................................................................15

    CONCLUSION..................................................................................................17

INDUSTRY OUTLOOK.......................................................................................18

    DIAGNOSTIC AND MEDICAL LABORATORIES IN THE U.S. ......................................18

VALUATION METHODOLOGY ...........................................................................25

    APPROACHES TO VALUE ..................................................................................25
    METHODS APPLIED..........................................................................................25
    METHOD NOT SELECTED ..................................................................................26

VALUATION ANALYSIS .....................................................................................27

    DCF METHOD ................................................................................................27
    GUIDELINE PUBLIC COMPANY METHOD .............................................................29
    GUIDELINE TRANSACTION METHOD ...................................................................30

RECONCILIATION............................................................................................31

ALLOCATION OF EQUITY.................................................................................32



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015688



# Table of Contents

METHODOLOGIES ............................................................................................................... 32

**ADJUSTMENTS TO FAIR VALUE** .......................................................................... **34**

**VALUATION CONCLUSION** ..................................................................................... **37**

**TERMS AND CONDITIONS** ...................................................................................... **38**

**APPRAISAL CERTIFICATION** .................................................................................. **40**

**SUPPLEMENT I: DLOM STUDIES** .................................... ERROR! BOOKMARK NOT DEFINED.

**SUPPLEMENT II: OWNERSHIP CHARACTERISTICS** ..... ERROR! BOOKMARK NOT DEFINED.

**EXHIBITS** ................................................................................................................... **41**



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015689

# Engagement Overview

## Purpose and Use

Millennium Lab Holdings, Inc. and Subsidiaries ("MLH," the "Company," or "Client") requested Vantage Point Advisors, Inc. to perform valuation services (the "Services") for financial reporting requirements as outlined under U.S. GAAP Codification of Accounting Standards Codification Topic 718: Compensation-Stock Compensation and Internal Revenue Code Section 409A ("IRC 409A") in relation to the valuation of privately-held equity securities issued as compensation. No other use is intended or inferred.

Our analysis provides an estimate of the fair value of the common stock in MLH. The valuation analysis was performed as of April 16, 2014 (the "Valuation Date") in connection with an anticipated recapitalization of the Company (the "Recapitalization"). The valuation analysis gave effect to the Recapitalization, which implied that the previously outstanding common stock and common stock options represented a 55.0 percent interest in MLH. Pursuant to the Recapitalization, MLH transferred a 45.0 percent interest in Millennium Lab Holdings II, LLC ("MLH II") to TA Associates, L.P. ("TA" or the "TA Funds") in exchange for the redemption of the outstanding warrants of TA Funds in MLH and in satisfaction of the outstanding debentures of MLH held by TA Funds. The valuation was performed assuming MLH II had become the direct 100 percent parent of Millennium Laboratories, LLC ("Labs LLC"), formerly Millennium Laboratories, Inc. ("Labs"), and the indirect 100 percent parent of the subsidiaries of Labs, Pain in the Air, LLC (formerly Pain in the Air, Inc.) and RxAnte, LLC (formerly RxAnte, Inc.).

We prepared this report in conformance with Standards 9 and 10 of the Uniform Standards of Professional Appraisal Practice ("USPAP") and the Statement on Standards for Valuation Services ("SSVS") as set forth by the American Institute of Certified Public Accountants ("AICPA"). In addition, our analysis considers guidance provided by the AICPA Accounting and Valuation Guide for the Valuation of Privately-Held-Company Equity Securities Issued as Compensation (the "AICPA Accounting Guide").



6

VANTAGE POINT ADVISORS

## Definition of Fair Value and Fair Market Value

The Financial Accounting Standards Board ("FASB") defines fair value[1] as:

> *"The price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."*

According to Revenue Ruling 59-60[2], fair market value is:

> *"The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts."*

## Scope of Services

Our analysis relied, in part, upon certain information provided by Management. With respect to this assignment, we did not independently investigate or otherwise verify the data provided by Management, and we do not express an opinion or other form of assurance regarding its accuracy or completeness.

The principal procedures in formulating our estimates of fair value include, without limitation, the following:

- Discussions with Management concerning the nature of and business operations of the Company, including historical performance.

- Reviews of financial statements of the Company.

- Analyses of the economy and industry within which the Company operates.

- Evaluation of management-prepared forecast for the years ending December 31, 2014 through December 31, 2020.

- Estimation of the Company's cost of capital.

---

[1] Accounting Standards Codification 820 – *Fair Value Measurements and Disclosures.*
[2] Treasury Regulation 20.2031-1(b); Revenue Ruling 59-60, 1959-1 C.B. 237.



7

VANTAGE POINT ADVISORS

VP_ML_00015691

- Estimation of fair value using valuation approaches and methodologies.

It is our understanding that there has been no material change in the existing financial condition (except for the Recapitalization as referred to in the forecasts referenced below) or business prospects of the Company since the date of the most recent financial statements obtained.

Management reported that it is not aware of any litigation, threatened or pending, or any other contingent or off balance sheet liabilities that could have an impact on the valuation.

## Sources of Information

Key documents reviewed and or considered were:

- Audited balance sheets of Millennium Laboratories, Inc. and Subsidiary as of December 31, 2009 and of Millennium Lab Holdings, Inc. and Subsidiaries as of December 31, 2010 through December 31, 2013;

- Management-prepared balance sheets of MLH and its subsidiaries, including Labs, as of March 31, 2014;

- Audited income statements of Millennium Laboratories, Inc. and Subsidiary for the year ended December 31, 2009 and of Millennium Lab Holdings, Inc. and Subsidiaries for the years ended December 31, 2010 through December 31, 2013;

- Management-prepared income statements of MLH and its subsidiaries, including Labs, for the 12-month period ended March 31, 2014;

- Certain Management-prepared financial information relating to the Recapitalization;

- Management-prepared forecast of the Company and its direct and indirect subsidiaries, including Labs, for the years ending December 31, 2014 through December 31, 2020; and

- Certificate of Formation and the AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF MILLENNIUM LAB HOLDINGS II, LLC, a Delaware limited liability company.



8

VANTAGE POINT ADVISORS

Confidential

# Company Overview

## Description

Founded in December of 2007 in San Diego, California, Labs provides health care professionals with pharmacogenetic testing, medication monitoring and drug detection services, clinical tools, scientific data and education in order to enhance clinical outcomes and patient safety. Millennium offers two core services: Millennium Urine Drug Testing ("UDT$^{SM}$") and Millennium Pharmacogenetic Testing ("PGT$^{SM}$"). Millennium UDT$^{SM}$ results in a safe and effective management of prescription medication by identifying medication and other substances present in, or absent from, the patient's body. Millennium PGT$^{SM}$ allows health care professionals to assess a number of key drug metabolism enzymes; identify the underlying genetic characteristics that impact the metabolism of medications; simplify specimen collection with patient-friendly, noninvasive, saliva-based exams; predict a patient's responses to medications; understand a patient's lower than expected clinical response; and explain a patient's higher than expected incidence of adverse effects.

As part of MLH's business strategy, it has relationships with Millennium Research Institute ("MRI") and Millennium Laboratories Clinical Supply, Inc. MRI is a non-profit research and teaching center for pain management. It collaborates with universities, researchers, government and industry partners to design and execute programs related to pain which train scientists and researchers. Millennium Laboratories Clinical Supply, Inc. provides Clinical Laboratory Improvement Amendments ("CLIA")-waived in-office urine drug testing devices and medication monitoring supplies.

The Company's sole purpose is to act as a holding company for Labs, and indirectly for the subsidiaries of Labs.

## Senior Management Team

The Company is led by its founder and Chairman of the Board, James Slattery. Prior to founding Labs in December 2007, Mr. Slattery achieved success in broadcast communications and real estate development. Among his many entrepreneurial accomplishments, Mr. Slattery created the first satellite network in the United States, which he later sold to a Fortune 50 broadcast company. Mr. Slattery holds a Bachelor's degree from the University of Massachusetts. Mr. Slattery received the Ernst & Young Entrepreneur of the Year® 2011 San Diego Award in the Life Sciences category. The Ernst & Young award recognizes entrepreneurs who demonstrate excellence and extraordinary success in such areas as innovation, financial performance and personal commitment to their businesses and communities.



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015693

Chief Executive Officer Brock Hardaway joined Labs in 2013 where he provides strategic leadership for the Company's long-term growth. Mr. Hardaway's two decades of leadership experience in the healthcare industry helps the Company focus on growing the Company's product and service offerings, increasing brand recognition, and maximizing earnings potential. Prior to joining Labs, he served as executive vice president of operations for Kindred Healthcare.

Howard Appel serves as the Company's and Labs' President. Prior to his promotion to President, he was Labs' Chief Financial Officer. Leveraging on more than twenty years of experience as a Certified Public Accountant and CFO, Mr. Appel takes on the role of President to provide oversight of the Company's and Labs' daily operations and implement its annual growth initiatives.  He also directs the Company's and Labs' strategic initiatives and long term planning.

## Competition

The clinical laboratory business is intensely competitive. Two major national independent clinical laboratories, Laboratory Corporation of America Holdings ("LabCorp") and Quest Diagnostics Incorporated ("Quest") had approximately $13.0 billion in revenue from clinical laboratory testing in 2013. Two other noteworthy clinical laboratory testing services competitors are Genzyme Corporation and Bio-Reference Laboratories, Inc. In terms of industry size, LabCorp believes that, in 2012, the entire United States clinical laboratory testing industry generated revenues of approximately $60.0 billion (up from $55.0 billion in 2010) based on the Washington G-2 reports.

Other competitors include specialized laboratories in specific areas of cancer such as Genoptix, Inc. (leukemia/lymphoma), Bostwick Laboratories, Inc. (prostate cancer), NeoGenomics, Inc. (breast cancer and leukemia/lymphoma), Caris Life Sciences, Inc. (colon cancer), and Clarient, Inc. (oncology diagnostic).

The testing performed in the United States is completed by hospitals and regional, specialty, and physicians laboratories. In addition to the leading competition from Quest and LabCorp and specialized laboratories, the Company also competes with smaller independent clinical and anatomical laboratories as well as laboratories owned by hospitals and physicians.

Healthcare providers often use the following factors in selecting a laboratory: accuracy, timeliness and consistency in reporting test results; reputation of the laboratory in the medical community or field of specialty; contractual relationships with managed care companies; service capability and convenience offered by the laboratory; number and types of tests performed; connectivity solutions offered; and pricing of the laboratory's services.



10

VANTAGE POINT ADVISORS

Confidential

## Competitive Strengths

Despite a significant pool of competitors within the industry, Labs has several competitive strengths that allow it to continue to grow and further penetrate the market.

### Market Share Leader

Labs is the market share leader and has a national presence in the UDT market. Labs continues to make strides in the PGT space and the recently added advanced analytics platform ("RxAnte") should help drive growth.

### Diverse and Loyal Customer Base

Labs serves over 6,700 physician practices with 200 network contracts covering over 168 million lives. Labs has an attractive payor mix with approximately 63.0 percent of volume under contract in 2013.

### 24-Hour Turnaround Time

Through the single focus of establishing efficient and accurate testing methodologies, MLH has developed proprietary methodologies that provide the fastest reliable UDT confirmations in the nation. Other regional labs have turnaround time ranging between 3-5 days while national labs' turnaround times are up to 10 days.

### Superior Testing Accuracy and Results

MLH is the only major Urine Testing Laboratory exclusively utilizing the latest technology LC-MS/MS. Its LC-MS/MS highly scalable and automated technology provides valid and accurate results on first pass. MLH proprietary laboratory information system ("MLIS") enables rapid compiling, processing, and reporting of patients' health records.

### Ease of Consultation Access

In addition to its industry-leading test accuracy, Labs also provides clinical decision support through its 12-hour daily customer support hotline.

### Strategic Relationship with Millennium Research Institute

Labs collaborates with MRI, a leading voice in education and research in toxicology, pharmacology, pain management and practice management. This relationship allows Labs to illustrate the clinical benefits and potential cost savings of UDT to national and regional health plans and government insurers.



11                    VANTAGE POINT ADVISORS

Confidential

*Accreditation*

As a national lab operating in all 50 states, Labs maintains full licensing and accreditations including CLIA certification. The College of American Pathologists ("CAP"), an entity requiring the highest proficiency testing standards in the industry, also provided accreditation to the Company. Other company-accreditations come from the Commission on Office Laboratory Accreditation ("COLA") and the Joint Commission. They also adhere to all applicable federal and state laws, rules, and regulations.

## Business Risks

There are several risks that could negatively influence Labs' business prospects and profitability.

*Increased Competition*

Increased competition could have material adverse impact on MLH's net revenue and profitability. The clinical laboratory industry is undergoing significant consolidation, and larger clinical laboratory providers are able to increase cost efficiencies driven by large-scale automated testing. This consolidation results in greater price competition and could lead to a reduction in profit margins if prices are forced to remain flat. Labs may also be forced to enter into agreements with large insurance companies to capture a larger customer base, which may result in lower unit prices.

*Changes in Regulations*

Changes in federal, state, local and third-party payer regulations or policies, insurance regulation or approvals or changes in other laws, regulations or policies may adversely affect governmental and third-party coverage and reimbursement for clinical laboratory testing and could have a material effect upon Labs' business.  These regulations cover areas including: billing and reimbursement of clinical tests; certification or licensure of clinical laboratories; the anti-self-referral and anti-kickback laws and regulations; the laws and regulations administered by the U.S. Food and Drug Administration; the corporate practice of medicine;  operational, personnel and quality requirements intended to ensure that clinical testing services are accurate, reliable and timely; physician fee splitting; relationships with physicians and hospitals; safety and health of laboratory employees; and handling, transportation and disposal of medical specimens.

*Violation of Government Regulation*

Labs is subject to extensive government regulation at the federal, state and local levels. MLH's failure to meet governmental requirements under these regulations could lead to civil and criminal penalties, exclusion from participation in Medicare and Medicaid and possible prohibitions or restrictions on the use of its laboratories.



12                                          VANTAGE POINT ADVISORS

*Technology*

Failure to develop, acquire or license new or improved testing technologies, or a move by Labs' customers to use new technologies to perform their own tests, could limit Labs' ability to remain competitive.

*Economic Environment*

Since Labs' operations are dependent upon the ongoing demand for diagnostic testing services by patients, physicians, hospitals, and others, a significant deterioration in the economy could negatively impact testing volumes, cash collections, and the availability of credit.

## Financial Overview

The Company provided audited financials for Labs and its subsidiary for the fiscal year ended December 31, 2009 and for Millennium Lab Holdings, Inc. and Subsidiaries for the fiscal years ended December 31, 2010 through December 31, 2013 (the "Review Period"). Such historical financial statements are presented as **Appendix A** and **Appendix B**.

During 2011, Labs established in-network status with several national payors. Since Labs' payor mix remained diverse, new contracts had minimal impact on the Labs' overall net revenue per specimen. Meanwhile Labs leveraged its available equipment and lab personnel capacity and increased its gross margins. Cost of goods sold includes reagents, lab supplies, and shipping which are directly tied to revenue volume.

In 2012, Labs' key development included its launch of several new products, penetration of new markets, and agreements with new customers (i.e., insurance companies). Revenue reached $632.6 million in 2013 with growth driven primarily by volume increases as Labs reached a milestone with specimens tested exceeding six million. A decline in reimbursement rates had a slight drag on revenues but growth was still strong at approximately 21.2 percent.

MLH acquired RxAnte, Inc. on December 23, 2013, which reported run rate revenues of $4.7 million and EBITDA of negative $2.5 million (adjusted purchase price of approximately $70.4 million). In addition to growing its core pain management business, Labs expects to see growth from increased treatment center volume and penetration into the cardiac, psychiatric, and primary physician markets.

Actual reported 2011 EBITDA margin was lower than adjusted EBITDA due to a reported one-time expense related to the TA transaction funded expenditures and related performance bonuses. These costs were not capitalized and were funded by debenture proceeds. 2011 EBITDA increased, but was below expectations, as Labs made significant investments in infrastructure through strategic hiring, office space expansion, and adoption of new technology. 2012 EBITDA further



13                VANTAGE POINT ADVISORS

increased as Labs achieved greater efficiency in its billing process and also generated higher test volume. Adjusted EBITDA in 2013 increased to $378.1 million, but margins were affected by competitive forces.

*Ownership*

Giving effect to the Recapitalization, the Company's 300,495.94 common shares and 31,918 common stock options had a claim on 55.0 percent of the remaining equity.



14                    VANTAGE POINT ADVISORS

# Economic Outlook[3]

## Gross Domestic Product ("GDP")

The Bureau of Economic Analysis reported that the nation's economy—as indicated by GDP—grew at an annual rate of 3.2 percent in the fourth quarter of 2013. This matched forecasts, as the result of a survey conducted by Bloomberg found that the median forecast of economists was a 3.2 percent rate. GDP is the total market value of all goods and services that are produced in the U.S. economy; it is generally considered the most comprehensive measure of economic growth. The Bureau of Economic Analysis revised the third-quarter GDP rate upward to 4.1 percent from a previously reported 2.8 percent. GDP grew 1.9 percent in 2013, a deceleration from 2.8 percent in 2012.

Consensus Economics Inc., publisher of *Consensus Forecasts—USA*, reports that the consensus of U.S. forecasters is that real GDP will increase at a seasonally adjusted annual rate of 2.5 percent in the first quarter of 2014 and 2.8 percent in the second quarter. Every month, Consensus Economics surveys a panel of 30 prominent U.S. economic and financial forecasters for their predictions on a range of variables, including future growth, inflation, current account and budget balances, and interest rates. The forecasters expect GDP to grow 2.6 percent in 2014, 3.1 percent in 2015, and 3.0 percent in 2016.

## Interest Rates

The Federal Open Market Committee ("FOMC") met twice during the fourth quarter of 2013, issuing two statements on its target for the federal funds rate. As expected, the FOMC continued its pledge to keep its target for the federal funds rate near zero. The federal funds rate is the interest rate at which a commercial bank lends immediately available funds in balances at the Federal Reserve to another commercial bank. The FOMC establishes a target rate and expands or contracts the money supply with the aim that the federal funds rate, a market rate, will approximate the target rate.

During the fourth quarter of 2013, the Board of Governors of the Federal Reserve left the discount rate unchanged, at 0.75 percent. The discount rate is the interest rate a commercial bank is charged to borrow funds, typically for a short period, directly from a Federal Reserve Bank. The board of directors of each Reserve Bank establishes the discount rate every 14 days, subject to the approval of the Board of Governors.

---

[3] Economic Outlook Update™ Q4 2013 published by Business Valuation Resources, LLC, © 2014, reprinted with permission.

 MILLENNIUM LABORATORIES

VANTAGE POINT ADVISORS

Confidential

## Unemployment

The U.S. Department of Labor reported that the pace of payroll growth slowed in December. There were 74,000 jobs created in December, well below the median forecast of 197,000 jobs in a Bloomberg survey of economists and below the 241,000 jobs created in November. The December employment report showed that job gains in November were revised upward, while jobs gains in October were unchanged. With those revisions, employment gains in November and October combined were 38,000 higher than previously reported. The December figure brings the three-month payroll growth average to 172,000 jobs per month and the twelve-month payroll growth average to 182,000 jobs per month. The White House Council of Economic Advisors noted that the economy has now added private-sector jobs for 46 consecutive months, with private-sector employment increasing by more than 8.2 million over that period. Over the last twelve months, 2.19 million jobs have been added across all sectors.

The unemployment rate (also known as the U3 unemployment rate) fell to 6.7 percent in December, or approximately 10.4 million unemployed, from 7.0 percent in November. This was the lowest unemployment rate since October 2008.

## Consumer Prices

The Conference Board's Consumer Confidence Index rose to 78.1 in December from a reading of 72.0 in November. The December rise broke a three-month consecutive decline. The December reading was above economists' forecasts, as the consensus forecast of economists surveyed by Bloomberg was 76.0. Sentiments toward current conditions increased to a five-and-a-half-year high, as consumers viewed both economic and labor market conditions more favorably. Looking ahead, consumers expressed increasing confidence in future economic and job prospects but were less optimistic about their earnings prospects. The report noted that consumers were more optimistic overall at the end of 2013 than when the year began.

The Forecasters believe consumer prices will rise at a rate of 1.7 percent in the first quarter of 2014 and 1.8 percent in the second quarter of 2014. They also expect consumer prices to increase 1.7 percent in 2014 and 2.1 percent in 2015.

## Government Spending

Total government spending fell at a rate of 4.9 percent in the fourth quarter, compared with an increasing rate of 0.4 percent in the third quarter. Total government spending has declined in 12 of the previous 16 quarters. This quarter's decline in government spending subtracted 0.93 percentage point from the fourth-quarter GDP rate. Total government spending decreased 2.2 percent in 2013 and 1.0 percent in 2012.



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015700

Federal national defense spending decreased at a rate of 14.0 percent in the fourth quarter. This came after declining at rates of 0.5 percent and 0.6 percent in the third and second quarters, respectively. Federal national defense spending declined 7.0 percent in 2013 and 3.2 percent in 2012.

# Conclusion

U.S. economic growth decelerated in the fourth quarter of 2013 and matched economists' predictions (3.2 percent). The third-quarter GDP rate was significantly revised upward by 1.3 percentage point. Fourth quarter consumer spending rose at its quickest rate in three years, contributing a sizable 2.26 percentage points to the fourth-quarter GDP rate—its largest contribution in three years.

The table to the right shows the consensus economic forecasts for real GDP growth and consumer price growth (inflation) of 2.5 percent and 2.3 percent, respectively. The sum of real GDP growth and consumer price index growth represents nominal GDP growth, or 4.8 percent, for the period 2019 through 2023.

| | HISTORICAL DATA | | | CONSENSUS FORECASTS** | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019-2023 |
| Real GDP* | 1.8 | 2.8 | 1.9 | 2.6 | 3.1 | 3.0 | 2.8 | 2.8 | 2.5 |
| Industrial production* | 3.4 | 3.6 | 2.6 | 3.0 | 3.7 | 3.3 | 2.9 | 2.7 | 2.7 |
| Personal consumption* | 2.5 | 2.2 | 2.0 | 2.5 | 2.8 | 2.7 | 2.6 | 2.5 | 2.5 |
| Real disposable personal income* | 2.4 | 2.0 | 0.7 | 2.7 | 3.2 | 3.1 | 3.0 | 2.8 | 2.7 |
| Nonresidential fixed investment* | 7.6 | 7.3 | 2.6 | 4.5 | 5.0 | 5.0 | 4.4 | 4.1 | 3.8 |
| Nominal pretax corp. profits* | 7.9 | 7.0 | 4.1 | 4.6 | 5.6 | 6.3 | 4.1 | 5.4 | 4.4 |
| Total government spending* | -3.2 | -1.0 | -2.2 | -0.1 | NA | NA | NA | NA | NA |
| Consumer prices* | 3.2 | 2.1 | 1.5 | 1.7 | 2.1 | 2.3 | 2.3 | 2.3 | 2.3 |
| 3-month Treasury bill rate | 0.05 | 0.09 | 0.06 | 0.1 | 0.9 | 2.3 | 3.4 | 3.8 | 3.8 |
| 10-year Treasury bond yield | 2.78 | 1.80 | 2.35 | 3.4 | 3.8 | 4.5 | 5.0 | 5.0 | 5.0 |
| Unemployment rate | 8.9 | 8.1 | 7.4 | 6.9 | NA | NA | NA | NA | NA |
| Housing starts (*millions*) | 0.609 | 0.781 | 0.923 | 1.120 | NA | NA | NA | NA | NA |

*Source of historical data: U.S. Department of Commerce, U.S. Department of Labor, U.S. Census Bureau, and The Federal Reserve Board.*
*Source of forecasts: Consensus Forecasts - USA, December 2013.*

*Notes:*
*\*Numbers are based on percent change from preceding period. Consumer prices are the percent change between annual averages. Historic unemployment rate, 3-month Treasury rate, and 10-year Treasury yield are the annual averages.*
*\*\*Forecast numbers are based on percent change from preceding period (excludes unemployment rate, housing starts, 3-month Treasury rate, and 10-year Treasury yield). Consumer Price Index information is the percent change between annual averages. The 2014 through 2018 forecasts for the 3-month Treasury rate and 10-year Treasury yield are for the end of each period. Forecasts for 2019-2023 signify the average for that period.*


MILLENNIUM LABORATORIES

17

VANTAGE POINT ADVISORS

VP_ML_00015701

# Industry Outlook

## Diagnostic and Medical Laboratories in the U.S.[4]

### *Industry Overview*

Diagnostic and medical laboratories provide analytic services to identify or determine the nature and cause of a disease or injury, through the evaluation of a patient's history, examination and data. These services are provided to healthcare providers or patients upon referral from health practitioners.

Operators in the industry are an integral part of medical evaluation and treatment. Operators in this industry provide healthcare practitioners with information concerning the onset, severity and cause of patients' physical ailments. While the industry has long been an essential component of healthcare, the aging population and ongoing progress toward preventive care has further boosted revenue over the past five years. Consequently, during the five years to 2013, revenue is expected to have increased at an annualized rate of 2.5 percent to $49.6 billion, which includes growth of 2.1 percent in 2013, due to favorable increases in federal funding for Medicare and Medicaid. Profit is also anticipated to have risen, from 11.3 percent of revenue in 2008 to 11.8 percent in 2013, bolstered by increasing demand for high-margin genetic testing and esoteric tests. Additionally, consolidation will also bolster industry revenue, as a result of cost synergies lowering research and development expenses and enabling large players to secure large-scale contracts with hospitals.

While the aging population strengthened demand, it has also challenged the industry. That is to say, laboratories are facing a shortage of skilled labor as baby boomers, which constitute a significant portion of the industry workforce, retire, and fewer individuals pursue healthcare professions. However, the number of industry employees has slightly increased at an annualized rate of 0.7 percent to 251,382 workers over the five years to 2013. To mitigate the shortage of skilled labor, many operators have increased salaries as a way to entice workers into the field, while retaining current employees. Although the rising use of automation and standardization in laboratories has somewhat lowered demand for employees, highly skilled workers are still required to examine laboratory results, keeping wage costs high.

---

[4] IBISWorld Industry Report "Diagnostic and Medical Laboratories in the U.S." Sarah Turk. December 2013.



18                                                    VANTAGE POINT ADVISORS

During the five years to 2018, revenue is forecast to grow at an annualized rate of 3.6 percent to $59.1 billion. Scientific advances will continue to yield new and improved service capabilities, and the aging U.S. population will require more laboratory testing and diagnostic imaging services. Additionally, the healthcare reform legislation of 2010 will continue to be implemented during the next five years, which will benefit the industry. As healthcare reform encourages more individuals to become insured, out-of-pocket costs for laboratory services are expected to decline, which will increase demand for industry services.

## Key External Drivers

### Number of People with Private Health Insurance

Health insurance reduces patients' out-of-pocket costs for healthcare, consequently encouraging individuals to visit their physicians. Payments from private insurance make up 43.5 percent of industry revenue; however, healthcare insurers have taken steps to control pricing, dampening demand for healthcare services. The number of people with private health insurance is expected to increase during 2014.

### Total Health Expenditure

Health expenditure relevant to this industry includes the cost of physician visits and prescriptions that require a laboratory test, prior to being written. Physicians rely on diagnostic testing to help identify the risk for a disease, and aid in the choice of therapeutic procedures. Moreover, many drug therapies do require a lab test before a prescription can be written. As the level of spending on healthcare in the U.S. increases, this will positively affect expenditure on industry services. Total health expenditure is expected to increase during 2014, representing a potential opportunity for the industry.

### Number of Adults Aged 50 and Older

The aging population drives demand for the industry because the need for industry services increases considerably with age. Many chronic diseases such as diabetes, congestive heart failure, chronic obstructive pulmonary disease and arthritis, are more common in older populations thus, the need for diagnostics will continue to increase as the population matures. The number of adults aged 50 and older is expected to increase slowly during 2014.

## Current Industry Performance

Healthcare has been shifting from curative care to detection, prevention and personalized care over the past five years, which has benefited the diagnostic and medical laboratories industry. More physicians and payers, such as Medicare, recognize the vital role diagnostic testing and disease prevention play in improving patient health and reducing healthcare



19                    VANTAGE POINT ADVISORS

costs. As such, the trend of preventive care stimulates demand for industry services, as more physicians monitor patients' blood and tissue, and test for health ailments with technology like MRI scans.

