# EXHIBIT 62

| | |
|---|---|
| **From:** | Karanikolaidis, Stathis |
| **To:** | Lee, Jenny Y.; Rapkin, Cory; Griswold, Ryan P; Mainelli, Matthew; Chiarelli, Benjamin R |
| **Sent:** | 3/29/2014 4:08:43 PM |
| **Subject:** | Re: Lender Presentation - Dry Run |

We ll script those 4 questions and make sure they get addressed. We ll reinforce at dinner. All follow up investor questions should be directed to us.

We can really do this in our sleep...

Stathis Karanikolaidis
Managing Director
Leveraged Finance
J.P. Morgan Securities LLC
Office: 212-270-7374
Cell: 917-406-8907

---

**From**: Lee, Jenny Y.
**Sent**: Saturday, March 29, 2014 12:03 PM
**To**: Karanikolaidis, Stathis; Rapkin, Cory; Griswold, Ryan P; Mainelli, Matthew; Chiarelli, Benjamin R
**Subject**: Fw: Lender Presentation - Dry Run

Appreciate Brock has done 15 calls, but a presentation in front of a big group is different than 1-1 calls. They need to do some sort of page flip to make sure they are to the point.

I want to be sure they hit hard the questions and predispositions that accounts have in their heads on 1) Competition from Labcorp and Quest and the smaller players
2) Reimbursement pressure
3) Litigation - what is the June court date that is coming up for the company...apollo mentioned it. They need to hit what they are being investigated for by the DOJ in a matter of fact way.
4) Dispel that the fear that their sales force is encouraging docs to over-test/over bill to drive volumes. Growth has been so fast. largely driven by volume, and accounts have started asking this question.

Jenny Lee
Managing Director
HY and Leveraged Loan Capital Markets
JP Morgan Securities
W: 212-270-0844
C: 917-846-2532

**Exhibit 0128**

---

**From**: Brock Hardaway [mailto:Brock.Hardaway@millenniumlabs.com]
**Sent**: Saturday, March 29, 2014 11:46 AM
**To**: Chiarelli, Benjamin R; Howard Appel <Howard@milleniumlaboratories.com>; Tim Kennedy <Tim.Kennedy@millenniumlabs.com>; Rapkin, Cory; Mainelli, Matthew; Karanikolaidis, Stathis; Lee, Jenny Y.; Daniel Pencak <Daniel.Pencak@millenniumlabs.com>; Griswold, Ryan P
**Cc**: Guttilla, Michael T; Yeh, Hank; Liou, Calvin O; Christoforou, Alla
**Subject**: RE: Lender Presentation - Dry Run

Team, good work. I am about to go through this again now before our 10 am PT call. I think we have done this presentation enough in the past week to do it in our sleep (in fact, I think I did it in my sleep last night!!!)..so no need to do a "dry run" this morning. Lets use the call time to review the slides changed, etc.

CONFIDENTIAL

Ben, baby?

Brock Hardaway
Chief Executive Officer
16981 Via Tazon
San Diego, CA  92127
Phone: 858-451-3535
Fax: 858-451-3636
Brock.Hardaway@MillenniumLabs.com

(Full Email Disclaimer – http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Chiarelli, Benjamin R [mailto:benjamin.r.chiarelli@jpmorgan.com]
**Sent:** Saturday, March 29, 2014 5:09 AM
**To:** Brock Hardaway; Howard Appel; Tim Kennedy; Rapkin, Cory; Mainelli, Matthew; Karanikolaidis, Stathis; Lee, Jenny Y.; Daniel Pencak; Griswold, Ryan P
**Cc:** Guttilla, Michael T; Yeh, Hank; Liou, Calvin O; Christoforou, Alla
**Subject:** RE: Lender Presentation - Dry Run

All

In advance of the dry run today please find attached the latest version of the presentation.  As always the password to open the file is JPMml2012*

Brock – I put the 5 additional options for slide 19 at the end of the deck for your review.  I still think we should go with the original slide without the projections so I put that option in there for now – I really don't want to lose this headroom concept as I think it's a powerful message (especially since we are really the only company with the salesforce capable of penetrating PCPs effectively).  We can discuss on the call or happy to hop on the phone this morning prior to if that is better for you.

Best,
Ben

---

**Benjamin R. Chiarelli** | Vice President | Healthcare Investment Banking | **J.P. Morgan**
383 Madison Avenue, 37th floor | New York, New York 10179
T: 212.622.7229 | F: 646.224.5595 | benjamin.r.chiarelli@jpmorgan.com

**Alternate contact:** Jean Meehan | Executive Assistant | T: 212.622.2168 | jean.a.meehan@jpmorgan.com

-----Original Appointment-----
**From:** Susan Elsdon [mailto:Susan.Elsdon@millenniumlabs.com]
**Sent:** Friday, March 28, 2014 5:49 PM
**To:** Susan Elsdon; Brock Hardaway; Howard Appel; Tim Kennedy; Rapkin, Cory; Chiarelli, Benjamin R; Mainelli, Matthew; Karanikolaidis, Stathis; Lee, Jenny Y.; Daniel Pencak; Griswold, Ryan P
**Subject:** Lender Presentation - Dry Run
**When:** Saturday, March 29, 2014 1:00 PM-2:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Conference Call: 1-866-918-0830/Conference Code: 2045358477#

CONFIDENTIAL

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

CONFIDENTIAL

JPMC-MIL-CORP-00046784

# EXHIBIT 63

**From:**  Guttilla, Michael T <michael.t.guttilla@jpmorgan.com>
**To:**  Griswold, Ryan P <ryan.p.griswold@jpmorgan.com>
**CC:**  Christoforou, Alla <alla.christoforou@jpmorgan.com>
**Sent:**  1/14/2014 8:14:59 PM
**Subject:**  RE: Millennium

Ryan – our thoughts below. Let us know if you want to add/edit anything. We can pass this along to Griff ahead of our 4pm call.

Couple questions/thoughts for when we discuss. Can we connect sometime after 4:00 your time?

1)   How much can jpm commit/hold? For an $850 BB ish deal I'd typically expect at least 15% / $125ish for the jbrs (jpm/suntrust + 1 or 2 others to get this done) – 5 internal rating, would be equal to a BB/Ba2, $150 is our threshold, but when we did the recent deal Dawn had some angst even with where we landed on that deal because we are above a lot of the peers at the 5-level

2)   What's our internal rating currently and p/f this dividend at 2.3x/3.0x – should not change materially, may be some chance of going down to 5-

3)   2013 end up where expected--$630ish of revenue and $360ish of ebitda? Have not seen year-end results yet, they are due by 3/30, we can put a call in to TA to see?

4)   Realize p/r raise won't be rated but do we have a  guesstimate on public rating at 2.3x/3.0x – low-to-mid BB

5)   Can I get /where can I get a summary of the litigation pending, how we're comfortable etc (banks turned this down in 2012 over that and use of proceeds), I missed the litigation update call during the nov 2013 execution – included below

6)   Can you remind me where leverage was (thru bank and TA debt) and dividend size when we did the deal in 2012? Bunch of banks wiffed over leverage/size of dividend/litigation then, realize we're in better mkt, bigger company now etc – 2.7x through bank debt, total debt was 4.6x including the TA debenture (based on $114.3mm EBITDA). The distribution was $300mm.

7)   Probably makes sense to do a quick check with Millennium for an update on new banks calling on them. Would be curious if/how many of the banks that looked at it in 2012 and passed  have tried to keep in touch with the company. – do we want to do this, given request came from TA? Perhaps we can work through TA on this?

8)   Straw man path to $850—JPM/Suntrust + 1 other JBR (bmo? Existing)  @ $125 = $375,  Fifth Third /Citi (existing) @75 each = $150, Regions /GECC (existing) @ $50 each,  BBH (existing) @$15.  Gets you $640  ish , need $200ish of new/retail.   Most likely suspects to revisit, all turned it down in 2012 over use of proceeds or litigation or TA debt structure-- Wells,  BAML, Sumitomo, USBank, Union Bank,  Raymond James,  BBVA Compass,  Bank of the West, BB&T, Cal Bank&Trust, Key, RBC, would/could check of bunch of others.   Stating the obvious but use of proceeds and litigation will remain the hurdle for new guys.   At the appropriate time, would make sense to screen existing guys early/pre launch for a reality check on capacity.

9)   I agree with your L+250, the 25 undrawn on the rc is low but meaningless given small rc size and it's below mkt in existing deal.  I might show range/bump up the new money  up-fronts to 40-50bps, we just paid 25bps for new 3.5yr money (7bps a year)  in November for what is a 1x lev deal and we'll be asking for sizeable  commitments/increase in commitments.  Maybe we get away with old money fee for what is 2yr ish extension + amendment, say 20bps.

**Litigation update from call during November syndication:**
An open investigation by the US Attorney in Boston:
1.   There are no outstanding claims/charges at this time.
2.   None of the employees have been asked to testify in front of the jury.
3.   Only 4 former employees have testified, all of whom are involved in civil lawsuits against the company.
4.   The company is cooperating with the Attorney's office.
5.   ML is providing all necessary documents to the Attorney's office upon request (Sales/mkt materials, core groups of custodians, testing data from State of Massachusetts claims to specify how the company

**Exhibit 0125**

CONFIDENTIAL

JPMC-MIL-CORP-00189654

bills for specimen validity)

6. The claim was filled in Massachusetts due to the fact that it used to have the most aggressive lawyer specializing in healthcare fraud, however, that is no longer the case (California, NJ, etc).

7. The main reason for the investigation is the fact that a lot of competitors have been filing claims with the same allegations, which is a red flag. However, all of the cases filed against the Company have been dismissed without prejudice, which makes ML confident in a similar outcome.

8. The attorney that has been working on the case recused herself from the case due to her seeking outside employment (unrelated to any of the parties involved in the case). The case currently does not have an attorney assigned to it, which might cause the process to lengthen (in which case another attorney will have to pick it up and start the work from scratch). According to company's estimate, this type of law suits takes ~2 years to conclude.

9. In 2012 ML had a lawsuit brought up by Robert Cunningham, a former compliance officer of Calloway regarding ML's billing practices, which was dismissed for lack of subject matter. This outcome reiterates the company's belief in success of the outstanding case.

There are 2 civil cases outstanding brought up by Ameritox:

1. Both of the cases filed in 2011 and are pending at the moment.

2. The cases are based on the claim regarding display of information depicting test report result based on bell curve (Ameritox patented it in 2011) and unfair business practices. One of the cases was dismissed for lack of jurisdiction and has been re-filed.

3. The company has had several similar law suits brought up since 2008 by Calloway and all of them have been dismissed.

Civil cases filed by former employees:

1. The company has discovered that the cases have been sponsored by Ameritox.

2. Summary judgments are pending for all of the cases.

Millennium has filled claims against Ameritox as well. The claims are similar to the claim brought up by Ameritox against ML.

JPMC-MIL-CORP-00189655

# EXHIBIT 64

| | |
|---|---|
| **From:** | Griswold, Ryan P <ryan.p.griswold@jpmorgan.com> |
| **To:** | Karanikolaidis, Stathis <Stathis.Karanikolaidis@jpmorgan.com> |
| **Sent:** | 3/16/2014 3:16:01 AM |
| **Subject:** | FW: ML | RAP (3-15-2014 @ 10:00PM) |

Pulp fiction....

Ryan P. Griswold | Vice President | Leveraged Finance | J.P. Morgan | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

Alternate contact: Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

-----Original Message-----
**From:** Brock Hardaway [Brock.Hardaway@millenniumlabs.com]
**Sent:** Saturday, March 15, 2014 11:13 PM Eastern Standard Time
**To:** Yeh, Hank
**Cc:** Howard Appel; Tim Kennedy; Daniel Pencak; Chiarelli, Benjamin R; Griswold, Ryan P; Liou, Calvin O; Christoforou, Alla
**Subject:** Re: ML | RAP (3-15-2014 @ 10:00PM)

JPM team, you all did incredible work on this . i know it has been a lot of back and forth and many long hours but the final product is going to be outstanding. i am very proud of what we have created at Millennium and our story -- you guys should be very proud of how you are helping us tell the story ... very, very, very well done!

Sent from my iPad

On Mar 15, 2014, at 7:24 PM, "Yeh, Hank" wrote:

> All,
>
> Please find attached the latest version of the RAP incorporating the additional footnote on the 2014 FCF.
>
> Thank you,
> Hank
>
> Hank Yeh | Associate | Investment Banking | Healthcare | J.P. Morgan |
> 383 Madison Avenue, 37th Floor, New York, NY 10179 |
> T: 212-622-2365 | F: 917-464-9059 | M: 267-825-3664 | hank.yeh@jpmorgan.com<mailto:hank.yeh@jpmorgan.com>
>
>
> This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.
>

CONFIDENTIAL

JPMC-00054929

# EXHIBIT 65
# FILED UNDER SEAL

# EXHIBIT 66
# FILED UNDER SEAL

# EXHIBIT 67

# Millennium Laboratories

Investor Q&A
March-14

| Category | Question | Answer | Institution / Investor |
|---|---|---|---|
| | EBITDA add backs timing | 10.5 slattery bonus was in q1; 10.7 vendor resolution was in q4; other small ones in q4 | Moody's |
| | Volume payor mix | 54% commercial; 31% medicare 9% medicaid; 6% workers comp | |
| | Any geographic concentrate by state | follows our volume; Florida is large; Southeast; tracks where the problems are | |
| | Liquidity analysis - any LCs | none; don't expect to use R/C | |
| | RxAnte earnouts | q4 14 and q4 15; assumed fully paid | |
| | All services billed under clinical fee schedule | yes | |
| | Thoughts around yesterday's announcement | still developing but very encouraging; pushed out; labcorp up 4%; we backed in 30% rate decline over projection period, this is way slower | |
| | Anyone limiting unnecessary testing; do you see that | No, can't tell doctors what to do | |
| | Given legal org structure, where we get financials | Millennium Lab Holdings II LLC; year end and quarterly; no operations at holding | |
| | Pain in the Air (airline sub), is there any limitation to incurring debt at that sub | yes, same as today | |
| | Related party leases for real estate | In 2013 based on GAAP, b/c of length of term and relationship, leases were classified as capitalized even though they are like operating; cash is the same, just reclassification | |
| | Cash outflows for the dividend | 1648, 1270 is dividend, 196 of TA debenture, 45.4 of fees, 52.5, current portion of JPM loan, 40 of taxes from q4; no cash against the warrants | |
| | Leverage Target | 3.0x | |
| | Differences between LC-MS and GCMS | liquid vs. gas, capital costs the same but process and scalability are very different; LC-MS has lower cut offs, higher sensitivity, higher specificity and higher accuracy; Instrument does not work without algorithms/methods and optimization of both is key; LC-MS + ML proprietary algorithms and customized methods allows to add more drugs to the test panel with virtually no additional cost which drops down to EBITDA. ML is the only lab that uses LC-MS platform exclusively (99.6%) | Deerfield |
| | Sustainability of High Margins | Lots of capacity and operational leverage, lean six sigma, costs saves; reimbursement trends; higher margin PGT, military, and RxAnte; additional tests to be added over time | |
| | Qualitative Test vs. Quant Test | binary vs. specific level; class of drug vs. individual drug. ML has the lowest cut off levels which allow to give industry leading sensitivity, specificity and accuracy. | |
| | LabCorp & Quest Model | No specialized sales force, white collections boxes outside of buildings; infrastructure and technology does not allow for fast turnaround; we are too big to acquire and our investment in LC-MS is a big amount for even them to spend ($200mm and 7 years to get to where ML is now); they already have UDT and haven't done anything w/ it in 5 years. ML has been successful at competing with the big guys in winning national contracts, for example United has contracts with ML and Labcorp only, but not with Quest. A part of the business is service – doctors need support etc. ML has a strong sales force (talk to doctors each 7-10 days). ML is much more efficient, everything is done in house. | |
| | DoD contract | 2 year campaign to win; 10 year deal; license to hunt, we hired Walgreens top government HC guy, huge validation.. Labcorp has a national agreement as well. ML is not competing on a test by test basis but offers a broad panel of over 85 drugs. ML has a fixed price of $250 and if you do the same number of tests with Labcorp it would cost 10 times that. It a potential $400mm book of business for the company. Expecting to start realizing revenue in 4Q14. Ml is the only toxicology lab that has DoD contract (sticky, exclusive). Private side info: Revenue and EBITDA from this contract is insignificant in projection assumptions (only 1%). But strategically is very important. A lot of upside but ML is not modeling it. | |
| | How long are contracts with payors? What are the rates? | 1-3 years, it varies. Rates structure also varies but some are tied to Medicare reimbursement schedules. | |
| | Regulation in the space? | | |
| | Margin movement from '10 to '11 to '12 | Moved from qualitative to quantative because clinicians typically did both; removing wasteful testing from the process; giving up the qualitative test hurt price per specimen and margins in the short run, adding new tests, improving efficiency and growing volume led to a bounce back in margins | |
| | Huge increase in volume | Almost all a result of new customers vs. existing; 83% of volume increase in 2012 and 95% of the increase in 2013 were from new customers | |
| | How much did TA put in | 196 in the form of a debenture in 2010; it had warrants which convert to 45% of the company which will happen as part of this trade | |
| | What are exit opportunities | IPO; too large for strategics; may run parallel path to gauge sponsor interest | |
| | Sales force pay | Sales reps are 80-90k plus commission; CCS are 50-60k plus commission; scewed toward variable with no cap on bonus | Lord Abbott |
| | SG&A | Headcount, mgmt, legal, systems; all proportionate of growth | |
| | Ownership Structure | 45% TA, 47% Jim, 8% management and other individuals; TA has no board seats | |
| | Tax Rate | 52.6% paid by shareholders directly (pass through entity) and 1% corporate tax | |
| | Working Cap | 10% of revenue each year so change isn't big/volatile | |

JPMC-MIL-CORP-00219685

| | | |
|---|---|---|
| | Valuation | LabCorp/Quest trade at 8.5x and don't have the margin or growth, low double digits at a minimum; this plus Aegis trading for 9-9.5x provides a valuation floor; comps are a mixture of specialty diagnostics company (GHDX, Myriad, Foundation, Oxford Immunotec, Veracyte) and HCIT names | |

CONFIDENTIAL

| | | |
|---|---|---|
| Regulation in the space? | On average patients are tested 2.1 times per year tested. Based on risk it ranges btw 2-4 up to 8 base don risk. The general trend is to increase testing. Over 20 states have released guidance or have mandated UDT. The motivation to test is two folds: clinical - to know who and what is taking and liability - the only objective tool docs have to rely on when making decisions which can protect them in case of a legal issue. | |
| Industry growth? | Domestic – 5%. International - behind but catching up very quickly. And nobody is attacking international growth. | |
| EBITDA margins and NRPS out-in network? | 63% in network, 24% out of network that pay over medicare contracted rates, 13% out of network pay almost nothing. ML is going after this 13% that currently don't reimburse - pure upside as the costs are already in. As this13% come in network and start reimbursing that incremental revenue will mitigate any decline in out of network (24%) rates shifting in the network with potential margin compression. In network $265 NRPS, Out of network $260 NRPS | |
| Who else has LC-MS | Other competitors have a max of 50% LCMS. ML is LC-MS exclusive | Crescent |
| Pharmocogenetics, has ML come up with it? | No, metabolization of different drug through specific genes is known to everyone. ML is able to analyze the data and help to predict what medication and in what quantities will work for different patient based on their phenotype. | |
| Is PGT making money already? | Yes, PGT has earned revenue in 2013 and is on track to more than double it based on 1Q14 results. Though its still so new that it requires education of doctors as well as payors, which ML has been doing successfully. They have a sales team dedicated to educating people about PGT benefits. | |
| Is target patients for a PGT test not a new patient but someone who is already undergoing treatment? | Not necessarily, PBGT can be used for either as it will give a doctor hard data to base their medication prescription on (either for a new or existing patients) and eliminate any guess work. Currently medications prescribed to people with the same condition only varies by dosage which is determined by sex and weight. In reality it all depends on how fast a person can metabolize certain drugs and that exactly what PGT test determines. Only need to test each gene once for a lifetime. | |
| How much of revenue growth in 2013 came from new customers? | 95% | |
| Turnaround time | We are UPS's large early morning delivery customer in the world; largest customer in CA. The turnaround time for ML is predominantly 24 hours | |
| LabCorp and Quest | Specialize in less critical test; no turnaround time b/c they split the test and send to multiple labs; they don't have payor mix outside of ours | |
| International | The space is behind the US but every trend show that it will catch up to US soon. Would do via JV to minimize capital/risk; beauty of the model is stick a machine a broad and all the analytics come from CA | |
| EBITDA margin decline in 2011 and increase in 2012 reasons? | Qualitative tests ML used to have weren't providing any value add information (binary yes or no response) – not the information physicians need. They moved to exclusive quantitative (LC-MS platform). They knew it will affect their performance. They've launched everything on new platform in 4Q11 and add more tests which attracted a lot of customers and resulted in pop in the EBITDA. | |
| Reimbursement trends? Slide 47 | 2011-12: 90mm – cause of LCMS platform btw 2011-12 MI added 17-20 tests at almost no cost - all new tests 2012-13: -42mm – payor mix shift, plans (blue cross), 5% medicare rate cut and fewer tests per specimen | |
| PGT Reimbursement | Tipping point 2 years ie standard practice; as we education / sell it is resonating and payors are adapting; docts don't understand pharmacology and we are leading the pack; 72% of our volume is made up of existing UDT customers; medicare pays for it, United, BlueCross does too; still educating other plans; avg reimbursement is 265 but lots of people not paying so will gravitate up to low 300s; mid 50% margin; big consumer market as well | Invesco |
| What does Rx Ante get you | End to end solution; stickiness w/ payors | |
| Is testing standard practice for docs | yes, if you prescribe opiotes; docs don't know who is abusing and this is their only way of knowing | |
| PGT importance | Black box warning on codeine b/c of conversion to morphine and dead children b/c mother's metabolizing too fast | |
| Turnover rate | About 16% turnover rate; high % get promoted to sales rep | |
| Cost of training new sales person | Do training every 6 weeks as well as adv. test every 6 weeks; we hire ex pharma reps who have to start as service reps | |
| In network vs. out of network | Payment we receive is 265 in in network; average across out of network 264, but brought down because 13% don't pay us (44 per specimen), remaining pay us 380 | |
| Key contract | 1 to 3 year contract; United 3 year; tied to Medicare fee schedule/hard coded | |
| Renewal rate | Only lost Aetna b/c they bought Coventry b/c they terminated all lab contracts and are reevaluating; they are customers of RxAnte | |
| Payor Change last year ($8 dollar decline in NRPS) | Bluecard program, was billing the state in CA but if not on their plan they send to patients home who don't pay; we are on 29 Blue's; some directed to patients, some didn't; 10 or 12 directed checks to the patients; now they are paying us and this issue is behind us | |
| Decline in PGT customers | change in sales force pulling them off and training them; now doubled our volume in last two months from q4 | |
| Purchase price for RxAnte | 75mm; 3x of '15 revenue; 20% of PP is earnouts | |
| Biggest payor in aggregate | 15%, the blues; 29 contracts; next largest is United 7%; top 5 is 15% | |
| | | KKR |
| Rev Breakdown | 95% UDT; Future state in 2017 where UDT comes down to 84% | |
| PGT sample | Prep sample is very complicated; we spit out a detail report on metabolism | |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| | Competitive Set in DoD | 2 contracts, national contract held by LC on an individual test; while our model offers comprehensive approach - 100 drug test for 250; their pricing is 10x ours on a per drug equivalent; selling is different which is why the new hire and why we are conservative; 10 years | |
| | Input Costs | We see them going down b/c operational efficient; we don't see costs going up | |

CONFIDENTIAL

| | | | Columbia |
|---|---|---|---|
| | How is my metabolism measured | Spit into a vial; Slide 20. Its all about how the body is set up: phonotype that ranges from poor to ultra rapid metabolism. 40-50% of drugs metabolizes through 2D6. If you are a rapid metabolize – you push it out of your system too quickly. The test recognizes what type you are for each individual gene. Last October they rolled out an app to allow to educate doctors and if they know if you are a poor metabolize the app will give his all the info he needs to know about potential drugs to prescribe. We are top 3 in PGT having only done it for 18months | |
| | How do you convince payors to move in network with you? | Also RxAnte has contract with individual health plans so ML can cross sell. United – pays out 10 times more to out of network labs so if they can redirect that volume to ML and save money. Given the national platform ML has it makes transition easier. Big picture – they realize that drug abuse is number one problem. | |
| | Reason for dividend | Estate planning for Jim; TA not driving | |
| | How many tests per patient (average, max over that period of time)? | How often to test is based on a physician. ML thinks that doctors tend to test more broadly to understand if a patient taking the drug but also if they are taking anything else or substitute (consistent across the industry). On average ML patients are being tested 2.1 times, while several states and societies have issued guidance which range btw 2-8 times per year based on risk profit. | |
| | Revenue from UDT/PGT/RxAnte? | 94-95% from UDT, PGT ~3% and growing rapidly (started in 2012) the rest is Rx Ante (also new and growing rapidly).ML wants to put all three in synergetic way. ML is not a lab company but focused on providing docs with clinical information from a broader perspective. | |
| | Who are PGT customers? | Cross utilization. Over 70-% of PGT business is done with UDT customers. It allows them to build on excising relationship. Also existing PGT customers can be approached from UDT side as well. | |
| | How much investments are you making (Capex and R&D)? | Its all in already. Full functioning PGT lab in San Diego. Agilent and Thermo Fisher make equipment but all the value in the algorithm. ML is sticking to the technology and infrastructure the have as it's the most sophisticated in the market | |
| | Physicians that orders those tests, can they do it themselves? | They can, though a lot of docs outsource for more sophisticated test. Additionally self referral issue momentum continues to grow. | |
| | How many docs are doing it themselves? | 10% in house, not significant. Majority of the industry is using 3rd party labs. Nobody is doing PGT in house. | |
| | Are there any co pays? | It depends, Medicare and Medicaid example – the entire pmt is covered by insurance. It varies on the commercial side. Still contracted is cheaper for a patient than none contracted. | |
| | Margins? | Some commercial payors pay more some less than medicare. Workers comp is higher than medicare (150-200% of medicare) – which set by each state. ML has over 8K different payors. | |
| | Reimbursement reduction risk? | Believe they'll go after older codes first (not the ones ML is billing for). Going forward potential impact 2-3 years down the road and is capped at 1-2% positive to 5-6% negative. As calculated via two methods used by medicare. | |
| | How do exchanges come into play? Sometimes rates are lower there? | 10% self pay ML gets very little now so they are able to capture some revenue (as they are moving to exchanges form self pay). No bad debt expense as they are billing on net basis. | |
| | What are you doing to address rate cuts? | Slide 34 –multiple things. MI built this business understanding rate pressure environment (they have a starting point EBITDA margin because of Platform they've built) but slide 34 shows key initiatives on cost cuts. Over the last 6 months the company has implemented significant efficiency initiatives. This year they can add volume without increasing any costs. They have also indentified 20mm of cost cutting. Lastly, projection reimbursement rate is conservative – which gives them a lot of upside. They have built in rate compression over the next few years. | |
| | How much growth came from market share vs. whitespace penetration? | In 2012 83% of incremental volume was net new volume growth. 17% from existing base. In 2013 – 95% net new growth and 5 from existing. | |
| | New customers, come from competitors or they've never done UDT before? | Both. | |
| | Maintenance capex? | 10K per machine per year. Actual capex requirement is low 2-3% per year. Number machines: 160 Agilent, 30 Thermo Fisher | |
| | Barriers to entry? | Capital investments. Most companies in the space are using GCMS platform. So to move to LCMS they have to put in $200+ mm in cap investment and scrap their own system. Additionally just machine want do much, its 150 configurations for each test that ML's scientists have come up with make it unique. Also, Labcorp and Quest are not in the same business – they are not a service company (ML is) | |
| | Case with Ameritox? | Its been a 5 year process, ML sued them as well and won, end of the day it will go away, might require additional few million in legal fees. Most likely will go to trial and nobody will be able to prove anything. From the start, the company was to litigate with competitors to get attention to their inappropriate practices (self referral, paying physicians, etc.). ML has never paid anything. | |

CONFIDENTIAL

| | | | |
|---|---|---|---|
| | How do you differ from Aegis and Ameritox? | National footprint, the others are regional. Service model (over 550 employee in the field dealing with customers – over 50%)<br>A lot of contracted business – more stable, less cost to the patient (less challenging for docs to use it)<br>Turnaround time – 24 hours<br>Choice – other labs offer preset panels and ML offers drug specific and panel specific tests<br>End to end solutions – have advanced analytics (to tell what population you need to be focused from the begging), pharmacokinetics (to tell what drugs and dosage will be effective) | Apollo |

JPMC-MIL-CORP-00219690

| Question | Answer | Note |
|---|---|---|
| How do you drive volume? | So far MI has been focused on pain doctors, only 20% come from PCP. While in the broader market 50% of prescriptions come from PCP. On average ML's patients are tested a little over 2 times a year. Based on risk assessment various medical societies have recommended to test btw 2-4 and up to 8 based on risk. | |
| Large degree of out of network? | Compare to Labcorp and Quest yes but compare to companies in their space (Aegis etc). ML has the most amount of contracted business. ML is evaluates in network opportunity case by case, there is no pressure. | |
| In network commercial and medicare/aid breakdown? | In network commercial and medicare/aid breakdown? Medicare/Medicaid ~$300-315 Regular commercial ~$230 Worker comp: 10% of rev and 4% of volume | |
| Useful life of equipment? | Manufacturer says 5 but their eq is 6 yrs in and doesn't have any issues | |
| Who used to perform the same services as you back when you started? | Ameritox, Callaway, Dominion, and a few others (probably around 5 names). | Oppenheimer |
| What multiple for RxAnte? | 3x of projected revenue of 2015, 20% of which is structured in earn outs. | |
| Reimbursement risk? | Built in a very conservative ~5% reduction in rates. But don't see that actually happening. The senate bill that came out last night: clinical fee schedule will be due for review and its proposing to push cuts till 2017 and limiting potential reduction. MI is estimated that the outcome for ML will be btw 2% positive – 5-6% negative. | |
| Commercial payors reimbursements? | 63% is contracted. United for example its fixed to 2010 medicare reimbursement schedule (commercial rate usually lag medicare by a few years as they are fixed for the length of a contract) | |
| Will you have to add more machines in 2014? | Slide 34 – ML is expected to have no issues to stay with this capacity for another 2-3 years. | |
| Do you market to health plans? | We do market to both physician (referrals) and payors to educate them, train them. Additionally as MI added PGT and RxAnte makes it more valuable for payors, presents an opportunity to cross sell in those two groups. Slide 35 and 36. On average ML tests patients only 2 times a year and most recommendations are btw 2-4 up to 8 sometimes. | |
| Who do you consider to be your competitors? | For comprehensive solution – none UDT – Aegis, Ameritox, Labcorp and Quest. None of them compete on the same way. Ability to have short turn around time (24 hours), no pre set panels (each individual drug and method) – complete discretion to doctor, national contracted strategy - offer diversified mix of payors to make it easier for docs (less unpleasant conversations from patients), same force and education / follow up / support stuff form MI and nobody else has that. | |
| New opportunities, acquisition? | Slide 9, RxAnte is a sweet spot: technology, cutting edge, small one ($75-100mm) MI has already looked at all OGT companies but passed on them as ML is already doing or planning on doing everything they are doing, ML is already top 3 by volume in PGT in the country | |
| As we look at Medicare vs. commercial pricing, what the difference? | $260-265 NRPS overall. Medicare – 300-315 NRPS, 240-250 Commercial. 10% of patients of volume ML doesn't get paid for at all so when these patient get into exchanges and ML gets reimbursed for it its all pure upside as costs have been incurred. | Shenkman |
| Regulatory environment, walk us though the proposed changes and how it will play out? | ML has absolute confidence in the volumes and they have built in conservatism into their model: rate compression -5% annually and still stay within 50% of margins). ML sees the regulation outcome might be positive as it pushes cuts to 2017 plus limits potential downside - the worst case scenario has been accounted for in the projections Either method they would use cross walk or gap fill, get you either to 2% increase or 5-6% decrease which are still built in to the projections. The worst case is 10—15% reduction overall starting 2017, while ML projected 5% reduction annually from 2014 so its accounted for. SRA is proposing to implement new code, which will be zero sum game to ML as a lot of opioids have not had a specific code for each drug. So ML will get reimbursed for some codes that were lumped into one before. | |
| Breakdown business btw screening and confirms? | Not a lot of screening cause they don't do qualitative screening. Don't do confirms really cause it accuses two tests done. Most of physicians don't order two tests (though they have an option). | |
| Coverage determinations? | Good for ML as it will eliminate physician's ability to own a lab which will allow the business to go back to ML. No forced panels – MI already has that (other don't) | |
| Commercial pricing pressure? | Blue cross / Blue shield and United contracts – in United they tied their fees schedule to 2010 fee schedule (their contract is 3 years which limits downside). As ML renegotiates contract with them for 2013-2016 they rates compression will be 5-6% which is already modeled in across the whole platform) | |
| Who are payors who don't reimburse you? | HMOs, some Blues that pay directly to members and members don't pay it to ML. Dozen of so states, instead of paying the lab they pay to patients – a lot of EBITDA In 2013 MI secured Well Point Anthem contract – over half of the states who redirected reimbursement will come to ML now so this pressure MI felt in 2013 will be limited in 2014. And that will continue t o happen across other payors over time. | |
| Going forward in network portion | 70% by year end. | |

JPMC-MIL-CORP-00219691

| | So if out of network coming into network, will it be reduction in rates? | It assumes that all percentages are the same , it will also drive volume. Also out of network who are paying more will more into and the ones who don't pay that much will move into in network it will be zero effect on margins. Additionally, ML has additional capability (~20%) as they have taken waste out of the system without any costs. So margins will be affected positively and any rate pressure can be offset. Some rate pressure is good for ML as they are the aggregator of business. | |
|---|---|---|---|

CONFIDENTIAL

| | | | |
|---|---|---|---|
| | Do you see lobby groups that you lean on for info? | Internal person and advisory board. | |
| | Do doctors required to prescribe these monitoring tests? | It became a standard practice that physicians test on random or regular basis. There are several states that have make recommendations and at least 7 have indicated guidance around frequency (one a year or several times). It's the only tool doctors have to monitor that the patents are taking (only objective way). Also it shows if you are combining pain drugs with other drugs that can be lethal. Also if docs are sued by patients they can show objective results | Beach point |
| | What if patient disagree? | Every time a new patients comes in on broad a part of the contract btw doc and patient that these tests are part of the treatment. If patients just say no, than the doc has to decide if they want to continue to treat these patients or kick them out. | |
| | What is unique about the company? | It became a standard practice that physicians test on random or regular basis. There are several states that have make recommendations and at least 7 have indicated guidance around frequency (one a year or several times). It's the only tool doctors have to monitor that the patents are taking (only objective way). Also it shows if you are combining pain drugs with other drugs that can be lethal. Also if docs are sued they can show objective results | |
| | What is your bad debt expense | zero, everything we book as revenue is net | |
| | What is maintenance capex | 1.3mm in 2014 | |
| | How machines do you own | 160 Agilent and 30 Thermo Fischer | |
| | Litigation | we used litigation proactively and early because the regulators were slow to react; sued 4 or 5 of our competitors, won 3; we've never paid a dime; We beat ameritox 2 years ago; now counter suing, coming to trial this summer; best guest is people will spend legal fees and no causality will be found | |
| | DOJ Investigation | View is that this will be a non-event; have not heard from them in some time; government investigations are rarely closed | |
| | | | CSAM |
| | UDT vs. PGT overlap | 72% of our PGT comes from UDT; big growth avenue | |

CONFIDENTIAL

JPMC-MIL-CORP-00219693

# EXHIBIT 68

| | |
|---|---|
| **From:** | Lee, Jenny Y. <Jenny.Y.Lee@jpmorgan.com> |
| **To:** | Murray, Gerry <GERRY.MURRAY@jpmorgan.com>;Lang, Ken" <ken.lang@jpmorgan.com> |
| **Sent:** | 4/17/2014 2:30:00 PM |
| **Subject:** | Fw: Congratulations |

FYI. Nice kudos from the CEO (Brock Hardaway) and President (Howard Appel) of Millenium on Stathis and the team.


Jenny Lee
Managing Director
HY and Leveraged Loan Capital Markets
JP Morgan Securities
W: 212-270-0844
C: 917-846-2532

----- Original Message -----
From: Howard Appel [mailto:Howard@milleniumlaboratories.com]
Sent: Thursday, April 17, 2014 10:18 AM
To: Brock Hardaway <Brock.Hardaway@millenniumlabs.com>
Cc: Karanikolaidis, Stathis; jmulloy@ta.com <jmulloy@ta.com>; tmarsh@ta.com <tmarsh@ta.com>; Tim.kennedy@millenniumlabs.com <'Tim.kennedy@millenniumlabs.com'>; Rapkin, Cory; Lee, Jenny Y.; Griswold, Ryan P; Guttilla, Michael T; Christoforou, Alla; Mainelli, Matthew; Chiarelli, Benjamin R; Carli, M F; Yeh, Hank; Liou, Calvin O
Subject: Re: Congratulations

Stathis. Being the old timer and impressed with the JPM team last time, you all were all amazing. It's more than getting the deal done; you've changed our personal lives for generations. Thank you all so much.

Howard Appel
President

> On Apr 17, 2014, at 2:33 PM, "Brock Hardaway" <Brock.Hardaway@millenniumlabs.com> wrote:
>
> Stathis, it was a great effort all around! Many kudos to the entire Jpm team. Look forward to seeing you in napa
>
> Sent from my iPhone
>
>> On Apr 17, 2014, at 4:23 AM, "Karanikolaidis, Stathis" <Stathis.Karanikolaidis@jpmorgan.com> wrote:
>>
>> Good morning and congratulations.
>>
>> It has been a pleasure working with you and your team. We are very proud of the result and we thank you for trusting us to lead this important transaction for you.
>>
>> The next order of business is closing celebrations. Napa sounds like a great destination. We ll get to work on planning.
>>
>> Regards,
>> Stathis
>>
>> Stathis Karanikolaidis
>> Managing Director
>> Leveraged Finance
>> J.P. Morgan Securities LLC
>> Office: 212-270-7374
>> Cell: 917-406-8907
>> This email is confidential and subject to important disclaimers and condit[...] offers for the purchase or sale of securities, accuracy and completeness of i[...] viruses, confidentiality, legal privilege, and legal entity disclaimers, avai[...] http://www.jpmorgan.com/pages/disclosures/email.

**Exhibit 298**

JPMC-MIL-CORP-00055405

# EXHIBIT 69
# FILED UNDER SEAL

# EXHIBIT 70
# FILED UNDER SEAL

# EXHIBIT 71
# FILED UNDER SEAL

# EXHIBIT 72

<table>
<tr><td colspan="2"><b>UNITED STATES BANKRUPTCY COURT</b><br>District of Delaware</td><td><b>VOLUNTARY PETITION</b></td></tr>
</table>

| Name of Debtor (if individual, enter Last, First, Middle):<br>Millennium Lab Holdings II, LLC | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all):<br>46-5355299 | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all): |
| Street Address of Debtor (No. and Street, City, and State):<br>16981 Via Tazon, Suite F<br>San Diego, California<br>ZIP CODE 92127 | Street Address of Joint Debtor (No. and Street, City, and State):<br>ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>San Diego | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br>ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>ZIP CODE | |

| **Type of Debtor**<br>(Form of Organization)<br>(Check **one** box.)<br><br>☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☑ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities, check this box and state type of entity below.) | **Nature of Business**<br>(Check **one** box.)<br><br>☐ Health Care Business<br>☐ Single Asset Real Estate as defined in 11 U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☑ Other | **Chapter of Bankruptcy Code Under Which the Petition is Filed** (Check **one** box.)<br><br>☐ Chapter 7    ☐ Chapter 15 Petition for<br>☐ Chapter 9      Recognition of a Foreign<br>☑ Chapter 11     Main Proceeding<br>☐ Chapter 12    ☐ Chapter 15 Petition for<br>☐ Chapter 13      Recognition of a Foreign<br>              Nonmain Proceeding |
|---|---|---|
| **Chapter 15 Debtors**<br>Country of debtor's center of main interests:<br><br>Each country in which a foreign proceeding by, regarding, or against debtor is pending: | **Tax-Exempt Entity**<br>(Check box, if applicable.)<br><br>☐ Debtor is a tax-exempt organization under title 26 of the United States Code (the Internal Revenue Code). | **Nature of Debts**<br>(Check **one** box.)<br>☐ Debts are primarily consumer debts, defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."   ☑ Debts are primarily business debts. |

| **Filing Fee** (Check one box.)<br><br>☑ Full Filing Fee attached.<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must attach signed application for the court's consideration. See Official Form 3B. | **Chapter 11 Debtors**<br>**Check one box:**<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☑ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br><br>**Check if:**<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $2,490,925 (*amount subject to adjustment on 4/01/16 and every three years thereafter*).<br>- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -<br>**Check all applicable boxes:**<br>☑ A plan is being filed with this petition.<br>☑ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b). |
|---|---|

| **Statistical/Administrative Information**<br><br>☑ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

**Estimated Number of Creditors**

| ☐<br>1-49 | ☐<br>50-99 | ☐<br>100-199 | ☐<br>200-999 | ☑<br>1,000-5,000 | ☐<br>5,001-10,000 | ☐<br>10,001-25,000 | ☐<br>25,001-50,000 | ☐<br>50,001-100,000 | ☐<br>Over 100,000 |
|---|---|---|---|---|---|---|---|---|---|

**Estimated Assets**

| ☐<br>$0 to $50,000 | ☐<br>$50,001 to $100,000 | ☐<br>$100,001 to $500,000 | ☐<br>$500,001 to $1 million | ☐<br>$1,000,001 to $10 million | ☐<br>$10,000,001 to $50 million | ☐<br>$50,000,001 to $100 million | ☑<br>$100,000,001 to $500 million | ☐<br>$500,000,001 to $1 billion | ☐<br>More than $1 billion |
|---|---|---|---|---|---|---|---|---|---|

**Estimated Liabilities**

| ☐<br>$0 to $50,000 | ☐<br>$50,001 to $100,000 | ☐<br>$100,001 to $500,000 | ☐<br>$500,001 to $1 million | ☐<br>$1,000,001 to $10 million | ☐<br>$10,000,001 to $50 million | ☐<br>$50,000,001 to $100 million | ☐<br>$100,000,001 to $500 million | ☐<br>$500,000,001 to $1 billion | ☑<br>More than $1 billion |
|---|---|---|---|---|---|---|---|---|---|

| **Voluntary Petition** *(This page must be completed and filed in every case.)* | Name of Debtor(s): Millennium Lab Holdings II, LLC |
|---|---|

| **All Prior Bankruptcy Cases Filed Within Last 8 Years** (If more than two, attach additional sheet.) | | |
|---|---|---|
| Location Where Filed: | Case Number: | Date Filed: |
| Location Where Filed: | Case Number: | Date Filed: |

| **Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor** (If more than one, attach additional sheet.) | | |
|---|---|---|
| Name of Debtor: Please see Schedule 1 | Case Number: | Date Filed: |
| District: District of Delaware | Relationship: Affiliate | Judge: Same |

| **Exhibit A** (To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐ Exhibit A is attached and made a part of this petition. | **Exhibit B** (To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X _____<br> Signature of Attorney for Debtor(s)      (Date) |
|---|---|

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☐    Yes, and Exhibit C is attached and made a part of this petition.

☑    No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐   Exhibit D, completed and signed by the debtor, is attached and made a part of this petition.

If this is a joint petition:

☐   Exhibit D, also completed and signed by the joint debtor, is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box.)

☑    Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☑    There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐    Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐    Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

_____
(Name of landlord that obtained judgment)

_____
(Address of landlord)

☐    Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐    Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐    Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

| **Voluntary Petition** _(This page must be completed and filed in every case.)_ | Name of Debtor(s): Millennium Lab Holdings II, LLC |
|---|---|

<strong>Signatures</strong>

| **Signature(s) of Debtor(s) (Individual/Joint)** | **Signature of a Foreign Representative** |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct. <br> [If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7. <br> [If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b). <br><br> I request relief in accordance with the chapter of title 11, United States Code, specified in this petition. <br><br> X _____ <br> Signature of Debtor <br><br> X _____ <br> Signature of Joint Debtor <br><br> _____ <br> Telephone Number (if not represented by attorney) <br><br> _____ <br> Date | I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition. <br><br> (Check only **one** box.) <br><br> ☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached. <br><br> ☐ Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached. <br><br> X _____ <br> (Signature of Foreign Representative) <br><br> _____ <br> (Printed Name of Foreign Representative) <br><br> _____ <br> Date |

| **Signature of Attorney\*** | **Signature of Non-Attorney Bankruptcy Petition Preparer** |
|---|---|
| X  /s/ Anthony W. Clark <br> _____ <br> Signature of Attorney for Debtor(s) <br> Anthony W. Clark <br> Printed Name of Attorney for Debtor(s) <br> Skadden, Arps, Slate, Meagher & Flom LLP <br> Firm Name <br> One Rodney Square, P.O. Box 636 <br> Wilmington, Delaware 19899 <br> Address <br> (302) 651-3000 <br> Telephone Number <br> 11/10/2015 <br> Date <br><br> \*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect. | I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached. <br><br> _____ <br> Printed Name and title, if any, of Bankruptcy Petition Preparer <br><br> _____ <br> Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.) |

| **Signature of Debtor (Corporation/Partnership)** | |
|---|---|
| I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor. <br><br> The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition. <br><br> X  /s/ W. Brock Hardaway <br> _____ <br> Signature of Authorized Individual <br> W. Brock Hardaway <br> Printed Name of Authorized Individual <br> Chief Executive Officer <br> Title of Authorized Individual <br> 11/10/2015 <br> Date | _____ <br> Address <br><br> X _____ <br> Signature <br><br> _____ <br> Date <br><br> Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above. <br><br> Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual. <br><br> If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person. <br><br> _A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156._ |

## **SCHEDULE 1**
SCHEDULE OF DEBTORS

On the date hereof, each of the affiliated entities listed below (including the debtor in this chapter 11 case) filed in this Court a petition for relief under chapter 11 of title 11 of the United States Code. Substantially contemporaneously with the filing of these petitions, these entities filed a motion requesting that their respective chapter 11 cases be jointly administered for procedural purposes only.

| DEBTOR | TAX ID NO |
|---|---|
| Millennium Lab Holdings II, LLC | 46-5355299 |
| Millennium Health, LLC | 26-1565558 |
| RxAnte, LLC | 45-4040219 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :     Chapter 11
                                          :
MILLENNIUM LAB HOLDINGS II, LLC,          :     Case No. 15-_____ (___)
                                          :
16981 Via Tazon, San Diego, California,   :     Tax I.D. No. 46-5355299
92127,                                    :
                        Debtor.           :
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**CONSOLIDATED LIST OF CREDITORS HOLDING
TWENTY LARGEST UNSECURED CLAIMS**

Set forth below is a list of creditors holding the twenty largest unsecured claims

against Millennium Lab Holdings II, LLC and certain of its subsidiaries (collectively, the

"Debtors"), as of approximately November 10, 2015. This list has been prepared on a

consolidated basis, based upon the books and records of the Debtors. The information presented

in the list shall not constitute an admission by, nor is it binding on, the Debtors.

The list is prepared in accordance with Fed. R. Bankr. P. 1007(d) for filing in this

Chapter 11 case. The list does not include (1) persons who come within the definition of

"insider" set forth in 11 U.S.C. § 101 or (2) secured creditors, unless the value of the collateral is

such that the unsecured deficiency places the creditor among holders of the largest unsecured

claims.

| (1) Name of creditor and complete mailing address, including zip code | (2) Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | (3) Nature of claim (trade debt, bank loan, government contract, etc.) | (4) Indicate if claim is contingent, unliquidated, disputed or subject to setoff | (5) Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|
| United States of America, United States Department of Justice, U.S. Attorney's Office, District of Massachusetts, United States Federal Courthouse, 1 Courthouse Way, Suite 9200, Boston MA 02210 | George B. Henderson, II Abraham R. George Assistant U.S. Attorney United States Attorney's Office John Joseph Moakley U.S. Courthouse One Courthouse Way, Suite 9200 Boston, Massachusetts 02210 Douglas J. Rosenthal Augustine M. Ripa U.S. Department of Justice Fraud Section, Civil Division Patrick Henry Building 601 D Street NW, Room 9209 Washington DC 20004 | Government settlement | | $206,000,000.00 |
| United Healthcare, 9700 Health Care Lane, Minnetonka, MN 55343 | ATTN: Vice President, National Lab Network, United Healthcare, 9700 Health Care Lane, Minnetonka, MN 55343 | Private payor settlement | | 15,000,000.00 |
| OneBeacon Surety Group, 605 Highway 169 North, Suite 800, Plymouth, MN 55441 | Terry Dahl, (212) 440-6550 Vice President Claims Counsel, OneBeacon Surety Group, 77 Water St, 17th Floor, New York, NY 10005 | Judgment | Contingent | 8,982,312.87 |
| Zempleo Inc., 4000 Executive Parkway, Suite 240, San Ramon, CA, 94583 | Accounts Receivable Department (925) 444-2883 | Trade | | 344,763.58 |

2

| (1) | (2) | (3) | (4) | (5) |
|---|---|---|---|---|
| *Name of creditor and complete mailing address, including zip code* | *Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | *Nature of claim (trade debt, bank loan, government contract, etc.)* | *Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | *Amount of claim (if secured, also state value of security)* |
| Suna Solutions, Inc., 4000 Executive Parkway, Suite 240, San Ramon, CA, 94583 | Dan DiLullo PHR Director of Operations Suna Solutions, Inc. (925) 913-4172 \| | Trade | | 330,880.11 |
| Aerotek Inc., 7301 Parkway Dr., Hanover, MD 21076 | | Trade | | 270,806.04 |
| Blue Shield of CA/Health Ins., File 55331, Los Angeles, CA 90074-5331 | | Health Insurance | | 265,000.00 |
| SDG & E, PO Box 25110, Santa Ana, CA 92799-5110 | | Utility | | 183,000.00 |
| American Express, Box 0001, Los Angeles, CA 90096-8000 | | Trade | | 153,358.46 |
| Primero Systems, PO Box 720490, San Diego, CA 92172-0490 | | Trade | | 140,687.89 |
| AETNA, PO Box 14020, ATTN: Overpayment Recoveries, Lexington, KY 40512 | | Payor refund | | 137,904.21 |
| Pathway Genomics Corporation, 4755 Nexus Center Drive, San Diego, CA 92121 | | Trade | | 125,000.00 |
| Andwin Scientific Clinical, P.O. Box 689, Woodland Hills, CA 91365 | Razel Alona (818)999-2828 x4214 ralona@andwin.com | Trade | | 95,188.66 |
| Kura Biotech (La Piedra Biotecnologia Spa), Gnechen J2, Puerto Varas, Chile 5551117 | Ana Humada +56 65 2234655 a.ahumada@kurabiotec.com | Trade | | 90,000.00 |

3

| (1)<br><br>*Name of creditor and complete mailing address, including zip code* | (2)<br><br>*Name, telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted* | (3)<br><br>*Nature of claim (trade debt, bank loan, government contract, etc.)* | (4)<br><br>*Indicate if claim is contingent, unliquidated, disputed or subject to setoff* | (5)<br><br>*Amount of claim (if secured, also state value of security)* |
|---|---|---|---|---|
| Arnold & Porter LLP, 555 Twelfth Street, NW, Washington, DC 20004-1206 | | Trade | | 88,392.92 |
| Moody's Investment, PO Box 102597, Atlanta, GA 30368-0597 | | Trade | | 61,666.72 |
| Solomon Page Group LLC, P O BOX 75314, Chicago IL, 60675-5314 | Pablo Espinal 212-403-7182 pespinal@solomonpage.com | Trade | | 56,109.00 |
| Orrick Herrington & Sutcliffe LLP, 2050 Main St # 1100, Irvine, CA 92614 | | Trade | | 55,000.00 |
| KPMG LLP, Dept 0906, P O Box 120906, Dallas, TX 75312-0906 | | Trade | | 46,000.00 |
| Kipu Systems LLC, 444 Brickell Avenue, Suite 850, Miami FL 33131 | Mercedes Net 561-349-5941 Mercedes.net@kipusystems.com | Trade | | 41,724.00 |

4

**DECLARATION**

I, W. Brock Hardaway, an authorized signatory for the Debtors in this case, declare under penalty of perjury that I have read the foregoing Consolidated List of Creditors Holding Twenty Largest Unsecured Claims and that it is true and correct to the best of my knowledge, information and belief.

Dated: San Diego, California
November 10, 2015

By:    /s/ W. Brock Hardaway
Name: W. Brock Hardaway

5

1223866-NYCSR03A - MSW

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| MILLENNIUM LAB HOLDINGS II, LLC, | : | Case No. 15-_____ (___) |
|  | : |  |
| 16981 Via Tazon, San Diego, California, 92127, | : | Joint Administration Pending |
|  | : |  |
| Debtor. | : | Tax I.D. No. 46-5355299 |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## CORPORATE OWNERSHIP STATEMENT AND
## LIST OF EQUITY SECURITY HOLDERS OF
## <u>MILLENNIUM LAB HOLDINGS II, LLC</u>

The attached organizational chart identifies all entities in which the above-captioned debtor and debtor in possession (the "<u>Debtor</u>") owns an interest.

In addition, pursuant to Rules 1007(a)(1) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the undersigned authorized officer of the Debtor certifies that the following entities directly or indirectly own 10% or more of any class of the Debtor's equity interests: TA Millennium, Inc. and affiliates (100% of Class A units); Millennium Lab Holdings, Inc. (100% of Class B units); MLHCU, LLC (100% of Class C units); William Brock Hardaway and Martin Price (36.2% and 13.0%, respectively, of MLHCU, LLC's Profit Interests Units and Fixed Liquidity Units); James Slattery and affiliates (100% of Millennium Lab Holdings, Inc.).

## DECLARATION

I, W. Brock Hardaway, an authorized signatory for the Debtor in this case, declare under penalty of perjury that I have read the foregoing Corporate Ownership Statement and that it is true and correct to the best of my knowledge, information and belief.

Dated: San Diego, California
November 10, 2015

By:     /s/ W. Brock Hardaway
Name: W. Brock Hardaway

1226044-NYCSR03A - MSW



# MILLENNIUM LAB HOLDINGS II, LLC

Secretary's Certificate

The undersigned, being the Secretary of Millennium Lab Holdings, LLC, a Delaware limited liability company (the "Company"), does hereby certify as follows:

Attached hereto as <u>Annex A</u> is a true, correct and complete copy of the resolutions duly adopted by the Board of Managers of the Company on November 10, 2015 (the "Resolutions"), and such Resolutions have not been modified or rescinded and are in full force and effect.

IN WITNESS WHEREOF, the undersigned, has executed and caused this certificate to be delivered as of November 10, 2015.

MILLENNIUM LAB HOLDINGS II, LLC

By: /s/ Heidi Smith_____
    Name: Heidi Smith
    Title: Secretary

## RESOLUTIONS OF
## THE BOARD OF MANAGERS OF
## MILLENNIUM LAB HOLDINGS II, LLC

### NOVEMBER 10, 2015

WHEREAS, the Board of Managers of Millennium Lab Holdings II, LLC, a Delaware limited liability company (the "Company"), **DOES HEREBY CONSENT** to the taking of the following actions and **DOES HEREBY ADOPT** the following resolutions pursuant to the Company's bylaws and the Limited Liability Company Act of the State of Delaware;

WHEREAS, the Board of Managers has considered presentations by the management and the financial and legal advisors of the Company regarding the liabilities and liquidity situation of the Company, the strategic alternatives available to it, and the effect of the foregoing on the Company's business, creditors, and other parties in interest;

WHEREAS, the Board of Managers has had the opportunity to consult with the Company's management and financial and legal advisors and fully consider each of the strategic alternatives available to the Company;

WHEREAS, the Board of Managers has been presented with a proposed petition to be filed by the Company in the United Stated Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), in which the authority to operate as a debtor-in-possession will be sought;

WHEREAS, the Board of Managers, having considered the financial and operational aspects of the Company's business and the best course of action to maximize value, deem it advisable and in the best interests of the Company, its creditors, and other interested parties that a petition be filed by the Company seeking relief under the provisions of chapter 11 of the Bankruptcy Code;

NOW, THEREFORE, BE IT

RESOLVED, that in the judgment of the Board of Managers it is desirable and in the best interests of the Company, its subsidiaries, creditors, employees, stakeholders and other interested parties, that a voluntary petition be filed by the Company seeking relief under the provisions of chapter 11 of the Bankruptcy Code, and the filing of such petition is authorized hereby; and it is further

RESOLVED, that the officers of the Company, or any one of them (collectively, the "Officers"), be, and each hereby is, authorized and empowered, on behalf of and in the name of the Company, to execute and verify a petition in the name of

the Company under chapter 11 of the Bankruptcy Code and to cause the same to be filed in the Bankruptcy Court in such form and at such time as the Officer(s) executing said petition on behalf of the Company shall determine; and it is further

RESOLVED, that the Officers, or any one of them, be, and each hereby is, authorized and empowered, on behalf of and in the name of the Company, to execute, verify and/or file, or cause to be executed, verified and/or filed (or direct others to do so on their behalf as provided herein) all necessary documents, including, without limitation, all petitions, affidavits, statements, schedules, motions, lists, applications, pleadings and other papers, and in that connection to employ and retain all assistance by legal counsel, accountants or other professionals, and to take any and all action which they deem necessary and proper in connection with the chapter 11 case, including any and all action necessary or proper in connection with obtaining authorization to use cash collateral (in such amounts and on such terms as may be agreed by any Officer, including the grant of replacement liens, as is reasonably necessary for the continuing conduct of the affairs of the Company and certain of its subsidiaries and affiliates), with a view to the successful prosecution of such case including, without limitation, any action necessary to maintain the ordinary course operation of the Company's business; and it is further

RESOLVED, that the Officers, or any one of them, be, and each hereby is, authorized and empowered, on behalf of and in the name of the Company, to retain and employ professionals to render services to the Company in connection with the chapter 11 case, including, without limitation, the firm Skadden, Arps, Slate, Meagher & Flom LLP, to act as chapter 11 counsel; Young Conaway Stargatt & Taylor, LLP to act as conflicts counsel; Lazard Frères & Co., LLC to act as investment banker; Alvarez & Marsal to act as financial advisor; and Prime Clerk LLC to act as claims and noticing agent and administrative advisor; and it is further

RESOLVED, that the Officers, or any one of them, be, and each hereby is, authorized and empowered, on behalf of and in the name of the Company, to amend, supplement or otherwise modify from time to time the terms of any documents, certificates, instruments, agreements, financing statements, notices, undertakings or other writings referred to in the foregoing resolutions; and it is further

RESOLVED, that the Officers be, and each of them hereby is, authorized and empowered, on behalf of and in the name of the Company, to take or cause to be taken any and all such further action and to execute, deliver, verify and/or file, or cause to be executed, delivered, verified and/or filed (or direct others to do so on its behalf as provided herein) all such further documents, agreements, instruments, financing statements, notices, undertakings, certificates and other writings to effectuate the purpose and intent of any and all of the foregoing resolutions; and it is further

RESOLVED, that the Officers be, and each of them hereby is, authorized and empowered, on behalf of and in the name of the Company, to pay and direct the payment of all fees and expenses as in their judgment shall be necessary, appropriate, or

advisable in the good faith judgment of such Officers to effectuate the purpose and intent of any and all of the foregoing resolutions; and it is further

RESOLVED, that all acts lawfully done or actions lawfully taken by any Officer to seek relief on behalf of the Company under chapter 11 of the Bankruptcy Code, or in connection with the chapter 11 case, or any matter related thereto, be, and hereby are, adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Company as fully as if such actions had been presented to the Board of Managers for its prior approval.

# EXHIBIT 73

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| | : Case No. 15-12284 (LSS) |
| MILLENNIUM LAB HOLDINGS II, LLC, et al., | : |
| | : Jointly Administered |
| Debtors.[1] | : |
| | : **Related Docket No. 14** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF FILING OF AMENDED PREPACKAGED JOINT PLAN OF REORGANIZATION OF MILLENNIUM LAB HOLDINGS II, LLC, ET AL.**

       **PLEASE TAKE NOTICE THAT** on December 9, 2015, Millennium Lab Holdings II, LLC ("Millennium" or the "Debtors"), the debtors and debtors-in-possession in the above-captioned case filed the Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. (the "Amended Plan"), annexed hereto as Exhibit 1.  A blackline reflecting changes to the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. filed on November 10, 2015 (Docket No. 14) is annexed hereto as Exhibit 2.

Dated:  December 9, 2015

*/s/ Jason M. Liberi*

| | |
|---|---|
| Anthony W. Clark (I.D. No. 2051) | Kenneth S. Ziman |
| Jason M. Liberi (I.D. No. 4425) | Raquelle L. Kaye |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| One Rodney Square, P.O. Box 636 | Four Times Square |
| Wilmington, Delaware 19899-0636 | New York, New York  10036-6522 |
| Telephone: (302) 651-3000 | Telephone: (212) 735-3000 |
| Fax: (302) 651-3001 | Facsimile: (212) 735-2000 |

Felicia Gerber Perlman
Matthew N. Kriegel
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois  60606-1720
Telephone: (312) 407-0700
Facsimile: (312) 407-0411
*Counsel for Debtors and Debtors in Possession*

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California, 92127.

# EXHIBIT 1

## AMENDED PLAN

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
In re:   :   Chapter 11
:
MILLENNIUM LAB HOLDINGS II, LLC, <u>et al.</u>,   :   Case No. 15-12284 (LSS)
:
Debtors.[1]   :   Jointly Administered
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**AMENDED PREPACKAGED JOINT PLAN OF REORGANIZATION
OF MILLENNIUM LAB HOLDINGS II, LLC, et al.**

Dated: December 9, 2015    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Anthony W. Clark (I.D. No. 2051)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
T: (302) 651-3000
F: (302) 651-3001

– and –

Kenneth S. Ziman
Raquelle L. Kaye
Four Times Square
New York, New York 10036-6522
T: (212) 735-3000
F: (212) 735-2000

– and –

Felicia Gerber Perlman
Matthew Kriegel
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel to Debtors and Debtors in Possession*

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California 92127.

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................1

ARTICLE I RULES OF INTERPRETATION, COMPUTATION OF TIME,
          GOVERNING LAW AND DEFINED TERMS..........................................................1
    A.    Rules of Interpretation, Computation of Time and Governing Law..................1
    B.    Definitions...........................................................................................................2

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ........................................................19
    A.    Administrative Claims ........................................................................................19
    B.    Priority Tax Claims ............................................................................................20

ARTICLE III CLASSIFICATION AND TREATMENT OF CLASSIFIED
          CLAIMS AND EQUITY INTERESTS.....................................................................21
    A.    Introduction.........................................................................................................21
    B.    Summary of Classification and Treatment of Classified Claims and
          Equity Interests ..................................................................................................21
    C.    Classification and Treatment of Claims and Equity Interests............................21
    D.    Special Provision Governing Unimpaired Claims..............................................27
    E.    Discharge of Claims............................................................................................27
    F.    Alternative Treatment .........................................................................................27

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN...................................................28
    A.    Presumed Acceptance of Plan.............................................................................28
    B.    Deemed Rejection of Plan ...................................................................................28
    C.    Voting Classes .....................................................................................................28
    D.    Acceptance by Impaired Classes of Claims........................................................28
    E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ...............28

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN .................................................28
    A.    General Settlement of Claims..............................................................................28
    B.    Corporate Existence ............................................................................................30
    C.    Vesting of Assets in the Reorganized Debtors ...................................................30
    D.    New Term Loan; Sources of Consideration for Plan Distributions...................30
    E.    New Holdco Common Stock Issued Under the Plan ..........................................31
    F.    Millennium Corporate Claim Trust ....................................................................31
    G.    Millennium Lender Claim Trust .........................................................................33
    H.    Issuance of New Securities and Related Documentation ...................................34
    I.    Release of Liens, Claims and Equity Interests....................................................35
    J.    Reservation of Certain Claims of Governmental Units ......................................35
    K.    New Holdco and Reorganized Debtors Organizational Documents...................36
    L.    Directors and Officers of Reorganized Debtors..................................................36
    M.    Restructuring Transactions .................................................................................37
    N.    Corporate Action.................................................................................................37

O. Cancellation of Notes, Certificates and Instruments.........................................38
P. Preservation and Maintenance of Debtor Causes of Action ..........................39
Q. Exemption from Certain Transfer Taxes ........................................................40
R. Certain Tax Matters ........................................................................................40
S. Further Transactions .......................................................................................42

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND
        UNEXPIRED LEASES .........................................................................................43
A. Assumed Contracts and Leases......................................................................43
B. Assignment of Executory Contracts or Unexpired Leases ............................43
C. Rejection of Executory Contracts or Unexpired Leases ................................44
D. Cure of Defaults for Assumed Executory Contracts and Unexpired
      Leases...............................................................................................................44
E. Assumption of Officer Insurance Policies .....................................................45
F. Indemnification Provisions ............................................................................45
G. Compensation and Benefit Programs .............................................................46
H. Workers' Compensation Benefits....................................................................46
I. Third Party Payer Contracts...........................................................................47
J. Medicare and Medicaid Agreements ..............................................................47

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS.......................................48
A. Distribution Record Date ...............................................................................48
B. Dates of Distributions ....................................................................................48
C. Distribution Agent ..........................................................................................48
D. Cash Distributions..........................................................................................49
E. Rounding of Payments ....................................................................................49
F. Distributions on Account of Allowed Claims.................................................49
G. General Distribution Procedures.....................................................................50
H. Address for Delivery of Distributions.............................................................50
I. Undeliverable Distributions and Unclaimed Distributions............................50
J. Withholding Taxes...........................................................................................50
K. Setoffs .............................................................................................................51
L. Surrender of Cancelled Instruments or Securities .........................................51
M. Lost, Stolen, Mutilated or Destroyed Securities ...........................................51

ARTICLE VIII CONDITIONS PRECEDENT TO THE PLAN'S
        CONFIRMATION AND EFFECTIVE DATE ............................................52
A. Conditions to Confirmation ...........................................................................52
B. Conditions to Effective Date...........................................................................52
C. Conditions to the Equity Transfer Date .........................................................53
D. Waiver of Conditions......................................................................................54
E. Effect of Non Occurrence of Conditions to the Effective Date .....................54

ARTICLE IX RETENTION OF JURISDICTION........................................................54
A. Retention of Jurisdiction.................................................................................54
B. Lack of Bankruptcy Court Jurisdiction..........................................................56
C. Failure of Bankruptcy Court to Exercise Jurisdiction...................................56

ARTICLE X EFFECTS OF CONFIRMATION ........................................................................56

    A.      Binding Effect ..........................................................................................56

    B.      Subordination Rights ................................................................................57

    C.      Discharge of the Debtors ..........................................................................57

    D.      Exculpation and Limitation of Liability ..................................................57

    E.      Releases by Debtor ..................................................................................58

    F.      Releases by TA and MLH .........................................................................59

    G.      Releases by Lender Releasing Parties .......................................................60

    H.      Releases by Third Party Releasing Parties ...............................................61

    I.      Waiver of Limitations on Releases of Unknown Claims ............................62

    J.      Bar Order .................................................................................................63

    K.      Injunction ................................................................................................64

    L.      Retained Claims ......................................................................................65

    M.      Other Obligations With Respect To Released Parties ...............................67

ARTICLE XI MISCELLANEOUS PROVISIONS .................................................................68

    A.      Dissolution of the Committee ...................................................................68

    B.      Payment of Statutory Fees .......................................................................68

    C.      Modification of Plan ................................................................................68

    D.      Revocation of Plan ...................................................................................69

    E.      Severability of Plan Provisions .................................................................69

    F.      Successors and Assigns .............................................................................69

    G.      Reservation of Rights ...............................................................................69

    H.      Further Assurances ...................................................................................70

    I.      Notices to Debtors ....................................................................................70

    J.      Governing Law ........................................................................................73

    K.      Exhibits ...................................................................................................73

    L.      No Strict Construction .............................................................................73

    M.      Conflicts ..................................................................................................73

PLAN EXHIBITS

Exhibit A        Millennium Corporate Claim Trust Agreement
Exhibit B        Millennium Lender Claim Trust Agreement
Exhibit C        New Holdco Charter
Exhibit D        New Holdco Bylaws
Exhibit E        New Term Loan Agreement

PLAN APPENDICES

Appendix 1    RSA

JOINT PLAN OF REORGANIZATION OF
MILLENNIUM LAB HOLDINGS II, LLC, et al.

## INTRODUCTION

Millennium Lab Holdings II, LLC, a Delaware limited liability company, together with the above-captioned debtors (each a "Debtor" and collectively, the "Debtors") hereby proposes this prepackaged joint plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors.  Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I.B of the Plan.  The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code.  Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, properties, events leading up to Solicitation of the Plan, projections, and for a summary and analysis of this Plan and the treatment provided for herein.  The Debtors urge all Holders of Impaired Claims (as defined below) to review the Disclosure Statement and Plan in full.  There also are other agreements and documents that will be filed with the Bankruptcy Court that are referenced in this Plan, the Plan Supplement or the Disclosure Statement as Exhibits.  All such Exhibits are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions set forth in the RSA (as defined herein), this Plan, and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to the Effective Date.

If the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, but without prejudice to the respective parties' rights under the RSA, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required.  The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

## ARTICLE I

## RULES OF INTERPRETATION, COMPUTATION OF TIME,
## GOVERNING LAW AND DEFINED TERMS

### A.    Rules of Interpretation, Computation of Time and Governing Law

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or

– 1 –

supplemented; (d) unless otherwise specified, all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be and (j) "$" or "dollars" means dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.    Definitions

1.1    "Ad Hoc Group" means the members of the ad hoc group of Prepetition Lenders represented by Brown Rudnick LLP and listed on Exhibit A to the RSA term sheet, as amended from time to time as provided for in the RSA.

1.2    "Ad Hoc Group Majority" has the meaning set forth in the RSA.

1.3    "Administrative Agent" means Wilmington Savings Fund Society, FSB as successor administrative agent under the Existing Credit Agreement.

1.4    "Administrative Agent Fees" means the fees, expenses, and indemnities payable to the Administrative Agent, in its capacity as administrative agent, under the terms of the Existing Loan Documents.

1.5    "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtors' Estates and operating their businesses, including wages, salaries, or commissions for services rendered, (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date, and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code.

1.6    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.7    "Allowed" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest or any portion thereof that the Debtors have assented to the validity of or that has been (a) allowed by an order of the Bankruptcy Court, (b) allowed pursuant to the terms of this Plan, (c) allowed by agreement between the Holder of such Claim or Equity Interest and the Debtors or Reorganized Debtors, or (d) allowed or held to be valid or enforceable by an

order or judgment of a court or other tribunal in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" or an Equity Interest as an "Allowed Equity Interest," the Debtors do not waive their rights to contest the amount and validity of such Claim or Equity Interest to the extent it is disputed, contingent or unliquidated, in the manner and venue in which such Claim or Equity Interest would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; and provided, further that the amount of any Allowed Claim or Allowed Equity Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.

1.8     "Approved Plan" has the meaning set forth in the RSA.

1.9     "Assumed Agreement" means an Executory Contract or Unexpired Lease which has been assumed by the Debtors.

1.10    "Avoidance Actions" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

1.11    "Backstop MLH Shareholder" means any Contributing MLH Shareholder that funds a Non-Contributing MLH Shareholder's Pro Rata portion of the MLH Contribution.

1.12    "Ballots" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote may, among other things, indicate their acceptance or rejection of this Plan and consent to the releases, exculpations and related provisions provided for in this Plan, including the ballots cast on or before the Solicitation Termination Date.

1.13    "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended.

1.14    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court with jurisdiction over the Chapter 11 Cases.

1.15    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, the Local Rules, and the Federal Rules of Civil Procedure, in each case as amended from time to time and as applicable to the Chapter 11 Cases or proceedings therein.

1.16    "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

1.17    "Cash" means legal tender of the United States of America.

1.18    "Cause of Action" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.    Cause of Action also includes: (a) any right of setoff, cross-claim, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (b) with respect to the Debtors, the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Action; and (f) any state law fraudulent transfer claim.

1.19    "Chapter 11 Cases" means the chapter 11 bankruptcy cases that may be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

1.20    "CIA" means that certain Corporate Integrity Agreement between Millennium and OIG dated October 15, 2015.

1.21    "Claim" means a "claim" against the Debtors as defined in section 101(5) of the Bankruptcy Code.

1.22    "Class" means one of the classes of Claims or Equity Interests listed in Article III of the Plan.

1.23    "CMS" means the Centers for Medicare and Medicaid Services.

1.24    "Company" means the Debtors, collectively.

1.25    "Comparative Fault Reduction" has the meaning set forth in Article X.L(i).

1.26    "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order subject to all conditions specified in Article VIII.A having been satisfied, or waived as provided for in Article VIII.

1.27    "Confirmation Date" means the date of entry by the Bankruptcy Court of the Confirmation Order on its docket, within the meanings of Bankruptcy Rules 5003 and 9021.

1.28    "Confirmation Hearing" means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.29    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan entered pursuant to section 1129 of the Bankruptcy Code and in the form and with the provisions as required herein.

1.30    "Consenting Lender Indemnity-Related Rights" has the meaning set forth in Article V.O of this Plan.

1.31    "Consenting Lenders" has the meaning set forth in the RSA.

1.32    "Consistent With The Restructuring Term Sheet" has the meaning set forth in the RSA.

1.33    "Consummation Deadline" has the meaning set forth in Article V.S of this Plan.

1.34    "Contributing MLH Shareholder" means an MLH Shareholder that has contributed to funding the MLH Contribution.

1.35    "Core Released Claims" means, collectively, any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or Causes of Action, whether known or unknown, foreseen or unforeseen, including direct and derivative claims, relating to any actions, transactions, events, or omissions taking place on or before the Effective Date arising out of, or in any way related to in any manner, the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, and the Restructuring Transactions and any transactions related thereto, including, without limitation, the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement and any and all claims arising out of, or related to in any manner, the negotiation, solicitation, due diligence, documentation, execution, implementation, administration, and or the enforcement of the Existing Credit Agreement and the transactions related thereto.  For the avoidance of doubt, Core Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agent as provided in Article V.O and Article VI.F of this Plan, any Retained Claims or claims against Excluded Parties.

1.36    "Cure" means the payment of Cash by the Debtors, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtors that the Debtors may assume under section 365(a) of the Bankruptcy Code.  For the avoidance of doubt, the cure of all Medicare and Medicaid Agreements is set forth in Article VI.J of this Plan.

1.37    "Debtor Releasing Parties" means the Debtors and the Reorganized Debtors, each in their individual capacities and as debtors in possession.

1.38    "Debtors" means Holdings, Millennium, and RxAnte, LLC, as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.39    "Disclosure Statement" means that certain Disclosure Statement for the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. under Chapter 11 of the Bankruptcy Code,  as amended, supplemented, or modified from time to time, and that is prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.40    "Distribution Agent" means New Holdco or any party designated by New Holdco to serve as distribution agent under this Plan.  Except for distributions of New Holdco Common Stock, which shall be effected by book entry by New Holdco, for purposes of distributions under this Plan to Holders of Allowed Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent.  For purposes of distributions under this Plan to Holders of Early Commitment Facility Claims, the Early Commitment Facility Agent shall act as the Distribution Agent.

1.41    "D&O Liability Insurance Policies" means all insurance policies for officers' liability maintained by the Debtors as of the Petition Date.

1.42    "DHA" means the Defense Health Agency of the United States Department of Defense.

1.43    "Distribution Record Date" means the date of entry of the Confirmation Order.

1.44    "Early Commitment Deadline" means 12:00 p.m. (prevailing Eastern Time) on November 5, 2015.

1.45    "Early Commitment Facility" means that senior secured term loan, which is senior in lien priority to the Existing Credit Agreement Claims, dated as of November 5, 2015 among Millennium, as borrower, the Early Commitment Facility Agent, as administrative agent, and the Consenting Lenders that voted to approve a Qualified Out-of-Court Transaction and this Plan and the releases thereunder or hereunder by the Early Commitment Deadline, and which was distributed Pro Rata to the Consenting Lenders.  Each Consenting Lender that participates in the Early Commitment Facility shall receive its Pro Rata share (based on all Existing Credit Agreement Claims held by Prepetition Lenders) of $50.0 million.

1.46    "Early Commitment Facility Agent" means Wilmington Savings Fund Society, FSB as administrative agent under the Early Commitment Facility and related loan documents.

1.47    "Early Commitment Facility Agent Fees" means the fees, expenses, and indemnities payable to the Early Commitment Facility Agent, in its capacity as administrative agent, under the terms of the Early Commitment Facility and loan documents related thereto.

1.48    "Early Commitment Facility Claim" means a Claim or obligation arising under or relating to the Early Commitment Facility other than the Early Commitment Facility Agent Fees.  The aggregate of all Early Commitment Facility Claims shall be Allowed in an aggregate principal amount not to exceed $50.0 million, plus any and all accrued interest, fees, and other amounts due and payable under the Early Commitment Facility.

1.49    "Effective Date" means the date on which the Plan shall take effect, which date shall be a Business Day on which (a) all conditions in Article VIII.B of the Plan have been satisfied or waived as provided for in Article VIII and (b) consummation of the Restructuring Transactions has commenced.

1.50    "Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

1.51    "Equity Defendants" has the meaning set forth in Article X.F(iii) hereof.

1.52    "Equity Interest" means all outstanding ownership interests in any of the Debtors, including any interest evidenced by common or preferred stock, membership interest, option, or other right to purchase or otherwise receive any ownership interest in any of the Debtors, or any right to payment or compensation based upon any such interest, whether or not such interest is owned by the Holder of such right to payment or compensation.

1.53    "Equity Transfer Date" means the date on which the Equity Interests in Reorganized Millennium are (i) transferred from the Holders of the Existing Equity Interests of Millennium to the Holders of Allowed Existing Credit Agreement Claims and (ii) immediately thereafter, transferred from the Holders of Allowed Existing Credit Agreement Claims to New Holdco, which date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA, and in any event shall be no later than December 31, 2015.

1.54    "Estates" means the estates of the Debtors in the Chapter 11 Cases, as created under section 541 of the Bankruptcy Code.

1.55    "Excluded Parties" means any party not expressly identified as one of the Released Parties, or as a Related Party of such Released Party, including but not limited to (a) Bank of Montreal, (b) BMO Capital Markets, (c) Citibank Global Markets Inc., (d) Citibank, N.A., (e) J.P. Morgan Securities LLC, (f) JPMorgan Chase Bank, N.A., in its individual corporate capacity and in its capacity as a Prior Agent, (g) KPMG LLP, (h) Skadden, Arps, Slate, Meagher & Flom LLP (including its partners and other attorneys), (i) Suntrust Bank, and (j) any affiliates or Related Parties of the foregoing parties listed in (a) through (i).

1.56    "Exculpated Parties" means, collectively, (a) the Debtors, (b) the Reorganized Debtors, (c) the Settling Members, (d) the Ad Hoc Group, (e) the Participating Lenders, (f) the Administrative Agent, (g) the Early Commitment Facility Agent, and (h) each such party's Related Parties; provided, however, that, for the avoidance of doubt, no Excluded Party shall be an Exculpated Party.

1.57    "Exculpation" means the exculpation provided in Article X.C hereof.

1.58    "Executory Contract" means a contract to which any of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.59    "Exhibit" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified, or otherwise supplemented from time to time).

1.60    "Existing Credit Agreement" means that certain Credit Agreement, dated as of April 16, 2014, as amended by the Existing Credit Agreement Solicitation Amendment (as

amended, supplemented, or otherwise modified from time to time), among Millennium, Holdings, the Administrative Agent, and the lenders from time to time party thereto.

1.61    "Existing Credit Agreement Claim" means a Claim or obligation arising under or relating to the Existing Loan Documents, including the Existing Credit Agreement, other than the Prior Agent Indemnity Claims.  The aggregate of all Existing Credit Agreement Claims shall be Allowed in the aggregate amount of $1,752,812,500 in outstanding principal, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents other than the Prior Agent Indemnity Claims.

1.62    "Existing Credit Agreement Solicitation Amendment" means that certain amendment to the Existing Credit Agreement that, among other things, allows the issuance of the Early Commitment Facility consistent with the terms of the RSA.

1.63    "Existing Equity Interest" means an Equity Interest in any Debtor that is authorized, issued, and outstanding prior to the Effective Date.

1.64    "Existing Loan Documents" means the Existing Credit Agreement together with all related loan documentation.

1.65    "Federal Administrative Settlement Agreement" means that certain Millennium Health, LLC Settlement Agreement to Resolve Administrative Denial and Overpayment Claims, as amended, supplemented, or modified from time to time, between and among HHS, acting through CMS and its officers and agents, including its contractors, and Millennium dated October 15, 2015.

1.66    "Federal PGT Settlement Agreement" means that certain Settlement Agreement – Pharmacogenetic Testing, as amended, supplemented, or modified from time to time, between and among the United States Parties and Millennium dated October 15, 2015.

1.67    "Federal Settlement Parties" means the United States Parties, and the USA on behalf of HHS and CMS.

1.68    "Federal UDT Settlement Agreement" means that certain Settlement Agreement – Urine Drug Testing, as amended, supplemented, or modified from time to time, between and among the United States Parties and Millennium dated October 15, 2015.

1.69    "Final Order" means an order or judgment of the Bankruptcy Court or another court of competent jurisdiction as to which no stay has been entered and either the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired;

– 8 –

provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

1.70    "General Unsecured Claim" means any Claim against any Debtor that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Early Commitment Facility Claim, Existing Credit Agreement Claim, Prior Agent Indemnity Claim, Other Secured Claim, Government Claim, MLH Tax Note Claim, or Intercompany Claim.

1.71    "Government Claim" means a Claim by any of the USA Settlement Parties against any of the Debtors, as described in, and restricted by, the respective USA Settlement Agreements.  The Government Claims are not disputed, dischargeable, unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision.  The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

1.72    "Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

1.73    "Gross Damages" has the meaning set forth in has the meaning set forth in Article X.L(i).

1.74    "HHS" means the United States Department of Health and Human Services.

1.75    "Holder" means an Entity holding a Claim against, or Equity Interest in, any Debtor as of the applicable date of determination.

1.76    "Holdings" means Millennium Lab Holdings II, LLC, a Delaware limited liability company.

1.77    "Holdings LLC Agreement" means that certain Second Amended and Restated Limited Liability Agreement of Millennium Lab Holdings II, LLC.

1.78    "Impaired" refers to being impaired within the meaning of section 1124 of the Bankruptcy Code.

1.79    "Indemnification Agreement" means that certain Indemnification Agreement dated August 10, 2015 by and among Holdings, Millennium, and W. Brock Hardaway, that certain Indemnification Agreement dated August 10, 2015 by and among Holdings, Millennium, and Martin A. Price, and any other indemnification agreement between any of the Debtors and a Senior Executive not applicable to other executive officers.

1.80    "Initial USA Settlement Deposit" means the irrevocable $50 million ($50,000,000.00) initial deposit paid to the USA Settlement Parties upon execution of the USA

Settlement Agreements in partial satisfaction of Millennium's settlement obligations under the USA Settlement Agreements.

1.81 "Intercompany Claim" means any Claim by a Debtor against another Debtor.

1.82 "Interim Cash Collateral Order" means the Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363,502,503,507, and 552, Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Credit Parties; (III) Allowing Subrogation Claim; (IV) Scheduling Final Hearing; and (V) Granting Related Relief (Docket No. 94).

1.83 "JS Real Estate Leases" means the four (4) leases by and among Millennium, as lessee, and Pain In San Diego, LLC, a California limited liability company, as lessor, relating to Millennium's facilities at 16980 Via Tazon Building 1, San Diego, California 92127, 16981 Via Tazon Building 2, San Diego, California, 16980 Via Tazon, San Diego, California, and 15330 Avenue of Science, San Diego, California, in each case, as amended, supplemented, or otherwise modified from time to time.

1.84 "Lender Releasing Parties" means, collectively, the Consenting Lenders, the Administrative Agent, and the Early Commitment Facility Agent.

1.85 "Lien" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

1.86 "Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.87 "Medicare and Medicaid Agreements" means any and all agreements or documentation necessary and required to enable the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, to participate in, and seek reimbursement from, the Medicare programs and Medicaid programs pursuant to 42 U.S.C. §§ 1395 et seq. and 42 U.S.C. §§ 1396 et seq., including, but not limited to, the Debtors' and Reorganized Debtors' (as applicable) enrollment agreements required under 42 C.F.R. §§ 424.500 et seq., and evidenced by their execution of the appropriate CMS 855 forms.

1.88 "Millennium" means Millennium Health, LLC, a California limited liability company.

1.89 "Millennium Claim Trusts" means the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust.

1.90 "Millennium Corporate Claim Trust" means the grantor trust to be established by Millennium on the Equity Transfer Date, but immediately following the transfers described in clauses (i) and (ii) of the definition of Equity Transfer Date, in accordance with the terms of the Millennium Corporate Claim Trust Agreement.

1.91    "Millennium Corporate Claim Trust Advisory Board" means that certain three-member board of the Millennium Corporate Claim Trust appointed by an Ad Hoc Group Majority.

1.92    "Millennium Corporate Claim Trust Agreement" means that certain trust agreement by and among the Millennium and Millennium Corporate Claim Trust Trustee, in substantially in the form attached as Exhibit A hereto.

1.93    "Millennium Funding Contribution" means the cash payment to be made by MLH and TA collectively to Millennium in an amount equal to $325 million less the amount comprising the USA Settlement Funding Contribution to Millennium.

1.94    "Millennium Lender Claim Trust" means the grantor trust to be established by Millennium on the Equity Transfer Date, but immediately following the transfers described in clauses (i) and (ii) of the definition of Equity Transfer Date, in accordance with the terms of the Millennium Lender Claim Trust Agreement.

1.95    "Millennium Lender Claim Trust Advisory Board" means that certain three-member board of the Millennium Lender Claim Trust appointed by an Ad Hoc Group Majority.

1.96    "Millennium Lender Claim Trust Agreement" means that certain trust agreement by and among the Company and Millennium Lender Claim Trust Trustee, in substantially in the form attached as Exhibit B hereto.

1.97    "MLH" means Millennium Lab Holdings, Inc., a Delaware Corporation.

1.98    "MLH and/or TA Liability" has the meaning set forth in Article X.L(ii) of this Plan.

1.99    "MLH Contribution" means fifty five percent (55%) of the Settlement Contribution, or $178.75 million, to be funded by MLH.

1.100   "MLH Shareholders" means the holders of equity interests in MLH.

1.101   "MLH Tax Note" means that certain Promissory Note dated as of May 1, 2014, issued by Millennium to MLH in the original principal sum of $19,755,547.00, as amended, supplemented or modified from time to time.

1.102   "MLH Tax Note Claims" means any Claims or obligations arising under or pursuant to the MLH Tax Note.

1.103   "New Board" means the initial board of directors of New Holdco as designated pursuant to Article V.L of this Plan.

1.104   "New Holdco" means a Delaware corporation to be formed by the Prepetition Lenders on or prior to the Equity Transfer Date which shall be the parent holding company of Reorganized Millennium pursuant to the transactions contemplated herein.

– 11 –

1.105  "New Holdco Common Stock" means the shares of common stock of New Holdco with a par value of $0.01 and that shall be fully paid and non-assessable upon issuance.

1.106  "New Holdco Organizational Documents" means the charter of incorporation of New Holdco in substantially the form contained in Exhibit C of this Plan, the bylaws of New Holdco in substantially the form contained in Exhibit D of this Plan, or any other applicable organizational documents of New Holdco.

1.107  "New Securities and Debt Documents" means collectively, the New Holdco Common Stock, the New Term Loan Agreement, and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to this Plan.

1.108  "New Term Loan" means that certain secured term loan in the aggregate principal amount of $600 million to be made under the terms of the New Term Loan Agreement.

1.109  "New Term Loan Agreement" means that certain agreement providing for the New Term Loan in the form attached as Exhibit E of this Plan to be included in the Plan Supplement.

1.110  "Non-Consenting Lender" means a Prepetition Lender that is not a Consenting Lender.

1.111  "Non-Contributing MLH Shareholder" means an MLH Shareholder that has not funded, in any part, the MLH Contribution.

1.112  "Non-Contributing MLH Shareholder Claim" means any known and unknown claims and causes of action against Non-Contributing MLH Shareholders.

1.113  "Non-Contribution Action" has the meaning set forth in Article X.L(ii) of this Plan.

1.114  "OIG" means the Office of the Inspector General of HHS.

1.115  "Operating Agreements" has the meaning set forth in Article VI.F of this Plan.

1.116  "OPM" means the United States Office of Personnel Management.

1.117  "Ordinary Course Professionals Order" means an order of the Bankruptcy Court, if any, approving a motion to employ ordinary course professionals in the Chapter 11 Cases.

1.118  "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

1.119  "Other Secured Claims" means all Secured Claims against the Debtors other than the Prior Agent Indemnity Claims or the Existing Credit Agreement Claims.

– 12 –

1.120   "Participating Lenders" has the meaning set forth in the RSA.

1.121   "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

1.122   "Petition Date" means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

1.123   "Plaintiff States" means the plaintiff states that are party to the States UDT Settlement and the States PGT Settlement Agreement and any such states that may become a party thereto from time to time.

1.124   "Plan" has the meaning set forth in the Introduction and includes the Exhibits and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

1.125   "Plan Supplement" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before 10 days prior to the Confirmation Hearing.

1.126   "Post-Closing Tax Period" means any tax period beginning after the Equity Transfer Date and, with respect to any tax period beginning on or before and ending after the Equity Transfer Date, the portion of such taxable period beginning after the Equity Transfer Date.

1.127   "Pre-Closing Tax Period" means any taxable period ending on or before the Equity Transfer Date and, with respect to any taxable period beginning on or before and ending after the Equity Transfer Date, the portion of such taxable period ending on and including the Equity Transfer Date.

1.128   "Prepetition Lenders" means the banks, financial institutions and other parties identified as "Lenders" in the Existing Credit Agreement from time to time.

1.129   "Preserved Estate Claims" means all known and unknown claims and Causes of Action (including derivative claims) of Millennium against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties.

1.130   "Preserved Indemnified Parties" has the meaning set forth in Article VI.F of this Plan.

1.131   "Preserved Lender Claims" means all known and unknown direct and derivative claims and Causes of Action of the Lenders against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties.

1.132   "Prior Agents" means, collectively: (a) JPMorgan Chase Bank, N.A., in its capacity as the prior administrative agent under the Existing Loan Documents, (b) Citibank Global Markets Inc., it its capacity as the syndication agent under the Existing Loan Documents, (c) BMO Capital Markets Corp. and Suntrust Bank, in their capacities as Co-Managers and Co-Documentation Agents under the Existing Loan Documents, (d) J.P. Morgan Securities LLC and Citibank Global Markets Inc., in their capacities as Joint Lead Arrangers and Joint Bookrunners under the Existing Loan Documents and (e) to the extent indemnified under the Existing Loan Documents, any affiliates, officers, directors, employees, agents, advisors, partners and controlling persons of the foregoing parties listed in clauses (a) through (d) hereof.

1.133   "Prior Agent Indemnity Claims" means all indemnification Claims of the Prior Agents against any of the Debtors arising under and to the extent provided in the Existing Loan Documents.

1.134   "Prior Agent Lender Indemnity Obligations" means all indemnification obligations of the Prepetition Lenders to the Prior Agents arising under and to the extent provided in the Existing Loan Documents.

1.135   "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.136   "Pro Rata" means, at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims in that Class, unless the Plan provides otherwise.

1.137   "Professional" means any Entity employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code or otherwise.

1.138   "Professional Claims Bar Date" means the date that is forty-five (45) days after the Effective Date.

1.139   "Professional Fee Claim" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

1.140   "Professional Fee Escrow Account" means an account to be funded by the Debtors pursuant to Article II.A(i)(3) of the Plan, in an amount equal to the Professional Fee Reserve Amount.

1.141   "Professional Fee Reserve Amount" means the aggregate amount of unpaid Professional Fee Claims through the Effective Date, as estimated pursuant to Article II.A(i)(2) of the Plan.

1.142   "Proof of Claim" means a proof of Claim or Equity Interest filed against any Debtor in the Chapter 11 Cases.

1.143 "Qualified Out-of-Court Transaction" has the meaning set forth in the RSA.

1.144 "Reinstated" or "Reinstatement" means, with respect to any Claim: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

1.145 "Related Parties" means, with respect to an Entity, collectively, current and former affiliates of such Entity, and such Entity's and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals, managers, officers, and equity holders (regardless of whether such interests are held directly or indirectly), equity holders' spouses, trusts, assigns, heirs, beneficiaries, members, partners, employees, advisory and observer board members, financial advisors, Kirkland & Ellis LLP, as attorneys for James Slattery, Goodwin Procter LLP, as attorneys for TA and its Related Parties (but for the avoidance of doubt, not as attorneys for Millennium), accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals. For the avoidance of doubt, none of the Excluded Parties shall be a Related Party to any of the Released Parties.

1.146 "Released Claims" means (a) solely with respect to the Released Parties, any and all Core Released Claims and (b) with respect to the Related Parties of the Released Parties, all Core Released Claims, but only to the extent such claims relate to the Company, including the governance thereof, or that relate to or arise out of the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, the Restructuring Transactions and any transactions related thereto, including the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement. For the avoidance of doubt, Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agents as provided in Article V.O and Article VI.F of this Plan.

1.147 "Released Parties" means, collectively, in each case solely in their respective capacities as such: (a) Holdings; (b) MLH; (c) TA; (d) the Participating Lenders and Consenting Lenders; (e) Wilmington Savings Fund Society, FSB, in its capacity as the Administrative Agent; (f) Jeanne Bonell; (g); Michael Slattery; (h) James Slattery; (i) Howard

– 15 –

Appel; (j) David Cohen; (k) Greg Stein, (l) Sunshine Alexis Stein; (m) Dr. Marvin Retsky; (n) Murray Rosenthal; (o) those persons serving as officers or managers of the Company as of the Closing Date or Effective Date, as applicable, (p) the Early Commitment Facility Agent, and (q) Brown Rudnick, LLP and FTI; provided, however, that in the event that an Excluded Party is also a Prepetition Lender under the Existing Credit Agreement, its status as a Participating Lender or a Consenting Lender shall not make it a Released Party for any purpose.

1.148   "Reorganized" means, in reference to a Debtor, such Debtor from and after the Effective Date.

1.149   "Restructuring Transactions" means the restructuring transactions described in the RSA and herein, whether implemented pursuant to a Qualified Out-of-Court Transaction or an Approved Plan, in each case, which shall be implemented Consistent With The Restructuring Term Sheet and the tax provisions described therein.

1.150   "Retained Claim Judgment" has the meaning set forth in Article X.L of this Plan.

1.151   "Retained Claim Plaintiff" has the meaning set forth in Article X.L of this Plan.

1.152   "Retained Claims" means collectively, the Preserved Estate Claims and the Preserved Lender Claims.

1.153   "Retained Corporate Causes of Action" means any and all claims and Causes of Action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) belonging to Millennium and the Administrative Agent (in its capacity as agent under the Existing Loan Documents), including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action expressly released under this Plan, including, without limitation the claims subject to the bar order pursuant to Article X.J of this Plan and the injunction pursuant to Article X.K of this Plan.

1.154   "Retained Lender Causes of Action" means the individual claims and Causes of Action of each of the Consenting Lenders against any Person or Entity related to the Debtors, including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action that are released under this Plan and/or subject to the bar order and injunction provisions of this Plan.

1.155   "RSA" means that certain Restructuring Support Agreement dated October 15, 2015 by and among the Debtors, the Settling Members, and each of the Participating Lenders signatories thereto, attached hereto as Appendix 1, as may be amended, supplemented, or modified from time to time, as provided for therein.

1.156   "Secured Claim" means a Claim that is secured by a Lien on property in which the Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

– 16 –

1.157    "Securities Act" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

1.158    "Senior Executive" shall have the meaning set forth in the RSA.

1.159    "Settlement Contribution" means a cash payment of $325 million comprised of the USA Settlement Funding Contribution and the Millennium Funding Contribution, to be paid to, or for the benefit of, Millennium pursuant to the terms of the USA Settlement Agreements, the RSA, and this Plan.

1.160    "Settlement Letters of Credit" means (i) the irrevocable letters of credit in the amount, including interest, as required by the USA Settlement Agreements, posted by MLH and TA on or before November 9, 2015 for the benefit of the USA Settlement Parties pursuant to the terms of the USA Settlement Agreements; or (ii) the funds in the amount, including interest, as required by the USA Settlement Agreements to be placed into escrow by MLH and/or TA on or before November 9, 2015, pursuant to the terms of the USA Settlement Agreements and the terms of escrow agreements mutually acceptable to the USA Settlement Parties and MLH and/or TA.

1.161    "Settlement Letters of Credit Funds" means the cash proceeds from a draw on the Settlement Letters of Credit by the USA, including a draw on the funds in escrow.

1.162    "Settling Members" means, collectively, MLH and TA.

1.163    "Solicitation" means the Debtors' formal request for acceptances of the Plan, consistent with section 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.

1.164    "Solicitation Termination Date" means November 8, 2015 at 5:00 p.m. (prevailing Eastern Time).

1.165    "States PGT Settlement Agreement" means those certain Millennium Genetic Testing State Settlement Agreements, as amended, supplemented, or modified from time to time, between and among Millennium and the Plaintiff States that are party thereto from time to time.

1.166    "States UDT Settlement Agreement" means those certain Millennium UDT State Settlement Agreements, as amended, supplemented, or modified from time to time, between and among Millennium and the Plaintiff States that are party thereto from time to time.

1.167    "Subrogation Claim" has the meaning set forth in the RSA, and includes the Liens and assignments described in the RSA to secure payment of such claim subject to the terms of any Final Order authorizing the Debtors' use of its cash collateral and granting related relief, or, if no Final Order is entered, the Interim Cash Collateral Order.

1.168    "TA" means TA Millennium, Inc., a Delaware corporation.

– 17 –

1.169  "TA Shareholders" means the holders of equity interests in TA.

1.170  "Tax Code" means the Internal Revenue Code of 1986, as amended.

1.171  "Third Party Payers" means, collectively, the Entities that pay or reimburse the Debtors for services rendered to a third party.

1.172  "Third Party Payer Contracts" means contracts between the Debtors and Third Party Payers.

1.173  "Third Party Releasing Parties" means, collectively, the Holders of Claims against or with respect to or Equity Interests in the Debtors, including Non-Consenting Lenders.

1.174  "Trust Delayed Draw Facility" means that $7,000,000 facility between Reorganized Millennium, the Millennium Corporate Claim Trust, and the Millennium Lender Claim Trust, pursuant to which Reorganized Millennium shall advance up to $7,000,000 in the aggregate to the Millennium Corporate Claim Trust and/or the Millennium Lender Claim Trust in respect of fees and costs thereof.

1.175  "Unexpired Lease" means a lease to which any of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including, without limitation, the JS Real Estate Leases.

1.176  "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

1.177  "Unimpaired" means any Claim or Equity Interest that is not designated as Impaired.

1.178  "United States Parties" means collectively, the USA on behalf of the OIG, the DHA, and the OPM.

1.179  "USA" means the United States of America.

1.180  "USA Settlement Parties" means collectively, the Federal Settlement Parties and the Plaintiff States.

1.181  "USA Settlement Agreements" means, collectively, the Federal UDT Settlement Agreement, the States UDT Settlement Agreement, the Federal PGT Settlement Agreement, the States PGT Settlement Agreement, the Federal Administrative Settlement Agreement, and the CIA, and all respective exhibits thereto.

1.182  "USA Settlement Assumption Order" means the Final Order approving the assumption of the USA Settlement Agreements, which order may be the Confirmation Order.

– 18 –

1.183   "USA Settlement Funding Contribution" means the payment to be made by MLH and TA severally to or for the benefit of Millennium in the amount of $206 million plus accrued interest to be distributed to the USA as provided in the USA Settlement Agreements on account of the Government Claims.

1.184   "Voting Agent" means Prime Clerk LLC, and any successor.

1.185   "Voting Class" means the Class of Existing Credit Agreement Claims.

1.186   "Voting Record Date" means the date for determining which Holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is October 29, 2015 for all Holders of Claims.

**ARTICLE II**

**TREATMENT OF UNCLASSIFIED CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

**A.      Administrative Claims**

Subject to subparagraph (i) below, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Administrative Claim will (i) be Reinstated, (ii) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder, or (iii) will otherwise be left Unimpaired; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.  Any taxes that arose postpetition shall be paid in the ordinary course of business and the taxing authorities that hold Claims on account of such postpetition taxes shall not be required to file a proof of claim for an Administrative Claim in the Chapter 11 Cases.

   (i)      Professional Fee Claims

   1.      Professional Fee Claims.  Professionals or other Entities asserting a Professional Fee Claim for services rendered before the Effective Date must file and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no later than the Professional Claims Bar Date; provided that the upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of

– 19 –

business for any work performed after the Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order.  Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 60 days after the Effective Date or (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice to the Reorganized Debtors of such hearing.

2.      Professional Fee Reserve Amount.   Prior to the Effective Date, the Professionals shall estimate their Professional Fee Claims through the Effective Date and shall deliver such estimate to the Debtors for the purposes of determining the amount held in the Professional Fee Escrow Account. If a Professional has not provided such an estimate, the Debtors may, in their reasonable discretion, estimate the Professional Fee Claims of such Professional for the purpose of determining the amount held in the Professional Fee Escrow Account.

3.      Professional Fee Escrow Account.  On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Debtors and be distributed pursuant to the Plan.

4.      RSA Fees.  The foregoing shall not apply to (x) the Debtors' obligations to pay the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group as professional advisors to the Ad Hoc Group pursuant to the RSA and this Plan or (y) the Administrative Agent's Fees under this Plan.

## B.      Priority Tax Claims

On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Priority Tax Claim will (i) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Priority Tax Claim or (b) such other less favorable treatment as agreed to in

writing by the Debtors or Reorganized Debtors, as applicable, and such Holder or (ii) otherwise be left Unimpaired; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date.

**ARTICLE III**

**CLASSIFICATION AND TREATMENT OF
CLASSIFIED CLAIMS AND EQUITY INTERESTS**

**A.      Introduction**

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

**B.      Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Early Commitment Facility Claims | Unimpaired | Presumed to Accept |
| 2 | Existing Credit Agreement Claims | Impaired | Entitled to Vote |
| 3 | Prior Agent Indemnity Claims | Unimpaired | Presumed to Accept |
| 4 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5 | Government Claims | Unimpaired | Presumed to Accept |
| 6 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | MLH Tax Note Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 9 | Existing Equity Interests in Holdings | Unimpaired | Presumed to Accept |
| 10 | Existing Equity Interests in Millennium | Impaired | Deemed to Reject |
| 11 | Existing Equity Interests in RxAnte, LLC | Unimpaired | Presumed to Accept |

**C.      Classification and Treatment of Claims and Equity Interests**

(i)      Class 1 – Early Commitment Facility Claims.

1.      Classification:  Class 1 consists of all Early Commitment Facility Claims.

2.      Treatment: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Early Commitment Facility Claim shall be paid in full

– 21 –

in Cash.  In addition, on or as soon as reasonably practicable after the Effective Date, the Early Commitment Facility Agent shall receive payment in full in Cash of the Early Commitment Facility Agent Fees, and the Reorganized Debtors are authorized to pay such Early Commitment Facility Agent Fees without the need for further Bankruptcy Court approval.

       3.     <u>Impairment and Voting</u>:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(ii)     <u>Class 2 – Existing Credit Agreement Claims</u>.

       1.     <u>Classification</u>:  Class 2 consists of all Existing Credit Agreement Claims.  The Existing Credit Agreement Claims are Allowed Claims in an aggregate outstanding principal amount of $1,752,812,500, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents except Prior Agent Indemnity Claims.

       2.     <u>Treatment</u>:  On the Equity Transfer Date, all of the Debtors' outstanding obligations under the Existing Loan Documents shall be extinguished, canceled, and discharged, and in exchange therefor, and in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Existing Credit Agreement Claim, except the Administrative Agent on account of Administrative Agent Fees, shall receive:

          (A)     on the Equity Transfer Date, such Holder's Pro Rata share of and interest in 100% of the equity in Reorganized Millennium, which shall immediately be transferred to New Holdco in exchange for such Holder's Pro Rata share of 100% of the New Holdco Common Stock, subject to potential dilution from any equity incentive plan adopted in the future, in accordance with Article V. D(iii) of this Plan;

          (B)     on the Equity Transfer Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata share of and interest in the New Term Loan;

          (C)     on the Equity Transfer Date, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.F of this Plan, such Holder's Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust; and

          (D)     to the extent such Holder held any Retained Lender Causes of Action on the Equity Transfer Date and is a Consenting Lender, such Retained Lender Causes of Action shall be deemed automatically contributed to the Millennium Lender Claim Trust by each of the Consenting Lenders on such date without any further court order or action of the Consenting Lenders required, and in exchange therefor, subject to the reimbursement rights of the Backstop

– 22 –

MLH Shareholders as provided in Article V.G of this Plan, such Holder shall receive its Pro Rata (based solely on the aggregate amount of Existing Credit Agreement Claims held by such Consenting Lender to the aggregate Existing Credit Agreement Claims held by all Consenting Lenders) share of beneficial interests in the Millennium Lender Claim Trust.

In addition, on or as reasonably practicable after the Equity Transfer Date, the Administrative Agent shall receive payment in full in Cash of the Administrative Agent Fees, and Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group shall receive payment in full of any fees and expenses owed to them under the RSA as advisors to the Ad Hoc Group. New Holdco, Reorganized Millennium, and its subsidiaries are authorized to pay such fees without the need for further Bankruptcy Court approval or the filing of fee applications. The payment of such fees shall be subject to paragraph 14(d) of the Interim Cash Collateral Order.

Collectively, the distributions of payments to the Holders of Existing Credit Agreement Claims and the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan, and the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group pursuant to the RSA shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding obligations under the Existing Credit Agreement, except as provided with respect to the Administrative Agent in Article V.O hereof.

3. <u>Impairment and Voting</u>: Class 2 is Impaired by the Plan. Each Holder of an Allowed Existing Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(iii) <u>Class 3 – Prior Agent Indemnity Claims</u>.

1. <u>Classification</u>: Class 3 consists of all Prior Agent Indemnity Claims.

2. <u>Treatment</u>: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prior Agent Indemnity Claim shall (A) have its Allowed Prior Agent Indemnity Claim Reinstated; (B) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (C) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 3 Claim will have agreed upon in writing; <u>provided</u>, <u>however</u> for the avoidance of doubt, pursuant to the Existing Credit Agreement Solicitation Amendment and under this Plan, Reorganized Holdings shall be released from its guaranty of the obligations under the Existing Credit Agreement and such guaranty shall be fully and completely discharged upon the occurrence of the Effective Date and the payment in full of the principal and interest outstanding under the Early Commitment Facility.

3. <u>Impairment and Voting</u>: Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively presumed to have accepted the Plan pursuant to

section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(iv)   Class 4 – Other Secured Claims.

     1.   Classification:  Class 4 consists of all Other Secured Claims.

     2.   Treatment: With respect to each Other Secured Claim that becomes due or payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim (A) shall be paid in full in Cash, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be; (B) shall have its Allowed Other Secured Claim Reinstated, and paid in full, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later to occur of the Effective Date or when such Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations; (C) shall have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 4 Claim will have agreed upon in writing; provided that Class 4 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.

     3.   Impairment and Voting:  Class 4 is an Unimpaired Class, and the Holders of Class 4 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 4 Claims will not be entitled to vote to accept or reject the Plan.

(v)   Class 5 – Government Claims.

     1.   Classification:  Class 5 consists of all Government Claims.  The Government Claims are not disputed, dischargeable, unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision.  The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

     2.   Treatment:  On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Government Claim, (A) (i) the USA Settlement Agreements shall be assumed under the Plan if the USA Settlement

Assumption Order has not been entered by the Bankruptcy Court, (ii) any payments made under the USA Settlement Agreements, including the Initial USA Settlement Deposit, shall be final and irrevocable and shall not be subject to avoidance or recovery on any basis in law or equity, and (iii) any Avoidance Action against the USA Settlement Parties on account of the Initial USA Settlement Deposit shall be waived and released, and (B) the USA shall receive (1) the Settlement Letters of Credit Funds plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements or (2) Cash in the amount of $206 million plus all accrued interest, costs, and fees to the extent required by the USA Settlement Agreements.

3.      Impairment and Voting: Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan.

(vi)     Class 6 – General Unsecured Claims.

1.      Classification:  Class 6 consists of all General Unsecured Claims.

2.      Treatment:  On or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall (A) be paid in full in Cash; (B) have its Allowed General Unsecured Claim Reinstated, and paid in full, including postpetition interest (which shall not accrue at a default rate), if any, on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' or Reorganized Debtors' business operations or when such Claim becomes due or Allowed by order or judgment of a court or other tribunal of competent jurisdiction; (C) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 6 Claim will have agreed upon in writing.

3.      Impairment and Voting: Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 6 Claims will not be entitled to vote to accept or reject the Plan.

(vii)    Class 7 – MLH Tax Note Claims.

1.      Classification: Class 7 consists of all MLH Tax Note Claims.

2.      Treatment:  On the Effective Date, all of the Debtors' outstanding obligations under the MLH Tax Note shall be extinguished, canceled, and discharged, and each Holder of an MLH Tax Note Claim shall receive no distribution on account of such Claim.

3.      Impairment and Voting:  Class 7 is an Impaired Class, and the Holders of Class 7 Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Claims will not be entitled to vote to accept or reject the Plan.

(viii)   Class 8 – Intercompany Claims.

1.      Classification: Class 8 consists of all Intercompany Claims.

2.      Treatment: On the Effective Date, all Allowed Intercompany Claims, at the sole option of the Debtors or Reorganized Debtors, shall be (A) Reinstated and treated  or paid in the ordinary course of the Debtors' or Reorganized Debtors' business operations or (B) canceled, extinguished, and discharged.

3.      Impairment and Voting:  Class 8 is an Unimpaired Class, and the Holders of Class 8 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

(ix)    Class 9 – Existing Equity Interests in Holdings.

1.      Classification: Class 9 consists of all Existing Equity Interests in Holdings.

2.      Treatment: On the Effective Date, all Allowed Existing Equity Interests in Holdings shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.      Impairment and Voting:  Class 9 is an Unimpaired Class, and the Holders of Class 9 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 9 Equity Interests will not be entitled to vote to accept or reject the Plan.

(x)     Class 10 – Existing Equity Interests in Millennium.

1.      Classification: Class 10 consists of all Existing Equity Interests in Millennium.

2.      Treatment: On the Equity Transfer Date, all Existing Equity Interests in Millennium shall be presumed automatically cancelled, released, and extinguished without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors or the Reorganized Debtors thereunder shall be discharged.

3.      Impairment and Voting:  Class 10 is an Impaired Class, and the Holders of Class and the Holders of Class 10 Equity Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 10 Equity Interests will not be entitled to vote to accept or reject the Plan.

(xi)    Class 11 – Existing Equity Interests in RxAnte LLC.

1.    Classification: Class 11 consists of all Existing Equity Interests in RxAnte LLC.

2.    Treatment: On the Effective Date, all Allowed Existing Equity Interests in RxAnte LLC shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.    Impairment and Voting:  Class 11 is an Unimpaired Class, and the Holders of Class 11 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Class 11 Equity Interests will not be entitled to vote to accept or reject the Plan.

D.    **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

E.    **Discharge of Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, and effective as of the Effective Date or Equity Transfer Date, as applicable: (i) the rights afforded herein and the treatment of all Claims and Equity Interests herein will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

F.    **Alternative Treatment**

Notwithstanding any provision herein to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other less favorable distribution or treatment to which it and the Debtors or Reorganized Debtors may agree in writing.

– 27 –

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Presumed Acceptance of Plan**

Classes 1, 3, 4, 5, 6, 8, 9 and 11 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**B.      Deemed Rejection of Plan**

Classes 7 and 10 are Impaired and Holders of Class 7 Claims and Class 10 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.      Voting Classes**

Each Holder of an Allowed Claim or Equity Interest as of the applicable Voting Record Date in the Voting Class (Class 2) will be entitled to vote to accept or reject the Plan.

**D.      Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**E.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit thereto in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. Such modification shall not substantially alter the treatment of the Government Claims pursuant to the USA Settlement Agreements.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      General Settlement of Claims**

As set forth herein, this Plan embodies an overall negotiated settlement of numerous disputed Claims and issues pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates,

– 28 –

creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

(i)        Settlements and Releases

In consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement between the Debtors, the Settling Members, and the Consenting Lenders regarding, inter alia, the Released Claims held by (or that could be asserted by or on behalf of) the Consenting Lenders, the Existing Credit Agreement Claims (including, without limitation, the treatment of the Holders of Existing Credit Agreement Claims under the Plan and the releases provided for herein), and the treatment of the Settling Members under the Plan (including the releases and related provisions provided herein), and in partial consideration therefor, the Settlement Contribution.

In accordance with and subject to the terms of the RSA and the USA Settlement Agreements, and in exchange for the treatment of the Settling Members provided for in the RSA and this Plan (including the releases provided for herein), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Settling Members shall collectively make a Cash payment to, or for the benefit of, Millennium in the form of the Settlement Contribution.  The Settlement Contribution shall be funded 55% by MLH, and 45% by TA as follows: (x) $178.75 million to be funded by MLH and (y) $146.25 million to be funded by TA.  The USA Settlement Funding Contribution shall be paid to the USA.  If the USA Settlement Funding Contribution is not paid to the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

(ii)       USA Settlement

The provisions of the USA Settlement Agreements constitute a good faith compromise and settlement between the Debtors and the USA Settlement Parties of the Government Claims as specifically described in, and restricted by, the USA Settlement Agreements.  The Debtors shall continue to perform their obligations under the USA Settlement Agreements and the USA Settlement Assumption Order.  To the extent the USA Settlement Assumption Order has not been entered on or before the Effective Date, the USA Settlement Agreements shall be assumed and the Subrogation Claim shall be approved under this Plan.  Pursuant to Article III.C(v)(2), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors shall pay (or cause to be paid) the Government Claims in full from the proceeds of the USA Settlement Funding Contribution plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements.  The USA Settlement Funding Contribution shall be paid to the USA.  If the USA Settlement Funding Contribution is not paid to the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.  The Cash payment of the Initial USA Settlement Deposit shall be final and irrevocable and shall not be subject to any Avoidance Action or any other avoidance or recovery on any basis in law or equity.  Any and all

– 29 –

claims against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit shall be waived by the Debtors and their Estates and no Entity shall bring any claim against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit, and all such claims by any Entity are permanently and indefinitely prohibited, barred, and enjoined.

## B.      Corporate Existence

On or prior to the Effective Date, New Holdco will be formed, and pursuant to the transactions contemplated under this Plan, will become the parent entity of Reorganized Millennium. The charter of incorporation and by-laws of New Holdco will be substantially in the form of the New Holdco Organizational Documents.  The Reorganized Debtors shall continue to exist as separate legal entities, pursuant to the applicable organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended by the Plan, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date.  To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.      Vesting of Assets in the Reorganized Debtors

Except as provided in Article V.F of the Plan with respect to the property and assets to be transferred to the Millennium Corporate Claim Trust, elsewhere in the Plan, in the USA Settlement Agreements, or in the Confirmation Order, on or after the Equity Transfer Date, all property and assets of the Estates (including, without limitation, Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of this Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens or Claims.  Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

## D.      New Term Loan; Sources of Consideration for Plan Distributions

(i)      New Term Loan

On the Equity Transfer Date, the applicable Reorganized Debtors will be authorized to execute and deliver the New Term Loan Agreement, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in

each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the New Term Loan Agreement).

       (ii)     Settlement Contribution

On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors will receive the benefit of the Settlement Contribution by reason of the funding of the USA Settlement Funding Contribution and receipt of the Millennium Funding Contribution thereafter, and the USA Settlement Funding Contribution shall be paid to the USA. As set forth herein, the Settlement Contribution will be utilized (1) to make (or cause to be made) the required distributions to the Holders of Allowed Government Claims under the Plan; (2) to reimburse Millennium for the Initial USA Settlement Deposit; (3) for working capital needs in the Reorganized Debtors' operations; and (4) to pay the Early Commitment Facility Claims. If the USA Settlement Funding Contribution is not paid to the USA as contemplated in this Plan, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

       (iii)    Equity Interests in Reorganized Millennium

On the Equity Transfer Date, 100% of the Equity Interests of Reorganized Millennium shall be transferred and shall be deemed transferred, on behalf of Holders of Existing Credit Agreement Claims, to New Holdco in exchange for 100% of the New Holdco Common Stock.

       (iv)    Cash Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Debtors' or Reorganized Debtors' Cash balances, including Cash from operations and the Millennium Funding Contribution. Other than the USA Settlement Funding Contribution, Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

**E.     New Holdco Common Stock Issued Under the Plan**

On the Equity Transfer Date, immediately following the transfer of 100% of the Equity Interests in Reorganized Millennium to New Holdco, in exchange therefor, New Holdco will distribute the New Holdco Common Stock Pro Rata to the Holders of Existing Credit Agreement Claims pursuant to the terms set forth in the Plan and the RSA. The New Holdco Common Stock shall be subject to potential dilution from any equity incentive plan adopted in the future.

**F.     Millennium Corporate Claim Trust**

       (i)     Formation of Millennium Corporate Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Corporate Claim Trust shall be created by

– 31 –

Millennium and shall be funded by Reorganized Millennium in the amount of $1,000,000 in Cash (as provided below) plus such additional tangible or intangible assets of Millennium as Reorganized Millennium shall determine. The Millennium Corporate Claim Trust shall be governed and administered in accordance with the Millennium Corporate Claim Trust Agreement substantially in the form attached as Exhibit A. The Millennium Corporate Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Corporate Claim Trust, and if necessary, a replacement trustee therefor.

 (ii) Millennium Corporate Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Corporate Claim Trust, the Retained Corporate Causes of Action shall be automatically deemed to have been contributed to the Millennium Corporate Claim Trust. The Millennium Corporate Claim Trust shall be funded by an initial Cash contribution by Reorganized Millennium of in the amount of $1,000,000. Reorganized Millennium shall be obligated to pay the reasonable fees and expenses of administering the Millennium Corporate Claim Trust and liquidating the Retained Corporate Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust). Once this $10,000,000 is exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Corporate Claim Trust at the request of the Millennium Corporate Claim Trust Advisory Board. Amounts advanced by Reorganized Millennium to the Millennium Corporate Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Corporate Claim Trust (*i.e.*, gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Corporate Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium). The initial $1,000,000 cash contribution and subsequent payment of up to $10,000,000 of invoices shall not be required to be reimbursed.

 (iii) Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Corporate Claim Trust are the Holders of Existing Credit Agreement Claims. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Corporate Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Lender Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution. Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with this Article V.F(iii), the Holders of Existing Credit Agreement Claims shall receive their Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust, as provided in Article III.C(ii)(2) of this Plan.

(iv)      Federal Income Tax Treatment of Millennium Corporate Claim Trust

The Millennium Corporate Claim Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.  The Millennium Corporate Claim Trust shall not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the trust.  Accordingly, the beneficiaries of the Millennium Corporate Claim Trust shall be treated for U.S. federal income tax purposes (i) as direct recipients of an undivided interest in the assets transferred to the Millennium Corporate Claim Trust and as having immediately contributed such assets to the Millennium Corporate Claim Trust, and (ii) thereafter, as the grantors and deemed owners of the Millennium Corporate Claim Trust and thus, the direct owners of an undivided interest in the assets held by the Millennium Corporate Claim Trust.  For all U.S. federal income tax purposes, all parties shall use the valuation of the assets transferred to the Millennium Corporate Claim Trust as jointly determined by the trustee or its designee, TA, and MLH, with each such party acting reasonably and in good faith to cooperate with one another to jointly determine such values.

## G.      Millennium Lender Claim Trust

(i)      Formation of Millennium Lender Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Lender Claim Trust shall be created and shall be funded by Reorganized Millennium in the amount of $2,000,000 Cash (as provided below), plus such additional tangible or intangible assets as the Reorganized Millennium shall determine.  The Millennium Lender Claim Trust shall be governed and administered in accordance with the Millennium Lender Claim Trust Agreement substantially in the form attached as Exhibit B.  The Millennium Lender Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Lender Claim Trust, and if necessary, a replacement trustee therefor.

(ii)      Millennium Lender Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Lender Claim Trust, the Consenting Lenders shall each be automatically deemed to have contributed the Retained Lender Causes of Action to the Millennium Lender Claim Trust.  The Millennium Lender Claim Trust shall be funded by an initial contribution by Reorganized Millennium of in the amount of $2,000,000.  Thereafter, Reorganized Millennium shall also be obligated to pay the reasonable fees and expenses of administering the Millennium Lender Claim Trust and liquidating the Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust).  Once this $10,000,000 has been exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Lender Claim Trust at the request of the

– 33 –

Millennium Lender Claim Trust Advisory Board.    Amounts advanced by Reorganized Millennium to the Millennium Lender Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Lender Claim Trust (*i.e.*, gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Lender Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium).    The initial $2,000,000 cash contribution and subsequent payment of up to $10,000,000 in payment of invoices shall not be required to be reimbursed.

(iii)    Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Lender Claim Trust are the Consenting Lenders. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Lender Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Corporate Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution.  Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with this Article V.G(iii), the Consenting Lenders shall receive their Pro Rata share, based on the aggregate principal amount of only those Existing Credit Agreement Claims held by all Consenting Lenders, of beneficial interests in the Millennium Lender Claim Trust, as provided in Article III.C(ii)2 of this Plan.

(iv)    Federal Income Tax Treatment of Millennium Lender Claim Trust

The Millennium Lender Claim Trust shall be structured to qualify as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.

## H.    Issuance of New Securities and Related Documentation

On the Equity Transfer Date, but after the transactions described in clause (i) of the definition of Equity Transfer Date, the Reorganized Debtors and New Holdco will be authorized to, and will, issue and execute, as applicable, the New Securities and Debt Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The issuance and distribution of the New Holdco Common Stock will be made in reliance on the exemption from registration provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and will be exempt from registration under applicable securities laws.  Without limiting the effect of section 1145 of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, all financing documents, agreements, and instruments entered into and delivered on or as of the Equity Transfer Date contemplated by or in furtherance of the Plan, including, without limitation, the New Term Loan Agreement, the New Holdco Common Stock and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon

the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Equity Transfer Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of New Holdco will be that number of shares of New Holdco Common Stock as may be designated in the New Holdco Organizational Documents.

## I.    Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Equity Transfer Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, or Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens, Claims, or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

## J.    Reservation of Certain Claims of Governmental Units

Notwithstanding any other provision of the Plan, the Bankruptcy Code, or the Confirmation Order, the Debtors  shall not be released from, property and assets shall not vest in the Reorganized Debtors free and clear of, and the USA Settlement Parties specifically reserve, the following claims:

(i)    Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

(ii)    Any criminal liability;

(iii)    Except as explicitly stated in the USA Settlement Agreements, any administrative liability/action, including, without limitation, mandatory exclusion from federal health care programs;

(iv)    Any liability to the USA (or its agencies) for any conduct other than the (i) Covered Conduct in the Federal UDT Settlement Agreement, (ii) Covered Conduct in the States UDT Settlement Agreement, (iii) Covered Conduct in the Federal PGT Settlement Agreement, and (iv) Covered Conduct in the States PGT Settlement Agreement (in each case, as "Covered Conduct" is defined in each respective USA Settlement Agreement);

(v)    Any liability based upon obligations created by the USA Settlement Agreements;

(vi)    Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

(vii)    Any liability for failure to deliver goods or services due;

(viii)    Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct (as defined in each respective USA Settlement Agreement); and

(ix)    Any liability of individuals as specifically reserved for in each respective USA Settlement Agreement related to the Covered Conduct (as defined in each respective USA Settlement Agreement);

(x)    Any right of HHS or CMS to reopen and deny claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for fraud or similar fault under 42 C.F.R. § 405.980; or

(xi)    Any liability for the claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for which payment is reduced pursuant to any Medicare coverage or payment law, regulation, or guidance, other than for submission of claims that were not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

### K.    New Holdco and Reorganized Debtors Organizational Documents

The certificates of incorporation and bylaws or other organizational documents of the Reorganized Debtors shall be amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code Consistent With The Restructuring Term Sheet. The New Holdco Organizational Documents shall satisfy the provisions of the Plan and the Bankruptcy Code, and shall authorize the issuance of New Holdco Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan. In each case, the applicable organizational documents of the Reorganized Debtors or New Holdco will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, and (iii) with respect to New Holdco, Millennium and its subsidiaries, include other provisions concerning corporate governance and shareholder rights as may be agreed upon by the Ad Hoc Group Majority. After the Effective Date, New Holdco and the Reorganized Debtors may amend and restate their certificate of incorporation, by-laws, and other applicable organizational documents, as permitted by applicable law.

### L.    Directors and Officers of Reorganized Debtors

On the Effective Date, the New Board shall be as selected by the Ad Hoc Group Majority and disclosed in the Plan Supplement. To the extent not previously disclosed, the Debtors will disclose, prior to the Confirmation Hearing, the affiliations of each Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such

– 36 –

Person is an insider, the nature of any compensation for such Person.  Each such director and each officer of Millennium and RxAnte will serve from and after the Effective Date pursuant to applicable law and the terms of the New Holdco Organizational Documents and their other constituent and organizational documents and any employment agreements entered into with such Person.

## M.      Restructuring Transactions

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtors and/or the Reorganized Debtors shall enter into the Restructuring Transactions and any documents contemplated hereunder.  The Debtors and/or the Reorganized Debtors shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization structure of the Reorganized Debtors Consistent With The Restructuring Term Sheet.  The Restructuring Transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtors to be necessary or appropriate.  The actions taken by the Debtors and/or the Reorganized Debtors to effect the Restructuring Transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan and any documents contemplated hereunder, and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and any documents contemplated hereunder, and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion, or other organizational documents pursuant to applicable state law; and (iv) all other actions that the Debtors and/or the Reorganized Debtors determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

## N.      Corporate Action

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the Restructuring Transactions, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, members, officers, or directors of any Debtor (as of prior to the Effective Date) will be deemed to have been so

approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the equity holders, members, officers, or directors, of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the equity holders, members, officers, or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person.  On the Effective Date, any appropriate officer of the Debtors or the Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, file, record, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or referenced in the Plan in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable, including but not limited to those items referenced specifically in Article V.M and this Article V.N, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Entity.  The secretary and any assistant secretary of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

**O.     Cancellation of Notes, Certificates and Instruments**

On the Equity Transfer Date, and provided that the New Securities and Debt Documents have been authorized by the Bankruptcy Court, executed by New Holdco and the Reorganized Debtors, as applicable and delivered to the party or parties entitled thereto, except as provided below, all notes, stock, instruments, certificates, agreements and other documents evidencing the Existing Credit Agreement Claims and the Existing Equity Interests in Millennium will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. On the day following the date that the final distribution is made by Administrative Agent, the Administrative Agent will be released and discharged from any further responsibility under the Existing Loan Documents; provided, however, that any and all rights of indemnification applicable to the Administrative Agent (including, without limitation, any rights related to reimbursement of Administrative Agent Fees) or the Prior Agents, respectively, under the Existing Loan Documents and related documents shall survive and remain in full force and effect; provided further, however, until the Administrative Agent Fees have been paid in full, the Administrative Agent will retain its charging liens under the Existing Loan Documents with respect to any cash distributions to be made under the Plan by the Administrative Agent.  For the avoidance of doubt, by virtue of such Reinstatement or assumption, as applicable, any Prior Agent Indemnity Claims and Prior Agent Lender Indemnity Obligations shall continue to be governed by Sections 9.7 and 10.5, as applicable, of the Existing Credit Agreement and any other applicable provisions

of the Existing Loan Documents, and the Consenting Lenders shall have and retain all indemnity-related rights conferred on them pursuant to Section 9.7 of the Existing Credit Agreement and any other applicable provisions of the Existing Loan Documents and applicable law (collectively, the "Consenting Lender Indemnity-Related Rights") and in the event either the Prepetition Lenders or the Debtors (or the Reorganized Debtors, except for Holdings) make any payment in respect of a Prior Agent Indemnity Claim or Prior Agent Lender Indemnity Obligation, as applicable, nothing contained in this Plan shall be deemed to constitute a release of any Consenting Lender Indemnity-Related Rights or other indemnity, contribution or other claims or rights the Prepetition Lenders, the Debtors or such Reorganized Debtors may have as against each other under the Existing Loan Documents or otherwise applicable law.

**P.      Preservation and Maintenance of Debtor Causes of Action**

(i)      Maintenance of Causes of Action

Except as otherwise provided in Article X or elsewhere in this Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, after the Effective Date, the Reorganized Debtors or the Millennium Corporate Claim Trust (in accordance with Article V.F of this Plan), as applicable, shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action that are not Released Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases. The Reorganized Debtors, as the successors in, interest to the Debtors and the Estates, or the Millennium Corporate Claim Trust (in accordance with Article V.F of this Plan), as applicable, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any claims or Causes of Action that are not Released Claims without notice to or approval from the Bankruptcy Court. The Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) may pursue such retained claims, rights or Causes of Action, suits, or proceedings as appropriate, but for the avoidance of doubt, not any Released Claims, in accordance with the best interests of the Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) who hold such rights.

(ii)      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), or (B) subject to the bar order and injunction provisions in Article X.J of this Plan, Article X.K of this Plan, and the Confirmation Order, the Debtors expressly reserve such Cause of Action for later adjudication (including, without limitation, other than with respect to Released Claims, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Retained Corporate Causes of Action) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes

of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article X of the Plan) or any other Final Order (including, without limitation, the Confirmation Order).  Any Retained Corporate Causes of Action shall be transferred to the Millennium Corporate Claim Trust in accordance with Article V.F of this Plan for later adjudication by the Millennium Corporate Claim Trust. In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

**Q.      Exemption from Certain Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by a Debtors to a Reorganized Debtors or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**R.      Certain Tax Matters**

(i)      Tax Characterization of the Restructuring

For U.S. federal income tax purposes (and for all other applicable tax purposes): (A) all income and gain resulting from the cancellation or modification of debt or claims pursuant to this Agreement shall be allocated in accordance with the Holdings LLC Agreement; (B) the acquisition by the Holders of Existing Credit Agreement Claims of 100% of the existing and outstanding Equity Interests in Millennium, a disregarded entity, shall be treated as the transfer of assets owned by Millennium by Holdings to the Holders of Existing Credit Agreement Claims and the acquisition of the assets of Millennium by the Holders of Existing Credit Agreement Claims; and (C) the contribution of 100% of the issued and outstanding Equity Interests of Millennium to New Holdco in exchange for 100% of the New Holdco Common Stock shall be treated as an exchange qualifying under Section 351 of the Tax Code.

Subject to the preceding paragraph, for U.S. federal tax purposes (and for all other applicable tax purposes), the creation of the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of assets to the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of beneficial interests in the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, and the transfer of 100% of the Equity Interests In Reorganized Millennium to the Holders of Existing Credit Agreement Claims shall be characterized as an integrated transaction.  Such integrated transaction shall be treated as the receipt by each Holder of Existing Credit Agreement Claims, in full and final satisfaction of the Existing Credit Agreement Claims, of its Pro Rata share of and interest in (A) 100% of the

Equity Interests in Reorganized Millennium and (B) 100% of the beneficial interests in the Millennium Corporate Claim Trust.

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, the MLH Shareholders, and the TA Shareholders shall file all tax returns consistent with the characterization provided in this Article V.R, unless otherwise required by a final "determination" within the meaning of Section 1313 of the Tax Code.

(ii)    USA Settlement Deduction

Any tax deduction with respect to amounts payable from the Settlement Contribution, whether under the USA Settlement Agreements or otherwise shall be deductions of Holdings attributable to a Pre-Closing Tax Period and shall be allocated 55% to MLH and 45% to TA. Any such deductions allocated to MLH while MLH is an S corporation will be allocated out to MLH's historic owners and such deductions shall be for the benefit of the historic MLH Shareholders.

(iii)    Section 754 Election

Holdings and any of its subsidiaries that are treated as partnerships for federal and state income tax purposes shall make elections under Section 754 of the Tax Code for the taxable year of the partnership in which the restructuring occurs, if such an election has not already been made.

(iv)    Cooperation; Amended Returns

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, and the historic TA Shareholders, and the historic MLH Shareholders shall work cooperatively and collectively with respect to tax reporting and to take consistent tax positions; provided, however, that such agreement to work cooperatively and collectively shall not bind any of the identified parties to any valuation of Millennium (except with respect to transfers to the Millennium Corporate Claim Trust, as identified in Article V.F(iv) hereof).  Neither New Holdco nor any Prepetition Lender shall (i) file or amend any tax return of the Company for any Pre-Closing Tax Period, except as required by law, or (ii) enter into any voluntary disclosure agreements, enter into any settlements, forego any right to a refund, or extend the statute of limitations of a tax, in each case with respect to a Pre-Closing Tax Period, if such action would reasonably be likely to adversely affect the historic owners of TA or MLH, without the consent of the historic owners of TA and MLH, which consent shall not be unreasonably withheld, conditioned or delayed.

(v)    Holdings Tax Returns

All income tax returns and similar tax returns of Holdings shall be prepared jointly by TA and MLH.  Both TA and MLH will have the right to approve such tax returns prior to the filing of such tax returns.  Holdings will be liquidated for tax purposes no later than February 28, 2016. MLH, TA and Holdings will make no claims against the Holders of Existing Credit Agreement Claims, Millennium or New Holdco for any taxes of Holdings.  The Prepetition Lenders will not be liable for any income or tax liabilities from or with respect to Holdings for any tax periods, nor will the Prepetition Lenders be liable for any income or tax liabilities attributable to the

Company's assets for a Pre-Closing Tax Period.  Holdings shall have no liability with respect to the debt owed to the Holders of Existing Credit Agreement Claims or the Prior Agent Indemnity Claims.  Holdings intends to treat any of the debt owed to the Holders of Existing Credit Agreement Claims and Prior Agent Indemnity Claims in excess of the value of Millennium as resulting in debt cancellation income to Holdings for tax purposes.

(vi)    Entity Classifications

Holdings will continue to be classified as a partnership for tax purposes until its liquidation for tax purposes. Millennium and its subsidiaries shall continue to be classified as entities disregarded as separate from their owners (within the meaning of Treas. Reg. Section 301.7701-3) for all tax purposes through the Equity Transfer Date.  No party (other than New Holdco or the Holders of Existing Credit Agreement Claims with respect to Post-Closing Tax Periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities.

(vii)    TA and MLH Taxes and Refunds

The present owners of TA and/or TA will receive all tax refunds and tax benefits of TA. TA and the present owners of TA will be responsible for and will make no claims against the Prepetition Lenders, New Holdco, the Company, MLH or the owners of MLH for any taxes of TA, or the present owners of TA, respectively. MLH and/or the present owners of MLH will receive all tax refunds and tax benefits of MLH. MLH and the present owners of MLH will be responsible for and will make no claims against the Prepetition Lenders, the Company, TA or the owners of TA for any taxes of MLH, or the present owners of MLH, respectively.

(viii)    Post-Closing Taxes

New Holdco shall be responsible for all taxes of Reorganized Millennium and its subsidiaries attributable to Post-Closing Tax Periods, and shall be entitled to receive all tax refunds and benefits of Millennium attributable to Post-Closing Tax Periods.

**S.    Further Transactions**

If the conditions to occurrence of the Effective Date set forth in Article VIII.B are not satisfied on or before December 30, 2015 (the "Consummation Deadline"), the Debtors shall not be authorized to proceed to consummate the Plan.  Subject to the consent of the Federal Settlement Parties, MLH, TA, and an Ad Hoc Group Majority, as determined in each such party's sole and absolute discretion, the Debtors may extend the Consummation Deadline from time to time in order to preserve the ability to consummate the Plan.

# ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

### A.    Assumed Contracts and Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be rejected before the Effective Date; or (5) is to be rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.   All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtors, and be enforceable by the Reorganized Debtors in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions such assumption, assignment or transfer.   Any provision in the Assumed Agreements that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable.   Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be unenforceable.   To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.   Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### B.    Assignment of Executory Contracts or Unexpired Leases

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and

assignment, which will:  (a) list the applicable Cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed Cure amounts.  Any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related Cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or Cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or Cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

## C.     Rejection of Executory Contracts or Unexpired Leases

All Executory Contracts and Unexpired Leases designated for rejection in the Plan Supplement will be deemed rejected as of the Effective Date.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in this Article of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.  Rejection damages claims are Class 6 Claims.

## D.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption other than with respect to any alleged Cure amount, which may be asserted at any time.  In the event of a dispute regarding (1) the amount of any payments to Cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to Cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**E.       Assumption of Officer Insurance Policies**

The Debtors, and upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

**F.       Indemnification Provisions**

The indemnification provisions currently in place under the Limited Liability Company Operating Agreement for Millennium dated as of April 11, 2014 (without regard to any amendments which may have been made thereto or any board resolutions which may have been adopted in respect of indemnification) (the "Operating Agreement") and the Existing Loan Documents solely for the following: (i) the Prior Agents; (ii) the Administrative Agent; (iii) the Early Commitment Facility Agent; (iv) the officers of Millennium who served in such capacity as of the Petition Date or any time thereafter through the Effective Date and (v) the Prepetition Lenders (but solely to the extent of, and without prejudice to, any of the Consenting Lender Indemnity-Related Rights or any other indemnity, contribution or other Claims they may have against the Debtors (or the Reorganized Debtors, except for Holdings) under the Existing Loan Documents on account of their making a payment in respect of a Prior Agent Lender Indemnity Claim) (collectively, the "Preserved Indemnified Parties") with respect to or based upon any act or omission taken or omitted in such capacities will be Reinstated (or assumed, as the case may be) solely in respect to the Preserved Indemnified Parties, and will survive effectiveness of the

Plan. No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying Operating Agreement and Existing Loan Documents. Notwithstanding anything in this Article VI.F to the contrary, no other claimed Indemnification Agreement regarding any Senior Executive shall be assumed or Reinstated unless mutually agreed upon by the Ad Hoc Group Majority and the respective Senior Executive with respect to any such indemnity terms (and such other Indemnification Agreements may be amended by the mutual agreement of the Ad Hoc Group Majority and the respective Senior Executive). If the Ad Hoc Group Majority and Senior Executive do not reach an agreement regarding the assumption or Reinstatement of such Senior Executive's other claimed Indemnification Agreements, all parties reserve their rights regarding such other claimed Indemnification Agreements.  For the avoidance of doubt, nothing in this Article VI.F shall (i) expand the indemnification obligations owed by any of the Releasing Parties to the Released Parties beyond the limits set forth in Article X.M hereof; (ii) constitute a Reinstatement or assumption of any indemnification obligations which may be owed by Millennium or any other Debtor to Holdings or any other Person or Entity other than the Preserved Indemnified Parties solely with respect to the indemnification provisions set forth above,  or (iii) constitute a Reinstatement or assumption of any indemnification obligations of either Millennium to Holdings, or Holdings or any Debtor to any of the Preserved Indemnified Parties or any other Person or Entity except for Millennium.

## G.      Compensation and Benefit Programs

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to its employees, retirees, and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  To the extent that such plans or agreements providing for bonuses or severance to insiders may fall within this Article VI.G of the Plan, such plans and agreements will not be assumed; provided, however, that such insiders may assert any claims arising under such plans or agreements against the applicable Debtors as Class 6 Claims.

## H.      Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under:  (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance, All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements,

policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

## I.    Third Party Payer Contracts

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all Third Party Payer Contracts are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  Any provision in the Third Party Payer Contracts that purports to declare a breach or default or to accelerate any payment obligations based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable.  Nothing under the Plan shall affect the Debtors' or the applicable counterparty's rights, claims and defenses in respect of any Third Party Payer Contract, or the right of either party thereto to future adjudication of any disputes in respect thereto in accordance with the applicable provisions of such Third Party Payer Contract.

## J.    Medicare and Medicaid Agreements

The Medicare and Medicaid Agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; provided that, for the avoidance of doubt, Holdings is not assuming any Medicare and Medicaid Agreements.  Nothing under the Plan will affect the USA's, HHS's, or CMS's rights, claims, and defenses in respect of any Medicare and Medicaid Agreements for future adjudication in accordance with the applicable provisions of such Medicare and Medicaid Agreements.  The "cure" and adequate assurance of future performance under section 365 of the Bankruptcy Code for the assumption of the Medicare and Medicaid Agreements shall be: (a) the performance by the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, of their obligations under the USA Settlement Agreements; and (b) the continued participation of the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, in the Medicare and Medicaid programs in the ordinary course of business to be governed by and subject to, the terms and conditions of the Medicare and Medicaid Agreements and the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments other than the Determined Overpayments (as defined in the Federal Administrative Settlement Agreement) in the ordinary course of business.  In the event that any of the Medicare and Medicaid Agreements are subsequently terminated and the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries re-enroll in the Medicare and Medicaid programs, such parties agree that they shall assume successor liability as to any liability arising under the Medicare Agreements and that such successor liability shall be governed by and subject to, the terms and conditions of the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments in the ordinary course of business.

– 47 –

# ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Distribution Record Date

Distributions hereunder to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Transfers of Claims after the Distribution Record Date shall not be recognized for purposes of this Plan. On the Distribution Record Date, the Administrative Agent shall provide a true and correct copy of the registry for the Existing Credit Agreement Claims to the Debtors. The Distribution Agent, or any party responsible for making distributions pursuant to this Article VII.A shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

### B.     Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Except as otherwise provided in the Plan or Confirmation Order and in the USA Settlement Agreements, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Equity Transfer Date, all debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order.  All payments and all distributions made by the Reorganized Debtors under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Reorganized Debtors.

### C.     Distribution Agent

Except as provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors, New Holdco, or the Administrative Agent, respectively, as Distribution Agent, or by such other Entity designated by the Reorganized Debtors or New Holdco as a Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Reorganized Debtors' duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court.  For purposes of distributions under this Plan to the Holders of Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent and in acting in such

capacity shall be entitled to all of the rights, protections, and indemnities afforded to the Administrative Agent under the Existing Credit Agreement.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  If the Distribution Agent is an entity other than a Reorganized Debtor or New Holdco, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

## D.     Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## E.     Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar.  To the extent Cash, notes, warrants, shares, stock are to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash, notes, or shares shall be treated as an Unclaimed Distribution under the Plan.

No fractional shares shall be issued or distributed under the Plan.  Each Person entitled to receive Equity Interests or New Holdco Common Stock shall receive the total number of whole shares of Equity Interests or New Holdco Common Stock, as applicable to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of Equity Interests or New Holdco Common Stock, the actual distribution of shares of such Equity Interests shall be rounded to the next lower whole number.

## F.     Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order.  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

### G.    General Distribution Procedures

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.   All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

### H.    Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the extent such proofs of claim are filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, (3) at the addresses in the Debtors' books and records, or (4) in accordance with the Existing Credit Agreement.

### I.    Undeliverable Distributions and Unclaimed Distributions

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address.

Any Entity which fails to claim any Unclaimed Distribution within one year from the date upon which a distribution is first made to such entity shall be deemed to forfeit all rights to such Unclaimed Distribution under the Plan.   Such Unclaimed Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to and vest in the Reorganized Debtor free of any restrictions thereon.   Entities which fail to claim such Unclaimed Distribution shall have no claim whatsoever on account of such Unclaimed Distribution against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

### J.    Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate.   From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. As a condition to receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws.   For the avoidance of doubt, no amounts shall be withheld from any contributions or transfers, pursuant to the terms of this Plan, to the Millennium Corporate Claim Trust, or the Millennium Lender Claim Trust.

– 50 –

**K.  Setoffs**

The Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and causes of action that the Reorganized Debtors possesses against such Holder.  The Reorganized Debtors shall provide prompt notice of any setoff to the Holder of the subject Allowed Claim, and all Holders of Allowed Claims shall have the right to challenge such setoff in any forum with jurisdiction over the parties.

**L.  Surrender of Cancelled Instruments or Securities**

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.O of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to the Reorganized Debtors or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

**M.  Lost, Stolen, Mutilated or Destroyed Securities**

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Reorganized Debtors and other applicable Distribution Agent:  (x) evidence reasonably satisfactory to the Reorganized Debtors and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Reorganized Debtors and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest.  Upon compliance with Article VII.L of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Reorganized Debtors and other applicable Distribution Agents.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE PLAN'S
## CONFIRMATION AND EFFECTIVE DATE

**A.      Conditions to Confirmation**

The Plan's Confirmation is subject to the satisfaction of each of the following conditions precedent:

(i)      The Plan and Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Federal Settlement Parties, the Ad Hoc Group, and the Settling Members and shall be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements.  This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(ii)      The RSA shall not have been terminated by any of the parties thereto.

(iii)      The Debtors shall have filed a motion seeking assumption of the USA Settlement Agreements and approval of the Subrogation Claim.

**B.       Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)      The Effective Date shall not occur prior to December 15, 2015.

(ii)      The Bankruptcy Court shall have entered an order confirming the Plan.  This condition precedent is not subject to waiver by any party.

(iii)      The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order (1) shall (A) approve the releases (including the third party release) and exculpations provided for in Article X.E, Article X.F, Article X.G, and Article X.H of this Plan, but not approve the release of, and specifically reserve for the benefit of the USA and Plaintiff States, the claims and liabilities provided for in Article V.J of this Plan; (B) contain the contribution claim and Non-Contribution Claim protections provided for in Article X.L of this Plan and such other protections for the Released Parties and their respective Related Parties set forth in the RSA; and (C) contain the bar order provisions set forth in Article X.J of this Plan, in each case, in form, scope, and substance consistent in all material respects with the RSA; and (2) shall otherwise be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements.  This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(iv)      The Confirmation Order shall be a Final Order; provided, however, that only the Settling Members may agree in writing, in their sole and absolute discretion, to waive the condition that the Confirmation Order be a final, non-appealable order.

(v)        The RSA shall have been assumed pursuant to the Confirmation Order and shall not have been terminated by any of the parties thereto.

(vi)        The USA Settlement Agreements shall have been assumed pursuant to the USA Settlement Assumption Order or Confirmation Order and shall not have been terminated by any of the parties thereto. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(vii)        Good faith efforts have been made for the organizational documents of the Reorganized Debtors to have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization.

(viii)        New Holdco shall have been formed and the New Holdco Organizational Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws.

(ix)        The Debtors shall have received any and all required regulatory approvals to consummate the transactions contemplated by the Plan, the Disclosure Statement, and any documents contemplated thereunder.

(x)        The transactions contemplated by this Plan, the Disclosure Statement, and any other documents contemplated hereunder or thereunder shall have been approved to the extent required and shall not be subject to avoidance.

(xi)        All other documents and agreements necessary to implement the Plan on the Effective Date to the extent required herein or in the RSA, including the without limitation the New Term Loan Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

(xii)        All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

(xiii)        The New Securities and Debt Documents shall be in form and substance reasonably satisfactory to the Debtors and an Ad Hoc Group Majority, and shall have been executed and delivered by all parties thereto to the extent required hereunder.

## C.        Conditions to the Equity Transfer Date

The occurrence of the Equity Transfer Date is subject to each of the following conditions precedent:

(i)        All conditions to the Effective Date of the Plan as provided in Article VIII.B above shall have been satisfied or waived.

(ii)        The Equity Transfer Date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA.

– 53 –

(iii)    The JS Real Estate Leases shall have been amended on the terms specified in the RSA and assumed by Millennium.

(iv)    The Debtors shall have paid or caused to be paid the USA Settlement Funding Contribution to the USA.

## D.    Waiver of Conditions

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article VIII may be waived only if waived in writing by each of the Debtors, the Ad Hoc Group Majority, and the Settling Members (except as otherwise stated in this Article VIII or the RSA) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan subject to any consents that may be required under the RSA.  The failure to satisfy or waive a condition to the Effective Date may be asserted by any of the Debtors, the Ad Hoc Group Majority, and the Settling Members regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors, the Ad Hoc Group Majority, or the Settling Members to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

## E.    Effect of Non Occurrence of Conditions to the Effective Date

If the Effective Date of the Plan does not occur on or before December 30, 2015, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect; provided, however, that such date may be extended by agreement of all of the Debtors, the Ad Hoc Group Majority, MLH, TA, and the Federal Settlement Parties, each acting in their respective sole and absolute discretion.

**ARTICLE IX**

**RETENTION OF JURISDICTION**

## A.    Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

(i)    allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

– 54 –

(ii)      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date; provided, however, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

(iii)      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

(iv)      resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(v)      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(vi)      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, provided that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

(vii)      enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

(viii)      resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(ix)      issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of this Plan, except as otherwise provided in this Plan;

(x)      enforce the terms and condition of this Plan and the Confirmation Order;

(xi)      resolve any cases, controversies, suits or disputes with respect to the release, the Exculpation, the indemnification provisions and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

(xii)      to enforce the releases, bar order(s), and injunction(s) provided in Article X hereof;

(xiii)   resolve any cases, controversies, suits, or disputes with respect to the release of all claims against USA Settlement Parties on account of the payment of the Initial USA Settlement Deposit and the USA Settlement Funding Contribution;

(xiv)   enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xv)   resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement;

(xvi)   enter an order concluding or closing the Chapter 11 Cases; and

(xvii)  to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

**B.      Lack of Bankruptcy Court Jurisdiction**

Notwithstanding any other provision of this Plan or the Confirmation Order, the Bankruptcy Court shall not have jurisdiction with respect to: (i) any actions or proceedings to enforce the Guarantee Agreement, an exhibit to the USA Settlement Agreements; (ii) any claims, actions or proceedings for any of the liabilities provided for in Article V.J of this Plan; and (iii) any claims, actions or proceedings regarding regulation and administration of the participation in the Medicare and Medicaid programs by the Debtors, New Holdco, Reorganized Millennium, and all subsidiaries of Reorganized Millennium, as applicable.

**C.      Failure of Bankruptcy Court to Exercise Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Article IX.A of the Plan, the provisions of this Article IX shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**ARTICLE X**

**EFFECTS OF CONFIRMATION**

**A.      Binding Effect**

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN

THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## B.    Subordination Rights

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan.

## C.    Discharge of the Debtors

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in the Debtors or any of their assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Equity Interests in the Debtors, subject to the occurrence of the Effective Date.  However, the foregoing provisions will have no effect on the Debtors' liabilities as reserved by the USA Settlement Agreements and as provided for in Article V.J of this Plan, whether such liabilities arose prior to or after the Confirmation Date.

## D.    Exculpation and Limitation of Liability

The Exculpated Parties and the USA Settlement Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection

with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, the RSA, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement including the Retained Claims.

**E.      Releases by Debtor**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN OR THE CONFIRMATION ORDER, EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES (AND EACH SUCH RELEASED PARTY AND THEIR RESPECTIVE RELATED PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER, OR ON BEHALF OF ANOTHER PARTY AGAINST THE RELEASED PARTIES OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT, INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH DEBTOR RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST; AND/OR (IV) ANY CLAIMS OR DEFENSES AGAINST THIRD PARTY PAYERS UNDER ASSUMED CONTRACTS; PROVIDED, FURTHER, HOWEVER THAT FOR PURPOSE OF THIS Article X.E (I) NEITHER RXANTE, LLC NOR MILLENNIUM SHALL BE CONSIDERED A RELATED PARTY OF HOLDINGS

AND (II) NO EMPLOYEE OR PROFESSIONAL OF HOLDINGS SHALL BE CONSIDERED A RELATED PARTY OF HOLDINGS.

FURTHERMORE, EFFECTIVE AS OF THE EFFECTIVE DATE OF THE USA SETTLEMENT AGREEMENTS AND CONTINUING TO BE EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE USA SETTLEMENT PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER, AND RELEASE TO THE USA SETTLEMENT PARTIES AND THE USA SETTLEMENT PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED, AND DISCHARGED BY THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS RELEASED PURSUANT TO THE USA SETTLEMENT AGREEMENTS.

THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.  FOR PURPOSES OF THIS RELEASE, AND WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE DEBTORS ARE SPECIFICALLY ASSUMING CONTROL OF AND RELEASING ALL AVOIDANCE ACTIONS AGAINST THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES INCLUDING, WITHOUT LIMITATION, ALL CLAIMS AND CAUSES OF ACTION THAT ARE COVERED OR THAT ARISE UNDER BANKRUPTCY CODE SECTION 544.

**F.      Releases by TA and MLH**

(i)      SUBJECT TO (iii) BELOW, TA, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, HEREBY (A) FULLY AND COMPLETELY RELEASES AND FOREVER DISCHARGES HOLDINGS, MLH, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY AND ALL CORE RELEASED CLAIMS THAT TA OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY, AND INCLUDING, FOR THE AVOIDANCE OF DOUBT, ANY CLAIMS ARISING FROM MLH'S FAILURE TO MAINTAIN ITS STATUS AS AN S CORP), AGAINST HOLDINGS OR MLH OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGES AND WAIVES ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT)

WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(ii)     SUBJECT TO (iii) BELOW,  MLH, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, HEREBY (A) FULLY AND COMPLETELY RELEASES AND FOREVER DISCHARGES HOLDINGS AND TA, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY AND ALL CORE RELEASED CLAIMS THAT MLH OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY), AGAINST HOLDINGS OR TA OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGES AND WAIVES ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT) WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(iii)     FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING SUBPARAGRAPHS (I) AND (II) ABOVE, IN ANY LAWSUIT OR OTHER LEGAL ACTION BY AN EXCLUDED PARTY AGAINST TA, MLH OR THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "EQUITY DEFENDANTS"), EACH EQUITY DEFENDANT PRESERVES AND DOES NOT WAIVE THE RIGHT TO DEFEND OR OTHERWISE RESPOND TO SUCH ACTION BY ASSERTING THAT ANOTHER EQUITY DEFENDANT IS RESPONSIBLE FOR ANY OR ALL CAUSES OF ACTION ASSERTED BY, OR DAMAGES CLAIMED BY, AN EXCLUDED PARTY; AND PROVIDED, FURTHER, HOWEVER, NOTHING IN THIS PARAGRAPH RELEASES ANY PERSON FROM ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN, INCLUDING THE PROVISIONS OF Article V.R OF THIS PLAN.

**G.     Releases by Lender Releasing Parties**

EFFECTIVE AS OF THE EFFECTIVE DATE, THE LENDER RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE LENDER RELEASING PARTIES OR THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY AND ITS RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH LENDER RELEASING PARTY TO

– 60 –

ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; AND/OR (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

**H.      Releases by Third Party Releasing Parties**

EFFECTIVE AS OF THE EFFECTIVE DATE, THE THIRD PARTY RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES, AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT ANY OF THE THIRD PARTY RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND/OR PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING (A) RETAINED CLAIMS, (B) ANY CLAIMS AGAINST EXCLUDED PARTIES , (C) ANY PRIOR AGENT INDEMNITY CLAIMS OR PRIOR AGENT LENDER INDEMNITY OBLIGATIONS UNDER THE EXISTING LOAN DOCUMENTS WITH RESPECT TO MILLENNIUM AND THE CONSENTING LENDERS, AS APPLICABLE, AND TO THE EXTENT A CONSENTING LENDER PAYS A PRIOR AGENT LENDER INDEMNITY OBLIGATION, ANY CONSENTING LENDER INDEMNITY-RELATED RIGHTS OR OTHER CONTRIBUTION, INDEMNITY  OR OTHER CLAIM OF SUCH CONSENTING LENDER  AGAINST THE DEBTORS (OR REORGANIZED DEBTORS, EXCEPT FOR HOLDINGS), UNDER THE EXISTING LOAN DOCUMENTS OR OTHERWISE APPLICABLE LAW (WITHOUT PREJUDICE TO ANY SUCH CONSENTING LENDER INDEMNITY-RELATED RIGHTS), (II) THE RIGHTS OF SUCH THIRD PARTY RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR REINSTATED OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER

OF THE BANKRUPTCY COURT; (III) ANY LIABILITY EXPRESSLY RESERVED BY CERTAIN GOVERNMENTAL UNITS AS PROVIDED IN Article V.J OF THIS PLAN; (IV) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST; AND/OR (V) THE RIGHT OF AN EXCLUDED PARTY, IF SUED IN ANY LAWSUIT OR OTHER LEGAL PROCEEDING BY A MILLENNIUM CLAIM TRUST, MILLENNIUM, A CONSENTING LENDER AND/OR ANY OTHER RELEASED PARTY OR ANY OF ITS RELATED PARTIES (ANY SUCH PARTY INSTITUTING SUCH LAWSUIT OR OTHER LEGAL PROCEEDING, IN ITS CAPACITY AS SUCH, THE "ASSERTING PARTY"), TO ASSERT ANY DEFENSE, CROSS-CLAIM AND/OR COUNTERCLAIM, IF ANY, AGAINST SUCH ASSERTING PARTY IN SUCH LAWSUIT OR OTHER LEGAL PROCEEDING WHERE SUCH EXCLUDED PARTY IS SUED; PROVIDED, HOWEVER, THAT IN THE EVENT A CROSS-CLAIM OR COUNTERCLAIM, IF ANY, IS ASSERTED, (X) IN NO EVENT SHALL ANY RECOVERY BY THE EXCLUDED PARTY ON SUCH CROSS-CLAIM OR COUNTERCLAIM AGAINST SUCH ASSERTING PARTY (WITHOUT GIVING EFFECT TO INDEMNIFIABLE DEFENSE COSTS, IF ANY, INDEMNIFIABLE BY SUCH ASSERTING PARTY) EXCEED THE AMOUNT OF ANY RECOVERY OBTAINED (WITHOUT GIVING EFFECT TO INDEMNIFIABLE DEFENSE COSTS, IF ANY, INDEMNIFIABLE BY SUCH ASSERTING PARTY) AGAINST THAT EXCLUDED PARTY BY SUCH ASSERTING PARTY AND (Y) THE PROVISIONS OF Article X.L OF THIS PLAN SHALL OTHERWISE BE APPLICABLE TO SUCH CROSS-CLAIM OR COUNTERCLAIM.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

## I.    Waiver of Limitations on Releases of Unknown Claims

Each of the Debtors, Lender Releasing Parties, and Third Party Releasing Parties agree and acknowledge that the releases contained in Article X.E, Article X.F, Article X.G, and Article X.H shall extend to Released Claims that the parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which the Parties shall be deemed to waive, and shall waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims; further, with respect to any and all of the Released Claims, including any and all unknown claims that the Parties shall be deemed to waive, and shall waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:

– 62 –

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The parties also shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code § 1542. The Parties also acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is the intention of the parties to fully, finally, and forever settle and release with prejudice any and all Released Claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts. The parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.

However, nothing in this section shall affect the claims and liabilities specifically reserved for Governmental Units in the USA Settlement Agreements as provided for in Article V.J of this Plan.

## J.    Bar Order

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, including, without limitation all Third Party Releasing Parties, any Non-Consenting Lenders, each Excluded Party, and, for the avoidance of doubt, any Consenting Lender, whether directly, derivatively or otherwise, of any claims or Causes of Action released pursuant to this Plan, including but not limited to the claims and Causes of Action released in Articles X.E, F, G, and H.  For the avoidance of doubt and subject to the following sentence, this injunction shall permanently bar, enjoin, and restrain (i) all persons and entities (including, without limitation, each Non-Consenting Lender, each Third Party Releasing Party, and each Excluded Party) from commencing or prosecuting any litigation or asserting any claims against Holdings, TA, MLH, or their respective Related Parties based on any Released Claims; (ii) to the maximum extent possible under applicable law, each Excluded Party and each Third Party Releasing Party from commencing, prosecuting, or asserting against any of the Released Parties any claims, actions or proceedings for contribution or indemnity, or otherwise, including any claims, actions or proceedings for contribution or indemnity or otherwise with respect to any liability or obligation of any Excluded Party to Millennium or the Consenting Lenders arising out of or in connection with any Retained Claims. The foregoing provision shall not operate to enjoin (i) the commencement or prosecution by the USA Settlement Parties of any action or proceeding to enforce the Guarantee Agreement, an exhibit to the USA Settlement Agreements, (ii) the commencement or prosecution by a Prior Agent of any action or proceeding to enforce any Prior Agent Lender Indemnity Claims or Prior Agent Lender Indemnity Obligations  under the Existing Loan Documents with respect to Millennium and the Consenting Lenders, as applicable, or (iii) the right of an Excluded Party, if sued in any lawsuit or other legal proceeding by an Asserting Party to assert any defense, cross-claim and/or counterclaim, if any, against such

Asserting Party in such lawsuit or other legal proceeding where such Excluded Party is sued; provided, however, that in the event a cross-claim or counterclaim, if any, is asserted, (x) in no event shall any recovery by the Excluded Party on such cross-claim or counterclaim against such Asserting Party (without giving effect to indemnifiable defense costs, if any, indemnifiable by such Asserting Party) exceed the amount of any recovery obtained (without giving effect to indemnifiable defense costs, if any, indemnifiable by such Asserting Party) against that Excluded Party by such Asserting Party and (y) the provisions of Article X.L of this Plan shall otherwise be applicable to such cross-claim or counterclaim.

In addition to the foregoing, to the extent that any Non-Consenting Lender obtains a judgment pursuant to which MLH and/or TA become liable to a Non-Consenting Lender, MLH and/or TA shall be entitled to a dollar for dollar offset and credit against any such judgment in an amount equal to the product of: (x) the Pro Rata amount of that indebtedness under the Existing Credit Agreement that such Non-Consenting Lender held and upon which its claim against MLH and/or TA is based multiplied by (y) the Settlement Contribution.

The Released Parties and their Related Parties shall have no liability to any Excluded Party, Millennium or the Prepetition Lenders with respect to any Retained Claims that are, immediately prior to the Effective Date, subject to contractual or other indemnity by Millennium in favor of the Excluded Parties other than any liability of Millennium or any Prepetition Lender (including, without limitation, a Consenting Lender) to a Prior Agent for any Prior Agent Indemnity Claims or Prior Agent Lender Indemnity Obligations, as applicable, and all such claims shall be barred, enjoined and released.

## K.      Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.  FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY AVOIDANCE ACTION (AS DEFINED IN THIS PLAN) OR ANY OTHER ACTION TO AVOID OR RECOVER THE INITIAL USA SETTLEMENT DEPOSIT.  BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

**L.      Retained Claims**

The Preserved Estate Claims are hereby expressly preserved and the Preserved Lender Claims are hereby expressly preserved.  The releases provided for herein do not preclude the Prepetition Lenders or Millennium, or their representatives or assigns, including one or more litigation trusts to whom a Preserved Lender Claim or Preserved Estate Claim is assigned (the Prepetition Lenders, Millennium and any of their successors and assigns, including such litigation trust or trusts, hereinafter, collectively, the "Retained Claim Plaintiff") from prosecuting, and the Prepetition Lenders and Millennium retain the right, respectively, to bring, the Retained Claims against the Excluded Parties.  In the event that the Retained Claim Plaintiff obtains a monetary judgment, award or judicial recovery against an Excluded Party or Excluded Parties on account of any Retained Claim (a "Retained Claim Judgment"), the parties' rights shall be as follows:

(i)      where the Retained Claim is one subject to which statutory or common law contribution on account of comparative fault applies, then the Prepetition Lenders and Millennium agree that the Excluded Party or Excluded Parties shall be entitled to reduce the amount of its liability to the Retained Claim Plaintiff by the equitable share of Gross Damages attributable to MLH and/or TA (or their respective Related Parties) as established by the Excluded Party or Excluded Parties in litigation with the Retained Claim Plaintiff (without TA's and MLH's or their respective Related Parties' being named in and participating in such litigation as a party) based upon the percentage of comparative fault (if any) determined to be attributable to TA and MLH or their respective Related Parties (a "Comparative Fault Reduction"), and the Retained Claim Plaintiff shall not seek to recover any Comparative Fault Reduction from MLH or TA (or their Related Parties); provided, however, while the Comparative Fault Reduction shall be calculated based on all damages and losses to which the tortious or other misconduct of the Excluded Party contributed, without netting out the Settlement Contribution or any other source of recovery of the Retained Claim Plaintiff ("Gross Damages"), if after giving effect to the Comparative Fault Reduction, the sum of the amount of the liability of the Excluded Party plus the amount of the Settlement Contribution, exceeds Gross Damages, the Excluded Party shall be entitled to an additional reduction in liability to the Retained Claim Plaintiff equal to such excess so that the Retained Claim Plaintiff shall not recover in excess of its Gross Damages; and

(ii)      where the Retained Claim Plaintiff has commenced an action against one or more of the Excluded Parties asserting one or more of the Retained Claims, and the action is one to which the statutory, common law or contractual provisions hereunder for contribution and the corresponding reduction of claims on account of settlement or comparative fault would not otherwise apply and are not available, in the absence of agreement, to the Excluded Party (a "Non-Contribution Action"), and where such Excluded Party or Excluded Parties successfully has joined MLH and/or TA (or any of their Related Parties) as a party to such Non-Contribution Action, or where MLH and/or TA (or any of their Related Parties) successfully has intervened in such action (it being understood that Retained Claim Plaintiff affirmatively consents to any such petition for intervention  by MLH and/or TA (or any of their Related Parties)), and where the Retained Claim Plaintiff successfully obtains a Retained Claim Judgment against one or more of the Excluded Parties for one or more Retained Claims, and where in such action the Excluded Party or Excluded Parties also successfully have obtained a judgment, award or judicial recovery against MLH and/or TA or their respective Related Parties in any way related to the Company in

a Non-Contribution Action (the "<u>MLH and/or TA Liability</u>"), then the Retained Claim Plaintiff shall stipulate and consent to a judgment credit or judgment reduction to the Retained Claim Judgment in an amount that is dollar for dollar equal to the MLH and/or TA Liability, and the Retained Claim Plaintiff shall not seek to collect such amount from MLH or TA (or any of their Related Parties).

In the event that, after one or more trustees are appointed to pursue Retained Claims, an Excluded Party or Excluded Parties commences an action only against MLH and/or TA related to the Company, MLH and TA promptly shall seek to dismiss such action or consolidate it with any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties in the forum selected by the Retained Claim Plaintiff, or alternatively seek to stay such action asserted only against MLH and/or TA pending the conclusion of any action commenced by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties. In any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties as contemplated herein, the Retained Claim Plaintiff shall plead the existence of the judgment credit provisions of subparagraph (i) delineated herein, shall notify MLH and TA when any such lawsuit is filed, and shall provide copies of its initial pleadings in any such lawsuit to MLH and TA. Moreover, in any litigation by the Retained Claim Plaintiff of a Retained Claim (regardless of whether MLH, TA, or their respective Related Parties have been joined as parties to such litigation), or in any circumstance in which a Retained Claim is to be settled by the Retained Claim Plaintiff (regardless of whether a lawsuit has been commenced against the Excluded Party or Excluded Parties), the Retained Claim Plaintiff, the Prepetition Lenders, and Millennium shall use their respective commercially reasonable and good faith best efforts in connection with any settlement of any Retained Claims with any such Excluded Party or Excluded Parties to obtain a release of any claims held by such Excluded Party or Excluded Parties against MLH and TA relating to the Retained Claims, provided MLH and TA reasonably cooperate in such efforts, if their consent is requested or required. The Retained Claim Plaintiff shall have the right, but not the obligation, to (i) designate, in its sole discretion, counsel to defend or represent MLH and/or TA (or any of their Related Parties) in such action where MLH and/or TA (or any of their Related Parties) are named as parties or have intervened, with such attorney costs subject to the $3 million aggregate reimbursement cap set forth herein, and (ii) assume the defense of MLH and/or TA in any such action until such reimbursement cap is exhausted. Such reimbursement of attorney costs shall be pro rata with attorney costs of other defense counsel that may be retained by MLH and/or TA (or any of their Related Parties), and such cost sharing shall be done in a manner that is subject to the reasonable consent of MLH and/or TA (or any of their Related Parties). In any such action, neither MLH nor TA (nor any of their Related Parties) shall (i) consent or stipulate to any judgment, award or judicial recovery in such action with respect to claims against or concerning them without the consent of Retained Claim Plaintiff, which shall be exercised in the sole discretion of the Retained Claim Plaintiff or (ii) take actions or advance positions with respect to whether a claim against or concerning them is not subject to Comparative Fault Reduction, without the express consent of the Retained Claim Plaintiff. To the extent that any settlement of any Retained Claim between a Retained Claim Plaintiff, on the one hand, and the Excluded Party or Excluded Parties, on the other hand, is required to be approved by the Bankruptcy Court or any other court of competent jurisdiction, MLH and TA shall be provided with notice thereof and with an opportunity for a hearing thereon. For the avoidance of doubt, the Prepetition Lenders, pursuant to the foregoing, do not hereby acknowledge that any Non-Contribution Action exists in favor of any Excluded Party or that any

such Non-Contribution Action would arise in connection with the assertion by the Plaintiff of a Retained Claim.

## M.    Other Obligations With Respect To Released Parties

MLH and/or TA (or any of their respective Related Parties), if sued, or made subject to discovery by any of the Excluded Parties, with respect to litigation by the Retained Claim Plaintiff, the Prepetition Lenders or Millennium against any of the Excluded Parties of any of the Retained Claims, or if MLH and/or TA (or any of their respective Related Parties) are named as parties in any litigation by any of the Non-Consenting Lenders in connection with, relating to, arising out of, following, or on account of the litigation by any Non-Consenting Lender of Released Claims, may seek any available insurance coverage, including any available Millennium insurance or insurance held separately by MLH or TA, for such defense costs incurred, and Millennium, the Prepetition Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy.  If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (and their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), incurred by MLH and TA (or their Related Parties) in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Retained Claim Plaintiff, Millennium or Prepetition Lenders, or any of the Non-Consenting Lenders, against or with any Excluded Party or Excluded Parties in which MLH or TA (or their Related Parties) are sued or made subject to discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to the extent of an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

To the extent that the Released Parties do not obtain a full and complete release from the Third Party Releasing Parties and/or Excluded Parties from Released Claims in any way relating to the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, or the Restructuring Transactions that any of the Third Party Releasing Parties and/or Excluded Parties would have been legally entitled to assert in its own right or on behalf of another party (including, for the avoidance of doubt, the Company) against a Released Party, in such event, MLH and TA (and their Related Parties) may seek any available insurance, including any available Millennium insurance and any insurance separately available to MLH or TA individually, for such defense costs incurred and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy.  If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (or their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Third Party Releasing Parties or the Non-Consenting Lenders, in which

MLH or TA (or their Related Parties) is named as a party or is the subject of discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to the extent that, all reimbursed costs, including those costs set forth in the preceding paragraph, shall not exceed an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

For the avoidance of doubt, in no event shall New Holdco (and its subsidiaries) be responsible for more than $3,000,000 in aggregate of any and all expenses incurred by MLH and TA for any litigation-related defense costs (exclusive of any settlement payments) that may be incurred by them in connection with litigation relating to the Third Party Releasing Parties or the Excluded Parties. For the further avoidance of doubt, any enforcement of MLH or TA or their Related Parties of the Bar Order described in Article X.J above shall be deemed to fall within the litigation-related costs that are covered in Article X.L and this Article X.M.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

### A.    Dissolution of the Committee

On the Effective Date, any statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

### B.    Payment of Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

### C.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan and in the RSA: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; provided that any such modification must be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted

– 68 –

this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder, or release any claims or liabilities reserved by such Holder under this Plan.

## D.    Revocation of Plan

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to file subsequent chapter 11 plans, but without prejudice to the respective parties' rights under the RSA and under the USA Settlement Agreements.  If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## E.    Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted and the Debtors, at their option may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan. Notwithstanding any such holding, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Notwithstanding anything to the contrary in this Article XI.E, no alteration or interpretation can modify the conditions to the Effective Date set forth in Article VIII.B or compel the funding of Settlement Contribution if the conditions to such funding set forth in the RSA have not been satisfied.

## F.    Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

## G.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date shall have

– 69 –

occurred..  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

## H.     Further Assurances

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtors shall file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## I.     Notices to Debtors

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, (e) facsimile transmission or (f) email transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

**If to the Debtors:**

Millennium Health, LLC
16981 Via Tazon, Suite F
San Diego, CA 92127
Facsimile:      (858) 217-1910
Attention:      Martin Price, Esq., President and General Counsel
                (martin.price@millenniumhealth.com)

**with a copy to (which shall not constitute notice):**

Counsel to the Debtors

Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Facsimile:      (302) 651-3001
Attention:      Anthony W. Clark (anthony.clark@skadden.com)
                Jason M. Liberi (jason.liberi@skadden.com)

- and -

– 70 –

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036-6522
Facsimile:      (212) 735-2000
Attention:      Kenneth S. Ziman (ken.ziman@skadden.com)
                Raquelle L. Kaye (raquelle.kaye@skadden.com)

- and -

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Facsimile:      (312) 407-0411
Attention:      Felicia Gerber Perlman (felicia.perlman@skadden.com)
                Matthew Kriegel (matthew.kriegel@skadden.com)

**If to the Participating Lenders:**

To each Participating Lender at the address identified in
such Participating Lender's signature page

**with a copy to (which shall not constitute notice):**

Brown Rudnick LLP
7 Times Square
New York, New York 10036
Telephone:      (212) 209-4862
Facsimile:      (212) 209-4801
Attention:      Robert J. Stark (rstark@brownrudnick.com)
                Sigmund S. Wissner-Gross
                (swissnergross@brownrudnick.com)

- and -

Brown Rudnick LLP
One Financial Center
Boston, MA  02111
Telephone:      (617) 856-8200
Facsimile:      (617) 856-8201
Attention:      Steven B. Levine (slevine@brownrudnick.com)

– 71 –

**If to MLH:**

>   Millennium Lab Holdings, Inc.
>   James Slattery
>   16981 Via Tazon, Suite F
>   San Diego, CA 92127
>   Telephone:     (858) 451-3535
>   Facsimile:     (858) 217-1910
>   Attention:     Martin Price, Esq.

**with a copy to (which shall not constitute notice):**

>   Kirkland & Ellis LLP
>   601 Lexington Avenue
>   New York, New York 10022
>   Telephone:     (212) 446-4750
>   Facsimile:     (212) 446-4900
>   Attention:     Paul M Basta, P.C. (paul.basta@kirkland.com)
>                  Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com)

**If to TA:**

>   TA Millennium, Inc.
>   c/o TA Associates
>   John Hancock Tower
>   200 Clarendon Street
>   56th Floor
>   Boston, MA 02116
>   Telephone:     (617) 574-6725
>   Facsimile:     (617) 574-6728
>   Attention:     Jeffrey C. Hadden

**with a copy to (which shall not constitute notice):**

Goodwin Procter LLP
620 Eighth Avenue
New York, New York 10018
Telephone:    (212) 813-8800
Facsimile:    (212) 409-8404
Attention:    Michael H. Goldstein (mgoldstein@goodwinprocter.com)
              William P. Weintraub (wweintraub@goodwinprocter.com)

**J.    Governing Law**

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**K.    Exhibits**

All exhibits and schedules to this Plan, including the Exhibits, are incorporated and are a part of this Plan as if set forth in full herein.

**L.    No Strict Construction**

This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors, the Ad Hoc Group, the Participating Lenders, the Settling Members, and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, Exhibits, and the agreements and documents contemplated therein or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, Exhibits, and the documents contemplated thereunder and related thereto.

**M.    Conflicts**

In the event that a provision of the Disclosure Statement conflicts with a provision of this Plan, the terms of this Plan shall govern and control to the extent of such conflict.

[Remainder of page intentionally left blank]

– 73 –

Dated: Wilmington, Delaware
         December 9, 2015

MILLENNIUM LAB HOLDINGS II, LLC, on behalf of itself and its affiliates listed below

/s/ W. Brock Hardaway
Name:      W. Brock Hardaway
Title:        Chief Executive Officer

MILLENNIUM HEALTH LLC
RXANTE LLC

# APPENDIX 1

## RSA

EXECUTION VERSION

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (this "<u>Agreement</u>"), dated as of October 14, 2015, is entered into by and among (a) Millennium Lab Holdings II, LLC ("<u>Holdings</u>"), Millennium Health, LLC ("<u>Millennium</u>"), and all of Millennium's direct and indirect subsidiaries (collectively, the "<u>Company</u>"), (b) the undersigned lenders (solely in such capacity, the "<u>Participating Lenders</u>") party to that certain Credit Agreement, dated April 16, 2014 (as amended, modified, supplemented, and extended from time to time, the "<u>Existing Credit Agreement</u>", and together with all related loan documentation the "<u>Existing Loan Documents</u>"), among Millennium as the borrower, Holdings and RxAnte LLC ("<u>RxAnte</u>") as guarantors, the lenders from time to time party thereto (the "<u>Lenders</u>"), (c) Millennium Lab Holdings, Inc. ("<u>MLH</u>") and (d) TA Millennium, Inc. ("<u>TA</u>"). The Company, each Participating Lender, MLH and TA and each other person that becomes a party hereto in accordance with the terms hereof are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>." Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Restructuring Term Sheet (as defined below).

## RECITALS

WHEREAS, the Company has determined that a restructuring (the "<u>Restructuring</u>") of its obligations under the Existing Credit Agreement and existing equity interests in the Company is necessary and would be in the best interest of the Company and its stakeholders;

WHEREAS, the Parties desire to effectuate the DOJ Settlement Agreement;

WHEREAS, as of the date of this Agreement, the Company is obligated to, among other parties, the Lenders under the Existing Credit Agreement in the aggregate principal amount of $1,752,812,500 plus accrued interest (the "<u>Lender Claims</u>" together with all other claims and obligations arising under or related to the Existing Credit Agreement, "<u>Existing Credit Agreement Claims</u>");

WHEREAS, the Parties desire to consummate the Restructuring in accordance with the terms of this Agreement and the terms of the Restructuring Term Sheet;

WHEREAS, the Restructuring will be effected either (a) through a consensual out-of-court transaction (an "<u>Out-of-Court Transaction</u>") or (b) pursuant to a joint "pre-packaged" chapter 11 plan of reorganization (a "<u>Plan</u>"), in each case subject to being Consistent With The Restructuring Term Sheet, and with the support of (i) each of the Participating Lenders, (ii) MLH, and (iii) TA;

WHEREAS, the Parties desire to work together to complete the negotiation of the terms of the documents necessary to effect the Restructuring; and

WHEREAS, this Agreement is not intended to be and shall not be deemed to be a solicitation for votes on a plan of reorganization;

NOW, THEREFORE, in exchange for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

1. <u>Definitions and Interpretation</u>.

(a) The following terms used in this Agreement shall have the following definitions:

"<u>Ad Hoc Group</u>" means the members of the ad hoc group of Lenders represented by Brown Rudnick LLP and listed on <u>Exhibit A</u> to the Term Sheet, as amended from time to time as provided for in the Term Sheet.

"<u>Ad Hoc Group Majority</u>" shall have the meaning set forth in the Term Sheet.

"<u>Ad Hoc Group Super-Majority</u>" shall have the meaning set forth in the Term Sheet.

"<u>Administrative Agent</u>" means Wilmington Federal Savings Bank, FSB in its capacity as Administrative Agent under the Existing Credit Agreement.

"<u>Agreement</u>" has the meaning set forth in the preamble hereof.

"<u>Alternative Proposal</u>" has the meaning set forth in <u>Section 5(a)(v)</u> hereof.

"<u>Approved Out-of-Court Transaction Documents</u>" has the meaning set forth in <u>Section 3(a)</u> hereof.

"<u>Approved Plan</u>" means a plan of reorganization for the Company that is consistent in all material respects with this Agreement and is Consistent With The Restructuring Term Sheet.

"<u>Approved Plan Documents</u>" has the meaning set forth in <u>Section 3(b)</u> hereof.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

"<u>Bankruptcy Court</u>" has the meaning set forth in <u>Section 3(b)</u> hereof.

"<u>Business Day</u>" means any day other than Saturday, Sunday, and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"<u>Chapter 11 Cases</u>" means proceedings under chapter 11 of the Bankruptcy Code for the Company.

"Closing Date" shall have the meaning set forth in the Term Sheet.

"CMS" means the Center for Medicare and Medicaid Services, an agency of HHS.

"Commencement Date" means the date on which the Company shall have commenced the Chapter 11 Cases.

"Company" has the meaning set forth in the preamble hereof.

"Consenting Lenders" means those Lenders who approve (i) the Out-of-Court Transaction and the Out-of-Court Releases on or before the Solicitation Termination Date and (ii) the Approved Plan and the releases provided for therein as part of the pre-filing Solicitation on or before the Solicitation Termination Date.

"Consistent With The Restructuring Term Sheet" means, (i) in the case of a Restructuring consummated pursuant to an Out-of-Court Transaction, that the Out-of-Court Transaction and the Out-Of-Court Transaction Documents contain the terms and conditions of the Restructuring Term Sheet, are consistent in all material respects with this Agreement and the Restructuring Term Sheet, and do not in any manner, by their terms, contain any provisions that amend, modify, supplement, supersede or conflict with, any of the provisions of this Agreement or the Restructuring Term Sheet in any manner that is adverse to, or prejudicial to, the Company, MLH, TA or the Participating Lenders; and (ii) in the case of a Restructuring consummated pursuant to an Approved Plan, the Approved Plan and the Approved Plan Documents contain the terms and conditions of the Restructuring Term Sheet, are consistent in all material respects with the this Agreement and the Restructuring Term Sheet, and do not in any manner, by their terms, contain any provisions that amend, modify, supplement, supersede or conflict with, any of the provisions of this Agreement or the Restructuring Term Sheet in any manner that is adverse to, or prejudicial to, the Company, MLH, TA or the Participating Lenders.

"Disclosure Statement" means a disclosure statement with respect to the Plan consistent with the requirements of section 1125 of the Bankruptcy Code.

"DOJ" has the meaning set forth in the preamble hereof.

"DOJ Funding Contribution" has the meaning set forth in the Term Sheet.

"DOJ Parties" means, collectively, the DOJ, CMS, OIG, and the Plaintiff States.

"DOJ Settlement" has the meaning set forth in the Term Sheet.

"DOJ Settlement Agreement" has the meaning set forth in the Term Sheet.

"DOJ Term Sheet" means that certain Terms Sheet dated May 20, 2015 among Millennium, the DOJ, and the Plaintiff States, as amended, modified or supplemented by a settlement agreement(s) among Millennium and the DOJ and Plaintiff States, as agreed to in writing by MLH, TA and the Ad Hoc Group.

"Early Commitment Facility" shall have the meaning set forth in the Term Sheet.

"Effective Date" shall have the meaning set forth in the Term Sheet.

"Existing Credit Agreement" has the meaning set forth in the preamble hereof.

"Existing Credit Agreement Claims" has the meaning set forth in the recitals hereof.

"Existing Loan Documents" has the meaning set forth in the preamble hereof.

"General Termination Event" has the meaning set forth in Section 8 hereof.

"Guarantee Agreement" means that certain Guarantee Agreement among the DOJ Parties, MLH, TA and the Consenting Lenders.

"HHS" means the United States Department of Health and Human Services.

"Holdings" has the meaning set forth in the preamble hereof.

"Initial DOJ Deposit" has the meaning set forth in the Term Sheet.

"Lender Claims" has the meaning set forth in the recitals hereof.

"Lenders" has the meaning set forth in the preamble hereof.

"Master Restructuring Agreement" has the meaning set forth in the Term Sheet.

"Material Adverse Event" means, the occurrence of one of the events or conditions set forth on Exhibit 3 hereto, the occurrence of which shall be determined as of the dates and times specified in Exhibit 3.

"Millennium" has the meaning set forth in the preamble hereof.

"MLH" has the meaning set forth in the preamble hereof.

"MLH Contribution" has the meaning set forth in the Term Sheet.

"MLH DOJ Funding Contribution" means fifty-five percent (55%), or $113,300,000, of the DOJ Funding Contribution.

"MLH/TA Termination Event" has the meaning set forth in Section 8 hereof.

"Non-Consenting Lenders" means those Lenders who do not approve (i) the Out-of-Court Transaction and the Out-of-Court Releases on or before the Solicitation Termination Date or (ii) the Approved Plan and the releases provided for therein as part of the pre-filing Solicitation on or before the Solicitation Termination Date.

"OIG" means the HHS Office of Inspector General.

4

"Out-of-Court Releases" has the meaning set forth in the Term Sheet.

"Out-of-Court Requisite Lenders" means, as of Solicitation Termination Date, Lenders holding all but $50 million of the outstanding principal indebtedness under the Existing Credit Agreement; provided, however, MLH, TA, the Ad Hoc Group Super-Majority and the Company may agree in writing that the amount of outstanding principal indebtedness under the Existing Credit Agreement held by Non-Consenting Lenders may exceed $50 million for the purposes of determining the Out-of-Court Requisite Lenders, in each of their sole and respective absolute discretion.

"Out-of-Court Transaction Documents" shall have the meaning set forth in Section 3(a) hereof.

"Participating Lenders" has the meaning set forth in the preamble hereof.

"Participating Lender Termination Event" has the meaning set forth in Section 8 hereof.

"Parties" has the meaning set forth in the preamble hereof.

"Plaintiff States" mean the plaintiff states that are party to the DOJ Terms Sheet.

"Plan" has the meaning set forth in the preamble hereof.

"Plan Related Documents" has the meaning set forth in Section 3(b) hereof.

"Prior Agent" means JPMorgan Chase Bank, N.A. as the prior administrative agent under the Existing Credit Agreement.

"Qualified Marketmaker" means an entity that (A) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (B) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"Qualified Out-of-Court Transaction" has the meaning set forth in Section 3(a) hereof.

"Requisite Consenting Lenders" means, as of the date of determination, both (i) Lenders holding a majority in number of the Existing Credit Agreement Claims and (ii) Lenders holding in the aggregate no less than eighty-five percent (85%) in aggregate principal amount of indebtedness outstanding under the Existing Credit Agreement (the "Debt Threshold Amount"); provided, however that the Debt Threshold Amount may be reduced by agreement of MLH and TA to no less than sixty-six and two-thirds percent (66 2/3%) in the aggregate principal amount of indebtedness outstanding under the Existing Credit Agreement.

5

"Requisite Participating Lenders" means, as of the date of determination, Participating Lenders holding at least a majority and in number and more than sixty-six and two-thirds (66 2/3rds) in principal amount of the aggregate amount of Lender Claims held by all Lenders.

"Restructuring" means the transactions contemplated by this Agreement.

"Restructuring Term Sheet" means, collectively, the Term Sheet and the DOJ Terms Sheet.

"RxAnte" has the meaning set forth in the preamble hereof.

"Solicitation" means the Company's formal request for acceptances of the Plan, consistent with section 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.

"Solicitation Commencement Date" has the meaning set forth in Section 8(a)(ii) hereof.

"Solicitation Termination Date" means the date on which solicitation of the Out-of-Court Transaction and Approved Plan terminates, which date shall be determined by the Company and the Ad Hoc Group, MLH, and TA, but shall be (i) at least five (5) days after the Solicitation Commencement Date, and (ii) in no event later than November 8, 2015.

"Subrogation Claim" has the meaning set forth in the Term Sheet.

"TA" has the meaning set forth in the preamble hereof.

"TA Contribution" has the meaning set forth in the Term Sheet.

"TA DOJ Funding Contribution" means forty-five percent (45%), or $92,700,000, of the DOJ Funding Contribution.

"Term Sheet" means the Term Sheet annexed hereto as Exhibit 1, as the same may be amended, modified, supplemented in a writing executed by the Company, an Ad Hoc Group Majority, MLH and TA.

"Third-Party Escrow" means an escrow account (or letter(s) of credit) established pursuant to third-party escrow agreements (or letter(s) of credit documents) among, MLH and TA, on the one hand, and the United States, on the other hand, on terms and conditions acceptable to them in their sole and absolute discretion, which escrow agreements (or letter(s) of credit documents) shall provide that if the conditions precedent in the escrow agreements (or letter(s) of credit documents) are satisfied the escrow funds (or letter(s) of credit) can be released to the DOJ Parties, which conditions precedent shall include, among other things, that if the Restructuring does not close on or before December 30, 2015, for whatever reason whatsoever, the escrow funds (or letter(s) of credit) shall be released and returned to MLH and TA, respectively.

6

(b) <u>Other Interpretive Provisions</u>. The word "include" and its various forms shall be read as if followed by the phrase "without limitation". "Will" and "shall" have the same meaning. Where appropriate in context, terms used in this Agreement shall include both the singular and the plural. Headings are for convenience only and shall not affect the interpretation of this Agreement.

2. <u>Proposed Restructuring; Incorporation of the Restructuring Term Sheet</u>.

The Restructuring will be accomplished pursuant to a Qualified Out-of-Court Transaction or, in the event that an Out-of-Court Transaction is not approved by the Out-of-Court Requisite Lenders, pursuant to an Approved Plan, in each case which Approved Plan is Consistent With The Restructuring Term Sheet. The Restructuring Term Sheet is incorporated herein by reference and is made part of this Agreement.

3. <u>Implementation of the Restructuring</u>.

(a) The Company intends to implement the Restructuring on a consensual basis in an Out-of-Court Transaction, which will be Consistent With The Restructuring Term Sheet and provide for, among other things, the payment of the monetary obligations of the DOJ Settlement Agreement and the modification or satisfaction of Existing Credit Agreement Claims. Such consensual modifications and satisfactions will be implemented pursuant to various agreements and related documentation (collectively, the "<u>Out-of-Court Transaction Documents</u>"). Each of the Out-of-Court Transaction Documents shall be Consistent With The Restructuring Term Sheet and shall be in form and substance reasonably acceptable to the Company and the Ad Hoc Group, MLH and TA, <u>provided</u>, <u>however</u>, that any provision thereof which affects the rights, benefits, obligations or exposure of any of the Company, the Participating Lenders, MLH or TA shall be acceptable to such person in its sole and absolute discretion (the Out-of-Court Transaction Documents in the foregoing forms or with the foregoing required approvals are collectively referred to herein as the "<u>Approved Out-of-Court Transaction Documents</u>" and the Restructuring contemplated by the Approved Out-of-Court Transaction Documents is referred to herein as the "<u>Qualified Out-of-Court Transaction</u>").

(b) If on or before the Solicitation Termination Date, the Out-of-Court Transaction and the Out-of-Court Releases, in each case Consistent With The Restructuring Term Sheet, are not approved by the Out-of-Court Requisite Lenders, but the Approved Plan and the releases provided for therein are approved by the Requisite Consenting Lenders as part of the pre-filing Solicitation, and the same is confirmed in writing by MLH and TA, then, and only then, shall the Company effectuate the Restructuring by commencing the Chapter 11 Cases under the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") on or before the Commencement Date. As part of the Chapter 11 Cases, the Company intends to file the plan-related documents (the "<u>Plan Related Documents</u>"), which shall include, but not be limited to, (a) the Disclosure Statement, (b) the materials related to the Solicitation, (c) the Approved Plan, (d) any other documents or agreements required in connection with the Plan and Disclosure Statement, including, but not limited to, (1) a proposed confirmation order, (2) any appendices, amendments, modifications, supplements, exhibits and schedules relating to the Plan or the Disclosure Statement, and (3) any motion and proposed order relating to the use of cash collateral and any other motions or applications filed by the

7

Company in the Chapter 11 Cases. Each of the Plan Related Documents (including any amendments, modifications, supplements, exhibits and schedules) shall be Consistent With The Restructuring Term Sheet, and shall be in form and substance reasonably acceptable to the Ad Hoc Group, MLH, and TA; provided, however, that any provision of any of the Plan Related Documents which affects the rights, benefits, obligations or exposure of any of the Company, the Participating Lenders, MLH or TA shall be acceptable to such person in its sole and absolute discretion (such Plan Related Documents with the foregoing required approvals are collectively referred to herein as the "Approved Plan Documents"). In addition, concurrent with the commencement of the Chapter 11 Cases, the Company shall file a motion to assume the DOJ Settlement, approve and confirm the transactions thereunder, including without limitation, approving the Initial DOJ Deposit and ordering that the payment of the Initial DOJ Deposit shall not be subject to avoidance or recovery for any reason whatsoever.

4.      Representations of the Parties

(a)      Representations of the Company. The Company hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(i)      It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of the Company's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(ii)      The execution, delivery and performance by the Company of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(iii)      To the extent this Agreement becomes effective pursuant to Section 16 hereof, this Agreement is the legally valid and binding obligation of the Company, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(iv)      The execution, delivery and performance by the Company of this Agreement does not and shall not require any material registration or material filing with, material consent or material

8

approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body, except such filing as may be necessary and/or required for approval by the Bankruptcy Court of the Company's authority to implement this Agreement and, if applicable, notice to the DOJ of our intent to execute the Restructuring pursuant to an Approved Plan.

(v)    To its actual knowledge, no event or circumstance which does, or would be reasonably likely to, constitute a Material Adverse Event exists as of the date of this Agreement.

(vi)    From and after June 1, 2015, it has neither paid nor reimbursed TA or MLH for any professional fees they have incurred in connection with the Company or and DOJ-related matters, except for payments to Kirkland & Ellis LLP for legal services in the amount of approximately $1.35 million and payments to CEA LLP for tax and accounting services in the amount of approximately $177,500.

(b)    Representations of the Participating Lenders.  Each Participating Lender hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(i)    It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(ii)    The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(iii)    To the extent this Agreement becomes effective pursuant to Section 16 hereof, this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

9

Case 15-12284-LSS   Doc 15-1   Filed 11/10/15   Page 11 of 79

(iv)     Such Participating Lender (i) either (A) is the sole legal and beneficial owner of the Existing Credit Agreement Claims set forth below its name on the signature page hereof, free and clear of all claims, liens and encumbrances, or (B) has investment or voting discretion with respect to such Existing Credit Agreement Claims in respect to matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Existing Credit Agreement Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Existing Credit Agreement Claims in respect to matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Existing Credit Agreement Claims.  Furthermore, such Participating Lender has made no prior assignment, sale, participation, grant, conveyance, hypothecation, security interest or lien grant, voting proxy, transfer or power of attorney, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Existing Credit Agreement Claims that are subject to this Agreement, the terms of which agreement are, as of the date hereof, inconsistent with the representations and warranties of such Participating Lender herein or would render such Participating Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

(v)     Such Participating Lender (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Company that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

(c)     Representations of MLH and TA.  MLH and TA hereby represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof:

(i)     It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(ii)     The execution, delivery and performance by such Party of this Agreement does not and shall not (i) violate (A) any

10

provision of law, rule or regulation applicable to it or any of its subsidiaries or (B) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

(iii)    To the extent this Agreement becomes effective pursuant to Section 16 hereof, this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

5.    Agreements of the Participating Lenders

(a)    Subject to the terms and conditions hereof and for so long as no General Termination Event or Participating Lender Termination Event, as defined in Section 8 below, shall have occurred, and except as the Company, MLH, and TA may expressly release the Participating Lenders in writing from any of the following obligations, each Participating Lender shall:

(i)    agree to and support the Master Restructuring Agreement, including consent to (A) the terms of the Out-of-Court Restructuring, (B) the new secured term loan on the terms substantially set forth in Annex A to the Term Sheet, and (C) the amendments to the Existing Loan Documents;

(ii)    (A) agree to any Qualified Out-of-Court Transaction and deliver and not withdraw the requisite consents and vote (when solicited to do so and by the applicable deadline for doing so) such Existing Credit Agreement Claims in favor of the Approved Plan proposed by the Company, (B) deliver its duly executed and completed ballot voting in favor of such Approved Plan on a timely basis following commencement of the Solicitation for such Qualified Out-of-Court Transaction and Approved Plan, (C) deliver its consent to the releases, including the third party releases, provided for in the Approved Plan, and (D) not change or withdraw such agreement or vote or consent (or cause or direct such agreement or vote or consent to be changed or withdrawn), provided that such agreement and vote and consent may be revoked or withdrawn immediately upon occurrence of a General Termination Event or Participating Lender Termination Event (as defined in Section 8 below);

(iii)    not object to, or vote any of such Existing Credit Agreement Claims to reject or impede, a Qualified Out-of-Court

11

Transaction or Approved Plan, support directly or indirectly any such objection or impediment or otherwise take any action or commence any proceeding to oppose or to seek any modification of a Qualified Out-of-Court Transaction or Approved Plan or, to the extent applicable, any of the Approved Plan Documents filed by the Company in connection with the Chapter 11 Cases and confirmation of the Approved Plan, or any other documents prepared by the Company in connection with consummation of a Qualified Out-of-Court Transaction;

(iv)      agree to use commercially reasonable and good faith best efforts to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Out-of-Court Transaction Documents or Approved Plan Documents, as applicable, including, without limitation, supporting the releases and third party releases provided for in the Approved Plan, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Out-of-Court Transaction Documents or the Approved Plan Documents, as applicable, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (D) not take any actions inconsistent with this Agreement, the Approved Plan, the Approved Out-of-Court Transaction Documents or the Approved Plan Documents and the confirmation and consummation of the Approved Plan, to the extent applicable;

(v)      not directly or indirectly seek, solicit, support, encourage, vote such Existing Credit Agreement Claims for, or consent to (A) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring of the Company (each, an "Alternative Proposal") other than a Qualified Out-of-Court Transaction or Approved Plan; (B) any other action that is inconsistent with, or that would delay or obstruct, a Qualified Out-of-Court Transaction or Approved Plan; or (C) solicit or direct any person or entity to undertake any of the foregoing; provided, however, that the Participating Lenders may agree to modifications to the Plan and the Approved Plan Documents, as provided herein;

(vi)      authorizes the Ad Hoc Group to take all actions contemplated by this Agreement and the Restructuring Term Sheet;

(vii)      and hereby does acknowledge and agree to the provisions in the Term Sheet with respect to the Subrogation Claim, the assignment of cash distributions to pay the Subrogation Claim, the granting of a lien to secure the Subrogation Claim, and the obligations in connection therewith as more particularly described in the Term Sheet;

12

(viii)    refrain from taking any action, directly or indirectly, that may result in the commencement of cases under (A) chapter 7 or chapter 11 of the United States Bankruptcy Code or (B) any other applicable bankruptcy, insolvency or similar law, in any case, by or against the Company, for ninety-one (91) days after the Closing Date of a Qualified Out-of-Court Transaction; and

(ix)    during the period for which this Agreement remains in effect, hereby forbear from exercising any rights and remedies under the Existing Credit Agreement, or applicable law, available to them or the Administrative Agent in respect of or arising out of any Default or Event of Default under the Existing Credit Agreement (each as defined therein) existing as of the effective date of this Agreement, including without limitation any Default or Event of Default arising from or related to the execution, delivery or performance of the DOJ Settlement Agreement.

The Parties agree that this Agreement does not constitute a commitment to, nor shall it obligate any of the Parties to, provide any new financing or credit support, other than as set forth on the Restructuring Term Sheet.

(b)    Each Participating Lender agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, hypothecate, assign or otherwise dispose of any Existing Credit Agreement Claims, or any option thereon or any right or interest (voting or otherwise) in any or all of its Existing Credit Agreement Claims (including, without limitation, any participation therein), unless (i) the transferee, participant or other party (A) is a Participating Lender or (B) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended) and agrees in writing to assume and be bound by all of the terms of this Agreement with respect to all Existing Credit Agreement Claims such transferee, participant or other party currently holds or shall acquire in the future by executing the Joinder attached hereto as Exhibit 2 (such transferee, participant or other party, if any, to also be a "Participating Lender" hereunder), (ii) the transferor complies with any applicable transfer restrictions and/or conditions to transfer set forth herein; and (iii) the transfer is permitted under, and otherwise complies with, the Existing Credit Agreement and applicable law.  If a transferee of any of the Existing Credit Agreement Claims is not a Participating Lender or does not execute a Joinder in substantially the form attached hereto as Exhibit 2 prior to the completion of such transfer, participation or other grant or otherwise agree to be bound by all of the terms of this Agreement, then such sale, transfer, assignment or other disposition of the Existing Credit Agreement Claims or related option, right or interest shall be deemed void *ab initio*.  This Agreement shall in no way be construed to preclude any Participating Lender from acquiring additional Existing Credit Agreement Claims subject to compliance with the Existing Credit Agreement and applicable law; provided, however, that any such additional holdings shall automatically be deemed to be subject to all of the terms of this Agreement and each such Participating Lender agrees that such additional Existing Credit Agreement Claims shall be subject to this Agreement and that it shall vote (or cause to be voted) any such additional Existing Credit Agreement Claims entitled to vote on the Plan (in each case, to the extent still held by it or on its behalf at the time of such vote) in a manner consistent with this Section 5.

13

Subject to the terms and conditions of any order of the Bankruptcy Court, each Participating Lender agrees to provide to counsel for the Company (i) a copy of any Joinder and (ii) a notice of the acquisition of any additional Existing Credit Agreement Claims, in each case within three (3) business days of the consummation of the transaction disposing of, or acquiring, Existing Credit Agreement Claims.

(c)    Notwithstanding anything herein to the contrary, (A) any Participating Lender may Transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in such Existing Credit Agreement Claims against the Debtors to an entity that is acting in its capacity in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Participating Lender; provided that (i) the Qualified Marketmaker subsequently transfers (by purchase, sale, assignment, participation or otherwise) the right, title or interest in such Existing Credit Agreement Claims against the Debtors to a transferee that is or becomes a Participating Lender by executing a Joinder and (ii) prior to such transfer and the execution of a Joinder,  the Participating Lender which is the transferor of such Existing Credit Agreement Claim retains the right and obligation to vote such claim in favor of a Qualified  Out-of-Court Transaction or an Approved Plan in accordance with Section 5(a) hereof and (B) to the extent that a Participating Lender is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title  or interest in such Existing Credit Agreement Claims against the Debtors that the Qualified Marketmaker acquires from a holder of the Existing Credit Agreement Claims that is not a Participating Lender, without the requirement that the transferee be or become a Participating Lender.

(d)    In the event that MLH and/or TA is required to perform under the Guarantee Agreement and make a payment thereunder to the DOJ Parties, MLH and TA, to the extent of such respective payment, shall be entitled to an offset against any judgment that may obtained against MLH or TA by, or on behalf of, the Consenting Lenders based upon the Released Claims as defined in the Restructuring Term Sheet.

6.    Agreements of MLH and TA

(a)    As long as a General Termination Event or MLH/TA Termination Event has not occurred, and except as the Participating Lenders and the Company may expressly release MLH and TA jointly (and not severally), as applicable, in writing from any of the following obligations,

(i)    MLH agrees to fund the MLH Contribution in accordance with the Restructuring Term Sheet upon the consummation of the transactions contemplated by the Out-of-Court Transaction or the Approved Plan, as applicable, in each case Consistent With The Restructuring Term Sheet.

(ii)    Pursuant to a Third Party-Escrow, MLH agrees to deposit the MLH DOJ Funding Contribution in the Third-Party Escrow, or provide other alternative assurance of performance acceptable to the DOJ, no later than three (3) business days following (A) approval by

14

the Out-of-Court Requisite Lenders of the Out-of-Court Transaction and the Out-of-Court Releases on or before the Solicitation Termination Date or (B) approval of the Requisite Consenting Lenders of the Approved Plan and the releases provided for therein as part of the pre-filing Solicitation on or before the Solicitation Termination Date.

(iii)   MLH agrees to enter into the Guarantee Agreement  as contemplated by the Restructuring Term Sheet..

(iv)   TA agrees to fund the TA Contribution accordance with the Restructuring Term Sheet upon the consummation of the transactions contemplated by the Out-of-Court Transaction or the Approved Plan, as applicable, in each case Consistent With The Restructuring Term Sheet.

(v)   Pursuant to a Third Party-Escrow, TA agrees to deposit the TA DOJ Funding Contribution in the Third-Party Escrow, or provide other alternative assurance of performance acceptable to the DOJ, no later than three (3) business days following (A) approval by the Out-of-Court Requisite Lenders of the Out-of-Court Transaction and the Out-of-Court Releases on or before the Solicitation Termination Date or (B) approval of the Requisite Consenting Lenders of the Approved Plan and the releases provided for therein as part of the pre-filing Solicitation on or before the Solicitation Termination Date.

(vi)   TA agrees to enter into the Guarantee Agreement.

(vii)   MLH and TA each agree to use commercially reasonable and good faith best efforts to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Out-of-Court Transaction Documents or Approved Plan Documents, as applicable, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Out-of-Court Transaction Documents or Approved Plan Documents, as applicable, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (D) not take any actions inconsistent with this Agreement, the Approved Plan, the Approved Out-of-Court Transaction Documents or the Approved Plan Documents and the confirmation and consummation of the Approved Plan, to the extent applicable.

(viii)   MLH and TA shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any Alternative Proposal other than a Qualified Out-of-Court Transaction or Approved Plan (as it may be amended, supplemented or otherwise modified as

15

provided herein), nor shall MLH or TA solicit or direct any person or entity to undertake any of the foregoing; provided, however, that MLH and TA may agree to modifications to the Plan and the Approved Plan Documents, as provided herein.

7.      Agreements of the Company

(a)      As long as a General Termination Event has not occurred, and except as the Participating Lenders, MLH, and TA may expressly release the Company, as applicable, in writing from any of the following obligations,

(i)      The Company hereby agrees to prepare or cause the preparation of the Out-of-Court Transaction Documents, and the Approved Plan Documents.

(ii)      The Company agrees to use commercially reasonable efforts to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Out-of-Court Transaction Documents or the Approved Plan Documents, as applicable, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Out-of-Court Transaction Documents or the Approved Plan Documents, as applicable, (C) obtain any and all required regulatory approvals and third-party approvals for the Restructuring, and (D) not take any actions inconsistent with this Agreement, the Approved Plan, the Approved Out-of-Court Transaction Documents or the Approved Plan Documents and the confirmation and consummation of the Approved Plan, to the extent applicable.

(iii)      The Company shall cause each of its subsidiaries and affiliates to (A) support and complete the Restructuring and all other actions contemplated in connection therewith and under the Out-of-Court Transaction Documents or the Approved Plan Documents, as applicable, (B) take any and all necessary and appropriate actions in furtherance of the Restructuring and the other actions contemplated under the Out-of-Court Transaction Documents or the Plan and the Approved Plan Documents, as applicable, (C) not take any action described in Sections 8(b)(i), (ii), (iii), or (iv) that would cause a Participating Lender Termination Event and (D) not take any actions inconsistent with this Agreement, the Approved Plan, the Approved Out-of-Court Transaction Documents, or the Approved Plan Documents and the confirmation and consummation of the Approved Plan, to the extent applicable.

(iv)      The Company shall not, directly or indirectly, seek, solicit, negotiate, support or engage in any discussions relating to, or enter into any agreements relating to, any Alternative Proposal other than a Qualified Out-of-Court Transaction or an Approved

16

Plan (as it may be amended, supplemented or otherwise modified as provided herein), nor shall the Company solicit or direct any person or entity, including, without limitation, any member of the Company's board of directors or any holder of equity in the Company, to undertake any of the foregoing; provided, however, that the Company may agree to modifications to the Plan and the Approved Plan Documents, as provided herein.

(b)    The Company shall promptly notify the Participating Lenders if it becomes aware that a Material Adverse Effect exists.

(c)    The Company shall (i) in connection with an Out-of-Court Restructuring pay when due and payable, and in any case, on or before the Closing Date, or (ii) in connection with the Chapter 11 cases, shall seek the authority to pay when due and payable, and in any case on or before the Effective Date, the respective reasonable and documented fees and expenses incurred in connection with the Restructuring by (i) the professional advisors for the Company and (ii) Brown Rudnick, LLP and FTI as professional advisors to the Ad Hoc Group. All such reasonable and documented fees, expenses and disbursements of such firms incurred up to the Petition Date shall be paid in full and all retainers replenished.

8.    Termination of Obligations.

(a)    General Termination Events. This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect upon the occurrence of any of the following unless such General Termination Event is waived or extended by the Company, MLH, TA and an Ad Hoc Group Majority in writing (each, a "General Termination Event"):

(i)    at any time by the mutual written consent of the Company, an Ad Hoc Group Majority, MLH, and TA;

(ii)    at 5:00 P.M. prevailing Eastern Time on October 29, 2015 unless the Company has begun Solicitation for the Out-of-Court Transaction and the Approved Plan (the "Solicitation Commencement Date");

(iii)    if the Out-of-Court Transaction and Out-of-Court Releases are not approved by the Out-of-Court Requisite Lenders by the Solicitation Termination Date, but the Approved Plan and the releases provided for therein are approved by the Requisite Consenting Lenders as part of the pre-filing Solicitation by the Solicitation Termination Date, and the same is confirmed in writing by MLH and TA, and the Company commences the Chapter 11 Cases, at 5:00 p.m. prevailing Eastern Time on December 15, 2015 unless the Bankruptcy Court shall have approved the Disclosure Statement and confirmed the Approved Plan by such date;

(iv)    at 5:00 p.m. prevailing Eastern Time on December 30, 2015 if there has not occurred (A) the Closing Date of a

17

Qualified Out-of-Court Transaction or (B) the Effective Date of an Approved Plan on or before such date;

(v)    upon the entry of an order by the Bankruptcy Court (1) dismissing any of the Chapter 11 Cases, (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (3) appointing a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases;

(vi)    the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Approved Plan in any material respect (in each case with such amendments and modifications as have been effected in accordance with the terms hereof) or is not Consistent With The Restructuring Term Sheet;

(vii)    upon the DOJ Parties taking any Enforcement Action (as defined in the Term Sheet);

(viii)    the issuance by any governmental authority, including the Bankruptcy Court or any other regulatory authority or court of competent jurisdiction, of any ruling or order permanently enjoining the consummation of a material portion of the Restructuring;

(ix)    the entry of an order by the any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the Existing Credit Agreement Claims or liens securing them;

(x)    upon the material breach by any of the Participating Lenders of any of the undertakings, representations, warranties or covenants of such Participating Lender(s) set forth in this Agreement, including the Participating Lenders' obligations under Section 5, which breach remains uncured for a period of three (3) business days after the receipt by the Participating Lender(s) of notice of such breach from the Company, MLH, or TA; provided however that the foregoing shall constitute a General Termination Event in favor of the Company, MLH and TA only, and shall not constitute a General Termination Event in favor of any of the Participating Lenders (including the breaching Participating Lender); provided further however that in the event the Company, MLH or TA terminates this Agreement with respect to the foregoing General Termination Event, such termination shall be effective only with respect to the breaching Participating Lender(s) and this Agreement shall remain in full force and effect with respect to all other Participating Lenders, the Company, MLH and TA; provided further however that nothing herein shall limit the right to obtain specific performance against such breaching Participating Lender;

(xi) upon the material breach by MLH or TA of any of the undertakings, representations, warranties or covenants of the MLH and TA set forth in this Agreement, including the their respective obligations under Section 6, which breach remains uncured for a period of three (3) business days after the receipt of written notice of such breach from the Company, or an Ad Hoc Group Majority.

(xii) upon occurrence of a Material Adverse Event, which continues to exist for a period of five (5) days after the receipt of written notice of such Material Adverse Event by the Company from an Ad Hoc Group Majority, MLH, or TA.

(b) <u>Participating Lender Termination Events</u>. This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect upon written notice from an Ad Hoc Group Majority to the Company, MLH, and TA, terminating this Agreement after the occurrence of any of the following events (each, a "<u>Participating Lender Termination Event</u>"):

(i) upon the filing by the Company of any motion or other request for relief seeking to (1) dismiss any of the Chapter 11 Cases, (2) convert any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (3) appoint a trustee or an examiner with expanded powers pursuant to section 1104 of the Bankruptcy Code in any of the Chapter 11 Cases, unless such motion or other request for relief is withdrawn prior to the earlier of (x) three (3) business days after filing such motion or other request for relief with the Bankruptcy Court and (y) entry of an order by the Bankruptcy Court approving the requested relief;

(ii) upon the withdrawal, amendment or modification by the Company or any other Party of the Approved Plan or any of the Approved Plan Documents or the filing of a pleading seeking to amend or modify the Approved Plan or any of the Approved Plan Documents, which withdrawal, amendment, modification or filing is not Consistent With The Restructuring Term Sheet (with such amendments and modifications as have been effected in accordance with the terms hereof), or if the Company, files any motion or pleading with the Bankruptcy Court that is not Consistent With The Restructuring Term Sheet and such motion or pleading has not been withdrawn prior to the earlier of (i) three (3) business days after the Company receives written notice from the Ad Hoc Group that such motion or pleading is inconsistent with this Agreement or the Approved Plan or the Approved Plan Documents, as applicable, and (ii) the entry of an order of the Bankruptcy Court approving such motion;

(iii) the Company files, proposes or otherwise supports any plan of reorganization other than the Approved Plan; or

19

(iv)  upon the material breach by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including the Company's obligations under Section 7, which breach remains uncured for a period of three (3) business days after the receipt of written notice of such breach from an Ad Hoc Group Majority, MLH, or TA.

(c)  Additional MLH/TA Termination Events. This Agreement shall terminate and, except as otherwise provided herein, all obligations of the parties hereto shall immediately terminate and be of no further force and effect upon written notice from MLH or TA, to the Company and an Ad Hoc Group Majority, terminating this Agreement after the occurrence of any of the following events (each, a "MLH/TA Termination Event"):

(i)  the occurrence of any Participating Lender Termination Event;

(ii)  the Requisite Consenting Lenders have failed to execute this Agreement or Joinder on or before the business day proceeding the Commencement Date, if any; or

(iii)  on or before December 30, 2015, if the Bankruptcy Court does not enter an order, which is final and non-appealable, that confirms the Approved Plan.

(d)  Effect of Termination Events.

For the avoidance of doubt, in the event of commencement of the Chapter 11 Cases, the Parties hereby waive any requirement under section 362 of the Bankruptcy Code to lift the automatic stay thereunder for purposes of providing notice under this Agreement (and agree not to object to any non-breaching Party seeking, if necessary, to lift such automatic stay in connection with the giving of any such notice).

Upon occurrence of a General Termination Event, Participating Lender Termination Event, or MLH/TA Termination Event, this Agreement shall forthwith become void and of no further force or effect, each Party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement and any of the Approved Out-of-Court Transaction Documents or Approved Plan Documents, as applicable, and there shall be no liability or obligation on the part of any Party hereto; provided, however, that in no event shall any such termination relieve a Party hereto from (i) liability for its breach or non-performance of its obligations hereunder prior to the date of such termination, (ii) obligations under this Agreement which by their terms expressly survive any such termination, and (iii) any remedy provided in Section 10 hereof on account of such breach or non-performance; and provided, further that, notwithstanding anything to the contrary herein, any General Termination Event may be waived in accordance with the procedures established by Section 12 hereof, in which case the General Termination Event so waived shall be deemed not to have occurred, this Agreement shall be deemed to continue in full force and effect, and the rights and obligations of the Parties hereto shall be restored, subject to any modification set forth in such waiver. Upon

20

termination of this Agreement, any and all votes delivered by a Participating Lender prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Company. Upon termination of this Agreement, except as provided in Section 20 hereof, or the proviso to the first sentence of this paragraph, no Party shall have any continuing liability or obligation to any Party hereunder that arises after such termination; provided however that the Participating Lenders obligations with respect to the Subrogation Claim and the obligations in connection therewith described in the Term Sheet shall survive any such termination. Upon the occurrence of the General Termination Event under this Agreement, the fees and expense reimbursements required by Section 7(b) hereof shall be payable for work through the termination date.

9.      Good Faith Cooperation; Further Assurances; Transaction Documents

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring, including taking such reasonable actions to document and implement the transactions contemplated by this Agreement. Furthermore, each of the Parties shall take such actions (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary to carry out the purposes and intent of this Agreement.

10.     Remedies

All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party; provided, however, that if there is a breach of the Agreement by a Participating Lender, money damages shall be an insufficient remedy to the other Participating Lenders and any Participating Lender can seek specific performance as against another Participating Lender; provided further that in connection with any remedy asserted in connection with this Agreement, each Party agrees to waive any requirement for the securing or posting of a bond in connection with any remedy. All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party or any other Party.

11.     Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Company and the Participating Lenders (and their respective advisors) with respect to the subject matter hereof.

12.     Amendments

Except as otherwise provided in this Agreement, this Agreement (including the Restructuring Term Sheet) may not be modified, amended, or supplemented and no General Termination Event may be waived without the prior written consent of the Company, an Ad Hoc

Group Majority, MLH, and TA, in each of their sole and absolute discretion; *provided* that any waiver, modification, amendment or supplement to this Section 12 shall require the written consent of all of the Parties.

13. <u>Independent Analysis</u>

Each Party hereto hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

14. <u>Representation by Counsel</u>

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto. None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

15. <u>Governing Law</u>

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State and County of New York. By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State and County of New York, upon the commencement of the Chapter 11 Cases, each of the Parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

16. <u>Effective Date</u>

This Agreement shall become effective, and each Party shall be bound to the terms of this Agreement, as of the date the Company, the Requisite Participating Lenders, MLH, and TA have executed and delivered a signature page to this Agreement. This Agreement shall not be binding upon or enforceable against any Party, and no Party shall have any rights or

obligations under this Agreement, until this Agreement has become effective in accordance with this Section 16.

17. Notices

All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Parties, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, during standard business hours (from 8:00 A.M. to 6:00 P.M. at the place of receipt) at the following addresses, emails and facsimile numbers:

**If to the Company:**

Millennium Health, LLC
16981 Via Tazon, Suite F
San Diego, CA 92127
Telephone:     (858) 451-3535
Facsimile:     (858) 217-1910
Attention:     Martin Price, Esq., President and General Counsel
(martin.price@millenniumhealth.com)

**with a copy to (which shall not constitute notice):**

Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, New York 10036
Telephone:     (212) 735-3310
Facsimile:     (917) 777-3310
Attention:     Kenneth S. Ziman (ken.ziman@skadden.com)

**If to the Participating Lenders:**

To each Participating Lender at the address identified in such
Participating Lender's signature page

**with a copy to (which shall not constitute notice):**

Brown Rudnick LLP
7 Times Square
New York, New York 10036
Telephone:     (212) 209-4862
Facsimile:     (212) 209-4801
Attention:     Robert J. Stark (rstark@brownrudnick.com)

23

**If to MLH:**

Millennium Lab Holdings, Inc.
James Slattery
16981 Via Tazon, Suite F
San Diego, CA 92127
Telephone:      (858) 451-3535
Facsimile:      (858) 217-1910
Attention:      Martin Price, Esq.

**with a copy to (which shall not constitute notice):**
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4750
Facsimile:      (212) 446-4900
Attention:      Paul M Basta, P.C. (paul.basta@kirkland.com)
                Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com)

**If to TA:**

TA Millennium, Inc.
c/o TA Associates
John Hancock Tower
200 Clarendon Street
56th Floor
Boston, MA 02116
Telephone:      (617) 574-6725
Facsimile:      (617) 574-6728
Attention:      Jeffrey C. Hadden

**with a copy to (which shall not constitute notice):**

Goodwin Procter LLP
620 Eighth Avenue
New York, New York 10018
Telephone:      (212) 813-8800
Facsimile:      (212) 409-8404
Attention:      Michael H. Goldstein
                William P. Weintraub

18.    <u>Reservation of Rights</u>

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and

24

preserve its rights, remedies and interests, including the Existing Credit Agreement Claims and any other claims against the Company or other parties, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, after a General Termination Event, Participating Lender Termination Event, or MLH/TA Termination Event the Parties hereto each fully reserve any and all of their respective rights, remedies and interests, in the case of any claim for breach of this Agreement. Furthermore, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases so long as any appearance by a Party and the positions advocated by such Party in connection therewith are Consistent With The Restructuring Term Sheet and are not for the purpose of, and would not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring. Notwithstanding any contained in this Agreement, this Agreement and all other exhibits, schedules and appendices thereto are subject to Rule 408 of the Federal Rules of Evidence and shall not be admissible into evidence other than in a proceeding seeking to enforce their terms.

19. Rule of Interpretation

Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include (a) votes or voting on a plan of reorganization under the Bankruptcy Code and (b) all means of expressing agreement with, or rejection of, as the case may be, a restructuring or reorganization transaction that is not implemented under the Bankruptcy Code.

20. Survival

Notwithstanding (i) any sale of the Existing Credit Agreement Claims in accordance with Section 5(a)(i) or (ii) the termination of this Agreement in accordance with its terms, (x) the agreements and obligations of the Company in Sections 5(a)(vii), 7(c) (solely to the extent of fees and expenses accrued before termination), (y) the Parties' obligations which survive termination pursuant to the second paragraph of Section 8(d) hereof and (z) the Parties' obligations under Sections 18 and 28 shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

21. Successors and Assigns; Severability; Several Obligations

This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction. The agreements, representations and obligations of the Participating Lenders under this Agreement are, in all respects, several and not joint.

22. Third-Party Beneficiary

This Agreement is intended for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

25

23.     Counterparts

   This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

24.     Entire Agreement

   This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Out-of-Court Transaction Documents, Approved Plan and, to the extent applicable, the Approved Plan Documents; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Company and any Participating Lender shall continue in full force and effect.

25.     Headings

   The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

26.     No Solicitation

   This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan.  The acceptance of each of the Lenders will not be solicited until the Lenders have received the Disclosure Statement and related ballot.

27.     Settlement Discussions

   This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

28.     Publicity

   The Company shall submit drafts to the advisors to the Participating Lenders, MLH, and TA of any press releases and/or public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement prior to making any such disclosure, and shall afford them a reasonable opportunity to comment on such documents and disclosures. Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Participating Lender, no Party or its advisors shall (a) use the name of any Participating Lender in any public manner or (b) disclose to any person (including, for the avoidance of doubt, any other Participating Lender), other than the

26

Company, advisors to the Company, and advisors to the Participating Lenders, the principal amount or percentage of any Existing Credit Agreement Claims held by any Participating Lender, in each case, without such Participating Lender's prior written consent; <u>provided</u>, <u>however</u>, that (i) if such disclosure is required by law or regulation, the disclosing party shall use reasonable best efforts to afford the relevant Participating Lender a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of the Existing Credit Agreement Claims.

29.     <u>Conflicts Between the Restructuring Transaction Documents and this Agreement.</u>

In the event of any conflict among the terms and provisions in the Approved Out-of-Court Documents or the Approved Plan and the Approved Plan Documents, as applicable, on the one hand, and this Agreement, on the other hand, the terms and provisions of the Approved Out-of-Court Documents or the Approved Plan and Approved Plan Documents, as applicable, shall control.  Nothing contained in this <u>Section 29</u> shall affect, in any way, the requirements set forth herein for the amendment of this Agreement and the Approved Out-of-Court Documents and Approved Plan set forth in <u>Section 12</u> hereof.

*[Remainder of page intentionally left blank]*

27

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**MILLENNIUM LAB HOLDINGS II, LLC**
**(on behalf of itself and all of its direct and**
**indirect affiliates)**

By: _____
Name: _W. Brock Hardaway_
Its: _CEO_

*Signature Page to Restructuring Support Agreement*

**Summary of Participating Lender Signatures**

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| Invesco Ltd. | A Voce CLO, Ltd. | | |
| Invesco Ltd. | American General Life Insurance Company | | |
| Invesco Ltd. | The United States Life Insurance Company In the City of New York | | |
| Invesco Ltd. | The Variable Annuity Life Insurance Company | | |
| Invesco Ltd. | American Home Assurance Company | | |
| Invesco Ltd. | Commerce and Industry Insurance Company | | |
| Invesco Ltd. | Lexington Insurance Company | | |
| Invesco Ltd. | National Union Fire Insurance Company of Pittsburgh, Pa. | | |
| Invesco Ltd. | Avalon IV Capital, Ltd. | | |
| Invesco Ltd. | Betony CLO, Ltd. | | |
| Invesco Ltd. | Blue Hill CLO, Ltd. | | |
| Invesco Ltd. | BOC Pension Investment Fund | | |
| Invesco Ltd. | Diversified Credit Portfolio Ltd. | | |
| Invesco Ltd. | Invesco Dynamic Credit Opportunities Fund | | |
| Invesco Ltd. | Invesco Floating Rate Fund | | |
| Invesco Ltd. | Kaiser Foundation Health | | |
| Invesco Ltd. | Kaiser Permanente Group Trust | | |
| Invesco Ltd. | Limerock CLO II, Ltd. | | |
| Invesco Ltd. | Limerock CLO III, Ltd. | | |
| Invesco Ltd. | Linde Pension Plan Trust | | |
| Invesco Ltd. | Marea CLO, Ltd. | | |
| Invesco Ltd. | Medical Liability Mutual Insurance Company | | |
| Invesco Ltd. | Invesco BL Fund, Ltd. | | |
| Invesco Ltd. | Nomad CLO, Ltd. | | |
| Invesco Ltd. | North End CLO, Ltd. | | |
| Invesco Ltd. | The City of New York Group Trust | | |
| Invesco Ltd. | Invesco Polaris US Bank Loan Fund | | |
| Invesco Ltd. | Invesco Senior Income Trust | | |
| Invesco Ltd. | Invesco Senior Loan Fund | | |
| Invesco Ltd. | Sentry Insurance a Mutual Company | | |
| Invesco Ltd. | Invesco SSL Fund LLC | | |
| Invesco Ltd. | Wasatch CLO Ltd | | |
| Invesco Ltd. | Invesco Zodiac Funds - Invesco US Senior Loan Fund | | |
| Invesco Ltd. | Invesco Zodiac Funds - Invesco Global Senior Loan Fund | | |
| **Invesco Ltd. Subtotal** | **-** | | |
| Eaton Vance Management | AGF Floating Rate Income Fund | | |
| Eaton Vance Management | Eaton Vance CLO 2013-1 LTD | | |
| Eaton Vance Management | Eaton Vance CLO 2014-1 Ltd. | | |
| Eaton Vance Management | Eaton Vance CLO 2015-1 Ltd. | | |
| Eaton Vance Management | DaVinci Reinsurance Ltd. | | |
| Eaton Vance Management | Eaton Vance Loan Holding Limited | | |
| Eaton Vance Management | Eaton Vance Floating-Rate Income Plus Fund | | |
| Eaton Vance Management | Eaton Vance Senior Floating-Rate Trust | | |
| Eaton Vance Management | Eaton Vance Floating-Rate Income Trust | | |
| Eaton Vance Management | Eaton Vance International (Cayman Islands) Floating-Rate Income Portfolio | | |
| Eaton Vance Management | Eaton Vance Short Duration Diversified Income Fund | | |
| Eaton Vance Management | Eaton Vance Institutional Senior Loan Fund | | |
| Eaton Vance Management | Eaton Vance Limited Duration Income Fund | | |
| Eaton Vance Management | Eaton Vance Floating Rate Portfolio | | |
| Eaton Vance Management | Google Inc. | | |
| Eaton Vance Management | KP Fixed Income Fund | | |
| Eaton Vance Management | MET Investors Series Trust-Met/Eaton Vance Floating Rate Portfolio | | |
| Eaton Vance Management | Pacific Select Fund-Floating Rate Loan Portfolio | | |
| Eaton Vance Management | Pacific Funds Series Trust - PF Floating Rate Loan Fund | | |
| Eaton Vance Management | Renaissance Reinsurance Ltd. | | |

| Summary of Participating Lender Signatures | | | |
|---|---|---|---|
| **Lender Group / Manager / Advisor** | **Participating Lender** | **Amount** | **Percent** |
| Eaton Vance Management | Columbia Funds Variable Series Trust II - Variable Portfolio-Eaton Vance Floating Rate Income Fund | | |
| Eaton Vance Management | Senior Debt Portfolio | | |
| Eaton Vance Management | Eaton Vance VT Floating-Rate Income Fund | | |
| Eaton Vance Management | Eaton Vance Senior Income Trust | | |
| **Eaton Vance Management Subtotal** | **-** | | |
| Symphony Asset Management LLC | Symphony Senior Loan Master Fund, LTD. | | |
| Symphony Asset Management LLC | Symphony Long-Short Credit Master Fund, LTD. | | |
| Symphony Asset Management LLC | Symphony Event Driven Opportunities Master Fund, L.P. | | |
| Symphony Asset Management LLC | Symphony CLO XV, LTD | | |
| Symphony Asset Management LLC | Symphony CLO XIV, LTD | | |
| Symphony Asset Management LLC | Symphony CLO XII, LTD | | |
| Symphony Asset Management LLC | Symphony CLO XI, Limited Partnership | | |
| Symphony Asset Management LLC | Symphony CLO X, LTD | | |
| Symphony Asset Management LLC | Symphony CLO VIII, Limited Partnership | | |
| Symphony Asset Management LLC | Symphony CLO V, LTD. | | |
| Symphony Asset Management LLC | Symphony CLO IX, Limited Partnership | | |
| Symphony Asset Management LLC | SSF Trust | | |
| Symphony Asset Management LLC | SCOF-2 LTD. | | |
| Symphony Asset Management LLC | Principal Funds Inc. - Diversified Real Asset Fund | | |
| Symphony Asset Management LLC | Nuveen Symphony Floating Rate Income Fund | | |
| Symphony Asset Management LLC | Nuveen Short Duration Credit Opportunities Fund | | |
| Symphony Asset Management LLC | Nuveen Senior Income Fund | | |
| Symphony Asset Management LLC | Nuveen Floating Rate Income Opportunity Fund | | |
| Symphony Asset Management LLC | Nuveen Floating Rate Income Fund | | |
| Symphony Asset Management LLC | Nuveen Diversified Dividend & Income Fund | | |
| Symphony Asset Management LLC | Nuveen Credit Strategies Income Fund | | |
| Symphony Asset Management LLC | Nomura Multi Managers Fund - Global Bond GBD SYM Account | | |
| Symphony Asset Management LLC | Municipal Employees' Annuity and Benefit Fund of Chicago (Symphony) | | |
| Symphony Asset Management LLC | Menard, Inc. | | |
| Symphony Asset Management LLC | Diversified Real Asset CIT | | |
| Symphony Asset Management LLC | Nuveen Tax Advantaged Total Return Strategy Fund | | |
| **Symphony Asset Management LLC Subtotal** | **-** | | |
| OppenheimerFunds, Inc. | HarbourView CLO VII, Ltd. | | |
| OppenheimerFunds, Inc. | Oppenheimer Fundamental Alternatives Fund | | |
| OppenheimerFunds, Inc. | Catlin RE Switzerland Ltd. | | |
| OppenheimerFunds, Inc. | Catlin Underwriting Agencies Limited | | |
| OppenheimerFunds, Inc. | Oppenheimer Master Loan Fund LLC | | |
| OppenheimerFunds, Inc. | Oppenheimer Senior Floating Rate Plus Fund | | |
| OppenheimerFunds, Inc. | Oppenheimer Senior Floating Rate Fund | | |
| **OppenheimerFunds, Inc. Subtotal** | **-** | | |
| Ares Management LLC | Ares XXIII CLO Ltd. | | |
| Ares Management LLC | Ares XXIV CLO Ltd. | | |
| Ares Management LLC | Ares XXV CLO Ltd. | | |
| Ares Management LLC | Ares XXVI CLO Ltd. | | |
| Ares Management LLC | Ares XXVII CLO Ltd. | | |
| Ares Management LLC | Ares XXVIII CLO Ltd. | | |
| Ares Management LLC | Ares XXIX CLO Ltd. | | |
| Ares Management LLC | Ares XXX CLO Ltd. | | |
| Ares Management LLC | Ares XXXI CLO Ltd. | | |
| Ares Management LLC | Ares XXXII CLO Ltd. | | |
| Ares Management LLC | Ares XXXIII CLO Ltd. | | |
| Ares Management LLC | Ares Senior Loan Trust | | |
| Ares Management LLC | Ares Enhanced Loan Investment Strategy IR, Ltd. | | |
| Ares Management LLC | Wellpoint, Inc. | | |
| Ares Management LLC | Ontario Public Service Employees Union Pension Plan Trust Fund | | |
| Ares Management LLC | Renaissance Floating Rate Income Fund | | |

| Summary of Participating Lender Signatures | | | |
|---|---|---|---|
| **Lender Group / Manager / Advisor** | **Participating Lender** | **Amount** | **Percent** |
| Ares Management LLC | Enhanced Loan Investment Strategy | | |
| Ares Management LLC | Superannuation Funds Management Corporation of Southern Australia | | |
| Ares Management LLC | Russell Institutional Funds, LLC | | |
| Ares Management LLC | Community Insurance Company | | |
| Ares Management LLC | Aviva Staff Pension Scheme | | |
| Ares Management LLC | Goldman Sachs Trust II - Goldman Sachs Multi-Manager Alternatives Fund | | |
| Ares Management LLC | Kaiser Foundation Hospitals | | |
| Ares Management LLC | Kaiser Permanente Group Trust | | |
| Ares Management LLC | Lloyds Bank Pension Trust (No. 1) Limited | | |
| Ares Management LLC | Lloyds Bank Pension Trust (No. 2) Limited | | |
| Ares Management LLC | Goldman Sachs Trust II - Goldman Sachs Multi-Manager Non-Core Fixed Income Fund | | |
| Ares Management LLC | Ares Institutional Loan Fund B.V. | | |
| Ares Management LLC | SEI Global Master Fund PLC - The SEI High Yield Fixed Income Fund | | |
| Ares Management LLC | SEI Institutional Investments Trust - High Yield Bond Fund | | |
| Ares Management LLC | SEI Institutional Investments Trust - Opportunistic Income Fund | | |
| Ares Management LLC | SEI Institutional Managed Trust - High Yield Bond Fund | | |
| Ares Management LLC | SEI Institutional Managed Trust Enhanced Income Fund | | |
| **Ares Management LLC Subtotal** | **-** | | |
| Marathon Asset Management LP | Marathon Asset Management LP | | |
| Marathon Asset Management LP | Marathon Special Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Dislocation Fund L.P. | | |
| Marathon Asset Management LP | Marathon Liquid Credit Long Short Fund | | |
| Marathon Asset Management LP | Penteli Master Fund, Ltd. | | |
| Marathon Asset Management LP | KTRS Credit Fund, LP | | |
| Marathon Asset Management LP | Marathon Centre Street Partnership, L.P. | | |
| Marathon Asset Management LP | Baldr Mason Fund Inc. | | |
| Marathon Asset Management LP | Marathon Special Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Dislocation Fund L.P. | | |
| Marathon Asset Management LP | Penteli Master Fund, Ltd. | | |
| Marathon Asset Management LP | Master SIF SICAV-SIF | | |
| Marathon Asset Management LP | MV Credit Opportunity Fund, L.P. | | |
| Marathon Asset Management LP | KTRS Credit Fund, LP | | |
| Marathon Asset Management LP | Marathon Centre Street Partnership, L.P. | | |
| Marathon Asset Management LP | Marathon Court Square, LP | | |
| Marathon Asset Management LP | Baldr Mason Fund Inc. | | |
| Marathon Asset Management LP | Marathon Special Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Opportunity Master Fund, Ltd. | | |
| Marathon Asset Management LP | Marathon Credit Dislocation Fund L.P. | | |
| Marathon Asset Management LP | Marathon Liquid Credit Long Short Fund | | |
| Marathon Asset Management LP | KTRS Credit Fund, LP | | |
| Marathon Asset Management LP | Marathon Centre Street Partnership, L.P. | | |
| **Marathon Asset Management LP Subtotal** | **-** | | |
| Brigade Capital Management, LP | Future Directions Credit Opportunities Fund | | |
| Brigade Capital Management, LP | Brigade Credit Fund II Ltd. | | |
| Brigade Capital Management, LP | Big River Group Fund SPC Limited - Bond Segregated Portfolio | | |
| Brigade Capital Management, LP | Citigroup Pension Plan | | |
| Brigade Capital Management, LP | Battalion CLO III Ltd. | | |
| Brigade Capital Management, LP | Battalion CLO IV Ltd. | | |
| Brigade Capital Management, LP | Battalion CLO V Ltd. | | |
| Brigade Capital Management, LP | Battalion CLO VI Ltd. | | |
| Brigade Capital Management, LP | Battalion CLO VII Ltd. | | |
| Brigade Capital Management, LP | Delta Master Trust | | |
| Brigade Capital Management, LP | Brigade Distressed Value Master Fund Ltd. | | |

| Summary of Participating Lender Signatures | | | |
|---|---|---|---|
| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
| Brigade Capital Management, LP | FedEx Corporation Employees' Pension Trust | | |
| Brigade Capital Management, LP | FirstEnergy System Master Retirement Trust | | |
| Brigade Capital Management, LP | JPMorgan Chase Retirement Plan Brigade Bank Loan | | |
| Brigade Capital Management, LP | Brigade Opportunistic Credit LBG Fund Ltd. | | |
| Brigade Capital Management, LP | Los Angeles County Employees Retirement Association | | |
| Brigade Capital Management, LP | Brigade Leveraged Capital Structures Fund Ltd. | | |
| Brigade Capital Management, LP | Goldman Sachs Trust II - Goldman Sachs Multi Manager Alternatives Fund | | |
| Brigade Capital Management, LP | OCA Brigade Credit Fund II LLC | | |
| Brigade Capital Management, LP | Russell Investment Company Russell Multi-Strategy Alternative Fund | | |
| Brigade Capital Management, LP | SC Credit Opportunities Mandate LLC | | |
| Brigade Capital Management, LP | The Coca-Cola Company Master Retirement Trust | | |
| Brigade Capital Management, LP | Tasman Fund LP | | |
| Brigade Capital Management, LP | Brigade Opportunistic Credit Fund 16 LLC | | |
| Brigade Capital Management, LP | Texas Absolute Credit Opportunities Strategy LP | | |
| Brigade Capital Management, LP | Virtus Alternative Income Solution Fund | | |
| Brigade Capital Management, LP | Virtus Alternative Inflation Solution Fund | | |
| Brigade Capital Management, LP | Virtus Alternative Total Solution Fund | | |
| **Brigade Capital Management, LP Subtotal** | **-** | | |
| THL Credit | THL Credit Senior Loan Strategies, LLC | | |
| THL Credit | THL Credit Advisors, LLC | | |
| **THL Credit Subtotal** | **-** | | |
| Crescent Capital Group LP | Crescent Senior Secured Floating Rate Loan Fund, LLC | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund VIII, Ltd. | | |
| Crescent Capital Group LP | West Bend Mutual Insurance Company | | |
| Crescent Capital Group LP | Illinois State Board of Investment | | |
| Crescent Capital Group LP | Aucara Heights Inc. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund III, Ltd. | | |
| Crescent Capital Group LP | Trustmark Insurance Company | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund IV, Ltd. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund V, Ltd. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund VI, Ltd. | | |
| Crescent Capital Group LP | National Electrical Benefit Fund | | |
| Crescent Capital Group LP | Allied World Assurance Company Ltd | | |
| Crescent Capital Group LP | Crescent Capital High Income Fund B, L.P. | | |
| Crescent Capital Group LP | Crescent Capital High Income Fund L.P. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund, Ltd. | | |
| Crescent Capital Group LP | Atlas Senior Loan Fund II, Ltd. | | |
| Crescent Capital Group LP | American Beacon Crescent Short Duration High Income Fund | | |
| Crescent Capital Group LP | TCW Senior Secured Loan Fund, LP | | |
| **Crescent Capital Group LP Subtotal** | **-** | | |
| Guardian Life Insurance | The Guardian Life Insurance Company of America | | |
| Guardian Life Insurance | The RS Floating Rate Fund | | |
| **Guardian Life Insurance Subtotal** | **-** | | |
| Franklin Advisers, Inc. | Franklin Advisers, Inc. | | |
| Franklin Advisers, Inc. | Commonwealth Fixed Interest Fund 17 | | |
| **Franklin Advisers, Inc. Subtotal** | **-** | | |
| Glendon Capital Management, LP | Glendon Opportunities Fund, LP | | |
| Glendon Capital Management, LP | Altair Global Credit Opportunities Fund (A), LLC | | |
| Glendon Capital Management, LP | Cornell University | | |
| **Glendon Capital Management, LP Subtotal** | **-** | | |
| GSO Capital | GSO Cactus Credit Opportunities Fund LP | | |
| GSO Capital | GSO Churchill Partners LP | | |
| GSO Capital | GSO Coastline Credit Partners LP | | |
| GSO Capital | GSO Credit Alpha Trading (Cayman) LP | | |
| GSO Capital | GSO Credit-A Partners LP | | |
| GSO Capital | GSO Palmetto Opportunistic Investment Partners LP | | |

**Summary of Participating Lender Signatures**

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| GSO Capital | GSO Special Situations Master Fund LP | | |
| GSO Capital | Steamboat Credit Opportunities Master Fund LP | | |
| **GSO Capital Subtotal** | - | | |
| BlackRock Financial Management Inc. | JPMBI re BlackRock BankLoan Fund | | |
| BlackRock Financial Management Inc. | BlackRock Floating Rate Income Trust | | |
| BlackRock Financial Management Inc. | BlackRock Defined Opportunity Credit Trust | | |
| BlackRock Financial Management Inc. | BlackRock Limited Duration Income Trust | | |
| BlackRock Financial Management Inc. | BlackRock Funds II, BlackRock Floating Rate Income Portfolio | | |
| BlackRock Advisors, LLC | BlackRock Funds II, BlackRock Multi-Asset Income Portfolio | | |
| BlackRock Financial Management Inc. | BlackRock Secured Credit Portfolio of BlackRock Funds II | | |
| BlackRock Institutional Trust Company, N.A. | BlackRock Short Duration High Income Fund | | |
| BlackRock Financial Management Inc. | BlackRock Debt Strategies Fund, Inc. | | |
| BlackRock Financial Management Inc. | BlackRock Floating Rate Income Strategies Fund, Inc. | | |
| BlackRock Financial Management Inc. | BlackRock Global Investment Series: Income Strategies Portfolio | | |
| BlackRock Financial Management Inc. | Ironshore Inc. | | |
| BlackRock Financial Management Inc. | Magnetite VI, Limited | | |
| BlackRock Financial Management Inc. | Magnetite VII, Limited | | |
| BlackRock Financial Management Inc. | Magnetite VIII, Limited | | |
| BlackRock Financial Management Inc. | Magnetite IX, Limited | | |
| BlackRock Financial Management Inc. | The PNC Financial Services Group, Inc. Pension Plan | | |
| BlackRock Financial Management Inc. | BlackRock Senior Floating Rate Portfolio | | |
| BlackRock Financial Management Inc. | New York State Common Retirement Fund | | |
| BlackRock Financial Management Inc. | Magnetite XII, Ltd. | | |
| BlackRock Financial Management Inc. | Magnetite XI, Limited | | |
| BlackRock Financial Management Inc. | Magnetite XIV, Limited | | |
| **BlackRock Financial Management Inc. Subtotal** | - | | |
| Sound Point Capital Management | Sound Point Capital Management | | |
| **Sound Point Capital Management Subtotal** | - | | |
| Trimaran Advisors, L.L.C. | KCAP Financial, Inc. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2012-1 Ltd. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2013-1 Ltd. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2014-1 Ltd. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2014-2 Ltd. | | |
| Trimaran Advisors, L.L.C. | Catamaran CLO 2015-1 Ltd. | | |
| **Trimaran Advisors, L.L.C. Subtotal** | - | | |
| Metropolitan Life Insurance Company | Metropolitan Life Insurance Company | | |
| **Metropolitan Life Insurance Company Subtotal** | - | | |
| MJX Asset Management LLC | Venture X CLO, Limited | | |
| MJX Asset Management LLC | Venture XI CLO, Limited | | |
| MJX Asset Management LLC | Venture XII CLO, Limited | | |
| MJX Asset Management LLC | Venture XIII CLO, Limited | | |
| MJX Asset Management LLC | Venture XIV CLO, Limited | | |
| MJX Asset Management LLC | Venture XIX CLO, Limited | | |
| MJX Asset Management LLC | Venture XX CLO, Limited | | |
| MJX Asset Management LLC | Venture XV CLO, Limited | | |
| MJX Asset Management LLC | Venture XVI CLO, Limited | | |
| MJX Asset Management LLC | Venture XVIII CLO, Limited | | |
| MJX Asset Management LLC | Venture XVII CLO, Limited | | |
| **MJX Asset Management LLC Subtotal** | - | | |
| Healthcare Financial Solutions LLC | Healthcare Financial Solutions LLC | | |
| **Healthcare Financial Solutions LLC Subtotal** | - | | |
| New York Life | New York Life Insurance Company | | |
| New York Life | New York Life Insurance and Annuity Corporation | | |
| New York Life | Flatiron CLO 2011-1 Ltd. | | |
| New York Life | Flatiron CLO 2012-1 Ltd. | | |
| New York Life | Flatiron CLO 2013-1 Ltd. | | |
| New York Life | Flatiron CLO 2014-1 Ltd. | | |

**Summary of Participating Lender Signatures**

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| New York Life | Flatiron CLO 2015-1 Ltd. | | |
| New York Life | Flatiron CLO 2007-1 Ltd. | | |
| New York Life | MainStay Floating Rate Fund | | |
| New York Life | MainStay VP Floating Rate Portfolio | | |
| **New York Life Subtotal** | - | | |
| BNP Paribas | BNP Paribas Global Senior Corporate Loans | | |
| BNP Paribas | BNPP IP CLO 2014-II, LLC | | |
| BNP Paribas | BNPP IP CLO 2014-I, Ltd. | | |
| **BNP Paribas Subtotal** | - | | |
| WhiteHorse | WhiteHorse VI, Ltd. | | |
| WhiteHorse | WhiteHorse VII, Ltd. | | |
| WhiteHorse | WhiteHorse VIII, Ltd. | | |
| WhiteHorse | WhiteHorse IX, Ltd. | | |
| WhiteHorse | WhiteHorse X, Ltd. | | |
| **WhiteHorse Subtotal** | - | | |
| American Capital CLO Management, LLC | ACAS CLO 2012-1, Ltd | | |
| American Capital CLO Management, LLC | ACAS CLO 2013-2, Ltd | | |
| American Capital CLO Management, LLC | ACAS CLO 2014-1, Ltd | | |
| American Capital CLO Management, LLC | ACAS CLO 2014-2, Ltd | | |
| American Capital CLO Management, LLC | ACAS CLO 2015-1, Ltd | | |
| American Capital ACSF Management, LLC | ACSF Funding I, LLC | | |
| American Capital ACSF Management, LLC | ACAS Funding I, LLC | | |
| American Capital ACSF Management, LLC | ACAS Funding II, LLC | | |
| **American Capital Subtotal** | - | | |
| Allstate Life Insurance Company | Allstate Life Insurance Company | | |
| Allstate Life Insurance Company | Allstate Life Insurance Company | | |
| Allstate Life Insurance Company | AIMCO CLO, Series 2014-A | | |
| **Allstate Life Insurance Company Subtotal** | - | | |
| Credit Value Partners, LP | Credit Value Partners, LP | | |
| **Credit Value Partners, LP Subtotal** | - | | |
| KVK | KVK CLO 2014-1 LTD. | | |
| KVK | KVK CLO 2015-1 LTD. | | |
| KVK | KVK CLO 2014-3 LTD. | | |
| KVK | KVK CLO 2014-2 LTD. | | |
| **KVK Subtotal** | - | | |
| CVC Credit Partners, LLC | Apidos CLO IX | | |
| CVC Credit Partners, LLC | Apidos CLO X | | |
| CVC Credit Partners, LLC | Apidos CLO XI | | |
| CVC Credit Partners, LLC | Apidos CLO XII | | |
| CVC Credit Partners, LLC | Apidos CLO XIV | | |
| CVC Credit Partners, LLC | Apidos CLO XIX | | |
| CVC Credit Partners, LLC | Apidos CLO XV | | |
| CVC Credit Partners, LLC | Apidos CLO XVI | | |
| CVC Credit Partners, LLC | Apidos CLO XVII | | |
| CVC Credit Partners, LLC | Apidos CLO XVIII | | |
| CVC Credit Partners, LLC | Apidos CLO XX | | |
| **CVC Credit Partners, LLC Subtotal** | - | | |
| MidOcean Credit | MidOcean Credit CLO I | | |
| MidOcean Credit | MidOcean Credit CLO II | | |
| MidOcean Credit | MidOcean Credit CLO III | | |
| MidOcean Credit | MidOcean Credit Focus Fund I LP | | |
| MidOcean Credit | MidOcean Credit Opportunity Master Fund, L.P. | | |
| **MidOcean Credit Subtotal** | - | | |
| Deutsche Bank | Deutsche Bank AG Cayman Islands Branch | | |
| **Deutsche Bank Subtotal** | - | | |
| Trinitas | Trinitas CLO I, Ltd. | | |
| Trinitas | Trinitas CLO II, Ltd. | | |
| Trinitas | Trinitas CLO III, Ltd. | | |
| **Trinitas Subtotal** | - | | |
| Marblegate | Marblegate Special Opportunities Master Fund LP | | |
| Marblegate | P Marblegate Ltd | | |
| **Marblegate Subtotal** | - | | |
| 3i Debt Management U.S. LLC | 3i US Senior Loan Fund, L.P. | | |

**Summary of Participating Lender Signatures**

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| 3i Debt Management U.S. LLC | COA Summit CLO Ltd. | | |
| 3i Debt Management U.S. LLC | Fraser Sullivan CLO VII Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO I Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO II Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO III Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO IV Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO V Ltd. | | |
| 3i Debt Management U.S. LLC | Jamestown CLO VI Ltd. | | |
| **3i Debt Management U.S. LLC Subtotal** | - | | |
| Tall Tree Investment Management, LLC | Nelder Grove CLO, Ltd. | | |
| Tall Tree Investment Management, LLC | Tuolumne Grove CLO, Ltd. | | |
| Tall Tree Investment Management, LLC | Lockwood Grove CLO, Ltd. | | |
| **Tall Tree Investment Management, LLC Subtotal** | - | | |
| Credit Suisse Loan Funding LLC | Credit Suisse Loan Funding LLC | | |
| **Credit Suisse Loan Funding LLC Subtotal** | - | | |
| Metropolitan West Asset Management, LLC | Metropolitan West Floating Rate Income Fund | | |
| TCW Asset Management Company | Figueroa CLO 2013-2, Ltd. | | |
| TCW Asset Management Company | Figueroa CLO 2014-1, Ltd. | | |
| TCW Asset Management Company | Figueroa CLO 2013-1, Ltd. | | |
| **TCW Asset Management Company Subtotal** | - | | |
| ZAIS Group | ZAIS CLO 1, Limited | | |
| ZAIS Group | ZAIS CLO 2, Limited | | |
| ZAIS Group | ZAIS CLO 3, Limited | | |
| **ZAIS Group Subtotal** | - | | |
| Insight Investment | Cutwater 2014-I, Ltd. | | |
| Insight Investment | Cutwater 2014-II, Ltd. | | |
| **Insight Investment Subtotal** | - | | |
| Cedar Funding Ltd. | Cedar Funding Ltd. | | |
| Cedar Funding Ltd. | Cedar Funding IV CLO, Ltd. | | |
| Cedar Funding Ltd. | Cedar Funding II CLO, Ltd. | | |
| Cedar Funding Ltd. | Cedar Funding III CLO, Ltd. | | |
| **Cedar Funding Ltd. Subtotal** | - | | |
| FOC Partners | Stanford Street CLO, LTD | | |
| FOC Partners | Longfellow Place CLO, LTD | | |
| FOC Partners | Hull Street CLO, LTD | | |
| **FOC Partners Subtotal** | - | | |
| Steele Creek | Steele Creek CLO 2014-1, LTD | | |
| Steele Creek | Steele Creek CLO 2015-1, LTD | | |
| **Steele Creek Subtotal** | - | | |
| Sound Harbor | Sound Harbor Loan Funds 2014-1 | | |
| **Sound Harbor Subtotal** | - | | |
| Och-Ziff Loan Management | OZLM Funding II, Ltd. | | |
| Och-Ziff Loan Management | OZLM Funding III, Ltd. | | |
| Och-Ziff Loan Management | OZLM Funding IV, Ltd. | | |
| Och-Ziff Loan Management | OZLM Funding V, Ltd. | | |
| Och-Ziff Loan Management | OZLM VI, Ltd. | | |
| Och-Ziff Loan Management | OZLM VII, Ltd. | | |
| Och-Ziff Loan Management | OZLM VIII, Ltd. | | |
| Och-Ziff Loan Management | OZLM IX, Ltd. | | |
| Och-Ziff Loan Management | OZLM X, Ltd. | | |
| Och-Ziff Loan Management | OZLM XI, Ltd. | | |
| **Och-Ziff Loan Management Subtotal** | - | | |
| HRS Investment Holdings LLC | HRS Investment Holdings LLC | | |
| **HRS Investment Holdings LLC Subtotal** | - | | |
| First Trust | First Trust Senior Loan ETF | | |
| First Trust | First Trust Senior Floating Rate Income Fund II | | |
| First Trust | First Trust Short Duration High Income Fund | | |
| First Trust | First Trust Senior Loan Fund | | |
| **First Trust Subtotal** | - | | |
| Loomis, Sayles & Company | Loomis Sayles CLO II, Ltd. | | |
| **Loomis, Sayles & Company Subtotal** | - | | |
| Saratoga Investment Corp. | Saratoga Investment Corp. CLO 2013-1 | | |
| **Saratoga Investment Corp. Subtotal** | - | | |

**Summary of Participating Lender Signatures**

| Lender Group / Manager / Advisor | Participating Lender | Amount | Percent |
|---|---|---|---|
| P. Shoenfeld Asset Management LP | Thracia, LLC | | |
| **P. Shoenfeld Asset Management LP Subtotal** | **-** | | |
| Centerbridge | CCP Credit Acquisition Holdings, LLC | | |
| **Centerbridge Subtotal** | **-** | | |
| KKR | Spruce Investors II Limited Partnership | | |
| KKR | Maryland State Retirement and Pension System | | |
| KKR | Spruce Investors Limited | | |
| KKR | Presidio Investors Limited | | |
| KKR | Oregon Public Employees Retirement Fund | | |
| **KKR Subtotal** | **-** | | |
| MatlinPatterson Global Advisers LLC | MatlinPatterson Global Opportunities Master Fund, L.P. | | |
| **MatlinPatterson Global Advisers LLC Subtotal** | **-** | | |
| Lake Loan Funding LLC | Lake Loan Funding LLC | | |
| **Lake Loan Funding LLC Subtotal** | **-** | | |
| Aegon USA Investment Management | Transamerica Floating Rate | | |
| **Aegon USA Investment Management Subtotal** | **-** | | |
| **Total Participating** | **-** | **1,500,961,623.15** | **85.63%** |
| **Total Principal Balance** | **-** | **1,752,812,500.00** | **100.00%** |

**MILLENNIUM LAB HOLDINGS, INC.**
**(on behalf of itself and each of its direct and**
**indirect affiliates)**

By: _____

Name: _____
James Slattery

Its: _____
Chairman of the Board

*Signature Page to Restructuring Support Agreement*

**TA MILLENNIUM, INC.**
**(on behalf of itself and each of its direct and indirect affiliates)**

By: _____

Name: JEFFREY E. HADDEN

Its: _____

<u>EXHIBIT 1</u>

RESTRUCTURING TERM SHEET

_____

### MILLENNIUM HEALTH, LLC, ET AL.

### RESTRUCTURING TERM SHEET

_____

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY EXCHANGE OR PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS. THIS TERM SHEET DOES NOT ADDRESS ALL MATERIAL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL FINANCIAL RESTRUCTURING AND ANY AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND THE RESTRUCTURING SUPPORT AGREEMENT AND OTHERWISE ACCEPTABLE TO THE AD HOC GROUP,[1] MLH, TA, AND THE COMPANY. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES. THIS TERM SHEET AND THE INFORMATION CONTAINED HEREIN ARE STRICTLY CONFIDENTIAL AND SHALL NOT BE SHARED WITH ANY OTHER PARTY ABSENT THE PRIOR WRITTEN CONSENT OF MILLENNIUM HEALTH, LLC.**

This term sheet and the exhibits attached hereto (the "Term Sheet") set forth the principal terms of a proposed financial restructuring for the existing debt of the Company under the Existing Credit Agreement and certain other obligations of, and existing equity interests in, the Company on a consensual basis through an Out-of-Court Transaction, or in the event that an Out-of-Court Transaction is not consummated in accordance with the terms hereof, through an Approved Plan as to which votes are solicited prior to, and that is confirmed in connection with a case commenced under chapter 11 of the Bankruptcy Code.

_____

[1] Terms used but not defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement dated as of October 14, 2015 (the "Agreement").

| Overview | |
|---|---|
| Parties | Holdings, Millennium, MLH, TA, and the Participating Lenders |
| Transaction Summary | The purpose of the Restructuring is to (i) implement a settlement among the Company, the Lenders, MLH, and TA as described more fully herein, (ii) effectuate the DOJ Settlement, (iii) effect a recapitalization of the Company's balance sheet on a consensual basis through an Out-of-Court Transaction, (iv) cause the existing equity of Millennium to be cancelled, and (v) cause the issuance of 100% of the equity of reorganized Millennium to Lenders, who shall form a new holding company that is classified as a corporation for tax purposes ("New Holdco"), to which the equity of reorganized Millennium shall be contributed by Lenders in exchange for 100% of the stock of New Holdco. In the event that the Out-of-Court Transaction and Out-of-Court Releases are not approved by the end of the Solicitation (as determined by the Company and confirmed by the Ad Hoc Group Majority, MLH, and TA) by Out-of-Court Requisite Lenders, but the Approved Plan and the releases provided for therein are approved by the Requisite Consenting Lenders as part of the pre-filing Solicitation (as determined by the Company and confirmed by the Ad Hoc Group Majority, MLH, and TA), then, and only then, shall the Company effectuate the Restructuring through a pre-packaged chapter 11 Approved Plan Consistent With The Restructuring Term Sheet. The Restructuring will be effectuated pursuant to the "Milestones" set forth on Annex A. |
| Outside Date | The closing date of the Out-of-Court Transaction (the "Closing Date") or the effective date of the Plan (the "Effective Date") shall have occurred by December 30, 2015 (but as provided below not sooner than December 15, 2015), unless otherwise agreed to by, and in each's sole and absolute discretion, Millennium, MLH, TA, and by more than 66.67% in principal amount of the ad hoc group of Lenders listed on Exhibit A, (the "Ad Hoc Group") as such list may be amended in writing with notice to the parties hereto from time to time by the Ad Hoc Group provided that the Ad Hoc Group at all times holds no less than fifty and one one-hundredths percent (50.1%) of the principal amount outstanding under the Existing Credit Agreement. As used in this Term Sheet and the Restructuring Support Agreement, "Ad Hoc Group Majority" means holders of more than 50.1% in principal amount of the total principal amount of Loans under the Existing Credit Agreement then collectively held by members of the Ad Hoc Group and " Ad Hoc Group Super-Majority " means holders of more than 66.67% of the total principal amount of Loans under the Existing Credit Agreement then collectively held by the then members of the Ad Hoc Group. |
| Shareholder Contributions | |
| Settlement Contribution | MLH and TA shall collectively make a cash payment of $325 million to, or for the benefit of, Millennium upon the consummation of the transactions contemplated by the Out-of-Court Transaction or the Approved Plan, as applicable, in each case Consistent With The Restructuring Term Sheet, and which shall be comprised of:<br><br>(a) $206 million to be distributed to the DOJ on account of the Government Claims, plus any accrued interest thereon to the extent required by the DOJ |

| | Settlement Agreement (the "<u>DOJ Funding Contribution</u>"), and in full and final satisfaction of Millennium's monetary obligations under the DOJ Terms Sheet and/or the DOJ Settlement Agreement in accordance with the terms set forth herein and therein; and |
|---|---|
| | (b)  an amount equal to $325 million less the DOJ Funding Contribution (the "<u>Millennium Funding Contribution</u>, and together with the DOJ Funding Contribution the "<u>Settlement Contribution</u>") to be paid to Millennium to reimburse Millennium for the Initial DOJ Deposit, for working capital purposes, and as otherwise set forth herein. |
| | The Settlement Contribution shall be funded fifty-five percent (55%) by MLH and forty-five percent (45%) by TA as follows: (x) $178.75 million to be funded by MLH (the "<u>MLH Contribution</u>") and (y) $146.25 million to be funded by TA (the "<u>TA Contribution</u>"). |
| No Further Distributions or Payments | Until the Closing Date or the Effective Date, other than ordinary course business expenses, or as permitted on <u>Annex E</u> (which shall   include scheduled payments of rent and other charges coming due under the JS Real Estate Leases and payments in connection with the purchase of supplies and inventory from Millennium Laboratories Clinic Supply, Inc. at prices not in excess of arm's-length terms consistent with Section 7.10(a) of the Existing Credit Agreement), no distributions or payments, including tax distributions, other payments for taxes, or accounting /tax advisory expense benefits or any other Restricted Payments (as defined in the Existing Credit Agreement), shall be made from Holdings, Millennium, or its subsidiaries to TA, or the shareholders of TA (the "<u>TA Shareholders</u>") or to MLH, or the shareholders of MLH (the "<u>MLH Shareholders</u>," and together with the TA Shareholders, the "<u>Shareholders</u>"), or between any of the foregoing parties, under any existing agreement between such parties. |
| MLH Tax Note | There shall be no further payments made under that certain Promissory Note, dated as of May 1, 2014, issued by Millennium to MLH in the principal sum of $19,755,547.00 (as amended, the "<u>MLH Tax Note</u>"). |
| JS Real Estate | The four (4) leases related to Millennium's headquarters facilities in San Diego shall be amended to provide the tenant with two optional five year extensions on the same terms (with annual CPI rate adjustments) and freely transferable by the tenant or landlord. |
| **DOJ Settlement** | |
| Definitive Documentation | Prior to the commencement of the Solicitation, Millennium will enter into definitive documentation with the DOJ Parties, including a definitive settlement agreements (the "<u>DOJ Settlement Agreement</u>") and a corporate integrity agreement (a "<u>CIA</u>"), the DOJ Settlement Agreement being in form and substance satisfactory to Millennium, the DOJ Parties, MLH, TA, and  an  Ad Hoc Group Majority, in each of their sole and respective absolute discretion, resolving all outstanding issues between the DOJ, CMS, and OIG, and the Plaintiff  States (any such claims held by the DOJ Parties, the "<u>Government Claims</u>") on the one hand, and any of the Company, MLH, TA, and their respective Related Parties on the other (such documentation, the "<u>DOJ Settlement </u>"). |
| | Upon execution of the DOJ Settlement Agreement Millennium shall pay the |

3

DOJ a $50 million initial settlement deposit (the "Initial DOJ Deposit"), which shall be credited toward Millennium's total settlement obligations.

As part of the DOJ Settlement Agreement, TA and MLH shall collectively guarantee the $50 million Initial DOJ Deposit to the DOJ pursuant to a Guarantee Agreement in form and substance acceptable to TA and MLH and the DOJ, in each of their sole and absolute discretion.  In the event that TA and MLH are required to make payment to the DOJ of such $50 million pursuant to such Guaranty Agreement, TA and MLH shall have a subrogation claim (the "Subrogation Claim") (which shall be a 45%/55% interest, respectively, in such Subrogation Claim) against  Millennium for the full amount so paid, which Millennium and the Consenting Lenders agree shall be an allowed claim in the Chapter 11 Cases. The Consenting Lenders, severally and not jointly will, and hereby do, assign to TA and MLH on account of and to secure their Subrogation Claim, such Consenting Lender's pro-rata share (based on the portion which the principal amount of loans it owns bears to the aggregate principal amount of all loans owned by Consenting Lenders) of any cash distributions it receives from Millennium's bankruptcy estate in an aggregate amount not to exceed the lesser of (x) $25.0 million for all Consenting Lenders in the aggregate, or (y) 50% of the amount of the Initial DOJ Deposit which is avoided pursuant to a final order in such case or proceeding and required to be disgorged. The obligation of each Consenting Lender shall be limited to the assignment of cash distributions received from the Millennium bankruptcy estate, except for such cash distributions, shall be non-recourse to the Consenting Lenders' own funds or assets and shall be several and not joint.

Millennium and the Consenting Lenders agree that the Subrogation Claim shall have a super-priority lien on the proceeds of  avoidance actions recoveries by the Millennium bankruptcy estate against the DOJ in an amount not to exceed the lesser of (i) $25 million or (ii) 50% of such Subrogation Claim and that concurrent with commencing the Chapter 11 Cases, Millennium shall file a motion to allow the Subrogation Claim and to grant MLH and TA a super-priority lien on such avoidance actions proceeds to secure the Subrogation Claim, and the Consenting Lenders will support the motion and such relief.

Execution of the DOJ Settlement Agreement is a condition precedent to commencing Solicitation.

| **Restructuring Transaction Summary** |
|---|

| Out-of-Court Transaction Summary | In connection with the Out-of-Court Transaction, contingent upon approval and effectiveness of the Out-of-Court Releases by the Out-of-Court Requisite Lenders (both as defined below), control of Millennium shall be transferred to the Lenders, and the debt owed to the Lenders will be restructured, as follows: |
|---|---|
| | (a)      at least one business day prior to the Closing Date, the Settlement Contribution shall be paid by MLH and TA collectively to or for the benefit of Millennium and the DOJ Funding Contribution shall be paid over to the DOJ; |
| | (b)      all of Millennium's outstanding obligations under the Existing Loan Documents will be extinguished as of the Closing Date except to the extent applicable to any Non-Consenting Lender and all of Millennium's existing equity shall be cancelled; |

4

| | |
|---|---|
| | (c)    each Consenting Lender shall receive on the Closing Date, in full and final satisfaction of the obligations under the Existing Loan Documents, its *pro rata* share of and interest in:<br><br>(i)    100% of the equity in reorganized Millennium, which will be subsequently transferred by the Consenting Lenders to New Holdco.<br><br>(ii)    a new secured term loan issued by New Holdco in the aggregate principal amount of $600 million on the terms substantially set forth in <u>Annex B</u> to this Term Sheet (the "<u>New Credit Agreement</u>").<br><br>(iii)    the Millennium Corporate Claim Trust substantially on the terms set forth in <u>Annex C</u> to this Term Sheet.<br><br>(iv)    to the extent a Lender held a directly owned claim prior to a record date to be established by an Ad Hoc Group Majority, the opportunity to contribute such directly owned claims, and receive a pro rata beneficial interest in the Millennium Lender Claim Trust to be formed pursuant to <u>Annex C</u>.<br><br>(d)    after the transfer of 100% of the equity in reorganized Millennium to the Consenting Lenders, the Consenting Lenders shall cause 100% of the equity of reorganized Millennium to be transferred to New Holdco in exchange for 100% of the common stock of New Holdco, subject to dilution for awards issued pursuant to the Employee Incentive Plans described herein (such transactions described in paragraphs (a) through (c) of this section, the "<u>Transfer of Control</u>"). |
| Out-of-Court Early Commitment Fee | Upon approval of the Out-of-Court Transaction and Out-of-Court Releases by the Requisite Consenting Lenders, each Lender that consents to the Out-of-Court Transaction and the Out-of-Court Releases by 12:00 p.m. (prevailing Eastern Standard Time) on November 5, 2015 (the "<u>Early Commitment Deadline</u>"), shall receive its *pro rata* share of a new senior secured term loan, which shall be senior in lien and payment priority to the Existing Credit Agreement Claims. The Existing Loan Documents will be amended to permit the incurrence of such loans and the related liens and any necessary intercreditor and subordination agreements will be entered into between Millennium and the Participating Lenders), in the aggregate principal amount of $50.0 million (the "<u>Early Commitment Facility</u>").<br><br>The Early Commitment Facility shall otherwise be on substantially the same terms, including maturity, interest, prepayment rights, and covenants as the Existing Credit Agreement. (prior to the amendments thereto contemplated by <u>Annex D</u> hereto).<br><br>The Early Commitment Facility is fully earned, non-refundable, and non-avoidable at the time of issuance. The Early Commitment Facility will be paid in full in cash upon the Closing Date of the Out-of-Court Transaction or the effective date of an Approved Plan. In the event that the Out-of-Court Transaction does not close and an Approved Plan is not consummated, the Early Commitment Facility shall continue in full force and effect in accordance with its terms. |
| Out-of-Court Forbearance | In connection with the Out-of-Court Transaction, effective upon the Closing Date, each Consenting Lender shall approve:<br><br>(i)    an amendment to the Existing Credit Agreement on the terms substantially set forth in <u>Annex D</u> to this Term Sheet providing for, among other things, a permanent waiver of any defaults and/or events of |

| | |
|---|---|
| | default and an agreement not to declare any defaults, acceleration or otherwise exercise remedies for a period of ninety-one (91) days following the closing of the Out-of-Court Transaction.[2] |
| | (ii)    a non-amendable provision in the New Credit Agreement which provides for an agreement not to declare any defaults, acceleration or otherwise exercise remedies for a period of ninety-one (91) days following either the closing of the Out-of-Court Transaction or after the Effective Date of the Approved Plan.[3] |
| | (iii) The other modifications to the terms of the Existing Credit Agreement set forth on <u>Annex D</u> hereto. |
| Corporate Governance | Until the Closing Date of the Out-of-Court Transaction, MLH shall maintain full control and governance of Holdings and MLH shall maintain full control and governance of Millennium, each in accordance with the operating agreements of Holdings and Millennium; <u>provided</u>, <u>however</u>, that MLH shall not cause Millennium to do, and Millennium shall not do, any action which Millennium is not permitted to take without the consent of the Ad Hoc Group Majority under the section captioned "Ordinary Course Operations" and <u>Annex E</u> hereto without first obtaining such consent as provided on <u>Annex E</u>.

Without limitation of the generality of the foregoing, notwithstanding anything in <u>Annex E</u> or any provision of this Term Sheet to the contrary, no further distributions or payments (other than scheduled payments of rent and other charges coming due under the JS Real Estate Leases and payments in connection with the purchase of supplies and inventory from Millennium Laboratories Clinic Supply, Inc. at prices not in excess of arm's-length terms consistent with Section 7.10(a) of the Existing Credit Agreement), except as specifically set forth herein, will be made to any TA Shareholder or MLH Shareholder or any Related Party (as defined below) to TA or MLH, or to any professional acting on their behalf. In addition, simultaneously with their delivery to members of the Millennium board, a copy of all board packages, resolutions and other written materials prepared for the board shall be provided to Brown Rudnick LLP, as counsel to the Ad Hoc Group, on a "attorney's eyes only" basis; provided however that such materials shall be redacted to prevent the disclosure of privileged information.

Following the Closing Date of the Out-of-Court Transaction, the bylaws and other governance documents of reorganized Millennium and New Holdco shall prohibit the board of directors of reorganized Millennium and New Holdco, as well as the shareholders of reorganized Millennium and New Holdco, from, directly or indirectly, commencing or filing a petition seeking any voluntary, or consenting to or acquiescing in any involuntary, in each case, Insolvency Proceeding against, or with respect to, reorganized Millennium or New Holdco, for a period of ninety-one (91) days following the closing of the Out-of-Court Transaction or the Effective Date. For purposes hereof, "Insolvency Proceeding" shall mean a bankruptcy, insolvency, assignment for the benefit of creditors, receivership, custodian, |

---

[2]    The only remaining debt outstanding under the Existing Credit Agreement following closing of the Out-of-Court Transaction will be held by the Non-Consenting Lenders.

[3]    Because the Consenting Lenders will control 100% of the equity in the reorganized Millennium following closing of the Out-of-Court Transaction, they will also control reorganized Millennium's compliance with the New Credit Agreement.

|  | or similar proceeding, under, in each case, any applicable federal or state law relating to bankruptcy, insolvency, reorganization, winding up liquidation of a person or its assets. |
| --- | --- |
| Master Restructuring Agreement | In connection with the Out-of-Court Transaction, each Consenting Lender shall execute a master restructuring agreement (the "Master Restructuring Agreement") pursuant to which each Consenting Lender shall: (x) consent to and approve (i) the terms of the Out-of-Court Restructuring (including, without limitation, the Out-of-Court Releases), (ii) the new secured term loan on the terms substantially set forth in Annex B to this Term Sheet, and (iii) the amendments to the Existing Credit Agreement on the terms substantially set forth in Annex D to this Term Sheet; and (x) vote in favor of the Approved Plan and consent to and agree to provide the releases provided for therein by executing the ballot and releases made a part of the Master Restructuring Agreement. The Company, MLH, TA and the Consenting Lenders shall all be parties to the Master Restructuring Agreement. |
| Bankruptcy Toggle | If the Company does not receive consents to the Out-of-Court Transaction and the Out-of-Court Releases from Lenders holding all but $50 million of the outstanding principal indebtedness under the Existing Credit Agreement (the "Out-of-Court Requisite Lenders") by the Solicitation Termination Date, but the Approved Plan and the releases provided for therein are approved by the Requisite Consenting Lenders as part of the pre-filing Solicitation by the Solicitation Termination Date, and the same is confirmed in writing by MLH and TA, then, and only then, shall the Company commence the Chapter 11 Cases in the Bankruptcy Court and the parties will work together to implement the transactions pursuant to an Approved Plan Consistent With The Restructuring Term Sheet.

MLH, TA, the Ad Hoc Group Super Majority and the Company may agree in writing that the amount of outstanding principal indebtedness under the Existing Credit Agreement held by Non-Consenting Lenders may exceed $50 million for the purposes of determining the Out-of-Court Requisite Lenders.

The proposed Debtors in the Chapter 11 Cases will be: Holdings, Millennium, and RxAnte. |
| Restructuring Transactions | The Restructuring transactions (the "Restructuring Transactions") described herein, whether implemented pursuant to a Qualified Out-of-Court Restructuring or an Approved Plan, in each case shall be implemented Consistent With The Restructuring Term Sheet and consistent with the tax provisions described in Annex F. For the avoidance of doubt, the Restructuring Transactions may include the creation of new or successor entities, or the alternation of or elimination of existing entities. |
| Transfer of MLH Claims | Any claims, known and unknown, and causes of action against non-contributing MLH Shareholders shall be assigned to the Millennium Corporate Claim Trust or the Millennium Lender Trust, as applicable, and the proceeds of such claims shall be distributed consistent with the provisions described in Annex C. |
| Releases/Exculpations | (a) Out-of-Court Releases. |

7

|  | (i) The Settlement Contribution and Transfer of Control are contingent on:<br><br>(A) a full and complete release of the Released Parties[4] and their respective Related Parties[5] by the Company of the Released Claims[6] that the Company or its Related Parties would have been legally entitled to assert in their own right, on behalf of one another or on behalf of another party against the Released Parties or their respective Related Parties; and<br><br>(B) a full and complete release of the Company, the Released Parties and their respective Related Parties, by the RSA Releasing Parties,[7] and each of the foregoing parties Related Parties, from the Released Claims that the RSA Releasing Parties or their Related Parties, would have been legally entitled to assert in their own right or on behalf of another party, or through derivative standing or otherwise, (including, for the avoidance of doubt, on behalf of or derivatively for the Company) against the Released Parties; provided, however, that there shall be no release of any of the Released Claims by the Participating Lenders or the Company of any party not expressly identified as one of the Released Parties, or as a Related Party of such Released Party, including but not limited to (1) Skadden, Arps, Slate, Meagher & Flom (including its partners and other attorneys), (2) JPMorgan Chase Bank, N.A., (3) J.P. Morgan Securities LLC, (4) Citibank Global Markets Inc.; (5) BMO Capital Markets, (5) Suntrust Bank, (6) KPMG LLP, (7) Citibank, N.A., (8) Bank of Montreal and any affiliates or Related Parties of the foregoing parties listed in (1) to (8) (the "Excluded Parties"), and the Retained Claims (as defined |
|---|---|

---

[4] "Released Parties" means, collectively, in each case solely in their respective capacities as such: (a) Holdings; (b) MLH; (c) TA; (d) the Participating Lenders; (e) Wilmington Federal Savings Bank, FSB, in its capacity as the successor Administrative Agent.; (f) Jeanne Bonell; (g); Michael Slattery; (h) James Slattery; (i) Howard Appel; (j) David Cohen; (k) Greg Stein; (l) Sunshine Alexis Stein; (m) Dr. Marvin Retsky; (n) and those persons serving as officers or managers of the Company as of the Closing Date or Effective Date, as applicable; and (o) Brown Rudnick, LLP and FTI.

[5] "Related Parties" means, collectively, current and former affiliates and such entities' and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals, managers, officers, and equity holders (regardless of whether such interests are held directly or indirectly), equity holder's spouses, trusts, assigns, heirs, beneficiaries, members, partners, employees, advisory and observer board members, financial advisors, Kirkland & Ellis LLP, as attorneys for James Slattery, Goodwin Procter LLP, as attorneys for TA and its Related Parties (but for the avoidance of doubt, not as attorneys for Millennium), accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals. For the avoidance of doubt,. none of the Excluded Parties shall be a Related Party to any of the Released Parties.

[6] "Released Claims" means (a) solely with respect to the Released Parties, any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or causes of action, whether known or unknown, foreseen or unforeseen, including direct and derivative claims, relating to any actions, transactions, events, or omissions taking place on or before the Closing Date of an Out-of-Court Transaction or the Effective Date of an Approved Plan, as applicable, arising out of, or in any way related to in any manner, the Company, the Government Claims, the DOJ Settlement, the Existing Credit Agreement, and the Restructuring and any transactions related thereto, including, without limitation, the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement and any and all claims arising out of, or related to in any manner, the negotiation, solicitation, due diligence, documentation, execution, implementation, administration, and or the enforcement of the Existing Credit Agreement and the transactions related thereto (collectively, the "Core Released Claims"); and (b) with respect to the Related Parties of the Released Parties, all Core Released Clams, but only to the extent such claims relate to the Company, including the governance thereof, or that relate to or arise out of the Government Claims, the DOJ Settlement, the Existing Credit Agreement, the Restructuring and any transactions related thereto, including the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement.

[7] "RSA Releasing Parties" means, collectively, the Participating Lenders.

below) shall be expressly excluded from this subparagraph (B), and all such Retained Claims may be pursued against the Excluded Parties and shall be subject to paragraph (c) below.

(ii)    Any claims against the non-contributing MLH Shareholders shall be expressly excluded from the Out-of-Court Releases in order to preserve the claims being transferred to the Millennium Corporate Claim Trust or the Millennium Lender Trust, as applicable (the releases described in this paragraph (a), the "Out-of-Court Releases").

(b)    In-Court Releases/Exculpations.

(i)    The Settlement Contribution and the treatment to be provided to the Existing Credit Agreement Claims (described below) are contingent on the following releases to be provided for in an Approved Plan that is confirmed by the Bankruptcy Court:

(A)    a full and complete release of the Released Parties and their respective Related Parties by the Company from Released Claims;

(B)    a full and complete release of the Company, the Released Parties and their respective Related Parties by the RSA Releasing Parties from Released Claims that the RSA Releasing Parties, or each of the foregoing party's Related Parties, would have been legally entitled to assert in their own right or on behalf of another party, or through derivative standing or otherwise, (including, for the avoidance of doubt, on behalf of or derivatively for the Company) against a Released Party; provided, however, that the release by the Participating Lenders shall not include the Retained Claims and such Retained Claims shall be subject to paragraph (c) below; and

(C)    a full and complete release of the Company, the Released Parties and their respective Related Parties by the Third-Party Releasing Parties[8] from Released Claims that any of the Third-Party Releasing Parties would have been legally entitled to assert in its own right or on behalf of another party, or through derivative standing or otherwise, (including, for the avoidance of doubt, on behalf of or derivatively for the Company) against a Released Party.

(D)    a bar order directed to and prohibiting any person from commencing or asserting any Released Claims against the Released Parties and their respective Related Parties, including, without limitation, all Third-Party Releasing Parties, any Non-Consenting Lender and, for the avoidance of doubt, any Consenting Lender.

(ii)    The Plan releases shall expressly exclude any claims against the non-contributing MLH Shareholders in order to preserve the claims being transferred to the Millennium Corporate Claim Trust or Millennium Lender Trust, as applicable (the releases described in this paragraph (b), the "In-Court Releases").

(iii)    The Plan shall include customary exculpation provisions, including exculpation for the Released Parties.

(c) Whether the Restructuring Transactions contemplated herein are effected

---

[8]    "Third-Party Releasing Parties" means any holder of a Claim (as defined in the Bankruptcy Code) or Interest against the Company.

9

through an Out-of-Court Transaction or an Approved Plan, all known and unknown claims[9] (including derivative claims) of Millennium against the Excluded Parties are preserved (such preserved claims are the "Estate Claims"), and all known and unknown direct and derivative claims of the Lenders against the Excluded Parties are preserved (such preserved claims are the "Lender Claims"). The releases provided for herein do not preclude the Lenders or Millennium, or their representatives or assigns, including one or more litigation trusts to whom a Lender Claim or Estate Claim is assigned (the Lenders, Millennium and any of their successors and assigns, including such litigation trust or trusts, hereinafter, collectively, the "Plaintiff") from prosecuting, and the Lenders and Millennium retain the right, respectively, to bring, the Lender Claims and Estate Claims (collectively, the "Retained Claims") against the Excluded Parties. In the event that the Plaintiff obtains a monetary judgment, award or judicial recovery against an Excluded Party or Excluded Parties on account of any Retained Claim (a "Plaintiff Judgment"), the parties' rights shall be as follows (and shall be incorporated in the Approved Plan): (i) where the Retained Claim is one subject to which statutory or common law contribution on account of comparative fault applies, then Lenders and Millennium agree that the Excluded Party or Excluded Parties shall be entitled to reduce the amount of its liability to the Plaintiff by the equitable share of Gross Damages (as hereinafter defined) attributable to MLH and/or TA (or their respective Related Parties) as established by the Excluded Party or Excluded Parties in litigation with the Plaintiff (without TA's and MLH's or their respective Related Parties' being named in and participating in such litigation as a party) based upon the percentage of comparative fault (if any) determined to be attributable to TA and MLH or their respective Related Parties (a "Comparative Fault Reduction"), and Plaintiff shall not seek to recover any Comparative Fault Reduction from MLH or TA (or their Related Parties); provided, however, while the Comparative Fault Reduction shall be calculated based on all damages and losses to which the tortious or other misconduct of the Excluded Party contributed, without netting out the Settlement Contribution or any other source of recovery of the Plaintiff ("Gross Damages"), if after giving effect to the Comparative Fault Reduction, the sum of the amount of the liability of the Excluded Party plus the amount of the Settlement Contribution, exceeds Gross Damages, the Excluded Party shall be entitled to an additional reduction in liability to the Plaintiff equal to such excess so that the Plaintiff shall not recover in excess of its Gross Damages; and (ii) where Plaintiff has commenced an action against one or more of the Excluded Parties asserting one or more of the Retained Claims, and the action is one to which the statutory, common law or contractual provisions hereunder for contribution and the corresponding reduction of claims on account of settlement or comparative fault would not otherwise apply and are not available, in the absence of agreement, to the Excluded Party (a "Non-Contribution Action"), and where such Excluded Party or Excluded Parties successfully has joined MLH and/or TA (or any of their Related Parties) as a party to such Non-Contribution Action, or where MLH and/or TA (or any of their Related Parties) successfully has intervened in such action (it being understood that Plaintiff affirmatively consents to any such

---

[9] All references to "unknown claims" in this Term Sheet shall be deemed to include a release of such claims that would not otherwise be released pursuant to the operation of California Civil Code Section 1542 and any other similar statutory provisions. The parties also agree that they waive solely with respect to Released Claims, to the fullest extent possible, any and all protections or preservations for fraudulent inducement (or similar) claims that might be premised on unknown or subsequently discovered facts. The final settlement agreement shall include a specific waiver of such claims.

10

petition for intervention by MLH and/or TA (or any of their Related Parties)), and where the Plaintiff successfully obtains a Plaintiff Judgment against one or more of the Excluded Parties for one or more Retained Claims, and where in such action the Excluded Party or Excluded Parties also successfully have obtained a judgment, award or judicial recovery against MLH and/or TA or their respective Related Parties in any way related to the Company in a Non-Contribution Action (the "MLH and/or TA Liability"), then the Plaintiff shall stipulate and consent to a judgment credit or judgment reduction to the Plaintiff Judgment in an amount that is dollar for dollar equal to the MLH and/or TA Liability, and Plaintiff shall not seek to collect such amount from MLH or TA (or any of their Related Parties). In the event that, after one or more Trustees are appointed to pursue Estate Claims and/or Lender Claims, an Excluded Party or Excluded Parties commences an action only against MLH and/or TA related to the Company, MLH and TA promptly shall seek to dismiss such action or consolidate it with any lawsuit brought by the Plaintiff against an Excluded Party or Excluded Parties in the forum selected by Plaintiff, or alternatively seek to stay such action asserted only against MLH and/or TA pending the conclusion of any action commenced by Plaintiff against an Excluded Party or Excluded Parties. In any lawsuit brought by the Plaintiff against an Excluded Party or Excluded Parties as contemplated herein, the Plaintiff shall plead the existence of the judgment credit provisions of subparagraph (c)(i) delineated herein, shall notify MLH and TA when any such lawsuit is filed, and shall provide copies of its initial pleadings in any such lawsuit to MLH and TA. Moreover, in any litigation by the Plaintiff of a Retained Claim (regardless of whether MLH, TA, or their respective Related Parties have been joined as parties to such litigation), or in any circumstance in which a Retained Claim is to be settled by the Plaintiff (regardless of whether a lawsuit has been commenced against the Excluded Party or Excluded Parties), the Plaintiff, the Lenders, and Millennium shall use their respective commercially reasonable and good faith best efforts in connection with any settlement of any Retained Claims with any such Excluded Party or Excluded Parties to obtain a release of any claims held by such Excluded Party or Excluded Parties against MLH and TA relating to the Retained Claims, provided MLH and TA reasonably cooperate in such efforts, if their consent is requested or required. The Plaintiff shall have the right, but not the obligation, to (i) designate, in its sole discretion, counsel to defend or represent MLH and/or TA (or any of their Related Parties) in such action where MLH and/or TA (or any of their Related Parties) are named as parties or have intervened, with such attorney costs subject to the $3 million aggregate reimbursement cap set forth herein, and (ii) assume the defense of MLH and/or TA in any such action until such reimbursement cap is exhausted. Such reimbursement of attorney costs shall be pro rata with attorney costs of other defense counsel that may be retained by MLH and/or TA (or any of their Related Parties), and such cost sharing shall be done in a manner that is subject to the reasonable consent of MLH and/or TA (or any of their Related Parties). In any such action, neither MLH nor TA (nor any of their Related Parties) shall (i) consent or stipulate to any judgment, award or judicial recovery in such action with respect to claims against or concerning them without the consent of Plaintiff, which shall be exercised in the sole discretion of Plaintiff or (ii) take actions or advance positions with respect to whether a claim against or concerning them is not subject to Comparative Fault Reduction, without the express consent of Plaintiff. To the extent that any settlement of any Retained Claim between Plaintiff, on the one hand, and the Excluded Party or Excluded Parties, on the other hand, is required to be approved by the Bankruptcy Court or any other court of

11

competent jurisdiction, MLH and TA shall be provided with notice thereof and with an opportunity for a hearing thereon.  For the avoidance of doubt, the Lenders, pursuant to the foregoing, do not hereby acknowledge that any Non-Contribution Action exists in favor of any Excluded Party or that any such Non-Contribution Action would arise in connection with the assertion by the Plaintiff of a Retained Claim.

(d)   Lenders, Millennium and New Holdco (and its subsidiaries) further agree that, MLH and/or TA (or any of their respective Related Parties), if sued, or made subject to discovery by any of the Excluded Parties, with respect to litigation by the Plaintiff, the Lenders or Millennium against any of the Excluded Parties of any of the Retained Claims, or if MLH and/or TA (or any of their respective Related Parties) are named as parties in any litigation by any of the Non-Consenting Lenders in connection with, relating to, arising out of, following, or on account of the litigation by any Non-Consenting Lender of Released Claims, may seek any available insurance coverage, including any available Millennium insurance or insurance held separately by MLH or TA, for such defense costs incurred, and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy. Lenders further agree that, if the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (and their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), incurred by MLH and TA (or their Related Parties) in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Plaintiff, Millennium or Lenders, or any of the Non-Consenting Lenders, against or with any Excluded Party or Excluded Parties in which MLH or TA (or their Related Parties) are sued or made subject to discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of Lenders, such approval not to be unreasonably withheld), solely to the extent of an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.[10]

(e) In the event the Restructuring Transactions contemplated herein are effected through an Approved Plan,  the Approved Plan shall provide for an order (the "Bar Order") (i) barring, enjoining and restraining all persons and entities (including, without limitation, each Non-Consenting Lender, each Third Party Releasing Party, and each Excluded Party) from commencing or prosecuting any litigation or asserting any claims against Holdings, TA,

---

[10]   This Agreement shall operate as a demand that each of Millennium, the Consenting Lenders, MLH and TA institute a litigation hold and each such party shall, promptly following the effective date of the Agreement, issue a litigation hold notice to their respective Related Parties that could reasonably be expected to have in their possession, custody or control any documents, including electronic documents, relating to the Retained Claims or Released Claims. In addition, Millennium and MLH shall issue a litigation hold notice to any Released Parties affiliated with each of them, respectively. Litigation hold notices shall specify that such litigation hold shall continue until further notice from Millennium and the trustee of any litigation trusts established under an Approved Plan that all litigation against Excluded Parties has been settled, abandoned or otherwise concluded.

No further professional fees may be paid for or on account of TA and MLH's professionals after October 9, 2015, except as expressly set forth herein.

12

MLH, or their respective Related Parties based on any Released Claims; (ii) barring, enjoining and restraining, to the maximum extent possible under applicable law, each Excluded Party and each Third-Party Releasing Party from commencing, prosecuting, or asserting against any of the Released Parties any claims, actions or proceedings for contribution or indemnity, or otherwise, including any claims, actions or proceedings for contribution or indemnity or otherwise with respect to any liability or obligation of any Excluded Party to Millennium or the Lenders arising out of or in connection with any Retained Claims; (iii) providing that to the extent that any Non-Consenting Lender obtains a judgment pursuant to which MLH and/or TA become liable to a Non-Consenting Lender, MLH and/or TA shall be entitled to a dollar for dollar offset and credit against any such judgment in an amount equal to the product of: (x) the pro-rata amount of that indebtedness under the Existing Credit Agreement that such Non-Consenting Lender held and upon which its claim against MLH and/or TA is based; multiplied by (y) the Settlement Contribution; and (iv) providing that the Released Parties and their Related Parties shall have no liability to any Excluded Party, Millennium or the Lenders with respect to any Retained Claims, or Lender Claims or Estate Claims that are, immediately prior to the Closing Date or the Effective Date, as applicable, subject to contractual or other indemnity by Millennium in favor of the Excluded Parties, and that all such claims shall be barred, enjoined and released.

(f)    In the event the Restructuring Transactions contemplated herein are effected through an Approved Plan, to the extent that the Released Parties do not obtain a full and complete release from the Third-Party Releasing Parties and/or Excluded Parties from Released Claims in any way relating to the Company, the Government Claims, the DOJ Settlement, the Existing Credit Agreement, or the transactions contemplated by the Restructuring that any of the Third-Party Releasing Parties and/or Excluded Parties would have been legally entitled to assert in its own right or on behalf of another party (including, for the avoidance of doubt, the Company) against a Released Party, in such event  MLH and TA (and their Related Parties)  may seek any available insurance, including any available Millennium insurance and any insurance separately available to MLH or TA individually, for such defense costs incurred and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy. Lenders further agree that, if the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (or their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities),  in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Third-Party Releasing Parties or the Non-Consenting Lenders, in which MLH or TA (or their Related Parties) is named as a party or is the subject of discovery , including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of Lenders, such approval not to be unreasonably withheld), solely to the extent that, all reimbursed costs, including those costs set forth in "d" above, shall not exceed an aggregate maximum of $3 million,  50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

13

| | |
|---|---|
| | For the avoidance of doubt, in no event shall New Holdco (and its subsidiaries) be responsible for more than $3,000,000 in aggregate of any and all expenses incurred by MLH and TA for any litigation-related defense costs (exclusive of any settlement payments) that may be incurred by them in connection with litigation relating to the Third-Party Releasing Parties or the Excluded Parties.  For the further avoidance of doubt, any enforcement of MLH or TA or their Related Parties of the Bar Order described in (e) above shall be deemed to fall within the litigation-related costs that are covered in (c), (d) and (f) above. |
| **Treatment of Claims and Interests Under Approved Plan** | |
| Administrative, Priority Tax and Other Priority Claims | On or as soon as practicable after the Effective Date, each holder of an administrative, priority tax, or other priority claim shall receive cash equal to the full amount of its claim or otherwise be left unimpaired. *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Early Commitment Facility | The Early Commitment Facility shall be paid in full in cash. *Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Existing Credit Agreement Claims | All of the Company's outstanding obligations under the Existing Loan Documents will be extinguished, canceled, and discharged as of the Effective Date, and in exchange therefor, and in full and final satisfaction of such claims, each holder of an Existing Credit Agreement Claim (as defined below) shall receive on the Effective Date its *pro rata* share of and interest in: (a)  100% of the equity in reorganized Millennium (but which shall be transferred no earlier than one business day after the payment of the Settlement Contribution) which will subsequently be transferred by the Lenders to New Holdco; and (b)  a new secured term loan issued by New Holdco in the aggregate principal amount of $600 million on the terms substantially as set forth in Annex B to this Term Sheet. (c)  the Millennium Corporate Claim Trust on the terms substantially set forth in Annex C to this Term Sheet. (d)  to the extent a Lender held a directly owned claim prior to a record date to be established by an Ad Hoc Group Majority, the opportunity to contribute such directly owned claims, and receive a pro rata beneficial interest in the Millennium Lender Claim Trust to be formed pursuant to Annex C. "Existing Credit Agreement Claims" means all claims and obligations arising under or relating to the Existing Loan Documents, including the Existing Credit Agreement, in a total outstanding principal amount of approximately $1.752 billion, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents, other than the Prior Agent Indemnity Claims. *Impaired; entitled to vote.* |

14

| | |
|---|---|
| Prior Agent Indemnity Claims | On the Effective Date, the Prior Agent Indemnity Claims shall be assumed.<br><br>The "Prior Agent Indemnity Claims" means all indemnification claims of JPMorgan Chase Bank, N.A. arising under the Existing Loan Documents.<br><br>*Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Other Secured Claims | On the Effective Date or as soon as practicable thereafter, all secured claims other than Existing Credit Agreement Claims shall be assumed or reinstated and paid in full in cash in the ordinary course as such claims become due or shall receive such other treatment as satisfies the requirements of section 1124 of the Bankruptcy Code.<br><br>*Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Government Claims | On the Effective Date or as soon thereafter as practicable, but at least one business day prior to the cancellation of the equity interests in Millennium, in satisfaction of the Government Claims, the DOJ shall receive a distribution in cash of $206 million plus accrued interest, which shall be funded pursuant to the DOJ Funding Contribution and from Millennium in accordance with the terms of the DOJ Settlement. The Plan will provide that the Initial DOJ Deposit payment will be irrevocable and not subject to avoidance and that all preference and other claims against the DOJ shall be waived.<br><br>*Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| General Unsecured Claims | All general unsecured claims (other than the Government Claims and the MLH Tax Note Claims) shall be reinstated or paid in full in cash in the allowed amount of the claim or in the ordinary course as such claims become due, as applicable.<br><br>*Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| MLH Tax Note Claims | On the Effective Date, the MLH Tax Note shall be deemed canceled. All claims arising out of or pursuant to the MLH Tax Note (the "MLH Tax Note Claims") shall be canceled and discharged and holders of MLH Tax Note Claims shall receive no distribution on account of such claims.<br><br>*Impaired; not entitled to vote; conclusively deemed to reject.* |
| Intercompany Claims | All intercompany claims shall be (i) reinstated, in full or in part, and treated in the ordinary course of business or (ii) cancelled and discharged. |
| Existing Equity Interests in Holdings | On the Effective Date for Holdings, or as soon as practicable thereafter, all the existing equity interests shall be unimpaired.<br><br>*Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| Existing Equity in Millennium | On the Effective Date for Millennium, or as soon as practicable thereafter, all the existing equity interests in Millennium shall be canceled, extinguished and discharged.<br><br>*Impaired; not entitled to vote; conclusively deemed to reject.* |
| Existing Equity in Millennium | On the Effective Date, or as soon as practicable thereafter, all allowed |

15

| | |
|---|---|
| Subsidiaries | equity interests in Millennium's subsidiaries that are Debtors shall be reinstated and otherwise unaffected by the Plan.<br><br>*Unimpaired; not entitled to vote; conclusively presumed to accept.* |
| **Plan Implementation Provisions** | |
| Use of Cash Collateral | In connection with the  Chapter 11 Cases, the Participating Lenders shall consent to the use of cash collateral (as such term is defined in the Bankruptcy Code) , subject to reasonable terms regarding, among other customary provisions, adequate protection to be negotiated by the Company and the Ad Hoc Group. |
| Treatment of Executory Contracts and Unexpired Leases | Each executory contract or unexpired lease to which the Company is party shall be deemed assumed as of the Effective Date, except those executory contracts or unexpired leases identified on the schedule of "Rejected Executory Contracts and Unexpired Leases" to be included in the Plan supplement as an exhibit to the Plan (which schedule shall be subject to the approval of the Ad Hoc Group), or except as otherwise rejected pursuant to the Plan or by separate order of the Bankruptcy Court.  The executory contracts and unexpired leases identified on the schedule of "Rejected Executory Contracts and Unexpired Leases" shall be deemed rejected as of the Effective Date.  The Restructuring Support Agreement shall be deemed assumed upon confirmation of the Plan. The four (4) leases related to Millennium's headquarter facilities in San Diego shall be assumed in accordance with the terms set forth herein. |
| Transfer of Newly Issued Equity to New Holdco/Establishment of Lender Litigation Trust | On the Effective Date, or as soon as practicable thereafter, but not before one business day after the payment of the Settlement Contribution and the payment of the Government Claims, 100% of the existing equity of Millennium shall be cancelled and 100% of the equity of reorganized Millennium shall be issued to Lenders, who shall form New Holdco, to which the equity of reorganized Millennium shall be contributed by Lenders in exchange for 100% of the stock of New Holdco, subject to dilution for awards issued pursuant to the Employee Incentive Plans described herein.<br><br>The Millennium Lender Claim Trust shall be established in accordance with <u>Annex C</u> hereof and each of the Consenting Lenders shall contribute or be deemed to have contributed any and all of their individual claims and causes of action against any person or entity related to the Debtors (other than Released Claims against Released Parties) to such Trust. |
| **Corporate Governance and Employee Incentive Plans** | |
| Board of Directors | Composition of the Board of Directors will be determined by an Ad Hoc Group Majority prior to the Solicitation Commencement Date. |
| Corporate Governance Documents | In connection with the consummation of the Plan or Out-of-Court Restructuring, New Holdco shall adopt an amended and restated certificate of incorporation, bylaws, and shareholders' agreement that will include the provisions described herein in the section "Corporate Governance" with respect to Millennium and New Holdco, and on terms that shall be reasonably acceptable to the Ad Hoc Group, subject to consultation with Millennium. |

|  | The amended and restated certificate of incorporation, bylaws and any other corporate documentation for New Holdco shall include customary provisions concerning, among other things, some or all of the following, in each case, with the specific terms thereof to be in the discretion of the Ad Hoc Group and satisfactory thereto:<br><br>(a) selection of the Board of Directors;<br><br>(b) rights of stockholders to act by written consent and of stockholders holding a minimum percentage of stock to call a special meeting;<br><br>(c) rights to receive financial and other information to be provided to stockholders, subject to restrictions regarding confidentiality and access by competitors;<br><br>(d) restrictions on trading shares to non-accredited investors and competitors and as necessary to preserve status as a private company, but otherwise freely tradeable to the extent permitted by applicable law;<br><br>(e) preemptive rights and drag-along and tag-along rights; and<br><br>(f) opting out of section 203 of the Delaware General Corporation Law. |
| --- | --- |
| Senior Executive Officers | The below-listed individuals shall continue to serve as senior executive officers of New Holdco (collectively, the "Senior Executives"), and shall enter into employment agreements with Millennium as of the Closing Date or the Effective Date, as applicable, on terms agreeable to such Senior Executives and an Ad Hoc Group Majority:<br><br>(a) Brock Hardaway<br><br>(b) Martin Price<br><br>For the avoidance of doubt, no Senior Executive or other employee is a third-party beneficiary hereof and no Senior Executive's or other employee's continued employment shall be a condition precedent to any party's obligations to consummate the Restructuring Transactions. It is anticipated that certain other high-level employees of Millennium may receive employment agreements on terms to be determined. The key terms of such executive employment agreements shall be as agreed by the executives and the Ad Hoc Group. |
| Employee Incentive Plans | In addition to base compensation, the Ad Hoc Group and the Senior Executives may agree upon additional forms of incentive compensation. |
| **Miscellaneous Provisions** | |
| Ordinary Course Operations | Millennium shall operate in the ordinary course of business consistent with current practices; provided, however, Millennium acting in accordance with, or in anticipation of any, either a CIA with OIG, or any changes in federal, state or private reimbursement practices, shall be operating in the ordinary course of business; and provided, further, that any actions that Millennium is prohibited from taking, or is required to take, in connection with the Chapter 11 Cases or the Plan shall be deemed to be ordinary course of business transactions.<br><br>Without limitation of the generality of the foregoing, Millennium shall not take or agree in writing or otherwise to take any of the actions prohibited |

17

| | under <u>Annex E</u> hereof without prior notice to and the consent of the Ad Hoc Group without first obtaining such consent as provided on <u>Annex E</u>. |
|---|---|
| Conditions to Effectiveness | If implemented through an Approved Plan, the Restructuring shall be subject to such conditions to effectiveness as are customary in restructurings of this type, including without limitation: (i) the RSA shall not be terminated; (ii) on or before December 30, 2015, the Bankruptcy Court must enter an order, which is final and non-appealable, that confirms the Approved Plan, that approves the releases (including third party releases) and exculpations, that contains the contribution claim and Non-Contribution Claim protections and other protections for the Released Parties and their respective Related Parties, and that contains the bar order language, in each case, in form, scope, and substance consistent in all material respects with the "Releases/Exculpations" provisions of the Term Sheet; (iii) all of the transactions contemplated by the Approved Plan shall be approved and not subject to avoidance; and (iv) the confirmation order shall be Consistent With The Restructuring Term Sheet.<br><br>The condition that the confirmation order is a final non-appealable order may be waived only if agreed to in writing by MLH, and TA, each in their sole and absolute discretion.<br><br>The Out-of-Court Transaction shall be subject to and conditioned on the receipt of any required material regulatory authorizations and consents and other customary conditions and that the RSA shall not have been terminated.<br><br>Neither the Out-of-Court Transaction nor the Restructuring under the Approved Plan shall close prior to December 15, 2015. |
| Press; Qui Tam and a Relator Disclosure | (a)   Millennium, MLH, TA, and the Participating Lenders will keep the specific terms of the transactions contemplated in this Term Sheet confidential and will not disclose them to any person (with customary exceptions for affiliates, persons who need to know).<br><br>(b)   Millennium, MLH, TA, and the Ad Hoc Group will agree on the language of a press release disclosing that an agreement among the Parties and with the DOJ Parties has been reached.<br><br>(c)   Millennium, MLH, TA, and the Participating Lenders shall not make any disparaging comments about the other, including with respect to any of the facts and circumstances giving rise to the transactions contemplated by the Restructuring Term Sheet.<br><br>(d)   Millennium will use its reasonable best efforts to ensure that DOJ and Relator Actions are unsealed substantially simultaneously with Millennium's announcement of Lender Solicitation results. |

18

**ANNEX A**

**MILESTONES**

| Milestones | |
|---|---|
| Targeted Solicitation Date | October 29, 2015 |
| Targeted Filing Date (if necessary) | November 10, 2015 |
| Earliest Closing Date for In-Court or Out-of-Court Transaction | December 15, 2015 |

19

**ANNEX B**

**TERMS OF NEW DEBT**

Capitalized terms used but not defined herein shall have the meanings attributed to such terms in the Restructuring Term Sheet ("Restructuring Term Sheet") to which this term sheet is attached.

| Terms of New Debt | |
|---|---|
| Borrowers | Millennium Health, LLC and New Holdco (the "Borrowers") |
| Guarantors | RxAnte and each other direct and indirect domestic subsidiary of the Borrowers, subject to exceptions substantially similar to those set forth in the Existing Credit Agreement (such subsidiaries other than Millennium Health, LLC, collectively, the "Subsidiary Guarantors"; together with the Borrowers, the "Obligors"). |
| Lenders | Lenders party to the Existing Credit Agreement. |
| Required Lenders | Those Lenders holding greater than fifty percent (50%) of the outstanding principal amount of the Term Loans of all Lenders. |
| Administrative Agent | [TBD] (the "Agent"). |
| Type and Amount | New term loan in the aggregate principal amount of $600 million ("Term Loan"; the credit facility to which the terms of this term sheet apply, the "Term Loan Facility").  The Term Loan shall be deemed made in a single drawing on the Closing Date (subject to the prior satisfaction of the Conditions Precedent (hereinafter defined)) in exchange for, together with equity to be distributed in connection with the Restructuring Transactions, the cancellation of the outstanding loans under the Existing Credit Agreement. |
| Security | The Term Loan shall be secured by a perfected first priority security interest in substantially all property and assets of the Borrowers and the Subsidiary Guarantors (real and personal, tangible and intangible, whether now owned or hereafter acquired, developed and/or existing and wherever located and, including, without limitation, a perfected first priority security interest in all of the equity interests held by the Borrowers and all Subsidiary Guarantors), in each case, subject to the exceptions and limitations substantially similar to those set forth in the Existing Credit Agreement and the Loan Documents (as defined in the Existing Credit Agreement), provided that (x) the Obligors' cash and deposit accounts shall be subject to control agreements, under which the Agent shall be granted a perfected first priority security interest in the cash and deposit accounts (subject to customary exceptions), but the Borrowers shall be permitted to use such cash in the ordinary course of business unless and until an Event of Default occurs and is continuing, (y) Obligors' letter of credit rights valued at greater than a mutually agreed upon threshold shall constitute Collateral under the Term Loan Facility and (z) the types of property and assets described in clauses (d) and (r) of the definition of "Excluded Collateral" (as defined in the Existing Credit Agreement) shall |

| | not constitute Collateral under the Term Loan Facility so long as "but only to the extent that the granting of security interests therein would be prohibited by the terms thereof" shall be added to the end of such exceptions when they are excluded from Collateral under the Term Loan Facility (collectively, the "Collateral"). |
|---|---|
| Maturity | The Term Loan will mature on the date that is five years after the Effective Date (the "Term Maturity Date"). |
| Interest Rate | The Borrowers may elect that the Term Loan bear interest at a rate per annum equal to (a) the Base Rate plus the 5.50% per annum or (b) the LIBOR Rate plus 6.50% per annum.<br><br>The terms "Base Rate" and "LIBOR Rate" shall have the meanings customary and appropriate for financings of this type, and the basis for calculating accrued interest and the interest periods for loans bearing interest based on the LIBOR Rate shall be customary and appropriate for financings of this type and substantially similar to the Existing Credit Agreement; provided, that at no time will the (i) LIBOR Rate be deemed to be less than 1.00% per annum and (ii) Base Rate be deemed to be less than 2.00% per annum. |
| Interest Payment Dates | In the case of that portion of the Term Loan bearing interest at the Base Rate ("Base Rate Loans"), interest shall be payable quarterly in arrears.<br><br>In the case of that portion of the Term Loan bearing interest at the LIBOR Rate ("LIBOR Rate Loans"), interest shall be payable on the last day of each relevant interest period; provided, that if any interest period is longer than three months, interest shall be payable on each successive date three months after the first day of such interest period. |
| Default Rate | Upon the occurrence and during the continuation of an Event of Default (hereinafter defined), the interest rate on the Term Loan will be increased by two percent (2.00%) per annum at the direction of Administrative Agent (which shall be at the direction of the Required Lenders), which may be charged back to the initial date on which such Event of Default occurred. |
| Amortization; Prepayments | (a)  Amortization: 1.00% of the original principal amount per annum of the Term Loan, payable in equal quarterly installments.  The balance of the Term Loan will be repayable on the Term Maturity Date.<br><br>(b)  Voluntary prepayments: Permitted, in whole or in part, at any time, without premium or penalty.<br><br>(c) Mandatory prepayments: The Term Loan shall  include mandatory prepayment requirements (including, without limitation, an excess cash flow payment requirement on terms TBD)  provided that the percentage(s) of "excess cash flow", financial metrics and financial covenant definitions, in |

21

| | |
|---|---|
| | each case, related to the excess cash flow payment requirement shall be mutually agreed upon and based upon such percentage(s), financial metrics and definitions as are customary for a financing of this type to a similarly situated borrower). |
| Conditions Precedent To Closing Date | Conditions precedent customary for this type of financing, including, without limitation (collectively, the "Conditions Precedent"; the date on which each of the Conditions Precedent are satisfied or waived and the closing occurs, the "Closing Date"): <br><br> 1) Solely in the case of a prepackaged bankruptcy, (i) entry of a final non-appealable order of the Bankruptcy Court (which is not subject to any appeal or contest unless waived in accordance with the terms of the Restructuring Term Sheet, including by MLH and TA, each in their sole and absolute discretion) approving a plan of reorganization which plan has been approved by the Requisite Consenting Lenders and other requisite creditors necessary to approve such plan (the "Plan of Reorganization"); <br><br> 2) Solely in the case of a prepackaged bankruptcy, debtor in possession lenders' administrative agent shall have received a cash payment in the amount necessary to repay all of the debtor in possession loans (if any) and the other obligations outstanding under the debtor in possession facility (if any), for the ratable benefit of the debtor in possession lenders; <br><br> 3) Payment of all (x) accrued and unpaid fees, costs and expenses that are payable by the Obligors on the Closing Date, including without limitation, any applicable administrative agent fee due and payable under the Term Loan Facility and (y) reasonable fees, costs and expenses incurred by Agent and the Lenders, including reasonable attorneys' fees of the Agent and one counsel for the Lenders, in connection with the preparation, negotiation, execution, and delivery of the Loan Documents, through the Closing Date; <br><br> 4) Execution and delivery of definitive documentation evidencing the Term Loan Facility including, without limitation, the loan agreement, security agreement, subordination agreement (if any), and other agreements as reasonably required by Agent and Lenders in their reasonable discretion, each in form and substance reasonably satisfactory to the Agent and Lenders and consistent with the Documentation Principles (hereinafter defined) (collectively, the "Loan Documents"); <br><br> 5) There shall have occurred no Material Adverse Event (as defined in the Restructuring Support Agreement) since the date of the execution of this Agreement; <br><br> 6) The DOJ Settlement shall be in full force and effect and the CIA shall be in form and substance satisfactory to Lenders; and <br><br> 7) Satisfaction of the conditions to effectiveness in the Restructuring Term Sheet and such other conditions precedent as are customary for |

22

| | financings of this type to a similarly situated borrower. |
|---|---|
| Representations and Warranties | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those representations and warranties set forth in the Existing Credit Agreement. |
| Affirmative Covenants | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those affirmative covenants set forth in the Existing Credit Agreement. |
| Negative Covenants | Usual and customary for financings of this type to a similarly situated borrower and substantially similar to those negative covenants set forth in the Existing Credit Agreement. |
| Financial Covenant | Leverage ratio, interest coverage ratio and/or minimum liquidity/cash covenant (to be mutually agreed), in each case, with levels, measurement periods and financial covenant related definitions to be mutually agreed (it being understood that the financial covenant related definitions shall be customary for a financing of this type to a similarly situated borrower). |
| Events of Default | Usual and customary for financings of this type and similar to those Events of Default set forth in the Existing Credit Agreement (but, for the avoidance of doubt, including Events of Default arising as a result of the commencement of a government investigation or proceeding involving an Obligor that could reasonably be expected to cause a Material Adverse Effect (as defined in the Existing Credit Agreement). |
| Default, Acceleration, other Remedies | The Agent and Lenders shall be prohibited from and shall forbear from (x) declaring any defaults under the Term Loan Facility and (y) accelerating any debt under the Term Loan Facility or otherwise exercising rights or remedies under the Term Loan Facility, in each case, for a period of ninety-one (91) days either following the closing of the Out-of-Court Transaction or the Effective Date.  This provision shall be non-amendable. |
| Documentation Principles | The definitive documentation for the Term Loan Facility shall reflect the provisions set forth in this term sheet and shall otherwise be substantially consistent with the Existing Credit Agreement and Loan Documents (as defined in the Existing Credit Agreement), adjusted to reflect (i) the elimination of the revolving credit facility, swing line facility and letter of credit facility; (ii) the Obligors' existing financial condition, the Out-of-Court Transaction or prepackaged bankruptcy plan, as applicable, and other revisions to account for changes to  the Obligors' corporate structure and business related to the foregoing, (iii) a cap (to be mutually agreed) on the aggregate amount of assets of and revenues that can be derived from Unrestricted Subsidiaries (as defined in the Existing Credit Agreement) and (iv) other items to be reasonably agreed (collectively, the "Documentation Principles").   Each reference in this term sheet to the phrase "substantially consistent with Existing Credit Agreement", "substantially similar to . . . the Existing Credit Agreement", "similar to those Events of Default set forth in |

| | the Existing Credit Agreement" or any similar phrase shall be subject to the Documentation Principles. With respect to terms and conditions not addressed herein or in any final Restructuring documentation based upon this term sheet, those terms and conditions shall be reasonably agreed in good faith negotiations between the Lenders and Borrowers, and shall be usual and customary for similarly situated facilities of this type. |
|---|---|
| Assignments | The Lenders will be permitted to make assignments in respect of the Term Loan Facility in a manner substantially consistent with the assignment provisions set forth in the Existing Credit Agreement; provided, that the Borrowers' consent shall only be required to consummate such assignments to the extent that no Events of Default are then continuing. |
| Expenses and Indemnification; Yield Protection and Taxes | Usual and customary for financings of this type and substantially similar to similar provisions set forth in the Existing Credit Agreement provided that there shall be no cap thereunder in regards to reimbursable fees, costs and expenses, including without limitation, legal fees. |
| Governing Law and Forum | New York |

24

**ANNEX C**

**CREATION OF CORPORATE CLAIM AND LENDER LITIGATION TRUSTS**

| | |
|---|---|
| Creditor and Individual Lender Claim Litigation Trusts | Immediately following the transfer of 100% of the equity in reorganized Millennium to the Lenders (the, "Transfer Date") whether pursuant to an Out-of-Court Transaction or an Approved Plan, two litigation trusts shall be created–the "Millennium Corporate Claim Trust" and the "Millennium Lender Claim Trust" (together, the "Trusts"), which trusts shall constitute "grantor trusts" under the Internal Revenue Code, and each of which shall be funded by the reorganized Millennium in such amount and/or receive such other tangible or intangible assets as the reorganized Millennium shall determine. The materials distributed in connection with the Solicitation shall contain a description of the material terms and conditions concerning the formation, organization, operation, funding and powers of such Trusts as contemplated by the Ad Hoc Consortium of Lenders. |
| Grant of Claims to the Trusts | On the Transfer Date, any and all claims and causes of action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) belonging to the Company or the Agent under the Existing Credit Agreement other than Released Claims against Released Parties) (collectively, the "Retained Corporate Causes of Action") shall be contributed to the Millennium Corporate Claim Trust for prosecution, settlement, or other liquidation, in the discretion of the Trustee (defined below). On the Transfer Date, each of the Participating Lenders shall contribute or be deemed to have contributed any and all of their individual claims and causes of action against any person or entity related to the Debtors (other than Released Claims against Released Parties) to the Millennium Lender Claim Trust for prosecution, settlement or other liquidation, in the discretion of the Trustee (the "Lender Causes of Action"; and together with the Retained Corporate Causes of Action, the "Causes of Action"). |
| Contribution by the Debtors | The Steering Committee for the Ad Hoc Consortium of Lenders contemplate that the Millennium Corporate Claim Trust shall be funded by an initial contribution made by the reorganized Millennium on the Transfer Date of $1,000,000 and the Millennium Lender Claim Trust shall be funded by an initial contribution to be made by the reorganized Millennium on the Transfer Date in the amount of $2,000,000.00. In addition, on the Transfer Date, the Trusts and the reorganized Millennium shall enter into a $7 million Delayed Draw Facility with the Trusts pursuant to which the reorganized Millennium shall advance up to $7,000,000 in additional funds in respect of fees and costs of the Trusts at the request of their respective Trust Advisory Boards. Notwithstanding the existence of the $7,000,000 facility, the reorganized Millennium shall also be obligated to pay the reasonable fees and expenses of administering the Trusts and liquidating the Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor. Amounts contributed, advanced or paid by reorganized Millennium to the Trusts (including, but not limited, draws on the Delayed Draw Term Loan) shall be reimbursed to it, without interest, from net proceeds recovered by the Trusts (i.e., gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Trusts and in connection with prosecution, settlement or liquidation of the Causes of Action which have |

25

| | |
|---|---|
| | not previously been reimbursed or paid by the reorganized Millennium). |
| Beneficiaries | All Lenders shall be the beneficiaries of the Millennium Corporate Claim Trust. Participating Lenders shall be the sole beneficiaries of the Millennium Lender Claim Trust. In each case, the Lenders who are beneficiaries of each Trust shall hold beneficial interests therein in the same proportion as the principal amount of the Loans they hold under the Existing Credit Agreement as of the record date used for purposes of the Solicitation bears to the total amount of Loans held by Lenders who are beneficiaries of that Trust. |
| Non-Contributing MLH Shareholder Claims and Causes of Action | With respect to any proceeds recovered by the Millennium Corporate Claim Trust or Millennium Lender Trust from any claims or causes of action against non-contributing MLH Shareholders, such proceeds shall be distributed first to the contributing MLH Shareholders, up to the amount of the non-contributing MLH Shareholders pro-rata share of the MLH Contribution, and second to the Lenders or Participating Lenders, as applicable. |
| Governance | Each of the Trusts shall be governed by a three-member board appointed by an Ad Hoc Group Majority (the "Trust Advisory Board"). Among its other duties, the Trust Advisory Board shall select a trustee or trustees for the Trusts and if necessary, a replacement Trustee therefor. |
| Tax Reporting | Subject to Annex F, all parties agree to characterize and report the creation of the Trusts, the transfer of claims to the Trusts, the transfer of Trust beneficial interests to the Lenders, and the transfer of 100% of the equity in Reorganized Millennium to the Lenders as an integrated transaction for tax purposes. Such integrated transaction shall be characterized and reported as each Lender's receipt, in full and final satisfaction of the obligations under the Existing Loan Documents, of its pro rata share of and interest in (i) 100% of the equity in reorganized Millennium and (ii) 100% of the beneficial interests in the Millennium Corporate Claim Trust. The grantor trusts and the contributions to the grantor trusts shall be structured in a tax-efficient manner as determined by the Lenders, and all parties hereto agree to report for all tax purposes in a manner consistent therewith. |
| Forms of Trust Agreements | Forms of Trust Agreements for each Trust shall be included in the Solicitation Materials. |

26

**ANNEX D**

**EXISTING CREDIT AGREEMENT AMENDMENTS**

In connection with the Solicitation of consent to the Restructuring Transaction, the Consenting Lenders shall consent to the following amendments to the Existing Credit Agreement effective as of the consummation of the Restructuring Transactions whether through the Out-of-Court Transaction or an Approved Plan:

| Waiver of Defaults | Any defaults and/or events of default under the Existing Credit Agreement as of the date the Restructuring Transactions are consummated through an Out-of-Court Transaction shall be permanently waived. |
|---|---|
| Forbearance | The Lenders remaining under the Existing Credit Agreement as of the date the Restructuring Transactions are consummated and the Agent shall be prohibited (and shall forebear) from declaring any defaults under the Existing Credit Agreement and the other Loan Document (as defined in the Existing Credit Agreement), accelerating any of the loans or other obligations under the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) or otherwise exercising any of their rights or remedies under the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) for a period of ninety-one (91) days following the closing of the Out-of-Court Transaction and Effective Date. |
| Deleted Provisions | The following provisions of the Existing Credit Agreement shall be deleted:<br><br>(a)      Section 2.11(a) (Mandatory Prepayment/Proceeds of Indebtedness);<br><br>(b)      Section 2.11(b) (Mandatory Prepayment/Proceeds from Asset Sale and Recovery Event);<br><br>(c)      Article IV (Representations and Warranties);<br><br>(d)      Article VI (Affirmative Covenants) with the exception of Section 6.13<br><br>(e)      Article 7 (Negative Covenants); and<br><br>(f)      Sections 8.1(b), (c), (d), (e), (g), (h), (i), (j), (k) and (l) (Events of Default). |
| Pro Rata Treatment of Payments | Section 2.17 (Pro Rata Treatment of Payments) shall be revised to (x) expressly permit the contemplated exchange of loans under the Existing Credit Agreement ("Term Loans") for loans under the exit facility, the terms of which are set forth in Annex B (such exit facility, the "Exit Facility") (y) provide for the subordination of the liens securing the obligations under the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) to the liens securing the obligations under the Exit Facility and Early Commitment Facility and (z) the incurrence by Millennium of the Early Commitment Facility. |
| Prohibition of Assignment | Section 10.6 shall be amended to provide that any assignment of Term Loans and/or other Obligations (as defined in the Existing Credit Agreement) and the granting of participations in any Term Loans and other Obligations (as defined in the Existing Credit Agreement), in each case, by any Lender |

27

| | under Existing Credit Agreement, is prohibited. |
|---|---|
| Intercreditor and Subordination | The Consenting Lenders shall authorize the Administrative Agent to enter into an intercreditor and subordination agreement on customary and reasonable terms according priority to the liens securing the Exit Facility and Early Commitment Facility over the liens securing the Existing Credit Agreement. |
| Excess Cash Flow | Section 2.11(c) shall be amended to provide that no Excess Cash (7) Flow (as defined in the Existing Credit Agreement) payment shall be payable if an excess cash flow payment is payable under the Exit Facility. |

**ANNEX E**

**PROHIBITED ACTIONS DEEMED OUTSIDE OF THE ORDINARY COURSE OF BUSINESS**

During the pendency of the Restructuring Support Agreement, Millennium shall not undertake any of the following actions without the consent of the Ad Hoc Group, which consent shall not be reasonably withheld.[1] Upon receiving notice and request for consent to any of the actions prohibited under Annex E, the Ad Hoc Group shall not be deemed to have consented to such actions unless the Ad Hoc Group advises Millennium within five (5) business days after receiving such notice that it consents to such action. For the avoidance of doubt, the following actions shall only apply to actions taken after the signing of the Restructuring Support Agreement through the Closing Date or the Effective Date.

| | |
|---|---|
| Indebtedness | Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except as permitted under Sections 7.2(c), (e) (provided that the dollar amount of such Indebtedness under this clause (e) shall be limited to one million dollars ($1,000,000) during the pendency of the Restructuring Support Agreement), (j) (provided that the dollar amount of such Indebtedness under this clause (j) shall be limited to one million dollars ($1,000,000) during the pendency of the Restructuring Support Agreement), (l), (m), (n) or (r) of the Existing Credit Agreement. |
| Liens | Create, incur, assume or suffer to exist any Lien upon any of its property, except liens securing the obligations under the Existing Credit Agreement and as permitted under Sections 7.3(a), (b), (c), (d), (m), (o), (p) and (s) of the Existing Credit Agreement. |
| Disposition of Property | Dispose of any of its property, issue or sell any shares of such Restricted Subsidiaries Capital Stock to any Person except as permitted under Sections 7.5(a), (b), (d), (e), (g) or (h) of the Existing Credit Agreement. |
| Restricted Payments | Make any Restricted Payment except as permitted under Sections 7.6 (a), (c) or (i) (provided that any payments under clause (i) shall only be permitted to the extent expressly permitted under this Annex E) of the Existing Credit Agreement.<br><br>For the avoidance of doubt, notwithstanding anything in this Annex E or any provision of this Term Sheet to the contrary, no further distributions or payments (other than scheduled payments of rent and other charges coming due under the JS Real Estate Leases and payments in connection with the purchase of supplies and inventory from Millennium Laboratories Clinic Supply, Inc. at prices not in excess of arm's-length terms consistent with Section 7.10(a) of the Existing Credit Agreement) will be made to any TA Shareholder or MLH Shareholder or any Related Party (as defined below) to |

---

[1] Capitalized terms used herein and not defined herein or in the Restructuring Support Agreement or the Restructuring Term Sheet shall have the same meaning as in the Existing Credit Agreement. All section references herein are to the Existing Credit Agreement.

|  | TA or MLH. |
|---|---|
| Investments/Subsidiaries/Joint Ventures | Make any Investment other than as permitted under Sections 7.8 (a), (b), (c), (d) (provided that the dollar amount of such Investments under this clause (d) shall be limited to one million dollars ($1,000,000) during the pendency of the Restructuring Support Agreement), (e), (f), (i) and (k) of the Existing Credit Agreement. Create any Subsidiaries, or enter into any joint venture, or similar agreement. |
| Issuance of Stock | Issue, deliver, sell, or authorize (i) any additional shares of capital stock or other form of equity, (ii) securities convertible into capital stock or any other form of equity, or (iii) subscriptions, rights, warrants or options to acquire capital stock or other form of equity. |
| Amendments to Charter Documents | Amend or propose to amend its charter or other organizational documents except as contemplated by the Restructuring Term Sheet. |
| Modification of Compensation/Benefits | Modify compensation/benefit arrangements with senior-management level employees or independent contractors by more than $100,000 (provided that in the aggregate such amounts do not exceed $1,000,000 and absolutely no increases in the compensation of the Senior Executives may be made without consent of an Ad Hoc Group Majority); enter into new arrangements with senior-management level employees or independent contractors; grant severance or termination pay to senior management-level employees in amounts greater than $100,000 (provided that in the aggregate such severance and termination payments do not exceed $1,000,000 and absolutely no increases in the compensation of the Senior Executives may be made without consent of an Ad Hoc Group Majority); enter into collective bargaining agreements; establish, adopt, enter into or amend any bonus, profit sharing, thrift, compensation, stock option, restricted stock, pension, retirement, deferred compensation, employment, termination or severance or other plan, trust, fund, policy or arrangement applicable to any senior-management level employee. |
| Litigation | Initiate, compromise, release or settle any material litigation, investigation or arbitration proceeding except for the DOJ Settlement, in a manner that would require payment by the company in excess of $1,000,000. All claims against any of the Excluded Parties shall be considered material and shall not be released or settled. |
| Material Contracts | Modify, amend or terminate any material contract pursuant to which Millennium makes or receives payments in excess of $10,000,000 on an annual basis or waive, release or assign any material rights or claims including, but not limited to, compromise of any material accounts receivable in excess of $1,000,000. |
| Tax | Make or rescind tax elections, settle or compromise any tax liability or amend any tax return.<br><br>The prohibition on making or rescinding tax elections shall also be subject to |

|  | Annex F. Therefore, no party (other than the Lenders with respect to post-closing tax periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities. The Ad Hoc Group shall not be deemed to have consented to any such election identified in Annex F. |
|---|---|
| Capital Expenditures | Make any capital expenditure in excess of $1,000,000. |
| Accounting Methods | Change its methods of accounting (except as required by law or GAAP). |
| Employee Indebtedness | Forgive Indebtedness owed by any employee (of Holdings, the Borrower or any of their respective Subsidiaries) to Holdings, the Borrower or any of their respective Subsidiaries. |

**ANNEX F**

**RESTRUCTURING TRANSACTIONS TAX MATTERS**

| Restructuring Transactions Tax Matters | |
|---|---|
| Tax Treatment of the Restructuring | All income and gain resulting from the cancellation or modification of debt or claims shall be allocated to MLH and TA in accordance with the Holdings LLC agreement.<br><br>100% of the existing equity of Millennium, a disregarded entity, shall be cancelled and 100% of the equity of reorganized Millennium shall be issued to Lenders, in a transaction which shall constitute the acquisition of the assets of Millennium by Lenders; the Lenders shall form New Holdco, to which the equity of reorganized Millennium shall be contributed by Lenders in exchange for 100% of the stock of New Holdco in a transaction constituting a Section 351 exchange. |
| Section 754 Election | Holdings and any of its subsidiaries that are treated as partnerships for federal and state income tax purposes) shall make elections under Section 754 of the Internal Revenue Code of 1986, as amended (the "Tax Code") for the taxable year of the partnership in which the restructuring occurs, if one is not already in place. |
| Tax Matters and Reporting | Millennium, Holdings, MLH, TA, the Lenders, New Holdco, and the Shareholders shall file all tax returns consistent with the characterization provided herein and in the Plan of Reorganization, unless otherwise required by a final "determination" within the meaning of Section 1313 of the Tax Code.<br><br>The present owners of TA and/or TA will receive all tax refunds and tax benefits of TA. TA and the present owners of TA will be responsible for and will make no claims against the Lenders, New Holdco the Company, MLH or the owners of MLH for any taxes of TA, or the present owners of TA, respectively.<br><br>The present owners of MLH will receive all tax refunds and tax benefits of MLH. MLH and the present owners of MLH will be responsible for and will make no claims against the Lenders, the Company, TA or the owners of TA for any taxes of MLH, or the present owners of MLH, respectively.<br><br>MLH, TA and Holdings will make no claims against the Lenders, Millennium or New Holdco for any taxes of Holdings. Lenders will not be allocated any income or tax liabilities from Holdings for any tax periods nor will Lenders be allocated any income or tax liabilities attributable to Millennium's assets for the pre-closing period.<br><br>Any deductions for the $256m DOJ payment shall be a pre-closing deduction of Holdings and shall be allocated 55/45 to MLH and TA, respectively. Any deductions for the Settlement Contribution shall be a pre-closing deduction of Holdings to the extent permitted by law and shall be allocated 55/45 to MLH and TA, respectively. It is understood that any other such deductions allocated to MLH while MLH is an S corporation will be allocated out to MLH's historic owners and such deductions shall be for the benefit of the historic MLH shareholders. It is understood that for tax |

32

| | purposes the transfer of the interests in Millennium shall be treated as the transfer of assets owned by Millennium by Holdings to the Lenders. It is further understood that after the transfer of the interests in Millennium to the Lenders, Holdings shall have no liability with respect to the debt owed to the Lenders. It is also understood that Holdings intends to treat any of the debt owed to the Lenders in excess of the value of Millennium as resulting in debt cancellation income to Holdings for tax purposes.<br><br>New Holdco to be responsible for all post-closing taxes of Millennium, and to receive all post-closing tax refunds and benefits of Millennium attributable to the post-closing period.<br><br>Millennium, Holdings, MLH, TA, the Lenders, New Holdco, and the historic owners of both TA and MLH to work cooperatively and collectively with respect to tax reporting and to take consistent tax positions. Neither New Holdco nor any Lender shall (i) file or amend any tax return of Millennium or its subsidiaries for any pre-closing tax period, except as required by law, or (ii) enter into any voluntary disclosure agreements, enter into any settlements, forego any right to a refund, or extend the statute of limitations of a tax, in each case with respect to a pre-closing tax period, if such action would reasonably be likely to adversely affect the historic owners of TA or MLH, without the consent of the historic owners of TA and MLH, which consent shall not be unreasonably withheld or delayed.<br><br>All income tax returns and similar tax returns of Holdings will be prepared jointly by TA and MLH. Both TA and MLH will have the right to approve such tax returns prior to the filing of such tax returns. Holdings will be liquidated for tax purposes no later than February 28, 2016. Holdings will continue to be classified as a partnership for tax purposes until its liquidation for tax purposes. Millennium and its subsidiaries shall continue to be classified as disregarded entities for all tax purposes until the transfer of the interests in reorganized Millennium to the Lenders. No party (other than the Lenders with respect to post-closing tax periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities. |

33

**EXHIBIT A**

**AD HOC GROUP OF LENDERS**

1. Ares Management LLC
2. Brigade Capital Management, LP
3. Eaton Vance Management
4. Invesco Ltd.
5. Marathon Asset Management LP
6. Oppenheimerfunds Inc.
7. Symphony Asset Management LLC
8. THL Credit Advisors, LLC
9. THL Credit Senior Loan Strategies, LLC

EXHIBIT 2

JOINDER

JOINDER

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of October [__], 2015 (the "Agreement"), by and among Millennium Lab Holdings II, LLC ("Holdings"), Millennium Health, LLC ("Millennium"), and all of Millennium's direct and indirect subsidiaries (collectively, the "Company"), **[Transferor's Name]** ("Transferor"), and certain other parties signatory thereto, and agrees to be bound by the terms and conditions thereof to the extent Transferor was thereby bound, and shall be deemed a "Participating Lender" under the terms of the Agreement.

Date Executed:  _____, 201_

**TRANSFEREE**

Name of Institution:  _____

By:  _____
Name:  _____
Its:  _____
Telephone:  _____
Facsimile:  _____

**Existing Credit Agreement Claims**

$  _____

EXHIBIT 3

MATERIAL ADVERSE EVENTS

(a)     For the cumulative period between October 1, 2015 and three business days prior to the Effective Date of a Plan of Reorganization (ED Test Date),[1] Total Revenue and EBITDA are less than 80% of the forecast for such period excluding, in each case, any prior period negative adjustments that were not already identified in the forecast for periods prior to October 1, 2015.  For any partial month in which the ED Test Date falls, the total volume of UDT specimens for the 30-day period (or 31-day period, as applicable and, in each case, excluding legal holidays) preceding the ED Test Date are less than 80% of the forecasted total volume for such month.

(b)     Between October 1, 2015 and the ED Test Date actual terminations of commercial payor contracts, which payor contracts account for more than 15% of total revenues in the aggregate as reflected in 2016 forecast (as adjusted pro forma for commercial payor contracts entered into following October 1, 2015).

(c)     Prior to the ED Test Date, other than the proposed CMS pricing announced on September 25, 2015, any changes to government or individual commercial payor policies covering UDT implemented after September 30, 2015 and prior to the ED Test Date, that collectively, on a pro forma basis for all of 2015 as if the change occurred effective January 1, 2015, would have had a negative impact on 2015 forecasted EBITDA of more than 15% (net of the offset that the Company would be reasonably expected to have realized as a result of implementing commercially reasonable mitigation strategies, which mitigation strategies shall in no event be more than 10% of 2015 forecasted EBITDA, in response to any such changes).

(d)     Prior to the ED Test Date, the Company becomes aware that it is the target of any new action, litigation, investigation or proceeding by CMS, the DOJ or another governmental entity that would reasonably be expected to have a material adverse impact on the Company's operations.  The Company will notify the professionals to the Ad Hoc Lenders of any new action, litigation, investigation or proceeding by CMS, the DOJ or another governmental entity within 2 business days of the Company becoming aware of any such action, litigation, investigation or proceeding and provide details of such item to the Ad Hoc Lenders' professionals.

(e)     Management fails to attest in writing as of the ED Test Date that they still reasonably believe that 2016 forecasted EBITDA will not be less than $112.5 million.

(f)     Management fails to attest in writing as of the ED Test Date that they reasonably believe that as of the Effective Date, restructuring and other debt like obligations (other than reinstated lender debt obligations) would not exceed by more than 20% the amounts reflected in the most recent forecast provided to the Ad Hoc Lenders (e.g., $145mm threshold).

(g)     A material breach of the Corporate Integrity Agreement or Settlement Agreement with the DOJ as set forth in a written notice by the DOJ.

---

[1]     The Target Restructuring Effective Date is December 15, 2015, and the outside date is December 30, 2015.

(h)     Revocation of Medicare billing privileges, or a suspension of Medicare reimbursements by CMS that is not reasonably expected to be lifted contemporaneously with the occurrence of the Effective Date and the payment of unpaid amounts under the Settlement Agreement.

(i)     Loss of lab license.

For the purposes of, and in connection with, the foregoing Material Adverse Events:

(a)     A schedule shall be attached hereto reflecting monthly UDT volume, EBITDA and Total Revenue, which is the same as the forecast provided to FTI on July 29, 2015.

(b)     The Company shall provide financial reporting on a monthly basis to the professionals for the Ad Hoc Group as previously agreed plus a certificate with sufficient detail to verify compliance.

(c)     Revenue is as booked in accordance with GAAP and EBITDA is used herein as defined in the Existing Credit Agreement for 2015 figures and for 2016 calculated consistent with the forecast provided to the Lenders on July 29, 2015.

## UDT Volume, EBITDA and Total Revenue Schedule

|  | Oct-15 | Nov-15 | Dec-15 |
|---|---|---|---|
| UDT Volume | 218,747 | 218,747 | 218,747 |
| Total Revenue (in '000's) | $45,389 | $45,419 | $45,182 |
| Total EBITDA (in '000's) | $19,327 | $19,340 | $18,718 |

**EXHIBIT 2**

**BLACKLINE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
- - - - -           :
            :   Chapter 11
In re:           :
            :   Case No. 15-12284 (——LSS)
MILLENNIUM LAB HOLDINGS II, LLC, et al., :
            :   ~~Joint Administration Pending~~Jointly
Debtors.[1]         :   Administered
            x
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - -

---

## **AMENDED PREPACKAGED JOINT PLAN OF REORGANIZATION OF MILLENNIUM LAB HOLDINGS II, LLC, et al.**

---

Dated:   ~~October 29~~December 9,   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2015

              Anthony W. Clark (I.D. No. 2051)
              Jason M. Liberi (I.D. No. 4425)
              One Rodney Square
              P.O. Box 636
              Wilmington, Delaware 19899-0636
              T: (302) 651-3000
              F: (302) 651-3001

              – and –

              Kenneth S. Ziman ~~*(pro hac vice admission pending)*~~
              Raquelle L. Kaye ~~*(pro hac vice admission pending)*~~
              Four Times Square
              New York, New York 10036-6522
              T: (212) 735-3000
              F: (212) 735-2000

              – and –

              Felicia Gerber Perlman ~~*(pro hac vice admission pending)*~~
              Matthew Kriegel ~~*(pro hac vice admission pending)*~~
              155 N. Wacker Drive
              Chicago, Illinois 60606-1720

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California 92127.

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

Telephone: (312) 407-0700
Fax: (312) 407-0411

*Proposed Counsel to Debtors and Debtors in Possession*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

ARTICLE I RULES OF INTERPRETATION, COMPUTATION OF TIME,
        GOVERNING LAW AND DEFINED TERMS ................................................ 1
    A.    Rules of Interpretation, Computation of Time and Governing Law ............ 1
    B.    Definitions .................................................................................................... 2

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ............................................. 19
    A.    Administrative Claims .................................................................................. 19
    B.    Priority Tax Claims ...................................................................................... 20

ARTICLE III CLASSIFICATION AND TREATMENT OF CLASSIFIED
        CLAIMS AND EQUITY INTERESTS .......................................................... 21
    A.    Introduction .................................................................................................. 21
    B.    Summary of Classification and Treatment of Classified Claims and Equity
        Interests ....................................................................................................... 21
    C.    Classification and Treatment of Claims and Equity Interests ...................... 21
    D.    Special Provision Governing Unimpaired Claims ........................................ 27
    E.    Discharge of Claims ..................................................................................... 27
    F.    Alternative Treatment .................................................................................. 27

ARTICLE IV ACCEPTANCE OR REJECTION OF THE PLAN ..................................... ~~27~~28
    A.    Presumed Acceptance of Plan ...................................................................... ~~27~~28
    B.    Deemed Rejection of Plan ............................................................................ 28
    C.    Voting Classes ............................................................................................. 28
    D.    Acceptance by Impaired Classes of Claims ................................................. 28
    E.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ............ 28

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ................................... 28
    A.    General Settlement of Claims ....................................................................... 28
    B.    Corporate Existence ..................................................................................... ~~29~~30
    C.    Vesting of Assets in the Reorganized Debtors ............................................. 30
    D.    New Term Loan; Sources of Consideration for Plan Distributions .............. 30
    E.    New Holdco Common Stock Issued Under the Plan ..................................... 31
    F.    Millennium Corporate Claim Trust .............................................................. 31
    G.    Millennium Lender Claim Trust ................................................................... 33
    H.    Issuance of New Securities and Related Documentation .............................. 34
    I.    Release of Liens, Claims and Equity Interests ............................................. 35
    J.    Reservation of Certain Claims of Governmental Units ................................ 35
    K.    New Holdco and Reorganized Debtors Organizational Documents .............. 36
    L.    Directors and Officers of Reorganized Debtors ........................................... 36

i

M.    Restructuring Transactions  37
N.    Corporate Action  37
O.    Cancellation of Notes, Certificates and Instruments  38
P.    Preservation and Maintenance of Debtor Causes of Action  3839
Q.    Exemption from Certain Transfer Taxes  3940
R.    Certain Tax Matters  40
S.    Further Transactions  42

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND
    UNEXPIRED LEASES  4243
A.    Assumed Contracts and Leases  4243
B.    Assignment of Executory Contracts or Unexpired Leases  43
C.    Rejection of Executory Contracts or Unexpired Leases  44
D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases  44
E.    Assumption of Officer Insurance Policies  4445
F.    Indemnification Provisions  45
G.    Compensation and Benefit Programs  4546
H.    Workers' Compensation Benefits  46
I.    Third Party Payer Contracts  4647
J.    Medicare and Medicaid Agreements  4647

ARTICLE VII PROVISIONS GOVERNING DISTRIBUTIONS  4748
A.    Distribution Record Date  4748
B.    Dates of Distributions  4748
C.    Distribution Agent  4748
D.    Cash Distributions  4849
E.    Rounding of Payments  4849
F.    Distributions on Account of Allowed Claims  4849
G.    General Distribution Procedures  4950
H.    Address for Delivery of Distributions  4950
I.    Undeliverable Distributions and Unclaimed Distributions  4950
J.    Withholding Taxes  4950
K.    Setoffs  5051
L.    Surrender of Cancelled Instruments or Securities  5051
M.    Lost, Stolen, Mutilated or Destroyed Securities  5051

ARTICLE VIII CONDITIONS PRECEDENT TO THE PLAN'S
    CONFIRMATION AND EFFECTIVE DATE  5152
A.    Conditions to Confirmation  5152
B.    Conditions to Effective Date  5152
C.    Conditions to the Equity Transfer Date  5253
D.    Waiver of Conditions  5354
E.    Effect of Non Occurrence of Conditions to the Effective Date  5354

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

ARTICLE IX RETENTION OF JURISDICTION ................................................................. 5354
    A.    Retention of Jurisdiction ............................................................. 5354
    B.    Lack of Bankruptcy Court Jurisdiction ...................................... 5556
    C.    Failure of Bankruptcy Court to Exercise Jurisdiction ................ 5556

ARTICLE X EFFECTS OF CONFIRMATION ..................................................................... 5556
    A.    Binding Effect ............................................................................. 5556
    B.    Subordination Rights ................................................................... 5657
    C.    Discharge of the Debtors ............................................................. 5657
    D.    Exculpation and Limitation of Liability ...................................... 5657
    E.    Releases by Debtor ...................................................................... 5758
    F.    Releases by TA and MLH ........................................................... 5859
    G.    Releases by Lender Releasing Parties ......................................... 5960
    H.    Releases by Third Party Releasing Parties .................................. 6061
    I.    Waiver of Limitations on Releases of Unknown Claims ............. 6162
    J.    Bar Order ..................................................................................... 6163
    K.    Injunction .................................................................................... 6264
    L.    Retained Claims .......................................................................... 6265
    M.    Other Obligations With Respect To Released Parties .................. 6567

ARTICLE XI MISCELLANEOUS PROVISIONS ................................................................. 6668
    A.    Dissolution of the Committee ...................................................... 6668
    B.    Payment of Statutory Fees .......................................................... 6668
    C.    Modification of Plan ................................................................... 6668
    D.    Revocation of Plan ...................................................................... 6769
    E.    Severability of Plan Provisions ................................................... 6769
    F.    Successors and Assigns ............................................................... 6769
    G.    Term of Injunctions or Stays ...................................................... 67
    HG.    Reservation of Rights .................................................................. 6869
    IH.    Further Assurances ...................................................................... 6870
    JI.    Notices to Debtors ...................................................................... 6870
    KJ.    Governing Law ........................................................................... 7173
    LK.    Exhibits ....................................................................................... 7173
    ML.    No Strict Construction ................................................................ 7173
    NM.    Conflicts ...................................................................................... 7173

PLAN EXHIBITS

| | |
|---|---|
| Exhibit A | Millennium Corporate Claim Trust Agreement |
| Exhibit B | Millennium Lender Claim Trust Agreement |
| Exhibit C | New Holdco Charter |
| Exhibit D | New Holdco Bylaws |
| Exhibit ~~F~~E | New Term Loan Agreement |

PLAN APPENDICES

Appendix 1   RSA

iv

JOINT PLAN OF REORGANIZATION OF
MILLENNIUM LAB HOLDINGS II, LLC, et al.

**INTRODUCTION**

Millennium Lab Holdings II, LLC, a Delaware limited liability company, together with the above-captioned debtors (each a "Debtor" and collectively, the "Debtors") hereby proposes this prepackaged joint plan of reorganization (the "Plan") for, among other things, the resolution of the outstanding Claims against, and Equity Interests in, the Debtors. Unless otherwise noted, capitalized terms used in this Plan have the meanings set forth in Article I.B of the Plan. The Debtors are the proponents of this Plan within the meaning of section 1129 of the Bankruptcy Code. Reference is made to the Disclosure Statement (as such term is defined herein and distributed contemporaneously herewith) for a discussion of the Debtors' history, business, properties, events leading up to Solicitation of the Plan, projections, and for a summary and analysis of this Plan and the treatment provided for herein. The Debtors urge all Holders of Impaired Claims (as defined below) to review the Disclosure Statement and Plan in full. There also are other agreements and documents that will be filed with the Bankruptcy Court that are referenced in this Plan, the Plan Supplement or the Disclosure Statement as Exhibits. All such Exhibits are incorporated into and are a part of this Plan as if set forth in full herein. Subject to certain restrictions set forth in the RSA (as defined herein), this Plan, and requirements set forth in 11 U.S.C. § 1127 and Fed. R. Bankr. P. 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to the Effective Date.

If the Plan cannot be confirmed as to some or all of the Debtors, then, in the Debtors' sole discretion, but without prejudice to the respective parties' rights under the RSA, (a) the Plan may be revoked as to all of the Debtors, or (b) the Debtors may revoke the Plan as to any Debtor (and any such Debtor's Chapter 11 Case may be converted to a chapter 7 liquidation, continued or dismissed in the Debtors' sole discretion) and confirm the Plan as to the remaining Debtors to the extent required. The Debtors reserve the right to seek confirmation of the Plan pursuant to the "cram down" provisions contained in section 1129(b) of the Bankruptcy Code with respect to any non-accepting Class of Claims.

**ARTICLE I**

**RULES OF INTERPRETATION, COMPUTATION OF TIME,
GOVERNING LAW AND DEFINED TERMS**

**A.    Rules of Interpretation, Computation of Time and Governing Law**

For purposes hereof: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means

– 1 –

that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles", "Sections", and "Exhibits" are references to Articles, Sections, and Exhibits hereof or hereto; (e) unless otherwise stated, the words "herein," "hereof," "hereunder" and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) any reference to an Entity as a Holder of a Claim or Equity Interest includes such Entity's successors and assigns; (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be and (j) "$" or "dollars" means dollars in lawful currency of the United States of America. The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

## B.     Definitions

1.1     "Ad Hoc Group" means the members of the ad hoc group of Prepetition Lenders represented by Brown Rudnick LLP and listed on Exhibit A to the RSA term sheet, as amended from time to time as provided for in the RSA.

1.2     "Ad Hoc Group Majority" has the meaning set forth in the RSA.

1.3     "Administrative Agent" means Wilmington Savings Fund Society, FSB as successor administrative agent under the Existing Credit Agreement.

1.4     "Administrative Agent Fees" means the fees, expenses, and indemnities payable to the Administrative Agent, in its capacity as administrative agent, under the terms of the Existing Loan Documents.

1.5     "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtors' Estates and operating their businesses, including wages, salaries, or commissions for services rendered, (b) Professional Fee Claims and any other compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses Allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date, and (c) all fees and charges assessed against the Estates under chapter 123 of title 28, United States Code.

1.6     "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

– 2 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

1.7 "Allowed" means, with respect to any Claim or Equity Interest, such Claim or Equity Interest or any portion thereof that the Debtors have assented to the validity of or that has been (a) allowed by an order of the Bankruptcy Court, (b) allowed pursuant to the terms of this Plan, (c) allowed by agreement between the Holder of such Claim or Equity Interest and the Debtors or Reorganized Debtors, or (d) allowed or held to be valid or enforceable by an order or judgment of a court or other tribunal in which such Claim could have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" or an Equity Interest as an "Allowed Equity Interest," the Debtors do not waive their rights to contest the amount and validity of such Claim or Equity Interest to the extent it is disputed, contingent or unliquidated, in the manner and venue in which such Claim or Equity Interest would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced; and provided, further that the amount of any Allowed Claim or Allowed Equity Interest shall be determined in accordance with the Bankruptcy Code, including sections 502(b), 503(b) and 506 of the Bankruptcy Code.

1.8 "Approved Plan" has the meaning set forth in the RSA.

1.9 "Assumed Agreement" means an Executory Contract or Unexpired Lease which has been assumed by the Debtors.

1.10 "Avoidance Actions" means any and all avoidance, recovery, subordination or other actions or remedies that may be brought by and on behalf of the Debtors or their Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies arising under chapter 5 of the Bankruptcy Code.

1.11 "Backstop MLH Shareholder" means any Contributing MLH Shareholder that funds a Non-Contributing MLH Shareholder's Pro Rata portion of the MLH Contribution.

1.12 "Ballots" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote may, among other things, indicate their acceptance or rejection of this Plan and consent to the releases, exculpations and related provisions provided for in this Plan, including the ballots cast on or before the Solicitation Termination Date.

1.13 "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended.

1.14 "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware or any other court with jurisdiction over the Chapter 11 Cases.

1.15 "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, the Local Rules, and the Federal Rules of Civil

– 3 –

Procedure, in each case as amended from time to time and as applicable to the Chapter 11 Cases or proceedings therein.

1.16 "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York.

1.17 "Cash" means legal tender of the United States of America.

1.18 "Cause of Action" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, foreseen or unforeseen, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action also includes: (a) any right of setoff, cross-claim, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (b) with respect to the Debtors, the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any Avoidance Action; and (f) any state law fraudulent transfer claim.

1.19 "Chapter 11 Cases" means the chapter 11 bankruptcy cases that may be commenced by the Debtors on the Petition Date in the Bankruptcy Court.

1.20 "CIA" means that certain Corporate Integrity Agreement between Millennium and OIG dated October 15, 2015.

1.21 "Claim" means a "claim" against the Debtors as defined in section 101(5) of the Bankruptcy Code.

1.22 "Class" means one of the classes of Claims or Equity Interests listed in Article III of the Plan.

1.23 "CMS" means the Centers for Medicare and Medicaid Services.

1.24 "Company" means the Debtors, collectively.

1.25 "Comparative Fault Reduction" has the meaning set forth in Article X.L(i).

1.26 "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order subject to all conditions specified in Article VIII.A having been satisfied, or waived as provided for in Article VIII.

– 4 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

1.27    "Confirmation Date" means the date of entry by the Bankruptcy Court of the Confirmation Order on its docket, within the meanings of Bankruptcy Rules 5003 and 9021.

1.28    "Confirmation Hearing" means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.29    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan entered pursuant to section 1129 of the Bankruptcy Code and in the form and with the provisions as required herein.

1.30    "Consenting Lender Indemnity-Related Rights" has the meaning set forth in Article V.O of this Plan.

1.30 1.31    "Consenting Lenders" has the meaning set forth in the RSA.

1.31 1.32    "Consistent With The Restructuring Term Sheet" has the meaning set forth in the RSA.

1.32 1.33    "Consummation Deadline" has the meaning set forth in Article V.S of this Plan.

1.33 1.34    "Contributing MLH Shareholder" means an MLH Shareholder that has contributed to funding the MLH Contribution.

1.34 1.35    "Core Released Claims" means, collectively, any and all claims, obligations (contractual or otherwise), suits, judgments, damages, rights, liabilities, or Causes of Action, whether known or unknown, foreseen or unforeseen, including direct and derivative claims, relating to any actions, transactions, events, or omissions taking place on or before the Effective Date arising out of, or in any way related to in any manner, the Company, the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, and the Restructuring Transactions and any transactions related thereto, including, without limitation, the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement and any and all claims arising out of, or related to in any manner, the negotiation, solicitation, due diligence, documentation, execution, implementation, administration, and or the enforcement of the Existing Credit Agreement and the transactions related thereto.  For the avoidance of doubt, Core Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agent as provided in Article V.O and Article VI.F of this Plan, any Retained Claims or claims against Excluded Parties.

1.35 1.36    "Cure" means the payment of Cash by the Debtors, or the distribution of other property or other action (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired

– 5 –

Lease of the Debtors that the Debtors may assume under section 365(a) of the Bankruptcy Code. For the avoidance of doubt, the cure of all Medicare and Medicaid Agreements is set forth in Article VI.J of this Plan.

1.361.37 "Debtor Releasing Parties" means the Debtors and the Reorganized Debtors, each in their individual capacities and as debtors in possession.

1.371.38 "Debtors" means Holdings, Millennium, and RxAnte, LLC, as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.381.39 "Disclosure Statement" means that certain Disclosure Statement for the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. under Chapter 11 of the Bankruptcy Code, as amended, supplemented, or modified from time to time, and that is prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.391.40 "Distribution Agent" means New Holdco or any party designated by New Holdco to serve as distribution agent under this Plan. Except for distributions of New Holdco Common Stock, which shall be effected by book entry by New Holdco, for purposes of distributions under this Plan to Holders of Allowed Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent. For purposes of distributions under this Plan to Holders of Early Commitment Facility Claims, the Early Commitment Facility Agent shall act as the Distribution Agent.

1.401.41 "D&O Liability Insurance Policies" means all insurance policies for officers' liability maintained by the Debtors as of the Petition Date.

1.411.42 "DHA" means the Defense Health Agency of the United States Department of Defense.

1.421.43 "Distribution Record Date" means the date of entry of the Confirmation Order.

1.431.44 "Early Commitment Deadline" means 12:00 p.m. (prevailing Eastern Time) on November 5, 2015.

1.441.45 "Early Commitment Facility" means that senior secured term loan, which is senior in lien priority to the Existing Credit Agreement Claims, dated as of November 5, 2015 among Millennium, as borrower, the Early Commitment Facility Agent, as administrative agent, and the Consenting Lenders that voted to approve a Qualified Out-of-Court Transaction and this Plan and the releases thereunder or hereunder by the Early Commitment Deadline, and which was distributed Pro Rata to the Consenting Lenders. Each Consenting Lender that participates in the Early Commitment Facility shall receive its Pro Rata share (based on all Existing Credit Agreement Claims held by Prepetition Lenders) of $50.0 million.

– 6 –

1.451.46 "Early Commitment Facility Agent" means Wilmington Savings Fund Society, FSB as administrative agent under the Early Commitment Facility and related loan documents.

1.461.47 "Early Commitment Facility Agent Fees" means the fees, expenses, and indemnities payable to the Early Commitment Facility Agent, in its capacity as administrative agent, under the terms of the Early Commitment Facility and loan documents related thereto.

1.471.48 "Early Commitment Facility Claim" means a Claim or obligation arising under or relating to the Early Commitment Facility other than the Early Commitment Facility Agent Fees. The aggregate of all Early Commitment Facility Claims shall be Allowed in an aggregate principal amount not to exceed $50.0 million, plus any and all accrued interest, fees, and other amounts due and payable under the Early Commitment Facility.

1.481.49 "Effective Date" means the date on which the Plan shall take effect, which date shall be a Business Day on which (a) all conditions in Article VIII.B of the Plan have been satisfied or waived as provided for in Article VIII and (b) consummation of the Restructuring Transactions has commenced.

1.491.50 "Entity" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

1.501.51 "Equity Defendants" has the meaning set forth in Article X.F(iii) hereof.

1.511.52 "Equity Interest" means all outstanding ownership interests in any of the Debtors, including any interest evidenced by common or preferred stock, membership interest, option, or other right to purchase or otherwise receive any ownership interest in any of the Debtors, or any right to payment or compensation based upon any such interest, whether or not such interest is owned by the Holder of such right to payment or compensation.

1.521.53 "Equity Transfer Date" means the date on which the Equity Interests in Reorganized Millennium are (i) transferred from the Holders of the Existing Equity Interests of Millennium to the Holders of Allowed Existing Credit Agreement Claims and (ii) immediately thereafter, transferred from the Holders of Allowed Existing Credit Agreement Claims to New Holdco, which date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA, and in any event shall be no later than December 31, 2015.

1.531.54 "Estates" means the estates of the Debtors in the Chapter 11 Cases, as created under section 541 of the Bankruptcy Code.

1.541.55 "Excluded Parties" means any party not expressly identified as one of the Released Parties, or as a Related Party of such Released Party, including but not

– 7 –

limited                                                  to
(a) Bank of Montreal, (b) BMO Capital Markets, (c) Citibank Global Markets Inc., (d) Citibank, N.A., (e) J.P. Morgan Securities LLC, (f) JPMorgan Chase Bank, N.A., in its individual corporate capacity and in its capacity as a Prior ~~Administrative~~ Agent, (g) KPMG LLP, (h) Skadden, Arps, Slate, Meagher & Flom LLP (including its partners and other attorneys), (i) Suntrust Bank, and (j) any affiliates or Related Parties of the foregoing parties listed in (a) through (i).

~~1.55~~1.56     "Exculpated Parties" means, collectively, (a) the Debtors, (b) the Reorganized Debtors, (c) the Settling Members, (d) the Ad Hoc Group, (e) the Participating Lenders, (f) the Administrative Agent, (g) the Early Commitment Facility Agent, and (h) each such party's Related Parties; provided, however, that, for the avoidance of doubt, no Excluded Party shall be an Exculpated Party.

~~1.56~~1.57     "Exculpation" means the exculpation provided in Article X.C hereof.

~~1.57~~1.58     "Executory Contract" means a contract to which any of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

~~1.58~~1.59     "Exhibit" means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement (as such exhibits are amended, modified, or otherwise supplemented from time to time).

~~1.59~~1.60     "Existing Credit Agreement" means that certain Credit Agreement, dated as of April 16, 2014, as amended by the Existing Credit Agreement Solicitation Amendment (as amended, supplemented, or otherwise modified from time to time), among Millennium, Holdings, the Administrative Agent, and the lenders from time to time party thereto.

~~1.60~~1.61     "Existing Credit Agreement Claim" means a Claim or obligation arising under or relating to the Existing Loan Documents, including the Existing Credit Agreement, other than the Prior Agent Indemnity Claims.  The aggregate of all Existing Credit Agreement Claims shall be Allowed in the aggregate amount of $1,752,812,500 in outstanding principal, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents other than the Prior Agent Indemnity Claims.

~~1.61~~1.62     "Existing Credit Agreement Solicitation Amendment" means that certain amendment to the Existing Credit Agreement that, among other things, allows the issuance of the Early Commitment Facility consistent with the terms of the RSA.

~~1.62~~1.63     "Existing Equity Interest" means an Equity Interest in any Debtor that is authorized, issued, and outstanding prior to the Effective Date.

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

1.631.64 "Existing Loan Documents" means the Existing Credit Agreement together with all related loan documentation.

1.641.65 "Federal Administrative Settlement Agreement" means that certain Millennium Health, LLC Settlement Agreement to Resolve Administrative Denial and Overpayment Claims, as amended, supplemented, or modified from time to time, between and among HHS, acting through CMS and its officers and agents, including its contractors, and Millennium dated October 15, 2015.

1.651.66 "Federal PGT Settlement Agreement" means that certain Settlement Agreement – Pharmacogenetic Testing, as amended, supplemented, or modified from time to time, between and among the United States Parties and Millennium dated October 15, 2015.

1.661.67 "Federal Settlement Parties" means the United States Parties, and the USA on behalf of HHS and CMS.

1.671.68 "Federal UDT Settlement Agreement" means that certain Settlement Agreement – Urine Drug Testing, as amended, supplemented, or modified from time to time, between and among the United States Parties and Millennium dated October 15, 2015.

1.681.69 "Final Order" means an order or judgment of the Bankruptcy Court or another court of competent jurisdiction as to which no stay has been entered and either the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or the Reorganized Debtors, or, in the event that an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court shall have been determined by the highest court to which such order was appealed, or certiorari, new trial, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

1.691.70 "General Unsecured Claim" means any Claim against any Debtor that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Early Commitment Facility Claim, Existing Credit Agreement Claim, Prior Agent Indemnity Claim, Other Secured Claim, Government Claim, MLH Tax Note Claim, or Intercompany Claim.

1.701.71 "Government Claim" means a Claim by any of the USA Settlement Parties against any of the Debtors, as described in, and restricted by, the respective USA Settlement Agreements. The Government Claims are not disputed, dischargeable,

– 9 –

unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision. The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

1.71 1.72 "Governmental Unit" means a "governmental unit" as defined in section 101(27) of the Bankruptcy Code.

1.72 1.73 "Gross Damages" has the meaning set forth in has the meaning set forth in Article X.L(i).

1.73 1.74 "HHS" means the United States Department of Health and Human Services.

1.74 1.75 "Holder" means an Entity holding a Claim against, or Equity Interest in, any Debtor as of the applicable date of determination.

1.75 1.76 "Holdings" means Millennium Lab Holdings II, LLC, a Delaware limited liability company.

1.76 1.77 "Holdings LLC Agreement" means that certain Second Amended and Restated Limited Liability Agreement of Millennium Lab Holdings II, LLC.

1.77 1.78 "Impaired" refers to being impaired within the meaning of section 1124 of the Bankruptcy Code.

1.78 1.79 "Indemnification Agreement" means that certain Indemnification Agreement dated August 10, 2015 by and among Holdings, Millennium, and W. Brock Hardaway, that certain Indemnification Agreement dated August 10, 2015 by and among Holdings, Millennium, and Martin A. Price, and any other indemnification agreement between any of the Debtors and a Senior Executive not applicable to other executive officers.

1.79 1.80 "Initial USA Settlement Deposit" means the irrevocable $50 million ($50,000,000.00) initial deposit paid to the USA Settlement Parties upon execution of the USA Settlement Agreements in partial satisfaction of Millennium's settlement obligations under the USA Settlement Agreements.

1.80 1.81 "Intercompany Claim" means any Claim by a Debtor against another Debtor.

1.82 "Interim Cash Collateral Order" means the Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363,502,503,507, and 552, Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtors to Use Cash Collateral; (II) Granting Adequate Protection to Prepetition Credit Parties; (III) Allowing

– 10 –

Subrogation Claim; (IV) Scheduling Final Hearing; and (V) Granting Related Relief (Docket No. 94).

1.811.83 "JS Real Estate Leases" means the four (4) leases by and among Millennium, as lessee, and Pain In San Diego, LLC, a California limited liability company, as lessor, relating to Millennium's headquarters facilities at 16980 Via Tazon Building 1, San Diego, California 92127, 16981 Via Tazon Building 2, San Diego, California, 16980 Via Tazon, San Diego, California 92127, and 15330 Avenue of Science, San Diego, California, in each case, as amended, supplemented, or otherwise modified from time to time.

1.821.84 "Lender Releasing Parties" means, collectively, the Consenting Lenders, the Administrative Agent, and the Early Commitment Facility Agent.

1.831.85 "Lien" means a "lien" as defined in section 101(37) of the Bankruptcy Code, and, with respect to any asset, includes, without limitation, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

1.841.86 "Local Rules" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

1.851.87 "Medicare and Medicaid Agreements" means any and all agreements or documentation necessary and required to enable the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, to participate in, and seek reimbursement from, the Medicare programs and Medicaid programs pursuant to 42 U.S.C. §§ 1395 et seq. and 42 U.S.C. §§ 1396 et seq., including, but not limited to, the Debtors' and Reorganized Debtors' (as applicable) enrollment agreements required under 42 C.F.R. §§ 424.500 et seq., and evidenced by their execution of the appropriate CMS 855 forms.

1.861.88 "Millennium" means Millennium Health, LLC, a California limited liability company.

1.871.89 "Millennium Claim Trusts" means the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust.

1.881.90 "Millennium Corporate Claim Trust" means the grantor trust to be established by Millennium on the Equity Transfer Date, but immediately following the transfers described in clauses (i) and (ii) of the definition of Equity Transfer Date, in accordance with the terms of the Millennium Corporate Claim Trust Agreement.

1.891.91 "Millennium Corporate Claim Trust Advisory Board" means that certain three-member board of the Millennium Corporate Claim Trust appointed by an Ad Hoc Group Majority.

– 11 –

1.901.92 "Millennium Corporate Claim Trust Agreement" means that certain trust agreement by and among the Millennium and Millennium Corporate Claim Trust Trustee, in substantially in the form attached as Exhibit A hereto.

1.911.93 "Millennium Funding Contribution" means the cash payment to be made by MLH and TA collectively to Millennium in an amount equal to $325 million less the amount comprising the USA Settlement Funding Contribution to Millennium.

1.921.94 "Millennium Lender Claim Trust" means the grantor trust to be established by Millennium on the Equity Transfer Date, but immediately following the transfers described in clauses (i) and (ii) of the definition of Equity Transfer Date, in accordance with the terms of the Millennium Lender Claim Trust Agreement.

1.931.95 "Millennium Lender Claim Trust Advisory Board" means that certain three-member board of the Millennium Lender Claim Trust appointed by an Ad Hoc Group Majority.

1.941.96 "Millennium Lender Claim Trust Agreement" means that certain trust agreement by and among the Company and Millennium Lender Claim Trust Trustee, in substantially in the form attached as Exhibit B hereto.

1.951.97 "MLH" means Millennium Lab Holdings, Inc., a Delaware Corporation.

1.961.98 "MLH and/or TA Liability" has the meaning set forth in Article X.L(ii) of this Plan.

1.971.99 "MLH Contribution" means fifty five percent (55%) of the Settlement Contribution, or $178.75 million, to be funded by MLH.

1.981.100 "MLH Shareholders" means the holders of equity interests in MLH.

1.991.101 "MLH Tax Note" means that certain Promissory Note dated as of May 1, 2014, issued by Millennium to MLH in the original principal sum of $19,755,547.00, as amended, supplemented or modified from time to time.

1.1001.102 "MLH Tax Note Claims" means any Claims or obligations arising under or pursuant to the MLH Tax Note.

1.1011.103 "New Board" means the initial board of directors of New Holdco as designated pursuant to Article V.L of this Plan.

– 12 –

1.1021.104 "New Holdco" means a Delaware corporation to be formed by the Prepetition Lenders on or prior to the Equity Transfer Date which shall be the parent holding company of Reorganized Millennium pursuant to the transactions contemplated herein.

1.1031.105 "New Holdco Common Stock" means the shares of common stock of New Holdco with a par value of $0.01 and that shall be fully paid and non-assessable upon issuance.

1.1041.106 "New Holdco Organizational Documents" means the charter of incorporation of New Holdco in substantially the form contained in Exhibit C of this Plan, the bylaws of New Holdco in substantially the form contained in Exhibit D of this Plan, or any other applicable organizational documents of New Holdco.

1.1051.107 "New Securities and Debt Documents" means collectively, the New Holdco Common Stock, the New Term Loan Agreement, and any and all other securities, notes, stock, instruments, certificates, and other documents or agreements required to be issued, executed or delivered pursuant to this Plan.

1.1061.108 "New Term Loan" means that certain secured term loan in the aggregate principal amount of $600 million to be made under the terms of the New Term Loan Agreement.

1.1071.109 "New Term Loan Agreement" means that certain agreement providing for the New Term Loan in the form attached as Exhibit FE of this Plan to be included in the Plan Supplement.

1.1081.110 "Non-Consenting Lender" means a Prepetition Lender that is not a Consenting Lender.

1.1091.111 "Non-Contributing MLH Shareholder" means an MLH Shareholder that has not funded, in any part, the MLH Contribution.

1.1101.112 "Non-Contributing MLH Shareholder Claim" means any known and unknown claims and causes of action against Non-Contributing MLH Shareholders.

1.1111.113 "Non-Contribution Action" has the meaning set forth in Article X.L(ii) of this Plan.

1.1121.114 "OIG" means the Office of the Inspector General of HHS.

1.1131.115 "Operating Agreements" has the meaning set forth in Article VI.F of this Plan.

1.1141.116 "OPM" means the United States Office of Personnel Management.

– 13 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

1.1151.117 "Ordinary Course Professionals Order" means an order of the Bankruptcy Court, if any, approving a motion to employ ordinary course professionals in the Chapter 11 Cases.

1.1161.118 "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

1.1171.119 "Other Secured Claims" means all Secured Claims against the Debtors other than the Prior Agent Indemnity Claims or the Existing Credit Agreement Claims.

1.1181.120 "Participating Lenders" has the meaning set forth in the RSA.

1.1191.121 "Person" means a "person" as defined in section 101(41) of the Bankruptcy Code and also includes any natural person, corporation, general or limited partnership, limited liability company, firm, trust, association, government, governmental agency or other Entity, whether acting in an individual, fiduciary or other capacity.

1.1201.122 "Petition Date" means the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

1.1211.123 "Plaintiff States" means the plaintiff states that are party to the States UDT Settlement and the States PGT Settlement Agreement and any such states that may become a party thereto from time to time.

1.1221.124 "Plan" has the meaning set forth in the Introduction and includes the Exhibits and all supplements, appendices, and schedules thereto, either in its present form or as the same may be altered, amended, modified or otherwise supplemented from time to time.

1.1231.125 "Plan Supplement" means, collectively, the compilation of documents and forms of documents, and all exhibits, attachments, schedules, agreements, documents and instruments referred to therein, ancillary or otherwise, including, without limitation, the Exhibits, all of which are incorporated by reference into, and are an integral part of, this Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before 10 days prior to the Confirmation Hearing.

1.1241.126 "Post-Closing Tax Period" means any tax period beginning after the Equity Transfer Date and, with respect to any tax period beginning on or before and ending after the Equity Transfer Date, the portion of such taxable period beginning after the Equity Transfer Date.

1.1251.127 "Pre-Closing Tax Period" means any taxable period ending on or before the Equity Transfer Date and, with respect to any taxable period beginning on or before

– 14 –

and ending after the Equity Transfer Date, the portion of such taxable period ending on and including the Equity Transfer Date.

1.126<u>1.128</u>    "Prepetition Lenders" means the banks, financial institutions and other parties identified as "Lenders" in the Existing Credit Agreement from time to time.

1.127<u>1.129</u>    "Preserved Estate Claims" means all known and unknown claims and Causes of Action (including derivative claims) of Millennium against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties.

1.128<u>1.130</u>    "Preserved Indemnified Parties" has the meaning set forth in Article VI.F of this Plan.

1.129<u>1.131</u>    "Preserved Lender Claims" means all known and unknown direct and derivative claims and Causes of Action of the Lenders against the Excluded Parties or any other Entity that is not a Released Party or their respective Related Parties.

1.130<u>1.132</u>    "Prior ~~Administrative Agent~~<u>Agents</u>" means<u>, collectively: (a)</u> JPMorgan Chase Bank, N.A., in its capacity as the prior administrative agent under the Existing Loan Documents~~.~~<u>, (b) Citibank Global Markets Inc., it its capacity as the syndication agent under the Existing Loan Documents, (c) BMO Capital Markets Corp. and Suntrust Bank, in their capacities as Co-Managers and Co-Documentation Agents under the Existing Loan Documents, (d) J.P. Morgan Securities LLC and Citibank Global Markets Inc., in their capacities as Joint Lead Arrangers and Joint Bookrunners under the Existing Loan Documents and (e) to the extent indemnified under the Existing Loan Documents, any affiliates, officers, directors, employees, agents, advisors, partners and controlling persons of the foregoing parties listed in clauses (a) through (d) hereof.</u>

1.131<u>1.133</u>    "Prior Agent Indemnity Claims" means all indemnification ~~claims~~<u>Claims</u> of the Prior ~~Administrative Agent~~<u>Agents against any of the Debtors</u> arising under <u>and to the extent provided in</u> the Existing Loan Documents.

<u>1.134   "Prior Agent Lender Indemnity Obligations" means all indemnification obligations of the Prepetition Lenders to the Prior Agents arising under and to the extent provided in the Existing Loan Documents.</u>

1.132<u>1.135</u>    "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.133<u>1.136</u>    "Pro Rata" means, at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims in that Class, unless the Plan provides otherwise.

1.134<u>1.137</u>    "Professional" means~~: (a)~~ any Entity employed in the Chapter 11 Cases pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code or otherwise ~~and (b)~~

– 15 –

any Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

1.138 "Professional Claims Bar Date" means the date that is forty-five (45) days after the Effective Date.

1.135 1.139 "Professional Fee Claim" means a Claim under sections 328, 330(a), 331, 363, 503 or 1103 of the Bankruptcy Code for compensation for services rendered or reimbursement of costs, expenses or other charges incurred after the Petition Date and prior to and including the Effective Date.

1.136 1.140 "Professional Fee Escrow Account" means an account to be funded by the Debtors pursuant to Article II.A(i)(3) of the Plan, in an amount equal to the Professional Fee Reserve Amount.

1.137 1.141 "Professional Fee Reserve Amount" means the sum of (a) the aggregate amounts withheld by the Debtors as of the Confirmation Date as a holdback on payment of aggregate amount of unpaid Professional Fee Claims pursuant to any compensation procedures order and (b) twenty (20) percent of that portion of the unbilled fees of Professionals through the Effective Date, as estimated pursuant to Article II.A(i)(3 2) of the Plan attributable to fees incurred as of the Confirmation Date.

1.138 1.142 "Proof of Claim" means a proof of Claim or Equity Interest filed against any Debtor in the Chapter 11 Cases.

1.139 1.143 "Qualified Out-of-Court Transaction" has the meaning set forth in the RSA.

1.140 1.144 "Reinstated" or "Reinstatement" means, with respect to any Claim: (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim in accordance with Section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) of the Bankruptcy Code expressly does not require to be cured; (ii) reinstating the maturity of such Claim as such maturity existed before such default; (iii) compensating the Holder of such Claim for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim arises from any failure to perform a non-monetary obligation, other than a default arising from failure to operate a non-residential real property lease subject to section 365(b)(1)(A) of the Bankruptcy Code, compensating the Holder of such Claim (other than any Debtor or an insider of any Debtor) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

– 16 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

1.141 1.145 "Related Parties" means, with respect to an Entity, collectively, current and former affiliates of such Entity, and such Entity's and such affiliates' predecessors, successors and assigns, subsidiaries, managed accounts or funds, current and former directors, principals, managers, officers, and equity holders (regardless of whether such interests are held directly or indirectly), equity holders' spouses, trusts, assigns, heirs, beneficiaries, members, partners, employees, advisory and observer board members, financial advisors, Kirkland & Ellis LLP, as attorneys for James Slattery, Goodwin Procter LLP, as attorneys for TA and its Related Parties (but for the avoidance of doubt, not as attorneys for Millennium), accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals. For the avoidance of doubt, none of the Excluded Parties shall be a Related Party to any of the Released Parties.

1.142 1.146 "Released Claims" means (a) solely with respect to the Released Parties, any and all Core Released Claims and (b) with respect to the Related Parties of the Released Parties, all Core Released Claims, but only to the extent such claims relate to the Company, including the governance thereof, or that relate to or arise out of the Government Claims, the USA Settlement Agreements, the Existing Credit Agreement, the Restructuring Transactions and any transactions related thereto, including the dividend recapitalization and refinancing accomplished with the proceeds of the Existing Credit Agreement. For the avoidance of doubt, Released Claims do not include any claims or liabilities reserved for Governmental Units as provided in Article V.J of this Plan or the Administrative Agents as provided in Article V.O and Article VI.F of this Plan.

1.143 1.147 "Released Parties" means, collectively, in each case solely in their respective capacities as such: (a) Holdings; (b) MLH; (c) TA; (d) the Participating Lenders and Consenting Lenders; (e) Wilmington Savings Fund Society, FSB, in its capacity as the Administrative Agent; (f) Jeanne Bonell; (g); Michael Slattery; (h) James Slattery; (i) Howard Appel; (j) David Cohen; (k) Greg Stein, (l) Sunshine Alexis Stein; (m) Dr. Marvin Retsky; (n) Murray Rosenthal; (o) those persons serving as officers or managers of the Company as of the Closing Date or Effective Date, as applicable, (p) the Early Commitment Facility Agent, and (q) Brown Rudnick, LLP and FTI; provided, however, that in the event that an Excluded Party is also a Prepetition Lender under the Existing Credit Agreement, its status as a Participating Lender or a Consenting Lender shall not make it a Released Party for any purpose.

1.144 1.148 "Reorganized" means, in reference to a Debtor, such Debtor from and after the Effective Date.

1.145 1.149 "Restructuring Transactions" means the restructuring transactions described in the RSA and herein, whether implemented pursuant to a Qualified Out-of-Court Transaction or an Approved Plan, in each case, which shall be implemented Consistent With The Restructuring Term Sheet and the tax provisions described therein.

1.146 1.150 "Retained Claim Judgment" has the meaning set forth in Article X.L of this Plan.

– 17 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

1.147<u>1.151</u>     "Retained Claim Plaintiff" has the meaning set forth in Article X.L of this Plan.

1.148<u>1.152</u>     "Retained Claims" means collectively, the Preserved Estate Claims and the Preserved Lender Claims.

1.149<u>1.153</u>     "Retained Corporate Causes of Action" means any and all claims and Causes of Action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) belonging to Millennium and the Administrative Agent (in its capacity as agent under the Existing Loan Documents), including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action expressly released under this Plan, including, without limitation the claims subject to the bar order pursuant to Article X.J of this Plan and the injunction pursuant to Article X.K of this Plan.

1.150<u>1.154</u>     "Retained Lender Causes of Action" means the individual claims and Causes of Action of each of the Consenting Lenders against any Person or Entity related to the Debtors, including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action that are released under this Plan and/or subject to the bar order and injunction provisions of this Plan.

1.151<u>1.155</u>     "RSA" means that certain Restructuring Support Agreement dated October 15, 2015 by and among the Debtors, the Settling Members, and each of the Participating Lenders signatories thereto, attached ~~as Exhibit A to the Disclosure Statement~~<u>hereto as Appendix 1</u>, as may be amended, supplemented, or modified from time to time, as provided for therein.

1.152<u>1.156</u>     "Secured Claim" means a Claim that is secured by a Lien on property in which the Estates have an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.153<u>1.157</u>     "Securities Act" means the Securities Act of 1933, as now in effect or hereafter amended, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

1.154<u>1.158</u>     "Senior Executive" shall have the meaning set forth in the RSA.

1.155<u>1.159</u>     "Settlement Contribution" means a cash payment of $325 million comprised of the USA Settlement Funding Contribution and the Millennium Funding Contribution, to be paid to, or for the benefit of, Millennium pursuant to the terms of the USA Settlement Agreements, the RSA, and this Plan.

1.156<u>1.160</u>     "Settlement Letters of Credit" means (i) the irrevocable letters of credit in the amount, including interest, as required by the USA Settlement Agreements, posted

– 18 –

by MLH and TA on or before November 9, 2015 for the benefit of the USA Settlement Parties pursuant to the terms of the USA Settlement Agreements; or (ii) the funds in the amount, including interest, as required by the USA Settlement Agreements to be placed into escrow by MLH and/or TA on or before November 9, 2015, pursuant to the terms of the USA Settlement Agreements and the terms of escrow agreements mutually acceptable to the USA Settlement Parties and MLH and/or TA.

1.157 1.161 "Settlement Letters of Credit Funds" means the cash proceeds from a draw on the Settlement Letters of Credit by the USA, including a draw on the funds in escrow.

1.158 1.162 "Settling Members" means, collectively, MLH and TA.

1.159 1.163 "Solicitation" means the Debtors' formal request for acceptances of the Plan, consistent with section 1125 and 1126 of the Bankruptcy Code, rules 3017 and 3018 of the Federal Rules of Bankruptcy Procedure, and applicable non-bankruptcy law.

1.160 1.164 "Solicitation Termination Date" means November 8, 2015 at 5:00 p.m. (prevailing Eastern Time).

1.161 1.165 "States PGT Settlement Agreement" means those certain Millennium Genetic Testing State Settlement Agreements, as amended, supplemented, or modified from time to time, between and among Millennium and the Plaintiff States that are party thereto from time to time.

1.162 1.166 "States UDT Settlement Agreement" means those certain Millennium UDT State Settlement Agreements, as amended, supplemented, or modified from time to time, between and among Millennium and the Plaintiff States that are party thereto from time to time.

1.163 1.167 "Subrogation Claim" has the meaning set forth in the RSA, and includes the Liens and assignments described in the RSA to secure payment of such claim subject to the terms of any Final Order authorizing the Debtors' use of its cash collateral and granting related relief, or, if no Final Order is entered, the Interim Cash Collateral Order.

1.164 1.168 "TA" means TA Millennium, Inc., a Delaware corporation.

1.165 1.169 "TA Shareholders" means the holders of equity interests in TA.

1.166 1.170 "Tax Code" means the Internal Revenue Code of 1986, as amended.

1.167 1.171 "Third Party Payers" means, collectively, the Entities that pay or reimburse the Debtors for services rendered to a third party.

– 19 –

1.168<u>1.172</u>    "Third Party Payer Contracts" means contracts between the Debtors and Third Party Payers.

1.169<u>1.173</u>    "Third Party Releasing Parties" means, collectively, the Holders of Claims against or with respect to or Equity Interests in the Debtors, including Non-Consenting Lenders.

1.170<u>1.174</u>    "Trust Delayed Draw Facility" means that $7,000,000 facility between Reorganized Millennium, the Millennium Corporate Claim Trust, and the Millennium Lender Claim Trust, pursuant to which Reorganized Millennium shall advance up to $7,000,000 in the aggregate to the Millennium Corporate Claim Trust and/or the Millennium Lender Claim Trust in respect of fees and costs thereof.

1.171<u>1.175</u>    "Unexpired Lease" means a lease to which any of the Debtors are a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code, including, without limitation, the JS Real Estate Leases.

1.172<u>1.176</u>    "Unclaimed Distribution" means any distribution under the Plan on account of an Allowed Claim to a Holder that has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' request for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

1.173<u>1.177</u>    "Unimpaired" means any Claim or Equity Interest that is not designated as Impaired.

1.174<u>1.178</u>    "United States Parties" means collectively, the USA on behalf of the OIG, the DHA, and the OPM.

1.175<u>1.179</u>    "USA" means the United States of America.

1.176<u>1.180</u>    "USA Settlement Parties" means collectively, the Federal Settlement Parties and the Plaintiff States.

1.177<u>1.181</u>    "USA Settlement Agreements" means, collectively, the Federal UDT Settlement Agreement, the States UDT Settlement Agreement, the Federal PGT Settlement Agreement, the States PGT Settlement Agreement, the Federal Administrative Settlement Agreement, and the CIA, and all respective exhibits thereto.

1.178<u>1.182</u>    "USA Settlement Assumption Order" means the Final Order approving the assumption of the USA Settlement Agreements, which order may be the Confirmation Order.

– 20 –

1.1791.183    "USA Settlement Funding Contribution" means the payment to be made by MLH and TA severally to or for the benefit of Millennium in the amount of $206 million plus accrued interest to be distributed to the USA as provided in the USA Settlement Agreements on account of the Government Claims.

1.1801.184    "Voting Agent" means Prime Clerk LLC, and any successor.

1.1811.185    "Voting Class" means the Class of Existing Credit Agreement Claims.

1.1821.186    "Voting Record Date" means the date for determining which Holders of Claims are entitled to receive the Disclosure Statement and vote to accept or reject this Plan, as applicable, which date is October 29, 2015 for all Holders of Claims.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

## A.    Administrative Claims

Subject to subparagraph (i) below, on or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Administrative Claim will (i) be Reinstated, (ii) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Administrative Claim or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder, or (iii) will otherwise be left Unimpaired; provided, however, that Administrative Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtors or Reorganized Debtors in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.  Any taxes that arose postpetition shall be paid in the ordinary course of business and the taxing authorities that hold Claims on account of such postpetition taxes shall not be required to file a proof of claim for an Administrative Claim in the Chapter 11 Cases.

(i)    Professional Fee Claims

1.    Professional Fee Claims.  Professionals or other Entities asserting a Professional Fee Claim for services rendered before the ConfirmationEffective Date must file and serve on the Reorganized Debtors and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claim no

– 21 –

later than the Professional Claims Bar Date; provided that the upon the ~~Confirmation~~Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors will employ and pay Professionals in the ordinary course of business for any work performed after the ~~Confirmation~~Effective Date, including those fees and expenses incurred by Professionals in connection with the implementation and consummation of the Plan, in each case without further application or notice to or order of the Bankruptcy Court; provided, further, that any professional who may receive compensation or reimbursement of expenses pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses for services rendered before the Confirmation Date, without further Bankruptcy Court order, pursuant to the Ordinary Course Professionals Order. Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors and the requesting party by the later of (a) 60 days after the Effective Date or (b) 30 days after the Filing of the applicable request for payment of the Professional Fee Claim. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice to the Reorganized Debtors of such hearing ~~to the Reorganized Debtors~~.

2.      ~~Payment of Interim Amounts.  Subject to the~~ Professional Fee Reserve Amount~~, on the Effective Date, the Debtors or the Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts billed relating to prior periods through the Effective Date as to which no objection has been filed.  In order to receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, no later than two (2) days prior~~. Prior to the Effective Date, the Professionals shall estimate ~~fees and expenses due for periods that have not been billed as of~~their Professional Fee Claims through the Effective Date and shall deliver such estimate to ~~counsel for the Debtor~~the Debtors for the purposes of determining the amount held in the Professional Fee Escrow Account. If a Professional has not provided such an estimate, the Debtors may, in their reasonable discretion, estimate the Professional Fee Claims of such Professional for the purpose of determining the amount held in the Professional Fee Escrow Account. ~~Within fifteen (15) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period.~~

3.      Professional Fee Escrow Account.  On the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Each Holder of an Allowed Professional Fee Claim will be paid by the Reorganized Debtors in Cash from the Professional Fee Escrow Account within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim.  If the Professional Fee Escrow Account is depleted, each Holder of an Allowed Professional Fee Claim will be paid the full amount of such Allowed Professional Fee Claim by the Reorganized Debtors in

– 22 –

Cash within five (5) Business Days of entry of the order approving such Allowed Professional Fee Claim. All amounts remaining in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full shall revert to the Debtors and be distributed pursuant to the Plan.

4. <u>RSA Fees</u>. The foregoing shall not apply to (x) the Debtors' obligations to pay the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group as professional advisors to the Ad Hoc Group pursuant to the RSA and this Plan or (y) the Administrative Agent's Fees under this Plan.

## B.    Priority Tax Claims

On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Priority Tax Claim will (i) receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim either (a) payment in full in Cash for the unpaid portion of such Allowed Priority Tax Claim or (b) such other less favorable treatment as agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and such Holder or (ii) otherwise be left Unimpaired; provided, however, that such parties may further agree for the payment of such Allowed Priority Tax Claim at a later date. ~~Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree or order converting or dismissing the Chapter 11 Cases provided, however, that the Debtors may prepay any or all such Claims at any time, without premium or penalty.~~

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF
## CLASSIFIED CLAIMS AND EQUITY INTERESTS

## A.    Introduction

All Claims and Equity Interests, except Administrative Claims and Priority Tax Claims, are placed in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified. The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes, including, without limitation, voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled prior to the Effective Date.

– 23 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

**B.** **Summary of Classification and Treatment of Classified Claims and Equity Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Early Commitment Facility Claims | Unimpaired | Presumed to Accept |
| 2 | Existing Credit Agreement Claims | Impaired | Entitled to Vote |
| 3 | Prior Agent Indemnity Claims | Unimpaired | Presumed to Accept |
| 4 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 5 | Government Claims | Unimpaired | Presumed to Accept |
| 6 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | MLH Tax Note Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 9 | Existing Equity Interests in Holdings | Unimpaired | Presumed to Accept |
| 10 | Existing Equity Interests in Millennium | Impaired | Deemed to Reject |
| 11 | Existing Equity Interests in RxAnte, LLC | Unimpaired | Presumed to Accept |

**C.** **Classification and Treatment of Claims and Equity Interests**

(i)     Class 1 – Early Commitment Facility Claims.

1.     Classification:  Class 1 consists of all Early Commitment Facility Claims.

2.     Treatment: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Early Commitment Facility Claim shall be paid in full in Cash.  In addition, on or as soon as reasonably practicable after the Effective Date, the Early Commitment Facility Agent shall receive payment in full in Cash of the Early Commitment Facility Agent Fees, and the Reorganized Debtors are authorized to pay such Early Commitment Facility Agent Fees without the need for further Bankruptcy Court approval.

3.     Impairment and Voting:  Class 1 is an Unimpaired Class, and the Holders of Class 1 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Claims will not be entitled to vote to accept or reject the Plan.

(ii)     Class 2 – Existing Credit Agreement Claims.

1.     Classification:  Class 2 consists of all Existing Credit Agreement Claims. The Existing Credit Agreement Claims are Allowed Claims in an aggregate outstanding principal amount of $1,752,812,500, plus any and all accrued interest, fees, and other amounts due and payable under the Existing Loan Documents except Prior Agent Indemnity Claims.

– 24 –

2.      Treatment:  On the Equity Transfer Date, all of the Debtors' outstanding obligations under the Existing Loan Documents shall be extinguished, canceled, and discharged, and in exchange therefor, and in full and final satisfaction, settlement, release, and discharge of such Claims, each Holder of an Existing Credit Agreement Claim, except the Administrative Agent on account of Administrative Agent Fees, shall receive:

(A)      on the Equity Transfer Date, such Holder's Pro Rata share of and interest in 100% of the equity in Reorganized Millennium, which shall immediately be transferred to New Holdco in exchange for such Holder's Pro Rata share of 100% of the New Holdco Common Stock, subject to potential dilution from any equity incentive plan adopted in the future, in accordance with Article V. D(iii) of this Plan;

(B)      on the Equity Transfer Date or as soon as reasonably practicable thereafter, such Holder's Pro Rata share of and interest in the New Term Loan;

(C)      on the Equity Transfer Date, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.F of this Plan, such Holder's Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust; and

(D)      to the extent such Holder held any Retained Lender Causes of Action on the Equity Transfer Date and is a Consenting Lender, such Retained Lender Causes of Action shall be deemed automatically contributed to the Millennium Lender Claim Trust by each of the Consenting Lenders on such date without any further court order or action of the Consenting Lenders required, and in exchange therefor, subject to the reimbursement rights of the Backstop MLH Shareholders as provided in Article V.G of this Plan, such Holder shall receive its Pro Rata (based solely on the aggregate amount of Existing Credit Agreement Claims held by such Consenting Lender to the aggregate Existing Credit Agreement Claims held by all Consenting Lenders) share of beneficial interests in the Millennium Lender Claim Trust.

In addition, on or as reasonably practicable after the Equity Transfer Date, the Administrative Agent shall receive payment in full in Cash of the Administrative Agent Fees, and Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group shall receive payment in full of any fees and expenses owed to them under the RSA as advisors to the Ad Hoc Group.  New Holdco, Reorganized Millennium, and its subsidiaries are authorized to pay such fees without the need for further Bankruptcy Court approval or the filing of fee applications.  The payment of such fees shall be subject to paragraph 14(d) of the Interim Cash Collateral Order.

– 25 –

Collectively, the distributions of payments to the Holders of Existing Credit Agreement Claims and the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan, and the fees and expenses of Brown Rudnick, LLP, FTI, and Delaware Counsel to the Ad Hoc Group pursuant to the RSA shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding obligations under the Existing Credit Agreement, except as provided with respect to the Administrative Agent in Article V.O hereof.

3.    Impairment and Voting:  Class 2 is Impaired by the Plan.  Each Holder of an Allowed Existing Credit Agreement Claim is entitled to vote to accept or reject the Plan.

(iii)    Class 3 – Prior Agent Indemnity Claims.

1.    Classification:  Class 3 consists of all Prior Agent Indemnity Claims.

2.    Treatment:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Prior Agent Indemnity Claim shall (A) have its Allowed Prior Agent Indemnity Claim Reinstated; (B) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (C) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 3 Claim will have agreed upon in writing; provided, however for the avoidance of doubt, pursuant to the Existing Credit Agreement Solicitation Amendment and under this Plan, Reorganized Holdings shall be released from its guaranty of the obligations under the Existing Credit Agreement and such guaranty shall be fully and completely discharged upon the occurrence of the Effective Date and the payment in full of the principal and interest outstanding under the Early Commitment Facility.

3.    Impairment and Voting:  Class 3 is an Unimpaired Class, and the Holders of Class 3 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 3 Claims will not be entitled to vote to accept or reject the Plan.

(iv)    Class 4 – Other Secured Claims.

1.    Classification:  Class 4 consists of all Other Secured Claims.

2.    Treatment: With respect to each Other Secured Claim that becomes due or payable prior to the Effective Date, on or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim (A) shall be paid in full in Cash, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be; (B) shall have its

– 26 –

Allowed Other Secured Claim Reinstated, and paid in full, including postpetition interest, if any, required to be paid pursuant to section 506 of the Bankruptcy Code as the case may be, on the later to occur of the Effective Date or when such Claim becomes due in the ordinary course of the Debtors' or Reorganized Debtors' business operations; (C) shall have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) shall receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder of such Allowed Class 4 Claim will have agreed upon in writing; provided that Class 4 Claims incurred by the Debtors in the ordinary course of business may be paid in the ordinary course of business in accordance with such applicable terms and conditions relating thereto in the discretion of the Debtors or Reorganized Debtors without further notice to or order of the Bankruptcy Court.

3. Impairment and Voting: Class 4 is an Unimpaired Class, and the Holders of Class 4 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 4 Claims will not be entitled to vote to accept or reject the Plan.

(v) Class 5 – Government Claims.

1. Classification: Class 5 consists of all Government Claims. The Government Claims are not disputed, dischargeable, unliquidated, or contingent, are Allowed and are liquidated in the amount specified in the USA Settlement Agreements, plus any accrued interest, costs, and fees due under the USA Settlement Agreements, and are not subject to objection under any provision of the Bankruptcy Code or any nonbankruptcy provision. The Government Claims will be reduced by the amount of the Initial USA Settlement Deposit, unless the Initial USA Settlement Deposit is subject to an Avoidance Action or other avoidance or recovery action.

2. Treatment: On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed Government Claim, (A) (i) the USA Settlement Agreements shall be assumed under the Plan if the USA Settlement Assumption Order has not been entered by the Bankruptcy Court, (ii) any payments made under the USA Settlement Agreements, including the Initial USA Settlement Deposit, shall be final and irrevocable and shall not be subject to avoidance or recovery on any basis in law or equity, and (iii) any Avoidance Action against the USA Settlement Parties on account of the Initial USA Settlement Deposit shall be waived and released, and (B) the USA shall receive (1) the Settlement Letters of Credit Funds plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements or (2) Cash in the amount of $206 million plus all accrued interest, costs, and fees to the extent required by the USA Settlement Agreements.

– 27 –

3. Impairment and Voting: Class 5 is an Unimpaired Class, and the Holders of Class 5 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 5 Claims will not be entitled to vote to accept or reject the Plan.

(vi) Class 6 – General Unsecured Claims.

1. Classification: Class 6 consists of all General Unsecured Claims.

2. Treatment: On or as soon as reasonably practicable after the Effective Date, at the sole option of the Debtors or Reorganized Debtors, in full and final satisfaction, settlement, release, and discharge of, and in exchange for each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall (A) be paid in full in Cash; (B) have its Allowed General Unsecured Claim Reinstated, and paid in full, including postpetition interest (which shall not accrue at a default rate), if any, on the later to occur of the Effective Date or when such Claims become due in the ordinary course of the Debtors' or Reorganized Debtors' business operations or when such Claim becomes due or Allowed by order or judgment of a court or other tribunal of competent jurisdiction; (C) have its Claim otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code; or (D) receive such other less favorable treatment as to which the Debtors or Reorganized Debtors and the Holder of such Allowed Class 6 Claim will have agreed upon in writing.

3. Impairment and Voting: Class 6 is an Unimpaired Class, and the Holders of Class 6 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 6 Claims will not be entitled to vote to accept or reject the Plan.

(vii) Class 7 – MLH Tax Note Claims.

1. Classification: Class 7 consists of all MLH Tax Note Claims.

2. Treatment: On the Effective Date, all of the Debtors' outstanding obligations under the MLH Tax Note shall be extinguished, canceled, and discharged, and each Holder of an MLH Tax Note Claim shall receive no distribution on account of such Claim.

3. Impairment and Voting: Class 7 is an Impaired Class, and the Holders of Class 7 Claims will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 7 Claims will not be entitled to vote to accept or reject the Plan.

(viii) Class 8 – Intercompany Claims.

1. Classification: Class 8 consists of all Intercompany Claims.

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

2.      Treatment: On the Effective Date, all Allowed Intercompany Claims, at the sole option of the Debtors or Reorganized Debtors, shall be (A) Reinstated and treated  or paid in the ordinary course of the Debtors' or Reorganized Debtors' business operations or (B) canceled, extinguished, and discharged.

3.      Impairment and Voting:  Class 8 is an Unimpaired Class, and the Holders of Class 8 Claims will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 8 Claims will not be entitled to vote to accept or reject the Plan.

(ix)     Class 9 – Existing Equity Interests in Holdings.

1.      Classification: Class 9 consists of all Existing Equity Interests in Holdings.

2.      Treatment: On the Effective Date, all Allowed Existing Equity Interests in Holdings shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.      Impairment and Voting:  Class 9 is an Unimpaired Class, and the Holders of Class 9 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 9 Equity Interests will not be entitled to vote to accept or reject the Plan.

(x)      Class 10 – Existing Equity Interests in Millennium.

1.      Classification: Class 10 consists of all Existing Equity Interests in Millennium.

2.      Treatment: On the Equity Transfer Date, all Existing Equity Interests in Millennium shall be presumed automatically cancelled, released, and extinguished without further action by the Debtors or Reorganized Debtors and the obligations of the Debtors or the Reorganized Debtors thereunder shall be discharged.

3.      Impairment and Voting:  Class 10 is an Impaired Class, and the Holders of Class and the Holders of Class 10 Equity Interests will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 10 Equity Interests will not be entitled to vote to accept or reject the Plan.

(xi)     Class 11 – Existing Equity Interests in RxAnte LLC.

1.      Classification: Class 11 consists of all Existing Equity Interests in RxAnte LLC.

– 29 –

2.    <u>Treatment</u>: On the Effective Date, all Allowed Existing Equity Interests in RxAnte LLC shall be Reinstated and otherwise rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.    <u>Impairment and Voting</u>:  Class 11 is an Unimpaired Class, and the Holders of Class 11 Equity Interests will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 11 Equity Interests will not be entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, nothing under the Plan will affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

**E.    Discharge of Claims**

Except as otherwise provided in the Plan or in the USA Settlement Agreements, and effective as of the Effective Date or Equity Transfer Date, as applicable: (i) the rights afforded herein and the treatment of all Claims and Equity Interests herein will be in exchange for and in complete satisfaction, settlement, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (ii) the Plan will bind all Holders of Claims and Equity Interests, notwithstanding whether any such Holders abstained from voting to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Equity Interests will be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (iv) except as otherwise expressly provided for in the Plan, all Entities will be precluded from asserting against, derivatively on behalf of, or through, the Debtors, the Debtors' Estates, the Reorganized Debtors, each of their successors and assigns, and each of their assets and properties, any other Claims or Equity Interests based upon any documents, instruments or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

**F.    Alternative Treatment**

Notwithstanding any provision herein to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any Holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other less favorable distribution or treatment to which it and the Debtors or Reorganized Debtors may agree in writing.

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

## ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Presumed Acceptance of Plan**

Classes 1, 3, 4, 5, 6, 8, 9 and 11 are Unimpaired under the Plan, and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

**B.      Deemed Rejection of Plan**

Classes 7 and 10 are Impaired and Holders of Class 7 Claims and Class 10 Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.      Voting Classes**

Each Holder of an Allowed Claim or Equity Interest as of the applicable Voting Record Date in the Voting Class (Class 2) will be entitled to vote to accept or reject the Plan.

**D.      Acceptance by Impaired Classes of Claims**

Pursuant to section 1126(c) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

**E.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**

The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit thereto in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  Such modification shall not substantially alter the treatment of the Government Claims pursuant to the USA Settlement Agreements.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**A.      General Settlement of Claims**

As set forth herein, this Plan embodies an overall negotiated settlement of numerous disputed Claims and issues pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements, and all other compromises and

settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their Estates, creditors, and other parties in interest, and are fair, equitable, and within the range of reasonableness.

(i)     Settlements and Releases

In consideration for the classification, distributions, releases and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan will constitute a good faith compromise and settlement between the Debtors, the Settling Members, and the Consenting Lenders regarding, inter alia, the Released Claims held by (or that could be asserted by or on behalf of) the Consenting Lenders, the Existing Credit Agreement Claims (including, without limitation, the treatment of the Holders of Existing Credit Agreement Claims under the Plan and the releases provided for herein), and the treatment of the Settling Members under the Plan (including the releases and related provisions provided herein), and in partial consideration therefor, the Settlement Contribution.

In accordance with and subject to the terms of the RSA and the USA Settlement Agreements, and in exchange for the treatment of the Settling Members provided for in the RSA and this Plan (including the releases provided for herein), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Settling Members shall collectively make a Cash payment to, or for the benefit of, Millennium in the form of the Settlement Contribution.  The Settlement Contribution shall be funded 55% by MLH, and 45% by TA as follows: (x) $178.75 million to be funded by MLH and (y) $146.25 million to be funded by TA.  The USA Settlement Funding Contribution shall be paid to the USA.  If the USA Settlement Funding Contribution is not paid to the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

(ii)    USA Settlement

The provisions of the USA Settlement Agreements constitute a good faith compromise and settlement between the Debtors and the USA Settlement Parties of the Government Claims as specifically described in, and restricted by, the USA Settlement Agreements.  The Debtors shall continue to perform their obligations under the USA Settlement Agreements and the USA Settlement Assumption Order.  To the extent the USA Settlement Assumption Order has not been entered on or before the Effective Date, the USA Settlement Agreements shall be assumed and the Subrogation Claim shall be approved under this Plan.  Pursuant to Article III.C(v)(2), on or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors shall pay (or cause to be paid) the Government Claims in full from the proceeds of the USA Settlement Funding Contribution plus Cash from Millennium in an amount equal to all costs and fees to the extent required by the USA Settlement Agreements.  The USA Settlement Funding Contribution shall be paid to the USA.  If the

– 32 –

USA Settlement Funding Contribution is not paid to the USA, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements. The Cash payment of the Initial USA Settlement Deposit shall be final and irrevocable and shall not be subject to any Avoidance Action or any other avoidance or recovery on any basis in law or equity. Any and all claims against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit shall be waived by the Debtors and their Estates and no Entity shall bring any claim against the USA Settlement Parties on account of payment of the Initial USA Settlement Deposit, and all such claims by any Entity are permanently and indefinitely prohibited, barred, and enjoined.

## B.   Corporate Existence

On or prior to the Effective Date, New Holdco will be formed, and pursuant to the transactions contemplated under this Plan, will become the parent entity of Reorganized Millennium. The charter of incorporation and by-laws of New Holdco will be substantially in the form of the New Holdco Organizational Documents. The Reorganized Debtors shall continue to exist as separate legal entities, pursuant to the applicable organizational documents in effect prior to the Effective Date, except to the extent such organizational documents are amended by the Plan, without any prejudice to any right to terminate such existence (whether by merger or otherwise) in accordance with applicable law after the Effective Date. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court.

## C.   Vesting of Assets in the Reorganized Debtors

Except as provided in Article V.F of the Plan with respect to the property and assets to be transferred to the Millennium Corporate Claim Trust, elsewhere in the Plan, in the USA Settlement Agreements, or in the Confirmation Order, on or after the Equity Transfer Date, all property and assets of the Estates (including, without limitation, Causes of Action and Avoidance Actions, but only to the extent such Causes of Action and Avoidance Actions have not been waived or released pursuant to the terms of this Plan, pursuant to an order of the Bankruptcy Court, or otherwise) and any property and assets acquired by the Debtors pursuant to the Plan, will vest in the Reorganized Debtors, free and clear of all Liens or Claims. Except as may be otherwise provided in the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors will pay the charges that they incur after the ~~Confirmation~~Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

**D.     New Term Loan; Sources of Consideration for Plan Distributions**

(i)     New Term Loan

On the Equity Transfer Date, the applicable Reorganized Debtors will be authorized to execute and deliver the New Term Loan Agreement, and will be authorized to execute, deliver, file, record and issue any other notes, guarantees, deeds of trust, documents (including UCC financing statements), amendments to the foregoing, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than expressly required by the New Term Loan Agreement).

(ii)     Settlement Contribution

On or as soon as reasonably practicable after the Effective Date, but in any event, at least one (1) Business Day prior to the Equity Transfer Date, and in no event later than December 30, 2015, the Debtors will receive the benefit of the Settlement Contribution by reason of the funding of the USA Settlement Funding Contribution and receipt of the Millennium Funding Contribution thereafter, and the USA Settlement Funding Contribution shall be paid to the USA.  As set forth herein, the Settlement Contribution will be utilized (1) to make (or cause to be made) the required distributions to the Holders of Allowed Government Claims under the Plan; (2) to reimburse Millennium for the Initial USA Settlement Deposit; (3) for working capital needs in the Reorganized Debtors' operations; and (4) to pay the Early Commitment Facility Claims.  If the USA Settlement Funding Contribution is not paid to the USA as contemplated in this Plan, then the USA shall receive Cash in the amount of $206 million, plus all interest, costs, and fees as required by the USA Settlement Agreements.

(iii)     Equity Interests in Reorganized Millennium

On the Equity Transfer Date, 100% of the Equity Interests of Reorganized Millennium shall be transferred and shall be deemed transferred, on behalf of Holders of Existing Credit Agreement Claims, to New Holdco in exchange for 100% of the New Holdco Common Stock.

(iv)     Cash Distributions

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Debtors or Reorganized Debtors to make payments required pursuant to the Plan will be obtained from the Debtors' or Reorganized Debtors' Cash balances, including Cash from operations and the Millennium Funding Contribution.  Other than the USA Settlement Funding Contribution, Cash payments to be made pursuant to the Plan will be made by the Reorganized Debtors.

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

## E.     New Holdco Common Stock Issued Under the Plan

On the Equity Transfer Date, immediately following the transfer of 100% of the Equity Interests in Reorganized Millennium to New Holdco, in exchange therefor, New Holdco will distribute the New Holdco Common Stock Pro Rata to the Holders of Existing Credit Agreement Claims pursuant to the terms set forth in the Plan and the RSA. The New Holdco Common Stock shall be subject to potential dilution from any equity incentive plan adopted in the future.

## F.     Millennium Corporate Claim Trust

(i)     Formation of Millennium Corporate Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Corporate Claim Trust shall be created by Millennium and shall be funded by Reorganized Millennium in the amount of $1,000,000 in Cash (as provided below) plus such additional tangible or intangible assets of Millennium as Reorganized Millennium shall determine. The Millennium Corporate Claim Trust shall be governed and administered in accordance with the Millennium Corporate Claim Trust Agreement substantially in the form attached as Exhibit A. The Millennium Corporate Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Corporate Claim Trust, and if necessary, a replacement trustee therefor.

(ii)     Millennium Corporate Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Corporate Claim Trust, the Retained Corporate Causes of Action shall be automatically deemed to have been contributed to the Millennium Corporate Claim Trust. The Millennium Corporate Claim Trust shall be funded by an initial Cash contribution by Reorganized Millennium of in the amount of $1,000,000. Reorganized Millennium shall be obligated to pay the reasonable fees and expenses of administering the Millennium Corporate Claim Trust and liquidating the Retained Corporate Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust). Once this $10,000,000 is exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Corporate Claim Trust at the request of the Millennium Corporate Claim Trust Advisory Board. Amounts advanced by Reorganized Millennium to the Millennium Corporate Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Corporate Claim Trust (*i.e.*, gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Corporate Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action

– 35 –

which have not previously been reimbursed or paid by the Reorganized Millennium). The initial $1,000,000 cash contribution and subsequent payment of up to $10,000,000 of invoices shall not be required to be reimbursed.

(iii)    Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Corporate Claim Trust are the Holders of Existing Credit Agreement Claims. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Corporate Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Lender Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution. Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with this Article V.F(iii), the Holders of Existing Credit Agreement Claims shall receive their Pro Rata share of beneficial interests in the Millennium Corporate Claim Trust, as provided in Article III.C(ii)(2) of this Plan.

(iv)    Federal Income Tax Treatment of Millennium Corporate Claim Trust

The Millennium Corporate Claim Trust shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code. The Millennium Corporate Claim Trust shall not continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the trust. Accordingly, the beneficiaries of the Millennium Corporate Claim Trust shall be treated for U.S. federal income tax purposes (i) as direct recipients of an undivided interest in the assets transferred to the Millennium Corporate Claim Trust and as having immediately contributed such assets to the Millennium Corporate Claim Trust, and (ii) thereafter, as the grantors and deemed owners of the Millennium Corporate Claim Trust and thus, the direct owners of an undivided interest in the assets held by the Millennium Corporate Claim Trust. For all U.S. federal income tax purposes, all parties shall use the valuation of the assets transferred to the Millennium Corporate Claim Trust as jointly determined by the trustee or its designee, TA, and MLH, with each such party acting reasonably and in good faith to cooperate with one another to jointly determine such values.

## G.    Millennium Lender Claim Trust

(i)    Formation of Millennium Lender Claim Trust

On the Equity Transfer Date, but after the transactions described in clauses (i) and (ii) of the definition of Equity Transfer Date, the Millennium Lender Claim Trust shall be created and shall be funded by Reorganized Millennium in the amount of $2,000,000 Cash (as provided below), plus such additional tangible or intangible assets as the Reorganized Millennium shall determine. The Millennium Lender Claim Trust shall be governed and administered in

– 36 –

accordance with the Millennium Lender Claim Trust Agreement substantially in the form attached as Exhibit B. The Millennium Lender Claim Trust shall be governed by the Trust Advisory Board, which shall select a trustee or trustees for the Millennium Lender Claim Trust, and if necessary, a replacement trustee therefor.

(ii)     Millennium Lender Claim Trust Assets

Substantially simultaneously with the formation of the Millennium Lender Claim Trust, the Consenting Lenders shall each be automatically deemed to have contributed the Retained Lender Causes of Action to the Millennium Lender Claim Trust. The Millennium Lender Claim Trust shall be funded by an initial contribution by Reorganized Millennium of in the amount of $2,000,000. Thereafter, Reorganized Millennium shall also be obligated to pay the reasonable fees and expenses of administering the Millennium Lender Claim Trust and liquidating the Causes of Action (including, for the avoidance of doubt, professional fees related thereto) upon receipt of an invoice therefor (not to exceed $10,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust). Once this $10,000,000 has been exhausted, Millennium shall advance additional funds from the Trust Delayed Draw Facility (not to exceed $7,000,000 in the aggregate of all such funds advanced to both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) in respect of fees and costs of the Millennium Lender Claim Trust at the request of the Millennium Lender Claim Trust Advisory Board. Amounts advanced by Reorganized Millennium to the Millennium Lender Claim Trust by virtue of draws on the Trust Delayed Draw Facility shall be reimbursed to it, without interest, from net proceeds recovered by the Millennium Lender Claim Trust (*i.e.*, gross recoveries from liquidation of the Causes of Action less any costs incurred in administering the Millennium Lender Claim Trust and in connection with prosecution, settlement or liquidation of the Causes of Action which have not previously been reimbursed or paid by the Reorganized Millennium). The initial $2,000,000 cash contribution and subsequent payment of up to $10,000,000 in payment of invoices shall not be required to be reimbursed.

(iii)     Beneficiaries; Reimbursement Rights of Backstop MLH Shareholders

The beneficiaries of the Millennium Lender Claim Trust are the Consenting Lenders. Solely to the extent of any net proceeds recovered from any Non-Contributing MLH Shareholder Claims, the Backstop MLH Shareholders shall be entitled to the reimbursement rights as follows: with respect to any net proceeds recovered by the Millennium Lender Claim Trust from any Non-Contributing MLH Shareholder Claims, such net proceeds shall be reimbursed first to the Backstop MLH Shareholders, in the aggregate with any net proceeds received from the Millennium Corporate Claim Trust up to the amount of the Non-Contributing MLH Shareholders' Pro Rata share of MLH Contribution. Subject to the reimbursement rights of the Backstop MLH Shareholders in accordance with this Article V.G(iii), the Consenting Lenders shall receive their Pro Rata share, based on the aggregate principal amount of only those Existing Credit Agreement Claims held by all Consenting Lenders, of beneficial interests in the Millennium Lender Claim Trust, as provided in Article III.C(ii)2 of this Plan.

– 37 –

(iv)     Federal Income Tax Treatment of Millennium Lender Claim Trust

The Millennium Lender Claim Trust shall be structured to qualify as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code.

## H.     Issuance of New Securities and Related Documentation

On the Equity Transfer Date, but after the transactions described in clause (i) of the definition of Equity Transfer Date, the Reorganized Debtors and New Holdco will be authorized to, and will, issue and execute, as applicable, the New Securities and Debt Documents, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  The issuance and distribution of the New Holdco Common Stock will be made in reliance on the exemption from registration provided by section 1145(a) of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, and will be exempt from registration under applicable securities laws.  Without limiting the effect of section 1145 of the Bankruptcy Code, or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, all financing documents, agreements, and instruments entered into and delivered on or as of the Equity Transfer Date contemplated by or in furtherance of the Plan, including, without limitation, the New Term Loan Agreement, the New Holdco Common Stock and any other agreement or document related to or entered into in connection with any of the foregoing, will become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

Upon the Equity Transfer Date, after giving effect to the transactions contemplated hereby, the authorized capital stock or other equity securities of New Holdco will be that number of shares of New Holdco Common Stock as may be designated in the New Holdco Organizational Documents.

## I.     Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Equity Transfer Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, or Equity Interests in or against the property of the Estates will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.  Any Entity holding such Liens, Claims, or Equity Interests will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the

– 38 –

Reorganized Debtors and shall incur no liability to any Entity in connection with its execution and delivery of any such instruments.

## J.   Reservation of Certain Claims of Governmental Units

Notwithstanding any other provision of the Plan, the Bankruptcy Code, or the Confirmation Order, the Debtors shall not be released from, property and assets shall not vest in the Reorganized Debtors free and clear of, and the USA Settlement Parties specifically reserve, the following claims:

(i)     Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

(ii)    Any criminal liability;

(iii)   Except as explicitly stated in the USA Settlement Agreements, any administrative liability/action, including, without limitation, mandatory exclusion from federal health care programs;

(iv)    Any liability to the USA (or its agencies) for any conduct other than the (i) Covered Conduct in the Federal UDT Settlement Agreement, (ii) Covered Conduct in the States UDT Settlement Agreement, (iii) Covered Conduct in the Federal PGT Settlement Agreement, and (iv) Covered Conduct in the States PGT Settlement Agreement (in each case, as "Covered Conduct" is defined in each respective USA Settlement Agreement);

(v)     Any liability based upon obligations created by the USA Settlement Agreements;

(vi)    Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

(vii)   Any liability for failure to deliver goods or services due;

(viii)  Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct (as defined in each respective USA Settlement Agreement); and

(ix)    Any liability of individuals as specifically reserved for in each respective USA Settlement Agreement related to the Covered Conduct (as defined in each respective USA Settlement Agreement);

(x)     Any right of HHS or CMS to reopen and deny claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for fraud or similar fault under 42 C.F.R. § 405.980; or

(xi)    Any liability for the claims related to Claims Universe A or Claims Universe B (as defined in the Federal Administrative Settlement Agreement) for which payment is reduced pursuant to any Medicare coverage or payment law, regulation, or guidance, other than for

– 39 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

submission of claims that were not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.

### K.  New Holdco and Reorganized Debtors Organizational Documents

The certificates of incorporation and bylaws or other organizational documents of the Reorganized Debtors shall be amended and restated as necessary to satisfy the provisions of the Plan and the Bankruptcy Code Consistent With The Restructuring Term Sheet.  The New Holdco Organizational Documents shall satisfy the provisions of the Plan and the Bankruptcy Code, and shall authorize the issuance of New Holdco Common Stock in an amount not less than the amount necessary to permit the distributions thereof required or contemplated by the Plan.  In each case, the applicable organizational documents of the Reorganized Debtors or New Holdco will (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein, and (iii) with respect to New Holdco, Millennium and its subsidiaries, include other provisions concerning corporate governance and shareholder rights as may be agreed upon by the Ad Hoc Group Majority.  After the Effective Date, New Holdco and the Reorganized Debtors may amend and restate their certificate of incorporation, by-laws, and other applicable organizational documents, as permitted by applicable law.

### L.  Directors and Officers of Reorganized Debtors

On the Effective Date, the New Board shall be as selected by the Ad Hoc Group Majority and disclosed in the Plan Supplement.  To the extent not previously disclosed, the Debtors will disclose, prior to the Confirmation Hearing, the affiliations of each Person proposed to serve on the initial board of directors or as an officer of the Reorganized Debtors, and, to the extent such Person is an insider other than by virtue of being a director or officer, the nature of any compensation for such Person.  Each such director and each officer of Millennium and RxAnte will serve from and after the Effective Date pursuant to applicable law and the terms of the New Holdco Organizational Documents and their other constituent and organizational documents and any employment agreements entered into with such Person.

### M.  Restructuring Transactions

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtors and/or the Reorganized Debtors shall enter into the Restructuring Transactions and any documents contemplated hereunder.  The Debtors and/or the Reorganized Debtors shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtors' business or the overall organization structure of the Reorganized Debtors Consistent With The Restructuring Term Sheet.  The Restructuring Transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtors to be necessary or appropriate.  The actions taken by the Debtors and/or the Reorganized Debtors to effect the Restructuring

– 40 –

Transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan and any documents contemplated hereunder, and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and any documents contemplated hereunder, and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion, or other organizational documents pursuant to applicable state law; and (iv) all other actions that the Debtors and/or the Reorganized Debtors determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the Restructuring Transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the Restructuring Transactions.

## N.    Corporate Action

Each of the Debtors and the Reorganized Debtors, as applicable, may take any and all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the Restructuring Transactions, including, without limitation, the distribution of the securities to be issued pursuant hereto in the name of and on behalf of the Reorganized Debtors and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers or directors of the Debtors or the Reorganized Debtors and as applicable or by any other Person (except for those expressly required pursuant to the Plan).

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the equity holders, members, officers, or directors of any Debtor (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement of further action by the equity holders, members, officers, or directors, of such Debtors, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of any Debtor or any Reorganized Debtors, as applicable, and any legal or corporate action required by any Debtor or any Reorganized Debtor as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the equity holders, members, officers, or directors of any Debtor or any Reorganized Debtors, as applicable, or by any other Person.  On the Effective Date, any

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

appropriate officer of the Debtors or the Reorganized Debtors, as applicable, are authorized to issue, execute, and deliver, file, record, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or referenced in the Plan in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable, including but not limited to those items referenced specifically in Article V.M and this Article V.N, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Entity.  The secretary and any assistant secretary of each Debtor and each Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

## O.    Cancellation of Notes, Certificates and Instruments

On the Equity Transfer Date, and provided that the New Securities and Debt Documents have been authorized by the Bankruptcy Court, executed by New Holdco and the Reorganized Debtors, as applicable and delivered to the party or parties entitled thereto, except as provided below, all notes, stock, instruments, certificates, agreements and other documents evidencing the Existing Credit Agreement Claims and the Existing Equity Interests in Millennium will be canceled, and the obligations of the Debtors thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. On the day following the date that the final distribution is made by Administrative Agent, the Administrative Agent will be released and discharged from any further responsibility under the Existing Loan Documents; provided, however, that any and all rights of indemnification applicable to the Administrative Agent (including, without limitation, any rights related to reimbursement of Administrative Agent Fees) or the Prior ~~Administrative Agent~~Agents, respectively, under the Existing Loan Documents and related documents shall survive and remain in full force and effect; provided further, however, until the Administrative Agent Fees have been paid in full, the Administrative Agent will retain its charging liens under the Existing Loan Documents with respect to any cash distributions to be made under the Plan by the Administrative Agent. For the avoidance of doubt, by virtue of such Reinstatement or assumption, as applicable, any Prior Agent Indemnity Claims and Prior Agent Lender Indemnity Obligations shall continue to be governed by Sections 9.7 and 10.5, as applicable, of the Existing Credit Agreement and any other applicable provisions of the Existing Loan Documents, and the Consenting Lenders shall have and retain all indemnity-related rights conferred on them pursuant to Section 9.7 of the Existing Credit Agreement and any other applicable provisions of the Existing Loan Documents and applicable law (collectively, the "Consenting Lender Indemnity-Related Rights") and in the event either the Prepetition Lenders or the Debtors (or the Reorganized Debtors, except for Holdings) make any  payment in respect of a Prior Agent Indemnity Claim or Prior Agent Lender Indemnity Obligation, as applicable, nothing contained in this Plan shall be deemed to constitute a release of any Consenting Lender Indemnity-Related Rights or other indemnity, contribution or other claims

– 42 –

or rights the Prepetition Lenders, the Debtors or such Reorganized Debtors may have as against each other under the Existing Loan Documents or otherwise applicable law.

**P.      Preservation and Maintenance of Debtor Causes of Action**

(i)      Maintenance of Causes of Action

Except as otherwise provided in Article X or elsewhere in this Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, after the Effective Date, the Reorganized Debtors or the Millennium Corporate Claim Trust (in accordance with Article V.F of this Plan), as applicable, shall retain any and all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action that are not Released Claims, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.  The Reorganized Debtors, as the successors in, interest to the Debtors and the Estates, or the Millennium Corporate Claim Trust (in accordance with Article V.F of this Plan), as applicable, may, in their sole and absolute discretion, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any claims or Causes of Action that are not Released Claims without notice to or approval from the Bankruptcy Court.  The Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) may pursue such retained claims, rights or Causes of Action, suits, or proceedings as appropriate, but for the avoidance of doubt, not any Released Claims, in accordance with the best interests of the Reorganized Debtors or the Millennium Corporate Claim Trust, as applicable, or their successor(s) who hold such rights.

(ii)      Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is (A) expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), or (B) subject to the bar order and injunction provisions in Article X.J of this Plan, Article X.K of this Plan, and the Confirmation Order, the Debtors expressly reserve such Cause of Action for later adjudication (including, without limitation, other than with respect to Released Claims, Causes of Action not specifically identified or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist and all Retained Corporate Causes of Action) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action upon or after the Confirmation of the Plan or the Effective Date of the Plan based on the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article X of the Plan) or any other Final Order (including, without limitation, the Confirmation Order).  Any Retained Corporate Causes of Action shall be transferred to the Millennium Corporate Claim Trust in accordance with Article V.F of this

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

Plan for later adjudication by the Millennium Corporate Claim Trust. In addition, the Debtors and the Reorganized Debtors expressly reserve the right to pursue or adopt any claims alleged in any lawsuit in which any Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

## Q. Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers or mortgages from or by a Debtors to a Reorganized Debtors or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## R. Certain Tax Matters

(i)     Tax Characterization of the Restructuring

For U.S. federal income tax purposes (and for all other applicable tax purposes): (A) all income and gain resulting from the cancellation or modification of debt or claims pursuant to this Agreement shall be allocated in accordance with the Holdings LLC Agreement; (B) the acquisition by the Holders of Existing Credit Agreement Claims of 100% of the existing and outstanding Equity Interests in Millennium, a disregarded entity, shall be treated as the transfer of assets owned by Millennium by Holdings to the Holders of Existing Credit Agreement Claims and the acquisition of the assets of Millennium by the Holders of Existing Credit Agreement Claims; and (C) the contribution of 100% of the issued and outstanding Equity Interests of Millennium to New Holdco in exchange for 100% of the New Holdco Common Stock shall be treated as an exchange qualifying under Section 351 of the Tax Code.

Subject to the preceding paragraph, for U.S. federal tax purposes (and for all other applicable tax purposes), the creation of the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of assets to the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, the transfer of beneficial interests in the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust, and the transfer of 100% of the Equity Interests In Reorganized Millennium to the Holders of Existing Credit Agreement Claims shall be characterized as an integrated transaction. Such integrated transaction shall be treated as the receipt by each Holder of Existing Credit Agreement Claims, in full and final satisfaction of the Existing Credit Agreement Claims, of its Pro Rata share of and interest in (A) 100% of the Equity Interests in Reorganized Millennium and (B) 100% of the beneficial interests in the Millennium Corporate Claim Trust.

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, the MLH Shareholders, and the TA Shareholders shall file all tax returns consistent with the

– 44 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

characterization provided in this Article V.R, unless otherwise required by a final "determination" within the meaning of Section 1313 of the Tax Code.

(ii)     USA Settlement Deduction

Any tax deduction with respect to amounts payable from the Settlement Contribution, whether under the USA Settlement Agreements or otherwise shall be deductions of Holdings attributable to a Pre-Closing Tax Period and shall be allocated 55% to MLH and 45% to TA. Any such deductions allocated to MLH while MLH is an S corporation will be allocated out to MLH's historic owners and such deductions shall be for the benefit of the historic MLH Shareholders.

(iii)     Section 754 Election

Holdings and any of its subsidiaries that are treated as partnerships for federal and state income tax purposes shall make elections under Section 754 of the Tax Code for the taxable year of the partnership in which the restructuring occurs, if such an election has not already been made.

(iv)     Cooperation; Amended Returns

Millennium, Holdings, MLH, TA, the Prepetition Lenders, New Holdco, and the historic TA Shareholders, and the historic MLH Shareholders shall work cooperatively and collectively with respect to tax reporting and to take consistent tax positions; provided, however, that such agreement to work cooperatively and collectively shall not bind any of the identified parties to any valuation of Millennium (except with respect to transfers to the Millennium Corporate Claim Trust, as identified in Article V.F(iv) hereof).   Neither New Holdco nor any Prepetition Lender shall (i) file or amend any tax return of the Company for any Pre-Closing Tax Period, except as required by law, or (ii) enter into any voluntary disclosure agreements, enter into any settlements, forego any right to a refund, or extend the statute of limitations of a tax, in each case with respect to a Pre-Closing Tax Period, if such action would reasonably be likely to adversely affect the historic owners of TA or MLH, without the consent of the historic owners of TA and MLH, which consent shall not be unreasonably withheld, conditioned or delayed.

(v)     Holdings Tax Returns

All income tax returns and similar tax returns of Holdings shall be prepared jointly by TA and MLH.  Both TA and MLH will have the right to approve such tax returns prior to the filing of such tax returns.  Holdings will be liquidated for tax purposes no later than February 28, 2016. MLH, TA and Holdings will make no claims against the Holders of Existing Credit Agreement Claims, Millennium or New Holdco for any taxes of Holdings.  The Prepetition Lenders will not be liable for any income or tax liabilities from or with respect to Holdings for any tax periods, nor will the Prepetition Lenders be liable for any income or tax liabilities attributable to the Company's assets for a Pre-Closing Tax Period.  Holdings shall have no liability with respect to the debt owed to the Holders of Existing Credit Agreement Claims or

– 45 –

the Prior Agent Indemnity Claims. Holdings intends to treat any of the debt owed to the Holders of Existing Credit Agreement Claims and Prior Agent Indemnity Claims in excess of the value of Millennium as resulting in debt cancellation income to Holdings for tax purposes.

(vi)     Entity Classifications

Holdings will continue to be classified as a partnership for tax purposes until its liquidation for tax purposes. Millennium and its subsidiaries shall continue to be classified as entities disregarded as separate from their owners (within the meaning of Treas. Reg. Section 301.7701-3) for all tax purposes through the Equity Transfer Date. No party (other than New Holdco or the Holders of Existing Credit Agreement Claims with respect to Post-Closing Tax Periods) shall make an election to treat Millennium or any of its subsidiaries as an association taxable as a corporation or otherwise incorporate any of such entities.

(vii)     TA and MLH Taxes and Refunds

The present owners of TA and/or TA will receive all tax refunds and tax benefits of TA. TA and the present owners of TA will be responsible for and will make no claims against the Prepetition Lenders, New Holdco, the Company, MLH or the owners of MLH for any taxes of TA, or the present owners of TA, respectively. MLH and/or the present owners of MLH will receive all tax refunds and tax benefits of MLH. MLH and the present owners of MLH will be responsible for and will make no claims against the Prepetition Lenders, the Company, TA or the owners of TA for any taxes of MLH, or the present owners of MLH, respectively.

(viii)     Post-Closing Taxes

New Holdco shall be responsible for all taxes of Reorganized Millennium and its subsidiaries attributable to Post-Closing Tax Periods, and shall be entitled to receive all tax refunds and benefits of Millennium attributable to Post-Closing Tax Periods.

## S.     Further Transactions

If the conditions to occurrence of the Effective Date set forth in Article VIII.B are not satisfied on or before December 30, 2015 (the "Consummation Deadline"), the Debtors shall not be authorized to proceed to consummate the Plan. Subject to the consent of the Federal Settlement Parties, MLH, TA, and an Ad Hoc Group Majority, as determined in each such party's sole and absolute discretion, the Debtors may extend the Consummation Deadline from time to time in order to preserve the ability to consummate the Plan.

# ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

**A.    Assumed Contracts and Leases**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtors shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired                                    Lease:
(1) was assumed or rejected previously by the Debtors; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; (4) is otherwise identified in the Plan Supplement as an Executory Contract or Unexpired Lease to be rejected before the Effective Date; or (5) is to be rejected pursuant to the terms of the Plan.

Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, entry of the Confirmation Order by the Bankruptcy Court will constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtors, and be enforceable by the Reorganized Debtors in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions such assumption, assignment or transfer.  Any provision in the Assumed Agreements that purports to declare a breach or default based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable.  Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtors based on the filing of the Chapter 11 Cases or the financial condition of the Debtors shall be unenforceable.  To the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtors' assumption of such Executory Contract or Unexpired Lease, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Each Executory Contract and Unexpired Lease assumed pursuant to this Article of the Plan will revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

**B.      Assignment of Executory Contracts or Unexpired Leases**

In the event of an assignment of an Executory Contract or Unexpired Lease, at least twenty (20) days prior to the Confirmation Hearing, the Debtors will serve upon counterparties to such Executory Contracts and Unexpired Leases, a notice of the proposed assumption and assignment, which will:  (a) list the applicable Cure amount, if any; (b) identify the party to which the Executory Contract or Unexpired Lease will be assigned; (c) describe the procedures for filing objections thereto; and (d) explain the process by which related disputes will be resolved by the Bankruptcy Court; additionally, the Debtors will file with the Bankruptcy Court a list of such Executory Contracts and Unexpired Leases to be assigned and the proposed Cure amounts.  Any applicable Cure amounts will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assignment or any related Cure amount must be filed, served and actually received by the Debtors at least five (5) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assignment or Cure amount will be deemed to have consented to such assignment of its Executory Contract or Unexpired Lease.  The Confirmation Order will constitute an order of the Bankruptcy Court approving any proposed assignments of Executory Contracts or Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

In the event of a dispute regarding (a) the amount of any Cure payment, (b) the ability of any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assigned or (c) any other matter pertaining to assignment, the applicable Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assignment.  If an objection to assignment or Cure amount is sustained by the Bankruptcy Court, the Reorganized Debtors in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming and assigning it.

**C.      Rejection of Executory Contracts or Unexpired Leases**

All Executory Contracts and Unexpired Leases designated for rejection in the Plan Supplement will be deemed rejected as of the Effective Date.  The Confirmation Order will constitute an order of the Bankruptcy Court approving the rejections described in this Article of the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  All claims arising from the rejection of any Executory Contract or Unexpired Lease shall be treated as General Unsecured Claims, subject to any applicable limitation or defense under the Bankruptcy Code and applicable law.  Rejection damages claims are Class 6 Claims.

– 48 –

**D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption must be filed, served and actually received by the Debtors at least ten (10) days prior to the Confirmation Hearing.  Any counterparty to an Executory Contract and Unexpired Lease that fails to object timely to the proposed assumption will be deemed to have assented and will be deemed to have forever released and waived any objection to the proposed assumption other than with respect to any alleged Cure amount, which may be asserted at any time.  In the event of a dispute regarding (1) the amount of any payments to Cure a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed or (3) any other matter pertaining to assumption, the Cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to Cure is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming it.

**E.    Assumption of Officer Insurance Policies**

The Debtors, and upon the Effective Date, the Reorganized Debtors, will assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code.  Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan.  Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under the D&O Liability Insurance Policies.

**F.    Indemnification Provisions**

The indemnification provisions currently in place under the Limited Liability Company Operating Agreement for Millennium dated as of April 11, 2014 (without regard to any amendments which may have been made thereto or any board resolutions which may have been adopted in respect of indemnification) (the "Operating Agreement") and the Existing Loan

– 49 –

Documents solely for the following: (i) the Prior ~~Administrative Agent~~Agents; (ii) the Administrative Agent; (iii) the Early Commitment Facility Agent; ~~and~~ (iv) the officers of Millennium who served in such capacity as of the Petition Date or any time thereafter through the Effective Date and (v) the Prepetition Lenders (but solely to the extent of, and without prejudice to, any of the Consenting Lender Indemnity-Related Rights or any other indemnity, contribution or other Claims they may have against the Debtors (or the Reorganized Debtors, except for Holdings) under the Existing Loan Documents on account of their making a payment in respect of a Prior Agent Lender Indemnity Claim) (collectively, the "Preserved Indemnified Parties") with respect to or based upon any act or omission taken or omitted in such capacities will be Reinstated (or assumed, as the case may be) solely in respect to the Preserved Indemnified Parties, and will survive effectiveness of the Plan. No such Reinstatement or assumption shall in any way extend the scope or term of any indemnification provision beyond that contemplated in the underlying Operating Agreement and Existing Loan Documents. Notwithstanding anything in this Article VI.F to the contrary, no other claimed Indemnification Agreement regarding any Senior Executive shall be assumed or Reinstated unless mutually agreed upon by the Ad Hoc Group Majority and the respective Senior Executive with respect to any such indemnity terms (and such other Indemnification Agreements may be amended by the mutual agreement of the Ad Hoc Group Majority and the respective Senior Executive). If the Ad Hoc Group Majority and Senior Executive do not reach an agreement regarding the assumption or Reinstatement of such Senior Executive's other claimed Indemnification Agreements, all parties reserve their rights regarding such other claimed Indemnification Agreements. For the avoidance of doubt, nothing in this Article VI.F shall (i) expand the indemnification obligations owed by any of the Releasing Parties to the Released Parties beyond the limits set forth in Article X.M hereof; (ii) constitute a Reinstatement or assumption of any indemnification obligations which may be owed by Millennium or any other Debtor to Holdings or any other Person or Entity other than the Preserved Indemnified Parties solely with respect to the indemnification provisions set forth above, or (iii) constitute a Reinstatement or assumption of any indemnification obligations of either Millennium to Holdings, or Holdings or any Debtor to any of the Preserved Indemnified Parties or any other Person or Entity except for Millennium.

## G. Compensation and Benefit Programs

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtors generally applicable to its employees, retirees, and the employees and retirees of its subsidiaries, including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, life, and accidental death and dismemberment insurance plans, are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. To the extent that such plans or agreements providing for bonuses or severance to insiders may fall within this Article VI.G of the Plan, such plans and agreements will not be assumed; provided, however, that such insiders may assert any claims arising under such plans or agreements against the applicable Debtors as Class 6 Claims.

– 50 –

### H. Workers' Compensation Benefits

Except as otherwise provided in the Plan, as of the Effective Date, the Debtors and the Reorganized Debtors will continue to honor their obligations under: (i) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, and any other policies, programs, and plans regarding or relating to workers' compensation and workers' compensation insurance, All such contracts and agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan will not impair or otherwise modify any rights of the Reorganized Debtors under any such contracts, agreements, policies, programs or plans regarding or relating to workers' compensation or workers' compensation insurance.

### I. Third Party Payer Contracts

Except as otherwise provided in the Plan or any order of the Bankruptcy Court, all Third Party Payer Contracts are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code. Any provision in the Third Party Payer Contracts that purports to declare a breach or default or to accelerate any payment obligations based in whole or in part on commencement or continuance of these Chapter 11 Cases is hereby deemed unenforceable. Nothing under the Plan shall affect the Debtors' or the applicable counterparty's rights, claims and defenses in respect of any Third Party Payer Contract, or the right of either party thereto to future adjudication of any disputes in respect thereto in accordance with the applicable provisions of such Third Party Payer Contract.

### J. Medicare and Medicaid Agreements

The Medicare and Medicaid Agreements are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code; provided that, for the avoidance of doubt, Holdings is not assuming any Medicare and Medicaid Agreements. Nothing under the Plan will affect the USA's, HHS's, or CMS's rights, claims, and defenses in respect of any Medicare and Medicaid Agreements for future adjudication in accordance with the applicable provisions of such Medicare and Medicaid Agreements. The "cure" and adequate assurance of future performance under section 365 of the Bankruptcy Code for the assumption of the Medicare and Medicaid Agreements shall be: (a) the performance by the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, of their obligations under the USA Settlement Agreements; and (b) the continued participation of the Debtors and New Holdco, Reorganized Millennium, and its subsidiaries, as applicable, in the Medicare and Medicaid programs in the ordinary course of business to be governed by and subject to, the terms and conditions of the Medicare and Medicaid Agreements and the Medicare statutes, regulations, policies and

– 51 –

procedures, including the recovery of overpayments other than the Determined Overpayments (as defined in the Federal Administrative Settlement Agreement) in the ordinary course of business. In the event that any of the Medicare and Medicaid Agreements are subsequently terminated and the Debtors or New Holdco, Reorganized Millennium, and its subsidiaries re-enroll in the Medicare and Medicaid programs, such parties agree that they shall assume successor liability as to any liability arising under the Medicare Agreements and that such successor liability shall be governed by and subject to, the terms and conditions of the Medicare statutes, regulations, policies and procedures, including the recovery of overpayments in the ordinary course of business.

## ARTICLE VII

## PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Distribution Record Date

Distributions hereunder to the Holders of Allowed Claims shall be made to the Holders of such Claims as of the Distribution Record Date. Transfers of Claims after the Distribution Record Date shall not be recognized for purposes of this Plan. On the Distribution Record Date, the Administrative Agent shall provide a true and correct copy of the registry for the Existing Credit Agreement Claims to the Debtors. The Distribution Agent, or any party responsible for making distributions pursuant to this Article VII.A shall be entitled to recognize and deal for all purposes hereunder only with those record Holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

### B.    Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan or Confirmation Order and in the USA Settlement Agreements, Holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Equity Transfer Date, all debts of the Debtors shall be deemed fixed and adjusted pursuant to the Plan and the Reorganized Debtors shall have no liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Reorganized Debtors under the Plan shall be in full and final satisfaction, settlement and release of all Claims against the Reorganized Debtors.

– 52 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

## C.    Distribution Agent

Except as provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors, New Holdco, or the Administrative Agent, respectively, as Distribution Agent, or by such other Entity designated by the Reorganized Debtors or New Holdco as a Distribution Agent on the Effective Date.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of the Reorganized Debtors' duties as Distribution Agent unless otherwise ordered by the Bankruptcy Court.  For purposes of distributions under this Plan to the Holders of Existing Credit Agreement Claims, the Administrative Agent will be and shall act as the Distribution Agent and in acting in such capacity shall be entitled to all of the rights, protections, and indemnities afforded to the Administrative Agent under the Existing Credit Agreement.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions hereof.  If the Distribution Agent is an entity other than a Reorganized Debtor or New Holdco, such entity shall be paid its reasonable fees and expenses, including the reasonable fees and expenses of its attorneys or other professionals.

## D.    Cash Distributions

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtors, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

## E.    Rounding of Payments

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar or zero if the amount is less than one dollar.  To the extent Cash, notes, warrants, shares, stock are to be distributed under the Plan remain undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash, notes, or shares shall be treated as an Unclaimed Distribution under the Plan.

No fractional shares shall be issued or distributed under the Plan.  Each Person entitled to receive Equity Interests or New Holdco Common Stock shall receive the total number of whole shares of Equity Interests or New Holdco Common Stock, as applicable to which such Person is entitled.  Whenever any distribution to a particular Person would otherwise call for distribution of a fraction of shares of Equity Interests or New Holdco Common Stock, the

– 53 –

actual distribution of shares of such Equity Interests shall be rounded to the next lower whole number.

## F.      Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim, or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order.  Distributions to any Holder of an Allowed Claim shall be allocated first to the principal amount of any such Allowed Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual distribution shall reflect a rounding of such fraction down to the nearest dollar.

## G.      General Distribution Procedures

The Reorganized Debtors, or any other duly appointed Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise.  All Cash and other property held by the Reorganized Debtors for distribution under the Plan shall not be subject to any claim by any Person, except as provided under the Plan.

## H.      Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the address set forth on any proofs of claim filed by such Holders (to the extent such proofs of claim are filed in the Chapter 11 Cases), (2) at the addresses set forth in any written notices of address change delivered to the Debtors, (3) at the addresses in the Debtors' books and records, or (4) in accordance with the Existing Credit Agreement.

## I.      Undeliverable Distributions and Unclaimed Distributions

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtors as undeliverable, no further distribution shall be made to such Holder, and the Reorganized Debtors shall have no obligation to make any further distribution to the Holder, unless and until the Reorganized Debtors is notified in writing of such Holder's then current address.

Any Entity which fails to claim any Unclaimed Distribution within one year from the date upon which a distribution is first made to such entity shall be deemed to forfeit all rights to such Unclaimed Distribution under the Plan.  Such Unclaimed Distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to and vest in the Reorganized Debtor free of any restrictions thereon.  Entities which fail to claim such Unclaimed Distribution shall have no claim whatsoever on account of such Unclaimed

– 54 –

Distribution against the Debtors or the Reorganized Debtors or against any Holder of an Allowed Claim to whom distributions are made by the Reorganized Debtors.

## J.    Withholding Taxes

Pursuant to section 346(f) of the Bankruptcy Code, the Reorganized Debtors shall be entitled to deduct any federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. From and as of the Effective Date, the Reorganized Debtors shall comply with all reporting obligations imposed on it by any Governmental Unit in accordance with applicable law with respect to such withholding taxes. As a condition to receiving any distribution under the Plan, the Reorganized Debtors may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Reorganized Debtors to comply with applicable tax reporting and withholding laws. For the avoidance of doubt, no amounts shall be withheld from any contributions or transfers, pursuant to the terms of this Plan, to the Millennium Corporate Claim Trust, or the Millennium Lender Claim Trust.

## K.    Setoffs

The Reorganized Debtors may, to the extent permitted under applicable law, setoff against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Reorganized Debtors may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; provided, however, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such claims, rights and causes of action that the Reorganized Debtors possesses against such Holder. The Reorganized Debtors shall provide prompt notice of any setoff to the Holder of the subject Allowed Claim, and all Holders of Allowed Claims shall have the right to challenge such setoff in any forum with jurisdiction over the parties.

## L.    Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by the instruments, securities, notes, or other documentation canceled pursuant to Article V.O of the Plan, the Holder of such Claim will tender the applicable instruments, securities, notes or other documentation evidencing such Claim (or a sworn affidavit identifying the instruments, securities, notes or other documentation formerly held by such Holder and certifying that they have been lost), to the Reorganized Debtors or another applicable Distribution Agent unless waived in writing by the Debtors or the Reorganized Debtors, as applicable.

## M.    Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen,

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Reorganized Debtors and other applicable Distribution Agent: (x) evidence reasonably satisfactory to the Reorganized Debtors and other applicable Distribution Agent of such loss, theft, mutilation, or destruction; and (y) such security or indemnity as may be required by the Reorganized Debtors and other applicable Distribution Agents to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Allowed Equity Interest. Upon compliance with Article VII.L of the Plan as determined by the Debtors or Reorganized Debtors by a Holder of a Claim or Equity Interest evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Reorganized Debtors and other applicable Distribution Agents.

# ARTICLE VIII

## CONDITIONS PRECEDENT TO THE PLAN'S CONFIRMATION AND EFFECTIVE DATE

**A.     Conditions to Confirmation**

The Plan's Confirmation is subject to the satisfaction of each of the following conditions precedent:

(i)     The Plan and Confirmation Order shall be in form and substance reasonably satisfactory to the Debtors, the Federal Settlement Parties, the Ad Hoc Group, and the Settling Members and shall be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(ii)     The RSA shall not have been terminated by any of the parties thereto.

(iii)     The Debtors shall have filed a motion seeking assumption of the USA Settlement Agreements and approval of the Subrogation Claim.

**B.     Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)     The Effective Date shall not occur prior to December 15, 2015.

(ii)     The Bankruptcy Court shall have entered an order confirming the Plan. This condition precedent is not subject to waiver by any party.

(iiiii)     The Bankruptcy Court shall have entered the Confirmation Order and such Confirmation Order (1) shall (A) approve the releases (including the third party release) and exculpations provided for in Article X.E, Article X.F, Article X.G, and Article X.H of this

– 56 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

Plan, but not approve the release of, and specifically reserve for the benefit of the USA and Plaintiff States, the claims and liabilities provided for in Article V.J of this Plan; (B) contain the contribution claim and Non-Contribution Claim protections provided for in Article X.L of this Plan and such other protections for the Released Parties and their respective Related Parties set forth in the RSA; and (C) contain the bar order provisions set forth in Article X.J of this Plan, in each case, in form, scope, and substance consistent in all material respects with the RSA; and (2) shall otherwise be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements.  This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(~~iii~~iv)    The Confirmation Order shall be a Final Order; provided, however, that only the Settling Members may agree in writing, in their sole and absolute discretion, to waive the condition that the Confirmation Order be a final, non-appealable order.

(~~iv~~v)    The RSA shall have been assumed pursuant to the Confirmation Order and shall not have been terminated by any of the parties thereto.

(~~v~~vi)    The USA Settlement Agreements shall have been assumed pursuant to the USA Settlement Assumption Order or Confirmation Order and shall not have been terminated by any of the parties thereto. This condition precedent is not subject to waiver by the Debtors without notice to the USA Settlement Parties.

(~~vi~~vii) Good faith efforts have been made for the organizational documents of the Reorganized Debtors to have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization.

(~~vii~~viii) New Holdco shall have been formed and the New Holdco Organizational Documents shall have been adopted and (where required by applicable law) filed with the applicable authorities of the relevant jurisdictions of organization and shall have become effective in accordance with such jurisdiction's corporation or limited liability company laws.

(~~viii~~ix) The Debtors shall have received any and all required regulatory approvals to consummate the transactions contemplated by the Plan, the Disclosure Statement, and any documents contemplated thereunder.

(~~ix~~x)    The transactions contemplated by this Plan, the Disclosure Statement, and any other documents contemplated hereunder or thereunder shall have been approved to the extent required and shall not be subject to avoidance.

(~~x~~xi)    All other documents and agreements necessary to implement the Plan on the Effective Date to the extent required herein or in the RSA, including the without limitation the New Term Loan Agreement, shall have been executed and delivered and all other actions required to be taken in connection with the Effective Date shall have occurred.

(~~xi~~xii) All statutory fees and obligations then due and payable to the Office of the United States Trustee shall have been paid and satisfied in full.

– 57 –

(~~xii~~xiii) The New Securities and Debt Documents shall be in form and substance reasonably satisfactory to the Debtors and an Ad Hoc Group Majority, and shall have been executed and delivered by all parties thereto to the extent required hereunder.

## C.  Conditions to the Equity Transfer Date

The occurrence of the Equity Transfer Date is subject to each of the following conditions precedent:

(i)  All conditions to the Effective Date of the Plan as provided in Article VIII.B above shall have been satisfied or waived.

(ii)  The Equity Transfer Date shall be at least one (1) Business Day following payment of the Settlement Contribution and payment of the USA Settlement Funding Contribution to the USA.

(iii)  The JS Real Estate Leases shall have been amended on the terms specified in the RSA and assumed by Millennium.

(iv)  The Debtors shall have paid or caused to be paid the USA Settlement Funding Contribution to the USA.

## D.  Waiver of Conditions

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article VIII may be waived only if waived in writing by each of the Debtors, the Ad Hoc Group Majority, and the Settling Members (except as otherwise stated in this Article VIII or the RSA) without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan subject to any consents that may be required under the RSA.  The failure to satisfy or waive a condition to the Effective Date may be asserted by any of the Debtors, the Ad Hoc Group Majority, and the Settling Members regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of the Debtors, the Ad Hoc Group Majority, or the Settling Members to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time.

## E.  Effect of Non Occurrence of Conditions to the Effective Date

If the Effective Date of the Plan does not occur on or before December 30, 2015, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will:  (a) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors, any Holders or any other Entity; (c) constitute an allowance of any Claim or Equity Interest; or (d) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders or any other Entity in any respect; provided, however, that such date may be extended by agreement of all

– 58 –

of the Debtors, the Ad Hoc Group Majority, MLH, TA, and the Federal Settlement Parties, each acting in their respective sole and absolute discretion.

# ARTICLE IX

# RETENTION OF JURISDICTION

## A.      Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and this Plan as legally permissible, including, without limitation, jurisdiction to:

(i)      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of any Claim or Equity Interest;

(ii)      grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Confirmation Date; provided, however, that, from and after the Effective Date, the Reorganized Debtors shall pay Professionals in the ordinary course of business for any work performed after the Effective Date and such payment shall not be subject to the approval of the Bankruptcy Court;

(iii)      resolve any matters related to the assumption, assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable and to adjudicate and, if necessary, liquidate, any Claims arising therefrom, including, without limitation, those matters related to any amendment to this Plan after the Effective Date to add Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed;

(iv)      resolve any issues related to any matters adjudicated in the Chapter 11 Cases;

(v)      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

(vi)      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other Causes of Action that are pending as of the Effective Date or that may be commenced in the future, and grant or deny any applications involving the Debtors that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, provided that the Reorganized Debtors shall reserve the right to commence actions in all appropriate forums and jurisdictions;

– 59 –

(vii)    enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all other contracts, instruments, releases and other agreements or documents adopted in connection with this Plan, the Plan Supplement or the Disclosure Statement;

(viii)    resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

(ix)    issue injunctions and enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of this Plan, except as otherwise provided in this Plan;

(x)    enforce the terms and condition of this Plan and the Confirmation Order;

(xi)    resolve any cases, controversies, suits or disputes with respect to the release, the Exculpation, the indemnification provisions and other provisions contained in Article X hereof and enter such orders or take such others actions as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

(xii)    to enforce the releases, bar order(s), and injunction(s) provided in Article X hereof;

(xiii)    resolve any cases, controversies, suits, or disputes with respect to the release of all claims against USA Settlement Parties on account of the payment of the Initial USA Settlement Deposit and the USA Settlement Funding Contribution;

(xiv)    enter and implement such orders or take such others actions as may be necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

(xv)    resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement;

(xvi)    enter an order concluding or closing the Chapter 11 Cases; and

(xvii)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

## B.    Lack of Bankruptcy Court Jurisdiction

Notwithstanding any other provision of this Plan or the Confirmation Order, the Bankruptcy Court shall not have jurisdiction with respect to: (i) any actions or proceedings to

– 60 –

enforce the Guarantee Agreement, an exhibit to the USA Settlement Agreements; (ii) any claims, actions or proceedings for any of the liabilities provided for in Article V.J of this Plan; and

(iii) any claims, actions or proceedings regarding regulation and administration of the participation in the Medicare and Medicaid programs by the Debtors, New Holdco, Reorganized Millennium, and all subsidiaries of Reorganized Millennium, as applicable.

## C.    Failure of Bankruptcy Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, including the matters set for in Article IX.A of the Plan, the provisions of this Article IX shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE X

## EFFECTS OF CONFIRMATION

## A.    Binding Effect

ON THE EFFECTIVE DATE, AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE PLAN WILL BIND, AND WILL BE DEEMED BINDING UPON, ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, AND SUCH HOLDER'S RESPECTIVE SUCCESSORS AND ASSIGNS, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR AFFIRMATIVELY VOTED TO REJECT THE PLAN.

## B.    Subordination Rights

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan, takes into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise.  As of the Effective Date, any and all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code or otherwise, relating to the allowance, classification and treatment of all Allowed Claims and their respective distributions and treatments under the Plan will be settled, compromised, terminated and released pursuant to the Plan; provided, however, that nothing contained in the Plan will preclude any Person or Entity from exercising their rights pursuant to and consistent with the

– 61 –

terms of the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan.

## C.    Discharge of the Debtors

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Causes of Action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in the Debtors or any of their assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests.  Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtors and their Estates will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Equity Interests in the Debtors, subject to the occurrence of the Effective Date.  However, the foregoing provisions will have no effect on the Debtors' liabilities as reserved by the USA Settlement Agreements and as provided for in Article V.J of this Plan, whether such liabilities arose prior to or after the Confirmation Date.

## D.    Exculpation and Limitation of Liability

The Exculpated Parties and the USA Settlement Parties will neither have nor incur any liability to any Entity for any claims or Causes of Action arising before, on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, the RSA, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents, actions or inactions; provided, further, however that the foregoing provisions will not apply to any acts, omissions, Claims, Causes of Action or other obligations expressly set forth in and preserved by the Plan or the Plan Supplement including the Retained Claims.

– 62 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

## E.    Releases by Debtor

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS PLAN OR THE CONFIRMATION ORDER, EFFECTIVE AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE RELEASED PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER AND RELEASE TO THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES (AND EACH SUCH RELEASED PARTY AND THEIR RESPECTIVE RELATED PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED AND DISCHARGED BY THE DEBTOR RELEASING PARTIES) AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER, OR ON BEHALF OF ANOTHER PARTY AGAINST THE RELEASED PARTIES OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT, INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH DEBTOR RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; (III) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST; AND/OR (IV) ANY CLAIMS OR DEFENSES AGAINST THIRD PARTY PAYERS UNDER ASSUMED CONTRACTS; PROVIDED, FURTHER, HOWEVER THAT FOR PURPOSE OF THIS ARTICLE X.E (I) NEITHER RXANTE, LLC NOR MILLENNIUM SHALL BE CONSIDERED A RELATED PARTY OF HOLDINGS AND (II) NO EMPLOYEE OR PROFESSIONAL OF HOLDINGS SHALL BE CONSIDERED A RELATED PARTY OF HOLDINGS.

FURTHERMORE, EFFECTIVE AS OF THE EFFECTIVE DATE OF THE USA SETTLEMENT AGREEMENTS AND CONTINUING TO BE EFFECTIVE AS OF THE EFFECTIVE DATE OF THE PLAN, FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE USA SETTLEMENT PARTIES, THE ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED AND CONFIRMED, THE DEBTOR RELEASING PARTIES WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER PROVIDED A FULL DISCHARGE, WAIVER, AND RELEASE TO THE USA SETTLEMENT PARTIES

– 63 –

AND THE USA SETTLEMENT PARTIES SO RELEASED SHALL BE DEEMED FOREVER RELEASED, WAIVED, AND DISCHARGED BY THE DEBTOR RELEASING PARTIES AND THEIR RESPECTIVE PROPERTIES FROM ANY AND ALL CLAIMS RELEASED PURSUANT TO THE USA SETTLEMENT AGREEMENTS.

THE FOREGOING RELEASE SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THIS RELEASE.  FOR PURPOSES OF THIS RELEASE, AND WITHOUT LIMITING THE SCOPE OF THE FOREGOING, THE DEBTORS ARE SPECIFICALLY ASSUMING CONTROL OF AND RELEASING ALL AVOIDANCE ACTIONS AGAINST THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES INCLUDING, WITHOUT LIMITATION, ALL CLAIMS AND CAUSES OF ACTION THAT ARE COVERED OR THAT ARISE UNDER BANKRUPTCY CODE SECTION 544.

**F.  Releases by TA and MLH**

(i)  SUBJECT TO (iii) BELOW, TA, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, HEREBY (A) FULLY AND COMPLETELY RELEASES AND FOREVER DISCHARGES HOLDINGS, MLH, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY AND ALL CORE RELEASED CLAIMS THAT TA OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY, AND INCLUDING, FOR THE AVOIDANCE OF DOUBT, ANY CLAIMS ARISING FROM MLH'S FAILURE TO MAINTAIN ITS STATUS AS AN S CORP), AGAINST HOLDINGS OR MLH OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGES AND WAIVES ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT) WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(ii)  SUBJECT TO (iii) BELOW,  MLH, ON BEHALF OF ITSELF AND ITS RELATED PARTIES, HEREBY (A) FULLY AND COMPLETELY RELEASES AND FOREVER DISCHARGES HOLDINGS AND TA, AND THEIR RESPECTIVE RELATED PARTIES, AND THE RELATED PARTIES OF SUCH RELATED PARTIES, FROM ANY

– 64 –

AND ALL CORE RELEASED CLAIMS THAT MLH OR ANY OF ITS RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT, ON BEHALF OF ONE ANOTHER OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY), AGAINST HOLDINGS OR TA OR THEIR RESPECTIVE RELATED PARTIES AND (B) ACKNOWLEDGES AND WAIVES ANY CLAIM WITH RESPECT TO THE NON-COMPLIANCE, IF ANY, WITH THE UMBRELLA AGREEMENT (AS DEFINED IN SECTION 12.12 OF THE HOLDINGS LLC AGREEMENT) WITH RESPECT TO ANY OBLIGATIONS UNDER THE UMBRELLA AGREEMENT WITH RESPECT TO SECTION 8.5(B) OF THE HOLDINGS LLC AGREEMENT.

(iii) FOR THE AVOIDANCE OF DOUBT AND NOTWITHSTANDING SUBPARAGRAPHS (I) AND (II) ABOVE, IN ANY LAWSUIT OR OTHER LEGAL ACTION BY AN EXCLUDED PARTY AGAINST TA, MLH OR THEIR RESPECTIVE RELATED PARTIES (COLLECTIVELY, "EQUITY DEFENDANTS"), EACH EQUITY DEFENDANT PRESERVES AND DOES NOT WAIVE THE RIGHT TO DEFEND OR OTHERWISE RESPOND TO SUCH ACTION BY ASSERTING THAT ANOTHER EQUITY DEFENDANT IS RESPONSIBLE FOR ANY OR ALL CAUSES OF ACTION ASSERTED BY, OR DAMAGES CLAIMED BY, AN EXCLUDED PARTY; AND PROVIDED, FURTHER, HOWEVER, NOTHING IN THIS PARAGRAPH RELEASES ANY PERSON FROM ANY CLAIM OR OBLIGATION ARISING UNDER THIS PLAN, INCLUDING THE PROVISIONS OF ~~Article~~ARTICLE V.R OF THIS PLAN.

**G.     Releases by Lender Releasing Parties**

EFFECTIVE AS OF THE EFFECTIVE DATE, THE LENDER RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT THE LENDER RELEASING PARTIES OR THEIR RESPECTIVE RELATED PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY AND ITS RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING RETAINED CLAIMS AND ANY CLAIMS AGAINST EXCLUDED PARTIES; (II) THE RIGHTS OF SUCH LENDER RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; AND/OR (III) ANY CLAIMS AGAINST THE NON-

– 65 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

## H.     Releases by Third Party Releasing Parties

EFFECTIVE AS OF THE EFFECTIVE DATE, THE THIRD PARTY RELEASING PARTIES AND THEIR RESPECTIVE RELATED PARTIES SHALL BE DEEMED TO HAVE RELEASED THE COMPANY, THE RELEASED PARTIES, AND THEIR RESPECTIVE RELATED PARTIES FROM ANY AND ALL RELEASED CLAIMS THAT ANY OF THE THIRD PARTY RELEASING PARTIES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT OR ON BEHALF OF ANOTHER PARTY, OR THROUGH DERIVATIVE STANDING OR OTHERWISE (INCLUDING, FOR THE AVOIDANCE OF DOUBT, ON BEHALF OF OR DERIVATIVELY FOR THE COMPANY) AGAINST A RELEASED PARTY OR THEIR RESPECTIVE RELATED PARTIES; PROVIDED, HOWEVER, THAT THE FOREGOING PROVISIONS OF THIS RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE (I) ANY CAUSES OF ACTION EXPRESSLY SET FORTH IN AND/OR PRESERVED BY THE PLAN OR THE PLAN SUPPLEMENT INCLUDING (A) RETAINED CLAIMS AND, (B) ANY CLAIMS AGAINST EXCLUDED PARTIES; , (C) ANY PRIOR AGENT INDEMNITY CLAIMS OR PRIOR AGENT LENDER INDEMNITY OBLIGATIONS UNDER THE EXISTING LOAN DOCUMENTS WITH RESPECT TO MILLENNIUM AND THE CONSENTING LENDERS, AS APPLICABLE, AND TO THE EXTENT A CONSENTING LENDER PAYS A PRIOR AGENT LENDER INDEMNITY OBLIGATION, ANY CONSENTING LENDER INDEMNITY-RELATED RIGHTS OR OTHER CONTRIBUTION, INDEMNITY OR OTHER CLAIM OF SUCH CONSENTING LENDER AGAINST THE DEBTORS (OR REORGANIZED DEBTORS, EXCEPT FOR HOLDINGS), UNDER THE EXISTING LOAN DOCUMENTS OR OTHERWISE APPLICABLE LAW (WITHOUT PREJUDICE TO ANY SUCH CONSENTING LENDER INDEMNITY-RELATED RIGHTS), (II) THE RIGHTS OF SUCH THIRD PARTY RELEASING PARTY TO ENFORCE THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN OR REINSTATED OR ASSUMED PURSUANT TO THE PLAN OR ASSUMED PURSUANT TO FINAL ORDER OF THE BANKRUPTCY COURT; (III) ANY LIABILITY EXPRESSLY RESERVED BY CERTAIN GOVERNMENTAL UNITS AS PROVIDED IN

– 66 –

~~Article~~ARTICLE V.J OF THIS PLAN; ~~AND/OR~~ (IV) ANY CLAIMS AGAINST THE NON-CONTRIBUTING MLH SHAREHOLDERS IN ORDER TO PRESERVE THE CLAIMS BEING TRANSFERRED TO THE MILLENNIUM CORPORATE CLAIM TRUST OR MILLENNIUM LENDER CLAIM TRUST~~.~~; AND/OR (V) THE RIGHT OF AN EXCLUDED PARTY, IF SUED IN ANY LAWSUIT OR OTHER LEGAL PROCEEDING BY A MILLENNIUM CLAIM TRUST, MILLENNIUM, A CONSENTING LENDER AND/OR ANY OTHER RELEASED PARTY OR ANY OF ITS RELATED PARTIES (ANY SUCH PARTY INSTITUTING SUCH LAWSUIT OR OTHER LEGAL PROCEEDING, IN ITS CAPACITY AS SUCH, THE "ASSERTING PARTY"), TO ASSERT ANY DEFENSE, CROSS-CLAIM AND/OR COUNTERCLAIM, IF ANY, AGAINST SUCH ASSERTING PARTY IN SUCH LAWSUIT OR OTHER LEGAL PROCEEDING WHERE SUCH EXCLUDED PARTY IS SUED; PROVIDED, HOWEVER, THAT IN THE EVENT A CROSS-CLAIM OR COUNTERCLAIM, IF ANY, IS ASSERTED, (X) IN NO EVENT SHALL ANY RECOVERY BY THE EXCLUDED PARTY ON SUCH CROSS-CLAIM OR COUNTERCLAIM AGAINST SUCH ASSERTING PARTY (WITHOUT GIVING EFFECT TO INDEMNIFIABLE DEFENSE COSTS, IF ANY, INDEMNIFIABLE BY SUCH ASSERTING PARTY) EXCEED THE AMOUNT OF ANY RECOVERY OBTAINED (WITHOUT GIVING EFFECT TO INDEMNIFIABLE DEFENSE COSTS, IF ANY, INDEMNIFIABLE BY SUCH ASSERTING PARTY) AGAINST THAT EXCLUDED PARTY BY SUCH ASSERTING PARTY AND (Y) THE PROVISIONS OF ARTICLE X.L OF THIS PLAN SHALL OTHERWISE BE APPLICABLE TO SUCH CROSS-CLAIM OR COUNTERCLAIM.

THE FOREGOING RELEASES SHALL BE EFFECTIVE AS OF THE EFFECTIVE DATE WITHOUT FURTHER NOTICE TO OR ORDER OF THE BANKRUPTCY COURT, ACT OR ACTION UNDER APPLICABLE LAW, REGULATION, ORDER, OR RULE OR THE VOTE, CONSENT, AUTHORIZATION OR APPROVAL OF ANY PERSON AND THE CONFIRMATION ORDER WILL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES RELEASED PURSUANT TO THESE RELEASES.

## I.    Waiver of Limitations on Releases of Unknown Claims

Each of the Debtors, Lender Releasing Parties, and Third Party Releasing Parties agree and acknowledge that the releases contained in Article X.E, Article X.F, Article X.G, and Article X.H shall extend to Released Claims that the parties do not know or expect to exist at the time of the release, which, if known, might have affected the decision to enter into the release and which the Parties shall be deemed to waive, and shall waive and relinquish to the fullest extent permitted by law, any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory thereof, or principle of common law, which governs or limits a person's release of unknown claims; further, with respect to any and all of the Released Claims, including any and all unknown claims that the Parties shall be deemed to

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

waive, and shall waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The parties also shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code § 1542. The Parties also acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is the intention of the parties to fully, finally, and forever settle and release with prejudice any and all Released Claims, including any and all unknown claims, without regard to the subsequent discovery or existence of additional or different facts. The parties expressly agree that any fraudulent inducement or similar claims that could be premised on unknown facts or facts that are subsequently discovered are included within the definition of unknown claims.

However, nothing in this section shall affect the claims and liabilities specifically reserved for Governmental Units in the USA Settlement Agreements as provided for in Article V.J of this Plan.

## J.     Bar Order

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Entity, including, without limitation all Third Party Releasing Parties, any Non-Consenting Lenders, each Excluded Party, and, for the avoidance of doubt, any Consenting Lender, whether directly, derivatively or otherwise, of any claims or Causes of Action released pursuant to this Plan, including but not limited to the claims and Causes of Action released in Articles X.E, F, G, and H. For the avoidance of doubt and subject to the following sentence, this injunction shall permanently bar, enjoin, and restrain (i) all persons and entities (including, without limitation, each Non-Consenting Lender, each Third Party Releasing Party, and each Excluded Party) from commencing or prosecuting any litigation or asserting any claims against Holdings, TA, MLH, or their respective Related Parties based on any Released Claims; (ii) to the maximum extent possible under applicable law, each Excluded Party and each Third Party Releasing Party from commencing, prosecuting, or asserting against any of the Released Parties any claims, actions or proceedings for contribution or indemnity, or otherwise, including any claims, actions or proceedings for contribution or indemnity or otherwise with respect to any liability or obligation of any Excluded Party to Millennium or the Consenting Lenders arising out of or in connection with any Retained Claims. The foregoing provision shall not operate to enjoin (i) the commencement or prosecution by the USA Settlement Parties of any action or proceeding to enforce the Guarantee Agreement, an exhibit to the USA Settlement

– 68 –

Agreements, (ii) the commencement or prosecution by a Prior Agent of any action or proceeding to enforce any Prior Agent Lender Indemnity Claims or Prior Agent Lender Indemnity Obligations under the Existing Loan Documents with respect to Millennium and the Consenting Lenders, as applicable, or (iii) the right of an Excluded Party, if sued in any lawsuit or other legal proceeding by an Asserting Party to assert any defense, cross-claim and/or counterclaim, if any, against such Asserting Party in such lawsuit or other legal proceeding where such Excluded Party is sued; provided, however, that in the event a cross-claim or counterclaim, if any, is asserted, (x) in no event shall any recovery by the Excluded Party on such cross-claim or counterclaim against such Asserting Party (without giving effect to indemnifiable defense costs, if any, indemnifiable by such Asserting Party) exceed the amount of any recovery obtained (without giving effect to indemnifiable defense costs, if any, indemnifiable by such Asserting Party) against that Excluded Party by such Asserting Party and (y) the provisions of Article X.L of this Plan shall otherwise be applicable to such cross-claim or counterclaim.

In addition to the foregoing, to the extent that any Non-Consenting Lender obtains a judgment pursuant to which MLH and/or TA become liable to a Non-Consenting Lender, MLH and/or TA shall be entitled to a dollar for dollar offset and credit against any such judgment in an amount equal to the product of: (x) the Pro Rata amount of that indebtedness under the Existing Credit Agreement that such Non-Consenting Lender held and upon which its claim against MLH and/or TA is based multiplied by (y) the Settlement Contribution.

The Released Parties and their Related Parties shall have no liability to any Excluded Party, Millennium or the Prepetition Lenders with respect to any Retained Claims that are, immediately prior to the Effective Date, subject to contractual or other indemnity by Millennium in favor of the Excluded Parties other than any liability of Millennium or any Prepetition Lender (including, without limitation, a Consenting Lender) to a Prior Agent for any Prior Agent Indemnity Claims or Prior Agent Lender Indemnity Obligations, as applicable, and all such claims shall be barred, enjoined and released.

## K.     Injunction

EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION OR OTHER PROCEEDING, OR CREATING, PERFECTING OR ENFORCING ANY LIEN OF ANY KIND, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, EQUITY INTEREST, OR REMEDY RELEASED OR TO BE RELEASED, EXCULPATED OR TO BE EXCULPATED, OR DISCHARGED OR TO BE DISCHARGED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER. FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY AVOIDANCE ACTION (AS DEFINED IN THIS PLAN) OR ANY OTHER ACTION TO AVOID OR RECOVER THE INITIAL USA SETTLEMENT DEPOSIT. BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH

– 69 –

HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION.  ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASES UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, WILL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

## L.    Retained Claims

The Preserved Estate Claims are hereby expressly preserved and the Preserved Lender Claims are hereby expressly preserved.  The releases provided for herein do not preclude the Prepetition Lenders or Millennium, or their representatives or assigns, including one or more litigation trusts to whom a Preserved Lender Claim or Preserved Estate Claim is assigned (the Prepetition Lenders, Millennium and any of their successors and assigns, including such litigation trust or trusts, hereinafter, collectively, the "Retained Claim Plaintiff") from prosecuting, and the Prepetition Lenders and Millennium retain the right, respectively, to bring, the Retained Claims against the Excluded Parties.  In the event that the Retained Claim Plaintiff obtains a monetary judgment, award or judicial recovery against an Excluded Party or Excluded Parties on account of any Retained Claim (a "Retained Claim Judgment"), the parties' rights shall be as follows:

(i)      where the Retained Claim is one subject to which statutory or common law contribution on account of comparative fault applies, then the Prepetition Lenders and Millennium agree that the Excluded Party or Excluded Parties shall be entitled to reduce the amount of its liability to the Retained Claim Plaintiff by the equitable share of Gross Damages attributable to MLH and/or TA (or their respective Related Parties) as established by the Excluded Party or Excluded Parties in litigation with the Retained Claim Plaintiff (without TA's and MLH's or their respective Related Parties' being named in and participating in such litigation as a party) based upon the percentage of comparative fault (if any) determined to be attributable to TA and MLH or their respective Related Parties (a "Comparative Fault Reduction"), and the Retained Claim Plaintiff shall not seek to recover any Comparative Fault Reduction from MLH or TA (or their Related Parties); provided, however, while the Comparative Fault Reduction shall be calculated based on all damages and losses to which the tortious or other misconduct of the Excluded Party contributed, without netting out the Settlement Contribution or any other source of recovery of the Retained Claim Plaintiff ("Gross Damages"), if after giving effect to the Comparative Fault Reduction, the sum of the amount of the liability of the Excluded Party plus the amount of the Settlement Contribution, exceeds Gross Damages, the Excluded Party shall be entitled to an additional reduction in liability to the Retained Claim Plaintiff equal to such excess so that the Retained Claim Plaintiff shall not recover in excess of its Gross Damages; and

(ii)     where the Retained Claim Plaintiff has commenced an action against one or more of the Excluded Parties asserting one or more of the Retained Claims, and the action is one to which the statutory, common law or contractual provisions hereunder for contribution and the corresponding reduction of claims on account of settlement or comparative fault would

– 70 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

not otherwise apply and are not available, in the absence of agreement, to the Excluded Party (a "Non-Contribution Action"), and where such Excluded Party or Excluded Parties successfully has joined MLH and/or TA (or any of their Related Parties) as a party to such Non-Contribution Action, or where MLH and/or TA (or any of their Related Parties) successfully has intervened in such action (it being understood that Retained Claim Plaintiff affirmatively consents to any such petition for intervention  by MLH and/or TA (or any of their Related Parties)), and where the Retained Claim Plaintiff successfully obtains a Retained Claim Judgment against one or more of the Excluded Parties for one or more Retained Claims, and where in such action the Excluded Party or Excluded Parties also successfully have obtained a judgment, award or judicial recovery against MLH and/or TA or their respective Related Parties in any way related to the Company in a Non-Contribution Action (the "MLH and/or TA Liability"), then the Retained Claim Plaintiff shall stipulate and consent to a judgment credit or judgment reduction to the Retained Claim Judgment in an amount that is dollar for dollar equal to the MLH and/or TA Liability, and the Retained Claim Plaintiff shall not seek to collect such amount from MLH or TA (or any of their Related Parties).

In the event that, after one or more trustees are appointed to pursue Retained Claims, an Excluded Party or Excluded Parties commences an action only against MLH and/or TA related to the Company, MLH and TA promptly shall seek to dismiss such action or consolidate it with any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties in the forum selected by the Retained Claim Plaintiff, or alternatively seek to stay such action asserted only against MLH and/or TA pending the conclusion of any action commenced by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties.  In any lawsuit brought by the Retained Claim Plaintiff against an Excluded Party or Excluded Parties as contemplated herein, the Retained Claim Plaintiff shall plead the existence of the judgment credit provisions of subparagraph (i) delineated herein, shall notify MLH and TA when any such lawsuit is filed, and shall provide copies of its initial pleadings in any such lawsuit to MLH and TA.  Moreover, in any litigation by the Retained Claim Plaintiff of a Retained Claim (regardless of whether MLH, TA, or their respective Related Parties have been joined as parties to such litigation), or in any circumstance in which a Retained Claim is to be settled by the Retained Claim Plaintiff (regardless of whether a lawsuit has been commenced against the Excluded Party or Excluded Parties), the Retained Claim Plaintiff, the Prepetition Lenders, and Millennium shall use their respective commercially reasonable and good faith best efforts in connection with any settlement of any Retained Claims with any such Excluded Party or Excluded Parties to obtain a release of any claims held by such Excluded Party or Excluded Parties against MLH and TA relating to the Retained Claims, provided MLH and TA reasonably cooperate in such efforts, if their consent is requested or required.  The Retained Claim Plaintiff shall have the right, but not the obligation, to (i) designate, in its sole discretion, counsel to defend or represent MLH and/or TA (or any of their Related Parties) in such action where MLH and/or TA (or any of their Related Parties) are named as parties or have intervened, with such attorney costs subject to the $3 million aggregate reimbursement cap set forth herein, and (ii) assume the defense of MLH and/or TA in any such action until such reimbursement cap is exhausted.  Such reimbursement of attorney costs shall be pro rata with attorney costs of other defense counsel that may be retained by MLH and/or TA (or any of their Related Parties), and such cost sharing shall be done in a manner that is subject to the

– 71 –

reasonable consent of MLH and/or TA (or any of their Related Parties).  In any such action, neither MLH nor TA (nor any of their Related Parties) shall (i) consent or stipulate to any judgment, award or judicial recovery in such action with respect to claims against or concerning them without the consent of Retained Claim Plaintiff, which shall be exercised in the sole discretion of the Retained Claim Plaintiff or (ii) take actions or advance positions with respect to whether a claim against or concerning them is not subject to Comparative Fault Reduction, without the express consent of the Retained Claim Plaintiff.  To the extent that any settlement of any Retained Claim between a Retained Claim Plaintiff, on the one hand, and the Excluded Party or Excluded Parties, on the other hand, is required to be approved by the Bankruptcy Court or any other court of competent jurisdiction, MLH and TA shall be provided with notice thereof and with an opportunity for a hearing thereon.  For the avoidance of doubt, the Prepetition Lenders, pursuant to the foregoing, do not hereby acknowledge that any Non-Contribution Action exists in favor of any Excluded Party or that any such Non-Contribution Action would arise in connection with the assertion by the Plaintiff of a Retained Claim.

## M.    Other Obligations With Respect To Released Parties

MLH and/or TA (or any of their respective Related Parties), if sued, or made subject to discovery by any of the Excluded Parties, with respect to litigation by the Retained Claim Plaintiff, the Prepetition Lenders or Millennium against any of the Excluded Parties of any of the Retained Claims, or if MLH and/or TA (or any of their respective Related Parties) are named as parties in any litigation by any of the Non-Consenting Lenders in connection with, relating to, arising out of, following, or on account of the litigation by any Non-Consenting Lender of Released Claims, may seek any available insurance coverage, including any available Millennium  insurance or insurance held separately by MLH or TA, for such defense costs incurred, and Millennium, the Prepetition Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy.  If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (and their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), incurred by MLH and TA (or their Related Parties) in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Retained Claim Plaintiff, Millennium or Prepetition Lenders, or any of the Non-Consenting Lenders, against or with any Excluded Party or Excluded Parties in which MLH or TA (or their Related Parties) are sued or made subject to discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to the extent of an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

To the extent that the Released Parties do not obtain a full and complete release from the Third Party Releasing Parties and/or Excluded Parties from Released Claims in any way relating to the Company, the Government Claims, the USA Settlement Agreements, the

– 72 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

Existing Credit Agreement, or the Restructuring Transactions that any of the Third Party Releasing Parties and/or Excluded Parties would have been legally entitled to assert in its own right or on behalf of another party (including, for the avoidance of doubt, the Company) against a Released Party, in such event, MLH and TA (and their Related Parties) may seek any available insurance, including any available Millennium insurance and any insurance separately available to MLH or TA individually, for such defense costs incurred and Millennium, the Lenders and New Holdco (and its subsidiaries) shall reasonably and in good faith cooperate with any request by MLH and TA for such Millennium insurance coverage with respect to any defense costs that may be covered by such Millennium insurance policy.  If the foregoing Millennium, and TA and MLH respective, insurance coverage has been exhausted or is not otherwise available for defense costs, in such event New Holdco (and its subsidiaries) shall reimburse MLH and TA (or their Related Parties) for reasonable and documented attorney's fees and expenses (but not losses or liabilities), in connection with, relating to, arising out of, following or on account of the litigation of any claims by the Third Party Releasing Parties or the Non-Consenting Lenders, in which MLH or TA (or their Related Parties) is named as a party or is the subject of discovery, including the legal fees of MLH's and TA's (or their Related Parties') counsel of choice (subject to the approval of the Prepetition Lenders, such approval not to be unreasonably withheld), solely to the extent that, all reimbursed costs, including those costs set forth in the preceding paragraph, shall not exceed an aggregate maximum of $3 million, 50% of which shall be available to MLH for reimbursement as provided herein and 50% of which shall be available to TA for reimbursement as provided herein.

For the avoidance of doubt, in no event shall New Holdco (and its subsidiaries) be responsible for more than $3,000,000 in aggregate of any and all expenses incurred by MLH and TA for any litigation-related defense costs (exclusive of any settlement payments) that may be incurred by them in connection with litigation relating to the Third Party Releasing Parties or the Excluded Parties.  For the further avoidance of doubt, any enforcement of MLH or TA or their Related Parties of the Bar Order described in Article X.J above shall be deemed to fall within the litigation-related costs that are covered in Article X.L and this Article X.M.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

### A.  Dissolution of the Committee

On the Effective Date, any statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from, or related to, the Chapter 11 Cases.

### B.  Payment of Statutory Fees

All fees due and payable under Sectionpursuant to section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing,U.S.

– 73 –

Code prior to the Effective Date shall be paid by the Debtors on or before the Effective Date. All such fees that arise afterAfter the Effective Date but before the closing of the Chapter 11 Cases shall be paid from funds otherwise available for distribution hereunder., the Reorganized Debtors shall pay any and all such fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each and every one of the Debtors shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

## C.    Modification of Plan

Effective as of the date hereof and subject to the limitations and rights contained in this Plan and in the RSA: (a) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify this Plan prior to the entry of the Confirmation Order; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, after notice and hearing and entry of an order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code or remedy any defect or omission or reconcile any inconsistency in this Plan in such manner as may be necessary to carry out the purpose and intent of this Plan; provided that any such modification must be Consistent With The Restructuring Term Sheet and the USA Settlement Agreements. A Holder of a Claim or Equity Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of such Claim or Equity Interest of such Holder, or release any claims or liabilities reserved by such Holder under this Plan.

## D.    Revocation of Plan

The Debtors reserve the right to revoke or withdraw this Plan prior to the Confirmation Date and to file subsequent chapter 11 plans, but without prejudice to the respective parties' rights under the RSA and under the USA Settlement Agreements. If the Debtors revoke or withdraw this Plan, or if Confirmation or consummation of this Plan does not occur, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by this Plan and any document or agreement executed pursuant hereto shall be deemed null and void except as may be set forth in a separate order entered by the Bankruptcy Court; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## E.    Severability of Plan Provisions

If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted and the Debtors, at their option may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan.  Notwithstanding any such holding, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.  Notwithstanding anything to the contrary in this Article XI.E, no alteration or interpretation can modify the conditions to the Effective Date set forth in Article VIII.B or compel the funding of Settlement Contribution if the conditions to such funding set forth in the RSA have not been satisfied.

## F.    Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

## ~~G.    Term of Injunctions or Stays~~

~~Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Reorganized Debtors have made all distributions contemplated by this Plan and the Bankruptcy Court has entered an order closing the Chapter 11 Cases.~~

## ~~H~~G.    Reservation of Rights

Except as expressly set forth herein, this Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order and the Effective Date shall have occurred..  Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any other Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) the Debtors with respect to the Holders of Claims or Equity Interests or other Entity; or (2) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

## ~~I~~H.    Further Assurances

The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Equity Interests receiving distributions hereunder and all other Entities shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Confirmation Order.  On or before the Effective Date, the Debtors shall file with the

Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

**JI.    Notices to Debtors**

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, (e) facsimile transmission or (f) email transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile or email transmission, upon confirmation of transmission, addressed as follows:

**If to the Debtors:**

Millennium                     Health,                     LLC
16981 Via Tazon, Suite F
San Diego, CA 92127
Facsimile:          (858)                     217-1910
Attention:          Martin Price, Esq., President and General Counsel
                    (martin.price@millenniumhealth.com)

**with a copy to (which shall not constitute notice):**

Counsel to the Debtors

Skadden,      Arps,      Slate,      Meagher      &      Flom      LLP
One                          Rodney                          Square
P.O.                          Box                          636
Wilmington,                  Delaware                  19899-0636
Facsimile:    (302)                          651-3001
Attention:    Anthony    W.    Clark   (anthony.clark@skadden.com)
              Jason M. Liberi (jason.liberi@skadden.com)

- and -

Skadden,      Arps,      Slate,      Meagher      &      Flom      LLP
Four                          Times                          Square
New          York,          New          York          10036-6522
Facsimile:    (212)                          735-2000
Attention:    Kenneth    S.    Ziman   (ken.ziman@skadden.com)
              Raquelle    L.    Kaye   (raquelle.kaye@skadden.com)

- and -

– 76 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

Skadden, Arps, Slate, Meagher & Flom LLP
155 N. Wacker Drive
Chicago, Illinois 60606-1720
Facsimile: (312) 407-0411
Attention: Felicia Gerber Perlman (felicia.perlman@skadden.com)
Matthew Kriegel (matthew.kriegel@skadden.com)

**If to the Participating Lenders:**

To each Participating Lender at the address identified in
such Participating Lender's signature page

**with a copy to (which shall not constitute notice):**

Brown Rudnick LLP
7 Times Square
New York, New York 10036
Telephone: (212) 209-4862
Facsimile: (212) 209-4801
Attention: Robert J. Stark (rstark@brownrudnick.com)
Sigmund S. Wissner-Gross
(swissnergross@brownrudnick.com)

- and -

Brown Rudnick LLP
One Financial Center
Boston, MA  02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201
Attention: Steven B. Levine (slevine@brownrudnick.com)

**If to MLH:**

Millennium Lab Holdings, Inc.
James Slattery
16981 Via Tazon, Suite F
San Diego, CA 92127
Telephone: (858) 451-3535
Facsimile: (858) 217-1910
Attention: Martin Price, Esq.

**with a copy to (which shall not constitute notice):**

– 77 –

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan
of Millennium 1041589v4 12/9/2015 7:16:35 PM

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Telephone:	(212) 446-4750
Facsimile:	(212) 446-4900
Attention:	Paul M Basta, P.C. (paul.basta@kirkland.com)
		Joshua A. Sussberg, P.C. (joshua.sussberg@kirkland.com)

**If to TA:**

TA Millennium, Inc.
c/o TA Associates
John Hancock Tower
200 Clarendon Street
56th Floor
Boston, MA 02116
Telephone:	(617) 574-6725
Facsimile:	(617) 574-6728
Attention:	Jeffrey C. Hadden

**with a copy to (which shall not constitute notice):**

Goodwin Procter LLP
620 Eighth Avenue
New York, New York 10018
Telephone:	(212) 813-8800
Facsimile:	(212) 409-8404
Attention:	Michael H. Goldstein (mgoldstein@goodwinprocter.com)
		William P. Weintraub (wweintraub@goodwinprocter.com)

## ~~K~~J.	Governing Law

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

## ~~L~~K.	Exhibits

All exhibits and schedules to this Plan, including the Exhibits, are incorporated and are a part of this Plan as if set forth in full herein.

**~~M~~L. No Strict Construction**

This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtors, the Ad Hoc Group, the Participating Lenders, the Settling Members, and their respective professionals.  Each of the foregoing was represented by counsel of its choice who either (a) participated in the formulation and documentation of, or (b) was afforded the opportunity to review and provide comments on, this Plan, the Disclosure Statement, Exhibits, and the agreements and documents contemplated therein or related thereto.  Accordingly, unless explicitly indicated otherwise, the general rule of contract construction known as "contra proferentem" or other rule of strict construction shall not apply to the construction or interpretation of any provision of this Plan, the Disclosure Statement, Exhibits, and the documents contemplated thereunder and related thereto.

**~~N~~M. Conflicts**

In the event that a provision of the Disclosure Statement conflicts with a provision of this Plan, the terms of this Plan shall govern and control to the extent of such conflict.

[Remainder of page intentionally left blank]

– 79 –

Dated: Wilmington, Delaware
~~October 29~~December 9, 2015

MILLENNIUM LAB HOLDINGS II, LLC, on behalf of itself and its affiliates listed below

/s/ W. Brock Hardaway

Name: W. Brock Hardaway
Title: Chief Executive Officer

MILLENNIUM HEALTH LLC
RXANTE LLC

**APPENDIX 1**

**RSA**

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

| Summary report: Litéra® Change-Pro TDC 7.5.0.176 Document comparison done on 12/9/2015 7:16:35 PM | |
|---|---|
| **Style name:** Option 3a Strikethrough Double Score No Moves | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** dm://CHISR02A/1037244/18 | |
| **Modified DMS:** dm://CHISR02A/1041589/4 | |
| **Changes:** | |
| Add | 320 |
| Delete | 297 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 5 |
| **Total Changes:** | 622 |

Redline MH Prepackaged Plan of Reorganization 1037244v18 and Amended Prepackaged Plan of Millennium 1041589v4 12/9/2015 7:16:35 PM

# EXHIBIT 74

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

Debtors.[1]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

: Chapter 11
:
: Case No. 15-12284 (LSS)
:
: Jointly Administered
:
: **Related Docket Nos. 14, 114, 115**

**NOTICE OF FILING OF THIRD PLAN SUPPLEMENT FOR THE
AMENDED PREPACKAGED JOINT PLAN OF REORGANIZATION OF
MILLENNIUM LAB HOLDINGS II, LLC, ET AL.**

**PLEASE TAKE NOTICE THAT** on December 9, 2015, Millennium Lab Holdings II, LLC ("Millennium" or the "Debtors"),[2] the debtors and debtors-in-possession in the above-captioned case filed the Third Plan Supplement for the Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. (the "Third Plan Supplement"). The documents contained in the Third Plan Supplement are integral to and part of the Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. (as may be amended from time to time, the "Amended Plan") and, if the Amended Plan is confirmed, shall be approved. The hearing to consider confirmation of the Amended Plan currently is scheduled for December 10, 2015, at 11:00 a.m. (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that the Third Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time:

Exhibit A Millennium Corporate Claim Trust Agreement
Exhibit B Millennium Lender Claim Trust Agreement
Exhibit C New Holdco Charter
Exhibit D New Holdco Bylaws
Exhibit E New Term Loan Agreement
Exhibit F Registration Rights Agreement
Exhibit G Amended and Restated Operating Agreement of New Millennium Health, LLC
Exhibit H Director, Officer and Insider Disclosure
Exhibit I Loan Agreement between Millennium Corporate Claim Trust and Millennium Health, LLC
Exhibit J Loan Agreement between Millennium Lender Claim Trust and Millennium Health, LLC

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, subject to the terms and conditions set forth in the Amended Plan, to alter, amend, modify, or supplement any document in the Third Plan Supplement; provided, if any document in the Third Plan Supplement is altered, amended,

---

[1]   The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Millennium Lab Holdings II, LLC (5299); Millennium Health, LLC (5558); and RxAnte, LLC (0219). The Debtors' address is 16981 Via Tazon, San Diego, California, 92127.

[2]   Capitalized terms not otherwise defined herein shall have the meanings ascribed to the them in the Amended Plan.

modified, or supplemented in any material respect prior to the hearing to confirm the Amended Plan, the Debtors will file a blackline of such document with the Bankruptcy Court.[3]

The Amended Plan, Plan Supplement, Second Plan Supplement,[4] Third Plan Supplement, Disclosure Statement and other documents and materials related to the Chapter 11 Case are available for inspection on the Bankruptcy Court's website at www.deb.uscourts.gov, or free of charge on the Debtors' restructuring website at htttp://cases.primeclerk.com/millenniuminfo.

If you have any questions regarding this notice, or if you would like a paper copy of the Third Plan Supplement, you should contact the Administrative Agent by: (a) writing to Millennium Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, New York 10022, or (b) calling the Administrative Agent at (844) 276-3028 within the U.S. or Canada, or (917) 962-8498 for international calls.

Dated: December 9, 2015

*/s/ Jason M. Liberi*

| | |
|---|---|
| Anthony W. Clark (I.D. No. 2051) | Kenneth S. Ziman |
| Jason M. Liberi (I.D. No. 4425) | Raquelle L. Kaye |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP |
| One Rodney Square | Four Times Square |
| P.O. Box 636 | New York, New York  10036-6522 |
| Wilmington, Delaware 19899-0636 | Telephone: (212) 735-3000 |
| Telephone: (302) 651-3000 | Facsimile: (212) 735-2000 |
| Fax: (302) 651-3001 | |

Felicia Gerber Perlman
Matthew N. Kriegel
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 N. Wacker Drive, Suite 2700
Chicago, Illinois  60606-1720
Telephone: (312) 407-0700
Facsimile: (312) 407-0411

*Counsel for Debtors and Debtors in Possession*

---

[3]  Blacklines reflecting modifications to Exhibits A, B, C, E, F and G attached will be filed concurrently herewith.

[4]  The Plan Supplement for the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC et al. was filed on November 25, 2015 (Docket No. 114).  The Second Plan Supplement  for the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC et al. was filed on November 30, 2015 (Docket No. 115).

2

# EXHIBIT A

## MILLENNIUM CORPORATE CLAIM TRUST AGREEMENT

This Millennium Corporate Claim Trust Agreement (the **"Corporate Claim Trust Agreement"**), made this ___ day of _____, 2015, by and among (a) Millennium Health, LLC (the **"Company"**), on behalf of itself and the other Millennium Debtors (the "**Debtors**"), and (b) the individual identified on <u>Exhibit A</u>, as trustee for the Corporate Claim Trust established pursuant to this Corporate Claim Trust Agreement (such person and each successor trustee the **"Trustee"**) is executed to facilitate the implementation of the Chapter 11 Plan of Reorganization for the Millennium Debtors dated October 29, 2015 (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof, the **"Plan"**) that provides for the establishment of this trust (the **"Corporate Claim Trust"**). Each of the Debtors and the Trustee are sometimes referred to individually as a **"Party"** and collectively as the **"Parties."**

## RECITALS

WHEREAS, the Debtors filed for protection under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on November 10, 2015 (the **"Petition Date")**, in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**); and

WHEREAS, on _____ __, 2015, the Bankruptcy Court entered its order confirming the Plan (the **"Confirmation Order"**); and

WHEREAS, the Plan provides, among other things, as of the equity transfer date of the Plan (the "**Equity Transfer Date**") but after the transactions described in clauses (i) and (ii) of the definition thereof in the Plan for (a) the creation of the Corporate Claim Trust and the creation of the Corporate Claim Trust Beneficial Interests for the benefit of the Corporate Claim Trust Beneficiaries, (b) the transfer to the Corporate Claim Trust of the Trust Assets, and (c) the administration and liquidation of the Trust Assets and the distribution of the proceeds therefrom to the Corporate Claim Trust Beneficiaries, in accordance with this Corporate Claim Trust Agreement, the Plan, and the Confirmation Order; and

WHEREAS, pursuant to Treasury Regulation Section 301.7701-4(d), the Corporate Claim Trust is being created for the primary purpose of liquidating the Trust Assets in an expeditious but orderly manner for the benefit of the Corporate Claim Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to and consistent with the liquidating purpose of the Corporate Claim Trust and the Plan; and

WHEREAS, the Corporate Claim Trust is intended to qualify as a "grantor trust" for United States federal income tax purposes, pursuant to Sections 671-677 of the IRC, with the Corporate Claim Trust Beneficiaries to be treated as the grantors of the Corporate Claim Trust and deemed to be the owners of the Trust Assets (subject to the rights of creditors of the Corporate Claim Trust), and, consequently, the transfer of the Trust Assets to the Corporate Claim Trust shall be treated as a deemed transfer of those assets from the Debtors to the Corporate Claim Trust Beneficiaries followed by a deemed transfer by such Corporate Claim Trust Beneficiaries to the Corporate Claim Trust for federal income tax purposes; and

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the premises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

For all purposes of this Corporate Claim Trust Agreement, capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in Annex A attached hereto and made part hereof. Capitalized terms used herein and not otherwise defined herein or in Annex A shall have the meanings ascribed to such terms in the Plan. Unless otherwise specified, Article, Section, and Paragraph references herein are to Articles, Sections, and Paragraphs of this Corporate Claim Trust Agreement.

## ARTICLE II.
## ESTABLISHMENT OF THE CORPORATE CLAIM TRUST

2.1 Establishment of Corporate Claim Trust and Appointment of Trustee.

(a) Pursuant to the Plan, the Parties hereby establish a trust which shall be known as the "**Millennium Corporate Claim Trust**" on behalf of the Corporate Claim Trust Beneficiaries. This Corporate Claim Trust Agreement constitutes the governing instrument of the Corporate Claim Trust.

(b) The Trustee is hereby appointed as trustee of the Corporate Claim Trust effective as of the Equity Transfer Date and agrees to accept such appointment and hold the assets of the Corporate Claim Trust in trust for the Corporate Claim Trust Beneficiaries subject to the terms of the Plan, the Confirmation Order, and this Corporate Claim Trust Agreement. The Trustee and each successor trustee serving from time to time hereunder shall have all the rights, powers, and duties set forth herein.

(c) Subject to the terms of this Corporate Claim Trust Agreement, any action by the Trustee which affects the interests of more than one Corporate Claim Trust Beneficiary shall be binding and conclusive on all Corporate Claim Trust Beneficiaries so affected, even if such Corporate Claim Trust Beneficiaries have different or conflicting interests.

(d) The Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

2.2 Transfer of the Trust Assets. Pursuant to the Plan, as of the Equity Transfer Date:

(a) Upon the occurrence of the Equity Transfer Date but after the transactions described in clauses (i) and (ii) of the definition thereof in the Plan to the extent provided in the Plan, title to all of the Retained Corporate Causes of Action existing on such date shall immediately and without further action automatically be deemed to be transferred, assigned, delivered and shall vest in the Corporate Claim Trust free and clear of all Claims, Equity Interests, Liens, security interests, encumbrances, or interests of any kind in such property.

(b)       Upon the occurrence of the Equity Transfer Date of the Plan, the Debtors shall automatically be deemed to transfer, assign, and deliver to the Corporate Claim Trust and the Trustee all of their respective rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Retained Corporate Causes of Action (collectively, **"Privileges"** and, together with Retained Corporate Causes of Actions, **"Assigned Actions"**), which shall vest in the Trustee and the Corporate Claim Trust, in trust, and, consistent with Section 1123(b)(3)(B) of the Bankruptcy Code, for the benefit of the Corporate Claim Trust Beneficiaries. For purposes of the transfer of documents, the Corporate Claim Trust is an assignee and successor to the Debtors in respect of the Assigned Actions and shall be treated as such in any review of confidentiality restrictions in requested documents. For purposes of this Section 2.2(b), "privilege" means attorney-client privilege or work product protection (or both as the case may be) as those terms are defined in Federal Rule of Evidence 502(g) or any other privilege available under applicable law.  For the avoidance of doubt, following the Equity Transfer Date of the Plan, the Trustee shall have the power to waive the Privileges being so assigned. Notwithstanding the foregoing, the Trustee from time to time shall notify the Reorganized Debtors of Documents and any other information as to which the Trustee and the Trust Advisory Board acting together have determined, in their sole discretion, to waive the Privileges.  Within 10 business days after receipt of such notice (or such shorter time (but not less than three (3) business days) as may be determined by the Trustee, if the Trustee, in his reasonable discretion, determines that exigent circumstances exist), the Reorganized Debtors, via its general counsel or other officer or director designated by the Reorganized Debtors, shall advise the trust whether the Reorganized Debtors believe that waiving the Privileges for such Documents or other information will cause any harm to the Reorganized Debtors, stating why and estimating the range of the potential costs of such resulting harm.  Prior to exercising their power to waive in part or otherwise any aspect of the Privileges, the Trustee and the Trust Advisory Board shall give due consideration to the potential benefits to the Corporate Claim Trust and Lender Claim Trust compared to the potential cost to the Reorganized Debtor of such potential waiver as provided by the Reorganized Debtors (with the goal that the benefits to the Corporate Claim Trust and Lender Claim Trust shall outweigh the costs to Reorganized Debtor). The weighing of  the aforementioned costs and benefits and decision of whether to exercise the power to waive in part or otherwise any aspect of  the Privileges so assigned shall be within the Trustee's and the Trust Advisory Board's (acting together) sole discretion. For the avoidance of doubt, neither the Reorganized Debtor nor any of the other Millennium Debtors shall have nor shall assert any claim against either the Trustee or the Trust Advisory Board, or otherwise, arising out of or relating to the Trustee's and the Trust Advisory Board's determination, in their sole discretion, to waive in part or otherwise any aspect of the Privileges as assigned.  The Trustee, in his discretion, may also share any privileged documents or communications with the Lender Claim Trusts.  The Trustee need not notify the Reorganized Debtor if the Corporate Claim Trust elects to share any privileged documents or communications with the Lender Claim Trust, which the Corporate Claim Trust is authorized to do.  All communications between the Trustee and Trust Advisory Board on the one hand and the Reorganized Debtors on the other hand as described in this paragraph shall be deemed privileged and confidential communications, it being acknowledged that the subject matter of such communications is with respect to common litigation interests.  Such communications shall not be disclosed to any third parties except as may be required by an order of a court of competent jurisdiction upon prior notice to the Trustee and the Reorganized Debtors.

2.3     Funding of the Corporate Claim Trust.  The Corporate Claim Trust shall obtain the Funding Amount in accordance with the terms of the Plan plus such additional tangible or intangible assets of Millennium as the Reorganized Millennium shall determine.  In addition, the Corporate Claim Trust shall obtain funding as set forth in Article V, Section F(ii) of the Plan and Sections 4.11(l) hereof (regarding invoices not to exceed $10,000,000, in the aggregate of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) and 4.11(m) hereof (regarding invoices not to exceed $7,000,000, in the aggregate of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust). Any failure or inability of the Corporate Claim Trust to obtain funding will not affect the enforceability of the Corporate Claim Trust, provided that nothing herein shall preclude the Trustee from seeking additional financing from sources other than the Trust Assets in the discharge of its fiduciary duties.

2.4     Title to the Trust Assets.  The transfer of the Assigned Actions to the Corporate Claim Trust pursuant to Section 2.2 hereof is being made by the Debtors for the sole benefit, and on behalf of, the Corporate Claim Trust Beneficiaries. Upon the transfer of the Assigned Actions to the Corporate Claim Trust and the funding of the Corporate Claim Trust pursuant to Section 2.3 hereof, the Corporate Claim Trust shall succeed to all of the Debtors' rights, title, and interests in the Assigned Actions and no other entity shall have any interest, legal, beneficial, or otherwise, in the Corporate Claim Trust or the Trust Assets upon their assignment and transfer to the Corporate Claim Trust (other than as provided herein or in the Plan).

2.5     Nature and Purpose of the Corporate Claim Trust.

(a)     Purpose.  The Corporate Claim Trust shall be established for the primary purpose of liquidating the Trust Assets on behalf of, and for the benefit of, the Corporate Claim Trust Beneficiaries.  The Corporate Claim Trust shall serve as a mechanism for liquidating, converting to Cash and distributing the Trust Assets for the benefit of the Corporate Claim Trust Beneficiaries with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Corporate Claim Trust. The Corporate Claim Trust is organized and established as a trust pursuant to which the Trustee, subject to the terms and conditions contained herein and in the Plan, is to hold the Trust Assets and dispose of the same in accordance with this Corporate Claim Trust Agreement, the Plan, and Treasury Regulation Section 301.7701-4(d).

(b)     Relationship.  This Corporate Claim Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Corporate Claim Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Trustee, or the Corporate Claim Trust Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint ventures. The relationship of the Corporate Claim Trust Beneficiaries to the Trustee shall be solely that of beneficiaries of a trust and shall not be deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by this Corporate Claim Trust Agreement.

4

2.6 <u>Appointment as Representative</u>. Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Trustee shall be the duly appointed representative of the Debtors' estates for the purposes described herein, and, as such, to the extent provided herein, the Trustee succeeds to the rights and powers of the Debtors' estates and/or a trustee in bankruptcy with respect to prosecution of the Assigned Actions for the benefit of the Corporate Claim Trust Beneficiaries. To the extent that any Assigned Actions cannot be transferred to the Corporate Claim Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Trust Assets shall be deemed to have been retained by the Debtors (other than for tax purposes) and the Trustee shall be deemed to have been designated as a representative of the Debtors' estates to the extent provided herein pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code solely to enforce and pursue such Assigned Actions on behalf of the estates. Notwithstanding the foregoing, all net proceeds of the Trust Assets shall be distributed consistent with the provisions of the Plan and this Corporate Claim Trust Agreement.

2.7 <u>Relationship to, and Incorporation of, the Plan</u>. The principal purpose of this Corporate Claim Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order, and therefore this Corporate Claim Trust Agreement incorporates the provisions of the Plan and the Confirmation Order by this reference. To that end, the Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan that directly affect the interests of the Corporate Claim Trust, and to seek any orders from the Bankruptcy Court solely in furtherance of this Corporate Claim Trust Agreement. As among the Corporate Claim Trust, the Trustee, the Corporate Claim Trust Beneficiaries, and the Debtors, if any provisions of this Corporate Claim Trust Agreement are found to be inconsistent with the provisions of the Plan, or the Confirmation Order, each such document shall have controlling effect in the following rank order: (a) the Confirmation Order; (b) the Plan; and (c) this Corporate Claim Trust Agreement.

2.8 <u>Cooperation Provisions</u>. Upon the Equity Transfer Date, the Company agrees to fully cooperate with the Corporate Claim Trust with respect to the investigation and/or prosecution of any Retained Corporate Causes of Action. Such full cooperation shall include, but is not limited to (i) producing documents without the need for service of a formal discovery request, (ii) providing access to employees and, as applicable, former employees to be interviewed, and prepared as a deposition or trial witness, (iii) causing witnesses to appear at a deposition or trial without the need for the Trustee to serve a subpoena upon such witness; and (iv) retaining all books, records and other documents relating to the Retained Corporate Causes of Action and not destroying such records until after termination of the Corporate Claim Trust.

Upon the Equity Transfer Date, the Corporate Claim Trust and the Lender Claim Trust shall fully cooperate with each other with respect to their respective investigation and/or prosecution of any Retained Corporate Causes of Action and Retained Lender Causes of Action. Such cooperation shall include, but not be limited to, sharing and/or exchanging documents obtained in discovery and such other forms of mutual cooperation that, in the sole discretion of the Trustee and the trustee of the Lender Claim Trust, they deem appropriate and in the best interest of the respective Trust. Such cooperation shall be subject to all available common interest protection and/or privileges applicable to the foregoing investigation and/or prosecution.

## ARTICLE III.
## CORPORATE CLAIM TRUST BENEFICIAL INTERESTS

3.1     <u>Corporate Claim Trust Beneficial Interests</u>.  Corporate Claim Trust Beneficial Interests will be represented by book entries on the books and records of the Corporate Claim Trust by amount and by class.

3.2     <u>Allocation of Corporate Claim Trust Beneficial Interests</u>.  The allocation of the Corporate Claim Trust Beneficial Interests shall be accomplished as set forth in Article V, Section F of the Plan and the distribution of the Trust Assets shall be accomplished as set forth in Article V, Section F of the Plan.

3.3     <u>Interests Beneficial Only</u>.  The ownership of a Corporate Claim Trust Beneficial Interest shall not entitle any Corporate Claim Trust Beneficiary to any title in or to the assets of the Corporate Claim Trust as such (which title shall be vested in the Trustee) or to any right to call for a partition or division of the assets of the Corporate Claim Trust or to require an accounting. No surviving spouse, heir, or devisee of any deceased Corporate Claim Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Trust Assets.

3.4     <u>Identification of Holders of Corporate Claim Trust Beneficial Interests; Register and Registrar</u>.  The Corporate Claim Trust will not issue any certificate or certificates to evidence any Corporate Claim Trust Beneficial Interests. The record holders of Corporate Claim Trust Beneficial Interests shall be recorded and set forth in a register maintained by the Trustee, or a registrar if one is appointed by the Trustee, expressly for such purpose (**"Register"**). The Trustee may appoint a transfer agent or registrar for the purpose of recording ownership of the Corporate Claim Trust Beneficial Interests as herein provided.  The identity of the initial transfer agent and the terms of its compensation are set forth on <u>Exhibit D</u> hereto.  The transfer agent or Registrar, if other than the Trustee, may be such other institution acceptable to the Trustee and may be retained on such terms as the Trustee deems necessary and advisable.  For services hereunder, the transfer agent or registrar, unless it is the Trustee, shall be entitled to receive reasonable compensation from the Corporate Claim Trust as an expense of the Corporate Claim Trust.  None of the Debtors or their agents, professionals, contractors or employees shall have any responsibility or liability for the maintenance of the Register. All references in this Corporate Claim Trust Agreement to holders of Corporate Claim Trust Beneficial Interests shall mean holders of record as set forth in the official Register maintained by the Trustee, or a transfer agent or registrar if one is appointed by the Trustee, and shall not mean any beneficial owner not recorded on such official registry.  The Trustee (or transfer agent or registrar, if one is appointed by the Trustee) shall, upon the written request of a holder of a Corporate Claim Trust Beneficial Interest, provide reasonably adequate documentary evidence of such holder's Corporate Claim Trust Beneficial Interest as indicated in the Register.  The expense of providing such documentation shall be borne by the requesting holder of the Corporate Claim Trust Beneficial Interest.

3.5     <u>Transfer of Corporate Claim Trust Beneficial Interests</u>.

6

No transfer, sale, assignment, pledge, hypothecation or other disposition of any Corporate Claim Trust Beneficial Interests, either in whole or in part, may be effected until and unless (i) the Trustee receives written notice of such transfer, sale, assignment, pledge, hypothecation or disposition, which notice must be executed by the transferor and the transferee and must clearly identify the Corporate Claim Trust Beneficial Interest being transferred, sold, assigned, pledged or hypothecated, (ii) the transferee is an "accredited investor" within the meaning of Rule 501 under the Securities Act of 1933, as amended, and (iii) either (a) the Trustee has received such legal advice or other information (including, but not limited to, legal opinions) that the Trustee, in its reasonable discretion, deems necessary or appropriate to assure that any such disposition is not reasonably likely to require the Corporate Claim Trust to comply with the registration and reporting requirements of the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended or the Investment Company Act of 1940, as amended, or any applicable state securities laws or (b) the Trustee has determined to register under such Acts, as necessary, and/or make periodic reports in order to enable such disposition to be made. In the event that any such disposition is allowed, the Trustee may add such restrictions upon transfer and other terms to this Corporate Claim Trust Agreement as are deemed necessary or appropriate by the Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws. Transfers of record made in accordance with this Section 3.5 shall be indicated on the books and records of the Trustee (or a transfer agent or registrar, if one is appointed by the Trustee) maintained for such purpose. Any transfer, sale, assignment, pledge, hypothecation or other disposition of a Corporate Claim Trust Beneficial Interest or any part thereof in violation of this Section 3.5 shall be void ab initio. Notwithstanding the foregoing, no transfer, sale, assignment, pledge, hypothecation or other disposition of a Corporate Claim Trust Beneficial Interest or any part thereof shall be effective, and any such action shall be deemed void ab initio if, as a result of such action, (i) the Corporate Claim Trust would have 2,000 or more holders of record or any holders of record who are not "accredited investors" (as such concept is defined and measured for purposes of Section 12(g) of the Securities Exchange Act of 1934, as amended and any relevant rules promulgated thereunder and, in each case, subject to any amendment to the Securities Exchange Act of 1934 or the rules and regulations promulgated thereunder that increases the ownership thresholds set forth above, whereupon the thresholds set forth herein shall automatically be adjusted accordingly) (ii) the Corporate Claim Trust would be required to register under the Securities Exchange Act of 1934, as amended the Corporate Claim Trust Beneficial Interests, unless, in any such case, at the time of such action such Corporate Claim Trust Beneficial Interests were, prior to such proposed action, already registered under the Securities Exchange Act of 1934, as amended. Any permitted transfer shall become effective as of the last day of the calendar month in which it occurs.

(a)     Corporate Claim Trust Beneficial Interests shall be recorded in book-entry form only, shall not be certificated, and shall not be capable of being transferred, sold, assigned, pledged, or hypothecated, in whole or in part, unless the conditions set forth in this Section 3.5 are met. In connection with any such transfer of a Corporate Claim Beneficial Interest, a Transfer Notice in the form attached as Exhibit E hereto shall be provided to the Trustee, together with the questionnaire attached as an exhibit thereto appropriately completed.

(b)     The holder effecting a disposition of a Corporate Claim Trust Beneficial Interest or any part thereof shall pay, or reimburse the Corporate Claim Trust for, all reasonable costs incurred by the Corporate Claim Trust in connection with such disposition

7

(including, without limitation, the reasonable legal fees incurred in connection with the legal advice referred to herein) on or before the tenth (10th) business day after the receipt by that person of the Corporate Claim Trust's invoice for the amount due. If payment is not made by the date due, the person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to 8% plus any costs, including attorneys' fees, incurred in the collection of such amount.

3.6     Conflicting Corporate Claim Trust Beneficial Interests.  If any conflicting claims or demands are made or asserted with respect to a Corporate Claim Trust Beneficial Interest, the Trustee shall be entitled, at its sole discretion, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the Corporate Claim Trust Beneficial Interests subject to the claims or demands involved, or any part thereof, and the Trustee shall refer such conflicting claims or demands to the Bankruptcy Court, which to the fullest extent permitted by law, shall have jurisdiction over resolution of such conflicting claims or demands.  In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any such conflicting claims or demands.

3.7     Exemption from Registration.  The parties hereto intend that the rights of the Corporate Claim Trust Beneficiaries arising under this Corporate Claim Trust shall not be "securities" under applicable laws, but none of the parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the parties hereto intend for the exemption from registration provided by Section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

3.8     Change of Address.  A Corporate Claim Trust Beneficiary may, after the Equity Transfer Date, select an alternative distribution address by providing notice to the Trustee identifying such alternative distribution address. Such notification shall be effective only upon receipt by the Trustee. Absent actual receipt of such notice by the Trustee, the Trustee shall not recognize any such change of distribution address.

3.9     Tax Identification Numbers.  The Trustee will require any Corporate Claim Trust Beneficiary to furnish to the Trustee its social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8BEN, Form W-8BEN-E, or Form W-9) (the **"Tax Documents"**). The Trustee may condition any distribution to any Corporate Claim Trust Beneficiary upon the receipt of properly executed Tax Documents and the receipt of such other documents as the Trustee reasonably requests.

**ARTICLE IV.**
**RIGHTS, POWERS AND DUTIES OF TRUSTEE**

4.1     Role of the Trustee.  In furtherance of and consistent with the purpose of the Corporate Claim Trust and the Plan, subject to the terms and conditions contained herein and in the Plan, the Trustee shall (i) hold the Trust Assets for the benefit of Corporate Claim Trust Beneficiaries, (ii) prosecute, settle, abandon, or otherwise dispose of or liquidate the Retained

8

Corporate Causes of Action, and (iii) make Corporate Claim Trust Distributions in accordance with provisions of the Plan and this Corporate Claim Trust Agreement. Subject to Section 7.3 hereof, the Trustee shall be responsible for all decisions and duties with respect to the Corporate Claim Trust and the Trust Assets. In all circumstances, the Trustee shall act in the best interests of all Corporate Claim Trust Beneficiaries and in furtherance of the purpose of the Corporate Claim Trust, and shall use commercially reasonable efforts to dispose of the Trust Assets and to make timely Corporate Claim Trust Distributions and not unduly prolong the duration of the Corporate Claim Trust.

4.2     <u>Rights of Action/Reservation of Rights</u>.  Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, and except with respect to the Releases, in accordance with Section 1123(b) of the Bankruptcy Code, and subject to Section 7.3 hereof, the Corporate Claim Trust shall reserve, retain and may prosecute, enforce, litigate, settle, compromise, transfer or assign (or decline to do any of the foregoing) all Retained Corporate Causes of Action. Except as otherwise expressly set forth therein, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any right or Retained Corporate Causes of Action that the Debtors or their Estates may have or which the Corporate Claim Trust may choose to assert (subject to this Corporate Claim Trust Agreement), under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, any and all Claims against any Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof), to the extent such Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) asserts a cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against any of the Debtors, their officers, directors, or representatives.  The Trustee shall be deemed the appointed representative to, and may, except as otherwise provided in the Plan or the Confirmation Order, prosecute, enforce, litigate, settle, compromise, transfer, or assign any such rights, claims, Retained Corporate Causes of Action, suits, or proceedings as appropriate in favor of or against the Corporate Claim Trust, in accordance with the terms of this Corporate Claim Trust Agreement, the Plan, the Confirmation Order, and in the best interests of the Corporate Claim Trust and the Corporate Claim Trust Beneficiaries.

4.3     <u>Liability of Trustee</u>.

(a)     No provision of this Corporate Claim Trust Agreement shall require the Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it.

(b)     The Trustee shall not be personally liable for the validity or sufficiency of this Corporate Claim Trust Agreement or for the due execution hereof by the other parties hereto.

(c)     The Trustee acts solely as Trustee hereunder and not in its individual capacity, and all persons having any claim against the Trustee by reason of the transactions

contemplated by this Corporate Claim Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(d)     The Trustee shall not be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Corporate Claim Trust.

4.4     Authority to Settle Assigned Actions.  Subject to Section 7.3 hereof, the Trustee shall be empowered and authorized to settle, dispose of or abandon any Assigned Actions (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such Assigned Actions), and any determinations by the Trustee with regard to the amount or timing of settlement or other disposition of any Assigned Action shall be conclusive and binding on all Corporate Claim Trust Beneficiaries and all other parties in interest.

4.5     Retention of Counsel and Other Professionals.

(a)     The Trustee may, consistent with the Plan, but without necessity for review or approval by the Bankruptcy Court or any other Person (a) retain such independent experts and advisors (including, but not limited to, counsel, tax advisors, consultants, or other professionals) as the Trustee deems necessary to aid it in the performance of its duties and responsibilities hereunder and under the Plan and to perform such other functions as may be appropriate in furtherance of the intent and purpose of this Corporate Claim Trust Agreement, and (b) commit the Corporate Claim Trust to provide such professional persons or entities reasonable compensation and reimbursement from the Trust Assets for services rendered and expenses incurred. The Trustee may select any professionals in its sole discretion, without regard to such professionals' (1) affiliation with the Trustee and Trust Advisory Board Members, and (2) prior employment in any capacity in the Debtors' bankruptcy cases on behalf of any party.  The Trustee will make all reasonable and customary arrangements for payment or reimbursement of such compensation and expenses from the Trust Assets.

4.6     Corporate Claim Trust Expenses.

(a)     The Corporate Claim Trust shall pay all reasonable fees, costs, and expenses of the Corporate Claim Trust that are (i) incurred in connection with the administration of the Corporate Claim Trust, the protection, preservation, liquidation and distribution of Trust Assets, and the costs of investigating, prosecuting, resolving and/or settling or objecting to any Claims, any tax liability imposed on the Corporate Claim Trust, and any fees, costs and expenses of the Trustee, the members of the Trust Advisory Board, and any and all professionals retained by such parties; (ii) obligations or other liabilities incurred or assumed by the Corporate Claim Trust (including but not limited to any reserves established or assumed by the Corporate Claim Trust under the Plan); (iii) reasonably necessary to meet contingent liabilities and to maintain the value of the Trust Assets during liquidation; and (iv) to satisfy any other obligations of the Corporate Claim Trust set forth in the Plan, the Confirmation Order, or the Corporate Claim Trust Agreement.  All fees, costs, and expenses of the Corporate Claim Trust shall be made from the Trust Assets subject to Section 4.6(b).

(b)     Reasonable fees and expenses of administering the Corporate Claim Trust and Assigned Actions (including, professional fees related thereto) shall be funded by Reorganized Millennium to the extent set forth in the Plan and in Section 7.3(ix) hereof.

(c)     The Trustee may reimburse Backstop MLH Shareholders to the extent and in the amounts set forth in Article V, Section F(iii) of the Plan.

(d)     The Trustee shall, consistent with the Plan, retain Cash and fund one or more reserves, at any time and from time to time, with such amounts as the Trustee, in its reasonable discretion (after consultation with the Trust Advisory Board), deems reasonable and appropriate to ensure that the Corporate Claim Trust will be able to meet its obligations for fees, costs, and expenses as set forth in Section 4.6(a) hereof.

(e)     Notwithstanding any other provision of this Corporate Claim Trust Agreement to the contrary, the Trustee shall not be required to take any action or enter into or maintain any claim, demand, action, or proceeding relating to the Corporate Claim Trust unless it shall have, or have access to, sufficient funds for that purpose.

4.7     Distributions.

(a)     In the reasonable discretion of the Trustee and subject to the requirements of Revenue Procedure 94-45, the Trustee shall (after consultation with the Trust Advisory Board), in one or more Corporate Claim Trust Distributions, distribute Cash on hand (including, but not limited to, the Corporate Claim Trust's net income and net proceeds from the Trust Assets, any Cash received on account of Trust Assets, and treating as Cash for purposes of this Section 4.7 any permitted investments under Section 4.10 below), except such amounts as are reasonably necessary for the Corporate Claim Trust to meet Claims contingent liabilities, accrued, and future fees, costs, and expenses of the Corporate Claim Trust and to maintain the value of the Trust Assets. The Trustee shall make all such Corporate Claim Trust Distributions in accordance with provisions of the Plan and this Corporate Claim Trust Agreement; the net income of the Corporate Claim Trust and all net proceeds from the sale of Trust Assets shall be distributed at least annually (except that the Trustee may retain an amount of Cash or other Trust Assets or net income of the Corporate Claim Trust reasonably necessary to maintain the value of the Trust Assets to meet claims and contingent liabilities).

(b)     Prior to making any Corporate Claim Trust Distribution, the Corporate Claim Trust shall retain sufficient funds to meet the fees, costs and expenses set forth in Section 4.6(a), subject to Section 4.6(b).

(c)     The Corporate Claim Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding relating to wage claims). Any Trust Assets which are undistributable in accordance with this Section 4.7(c) as of the termination of the Corporate Claim Trust shall be distributed in accordance with provisions of the Plan and this Corporate Claim Trust Agreement.

11

(d)     The Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to Corporate Claim Trust Beneficiaries; provided, however, that such distribution agent shall have no greater authority than, and shall be subject to the same restrictions as, the Trustee under the Corporate Claim Trust Agreement.  For the avoidance of doubt, the Corporate Claim Trust shall not be required to distribute Cash which has been funded by or borrowed from the Company pursuant to the Plan to pay such fees, costs, and expenses.

(e)     Subject to Bankruptcy Rule 9010, any Corporate Claim Trust Distribution or delivery to a holder of an Allowed Claim shall be made: (1) at the addresses set forth on the respective proofs of Claim filed by such holders; (2) at the address set forth in any written notices of address changes delivered to the Trustee after the date of any related proof of Claim; or (3) at the address reflected in the Schedules if no proof of Claim is filed with the Trustee (as to Claims administered by the Corporate Claim Trust) has not received a written notice of a change of address.  Except as set forth in the Plan, if any Corporate Claim Trust Distribution or other communication from the Corporate Claim Trust is returned as undeliverable, no further Corporate Claim Trust Distribution shall be made to such holder unless the Trustee is notified in writing of such holder's then current address.  Undeliverable Corporate Claim Trust Distributions shall remain in the possession of the Trustee until the earlier of (i) such time as a Corporate Claim Trust Distribution becomes deliverable or (ii) such undeliverable Corporate Claim Trust Distribution becomes an Unclaimed Distribution pursuant to the provisions of the Plan and this Corporate Claim Trust Agreement.  Except as required by law, the Trustee (or its duly authorized agent) shall have no obligation to locate any Corporate Claim Trust Beneficiary.

(f)     After final Corporate Claim Trust Distributions have been made in accordance with the Combined Plan and Disclosure Statement, the Corporate Claim Trust shall not be obligated to make a Corporate Claim Trust Distribution of less than twenty five dollars ($25) to any holder of a Corporate Claim Trust Beneficial Interest.  In lieu of making any further Corporate Claim Trust Distributions to such holder, the Trustee may distribute such Cash to the charity of its choice; provided such charity is a Section 501(c)(3) under the IRC, is exempt from federal income tax, is not a "private foundation" under the IRC, and is unrelated to the Debtors, the Trustee, the Trust Advisory Board Members, or any Related Persons thereof.

(g)     Checks issued in respect of Allowed Claims shall be null and void if not negotiated within three (3) months after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Trustee by the holder of the Allowed Claim to whom such check was originally issued.  Any Claim in respect of such a voided check shall be made within three (3) months after the date of issuance of such check.  If no request is made as provided in the preceding sentence, the Check shall revert to the Trustee and such Corporate Claim Distribution shall be deemed to be reduced to zero.

(h)     Cash payments to foreign holders of Corporate Claim Trust Beneficial Interests may be made, at the option of the Trustee, in such funds and by such means as are necessary or customary in the foreign jurisdiction of such foreign holder.

12

(i)     The Trustee shall have the discretion (after consultation with the Trust Advisory Board) to determine the timing of Corporate Claim Trust Distributions in the most efficient and cost-effective manner possible; provided, however, that the Trustee's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

4.8     Distribution Record Date.  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims.  Except as set forth in Section 3.5, the Trustee shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

4.9     Management of the Trust Assets.

(a)     The Trust Assets and all other property held from time to time by the Corporate Claim Trust and any earnings, including without limitation, interest, on any of the foregoing shall be applied by the Trustee in accordance with the terms of this Corporate Claim Trust Agreement for the benefit of the Corporate Claim Trust Beneficiaries, and for no other party.

(b)     Except as otherwise provided in this Corporate Claim Trust Agreement, the Plan or the Confirmation Order, and subject to Treasury Regulations governing liquidating trusts and the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Trustee may control and exercise authority over the Trust Assets, over the acquisition, management and disposition thereof and over the management and conduct of the Corporate Claim Trust, in each case, to the extent necessary to enable the Trustee to fulfill the purpose of this Corporate Claim Trust Agreement. No person dealing with the Corporate Claim Trust will be obligated to inquire into the authority of the Trustee in connection with the acquisition, management or disposition of the Trust Assets.

(c)     In connection with the management and use of the Trust Assets and except as otherwise expressly limited in this Corporate Claim Trust Agreement, the Plan or the Confirmation Order, the Trustee will have in addition to any powers conferred upon the Trustee by any other provision of this Corporate Claim Trust Agreement, the power to take any and all actions as, in the Trustee's discretion, are necessary or advisable to effectuate the primary purposes of the Corporate Claim Trust, including, without limitation, the power and authority, to the extent consistent with the Plan, as applicable,  (i) to distribute the Trust Assets to Corporate Claim Trust Beneficiaries in accordance with the terms of this Corporate Claim Trust Agreement and the Plan, (ii) to pay all expenses of the Corporate Claim Trust, (iii) to sell, convey, transfer, assign, liquidate or abandon the Trust Assets, or any part thereof or any interest therein, upon such terms and for such consideration as the Trust Advisory Board deems reasonable, (iv) to endorse the payment of notes or other obligations of any Person or to make contracts with respect thereto, and (v) to borrow such sums of money, at any time and from time to time, for such periods of time, upon such terms and conditions, from such Persons, for such purposes as the Trust Advisory Board deems reasonable.

13

(d)    All decisions and actions by the Trustee under the authority of this Corporate Claim Trust Agreement will be binding upon all of the Corporate Claim Trust Beneficiaries and the Corporate Claim Trust.

4.10    Investment of Trust Assets.  Subject to Section 4.12 hereof, the Trustee may invest Trust Assets (pending distribution in accordance with this Corporate Claim Trust Agreement) only in Cash and Government securities as defined in Section 2(a)(16) of the Investment Company Act of 1940, as amended; provided, however, that the scope of any such investments shall be further limited to include only those investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d) or under applicable IRS guidelines, rulings, or other controlling authorities.

4.11    Additional Powers of the Trustee.  In addition to the powers set forth in the Plan, the Confirmation Order, or this Corporate Claim Trust Agreement, and subject to the terms and conditions thereof (including, without limitation, the consent and consultation rights, as applicable, of the Trust Advisory Board as set forth in this Corporate Claim Trust Agreement, and to the fullest extent permitted by law, the retained jurisdiction of the Bankruptcy Court as provided for in the Plan) and the Treasury Regulations governing liquidating trusts, the Trustee shall be empowered to:

(a)    open and close bank accounts (deposit, securities, or otherwise) including a Corporate Claim Trust Account, and hold, manage, convert to Cash, and distribute the Trust Assets, including all Corporate Claim Trust recoveries, in accordance with provisions of the Plan and this Corporate Claim Trust Agreement;

(b)    pay or reserve for payment all reasonable fees, costs and expenses of the Corporate Claim Trust that are (i) incurred in connection with the administration of the Corporate Claim Trust, the protection, preservation, liquidation and distribution of Trust Assets, and the costs of investigating, prosecuting, resolving and/or settling any Claims , any tax liability imposed on the Corporate Claim Trust, and any fees, costs and expense of any and all professionals retained by the Corporate Claim Trust ), (ii) obligations or other liabilities incurred by the Corporate Claim Trust ; (iii) reasonably necessary to meet contingent liabilities and to maintain the value of the Trust Assets during liquidation; and (iv) to satisfy any other obligations of the Corporate Claim Trust set forth in the Plan, the Confirmation Order, or the Corporate Claim Trust Agreement;

(c)    perform the duties, exercise the powers, and assert the rights of the Debtors and/or their Estates or a trustee under Sections 704 and 1106 of the Bankruptcy Code with respect to the Trust Assets, including assert claims, defenses, offsets, and privileges;

(d)    protect and enforce the rights of the Corporate Claim Trust to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(e)    determine and satisfy any and all obligations or liabilities created, incurred or assumed by the Corporate Claim Trust;

(f)     assert or waive any privilege or defense on behalf of the Corporate Claim Trust including, without limitation, any of the Privileges;

(g)     hold, manage, and distribute Cash or non-Cash Trust Assets obtained through the exercise of its power and authority and make all disbursements and Corporate Claim Trust Distributions relating to the Trust Assets;

(h)     obtain insurance coverage with respect to the potential liabilities and obligations of the Corporate Claim Trust, the Trustee, and the Trust Advisory Board under this Corporate Claim Trust Agreement (in the form of a directors and officers policy, an errors and omissions policy or otherwise);

(i)     file, if necessary, any and all tax and information returns with respect to the Corporate Claim Trust and pay taxes properly payable by the Corporate Claim Trust, if any;

(j)     request any appropriate tax determination with respect to the Corporate Claim Trust, including, without limitation, a determination pursuant to Section 505 of the Bankruptcy Code;

(k)     retain and reasonably compensate for services rendered and expenses incurred (a) an accounting firm or financial consulting firm to perform such reviews and/or audits of the financial books and records of the Corporate Claim Trust as may be appropriate in the Trustee's discretion if any, (it being understood no such audit shall be required) and to prepare and file any tax returns or informational returns for the Corporate Claim Trust as may be required and (b) a transfer agent or registrar for the purpose of recording ownership of the Corporate Claim Trust Beneficial Interests;

(l)     submit invoices to Reorganized Millennium for payment of the reasonable fees and expenses of administering the Millennium Corporate Claim Trust and liquidating the Retained Corporate Causes of Action not to exceed $10,000,000, in the aggregate (of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust), as set forth in the Plan and subject to Section 7.3(ix) hereof;

(m)     submit invoices to and request an advance from Reorganized Millennium from the Trust Delayed Draw Facility for payment of the reasonable fees and expenses of administering the Millennium Corporate Claim Trust and liquidating the Retained Corporate Causes of Action not to exceed $7,000,000, in the aggregate (of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust), as set forth in the Plan and subject to Section 7.3(ix) hereof;

(n)     reimburse Reorganized Millennium, without interest, from the net proceeds recovered by the Corporate Claim Trust, amounts Reorganized Millennium has advanced to the Corporate Claim Trust by virtue of draws from the Trust Delayed Draw Facility to the extent set forth in the Plan and in the Delayed Draw Term Loan Agreement;

15

(o)    take or refrain from taking any and all actions the Trustee reasonably deems necessary for the continuation, protection, and maximization of the Trust Assets consistent with the purposes of the Corporate Claim Trust;

(p)    take all steps and execute all instruments and documents the Trustee reasonably deems necessary to effectuate the purposes of the Corporate Claim Trust and the Plan;

(q)    make continuing efforts to dispose of the Trust Assets, make timely distributions, and not unduly prolong the duration of the Corporate Claim Trust;

(r)    prepare and report, in the manner requested by the Trust Advisory Board, a periodic report of the status of Assigned Actions;

(s)    act as a signatory for the Debtors as necessary to effectuate the purposes of the Corporate Claim Trust and the Plan, including but not limited to, to effectuate the transfer of any of the Trust Assets to the Corporate Claim Trust;

(t)    monitor and enforce implementation of the Plan and take all actions the Trustee reasonably deems necessary under the Plan, the Confirmation Order, and this Corporate Claim Trust Agreement and the obligations thereunder and hereunder;

(u)    exercise such other powers as may be vested in the Trustee pursuant to an order of the Bankruptcy Court, the Plan, the Confirmation Order and this Corporate Claim Trust Agreement to be necessary and proper to carry out the purposes of the Corporate Claim Trust; and

4.12    <u>Limitations on Power and Authority of the Trustee</u>.  Notwithstanding anything in this Corporate Claim Trust Agreement to the contrary, the Trustee will not have the authority to do any of the following:

(a)    take any action in contravention of this Corporate Claim Trust Agreement, the Plan, or the Confirmation Order;

(b)    take any action which would make it impossible to carry on the activities of the Corporate Claim Trust;

(c)    possess property of the Corporate Claim Trust or assign the Corporate Claim Trust's rights in specific property for other than Corporate Claim Trust purposes and as provided herein;

(d)    permit the Corporate Claim Trust to engage in any trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Corporate Claim Trust;

(e)    permit the Corporate Claim Trust to receive or retain Cash or Cash equivalents in excess of a reasonable amount necessary to meet claims and contingent

16

liabilities (including without limitation expected expenses) or to maintain the value of its assets during liquidation;

(f) receive transfers of any listed stocks or securities, or any readily-marketable assets or any operating assets of a going business, except as is absolutely necessary or required under the Plan and the Confirmation Order; provided, however, that in no event shall the Trustee receive any such investment that would jeopardize treatment of the Corporate Claim Trust as a "liquidating trust" for United States federal income tax purposes under Treasury Regulation Section 301.7701-4(d), or any successor provision thereof;

(g) exercise any investment power other than is permitted by Section 4.10 hereof;

(h) receive or retain any operating assets of a going business, a partnership interest in a partnership that holds operating assets, or fifty percent (50%) or more of the stock of a corporation with operating assets, except as is absolutely necessary or required under the Plan and the Confirmation Order; provided, however, that in no event shall the Trustee receive or retain any such asset or interest that would jeopardize treatment of the Distribution Trust as a "liquidating trust" for United States federal income tax purposes under Treasury Regulation Section 301.7701-4(d), or any successor provision thereof;

(i) take any other action that would jeopardize treatment of the Corporate Claim Trust as a liquidating trust for United States federal income tax purposes under Treasury Regulation Section 301.7701-4(d), or any successor provision thereof; and

(j) take any action which requires prior written consent of the Trust Advisory Board pursuant to Section 7.3 hereof, without having received such consent.

4.13    Consultation with Trust Advisory Board.  The Trustee shall consult with the Trust Advisory Board regularly and at all such times as the Trustee deems necessary or appropriate in connection with carrying out the purposes of the Corporate Claim Trust or as requested by the Trust Advisory Board, and shall obtain approvals from the Trust Advisory Board as required under the Plan and this Corporate Claim Trust Agreement, including but not limited to Section 7.3 hereof.

4.14    Books and Records.  The Trustee shall maintain books and records relating to the Trust Assets and income of the Corporate Claim Trust and the payment of, expenses of, and liabilities of claims against or assumed by, the Corporate Claim Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Corporate Claim Trust. Nothing in this Corporate Claim Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Corporate Claim Trust, or as a condition for managing any payment or distribution out of the Trust Assets.

4.15    Reports.

(a)    The Trustee shall timely prepare, file and distribute such statements, reports and submissions as may be necessary to cause the Corporate Claim Trust and the Trustee to be in compliance with applicable law.

(b)    Securities Reports.    To the extent that the Corporate Claim Trust Beneficial Interests are deemed securities the issuance of Corporate Claim Trust Beneficial Interests under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and applicable state and local laws requiring registration of securities pursuant to Section 1145 of the Bankruptcy Code. If the Trustee determines, with the advice of counsel, that the Trustee is required to comply with the registration and reporting requirements of the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Trustee shall take commercially reasonable efforts to comply with such reporting requirements and file periodic reports with the Securities and Exchange Commission.

(c)    Financial Reports.    After the close of the calendar year-end following the Equity Transfer Date and for each calendar year end thereafter, and as soon as practicable upon termination of the Corporate Claim Trust, the Trustee shall prepare or have prepared financial statements of the Corporate Claim Trust for such period (which statements need not be audited by an outside firm of certified public accountants), which shall be made available to Corporate Claim Trust Beneficiaries by means of actual notice.  The Trust Advisory Board may require the Trustee to produce quarterly financial statements in the form requested by the Trust Advisory Board.  Alternatively, the Trustee may either post any such financial statements on a web site maintained by the Trustee or electronically file it with the Bankruptcy Court in lieu of actual notice to each Corporate Claim Trust Beneficiary (unless otherwise required by law).

4.16    Compliance with Laws.  Any and all distributions of Trust Assets and proceeds of borrowings, if any, shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

**ARTICLE V.**
**THE TRUSTEE**

5.1    Independent Trustee.    The Trustee may not be a Corporate Claim Trust Beneficiary or related or subordinate (within the meaning of Section 672(c) of the IRC) to any Corporate Claim Trust Beneficiary.

5.2    Citizenship.  The Trustee shall at all times be a "United States Person" as defined in Section 7701(a)(30) of the IRC.

5.3    Trustee's Compensation and Reimbursement.    The Trustee shall receive compensation from the Corporate Claim Trust as follows:

(a)    Compensation.  The Trustee shall receive as reasonable compensation in connection with the performance of services (including any work performed prior to the Equity Transfer Date) as set forth in Exhibit B hereto.  If the Trustee resigns or is removed, the Trust

18

Advisory Board shall give written consent to the compensation for the successor Trustee if greater than the compensation for the predecessor Trustee.

(b)    Expenses.    In addition, the Corporate Claim Trust will reimburse the Trustee (out of the Trust Assets) for all reasonable, out-of-pocket expenses incurred by the Trustee in connection with the performance of its duties hereunder and under the Plan.

(c)    Payment.    The fees and expenses payable to the Trustee shall be paid to the Trustee (out of the Trust Assets, subject to Section 4.6(b) hereof) without necessity for review or approval by the Bankruptcy Court or any other Person. To the fullest extent permitted by law, the Bankruptcy Court shall retain jurisdiction to adjudicate any dispute regarding the fees, compensation, and expenses of the Trustee.

5.4    Resignation.    The Trustee may resign by giving not less than sixty (60) days' prior written notice thereof to the Bankruptcy Court and the Trust Advisory Board. Unless the Bankruptcy Court (on motion of any Corporate Claim Trust Beneficiary) orders otherwise, (i) such resignation shall become effective on the date on which the Bankruptcy Court appoints a successor Trustee or a replacement Trustee is appointed pursuant to Section 5.6 of this Corporate Claim Trust Agreement, provided the Trust Advisory Board shall select a replacement Trustee within sixty (60) days of the notice from the Trustee and (ii) the Trustee shall be entitled to compensation and reimbursement up to the date on which the Trustee's resignation becomes effective.

5.5    Removal.    The Trustee may be removed, with or without cause, by the Trust Advisory Board. To the extent there is any dispute or motion regarding the removal of the Trustee (including any dispute relating to any compensation or expense reimbursement due under this Corporate Claim Trust Agreement), to the fullest extent permitted by law, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the foregoing, the Trustee will continue to serve as trustee after its removal until the time when appointment of a successor Trustee will become effective in accordance with Section 5.6 of this Corporate Claim Trust Agreement. For purposes of this Section 5.5, "cause" means (a) the Person's failure to perform its material duties hereunder; (b) the Person's commission of an act of fraud, theft, or embezzlement during the duties described hereunder; or (c) the Person's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; provided, however, that no "cause" shall exist involving subsection (a) above until the Person first has failed to cure such failure within thirty (30) days of having been given written notice of such failure.

5.6    Appointment of Successor Trustee.    Upon the resignation or removal of the Trustee, the members of the Trust Advisory Board shall appoint a successor. If the Trust Advisory Board cannot timely agree upon the successor Trustee, the Bankruptcy Court, to the fullest extent permitted by law, shall make the appointment. Any successor Trustee appointed hereunder shall execute, acknowledge, and file with the Corporate Claim Trust records an instrument accepting the appointment under this Corporate Claim Trust Agreement and agreeing to be bound thereto, and thereupon, the successor Trustee, without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the predecessor Trustee; provided, however, that a removed or resigning Trustee shall, nevertheless, when

19

requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Corporate Claim Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee. In no event shall any successor Trustee be an employee or affiliate of a Corporate Claim Trust Beneficiary.

5.7     Effect of Resignation or Removal. The death, resignation, incompetency or removal of the Trustee shall not operate to terminate the Corporate Claim Trust created by this Corporate Claim Trust Agreement or to revoke any existing agency created pursuant to the terms of this Corporate Claim Trust Agreement or invalidate any action theretofore taken by the Trustee or any prior Trustee. In the event of the resignation or removal of the Trustee, such Trustee will promptly (a) execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee to effect the termination of such Trustee's capacity under this Corporate Claim Trust Agreement, (b) deliver to the successor Trustee all documents, instruments, records and other writings related to the Corporate Claim Trust as may be in the possession of such Trustee (provided that such Trustee may retain one copy of such documents for archival purposes) and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

5.8     Confidentiality. The Trustee shall, during the period that the Trustee serves as Trustee under this Corporate Claim Trust Agreement and following the termination of this Corporate Claim Trust Agreement or following its removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Trust Assets relates or of which the Trustee has become aware in the Trustee's capacity as Trustee, except as otherwise required by law.

**ARTICLE VI.**
**[RESERVED]**

**ARTICLE VII.**
**TRUST ADVISORY BOARD**

7.1     Trust Advisory Board Generally. Pursuant to the Plan and this Corporate Claim Trust Agreement, the Trust Advisory Board ("**Trust Advisory Board**") shall be created on the Equity Transfer Date. The Trust Advisory Board's role shall be to advise, oversee, and approve the actions of the Trustee to the extent required herein. The Trust Advisory Board shall be comprised of three (3) members, each of whom shall at all times be "United States Persons" as defined in Section 7701(a)(30) of the IRC (the "**Trust Advisory Board Members**"), which members and any successor of any such member under shall be appointed in accordance with the Plan. The Trust Advisory Board shall have such duties and powers as provided for in this Corporate Claim Trust Agreement. Except as otherwise expressly provided herein, consent of a majority of the Trust Advisory Board Members shall be required to take any action or make any decision of the Trust Advisory Board. The initial Trust Advisory Board Members shall be, Matthew Cantor, Alan D. Halperin and Eugene I. Davis.

7.2     Resignation and Replacement of Trust Advisory Board Members.

20

(a)      Resignation.  Except as otherwise provided herein, (i) a Trust Advisory Board Member may resign at any time by giving written notice to the other Trust Advisory Board Members and to the Trustee, and (ii) the resignation of any such Trust Advisory Board Member shall take effect at such time as shall be specified in such notice which shall be effective as of a date not later than thirty (30) days from the date of such notice. A Trust Advisory Board Member appointed by a Lender shall resign, effective immediately, as of the time such Trust Advisory Board Member is no longer an employee, an officer, a director of, or a consultant to such Lender or any of its affiliates. The vacancy created by any resignation set forth in this Section 7.2(a) shall be filled in accordance with Section 7.2(b) hereof.

(b)      Removal and Replacement.  A Trust Advisory Board Member may be removed and replaced by the vote of the majority of the Corporate Claim Trust Beneficiaries voting in accordance with their respective pro rata share of Corporate Claim Trust Beneficial Interests, by amount.

7.3      Powers of the Trust Advisory Board.

(a)      The Trust Advisory Board shall provide advice, instruction, and direction on matters arising in the administration and in the disposition and distribution of the Trust Assets, and in the pursuit of Assigned Actions, as requested by the Trustee or as specifically provided in the Plan or this Corporate Claim Trust Agreement, and shall be authorized to take any and all actions reasonably necessary or appropriate in performing its oversight of the Trustee in carrying out its duties hereunder and under the Plan, including, without limitation, regularly consulting with the Trustee subject to Section 4.13 hereof.

(b)      In addition, the powers of the Trustee shall be subject to the prior written consent of the Trust Advisory Board with respect to the following and as otherwise set forth in this Trust Agreement:

(i)      The commencement of any Retained Corporate Causes of Action by the Corporate Claim Trust;

(ii)      The settlement, compromise, or other resolution of any Retained Corporate Causes of Action by the Corporate Claim Trust;

(iii)      The sale, transfer, assignment or other disposition of any Trust Assets having a valuation (for any individual transaction or series of related transactions) equal to or in excess of $10,000;

(iv)      The abandonment of any Trust Assets that have a valuation (for any individual transaction or series of related transactions) equal to or in excess of $10,000;

(v)      The borrowing of any funds by the Corporate Claim Trust or pledge of any portion of the Trust Assets except as permitted under the Trust Delayed Draw Facility,

21

(vi)      The amendment or waiver of any substantive provision of this Corporate Claim Trust Agreement provided that such amendment or waiver shall be consistent with the Plan and the Confirmation Order;

(vii)     The release or indemnity in favor of any third party other than as set forth in the Plan;

(viii)    The resolution of any matter which could reasonably be expected to have a material adverse effect on the amount of distributions to be made by the Corporate Claim Trust; or

(ix)     The submission of invoices to Reorganized Millennium in any one year equal to or in excess of $2,000,000, in the aggregate (of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) or to request any advance under the Trust Delayed Draw Facility; provided however, that consent of the Trust Advisory Board shall not otherwise be required until invoices have been submitted to Reorganized Millennium totaling in excess of $10,000,000, in the aggregate (in respect of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust), which $10,000,000 is not subject to reimbursement by the Millennium Corporate Claim Trust to Reorganized Millennium as set forth in the Plan.

(c)      The Trustee shall disclose to the Trust Advisory Board any connections, conflicts or potential conflicts of interest that the Trustee or its Related Persons have with respect to the exercise of any rights, powers, duties and privileges under this Corporate Claim Trust Agreement.  In the event that the Trustee cannot take or refrain from taking any action, including without limitation, the prosecution of any Retained Corporate Causes of Action nor the objection to any Claim, by reason of an actual or potential conflict of interest, the Trust Advisory Board acting by majority shall be authorized to take any such actions in its place and stead, including without limitation by the retention of professionals for purpose of taking such actions.

(d)      The Trustee may, at any time, decide to recommend that any matter before the Trustee, under any provision of this Corporate Claim Trust Agreement, be decided by consent of the Trust Advisory Board.

7.4      <u>Compensation of Trust Advisory Board</u>.  Trust Advisory Board Members shall be entitled to receive compensation in connection with their duties in accordance with the terms set forth in <u>Exhibit C</u>. Trust Advisory Board Members shall be reimbursed by the Corporate Claim Trust for all reasonable and duly documented expenses, which reimbursement shall include the reasonable expense for fees paid to counsel retained by the individual Trust Advisory Board Members in connection with carrying out their responsibilities hereunder, subject to an aggregate cap of $100,000 in each twelve month period, to be established by the Trust Advisory Board in its discretion.  For the avoidance of doubt, this cap shall be inapplicable to attorneys' fees incurred by an Trust Advisory Board Member as an Indemnified Person, which fees shall be payable subject to Article VIII.

22

7.5     Confidentiality.  Each Trust Advisory Board Member shall, during the period that he or she serves as a Trust Advisory Board Member under this Corporate Claim Trust Agreement and following the termination of this Corporate Claim Trust Agreement or following such Trust Advisory Board Member's removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Trust Assets relates or of which the Trust Advisory Board Member has become aware in his or her capacity as a Trust Advisory Board Member, except as otherwise required by law.

## ARTICLE VIII.
## LIABILITY AND INDEMNIFICATION

8.1     No Further Liability.  None of the Trustee and its Related Persons including Related Persons retained by the Corporate Claim Trust, or the Trust Advisory Board Members and their Related Persons (collectively, the **"Indemnified Persons"**) shall be liable for the act or omission taken or omitted to be taken in its capacity as the Trustee, Trust Advisory Board Member, or Related Persons thereto, other than acts or omissions resulting from such Indemnified Person's willful misconduct, gross negligence or fraud. The Trustee and any Trust Advisory Board Member may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons.  Notwithstanding such authority, neither the Trustee, nor any Trust Advisory Board Member shall be under any obligation to consult with his or her attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Trustee, any Trust Advisory Board Member, or Related Persons thereto, unless such determination constitutes willful misconduct, gross negligence or fraud.  Without limiting the generality of the foregoing, the Trustee and Trust Advisory Board Members may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by him or her to be genuine, and shall have no liability for actions taken in reliance thereon. None of the provisions of this Corporate Claim Trust Agreement shall require the Trustee or Trust Advisory Board to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. The Trustee may rely without inquiry upon writings delivered to it under the Plan which the Trustee reasonably believes to be genuine and to have been given by a proper Person. Notwithstanding the foregoing, nothing in this Section 8.1 shall relieve the Trustee and Trust Advisory Board Members from any liability for any actions or omissions which are finally judicially determined to have arisen primarily and directly out of their gross negligence, fraud or willful misconduct. Any action taken or omitted to be taken in the case of the Trustee with the express approval of the Bankruptcy Court will conclusively be deemed not to constitute gross negligence, fraud or willful misconduct.

8.2     Reliance.  Except as otherwise provided in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee and any Trust Advisory Board Member may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request consent, order or other paper or document reasonably believed by him or her to be genuine and to have been signed or presented by the proper party or parties.

23

8.3     Liability to Third Persons. No Corporate Claim Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the Trust Assets or the affairs of the Trustee. The Trustee and any counsel, accountants, appraisers and other professionals retained by the Corporate Claim Trust and the Trust Advisory Board Members shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person (including, in the case of the Trustee, to any counsel, accountants, appraisers or other professionals retained by the Corporate Claim Trust retained by the Trustee in accordance with this Corporate Claim Trust Agreement) in connection with the Trust Assets or the affairs of the Corporate Claim Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a final order of the Bankruptcy Court to be primarily and directly due to their respective gross negligence, intentional fraud, criminal conduct or willful misconduct, and all such persons shall look solely to the Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Corporate Claim Trust. Other than as set forth in the Plan or in the Confirmation Order, nothing in this Section 8.3 shall be deemed to release any Corporate Claim Trust Beneficiary from any actions or omissions occurring prior to the Equity Transfer Date.

8.4     Exculpation. As of the Equity Transfer Date, the Trustee and any counsel, accountants, appraisers and other professionals retained by the Corporate Claim Trust, the Trustee, and Trust Advisory Board Members shall be and hereby are exculpated by all Persons, including without limitation, Corporate Claim Trust Beneficiaries, holders of Claims, holders of Equity interests, and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Corporate Claim Trust Agreement or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Bankruptcy Court to have arisen primarily and directly as finally judicially determined out of their own respective intentional fraud, criminal conduct, gross negligence or willful misconduct. No Corporate Claim Trust Beneficiary, holder of a Claim, holder of an Equity Interest, or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trustee, the Corporate Claim Trust, the employees, professionals or representatives of either the Trustee or the Corporate Claim Trust (including any counsel, accountants, appraisers and other professionals retained by the Corporate Claim Trust), or the Trust Advisory Board Members for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order, and this Corporate Claim Trust Agreement. Any action taken or omitted to be taken with the express approval of the Bankruptcy Court shall conclusively be deemed not to constitute gross negligence or willful misconduct. Each of the Trustee and the Trust Advisory Board Members may, in connection with the performance of their respective functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, not taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.

8.5     Indemnification.

(a)     To the fullest extent permitted by law, the Corporate Claim Trust, to the extent of its assets legally available for that purpose, shall indemnify and hold harmless the

24

Indemnified Persons from and against any and all loss, cost, damage, expense (including, without limitation, fees and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does or refrains from doing for the business or affairs of the Corporate Claim Trust, except to the extent that it is finally judicially determined by a court of competent jurisdiction that the loss, cost, damage, expense or liability primarily and directly resulted from the Indemnified Person's gross negligence, fraud or willful misconduct.

(b)     Notwithstanding any provision herein to the contrary, the Indemnified Persons, Trustee, and Trust Advisory Board Members shall be entitled to obtain advances from the Corporate Claim Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts and omissions, actual or alleged, of an Indemnified Person in its capacity as such, provided, however, that the Indemnified Persons receiving such advances shall repay the amounts so advanced to the Corporate Claim Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Persons were not entitled to any indemnity under the provisions of this Section 8.5. The foregoing indemnity in respect of any Indemnified Person shall survive the termination of such Person from the capacity for which they are indemnified. Termination or modification of this Corporate Claim Trust Agreement shall not affect any indemnification rights or obligations then existing.

(c)     Any Indemnified Person, the Trustee, and any Trust Advisory Board Member may waive the benefits of indemnification under this Section 8.5, but only by an instrument in writing executed by such person.

(d)     Any Claim of the Indemnified Persons, the Trustee, or the Trust Advisory Board Members to be indemnified, held harmless or reimbursed shall be satisfied solely from first, any bonds or applicable insurance that the Corporate Claim Trust has purchased, as provided in Section 4.11(h) and Section 8.9, and second, to the extent the proceeds of such bonds or insurance are insufficient to satisfy any such claims, the Trust Assets.

(e)     As far as practicable, the Trustee shall cause any written instrument creating an obligation of the Corporate Claim Trust to include a reference to this Corporate Claim Trust Agreement and to provide that none of the Corporate Claim Trust Beneficiaries, Trust Advisory Board Members, or the Trustee or its agents or professionals shall be liable thereunder and that the other parties to such instruments shall look solely to the Trust Assets, including any bonds or applicable insurance that the Corporate Claim Trust has purchased as provided in Section 4.11(h) and Section 8.9,  for payment of any claim thereunder or the performance thereof; provided, however, that the omission of such provision for any such instrument shall not render liable any Corporate Claim Trust Beneficiary, Trust Advisory Board Member, or Trustee or Trustee's agents or professionals.

8.6     Corporate Claim Trust Liabilities.  All liabilities of the Corporate Claim Trust, including without limitation indemnity obligations under Section 8.5 of this Corporate Claim Trust Agreement, will be liabilities of the Corporate Claim Trust as an entity, and will be paid or satisfied from Trust Assets, including any bonds or applicable insurance that the Corporate Claim Trust has purchased as provided in Section 4.11(h) and Section 8.9. No liability of the

Corporate Claim Trust will be payable in whole or in part by any  Corporate Claim Trust Beneficiary individually or in the Corporate Claim Trust Beneficiary's capacity as a Corporate Claim Trust Beneficiary, by the Trustee, or Trust Advisory Board Member individually or in the their capacity as Trustee, or Trust Advisory Board Member, or by any member, partner, shareholder, director, officer, professional, employees, agent, affiliate or advisor of any Corporate Claim Beneficiary, the Trustee, the Trust Advisory Board Members or their respective affiliates.

8.7     Limitation of Liability.  The Trustee and any counsel, accountants, appraisers and other professionals retained by the Corporate Claim Trust and Trust Advisory Board Members shall not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Corporate Claim Trust Agreement under any circumstances.

8.8     Burden of Proof.   In making a determination with respect to entitlement to exculpation or indemnification hereunder, the person, persons or entity making such determination shall presume that the Indemnified Person is entitled to exculpation and indemnification under this Corporate Claim Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

8.9     Insurance.  The Trustee shall obtain and maintain customary insurance coverage for the protection of the Trustee and the Trust Advisory Board under this Trustee Agreement unless both the Trustee and the Trust Advisory Board unanimously agree that such insurance should not be required.

## ARTICLE IX.
## TAX MATTERS

9.1     Treatment of Trust Assets Transfer.  For all United States federal income tax purposes, all Parties (including the Debtors, the Trustee, the Plan Administrator, and the Corporate Claim Trust Beneficiaries) shall treat the transfer of the Trust Assets to the Corporate Claim Trust  as (i) a transfer of the Trust Assets (subject to any obligations related to those assets) directly to the Corporate Claim Trust Beneficiaries, followed by (ii) the transfer by such Corporate Claim Trust Beneficiaries of such Trust Assets  to the Corporate Claim Trust in exchange for Corporate Claim Trust Beneficial Interests.  Accordingly, the  Corporate Claim Trust Beneficiaries  shall be treated for United States federal income tax purposes (and, to the extent permitted, for state and local income tax purposes) as the grantors and owners of their respective shares of the Trust Assets.

9.2     Income Tax Status.

(a)     For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), this Corporate Claim Trust shall be treated as a liquidating trust pursuant to Treasury Regulation Section 301.7701-4(d) and as a grantor trust pursuant to IRC Sections 671-677. To the extent consistent with Revenue Procedure 94-45 and not otherwise inconsistent with this Corporate Claim Trust Agreement, this Corporate Claim Trust Agreement shall be construed so as to satisfy the requirements for liquidating trust status.

26

(b)     The Corporate Claim Trust shall at all times be administered so as to constitute a domestic trust for United States federal income tax purposes.

9.3     Tax Returns.   In accordance with IRC Section 6012 and Treasury Regulation Section 1.671-4(a), the Corporate Claim Trust shall file with the IRS annual tax returns on Form 1041 as a grantor trust. In addition, the Corporate Claim Trust shall file in a timely manner such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon. Within a reasonable time following the end of the taxable year, the Corporate Claim Trust shall send to each Corporate Claim Trust Beneficiary a separate statement setting forth such Corporate Claim Trust Beneficiary's or share of items of income, gain, loss, deduction or credit and will instruct each such Corporate Claim Trust Beneficiary to report such items on his/her applicable income tax return. The Corporate Claim Trust may provide each Corporate Claim Trust Beneficiary with a copy of the Form 1041 for the Corporate Claim Trust (without attaching any other Corporate Claim Trust Beneficiary's Schedule K-1 or other applicable information form) along with such Corporate Claim Trust Beneficiary's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement.

9.4     Withholding of Taxes and Reporting Related to Corporate Claim Trust Operations.   The Corporate Claim Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Corporate Claim Trust shall be subject to any such withholding and reporting requirements. The Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, payment, and reporting requirements. All amounts properly withheld from distributions to a Corporate Claim Trust Beneficiary as required by applicable law and paid over to the applicable taxing authority for the account of such Corporate Claim Trust Beneficiary shall be treated as part of the Corporate Claim Trust Distribution to such Corporate Claim Trust Beneficiary. To the extent that the operation of the Corporate Claim Trust or the liquidation of the Trust Assets creates a tax liability imposed on the Corporate Claim Trust, the Corporate Claim Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Corporate Claim Trust payable without Bankruptcy Court order. Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Corporate Claim Trust Beneficiaries shall be required to provide any information necessary to effect the withholding of such taxes.

9.5     Valuation.   Within 180 days after the Equity Transfer Date, the Trustee shall make a good faith valuation of the Trust Assets and advise the Trust Advisory Board of such valuation.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Debtors, the Trustee, the Trust Advisory Board, and the Corporate Claim Trust Beneficiaries) for all United States federal income tax purposes. The Corporate Claim Trust also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Corporate Claim Trust that are required by any governmental unit.

9.6     Expedited Determination of Taxes.   The Trustee may request an expedited determination of taxes of the Corporate Claim Trust, under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the Corporate Claim Trust for all taxable periods through the termination of the Corporate Claim Trust.

27

## ARTICLE X.
## TERMINATION OF CORPORATE CLAIM TRUST

The Trustee and the Corporate Claim Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Trustee determines that the pursuit of additional Assigned Actions is not likely to yield sufficient additional Cash to justify further pursuit of such claims and (b) all distributions of Cash and other Trust Assets required to be made by the Trustee under the Plan and this Corporate Claim Trust Agreement have been made in accordance with provisions of the Plan and this Corporate Claim Trust Agreement, but in no event shall the Corporate Claim Trust be dissolved later than five (5) years from the Equity Transfer Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of any extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable letter ruling from the IRS that any further extension would not adversely affect the status of the Corporate Claim Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on and liquidation of the Trust Assets. Upon dissolution of the Corporate Claim Trust, any remaining Cash on hand and other Trust Assets shall be distributed in accordance with provisions of the Plan and this Corporate Claim Trust Agreement. Article VIII shall survive any termination of the Corporate Claim Trust Agreement.

## ARTICLE XI.
## AMENDMENT AND WAIVER

Any substantive provision of this Corporate Claim Trust Agreement may be amended or waived in writing by the Trustee only (i) upon approval of the Bankruptcy Court or (ii) with the majority consent of the Trust Advisory Board provided that such amendments or waivers shall not be inconsistent with the terms of the Plan or Confirmation Order. Technical amendments to this Corporate Claim Trust Agreement may be made, as necessary to clarify this Corporate Claim Trust Agreement or enable the Trustee only to effectuate the terms of this Corporate Claim Trust Agreement, by the Trustee with the majority consent of the Trust Advisory Board notwithstanding the foregoing,  all amendments to this Corporate Claim Trust Agreement shall be consistent with the purpose and intention of the Corporate Claim Trust to liquidate in an expeditious but orderly manner the Trust Assets in accordance with Treasury Regulation Section 301.7701-4(d) and Section 2.5 hereof.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

12.1   Intention of Parties to Establish Corporate Claim Trust.  This Corporate Claim Trust Agreement is intended to create for United States federal income tax purposes a "liquidating trust" that satisfies the requirements of Revenue Procedure 94-45 and, to the fullest extent provided by law, shall be governed and construed in all respects as such a liquidating trust. Notwithstanding anything to the contrary contained herein, any ambiguity herein shall be construed consistent herewith and, if necessary, this Corporate Claim Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

28

12.2 <u>Effectiveness</u>. This Corporate Claim Trust Agreement shall become effective on the Equity Transfer Date but after the transactions described in clauses (i) and (ii) in the definition thereof in the Plan.

12.3 <u>Counterparts</u>. This Corporate Claim Trust Agreement may be executed in two or more counterparts, all of which shall be taken together to constitute one and the same instrument.

12.4 <u>Governing Law</u>. Except to the extent the Bankruptcy Code or Federal Rules of Bankruptcy Procedure are applicable, this Corporate Claim Trust Agreement shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the domestic laws of the state of Delaware, without giving effect to the principles of conflicts of law thereof.

12.5 <u>Headings</u>. Sections, subheadings and other headings used in this Corporate Claim Trust Agreement are for convenience only and shall not affect the construction or interpretation of this Corporate Claim Trust Agreement or any provision thereof.

12.6 <u>Severability</u>. If any provision of this Corporate Claim Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Corporate Claim Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provisions of this Corporate Claim Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

12.7 <u>Notices</u>. All notices, requests or other communications, required or permitted to be made in accordance with this Corporate Claim Trust Agreement including any change of address of any Corporate Claim Trust Beneficiary for the purposes of receiving distributions from the Corporate Claim Trust shall be in writing and shall be delivered personally or by first class or express mail, return receipt requested or fax with confirmation of receipt or email with receipt acknowledgement. Notices should be directed to:

(a) If to the Corporate Claim Trust, the Trustee, and the Trust Advisory Board: as specified in <u>Exhibit A</u>.

(b) If to a Corporate Claim Trust Beneficiary: to the name and address set forth on the Register maintained by the Trustee, or a transfer agent or registrar if one is appointed by the Trustee, provided that general notices to all Corporate Claim Trust Beneficiaries may be made by posting such notice to a web-site identified in advance for communication with Corporate Claim Trust Beneficiaries.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Corporate Claim Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

**[MILLENNIUM HEALTH, LLC,** on behalf of itself and the other Debtors]

By: _____

Name: _____

Title: _____


[                              ], TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST ESTABLISHED UNDER THE MILLENNIUM CORPORATE CLAIM TRUST AGREEMENT DATED PURSUANT TO THE PREPACKAGED JOINT PLAN OF REORGANIZATION OF MILLENNIUM LAB HOLDINGS II, LLC, ET AL.

_____

[Name], as Trustee

30

# **APPENDIX A**

## DEFINITIONS

"**Corporate Claim Trust Beneficial Interests**" means a beneficial interest in the Corporate Claim Trust to be issued to each Lender, which entitles its holder to receive Corporate Claim Trust Distributions from the Corporate Claim Trust as forth on the books and records of this Corporate Claim Trust Agreement.

"**Corporate Claim Trust Beneficiaries**" means the holder of Corporate Claim Trust Beneficial Interests.

"**Corporate Claim Trust Distribution**" means the distributions of Cash (or other Trust Assets) to be made by the Trustee in accordance with the terms of the Plan and this Corporate Claim Trust Agreement.

"**Corporate Claim Trust Recoveries**" means, at any time, the amount of Cash or other consideration obtained by or paid to the Trustee (or other Person acting on behalf of the Corporate Claim Trust) in connection with the monetization of any Trust Assets.

"**Delayed Draw Term Loan Agreement**" means that certain agreement entered into in connection with the Trust Delayed Draw Facility.

"**Funding Amount**" means the sum of $1,000,000 in Cash to be paid, on the Equity Transfer Date, to the Corporate Claim Trust.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**Lenders**" means Holders of Existing Credit Agreement Claims.

"**Related Persons**" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former shareholders, affiliates (whether by operation of law or otherwise), subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, and any Person claiming by or through them.

"**Retained Corporate Causes of Action**" means any and all claims and Causes of Action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) belonging to Millennium and the Administrative Agent, including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action released under the Plan, including, without limitation the claims subject to the bar order pursuant to Article X.J of the Plan and the injunction pursuant to Article X.K of the Plan.

"**Treasury Regulation**" means any regulation promulgated under the Internal Revenue Code of 1986, as amended.

32

"**Trust Advisory Board**" means the Millennium Corporate Claim Trust Advisory Board.

"**Trust Advisory Board Member**" means a member of the Trust Advisory Board.

"**Trust Assets**" means collectively, the Retained Corporate Causes of Action and the Funding Amount and any and all other assets vested in the Trust from time to time.

**EXHIBIT A**

**Identity and Contact Information for the Corporate Claim Trust, the Trustee, and the Trust Advisory Board**

Corporate Claim Trust:

Mark Kirshner
Goldin Associates LLC
350 Fifth Avenue
The Empire State Building
New York, NY 10118
Tel: (212) 593-2255
Fax: (212) 888-2841
Email: MKirschner@goldinassociates.com

Trustee:

Mark Kirshner
Goldin Associates LLC
350 Fifth Avenue
The Empire State Building
New York, NY 10118
Tel: (212) 593-2255
Fax: (212) 888-2841
Email: MKirschner@goldinassociates.com

Trust Advisory Board:

Matthew Cantor
Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Tel: (646) 285-9700
Fax: [_____]
Email: matthew.cantor@lehmanholdings.com

Alan D. Halperin
Halperin Battaglia Benzija, LLP
40 Wall Street, 37th Floor
New York, New York 10005
Tel: (212) 765-9100
Fax: (212) 765-0964
Email: ahalperin@halperinlaw.net

33

Eugene I. Davis
Pirinate Consulting Group
6 Canoe Brook Drive
Livingston, NJ  07039

Tel: (973) 533-8027
Fax: (973) 535-1945
Email: genedavis@pirinateconsulting.com

## EXHIBIT B

### Compensation for Trustee

The following aggregate compensation schedule shall apply to the Trustee of the Corporate Claim Trust:

a) A monthly fixed fee plus any out of pocket expenses equal to (i) $10,000 per month for years one and two, (ii) $7,500 per month for years three and four, (iii) $5,000 per month for year five, and (iv) $2,500 per month for year six.

b) A success fee equal to one and a half percent (1.50%) of net litigation recoveries, defined as gross litigation recoveries less all litigation legal, expert witness, e-discovery fees, and court and discovery costs (but not general Corporate Claim Trust accounting, insurance, and administration fees). Twenty-five percent (25%) of fixed fees (as described in section (a) above) earned by the Trustee will be credited against the success fee.

## EXHIBIT C

**Trust Advisory Board Member Compensation**

Each Trust Advisory Board Member shall receive compensation equal to $15,000 per year.

## EXHIBIT D

### Transfer Agent or Registrar

Wilmington Fund for Savings, FSB
500 Delaware Avenue
Wilmington, DE  19899
Attention:  Patrick J. Healy, Vice President
Tel:  (302) 888-7420
Fax:  (302) 636-4149
Email:  phealy@wsfsbank.com

Compensation:  $15,000 per year plus $15.00 wire fee for each disbursement

## EXHIBIT E

### FORM OF TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned record holder of [Corporate Claim Trust Beneficial Interests] hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

| [INSERT NAME] |
| [INSERT ADDRESS] |

Please print or typewrite name and address including zip code of assignee

| [INSERT # OF INTERESTS] |

and all related rights under the [Corporate Claim Trust Agreement], hereby irrevocably constituting and appointing

| [INSERT PERSON] |

attorney to transfer said [Corporate Claim Trust Beneficial Interests] on the books of the [Corporate Claim Trust] with full power of substitution in the premises.

In connection with any transfer of [Corporate Claim Trust Beneficial Interests], the undersigned confirms that such transfer is made without utilizing any general solicitation or general advertising and further as follows:

These [Corporate Claim Trust Beneficial Interests] are being transferred to an "accredited investor" (as defined in Rule 501 under the Securities Act of 1933, as amended) and certification in the form of **Exhibit A** hereto is being furnished herewith.

Date: _____

Seller _____

By _____

NOTICE:  The signature to this assignment must correspond with the name set forth in the official Register maintained by the Trustee, or transfer agent or registrar if one is appointed by the Trustee, without alteration or any change whatsoever.

On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature of Notary Public

*Seal*

_____
Printed Name of Notary Public

My Commission Expires:

_____

39

**EXHIBIT A**

Accredited Investor Certificate

[TRUSTEE/TRANSFER AGENT/REGISTRAR]
[ADDRESS]
Telephone No.: [INSERT]
Fax No.: [INSERT]
Email: [INSERT]

Re:   [Corporate Claim Trust Beneficial Interests] under the
      [Corporate Claim Trust Agreement]

Ladies and Gentlemen:

This Certificate relates to our proposed purchase or exchange of [Corporate Claim Trust Beneficial Interests] in accordance with the [Corporate Claim Trust Agreement].

We hereby confirm that:

1.   We are an "accredited investor" within the meaning of Rule 501 under the Securities Act of 1933, as amended (the "Securities Act") (an "Accredited Investor").

2.   Any acquisition of [Corporate Claim Trust Beneficial Interests] by us will be for our own account or for the account of one or more other Accredited Investors as to which we exercise sole investment discretion.

3.   We are not acquiring the [Corporate Claim Trust Beneficial Interests] with a view to any distribution thereof in a transaction that would violate the Securities Act or the securities laws of any State of the United States or any other applicable jurisdiction; *provided* that the disposition of our property and the property of any accounts for which we are acting as fiduciary will remain at all times within our and their control.

4.   We understand that the [Corporate Claim Trust Beneficial Interests] are subject to a [Corporate Claim Trust Agreement, dated [DD/MM/YY]], and that by accepting any [Corporate Claim Trust Beneficial Interests] we are agreeing to and shall become bound by all of the provisions of that [Corporate Claim Trust Agreement], including certain restrictions on transfer set forth therein.

5.   We are aware that the [Corporate Claim Trust Beneficial Interests] are highly speculative and that there can be no assurance as to what return, if any, there may be.

6.   We have had access to such information as we have deemed necessary to our determination to acquire the [Corporate Claim Trust Beneficial Interests] and we

40

have not relied upon any statements, whether written or oral, of the [Corporate Claim Trust] or the Trustee in making such determination.

7.   We acknowledge that neither the [Corporate Claim Trust] nor the Trustee has provided, or will provide in the future, any legal or tax advice regarding the [Corporate Claim Trust Beneficial Interests] and that we should consult our own tax or legal advisor for any such advice.

We agree for the benefit of the [Corporate Claim Trust], on our own behalf and on behalf of each account for which we are acting, that such [Corporate Claim Trust Beneficial Interests] may be offered, sold, pledged or otherwise transferred only in accordance with the [Corporate Claim Trust Agreement] and the Securities Act and any applicable securities laws of any State of the United States.

Prior to the registration of any transfer, we acknowledge that a duly completed and signed certificate (the form of which may be obtained from the Trustee) must be delivered to the Trustee and that the [Corporate Claim Trust] reserves the right to require the delivery of such legal opinions, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act, applicable state securities laws, the Trust Indenture Act of 1939, as amended, the Securities Exchange Act of 1934, as amended and the [Corporate Claim Trust Agreement].

We understand that the Trustee will not be required to accept for registration of transfer any [Corporate Claim Trust Beneficial Interests] acquired by us, except upon presentation of evidence satisfactory to the [Corporate Claim Trust] and the Trustee that the foregoing restrictions on transfer have been complied with, including without limitation those set forth in the [Corporate Claim Trust Agreement]. We further agree to provide to any person acquiring any of the [Corporate Claim Trust Beneficial Interests] from us a notice advising such person that resales of the [Corporate Claim Trust Beneficial Interests] are restricted as stated herein.

We understand that we are subject to the federal income tax treatment imposed under the United States Internal Revenue Code of 1986, as amended, and applicable Treasury Regulations with respect thereto (as well as the tax laws of other applicable state, local or other jurisdictions) as a result of the ownership of [Corporate Claim Trust Beneficial Interests] and we agree to comply in all respects with the obligations imposed as a result of such tax laws. Without limiting the foregoing, we understand that the [Corporate Claim Trust] is intended to, and shall be construed in all respects so as to, constitute a "grantor trust"; by acquisition of [Corporate Claim Trust Beneficial Interests], we shall be a "grantor" of such "grantor trust" as of the date of our acquisition of such [Corporate Claim Trust Beneficial Interests].

We agree to notify you promptly in writing if any of our acknowledgments, representations or agreements herein ceases to be accurate and complete.

We represent to you that we have full power to make the foregoing acknowledgments, representations and agreements on our own behalf and on behalf of any account for which we are acting.

41

You and the [<mark>Corporate Claim Trust</mark>] are entitled to rely upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

[NAME OF PURCHASER (FOR
    TRANSFERS) OR OWNER (FOR
    EXCHANGES)]


By: _____
    Name:
    Title:
    Address:

Date: _____


On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.


WITNESS my hand and official seal.

_____
*Seal*
                     Signature of Notary Public

_____
                     Printed Name of Notary Public

My Commission Expires:

_____

Upon transfer, the [Corporate Claim Trust Beneficial Interests] would be registered in the name of the new owner as follows:

By: _____

Date: _____

Taxpayer ID number: _____

# EXHIBIT B

## MILLENNIUM LENDER CLAIM TRUST AGREEMENT

This Millennium Lender Claim Trust Agreement (the **"Lender Claim Trust Agreement"**), made this ___ day of _____, 2015, by and among (a) Millennium Health, LLC (the **"Company"**), (b) the **"Consenting Lenders"**, and (c) Mark Kirshner, as trustee for the trust established pursuant to this Lender Claim Trust Agreement (such person and each successor trustee the **"Trustee"**), is executed to facilitate the implementation of the Chapter 11 Plan of Reorganization for the Millennium Debtors dated October 29, 2015 (as the same may be amended, modified or supplemented from time to time in accordance with the terms and provisions thereof, the **"Plan"**) that provides for the establishment of this trust (the **"Lender Claim Trust"**). Each of the Company, the Consenting Lenders, and the Trustee are sometimes referred to individually as a **"Party"** and collectively as the **"Parties."**

## RECITALS

WHEREAS, the Millennium Debtors filed for protection under chapter 11 of Title 11 of the United States Code (the **"Bankruptcy Code"**) on November 10, 2015 (the **"Petition Date")**, in the United States Bankruptcy Court for the District of Delaware (the **"Bankruptcy Court"**); and

WHEREAS, on _____ __, 2015, the Bankruptcy Court entered its order confirming the Plan (the **"Confirmation Order"**); and

WHEREAS, the Plan provides, among other things, as of the equity transfer date of the Plan (the "**Equity Transfer Date**") but after the transactions described in clauses (i) and (ii) in the definition thereof in the Plan, for the creation of the Lender Claim Trust, the administration and distribution of Trust Assets to the Lender Claim Trust Beneficiaries, in accordance with this Lender Claim Trust Agreement, the Plan, and the Confirmation Order; and

WHEREAS, the Lender Claim Trust is intended to qualify as a "grantor trust" for U.S federal income tax purposes, pursuant to Sections 671-677 of the IRC, with the Lender Claim Trust Beneficiaries to be treated as the grantors of the Lender Claim Trust; and

NOW, THEREFORE, pursuant to the Plan and the Confirmation Order, in consideration of the premises, the mutual agreements of the Parties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE I.
## DEFINITIONS

For all purposes of this Lender Claim Trust Agreement, capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in Annex A attached hereto and made part hereof. Capitalized terms used herein and not otherwise defined herein or in Annex A shall have the meanings ascribed to such terms in the Plan. Unless otherwise specified, Article, Section, and Paragraph references herein are to Articles, Sections, and Paragraphs of this Lender Claim Trust Agreement.

## ARTICLE II.
## ESTABLISHMENT OF THE LENDER CLAIM TRUST

2.1     Establishment of Lender Claim Trust and Appointment of Trustee.

(a)     Pursuant to the Plan, the Parties hereby establish a trust which shall be known as the "**Millennium Lender Claim Trust**" on behalf of the Lender Claim Trust Beneficiaries.  This Lender Claim Trust Agreement constitutes the governing instrument of the Lender Claim Trust.  The Trustee is hereby appointed as trustee of the Lender Claim Trust effective as of the Equity Transfer Date and agrees to accept such appointment and hold the assets of the Lender Claim Trust in trust for the Lender Claim Trust Beneficiaries subject to the terms of the Plan, the Confirmation Order, and this Lender Claim Trust Agreement. The Trustee and each successor trustee serving from time to time hereunder shall have all the rights, powers, and duties set forth herein.

(b)     Subject to the terms of this Lender Claim Trust Agreement, any action by the Trustee which affects the interests of more than one Lender Claim Trust Beneficiary shall be binding and conclusive on all Lender Claim Trust Beneficiaries so affected, even if such Lender Claim Trust Beneficiaries have different or conflicting interests.

(c)     The Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

2.2     Transfer of the Trust Assets.  Pursuant to the Plan, as of the Equity Transfer Date:

(a)     Upon the occurrence of the Equity Transfer Date of the Plan to the extent provided in the Plan, title to all of the Retained Lender Causes of Action existing on such date shall immediately and without further action automatically be deemed to be transferred, assigned, delivered, and shall vest in the Lender Claim Trust free and clear of any and all liens, claims, encumbrances, or interests of any kind in such property.

(b)     Pursuant to the terms of the Millennium Corporate Claims Trust, upon the occurrence of the Equity Transfer Date but after the transactions described in clauses (i) and (ii) in the definition thereof of the Plan, the Consenting Lenders shall automatically be deemed to transfer, assign, and deliver to the Millennium Corporate Claim Trust and the Trustee thereof all of their respective rights, title and interests in and to any privilege or immunity attaching to any documents or communications (whether written or oral) associated with any of the Retained Lender Causes of Action (collectively, **"Privileges"** and, together with Retained Lender Causes of Actions, **"Assigned Actions"**), which shall vest in the Trustee and the Millennium Corporate Claim Trust, in trust.  The Lender Claim Trust and the Millennium Corporate Claim Trust have a common, joint interest in pursuant of the causes of action respectively assigned to each such Trust.   Pursuant to the terms of the Millennium Corporate Claims Trust, the Trustee of the Millennium Corporate Claims Trust is authorized to share any privileged documents or communications with the Lender Claim Trust (or the Trustee thereof) without any prior notification to the Reorganized Debtors except as may be expressly required under Section 2.2(b) of the Millennium Corporate Claims Trust and the Trustee of the Lender Claim Trust is hereby authorized to receive and utilize any such privileged documents or communications in his

2

discretion, with the prior consent of the Trustee of the Millennium Corporate Claims Trust, but subject to the terms and conditions of Section 2.2(b) of the Millennium Corporate Claims Trust. For purposes of the transfer of documents, by virtue of its common interest with the Millennium Corporate Claims Trust, the Lender Claim Trust shall be deemed vested with all rights granted to the Millennium Corporate Claims Trust or the Trustee thereof as an assignee and successor to the Company in respect of privileged documents and communications and shall be treated as such an assignee or successor in any review of confidentiality restrictions in requested documents. For purposes of this Section 2.2(b), "privilege" means attorney-client privilege or work product protection (or both as the case may be) as those terms are defined in Federal Rule of Evidence 502(g) or any other privilege available under applicable law.

2.3 <u>Funding of the Lender Claim Trust</u>. The Lender Claim Trust shall obtain the Funding Amount in accordance with the terms of the Plan plus such additional tangible or intangible assets as the Reorganized Millennium shall determine. In addition, the Lender Claim Trust shall obtain funding as set forth in Article V, Section G(ii) of the Plan and Sections 4.11(l) hereof (regarding invoices not to exceed $10,000,000, in the aggregate of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) and 4.11(m) hereof (regarding invoices not to exceed $7,000,000, in the aggregate of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust). Any failure or inability of the Lender Claim Trust to obtain funding will not affect the enforceability of the Lender Claim Trust, provided that nothing herein shall preclude the Trustee from seeking additional financing from sources other than the Trust Assets in the discharge of its fiduciary duties.

2.4 <u>Title to the Trust Assets</u>. The transfer of the Trust Assets to the Lender Claim Trust pursuant to Section 2.2 hereof is being made by the Consenting Lenders for the sole benefit, and on behalf of, the Lender Claim Trust Beneficiaries. Upon the transfer of the Trust Assets to the Lender Claim Trust, the Lender Claim Trust shall succeed to all of the Consenting Lenders' rights, title, and interests in the Trust Assets and no other entity shall have any interest, legal, beneficial, or otherwise, in the Lender Claim Trust or the Trust Assets upon their assignment and transfer to the Lender Claim Trust (other than as provided herein or in the Plan).

2.5 <u>Nature and Purpose of the Lender Claim Trust</u>.

(a) <u>Purpose</u>. The Lender Claim Trust shall be established on behalf of, and for the benefit of, the Lender Claim Trust Beneficiaries, and to serve as a mechanism for converting to Cash the Trust Assets for the benefit of the Lender Claim Trust Beneficiaries with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the purposes of the Lender Claim Trust.

(b) <u>Relationship</u>. This Lender Claim Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust. The Lender Claim Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or association, nor shall the Trustee, or the Lender Claim Trust Beneficiaries, or any of them, for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint ventures. The relationship of the Lender Claim Trust Beneficiaries to the Trustee shall be solely that of beneficiaries of a trust and shall not be

3

deemed a principal and agency relationship, and their rights shall be limited to those conferred upon them by this Lender Claim Trust Agreement.

2.6 <u>Appointment as Representative</u>. Pursuant to Section 1123(b)(3) of the Bankruptcy Code, the Trustee shall be the duly appointed representative of the Consenting Lenders' for the purposes described herein, and, as such, to the extent provided herein, the Trustee succeeds to the rights and powers of the Consenting Lenders' with respect to prosecution of the Assigned Actions for the benefit of the Lender Claim Trust Beneficiaries. To the extent that any Assigned Actions cannot be transferred to the Lender Claim Trust because of a restriction on transferability under applicable law, such Trust Assets shall be deemed to have been retained by the Consenting Lenders (other than for tax purposes) and the Trustee shall be deemed to have been designated as a representative of the Consenting Lenders' to the extent provided herein solely to enforce and pursue such Assigned Actions on behalf of the estates. Notwithstanding the foregoing, all net proceeds of the Trust Assets shall be distributed consistent with the provisions of this Lender Claim Trust Agreement.

2.7 <u>Relationship to, and Incorporation of, the Plan</u>. The principal purpose of this Lender Claim Trust Agreement is to aid in the implementation of the Plan and the Confirmation Order, and therefore this Lender Claim Trust Agreement incorporates the provisions of the Plan and the Confirmation Order by this reference. To that end, the Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, to seek any orders from the Bankruptcy Court in furtherance of implementation of the Plan that directly affect the interests of the Lender Claim Trust, and to seek any orders from the Bankruptcy Court solely in furtherance of this Lender Claim Trust Agreement. As among the Lender Claim Trust, the Trustee, the Lender Claim Trust Beneficiaries, and the Consenting Lenders, if any provisions of this Lender Claim Trust Agreement are found to be inconsistent with the provisions of the Plan, or the Confirmation Order, each such document shall have controlling effect in the following rank order: (a) the Confirmation Order; (b) the Plan; and (c) this Lender Claim Trust Agreement.

2.8 <u>Cooperation Provisions</u>. Upon the Equity Transfer Date, the Company agrees to fully cooperate with the Lender Claim Trust with respect to the investigation and/or prosecution of any Retained Lender Causes of Action. Such full cooperation shall include, but is not limited to (i) producing documents without the need for service of a formal discovery request, (ii) providing access to employees and, as applicable, former employees to be interviewed, and prepared as a deposition or trial witness, (iii) causing witnesses to appear at a deposition or trial without the need for the Trustee to serve a subpoena upon such witness; and (iv) retaining all books, records and other documents relating to the Retained Lender Causes of Action and not destroying such records until after termination of the Lender Claim Trust.

Following the Equity Transfer Date, the Corporate Claim Trust and the Lender Claim Trust shall fully cooperate with each other with respect to their respective investigation and/or prosecution of any Retained Corporate Causes of Action and Retained Lender Causes of Action. Such cooperation shall include, but not be limited to, sharing and/or exchanging documents obtained in discovery and such other forms of mutual cooperation that, in the sole discretion of the Trustee and the trustee of the Corporate Claim Trust, they deem appropriate and in the best

interest of the respective Trust.  Such cooperation shall be subject to all available common interest protection and/or privileges applicable to the foregoing investigation and/or prosecution.

## ARTICLE III.
## LENDER CLAIM TRUST BENEFICIAL INTERESTS

3.1     <u>Lender Claim Trust Beneficial Interests</u>.  Lender Claim Trust Beneficial Interests will be represented by book entries on the books and records of the Lender Claim Trust by amount and by class.

3.2     <u>Allocation of Lender Claim Trust Beneficial Interests</u>.  The allocation of the Lender Claim Trust Beneficial Interests shall be accomplished as set forth in Article V, Section G of the Plan and the distribution of the Trust Assets shall be accomplished as set forth in Section Article V, Section G of the Plan.

3.3     <u>Interests Beneficial Only</u>.  The ownership of a Lender Claim Trust Beneficial Interest shall not entitle any Lender Claim Trust Beneficiary to any title in or to the assets of the Lender Claim Trust as such (which title shall be vested in the Trustee) or to any right to call for a partition or division of the assets of the Lender Claim Trust or to require an accounting. No surviving spouse, heir, or devisee of any deceased Lender Claim Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Trust Assets.

3.4     <u>Identification of Holders of Lender Claim Trust Beneficial Interests; Register and Registrar</u>.  The Lender Claim Trust will not issue any certificate or certificates to evidence any Lender Claim Trust Beneficial Interests. The record holders of Lender Claim Trust Beneficial Interests shall be recorded and set forth in a register maintained by the Trustee, or a registrar if one is appointed by the Trustee, expressly for such purpose (**"Register"**). The Trustee may appoint a transfer agent or registrar for the purpose of recording ownership of the Lender Claim Trust Beneficial Interests as herein provided.  The identity of the initial transfer agent and the terms of its compensation are set forth on <u>Exhibit</u> <u>D</u> hereto.  The transfer agent or registrar, if other than the Trustee, may be such other institution acceptable to the Trustee and may be retained on such terms as the Trustee deems necessary and advisable.  For services hereunder, the transfer agent or registrar, unless it is the Trustee, shall be entitled to receive reasonable compensation from the Lender Claim Trust as an expense of the Lender Claim Trust.  None of the Consenting Lenders or their agents, professionals, contractors or employees shall have any responsibility or liability for the maintenance of the Register. All references in this Lender Claim Trust Agreement to holders of Lender Claim Trust Beneficial Interests shall mean holders of record as set forth in the official Register maintained by the Trustee, or a transfer agent or registrar if one is appointed by the Trustee, and shall not mean any beneficial owner not recorded on such official registry.  The Trustee (or transfer agent or registrar, if one is appointed by the Trustee) shall, upon the written request of a holder of a Lender Claim Trust Beneficial Interest, provide reasonably adequate documentary evidence of such holder's Lender Claim Trust Beneficial Interest as indicated in the Register.  The expense of providing such documentation shall be borne by the requesting holder of the Lender Claim Trust Beneficial Interest.

3.5     <u>Transfer and Exchange of Lender Claim Trust Beneficial Interests</u>.

No transfer, sale, assignment, pledge, hypothecation or other disposition of any Lender Claim Trust Beneficial Interests, either in whole or in part, may be effected until and unless (i) the Trustee receives written notice of such transfer, sale, assignment, pledge, hypothecation or disposition, which notice must be executed by the transferor and the transferee and must clearly identify the Lender Claim Trust Beneficial Interest being transferred, sold, assigned, pledged or hypothecated, (ii) the transferee is an "accredited investor" within the meaning of Rule 501 under the Securities Act of 1933, as amended, and (iii) either (a) the Trustee has received such legal advice or other information that the Trustee, in its reasonable discretion, deems necessary or appropriate to assure that any such disposition is not reasonably likely to require the Lender Claim Trust to comply with the registration and reporting requirements of the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended or the Investment Company Act of 1940, as amended, or any applicable state securities laws or (b) the Trustee has determined to register under such Acts, as necessary, and/or make periodic reports in order to enable such disposition to be made. In the event that any such disposition is allowed, the Trustee may add such restrictions upon transfer and other terms to this Lender Claim Trust Agreement as are deemed necessary or appropriate by the Trustee, with the advice of counsel, to permit or facilitate such disposition under applicable securities and other laws. Transfers of record made in accordance with this Section 3.5 shall be indicated on the books and records of the Trustee (or a transfer agent or registrar, if one is appointed by the Trustee) maintained for such purpose. Any transfer, sale, assignment, pledge, hypothecation or other disposition of a Lender Claim Trust Beneficial Interest or any part thereof in violation of this Section 3.5 shall be void ab initio. Notwithstanding the foregoing, no transfer, sale, assignment, pledge, hypothecation or other disposition of a Lender Claim Trust Beneficial Interest or any part thereof shall be effective, and any such action shall be deemed void ab initio if, as a result of such action, (i) the Lender Claim Trust would have 2,000 or more holders of record or any holders of record who are not "accredited investors" (as such concepts are defined and measured for purposes of Section 12(g) of the Securities Exchange Act of 1934, as amended and any relevant rules promulgated thereunder and, in each case, subject to any amendment to the Securities Exchange Act of 1934 or the rules and regulations promulgated thereunder that increases the ownership thresholds set forth above, whereupon the thresholds set forth herein shall automatically be adjusted accordingly) or (ii) the Lender Claim Trust would be required to register under the Securities Exchange Act of 1934, as amended the Lender Claim Trust Beneficial Interests, unless, in any such case, at the time of such action such Lender Claim Trust Beneficial Interests were, prior to such proposed action, already registered under the Securities Exchange Act of 1934, as amended. Any permitted transfer shall become effective as of the last day of the calendar month in which it occurs.

(a)     Lender Claim Trust Beneficial Interests shall be recorded in book-entry form only, shall not be certificated, and shall not be capable of being transferred, sold, assigned, pledged, or hypothecated, in whole or in part, unless the conditions set forth in this Section 3.5 are met. In connection with any such transfer of a Lender Claim Beneficial Interest, a Transfer Notice in the form attached as Exhibit E hereto shall be provided to the Trustee, together with the questionnaire attached as an exhibit thereto appropriately completed.

(b)     The holder effecting a disposition of a Lender Claim Trust Beneficial Interest or any part thereof shall pay, or reimburse the Lender Claim Trust for, all reasonable costs incurred by the Lender Claim Trust in connection with such disposition (including,

6

without limitation, the reasonable legal fees incurred in connection with the legal advice referred to herein) on or before the tenth (10th) business day after the receipt by that person of the Lender Claim Trust's invoice for the amount due. If payment is not made by the date due, the person owing that amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to 8% plus any costs, including attorneys' fees, incurred in the collection of such amount.

3.6     Conflicting Lender Claim Trust Beneficial Interests.  If any conflicting claims or demands are made or asserted with respect to a Lender Claim Trust Beneficial Interest, the Trustee shall be entitled, at its sole discretion, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the Lender Claim Trust Beneficial Interests subject to the claims or demands involved, or any part thereof, and the Trustee shall refer such conflicting claims or demands to the Bankruptcy Court, which to the fullest extent permitted by law, shall have jurisdiction over resolution of such conflicting claims or demands.  In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any such conflicting claims or demands.

3.7     Exemption from Registration.  The parties hereto intend that the rights of the Lender Claim Trust Beneficiaries arising under this Lender Claim Trust shall not be "securities" under applicable laws, but none of the parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If such rights constitute securities, the parties hereto intend for the exemption from registration provided by Section 1145 of the Bankruptcy Code and under applicable securities laws to apply to their issuance under the Plan.

3.8     Change of Address.  A Lender Claim Trust Beneficiary may, after the Equity Transfer Date, select an alternative distribution address by providing notice to the Trustee identifying such alternative distribution address. Such notification shall be effective only upon receipt by the Trustee. Absent actual receipt of such notice by the Trustee, the Trustee shall not recognize any such change of distribution address.

3.9     Tax Identification Numbers.  The Trustee will require any Lender Claim Trust Beneficiary to furnish to the Trustee its social security number or employer or taxpayer identification number as assigned by the IRS and complete any related documentation (including but not limited to a Form W-8BEN, Form W-8BEN-E, or Form W-9) (the **"Tax Documents"**). The Trustee may condition any distribution to any Lender Claim Trust Beneficiary upon the receipt of properly executed Tax Documents and the receipt of such other documents as the Trustee reasonably requests.

## ARTICLE IV.
### RIGHTS, POWERS AND DUTIES OF TRUSTEE

4.1     Role of the Trustee.  In furtherance of and consistent with the purpose of the Lender Claim Trust and the Plan, subject to the terms and conditions contained herein and in the Plan, the Trustee shall (i) hold the Trust Assets for the benefit of Lender Claim Trust Beneficiaries, (ii) prosecute, settle, abandon, or otherwise dispose of or liquidate the Retained

Lender Causes of Action, and (iii) make Lender Claim Trust Distributions in accordance with provisions of the Plan and this Lender Claim Trust Agreement. Subject to Section 7.3 hereof, the Trustee shall be responsible for all decisions and duties with respect to the Lender Claim Trust and the Trust Assets. In all circumstances, the Trustee shall act in the best interests of all Lender Claim Trust Beneficiaries and in furtherance of the purpose of the Lender Claim Trust, and shall make timely Lender Claim Trust Distributions and not unduly prolong the duration of the Lender Claim Trust.

4.2     Rights of Action/Reservation of Rights. Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, and except with respect to the Releases, in accordance with Section 1123(b) of the Bankruptcy Code, and subject to Section 7.3 hereof, the Lender Claim Trust shall reserve, retain and may prosecute, enforce, litigate, settle, compromise, transfer or assign (or decline to do any of the foregoing) all Retained Lender Causes of Action. Except as otherwise expressly set forth therein, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any right or Retained Lender Causes of Action that the Consenting Lenders or their Estates may have or which the Lender Claim Trust may choose to assert (subject to this Lender Claim Trust Agreement), under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, any and all Claims against any Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof), to the extent such Person (and any government, governmental agency or any subdivision, department or other instrumentality thereof) asserts a cross-claim, counterclaim and/or Claim for setoff which seeks affirmative relief against any of the Consenting Lenders, their officers, directors, or representatives. The Trustee shall be deemed the appointed representative to, and may, except as otherwise provided in the Plan or the Confirmation Order, prosecute, enforce, litigate, settle, compromise, transfer, or assign any such rights, claims, Retained Lender Causes of Action, suits, or proceedings as appropriate in favor of or against the Lender Claim Trust, in accordance with the terms of this Lender Claim Trust Agreement, the Plan, the Confirmation Order, and the best interests of the Lender Claim Trust and the Lender Claim Trust Beneficiaries.

4.3     Liability of Trustee.

(a)     No provision of this Lender Claim Trust Agreement shall require the Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it.

(b)     The Trustee shall not be personally liable for the validity or sufficiency of this Lender Claim Trust Agreement or for the due execution hereof by the other parties hereto.

(c)     The Trustee acts solely as Trustee hereunder and not in its individual capacity, and all persons having any claim against the Trustee by reason of the transactions contemplated by this Lender Claim Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(d)     The Trustee shall not be personally liable for any representation, warranty, covenant, agreement, or indebtedness of the Lender Claim Trust.

4.4     <u>Authority to Settle Assigned Actions</u>.  Subject to Section 7.3 hereof, the Trustee shall be empowered and authorized to settle, dispose of or abandon any Assigned Actions (including any counterclaims to the extent such counterclaims are set off against the proceeds of any such Assigned Actions), and any determinations by the Trustee with regard to the amount or timing of settlement or other disposition of any Assigned Action shall be conclusive and binding on all Lender Claim Trust Beneficiaries and all other parties in interest.

4.5     <u>Retention of Counsel and Other Professionals</u>.

(a)     The Trustee may, consistent with the Plan, but without necessity for review or approval by the Bankruptcy Court or any other Person (a) retain such independent experts and advisors (including, but not limited to, counsel, tax advisors, consultants, or other professionals) as the Trustee deems necessary to aid it in the performance of its duties and responsibilities hereunder and under the Plan and to perform such other functions as may be appropriate in furtherance of the intent and purpose of this Lender Claim Trust Agreement, and (b) commit the Lender Claim Trust to provide such professional persons or entities reasonable compensation and reimbursement from the Trust Assets for services rendered and expenses incurred. The Trustee may select any professionals in its sole discretion, without regard to such professionals' (1) affiliation with the Trustee and Trust Advisory Board Members, and (2) prior employment in any capacity in the Millennium Debtors' bankruptcy cases on behalf of any party.  The Trustee will make all reasonable and customary arrangements for payment or reimbursement of such compensation and expenses from the Trust Assets.

4.6     <u>Lender Claim Trust Expenses</u>.

(a)     The Lender Claim Trust shall pay all reasonable fees, costs, and expenses of the Lender Claim Trust that are (i) incurred in connection with the administration of the Lender Claim Trust, the protection, preservation, liquidation, and distribution of Trust Assets, and the costs of investigating, prosecuting, resolving and/or settling or objecting to any Claims, any tax liability imposed on the Lender Claim Trust, and any fees, costs and expenses of the Trustee, the members of the Trust Advisory Board, and any and all professionals retained by such parties; (ii) obligations or other liabilities incurred or assumed by the Lender Claim Trust (including but not limited to any reserves established or assumed by the Lender Claim Trust under the Plan); (iii) reasonably necessary to meet contingent liabilities and to maintain the value of the Trust Assets during liquidation; and (iv) to satisfy any other obligations of the Lender Claim Trust set forth in the Plan, the Confirmation Order, or the Lender Claim Trust Agreement.  All fees, costs, and expenses of the Lender Claim Trust shall be made from the Trust Assets subject to Section 4.6(b).

(b)     Reasonable fees and expenses of administering the Lender Claim Trust and Assigned Actions (including, professional fees related thereto) shall be funded by Reorganized Millennium to the extent set forth in the Plan and Section 7.3(ix) hereof.

(c)     The Trustee may reimburse to Backstop MLH Shareholders to the extent and in amounts set forth in Article V, Section G(iii) of the Plan.

(d)     The Trustee shall, consistent with the Plan, retain Cash and fund one or more reserves, at any time and from time to time, with such amounts as the Trustee, in its reasonable discretion (after consultation with the Trust Advisory Board), deems reasonable and appropriate to ensure that the Lender Claim Trust will be able to meet its obligations for fees, costs, and expenses as set forth in Section 4.6(a) hereof.

(e)     Notwithstanding any other provision of this Lender Claim Trust Agreement to the contrary, the Trustee shall not be required to take any action or enter into or maintain any claim, demand, action, or proceeding relating to the Lender Claim Trust unless it shall have, or have access to, sufficient funds for that purpose.

4.7     Distributions.

(a)     In the reasonable discretion of the Trustee, the Trustee shall (after consultation with the Trust  Advisory Board), in one or more Lender Claim Trust Distributions, distribute Cash on hand (including, but not limited to, the Lender Claim Trust's net income and net proceeds from the Trust Assets, any Cash received on account of Trust Assets, except such amounts  as are reasonably necessary for the Lender Claim Trust to meet Claims, contingent liabilities accrued, and future fees, costs, and expenses of the Lender Claim Trust and to maintain the value of the Trust Assets. The Trustee shall make all such Lender Claim Trust Distributions in accordance with provisions of the Plan and this Lender Claim Trust Agreement; the net income of the Lender Claim Trust and all net proceeds from the sale of Trust Assets shall be distributed at least annually (except that the Trustee may retain an amount of Cash or other Trust Assets or net income of the Lender Claim Trust reasonably necessary to maintain the value of the Trust Assets to meet claims and contingent liabilities).

(b)     Prior to making any Lender Claim Trust Distribution, the Lender Claim Trust shall retain sufficient funds to meet the fees, costs and expenses set forth in Section 4.6(a), subject to Section 4.6(b).  For the avoidance of doubt, the Lender Claim Trust shall not be required to distribute Cash which has been funded by or provided from the Company pursuant to the Plan to pay such fees, costs, and expenses.

(c)     The Lender Claim Trust may withhold from amounts distributable to any Person any and all amounts, determined in the Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive, or other governmental requirement (including, without limitation, tax withholding relating to wage claims). Any Trust Assets which are undistributable in accordance with this Section 4.7(c) as of the termination of the Lender Claim Trust shall be distributed in accordance with provisions of the Plan and this Lender Claim Trust Agreement.

(d)     The Trustee may retain a distribution agent for the effective administration and distribution of amounts payable to Lender Claim Trust Beneficiaries; provided, however, that such distribution agent shall have no greater authority than, and shall be subject to the same restrictions as, the Trustee under the Lender Claim Trust Agreement.

10

(e)     Subject to Bankruptcy Rule 9010, any Lender Claim Trust Distribution or delivery to a holder of an Allowed Claim shall be made: (1) at the addresses set forth on the respective proofs of Claim filed by such holders; (2) at the address set forth in any written notices of address changes delivered to the Trustee after the date of any related proof of Claim; or (3) at the address reflected in the Schedules if no proof of Claim is filed with the Trustee (as to Claims administered by the Lender Claim Trust) has not received a written notice of a change of address.  Except as set forth in the Plan, if any Lender Claim Trust Distribution or other communication from the Lender Claim Trust is returned as undeliverable, no further Lender Claim Trust Distribution shall be made to such holder unless the Trustee is notified in writing of such holder's then current address.  Undeliverable Lender Claim Trust Distributions shall remain in the possession of the Trustee until the earlier of (i) such time as a Lender Claim Trust Distribution becomes deliverable or (ii) such undeliverable Lender Claim Trust Distribution becomes an Unclaimed Distribution pursuant to the provisions of the Plan and this Lender Claim Trust Agreement.  Except as required by law, the Trustee (or its duly authorized agent) shall have no obligation to locate any Lender Claim Trust Beneficiary.

(f)     After final Lender Claim Trust Distributions have been made in accordance with the Combined Plan and Disclosure Statement, the Lender Claim Trust shall not be obligated to make a Lender Claim Trust Distribution of less than twenty five dollars ($25) to any holder of a Lender Claim Trust Beneficial Interest.  In lieu of making any further Lender Claim Trust Distributions to such holder, the Trustee may distribute such Cash to the charity of its choice; provided such charity is a Section 501(c)(3) under the IRC, is exempt from federal income tax, is not a "private foundation" under the IRC, and is unrelated to the Trustee, the Trust Advisory Board Members, or any Related Persons thereof.

(g)     Checks issued in respect of Allowed Claims shall be null and void if not negotiated within three (3) months after the date of issuance thereof.  Requests for reissuance of any voided check shall be made directly to the Trustee by the holder of the Allowed Claim to whom such check was originally issued.  Any Claim in respect of such a voided check shall be made within three (3) months after the date of issuance of such check.  If no request is made as provided in the preceding sentence, the Check shall revert to the Trustee and such Lender Claim Trust Distribution shall be deemed to be reduced to zero.

(h)     Cash payments to foreign holders of Lender Claim Trust Beneficial Interests may be made, at the option of the Trustee, in such funds and by such means as are necessary or customary in the foreign jurisdiction of such foreign holder.

(i)     The Trustee shall have the discretion (after consultation with the Trust Advisory Board) to determine the timing of Lender Claim Trust Distributions in the most efficient and cost-effective manner possible; provided, however, that the Trustee's discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

4.8     Distribution Record Date.  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims.  Except as set forth in Section 3.5, the Trustee shall be

11

entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date.

4.9 <u>Management of the Trust Assets</u>.

(a) The Trust Assets and all other property held from time to time by the Lender Claim Trust and any earnings, including without limitation, interest, on any of the foregoing shall be applied by the Trustee in accordance with the terms of this Lender Claim Trust Agreement for the benefit of the Lender Claim Trust Beneficiaries, and for no other party.

(b) Except as otherwise provided in this Lender Claim Trust Agreement, the Plan or the Confirmation Order, and subject to the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Trustee may control and exercise authority over the Trust Assets, over the acquisition, management and disposition thereof and over the management and conduct of the Lender Claim Trust, in each case, to the extent necessary to enable the Trustee to fulfill the purpose of this Lender Claim Trust Agreement. No person dealing with the Lender Claim Trust will be obligated to inquire into the authority of the Trustee in connection with the acquisition, management or disposition of the Trust Assets.

(c) In connection with the management and use of the Trust Assets and except as otherwise expressly limited in this Lender Claim Trust Agreement, the Plan or the Confirmation Order, the Trustee will have in addition to any powers conferred upon the Trustee by any other provision of this Lender Claim Trust Agreement, the power to take any and all actions as, in the Trustee's discretion, are necessary or advisable to effectuate the primary purposes of the Lender Claim Trust, including, without limitation, the power and authority, to the extent consistent with the Plan, as applicable, (i) to distribute the Trust Assets to Lender Claim Trust Beneficiaries in accordance with the terms of this Lender Claim Trust Agreement and the Plan, (ii) to pay all expenses of the Lender Claim Trust, (iii) to sell, convey, transfer, assign, liquidate or abandon the Trust Assets, or any part thereof or any interest therein, upon such terms and for such consideration as the Trust Advisory Board deems reasonable, (iv) to endorse the payment of notes or other obligations of any Person or to make contracts with respect thereto, and (v) to borrow such sums of money, at any time and from time to time, for such periods of time, upon such terms and conditions, from such Persons, for such purposes as the Trust Advisory Board deems reasonable.

(d) All decisions and actions by the Trustee under the authority of this Lender Claim Trust Agreement will be binding upon all of the Lender Claim Trust Beneficiaries and the Lender Claim Trust.

4.10 <u>Investment of Trust Assets</u>. Subject to Section 4.12 hereof, the Trustee may invest Trust Assets (pending distribution in accordance with this Lender Claim Trust Agreement) only in Cash and Government Securities as defined in Section 2(a)(16) of the Investment Company Act of 1940, as amended. Notwithstanding any other provision of this Lender Claim Trust Agreement, the Trustee may not "vary the investments" of the Lender Claim Trust Beneficiaries within the meaning of Treasury Regulation Section 301.7701-4(c).

4.11    Additional Powers of the Trustee.  In addition to the powers set forth in the Plan, the Confirmation Order, or this Lender Claim Trust Agreement, and subject to the terms and conditions thereof (including, without limitation, the consent and consultation rights, as applicable, of the Trust Advisory Board as set forth in this Lender Claim Trust Agreement, and to the fullest extent permitted by law, the retained jurisdiction of the Bankruptcy Court as provided for in the Plan) and the Treasury Regulations governing trusts, the Trustee shall be empowered to:

(a)    open and close bank accounts (deposit, securities, or otherwise) including a Lender Claim Trust Account, and hold, manage, convert to Cash, and distribute the Trust Assets, including all Lender Claim Trust recoveries, in accordance with provisions of the Plan and this Lender Claim Trust Agreement;

(b)    pay or reserve for payment all reasonable fees, costs and expenses of the Lender Claim Trust that are (i) incurred in connection with the administration of the Lender Claim Trust, the protection, preservation, liquidation and distribution of Trust Assets, and the costs of investigating, prosecuting, resolving and/or settling any Claims (including but not limited to any tax liability imposed on the Lender Claim Trust and any fees, costs and expense of any and all professionals retained by the Lender Claim Trust), (ii) obligations or other liabilities incurred or assumed by the Lender Claim Trust; (iii) reasonably necessary to meet contingent liabilities and to maintain the value of the Trust Assets; and (iv) to satisfy any other obligations of the Lender Claim Trust set forth in the Plan, the Confirmation Order, or the Lender Claim Trust Agreement;

(c)    perform the duties, exercise the powers, and assert the rights of a trustee under Sections 704 and 1106 of the Bankruptcy Code with respect to the Trust Assets, including assert claims, defenses, offsets, and privileges;

(d)    protect and enforce the rights of the Lender Claim Trust to the Trust Assets by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium, or similar law and general principles of equity;

(e)    determine and satisfy any and all obligations or liabilities created, incurred or assumed by the Lender Claim Trust;

(f)    assert or waive any privilege or defense on behalf of the Lender Claim Trust including, without limitation, any of the Privileges;

(g)    hold, manage, and distribute Cash or non-Cash Trust Assets obtained through the exercise of its power and authority and make all disbursements and Lender Claim Trust Distributions relating to the Trust Assets;

(h)    obtain insurance coverage with respect to the potential liabilities and obligations of the Lender Claim Trust, the Trustee, and the Trust Advisory Board under this Lender Claim Trust Agreement (in the form of a directors and officers policy, an errors and omissions policy or otherwise);

(i)     file, if necessary, any and all tax and information returns with respect to the Lender Claim Trust and pay taxes properly payable by the Lender Claim Trust, if any;

(j)     request any appropriate tax determination with respect to the Lender Claim Trust, including, without limitation, a determination pursuant to Section 505 of the Bankruptcy Code;

(k)     retain and reasonably compensate for services rendered and expenses incurred (a) an accounting firm or financial consulting firm to perform such reviews and/or audits of the financial books and records of the Lender Claim Trust as may be appropriate in the Trustee's discretion if any, (it being understood no such audit shall be required) and to prepare and file any tax returns or informational returns for the Lender Claim Trust as may be required and (b) a transfer agent or registrar for the purpose of recording ownership of the Lender Claim Trust Beneficial Interests;

(l)     submit invoices to Reorganized Millennium for payment of the reasonable fees and expenses of administering the Millennium Lender Claim Trust and liquidating the Retained Lender Causes of Action not to exceed $10,000,000, in the aggregate (of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust), as set forth in the Plan and in Section 7.3(ix) hereof;

(m)     submit invoices to and request an advance from Reorganized Millennium from the Trust Delayed Draw Facility for payment of the reasonable fees and expenses of administering the Millennium Lender Claim Trust and liquidating the Retained Lender Causes of Action not to exceed $7,000,000, in the aggregate (of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust), as set forth in the Plan and subject to Section 7.3(ix) hereof;

(n)     reimburse Reorganized Millennium, without interest, from the net proceeds recovered by the Lender Claim Trust, amounts Reorganized Millennium has advanced to the Lender Claim Trust by virtue of draws from the Trust Delayed Draw Facility to the extent set forth in the Plan and the Delayed Draw Term Loan Agreement;

(o)     take or refrain from taking any and all actions the Trustee reasonably deems necessary for the continuation, protection, and maximization of the Trust Assets consistent with the purposes of the Lender Claim Trust;

(p)     take all steps and execute all instruments and documents the Trustee reasonably deems necessary to effectuate the purposes of the Lender Claim Trust and the Plan;

(q)     make continuing efforts to dispose of the Trust Assets, make timely distributions, and not unduly prolong the duration of the Lender Claim Trust;

(r)     prepare and report, in the manner requested by the Trust Advisory Board, a periodic report of the status of the Assigned Actions;

14

(s)   act as a signatory for the Company as necessary to effectuate the purposes of the Lender Claim Trust and the Plan, including but not limited to, to effectuate the transfer of any of the Trust Assets to the Lender Claim Trust;

(t)   monitor and enforce implementation of the Plan and take all actions the Trustee reasonably deems necessary under the Plan, the Confirmation Order, and this Lender Claim Trust Agreement and the obligations thereunder and hereunder;

(u)   exercise such other powers as may be vested in the Trustee pursuant to an order of the Bankruptcy Court, the Plan, the Confirmation Order and this Lender Claim Trust Agreement to be necessary and proper to carry out the purposes of the Lender Claim Trust.

4.12   <u>Limitations on Power and Authority of the Trustee</u>.  Notwithstanding anything in this Lender Claim Trust Agreement to the contrary, the Trustee will not have the authority to do any of the following:

(a)   take any action in contravention of this Lender Claim Trust Agreement, the Plan, or the Confirmation Order;

(b)   take any action which would make it impossible to carry on the activities of the Lender Claim Trust;

(c)   possess property of the Lender Claim Trust or assign the Lender Claim Trust's rights in specific property for other than Lender Claim Trust purposes and as provided herein;

(d)   permit the Lender Claim Trust to engage in any trade or business except to the extent necessary to, and consistent with, the purposes of the Lender Claim Trust;

(e)   permit the Lender Claim Trust to receive or retain Cash or Cash equivalents in excess of a reasonable amount necessary to meet claims and contingent liabilities (including without limitation expected expenses) or to maintain the value of its assets;

(f)   receive transfers of any listed stocks or securities, or any readily-marketable assets or any operating assets of a going business, except as is absolutely necessary or required under the Plan and the Confirmation Order;

(g)   exercise any investment power other than as permitted by Section 4.10 hereof;

(h)   receive or retain any operating assets of a going business, a partnership interest in a partnership that holds operating assets, or fifty percent (50%) or more of the stock of a corporation with operating assets, except as is absolutely necessary or required under the Plan and the Confirmation Order;

(i)   take any other action that would jeopardize treatment of the Lender Claim Trust as a grantor trust for United States federal income tax purposes; and

15

(j)    take any action which requires prior written consent of the Trust Advisory Board pursuant to Section 7.3 hereof, without having received such consent.

4.13    Consultation with Trust Advisory Board.  The Trustee shall consult with the Trust Advisory Board regularly and at all such times as the Trustee deems necessary or appropriate in connection with carrying out the purposes of the Lender Claim Trust or as requested by the Trust Advisory Board, and shall obtain approvals from the Trust Advisory Board as required under the Plan and this Lender Claim Trust Agreement, including but not limited to Section 7.3 hereof.

4.14    Books and Records.  The Trustee shall maintain books and records relating to the Trust Assets and income of the Lender Claim Trust and the payment of, expenses of, and liabilities of claims against or assumed by, the Lender Claim Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Lender Claim Trust. Nothing in this Lender Claim Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Lender Claim Trust, or as a condition for managing any payment or distribution out of the Trust Assets.

4.15    Reports.

(a)    The Trustee shall timely prepare, file and distribute such statements, reports and submissions as may be necessary to cause the Lender Claim Trust and the Trustee to be in compliance with applicable law.

(b)    Securities Reports.  To the extent that the Lender Claim Trust Beneficial Interests are deemed securities the issuance of Lender Claim Trust Beneficial Interests under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and applicable state and local laws requiring registration of securities pursuant to Section 1145 of the Bankruptcy Code. If the Trustee determines, with the advice of counsel, that the Trustee is required to comply with the registration and reporting requirements of the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Trustee shall take commercially reasonable efforts to comply with such reporting requirements and file periodic reports with the Securities and Exchange Commission.

(c)    Financial Reports.  After the close of the calendar year-end following the Equity Transfer Date and for each calendar year end thereafter, and as soon as practicable upon termination of the Lender Claim Trust, the Trustee shall prepare or have prepared financial statements of the Lender Claim Trust for such period, which shall be made available to Lender Claim Trust Beneficiaries by means of actual notice (which statements need not be audited by an outside firm of certified public accountants).  The Trust Advisory Board may require the Trustee to produce quarterly financial statements in the form requested by the Trust Advisory Board.  Alternatively, the Trustee may either post any such financial statements on a web site maintained by the Trustee or electronically file it with the Bankruptcy Court in lieu of actual notice to each Lender Claim Trust Beneficiary (unless otherwise required by law).

16

4.16    Compliance with Laws.  Any and all distributions of Trust Assets and proceeds of borrowings, if any, shall be in compliance with applicable laws, including, but not limited to, applicable federal and state securities laws.

## ARTICLE V.
## THE TRUSTEE

5.1    Independent Trustee.  The Trustee may not be a Lender Claim Trust Beneficiary or related or subordinate (within the meaning of Section 672(c) of the IRC) to any Lender Claim Trust Beneficiary.

5.2    Citizenship.  The Trustee shall at all times be a "United States Person" as defined in Section 7701(a)(30) of the IRC.

5.3    Trustee's Compensation and Reimbursement.    The Trustee shall receive compensation from the Lender Claim Trust as follows:

(a)    Compensation.  The Trustee shall receive as reasonable compensation in connection with the performance of services (including any work performed prior to the Equity Transfer Date) as set forth in Exhibit B hereto.  If the Trustee resigns or is removed, the Trust Advisory Board shall give written consent to the compensation for the successor Trustee if greater than the compensation for the predecessor Trustee.

(b)    Expenses.  In addition, the Lender Claim Trust will reimburse the Trustee (out of the Trust Assets) for all reasonable, out-of-pocket expenses incurred by the Trustee in connection with the performance of its duties hereunder and under the Plan.

(c)    Payment.  The fees and expenses payable to the Trustee shall be paid to the Trustee (out of the Trust Assets, subject to Section 4.6(b) hereof) without necessity for review or approval by the Bankruptcy Court or any other Person. To the fullest extent permitted by law, the Bankruptcy Court shall retain jurisdiction to adjudicate any dispute regarding the fees, compensation, and expenses of the Trustee.

5.4    Resignation.  The Trustee may resign by giving not less than sixty (60) days' prior written notice thereof to the Bankruptcy Court and the Trust Advisory Board. Unless the Bankruptcy Court (on motion of any Lender Claim Trust Beneficiary) orders otherwise, (i) such resignation shall become effective on the date on which the Bankruptcy Court appoints a successor Trustee or a replacement Trustee is appointed pursuant to Section 5.6 of this Lender Claim Trust Agreement, provided the Trust Advisory Board shall select a replacement Trustee within sixty (60) days of the notice from the Trustee and (ii) the Trustee shall be entitled to compensation and reimbursement up to the date on which the Trustee's resignation becomes effective.

5.5    Removal.  The Trustee may be removed, with or without cause, by the Trust Advisory Board. To the extent there is any dispute or motion regarding the removal of the Trustee (including any dispute relating to any compensation or expense reimbursement due under this Lender Claim Trust Agreement), to the fullest extent permitted by law, the Bankruptcy Court shall retain jurisdiction to consider and adjudicate any such dispute. Notwithstanding the

foregoing, the Trustee will continue to serve as trustee after its removal until the time when appointment of a successor Trustee will become effective in accordance with Section 5.6 of this Lender Claim Trust Agreement. For purposes of this Section 5.5, "cause" means (a) the Person's failure to perform its material duties hereunder; (b) the Person's commission of an act of fraud, theft, or embezzlement during the duties described hereunder; or (c) the Person's conviction for the commission of a felony with all appeals having been exhausted or appeal periods lapsed; provided, however, that no "cause" shall exist involving subsection (a) above until the Person first has failed to cure such failure within thirty (30) days of having been given written notice of such failure.

5.6     Appointment of Successor Trustee.  Upon the resignation or removal of the Trustee, the members of the Trust Advisory Board shall appoint a successor.  If the Trust Advisory Board cannot timely agree upon the successor Trustee, the Bankruptcy Court, to the fullest extent permitted by law, shall make the appointment. Any successor Trustee appointed hereunder shall execute, acknowledge, and file with the Lender Claim Trust records an instrument accepting the appointment under this Lender Claim Trust Agreement and agreeing to be bound thereto, and thereupon, the successor Trustee, without any further act, deed, or conveyance, shall become vested with all rights, powers, trusts, and duties of the predecessor Trustee; provided, however, that a removed or resigning Trustee shall, nevertheless, when requested in writing by the successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee under the Lender Claim Trust all the estates, properties, rights, powers, and trusts of such predecessor Trustee.  In no event shall any successor Trustee be an employee or affiliate of a Consenting Lender.

5.7     Effect of Resignation or Removal.  The death, resignation, incompetency or removal of the Trustee shall not operate to terminate the Lender Claim Trust created by this Lender Claim Trust Agreement or to revoke any existing agency created pursuant to the terms of this Lender Claim Trust Agreement or invalidate any action theretofore taken by the Trustee or any prior Trustee. In the event of the resignation or removal of the Trustee, such Trustee will promptly (a) execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee to effect the termination of such Trustee's capacity under this Lender Claim Trust Agreement, (b) deliver to the successor Trustee all documents, instruments, records and other writings related to the Lender Claim Trust as may be in the possession of such Trustee (provided that such Trustee may retain one copy of such documents for archival purposes) and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

5.8     Confidentiality.  The Trustee shall, during the period that the Trustee serves as Trustee under this Lender Claim Trust Agreement and following the termination of this Lender Claim Trust Agreement or following its removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Trust Assets relates or of which the Trustee has become aware in the Trustee's capacity as Trustee, except as otherwise required by law.

18

## ARTICLE VI.
## [RESERVED]

## ARTICLE VII.
## TRUST ADVISORY BOARD

7.1     Trust Advisory Board Generally.  Pursuant to the Plan and this Lender Claim Trust Agreement, the Trust Advisory Board ("**Trust Advisory Board**") shall be created on the Equity Transfer Date.  The Trust Advisory Board's role shall be to advise, oversee, and approve the actions of the Trustee to the extent required herein.  The Trust Advisory Board shall be comprised of three (3) members, each of whom shall at all times be "United States Persons" as defined in Section 7701(a)(30) of the IRC (the "**Trust Advisory Board Members**"), which members and any successor of any such member under shall be appointed in accordance with the Plan.  The Trust Advisory Board shall have such duties and powers as provided for in this Lender Claim Trust Agreement. Except as otherwise expressly provided herein, consent of a majority of the Trust Advisory Board Members shall be required to take any action or make any decision of the Trust Advisory Board.  The initial Trust Advisory Board Members shall be, Matthew Cantor, Alan D. Halperin and Eugene I. Davis.

7.2     Resignation and Replacement of Trust Advisory Board Members.

(a)     Resignation.  Except as otherwise provided herein, (i) a Trust Advisory Board Member may resign at any time by giving written notice to the other Trust Advisory Board Members and to the Trustee, and (ii) the resignation of any such Trust Advisory Board Member shall take effect at such time as shall be specified in such notice which shall be effective as of a date not later than thirty (30) days from the date of such notice. A Trust Advisory Board Member appointed by a Consenting Lender shall resign, effective immediately, as of the time such Trust Advisory Board Member is no longer an employee, an officer, a director of, or a consultant to such Consenting Lender or any of its affiliates. The vacancy created by any resignation set forth in this Section 7.2(a) shall be filled in accordance with Section 7.2(b) hereof.

(b)     Removal and Replacement.  A Trust Advisory Board Member may be removed and replaced by the vote of the majority of the Lender Claim Trust Beneficiaries voting in accordance with their respective pro rata share of Lender Claim Trust Beneficial Interests, by amount.

7.3     Powers of the Trust Advisory Board.

(a)     The Trust Advisory Board shall provide advice, instruction, and direction on matters arising in the administration and in the disposition and distribution of the Trust Assets, and in the pursuit of Assigned Actions, as requested by the Trustee or as specifically provided in the Plan or this Lender Claim Trust Agreement, and shall be authorized to take any and all actions reasonably necessary or appropriate in performing its oversight of the Trustee in

19

carrying out its duties hereunder and under the Plan, including, without limitation, regularly consulting with the Trustee subject to Section 4.13 hereof.

(b) In addition, the powers of the Trustee shall be subject to the prior written consent of the Trust Advisory Board with respect to the following and as otherwise set forth in this Trust Agreement:

(i) The commencement of any Retained Lender Causes of Action by the Lender Claim Trust;

(ii) The settlement, compromise, or other resolution of any Retained Lender Causes of Action by the Lender Claim Trust;

(iii) The sale, transfer, assignment or other disposition of any Trust Assets having a valuation (for any individual transaction or series of related transactions) equal to or in excess of $10,000;

(iv) The abandonment of any Trust Assets that have a valuation (for any individual transaction or series of related transactions) equal to or in excess of $10,000;

(v) The borrowing of any funds by the Lender Claim Trust or pledge of any portion of the Trust Assets except as permitted under the Trust Delayed Draw Facility,

(vi) The amendment or waiver of any substantive provision of this Lender Claim Trust Agreement provided that such amendment or waiver shall be consistent with the Plan and the Confirmation Order;

(vii) The release or indemnity in favor of any third party, other than as set forth in the Plan;

(viii) The resolution of any matter which could reasonably be expected to have a material adverse effect on the amount of distributions to be made by the Lender Claim Trust; or

(ix) The submission of invoices to Reorganized Millennium in any one year equal to or in excess of $2,000,000, in the aggregate (of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust) or to request any advance under the Trust Delayed Draw Facility; provided however, that consent of the Trust Advisory Board shall not otherwise be required until invoices have been submitted to Reorganized Millennium totaling in excess of $10,000,000, in the aggregate (in respect of both the Millennium Corporate Claim Trust and the Millennium Lender Claim Trust), which $10,000,000 is not subject to reimbursement by the Millennium Lender Claim Trust to Reorganized Millennium as set forth in the Plan.

(c) The Trustee shall disclose to the Trust Advisory Board any connections, conflicts or potential conflicts of interest that the Trustee, or its Related Persons have with

20

respect to the exercise of any rights, powers, duties and privileges under this Lender Claim Trust Agreement. In the event that the Trustee cannot take or refrain from taking any action, including without limitation, the prosecution of any Retained Lender Causes of Action nor the objection to any Claim, by reason of an actual or potential conflict of interest, the Trust Advisory Board acting by majority shall be authorized to take any such actions in its place and stead, including without limitation by the retention of professionals for purpose of taking such actions.

(d) The Trustee may, at any time, decide to recommend that any matter before the Trustee, under any provision of this Lender Claim Trust Agreement, be decided by consent of the Trust Advisory Board.

7.4 Compensation of Trust Advisory Board. Trust Advisory Board Members shall be entitled to receive compensation in connection with their duties in accordance with the terms set forth in Exhibit C. Trust Advisory Board Members shall be reimbursed by the Lender Claim Trust for all reasonable and duly documented expenses, which reimbursement shall include the reasonable expense for fees paid to counsel retained by the individual Trust Advisory Board Members in connection with carrying out their responsibilities hereunder, subject to an aggregate cap of $100,000 in each twelve month period, to be established by the Trust Advisory Board in its discretion. For the avoidance of doubt, this cap shall be inapplicable to attorneys' fees incurred by an Trust Advisory Board Member as an Indemnified Person, which fees shall be payable subject to Article VIII.

7.5 Confidentiality. Each Trust Advisory Board Member shall, during the period that he or she serves as a Trust Advisory Board Member under this Lender Claim Trust Agreement and following the termination of this Lender Claim Trust Agreement or following such Trust Advisory Board Member's removal or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Trust Assets relates or of which the Trust Advisory Board Member has become aware in his or her capacity as a Trust Advisory Board Member, except as otherwise required by law.

## ARTICLE VIII.
## LIABILITY AND INDEMNIFICATION

8.1 No Further Liability. None of the Trustee and its Related Persons including Related Persons retained by the Lender Claim Trust, or the Trust Advisory Board Members and their Related Persons (collectively, the **"Indemnified Persons"**) shall be liable for the act or omission taken or omitted to be taken in its capacity as the Trustee, Trust Advisory Board Member, or Related Persons thereto, other than acts or omissions resulting from such Indemnified Person's willful misconduct, gross negligence or fraud. The Trustee and any Trust Advisory Board Member may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons. Notwithstanding such authority, neither the Trustee nor any Trust Advisory Board Member shall be under any obligation to consult with his or her attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Trustee, any Trust

21

Advisory Board Member, or Related Persons thereto, unless such determination constitutes willful misconduct, gross negligence or fraud.  The Trustee and Trust Advisory Board Members may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by him or her to be genuine, and shall have no liability for actions taken in reliance thereon. None of the provisions of this Lender Claim Trust Agreement shall require the Trustee or Trust Advisory Board to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. The Trustee may rely without inquiry upon writings delivered to it under the Plan which the Trustee reasonably believes to be genuine and to have been given by a proper Person. Notwithstanding the foregoing, nothing in this Section 8.1 shall relieve the Trustee and Trust Advisory Board Members from any liability for any actions or omissions which are finally judicially determined to have arisen primarily and directly out of their gross negligence, fraud or willful misconduct. Any action taken or omitted to be taken in the case of the Trustee with the express approval of the Bankruptcy Court will conclusively be deemed not to constitute gross negligence, fraud or willful misconduct.

8.2     Reliance.  Except as otherwise provided in this Trust Agreement, the Plan, or the Confirmation Order, the Trustee and any Trust Advisory Board Member may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request consent, order or other paper or document reasonably believed by him or her to be genuine and to have been signed or presented by the proper party or parties.

8.3     Liability to Third Persons.  No Lender Claim Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the Trust Assets or the affairs of the Trustee. The Trustee and any counsel, accountants, appraisers and other professionals retained by the Lender Claim Trust and the Trust Advisory Board Members shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person (including, in the case of the Trustee, to any counsel, accountants, appraisers or other professionals retained by the Lender Claim Trust retained by the Trustee in accordance with this Lender Claim Trust Agreement) in connection with the Trust Assets or the affairs of the Lender Claim Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a final order of the Bankruptcy Court to be primarily and directly due to their respective gross negligence, intentional fraud, criminal conduct or willful misconduct, and all such persons shall look solely to the Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Lender Claim Trust. Other than as set forth in the Plan or in the Confirmation Order, nothing in this Section 8.3 shall be deemed to release any Lender Claim Trust Beneficiary from any actions or omissions occurring prior to the Equity Transfer Date.

8.4     Exculpation.  As of the Equity Transfer Date, the Trustee and any counsel, accountants, appraisers and other professionals retained by the Lender Claim Trust and Trust Advisory Board Members shall be and hereby are exculpated by all Persons, including without limitation, Lender Claim Trust Beneficiaries, holders of Claims, holders of Equity interests, and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Lender Claim Trust Agreement or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to

22

act that are determined by final order of the Bankruptcy Court to have arisen primarily and directly as finally judicially determined out of their own respective intentional fraud, criminal conduct, gross negligence or willful misconduct. No Lender Claim Trust Beneficiary, holder of a Claim, holder of an Equity Interest, or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trustee, the Lender Claim Trust, the employees, professionals or representatives of either the Trustee or the Lender Claim Trust (including any counsel, accountants, appraisers, and other professionals retained by the Lender Claim Trust) or the Trust Advisory Board Members for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order, and this Lender Claim Trust Agreement. Any action taken or omitted to be taken with the express approval of the Bankruptcy Court shall conclusively be deemed not to constitute gross negligence or willful misconduct. Each of the Trustee and the Trust Advisory Board Members may, in connection with the performance of their respective functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, not taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.

      8.5    <u>Indemnification</u>.

      (a)    To the fullest extent permitted by law, the Lender Claim Trust, to the extent of its assets legally available for that purpose, shall indemnify and hold harmless the Indemnified Persons from and against any and all loss, cost, damage, expense (including, without limitation, fees, and expenses of attorneys and other advisors and any court costs incurred by any Indemnified Person) or liability by reason of anything any Indemnified Person did, does or refrains from doing for the business or affairs of the Lender Claim Trust, except to the extent that it is finally judicially determined by a court of competent jurisdiction that the loss, cost, damage, expense or liability primarily and directly resulted from the Indemnified Person's gross negligence, fraud or willful misconduct.

      (b)    Notwithstanding any provision herein to the contrary, the Indemnified Persons, Trustee, and Trust Advisory Board Members shall be entitled to obtain advances from the Lender Claim Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts and omissions, actual or alleged, of an Indemnified Person in its capacity as such, provided, however, that the Indemnified Persons receiving such advances shall repay the amounts so advanced to the Lender Claim Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Persons were not entitled to any indemnity under the provisions of this Section 8.5. The foregoing indemnity in respect of any Indemnified Person shall survive the termination of such Person from the capacity for which they are indemnified. Termination or modification of this Lender Claim Trust Agreement shall not affect any indemnification rights or obligations then existing.

      (c)    Any Indemnified Person, the Trustee, and any Trust Advisory Board Member may waive the benefits of indemnification under this Section 8.5, but only by an instrument in writing executed by such person.

23

(d)     Any Claim of the Indemnified Persons, the Trustee, or the Trust Advisory Board Members to be indemnified, held harmless or reimbursed shall be satisfied solely from first, any bonds or applicable insurance that the Lender Claim Trust has purchased, as provided in Section 4.11(h) and Section 8.9, and second, to the extent the proceeds of such bonds or insurance are insufficient to satisfy any such claims, the Trust Assets.

(e)     As far as practicable, the Trustee shall cause any written instrument creating an obligation of the Lender Claim Trust to include a reference to this Lender Claim Trust Agreement and to provide that none of the Lender Claim Trust Beneficiaries, Trust Advisory Board Members, or the Trustee or its agents or professionals shall be liable thereunder and that the other parties to such instruments shall look solely to the Trust Assets, including any bonds or applicable insurance that the Lender Claim Trust has purchased as provided in Section 4.11(h) and Section 8.9,  for payment of any claim thereunder or the performance thereof; provided, however, that the omission of such provision for any such instrument shall not render liable any Lender Claim Trust Beneficiary, Trust Advisory Board Member, or Trustee or Trustee's agents or professionals.

8.6     <u>Lender Claim Trust Liabilities</u>.   All liabilities of the Lender Claim Trust, including without limitation indemnity obligations under Section 8.5 of this Lender Claim Trust Agreement, will be liabilities of the Lender Claim Trust as an entity, and will be paid or satisfied from Trust Assets, including any bonds or applicable insurance that the Lender Claim Trust has purchased as provided in Section 4.11(h) and Section 8.9. No liability of the Lender Claim Trust will be payable in whole or in part by any  Lender Claim Trust Beneficiary individually or in the Lender Claim Trust Beneficiary's capacity as a Lender Claim Trust Beneficiary, by the Trustee or Trust Advisory Board Member individually or in the their capacity as Trustee or Trust Advisory Board Member, or by any member, partner, shareholder, director, officer, professional, employees, agent, affiliate or advisor of any Lender Claim Trust Beneficiary, the Trustee, the Trust Advisory Board Members or their respective affiliates.

8.7     <u>Limitation of Liability</u>.   The Trustee and any counsel, accountants, appraisers and other professionals retained by the Lender Claim Trust, and Trust Advisory Board Members shall not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Lender Claim Trust Agreement under any circumstances.

8.8     <u>Burden of Proof</u>.   In making a determination with respect to entitlement to exculpation or indemnification hereunder, the person, persons or entity making such determination shall presume that the Indemnified Person is entitled to exculpation and indemnification under this Lender Claim Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

8.9     <u>Insurance</u>.  The Trustee shall obtain and maintain customary insurance coverage for the protection of the Trustee and the Trust Advisory Board under this Lender Claim Trust Agreement unless both the Trustee and the Trust Advisory Board unanimously agree that such insurance should not be required.

24

## ARTICLE IX.
## TAX MATTERS

9.1     Treatment of Trust Asset Transfer.   For all United States federal income tax purposes, all Parties shall treat the transfer of the Trust Assets to the Lender Claim Trust, including any amounts or other assets subsequently transferred to the Lender Claim Trust, as the transfer by such persons, as grantors, to the Lender Claim Trust in exchange for Lender Claim Trust Beneficial Interests.

9.2     Income Tax Status.   For United States federal income tax purposes (and for purposes of all state, local and other jurisdictions to the extent applicable), this Lender Claim Trust shall be treated as a grantor trust pursuant to IRC Sections 671-677. The Lender Claim Trust shall at all times be administered so as to constitute a domestic trust for United States federal income tax purposes.

9.3     Tax Returns.   In accordance with IRC Section 6012 and Treasury Regulation Section 1.671-4(a), the Lender Claim Trust shall file with the IRS annual tax returns on Form 1041 as a grantor trust. In addition, the Lender Claim Trust shall file in a timely manner such other tax returns, including any state and local tax returns, as are required by applicable law and pay any taxes shown as due thereon. Within a reasonable time following the end of the taxable year, the Lender Claim Trust shall send to each Lender Claim Trust Beneficiary a separate statement setting forth such Lender Claim Trust Beneficiary's or share of items of income, gain, loss, deduction or credit and will instruct each such Lender Claim Trust Beneficiary to report such items on his/her applicable income tax return. The Lender Claim Trust may provide each Lender Claim Trust Beneficiary with a copy of the Form 1041 for the Lender Claim Trust (without attaching any other Lender Claim Trust Beneficiary's Schedule K-1 or other applicable information form) along with such Lender Claim Trust Beneficiary's Schedule K-1 or other applicable information form in order to satisfy the foregoing requirement.

9.4     Withholding of Taxes and Reporting Related to Lender Claim Trust Operations. The Lender Claim Trust shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions made by the Lender Claim Trust shall be subject to any such withholding and reporting requirements. The Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with any such withholding, payment, and reporting requirements. All amounts properly withheld from distributions to a Lender Claim Trust Beneficiary as required by applicable law and paid over to the applicable taxing authority for the account of such Lender Claim Trust Beneficiary shall be treated as part of the Lender Claim Trust Distribution to such Lender Claim Trust Beneficiary. To the extent that the operation of the Lender Claim Trust or the liquidation of the Trust Assets creates a tax liability imposed on the Lender Claim Trust, the Lender Claim Trust shall timely pay such tax liability and any such payment shall be considered a cost and expense of the operation of the Lender Claim Trust payable without Bankruptcy Court order. Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from distributions hereunder. All Lender Claim Trust Beneficiaries shall be required to provide any information necessary to effect the withholding of such taxes.

9.5     <u>Valuation</u>.  Within 180 days after the Equity Transfer Date, the Trustee shall make a good faith valuation of the Trust Assets and advise the Trust Advisory Board of such valuation.  Such valuation shall be made available from time to time, to the extent relevant, and used consistently by all parties (including the Consenting Lenders, the Trustee, the Trust Advisory Board, and the Lender Claim Trust Beneficiaries) for all United States federal income tax purposes. The Lender Claim Trust also shall file (or cause to be filed) any other statements, returns or disclosures relating to the Lender Claim Trust that are required by any governmental unit.

9.6     <u>Expedited Determination of Taxes</u>.  The Trustee may request an expedited determination of taxes of the Lender Claim Trust, under Section 505 of the Bankruptcy Code for all returns filed for, or on behalf of, the Lender Claim Trust for all taxable periods through the termination of the Lender Claim Trust.

## ARTICLE X.
## TERMINATION OF LENDER CLAIM TRUST

The Trustee and the Lender Claim Trust shall be discharged or dissolved, as the case may be, at such time as (a) the Trustee determines that the pursuit of additional Assigned Actions is not likely to yield sufficient additional Cash to justify further pursuit of such claims and (b) all distributions of Cash and other Trust Assets required to be made by the Trustee under the Plan and this Lender Claim Agreement have been made in accordance with provisions of the Plan and this Lender Claim Trust Agreement, but in no event shall the Lender Claim Trust be dissolved later than five (5) years from the Equity Transfer Date unless the Bankruptcy Court, upon motion made by a party in interest within the six (6) month period prior to such fifth (5th) anniversary (and, in the event of further extension, at least six (6) months prior to the end of any extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions is necessary to facilitate or complete the recovery on and liquidation of the Trust Assets. Upon dissolution of the Lender Claim Trust, any remaining Cash on hand and other Trust Assets shall be distributed in accordance with provisions of the Plan and this Lender Claim Trust Agreement. Article VIII shall survive any termination of the Lender Claim Trust Agreement.

## ARTICLE XI.
## AMENDMENT AND WAIVER

Any substantive provision of this Lender Claim Trust Agreement may be amended or waived in writing by the Trustee only (i) upon approval of the Bankruptcy Court or (ii) with majority consent of the Trust Advisory Board provided that such amendments or waivers shall not be inconsistent with the terms of the Plan or Confirmation Order. Technical amendments to this Lender Claim Trust Agreement may be made, as necessary to clarify this Lender Claim Agreement or enable the Trustee to effectuate the terms of this Lender Claim Trust Agreement, by the Trustee only with the majority consent of the Trust Advisory Board; notwithstanding the foregoing, all amendments to this Lender Claim Trust Agreement shall be consistent with the nature and purpose of the Lender Claim Trust in accordance with Section 2.5 hereof.

26

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

12.1 <u>Intention of Parties to Establish Lender Claim Trust</u>. This Lender Claim Trust Agreement is intended to create for United States federal income tax purposes a "grantor trust" and, to the fullest extent provided by law, shall be governed and construed in all respects as such a grantor trust. Notwithstanding anything to the contrary contained herein, any ambiguity herein shall be construed consistent herewith and, if necessary, this Lender Claim Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

12.2 <u>Effectiveness</u>. This Lender Claim Trust Agreement shall become effective on the Equity Transfer Date.

12.3 <u>Counterparts</u>. This Lender Claim Trust Agreement may be executed in two or more counterparts, all of which shall be taken together to constitute one and the same instrument.

12.4 <u>Governing Law</u>. Except to the extent the Bankruptcy Code or Federal Rules of Bankruptcy Procedure are applicable, this Lender Claim Trust Agreement shall be governed by, and construed and enforced in accordance with, the federal laws of the United States and, to the extent there is no applicable federal law, the domestic laws of the state of Delaware, without giving effect to the principles of conflicts of law thereof.

12.5 <u>Headings</u>. Sections, subheadings and other headings used in this Lender Claim Trust Agreement are for convenience only and shall not affect the construction or interpretation of this Lender Claim Trust Agreement or any provision thereof.

12.6 <u>Severability</u>. If any provision of this Lender Claim Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Lender Claim Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provisions of this Lender Claim Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

12.7 <u>Notices</u>. All notices, requests or other communications, required or permitted to be made in accordance with this Lender Claim Trust Agreement including any change of address of any Lender Claim Trust Beneficiary for the purposes of receiving distributions from the Lender Claim Trust shall be in writing and shall be delivered personally or by first class or express mail, return receipt requested or fax with confirmation of receipt or email with receipt acknowledgement. Notices should be directed to:

(a) If to the Lender Claim Trust, the Trustee, or the Trust Advisory Board: as specified in <u>Exhibit A</u>.

(b) If to a Lender Claim Trust Beneficiary: to the name and address set forth on the Register maintained by the Trustee, or a transfer agent or registrar if one is appointed by the Trustee, provided that general notices to all Lender Claim Trust Beneficiaries may be made

28

by posting such notice to a web-site identified in advance for communication with Lender Claim Trust Beneficiaries.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Lender Claim Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

[                    ],

By: _____

Name:_____

Title:_____


[                            ], TRUSTEE OF THE MILLENNIUM LENDER CLAIM TRUST ESTABLISHED UNDER THE MILLENNIUM LENDER CLAIM TRUST AGREEMENT DATED PURSUANT TO THE PREPACKAGED JOINT PLAN OF REORGANIZATION OF MILLENNIUM LAB HOLDINGS II, LLC, ET AL.


_____
[Name], as Trustee

29

**APPENDIX A**

DEFINITIONS

"**Consenting Lenders**" has the meaning set forth in the RSA.

"**Delayed Draw Term Loan Agreement**" means that certain agreement entered into in connection with the Trust Delayed Draw Facility.

"**Lender Claim Trust Beneficial Interests**" means a beneficial interest in the Lender Claim Trust to be issued to each Consenting Lender, which entitles its holder to receive Lender Claim Trust Distributions from the Lender Claim Trust as forth on the books and records of this Lender Claim Trust Agreement.

"**Lender Claim Trust Beneficiaries**" means the holder of Lender Claim Trust Beneficial Interests.

"**Lender Claim Trust Distribution**" means the distributions of Cash (or other Trust Assets) to be made by the Trustee in accordance with the terms of the Plan and this Lender Claim Trust Agreement.

"**Lender Claim Trust Recoveries**" means, at any time, the amount of Cash or other consideration obtained by or paid to the Trustee (or other Person acting on behalf of the Lender Claim Trust) in connection with the monetization of any Trust Assets.

"**Funding Amount**" means the sum of $2,000,000 in Cash to be paid, on the Equity Transfer Date, to the Lender Claim Trust.

"**IRC**" means the Internal Revenue Code of 1986, as amended.

"**IRS**" means the Internal Revenue Service.

"**Related Persons**" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former shareholders, affiliates (whether by operation of law or otherwise), subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, and any Person claiming by or through them.

"**Retained Lender Causes of Action**" means the individual claims and Causes of Action of each of the Consenting Lenders and any Holder of an Existing Credit Agreement Claim that elects to contribute such Holder's individual claims and Causes of Action against any Person or Entity related to the Debtors, including Retained Claims and Non-Contributing MLH Shareholder Claims, other than Claims and Causes of Action released under the Plan and/or subject to the bar order and injunction provisions of the Plan.

"**Treasury Regulation**" means any regulation promulgated under the Internal Revenue Code of 1986, as amended.

"**Trust Advisory Board**" means the Millennium Lender Claim Trust Advisory Board as defined in the Plan.

"**Trust Advisory Board Member**" means a member of the Trust Advisory Board.

"**Trust Assets**" means collectively, the Retained Lender Causes of Action and the Funding Amount and any and all other assets vested in the Trust from time to time.

<u>**EXHIBIT A**</u>

**Trustee for the Lender Claim Trust**

**Identity and Contact Information for the Lender Claim Trust, the Trustee, and the Trust Advisory Board**

<u>To the Lender Claim Trust</u>:

Mark Kishner
Goldin Associates LLC
350 Fifth Avenue
The Empire State Building
New York, NY 10118
Tel: (212) 593-2255
Fax: (212) 888-2841
Email: MKirschner@goldinassociates.com

<u>To the Trustee</u>:

Mark Kishner
Goldin Associates LLC
350 Fifth Avenue
The Empire State Building
New York, NY 10118
Tel: (212) 593-2255
Fax: (212) 888-2841
Email: MKirschner@goldinassociates.com

<u>To the Trust Advisory Board</u>:

Matthew Cantor
Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Tel: (646) 285-9700
Fax: [_____]
Email: matthew.cantor@lehmanholdings.com

Alan D. Halperin
Halperin Battaglia Benzija, LLP
40 Wall Street, 37th Floor
New York, New York 10005
Tel: (212) 765-9100

Fax: (212) 765-0964
Email: ahalperin@halperinlaw.net

Eugene I. Davis
Pirinate Consulting Group
6 Canoe Brook Drive
Livingston, NJ  07039
Tel: (973) 533-8027
Fax: (973) 535-1945
Email: genedavis@pirinateconsulting.com

## EXHIBIT B

### Compensation for Trustee

The following aggregate compensation schedule shall apply to the Trustee of the Lender Claim Trust:

a) A monthly fixed fee plus any out of pocket expenses equal to (i) $10,000 per month for years one and two, (ii) $7,500 per month for years three and four, (iii) $5,000 per month for year five, and (iv) $2,500 per month for year six.

b) A success fee equal to one and a half percent (1.50%) of net litigation recoveries, defined as gross litigation recoveries less all litigation legal, expert witness, e-discovery fees, and court and discovery costs (but not general Lender Claim Trust accounting, insurance, and administration fees).  Twenty-five percent (25%) of fixed fees (as described in section (a) above) earned by the Trustee will be credited against the success fee.

**<u>EXHIBIT C</u>**

**Trust Advisory Board Member Compensation**

Each Trust Advisory Board Member shall receive compensation equal to $15,000 per year.

## EXHIBIT D

## FORM OF TRANSFER NOTICE

FOR VALUE RECEIVED the undersigned record holder of [Lender Claim Trust Beneficial Interests] hereby sell(s), assign(s) and transfer(s) unto

Insert Taxpayer Identification No.

[INSERT NAME]

[INSERT ADDRESS]

Please print or typewrite name and address including zip code of assignee

[INSERT # OF INTERESTS]

and all related rights under the [Lender Claim Trust Agreement], hereby irrevocably constituting and appointing

[INSERT PERSON]

attorney to transfer said [Lender Claim Trust Beneficial Interests] on the books of the [Lender Claim Trust] with full power of substitution in the premises.

In connection with any transfer of [Lender Claim Trust Beneficial Interests], the undersigned confirms that such transfer is made without utilizing any general solicitation or general advertising and further as follows:

These [Lender Claim Trust Beneficial Interests] are being transferred to an "accredited investor" (as defined in Rule 501 under the Securities Act of 1933, as amended) and certification in the form of **Exhibit A** hereto is being furnished herewith.

Date: _____

                                                       _____

Seller

By _____

NOTICE:  The signature to this assignment must correspond with the name set forth in the official Register maintained by the Trustee, or transfer agent or registrar if one is appointed by the Trustee, without alteration or any change whatsoever.

On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

*Seal*

_____

Signature of Notary Public

_____

Printed Name of Notary Public

My Commission Expires:

_____

37

Accredited Investor Certificate

[TRUSTEE/TRANSFER AGENT/REGISTRAR]
[ADDRESS]
Telephone No.: [INSERT]
Fax No.: [INSERT]
Email: [INSERT]

Re:     [Lender Claim Trust Beneficial Interests] under the
        [Lender Claim Trust Agreement]

Ladies and Gentlemen:

This Certificate relates to our proposed purchase or exchange of [Lender Claim Trust Beneficial Interests] in accordance with the [Lender Claim Trust Agreement].

We hereby confirm that:

1.    We are an "accredited investor" within the meaning of Rule 501 under the Securities Act of 1933, as amended (the "Securities Act") (an "Accredited Investor").

2.    Any acquisition of [Lender Claim Trust Beneficial Interests] by us will be for our own account or for the account of one or more other Accredited Investors as to which we exercise sole investment discretion.

3.    We are not acquiring the [Lender Claim Trust Beneficial Interests] with a view to any distribution thereof in a transaction that would violate the Securities Act or the securities laws of any State of the United States or any other applicable jurisdiction; *provided* that the disposition of our property and the property of any accounts for which we are acting as fiduciary will remain at all times within our and their control.

4.    We understand that the [Lender Claim Trust Beneficial Interests] are subject to a [Lender Claim Trust Agreement, dated [DD/MM/YY]], and that by accepting any [Lender Claim Trust Beneficial Interests] we are agreeing to and shall become bound by all of the provisions of that [Lender Claim Trust Agreement], including certain restrictions on transfer set forth therein.

5.    We are aware that the [Lender Claim Trust Beneficial Interests] are highly speculative and that there can be no assurance as to what return, if any, there may be.

6.    We have had access to such information as we have deemed necessary to our determination to acquire the [Lender Claim Trust Beneficial Interests] and we have not relied upon any statements, whether written or oral, of the [Lender Claim Trust] or the Trustee in making such determination.

38

7.      We acknowledge that neither the [Lender Claim Trust] nor the Trustee has provided, or will provide in the future, any legal or tax advice regarding the [Lender Claim Trust Beneficial Interests] and that we should consult our own tax or legal advisor for any such advice.

We agree for the benefit of the [Lender Claim Trust], on our own behalf and on behalf of each account for which we are acting, that such [Lender Claim Trust Beneficial Interests] may be offered, sold, pledged or otherwise transferred only in accordance with the [Lender Claim Trust Agreement] and the Securities Act and any applicable securities laws of any State of the United States.

Prior to the registration of any transfer, we acknowledge that a duly completed and signed certificate (the form of which may be obtained from the Trustee) must be delivered to the Trustee and that the [Lender Claim Trust] reserves the right to require the delivery of such legal opinions, certifications or other evidence as may reasonably be required in order to determine that the proposed transfer is being made in compliance with the Securities Act, applicable state securities laws, the Trust Indenture Act of 1939, as amended, the Securities Exchange Act of 1934, as amended and the [Lender Claim Trust Agreement].

We understand that the Trustee will not be required to accept for registration of transfer any [Lender Claim Trust Beneficial Interests] acquired by us, except upon presentation of evidence satisfactory to the [Lender Claim Trust] and the Trustee that the foregoing restrictions on transfer have been complied with, including without limitation those set forth in the [Lender Claim Trust Agreement]. We further agree to provide to any person acquiring any of the [Lender Claim Trust Beneficial Interests] from us a notice advising such person that resales of the [Lender Claim Trust Beneficial Interests] are restricted as stated herein.

We understand that we are subject to the federal income tax treatment imposed under the United States Internal Revenue Code of 1986, as amended, and applicable Treasury Regulations with respect thereto (as well as the tax laws of other applicable state, local or other jurisdictions) as a result of the ownership of [Lender Claim Trust Beneficial Interests] and we agree to comply in all respects with the obligations imposed as a result of such tax laws. Without limiting the foregoing, we understand that the [Lender Claim Trust] is intended to, and shall be construed in all respects so as to, constitute a "grantor trust"; by acquisition of [Lender Claim Trust Beneficial Interests], we shall be a "grantor" of such "grantor trust" as of the date of our acquisition of such [Lender Claim Trust Beneficial Interests].

We agree to notify you promptly in writing if any of our acknowledgments, representations or agreements herein ceases to be accurate and complete.

We represent to you that we have full power to make the foregoing acknowledgments, representations and agreements on our own behalf and on behalf of any account for which we are acting.

You and the [Lender Claim Trust] are entitled to rely upon this Certificate and are irrevocably authorized to produce this Certificate or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

39

Very truly yours,

[NAME OF PURCHASER (FOR
    TRANSFERS) OR OWNER (FOR
    EXCHANGES)]

By: _____

    Name:
    Title:
    Address:

Date: _____

On _____, before me, _____, Notary Public, personally appeared _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

    Signature of Notary Public

*Seal*

_____

    Printed Name of Notary Public

My Commission Expires:

_____

40

Upon transfer, the [<mark>Lender Claim Trust Beneficial Interests</mark>] would be registered in the name of the new owner as follows:

By: _____

Date: _____

Taxpayer ID number: _____

**EXHIBIT C**

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
NEW MILLENNIUM HOLDCO, INC.

---

Pursuant to Sections 241, 245 and 303 of the
Delaware General Corporation Law

---

New Millennium Holdco, Inc. (the "Corporation"), a corporation organized and existing under the General Corporation Law of the State of Delaware (the "GCL"), does hereby certify as follows:

(1)     The name of the Corporation is New Millennium Holdco, Inc.  The Corporation was originally incorporated under the name New Millennium Holdco, Inc.  The original certificate of incorporation of the Corporation was filed with the office of the Secretary of State of the State of Delaware on October 28, 2015.

(2)     This Amended and Restated Certificate of Incorporation was duly adopted by the Board of Directors of the Corporation (the "Board of Directors") in accordance with Sections 241 and 245 of the GCL, and pursuant to the authority granted under Section 303 of the GCL, to put into effect and carry out the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. dated October 29, 2015 under chapter 11 of Title 11 of the United States Code, as confirmed on [_____] by order (the "Order") of the United States Bankruptcy Court for the District of Delaware (Case No. 15-12284(LSS)).  Provision for the making of this Amended and Restated Certificate of Incorporation is contained in the Order.

(3)     The text of the Certificate of Incorporation is amended and restated in its entirety as follows:

G-WILSR01A - MSW

FIRST: The name of the Corporation is New Millennium Holdco, Inc. (the "Corporation").

SECOND: The address of the registered office of the Corporation in the State of Delaware is 1675 South State Street, Suite B, Dover, Kent County, 19901. The name of its registered agent at that address is Capitol Services, Inc.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware (the "GCL").

FOURTH: (a) Authorized Capital Stock. The total number of shares of stock which the Corporation shall have authority to issue is [_____][1] shares of common stock, par value $0.01 per share (the "Common Stock").

(b) Common Stock. The powers, preferences and rights, and the qualifications, limitations and restrictions, of the Common Stock are as follows:

(1) Voting. Except as otherwise expressly required by law or provided in this Amended and Restated Certificate of Incorporation, the holders of any outstanding shares of Common Stock (each, a "Common Stockholder") shall vote together as a single class on all matters with respect to which stockholders are entitled to vote under applicable law, this Amended and Restated Certificate of Incorporation or the By-Laws of the Corporation, or upon which a vote of stockholders is otherwise duly called for by the Corporation. At each annual or special meeting of stockholders, each Common Stockholder on the relevant record date shall be

---

[1] Such number to reflect a number of shares of common stock equal to at least 2X the number of shares outstanding immediately after the Equity Transfer Date.

entitled to cast one vote in person or by proxy for each share of Common Stock standing in such holder's name on the stock transfer records of the Corporation.

(2)    <u>Common Stockholder Approval for Certain Issuances of Stock</u>.

(A)    The Corporation shall not take any action or engage in any transaction set forth in Sections (b)(2)(A)(i), (ii) or (iii) of this Article FOURTH without (x) the prior written consent or affirmative vote of a majority of the entire Board of Directors of the Corporation (the "<u>Board of Directors</u>") then in office and (x) the prior written consent of the Common Stockholders, or, in the case of clauses (i) and (ii) below, the affirmative vote of a majority of the total number of votes of the Common Stock represented, in person or by proxy, and entitled to vote at a meeting at which a quorum is present, and in the case of clause (iii) below, the affirmative vote of a majority of the outstanding Common Stock entitled to vote thereon:

(i) sell or issue Common Stock or other Equity Securities (as defined below) as consideration for the acquisition of any business or person (whether by the acquisition of equity securities, assets, by merger, consolidation, or otherwise) if the number of shares of Common Stock or other Equity Securities to be issued is, or may be upon issuance, exercise or conversion thereof, equal to or in excess of twenty percent (20%) of the number of shares of Common Stock outstanding before such issuance of Common Stock or other Equity Securities;

(ii) adopt or approve any Equity Compensation Plan; or

(iii) adopt, amend, alter or repeal any provision of the Corporation's By-Laws in any manner that adversely affects the relative rights, preferences, qualifications, limitations or restrictions of the Common Stock.

(B)     For purposes of this Amended and Restated Certificate of Incorporation:

(i) "Equity Securities" shall mean (a) Common Stock, (b) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Common Stock, and (c) warrants, options or other rights to purchase or otherwise acquire Common Stock.

(ii) "Equity Compensation Plan" shall mean any plan or other arrangement that provides for the grant, award or delivery of Equity Securities or any derivative thereof to any employee, director or other service provider as compensation for services. A compensatory grant of options or other Equity Securities that is not made pursuant to a plan shall be deemed to be an Equity Compensation Plan for these purposes.

(iii) For questions of interpretation regarding Section (b)(2)(A)(iii) of this Article FOURTH, reference shall be made to the analogous concept in Nasdaq rule 5635(d) (or any successor thereof) and any relevant interpretations or guidance related thereto.

(3)     <u>No Cumulative Voting</u>.  Common Stockholders shall not have cumulative voting rights.

(4)     <u>Dividends</u>.  Subject the provisions of this Amended and Restated Certificate of Incorporation, as it may be amended from time to time, Common Stockholders shall be entitled to receive such dividends and other distributions in cash, stock or property of the Corporation when, as and if declared thereon by the Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

G-WILSR01A - MSW

(5)	Liquidation, Dissolution, etc.  In the event of any liquidation, dissolution or winding up (either voluntary or involuntary) of the Corporation, Common Stockholders shall be entitled to receive the assets and funds of the Corporation available for distribution after payments to creditors in proportion to the number of shares held by them, respectively.

(6)	Information Rights.

(A)	Subject to the terms and conditions set forth below, the Corporation shall use its reasonable best efforts to deliver or make available to each Common Stockholder: (i) within forty-five (45) days after the end of each fiscal quarter, unaudited quarterly financial statements of the Corporation and its consolidated subsidiaries for the quarterly period then ended; (ii) within ninety (90) days after the end of each fiscal year (120 days in the case of fiscal year 2015), audited financial statements of the Corporation and its consolidated subsidiaries for such year; (iii) within ninety (90) days after the end of each fiscal year (120 days in the case of fiscal year 2015), a detailed consolidated budget for the following fiscal year (the "Projections"), with updated Projections to be provided within forty-five (45) days after the end of each fiscal quarter in the event of any material change, including a change of 10% or more to a significant metric provided in such Projections, including without limitation metrics such as revenues, operating expenses, capital expenses, or EBITDA; and (iv) to the extent required to be provided to any of the Corporation's lenders or holders of capital stock, within forty-five (45) days (or ninety (90) days, in the case of the fourth fiscal quarter of each fiscal year, or 120 days in the case of the fourth fiscal quarter of fiscal year 2015) after the end of each fiscal quarter, a narrative discussion and analysis of the financial condition and results of operations for such fiscal quarter and for the period from the beginning of the then current fiscal

G-WILSR01A - MSW

year to the end of such fiscal quarter, as compared to the portion of the Projections covering such periods and to the comparable periods of the previous year.

(B)     Subject to the terms and conditions set forth below, the Corporation shall host a conference call each fiscal quarter with the Common Stockholders and senior members of management of the Corporation (with a question and answer period) (a "Conference Call").  Each Conference Call shall be open, subject to the terms and conditions below, to each Common Stockholder (including beneficial owners of Common Stock) of the Corporation and such other persons as may be invited by the Corporation from time to time.

(C)     Subject to the terms and conditions set forth below, at the request of a Common Stockholder, the Corporation shall provide, on a confidential basis, any person seeking to buy a Common Stockholder's Common Stock (a "Prospective Purchaser"), provided that person is a Qualified Institutional Buyer or an Accredited Investor (as each term is, respectively, defined by Rule 144A ("Rule 144A") and Regulation D of the Securities Act of 1933, as amended) and that person is not an Adverse Person (as that term is defined below), with such information regarding the Corporation of the type set forth in Section (b)(6) of this Article FOURTH, including without limitation such information as the Prospective Purchaser may request to the extent necessary to enable the seller to claim the exemption from registration provided by Rule 144A.  The Corporation shall use its commercially reasonable efforts to cause the Common Stock to be eligible for clearance and settlement through the facilities of The Depository Trust Company ("DTC"), as soon as reasonably practicable after, and for so long thereafter as, such eligibility is permitted under DTC's operation arrangements, unless otherwise agreed by the affirmative vote of a majority of the entire Board of Directors.

G-WILSR01A - MSW

Notwithstanding the foregoing, the right of each Common Stockholder or Prospective Purchaser to receive or access the information described in this Section (b)(6) of this Article FOURTH shall be subject to, and conditioned upon, such Common Stockholder or Prospective Purchaser executing and delivering an agreement in form and substance reasonably satisfactory to the Corporation.  Notwithstanding anything in this Section (b)(6) of this Article FOURTH to the contrary, the Corporation shall have no obligation to deliver or make available any information to any Common Stockholder or Prospective Purchaser that, in the good faith reasonable judgment of the Board of Directors, a duly authorized committee of the Board of Directors, or a duly authorized officer of the Corporation, is an actual direct competitor of the Corporation (an "Adverse Person"), including any officer, director, employee, member, partner or representative of any Adverse Person; provided, however, that notwithstanding the foregoing any (x) commercial bank, investment bank, insurance company, financial institution, fund invested primarily in debt instruments or any similar entity, in each case, that provides debt to, or invests in the debt of, an Adverse Person or (y) hedge fund, private equity firm, investment bank or any similar entity with ownership interests in a portfolio company that is an Adverse Person, in each case, shall not be deemed to be an Adverse Person for any purpose hereunder.

Furthermore, notwithstanding the foregoing, the Corporation shall not be obligated to perform its obligations under Section (b)(6)(A) or (B) of this Article FOURTH if, at the request of the majority of the Board of Directors, the Common Stockholders approve a waiver of the Corporation's obligation to provide any or all of the information otherwise required to be provided hereunder on the terms required hereunder, either through the prior written consent of the Common Stockholders, or the affirmative vote of a majority of the total number of votes of the Common Stock represented, in person or by proxy, and entitled to vote at a meeting at which

a quorum is present. Such consent may be of a limited duration as set forth in the Board of Directors' request and as approved by the Common Stockholders.

(7)    Prohibited Transfers. Any Transfer (as hereinafter defined) of any class of capital securities that would be a Restricted Transfer (as hereinafter defined) if effected, shall, in each case, be null and void *ab initio*. A "Restricted Transfer" means any Transfer that (i) would, if effected, result in the Corporation having 2,000 or more holders of record or 500 or more holders of record who are not "accredited investors" (as such concepts are defined and measured for purposes of Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and any relevant rules promulgated thereunder and, in each case, subject to any amendment to the Exchange Act or the rules and regulations promulgated thereunder that increases the ownership thresholds set forth above, whereupon the thresholds set forth herein shall automatically be adjusted accordingly) of any class of capital securities of the Corporation or (ii) would, if effected, cause the Corporation to be required to register under the Exchange Act the class of Common Stock or other Equity Securities proposed to be Transferred, unless, in any such case, at the time of such Transfer such class of securities proposed to be Transferred was, prior to such proposed Transfer, already registered under the Exchange Act. As used herein, "Transfer" means any direct, indirect or synthetic sale, assignment, pledge, lease, hypothecation, mortgage, gift or creation of security interest, lien or trust (voting or otherwise) or other encumbrance or other disposition or transfer (by operation of law or otherwise, including by means of reference under a derivative, participation or similar contract or by the direct, indirect or synthetic transfer or issuance of Equity Securities) of any share of Common Stock or other Equity Securities.

(8)     Notice of Transfer.  A purported Transfer of Common Stock or other Equity Securities shall not be valid until such Transfer recorded in accordance with the Corporation's By-Laws.

(9)     Notwithstanding anything to the contrary set forth herein, Sections (b)2, (b)6, (b)7 and (b)8 of this Article FOURTH shall terminate automatically and be of no further force or effect upon the consummation of any initial public offering of Common Stock or other Equity Securities which generates net proceeds of at least $50,000,000.

FIFTH:  The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders.

(a)     The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

(b)     The Board of Directors shall initially consist of five (5) members, and thereafter shall consist of not less than one or more than nine (9) members, the exact number of which shall be fixed from time to time by resolution adopted by the affirmative vote of a majority of the entire Board of Directors.  Upon this Amended and Restated Certificate of Incorporation becoming effective pursuant to the GCL, the Board of Directors shall consist of the persons named as directors in the  Modified Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC or any supplement thereto.

(c)     Unless and except to the extent that the By-Laws of the Corporation shall so require, the election of directors of the Corporation need not be by written ballot.

(d)     Any vacancy on the Board of Directors that results from an increase in the number of directors may be filled by the vote of a majority of the remaining members of the

G-WILSR01A - MSW

Board of Directors then in office, even if less than a quorum, or by a sole remaining director, or a majority of the voting power of the Corporation's then outstanding capital stock entitled to vote at an election of directors. Any or all of the directors of the Corporation may be removed from office at any time, with or without cause, by the affirmative vote of the holders of at least a majority of the voting power of the Corporation's then outstanding capital stock entitled to vote at an election of directors.

(e) In addition to the powers and authority hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the GCL, this Amended and Restated Certificate of Incorporation, and any By-Laws adopted by the stockholders; provided, however, that no By-Laws hereafter adopted by the stockholders shall invalidate any prior act of the directors which would have been valid if such By-Laws had not been adopted.

SIXTH: No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or any of its stockholders; (ii) for acts or omissions not in good faith or which involve fraud, gross negligence, willful misconduct, intentional misconduct or a knowing violation of law; (iii) under Section 174 of the GCL; (iv) for any transaction from which the director derived an improper personal benefit; or (v) to the extent such exemption from liability or limitation thereof is not permitted under the GCL as the same exists or may hereafter be amended. Any repeal or modification of this Article SIXTH shall not adversely affect any right or protection of a director of the Corporation existing

G-WILSR01A - MSW

at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

SEVENTH:  To the fullest extent permitted by applicable law, the Corporation is authorized to provide indemnification of (and advancement of expenses to) directors, officers, employees and agents of the Corporation (and any other persons to which the GCL permits the Corporation to provide indemnification) through the Corporation's By-Laws, agreements with such agents or other persons, vote of stockholders or disinterested directors or otherwise, in excess of the indemnification and advancement otherwise permitted by Section 145 of the GCL.

Any repeal or modification of this Article SEVENTH shall not adversely affect any rights to indemnification and to the advancement of expenses of a director, officer, employee or agent of the Corporation existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

EIGHTH:  Meetings of stockholders may be held within or without the State of Delaware, as the By-Laws may provide.  The books of the Corporation may be kept (subject to any provision contained in the GCL) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the By-Laws of the Corporation.

NINTH:  In furtherance and not in limitation of the powers conferred upon it by the laws of the State of Delaware, except as limited by Article FOURTH hereto, the Board of Directors shall have the power to adopt, amend, alter or repeal the Corporation's By-Laws.  The affirmative vote of at least a majority of the entire Board of Directors shall be required to adopt, amend, alter or repeal the Corporation's By-Laws.  Except as limited by Article FOURTH hereto and the Corporation's By-Laws, the Corporation's By-Laws also may be adopted, amended,

G-WILSR01A - MSW

altered or repealed by the affirmative vote of at least a majority (or such higher percentage, if any, as may then be required by applicable law) of the voting power of the shares entitled to vote at an election of directors.

TENTH:  The corporation hereby elects that it shall not be governed by or subject to Section 203 of the GCL or any successor provision thereto.

ELEVENTH:  Pursuant to Section 1123(a)(6) of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), the Corporation will not issue non-voting equity securities (which shall not be deemed to include any warrants or options to purchase capital stock of the Corporation); provided, however, that this provision (a) will have no further force or effect beyond that required under Section 1123 of the Bankruptcy Code, (b) will have such force and effect, if any, only for so long as such section is in effect and applicable to the Corporation or any of its wholly-owned subsidiaries and (c) in all events may be amended or eliminated in accordance with applicable law as from time to time in effect

TWELFTH:  The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation in the manner now or hereafter prescribed in this Amended and Restated Certificate of Incorporation, the Corporation's By-Laws or the GCL, and all rights herein conferred upon stockholders are granted subject to such reservation.

[*signature page follows*]

G-WILSR01A - MSW

IN WITNESS WHEREOF, the Corporation has caused this Amended and

Restated Certificate of Incorporation to be executed on its behalf this [_____] day of December,

2015.

NEW MILLENNIUM HOLDCO, INC.

By:_____
      Name:
      Title:

62232643 v2-032658/0001

G-WILSR01A - MSW

**EXHIBIT D**

# AMENDED AND RESTATED

# BY-LAWS

## OF

## NEW MILLENNIUM HOLDCO, INC.

### A Delaware Corporation

**Effective December [____], 2015**

**TABLE OF CONTENTS**

<u>Page</u>

ARTICLE I
OFFICES

Section 1.1    Registered Office ............................................................................................1
Section 1.2    Other Offices.................................................................................................1

ARTICLE II
MEETINGS OF STOCKHOLDERS

Section 2.1    Place of Meetings..........................................................................................1
Section 2.2    Annual Meetings ..........................................................................................1
Section 2.3    Special Meetings ..........................................................................................2
Section 2.4    Notice ...........................................................................................................2
Section 2.5    Adjournments...............................................................................................3
Section 2.6    Quorum ........................................................................................................3
Section 2.7    Voting ..........................................................................................................3
Section 2.8    Proxies.........................................................................................................4
Section 2.9    Consent of Stockholders in Lieu of Meeting ...............................................5
Section 2.10   List of Stockholders Entitled to Vote...........................................................7
Section 2.11   Record Date. ................................................................................................7
Section 2.12   Stock Ledger ................................................................................................9
Section 2.13   Conduct of Meetings....................................................................................9
Section 2.14   Stockholder Access to Proxy Solicitation Materials...................................10

ARTICLE III
DIRECTORS

Section 3.1    Number and Election of Directors ..............................................................10
Section 3.2    Vacancies ...................................................................................................11
Section 3.3    Duties and Powers......................................................................................12
Section 3.4    Meetings.....................................................................................................12
Section 3.5    Organization...............................................................................................13
Section 3.6    Resignations and Removals of Directors....................................................13
Section 3.7    Quorum ......................................................................................................14
Section 3.8    Actions of the Board by Written Consent....................................................14
Section 3.9    Meetings by Means of Conference Telephone ...........................................15
Section 3.10   Committees ................................................................................................15
Section 3.11   Compensation ............................................................................................16

773283.04A-WILSR01A - MSW

## ARTICLE IV
## OFFICERS

Section 4.1 General ..................................................................................................... 17
Section 4.2 Election ..................................................................................................... 17
Section 4.3 Voting Securities Owned by the Corporation ........................................... 18
Section 4.4 Chairman of the Board of Directors ......................................................... 18
Section 4.5 President .................................................................................................... 19
Section 4.6 Vice Presidents .......................................................................................... 19
Section 4.7 Secretary .................................................................................................... 19
Section 4.8 Treasurer .................................................................................................... 20
Section 4.9 Other Officers ............................................................................................ 21

## ARTICLE V
## STOCK

Section 5.1 Shares of Stock .......................................................................................... 21
Section 5.2 Signatures ................................................................................................... 22
Section 5.3 Lost Certificates ......................................................................................... 22
Section 5.4 Transfers ..................................................................................................... 23
Section 5.5 Dividend Record Date ................................................................................ 23
Section 5.6 Record Owners ........................................................................................... 24
Section 5.7 Transfer and Registry Agents .................................................................... 24

## ARTICLE VI
## NOTICES

Section 6.1 Notices ....................................................................................................... 25
Section 6.2 Waivers of Notice ...................................................................................... 26

## ARTICLE VII
## GENERAL PROVISIONS

Section 7.1 Dividends ................................................................................................... 26
Section 7.2 Disbursements ............................................................................................ 26
Section 7.3 Fiscal Year ................................................................................................. 26
Section 7.4 Corporate Seal ............................................................................................ 27
Section 7.5 Electronic Transmission ............................................................................ 27

## ARTICLE VIII
## INDEMNIFICATION

Section 8.1 Indemnification of Directors and Officers ................................................ 27
Section 8.2 Indemnification of Employees and Agents ................................................ 28
Section 8.3 Insurance .................................................................................................... 28
Section 8.4 Certain Definitions ..................................................................................... 28
Section 8.5 Amendments to Article VIII ...................................................................... 29

ii

773283.04A-WILSR01A - MSW

ARTICLE IX
AMENDMENTS

Section 9.1     Amendments ...................................................................................................29
Section 9.2     Entire Board of Directors.................................................................................30

iii

773283.04A-WILSR01A - MSW

**BY-LAWS**

**OF**

**NEW MILLENNIUM HOLDCO, INC.**

**(hereinafter called the "Corporation")**

**ARTICLE I**

**OFFICES**

Section 1.1     Registered Office.  The registered office of the Corporation shall be in the City of Dover, Kent County, State of Delaware.

Section 1.2     Other Offices.  The Corporation may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine.

**ARTICLE II**

**MEETINGS OF STOCKHOLDERS**

Section 2.1     Place of Meetings.  Meetings of the stockholders for the election of directors or for any other purpose shall be held at such time and place, either within or without the State of Delaware, as shall be designated from time to time by the Board of Directors.  Notwithstanding the foregoing, the Board of Directors may, in its sole discretion, determine that meetings of the stockholders shall not be held at any place, but instead be held by means of remote communications, subject to such guidelines and procedures as the Board of Directors may adopt from time to time.

Section 2.2     Annual Meetings.  The Annual Meetings of Stockholders for the election of directors shall be held at such date and time as may be fixed by resolution of the Board of Directors.

1

Section 2.3    Special Meetings.  Unless otherwise required by law or by the certificate of incorporation of the Corporation, as amended and restated from time to time (the "Certificate of Incorporation"), Special Meetings of Stockholders, for any purpose or purposes, may be called by either (i) the Chairman, if there be one, or (ii) the President, (iii) any Vice President, if there be one, (iv) the Secretary or (v) any Assistant Secretary, if there be one, and shall be called by any such officer at the request in writing, in accordance with the terms of such request, of (i) the Board of Directors, (ii) a committee of the Board of Directors that has been duly designated by the Board of Directors and whose powers and authority include the power to call such meetings or (iii) stockholders owning at least ten percent (10%) of the capital stock of the Corporation issued and outstanding and entitled to vote.  Such request shall state the purpose or purposes of the proposed meeting.

Section 2.4    Notice.  Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, date and hour of the meeting, and, in the case of a Special Meeting, the purpose or purposes for which the meeting is called.  Unless otherwise required by law, written notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to notice of and to vote at such meeting.  Notwithstanding the foregoing, the Corporation shall give each holder of record of at least five percent (5%) of the then issued and outstanding shares of the Corporation's Common Stock ("5% Holders") written notice of any Annual or Special Meeting for the election of directors at least ten (10) days prior to giving notice in

2

accordance with the requirements of Section 2.4 above to facilitate the stockholder rights set forth in Section 2.14.

Section 2.5     Adjournments.  Any meeting of the stockholders may be adjourned from time to time to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken.  At the adjourned meeting, the Corporation may transact any business which might have been transacted at the original meeting.  If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting in accordance with the requirements of Section 2.4 hereof shall be given to each stockholder of record entitled to notice of and to vote at the meeting.

Section 2.6     Quorum.  Unless otherwise required by applicable law or the Certificate of Incorporation, the holders of a majority of the Corporation's capital stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business.  A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum.  If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, in the manner provided in Section 2.5 hereof, until a quorum shall be present or represented.

Section 2.7     Voting.  Unless otherwise required by law, the Certificate of Incorporation or these By-Laws or permitted by the rules of any stock exchange on

3

773283.04A-WILSR01A - MSW

which the Corporation's shares are listed and traded, any question brought before any meeting of the stockholders, other than the election of directors, shall be decided by the vote of the holders of a majority of the total number of votes of the Corporation's capital stock represented at the meeting and entitled to vote on such question, voting as a single class. Unless otherwise provided in the Certificate of Incorporation, and subject to Section 2.11(a) of this Article II, each stockholder represented at a meeting of the stockholders shall be entitled to cast one (1) vote for each share of the capital stock entitled to vote thereat held by such stockholder. Such votes may be cast in person or by proxy as provided in Section 2.8 of this Article II.

Section 2.8    Proxies. Each stockholder entitled to vote at a meeting of the stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder as proxy, but no such proxy shall be voted upon after three years from its date, unless such proxy provides for a longer period. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, the following shall constitute a valid means by which a stockholder may grant such authority:

(i)    A stockholder may execute a writing authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished by the stockholder or such stockholder's authorized officer, director, employee or agent signing such writing or causing such person's signature to be affixed to such writing by any reasonable means, including, but not limited to, by facsimile signature.

4

773283.04A-WILSR01A - MSW

(ii)     A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the electronic transmission (including telephone, electronic mail, the Internet or such other electronic means as the Board of Directors may determine from time to time) to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such electronic transmission must either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized by the stockholder.  If it is determined that such electronic transmissions are valid, the inspectors or, if there are no inspectors, such other persons making that determination shall specify the information on which they relied.

Any copy, electronic copy, facsimile telecommunication or other reliable reproduction of the writing or transmission authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used; provided, however, that such copy, electronic copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission.

Section 2.9     Consent of Stockholders in Lieu of Meeting.  Unless otherwise provided in the Certificate of Incorporation, any action required or permitted to

5

be taken at any Annual or Special Meeting of Stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Such consent or consents shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to therein unless, within sixty (60) days of the earliest dated consent delivered in the manner required by this Section 2.9 to the Corporation, written consents signed by a sufficient number of holders to take action are delivered to the Corporation in the same manner.  Any copy, electronic copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, electronic copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that

6

773283.04A-WILSR01A - MSW

written consents signed by a sufficient number of holders to take the action were delivered to the Corporation as provided above in this Section 2.9.

Section 2.10  List of Stockholders Entitled to Vote.  The officer of the Corporation who has charge of the stock ledger of the Corporation shall prepare and make, at least ten (10) days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder.  Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting (i) either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held or (ii) during ordinary business hours, at the principal place of business of the Corporation.  The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

Section 2.11  Record Date.

(a)  In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of the stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of or to

7

vote at a meeting of the stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of the stockholders shall apply to any adjournment of the meeting.

(b)     In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  If no record date has been fixed by the Board of Directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of the stockholders are recorded.  Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.  If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the Board of Directors

8

773283.04A-WILSR01A - MSW

adopts the resolution taking such prior action.  Any stockholder of record seeking to have the stockholders authorize or take corporate action by written consent may, by written notice to the Secretary of the Corporation at the principal executive offices of the Corporation, request the Board of Directors to fix a record date.  The Board of Directors shall promptly, but in all events within ten (10) days after the date on which such a request is received, adopt a resolution fixing the record date (unless a record date has previously been fixed by the Board of Directors pursuant to the first sentence of this Section 2.11).

Section 2.12  <u>Stock Ledger</u>.  Subject to Section 5.7 of these By-Laws, the stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by Section 2.10 or the books of the Corporation, or to vote in person or by proxy at any meeting of the stockholders.

Section 2.13  <u>Conduct of Meetings</u>.  The Board of Directors of the Corporation may adopt by resolution such rules and regulations for the conduct of any meeting of the stockholders as it shall deem appropriate.  Except to the extent inconsistent with such rules and regulations as adopted by the Board of Directors, the chairman of any meeting of the stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the reasonable judgment of such chairman, are appropriate for the proper conduct of the meeting.  Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman of the meeting, may include, without limitation, the following:  (i) the establishment of an agenda or order of business for the meeting; (ii) the determination of when the polls shall open and close for any given matter to be voted

9

on at the meeting; (iii) rules and procedures for maintaining order at the meeting and the safety of those present; (iv) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; and (v) limitations on the time allotted to questions or comments by participants.

Section 2.14    Stockholder Access to Proxy Solicitation Materials. Subject to the requirements of this Section 2.14, each 5% Holder (as defined in Section 2.4 of these By-Laws) shall be entitled to nominate directors for election and have such nominees and a brief description thereof included in (a) any notice given by the Corporation of an Annual or Special Meeting for the election of directors or (b) any related solicitation materials delivered to stockholders of the Corporation in connection therewith.  For such nominees and related information to be included, 5% Holders must provide written notice to the Secretary of the Corporation within five (5) days of the notice provided in accordance with the last sentence of Section 2.4 of these By-Laws. Notwithstanding the foregoing, the Corporation shall have no obligation to include any such nominee that does not satisfy the requirements to serve as a director pursuant to applicable law, the Certificate of Incorporation or these By-Laws, or if the Board of Directors shall determine, in the exercise of its fiduciary duties, that the inclusion of such person would not be in the best interests of the Corporation and its stockholders.

## ARTICLE III

## DIRECTORS

Section 3.1    Number and Election of Directors.  The Board of Directors shall consist of not less than one nor more than nine members, the exact number of which

10

773283.04A-WILSR01A - MSW

Case 17-12560-BLS Doc 3475 Filed 02/09/23 Page 416 of 800

shall initially be fixed by the Incorporator and thereafter from time to time by the Board

of Directors or as otherwise provided for in the Certificate of Incorporation.  Except as

provided in Section 3.2, directors shall be elected by a plurality of the votes cast at each

Annual or Special Meeting for the election of directors and each director so elected shall

hold office until the next annual election or Special Meeting held for the purpose of

electing directors and until such director's successor is duly elected and qualified, or until

such director's earlier death, resignation or removal.  Directors need not be stockholders.

At all times, except in the case of a vacancy, a majority of the Board of Directors shall be

Independent Directors (as defined below). For the purposes of these By-Laws,

"Independent Director" shall mean a member of the Board of Directors who does not (i)

accept or receive directly or indirectly any consulting fee, advisory fee or other

compensation from the Corporation or any of its subsidiaries, other than in exchange for

his or her services as a member of the Board of Directors or (ii) be an affiliated person (as

that term is defined by Rule 10A-3 of the Exchange Act, and as subject to applicable safe

harbors) of the Corporation or any of its subsidiaries.  As used herein, compensatory fees

do not include the receipt of fixed amounts of compensation under a retirement plan

(including deferred compensation) for prior service with the Corporation (provided that

such compensation is not contingent in any way on continued service).

Section 3.2    Vacancies.  Unless otherwise required by law or the

Certificate of Incorporation, vacancies on the Board of Directors or any committee

thereof arising through death, resignation, removal, an increase in the number of directors

constituting the Board of Directors or such committee or otherwise may be filled by the

vote of a majority of the directors then in office, even if less than a quorum, or by a sole

11

remaining director, or a majority of the voting power of the Corporation's then outstanding capital stock entitled to vote at an election of directors. The directors so chosen shall, in the case of the Board of Directors, hold office until the next annual election or Special Meeting held for the purpose of electing directors and until their successors are duly elected and qualified, or until their earlier death, resignation or removal and, in the case of any committee of the Board of Directors, shall hold office until their successors are duly appointed by the Board of Directors or until their earlier death, resignation or removal.

Section 3.3 <u>Duties and Powers</u>. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors which may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders.

Section 3.4 <u>Meetings</u>. The Board of Directors and any committee thereof may hold meetings, both regular and special, either within or without the State of Delaware. Regular meetings of the Board of Directors or any committee thereof may be held without notice at such time and at such place as may from time to time be determined by the Board of Directors or such committee, respectively. Special meetings of the Board of Directors may be called by the Chairman, if there be one, the President, or by any director. Special meetings of any committee of the Board of Directors may be called by the chairman of such committee, if there be one, the President, or any director serving on such committee. Notice thereof stating the place, date and hour of the meeting shall be given to each director (or, in the case of a committee, to each member of such

12

committee) either by mail not less than seventy-two (72) hours before the date of the meeting, by telephone, or electronic transmission on twenty-four (24) hours' notice, or on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances.

Section 3.5    Organization.  At each meeting of the Board of Directors or any committee thereof, the Chairman of the Board of Directors or the chairman of such committee, as the case may be, or, in his or her absence or if there be none, a director chosen by a majority of the directors present, shall act as chairman.  Except as provided below, the Secretary of the Corporation shall act as secretary at each meeting of the Board of Directors and of each committee thereof.  In case the Secretary shall be absent from any meeting of the Board of Directors or of any committee thereof, an Assistant Secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the Secretary and all the Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting.  Notwithstanding the foregoing, the members of each committee of the Board of Directors may appoint any person to act as secretary of any meeting of such committee and the Secretary or any Assistant Secretary of the Corporation may, but need not if such committee so elects, serve in such capacity.

Section 3.6    Resignations and Removals of Directors.  Any director of the Corporation may resign from the Board of Directors or any committee thereof at any time, by giving notice in writing to the Chairman of the Board of Directors, if there be one, the President or the Secretary of the Corporation and, in the case of a committee, to the chairman of such committee, if there be one.  Such resignation shall take effect at the

13

773283.04A-WILSR01A - MSW

time therein specified or, if no time is specified, immediately; and, unless otherwise specified in such notice, the acceptance of such resignation shall not be necessary to make it effective.  Except as otherwise required by applicable law, any director or the entire Board of Directors may be removed from office at any time by the affirmative vote of the holders of at least a majority in voting power of the issued and outstanding capital stock of the Corporation entitled to vote in the election of directors.  Any director serving on a committee of the Board of Directors may be removed from such committee at any time by the Board of Directors.

Section 3.7    Quorum.  Except as otherwise required by law, the Certificate of Incorporation or the rules and regulations of any securities exchange or quotation system on which the Corporation's securities are listed or quoted for trading, at all meetings of the Board of Directors or any committee thereof, a majority of the entire Board of Directors or a majority of the directors constituting such committee, as the case may be, shall constitute a quorum for the transaction of business and the act of a majority of the directors or committee members present at any meeting at which there is a quorum shall be the act of the Board of Directors or such committee, as applicable.  If a quorum shall not be present at any meeting of the Board of Directors or any committee thereof, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting of the time and place of the adjourned meeting, until a quorum shall be present.

Section 3.8    Actions of the Board by Written Consent.  Unless otherwise provided in the Certificate of Incorporation or these By-Laws, any action required or permitted to be taken at any meeting of the Board of Directors or of any

14

773283.04A-WILSR01A - MSW

committee thereof may be taken without a meeting, if all the members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing(s) or electronic transmission(s) are filed with the minutes of proceedings of the Board of Directors or such committee.  Such consent shall be treated for all purposes as a vote of the Board of Directors or committee, as the case may be, at a meeting.

Section 3.9     Meetings by Means of Conference Telephone.  Unless otherwise provided in the Certificate of Incorporation or these By-Laws, members of the Board of Directors of the Corporation, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 3.9 shall constitute presence in person at such meeting.

Section 3.10    Committees.  The Board of Directors may, by the affirmative vote of a majority of the directors then in office, designate one or more committees, each committee to consist of one or more of the directors of the Corporation. A committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to such subcommittee any or all of the powers of the committee. Each member of a committee must meet the requirements for membership, if any, imposed by applicable law and the rules and regulations of any securities exchange or quotation system on which the securities of the Corporation are listed or quoted for trading.  The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified

15

member at any meeting of any such committee.  Subject to the rules and regulations of any securities exchange or quotation system on which the securities of the Corporation are listed or quoted for trading, in the absence or disqualification of a member of a committee, and in the absence of a designation by the Board of Directors of an alternate member to replace the absent or disqualified member, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another qualified member of the Board of Directors to act at the meeting in the place of any absent or disqualified member.  Any committee, to the extent permitted by law and provided in the resolution establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it. Each committee shall keep regular minutes and report to the Board of Directors when required.  Unless the Board of Directors shall otherwise provide, any such committee may make rules for the conduct of its business, but unless otherwise provided by the Board of Directors or such rules, its meetings shall be called, notice given or waived, its business conducted or its action taken as nearly as may be in the same manner as is provided in these By-Laws with respect to meetings or for the conduct of business or the taking of actions by the Board of Directors.

Section 3.11    Compensation.  The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary for service as director, payable in cash or securities.  No such payment shall preclude any director

16

773283.04A-WILSR01A - MSW

from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for service as committee members.

## ARTICLE IV

## OFFICERS

Section 4.1  General. The officers of the Corporation shall be chosen by the Board of Directors and shall consist of a President, a Secretary and a Treasurer. The Board of Directors, in its discretion, also may choose a Chairman of the Board of Directors (who must be a director) and one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers and other officers. Any number of offices may be held by the same person, unless otherwise prohibited by law, the Certificate of Incorporation or these By-Laws. The officers of the Corporation need not be stockholders of the Corporation nor, except in the case of the Chairman of the Board of Directors, need such officers be directors of the Corporation.

Section 4.2  Election. The Board of Directors, at its first meeting held after each Annual Meeting of Stockholders or action by written consent of stockholders in lieu of the Annual Meeting of Stockholders, shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors; and each officer of the Corporation shall hold office until such officer's successor is elected and qualified, or until such officer's earlier death, resignation or removal. Any officer elected by the Board of Directors may be removed at any time, with or without cause, by the Board of Directors. Any officer of the Corporation may resign at any time, by giving

17

773283.04A-WILSR01A - MSW

notice in writing to the Corporation at its principal office or to the President, Secretary or Assistant Secretary, if any, and shall take effect at the time therein specified or, if no time is specified, immediately; and, unless otherwise specified in such notice, the acceptance of such resignation shall not be necessary to make it effective.  Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors.

Section 4.3    Voting Securities Owned by the Corporation.  Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the President or any Vice President or any other officer authorized to do so by the Board of Directors and any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present.  The Board of Directors may, by resolution, from time to time confer like powers upon any other person or persons.

Section 4.4    Chairman of the Board of Directors.  The Board of Directors may appoint, from among the directors, a Chairman of the Board; provided, however, that the initial Chairman of the Board must be an Independent Director (as defined in Section 3.1 of these By-Laws).  If the Board of Directors appoints a Chairman of the Board, except as otherwise determined by the Board of Directors, the Chairman of the Board shall preside at all meetings of the Board of Directors and all meetings of the

18

stockholders at which such director is present and, if an Independent Director, shall have the power and authority to coordinate the activities of the independent directors, to serve as liaison between the Chief Executive Officer and the independent directors and, if present, to preside at the executive sessions of the independent directors of the Corporation, and shall have such other powers and authority as may be assigned to such office by the Board of Directors from time to time.

Section 4.5    President.  The President shall, subject to the control of the Board of Directors and, if there be one, the Chairman of the Board of Directors, have general supervision of the business of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect.  In the absence or disability of the Chairman of the Board of Directors, or if there be none, the President shall preside at all meetings of the stockholders and, provided the President is also a director, the Board of Directors.  Unless the Board of Directors shall otherwise designate, the President shall be the Chief Executive Officer of the Corporation.  The President shall also perform such other duties and may exercise such other powers as may from time to time be assigned to such officer by these By-Laws or by the Board of Directors.

Section 4.6    Vice Presidents.  The Vice-President(s), if any, shall have such powers and perform such duties as the board of directors may from time to time determine.

Section 4.7    Secretary.  The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings thereat in a book or books to be kept for that purpose; the Secretary shall also perform like duties for committees of the Board of Directors when required.  The Secretary shall

19

give, or cause to be given, notice of all meetings of the stockholders and special meetings

of the Board of Directors, and shall perform such other duties as may be prescribed by

the Board of Directors, the Chairman of the Board of Directors or the President, under

whose supervision the Secretary shall be.  If the Secretary shall be unable or shall refuse

to cause to be given notice of all meetings of the stockholders and special meetings of the

Board of Directors, and if there be no Assistant Secretary, then either the Board of

Directors or the President may choose another officer to cause such notice to be given.

The Secretary shall have custody of the seal of the Corporation and the Secretary or any

Assistant Secretary, if there be one, shall have authority to affix the same to any

instrument requiring it and when so affixed, it may be attested by the signature of the

Secretary or by the signature of any such Assistant Secretary.  The Board of Directors

may give general authority to any other officer to affix the seal of the Corporation and to

attest to the affixing by such officer's signature.  The Secretary shall see that all books,

reports, statements, certificates and other documents and records required by law to be

kept or filed are properly kept or filed, as the case may be.  In the absence of the

Secretary at any meeting, a temporary secretary shall be chosen who shall record the

proceedings of the meeting in the aforesaid books.  Assistant Secretaries, if any, shall

have such powers and perform such duties as the Board of Directors may from time to

time designate.

Section 4.8     Treasurer.  The Treasurer, subject to the direction and

under the supervision and control of the Board of Directors, shall have general charge of

the financial affairs of the Corporation. The Treasurer shall have custody of all funds,

securities and valuable papers of the corporation, except as the Board of Directors may

20

773283.04A-WILSR01A - MSW

otherwise provide. The Treasurer shall keep or cause to be kept full and accurate records of account which shall be the property of the Corporation, and which shall be always open to the inspection of each elected officer and director of the Corporation. The Treasurer shall deposit or cause to be deposited all funds of the Corporation in such depository or depositories as may be authorized by the Board of Directors. The Treasurer shall have the power to endorse for deposit or collection all notes, checks, drafts, and other negotiable instruments payable to the corporation. The Treasurer shall perform such other duties as are incidental to the office, and such other duties as may be assigned by the Board of Directors.  Assistant Treasurers, if any, shall have such powers and perform such duties as the Board of Directors may from time to time determine.

Section 4.9      Other Officers.  Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors.  The Board of Directors may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

## ARTICLE V

## STOCK

Section 5.1      Shares of Stock.  The shares of capital stock of the Corporation shall be represented by certificates in such form as shall, in conformity to law, be prescribed from time to time by the Board of Directors, provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation.

21

Each certificate shall be signed by (a) the Chairman of the Board, the Chief Executive Officer, the President or any Vice-President and (b) the Chief Financial Officer, the Secretary or Assistant Secretary or the Treasurer or Assistant Treasurer, or such other officers designated by the Board of Directors from time to time as permitted by law, shall bear the seal of the Corporation, and shall express on its face its number, date of issue, class, the number of shares for which, and the name of the person to whom, it is issued. The corporate seal and any or all of the signatures of Corporation officers may be facsimile. Notwithstanding the adoption of any such resolution providing for uncertificated shares, every holder of uncertificated shares shall be entitled to have a certificate for shares of capital stock of the Corporation created in accordance with this Section 5.1 certifying the number of shares owned by such stockholder in the Corporation.

Section 5.2    Signatures.  Any or all of the signatures on a certificate may be a facsimile.  In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

Section 5.3    Lost Certificates.  In case of the loss, destruction or mutilation of a certificate of stock, a replacement certificate may be issued in place thereof upon such terms as the Board of Directors may prescribe, including, in the discretion of the Board of Directors, a requirement of bond and indemnity to the corporation.

773283.04A-WILSR01A - MSW

Section 5.4    Transfers.[1]  Stock of the Corporation shall be transferable in the manner prescribed by applicable law, the Certificate of Incorporation and in these By-Laws. Transfers of stock shall be made only on the books of the Corporation, and in the case of certificated shares of stock, title to a certificate of stock and to the shares represented thereby shall be transferred by delivery to the Corporation or its transfer agent of the certificate properly endorsed, or by delivery of the certificate accompanied by a written assignment of the same, or a properly executed written power of attorney to sell, assign or transfer the same or the shares represented thereby. Upon surrender of a certificate for the shares being transferred, a new certificate or certificates shall be issued according to the interests of the parties. In the case of uncertificated shares of stock, title to the uncertificated shares shall be transferred upon receipt by the Corporation or its transfer agent of proper transfer instructions from the registered holder of the shares or by transfer instructions accompanied by a written assignment of the same, or a properly executed written power of attorney to sell, assign or transfer the uncertificated shares.

Section 5.5    Dividend Record Date.  In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action.  If no record date

---

[1] [NTD: Company to explore whether it can make New Holdco shares DTC eligible for 144A transfers.]

23

is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 5.6    Record Owners.  The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by law.

Section 5.7    Transfer and Registry Agents.  The board of directors may appoint a transfer agent and a registrar of the certificates of stock of the Corporation. Any transfer agent so appointed shall maintain, among other records, a stockholders' ledger, setting forth the names and addresses of the holders of all issued shares of stock of the Corporation, the number of shares held by each, the certificate numbers representing such shares, and the date of issue of the certificates representing such shares. Any registrar so appointed shall maintain, among other records, a share register, setting forth the total number of shares of each class of shares which the Corporation is authorized to issue and the total number of shares actually issued. The stockholders' ledger and the share register are hereby identified as the stock transfer books of the Corporation; but as between the stockholders' ledger and the share register, the names and addresses of stockholders, as they appear on the stockholders' ledger maintained by the transfer agent shall be the official list of stockholders of record of the Corporation. The name and address of each

24

stockholder of record, as they appear upon the stockholders' ledger, shall be conclusive evidence of who are the stockholders entitled to receive notice of the meetings of stockholders, to vote at such meetings, to examine a complete list of the stockholders entitled to vote at meetings, and to own, enjoy and exercise any other property or rights deriving from such shares against the Corporation. Stockholders, but not the Corporation, its directors, officers, agents or attorneys, shall be responsible for notifying the transfer agent, in writing, of any changes in their names or addresses from time to time, and failure to do so will relieve the Corporation, its other stockholders, directors, officers, agents and attorneys, and its transfer agent and registrar, of liability for failure to direct notices or other documents, or pay over or transfer dividends or other property or rights, to a name or address other than the name and address appearing in the stockholders' ledger maintained by the transfer agent.

## ARTICLE VI

## **NOTICES**

Section 6.1 Notices. Any notice required to be given under these By-Laws may be given by (i) delivery in person, (ii) mailing it, postage prepaid, first class, (iii) mailing it by nationally or internationally recognized second day or faster courier service, or (iv) electronic transmission, in each case, to the addressee. If mailed, such notice shall be deemed to be delivered when deposited in the United States mail so addressed, with postage thereon prepaid. If notice be by facsimile, electronic message, or other means of electronic communication, such notice shall be deemed to be given at the time provided in the General Corporation Law of the State of Delaware (the "DGCL"). Such further notice shall be given as may be required by law.

773283.04A-WILSR01A - MSW

Section 6.2    Waivers of Notice.  Whenever any notice whatever is required to be given by law, the Certificate of Incorporation or these By-Laws, a written waiver thereof, signed by the person or persons entitled to such notice, or a waiver by electronic communications by such person or persons whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.  Neither the business to be conducted at, nor the purpose of such meeting, need be specified in such waiver.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except where a person attends a meeting for the express purpose of objecting at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

## ARTICLE VII

## GENERAL PROVISIONS

Section 7.1    Dividends.  Subject to the provisions, if any, of the Certificate of Incorporation, dividends upon the capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting (or by written consent in lieu thereof in accordance with these By-Laws), pursuant to law.  Dividends may be paid in cash, in property or contractual rights, or in shares of the Corporation's capital stock.

Section 7.2    Disbursements.  All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 7.3    Fiscal Year.  The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

773283.04A-WILSR01A - MSW

Section 7.4    Corporate Seal.  The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

Section 7.5    Electronic Transmission.  Notwithstanding any reference in these By-Laws to written instruments, all notices, meetings, consents and other communications contemplated by these By-Laws may be conducted by means of an electronic transmission, to the extent permitted by law, if specifically authorized by the Board of Directors of the Corporation.

## ARTICLE VIII

## INDEMNIFICATION

Section 8.1    Indemnification of Directors and Officers.  The Corporation shall indemnify and advance expenses to any person who, from and after the effective date of these By-laws (the "Effective Date") (i) is a director or officer of the Corporation or (ii) becomes a former director or officer of the Corporation, in each case in connection with any action, suit or proceeding that relates to or arises from any action or inaction by the Corporation or any such person from and after the Effective Date, solely in accordance with and pursuant to the terms of the Indemnification Agreement in the form attached hereto as Annex A (the "Indemnification Agreement"), the terms and conditions of which are incorporated by reference herein as if fully set forth herein. Without any further action, each of the Corporation, on the one hand, and each director and officer of the Corporation, on the other hand, shall be deemed to have executed the Indemnification Agreement as of the effective date of such director's or officer's due

27

election or appointment as such, and no additional action or approval shall be required by either the Corporation, on the one hand, or any such director or officer, on the other hand, to be entitled to the rights provided by, and to be subject to the obligations under, such Indemnification Agreement.

Section 8.2    Indemnification of Employees and Agents.  The Corporation may, to the extent authorized from time to time by the Board of Directors, provide rights to indemnification and/or to the advancement of expenses to any person who, from and after the Effective Date, (i) is an employee or agent of the Corporation or (ii) becomes a former employee or agent of the Corporation, in each case in connection with any action, suit or proceeding that relates to or arises from any action or inaction by the Corporation or any such person from and after the Effective Date.

Section 8.3    Insurance.  The Corporation may purchase and maintain insurance on behalf of any person who, from and after the Effective Date, (i) is a director, officer, employee or agent of the Corporation or any of its subsidiaries or (ii) becomes a former director, officer, employee or agent of the Corporation or any of its subsidiaries, in each case against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, that relates to or arises from any action or inaction by the Corporation or any of its subsidiaries or any such person from and after the Effective Date, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article VIII.

Section 8.4    Certain Definitions.  For purposes of this Article VIII, references to "the Corporation" shall include, in addition to the resulting corporation, any

28

773283.04A-WILSR01A - MSW

constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation shall stand in the same position under the provisions of this Article VIII with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

Section 8.5    Amendments to Article VIII.  Neither any provision of this Article VIII nor the Indemnification Agreement may be altered, amended or repealed, in whole or in part, or any new By-Law adopted, which in any case purports to increase the benefits available to any director, officer, employee or agent entitled to indemnification hereunder or thereunder, without the approval of the holders of a majority of the outstanding Common Stock issued and outstanding at the time of such approval.

## ARTICLE IX

## AMENDMENTS

Section 9.1    Amendments.  Except as expressly provided otherwise by the DGCL, the Certificate of Incorporation, or other provisions of these By-Laws, these By-Laws may be altered, amended or repealed, in whole or in part, or new By-Laws may be adopted by the stockholders or by the Board of Directors; provided, however, that notice of such alteration, amendment, repeal or adoption of new By-Laws be contained in the notice of such meeting of the stockholders or Board of Directors, as the case may be. All such amendments must be approved by either the holders of a majority of the outstanding capital stock entitled to vote thereon or by a majority of the entire Board of

29

Directors then in office, except that, so long as any shares of stock are outstanding, the alteration, amendment, repeal or adoption of By-Laws that adversely affect the relative rights, preferences, qualifications, limitations or restrictions of the Common Stock, including without limitation the "Independent Director" requirements of Section 3.1 and the stockholder voting requirement set forth in this Section 9.1, shall require the approval of both (i) a majority of the entire Board of Directors then in office and (ii) the holders of a majority of the outstanding Common Stock  issued and outstanding at the time of such vote.

Section 9.2    Entire Board of Directors.  As used in this Article IX and in these By-Laws generally, the term "entire Board of Directors" means the total number of directors which the Corporation would have if there were no vacancies.

* * *

30

Adopted as of: December [_____], 2015

31

773283.04A-WILSR01A - MSW

**EXHIBIT E**

$600,000,000

CREDIT AGREEMENT

among

NEW MILLENNIUM HOLDCO, INC.,

as Holdings and a Borrower,

MILLENNIUM HEALTH, LLC,

as a Borrower,

The Several Lenders from Time to Time Parties Hereto,

and

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,

as Administrative Agent

Dated as of _____ __, 2015

TABLE OF CONTENTS

Page

SECTION 1.    DEFINITIONS .................................................................................................... 1
    1.1    Defined Terms ................................................................................................. 1
    1.2    Other Definitional Provisions ....................................................................... 34

SECTION 2.    AMOUNT AND TERMS OF LOANS ............................................................... 34
    2.1    Closing Date Term Loan ................................................................................ 35
    2.2    Initial Type of Term Loan ............................................................................. 35
    2.3    Repayment of Term Loan .............................................................................. 35
    2.4    Joint and Several Liability ............................................................................ 35
    2.5    [Intentionally Omitted]. ................................................................................. 36
    2.6    [Intentionally Omitted] .................................................................................. 36
    2.7    [Intentionally Omitted] .................................................................................. 36
    2.8    Fees. ............................................................................................................... 36
    2.9    [Intentionally Omitted] .................................................................................. 36
    2.10   Optional Prepayments ................................................................................... 36
    2.11   Mandatory Prepayments ................................................................................ 36
    2.12   Conversion and Continuation Options .......................................................... 38
    2.13   Limitations on Eurodollar Tranches .............................................................. 38
    2.14   Interest Rates and Payment Dates ................................................................. 38
    2.15   Computation of Interest and Fees ................................................................. 39
    2.16   Inability to Determine Interest Rate .............................................................. 39
    2.17   Pro Rata Treatment and Payments ................................................................ 40
    2.18   Requirements of Law .................................................................................... 41
    2.19   Taxes .............................................................................................................. 43
    2.20   Indemnity ....................................................................................................... 46
    2.21   Change of Lending Office ............................................................................. 47
    2.22   Replacement of Lenders ................................................................................ 47
    2.23   [Intentionally Omitted] .................................................................................. 47
    2.24   Incremental Term Loans ................................................................................ 47

SECTION 3.    [INTENTIONALLY OMITTED] ..................................................................... 49

SECTION 4.    REPRESENTATIONS AND WARRANTIES ................................................. 49
    4.1    Financial Condition ....................................................................................... 49
    4.2    No Change ...................................................................................................... 49
    4.3    Existence; Compliance with Law .................................................................. 50
    4.4    Power; Authorization; Enforceable Obligations ........................................... 50
    4.5    No Legal Bar .................................................................................................. 50
    4.6    Litigation ........................................................................................................ 50
    4.7    No Default ...................................................................................................... 50
    4.8    Ownership of Property; Liens ........................................................................ 50
    4.9    Intellectual Property ...................................................................................... 51
    4.10   Taxes .............................................................................................................. 51
    4.11   Federal Regulations ...................................................................................... 51
    4.12   Labor Matters ................................................................................................ 51
    4.13   ERISA ............................................................................................................ 51
    4.14   Investment Company Act; Other Regulations ............................................... 52

i

| | | |
|---|---|---|
| 4.15 | Subsidiaries | 52 |
| 4.16 | Closing Date Exchange; Use of Proceeds | 52 |
| 4.17 | Environmental Matters | 52 |
| 4.18 | Forward-Looking Statements | 53 |
| 4.19 | Accuracy of Information | 53 |
| 4.20 | Security Documents | 54 |
| 4.21 | [Intentionally Omitted] | 54 |
| 4.22 | Solvency | 54 |
| 4.23 | OFAC Compliance; Anti-Corruption Laws | 54 |
| 4.24 | Anti-Terrorism Laws | 55 |

| | | |
|---|---|---|
| SECTION 5. | CONDITIONS PRECEDENT | 55 |
| 5.1 | Conditions to Deemed Making of the Closing Date Term Loan on the Closing Date | 55 |
| 5.2 | Conditions to Each Extension of Credit | 58 |

| | | |
|---|---|---|
| SECTION 6. | AFFIRMATIVE COVENANTS | 58 |
| 6.1 | Financial Statements | 58 |
| 6.2 | Certificates; Other Information | 59 |
| 6.3 | Maintenance of Existence; Compliance | 61 |
| 6.4 | Maintenance of Property; Insurance | 61 |
| 6.5 | Inspection of Property; Books and Records; Discussions | 61 |
| 6.6 | Notices | 62 |
| 6.7 | Environmental Laws | 62 |
| 6.8 | [Intentionally Omitted] | 63 |
| 6.9 | Additional Collateral | 63 |
| 6.10 | Ratings | 65 |
| 6.11 | Quarterly Conference Calls | 65 |
| 6.12 | Conditions Subsequent | 65 |
| 6.13 | Designation of Subsidiaries | 66 |
| 6.14 | Unrestricted Subsidiaries | 66 |

| | | |
|---|---|---|
| SECTION 7. | NEGATIVE COVENANTS | 66 |
| 7.1 | Minimum Liquidity | 67 |
| 7.2 | Indebtedness | 67 |
| 7.3 | Liens | 69 |
| 7.4 | Fundamental Changes | 72 |
| 7.5 | Disposition of Property | 73 |
| 7.6 | Restricted Payments | 74 |
| 7.7 | [Intentionally Omitted] | 75 |
| 7.8 | Investments | 76 |
| 7.9 | Payments and Modifications of Subordinated Indebtedness | 77 |
| 7.10 | Transactions with Affiliates | 77 |
| 7.11 | Sales and Leasebacks | 78 |
| 7.12 | Swap Agreements | 78 |
| 7.13 | Changes in Fiscal Periods | 78 |
| 7.14 | Negative Pledge Clauses | 78 |
| 7.15 | Clauses Restricting Subsidiary Distributions | 79 |
| 7.16 | Lines of Business | 80 |
| 7.17 | Use of Proceeds | 80 |
| 7.18 | Amendments or Waivers of Organizational Documents | 80 |

| | | | |
|---|---|---|---|
| SECTION 8. | | EVENTS OF DEFAULT | 80 |
| | 8.1 | Events of Default | 80 |
| | 8.2 | Right to Cure | 83 |
| SECTION 9. | | THE ADMINISTRATIVE AGENT | 84 |
| | 9.1 | Appointment | 84 |
| | 9.2 | Delegation of Duties | 84 |
| | 9.3 | Exculpatory Provisions | 85 |
| | 9.4 | Reliance by the Administrative Agent | 85 |
| | 9.5 | Notice of Default | 85 |
| | 9.6 | Non-Reliance on Administrative Agent and Other Lenders | 86 |
| | 9.7 | Indemnification | 86 |
| | 9.8 | Administrative Agent in Its Individual Capacity | 87 |
| | 9.9 | Successor Administrative Agent | 87 |
| | 9.10 | Direction | 87 |
| | 9.11 | Disqualified Lenders | 87 |
| | 9.12 | Specified Swap Agreements; Secured Cash Management Agreements | 87 |
| SECTION 10. | | MISCELLANEOUS | 88 |
| | 10.1 | Amendments and Waivers | 88 |
| | 10.2 | Notices. | 90 |
| | 10.3 | No Waiver; Cumulative Remedies | 93 |
| | 10.4 | Survival of Representations and Warranties | 93 |
| | 10.5 | Payment of Expenses and Taxes | 93 |
| | 10.6 | Successors and Assigns; Participations and Assignments | 95 |
| | 10.7 | Adjustments; Set-off | 99 |
| | 10.8 | Counterparts; No Requirement of Lender Signatures | 100 |
| | 10.9 | Severability | 100 |
| | 10.10 | Integration | 100 |
| | 10.11 | GOVERNING LAW | 100 |
| | 10.12 | Submission to Jurisdiction; Waivers | 101 |
| | 10.13 | Acknowledgements | 101 |
| | 10.14 | Releases of Guarantees and Liens | 102 |
| | 10.15 | Confidentiality | 103 |
| | 10.16 | **WAIVERS OF JURY TRIAL** | 104 |
| | 10.17 | USA Patriot Act | 104 |
| | 10.18 | Usury | 104 |
| | 10.19 | Existing Credit Agreement | 104 |

SCHEDULES:

1.1A    Closing Date Term Loan Percentage
1.1B    Mortgaged Property
1.1C    Disqualified Lenders
4.4     Consents, Authorizations, Filings and Notices
4.9     Intellectual Property
4.15    Subsidiaries
4.20(a) Filing Jurisdictions
4.20(b) Mortgage Filing Jurisdictions
6.12    Conditions Subsequent
7.2(d)  Existing Indebtedness
7.3(f)  Existing Liens

EXHIBITS:

A      Form of Guarantee and Collateral Agreement
B      Form of Compliance Certificate
C      Form of Closing Certificate
D-1    Form of Assignment and Assumption
D-2    Form of Affiliated Lender Assignment and Assumption
E      Reserved
F      Reserved
G-1    Form of U.S. Tax Compliance Certificate—For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes
G-2    Form of U.S. Tax Compliance Certificate—For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes
G-3    Form of U.S. Tax Compliance Certificate—For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes
G-4    Form of U.S. Tax Compliance Certificate— For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes
H-1    Form of Increased Facility Activation Notice—Incremental Term Loans
H-2    Reserved
H-3    Form of New Lender Supplement

1

CREDIT AGREEMENT (this "Agreement"), dated as of _____ __, 2015, among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC (formerly known as Millennium Laboratories, LLC), a California limited liability company ("MH" and a "Borrower"; together with Holdings, the "Borrowers"), the several banks and other financial institutions or entities from time to time parties to this Agreement, including pursuant to Section 10.8 (the "Lenders") and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as Administrative Agent.

WHEREAS, Millennium Lab Holdings II, LLC, a Delaware limited liability company ("Old Holdco") and MH entered into that certain Credit Agreement, dated as of April 16, 2014, with the administrative agent and the lenders party thereto (as amended, restated, supplemented and/or modified prior to the date hereof, the "Existing Credit Agreement");

WHEREAS, on November 10, 2015 (the "Petition Date"), MH, RxAnte, LLC, a Delaware limited liability company, and Old Holdco, each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and commenced their chapter 11 cases, which are being jointly administered under Case No. 15-12284 (collectively, "Cases");

WHEREAS, on the Approved Plan Effective Date, pursuant to the Plan of Reorganization each of the lenders party to the Existing Credit Agreement shall receive, among other consideration, its Pro Rata Share of the Closing Date Term Loan (hereinafter defined) in return for the cancellation of the Existing Loan owed to it;

WHEREAS, subject to the terms and conditions hereof, the Closing Date Term Loan shall be deemed made on the Closing Date;

The parties hereto hereby agree as follows:

## SECTION 1.   DEFINITIONS

1.1   Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABL Collateral": as defined in the ABL Intercreditor Agreement, but shall include all or any of the following assets of any Loan Party: (a) accounts, (b) inventory, (c) deposit accounts holding no assets other than cash and cash equivalents (with certain carveouts in regards to deposit accounts holding cash and/or cash equivalents that constitute proceeds of Collateral that is not ABL Collateral), (d) all general intangibles, intellectual property, rights, remedies guarantees, security interests, rights of enforcement and collection, and other property of every kind and description, in each case, solely to the extent necessary for the collection of accounts and inventory, (e) all books and records pertaining to the other property described in this definition and (f) proceeds of the foregoing.

"ABL Facility": an asset based revolving credit facility secured by Liens on the Collateral in accordance with Section 7.3(j).

"ABL Intercreditor Agreement":  an intercreditor agreement between the Administrative Agent (entered into with the written direction of the Required Lenders), the administrative agent under the ABL Facility and the Loan Parties, in form and substance satisfactory to the Administrative Agent and the Required Lenders.

"ABR":  for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate that would be calculated as of such day (or, if such day is not a Business Day, as of the next preceding Business Day) in respect of a proposed Eurodollar Loan with a one-month Interest Period plus 1.0%; provided that the ABR shall be at all times not less than 2.0% with respect to the Closing Date Term Loan.  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate shall be effective as of the opening of business on the day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"Administrative Agent":  Credit Suisse AG, Cayman Islands Branch, together with its affiliates, as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly to direct or cause the direction of the management and policies of such Person, whether by contract, ownership of voting securities or otherwise.

"Affiliated Lender Assignment and Assumption": an Affiliated Lender Assignment and Assumption, substantially in the form of Exhibit D-2.

"Aggregate Available ECF Amount":  at any time (the "Reference Time"), an amount equal to the sum of the Aggregate ECF Amount for each Calculation Period ending prior to the Reference Time, commencing with the Calculation Period ending on December 31, 2016.

"Aggregate Exposure":  with respect to any Lender at any time, an amount equal to the aggregate then unpaid principal amount of such Lender's Term Loans.

"Aggregate Exposure Percentage":  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the Aggregate Exposure of all Lenders at such time.

"Agreement":  as defined in the preamble hereto.

"Aircraft":  the Gulfstream Aircraft and each other aircraft from time to time owned by the Borrowers or any of their  Subsidiaries, in each case, together with all related property.

"Anti-Corruption Laws": all laws, rules, and regulations of any jurisdiction applicable to the Borrowers, their Affiliates or their Subsidiaries from time to time concerning or relating to bribery or corruption, including, without limitation, the U.S. Foreign Corrupt Practices Act and the UK Bribery Act.

"Applicable Margin":

(a)      for each Type of Closing Date Term Loan,  the rate per annum set forth under the relevant column heading below:

| | ABR Loans | Eurodollar Loans |
|---|---|---|
| Closing Date Term Loans | 5.50% | 6.50% |

(b)      for the Incremental Term Loans, such rates per annum as shall be agreed to by the Borrowers and the Incremental Term Lenders as shown on the applicable Increased Facility Activation Notice.

"Approved Fund":  as defined in Section 10.6(b).

"Approved Plan Effective Date":  the effective date of the Plan of Reorganization.

"Asset Sale":  any Disposition of property or series of related Dispositions of property (excluding any such Disposition permitted by clause (a), (b), (c), (e), (g), (h), (i), (j), (k) and (l) of Section 7.5) that yields gross proceeds to any Group Member (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $5,000,000.

"Assignee":  as defined in Section 10.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit D-1, with such amendments or modifications as may be approved by the Administrative Agent.

"Available ECF Amount":  for any Calculation Period, an amount equal to (a) the sum, without duplication, of (i) the Borrowers' ECF Percentage of Excess Cash Flow for such Calculation Period, plus (ii) the amount of any cash or Cash Equivalents received by the Borrowers (other than from a Person that is a Subsidiary Guarantor thereof) during the Calculation Period from the issuance and sale of its Specified Equity (other than any Specified Equity Contribution or any Specified Equity issued to a Subsidiary of Holdings) and contributed to the Borrowers as cash common equity, plus (iii) the amount of any distribution in cash or Cash Equivalents received by any Loan Party or received by any Loan Party upon any Disposition in each case during such Calculation Period, in each case, in respect of any Investment made by such Person in reliance on Section 7.8(h) (not to exceed the original amount of such Investment), plus (iv) any Declined Prepayment Amount during such Calculation Period, minus (b) without duplication,  the aggregate amount of Investments made in reliance on Section 7.8(h) during the Calculation Period.  Without limiting or otherwise modifying the last sentence of the definition of Excess Cash Flow in this Section 1.1, it is understood and agreed that Available ECF Amount for any Calculation Period shall not be a negative number.  Notwithstanding any other provisions set forth herein (x) the Available ECF Amount shall equal zero for any Calculation Period to the extent that the Borrowers' Minimum Liquidity as of the last day of such Calculation Period, is less than $125,000,000 after giving effect to any amount payable under Section 2.11(c) for such Calculation Period and (y) if, on the last day of such Calculation Period, Minimum Liquidity is equal to or more than $125,000,000, the Available ECF Amount for such Calculation Period shall be reduced to that amount that, if payable as a Restricted Payment, could be paid without reducing Minimum Liquidity to less than $125,000,000.  The Available ECF Amount for a Calculation Period shall only be measured as of the end of such Calculation Period. The Calculation Period ending on December 31, 2016 shall be the first Calculation Period during which Available ECF Amount shall be measured.

"BALC":  as defined in the term "Master Lease Agreement".

"Bankruptcy Event":  with respect to any Person, such Person becomes the subject of a voluntary bankruptcy or insolvency proceeding, or becomes the subject of an involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business

appointed for it, or, in the good faith determination of the Administrative Agent, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof; provided, further, that such ownership interest does not result in or provide such Person with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"Benefitted Lender":  as defined in Section 10.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors":  as to any Person, the board of directors or other governing body of such Person, or if such Person is managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" and "Borrowers":  as defined in the preamble hereto.

"Borrowers' ECF Percentage":  50%.

"Borrower Materials":  as defined in Section 10.2.

"Borrowing Date":  any Business Day specified by the Borrowers as a date on which the Borrowers request the relevant Lenders to make Loans hereunder.

"Business":  as defined in Section 4.17(b).

"Business Day":  a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the London interbank eurodollar market.

"Calculation Period":  each fiscal year of Holdings ending on December 31, commencing with the fiscal year of Holdings ending on December 31, 2016.

"Capital Expenditures":  for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Restricted Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP, other than to the extent arising under real estate leases described in Section 7.10, as the same may be renewed, amended or replaced from time to time, on a consolidated balance sheet of such Person and its Restricted Subsidiaries, and other than expenditures made in connection with, or as part of, Investments or Permitted Acquisitions.

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, which obligations are required to be classified and accounted for as capital leases on a balance

sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock":  any and all shares, interests, participations, units or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a limited liability company or other Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing, but excluding any debt securities convertible into any of the foregoing.

"Capitalized Earn-Out Obligations":  any Earn-Out Obligations that are required to be classified as and accounted for as liabilities on a balance sheet of a Group Member under GAAP.

"Cases": as defined in the Recitals hereto.

"Cash Equivalents":  (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days, with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; (g) money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition (provided that such fund shall not be required to hold assets that satisfy each of such clauses (a) through (f)); or (h) money market funds that (i) comply with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AA by S&P and Aa2 by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Cash Management Arrangement": any arrangement for treasury, depositary, purchasing card, credit card or cash management services, including, without limitation, in connection with any automated clearing house transfers of funds or any similar transactions.

"Change in Control": (i) at any time on or after the consummation of a Qualified IPO, any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), shall become, or obtain rights (whether by means or warrants, options or otherwise) to become, the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of more than 35% of the outstanding common equity of Holdings; (ii) the Board of Directors of Holdings shall cease to consist of a majority of Continuing Directors; or (iii) Holdings shall cease to own and control, of record and beneficially, directly,

100% of each class of outstanding Capital Stock of MH free and clear of all Liens (except Liens created by the Guarantee and Collateral Agreement and other Liens permitted under Section 7.3) or (iv) Borrowers shall cease to own and control, of record and beneficially, directly or indirectly, 100% of each class of outstanding Capital Stock of the Loan Parties (other than the Borrowers and other than in accordance with Dispositions permitted under Section 7.5 hereof) clear of all Liens (except Liens created by the Guarantee and Collateral Agreement and other Liens permitted under Section 7.3).  The parties agree that neither the  a Qualified IPO nor the Transaction shall, in and of itself, constitute a Change in Control.

"Closing Date":  the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied, which date is December [__], 2015.

"Closing Date Exchange":  the receipt by the Lenders of the Closing Date Term Loan on the Closing Date in exchange for, among other consideration, the cancellation of the Existing Loans in accordance with the Master Restructuring Agreement and the Plan of Reorganization.

"Closing Date Term Lender":  each Lender that holds a Closing Date Term Loan.

"Closing Date Term Loan Percentage":  as to any Lender, the percentage set forth opposite such Lender's name on Schedule 1.1A.  The aggregate amount of the Closing Date Term Loan on the Closing Date, immediately after giving effect to the deemed making of the Closing Date Term Loan on the Closing Date, is $600,000,000.

"Closing Date Term Loan Maturity Date":  December [__], 2020.

"Closing Date Term Loan":  as defined in Section 2.1.

"Code":  the Internal Revenue Code of 1986, as amended.

"Collateral":  all property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, but in any event excluding the Excluded Property.

"Commitment Fee Facility": that certain credit facility evidencing MH's obligation to pay an aggregate principal amount of $46,626,404.14 of loans (plus all outstanding interest accrued thereon) to the lenders party to that certain Credit Agreement dated as of November 9, 2015 by and between Old Holdco, MH, the lenders party thereto and Wilmington Savings Fund Society, FSB, as administrative agent.

"Commodity Exchange Act": the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communications": as defined in Section 10.2.

"Compliance Certificate":  a certificate duly executed by a Responsible Officer substantially in the form of Exhibit B.

"Confirmation Order":  the order of the Bankruptcy Court confirming the Plan of Reorganization entered pursuant to section 1129 of the Bankruptcy Code in the form and with the provisions as required herein and in the Master Restructuring Agreement.

"Connection Income Taxes": Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Current Assets": at any date, all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of Holdings and its Restricted Subsidiaries at such date.

"Consolidated Current Liabilities": at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of Holdings and its Restricted Subsidiaries at such date, but excluding the current portion of any Funded Debt of Holdings and its Restricted Subsidiaries.

"Consolidated Debt": at any date, the sum of the aggregate principal amount, without duplication, of all Indebtedness described in clauses (a), (b), (c), (e), (f), (h), and (i) (other than, in the case of clause (h), contingent obligations in respect thereof) of the definition of "Indebtedness" and all Guarantee Obligations thereof of Holdings and its Restricted Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP).

"Consolidated EBITDA": for any period, Consolidated Net Income for such period,

plus

(a)     without duplication and to the extent deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)     consolidated interest expense, amortization or writeoff of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including letters of credit) (but excluding interest expense, amortization, write-off of debt discount and debt issuance costs, commissions, discounts, fees and charges in relation to Indebtedness that is excluded from Consolidated Total Debt);

(ii)     provision for Federal, foreign or state Taxes based on income, profits or capital, including franchise Taxes and similar Taxes paid or accrued during such period (including in respect of repatriated funds), any expenses resulting from a dispute with a Governmental Authority with respect to any such Taxes;

(iii)     depreciation expense and amortization expense;

(iv)     amortization or write-down of intangibles (including, but not limited to, goodwill) and organization costs;

(v)     extraordinary, unusual or non-recurring costs, charges or expenses;

(vi)     non-cash charges (including, without limitation, non-cash costs and/or expenses incurred pursuant to any management equity plan, stock option plan or any other stock subscription or shareholder agreement), losses or expenses;

(vii)     (A) restructuring charges, costs or expenses (including restructuring costs related to acquisitions after the Closing Date and new reserves or adjustments to

existing reserves), severance costs, relocation costs, integration costs, other business optimization expenses or reserves, signing costs, retention or completion bonuses, Expensed Earn-Out Obligations payments made during the applicable period related to the redemption of employee options of Millennium Holdings related to the Transactions (as defined in the Existing Credit Agreement) on or after the Closing Date (as defined in the Existing Credit Agreement), transition costs, costs related to closure/consolidation of facilities and curtailments or modifications to pension and post-retirement employee benefit plans (including any settlement of pension liabilities); provided that any amounts added back pursuant to this clause (a)(vii) for the applicable period, together with any amounts added back pursuant to clause (a)(xii) below for such period shall not exceed 10% of Consolidated EBITDA for such period (calculated prior to giving effect to any increase pursuant to this clause (a)(vii)), (B) any contributions to the Millennium Lender Claim Trust and to Millennium Corporate Claim Trust (each as defined in the Master Restructuring Agreement) pursuant to Article V.F and Article V.G of the Plan of Reorganization and the sum of any losses and/or charges on account of the Trustee Loans, in each case, provided that the aggregate amount of such contributions, losses and charges shall not exceed $20,000,000 and (C) restructuring charges, costs, expenses and payments, in each case, related to the Transactions, provided that the aggregate amount of such charges, costs and expenses and/or payments shall not exceed $10,000,000.

(viii)    [reserved];

(ix)    in the case of any period (A) that includes the date on which a Permitted Acquisition or an Investment that is permitted under this Agreement closes, reasonable transaction costs related to such Permitted Acquisition or Investment, and (B) that includes amortized transaction costs related to the RX Ante Acquisition or a Permitted Acquisition as reflected on the audited financial statements of Holdings and its consolidated Subsidiaries, reasonable transaction costs related to the RX Ante Acquisition or such Permitted Acquisition; and in the case of any period, transaction costs and expenses associated with proposed, but not consummated, acquisitions and Investments that would have been permitted under this Agreement;

(x)    losses on asset sales, disposals or abandonments;

(xi)    expenses, charges or losses to the extent indemnified or insured by a third party (excluding Borrowers and its Subsidiaries), including those covered by indemnification provisions in connection with the RX Ante Acquisition or Permitted Acquisitions, to the extent (i) the Borrowers has determined that there is a reasonable basis for such coverage, (ii) coverage has not been denied and (iii) such amounts are actually reimbursed by such third party in cash within 90 days after the related amount is first added back to Consolidated EBITDA pursuant to this clause (xi) (and if not so reimbursed within such 90 day period, such amount shall be deducted from Consolidated EBITDA during the applicable future period); and

(xii)    in connection with a Permitted Acquisition, without duplication, the amount of net cost savings and synergies projected by the Borrowers in good faith to be realized as a result of specified actions taken or expected to be taken and calculated on a pro forma basis as though such cost savings and synergies had been realized on the first day of such period, net of the amount of actual benefits realized from such actions; provided that the chief financial officer of the Borrowers shall have certified to the Administrative Agent that (x) such cost savings and synergies are reasonably identifiable

and factually supportable, reasonably attributable to the actions specified and reasonably anticipated to result from such actions, (y) such actions have been taken, initiated or are reasonably expected to be taken and (z) the benefits resulting therefrom are anticipated by the Borrowers to be realized within 18 months after the date of such Permitted Acquisition; and provided, further, that any amounts added back pursuant to this clause (a)(xii) for the applicable period, together with any amounts added back pursuant to clause (a)(vii) above for such period, shall not exceed 10% of Consolidated EBITDA for such period (calculated prior to giving effect to any increase pursuant to this clause (a)(xii));

(xiii)   in the case of any period that includes the Closing Date, the fees and expenses payable to all rating agencies in connection with the rating of the Borrowers and the Loans on or around the Closing Date;

minus

(b)   without duplication and to the extent included in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)   extraordinary, unusual or non-recurring gains;

(ii)   interest income;

(iii)   non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Net Income or Consolidated EBITDA in any prior period);

(iv)   gains on asset sales, disposals or abandonments;

(v)   all payments and reversals that reduce any reserve that was accrued in a prior period (but only to the extent amounts in respect of such accrual were added back in determining Consolidated EBITDA pursuant to clause (a) above during such period); and

(vi)   any income or gains recognized on account of the Trustee Loans;

in each case, as determined on a consolidated basis for the Holdings and its Restricted Subsidiaries; provided that, to the extent included in Consolidated Net Income,

(I)   there shall be included in determining Consolidated EBITDA for any period, without duplication, the Acquired EBITDA for such period of any entity acquired in a Permitted Acquisition (an "Acquired Entity") during such period to the extent not subsequently sold, transferred or otherwise disposed of in or prior to such period determined on a historical pro forma basis, and

(II)   there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA for such period of any person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations by the Borrowers or any Subsidiary during such period (each such person, property, business or asset so sold, transferred or otherwise disposed of, closed or classified, a "Sold Entity") determined on a historical pro forma basis.  For these purposes:

"Acquired EBITDA":  with respect to any Acquired Entity, Consolidated EBITDA of such Acquired Entity for the applicable period (determined as if references to the Borrowers and their Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Acquired Entity and its Subsidiaries) but excluding the Consolidated EBITDA of any related person, property, business or asset to the extent not so acquired, all as determined on a consolidated basis for such Acquired Entity.

"Disposed EBITDA":  with respect to any Sold Entity, the amount of Consolidated EBITDA of such Sold Entity for the applicable period, as applicable (determined as if references to the Borrowers and their Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity and its Subsidiaries) but excluding the Consolidated EBITDA of any related person, property, business or asset to the extent not so sold, transferred, or otherwise disposed of, closed or classified as discontinued, all as determined on a consolidated basis for such Sold Entity.

For the avoidance of doubt, Consolidated EBITDA shall not include any cancellation of indebtedness income arising in connection with the cancellation and discharge of any of the Indebtedness and other liabilities of the Loan Parties in connection with the Cases or otherwise.

"Consolidated Leverage Ratio":  means the ratio of, as of the last day of any fiscal quarter of Holdings,  (a) Consolidated Debt on such day to (b) Consolidated EBITDA for the four (4)-Fiscal Quarter period ending on such  date provided that (i) for the first full fiscal quarter after the Closing Date, for purposes of measuring the Consolidated Leverage Ratio at the end of such fiscal quarter, clause (b) of this definition shall equal the product of Consolidated EBITDA for such fiscal quarter multiplied by 4, (ii) for the second full fiscal quarter after the Closing Date, for purposes of measuring the Consolidated Leverage Ratio at the end of such fiscal quarter, clause (b) of this definition shall equal the product of Consolidated EBITDA for such fiscal quarter multiplied by 2 and (iii) for the third full fiscal quarter after the Closing Date, for purposes of measuring the Consolidated Leverage Ratio at the end of such fiscal quarter, clause (b) of this definition shall equal the product of Consolidated EBITDA for such fiscal quarter multiplied by 4/3.  The Consolidated Leverage Ratio shall not be measured until after the first full fiscal quarter of Holdings is completed.

"Consolidated Net Income":  for any period, the consolidated net income (or loss) of Holdings and its Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Restricted Subsidiary of Holdings or is merged into or consolidated with Holdings or any of its Restricted Subsidiaries, (b) the income (or deficit) of any Person (other than a Restricted Subsidiary of Holdings) in which Holdings or any of its Restricted Subsidiaries has an ownership interest, except to the extent that any such income is actually received by Holdings or such Restricted Subsidiary in the form of dividends or similar distributions, and (c) the undistributed earnings of any Restricted Subsidiary of Holdings to the extent that the declaration or payment of dividends or similar distributions by such Restricted Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other than under any Loan Document) or Requirement of Law applicable to such Restricted Subsidiary.

"Consolidated Total Debt":  at any date, the sum of the aggregate principal amount, without duplication, of all Indebtedness described in clauses (a), (b), (c), (e), (f), (h), (i) and (l) (other than, in the case of clause (h), contingent obligations in respect thereof) of the definition of "Indebtedness" and all Guarantee Obligations thereof of Holdings and its Restricted Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP.

"Consolidated Total Leverage Ratio":  means the ratio of, as of the last day of any fiscal quarter of Holdings,  (a) Consolidated Total Debt on such day to (b) Consolidated EBITDA for the four (4)-Fiscal Quarter period ending on such date provided that (i) for the first full fiscal quarter after the Closing Date, for purposes of measuring the Consolidated Total Leverage Ratio at the end of such fiscal quarter, clause (b) of this definition shall equal the product of Consolidated EBITDA for such fiscal quarter multiplied by 4, (ii) for the second full fiscal quarter after the Closing Date, for purposes of measuring the Consolidated Total Leverage Ratio at the end of such fiscal quarter, clause (b) of this definition shall equal the product of Consolidated EBITDA for such fiscal quarter multiplied by 2 and (iii) for the third full fiscal quarter after the Closing Date, for purposes of measuring the Consolidated Total Leverage Ratio at the end of such fiscal quarter, clause (b) of this definition shall equal the product of Consolidated EBITDA for such fiscal quarter multiplied by 4/3.  The Consolidated Total Leverage Ratio shall not be measured until after the first full fiscal quarter of Holdings is completed.

"Consolidated Working Capital":  at any date, the excess of Consolidated Current Assets on such date over Consolidated Current Liabilities on such date.

"Continuing Directors":  the managers of Holdings on the Closing Date and each other manager or director, if, in each case, such other manager or director's nomination for election to the Board of Directors of Holdings is recommended by a majority of the then Continuing Directors.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Corporate Integrity Agreement": that certain Corporate Integrity Agreement, dated October 15, 2015, by and among the Office of Inspector General of the Department of Health and Human Services and MH.

"Credit Party":  the Administrative Agent or any Lender.

"Debenture Holders":  as defined in the term "TA Debenture Agreement".

"Default":  any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender":  any Lender that (a) has failed, within two Business Days of the date required to be paid, to pay over to any Credit Party any amount required to be paid by it hereunder, (b) has notified the Borrowers or any Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under any agreements in which it commits to extend credit, or (c) has become the subject of a Bankruptcy Event.

"Default Rate": as defined in Section 2.14(c) hereof.

"Disclosure Statement": as defined in the Plan of Reorganization.

"Disposition":  with respect to any property, any sale, license, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof, including without limitation, Asset Sales. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Disqualified Lender": those Persons set forth on Schedule 1.1C (as such list may be supplemented after the Closing Date by the Borrowers in writing to the Administrative Agent and the

Lenders solely to reflect additional competitors of the Borrowers or any Subsidiary thereof); provided, that to the extent persons are identified as Disqualified Lenders after the Closing Date, the inclusion of such Persons as Disqualified Lenders shall not retroactively apply to prior assignments or participations in respect of any Loan hereunder.

"Disregarded Subsidiary":  any direct or indirect Subsidiary of a Foreign Subsidiary.

"DL":  shall mean DeLage Landen Financial Services.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Domestic Subsidiary":  any Subsidiary of Holdings organized under the laws of any jurisdiction within the United States.

"Dutch Auction": an auction of any portion of the Term Loans conducted pursuant to Section 10.6(e) to allow a Purchasing Borrower Party to prepay a portion of the Term Loans at a discount to par value and on a non pro rata basis, in each case in accordance with the applicable Dutch Auction Procedures.

"Dutch Auction Procedures": with respect to the purchase of a portion of the Term Loans by a Purchasing Borrower Party pursuant to Section 10.6(e), Dutch Auction procedures as reasonably agreed upon by such Purchasing Borrower Party and the Administrative Agent.

"Earn-Out Obligations": those payments and payment obligations of the Borrowers and their Restricted Subsidiaries to former owners of assets or businesses which were incurred by the Borrower(s) or one of their Restricted Subsidiaries in connection with the RX Ante Acquisition or a Permitted Acquisition that are in the nature of deferred purchase price, earnouts, holdbacks, or compensation, retention payments, severance payments and bonuses.

"ECF Percentage":  50%.

"Enforceability Exceptions":  as defined in Section 4.4.

"Environmental Laws":  any and all applicable material foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law), and amendments thereto,regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate":  (a) any entity, whether or not incorporated, that is under common control with a Group Member within the meaning of Section 4001(a)(14) of ERISA; (b) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Code of which a Group Member is a member; (c) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Code of which a Group Member is a member; and (d) with respect to any Group Member, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Code of which that Group Member, any corporation described in clause (b) above or any trade or business described in clause (c) above is a member.

13

"ERISA Event":  (a) the failure of any Plan to comply with any material provisions of ERISA and/or the Code (and applicable regulations under either) or with the material terms of such Plan; (b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any Reportable Event; (d) the failure of any Group Member or ERISA Affiliate to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (e) a determination that any Pension Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Section 303 of ERISA); (f) the filing pursuant to Section 412 of the Code or Section 302 of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan; (g) the occurrence of any event or condition which would reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or the incurrence by any Group Member or any  ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Pension Plan; (h) the receipt by any Group Member or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (i) the failure by any Group Member or any of its ERISA Affiliates to make any required contribution to a Multiemployer Plan pursuant to Sections 431 or 432 of the Code; (j) the incurrence by any Group Member or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (k) the receipt by any Group Member or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from a Group Member or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), or terminated (within the meaning of Section 4041A of ERISA); or (l) the failure by any Group Member or any of its ERISA Affiliates to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability under Section 4201 of ERISA.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period, as displayed on the Reuters Screen LIBOR01 Page or LIBOR02 Page (or, in the event such rate does not appear on any of such Reuters pages, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time, as selected by the Administrative Agent in its reasonable discretion; in each case, the "Screen Rate") as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period. In the event that the Screen Rate shall not be available at such time for such Interest Period with respect to Dollars, then the "Eurodollar Base Rate" shall be the Interpolated Rate at such time.  The Eurodollar Base Rate shall be at all times not less than 1.00% with respect to the Closing Date Term Loan.

"Eurodollar Loans": Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Tranche": the collective reference to Eurodollar Loans under a particular Facility the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow": for any Calculation Period, the difference between:

(a) the sum, without duplication, of

(i) Consolidated Net Income for such Calculation Period,

(ii) the amount of all non-cash charges (including, without limitation depreciation and amortization, amortization of original issue discount, non-cash compensation and those other non-cash items more specifically described in clauses (a)(iii), (iv), (v), (vi) and (vii) of the definition of Consolidated EBITDA) deducted in arriving at such Consolidated Net Income,

(iii) decreases in Consolidated Working Capital for such Calculation Period,

(iv) the aggregate net amount of non-cash loss on the Disposition of property by Holdings and its Restricted Subsidiaries during such Calculation Period (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income, and

(v) increases in deferred Taxes to the extent deducted in arriving at such Consolidated Net Income, and

(vi) Expensed Earn-Out Obligations, minus

(b) the sum, without duplication, of

(i) interest expense and interest paid on all Indebtedness permitted under this Agreement;

(ii) the amount of all non-cash credits included in arriving at such Consolidated Net Income,

(iii) the aggregate amount actually paid (or committed to be paid pursuant to a binding contract within six months of such Calculation Period end) by Holdings and its Restricted Subsidiaries in cash during such Calculation Period on account of Capital Expenditures (excluding the principal amount of Indebtedness incurred in connection with such expenditures and any such expenditures financed with the proceeds of any Reinvestment Deferred Amount),

(iv) the aggregate amount of all repayments and prepayments of revolving loans and swingline loans and cash collateralization of letters of credit under the ABL Facility during such Calculation Period to the extent accompanying permanent optional reductions of the revolving commitments under the ABL Facility,

(v) the aggregate amount of all regularly scheduled principal payments of Funded Debt (including the Closing Date Term Loan) of Holdings and its Restricted Subsidiaries made during such Calculation Period (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder),

(vi) increases in Consolidated Working Capital for such Calculation Period,

(vii) the aggregate net amount of non-cash gain on the Disposition of property by Holdings and its Restricted Subsidiaries during such Calculation Period (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such Consolidated Net Income,

(viii) the aggregate amount actually paid by Holdings during such Calculation Period, on account of Taxes,

(ix) decreases in deferred Taxes to the extent included in arriving at such Consolidated Net Income,

(x) cash consideration actually paid in respect of any Permitted Acquisition permitted by Section 7.8(g) during such Calculation Period,

(xi) payments made and reserves taken during such Calculation Period for indemnities and warranties in connection with Dispositions and Investments (including, without limitation, Permitted Acquisitions) permitted under this Agreement,

(xii) payments to option holders in respect of unvested option plans to the extent recorded as an expense in accordance with GAAP;

(xiii) payments made in cash during such Calculation Period in regards to any litigation settlements; and

(xiv) the aggregate amount of all expenses related to the Transactions to the extent paid in cash during such Calculation Period.

For the avoidance of doubt, it is understood and agreed that "Excess Cash Flow" for any Calculation Period may be a negative number, which would reduce the Available ECF Amount for such Calculation Period.

"Excess Cash Flow Application Date":  as defined in Section 2.11(c).

"Excluded Actions": making, entering into, obtaining or doing any of the following (i) deposit account control agreements or similar control agreements with respect to deposit, securities or commodities accounts (x) used primarily for payroll, employee benefit payments or other payments to employees or (y) containing less than $10,000 at all times; (ii) any security agreements, pledge agreements or other security documents under laws of a Foreign Jurisdiction or taking any action to grant or perfect any Lien or security interest (x) in any Collateral (or, with respect to Intellectual Property, registered or applied-for) located in a Foreign Jurisdiction or (y) under the laws of a Foreign Jurisdiction;

16

(iii) the filing of any notices to or obtaining of any acknowledgments or consents from any government agency under the Federal Assignment of Claims Act, applicable Medicare statutes or regulations or other comparable laws or regulations; (iv) acknowledgements of warehousemen, bailees or consignees, or landlord lien waivers, estoppels or collateral access agreements in relation to personal property or fixtures; (v) control agreements or other steps for perfection in relation to investment property (or Investments constituting general intangibles) of which the issuer is not a direct or indirect Subsidiary of Holdings; or (vi) any other actions as to which the Administrative Agent shall determine (solely at the direction of the Required Lenders in their sole discretion), in consultation with the Borrowers, that the cost of obtaining or perfecting a security interest therein is excessive in relation to the value of the security to be afforded thereby.

"Excluded Collateral":

(a)     all Aircraft and all related assets;

(b)     the assets of the Excluded Domestic Subsidiary, any Excluded Foreign Subsidiary or any Unrestricted Subsidiary, and the Capital Stock of the Excluded Domestic Subsidiary or any Unrestricted Subsidiary;

(c)     all property leased from time to time (including, without limitation, all property leased from BALC under the Master Lease Agreement and all property leased from TFS, SDFC and DL) other than the leasehold interests referred to in the definition of Mortgaged Properties;

(d)     all property subject to seller financing, purchase money security interest or similar arrangement permitted by the Loan Documents but only to the extent that the granting of security interest therein is prohibited by the terms thereof (in each case, unless, after giving effect to the applicable "anti-assignment" provisions of the Uniform Commercial Code, the assignment thereof is deemed effective under the applicable Uniform Commercial Code notwithstanding such prohibitions, in which case, such property shall not constitute Excluded Collateral);

(g)     all rights as lessor or lessee under leases (other than the leasehold interests referred to in the definition of Mortgaged Properties); provided that Excluded Collateral shall not include the Proceeds of such leases;

(h)     all leasehold interests other than the leasehold interests referred to in the definition of Mortgaged Properties;

(i)     all motor vehicles and other assets subject to certificates of title; provided that Excluded Collateral shall not include the Proceeds of such vehicles and other assets;

(j)     letter of credit rights in regards to any letter of credit with a face amount of less than $1,000,000;

(k)     commercial tort claims with a value of less than $2,000,000 (determined by the Borrowers in good faith);

(l)     all real property, fixtures and related assets subject to a mortgage or deed of trust in favor of a third party as permitted under this Agreement;

(m)     all contracts, agreements, licenses (including, without limitation, any governmental licenses or state or local franchises, charters and authorizations), rights and privileges and

other assets over which, in each case, the granting of security interests would be prohibited by the terms of such contract, agreement, license, right, privilege or other asset, by a Requirement of Law or by the organizational documents of any non-Wholly-Owned Subsidiary (in each case, after giving effect to the applicable anti "anti-assignment" provisions of the Uniform Commercial Code, other than the proceeds thereof, to the extent that the assignment thereof is deemed effective under the applicable Uniform Commercial Code notwithstanding such prohibitions), except to the extent such Requirement of Law or provision in the organizational documents is ineffective under applicable law or to the extent that the granting of a security interest therein would result in material adverse tax consequences as reasonably determined by the Borrowers; provided further that Excluded Collateral shall not include any Proceeds of any such lease, license, contract, agreement, right, privilege or other asset;

(n)     all present and future fee owned real property with a fair market value of less than $2,500,000;

(o)     equity interests in any Person other than Wholly-Owned Subsidiaries to the extent not permitted by the terms of such Person's organizational or, if applicable, joint venture documents (except to the extent such prohibition is deemed ineffective under the Uniform Commercial Code);

(p)     equity interests in excess of 65% of the voting Capital Stock of (A) any Excluded Foreign Subsidiary, or (B) any Domestic Subsidiary that has no material assets other than the Capital Stock of one or more Foreign Subsidiaries;

(q)     any of the Capital Stock of (A) indirect Foreign Subsidiaries (other than, for the avoidance of doubt, first-tier Foreign Subsidiaries subject to the restrictions in clause (b) or (p) above) or (B) any direct or indirect Domestic Subsidiary of a Foreign Subsidiary;

(r)     all property subject to a Lien as permitted under Section 7.3(l) but only to the extent that the granting of security interest therein is prohibited by the terms thereof (in each case, unless, after giving effect to the applicable "anti-assignment" provisions of the Uniform Commercial Code, the assignment thereof is deemed effective under the applicable Uniform Commercial Code notwithstanding such prohibitions, in which case, such property shall not constitute Excluded Collateral);

(s)     any deposit account or securities account used primarily for payroll, employee benefit payments or other payments to employees and any deposit account holding less than $10,000 at all times; and

(t)     all other assets as to which the Administrative Agent shall determine (solely at the direction of the Required Lenders in their sole discretion), in consultation with the Borrowers, that the cost of obtaining a security interest therein is excessive in relation to the value of the security to be afforded thereby.

"Excluded Domestic Subsidiary":  Pain in the Air (and its successors).

"Excluded Foreign Subsidiary":  any Foreign Subsidiary and any FSHCO in respect of which either (i) the pledge of all of the Capital Stock of such Subsidiary as Collateral or (ii) the guaranteeing by such Subsidiary of the Obligations, in each case, would, in the good faith judgment of the Borrowers, result in material adverse tax consequences to Holdings, MH or any other Group Member. "Excluded Foreign Subsidiary" in any event shall include all Disregarded Subsidiaries.

18

"Excluded Property":  as defined in the Guarantee and Collateral Agreement, and including, without limitation, the Excluded Collateral.

"Excluded Swap Obligations":  with respect to any Guarantor, any Swap Obligation if, and to the extent that, and only for so long as, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, as applicable, such Swap Obligation (or any guarantee thereof) (after giving effect to any keepwell, guaranty or other support agreement) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure to constitute an "eligible contract participant," as defined in the Commodity Exchange Act and the regulations thereunder, at the time the guarantee of (or grant of such security interest by, as applicable) such Guarantor becomes or would become effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one Swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes": any of the following Taxes imposed on or with respect to a Credit Party or required to be withheld or deducted from a payment to a Credit Party, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Credit Party being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan (other than pursuant to an assignment request by the Borrowers under Section 2.22) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.19, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Credit Party's failure to comply with Section 2.19(f) and (d) any U.S. Federal withholding Taxes imposed under FATCA.

"Existing Credit Agreement": as defined in the Recitals hereto.

"Existing Loans": the "Loans" as defined in the Existing Credit Agreement that were owed to the Lenders party hereto on the Closing Date immediately before giving effect to the Closing Date Exchange.

"Expensed Earn-Out Obligations":  as to any period, any Earn-Out Obligations to the extent that they are required to be reported as expenses, depreciation, amortization or other deductions from revenue in arriving at Consolidated Net Income on the financial statements of any Group Member under GAAP in such period.

"Facility":  each of (a) the Closing Date Term Loan and (b) the Incremental Term Loans (the "Incremental Facility").

"FATCA": Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter": that certain "Agent Fee Letter", dated as of [___], 2015, between the [Borrowers] and Credit Suisse AG, Cayman Islands Branch.

"FSHCO": any Domestic Subsidiary substantially all of whose assets are Capital Stock (or Capital Stock and Indebtedness) of one or more Foreign Subsidiaries or other FSHCOs, and cash or Cash Equivalents incidental to the ownership of such Capital Stock and Indebtedness.

"Foreign Jurisdiction": any jurisdiction other than the United States, any state thereof or the District of Columbia.

"Foreign Subsidiary":  any Subsidiary of the Borrowers that is not a Domestic Subsidiary.

"Foreign Benefit Arrangement":  any employee benefit arrangement mandated by non-US law that is maintained or contributed to by any Group Member or any ERISA Affiliate.

"Foreign Plan":  each employee benefit plan (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA) that is not subject to US law and is maintained or contributed to by any Group Member or any ERISA Affiliate.

"Foreign Plan Event":  with respect to any Foreign Benefit Arrangement or Foreign Plan, (a) the failure to make or, if applicable, accrue in accordance with normal accounting practices, any employer or employee contributions required by applicable law or by the terms of such Foreign Benefit Arrangement or Foreign Plan; (b) the failure to register or loss of good standing with applicable regulatory authorities of any such Foreign Benefit Arrangement or Foreign Plan required to be registered; or (c) the failure of any Foreign Benefit Arrangement or Foreign Plan to comply with any material provisions of applicable law and regulations or with the material terms of such Foreign Benefit Arrangement or Foreign Plan.

"Funded Debt":  as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation and, in the case of the Borrowers, Indebtedness in respect of the Loans.

"Funding Office":  the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrowers and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.  In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this

Agreement, then the Borrowers and the Administrative Agent agree to enter into good faith negotiations in order to amend such provisions of this Agreement so as to reflect equitably such Accounting Changes with the desired result that the criteria for evaluating Holdings' financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made. Until such time as such an amendment shall have been executed and delivered by the Borrowers, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred. "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

"Governmental Authority": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members": the collective reference to the Borrowers and their respective Restricted Subsidiaries.

"Guarantee and Collateral Agreement": the Guarantee and Collateral Agreement to be executed and delivered by the Borrowers and each Subsidiary Guarantor, substantially in the form of Exhibit A.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrowers in good faith.

"Guarantors": the collective reference to the Subsidiary Guarantors.

"Gulfstream Aircraft": the Gulfstream G-IV Aircraft bearing manufacturer's serial number 1062 and FAA registration number N619ML.

"Holdings":  as defined in the preamble hereto.

"Increased Facility Activation Date":  any Business Day on which any Lender shall execute and deliver to the Administrative Agent an Increased Facility Activation Notice pursuant to Section 2.24(a).

"Increased Facility Activation Notice":  a notice substantially in the form of Exhibit H-1.

"Increased Facility Closing Date":  any Business Day designated as such in an Increased Facility Activation Notice.

"Incremental Facility":  as defined in the definition of "Facility".

"Incremental Term Lenders":  (a) on any Increased Facility Activation Date relating to Incremental Term Loans, the Lenders signatory to the relevant Increased Facility Activation Notice and (b) thereafter, each Lender that is a holder of an Incremental Term Loan.

"Incremental Term Loans":  any term loans made pursuant to Section 2.24(a).

"Incremental Term Maturity Date":  with respect to the Incremental Term Loans to be made pursuant to any Increased Facility Activation Notice, the maturity date specified in such Increased Facility Activation Notice, which date shall not be earlier than the final maturity of the Closing Date Term Loan Maturity Date.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade and operating payables incurred in the ordinary course of such Person's business and, for the avoidance of doubt, obligations for compensation of employees or redemption of employee stock options shall not be considered "Indebtedness"), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all reimbursement obligations of such Person in respect of drawings or payments made under letters of credit, acceptances, surety bonds and similar arrangements that are not satisfied or converted into indebtedness for borrowing money within two Business Days (or such longer period as shall be provided for in the agreements pursuant to which the same arise) following the date of receipt by such Person of a notice of such drawing or payment, (g) the liquidation value of all mandatorily redeemable preferred Capital Stock issued and outstanding of such Person, (h) Capitalized Earn-Out Obligations, (i) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (j) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, (k) for the purposes of Section 8.1(e) only, all net obligations of such Person in respect of Swap Agreements, and (l) any settlements of claims, investigations, liabilities and/or litigation to the extent payable over more than 90 days.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Taxes":  (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a) above, Other Taxes.

"Insolvent":  with respect to any Multiemployer Plan, the condition that such plan is insolvent within the meaning of Section 4245 of ERISA.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intellectual Property Agreements": as defined in the Guarantee and Collateral Agreement.

"Intercompany Note": that certain Intercompany Subordinated Demand Promissory Note, dated as of the Closing Date, by and among the Loan Parties and their respective Subsidiaries, each as a payor and as a payee.

"Interest Payment Date":  (a) as to any ABR Loan, the last Business Day of each March, June, September and December (or, if an Event of Default is in existence, the last Business Day of each calendar month) to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or less, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and (d) as to any Loan, the date of any repayment or prepayment made in respect thereof.

"Interest Period":  as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months (or twelve months if agreed to by all Lenders) thereafter, as selected by the Borrowers in their notice of borrowing or notice of conversion, as the case may be, given with respect thereto provided that the initial Interest Period in regards to the Closing Date Term Loan deemed made on the Closing Date shall commence on the Closing Date and end on January 31, 2016; and (b) thereafter, each period commencing on the last day of the preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months (or twelve months if agreed to by all Lenders) thereafter, as selected by the Borrowers by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)      if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)      the Borrowers may not select an Interest Period under a particular Facility that would extend beyond the date final payment is due on the relevant Term Loan, as the case may be;

(iii)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(iv)    the Borrowers shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"Interpolated Rate": at any time, for any Interest Period, the rate per annum determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the Screen Rate for the longest period (for which Screen Rate is available in Dollars) that is shorter than the Interest Period for which the Screen Rate is not available and (b) the Screen Rate for the shortest period (for which Screen Rate is available in Dollars) that exceeds the Interest Period for which the Screen Rate is not available, in each case, as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period.

"Investments":  as defined in Section 7.8.

"IRS":  the United States Internal Revenue Service.

"Lenders":  as defined in the preamble hereto.

"Lien":  any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan":  any loan made by any Lender pursuant to this Agreement.

"Loan Documents":  this Agreement, the Security Documents, the Notes, any ABL Intercreditor Agreement and any Second Lien Intercreditor Agreement (in each case to the extent in effect) and any amendment, restatement, amendment and restatement, waiver, supplement or other modification to any of the foregoing.

"Loan Parties":  each Group Member that is a party to a Loan Document (other than the Intercompany Note).

"Majority Facility Lenders":  with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans under such Facility.

"Master Lease Agreement":  the Master Lease Agreement, dated as of July 13, 2011, between Banc of America Leasing & Capital, LLC, a Delaware limited liability company ("BALC"), as lessor, and MH, as lessee, as amended through the Closing Date.

"Master Restructuring Agreement": as defined in the Disclosure Statement as in effect on the date hereof.

"Material Adverse Effect":  a material adverse effect on (a) the business, property, financial condition or results of operations of Holdings and its Subsidiaries taken as a whole or (b) the

validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"Material Subsidiary": at any date of determination, a Subsidiary of Holdings (a) whose total assets at the date of the most recent consolidated balance sheet included in the financial statements delivered pursuant to Section 5.1(d) or Section 6.1 were equal to or greater than 5% of the consolidated total assets of Holdings and its Subsidiaries at such date or (b) whose gross revenues for the most recent fiscal period covered in the consolidated statement of income included in the financial statements delivered pursuant to Section 5.1(d) or Section 6.1 were equal to or greater than 5% of the consolidated gross revenues of Holdings and its Subsidiaries for such period, in each case determined in accordance with GAAP.

"Materials of Environmental Concern":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including, but not limited to, asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Members Debt": as defined in the Existing Credit Agreement.

"MH": as defined in the Preamble hereto.

"Millennium Holdings": Millennium Lab Holdings, Inc., a Delaware corporation.

"Minimum Liquidity":  at any time, the sum of the Borrowers' unrestricted cash and Cash Equivalents (as such sum is determined under GAAP) and the amount available to be drawn by the Borrowers under the ABL Facility.

"MNPI": any information regarding the Borrowers, their Subsidiaries or their Affiliates, or the Borrowers' assets, their ability to perform their Obligations or any other matter that would reasonably be expected to be material to a decision by any Lender to participate in any Dutch Auction or assign or acquire any portion of the Closing Date Term Loan or to enter into any of the transactions contemplated thereby and that has not previously been disclosed to the Administrative Agent and the Lenders.

"Moody's": Moody's Investors Service, Inc. or any successor thereto.

"Mortgaged Properties":  the leasehold interests in real property listed on Schedule 1.1B, and any real property which is required to be subject to Mortgage pursuant to Section 6.9(b).

"Mortgages":  each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Lenders, in form and substance reasonably acceptable to the Administrative Agent (at the direction of the Required Lenders).

"Multiemployer Plan":  a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received in cash or Cash Equivalents), net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien not prohibited hereunder on any asset that is the subject of such Asset

Sale or Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith."New Lender": as defined in Section 2.24(c).

"New Lender Supplement": as defined in Section 2.24(c).

"Non ABL Collateral": all Collateral other than the ABL Collateral.

"Non-Loan Party Investments": as defined in the definition of "Permitted Acquisition" set forth in this Section 1.1.

"No MNPI Representation": by a Person, a representation that such Person is not in possession of any MNPI that has not been disclosed to the Lenders generally (other than those Lenders who have elected to not receive any non-public information with respect to the Group Members).

"Non-U.S. Lender": (a) if either Borrower is a U.S. Person, a Lender, with respect to the Borrower, that is not a U.S. Person, and (b) if the Borrowers are not U.S. Persons, a Lender, with respect to the Borrowers, that is resident or organized under the laws of a jurisdiction other than that in which the Borrowers are resident for tax purposes.

"Notes": the collective reference to any promissory note evidencing Loans.

"Obligations": the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrowers, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrowers to the Administrative Agent, to any Lender (or, in the case of Specified Swap Agreements and Specified Cash Management Agreements, any affiliate of any Lender) and/or to any other Person or entity as set forth herein, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, any Specified Swap Agreement, any Specified Cash Management Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrowers pursuant to the terms hereof and/or of any of the foregoing agreements) or otherwise.

"Old Holdco": as defined in the Recitals hereto.

"Organizational Documents": (i) with respect to any corporation or company, its certificate, memorandum or articles of incorporation, organization or association, as amended, and its bylaws, as amended, (ii) with respect to any limited partnership, its certificate or declaration of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, (iv) with respect to any limited liability company, its articles of organization or certificate of formation, as amended, and its operating agreement or limited liability company agreement, as amended or (v) with respect to any of the foregoing, the equivalent or comparable constitutive documents with respect to any non-US jurisdiction. In the event any term or

condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes":  with respect to any Credit Party, Taxes imposed as a result of a present or former connection between such Credit Party and the jurisdiction imposing such Tax (other than connections arising from such Credit Party having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes":  all present or future stamp, court, or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.22).

"Pain in the Air":  Pain In The Air, LLC, a California limited liability company and Wholly Owned Subsidiary of the Borrowers.

"Participant":  as defined in Section 10.6(c).

"Participant Register":  as defined in Section 10.6(c).

"Patriot Act":  as defined in Section 10.17.

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA or any successor entity performing similar functions.

"Pension Plan":  any Plan subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA.

"Permitted Acquisition":  any acquisition (including, without limitation, by way of merger or consolidation) by the Borrower(s) or a Subsidiary Guarantor of all or substantially all the assets of, or all the Capital Stock in, a Person or a business unit, division or line of business of a Person, other than such acquisition of, or of the assets or Capital Stock of, any Loan Party, if (a) such acquisition was not effected pursuant to a hostile offer, (b) such acquired Person, division or line of business of a Person is, or is engaged in, any business or business activity conducted by the Borrowers and their Subsidiaries on the Closing Date, any business or business activities incidental or related thereto, or any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto, (c) other than in the case of the Excluded Domestic Subsidiary, an Excluded Foreign Subsidiary or an Unrestricted Subsidiary, and except as permitted by Section 7.5(f), within 30 days after the consummation of such acquisition, all property, assets and business (other than Excluded Property) acquired in such acquisition shall constitute Collateral and any newly created or acquired Subsidiary shall be 100% owned directly or indirectly by the Borrowers and shall become a Subsidiary Guarantor pursuant to and to the extent required by Section 6.9, (d) immediately before and immediately after giving effect thereto:  (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom; (ii) all transactions related thereto shall be consummated in accordance in all material respects with applicable laws; and (iii) (A) (x) Holdings shall be in pro forma compliance, immediately after giving effect to such acquisition, with the covenant contained in Section 7.1(y) the Consolidated Leverage Ratio of Holdings and its Restricted Subsidiaries shall not be greater, calculated on a  pro forma basis,

than 4.6 to 1.0 and (z) the Consolidated Total Leverage Ratio of Holdings and its Restricted Subsidiaries shall not be greater, calculated on a pro forma basis, than 5.25 to 1.0, in the case of each of the Consolidated Leverage Ratio and Consolidated Total Leverage Ratio, recomputed as at the last day of the most recently ended fiscal quarter of Holdings, and, in the case of clauses (x), (y) and (z) immediately above, Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, together with all relevant financial information for such acquisition, and (B) any acquired or newly formed Restricted Subsidiary of the Borrowers shall not be liable for any Indebtedness (except for the Obligations and Indebtedness permitted by Sections 7.2(h) and 7.2(i)); provided that notwithstanding the foregoing, the aggregate Investments (made in connection with consummating Permitted Acquisition(s)) made by Loan Parties in Persons that will not be a Loan Party after giving effect to such Permitted Acquisition(s) (and assets acquired as part of Permitted Acquisition(s) that are not owned by a Loan Party after giving effect to such Permitted Acquisition(s)) (such acquired Person(s) not constituting a Loan Party and/or assets not owned by a Loan Party, in each case, after giving effect to the applicable Permitted Acquisition(s), the "Non-Loan Party Investments"), in each case, shall not exceed an amount equal to $25,000,000 (after giving effect to such Non-Loan Party Investment) minus any Investments made in accordance with Section 7.8(h).

"Permitted Second Priority Indebtedness": any secured Indebtedness incurred by the Borrower(s) or any Loan Party in the form of one or more series of junior lien secured notes or junior lien secured loans; provided that (i) such Indebtedness is secured by the Collateral on a junior basis with the Obligations (and the Indebtedness permitted under Section 7.2(o) hereof) and is not secured by any property or assets of Holdings or any Restricted Subsidiary other than the Collateral, (ii) such Indebtedness does not have scheduled amortization or mandatory redemption or prepayment features (other than customary asset sale, Recovery Event, change of control provisions and events of default) that could result in the redemptions, amortization or prepayments of such Indebtedness prior to the latest maturity of the Term Loans, (iii) the collateral agent or other similar representative of the holders of such Indebtedness shall have become party to an intercreditor agreement (the "Second Lien Intercreditor Agreement") with the Administrative Agent (executed by the Administrative Agent at the written direction of the Required Lenders) in form and substance satisfactory to the Administrative Agent and the Required Lenders, and (iv) immediately before and immediately after giving effect to such incurrence no Default or Event of Default shall have occurred and be continuing or would result therefrom.

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": any employee benefit plan as defined in Section 3(3) of ERISA, including any employee welfare benefit plan (as defined in Section 3(1) of ERISA), any employee pension benefit plan (as defined in Section 3(2) of ERISA but excluding any Multiemployer Plan), and any plan which is both an employee welfare benefit plan and an employee pension benefit plan, and in respect of which any Group Member or any ERISA Affiliate is (or, if such Plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in section 3(5) of ERISA or to which any Group Member or ERISA Affiliate has any actual or contingent liability.

"Plan Effective Date": the date after which the Confirmation Order shall have become a final order and that all of the conditions precedent to the effectiveness of the Plan of Reorganization shall have been satisfied or waived in accordance with the terms thereof and the terms of the Restructuring Support Agreement.

"Plan of Reorganization": that certain Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al. dated October 29, 2015, filed with and confirmed by the Bankruptcy Court without material modification in connection with the Cases.

"Platform": as defined in Section 10.2.

"Prime Rate":  the rate of interest per annum announced from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by the Administrative Agent in connection with extensions of credit to debtors).

"Pro Forma Balance Sheet":  as defined in Section 4.1(a).

"Pro Rata Share": the aggregate principal amount of the Existing Loans owed to a lender under the Existing Credit Agreement divided by the aggregate principal amount of all Existing Loans owed to the lenders under the Existing Credit Agreement.

"Proceeds" as defined in the Guarantee and Collateral Agreement.

"Prohibited Transaction":  as defined in Section 406 of ERISA and Section 4975(c) of the Code.

"Projections":  as defined in Section 6.2(c).

"Properties":  as defined in Section 4.17(a).

"Public Lender":  as defined in Section 10.2.

"Purchasing Borrower Party":  Holdings or any Subsidiary of Holdings that becomes an Assignee pursuant to Section 10.6.

"Qualified IPO":  means the first issuance by Holdings (or any direct or indirect parent company of Holdings) of its common equity in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering), as a result of which such common equity is listed on a nationally-recognized stock exchange in the United States.

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member that constitutes a Domestic Subsidiary (other than a FSHCO).

"Refinancing Amendment":  as defined in Section 10.1.

"Register":  as defined in Section 10.6(b).

"Regulation T":  Regulation T of the Board as in effect from time to time.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reinvestment Deferred Amount":  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Group Member that constitutes a Domestic Subsidiary

29

(other than a FSHCO) in connection therewith that are not applied to prepay the Term Loans as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event":  any Asset Sale or Recovery Event in respect of which the Borrowers have delivered a Reinvestment Notice.

"Reinvestment Notice":  a written notice executed by a Responsible Officer stating that no Event of Default has occurred and is continuing and that the Borrowers (directly or indirectly through a Subsidiary) intend and expect to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event to acquire or repair assets useful in its business.

"Reinvestment Prepayment Amount":  with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the Borrowers' business.

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (a) (i) the date occurring twelve months after such Reinvestment Event or (ii) with respect to any Net Cash Proceeds attributable to such Reinvestment Event which have been committed pursuant to a binding contract to acquire or repair assets useful in the Borrowers' business by the date set forth in clause (a)(i), the date occurring eighteen months after such Reinvestment Event and (b) the date on which the Borrowers shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the Borrowers' business with all or any portion of the relevant Reinvestment Deferred Amount.

"Relevant Four Fiscal Quarter Period":  as defined in Section 8.2.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Replaced Term Loans":  as defined in Section 10.1.

"Replacement Term Loans":  as defined in Section 10.1.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than (i) the commencement of the Cases and (ii) those events as to which notice is waived pursuant to DOL Reg. Section 4043 as in effect on the Closing Date (no matter how such notice requirement may be changed in the future).

"Required Lenders":  at any time, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans then outstanding.

"Requirement of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  the chief executive officer, president or chief financial officer of either Borrower, but in any event, with respect to financial matters, the chief financial officer of the Borrowers.

"Restricted Payments":  as defined in Section 7.6.

"Restricted Subsidiary": any Subsidiary of the Borrowers that is not an Unrestricted Subsidiary.

"Restructuring Support Agreement": that certain Restructuring Support Agreement dated as of October 14, 2015 by and between Old Holdco, MH and its Subsidiaries, the undersigned Lenders thereto, Millennium Holdings and TA Millennium, Inc.

"Restructuring Term Sheet": as defined in the Disclosure Statement.

"RX Ante Acquisition":  the acquisition of 100% of the Capital Stock of RX Ante, Inc., which occurred on December 23, 2013.

"S&P": Standard & Poor's Financial Services LLC or any successor thereto.

"Sanctioned Country": at any time, a country or territory which is, or whose government is, the subject or target of any comprehensive Sanctions (currently, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person": at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State, the European Union, Her Majesty's Treasury, the United Nations Security Council, or other relevant sanctions authority (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person.

"Sanctions": economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by the U.S. government, including those administered by OFAC or the U.S. Department of State, the European Union, Her Majesty's Treasury, the United Nations Security Council, or other relevant sanctions authority.

"Screen Rate":  as defined in the definition of Eurodollar Base Rate.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Second Lien Intercreditor Agreement": as defined in the definition of Permitted Second Priority Indebtedness.

"Secured Parties": as defined in the Guarantee and Collateral Agreement.

"Securities Act": means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Documents":  the collective reference to the Guarantee and Collateral Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"SDFC":  Siemens Diagnostic Finance Co. LLC.

"Solvent":  when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of

such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature.  For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"Special Members Loan": as defined in the Existing Credit Agreement.

"Specified Cash Management Agreement":  any agreement providing for Cash Management Arrangements between the Borrowers or any Guarantor and any Person that is or was the Administrative Agent, a Lender or an affiliate of the Administrative Agent or a Lender at the time it provides Cash Management Arrangements to the Borrowers or affiliate thereof; provided, that such affiliate shall appoint the Administrative Agent as its agent and agree to be bound by the Loan Documents as a Secured Party, subject to Section 9.12.

"Specified Swap Agreement": any Swap Agreement in respect of interest rates entered into by the Borrowers or any Guarantor and any Person that is or was the Administrative Agent, a Lender or an affiliate of the Administrative Agent or a Lender at the time such Swap Agreement is entered into; provided, that the aggregate notional amount of such Swap Agreements shall not exceed fifty-percent (50%) of the aggregate principal amount of the Closing Date Term Loan outstanding as of the Closing Date.

"Specified Equity":  any equity security (which term shall include limited liability company membership interests and partnership interests, whether or not constituting a "security" under the Uniform Commercial Code) (i) having no mandatory redemption, repurchase or similar requirements (including at the option of the holders thereof, and including pursuant to a sinking fund obligation or otherwise) prior to 91 days after the latest maturity of the Term Loans (as in effect at the time of the issuance of such equity security) (unless such equity security by its terms provides that such equity security shall not be required to be repurchased unless permitted by this Agreement or unless the Term Loans have been repaid in full at least 91 days prior to the date of such required repurchase), (ii) upon which all dividends or distributions (if any) required to be paid shall, prior to 91 days after the latest maturity date of the Term Loans be payable solely in additional shares of such equity security (or other equity securities meeting the conditions specified in clauses (i), (ii) and (iii)) and (iii) which cannot, at the option of the holder thereof, be converted or exchanged for Indebtedness or other equity security not meeting the conditions of Specified Equity prior to 91 days after the latest maturity date of the Term Loans (as in effect at the time of the issuance of such equity security).

"Specified Equity Contribution": as defined in Section 8.2 hereof.

"Specified Representations": (a) in relation to Holdings and its Restricted Subsidiaries, the representations and warranties of the Borrowers set forth in Sections 4.2 (but subject to the limitations set forth therein), 4.3, 4.4, 4.5, 4.11, 4.14, 4.22, 4.23 and 4.24, and compliance with the applicable requirements for such Permitted Acquisition set forth in Section 7.8, and (b) in relation to the target company or assets of any Permitted Acquisition, such of the representations and warranties made by or on

behalf of such target company in the related purchase and sale or other acquisition agreement as are material to the interests of the Lenders, but only to the extent that the Borrowers or their Affiliate have the right to terminate their obligations under such acquisition agreement (or decline to consummate the Permitted Acquisition) as a result of a breach of such representations in such acquisition agreement.

"Subordinated Indebtedness":  Indebtedness the payment of which is subordinated to the payment of the Obligations.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrowers.

"Subsidiary Guarantor":  each Restricted Subsidiary of the Borrowers (other than MH) other than any Excluded Foreign Subsidiary, the Excluded Domestic Subsidiary and any Unrestricted Subsidiary.

"Swap": any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(27) of the Commodity Exchange Act.

"Swap Agreement":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrowers or any of its Subsidiaries shall be a "Swap Agreement".

"Swap Obligation": with respect to any Person, any obligation to pay or perform under any Swap.

"TA Debenture Agreement":  the Amended and Restated Debenture Purchase and Stock Redemption Agreement dated as of March 29, 2012, among the lenders party thereto (the "Debenture Holders"), TA Associates, L.P., as representative of the Debenture Holders, Millennium Holdings, MH, the guarantors named therein and the selling stockholders named therein, as in effect immediately prior to the Closing Date (as defined in the Existing Credit Agreement).

"Taxes": all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Lenders": the collective reference to the Closing Date Term Lenders and the Incremental Term Lenders.

"Term Loan Prepayment Amount": as defined in Section 2.11(e).

"Term Loans": the collective reference to the Closing Date Term Loan and the Incremental Term Loans.

"Term Percentage":  as to any Term Lender at any time, the percentage which the aggregate principal amount of such Lender's Term Loans under the relevant Facility then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding under the relevant Facility.

"TFS": Thermo Fisher Scientific.

"Transactions": collectively, (a) the execution and delivery of the Loan Documents, the creation of Liens pursuant to the Security Documents and the making of the Loans on the Closing Date, (b) the Closing Date Exchange, the cancellation of the Existing Loans  and the termination of all Liens securing the Obligations (as defined in the Existing Credit Agreement), in each case, pursuant to the Plan of Reorganization, (c) consummation of the Restructuring Transactions (as defined in the Plan of Reorganization) and (d) the payment of fees and expenses in connection with the foregoing.

"Transferee":  any Assignee or Participant.

"Trustee Loan Documents": as defined in Section 7.8(m).

"Trustee Loans": as defined in Section 7.8(m).

"Type":  as to any Loan, its nature as an ABR Loan or a Eurodollar Loan as of a particular time.

"United States":  the United States of America.

"Unrestricted Subsidiary":  any Subsidiary of the Borrowers that (i) is not a Material Subsidiary and (ii) has been designated by the Board of Directors of the Borrowers as an Unrestricted Subsidiary pursuant to Section 6.13 subsequent to the Closing Date; provided that, at any date of determination, (a) the aggregate total assets of all Unrestricted Subsidiaries at the date of the most recent consolidated balance sheet included in the financial statements delivered pursuant to Section 5.1(d) or Section 6.1 does not exceed 25% of the consolidated total assets of Holdings and its Subsidiaries as of such date and (b) the aggregate gross revenues of all Unrestricted Subsidiaries for the most recent fiscal period covered in the consolidated statement of income included in the financial statements delivered pursuant to Section 5.1(d) or Section 6.1 does not exceed 25% of the consolidated gross revenues of Holdings and its Subsidiaries for such period, in each case determined in accordance with GAAP.

"Unsecured Working Capital Facility":  as defined in Section 7.2(v).

"U.S. Person": a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate": as defined in Section 2.19(f)(ii)(B)(3).

"Wholly Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

34

"Wholly Owned Subsidiary Guarantor": any Subsidiary Guarantor that is a Wholly Owned Subsidiary of the Borrowers.

"Withdrawal Liability": any liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

1.2     Other Definitional Provisions.

(a)     Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)     As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP  (provided that (x) all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Holdings or any Subsidiary at "fair value", as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof and (y) all leases of Holdings and its Subsidiaries that are treated as operating leases for purposes of GAAP as in effect on the Closing Date shall continue to be accounted for as operating leases for purposes of the defined financial terms under this Agreement regardless of any change to GAAP following the Closing Date which would otherwise require such leases to be treated as capital leases (it being understood that this clause (y) shall not affect Holdings and its Subsidiaries' financial reporting)), (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

SECTION 2.     AMOUNT AND TERMS OF LOANS

2.1     <u>Closing Date Term Loan</u> .  Subject to the terms and conditions hereof, each Closing Date Term Lender shall receive, among other consideration, its Closing Date Term Loan Percentage of the term loans deemed made to the Borrowers hereunder on the Closing Date (the "<u>Closing Date Term Loan</u>"), in return for the irrevocable cancellation and termination of such Lender's Existing Loans pursuant to the Plan of Reorganization.  The Closing Date Term Loan may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrowers and notified to the Administrative Agent in accordance with Sections 2.2 and 2.12.

2.2     <u>Initial Type of Term Loan</u>.  The Closing Date Term Loan shall be deemed made on the Closing Date and shall initially be a Eurodollar Loan.  For the avoidance of doubt, the Lenders shall not be required to fund any portion of the Closing Date Term Loan as such Closing Date Term Loan shall be deemed made on the Closing Date in return for the cancellation of the Existing Loans pursuant to the Plan of Reorganization.

2.3     <u>Repayment of Term Loan</u>.  The Closing Date Term Loan shall be payable in consecutive quarterly installments by the Borrowers on the last day of March, June, September and December of each year, commencing on March 31, 2016, each of which shall be in the amount set forth below opposite such installment; <u>provided</u>, however, that if the date set forth below shall not be a Business Day, such payment shall be made on the immediately preceding Business Day:

| Installment | Principal Amount |
|---|---|
| March 31, 2016 | $1,500,000 |
| June 30, 2016 | $1,500,000 |
| September 30, 2016 | $1,500,000 |
| December 31, 2016 | $1,500,000 |
| March 31, 2017 | $1,500,000 |
| June 30, 2017 | $1,500,000 |
| September 30, 2017 | $1,500,000 |
| December 31, 2017 | $1,500,000 |
| March 31, 2018 | $1,500,000 |
| June 30, 2018 | $1,500,000 |
| September 30, 2018 | $1,500,000 |
| December 31, 2018 | $1,500,000 |
| March 31, 2019 | $1,500,000 |
| June 30, 2019 | $1,500,000 |
| September 30, 2019 | $1,500,000 |
| December 31, 2019 | $1,500,000 |
| March 31, 2020 | $1,500,000 |
| June 30, 2020 | $1,500,000 |
| September 30, 2020 | $1,500,000 |
| [December 31, 2020] | $1,500,000 |
| Closing Date Term Loan Maturity Date | Aggregate principal amount of Closing Date Term Loan outstanding |

2.4     <u>Joint and Several Liability</u>.  The Borrowers shall be jointly and severally liable for all of the Obligations and all other obligations under the Loan Documents.

2.5     [Intentionally Omitted].

2.6     [Intentionally Omitted].

2.7     [Intentionally Omitted].

2.8     Fees.

(a)     Reserved.

(b)     The Borrowers agree to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in the Fee Letter and to perform any other obligations contained therein.

2.9     [Intentionally Omitted].

2.10    Optional Prepayments.

(a)     The Borrowers may at any time and from time to time prepay the Loans (the Loans and Type to be prepaid may be selected by the Borrowers in their sole and subjective discretion), in whole or in part, without premium or penalty, upon irrevocable (or if consented to by the Administrative Agent, revocable) notice delivered to the Administrative Agent no later than 11:00 A.M., New York City time, three Business Days prior thereto, in the case of Eurodollar Loans, and no later than 11:00 A.M., New York City time, one Business Day prior thereto, in the case of ABR Loans, which notice shall specify the date and amount of prepayment and whether the prepayment is of Eurodollar Loans or ABR Loans; provided, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrowers shall also pay any amounts owing pursuant to Section 2.20. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid.  Partial prepayments of Term Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof, except that if the balance of the Term Loans is less than $1,000,000, then prepayment of such lesser amount shall be permitted.

(b)     Reserved.

2.11    Mandatory Prepayments.

(a)     If any Indebtedness shall be issued or incurred by the Borrowers or any Guarantor (excluding any Indebtedness incurred in accordance with Section 7.2), an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of such issuance or incurrence toward the prepayment of the Term Loans as set forth in Section 2.11(d).

(b)     If on any date the Borrowers, any Guarantor or, in relation to the Gulfstream Aircraft only, Pain in the Air, shall receive Net Cash Proceeds from any Asset Sale or Recovery Event then, unless a Reinvestment Notice shall be delivered in respect thereof, such Net Cash Proceeds shall be applied on such date toward the prepayment of the Term Loans as set forth in Section 2.11(d); provided, that, notwithstanding the foregoing, on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Term Loans as set forth in Section 2.11(d).

(c)        If, for any Calculation Period, there shall be Excess Cash Flow, the Borrowers shall, on the relevant Excess Cash Flow Application Date, apply to prepay the Term Loans the excess of (i) the ECF Percentage of such Excess Cash Flow over (ii) the sum of all voluntary prepayments of Term Loans during such Calculation Period;  provided that, notwithstanding the foregoing or any other provisions herein, the amount of any such payment required to be made for a Calculation Period shall be reduced by the amount necessary to enable the Borrowers to maintain Minimum Liquidity of $100,000,000 on the Excess Cash Flow Application Date (after giving effect to the making of any payment under this Section 2.11(c)).  Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than five days after the earlier of (i) the date 30 days after the date on which the financial statements of Holdings referred to in Section 6.1(a) for the Calculation Period with respect to which such prepayment is made, are required to be delivered to the Lenders and (ii) the date such financial statements are actually delivered.  There shall be no prepayment pursuant to this Section 2.11(c) for any Calculation Period ending prior to the Calculation Period ending on December 31, 2016.

(d)        Amounts to be applied in connection with prepayments made pursuant to Section 2.11 shall be applied to the prepayment of the Term Loans in accordance with Section 2.17(b).  Unless the Borrowers and the Administrative Agent agree otherwise, and except as otherwise expressly provided above to the contrary, the application of any prepayment pursuant to Section 2.11 shall be made, first, to ABR Loans and, second, to Eurodollar Loans in a manner that minimizes the amount of any payments required to be made by the Borrowers pursuant to Section 2.20; provided that, without modifying Section 2.17(b) hereof, if any Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.11(e), the portion of such prepayment that is not waived shall be applied on a pro rata basis to the then outstanding Term Loans being prepaid irrespective of whether such outstanding Term Loans are ABR Loans or Eurodollar Loans (but, for the avoidance of doubt, not including the Term Loans of any Lender(s) who rejected such prepayment in accordance with Section 2.11(e) hereof).  Each prepayment of the Term Loans under Section 2.11 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid.

(e)        Notwithstanding anything to the contrary in Section 2.11(c), 2.11(d) or 2.17, the Borrowers may, in lieu of applying the amounts referred to above in this Section 2.11 (the "Term Loan Prepayment Amount") to the prepayment of Term Loans as provided in paragraph (d) above, on the date specified in Section 2.11 for such prepayment, give the Administrative Agent telephonic notice (promptly confirmed in writing) requesting that the Administrative Agent prepare and provide to each Term Lender a notice (each, a "Prepayment Option Notice") as described below.  As promptly as practicable after receiving such notice from the Borrowers, the Administrative Agent will send to each Term Lender a Prepayment Option Notice, which shall include an offer by the Borrowers to prepay on the date (each a "Mandatory Prepayment Date") that is 10 Business Days after the date of the Prepayment Option Notice, the relevant Term Loans of such Lender by an amount equal to the portion of the Term Loan Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Term Loans, the entire prepayment amount, such Lender's pro rata share of such prepayment, the option to such Lender to decline such prepayment, and the deadline for such Lender to decline the prepayment amount. On the Mandatory Prepayment Date, (i) the Borrowers shall pay to each Term Lender who has not declined such prepayment the aggregate amount necessary to prepay the outstanding relevant Term Loans of such Term Lender in an amount equal to such Lender's portion of the Term Loan Prepayment Amount and (ii) the Borrowers shall be entitled to retain the portion of the Term Loan Prepayment Amount declined by the relevant Term Lenders (such amount, the "Declined Prepayment Amount") (it being understood that in order for such prepayment to be effectively declined by any Lender, such Lender must advise the Administrative Agent and the Borrowers, in writing, of its election to decline such prepayment, prior to the Mandatory Prepayment Date).

38

(f)     Notwithstanding anything to the contrary in this Agreement, so long as no Default or Event of Default has occurred and is continuing, the Borrowers may request that any Term Loan Prepayment Amount be paid to the Administrative Agent but not applied to any Loans until such prepayment can be made at a time and in a manner that will avoid any breakage costs that would be required to be reimbursed by the Borrowers pursuant to Section 2.20; provided that, for the avoidance of doubt, interest will continue to accrue on the Term Loan Prepayment Amount until the date that such prepayment is actually applied to the Loans.

2.12    Conversion and Continuation Options.

(a)     The Borrowers may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date, provided that any such conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto.  The Borrowers may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), provided that no ABR Loan under a particular Facility may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Majority Facility Lenders in respect of such Facility have determined in their sole discretion not to permit such conversions.  If no Interest Period is specified in any such notice with respect to any conversion to a Eurodollar Loan, the Borrowers shall be deemed to have selected an Interest Period of one month's duration.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)     Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrowers giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan under a particular Facility may be continued as such (i) when any Event of Default has occurred and is continuing and the Majority Facility Lenders in respect of such Facility have determined in their sole discretion not to permit such continuations or (ii) if an Event of Default specified in clause (i) or (ii) of Section 8.1(f) with respect to the Borrowers is in existence, and provided, further, that if the Borrowers shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR Loans on the last day of such then expiring Interest Period.   If no Interest Period is specified in any such notice with respect to any continuation as a Eurodollar Loan, the Borrowers shall be deemed to have selected an Interest Period of one month's duration.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.13    Limitations on Eurodollar Tranches.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $5,000,000 or a whole multiple of $1,000,000 in excess thereof and (b) no more than five Eurodollar Tranches shall be outstanding at any one time.

2.14    Interest Rates and Payment Dates.

(a)        Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)        Each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)        Upon the occurrence of any Event of Default hereunder, at the direction of the Administrative Agent (which shall solely be at the direction of the Required Lenders, in their sole and absolute discretion), all Obligations shall bear interest at a rate per annum equal (x) in the case of Loans, to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% per annum and, (y) in the case of any other Obligations (including all fees, costs and expenses outstanding hereunder), to the rate then applicable to ABR Loans, plus 2% per annum (the rate in clause (x) or clause (y), as applicable, the "Default Rate"), in each case from the date on which the Event of Default initially occurred (or such later date in Required Lenders' sole discretion), whether or not the Administrative Agent imposes the Default Rate immediately upon the occurrence of such Event of Default or at a later date.

(d)        Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand..

2.15    Computation of Interest and Fees.

(a)        Interest and fees payable pursuant hereto shall be calculated on the basis of a 360- day year for the actual days elapsed, except that, with respect to ABR Loans, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed (including the first day but excluding the last day).  The Administrative Agent shall as soon as practicable notify the Borrowers and the relevant Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurodollar Rate shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify the Borrowers and the relevant Lenders of the effective date and the amount of each such change in interest rate.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall bear interest for one day.

(b)        Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrowers and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Borrowers, deliver to the Borrowers a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.14(a).

2.16    Inability to Determine Interest Rate.  If prior to the first day of any Interest Period:

(a)        the Administrative Agent shall have reasonably determined (which determination shall be conclusive and binding upon the Borrowers) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)       the Administrative Agent shall have received notice from the Majority Facility Lenders in respect of the relevant Facility that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders absent manifest error or bad faith) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrowers and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurodollar Loans under the relevant Facility requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans under the relevant Facility that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans under the relevant Facility shall be converted, on the last day of the then-current Interest Period, to ABR Loans.  Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Facility shall be made or continued as such, nor shall the Borrowers have the right to convert Loans under the relevant Facility to Eurodollar Loans.

2.17    Pro Rata Treatment and Payments.

(a)       Each payment by the Borrowers on account of any fee shall be made pro rata according to the respective Term Percentages of the relevant Lenders.

(b)       Each payment (including each prepayment) by the Borrowers on account of principal of and interest on the Term Loans shall be made ratably among the relevant Facilities for the Term Loans pro rata according to the respective outstanding principal amounts of the Term Loans then held by the Term Lenders under the relevant Facility (except as otherwise provided in Section 2.11(e)).  The amount of each optional prepayment of Term Loans made pursuant to Section 2.10 shall be applied to the scheduled installments thereof as directed by the Borrowers.  The amount of each mandatory prepayment of the Term Loans made pursuant to Section 2.11 shall be applied ratably among the relevant Facilities for the Term Loans, first, to accrued interest and any amounts owing pursuant to Section 2.20, if any, with respect to such prepayment, second, to scheduled installments thereof occurring within the next 24 months in direct order of maturity and third, ratably to the then remaining installments thereof (other than the installment due at the Closing Date Term Loan Maturity Date or the relevant maturity date of the other applicable Term Loans), unless no installments prior to the final installment remain outstanding).  Amounts prepaid on account of the Term Loans may not be reborrowed.

(c)       Reserved.

(d)       All payments (including prepayments) to be made by the Borrowers hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  The Administrative Agent shall distribute such payments to each relevant Lender promptly upon receipt in like funds as received, net of any amounts owing by such Lender pursuant to Section 9.7 (which reduction shall not affect the deemed satisfaction of the payment made by the Borrowers).  If any payment hereunder (other than payments on the Eurodollar Loans or as otherwise expressly provided herein, including, without limitation, Section 2.3 hereof) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension

would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(e)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to ABR Loans under the relevant Facility, on demand, from the Borrowers.

(f)     Unless the Administrative Agent shall have been notified in writing by the Borrowers prior to the date of any payment due to be made by the Borrowers hereunder that the Borrowers will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrowers is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrowers within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrowers.

(g)     If any Lender shall fail to make any payment required to be made by it pursuant to Sections 2.17(e), 2.17(f), 2.19(e),  or 9.7, then the Administrative Agent may, in its discretion (at the direction of the Required Lenders) and notwithstanding any contrary provision hereof, (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender for the benefit of the Administrative Agent, to satisfy such Lender's obligations to it under such Sections until all such unsatisfied obligations are fully paid, and/or (ii) hold any such amounts in a segregated account as cash collateral for, and application to, any future funding obligations of such Lender under any such Section, in the case of each of clauses (i) and (ii) above, in any order as determined by the Administrative Agent in its discretion (at the direction of the Required Lenders).

2.18     Requirements of Law.

(a)     If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the Closing Date:

(i)        shall subject any Credit Party to any Taxes (other than (A) Indemnified Taxes and (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

(ii)       shall impose, modify or hold applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit (or participations therein) by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)      shall impose on such Lender any other condition (other than Taxes);

and the result of any of the foregoing is to increase the cost to such Lender or such other Credit Party, by an amount that such Lender or other Credit Party deems to be material, of making, converting into, continuing or maintaining Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrowers shall promptly pay such Lender or such other Credit Party, upon its demand, any additional amounts necessary to compensate such Lender or such other Credit Party for such increased cost or reduced amount receivable.  If any Lender or such other Credit Party becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrowers (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled (but only to the extent that the applicable Lender is imposing such charges or additional amounts on other borrowers which such Lender considers to be similarly situated to the Borrowers).

(b)       If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital or liquidity requirements or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital or liquidity requirements (whether or not having the force of law) from any Governmental Authority made subsequent to the Closing Date shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy or liquidity) by an amount deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrowers (with a copy to the Administrative Agent) of a written request therefor, the Borrowers shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction (but only to the extent that the applicable Lender is imposing such charges or additional amounts on other borrowers such Lender considers to be similarly situated to the Borrowers).

(c)       Notwithstanding anything herein to the contrary, (i) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, and (ii) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof, shall in each case be deemed to be a change in law, regardless of the date enacted, adopted, issued or implemented; provided that to the extent any charge or additional amount is requested by a Lender after the Closing Date under Section 2.18(a) or (b) as a result of any requests, rules, guidelines or directives promulgated under by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or by United States or foreign regulatory authorities, in each case pursuant to Basel III, or pursuant to the Dodd-

Frank Wall Street Reform and Consumer Protection Act, then such Lender shall be compensated only if such Lender is imposing such charges or additional amounts on other borrowers such Lender considers to be similarly situated to the Borrowers.

(d)     A certificate setting forth the basis thereof as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrowers (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error.  Notwithstanding anything to the contrary in this Section, the Borrowers shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than nine months prior to the date that such Lender notifies the Borrowers of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect.  The obligations of the Borrowers pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.19    Taxes.

(a)     Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that, after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.19), the amounts received with respect to this agreement equal the sum which would have been received had no such deduction or withholding been made.

(b)     The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for, Other Taxes.

(c)     As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.19, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(d)     The Loan Parties shall jointly and severally  indemnify each Credit Party, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Credit Party or required to be withheld or deducted from a payment to such Credit Party and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Taxes and without limiting the

44

obligation of the Loan Parties to do so) and (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(c) relating to the maintenance of a Participant Register, in either case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)	(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.19(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)	Without limiting the generality of the foregoing, in the event that the Borrowers (together with Holdings) are U.S. Persons for U.S. Federal tax purposes,

(A)	any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. Federal backup withholding tax;

(B)	any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable:

(1)	in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN (or applicable successor form) establishing an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN (or applicable successor form) establishing

45

an exemption from, or reduction of, U.S. Federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed originals of IRS Form W-8ECI;

(3) in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit G-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of either of the Borrowers within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed originals of IRS Form W-8BEN (or applicable successor form); or

(4) to the extent a Non-U.S. Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN (or applicable successor form), a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-2 or Exhibit G-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-4 on behalf of each such direct and indirect partner;

(C) any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. Federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or provide a successor form or certification, as appropriate, or promptly notify the Borrowers and the Administrative Agent in writing of its legal inability to do so. For the avoidance of doubt, the parties agree that for a non-U.S. entity the final IRS Form W-8BEN-E is a successor form to IRS Form W-8BEN.

(g)    If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.19 (including by the payment of additional amounts pursuant to this Section 2.19), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Each party's obligations under this Section 2.19 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all obligations under the Loan Documents.

(i)    For purposes of this Section 2.19, the term "applicable law" includes FATCA.

2.20    Indemnity. The Borrowers jointly and severally agree to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender sustains or incurs as a consequence of (a) default by any Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrowers have given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by any Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrowers have given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest (less the Applicable Margin included therein, if any) that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans (less the Applicable Margin included therein, if any) provided for herein over (ii) the amount of interest (as reasonably determined by such Lender) (less the Applicable Margin included therein, if any) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrowers by any Lender, which sets forth the basis therefor, shall be conclusive in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.21    <u>Change of Lending Office</u>.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.18 or 2.19(a) with respect to such Lender, it will, if requested by the Borrowers, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; <u>provided</u>, that such designation is made on terms that, in the sole judgment exercised in good faith of such Lender, cause such Lender and its lending offices to suffer no economic, legal or regulatory disadvantage, and <u>provided</u>, <u>further</u>, that nothing in this Section shall affect or postpone any of the obligations of the Borrowers or the rights of any Lender pursuant to Section 2.18 or 2.19(a).

2.22    <u>Replacement of Lenders</u>.  The Borrowers shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.16(b), 2.18 or 2.19(a), (b) becomes a Defaulting Lender, or (c) does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that requires the consent of each of the Lenders or each of the Lenders affected thereby (so long as the consent of the Required Lenders has been obtained), with a replacement financial institution; <u>provided</u> that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.21 so as to eliminate the continued need for payment of amounts owing pursuant to Section 2.16(b), 2.18 or 2.19(a), (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrowers shall be liable to such replaced Lender under Section 2.20 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6, (viii) until such time as such replacement shall be consummated, the Borrowers shall pay all additional amounts (if any) required pursuant to Section 2.16(b), 2.18 or 2.19(a), as the case may be, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrowers, the Administrative Agent or any other Lender shall have against the replaced Lender.  Each party hereto agrees that an assignment  required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment need not be a party thereto.

2.23    [Intentionally Omitted].

2.24    <u>Incremental Term Loans</u>.

(a)    The Borrowers and any one or more Lenders (including New Lenders) may from time to time agree that such Lenders shall make, obtain or increase the amount of their Incremental Term Loans, as applicable, by executing and delivering to the Administrative Agent an Increased Facility Activation Notice specifying (i) the amount of such increase and the Facility or Facilities involved, (ii) the applicable Increased Facility Closing Date, (iii) the applicable Incremental Term Maturity Date, (iv) the amortization schedule for such Incremental Term Loans, which shall be based upon the same percentage of amortization set forth in Section 2.3, (v) the Applicable Margin for such Incremental Term Loans and (vi) any other terms applicable to the Incremental Term Loans; <u>provided</u> that (A) No Default or Event of Default shall exist on the Increased Facility Closing Date and immediately after giving effect to the incurrence of such Incremental Term Loans (<u>provided</u> that if the proceeds of such Incremental Facility are, substantially concurrently with the receipt thereof, to be used by the Borrowers to finance, in whole or in part, a Permitted Acquisition, then the foregoing shall be limited to customary "specified events of default" as agreed by the Administrative Agent and the Borrowers in light of prevailing "certain

funds" conditions, (B) Holdings shall be in pro forma compliance, immediately before and after giving effect to the incurrence of such Incremental Term Loans , with the covenant contained in Section 7.1, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, (C) the representations and warranties in Section 4 shall be true and correct in all material respects immediately prior to, and after giving effect to, the incurrence of such Incremental Term Loans (provided that if the proceeds of such Incremental Facility are, substantially concurrently with the receipt thereof, to be used by the Borrowers to finance, in whole or in part, a Permitted Acquisition, then the foregoing shall be limited to the Specified Representations), (D) the Incremental Term Maturity Date and weighted average life to maturity of any Incremental Term Loans shall not be earlier than the maturity date and weighted average life to maturity, respectively, of the Closing Date Term Loan, and (E) if the all-in yield (determined by taking into account interest rate margins, original issue discount, upfront fees and interest rate floors, but excluding arrangement, structuring, underwriting, commitment or other similar fees) exceeds by more than 0.50% the all-in yield for the Closing Date Term Loan (calculated in the same manner as the previous parenthetical phrase), the Applicable Margin for the Closing Date Term Loan shall be increased so that the all-in yield in respect of such Incremental Term loans is no higher than 0.50% above the all-in yield for the Closing Date Term Loan (it being agreed that any increase in yield in the Closing Date Term Loan required due to the application of interest rate floors on the Incremental Term Loans shall be effected solely through an increase in any interest rate floors applicable to the Closing Date Term Loan).  Any other terms of the Incremental Term Loans shall be reasonably satisfactory to the Required Lenders to the extent that they are not consistent with the terms of the existing Closing Date Term Loan.

(b)      Notwithstanding the foregoing, (i) without the consent of the Required Lenders, (x) the aggregate amount of borrowings of Incremental Term Loans obtained on and after the Closing Date pursuant to this Section 2.24 shall not exceed $50,000,000 and (ii) without the consent of the Administrative Agent, each increase effected pursuant to this paragraph shall be in a minimum amount of at least $5,000,000.  No Lender shall have any obligation to participate in any increase described in this paragraph unless it agrees to do so in its sole discretion.

(c)      Any additional bank, financial institution or other entity which, with the consent of the Borrowers and the Administrative Agent (which consent shall not be unreasonably withheld (unless such prospective "Lender" is not an eligible Assignee pursuant to Section 10.6(b)(i)), elects to become a "Lender" under this Agreement in connection with any transaction described in Section 2.24(a) shall execute a New Lender Supplement (each, a "New Lender Supplement"), substantially in the form of Exhibit H-3, whereupon such bank, financial institution or other entity (a "New Lender") shall become a Lender for all purposes and to the same extent as if originally a party hereto and shall be bound by the obligations, and entitled to the benefits, of this Agreement.

(d)      Reserved

(e)      Notwithstanding anything to the contrary in this Agreement, each of the parties hereto hereby agrees that, on each Increased Facility Activation Date, this Agreement shall be amended to the extent (but only to the extent) necessary to reflect the existence and terms of the Incremental Term Loans evidenced thereby.  Any such deemed amendment may be effected in writing by the Administrative Agent with the Borrowers' consent (not to be unreasonably withheld) and furnished to the other parties hereto.

SECTION 3.    [INTENTIONALLY OMITTED]

SECTION 4.    REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to induce the Lenders to deem the Loans made, the Borrowers hereby jointly and severally represent and warrant to the Administrative Agent and each Lender that:

4.1    Financial Condition.

(a)    The unaudited pro forma forecasted consolidated balance sheet of Holdings and its consolidated Subsidiaries as of November 30, 2015 (including notes thereto) (the "Pro Forma Balance Sheet"), copies of which have heretofore been furnished to each Lender, have been prepared giving effect (as if such events had occurred on such date) to the Transactions.  The Pro Forma Balance Sheet has been prepared based on the information reasonably available to Holdings as of the date of delivery thereof, and presents fairly in the good faith belief of Holdings on a pro forma basis the estimated financial position of Holdings and its consolidated Subsidiaries as of November 30, 2015, assuming that the events specified in the preceding sentence actually occurred at such date.

(b)    The audited consolidated balance sheets of Millennium Holdings and its consolidated Subsidiaries as at December 31, 2012, December 31, 2013 and December 31, 2014, and the related consolidated statements of income and of cash flows for the fiscal years ended on such dates, reported on by and accompanied by an unqualified report from KPMG LLP present fairly the consolidated financial condition of Millennium Holdings and its consolidated Subsidiaries as at such date, and the consolidated results of its operations and its consolidated cash flows for the respective fiscal years then ended.  All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein).  As of the Closing Date, no Group Member has any material Guarantee Obligations, contingent liabilities and liabilities for taxes, or any long-term leases or unusual forward or long-term commitments, including any interest rate or foreign currency swap or exchange transaction or other obligation in respect of derivatives, that are not reflected in the most recent financial statements referred to in this paragraph to the extent that GAAP would require that disclosure.  During the period from December 31, 2014 to and including the Closing Date there has been no Disposition by any Group Member of any material part of its business or property other than the Dispositions permitted under the Existing Credit Agreement.

4.2    No Change.  Since December 31, 2014, other than (w) as described in the Disclosure Statement, (x) the commencement of the Cases and the events typically resulting from the commencement of the Cases and (y) such changes and developments that are contemplated by the Plan of Reorganization, there has been no development or event that has had or would reasonably be expected to have a Material Adverse Effect.  Notwithstanding the foregoing, solely for purposes of determining the satisfaction of the conditions precedent for the making of the Closing Date Term Loan on the Closing Date and for purposes of determining the satisfaction of conditions precedent to the funding of any Incremental Facility that would be used for financing a Permitted Acquisition (but not for determining the satisfaction of such conditions precedent at any other time), changes, developments or events that result from economic, political, industry or market changes generally shall not be taken into account in determining whether a Material Adverse Effect or a material adverse change has occurred or would reasonably expected to occur unless such changes, developments or events adversely affect the Borrowers and their Subsidiaries in a materially disproportionate manner relative to other participants in the industries in which the Borrowers and their Subsidiaries operate.

4.3     Existence; Compliance with Law.  Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification except to the extent that the failure to be so qualified and/or to be in good standing would not reasonably be expected to cause a Material Adverse Effect and (d) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4     Power; Authorization; Enforceable Obligations.  Each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrowers, to obtain the Loans hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrowers, to authorize the Borrowers to obtain the Loans on the terms and conditions of this Agreement.  No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except (i) consents, authorizations, filings and notices described in Schedule 4.4, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect, (ii) the Confirmation Order and (iii) the filings referred to in Section 4.20.  Each Loan Document has been duly executed and delivered on behalf of each Loan Party a party thereto.  This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles or public policy (whether enforcement is sought by proceedings in equity or at law) (collectively, the "Enforceability Exceptions").

4.5     No Legal Bar.  The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate in any material respect any Requirement of Law or any material Contractual Obligation of any Group Member and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such material Contractual Obligation (other than the Liens created by the Security Documents).  No Requirement of Law or Contractual Obligation applicable to the Borrowers or any of their Subsidiaries would reasonably be expected to have a Material Adverse Effect.

4.6     Litigation.  Other than the Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the actual knowledge of either of the Borrowers, threatened by or against any Group Member or against any of their respective properties or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that would reasonably be expected to have a Material Adverse Effect.

4.7     No Default.  No Group Member is in default under or with respect to any of its Contractual Obligations in any respect that would reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

4.8     Ownership of Property; Liens.  Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold or license interest

in, all its other property (other than Intellectual Property, which is addressed in Section 4.9), and none of such property is subject to any Lien except as permitted by Section 7.3.

4.9     Intellectual Property.  (a) Each Group Member owns, or is licensed to use, or otherwise has valid rights to use,  all Intellectual Property necessary for the conduct of its business as currently conducted, except to the extent to which such failure would not reasonably be expected to have a Material Adverse Effect; (b) except as set forth on Schedule 4.9 hereto, no material claim has been asserted and is pending by any Person against a Group Member challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor do the Borrowers have actual knowledge (without a duty of inquiry) of, any valid basis for any such claim, which, if adjudicated adversely against the Borrowers or any Group Member, would reasonably be expected to have a Material Adverse Effect; and (c) the use of any Intellectual Property by each Group Member does not infringe on the Intellectual Property rights of any Person, except to the extent to which such infringement would not reasonably be expected to have a Material Adverse Effect.

4.10     Taxes.  Each Group Member has filed or caused to be filed all material Federal, state and other material Tax returns that are required to be filed and has paid all Taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other material Taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Group Member); no Tax Lien has been filed, and, to the actual knowledge of the Borrowers, no claim is being asserted, with respect to any such Tax, fee or other charge.

4.11     Federal Regulations.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for buying or carrying any margin stock (within the meaning of Regulation T, U or X of the Board), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.  No more than 25% of the assets of the Group Members consist of "margin stock" as so defined.  If requested by any Lender or the Administrative Agent, the Borrowers will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

4.12     Labor Matters.  Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Group Member pending or, to the actual knowledge of the Borrowers, threatened; (b) hours worked by and payment made to employees of each Group Member have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Group Member on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant Group Member.

4.13     ERISA.  Except as would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (a) each Group Member and each of their respective ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Plans and the regulations and published interpretations thereunder; (b) no ERISA Event or Foreign Plan Event has occurred or is reasonably expected to occur; and (c) all amounts required by applicable law with respect to, or by the terms of, any retiree welfare benefit arrangement maintained by any Group Member or any ERISA Affiliate or to which any Group Member or any ERISA Affiliate has an obligation to contribute have been accrued in accordance with Accounting Standards Codification Topic No. 715-60.  The present value of all accumulated benefit obligations under each Pension Plan

(based on the assumptions used for purposes of Accounting Standards Codification No. 715-30) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than an immaterial amount the fair market value of the assets of such Pension Plan allocable to such accrued benefits, and the present value of all accumulated benefit obligations of all underfunded Pension Plans (based on the assumptions used for purposes of Accounting Standards Codification No. 715-30 did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than an immaterial amount the fair market value of the assets of all such underfunded Pension Plans.

4.14     Investment Company Act; Other Regulations.  No Loan Party is required to register as an "investment company", nor is any Loan Party a company "controlled" by a Person required to register as an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to regulation under any material Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

4.15     Subsidiaries.  Except as disclosed to the Administrative Agent by the Borrowers in writing from time to time after the Closing Date, (a) Schedule 4.15 sets forth the name and jurisdiction of incorporation or formation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and whether or not such Subsidiary is a Restricted Subsidiary and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrowers or any Restricted Subsidiary, except as created by the Loan Documents.

4.16     Closing Date Exchange; Use of Proceeds.  Pursuant to the Plan of Reorganization, all of the Existing Loans outstanding under the Existing Credit Agreement on the Closing Date (immediately before giving effect to the Closing Date Exchange) shall be deemed cancelled in return for, among other consideration, the Closing Date Term Loan deemed made on the Closing Date.  For the avoidance of doubt, the Lenders shall not be required to fund and the Borrowers shall not receive any cash proceeds from the Closing Date Term Loan.  The proceeds of Incremental Facilities shall be used, in the Borrowers' discretion, (i) to finance acquisitions, investments and distribution to shareholders not prohibited hereunder and (ii) for other general corporate purposes of the Borrowers and their Subsidiaries.

4.17     Environmental Matters.  Except as would not reasonably be expected to have a Material Adverse Effect:

(a)     the facilities and properties owned, leased or operated by any Group Member (the "Properties") do not contain any Materials of Environmental Concern on, under, or migrating from in amounts or concentrations or under circumstances that constitute or constituted a violation of, or would give rise to liability under, any Environmental Law;

(b)     no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "Business"), nor do the Borrowers have actual knowledge or reason to believe that any such notice will be received or is being threatened;

(c)     Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location that would give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that would give rise to liability under, any applicable Environmental Law;

(d)     no judicial proceeding or governmental or administrative action is pending or, to the actual knowledge of the Borrowers, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial mandates or requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e)     there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Group Member in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that would give rise to liability under Environmental Laws;

(f)     the Properties and all operations at the Properties are in compliance, and have in the last five years been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business, and all Group Members have, maintain, and are in compliance with any and all licenses, approvals, notifications, registrations, and permits required by applicable Environmental Law for the operation of the Properties;

(g)     no Group Member has assumed any liability of any other Person under Environmental Laws; and

(h)     to the knowledge of the Borrowers, there are no Materials of Environmental Concern, underground storage tanks, aboveground storage tanks, or electrical transformers on the Properties.

4.18     Forward-Looking Statements. The Pro Forma Balance Sheet and other materials produced by the Borrowers may include certain forward looking statements and projections provided by the Borrowers. Any such statements and projections reflect various estimates and assumptions by the Borrowers concerning anticipated results. No representations or warranties are made by the Borrowers or any of their affiliates as to the accuracy of any such anticipated results. Whether or not any such forward looking statements or projections are in fact achieved will depend upon future events some of which are not within the control of the Borrowers. Accordingly, actual results may vary from the projected results, and such variations may be material.

4.19     Accuracy of Information. No written statement or information contained in this Agreement, any other Loan Document, the Master Restructuring Agreement, the Plan of Reorganization, the Disclosure Statement or any document contemplated hereby or thereby or the Cases or any other document, certificate or statement furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders, or any of them, for use in connection with the transactions contemplated by this Agreement, the other Loan Documents, the Master Restructuring Agreement, the Plan of Reorganization or the Disclosure Statement, taken as a whole, contained as of the date such statement, information, document or certificate was so furnished (and in any event given prevailing effect to more recent written statements or information to the extent of any conflict or inconsistency with any previous written statements or information), any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements thereto). The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrowers to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such

financial information may differ from the projected results set forth therein by a material amount. There is no fact known to any Loan Party that would reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents, or in any other documents, certificates and statements furnished to the Administrative Agent and the Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

4.20    Security Documents.

(a)    The Guarantee and Collateral Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof, subject to the Enforceability Exceptions. In the case of the Pledged Stock and Pledged Notes described in the Guarantee and Collateral Agreement constituting certificated securities, when stock certificates representing such Pledged Stock or promissory notes evidencing the Pledged Notes, in each case, are delivered to the Administrative Agent (together with a properly completed and signed stock power or endorsement), and in the case of the other Collateral described in the Guarantee and Collateral Agreement, when financing statements and other filings specified on Schedule 4.20(a) in appropriate form are filed in the offices specified on Schedule 4.20(a), the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral (to the extent capable of perfection by such delivery and such filings) and the proceeds thereof, as security for the Obligations (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (except Liens permitted by Section 7.3).

(b)    Each of the Mortgages is (or, upon delivery thereof in accordance with Section 6.12 hereof, shall be) effective to create in favor of the Administrative Agent, for the benefit of the Lenders, a legal, valid and enforceable Lien on the Mortgaged Properties described therein and proceeds thereof, subject to the Enforceability Exceptions, and when the Mortgages are filed in the offices specified on Schedule 4.20(b), each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except Liens permitted by Section 7.3). Schedule 1.1B lists, as of the Closing Date, each parcel of owned real property and each leasehold interest in real property located in the United States and held by the Borrowers or any of their Restricted Subsidiaries.

4.21    [Intentionally Omitted].

4.22    Solvency. Each Loan Party is, and after giving effect to the Transactions and the incurrence of all Indebtedness and obligations being incurred in connection herewith and therewith will be and will continue to be, Solvent.

4.23    OFAC Compliance; Anti-Corruption Laws. No Group Member or any Affiliate of a Group Member are in violation of and shall not violate, in each case, in any material respect, any Sanctions. The Borrowers have implemented and maintain in effect policies and procedures reasonably designed to ensure compliance by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrowers, their Subsidiaries and their respective officers and employees and, to the knowledge of the Borrowers, their directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects. None of (a) the Borrowers, any Subsidiaries or any of their respective directors or officers, or (b) to the knowledge of the Borrowers, any employee or Affiliate of the Borrowers or any Subsidiaries, or (c) to the knowledge of the Borrowers, any agent of the Borrowers or any Subsidiaries that will act in any capacity in connection with or benefit from the credit facility established hereby, is a

Sanctioned Person.   Neither the making of any Loan, the use of the proceeds thereof or other transaction contemplated by this Agreement will, directly or indirectly, be used (x) to fund any activities or business of or with a Sanctioned Person or in any Sanctioned Country, except to the extent permissible for a Person required to comply with Sanctions or (y) in any other manner that would result in a violation of Anti-Corruption Laws or Sanctions by any party hereto.

4.24    Anti-Terrorism Laws.  Neither any Loan Party nor any of its Subsidiaries is an "enemy" or an "ally of the enemy" within the meaning of Section 2 of the Trading with the Enemy Act of the United States of America (50 U.S.C. App. §§ 1 *et seq.*), as amended.  Neither any Loan Party nor any or its Subsidiaries is in violation of (a) the Trading with the Enemy Act, as amended, (b) any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto or (c) the Patriot Act.  None of the Loan Parties (i) is a blocked person described in Section 1 of the Executive Order Number 13224 (Anti-Terrorism Order) or (ii) to the actual knowledge of any Responsible Officer, engages in any dealings or transactions, or is otherwise associated, with any such blocked person.

SECTION 5.    CONDITIONS PRECEDENT

5.1    Conditions to Deemed Making of the Closing Date Term Loan on the Closing Date.  The agreement of each Lender to deem its portion of the Closing Date Term Loan made is subject to the satisfaction, prior to or concurrently with the deemed making of the Closing Date Term Loan on the Closing Date, of the following conditions precedent (subject to Section 6.12 hereof):

(a)    Credit Agreement; Guarantee and Collateral Agreement.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Administrative Agent, the Borrowers [and each Person listed on Schedule 1.1A][1] and (ii) the Guarantee and Collateral Agreement, executed and delivered by the Administrative Agent, the Borrowers and each Subsidiary Guarantor.

(b)    Repayment of Existing Indebtedness.  The Administrative Agent shall have received evidence reasonably satisfactory to it (at Required Lenders' direction) that (i) all principal, interest, fees and other amounts owing or accrued and unpaid under the Existing Credit Agreement have been deemed paid, cancelled and discharged and the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) shall have been terminated, (ii) all Liens granted in favor of lenders and administrative agent under the Existing Credit Agreement and the other Loan Documents (as defined in the Existing Credit Agreement) shall have been released, or substantially concurrently with the making of the Closing Date Term Loan will be released, (iii) all principal, interest, fees and other amounts owing or accrued and unpaid under the Commitment Fee Facility have been paid in full in cash on the Closing Date, (iv) all Liens granted in favor of the administrative agent under the Commitment Fee Facility shall have been released on the Closing Date or substantially concurrently with the making of the Closing Date Term Loan will be released, (v) the TA Debenture Agreements shall have been terminated, (vi) all principal, interest, fees and other amounts owing or accrued and unpaid under the Special Members Loan have been paid in full in cash or cancelled and discharged on the Closing Date and any and all Liens securing the Special Members Loan (if any) shall have been released on the Closing Date or substantially concurrently with the making of the Closing Date Term Loan will be released and (vii) all principal, interest, fees and other amounts owing or accrued and unpaid on account of the Members Debt have been paid in full in cash or cancelled and discharged on the Closing Date and any and all Liens securing the Members Debt (if any) shall have been released on the Closing Date or substantially concurrently with the making of the Closing Date Term Loan will be released.  The

---

[1] NTD: May be removed in the Administrative Agent's discretion.

Administrative Agent shall have received evidence reasonably satisfactory to it (at the Required Lenders' direction) that substantially concurrently with the making of the Closing Date Term Loan hereunder Holdings and its Subsidiaries shall not have (or the Administrative Agent shall be reasonably satisfied (at the Required Lenders' direction) that all necessary actions have been taken so that Holdings and its Subsidiaries promptly after the making of the Closing Date Term Loan shall not have) any material Indebtedness for borrowed money (which term shall not include obligations in relation to the redemption of employee stock options) other than (it being agreed that inclusion in this list does not signify a determination as to whether or not the relevant Indebtedness is material): (1) Indebtedness outstanding under this Agreement (2) Indebtedness owed to TFS or to DL or to SDFC or to TimePayment Corporation Financing in an aggregate principal amount not to exceed $3,000,000 and (3) Indebtedness owed to BALC under the Master Lease Agreement in an aggregate principal amount not to exceed $30,000,000.

(c)    Reserved.

(d)    Pro Forma Balance Sheet; Financial Statements.  The Lenders shall have received (i) the Pro Forma Balance Sheet and (ii) audited consolidated financial statements of Millennium Holding and its consolidated Subsidiaries for the 2012, 2013 and 2014 fiscal years.

(e)    Projections.  The Lenders shall have received projections through December 31, 2019 (which projections shall be on a quarterly basis for the 2016 fiscal year and on an annual basis thereafter).

(f)    Approvals.  All governmental and third party approvals necessary in connection with the continuing operations of the Group Members and, as to the Group Members, the transactions contemplated hereby shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the financing contemplated hereby.

(g)    Lien Searches.  The Administrative Agent shall have received the results of a recent Lien search with respect to each Loan Party, and such search shall reveal no Liens on any of the assets of the Loan Parties except for Liens permitted by Section 7.3 or discharged on or prior to the Closing Date pursuant to documentation satisfactory to the Administrative Agent.

(h)    Fees.  The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date.

(i)    Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments, including the certificate of incorporation, certificate of formation or articles of organization, as applicable, of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party, and (ii) a long form good standing certificate for each Loan Party issued as of a recent date from such Loan Party's applicable jurisdiction of organization.

(j)    Legal Opinions.  The Administrative Agent shall have received the following executed legal opinions:

57

(i)　the legal opinion of Skadden, Arps, Slate, Meagher & Flom LLP, counsel to the Borrowers and the Subsidiary Guarantors, in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders; and

(ii)　the legal opinion of such other special and local counsel as may be reasonably required by the Administrative Agent (at the Required Lenders' direction).

Each such legal opinion shall cover such other matters incident to the transactions contemplated by this Agreement as the Administrative Agent or Required Lenders may reasonably require.

(k)　Pledged Stock; Stock Powers; Pledged Notes. The Administrative Agent shall have received (i) the certificates representing the shares of Capital Stock pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Administrative Agent pursuant to the Guarantee and Collateral Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof.

(l)　Filings, Registrations and Recordings. The Required Lenders shall be satisfied that each document (including any Uniform Commercial Code financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent or the Required Lenders to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Lenders, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 7.3 and other than documents, filings, registrations and recordings that the Administrative Agent or the Required Lenders have agreed may be effected at a later date), shall be in proper form for filing, registration or recordation.

(m)　Flood Hazards. With respect to each Mortgaged Property listed on Schedule 1.1B, the Administrative Agent shall have received (i) a life of loan standard flood hazard determination, (ii) a policy of flood insurance that (1) covers any parcel of such Mortgaged Property that is improved real property that is located in a "special flood hazard area", (2) is written in an amount, and is in form and substance that is reasonably satisfactory to the Required Lenders, and (3) has a term ending not later than the maturity of the Indebtedness secured by such Mortgage and (iii) if such Mortgaged Property has any improvements that are located in a special flood hazard area, confirmation that the Borrowers have received the notice required pursuant to Section 208.25(i) of Regulation H of the Board.

(n)　Solvency Certificate. The Administrative Agent shall have received a certificate, dated the Closing Date and signed by the chief financial officer of Holdings, stating that the Loan Parties on a consolidated basis after giving effect to the Transactions on the Closing Date, are Solvent.

(o)　Insurance. The Administrative Agent shall have received insurance certificates satisfying the requirements of Section 5.2(b) of the Guarantee and Collateral Agreement.

(p)　Patriot Act. The Administrative Agent and each Lender shall have received all documentation and other information about the Loan Parties at least five (5) Business Days prior to the Closing Date as shall have been requested by the Administrative Agent (either on its behalf or on behalf of any Lender) that the Administrative Agent or any Lender shall have reasonably determined is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act; provided that all such documentation and other information has been requested within seven (7) days prior to the Closing Date.

58

(q)     Plan Effective Date.  Administrative Agent shall have received evidence, in form and substance satisfactory to the Administrative Agent and the Required Lenders, that prior to the date hereof or concurrently herewith, the Approved Plan Effective Date shall have occurred, the Confirmation Order shall be valid, subsisting and continuing and all conditions precedent to the effectiveness of the Plan of Reorganization shall have been fulfilled, or validly waived.

For the purpose of determining compliance with the conditions specified in this Section 5.1, irrespective of whether any Lender has signed this Agreement or otherwise accepted the benefits of this Agreement, each and every Person specified on Schedule 1.1A (and any of its affiliates, successors and assigns), shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 5.1 unless the Administrative Agent shall have received written notice from such Lender at least one Business Day prior to the proposed Closing Date (such proposed Closing Date to be December 15, 2015) specifying its objection thereto.

5.2     Conditions to Each Extension of Credit.  The agreement of each Lender to deem its portion of the Closing Date Term Loan made on the Closing Date and make any extension of credit requested to be made by it on any date under the Incremental Facility is subject to the satisfaction of the following conditions precedent:

(a)     Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date; provided that any representation or warranty that is qualified as "materiality," "Material Adverse Effect" or similar language will be required to be true and correct in all respects (after giving effect to any such qualification therein).

(b)     No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the deemed making of the Closing Date Term Loan or the extensions of credit requested to be made on such date, as applicable.

Each borrowing or deemed borrowing by the Borrowers hereunder shall constitute a representation and warranty by the Borrowers as of the date of such borrowing that the conditions contained in this Section 5.2 have been satisfied.

SECTION 6.     AFFIRMATIVE COVENANTS

The Borrowers hereby jointly and severally agree that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, each of the Borrowers shall and shall cause each of its Restricted Subsidiaries to:

6.1     Financial Statements.  Furnish to the Administrative Agent (for distribution to each Lender):

(a)     as soon as available, but in any event within (i) 120 days after the end of the 2015 fiscal year of Holdings and (ii) 90 days after the end of each subsequent fiscal year of Holdings, a copy of the audited consolidated balance sheet of Holdings and its consolidated Subsidiaries, including MH, as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by KPMG LLP or other independent certified public accountants of nationally recognized standing; and

59

(b)    as soon as available, but in any event not later than (45 days after the end of each of the first three quarterly periods of each fiscal year of Holdings, the unaudited consolidated balance sheet of Holdings and its consolidated Subsidiaries, including MH, as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, reviewed pursuant to agreed-upon procedures to be agreed among KPMG LLP, the Borrowers, and the Administrative Agent (at the Required Lenders' direction) by KPMG LLP or other independent certified public accountants of nationally recognized standing and certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year end audit adjustments).

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except as noted above) (except as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein) consistently throughout the periods reflected therein and with prior periods.

6.2    Certificates; Other Information.  Furnish to the Administrative Agent for delivery to each Lender:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Event of Default pursuant to Section 7.1, except as specified in such certificate;

(b)    concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer stating that, as of the date of such certificate and to the knowledge of such Responsible Officer, each Loan Party during the period covered by such certificate has observed or performed all of its covenants and other agreements, and has satisfied every condition to be satisfied for such period as of such date contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has no actual knowledge of any Default or Event of Default except as specified in such certificate, (ii) in the case of financial statements with respect to a Calculation Period, a Compliance Certificate containing all information and calculations, including calculations setting forth the amount of Excess Cash Flow for such Calculation Period and the Available ECF Amount and the Aggregate Available ECF Amount as of such Calculation Period end and the amount of the applicable prepayment required pursuant to Section 2.11(c), necessary for determining compliance by each Group Member with the provisions of this Agreement referred to therein as of the last day of the Calculation Period, as the case may be, (iii) to the extent not previously disclosed to the Administrative Agent, (1) a list of any Intellectual Property applications or registrations issued to or acquired by any Group Member and any material written license by which any Group Member becomes an exclusive licensee of any U.S. Intellectual Property application or registration and (2) a description of any Person that has become a Group Member, in each case since the date of the most recent report delivered pursuant to this clause (iii) (or, in the case of the first such report so delivered, since the Closing Date) and (iv) a certificate of a Responsible Officer of the Borrowers listing each Subsidiary that has been designated as an Unrestricted Subsidiary in accordance with the provisions hereof, and certifying that such Unrestricted Subsidiary (A) is not a Material Subsidiary and (B) together with all other Unrestricted Subsidiaries, (x) has assets comprising less than or equal to 25% of the consolidated total assets of Holdings and its Subsidiaries at such date and (y) contributes less than or equal to 25% of the aggregate gross revenues of Holdings and its Subsidiaries for the applicable period (covered in the consolidated statement of income included in the financial statements delivered pursuant to Sections 6.1(a) or 6.1(b)), in each case determined in accordance with GAAP;

60

(c)        as soon as available, and in any event no later than (i) 120 days after the end of the 2015 fiscal year of Holdings and (ii) 90 days after the end of each subsequent fiscal year of Holdings, a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet of Holdings and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a description of the underlying assumptions applicable thereto), and, as soon as available (and in any case, within 45 days (or 90 days, in the case of the fourth fiscal quarter of each fiscal year) after the end of each fiscal quarter of Holdings), a detailed description of significant revisions, if any, to such budget and quarterly projections with respect to such fiscal year (collectively, the "Projections"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections are based on reasonable estimates, information and assumptions which the Responsible Officer believes to be reasonable at the time when made, and that such Responsible Officer has no reason to believe that such Projections are incorrect or misleading in any material respect;

(d)        within 45 days (or (i) 120 days, in the case of the fourth fiscal quarter of the 2015 fiscal year of Holdings and (ii) 90 days, in the case of the fourth fiscal quarter of each subsequent fiscal year) after the end of each fiscal quarter of Holdings, a narrative discussion and analysis of the financial condition and results of operations of Holdings and its Restricted Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, as compared to the portion of the Projections covering such periods and to the comparable periods of the previous year;

(e)        within 90 days after the end of each fiscal year commencing with the fiscal year ending December 31, 2016, with respect to the fiscal year just ended, the Borrowers shall deliver to the Administrative Agent a certificate of its Responsible Officer certifying that all UCC financing statements (including fixtures filings, as applicable) and all supplements to the Intellectual Property Agreements or other appropriate filings, recordings or registrations, have been filed of record in each governmental, municipal or other appropriate office in each applicable jurisdiction to the extent necessary to effect, protect and perfect the security interests in the Collateral owned by the Loan Parties as of the end of such fiscal year, in accordance with the Security Documents, subject to the compliance periods set forth therein, for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period);

(f)        within five days after the same are sent, copies of all financial statements and reports that the Borrowers send to the holders of any class of their respective debt securities and, within five days after the same are filed, copies of all financial statements and reports that the Borrowers may make to, or file with, the SEC;

(g)        promptly following receipt thereof, copies of (i) any documents described in Section 101(k) or 101(l) of ERISA that any Group Member or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided, that if the relevant Group Members or ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plans, then, upon reasonable request of the Administrative Agent, such Group Member or the ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrowers shall provide copies of such documents and notices to the Administrative Agent promptly after receipt thereof;

(h)        a report of a reputable insurance broker with respect to the insurance required to be maintained by Section 5.2 of the Guarantee and Collateral Agreement substantially concurrently with the delivery of any financial statements pursuant to Section 6.1(a), and such supplemental reports with

61

respect thereto as the Administrative Agent may from time to time reasonably request (at the direction of the Required Lenders);

(i)    promptly, such additional financial and other information as any Lender may from time to time reasonably request; provided that such Lender shall make all such requests through the Administrative Agent which shall forward such requests and the responses thereto to the Borrowers and such Lender, respectively; and

(j)    within fifteen (15) days after the end of each month, the Borrowers shall deliver to the Administrative Agent a certificate of its Responsible Officer certifying that the Borrowers were in compliance with Section 7.1 at all times during the immediately preceding month provided that no such certificate shall be required to be delivered under this clause (j) for any month in which a certificate is due under Section 6.2(b) hereof.

6.3    Maintenance of Existence; Compliance. (a)(i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary in the normal conduct of its business, except, in each case in clause (i) or (ii), as otherwise permitted by Section 7.4, Section 7.5 or Section 7.8, and except, in the case of clause (i)(other than with respect to a Loan Party) or (ii) above, to the extent that failure to do so would not reasonably be expected to have a Material Adverse Effect; (b) comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (c) maintain in effect and use reasonable efforts to enforce policies and procedures reasonably designed to ensure compliance by the Borrowers, their Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

6.4    Maintenance of Property; Insurance. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted provided that this shall not be construed to prohibit any Dispositions permitted hereunder and (b) maintain with financially sound and reputable insurance companies insurance policies, including flood insurance policies with respect to any improved real property which is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, on all its property in at least such amounts (and with such deductibles) and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business. Each such policy of insurance shall (i) name the Administrative Agent, on behalf of the Lenders, as an additional insured thereunder, as its interests may appear in form and substance reasonably satisfactory to the Administrative Agent (as directed by the Required Lenders), (ii) contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Lenders, as the loss payee thereunder, as applicable, and (iii) provide for at least thirty (30) days' (or such shorter period as may be consented to by the Administrative Agent in its reasonable discretion (at the Required Lenders' direction)) prior written notice to the Administrative Agent of any cancellation of such policy (with the exception of cancellation due to nonpayment in which case, ten (10) days prior notice shall be provided); provided, further that, unless an Event of Default shall have occurred and be continuing, the Administrative Agent shall turn over to the applicable Borrower any amounts received by it as loss payee under any casualty insurance maintained by such Borrower or its Subsidiaries, provided that such amounts shall be subject to the provisions of Section 2.11(b).

6.5    Inspection of Property; Books and Records; Discussions. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all

Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and employees of the Group Members and with their independent certified public accountants; <u>provided</u> that any visit, inspection or examination by a Lender (as opposed to the Administrative Agent) shall be at such Lender's expense so long as no Default or Event of Default has occurred and is continuing; and <u>provided</u>, <u>further</u>, that any visit, inspection or examination by the Administrative Agent beyond the first visit, inspection or examination in any twelve-month period shall be at the Administrative Agent's sole expense so long as no Default or Event of Default has occurred and is continuing (it being understood that if a Default or an Event of Default has occurred and is continuing, all of such visits, inspections and examinations by the Administrative Agent and the Lenders shall be at the Borrowers' expense).

6.6　　<u>Notices</u>.  Promptly upon a Responsible Officer obtaining knowledge thereof, give notice to the Administrative Agent and each Lender of:

(a)　　the occurrence of any Default or Event of Default;

(b)　　any litigation, investigation or proceeding, individually or in the aggregate (with all other litigation, investigations and proceedings occurring during such fiscal year of Holdings), that may exist at any time between any Group Member and any Governmental Authority, that if adversely determined would reasonably be expected to cause the Loan Parties to incur at least $5,000,000 of damages, penalties, fines, costs and/or expenses;

(c)　　any litigation or proceeding, individually or in the aggregate (with all other litigation and proceedings occurring during such fiscal year of Holdings) affecting any Group Member (i) in which the amount involved is $15,000,000 or more and not fully covered by insurance (other than applicable deductibles and co-insurance amounts), (ii) in which injunctive or similar relief is sought which, if granted, could reasonably be expected to have a Material Adverse Effect or (iii) which relates directly to any Loan Document, the Plan of Reorganization, the Master Restructuring Agreement or the Restructuring Support Agreement;

(d)　　the occurrence of any ERISA Event or Foreign Plan Event that, alone or together with any other ERISA Events and/or Foreign Plan Events that have occurred, would reasonably be expected to result in liability of any Group Member or any ERISA Affiliate in an aggregate amount exceeding a material amount, as soon as possible and in any event within 10 days after the Borrowers know or have reason to know thereof; and

(e)　　any development or event that has had or would reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.6 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto, if known at the time of that representation.

6.7　　<u>Environmental Laws</u>.

(a)　　Comply in all material respects with, and use commercially reasonable efforts to assure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and ensure that all

tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, in each case except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders, decrees,  directives, and other requirements of any Governmental Authorities regarding Environmental Laws, in each case except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.  In the event the Borrowers fail to complete any such activity required by any Governmental Authority as set forth herein, the Administrative Agent, at the Required Lenders' direction, reserves the right to enter onto the property, or have its consultants enter onto the property, to complete said activities and to add the reasonable and documented costs associated with those activities to the principal amount of the Loans, provided that the Administrative Agent shall have no obligation to do so and the Administrative Agent and the Lenders shall not be liable to the Loan Parties and/or their Subsidiaries for any such activities completed.

6.8    [Intentionally Omitted].

6.9    Additional Collateral.

(a)    With respect to any property acquired after the Closing Date by any Group Member (other than (w) registrations or applications for Intellectual Property, which are addressed in Section 5.8(f) of the Security Agreement, (x) any property of the type described in paragraph (b), (c) or (d) below, (y) property acquired by the Excluded Domestic Subsidiary, any Excluded Foreign Subsidiary or any Unrestricted Subsidiary and (z) any Excluded Property) required to be pledged as Collateral pursuant to the terms of the Security Documents as to which the Administrative Agent, for the benefit of the Lenders, does not have a perfected Lien, within thirty (30) days after the date of acquisition thereof (or such later date acceptable to the Administrative Agent (at the direction of the Required Lenders in their sole discretion) in writing) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a security interest in such property and (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in such property subject to the thresholds, limitations and exclusions set forth in the Security Documents (subject only to the Liens permitted under Section 7.3 hereof), including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent or the Required Lenders.

(b)    With respect to any fee interest in any real property in the United States having a value (together with improvements thereof) of at least $2,500,000 acquired after the Closing Date by any Group Member (other than any real property acquired by the Excluded Domestic Subsidiary, any Excluded Foreign Subsidiary or any Unrestricted Subsidiary and other than any real property that is the subject of any mortgage or similar financing permitted under Section 7.3(bb)), within 90 days after the date of acquisition thereof (or such later date acceptable to the Administrative Agent in its sole discretion (at the direction of the Required Lenders) in writing) (i) execute and deliver a first priority Mortgage, in favor of the Administrative Agent, for the benefit of the Lenders, covering such real property, (ii) if requested by the Administrative Agent, provide the Lenders with (x) title and extended coverage insurance issued by a nationally recognized title insurance company in the applicable jurisdiction covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent (at the direction of the

Required Lenders)), insuring the relevant Mortgage as having created a valid subsisting Lien on the real property described therein with the ranking or the priority which it is expressed to have in such Mortgage, subject only to Liens permitted under Section 7.3 hereof, together with such customary endorsements, coinsurance and reinsurance as the Administrative Agent may reasonably request to the extent the same are available in the applicable jurisdiction, as well as a current ALTA survey thereof, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent (at the direction of the Required Lenders) in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders), (iii) if requested by the Administrative Agent (at the direction of the Required Lenders), deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders), and (iv) the Administrative Agent shall have received (A) a life of loan standard flood hazard determination covering such property, (B) a policy of flood insurance that (1) covers any parcel of such Mortgaged Property that is improved real property that is located in a "special flood hazard area", (2) is written in an amount, and is in form and substance that is reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders), and (3) has a term ending not later than the maturity of the Indebtedness secured by such Mortgage and (C) if such Mortgaged Property has any improvements that are located in a special flood hazard area, confirmation that the Borrowers have received the notice required pursuant to Section 208.25(i) of Regulation H of the Board.

(c)     With respect to any new Subsidiary (other than (i) the Excluded Domestic Subsidiary, (ii) an Excluded Foreign Subsidiary, (iii) an Unrestricted Subsidiary, (iv) a Subsidiary formed or acquired by a Borrower or any Restricted Subsidiary that will be dissolved or merged into a Borrower or another Restricted Subsidiary within 60 days after the formation or acquisition thereof (provided that (x) such Subsidiary shall comply with the requirements of this Section 6.9(c) immediately to the extent not dissolved or merged with a Borrower or any Restricted Subsidiary within such 60-day period and (y) after such merger, the Borrowers shall comply or shall cause such applicable Restricted Subsidiary to comply with Section 6.9(a) and (b), as applicable), and (v) a Subsidiary formed or acquired as part of a Permitted Acquisition financed by Indebtedness permitted by Section 7.2(h) created or acquired after the Closing Date by any Group Member (which, for the purposes of this paragraph (c), shall include any existing Subsidiary that ceases to be an Excluded Domestic Subsidiary, an Excluded Foreign Subsidiary or an Unrestricted Subsidiary), within thirty (30) days after such event (or such later date acceptable to the Administrative Agent (at the direction of the Required Lenders in their sole discretion) in writing) (A) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems necessary or advisable (at the direction of the Required Lenders) to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any Group Member, (B) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, (C) cause such new Subsidiary (1) to become a party to the Guarantee and Collateral Agreement, (2) to take such actions necessary or advisable to grant to the Administrative Agent for the benefit of the Lenders a perfected first priority security interest in the Collateral described in the Guarantee and Collateral Agreement with respect to such new Subsidiary (subject to the Liens permitted under Section 7.3 hereof), including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent (at the direction of the Required Lenders) and (3) to deliver to the Administrative Agent a certificate of such new Subsidiary, substantially in the form of Exhibit C, with appropriate insertions and attachments, and (D) if requested by the Administrative Agent (at the direction of the Required Lenders), deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably

satisfactory to the Administrative Agent (at the direction of the Required Lenders); <u>provided</u> that the Capital Stock of any direct or indirect non-Wholly Owned Subsidiary of the Borrowers shall not be required to be pledged if and to the extent such pledge would be prohibited (except to the extent such prohibition would be deemed ineffective under the Uniform Commercial Code) by such non-Wholly Owned Subsidiary's organizational or governing documents or material joint venture documents; and <u>provided</u>, <u>further</u>, that the Capital Stock of any Disregarded Subsidiary shall not be required to be pledged.

(d)     With respect to any new Excluded Foreign Subsidiary that is a Restricted Subsidiary created or acquired after the Closing Date by any Group Member (other than by any Group Member that is an Excluded Foreign Subsidiary), promptly (and, in any case, no more than thirty days after such Subsidiary is formed) (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Lenders, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any such Group Member (provided that in no event shall more than 65% of the total outstanding voting Capital Stock of any such new Subsidiary be required to be so pledged), (ii) deliver to the Administrative Agent the certificates, if any, representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Group Member, and take such other action as may be necessary or, in the opinion of the Administrative Agent (at the direction of the Required Lenders), desirable to perfect the Administrative Agent's security interest therein, and (iii) if requested by the Administrative Agent (at the direction of the Required Lenders), deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders).

(e)     Anything in this Agreement or the other Loan Documents to the contrary notwithstanding, in no event shall any Group Member be required to grant any Lien on Excluded Property or to take any of the Excluded Actions.

6.10     <u>Ratings</u>. The Borrowers will use commercially reasonable efforts to obtain and maintain with Moody's and S&P a corporate rating for the Borrowers and a credit rating for the Loans.

6.11     <u>Quarterly Conference Calls</u>. Host a conference call each fiscal quarter (at times agreed with the Administrative Agent (at the direction of the Required Lenders)) with the Lenders and senior members of management of the Borrowers (with a question and answer period).

6.12     <u>Conditions Subsequent</u>. The Borrowers  (i) shall, within thirty (30) days after the Closing Date, commence the process with Moody's and S&P to obtain a corporate rating and credit rating in accordance with Section 6.10 hereof, (ii) shall provide to the Administrative Agent, within forty five (45) days after the Closing Date, deposit account control agreements and securities account control agreements executed by each applicable depository institution, each applicable Loan Party and the Administrative Agent granting Control (as defined in the Guarantee and Collateral Agreement) of each of the Loan Party's deposit accounts and securities accounts (other than those deposit accounts or securities accounts constituting Excluded Collateral) to the Administrative Agent, (iii) shall provide to the Administrative Agent, within 90 days of the Closing Date (or such later date acceptable to the Administrative Agent in its sole discretion in writing (at the direction of the Required Lenders)), with respect to each Mortgaged Property existing on the Closing Date and listed in Schedule 1.1B all those deliverables referred to in Section 6.9(b) (other than clause (iv) thereof) for real estate property, together with a landlord waiver and consent with respect to each such Mortgaged Property in form and substance reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders) and (iv)

complete the actions listed on Schedule 6.12 by the times stated therein (or such later date as may be consented to by the Administrative Agent in its reasonable discretion).

6.13    Designation of Subsidiaries. Holdings may at any time designate any Restricted Subsidiary that has been formed or acquired after the Closing Date as an Unrestricted Subsidiary, or any Unrestricted Subsidiary as a Restricted Subsidiary, provided that (i) the Borrowers may not designate a Subsidiary as an Unrestricted Subsidiary if such Subsidiary is a Material Subsidiary or if such Subsidiary does not otherwise qualify as an Unrestricted Subsidiary, and (ii) immediately before and immediately after such designation, no Default or Event of Default shall have occurred and be continuing.  The designation of any Restricted Subsidiary as an Unrestricted Subsidiary pursuant to the terms hereof shall constitute an Investment by the applicable Loan Party therein in an amount equal to the fair market value of such Borrower's or the applicable Subsidiary's (as applicable) Investment therein at the date of such designation to the extent not previously counted as an Investment for purposes of any of compliance with the subclauses of Section 7.8.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of such designation of any Indebtedness or Liens of such Subsidiary existing at the time of such designation. Each designation or redesignation must be evidenced by a resolution of the Board of Directors of Holdings, a certified copy of which shall be delivered to the Administrative Agent together with a certificate of a Responsible Officer of Holdings certifying that such designation or redesignation, as applicable, complies with the foregoing conditions.  Notwithstanding any other provisions set forth herein, MH shall not be designated as an Unrestricted Subsidiary.

6.14    Unrestricted Subsidiaries.  If, at any time and from time to time after the Closing Date (i) any Unrestricted Subsidiary (x) has assets comprising 5% or more of the total assets of Holdings and its Subsidiaries on the last day of the fiscal quarter or fiscal year then most recently ended for which financial statements are required to be delivered pursuant to Section 5.1(d) or 6.1, as applicable, or (y) contributes 5% or more of the revenues of Holdings and its Subsidiaries for such period ending on the last day of the fiscal quarter or fiscal year then most recently ended for which financial statements are required to be delivered pursuant to Section 5.1(d) or 6.1, as applicable, then the Borrowers shall, not later than 30 days after the date by which such financial statements are required to be delivered pursuant to this Agreement, cause such Subsidiary to be designated as a Restricted Subsidiary and, to the extent constituting a Domestic Subsidiary to become a Guarantor in accordance with and otherwise take all actions required under Section 6.9 hereof to perfect the Administrative Agent's Liens in the property and assets of such Subsidiary and (ii) any Unrestricted Subsidiary, together with all other Unrestricted Subsidiaries, (x) has assets comprising more than 25% of total assets of Holdings and its Subsidiaries on the last day of the fiscal quarter or fiscal year then most recently ended for which financial statements are required to be delivered pursuant to Section 5.1(d) or 6.1, as applicable or (y) contributes more than 25% of the revenues of Holdings and its Subsidiaries for such period ending on the last day of the fiscal quarter or fiscal year then most recently ended for which financial statements are required to be delivered pursuant to Section 5.1(d) or 6.1, as applicable, then the Borrowers shall, not later than 30 days after the date by which such financial statements are required to be delivered pursuant to this Agreement, cause one or more of such Unrestricted Subsidiaries to be designated as a Restricted Subsidiary and, to the extent constituting a Domestic Subsidiary, to become a Guarantor in accordance with and otherwise take all actions required under, Section 6.9 hereof to perfect the Administrative Agent's Liens in the property and assets of such Subsidiary (as if such property and/or asset was acquired after the Closing Date) such that the conditions contained in clauses (ii)(x) and (ii)(y) of this Section 6.14 shall cease to be true.

SECTION 7.    NEGATIVE COVENANTS

The Borrowers hereby jointly and severally agree that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, each of the Borrowers shall not, and shall not permit any of their Restricted Subsidiaries to, directly or indirectly:

7.1    Minimum Liquidity.  At any time, maintain less than $40,000,000 of Minimum Liquidity for any consecutive three (3) Business Day period.

7.2    Indebtedness. Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)    Indebtedness of any Loan Party pursuant to any Loan Document;

(b)    Indebtedness of any Loan Party to any other Loan Party or any Subsidiary; provided (i) all such Indebtedness owed to a Loan Party shall be (x) evidenced by the Intercompany Note and (y) subject to a first priority lien pursuant to the Guarantee and Collateral Agreement (subject only to the liens permitted under Section 7.3 hereof) and (ii) all such Indebtedness that is owed to a Subsidiary that is not a Loan Party shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the Intercompany Note (which terms shall limit the obligation to subordinate to the extent that material adverse tax consequences under Section 956 of the Code will arise from such subordination);

(c)    Guarantee Obligations incurred by the Borrowers or any of their respective Restricted Subsidiaries in respect of Indebtedness of the Borrowers or any Subsidiary Guarantor otherwise permitted hereunder;

(d)    Indebtedness outstanding on the Closing Date and listed on Schedule 7.2(d), and any refinancings, refundings, renewals or extensions thereof (without increasing the principal other than capitalizing interest and fees due, or shortening the maturity thereof);

(e)    Indebtedness (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 7.3(g) in an aggregate principal amount not to exceed $25,000,000 at any one time outstanding;

(f)    to the extent constituting Indebtedness, any settlement of litigation or of claims which is payable over time;

(g)    additional Indebtedness of the Borrowers or any of their Restricted Subsidiaries in an aggregate principal amount (for the Borrowers and all Restricted Subsidiaries) not to exceed $10,000,000 at any one time outstanding;

(h)    Indebtedness of a Person or Indebtedness attaching to assets of a Person that, in either case, becomes a Subsidiary or Indebtedness attaching to assets that are acquired by the Borrowers or any of their Subsidiaries, in each case after the Closing Date as a result of a Permitted Acquisition, provided that (i) such Indebtedness existed at the time such Person became a Subsidiary or at the time such assets were acquired and, in each case, was not created in anticipation thereof and (ii) such Indebtedness is not guaranteed in any respect by any Borrower or any other Subsidiary and is not secured by any of the property or assets of any Borrower or any Loan Party;

(i)    unsecured senior Indebtedness, unsecured Subordinated Indebtedness or Permitted Second Priority Indebtedness of the Borrowers or any of their Restricted Subsidiaries in an aggregate principal amount (for the Borrowers and all Restricted Subsidiaries) not to exceed $100,000,000 at any one time outstanding provided that, immediately before and immediately after giving effect to such incurrence: (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom; (ii) immediately after giving effect to such incurrence, (x) the Consolidated Leverage Ratio of Holdings and its Restricted Subsidiaries, calculated on a pro forma basis, shall not be

68

greater than 4.6 to 1.0 and (y) immediately after giving effect to such incurrence, the Consolidated Total Leverage Ratio of Holdings and its Restricted Subsidiaries, calculated on a pro forma basis, shall not be greater than 5.25 to 1.0, in each case, recomputed as at the last day of the most recently ended fiscal quarter of Holdings, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect, together with the relevant financial information for such incurrence; (iii) other than Permitted Second Priority Indebtedness, such Indebtedness shall not mature or have scheduled amortization or payments of principal and shall not be subject to mandatory redemption, repurchase, prepayment or sinking fund obligations (except customary asset sale or change of control provisions) prior to the date that is at least ninety-one (91) days after the latest maturity of the Term Loans at the time such Indebtedness is incurred; (iv) such Indebtedness shall have terms and conditions (other than pricing, rate floors, discounts, fees, premiums and optional prepayment or redemption provisions) that in the good faith determination of the Borrowers are not materially less favorable (when taken as a whole) to the Borrowers than the terms and conditions of the Loan Documents (when taken as a whole) and shall not have any financial covenants; and (v) if such Indebtedness is Subordinated Indebtedness, the subordination provisions thereof shall be on customary terms;

(j)        Reserved;

(k)        Capitalized Earn-Out Obligations in an amount not to exceed $30,000,000 appearing on the consolidated balance sheet of Holdings and its consolidated Restricted Subsidiaries at any one time;

(l)        netting services, overdraft protection arrangements and other Indebtedness owed to banks, securities intermediaries, other financial institutions, in connection with deposit accounts, securities accounts or Cash Management Arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments in the ordinary course of business;

(m)        Indebtedness owed to sureties and other accommodation parties in connection with the issuance of performance bonds, surety bonds and other similar instruments, in each case in the ordinary course of business;

(n)        Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(o)        Indebtedness under the ABL Facility provided that (x) the aggregate principal amount of the Indebtedness outstanding under the ABL Facility does not exceed $50,000,000 at any time minus all loans and unfunded commitments outstanding under any Unsecured Working Capital Facility permitted under Section 7.2(v) and (y) such Indebtedness is subject to the ABL Intercreditor Agreement;

(p)        indemnification and warranty obligations and purchase price adjustments (other than Capitalized Earn-Out Obligations) incurred in connection with Dispositions and Investments (including, without limitation, Permitted Acquisitions) permitted under this Agreement;

(q)        Reserved;

(r)        Indebtedness consisting of obligations under deferred compensation or other similar arrangements, or in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, or other reimbursement-type obligations regarding workers compensation claims, in each case incurred in the ordinary course of business;

69

(s)     Indebtedness consisting of take-or-pay obligations contained in supply arrangements in the ordinary course of business, or the financing of insurance premiums in the ordinary course of business;

(t)     Indebtedness incurred to finance the acquisition or holding of real property, or that was applicable to such real property at the time of acquisition thereof, in an aggregate principal amount not to exceed $5,000,000 at any one time outstanding;

(u)     Reserved;

(v)     unsecured senior Indebtedness or unsecured Subordinated Indebtedness in an aggregate principal amount not to exceed $5,000,000 in connection with (i) overdraft, (ii) Cash Management Arrangements, and/or (iii) any unsecured working capital facility (the "Unsecured Working Capital Facility"); provided that, immediately before and immediately after giving effect to such incurrence: (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom; and (B) if such Indebtedness is Subordinated Indebtedness, the subordination provisions thereof shall be on customary terms, and (C) any Indebtedness permitted under clause (iii) of this Section 7.2(v) shall not exceed an amount equal to $5,000,000 minus the sum of (x) the amount by which the outstanding loans and unfunded commitments outstanding under the ABL Facility exceeds $45,000,000 plus (y) the amounts outstanding under clauses (i) and (ii) of this Section 7.2(v); and

(w)     all premiums (if any), interest (including, without limitation, post-petition interest),  fees, expenses, charges and additional or contingent obligations in respect of Indebtedness described in any other provision of this Section 7.2.

7.3     Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)     Liens for Taxes not yet due or are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of Holdings or its Restricted Subsidiaries, as the case may be, in conformity with and to the extent required by GAAP;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings, or if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Liens, provided that adequate reserves with respect thereto are maintained on the books of Holdings or its Restricted Subsidiaries;

(c)     pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)     easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrowers or any of their Restricted Subsidiaries;

(f)    Liens in existence on the Closing Date listed on Schedule 7.3(f), securing Indebtedness permitted by Section 7.2(d), <u>provided</u> that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased;

(g)    Liens securing Indebtedness of the Borrowers or any Restricted Subsidiary incurred pursuant to Section 7.2(e) to finance the acquisition of assets in the ordinary course of business (excluding, for the avoidance of doubt, any Permitted Acquisition or similar acquisition), including, without limitation, any interest or title of BALC under the Master Lease Agreement and of TFS or SDFC or DL under any equipment financing agreement existing on the Closing Date or thereafter; provided that (i) such Liens shall be created substantially simultaneously or within 270 days after the acquisition of such assets, and (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness (and substitutions, replacements and proceeds thereof);

(h)    Liens created pursuant to the Security Documents;

(i)    any interest or title of a lessor or licensor under any lease, sublease, license or sublicense entered into by the Borrowers or any Restricted Subsidiary in the ordinary course of its business and covering only the assets so leased or licensed; and any security deposits, escrows and other similar arrangements in connection therewith in the ordinary course of business;

(j)    Liens securing the Indebtedness permitted under Section 7.2(o) hereof provided that (x) the Liens on the ABL Collateral securing the obligations under the ABL Facility are senior to the Liens on the ABL Collateral securing the Obligations and (y) the Liens on Non ABL Collateral securing the obligations under the ABL Facility are junior to the Liens on all Non ABL Collateral securing the Obligations, in each case, in accordance with the ABL Intercreditor Agreement;

(k)    Liens on property or shares of Capital Stock of a Person at the time such Person becomes a Restricted Subsidiary, in each case after the Closing Date; provided that (i) such Liens are not created, incurred or assumed in connection with, or in contemplation of, such other Person becoming a Restricted Subsidiary, (ii) any such Lien may not extend to any other property owned by the Borrowers or any other Restricted Subsidiary of a Borrower and (iii) the Indebtedness secured thereby is permitted under Section 7.2;

(l)    Liens securing Indebtedness permitted under Section 7.2(h); provided that (i) such Liens shall not have been created, incurred or assumed in contemplation of the Permitted Acquisition, (ii) such Liens do not at any time encumber any property other than the property acquired in such Permitted Acquisition and (iii) the amount of Indebtedness secured thereby is not increased by reason of such Permitted Acquisition;

(m)    leases, subleases, licenses and sublicenses in the ordinary course of business, that do not interfere in any material respect with the business of the Group Members taken as a whole; and security deposits, escrows and other similar arrangements in connection therewith in the ordinary course of business;

(n)    Liens securing or otherwise arising from judgments for the payment of money not constituting an Event of Default under Section 8.1(h);

(o)    Liens on goods the purchase of which is financed or supported by a documentary letter of credit, and on bills of lading, drafts and other documents of title arising by operation of law or pursuant to standard terms of agreements in the ordinary course of business;

(p)    rights of set-off, bankers lien, netting agreements and other Liens arising by operation of law or by the terms of documents of banks and other financial institutions in relation to the maintenance or administration of deposit accounts, securities accounts, Cash Management Arrangements or in connection with the issuance of letters of credit, bank guarantees or other similar instruments;

(q)    Liens arising from precautionary Uniform Commercial Code financing statement filings or similar filings made in connection with operating leases entered into by Group Members;

(r)    Liens in favor of customs or revenue authorities arising as a matter of law to secure the payment of customs duties in relation to the importation of goods in the ordinary course of business;

(s)    Liens of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection;

(t)    Liens on cash advances or escrow deposits in favor of any seller or lessor of any property to be acquired in an Investment permitted by Section 7.8 or other purchase of assets permitted by this Agreement, to be applied against the purchase price for such Investment or asset, solely to the extent that such Investment or such purchase would have been permitted on the date of the creation of such Lien;

(u)    (i) Liens consisting of or contained in an agreement to Dispose of property in a Disposition permitted by Section 7.5 (whether or not consummated), either restraining the Disposition thereof to Persons other than the proposed purchaser or providing for funds or other property to be applied against the sale price for such Disposition, solely to the extent that such Disposition would have been permitted on the date of the creation of such Lien and (ii) to the extent constituting a Lien, a Disposition that is permitted by Section 7.5 (other than Section 7.5(k));

(v)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale or purchase of goods in the ordinary course of business permitted by this Agreement;

(w)    Reserved;

(x)    Liens on insurance policies and the proceeds thereof securing the financing of premiums with respect thereto, provided that such Liens are limited to the applicable unearned insurance premiums;

(y)    Liens on assets of the Excluded Domestic Subsidiary or any Excluded Foreign Subsidiaries;

(z)    Liens not otherwise permitted by this Section so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to the Borrowers and all Subsidiaries) $10,000,000 at any one time outstanding;

(aa)    Liens on the Collateral securing the Indebtedness permitted under Section 7.2(i) so long as such Liens rank junior to (i) the Liens in favor of the Administrative Agent pursuant to the terms of the Second Lien Intercreditor Agreement and (ii) the Liens securing the Indebtedness permitted under Section 7.2(o);

(bb)    Liens securing Indebtedness permitted under Section 7.2(t) to finance the acquisition or holding of real property, <u>provided</u> that such Liens do not at any time encumber any property other than the real property financed by such Indebtedness (other than fixtures, assignment of rents and other personal property related to such real property pursuant to the customary terms of mortgages or deeds of trust in the relevant market);

(cc)    licenses, leases and subleases of the Aircraft granted to a Borrower by Pain in the Air; and

(dd)    the modification, replacement, renewal or extension of any Lien permitted by clauses (f), (g), (i), (j), (k), (l), (v), (y), (aa) and (bb), <u>provided</u> that (i) the Lien does not extend to any additional property and (ii) the modification, replacement, renewal or extension of the Indebtedness secured or benefited from such Lien is permitted by this Agreement.

7.4    <u>Fundamental Changes</u>.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)    any Restricted Subsidiary of a Borrower (other than MH) may be merged or consolidated with or into a Borrower (<u>provided</u> that such Borrower shall be the continuing or surviving entity) or with or into any Restricted Subsidiary (<u>provided</u> that if any Loan Party is party to such merger or consolidation, such Loan Party shall be the continuing or surviving entity);

(b)    any Restricted Subsidiary of the Borrowers may Dispose of any or all of its assets (i) to a Borrower or any other Restricted Subsidiary (upon voluntary liquidation or otherwise; <u>provided</u>, that if the Restricted Subsidiary effecting the Disposition is a Loan Party, the assets so Disposed shall be received by another Loan Party; and <u>provided</u>, <u>further</u>, that if the Restricted Subsidiary effecting the Disposition is a Wholly-Owned Subsidiary Guarantor, the assets so Disposed shall be received by another Wholly-Owned Subsidiary Guarantor) or (ii) pursuant to a Disposition permitted by Section 7.5 other than, in the case of this clause (b), the Disposition of a Borrower including, without limitation, the Disposition of all or substantially all of the property and assets of a Borrower;

(c)    any Investment expressly permitted by Section 7.8 may be structured as a merger, consolidation or amalgamation; <u>provided</u>, <u>further</u> that in all circumstances, the surviving Person of such merger, consolidation or amalgamation shall be a Borrower or a Restricted Subsidiary or, if such merger, consolidation or amalgamation involves a Loan Party, the surviving Person shall be a Loan Party; <u>provided</u>, <u>further</u> that if such merger, consolidation or amalgamation involves a Borrower, the surviving Person shall be a Borrower;

(d)    any Permitted Acquisition expressly permitted by Section 7.8 may be structured as a merger, consolidation or amalgamation; <u>provided</u> that in all circumstances, the surviving Person of such merger, consolidation or amalgamation shall be a Borrower or a Restricted Subsidiary;

(e)    dormant or inactive Restricted Subsidiaries and Excluded Foreign Subsidiaries may be liquidated, wound up, merged with any Person or otherwise Disposed of if (x) the Borrowers determine in good faith that such action is in the best interest of Holdings and its Restricted Subsidiaries and if not materially disadvantageous to the Lenders and (y) to the extent such Restricted Subsidiary is a Loan Party, any assets or business not otherwise disposed of or transferred in accordance with Section 7.5 shall be transferred to or otherwise owned or conducted by another Loan Party after giving effect to such liquidation, dissolution or merger;

(f)        so long as no Default or Event of Default exists or would result therefrom, a Borrower may merge or consolidate with or into any other Person (any such Person, the "Successor Company"); provided (i) the Successor Company shall be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia, (ii) the Successor Company shall expressly assume all the obligations of such Borrower under this Agreement and the other Loan Documents to which such Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent and the Required Lenders, (iii) each Guarantor, unless it is the other party to such merger or consolidation, shall have confirmed that its guarantee under the Guarantee and Collateral Agreement shall apply to the Successor Company's obligations under the Loan Documents, (iv) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the applicable Security Documents confirmed that its obligations thereunder shall apply to the Successor Company's obligations under the Loan Documents, (v) the other Borrower shall have confirmed its obligations under the Loan Documents and that it remains jointly and severally liable (with the Successor Company) in regards to all of the Obligations (including without limitation, all Obligations under this Agreement and the Security Documents), (vi) if requested by the Administrative Agent, each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have by an amendment to or restatement of the applicable Mortgage (or other instrument reasonably satisfactory to the Administrative Agent and the Required Lenders) confirmed that its obligations thereunder shall apply to the Successor Company's obligations under the Loan Documents, and (vii) such Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Security Document preserves the enforceability of this Agreement and the Security Documents and the perfection of the Liens under the Security Documents;

(g)        Pain in the Air may Dispose of the Aircraft to the extent permitted by Section 7.5(d);

(h)        Reserved; and

(i)        a Qualified IPO may be consummated.

7.5        Disposition of Property.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Restricted Subsidiary, issue or sell any shares of such Restricted Subsidiary's Capital Stock to any Person, except:

(a)        (i) the Disposition of obsolete or worn out property in the ordinary course of business; and (ii) Dispositions of equipment and other property to the extent promptly replaced with property of at least comparable usefulness provided that if any equipment or property constituting Collateral is Disposed of pursuant to this Section 7.5(a)(ii), the replacement equipment or property shall also constitute Collateral;

(b)        the sale of inventory in the ordinary course of business;

(c)        the sale or issuance of any Subsidiary's Capital Stock to a Borrower or any Wholly Owned Subsidiary Guarantor;

(d)        the sale or Disposition of any Aircraft by Pain in the Air at fair market value, including any such Disposition executed by means of the sale or Disposition of the Capital Stock of any Subsidiary of the Borrower owning such Aircraft; provided that at the time (i) of any such sale or Disposition such Subsidiary shall not own any material assets or conduct any business other than owning,

leasing or operating such Aircraft and (ii) the proceeds of such Disposition of Aircraft and/or the Capital Stock are applied in accordance with Section 2.11(b);

(e)     Dispositions of Cash Equivalents;

(f)     Dispositions of business lines and other assets (including shares of Capital Stock) (i) acquired in connection with a Permitted Acquisition or other Investment permitted hereunder, which assets are not anticipated to be useful to the core or principal business of the Group Members or (ii) made to obtain the approval of any applicable antitrust or other regulatory authority in connection with a Permitted Acquisition, in each case, provided that, in regards to any Permitted Acquisition or any other acquisition constituting an Investment, the aggregate amount of assets disposed of pursuant to this clause (f) shall not exceed twenty percent (20%) of the net purchase price of such Permitted Acquisition or other acquisition constituting an Investment, as applicable;

(g)     endorsement, discounting or other Dispositions of instruments, accounts receivable, payment intangibles or other similar items for deposit, collection, enforcement or settlement, in each case in the ordinary course of business;

(h)     leases, subleases, non-exclusive licenses and non-exclusive sublicenses in the ordinary course of business, that do not interfere in any material respect with the business of the Group Members taken as a whole;

(i)     Dispositions of property that has been the subject of a casualty or other Recovery Event to an insurer upon or in anticipation of the receipt of the Net Cash Proceeds of such Recovery Event; and Dispositions of condemned property as a result of the exercise of eminent domain or similar power to the respective Governmental Authority; provided that, in each case, such Net Cash Proceeds are applied in accordance with Section 2.11(b) hereof to the extent required by such Section;

(j)     Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between the joint venture partners;

(k)     to the extent constituting Dispositions, transactions permitted by Section 7.3 (other than Section 7.3(u)(ii)), Section 7.4, Section 7.6, Section 7.8 and Sections 7.10(a)-(k), in each case permitted other than by reference to this Section 7.5(k);

(l)     to the extent constituting Dispositions, the Transactions; and

(m)     any Asset Sales; provided that (i) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof (determined in good faith by the Board of Directors of the Borrowers (or similar governing body)), (ii) no less than 70% thereof shall be paid in Cash; (iii) the Net Cash Proceeds thereof shall be applied as required by Section 2.11(b) and (iv) at the time of such Asset Sale, no Default or Event of Default shall have occurred and be continuing or would result therefrom (it being understood and agreed that the proceeds of such Asset Sale shall be valued at the principal amount thereof in the case of non-Cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-Cash proceeds).

7.6     Restricted Payments. Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof (including funding trusts or similar vehicles for the purpose of tax payments), either directly or indirectly, whether in cash or property or in

obligations of any Group Member (but in each of the foregoing cases, other than any of the foregoing payable solely in Specified Equity of the Person making such dividend, purchase, redemption, defeasance, retirement or distribution) (collectively, "Restricted Payments"), except that:

(a)    any Restricted Subsidiary may make Restricted Payments to the Borrowers and any Restricted Subsidiaries of MH may make Restricted Payments to any Wholly Owned Subsidiary Guarantor; provided that, for the avoidance of doubt, this clause (a) shall not be deemed to permit the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of Holdings;

(b)    so long as no Default or Event of Default shall have occurred and be continuing, Holdings may purchase Holdings' Capital Stock from present or former officers or employees of any Group Member upon the death, disability, retirement or termination of employment of any such Person or pursuant to any employee or director equity plan, stock option plan or other similar benefit plan, provided, that the amount of payments under this clause (b) (net of any proceeds received by Holdings and contributed to MH after the Closing Date in connection with resales of any membership interest or equity options so purchased) shall not exceed in the aggregate 2.5% of Consolidated EBITDA for each fiscal year of Holdings (based on the most recent financial statements of Holdings and its Restricted Subsidiaries for the prior fiscal year that have been delivered pursuant to Section 5.1(d) or Section 6.1(a));

(c)    Reserved;

(d)    Reserved;

(e)    Holdings shall be permitted to make distributions to the owners of its Capital Stock and/or otherwise purchase its Capital Stock in an aggregate amount not to exceed the Aggregate Available ECF Amount; provided that both before and immediately after giving effect to any such payment, (A) no Default or Event of Default shall have occurred and be continuing or would result therefrom, (B) no Available ECF Amount derived from a Calculation Period shall be permitted to fund such Restricted Payments until any and all amounts required to be applied to prepay Loans pursuant to Section 2.11(c) from Excess Cash Flow derived from such Calculation Period shall have been so applied and (C) the Borrowers shall have no less than $125,000,000 of Minimum Liquidity; provided, further, that (i) Holdings shall have delivered the financial statements, if any, then required by Section 6.1(a) together with a Compliance Certificate setting forth the calculation of the Available ECF Amount and the Aggregate Available ECF Amount to the Administrative Agent prior to making any such payment and (ii) no Restricted Payment shall be permitted to be made under this Section 7.6(e) until all amounts (if any) required to be applied to prepay Loans pursuant to Section 2.11(c) for the Calculation Period ending on December 31, 2016 shall have been so applied (for the avoidance of doubt, any Restricted Payments made under this Section 7.6(e) shall reduce the Aggregate Available ECF Amount dollar for dollar by the amount of such Restricted Payment);

(f)    Reserved;

(g)    Reserved;

(h)    Reserved; and

(i)    after the consummation of a Qualified IPO, payment in cash for the value of fractional shares that otherwise would be issued to holders of the equity of Holdings.

7.7    [Intentionally Omitted].

7.8    <u>Investments</u>.  Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting a business unit of, or make any other investment in, any other Person (all of the foregoing, "<u>Investments</u>"), except:

(a)    extensions of trade and operating credit in the ordinary course of business;

(b)    Investments in Cash Equivalents and other Cash Management Arrangements;

(c)    Guarantee Obligations permitted by Section 7.2;

(d)    loans and advances to employees of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses) in an aggregate amount for all Group Members not to exceed $2,500,000 at any one time outstanding;

(e)    Investments in assets useful in the business of the Borrowers and their Subsidiaries made by the Borrowers or any of their Subsidiaries with the proceeds of any Reinvestment Deferred Amount provided that if any Reinvestment Event occurs in regards to Collateral, any reinvestment of the Net Cash Proceeds from such Collateral shall be in property and/or assets constituting Collateral;

(f)    intercompany Investments by any Group Member in any Borrower or any Person that, prior to such Investment, is a Subsidiary Guarantor;

(g)    Permitted Acquisitions by the Borrowers or any Subsidiary Guarantor in an unlimited amount;

(h)    in addition to Investments otherwise expressly permitted by this Section, Investments by the Borrowers or any of their Subsidiaries in an aggregate amount (valued at cost) not to exceed during the term of this Agreement, (x) $25,000,000 minus (y) the aggregate amount of Non-Loan Party Investments made after the Closing Date  (which aggregate amount shall be net of returns on such Investments received by the Borrowers or any of their Subsidiaries); <u>provided</u> that no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(i)    Investments consisting of prepayments to suppliers and other extensions of trade credit in the ordinary course of business;

(j)    to the extent constituting an Investment, the Transactions;

(k)    advances of payroll payments to employees in the ordinary course of business;

(l)    Investments received in connection with settlements of litigation or other disputes with, or the bankruptcy or reorganization of, suppliers, customers or other third parties, or from financially troubled account debtors or upon exercise of remedies with respect to any secured Investment;

(m)    loans in the aggregate principal amount of $7,000,000 to Millennium Lender Claim Trust  and to Millennium Corporate Claim Trust (each as defined in the Master Restructuring Agreement) ("<u>Trustee Loans</u>"; the documentation evidencing the Trustee Loans, the "<u>Trustee Loan Documents</u>");

(n)    Swap Agreements permitted under Section 7.12;

(o)    loans to the Borrowers and their Subsidiaries to the extent permitted under Section 7.2(b); and

(p)    to the extent constituting Investments, Investments permitted under Section 7.3 (other than Section 7.3(t)) and Section 7.6.

7.9    Payments and Modifications of Subordinated Indebtedness . (a) Make any payment, prepayment, repurchase or redemption of, or otherwise defease or segregate funds with respect to, any Subordinated Indebtedness, Permitted Second Priority Indebtedness, or unsecured Indebtedness (for borrowed money) other than, (x) regularly scheduled interest and principal payments and (y) prepayments or redemptions in connection with refinancings permitted by Section 7.2, in each case so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom; (b) amend, modify, waive or otherwise change, or consent or agree to any amendment, waiver or modification or other change to any of the terms of any Subordinated Indebtedness, Permitted Second Priority Indebtedness, or unsecured Indebtedness (for borrowed money) (other than such amendment, modification, waiver or other change that is not adverse in any material respects to the Lenders); or (c) enter into any Subordinated Indebtedness or Permitted Second Priority Indebtedness unless the obligations of the Loan Parties pursuant to the Loan Documents are designated as "Senior Indebtedness" (or any other defined term having a similar purpose) for the purposes of such Subordinated Indebtedness or Permitted Second Priority Indebtedness, as applicable.

7.10    Transactions with Affiliates.  Enter into any transaction involving aggregate consideration in excess of $500,000, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Borrowers or any Wholly Owned Subsidiary Guarantor) unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of business of the relevant Group Member, and (c) upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.  For the avoidance of doubt, the following relationships, agreements and transactions, and amendments, restatements, and renewals of such relationships, agreements and transactions, are acknowledged to be in the ordinary course of business of the relevant Group Member, upon fair and reasonable terms, and accordingly permitted under this Section 7.10:

(a)    solely until ninety (90) days after the date hereof, all transactions between the Group Members, on one hand, and Millennium Laboratories Clinical Supply, Inc. ("MLCS"), on the other, to the extent such transactions are on an arms' length basis for a valid business purpose and no amounts are advanced by the Group Members to MLCS, provided that any costs (which shall be on market terms) may be shared and paid by MLCS to MH or its Subsidiaries pursuant to arm's length commercially reasonable expense sharing and employee leasing agreements;

(b)    Reserved;

(c)    the Group Members may pay base rent and other amounts to Pain in San Diego, LLC, with respect to the MH's lease of 16981 Via Tazon, Building 1, San Diego, California 92127, in an aggregate amount not to exceed the amounts payable under the current lease agreement (as amended through the Closing Date) with respect to such property, including by giving effect to the rent escalation clauses set forth therein, during any twelve-month period;

(d)    the Group Members may, in the aggregate, pay base rent and other amounts to Pain in San Diego, LLC, with respect to the MH's lease of 16981 Via Tazon, Building 2, San Diego, CA 92127, in an aggregate amount not to exceed the amounts payable under the current lease agreement (as

amended through the Closing Date) with respect to such property, including by giving effect to the rent escalation clauses set forth therein, during any twelve-month period;

(e)        the Group Members may, in the aggregate, pay base rent and other amounts to Pain in San Diego, LLC, with respect to the MH's sublease (or lease) of 16980 Via Tazon, San Diego, CA 92127, in an aggregate amount not to exceed the amounts payable under the current lease agreement (as amended through the Closing Date) with respect to such property, including by giving effect to the rent escalation clauses set forth therein, during any twelve-month period;

(f)        the Group Members may, in the aggregate, pay base rent and other amounts to Pain In San Diego, LLC, with respect to the MH's lease of 15330 Avenue of Science, San Diego, CA, in an aggregate amount not to exceed the amounts payable under the current lease agreement (as amended through the Closing Date) with respect to such property, including by giving effect to the rent escalation clauses set forth therein, during any twelve-month period;

(g)        Pain in the Air and MH may fulfill their respective obligations under any hangar lease agreements, aircraft management agreements, and other related agreements as are in effect on the Closing Date;

(h)        Reserved;

(i)        Pain in the Air and MH may fulfill their respective obligations under the Exclusive Aircraft Dry Lease Agreement, dated as of December 3, 2013 as in effect on the Closing Date, pertaining to the Gulfstream Aircraft;

(j)        transactions otherwise permitted under Section 7.2 and/or Section 7.8 to the extent constituting loans by a Restricted Subsidiary to another Restricted Subsidiary; and

(k)        the Group Members may consummate the Transactions.

7.11        <u>Sales and Leasebacks</u>.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property that has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member, except to the extent that such transaction would be permitted as secured Indebtedness under Section 7.2(e) or Section 7.3(g).

7.12        <u>Swap Agreements</u>.  Enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the any Borrower or any of the Borrowers' Subsidiaries have actual exposure (other than those in respect of Capital Stock) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrowers or any of their Subsidiaries.

7.13        <u>Changes in Fiscal Periods</u>.  Permit the fiscal year of Holdings to end on a day other than December 31 or change Holdings' method of determining fiscal quarters.

7.14        <u>Negative Pledge Clauses</u>.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than:

(a)    this Agreement and the other Loan Documents;

(b)    any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby);

(c)    customary provisions in leases, licenses and other contracts restricting the assignment thereof entered in the ordinary course of business;

(d)    customary provisions in agreements and instruments for Indebtedness permitted under Section 7.2 to the extent such prohibition or limitation apply only to the assets financed or secured by such Indebtedness;

(e)    restrictions and conditions contained in agreements relating to the sale of a Subsidiary or business or on any other assets pending sale, in each case provided that (i) such Disposition is permitted by this Agreement and (ii) such restrictions relate solely to the Capital Stock or assets of such Subsidiary subject to such Disposition;

(f)    restrictions or conditions set forth in any agreement (including, without limitation, Indebtedness) in effect at any time any Person becomes a Restricted Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided that such restriction or condition shall be limited to such Person and such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary; and provided, further, that this clause (f) shall not apply to restrictions or conditions applicable to a Person that becomes a Restricted Subsidiary pursuant to Section 6.13.

(g)    restrictions on cash or Cash Equivalents or other deposits imposed by agreements entered into in the ordinary course of business (or other restrictions on cash or deposits constituting Liens permitted under Section 7.3 and limited to such cash or Cash Equivalents);

(h)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under this Agreement and applicable solely to such joint ventures; and

(i)    customary net worth maintenance requirements in real property leases entered into by Group Members in the ordinary course of business, so long as the Borrowers have determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Borrowers and their Restricted Subsidiaries to meet their ongoing obligations.

7.15    Clauses Restricting Subsidiary Distributions.  Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary of any Borrower to (a) make Restricted Payments in respect of any Capital Stock of such Restricted Subsidiary held by, or pay any Indebtedness owed to, any Borrower or any other Restricted Subsidiary of any Borrower, (b) make loans or advances to, or other Investments in, any Borrower or any other Restricted Subsidiary of any Borrower or (c) transfer any of its assets to any Borrower or any other Restricted Subsidiary of any Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, (ii) any restrictions with respect to a Restricted Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Restricted Subsidiary, (iii) any restrictions existing under any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be

effective against the assets secured or financed thereby), (iv) any restrictions in customary provisions in leases, licenses and other contracts restricting the assignment thereof entered in the ordinary course of business; (v) any restrictions in customary provisions in agreements and instruments for Indebtedness permitted under Section 7.2 to the extent such prohibition or limitation apply only to the assets financed or secured by such Indebtedness, (vi) restrictions and conditions contained in agreements relating to the sale of a Subsidiary or business or on any other assets pending sale, in each case provided that (x) such Disposition is permitted by this Agreement and (y) such restrictions relate solely to the Capital Stock or assets of such Subsidiary subject to such Disposition, (vii) restrictions or conditions set forth in any agreement (including, without limitation, Indebtedness) in effect at any time any Person becomes a Restricted Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition); provided that such restriction or condition shall be limited to such Person and such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary; and provided, further, that this clause (vii) shall not apply to restrictions or conditions applicable to a Person that becomes a Restricted Subsidiary pursuant to Section 6.13, (viii) Liens on cash or Cash Equivalents or other deposits permitted under Section 7.3 and restrictions related thereto solely to the extent that such restrictions only apply to such cash or Cash Equivalents and (ix) customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under this Agreement and applicable solely to such joint ventures.

7.16    Lines of Business.  Enter into any business, either directly or through any Restricted Subsidiary, except for those businesses in which the Borrowers and their Restricted Subsidiaries are engaged on the date of this Agreement or that are incidental or related thereto, or that is reasonably similar thereto or a reasonable extension, development or expansion thereof or ancillary thereto, including without limitation laboratory services (whether involving urine testing, saliva testing, blood testing or otherwise, and whether related to drug testing, genetic testing or otherwise), and other health and medical services.

7.17    Use of Proceeds.  The Borrowers shall not request any Loan, and the Borrowers shall not use, and shall procure that  their Subsidiaries and their or their respective directors, officers, employees and agents shall not use, the proceeds of any Loan (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permissible for a Person required to comply with Sanctions or (C) in any manner that would result in the violation of  any Sanctions applicable to any party hereto.

7.18    Amendments or Waivers of Organizational Documents.  Agree to any material amendment, restatement, supplement or other modification to, or waiver of, any Organizational Documents of any Loan Party if such amendment, restatement, supplement, modification or waiver is materially adverse to the rights or remedies of the Administrative Agent or Lenders under the Loan Documents or with respect to the Loan Parties, without in each case obtaining the prior written consent of the Required Lenders to such amendment, restatement, supplement or other modification or waiver.

SECTION 8.    EVENTS OF DEFAULT

8.1    Events of Default.  If any of the following events shall occur and be continuing:

(a)    the Borrowers shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrowers shall fail to pay any interest on any Loan, or any other amount payable hereunder or under any other Loan Document, within five days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)      any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)      any Loan Party shall default in the observance or performance of any agreement contained in clause (i) of Section 6.3(a) (with respect to the Borrowers only), Section 6.6(a) or Section 7 of this Agreement or Section 5.5 of the Guarantee and Collateral Agreement; or

(d)      any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days after notice to the Borrowers from the Administrative Agent or the Required Lenders; or

(e)      any Group Member shall (x) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto; or (y) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (z) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (x), (y) or (z) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (x), (y) and/or (z) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the aggregate outstanding principal amount of which is $15,000,000 or more; provided further that such default, event or condition described in clause (x), (y) or z) of this paragraph (e) is unremedied and is not waived by the holders of such Indebtedness prior to the acceleration of the Loans pursuant to this Section 8.1; or

(f)      (i) any Group Member shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; or (ii) there shall be commenced against any Group Member any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed or undischarged for a period of 60 days; or (iii) there shall be commenced against any Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) any Group Member shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) any Group Member shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they

become due; or (vi) or any Group Member shall make a general assignment for the benefit of its creditors; or

(g)      (i) an ERISA Event and or a Foreign Plan Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Pension Plan; (iii) the PBGC shall institute proceedings to terminate any Pension Plan; (iv) any Group Member or any of their respective ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; or (v) any other event or condition shall occur or exist with respect to a Plan, a Foreign Benefit Arrangement, or a Foreign Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, would, in the sole judgment of the Required Lenders, reasonably be expected to result in a Material Adverse Effect; or

(h)      one or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $15,000,000 or more, and all such judgments or decrees shall not have been paid, satisfied, discharged, stayed or appealed (and bonded pending appeal to the extent required by the applicable court) within 30 days from the entry thereof; or

(i)      any of the Security Documents (or any ABL Intercreditor Agreement or Second Lien Intercreditor Agreement) shall cease, for any reason, to be in full force and effect (in the case of the ABL Intercreditor Agreement and/or the Second Lien Intercreditor Agreement, after such agreement(s) become effective), or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents that cover a material portion of the Collateral shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(j)      the guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason, to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(k)      a Change in Control shall have occurred; or

(l)      Holdings shall (i) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than those incidental to its ownership of the Capital Stock of MH, (ii) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (x) nonconsensual obligations imposed by operation of law, (y) obligations pursuant to the Loan Documents to which it is a party and the Trustee Loan Documents to which it is a party and (z) obligations with respect to its Capital Stock, or (iii) own, lease, manage or otherwise operate any properties or assets (including cash (other than cash received in connection with dividends made by MH in accordance with Section 7.6) and cash equivalents) other than the ownership of shares of Capital Stock of MH;

(m)      the commencement of an investigation, litigation and/or proceeding by any Governmental Authority or any other Person, the results of which, could reasonably be expected to have a Material Adverse Effect;

(n)      the Borrowers or any other Loan Party shall make any payment in violation of any subordination terms or conditions, if any, with respect to any Subordinated Indebtedness;

(o)      a revocation of the Borrowers' enrollment and billing privileges in the Medicare program pursuant to 42 C.F.R. § 424.535 shall have taken effect;

(p)      (i) Either of the Borrowers shall have received a Notice of Material Breach and Intent to Exclude under (and as defined in) the Corporate Integrity Agreement, (ii) the Borrowers shall not have cured the material breach alleged therein within the cure period provided for in Section X.D.3 of the Corporate Integrity Agreement, (iii) the Borrowers shall have exhausted all review rights to which they are entitled under Section X.E.1. of the Corporate Integrity Agreement with respect to such alleged material breach and (iv) the exclusion of the Borrowers from participation in the Federal health care programs shall have taken effect pursuant to the terms of the Corporate Integrity Agreement;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to either Borrower, automatically, the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents shall immediately become due and payable and (B) if such event is any other Event of Default, any of the following actions may be taken:  (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrowers, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, exercise all other rights and remedies available under the Loan Documents and applicable law.

Except as expressly provided above in this Section 8.1, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrowers. Notwithstanding any other provisions set forth herein or in any other Loan Documents, the Administrative Agent and Lenders agree that the Administrative Agent and Lenders shall be prohibited (and agree to forbear) from (x) declaring any Defaults or Events of Default hereunder or under any other Loan Documents and (y) accelerating any of the Obligations or exercising any other rights or remedies hereunder or under any other Loan Documents (other than to impose the Default Rate), in each case, for a period of ninety-one (91) days after the Approved Plan Effective Date**.**

8.2      Right to Cure.  Notwithstanding anything to the contrary contained in Section 8.1, for purposes of determining whether an Event of Default has occurred under the financial covenant set forth in Section 7.1, any cash equity issuance (in the form of common equity or other equity having terms reasonably acceptable to the Administrative Agent (at the direction of the Required Lenders)) made by Holdings will, at the request of the Borrowers and provided that the proceeds thereof  are deposited in and maintained by the Borrowers (until used by the Borrowers) in one or more of their deposit accounts subject to the "Control" (as defined in the Guarantee and Collateral Agreement) of the Administrative Agent pursuant to a deposit account control agreement in form and substance satisfactory to the Administrative Agent and the Required Lenders, be included in the calculation of Minimum Liquidity solely for the purposes of determining compliance with the financial covenant set forth in Section 7.1 hereof and satisfying the Minimum Liquidity threshold set forth in Section 2.11(c) hereof  (any such equity contribution, a "Specified Equity Contribution"); provided that (a) the Borrowers shall not be permitted to so request that a Specified Equity Contribution be included in Minimum Liquidity unless, after giving effect to such requested Specified Equity Contribution, there will be a period of at least two consecutive fiscal quarters in the Relevant Four Fiscal Quarter Period in which no Specified Equity Contribution has been made, (b) no more than four Specified Equity Contributions will be made in the aggregate, (c) the amount of any Specified Equity Contribution and the use of proceeds therefrom will be no greater than the amount required to cause the Borrowers to be in compliance with the financial covenant set forth in section 7.1 hereof and (d) all Specified Equity Contributions and the use of proceeds

therefrom will be disregarded for all other purposes under the Loan Documents (including calculating Consolidated EBITDA for purposes of determining basket levels, Applicable Margin and other items governed by reference to Consolidated EBITDA). For purposes of this paragraph, the term "Relevant Four Fiscal Quarter Period" shall mean, with respect to any requested Specified Equity Contribution, the four fiscal quarter period ending on (and including) the fiscal quarter in which Minimum Liquidity will be increased as a result of such Specified Equity Contribution.

SECTION 9.    THE ADMINISTRATIVE AGENT

9.1    Appointment. Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Administrative Agent is hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral (including any intercreditor agreements referred to herein) and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders (or all Lenders, if so required hereunder), which negotiation, enforcement or settlement will be binding upon each Lender. Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, regardless of whether any Default has occurred or is continuing, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. With respect to any provision of this Agreement or any other Loan Document that provides for or permits the Administrative Agent to take any action in its discretion, to determine whether the occurrence of any event is to its satisfaction, or for the Administrative Agent to make any other similar determination, the Administrative Agent may consult with the Lenders and choose to take such action (or make such determination) only with the direction of the Required Lenders (or such other number or percentage of Lenders as shall be necessary under the circumstances as provided in Section 10.1); provided, however, that the Administrative Agent shall have no obligation to do so prior to receiving such direction, unless expressly required pursuant to this Agreement or such other Loan Document. The Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is instructed in writing to exercise by the Required Lenders (or such other number or percentage of Lenders as shall be necessary under the circumstances as provided in Section 10.1). For the avoidance of doubt, the Administrative Agent shall be entitled to all protections of this Agreement, including under Sections 9.3, 9.4 and 9.7 (below) in connection with its taking of any such discretionary or good faith action.

9.2    Delegation of Duties. The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents, sub-agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent and any such agent or sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective related parties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys in-fact selected by it with reasonable care. The exculpatory provision of Section 9.3 and the indemnity provisions of Section 9.7 shall apply, *mutatis mutandis*, to any such agents, sub-agents and attorneys-in-fact and to the related parties of each such Person.

9.3     Exculpatory Provisions.  Neither the Administrative Agent nor any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder.  The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.  Furthermore, except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, nor be liable for the failure to disclose, any information relating to Holdings, the Borrowers or any of their Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent and/or collateral agent or any of its Affiliates in any capacity.

9.4     Reliance by the Administrative Agent.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying and shall not incur any liability for relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrowers), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent shall not be liable for any action taken or not taken by it in accordance with the advice of such counsel, accountants or experts.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5     Notice of Default.  The Administrative Agent shall be deemed not to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received written notice from a Lender or Borrower(s) referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default", and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made on or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance by the Loan Parties of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any conditions set forth in Article 5 or elsewhere in this Agreement, other than to confirm receipt of items expressly required

to be delivered to the Administrative Agent, and in determining compliance with any condition hereunder to the making or deemed making of a Loan that by its terms must be fulfilled to the satisfaction of any Lender(s), the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making or deemed making of such Loan. In the event that the Administrative Agent receives such a notice of default, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders) or the Majority Facility Lenders under the applicable Facility; provided that unless and until the Administrative Agent shall have received such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6    Non-Reliance on Administrative Agent and Other Lenders. Each Lender expressly acknowledges that neither the Administrative Agent nor any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates.

9.7    Indemnification. The Lenders agree to indemnify the Administrative Agent and its officers, directors, employees, affiliates, agents, advisors and controlling persons (each, an "Agent Indemnitee") (to the extent not reimbursed by the Borrowers and without limiting the obligation of the Borrowers to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, the Loans, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that in the case of any Agent Indemnitee no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a

final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

9.8     <u>Administrative Agent in Its Individual Capacity</u>.  The Administrative Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though the Administrative Agent were not the Administrative Agent.  With respect to its Loans made or renewed by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

9.9     <u>Successor Administrative Agent</u>.  The Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders and the Borrowers.  If the Administrative Agent shall resign or is replaced as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (unless an Event of Default shall have occurred and be continuing) be subject to approval by the Borrowers (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor agent has accepted appointment as Administrative Agent by the date that is 30 days following a retiring Administrative Agent's notice of resignation or Required Lenders' notice of replacement, as applicable, the retiring Administrative Agent's resignation or replacement shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After any retiring Administrative Agent's resignation or replacement as Administrative Agent, the provisions of this Section 9 and of Section 10.5 shall continue to inure to its benefit.

9.10    <u>Direction</u>.  The Lenders hereby direct the Administrative Agent to execute the Guarantee and Collateral Agreement, substantially in the form attached to Exhibit A hereto, the Intellectual Property Agreements and all deposit account control agreements to be executed on the Closing Date and/or pursuant to Section 6.12.

9.11    <u>Disqualified Lenders</u>.  The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Disqualified Lenders or to assignments or participations to affiliates of a Borrower.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any other Lender or participant or prospective Lender or Participant is a Disqualified Lender or affiliate of a Borrower or (y) have any liability with respect to or arising out of any assignment or participation of Loans, or disclosure of confidential information, to any Disqualified Lender by any other Lender.

9.12    <u>Specified Swap Agreements; Secured Cash Management Agreements</u>.  Except as otherwise expressly set forth herein or in any Security Document, no Lender or affiliate of a Lender party to any Specified Swap Agreement or any Specified Cash Management Agreement that obtains the benefit of Section 6.5 of the Guarantee and Collateral Agreement, Section 2 of the Guarantee and Collateral Agreement or any Collateral by virtue of the provisions hereof or of any Security Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any

other Loan Document or otherwise in respect of the Collateral (including the release or impairment of any Collateral) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents. The Administrative Agent shall be entitled to assume no amounts are due or owing in respect of Specified Swap Agreements and Specified Cash Management Agreements to any Person with an interest in any Specified Swap Agreement or Specified Cash Management Agreement unless such Person has provided a written certification (setting forth a reasonably detailed calculation) to the Administrative Agent as to the amounts that are due and owing to it and such written certification is received by the Administrative Agent a reasonable period of time prior to the making of any distribution pursuant to Section 6.5 of the Guarantee and Collateral Agreement.  The Administrative Agent shall have no obligation to calculate the amount due and payable with respect to any Specified Swap Agreement or Specified Cash Management Agreement, but may rely upon the written certification of the amount due and payable from the applicable counterparty or applicable provider, as the case may be.  In the absence of an updated certification, the Administrative Agent shall be entitled to assume that the amount due and payable to such Person is the amount last certified to the Administrative Agent by such Person as being due and payable (less any distributions made by the Administrative Agent to such Person on account thereof).  Each counterparty to a Specified Swap Agreement and each provider and/or counterparty in respect of any Specified Cash Management Agreement, by accepting the benefits of Section 6.5 of the Guarantee and Collateral Agreement, acknowledges and agrees that neither the Administrative Agent nor any Lender owes such Person, solely by virtue of its interest in Specified Swap Agreement or Specified Cash Management Agreement, any duty under the Loan Documents or in regards to the Collateral (except that any payments in respect of the Obligations and proceeds of Collateral, in each case received by the Administrative Agent, shall be applied as provided in Section 6.5 of the Guarantee and Collateral Agreement).

SECTION 10.   MISCELLANEOUS

10.1    Amendments and Waivers.  Neither this Agreement, any other Loan Document (excluding the ABL Intercreditor Agreement and the Second Lien Intercreditor Agreement), nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1 and Section 2.24(e).  The Required Lenders and each Loan Party a party to the relevant Loan Document (excluding the ABL Intercreditor Agreement and the Second Lien Intercreditor Agreement, which may be amended solely by written consent of all parties thereto, as applicable) may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party a party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) forgive the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date of any amortization payment in respect of any Term Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Majority Facility Lenders of each adversely affected Facility) and (y) that any amendment or modification of defined terms used in the financial covenant in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)), (ii) extend the scheduled date of any payment thereof, without the written consent of each Lender directly affected thereby; (iii) eliminate or reduce the voting rights of any Lender under this Section 10.1 without the written consent of such Lender; (iv) reduce any percentage specified in the definition of the Required Lenders, consent to the assignment or transfer by the Borrowers of any of their rights and obligations

under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release any material Subsidiary Guarantor or all or substantially all of the Subsidiary Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the written consent of all Lenders; (v) reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility; (vi) amend, modify or waive any provision in Section 2.17 or any other provision allocating the proceeds of payment(s) or proceeds of Collateral under this Agreement or any other Loan Document without the written consent of all Lenders other than (A) in accordance with Section 7.3(j) hereof (as in effect on the Closing Date), (B) in connection with any subordination of Liens to the liens of depository institutions under deposit account control agreements and (C) in connection with the subordination of Liens under the Mortgages to the rights of the owners (or lenders to the owners) of the Mortgaged Property pursuant to the Mortgages; (vii) subordinate the Liens securing the Obligations to the Liens of any other Persons on securing borrowed money and/or obligations evidenced by notes, bonds, debentures, loan agreements or other similar instruments other than as expressly contemplated herein or in accordance with Section 7.3(j) (as in effect on the Closing Date), (viii) amend, modify or waive any provision of Section 9 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent;  provided, further, that notwithstanding anything to the contrary contained herein, any amendment, modification or waiver of this Agreement that by its terms directly affects only the rights or duties under this Agreement of Lenders holding Loans  of a particular Facility (or Facilities) and do not directly affect Lenders under any other Facility shall require the written consent of the requisite percentage interest of the Lenders of the affected Facility (or Facilities), without the consent of the Required Lenders.  Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans.  In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

Notwithstanding the foregoing, (x) this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrowers (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share in the benefits of this Agreement and the other Loan Documents with the Term Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders and Majority Facility Lenders (as applicable) and (y) the last sentence of Section 8.1 shall not be amended.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrowers and the Lenders providing the relevant Replacement Term Loans (as defined below) (such amendment, a "Refinancing Amendment") to permit the refinancing, replacement or modification of one or more tranches of Term Loans ("Replaced Term Loans") with a replacement term loan tranche hereunder ("Replacement Term Loans"), provided that (i) all terms applicable to such Replacement Term Loans (except as to interest rates, fees, final maturity date, premiums and optional prepayment provisions, provided that with respect to any Replacement Term Loans that refinance, replace or modify one or more tranches of Incremental Term Loans without refinancing, replacing or modifying at the same time all of the outstanding Closing Date Term Loan, if the all-in yield (determined by taking into account interest rate margins, original issue discount, upfront fees and interest rate floors, but excluding arrangement, structuring, underwriting, commitment or other similar fees) of such Replacement Term Loans exceeds by more than 0.50% the all-in yield for the Closing Date Term Loan (calculated in the same manner as the previous parenthetical phrase), the

Applicable Margin for the Closing Date Term Loan shall be increased so that the all-in yield in respect of such Replacement Term Loans is no higher than 0.50% above the all-in yield for the Closing Date Term Loan (it being agreed that any increase in yield in the Closing Date Term Loan required due to the application of interest rate floors on the Replacement Term Loans shall be effected solely through an increase in any interest rate floors applicable to the Closing Date Term Loan) shall be customary market terms for term loans at the time of the issuance of such Replacement Term Loans and shall be substantially identical to, or, taken as a whole, materially less favorable to the lenders providing such Replacement Term Loans than, those applicable to such Replaced Term Loans (save for any terms that apply solely after the latest maturity date of the Term Loans hereunder prior to giving effect to such Replacement Term Loans), (ii) the final maturity date of any Replacement Term Loans shall be no earlier than the then latest maturity date of the Term Loans hereunder prior to giving effect to such Replacement Term Loans, (iii) such Replacement Term Loans will rank *pari passu* or junior in right of payment with the other Loans hereunder and (iv) all documentation in respect of such Replacement Term Loans shall be consistent with the foregoing. On the effective date of a Refinancing Amendment on which Replacement Term Loans are effected, subject to the satisfaction of the foregoing terms and conditions, each Replacement Term Loan shall be deemed for all purposes a Term Loan and each Lender providing such Replacement Term Loans shall become a Lender with respect to such Replacement Term Loans and all matters relating thereto.  For the avoidance of doubt, no Lender shall be required to provide any Replacement Term Loans.

Notwithstanding the foregoing, this Agreement and any other Loan Document may be amended solely with the consent of the Administrative Agent and the Borrowers without the need to obtain the consent of any other Lender if such amendment is delivered in order (w) to correct or cure ambiguities, errors, omissions or defects, (x) to effect administrative changes of a technical or immaterial nature or (y) to fix incorrect cross references or similar inaccuracies in this Agreement or the applicable Loan Document, in each case of clauses (w), (x) and (y), such amendment shall become effective without any further action or the consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.  The Security Documents and related documents in connection with this Agreement and the other Loan Documents may be, together with this Agreement, amended, supplemented and waived with the consent of the Administrative Agent at the request of the Borrowers without the need to obtain the consent of any other Lender if such amendment, supplement or waiver is delivered in order (i) to comply with local Law or advice of local counsel, (ii) to correct or cure ambiguities, omissions, mistakes or defects or (iii) to cause such Security Documents or other document to be consistent with this Agreement and the other Loan Documents and, in each case, such amendment shall become effective without any further action or the consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

10.2    Notices.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or five Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case the Borrowers and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

| The Borrowers: | 16981 Via Tazon |
| | San Diego, CA 92127 |
| | Attention: Martin Price, General |
| | Counsel |

Telecopy: 858-217-8502
Telephone: 858-451-3535

With a copy (which copy shall
not constitute notice) to:

Jack N. Rudel, Esq.
Jennings, Strouss & Salmon,
PLC
One E. Washington St., Ste. 1900
Phoenix, AZ 85004
Telecopy: 602-495-2680
Telephone: 602-252-5951

and:

Steven Messina
Skadden, Arps, Slate, Meagher &
FLom LLP
Four Times Square
New York, NY 10036-6522
Telecopy: 917-777-3509
Telephone: 212-735-3509

Administrative Agent:      Credit Suisse AG, Cayman Islands Branch
Eleven Madison Avenue
New York, NY 10010
Attention: Agency Manager
Telecopy: (212) 322-2291
Telephone: (919) 994-6369
Email: agency.loanops@credit-suisse.com

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received.

     All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 10.2 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 10.2. As agreed to among the Borrowers and the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

     The Borrowers hereby agree, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrowers, that each Borrower will, or will cause its Subsidiaries to, provide to the Administrative Agent

all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Section 6, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to the occurrence of an event pursuant to Section 2 of this Agreement, (ii) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (iii) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrowers agree, and agree to cause their Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrowers hereby acknowledge that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrowers hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on Intralinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "*public-side*" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrowers or their securities) (each, a "Public Lender"). The Borrowers hereby agree that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "*PUBLIC*" which, at a minimum, shall mean that the word "*PUBLIC*" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "*PUBLIC,*" the Borrowers shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to the Borrowers or their securities for purposes of United States federal and state securities laws (*provided, however*, that to the extent such Borrower Materials constitute non-public information, they shall be treated as set forth in Section 10.15); (y) all Borrower Materials marked "*PUBLIC*" are permitted to be made available through a portion of the Platform designated as "*Public Investor;*" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "*PUBLIC*" as being suitable only for posting on a portion of the Platform not marked as "*Public Investor.*" Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "*PUBLIC*", unless the Borrowers notify the Administrative Agent promptly that any such document contains material non-public information: (1) the Loan Documents, (2) notification of changes in the terms of the Loans, and (3) all financial statements, reports and certificates delivered pursuant to Sections 6.1(a) and (b) and 6.2(b).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "*Private Side Information*" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "*Public Side Information*" portion of the Platform and that may contain material non-public information with respect to the Borrowers or their securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "*AS IS*" AND "*AS AVAILABLE*".  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A

PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents to the extent that such Communications have been posted to the Platform.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

10.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Payment of Expenses and Taxes.  The Borrowers agree (a) (i) to pay or reimburse the Administrative Agent for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement, waiver or modification to, this Agreement and/or any other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of primary counsel for such Person  (and, if reasonably necessary, of one local counsel in any relevant jurisdiction and one firm of specialist counsel for any reasonably necessary specialized area of law) and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrowers at least one Business Day prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a monthly basis or such other periodic basis as the Administrative Agent shall deem appropriate and (ii) to pay or reimburse the Lenders for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment,

supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of primary counsel for such Persons (selected by the Required Lenders) collectively, taken as a whole and, solely in the case of a conflict of interest, one additional counsel to all affected Persons, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant jurisdiction and one firm of specialist counsel for any reasonably necessary specialized area of law to all such Persons, taken as a whole and, in each case, selected by the Required Lenders, and, solely in the case of a conflict of interest, one additional local counsel to all affected Persons, taken as a whole) and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrowers at least one Business Day prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on a monthly basis or such other periodic basis as the Required Lenders shall deem appropriate, (b) to pay or reimburse each Lender, and the Administrative Agent for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of (i) one firm of primary counsel to the Administrative Agent (and, if reasonably necessary, of one local counsel in any relevant jurisdiction and one firm of specialist counsel for any reasonably necessary specialized area of law) and (ii) one firm of primary counsel to the Lenders, taken as a whole (selected by the Required Lenders) (and, if reasonably necessary, of one local counsel in any relevant jurisdiction and one firm of specialist counsel for any reasonably necessary specialized area of law to all such Lenders, taken as a whole and, in each case, selected by the Required Lenders, and, solely in the case of a conflict of interest, one additional local counsel to all affected Lenders, taken as a whole), (c) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other Taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Lender and the Administrative Agent, their respective affiliates, and their respective officers, directors, employees, agents, advisors, partners and controlling persons and other representatives of each of the foregoing (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents, including any claim, litigation, investigation or proceeding regardless of whether any Indemnitee is a party thereto and whether or not the same are brought by the Borrowers, their equity holders, affiliates or creditors or any other Person, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable and documented out-of-pocket fees and expenses of one legal counsel for such Indemnitee(s) constituting the Administrative Agent (and/or its respective officers, directors, employees, agents, advisors, partners and controlling persons and other representatives of each of the foregoing) and one legal counsel for the Indemnitees constituting the Lender(s) (selected by the Required Lenders) (and their respective officers, directors, employees, agents, advisors, partners and controlling persons and other representatives of each of the foregoing) collectively and (x) solely in the case of a conflict of interest as between the Indemnitee(s) constituting the Administrative Agent (and their respective officers, directors, employees, agents, advisors, partners and controlling persons and other representatives of each of the foregoing), one additional counsel to all of such affected Indemnitees, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant jurisdiction to all such Indemnitees, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected Indemnitees, taken as a whole) in connection with claims, actions or proceedings by any of

such Indemnitees against any Loan Party under any Loan Document and (y) solely in the case of a conflict of interest as between the Indemnitee(s) constituting the Lender(s) (and/or their respective officers, directors, employees, agents, advisors, partners and controlling persons and other representatives of each of the foregoing), one additional counsel to all of such affected Indemnitees, taken as a whole (and, if reasonably necessary, of one local counsel in any relevant material jurisdiction to all such Indemnitees, taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected Indemnitees, taken as a whole) in connection with claims, actions or proceedings by any of such Indemnitees against any Loan Party under any Loan Document, (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrowers shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from (i) the gross negligence, willful misconduct, bad faith or material breach by such Indemnitee of this Agreement or the other Loan Documents or (ii) disputes solely among Indemnitees (or their related persons) (other than in connection with any Indemnitee acting in its capacity as Administrative Agent or any other agent or co-agent (if any), in each case in their respective capacities as such), and not arising out of or in connection with any act or omission of any Borrower or any of their Subsidiaries, and provided, further, that this Section 10.5(d) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrowers agree not to assert and to cause their Subsidiaries not to assert, and hereby waive and agree to cause their Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. No Indemnitee shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent any such damages are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence, willful misconduct, bad faith or material breach of this Agreement or the other Loan Documents by such Indemnitee. No Indemnitee shall be liable for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby. None of the Borrowers, the Borrowers' Subsidiaries, any Guarantors or their respective directors, officers, employees, advisors and agents of the foregoing shall be liable for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided that nothing contained in this sentence shall limit the Borrowers', the Borrowers' Subsidiaries' or the Guarantors' indemnification obligations pursuant to this Section 10.5. All amounts due under this Section 10.5 shall be payable not later than 10 days after written demand therefor. Statements payable by the Borrowers pursuant to this Section 10.5 shall be submitted to Howard Appel, President (Telephone No. (858) 451-3535) (Telecopy No. (858) 451-3636), at the address of the Borrowers set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrowers in a written notice to the Administrative Agent. The agreements in this Section 10.5 shall survive the termination of this Agreement and the repayment of the Loans and all other amounts payable hereunder.

10.6    Successors and Assigns; Participations and Assignments.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrowers shall not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.

(b)      (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than a natural person, any Disqualified Lender, Borrowers or any of their Subsidiaries (other than as provided in Section 10.6(e)) (each, an "Assignee"), all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it) with the prior written consent of:

(A)      the Borrowers (such consent not to be unreasonably withheld, conditioned or delayed), provided that no consent of the Borrowers shall be required for an assignment to a Lender, an affiliate of a Lender, an Approved Fund (as defined below) or, if an Event of Default has occurred and is continuing, any other Person, and provided, further, that the Borrowers shall be deemed to have consented to any such assignment unless the Borrowers shall object thereto by written notice to the Administrative Agent within five Business Days after having received telecopy or electronic written notice thereof; and

(B)      the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Term Loan to a Lender, an affiliate of a Lender or an Approved Fund.

(C)      Reserved.

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Loans under any Facility, the amount of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 in the case of the Closing Date Term Loan or the Incremental Term Facility, unless each of the Borrowers and the Administrative Agent otherwise consent, provided that (1) no such consent of the Borrowers shall be required if an Event of Default has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its affiliates or Approved Funds, if any;

(B)      (1) the parties to each assignment shall (x) execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or (y) if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Assumption, and, in each case, shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; and

(C)      the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrowers and their Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws, and all applicable tax forms.

For the purposes of this Section 10.6, "Approved Fund" means any Person (other than a natural person or a Disqualified Lender) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 10.5).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)    The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.

(v)    Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b)(ii) above, if applicable, and any written consent to such assignment required by paragraph (b)(i) of this Section and any applicable tax forms, the Administrative Agent shall accept such Assignment and Assumption and promptly record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.  No Group Member shall be responsible to pay or reimburse any transfer, processing or recordation fees, costs or expenses arising in connection with an assignment (other than an assignment pursuant to paragraph (e) below).

(c)    Any Lender may, without the consent of the Borrowers or the Administrative Agent, sell participations to one or more banks or other entities (other than to a natural person, to Holdings or any of its Subsidiaries or to any Disqualified Lender) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (i) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (ii) directly affects such Participant. Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.22 with respect to any Participant. The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.18, 2.19 and 2.20 (subject to the requirements and limitations therein, including the requirements under Section 2.19(f) (it being understood that the documentation required under Section 2.19(f) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (i) agrees to be subject to the provisions of Sections 2.18 and 2.19 as if it were an assignee under paragraph (b) of this Section and (ii) shall not be entitled to receive any greater payment under Sections 2.18 or 2.19, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from an adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the Closing Date that occurs after the Participant acquired the applicable participation. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided such Participant shall be subject to Section 10.7(a) as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Loans, or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto. The Borrowers, upon receipt of written notice from the relevant Lender, agree to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in this paragraph (d).

(e)     Notwithstanding anything else to the contrary contained in this Agreement, any Lender may assign all or a portion of its Term Loans to any Purchasing Borrower Party in accordance with Section 10.6(b); provided that:

(i)     the assigning Lender and the Purchasing Borrower Party purchasing such Lender's Term Loans, as applicable, shall execute and deliver to the Administrative

Agent an Affiliated Lender Assignment and Assumption in lieu of an Assignment and Assumption;

(ii)     such assignment shall be made pursuant to a Dutch Auction open to all Lenders on a pro rata basis;

(iii)     any Loans assigned to any Purchasing Borrower Party shall be automatically and permanently cancelled upon the effectiveness of such assignment and will thereafter no longer be outstanding for any purpose hereunder;

(iv)     both immediately before and immediately after giving effect to any such purchase, no Default or Event of Default shall exist;

(v)     Reserved;

(vi)     any gain from any such purchase shall not increase Consolidated EBITDA;

(vii)     the applicable Purchasing Borrower Party shall at the commencement of such Dutch Auction and at the time of such assignment affirm the No MNPI Representation; and

(viii)     the aggregate outstanding principal amount of the Term Loans shall be deemed reduced by the aggregate principal amount of the Term Loans purchased pursuant to this Section 10.6(e) and each principal repayment installment with respect to the Term Loans shall be reduced pro rata by the aggregate principal amount of Term Loans purchased.

(f)     For all purposes hereof, a natural person shall be deemed to include a holding company, investment vehicle or trust for, or owned or operated primarily for the benefit of, a natural person.

10.7     Adjustments; Set-off.

(a)     Except to the extent that this Agreement or a court order expressly provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefitted Lender") shall receive any payment of all or part of the Obligations owing to it (other than in connection with an assignment made pursuant to Section 10.6), or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8.1(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefitted Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefitted Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefitted Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest; provided further, that to the extent prohibited by applicable law as described in the definition of "Excluded Swap Obligation", no amounts received from, or set off with respect to, any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without notice to the Borrowers, any such notice being expressly waived by the Borrowers to the extent permitted by applicable law, upon any Obligations becoming due and payable by the Borrowers (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of the Borrowers; provided that if any Defaulting Lender shall exercise any such right of setoff, (i) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (ii) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Lender agrees promptly to notify the Borrowers and the Administrative Agent after any such application made by such Lender, provided that the failure to give such notice shall not affect the validity of such application.

10.8     Counterparts; No Requirement of Lender Signatures.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrowers and the Administrative Agent.

NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, EACH PERSON LISTED ON SCHEDULE 1.1A SHALL BE A PARTY HERETO IN ACCORDANCE WITH THE PLAN OF REORGANIZATION AND THE CONFIRMATION ORDER, AND PURSUANT TO THE PLAN OF REORGANIZATION AND THE CONFIRMATION ORDER, IS BOUND HEREBY NOTWITHSTANDING THE FAILURE OF ANY SUCH PERSON TO EXECUTE A SIGNATURE PAGE HERETO.  EACH PERSON LISTED ON SCHEDULE 1.1A SHALL BE A LENDER HEREUNDER WITH RESPECT TO ANY TERM LOANS HELD BY IT AND SHALL BE DEEMED TO HAVE IRREVOCABLY ACCEPTED ALL RIGHTS AND OBLIGATIONS OF A LENDER HEREUNDER, INCLUDING OBLIGATIONS IN FAVOR OF THE ADMINISTRATIVE AGENT.

10.9     Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10     Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrowers, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to the subject matter hereof or thereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11     GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND

CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

   10.12 <u>Submission to Jurisdiction; Waivers</u>.  Each of the Borrowers, and the Administrative Agent and each of the Lenders, hereby irrevocably and unconditionally:

   (a) submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof; <u>provided</u>, that nothing contained herein or in any other Loan Document will prevent any Lender or the Administrative Agent from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

   (b) consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

   (c) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrowers, the Administrative Agent or any Lender, as the case may be, each at the address provided in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

   (d) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law; and

   (e) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any indirect, special, exemplary, punitive or consequential damages; <u>provided</u> that nothing contained in this clause (e) shall limit the Borrowers', the Borrowers' Subsidiaries' or the Guarantors' indemnification obligations pursuant to Section 10.5.

   10.13 <u>Acknowledgements</u>.  Each of the Borrowers hereby acknowledges and agrees that (a) no fiduciary, advisory or agency relationship between the Loan Parties and the Credit Parties is intended to be or has been created in respect of any of the transactions contemplated by this Agreement or the other Loan Documents, irrespective of whether the Credit Parties have advised or are advising the Loan Parties on other matters, and the relationship between the Credit Parties, on the one hand, and the Loan Parties, on the other hand, in connection herewith and therewith is solely that of creditor and debtor, (b) the Credit Parties, on the one hand, and the Loan Parties, on the other hand, have an arm's length business relationship that does not directly or indirectly give rise to, nor do the Loan Parties rely on, any fiduciary duty to the Loan Parties or their affiliates on the part of the Credit Parties, (c) the Loan Parties are capable of evaluating and understanding, and the Loan Parties understand and accept, the terms, risks and conditions of the transactions contemplated by this Agreement and the other Loan Documents, (d) the Loan Parties have been advised that the Credit Parties are engaged in a broad range of transactions that may involve interests that differ from the Loan Parties' interests and that the Credit Parties have no obligation to disclose such interests and transactions to the Loan Parties, (e) the Loan Parties have consulted their own legal, accounting, regulatory and tax advisors to the extent the Loan Parties have deemed appropriate in the negotiation, execution and delivery of this Agreement and the other Loan

Documents, (f) each Credit Party has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by it and the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Loan Parties, any of their affiliates or any other Person, (g) none of the Credit Parties has any obligation to the Loan Parties or their affiliates with respect to the transactions contemplated by this Agreement or the other Loan Documents except those obligations expressly set forth herein or therein or in any other express writing executed and delivered by such Credit Party and the Loan Parties or any such affiliate and (h) no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Credit Parties or among the Loan Parties and the Credit Parties.

10.14   Releases of Guarantees and Liens.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.1) to take any action requested by the Borrowers having the effect of releasing any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any Disposition (including by merger or consolidation)  not prohibited by any Loan Document or that has been consented to in accordance with Section 10.1 or (ii) under the circumstances described in paragraphs (a), (b) and (c) below.  In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to the Borrowers (or to such third party as the Borrowers may reasonably designate), and file, register and record, at the Borrowers' expense, all documents and to such further acts as the Borrowers shall reasonably request to evidence such termination or release.

(a)      At such time as the Loans and the other obligations under the Loan Documents (other than obligations under or in respect of Specified Swap Agreements or Specified Cash Management Agreements) shall have been paid in full, all Collateral shall automatically be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) and Liens created by the Security Documents shall automatically be released, in each case without delivery of any document or performance of any further act by any Person.

(b)      A Subsidiary Guarantor shall automatically be released from its obligations under the Loan Documents, and all security interests created by the Security Documents in Collateral owned by such Loan Party shall be automatically released upon the consummation of any Disposition (including by merger or consolidation) permitted by this Agreement as a result of which such Subsidiary Guarantor ceases to be a Restricted Subsidiary (including pursuant to a merger with a Subsidiary that is not a Subsidiary Guarantor or a designation or conversion as an Excluded Foreign Subsidiary or Unrestricted Subsidiary, in each case in a transaction permitted by, and pursuant to, this Agreement).

(c)      Upon (i) any sale or other Disposition (including by merger or consolidation) by the Borrowers or any Subsidiary Guarantor (other than to the Borrowers or any other Subsidiary Guarantor) of any Collateral permitted under the Loan Documents, or (ii) the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral or the release of any Subsidiary Guarantor from its guarantee under the Guarantee and Collateral Agreement pursuant to the Loan Documents, the security interests in such Collateral created by the Security Documents or such guarantee, as applicable, shall be automatically released.

(d)      The Administrative Agent may rely, and shall have no liability for relying, on any certificate or other certification provided by the Borrowers, certifying that any transaction is permitted hereunder.

10.15    <u>Confidentiality</u>.  Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement, and further not to use any such non-public information other than in connection with the making and administration of the Loans; <u>provided</u> that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information in any of the following respects, <u>provided</u>, <u>however</u> that no such information shall be provided by any Lender to any Disqualified Lender, (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisor to such counterparty), (c) to its employees, directors, agents, partners, attorneys, accountants and other professional advisors or those of any of its affiliates, (d) upon the request or demand of any Governmental Authority (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process), or in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (e) if requested or required to do so in connection with any litigation or similar proceeding; <u>provided</u>, <u>however</u>, that prior to any such disclosure the Administrative Agent or Lender, as applicable, shall, to the extent allowable by law, provide the Borrowers with prompt prior written notice of such requirement, and the Borrowers may seek a protective order or other appropriate remedy to protect the non-public information, (f) that has been publicly disclosed (other than as a result of a breach of this Section 10.15), (g) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, (h) in connection with the exercise of any remedy hereunder or under any other Loan Document; <u>provided</u>, <u>however</u>, that any such disclosure or use of the non-public information shall be limited to only that non-public information which is required to be disclosed in connection therewith, and shall be limited to only those persons who need to know such information, (i) to a regulatory or self-regulatory authority, bank examiner or auditor in connection with a routine audit or examination by, or a blanket document request from, such regulatory or self-regulatory authority, bank examiner or auditor, or (j) if agreed by the Borrowers by prior written consent, in their sole discretion, to any other Person.  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and publicly available information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Administrative Agent and the Lenders in connection with the numbering, administration, settlement and management of this Agreement and the other Loan Documents.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrowers and their Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrowers or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrowers and their Affiliates and their related parties or their respective securities.  Accordingly, each Lender represents to the Borrowers and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

10.16    <u>**WAIVERS OF JURY TRIAL**</u>.  **THE BORROWERS, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

10.17    <u>USA Patriot Act</u>.  Each Lender hereby notifies the Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Patriot Act</u>"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes the name and address of the Borrowers and other information that will allow such Lender to identify the Borrowers in accordance with the Patriot Act.

10.18    <u>Usury</u>.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excessive interest shall be applied to the principal of the Obligations or, if it exceeds the unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged or received by the Administrative Agent or any Lender exceeds the Maximum Rate, such Person may, to the extent permitted by Requirements of Law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate and spread, in equal or unequal parts, the total amount of interest throughout the contemplated term of this Agreement.

10.19    <u>Existing Credit Agreement</u>.  All of the Indebtedness under the Existing Credit Agreement for borrowed money of the Borrowers and their Subsidiaries shall be deemed repaid in full and all security interests and Liens related thereto shall be deemed terminated on the Closing Date after giving effect to the Closing Date Exchange.

2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

NEW MILLENNIUM HOLDCO, INC.

By: _____

   Name:
   Title:


MILLENNIUM HEALTH, LLC

By _____

   Name:
   Title:

[Signature Page to Credit Agreement ($600 million Exit Facility Financing)]

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH, as Administrative Agent

By:
    Name:
    Title:


By:
    Name:
    Title:

[Signature Page to Credit Agreement ($600 million Exit Facility Financing)]

_____, as a
Lender

By:_____
   Name:
   Title:

[Signature Page to Credit Agreement ($600 million Exit Facility Financing)]

EXHIBIT A

**FORM OF**
**GUARANTEE AND COLLATERAL AGREEMENT**

GUARANTEE AND COLLATERAL AGREEMENT


made by


NEW MILLENNIUM HOLDCO, INC.,

MILLENNIUM HEALTH, LLC,

and certain of its Subsidiaries


in favor of


CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,

as Administrative Agent


Dated as of [_____], 2015

TABLE OF CONTENTS

Page

SECTION 1.    DEFINED TERMS ................................................................................................ 1
    1.1    Definitions. ................................................................................................................ 1
    1.2    Other Definitional Provisions. .................................................................................. 5

SECTION 2.    GUARANTEE ...................................................................................................... 5
    2.1    Guarantee. ................................................................................................................. 5
    2.2    Right of Contribution. ............................................................................................... 6
    2.3    No Subrogation. ........................................................................................................ 6
    2.4    Amendments, etc. with respect to the Borrower Obligations. ................................... 6
    2.5    Guarantee Absolute and Unconditional. ................................................................... 7
    2.6    Reinstatement. ........................................................................................................... 7
    2.7    Payments. .................................................................................................................. 8
    2.8    Keepwell. .................................................................................................................. 8

SECTION 3.    GRANT OF SECURITY INTEREST ................................................................. 8

SECTION 4.    REPRESENTATIONS AND WARRANTIES....................................................... 9
    4.1    Title; No Other Liens. ............................................................................................... 9
    4.2    Perfected First Priority Liens. ................................................................................. 10
    4.3    Jurisdiction of Organization; Chief Executive Office. ............................................ 10
    4.4    Inventory and Equipment. ....................................................................................... 10
    4.5    Farm Products. ........................................................................................................ 10
    4.6    Investment Property. ............................................................................................... 10
    4.7    Receivables. ............................................................................................................ 11
    4.8    Intellectual Property. .............................................................................................. 11
    4.9    Commercial Tort Claims. ........................................................................................ 11
    4.10   Deposit Accounts and Securities Accounts. ........................................................... 11

SECTION 5.    COVENANTS .................................................................................................... 11
    5.1    Delivery of Instruments, Certificated Securities and Chattel Paper. ....................... 11
    5.2    Maintenance of Insurance. ...................................................................................... 12
    5.3    Equipment and Inventory. ....................................................................................... 12
    5.4    Maintenance of Perfected Security Interest; Further Documentation. ..................... 12
    5.5    Changes in Name, etc. ............................................................................................. 13
    5.6    Investment Property. ............................................................................................... 13
    5.7    Receivables. ............................................................................................................ 14
    5.8    Intellectual Property. .............................................................................................. 14
    5.9    Commercial Tort Claims. ........................................................................................ 15
    5.10   Deposit Accounts and Securities Accounts. ........................................................... 15
    5.11   Letter-of-Credit Rights. .......................................................................................... 16

SECTION 6.    REMEDIAL PROVISIONS ............................................................................... 16
    6.1    Certain Matters Relating to Receivables. ................................................................ 16
    6.2    Communications with Obligors; Grantors Remain Liable. ...................................... 17
    6.3    Pledged Stock. ........................................................................................................ 17
    6.4    Proceeds to be Turned Over To Administrative Agent. ............................................ 18

i

6.5      Application of Proceeds. .......................................................................................... 18
6.6      Code and Other Remedies. ...................................................................................... 19
6.7      Private Sale. ............................................................................................................. 19
6.8      Subordination. ......................................................................................................... 20
6.9      Deficiency. ............................................................................................................... 20
6.10     HIPAA Compliance. ................................................................................................ 20

SECTION 7.    THE ADMINISTRATIVE AGENT ................................................................. 20
7.1      Administrative Agent's Appointment as Attorney-in-Fact, etc. ..................................... 20
7.2      Duty of Administrative Agent. .................................................................................. 22
7.3      Authorization to File Financing Statements. ........................................................... 22
7.4      Authority of Administrative Agent. .......................................................................... 22

SECTION 8.    MISCELLANEOUS ............................................................................................ 23
8.1      Amendments in Writing. .......................................................................................... 23
8.2      Notices. .................................................................................................................... 23
8.3      No Waiver by Course of Conduct; Cumulative Remedies. ...................................... 23
8.4      Enforcement Expenses; Indemnification. ................................................................ 23
8.5      Successors and Assigns. ........................................................................................... 24
8.6      Set-Off. ..................................................................................................................... 24
8.7      Counterparts. ............................................................................................................ 24
8.8      Severability. .............................................................................................................. 24
8.9      Section Headings. ..................................................................................................... 24
8.10     Integration. ............................................................................................................... 24
8.11     GOVERNING LAW. ................................................................................................ 24
8.12     Submission To Jurisdiction; Waivers. ..................................................................... 24
8.13     Acknowledgements. .................................................................................................. 25
8.14     Additional Grantors. ................................................................................................ 25
8.15     Reserved. .................................................................................................................. 25
8.16     Releases. ................................................................................................................... 25
8.17     WAIVER OF JURY TRIAL. .................................................................................... 26

SCHEDULES

Schedule 1     Notice Addresses
Schedule 2     Investment Property
Schedule 3     Perfection Matters
Schedule 4     Jurisdictions of Organization and Chief Executive Offices
Schedule 5     Inventory and Equipment Locations
Schedule 6     Intellectual Property
Schedule 7     Deposit Accounts and Securities Accounts

EXHIBITS

Exhibit A      UCC-1 Financing Statements
Exhibit B      Copyright Security Agreement
Exhibit C      Patent Security Agreement
Exhibit D      Trademark Security Agreement

<u>ANNEXES</u>
Annex 1          Assumption Agreement

1

GUARANTEE AND COLLATERAL AGREEMENT

GUARANTEE AND COLLATERAL AGREEMENT, dated as of [_____], 2015, made by each of the signatories hereto as a "Grantor" (together with any other entity that may become a party hereto as provided herein, the "Grantors"), in favor of Credit Suisse AG, Cayman Islands Branch, as Administrative Agent (in such capacity, the "Administrative Agent") for the Secured Parties (as defined below).

W I T N E S S E T H:

WHEREAS, pursuant to the Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among NEW MILLENNIUM HOLDCO, INC. ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC ("Millennium", and a "Borrower"; together with Holdings, the "Borrowers"), the lenders party thereto (the "Lenders") and the Administrative Agent the Lenders have severally agreed that the Loans shall be deemed made to the Borrowers upon the terms and subject to the conditions set forth therein;

WHEREAS, Millennium is the wholly owned subsidiary of Holdings;

WHEREAS, each Grantor will derive substantial direct and indirect benefit from the Loans under the Credit Agreement; and

WHEREAS, it is a condition precedent to the obligation of the Lenders to deem the Loans made to the Borrowers under the Credit Agreement that the Grantors shall have executed and delivered this Agreement to the Administrative Agent for the ratable benefit of the Secured Parties;

NOW, THEREFORE, in consideration of the premises and to induce the Administrative Agent and the Lenders to enter into the Credit Agreement and to induce the Lenders to deem the Loans made to the Borrowers thereunder, each Grantor hereby agrees with the Administrative Agent, for the ratable benefit of the Secured Parties, as follows:

SECTION 1.    DEFINED TERMS

1.1    Definitions.

(a)  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement, and the following terms are used herein as defined in the New York UCC:  Accounts, Certificated Security, Chattel Paper, Commercial Tort Claims, Documents, Equipment, Farm Products, Fixtures, General Intangibles, Instruments, Inventory, Letter-of-Credit Rights, Securities Accounts and Supporting Obligations.

(b)  The following terms shall have the following meanings:

"Agreement":  this Guarantee and Collateral Agreement, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Borrower Obligations":  all "Obligations" as defined in the Credit Agreement; provided, that for purposes of determining any Guarantor Obligations of any Guarantor under this Agreement, the

definition of "Borrower Obligations" shall not create any guarantee by any Guarantor of any Excluded Swap Obligations of such Guarantor.

"Collateral":  as defined in Section 3.

"Collateral Account":  any collateral account established by the Administrative Agent as provided in Section 6.1 or 6.4.

"Control": shall mean (1) with respect to any Deposit Accounts, control within the meaning of Section 9-104 of the New York UCC, (2) with respect to any Securities Account, control within the meaning of Section 9-106 of the New York UCC and (2) with respect to any Letter-of-Credit Rights, control within the meaning of Section 9-107 of the New York UCC.

"Copyrights":  all copyrights, arising under the laws of the United States, any other country or any political subdivision thereof and/or all applications therefor, including but not limited to copyrights in software and all rights in and to databases, and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered and whether or not the underlying works of authorship have been published, moral rights, reversionary interests, termination rights, and, with respect to any and all of the foregoing: (i) all registrations, recordings and applications therefor including, without limitation, registrations and applications referred to on Schedule 6 hereto, (ii) all extensions and renewals thereof, (iii) the right to sue or otherwise recover for past, present and future infringements thereof, (iv) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and (v) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"Copyright Licenses":  any and all agreements, licenses and covenants granting to the Grantor any exclusive right in or to any Copyrights including without limitation, (x) the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright and (y) the Copyright Licenses referred to on Schedule 6 hereto.

"Copyright Security Agreement":  shall mean a Copyright Security Agreement substantially in the form of Exhibit B.

"Deposit Account":  as defined in the New York UCC of any applicable jurisdiction and, in any event, including, without limitation, any demand, time, savings, passbook or like account maintained with a depositary institution.

"Excluded Property":  as defined in Section 3.

"Excluded Stock":  (i) the Capital Stock of any direct or indirect non-Wholly Owned Subsidiary of the Borrowers if and to the extent a pledge hereunder would be prohibited (except to the extent such prohibition would be deemed ineffective under the New York UCC) by such non-Wholly Owned Subsidiary's organizational or governing documents or material joint venture documents (provided that at the time such document or agreement became effective it did not violate Section 7.14 of the Credit Agreement), (ii) the Capital Stock of any Disregarded Subsidiary or Unrestricted Subsidiary, and (iii) Capital Stock of any Foreign Subsidiary that is not directly held by a Grantor that is organized under the laws of a state of the United States.

"Foreign Subsidiary":  (x) any Subsidiary organized under the laws of any jurisdiction outside the United States of America or (y) any FSHCO.

"Foreign Subsidiary Voting Stock":  the voting Capital Stock of any Foreign Subsidiary.

"Guarantor Obligations":  with respect to any Guarantor, all obligations and liabilities of such Guarantor which may arise under or in connection with this Agreement (including, without limitation, Section 2) or any other Loan Document, any Specified Swap Agreement or any Specified Cash Management Agreement (including, in each case, amounts accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or commencement of any insolvency, reorganization or like proceeding, relating to the Borrowers or any Guarantor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) to which such Guarantor is a party, in each case whether on account of guarantee obligations, reimbursement obligations, fees, indemnities, costs, expenses or otherwise (including, without limitation, all fees and disbursements of counsel to any of the Secured Parties that are required to be paid by such Guarantor pursuant to the terms of this Agreement or any other Loan Document), and whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred.

"Guarantors":  the collective reference to each Grantor other than the Borrowers.

"HIPAA":  the privacy, transaction and security provisions of the Health Insurance Portability and Accountability Act of 1996, as it may be amended, and all regulations promulgated thereunder, as they may be amended from time-to-time.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, the Copyrights, the Copyright Licenses, the Patents, the Patent Licenses, the Trademarks and the Trademark Licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intellectual Property Agreements":  the Patent Security Agreement, the Trademark Security Agreement and the Copyright Security Agreement.

"Intercompany Note":  any promissory note evidencing loans made by any Grantor to Holdings or any of its Subsidiaries, including without limitation the Intercompany Note (as defined in the Credit Agreement).

"Investment Property":  the collective reference to (i) all "investment property" as such term is defined in Section 9-102(a)(49) of the New York UCC (other than any Foreign Subsidiary Voting Stock and Excluded Stock), including, without limitation, all Securities Accounts and (ii) whether or not constituting "investment property" as so defined, all Pledged Notes and all Pledged Stock.

"Issuers":  the collective reference to each issuer of any Investment Property.

"New York UCC":  the Uniform Commercial Code as from time to time in effect in the State of New York; provided, however, that in the event that, by reason of mandatory provisions of law, any or all of the perfection or priority of, or remedies with respect to, any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the State of New York, the term "New York UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions hereof relating to such perfection, priority or remedies.

"Obligations":  (i) in the case of the Borrowers, the Borrower Obligations, and (ii) in the case of each Guarantor, its Guarantor Obligations.

4

"Patents":  all patents registered in the United States, any other country or any political subdivision thereof (and/or all applications therefor), and certificates of invention, inventions or similar industrial property rights, and applications for any of the foregoing, including, but not limited to: (i) each patent and patent application referred to or required to be referred to on Schedule 6 hereto, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (iii) all improvements thereto, (iv) the right to sue or otherwise recover for past, present and future infringements or other violations thereof, (v) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, and proceeds of suit now or hereafter due and/or payable with respect thereto, and (vi) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"Patent License":  all agreements, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered in whole or in part by a Patent, including, without limitation, any of the foregoing referred to in Schedule 6.

"Patent Security Agreement":  shall mean a Patent Security Agreement substantially in the form of Exhibit C.

"Pledged Notes":  all promissory notes listed on Schedule 2, all Intercompany Notes at any time issued to any Grantor and all other promissory notes issued to or held by any Grantor (other than promissory notes issued in connection with extensions of trade credit by any Grantor in the ordinary course of business).

"Pledged Stock":  the shares of Capital Stock listed on Schedule 2, together with any other shares, stock certificates, options, interests or rights of any nature whatsoever in respect of the Capital Stock of any Person that may be issued or granted to, or held by, any Grantor while this Agreement is in effect; provided that in no event shall (x) more than 65% of the total outstanding Foreign Subsidiary Voting Stock of any Foreign Subsidiary or (y) any Excluded Stock be required to be pledged hereunder.

"Proceeds":  all "proceeds" as such term is defined in Section 9-102(a)(64) of the New York UCC and, in any event, shall include, without limitation, all dividends or other income from the Investment Property, collections thereon or distributions or payments with respect thereto.

"Qualified Keepwell Provider":  in respect of any Swap Obligation, each Loan Party that, at the time that the relevant guarantee (or grant of the relevant security interest, as applicable) becomes effective with respect to such Swap Obligation, has total assets exceeding $10,000,000 or otherwise constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" with respect to such Swap Obligation at such time by entering into a keepwell pursuant to section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Receivable":  any right to payment for goods sold or leased or for services rendered, whether or not such right is evidenced by an Instrument or Chattel Paper and whether or not it has been earned by performance (including, without limitation, any Account).

"Secured Parties":  the collective reference to the Administrative Agent, the Lenders and any other Person or entity to which Borrower Obligations and/or Guarantor Obligations, as applicable, are owed.

"Securities Act":  the Securities Act of 1933, as amended.

"Trademarks":  all trademarks, including, without limitation, all trademarks registered in the United States, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto (and/or all applications therefor), trade names, trade dress, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, whether or not registered, and with respect to any and all of the foregoing: (i) all registrations and applications therefor, including, without limitation, the registrations and applications referred to or required to be referred to on Schedule 6 hereto, (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by any of the foregoing, (iv) the right to sue or otherwise recover for past, present and future infringement, dilution or other violation of any of the foregoing or for any injury to the related goodwill, (v) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and (vi) all other rights of any kind accruing thereunder or pertaining thereto throughout the world.

"Trademark License":  any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, including, without limitation, any of the foregoing referred to in Schedule 6.

"Trademark Security Agreement:  shall mean a Trademark Security Agreement substantially in the form of Exhibit D.

1.2    Other Definitional Provisions.  The words "hereof," "herein", "hereto" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section and Schedule references are to this Agreement unless otherwise specified.

(a)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(b)    Where the context requires, terms relating to the Collateral or any part thereof, when used in relation to a Grantor, shall refer to such Grantor's Collateral or the relevant part thereof.

SECTION 2.    GUARANTEE

2.1 Guarantee.

(a)    Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Administrative Agent, for the ratable benefit of the Secured Parties and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Borrowers when due (whether at the stated maturity, by acceleration or otherwise) of the Borrower Obligations (other than with respect to any Guarantor any Excluded Swap Obligations of such Guarantor).

(b)    Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor hereunder and under the other Loan Documents shall in no event exceed the amount which can be guaranteed by such Guarantor under applicable federal and state laws relating to the insolvency of debtors (after giving effect to the right of contribution established in Section 2.2).

6

(c)        Each Guarantor agrees that the Borrower Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Section 2 or affecting the rights and remedies of any Secured Party hereunder.

(d)        The guarantee contained in this Section 2 shall remain in full force and effect until all the Borrower Obligations and the obligations of each Guarantor under the guarantee contained in this Section 2 shall have been satisfied by payment in full in cash and the Commitments shall be terminated, notwithstanding that from time to time during the term of the Credit Agreement the Borrowers may be free from any Borrower Obligations.

(e)        No payment made by the Borrowers, any of the Guarantors, any other guarantor or any other Person or received or collected by any Secured Party from the Borrowers, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Borrower Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Borrower Obligations or any payment received or collected from such Guarantor in respect of the Borrower Obligations), remain liable for the Borrower Obligations up to the maximum liability of such Guarantor hereunder until the Borrower Obligations are paid in full in cash and the Commitments are terminated.

2.2        Right of Contribution.  Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment.  Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of Section 2.3. The provisions of this Section 2.2 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Secured Parties, and each Subsidiary Guarantor shall remain liable to the Secured Parties for the full amount guaranteed by such Subsidiary Guarantor hereunder.

2.3        No Subrogation.  Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by any Secured Party, no Guarantor shall be entitled to be subrogated to any of the rights of any Secured Party against the Borrowers or any other Guarantor or any collateral security or guarantee or right of offset held by  any Secured Party for the payment of the Borrower Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrowers or any other Guarantor in respect of payments made by such Guarantor hereunder, until all amounts owing to the Secured Parties by the Borrowers on account of the Borrower Obligations are paid in full in cash and the Commitments are terminated.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Borrower Obligations shall not have been paid in full in cash, such amount shall be held by such Guarantor in trust for the Secured Parties, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Administrative Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Administrative Agent, if required), to be applied against the Borrower Obligations, whether matured or unmatured, in such order as the Administrative Agent may determine.

2.4        Amendments, etc. with respect to the Borrower Obligations.  Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Borrower Obligations made by any Secured Party may be rescinded by such Secured Party and any of the Borrower Obligations continued, and the Borrower Obligations, or the liability of any other Person upon or for any

part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by any Secured Party, and the Credit Agreement and the other Loan Documents and any other documents executed and delivered in connection therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent and the Required Lenders (or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by any Secured Party for the payment of the Borrower Obligations may be sold, exchanged, waived, surrendered or released.  No Secured Party shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Borrower Obligations or for the guarantee contained in this Section 2 or any property subject thereto.

2.5     Guarantee Absolute and Unconditional.  Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Borrower Obligations and notice of or proof of reliance by any Secured Party upon the guarantee contained in this Section 2 or acceptance of the guarantee contained in this Section 2; the Borrower Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Section 2; and all dealings between either Borrower and any of the Guarantors, on the one hand, and any Secured Party, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Section 2.  Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon either Borrower or any of the Guarantors with respect to the Borrower Obligations.  Each Guarantor understands and agrees that the guarantee contained in this Section 2 shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of the Credit Agreement or any other Loan Document, any of the Borrower Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by either Borrower or any other Person against any Secured Party, or (c) any other circumstance whatsoever (with or without notice to or knowledge of any Borrower or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of any Borrower for the Borrower Obligations, or of such Guarantor under the guarantee contained in this Section 2, in bankruptcy or in any other instance. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, any Secured Party may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against either Borrower (or both Borrowers), any other Guarantor or any other Person or against any collateral security or guarantee for the Borrower Obligations or any right of offset with respect thereto, and any failure by any Secured Party to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrowers, any other Guarantor or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrowers, any other Guarantor or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of any Secured Party against any Guarantor.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

2.6     Reinstatement.  The guarantee contained in this Section 2 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Borrower Obligations is rescinded or must otherwise be restored or returned by any Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of either Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar

8

officer for, either Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payments had not been made.

2.7 <u>Payments.</u> Each Guarantor hereby guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim in Dollars at the Funding Office.

2.8 <u>Keepwell.</u> Each Qualified Keepwell Provider hereby jointly and severally absolutely, unconditionally, and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this guarantee in respect of any Swap Obligation (provided, however, that each Qualified Keepwell Provider shall only be liable under this Section 2.8 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 2.8, or otherwise under this guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified Keepwell Provider under this Section 2.8 shall remain in full force and effect until a discharge of all Guarantor Obligations pursuant to Section 10.14 of the Credit Agreement. Each Qualified Keepwell Provider intends that this Section 2.8 constitute, and this Section 2.8 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 3.    GRANT OF SECURITY INTEREST

Each Grantor hereby collaterally assigns (other than with respect to Intellectual Property) to the Administrative Agent, and hereby grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a security interest in and continuing lien on, all of such Grantor's right, title and interest in the following, in each case whether now owned or existing or hereafter acquired, created or arising and wherever located or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "<u>Collateral</u>"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Obligations:

(a)    all Accounts;

(b)    all Chattel Paper;

(c)    all cash and Deposit Accounts;

(d)    all Documents (other than title documents with respect to Vehicles);

(e)    all Equipment;

(f)    all Fixtures;

(g)    all General Intangibles (including any equity interests in other Persons that do not constitute Investment Property);

(h)    all Instruments;

(i)    all Intellectual Property;

(j)    all Inventory;

9

(k)        all Investment Property;

(l)        all Commercial Tort Claims with a value in excess of $2,000,000;

(m)        all Letter-of-Credit Rights;

(n)  all other property not otherwise described above (except for any property specifically excluded from any clause in this section above, and any property specifically excluded from any defined term used in any clause of this section above);

(o)        all books and records pertaining to the Collateral; and

(p)        to the extent not otherwise included, all Proceeds, Supporting Obligations and products of any and all of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing;

provided, however, that notwithstanding any of the other provisions set forth in this Section 3, this Agreement shall not constitute a grant of a security interest in, and the term "Collateral" shall not include, any of the following (the "Excluded Property") (it being understood that, notwithstanding the foregoing, such grant will be automatically applicable and such formerly Excluded Property shall automatically be "Collateral" (without any further action by any Person) at such time as any such property or assets ceases to constitute Excluded Property): (i) the Excluded Collateral (as defined in the Credit Agreement), (ii) any Trademark application filed in the United States Patent and Trademark Office on the basis of the Grantor's intent-to-use such Trademark unless and until evidence of use of the Trademark has been filed with, and accepted by the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.), to the extent that granting a security interest in such Trademark application prior to such filing and acceptance would adversely affect the enforceability or validity of such Trademark application or the resulting Trademark registration and (iii)  any property as to which it is agreed under the Credit Agreement that such property is not or will not be subject to a security interest.

SECTION 4.    REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into the Credit Agreement and to induce the Lenders to deem the Loans made to the Borrowers thereunder, each Grantor hereby represents and warrants to the Administrative Agent and each Lender that:

4.1        Title; No Other Liens. Except for the security interest granted to the Administrative Agent for the ratable benefit of the Secured Parties pursuant to this Agreement and the other Liens permitted to exist on the Collateral by the Credit Agreement, such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others.  No effective financing statement or other public notice with respect to all or any part of the Collateral shall be on file or of record in any public office following the Closing Date, except such as have been filed in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, pursuant to this Agreement or as are permitted by the Credit Agreement.  For the avoidance of doubt, it is understood and agreed that any Grantor may, as part of its business, grant non-exclusive licenses to third parties (and/or an exclusive license to Boehringer Ingelheim International GmbH regarding certain customized predictive models provided that such license (x) is not prohibited under the Loan Documents and (y) is in regards to Intellectual Property that does not exist or is not owned by any Grantor, in each case, as of the date hereof) to use Intellectual Property owned, developed or licensed by a Grantor, or in which a Grantor otherwise has rights.  For purposes of

10

this Agreement and the other Loan Documents, such licensing activity shall not constitute a "Lien" on such Intellectual Property.  Administrative Agent agrees to execute such documents, agreements and instruments as may be reasonably requested by a Grantor to confirm that a non-exclusive license may be made by a Grantor, despite the existence of a security interest in the underlying Intellectual Property granted hereunder in favor of the Administrative Agent.

4.2    Perfected First Priority Liens.  The security interests granted pursuant to this Agreement (a) upon this Agreement becoming effective and the due filing and other actions specified on Schedule 3 (which, in the case of all filings and other documents referred to on said Schedule, in the form delivered to the Administrative Agent and attached hereto as Exhibit A), will constitute valid perfected security interests in all of the Collateral in favor of the Administrative Agent, for the ratable benefit of the Secured Parties (subject to the limitations and thresholds set forth herein), as collateral security for such Grantor's Obligations, enforceable in accordance with the terms hereof, except for property as to which such Grantor is not required by this Agreement to take actions for perfection, and (b) are prior to all other Liens on the Collateral in existence on the date hereof except for Liens permitted by the Credit Agreement.

4.3    Jurisdiction of Organization; Chief Executive Office.  On the date hereof, such Grantor's jurisdiction of organization, identification number from the jurisdiction of organization (if any), and the location of such Grantor's chief executive office are specified on Schedule 4.  Such Grantor has furnished to the Administrative Agent a certified charter, certificate of incorporation or other organization document and long-form good standing certificate as of a date which is recent to the date hereof.

4.4    Inventory and Equipment.  On the date hereof, the Inventory (if any) and the Equipment (other than mobile goods) are kept at the locations listed on Schedule 5.

4.5    Farm Products.  None of the Collateral pledged by a Grantor constitutes, or to the knowledge of the respective Grantor, is the Proceeds of, Farm Products.

4.6    Investment Property.

(a)  The shares of Pledged Stock pledged by such Grantor hereunder constitute all the issued and outstanding shares of all classes of the Capital Stock of each Issuer owned by such Grantor or, in the case of Foreign Subsidiary Voting Stock, if less, 65% of the outstanding Foreign Subsidiary Voting Stock of each relevant Issuer.

(b)  All the shares of the Pledged Stock have been duly and validly issued and are fully paid and nonassessable.

(c)  Each of the Pledged Notes constitutes the legal, valid and binding obligation of the obligor with respect thereto, enforceable in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law), public policy, and an implied covenant of good faith and fair dealing.

(d)  Such Grantor is the record and beneficial owner of the Investment Property pledged by it hereunder, free of any and all Liens or options in favor of, or claims of, any other Person, except for the Liens permitted by the Credit Agreement.

11

4.7     Receivables.  No amount payable to such Grantor under or in connection with any Receivable is evidenced by any Instrument or Chattel Paper which has not been delivered to the Administrative Agent.

4.8     Intellectual Property

(a)  Schedule 6 lists all Intellectual Property applications and registrations owned by such Grantor in its own name on the date hereof and any material written license pursuant to which any Grantor is an exclusive licensee or licensor of U.S. Intellectual Property applications or registrations as of the date hereof.  Except as set forth in Schedule 4.9 to the Credit Agreement, including the claims by Ameritox, Ltd. which are subject to pending litigation in the U.S. Federal District Court for the Western District of Wisconsin, no material claim has been asserted and is pending by any Person against such Grantor challenging or questioning the use of any Intellectual Property by such Grantor or the validity or effectiveness of any Intellectual Property of such Grantor, nor does such Grantor have actual knowledge (without a duty of inquiry) of, any valid basis for any such claim, which, if adjudicated adversely against such Grantor, would reasonably be expected to have a Material Adverse Effect.

(b)  Except as set forth in Schedule 6, on the date hereof, none of the Intellectual Property is the subject of any exclusive licensing or franchise agreement pursuant to which such Grantor is the licensor or franchisor.

4.9     Commercial Tort Claims.

(a)  On the date hereof, no Grantor has rights in any Commercial Tort Claim with an expected value in excess of $2,000,000.

(b)  Upon the filing of a financing statement adequately describing any Commercial Tort Claim referred to in Section 5.10 hereof against such Grantor in the jurisdiction specified in Schedule 3 hereto, to the extent that such a security interest in and to such a Commercial Tort Claim may be perfected by a filing of a financing statement in such jurisdiction and such Commercial Tort Claim is segregable for contract claims and other causes of action in the same dispute, the security interest granted in such Commercial Tort Claim will constitute a valid perfected security interest in favor of the Administrative Agent, for the ratable benefit of the Secured Parties, as collateral security for such Grantor's Obligations, enforceable in accordance with the terms hereof, which security interest shall be prior to all other Liens on such Collateral except for Liens permitted by the Credit Agreement.

4.10     Deposit Accounts and Securities Accounts.  As of the date hereof, Schedule 7 lists all Deposit Accounts and Securities Accounts maintained by each Grantor, including the name of each institution where each such Deposit Account or Securities Account is held, the name, type and account number of each such Deposit Account or Securities Account, the approximate amount on deposit in each such Deposit Account or Securities Account, and the name of each Grantor that is listed as the customer of such Deposit Account or Securities Account.

SECTION 5.    COVENANTS

Each Grantor covenants and agrees with the Administrative Agent and the Lenders that, from and after the date of this Agreement until the Obligations shall have been paid in full in cash:

5.1     Delivery of Instruments, Certificated Securities and Chattel Paper.  If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any Instrument, Certificated Security or Chattel Paper in a stated or face amount in excess of $3,000,000

12

individually (other than any Indebtedness that is evidenced by any Intercompany Note, which shall be delivered pursuant to this Section notwithstanding its face amount), such Instrument, Certificated Security or Chattel Paper shall be immediately delivered to the Administrative Agent, duly indorsed in a manner satisfactory to the Administrative Agent, to be held as Collateral pursuant to this Agreement.

5.2  <u>Maintenance of Insurance.</u>

(a)      Such Grantor will maintain, with financially sound and reputable companies, insurance policies (i) insuring its property and assets (including without limitation, the Collateral)  against loss by fire, explosion, theft and such other casualties as may be reasonably satisfactory to the Administrative Agent and (ii) insuring such Grantor against liability for personal injury and property damage relating to its property and assets (including without limitation, the Collateral) , such policies to be in such form and amounts and having such coverage (with such deductibles) as may be reasonably satisfactory to the Administrative Agent.

(b)      In addition to the requirements set forth in Section 6.4 of the Credit Agreement, all such insurance shall, (i) if reasonably requested by the Administrative Agent if available from the insurer on commercially reasonable terms, include a breach of warranty clause and (ii) be reasonably satisfactory in all other respects to the Administrative Agent (at the direction of the Required Lenders).

5.3      <u>Equipment and Inventory.</u> Each Grantor shall keep its Equipment and Inventory constituting Collateral at the locations specified on Schedule 5 (as such schedule may be amended or supplemented from time to time in accordance with this Section 5.3), other than Equipment and/or Inventory (i) out for repair, (ii) in transit in the ordinary course of business or in transit to another location set forth on Schedule 5, (iii) in use or on display at any trade show, conference or similar event in the ordinary course of business, (iii) maintained with customers, or (iv) at other locations so long as the aggregate value of all of such Equipment and Inventory located at such locations shall not exceed $5,000,000 at any time, in each case, unless it shall have notified the Administrative Agent in writing prior to thirty (30) days after any change in locations, identifying such new locations and providing such other information in connection therewith as the Administrative Agent may reasonably request provided that the Grantors shall not move any Equipment, Inventory or any of their other property or assets outside the United States.

5.4      <u>Maintenance of Perfected Security Interest; Further Documentation.</u>

(a)      Subject to the thresholds, exclusions and limitations set forth herein and the other Loan Documents, such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority required by the Loan Documents and shall defend such security interest against the claims and demands of all Persons whomsoever, subject to the rights of such Grantor under the Loan Documents to dispose of the Collateral, and subject to Liens permitted by the Credit Agreement.

(b)      Such Grantor will furnish to the Administrative Agent and the Lenders from time to time, upon reasonable request, but no more than once each calendar year (other than following the occurrence and during the continuance of an Event of Default) statements and schedules further identifying and describing the assets and property of such Grantor and such other reports in connection therewith as the Administrative Agent may reasonably request, all in reasonable detail.

(c)      At any time and from time to time, upon the written request of the Administrative Agent, and at the sole expense of such Grantor, such Grantor will promptly and duly execute and deliver, and have recorded, such further instruments and documents and take such further actions as the

Administrative Agent may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, (i) filing any financing or continuation statements under the Uniform Commercial Code (or other similar laws) in effect in any jurisdiction with respect to the security interests created hereby and (ii) in the case of Investment Property, Letter-of-Credit Rights, Deposit Accounts and any other relevant Collateral, taking any reasonable actions necessary to enable the Administrative Agent to obtain Control with respect thereto.

(d)     Any other provisions of this Agreement or the other Loan Documents to the contrary notwithstanding, in no event shall any Grantor be required to take any of the Excluded Actions.

5.5  Changes in Name, etc.  Such Grantor will not, except upon 15 days' prior written notice to the Administrative Agent and delivery to the Administrative Agent of all additional executed financing statements and other documents reasonably requested by the Administrative Agent to maintain the validity, perfection and priority of the security interests provided for herein, (i) change its jurisdiction of organization or the location of its chief executive office or sole place of business or principal residence from that referred to in Section 4.3 or (ii) change its name.

5.6  Investment Property.

(a)  If such Grantor shall become entitled to receive or shall receive any certificate (including, without limitation, any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights in respect of the Capital Stock of any Issuer, whether in addition to, in substitution of, as a conversion of, or in exchange for, any shares of the Pledged Stock, or otherwise in respect thereof, such Grantor shall accept the same as the agent of the Secured Parties, hold the same in trust for the Secured Parties and deliver the same forthwith to the Administrative Agent in the exact form received, duly indorsed by such Grantor to the Administrative Agent, if required, together with an undated stock power covering such certificate duly executed in blank by such Grantor and with, if the Administrative Agent so requests, signature guaranteed, to be held by the Administrative Agent, subject to the terms hereof, as additional collateral security for the Obligations.  At any time after the occurrence and during the continuance of an Event of Default, any sums paid upon or in respect of the Investment Property upon the liquidation or dissolution of any Issuer shall be paid over to the Administrative Agent to be held by it hereunder as additional collateral security for the Obligations, and in case any other distribution of capital shall be made on or in respect of the Investment Property or any property shall be distributed upon or with respect to the Investment Property pursuant to the recapitalization or reclassification of the capital of any Issuer or pursuant to the reorganization thereof, the property so distributed shall, unless otherwise subject to a perfected security interest in favor of the Administrative Agent, be delivered to the Administrative Agent to be held by it hereunder as additional collateral security for the Obligations.  If any sums of money or property so paid or distributed in respect of the Investment Property shall be received by such Grantor, such Grantor shall, until such money or property is paid or delivered to the Administrative Agent, hold such money or property in trust for the Secured Parties, segregated from other funds of such Grantor, as additional collateral security for the Obligations.

(b)     Without the prior written consent of the Administrative Agent, such Grantor will not (i) vote to enable, or take any other action to permit, any Issuer to issue any Capital Stock of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any Capital Stock of any nature of any Issuer unless such Grantor complies with the requirements of clause (a) above, (ii) sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, the Investment Property (except as permitted by the Credit Agreement), (iii) create, incur or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Investment Property or Proceeds thereof, or any interest therein, except for the Liens permitted by the Credit Agreement, or

14

(iv) enter into any agreement or undertaking restricting the right or ability of such Grantor or the Administrative Agent to sell, assign or transfer any of the Investment Property or Proceeds thereof, except as permitted by the Credit Agreement.

(c)     In the case of each Grantor which is an Issuer, such Issuer agrees that (i) it will be bound by the terms of this Agreement relating to the Investment Property issued by it and will comply with such terms insofar as such terms are applicable to it, (ii) it will notify the Administrative Agent promptly in writing of the occurrence of any of the events described in Section 5.6(a) with respect to the Investment Property issued by it and (iii) the terms of Sections 6.3(c) and 6.7 shall apply to it, mutatis mutandis, with respect to all actions that may be required of it pursuant to Section 6.3(c) or 6.7 with respect to the Investment Property issued by it.

5.7     Receivables.

(a)     Other than in the ordinary course of business, such Grantor will not (i) grant any extension of the time of payment of any Receivable, (ii) compromise or settle any Receivable for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any Receivable, (iv) allow any credit or discount whatsoever on any Receivable or (v) amend, supplement or modify any Receivable in any manner that would reasonably be expected to materially adversely affect the value thereof without benefit to the Grantor.

(b)     Such Grantor will deliver to the Administrative Agent a copy of each material demand, notice or document received by it that questions or calls into doubt the validity or enforceability of more than 10% (by dollar value) of the aggregate amount of the then outstanding Receivables (net of allowance for estimated differences between amounts billed and estimated payment amounts to be received, and after giving effect to discounts, returns, collection for doubtful accounts, and other reserves).

5.8     Intellectual Property.

(a)  Such Grantor (either itself or through licensees) will (i) continue to use each material Trademark on each and every material trademark class of goods applicable to its current line as reflected in its current catalogs, brochures and price lists in order to maintain such Trademark in full force free from any claim of abandonment for non-use, except to the extent that such Grantor in its reasonable business judgment determines that such Trademark (or class of goods) is no longer of material value to such Grantor (ii) in all material respects maintain as in the past at least the quality of products and services offered under such Trademark, (iii) use such Trademark with the appropriate notice of registration (where required by applicable Requirements of Law) and all other notices and legends required by applicable Requirements of Law, (iv) not adopt or use any mark which is confusingly similar or a colorable imitation of such Trademark unless the Administrative Agent, for the ratable benefit of the Secured Parties, shall, subject to the thresholds, exclusions, and limitations set forth herein and the other Loan Documents, obtain a perfected security interest in such mark pursuant to this Agreement, and (v) not (and not permit any licensee or sublicensee thereof to) do any act or knowingly omit to do any act whereby such Trademark would reasonably be expected to become invalidated or impaired in any way.

(b)  Such Grantor (either itself or through licensees) will not do any act, or omit to do any act, whereby any material Patent may become forfeited, abandoned or dedicated to the public, except to the extent that such Grantor in its reasonable business judgment determines that such Patent is no longer of material value to such Grantor.

(c)  Such Grantor (either itself or through licensees) (i) will employ each material Copyright and (ii) will not (and will not permit any licensee or sublicensee thereof to) do any act or knowingly omit to

15

do any act whereby any material portion of the Copyrights may become invalidated or otherwise impaired, except to the extent that such Grantor in its reasonable business judgment determines that such Copyright is no longer of material value to such Grantor.  Such Grantor will not (either itself or through licensees) do any act whereby any material portion of the Copyrights may fall into the public domain, except to the extent that such Grantor in its reasonable business judgment determines that such Copyright is no longer of material value to such Grantor.

(d)  Such Grantor (either itself or through licensees) will not do any act that knowingly uses any material Intellectual Property to infringe the intellectual property rights of any other Person in any material respect.

(e)  Intentionally Omitted.

(f)  Whenever such Grantor, either by itself or through any agent, employee, licensee or designee, shall file an application for the registration of any Intellectual Property with the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in the United States, concurrently with the delivery of any financial statements required to be delivered under Section 6.1 of the Credit Agreement (with the exception of the fourth fiscal quarter of every fiscal year, in which case, within 45 days after the end of such fiscal quarter), such Grantor shall execute and deliver, and have recorded, any and all Copyright Security Agreements, Patent Security Agreements and Trademark Security Agreements, as applicable (and all other agreements, instruments, documents and other papers as the Administrative Agent may reasonably request) to evidence the Administrative Agent's security interest (for the ratable benefit of the Secured Parties) in all such Copyrights, Patents or Trademarks and the goodwill and general intangibles of such Grantor relating thereto or represented thereby (and shall provide Administrative Agent with a copy of all of such agreements, documents, instruments and papers concurrently with filing and/or recording the same).

(g)  Such Grantor will take all reasonable and necessary steps, including, without limitation, in any proceeding before the United States Patent and Trademark Office, the United States Copyright Office or any similar office or agency in any other country or any political subdivision thereof, to maintain and pursue each application (and to obtain the relevant registration) and to maintain each registration of the material Intellectual Property, including, without limitation, filing of applications for renewal, affidavits of use and affidavits of incontestability.

(h)  In the event that any material Intellectual Property is infringed, misappropriated or diluted by a third party, such Grantor shall (i) take such actions as such Grantor shall reasonably deem appropriate under the circumstances to protect such Intellectual Property and (ii) if such Intellectual Property is of material economic value, promptly notify the Administrative Agent after it learns thereof and sue for infringement, misappropriation or dilution, to seek injunctive relief where appropriate and to recover any and all damages for such infringement, misappropriation or dilution, except to the extent that such Grantor, in its reasonable judgment, determines that suit or injunctive relief would not be in the best interests of such Grantor.

5.9  Commercial Tort Claims.  If such Grantor shall obtain an interest in any Commercial Tort Claim with an expected value in excess of $2,000,000, such Grantor shall within 30 days of obtaining such interest sign and deliver documentation acceptable to the Administrative Agent granting a security interest under the terms and provisions of this Agreement in and to such Commercial Tort Claim.

5.10    Deposit Accounts and Securities Accounts.  Subject to Section 6.12 of the Credit Agreement, with respect to any Deposit Account or Securities Account constituting Collateral, each Grantor shall be required to grant Control thereof to the Administrative Agent promptly after opening any

16

such Deposit Account or Securities Account.  With respect to any Deposit Account or Securities Account to which the Administrative Agent is required to have Control thereof pursuant to this Section 5.10, such Grantor shall cause the depositary institution maintaining such Deposit Account or Securities Account to enter into a control agreement in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders, pursuant to which such depository institution shall agree to comply with the Administrative Agent's instructions with respect to the disposition of funds in such Deposit Account or Securities Account without further consent by such Grantor.

5.11    Letter-of-Credit Rights.  With respect to any Letter-of-Credit Rights constituting Collateral (other than any Letter-of-Credit Rights constituting a Supporting Obligation for a Receivable in which the Administrative Agent has a perfected security interest) with a value in excess of $1,000,000 individually, each Grantor shall ensure that the Administrative Agent has Control thereof by obtaining the written consent of each issuer of each related Letter-of-Credit to the assignment of the proceeds of such Letter-of-Credit to the Administrative Agent.

SECTION 6.    REMEDIAL PROVISIONS

6.1 Certain Matters Relating to Receivables.

(a)  The Administrative Agent shall have the right to make test verifications of the Receivables in any manner and through any medium that it reasonably considers advisable, and each Grantor shall furnish all such assistance and information (subject to Section 6.10) as the Administrative Agent may require in connection with such test verifications (which test verifications shall be made by the Administrative Agent, if at all, only concurrently with and as part of the Administrative Agent's inspection permitted under Section 6.5(b) of the Credit Agreement, but in any event, other than following the occurrence and during the continuance of an Event of Default, not more often than once each calendar year); provided that the Administrative Agent shall not, as part of any test verifications or otherwise, communicate with any account debtor or other customer of any Grantor except as expressly permitted under Section 6.2.  At any time and from time to time, upon the Administrative Agent's request and at the expense of the relevant Grantor, such Grantor shall cause independent public accountants or others satisfactory to the Administrative Agent to furnish to the Administrative Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Receivables (which request shall be made by the Administrative Agent, if at all, only concurrently with and as part of the Administrative Agent's inspection permitted under Section 6.5(b) of the Credit Agreement, but in any event, other than following the occurrence and during the continuance of an Event of Default, not more often than once each calendar year).

(b)  The Administrative Agent hereby authorizes each Grantor to collect such Grantor's Receivables, subject to the Administrative Agent's direction and control, and the Administrative Agent may curtail or suspend said authority at any time after the occurrence and during the continuance of an Event of Default.  If required by the Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, any payments of Receivables, when collected by any Grantor, (i) shall be forthwith (and, in any event, within two Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Administrative Agent if required, in a Collateral Account maintained under the sole dominion and control of the Administrative Agent, subject to withdrawal by the Administrative Agent for the account of the Secured Parties only as provided in Section 6.5, and (ii) until so turned over, shall be held by such Grantor in trust for the Secured Parties, segregated from other funds of such Grantor.  Each such deposit of Proceeds of Receivables shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(c)  From and during the continuance of an Event of Default, at the Administrative Agent's request, each Grantor shall deliver to the Administrative Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including, without limitation, all original orders, invoices and shipping receipts.

6.2  Communications with Obligors; Grantors Remain Liable.

(a)  The Administrative Agent in its own name or in the name of others may at any time after the occurrence and during the continuance of an Event of Default communicate with obligors under the Receivables to verify with them to the Administrative Agent's satisfaction the existence, amount and terms of any Receivables.

(b)  Upon the request of the Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, each Grantor shall notify obligors on the Receivables that the Receivables have been assigned to the Administrative Agent for the ratable benefit of the Secured Parties and that payments in respect thereof shall be made directly to the Administrative Agent.

(c)  Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Receivables to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto.  No Secured Party shall have any obligation or liability under any Receivable (or any agreement giving rise thereto) by reason of or arising out of this Agreement or the receipt by any Secured Party of any payment relating thereto, nor shall any Secured Party be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Receivable (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

6.3  Pledged Stock.

(a)  Unless an Event of Default shall have occurred and be continuing and the Administrative Agent shall have given notice to the relevant Grantor of the Administrative Agent's intent to exercise its corresponding rights pursuant to Section 6.3(b), each Grantor shall be permitted to receive all dividends, payments, distributions and other Proceeds paid in respect of the Pledged Stock and all payments made in respect of the Pledged Notes, in each case paid in the normal course of business of the relevant Issuer and consistent with past practice, to the extent permitted in the Credit Agreement, and to exercise all voting and corporate or other organizational rights with respect to the Investment Property; provided, however, that no vote shall be cast or corporate or other organizational right exercised or other action taken which, in the Administrative Agent's reasonable judgment, would impair the Administrative Agent's security interest in the Pledged Stock or which would be inconsistent with or result in any violation of any provision of the Credit Agreement, this Agreement or any other Loan Document.

(b)  If an Event of Default shall occur and be continuing and the Administrative Agent shall give notice of its intent to exercise such rights to the relevant Grantor or Grantors, (i) the Administrative Agent shall have the right to receive any and all cash dividends, payments or other Proceeds paid in respect of the Investment Property and make application thereof to the Obligations in accordance with Section 6.5, and (ii) any or all of the Investment Property shall be registered in the name of the Administrative Agent or its nominee, and the Administrative Agent or its nominee may thereafter exercise (x) all voting, corporate and other rights pertaining to such Investment Property at any meeting of shareholders of the relevant Issuer or Issuers or otherwise and (y) any and all rights of conversion, exchange and subscription

and any other rights, privileges or options pertaining to such Investment Property as if it were the absolute owner thereof (including, without limitation, the right to exchange at its discretion any and all of the Investment Property upon the merger, consolidation, reorganization, recapitalization or other fundamental change in the corporate or other organizational structure of any Issuer, or upon the exercise by any Grantor or the Administrative Agent of any right, privilege or option pertaining to such Investment Property, and in connection therewith, the right to deposit and deliver any and all of the Investment Property with any committee, depositary, transfer agent, registrar or other designated agency upon such terms and conditions as the Administrative Agent may determine), all without liability except to account for property actually received by it, but the Administrative Agent shall have no duty to any Grantor to exercise any such right, privilege or option and shall not be responsible for any failure to do so or delay in so doing.

(c) Each Grantor hereby authorizes and instructs each Issuer of any Investment Property or any other equity interests pledged by such Grantor hereunder to (i) comply with any instruction received by it from the Administrative Agent in writing that (x) states that an Event of Default has occurred and is continuing and (y) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from such Grantor, and each Grantor agrees that each Issuer shall be fully protected in so complying, and (ii) unless otherwise expressly permitted hereby, pay any dividends or other payments with respect to the Investment Property directly to the Administrative Agent.

6.4     Proceeds to be Turned Over To Administrative Agent.  In addition to the rights of the Secured Parties specified in Section 6.1 with respect to payments of Receivables, if an Event of Default shall occur and be continuing and the Administrative Agent has given notice of its intent to exercise such rights to the relevant Grantor or Grantors, all Proceeds received by any Grantor consisting of cash, checks and other near-cash items shall be held by such Grantor in trust for the Secured Parties, segregated from other funds of such Grantor, and shall, forthwith upon receipt by such Grantor, be turned over to the Administrative Agent in the exact form received by such Grantor (duly indorsed by such Grantor to the Administrative Agent, if required).  All Proceeds received by the Administrative Agent hereunder shall be held by the Administrative Agent in a Collateral Account maintained under its sole dominion and control until applied to the Obligations in accordance with Section 6.5 hereof.  All Proceeds while held by the Administrative Agent in a Collateral Account (or by such Grantor in trust for the Secured Parties) shall continue to be held as collateral security for all the Obligations until applied to the Obligations in accordance with Section 6.5 hereof and shall not constitute payment thereof until applied as provided in Section 6.5.

6.5     Application of Proceeds.  At such intervals as may be agreed upon by the Borrowers and the Administrative Agent, or, if an Event of Default shall have occurred and be continuing, at any time at the Administrative Agent's election (at the direction of the Required Lenders), the Administrative Agent may apply all or any part of Proceeds constituting Collateral, whether or not held in any Collateral Account, and any proceeds of the guarantee set forth in Section 2, in payment of the Obligations in the following order:

First, to pay incurred and unpaid fees and expenses and claims of indemnification (including, without limitation, the reasonable and documented fees and disbursements of its counsel) of the Administrative Agent under the Loan Documents;

Second, to pay incurred and unpaid costs and expenses of the Lenders under the Loan Documents;

19

Third, to the payment of amounts then due and owing and remaining unpaid in respect of the Obligations, pro rata among the Secured Parties according to the amounts of the Obligations then due and owing and remaining unpaid to the Secured Parties;

Fourth, to the prepayment of the Obligations, pro rata among the Secured Parties according to the amounts of the Obligations then held by the Secured Parties;

Fifth, to the payment of all other outstanding Obligations, pro rata among the Secured Parties according to the amounts of the Obligations then held by the Secured Parties;

Sixth, any balance remaining after the Obligations shall have been paid in full shall be paid over to the Borrowers or at the direction of the Borrower.

Notwithstanding the foregoing, no amounts received from any Guarantor shall be applied to any Excluded Swap Obligations of such Guarantor.

6.6     Code and Other Remedies.  If an Event of Default shall occur and be continuing, the Administrative Agent, on behalf of the Secured Parties, may exercise, in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the New York UCC or any other applicable law.  Without limiting the generality of the foregoing, the Administrative Agent, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), may in such circumstances forthwith collect, receive, appropriate and realize upon the Collateral, or any part thereof, and/or may forthwith sell, lease, assign, give option or options to purchase, or otherwise dispose of and deliver the Collateral or any part thereof (or contract to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Administrative Agent or any Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Administrative Agent or any Lender shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption in any Grantor, which right or equity is hereby waived and released.  Each Grantor further agrees, at the Administrative Agent's request, to assemble the Collateral and make it available to the Administrative Agent at places which the Administrative Agent shall reasonably select, whether at such Grantor's premises or elsewhere.  The Administrative Agent shall apply the net proceeds of any action taken by it pursuant to this Section 6.6 in accordance with Section 6.5 hereof, and only after such application and after the payment by the Administrative Agent of any other amount required by any provision of law, including, without limitation, Section 9-615(a)(3) of the New York UCC, need the Administrative Agent account for the surplus, if any, to any Grantor.  To the extent permitted by applicable law, each Grantor waives all claims, damages and demands it may acquire against any Secured Party arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

6.7     Private Sale.

(a)     Each Grantor recognizes that the Administrative Agent may be unable to effect a public sale of any or all the Pledged Stock, by reason of certain prohibitions contained in the Securities Act and

20

applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers which will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that any such private sale may result in prices and other terms less favorable than if such sale were a public sale and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner. The Administrative Agent shall be under no obligation to delay a sale of any of the Pledged Stock for the period of time necessary to permit the Issuer thereof to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Issuer would agree to do so.

(b)    Each Grantor agrees to use commercially reasonable efforts to do or cause to be done all such other acts as may be necessary to make such sale or sales of all or any portion of the Pledged Stock pursuant to this Section 6.7 valid and binding and in compliance with any and all other applicable Requirements of Law. Each Grantor further agrees that a breach of any of the covenants contained in this Section 6.7 will cause irreparable injury to the Secured Parties, that the Secured Parties have no adequate remedy at law in respect of such breach and, as a consequence, that each and every covenant contained in this Section 6.7 shall be specifically enforceable against such Grantor, and such Grantor hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred under the Credit Agreement. Notwithstanding anything set forth herein to the contrary, no Grantor shall have any duty with respect to Pledged Stock to, or any duty to cause any Issuer of any Pledged Stock to, execute and deliver, or cause any Person to execute and deliver, any instruments or documents, and do or cause to be done any other acts to register Pledged Stock under the provisions of the Securities Act.

6.8    Subordination. Each Grantor hereby agrees that, upon the occurrence and during the continuance of an Event of Default, unless otherwise agreed by the Administrative Agent, or except to the extent otherwise set forth in the Loan Documents, all Indebtedness owing by it to any Subsidiary of the Borrowers shall be fully subordinated to the indefeasible payment in full in cash of such Grantor's Obligations.

6.9    Deficiency. Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of the Collateral are insufficient to pay its Obligations and the fees and disbursements of any attorneys employed by the Secured Parties to collect such deficiency to the extent such fees and disbursements are reimbursable under the Loan Documents.

6.10    HIPAA Compliance. Nothing in this Agreement or any other Loan Document shall require any Grantor or its Affiliates to provide any Protected Health Information (as defined by HIPAA) in violation of any Requirement of Law.

SECTION 7.    THE ADMINISTRATIVE AGENT

7.1    Administrative Agent's Appointment as Attorney-in-Fact, etc. Each Grantor hereby irrevocably constitutes and appoints the Administrative Agent and any officer or agent or sub-agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement, and, without limiting the generality of the foregoing, each Grantor hereby gives the Administrative Agent the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any or all of the following:

21

(i)        in the name of such Grantor or its own name, or otherwise, take possession of and indorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under any Receivable or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Administrative Agent for the purpose of collecting any and all such moneys due under any Receivable or with respect to any other Collateral whenever payable;

(ii)       in the case of any Intellectual Property, execute and deliver, and have recorded, any and all agreements, instruments, documents and papers as the Administrative Agent may request to evidence the Secured Parties' security interest in such Intellectual Property and the goodwill and general intangibles of such Grantor relating thereto or represented thereby;

(iii)      pay or discharge taxes and Liens levied or placed on or threatened against the Collateral, effect any repairs or any insurance called for by the terms of this Agreement and pay all or any part of the premiums therefor and the costs thereof;

(iv)      execute, in connection with any sale provided for in Section 6.6 or 6.7, any indorsements, assignments or other instruments of conveyance or transfer with respect to the Collateral; and

(v)       (1) direct any party liable for any payment under any of the Collateral to make payment of any and all moneys due or to become due thereunder directly to the Administrative Agent or as the Administrative Agent shall direct; (2) ask or demand for, collect, and receive payment of and receipt for, any and all moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral; (3) sign and indorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, drafts against debtors, assignments, verifications, notices and other documents in connection with any of the Collateral; (4) commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Collateral or any portion thereof and to enforce any other right in respect of any Collateral; (5) defend any suit, action or proceeding brought against such Grantor with respect to any Collateral; (6) settle, compromise or adjust any such suit, action or proceeding and, in connection therewith, give such discharges or releases as the Administrative Agent may deem appropriate; (7) assign any Copyright, Patent or Trademark (along with the goodwill of the business to which any such Copyright, Patent or Trademark pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Administrative Agent shall in its sole discretion determine (at the direction of the Required Lenders); and (8) generally, sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the Administrative Agent were the absolute owner thereof for all purposes, and do, at the Administrative Agent's option (at the direction of the Required Lenders) and such Grantor's expense, at any time, or from time to time, all acts and things which the Administrative Agent deems necessary (at the direction of the Required Lenders) to protect, preserve or realize upon the Collateral and the Secured Parties' security interests therein and to effect the intent of this Agreement, all as fully and effectively as such Grantor might do.

Anything in this Section 7.1(a) to the contrary notwithstanding, the Administrative Agent agrees that it will not exercise any rights under the power of attorney provided for in this Section 7.1(a) (other than pursuant to clause (ii) thereof) unless an Event of Default shall have occurred and be continuing.

(b) If any Grantor fails to perform or comply with any of its agreements contained herein, the Administrative Agent, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such agreement.

22

(c) The expenses of the Administrative Agent incurred in connection with actions undertaken as provided in this Section 7.1, together with interest thereon at a rate per annum equal to the highest rate per annum at which interest would then be payable on any category of past due ABR Loans under the Credit Agreement, from the date of payment by the Administrative Agent to the date reimbursed by the relevant Grantor, shall be payable by such Grantor to the Administrative Agent on demand.

(d) Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

7.2    Duty of Administrative Agent. The Administrative Agent's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under Section 9-207 of the New York UCC or otherwise, shall be to deal with it in the same manner as the Administrative Agent deals with similar property for its own account. As between the Administrative Agent and the other Secured Parties on one hand, and the Grantors, on the other hand, neither the Administrative Agent, any other Secured Party nor any of their respective officers, directors, employees, partners, representatives or agents (or sub-agents) (nor any representatives of any of the foregoing) shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof. The powers conferred on the Secured Parties hereunder are solely to protect the Secured Parties' interests in the Collateral and shall not impose any duty upon any Secured Party to exercise any such powers. The Secured Parties shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither they nor any of their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence, bad faith, material breach of this Agreement or willful misconduct.

7.3    Authorization to File Financing Statements. Pursuant to any applicable law, each Grantor authorizes the Administrative Agent to file or record financing statements and other filing or recording documents or instruments with respect to the Collateral without the signature of such Grantor in such form and in such offices as the Administrative Agent determines appropriate to perfect the security interests of the Administrative Agent under this Agreement. Each Grantor authorizes the Administrative Agent to use collateral descriptions such as "all personal property" or "all assets", in each case "whether now owned or hereafter acquired", or descriptions of similar import in any such financing statement. Each Grantor hereby ratifies and authorizes the filing by the Administrative Agent of (i) any financing statement with respect to the Collateral made on or prior to the date hereof and (ii) any renewals thereof and any new financing statement with respect to each additional Subsidiary that becomes a Grantor pursuant to Section 8.14, to the extent such financing statement has the same collateral description as the financing statements in effect at such time.

7.4    Authority of Administrative Agent. Each Grantor acknowledges that the rights and responsibilities of the Administrative Agent under this Agreement with respect to any action taken by the Administrative Agent or the exercise or non-exercise by the Administrative Agent of any option, voting right, request, judgment or other right or remedy provided for herein or resulting or arising out of this Agreement shall, as between the Administrative Agent and the other Secured Parties, be governed by the Credit Agreement and by such other agreements with respect thereto as may exist from time to time among them, but, as between the Administrative Agent and the Grantors, the Administrative Agent shall be conclusively presumed to be acting as agent for the Secured Parties with full and valid authority so to act or refrain from acting, and no Grantor shall be under any obligation, or entitlement, to make any inquiry respecting such authority.

23

SECTION 8.    MISCELLANEOUS

8.1      Amendments in Writing. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 10.1 of the Credit Agreement.

8.2      Notices.  All notices, requests and demands to or upon the Administrative Agent or any Grantor hereunder shall be effected in the manner provided for in Section 10.2 of the Credit Agreement; provided that any such notice, request or demand to or upon any Guarantor shall be addressed to such Guarantor at its notice address set forth on Schedule 1.

8.3      No Waiver by Course of Conduct; Cumulative Remedies.  Neither the Administrative Agent nor any Lender shall by any act (except by a written instrument pursuant to Section 8.1), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Administrative Agent or any Lender, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by any Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which any Secured Party would otherwise have on any future occasion.  The rights and remedies herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

8.4      Enforcement Expenses; Indemnification.  Without limiting any Guarantor Obligations on account of any Borrower Obligations concerning enforcement expenses, indemnification or any other matter:

(a)      Each Guarantor agrees to pay or reimburse each Lender and the Administrative Agent for all its reasonable and documented out-of-pocket costs and expenses incurred in collecting against such Guarantor under the guarantee contained in Section 2 or otherwise enforcing or preserving any rights under this Agreement and the other Loan Documents to which such Guarantor is a party, including, without limitation, the fees and disbursements of (i) one counsel to the Administrative Agent (and, if reasonably necessary, of one local counsel in any relevant jurisdiction to the Administrative Agent) and (ii) one counsel to the Lenders (selected by the Required Lenders), taken as a whole (and, if reasonably necessary, of one local counsel in any relevant jurisdiction to all such Lenders (selected by the Required Lenders), taken as a whole and, solely in the case of a conflict of interest, one additional local counsel to all affected Lenders, taken as a whole).

(b)      Each Guarantor agrees to pay, and to save the Secured Parties harmless from, any and all liabilities with respect to, or resulting from any delay in paying, any and all stamp, excise, sales or other taxes which may be payable or determined to be payable with respect to any of the Collateral or in connection with any of the transactions contemplated by this Agreement.

(c)      Each Guarantor agrees to pay, and to save the Secured Parties harmless from, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement and all other Loan Documents to the extent the Borrowers would be required to do so pursuant to Section 10.5 of the Credit Agreement.

(d)      The agreements in this Section 8.4 shall survive repayment of the Obligations and all other amounts payable under the Credit Agreement and the other Loan Documents.

24

8.5     Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Secured Parties and their successors and assigns; provided that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Administrative Agent and the Lenders.

8.6     Set-Off. In addition to any rights and remedies of the Secured Parties provided by law, each Secured Party shall have the right, without notice to any Grantor, any such notice being expressly waived by each Grantor to the extent permitted by applicable law, upon any Obligations becoming due and payable by any Grantor (whether at the stated maturity, by acceleration or otherwise), to apply to the payment of such Obligations, by setoff or otherwise, any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Secured Party, any affiliate thereof or any of their respective branches or agencies to or for the credit or the account of such Grantor.  Each Secured Party agrees promptly to notify the relevant Grantor and the Administrative Agent after any such application made by such Secured Party, provided that the failure to give such notice shall not affect the validity of such application.

8.7     Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by email or telecopy), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

8.8     Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.9     Section Headings. The Section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

8.10    Integration. This Agreement and the other Loan Documents represent the agreement of the Grantors and the Secured Parties with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by any Secured Party relative to subject matter hereof and thereof not expressly set forth or referred to herein or in the other Loan Documents.  In the event of a conflict or inconsistency between the terms of this Agreement and the Credit Agreement (including as to notice periods, grace periods and cure periods), the terms of the Credit Agreement shall control.

8.11    GOVERNING LAW.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

8.12    Submission To Jurisdiction; Waivers.  Each Grantor hereby irrevocably and unconditionally:

(a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof; provided, that nothing contained herein or in any other Loan Document will prevent any Secured Party

25

from bringing any action to enforce any award or judgment or exercise any right under the Security Documents or against any Collateral or any other property of any Loan Party in any other forum in which jurisdiction can be established;

(b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Grantor at its address referred to in Section 8.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages; provided that nothing contained in this clause (e) shall limit the Borrowers', the Borrowers' Subsidiaries' or the Guarantors' indemnification obligations.

8.13     Acknowledgements.  Each Grantor hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents to which it is a party;

(b)     no Secured Party has any fiduciary relationship with or duty to any Grantor arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Grantors, on the one hand, and the Secured Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Secured Parties or among the Grantors and the Secured Parties.

8.14     Additional Grantors.  Each Subsidiary of the Borrowers that is required to become a party to this Agreement pursuant to Section 6.9 of the Credit Agreement shall become a Grantor for all purposes of this Agreement upon execution and delivery by such Subsidiary of an Assumption Agreement in the form of Annex 1 hereto.

8.15     Reserved.

8.16     Releases.

(a)     At such time as the Loans and the other Obligations (other than Obligations in respect of Specified Swap Agreements and Specified Cash Management Agreements) shall have been paid in full in cash, the Collateral shall be released from the Liens created hereby, and this Agreement and all obligations (other than those expressly stated to survive such termination) of the Administrative Agent and each Grantor hereunder shall terminate, all without delivery of any instrument or performance of any act by any party, and all rights to the Collateral shall revert to the Grantors.  At the request and sole

26

expense of any Grantor following any such termination, the Administrative Agent shall deliver to such Grantor any Collateral then held by the Administrative Agent hereunder, and execute and deliver to such Grantor such documents as such Grantor shall reasonably request to evidence such termination.

(b)     If any of the Collateral shall be sold, transferred or otherwise disposed of by any Grantor in a Disposition permitted by the Credit Agreement, then the Administrative Agent, at the request and sole expense of such Grantor, shall execute and deliver to such Grantor all releases or other documents reasonably necessary or desirable for the release of the Liens created hereby on such Collateral; provided that the Borrowers shall have delivered to the Administrative Agent, at least three Business Days (or four Business Days if such written request is received after 10:00 a.m. New York City time on the first day of such three Business Day period) (or such shorter time as the Administrative Agent may consent to) prior to the date of the proposed release, a written request for release identifying the relevant Collateral and the terms of the sale or other Disposition in reasonable detail, including the price thereof and any expenses in connection therewith, together with a certification by the Borrowers stating that such Disposition is in compliance with the Credit Agreement and the other Loan Documents.  At the request and sole expense of the Borrowers, a Subsidiary Guarantor shall be released from its obligations hereunder in the event that all the Capital Stock of such Subsidiary Guarantor shall be sold, transferred or otherwise disposed of in a Disposition permitted by the Credit Agreement; provided that the Borrowers shall have delivered to the Administrative Agent, at least three Business Days (or four Business Days if such written request is received after 10:00 a.m. New York City time on the first day of such three Business Day period) (or such shorter time as the Administrative Agent may consent to) prior to the date of the proposed release, a written request for release identifying the relevant Subsidiary Guarantor and the terms of the sale or other Disposition in reasonable detail, including the price thereof and any expenses in connection therewith, together with a certification by the Borrowers stating that such Disposition is in compliance with the Credit Agreement and the other Loan Documents.  The Administrative Agent shall be entitled to rely (without any need for further investigation) and shall have no liability for relying on any such notice, certificate or other certification delivered pursuant to this paragraph.

(c)     Nothing in this Agreement shall limit the termination and release provisions of Section 10.14 of the Credit Agreement.  The Administrative Agent shall have no liability whatsoever to any other Secured Party as a result of the release of any Collateral or any Guarantor by it in accordance with the terms of this Section 8.16, including in connection with (or as a result of) reliance on any certificate delivered pursuant to Section 8.16(b).

8.17    WAIVER OF JURY TRIAL

EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

IN WITNESS WHEREOF, each of the undersigned has caused this Guarantee and Collateral Agreement to be duly executed and delivered as of the date first above written.

**GRANTORS:**

NEW MILLENNIUM HOLDCO, INC.

By: _____
　　　Name:
　　　Title:

MILLENNIUM HEALTH, LLC

By: _____
　　　Name:
　　　Title:

RXANTE, LLC

By: _____
　　　Name:
　　　Title:

[Signature Page to Guarantee and Collateral Agreement ($600 million Exit Facility)]

**ADMINISTRATIVE AGENT:**

CREDIT SUISSE AG, CAYMAN ISLANDS
BRANCH, as Administrative Agent

By_____
    Name:
    Title:

By_____
    Name:
    Title:

[Signature Page to Guarantee and Collateral Agreement ($600 million Exit Facility)]

Annex 1 to
Guarantee and Collateral Agreement

ASSUMPTION AGREEMENT, dated as of _____, 20__, made by _____ (the "Additional Grantor"), in favor of CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent") for the Secured Parties.  All capitalized terms not defined herein shall have the meaning ascribed to them in the Guarantee and Collateral Agreement (as defined below).

W I T N E S S E T H:

WHEREAS,  New Millennium Holdco, Inc. ("Holdings" and a "Borrower"), Millennium Health, LLC ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the lenders party thereto and the Administrative Agent have entered into a Credit Agreement, dated as of _____ __, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, in connection with the Credit Agreement, the Borrowers and certain of their Subsidiaries (other than the Additional Grantor) have entered into the Guarantee and Collateral Agreement, dated as of _____ __, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Guarantee and Collateral Agreement") in favor of the Administrative Agent for the ratable benefit of the Secured Parties;

WHEREAS, the Credit Agreement requires the Additional Grantor to become a party to the Guarantee and Collateral Agreement; and

WHEREAS, the Additional Grantor has agreed to execute and deliver this Assumption Agreement in order to become a party to the Guarantee and Collateral Agreement;

NOW, THEREFORE, IT IS AGREED:

1. Guarantee and Collateral Agreement.  By executing and delivering this Assumption Agreement, the Additional Grantor, as provided in Section 8.14 of the Guarantee and Collateral Agreement, hereby becomes a party to the Guarantee and Collateral Agreement as a Grantor and Guarantor for all purposes thereunder and, without limiting the generality of the foregoing, hereby expressly assumes, jointly and severally, all obligations and liabilities of a Grantor and Guarantor thereunder and hereby grants a security interest in all of its right, title and interest in the Collateral as collateral security for the prompt and complete payment and performance when due of the Additional Grantor's Obligations.  The information set forth in Annex 1-A hereto is hereby added to the information set forth in the Schedules to the Guarantee and Collateral Agreement.  The Additional Grantor hereby represents and warrants that each of the representations and warranties contained in Section 4 of the Guarantee and Collateral Agreement is true and correct on and as the date hereof (after giving effect to this Assumption Agreement and the supplements attached hereto) as if made on and as of such date.  Each Additional Grantor authorizes the Administrative Agent to use collateral descriptions such as "all personal property" or "all assets", in each case "whether now owned or hereafter acquired", or descriptions of similar import in any financing statements.

2

      **2.  <u>Governing Law</u>.  THIS ASSUMPTION AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

      IN WITNESS WHEREOF, the undersigned has caused this Assumption Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GRANTOR]

By:_____
     Name:
     Title:

[Signature Page to Guarantee and Collateral Agreement ($600 million Exit Facility)]

**EXHIBIT A**

**TO GUARANTEE AND COLLATERAL AGREEMENT**

**[Attached]**

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address) | |

    **Mary Ann Kramer**
    **Brown Rudnick LLP**
    **One Financial Center**
    **Boston, MA 02111**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **New Millennium Holdco, Inc.** | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **16981 Via Tazon** | **San Diego** | **CA** | **92127** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Credit Suisse AG, Cayman Islands Branch, as Administrative Agent** | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **Eleven Madison Avenue** | **New York** | **NY** | **10010** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of the Debtor, whether now owned or hereafter acquired.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**To be filed with the Delaware Secretary of State**

International Association of Commercial Administrators (IACA)

**FILING OFFICE COPY —** UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

███████████
███████████
███████████

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional) | |
| B. E-MAIL CONTACT AT FILER (optional) | |
| C. SEND ACKNOWLEDGMENT TO:  (Name and Address) | |

**Mary Ann Kramer**
**Brown Rudnick LLP**
**One Financial Center**
**Boston, MA 02111**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME:  Provide only <u>one</u> Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME **RxAnte, LLC** | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS **901 N. Glebe Rd., Suite 850** | CITY **Arlington** | STATE **VA** | POSTAL CODE **22203** | COUNTRY **USA** |

2. DEBTOR'S NAME:  Provide only <u>one</u> Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY):  Provide only <u>one</u> Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME **Credit Suisse AG, Cayman Islands Branch, as Administrative Agent** | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS **Eleven Madison Avenue** | CITY **New York** | STATE **NY** | POSTAL CODE **10010** | COUNTRY **USA** |

4. COLLATERAL:  This financing statement covers the following collateral:

**All assets of the Debtor, whether now owned or hereafter acquired.**

5. Check <u>only</u> if applicable and check <u>only</u> one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check <u>only</u> if applicable and check <u>only</u> one box: | | | 6b. Check <u>only</u> if applicable and check <u>only</u> one box: |
|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien   ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**To be filed with the Delaware Secretary of State**

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| --- |

| B. E-MAIL CONTACT AT FILER (optional) |
| --- |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

**Mary Ann Kramer**
**Brown Rudnick LLP**
**One Financial Center**
**Boston, MA 02111**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| **Millennium Health, LLC** | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| **16981 Via Tazon** | **San Diego** | **CA** | **92127** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
| --- | --- | --- | --- |
| **Credit Suisse AG, Cayman Islands Branch, as Administrative Agent** | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |
| **Eleven Madison Avenue** | **New York** | **NY** | **10010** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**All assets of the Debtor, whether now owned or hereafter acquired.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:  ☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility     6b. Check only if applicable and check only one box:  ☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
  **To be filed with the California Secretary of State**

**FILING OFFICE COPY —** UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)          International Association of Commercial Administrators (IACA)

**EXHIBIT B**

**TO GUARANTEE AND COLLATERAL AGREEMENT**

**FORM OF COPYRIGHT SECURITY AGREEMENT**

This Copyright Security Agreement dated as of ____, 2015 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Copyright Security Agreement**") is made by each of the signatories hereto as a "Grantor" (each, a "**Grantor**" and, collectively, the "**Grantors**") in favor of Credit Suisse AG, Cayman Islands Branch, in its capacity as Administrative Agent (in such capacity, the "**Administrative Agent**") for the Secured Parties (as defined in the Guarantee and Collateral Agreement referred to below).

W I T N E S S E T H :

WHEREAS, the Grantor is party to that certain Guarantee and Collateral Agreement dated as of _____, 2015 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Guarantee and Collateral Agreement**") by and among New Millennium Holdco, Inc., a Delaware corporation (the "**Company**"), the Grantor, certain other subsidiaries of the Company and the Administrative Agent, and in connection therewith, the Grantor is required to execute and deliver this Copyright Security Agreement;

NOW, THEREFORE, in consideration of the foregoing premises, and to induce the Administrative Agent and the Lenders to enter into the Credit Agreement, the Grantor hereby agrees with the Administrative Agent, for the ratable benefit of the Secured Parties, as follows:

SECTION 1. *Defined Terms*. Unless otherwise defined herein, terms defined in the Guarantee and Collateral Agreement and used herein shall have the meaning given to them in the Guarantee and Collateral Agreement.

SECTION 2. *Grant of Security Interest in Copyright Collateral*. The Grantor hereby grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a security interest in and continuing lien on, all of the Grantor's right, title and interest in the following, in each case whether now owned or existing or hereafter acquired, created or arising and wherever located or in which the Grantor now has or at any time in the future may acquire any right, title or interest, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Grantor's Obligations:

(a)    all copyrights in the United States (and/or all applications therefor), including but not limited to copyrights in software and all rights in and to databases, and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered and whether or not the underlying works of authorship have been published, moral rights, reversionary interests, termination rights, and, with respect to any and all of the foregoing: (i) all registrations, recordings and applications therefor including, without limitation, the registrations and applications referred to on or required to be referred to on Schedule I hereto, (ii) all extensions and renewals thereof, (iii) the right to sue or otherwise recover for past, present and future infringements thereof, (iv) all Proceeds of the foregoing, including, without limitation,

license fees, royalties, income, payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and (v) all other rights of any kind accruing thereunder or pertaining thereto throughout the world (excluding any Excluded Property, collectively, "**Copyrights**"); and (b) any and all agreements, licenses and covenants granting to the Grantor any exclusive right in or to any Copyrights including without limitation, the grant of rights to manufacture, distribute, exploit and sell materials derived from any Copyright, including without limitation those referred to or required to be referred to on Schedule II hereto (excluding any Excluded Property, together with the Copyrights, the "**Copyright Collateral**"); provided, however, that notwithstanding any of the other provisions set forth in this Section 2, this Copyright Security Agreement shall not constitute a grant of a security interest in any Excluded Property.

SECTION 3.  *Security Agreement*.   The security interest granted pursuant to this Copyright Security Agreement is granted in conjunction with the security interest granted to the Administrative Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement, and the Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the security interest in the Copyright Collateral made and granted hereby are more fully set forth in the Guarantee and Collateral Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein.  In the event that any provision of this Copyright Security Agreement is deemed to conflict with the Guarantee and Collateral Agreement, the provisions of the Guarantee and Collateral Agreement shall control.

SECTION 4.  *Counterparts*.  This Copyright Security Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

SECTION 5.  GOVERNING LAW.   THIS COPYRIGHT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the Grantor has caused this Copyright Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

_____,
as Grantor

By: _____
      Name:
      Title:

[Signature Page to Copyright Security Agreement (Commitment Fee Facility)]

Accepted and Agreed:

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH**, as Administrative Agent

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

[Signature Page to Copyright Security Agreement (Commitment Fee Facility)]

**SCHEDULE I**
**to**
**COPYRIGHT SECURITY AGREEMENT**

**COPYRIGHT REGISTRATIONS AND APPLICATIONS**

**SCHEDULE II**
**to**
**COPYRIGHT SECURITY AGREEMENT**

**EXCLUSIVE COPYRIGHT LICENSES**

**EXHIBIT C**

**TO GUARANTEE AND COLLATERAL AGREEMENT**

**FORM OF PATENT SECURITY AGREEMENT**

This Patent Security Agreement dated as of _____, 2015 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Patent Security Agreement**") is made by each of the signatories hereto as a "Grantor" (each, a "**Grantor**" and, collectively, the "**Grantors**") in favor of Credit Suisse AG, Cayman Islands Branch, in its capacity as Administrative Agent (in such capacity, the "**Administrative Agent**") for the Secured Parties (as defined in the Guarantee and Collateral Agreement referred to below).

W I T N E S S E T H:

WHEREAS, the Grantors are party to that certain Guarantee and Collateral Agreement dated as of _____, 2015 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Guarantee and Collateral Agreement**") by and among New Millennium Holdco, Inc., a Delaware corporation (the "**Company**"), the Grantors, certain other subsidiaries of the Company and the Administrative Agent, and in connection therewith the Grantors are required to execute and deliver this Patent Security Agreement;

NOW, THEREFORE, in consideration of the foregoing premises, and to induce the Administrative Agent and the Lenders to enter into the Credit Agreement, the Grantors hereby agree with the Administrative Agent, for the ratable benefit of the Secured Parties, as follows:

SECTION 1.  *Defined Terms*. Unless otherwise defined herein, terms defined in the Guarantee and Collateral Agreement and used herein shall have the meaning given to them in the Guarantee and Collateral Agreement.

SECTION 2.  *Grant of Security Interest in Patent Collateral*.  Each Grantor hereby grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a security interest in and continuing lien on, all of such Grantor's right, title and interest in the following, in each case whether now owned or existing or hereafter acquired, created or arising and wherever located or in which such Grantor now has or at any time in the future may acquire any right, title or interest, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Obligations: all patents registered in the United States (and/or all applications therefor) and certificates of invention, inventions or similar industrial property rights, and applications for any of the foregoing, including, but not limited to: (i) each patent and patent application referred to or required to be referred to on Schedule I hereto, (ii) all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, (iii) all improvements thereto, (iv) the right to sue or otherwise recover for past, present and future infringements or other violations thereof, (v) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages, and proceeds of suit now or hereafter due and/or payable with

respect thereto, and (vi) all other rights of any kind accruing thereunder or pertaining thereto throughout the world (excluding any Excluded Property, collectively, the "**Patent Collateral**"); provided, however, that notwithstanding any of the other provisions set forth in this Section 2, this Patent Security Agreement shall not constitute a grant of a security interest in any Excluded Property.

SECTION 3.  *Security Agreement*. The security interest granted pursuant to this Patent Security Agreement is granted in conjunction with the security interest granted to the Administrative Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement, and the Grantors hereby acknowledge and affirm that the rights and remedies of the Administrative Agent with respect to the security interest in the Patent Collateral made and granted hereby are more fully set forth in the Guarantee and Collateral Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. In the event that any provision of this Patent Security Agreement is deemed to conflict with the Guarantee and Collateral Agreement, the provisions of the Guarantee and Collateral Agreement shall control.

SECTION 4.  *Counterparts*. This Patent Security Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

SECTION 5.  GOVERNING LAW.  THIS PATENT SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, each Grantor has caused this Patent Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

_____,
     as Grantor


By: _____
     Name:
     Title:

Accepted and Agreed:

**CREDIT SUISSE AG, CAYMAN
ISLANDS BRANCH**, as Administrative
Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**SCHEDULE I**
**to**
**PATENT SECURITY AGREEMENT**

**PATENTS AND PATENT APPLICATIONS**

**EXHIBIT D**

**TO GUARANTEE AND COLLATERAL AGREEMENT**

**FORM OF TRADEMARK SECURITY AGREEMENT**

This Trademark Security Agreement dated as of _____, 2015 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Trademark Security Agreement**") is made by each of the signatories hereto as a "Grantor" (each, a "**Grantor**" and, collectively, the "**Grantors**") in favor of Credit Suisse AG, Cayman Islands Branch, in its capacity as Administrative Agent (in such capacity, the "**Administrative Agent**") for the Secured Parties (as defined in the Guarantee and Collateral Agreement referred to below).

W I T N E S S E T H :

WHEREAS, the Grantors are party to that certain Guarantee and Collateral Agreement dated as of _____, 2015 (as it may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Guarantee and Collateral Agreement**") by and among New Millennium Holdco, Inc., a Delaware corporation (the "**Company**"), the Grantors, certain other subsidiaries of the Company and the Administrative Agent, and in connection therewith, the Grantors are required to execute and deliver this Trademark Security Agreement;

NOW, THEREFORE, in consideration of the foregoing premises, and to induce the Administrative Agent and the Lenders to enter into the Credit Agreement, the Grantors hereby agree with the Administrative Agent, for the ratable benefit of the Secured Parties, as follows:

SECTION 1.    *Defined Terms*. Unless otherwise defined herein, terms defined in the Guarantee and Collateral Agreement and used herein shall have the meaning given to them in the Guarantee and Collateral Agreement.

SECTION 2.    *Grant of Security Interest in Trademark Collateral*.

Each Grantor hereby grants to the Administrative Agent, for the ratable benefit of the Secured Parties, a security interest in and continuing lien on, all of such Grantor's right, title and interest in the following, in each case whether now owned or existing or hereafter acquired, created or arising and wherever located or in which such Grantor now has or at any time in the future may acquire any right, title or interest, as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration, or otherwise) of such Grantor's Obligations: all trademarks, including, without limitation, all trademarks registered in the United States, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, or otherwise, and all common-law rights related thereto (and/or all applications therefor), trade names, trade dress, corporate names, company names, business names, fictitious business names, Internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, designs and general intangibles of a like nature, whether or not registered, and with respect to any and all of

the foregoing: (i) all registrations and applications therefor, including, without limitation, the registrations and applications referred to or required to be referred to on Schedule I hereto, (ii) all extensions or renewals of any of the foregoing, (iii) all of the goodwill of the business connected with the use of and symbolized by any of the foregoing, (iv) the right to sue or otherwise recover for past, present and future infringement, dilution or other violation of any of the foregoing or for any injury to the related goodwill, (v) all Proceeds of the foregoing, including, without limitation, license fees, royalties, income payments, claims, damages and proceeds of suit now or hereafter due and/or payable with respect thereto, and (vi) all other rights of any kind accruing thereunder or pertaining thereto throughout the world (excluding any Excluded Property, collectively, the "**Trademark Collateral**"); provided, however, that notwithstanding any of the other provisions set forth in this Section 2, this Trademark Security Agreement shall not constitute a grant of a security interest in any Excluded Property, including, without limitation, any Trademark application filed in the United States Patent and Trademark Office on the basis of a Grantor's intent-to-use such Trademark unless and until evidence of use of the Trademark has been filed with, and accepted by the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.), to the extent that granting a security interest in such Trademark application prior to such filing and acceptance would adversely affect the enforceability or validity of such Trademark application or the resulting Trademark registration.

SECTION 3.  *Security Agreement*.  The security interest granted pursuant to this Trademark Security Agreement is granted in conjunction with the security interest granted to the Administrative Agent for the ratable benefit of the Secured Parties pursuant to the Guarantee and Collateral Agreement, and the Grantors hereby acknowledge and affirm that the rights and remedies of the Administrative Agent with respect to the security interest in the Trademark Collateral made and granted hereby are more fully set forth in the Guarantee and Collateral Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. In the event that any provision of this Trademark Security Agreement is deemed to conflict with the Guarantee and Collateral Agreement, the provisions of the Guarantee and Collateral Agreement shall control.

SECTION 4.  *Counterparts*.  This Trademark Security Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

SECTION 5. GOVERNING LAW.   THIS TRADEMARK SECURITY AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, each Grantor has caused this Trademark Security Agreement to be executed and delivered by its duly authorized officer as of the date first set forth above.

                             _____,

                             as Grantor

By:   _____

        Name:

        Title:

Accepted and Agreed:

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH**, as Administrative Agent

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**SCHEDULE I**
to
**TRADEMARK SECURITY AGREEMENT**

**TRADEMARK REGISTRATIONS AND APPLICATIONS**

**Registered Trademarks**


**Trademark Applications**

**FORM OF**
**COMPLIANCE CERTIFICATE**

This Compliance Certificate (this "Certificate") is delivered on this ____ day of _____, 20__ pursuant to Section 6.2(b) of the Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time) (the "Credit Agreement"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC, a California limited liability company ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

1.    I am the duly elected, qualified and acting [___] of Holdings and [___] of Millennium.

2.    I have reviewed and am familiar with the contents of this Certificate.

3.    I have reviewed the terms of the Credit Agreement and the Loan Documents and have made or caused to be made under my supervision, a review in reasonable detail of the transactions and condition of the Borrowers during the accounting period covered by the financial statements attached hereto as Attachment 1 (the "Financial Statements"). Based on such review, as of the date of this Certificate, to my knowledge each Loan Party has observed or performed all of its covenants and other agreements, and has observed, performed or satisfied every condition to be observed, performed or satisfied by it, as of the date required in the Credit Agreement and the other Loan Documents to which it is a party during or at the end of the accounting period covered by the Financial Statements and I have no actual knowledge of the existence of any condition or event which constitutes a Default or Event of Default[, except as set forth below].

4.    Attached hereto as Attachment 2 are the computations showing compliance with the covenants set forth in Section 7.1, 7.2, 7.3, 7.5, 7.6 and 7.8 of the Credit Agreement, [including the computations setting forth the amount of Excess Cash Flow, the Available ECF Amount for the Calculation Period ended [December 31, ____] and the Aggregate Available ECF Amount as of [December 31, ____], and the amount of the applicable prepayment required pursuant to Section 2.11(c) of the Credit Agreement.][1]

5.    Set forth on Attachment 3 are the following, to extent not previously disclosed to the Administrative Agent:

(a)    a list of Intellectual Property acquired by any Loan Party; and

(b)    a description of any Person that has become a Group Member.

7.    Set forth on Attachment 4 is each Subsidiary that has been designated as an Unrestricted Subsidiary in accordance with the provisions of the Credit Agreement. Each such

---

[1] To be included only for each "Calculation Period."

Unrestricted Subsidiary (A) is not a Material Subsidiary and (B) together with all other Unrestricted Subsidiaries, (x) has assets comprising less than or equal to 25% of the consolidated total assets of Holdings and its Subsidiaries as at such date and (y) contributes less than or equal to 25% of the aggregate gross revenues of Holdings and its Subsidiaries for the applicable period (covered in the consolidated statement of income included in the financial statements attached hereto in Attachment 1).

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, I have executed this Certificate as of the date first set forth above.

_____
Name:
Title:

Attachment 1
to Compliance Certificate


[Attach Financial Statements]

Attachment 2
to Compliance Certificate

The information described herein is as of _____, _____, and pertains to the period from _____, _____ to _____, _____.

[Set forth Covenant [and Excess Cash Flow Calculations]]

(a) Intellectual Property acquired by any Loan Party

(b) New Group Members

[Unrestricted Subsidiaries]

EXHIBIT C

**FORM OF
CLOSING CERTIFICATE**

**[_____], 2015**

Pursuant to Section 5.1(i) of the Credit Agreement, dated as of the date hereof (the "Credit Agreement"; terms defined therein being used herein as therein defined), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC, a California limited liability company ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"), the undersigned [INSERT TITLE OF OFFICER] of [INSERT NAME OF LOAN PARTY] (the "Certifying Loan Party") hereby certifies, in [his/her] capacity as such, and not in [his/her] individual capacity as follows:

1. The representations and warranties of the Certifying Loan Party set forth in each of the Loan Documents to which it is a party or which are contained in any certificate furnished by or on behalf of the Certifying Loan Party pursuant to any of the Loan Documents to which it is a party are true and correct in all material respects, subject to the limitations set forth therein, on and as of the date hereof with the same effect as if made on the date hereof, except for representations and warranties expressly stated to relate to a specific earlier date, in which case such representations and warranties were true and correct, subject to the limitations set forth therein, in all material respects as of such earlier date.

2. _____ is the duly elected and qualified Secretary of the Certifying Loan Party and the signature set forth for such officer below is such officer's true and genuine signature.

3. [No Default or Event of Default has occurred and is continuing as of the date hereof or after giving effect to the Loans to be made or deemed made on the date hereof and the use of proceeds thereof.][2]

4. [The conditions precedent set forth in Section 5.1 of the Credit Agreement were satisfied or waived as of the Closing Date.][3]

The undersigned Secretary of the Certifying Loan Party certifies, in [his/her] capacity as such, and not in [his/her individual capacity], as follows:

1. The Certifying Loan Party is (A) a [limited liability company]/[corporation] duly formed, (B) duly organized, (C) validly existing and (D) in good standing under the laws of the jurisdiction of its organization.

2. Attached hereto as Annex 1 is a true, correct and complete copy of resolutions (the "Resolutions") duly adopted by the written consent of the [Sole Member]/[Board of Directors] of the Certifying Loan Party [as of the date hereof], relating to the execution and delivery of the Credit Agreement, the other Loan Documents and certain other agreements, instruments and documents relating thereto and the performance of the Certifying Loan Party's obligations thereunder. Such resolutions have not in any

---

[2] Borrowers only.
[3] Borrowers only.

way been amended, modified, revoked or rescinded, have been in full force and effect since their adoption to and including the date hereof and are now in full force and effect and are the only corporate proceedings of the Certifying Loan Party now in force relating to or affecting the matters referred to therein.

3. Attached hereto as <u>Annex 2</u> is a true, correct and complete copy of the [Operating Agreement]/[Limited Liability Company Agreement]/[Bylaws] of the Certifying Loan Party as in effect at the date on which the Resolutions were adopted for the Certifying Loan Party and at all subsequent times to and including the date hereof.  [There are no other agreements (whether referred to as a limited liability company agreement, operating agreement or otherwise), written, oral or implied, of the member or members of the Certifying Loan Party as to the affairs of the Certifying Loan Party and the conduct of its business other than as attached hereto][4].

4. Attached hereto as <u>Annex 3</u> is a true, correct and complete copy of the [Certificate of Formation]/[Certificate of Incorporation] of the Certifying Loan Party as in effect on the date hereof. No amendment, restatement or modification thereto has been approved by the [Sole Member]/[Board of Directors] of the Certifying Loan Party or filed with any public official, except for such amendments, restatements or modifications that are contained in Annex 3.

5. Attached hereto as <u>Annex 4</u> is a copy of the Certificate of the Secretary of State of the State of [Delaware] to the Certifying Loan Party, certifying as to the Certifying Loan Party's good standing.

6. The following persons are now duly elected and qualified officers of the Certifying Loan Party holding the offices indicated next to their respective names below, and the signatures appearing opposite their respective names below are the true and genuine signatures of such officers, and each of such officers is duly authorized to execute and deliver on behalf of the Certifying Loan Party each of the Loan Documents to which it is a party and any certificate or other document to be delivered by the Certifying Loan Party pursuant to the Loan Documents to which it is a party:

[Remainder of page intentionally left blank]

---

[4] Bracketed language is for any Loan Party that is a domestic limited liability company.

| Name | Office | Signature |
|------|--------|-----------|
|      |        | _____ |
|      |        | _____ |
|      |        | _____ |

IN WITNESS WHEREOF, the undersigned have hereunto set our names as of the date first set forth above.

_____     _____
Name:                                Name:
Title:                               Title:  Secretary

**FORM OF**
**ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into between the Assignor named below (the "Assignor") and the Assignee named below (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). In the case where the Assigned Interest covers all of the Assignor's rights and obligations under the Credit Agreement, the Assignor shall cease to be a party thereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 10.5 of the Credit Agreement with respect to facts and circumstances occurring on or prior to the Effective Date and subject to its obligations hereunder and under Section 9.13 of the Credit Agreement. Such sale and assignment is (i) subject to acceptance and recording thereof in the Register by the Administrative Agent pursuant to Section 10.6(b)(v) of the Credit Agreement, (ii) without recourse to the Assignor and (iii) except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

1. Assignor: _____

2. Assignee: _____
   [and is an Affiliate/Approved Fund of [*identify Lender*][5]]

3. Borrowers: New Millennium Holdco, Inc.; Millennium Health, LLC

4. Administrative Agent: Credit Suisse AG, Cayman Islands Branch, as administrative agent under the Credit Agreement

---

[5] Select as applicable.

5.       Credit Agreement:       The Credit Agreement dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time), among Millennium Holdco, Inc. ("Holdings" and a "Borrower), Millennium Health, LLC ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the Lenders party thereto,  and Credit Suisse AG, Cayman Islands Branch, as Administrative Agent

6.       Assigned Interest:

| Facility Assigned[6] | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans[7] | CUSIP Number |
|---|---|---|---|---|
| | $ | $ | % | |
| | $ | $ | % | |
| | $ | $ | % | |

Effective Date:    _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The Assignee agrees to deliver to the Administrative Agent a completed administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrowers, the Loan Parties and their Affiliates or their respective securities) will be made available and who may receive such information in accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR

_____
NAME OF ASSIGNOR

By:_____
   Name:
   Title:

ASSIGNEE

_____
NAME OF ASSIGNEE

---

[6] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Assignment (e.g. "Closing Date Term Loan").

[7] Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders.

2

By:_____
  Name:
  Title:

3

[Consented to and]^8 Accepted:

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent


By_____
   Name:
   Title:

By_____
   Name:
   Title:


[Consented to:]^9

NEW MILLENNIUM HOLDCO, INC.


By_____
   Name:
   Title:


MILLENNIUM HEALTH, LLC


By_____
   Name:
   Title:


[NAME OF ANY OTHER RELEVANT PARTY]


By_____
   Name
   Title:

---

^8 To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

^9 To be added only if the consent of the Borrowers and/or other parties is required by the terms of the Credit Agreement.

4

Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC, a California limited liability company ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent")

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.  Representations and Warranties.

1.1   Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and the outstanding balance of its Term Loans, without giving effect to assignments thereof which have not become effective, are set forth in such Assignment and Assumption and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (b) except as set forth in clause (a) above, makes no representation or warranty and assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document or any instrument or document related thereto, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any instrument or document related thereto or any collateral thereunder, (iii) the financial condition of the Borrowers, any of their Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrowers, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document or any instrument or document related thereto.

1.2 Assignee.  The Assignee (a) represents and warrants that (i) it has examined the list of Disqualified Lenders and is not a Disqualified Lender, (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (iii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iv) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and the other Loan Documents as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (v) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 6.1 thereof, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (vi) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (vii) it has delivered a true and complete Administrative Questionnaire and (viii)  if it is a Non-U.S. Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly

completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents (ii) it appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement and any other Loan Document or any other instrument or document furnished pursuant hereto or thereto as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto, and (iii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    <u>Payments</u>.    From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by email or telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

2

EXHIBIT D-2

**FORM OF**
**AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION**

This Affiliated Lender Assignment and Assumption (the "Affiliated Lender Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into between the Assignor named below (the "Assignor") and the Assignee named below (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Affiliated Lender Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, including Section 10.6(e) thereof, as of the Effective Date inserted by the Administrative Agent below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the facility identified below (including any guarantees included in such facility) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). In the case where the Assigned Interest covers all of the Assignor's rights and obligations under the Credit Agreement, the Assignor shall cease to be a party thereto but shall continue to be entitled to the benefits of Sections 2.18, 2.19, 2.20 and 10.5 of the Credit Agreement with respect to facts and circumstances occurring on or prior to the Effective Date and subject to its obligations hereunder and under Section 9.13 of the Credit Agreement. Such sale and assignment is (i) without recourse to the Assignor and (ii) except as expressly provided in this Affiliated Lender Assignment and Assumption, without representation or warranty by the Assignor.

1. Assignor: _____

2. Assignee: _____[10]

3. Borrower: New Millennium Holdco, Inc.; Millennium Health, LLC

4. Administrative Agent: Credit Suisse AG, Cayman Islands Branch, as administrative agent under the Credit Agreement

5. Credit Agreement: The Credit Agreement dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time), among

---

[10] Insert name of Purchasing Borrower Party.

New Millennium Holdco, Inc. ("Holdings" and a "Borrower),
Millennium Health, LLC ("Millennium" and a "Borrower"; together with
Holdings, the "Borrowers"), the Lenders party thereto,  and Credit Suisse
AG, Cayman Islands Branch, as Administrative Agent

6.      Assigned Interest:

| Facility Assigned[11] | Aggregate Amount of Loans for all Lenders | Amount of Loans Assigned | Percentage Assigned of Loans[12] | CUSIP Number |
|---|---|---|---|---|
| | $ | $ | % | |
| | $ | $ | % | |
| | $ | $ | % | |

The parties hereto agree that any Loans assigned to any Assignee pursuant to this Affiliated Lender
Assignment and Assumption will be automatically and permanently cancelled on the Effective Date upon
the effectiveness of this Affiliated Lender Assignment and Assumption and will thereafter no longer be
outstanding for any purpose under the Credit Agreement.

Effective  Date:      _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND
WHICH  SHALL  BE  THE  EFFECTIVE  DATE  OF  RECORDATION  OF  TRANSFER  IN  THE
REGISTER THEREFOR.]

The terms set forth in this Affiliated Lender Assignment and Assumption are hereby agreed to:

ASSIGNOR

_____
NAME OF ASSIGNOR

By:_____
   Name:
   Title:

ASSIGNEE

_____
NAME OF ASSIGNEE

By:_____
   Name:
   Title:

---

[11] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being
       assigned under this Assignment (e.g. "Closing Date Term Loan").

[12] Set forth, to at least 9 decimals, as a percentage of the Loans of all Lenders.

2

[Consented to and]¹³ Accepted:

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent

By_____
   Name:
   Title:

By_____
   Name:
   Title:

[Consented to:]¹⁴

NEW MILLENNIUM HOLDCO, INC.

By_____
   Name:
   Title:

MILLENNIUM HEALTH, LLC

By_____
   Name:
   Title:

---

¹³ To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement.

¹⁴ To be added only if the consent of the Borrowers is required by the terms of the Credit Agreement.

Credit Agreement, dated as of _____ __, 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC, a California limited liability company ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent")

STANDARD TERMS AND CONDITIONS FOR
AFFILIATED LENDER ASSIGNMENT AND ASSUMPTION

1.  Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and the outstanding balance of its Term Loans, without giving effect to assignments thereof which have not become effective, are set forth in such Affiliated Lender Assignment and Assumption and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Affiliated Lender Assignment and Assumption and to consummate the transactions contemplated hereby and (b) except as set forth in clause (a) above, makes no representation or warranty and assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document or any instrument or document related thereto, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any instrument or document related thereto or any collateral thereunder, (iii) the financial condition of the Borrowers, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrowers, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document or any instrument or document related thereto.

1.2  Assignee.  The Assignee (a) represents and warrants that (i) it is a Purchasing Borrower Party, (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Affiliated Lender Assignment and Assumption and to consummate the transactions contemplated hereby, (iii) it satisfies the requirements specified in Section 10.6(e) of the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest, including, without limitation, (1) both immediately before and after giving effect to this Affiliated Lender Assignment and Assumption, no Default or Event of Default exists, (2) Reserved and (3) the No MNPI Representation is true and correct as of the Effective Date, (iv) Reserved, (v) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 6.1 thereof, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Affiliated Lender Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, (vi) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (vii) it has delivered a true and complete Administrative Questionnaire and  (viii) if it is a Non-U.S. Lender, attached to the Affiliated Lender Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly

completed and executed by the Assignee and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (ii) it appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Credit Agreement as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto, and (iii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    Payments.    From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date.

3.    General Provisions. This Affiliated Lender Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Affiliated Lender Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Affiliated Lender Assignment and Assumption by email or telecopy shall be effective as delivery of a manually executed counterpart of this Affiliated Lender Assignment and Assumption.  This Affiliated Lender Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

[INTENTIONALLY OMITTED]

EXHIBIT F

[INTENTIONALLY OMITTED]

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC, a California limited liability company ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.19 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of either of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to either of the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrowers with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E (or applicable successor form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrowers and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____

    Name:
    Title:

Date: _____ __, 20__

<u>EXHIBIT G-2</u>

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("<u>Holdings</u>" and a "<u>Borrower</u>"), MILLENNIUM HEALTH, LLC, a California limited liability company ("<u>Millennium</u>" and a "<u>Borrower</u>"; together with Holdings, the "<u>Borrowers</u>"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "<u>Administrative Agent</u>"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.19 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of either of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to either of the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN (or applicable successor form). By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
    Name:
    Title:

Date: _____ __, 20__

<u>EXHIBIT G-3</u>

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("<u>Holdings</u>" and a "<u>Borrower</u>"), MILLENNIUM HEALTH, LLC, a California limited liability company ("<u>Millennium</u>" and a "<u>Borrower</u>"; together with Holdings, the "<u>Borrowers</u>"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "<u>Administrative Agent</u>"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.19 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of either of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to either of the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN (or applicable successor form) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN (or applicable successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____

    Name:
    Title:

Date: _____ __, 20__

**FORM OF**
**U.S. TAX COMPLIANCE CERTIFICATE**

(For Non-U.S. Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is made to the Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC, a California limited liability company ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.19 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of either of the Borrowers within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to either of the Borrowers as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrowers with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN (or applicable successor form) or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN (or applicable successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrowers and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: _____
    Name:
    Title:
Date: _____ __, 20__

**FORM OF**
**INCREASED FACILITY ACTIVATION NOTICE—INCREMENTAL TERM LOANS**

To:     Credit Suisse AG, Cayman Islands Branch, as Administrative Agent
        under the Credit Agreement referred to below

Reference is made to the Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC, a California limited liability company ("Millennium" and a "Borrower"; together with Holdings, the "Borrowers"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

This notice is an Increased Facility Activation Notice referred to in the Credit Agreement, and the Borrowers and each Lender party hereto hereby notify you that:

1.      Each Lender party hereto agrees to make an Incremental Term Loan in the amount set forth opposite such Lender's name on the signature pages hereof under the caption "Incremental Term Loan Amount".

2.      The Increased Facility Closing Date is _____.

3.      The aggregate principal amount of Incremental Term Loans contemplated hereby is $_____.

4.      The Incremental Term Loan of each Lender party hereto shall mature in ___ consecutive installments, commencing on _____, 20__, each of which shall be in an amount equal to (i) the percentage which the principal amount of such Lender's Incremental Term Loan made on the Increased Facility Closing Date constitutes of the aggregate principal amount of Incremental Term Loans made on the Increased Facility Closing Date multiplied by (ii) the amount set forth below opposite such installment:

| Installment | Principal Amount |
|---|---|
| [Insert installment dates and amounts] | |

5.      The Incremental Term Maturity Date for the Incremental Term Loans contemplated hereby is _____, 20__.

6.      The Applicable Margin for the Incremental Term Loans contemplated hereby is ___% per annum in the case of Eurodollar Loans and __% per annum in the case of ABR Loans. [INSERT GRID IF APPLICABLE]

7.      [Insert any other terms applicable to the Incremental Term Loans to the extent different than the Closing Date Term Loan.]

2

        8.     The agreement of each Lender party hereto to make an Incremental Term Loan on the Increased Facility Closing Date is subject to the satisfaction of the following conditions precedent:

        (a)  The Administrative Agent shall have received this notice, executed and delivered by the Borrowers and each Lender party hereto.

        (b)  Holdings shall be in pro forma compliance, immediately before and after giving effect to the incurrence of such Incremental Term Loans, with the covenant contained in Section 7.1, and Holdings shall have delivered to the Administrative Agent a certificate of a Responsible Officer of Holdings to such effect.

        (c)  [Insert other applicable conditions precedent, including, without limitation, delivery of a closing certificate from the Borrowers and amendments to the Security Documents (to the extent necessary).]

        (d)  After giving effect to the making of the Incremental Term Loans contemplated hereby on the Increased Facility Closing Date, (i) each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date and (ii) no Default or Event of Default shall have occurred and be continuing.[15]

[Signature page follows]

---

[15] To be modified according to Section 2.24 to the extent the proceeds of the Incremental Term Loans are used to fund a Permitted Acquisition.

NEW MILLENNIUM HOLDCO, INC.


By:_____
   Name:
   Title:


MILLENNIUM HEALTH, LLC


By:_____
   Name:
   Title:


Incremental Term Loan Amount        [NAME OF LENDER]
$


By:_____
   Name:
   Title:


CONSENTED TO:
CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent


By:_____
   Name:
   Title:

By:_____
   Name:
   Title:

[INTENTIONALLY OMITTED]

**FORM OF
NEW LENDER SUPPLEMENT**

SUPPLEMENT, dated _____, to the Credit Agreement, dated as of [_____], 2015 (as amended, restated, supplemented or modified from time to time, the "Credit Agreement"), among NEW MILLENNIUM HOLDCO, INC., a Delaware corporation ("Holdings" and a "Borrower"), MILLENNIUM HEALTH, LLC, a California limited liability company ("Millennium" and a "Borrower'" together with Holdings, the "Borrowers"), the Lenders party thereto, and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, the "Administrative Agent"). Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

W I T N E S S E T H :

WHEREAS, the Credit Agreement provides in Section 2.24(c) thereof that any bank, financial institution or other entity may become a party to the Credit Agreement with the consent of the Borrowers and the Administrative Agent (which consent shall not be unreasonably withheld) in connection with a transaction described in Section 2.24(a) thereof by executing and delivering to the Borrowers and the Administrative Agent a supplement to the Credit Agreement in substantially the form of this Supplement; and

WHEREAS, the undersigned now desires to become a party to the Credit Agreement;

NOW, THEREFORE, the undersigned hereby agrees as follows:

1. The undersigned agrees to be bound by the provisions of the Credit Agreement, and agrees that it shall, on the date this Supplement is accepted by the Borrowers and the Administrative Agent, become a Lender for all purposes of the Credit Agreement to the same extent as if originally a party thereto, with an Incremental Term Loan of $_____.

2. The undersigned (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Supplement and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to become a Lender, (iii) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 6.1 thereof, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Supplement on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender and (iv) if it is a Non-U.S. Lender, attached to this Supplement is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the undersigned, and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

3.    The undersigned's address for notices for the purposes of the Credit Agreement is as follows:

_____

_____

_____

IN WITNESS WHEREOF, the undersigned has caused this Supplement to be executed and delivered by a duly authorized officer on the date first above written.

[NAME OF LENDER]

By:_____
    Name:
    Title:

Accepted this _____ day of _____, 20__:

NEW MILLENNIUM HOLDCO, INC.

By:_____
    Name:
    Title:

MILLENNIUM HEALTH, LLC

By:_____
    Name:
    Title:

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,
as Administrative Agent

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

62222235 v9-WorkSiteUS-032658/0001

**EXHIBIT F**

Case 1:15-cv-01284-LSS   Doc 84179-6   Filed 02/20/15   Page 635 of 800

## REGISTRATION RIGHTS AGREEMENT

This **REGISTRATION RIGHTS AGREEMENT** (this "*Agreement*") is made as of [_____], 2015, by and among New Millennium Holdco, Inc., Delaware corporation (the "*Company*"), and each Holder (as defined herein) who becomes a party to this Agreement pursuant to Section 1.12 hereof.

## RECITALS

**WHEREAS**, pursuant to the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC et al. dated as of October 29, 2015, as confirmed on [_____], 2015 (the "*Plan*"), and which became effective on [_____], 2015, the newly reorganized Company has agreed to enter into this Agreement for the benefit of each Holder (as defined herein);

**NOW**, **THEREFORE**, in consideration of the premises and respective covenants and agreements set forth in this Agreement and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I.

## REGISTRATION RIGHTS

**Section 1.1**     **Definitions**.  For purposes of this Agreement:

"*Affiliate*" means, with respect to any Person, any other Person who directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person.  For purposes of this definition of Affiliate, "*control*" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Board*" means the Board of Directors of the Company or any authorized committee thereof.

"*Common Stock*" means shares of the Company's common stock, par value of $0.01 per share.

"*Company*" has the meaning specified in the first paragraph to this Agreement.

"*Demand Notice*" has the meaning specified in Section 1.2(a) hereof.

"*Demand Registration*" has the meaning specified in Section 1.2(a) hereof.

"*Equity Transfer Date*" has the meaning specified in Section 1.52 of the Plan.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

-LACSR01A - MSW

"*FINRA*" means the Financial Industry Regulatory Authority, Inc., or any successor entity thereof.

"*Holder*" means a Person that (i) becomes a party to this Agreement in accordance with Section 1.12 hereof and (ii) beneficially owns at least [NUMBER][1] shares of Registrable Securities. The term Holder (x) shall not include any registered owner of Registrable Securities that holds such Registrable Securities in "street name" on behalf of beneficial owners thereof and (y) shall include (i) any Affiliate of a Holder and (ii) any funds or accounts managed and/or advised by any entity that manages and/or advises a Holder or any of its Affiliates (each, a "*Related Fund*"), in each case, to the extent any such Affiliate or Related Fund holds Registrable Securities and becomes a party to this Agreement.

"*IPO*" means an initial underwritten public offering of the Common Stock pursuant to an effective Registration Statement (other than a registration (i) pursuant to a Registration Statement on Form S-8 (or any successor form) (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to any employee stock plan or other employee benefit arrangement) or (ii) in connection with any dividend or distribution reinvestment or similar plan).

"*Maximum Offering Amount*" has the meaning specified in Section 1.2(c)(ii) hereof.

"*Majority in Interest of Participating Holders*" means Participating Holders owning a majority of the Registrable Securities included in a Registration Statement.

"*Participating Holders*" means Holders participating, or electing to participate, in a registration of Registrable Securities.

"*Person*" means any individual, firm, corporation, company, partnership, trust, incorporated or unincorporated association, limited liability company, joint venture, joint stock company, government (or an agency or political subdivision thereof) or other entity of any kind, and shall include any successor (by merger or otherwise) of any such entity.

"*Piggyback Holder*" has the meaning specified in Section 1.3(b) hereof.

"*Piggyback Registration*" has the meaning specified in Section 1.3(a) hereof.

"*Plan*" has the meaning set forth in the recitals to this Agreement.

"*Registrable Securities*" means (a) any shares of Common Stock acquired by any Holder pursuant to the Plan or subsequently acquired by any Holder after the Equity Transfer Date and (b) any capital stock or other securities of the Company issued or issuable with respect to the shares of Common Stock referred to in clause (a): (i) upon any conversion or exchange thereof, (ii) by way of stock dividend or other distribution, stock split or reverse stock split or (iii) in connection with a combination of shares, recapitalization, merger, consolidation, exchange offer, reorganization or other similar event; provided, however, that shares of Common Stock or other

---

[1] Such number to represent 2% of the outstanding Common Stock at the Equity Transfer Date.

2

securities that are considered to be Registrable Securities shall cease to be Registrable Securities (A) upon the disposition thereof pursuant to and in accordance with an effective Registration Statement, (B) upon the sale thereof to the public through a broker, dealer or market maker pursuant to Rule 144 under the Securities Act (or any similar rule promulgated by the SEC then in force), (C) when such securities are eligible for sale without registration pursuant to Rule 144 (or any similar provisions then in force) under the Securities Act without limitation thereunder on volume or manner of sale, provided that this clause (C) shall not apply unless the Company has consummated an IPO and two years have elapsed since the effective date thereof (provided that such two year period shall be extended by the aggregate number of days for which the obligation to file a Registration Statement has been suspended or delayed pursuant to Section 1.2(d) hereof), (D) when transferred in a transaction in which the transferor's rights under this Agreement are not validly assigned in accordance with this Agreement or (E) when they cease to be outstanding.

"*Registration Expenses*" mean all expenses (other than Selling Expenses) arising from or incident to the performance of, or compliance with, this ARTICLE I, including, without limitation, (i) SEC, stock exchange, FINRA and other registration and filing fees, (ii) all fees and expenses incurred in connection with complying with any securities or blue sky laws (including, without limitation, fees, charges and disbursements of counsel in connection with blue sky qualifications of Registrable Securities), (iii) all printing, messenger and delivery expenses, (iv) the fees, charges and disbursements of counsel to the Company and of its independent public accountants and any other accounting and legal fees, charges and expenses incurred by the Company (including, without limitation, any expenses arising from any special audits or "cold comfort" letters required in connection with or incident to any registration), (v) the fees, charges and disbursements of any special experts retained by the Company in connection with any registration pursuant to the terms of this Agreement, (vi) all internal expenses of the Company (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), (vii) the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange and (viii) Securities Act liability insurance (if the Company elects to obtain such insurance), regardless of whether any Registration Statement filed in connection with such registration is declared effective. "*Registration Expenses*" shall also include reasonable and documented fees, charges and disbursements of one (1) firm of counsel to all of the Participating Holders participating in any underwritten public offering pursuant to this ARTICLE I (which shall be selected by a Majority in Interest of Participating Holders).

"*Registration Statement*" shall mean any Registration Statement of the Company filed with the SEC on the appropriate form pursuant to the Securities Act which covers any of the shares of Common Stock pursuant to the provisions of this Agreement and all amendments and supplements to any such Registration Statement, including confidentially submitted drafts, post-effective amendments, in each case including the prospectus contained therein, all exhibits thereto and all materials incorporated by reference therein.

"*Requesting Holder*" means any Holder making a request for a Demand Registration pursuant to Section 1.2(a) hereof.

"*SEC*" or "*Commission*" means the United States Securities and Exchange Commission.

-LACSR01A - MSW

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Selling Expenses*" shall mean the underwriting fees, discounts, selling commissions and stock transfer taxes applicable to any Registrable Securities, and the fees and disbursements of counsel to the Participating Holders other than those listed in the definition of Registration Expense.

"*Shelf Registration*" has the meaning specified in Section 1.2(a) hereof.

"*Valid Business Reason*" has the meaning specified in Section 1.2(d) hereof.

**Section 1.2     Demand Registration**.

(a)     Request by Holders.  Subject to the terms and conditions set forth in this Agreement, including the limitations of Section 1.2(d) and Section 1.5(b), Holders of Registrable Securities may make a written request to the Company (a "*Demand Notice*") to register all or part of their Registrable Securities for resale under the Securities Act (a "*Demand Registration*") as follows:

(i)     prior to the completion of an IPO, Holders may make such a request at any time following the date that is two years after the Equity Transfer Date, provided that the Holders making such request hold at least a majority of all Registrable Securities outstanding at such time; and

(ii)     after the completion of an IPO, Holders may make such a request at any time, provided that (x) the Holders making such request hold at least 10% of all Registrable Securities outstanding at such time and (y) the amount of Registrable Securities requested to be included in such registration shall not be less than 5% of the number of shares of Common Stock outstanding at such time.

Each Demand Notice shall (A) specify the number of Registrable Securities that the Requesting Holders intend to sell or dispose of and (B) state the intended method or methods of sale or disposition of the Registrable Securities.  In connection with any Demand Registration, the Requesting Holders may require the Company to file a shelf registration statement with the SEC in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule in effect) (a "*Shelf Registration*"), provided that the Company is then eligible to use Form S-3 (or any successor form) under the Securities Act for such intended resale.

(b)     Demand Registration.  Following receipt of a Demand Notice, the Company shall:

(i)     give written notice of such request for registration to all Holders of Registrable Securities within twenty (20) days after receipt of a Demand Notice;

(ii)     cause to be filed (or confidentially submitted), as soon as reasonably practicable, but in any event within 60 days (or, in the case of an IPO, 120 days) after the date of delivery of the Demand Notice, a Registration Statement covering such Registrable Securities that the Company has been so

4

-LACSR01A - MSW

requested to register by the Requesting Holders and other Holders of Registrable Securities who make a request to the Company, within fifteen (15) days after the mailing of the Company's notice referred to in Section 1.2(b)(i) hereof, that their Registrable Securities also be registered, providing for the registration under the Securities Act of such Registrable Securities to the extent necessary to permit the disposition of such Registrable Securities in accordance with the intended method of distribution specified in such Demand Notice, subject to the limitations of Section 1.2(c); provided that, if requested by the Requesting Holders, any such registration will be a Shelf Registration, provided the Company is then eligible to use Form S-3 (or any successor form) under the Securities Act; and

(iii)    use its commercially reasonable efforts to have such Registration Statement declared effective by the SEC as soon as reasonably practicable thereafter.

(c)    Selection of Underwriters; Priority for Demand Registrations.

(i)    In the event that the Requesting Holders intend to distribute the Registrable Securities covered by the Demand Notice by means of an underwriting, they shall so advise the Company as part of the Demand Notice, and the Company shall include such information in the notice it provides to all Holders pursuant to Section 1.2(b)(i) hereof. The managing underwriter for such underwriting shall be one or more reputable nationally recognized investment banks selected by the holders of a Majority in Interest of Participating Holders, subject to the approval of the Company, which approval shall not be unreasonably withheld, delayed or conditioned. In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting, including as provided in Section 1.9, and the inclusion of such Holder's Registrable Securities in the underwriting to the extent provided in this Section 1.2(c). If requested by the underwriters, the Company and all Holders proposing to distribute their securities through such underwriting shall enter into an underwriting agreement with the underwriters selected for such underwriting, which underwriting agreement shall be in customary form and reasonably satisfactory in form and substance to the Company, the holders of a Majority in Interest of Participating Holders and the underwriters and shall contain such representations and warranties by the Company and the Participating Holders and such other terms and provisions as are customarily contained in agreements of this type, including, but not limited to, indemnities to the effect and to the extent provided in this Agreement or as are otherwise then customary (with respect to a party hereto, only if more extensive), provisions for the delivery of officer's certificates, opinions of counsel for the Company and the Participating Holders and accountants' "cold comfort" letters, and lock-up arrangements.

(ii)    If any Demand Registration involves an underwritten offering and the managing underwriter of such offering advises the Company that, in its good faith view, the number of Registrable Securities and, if permitted hereunder, other securities requested to be included in such offering exceeds the largest number of securities which can reasonably be sold in an orderly manner without having an adverse effect on such

5

offering (the "**_Maximum Offering Amount_**"), then the Company shall include in such registration the number which can be so sold in the following order of priority:

> (A)     first, all Registrable Securities requested by the Participating Holders to be included in such registration shall be included, but, if the number of Registrable Securities requested to be included in such registration exceeds the Maximum Offering Amount, then the number of Registrable Securities that each Participating Holder will be entitled to include in such registration will be allocated on a _pro rata_ basis; and

> (B)     second, other securities, if any, requested to be included in such registration to the extent permitted hereunder (including, for the avoidance of doubt, shares of Common Stock to be sold for the account of the Company and/or other holders of Common Stock) allocated among such Persons in such manner as they may agree.

For purposes of Section 1.2(c)(ii)(A), the _pro rata_ portion of Registrable Securities of each Participating Holder shall be the product of (i) the total number of Registrable Securities which the managing underwriter agrees to include in the public offering and (ii) the ratio which such Participating Holder's total Registrable Securities bears to the total number of Registrable Securities of all Participating Holders to be included in such Registration Statement.  To facilitate the allocation of shares in accordance with the above provisions, the Company or the managing underwriter may round the number of shares allocated to any Participating Holder to the nearest 100 shares.

> (d)     Limitations on Demand Registrations.

> (i)     Notwithstanding anything herein to the contrary, the Company (i) may delay making a filing (or confidential submission) of a Registration Statement (including any amendment or supplement thereto or any prospectus or prospectus supplement related thereto) or taking action in connection therewith or (ii) may suspend having a Registration Statement remain effective, if the Company provides written notice to the Holders (in the case of clause (i), prior to the time, it would otherwise have been required to file (or confidentially submit) such Registration Statement (including any amendment or supplement thereto or any prospectus or prospectus supplement related thereto) or take such action pursuant to this Section 1.2, and, in the case of clause (ii), prior to such suspension), stating that the Board has determined in good faith that such action or effectiveness, as applicable, would (A) be expected to materially adversely affect, impede or interfere with any plan or proposal of a significant financing, acquisition, disposition, merger, corporate reorganization, securities offering, segment reclassification or discontinuation of operations or other material transaction or any negotiations or discussions with respect thereto, (B) require premature disclosure of material information that the Company has a bona fide business purpose for preserving as confidential or (C) render the Company unable to comply with, or would reasonably be expected to cause an undue burden on the Company in complying with, requirements under the Securities Act or the Exchange Act (each, a "**_Valid Business Reason_**");

6

provided, however, that such right to delay shall be exercised by the Company not more than three times in any 12 month period and the Company shall only have the right to delay so long as such Valid Business Reason exists (but in no event for a period longer than sixty (60) days in any 180-day period or ninety (90) days in any twelve month period and provided that a period of at least thirty (30) days shall elapse between the termination of any delay or suspension and the commencement of another delay or suspension), and during such time the Company may not file a Registration Statement for securities to be issued and sold for its own account or for that of anyone other than the Holders of Registrable Securities (other than a registration (i) pursuant to a Registration Statement on Form S-8 (or any successor form) (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to any employee stock plan or other employee benefit arrangement), (ii) pursuant to a Registration Statement on Form S-4 (or any successor form), (iii) that relates to a transaction subject to Rule 145 under the Securities Act (or any successor rule thereto) or (iv) in connection with any dividend or distribution reinvestment or similar plan).

(ii)     The Company shall not be required to effect more than (x) three (3) Demand Registrations relating to Demand Notices made pursuant to Section 1.2(a)(ii) hereof, plus (y) one (1) Demand Registration relating to a Demand Notice made pursuant to Section 1.2(a)(i), provided that, if the Company is eligible to use Form S-3 (or any successor form) under the Securities Act for such intended resale of Registrable Securities, there shall be no limit on the number of Demand Registrations that are Shelf Registrations not involving an underwritten offering that the Company may be required to effect.  A Demand Registration shall not be deemed to have been effected and shall not count as one of the Demand Registrations referenced in the immediately preceding sentence (i) unless a Registration Statement with respect thereto has become effective and remained effective in compliance with the provisions of the Securities Act with respect to the disposition of all Registrable Securities covered by such Registration Statement until such time as all of such Registrable Securities have been disposed of in accordance with the intended methods of disposition by the Holders thereof set forth in such Registration Statement or have ceased to be Registrable Securities; provided, however, that such period shall not exceed 120 days (except in the case of a Shelf Registration, which shall be required to remain effective as provided in Section 1.5(a)(i)); (ii) if, after it has become effective, such registration is interfered with by any stop order, injunction or other order or requirement of the SEC or other governmental agency or court for any reason and has not thereafter become effective or if the offering of Registrable Securities is not consummated for any reason, including, without limitation, if the underwriters of an underwritten public offering advise the Participating Holders that the Registrable Securities cannot be sold at a net price per share equal to or above the minimum net price acceptable to the holders of a Majority in Interest of Participating Holders; (iii) if conditions to closing specified in the underwriting agreement, if any, entered into in connection with such registration are not satisfied by the Company or waived (unless a substantial cause of the Company not satisfying such conditions to closing is attributable to one or more Participating Holders); or (iv) if the amount of Registrable Securities of Requesting Holders included in the registration are cut back as a result of the exercise of the underwriting cutback priority in Section 1.2(c)(ii) to fewer than 50% of the Registrable Securities originally requested by the Participating Holders to be registered;

7

(iii)    The Company will not be required to effect any Demand Registration relating to a Demand Notice made pursuant to Section 1.2(a)(i) to the extent the Company reasonably believes, based on the advice of an underwriter, that (a) such an offering would not reasonably be expected to generate net proceeds of at least $50 million and (b) the pre-offering net equity value of the Company based upon the expected IPO price would not be at least $200 million.

(iv)    The Company will not be required to effect any Demand Registration during the period starting on the date thirty (30) days prior to the Company's estimated date of filing (or confidential submission) of, and ending on the date one-hundred eighty (180) days, in the case of an IPO, or ninety (90) days, in the case of any registration under the Securities Act other than an IPO, immediately following the effective date of, any Registration Statement (other than a registration (i) pursuant to a Registration Statement on Form S-8 (or any successor form) (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to any employee stock plan or other employee benefit arrangement), (ii) pursuant to a Registration Statement on Form S-4 (or any successor form), (iii) that relates to a transaction subject to Rule 145 under the Securities Act (or any successor rule thereto) or (iv) in connection with any dividend or distribution reinvestment or similar plan) pertaining to the securities of the Company (including, for the avoidance of doubt, any Registration Statement contemplated by this Agreement), <u>provided</u> that the Company is employing in good faith all commercially reasonable efforts to cause such Registration Statement to become effective.

(e)    <u>Cancellation of Registration</u>.  A Majority in Interest of the Participating Holders shall have the right to cancel a proposed Demand Registration of Registrable Securities pursuant to this Section 1.2 prior to the effectiveness of such registration when, (i) in their discretion, market conditions are so unfavorable as to be seriously detrimental to an offering pursuant to such registration or (ii) the request for cancellation is based upon material adverse information relating to the Company that is different from the information known (including any information furnished by the Company to its security holders, whether or not actually known by the Participating Holders) to the Participating Holders at the time of the Demand Notice. Such cancellation of a registration pursuant to clause (ii) above shall not be counted as one of the total number of Demand Registrations referenced in Section 1.2(d)(ii) hereof and notwithstanding anything to the contrary in this Agreement, the Company shall be responsible for all Registration Expenses incurred in connection with the registration prior to the time of cancellation.

**Section 1.3    <u>Piggyback Registrations</u>**.

(a)    <u>Right to Include Registrable Securities</u>.  Subject to the terms and conditions set forth in this Agreement, each time that the Company proposes for any reason to register any of its securities of the same class as the Registrable Securities under the Securities Act, either for its own account or for the account of a stockholder or stockholders exercising demand registration rights (other than Demand Registrations pursuant to Section 1.2 hereof or a registration (i) pursuant to a Registration Statement on Form S-8 (or any successor form) (or other registration solely relating to an offering or sale to employees or directors of the Company pursuant to any employee stock plan or other employee benefit arrangement), (ii) pursuant to a

8

Registration Statement on Form S-4 (or any successor form), (iii) that relates to a transaction subject to Rule 145 under the Securities Act (or any successor rule thereto) or (iv) in connection with any dividend or distribution reinvestment or similar plan) (a "***Proposed Registration***"), the Company shall promptly give written notice (which notice shall be given not less than fifteen (15) days prior to the expected filing date of the Proposed Registration and shall describe the intended method of distribution for the offering relating to the Proposed Registration) of such Proposed Registration to all Holders of Registrable Securities and shall offer such Holders the right to request inclusion of any of such Holder's Registrable Securities in the Proposed Registration (a "***Piggyback Registration***"). No registration pursuant to this Section 1.3 shall relieve the Company of its obligation to effect a Demand Registration, as contemplated by Section 1.2 hereof. The rights to Piggyback Registration may be exercised on an unlimited number of occasions. For the avoidance of doubt, the Company shall have no obligation to give notice of, or include any Holder in, a registered public offering by a stockholder, including such an offering not involving a "road show", an offering commonly known as a "block trade," or a "bought deal," or an offering of securities pursuant to a then-effective registration statement that was not prohibited by this Agreement.

      (b)    <u>Piggyback Procedure</u>. Each Holder shall have ten (10) days from the date of receipt of the Company's notice referred to in Section 1.3(a) above to deliver to the Company a written request specifying the number of Registrable Securities such Piggyback Holder intends to register and sell in the offering relating to such Piggyback Registration (any Holder so requesting to have any of their Registrable Securities included in the Proposed Registration, a "***Piggyback Holder***"). Any Piggyback Holder shall have the right to withdraw such Piggyback Holder's request for inclusion of such Holder's Registrable Securities in any Registration Statement pursuant to this Section 1.3 by giving written notice to the Company of such withdrawal; <u>provided</u>, <u>however</u>, that the Company may ignore a notice of withdrawal made within 24 hours of the earlier of (A) time the Registration Statement is to become effective and (B) the filing of the applicable "red herring" prospectus or prospectus supplement with respect to the Registration Statement used for marketing such transaction. Subject to Section 1.3(c) below, the Company shall use commercially reasonable efforts to include in such Registration Statement all such Registrable Securities requested to be included therein in accordance with the provisions set forth in this Section 1.3(b); <u>provided</u>, <u>further</u>, that the Company may at any time withdraw or cease proceeding with any such Proposed Registration if it shall at the same time withdraw or cease proceeding with the registration of all other securities of the same class as the Registrable Securities originally proposed to be registered, without prejudice, however, but subject to Section 1.2 and the other express terms and conditions of this Agreement, to the rights of any Holder to request that a Demand Registration be effected; and <u>provided</u>, <u>further</u>, that no registration effected under this provision will relieve the Company from its obligations to effect a Demand Registration upon a Demand Notice, subject to the express terms and conditions set forth in this Agreement.

      (c)    <u>Priority for Piggyback Registration</u>. If any Proposed Registration involves an underwritten offering and the managing underwriter of such offering advises the Company that, in its good faith view, the number of securities requested to be included in such offering exceeds the Maximum Offering Amount, then the Company shall include in such registration the number of securities which can be so sold in the following order of priority, subject to Section 1.3(d) below:

9

-LACSR01A - MSW

(i)     first, all securities that the Company proposes to register for its own account (the "**Company Securities**");

(ii)     second, to the extent that the number of Company Securities is less than the Maximum Offering Amount, the remaining securities to be included in such registration will be allocated on a *pro rata* basis among (A) all Piggyback Holders requesting that Registrable Securities be included in such Registration, and (B) all other holders ("**Other Holders**") of the Company's securities who have been granted "piggy-back" registration rights with respect to such securities (the "**Other Securities**") and have requested that such Other Securities be included in such registration.

For purposes of this Section 1.3(c), the *pro rata* portion of Registrable Securities of each Piggyback Holder and Other Securities of each Other Holder shall be the product of (i) the total number of Registrable Securities and Other Securities which the managing underwriter agrees to include in the public offering and (ii) the ratio which such Piggyback Holder's or Other Holder's total Registrable Securities or Other Securities, as the case may be, bears to the total number of Registrable Securities and Other Securities to be included in such Registration Statement.  To facilitate the allocation of shares in accordance with the above provisions, the Company or the managing underwriter may round the number of shares allocated to any Participating Holder or Other Holder to the nearest 100 shares.

(d)     Notwithstanding the foregoing, in no event shall the amount of securities of the Piggyback Holders included in the Proposed Registration be reduced below 20% of the total amount of securities included in the offering, unless such offering is the IPO, in which case the Piggyback Holders may be excluded below this amount if the underwriters make the determination described above and no other stockholders' securities are included in such offering.  For the avoidance of doubt, if, in an offering other than the IPO, the amount of securities of the Piggyback Holders included in the Proposed Registration would be reduced below 20% of the total amount of securities included in the offering as a result of Section 1.3(c) above, the Company shall have the right to allocate such Piggyback Holders additional securities in order to comply with the foregoing sentence.  If as a result of the provisions of this Section 1.3(c), any Piggyback Holder shall not be entitled to include more than 20% of its Registrable Securities in a registration that such Piggyback Holder has requested to be so included, such Piggyback Holder may withdraw such Piggyback Holder's request to include Registrable Securities in such Registration Statement; provided that such Piggyback Holder must give notice to the Company of its withdrawal pursuant to and in accordance with the time period specified in Section 1.3(b) or, if after such time period, as soon as reasonably practicable after receiving notice of such underwriting cutback.  If any Piggyback Holder removes its shares from such registration, its shares may be allocated by the Company in its reasonable discretion.

(e)     Underwritten Offering.  In the event that the Proposed Registration by the Company is, in whole or in part, an underwritten public offering of securities of the Company, any notice from the Company to the Holders under this Section 1.3 shall offer the Holders the right, and the Holders shall be obligated, to include any Registrable Securities covered by the Proposed Registration in the underwriting on the same terms and conditions as the shares, if any, otherwise being sold through underwriters under such Proposed Registration.  The managing

10

underwriter for such underwriting shall be one or more reputable nationally recognized investment banks selected by the Company.

**Section 1.4** **Holdback Agreements**. Restrictions on Public Sale by Holders. Each Holder hereby agrees that, if and whenever the Company (i) proposes to register any of the Common Stock or any securities convertible into or exchangeable or exercisable for such securities, whether or not for its own account, or (ii) is required to use its commercially reasonable efforts to effect the registration of any Registrable Securities under the Securities Act pursuant to a Demand Registration, such Holder, if requested by the managing underwriter in an underwritten offering, agrees to enter into a "lock-up agreement" in form and substance reasonably satisfactory to the Holders representing a majority of the Registrable Securities subject to such registration statement containing terms (including the duration of the lock-up period, which, for the avoidance of doubt shall not exceed 180 days in the case of an IPO or 90 days in the case of any registration under the Securities Act other than an IPO) that are customary at the time of such agreement is entered into for offerings of similar size and type, and the Company shall cause all of the Company's directors and executive officers to sign lock-up agreements on comparable terms in connection therewith (or on such terms as may be required by the managing underwriter), subject to customary exclusions. Notwithstanding the foregoing, if (x) during the last 17 days of the foregoing 180-day period or 90-day period, as applicable, the Company issues an earnings release or material news or a material event relating to the Company occurs or (y) prior to the expiration of the 180-day period or 90-day period, as applicable, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the period, then, to the extent required by the Securities Act or the Exchange Act, the restrictions described above shall continue to apply until the expiration of an 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event. Any such lock-up agreements signed by the Holders shall contain reasonable and customary exceptions, including, without limitation, the right of a Holder to make transfers to certain affiliates; provided such affiliates agree to be bound by the terms of the lock-up agreement. The Company may impose stop-transfer instructions with respect to the shares of Common Stock or other securities subject to the foregoing restrictions until the end of the relevant lock-up period.

**Section 1.5** **Registration Procedures**.

(a) Obligations of the Company. If and whenever registration of Registrable Securities is required pursuant to this Agreement, subject to the express terms and conditions set forth in this Agreement, the Company shall use commercially reasonable efforts to effect the registration and sale of such Registrable Securities in accordance with the intended method of distribution thereof as promptly as reasonably practicable, and in connection with any such request, the Company shall, as promptly as reasonably practicable and as applicable:

(i) *Preparation of Registration Statement; Effectiveness*. Prepare and file (or confidentially submit) with the SEC (in any event not later than 60 days (or, in the case of an IPO, 120 days) after the date of delivery of a Demand Notice a Registration Statement with respect to the applicable Registrable Securities on any form on which the Company then qualifies, which counsel for the Company shall deem appropriate and pursuant to which such offering may be made in accordance with the intended method of

11

distribution thereof, and use commercially reasonable efforts to cause any such Demand Registration required hereunder to become effective as soon as reasonably practicable, and remain effective for a period of not less than 120 days (or such shorter period in which all Registrable Securities have been sold in accordance with the methods of distribution set forth in the Registration Statement or have ceased to be Registrable Securities); provided, however, that, in the case of any Shelf Registration of Registrable Securities which are intended to be offered on a continuous or delayed basis, such 120-day period shall be extended, if necessary, to keep the Registration Statement effective until all such Registrable Securities are disposed of or have ceased to be Registrable Securities;

(ii)    *Participation in Preparation*.  Provide any Participating Holder, any underwriter participating in any disposition pursuant to a Registration Statement filed pursuant to this Agreement, and any attorney, accountant or other similar agent retained by any Participating Holder or underwriter (each, an "*Agent*" and, collectively, the "*Agents*"), a reasonable opportunity to review and comment on such Registration Statement, each prospectus filed with respect to the Registrable Securities included therein or filed with the SEC and each amendment or supplement thereto (excluding any exhibits thereto and any filing made under the Exchange Act that is to be incorporated by reference therein);

(iii)    *Due Diligence*.  For a reasonable period prior to the filing (or confidential submission) of any Registration Statement pursuant to this Agreement (excluding any amendments as a result of any filing made under the Exchange Act that is to be incorporated by reference therein), make available for inspection by the Agents, if any, of any Participating Holder or underwriter participating in any disposition pursuant to such Registration Statement upon reasonable notice and during normal business hours such financial and other information and books and records, pertinent corporate documents and properties of the Company and its subsidiaries and cause the officers, directors, employees, counsel and independent certified public accountants of the Company and its subsidiaries to respond to such inquiries and to supply all information reasonably requested by any such Agent in connection with such Registration Statement, as shall be reasonably necessary, in the judgment of the Agents, to conduct a reasonable and customary due diligence investigation within the meaning of the Securities Act; provided, however, that if requested by the Company, each Agent and each Participating Holder shall enter into a confidentiality agreement with the Company prior to participating in the preparation of such Registration Statement or the Company's release or disclosure of confidential information to such Agent;

(iv)    *General Notifications*.  Promptly notify in writing the Participating Holders, the sales or placement agent, if any, therefor and the managing underwriter of the securities being sold, if applicable, (A) when a Registration Statement filed pursuant to this Agreement or the prospectus included therein or any prospectus amendment or supplement or post-effective amendment (excluding any amendments as a result of any filing made under the Exchange Act that is to be incorporated by reference therein), has been filed, and, with respect to any such Registration Statement or any such post-effective amendment, when the same has become effective, (B) when the SEC

12

notifies the Company whether there will be a "review" of such Registration Statement, (C) of the receipt of any comments by the SEC and by the blue sky or securities commissioner or regulator of any state with respect to such Registration Statement and (D) of any request by the SEC for any amendments or supplements to such Registration Statement or the prospectus or for additional information, in each case, with respect to the Registrable Securities;

(v) *10b-5 Notification.*  Promptly notify in writing the Participating Holders, the sales or placement agent, if any, therefor and the managing underwriter of the securities being sold pursuant to any Registration Statement filed pursuant to this Agreement at any time when a prospectus with respect to the Registrable Securities relating thereto is required to be delivered under the Securities Act upon discovery that, or upon the happening of any event as a result of which, any prospectus with respect to the Registrable Securities included in such Registration Statement (or amendment or supplement thereto) contains an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances under which they were made not misleading, and the Company shall promptly prepare a supplement or amendment to such prospectus and file it with the SEC (in any event no later than ten (10) days following notice of the occurrence of such event to each Participating Holder, such sales or placement agent and such managing underwriter; provided; that such ten (10) day period may be extended pursuant to Section 1.2(d)(i)) so that after delivery of such prospectus, as so amended or supplemented, to the purchasers of such Registrable Securities, such prospectus, as so amended or supplemented, shall not contain an untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein in the light of the circumstances under which they were made not misleading;

(vi) *Notification of Stop Orders; Suspensions of Qualifications and Exemptions.*  Promptly notify in writing the Participating Holders, the sales or placement agent, if any, therefor and the managing underwriter of the securities being sold of (A) any stop order issued or, to the knowledge of the Company, threatened to be issued by the SEC with respect to a Registration Statement filed pursuant to this Agreement  or (B) any notification with respect to the suspension of the qualification or exemption from qualification of any of the Registrable Securities for sale in any jurisdiction or, to the knowledge of the Company, the initiation or threatening of any proceeding for such purpose, and the Company agrees to use commercially reasonable efforts to (x) prevent the issuance of any such stop order, and in the event of such issuance, to obtain the withdrawal of any such stop order and (y) obtain the withdrawal of any order suspending or preventing the use of any related prospectus with respect to the Registrable Securities or suspending the qualification of any Registrable Securities included in such Registration Statement for sale in any jurisdiction at the earliest reasonably practicable date;

(vii) *Amendments and Supplements; Acceleration.*  (A) Prepare and file with the SEC such amendments and supplements to each Registration Statement filed pursuant to this Agreement as may be necessary to comply with the provisions of the Securities Act, including post-effective amendments to each such Registration Statement

13

as may be necessary to keep such Registration Statement continuously effective for the applicable time period required hereunder; (B) cause the related prospectus with respect to the Registrable Securities to be supplemented by any required prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) promulgated under the Securities Act; and (C) comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of the Registrable Securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement as so amended or in such prospectus as so supplemented;

(viii)  *Copies*.  Furnish as promptly as reasonably practicable to each Participating Holder and Agent prior to filing (or confidentially submitting) a Registration Statement pursuant to this Agreement or any supplement or amendment thereto with respect to the Registrable Securities, copies of such Registration Statement, supplement or amendment as it is proposed to be filed, and after such filing such number of copies of such Registration Statement, each such amendment and supplement thereto with respect to the Registrable Securities (in each case including all exhibits thereto), the prospectus included in such Registration Statement (including each preliminary prospectus) with respect to the Registrable Securities and such other documents as each such Participating Holder or underwriter may reasonably request in order to facilitate the disposition of the Registrable Securities owned by such Participating Holder;

(ix)  *Blue Sky*.  Use commercially reasonable efforts to, prior to any public offering of the Registrable Securities, register or qualify (or seek an exemption from registration or qualifications) such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any Participating Holder or underwriter may reasonably request, and to continue such qualification in effect in each such jurisdiction for as long as is permissible pursuant to the laws of such jurisdiction, or for as long as a Participating Holder or underwriter reasonably requests or for so long as the applicable Registration Statement remains effective under the Securities Act, whichever is shortest, and do any and all other acts and things which may be reasonably necessary or advisable to enable any Participating Holder to consummate the disposition in such jurisdictions of the Registrable Securities; provided, however, that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business, or to file a general consent of process in any such states or jurisdictions or subject itself to material taxation in any such state or jurisdiction, but for this subparagraph;

(x)  *Other Approvals*.  Use commercially reasonable efforts to obtain all other approvals, consents, exemptions or authorizations from such governmental agencies or authorities as may be necessary to enable the Participating Holders and underwriters to consummate the disposition of Registrable Securities;

(xi)  *Agreements*.  Enter into and perform customary agreements (including any underwriting agreements in customary form), and take such other actions as may be reasonably required in order to expedite or facilitate the disposition of Registrable Securities;

-LACSR01A - MSW

(xii)  *"Cold Comfort" Letter.*  In the event of any underwritten public offering and as provided in the applicable underwriting agreement, use commercially reasonable efforts to obtain a "cold comfort" letter from the Company's independent public accountants in customary form and covering such matters of the type customarily covered by "cold comfort" letters as the managing underwriter may reasonably request;

(xiii)  *Legal Opinion.*  In the event of any underwritten public offering and as provided in the applicable underwriting agreement, furnish, at the request of any underwriter of Registrable Securities on the date such securities are delivered to the underwriters for sale pursuant to such registration, an opinion or legal letter, dated such date, of counsel representing the Company for the purposes of such registration, addressed to the underwriters, covering such legal matters with respect to the registration in respect of which such opinion is being given as such underwriter may reasonably request and as are customarily included in such opinions, subject to customary assumptions and qualifications;

(xiv)  *SEC Compliance, Earnings Statement.*  Use commercially reasonable efforts to comply with all applicable rules and regulations of the SEC and make available to its shareholders, as soon as reasonably practicable, but no later than fifteen (15) months after the effective date of any Registration Statement, an earnings statement covering a period of 12 months beginning after the effective date of such Registration Statement, in a manner which satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder and which requirement will be deemed satisfied if the Company timely files complete and accurate information on Forms 10-Q and 10-K and Current Reports on Form 8-K under the Exchange Act and otherwise complies with Rule 158 under the Securities Act;

(xv)  *FINRA.*  Cooperate with each Participating Holder and each underwriter participating in the disposition of such Registrable Securities and underwriters' counsel in connection with any filings required to be made with the FINRA;

(xvi)  *Road Show.*  In the event of any underwritten public offering, making appropriate officers as are reasonably requested by the managing underwriter available to participate in a customary "road show" or similar marketing effort being conducted by such underwriter with respect to such underwritten public offering;

(xvii)  *Listing.*  Use its commercially reasonable efforts to cause all such Registrable Securities to be listed or quoted on each securities exchange or market system on which similar securities issued by the Company are so listed or quoted (or, in the case of the IPO, to become so listed or quoted if requested);

(xviii)  *Transfer Agent, Registrar and CUSIP.*  Provide a transfer agent and registrar for all Registrable Securities registered pursuant hereto and a CUSIP number for all such Registrable Securities, in each case, no later than the effective date of such registration; and

15

(xix) *Efforts*. Use commercially reasonable efforts to take all other actions necessary to effect the registration of the Registrable Securities contemplated hereby.

(b) <u>Seller Information</u>. The Company may require each Participating Holder as to which any registration of such Holder's Registrable Securities is being effected to furnish to the Company such information regarding such Participating Holder and such Participating Holder's method of distribution of such Registrable Securities as the Company may from time to time reasonably request in writing or as may be required by law. If a Participating Holder refuses to provide the Company with any of such information, the Company may exclude such Participating Holder's Registrable Securities from the Registration Statement if the Company determines, based on the advice of counsel, that such information is necessary to effect the registration and such Participating Holder continues thereafter to withhold such information. The exclusion of a Participating Holder's Registrable Securities shall not affect the registration of the other Registrable Securities to be included in the Registration Statement; <u>provided</u> the Company will not be required to effect such registration if such Demand Registration would no longer meet any of the conditions of Section 1.2 hereof applicable to such Registration Statement.

(c) <u>Notice to Discontinue</u>. Each Participating Holder whose Registrable Securities are covered by a Registration Statement filed pursuant to this Agreement agrees that, upon receipt of written notice from the Company of the happening of any event of the kind described in Section 1.5(a)(v), such Participating Holder shall forthwith discontinue the disposition of Registrable Securities until such Participating Holder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 1.5(a)(v) or until it is advised in writing by the Company that the use of the prospectus may be resumed and has received copies of any additional or supplemental filings which are incorporated by reference into the prospectus, and, if so directed by the Company in the case of an event described in Section 1.5(a)(v), such Participating Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Participating Holder's possession, of the prospectus covering such Registrable Securities which is current at the time of receipt of such notice. If the Company shall give any such notice, the Company shall extend the period during which such Registration Statement is to be maintained effective by the number of days during the period from and including the date of the giving of such notice pursuant to Section 1.5(a)(v) to and including the date when the Participating Holder shall have received the copies of the supplemented or amended prospectus contemplated by, and meeting the requirements of Section 1.5(a)(v).

Section 1.6 **Registration Expenses and Selling Expenses**. Except as otherwise provided herein, all Registration Expenses shall be borne by the Company. All Selling Expenses relating to Registrable Securities registered shall be borne by the Participating Holders of such Registrable Securities pro rata on the basis of the number of Registrable Securities sold.

Section 1.7 **Indemnification**.

(a) <u>Indemnification by the Company</u>. In the event any Registrable Securities are included in a Registration Statement, the Company will indemnify and hold harmless to the

16

fullest extent permitted by law each Holder, its Affiliates, any underwriter and each of their respective directors, officers, employees, advisors, agents, stockholders, members, general partners and limited partners and each Person who controls (within the meaning of the Securities Act or the Exchange Act) any of such Persons (collectively, "*Company Indemnified Parties*") from and against any and all losses, claims, damages, expenses (including, without limitation, reasonable costs of investigation and fees, disbursements and other charges of counsel (subject to Section 1.7(c) below), any amounts paid in settlement effected with the Company's consent, which consent shall not be unreasonably withheld or delayed, and any costs incurred in enforcing the Company's indemnification obligations hereunder) or other liabilities (collectively, "*Losses*") to which any such Company Indemnified Party may become subject under the Securities Act, the Exchange Act, any other federal, state or foreign law or any rule or regulation promulgated thereunder, or under any common law or otherwise, insofar as such Losses (or actions or proceedings, whether commenced or threatened, in respect thereof) are resulting from or arising out of or based upon (i) any untrue, or alleged untrue, statement of a material fact contained in such Registration Statement, including any prospectus or preliminary prospectus with respect to the Registrable Securities contained therein or any amendments or supplements thereto, any free writing prospectuses with respect to such Registration Statement and the Registrable Securities or any document incorporated by reference in any of the foregoing or resulting from or arising out of or based upon any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a prospectus, preliminary prospectus or free writing prospectus, in the light of the circumstances under which they were made), not misleading or (ii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any other federal law, any state or foreign securities law, or any rule or regulation promulgated under any of the foregoing laws, relating to the offer or sale of the Registrable Securities, and in any such case the Company, subject to Section 1.7(c), will promptly reimburse each such Company Indemnified Party for any reasonable and documented legal fees and expenses and other Losses reasonably incurred in connection with investigating, preparing or defending any such claim, loss, damage, liability, action or investigation or proceeding (collectively, a "*Claim*"); provided, however, that the Company shall not be liable to any Company Indemnified Party for any Losses that result from or arise out of or are based upon any untrue statement or omission made in conformity with written information provided by, or on behalf of, a Company Indemnified Party expressly for use in the Registration Statement. Such indemnity obligation shall remain in full force and effect regardless of any investigation made by or on behalf of the Company Indemnified Parties and shall survive the transfer of Registrable Securities by such Company Indemnified Parties.

(b)  Indemnification by Participating Holders.  In connection with any proposed registration in which a Holder is participating pursuant to this Agreement, each such Participating Holder agrees, severally and not jointly, to indemnify and hold harmless the Company, any underwriter, their respective Affiliates and their respective directors, officers, employees, advisors, agents and stockholders, members, general partners and limited partners and each Person who controls (within the meaning of the Securities Act or the Exchange Act) the Company or any underwriter (collectively, "*Holder Indemnified Parties*") to the same extent as the foregoing indemnity from the Company to the Holders as set forth in Section 1.7(a) (subject to the proviso to this sentence and applicable law), but only with respect to any such untrue statement or omission made in conformity with information relating to such Participating Holder furnished in writing to the Company by such Participating Holder expressly for use in such

17

-LACSR01A - MSW

Registration Statement; provided, however, that the liability of any Participating Holder under this Section 1.7(b) shall be limited to the amount of the net proceeds (after underwriting fees, commissions or discounts) received by such Participating Holder in the sale of Registrable Securities giving rise to such liability. Such indemnity obligation shall remain in full force and effect regardless of any investigation made by or on behalf of the Holder Indemnified Parties and shall survive the transfer of Registrable Securities by such Participating Holder.

(c)     Conduct of Indemnification Proceedings.   Any Person entitled to indemnification hereunder (the "**Indemnified Party**") agrees to give prompt written notice to the indemnifying party (the "**Indemnifying Party**") after the receipt by the Indemnified Party of any written notice of the commencement of any action, suit, proceeding or investigation for which the Indemnified Party intends to claim indemnification or contribution pursuant to this Agreement; provided, however, that the failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party of any liability that it may have to the Indemnified Party hereunder unless and to the extent such Indemnifying Party is materially prejudiced by such failure. If notice of commencement of any such action is given to the Indemnifying Party as above provided, the Indemnifying Party shall be entitled to participate in and, to the extent it may wish, jointly with any other Indemnifying Party similarly notified, to assume the defense of such action at its own expense, with counsel chosen by it and reasonably satisfactory to such Indemnified Party.  Notwithstanding the rights of Indemnifying Parties in the prior sentence, the Indemnified Party shall have the right to employ separate counsel in any such action, and the Indemnifying Party shall bear the reasonable fees, costs and expenses of one such separate counsel for all of the Indemnified Parties if: (i) the Indemnifying Party agrees to pay the same; (ii) the Indemnifying Party fails to assume the defense of such action with counsel reasonably satisfactory to the Indemnified Party within thirty (30) days after receiving notice from such Indemnified Party that the Indemnified Party believes it has failed to do so; or (iii) the Indemnified Party reasonably believes that the joint representation of the Indemnified Party and any other party in such proceeding (including but not limited to the Indemnifying Party) would be inappropriate under applicable standards of professional conduct. In the case of clause (ii) above and (iii) above, the Indemnifying Party shall not have the right to assume the defense of such action on behalf of such Indemnified Party.  No Indemnifying Party shall be liable for any settlement entered into without its written consent, which consent shall not be unreasonably withheld.  No Indemnifying Party shall, without the written consent of the Indemnified Party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder (whether or not the Indemnified Party is an actual or potential party to such action or claim) unless such settlement, compromise or judgment (A) includes an unconditional release of the Indemnified Party from all liability arising out of such action or claim and (B) does not include a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of any Indemnified Party. The rights afforded to any Indemnified Party hereunder shall be in addition to any rights that such Indemnified Party may have at common law, by separate agreement or otherwise.

(d)     Contribution.  If the indemnification provided for in this Section 1.7 from the Indemnifying Party is unavailable to an Indemnified Party in respect of any Losses referred to herein, then the Indemnifying Party, in lieu of indemnifying the Indemnified Party, shall contribute to the amount paid or payable by the Indemnified Party as a result of such Losses in

18

such proportion as is appropriate to reflect the relative faults of the Indemnifying Party and the Indemnified Party, as well as any other relevant equitable considerations. The relative faults of the Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, was made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the Indemnifying Party's and Indemnified Party's relative intent, knowledge, access to information and opportunity to correct or prevent such action; provided, however, that the liability of any Holder under this Section 1.7(d) shall be limited to the amount of the net proceeds (after underwriting fees, commissions or discounts) received by such Holder in the sale of Registrable Securities giving rise to such liability. The amount paid or payable by a party as a result of the Losses or other liabilities referred to above shall be deemed to include, subject to the limitations set forth in Section 1.7(a), Section 1.7(b) and Section 1.7(c), any legal or other fees, charges or expenses reasonably incurred by such party in connection with any investigation or proceeding. The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 1.7(d) were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to in the immediately preceding paragraph. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution pursuant to this Section 1.7(d) from any Person who was not guilty of such fraudulent misrepresentation.

(e) The obligations of the Company and Holders under this Article I shall survive the completion of any offering of Registrable Securities pursuant to a registration statement under this Article I, and shall survive the termination of this Agreement.

**Section 1.8** **Rule 144 and 144A; Other Exemptions**. With a view to making available to the Holders the benefits of Rule 144 and Rule 144A promulgated under the Securities Act and other rules and regulations of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration, the Company covenants that it will (i) if it is subject to the periodic reporting requirements under the Exchange Act, use commercially reasonable efforts to file in a timely manner all reports and other documents required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder and (ii) take such further action as each Holder may reasonably request (including, but not limited to, providing any information necessary to comply with Rule 144 and Rule 144A, if available with respect to resales of the Registrable Securities under the Securities Act), all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 and Rule 144A (if available with respect to resales of the Registrable Securities) under the Securities Act, as such rules may be amended from time to time. Upon the written request of a Holder, the Company shall deliver to the Holder a written statement as to whether it has complied with such requirements. In addition to the foregoing, the Company shall use its commercially reasonable efforts to assist a Holder in facilitating private sales of Registrable Securities of more than 5% of the number of shares of Common Stock outstanding at such time by, among other things, providing officer's certificates and other customary closing documents reasonably requested by a Holder.

19

**Section 1.9** <u>**Certain Limitations On Registration Rights**</u>. No Holder may participate in any Registration Statement hereunder involving an underwritten public offering unless such Holder completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements, and other documents reasonably required under the terms of the underwriting arrangements made in connection with such Registration Statement and agrees to sell such Holder's Registrable Securities on the basis provided in any underwriting agreement approved by the Holder or Holders entitled hereunder to approve such arrangements; <u>provided</u>, <u>however</u>, that no such Holder shall be required to make any representations or warranties to the Company or the underwriters in connection with any such registration other than representations and warranties as to (i) such Holder's ownership of its Registrable Securities to be sold or transferred and its intended method of distribution, (ii) such Holder, including such Holder's authorization, power and authority to effect such transfer, (iii) such matters pertaining to compliance with securities laws as may be reasonably requested and (iv) such other customary matters as the managing underwriter may reasonably request.

**Section 1.10** <u>**Limitations on Subsequent Registration Rights**</u>. The Company represents and warrants that it has not granted registration rights prior to the date hereof that remain in effect and agrees that from and after the date of this Agreement, it shall not, without the prior written consent of a majority of the Holders of the Registrable Securities then outstanding, enter into any agreement (or amendment or waiver of the provisions of any agreement) with any holder or prospective holder of any securities of the Company of the same class as the Registrable Securities that would grant such holder (i) the right to include securities in any registration pursuant to this Agreement or (ii) registration rights that are more favorable, *pari passu* or senior to those granted to the Holders hereunder.

**Section 1.11** <u>**Transfer of Registration Rights**</u>. The rights of a Holder hereunder may be transferred or assigned in connection with any transfer of Registrable Securities if (i) such transfer is permitted under or accomplished in accordance with the requirements set forth in the Company's Certificate of Incorporation and Bylaws, (ii) the transferee or assignee beneficially owns at least [NUMBER][2] shares of Registrable Securities and becomes a party to this Agreement and (iii) the Company is given written notice by such Holder of such transfer or assignment, stating the name and address of the transferee or assignee and identifying the Registrable Securities with respect to which such rights are being transferred or assigned; <u>provided</u> that the rights and obligations that are assigned shall apply only to the Registrable Securities sold or transferred by a Holder, including any shares issued in respect of such Registrable Securities pursuant to clause (b) of the definition of "Registrable Securities," but expressly excluding any other securities of the Company acquired by such assignee, including without limitation, pursuant to clause (a) of such definition.

**Section 1.12** <u>**Parties to Agreement.**</u> The parties to this Agreement shall be (i) the Company, (ii) any Person who, together with its Affiliates, receives at least [NUMBER][3] shares of Registrable Securities on the Equity Transfer Date pursuant to the terms of the Plan (who shall be automatically deemed to be party to this Agreement upon such acquisition) and (iii) any

---

[2] Such number to represent 2% of the outstanding Common Stock at the Equity Transfer Date.

[3] Such number to represent 2% of the outstanding Common Stock at the Equity Transfer Date.

20

Person who is a permitted transferee of Registrable Securities pursuant to Section 1.11 hereof that (A) provides written notice of its election to become a party to this Agreement to the Company in accordance with Section 2.3 hereof within 30 days after the date of any transfer pursuant to Section 1.11, and (B) in connection therewith promptly executes and returns to the Company a counterpart signature page to this Agreement.  The Company shall furnish, without charge, to each Person referred to in the immediately preceding sentence a copy of this Agreement upon written request to the Company in accordance with Section 2.3 hereof.

**Section 1.13  Number of Registrable Securities Outstanding.**  In order to determine the number of Registrable Securities outstanding at any time, upon the written request of the Company to the Holders, each Holder shall promptly inform the Company of the number of Registrable Securities that such Holder owns, and the Company may conclusively rely upon any such information provided under this Agreement for the purpose of determining the number of such Registrable Securities.

## ARTICLE II.

### GENERAL PROVISIONS

**Section 2.1  Entire Agreement**.  This Agreement constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

**Section 2.2  Assignment; Binding Effect**.  No party may assign either this Agreement or any of its rights, interests or obligations hereunder (i) without the prior written approval of the other parties or (ii) except in accordance with the express provisions of this Agreement.  All of the terms, agreements, covenants, representations, warranties and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the parties and their respective successors and permitted assigns.

**Section 2.3  Notices**.  All notices, requests and other communications provided for or permitted to be given under this Agreement must be in writing and be given by personal delivery, by certified or registered United States mail (postage prepaid, return receipt requested), by a nationally recognized overnight delivery service for next day delivery, by facsimile transmission or e-mail, as follows (or to such other address as any party may give in a notice given in accordance with the provisions hereof):

If to any Holder, at its last known address appearing on the books of the Company maintained for such purpose.

If to the Company, at

New Millennium Holdco, Inc.
16981 Via Tazon
San Diego, CA 92127

21

Telephone: (858) 451-3535
Facsimile: (858) 217-1910
E-mail: martin.price@millenniumhealth.com
Attention: Martin Price, Esq., President and General Counsel

All notices, requests or other communications will be effective and deemed given only as follows: (i) if given by personal delivery, upon such personal delivery, (ii) if sent by certified or registered mail, on the fifth business day after being deposited in the United States mail, (iii) if sent for next day delivery by overnight delivery service, on the date of delivery as confirmed by written confirmation of delivery, (iv) if sent by facsimile or e-mail, upon the transmitter's confirmation of receipt of such facsimile or e-mail transmission, as applicable, except that if such confirmation is received after 5:00 p.m. (in the recipient's time zone) on a business day, or is received on a day that is not a business day, then such notice, request or communication will not be deemed effective or given until the next succeeding business day. Notices, requests and other communications sent in any other manner, including by electronic mail, will not be effective.

Section 2.4 **Specific Performance; Remedies**. Each party acknowledges and agrees that the other parties would be damaged irreparably if any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached and the Company agrees that it shall not oppose any such demand for specific performance on the basis that monetary damages are available. Accordingly, the parties will be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and its provisions in any action or proceeding instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter, in addition to any other remedy to which they may be entitled, at law or in equity. Except as expressly provided herein, the rights, obligations and remedies created by this Agreement are cumulative and in addition to any other rights, obligations or remedies otherwise available at law or in equity. Except as expressly provided herein, nothing herein will be considered an election of remedies.

Section 2.5 **Submission to Jurisdiction; Waiver of Jury Trial**.

(a) Submission to Jurisdiction. Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall only be brought in any federal court located in the State of New York or any New York state court, and each party consents to the exclusive jurisdiction and venue of such courts (and of the appropriate appellate courts therefrom) in any such action, suit or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum. Process in any such action, suit or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of any such court.

(b) Waiver of Jury Trial. EACH PARTY ACKNOWLEDGES THAT ANY DISPUTE THAT MAY ARISE OUT OF OR RELATING TO THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE SUCH

22

-LACSR01A - MSW

PARTY HEREBY EXPRESSLY WAIVES ITS RIGHT TO JURY TRIAL OF ANY DISPUTE BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER AGREEMENTS RELATING HERETO OR ANY DEALINGS AMONG THEM RELATING TO THE TRANSACTIONS CONTEMPLATED HEREBY.  THE SCOPE OF THIS WAIVER IS INTENDED TO ENCOMPASS ANY AND ALL ACTIONS, SUITS AND PROCEEDINGS THAT RELATE TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY REPRESENTS THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT IN THE EVENT OF ANY ACTION, SUIT OR PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) SUCH PARTY UNDERSTANDS AND WITH THE ADVICE OF COUNSEL HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND REPRESENTATIONS IN THIS SECTION 2.5(b).

**Section 2.6** **Governing Law**.  This Agreement will be governed by and construed in accordance with the laws of the State of New York.

**Section 2.7** **Headings**.  The article and section headings contained in this Agreement are inserted for convenience only and will not affect in any way the meaning or interpretation of this Agreement.

**Section 2.8** **Amendments; Waivers**.  An amendment, modification or waiver to any provision of this Agreement will require the written consent of the Company and the holders of a majority of the Registrable Securities outstanding on the date of such amendment, modification or amendment, except in the case of any amendment, modification or waiver of any warranty, covenant, obligation or other provision of this Agreement relating only to a particular Registration Statement which has been filed with the SEC, which will require the written consent of Holders representing a Majority in Interest of  Participating Holders relating to that Registration Statement.

No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any such prior or subsequent occurrence.  Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

**Section 2.9** **Severability**.  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof; provided, that if any provision of this Agreement, as applied to any party or to any circumstance, is judicially determined not to be enforceable in accordance with its terms, the parties agree that the court judicially making such determination

23

may modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its modified form, such provision will then be enforceable and will be enforced.

Section 2.10    **Counterparts; Effectiveness**.  This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.  This Agreement will become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

Section 2.11    **Construction**.  This Agreement has been freely and fairly negotiated among the parties.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party because of the authorship of any provision of this Agreement.  Any reference to any law will be deemed to refer to such law as in effect on the date hereof and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "include," "includes," and "including" will be deemed to be followed by "without limitation."  Pronouns in masculine, feminine, and neuter genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement," "herein," "hereof," "hereby," "hereunder," and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.  The parties intend that each representation, warranty, and covenant contained herein will have independent significance.  If any party has breached any covenant contained herein in any respect, the fact that there exists another covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached will not detract from or mitigate the fact that the party is in breach of the first covenant.

Section 2.12    **Adjustments for Stock Splits, Etc**.  Wherever in this Agreement there is a reference to a specific number of shares of the Company's capital stock of any class or series, then, upon the occurrence of any subdivision, combination or stock dividend of such class or series of stock, the specific number of shares so referenced in this Agreement will automatically be proportionally adjusted to reflect the effect of such subdivision, combination or stock dividend on the outstanding shares of such class or series of stock.

Section 2.13    **Aggregation of Stock**.  All shares of Registrable Securities owned or acquired by any Holder or its Affiliated entities or persons (assuming full conversion, exchange and exercise of all convertible, exchangeable and exercisable securities into Registrable Securities) shall be aggregated together for the purpose of determining the availability of any right under this Agreement, and for purposes concerning any underwriting cutback provision in Section 1.2(c)(ii) or Section 1.3(c), any such Holder and its Affiliates shall be deemed to be a single Participating Holder, and any proportionate reduction with respect to such "Participating Holder" shall be based upon the aggregate number of Registrable Securities owned by all Persons included in such "Participating Holder."

Section 2.14    **No Third-Party Beneficiaries**.  This Agreement is for the sole benefit of the parties hereto (including any future parties pursuant to Section 1.12) and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall

24

25

confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, under or by reason of this Agreement.

**[SIGNATURE PAGES FOLLOW]**

-LACSR01A - MSW

IN WITNESS WHEREOF, the parties hereto have executed this Registration Rights Agreement as of the date first above written.

**COMPANY:**                                      New Millennium Holdco, Inc.


By:_____
Name:
Title:

**HOLDER:**                              **[HOLDER]**

By:_____

Name:

Title:

**EXHIBIT G**

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF**
**MILLENNIUM HEALTH, LLC**
*a California Limited Liability Company*

This Amended and Restated Operating Agreement (this "**Agreement**") of MILLENNIUM HEALTH, LLC, a California limited liability company (the "**Company**"), effective as of [_____] (the "**Equity Transfer Date**"), is entered into by and between the Company and NEW MILLENNIUM HOLDCO, INC., a Delaware corporation, as the sole member of the Company (the "**Member**").

**BACKGROUND**

On December 19, 2007, the Company incorporated as Millennium Laboratories, Inc., a California corporation.

On April 11, 2014, the Company converted (the "**Conversion**") into Millennium Laboratories, LLC, a California limited liability company (the "**California Company**") pursuant to, and in accordance with, California Corporations Code Sections 1150 et seq., such Conversion having been effective upon the filing of the Articles of Organization - Conversion, attached hereto as Exhibit A, (the "**Articles**") with the Secretary of State of the State of California.

On April 11, 2014, Millennium Lab Holdings II, LLC, a Delaware limited liability company (formerly known as, and at that time known as, Millennium Lab Holdings, Inc., a Delaware corporation) and at that time the sole member of the Company, adopted that certain Operating Agreement of Millennium Laboratories, LLC (the "**Existing Operating Agreement**").

On August 15, 2014, the Company changed its name from "Millennium Laboratories, LLC" to "Millennium Health, LLC".

On the Equity Transfer Date, in connection with a reorganization transaction, New Millennium Holdco, Inc. became the sole member of the Company.

On the date hereof, the Member now desires to amend and restate the operating agreement in its entirety as stated herein.

**ARTICLE I**
**Formation**

1.1 **Formation**. The Company was formed pursuant to the Conversion, such Conversion having been effective upon the filing of the Articles. The Member shall file or cause to be filed all certificates or documents as may be necessary or appropriate for the formation, continuation, qualification and operation of a limited liability company in the State of California, and any other state in which the Company may elect to do business. To the extent that it is determined to be necessary or appropriate, the Member shall do all things to maintain the Company as a limited liability company under the laws of the State of California and any other state in which the Company may elect to do business.

1.2     **Definitions**.

"Act" shall mean the California Revised Uniform Limited Liability Company Act, Cal. Corp. Code §§ 17701.01 *et seq.*

"Withdrawal Event" shall mean those events and circumstances identified in Section 17706.02 of the Act.

## ARTICLE II
### General Provisions

2.1     **Name**.  The name of the Company shall be "Millennium Health, LLC," or such other name as the Member from time to time shall select.

2.2     **Principal Office and Place of Business**.  The principal office and place of business of the Company shall be located at such place as the Member from time to time shall determine.

2.3     **Company Purposes**.  The purpose for which the Company has been formed is to engage in any lawful act or activity for which limited liability companies may be formed under the Act, as determined by the Member from time to time.

2.4     **Term**.  The term of the Company as a limited liability company, notwithstanding the date of its formation as a corporation, commenced on the filing of the Articles, and shall be perpetual until dissolved in accordance with Section 10.1 of this Agreement.

2.5     **Agent for Service of Process**.  The Agent for Service of Process for the Company shall be Capitol Corporate Services, Inc., 455 Capitol Mall Complex, Suite 217, Sacramento, CA 95814, or such other person as the Member shall appoint from time to time.

2.6     **Members**.

(a)     Member.  The name and the business, residence, or mailing address of the sole Member are reflected on Exhibit B, as may be amended from time to time.

(b)     Percentage Interest.  The Member owns one hundred percent (100%) of the interest in the Company.

(c)     Additional Members.  One or more additional members may be admitted to the Company with the consent of the Member.  Prior to the admission of any such additional members to the Company, the Member shall amend this Agreement to make such changes as the Member shall determine to reflect the fact that the Company shall have such additional members.  Each additional member shall execute and deliver a supplement or counterpart to this Agreement, as necessary.

2.7     **Certification of Interests**.  The Company shall maintain records for the purposes of registering the transfer of the membership interests in the Company.  Each membership interest in the Company shall constitute a 'security' within the meaning of, and governed by (i)

2

Article 8 of the Uniform Commercial Code (including Section 8-102(a)(15) thereof) as in effect from time to time in the State of California, and (ii) Article 8 of the Uniform Commercial Code of any other applicable jurisdiction that now or hereafter substantially includes the 1994 revisions to Article 8 thereof as adopted by the American Law Institute and National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995. Each membership interest shall be certificated in the form approved by the Member, and each such certificate shall be executed by manual or facsimile signature of an Officer on behalf of the Company.

## ARTICLE III
### Capital Contributions

3.1 **Initial Capital Contributions by the Member**. The Member has previously contributed to the capital of the Company such amounts as are reflected in the books and records of the Company.

3.2 **Additional Capital Contributions**. The Member shall not have any obligation to advance any additional funds or other property to the Company (either as a loan or capital contribution).

## ARTICLE IV
### Distributions

4.1 **Distributions**. At such times as determined by the Member, the Member shall cause the Company to distribute to the Member any cash or property held by it that is neither reasonably necessary for the operation of the Company nor in violation of the Act. The Member shall be liable to the Company for distributions made pursuant to this Section 4.1 only to the extent now or hereafter provided by the Act.

4.2 **Return of Capital**. The Member shall not be entitled to the return of, or interest on, the Member's capital contributions except as provided herein.

## ARTICLE V
### Tax Status; Profits and Losses

5.1 **Tax Status; Profits and Losses.** The Company shall be treated as a disregarded entity for federal income tax purposes. All profits and losses of the Company shall be allocated to the Member. The Member shall not be liable for any debts or losses of the Company beyond the aggregate amount of its capital contribution, except as otherwise required by law.

## ARTICLE VI
### Management of the Company

6.1 **Management**. The management of the Company shall be retained by the Member.

6.2    **Rights and Powers of the Member**.

(a)    <u>Rights of the Member</u>.  The Member shall have full, exclusive and complete power to manage and control the operations and affairs of the Company and to make all decisions regarding the business of the Company.  Any action taken by the Member, following the approval of such action by the board of directors of the Member (or any authorized committee of the Member's board of directors), or pursuant to a delegation of authority by the board of directors of the Member or a duly authorized committee of the Member's board of directors,  shall constitute the act of and serve to bind the Company.  The Member shall have all of the rights and powers provided to a member of a member-managed limited liability company by law, including the power and authority to execute instruments and documents, to mortgage or dispose of any real property held in the name of the Company, and to take any other actions on behalf of the Company, whether or not such actions are for carrying on the business of the Company in its usual way.

(b)    <u>Title to Property</u>.  Title to any property (whether real, personal or mixed) owned by or leased to the Company shall be held in the name of the Company, or in the name of any nominee the Member may in its sole discretion designate.

(c)    <u>Reliance by Third Parties</u>.  A third party shall be entitled to rely on all actions of the Member as actions of the Company.  Every instrument purporting to be the action of the Company and executed by the Member shall be conclusive evidence in favor of any person relying thereon or claiming thereunder that, at the time of delivery thereof, this Agreement was in full force and effect and that the execution and delivery of that instrument is duly authorized by such Member and the Company.

(d)    <u>Election of Officers; Delegation of Authority</u>.  The Member may appoint, employ or otherwise contract with any persons or entities for the transaction of the business of the Company or the performances of services for or on behalf of the Company, and the Member may delegate to any such person (who may be designated an officer of the Company) or entity such authority to act on behalf of the Company as the Member may from time to time deem appropriate.  Each such designated officer (an "**Officer**") (i) shall have the powers associated with the same office of a Delaware corporation (and such additional or different powers as may be designated by the Member from time to time), subject to <u>Section 6.3</u> below and (ii) shall hold office until his or her resignation or his or her removal, with or without cause, by the Member.  Any action taken by an Officer designated by the Member pursuant to authority delegated to such Officer shall constitute the act of and serve to bind the Company.  Persons dealing with the Company are entitled to rely conclusively on the power and authority of any Officer designated by the Member and any instrument designating such Officer and the authority delegated to him or her.

6.3    **Matters Reserved to the Member**.  For the avoidance of doubt, no Officer shall be authorized to take any of the following actions, without the prior approval of the Member (acting through the Member's board of directors or an authorized committee thereof), such actions otherwise being within the sole and exclusive authority of the Member:

4

(a)     Selling, conveying, assigning, transferring, pledging or otherwise disposing of all or a portion of any Company property other than in the ordinary course of the Company's business;

(b)     Incurring any lease, conveyance, mortgage or other indebtedness of the Company or incurring any indebtedness of the Company, or guaranteeing the obligations of another;

(c)     Changing any of the Company's purposes;

(d)     Using the Company's funds or capital in any way other than for the identified business and purpose of the Company;

(e)     Commingling any Company funds or capital with the funds of any other person other than the Member and the Member's or the Company's subsidiaries;

(f)     Confessing a judgment against the Company or the Company's assets;

(g)     Filing a voluntary petition on behalf of the Company seeking protection under the United States Bankruptcy Code or debtor relief or insolvency laws of any jurisdiction;

(h)     Making an assignment of the Company's assets for the benefit of creditors, or appointing (or consenting to the appointment of) a receiver for the assets of the Company for the benefit of creditors;

(i)     Amending the Company's Articles;

(j)     Altering, amending or repealing this Agreement, in whole or in part, including Annex A hereto, or adopting any new or restated operating agreement;

(k)     Issuing any membership interests, equity rights, warrants, options, convertible securities in the Company;

(l)     Making any distributions in respect of membership or other equity interests of the Company other than to capital or the Member;

(m)     Taking any action with respect to any grant of indemnification or advancement of expenses and entering into or modifying any agreements pertaining thereto, pursuant to Section 6.5 or otherwise; or

(n)     Agreeing to take any of the foregoing actions.

6.4     **Indemnification of Member**.  To the fullest extent permitted by the Act and this Section 6.4, the Company shall indemnify, defend, and hold harmless the Member for, from and against any liability, damage, cost, expense, loss, claim, judgment, penalty, fine, action or settlement of any kind or nature whatsoever (including all attorneys' fees, costs and expenses of defense, appeal and settlement of any proceedings instituted against the Member) that in any way relates to or arises out of, or is alleged to relate to or arise out of, any action or inaction on the

5

part of the Company or the Member acting on behalf of the Company, including without limitation with respect to the conversion, formation, operation or termination of the Company, and the Company shall advance expenses to the Member in connection therewith as the Member may so determine.

6.5     **Indemnification of Others.**

(a)     The Company shall indemnify and advance expenses to any person who from and after the Equity Transfer Date (i) is an officer of the Company or (ii) becomes a former officer of the Company, in each case in connection with any action, suit or proceeding that relates to or arises from any action or inaction by the Company or any such person from and after the Equity Transfer Date, solely in accordance with and pursuant to the terms of the Indemnification Agreement in the form attached hereto as Annex A (the "**Indemnification Agreement**") the terms and conditions of which are incorporated by reference herein as if fully set forth herein.  Without any further action, each of the Company, on the one hand, and each officer of the Company, on the other hand, shall be deemed to have executed the Indemnification Agreement as of the effective date of such officer's due appointment as such, and no additional action or approval shall be required by either the Company, on the one hand, or any such officer, on the other hand, to be entitled to the rights provided by, and to be subject to the obligations under, such Indemnification Agreement.  Each person who from and after the Equity Transfer Date (i) is an officer of the Company or (ii) becomes a former officer of the Company is an intended third-party beneficiary under this Section 6.5(a) and such persons shall have an independent right of action to enforce the terms hereof.

(b)     The Company may, to the extent authorized from time to time by the Member, provide rights to indemnification and/or to the advancement of expenses to any person who from and after the Equity Transfer Date (i) is an employee or agent of the Company or (ii) becomes a former employee or agent of the Company, in each case in connection with any action, suit or proceeding that relates to or arises from any action or inaction by the Company or any such person from and after the Equity Transfer Date

(c)     The Company may purchase and maintain insurance on behalf of any person who from and after the Equity Transfer Date (i) is a director, officer, employee or agent of the Member or the Company or (ii) becomes a former director, officer, employee or agent of the Member or the Company, in each case, against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, that relates to or arises from any action or inaction by the Member or the Company or any such person from and after the Equity Transfer Date, whether or not the Company would have the power to indemnify such person against such liability under the provisions of this Section 6.5.

6.6     **Indemnification for Prior Acts**.  In addition to and without limitation of their entitlement to indemnification to the extent provided by Section 6.5 hereof, solely with respect to the Covered Officers, each Covered Officer shall continue to be entitled to indemnification with respect to claims and proceedings that relate to or arise from any Prior Acts solely pursuant to (i) the Hardaway Employment Agreement with respect to Mr. Hardaway and (ii) the Price Employment Agreement with respect to Mr. Price.  Other than as provided in the foregoing sentence, the Covered Officers shall have no other entitlement or rights to indemnification with

6

respect to claims and proceedings that relate to or arise from Prior Acts, and the Company shall have no other obligations with respect thereto. Each Covered Officer is an intended third-party beneficiary under this Section 6.6 and such Covered Officers shall have an independent right of action to enforce the terms hereof. For purposes of this Section 6.6, the following terms shall have the indicated meanings:

(a) "**Covered Officer**" shall mean each of (i) Mr. William Brock Hardaway, who served the Company as its Chief Executive Officer prior to the Equity Transfer Date and who, effective as of the Equity Transfer Date, will serve the Company as its Chief Executive Officer pursuant to the Hardaway Employment Agreement and (ii) Mr. Martin Price, who served the Company as its General Counsel prior to the Equity Transfer Date and who, effective as of the Equity Transfer Date, will serve the Company as its General Counsel pursuant to the Price Employment Agreement.

(b) "**Hardaway Employment Agreement**" shall mean that certain Employment Agreement between the Company and Mr. Hardaway effective as of the Equity Transfer Date.

(c) "**Price Employment Agreement**" shall mean that certain Employment Agreement between the Company and Mr. Price effective as of the Equity Transfer Date.

(d) "**Prior Acts**" shall mean, with respect to each Covered Officer, any action or inaction on the part of the Company or such Covered Officer occurring prior to the Equity Transfer Date.

6.7 **Reimbursable Expenses**. The Company will reimburse the Member for all actual out-of-pocket third-party expenses incurred in connection with the carrying out of the duties set forth in this Agreement.

## ARTICLE VII
### The Member

7.1 **Meetings of the Member**. Meetings of the Member shall be held on the call of the Member without the requirement of notice. The Member may act without a meeting if the action taken is reduced to writing (either prior to or thereafter) and approved and signed by the Member. Written minutes shall be taken at each meeting of the Member; however, any action taken or matter agreed upon by the Member shall be deemed final, whether or not written minutes are prepared or finalized.

7.2 **Limitation of Liability**. To the fullest extent permitted under the Act or any other applicable law, the Member shall not be liable for any debts, obligations or liabilities of the Company, whether arising in tort, contract or otherwise, solely by reason of being a Member.

## ARTICLE VIII
### Books, Records, Reports and Accounting

8.1 **Records**. The Member shall keep or cause to be kept at the principal office of the Company the following: (a) a current list of the full name and last known business, residence or

mailing address of each Member, (b) a copy of the initial Articles and all amendments thereto, (c) copies of this Agreement and all amendments hereto and copies of any prior written operating agreements no longer in effect, (d) copies of any written and signed promises by the Member to make capital contributions to the Company, (e) copies of the Company's federal, state and local income tax returns and reports, if any, for the seven most recent years, (f) copies of any prepared financial statements of the Company for the seven most recent years and (g) minutes of every meeting of the Member as well as any written consents of Member or actions taken by Member without a meeting. Any such records maintained by the Company may be kept on or be in the form of any information storage device, provided that the records so kept are convertible into legible written form within a reasonable period of time.

8.2 **Fiscal Year and Accounting**. The fiscal year of the Company shall end on December 31 of each year. All decisions as to other accounting matters, except as specifically provided to the contrary herein, shall be made by the Member.

8.3 **Preparation of Tax Returns**. The Member shall arrange for the preparation and timely filing of all returns of the Company for federal and state income tax purposes and shall cause to be furnished to the Member the tax information reasonably required for federal and state income tax reporting purposes. The classification, realization and recognition of income, gain, losses and deductions and other items, for federal income tax purposes, shall be on that method of accounting as the Member shall determine in its sole discretion.

8.4 **Tax Elections**. The Member may in its discretion and in accordance with the terms of this Agreement determine whether to make any available elections pursuant to the Internal Revenue Code of 1986, as amended.

## ARTICLE IX
## Transfers and Withdrawals

9.1 **Transfers**. The Member may make any transfer of all or any portion of its membership interest in the Company. The transferee of any membership interests shall be admitted to the Company as a member of the Company on the effective date of such transfer (i) upon such transferee's written acceptance of the terms and provision of this Agreement, as amended and its written assumption of the obligations hereunder of the transferor of the membership interests, and (ii) the recording of such transferee's name and address on Exhibit B hereto.

9.2 **Withdrawal of Member**. The bankruptcy of a Member shall not be deemed to be a Withdrawal Event.

## ARTICLE X
## Liquidation and Winding Up

10.1 **Dissolution**. The Company shall dissolve only upon:

(a) the written consent of the Member;

8

(b)      the entry of a decree of judicial dissolution under Section 17707.03 of the Act; or

(c)      any other event or circumstance giving rise to the dissolution of the Company under the Act, unless the Company's existence is continued pursuant to the Act.

10.2    **Liquidation**.  Upon dissolution of the Company, unless continued in accordance with Section 10.1(c) hereof, it shall be wound up and liquidated as rapidly as business circumstances permit, the Member shall act as the liquidating trustee, and the assets of the Company shall be liquidated and the proceeds thereof shall be paid (to the extent permitted by applicable law) in the following order:

(a)      first, to creditors, including Members that are creditors, in the order of priority as required by applicable law;

(b)      second, to a reserve for contingent liabilities to be distributed at the time and in the manner as the liquidating trustee determines in its discretion; and

(c)      third, to the Member.

10.3    **Reasonable Time for Winding Up**.  A reasonable time shall be allowed for the orderly winding up of the business and affairs of the Company and the liquidation of its assets pursuant to Section 10.2 in order to minimize any losses otherwise related to that winding up.

10.4    **Filing Upon Dissolution**.  As soon as possible following the dissolution of the Company, if the Company is not continued pursuant to Section 10.1(c) hereof, the Member shall execute and file a Certificate of Dissolution with the Secretary of State of the State of California, if required by the Act.  Upon the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but its separate existence shall continue until the Certificate of Cancellation has been filed with the Secretary of State of the State of California as required by the Act or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

**ARTICLE XI**
**Miscellaneous**

11.1    **Governing Law**.  This Agreement shall be governed exclusively by and construed in accordance with the laws of the State of California, and specifically the Act, exclusive of its conflict-of-laws principles.

11.2    **Notices**.  Notices shall be delivered either by private messenger service, facsimile transmission, or by private or governmental mail.  Any notice or document required or permitted hereunder to a Member shall be in writing and shall be deemed to be given on the date received by the Member; provided, however, that all notices and documents mailed to a Member in the United States Mail, postage prepaid, certified mail, return receipt requested, addressed to the Member at its respective address as shown in the records of the Company, shall be deemed to have been received five days after mailing.  The address of the Member shall for all purposes be as set forth on the signature page hereto unless otherwise changed by the Member.

9

11.3 **Severability**. If any provision of this Agreement shall be conclusively determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement shall not be affected thereby.

11.4 **Binding Effect**. Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the Member and its respective successors and assigns.

11.5 **Titles and Captions**. All article, section and paragraph titles and captions contained in this Agreement are for convenience only and are not a part of the context hereof.

11.6 **Pronouns and Plurals**. All pronouns and any variations thereof are deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the appropriate person(s) may require.

11.7 **No Third Party Rights**. This Agreement is intended to create enforceable rights for the party hereto only, and, except as expressly provided herein (including in Section 6.5 and 6.6), creates no rights in, or obligations to, any other persons whatsoever.

11.8 **Time is of the Essence**. Time is of the essence in the performance of each and every obligation herein imposed.

11.9 **Further Assurances**. The party hereto shall execute all further instruments and perform all acts which are or may become necessary to effectuate and to carry on the business contemplated by this Agreement.

11.10 **Schedules Included in Exhibits; Incorporation by Reference**. Any reference to an Exhibit to this Agreement contained herein shall be deemed to include any Schedules to such Exhibit. Each of the Exhibits referred to in this Agreement, and each Schedule to such Exhibits, is hereby incorporated by reference in this Agreement as if such Schedules and Exhibits were set out in full in the text of this Agreement.

11.11 **Amendments**. This Agreement may not be amended except by the Member.

11.12 **Creditors**. None of the provisions of this Agreement shall be for the benefit of or enforceable by any creditors of the Company.

11.13 **Entire Agreement**. This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior operating agreements (as the same may have been amended to date), whether written or oral, and understandings relating to such subject matter. Any and all prior operating agreements, including without limitation that certain Operating Agreement of the Company, effective as of April 11, 2014 (as the same may have been amended, modified or restated to date), have been integrated as deemed appropriate into this Agreement and are hereby terminated and superseded by this Agreement in their entirety.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE.]**

IN WITNESS WHEREOF, the undersigned have executed this Agreement effective as of the day and year first above written.

**COMPANY:**

MILLENNIUM HEALTH, LLC,
a California limited liability company

By: NEW MILLENNIUM HOLDCO, INC.,
    a Delaware corporation, its Sole Member


By: _____
    Name:
    Title:


**MEMBER:**

NEW MILLENNIUM HOLDCO, INC.,
a Delaware corporation


By: _____
    Name:
    Title:

**Exhibit A**

Articles of Organization - Conversion


[See attached.]

01235619

201410110425

| LLC-1A | File # _____ |

**State of California**
Secretary of State
3070734 'out'

**Limited Liability Company**
**Articles of Organization - Conversion**

FILED
Secretary of State
State of California

APR 1 1 2014

IMPORTANT — Read all instructions before completing this form.    10 CC  This Space For Filing Use Only

**Converted Entity Information**

1. Name of Limited Liability Company  (The name must include the words Limited Liability Company or the abbreviations LLC or L.L.C.  The words Limited and Company may be abbreviated to Ltd. and Co., respectively.)

   Millennium Laboratories, LLC

2. The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

3. The limited liability company will be managed by (check only one):

   ☐ One Manager     ☐ More Than One Manager     ☑ All Limited Liability Company Member(s)

4. Initial Street Address of Limited Liability Company's Designated Office in CA        City          State CA    Zip Code
   16981 Via Tazon, San Diego                                                                                92127

5. Initial Mailing Address of Limited Liability Company, if different from Item 4      City          State      Zip Code

6. Name of Initial Agent For Service of Process  (Item 6: List a California resident or a California registered corporate agent that agrees to be your initial agent for service of process in case the LLC is sued. You may list any adult who lives in California. You may not list an LLC as the agent. Item 7: If the agent is an individual, list the agent's business or residential street address in California. Do not list an address if the agent is a California registered corporate agent as the address for service of process is already on file. Item 8: If the converting entity is a CA limited partnership, enter the mailing address of the agent, if different from Item 7, or if the agent is a California registered corporate agent.)

   Capitol Corporate Services, Inc.

7. If an Individual, Street Address of Agent for Service of Process in CA              City          State CA    Zip Code

8. Mailing Address of Agent for Service of Process                                    City          State      Zip Code

**Converting Entity Information**

9. Name of Converting Entity

   Millennium Laboratories, Inc.

| 10. Form of Entity | 11. Jurisdiction | 12. CA Secretary of State File Number, if any |
| Corporation | California | C3070736 |

13. The principal terms of the plan of conversion were approved by a vote of the number of interests or shares of each class that equaled or exceeded the vote required. If a vote was required, the following was required for each class:

    The class and number of outstanding interests entitled to vote.        AND        The percentage vote required of each class.
    Common Stock                                                                        More than 51%
    566,570 Outstanding Shares

**Additional Information**

14. Additional information set forth on the attached pages, if any, is incorporated herein by this reference and made part of this certificate.

15. I certify under penalty of perjury that the contents of this document are true. I declare I am the person who executed this instrument, which execution is my act and deed.

    _____          Howard Appel, President
    Signature of Authorized Person      Type or Print Name and Title of Authorized Person

    _____          Heidi Smith, Secretary
    Signature of Authorized Person      Type or Print Name and Title of Authorized Person

                                                        APPROVED BY SECRETARY OF STATE

LLC-1A (REV 01/2014)

I hereby certify that the foregoing
transcript of _____ page(s)
is a full, true and correct copy of the
original record in the custody of the
California Secretary of State's office.

APR 1 1 2014

Date: _____

DEBRA BOWEN, Secretary of State

14

**<u>Exhibit B</u>**

**As of [_____]**

Member

The name and the business, residence, or mailing address of the sole Member are as follows:

<u>Name</u>                                    <u>Address</u>

New Millennium Holdco, Inc.                    16981 Via Tazon
                                               San Diego, CA 92127
                                    Attention:  Martin Price, Esq., President and
                                               General Counsel

**<u>Annex A</u>**

Indemnification Agreement


[See attached.]

# EXHIBIT H

## Annex 1

### Identification of Directors and Officers of the Reorganized Debtors

**A. Board of Directors of Reorganized New Millennium Holdco, Inc.**

1. **Chairman – Ronald A. Rittenmeyer**

   Since 2014, Mr. Rittenmeyer has been Chief Executive Officer of Turnberry Advisors LLC, a business transformation consulting firm. Prior thereto, Mr. Rittenmeyer served as Chairman, President and Chief Executive Officer of Expert Global Solutions, Inc. (formerly NCO Group, Inc. which merged with APAC Customer Services, Inc. in 2012) from 2011 to June 2014. Mr. Rittenmeyer held a number of roles including Chairman, Chief Executive Officer and President at Electronic Data Systems Corporation, a leading global technology services company delivering business solutions to its clients, from 2005 until its sale to Hewlett-Packard in late 2008. Under his leadership, EDS completely transformed its entire sales and delivery operations, while delivering dramatic improvements in quality and productivity. Prior to EDS, Mr. Rittenmeyer was Chairman, President and CEO of Safety- Kleen Corporation, Chairman, President and CEO of RailTex, President and CEO of Ameriserve Food Services, President and COO of Ryder TRS, President and COO of Merisel and COO of Burlington Northern Railroad. He spent 20 years at Frito-Lay Inc. and PepsiCo Foods International holding a variety of senior level positions. He currently serves on the Board of Directors of American International Group (AIG), Tenet Healthcare Corporation, IMS Health and privately held company Avaya Inc. Mr. Rittenmeyer holds a Bachelor's degree in Commerce and Economics from Wilkes University, and his MBA from Rockhurst University.

2. **Eugene I. Davis**

   Since 1999, Mr. Davis has been Chairman and Chief Executive of PIRINATE Consulting Group, LLC, a privately-held consulting firm specializing in turn-around management, merger and acquisition consulting, hostile and friendly takeovers and strategic planning advisory services. Since founding PIRINATE in 1999, Mr. Davis has managed numerous assignments involving businesses in various industries including many in the healthcare and medical technology industries and has served on the board of directors of numerous companies in various capacities. From 1998 to 1999, he served as Chief Operating Officer of Total-Tel USA Communications, Inc., a telecommunications provider. Prior thereto, Mr. Davis was a director of Emerson Radio Corp. from 1990 to 1997, where he also served in various executive positions, including Vice Chairman, President and Executive Vice President. From 1996 to 1997, Mr. Davis served as Chief Executive Officer and a director (and as Vice Chairman in 1997) of Sports Supply Group, Inc. a distributor of sporting goods and athletic equipment. Mr. Davis holds a bachelor's degree in international politics from Columbia College, a master's degree in international law and organization from the School of International Affairs of Columbia University and a Juris Doctorate degree from Columbia University School of Law.

3. **Stephen Gray**

Mr. Gray has over 40 years of experience leading the successful operational and/or financial restructuring of hundreds of companies. He has worked as a crisis manager (CEO or CRO), turnaround consultant, restructuring advisor, trustee and receiver in a wide variety of industries, including healthcare companies. Since 2014, Mr. Gray has been the Managing Member of Gray & Company, a privately-held practice specializing in restructuring services. Prior thereto, Mr. Gray was the Leader of the Fiduciary Services Practice at Deloitte. From 2007 to 2012, Mr. Gray was a Senior Managing Partner at CRG Partners (acquired by Deloitte in 2012). Prior to CRG, Mr. Gray was the Founder and Chief Executive Officer of The Recovery Group, Inc. (TRG), which was merged with Corporate Revitalization Partners to form CRG Partners in 2007. Mr. Gray holds a Bachelor's degree in Engineering Science from George Washington University and was a Master's level teaching fellow in Mechanical Engineering at Tufts University

4. **William Brock Hardaway**

Mr. Hardaway serves as Chief Executive Officer of the Debtors, having joined the Debtors in 2013 and provides the strategic direction for the company's long-term growth, including growing the company's product and service offerings, increasing brand recognition, and maximizing earnings potential. He has two decades of leadership experience in healthcare and a strong track record of growth and performance. Prior to joining the Company in February 2013, he served as regional vice president of operations at Select Medical Corporation, president and chief operating officer of Triumph HealthCare, LLC, executive vice president and hospital division president of RehabCare, and most recently served as executive vice president of operations for Kindred Healthcare. He received a bachelor's degree in hospital administration from Southwest Texas State University and a master's degree in business administration from St. Edward's University Executive Program in Austin, Texas.

A fifth director for New Holdco will be appointed by members of the Ad Hoc Group of Lenders in consultation with the Board of Directors, consistent to the provisions of Article V.N of the Plan.

The Board of Managers, if any, of Holdings will be determined by its members in accordance with the terms of its operating agreement.

## C. Officers of Reorganized New Millennium Holdco, Inc.

1. **Chief Executive Officer – William Brock Hardaway**

2. **Chief Financial Officer – Timothy Kennedy**

3. **General Counsel – Martin Price**

2

4. **Secretary – Heidi Smith**

5. **Chief Information Officer – William Zondler**

6. **Chief Compliance Officer – Darrell Contreras**

7. **Chief Marketing Officer – Nikhil Nayak**

8. **Executive Vice President, Corporate Strategy – Josh Benner**

9. **Regional Vice President East – Bret Anderson**

10. **Regional Vice President West – June Nicole Moberg**

11. **Senior Vice President and Chief Scientific Officer – Charles Mikel**

12. **Senior Vice President, Sales – Jason Bristol**

13. **Senior Vice President, Sales – Joseph Depriest**

14. **Senior Vice President, Sales – Brandon Worley**

15. **Senior Vice President, Population Health – Aaron McKethan**

16. **Senior Vice President, Health Outcomes Research – Rami Ben-Joseph**

17. **Senior Vice President and General Manager Medication – Jennifer Strickland**

18. **Senior Vice President, Clinical and Chief Clinical Officer – Angela Huskey**

19. **Vice President of Financial Planning and Analysis - Daniel Pencak**

**D. Officers of Reorganized Millennium Health, LLC**

1. **Chief Executive Officer – William Brock Hardaway**

2. **Chief Financial Officer and Treasurer – Timothy Kennedy**

3. **General Counsel – Martin Price**

4. **Secretary – Heidi Smith**

5. **Chief Information Officer – William Zondler**

**E. Officers of Reorganized RxAnte, LLC**

1. **President – Aaron McKethan**

2. **Chief Executive Officer – Josh Benner**

3. **Chief Financial Officer – Timothy Kennedy**

4. **Treasurer – Heidi Smith**

5. **Secretary – Andrew Clearwater**

6. **Chief Operating Officer – Peter Aldrich**

Additional officers of New Holdco, Holdings, RxAnte, LLC and Millennium may be selected consistent with the provisions of Article V.N of the Plan.

4

## Annex 2

### Compensation of Insiders Pursuant to § 1129(a)(5)(B)

**Compensation of Directors**

The compensation of directors is currently under negotiation and will be determined by the Company in consultation with the Ad Hoc Group of Lenders.

**Compensation of Insider Officers**

W. Brock Hardaway: Mr. Hardaway is currently the Company's Chief Executive Officer and will continue with the Reorganized Debtors in his current role. Pursuant to an employment agreement to be entered into as of the Plan Effective Date, Mr. Hardaway will receive base salary consistent with current practices ($1,000,000/yr) and an annual cash bonus based on the Company's performance as compared with projections. Mr. Hardaway will also receive health and other benefits similar to those provided to other senior executives. Mr. Hardaway will be entitled to certain termination benefits upon termination without cause or for good reason, all as more specifically provided in his employment agreement.

Timothy Kennedy: Mr. Kennedy is currently the Company's Chief Financial Officer and will continue with the Reorganized Debtors in his current role. Pursuant to an employment agreement entered into as of June 14, 2013, Mr. Kennedy will receive base salary consistent with current practices ($350,000/yr) and an annual cash bonus based on the Company's performance as compared with projections. Mr. Kennedy will also receive health and other benefits similar to those provided to other senior executives. Mr. Kennedy will be entitled to certain termination benefits upon termination without cause or for good reason, all as more specifically provided in his employment agreement.

Martin Price: Mr. Price is currently the Company's General Counsel and will continue with the Reorganized Debtors in his current role. Pursuant to an employment agreement to be entered into as of the Plan Effective Date, Mr. Price will receive base salary consistent with current practices ($800,000/yr) and an annual cash bonus based on the Company's performance as compared with projections. Mr. Price will also receive health and other benefits similar to those provided to other senior executives. Mr. Price will be entitled to certain termination benefits upon termination without cause or for good reason, all as more specifically provided in his employment agreement. Mr. Price will also receive a bonus of $250,000 upon the Debtors' emergence from Chapter 11 in recognition of his contributions to the Debtors' restructuring efforts.

Aaron McKethan: Mr. McKethan is currently the Company's Senior Vice President, Population Health and the President of RxAnte, LLC and will continue with the Reorganized Debtors in his current roles. Pursuant to an employment agreement entered into as of August 5, 2014, Mr. McKethan will receive base salary consistent with current practices ($350,000/yr) and an annual cash bonus based on the Company's performance as compared

with projections.  Mr. McKethan will also receive health and other benefits similar to those provided to other senior executives.  Mr. McKethan will be entitled to certain termination benefits upon termination without cause or for good reason, all as more specifically provided in his employment agreement.

    <u>Josh Benner</u>: Mr. Benner is currently the Company's Executive Vice President, Corporate Strategy and the Chief Executive Officer of RxAnte, LLC and will continue with the Reorganized Debtors in his current roles.  Pursuant to an employment agreement entered into as of August 5, 2014, Mr. Benner will receive base salary consistent with current practices ($400,000/yr) and an annual cash bonus based on the Company's performance as compared with projections.  Mr. Benner will also receive health and other benefits similar to those provided to other senior executives.   Mr. Benner will be entitled to certain termination benefits upon termination without cause or for good reason, all as more specifically provided in his employment agreement.

# EXHIBIT I

LOAN AGREEMENT

LOAN AGREEMENT, dated as of ____, 2015, among the Millennium Corporate Claim Trust (the "Borrower") and Millennium Health, LLC, a California limited liability company and each of its successors or assignees, in its capacity as lender (the "Lender") (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement").

WHEREAS, on November 10, 2015, Millennium Lab Holdings II, LLC, a Delaware limited liability company, RxAnte, LLC, a Delaware limited liability company and the Lender (collectively, the "Debtors"), each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware and commenced their chapter 11 cases, which are being jointly administered under Case No. 15-12284 (collectively, "Cases");

WHEREAS, on December __, 2015, the Bankruptcy Court entered its order confirming the Plan (hereinafter defined);

WHEREAS, the Plan provides for, among other things (x) the creation of the Borrower, (y) the contribution of the Trust Assets (hereinafter defined) to the Borrower pursuant to Article V.F of the Plan and (z) the liquidation (and conversion to cash) of the Corporate Claim Trust Assets and the distribution of the proceeds therefrom to the Corporate Claim Trust Beneficiaries (hereinafter defined);

WHEREAS, pursuant to the Plan, the Lender has agreed to make up to $7,000,000 of loans (the "Maximum Loan Amount") to fund the liquidation (and conversion to cash) of the Corporate Claim Trust Assets by, among other means, pursuing, litigating and/or settling claims and/or causes of action constituting the Trust Assets, subject to the terms and conditions set forth herein;

The parties hereto hereby agree as follows:

1.      LOANS AND PAYMENT.

(a)      Loans.  The Borrower may borrow amounts under this Agreement in any amount requested by the Borrower (each such borrowing, a "Loan"; together with each other Loan, the "Loans") during the Availability Period; provided, that (i) the aggregate principal amount of all Loans made hereunder plus the aggregate principal amount of all loans made under the Lender Claim Trust Loan Agreement shall not exceed the Maximum Loan Amount at any time, (ii) the proceeds of all Loans shall be used solely in furtherance of the Trust Purpose (including, but not limited to, for the avoidance of doubt, to fund and/or reimburse any of the fees, costs and expenses of the professionals retained by the Borrower in connection therewith), (iii) no borrowing request hereunder shall request Loans in an amount that would exceed the Available Amount at such time and (iv) if, after giving effect to the making of a Loan, the aggregate principal amount of Loans made under this Agreement (including such Loan requested) plus the aggregate principal amount of all loans made under the Lender Claim Trust Loan Agreement, in each case, as of the date of such Loan, would exceed the Maximum Loan Amount, then the amount of the requested Loan shall be automatically reduced to the Available Amount at such time (for the avoidance of doubt, no Loans may be requested or funded until $13,000,000 has been contributed to the Trusts by the Lender pursuant to Article V.F and Article V.G of the Plan ("Non Loan Contribution") and the entire amount of the Non Loan Contribution has been used by the Trusts in furtherance of the Trust Purpose and/or the trust purpose under the Lender Claim Trust Agreement, as applicable).  Loans borrowed hereunder and prepaid or repaid may not be reborrowed.

(b)     Payment.  The outstanding principal under this Agreement will be due and payable in full on the Maturity Date; provided, however, that the Borrower shall not be required to pay any amounts outstanding hereunder unless the Borrower has received proceeds from the Corporate Claim Trust Assets, whether from settlement, litigation, settlement, judgment or otherwise ("Claim Proceeds").  All payments and prepayments of principal under this Agreement will be made at the address of the Lender set forth in Section 11(d) or at such other address as is provided by the Lender to the Borrower in writing.  Notwithstanding any other provisions set forth herein, the Lender's sole recourse in regards to repayment of the obligations of the Borrower hereunder shall be to the Trust Assets and the Claim Proceeds.

(c)     Prepayment.  The Borrower shall prepay any Loans then outstanding from any Claim Proceeds received by the Borrower promptly upon receipt thereof even if received prior to the Maturity Date, minus any fees, costs and expenses of the professional retained by the Borrower (and any other fees, costs or expenses incurred by the Borrower in connection with converting the Corporate Claim Trust Assets to Claim Proceeds) outstanding at such time.  The Borrower may prepay the outstanding Loans in whole or in part at any time without premium or penalty.

2.     INTEREST.  Interest shall not accrue on the unpaid principal amount of the Loans.

3.     CONDITIONS PRECEDENT.  This Agreement shall become effective on and as of the date on which the following conditions precedent have been satisfied:

(a)     this Agreement shall have been duly executed and delivered by the Lender and the Borrower; and

(b)     each of the representations and warranties made by the Borrower shall be true and correct in all material respects.

4.     EFFECTIVE DATE.  Loans may only be requested and funded after this Agreement is effective and the Non Loan Contribution has been made to the Trusts by the Lender pursuant to Article V.F and Article V.G of the Plan and the entire amount of the Non Loan Contribution has been used by the Trusts in furtherance of the Trust Purpose and/or the trust purpose under the Lender Claim Trust Agreement, as applicable (the date (after this Agreement is effective) on which the entire Non Loan Contribution has been so used by the Trusts, the "Effective Date").

5.     EVENTS OF DEFAULT & REMEDIES.

(a)     Events of Default.  If any of the events specified in this Section 5 shall occur (herein individually referred to as an "Event of Default"), the Lender may, so long as such condition exists, declare the entire outstanding aggregate principal amount of the Loans immediately due and payable, by notice in writing to the Borrower:

(i)      the Borrower shall fail to perform any obligation under Sections 1(b), 1(c) or 8 under this Agreement, and such failure shall continue for a period of 60 days after the Lender gives the Borrower written notice thereof; or

(ii)     the occurrence of an Insolvency Event relating to the Borrower.

2

(b)     Remedies.  Upon the occurrence and during the continuation of an Event of Default, in addition to having the right to accelerate the obligations hereunder pursuant to Section 5(a), the Lender may (in accordance with the terms of this Agreement) proceed directly and at once, without notice, against the Borrower to collect and recover the full amount, or any portion owing under this Agreement and otherwise avail itself of any other legal or equitable rights which the Lender may have at law or in equity or under this Agreement.  The remedies of the Lender as provided herein shall be distinct and cumulative, and may be pursued singly, successively or together, at the sole discretion of the Lender, and may be exercised as often as occasion therefor shall arise.  Failure to exercise any of the foregoing options upon the occurrence of an Event of Default shall not constitute a waiver of or the right to exercise the same or any other option at any subsequent time in respect to the same or any other Event of Default, and no single or partial exercise of any right or remedy shall preclude other or further exercise of the same or any other right or remedy.  The Lender shall have no duty to exercise any or all of the rights and remedies herein provided or contemplated.  The acceptance by the Lender of any payment hereunder that is less than payment in full of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the foregoing rights or remedies at that time, or nullify any prior exercise of any such rights or remedies without the express written consent of the Lender.  Notwithstanding any other provisions set forth herein, the Lender's sole recourse in regards to repayment of the obligations of the Borrower hereunder shall be to the Trust Assets and the Claim Proceeds.

6.     DEFINITIONS.

"Availability Period" means from the Effective Date to the earlier to occur of (i) the Maturity Date and (ii) the date on which the sum of (x) the aggregate principal amount of the Loans made hereunder and (y) the aggregate principal amount of the loans made under the Lender Claim Trust Loan Agreement equals the Maximum Loan Amount.

"Available Amount" means, at any measurement time, the Maximum Loan Amount minus the sum of (i) the aggregate principal amount of the Loans made hereunder and (ii) the aggregate principal amount of the loans made under the Lender Claim Trust Loan Agreement at such time.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Borrower" has the meaning given to such term in the Preamble.

"Business Day" means any day other than any Saturday, Sunday or other day on which banks in Los Angeles, California or New York, New York are required or authorized by law or regulation to close.

"Claim Proceeds" has the meaning given to such term in Section 1(b) hereof.

"Contractual Obligation" means, with respect to any Person, any provision of any securities issued by such Person or any indenture, mortgage, deed of trust, contract, undertaking, agreement, instrument or other document to which such Person is a party or by which it or any of its property is bound or is subject.

"Corporate Claim Trust Agreement" means the Millennium Corporate Claim Trust Agreement, dated as of December __, 2015, by and among (a) Millennium Health, LLC, on behalf of itself and the other Debtors, and the trustee party thereto for the Borrower.

3

"Corporate Claim Trust Assets" means any and all claims and causes of action (whether arising under chapter 5 of the Bankruptcy Code or otherwise) initially belonging to the Lender and the administrative agent under that certain Credit Agreement, dated as of April 16, 2014, among the Lender, the administrative agent and the lenders party thereto, the Borrower and certain of its affiliates, including Retained Claims and Non-Contributing MLH Shareholder Claims (each as defined in the Plan), other than claims and causes of action expressly released under the Plan, including without limitation, the claims subject to the bar order pursuant to Article X.J of the Plan and the injunction pursuant to Article X.K of the Plan.

"Corporate Claim Trust Beneficiaries" means Holders of Existing Credit Agreement Claims (as defined in the Plan) and/or their successors and assigns.

"Debtors" has the meaning given to such term in the Recitals.

"Formation Documents" means the trust agreement and the certificate of trust of the Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Governmental Authority" means, with respect to any Person, any nation or government, any State or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court.

"Insolvency Event" means with respect to any Person, (i) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any applicable Insolvency Law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days or (ii) the commencement by such Person of a voluntary case under any Insolvency Law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, (iii) the taking of action by such Person in furtherance of any of the actions described in clause (i) or (ii), or (iv) the failure by such Person generally to pay its debts as such debts become due.

"Insolvency Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, suspension of payments, marshaling of assets and liabilities or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Lender Claim Trust Agreement" means that certain Millennium Lender Claim Trust Agreement, dated as of December __, 2015, by and among Lender, the "Consenting Lenders" (as defined in the Plan) and the trustee party thereto for the Millennium Lender Claim Trust.

"Lender Claim Trust Loan Agreement" means that certain Loan Agreement, dated as of December __, 2015, by and between the Millennium Lender Claim Trust and the Lender.

"Loan" and "Loans" has the meaning given to such term in Section 1(a) hereof.

4

"Material Adverse Effect" means with respect to the Borrower and to any event or circumstance, a material adverse effect on (i) the business, condition (financial or otherwise), operations, performance, or properties of the Borrower, (ii) the validity, enforceability or collectability of this Agreement and (iii) the rights and remedies of the Lender under this Agreement.

"Maturity Date" means the date on which the Borrower has been dissolved in accordance with the Corporate Claim Trust Agreement.

"Maximum Loan Amount" has the meaning given to such term in the Recitals.

"Millennium Corporate Claim Trust" has the meaning given to such term in the Plan.

"Millennium Lender Claim Trust" has the meaning given to such term in the Plan.

"Non Loan Contribution" has the meaning given to such term in Section 1(a).

"Person" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, entity, joint venture, labor organization, unincorporated organization or governmental authority.

"Plan" means the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC et al. dated as of October 29, 2015.

"Trust Assets" means collectively, the Corporate Claim Trust Assets and the sum of $1,000,000 paid by the Lender to the Borrower pursuant to Article V.F of the Plan.

"Trust Purpose" means to (x) hold the Trust Assets until liquidation, (y) liquidate (and convert to cash) the Corporate Claim Trust Assets on behalf of, and for the benefit of, the Corporate Claim Trust Beneficiaries, including without limitation, by pursuing, litigating and/or settling any claims and/or causes of actions constituting Corporate Claim Trust Assets, or by assignment, disposition or otherwise, and (z) distribute the Claim Proceeds for the benefit of the Corporate Claim Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Borrower, as such purpose may be amended, supplemented and/or modified from time to time in accordance with the Corporate Claim Trust Agreement (for the avoidance of doubt, any change of the trust purpose in the Corporate Claim Trust Agreement shall have the immediate effect of revising this definition without the need for any further action by the parties hereto or any amendment to this Agreement).

"Trusts" means collectively, the Borrower and the Millennium Lender Claim Trust.

7. REPRESENTATIONS AND WARRANTIES OF THE BORROWER. The Borrower hereby represents and warrants to the Lender as of the date hereof as follows:

(a) it has been duly formed, and is validly existing pursuant to the Corporate Claim Trust Agreement with the power and authority to own or lease its properties and carry out the Trust Purpose;

(b) it (i) has all necessary power, authority and legal right to execute and deliver this Agreement and perform its obligations hereunder and (ii) has duly authorized the execution, delivery and performance of this Agreement;

5

(c)     the execution and delivery by it of this Agreement, and the performance by it of its obligations hereunder do not (i) conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Formation Documents or any Contractual Obligation of the Borrower except for such conflicts, breaches or defaults that would not reasonably be expected to cause a Material Adverse Effect or (ii) violate any laws applicable to it except for such violations that would not reasonably be expected to cause a Material Adverse Effect;

(d)     there is no litigation, proceeding or investigation pending or, to the best knowledge of the Borrower, threatened against the Borrower, before any Governmental Authority asserting the invalidity of this Agreement or (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement; and

(e)     all approvals, authorizations, consents, orders, licenses or other actions of any Person or of any Governmental Authority required for the due execution, delivery and performance by the Borrower of this Agreement have been obtained except to the extent that failure to obtain such approvals, authorizations, consents, orders, licenses or other actions would not reasonably be expected to cause a Material Adverse Effect.

8.     <u>COVENANTS OF THE BORROWER.</u>  From the date hereof until the Availability Period has ended and all outstanding Loans have been paid in full:

(a)     the Borrower will preserve and maintain its existence, rights, franchises and privileges in the State of Delaware;

(b)     the Borrower will not (nor has it taken any such action in the past):

(i)     amend, modify, waive or terminate any provision of its Formation Documents or fail to observe applicable trust formalities (if any), in each case to the extent that such amendment, modification, waiver, termination or failure would adversely affect the Lender in any material respect;

(ii)     use the proceeds of any Loan for any purpose other than (x) in furtherance of the Trust Purpose (which, for the avoidance of doubt, shall include, without limitation, the payment and/or reimbursement of the fees, costs and expenses incurred by the Borrower in connection therewith, including without limitation, the fees, costs and expenses of the professionals retained by the Borrower in furtherance of the Trust Purpose) and (y) in accordance with the Formation Documents;

(iii)     merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure other than, in the case of liquidation, transfer or disposal, in connection with converting the Corporate Claim Trust Assets to Claim Proceeds; and

(iv)     commingle its assets with the assets of any other Person other than the trustee of the Borrower.

(c)     the Borrower shall not distribute any Claim Proceeds (or any other amounts or Trust Assets) to the Corporate Claim Trust Beneficiaries before all outstanding Loans and other amounts outstanding hereunder have been paid in full in cash.

(d)    the Borrower shall not, and shall not permit the trustee of the Borrower to, create, incur, assume or suffer to exist any liens on any of the Trust Assets other than liens of the trustee of the Borrower and statutory liens, in each case, if applicable.

9.    Record Keeping. The Lender shall maintain a register  (the "Register"), in which it shall record (a) the principal amount of each Loan, (b) each amount received by the Lender from the Borrower on account of this Agreement and (c) the net amount outstanding after each Loan, repayment or prepayment.  The entries made in the Register shall be prima facie evidence of the existence and amounts of the obligations of the Borrower (subject to manifest effort), but in no event shall any failure of the Lender to maintain the Register, relieve the Borrower from any of its obligations.

10.    GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.

(a)    Governing Law.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to its conflict of law principles.

(b)    Jurisdiction; WAIVER OF JURY TRIAL.  Any lawsuit or other legal actions (in any case, a "Proceeding") arising out of or based upon this Agreement shall be brought and determined in the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof.  The parties agree that, after a Proceeding is before a court as specified in this Section 10(b) and during the pendency of such Proceeding before such court, all actions with respect to such Proceeding or any other Proceeding, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.  Each party waives, and agrees not to assert, as a defense in any Proceeding that it is not subject thereto or that such Proceeding may not be brought or is not maintainable in such court or that its property is exempt or immune from execution, that the Proceeding is brought in an inconvenient forum or that the venue of the Proceeding is improper.  Each party irrevocably consents to the service of any and all process in any such Proceeding by the delivery of such process to such party at the address and in the manner provided in Section 11(d).  EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING (INCLUDING ANY COUNTERCLAIM) ARISING OUT OF OR BASED UPON THIS AGREEMENT.  Each party agrees that a final judgment in any Proceeding described in this Section 10(b) after the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

11.    MISCELLANEOUS.

(a)    Assignments.  Lender shall not assign or transfer any of its right, title and/or interest in the Loans or this Agreement without the prior written consent of Borrower.

(b)    Headings.  All headings used herein are used for convenience only and shall not be used to construe or interpret this Agreement.  Except where otherwise indicated, all references herein to Sections refer to Sections hereof.

(c)    Modification; Waiver.  No provision of this Agreement may be amended, supplemented or otherwise modified except by a written agreement mutually executed by each of the parties hereto (except for assignments as permitted hereunder).  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof.  Any such waiver shall be validly and sufficiently authorized

7

for purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party.  Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

(d)    Notice Generally.  All notices, consents and other communications required or permitted by this Agreement shall be in writing and shall be (i) delivered to the appropriate address by hand, by nationally recognized overnight service or by courier service (costs prepaid), (ii) sent by facsimile or e-mail, or (iii) sent by registered or certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by written notice to the other party):

if to the Borrower, to:

_____
_____
_____
_____

with a copy to (which shall not constitute notice):

_____
_____
_____
_____

and if to the Lender, to:

16981 Via Tazon
San Diego, CA 92127
Attention: Martin Price, General Counsel

Telecopy: 858-217-8502
Telephone: 858-451-3535
E-mail: Martin.Price@millenniumhealth.com

with a copy to (which shall not constitute notice):

Steven Messina
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522

8

Telecopy: 917-777-3509
Telephone: 212-735-3509
E-mail: Steven.Messina@Skadden.com


with a copy to (which shall not constitute notice):

Andreas P. Andromalos
Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Telecopy: 617-289-0495
Telephone: 617-856-8229
E-mail: AAndromalos@brownrudnick.com


All notices, consents, waivers and other communications shall be deemed to have been duly given (as applicable):  if delivered by hand, when delivered by hand; if delivered by overnight service, when delivered by nationally recognized overnight service; if delivered by courier, when delivered by courier; if sent via registered or certified mail, five (5) Business Days after being deposited in the mail, postage prepaid; or if delivered by email or facsimile, when received by the recipient prior to 5:00 p.m. local time for the recipient (and if received by the recipient after 5:00 p.m. local time for the recipient, then delivery will be deemed duly given at 9:00 a.m. local time for the recipient on the subsequent Business Day, unless receipt is otherwise confirmed by the recipient by response email or facsimile prior thereto).

(e)    Severability.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held invalid, illegal or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid, illegal or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid, illegal or unenforceable, unless such a construction would be unreasonable.

(f)    Entire Agreement.  This Agreement supersedes all prior agreements, representations and warranties, whether written or oral, of the parties with respect to the subject matter contained herein and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to such subject matter.

[Execution Page Follows]

9

IN WITNESS WHEREOF, each of the parties have duly executed this Agreement as of the date first set forth above.

**BORROWER:**
MILLENNIUM CORPORATE CLAIM TRUST

By: _____
     Name:
     Title: Trustee

**LENDER:**
MILLENNIUM HEALTH, LLC

By: _____
     Name:
     Title:

[Signature Page – Loan Agreement (Millennium Corporate Claim Trust)]

62227060 v16-WorksiteUS-032658/0001

1930345.02-NYCSR07A - MSW

# EXHIBIT J

## LOAN AGREEMENT

LOAN AGREEMENT, dated as of ____, 2015, among the Millennium Lender Claim Trust (the "Borrower") and Millennium Health, LLC, a California limited liability company and each of its successors or assignees, in its capacity as lender (the "Lender") (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement").

WHEREAS, on November 10, 2015, Millennium Lab Holdings II, LLC, a Delaware limited liability company, RxAnte, LLC, a Delaware limited liability company and the Lender (collectively, the "Debtors"), each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware and commenced their chapter 11 cases, which are being jointly administered under Case No. 15-12284 (collectively, "Cases");

WHEREAS, on December __, 2015, the Bankruptcy Court entered its order confirming the Plan (hereinafter defined);

WHEREAS, the Plan provides for, among other things (x) the creation of the Borrower, (y) the contribution of the Trust Assets (hereinafter defined) to the Borrower pursuant to Article V.G of the Plan and (z) the liquidation (and conversion to cash) of the Lender Claim Trust Assets and the distribution of the proceeds therefrom to the Lender Claim Trust Beneficiaries (hereinafter defined);

WHEREAS, pursuant to the Plan, the Lender has agreed to make up to $7,000,000 of loans (the "Maximum Loan Amount") to fund the liquidation (and conversion to cash) of the Lender Claim Trust Assets by, among other means, pursuing, litigating and/or settling claims and/or causes of action constituting the Trust Assets, subject to the terms and conditions set forth herein;

The parties hereto hereby agree as follows:

1.      LOANS AND PAYMENT.

(a)      Loans.  The Borrower may borrow amounts under this Agreement in any amount requested by the Borrower (each such borrowing, a "Loan"; together with each other Loan, the "Loans") during the Availability Period; provided, that (i) the aggregate principal amount of all Loans made hereunder plus the aggregate principal amount of all loans made under the Corporate Claim Trust Loan Agreement shall not exceed the Maximum Loan Amount at any time, (ii) the proceeds of all Loans shall be used solely in furtherance of the Trust Purpose (including, but not limited to, for the avoidance of doubt, to fund and/or reimburse any of the fees, costs and expenses of the professionals retained by the Borrower in connection therewith), (iii) no borrowing request hereunder shall request Loans in an amount that would exceed the Available Amount at such time and (iv) if, after giving effect to the making of a Loan, the aggregate principal amount of Loans made under this Agreement (including such Loan requested) plus the aggregate principal amount of all loans made under the Corporate Claim Trust Loan Agreement, in each case, as of the date of such Loan, would exceed the Maximum Loan Amount, then the amount of the requested Loan shall be automatically reduced to the Available Amount at such time (for the avoidance of doubt, no Loans may be requested or funded until $13,000,000 has been contributed to the Trusts by the Lender pursuant to Article V.F and Article V.G of the Plan ("Non Loan Contribution") and the entire amount of the Non Loan Contribution has been used by the Trusts in furtherance of the Trust Purpose and/or the trust purpose under the Corporate Claim Trust Agreement, as applicable).  Loans borrowed hereunder and prepaid or repaid may not be reborrowed.

(b)      Payment.  The outstanding principal under this Agreement will be due and payable in full on the Maturity Date; provided, however, that the Borrower shall not be required to pay any amounts outstanding hereunder unless the Borrower has received proceeds from the Lender Claim Trust Assets, whether from settlement, litigation, settlement, judgment or otherwise ("Claim Proceeds").  All payments and prepayments of principal under this Agreement will be made at the address of the Lender set forth in Section 11(d) or at such other address as is provided by the Lender to the Borrower in writing.  Notwithstanding any other provisions set forth herein, the Lender's sole recourse in regards to repayment of the obligations of the Borrower hereunder shall be to the Trust Assets and the Claim Proceeds.

(c)      Prepayment.  The Borrower shall prepay any Loans then outstanding from any Claim Proceeds received by the Borrower promptly upon receipt thereof even if received prior to the Maturity Date, minus any fees, costs and expenses of the professional retained by the Borrower (and any other fees, costs or expenses incurred by the Borrower in connection with converting the Lender Claim Trust Assets to Claim Proceeds) outstanding at such time.  The Borrower may prepay the outstanding Loans in whole or in part at any time without premium or penalty.

2.      INTEREST.  Interest shall not accrue on the unpaid principal amount of the Loans.

3.      CONDITIONS PRECEDENT.  This Agreement shall become effective on and as of the date on which the following conditions precedent have been satisfied:

(a)      this Agreement shall have been duly executed and delivered by the Lender and the Borrower; and

(b)      each of the representations and warranties made by the Borrower shall be true and correct in all material respects.

4.      EFFECTIVE DATE.  Loans may only be requested and funded after this Agreement is effective and the Non Loan Contribution has been made to the Trusts by the Lender pursuant to Article V.F and Article V.G of the Plan and the entire amount of the Non Loan Contribution has been used by the Trusts in furtherance of the Trust Purpose and/or the trust purpose under the Corporate Claim Trust Agreement, as applicable (the date (after this Agreement is effective) on which the entire Non Loan Contribution has been so used by the Trusts, the "Effective Date").

5.      EVENTS OF DEFAULT & REMEDIES.

(a)      Events of Default. If any of the events specified in this Section 5 shall occur (herein individually referred to as an "Event of Default"), the Lender may, so long as such condition exists, declare the entire outstanding aggregate principal amount of the Loans immediately due and payable, by notice in writing to the Borrower:

(i)      the Borrower shall fail to perform any obligation under Sections 1(b), 1(c) or 8 under this Agreement, and such failure shall continue for a period of 60 days after the Lender gives the Borrower written notice thereof; or

(ii)      the occurrence of an Insolvency Event relating to the Borrower.

2

(b)     Remedies.  Upon the occurrence and during the continuation of an Event of Default, in addition to having the right to accelerate the obligations hereunder pursuant to Section 5(a), the Lender may (in accordance with the terms of this Agreement) proceed directly and at once, without notice, against the Borrower to collect and recover the full amount, or any portion owing under this Agreement and otherwise avail itself of any other legal or equitable rights which the Lender may have at law or in equity or under this Agreement.  The remedies of the Lender as provided herein shall be distinct and cumulative, and may be pursued singly, successively or together, at the sole discretion of the Lender, and may be exercised as often as occasion therefor shall arise.  Failure to exercise any of the foregoing options upon the occurrence of an Event of Default shall not constitute a waiver of or the right to exercise the same or any other option at any subsequent time in respect to the same or any other Event of Default, and no single or partial exercise of any right or remedy shall preclude other or further exercise of the same or any other right or remedy.  The Lender shall have no duty to exercise any or all of the rights and remedies herein provided or contemplated.  The acceptance by the Lender of any payment hereunder that is less than payment in full of all amounts due and payable at the time of such payment shall not constitute a waiver of the right to exercise any of the foregoing rights or remedies at that time, or nullify any prior exercise of any such rights or remedies without the express written consent of the Lender.  Notwithstanding any other provisions set forth herein, the Lender's sole recourse in regards to repayment of the obligations of the Borrower hereunder shall be to the Trust Assets and the Claim Proceeds.

6.      DEFINITIONS.

"Availability Period" means from the Effective Date to the earlier to occur of (i) the Maturity Date and (ii) the date on which the sum of (x) the aggregate principal amount of the Loans made hereunder and (y) the aggregate principal amount of the loans made under the Corporate Claim Trust Loan Agreement equals the Maximum Loan Amount.

"Available Amount" means, at any measurement time, the Maximum Loan Amount minus the sum of (i) the aggregate principal amount of the Loans made hereunder and (ii) the aggregate principal amount of the loans made under the Corporate Claim Trust Loan Agreement at such time.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"Borrower" has the meaning given to such term in the Preamble.

"Business Day" means any day other than any Saturday, Sunday or other day on which banks in Los Angeles, California or New York, New York are required or authorized by law or regulation to close.

"Claim Proceeds" has the meaning given to such term in Section 1(b) hereof.

"Contractual Obligation" means, with respect to any Person, any provision of any securities issued by such Person or any indenture, mortgage, deed of trust, contract, undertaking, agreement, instrument or other document to which such Person is a party or by which it or any of its property is bound or is subject.

"Corporate Claim Trust Agreement" means the Millennium Corporate Claim Trust Agreement, dated as of December __, 2015, by and among (a) Millennium Health, LLC, on behalf of itself and the other Debtors, and the trustee party thereto for the Millennium Corporate Claim Trust.

3

"Corporate Claim Trust Loan Agreement" means that certain Loan Agreement, dated as of December __, 2015, by and between the Millennium Corporate Claim Trust and the Lender.

"Debtors" has the meaning given to such term in the Recitals.

"Formation Documents" means the trust agreement and the certificate of trust of the Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Governmental Authority" means, with respect to any Person, any nation or government, any State or other political subdivision thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any court.

"Insolvency Event" means with respect to any Person, (i) the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of such Person or any substantial part of its property in an involuntary case under any applicable Insolvency Law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or ordering the winding-up or liquidation of such Person's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days or (ii) the commencement by such Person of a voluntary case under any Insolvency Law now or hereafter in effect, or the consent by such Person to the entry of an order for relief in an involuntary case under any such law, or the consent by such Person to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official for such Person or for any substantial part of its property, or the making by such Person of any general assignment for the benefit of creditors, (iii) the taking of action by such Person in furtherance of any of the actions described in clause (i) or (ii), or (iv) the failure by such Person generally to pay its debts as such debts become due.

"Insolvency Laws" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, arrangement, rearrangement, receivership, insolvency, reorganization, suspension of payments, marshaling of assets and liabilities or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"Lender Claim Trust Agreement" means that certain Millennium Lender Claim Trust Agreement, dated as of December __, 2015, by and among Lender, the "Consenting Lenders" (as defined in the Plan) and the trustee party thereto for the Borrower.

"Lender Claim Trust Assets" means the individual claims and causes of action initially belonging to the Consenting Lenders (as defined in the Plan) and any holder of an Existing Credit Agreement Claim (as defined in the Plan) that elected to contribute such holder's individual claims and causes of action against any Person or entity related to the Debtors, including Retained Claims and Non-Contributing MLH Shareholder Claims (each as defined in the Plan), other than claims and causes of action expressly released under the Plan and/or subject to the bar order and injunction provisions of the Plan.

"Lender Claim Trust Beneficiaries" means holders of Lender Claim Trust Beneficial Interests (as defined in the Plan) and/or their successors and assigns.

"Loan" and "Loans" has the meaning given to such term in Section 1(a) hereof.

"Material Adverse Effect" means with respect to the Borrower and to any event or circumstance, a material adverse effect on (i) the business, condition (financial or otherwise), operations,

performance, or properties of the Borrower, (ii) the validity, enforceability or collectability of this Agreement and (iii) the rights and remedies of the Lender under this Agreement.

"Maturity Date" means the date on which the Borrower has been dissolved in accordance with the Lender Claim Trust Agreement.

"Maximum Loan Amount" has the meaning given to such term in the Recitals.

"Millennium Corporate Claim Trust" has the meaning given to such term in the Plan.

"Millennium Lender Claim Trust" has the meaning given to such term in the Plan.

"Non Loan Contribution" has the meaning given to such term in Section 1(a).

"Person" means any individual, partnership, limited liability company, corporation, association, joint stock company, trust, entity, joint venture, labor organization, unincorporated organization or governmental authority.

"Plan" means the Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC et al. dated as of October 29, 2015.

"Trust Assets" means collectively, the Lender Claim Trust Assets and the sum of $2,000,000 paid by the Lender to the Borrower pursuant to Article V.G of the Plan.

"Trust Purpose" means to (x) hold the Trust Assets until liquidation, (y) liquidate (and convert to cash) the Lender Claim Trust Assets on behalf of, and for the benefit of, the Lender Claim Trust Beneficiaries, including without limitation, by pursuing, litigating and/or settling any claims and/or causes of actions constituting Lender Claim Trust Assets, or by assignment, disposition or otherwise, and (z) distribute the Claim Proceeds for the benefit of the Lender Claim Trust Beneficiaries, with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purposes of the Borrower, as such purpose may be amended, supplemented and/or modified from time to time in accordance with the Lender Claim Trust Agreement (for the avoidance of doubt, any change of the trust purpose in the Lender Claim Trust Agreement shall have the immediate effect of revising this definition without the need for any further action by the parties hereto or any amendment to this Agreement).

"Trusts" means collectively, the Millennium Corporate Claim Trust and the Borrower .

7.      REPRESENTATIONS AND WARRANTIES OF THE BORROWER.  The Borrower hereby represents and warrants to the Lender as of the date hereof as follows:

(a)      it has been duly formed, and is validly existing pursuant to the Lender Claim Trust Agreement with the power and authority to own or lease its properties and carry out the Trust Purpose;

(b)      it (i) has all necessary power, authority and legal right to execute and deliver this Agreement and perform its obligations hereunder and (ii) has duly authorized the execution, delivery and performance of this Agreement;

(c)      the execution and delivery by it of this Agreement, and the performance by it of its obligations hereunder do not (i) conflict with, result in any breach of any of the terms and

5

provisions of, or constitute (with or without notice or lapse of time or both) a default under, the Formation Documents or any Contractual Obligation of the Borrower except for such conflicts, breaches or defaults that would not reasonably be expected to cause a Material Adverse Effect or (ii) violate any laws applicable to it except for such violations that would not reasonably be expected to cause a Material Adverse Effect;

(d)     there is no litigation, proceeding or investigation pending or, to the best knowledge of the Borrower, threatened against the Borrower, before any Governmental Authority asserting the invalidity of this Agreement or (ii) seeking to prevent the consummation of any of the transactions contemplated by this Agreement; and

(e)     all approvals, authorizations, consents, orders, licenses or other actions of any Person or of any Governmental Authority required for the due execution, delivery and performance by the Borrower of this Agreement have been obtained except to the extent that failure to obtain such approvals, authorizations, consents, orders, licenses or other actions would not reasonably be expected to cause a Material Adverse Effect.

8.     <u>COVENANTS OF THE BORROWER.</u>  From the date hereof until the Availability Period has ended and all outstanding Loans have been paid in full:

(a)     the Borrower will preserve and maintain its existence, rights, franchises and privileges in the State of Delaware;

(b)     the Borrower will not (nor has it taken any such action in the past):

(i)     amend, modify, waive or terminate any provision of its Formation Documents or fail to observe applicable trust formalities (if any), in each case to the extent that such amendment, modification, waiver, termination or failure would adversely affect the Lender in any material respect;

(ii)     use the proceeds of any Loan for any purpose other than (x) in furtherance of the Trust Purpose (which, for the avoidance of doubt, shall include, without limitation, the payment and/or reimbursement of the fees, costs and expenses incurred by the Borrower in connection therewith, including without limitation, the fees, costs and expenses of the professionals retained by the Borrower in furtherance of the Trust Purpose) and (y) in accordance with the Formation Documents;

(iii)     merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure other than, in the case of liquidation, transfer or disposal, in connection with converting the Lender Claim Trust Assets to Claim Proceeds; and

(iv)     commingle its assets with the assets of any other Person other than the trustee of the Borrower.

(c)     the Borrower shall not distribute any Claim Proceeds (or any other amounts or Trust Assets) to the Lender Claim Trust Beneficiaries before all outstanding Loans and other amounts outstanding hereunder have been paid in full in cash.

6

(d)    the Borrower shall not, and shall not permit the trustee of the Borrower  to, create, incur, assume or suffer to exist any liens on any of the Trust Assets other than liens of the trustee of the Borrower and statutory liens, in each case, if applicable.

9.    <u>Record Keeping</u>. The Lender shall maintain a register  (the "<u>Register</u>"), in which it shall record (a) the principal amount of each Loan, (b) each amount received by the Lender from the Borrower on account of this Agreement and (c) the net amount outstanding after each Loan, repayment or prepayment.  The entries made in the Register shall be prima facie evidence of the existence and amounts of the obligations of the Borrower (subject to manifest effort), but in no event shall any failure of the Lender to maintain the Register, relieve the Borrower from any of its obligations.

10.    <u>GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL</u>.

(a)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to its conflict of law principles.

(b)    <u>Jurisdiction; WAIVER OF JURY TRIAL</u>.  Any lawsuit or other legal actions (in any case, a "<u>Proceeding</u>") arising out of or based upon this Agreement shall be brought and determined in the exclusive jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York, and appellate courts from any thereof.  The parties agree that, after a Proceeding is before a court as specified in this Section 10(b) and during the pendency of such Proceeding before such court, all actions with respect to such Proceeding or any other Proceeding, including any counterclaim, cross-claim or interpleader, shall be subject to the exclusive jurisdiction of such court.  Each party waives, and agrees not to assert, as a defense in any Proceeding that it is not subject thereto or that such Proceeding may not be brought or is not maintainable in such court or that its property is exempt or immune from execution, that the Proceeding is brought in an inconvenient forum or that the venue of the Proceeding is improper.  Each party irrevocably consents to the service of any and all process in any such Proceeding by the delivery of such process to such party at the address and in the manner provided in Section 11(d).  EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY PROCEEDING (INCLUDING ANY COUNTERCLAIM) ARISING OUT OF OR BASED UPON THIS AGREEMENT.  Each party agrees that a final judgment in any Proceeding described in this Section 10(b) after the expiration of any period permitted for appeal and subject to any stay during appeal shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

11.    <u>MISCELLANEOUS</u>.

(a)    <u>Assignments.</u>  Lender shall not assign or transfer any of its right, title and/or interest in the Loans or this Agreement without the prior written consent of Borrower.

(b)    <u>Headings</u>.  All headings used herein are used for convenience only and shall not be used to construe or interpret this Agreement.  Except where otherwise indicated, all references herein to Sections refer to Sections hereof.

(c)    <u>Modification; Waiver</u>.  No provision of this Agreement may be amended, supplemented or otherwise modified except by a written agreement mutually executed by each of the parties hereto (except for assignments as permitted hereunder).  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof.  Any such waver shall be validly and sufficiently authorized

7

for purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party.  Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  To the maximum extent permitted by applicable law, (a) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

(d)     Notice Generally.  All notices, consents and other communications required or permitted by this Agreement shall be in writing and shall be (i) delivered to the appropriate address by hand, by nationally recognized overnight service or by courier service (costs prepaid), (ii) sent by facsimile or e-mail, or (iii) sent by registered or certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a party may designate by written notice to the other party):

if to the Borrower, to:

_____
_____
_____
_____

with a copy to (which shall not constitute notice):

_____
_____
_____
_____

and if to the Lender, to:

16981 Via Tazon
San Diego, CA 92127
Attention: Martin Price, General Counsel

Telecopy: 858-217-8502
Telephone: 858-451-3535
E-mail: Martin.Price@millenniumhealth.com

with a copy to (which shall not constitute notice):

Steven Messina
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036-6522

8

Telecopy: 917-777-3509
Telephone: 212-735-3509
E-mail: Steven.Messina@Skadden.com

with a copy to (which shall not constitute notice):

Andreas P. Andromalos
Brown Rudnick LLP
One Financial Center
Boston, MA 02111
Telecopy: 617-289-0495
Telephone: 617-856-8229
E-mail: AAndromalos@brownrudnick.com

All notices, consents, waivers and other communications shall be deemed to have been duly given (as applicable):  if delivered by hand, when delivered by hand; if delivered by overnight service, when delivered by nationally recognized overnight service; if delivered by courier, when delivered by courier; if sent via registered or certified mail, five (5) Business Days after being deposited in the mail, postage prepaid; or if delivered by email or facsimile, when received by the recipient prior to 5:00 p.m. local time for the recipient (and if received by the recipient after 5:00 p.m. local time for the recipient, then delivery will be deemed duly given at 9:00 a.m. local time for the recipient on the subsequent Business Day, unless receipt is otherwise confirmed by the recipient by response email or facsimile prior thereto).

(e)    Severability.  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held invalid, illegal or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid, illegal or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid, illegal or unenforceable, unless such a construction would be unreasonable.

(f)    Entire Agreement.  This Agreement supersedes all prior agreements, representations and warranties, whether written or oral, of the parties with respect to the subject matter contained herein and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to such subject matter.

[Execution Page Follows]

9

IN WITNESS WHEREOF, each of the parties have duly executed this Agreement as of the date first set forth above.

**BORROWER:**
MILLENNIUM LENDER CLAIM TRUST

By: _____
    Name:
    Title: Trustee

**LENDER:**
MILLENNIUM HEALTH, LLC

By: _____
    Name:
    Title:

[Signature Page – Loan Agreement (Millennium Lender Claim Trust)]

62246949 v5-WorksiteUS-032658/0001

1930345.02-NYCSR07A - MSW

# EXHIBIT 75
# FILED UNDER SEAL

# EXHIBIT 76
# FILED UNDER SEAL

# EXHIBIT 77

| | |
|---|---|
| **From:** | Griswold, Ryan P [ryan.p.griswold@jpmorgan.com] |
| **Sent:** | Sunday, February 12, 2012 6:44 PM |
| **To:** | Howard Appel |
| **Cc:** | Mulloy, Jennifer; David Cohen; Chiarelli, Benjamin R; Guttilla, Michael T; Karanikolaidis, Stathis; Zabaloieff, Alexander J; Martin Price |
| **Subject:** | RE: Meeting |

Okay, thanks.

**Ryan P. Griswold** | Vice President | Syndicated & Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

**Alternate contact:** Lynitta Freeman-Moore | T: 212.270.9732 | lynitta.freeman-moore@jpmorgan.com

**From:** Howard Appel [mailto:Howard@milleniumlaboratories.com]
**Sent:** Sunday, February 12, 2012 5:59 PM
**To:** Griswold, Ryan P
**Cc:** Mulloy, Jennifer; David Cohen; Chiarelli, Benjamin R; Guttilla, Michael T; Karanikolaidis, Stathis; Zabaloieff, Alexander J; Martin Price
**Subject:** Re: Meeting

Mark is only person from cea. Martin price our GC will join us too.    Will pull in hogan Lovells later.

Howard Appel
Millennium Laboratories
(619) 742-1082

On Feb 12, 2012, at 1:21 PM, "Griswold, Ryan P" <ryan.p.griswold@jpmorgan.com> wrote:

> Okay, we will include them.
>
> **Ryan P. Griswold** | Vice President | Syndicated & Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com
>
> **Alternate contact:** Lynitta Freeman-Moore | T: 212.270.9732 | lynitta.freeman-moore@jpmorgan.com
>
> **From:** Mulloy, Jennifer [mailto:jmulloy@ta.com]
> **Sent:** Sunday, February 12, 2012 4:00 PM
> **To:** Griswold, Ryan P
> **Cc:** Howard Appel; David Cohen; Chiarelli, Benjamin R; Guttilla, Michael T; Karanikolaidis, Stathis; Zabaloieff, Alexander J
> **Subject:** Re: Meeting
>
> Let's invite SunTrust and GE. The point people are Pat Stevens at Suntrust and Pat Henahan and Michael Broderick at GE. Do you need their contact info?
>
> Jennifer M. Mulloy

1

**Exhibit
0184**
TA 30(b)(6)

MH00060793
ML_DE_00720405

TA Associates
(650) 473-2229
jmulloy@ta.com


On Feb 12, 2012, at 3:55 PM, "Griswold, Ryan P" <ryan.p.griswold@jpmorgan.com> wrote:

Team,
In advance of tomorrow, I have a couple quick questions:
-Do you want to include SunTrust and/or GE? If so, who are the proper contacts. We are fine w/ including them or catching them up later.
-Apologies if I missed this, but who is the proper contact at Hogan Lovells
-Is there anyone other than Mark Stepka that we should include from CEA?

We look forward to the conversation tomorrow. We will distribute organizational materials ahead of the call. Let us know if you need anything or have questions ahead of the call.

---

**Ryan P. Griswold** | Vice President | Syndicated & Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY  10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

**Alternate contact:** Lynitta Freeman-Moore | T: 212.270.9732 | lynitta.freeman-moore@jpmorgan.com

---

**From:** Howard Appel [mailto:Howard@milleniumlaboratories.com]
**Sent:** Friday, February 10, 2012 6:43 PM
**To:** Karanikolaidis, Stathis
**Cc:** Rapkin, Cory; jmulloy@ta.com; David Cohen; Mainelli, Matthew; LeeLum, Dawn; Chiarelli, Benjamin R; Griswold, Ryan P; Guttilla, Michael T
**Subject:** Re: Meeting

Can we do earlier.   I have an appt at 11 that I can't move.

Thank you


Howard Appel
Millennium Laboratories
(619) 742-1082

On Feb 10, 2012, at 3:24 PM, "Karanikolaidis, Stathis" <Stathis.Karanikolaidis@jpmorgan.com> wrote:

I echo Cory's comments. We greatly appreciate the opportunity and look forward to working with your team on this important transaction.

How about noon est on Mon? It probably makes sense to include counsel at this stage, since we will be discussing timing and deliverables.

2

CONFIDENTIAL
Confidential

MH00060794
ML_DE_00720406

We will put together an organizational book, which we will distribute prior to the call. Let us know if noon est works and we will distribute a calendar invite.

Regards,
Stathis


Stathis Karanikolaidis
Executive Director
Syndicated & Leveraged Finance
J.P. Morgan Securities Inc.
Office: 212-270-7374
Cell: 917-406-8907
Fax: 212-270-1063

---

**From**: Howard Appel [mailto:Howard@milleniumlaboratories.com]
**Sent**: Friday, February 10, 2012 06:19 PM
**To**: Rapkin, Cory
**Cc**: Karanikolaidis, Stathis; Mulloy, Jennifer <jmulloy@ta.com>; David Cohen <David@milleniumlaboratories.com>; Mainelli, Matthew; LeeLum, Dawn; Chiarelli, Benjamin R
**Subject**: Re: Meeting

Us too.   Look forward to Monday



Howard Appel
Millennium Laboratories
(619) 742-1082

On Feb 10, 2012, at 3:00 PM, "Rapkin, Cory" <Cory.Rapkin@jpmorgan.com> wrote:

> Howard – on behalf of my colleagues at JPM, I wanted to thank you for the opportunity to work with you and the team at Millennium. We see this transaction as an important first step in a relationship with you and Millennium, as well as a continuation of a long-term relationship with Jennifer and TA.
>
> As for the kick-off call - Monday morning will work for me, I will confirm with Stathis and the rest of our team.
>
> Thanks again for your support.
>
> Best regards,
>
> Cory

3

CONFIDENTIAL
Confidential

MH00060795
ML_DE_00720407

---

**Cory Rapkin** | Managing Director | Investment Banking |
Healthcare | **J.P. Morgan** | 383 Madison Avenue, 37th Floor,
New York, NY 10179 | T: 212 622 2331 | F: 917 456 3181 |
M: 917 902 0184 | cory.rapkin@jpmorgan.com |
jpmorgan.com

**Alternate contact:** Mildred Berkman | T: 212 622 4322 | F:
917 464 4174 | mildred.l.berkman@jpmorgan.com

---

**From:** Howard Appel
[mailto:Howard@milleniumlaboratories.com]
**Sent:** Friday, February 10, 2012 5:07 PM
**To:** Karanikolaidis, Stathis; Rapkin, Cory
**Cc:** Mulloy, Jennifer; David Cohen
**Subject:** Meeting

Stathis and Cory, we just hung up the phone w Jen and
she said she is calling you today to coordinate schedules
next week.  If possible can we kick off this process with
a call on Monday - preferably early – and from there we
can plan to meet soon after in San Diego.

Thank you for taking on this process, we look forward to
a long-term relationship with JPM.

Warmest Regards,



Howard Appel
President

16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534
Fax: 858-451-3636
howard@milleniumlaboratories.com



(Full Email Disclaimer –
http://www.millenniumlaboratories.com/emaildiscla
imer.html)

This email is confidential and subject to important
disclaimers and conditions including on offers for
the purchase or sale of securities, accuracy and
completeness of information, viruses,

4

CONFIDENTIAL
Confidential

MH00060796
ML_DE_00720408

confidentiality, legal privilege, and legal entity
disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.

This email is confidential and subject to important disclaimers and conditions
including on offers for the purchase or sale of securities, accuracy and
completeness of information, viruses, confidentiality, legal privilege, and legal
entity disclaimers, available at
http://www.jpmorgan.com/pages/disclosures/email.

This message is intended only for the designated recipient(s). It may contain
confidential or proprietary
information and may be subject to other confidentiality protections. If you
are not a designated recipient, you may
not review,copy or distribute this message. If you receive this in error,
please notify the sender by reply e-mail
and delete this message. Thank you.

This email is confidential and subject to important disclaimers and conditions including on offers for the
purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal
legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

CONFIDENTIAL
Confidential

MH00060797
ML_DE_00720409

# EXHIBIT 78
# FILED UNDER SEAL

# EXHIBIT 79

| | |
|---|---|
| **From:** | Martin Price <Martin.Price@millenniumlabs.com> |
| **To:** | Neuner, Lynn <lneuner@stblaw.com> |
| **CC:** | Martin Price <Martin.Price@millenniumlabs.com>;Sheehan, William B." <wsheehan@stblaw.com>;ryan.p.griswold@jpmorgan.com" <ryan.p.griswold@jpmorgan.com>;michael.t.guttilla@jpmorgan.com" <michael.t.guttilla@jpmorgan.com> |
| **Sent:** | 3/14/2014 2:54:03 AM |
| **Subject:** | Re: JPM - diligence |

Lynn,

Mike is not available at that time, but if there are questions I am not in position to answer, we can reach him later in the day. I may also invite Hogan to join. They continue to play a background role in the investigation and know the issues.

Speak to you in the morning.

Martin Price
General Counsel
(858) 451-3535

please excuse typos

Martin Price
General Counsel
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 217-8502
Martin.Price@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

On Mar 13, 2014, at 9:58 AM, "Neuner, Lynn" <lneuner@stblaw.com> wrote:

Martin: For tomorrow's call, we will have questions on both the Massachusetts inquiry and the civil docket, in case you want to invite Mike Loucks to join as well. Thanks and talk to you then, Lynn

**From:** Martin Price [mailto:Martin.Price@millenniumlabs.com]
**Sent:** Tuesday, March 11, 2014 11:57 PM
**To:** Neuner, Lynn; Sheehan, William B.
**Cc:** ryan.p.griswold@jpmorgan.com; michael.t.guttilla@jpmorgan.com
**Subject:** RE: JPM - diligence

Hi Lynn,

Let's do 9am on Friday am PST.

Thanks

Martin A. Price

**Exhibit
0127**

CONFIDENTIAL

General Counsel
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534
Fax: 858-451-3636
mprice@millenniumlaboratories.com

(Full Email Disclaimer – http://www.millenniumlaboratories.com/emaildisclaimer.html)


Martin Price
General Counsel
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 217-8502
Martin.Price@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)


---

**From:** Neuner, Lynn [mailto:lneuner@stblaw.com]
**Sent:** Tuesday, March 11, 2014 12:04 PM
**To:** Martin Price; Sheehan, William B.
**Cc:** ryan.p.griswold@jpmorgan.com; michael.t.guttilla@jpmorgan.com
**Subject:** RE: JPM - diligence

Thanks, Martin.  How about Friday morning?  I have conflicts the other times.  Let me know what works for you.
Thanks, Lynn

---

**From:** Martin Price [mailto:Martin.Price@millenniumlabs.com]
**Sent:** Monday, March 10, 2014 11:00 PM
**To:** Neuner, Lynn; Sheehan, William B.
**Cc:** ryan.p.griswold@jpmorgan.com; michael.t.guttilla@jpmorgan.com
**Subject:** RE: JPM - diligence

Hi Lynn,

I'm traveling Wednesday to the east coast so I would suggest we either do this tomorrow between 8:30-12pm or 2-4pm PDT, or sometime on Thursday morning EST – best for me would be at 11am EST (I could probably also do 10am EST).  Please let me know if any of those slots work for you.  If not, I'll try to devise alternatives.  Friday I'm back in San Diego and available most of the day.

Here is the list of the open cases.  I presume you can find what you're looking for on Pacer, but if there's a state court or other unsealed pleading you are having any difficulty finding, please let me know and we'll shoot it right over.  I do not think any of these cases are new since we spoke last February, with the possible exception of the affirmative state court case we've filed against Nelson.

Ameritox Ltd. v. Millennium, Civ. A. No. 3:13-cv-00832-WMC (US District Court, Western District of Wisconsin).  This patent infringement case was originally filed in the District of Maryland on June 23, 2011 (Case No. 1:2011-cv-01722-MJG).
Ameritox Ltd. v. Millennium, Civ. A. No. 8:11-cv-00775-SCB-TBM (US District Court, Middle District of Florida – Tampa Division
U.S. Ex Rel. Robert Cunningham v. Millennium Labs, Civ. A. No. 1:09-cv-12209-RWZ (U.S. District Court, District of Massachusetts).
*U.S. Attorneys' Office Investigation*
Joshua Hugo v. Millennium, Civ. A. No. 3:12-cv-00167-TAV-HBG (U.S. District Court, Western District of

Tennessee), 14-5132 (U.S. Court of Appeals for the Sixth Circuit).
Kelly Nelson v. Millennium et al., Civ. A. No. 2:12-cv-01301-SLG (U.S. District Court, District of Arizona).
Millennium v. Kelly Nelson, CV2013-006372 (Superior Court of Arizona, Maricopa County).
Jodie Strain v. Millennium, 12-02-02276 (District Court of Montgomery County, Texas 284th Judicial District).
Edward Zicari v. Millennium, DC-12-12598 (District Court M-298, Judicial District Dallas County, Texas).
NicSyd Enterprises, Inc. v. Millennium, A1-90463-27 (Judicate West Arbitration).

Martin A. Price
General Counsel
16981 Via Tazon
San Diego, CA 92127
Phone: 877-451-3534
Fax: 858-451-3636
mprice@millenniumlaboratories.com

(Full Email Disclaimer – http://www.millenniumlaboratories.com/emaildisclaimer.html)

Martin Price
General Counsel
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 217-8502
Martin.Price@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

**From:** Neuner, Lynn [mailto:lneuner@stblaw.com]
**Sent:** Monday, March 10, 2014 4:11 PM
**To:** Martin Price; Sheehan, William B.
**Cc:** ryan.p.griswold@jpmorgan.com; michael.t.guttilla@jpmorgan.com
**Subject:** RE: JPM - diligence

Martin: We wanted to schedule the follow-up call on the litigation diligence. Would Wednesday or Thursday afternoon (EST) work for you? Also, could you please send the list of cases with case numbers that you referenced? Thanks. Lynn

**From:** Martin Price [mailto:Martin.Price@millenniumlabs.com]
**Sent:** Tuesday, March 04, 2014 7:50 PM
**To:** Sheehan, William B.
**Cc:** Martin Price; ryan.p.griswold@jpmorgan.com; michael.t.guttilla@jpmorgan.com; Neuner, Lynn
**Subject:** Re: JPM - diligence

Sure. That works.

Martin Price
202.329.1010/858.451.3535
please excuse typos

Martin Price
General Counsel

                                     JPMC-MIL-CORP-00192014

Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 217-8502
Martin.Price@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)


On Mar 4, 2014, at 4:43 PM, "Sheehan, William B." <wsheehan@stblaw.com> wrote:

Martin,

How about 2:30 p.m. EST on Friday?

Thanks.

---

**From:** Martin Price [mailto:Martin.Price@millenniumlabs.com]
**Sent:** Tuesday, March 04, 2014 06:43 PM Eastern Standard Time
**To:** Sheehan, William B.; 'Griswold, Ryan P' <ryan.p.griswold@jpmorgan.com>
**Cc:** Guttilla, Michael T <michael.t.guttilla@jpmorgan.com>; Neuner, Lynn
**Subject:** RE: JPM - diligence

Bill/Lynn

We are open after 11am EST Friday, at your convenience. I will likely ask Mike Loucks of Skadden's Boston team to join for the discussion of the DOJ matter. Let me know what works on your end.

(in advance I'll send a list of open civil matters).

Martin


Martin Price
General Counsel
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 217-8502
Martin.Price@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Sheehan, William B. [mailto:wsheehan@stblaw.com]
**Sent:** Tuesday, March 04, 2014 3:20 PM
**To:** Martin Price; 'Griswold, Ryan P'
**Cc:** Guttilla, Michael T; Neuner, Lynn
**Subject:** RE: JPM - diligence

Sounds good to me. Martin, Lynn (copied) and I are available for a legal call on Friday or early next week, whatever works best for you. Thanks.

---

**From:** Martin Price [mailto:Martin.Price@millenniumlabs.com]
**Sent:** Tuesday, March 04, 2014 6:18 PM
**To:** 'Griswold, Ryan P'; Sheehan, William B.
**Cc:** Guttilla, Michael T
**Subject:** RE: JPM - diligence

Got it. Just let me know what you need on my end.

CONFIDENTIAL

JPMC-MIL-CORP-00192015

Martin Price
General Counsel
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 217-8502
Martin.Price@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

---

**From:** Griswold, Ryan P [mailto:ryan.p.griswold@jpmorgan.com]
**Sent:** Tuesday, March 04, 2014 3:16 PM
**To:** Martin Price; wsheehan@stblaw.com
**Cc:** Guttilla, Michael T
**Subject:** RE: JPM - diligence

I think it's best to do a follow up call on legal/litigation matters. We can cover at a high level Thursday but probably don't need to tie up mgmt going through.

Ryan P. Griswold | Vice President | Leveraged Finance | J.P. Morgan | 383 Madison Avenue, 27th Floor, New York, NY 10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

Alternate contact: Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

-----Original Message-----
**From:** Martin Price [Martin.Price@millenniumlabs.com]
**Sent:** Tuesday, March 04, 2014 06:05 PM Eastern Standard Time
**To:** wsheehan@stblaw.com
**Cc:** Griswold, Ryan P; Guttilla, Michael T
**Subject:** RE: JPM - diligence

Bill,

In advance of Thursday's diligence call, I noted several items related to pending litigation and the HIPAA subpoenas. Would your team prefer that we handle that discussion separately with Lynn (or someone else) or collectively with the group – or some hybrid of the two? If the former, I'd be glad to reach out to Lynn directly to coordinate.

Thanks.

Martin

Martin Price
General Counsel
Millennium Laboratories
Office: (858) 451-3535
Fax: (858) 217-8502
Martin.Price@millenniumlabs.com
(Full Email Disclaimer - http://millenniumlabs.com/emaildisclaimer/)

CONFIDENTIAL

JPMC-MIL-CORP-00192016

This email is confidential and subject to important disclaimers and conditions including on offers for the purchase or sale of securities, accuracy and completeness of information, viruses, confidentiality, legal privilege, and legal entity disclaimers, available at http://www.jpmorgan.com/pages/disclosures/email.

CONFIDENTIAL

JPMC-MIL-CORP-00192017

# EXHIBIT 80
# FILED UNDER SEAL

# EXHIBIT 81

Message

| | |
|---|---|
| **From**: | Matt Simmons [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MATT SIMMONS] |
| **Sent**: | 1/20/2014 6:40:01 PM |
| **To**: | Brock Hardaway [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Brock Hardaway9d9]; Howard Appel [/O=MILLENNIUM LABORATORIES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Howard Appelbdc13407] |
| **Subject**: | Noridian LCD |
| **Attachments**: | NoridianLCD.Drugs of Abuse Testing.pdf |

Lastly, here's the Noridian draft LCD.

As mentioned, with the exception of five new citations, it is identical to Palmetto's.

Matt Simmons
Director of Government Affairs
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534
Fax: 858-451-3636
msimmons@millenniumlabs.com



(Full Email Disclaimer – http://millenniumlabs.com/emaildisclaimer/)

Confidential

# Drugs of Abuse Testing

## Noridian Healthcare Solutions, LLC



Please note: **This is a Draft policy.**
Proposed/Draft LCDs are works in progress that are available on the Medicare Coverage Database site for public review. Proposed/Draft LCDs are not necessarily a reflection of the current policies or practices of the contractor.

## Contractor Information

| **Contractor Name** | ↑ | Noridian Healthcare Solutions, LLC |
|---|---|---|
| **Contract Number** | ↑ | 01112 |
| **Contract Type** | ↑ | MAC - Part B |
| **Associated Contract Numbers** | ↑ | (MAC - Part B - 01182) Noridian Healthcare Solutions, LLC, (MAC - Part B - 01212) Noridian Healthcare Solutions, LLC, (MAC - Part B - 01312) Noridian Healthcare Solutions, LLC |

## Proposed/Draft LCD Information

1

Confidential

ML_DE_00035508

## Contractor Information

Draft

| | | |
|---|---|---|
| **Source LCD ID** | ↑ | N/A |
| **Proposed LCD ID** | ↑ | DL34692 |
| **Proposed LCD Version Number** | ↑ | 2 |
| **Proposed LCD Title** | ↑ | Drugs of Abuse Testing |
| **AMA CPT / ADA CDT Copyright Statement** | ↑ | CPT only copyright 2002-2013 American Medical Association. All rights reserved. CPT is a registered trademark of the American Medical Association. Applicable FARS/DFARS Apply to Government Use. Fee schedules, relative value units, conversion factors and/or related components are not assigned by the AMA, are not part of CPT, and the AMA is not recommending their use. The AMA does not directly or indirectly practice medicine or dispense medical services. The AMA assumes no liability for data contained or not contained herein. The Code on Dental Procedures and Nomenclature (Code) is published in Current Dental Terminology (CDT). Copyright (c) American Dental Association. All rights reserved. CDT and CDT-2010 are trademarks of the American Dental Association. |
| **CMS National Coverage Policy** | ↑ | Title XVIII of the Social Security Act, §1862(a)(1)(A). Allows coverage and payment for only those services that are considered to be reasonable and necessary.<br><br>Title XVIII of the Social Security Act, §1833(e). Prohibits Medicare payment for any claim which lacks the necessary information to process the claim.<br><br>42 CFR 410.32(a). Order diagnostic tests.<br><br>42 CFR 411.15(k)(1). Particular Services excluded from coverage.<br><br>CMS On-Line Manual, Publication 100-02, Medicare Benefit Policy Manual,Chapter 15, §§80.0, 80.1.1, 80.2. Clinical Laboratory services. |
| **Jurisdiction** | ↑ | |

## Coverage Guidance

2

Confidential

| **Contractor Information** | | |
|---|---|---|
| **Coverage Indications, Limitations and/or Medical Necessity** |  | This policy provides an overview of distinctions between qualitative, confirmation and quantitative drugs of abuse testing, and clearly indicates that coverage is dependent on proper documentation of clinical decision-making and test orders that are tailored to the individual patient's medical needs. This policy addresses drugs of abuse testing for Medicare patients. It does not address neonatal testing for suspected prenatal drug exposure.<br><br>Drugs of Abuse testing may be useful in the clinical setting because it may provide objective information to assist the provider in diagnosing and making treatment decisions. Clinicians use qualitative and quantitative drugs of abuse testing to look for the presence (or absence) of drugs in the body. In general, drug testing can be helpful in the medical disciplines of emergency medical care for drug-drug interactions and, to some degree, drug overdose, the treatment of neonates, addiction medicine and the medical management of patients using chronic opioid therapy (COT). However, the nature of drugs of abuse testing for each of these groups is somewhat different because treatment goals and timelines generally vary.<br><br>By way of definition and as used in this document, the following terminology relates to the basic forms of drugs of abuse testing: |

| Term | General Purpose in Clinical Drugs of Abuse Testing |
|---|---|
| Qualitative Drug Testing | Generally used to determine the presence or absence of drug or drug metabolite in the sample. The test result is expressed in non-numerical terms, with a negative or positive result. |
| Quantitative Drug Testing | Generally used when it is medically necessary to determine the specific quantity of drug or drug metabolite present in the sample. The test result is expressed in numerical terms. |
| Confirmation Testing | Generally used to evaluate initial qualitative screening results to minimize the potential of a clinician relying on a false negative or positive result. Confirmation testing is often recommended when initial screening involves a CLIA-waived or moderate immunoassay screening, but is not medically necessary in all patient cases. A confirmation test order must be medically necessary and reasonable and patient self-report may, in some cases, reduce the need for confirmation of screen results.<br><br>Confirmation tests may be expressed in qualitative (CPT 80102) or quantitative (codes within the Therapeutic or Chemistry sections of the CPT) values. |

3

ML_DE_00035510

## Contractor Information

The use of qualitative versus quantitative confirmation testing depends upon the individual patient's case and medical necessity therefore.

More detailed information about medical necessity for test orders, indications and exclusions is set forth below:

**Specific Test Methods**

Clinical laboratories of all types use a variety of test methods to perform qualitative drug analysis, including enzyme immunoassays (EIA and IA), thin-layer chromatography, and spectrometry. In-office and onsite testing generally involves chemical "spot" tests, including dipstick, cassettes and cup methods (generally classified as CLIA-waived), and bench-top chemistry analyzers (classified under CLIA as moderately complex). In either case, EIA and IA drug screening are limited in several ways because:

- they generally screen for drug classes rather than specific drugs;

- they cannot provide information on many specialty drugs; and

- these methods may produce false positives and cross-react with other drug analytes.

These drug screen methods are also unable to identify specific drugs within many drug classes, including the amphetamines, barbiturates, benzodiazepines, and opiate/opioids. Due to these limitations, confirmatory testing with a more specific method such as GC-MS, LC-MS/MS may be medically necessary and reasonable within the confines of the clinical criteria and coverage indications set forth below. However, confirmatory testing should ONLY be ordered and performed on a patient/drug specific basis, within the parameters outlined in this policy, and documented in the patient record.

Confirmatory tests either verify or refute the result of the screening assay. With recent improvements in technology, some laboratories may bypass screening tests and submit all specimens for analysis by

4

Confidential

| Contractor Information | | |
|---|---|---|
| | | what have traditionally been referred to as confirmatory test methods, such as gas or liquid chromatography, mass spectrometry. Confirmatory tests use a more specific, and usually more sensitive, method than do screening tests and are usually performed in an independent laboratory.<br><br>Confirmatory tests usually:<br><br>• Provide quantitative concentrations (e.g., ng/mL) of specific substances or their metabolites in the specimen;<br><br>• Have high specificity and sensitivity;<br><br>• Require a trained technician to perform the test and interpret the results;<br><br>• Can identify specific drugs within drug classes<br><br>In clinical situations, confirmation is not always necessary and should be based on provider choice to allow for the proper evaluation of medical necessity. Clinical correlation is appropriate. For example, if the patient or a family member affirms that drug use occurred, a confirmation drug test is not usually needed.<br><br>The terms "drug screening" and "drug testing" are somewhat misleading because they may be interpreted that all drugs will be identified by ordered test panels. In reality, the drug or drug metabolites detected by a test depend on the testing method and the device or test method cutoff concentrations. In the clinical care of patients, the need for testing each drug ordered must be documented and the connection between the test order and clinical decision-making following test results must be reasonable and medically necessary to the ongoing care of the patient.<br><br>**Drug Test Panels**<br><br>A drug test panel is a list (or menu) of drugs or drug classes that can be tested for in a specimen. These can be ordered to identify drugs of abuse or in pain management. No single drug panel is suitable for all clinical uses, and test options should be adapted to clinical needs |

5

ML_DE_00035512

# EXHIBIT 82

| | |
|---|---|
| **From:** | Griswold, Ryan P <ryan.p.griswold@jpmorgan.com> |
| **To:** | Karanikolaidis, Stathis <Stathis.Karanikolaidis@jpmorgan.com> |
| **Sent:** | 3/27/2014 9:55:05 PM |
| **Subject:** | FW: Risk schedule |
| **Attachments:** | Risk insert MAP draft.docx |

**Ryan P. Griswold** | Vice President | Leveraged Finance | **J.P. Morgan** | 383 Madison Avenue, 27th Floor, New York, NY  10179 | T: 212.270.3524 | C: 512.913.7091 | F: 347.368.2211 | ryan.p.griswold@jpmorgan.com | jpmorgan.com

**Alternate contact:** Sarina Lightbourne | T: 212.270.9792 | sarina.lightbourne@jpmorgan.com

**From:** Chiarelli, Benjamin R
**Sent:** Thursday, March 27, 2014 5:52 PM
**To:** Daniel Pencak; Liou, Calvin O; Yeh, Hank
**Cc:** Griswold, Ryan P
**Subject:** RE: Risk schedule

Danny

We should probably discuss (assuming Ryan agrees) – this is not an SEC document and it really is not customary to have "risk factors" in the CIM.  I really do not want to include this.

Best,
Ben

**Benjamin R. Chiarelli** | Vice President | Healthcare Investment Banking | **J.P. Morgan**
383 Madison Avenue, 37th floor | New York, New York 10179
T: 212.622.7229 | F: 646.224.5595 | benjamin.r.chiarelli@jpmorgan.com

**Alternate contact:** Jean Meehan | Executive Assistant | T: 212.622.2168 | jean.a.meehan@jpmorgan.com

**From:** Daniel Pencak [mailto:Daniel.Pencak@millenniumlabs.com]
**Sent:** Thursday, March 27, 2014 5:47 PM
**To:** Liou, Calvin O; Yeh, Hank
**Cc:** Chiarelli, Benjamin R
**Subject:** Risk schedule

Ben – Our legal team would like to add the attached to the CIM….please add after Reimbursement and before Regulatory.

Daniel Pencak, CPA, CGMA
Vice President – Financial Planning & Analysis
16981 Via Tazon
San Diego, CA  92127
Phone: 877-451-3534 ext 1234
Cell: 317-402-9606
Fax:  858-451-3636
dpencak@millenniumlabs.com

**Exhibit 293**

JPMC-MIL-CORP-00045573

**Highlighted Risk Factors**

Millennium operates in a heavily regulated environment associated with certain risks which may or may not be particularized to the Company, including:

▥ **Reimbursement & Coverage.**  Government payers, such as Medicare and Medicaid, as well as insurers, including MCOs, have increased their efforts to control the cost, utilization and delivery of health care services. From time to time, Congress has considered and implemented changes in the Medicare fee schedules in conjunction with budgetary legislation. Further reductions of reimbursement for Medicare and Medicaid services or changes in policy regarding coverage of tests or other requirements for payment may be implemented from time to time. Such changes in federal, state, local and third-party payer regulations or policies may have a material adverse impact on the Company's business.  The Company is also subject to extensive government regulation at the federal, state and local levels. While the Company believes that it meets all statutory and regulatory requirements, there is a risk that government authorities might take a contrary position. Such occurrences, regardless of their outcome, could damage the Company's reputation and adversely affect important business relationships it has with third parties.

▥ **Laboratory Licensing.**  The clinical laboratory testing industry is subject to extensive regulation, and many of these statutes and regulations have not been interpreted by the courts. CLIA extends federal oversight to virtually all clinical laboratories by requiring that they be certified by the federal government or by a federally-approved accreditation agency. The sanction for failure to comply with CLIA requirements may be suspension, revocation or limitation of a laboratory's CLIA certificate, which is necessary to conduct business. In addition, the Company is subject to regulation under state law. State laws may require that laboratories and/or laboratory personnel meet certain qualifications, specify certain quality controls or require maintenance of certain records. Presently, in addition to all necessary licenses, the Company's lab is certified by the College of American Pathologist (CAP), recognized as gold-standard accrediting organization.

▥ **HIPAA and HITECH.** The HIPAA privacy and security regulations, including the expanded requirements under HITECH, establish comprehensive federal standards with respect to the use and disclosure of protected health information by health plans, healthcare providers and healthcare clearinghouses, in addition to setting standards to protect the confidentiality, integrity and security of protected health information. The Company has implemented policies and procedures related to compliance with the HIPAA privacy and security regulations, as required by law. The privacy and security regulations establish a "floor" and do not supersede state laws that are more stringent. Therefore, the Company is required to comply with both federal privacy and security regulations and varying state privacy and security laws. HIPAA, as amended by HITECH, provides for significant fines and other penalties for wrongful use or disclosure of protected health information in violation of the privacy and security regulations, including potential civil and criminal fines and penalties.

▥ **Competition.**  The clinical laboratory business is intensely competitive both in terms of price and service. The Company may also face increased competition from companies that do not comply with existing laws or regulations or otherwise disregard compliance standards in the industry. Additionally, the Company may also face changes in fee schedules, competitive bidding for laboratory services or other actions or pressures reducing payment schedules as a result of increased or additional competition.

▥ **Litigation and Investigations.**  The Company may become subject in the ordinary course of business to material legal action related to, among other things, commercial disputes, professional liability and employee-related matters, as well as inquiries and requests for information from governmental agencies and bodies and Medicare or Medicaid carriers requesting comment and/or information on allegations of billing irregularities or billing and pricing arrangements that are brought to their attention through billing audits or third parties. Legal actions could result in substantial monetary damages as

JPMC-MIL-CORP-00045574

well as damage to the Company's reputation with customers, which could have a material adverse effect upon its business.

CONFIDENTIAL

JPMC-MIL-CORP-00045575

# EXHIBIT 83

**To:**        Skolnik, Brett[Brett.Skolnik@bmo.com]; Glover, Tom[tom.glover@bmo.com]; Morse, Kristen[Kristen.Morse@bmo.com]
**Cc:**        Milewski, Tomasz[Tomasz.Milewski@bmo.com]
**From:**      Ho, Phillip
**Sent:**      2012-11-30T11:39:51-05:00
**Importance:**        Normal
**Subject:**   Millennium Labs / DOJ
**Received:**          2012-11-30T11:39:51-05:00

Spoke with Howard after the earnings call.

Here's his take on the DOJ investigation:

- Subpoena (received 3/27) from U.S. Attorney in Boston doesn't specify what she's investigating but asks for a broad set of information for 2008 - 2011 and part of 2012.  Info requested includes billing, requisitions, marketing materials, training, sales conference materials, competitor information, employment files, legal opinions, etc.  No information regarding their physician clients was requested.  Clearly looking at the company's sales practices.
- Timeline is up to the U.S. Attorney.  Millennium is cooperating and providing information when requested and can only wait for the DOJ.  Could take 1 – 2 years to resolve.
- They believe, but aren't sure, the investigation is a likely qui tam (whistle blower) matter involving 2 former sales people who worked together in Texas – 1 was a sales manager and the other a sales rep who became the sales manager's girlfriend after they had worked together.  Howard says they were both terminated for cause some time ago.
- His law firm tells him the 3 possible outcomes are:
  - case is dropped;
  - systemic abuse is found and severe penalties and fines result (If qui tam, could be treble damages);
  - company found to have breached a few healthcare regulations and has to pay a modest fine and penalty.
- Most likely scenario is the modest penalty/fine one.
- The Company doesn't believe the systemic scenario will occur because they've spent over a $1MM over the past couple of years to ensure their sales practices are appropriate and had compliance programs put in place by Hogan Lovells (one of the leading D.C. law firms on healthcare).  Martin Price, their GC, came from Hogan.
- On the medical necessity question, Howard says that's not plausible because ML doesn't order the drug tests, the docs do.  ML actually has docs sign a letter where they agree to not order tests unless medically necessary.  Obviously there's a real judgment call by the doc on what's medical necessary.
- I pointed out that to my knowledge there's no financial incentive for docs to over order drug or urine tests.  He said a Quest or a Millennium doesn't make payments to docs but ML believes some of their competitors  do.
- On the grand jury investigation, their law firm's view is that is the only means the federal government has to compel people to testify so they aren't surprised that's the route the investigation has taken.
- As part of discovery in the lawsuits involving Aegis, Howard noted they had discovered evidence that the former sales manager had provided the Company's customer list and other internal information to at least Aegis.
- Also, note that the US Attorney is looking into possible abuses of Medicare and Medicaid,

Exhibit 339

which were ~50% of revenues earlier this year but possibly less now.

Having gone through a similar situation very recently with another client, the company's views on timeline and likely outcome here are very consistent with what I heard from my other client's legal counsel.

**Phillip Ho**
Director | I&CB US | LPG Diversified
*Please note new address and phone number below:*
3 Times Square | 29th Floor | New York, NY  10036
T: 212.702.1194 | F: 212.702.1961 | C: 917.743.4508
phillip.ho@bmo.com



BMO Capital Markets
Your ambition achieved.

CONFIDENTIAL

BMO-ML-00044850

# EXHIBIT 84

Page 1

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

------------------------------------------------x

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                              Debtors.

MARC S. KIRSCHNER solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                              Plaintiff,

 -against-

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                              Defendants.

Case No. 15-12284 (LSS)

------------------------------------------------ x

                         April 12, 2021

                         9:02 a.m.


     VIDEO-RECORDED DEPOSITION of MARTIN PRICE,

taken pursuant to Notice, held virtually via

Zoom, before Fran Insley, a Notary Public of

the States of New York and New Jersey.

Price

the DOJ subpoena."

(Whereupon Plaintiff's Exhibit 1 was
marked for identification.)

Q.    My first question is, you're familiar that Ms. Neuner was an attorney at Simpson Thacher for JPMorgan; is that correct?

A.    I recall that, yes.  Do these exhibits correspond to what's in this binder in front of me?  'Cause it's going to be much easier for me to look at the hard copy than try to make it out what's on the screen.

Q.    I'm going to try to make them correspond as much as possible, so yes.  Let's start with tab 1, which is marked as Exhibit 1, and if you just flip the page, the Bates number ends in 752, there's an e-mail dated March 27, 2012 from Ms. Neuner to you and to some others, and that's where I started us out.

A.    Got it.  Thank you.

Q.    The subject line is "Project Mantis," M-A-N-T-I-S.  Do you see that?

A.    I do.

Q.    And do you recall that that corresponded with a loan that JPMorgan was

Price

leading for Millennium in and around 2012 of about $300 million?

A.    I don't recall that specifically, but that sounds right.

Q.    Do you have any recollection about the fact that between the time of the commitment and time of the loan closure Millennium received a subpoena from the Department of Justice?

A.    I don't have a specific recollection of the exact timetable.  I do recall receiving a HIPAA subpoena from the Department of Justice around the time of the closing of the debt instrument.

Q.    And you informed JPMorgan and the other bank lenders as soon as you received the subpoena, correct?

A.    Again, I don't remember the specific timing.  I'm sure we notified them promptly.

Q.    And this exhibit indicates that you spoke with them the same day; does it not?

MR. WERNER:  Objection.

A.    I don't know what day the subpoena arrived, so I can't answer that, Lyndon.

Page 52

Price

Q.    All I was asking you is do you recall the episode where it was brought to your attention that CodeMap during the course of its audit disagreed with the October 2010 letter of Hogan?

MR. WERNER:  Object to form.

MS. CASSADY:  Object to form.

A.    I recall generally what I just described to you.  Specifically I don't recall this e-mail exchange from January 2011.

Q.    Why don't you go to pages 28 and 29 of the attachment, which are Bates numbers ending in 2013 and 2014.

A.    Okay.

Q.    You'll see there is a section called, "Provision of Point of Care Testing Supplies"?

A.    I see that.

Q.    And there's a lot of what I'll call redlining?

A.    Yes.

Q.    And if you go to the cover e-mail to the document, those reflect Mr. Appel's edits to the CodeMap report, correct?

Price

MR. WERNER:   Object to the form.

A.      That's what it says, yes.

Q.      And does this refresh your recollection that the Root report disagreed with the Hogan advice in the letter that's exhibited to the report?

A.      No.

MS. CASSADY:   Object to form.

Q.      If you would go to page 41 of the document which is ending in 2026 Bates number.

A.      Okay.

Q.      And you read in the recommendation section, the original recommendation of the Roots was to "cease providing the cups."  Do you see that?  That's stricken?

A.      I -- well, I see that it's stricken in this version, yes.

Q.      And Mr. Appel put in an insert of "reconsider"?  Do you see that?

MS. CASSADY:   Object to the form.

A.      I see what's in the document here, yes.

Q.      And is it your understanding from the way redlining works, that that's an

**Page 54**

Price insertion?

A.    Yes.

Q.    And if you look across there is a ranking of the issues, although this one appears at the bottom of the box.  Do you see that?

A.    I see that, yes.

Q.    And the Roots ranked this as number one, correct?

MR. WERNER:  Object to the form.

A.    Yes.

Q.    If you go just above the recommendation box, it says, "A ranking of 1 indicates that we strongly encourage Millennium to implement the recommendation, and that failure to do so will result in an unreasonable risk of civil, criminal, or administrative law liability or adversely affect the effectiveness of Millennium's compliance program."  Do you see that?

A.    I see that, yes.

Q.    And the decision was made to terminate this -- instead of implement to terminate this recommendation -- to terminate

Price CodeMap, correct?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to the form.

A.    No, I believe we continued to work with CodeMap.

Q.    As an auditor, as a compliance auditor.

MS. CASSADY:  Object to the form.

A.    Sitting here today, I can't recall specifically what the function is that they were retained to do.  I know they did not perform our annual compliance audit after a certain point.  The timing around that I just can't recall that now.

Q.    Do you have any basis to disagree with the top of the document which says, "Draft Annual Compliance Audit Report," that that was their engagement at the time?

MR. WERNER:  Object to the form.

A.    I just don't know.  I didn't engage them.  I don't know what it was.

Q.    Was this the first time that you had heard of the Roots' disagreement with Hogan's advice on the cups?

Price

MS. CASSADY:  Object to the form.

A.    I don't recall.

MR. TRETTER:  If the concierge would mark the next exhibit as 5B.  It's just a series of e-mails.

(Whereupon Plaintiff's Exhibit 5B was marked for identification.)

THE CONCIERGE:  What is the Bates number?

MR. TRETTER:  It ends in 165 to 166.

Q.    These look to be a series of e-mails in January of 2011 regarding this draft Root report.  And if you look at on the first page, four e-mails down, the one from Helen Trilling to Howard Appel and you and Ron Wisor, she says in the second line, "One question is why Root would be addressing issues on which we have opined at all."  Do you see that?

A.    I do.

Q.    Did Mr. Appel ever tell you that in fact the Roots had written their opinion first and that he had solicited Hogan's October 2010 letter after the Roots?

MR. WERNER:  Object to the form.

Page 57

Price

MS. CASSADY: Object to the form.

A. I don't recall that one way or another.

Q. Did you ever learn that yourself once you became general counsel of Millennium?

MR. WERNER: Object to the form.

A. I don't recall that one way or another, no.

Q. At the top of that exhibit you write, "OK," and this is just to your then partners, Ms. Trilling and Mr. Wisor. It looks like Mr. Appel had been dropped from the chain. You say, "I know Howard is anxious on this." You knew he was anxious because they intended to go forward with the cups notwithstanding this conflict of advice, correct?

MR. WERNER: Object to the form.

MS. CASSADY: Object to the form.

A. I know Howard is very conservative by nature and wanted to resolve what was a -- well, I don't want to speculate here. I don't recall specifically other than general comments I could make about Howard's overall approach towards compliance and the regard in which he

Page 58

Price

held Howard -- Ron and Helen's opinions.

Q.    Do you recall that you and Millennium were concerned that the Root document as well as -- sorry, the Root document, the draft would be discoverable by the Department of Justice because it was part of a business compliance audit rather than something that was covered by privilege?

MS. CASSADY:   Object to the form.

MR. WERNER:   Object to the form.

A.    Sitting here today, I don't recall that specifically, no.

Q.    Do you recall that Hogan advised Mr. Appel against having the Roots complete the audit?

A.    That sounds generally right.  I don't recall that specifically, but generally that sounds right.

Q.    Maybe the next exhibit will refresh your recollection.

MR. TRETTER:   If we could go to tab 6.  Let's wait for the concierge.

(Whereupon Plaintiff's Exhibit 6 was marked for identification.)

**Page 59**

Price

Q.    We have now Plaintiff's Exhibit 6, which is a series of e-mails also in January of 2011.  These appear to be between Mr. Appel and somebody named Andrew Hefty on behalf of Millennium and you and others at Hogan.  Who was Andrew Hefty?

A.    Andrew Hefty was the general counsel at Millennium at one point.

Q.    The domain we see for his e-mail is something called, in one word, "becausepainmatters.com."  What was because pain matters?

A.    That was the e-mail handle for Millennium probably until 2011, and some people continued to use it when I left.

Q.    Does this document refresh your recollection that you and others at Hogan advised Millennium to instruct CodeMap not to complete the audit?

A.    I don't see that specifically in here.  If you can point me to that.  This confirms my general recollection in response to your earlier question.

Q.    Well, in your e-mail of January 19

Page 60

Price

to Mr. Hefty you write, "My view is that unless there is some imperative to paper this (and if choosing to do so, I would include the comments Helen suggested about handling compliance issues with outside counsel, etc.), we are better off communicating this orally."  And the "this" was to stop the audit, correct?

MR. WERNER:  Objection to form.

MS. CASSADY:  Objection to form.

A.    Well, I mean, I'm just reading what's in the document below, which was we decide to bet your draft report will suffice and that there's therefore no need for you to finalize the report.

Q.    And that's what happened, correct?

A.    That's my recollection sitting here today, yes.

MR. TRETTER:  Perhaps we can go to the next one, then, tab 7 as Exhibit 7.

(Whereupon Plaintiff's Exhibit 7 was marked for identification.)

MR. TRETTER:  Thank you.

Q.    So this looks to be a series of e-mails between and among you while you were

Price

A.   As we went through before, I don't recall that specifically from CodeMap, no.

Q.   Well, when we saw the draft compliance report and they said you should cease doing this because it was a regulatory risk, isn't that what they were saying?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to the form.

A.   I mean, here I see a reference to non-CLIAwaived screening cups.  My recollection ten years later is we were using CLIAwaived screening cups.  You know, honestly, this is just a -- this a complex regulatory analysis that I can't put myself back ten years ago around all the different competing discussions.

Q.   Well, this opinion of -- or you characterize it as a disagreement with our cup policy, you're talking about Millennium's at that time, correct?

A.   I mean, honestly, sitting here today, I don't know why I'm staring at a document from -- why I'm looking at that point at a document from McDonald Hopkins to another competing lab, but so.  I just don't recall

Page 80

Price

this context.

Q.    In this particular time period, this was after the March notes with Lynn Neuner, so this is when you had already received the DOJ subpoena, correct?

MS. CASSADY:  Objection to form.

A.    I think we established earlier that was what, March 27, so, you know, I don't recall -- sitting here today, I couldn't tell you that time frame, but that sounds right.

Q.    So you're saying to Mr. Wisor, "In light of this letter," meaning the one from Jane Pine Wood, "and the recent one I circulated from Ameritox last week, this strikes me as the sort of issue we might consider getting a specific opinion on from OIG.  Better safe than sorry."  When you were referring to a specific opinion from OIG, there was an ability for a provider to obtain an advisory opinion from its regulator, correct?

MS. CASSADY:  Object to the form.

A.    Yes.  You can submit -- you can submit -- you can request that OIG provide an opinion letter, correct.

Page 81

Price

Q.     So in light of what Jane Pine Wood was suggesting, and as it would apply to your particular cup program at Millennium, you said why don't we get such an opinion, better safe than sorry, right?

A.     What I say is this strikes me as a sort of issue we might consider getting a specific opinion on from OIG.

Q.     And Millennium never did so, correct?

MR. WERNER:  Object to the form.

A.     I don't recall that we didn't or that we did.

Q.     Millennium kept providing the cup program for years after this, correct?

MS. CASSADY:  Object to the form.

MR. WERNER:  Object to the form.

A.     I don't recall a specific timetable around when we stopped the cup program.

Q.     Well, if I told you you stopped the cup program after the Ameritox verdict in June of 2014, would that refresh your recollection?

MS. CASSADY:  Object to the form.

A.     At least one iteration I believe we

Price

did, yes.

Q.    Now, Hogan Lovells represented Millennium as outside counsel in connection with the DOJ subpoena; is that correct, at least initially?

A.    At least initially, that's correct.

Q.    And the Department of Justice objected to Hogan's role because it was conflicted as having provided some of the advice that was the subject of the investigation; is that also correct?

MS. CASSADY:  Object to the form.

A.    I don't recall them formally objecting.  I recall that being a discussion about that topic.

Q.    Well, Hogan did in fact resign as counsel, at least counsel of record in the investigation; is that correct?

MR. WERNER:  Object to the form.

A.    That's not how I would characterize it.

Q.    Well, how would you characterize it?

A.    I think there was a shared -- well, I don't recall specifically how the request or

Page 93

Price

Collora resigned, Mr. Loucks of the Skadden firm took over the company's defense of the DOJ investigation; is that correct?

A.    That's correct.

Q.    And the company had already retained Skadden in 2013 to assist with the Ameritox litigation; is that correct?

A.    That's correct.

Q.    And at that time they were also assisting the Collora firm in the DOJ litigation, correct?

A.    We were keeping a lot of Boston law firms busy.  The answer is yes.

Q.    And Mr. Loucks had been in the Boston U.S. Attorney's Office prior to joining Skadden?

A.    He was the First Assistant U.S. Attorney and the head of the Healthcare Fraud Unit for a number of years.

Q.    And you believed he would be well-equipped to help Millennium in the DOJ investigation?

A.    Yes.

Q.    And he ultimately advised against

Page 132

Price

Q.    And he continued to assist Skadden on its work in defending the company in the DOJ investigation, correct?

MS. CASSADY:  Object to form.

A.    Correct.  Substantively, Steve is a white collar lawyer.

Q.    And when he mentions in his responsive e-mail to you, "I enjoyed seeing some of the data in the USAO slides and we will be discussing with Mike tomorrow."  During this time period the company was making presentations to the U.S. Attorney's Office and there were PowerPoint slides that Mr. Immelt was commenting on?

MS. CASSADY:  Object to form.

A.    That appears to be what he's -- yes, I believe that's what he's commenting on.

Q.    First I guess I should break it up. Do you recall a series of presentations by Millennium and its counsel to the Boston U.S. Attorney's Office in or around March and April of 2014 at the same time that the company was considering this leveraged debt recapitalization?

**Page 133**

Price

MR. WERNER:   Object to the form.

MS. CASSADY:   Object to the form.

A.      Yes, I do.   There was -- if I may expand -- well, yes, I recall we were making presentations at that time.

Q.      Well, there had been a changeover in some of the attorneys from the U.S. Attorney's Office in early 2014, correct?

A.      There was a wholesale turnover on the case.   The criminal lead, Susan Winkler, had left the office.   A new criminal lead, David Schumacher, had come on.   Prior to that there had been no civil office engagement. Bunker Henderson and the civil team, as I recall, came on the scene in early 2014.   They did not have access to any of the documents, presentations, witness interviews or any history of the case at all.   And, you know, the case had been going on for a couple of years at that point, and so to sort of bring them up to speed on, you know, where the evolution of the investigation from our perspective to date and try to frame the issues and push towards, you know, a successful resolution, we engaged

Page 134

Price proactively with the office, the civil side, to bring them up to speed.  That was following the declination from the criminal side.

Q.    Well, I think may be the time frame's a little bit muddled, but here we're talking about early 2014.  The declination I'll tell you --

A.    You're right, you're right.  Yep, you're right.  The declination came after the notice of intervention, right.

Q.    And so these early meetings involved both the criminal and the civil offices of the U.S Attorney's Office, did they not?

MR. WERNER:  Object to the form.

MS. CASSADY:  Object to form.

A.    I recall them being directed towards the civil.  I have a specific recollection that, one, that there was a representative from criminal that came for 30 minutes and then departed or so.  I don't remember specifically all of them.  I know Schumacher and some of his colleagues were at one of them, but my recollection, generally we were focused on the civil side at that point.

Price

Q.    Just quickly, do you recall that there had been a presentation to the original group of prosecutors in 2013 that was reprised for the new group of prosecutors?

MS. CASSADY:  Object to form.

A.    I don't recall specifically -- I recall generally repackaging some of what we had used to orient Susan Winkler's team when a new team came on board, yes.

Q.    And then another presentation was made to the U.S. Attorney's Office about the POCT, the point of care test cups in particular.  That was also done in March of 2014?

MR. WERNER:  Object to the form.

A.    I don't recall specifically, but I know we did a couple of presentations for the new team, and I'm sure the cups were -- the cup program was one of them.  I'd be shocked if it was not.

Q.    And you did another presentation to the U.S. Attorney's Office on the troubled practices program?

MS. CASSADY:  Object to form.

Price

MR. WERNER:  Object to form.

A.    I don't recall that specifically, but again, it would not -- I suspect we did. That wouldn't surprise me at all if that was one of our early presentations.

MR. TRETTER:  Let's mark our next exhibit, tab 24 as Exhibit 23.

(Whereupon Plaintiff's Exhibit 23 was marked for identification.)

MR. TRETTER:  While the concierge is doing that, I'm just going to try to change the mind set a little bit.  I don't want to talk about the DOJ matter.  I'm going to talk a little bit more about regulatory and reimbursement stuff.  We'll see some documents about the LCDs or local coverage determinations.

Thank you, Mr. Concierge.

Q.    Mr. Price, this looks like a series of e-mails around the same time, February, end of February of 2014, but it involves something called LCD.  Am I right that that's an abbreviation for local coverage determination?

A.    That's correct.

Page 218

Price

A.   It was reassuring.  And they had validated -- it validated what Helen and Ron had been telling us and the decision by the company to -- I know because -- the decision by the company to take its legal work to Hogan.

MS. CASSADY:  I think we've been going a little over an hour now.  Do you mind if we take a quick ten-minute break?

THE WITNESS:  That's fine.

THE VIDEOGRAPHER:  Off the record, 15:14.

(Off the record.)

THE VIDEOGRAPHER:  Back on the record at 15:25.

Q.   Mr. Price, I'm going to switch topics now and talk about the 2012 time period.  And I'll refer you back to Plaintiff's Exhibit 1, which is tab 1 in your binder.  This is the March 27, 2012 e-mail chain between you, Lynn Neuner, Bill Sheehan and Donald Conklin about the DOJ subpoena.

A.   Okay.

Q.   And if you refer down, you write to Ms. Neuner, "Hogan, as you know, helped us

Price

implement various policies in late 2009 in anticipation that Government would ultimately look into these issues."  Does this reflect your understanding that Hogan began looking into Millennium's policies in late 2009?

A.    Yes.

Q.    And this would have been before the draft audit report by CodeMap in 2010?

A.    Yes.

Q.    You also make a statement about "So they offer the regulatory perspective on what the DOJ seemed focused on and how ML is positioned relative to the field."  Do you understanding at the time of how Millennium was positioned relative to the field?

A.    As I mentioned before, you know, in some -- you know, we had brought on Hogan, our business was scaling.  We understood that as a large provider of diagnostic services we would have a target on us and began through the engagement of Hogan to validate our and where necessary adjust our policies and programs to comply with the law in an environment -- in a competitive environment where most of our

**Page 220**

Price competitors had not done so.

Q.    I'm going to refer you now to Plaintiff's Exhibit number 2, which is tab 2 in your binder.  Again these are notes prepared by Lynn Neuner titled, "Conference Call Re Millennium, dated 3/27/12."  And you previously testified, I believe, that you understand these to be the notes from the call that we just referred to?

A.    These look to be notes from a call that I participated in with the folks at Simpson Thacher, yes.

Q.    And on the first page, which is ending 0008, again Ms. Neuner writes, "Came in a couple of hours ago, prevalent in our industry, not that different from first CID." You testified, I believe, that this refers to the 2012 DOJ subpoena; is that correct?

A.    Yes.

Q.    Do you agree with the statement and the notes that this type of subpoena was prevalent in our industry?

A.    Yes.

Q.    Is it also consistent with your

Price

recollection that it was not that different from the first CID?

A.    Yes.

Q.    The CID refers to the CID issued in connection with the Cunningham qui tam complaint that we discussed earlier?

A.    Correct.

Q.    And you believe the 2012 subpoena raised similar issues as the first CID?

A.    Yes.  I believe they were overlapping issues.

Q.    And further down on the page by the numbers 1 and 2, 1. "use of custom profiles, standing orders, 2. confirmation testing of negative tests/screen results CMS was concerned about.  In 2009 Hogan started working on these issues."  Does this refresh your recollection that in 2009 Hogan started working on the custom profile policy issues in addition to the POC cup agreement?

A.    Yeah, Helen specifically worked closely with Howard to revamp our test requisition forms.  I remember that well.  I was not deeply involved in that, but that would

**Page 272**

**A C K N O W L E D G M E N T**

STATE OF                    :

                           :ss

COUNTY OF                   :


        I, MARTIN PRICE, hereby certify that I have read the transcript of my testimony taken under oath in my deposition on the 12th day of April, 2021; that the transcript is a true, complete record of my testimony and that the answers on the record as given by me are true and correct.


                        _____
                        MARTIN PRICE


Signed and subscribed to before me this _____ day of _____, 20____.


_____
Notary Public

**Page 273**

C E R T I F I C A T E

I, FRAN INSLEY, hereby certify that the Deposition of MARTIN PRICE was held before me on the 12th day of April, 2021; that said witness was duly sworn before the commencement of testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Deposition of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of April, 2021.

_____

FRAN INSLEY

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - -x

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

                         Debtors.

MARC S. KIRSCHNER solely in his capacity

as TRUSTEE OF THE MILLENNIUM CORPORATE

CLAIM TRUST,

                         Plaintiff,

      -against-

JPMORGAN CHASE BANK, N.A., CITIBANK N.A.,

BMO HARRIS BANK, N.A., and SUNTRUST BANK,

                         Defendants.

Case No. 15-12284 (LSS)

- - - - - - - - - - - - - - - - - - - - -x

                  June 7, 2021

                  1:31 p.m.

            CONTINUED VIDEO-RECORDED

DEPOSITION of MARTIN PRICE, taken

pursuant to Notice, held virtually via

Zoom, before Sharon Pearce, RMR, CRR,

CRC, NYRCR, a Registered Merit Reporter,

Certified Realtime Reporter, and Notary

Public of the State of New York.

PRICE

That's my understanding."

And that was testimony that you gave just a few weeks ago; correct?

A.    Yes.

Q.    Okay.  If you go to Tab 32, these are also Ms. Neuner's notes, a different set of notes.

Do you have those?

A.    I do.

Q.    This is going to have to be marked as a new exhibit.  It's Tab 32.

(Plaintiff's Exhibit 104, Handwritten notes dated March 14, 2014, Bates STB_ML-00000001, was hereby marked for identification, as of this date.)

Q.    And to level set us, Mr. Price, while we're putting that up for everybody, there are some names at the top of the first page.  It says "Call with M. Price, R. Wisor, L. Neuner, R. Arnay, and Isaac Gruber."  And I believe the other two are people from Simpson Thacher.

Do you recall there was -- I

Page 338

PRICE

think your testimony was there were several due diligence calls that you were involved in, one involving an all-hands group, one a smaller group, and then one that was sort of related to -- specifically to the Ameritox situation.

Do you recall that testimony?

A.    That sounds about right.

Q.    And this would have been notes of the meeting of the smaller one just with the Simpson Thacher folks; right?

A.    That's what it looks like from, if these are Lynn's notes, from Lynn's notes.  Yes.

Q.    Okay.  And if you go to the page that's stamped 0004, there's a reference to a 3/13/14 meeting at USAO, which I'll represent is the U.S. Attorney's Office. The first line under that is "M. Price was there at meeting."

Do you recall, independent of these notes, that you were actually at a meeting with the Boston U.S. Attorney's Office where you made or your lawyers made

PRICE

presentations?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Objection.

A.     Several of them.  Several of them.  Yes.

Q.     Okay.  And in these notes or at, you know, several, let's say, from 3/13 to the date of these notes was 3/14, the next day, you were talking to Ms. Neuner; correct?

A.     Again, that's -- I have no recollection, sitting here today, of whether it was 3/13 or some other date.  I am certain that in the March/April timeframe, we had a number of meetings with the U.S. Attorney's Office in Boston.

Q.     Okay.  And in fact, it says -- at least what you were telling -- the notes say -- and I guess all I can ask you was is this consistent with your recollection -- a few lines down, "6-7 hours over last two weeks."

So my question would be would that be consistent with your recollection

PRICE

that you had spent six to seven hours with the U.S. Attorney's Office over the past two weeks in March?

MR. WERNER:   Object to the form.

MR. POPOVSKY:   Objection.

A.      Sitting here today, that sounds about right.  I can't recall that we had two or three meetings in that timeframe.  It was -- I think we covered this in the deposition earlier, they had switched over folks, and we were arranging a number of meetings to get them up to speed.

Q.      And then they say, "We were feeding them info" or "We were telling them info" I think it says.  Sorry about that.  "They ask questions why appropriate to let 70 -- to test 73-year-old woman for cocaine?"

Do you see that?

MR. POPOVSKY:   Objection.

A.      Yes.

Q.      And is that consistent with the questions that they were asking of you?

MR. WERNER:   Object to the form.

**Page 341**

PRICE

A.   I don't recall the specific questions, but if the question is was that the type of question, which generally reflected having not looked at any evidence or documents we had been producing for two years, yeah, that's the kind of question they were asking at that stage.

Q.   Okay.  And then the next line says "Custom profile.  Does this encourage doctors to do unnecessary tests?"

Is that another example of a question that they would have been asking?

MR. POPOVSKY:  Objection.

MR. WERNER:  Object to the form.

A.   Again, I don't recall, but it would not surprise me, because we would have led with our custom profiles to distinguish it from panel testing.  So I'm sure we would have raised that.  Whether they -- I'm sure that would have been a discussion point.  Whether we raised that or they raised that, I don't know.

Q.   Okay.  And both of these issues,

PRICE

the 73-year-old -- testing the 73-year-old woman for cocaine and whether that was medically necessary and the use of custom profiles, those were ultimately issues that were included in the DOJ complaint, were they not?

MR. POPOVSKY:  Objection to form.

MR. WERNER:  Join.

A.    I don't -- it's been a long time since I read the DOJ complaint.  So I don't recall whether these specifically were in there or not.

Q.    And do you recall that we had -- you had had -- Skadden put together a key issues list of -- based on the documents, subpoenas, and the grand jury testimony that these were issues under key issues lists as well?

MR. WERNER:  Objection to form.

MR. POPOVSKY:  Object to the form.

A.    I don't recall that specifically.  I am sure our counsel had a

PRICE

key issues list -- a run-in key issues list throughout the course of the investigation.

Q.    Okay.  Then going back, it says, "Going back in two years another session" -- I'm still on page 4 -- then it says "yesterday's meeting cup agreement."

Do you see that?

A.    I do see that.  Yes.

Q.    And the cup agreement was in your key issues list, and it was another thing that was raised in the government complaint; correct?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Objection to form.

A.    There was no government complaint at that time.  What they were basically doing, now that I'm sitting here thinking about it, they were running through the Ameritox lawsuit that was pending in Middle District of Florida, and I recall they were asking questions about that.

PRICE

Q.    And you even said to Ms. Neuner that if you were to lose that Ameritox lawsuit, that would fuel the government's investigation on that issue.

MR. POPOVSKY:  Objection to form.

MR. WERNER:  Join.

A.    I don't recall that specifically.  But I can imagine saying something -- I can imagine saying something of that sort.  But sitting here today, I don't remember saying that specifically.

Q.    And you said -- I'm going to the next page.  You were telling Ms. Neuner that the next issue that you were going to be discussing with the government was something called the Trebled Practice Program?

A.    Yes.

Q.    And that was a program under which if a physician's practice was not sending in enough samples or doing enough tests, that you would be dropped as a

PRICE

client; correct?

MR. POPOVSKY:  Objection to form.

MR. WERNER:  Objection to form.

A.    No.  That's not correct.

Q.    But it says in the middle, "Force doctors to order more tests or fire them."

That's not a fair, accurate description of the program?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Objection.

A.    No.  For the most part, the trebled practices were cases where there was a payor mix where, you know, some payors either were low payers or no payers, and depending on the mix of the patients in that particular practice would make that practice unprofitable.  And obviously, there's a couple of variables that can change that.  Frequency of testing is not one of them.  Then you just have more -- you're just getting more specimens you're losing money on.

**Page 346**

PRICE

More testing, to the extent that you have payers that are paying, can change that dynamic.  But that was -- you know, it's a more complicated issue than just do more testing.  More testing would just have to cost us more money.  We were losing money on these accounts.

Q.    You, in fact, did a presentation to the U.S. Attorney's Office on the Trebled Practice Program?

A.    I don't -- sitting here, I don't recall that.  But I'm sure we did.

Q.    And continuing on this page, there's a -- page 5, toward the bottom, it says, "M. Price - obstruction of justice."

That was the issue about whether your comments at the 2012 meeting of the sales groups constituted witness intimidation; is that correct?

MR. WERNER:  Objection to form.

MR. POPOVSKY:  Objection to form.

A.    There was a -- there were questions raised and discovery sought

PRICE

around the PowerPoint presentation I gave at the 2012 National Sales Meeting. Correct.  There was never a statement about obstruction of justice or anything else.

Q.    That episode came out in the DOJ complaint in 2015; correct?

MR. POPOVSKY:  Objection to form.

MR. WERNER:  Join.

A.    Well, it came out years earlier, but there's a reference to that in the -- I do recall there being a reference to that in the DOJ complaint.

Q.    Do you recall Mr. Slattery disciplining you over that -- your remarks at that sales meeting?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Objection.

A.    Sitting here today, I do not.  I had discussions with Jim subsequent to that where he had expressed and I had agreed that it reflected, you know, poor judgment and awareness notwithstanding the

PRICE

intent and purpose.

Q.    But you would have suffered no financial repercussions from that; correct?

MR. WERNER:  Object to the form.

MR. POPOVSKY:  Objection.

A.    Financial repercussions?

Q.    Yes.  Sort of a penalty or a loss of bonus or things like that.

A.    I don't recall --

MR. WERNER:  Objection to form.

A.    -- being penalized financially ever in my career, and not for this, not related to this episode, no.

Q.    Would you go to Tab 36.  I think this has to be marked as a new exhibit as well.

(Plaintiff's Exhibit 105, An email chain dated March 11, 2014, Bates ML_DE_00488323, was hereby marked for identification, as of this date.)

Q.    And what number is this?

THE CONCIERGE:  105.

PRICE

That's -- that's my recollection of the theory and how we got to a damage number.

Q.    I have no further questions.

MR. POPOVSKY:  Mr. Price, thank you for your time again today.

THE WITNESS:  Thank you, guys.

MR. TRETTER:  Have a good game.

THE VIDEOGRAPHER:  This ends today's deposition.  We are going off the record at 16:50.

(TIME NOTED: 4:50 p.m.)

_____
MARTIN PRICE

Subscribed and sworn to
before me this _____
day of _____, 20___.


_____
Notary Public

CERTIFICATION

I, SHARON PEARCE, RMR, CRR, CRC, NYRCR, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 10th day of June, 2021.

_____

SHARON PEARCE

RMR, CRR, CRC, NYRCR

# EXHIBIT 85
# FILED UNDER SEAL

# EXHIBIT 86

**Page 1**

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

Case No. 15-12284 (LSS)

Jointly Administered

Adv. Pro. No. 17-51840 (LSS)

------------------------------------------X

In re:

MILLENNIUM LAB HOLDINGS II, LLC, et al.,

          Debtors.

MARC S. KIRSCHNER, solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST,

                   Plaintiff,

    - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A. and SUNTRUST BANK,

                  Defendants.

------------------------------------------X

               June 23, 2021

               8:36 a.m.

      CONFIDENTIAL TRANSCRIPT

      Remote video-teleconference deposition via Zoom of JENNY LEE, pursuant to notice, before Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and Notary Public of the State of New York.

LEE - CONFIDENTIAL

Q.        And all three of those individuals worked at JPMorgan in April of 2014, correct?

A.        Yes.

Q.        And those three individuals used e-mail in the ordinary course of their employment at JPMorgan during this time?

A.        Yes.

Q.        And this e-mail was sent in the ordinary course of business, is that correct?

A.        Yes.

Q.        Do you have any reason to doubt the authenticity of this e-mail?

A.        No.

Q.        In the first e-mail in this string dated Friday, April 11, 2014, Alla informs Ryan that Lynn from Simpson Thacher had informed Narmeen, N-A-R-M-E-E-N, from Oaktree that a worst case scenario liability for the Ameritox unfair business practice litigation was $200 million.

Page 114

LEE - CONFIDENTIAL

Do you see that?

A.    I do.

MR. DeLANGE:  Dewey, if you could mark as the next exhibit, it is document 23 in tab 9.

IT CONCIERGE:  Introducing that now.

MR. DeLANGE:  Exhibit 133 is a two-page e-mail string, Bates Nos. JPMC-MIL-CORP-00052756 through 52757.

(Plaintiff's Exhibit 133, Bates Nos. JPMC-MIL-CORP-00052756 through 52757, was marked for identification, as of this date.)

Q.    Ms. Lee, have you seen Exhibit 133 previously?

A.    Yes.

Q.    This is an e-mail that was forwarded to you regarding a Debt Wire U.S. alert, subject Millennium Health sponsor targeted by DOJ for settlement proceeds, do you see that?

A.    I do.

Q.    Did you receive this e-mail in

LEE - CONFIDENTIAL

objection?

MS. OSTRAGER:  The objection is to the characterization of the document and that the witness has already given you her understanding of what that number means and doesn't mean.

MR. DeLANGE:  I respectfully disagree, she's dancing.

I'll let her answer the question.

A.    Could you ask the question again.

Q.    Did your counsel at Simpson Thacher inform Oaktree that the worst case scenario liability was $200 million?

A.    Yes, she did, based on what's in this e-mail.

MR. DeLANGE:  I have nothing further.

THE VIDEO TECHNICIAN: Counsel, any followup questions?

(Continued on next page.)

**Page 127**

LEE - CONFIDENTIAL

MS. OSTRAGER:  No, thank you.

THE VIDEO TECHNICIAN: This will conclude today's testimony, the time is 12:18 p.m.

We are off the record.

(Time noted: 12:18 p.m.)

_____

JENNY LEE

Subscribed and sworn to before me this _____ day of _____, 20____.

_____

Notary Public

**Page 128**

**C E R T I F I C A T I O N**

I, Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and a Notary Public, do hereby certify that the foregoing witness, JENNY LEE, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

*Jineen Pavesi, RPR, RMR*

JINEEN PAVESI, RPR, RMR, CRR

# EXHIBIT 87

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                              |
MILLENNIUM HOLDINGS II, LLC,         |
et al.,                             |
                                    | Chapter 11
     Debtors.                       | Case No. 15-12284(LLS)
_____| Jointly Administered
                                    |
MARC S. KIRSCHNER solely in his      |
capacity as TRUSTEE of THE           |
MILLENNIUM CORPORATE                 |
CLAIM TRUST,                        | Adv. No. 17-51840(LSS)
                                    |
          Plaintiff,                |
                                    |
v.                                  |
                                    |
J.P. MORGAN CHASE BANK, N.A.,         |
CITIBANK N.A., BMO HARRIS           |
BANK, N.A. and SUNTRUST BANK,        |
                                    |
          Defendants.               |
-----------------------------------------------------------

REMOTE VIDEO-RECORDED DEPOSITION OF JAMES M. SLATTERY
VOLUME I
June 3, 2021
-----------------------------------------------------------

VIDEOCONFERENCED APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
     LYNDON TRETTER, ESQ.
     Wollmuth Maher & Deutsch, LLP
     51 JFK Parkway
     First Floor West
     Short Hills, New Jersey 07078
     Phone: 973-733-9200
     Email: ltretter@wmd-law.com
     NICOLE CLARK, ESQ.
     Wollmuth Maher & Deutsch, LLP
     500 5th Avenue, 12th Floor
     New York, New York 10110
     Phone: 212-382-3300
     Email: mclark@wmd-law.com

I want to draw your attention to Tab 25 in your binder, which will be newly marked as Exhibit 97.

(Exhibit Number 97 was remotely introduced.)

MR. POPOVSKY:  And which we can all see now.

Q.   (By Mr. Tretter)  The first page of it is just, sort of, an email from Howard Appel to you dated 3/4/2014, with a PDF attachment.

A.   Let me see if I can find that.  Yes.

Q.   Okay.  And the PDF attachment seems -- well, it has a couple of parts.  The first talks about, you know, proceeds available for distribution assumes 1.5 billion, and then breaks it down how that money would be distributed.  And you'll see that the Slattery trusts appear at the bottom of that.

Do you recall asking Mr. Appel to provide you this kind of information on what -- the distribution of theoretical leveraged loan amounts?

A.   No.  There was never a discussion with me, nor did anybody ever mention any amount of a loan other than 1.8.

Q.   But forgetting about the figure -- and I realize you did have some debt that got paid out, so 1.8 minus 300 million would be 1.5, if you had the banks being paid 300 million.

So forgetting about the specifics of what

starting number, do you recall Mr. Appel providing you spreadsheets about distributions of leveraged loan proceeds?

A.    No.  It wouldn't -- he wouldn't do that. Typically, in the way we did things, he would come in and he would verbally tell me that or call me on the phone.

Because I wasn't there at the time, so it would have been a phone call.  And he knows I don't use email. He may have tried to memorialize it that way.

Q.    Okay.  But sitting here today, you have no recollection of discussing with him the distributions?

A.    Oh, yeah.

Q.    You do?

A.    Sure.

Q.    What did you and he discuss?

A.    He told me that the loan was a billion eight, and he told me the amount that I could expect to get for my kids and myself.

Q.    Okay.  And did he tell you what he himself expected?

A.    No.  But I knew that he had five percent.  So he didn't have to -- he didn't -- it wasn't a reach to figure it out.

Q.    If you turn to -- let's see -- one to three -- the fourth page of the document, you'll see there's a

**Page 134**

I, JAMES SLATTERY, the deponent in the above deposition, do hereby acknowledge that I have read the foregoing transcript of my testimony, and state under oath that it, together with any attached Amendment to Deposition pages, constitutes my sworn testimony.

\_\_\_\_\_ I have made changes to my deposition

\_\_\_\_\_ I have NOT made any changes to my deposition

_____

JAMES SLATTERY

Subscribed and sworn to before me this _____ day of _____, 20\_\_\_\_.

My commission expires:  _____.

_____

NOTARY PUBLIC

REPORTER'S CERTIFICATE

STATE OF COLORADO            )

CITY AND COUNTY OF DENVER    )

I, Sara A. Stueve, a Registered Professional Reporter and Notary Public within and for the State of Colorado, commissioned to administer oaths, do hereby certify that previous to the commencement of the examination, the witness was duly sworn by me to testify the truth in relation to matters in controversy between the said parties; that the said deposition was taken in stenotype by me at the time and place aforesaid and was thereafter reduced to typewritten form by me; and that the foregoing is a true and correct transcript of my stenotype notes thereof; that I am not an attorney nor counsel nor in any way connected with any attorney or counsel for any of the parties to said action nor otherwise interested in the outcome of this action.

My commission expires October 26, 2024.

SARA A. STUEVE

Registered Professional Reporter

Notary Public, State of Colorado

# EXHIBIT 88
# FILED UNDER SEAL