## EXHIBIT E

Redacted Public Version of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette R. Austin Smith [Adv. Docket No. 284]

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| MILLENNIUM LAB HOLDINGS II, LLC, | § | Chapter 11 |
| *et al.*, | § | CASE NO. 15-12284 (LSS) |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |
| | § | |
| MARC S. KIRSCHNER solely in his | § | |
| capacity as TRUSTEE of the | § | |
| MILLENNIUM CORPORATE CLAIM | § | |
| TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | ADVERSARY NO. 17-51840 (LSS) |
| | § | |
| v. | § | Re: Adv. D.I. 248 |
| | § | |
| J.P. MORGAN CHASE BANK, N.A., | § | |
| CITIBANK N.A., BMO HARRIS BANK, N.A., | § | |
| and SUNTRUST BANK, | § | |
| | § | |
| Defendants. | § | |

# PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE CERTAIN
## PORTIONS OF THE RULE 26(a)(2) REPORT OF YVETTE R. AUSTIN SMITH

MCKOOL SMITH, P.C.
Kyle A. Lonergan
Josh J. Newcomer
Grant L. Johnson
McKool Smith, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York, 10001-8603
Tel: (212) 402-9400
klonergan@mckoolsmith.com
jnewcomer@mckoolSmith.com
gjohnson@mckoolSmith.com

COLE SCHOTZ P.C.
G. David Dean (No. 6403)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Tel: (302) 652-3131
ddean@coleschotz.com

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

I.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING.....................1

II.   SUMMARY OF ARGUMENT .................................................................................1

III.  STATEMENT OF FACTS ......................................................................................6

IV.   ARGUMENT..........................................................................................................12

       A.    Austin Smith's Use Of The WACC Calculated By VPA Is Consistent With Sound
             Valuation Practice. .......................................................................................13

             1.    Defendants Misstate The Record Evidence Considered By Austin
                   Smith And Her Testimony. ...................................................................14

             2.    Austin Smith's Use Of The WACC Calculated By VPA Is Reliable
                   And Widely-Accepted In The Third Circuit................................................15

             3.    Austin Smith Examined And Verified VPA's WACC Calculations
                   And Performed A Sensitivity Analysis........................................................16

             4.    Defendants Extensively Cross-Examined Austin Smith About Her
                   Comparable Company Analysis. ...............................................................17

             5.    Defendants' Request That The Court Disregard Austin Smith's
                   Deposition Testimony Is Without Merit. ...................................................18

       B.    Austin Smith's WACC Is Reliable ..........................................................24

             1.    Austin Smith—And VPA—Reliably Included A CSRP In The
                   WACC..................................................................................................24

             2.    Defendants' Argument About the Comparable Companies Used
                   By VPA Is A Red-Herring. .....................................................................27

       C.    Austin Smith's Application Of The Ability To Pay Debts And The Capital
             Adequacy Tests Are Consistent With Sound Valuation Practice. ........................28

V.    CONCLUSION......................................................................................................29

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allonhill, LLC v. Stewart Lender Servs.*,
2019 WL 1868610 (Bankr. Del. 2019) ...................................................................................26

*Allscripts Healthcare, LLC v. Andor Health, LLC*,
No. CV 21-704-MAK, 2022 WL 3021560 (D. Del. July 29, 2022) ...........................13, 16, 17

*Buchwald v. Renco Grp., Inc.*,
2014 U.S. Dist. LEXIS 197328 (S.D.N.Y. 2014) ..............................................................5, 26

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc.*,
350 F. Supp. 2d 582 (D. Del. 2004) ......................................................................................17

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
643 F. Supp. 2d 471 (S.D.N.Y. 2009) ...................................................................................19

*In re Orchard Enters. Inc.*,
2012 WL 2923305 (Del. Ch. July 18, 2012) ..........................................................................27

*In re Paoli R.R. Yard PCB Litigation*,
35 F.3d 717 (3d Cir. 1994) ....................................................................................................24

*In re SemCrude L.P.*,
648 F. App'x 205 (3d Cir. 2016) .....................................................................................17, 25

*Jacked Up, LLC v. Sara Lee Corp.*,
807 F. App'x 344 (5th Cir. 2020) ..........................................................................................17

*MFS/Sun Life Tr.-High Yield Series* v. *Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995) ........................................................................................30

*Moody v. Security Pacific Business Credit, Inc.*,
971 F.2d 1056 (3d Cir. 1992) ................................................................................................29

*MOSAID Technologies Inc. v. LSI Corporation*,
2014 WL 807877 (D. Del. Feb. 28, 2014) .............................................................................17

*Move, Inc. v. Zillow, Inc.*,
No. 14-2-07669-0 (Wash. Sup. Ct. 2016) .............................................................................27

*nCube Corp. v. SeaChange Int'l, Inc.*,
809 F. Supp. 2d 337 (D. Del. 2011) ................................................................................19, 20

*Peltz* v. *Hatten*,
   279 B.R. 710 (D. Del. 2002)..........................................................................................30

*Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.*,
   461 F.Supp.2d 271 (D.N.J. 2006) .................................................................................30

*Samsung Electronics Co. v. Nvidia Corp.*,
   314 F.R.D. 190 (E.D. Va. 2016) .............................................................................20, 22

*Solar Cells, Inc.* v. *True N. Partners, LLC*,
   2002 WL 749163 (Del. Ch. 2002) ................................................................................27

*U.S. v. Mitchell*,
   365 F.3d 215 (3d Cir. 2004)..........................................................................................13

*ZF Meritor, LLC v. Eaton Corp.*
   696 F.3d 254 (3d Cir. 2012)................................................................................16, 17, 19

**OTHER AUTHORITIES**

Fed. R. Evid. 702 .................................................................................................................13

Fed. R. Civ. P. 26................................................................................................................3, 23

Fed. R. Civ. P. 37............................................................................................................20, 24

Plaintiff Marc S. Kirschner, solely in his capacity as Trustee of the Millennium Corporate Claim Trust ("Plaintiff" or "Trustee"), hereby submits this Memorandum of Law in opposition to Defendants' Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette Austin Smith (D.I. 248) (the "Motion"),[1] and respectfully states as follows:

## I.  STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

The Trustee seeks to recover as fraudulent transfers $35.3 million in fees paid to Defendants in 2014, plus interest and costs, for arranging a $1.775 billion loan to Millennium, the entire proceeds of which were immediately paid out to Millennium's insiders and Defendants, leaving Millennium insolvent. The Trustee filed the complaint on November 7, 2017. (D.I. 1.) The Court denied Defendants' motion to dismiss on February 28, 2019. (D.I. 53.) Discovery closed on May 16, 2022. (D.I.  233.) On August 22, 2022, the Trustee filed a Partial Motion for Summary Judgment Regarding Defendants' Affirmative Defenses (D.I. 247) and *Daubert* Motions to Exclude the Testimony of Defendants' Proposed Experts, Amy Hutton and Branka Matevich (D.I. 253, 255). On the same day, Defendants filed a Motion for Summary Judgment (D.I. 250) and the subject Motion and accompanying Memorandum of Law (D.I. 249), seeking to strike a portion of the Rule 26(a)(2) Report of Plaintiff's insolvency expert, Yvette R. Austin Smith. This memorandum of law is submitted in opposition to the Motion.