The recession caused fewer individuals to have employer mandated health insurance and greatly limited industry revenue growth over the period. Nevertheless, growth in the elderly population, which requires industry services to monitor high rates of chronic illness, prompted revenue growth. During the five years to 2013, revenue is anticipated to have grown at an annualized rate of 2.5 percent to $49.6 billion, which includes growth of 2.1 percent in 2013, bolstered by the increase in federal funding for Medicare and Medicaid. Profit is also expected to have risen slightly, from about 11.3 percent in 2008 to 11.8 percent in 2013, due to industry consolidation and declining operational costs. This is because many large laboratories and diagnostic centers acquired small players to compete with other operators that test their laboratory samples in-house.

## Products and Services

Analytic or diagnostic services, including body fluid analysis (pathology) and diagnostic imaging, not only help physicians diagnose patients' ailments, but also form a critical part of the full continuum of healthcare delivery: prevention, diagnosis, treatment and monitoring. Scientific advancements in testing capabilities and the age profile of the population influence the extent to which specific types of analytic or diagnostic tests are used. Older people are more likely to suffer from heart disease, liver disease or cancer, which stimulates demand for the elderly to receive testing for these ailments.

The U.S. market in gene-based testing is in excess of $2.5 billion per year and is growing by more than 10.0 percent per year. The unveiling of the human genome has promoted growth in genomic testing. The discovery of new genes and the linkages of these genes with disease will result in more complex and thorough predictive, diagnostic and therapeutic testing.

## Major Market

### Independent Physicians, Physician Groups and Hospitals

Diagnostic and medical laboratories provide services that are used by hospitals, physicians, other healthcare providers and commercial clients. The tests assist in the diagnosis, evaluation, detection, therapy selection, monitoring and treatment of diseases and other medical conditions through the examination of substances in the blood, tissues and other specimens. These customer groups often enter into agreements with laboratories and centers to provide services, generally at discounted rates. Other customers that use tests include dental practices, veterinary clinics, pharmaceutical companies (e.g. for pathology clinical research on new drugs) and government entities. During the five years to 2013,



VANTAGE POINT ADVISORS

Confidential

there were no significant changes in the industry's market segmentation; heightened demand for healthcare services has sustained the growth for services provided by hospitals, physicians and other healthcare providers.

Physicians that require testing for their patients are one of the industry's primary sources of testing services. Physicians determine which laboratory to recommend or use based on a variety of factors. Physicians also purchase and use industry point-of-care tests, such as gene-based testing, which helps doctors to diagnose and predict diseases and improve their ability to analyze the effectiveness of treatments.

The industry provides hospitals with services ranging from routine and specialty testing to contract management services. Hospitals generally maintain an on-site laboratory to perform patients' tests that are needed immediately. However, hospitals also refer less time-sensitive procedures, less frequently needed procedures and highly specialized procedures to outside facilities, including independent clinical laboratories and larger medical centers.

*Payment Sources*

In most cases, the customer who orders the testing is not responsible for the service payments. Depending on the billing arrangement and applicable law, the payer may be a third party responsible for providing health insurance coverage to patients, such as a health insurance plan, self-insured employer benefit fund or Medicare or Medicaid. Payment methods for laboratory tests vary by the type of provider venue (e.g. inpatient, outpatient or ambulatory care) and type of test (e.g. clinical or anatomical pathology). For most inpatient care, public and private payers apply prospective payment systems, wherein rates are based on the patient's diagnosis. Most other federal payers and many private payers use Medicare's diagnosis-related group ("DRG") codes with assigning their own payment rates.

Medicare's implementation of DRGs and other prospective payment systems in the 1980s transformed hospital laboratories from profit centers to cost centers. DRGs created incentives to reduce the number of tests ordered and to shift inpatient care to hospital outpatient and ambulatory care settings. This increased the number of patients that independent laboratories serviced. Rising healthcare costs and efforts to control them, however, have prompted payers to bundle hospital outpatient services under "outpatient prospective payment systems." Under Medicare, this move has created an administrative and financial burden for some independent laboratories because they must bill hospitals directly for the technical aspect of testing and bill Medicare directly for pathologist fees. Medicare payments account for about 15.5 percent of industry revenue, and Medicaid payments account for about 4.0 percent of industry revenue.

Most federal payers and the majority of commercial payers base their reimbursement rates for laboratory services on those paid by Medicare; consequently, its payment policies are notably influential on industry performance.



21                                                    VANTAGE POINT ADVISORS

Reimbursement rates from Medicare have been following a downward trend during most of the five years to 2013 on an inflation-adjusted basis.

## Outlook

During the next five years, the diagnostic and medical laboratories industry is expected to benefit from healthcare reform. As healthcare overhaul increases the number of insured individuals, demand for industry services will grow in line with lower out-of-pocket costs for laboratory testing. Moreover, the aging U.S. population will stimulate demand for industry services, due to the high prevalence of chronic illness in this demographic.

During the five years to 2018, revenue is anticipated to grow at an annualized rate of 3.6 percent to $59.1 billion, due to an increased number of insured individuals using healthcare services, including MRI and CT scans. Profit is also expected to increase, from 11.8 percent of revenue in 2013 to 13.0 percent of revenue in 2018, as a result of consolidation. As many laboratories consolidate, operators will increasingly compete on the basis of price with hospitals that provide industry services in-house. In particular, large laboratories are acquiring smaller labs that provide either routine or specialized services, such as biomarkers. Also, as more patients seek an individually tailored healthcare plan, demand for high-margin molecular testing, such as genetic testing, will cause industry profit to increase.

### Healthcare Reform Helps the Industry

The Patient Protection and Affordable Care Act ("PPACA"), signed into law in 2010, will continue to affect the industry over the next five years. The PPACA's focus on disease prevention and its inclusion of laboratory services as part of the basic coverage for those currently uninsured will increase the number of patients with access to industry services. Under the PPACA, Medicare will cover the entire cost of preventive services such as screening tests. In addition, all private health plans must also provide coverage for preventive services without cost sharing.

Conversely, the PPACA also includes cuts to the consumer price index ("CPI") of about 1.75 percent, which will affect the lab fee schedule update through 2015, further reducing industry profitability. In addition, the law also establishes a permanent productivity adjustment to the fee schedule update, which is another type of reimbursement reduction. Nonetheless, the expected rise in coverage over the next five years will result in an increase in laboratory testing, helping to mitigate these cutbacks.



22    VANTAGE POINT ADVISORS

*Further Medicare Pressures*

The Congressional Budget Office and the National Commission on Fiscal Responsibility and Reform have proposed a cost-sharing structure for Medicare beneficiaries, which include the addition of a 20.0 percent coinsurance for laboratory services. This option would cut Medicare reimbursement for clinical laboratory services and require laboratories to collect the coinsurance from beneficiaries. A variation of this option has surfaced in connection with the debt ceiling extension negotiations, which would impose a $1.00 to $2.00 flat copayment per laboratory test.

The coinsurance or co-pay proposals could severely reduce profitability for many smaller laboratories that operate as the sole provider of laboratory services to Medicare's most vulnerable beneficiaries, that is to say those in nursing homes and other such settings. Co-pay collection is a considerable expense that small operators will struggle to cover.

*Medical Advances Drive Growth and Competition*

Medical advancements will allow for more accurate and timelier diagnoses and treatments. In particular, research in genomics will result in the development of more specialized diagnostic tests. Physicians will increasingly order gene-based and other esoteric tests to assist them in the diagnostic process, establish prognoses and choose therapeutic regimens. Esoteric tests include procedures in molecular diagnostics, protein chemistry, cellular immunology and advanced microbiology. Esoteric tests typically require hands-on attention from highly skilled technical personnel and sophisticated technology, equipment or materials. They can also be performed less frequently than routine tests. Consequently, esoteric tests are generally reimbursed at higher levels than routine tests.

## Conclusion

MLH, through its direct and indirect subsidiaries, including Labs, occupies a strong position in the diagnostics industry in the U.S. by virtue of its unique urine testing laboratory that utilizes the latest available technology. It has the available technology and capable management team necessary to continue development and increase its market share.

Although the drug testing laboratories have thus far greatly benefited from the DEA's efforts to control drug abuse, the industry has grown rapidly as medical knowledge has expanded. Certain laboratories, such as MLH, still depend on payment rates set by third-party payers like Medicare, Medicaid, MCOs, and other health insurers. The Company continues to see changes in Medicare reimbursement policies for qualitative drug screens, which directly impacted its net revenue per specimen.



23

VANTAGE POINT ADVISORS

Medical laboratories fared well during the recession due to the necessary nature of their services and the rapidly aging U.S. population, which has a greater need for medical testing. The industry can expect much of the same in the coming years. With more people receiving health insurance after the healthcare reformed enacted in 2010, demand for medical testing should increase. MLH is well positioned to capitalize on increased demand for laboratory services.

The clinical testing business is a fragmented and highly competitive industry. The Company is facing an increase in competitive pressure from physician offices and hospital outreach programs. Hospitals generally maintain onsite laboratories to perform testing on their patients (inpatient or outpatient). Most physicians have admitting privileges with hospitals as part of their medical practice and hospitals leverage their relationships with community physicians and encourage them to send their outreach testing to the hospital's laboratory. In addition, hospitals that own physician practices generally require the physicians to refer tests to the hospital's laboratory.

The Company's future earnings continue to be sensitive to the success of its customer maintenance and business development activities. The Company faces risk from its revenue concentration in Urine Drug Testing and growth could be dependent on growing its Pharmacogenetic Testing business. Any delay or negative developments with these efforts could impede the Company's growth trajectory and profitability levels.



24                                    VANTAGE POINT ADVISORS

Confidential

# Valuation Methodology

## Approaches to Value

To estimate the value of a company, three different approaches may be employed: (1) the income, (2) market and (3) cost approaches. These three approaches are summarized as follows:

- **Income Approach:** Under the income approach, value is measured as the present worth of anticipated future net cash flows generated by a business. In a multi-period model, net cash flows attributable to a business are forecast for an appropriate period and then discounted to present value using an appropriate discount rate. In a single-period model, net cash flow or earnings for a normalized period are capitalized to reach a determination of present value.

- **Market Approach:** The market approach is a technique used to estimate value from an analysis of actual transactions or offerings for economically comparable assets available as of the measurement date. The process is essentially that of comparison and correlation between the subject asset and similar assets recently sold or are offered for sale in the market. The transaction or offering prices of the comparable assets are adjusted for dissimilarities in characteristics including location, age, time of sale, size, and utility, among others. The adjusted prices of the comparable assets provide an indication of value for the subject asset.

- **Cost Approach:** In applying this approach, an analysis of the subject company's assets and liabilities is performed. The estimated fair market value of all existing and potential liabilities is deducted from the derived aggregate fair market value of a company's assets, resulting in an indication of stockholders' equity value.

## Methods Applied

The three approaches to value provide general overviews that govern valuation methods. Valuation methods provide detailed estimations of value. We applied the following methods:

- **Discounted Cash Flow ("DCF") Method:** The discounted cash flow method is based on the premise that the value of an asset is equal to the present value of the future economic benefits that accrue to its owners, using an appropriate discount rate that adequately considers the risk related to an investment in the business. Generally, application of the discounted cash flow method involves first forecasting revenues, operating expenses, capital



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015709

expenditures, and incremental working capital requirements for a discrete forecast period. Based on these forecasts, the net cash flow to be generated by the business is determined and discounted to present value. Next, the value of the business at the end of the projection period is determined and discounted to present value. The sum of the present value of the net cash flows during the projection period and the present value of the business at the end of the projection period represents the fair market value of the business.

- **Guideline Public Company ("GPC") Method:** Under the guideline public company method, value is estimated by comparing the subject company to similar companies with publicly traded ownership interests. Guideline companies are selected based on comparability to a subject company, and valuation multiples are calculated and applied to the subject company's operating data.

- **Guideline Transaction Method:** This method is part of the market approach. This method is similar to the GPC method, but the valuation data comes from mergers and acquisitions. Value derived is predicated on the valuation multiples of transactions involving companies with similar characteristics.

## Method Not Selected

We elected not to perform the following method:

- **Cost Approach:** We elected not to perform the cost approach. We believe the value of the Company's assets on a going-concern basis is directly related to the ability to generate a fair rate of return on invested capital. This factor is not adequately considered in the cost approach.



VANTAGE POINT ADVISORS

# Valuation Analysis

## DCF Method

We estimated MLH's range of business enterprise value ("BEV") under the DCF method at approximately $2.4 to $2.8 billion. The details of the DCF method are presented on **Page 2 of Exhibit 2**.

- **Management Forecast:** Management's forecast covers the years ending December 31, 2014 through December 31, 2020. Actual revenue reported in 2013 missed Management's prior forecast by 0.4 percent. After adjusting for non-recurring expenses, adjusted EBITDA for 2013 missed Management's prior forecast by approximately 1.3 percent. The lower-than-expected revenue and EBITDA are attributed to lower reimbursement rates and greater competition in the market.

- **Revenue Forecast:** Management expects slower growth for MLH as the Company reaches a more stable stage of development. Management forecasts revenue increasing from approximately $632.6 million for the trailing twelve months ("TTM") ended December 31, 2013 to approximately $733.3 million for the following twelve months ending December 31, 2014. In the next three years, Management forecasts revenue growth of 7.6 percent, 8.2 percent, and 9.4 percent. By the TTM ending December 31, 2020, the Company expects to generate $1.1 billion in revenue.

- **Operating Earnings Forecast:** Management forecasts an adjusted EBITDA level of approximately $417.9 million for the TTM ending December 31, 2014, which translates to an operating margin of 57.0 percent. This is a slight decrease from the EBITDA margin of 59.8 percent for the TTM ended December 31, 2013. Management expects EBITDA margins to steadily decrease to 52.4 percent by December 31, 2020. After achieving margin improvement in 2013 through leveraging the infrastructure buildup which occurred during fiscal 2011, Management expects pressure on gross margins as well as higher selling, general, and administration costs, which has tempered profitability expectations. Since the Company's technology is scalable and automated, the Company experienced high operating margins over the past few years; however, Management expects margins to decrease through the forecast period due to increased competition.

- **Tax:** We applied a statutory tax rate of 40.0 percent to the Company. This reflects the combined effects of federal and state income tax payments.



27                                        VANTAGE POINT ADVISORS

- **Depreciation and Capital Expenditures:** We relied on Management's forecast of depreciation expense and capital expenditures.

- **Incremental Working Capital:** Incremental changes in debt-free net working capital were estimated by Management.

- **Discount Rate: Page 3 of Exhibit 2** presents the selected discount rate. The "Discount Rate" section below describes our assumptions used.

- **Terminal Value:** In estimating the Company value into perpetuity we relied on the Exit Multiple Method. Under the Exit Multiple Method, we applied multiples to fiscal 2020 metrics. We selected revenue and EBITDA multiples based on discussions with Management and an analyses of the Company and industry.

## Discount Rate

We used the Company's weighted average cost of capital ("WACC") as the applicable discount rate. The WACC represents the required return that a company must earn to satisfy its creditors, owners, and other providers of capital.

**Page 4 of Exhibit 2** shows our estimation of the Company's WACC. The WACC is a weighted average of the Company's cost of equity ($K_e$) and the cost of debt ($K_d$). The weight of equity ($W_e$) and weight of debt ($W_d$) are determined by the capital structure. Applying a tax rate (t) yields an after-tax cost of debt. The formula for the WACC is arithmetically expressed by the following equation:

$$WACC = [K_e \times W_e] + [K_d \times W_d \times (1 - t)]$$

We calculated $K_e$ using a modification of the capital asset pricing model ("CAPM"). The general idea behind the CAPM is that investors need to be compensated for both time value of money and risk. The time value of money is represented by the risk-free rate ($R_f$) and compensates the investors for placing money in any investment over a period of time. The other component of the formula represents risk and calculates the amount of compensation the investor needs for taking on additional risk as an equity holder. This is accounted for by taking a risk measure, represented by beta ($\beta$), that compares the returns of the asset to the market over a period of time and to the market equity risk premium ($R_m$). Other risk factors include a size premium ($R_s$) and a company-specific risk premium, alpha ($\alpha$).



28

VANTAGE POINT ADVISORS

The modified CAPM is expressed arithmetically by the following equation:

$$K_e = R_f + (\beta \times R_m) + R_s + \alpha$$

- **Risk-Free Rate ($R_f$):** We used a risk-free rate of 3.2 percent based on yields of 20-year U.S. Treasuries as of the Valuation Date.

- **Beta ($\beta$):** Page 5 of **Exhibit 2** shows that we selected an unlevered beta of 1.00 based on a value near the maximum of the GPC betas observed, which was then relevered to 1.10.

- **Market Equity Risk Premium ($R_m$):** We selected a market equity risk premium of 6.2 percent based on the long-horizon equity risk premium (supply side) for the period 1926 – 2013 found in the *2014 Valuation Handbook - Guide to Cost of Capital* published by Duff & Phelps.

- **Size Premium ($R_s$):** We selected a size premium of 1.9 percent based on the 6th decile of companies shown in the *2014 Valuation Handbook - Guide to Cost of Capital* published by Duff & Phelps. The 6th decile spans equity premiums of companies ranging in size from a market capitalization value of $1.6 billion to $2.4 billion.

- **Company-Specific Risk Premium ($\alpha$):** We selected a specific risk premium of 5.0 percent. This risk reflects the additional risk of the market participant achieving the projections in light of the potential margin compression, due to regulatory changes, competition and forecast risks.

## Guideline Public Company Method

We estimated MLH's range of BEV under the GPC method at approximately $2.1 to $2.3 billion. The details of the GPC method are presented in **Exhibit 3**.

- **Guideline Public Companies:** We selected eight guideline public companies reasonably similar to MLH in size, operations, and industry, as shown on **Page 1 of Appendix D**.

- **Multiples Selection:** We selected low and high revenue and EBITDA multiples based on the BEV to operating metrics including the last twelve months ("LTM"), 1-year forward, and 2-year forward periods. In selecting revenue multiples, primary consideration was given to the Company's high margins. In selecting EBITDA multiples, the primary consideration was the risk of margin compression in the future.



29

VANTAGE POINT ADVISORS

## Guideline Transaction Method

We estimated MLH's range of BEV under the guideline transaction method at approximately $2.5 to $2.7 billion. The details of the guideline transaction method are presented in **Exhibit 4**.

- **Similar Transactions:** We observed twenty-five transactions that have closed in the past three and one-half years involving target companies reasonably similar to MLH in size, operations, and industry.

- **Multiples Selection:** We selected low and high BEV/LTM revenue multiples based on the Company's high historic and forecast EBITDA margins. We only considered the Company's BEV implied by the BEV/LTM revenue multiples after observing that positive EBITDA was reported for only 10 out of the 25 guideline transactions. Furthermore, the calculated BEV/EBITDA multiples from the available marketplace data showed a wide range with elevated variance. As such, data points on BEV/EBITDA multiples were deemed insufficient to estimate BEV.



MILLENNIUM LABORATORIES

30

VANTAGE POINT ADVISORS

# Reconciliation

We estimated the Company's BEV as a weighted average of the high and low indications of the selected methods, with more weight being placed on the income approach. This yielded an estimate of BEV ranging from approximately $2.3 to $2.7 billion.

The fair value of equity was estimated after subtracting the proforma JP Morgan debt, current portion of debt and capital leases, PNC debt, and long-term capital leases from the estimated BEV range, and adding cash and proceeds from the exercise of common stock options to the estimated BEV range.

The fair value of equity was estimated as follows (values are in thousands):

| | | | |
|---|---|---|---|
| **Income Approach** | | | |
| Discounted cash flow method | $2,438,000 | -- | $2,845,000 |
| | | | |
| **Market Approach** | | | |
| Guideline public company method | $2,087,000 | -- | $2,287,000 |
| Guideline transaction method | $2,490,000 | -- | $2,651,000 |
| | | | |
| **Estimated business enterprise value** | **$2,338,000** | -- | **$2,658,000** |
| *less:* 2014 JPM debt | ($1,775,000) | | ($1,775,000) |
| *less:* Current portion of debt and capital leases | ($18,841) | | ($18,841) |
| *less:* PNC debt | ($12,804) | | ($12,804) |
| *less:* Long term capital leases | ($9,005) | | ($9,005) |
| *add:* Cash | $72,418 | | $72,418 |
| *add:* Proceeds from options | $45,029 | | $45,029 |
| **Value of equity** | **$639,796** | | **$959,796** |



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015715

# Allocation of Equity

## Methodologies

Once total equity value is estimated, it must be allocated to the various equity classes comprising the Company's capitalization. This process ultimately results in creating a final estimate of value for the subject company's underlying equity interests.

While there are many different value allocation methods, these various methods can be grouped into three general categories as defined by the AICPA Accounting and Valuation Guide for the Valuation of Privately-Held-Company Equity Securities issued as Compensation (the "AICPA Accounting Guide"):

- **Probability-Weighted Expected Return Method ("PWERM").** The value of the common stock is estimated based upon an analysis of future enterprise value assuming several possible outcomes. Each discrete outcome is probability weighted and discounted to present value to arrive at a weighted-average value for the common stock. The key strength of this method is its conceptual framework. However, it is very difficult to apply in practice, especially in the case of companies where an exit event is not imminent.

- **The Option-pricing Method ("OPM").** The common stock and preferred stock are treated as call options on the subject company's enterprise value. A series of call options is modeled, with exercise prices determined in connection with the liquidation preference and various valuation 'break' points specific to the capital structure of the subject company. The key strength of this method is that it provides a dynamic analysis of the common stock value and quantifies the benefit of the potentially unlimited 'valuation upside' enjoyed by common stockholders. The primary disadvantage of this method is that it tends to overstate the value of the common stock in early stage companies where a successful exit remains speculative and there is a significant risk that the common stock may have little if any value.

- **The Current Value Method.** The enterprise value is allocated to the various classes of stock based on liquidation and conversion features, with any residual value being allocated to the common stock. The key strength of this method is it simplicity. The primary disadvantage of this method is that it will tend to understate the value of the common stock in situations where the subject company has moved beyond the development stage and has begun to accumulate significant value in the underlying common stock.



32

**VANTAGE POINT ADVISORS**

Given the Recapitalization, we elected to apply the current value method to allocate 55.0 percent of the estimated nonmarketable equity value and 55.0 percent of the $1.415 billion in distributions issued in connection with the Recapitalization.



33                                           VANTAGE POINT ADVISORS

# Adjustments to Fair Value

## Discount for Lack of Marketability

The concept of marketability deals with the liquidity of an ownership interest in a company; that is, how quickly and certainly it can be converted to cash at the owner's discretion. In valuing a minority interest in a privately-held entity or a thinly-traded public entity, recognition must be given to the lack of liquidity in the equity since the interest cannot meet the liquidity that interests in actively-traded public stock can achieve. Typically, a minority holder of private equity or thinly-traded public equity securities does not have immediate access to a market (i.e., a willing buyer); as opposed to a minority holder of actively-traded public equity securities who has the option to sell his/her shares on the open market at any time.

Because MLH is private, its shares are subject to a discount for lack of marketability ("DLOM") due to the lack of a liquid market for the shares. Our selection of the DLOM was based on a thorough review of the FMV Restricted Stock Study™ and application of the Average (Asian) Put Option and the Protective Put Option pricing models.

### FMV Restricted Stock Study™

We reviewed quantitative results and observed the median and average indicated discounts based on factors including: (a) offering amount; (b) net income; (c) market value of equity; (d) revenue; and (e) total assets for the Company.

Then we reviewed qualitative factors that affect the marketability of the preferred stock in the Company. The qualitative factors include: (a) expected growth rate in value and prospects for the industry; (b) expected dividend/distribution yield and dividend history; (c) ability to sell interests and restrictive transfer provisions; (d) prospects for liquidation of the company; (e) put rights of minority owners; (f) potential buyers of interests; (g) information access and reliability; (h) investment objectives and degree of professional management; (i) holding period until sale of underlying assets with distribution to shareholders, and (j) swing vote and non-voting rights.  See **Page 4 of Appendix C.**

### Average (Asian) Put Option

An average, or "Asian," put option conveys the right to sell at the average price attained by the subject shares during the life of the option. The model is more appropriate than traditional put options because it assumes that investors have no special ability to time the market. If investors cannot time the market, the restriction has the effect of depriving them of average (not maximum) trading profits.



34

VANTAGE POINT ADVISORS

The Asian put option relies on assumptions on expected time to liquidity and expected volatility over the time to liquidity. We estimated the time to liquidity based on discussions with Management and relied on historical price volatility of the GPCs.

Based on an estimated time to liquidity of three years and expected volatility of 43.0 percent, the Asian put option indicates a DLOM of 17.0 percent. See **Page 1 of Appendix C** for the average put option analysis.

*Finnerty Put Option*

In 2001, John Finnerty proposed a model that assumes the investor does not possess special market timing ability and would be equally likely to exercise the hypothetical liquid security at any given point of time. The value of marketability is modeled as the present value of cash flows, similar to an average-strike put option. The Finnerty method addresses the issue of assuming perfect market timing and the issue of assuming protection on the downside while still realizing appreciation on the upside in the protective put method. Mr. Finnerty also performed a regression analysis to restricted stock studies, adjusting to remove other significant factors, such as concentration of ownership and information effects, and found that after isolating the marketability-related factors, the discounts predicted by his method are consistent with empirical data.

The Finnerty put option relies on the same assumptions as the Asian put option with respect to expected time to liquidity and expected volatility over the time to liquidity.

Using the same assumptions applied in the Asian put option analysis, the Finnerty put option indicated a DLOM of 18.0 percent. See **Page 2 of Appendix C** for the Finnerty put option analysis.

*Conclusion*

Based on our DLOM analyses, it is our opinion that a 15.0 percent discount for lack of marketability should be applied to the 55.0 percent interest in the estimated equity value in MLH, excluding the $1.415 billion distribution associated with the Recapitalization. The application of the DLOM is shown below:



VANTAGE POINT ADVISORS

Confidential

| | | | | |
|---|---|---|---|---|
| **Fair value of equity** | | | **$639,796** | **$959,796** |
| Estimated value of 55.0 percent marketable interest | 55.0% | | $351,888 – | $527,888 |
| *less:* Discount for lack of marketability | 15.0% | | ($52,783) – | ($79,183) |
| **Estimated fair value of 55.0 percent nonmarketable interest** | | | **$299,105** | **$448,705** |
| Estimated fair value of 55.0 percent nonmarketable interest (Point Estimate) | | | | $370,000 |
| *add:* 55.0 percent distribution of $1,415,000 | 55.0% | | | $778,250 |
| **Estimated fair value of 55.0 percent of equity value** | | | | **$1,148,250** |



36    VANTAGE POINT ADVISORS

    VP_ML_00015720

# Valuation Conclusion

Based on the assumptions and analyses outlined in this report, we estimated the fair value per share of common stock in MLH as of April 16, 2014 as follows:

| Summary of Value | Apr-16-2014 |
|---|---|
| Estimated fair value of 55.0 percent of equity value | $1,148,250 |
| Number of common shares | 332,414 |
| Value per share of common, nonmarketable | $3.454 |
| **Estimated fair value per share of common stock, nonmarketable (rounded) (USD)** | **$3,460.0** |

We are independent of the Company, and have no current or prospective interest in the Company. Our fee for this appraisal was in no way influenced by the results of our analyses.

The terms and conditions that follow are an integral part of this valuation opinion.



37

VANTAGE POINT ADVISORS

Confidential

# Terms and Conditions

This value opinion report has been prepared pursuant to the following general assumptions and general limiting conditions:

1) We assume no responsibility for the legal description of real property or matters including legal or title considerations. For real property included in this appraisal, we were not furnished legal descriptions or other detailed site and improvement drawings. Title to the subject assets, properties or business interests is assumed to be good and marketable unless otherwise stated.

2) The subject assets, properties or business interests are appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3) We assume responsible ownership and competent management with respect to the subject assets, properties or business interests.

4) The information furnished by Management is believed to be reliable. However, we issue no warranty or other form of assurance regarding its accuracy.

5) We assume that there is full compliance with all applicable federal, state and local regulations and laws unless non-compliance is stated, defined and considered in the appraisal report.

6) We assume that all required licenses, certificates of occupancy, consents or legislative or administrative authority from any local, state or national government, private entity or organization have been or can be obtained or renewed for any use on which the valuation opinion contained in this report is based.

7) Possession of this valuation report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without our written consent and, in any event, only with proper written qualifications and only in its entirety.

8) We, by reason of this valuation, are not required to give testimony or to be in attendance in court with reference to the assets, properties or business interests in question unless arrangements have been previously made.

9) This valuation report has been prepared in conformity with, and is subject to, the requirements of the code of professional ethics and standards of professional conduct of the professional appraisal organizations of which we are members.