## II.  SUMMARY OF ARGUMENT

The Trustee's expert, Yvette Austin Smith, whose qualifications are undisputed and who has testified at eleven previous trials and hearings, performed a robust analysis of Millennium's

---

[1] J.P. Morgan Chase Bank, N.A., Citibank N.A., BMO Harris Bank, N.A., and SunTrust Bank are collectively referred to herein as "Defendants." The Memorandum of Law in Support of Defendants' Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette Austin Smith (D.I. 249) is cited to herein as "Def. Br."  Austin Smith's report and deposition transcript are cited to herein as "YAS Report" and "YAS Tr.", respectively.

solvency under each of the three accepted solvency tests. Under each test, she concluded that Millennium was insolvent after adjusting management's inflated revenue projections (the "Padres Projections") to conform to accepted valuation standards. In her hundred-plus page report supporting her opinions, Austin Smith disclosed her qualifications, methodologies, inputs, and analyses regarding dozens of topics. Defendants do not contest Austin Smith's qualifications and do not move to strike the vast majority of her opinions.

Defendants focus on one element of Austin Smith's analysis, the weighted average cost of capital ("WACC"), which she used in her Balance Sheet test opinion. Austin Smith concluded that Millennium was insolvent over a range of WACCs based on her independent analysis and third-party Vantage Point Advisors' ("VPA") contemporaneously calculated WACC, which was relied on by Millennium and its Board of Directors in approving the dividend recapitalization in 2014 (the "2014 Transaction"). The lynchpin of Defendants' Motion is their claim that Austin Smith blindly adopted VPA's WACC, without reviewing or understanding VPA's methodology.[2] That is flat-out wrong. Defendants mistakenly contend that VPA's WACC methodology was only contained in *one document* (labeled "DRAFT") of the thousands VPA produced in this case.[3] Unsurprisingly, that is not true. The same methodology and conclusion were contained in another VPA document—Exhibit 59 to the deposition of Heidi Smith. Austin Smith cites Exhibit 59 in the body of her report when she discusses VPA's solvency analysis and also includes it in her list of documents she relied upon.[4]

---

[2] Def. Br. at 5–6, 10–12.

[3] Def. Br. at 6 (citing VP_ML_00002551).

[4] Ex. 1 (YAS Report) ¶ 68 n.120 (citing Smith Ex. 59); *Id.*, Appendix E, p. 99; Ex. 6 (Smith Ex. 59 VPA Analysis) at -15731. The only difference in the WACC calculation between the "DRAFT" document cited by Defendants and Austin Smith's document is the Cost of Debt, which does not impact the 14.8% WACC.

The remainder of Defendants' arguments are equally meritless. Defendants complain that Austin Smith did not provide sufficient disclosures in her report about her WACC. But Austin Smith's disclosures were sufficient. In her report, Austin Smith disclosed her use of a 14.8% WACC, that it was based on calculations by VPA, that it was consistent with third-party FTI's calculation of a 14.0% WACC, that she performed a sensitivity analysis and calculated Millennium's solvency over a range of WACCs, and that she arrived at 9.8%, the lower end of that sensitivity range, based on a WACC derived from her own selection of five comparable companies plus a small company risk premium ("SCRP") (the use of which Defendants do not challenge in their Motion). Austin Smith also disclosed that her five selected companies were not sufficiently comparable to Millennium and underestimated its risk, requiring adjustments to be made to account for Millennium's risk.[5]

These disclosures satisfied Rule 26 and provided sufficient information to which Defendants could and did respond. Defendants' expert, Amy Hutton, (1) recreated the calculation used to arrive at the 14.8% WACC and (2) modified those inputs to generate a lower 7.2% WACC that Hutton claimed in her report corrects for Austin Smith's improper adjustments to the WACC. (Notably, after issuing her report, Hutton disavowed her 7.2% WACC when subjected to cross-examination at her deposition.) While Hutton's opinion is not reliable for the reasons described in the Trustee's pending motion to exclude her testimony, it is groundless for Defendants to claim that Austin Smith needed to disclose anything more for Hutton to respond.

Austin Smith's disclosures in her report were also sufficient to permit Defendants' counsel to depose Austin Smith at length about her WACC, as demonstrated by the attached full excerpts of Defendants' questioning and Austin Smith's testimony at deposition concerning her WACC. In

---

[5] Ex. 1 (YAS Report) ¶¶ 143, 148 & n.252.

response to Defendants' counsel's questions, Austin Smith elaborated upon the opinions and information contained in her report and rebutted Hutton's criticisms. For example, she explained that VPA's analysis was reliable because it applied the industry standard Capital Asset Pricing Model ("CAPM"), that VPA's eight comparable companies included the five she identified as most comparable plus others she considered in her next tier of relative comparability, that VPA's use of the SCRP and CSRP conformed to industry practice since the eight comparable companies did not sufficiently account for Millennium's risk (as Austin Smith had explained in her report with respect to her five selected companies), and that other market participant analyses using her selected comparable companies were consistent with VPA's WACC.

While Defendants ask the Court to ignore her deposition testimony, there is no basis to do so. Austin Smith offered no new opinions in her deposition (her opinion on Millennium's WACC remained at 14.8%, with a sensitivity range of 9.8% to 14.8%). Rather, when asked by opposing counsel during the deposition to explain her opinions, she did just that. Experts are supposed to elaborate on the opinions contained in their reports in a deposition.

Nor can Defendants claim prejudice. *At no point prior to the Motion* did Defendants claim that Austin Smith insufficiently disclosed her opinions in her report or improperly offered new opinions at her deposition. Defendants did not object, claim prejudice, seek leave to supplement their expert reports, or seek more discovery of Austin Smith, such as additional time to question Austin Smith on the basis of purported late disclosures. Nor did they come to this Court for any type of relief in this regard during expert discovery. Instead, in their Motion, Defendants attempt a bait-and-switch, claiming for the first time that Austin Smith's disclosures in her report were inadequate, that they were prejudiced as a result, and that the Court should impose the ultimate sanction of striking Austin Smith's WACC opinion and granting summary judgment in favor of

4

Defendants. This Hail Mary should be rejected. In her report, Austin Smith sufficiently disclosed her opinions, including her adoption of VPA's 14.8% WACC and her calculation of a 14.8% to 9.8% WACC sensitivity range, and then answered all of Defendants' questions at her deposition.

Defendants next ask the Court to conclude that Austin Smith's and VPA's WACC is unreliable because it was derived from an unsound methodology. But this too is incorrect. Austin Smith and VPA (and Hutton) used the CAPM to derive their WACC. CAPM is a widely accepted and frequently applied by courts.[6]

Defendants are left to criticize Austin Smith's inputs into CAPM, but complain about only two inputs—the use of the CSRP and VPA's use of comparable companies that Austin Smith had concluded did not sufficiently capture Millennium's risk. These complaints fail. CSRPs are widely used by industry practitioners to adjust WACCs calculated from public companies that do not adequately capture the risk of the subject private company. Consistent with industry practice, VPA and FTI used a CSRP to calculate a WACC for Millennium at or around the time of the 2014 Transaction. The use of CSRPs are accepted by numerous courts, and are commonly used by experts to offer valuation opinions in litigation, including by Hutton herself in a prior case. Austin Smith's reliance on an industry standard and court-accepted practice is no grounds to strike her WACC.

Equally baseless, Defendants' argument about VPA's use of comparable companies that Austin Smith concluded were not sufficiently comparable is a red herring. Austin Smith's conclusion concerning lack of comparability meant that adjustments needed to be made to the WACC derived from these public companies to account for the increased risk posed by Millennium, and that is just what Austin Smith and VPA did by using the SCRP and CSRP. After

---

[6] *See, e.g.*, *Buchwald v. Renco Grp., Inc.*, 2014 U.S. Dist. LEXIS 197328 (S.D.N.Y. 2014).

reviewing VPA's methodology and other market evidence, Austin Smith concluded that VPA's adjustments were a reliable way to address Millennium's increased risk as compared to the selected comparable companies.