VANTAGE POINT ADVISORS

Confidential

VP_ML_00015722

10) Disclosure of the contents of this valuation report is governed by the bylaws and regulations of the CFA Institute and the American Society of Appraisers.

11) No part of the contents of this report, especially any conclusions of value, the identity of the appraisers or the firm with which the appraisers are associated, shall be disseminated to the public through advertising, public relations, news, sales or other media without our prior written consent and approval.

12) We assume no responsibility for any financial reporting judgments that are appropriately those of Management. Management accepts the responsibility for any related financial reporting with respect to the assets, properties or business interests encompassed by this appraisal.



39

**VANTAGE POINT ADVISORS**

VP_ML_00015723

# Appraisal Certification

I certify that, to the best of my knowledge and belief:

1) The statements of fact contained in this report are true and correct.

2) The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3) I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest with respect to the parties involved.

4) Within the three-year period immediately preceding acceptance of this assignment, we provided a valuation of equity interests of the business as of December 31, 2011; March 29 and December 31, 2012; and December 31, 2013.

5) I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6) My engagement in this assignment was not contingent upon developing or reporting predetermined results.

7) My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the Company, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8) My analysis, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice and the Statement on Standards for Valuation Services.

9) Han Le, an analyst at Vantage Point Advisors, Inc., provided significant business and/or intangible asset appraisal assistance to the individuals signing this certification.

Todd G. Poling
**President**
**Vantage Point Advisors, Inc.**

Rich Barth
**Director**
**Vantage Point Advisors, Inc.**



40

**VANTAGE POINT ADVISORS**

# Exhibits

Summary and Reconciliation_____Exhibit 1

Income Approach - Discounted Cash Flow Method_____Exhibit 2

Market Approach - Guideline Public Company Method_____Exhibit 3

Market Approach - Guideline Transaction Method_____Exhibit 4


Historical Balance Sheets_____Appendix A

Historical and Adjusted Income Statements_____Appendix B

Discount for Lack of Marketability_____Appendix C

Guideline Public Company Data_____Appendix D



41                                    VANTAGE POINT ADVISORS

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Exhibit 1, Page 1**

Summary

(USD thousands) except Fair Value Per Share                                    Valuation as of April 16, 2014

| Summary of Value | Apr-16-2014 |
|---|---|
| (1) Estimated fair value of 55.0 percent of equity value | $1,148,250 |
| (2) Number of common shares | 332,414 |
| Value per share of common, nonmarketable | $3.454 |
| **Estimated fair value per share of common stock, nonmarketable (rounded) (USD)** | **$3,460.0** |

Notes:

(1) See Exhibit 1, Page 2 for the derivation of equity value.

(2) The sum of 300,495.94 shares of common stock and 31,917.82 in-the-money common stock options.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                   **Exhibit 1, Page 2**

Reconciliation

(USD thousands)                                                              Valuation as of April 16, 2014

| Business Enterprise Value ("BEV") from Operations | | Estimated Range of Value | | |
|---|---|---|---|---|
| **Income Approach** | | | | |
| (1) | Discounted cash flow method | $2,438,000 | -- | $2,845,000 |
| | **Market Approach** | | | |
| (2) | Guideline public company method | $2,087,000 | -- | $2,287,000 |
| (3) | Guideline transaction method | $2,490,000 | -- | $2,651,000 |
| (4) | **Estimated business enterprise value** | **$2,338,000** | -- | **$2,658,000** |
| (5) | *less:* 2014 JPM debt | ($1,775,000) | | ($1,775,000) |
| (5) | *less:* Current portion of debt and capital leases | ($18,841) | | ($18,841) |
| (5) | *less:* PNC debt | ($12,804) | | ($12,804) |
| (5) | *less:* Long term capital leases | ($9,005) | | ($9,005) |
| (5) | *add:* Cash | $72,418 | | $72,418 |
| (6) | *add:* Proceeds from options | $45,029 | | $45,029 |
| | **Value of equity** | **$639,796** | | **$959,796** |
| | Estimated value of 55.0 percent marketable interest  `55.0%` | $351,888 | -- | $527,888 |
| (7) | *less:* Discount for lack of marketability  `15.0%` | ($52,783) | -- | ($79,183) |
| | **Estimated fair value of 55.0 percent nonmarketable interest** | **$299,105** | | **$448,705** |
| | Estimated fair value of 55.0 percent nonmarketable interest (Point Estimate) | | | $370,000 |
| (5) | *add:* 55.0 percent distribution of $1,415,000  `55.0%` | | | $778,250 |
| | **Estimated fair value of 55.0 percent of equity value** | | | **$1,148,250** |

Notes:

(1) See Exhibit 2, Page 1.

(2) See Exhibit 3, Page 1.

(3) See Exhibit 4, Page 1.

(4) Weighted average of the income approach and the market approach, where more weight is placed on the income approach.

(5) Per Management. Assumes proforma recapitalization figures.

(6) The proceeds from the exercise of options is estimated as follows:

| Shares | Strike Price (USD) | Cash Proceeds (USD) |
|---|---|---|
| 10,358 | $500 | $5,178,830 |
| 4,652 | $690 | $3,209,639 |
| 11,547 | $2,167 | $25,023,129 |
| 2,921 | $2,167 | $6,329,070 |
| 1,534 | $2,167 | $3,323,463 |
| 657 | $2,167 | $1,423,329 |
| 250 | $2,167 | $541,750 |
| 31,918 | | $45,029,210 |

(7) See Appendix C.

Confidential

# Income Approach - Discounted Cash Flow Method



Confidential

# Millennium Lab Holdings, Inc. and Subsidiaries

**Exhibit 2, Page 1**

Discounted Cash Flow Method Summary

(USD thousands)

Valuation as of April 16, 2014

| Summary of Discounted Cash Flow Method | Estimated Ranges of Value | | |
|---|---|---|---|
| Exit multiple method | $2,438,319 | -- | $2,844,883 |
| **Estimated business enterprise value range** | **$2,438,000** | -- | **$2,845,000** |

(1) **WACC vs Exit EV / EBITDA Multiple**

BEV / EBITDA Exit Multiple

| | | 5.50 x | 6.00 x | 6.50 x |
|---|---|---|---|---|
| | 15.8% | $2,488,814 | $2,544,351 | $2,599,887 |
| WACC | 14.8% | $2,600,884 | $2,659,747 | $2,718,611 |
| | 13.8% | $2,720,040 | $2,782,462 | $2,844,883 |

WACC vs Exit EV / Revenue Multiple

BEV/ Revenue Exit Multiple

| | | 3.00 x | 3.50 x | 4.00 x |
|---|---|---|---|---|
| | 15.8% | $2,438,319 | $2,438,319 | $2,544,351 |
| WACC | 14.8% | $2,547,363 | $2,547,363 | $2,659,747 |
| | 13.8% | $2,663,284 | $2,663,284 | $2,782,462 |

Notes:

(1) See Exhibit 2, Page 2.

VP_ML_00015729

**Millennium Lab Holdings, Inc. and Subsidiaries**  
Discounted Cash Flow Method - Exit Multiple  
(USD thousands)

**Exhibit 2, Page 2**  
Valuation as of April 16, 2014

(1) **Discounted Cash Flow Analysis**

| | Historical (2) Dec-31-2013 | Fiscal years ending: Dec-31-2014 | Dec-31-2015 | Dec-31-2016 | Dec-31-2017 | Dec-31-2018 | Dec-31-2019 | Dec-31-2020 |
|---|---|---|---|---|---|---|---|---|
| Net sales | $632,632 | $733,282 | $788,757 | $853,081 | $933,009 | $1,008,084 | $1,070,618 | $1,134,684 |
| *Annual growth* | *21.2%* | *15.9%* | *7.6%* | *8.2%* | *9.4%* | *8.0%* | *6.2%* | *6.0%* |
| Cost of sales | $75,256 | $93,805 | $114,200 | $131,573 | $148,542 | $165,618 | $178,351 | $192,811 |
| *% of revenue* | *11.9%* | *12.8%* | *14.5%* | *15.4%* | *15.9%* | *16.4%* | *16.7%* | *17.0%* |
| Gross profit | $557,376 | $639,477 | $674,557 | $721,508 | $784,467 | $842,466 | $892,268 | $941,873 |
| Operating expenses (excl. D&A and other adj.) | $179,255 | $221,604 | $238,794 | $262,474 | $286,432 | $310,312 | $327,826 | $347,558 |
| (3) EBITDA | $378,121 | $417,873 | $435,763 | $459,034 | $498,035 | $532,154 | $564,442 | $594,315 |
| *% of revenue* | *59.8%* | *57.0%* | *55.2%* | *53.8%* | *53.4%* | *52.8%* | *52.7%* | *52.4%* |
| (4) *less:* Depreciation and amortization | $16,905 | $22,730 | $23,238 | $22,095 | $20,892 | $20,455 | $23,248 | $22,480 |
| *less:* Amortization of transaction expenses | - | $4,864 | $6,486 | $6,486 | $6,486 | $6,486 | $6,486 | $6,486 |
| (5) *less:* Other adjustments | $25,466 | $18,465 | $14,443 | $4,885 | $5,104 | $5,335 | $5,603 | $5,892 |
| *less:* One-time deductible expense | - | $11,750 | - | - | - | - | - | - |
| EBIT | $335,750 | $360,064 | $391,596 | $425,569 | $465,553 | $499,878 | $529,105 | $559,458 |
| (6) Income tax expense  40.0% | | $144,025 | $156,639 | $170,227 | $186,221 | $199,951 | $211,642 | $223,783 |
| Debt-free net income | | $216,038 | $234,958 | $255,341 | $279,332 | $299,927 | $317,463 | $335,675 |
| Cash flow adjustments | | | | | | | | |
| Amortization of transaction expenses | | $4,864 | $6,486 | $6,486 | $6,486 | $6,486 | $6,486 | $6,486 |
| (4) Depreciation and amortization | | $22,730 | $23,238 | $22,095 | $20,892 | $20,455 | $23,248 | $22,480 |
| (4) Capital expenditures | | ($23,886) | ($15,474) | ($19,286) | ($24,505) | ($34,644) | ($24,205) | ($24,690) |
| Stock-based compensation | | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| (7) Incremental debt-free net working capital | | ($17,564) | ($3,140) | ($7,101) | ($7,834) | ($6,906) | ($5,683) | ($6,075) |
| Debt-free net cash flow (DFNCF) | | $202,183 | $246,067 | $257,535 | $274,370 | $285,318 | $317,310 | $333,876 |
| Partial period adjustment | | 0.7083 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Discount period (mid-period convention) | | 0.3542 | 1.2083 | 2.2083 | 3.2083 | 4.2083 | 5.2083 | 6.2083 |
| (8) Present value (PV) factor  14.8% | | 0.9523 | 0.8464 | 0.7373 | 0.6422 | 0.5594 | 0.4873 | 0.4245 |
| PV of DFNCF | | $136,380 | $208,269 | $189,873 | $176,207 | $159,615 | $154,627 | $141,725 |

| Terminal Value: Exit Multiple Method | Revenue | EBITDA |
|---|---|---|
| Financial Metrics 2020 | $1,134,684 | $594,315 |
| Exit EBITDA multiple | 3.5x | 6.0x |
| BEV | $3,971,394 | $3,565,889 |
| Weight | 50.0% | 50.0% |
| Weighted BEV | $1,985,697 | $1,782,945 |
| Terminal value, 2020 | | $3,768,642 |
| Discount period | | 6.7083 |
| PV factor | | 0.3962 |
| Terminal value | | $1,493,051 |

| | |
|---|---|
| Net PV of interim period DFNCF | $1,166,696 |
| (9) Terminal value | $1,493,051 |
| Business enterprise value | $2,659,747 |

(10) | **Estimated BEV range, marketable (rounded)** | **$2,438,300** | **to** | **$2,844,900** |

Notes:  
Source: Management-prepared forecast.

(1) Management-prepared forecasts for the years ending December 31, 2014 through December 31, 2017. We extended the forecast to taper revenue growth and normalize operating margins.  
(2) See Appendix B, Page 1.  
(3) EBITDA margins for the year ending December 31, 2018 was estimated based on margins observed from guideline public companies. See Appendix D, Page 3.  
(4) Management-provided estimation of depreciation expense and capital expenditures.  
(5) Other adjustments includes stock-based compensation, RxAnte transaction costs, and revenue sharing.  
(6) Estimated effective tax rate for the subject company which reflects the combined effects of federal and state income tax payments.  
(7) Management-provided estimation of debt-free net working capital.  
(8) See Exhibit 2, Page 3.  
(9) We used the Exit Multiple Method to estimate the value into perpetuity. See Exhibit 3, Page 3 for the guideline public company multiples considered in the exit assumption.  
(10) See Exhibit 2, Page 1.

Confidential

VP_ML_00015730

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Exhibit 2, Page 3**

Weighted Average Cost of Capital

(Values as presented)                                                    Valuation as of April 16, 2014

| Weighted Average Cost of Capital (WACC) | Cost of Capital | % in Capital Structure | Weighted Cost |
|---|---|---|---|
| (1) Debt | 2.7% | 14.6% | 0.4% |
| Equity | 16.9% | 85.4% | 14.4% |
| Weighted average cost of capital | | | 14.8% |
| **Estimated WACC (rounded)** | | | **14.8%** |

**Cost of Equity - Modified Capital Asset Pricing Model (CAPM)**

| | | | |
|---|---|---|---|
| (2) Risk-free rate | | | 3.2% |
| (3)    Market equity risk premium | | 6.2% | |
| (4)    Relevered beta | x | 1.10 | |
| Beta adjusted equity risk premium | | | 6.8% |
| (5) Size premium | | | 1.9% |
| (6) Company-specific risk adjustment | | | 5.0% |
| **Estimated cost of equity** | | | **16.9%** |

**Cost of Debt**

| | |
|---|---|
| (7) Pre-tax cost of debt | 4.5% |
| Income tax rate | 40.0% |
| **Estimated after-tax cost of debt** | **2.7%** |

Notes:

(1) Based on the Company's target capital structure.

(2) Based on the nominal 20-year U.S. Treasury bond as of April 16, 2014.  Source:  The Federal Reserve Board.

(3) Source:  2014 Valuation Handbook - Guide to Cost of Capital. Duff & Phelps LLC.  Reflects long-horizon equity risk premium (supply side) for the period 1926 - 2013.

(4) See Exhibit 2, Page 4 for the estimation of beta.

(5) Source:  2014 Valuation Handbook - Guide to Cost of Capital. Duff & Phelps LLC.  Size premium (return in excess of CAPM) for companies in size decile 6 from 1926 to 2013. Decile 6 includes companies with market capitalizations of $1,626.386 to $2,431.229 million.

(6) Represents risk specific to the Company and includes additional risk and variance in the forecast as well as risks related to regulatory changes and pressures.

(7) The Company's cost of borrowing was estimated using the Moody's Seasoned Baa Corporate Bond Yield as of the Valuation Date.

Confidential                                    VP_ML_00015731

**Millennium Lab Holdings, Inc. and Subsidiaries**          **Exhibit 2, Page 4**

Weighted Average Cost of Capital - Beta

(Values as presented)                                  Valuation as of April 16, 2014

| Guideline Company | Ticker Symbol | Levered Beta (1) | Interest-bearing Debt ($mil) | Market Capitalization ($mil) | Market Value of Invested Capital ($mil) | Debt | Equity | Unlevered Beta (2) |
|---|---|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | 1.921 | $3,843.2 | $2,933.9 | $6,777.0 | 56.7% | 43.3% | 1.076 |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | 0.950 | $52.6 | $759.2 | $811.8 | 6.5% | 93.5% | 0.912 |
| Cepheid | NasdaqGS:CPHD | 1.096 | $1.7 | $3,312.2 | $3,313.9 | 0.1% | 99.9% | 1.095 |
| Genomic Health Inc. | NasdaqGS:GHDX | 0.371 | $0.0 | $836.7 | $836.7 | 0.0% | 100.0% | 0.371 |
| Laboratory Corp. of America Holdings | NYSE:LH | 0.575 | $3,000.4 | $8,667.6 | $11,668.0 | 25.7% | 74.3% | 0.476 |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | 1.133 | $0.0 | $892.5 | $892.5 | 0.0% | 100.0% | 1.133 |
| Myriad Genetics Inc. | NasdaqGS:MYGN | 0.589 | $0.0 | $2,797.1 | $2,797.1 | 0.0% | 100.0% | 0.589 |
| Quest Diagnostics Inc. | NYSE:DGX | 0.653 | $3,366.0 | $8,652.9 | $12,018.9 | 28.0% | 72.0% | 0.529 |
| **Minimum:** | | 0.371 | $0.0 | $759.2 | $811.8 | 0.0% | 43.3% | 0.371 |
| **Lower (First) Quartile:** | | 0.586 | $0.0 | $878.6 | $878.6 | 0.0% | 73.7% | 0.516 |
| **Median:** | | 0.802 | $27.2 | $2,865.5 | $3,055.5 | 3.3% | 96.7% | 0.751 |
| **Average:** | | 0.911 | $1,283.0 | $3,606.5 | $4,889.5 | 14.6% | 85.4% | 0.773 |
| **Upper (Third) Quartile:** | | 1.105 | $3,091.8 | $4,647.4 | $7,999.8 | 26.3% | 100.0% | 1.081 |
| **Maximum:** | | 1.921 | $3,843.2 | $8,667.6 | $12,018.9 | 56.7% | 100.0% | 1.133 |

**Selected unlevered beta:**          **1.00**

| Subject Company | Unlevered Beta | Target Cap Structure Debt | Equity | Relevered Beta (2) |
|---|---|---|---|---|
| Millennium Lab Holdings, Inc. and Su | 1.00 | 14.6% | 85.4% | 1.10 |

**Concluded relevered beta:**          **1.10**

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(x) Denotes company excluded from the descriptive statistics. We excluded any companies with negative beta values.

(1) Beta values obtained through a linear regression of the total returns of the guideline public companies against the market's total returns. The S&P 500 Index was used as the measure for market returns. Monthly historical stock price data with a look-back period of 60 months, when applicable.

(2) $BU = BL \div [1+(1-T) \times (Wd \div We)]$; $BL = BU \times [1+(1-T) \times (Wd \div We)]$.

    Definitions:

    BU = Beta unlevered;

    BL = Beta levered;

    T = Estimated tax rate of 40.0 percent;

    Wd = Percentage of debt capital in the capital structure; debt capital is comprised of interest-bearing debt; and

    We = Percentage of equity capital in the capital structure; equity capital is comprised of the market value of common equity.

## Market Approach - Guideline Public Company Method



Confidential

# Millennium Lab Holdings, Inc. and Subsidiaries

**Exhibit 3, Page 1**

Guideline Public Company Method - Summary

(USD thousands)

Valuation as of April 16, 2014

| | Financial Metric | (1) | Selected Multiple | | | Indicated BEV | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Low | | High | Low | | High |
| **Last Twelve Months ("LTM")** | | | | | | | | |
| (2) Revenue | $645,351 | | 3.00 x | -- | 3.50 x | $1,936,054 | -- | $2,258,730 |
| (2) Adjusted EBITDA | $380,868 | | 5.50 x | -- | 6.00 x | $2,094,776 | -- | $2,285,210 |
| | | | | | | | | |
| **1-Year Forward ("FY+1")** | | | | | | | | |
| (2) Revenue, *excluding RxAnte* | $720,523 | | 2.75 x | -- | 3.00 x | $1,981,439 | -- | $2,161,570 |
| (2) EBITDA, *excluding RxAnte* | $419,378 | | 5.25 x | -- | 5.75 x | $2,201,732 | -- | $2,411,421 |
| | | | | | | | | |
| **2-Year Forward ("FY+2")** | | | | | | | | |
| (2) Revenue, *excluding RxAnte* | $764,230 | | 2.50 x | -- | 2.75 x | $1,910,575 | -- | $2,101,632 |
| (2) EBITDA, *excluding RxAnte* | $429,462 | | 4.75 x | -- | 5.00 x | $2,039,943 | -- | $2,147,308 |

| | Low | High |
| --- | --- | --- |
| **Lower quartile business enterprise value** | **$1,947,400** | **$2,150,874** |
| **Median business enterprise value** | **$2,010,691** | **$2,210,150** |
| **Average business enterprise value** | **$2,027,420** | **$2,227,645** |
| **Upper quartile business enterprise value** | **$2,081,067** | **$2,278,590** |

| | Low | | High |
| --- | --- | --- | --- |
| (3) Estimated BEV range | $2,016,645 | -- | $2,216,815 |
| (4) *Adjustment for acquisition of RxAnte, Inc.* | *$70,419* | -- | *$70,419* |
| Estimated BEV, *including RxAnte, Inc.* | $2,087,063 | -- | $2,287,233 |
| **Estimated BEV range (rounded)** | **$2,087,000** | **to** | **$2,287,000** |

Notes:

(1) See Exhibit 3, Page 2 and Exhibit 3, Page 3 for the market multiples.

(2) See Appendix B, Page 1 for the historical income statements.

(3) Estimated as the average conclusion of the summary statistics.

(4) Represents the adjusted purchase price paid for RxAnte, Inc. on December 23, 2013. The Company's financials are not retroactively consolidated with RxAnte.

VP_ML_00015734

# Millennium Lab Holdings, Inc. and Subsidiaries

**Exhibit 3, Page 2**

Guideline Public Company Method - BEV / Revenue Multiples

(Values as presented)

Valuation as of April 16, 2014

| | BEV / Revenue (1) | | | |
| | | | Forward | |
| **Guideline Company** | **LTM** | **LFY** | **1 Year** | **2 Year** |
|---|---|---|---|---|
| Alere Inc. | 2.32x | 2.32x | 2.16x | 2.08x |
| Bio-Reference Laboratories Inc. | 1.08x | 1.11x | 0.98x | N/A |
| Cepheid | 8.07x | 8.07x | 6.08x | 5.17x |
| Genomic Health Inc. | 2.80x | 2.80x | 2.27x | 1.80x |
| Laboratory Corp. of America Holdings | 1.94x | 1.94x | 1.86x | 1.82x |
| Meridian Bioscience, Inc. | 4.51x | 4.50x | 4.14x | 3.86x |
| Myriad Genetics Inc. | 3.31x | 3.99x | 3.16x | 3.02x |
| Quest Diagnostics Inc. | 1.66x | 1.66x | 1.59x | 1.57x |
| **Minimum:** | 1.08x | 1.11x | 0.98x | 1.57x |
| **Lower (First) Quartile:** | 1.87x | 1.87x | 1.79x | 1.81x |
| **Median:** | 2.56x | 2.56x | 2.21x | 2.08x |
| **Average:** | 3.21x | 3.30x | 2.78x | 2.76x |
| **Upper (Third) Quartile:** | 3.61x | 4.11x | 3.41x | 3.44x |
| **Maximum:** | 8.07x | 8.07x | 6.08x | 5.17x |
| (3) **Coefficient of Variation:** | 0.7 | 0.7 | 0.6 | 0.5 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(x) represents that an outlier was excluded from one of the summarizing statistics.

*N/A represents not available or not applicable.

(1) See Exhibit 3, Page 4 and Appendix D, Page 2 for the BEV and revenue data, respectively.

(2) Coefficient of variation measures the variability of the multiples data. It is calculated by dividing the standard deviation by the mean. A lower coefficient of variation indicates lower variability relative to the size of the mean and suggests a more statistically relevant data set.

Confidential

VP_ML_00015735

# Millennium Lab Holdings, Inc. and Subsidiaries

**Exhibit 3, Page 3**

Guideline Public Company Method - BEV / EBITDA Multiples

(Values as presented)

Valuation as of April 16, 2014

| Guideline Company | BEV / EBITDA (1) | | | |
| | | | Forward | |
| | LTM | LFY | 1 Year | 2 Year |
| --- | --- | --- | --- | --- |
| Alere Inc. | 11.47x | 11.47x | 9.83x | 9.16x |
| Bio-Reference Laboratories Inc. | 8.57x | 7.84x | 7.24x | N/A |
| (x) Cepheid | 382.09x | 382.09x | 75.92x | 41.05x |
| Genomic Health Inc. | NMF | NMF | NMF | NMF |
| Laboratory Corp. of America Holdings | 9.38x | 9.38x | 9.23x | 8.76x |
| Meridian Bioscience, Inc. | 13.80x | 13.49x | 11.79x | 10.61x |
| Myriad Genetics Inc. | 8.13x | 10.25x | 8.95x | 9.45x |
| Quest Diagnostics Inc. | 8.24x | 8.24x | 7.93x | 7.70x |
| Minimum: | 8.13x | 7.84x | 7.24x | 7.70x |
| Lower (First) Quartile: | 8.32x | 8.52x | 8.18x | 8.76x |
| Median: | 8.97x | 9.81x | 9.09x | 9.16x |
| Average: | 9.93x | 10.11x | 9.16x | 9.14x |
| Upper (Third) Quartile: | 10.95x | 11.17x | 9.68x | 9.45x |
| Maximum: | 13.80x | 13.49x | 11.79x | 10.61x |
| (3) Coefficient of Variation: | 2.2 | 2.2 | 1.4 | 0.9 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(x) represents that an outlier was excluded from one of the summarizing statistics.

*N/A represents not available or not applicable; NMF represents not meaningful.

(1) See Exhibit 3, Page 4 and Appendix D, Page 2 for the BEV and EBITDA data, respectively.

(2) Coefficient of variation measures the variability of the multiples data.  It is calculated by dividing the standard deviation by the mean.  A lower coefficient of variation indicates lower variability relative to the size of the mean and suggests a more statistically relevant data set.

VP_ML_00015736

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                **Exhibit 3, Page 4**

Guideline Public Company Method - Business Enterprise Value

(USD millions) excluding trading and price data                                    Valuation as of April 16, 2014

| Guideline Company | Ticker | Shares Outstanding (mil) | Closing Price Apr-16-2014 | Daily Trade Volume | 52-Week Low | 52-Week High |
|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | 82.51 | $35.56 | 716,350 | $24.00 | $39.90 |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | 27.72 | $27.39 | 269,720 | $23.50 | $37.97 |
| Cepheid | NasdaqGS:CPHD | 69.60 | $47.59 | 774,940 | $30.95 | $55.89 |
| Genomic Health Inc. | NasdaqGS:GHDX | 31.18 | $26.83 | 268,000 | $25.50 | $38.99 |
| Laboratory Corp. of America Holdings | NYSE:LH | 85.02 | $101.95 | 788,800 | $87.01 | $108.00 |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | 41.55 | $21.48 | 203,630 | $19.15 | $27.72 |
| Myriad Genetics Inc. | NasdaqGS:MYGN | 72.97 | $38.33 | 1,751,580 | $20.02 | $42.50 |
| Quest Diagnostics Inc. | NYSE:DGX | 144.26 | $59.98 | 2,225,720 | $50.46 | $64.10 |

| Guideline Company | Last Fiscal Year End (LFY) | Latest Filing Period Date (1) | Market Capitalization | Net Debt (2) | Preferred Stock | Minority Interest | Business Enterprise Value |
|---|---|---|---|---|---|---|---|
| Alere Inc. | 12/31/2013 | 12/31/2013 | $2,933.9 | $3,480.4 | $606.5 | $4.9 | $7,025.6 |
| Bio-Reference Laboratories Inc. | 10/31/2013 | 1/31/2014 | $759.2 | $38.1 | N/A | N/A | $797.3 |
| Cepheid | 12/31/2013 | 12/31/2013 | $3,312.2 | ($73.2) | N/A | N/A | $3,239.0 |
| Genomic Health Inc. | 12/31/2013 | 12/31/2013 | $836.7 | ($105.4) | N/A | N/A | $731.3 |
| Laboratory Corp. of America Holdings | 12/31/2013 | 12/31/2013 | $8,667.6 | $2,596.4 | N/A | $19.4 | $11,283.4 |
| Meridian Bioscience, Inc. | 9/30/2013 | 12/31/2013 | $892.5 | ($43.7) | N/A | N/A | $848.8 |
| Myriad Genetics Inc. | 6/30/2013 | 12/31/2013 | $2,797.1 | ($353.6) | N/A | N/A | $2,443.5 |
| Quest Diagnostics Inc. | 12/31/2013 | 12/31/2013 | $8,652.9 | $3,179.0 | N/A | $25.0 | $11,856.9 |

|  |  |
|---|---|
| Minimum: | $731.3 |
| Lower (First) Quartile: | $835.9 |
| Median: | $2,841.2 |
| Upper (Third) Quartile: | $8,090.1 |
| Maximum: | $11,856.9 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(1) Guideline company data is taken from the most recent quarterly or annual report filed nearest the Valuation Date.