Finally, Defendants provide a half-hearted criticism that Austin Smith failed to consider Millennium's ability to refinance the $1.775 billion term loan when applying the Capital Adequacy test and Ability to Pay Debts test. But, she did just that, as expressly stated in her report: "I further considered Millennium's prospects for refinancing the Term Loan at maturity in April 2021." Austin Smith concluded that because Millennium's leverage ratio was above the typical ratio for its Caa-C rated debt, a credit rating for bonds "typically in default,"[7] Millennium would not be able to repay the term loan at maturity, an opinion that is bolstered by the other unchallenged opinions in her report that Millennium's business model was stressed. In the face of this clear opinion in her report, Defendants' counsel did not ask a single question about this issue at Austin Smith's deposition.

In light of Austin Smith's robust analysis, the soundness of her WACC opinions, her reliance on the VPA document that Defendants missed or ignored, and her explanations of her opinions that Defendants fail to address, Defendants' Motion should be denied.

## III.    STATEMENT OF FACTS

The Trustee retained Yvette Austin Smith to opine on Millennium's solvency at the time of the 2014 Transaction. Austin Smith has an MBA from Columbia University and is a Principal and Chairman of The Brattle Group, an international economic and financial consulting firm. She co-leads the firm's M&A Litigation practice and previously led the firm's Bankruptcy and Restructuring practice.[8] Austin Smith frequently provides subject matter expertise in valuation,

---

[7] https://ratings.moodys.io/ratings.
[8] Ex. 1 (YAS Report) ¶1.

credit, and solvency analysis in the context of mergers and acquisitions, leveraged buyouts, recapitalization, debt recharacterization, and avoidance actions.[9] Austin Smith has performed expert analysis and testified as an expert witness on solvency numerous times in numerous industries, including the health care industry.[10] Contrary to Defendants' assertions and despite their expert Amy Hutton's unfamiliarity and lack of experience with the health care industry, Austin Smith has significant experience as an expert with health care matters, including in the areas of medical billing, reimbursement, and regulation.[11]

Austin Smith's report is over 100 pages, includes more than 300 footnotes, attaches six appendices, and lists hundreds of documents that she relied upon in forming her opinions. Austin Smith's report addresses a multitude of topics that factor into her solvency analyses, including the WACC. Defendants' rebuttal solvency expert, Amy Hutton, recited all of the components of Austin Smith's WACC calculation in her rebuttal report, and adjusted those components to provide a different WACC (which she later disavowed on cross-examination).[12] Moreover, Defendants cross-examined Austin Smith at length at her deposition about her WACC, and she responded in detail, as reflected in the deposition excerpts attached as Exhibit 2.

In her report, Austin Smith performed three solvency analyses: a Balance Sheet test, an Ability to Pay Debts test, and a Capital Adequacy test. Under all three tests, Austin Smith found Millennium to be insolvent.[13] For the Balance Sheet test, Austin Smith measured the value of the company's assets as compared to the company's debt, using a discounted cash flow ("DCF") analysis. As part of that analysis, Austin Smith performed an independent review of the

---

[9] *Id.* at ¶¶1–3.
[10] Ex. 2 (YAS Tr.) at 40:13–41:17.
[11] *Id.* at 46:18–47:20.
[12] Ex. 3 (Hutton Report) ¶¶ 32–42; Ex. 4 (Hutton Tr.) at 205:6–207:10.
[13] Ex. 1 (YAS Report) ¶¶ 143, Table 7, 172, Table 10.

contemporaneous market evidence at the time of the 2014 Transaction and concluded that management's financial projections made a number of unreasonable assumptions under the applicable valuation standards. Austin Smith made several adjustments to bring the Padres Projections into compliance with those standards ("Modified Padres Projections"). In their Motion, Defendants do not seek to exclude any of Austin Smith's adjustments to the Padres Projections.

As part of her DCF analysis and consistent with accepted industry practice, Austin Smith calculated a WACC to discount the cash flows in the Modified Padres Projections back to the time of the valuation (*i.e.*, the 2014 Transaction). Austin Smith determined that the correct WACC for Millennium at the time of the 2014 Transaction was 14.8%.[14] In order to determine the WACC, Austin Smith applied the widely accepted CAPM, like Hutton and the market participants (including Defendants) did. Applying CAPM, consistent with sound valuation practices, Austin Smith first searched for public companies that were comparable to Millennium from which she could directly derive a beta (*i.e.*, systemic risk of the company) to calculate the WACC. Austin Smith identified five public companies that were the closest and most comparable to Millennium that she could find, but because the companies were not sufficiently comparable to Millennium the beta and WACC derived from those companies underestimated the risk presented by Millennium, which is common when valuing private companies like Millennium.[15] As a result, Austin Smith concluded that adjustments would need to be made to the WACC of those five companies to accurately represent the risk of Millennium and looked to additional market evidence at the time of the 2014 Transaction to help her determine the appropriate WACC for Millennium.[16]

The additional market evidence that Austin Smith examined centered on the solvency

---

[14] Ex. 1 (YAS Report) ¶ 143.

[15] Ex. 2 (YAS Tr.) at 117:4–118:9, 121:19–125:6, 146:10–15.

[16] *Id.*; Ex. 1 (YAS Report) at ¶ 148 n.285.

analysis contemporaneously performed by VPA that was used by Millennium's management and Board of Directors to approve the 2014 Transaction.[17] Pursuant to the terms of its engagement letter with Millennium (and unlike Austin Smith), VPA used management's Padres Projections without independently reviewing and confirming them. In sharp contrast, VPA independently calculated the WACC that it used in its valuation, which Austin Smith adopted.[18]

Austin Smith carefully examined VPA's WACC analysis to confirm that it was reliable. Relying on Plaintiff's deposition Exhibit 59—which fully documented the methodology, inputs, calculations, and conclusions of VPA's analysis—Austin Smith confirmed that VPA applied the CAPM, that the comparable companies that VPA selected comported with her own independent comparable company analysis, and that she agreed with VPA's adjustment to the beta and use of the SCRP and CSRP to account for the lack of comparability of the selected companies.[19]

VPA's SCRP and CSRP adjustments were 1.9% and 5%, respectively.[20] Austin Smith confirmed that the SCRP was derived from a source widely accepted by practitioners (*i.e.*, Ibbotson, now Duff & Phelps) and, in light of her prior conclusion that the selected public companies understated Millennium's risk, that the SCRP and CSRP together reliably accounted for the risk posed by Millennium at the time of the 2014 Transaction that was not captured in the beta of VPA's selected public companies.[21]

---

[17] *Id*. at 118:10–120:25; Ex. 5 (Smith Ex. 57 VPA Solvency Letter).

[18] Defendants also assert that Austin Smith did not know of VPA. Again, this is wrong.  Instead, Austin Smith testified that she knew of VPA, but had not personally worked with the firm. When asked about VPA's reputation, Austin Smith reiterated that she had not worked with the firm and thus declined to subjectively weigh in on their "reputation."  Ex. 2 (YAS Tr.) at 127:6–21.

[19] Ex. 2 (YAS Tr.) at 125:10–127:5, 135:9–138:20, 141:17–144:10.  Among other things, Austin Smith also reviewed VPA's use of the ten-year Treasury for the risk-free rate and the supply side equity risk premium, and all other components of VPA's WACC calculation.  *Id*. at 135:11–21.

[20] Ex. 6 (Smith Ex. 59 VPA Analysis) at -15731.

[21] Ex. 2 (YAS Tr.) at 125:25–127:5, 135:9–138:20, 141:17–144:10.