(2) Net debt is equal to total debt minus total cash and short-term investments.

**Millennium Lab Holdings, Inc. and Subsidiaries**
Guideline Public Company Method - Comparative Analysis of Revenue and Profitability
(USD millions)

**Exhibit 3, Page 5**

Valuation as of April 16, 2014

### LTM Revenue

| Rank | Company | Revenue ($ mil) |
|---|---|---|
| 1 | Quest Diagnostics Inc. | $7,146.0 |
| 2 | Laboratory Corp. of America Holdings | $5,808.3 |
| 3 | Alere Inc. | $3,029.4 |
| 4 | Myriad Genetics Inc. | $737.1 |
| 5 | Bio-Reference Laboratories Inc. | $735.4 |
| 6 | Millennium Lab Holdings, Inc. and Su | $645.4 |
| 7 | Cepheid | $401.3 |
| 8 | Genomic Health Inc. | $261.6 |
| 9 | Meridian Bioscience, Inc. | $188.1 |

| Median (excl. Millennium Lab Holdings, Inc. an | $736.2 |
|---|---|

### LTM EBITDA

| Rank | Company | EBITDA ($ mil) |
|---|---|---|
| 1 | Quest Diagnostics Inc. | $1,439.0 |
| 2 | Laboratory Corp. of America Holdings | $1,203.5 |
| 3 | Alere Inc. | $612.3 |
| 4 | Millennium Lab Holdings, Inc. and Su | $380.9 |
| 5 | Myriad Genetics Inc. | $300.5 |
| 6 | Bio-Reference Laboratories Inc. | $93.1 |
| 7 | Meridian Bioscience, Inc. | $61.5 |
| 8 | Cepheid | $8.5 |
| 9 | Genomic Health Inc. | ($5.5) |

| Median (excl. Millennium Lab Holdings, Inc. an | $196.8 |
|---|---|

### LTM EBIT

| Rank | Company | EBIT ($ mil) |
|---|---|---|
| 1 | Quest Diagnostics Inc. | $1,156.0 |
| 2 | Laboratory Corp. of America Holdings | $1,012.7 |
| 3 | Millennium Lab Holdings, Inc. and Su | $361.2 |
| 4 | Myriad Genetics Inc. | $291.2 |
| 5 | Alere Inc. | $172.8 |
| 6 | Bio-Reference Laboratories Inc. | $72.1 |
| 7 | Meridian Bioscience, Inc. | $55.8 |
| 8 | Genomic Health Inc. | ($11.8) |
| 9 | Cepheid | ($14.7) |

| Median (excl. Millennium Lab Holdings, Inc. an | $122.5 |
|---|---|

### LTM Net Income

| Rank | Company | Net Income ($ mil) |
|---|---|---|
| 1 | Quest Diagnostics Inc. | $849.0 |
| 2 | Laboratory Corp. of America Holdings | $573.8 |
| 3 | Millennium Lab Holdings, Inc. and Su | $254.2 |
| 4 | Myriad Genetics Inc. | $187.8 |
| 5 | Bio-Reference Laboratories Inc. | $40.1 |
| 6 | Meridian Bioscience, Inc. | $37.0 |
| 7 | Genomic Health Inc. | ($12.8) |
| 8 | Cepheid | ($18.0) |
| 9 | Alere Inc. | ($71.3) |

| Median (excl. Millennium Lab Holdings, Inc. an | $38.5 |
|---|---|

### LTM Gross Margin

| Rank | Company | Gross Margin |
|---|---|---|
| 1 | Millennium Lab Holdings, Inc. and Su | 88.1% |
| 2 | Myriad Genetics Inc. | 87.2% |
| 3 | Genomic Health Inc. | 79.1% |
| 4 | Meridian Bioscience, Inc. | 63.9% |
| 5 | Alere Inc. | 49.9% |
| 6 | Cepheid | 48.5% |
| 7 | Bio-Reference Laboratories Inc. | 46.3% |
| 8 | Quest Diagnostics Inc. | 40.1% |
| 9 | Laboratory Corp. of America Holdings | 38.3% |

| Median (excl. Millennium Lab Holdings, Inc. an | 49.2% |
|---|---|

### LTM EBITDA Margin

| Rank | Company | EBITDA Margin |
|---|---|---|
| 1 | Millennium Lab Holdings, Inc. and Su | 59.0% |
| 2 | Myriad Genetics Inc. | 40.8% |
| 3 | Meridian Bioscience, Inc. | 32.7% |
| 4 | Laboratory Corp. of America Holdings | 20.7% |
| 5 | Alere Inc. | 20.2% |
| 6 | Quest Diagnostics Inc. | 20.1% |
| 7 | Bio-Reference Laboratories Inc. | 12.7% |
| 8 | Cepheid | 2.1% |
| 9 | Genomic Health Inc. | -2.1% |

| Median (excl. Millennium Lab Holdings, Inc. an | 20.2% |
|---|---|

### LTM EBIT Margin

| Rank | Company | EBIT Margin |
|---|---|---|
| 1 | Millennium Lab Holdings, Inc. and Su | 56.0% |
| 2 | Myriad Genetics Inc. | 39.5% |
| 3 | Meridian Bioscience, Inc. | 29.7% |
| 4 | Laboratory Corp. of America Holdings | 17.4% |
| 5 | Quest Diagnostics Inc. | 16.2% |
| 6 | Bio-Reference Laboratories Inc. | 9.8% |
| 7 | Alere Inc. | 5.7% |
| 8 | Cepheid | -3.7% |
| 9 | Genomic Health Inc. | -4.5% |

| Median (excl. Millennium Lab Holdings, Inc. an | 13.0% |
|---|---|

### LTM Net Income Margin

| Rank | Company | Net Income Margin |
|---|---|---|
| 1 | Millennium Lab Holdings, Inc. and Su | 39.4% |
| 2 | Myriad Genetics Inc. | 25.5% |
| 3 | Meridian Bioscience, Inc. | 19.7% |
| 4 | Quest Diagnostics Inc. | 11.9% |
| 5 | Laboratory Corp. of America Holdings | 9.9% |
| 6 | Bio-Reference Laboratories Inc. | 5.5% |
| 7 | Alere Inc. | -2.4% |
| 8 | Cepheid | -4.5% |
| 9 | Genomic Health Inc. | -4.9% |

| Median (excl. Millennium Lab Holdings, Inc. an | 7.7% |
|---|---|

Confidential

VP_ML_00015738

**Millennium Lab Holdings, Inc. and Subsidiaries**
Guideline Public Company Method - Comparative Analysis of Historical Cash Flow and Working Capital and Historical and Forecast Growth
(Values as presented)

**Exhibit 3, Page 6**

Valuation as of April 16, 2014

### 3-Year Historical Average Cap Ex-to-Revenue

| Rank | Company | Cap Ex / Revenue |
|---|---|---|
| 1 | Cepheid | 8.5% |
| 2 | Alere Inc. | 4.8% |
| 3 | Genomic Health Inc. | 3.8% |
| 4 | Meridian Bioscience, Inc. | 3.2% |
| 5 | **Millennium Lab Holdings, Inc. and Sub** | 3.1% |
| 6 | Laboratory Corp. of America Holdings | 3.1% |
| 7 | Bio-Reference Laboratories Inc. | 2.9% |
| 8 | Quest Diagnostics Inc. | 2.6% |
| 9 | Myriad Genetics Inc. | 1.6% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 3.1% |

### 3-Year Historical Average Depreciation-to-Revenue

| Rank | Company | Depreciation / Revenue |
|---|---|---|
| 1 | Alere Inc. | 15.7% |
| 2 | Cepheid | 5.8% |
| 3 | Quest Diagnostics Inc. | 3.8% |
| 4 | Laboratory Corp. of America Holdings | 3.4% |
| 5 | Meridian Bioscience, Inc. | 3.3% |
| 6 | Bio-Reference Laboratories Inc. | 2.8% |
| 7 | Genomic Health Inc. | 2.8% |
| 8 | **Millennium Lab Holdings, Inc. and Sub** | 2.4% |
| 9 | Myriad Genetics Inc. | 1.7% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 3.3% |

### 3-Year Historical Average Working Cap-to-Revenue

| Rank | Company | WC / Revenue |
|---|---|---|
| 1 | Myriad Genetics Inc. | 72.6% |
| 2 | Genomic Health Inc. | 46.2% |
| 3 | Meridian Bioscience, Inc. | 45.5% |
| 4 | Cepheid | 44.9% |
| 5 | Alere Inc. | 27.1% |
| 6 | **Millennium Lab Holdings, Inc. and Sub** | 24.5% |
| 7 | Bio-Reference Laboratories Inc. | 23.7% |
| 8 | Laboratory Corp. of America Holdings | 8.1% |
| 9 | Quest Diagnostics Inc. | 2.8% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 36.0% |

### 3-Year Historical Average DFNWC-to-Revenue

| Rank | Company | DFNWC / Revenue |
|---|---|---|
| 1 | Meridian Bioscience, Inc. | 26.1% |
| 2 | Bio-Reference Laboratories Inc. | 23.2% |
| 3 | Alere Inc. | 17.5% |
| 4 | Cepheid | 15.3% |
| 5 | **Millennium Lab Holdings, Inc. and Sub** | 11.3% |
| 6 | Myriad Genetics Inc. | 8.3% |
| 7 | Laboratory Corp. of America Holdings | 6.4% |
| 8 | Quest Diagnostics Inc. | 3.8% |
| 9 | Genomic Health Inc. | 2.5% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 11.8% |

### 1-Year Trailing Revenue Growth

| Rank | Company | Revenue Growth |
|---|---|---|
| 1 | Myriad Genetics Inc. | 35.2% |
| 2 | Cepheid | 21.2% |
| 3 | **Millennium Lab Holdings, Inc. and Sub** | 21.2% |
| 4 | Bio-Reference Laboratories Inc. | 15.5% |
| 5 | Genomic Health Inc. | 11.2% |
| 6 | Alere Inc. | 7.5% |
| 7 | Meridian Bioscience, Inc. | 5.7% |
| 8 | Laboratory Corp. of America Holdings | 2.4% |
| 9 | Quest Diagnostics Inc. | -3.2% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 9.4% |

### 3-Year Trailing Revenue Growth

| Rank | Company | Revenue Growth |
|---|---|---|
| 1 | **Millennium Lab Holdings, Inc. and Sub** | 57.9% |
| 2 | Myriad Genetics Inc. | 25.0% |
| 3 | Cepheid | 23.6% |
| 4 | Bio-Reference Laboratories Inc. | 15.2% |
| 5 | Genomic Health Inc. | 13.7% |
| 6 | Alere Inc. | 12.0% |
| 7 | Meridian Bioscience, Inc. | 10.9% |
| 8 | Laboratory Corp. of America Holdings | 5.1% |
| 9 | Quest Diagnostics Inc. | -0.5% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 12.8% |

### 1-Year Trailing EBITDA Growth

| Rank | Company | EBITDA Growth |
|---|---|---|
| 1 | Myriad Genetics Inc. | 45.4% |
| 2 | **Millennium Lab Holdings, Inc. and Sub** | 12.0% |
| 3 | Meridian Bioscience, Inc. | 4.6% |
| 4 | Alere Inc. | 3.1% |
| 5 | Bio-Reference Laboratories Inc. | -2.9% |
| 6 | Laboratory Corp. of America Holdings | -4.0% |
| 7 | Quest Diagnostics Inc. | -9.8% |
| 8 | Cepheid | -37.7% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | -2.9% |

### 3-Year Trailing EBITDA Growth

| Rank | Company | EBITDA Growth |
|---|---|---|
| 1 | **Millennium Lab Holdings, Inc. and Sub** | 182.8% |
| 2 | Myriad Genetics Inc. | 25.5% |
| 3 | Bio-Reference Laboratories Inc. | 14.3% |
| 4 | Meridian Bioscience, Inc. | 12.7% |
| 5 | Alere Inc. | 10.5% |
| 6 | Laboratory Corp. of America Holdings | 0.4% |
| 7 | Quest Diagnostics Inc. | -2.4% |
| 8 | Cepheid | -8.2% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 10.5% |

### 1-Year Forward Revenue Growth

| Rank | Company | Revenue Growth |
|---|---|---|
| 1 | Cepheid | 32.7% |
| 2 | Genomic Health Inc. | 23.4% |
| 3 | **Millennium Lab Holdings, Inc. and Sub** | 15.9% |
| 4 | Bio-Reference Laboratories Inc. | 10.7% |
| 5 | Meridian Bioscience, Inc. | 9.1% |
| 6 | Alere Inc. | 7.3% |
| 7 | Myriad Genetics Inc. | 4.8% |
| 8 | Laboratory Corp. of America Holdings | 4.4% |
| 9 | Quest Diagnostics Inc. | 4.1% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 8.2% |

### 2-Year Forward Revenue Growth

| Rank | Company | Revenue Growth |
|---|---|---|
| 1 | Cepheid | 25.0% |
| 2 | Genomic Health Inc. | 24.6% |
| 3 | **Millennium Lab Holdings, Inc. and Sub** | 11.7% |
| 4 | Meridian Bioscience, Inc. | 8.1% |
| 5 | Alere Inc. | 5.5% |
| 6 | Myriad Genetics Inc. | 4.7% |
| 7 | Laboratory Corp. of America Holdings | 3.2% |
| 8 | Quest Diagnostics Inc. | 2.9% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 5.5% |

### 1-Year Forward EBITDA Growth

| Rank | Company | EBITDA Growth |
|---|---|---|
| 1 | Cepheid | 403.3% |
| 2 | Bio-Reference Laboratories Inc. | 18.3% |
| 3 | Meridian Bioscience, Inc. | 17.1% |
| 4 | Alere Inc. | 16.8% |
| 5 | **Millennium Lab Holdings, Inc. and Sub** | 10.5% |
| 6 | Quest Diagnostics Inc. | 4.0% |
| 7 | Laboratory Corp. of America Holdings | 1.6% |
| 8 | Myriad Genetics Inc. | -9.2% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 16.8% |

### 2-Year Forward EBITDA Growth

| Rank | Company | EBITDA Growth |
|---|---|---|
| 1 | Cepheid | 205.1% |
| 2 | Meridian Bioscience, Inc. | 14.0% |
| 3 | Alere Inc. | 11.9% |
| 4 | **Millennium Lab Holdings, Inc. and Sub** | 7.4% |
| 5 | Quest Diagnostics Inc. | 3.5% |
| 6 | Laboratory Corp. of America Holdings | 3.4% |
| 7 | Myriad Genetics Inc. | -7.2% |

| | | |
|---|---|---|
| Median (excl. Millennium Lab Holdings, Inc. an | | 7.7% |

Confidential

## Market Approach - Guideline Transaction Method



VP_ML_00015740

**Millennium Lab Holdings, Inc. and Subsidiaries**                                          **Exhibit 4, Page 1**
Guideline Transaction Method - Summary
(USD thousands)                                                                Valuation as of April 16, 2014

| | Financial Metric | (1) | Selected Multiple | | Indicated BEV Range | | |
|---|---|---|---|---|---|---|---|
| | | | Low | High | Low | | High |
| **Last Twelve Months ("LTM")** | | | | | | | |
| (2) Revenue | $645,351 | | 3.75 x | -- 4.00 x | $2,420,067 | -- | $2,581,405 |
| (3) Estimated weighted BEV range | | | | | $2,420,000 | -- | $2,581,000 |
| *Adjustment for acquisition of RxAnte, Inc.* | | | | | *$70,419* | -- | *$70,419* |
| **Estimated BEV range (rounded)** | | | | | **$2,490,000** | **to** | **$2,651,000** |

Notes:

(1) See Exhibit 4, Page 2.

(2) See Appendix B, Page 1.

(3) We did not add back the value of RxAnte to the value indicated by this method as there was insufficient information on the transactions.

                                                                                VP_ML_00015741

**Millennium Lab Holdings, Inc. and Subsidiaries**
Guideline Transaction Method - Transaction Data
(USD millions)

**Exhibit 4, Page 2**

Valuation as of April 16, 2014

| Announced Date | Effective Date | SIC Code | Buyer Company | Target Company | Revenue | EBITDA | EBITDA Margin | BEV | BEV / Revenue | BEV / EBITDA |
|---|---|---|---|---|---|---|---|---|---|---|
| Mar-12-2014 | Mar-12-2014 | N/A | EKF Diagnostics Holdings plc | Separation Technology Inc. | $4.0 | $0.5 | 12.5% | $4.0 | 1.00x | 8.00x |
| Jan-1-2014 | Jan-1-2014 | N/A | Apredica, LLC (nka:Cyprotex US, LLC) | CeeTox, Inc. | $3.8 | N/A | N/A | $6.1 | 1.62x | N/A |
| Oct-22-2013 | Oct-22-2013 | 8011 | Miraca Life Sciences, Inc. | PLUS Diagnostics, Inc. | $75.4 | N/A | N/A | $83.1 | 1.10x | N/A |
| Aug-26-2013 | Aug-26-2013 | N/A | Vansen Pharma Inc. | Merus Labs International Inc., Factive Product | $1.1 | N/A | N/A | $3.4 | 3.06x | N/A |
| Jul-26-2013 | Jul-26-2013 | 3231 | Trinity Biotech plc | Immco Diagnostics, Inc. | $12.5 | N/A | N/A | $32.8 | 2.62x | N/A |
| Sep-15-2012 | Mar-14-2013 | 8731 | BGI | Complete Genomics, Inc. | $19.2 | ($64.8) | -336.8% | $90.2 | 4.68x | -1.39x |
| Jan-5-2013 | Jan-31-2013 | 3841 | Natus Medical Inc. | Grass Technologies Corporation | $18.5 | N/A | N/A | $18.6 | 1.01x | N/A |
| Apr-29-2012 | Aug-1-2012 | 2835 | Hologic Inc. | Gen-Probe Incorporated | $586.6 | $183.5 | 31.3% | $3,890.9 | 6.63x | 21.20x |
| Jun-3-2012 | Jul-31-2012 | 8071 | Laboratory Corp. of America Holdings | MEDTOX Scientific Inc. | $111.6 | $14.5 | 13.0% | $241.2 | 2.16x | 16.61x |
| Apr-5-2011 | Dec-15-2011 | 8071 | Laboratory Corp. of America Holdings | Orchid Cellmark Inc. | $66.2 | $1.5 | 2.3% | $66.7 | 1.01x | 43.98x |
| May-23-2011 | Aug-31-2011 | N/A | N/A | Pacific Biomarkers, Inc. (lab and biomarker services) | $9.7 | N/A | N/A | $2.3 | 0.24x | N/A |
| Jul-2-2011 | Aug-18-2011 | 2835 | TPG Capital, L.P.; TPG Partners VI, L.P. | Immucor, Inc. | $333.1 | $148.1 | 44.5% | $1,642.5 | 4.93x | 11.09x |
| Jul-25-2011 | Jul-25-2011 | N/A | Brooks Automation, Inc. | NEXUS Biosystems, Inc | $32.2 | $5.2 | 16.2% | $85.0 | 2.64x | 16.32x |
| Feb-6-2011 | Jun-29-2011 | 3826 | Danaher Corp. | Beckman Coulter, Inc. | $3,663.4 | $796.6 | 21.7% | $6,852.8 | 1.87x | 8.60x |
| Dec-12-2010 | May-13-2011 | 3823 | Thermo Fisher Scientific, Inc. | Dionex Corp. | $431.8 | $103.3 | 23.9% | $2,129.2 | 4.93x | 20.61x |
| Mar-17-2011 | May-10-2011 | N/A | Quest Diagnostics Inc. | Celera Corporation | $128.2 | ($21.1) | -16.4% | $330.4 | 2.58x | -15.69x |
| Feb-24-2011 | Apr-4-2011 | 8071 | Quest Diagnostics Inc. | Athena Diagnostics, Inc. | $110.0 | N/A | N/A | $740.0 | 6.73x | N/A |
| Jan-24-2011 | Mar-4-2011 | 8071 | Novartis Finance Corporation | Genoptix, Inc. | $196.9 | $47.0 | 23.9% | $310.9 | 1.58x | 6.61x |
| Feb-11-2011 | Feb-11-2011 | N/A | Crosstex International, Inc. | ConFirm Monitoring Systems, Inc. | $4.0 | N/A | N/A | $8.5 | 2.13x | N/A |
| Feb-7-2011 | Feb-7-2011 | 8071 | Physician's Automated Laboratory, Inc. | Central Coast Pathology Consultants, Inc. | $20.0 | N/A | N/A | $28.0 | 1.40x | N/A |
| Nov-18-2010 | Feb-1-2011 | 3841 | Sekisui Medical CO., Ltd. | Genzyme Diagnostics, Inc. | $167.0 | N/A | N/A | $265.0 | 1.59x | N/A |
| Jan-14-2011 | Jan-14-2011 | N/A | Seattle Reproductive Medicine, Inc. | Northwest Center for Reproductive Sciences LLC | $5.0 | N/A | N/A | $2.4 | 0.48x | N/A |
| Oct-22-2010 | Dec-21-2010 | 8734 | GE Healthcare Ltd. | Clarient, Inc. | $110.1 | $6.6 | 6.0% | $585.1 | 5.32x | 88.88x |
| Nov-8-2010 | Dec-2-2010 | 8734 | Sonic Healthcare Limited | CBLPath, Inc. | $80.0 | N/A | N/A | $123.5 | 1.54x | N/A |
| Sep-13-2010 | Nov-30-2010 | 8731 | Laboratory Corp. of America Holdings | Esoterix Genetic Laboratories, LLC | $371.0 | N/A | N/A | $925.2 | 2.49x | N/A |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Millennium Lab Holdings, Inc. and Subsidiaries | $645.4 | $380.9 | 59.0% | | | |

| | Revenue | EBITDA | EBITDA Margin | BEV | BEV / Revenue | BEV / EBITDA |
|---|---|---|---|---|---|---|
| Minimum: | $1.1 | ($64.8) | -336.8% | $2.3 | 0.24x | -15.69x |
| Lower (First) Quartile: | $12.5 | $1.3 | 5.1% | $18.6 | 1.40x | 7.65x |
| Median: | $75.4 | $10.6 | 14.6% | $90.2 | 2.13x | 13.70x |
| Upper (Third) Quartile: | $167.0 | $114.5 | 23.9% | $585.1 | 3.06x | 20.76x |
| Maximum: | $3,663.4 | $796.6 | 44.5% | $6,852.8 | 6.73x | 88.88x |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

(x) represents that an outlier was excluded from one of the summarizing statistics.

*N/A represents not available or not applicable.

** --- represents transactions occurring in the past twelve months

Confidential

VP_ML_00015742

**Millennium Lab Holdings, Inc. and Subsidiaries**

**Exhibit 4, Page 3**

Guideline Transaction Method - Target Company Business Descriptions

Valuation as of April 16, 2014

| Target Company | Business Description |
|---|---|
| Separation Technology Inc. | Separation Technology Inc. provides centrifugation solutions to the laboratory marketplace. |
| CeeTox, Inc. | As of January 1, 2014, CeeTox, Inc. was acquired by Apredica, Inc.. |
| PLUS Diagnostics, Inc. | PLUS Diagnostics, Inc. is a cytology, histology, and molecular pathology laboratory. |
| Merus Labs International Inc., Factive Product | As of August 26, 2013, Factive Product of Merus Labs International Inc. was acquired by Okana Ventures Inc. Merus Labs International Inc., North American Rights of Factive Drug comprises North American product rights for Factive (Gemifloxacin Mesylate) tablets including trademark and patent, inventory on hand, various contingent liabilities, and certain related intellectual property and other information and materials required to market the brand in the North American market. |
| Immco Diagnostics, Inc. | Immco Diagnostics, Inc. develops, manufactures, and distributes diagnostic kits and laboratory supplies for hospitals, clinical laboratories, and research institutions for rapid diagnostic tests, drugs of abuse, fertility, infectious diseases, autoimmunity, serology, microbiology, interlab electrophoresis, laboratory instrumentation, infectious diseases, UPT urine transport vials, chromsystems HPLC and LC-MS/MS, and urinalysis. |
| Complete Genomics, Inc. | Complete Genomics, Inc., a life sciences company, develops and commercializes a DNA sequencing platform for human genome sequencing and analysis. |
| Grass Technologies Corporation | Grass Technologies Corporation manufactures neurophysiological monitoring instruments for research and clinical applications, such as sleep monitoring and analysis, long-term monitoring, electroencephalograph (EEG) monitoring, and neurophysiological research studies. |
| Gen-Probe Incorporated | Gen-Probe Incorporated engages in the development, manufacture, and marketing of molecular diagnostic products and services that are used primarily to diagnose human diseases and screen donated human blood. |
| MEDTOX Scientific Inc. | MEDTOX Scientific, Inc., through its subsidiaries, provides forensic and clinical laboratory services, and diagnostic devices and other similar products. |
| Orchid Cellmark Inc. | Orchid Cellmark Inc. provides identity DNA testing services to law enforcement agencies, government crime laboratories, and private clients. |
| Pacific Biomarkers, Inc. (lab and biomarker services) | Pacific Biomarkers, Inc, specialty reference laboratory services and clinical biomarker services offer specialty reference laboratory and clinical biomarker services. |
| Immucor, Inc. | Immucor, Inc. develops, manufactures, and sells transfusion and transplantation diagnostics products worldwide. |
| NEXUS Biosystems, Inc | NEXUS Biosystems, Inc. provides automated sample management systems and technologies for pharmaceutical, biotech, biorepository, agrochemical, forensic, and related research institutions worldwide. |
| Beckman Coulter, Inc. | Beckman Coulter, Inc. develops, manufactures, and markets diagnostic systems that automate complex biomedical testing. |
| Dionex Corp. | Dionex Corporation designs, manufactures, markets, and services analytical instrumentation and related accessories, and chemicals. |
| Celera Corporation | Celera Corporation develops and manufactures molecular diagnostic products for hospitals and clinical laboratories to detect, characterize, monitor, and select treatments for diseases. |
| Athena Diagnostics, Inc. | Athena Diagnostics, Inc. offers diagnostic testing for neurological diseases, and tests for Alzheimer's disease, endocrine, renal conditions, muscular dystrophy, and other neuromuscular and developmental disorders. |
| Genoptix, Inc. | Genoptix, Inc. develops and commercializes evidence-driven diagnostic tests to improve physicians' ability to optimize patient outcomes. |
| ConFirm Monitoring Systems, Inc. | ConFirm Monitoring Systems, Inc. provides laboratory services and infection control products for healthcare professionals in North America. |
| Central Coast Pathology Consultants, Inc. | Central Coast Pathology Consultants, Inc. provides clinical and anatomic pathology laboratory services. |
| Genzyme Diagnostics, Inc. | Sekisui Diagnostics, LLC. manufactures and supplies intermediates for diagnostic manufacturers and clinical laboratories worldwide. |
| Northwest Center for Reproductive Sciences LLC | As of January 14, 2011, Northwest Center for Reproductive Sciences LLC was acquired by Seattle Reproductive Medicine, Inc. Northwest Center for Reproductive Sciences LLC is an infertility clinic in Washington. |
| Clarient, Inc. | Clarient, Inc. provides oncology testing and diagnostic services in the United States. |
| CBLPath, Inc. | CBLPath, Inc., a specialty lab, provides sub-specialized anatomic pathology and molecular diagnostic laboratory services. |
| Esoterix Genetic Laboratories, LLC | Esoterix Genetic Laboratories, LLC provides pathology, oncology, reproductive, and genetic medicine testing services for physicians and their patients in the United States. |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

Confidential

VP_ML_00015743

**Appendices**



Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                                              **Appendix A, Page 1**

Balance Sheets

(USD thousands)                                                                              Valuation as of April 16, 2014