In addition, as her report and deposition testimony demonstrate, Austin Smith confirmed the reliability of the 14.8% WACC in several ways. First, she compared VPA's 14.8% to the WACC calculated by another valuation firm, FTI, which, using CAPM, applied a comparable 14.0% WACC to Millennium.[22] While Defendants complain that FTI's analysis was done nineteen months after VPA's, Austin Smith explained that FTI's analysis resulted in a WACC that was slightly lower than at the time of the 2014 Transaction because the reorganized, post-confirmation Millennium was using fresh start accounting with its debt and other obligations having been adjusted as a result of the bankruptcy process.[23] That FTI computed a WACC for Millennium post-bankruptcy that was similar to VPA's WACC at the time of the 2014 Transaction is significant evidence to Austin Smith that VPA's WACC is correct.[24] As an additional point of confirmation, Austin Smith noted that the starting point for FTI's analysis was the observed betas for a set of companies that included all five of the comparable companies Ms. Austin Smith independently identified.[25] Austin Smith further confirmed VPA's WACC in response to Hutton's report by comparing it to the simultaneously computed 24.3% WACC by TA Associates. TA Associates was Millennium's equity holder who bore the risk most comparable to the lenders in the 2014 Transaction. As TA Associates computed a higher WACC for Millennium than VPA, this showed Austin Smith that VPA's WACC is, if anything, conservative.[26] The starting point for TA Associates' analysis was a set of four comparable companies, three of which were included in the five comparable companies Ms. Austin Smith independently identified.[27]

---

[22] Ex. 1 (YAS Report) ¶ 143 (citing FTI Valuation); Ex. 2 (YAS Tr.) at 119:4–10; *see also* Ex. 8 (FTI Valuation) at -763.

[23] Ex. 2 (YAS Tr.) at 128:2–130:15.

[24] Ex. 2 (YAS Tr.) at 118:15–119:4, 138:10–20.

[25] *Id*. at 297:16–298:2.

[26] Ex. 2 (YAS Tr.) at 119:4–10; *see also* Ex. 7 (TA Associates Valuation).

[27] Ex. 7 (TA Associates Valuation) at -0312.006.

Furthermore, Austin Smith conducted a sensitivity analysis, which established that Millennium was insolvent *even when applying the much lower* WACC of 9.8%, which corresponds both to (1) the VPA WACC of 14.8% with the CSRP of 5% challenged by Defendants removed and (2) the WACC calculated from Austin Smith's five most comparable companies plus the widely-accepted and benchmarked SCRP, but without the CSRP.[28] Notably, Austin Smith's and VPA's use of the SCRP is not challenged by Defendants in their Motion. Instead of concluding that her five selected public companies could not be used to calculate Millennium's WACC, as Defendants contend, Austin Smith used these companies not only to confirm VPA's, FTI's, and TA Associates' selected comparable companies, but also to perform a sensitivity analysis showing that Millennium was insolvent under a wide range of WACC calculations.

As for Defendants' contention that Hutton believes a WACC of 7.2% should be used for Millennium,[29] that is not true. Under cross-examination, Hutton repeatedly admitted at her deposition that she is not opining that 7.2% (or any other WACC) is the correct WACC for Millennium.[30] Defendants simply have no proof that 7.2% or any other WACC is the correct WACC for Millennium at the time of the 2014 Transaction.[31]

Apart from the Balance Sheet test, Austin Smith also concluded that Millennium was insolvent under the Ability to Pay Debts test and the Capital Adequacy test. Austin Smith relied

---

[28] Ex. 1 (YAS Report) ¶ 148, n.285; *id*. at Table 7.

[29] Def. Br. at 3, 5, 18 n.11.

[30] Ex. 4 (Hutton Tr.) at 205:6–207:10 ("I did not derive from bottoms-up my own WACC").)

[31] And with regard to the various WACCs calculated by the Defendants at the time of the 2014 Transaction, which Defendants never questioned Austin Smith about at her deposition, Austin Smith reviewed those in response to Hutton's report and found them to be unreliable and unreasonable. For example, Defendants used the following companies as comparable companies that bear no resemblance to Millennium and made no adjustments to the WACC derived from those companies to account for their lack of comparability: Catamaran Corporation (pharmacy benefits manager), Advisory Board Company (research and consulting company), and Athenahealth, Inc. (tele-health company).

on the Modified Padres Projections with respect to both tests. As to the former test, she calculated that by 2018, Millennium would have been unable to make interest payments on its debts.[32] Directly contradicting Defendants' contentions in their Motion, Austin Smith concluded that Millennium would be unable to refinance its debt given that it had debt levels above those associated with a "Caa-C" rating.[33] A credit rating of C is described by Moody's Investor Services as "the lowest-rated class of bonds and are typically in default, with little prospect for recovery of principal and interest."[34]  Defendants contend that Austin Smith made no such finding concerning refinancing despite her report expressly stating that she "considered Millennium's prospects for refinancing the Term Loan at maturity in April 2021" and concluded that "[t]here was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021."[35] The third test for avoidance is the Capital Adequacy test. To conduct this test, Austin Smith determined a reasonable downside scenario based on management's predictions.[36] That scenario showed that it was reasonably foreseeable that Millennium would be left with inadequate capital. Notwithstanding that Austin Smith reached these conclusions, Defendants chose not to ask any questions of her about the issues they raise at her deposition.

## IV.    ARGUMENT

Austin Smith's opinion was the product of the reliable application of the facts to accepted methodologies. It is undisputed that Austin Smith is qualified to render her opinions, and Federal Rule of Evidence 702 provides that a person qualified by "knowledge, skill, experience, training, or education" may provide expert opinion and testimony if:

---

[32] Ex. 1 (YAS Report) ¶ 165.

[33] *Id*. ¶ 169.

[34] https://ratings.moodys.io/ratings.

[35] Ex. 1 (YAS Report) ¶ 169.

[36] Ex. 1 (YAS Report) ¶¶ 171–72. It is accepted practice to test capital adequacy by applying a downside scenario. Ex. 9 (Heaton *Solvency Tests*).

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Austin Smith satisfies these requirements. "Rule 702 and *Daubert* put their faith in an adversary system designed to expose flawed expertise."[37] Accordingly, "[a]s long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."[38] These standards apply to an experts' reliance on another party's analysis. Indeed, an "expert's reliance upon others' estimates need not be 'correct,' it must only be 'reliable'" and "[w]hether the expert relied on the best data in forming his opinions is a question for the jury" since "[i]f a rational connection exists between the data and the opinion, an expert's reliance on allegedly faulty information is a matter to be explored on cross-examination; it does not go to admissibility."[39]

### A.    Austin Smith's Use Of The WACC Calculated By VPA Is Consistent With Sound Valuation Practice.

Defendants seek to strike part of Austin Smith's opinion because she used a WACC in her DCF analysis that had been originally calculated by Millennium's contemporaneous solvency adviser, VPA, and relied upon by Millennium and its Board of Directors in approving the 2014 Transaction. VPA used CAPM, a widely accepted methodology, that Defendants' own expert Hutton used to calculate a WACC. Austin Smith explained her methodology and why the WACC

---

[37] *U.S. v. Mitchell,* 365 F.3d 215, 235 (3d Cir. 2004).

[38] *Id.* at 244 (citations and internal quotation omitted).

[39] *Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704-MAK, 2022 WL 3021560, at *15 (D. Del. July 29, 2022) (internal citations, quotation marks, and ellipses omitted).

used by VPA was correct; but, for the present motion, Austin Smith's WACC need not even be correct, rather only her reliance on it need be reliable. It was. Defendants' Motion misstates the analysis performed, and documents considered, by Austin Smith and misstates the applicable law.