**Balance Sheets**

|  | Dec-31-2008 | Dec-31-2009 | Dec-31-2010 | Dec-31-2011 | Dec-31-2012 | Dec-31-2013 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents | $3,064 | $13,175 | $14,872 | $30,088 | $143,796 | $196,328 |
| Accounts receivable | $5,883 | $18,230 | $38,615 | $44,087 | $65,051 | $81,188 |
| Prepaid expenses and other | $5 | $382 | $3,310 | $9,273 | $31,716 | $14,957 |
| Total current assets | $8,952 | $31,786 | $56,796 | $83,448 | $240,563 | $292,473 |
| Property and equipment | | | | | | |
| Property and equipment | $2,553 | $9,873 | $36,156 | $53,790 | $90,516 | $139,803 |
| Accumulated depreciation and amortization | ($247) | ($1,000) | ($2,860) | ($8,327) | ($17,625) | ($33,899) |
| Net property and equipment | $2,306 | $8,873 | $33,296 | $45,463 | $72,891 | $105,904 |
| Other assets | | | | | | |
| Other assets | $244 | $349 | $3,231 | $4,475 | $13,362 | $14,768 |
| Intangible assets | $0 | $0 | $0 | $0 | $0 | $22,530 |
| Goodwill | $0 | $0 | $0 | $0 | $0 | $30,941 |
| Total other assets | $244 | $349 | $3,231 | $4,475 | $13,362 | $68,239 |
| Total assets | $11,501 | $41,009 | $93,323 | $133,386 | $326,816 | $466,616 |
| **Liabilities and stockholders' equity** | | | | | | |
| Liabilities | | | | | | |
| Current liabilities | | | | | | |
| Current portion of long-term debt | $0 | $932 | $711 | $790 | $26,868 | $48,984 |
| Current portion of capital lease obligations | $0 | $292 | $685 | $3,659 | $11,032 | $14,570 |
| Accounts payable | $699 | $1,896 | $2,000 | $2,467 | $4,082 | $3,388 |
| Accrued expenses and other current liabilities | $584 | $2,194 | $6,475 | $15,043 | $24,925 | $44,026 |
| Dividends payable | $1,000 | $283 | $12,995 | $14,558 | $0 | $0 |
| Deferred tax liabilities | $0 | $0 | $810 | $918 | $635 | $699 |
| Due to shareholders | $2,002 | $302 | $0 | $0 | $0 | $0 |
| Due to related party | $0 | $0 | $0 | $0 | $0 | $0 |
| Total current liabilities | $4,285 | $5,899 | $23,682 | $37,435 | $67,542 | $111,667 |
| Long-term liabilities | | | | | | |
| Long-term debt, net of current portion | $1,900 | $3,919 | $200,725 | $201,779 | $469,962 | $473,519 |
| Capital lease obligations, net of current portion | $0 | $774 | $3,193 | $8,055 | $17,430 | $30,452 |
| Stock purchase warrants liability | $0 | $0 | $14,943 | $96,270 | $493,194 | $527,889 |
| Contingent consideration | $0 | $0 | $0 | $0 | $0 | $3,367 |
| Other liabilities | $149 | $382 | $0 | $0 | $3,652 | $1,565 |
| Total long-term liabilities | $2,049 | $5,075 | $218,861 | $306,104 | $984,238 | $1,036,792 |
| Total liabilities | $6,334 | $10,974 | $242,542 | $343,539 | $1,051,780 | $1,148,459 |
| Stockholders' equity | | | | | | |
| Common stock | $119 | $503 | $19,075 | $19,287 | $19,660 | $22,708 |
| Retained earnings (deficit) | $5,048 | $29,532 | ($15,646) | ($76,792) | ($591,976) | ($551,903) |
| Treasury stock | $0 | $0 | ($152,648) | ($152,648) | ($152,648) | ($152,648) |
| Stockholders' equity (deficit) | $5,167 | $30,035 | ($149,219) | ($210,153) | ($724,964) | ($681,843) |
| Total liabilities and stockholders' equity | $11,501 | $41,009 | $93,323 | $133,386 | $326,816 | $466,616 |

Notes:

*Source: Management-provided balance sheets as of December 31, 2008 through 2013.*

Confidential                                                                                          VP_ML_00015745

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Appendix A, Page 2**

Balance Sheets - Common Size

(Values as presented)                                                                Valuation as of April 16, 2014

**Common Size Balance Sheets**

|  | Dec-31-2008 | Dec-31-2009 | Dec-31-2010 | Dec-31-2011 | Dec-31-2012 | Dec-31-2013 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Current assets | | | | | | |
| Cash and cash equivalents | 26.6% | 32.1% | 15.9% | 22.6% | 44.0% | 42.1% |
| Accounts receivable | 51.2% | 44.5% | 41.4% | 33.1% | 19.9% | 17.4% |
| Prepaid expenses and other | 0.0% | 0.9% | 3.5% | 7.0% | 9.7% | 3.2% |
| Total current assets | 77.8% | 77.5% | 60.9% | 62.6% | 73.6% | 62.7% |
| Property and equipment | | | | | | |
| Property and equipment | 22.2% | 24.1% | 38.7% | 40.3% | 27.7% | 30.0% |
| Accumulated depreciation and amortization | -2.1% | -2.4% | -3.1% | -6.2% | -5.4% | -7.3% |
| Net property and equipment | 20.0% | 21.6% | 35.7% | 34.1% | 22.3% | 22.7% |
| Other assets | | | | | | |
| Other assets | 2.1% | 0.9% | 3.5% | 3.4% | 4.1% | 3.2% |
| Intangible assets | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 4.8% |
| Goodwill | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 6.6% |
| Total other assets | 2.1% | 0.9% | 3.5% | 3.4% | 4.1% | 14.6% |
| **Total assets** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Liabilities and stockholders' equity** | | | | | | |
| Liabilities | | | | | | |
| Current liabilities | | | | | | |
| Current portion of long-term debt | 0.0% | 2.3% | 0.8% | 0.6% | 8.2% | 10.5% |
| Current portion of capital lease obligations | 0.0% | 0.7% | 0.7% | 2.7% | 3.4% | 3.1% |
| Accounts payable | 6.1% | 4.6% | 2.1% | 1.8% | 1.2% | 0.7% |
| Accrued expenses and other current liabilities | 5.1% | 5.4% | 6.9% | 11.3% | 7.6% | 9.4% |
| Dividends payable | 8.7% | 0.7% | 13.9% | 10.9% | 0.0% | 0.0% |
| Deferred tax liabilities | 0.0% | 0.0% | 0.9% | 0.7% | 0.2% | 0.1% |
| Due to shareholders | 17.4% | 0.7% | 0.0% | 0.0% | 0.0% | 0.0% |
| Due to related party | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Total current liabilities | 37.3% | 14.4% | 25.4% | 28.1% | 20.7% | 23.9% |
| Long-term liabilities | | | | | | |
| Long-term debt, net of current portion | 16.5% | 9.6% | 215.1% | 151.3% | 143.8% | 101.5% |
| Capital lease obligations, net of current portion | 0.0% | 1.9% | 3.4% | 6.0% | 5.3% | 6.5% |
| Stock purchase warrants liability | 0.0% | 0.0% | 16.0% | 72.2% | 150.9% | 113.1% |
| Contingent consideration | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.7% |
| Other liabilities | 1.3% | 0.9% | 0.0% | 0.0% | 1.1% | 0.3% |
| Total long-term liabilities | 17.8% | 12.4% | 234.5% | 229.5% | 301.2% | 222.2% |
| Total liabilities | 55.1% | 26.8% | 259.9% | 257.6% | 321.8% | 246.1% |
| Stockholders' equity | | | | | | |
| Common stock | 1.0% | 1.2% | 20.4% | 14.5% | 6.0% | 4.9% |
| Retained earnings (deficit) | 43.9% | 72.0% | -16.8% | -57.6% | -181.1% | -118.3% |
| Treasury stock | 0.0% | 0.0% | -163.6% | -114.4% | -46.7% | -32.7% |
| Stockholders' equity (deficit) | 44.9% | 73.2% | -159.9% | -157.6% | -221.8% | -146.1% |
| **Total liabilities and stockholders' equity** | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Notes:

*Source:  Management-provided balance sheets as of December 31, 2008 through 2013.*

Confidential                                                                          VP_ML_00015746

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                                    **Appendix B, Page 1**

Income Statements

(USD thousands)                                                                                          Valuation as of April 16, 2014

**Income Statements**

| | Fiscal years ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **Dec-31-2008** | **Dec-31-2009** | **Dec-31-2010** | **Dec-31-2011** | **Dec-31-2012** | **Dec-31-2013** |
| Net sales | $11,875 | $64,463 | $160,681 | $232,619 | $522,164 | $632,632 |
| Cost of sales | $0 | $0 | $25,704 | $37,029 | $54,943 | $75,256 |
| Gross profit | $11,875 | $64,463 | $134,977 | $195,590 | $467,221 | $557,376 |
| Operating expenses | | | | | | |
| Selling, general, and administrative expenses | $5,279 | $23,892 | $118,250 | $93,137 | $156,684 | $212,439 |
| Total operating expense | $5,279 | $23,892 | $118,250 | $93,137 | $156,684 | $212,439 |
| Operating income | $6,596 | $40,571 | $16,727 | $102,453 | $310,537 | $344,937 |
| Other income / (expense) | | | | | | |
| Interest expense | ($129) | ($252) | ($13,847) | ($32,408) | ($42,186) | ($44,400) |
| Interest income | $1 | $1 | $163 | $13 | $41 | $163 |
| Change in fair value of interest rate cap | $0 | $0 | $0 | $0 | ($1,102) | ($180) |
| Loss on extinguishment of debt | $0 | $0 | $0 | $0 | ($88,651) | $0 |
| Change in fair value of stock purchase warrants | $0 | $0 | ($3,881) | ($81,327) | ($469,568) | ($34,695) |
| Other income (expense) | $6 | $12 | $4,940 | $781 | $284 | ($9,186) |
| Net other income / (expense) | ($123) | ($239) | ($12,625) | ($112,941) | ($601,182) | ($88,298) |
| Pretax income | $6,473 | $40,332 | $4,102 | ($10,488) | ($290,645) | $256,639 |
| Income tax expense / (benefit) | $13 | $836 | $269 | $1,806 | $1,630 | $2,401 |
| **Net income** | **$6,460** | **$39,496** | **$3,833** | **($12,294)** | **($292,275)** | **$254,238** |

Notes:

*Source: Management-provided income statements for the December 31, 2008 through December 31, 2013.*

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                   **Appendix B, Page 2**

Income Statements - Common Size

(Values as presented)                                                                    Valuation as of April 16, 2014

**Common Size Income Statements**

|  | *Fiscal years ended* | | | | | |
|---|---|---|---|---|---|---|
|  | **Dec-31-2008** | **Dec-31-2009** | **Dec-31-2010** | **Dec-31-2011** | **Dec-31-2012** | **Dec-31-2013** |
| Net sales | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of sales | 0.0% | 0.0% | 16.0% | 15.9% | 10.5% | 11.9% |
| Gross profit | 100.0% | 100.0% | 84.0% | 84.1% | 89.5% | 88.1% |
| Operating expenses |  |  |  |  |  |  |
| Selling, general, and administrative expenses | 44.5% | 37.1% | 73.6% | 40.0% | 30.0% | 33.6% |
| Total operating expense | 44.5% | 37.1% | 73.6% | 40.0% | 30.0% | 33.6% |
| Operating income | 55.5% | 62.9% | 10.4% | 44.0% | 59.5% | 54.5% |
| Other income / (expense) |  |  |  |  |  |  |
| Interest expense | -1.1% | -0.4% | -8.6% | -13.9% | -8.1% | -7.0% |
| Interest income | 0.0% | 0.0% | 0.1% | 0.0% | 0.0% | 0.0% |
| Change in fair value of interest rate cap | 0.0% | 0.0% | 0.0% | 0.0% | -0.2% | 0.0% |
| Loss on extinguishment of debt | 0.0% | 0.0% | 0.0% | 0.0% | -17.0% | 0.0% |
| Change in fair value of stock purchase warrants | 0.0% | 0.0% | -2.4% | -35.0% | -89.9% | -5.5% |
| Other income (expense) | 0.0% | 0.0% | 3.1% | 0.3% | 0.1% | -1.5% |
| Net other income / (expense) | -1.0% | -0.4% | -7.9% | -48.6% | -115.1% | -14.0% |
| Pretax income | 54.5% | 62.6% | 2.6% | -4.5% | -55.7% | 40.6% |
| Income tax expense / (benefit) | 0.1% | 1.3% | 0.2% | 0.8% | 0.3% | 0.4% |
| **Net income** | **54.4%** | **61.3%** | **2.4%** | **-5.3%** | **-56.0%** | **40.2%** |

Notes:

*Source:  Management-provided income statements for the  December 31, 2008 through December 31, 2013.*

Confidential                                                                                          VP_ML_00015748

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                                **Appendix B, Page 3**
Adjusted Income Statements
(USD thousands)                                                                                        Valuation as of April 16, 2014

**Adjusted Income Statements**

|  | 3-Year | Fiscal years ended | | | | Forecast | |
|---|---|---|---|---|---|---|---|
|  | Average | Dec-31-2011 | Dec-31-2012 | Dec-31-2013 | Apr-16-2014 | Dec-31-2014 | Dec-31-2015 |
| **Revenue** |  | $232,619 | $522,164 | $632,632 | $645,351 | **$733,282** | **$788,757** |
| Cost of sales |  | $37,029 | $54,943 | $75,256 | N/A | $93,805 | $114,200 |
| Gross profit |  | $195,590 | $467,221 | $557,376 | N/A | $639,477 | $674,557 |
| Operating expenses |  |  |  |  |  |  |  |
| *less:*  Selling, general, and administrative expenses |  | ($93,137) | ($156,684) | ($212,439) | N/A | ($249,199) | ($268,518) |
| *add:*  Depreciation and amortization |  | $5,832 | $10,542 | $16,905 | N/A | $27,595 | $29,724 |
| *add:*  Adjustments |  | $7,753 | $16,516 | $25,466 | N/A | N/A | N/A |
| **Adjusted EBITDA** | $277,251 | **$116,038** | **$337,595** | **$378,121** | **$380,868** | **$417,873** | **$435,763** |
| *less:*  Depreciation and amortization |  | ($5,832) | ($10,542) | ($16,905) | N/A | ($27,595) | ($29,724) |
| **Adjusted EBIT** | $266,158 | **$110,206** | **$327,053** | **$361,216** | **N/A** | **$390,279** | **$406,039** |

**Adjustments**

| **EBITDA adjustments** |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|
| Stock-based Compensation |  | $212 | $373 | $3,048 | N/A | N/A | N/A |
| Transaction Expenses |  | $0 | $8,114 | $657 | N/A | N/A | N/A |
| Other Adjustments |  | $6,759 | $7,746 | $0 | N/A | N/A | N/A |
| Executive Payout |  | N/A | N/A | $10,542 | N/A | N/A | N/A |
| Pathways |  | $781 | $284 | $10,755 | N/A | N/A | N/A |
| Loss on disposal of assets |  | N/A | N/A | $464 | N/A | N/A | N/A |
| **Total adjustments to EBITDA** |  | **$7,753** | **$16,516** | **$25,466** | **N/A** | **N/A** | **N/A** |

Notes:

(1) See Appendix B, Page 1 for the historical income statements.

(2) See Exhibit 2, Page 2 for the forecast income statements.

Confidential                                                                                        VP_ML_00015749

**Millennium Lab Holdings, Inc. and Subsidiaries**      **Appendix C, Page 1**

Discount for Lack of Marketability - Asian Put

(Values as presented)                                  Valuation as of April 16, 2014

---

**Discount for Lack of Marketability ("DLOM") - Asian Put Option Analysis**

| | |
|---|---:|
| (1) Time to expiration (years) | 3.00 |
| Current price | $1.00 |
| Strike price | $1.00 |
| Dividend yield | 0.0% |
| (2) Volatility | 43.0% |
| $v^2_T$ | 0.194 |
| $v_T$ | 0.440 |
| (3) Asian put value | 0.174 |
| Implied DLOM on 3.0-year holding period | 17.4% |

| | |
|---|---:|
| **Estimated DLOM** | **17.0%** |

Notes:

(1) Estimated based on discussions with Management regarding expectations of a future liquidity or exit event.

(2) See Exhibit 6, Page 1 for the implied volatility of common stock.

(3) We used an average price, or "Asian," put option where the payoff depends on the average price of the underlying asset during the life of the option.  Traditional put option models can overstate marketability given that the combination of a restricted stock and a put option provides 100.0 percent downside protection and 100.0 percent upside participation; however, the owner of a marketable security does not have 100.0 percent downside protection.

Confidential

## Millennium Lab Holdings, Inc. and Subsidiaries          Appendix C, Page 2

Discount for Lack of Marketability - Finnerty Put

(Values as presented)                                    Valuation as of April 16, 2014

### Discount for Lack of Marketability ("DLOM") - Finnerty Put Option Analysis

| | | |
|---|---|---|
| (1) | Risk-free rate | 0.87% |
| (2) | Time to expiration (years) | 3.00 |
| (3) | Volatility | 43.0% |
| | Dividend yield | 0.0% |
| | v | 0.410 |
| | A | 0.269 |
| | B | (0.141) |
| | Finnerty put value | 0.178 |
| (4) | Implied DLOM on 3.0-year holding period | 17.8% |

| | |
|---|---|
| **Concluded discount for lack of marketability** | **18.0%** |

Notes:

(1) U.S. Treasury with term comparable to the estimated time to expiration.  Source:  Capital IQ, a division of Standard & Poor's.

(2) Estimated based on discussions with Management regarding expectations of a future liquidity or exit event.

(3) Historical volatility of the guideline companies. See Appendix C, Page 3.

(4) Finnerty Put Option Analysis based on John D. Finnerty, "The Impact of Transfer Restrictions on Stock Prices." October 2009.

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                                                     **Appendix C, Page 3**

Volatility

(Values as presented)                                                                                                     Valuation as of April 16, 2014

| Guideline Company | (1) Ticker | (2) Capital Structure (in $mil) | | Black-Scholes Inputs | | | | Black-Scholes Outputs | | | | Equity Call Value | (4) Asset Volatility Ratio | Asset Volatility |
| | | Market Cap | Total Debt | Dividend Yield | Days to Expiration | (3) Equity Volatility | Risk-free Rate | D1 | D2 | N(D1) | N(D2) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | $2,933.88 | $3,843.16 | N/A | 1,096 | 36.0% | 0.87% | 1.262 | 0.638 | 0.897 | 0.738 | $3,311.90 | 0.545 | 19.6% |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | $759.17 | $52.63 | N/A | 1,096 | 41.8% | 0.87% | 4.176 | 3.452 | 1.000 | 1.000 | $760.52 | 0.937 | 39.2% |
| Cepheid | NasdaqGS:CPHD | $3,312.22 | $1.67 | N/A | 1,096 | 44.7% | 0.87% | 10.219 | 9.444 | 1.000 | 1.000 | $3,312.26 | 1.000 | 44.7% |
| Genomic Health Inc. | NasdaqGS:GHDX | $836.67 | $0.00 | N/A | 1,096 | 40.4% | 0.87% | N/A | N/A | 1.000 | 1.000 | $836.67 | 1.000 | 40.4% |
| Laboratory Corp. of America Holdings | NYSE:LH | $8,667.59 | $3,000.40 | N/A | 1,096 | 20.5% | 0.87% | 4.072 | 3.717 | 1.000 | 1.000 | $8,744.65 | 0.749 | 15.4% |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | $892.52 | $0.00 | 3.7% | 1,096 | 31.6% | 0.87% | N/A | N/A | 1.000 | 1.000 | $892.52 | 1.000 | 31.6% |
| Myriad Genetics Inc. | NasdaqGS:MYGN | $2,797.09 | $0.00 | N/A | 1,096 | 39.0% | 0.87% | N/A | N/A | 1.000 | 1.000 | $2,797.09 | 1.000 | 39.0% |
| Quest Diagnostics Inc. | NYSE:DGX | $8,652.89 | $3,366.00 | 2.2% | 1,096 | 21.8% | 0.87% | 3.628 | 3.250 | 1.000 | 0.999 | $8,739.49 | 0.727 | 15.8% |

|  |  |
|---|---|
| Minimum: | 15.4% |
| Lower (First) Quartile: | 18.7% |
| Median: | 35.3% |
| Average: | 30.7% |
| Upper (Third) Quartile: | 39.5% |
| Maximum: | 44.7% |

(5) **Selected asset volatility:**    **39.0%**

| Subject Company | Capital Structure (in $mil) | | Black-Scholes Inputs | | | | Black-Scholes Outputs | | | | Equity Call Value | Asset Volatility Ratio | Asset Volatility |
| | (6) Equity Value | (7) Total Debt | Dividend Yield | Days to Expiration | Equity Volatility | Risk-free Rate | D1 | D2 | N(D1) | N(D2) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Millennium Lab Holdings, Inc. and Subsidiaries | $17.13 | $1.77 | 0.0% | 1,096 | 42.9% | 0.87% | 3.596 | 2.853 | 1.000 | 0.998 | $17.17 | 0.909 | 39.0% |

(8) **Estimated equity volatility**    **43.0%**

Notes:

Source:  Capital IQ, a division of Standard & Poor's.

(1) See Appendix D, Page 1 for descriptions of the selected guideline public companies.

(2) Market data of guideline companies was based on the latest reported financials available as of the Valuation Date.

(3) Equity volatility was calculated using daily price changes over a 3.00-year lookback from April 16, 2014.

(4) Asset volatility as a percentage of equity volatility.  Calculation based on equity call value as a percentage of enterprise value divided by N(D1) from Black-Scholes equity call value calculation.

(5) We selected a volatility near the average of the market data.

(6) See Exhibit 6, Page 1.

(7) See Appendix A, Page 1.

(8) Concluded equity volatility was based on the selected asset volatility from the guideline company data and the Company's capital structure.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**

Discount For Lack of Marketability ("DLOM")

(USD thousands)

**Appendix C, Page 4**

Valuation as of April 16, 2014

**Summary Results from Application of the FMV Restricted Stock Study™**

**Comparative Analysis with Respect to Financial and Market Risk**

(USD thousands)

| Factor | Subject Company Values | Indicated Median Discount | Indicated Average Discount |
|---|---|---|---|
| (1) **Offering amount** | $439,888 | 13.0% | 16.0% |
| **Net income** | $254,238 | 14.0% | 17.0% |
| **Market value of equity** | $799,796 | 11.0% | 14.0% |
| **Revenue** | $645,351 | 14.0% | 16.0% |
| **Total assets** | $466,616 | 11.0% | 14.0% |
| **Overall average:** | | 12.6% | 15.4% |

| Restricted Stock Equivalent Discount | 14.0% |
|---|---|

**Comparative Analysis with Respect to Overall Market Volatility**

| VIX Range | | Multiplicative Volatility Adjustment Factor |
|---|---|---|
| Low | High | |
| 11.2% | 23.2% | 1.00 |
| 23.2% | 26.0% | 1.16 |
| 26.0% | 32.9% | 1.23 |
| 32.9% | 40.0% | 1.37 |
| 40.0% | 50.0% | 1.54 |
| 50.0% | 60.0% | 1.75 |

| | | |
|---|---|---|
| Restricted Stock Equivalent Discount | | 14.0% |
| (2) *multiply:* Volatility Adjustment Factor | 14.3% | 1.00 |

| Preliminary Discount (ARSED) | 14.0% |
|---|---|

**Summary Results from Analysis of Subjective Factors Affecting Marketability**

| Qualitative Factors | Issue for Subject Interest | Discount Relative to FMV Study |
|---|---|---|
| **Expected Growth Rate in Value; Prospects for the Industry; Economic Cycle** | The Company has strong growth prospects in an expanding industry space. It is also competitively well-positioned within its industry. | Lower |
| **Expected Dividend/Distribution Yield and Dividend History** | The Company is required to make Tax Distributions annually. For this analysis, we have assumed no other dividends. | Neutral |
| **Ability to Sell Interests and Restrictive Transfer Provisions** | The Class A members cannot transfer all or any portion of their Units without prior written consent of the Class B Majority, except as otherwise permitted per Section 8.1 and 8.2. | Higher |
| **Prospects for Liquidation** | There are no imminent prospects for a liquidation. | Higher |
| **Holding Period Until the Sale of the Underlying Assets with a Distribution to the Partners** | There are currently no plans for an imminent liquidity event, and the expected holding period is approximately three years. | Higher |
| **Potential Buyers of Minority Interests and Prior Transactions** | As of the Valuation Date, there are no offers to buy any minority interests. | Higher |
| **Information Access and Reliability** | The Company is required to deliver financial statements to each TA Member; however, the financial statements are not available to the investing public. | Higher |
| **Investment Objectives; Degree of Professional Management; Risk** | Investment objective is for long-term investment. | Higher |

| (3) Estimated discount for lack of marketability | 15.0% |
|---|---|

Notes:

(1) Based on the subject interest's percentage of ownership.

(2) Represents the trailing sixth-month average of the CBOE Volatility Index (VIX) as of the Valuation Date.

(3) We selected a discount rate after considering both the quantitative and qualitative factors of the subject interest.