### 1. Defendants Misstate The Record Evidence Considered By Austin Smith And Her Testimony.

The lynchpin of Defendants' Motion is their claim that "Austin Smith ... did not even know the methodology used by Vantage Point or the assumptions on which Vantage Point's WACC was based before adopting it as her own."[40] This contention is without merit. Defendants base this accusation on the flawed premise that because a specific Vantage Point document did not appear on Austin Smith's list of materials relied upon, she blindly adopted VPA's WACC without understanding the analysis that led to it.[41]

Defendants ask the Court to assume that only the specific document (labeled "DRAFT") they cite sets forth VPA's methodology. But, that is incorrect (as one would expect, since VPA produced 5,665 documents in this case). Austin Smith relied on another VPA document (Exhibit 59 to the deposition of Heidi Smith) that sets forth VPA's methodology and the WACC information that is contained in the document Defendants cite.[42] This document was expressly included in Austin Smith's list of documents relied upon.[43] And Austin Smith also cited deposition Exhibit 59 directly in the text of her report when referencing VPA's solvency analysis.[44] Moreover, Austin Smith's discussion in her report of the specific SCRP used by VPA would not have been

---

[40] Def. Br. 10.

[41] *Id*. at 6 (citing YAS Tr. 134:19–135:8).

[42] Ex. 1 (YAS Report) ¶ 68 n.120 (citing Smith Ex. 59).

[43] Ex. 1 (YAS Report) Appendix E, p. 99; *id*. ¶ 68 n.120 (citing Smith Ex. 59); Ex. 6 (Smith Ex. 59 VPA Analysis) at -15731.

[44] Ex. 1 (YAS Report) Appendix E, p. 99; *id*. ¶ 68 n.120; Ex. 6 (Smith Ex. 59 VPA Analysis).

possible unless she had reviewed a document containing VPA's methodology.[45]

Finally, contrary to Defendants' assertion, in her deposition, Austin Smith testified that she had reviewed and considered VPA's methodology and had relied upon a document that described VPA's methodology in preparing her report, but that it was "unclear" whether it was the specific document counsel for Defendants put in front of her as an exhibit or another document.[46] Notwithstanding Defendants' incorrect assertions, the record indisputably demonstrates, both in her report and her testimony, that Austin Smith examined VPA's methodology and concluded it was reliable.

### 2. Austin Smith's Use Of The WACC Calculated By VPA Is Reliable And Widely-Accepted In The Third Circuit.

As Defendants concede,[47] an expert is permitted to use calculations by another party as part of her opinion, as Austin Smith did here. Courts merely require that the expert explain "why [they] relied on such estimates and ... why [they] believed the estimates were reliable."[48] For example, in *Insight Equity v. Transitions Optical, Inc.*, the court refused to exclude an expert for relying on another party's sales projections because, while an expert should "explain 'why he relied on such estimates and must demonstrate why he believes the estimates were reliable,'" the expert "did just that when he explained that the estimates were actually used in the course of business and incorporated actual sales data."[49] Similarly, in *Allscripts Healthcare, LLC v. Andor Health, LLC*, the court admitted an expert to testify who relied on another party's financial projections because the expert "explained at his deposition he found the[m] valid because [the research firm] adopted

---

[45] Ex. 1 (YAS Report) ¶ 68 n.120 (comparing her calculated WACC with VPA's WACC without the CSRP); Ex. 2 (YAS Tr.) at 132:20–136:19.

[46] Ex. 2 (YAS Tr.) at 134:19–135:8.

[47] Def. Br. 9 ("In some circumstances, courts may accept the testimony of an expert whose opinion relies on an analysis conducted by someone else." (internal quotations omitted)).

[48] *ZF Meritor, LLC v. Eaton Corp.* 696 F.3d 254, 292 (3d Cir. 2012).

[49] 252 F.Supp.3d 382, 396 (D. Del. May 9, 2017).

15

them after performing due diligence."[50] Austin Smith easily satisfies this standard.

### 3.   Austin Smith Examined And Verified VPA's WACC Calculations And Performed A Sensitivity Analysis.

Austin Smith examined and verified VPA's WACC calculations, including against her own prior examination of comparable companies, checked VPA's calculations against those of other market participants, and performed a sensitivity analysis. Austin Smith explained this in her report and deposition testimony. As detailed above, Austin Smith explained that after concluding her five selected comparable companies were not sufficiently comparable to directly derive the WACC because they underestimated Millennium's risk, she looked to how contemporaneous market participants addressed the issue and concluded that VPA's handling of Millennium's risk in its calculation of the WACC was proper and supported by other market evidence.

Courts approve of the use of contemporaneous market evidence to support an expert's opinion. For example, in *In re SemCrude L.P.*, the Third Circuit held that an expert was entitled to rely on the contemporaneous valuation performed by a market participant.[51] That alone should settle the matter.

The cases cited by Defendants are not to the contrary. In *ZF Meritor, LLC v. Eaton Corp*, the expert relied on a one-page set of internal company financial projections in order to calculate a damages scenario. The Third Circuit upheld the district court's exclusion of the expert because he did not know "the methodology used to create the [projections] or the assumptions on which the [projections'] price and volume estimates were based."[52] The district court, in considering a similar fact pattern to *ZF Meritor*, has explained that "*ZF Meritor* is not the typical case; rather, it represents an extreme category of cases in which the data relied on by an expert is so patently

---

[50] 2022 WL 3021560, at *16–18 (D. Del. July 29, 2022).
[51] *In re SemCrude L.P.*, 648 F. App'x 205, 213–14 (3d Cir. 2016).
[52] *ZF Meritor*, 696 F.3d at 292–93.

unreliable as to render it inadmissible" and "must [be] interpret[ed] ... in the context of our Court of Appeals's broader interpretation of the Federal Rules of Evidence: to encourage the use of expert testimony to render trials more rational and efficient."[53] In *MOSAID Technologies Inc. v. LSI Corporation*,[54] *Chemipal Ltd. v. Slim-Fast Nutritional Foods Intern., Inc.*,[55] and *Jacked Up, LLC v. Sara Lee Corp.*,[56] courts excluded experts who made no effort to understand the data they relied upon. And in *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, the court *rejected* an attempt to exclude an expert for supposedly failing to verify data gathered by others.[57]

Unlike the experts excluded in *ZF Meritor*, *MOSAID Technologies*, *Chemipal,* and *Jacked Up*, who relied on projections they did not understand or investigate, Austin Smith reviewed and understood VPA's WACC and the elements of it, conducted extensive due diligence, including a sensitivity analysis, explained why she determined it to be reliable, and was cross-examined at length by Defendants with respect to those opinions.

While Defendants contend that Austin Smith is being inconsistent by only adopting VPA's WACC, but rejecting VPA's use of the Padres Projections, this criticism is off-base. The WACC is the only relevant component of VPA's solvency analysis that it independently calculated. On the other hand, the Padres Projections were provided by management. Under its engagement letter, VPA accepted those projections unconditionally and (unlike Austin Smith) did not review or confirm them.

4. **Defendants Extensively Cross-Examined Austin Smith About Her Comparable Company Analysis.**

---

[53] *Allscripts Healthcare, LLC v. Andor Health, LLC*, No. CV 21-704-MAK, 2022 WL 3021560, at *18 (D. Del. July 29, 2022) (internal quotation marks and citations omitted).
[54] 2014 WL 807877 (D. Del. Feb. 28, 2014).
[55] 350 F. Supp. 2d 582 (D. Del. 2004).
[56] 807 F. App'x 344 (5th Cir. 2020).
[57] 2020 WL 4676351, at *4 (W.D. Pa. Aug. 12, 2020).