Confidential

**Millennium Lab Holdings, Inc. and Subsidiaries**                    **Appendix C, Page 5**

Discount for Lack of Marketability - Summary of Restricted Stock Case Studies

(Values as presented)                              Valuation date as of April 16, 2014

**Restricted Stock Case Studies**

| Years Studied | Source | Number of Transactions | Average | Median |
|---|---|---|---|---|
| 1991-1997 | Houlihan Lokey (transactions prior to 4/29/97) | 121 | 21.0% | 17.0% |
| 1996-1998 | Columbia Financial (4/29/97 to 12/31/98) | 15 | 13.0% | 9.0% |
| 1996-1997 | Columbia Financial (transactions prior to 4/29/97) | 23 | 21.0% | 14.0% |
| 1980-1996 | Management Planning, Inc. | 53 | 27.0% | 25.0% |
| 1991-1995 | Munroe, Park & Johnson | 72 | 20.0% | N/A |
| 1979-1992 | FMV Opinions (Hall/Polacek) | 100+ | 23.0% | N/A |
| 1980-1991 | UCLA | 44 | 25.0% | 24.0% |
| 1981-1988 | Sibler Research Consultants | 69 | 34.0% | N/A |
| 1981-1984 | Williamette | 33 | N/A | 31.0% |
| 1978-1982 | Standard Research (Stryker/Pittock) | 28 | N/A | 45.0% |
| 1969-1972 | Maher | 34 | 35.0% | 33.0% |
| 1968-1972 | Moroney | 146 | 36.0% | 33.0% |
| 1968-1972 | Trout | 60 | 33.0% | N/A |
| 1968-1970 | Gelmar | 89 | 33.0% | 33.0% |
| 1966-1969 | Institutional Investor (SEC) | 398 | 26.0% | 26.0% |
| | Median: | | 26.0% | 26.0% |
| | Average: | | 26.7% | 26.4% |

Notes:

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                          **Appendix D, Page 1**
Guideline Public Company Data - Business Descriptions

Valuation as of April 16, 2014

| Guideline Company | Ticker | Description |
|---|---|---|
| Alere Inc. | NYSE:ALR | Alere Inc. provides diagnostics and services for cardiology, infectious disease, toxicology, and diabetes in the United States and internationally. |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in New Jersey, New York, Maryland, Massachusetts, Texas, and Ohio. |
| Cepheid | NasdaqGS:CPHD | Cepheid, a molecular diagnostics company, develops, manufactures, and markets integrated systems for testing in the clinical and non-clinical markets; and for application in legacy non-clinical market. |
| Genomic Health Inc. | NasdaqGS:GHDX | Genomic Health, Inc., a healthcare company, provides actionable genomic information to personalize cancer treatment decisions in the United States and internationally. |
| Laboratory Corp. of America Holdings | NYSE:LH | Laboratory Corporation of America Holdings operates as an independent clinical laboratory company worldwide. |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | Meridian Bioscience, Inc., a life science company, develops, manufactures, sells, and distributes diagnostic test kits primarily for gastrointestinal, viral, respiratory, and parasitic infectious diseases. |
| Myriad Genetics Inc. | NasdaqGS:MYGN | Myriad Genetics, Inc., a molecular diagnostic company, focuses on the development and marketing of predictive medicine, personalized medicine, and prognostic medicine tests primarily in the United States. |
| Quest Diagnostics Inc. | NYSE:DGX | Quest Diagnostics Incorporated provides diagnostic testing information services in the United States and internationally. |

*Source: Capital IQ, a division of Standard & Poor's.*

Confidential                                                                                    VP_ML_00015755

**Millennium Lab Holdings, Inc. and Subsidiaries**   **Appendix D, Page 2**

Guideline Public Company Data - Operating Metrics

(USD millions)   Valuation as of April 16, 2014

| Guideline Company | Last Fiscal Year (LFY) End | Revenue | | | | EBITDA | | | | EBIT | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | LTM | LFY | 1-Year Forward | 2-Year Forward | LTM | LFY | 1-Year Forward | 2-Year Forward | LTM | LFY |
| Alere Inc. | Dec-31-2013 | $3,029.4 | $3,029.4 | $3,251.0 | $3,371.9 | $612.3 | $612.3 | $714.8 | $767.2 | $172.8 | $172.8 |
| Bio-Reference Laboratories Inc. | Oct-31-2013 | $735.4 | $715.4 | $814.4 | N/A | $93.1 | $101.7 | $110.1 | N/A | $72.1 | $82.0 |
| Cepheid | Dec-31-2013 | $401.3 | $401.3 | $532.7 | $627.0 | $8.5 | $8.5 | $42.7 | $78.9 | ($14.7) | ($14.7) |
| Genomic Health Inc. | Dec-31-2013 | $261.6 | $261.6 | $322.9 | $406.1 | ($5.5) | ($5.5) | ($4.2) | ($3.8) | ($11.8) | ($11.8) |
| Laboratory Corp. of America Holdings | Dec-31-2013 | $5,808.3 | $5,808.3 | $6,062.5 | $6,187.0 | $1,203.5 | $1,203.5 | $1,222.3 | $1,287.8 | $1,012.7 | $1,012.7 |
| Meridian Bioscience, Inc. | Sep-30-2013 | $188.1 | $188.7 | $205.2 | $220.0 | $61.5 | $62.9 | $72.0 | $80.0 | $55.8 | $57.3 |
| Myriad Genetics Inc. | Jun-30-2013 | $737.1 | $613.2 | $772.7 | $808.8 | $300.5 | $238.4 | $272.9 | $258.6 | $291.2 | $229.5 |
| Quest Diagnostics Inc. | Dec-31-2013 | $7,146.0 | $7,146.0 | $7,436.2 | $7,564.5 | $1,439.0 | $1,439.0 | $1,495.9 | $1,540.1 | $1,156.0 | $1,156.0 |
| Minimum: | | $188.1 | $188.7 | $205.2 | $220.0 | ($5.5) | ($5.5) | ($4.2) | ($3.8) | ($14.7) | ($14.7) |
| Lower (First) Quartile: | | $366.4 | $366.4 | $480.2 | $516.5 | $48.2 | $49.3 | $64.7 | $79.4 | $38.9 | $40.0 |
| Median: | | $736.2 | $664.3 | $793.6 | $808.8 | $196.8 | $170.0 | $191.5 | $258.6 | $122.5 | $127.4 |
| Upper (Third) Quartile: | | $3,724.2 | $3,724.2 | $3,953.9 | $4,779.5 | $760.1 | $760.1 | $841.7 | $1,027.5 | $471.6 | $425.3 |
| Maximum: | | $7,146.0 | $7,146.0 | $7,436.2 | $7,564.5 | $1,439.0 | $1,439.0 | $1,495.9 | $1,540.1 | $1,156.0 | $1,156.0 |
| Millennium Lab Holdings, Inc. and Subsidiaries | | $645.35 | $632.63 | $733.28 | $788.76 | $380.87 | $378.12 | $417.87 | $435.76 | N/A | $361.22 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

# Millennium Lab Holdings, Inc. and Subsidiaries

**Appendix D, Page 3**

Guideline Public Company Data - Operating Margins

(Values as presented)

Valuation as of April 16, 2014

| Guideline Company | EBITDA | | | | EBIT | |
|---|---|---|---|---|---|---|
| | LTM | LFY | 1-Year Forward | 2-Year Forward | LTM | LFY |
| Alere Inc. | 20.2% | 20.2% | 22.0% | 22.8% | 5.7% | 5.7% |
| Bio-Reference Laboratories Inc. | 12.7% | 14.2% | 13.5% | N/A | 9.8% | 11.5% |
| Cepheid | 2.1% | 2.1% | 8.0% | 12.6% | -3.7% | -3.7% |
| Genomic Health Inc. | -2.1% | -2.1% | -1.3% | -0.9% | -4.5% | -4.5% |
| Laboratory Corp. of America Holdings | 20.7% | 20.7% | 20.2% | 20.8% | 17.4% | 17.4% |
| Meridian Bioscience, Inc. | 32.7% | 33.4% | 35.1% | 36.4% | 29.7% | 30.4% |
| Myriad Genetics Inc. | 40.8% | 38.9% | 35.3% | 32.0% | 39.5% | 37.4% |
| Quest Diagnostics Inc. | 20.1% | 20.1% | 20.1% | 20.4% | 16.2% | 16.2% |
| **Minimum:** | -2.1% | -2.1% | -1.3% | -0.9% | -4.5% | -4.5% |
| **Lower (First) Quartile:** | 10.0% | 11.2% | 12.1% | 16.5% | 3.4% | 3.4% |
| **Median:** | 20.2% | 20.2% | 20.1% | 20.8% | 13.0% | 13.8% |
| **Upper (Third) Quartile:** | 23.7% | 23.9% | 25.3% | 27.4% | 20.5% | 20.7% |
| **Maximum:** | 40.8% | 38.9% | 35.3% | 36.4% | 39.5% | 37.4% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 59.0% | 59.8% | 57.0% | 55.2% | N/A | 57.1% |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

Confidential

# Millennium Lab Holdings, Inc. and Subsidiaries

## Appendix D, Page 4

Guideline Public Company Data - Revenue Growth

(Values as presented)

Valuation as of April 16, 2014

| Guideline Company | Historical Revenue CAGR | | | Forecast Revenue CAGR | |
|---|---|---|---|---|---|
| | 1 Year | 2 Year | 3 Year | 1 Year | 2 Year |
| Alere Inc. | 7.5% | 12.7% | 12.0% | 7.3% | 5.5% |
| Bio-Reference Laboratories Inc. | 15.5% | 13.0% | 15.2% | 10.7% | N/A |
| Cepheid | 21.2% | 20.2% | 23.6% | 32.7% | 25.0% |
| Genomic Health Inc. | 11.2% | 12.7% | 13.7% | 23.4% | 24.6% |
| Laboratory Corp. of America Holdings | 2.4% | 2.4% | 5.1% | 4.4% | 3.2% |
| Meridian Bioscience, Inc. | 5.7% | 7.6% | 10.9% | 9.1% | 8.1% |
| Myriad Genetics Inc. | 35.2% | 29.0% | 25.0% | 4.8% | 4.7% |
| Quest Diagnostics Inc. | -3.2% | -1.7% | -0.5% | 4.1% | 2.9% |
| **Minimum:** | -3.2% | -1.7% | -0.5% | 4.1% | 2.9% |
| **Lower (First) Quartile:** | 4.9% | 6.3% | 9.5% | 4.7% | 4.0% |
| **Median:** | 9.4% | 12.7% | 12.8% | 8.2% | 5.5% |
| **Upper (Third) Quartile:** | 16.9% | 14.8% | 17.3% | 13.9% | 16.4% |
| **Maximum:** | 35.2% | 29.0% | 25.0% | 32.7% | 25.0% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 21.2% | 64.9% | 57.9% | 15.9% | 11.7% |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

**Millennium Lab Holdings, Inc. and Subsidiaries**                                        **Appendix D, Page 5**

Guideline Public Company Data - EBITDA Growth

(Values as presented)                                                              Valuation as of April 16, 2014

| Guideline Company | Historical EBITDA CAGR | | | Forecast EBITDA CAGR | |
|---|---|---|---|---|---|
| | 1 Year | 2 Year | 3 Year | 1 Year | 2 Year |
| Alere Inc. | 3.1% | 5.1% | 10.5% | 16.8% | 11.9% |
| Bio-Reference Laboratories Inc. | -2.9% | 8.1% | 14.3% | 18.3% | N/A |
| Cepheid | -37.7% | -42.9% | -8.2% | 403.3% | 205.1% |
| Genomic Health Inc. | N/A | N/A | N/A | N/A | N/A |
| Laboratory Corp. of America Holdings | -4.0% | -2.3% | 0.4% | 1.6% | 3.4% |
| Meridian Bioscience, Inc. | 4.6% | 11.2% | 12.7% | 17.1% | 14.0% |
| Myriad Genetics Inc. | 45.4% | 29.7% | 25.5% | -9.2% | -7.2% |
| Quest Diagnostics Inc. | -9.8% | -4.3% | -2.4% | 4.0% | 3.5% |
| **Minimum:** | -37.7% | -42.9% | -8.2% | -9.2% | -7.2% |
| **Lower (First) Quartile:** | -6.9% | -3.3% | -1.0% | 2.8% | 3.4% |
| **Median:** | -2.9% | 5.1% | 10.5% | 16.8% | 7.7% |
| **Upper (Third) Quartile:** | 3.8% | 9.6% | 13.5% | 17.7% | 13.5% |
| **Maximum:** | 45.4% | 29.7% | 25.5% | 403.3% | 205.1% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 12.0% | 80.5% | 182.8% | 10.5% | 7.4% |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

Confidential                                                                                   VP_ML_00015759

**Millennium Lab Holdings, Inc. and Subsidiaries**

**Appendix D, Page 6**

Guideline Public Company Data - Working Capital Levels

(Values as presented)

Valuation as of April 16, 2014

| Guideline Company | Working Capital / Revenue | | | | | Debt-Free Net Working Capital / Revenue | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 3-Yr. Avg. | LTM | 2011 | 2012 | 2013 | 3-Yr. Avg. | LTM |
| Alere Inc. | 28.0% | 26.9% | 26.4% | 27.1% | 26.4% | 18.5% | 17.6% | 16.3% | 17.5% | 16.3% |
| Bio-Reference Laboratories Inc. | 23.8% | 24.7% | 22.5% | 23.7% | 22.2% | 24.0% | 21.3% | 24.5% | 23.2% | 25.1% |
| Cepheid | 53.4% | 44.4% | 37.0% | 44.9% | 37.0% | 11.9% | 15.5% | 18.4% | 15.3% | 18.4% |
| Genomic Health Inc. | 49.9% | 44.6% | 44.0% | 46.2% | 44.0% | 1.2% | 2.5% | 3.8% | 2.5% | 3.8% |
| Laboratory Corp. of America Holdings | 5.9% | 6.4% | 12.0% | 8.1% | 12.0% | 5.5% | 6.6% | 7.0% | 6.4% | 7.0% |
| Meridian Bioscience, Inc. | 44.8% | 41.8% | 49.8% | 45.5% | 49.8% | 28.7% | 23.1% | 26.6% | 26.1% | 26.6% |
| Myriad Genetics Inc. | 89.7% | 75.5% | 52.5% | 72.6% | 52.5% | 10.6% | 9.8% | 4.5% | 8.3% | 4.5% |
| Quest Diagnostics Inc. | -2.2% | 6.9% | 3.5% | 2.8% | 3.5% | 4.5% | 3.1% | 3.9% | 3.8% | 3.9% |
| **Minimum:** | -2.2% | 6.4% | 3.5% | 2.8% | 3.5% | 1.2% | 2.5% | 3.8% | 2.5% | 3.8% |
| **Lower (First) Quartile:** | 19.3% | 20.3% | 19.9% | 19.8% | 19.6% | 5.2% | 5.7% | 4.4% | 5.7% | 4.4% |
| **Median:** | 36.4% | 34.3% | 31.7% | 36.0% | 31.7% | 11.2% | 12.7% | 11.6% | 11.8% | 11.6% |
| **Upper (Third) Quartile:** | 50.8% | 44.5% | 45.5% | 45.6% | 45.5% | 19.9% | 18.5% | 19.9% | 18.9% | 20.1% |
| **Maximum:** | 89.7% | 75.5% | 52.5% | 72.6% | 52.5% | 28.7% | 23.1% | 26.6% | 26.1% | 26.6% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 20.6% | 19.8% | 33.1% | 24.5% | 28.6% | 12.2% | 8.8% | 12.9% | 11.3% | 7.6% |

Notes:

Source:  Capital IQ, a division of Standard & Poor's.

Confidential

VP_ML_00015760

**Millennium Lab Holdings, Inc. and Subsidiaries**    **Appendix D, Page 7**

Guideline Public Company Data - Depreciation and Capital Expenditures

(Values as presented)    Valuation as of April 16, 2014

| Guideline Company | Depreciation & Amortization / Revenue | | | | | Capital Expenditures / Revenue | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 3-Yr. Avg. | LTM | 2011 | 2012 | 2013 | 3-Yr. Avg. | LTM |
| Alere Inc. | 16.4% | 16.2% | 14.5% | 15.7% | 14.4% | 5.6% | 4.9% | 4.0% | 4.8% | 3.8% |
| Bio-Reference Laboratories Inc. | 2.9% | 2.7% | 2.8% | 2.8% | 2.9% | 2.7% | 2.6% | 3.5% | 2.9% | 3.1% |
| Cepheid | 6.1% | 5.6% | 5.8% | 5.8% | 5.7% | 6.8% | 7.0% | 11.8% | 8.5% | 11.4% |
| Genomic Health Inc. | 3.5% | 2.3% | 2.4% | 2.8% | 2.5% | 3.0% | 4.2% | 4.2% | 3.8% | 3.7% |
| Laboratory Corp. of America Holdings | 3.6% | 3.3% | 3.3% | 3.4% | 3.4% | 2.6% | 3.1% | 3.5% | 3.1% | 3.7% |
| Meridian Bioscience, Inc. | 3.6% | 3.3% | 3.0% | 3.3% | 2.9% | 5.8% | 2.0% | 1.7% | 3.2% | 2.3% |
| Myriad Genetics Inc. | 1.8% | 1.8% | 1.4% | 1.7% | 1.4% | 0.9% | 1.9% | 1.9% | 1.6% | 1.6% |
| Quest Diagnostics Inc. | 3.7% | 3.8% | 4.0% | 3.8% | 4.1% | 2.2% | 2.5% | 3.2% | 2.6% | 3.5% |
| Minimum: | 1.8% | 1.8% | 1.4% | 1.7% | 1.4% | 0.9% | 1.9% | 1.7% | 1.6% | 1.6% |
| Lower (First) Quartile: | 3.4% | 2.6% | 2.7% | 2.8% | 2.8% | 2.5% | 2.4% | 2.9% | 2.8% | 2.9% |
| Median: | 3.6% | 3.3% | 3.1% | 3.3% | 3.2% | 2.9% | 2.8% | 3.5% | 3.1% | 3.6% |
| Upper (Third) Quartile: | 4.3% | 4.2% | 4.4% | 4.3% | 4.5% | 5.6% | 4.4% | 4.1% | 4.1% | 3.8% |
| Maximum: | 16.4% | 16.2% | 14.5% | 15.7% | 14.4% | 6.8% | 7.0% | 11.8% | 8.5% | 11.4% |
| Millennium Lab Holdings, Inc. and Subsidiaries | 2.5% | 2.0% | 2.7% | 2.4% | N/A | 4.1% | 2.1% | N/A | 3.1% | N/A |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

**Millennium Lab Holdings, Inc. and Subsidiaries**                                    **Appendix D, Page 8**

Guideline Public Company Data - Balance Sheet Ratios

(Values as presented)                                                     Valuation as of April 16, 2014

| Guideline Company | Cash and Equiv. (mil) | Cash / Revenue (1) | Current Ratio (2) | A/R Days (3) | Inventory Days (4) | A/P Days (5) | Debt / EBITDA | Debt / Mkt. Cap | Debt / BEV | Interest Coverage (6) |
|---|---|---|---|---|---|---|---|---|---|---|
| Alere Inc. | $361.9 | 11.9% | 2.19 | 65.8 | 84.4 | 42.2 | 6.28 | 1.31 | 0.55 | 2.39 |
| Bio-Reference Laboratories Inc. | $14.5 | 2.0% | 2.20 | 94.1 | 17.5 | 48.6 | 0.57 | 0.07 | 0.07 | 48.60 |
| Cepheid | $66.1 | 16.5% | 2.56 | 43.8 | 153.7 | 65.5 | 0.20 | 0.00 | 0.00 | 61.88 |
| Genomic Health Inc. | $33.3 | 12.7% | 4.86 | 36.1 | N/A | 33.5 | N/A | N/A | N/A | N/A |
| Laboratory Corp. of America Holdings | $404.0 | 7.0% | 1.95 | 47.2 | 13.1 | 27.4 | 2.49 | 0.35 | 0.27 | 12.47 |
| Meridian Bioscience, Inc. | $43.7 | 23.2% | 6.36 | 44.9 | 182.7 | 25.6 | N/A | N/A | N/A | N/A |
| Myriad Genetics Inc. | $71.6 | 9.7% | 6.74 | 39.5 | N/A | N/A | N/A | N/A | N/A | N/A |
| Quest Diagnostics Inc. | $187.0 | 2.6% | 1.22 | 43.9 | 7.8 | 19.7 | 2.34 | 0.39 | 0.28 | 8.88 |
| | | | | | | | | | | |
| Minimum: | $14.5 | 1.98% | 1.22 | 36.07 | 7.84 | 19.70 | 0.20 | 0.00 | 0.00 | 2.39 |
| Lower (First) Quartile: | $41.1 | 5.87% | 2.13 | 42.70 | 14.21 | 26.53 | 0.57 | 0.07 | 0.07 | 8.88 |
| Median: | $68.8 | 10.83% | 2.38 | 44.40 | 50.93 | 33.48 | 2.34 | 0.35 | 0.27 | 12.47 |
| Average: | $147.8 | 10.70% | 3.51 | 51.91 | 76.52 | 37.51 | 2.37 | 0.42 | 0.23 | 26.85 |
| Upper (Third) Quartile: | $230.7 | 13.66% | 5.24 | 51.87 | 136.33 | 45.42 | 2.49 | 0.39 | 0.28 | 48.60 |
| Maximum: | $404.0 | 23.24% | 6.74 | 94.07 | 182.69 | 65.53 | 6.28 | 1.31 | 0.55 | 61.88 |
| | | | | | | | | | | |
| Millennium Lab Holdings, Inc. and Subsidiaries | $0.20 | 31.03% | 2.62 | 42.19 | N/A | 18.12 | 4.63 | 2.21 | 0.71 | 0.22 |

Notes:

*Source: Capital IQ, a division of Standard & Poor's.*

*N/A represents not available or not applicable.

(1) Cash divided by LTM revenue.

(2) Current assets divided by current liabilities.

(3) Average accounts receivable multiplied by 365, divided by revenue.

(4) Average inventory multiplied by 365, divided by COGS.

(5) Average accounts payable multiplied by 365, divided by (COGS + change in inventory).

(6) EBITDA divided by interest expense.

**Millennium Lab Holdings, Inc. and Subsidiaries**                                          **Appendix D, Page 9**

Guideline Public Company Method - _Size Adjusted_ BEV / EBITDA Multiples

(Values as presented)                                                                       Valuation as of April 16, 2014

| Guideline Company | Unadjusted BEV / EBITDA (1) | | | | Multiply: Size Adjustment (2) | Size-Adjusted BEV / EBITDA | | | |
|---|---|---|---|---|---|---|---|---|---|
| | LTM | LFY | Forward Year | 2 Year | | LTM | LFY | Forward Year | 2 Year |
| Alere Inc. | 11.47x | 11.47x | 9.83x | 9.16x | -32.8% | 7.71x | 7.71x | 6.61x | 6.16x |
| Bio-Reference Laboratories Inc. | 8.57x | 7.84x | 7.24x | N/A | -28.1% | 6.16x | 5.64x | 5.21x | N/A |
| Cepheid | 382.09x | 382.09x | 75.92x | 41.05x | -32.8% | NMF | NMF | NMF | 27.60x |
| Genomic Health Inc. | NMF | NMF | NMF | NMF | -28.1% | NMF | NMF | NMF | NMF |
| Laboratory Corp. of America Holdings | 9.38x | 9.38x | 9.23x | 8.76x | -39.7% | 5.66x | 5.66x | 5.57x | 5.29x |
| Meridian Bioscience, Inc. | 13.80x | 13.49x | 11.79x | 10.61x | -28.1% | 9.93x | 9.70x | 8.48x | 7.63x |
| Myriad Genetics Inc. | 8.13x | 10.25x | 8.95x | 9.45x | -32.8% | 5.47x | 6.89x | 6.02x | 6.35x |
| Quest Diagnostics Inc. | 8.24x | 8.24x | 7.93x | 7.70x | -39.7% | 4.97x | 4.97x | 4.78x | 4.65x |
| **Minimum:** | 8.13x | 7.84x | 7.24x | 7.70x | | 4.97x | 4.97x | 4.78x | 4.65x |
| **Lower (First) Quartile:** | 8.40x | 8.81x | 8.44x | 8.86x | | 5.51x | 5.64x | 5.30x | 5.50x |
| **Median:** | 9.38x | 10.25x | 9.23x | 9.30x | | 5.91x | 6.27x | 5.80x | 6.25x |
| **Upper (Third) Quartile:** | 12.64x | 12.48x | 10.81x | 10.32x | | 7.33x | 7.51x | 6.46x | 7.31x |
| **Maximum:** | 382.09x | 382.09x | 75.92x | 41.05x | | 9.93x | 9.70x | 8.48x | 27.60x |
| (3) **Coefficient of Variation:** | 2.2 | 2.2 | 1.4 | 0.9 | | 0.3 | 0.3 | 0.2 | 0.9 |

Notes:

_Source: Capital IQ, a division of Standard & Poor's._

(x) represents that an outlier was excluded from one of the summarizing statistics.

*N/A represents not available or not applicable; NMF represents not meaningful.

(1) See Exhibit 3, Page 4 and Appendix D, Page 2 for the BEV and EBITDA data, respectively.

(2) See Appendix D, Page 10 for the size adjustment calculations.

(3) Coefficient of variation measures the variability of the multiples data. It is calculated by dividing the standard deviation by the mean. A lower coefficient of variation indicates lower variability relative to the size of the mean and suggests a more statistically relevant data set.

Confidential                                                                                 VP_ML_00015763

**Millennium Lab Holdings, Inc. and Subsidiaries**                                                                    **Appendix D, Page 10**
Guideline Public Company Method - Size Adjustment Calculations
(Values as presented)                                                                                                 Valuation as of April 16, 2014

| Guideline Company | Ticker | Size Premium (1) | Cost of Equity (2) | Debt (3) | Size-Adjusted WACC (4) | Long-term Growth Rate | Implied Capitalization Multiple | Size Adjustment (5) |
|---|---|---|---|---|---|---|---|---|
| Alere Inc. | NYSE:ALR | 1.8% | 11.7% | 2.7% | 10.4% | 3.0% | 13.47x | -32.8% |
| Bio-Reference Laboratories Inc. | NasdaqGS:BRLI | 2.4% | 12.4% | 2.7% | 10.9% | 3.0% | 12.59x | -28.1% |
| Cepheid | NasdaqGS:CPHD | 1.8% | 11.7% | 2.7% | 10.4% | 3.0% | 13.47x | -32.8% |
| Genomic Health Inc. | NasdaqGS:GHDX | 2.4% | 12.4% | 2.7% | 10.9% | 3.0% | 12.59x | -28.1% |
| Laboratory Corp. of America Holdings | NYSE:LH | 0.9% | 10.9% | 2.7% | 9.7% | 3.0% | 15.00x | -39.7% |
| Meridian Bioscience, Inc. | NasdaqGS:VIVO | 2.4% | 12.4% | 2.7% | 10.9% | 3.0% | 12.59x | -28.1% |
| Myriad Genetics Inc. | NasdaqGS:MYGN | 1.8% | 11.7% | 2.7% | 10.4% | 3.0% | 13.47x | -32.8% |
| Quest Diagnostics Inc. | NYSE:DGX | 0.9% | 10.9% | 2.7% | 9.7% | 3.0% | 15.00x | -39.7% |
| Millennium Lab Holdings, Inc. and Subsidiaries | | 6.0% | 16.0% | 2.7% | 14.0% | 3.0% | 9.05x | N/A |

Notes:

(1) Source: 2014 Valuation Handbook - Guide to Cost of Capital. Duff & Phelps LLC.

(2) Cost of equity is the aggregate of size premium and cost of equity per capital asset pricing model (CAPM).  The cost of equity per the capital asset pricing model is as follows:

| | Cost of equity per CAPM |
|---|---|
| Risk free rate | 3.2% |
| Beta adjusted equity risk premium | 6.8% |
| | 10.0% |

(3) To isolate the size premium, cost of debt is assumed to be the same as the subject company.

(4) The weighted average cost of capital calculated according to a split of 14.6 percent debt and 85.4 percent equity.

(5) Adjustment calculated relative to the subject Company's capitalization multiple.

# EXHIBIT 61

CONFIDENTIAL



# Rating Agency Presentation

March 2014

STRICTLY PRIVATE AND CONFIDENTIAL

CITI-DE-0001793

CONFIDENTIAL

Disclaimer

# SPECIAL NOTICE REGARDING MATERIAL NON-PUBLIC INFORMATION

**THIS DOCUMENT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWER, THE TARGET OR THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES.**

**BY ACCEPTING THIS DOCUMENT, THE RECIPIENT AGREES TO USE AND MAINTAIN ANY SUCH INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE POLICIES, CONTRACTUAL OBLIGATIONS AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.**

## DISCLAIMER

J.P. Morgan is a marketing name for investment banking businesses of JPMorgan Chase & Co. and its subsidiaries worldwide. Securities, syndicated loan arranging, financial advisory and other investment banking activities are performed by J.P. Morgan Securities LLC and its securities affiliates, and lending, derivatives and other commercial banking activities are performed by JPMorgan Chase Bank and its banking affiliates.  J.P. Morgan deal team members may be employees of any of the foregoing entities.