Defendants argue that Austin Smith's opinion should be excluded because "Defendants [would have] no one to ask about the reasoning behind the selection of Vantage Point's eight companies" or its selection of the beta.[58] This is without foundation. First, Defendants did ask Austin Smith about the eight companies selected by VPA, and she provided fulsome testimony in response.[59] Austin Smith explained that there was significant overlap in the comparable companies she had reviewed and those that VPA had selected. Specifically, the five companies that Austin Smith had identified as the most comparable to Millennium were included in the eight companies selected by VPA. Additionally, two or three of the remaining three companies selected by VPA were in the second tier of comparable companies she had reviewed. Austin Smith also testified about how VPA's selected companies and her own selected companies overlapped with FTI's and TA Associates' selected companies.[60] Second, Defendants' ability to probe the methodology employed by Austin Smith and VPA is evidenced by the work of their own expert. In her report, Hutton recreated the WACC calculation and substituted in her own inputs.[61] Third, if Defendants are arguing that Austin Smith should be able to read VPA's mind and testify about why VPA selected the eight companies, they are misconstruing the case law. Austin Smith need only explain why *she* relied on VPA's WACC and why *she* believes the WACC is reliable, which she did, after extensive due diligence and a sensitivity analysis.[62]

### 5. Defendants' Request That The Court Disregard Austin Smith's Deposition Testimony Is Without Merit.

Defendants next ask the Court to disregard Austin Smith's deposition testimony. There is no basis for doing so. Defendants claim that Austin Smith offers new opinions in her deposition

---

[58] Def. Br. 11.

[59] Ex. 2 (YAS Tr.) at 136:20–138:20, 288:13–288:17, 295:15–298:11, 305:11–307:13.

[60] *Id*. at 297:3–298:2.

[61] Ex. 3 (Hutton Report) ¶¶ 32–42.

[62] *See ZF Meritor, LLC v. Eaton Corp.* 696 F.3d 254, 292 (3d Cir. 2012).

18

testimony that are not disclosed in her report. This is incorrect. Delaware courts have explained that "[w]hen determining whether an expert's testimony is beyond the scope of the expert's written report, courts do not require verbatim consistency with the report, but allow testimony which is consistent with the report and is a reasonable synthesis and/or elaboration of the opinions contained in the expert's report."[63] And, "[s]ection 26(a)(2)(B) does not limit an expert's testimony simply to reading his report .... The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."[64]

Even when considering an expert's testimony *at trial*, "the key consideration when determining whether testimony is beyond the scope of an expert report is whether the objecting party had notice of the subject matter of the testimony based on the contents of the report and elaborations made during any deposition testimony."[65] Austin Smith's report provided "notice of the subject matter of [her] testimony" and her deposition testimony elaborated on her report.

Even if the report was inadequate, which it was not, Rule 37(c)(1) of the Federal Rules of Civil Procedure does not provide for a sanction where a "failure was substantially justified or is harmless." It is evident that Defendants suffered no prejudice—in her report, Defendants' expert Hutton shows that she understood Austin Smith's WACC opinion,[66] and Defendants had the opportunity to, and did, cross-examine Austin Smith at length at her deposition about the opinions provided in her report without objecting once to her testimony or purported lack of prior disclosure. And even if Defendants could establish prejudice, which they cannot, the appropriate remedy is

---

[63] *nCube Corp. v. SeaChange Int'l, Inc.*, 809 F. Supp. 2d 337, 347 (D. Del. 2011) (internal quotation marks, brackets, and ellipses omitted) (citations omitted).
[64] *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) (internal quotation marks omitted).
[65] *nCube Corp.*, 809 F. Supp. 2d at 347.
[66] Ex. 3 (Hutton Report) ¶¶ 32–42.

19

not to strike her opinion, but to provide Defendants with additional discovery, which they have not asked for and do not need.[67]

### a.     Austin Smith's report sets out her opinions on the WACC.

In her report, Austin Smith proffers her opinions regarding the WACC she selected for her solvency analysis. Specifically, Austin Smith opined that she identified the five most comparable companies, concluded that those companies were not sufficiently comparable to Millennium to directly derive a beta and WACC, reviewed contemporaneous market evidence and selected the 14.8% WACC calculated by VPA at the time of the 2014 Transaction as the correct WACC for Millennium, reviewed other market evidence and determined that the WACC employed by VPA was consistent with the WACC calculated by FTI, and performed a sensitivity analysis that showed Millennium to be insolvent over the entire range.[68] Austin Smith also explained in her report that the low end of her sensitivity analysis, 9.8%, corresponds closely to the WACC derived from her selected five most comparable companies plus the SCRP, which Defendants do not challenge in their Motion.[69] Notably, the 9.8% also corresponds approximately to VPA's WACC of 14.8% with the CSRP of 5% challenged by Defendants removed.

Defendants complain about the amount of discussion of the 14.8% WACC in Austin Smith's report, but are solely focusing on one element of one topic among hundreds of elements and dozens of topics in her report. The relevant inquiry is not the length of the discussion of WACC in Austin Smith's report, but whether the discussion provided notice of her opinions, which it did. Defendants' claim that Austin Smith did not adequately disclose her opinions concerning her selected WACC is without merit, as confirmed by the fact that they never once complained about

---

[67] *Samsung Electronics Co. v. Nvidia Corp.*, 314 F.R.D. 190, 200–05 (E.D. Va. 2016).
[68] Ex. 1 (YAS Report) ¶¶ 143, 148, 148 n.285, Table 7, 149–60.
[69] *Id*. at ¶ 148, n.285

any lack of disclosure until filing their Motion.

> **b.    Austin Smith's deposition testimony appropriately elaborated upon the opinions in her report.**

In her deposition, Austin Smith did not offer any new opinions. Instead, she elaborated on her opinions in response to questioning by Defendants' counsel. Defendants claim that Austin Smith's deposition testimony should be disregarded because her report did not contain all of the details she provided in her testimony.[70] But, that is exactly what depositions are for—to probe the expert's disclosed opinions and the bases for them. And, that is exactly what Defendants did— they used the deposition to probe Austin Smith's disclosed opinions. In addition, the parties agreed to forgo rebuttal reports, so the deposition was Defendants' only opportunity to probe Austin Smith's rebuttals of the opinions of Defendants' experts, which they did.

Defendants asked, and Austin Smith answered, numerous detailed questions about the opinions in her report concerning her selected WACC. Each of the answers Austin Smith provided concerned the opinions from her report: her review of comparable companies and determination that they were not sufficiently comparable, her review of market evidence and selection of VPA's 14.8% WACC, her review of FTI's WACC and its confirmation of VPA's WACC, and her use of a sensitivity analysis that ranged from a WACC of 9.8% to 14.8%.[71]

This is the antithesis of a situation where the expert is attempting to inject new opinions through a deposition. The cases cited by Defendants prove the point. In *LG Display Co. v. AU Optronics Corp.*, it was *undisputed* by the parties that the expert offered new opinions *at trial* that were not disclosed in his report or deposition.[72] The court also rejected a challenge to a different expert's trial testimony because there was "at least some basis in [the expert's] report for the

---

[70] Def. Br. 12–14.
[71] *See generally* Ex. 2 (YAS Tr.) at 113:7–158:8, 296:12–307:16.
[72] 265 F.R.D. 189, 192 (D. Del. Feb. 16 2010).

testimony he offered" and the movant was not unduly prejudiced "such that exclusion of his opinions is an appropriate remedy."[73]

In *Samsung Electronics Co. v. Nvidia Corp.*, the court found that an expert had failed to disclose materials in his report that he had relied on.[74] The court made clear that "[t]he case before this Court is not one of lack of clarity, however, but of absence of material" and "when an expert's disclosures are complete, but simply not articulated as clearly as it might have been," "[t]he rule is different."[75] And even under the circumstances in that case, the court's remedy was not to exclude the expert witness, but to order additional expert discovery to address the deficiency.[76] In *Reed v. Binder*, the experts failed to reveal basic information required by Rule 26, including their compensation, prior publications, and documents relied upon.[77] And again, the court did not exclude the expert, but instead required defendants to pay the experts' deposition fees.[78]