CITI-DE-00019794



CONFIDENTIAL

# Presenters

| Presenters | Title | Company |
|---|---|---|
| Brock Hardaway | Chief Executive Officer | MILLENNIUM LABORATORIES |
| Howard Appel | President | MILLENNIUM LABORATORIES |
| Tim Kennedy | Chief Financial Officer | MILLENNIUM LABORATORIES |
| Daniel Pencak | VP of FP&A | MILLENNIUM LABORATORIES |
| Stathis Karanikolaidis | Managing Director | J.P.Morgan |
| Ryan Griswold | Vice President | J.P.Morgan |
| Alessandro Ferrara | Executive Director | J.P.Morgan |



CITI-DE-0001795

# Transaction overview

- Millennium Laboratories, Inc. ("Millennium" or the "Company") is the leader in medication monitoring and drug detection for clinicians, payors and patients

- The Company has achieved strong growth and demonstrated exceptional financial performance with Adjusted EBITDA growing at a 74% CAGR from 2009 to 2013

- Millennium is seeking to enter into a new Credit Facility to:
  - Refinance existing $304 million Term Loan A
  - Convert / take out $196 million TA debentures
  - Pay distribution to shareholders
  - Pay transaction related fees and expenses

- This transaction will include:

  - New $50 million Revolving Credit facility due in 2019

  - New $1,765 million Term Loan B facility due 2021

- At close, pro forma net senior secured leverage will be 4.54x and net total leverage will be 4.63x, based on 12/31/13 FY Adjusted EBITDA of $378.1 million

- The Company is requesting corporate and facility ratings by March 28th, 2014



CONFIDENTIAL | 3

CONFIDENTIAL

CITI-DE-0001 9796

CONFIDENTIAL

# Transaction details

## Sources and Uses

| Sources | Amount ($mm) | Uses | Amount ($mm) |
|---|---|---|---|
| New R/C facility | $ - | Distribution to shareholders | $1,269.6 |
| New Term Loan B | 1,765.0 | Refinance Term Loan A | 304.0 |
| Balance sheet cash | 50.0 | Convert / take out TA debentures | 196.0 |
| | | Fees and expenses[1] | 45.4 |
| Total | $1,815.0 | Total | $1,815.0 |

## Pro Forma Capitalization

| ($mm) | Pro forma | xEBITDA[1] |
|---|---|---|
| Cash | $50.0 | |
| | | |
| $50mm R/C facility due 2019 | - | |
| New Term Loan B due 2021 | 1,765.0 | |
| Total secured debt | $1,765.0 | 4.67x |
| Net secured debt | $1,715.0 | 4.54x |
| Other debt[2] | 36.7 | |
| Total debt | $1,801.7 | 4.77x |
| Net debt | $1,751.7 | 4.63x |
| Adjusted EBITDA / Interest expense | | 8.55x |
| (EBITDA-capex) / Interest expense | | 8.10x |

[1] Based on FY13 12/31/2013 Adjusted EBITDA of $378.1mm
[2] Excludes ~$18mm related to company's facilities


MILLENNIUM
LABORATORIES

CONFIDENTIAL   |   4

CITI-DE-00019797

CONFIDENTIAL

# Indicative terms – Sr. secured credit facilities

## Summary terms and conditions

| | |
|---|---|
| **Borrower:** | Millennium Laboratories, Inc. (the "Company" or "Borrower") |
| **Guarantors:** | Holdings and all material domestic subsidiaries |
| **Purpose:** | Refinance all existing indebtedness, convert / take out TA debentures, dividend distribution, and pay fees and expenses |
| **Facility size:** | • $50mm RC<br>• $1,765 mm TLB |
| **Tenor:** | • RC: 5 years<br>• TLB: 7 years |
| **Security:** | First lien on all tangible and intangible assets and stock of the Borrower and its domestic subsidiaries; 2/3 of the stock of foreign subsidiaries |
| **Covenants:** | • RC: total leverage covenant<br>• TLB: covenant-lite |
| **Incremental:** | • $175mm plus unlimited amounts as long as the pro forma Leverage Ratio does not exceed 4.50x |
| **Negative covenants:** | • Usual and customary for transactions of this type, including:<br>  – Limitations on indebtedness<br>  – Limitations on restricted payments and investments<br>  – Limitations on liens<br>  – Limitations on transaction with affiliates<br>  – Limitations on asset sales, mergers and consolidations and other fundamental changes<br>  – Limitations on restrictions on subsidiary dividends and other restrictive agreements<br>  – Restricted payments and investments covenants |
| **Mandatory prepayments:** | • Subject to customary curve out and baskets:<br>  – 100% of net cash proceeds from any non-ordinary course sales or distribution of assets<br>  – 100% of the net cash proceeds from issuance of debt by Holdings and its subsidiaries<br>  – 50% (with step downs to 25% and 0%) of annual Excess Cash Flow |

CITI-DE-0001979B



# Timeline

| March 2014 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | | | | | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | **18** | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | **28** | 29 |
| 30 | **31** | | | | | |

| April 2014 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | **10** | 11 | 12 |
| 13 | 14 | **15** | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | | | |

▨ - denotes key transaction dates

| Date: | Event |
|---|---|
| March 18th | Meetings with Rating Agencies |
| March 28th | Receive ratings |
| March 31st | Lender meeting |
| April 10th | Commitments due |
| April 15th | Close and fund |



MILLENNIUM LABORATORIES

CONFIDENTIAL | 6

CONFIDENTIAL

# Agenda

| Section | Presenter |
|---|---|
| Executive summary | **Brock Hardaway,** Chief Executive Officer |
| Industry and company overview | **Brock Hardaway,** Chief Executive Officer |
| Key credit strengths | **Howard Appel,** President |
| Financial overview | **Timothy Kennedy,** Chief Financial Officer |
| Appendix | |



CITI-DE-00019800

CONFIDENTIAL | 7

CONFIDENTIAL

# EXECUTIVE SUMMARY

CITI-DE-00019801

CONFIDENTIAL

# Improving the lives of people suffering from pain, addiction and other disorders

**Who we are**

The leader in the science of toxicology and pharmacogenetics

**What we do**

Transforming the way health care professionals monitor and manage their patients' medication therapy

**How we do it**

Advanced technology and analytic solutions supported by people, research, and education

**Enable personalized treatment to improve clinical outcomes and patient safety**



MILLENNIUM
LABORATORIES

CITI-DE-00019802

CONFIDENTIAL

# Company snapshot

**Business highlights**

- Leading market share with national presence in UDT space
- One of the leading PGT labs in the U.S.
- Analyzed/tested over 6.4 million specimens since 2008; Tested ~2.4 million specimens in 2013
- Recently added advanced analytics platform with RxAnte
- Volume, Revenue and EBITDA CAGRs of over 74% from 2009 to 2013

**Key offerings**

- Urine Drug Testing ("UDT") – testing for patient medication monitoring and adherence
- Oral Fluid Testing ("OFT") – testing for individuals unable to provide a urine sample
- Pharmacogenetic Testing ("PGT") – testing to determine how an individual will respond to a particular drug therapy which increases safety and efficacy for truly personalized medicine
- RxAnte - suite of advanced analytic tools & decision support

**Customers and payors**

- Currently serve over 6,700 physician practices and growing
- 197 network contracts covering over 168 million lives
- Attractive payor mix
  - ~63% of volume is contracted (including Medicare, Medicaid and commercial plans)
- Over 8 million lives under management for RxAnte platform

**Organization and operations**

- Headquarters: San Diego, CA
- 207,000 square feet (7 buildings) campus with current lab with significant excess capacity
- 1,379 employees including a sales and service team of 550+ employees and 100+ scientists, PhDs and PharmDs
- Incredible culture and family atmosphere



MILLENNIUM
LABORATORIES

CITI-DE-00019803

CONFIDENTIAL

# Company history and milestones



Quarterly Average Specimens Per Day

10,537 (YTD-Feb)

**Aug 2008**
Millennium turns
EBITDA positive

**Jul 2010**
Millennium
secures
investment
capital from
TA Associates

**Apr 2011**
Millennium
begins selling
to addiction
treatment
centers

**Jun 2012**
Launch of
pharmacogenetic
testing

**Dec 2013**
6,000,000 specimen
tested since
inception

**Dec 2007**
Millennium
founded by
James
Slattery

**Jul 2009**
Millennium
expands sales
force creating
national
footprint

**Sep 2011**
18 New drug tests are
introduced between
Sep-11 and Jan-12

**Mar 2012**
Launch of new
proprietary Lab
Information
System

**Dec 2013**
Acquired
RxAnte

### 2008–2011

- Massive prescription drug/opioid problem in the U.S. results in high demand for ML services
- ML has market leading turnaround time, sensitivity, specificity and accuracy
- ML has broad testing menu and ability to rapidly respond to market needs
- Incredible culture in San Diego and in the field





### 2012–2013

- Pharmacogenetic (PGT) testing has the potential to be a game changer for medicine
  - Predict how an individual will respond to a particular drug therapy
- Introduced expanded psychiatry panel for UDT and PGT
- Renewed focus on PGT business line
  - Business line leader named
  - Dedicated sales team
- RxAnte acquisition





MILLENNIUM
LABORATORIES

CITI-DE-00019804

CONFIDENTIAL

# Our end-to-end, personalized solution
## High growth, synergistic business lines coming together

TRULY
**PERSONALIZED**
**& TARGETED**

RxAnte + PGT + UDT + = MEDICATION SOLUTIONS

| RxANTE ADVANCED ANALYTICS

to risk stratify populations | MILLENNIUM PGT

to establish precise medication therapies | MILLENNIUM UDT

to drive adherence to targeted medications through regular monitoring | Other interventions partnerships and initiatives |

We provide relevant, clinically actionable information to that is valuable to with industry leading speed and accuracy for the benefit of the



CITI-DE-00019805

CONFIDENTIAL

# Our end-to-end, personalized solution
## High growth, synergistic business lines coming together

TRULY
**PERSONALIZED**
& TARGETED

RxAnte + PGT + UDT + = MEDICATION SOLUTIONS

**RxANTE ADVANCED ANALYTICS**

to risk stratify populations

**MILLENNIUM PGT**

to establish precise medication therapies

**MILLENNIUM UDT**

to drive adherence to targeted medications through regular monitoring

Other interventions partnerships and initiatives

Revenue ($m)

| 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|
| 5 | 13 | 25 | 43 | 56 |

Revenue ($m)

| 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|
| 12 | 24 | 55 | 75 | 91 |

Revenue ($m)

| 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|
| 621 | 697 | 709 | 735 | 786 |

Total Revenue ($m)

| 2013 | 2014 | 2015 | 2016 | 2017 |
|------|------|------|------|------|
| 633 | 733 | 789 | 853 | 933 |


MILLENNIUM LABORATORIES

CITI-DE-00019806

CONFIDENTIAL | 13

CONFIDENTIAL

# Overview of Millennium's services

| | MILLENNIUM UDT | MILLENNIUM PGT | RxANTE |
|---|---|---|---|
| **What** | • Medication monitoring and drug detection used to evaluate patient treatment plans and improve clinical outcomes and patient safety | • Predict a patient's genetic predisposition to metabolizing medications | • Analytical platform that uses volumes of ordinary healthcare claims data to improve the use of medications |
| **How** | • Millennium is the leader in UDT<br>• State-of-the-art technology platform allows for industry leading turnaround time, sensitivity, specificity and accuracy<br>• Exclusive LC-MS technology platform<br>• Proprietary LIS | • Millennium helps clinicians develop a tailored treatment regimen based on these results<br>• Improved safety and drug effectiveness<br>• PGT Consult Mobile App | • Provides an advanced analytics platform that drives targeted, tailored drug therapy management programs<br>• Population medication management solution that is proven to help clients achieve better adherence, lower costs and improved patient outcomes |
| **Status** | • National presence covering all 50 states and Puerto Rico<br>• Currently serve over 6,400 physician practices with contracts covering over 168 million lives<br>• Tested over 6.4 million specimens to date with approximately 2.4 million of those tested in 2013 | • PGT launched in Q3 2012<br>• PGT specimen volume since launch has been over 78,000<br>• Processed 57,000 specimens in 2013 and over 18,000 YTD 2014 with records in March (record day, record week, record month) | • 8 million covered lives and adherence scores collected for over 90 million patients<br>• "Advanced analytics to risk-stratify populations"<br>• Contract with national Medicare Advantage Plans, PBMs, and Commercial Health Plans |



MILLENNIUM LABORATORIES

CITI-DE-00019807

CONFIDENTIAL

# Summary of financial results



**Specimens tested**

| | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| 000s | 177 | 496 | 1,118 | 1,809 | 2,388 |
| Growth rate | | 180.2% | 125.4% | 61.8% | 32.0% |

CAGR = 92%



**Net revenue**

| | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| ($mm) | $64 | $161 | $233 | $522 | $632 |
| Growth rate | | 149.3% | 44.8% | 124.5% | 21.0% |

CAGR = 77%



**Gross profit**

| | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| ($mm) | $55 | $135 | $196 | $467 | $557 |
| Growth rate | | 145.5% | 45.2% | 138.3% | 19.3% |

CAGR = 78%



**Adjusted EBITDA**

| | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| ($mm) | $41 | $102 | $109 | $330 | $378 |
| Growth rate | | 148.8% | 6.9% | 202.8% | 14.5% |
| Margin | 64.1% | 63.4% | 46.8% | 63.2% | 59.8% |

CAGR = 74%



MILLENNIUM
LABORATORIES

CONFIDENTIAL  |  15

CITI-DE-00019808

CONFIDENTIAL

# INDUSTRY OVERVIEW AND OPPORTUNITIES

CITI-DE-0001809

CONFIDENTIAL

MILLENNIUM UDT

$13bn

MILLENNIUM PGT

RVANTE



CITI-DE-00019810

# Abuse of pain and other prescription medications is a national epidemic



## The problem

- Opioid prescriptions grew 176% from 1991-2010 (5.5% CAGR during this period)

- Approximately 100 million Americans suffer from chronic pain

- 1 in 20 people in the US reported using prescription pain relievers for non-medical reasons in the past year

- Emergency department visits due to abuse of prescription drugs has increased by 115% in six years

- More than $323bn in annual costs associated with unintended consequences including lost productivity, emotional and physical stress

**Total Number of Opioid Prescriptions Dispensed by U.S Retail Pharmacies 1991–2010**



Source: National Institute on Drug Abuse (NIDA) research report series: Prescription Drugs: Abuse and Addiction



CONFIDENTIAL

CITI-DE-00019811



# Industry overview and outlook

## Key factors driving industry growth

- Rapid growth in drugs of abuse testing / monitoring space

  - Opioid use / abuse problem has been well documented and is clearly a national/global epidemic

  - Industry still relatively small and not well organized or understood

- Rapid growth of monitoring industry has essentially mirrored drug use/abuse trends

- Pain medication prescriptions jumped from 30 million in 1990 to 180 million in 2010[1]

- Aging population

- Expanded coverage under the Affordable Care Act

- Approximately 30% of Americans suffer from chronic pain

[1] National Institute on Drug Abuse 2011

## Americans have chronic pain



Source: American Association of Physicians in Medicine (AAPM)



10 Treatment admissions for abuse

32 Emergency department visits

1 Death

130 People who Misuse/abuse

825 Non-medical users

**For every tragic life-ending story, there are hundreds of additional patients suffering**



CONFIDENTIAL



# The UDT market is a large, growing and underpenetrated

## Key growth drivers

- Per IMS data, the US pain management pharmaceutical market was an estimated $18.2 billion in 2012 and growing
  - Rapidly aging population
  - Growth in chronic pain conditions
- As awareness increases, more patients in the "untapped market" will be tested
- More states are endorsing UDT testing as the standard of care and publishing guidelines
  - More than 20 states have issued guidelines around drugs of abuse testing
  - National Governor's Association (NGA) launched special panel to address opioid problem in seven states
- UDT is also used for adherence and compliance purposes in adjacent markets

Note: "Other competitors" include: hospital labs, specialty labs and general labs
[1] Cooperative Center of Health Services published 01/19/2010
[2] Millennium Management

## Estimated share of addressable pain management market [1,2]



Millennium ~16%

Untapped Addressable Market ~50%

Other Competitors ~34%

### Potential market opportunity of 16.0 million Specimens
~$2B addressable market (1.3 million chronic pain patients in the US receiving opioids, 12 specimens per patient annually, $240 per specimen, 70% of market is currently tested)

## Estimated size of current and adjacent addressable markets[2]



($B)

| | $6.3B |
| Chronic Pain | Psychiatric / Behavioral Health | Surgical / Perioperative | Concierge Medicine |

$4.2B   $6.3B   $1.4B   $0.9B


MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019813



# Large opportunity for expansion in Primary Care

| Number of chronic pain patients prescribed opioids in the U.S. (2012) – by specialty | Significant opportunity for expansion in Primary Care |
|---|---|



**Left chart: '000s of patients by Medical Specialty**

- PCP: 3,970
- Pain: 1,918
- NP/PA: 799
- Other: 453
- Behavioral Health: 42
- OB/GYN: 39
- Other: 2

Legend: ▩ Pain management    ▩ PCPs

**Right chart: Estimated number of Millennium patients ('000s)**

- 2011A: 413 / 128
- 2012A: 560 / 308
- 2013A: 570 / 499
- 2014E: 587 / 600
- 2015E: 604 / 687
- 2016E: 628 / 787

**% of total**

| PCP | Pain | NP/PA | Other | Behavioral Health | OB/GYN | Other |
|---|---|---|---|---|---|---|
| 55.0% | 26.6% | 11.1% | 6.3% | 0.6% | 0.5% | 0.0% |

Source: IMS

**% of total**

| | 2011A | 2012A | 2013A | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|---|
| Pain mgmt. | 76.3% | 64.6% | 53.3% | 49.4% | 46.8% | 44.4% |
| PCP | 15.9% | 20.0% | 20.7% | 23.3% | 25.7% | 28.2% |
| Other[1] | 7.8% | 15.4% | 26.0% | 27.2% | 27.5% | 27.4% |

[1]Other consists of treatment center, behavioral health, OBGYN and other specialties



MILLENNIUM LABORATORIES

CONFIDENTIAL

# The new VA and DoD relationship provides for a large and immediate growth channel



## History

- In June 2013, Millennium was awarded a Federal Supply Schedule (FSS) government contracting vehicle to provide comprehensive drug testing services administered by the Department of Veterans Affairs

- Contract number V797D-30178

  - Contract period June 2013 – 2023

  - Approved: comprehensive UDT panel

  - Includes 80+ drugs and metabolites

## Opportunity

- Estimated market size of over $400 million[1]

- Veterans Administration (VA) is America's largest integrated health care system providing care to almost 9 million enrollees

- Defense Health Program ("DHP") provides care to approximately 1.7 million active duty personnel with the majority of care provided directly in DHP facilities

- 50% of Veterans enrolled and receiving care at VA are affected by chronic pain[2]

- In Q1 2014, Millennium hired business leader that formerly led the multi-billion dollar government strategy at Walgreens

[1] Based on market sizing analysis performed by Sigma Health Consulting
[2] Veteran Affairs testimony to the U.S. House of Representatives



MILLENNIUM
LABORATORIES

CONFIDENTIAL  |  22



# International opportunity

## Spending by Therapy Area in 2017

| Top 20 Classes 71% | Others 29% | | Top 20 Classes 45% | Others 55% |
|---|---|---|---|---|

| Developed markets | Sales in 2017 (LC$) | | Pharmerging markets[1] | (LC$) |
|---|---|---|---|---|
| Oncology | $74-84Bn | | Pain | $22-25Bn |
| Diabetes | $34-39Bn | | Other CNS Drugs | $20-23Bn |
| Anti-INFs | $32-37Bn | | Antibiotics | $18-21Bn |
| Pain | $31-36Bn | | Oncology | $17-20Bn |
| Asthma/COPD | $31-36Bn | | Hypertension | $14-17Bn |
| Other CNS drugs | $26-31Bn | | Diabetes | $10-12Bn |
| Hypertension | $23-26Bn | | Dermatology | $10-12Bn |
| Immunostimulants | $22-25Bn | | Antiulcerants | $9-11Bn |
| HIV Antivirus | $22-25Bn | | Cholestrol | $6-8Bn |
| Dermatology | $22-25Bn | | Asthma/COPD | $3-5Bn |
| Antibiotics | $18-21Bn | | AntiEpileptics | $3-5Bn |
| Cholestrol | $16-19Bn | | Antivirals excluding HIV | $3-5Bn |
| Anti-Epileptics | $15-18Bn | | Immunosuppresants | $3-5Bn |
| Immunosuppressants | $15-18Bn | | Allery | $3-5Bn |
| Antipyschotics | $13-16Bn | | Antidepressants | $3-5Bn |
| Antiulcerants | $12-14Bn | | Antiplatelet | $3-5Bn |
| Antidepressants | $10-21Bn | | Antipsychotics | $2-31Bn |
| Antivirals excluding HIV | $8-10Bn | | Heparins | $1-2Bn |
| ADHD | $7-9Bn | | Erectile Dysfunction | $1-2Bn |
| Interferons | $6-8Bn | | Immunostimulants | $1-2Bn |

Specialty    Traditional

Source: IMS Health Thought Leadership September 2013

## By 2017, pain is projected to be the highest spend therapy area in Pharmerging Markets


MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019816

CONFIDENTIAL

MILLENNIUMUDT

$16bn

**MILLENNIUM PGT**

**$8bn**

VANTE



CITI-DE-00019817



# Pharmacogenetics (PGT)

*Defined as the study of how genetic variability affects an individual's response to medications*

## Goals of pharmacogenetic testing

* To predict a patient's genetic predisposition to metabolizing medications

* To develop a tailored or personalized treatment regimen to maximize safety and efficacy

* Technology will allow us to identify the most appropriate drug(s) based on the metabolism of each patient

  − Clarify or validate UDT results



Patient Group

Drug Efficacious and Toxic

Drug Effective and Not Toxic

Same Diagnosis Same Medications

Drug NOT Effective and Not Toxic

Drug NOT Effective and Toxic

---

**Metabolism profile**

| | | | |
|---|---|---|---|
| • Significantly increased enzyme activity<br>• Metabolizes certain medication at a significantly higher rate than normal | • Normal enzyme activity<br>• Metabolizes certain medication at a normal rate | • Reduced enzyme activity<br>• Metabolizes certain medications at a somewhat lower rate than expected | • No enzyme activity<br>• Metabolizes certain medications at a significantly lower rate than normal |

   

**Phenotype**

**Ultra-rapid** | **Extensive** | **Intermediate** | **Poor**

**Potential clinical impact**

| | | | |
|---|---|---|---|
| • Unexpected therapeutic response<br>• Increased risk for adverse effects<br>• Increased risk for medical interactions<br>• Need for dose adjustment<br>• Need for medication change | • Likely to have expected response to medications | • Minimal effect on therapeutic response and risk for adverse events | • Unexpected therapeutic response<br>• Increased risk for adverse effects<br>• Increased risk for medication interactions<br>• Need for dose adjustment<br>• Need for medication change |



MILLENNIUM LABORATORIES

CONFIDENTIAL

CITI-DE-00019818

CONFIDENTIAL

# PGT is a largely untapped market

## Key growth drivers

* Increased focus on personalized medicine and outcomes through "right drug / dosage, right patient" model

* As awareness increases, more patients in the "untapped market" will be tested

* High potential for cost savings by preventing and reducing adverse drug effects (safety) and starting patients on a targeted drug therapy (efficacy)

* More payors recognizing the clinical / economic value of PGT

* PGT could lead to improved patient adherence
    - Number one reason people are not adherent is because they do not believe their therapy will work

## Estimated share of current addressable market – pain management [1,2]



Potential market opportunity of 6.2 million Specimens $1.5bn addressable market (~8 million chronic pain patients in the US receiving opioids, 1.1 specimens per patient, $250 per specimen, 70% of market is addressable)

## Estimated size of current and adjacent addressable markets [2]



Note: "Other competitors" include: hospital labs, specialty labs and general labs
[1] Cooperative Center of Health Services published 01/19/2010
[2] Millennium Management


MILLENNIUM LABORATORIES

CONFIDENTIAL  |  26

CITI-DE-00019819

# Accessing the PGT opportunity

**Accessing Millennium's current population**

- Millennium will process approximately 2,800,000 UDT specimens for approximately 1.1 million patients in 2014
- Will process approximately 105,000 PGT samples in 2014
- Leveraging our current network, we estimate that approximately 75% of our patient population could clinically benefit from PGT
- 1.1 million total patients * 75% * $250 reimbursement of PGT = $206mm opportunity based on 2014 projected patient population

**Leveraging Millennium's network and infrastructure to expand into new markets**

- Chronic pain, psychiatry and other adjacent markets represent $5.7B of opportunity
- Millennium currently serves over 2,100 pain practices, 2,600 primary care physician practices, and 370 behavioral health facilities / practices
- Attractive reimbursement for pain management and psychiatric PGT testing (average Medicare reimbursement is currently >$700 per specimen)

**Exploring platform discussions to broaden gene offering**

- Expect pain management and psychiatric markets to be significant focus for short-term (<1 year)
- Exploring options to expand gene/drug/therapeutic offering
- Expect to be able to systematically launch additional genes / drugs in future periods



MILLENNIUM LABORATORIES

CONFIDENTIAL





RxANTE

$10bn



CITI-DE-00019821

# RxAnte overview
*Advanced analytical platform drives targeted, tailored drug therapy management programs to improve outcomes and lower costs*

CONFIDENTIAL

## Company history

* Founded in 2011

* Founder & President:
  Josh Benner, PharmD, ScD

* Locations:
  McLean, VA & Portland, ME

* Venture-backed In 2012:
  Aberdare Ventures &
  West Health Investment Fund

## Revenue growth



- 2011A: $0.3M
- 2012A: $2.4M
- 2013A: $5.0M

## Key metrics

* 8 million lives under management

* Over 90 million adherence scores

* 42 FTEs

* Strong EBITDA growth
  - 2015 $6.3m
  - 2016 $20.9m
  - 2017 $30.8m

* ~$10 billion addressable market

## Representative customers





CITI-DE-00019822

# The RxAnte system

CONFIDENTIAL

- The patent-pending RxAnte System uses advanced analytics, decision analytics, and evaluation analytics to improve outcomes and lower costs

- Improving medication use is one of the biggest opportunities to improve health outcomes and lower the cost of care

- RxAnte's mission is to be the most effective solution for improving the quality and outcomes of medication use

- RxAnte is the population medication management platform that uses advanced analytics to improve the quality and outcomes of drug therapy

- It works. RxAnte has helped our clients achieve better adherence and lower the cost of creating adherent patients





CITI-DE-00019823

# Our first "synergy" offering

## Addressing the epidemic of opioid abuse

**Overuse of opioid pain meds is a major public health problem, and risk of overuse / abuse can be identified using RxAnte's advanced analytics**

- ❋ **The optimal approach for managing opioid use has two prongs:**
  - — Address likely abuse at the patient, provider, and pharmacy levels
  - — Prevent abuse in those at-risk, as early as their first fill

- ❋ **RxAnte and Millennium are developing:**
  - — A profiling tool that identifies members, pharmacies, and prescribers who are likely over-users of opioid pain medications
  - — A risk score that identifies members at-risk of abuse, at the time of their initial fill

**RxAnte's solution is an unique, market leading tool to address this epidemic**

### Cost of prescription drug abuse on the U.S. Economy (2006)



Total cost 2006
$53.4 billion

Lost Productivity
$42 billion

Increased Criminal Justice Costs
**$2.2 billion**

Medical Complications
**$944 million**

Source: Trust for America's Health – Prescription Drug Abuse 2013



MILLENNIUM LABORATORIES

CONFIDENTIAL

# KEY CREDIT STRENGTHS

CITI-DE-0001825

CONFIDENTIAL

# Key credit strengths

Large, expanding and underpenetrated market opportunities – domestic and globally

Strong competitive position

Barriers to entry including national sales force, operational processes and proprietary algorithms

Highly efficient platform with potential for significant operational leverage

Diversified and growing customer base with strong payor relationships that include national contracts

Leading voice in the clinical research and academic communities

Industry leading margin profile with high Free Cash Flow

Execution-oriented management team with strategic vision and significant experience complimented by a renowned advisory board



CITI-DE-00019826

CONFIDENTIAL

# Millennium opportunity

## MILLENNIUM UDT

- Department of Defense / VA
- Primary care
- Psychiatric and behavioral health
- Surgical / preoperative
- Expanded therapeutic offering
  - Example: Starfire drugs
- International expansion

**$13+ billion opportunity**

## MILLENNIUM PGT

- Cross-selling within existing UDT customer base
- Primary care
- Psychiatric, behavioral health and addiction
- Department of Defense / VA
- Market share growth in pain management
- Surgical / preoperative
- Expanded therapeutic offering
  - Example: Starfire drugs / genes plus other genes / other drugs with clinical utility
- Consumer approach

**$8+ billion opportunity**

## RxAnte

- Cross selling within existing payors relationships
- Strong value proposition with Medicare Advantage plans for Star Ratings improvement
- Risk / Gain sharing model for Star Ratings improvement
- Medical cost savings model with commercial / Medicaid plans
- Integrated solutions for personalized drug therapy platform
- International medication adherence solutions

**$10+ billion opportunity**

**Current addressable domestic markets represent a $31+ billion opportunity**


MILLENNIUM LABORATORIES

CONFIDENTIAL | 34

# Strong competitive positioning

## Millennium is the lab of choice as a result of multiple customer-centric attributes

| | Millennium Laboratories | Aegis | Ameritox | LabCorp | Quest Diagnostics |
|---|---|---|---|---|---|
| Founded | 2007 | 1986 | 1996 | 1996 | 1967 |
| Headquarters | San Diego, CA | Nashville, TN | Baltimore, MD | Burlington, NC | Madison, NJ |
| **Sales model** | Sales Rep supported by Customer Support Rep, & in certain states a Laboratory Service Assistant | Limited Sales Representatives, primarily lab personnel in physician offices; customer lease agreements | Sales Representative & Laboratory Service Assistants | Sales Representative Not-specialized | Sales Representative some specialization |
| **Toxicologist Availability** | 12 Hours every business day | 9 Hours every business day | 12 Hours every business day | Dedicated Phone Line, no posted hours | 12 Hours every business day |
| **Clinical & PharmD Availability** | 9 PhD and PharmD field educators providing national support | Limited, 2 educators | Limited, 2 educators | Not known | Not known |
| **Health plan Contracts** | 197 contracts, 168 million lives covered | Limited | Limited | Numerous National and State Contracts | Numerous National and State Contracts |
| **Turnaround Time** | "Generally 24 hours after receipt at Lab" | 4-6 days | 3-8 days | Documented 6 - 14 days | Documented 2-11 days |
| **Service Offerings** | UDT, ODT, PGT RxAnte | UDT, ODT, Hormone, Sports & Forensic testing | UDT, ODT PGT (Outsourced) | Broad Test Menu, not specialized to core markets; Many tests not available w/UDT | Broad Test Menu, not specialized to core markets; Many tests not available w/UDT |
| **Customer Testing Selections** | Physician choice; selection of tests by individual drug and test method | Lab Determined Panels | Lab Determined Panels | Lab Determined Panels | Lab Determined Panels |
| **Technology Platform** | LC-MS, EIA limited | EIA, GC/MS, LC-MS | EIA, GC/MS, LC-MS | EIA, GC/MS, LC-MS/MS | EIA, GC/MS, LC-MS |
| **Advanced Predictive Analytics** | RxAnte | N/A | N/A | N/A | N/A |
| **UDT Volume Requirements** | <2 mL | 6 mL | 25 mL (when testing via GC/MS) | 15-30 mL | 15-30 mL |

Customer service

Technology

Source: Management



CONFIDENTIAL

CITI-DE-00019828

# Millennium's offering is highly differentiated with significant barriers to entry

**Clinical and economic benefits**

- Manage patients' disease state leading to more successful outcomes
- Manage clinician risk by proactively understanding appropriate medications
- Provide substantial savings in the overall cost of treatment