The other cases cited by Defendants do not advance their position. In *Johnson v. Vanguard Manufacturing, Inc.*, the court excluded an expert opinion that was first offered *at trial*, and, unlike here, was not disclosed in the expert's report or deposition.[79] Similarly, in *Hamlett v. Carroll Fulmer Logistics Corp.*, from the Southern District of Georgia, the court excluded an expert where it was "unrebutted" that he offered a new opinion at deposition.[80] In *Safeguard Sciences, Inc. v. Saints Cap. Dakota* and *Krys v. Aaron*, the court refused to permit an expert to offer a new opinion on the *eve of trial* that had not been disclosed in his report or deposition.[81] Finally, in *Hill v.*

---

[73] 265 F.R.D. 199, 205–206 (D. Del. Mar. 2 2010).
[74] 314 F.R.D. 190 (E.D. Va. 2016).
[75] 314 F.R.D. at 198 n.10 (citation omitted).
[76] *Id*. at 200–05.
[77] 165 F.R.D. 424, 429–30 (D.N.J. 1996).
[78] *Id*. at 431.
[79] 34 F. App'x 858 (3d Cir. 2002).
[80] 176 F. Supp. 3d 1360 (S.D. Ga. 2016).
[81] 2013 WL 12158979 (D. Del. Mar. 28, 2013); 112 F. Supp. 3d 181 (D.N.J. 2015).

*Koppers Industries*, the court did not allow experts to testify where it was undisputed that the plaintiff failed to disclose materials relied upon by the experts or the fact that one expert had relied substantially on the opinions of another who had not been disclosed.[82] Contrary to these cases, Austin Smith disclosed her opinions in her report, and elaborated on those opinions at her deposition.

### c.    Defendants' request that Austin Smith's WACC Opinion be stricken is extreme and unjustified.

Defendants' request that Austin Smith's WACC opinion be stricken, resulting in summary judgment for Defendants, is extreme and unjustified. "[T]he exclusion of critical evidence is an extreme sanction, not normally to be imposed absent a showing of willful deception or flagrant disregard of a court order by the proponent of the evidence."[83] Even if Austin Smith had failed to sufficiently disclose her opinions in her report, which she did not, the law is clear that a sanction is inappropriate where "the failure was substantially justified or is harmless."[84]

Defendants claim that they were prejudiced because their "expert ... could not assess Austin Smith's alleged methodology or respond to it in her rebuttal report."[85] But, as explained above, Austin Smith disclosed her opinions in her report. Moreover, Defendants' claim is belied by Hutton's report. After receiving Austin Smith's report and prior to Austin Smith's deposition, Hutton offered a lengthy (albeit flawed) opinion regarding Austin Smith's WACC, including multiple schedules and a narrative description breaking down the components of Austin Smith's WACC.[86] In fact, Hutton recreated Austin Smith's allegedly undisclosed WACC calculation, labels it "YAS WACC CALC," critiqued and adjusted certain components of it, and labeled her

---

[82] 2009 WL 3246630 (N.D. Miss. Sept. 30, 2009).
[83] *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 791–92 (3d Cir. 1994).
[84] Fed. R. Civ. P. 37(c)(1).
[85] Def. Br. 13.
[86] Ex. 1 (Hutton Report) ¶¶ 25–42.

23

adjustments to it "YAS Corrected WACC." Hutton's analysis proves both that Austin Smith's disclosure of her opinions in her report was sufficient and that there was no prejudice to Defendants. Plainly, Hutton understood Austin Smith's WACC opinions.

### B.    Austin Smith's WACC Is Reliable

Defendants' last resort is to attack the WACC on its merits. Their arguments fail.

#### 1.    Austin Smith—And VPA—Reliably Included A CSRP In The WACC.

Defendants claim that it was improper for Austin Smith to include a CSRP in her WACC calculation.[87] Defendants' complaint is unfounded because Austin Smith offered a reliable basis for using the CSRP, and its use is accepted in the industry and supported in the case law.

##### a.    Austin Smith offered a reliable basis to use the CSRP.

Austin Smith provided a reliable basis for including the CSRP in her WACC calculation. Austin Smith explained that when doing a valuation of a private company like Millennium, comparable public companies are often not available. As a result, it is widely accepted in the industry that a CSRP is often necessary to account for the "gap between what you are able to measure in the marketplace" and a WACC that accounts for the risk of the specific private company one is valuing.[88] Accordingly, after determining that her selected comparable companies understated Millennium's risk at the time of the 2014 Transaction, Austin Smith concluded it was necessary to make adjustments to the WACC.[89] To confirm her conclusion, Austin Smith looked to the market evidence. Specifically, Austin Smith examined VPA's and FTI's valuations in connection with her report, and TA Associates' valuation in response to Hutton's report and

---

[87] Def. Br. 14–16. Defendants also suggest that it was improper for VPA to select a beta of 1.0 rather than .77 (the median of the comparable companies). But VPA examined various potential measured beta from the comparable companies, see Ex. 6 (Smith Ex. 59 VPA Analysis) at -15732, and Defendants cite nothing suggesting that the median must be used.

[88] Ex. 2 (YAS Tr.) at 143:2–3.

[89] Ex. 2 (YAS Tr.) at 140:6–144:9.

observed that they all included comparable companies that overlapped with hers and included a CSRP (or equivalent risk premiums) to account for the increased risk of Millennium as compared to those companies. This is strong evidence of the reliability of Austin Smith's inclusion of a CSRP.[90]

### b.      CSRP is widely accepted by practitioners and courts.

Austin Smith's analysis is well-founded. Defendants' own expert, Hutton, acknowledges that public companies comparable to private companies are often impossible to find, which results in a beta that is not accurate.[91] Hutton also admits that practitioners frequently use a CSRP to adjust the WACC to account for the lack of comparability.[92] And Delaware courts have found that the use of a CSRP is often appropriate.[93] In fact, in *Allonhill, LLC v. Stewart Lender Services*, the court held that an expert erred by failing to include a CSRP when valuing a company whose business was troubled at the time of the relevant transaction, like Millennium's was, and incorporated a CSRP proffered by another expert in the valuation of the subject company.[94]

In the face of the widespread use of CSRPs by courts and practitioners, Defendants' cases do not support their request to strike portions of Austin Smith's opinion. In *Union Illinois 1995 Investment Ltd. Partnership*,[95] the Chancery Court expressly chose not "to take this opportunity to enter into the debate about whether company-specific risk premiums can be added to come up with an accurate cost of capital for use in a discounted cash flow analysis" and explained that "investors do consider company-specific risks in calculating the cost of capital they will use in investing

---

[90] *See, e.g., In re SemCrude L.P.*, 648 F. App'x 205, 213–14 (3d Cir. 2016).

[91] Ex. 4 (Hutton Tr.) at 117:15–120:11.

[92] Ex. 4 (Hutton Tr.) at 157:19–159:11, 198:17–198:20.

[93] *See Allonhill, LLC v. Stewart Lender Servs.*, 2019 WL 1868610, at *31 (Bankr. Del. 2019). *See also Buchwald v. Renco Grp., Inc.*, 2014 U.S. Dist. LEXIS 197328, at *16–27 (S.D.N.Y. 2014) (accepting expert's use of a CSRP).

[94] *See Allonhill, LLC*, 2019 WL 1868610, at *31.