**Unique technology platform**

- Effective exclusive use of Liquid Chromatography/Mass Spectrometry (LC-MS)
- Equipment powered by highly scalable proprietary Laboratory Information System (LIS) allows for increased throughput, reduced turnaround time, and accuracy of results
- LIS expandable to accommodate new technologies and geographies

**Differentiated offering with industry leading customer service**

- Industry leader in test offerings with some of the lowest level of detections
- Test forms designed provide physicians choice of specific drug / medication and test type
- Leveragable national sales and service team

**Leading voice in the clinical, research and academic communities**

- Develop, translate and disseminate cutting edge information to internal colleagues and external customers
- Millennium is dedicated to advancing clinical best practices and care outcomes through scientific research and education
- 18 full time employees dedicated to this effort

**Seven years and a total investment of over $200mm in infrastructure, technology, and people**


MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019829

# Value proposition and differentiation

**Millennium's testing services provide valuable information to Clinicians and Payors with evidence based offerings, industry leading speed and accuracy to improve patient outcomes**

**Clinicians**

- Providing clinicians with tools allowing them to more effectively prescribe and manage patients' disease state leading to more successful outcomes
- Improve safety and efficacy of prescribing and prevent potential complications
- Help clinicians meet regulatory requirements and adhere to national guidelines
- Provide objective tools and clinical resources that enable clinicians to optimize patient outcomes

**Payors**

- May reduce overall healthcare utilization and yield substantial savings in the overall cost of treatment
- Guidance to assist clinicians in identifying individualized drug & dosage to reduce adverse outcomes
- Ensure proper monitoring to help improve outcomes and reduce adverse events
- Reduce risk of medication misuse and non-adherence
- Results in better patient adherence and quality of care

**Patients**

- Provide important information to improve patient safety
- Increased quality of care and reduced adverse drug reactions and reduced drug-drug interaction
- Extensive contracted business reduces out of pocket costs patient costs
- Improved lives



# Cutting-edge scientific technology

## Summary comparison of an 18-drug panel

| LC-MS and Proprietary Algorithm | | GC-MS | |
| --- | --- | --- | --- |
| Number of steps to injection | 14 | Number of steps to injection | 495 |
| Instrumentation | 2 per 160 samples | Instrumentation | 34 per 160 samples |
| Machine time | 12.5 minutes per specimen | Machine time | 34-78 minutes per specimen |
| Sample requirements | <2mL urine | Sample requirements | 20+ mL urine |
| Sample preparation time | 10-90 minutes per batch | Sample preparation time | 120-240 minutes per batch |
| Upfront equipment cost | $250K - $450K | Upfront equipment cost | $150K - $200K |


MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019831

# State-of-the-art infrastructure offers significant operating leverage

CONFIDENTIAL

## Ability to leverage current assets

| Asset | Current capacity (specimens / day) | | Projected capacity (specimens / day) |
|---|---|---|---|
| Labor | 12,000 | ⟹ | **14,400** w/o additional labor |
| **Equipment** | | | |
| Hamilton | 13,400 | ⟹ | 16,000 w/o additional units |
| Olympus | 14,000 | ⟹ | 18,000 w/o additional units |
| LC-MS | 12,000 | ⟹ | 14,400 w/o additional units |
| Facilities | 14,000 | ⟹ | **16,800** w/o additional sqft |

## Operational excellence
### $20mm in quantifiable cost savings

**Commenced lean production initiative**

- 10 active work-streams across "order fulfillment"
- Cycle-time reduction
  - Improved on-time delivery
  - 20% increase in capacity to absorb growth and leverage assets

**Six Sigma**

- Initiative will begin in Q3 2014



## Process flow

- Point of service / sample submission
- Transport to Millennium Labs
- Reception at Millennium Labs
- Patient record management
- Sample preparation
- Clinical data acquisition
- Clinical data analysis
- Clinical data review and release



MILLENNIUM LABORATORIES

CONFIDENTIAL | 39

CITI-DE-00019832

CONFIDENTIAL

# High touch, national sales organization

## Commentary

- Composition of sales force
  - Regional VP's: 3
  - Regional Directors: 7
  - Regional Managers: 12
  - Sales Representatives: 101
  - Customer Service Support: 117
  - Genetic Sales Specials: 11
  - Laboratory Service Assistants: 300

- A majority of sales representatives promoted from CSSs

- Commitment to customers throughout ongoing education and training of sales and service team

- Commitment to compliance with dedicated Chief Compliance Officer and in-house legal team; compliance program modeled around OIG Model Compliance Plan for Clinical Laboratories

## Geographical diversity across all 50 states and Puerto Rico

Legend:
- ○ LSA
- ○ CSS
- ○ Rep
- ○ Manager

| Volume by region | |
| --- | --- |
| West | 22% |
| Central | 19% |
| Midsouth | 15% |
| Midwest | 15% |
| Big East | 29% |



MILLENNIUM LABORATORIES

CITI-DE-00019833

# Customer and specimen growth history

**Millennium continues to acquire new customers and deepen penetration of its existing customers**



**Millennium is focused on expanding volume with existing customers and maximizing productivity from its sales force**

- Over 680% growth in number of practices from Q1 2010 to Q4 2013
- Existing customer growth of 39.5% from 2011-2013
- Ability to leverage active accounts and existing relationships to drive PGT Volume
- All organic growth



CONFIDENTIAL

# Payor strategy and key contracts

## Managed care strategy / contract overview

- Millennium has established a 9 member Managed Markets team with a national coverage
- Proactively pursue network agreements to drive sales growth and maintain competitive advantage
- By utilizing clinical data and MRI research to educate national and regional health plans and government insurers, Millennium is able to illustrate the clinical benefits and potential cost savings
- Millennium has long-term contracts with key managed care companies, providing significant forward revenue visibility and stability
- 197 Network contracts covering 168 million lives
- 63% of business contracted (including Medicare, Medicaid, and commercial plans)
- Shared payor relationships with RxAnte

## Selected commercial contracts

- Key Agreements include:

 UnitedHealth Group

 Anthem

 WellCare

HUMANA.

 Amerigroup RealSolutions

 WELLPOINT

BlueCross BlueShield

Covering 24 states

## Contracted volume mix[1]



Note: excluding self-pay

Out of Network**, 13.0%

Out of Network, 24.0%

In-Network, 63.0%

** Opportunity: Out of network volume from payors with little to no reimbursement

[1] Contract status as of 03/01/2014

## Workers' compensation referral program

- Comprehensive approach to managing injured workers in collaboration with national carriers and PBMs
- Drives additional core business through directed introduction by carriers
- Launched April 2013
- 1,500+ specimens through direct referral program
- 60 new Millennium customers
- 7,000+ additional specimens through new and returning customer relationships
- Key agreements include:

 AIG

 Liberty Mutual

 NEW MEXICO MUTUAL



 Texas Mutual

 MILLENNIUM LABORATORIES

CITI-DE-00019835

# Diverse customer and payor mix
*As of Q4 2013*

## Broad customer base limits concentration

| Customer | Specimen Volume | % of Total |
|---|---|---|
| Practice A | 5,115 | 0.8% |
| Practice B | 4,519 | 0.7% |
| Practice C | 4,430 | 0.7% |
| Practice D | 4,238 | 0.6% |
| Practice E | 4,188 | 0.6% |
| Practice F | 3,933 | 0.6% |
| Practice G | 3,906 | 0.6% |
| Practice H | 3,761 | 0.6% |
| Practice I | 3,516 | 0.5% |
| Practice J | 3,284 | 0.5% |
| Top 10 | 40,890 | 6.2% |
| Remaining | 614,111 | 93.8% |
| Total | 655,001 | 100.0% |

## Payor volume mix



WC, 4.0%   Other, 1.0%
Medicaid, 9.0%
Medicare, 18.0%
Self-pay, 10.0%
Commercial, 58.0%

## Multiple specialty penetration and diversification



Volume: Other 10%, PCP 19%, Treatment and addiction 27%, Pain management 44%

Customers: Other 17%, PCP 40%, Treatment and addiction 11%, Pain management 32%

- ▨ Other
- ▨ PCP
- ▨ Treatment and addiction
- ▨ Pain management[1]

[1]Includes behavioral health, OBGYN and other specialties



MILLENNIUM LABORATORIES

CONFIDENTIAL

CITI-DE-00019836

# Millennium is a leading voice in toxicology and pharmacogenetics

## Initiatives focused on the key stakeholders

### Clinical

**Internal**

- Provide clinical input and strategic direction related to current and expanding products
- Develop and deliver sales training
- Contribute to development of clinical content for reports (UDT & PGT)
- Provide clinical expertise for and ensure accuracy of all ML created resources, presentations, publications, posters and marketing resources

**External**

- Identify knowledge gaps and facilitate solutions
- Provide managed markets, work comp, payor and policy group education
- Represent ML and provide education at Regional and National conferences
- Deliver 1:1 as well as small group support for customers
- Develop KOLs
- Lead speaker development and training

### Research

**Research Strategic Areas for PGT & UDT**

- Focus on Outcomes by clinicians, patients, and health plans
- Health Economic Outcomes
- Advancing Scientific Testing

**Interdisciplinary Research Team**

- Toxicologists / Scientists
- Physicians
- Psychologists
- Clinical Pharmacists
- Health Economists
- Nurses

**Publication Strategy**

- Over 40 original peer-reviewed journal articles published
- Over 70 research posters presented at state & national conferences

### Education

**Nat'l healthcare professionals education**

- ~ 13,000 educated in 2012
- ~ 21,000 educated in 2013

**Over 120 faculty experts educating on**

- Safely Prescribing Controlled Substances
- Clinical value of medication monitoring
- Risk Management in Care of Chronic Pain Patients
- Substance Use Disorders
- Crossroads of Pain and Addiction
- Clinical Value of Pharmacogenetic Testing
- Research Updates on Pain, Addiction, Medication Monitoring, Pharmacogenetics

**Educated via**

- Live trainings
- Online courses
- Clinical resources
- Publications
- Conferences
- Sponsored CME



MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019837

CONFIDENTIAL

# Industry leading margin profile with high free cash flow

## Adjusted EBITDA Margin



## Free Cash Flow



Note: FCF is defined as EBITDA less capital expenditures

## Sustainability of margins

- Efficiency of our dedicated LC-MS technology platform and proprietary methods

- Expansive test offering and rapid response to market demand

- Overall go to market strategy

  – Results-oriented sales team

  – Clinical education team

## Sustainability of cash generated over time

- Predictive / Analytic and decision support capabilities are in demand by health plans and difficult to replicate

- Operational excellence initiatives recently implemented

- Continued strong volume growth to leverage fixed overhead

- RxAnte margins on stand alone basis quickly grow from 26% in 2015 to mid to upper 50% range by 2018



MILLENNIUM
LABORATORIES

CITI-DE-00019838

# Execution – oriented management team with significant experience and strategic vision

| Executive | Experience |
|-----------|-----------|
| **James Slattery**<br>*Founder and Chairman* | • Ernst & Young Entrepreneur of the Year Award in 2011 in the San Diego region<br>• Achieved success in real estate development and broadcast communications, creating the first satellite radio network in the United States which he later sold to a Fortune 500 broadcast company |
| **Brock Hardaway**<br>*Chief Executive Officer* | • Served as executive VP of operations for Kindred Healthcare (NYSE: KND), which operates approximately 225 nursing and rehabilitation centers and 120 long-term acute care hospitals in 26 states; Oversaw day-to-day operations of 47 inpatient hospitals with approximately 11,000 employees, the largest region of the largest business unit within Kindred<br>• Retained by Kindred post acquisition of RehabCare, and served as EVP and hospital division President, reporting directly to the CEO<br>• President and chief operating officer of Triumph HealthCare, prior to its acquisition by RehabCare. Led the company through an unprecedented period of growth, and played a key role in the sale of the company to RehabCare Group |
| **Howard Appel**<br>*President* | • Prior to his promotion to President, he served Millennium as the company's CFO.  Was one of the first Millennium employees and has led many initiatives and operations during the company's extraordinary period of growth<br>• Previously the CFO of Laffer Associates for 17 years; held various securities licenses and Certified Public Accountant |
| **Mark Winham**<br>*Chief Operating Officer* | • Mr. Winham was the VP of global manufacturing at Life Technologies, responsible for the operations of 30+ sites world-wide with 2,500+ manufacturing professionals<br>• 25+ years of industry experience, of which 14 years in the laboratory at Johnson & Johnson, Sanofi-Aventis, and the UK National Health Service |
| **Tim Kennedy**<br>*Chief Financial Officer* | • Mr. Kennedy served as the CFO and GM of PLUS Diagnostics where he developed the infrastructure to support rapid growth, executed process improvements that maximized profit margins, increased product offerings, and enabled expansion to become a national service provider<br>• Previously served as owner and CFO of Diagnostic Imaging Management for 10+ years and prior at LabCorp as the VP of finance and the corporate controller where he led more than 50 acquisitions, adding to significant growth in revenue and was integral in the merger to form LabCorp |
| **Josh Benner, PhD**<br>*President – RxAnte* | • Founder and CEO of RxAnte prior to the recent acquisition<br>• As one of one of the leading voices on medication adherence in the country, Dr. Benner is a pharmacist and Harvard prepared health researcher that has led multiple companies through tremendous growth in the health IT sector |
| **Martin Price**<br>*General Counsel* | • Most recently, Mr. Price acted as outside counsel to the company while a Partner with the international law firm Hogan Lovells US LLP.<br>• Previously he was an associate with the international law firm Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates and a law clerk to the Honorable W. Curtis Sewell (ret.) of the U.S. District Court for the Eastern District of Virginia |

**Management has over 150 years of combined experience**



CONFIDENTIAL

CITI-DE-00019839

CONFIDENTIAL

# Strategic advisory board

**Millennium has assembled an advisory board composed of thought leaders, political leaders, and healthcare industry executives all in an effort to provide the company with sound advice and strategic direction**

   

**Former Senator Tom Daschle**

• Senior policy advisor in DLA Piper's Government Affairs practice

• Former Majority Leader and distinguished healthcare authority

**Mark McClellan, MD**

• Senior Fellow and Director of the Health Care Innovation and Value Initiative at the Brookings Institute

• Former Administrator of CMS and Former Commission of FDA

**John Short, PhD**

• Principal of Short Consulting LLC and most recently CEO of RehabCare

• Serves on several healthcare company boards including Kindred Healthcare, WellPoint, and CareMore

**Robert Pfotenhauer**

• Retired from executive management with United Health Group

• Played a key role in building the nation's leading Part D Prescription Drug company of United Health Group



CITI-DE-00019840

CONFIDENTIAL

# FINANCIAL OVERVIEW

CITI-DE-0001841

# Summary of financial results











CONFIDENTIAL

# Reimbursement trends: FY 2011 to FY 2013



NRPS        Tests per specimen - base        With new tests added

| Even with rate pressure, Millennium has several ways to combat these head winds | Prior to going "in-network" Millennium conducts an economic review | When payors move from out-of-network to in-network several things typically happen |
|---|---|---|
| ▫ High initial margins vs. competitors<br>▫ End-to-end solutions based approach<br>▫ Rapid turnaround times with best in class customer service<br>▫ Dedicated established relationships<br>▫ Operational leverage with proven ability to efficiently scale and improve profitability<br>▫ Expense reduction initiative plans | ▫ Ability to redirect out-of-network business<br>▫ Impact of the proposed rates on short-term revenue<br>▫ Break-even volume<br>▫ Market share analysis of the health plan in specific territories/regions<br>▫ Reduction in out-of-pocket expenses for patients | ▫ Volumes increase due to redirection<br>▫ Partnership to navigate industry dynamics<br>▫ Greater sharing of information to improve patient outcomes<br>▫ Health plan redirects payments from patients to Millennium |

**Millennium has successfully navigated this environment since inception**



MILLENNIUM
LABORATORIES

CITI-DE-00019843

# Net revenue per specimen: FY2012 to FY2013

## Commentary

- **Product positioning**: End-to-end solutions based approach

- **Experience**: Quickly adapting to a changing reimbursement environment
  - Rate cuts of over 8% from 2012 to 2013 and yet EBITDA grew 15% during same period

## Summary

| | | | |
|---|---|---|---|
| NRPS, FY 2012 | Test / specimen impact | Payor mix shift | Medicare rate cut | Payor changes | NRPS, FY 2013 |

$289 → ($2.51) → ($7.99) → ($6.09) → ($7.14) → $265

*(8.3)% NRPS*



CONFIDENTIAL | 51

CONFIDENTIAL

# EBITDA Bridge: FY 2011 to FY 2013

## Commentary

- Pricing is primarily driven by payor mix, tests ordered per specimen, test mix, and fee schedule pricing (i.e. the Medicare Clinical Lab Fee Schedule)

- Despite pricing pressures and building infrastructure for future growth, EBITDA continued to grow

## EBITDA Bridge



CITI-DE-00019845

# Overview of projection assumptions

| | |
|---|---|
| **UDT** | • Volume: 2014 volume growth rate of 19.0%, 2015 growth rate of 9.3%, and 2013-2020 CAGR of 9.7%<br><br>• NRPS: Reduction to NRPS of 5.7% and 8.4% in 2014 and 2015, respectively; 2013-2020 cumulative reduction of 30.9%<br><br>• COS per Specimen: 2013-2020 CAGR of (1.2%) as a result of operating leverage |
| **PGT** | • Volume: 2014 volume growth rate of 108.1%, 2015 growth rate of 125.4%, and 2013-2020 CAGR of 40.2%<br><br>• NRPS: Reduction to NRPS of 4.1% and 1.8% in 2014 and 2015, respectively; 2013-2020 cumulative reduction of 14.5%<br><br>• COS per Specimen: 2013-2020 CAGR of (2.6%) as a result of operating leverage |
| **RxAnte** | • Projected to grow from $12.8M of revenue to $87.8M of revenue by 2020<br><br>• EBITDA margins scale rapidly from 25.7% in 2015 to >50% by 2017 |
| **Operating expenses** | • Expenses were identified as fixed (capacity-based) or variable (volume-driven) and projected accordingly |
| **Key balance sheet assumptions** | • DSO remains in the range of 49 to 51 days |



MILLENNIUM LABORATORIES

CONFIDENTIAL

# Financial forecasts

## Specimens tested



| Growth rate | | 20.7% | 15.8% | 14.3% | 13.1% | 12.1% |
|---|---|---|---|---|---|---|

## Net revenue



| Growth rate | | 15.9% | 7.6% | 8.2% | 9.4% | 8.0% |
|---|---|---|---|---|---|---|

## Gross profit



| Growth rate | | 14.7% | 5.5%% | 7.0% | 8.7% | 7.4% |
|---|---|---|---|---|---|---|

## Adjusted EBITDA



| Growth rate | | 10.5% | 4.3% | 5.3% | 8.5% | 6.9% |
|---|---|---|---|---|---|---|
| Margin | 59.7% | 57.0% | 55.2% | 53.8% | 53.4% | 52.8% |



MILLENNIUM
LABORATORIES

CONFIDENTIAL | 54

CITI-DE-00019847

CONFIDENTIAL

# Financial forecasts (cont.)

## Capital expenditures

Growth    Maintenance    Other    % Sales



| % Sales | 3.3% | 2.0% | 2.3% | 2.6% | 3.4% |

## FCF[1]



[1] Net income plus D&A and stock-based compensation less tax distributions to shareholders, increase in working capital, capital expenditures, debt related amortization, and capital lease amortization
[2] 2014 FCF excludes Q1 2014

## Total leverage[3]

[3]Total Leverage (including PNC notes & capital leases)

## Interest coverage[4]

[4]EBIT / Net Interest Expense




MILLENNIUM
LABORATORIES

CITI-DE-00019848

CONFIDENTIAL

# Key credit strengths

Large, expanding and underpenetrated market opportunities – domestic and globally

Strong competitive position

Barriers to entry including national sales force, operational processes and proprietary algorithms

Highly efficient platform with potential for significant operational leverage

Diversified and growing customer base with strong payor relationships that include national contracts

Leading voice in the clinical research and academic communities

Industry leading margin profile with high Free Cash Flow

Execution-oriented management team with strategic vision and significant experience complimented by a renowned advisory board



CITI-DE-00019849

CONFIDENTIAL



# APPENDIX

CITI-DE-00019850

# EBITDA reconciliation

## Historical and projected EBITDA reconciliation

| ($mm) | Audited 2012 | Unaudited 2013 | Projected 2014 |
|---|---|---|---|
| Net income | ($292.28) | $178.90 | $297.22 |
| Plus: Interest expense | 3.89 | 5.82 | 38.62[1] |
| Plus: TA debenture interest | 29.40 | 29.40 | – |
| Plus: JPM interest expense | 8.90 | 9.18 | – |
| Plus: Non-deductible interest expense | – | – | 37.96 |
| Less: Interest income | (0.04) | (0.16) | – |
| Plus: Federal, state, and local income taxes | 1.63 | 2.40 | 3.39 |
| Plus: D&A | 10.54 | 16.90 | 22.73 |
| Plus: Non-cash compensation expenses | 0.37 | 3.05 | 3.98 |
| Plus: RxAnte transaction expenses | 8.11 | 0.66 | 13.99 |
| Plus: Change in fair value of stock purchase warrants | 469.57 | 110.00 | – |
| Plus: Change in fair value of interest rate swap | 1.10 | 0.18 | – |
| Plus: Loss on extinguishment of debt | 88.65 | – | – |
| **EBITDA** | **$329.85** | **$356.36** | **$417.87** |
| **Adjustments** | | | |
| Non-recurring compensation | – | 10.54 | – |
| Pathway expenses | – | 10.75 | – |
| Non-cash loss on disposal of assets | – | 0.46 | – |
| **Adjusted EBITDA** | **$329.85** | **$378.12** | **$417.87** |

Note:  Numbers may not foot due to rounding
[1] Includes TA, JPM, and other interest expenses



CONFIDENTIAL  |  58

# Compliance and legal update

- Established Medicare Compliance Program (December 2008) and appointed Chief Compliance Officer

- First UDT Lab to embrace OIG Model Compliance Plan for Clinical Laboratories and publicly post Compliance plan on website. (March 2012)

- Announced "Clinical Laboratory Responsibility Pledge" – a commitment to ethical and responsible business practices, and to never offer a service that would place the patient, healthcare professional or practice at risk (March 2012)

- Initiator and sole funder of unrestricted grant to Duke University for the purpose of convening industry stakeholders to develop elements of a voluntary code of ethical business practices (September 2012)

- Engaged Strategic Management, a nationally-recognized healthcare compliance organization directed by Inspector General Dick Kusserow to validate that ML's compliance program satisfied the seven elements of OIG's Model Compliance Plan for Clinical Laboratories. (October 2013)

- Chief Compliance Officer previously held senior compliance positions with Johnson & Johnson, Millennium Pharmaceuticals and AssureRx



CONFIDENTIAL | 59

CONFIDENTIAL

# Legal entity overview



- Millennium Laboratories, LLC: operating company including drug testing clinical laboratory.
- RxAnte, LLC: provides data-driven analytical platform to compliment testing services.
- Pain in the Air, LLC: primarily owns aircraft, which are leased to Millennium Laboratories, LLC.



- Non-profit research and state-of-the-art teaching center for pain management

- Collaborates with universities, researchers, government and industry partners to design and execute new educational programs related to pain that train scientists and researchers

- Provides physicians and payors a unique source of published research on pain and access to thought leaders from the industry

- Provides CLIA-waived in-office urine drug testing devices and medication monitoring supplies

Notes:
[1] Pain in the Air, LLC owns aircraft
[2] Affiliated entity
[3] Millennium Laboratories, Inc. to be converted to an LL prior to the closing date for the Senior Secured Facilities
[4] New passive holdings to be incorporated prior to the closing date for the Senior Credit Facilities for purpose of pledging the stock of the Borrower



MILLENNIUM
LABORATORIES

CITI-DE-00019853

# Millennium's UDT and PGT offerings
## Millennium offers one of the broadest test menus in the industry

### UDT

#### Synthetic Opioids

- Fentanyl
- Norfentanyl
- Methadone
- EDDP-(methadone metabolite)
- Propoxyphene
- Norpropoxyphene
- Tramadol
- O-desmethyl-tramadol
- N-desmethyl-tramadol
- Meperidine
- Normeperidine
- Tapentadol

#### Natural/Semi Syn. Opioids

- Codeine
- Morphine
- Hydrocodone
- Norhydrocodone
- Hydromorphone
- Xycodone
- Noroxycodone
- Oxymorphone
- Buprenorphine
- Norbuprenorphine
- Buprenorphine–Transdermal (Butrans®)
- Norbuprenorphine Transdermal (Butrans®)

#### Other Substances

- Alcohol
- Ethyl Glucuronide
- Ethyl Sulfate
- Nicotine Metabolite

#### Benzodiazepines

- Alpha-hydroxyalprazolam
- 7-Amino-clonazepam
- Lorazepam
- Nordiazepam
- Oxazepam
- Temazepam
- Alprazolam
- Clonazepam
- Diazepam

#### Illicit Substances

- Cocaine
- Benzoylecgonine (cocaine metabolite)
- Heroin
- 6-MAM (heroin metabolite)
- MDMA (ecstasy)
- Methamphetamine
- Methamphetamine (D&L isomers)
- Phencyclidine (PCP)
- Marijuana
- cTHC (marijuana metabolite)

#### Antipsychotics

- Aripiprazole
- Dehydroaripiprazole
- Clozapine
- N-Desmethylclozapine
- Haloperidol
- Haloperidol metabolite
- Olanzapine
- Quetiapine
- Norquetiapine
- Risperidone
- Hydroxyrisperidone

#### Serotonin Uptake Inhibitors

- Citalopram/Escitalopram
- N-Desmethylcitalopram
- Hydroxybupropion
- Duloxetine
- Fluoxetine/Norfluoxetine
- Paroxetine
- Venlafaxine
- Desmethylvenlafaxine

#### Barbiturates

- Phenobarbital
- Secobarbital
- Butalbital

#### Synthetic Cannabanoids

- AM2201 metabolite
- MAM2201 metabolite
- JWH018 metabolite
- JWH073 metabolite
- JWH081 metabolite
- JWH122 metabolite
- JWH210 metabolite
- JWH250 metabolite
- RCS4 metabolite
- RCS4 metabolite #9
- XLR11/UR144 metabolite

#### Cathinones (Bath salts)

- MDPV
- Mephedrone
- Methylone

#### Other

- Amphetamine
- Acetominophen
- Methylphenidate
- Ritalinic Acid
- Gabapentin
- Pregabalin
- Ketamine
- Norketamine
- Naltrexone
- Naltrexol (naltrexone etabolite)
- Zolpidem (zolpidem metabolite)
- Nurzolpidem
- Carisoprodol
- Meprobamate
- Cyclobenzaprine
- Desipramine
- Imipramine
- Amitriptyline
- Nortriptyline
- Dextromethorphan
- Dextrorphan (Dextromethorphan metabolite)
- Phentermine
- Epinephrine
- Norepinephrine
- Dopamine
- Catecholamines
- 5-HIAA urine
- Mitragynine
- 7-OH Mitragynine

### PGT

#### Antidepressants / SSRI SNRI

- Citalopram
- Escitalopram
- Paroxetine
- Sertraline
- Venlafaxine

#### Antidepressants / tricyclic

- Amitriptyline
- Clomipramine
- Desipramine
- Doxepin
- Imipramine
- Nortriptyline

#### Antipsychotics

- Aripiprazole
- Haloperidol
- Risperidone

#### Atomoxetine

- Atomoxetine

#### Benzodiazepines

- Diazepam
- Lorazepam
- Ozazepam

#### Methadone

- Methadone

#### Muscle Relaxants

- Carisoprodol

#### Opioids

- Codeine
- Hydrocodone
- Oxycodone
- Tramadol



MILLENNIUM
LABORATORIES

CONFIDENTIAL

CITI-DE-00019854

CONFIDENTIAL

# 70% of PGT customers are also UDT customers



**Millennium is leveraging current UDT customers to cross-sell PGT, maximizing sales force ROI per call**



PGT customers and volumes growing

- PGT customers
- Specimens



Approximately 70% of PGT customers order both UDT and PGT

- % of PGT customers that are UDT too
- # PGT Customers
- # PGT + UDT Customers

**Ability to leverage active accounts and existing relationships to drive PGT Volume**



MILLENNIUM
LABORATORIES

CITI-DE-00019855

CONFIDENTIAL

# National coverage

## Customers in most major cities



City with a customer within last 6 months

CITI-DE-00019856

CONFIDENTIAL



CITI-DE-00019857