[95] Def. Br. at 16 (quoting 847 A.2d 340, 354 n.28 (Del. Ch. 2004)).

money and that investment banks use company-specific risk premiums in advising clients ... particularly ... when a company's shares do not actively trade on a daily basis in a public market."[96] While he observed that "[p]ure proponents of the CAPM argue that only systemic risk as measured by beta is relevant to the cost of capital and that company-specific risks should be addressed by appropriate revisions in cash-flow estimates," he did not adopt that position.[97] Similarly, although the court in *In re Orchard Enterprises* disfavored use of CSRPs, it recognized that practitioners use them and it did not strike the expert's opinion, rather it selected a valuation that did not use a CSRP in the context of a post-trial decision in an appraisal action.[98] Furthermore, the Chancery Court distinguished the situation in that case, where the expert had been directly involved in preparing the management projections, from one in which the "expert is given management-prepared projections that he believes are inaccurate," such as occurred here.[99]

Likewise, while the Chancery Court indicated in *Solar Cells, Inc.* v. *True North Partners* that courts should ensure at trial that an expert is not using a CSRP to incorporate improper assumptions, the Court nowhere suggested or held that a CSRP generally should not be permitted.[100] Moreover, in contrast to the expert in *Solar Cells*, Austin Smith did not apply an ad hoc CSRP prepared for litigation but rather relied on one contemporaneously calculated by VPA.

Finally, Defendants rely on Hutton's opinion that a CSRP should never be used. But, as detailed herein and in the Trustee's Motion to Exclude the Testimony of Amy Hutton, Hutton's opinion is inconsistent with established precedent, the accepted methods of practitioners, and her

---

[96] 847 A.2d at 354 n.28.

[97] *Id*.

[98] *In re Orchard Enters. Inc.*, 2012 WL 2923305 (Del. Ch. July 18, 2012).

[99] *Id*. at *20.  As noted above, VPA did not confirm management's projections, and Austin Smith independently reviewed and modified those projections because they were inaccurate and unreliable.

[100] *Solar Cells, Inc.* v. *True N. Partners, LLC*, 2002 WL 749163, at *6 n.11 (Del. Ch. 2002).

own prior opinion in another case.[101] Hutton's explanation for why she rejected use of a CSRP was that it was academically "dissatisfying" to her.[102] But Hutton's "dissatisf[action]" with using a CSRP in this case when it does not serve her purpose is no reason to exclude Austin Smith's opinion. At most, Plaintiff's and Defendants' experts have a difference of opinion about the use of a CSRP to value Millennium that should be subjected to cross-examination at trial.

### c.   Millennium was insolvent even without applying a CSRP.

Finally, even if Defendants were right that the CSRP is not permitted as a matter of law, which is correct, Austin Smith's opinion that Millennium was insolvent at the time of the 2014 Transaction does not depend on the inclusion of the CSRP in her WACC calculation. As shown by Austin Smith's sensitivity analysis, Millennium was insolvent even when the CSRP is removed from her WACC calculation.[103]

### 2.   Defendants' Argument About the Comparable Companies Used By VPA Is A Red-Herring.

Defendants also seek to strike Austin Smith's opinion because VPA calculated its WACC using a set of eight companies that included the five companies that Austin Smith found to be insufficiently comparable to directly derive a beta. Defendants disregard, however, that VPA and Austin Smith both made adjustments that are widely accepted in the industry to account for the lack of comparability of their selected companies. Simply put, Austin Smith did not conclude that her five selected companies should not be used to compute the WACC (if their lack of comparability is appropriately accounted for). Instead, she concluded that they were the most comparable companies to Millennium and validated VPA's opinion because they were included

---

[101] D.I. 254 at 14–16; Ex. 10 (Hutton D., *Move, Inc. v. Zillow, Inc.*, No. 14-2-07669-0, at ¶ 42 (Wash. Sup. Ct. 2016).)

[102] Ex. 4 (Hutton Tr.) at 211:10–14.

[103] Ex. 1 (YAS Report) ¶ 148, Table 7.

in its eight comparable companies.

C.    **Austin Smith's Application Of The Ability To Pay Debts And The Capital Adequacy Tests Are Consistent With Sound Valuation Practice.**

Finally, Defendants argue that Austin Smith's opinion should be excluded because she "never concluded that Millennium would be unable to refinance the term loan or raise additional capital."[104] This is incorrect. She directly opined that Millennium would not be able to refinance the term loan:

> **I further considered Millennium's prospects for refinancing the Term Loan at maturity in April 2021**. Even under the expected case projections, the leverage ratio was 8.7 times at December 31, 2020. Under the reasonable downside projections, the leverage ratio was 19.8 times at December 31, 2020. As of December 2013, the median leverage ratio for 'Caa-C' credits was 8.3 times. Moody's defines 'Caa' credits, the highest quality credits in the 'Caa-C' range as "speculative of poor standing and are subject to very high credit risk." Thus, even under the expected case projections, Millennium was above the levels typically associated with Caa-C credits. **There was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021.**[105]

Clearly, Austin Smith considered Millennium's ability to refinance the term loan and concluded it could not.

While courts have found that unreasonably small capital "denotes a financial condition short of equitable insolvency,"[106] which exists in light of Millennium's insolvency, Austin Smith nonetheless also opined that "[u]nder the reasonable downside scenario, [Millennium's] negative equity values confirm that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with capital insufficient to sustain operations."[107] In rendering her opinions on the two

---

[104] Def. Br. at 19.

[105] Ex. 1 (YAS Report) ¶ 169 (emphasis added).

[106] *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056, 1064 (3d Cir. 1992).

[107] Ex. 1 (YAS Report) ¶ 172. Defendants suggest that the downside scenario is redundant to the Modified Padres Projections. But those Projections aligned the Padres Projections with knowable information as of the 2014 Transaction. It is accepted practice to use a downside scenario to account for results worse than what was knowable. *See* Ex. 9 (Heaton *Solvency Tests*).

28

tests, Austin Smith necessarily concluded that Millennium could not raise additional capital, because she concluded Millennium would be unable to pay its debts or sustain its operations. That conclusion is confirmed by Austin Smith's demonstration in her report that the enterprise value of Millennium was *less* than the amount of the outstanding debt, meaning that the only *theoretical* way Millennium could have raised enough equity to pay off Millennium's debt was to cancel all existing equity, and even that would be insufficient.[108] She further explained that Millennium could not have raised capital through operating cash flows or an alternative credit facility.[109] Regardless, the Capital Adequacy and Ability to Pay tests consider only reasonably anticipated sources of funding.[110] It was not necessary for Austin Smith to expressly reject every outlandish possibility for her testimony to be admitted.[111] And, again, Defendants made no attempt to question Austin Smith about these issues at her deposition.

## V.     CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court deny Defendants' Motion.

---

[108] Ex. 1 (YAS Report) Table 10.

[109] Ex. 1 (YAS Report) ¶¶ 166–68.

[110] *See Peltz* v. *Hatten*, 279 B.R. 710, 745 (D. Del. 2002); *MFS/Sun Life Tr.-High Yield Series* v. *Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995).

[111] *See, e.g., Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.*, 461 F.Supp.2d 271, 274 (D.N.J. 2006) ("An expert must consider enough factors to make his or her opinion sufficiently reliable in the eyes of the court but the expert need not consider every possible factor to render a reliable opinion." (internal quotation marks, brackets, and ellipses omitted)).

29

Dated: October 24, 2022
    Wilmington, Delaware           Respectfully submitted,

By: */s/ G. David Dean*
G. David Dean (No. 6403)
COLE SCHOTZ P.C.
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Tel: (302) 652-3131
ddean@coleschotz.com

Kyle A. Lonergan
Josh J. Newcomer
Grant L. Johnson
MCKOOL SMITH, P.C.
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York, 10001-8603
(212) 402-9400
klonergan@mckoolsmith.com
jnewcomer@mckoolSmith.com
gjohnson@mckoolSmith.com

***Attorneys for Plaintiff***

30