**EXHIBIT F**

Redacted Public Version of Declaration of Grant L. Johnson in Opposition to
Defendants' Daubert Motion to Exclude the Testimony of Plaintiff's Proposed Expert
Yvette Austin Smith [Adv. Docket No. 285]

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | |
| MILLENNIUM LAB HOLDINGS II, LLC, | § | Chapter 11 |
| *et al.*, | § | CASE NO. 15-12284 (LSS) |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

| | | |
|---|---|---|
| | § | |
| MARC S. KIRSCHNER solely in his | § | |
| capacity as TRUSTEE of the | § | |
| MILLENNIUM CORPORATE CLAIM | § | |
| TRUST, | § | |
| | § | |
| Plaintiff, | § | |
| | § | ADVERSARY NO. 17-51840 |
| | § | |
| v. | § | |
| | § | |
| J.P. MORGAN CHASE BANK, N.A., | § | |
| CITIBANK N.A., BMO HARRIS BANK, N.A., | § | |
| and SUNTRUST BANK, | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF GRANT L. JOHNSON**
**IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION TO EXCLUDE THE**
**TESTIMONY OF PLAINTIFF'S PROPOSED EXPERT YVETTE AUSTIN SMITH**

I, Grant Lawrence Johnson, pursuant to 28 U.S.C. § 1746, declare as follows:

I am an attorney with the law firm of McKool Smith, P.C., counsel to Marc S. Kirschner

in his role as Trustee of the Millennium Corporate Claims Trust. I am admitted *pro hac vice* before

the Court in this action. I submit this declaration in Opposition to Defendants' Daubert Motion to

Exclude the Testimony of Plaintiff's Proposed Expert Yvette Austin Smith.

1.     Attached hereto as Exhibit 1 a true and correct copy of the Expert Report of

Yvette Austin Smith.

2. Attached hereto as Exhibit 2 are excerpts from the deposition transcript of Yvette Austin Smith.

3. Attached hereto as Exhibit 3 a true and correct copy of the Expert Report of Amy Hutton.

4. Attached hereto as Exhibit 4 are excerpts from the deposition transcript of Amy Hutton

5. Attached hereto as Exhibit 5 a true and correct copy of Plaintiff's Exhibit 57 to the Deposition of Heidi Smith, Bates number ML_DE_00576935.

6. Attached hereto as Exhibit 6 a true and correct copy of Plaintiff's Exhibit 59 to the Deposition of Heidi Smith, Bates number VP_ML_00015683.

7. Attached hereto as Exhibit 7 a true and correct copy of the solvency analysis performed by TA Associates, Bates number TA_MLH-0009031.

8. Attached hereto as Exhibit 8 a true and correct copy of the 4/10/16 FTI Consulting Valuation, Bates Number KPMG-ML-EA15WB-0000743.

9. Attached hereto as Exhibit 9 a true and correct copy of excerpts of J.B. Heaton, *Solvency Tests*, The Business Lawyer, American Bar Association (May 2007).

10. Attached hereto as Exhibit 10 a true and correct copy of the Declaration of Dr. Amy Hutton in Support of Zillow Inc.'s Mot. to Excl. Test. of Damages Expert Bradford Cornell, *Move, Inc. v. Zillow, Inc.*, No. 14-2-07669-0 (Wash. Sup. Ct. April 19, 2016), as used in the deposition of Dr. Amy Hutton.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 24, 2022.                                            */s/ Grant L. Johnson*
New York, New York                                                              Grant L. Johnson

2

# REDACTED

# EXHIBIT 1

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MILLENNIUM LAB HOLDINGS II, LLC, et al.,<br><br>**Debtors.**<br><br>------------------------------------------------------------------------------------<br><br>MARC S. KIRSCHNER solely in his capacity as TRUSTEE of THE MILLENNIUM CORPORATE CLAIM TRUST,<br><br>**Plaintiff(s)**<br><br>v.<br><br>J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A. and SUNTRUST BANK,<br><br>**Defendant(s)** | Case No. 15-12284 (LSS)<br>Jointly Administered<br><br><br><br>Adv. Pro. No.<br>17-51840 (LSS) |

EXPERT REPORT OF

# YVETTE R. AUSTIN SMITH

**NOVEMBER 15, 2021**

## CONTENTS

**I.  Expert Qualifications** ................................................................................................1

**II.  Assignment and Summary of Opinions** ..............................................................2

**III. Basic Factual Overview** ..........................................................................................4
    A.  Overview of Millennium's Business .................................................................4
    B.  Millennium's Competitors................................................................................6
    C.  Historical Financial Metrics of Millennium's Business ...................................7

**IV. 2014 Financing Transaction** ..................................................................................15

**V.  Framework for Solvency Analysis** .....................................................................21
    A.  Balance Sheet Test ...........................................................................................23
    B.  Ability to Pay Debt Test ..................................................................................26
    C.  Adequate Capital Test .....................................................................................27
    D.  Summary of Millennium Solvency Analysis ..................................................28

**VI. Millennium Financial Projections in connection with the 2014 Transaction** ..................29
    A.  Padres Projections ...........................................................................................29
    B.  Vantage Point Solvency Analysis Based On Padres Projections ...................37

**VII. Solvency Analysis of Millennium Using the Correct Solvency Framework** ..................40
    A.  Millennium Business Trends as of 2014 Transaction .....................................40
    B.  Regulatory and Legal Environment as of 2014 Transaction ..........................45
    C.  Post-Transaction Events Related to Known or Knowable Risks in April 2014 ..............55
        1.  Verdict in Ameritox 2011 Lawsuit......................................................55
        2.  $90 Million Quantifiable Exposure Related to Free Specimen Cups .......56
        3.  Escalating US DOJ Investigations .......................................................57
    D.  Millennium files for bankruptcy......................................................................59
    E.  Modified Padres Projections............................................................................60
        1.  UDT Revenue Projections.....................................................................61
        2.  PGT Revenue and RxAnte Projections .................................................75
    F.  Expense Projections..........................................................................................75
    G.  Summary of Modified Padres Projections.......................................................76
    H.  Balance Sheet Test ...........................................................................................79
        1.  Discounted Cash Flow Analysis ...........................................................79
        2.  Guideline Public Companies.................................................................83
        3.  Precedent Transaction Analysis ............................................................88
        4.  Balance Sheet Test Conclusion.............................................................88

    I.    Ability to Pay Debts Test ..................................................................................88

    J.    Adequate Capital Test ......................................................................................92

    K.    Solvency Conclusion ........................................................................................93

**Appendix A : Solvency Test Exhibits**..........................................................................**94**

    A.1 Expected Case DCF Analysis...............................................................................94

    A.2 Expected Case EBIT Derivation ..........................................................................94

**Appendix B : Comparable Companies Analysis Exhibits**........................................**95**

    B.1 Description of SIC Industry Codes........................................................................95

    B.2 Description of Potential Comparable Companies ..................................................96

**Appendix C : Custom Profile Exhibit**.........................................................................**97**

**Appendix D : Sensitivity Analysis of Millennium's Equity Value**............................**98**

**Appendix E : Documents Relied Upon of Yvette Austin Smith**................................**99**

**Appendix F : Curriculum Vitae**..................................................................................**104**

## I.     EXPERT QUALIFICATIONS

1.  My name is Yvette Austin Smith. I am a Principal and Chairman of The Brattle Group and co-lead the firm's Mergers & Acquisitions ("M&A") Litigation practice and previously led the firm's Bankruptcy and Restructuring practice.  I specialize in M&A and bankruptcy disputes with subject matter expertise in valuation and credit and solvency analysis. I regularly provide testifying and consulting expert services in litigation matters related to mergers and acquisitions, leveraged buyouts, recapitalization, debt recharacterization and avoidance actions. Prior to joining The Brattle Group, I provided M&A advisory services, including buy-side and sell-side advisory, fairness opinions, solvency opinions and commercially reasonable debt opinions.

2.  I hold a Master's Degree in Business Administration from Columbia University's Graduate School of Business and a Bachelor's degree from Harvard College in Philosophy and Government, with *cum laude* honors. I have completed additional graduate coursework in financial mathematics at the Courant Institute of Mathematical Sciences at New York University. I have been an instructor at Harvard University Extension School, teaching the graduate finance course, Business Analysis and Valuation.

3.  I have written a number of publications and presented on valuation and credit analysis for organizations including the American Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, Thomson Reuters, and Bloomberg Law. I am a contributing author to the Model Merger Agreement for the Acquisition of a Public Company, published by the ABA's Mergers and Acquisitions Committee, and a contributing researcher to The Standard & Poor's Guide to Fairness Opinions: A User's Guide for Fiduciaries. I am also Co-Chair of the American Bar Association Joint Task Force on M&A Litigation and the founder and former Co-Chair of the ABA Financial Advisor Task Force. I was a contributing researcher to *Estimating Future Claims – Case Studies from Mass Torts and Product Liability*.  I have also authored and presented multiple continuing legal education courses and other seminars on valuation, solvency and credit analysis.

4.  The Brattle Group is compensated for my work in this matter at my current billing rate of $800 per hour. In preparing this report, I have also been assisted by Brattle staff members working

under my direction. The Brattle Group is being compensated for their work in this matter at standard commercial rates ranging from $285 to $455 per hour. Neither the amount nor the payment of fees to me or The Brattle Group in connection with this matter is contingent upon the opinions expressed herein or the outcome of the above-captioned litigation (the "Litigation").[1]

5.  A list of documents I relied upon to form my opinions appears in Appendix E. My CV is attached as Appendix F. I reserve the right to express additional opinions, supplement or amend the opinions expressed herein, and to respond to opinions offered by Defendants' experts in this case.[2]

## II.   ASSIGNMENT AND SUMMARY OF OPINIONS

6.  I have been retained by Wollmuth Maher & Deutsch LLP, counsel for the Plaintiff Marc S. Kirschner, solely in his capacity as Trustee of the Millennium Corporate Claim Trust, to evaluate the solvency of Millennium as of April 16, 2014, the date on which Millennium closed on a $1.825 billion syndicated loan facility and the related credit agreements became effective (the "2014 Transaction").  For the purpose of the solvency analysis described herein, April 16, 2014 is the date of valuation.

7.  Based on the analyses below, my expert opinions are:

- Millennium created the "Padres Projections" to support the 2014 Transaction, and the projections were provided to both the underwriters and Vantage Point Advisors, Inc. ("Vantage Point"), the contemporaneous solvency advisor. However, the Padres Projections were significantly flawed in that they failed to reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction.

- At the time of the 2014 Transaction, several trends were impacting Millennium's business and were reasonably expected to further impact the business going forward. Taken together, these trends indicated that Millennium was facing significant reimbursement,

---

[1]   Throughout this report, I use the term "I" when describing who completed the analyses upon which my opinions are based.  This is for ease of writing and should be understood to mean me, personally, or other professionals at The Brattle Group working under my direction.

[2]   Throughout this report I cite to specific record evidence.  The cited evidence is intended to be representative but not exhaustive.  I reserve the right to rely on additional record evidence.

legal, and regulatory risks and that the company was very likely to encounter slowing or negative growth and declining profitability. The Padres Projections failed to reasonably account for these risks.

- To accurately calculate value using a Discounted Cash Flow or "DCF" methodology, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation. This was not done at the time of the 2014 Transaction and a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction.

- Giving effect to the 2014 Transaction, Millennium's equity value was no greater than *negative* $958.9 million, before considering the company's significant contingent liabilities. In other words, the 2014 Transaction rendered Millennium balance sheet insolvent. Including a conservative estimate of the liabilities relating to the then pending litigation and government investigations, Millennium's equity value was no greater than *negative* $1,003.9 million.

- Due to the limited comparability of the identified public companies, I did not rely on the Guideline Public Company or "GPC" methodology. Nonetheless, I note that the *minimum* EBITDA multiple derived from the identified public companies is *above* the EBITDA multiple at which Millennium's financial advisors unsuccessfully attempted to sell the company just prior to the 2014 Transaction.

- Courts have found that unreasonably small capital is a financial condition *prior to* equitable insolvency. The results of the balance sheet test demonstrate that Millennium was equity insolvent.  Nonetheless, I also conducted a second analysis that shows that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with unreasonably small capital.

- The 2014 Transaction encumbered Millennium with debt beyond the company's ability to pay as that debt matured. Indeed, by 2018, Millennium would have had insufficient liquidity to meet interest payments required under the 2014 Transaction. Liquidity that may have otherwise been available via the company's revolving loan in 2018 was not projected to be available due to a projected covenant breach.

## III.    BASIC FACTUAL OVERVIEW

### A.    OVERVIEW OF MILLENNIUM'S BUSINESS

8.  Millennium Laboratories, Inc. ("Millennium" or the "Company")[3] was founded in San Diego, California in December 2007. The company received its first specimen for testing in March 2008 and completed its first full year of operation in 2009.[4] Millennium was founded as a company that exclusively provided urine drug testing ("UDT").[5] UDT is employed by clinicians to monitor prescription medication use and identify drugs of abuse.[6]

9.  The UDT industry focuses on identifying the presence of certain of types of drugs ("qualitative testing") and the more precise measurement of the specific drug and quantity of drugs in a urine specimen ("quantitative testing"). A qualitative test, such as immunoassay testing provided at the point-of-care, is able to detect the presence of certain drugs in a patient's urine, but cannot quantify the amount of any given drug present or distinguish between multiple substances in the same drug class.[7] These qualitative results are typically used in a physician's office to guide treatment discussions and initial prescribing decisions while the patient is still present in the office, and to inform physicians' judgment on the medical necessity, if any, of ordering and billing the patient or his/her insurer for additional confirmatory or quantitative testing.[8] Such quantitative testing is typically performed by a laboratory company via complex testing

---

[3]   Throughout its history, the Company experienced various changes in name and in corporate structure. For instance, Millennium Laboratories, Inc. was converted to an LLC prior to the closing date of the 2014 Transaction. *See* Millennium Laboratories Confidential Information Memorandum, p. 24 [ML_DE_00269115] ("Confidential Information Memorandum"). For the purposes of this report, I use the term "Millennium" to refer to the operating company that was the borrower in the 2014 Transaction regardless of time frame and the form of the Company at the time.

[4]   Confidential Information Memorandum, p. 40.

[5]   Confidential Information Memorandum, p. 40: "Millennium's first service offering was in the urine drug testing ("UDT") space where they set out to deliver fast, highly accurate results using LC-MS/MS technology driven by proprietary algorithms and customized methods."

[6]   Confidential Information Memorandum, p. 16.

[7]   Millennium Self-Disclosure Statement, p. 3 [ML_DE_00670668 at 0670]. According to Hogan Lovells US LLP (Millennium's legal counsel), the self-disclosure statement was made on behalf of Millennium "pursuant to the CMS Voluntary Self-Referral Disclosure Protocol to resolve a potential violation of the "Stark" physician self-referral (Section 1877 of the Social Security Act). This disclosure relates to Millennium's prior practice of providing point-of-care drug test cups at no charge to certain of its physician customers for use also as a specimen collection device." *See* Millennium Self-Disclosure Statement, p. 1 [ML_DE_00670668 at 0668].

[8]   Millennium Self-Disclosure Statement, p. 4 [ML_DE_00670668 at 0671].

---

technology to identify the specific drug type and quantify the precise amount in the specimen.[9] A laboratory may also perform "specimen validity testing" to determine whether the urine sample has been adulterated in some manner.[10]

10. Since its inception, Millennium focused on the pain management industry, an industry that prescribes drugs to relieve pain, including drugs that were susceptible to abuse.[11] Millennium's growth was influenced by the rapid increase in medical use and illicit abuse of opioid drugs, which were becoming a serious and growing health problem.[12] The UDT industry grew rapidly in the years leading up to the 2014 Transaction. From 1991 to 2010, U.S. opioid prescriptions (measuring only a portion of opioid use) grew by a 5.5% per annum compound annual growth rate ("CAGR").[13]

11. Clinicians who were customers of Millennium included pain practitioners, primary care physicians, addictionologists, orthopedic specialists, spine and sports medicine specialists and psychiatric specialists.[14] Millennium's customers were dispersed throughout the United States, with significant concentrations in Florida and the New England and Southwest regions.[15] Typically, urine samples were collected from the patient in a clinical setting and sent to a Millennium laboratory for analysis. Using Liquid Chromatography – Mass Spectrometry / Tandem Mass Spectrometry ("LC – MS/MS"), Millennium provided quantitative testing that detected the presence and precise level of drugs in a patient's urine.[16]

12. In June 2012, Millennium expanded its business operations to include pharmacogenetic testing ("PGT").[17] PGT detects genetic variations in enzymes associated with the metabolism of certain medications, which assists clinicians in identifying an appropriate drug therapy for a given

---

[9]    Millennium Self-Disclosure Statement, p. 4 [ML_DE_00670668 at 0671].
[10]   US DOJ Complaint [ML_DE_00595094 at footnote 2].
[11]   Confidential Information Memorandum, p. 40.
[12]   Confidential Information Memorandum, p. 40.
[13]   Confidential Information Memorandum, p. 62.
[14]   Confidential Information Memorandum, p. 17.
[15]   *See* Padres Projections (ML_DE_00057999), April 12 2014, tab "Volume".
[16]   Confidential Information Memorandum, p. 17.
[17]   Confidential Information Memorandum, p. 40.

patient.[18] In December 2013, Millennium acquired RxAnte. RxAnte intended to provide clinicians with data-driven analytics designed to improve the targeting of medication. Even after these business expansions, UDT remained Millennium's largest business segment. For the year ended December 31, 2013, for instance, UDT represented 98.1% of the Company's total revenue.[19]

### B.   MILLENNIUM'S COMPETITORS

13. The UDT industry was highly competitive at the time of the 2014 Transaction. Barriers to entry were low, as witnessed by high growth of independent and physician-owned laboratories.[20] Millennium's primary competitors were private companies such as Ameritox, Aegis, and Calloway. Millennium claimed that its key competitive advantage was faster turnaround times than its competitors. The Company sought to report test results by the next business day, compared to 3-4 days (or longer) for its competitors.[21]

14. To a lesser extent, Millennium also competed against larger clinical laboratory testing companies like Laboratory Corporation of America Holdings ("LabCorp") and Quest Diagnostics ("Quest"). LabCorp and Quest were significantly larger than Millennium and both provided other clinical diagnostic testing services in addition to UDT. Unlike Millennium, Quest and LabCorp developed their toxicology segments in 2012 and 2013 via acquisitions.[22] At the time of the 2014 Transaction, there was ongoing consolidation in the clinical laboratory testing business.[23] Larger companies such as LabCorp and Quest maintained a competitive advantage over smaller

---

[18]   Confidential Information Memorandum, p. 16.

[19]   *See* Padres Projections, April 12 2014, tab "Summary".

[20]   Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013 filed February 25, 2014 at p.5.

[21]   Confidential Information Memorandum, p. 80. Millennium further stated that it was the only operator to rely almost exclusively on liquid chromatography – mass spectrometry/tandem mass spectrometry ("LC-MS/MS") for testing. Confidential Information Memorandum, p. 17.

[22]   Quest Diagnostics Incorporated Form 10-K for the fiscal year ended December 31, 2013, filed February 18, 2014, at pp. 6 and 48; Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013, filed February 25, 2014, at F-13.

[23]   Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013, filed February 25, 2014, at p. 5.

companies like Millennium due to the cost efficiencies and large service networks.[24] A more efficient cost structure was particularly valuable in the face of expected reductions in reimbursement rates. Larger clinical laboratory testing companies represented a potential threat to Millennium as they began to expand further into the UDT industry.[25]

### C.   HISTORICAL FINANCIAL METRICS OF MILLENNIUM'S BUSINESS

15. Millennium generated the vast majority of its revenue from third-party payor arrangements. That is, Millennium was not paid directly by the patient in most instances.[26] Rather, a third-party entity reimbursed Millennium for the testing services. Third-party payors primarily consist of private health insurance, managed care organizations, workers compensation programs, and the government-sponsored programs of Medicare and Medicaid. Non-governmental third-party payors (*i.e.*, excluding Medicare and Medicaid and some workers compensation insurers), are commonly referred to generically as "commercial payors."

16. Millennium regularly conducted multiple tests on a single urine specimen. For example, as of December 2013, Millennium was conducting approximately 23 tests, on average, for each urine specimen.[27] After increasing the average number of tests per specimen at the end of 2011 and through the beginning of 2012, Millennium's average tests per specimen had remained fairly constant prior to the 2014 Transaction. *See* Figure 1. It is noteworthy that Millennium billed almost the same average number of tests per specimen to Medicare as to commercial payors,[28]

---

[24]   *Id.*

[25]   S&P credit rating report, dated March 28, 2014. ("While we believe Millennium holds the leading market position among its small niche competitors, its market share remains relatively small compared to the larger industry powerhouses Quest Diagnostics and Laboratory Corp. of America Holdings. Large competitors' presence in niche markets is currently small, but there is a potential threat that they might further expand into the field that exhibits relatively low barriers to entry.").

[26]   For the year-ended December 31, 2013, less than 0.7% of Millennium's revenue was identified as "self pay." *See* ML_DE_00732288 (Yearly 2009-2015M5 tab); 0.1% if all "patient" revenue is included; 0.7% if both "patient" and "client" revenue is included.

[27]   ML_DE_00732288 (Quarterly 2012-2015Q1 tab, cell CJ140)

[28]   For example, in 2013 Millennium billed an average 22.6 tests per specimen to Medicare, as compared with 23.6 tests on average across all payors. Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC. For the purposes of this analysis, I have defined these payors as the commercial payors. *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab).

despite Medicare's population likely skewing towards a much older age group.[29] As discussed further herein, government investigators alleged that Millennium maintained a regular practice of improperly billing Medicare for medically unnecessary tests, including tests for drugs that were not commonly abused by the older Medicare age cohort.[30]  At the time of the 2014 Transaction, Millennium knew or should have known, from its own billing records, the risks of continuing to bill Medicare for medically unnecessary tests.   These risks included not only declining test-per-specimen levels in the future but also exposure to monetary damages or fines for past billings to Medicare.



**FIGURE 1: QUARTERLY TESTS PER SPECIMEN**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab), YAS Workpaper 4.

---

[29]   *See* Centers for Medicare & Medicaid Services, *Original Medicare Enrollment: Part A and/or Part B Enrollees by Demographic Characteristics, Calendar Year 2013* 1 (2020), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/2013/Downloads/MDCR_ENROLL_AB/CPS_MDCR_ENROLL_AB_11.pdf

[30]   US Complaint In Intervention, United States of America, et al v. Millennium Laboratories, Inc. at 5 ("US DOJ Complaint") [ML_DE_00595094 at 5096].  *See also* : Center for Behavioral Health Statistics and Quality, *Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings* 18, 21 (2012), https://www.samhsa.gov/data/sites/default/files/NSDUHresults2012/NSDUHresults2012.pdf  (showing that illicit drug use among those aged 60 to 64 was 3.6 percent in 2012, as compared to 7.0% among all adults aged 26 or older).

17. The amount of revenue that Millennium generated per specimen (known as "net revenue per specimen" or "NRPS") was based not only on the number of tests per sample, but also the type of tests performed and the third-party payor providing reimbursement. Each test corresponded to a pre-identified code in a coding system commonly used in the healthcare industry. For commercial payors, the coding system was the Common Procedures Terminology ("CPT") developed by the American Medical Association. Medicare and Medicaid use a comparable coding system, the Healthcare Common Procedure Coding System ("HCPCS").[31] Millennium received payment (or "reimbursement") for each code it billed. For example, if Millennium conducted 23 separate tests on a single urine specimen, Millennium could receive up to 23 payments corresponding to that single specimen.[32] The actual amount of the reimbursement for a specific code was determined by individual reimbursement contracts between Millennium and the third-party payor. Medicare (under the fee for service model) provided reimbursement to Millennium through a similar fee schedule.

18. There was a wide diversion between individual reimbursement rates for separate codes. For instance, in 2014, Millennium received reimbursement from Medicare for quantitative tests for alcohol (82055) and acetaminophen (83516) at $14.74 and $12.66, respectively.[33] On the other hand, quantitative tests for hydromorphone (82649) and serotonin (84260) were reimbursed at the significantly higher rates of $35.07 and $42.26, respectively.[34] It is relevant to note that although commercial payors provided reimbursement at amounts that differed from Medicare (or, CMS more broadly), there is an established industry practice of commercial reimbursement rates following the trend of CMS reimbursement rates. For example, decreases in CMS

---

[31] Both HCPCS and CPT were developed to report medical procedures and services. HCPCS Level I codes are identical to CPT. However, HCPCS also includes Level II codes (non-physician services like ambulance rides, wheelchairs, walkers, other durable medical equipment, etc.) and HCPCS modifiers which differentiate it from CPT. *See* https://www.medicalbillingandcoding.org/hcpcs-codes/.

[32] These payments may be subject to caps and aggregations. For example, as of January 1, 2014, additional limitations were placed on the amount of tests that could be billed to certain codes for the same beneficiary for the same date of service. *See* Section VII.E.1.a.

[33] Millennium Health, 2014 Annual Physician Notice [ML_DE_00164030] at p. 4.

[34] Millennium Health, 2014 Annual Physician Notice [ML_DE_00164030] at p. 6.

reimbursement rates are frequently followed by decreases in commercial reimbursement rates. Millennium understood this practice at the time of the 2014 Transaction.[35]

19. Table 1 displays revenue and specimen volume figures for the top five payors in Millennium's UDT business for the year ended December 31, 2013, the last fiscal year prior to the 2014 Transaction.

**TABLE 1: TOP 5 PAYORS FOR UDT BUSINESS IN 2013: REVENUE AND SPECIMEN VOLUME**

| Rank | Payor | Revenue ($ millions) | % of Total Revenue |
|---|---|---|---|
| 1 | Medicare | 198.55 | 32.82% |
| 2 | Blue Cross Blue Shield | 84.89 | 14.03% |
| 3 | Medicaid - Contract | 51.23 | 8.47% |
| 4 | UHC | 50.32 | 8.32% |
| 5 | Managed Government | 49.75 | 8.22% |

| Rank | Payor | Specimen Volume (thousands) | % of Total Specimen Volume |
|---|---|---|---|
| 1 | Medicare | 428.56 | 18.62% |
| 2 | Blue Cross Blue Shield | 367.47 | 15.97% |
| 3 | Managed Government | 332.98 | 14.47% |
| 4 | Patient | 223.68 | 9.72% |
| 5 | UHC | 222.31 | 9.66% |

Source: ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab). "Other Payors" category excluded in ranking.[36]

---

[35] Pencak Deposition 209:21 - 210:20 and Plaintiff Ex. 158 [ML_DE_00045459]:

"Q. This [Pl's Ex. 158] is an email from Kenneth Kirsch to Charles Haley at Noridian dated March 13, 2014, the subject is 'Noridian LCD response.' The attachment is a March 13, 2014, letter, to a Bernice Hecker at Noridian. I really want to draw your attention to the bottom of page 2. Millennium writes there, "It is widely known that 'as Medicare goes, so go the other payors, ' many of whom will likely be emboldened by an opportunity provided by the policies in the LCD to cut a growing source of cost to their plans." Do you see that?

A. Yes.

Q. Is that consistent with your understanding of Millennium's view at the time?

A. Yeah, as I mentioned earlier, I mean, it's generally, especially if it is a savings, then commercial payors would likely adopt it."

[36] Throughout this report I refer to two different Padres Projections, being ML_DE_00044521 and ML_DE_00057999. These models are dated 3/14/2014 and 4/12/2014 respectively. The model dated 4/12/2014 is the most contemporaneous model to the 2014 Transaction. The total revenue from these two models is

20. As shown in Table 1, 18.62% of Millennium's 2013 total specimen volume related to patients covered by Medicare. However, because Medicare's reimbursement rates (for a given test) were significantly higher than commercial reimbursement rates, Medicare reimbursement accounted for an even higher percentage of Millennium's revenue - nearly 33% for 2013. This is consistent with published research at the time finding that Medicare paid between 18-30 percent more than commercial payors for the same laboratory tests.[37] In 2013, Millennium was the largest of *any* Medicare Part B biller by dollar amount.[38]

21. Members of the Blue Cross Blue Shield network and United Healthcare ("UHC") were Millennium's largest commercial payors. In aggregate, reimbursement payments from these payors equaled approximately 22% of Millennium's 2013 revenue. Reimbursement from *all* commercial payors equated to approximately 35% of Millennium's 2013 revenue.[39] Thus, Medicare, Blue Cross Blue Shield and UHC represented 55% of Millennium's 2013 revenue and Medicare and all commercial payors represented approximately 68% of Millennium's 2013 revenue. Also noted in Table 1, Managed Government comprised 14.5% of specimen volume but only 8.2% of revenue. Managed Government represents commercial payors approved by Medicare to administer Medicare coverage and add-on coverage for categories of care not always reimbursed by Medicare, such as dental and vision.[40] Notwithstanding that Millennium's Managed Government segment administered coverage under Medicare, the reimbursement rates for Managed Government were significantly lower than the reimbursement rates for "traditional" Medicare (also known as "fee for service"). As a result, Millennium's NRPS for Managed

---

identical, however the earlier model dated 3/14/2014 contains additional content (*e.g.*, more granular data by payor) that is useful for my analysis.

[37] Department of Health and Human Services, Office of Inspector General "Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings", June 2013, p. 9.

[38] Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. *See also* Medicare Physician and Other Supplier PUF Methodology describing the dataset, p. 4 (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Medicare-Physician-and-Other-Supplier-PUF-Methodology.pdf) and US DOJ Complaint at ¶ 2. Medicare Part B covers a wide variety of outpatient services, of which laboratory testing services is only one component.

[39] *See* ML_DE_00732288 (Yearly 2009-2015M5 tab).

[40] *See* https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans. Also includes dual health plans where a patient qualifies for both Medicaid and Medicare. For example, *see* https://www.uhccommunityplan.com.

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 11

Government was almost three times lower than its Medicare NRPS, despite a similar number of tests per specimen.[41]

22. Similarly, there were large differences in reimbursement rates amongst commercial payors, as evidenced by significant differences in NRPS.[42] For example, Millennium's NRPS for Aetna was more than two times higher than that for UHC and Humana even though Millennium's average tests per specimen for these payors was broadly similar.[43] Millennium actively sought to reduce its exposure to payors with low reimbursement rates.[44]

23. Millennium received reimbursement from billing to dozens of codes in a given year. For example, in each of 2012 and 2013, Millennium received reimbursement from Medicare in connection with more than 25 codes.[45] However, in 2012 and 2013, Millennium generated a disproportionate percentage of its Medicare revenue from reimbursement for billings under two specific HCPCS codes, 83925 (opioids drugs measurements) and 82542 (chemical analysis using chromatography technique).

---

[41] *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), column AI and AW, rows 129 and 132. In 2013, NRPS for Medicare and Managed Government was $467 and $144 respectively. In 2013, average tests per specimen for Medicare and Managed Government was 22.6 and 23.8 respectively.

[42] Tests per specimen was relatively consistent across commercial payors. *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), column AW, rows 124-137.

[43] *See* ML_DE_00732288 (Yearly 2009-2015M5 tab), columns AJ and AX, rows 124 and 135. In 2014, average NRPS for Aetna and UHC was $449 and $203 respectively. In 2014, average tests per specimen for Aetna and UHC was 25.3 and 23.4 respectively.

[44] Plaintiff Exhibit 17 to Price Deposition:

"Summer/Fall 2011: one troubled practice offered to 'double-up on its testing' and ML declined and terminated the relationship"

"Dr. O'Connell's practice ordered few tests/specimen and ML terminated the relationship 'because they did not think he was serious about quality UDT results'"

Pencak Deposition, Plaintiff Exhibit 135:

"They both seem to be newer practices so please make it a priority to follow up with the respective reps to make sure they are considering payor mix and tests per specimen when signing on new practices."

[45] Code level reimbursement is not available for Millennium's other payor types. Codes billed to Medicare are assumed to represent a subset of the total codes billed by Millennium to all payor types. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. CMS data indicates Millennium billed 33 codes to CMS in 2012 and 30 codes in 2013.

24. As shown in Table 2, for the year ended December 31, 2013, Millennium generated approximately 33% of its Medicare revenue from these two codes alone. The amount of revenue Millennium generated from these codes reflected the facts that these codes were associated with a high volume of tests performed by Millennium *and* that the reimbursement rates for these two codes were among the highest Medicare reimbursement rates for codes billed by Millennium. As discussed below, these two codes also were the focus of important new (or newly implemented) Medicare coverage determinations, policies, and restrictions (*i.e.*, medically unlikely edits ("MUEs")[46] and local coverage determinations ("LCDs"))[47] at the time of the 2014 Transaction.

**TABLE 2: MEDICARE REIMBURSEMENT AND VOLUME FOR 83925 AND 82542**

| HCPCS Code Subject to MUE | % of Millennium's Total Medicare Reimbursement | | % of Millennium's Total Medicare Test Volume | |
|---|---|---|---|---|
| | 2012 | 2013 | 2012 | 2013 |
| 83925 | 25.22% | 23.49% | 20.12% | 19.58% |
| 82542 | 1.56% | 9.54% | 1.34% | 8.61% |
| **Total** | **26.77%** | **33.04%** | **21.46%** | **28.19%** |

Source: Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

25. Prior to the 2014 Transaction, Millennium was engaged in two specific business practices that the Company acknowledged significantly contributed to its growth and profitability: the use of "Custom Profiles" and the provision of free specimen testing cups to Millennium customers.[48]

---

[46] MUEs are used by Medicare Administrative Contractors ("MACs") to reduce improper payments for Part B claims. *See* Section VII.E.1.b for further explanation of MUEs and their impact on Millennium.

[47] An LCD is a determination by a fiscal intermediary (under Medicare Part B, a MAC) as to whether or not a particular item or service is eligible for reimbursement under Medicare. See Section VII.E.1.c for further explanation of LCDs and their impact on Millennium.

[48] *See*, *e.g.*, Exhibit 4 to the US DOJ Complaint. ("As you know, the standing order is critical to our confirmation and billing process") [ML_DE_00628896 at 8897]. Exhibit 5 to the US DOJ Complaint ("If an account does not want a Standing Order in place for the 6 drugs not covered by the [POC test], we do not want to do business

Early versions of both of these business practices had been implemented by the end of Millennium's first full year of operation. Millennium initiated the practice of Custom Profiles in 2008.[49] Custom Profiles were standing orders indicating a panel of tests to be performed on a specimen, and which remained in effect for the physician's practice until and unless changed.[50] Thus, the panel of tests indicated by a Custom Profile was not specific to an individual patient (or specimen). When submitting an individual patient urine specimen to Millennium for testing, a customer with a Custom Profile would typically select one of three options on the test requisition form: (i) use Custom Profile, (ii) use Custom Profile and add additional tests (as indicated) or (iii) do not use Custom Profile and perform certain tests (as indicated).[51] As of the 2014 Transaction, approximately 64% of Millennium's customers used Custom Profiles. As explained more fully below, Millennium began transitioning away from the use of Custom Profiles in March 2015, approximately one year after the 2014 Transaction.[52]

---

with them") [ML_DE_00628899 at 8900]. Exhibit 7 to the US DOJ Complaint ("WE DON'T WANT TESTING TO DECLINE BY UPDATING THE CP WITH LESS TESTS") (capitalization in original) [ML_DE_00628908] at 8911. Exhibit 12 to the US DOJ Complaint ("There are not enough tests on the CP and [Mr. Appel] *will not approve*") (emphasis added) [ML_DE_00628930 at 8931]. Exhibit 13 to the US DOJ Complaint ("If practice falls below ML profitability guidelines, cup agreement will be denied") [ML_DE_00628932 at 8934]. Exhibit 66 to the US DOJ Complaint ("This cup agreement is vital to our practice") [ML_DE_00629092 at 9094].

[49] *See* US DOJ Complaint at ¶ 210 [ML_DE_00595094 at 5149] (Tampa Pain Relief Center used a Standing Order since 2008).

[50] US DOJ Complaint at ¶¶ 89-90 [ML_DE_00595094 at 5117] (A Custom Profile was alternately referred to as a Standing Order or Test Protocol).

[51] Exhibit 55 to the US DOJ Complaint [ML_DE_00629045 at 9046].

[52]

---

26. Millennium initiated the use of free specimen testing cup agreements in late 2009.[53] Under these agreements, Millennium provided specimen collection cups with integrated test strips to its customers free of charge. The specimen cups and test strips provided by Millennium allowed healthcare providers to perform qualitative UDT at the point of care. The agreements stated that in exchange for receiving the specimen cups free of charge, physicians agreed to use the cups for "collecting and transporting specimens for testing by our [Millennium's] laboratory."[54] The agreement also stated that Millennium would invoice the physicians for "excess cups" which were sent to the physician's office and had not been sent back to Millennium for quantitative testing.[55] According to Millennium, as of the 2014 Transaction, approximately 10% of Millennium's customers had entered into the free specimen cup agreements, representing 16% to 17% of total specimen volume.[56] As explained further below, Millennium terminated the free specimen cup agreements in June 2014, approximately two months after the 2014 Transaction.[57]

## IV.    2014 FINANCING TRANSACTION

27. In mid-2013, Millennium began conversations with J.P. Morgan, its primary banker, to refinance the Company's existing debt. Millennium's existing debt consisted primarily of a $330 million term loan syndicated among a few banks and a large commercial finance provider in March, 2012 (the "2012 Transaction").[58] J.P. Morgan was the Administrative Agent and "left lead"

---

[53]    Millennium Self-Disclosure Statement at p. 4 [ML_DE_00670668 at 0671].

[54]    Exhibit 39 to US DOJ Complaint [ML_DE_00_629262 at 9263] (second emphasis added):

  "To ensure compliance with requirements imposed by the federal "Stark" physician self-referral and anti-kickback laws, we cannot provide these specimen collection cups to your practice without charge unless they are used for collecting and transporting specimens for testing by our laboratory. While these specimen collection cups provide certain preliminary information that you may find useful to the management of your patients while awaiting the results of testing from Millennium's state-of-the-art laboratory, you agree that 1) you will not bill any patients or payors for the preliminary results provided within the functionality of these specimen collection cups, 2) you will not bill these same patients or payors for any other point-of-care urine drug test conducted in combination with these specimen collection cups and 3) you will not resell or redistribute these cups. In addition, you agree to work with us to account for the cups furnished under this agreement and to certify on a quarterly basis that none of the cups have been used to perform billable point-of-care testing."

[55]    Exhibit 39 to US DOJ Complaint [ML_DE_00_629262 at 9263].

[56]    Millennium Self-Disclosure Statement at p.3 [ML_DE_00670668 at 0670]. This assumes that the disclosed percentage of customers is consistent with the percentage of customers at the time of the 2014 Transaction.

[57]    Millennium Self-Disclosure Statement at p.5 [ML_DE_00670668 at 0672].

[58]    Exhibit 116 to Deposition of J. Lee (J.P. Morgan), June 23, 2021 [JPMC-MIL-CORP-00183881].

bookrunner for the 2012 Transaction. Prior to the 2014 Transaction, J.P. Morgan held $75.9 million in credit exposure from the 2012 Transaction.[59]

28. A significant motivation for the 2014 Transaction appears to have been to provide liquidity to Millennium's equity holders,[60] following earlier and unsuccessful attempts to sell the Company over an approximately three year period. In 2011, the Company engaged UBS to explore a sale transaction. After marketing to up to 16 potential acquirers, the sale process was considered "unsuccessful"; only one bid emerged, and that bid was far below the valuation expectations of $1.5 billion.[61] Risks around reimbursement were identified as a key reason for the unsuccessful sales process.[62] A second motivation of the refinancing transaction appears to have been to reduce J.P. Morgan's credit exposure to Millennium.[63]

29. In 2013, Millennium attempted, for a second time, to sell the Company or otherwise provide liquidity to its equity holders. However, perceived reimbursement risks appear to have also

---

[59]   J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]: "JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

[60]   Exhibit 116 to Deposition of J. Lee (J.P. Morgan), June 23, 2021 [JPMC-MIL-CORP-00183881] (emphasis added):

> "Attached please find our thoughts on a dividend recapitalization for Millennium. We have taken into consideration a number of factors:
> - Avoid issuing public securities and stay in the loan market
> - Keep the entire capital structure pre-payable without friction, in case there is a monetization event in the near to intermediate term
> - Maintain modest leverage, <u>given management's as well as TA's institutional perspective around pursuing the maximum available leverage</u>
>
> Take a look at the attached and let's have a call to walk you through it at your convenience. The markets remain strong and the Company has performed extremely well, allowing for a significant dividend, while keeping leverage at reasonable levels."

[61]   Exhibit 14 to Price Deposition. [BMO-ML-00030001]:

> "The process was unsuccessful, although did receive an offer from at least one party, which was far below valuation expectations (UBS indicated valuation would be closer to $1.5B in its pitch process)."

[62]   Exhibit 14 to Price Deposition. [BMO-ML-00030001]:

> "Buyer concerns were mostly related to reimbursement and that TA had just invested."

[63]   J.P. Morgan Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]:

> "**Transaction Rationale**
>
> …
>
> **Exposure Reduction**: JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

---

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 16

thwarted this second sales process. In October 2013 Millennium signed an engagement letter with Citi to pursue various strategic alternatives including a sale, recapitalization, issuing additional equity and liquidation.[64] Millennium asked Citi to explore if there was an opportunity to sell to a private equity sponsor at a valuation of 6x to-7x EBITDA or else take the Company public.[65] Citi noted at the time that private equity sponsors "have been generally skeptical of the business and risk of reimbursement."[66] Nonetheless, Citi reached out to potential buyers and in January 2014 pitched the transaction to a potential strategic buyer in Australia.[67] This potential buyer was described as "know[ing] ML's business well" but declined to engage in the sales process citing concern that Millennium operated in a "highly competed" industry with "unsustainable margins." The buyer also cited "issues re reimbursement in ML's end-markets."[68] On the heels of these two failed sales processes, Millennium pursued the 2014 Transaction.

30. The 2014 Transaction was ultimately structured as a $50 million revolving loan and a $1.775 billion Term Loan.[69] It appears that the decision to pursue the 2014 Transaction in the leveraged loan market was at least partially motivated by a desire to monetize the investment made by TA Associates ("TA") ahead of any potential regulatory/the United States Department of Justice ("US DOJ") investigation issues, notwithstanding the loss of substantial tax advantages.[70]

---

[64]   Letter from Citi Corporate and Investment Banking to Millennium, October 21, 2013, Exhibit 15 to Price Deposition [CITI-DE-00005790].

[65]   Email from Sarin to Blake, Re: Millennium update, October 12, 2013, Exhibit 223 to Deposition of M. Tortora (Citi), July 15, 2021 [CITI-DE-00071523 at 1523].

[66]   *Id.*

[67]   Email from Ristevski to Phin and Sarin, Re: Sonic, January 12, 2014, Exhibit 233 to Deposition of M. Tortora (Citi) [CITI-DE-00052087]. The potential buyer is believed to be Sonic Healthcare, referred to as "Sonic" in the Citi emails.

[68]   *Id.*

[69]   The syndicated term loan facility was upsized from $1.765 to $1.775 billion to accommodate an additional original issue discount to attract lenders, and the revolving credit facility was $50 million, for a total of $1.825 billion. *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014.

[70]   *See* email from James Hart of TA (Plaintiff Exhibit 198 TA Associates Deposition) [TA_MLH-00011849]:Email from Tony Marsh of TA (Plaintiff Exhibit 198 TA Associates Deposition) [TA MLH-00011849]:

"The implication of doing a debt recap there is massive from a tax structuring standpoint. We would blow the structure with the potential to lose the full step up at the next transaction that could be worth $100s of millions depending on the form of the exit."

*See also* Email from Kevin Landry of TA (Plaintiff Exhibit 194 TA Associates Deposition) [TA_MLH-00009903]:

Proceeds from the 2014 Transaction plus additional cash on Millennium's balance sheet were used to fully repay debt held by TA, fully repay the debt issued in connection with the 2012 Transaction, pay an approximately $1.3 billion dividend to shareholders and warrant holders in Millennium's parent companies and to fund transaction fees, including fees to underwriters. In addition, certain members of management received cash distributions at the time of the 2014 Transaction.[71] Table 3 shows estimated sources and uses of proceeds for the 2014 Transaction.

**TABLE 3: ESTIMATED SOURCES AND USES OF FUNDS: 2014 TRANSACTION ($ MILLIONS)**

| Sources | Amount ($M) | Uses | Amount ($M) |
|---|---|---|---|
| New Revolver ($50M) | - | Dividend to Shareholders | 1,269.6 |
| New Term Loan B | 1,775.0 | Refinance Term Loan A | 304.0 |
| Cash from Balance Sheet | 50.0 | Refinance TA Sub Debt | 196.0 |
|  |  | Estimated Fees and Expenses | 55.4 |
| **Total Sources** | **1,825.0** | **Total Uses** | **1,825.0** |

Source: Confidential Information Memorandum [ML_DE_00269115 at 9136], updated by Brattle to account for the final Original Issue Discount (*see* footnote 69).

31. The 2014 Transaction was underwritten by J.P. Morgan, Citi, Suntrust and Bank of Montreal ("BMO").[72] The underwriters agreed to take on minimal credit exposure to Millennium beyond

---

> "Millennium is obviously a VERY important asset for TA. We discussed the real economic tradeoffs of doing another recap in the second half of 2013, but under the "bird in the hand v. two in the bush" theory, it might make sense to pursue a recap sooner rather than later, despite the tax costs. From conversations after the PC meeting, I understand we may all be in violent agreement, but wanted to reinforce that the Portfolio Committee agrees with the approach of pushing for additional liquidity as soon as possible, given the size of a potential recap, the importance of Millennium to TA, and potential regulatory issues."

*See also* email from Mark Carter of TA (Plaintiff Exhibit 195 TA Associates Deposition) [TA_MLH-00041365]:

> "I know you are contemplating a recap versus the government inquiry but for what it is worth, you may want to explore the stretch senior market. Cov-lite probably up to 4.5x leverage L+350. The good news is there are no breakage costs so if you decide to redo the cap structure later after the government provides the all-clear, no problem. This may be an issue for senior management given the risks this presents but you could always provide a special bonus to them. The bonus would go against the strike price of their options so it isn't a double dip. I have used this mechanism recently so happy to discuss. You have done such a good job with Millennium that I am focused on de-risking this all important investment. I would ignore the hundreds of millions in tax benefits and blow it up."

[71] *See* email from Heidi Smith [ML_DE_00062278] and Excel attachment [ML_DE_00062280]; *see also* Martin Price Deposition Transcript, dated April 12, 2021, at 169:23-172:25.

[72] J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494]; Citi Millennium Labs Final Approval Memo, March 13, 2014 [CITI-DE-00017912]; BMO Loan Underwriting

---

the initial underwriting risk, committing to hold only the shorter tenor revolver (which contained lending covenants not provided to the term loan lenders) and entitling them to sell down 100% of the Term Loan to other investors.[73] In particular, notwithstanding its "strong relationship" with Millennium, J.P. Morgan appears to have been uncomfortable with assuming even the underwriting risk.[74] Indeed, J.P. Morgan internally expressed concern as to whether there was sufficient market demand to successfully syndicate the loan. In an email dated January 14, 2014, a J.P. Morgan employee noted that many banks had declined to be involved in the 2012 Transaction due to concerns about litigation risk, debt structure, and the use of proceeds.[75] The 2014 Transaction required new money, and it was noted that litigation risk and use of proceeds remained a hurdle for new lenders. During the course of the syndication, J.P. Morgan asked BMO to hold a portion of the Term Loan. The contemporaneous communications confirm that J.P. Morgan was having difficulty syndicating (*i.e.*, selling) the loan in the market.[76] Furthermore, following syndication, J.P. Morgan elected to reduce its credit exposure to

---

Committee Memorandum, March 11, 2014 [BMO-ML-00009109]; SunTrust DCC Memo, March 2014 [Suntrust_MIL-DE-00006771].

[73] The Master Consent to Assignment shows the initial allocation of the Term Loan amongst investors [ML_DE_00465366 at 5370-5371].

[74] TA Associates deposition, Exhibit 216 (emphasis from original): "One important point: to note: JPMorgan does NOT want the fact that this is an underwritten deal to get out in the marketplace with accounts. We should all be careful not to talk about this deal and the underwritten point, specifically." [TA_MLN-00013228].

[75] Exhibit 125 to Deposition of J. Lee (J.P. Morgan), June 23, 2021:

"Most likely suspects to revisit, all turned it down in 2012 over use of proceeds or litigation or TA debt structure-- Wells, BAM L, Sumitomo, US Bank, Union Bank, Raymond James, BBVA Compass, Bank of the West, BB&T, Cal Bank&Trust, Key, RBC, would/could check of bunch of others. Stating the obvious but use of proceeds and litigation will remain the hurdle for new guys. At the appropriate time, would make sense to screen existing guys early/pre launch for a reality check on capacity." [JPMC-MIL-CORP-00189654].

[76] Email from Phillip Ho, April 9, 2014 (Plaintiff's Exhibit 343 to Deposition of Phillip Ho) [ML00009325 at 326]:

"Can we have a call this morning? JP called last night. Management getting nervous; Howard's asked if BMO would consider holding some of the B. Ryan at JP and I both understood that's very unlikely given cov lite. But Suntrust saying they'd hold 40mm, which Ryan and I are very surprised about.

Books at just over $lbn. There are "some" limit orders at L400 and 99. Lot of guys still working. Ryan says JP very confident theVII be well inside of flex caps when deal gets flexed; not ready to do that yet since still more time before the deadline. JP won't hold B and he's not sure where Citi is on this.

I told Ryan we'd get back to Howard today, possibly this morning. Because I knew he'd call Howard last night, told him we'd try really hard but definitely no promises. CB for sure can't hold any. Maybe the BMO CLO could do 5mm??"

---

Millennium from $75.9 million to no more than $27.5 million of the revolver capacity.[77] The revolver was ultimately terminated on June 4, 2015, which allowed Millennium to avoid an event of default in the event of a breach of the leverage covenant (*i.e.*, the term loan did not contain the leverage covenant).[78] As discussed below, it was reasonable to expect that Millennium would breach the leverage covenant (contained only in the revolver agreement) by the third quarter of 2015.

32. The terms of the underwriting included the ability to "flex" (or modify) the loan terms to complete syndication of the loan. Market flex language is designed to partially mitigate the risk to underwriters that they cannot syndicate a loan, due to either changes in market conditions or negative sentiment towards a credit. Underwriters initially indicated to the market that the Term Loan would price at LIBOR plus 350-375 basis points with a 50 basis point original issue discount ("OID") to investors, however this was increased to 425 basis points and a 100 basis point OID to investors. The loan size was increased by $10 million to fund the additional OID. In addition, the excess cash flow sweep was increased, the cap on sweeps removed, and restrictions on other debt tightened.[79] The substantial revisions to the terms are consistent with a very difficult syndication. This is consistent with contemporaneous email communications from the lead syndicator for JP Morgan (Jenny Lee):  "[W]e came within 37.5 bps of our cap and we had 175 bps of flex. Never worked so hard in my life on a deal."[80]

---

[77]  J.P. Morgan Millennium Laboratories Approval Proposal, April 2014 [JPMC-MIL-CORP-00159494 at 500]: "JPM exposure to Millennium will be reduced to $27.5mm commitment to the new $50.0mm Revolver (subject to allocation) from $75.9mm hold across existing TL A and RC facilities."

[78]  Termination Notice, June 24, 2015 [JPMC-MIL-CORP-00108741].
Email from Martin Price to Brock Hardaway, June 29, 2015 [ML_DE_00601573]:

J.P. Morgan had advised Millennium prior to the closing of the 2014 Transaction that it could cancel the revolver to avoid a declaration of an event of default thereunder that might lead to acceleration of the term loan. *See* email from Stathis Karanikolaidis to Brock Hardaway [ML_DE_00001946].

[79]  *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014; Loanconnector, "Corrected: Millennium Labs launches $1.8B dividend recap loan", March 31, 2014.

[80]  *See* email dated April 16, 2014 from Jenny Lee to Brian Dolan [JPMC-00031194].

## V.   FRAMEWORK FOR SOLVENCY ANALYSIS

33. Solvency is an economic concept, the definition of which is informed by law and legal precedent. Consequently, an economic analysis of solvency must consider these sources of authoritative guidance. Section 548 of the U.S. Bankruptcy Code describes two circumstances under which a pre-petition transaction may be avoided: actual fraud and constructive fraud.  The pre-petition transaction in question may be a transfer of value or the incurrence of an obligation. The first circumstance is if the transaction is undertaken "with actual intent to hinder, delay, or defraud" a creditor. This has been defined as "actual fraud."[81]

34. For a determination of actual fraud, courts have looked to several indicia, including so-called "badges of fraud." However, I note that in this Litigation, the Court has stated that "badges of fraud is just one substitute for direct evidence" and that "a court may consider factors other than badges of fraud in its analysis"[82] such as circumstantial evidence that the "natural consequence" of a debtor's action is "to hinder, delay or defraud creditors."[83]

35. The Uniform Voidable Transactions Act ("UVTA")[84] provides a non-exclusive list of the "badges of fraud". They are:

  i.     Whether the transfer or obligation was to an insider;

  ii.    Whether the transferor retained possession or control of the property after the transfer

  iii.   Whether the transfer or obligation was concealed or disclosed

---

[81]   *Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 210 (3d Cir. 2006) ("'Actual' fraud is prohibited by § 548(a)(1)(A), which allows a trustee to avoid a transfer made 'with actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted.'").

[82]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Memorandum, February 29, 2019, at p. 7.

[83]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Memorandum, February 29, 2019, at p. 7.

[84]   In July 2014, the UVTA replaced the Uniform Fraudulent Transfer Act, which (at that time) was in force in 43 states (all states except Alaska, Kentucky, Louisiana, Maryland, New York, South Carolina, and Virginia). Uniform Law Commission, *Fraudulent Transfer Act* [https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3]; Jones Day, *Uniform Voidable Transactions Act Approved by Uniform Law Commission to Replace UFTA*, September/October 2014, https://www.jonesday.com/en/insights/2014/10/uniform-voidable-transactions-act-approved-by-uniform-law-commission-to-replace-ufta.

iv.  Whether, before the transfer was made or obligation was incurred, a creditor sued or threatened to sue the debtor

v.  Whether the transfer was of substantially all the debtor's assets

vi.  Whether the debtor had absconded

vii.  Whether the debtor had removed or concealed assets

viii.  Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred

ix.  Whether the debtor was insolvent or became insolvent shortly after the transfer was made or obligation was incurred

x.  Whether the transfer occurred shortly before or shortly after a substantial debt was incurred

xi.  Whether the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor

36. The second circumstance under which a transaction may be avoided, known as "constructive fraud," requires two elements:

i.  The first element is that the transferor "received less than a reasonably equivalent value in exchange for such transfer or obligation."

ii.  The second element is that he transferor must meet at least one of the following economic tests:

a.  was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation (often referred to as the "balance sheet test"); *or*

b.  was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital (often referred to as the "adequate capital" test); *or*

   c.   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured (often referred to as the "ability to pay debts" test).[85]

37. Note that reasonably equivalent value and insolvency are implicated under both actual fraud and constructive fraud.

38. Several standard economic analyses are used to assess the elements of constructive fraud and some of the indicia of actual fraud. These analyses are discussed in the following sections.

### A.    BALANCE SHEET TEST

39. Under the balance sheet test, a company is considered insolvent if at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.[86]  Debt is defined broadly to include liabilities associated with an obligation whether or not that obligation "is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."[87] Under the assumption that a company will continue as a going-concern, its business enterprise value ("BEV") is equivalent to the sum of all of the company's assets at fair valuation.[88]

40. BEV refers to the value of a firm that is available to compensate all capital providers (i.e., both equity and debt) to the firm. The difference between a company's BEV and its total liabilities represents the company's equity value. Equity value is available to compensate the firm's equity holders. It represents the firm's residual value, after repaying the firm's debt and other liabilities. Thus, the balance sheet test determines if a company's equity value is positive or negative.[89] If

---

[85]   11 U.S.C. § 548 (a)(1)(B).

[86]   *See* UVTA, Section 2 and United States Code, Title 11, Chapter 1, Section 101.  Fair valuation is not defined in the UVTA or the Bankruptcy Code.  However, case law has defined it in a manner consistent with fair market value. *Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 348 B.R. 234, 274 (Bankr. D. Del. 2005)("Fair valuation is generally interpreted as fair market value, that is the amount a hypothetical willing buyer would pay to a willing seller, rather than a distressed or liquidation value.").

[87]   *See* 11 U.S.C. § 101.

[88]   BEV is intended to include the value of a company's non-operating assets (if any).

[89]   By definition, the sum of a company's assets is equal to the total sources of financing for those asset (*i.e.*, Assets = Debt + Equity). Re-arranging the equation, Assets – Debt = Equity.  Therefore, if Debt > Assets then Equity < 0 (*i.e.*, Equity is negative).

the fair value of a company's equity is negative, it indicates that the company is insolvent. The methodologies to calculate BEV can be categorized into three fundamental approaches: income, market and asset.

41. Income-based approaches calculate the value of a firm based on various measures of cash flow produced by the firm. The cash flow measures should be projected (or forward-looking) and should represent best estimates of expected cash flows. The most common income-based approach is the discounted cash flow ("DCF") methodology. DCF calculates the value of a firm using projected unlevered free cash flows, also referred to as "debt-free cash flows." In summary, free cash flows are calculated as revenue less cash operating expenses, taxes, investments in working capital and capital expenditures. Unlevered free cash flows do not reflect either debt service payments or distributions to equity holders (*e.g.*, dividends). The projected free cash flows of the firm are discounted back to the date of valuation, using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows. It is important to note that the DCF methodology utilizes future (projected) cash flows to ascertain the value of a company at as specific point in time (*i.e.*, the date of valuation). For valuation analysis in connection with constructive or actual fraud there are two relevant valuation dates: (i) immediately prior to the transaction subject to avoidance and (ii) immediately upon giving effect to the transaction subject to avoidance. To accurately calculate value using DCF, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation.[90]

42. Capitalization of earnings or cash flow is another, though less common, income-based valuation methodology. Capitalization may be used as an alternative to DCF if the income stream to be capitalized is anticipated to grow at a constant rate from the date of valuation into perpetuity.

43. Market-based approaches calculate the value of a firm based on market transactions involving the purchase or sale of comparable companies or ownership interests in those companies. Guideline Public Companies and Precedent Transaction methodologies are both market-based approaches. The Guideline Public Company ("GPC") methodology begins by identifying a

---

[90] *See*: Fishman, Jay E., Pratt, Shannon P. and Morrison, William J.; *Standards of Value: Theory and Applications*, John Wiley & Sons, Inc. 2007, p. 61 (quoting from Bogdanski, Federal Tax Valuation, at 2.01[3][a].

cohort of publicly-traded companies that are reasonably comparable to the firm being valued. Comparability is established through identification of specific, relevant qualitative and quantitative factors. After identifying a cohort of comparable companies, valuation multiples are calculated for each comparable company by expressing an observable measure of the company's value as a function of an operating or financial metric for the company. Under the GPC methodology, the most common observable measure of enterprise value is the sum of (i) market capitalization and (ii) the face value of outstanding debt.[91] This sum may be reduced by the company's excess cash. The most common observable measure of equity value is market capitalization. Identical to DCF, market capitalization and the value of debt are measured as of the date(s) of valuation for the subject company. Enterprise value-to-EBITDA ("EV/EBITDA"), price-to-earnings ("P/E") and price-to-book value of equity ("P/B") are examples of valuation multiples. P/E and P/B multiples are calculated using observed measures of equity value. Due to differences in accounting policies among the comparable companies or non-recurring events that affect the financial or operational metrics of a comparable company, it may be necessary to adjust or "normalize" the valuation multiples for one or more of the comparable companies to ensure that the multiples are calculated on a consistent basis.

44. The valuation multiples derived from the cohort of comparable companies may be expressed as a range, an average or another point estimate derived from the cohort (*e.g.*, a quartile value). The range or point estimate of one or more valuation multiples is, then, applied to the relevant operating or financial metric of the firm being valued (the "subject company"). As an illustrative example, the average EV/EBITDA multiple derived from the cohort of comparable companies may be applied to the EBITDA of the subject company. In this way, one can calculate the BEV for the subject company.[92] In a typical circumstance, the metric used to derive the valuation multiples should be the same metric used to calculate the value of the subject company. For example, if the valuation multiple is based on 1-year projected EBITDA, the value of the subject

---

[91]   The observable measure of value may differ when the company's capital structure includes preferred equity or other classes of equity that are not publicly traded (the value of which may not be fully reflected in market capitalization). In addition, in some instances of valuation analysis (exclusive of solvency analysis), it may be appropriate to use the market value of debt instead of the face value of debt.

[92]   Some valuation multiples, such as P/E, derive an estimate of the *equity* value of the company instead of the *enterprise* value of the company.

company is determined by applying the valuation multiple to the subject company's 1-year projected EBITDA.

45. The Precedent Transaction methodology also relies on valuation multiples to calculate the value of a firm. However, the observable measure of value for the Precedent Transaction methodology differs from that of the GPC methodology. The measure of value for the Precedent Transaction methodology is the transaction price paid in a transaction in which the acquired company (also known as the "target company") is comparable to the firm being valued. The Precedent Transaction methodology derives an estimate of enterprise value and expresses that value as a function of an operating or financial metric for the target company.[93] By definition, this methodology relies on transactions that will have been priced and closed prior to the date of valuation for the subject company. Therefore, consideration must be given to the relationship between the market conditions at the time of the precedent transactions and the market conditions contemporaneous to the date of valuation.

46. Asset-based methodologies calculate the value of a firm as the sum of the value of the assets owned by the firm. Net asset value will typically represent the aggregate value of the assets less debt and other liabilities. Asset-based methodologies are typically limited to circumstances in which the value of a firm is not well-represented by a predictable measure of future cash flow and the firm's assets can be readily identified and accurately and discretely valued.

### B.   ABILITY TO PAY DEBT TEST

47. Under the ability to pay debt test a company is considered insolvent if, at the time of the transaction subject to avoidance, the company intended to incur, or believed that it would incur, debts that would be beyond the company's ability to pay as such debts matured. The definition of debt is identical to that under the balance sheet test. A company's ability to pay its debts is assessed by comparing the company's projected cash flows and cash reserves to the expected debt service requirements and a payoff or refinancing of the principal balance upon maturity. Debt service requirements are the cash flows and maintenance covenants required by the relevant

---

[93]   It is common to use a last twelve month (LTM) metric under the Precedent Transaction methodology, as projected data is often unavailable for the target company.

credit agreements. The most common cash flow requirements are interest and principal payments. In addition, credit agreements may require that the company maintain specified operating ratios. A common such ratio (referred to as a leverage ratio) is a limit on the amount of the company's debt relative to a company's EBITDA. Typically, if a company fails to comply with debt service requirements, such a failure is defined as an event of default under the relevant credit agreement. Furthermore, the occurrence of an event of default under a single credit agreement can give rise to additional events of default where the borrower is subject to cross-default provisions.

### C.    ADEQUATE CAPITAL TEST

48.   The third test for constructive fraud is whether a company engaged (or was about to engage) in a "business or a transaction for which any property remaining with the debtor was an unreasonably small capital."[94]  Capital refers to how a company finances its business operations. Most companies rely significantly (if not, primarily) on internally generated cash to finance operations. However, when internally generated cash flows are insufficient to fully finance operations, companies will raise either debt or equity capital from outside investors.[95]  Thus, capital refers to the combination of internal cash flows, equity and debt. For the purpose of assessing the adequate capital test, courts have said that an adequately capitalized company has sufficient capital, including access to capital, to sustain operations.[96] Access to capital typically refers to the ability to raise equity, raise debt, reduce cash flow obligations or generate cash flows through the sale or other monetization of assets.

---

[94]   As of 2016: the UFTA (which currently is in force in 35 states, the District of Columbia, and the U.S. Virgin Islands) and the UVTA, which has been adopted by nine states, include the phrase "the remaining assets of the debtor were unreasonably small in relation to the business or transaction" in place of the corresponding language regarding "unreasonably small capital" in section 548(a)(1)(B)(ii)(II). *See* UFTA § 4(a)(2)(i); UVTA § 4(a)(2)(i). The older UFCA, which remains in effect only in New York and Maryland, tracks the "unreasonably small capital" language in section 548(a)(1)(B)(ii)(II). *See* N.Y. Debt. & Cred. L. § 274; *see also* https://www.jonesday.com/en/insights/2016/08/the-third-circuit-weighs-in-again-on-the-meaning-of-unreasonably-small-capital-in-constructively-fraudulent-transfer-avoidance-litigation.

[95]   For example, *see* Principles of Corporate Finance, Brealey, Myers, Allen, 10th edition, January 1, 2012 at pp. 341-342.

[96]   *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).

49. Courts have indicated that the test for unreasonably small capital is "reasonable foreseeability"[97] as of the date of the challenged transaction. That is, a company has unreasonably small capital if it is reasonably foreseeable that the transaction will leave the company with capital insufficient to sustain operations. To assess reasonable foreseeability, "the critical question"[98] is whether the company's projections supporting the challenged transaction (which presumably showed that the company would be able to sustain operations) were reasonable when made. Reasonable projections do not merely rely on the company's historical operations. Rather, to be reasonable, the projections "must also account for difficulties that are likely to arise."[99] If the projections supporting the challenged transaction are found to be unreasonable, "it will follow that the debtor was left with an unreasonably small capital."[100] Finally, courts have found that unreasonably small capital is not synonymous with insolvency but, rather, "denotes a financial condition short of equitable insolvency."[101]

50. Multiple methodologies may be used to assess the adequacy of a company's capital. One set of methodologies considers the company's expected cash flows under a reasonable downside scenario. For example, is the company able to finance operations and maintain debt service under such a scenario? A second set of methodologies analyzes the company's leverage ratios (including expected leverage ratios). For example, is the company's leverage significantly in excess of leverage levels for comparable companies? The exact implementation of these methodologies will depend on the industry and/or other specific circumstances of the company in question.[102]

### D.    SUMMARY OF MILLENNIUM SOLVENCY ANALYSIS

51. To assess the solvency of Millennium as of the 2014 Transaction, I valued Millennium to determine if the value of the Company's assets exceeded the value of the Company's debt, including the debt incurred in the 2014 Transaction. I valued Millennium using a DCF analysis.

---

[97]  *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
[98]  *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
[99]  *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
[100] *Id.*; *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
[101] *Moody v. Security Pacific Business Credit, Inc.*, 971 F.2d 1056 (3d Cir. 1992).
[102] Collier on Bankruptcy ¶ 548.05[3][b] (16th ed. 2016).

As I demonstrate below, a proper DCF analysis shows that Millennium was balance sheet insolvent as a result of that transaction, with an equity value of no greater than *negative* $958.9 million, before accounting for contingent liabilities. I also sought to value Millennium using the GPC and Precedent Transaction methodologies. Due to the limited comparability of the identified public companies, I did not rely on the GPC methodology as my primary indication of value. Nonetheless, the most likely conclusion of value that results from the GPC methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital. I was unable to identify sufficiently comparable precedent transactions.

52. Courts have found that unreasonably small capital is a financial condition prior to equitable insolvency. Therefore, by definition, a balance sheet insolvent company is a company with unreasonably small capital. Nonetheless, I also conducted a second analysis that shows that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with unreasonably small capital. To address the third component of the solvency analysis, I also show below that the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay that debt as it matured.

## VI.   MILLENNIUM FINANCIAL PROJECTIONS IN CONNECTION WITH THE 2014 TRANSACTION

### A.   PADRES PROJECTIONS

53. Millennium created financial projections (the "Padres Projections") to support the 2014 Transaction, which were provided to both the underwriters and Vantage Point, the contemporaneous solvency advisor. In the aggregate, the Padres Projections covered the period 2014 through 2020. However, the Padres Projections reflected more detailed and monthly data from the first quarter of 2014 through the fourth quarter of 2018. For 2019 and 2020, the Padres Projections reflect less detailed and annual data.[103]

---

[103] For example, the Padres Projections include payor-specific NRPS, on a quarterly basis, through the fourth quarter of 2018. Payor-specific NRPS is not available for the 2019 and 2020 projection years. *See* ML_DE_00044521 Padres Working Model_03-14.xlsx.

54. The Padres Projections were significantly flawed in that the projections failed to reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction. The primary risk factors were regulatory and administrative curtailment by Medicare in allowed testing and reductions in reimbursement rates, reductions in reimbursement rates by commercial payors, loss of Millennium business (*e.g.*, reductions in specimen volume and NRPS) and liabilities and costs associated with governmental investigations and litigation, and follow-on private party litigation. These risk factors were clearly known based on both historical trends that were evident leading up to the 2014 Transaction and on information that was either publicly available or told to Millennium by its outside legal, regulatory and financial advisors. In some instances, and as explained more fully below, these factors had been explicitly identified and/or modeled by Millennium prior to the 2014 Transaction, but were omitted from the Padres Projections. Further, in the weeks prior to the 2014 Transaction, Millennium's in-house and outside legal counsel met on multiple occasions with criminal and civil investigators from the U.S. Attorneys' Office in Boston and they were preparing for an unfair competition trial brought by a competitor (*see* Ameritox litigation, below).[104]  In this Section of the report, I describe the flaws in the Padres Projections. In Section E, I discuss how I modified the Padres Projections to correct these flaws prior to conducing the solvency analysis.

55. As a result of omitting or failing to reasonably account for these known or knowable risk factors, the Padres Projections significantly overstated Millennium's projected revenue as of the 2014 Transaction. In addition, the Padres Projections failed to take into account liabilities relating to the then pending litigation and government investigations. Had these risk factors and historical trends been reasonably taken into account, it would have been clear that the 2014 Transaction rendered Millennium balance sheet insolvent, with unreasonably small capital and an inability to pay its debts as those debts matured.

56. The following charts compare the Padres Projections to Millennium's then-recent historical results, based on three key statistics for the UDT business: specimen volume, NRPS, and payor mix. These are metrics that Millennium regularly reviewed in the operations of its business.[105] In

---

[104]   Martin Price Deposition Transcript at 134:5-136:6.

[105]   *See,* for example, the June 2014 Financial Summary [ML_DE_00034943].

each instance, the Padres Projections are unreasonable because they ignore historical trends and factors that were known or knowable as of the 2014 Transaction. Figure 2 compares historical and projected specimen volumes for Millennium's two largest payor groups: Medicare and commercial. The projected volumes are the Padres Projections.



**FIGURE 2: QUARTERLY SPECIMEN VOLUMES BY PAYOR GROUP**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 3.

57. As shown in Figure 2, the Padres Projections assumed strong continued growth in specimen volumes for Medicare and commercial payors. The Padres Projections assumed that Medicare and commercial specimen volumes would grow by 21.0% and 16.7% in 2014 respectively.[106] Afterwards, Medicare and commercial specimen volumes were <u>both</u> projected to grow by 9.3% in 2015 and by approximately 10% per annum from 2016 through 2018.[107] There are two

---

[106] Refer to YAS Workpaper 3 for 2013-2014 growth rate to derive growth of actual volumes from 2013 and Padres projections.

[107] *See* ML_DE_00044521 Padres Working Model_03-14.xlsx. ("VolumeBuild – UDT" tab). Beyond 2018 the projections are not broken down to the payor level.

obvious flaws in these volume projections that render them unreasonable when made. First, the Padres Projections assume that specimen volume for Medicare and commercial payors will grow at the same rate, notwithstanding very different historical trends in specimen volumes for these two payor groups. Second, the strong projected growth trend ignores that growth had been slowing for *both* payor groups in the years leading up to the 2014 Transaction. Indeed, in an email addressing assumptions in the Padres Projections, Daniel Pencak, Head of Financial Planning and Analysis,[108] who oversaw Millennium's financial modelling, stated that the volume build-up was "rather arbitrary".[109]  In addition, no consideration was given to potential reductions in specimen volume from a settlement of the DOJ Investigation.  Millennium was aware of this risk prior the 2014 Transaction, as Millennium had previously acknowledged the decline in Ameritox's specimen volume following its governmental settlements in 2010.[110]

58. Table 4 shows the annual and first quarter 2014 growth rates in specimen volume for Medicare, commercial payor and Millennium's aggregate specimen volume (across all payor groups). In all years, from 2010 to 2014, Medicare specimen volume growth rates were lower than the rates for commercial payor specimen volume. Furthermore, the disparity in growth rates *increased* over this time period. Indeed, in first quarter of 2014, the quarter immediately prior to the 2014 Transaction, Millennium's Medicare specimen volume *contracted* by 3.2%,[111] whereas commercial specimen volume grew by 4.4%.[112] I have seen no support for the assumption that projected specimen volume growth rates for commercial and Medicare would be equal after the 2014 Transaction.

---

[108]  Pencak Deposition at 17:23 - 18:13.

[109]  Plaintiff Ex. 171 to Pencak Deposition:

> "As for volume, since the build-up was rather arbitrary, I think we will simply build the sensitivity analysis around a sliding scale of volume growth/decline vs. whatever pricing we show based on the various pricing assumptions (i.e. Medicare reimbursement changes, commercial contracts, traditional Medicaid changes, etc.)."

[110]  *See* Section B.

[111]  *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, growth percentage of cell K132 with respect to J132).

[112]  *See* ML_DE_00559340, tab 'Payor Stats – UDT'. ML_DE_00732288 (Quarterly 2012-2015Q1 tab, rows 124-126, 128 and 135). According to the management model dated June 8, 2015 ("Revised Management Model"), actual commercial specimen volume (comprising BCBS, UHC, Aetna, Cigna, Humana) in the first quarter of 2014 was 222,784, implying an actual commercial quarterly growth rate of 0.2% in the first quarter of 2014. Figure 2 shows the higher (4.4%) specimen volume growth for the first quarter of 2014, consistent with the more contemporaneous data source.

59. In addition, the Padres Projections do not adequately reflect the fact that the growth in Millennium's specimen volume had been slowing over time. The growth rate of Millennium's total specimen volume had been declining by approximately one-half, each year from 2010 to 2013. For example, the growth rate was 64.4% from 2011 to 2012 but only 30.5% from 2012 to 2013. The slowing growth trend was even more pronounced for Medicare specimen volume, decreasing to only 12.9% from 2012 to 2013 and *contracting* by 3.2% from the fourth quarter of 2013 to the first quarter of 2014. This is in contrast to the first quarter of 2013, during which Millennium's Medicare specimen volume increased by 0.4%, when compared to the fourth quarter of 2012.[113]

**TABLE 4: SPECIMEN VOLUME GROWTH 2009-2014**

|  |  | 2009 | 2010 | 2011 | 2012 | 2013 | 2013 Q4 | 2014 Q1 |
|---|---|---|---|---|---|---|---|---|
| Medicare | [1] | 45,835 | 119,599 | 250,691 | 379,051 | 428,009 | 111,203 | 107,685 |
| *Period-on-Period Growth* | [2] |  | 160.9% | 109.6% | 51.2% | 12.9% |  | -3.2% |
| Commercial | [3] | 55,195 | 155,040 | 348,521 | 607,323 | 810,881 | 222,344 | 232,225 |
| *Period-on-Period Growth* | [4] |  | 180.9% | 124.8% | 74.3% | 33.5% |  | 4.4% |
| Total Specimen Volume | [5] | 171,807 | 489,609 | 1,092,041 | 1,795,631 | 2,343,150 | 633,637 | 647,798 |
| *Period-on-Period Growth* | [6] |  | 185.0% | 123.0% | 64.4% | 30.5% |  | 2.2% |

Source: ML_DE_00732288 ('Yearly 2009-2015M5' and 'Quarterly 2012-2015Q1' tabs).

Commercial comprises BCBS, UHC, Aetna, Cigna, and Humana.

60. Figure 3 compares Millennium's historical and projected NRPS for Medicare and commercial payors.

---

[113]  Medicare quarterly specimen volumes for the fourth quarter of 2012 and the first quarter of 2013 are 101,788 and 102,229 respectively.

**FIGURE 3: QUARTERLY NET REVENUE PER SPECIMEN BY PAYOR GROUP**



Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 3.

61. As shown in Figure 3, in 2015 the Padres Projections assumed only a modest decline in NRPS for Medicare and commercial payors. From the start of the Padres forecast (first quarter of 2014) through the end of the more detailed projection through the fourth quarter of 2018, the Padres Projections assume a 20.6% and 26.2% reduction, respectively, in commercial and Medicare NRPS. From 2014 to 2020, the Padres Projections assumed an aggregate decrease of 26.5% in Millennium's UDT NRPS, across all payor groups. This is not consistent with contemporaneous efforts by both payor groups to significantly reduce reimbursement levels and tests per specimen, or the broader initiatives within the industry to reduce the incurrence of medically unnecessary tests.[114] Both of these trends were expected to play out over the shorter-term, and have a

---

[114]  *See*, for example, Special Fraud Alert: Laboratory Payments to Referring Physicians, Department of Health and Human Services Office of Inspector General, June 25, 2014. Hawk, PollyBeth, "Ready or Not: Hospital Value-Based Purchasing Poised to Transform Healthcare Reimbursement Model and Introduce New Fraud Targets Under the False Claims Act," Winter, 2013. Questionable Billing for Medicare Part B Clinical Laboratory

significantly larger impact than assumed in the Padres Projections. Indeed, in late February and early March 2014, it appears that Millennium modelled – outside the Padres Projections – a 30% reduction in Medicare NRPS beginning on July 1, 2014.[115]

62. Figure 4 compares Millennium's historical and projected payor mix, reflecting the payor contributions by Medicare, commercial and managed government. Payor contributions are measured by specimen volume.



**FIGURE 4: PAYOR MIX**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 3.

63. As shown in Figure 4, the Padres Projections assumed a relatively constant payor mix. However, the significantly different growth rates in payor group specimen volume, during the period

---

Services, Department of Health and Human Services Office of Inspector General, August 2014. A Strategy for Medicare Payment Reform, Center for American Progress, May 2015.

[115] *See* Plaintiff Exhibit 165 and 165A [ML DE 00058384] dated 2/28/2014 under "Net revenue per specimen (pricing):

"Assumed 30% reduction in Medicare reimbursement effective June 1, 2014"

*See also* email from Daniel Pencak to Brock Hardaway and Tim Kennedy dated 3/2/2014 [ML_DE_00068651]:

"Brock - see attached for the 2nd version that assumes a 30% reimbursement reduction in June 2014 related to Medicare"

leading up to the 2014 Transaction, completely undermines such an assumption.[116]  For example, as of the first quarter of 2012, specimen volume covered by Medicare reimbursement equaled 22.4% of Millennium's total specimen volume.  By the first quarter of 2014, Millennium's specimen volume covered by Medicare reimbursement had steadily declined to 16.6%. In contrast, the Padres Projections assumed that Medicare specimen volume would continue to equal 18.6% of Millennium's total specimen volume over the entire forecast period.  By overstating the proportion of Medicare specimen volume, the Padres Projections overstated Millennium's projected revenue (due to the higher Medicare NRPS relative to other payor groups).

64. As shown in Figure 4, the Padres Projections assume growth in the contribution of Managed Government, consistent with the historical trend. This is projected to coincide with a large decline in "Patient" specimen volumes, which I understand represents revenue from self-pay patients.[117] This assumption has a significant impact on projected revenue, as Managed Government NRPS is significantly higher than Patient NRPS. For example, in March 2014, Managed Government NRPS was $168, whereas Patient NRPS was $2.

65. The Padres Projections also assumed very high revenue growth rates for Millennium's non-UDT businesses. For the PGT business, the Padres Projections assumed that revenue would grow from $12 million in 2013 to $119.9 million in 2020, equating to an annual average growth rate (or CAGR) of 39%. The PGT business was expected to grow from 3.3% of Millennium's revenue in 2014 to 10.6% by 2020. Millennium's projected CAGR for the PGT business was more than three times that of the expected industry CAGR of 12.7%.[118]

---

[116]  In the Padres Projections, payor mix derived from the 'Payor Mix' tab remains constant for all payor groups throughout the forecasted period except for Managed Government, patient, and Medicaid Contract in certain periods. Managed Government is projected to increase from 14.5% in January 2015 to 19.3% in December 2018; patient pay is projected to decline from 9.8% to 2.0%; and Medicaid Contract is projected to increase from 7.7% to 10.3%.

[117]  For example, between March 2014 and December 2016, Management Government increases its contribution from 14.5% to 19.3%, whereas Patient declines from 9.8% to 2.0%. *See* ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab).

[118]  US Pharmocogentic Testing Market industry trend data. Refer to YAS Workpaper 1, tab 'US Report.' CAGR represents growth from 2015 to 2020.

66. Similarly, RxAnte's revenue was projected to grow from $12.8 million in 2014 to $87.8 million in 2020 (a CAGR of 38%). RxAnte's business share was expected to increase from 1.7% of Millennium's revenue in 2014 to 7.7% by 2020.

67. The Padres Projections further included a category of revenue labeled "Emerging Opportunities." For the following reasons, Emerging Opportunities should not form part of the expected cash flows when assessing balance sheet solvency:

  – The revenues appear aspirational rather than expected. According to the Padres Projections, there was no revenue associated with this category until 2015, around nine months following the 2014 Transaction.

  – The Confidential Information Memorandum contains limited discussion on the composition of Emerging Opportunities. Rather, discussion is limited to a description of the employment background of Elizabeth Peacock, the "Executive Vice President of Emerging Opportunities".

  – The Emerging Opportunities do not appear in the subsequent management model dated June 8, 2015 (the "Revised Management Model").[119]

### B.    VANTAGE POINT SOLVENCY ANALYSIS BASED ON PADRES PROJECTIONS

68. Millennium retained a financial advisor, Vantage Point, to conduct a solvency analysis in connection with the 2014 Transaction.[120] In its work, Vantage Point relied significantly on the flawed Padres Projections.[121] Vantage Point conducted its discounted cash flow analysis using the unmodified Padres Projections.[122] Given that the Padres Projections significantly overstated Millennium's projected revenue, it is unsurprising that Vantage Point's DCF analysis wrongly concluded that Millennium would be solvent immediately following the 2014 Transaction.

---

[119]  ML_DE_00559340.

[120]  Exhibit 56 to Smith Deposition [VP_ML_00014656]; Exhibit 59 to Smith Deposition [VP_ML_00015683].

[121]  Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.15, April 30, 2014 [ML_DE_00263273 at 3287].

[122]  I compared the management projections on page 15 of the Vantage Point report with the Padres Projections. *See* ML_DE_00263273 at 3287 and the projections in the April 12, 2014 model [ML_DE_00057999].

69. In addition, Vantage Point appears to have undertaken only a very limited analysis to understand whether it was reasonably foreseeable that the 2014 Transaction would result in Millennium being left with unreasonably small capital. Notwithstanding Vantage Point's inaccurate conclusion that Millennium was balance sheet solvent, a separate analysis of the adequacy of Millennium's capital was still necessary to determine if the 2014 Transaction constituted a fraudulent conveyance.

70. To assess Millennium's capital adequacy, Vantage Point "examin[ed] the cash flows of the Company [Millennium]" and "considered the debt ratios of comparable companies."[123] For the cash flow analysis, Vantage Point performed what it called a "stress test" of the Company's cash flows. However, instead of estimating the declines in cash flows that could result from stress factors that were known or knowable as of April 2014, Vantage Point simply identified mathematical decreases in EBITDA that, in the opinion of Vantage Point, would "call into question" debt service payments. For example, Vantage Point concluded that a 19.9% decline in FY2015 EBITDA (relative to projected levels) would jeopardize debt service payments.[124] However, the Vantage Point presentation does not discuss the *probability* of Millennium encountering a 19.9% decline in EBITDA. I note, by way of high-level comparison, for the 12-month period ended December 31, 2013 to the 12-month period ended December 31, 2015, Millennium's actual EBITDA declined by 59%.[125]

71. In considering the debt ratios of comparable companies, Vantage Point relied on publicly-traded companies, notwithstanding that Millennium was most comparable to privately-held companies

---

[123] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.34, April 30, 2014 [ML_DE_00263273 at 3306].

[124] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.32, April 30, 2014 [ML_DE_00263273 at 3304].

[125] Millennium filed for bankruptcy on November 10, 2015.

2013 EBITDA of $364.8 million based on 2013 financial statements [ML_DE_00187601 at 7606 and 7608]. Income from operations of $344.9 million, plus depreciation and amortization of $16.9 million, plus stock based comp of $3.0 million, equals $364.8 million.

2015 EBITDA of $148.0 million based on 2015 financial statements [KPMG-ML-EA15WB-0001528 at 1533 and 1535]. Income from operations of $120.9 million, plus depreciation and amortization of $27.1 million, equals $148.0 million.

According to the Confidential Information Memorandum [ML_DE_00269115 at 9201], EBITDA was $356.4 million in 2013. This would imply a reduction in EBITDA of 59%.

such as Ameritox and Calloway. Furthermore, the Vantage Point presentation does not discuss whether the publicly-traded companies had a greater ability to maintain higher leverage. For example, Vantage Point identified Labcorp as a comparable company to Millennium.[126] In 2013, Labcorp offered a broad range of clinical laboratory tests across several countries. Unlike Millennium, Labcorp had experienced relatively steady growth of around 2% per annum over the prior two years. Labcorp reported that just 3% of its 2013 revenue related to drugs of abuse testing, and it was 9.2 times the size of Millennium by 2013 revenue.[127] As a larger and more diversified company with a more stable history of growth, Labcorp was less vulnerable to regulatory changes in any one clinical testing segment, much less the significant business, legal, and regulatory risks and exposure faced by Millennium in April 2014.

72. Notwithstanding the known business trends and significant risk factors facing Millennium in April 2014, Vantage Point's solvency presentation contains no mention of Millennium's declining Medicare revenue and declining NRPS, risks associated with Millennium's use of Custom Profiles or free specimen testing cups, impacts of MUEs or LCDs, or commercial payor reimbursement pressures. Vantage Point also appears to have ignored obvious litigation and regulatory risks, relying instead on highly questionable representations from Millennium.[128] At the time the Vantage Point solvency opinion was issued, Millennium had received multiple subpoenas from the US DOJ, was aware of multiple qui tam lawsuits, and was engaged in litigation with Ameritox. Although Vantage Point states that it did not have legal expertise,[129] it is customary market practice when providing a solvency opinion to seek out third-party expertise for the purpose of adequately assessing the risks to the company's solvency.[130]

---

[126] Vantage Point notes that "none of the selected companies were identical or directly comparable to the [Millennium]". *See* Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.15, April 30, 2014 [ML_DE_00263273 at 3292].

[127] Labcorp's 2013 revenue was $5,808 million (source: S&P CapIQ), whereas Millennium's 2013 revenue was $633 million *See* ML_DE_00044521 Padres Working Model_03-14.xlsx ("Summary" tab).

[128] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p. 9, April 30, 2014 [ML_DE_00263273 at 3281]; Exhibit 56 to Smith Deposition [VP_ML_00014656].

[129] Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at p.7 and p.9, April 30, 2014 [ML_DE_00263273 at 3279, 3281].

[130] Based on my professional experience, including observing the practices of other financial advisors when providing solvency analyses.

## VII.   SOLVENCY ANALYSIS OF MILLENNIUM USING THE CORRECT SOLVENCY FRAMEWORK

### A.   MILLENNIUM BUSINESS TRENDS AS OF 2014 TRANSACTION

73.   At the time of the 2014 Transaction, the UDT industry, especially quantitative testing, was under significant pressure from government and commercial payors. Concerns were increasing about the expansive use of expensive urine drug tests without sufficient demonstration of medical necessity.[131]

74.   At the time of the 2014 Transaction, several trends, reflecting these same pressures, were impacting Millennium's business. Taken together, these trends indicated that Millennium was facing significant business, reimbursement, legal, and regulatory risks and exposures, and that the Company was very likely to encounter slowing or negative growth and declining profitability. The first trend was declining NRPS for Millennium's two largest payor groups: Medicare and commercial.[132] *See* Figure 5.

---

[131]   For example, *see* https://www.nytimes.com/2013/08/02/business/increase-in-urine-testing-raises-ethical-questions.html ("...urine-testing companies are aggressively marketing their services to physicians by trumpeting the big profits that await if they test their patients…"); *see also*: https://www.wsj.com/articles/doctors-cash-in-on-drug-tests-for-seniors-and-medicare-pays-the-bill-1415676782 ("Pain specialists order costly tests for illegal drugs such as cocaine and angel dust, which few seniors ever use").

[132]   As noted, Millennium reported billing data (including NRPS) for certain commercial payors, including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC.

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 40



**FIGURE 5: QUARTERLY NET REVENUE PER SPECIMEN**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). *See* YAS Workpaper 4.

75. As shown in Figure 5, after peaking in the third quarter of 2012, NRPS for Millennium's Medicare business was trending down as of the 2014 Transaction. From the third quarter of 2012 to the first quarter of 2014, Medicare NRPS declined by 12.8%.[133] This decline is largely attributable to reductions in tests per specimen[134] and reductions in Medicare billing rates.[135,136]

---

[133] Quarterly Medicare NRPS dropped from $518 in the third quarter of 2012 to $451 in the first quarter of 2014 (12.8% drop). *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, columns BE and BL, row 132).

[134] ML_DE_00732288 (Quarterly 2012-2015Q1 tab). For Medicare, quarterly trends for Tests Per Specimen (columns CC to CO) appear consistent with quarterly trends for NRPS (columns BC to BO).

[135] 2012 Annual Physician Notice (Exhibit 3 to DOJ Complaint) [ML_DE_0628891], 2013 Annual Physician Notice [ML_DE_00134548], and 2014 Annual Physician Notice [ML_DE_00164030]. Comparison of each HCPCS codes' billing rates from 2012-2014 indicate an annual decline in billing rates for the majority of HCPCS codes.

[136] According to KPMG work papers (see below), in an apparent effort to increase Medicare billings, Millennium changed its billing practices. In February 2014, Millennium increased billings to Medicare from 100% to 250% of the scheduled rate. As a result of this change, Millennium experienced a reduction in payments from "over 90%" of billed claims, to approximately 50% of billed claims. I have seen no evidence that such a strategy led to higher collections.

*See* KPMG 2014 work papers [KPMG-ML-EA14WB-0000347.xlsx, tab "2 - KPMG Look Back Analysis" (emphasis added):

76. NRPS for Millennium's commercial business also declined prior to the 2014 Transaction. Commercial NRPS declined by 14.3% from the second quarter of 2012 to the first quarter of 2014.[137] The observed decline was consistent with the contemporaneous negotiations between Millennium and multiple commercial payors. For example, effective in the first quarter of 2014, UHC, one of Millennium's largest commercial payors, reduced rates by 19%.[138] This followed discussions between Millennium and UHC in 2013, wherein UHC expressed concerns over inappropriate overutilization of UDT, the lack of value in quantitative testing, and over-testing due to custom profiles.[139] Other commercial payors were similarly seeking to reduce the number of reimbursable tests per year.[140] Furthermore, commercial NRPS was highly vulnerable to follow-on reductions linked to reductions in Medicare reimbursement rates. For example, during contract negotiations with UHC, Millennium agreed to a fee reduction equal to "42% of

---

"Per discussion with Rick Guzman, Sr. Director Revenue Cycle Management, the Company did not collect as expected from Medicare and Medicaid during the year due to multiple factors. **In February the Company began billing all payor groups including Medicare/Medicaid at 250% of the Medicare rate (previously billed at 100%).** Only the client payor group is billed at contractually agreed upon rates and have 100% expected collection rates. As a result of the increased billed claims, the Company saw a reduction of payments from Medicare from over 90% of billed claims to approximately 50%."

[137] Quarterly commercial NRPS dropped from $298 in the third quarter of 2012 to $255 in the first quarter of 2014 (14.3% drop). As noted, Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC. For the purposes of this analysis, I have defined these payors as the commercial payors. *See* ML_DE_00732288 (Quarterly 2012-2015Q1 tab, sum of "Estimated Revenue" divided by "Priced Accession Volume" for commercial payors).

[138] Marbach email to Appel dated August, 9, 2013 [ML_DE_00061777]. Email indicates rate reductions would be effective Q4 2013, however, the Padres Projections indicate that the 19% reduction actually occurred in the first quarter of 2014. *See* ML_DE_00057999 Padres Working Model_04-12-14.xlsx ("Payor Mix" tab row 20, column AB).

[139] Plaintiff Exhibit 141 to Pencak Deposition [ML_DE_0008373]

"Issues Raised:

Inappropriate overutilization of UDT, the lack of value to the providers for quantification vs. offering qualitative results, providers chasing a number+ the ability of providers to understand the nuances of reported results.

...

"CP's continue to be of great concern, since their perception is that providers are lazy & take the easy road instead of evaluating each patient's need for specific drug monitoring. That leads to higher # of tests / specimen & $$$."

[140] Beginning January 1, 2014, Tufts health plan "will not compensate for qualitative drug screen when billed with any combination of more than twenty (20) units within 365 days per Member, as it exceeds clinical guidelines." Tufts Plan changes, [ML_DE_00305155 at 5156]. Martin Price's email circulating the updated reimbursement policy [ML_DE_00305151 at 5152] states that "[w]e expect the other payors in MA to adopt something similar."

---

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 42

Medicare for UHC commercial business."[141] In November 2014, Aetna also instituted a strict reimbursement policy.[142]

77. As shown in Figure 5, from the fourth quarter of 2012 to the first quarter of 2014, the only payor group for which Millennium saw an increase in NRPS was Managed Government. However, even with a slight increase, NRPS for Managed Government remained significantly below that for Medicare and commercial payors.

78. A second trend impacting Millennium's business prior to the 2014 Transaction was slowing growth in specimen volume. As shown in Figure 6, between the first quarter of 2012 and first quarter of 2014, quarterly specimen volume growth declined from 14.5% to 2.2%.

**FIGURE 6: QUARTERLY TOTAL SPECIMEN VOLUME GROWTH**



Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

---

[141] Marbach email to Appel August, 9, 2013 [ML_DE_00061777]. *See also* Roger Feldman, Bryan Dowd, and Robert Coulam, "Medicare's Role in Determining Prices throughout the Health Care System", October 2015.

[142] [ML_DE_00202842]:

"Aetna allows eight (8) qualitative drug test encounters per 12 month period. Aetna allows eight (8) quantitative drug tests per day and eight (8) quantitative drug test encounters per 12 month period."

79. A third trend impacting Millennium's business prior to the 2014 Transaction was a shift in Millennium's payor mix away from traditional Medicare. As shown in Figure 7, specimen volume growth for Medicare was modest from the first quarter of 2012 to the first quarter of 2014 relative to the significant growth in specimen volume for commercial, Managed Government and "other" payors. "Other" payors reflects workers compensation, patient self-pay, and Medicaid. As a result, the proportion of specimen volume for which Millennium received Medicare reimbursement decreased over time. *See* Figure 8. Due to the significant difference in NRPS between Medicare and other payors (as noted – *see* Figure 5), the financial result of this shift in payor mix away from Medicare was a significant decrease in Millennium's aggregate NRPS (*i.e.*, NRPS across all payor groups), even assuming reimbursement rates for a given payor group were held constant.

**FIGURE 7: QUARTERLY SPECIMEN VOLUMES BY PAYOR GROUP**

Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

**FIGURE 8: PAYOR MIX**



Source: ML_DE_00732288 (Quarterly 2012-2015Q1 tab). Refer to YAS Workpaper 4.

## B.    REGULATORY AND LEGAL ENVIRONMENT AS OF 2014 TRANSACTION

80. Regulatory and legal scrutiny of the UDT industry had been increasing as of the 2014 Transaction. As early as 1998, the U.S. Department of Health and Human Services, Office of Inspector General ("HHS OIG") issued guidance to all clinical laboratories seeking reimbursement from Medicare and Medicaid. The HHS OIG guidance cautioned against the use of "standing orders" similar to Millennium's Custom Profile. Although the guidance did not prohibit this practice, it noted the propensity of standing orders to result in tests that were not reasonable and medically necessary. The guidance concluded that "as a result of the potential problems standing orders may cause, the use of standing orders is discouraged."[143]

---

[143]    Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45081:

"Although standing orders are not prohibited in connection with an extended course of treatment, too often they have led to abusive practices. Standing orders in and of themselves are not usually acceptable documentation that tests are reasonable and necessary. Accordingly, the insurer may reject standing orders as evidence that a test is reasonable and necessary. Medicare contractors can and may require additional

81. The HHS OIG guidance also outlined methods by which laboratories could monitor whether unnecessary tests were occurring. This included hiring an external consultant to analyze patterns of utilization and determine the cause of any excessive growth in claims submitted to Medicare.[144] HHS OIG proposed that an annual increase in test utilization of 10% or greater would occasion additional scrutiny as potentially excessive growth. As discussed below, Millennium did hire such an external consultant (CodeMap), who concluded that Millennium faced significant legal and regulatory risk arising from the Company's business practices.[145]   As shown in Table 5, as part of my review of Millennium's billings to Medicare, I noted that test utilization increased by 10% or more for multiple test codes.[146] In an April 2015 letter from Millennium's legal counsel to HHS OIG, Millennium claimed that beginning in 2010 it identified practices with high tests per specimen and "asked these practices to review their

---

documentation to support the medical necessity of the test. As a result of the potential problems standing orders may cause, the use of standing orders is discouraged."

*Id.* pp. 45079-45080:

"In addition to the general notices above, laboratories that continue to offer clients the opportunity to request customized profiles should provide annual written notices that: (1) Explain the Medicare reimbursement paid for each component of each such profile; (2) inform physicians that using a customized profile may result in the ordering of tests which are not covered, reasonable or necessary and that tests will not be billed; and (3) inform physicians that the OIG takes the position that an individual who knowingly causes a false claim to be submitted may be subject to sanctions or remedies available under civil, criminal and administrative law."

[144]   Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices, p. 45080:

"There are many methods by which a laboratory may determine excessive utilization of laboratory services. One approach to self-monitoring is to hire an outside consultant to analyze the laboratory's patterns of utilization, and investigate any potential problems or aberrancies. Another approach is to analyze test utilization data by CPT or HCPCS code, for the top 30 tests performed each year. Laboratories could do this by keeping track of the number of tests performed by CPT or HCPCS code or of the number of claims submitted for each test. The laboratories would then compute the percentage growth in the number of tests or claims submitted for each of the top 30 tests from one year to the next. We believe that if a test's utilization grows more than 10 percent, the laboratory should undertake a reasonable inquiry to ascertain the cause of such growth. If the laboratory determines that the increase in test utilization occurred for a benign reason, such as the acquisition of a new laboratory facility, then the laboratory need not take any action. However, if the laboratory determines that the increase in utilization was caused by a misunderstanding or ignorance by the ordering physicians or other authorized individuals regarding the billing consequences of the tests they ordered or an action on the part of the facility, the laboratory should take any steps that it deems reasonably necessary to address the issue and to ensure misconduct is not occurring."

[145]   Draft Annual Compliance Audit Report by Greg Root/CodeMap (Exhibit 5-A to Price Deposition), 11/24/2010 [ML_DE_00511984 at 2026]; Martin Price Deposition at 52:2353:3. Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

[146]   Note that coding practices change over time, and changes in test utilization for a particular code may not always represent a change in testing practices.

---

Expert Report of Yvette R. Austin Smith                                                    Adv. Pro. No.17-51840 (LSS) | 46

ordering patterns and determine whether any changes were appropriate."[147] I have seen no evidence that there was any change in the behavior of practices with high tests per specimen. Indeed, the average number of tests per specimen in 2013 (23.6) was almost identical to that in 2010 (24.0).[148]

82.  Seemingly contrary to OIG guidance, Millennium specifically targeted medical practices with low tests per specimen (the so-called "Troubled Practices Program"). Under the Troubled Practices Program, each practice with low tests per specimen was reviewed for potential "improvement." If the Custom Profiles for these Troubled Practices did not contain what Millennium considered a sufficient number of tests, or where Custom Profiles were not being utilized, Millennium threatened to remove the commissions paid to Millennium salespeople for these accounts unless they "improved."[149] According to Millennium, a major driver of increases in test per specimen in late 2011 was a focus on more "comprehensive testing", whereby Millennium would penalize underperforming practices, review Custom Profiles and/or require Lab Service Assistants or cup agreements.[150]

---

[147]  Letter from Martin Price to Andrea Berlin, April 30, 2015 [ML_DE_00594719].

[148]  The average number of tests per specimen was 24.0 in 2010, 17.6 in 2011, 23.8 in 2012, 23.6 in 2013 and 23.4 in 2014. *See* ML_DE_00732288 (Yearly 2009-2015 M5 tab, columns AT-AX, row 138).

[149]  For example, for Walter M. Kidwell, MD, it was stated under "status" in a document tracking the Troubled Practices Program that "The MA [medical assistant] was checking the DO NOT use custom profile incorrectly. They are now making sure to check Custom Profile – it has 9 tests plus validity", and that "Commissions suspended due to low tests. Reps need to ensure CP is being used." Other accounts noted that "Commissions to be paid based on updated CP." *See* Pencak Deposition, Plaintiff Exhibit 134 at p.2.

[150]  *See* Pencak Deposition, Plaintiff Exhibit 138. Millennium's commentary relates to an increase in tests per specimen from 16.4 in August 2011 to 20.1 in January 2012 (emphasis added):

"We have experienced an increase of 3.7 tests since a low of 16.4 in Aug-11.

The growth was due to the following:

· New test introductions accounted for .97 of the 3.7 (26%) test growth.

· Panel tests of opiates/barbs/TCA attributed 1.33 of the 3.7 (36%) test growth.

· Remaining 38% due to increase in existing drug offerings - further focus on importance of comprehensive testing **(i.e. penalizing underperforming practices, reviewing initial custom profiles, requiring comprehensive testing for LSA [Lab Service Assistant] or cup agreement)."** (emphasis added).

---

**TABLE 5: MILLENNIUM'S CODES EXCEEDING CHANGE IN TEST VOLUME BY OVER 10%**
**(2012 - 2013)**

| HCPCS Code | Change in Volume 2012 v. 2013 |
|---|---|
| G0431 | 17.94% |
| 82649 | 14.21% |
| 82646 | 14.19% |
| 82542 | 614.74% |
| 80152 | 13.59% |
| 83805 | 13.89% |
| 80160 | 13.57% |
| 80174 | 13.57% |
| 83840 | 13.65% |
| 80182 | 13.86% |
| 82205 | 37.20% |
| 80184 | 27.01% |
| 82055 | 38.56% |
| 83516 | 56.55% |

Source: Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

83. Another indication of the increased regulatory and legal scrutiny of the UDT industry and medically unnecessary testing were multiple legal and regulatory actions taken against some of Millennium's key competitors: Ameritox Ltd. and Calloway Laboratories.

84. Ameritox was a privately-held UDT company based in Midland, Texas, before ceasing operations in May 2018.[151] At the time of the closure, Ameritox was in a dispute with a medical insurance company, Humana, over uncovered, unnecessary and duplicative testing.[152] Ameritox was identified by Millennium as one of its four key competitors.[153] In fact, 99.7% of Ameritox's

---

[151] https://www.bizjournals.com/triad/news/2018/03/08/drug-testing-company-to-close-greensboro-facility.html
https://www.bizjournals.com/baltimore/news/2018/03/07/drug-testing-company-plans-to-close-columbia.html
[152] *Id.*
[153] Confidential Information Memorandum [ML_DE_00269115 at 9193].

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 48

2013 Medicare revenue derived from billing to reimbursement codes also billed by Millennium.[154]

85. In 2010, Ameritox entered into a settlement with the federal government and several state governments after being charged with various violations of the Anti-Kickback and Stark laws. As I understand, the Stark Law prohibits claims for services where the referring physician has a financial relationship with the service provider (in this case, a laboratory services company).[155] The settlement pertained to Ameritox business conduct over the years 2003 to 2010. The US DOJ charged Ameritox with providing customers benefits in exchange for the use of the companies' services that resulted in excessive, medically unnecessary UDT testing.[156] It was also alleged that Ameritox sent all urine screens automatically to a confirmation test without physician request, resulting in unnecessary testing, over testing, and overbilling.[157] As part of the settlement, Ameritox agreed to pay $16.3 million to the federal government and a number of states.[158] Ameritox also agreed to execute a corporate integrity agreement with the federal government, which required scrutiny of Ameritox's future business practices by HHS OIG.[159]

---

[154] Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021. Ameritox had a slightly different distribution of its revenue by code. In particular, Ameritox derived 15.49% of 2013 Medicare revenue from qualitative tests (code G0431), relative to 0.42% for Millennium. Ameritox did not bill at all to certain codes, for example, codes related to tests for certain anti-depressants.

[155] US DOJ Complaint [ML_DE_00595094 at 5107], pp. 14-15:

"The federal physician self-referral prohibition, 42 U.S.C. § 1395nn (commonly known as the "Stark Law") prohibits an entity from submitting claims to Medicare for twelve categories of "designated health services" ("DHS"), including clinical laboratory services, if such services were referred to the entity by a physician with whom the entity had a financial relationship that did not fall within a statutory or regulatory exception."

[156] Second Amended Complaint – Maul et al v. Ameritox, LLC. at ¶ 13.

[157] Second Amended Complaint – Maul et al v. Ameritox, LLC. at ¶ 15. iii.ii. Ameritox was also alleged to have misbranded its patented RX Guardian urine-testing technology by telling doctors it was approved by the FDA when in fact it was not. *Id.*

[158] Medicare programs in various states received $814,000 of the total settlement, while plaintiff Debra Maul received $3.4 million from the total settlement. Norton, Christopher, "Ameritox to Pay $16M to Resolve Medicaid FCA Suit," November 17, 2010. Retrieved from Law360 (www.law360.com/articles/209926/ameritox-to-pay-16m-to-resolve-medicaid-fca-suit).

[159] *See* Christopher Norton, "Ameritox To Pay $16M To Resolve Medicaid FCA Suit", Law 360, November 17, 2010.

According to Millennium, following the US DOJ settlement, Ameritox's specimen volumes declined by 50% in the first year and 30% over two years.[160]

86. In 2012, another Millennium competitor, Calloway Laboratories,[161] a privately-held company based in Massachusetts, entered into the first of several government settlements regarding multiple violations of Anti-Kickback and Stark laws.[162] In March 2012, Calloway Labs agreed to pay $20 million to settle charges by the Commonwealth of Massachusetts that the company defrauded Medicaid of millions of dollars through an elaborate kickback scheme to managers of sober houses paid through straw companies. In return, managers required the tenants of the sober houses to undergo excessive urine screening.[163] Millennium estimated that Calloway experienced a 30% decline in annual specimen volume following the March 2012 settlement.[164] Calloway Labs was then acquired by Ampersand Capital Partners in late 2012 and it eventually ceased operations in October 2015.[165]

87. Prior to the 2014 Transaction, Millennium received specific advice regarding its business practices in light of the heightened legal and regulatory scrutiny of the UDT industry. In January 2011, three years prior to the 2014 Transaction, Millennium was notified by its outside compliance auditor (CodeMap) as part of Millennium's 2010 Annual Compliance Audit that its free specimen cup agreement entailed "substantial risk of violating the Stark Law."[166] CodeMap characterized the risk to Millennium in connection with its testing protocols and the provision of free cups a "1" level of risk.[167] This was the highest level of risk on a sliding scale of 1-4. For

---

[160] Email from Martin Price to Kennedy and Hardaway, April 3, 2015 [ML_DE_00597259]; Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[161] Similarly to Millennium, Calloway focused on UDT, although Calloway was smaller than Millennium and had a slightly different business profile. According to CMS data, 94.9% of Calloway's 2013 Medicare revenue came from the same HCPCS codes billed by Millennium. However, 55.0% of Calloway's 2013 Medicare revenue was derived from qualitative testing (G0431), compared to 0.42% for Millennium.

[162] Patricia Wen, "Calloway Labs of Woburn agrees to $20 million settlement of Medicaid fraud case", March 30, 2012.

[163] Id.

[164] Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[165] Boston Business Journal, "Woburn-based Calloway Labs, fined $20M in kickback scandal, to close and layoff 240 employees", October 8, 2015

[166] Draft Annual 2010 Compliance Audit Report by Greg Root/CodeMap, 11/24/2010, p. 31 [ML_DE_00512026].

[167] Id. at 41-42.

these 1-level risks, CodeMap's recommendation was to "strongly encourage Millennium to implement the recommendation, and that failure to do so will result in ***an unreasonable risk*** (emphasis added) of civil, criminal, or administrative law liability or adversely affect the effectiveness of Millennium's compliance program."[168]

88.  ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████[169] In April 2012, Millennium's general counsel (Martin Price) received a copy of an April 2011 letter (addressed to a third party) in which the attorney from McDonald Hopkins (Jane Wood) ██████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████[170]

---

[168]  *Id.* at 41.

[169]  Ronald Wisor states on 4/4/2012 that Greg Root provided the opinion "a few years back" that the cup program was a grey area and that Wisor had offered an opinion at the time that it was a gray area [ML_DE_00569414].

According to Wisor: "Having had a chance to look more closely at the Stark rules and commentary, as well as the Florida rules, I think there is a decent argument to be made the provision of InstaCups by drug testing labs should be considered lawful, although the issue certainly is not free from doubt." *See* Wisor email dated 11/18/2009, Exhibit 3 to Price Deposition, [ML_DE_00498951].



*See also*: Draft Annual Compliance Audit Report by Greg Root/CodeMap, 11/24/2010 [ML_DE_00512026]; Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

[170]  Jane Pine Wood letter April 2012, Exhibit 10 to Martin Price deposition [ML_DE_00512070]; *see also* Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040].

89. In April 2011, a few months after CodeMap issued its draft report, Millennium was named in a lawsuit filed by Ameritox alleging that Millennium's specimen cup agreement was a violation of Anti-Kickback and Stark laws.[171] The complaint alleged (among other claims) that Millennium "implemented a scheme of providing improper and unfair financial inducements to health care providers…that violate state and federal laws in an attempt to increase its market share."[172] It further stated that "Millennium's unfair and deceptive scheme of improper inducements and kickbacks involved, in part, an agreement with health care providers and patients not to collect payments, which Millennium is required by law to collect, in exchange for the referral of patients. The purpose of the scheme was to improperly induce, influence, and encourage health care providers to engage in business with Millennium by providing the health care providers and their patients with an improper financial benefit."[173] Millennium's outside counsel ████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████.[174] Millennium's outside counsel ███████████████████████████████████████████████ ████████████████████ [175]

90. As early as 2010, Millennium was aware that its use of Custom Profiles was contrary to the guidance from HHS OIG and that their use increased the risk of Millennium's being found liable for billing for medically unnecessary tests. ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████[176] In February 2012, Martin Price sent an email to Millennium representatives

---

[171] Between 2011 and 2014, Ameritox brought claims against Millennium in at least eight separate forums, that included direct actions against Millennium, its employees and actions brought by third parties. *See* Millennium Voluntary Self-Referral Disclosure at p.2 [ML_DE_00670668 at 0669]

[172] Ameritox, Ltd v. Millennium Laboratories, Inc, April 8, 2011, 8:11-cv-775-T-24-TBM (the "Ameritox Complaint) at ¶ 13.

[173] Ameritox Complaint at ¶ 14.

[174] *See* Email from Ronald Wisor to Martin Price, April 4, 2012 [ML_DE_00569414].

[175] *See* Email from Ronald Wisor to Martin Price, April 4, 2012 [ML_DE_00569414].

[176] According to a letter from Millennium's legal counsel on April 30, 2015:

████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████

informing them of Millennium's policies around Custom Profiles and noting the rationale for such policies. In this email, ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████[177]

91. Since its inception, Millennium had been the target of at least eight qui tam lawsuits.[178] In a qui-tam lawsuit, also known as a "whistleblower" lawsuit, a private citizen brings a lawsuit against a

---



*See* letter from Skadden, Arps, Slate, Meagher & Flom LLP, April 30, 2015 (emphasis added) [ML_DE_00594736 at 4741].

[177]   *See* email from Martin Price to Millennium's sales representatives, dated February 10, 2012 (Exhibit 137 of Pencak Deposition) (emphasis added) [ML_DE_00236719 – 6720]:



[178]   Fred Schulte and Elizabeth Lucas, "Liquid Gold: Pain Doctors Soak Up Profits By Screening Urine for Drugs", November 6, 2017 (https://khn.org/news/liquid-gold-pain-doctors-soak-up-profits-by-screening-urine-for-drugs/). Qui tam lawsuits are typically filed under seal.

person or company who is believed to have violated the law in the performance of a contract with the government or in violation of a government regulation. Millennium's contracts with Medicare and Medicaid were the subject of the qui tam lawsuits. Federal or state governments occasionally intervene and become a party in a qui tam lawsuit. This is particularly true when the lawsuit is "based on significant violations which involve fraudulent or criminal acts and not technical violations and/or errors."[179] In fact, in December 2014 (eight months after the 2014 Transaction), the federal government did intervene in three qui tam lawsuits that had been filed against Millennium in January 2012, April 2012 and April 2013.[180]

92.  Prior to November 2012, there had been at least five grand jury subpoenas seeking records on Millennium.[181] Four witnesses testified that Millennium was encouraging doctors to order unnecessary urine tests and was charging excessive fees to Medicare and private insurers.[182]

93.  In addition to the qui tam law suits, by December 2012, Millennium was aware that the US DOJ was conducting a joint civil and criminal investigation of the Company. The conduct under investigation included (but was not limited to) health care fraud offenses and violation of the Anti-Kickback Act and False Claims Act in connection with billings of fraudulent claims to Federal healthcare programs and/or other payors, payment of remuneration to physicians and/or others to induce referrals of laboratory work to Millennium, and interference with witnesses and/or destruction of evidence.[183]

---

[179]  https://dictionary.law.com/default.aspx?selected=1709
[180]  US DOJ Complaint, March 19, 2015 [ML_DE_00629274].
[181]  Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation", November 16, 2012.
[182]  Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation", November 16, 2012.
[183]  Deposition of Daniel Pencak, July 1, 2021 ("Pencak Deposition) Exhibit 140; Loucks email (Exhibit 13 to Price Deposition) [ML_DE_00565040 at 5043].

### C.   POST-TRANSACTION EVENTS RELATED TO KNOWN OR KNOWABLE RISKS IN APRIL 2014

#### 1.   Verdict in Ameritox 2011 Lawsuit

94. Ameritox filed a complaint against Millennium on April 8, 2011 in Florida.[184] The complaint alleged that Millennium's specimen cup agreement was a violation of Anti-Kickback and Stark laws. Following trial, on June 16, 2014, a jury rendered its verdict that Millennium's provision of free POC cups to doctors who signed an agreement to not bill for the POC cups constituted "remuneration under the Stark Law" and "remuneration under the Anti-Kickback Statute."[185] Following the verdict, J.P. Morgan informed Millennium executives that they believed that the verdict would reduce Millennium's valuation by $500 million.[186] Consistent with an anticipated decrease in company value, Millennium ██████████████████████ ████████████████████████████████████[187] Shortly before the 2014 Transaction, Millennium's General Counsel informed J.P. Morgan's outside counsel that an adverse verdict in the then impending Ameritox trial would "fuel" the DOJ Investigation.[188]

---

[184]  Ameritox, Ltd v. Millennium Laboratories, Inc, April 8, 2011, 8:11-cv-775-T-24-TBM.

[185]  Jury Verdict, Ameritox, Ltd v. Millennium Laboratories, Inc, June 16, 2014, 8:11-cv-775-T-24-TBM [ML_DE_00080267]. Millennium later disclosed that it strongly disagreed with the verdict and that it requested the court to set it aside and / or order a new trial, ultimately appealing the decision. Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668 at 72].

[186]  Email from Martin Price, June 16, 2014 (Exhibit 106 to Price Deposition) [ML_DE_00669350]:



[187]  Email from Martin Price to Tim Kennedy, April 2, 2015 [ML_DE_00597259 at 7260]:

[188]  Exhibit 131 to the Lee Deposition [JPMC-MIL-CORP_00050228 at 0231].

### 2.    $90 Million Quantifiable Exposure Related to Free Specimen Cups

95.  As discussed above, prior to the 2014 Transaction Millennium was aware of the risks posed by its free specimen cup agreements. More specifically, notwithstanding that Millennium was in a position to quantify the financial impact of this risk *prior to the 2014 Transaction*, in fact, Millennium did so only *after* the Ameritox verdict.

96.  On August 15, 2014, two months after the Ameritox verdict and pursuant to CMS's Voluntary Self-Referral Disclosure Protocol, Millennium's outside counsel submitted a letter to CMS ("Voluntary Self-Referral Disclosure") in order to "resolve [Millennium's] potential violation" of the "Stark" physician self-referral law.[189] By this time, Millennium had cancelled its free specimen cup program.

97.  In this disclosure, Millennium argued that its free specimen cup agreement did not create a "compensation arrangement" of the type that is prohibited by the Stark law, but nevertheless acknowledged (in Exhibit K to the submission) that, during the four years prior to the cancellation of the cup agreement in June 2014, it had received approximately $90 million from Medicare alone relating to physicians with cup agreements.[190] Deposition testimony by Martin Price, confirmed that the books and records necessary for Millennium to quantify this liability were available prior to the 2014 Transaction.[191]

---

[189]  Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668].

[190]  Exhibit K to Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00514819] shows "payments received from Medicare for testing services ordered by physicians during the period which they or their practice had a cup agreement in place with Millennium over the four-year period prior to Millennium's termination of all such agreements in June 2014…" *See* Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00670668 at 81].

[191]  Martin Price Deposition Transcript, dated April 12, 2021, at 323:23-324:16:

"Q. Now, this liability was eminently calculable not just as of August 2014 but also as of April 2014; correct? Just as a matter of the books and records of the company.

MR. POPOVSKY: Objection to form.

MR. WERNER: Objection to form.

A. Was it -- is the question could we have calculated our Medicare billings from those customers who had cup agreements in April of 2014 –

Q. Yes.

A. -- if we had -- if we had set out -- if someone had asked us to do that? I don't doubt the company could have generated that number. I don't know if that's your question…"

### 3.      Escalating US DOJ Investigations

98.   As discussed above, by December 2012 (more than a year before the 2014 Transaction) Millennium was aware that the US DOJ was conducting a joint civil and criminal investigation of the Company. By August 2013, Millennium and its counsel were aware that former Millennium employee, Ryan Uehling, was at least one of the qui tam "relators."[192] In addition, Millennium made at least three presentations to representatives of the Boston U.S. Attorney's Office in March – April 2014, while the 2014 Transaction was in progress, concerning its business practices under investigation.[193] Only eight months after the 2014 Transaction, these known risks began to materialize.

99.   On December 19, 2014, the US DOJ intervened in consolidated complaints filed by Mark McGuire, Ryan Uehling, and Omni Healthcare Inc. under the qui tam provisions of the False Claims Act.[194] According to the US DOJ and qui tam complaints, Millennium "knowingly submitted many thousands of false and fraudulent claims to Medicare and Florida Medicaid for excessive and unnecessary testing, and for testing referred in violation of the Stark Law and the Anti-Kickback Statute, and was improperly paid many millions of dollars in reimbursement for these claims."[195]

100.   The United States alleged that Millennium systematically billed federal health care programs for excessive and unnecessary drug testing from January 1, 2008 through May 20, 2015.[196] The allegations stated that "Millennium caused physicians to order [urine drug tests] that were not reasonable and necessary,"[197] in part through Custom Profiles, leading to the over-billing of federal health care programs. The United States also alleged that Millennium "knowingly

---

192   *See* email from M. Price [ML_DE_00672098].

193   *See* Price Deposition at 132:8–136:6.

194   US DOJ Complaint [ML_DE_00595094 at ¶¶12-15].

195   US DOJ Complaint [ML_DE_00595094 at ¶ 8]. *See also United States of America ex rel Omni Healthcare Inc, and John Doe, v. Millennium Laboratories Inc.* at ¶¶ 2-3, *United States of America ex rel. Mark McGuire v. Millennium Laboratories, Inc.* at ¶ 2, and *United States of America ex rel. Ryan Uehling v. Millennium Laboratories, Inc.* at ¶ 2.

196   US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

197   US DOJ Complaint [ML_DE_00595094 at §VA]

submitted claims to Medicare for UDT that was referred in violation of the Stark and Anti-Kickback Statue"[198] by providing physicians with free drug test cups on the condition that the physicians return the specimens to Millennium for "over $90 million"[199] dollars' worth of additional testing. Additional claims included the "dissemination of false and misleading statements about drug abuse rates and the value of its testing"[200] despite Millennium having been warned by "consultants, customers, competitors, insurers and regulators" that "its marketing schemes were illegal."[201]

101. On October 2015, Millennium entered multiple settlement agreements (together, the "US DOJ Settlement"). Millennium agreed to pay $256 million in the form of two False Claims Act settlements between Millennium and the US DOJ and an administrative settlement agreement between Millennium and the Department of Health and Human Services.[202] First, Millennium agreed to pay $227 million to resolve False Claims Act allegations that it systematically billed federal health care programs for excessive and unnecessary drug testing from January 1, 2008 through May 20, 2015.[203] Millennium also agreed to pay $10 million to resolve allegations that it submitted false claims to federal health care programs for medically unnecessary genetic testing that was performed on a routine and preemptive basis from January 1, 2012 through May 20, 2015.[204] Finally, Millennium agreed to pay a $19 million settlement to CMS to resolve administrative actions regarding Millennium's claims to Medicare for certain drug test billing codes. These claims were the subject of claim denials and an overpayment action initiated by CMS and its contractors.[205] The settlement payments established in October 2015 were in addition to earlier Medicare claim denials. For example, over the period July 2013 to July 2014,

---

[198]   US DOJ Complaint [ML_DE_00595094 at ¶ 178].

[199]   US DOJ Complaint [ML_DE_00595094 at ¶ 6].

[200]   US DOJ Complaint [ML_DE_00595094 at ¶ 3].

[201]   US DOJ Complaint at ¶ 7 [ML_DE_00595094].

[202]   US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[203]   *Id.*

[204]   *Id.*

[205]   *Id.*

approximately $27 million of Millennium's Medicare claims were rejected because they exceeded MUE limits.[206] The $27 million in claim denials is discussed in greater detail, below.

### D.   MILLENNIUM FILES FOR BANKRUPTCY

102. As of the date of the US DOJ Settlement, Millennium lacked the cash on hand to satisfy the obligation to pay $256 million plus accrued interest.[207] After signing the term sheet with the US DOJ and several plaintiff states in May 2015, Millennium launched negotiations with prepetition lenders, including an ad hoc group that warned it might pursue claims and causes of actions related to the 2014 Transaction.[208] In July 2015, the Company informed the US DOJ that it would not be able to pay the settlement amount and its debt burden, and would need to restructure its balance sheet in order to do so; in response, the US DOJ set a mid-September deadline for the Company to present a payment plan.[209]

103. In addition to the US DOJ Settlement, Millennium was burdened by the $1.75 billion of debt it had incurred from the 2014 Transaction. As of the Chapter 11 petition date, Millennium had $1.75 billion outstanding from the Term Loan and a $46.6 million outstanding "early commitment facility," the latter of which Millennium had entered into just prior to bankruptcy.[210] The Company attempted to restructure out-of-court, but could not garner the necessary support of 97% of its senior creditors.[211] Nevertheless, more than 93% by amount and value of its senior claims voted in favor of the proposed restructuring plan, and on November 10,

---

[206]   Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1.

[207]   KPMG-ML-EA15WB-0001034.

[208]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶¶ 28-29; *see also* Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[209]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶ 30.

[210]   Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[211]   *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015, at ¶ 39.

2015, the Company filed voluntary prepackaged chapter 11 petitions in the U.S. Bankruptcy Court for the District of Delaware in order to implement the plan.[212]

104. The restructuring plan resulted in a reduction in the Company's debt by more than $1.15 billion, as the $1.75 billion senior facility was converted to $600 million of new term loans and the new term loan lenders received 100% of the equity in reorganized Millennium.  Total recovery under the $1.75 billion facility was estimated at 34%.[213] The restructuring plan also stipulated that Millennium and TA pay $325 million to the estate to pay the US DOJ Settlement and provide working capital, with $256 million plus $5.8 million of accrued interest to the US DOJ and the remainder to Millennium.[214]  In connection with these payments, Millennium executives and investors received certain releases.[215]

105. Lastly, the plan created two litigation trusts (one of which is the plaintiff in this Litigation) to prosecute and monetize legal claims and causes of action held by the debtor and prepetition lenders. The executed Confirmation Order Plan was filed on December 14, 2015, and Millennium emerged from its Chapter 11 reorganization on December 18, 2015.[216]

### E.    MODIFIED PADRES PROJECTIONS

106. The Padres Projections were significantly flawed in that the projections failed to reasonably reflect significant business, reimbursement, legal, and regulatory risks and exposures.  It was known or knowable as of the 2014 Transaction that, as a result of these risks, the Company was very likely to encounter slowing or negative growth and declining profitability.  Below I describe each of the adjustments I made to the Padres Projections to more accurately and reasonably

---

[212]   Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950?searchTerm=millennium.

[213]   Debtwire, "Millennium Health opt-out lenders, US Trustee attack plan's forced third-party releases," December 8, 2015, https://www.debtwire.com/intelligence/view/prime-2142085.

[214]   KPMG audit work paper "4.5.5.11 Filing of Chapter 11 Bankruptcy" [KPMG-ML-EA15WB-0001034].

[215]   KPMG-ML-EA15WB-0001034; *In re: Millennium Lab Holdings II, LLC, et al.,* (Case 15-12284-LSS), Exhibit 1 (Amended Plan) to Notice of (I) Entry Of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., and (II) Occurrence of Effective Date, December 14, 2015, at p. 35; *see also* pp. 58-62.

[216]   Debtwire, "Millennium Health completes financial restructuring, emerges from prepackaged Chapter 11" December 21, 2015, https://www.debtwire.com/intelligence/view/prime-2149950.

reflect risk factors and historical trends that were known or knowable as of the 2014 Transaction. I refer to the revised projections as the "Modified Padres Projections."

### 1. UDT Revenue Projections

#### a. *Adjustment to Projected Specimen Volume Growth Rates for Medicare and Commercial Payors*

107. I made specific adjustments to the Padres Projections to more accurately incorporate the known risks described above. Specifically, I adjusted the Padres Projections to reflect risks associated with: (i) Medically Unlikely Edits ("MUE"); (ii) Local Coverage Determination ("LCD"); (iii) discontinuance of Custom Profiles; (iv) the escalation of the DOJ investigation; and (v) discontinuance of the free specimen cup agreement. However, adjusting the Padres Projections for only these specific risks still does not result in a reasonable forecast for Millennium as of the 2014 Transaction. The MUE and LCD adjustments are one-time adjustments to Medicare NRPS. The discontinuance of Custom Profiles is a similar one-time adjustment to commercial payor NRPS. The adjustment for the escalation of the DOJ investigation decreases projected specimen volume over a two-year period. Finally, the discontinuance of the free specimen cup agreement represented a one-time decrease in UDT specimen volume.

108. None of these adjustments adequately address the exaggerated specimen volume growth rates in the Padres Projections.[217] Even in the hypothetical absence of the known specific risks facing Millennium as of the 2014 Transaction, the specimen volume growth rates in the Padres Projections were significantly inconsistent with Millennium's historical trends, Millennium's reasonably anticipated future trends and with broader UDT industry trends. Immediately below, I describe the adjustments I made to the specimen volume growth rates in the Padres Projections. In the next sections, I describe (in greater detail) the additional adjustments for each of the specific risk factors.

---

[217] As an illustrative example: Assuming specimen volume was originally projected to be 100 in Year 1 and 125 in Year 2, representing a 25% growth rate from Year 1 to Year 2, a one-time adjustment to specimen volume might illustratively reduce the specimen volume in Year 1 to 75 (from 100). Applying the same growth rate (*i.e.*, 25%) would result in Year 2 specimen volume of 93.75. However, if the 25% growth rate was unreasonable, making the one-time adjustment to specimen volume would be insufficient to result in reasonable projections.

109. As discussed in Section A, the Padres Projections included specimen growth rate assumptions that were unreasonable because they were inconsistent with contemporaneous trends. Further, longer term projections were inconsistent with projected laboratory testing industry growth. In particular, the projected specimen CAGR of 9.8% from 2014 to 2018 for Medicare was unreasonably high given declining growth rates and *negative* growth of 3.4% in the first quarter of 2014 actuals when compared to the fourth quarter of 2013 actuals.[218] By comparison, Medicare specimen volume increased modestly (+0.4%) between the first quarter of 2013 actuals when compared to the fourth quarter of 2012 actuals.  As shown in Table 9, specimen volumes had been declining since 2009. Further, the Padres Projections assumed the *same* growth rates for Medicare and commercial payors, an unreasonable assumption given different trends in growth rates at the time of the 2014 Transaction. A further reason to discredit this assumption is the known fact that overall reimbursement trends for commercial payors followed reimbursement trends for Medicare.  Thus, there was a known risk that commercial growth rates would eventually follow the steeper declines represented by Medicare growth rates.  Prior to making the specimen volume growth adjustments described below, I adjust these underlying specimen volume growth assumptions for Medicare to 0% in 2014, 2% in 2015 and 3% for 2016 onwards. A longer term growth rate of around 3% per annum is consistent with the projected growth rate for the broader industry, as represented by the larger publicly listed laboratory companies.[219] For commercial specimen volume growth, I assume significant underlying ongoing growth of 10% in 2014 (consistent with high but declining contemporaneous growth rates), reducing to 5% in 2015 and the long term industry growth rate of 3% in 2016 onwards. I

---

[218]  2013 actuals were derived from ML_DE_00044521 Padres Working Model_03-14.xlsx ("Payor Mix" tab), and 2014 actuals were derived from the 'Payor Stats – UDT' tab of the Revised Management Model [ML_DE_00559340].

[219]  Analyst reports projected an overall volume growth rate of 2.5% for LabCorp (Piper Jaffray report on LabCorp, March 10, 2014, at p. 1) and 4.60% for Quest for 2014E (Morgan Stanley report on Quest Diagnostics Inc., January 31, 2014, at p. 2).

Our long-term growth rate of 3% is consistent with broader laboratory industry median volume growth forecasts of 4.1% in 2014 and 2.6% in 2015 including growth from acquisitions (Maxim Group report on LabCorp, February 5, 2014; Piper Jaffray report on LabCorp, March 10, 2014; Morgan Stanley report on Quest, January 31, 2014; Deutsche Bank report, April 14, 2014; and Piper Jaffray report on Quest, January 30, 2014).

Moreover, 3% is conservative relative to the projected median laboratory industry organic volume growth rate of 1% in 2014 and 0.6% in 2015 (Maxim Group report on LabCorp, February 5, 2014; Piper Jaffray report on LabCorp, March 10, 2014; and Piper Jaffray report on Quest, January 30, 2014).

conservatively retain the Padres Projections' specimen volume growth assumptions for payor categories other than Medicare and commercial.

### b.    Medically Unlikely Edits (MUEs)

110.    The first adjustment I made to the Padres Projections was to restate Millennium's first quarter of 2014 financial results to account for the impact of MUEs, which are discussed further below, because the Padres Projections used *projected* financial results for the first quarter of 2014 as the starting point notwithstanding that the 2014 Transaction closed in April 2014. This adjustment involved two steps. As a first step, I modified the Padres Projections to reflect Millennium's actual (and lower) first quarter of 2014 results as a starting point. As a second step, as discussed below, I adjusted Millennium's *actual* first quarter of 2014 financial results to reflect the impact of MUE claim denials.

111.    MUEs are used by MACs to reduce improper payments for Medicare Part B claims.[220] Billings in excess of the units of service limits established by MUEs receive significant scrutiny from the MACs and may not be reimbursed by Medicare. This type of MUE claim denial is the focus of this portion of the analysis. In addition to denials of present claims, MUEs may also result in demands for recoupment of overpayments already made in excess of MUE limits.  As discussed further below, such recoupment represented an additional exposure for Millennium. MUEs may either be claim line edits or date of service ("DOS") edits.[221] If the MUE is a claim line edit, each line of a claim is adjudicated against the MUE limit for the HCPCS/CPT code on that claim line; if the units of service ("UOS") on the claim line exceeds the MUE limit, all UOS for that claim line are denied. If the MUE is a date of service MUE, all UOS for the HCPCS/CPT code reported by the same provider/supplier for the same beneficiary for the same date of service are aggregated. The aggregated value is compared to the MUE limit, and if the sum is greater than the MUE limit, *all* UOS for the code on the current claim are denied. Therefore, a date of service MUE creates the potential for a large disallowed claim amount as compared to a claim line MUE. Table 6 displays an illustrative example.

---

[220]    CMS website (https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE)

[221]    Letter from DLA Piper to Brock Hardaway, July 24, 2014 [ML_DE_00225152 at 5153]. *See also* CMS website, NCCI FAQs (https://www.cms.gov/medicare/national-correct-coding-initiative-edits/ncci-faqs).

**TABLE 6: ILLUSTRATIVE CLAIM EXAMPLE (SINGLE BENEFICIARY)**

| Date | Code | Units of Service | Adjudication if 83925 is: | |
|---|---|---|---|---|
| | | | If Claim Line Edit MUE (where MUE Limit = 6) | If Date of Service MUE (where MUE Limit = 6) |
| 1/1/2013 | 83925 | 8 | Denied (8 > 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |
| 1/1/2013 | 82542 | 12 | Approved | Approved |
| 1/1/2013 | 83925 | 2 | Approved (2 < 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |
| 1/1/2013 | 81242 | 16 | Approved | Approved |
| 1/1/2013 | 83925 | 1 | Approved (1 < 6) | Denied (8 + 2 +1 = 11 which exceeds 6) |

112. As shown in Table 6, the movement to DOS MUE for code 83925 leads to denial of all claims (for the same patient and the same provider) for that date of service. Under the claim line MUE, claim lines for 1-2 tests are allowed, as the claims are below the maximum limit of 6 claims for that code. Under the DOS MUE, all the claims for that beneficiary on the same date of service are aggregated and denied, as total aggregated claims for that date exceeds the MUE limit of 6.

113. According to communication between Millennium and its counsel at the time, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[222] As discussed above, for the year ended December 31, 2013, Millennium generated approximately 33% of its Medicare revenue, or approximately $70 million, from these two MUE codes alone. As Millennium was frequently billing in excess of DOS MUE limits, this change in the CMS MUE policy had an immediate and significant impact on Millennium's revenue.[223]  However, the reimbursement risk relating to DOS MUEs was known prior to January 1, 2014.

---

[222]   Letter from DLA Piper to Brock Hardaway, July 24, 2014 [ML_DE_00225152 at 5153, 5154].▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[223]   Prior to the 2014 Transaction, Millennium incurred significant denials under these codes. *See* "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 and ML_DE_00054258].

114. First, CMS announced on its website that effective April 1st, 2013, (*i.e.*, more than one year prior to the close of the 2014 Transaction), CMS would convert some claim line MUEs to DOS MUEs for certain CPT codes. CMS did not specify which codes would become DOS MUEs because of concerns about fraud and abuse.[224] This policy announcement also stated that if claim denials based on DOS edits were appealed, "MACs may pay UOS [units of service] in excess of the MUE value if there is adequate documentation of medical necessity of correctly reported units."[225] Second, according to Millennium's MAC, Noridian Healthcare Solutions ("Noridian"), CMS provided instructions in or around mid-2013 that "a quantity over [the MUE] limit must be denied in total (not just up to the limit [as Millennium] requested over and over again) and the need, once claims have been reviewed that _all_ aspects of medical necessity be present on reviewed claims (emphasis in original)."[226] Third, by as early as February 2014 Millennium was aware that its Medicare claims containing CPT codes 82542 and 83925, where units counts (per beneficiary, per day) exceeded the 6 and 4 limits, respectively were being denied at the rate of approximately $4 million per month, and Millennium continued to receive MUE denials under these two codes up until the time of the 2014 Transaction.[227]

115. Over the period July 2013 through July 2014,[228] approximately $27 million of Millennium's Medicare claims in connection with CPT codes 82542 and 83925 were rejected because they exceeded MUE limits for these codes.[229] This suggests that Millennium was billing above the

---

[224] Department of Health and Human Services Centers for Medicare & Medicaid Services Revised Modification to the Medically Unlikely Edit (MUE) Program [ML_DE_00206157].

[225] Department of Health and Human Services Centers for Medicare & Medicaid Services Revised Modification to the Medically Unlikely Edit (MUE) Program [ML_DE_00206157 at 6158].

[226] 2014-09-18 MUE Denial History Memo (18) [ML_DE_00206242]:

"Tim Kennedy, CFO, again brought up the issue of payment limits by MUEs and the difference in administration to these limits under Palmetto a year ago from Noridian once it assumed the contract. I then again went carefully through exactly what MUEs are, how they were developed, the role of specialty societies, the instructions from CMS about a year ago that a quantity over this limit must be denied in total (not just up to the limit as they requested over and over again) and the need, once claims have been reviewed that all aspects of medical necessity be present on reviewed claims."

[227] "Re: Medicare" e-mail dated February 14, 2014 [ML_DE_00060270], "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 at 8392 and ML_DE_00054258], "Medicare MUE – update on denials" email dated March 18, 2014 [ML_DE_00054044].

[228] KPMG-ML-EA14WB-0000347.xlsx ("1 – Summary Tab," cell B81, first paragraph).

[229] Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584 at 585] at p. 1. *See also* Administrative Settlement Agreement [ML_DE_00101487].

---

Expert Report of Yvette R. Austin Smith

existing MUE limits even prior to the conversion to DOS MUEs on January 1, 2014. However, of the $27 million in claim denials, at least $21.9 million (81%) pertained to billings between January and July 2014.[230] Thus, the conversion to DOS MUE significantly increased Millennium's claim denials under these two codes. In or about July 2015, Millennium revised its reported 2014 financial results to reflect a revenue write-off of approximately $27 million.[231]

116. Notwithstanding that MUE denials were known or knowable to Millennium as of the 2014 Transaction, the Company's recorded financial results (at that time) did not reflect the impact of – and subsequent revenue write-off from – such denials. Therefore, as a starting point for the Modified Padres Projections, I adjusted the Company's then-recorded first quarter of 2014 revenue to reflect the known reimbursement risk associated with MUEs.

117. Using the total MUE-impacted revenue in 2014 as of July 2014 ($21.9 million),[232] the number of months impacted (7 months),[233] and monthly Medicare UDT volumes from January to March 2014, I estimated the monthly NRPS decrease due to MUE claim denials for the 3-month period

---

[230]   Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1. Millennium wrote off $24.7 million in 2014 and $2.2 million in 2013 due to MUE. When making the adjustment to the Padres Projections for MUE, I conservatively assume that the 2014 write-off did not account for the $2.8 million in underpayments in Claims Universe A.

[231]   *Id.*

   *See* Administrative Settlement Agreement, October 16, 2015, pp. 1 and 2 [ML_DE_00101487 at 1488]:

      "Millennium submitted to Medicare 322,588 claim lines for Current Procedural Terminology ("CPT") codes 83925 and 82542 with claims dates between December 1, 2013 and July 31, 2014 for which the number of units of CPT codes 83925 and 82542 exceeded the Medically Unlikely Edit (MUE) thresholds for those CPT codes (referred to herein as "Claim Universe A").

      Medicare partially denied payment for services in Claims Universe A. An Appeal Process Agreement was signed and dated on December 12, 2014, between CMS's Part A/B Medicare Administrative Contractor (MAC), Noridian Healthcare Solutions, LLC ("Noridian") and Millennium, under which the parties agreed that Statistical Sampling and Extrapolation (SSOE) would be used to calculate the amount of Medicare overpayment and/or underpayment. Based on the SSOE, Noridian calculated a Medicare underpayment in the amount of $2,824,558.12 for services in Claims Universe A."

[232]   Millennium Internal Presentation on 2013-2015 NRPS Trends, July 27, 2015 [ML_DE_00079584] at p. 1. As noted, I conservatively deducted the Claims Universe A underpayments.

[233]   Number of months corresponding to Jan - July 2014 period. From August 2014, Millennium only billed up to the MUE limit. *See* KPMG-ML-EA14WB-0000347.xlsx.

prior to the 2014 Transaction.[234] This initial analysis produced a monthly NRPS decrease between $83.5 and $89.9 for the first quarter of 2014 (January – March).[235]

118. I further adjusted this NRPS decrease to exclude potential overlapping NRPS impacts from other adjustments in our model, specifically the impact on NRPS of the proposed Medicare LCD policy (further explained in the following paragraphs). According to Millennium's analyses assessing the potential impacts of LCD, one of the CPT codes subject to the revised MUE limit, (82542 – quantitative tests for cannabinoids), would also be potentially impacted by LCD changes.[236] As a result, I quantified the monthly NRPS contributions from this test and adjusted our initial NRPS adjustment to exclude these contributions. Ultimately, I calculated a monthly Medicare NRPS decrease between $77.7 and $83.7 from January to March 2014 to reflect only allowed billing under MUE limits. As a result, the starting point for Medicare NRPS in the Modified Padres Projections is lower, reflecting the MUE adjusted NRPS in the first quarter of 2014.

119. In August 2014, a little more than three months after the close of the 2014 Transaction, Millennium, consistent with advice it had previously received from its MAC, began billing Medicare within the MUE limits for these two codes.[237]

c.    *Local Coverage Determination*

120. An LCD is a determination by a fiscal intermediary (under Medicare Part B, a MAC) as to whether or not a particular item or service is eligible for reimbursement under Medicare.[238]

---

[234]  This implies a monthly impact of approximately $3.1 million ($21.9 million / 7). This is conservative relative to the internal estimate of $4 million per month made by Richard Guzman (Millennium Senior Director Revenue Cycle Management) on February 20, 2014. *See* "RE: Noridian" email dated February 21, 2014 [ML_DE_00058388 at 8392].

[235]  *See* YAS Workpaper 1.

[236]  Excel attachment to the email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[237]  KPMG-ML-EA14WB-0000347.xlsx ("1 – Summary Tab", cell B81, first paragraph).

[238]  *See* https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs, "What is an LCD?":

Local coverage determinations (LCDS) are defined in Section 1869(f)(2)(B) of the Social Security Act (the Act). This section states: "For purposes of this section, the term 'local coverage determination' means a determination by a fiscal intermediary or a carrier under part A or part B, as applicable, respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis under such parts, in accordance with section 1862(a)(1)(A)."

Towards the end of January 2014, Millennium began reviewing its MAC's (Noridian) draft revised LCD policy.[239] Noridian's draft LCD policy was intended to address "distinctions between qualitative, confirmation and quantitative drug of abuse testing" and to "clearly indicate" that Medicare reimbursement was dependent on documentation of medical necessity.[240] Consistent with this purpose, Noridian's policy emphasized two key priorities, including the appropriate use of (i) quantitative testing to confirm qualitative (usually, point of care) testing, and (ii) specimen validity testing.

121. In February 2014 (two months prior to the 2014 Transaction), Millennium was advised by Avalere, a healthcare reimbursement consulting firm, that Noridian was likely to finalize its draft LCD largely in its current draft form, noting its similarity to another LCD policy that had just been finalized in January 2014 by another MAC.[241] Millennium began modeling scenarios for assessing the potential financial impact of Noridian's LCD policy on its Medicare NRPS. According to a February 3, 2014 analysis, Millennium estimated a 33.3% decline in Medicare NRPS due to the LCD.[242] Another analysis from February 5, 2014, shows two scenarios with declines in Medicare NRPS of 18.3% and 5.6% due to the LCD.[243] However, the scenario indicating a 5.6% decline assumed routine confirmation testing for illicit drugs,[244] which did not appear to be consistent with LCD guidance that required positive qualitative tests before confirmation testing for drugs of abuse.[245,246] I note that while the 18.3% decline assumes a

---

See https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs

[239] Email from Simmons to Hardaway, "Re: Noridian LCD", January 1, 2014 [ML_DE_00035507]. Noridian LCD draft was an attachment to the email. See [ML_DE_00035508]

[240] Noridian Healthcare Solutions, LLC, Draft Drugs of Abuse Testing Policy, p. 3. [2014-01-20 ML_DE_00035508_Noridian LCD Draft]

[241] Avalere Coding and Reimbursement Assessment for Drugs of Abuse Testing, February 21, 2014, at pp. 4 & 44.

[242] Excel attachment to the email from Adams to Pencak,"Subject: Order by drugs v3.xlsx", February 3, 2014 [ML_DE_00060308].

[243] Excel attachment to the email from Pencak to Hardaway, "Subject: LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[244] Email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320].

[245] Noridian Healthcare Solutions, LLC, Drugs of Abuse Testing at p. 25 [ML_DE_00035508 at 5532].

[246] The 18.3% scenario assumed that the reduction in quantitative testing is partially offset by a substantial increase in high-complexity qualitative tests (code CPT Code G0431). Specifically, the 18.3% scenario assumed that 57.5% of specimens would be subject to a high-complexity qualitative test (compared to 1.8% of specimens in December 2013). See Excel attachment to the email from Pencak to Hardaway, "Subject: LCD Impact", February 5, 2014 [ML_DE_00054320, 3421]. Code G0431 is defined as "Drug screen, qualitative: multiple

---

decrease in confirmatory quantitative testing and an elimination of specimen validity testing (reducing NRPS), the financial impact of these changes are significantly offset by an assumed significant increase in high complexity qualitative testing (G0431 – Drug Screen (per patient encounter)).[247] The assumed increase in billings under G0431 is modeled to increase Medicare NRPS by $40.74 (an offsetting increase of approximately 9%).[248]

122. A third Millennium analysis dated February 28, 2014 modeled a "30% reduction in Medicare reimbursement effective June 1, 2014."[249] In deposition testimony, Mr. Pencak agreed that the 30% reduction in Medicare NRPS effective June 2014 was "fairly close" to the impact he had modeled earlier in 2014 for the potential LCD impact,[250] and that a 30% reimbursement reduction for Medicare was within Millennium's contemplation as of March 2014.[251] A subsequent analysis that Millennium conducted after the 2014 Transaction was confirmatory of the LCD policy impact that Millennium envisioned prior to the 2014 Transaction—*i.e.*, a greater than 30% reduction in Medicare NRPS. Specifically, the June 2015 Revised Management Model projected Medicare NRPS declining from $383 in September 2015 to $248 in October 2015, or a reduction of 35%.[252] The modeled decline to $248 represented an ever greater decline when compared to Millennium's Medicare NRPS for the first quarter of 2014 (immediately prior to the 2014 Transaction). The Revised Management Model projected a *45% decline* in Medicare NRPS, as compared to the first quarter of 2014.[253]

---

drug classes by high complexity test method (e.g., immunoassay, enzyme assay)." For example, *see* https://www.cgsmedicare.com/partb/pubs/news/2012/0412/cope18723.html.

[247] Notes to the model suggest that this increase is explained in whole or in part by changing the billing for Synthetic Cannabinoids Quantification (or "Spice") from 82542 to G0431. As Pencak contemporaneously notes, the new billing code is modeled to increase the reimbursement amount from $24 to $97.

[248] If the modeled increase in billings under G0431 is eliminated, LCD is modeled to reduce Millennium's Medicare NRPS by 26.6% (versus 18.3%).

[249] Excel attachment to the email from Kennedy to Pencak, "Re:Leveraged Recap Summary" February 28, 2014 [ML_DE_00058384, 8385].

[250] Pencak Deposition at 251:13 – 23, Exhibit 165-A.

[251] Pencak Deposition at 255:12 – 24.

[252] ML_DE_00559340, decrease of NRPS derived from cells M8 to N8 from the "UDT Rev" tab.

[253] ML_DE_00732288 tab "Quarterly 2012-2015Q1" cell BK132 states NRPS of $451 in the first quarter of 2014 (calculation: 248/451-1 = -45%).

123. Based on the above, I conservatively modified the Padres Projections to reflect a Medicare NRPS reduction of 18.3%, effective as of October 2015, due to elimination of coverage for certain negative confirmation testing and specimen validity testing (as dictated by the LCD).[254] This is consistent with the lower end of Millennium's own pre-transaction analysis and far less than the impact (*i.e.*, 35% to 45%) that was modeled *after* the 2014 Transaction.

    *d.*    *Expected Impact Due to the Discontinuance of Custom Profiles*

124. Discontinuance of Millennium's Custom Profiles was expected to significantly reduce the number of tests per specimen, resulting in a reduction in NRPS. As discussed above, "standing orders" such as the Custom Profiles were known to increase the risk of medically unnecessary tests. Although the Padres Projections do reflect a decline in Millennium's commercial payor NRPS, there is no indication that this projected decline is intended to represent the impact of the likely discontinuance of Custom Profiles. Notwithstanding the known risks associated with the Custom Profiles, there is no indication that Millennium sought to model the impact of the elimination of Custom Profiles until the Revised Management Model prepared in June 2015.

125. The Revised Management Model incorporated only a 7% decline in commercial payor NRPS due to the discontinuance of Custom Profiles. The decline was modeled to occur in July 2015.[255] However, based on data available as of the 2014 Transaction, the impact of the anticipated discontinuance of Custom Profiles – and the resulting decline in medically unnecessary tests – should have reasonable been estimated to cause a much larger decline in commercial payor NRPS.

126. To estimate the anticipated impact on commercial NRPS due to the elimination of Custom Profiles, I used Millennium's Medicare billings as a proxy.[256] Specifically, I compared Millennium's Medicare reimbursements by code to that of its closest competitors, using 2013

---

[254] Excel attachment to the email from Pencak to Hardaway, "Subject:LCD Impact", February 5, 2014 [ML_DE_00054320, 3421].

[255] ML_DE_00559340, tab 'UDT Rev.'

[256] Comparable data was not available for Millennium's billings to commercial payors. However, given the similar reimbursement trends between Medicare and commercial payors, I believe this analysis provides a reasonable estimate for this purpose.

billing data. To identify Medicare reimbursements and Millennium's competitors, I used the 2013 CMS Physician and Other Supplier Public Use File ("Physician and Other Supplier PUF"), which contains information on all submitted Part B Medicare claims in 2013 including reimbursement, quantity of tests or services performed, HCPCS code, and the identification of the provider that submitted the claim via a National Provider Identifier ("NPI").[257] I confirmed the companies closest to Millennium by selecting the providers that billed the quantity of tests, codes, and reimbursement and volumes per code most similar to Millennium's in 2013; these competitors were Ameritox and Aegis.[258] Similar to Millennium, these two companies focus almost exclusively on UDT and were cited by Millennium as competitors.[259]

127. Next, I identified the HCPCS codes for which Millennium received reimbursement from Medicare but for which neither Ameritox nor Aegis received Medicare reimbursement. Of the 30 codes for which Millennium received Medicare reimbursement in 2013, there were 9 codes for which neither Ameritox nor Aegis received Medicare reimbursement. I then calculated the percentage of Millennium's 2013 Medicare NRPS derived from these 9 codes. In 2013, Millennium derived 21.8% of its Medicare NRPS from these codes.[260]

128. My analysis assumes that UDT companies predominantly bill to a common universe of billing codes. I also took into account the fact that by 2013, Ameritox had entered into a settlement with the federal government and several state governments related to excessive and medically unnecessary testing. Thus, it is possible that the universe of reimbursement codes used by Ameritox had contracted by 2013. Based on a public records search, I was unable to find any

---

[257] Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[258] *See* Appendix C: Custom Profile Revenue Impact Analysis. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[259] Confidential Information Memorandum [ML_DE_00269115 at 9193].

[260] *See* Appendix C: Custom Profile Revenue Impact Analysis. Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

similar settlements involving Aegis with respect to excess or medically unnecessary testing.[261] Thus, it is probable that the universe of reimbursement codes used by Aegis was more consistent with medically necessary testing. Therefore, billing codes that were billed *only* by Millennium were more likely to represent medically unnecessary tests. For example, in 2013, Millennium received $4.8 million in reimbursement from Medicare for HCPCS/CPT code 80174. In 2013, neither Ameritox nor Aegis received reimbursement from Medicare for this code. This code is described as a test for tricyclic antidepressant (imipramine) and was highlighted in the US DOJ Complaint as a code associated with medically unnecessary testing.[262] Based on the foregoing analysis, I applied a 21.8% reduction in Millennium's commercial payor NRPS due to the elimination of Custom Profiles and the resulting reduction in medically unnecessary tests. In keeping with the Revised Management Model, I have assumed that this reduction occurs in July 2015.

129. However, it is important to note that this estimate may underestimate the quantity of medically unnecessary testing driven by Custom Profiles. The estimate of 21.8% does not take into account instances in which Millennium may have billed medically *unnecessary* tests to a code to which a competitor billed only medically *necessary* tests.

130. As confirmation of the likely impact of the discontinuance of Custom Profiles, I considered a second data point. Under the Modified Padres Projections, the combined impact of the revised MUE and new LCD policies is a 36.3% decline in Medicare NRPS.[263] As the revised MUE and new LCD policies focused significantly on the elimination of medically unnecessary tests, and given the history of commercial payors following the trend of Medicare reimbursement, I

---

[261] I searched Bloomberg Law and Lexis using the keywords Aegis (within 3 words of) insurance and Medicare. There were no cases related to Medicare billing practices or any other business practice that was filed under codes "375" False Claims Act or "376" Qui Tam statutes.

[262] US DOJ Complaint [ML_DE_00595094 at ¶134].

Centers for Medicare & Medicaid Services 2013 Physician and Other Supplier Public Use File. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[263] ~36.3% decline in Medicare NRPS = 18.0% MUE related decline (adjusted for LCD) + 18.3% decline due to LCD. 18.0% MUE related decline is calculated as the average Medicare NRPS decline in the first quarter of 2014 due to adjustment for claim values over MUE threshold ($81.2) / average Medicare NRPS in the first quarter of 2014 ($451.3). 18.3% decline due to LCD changes based on the scenario ran by Millennium in February 2014 to assess impact of LCD.

considered the Medicare NRPS reduction to be a relevant proxy for Millennium's commercial NRPS reduction following the discontinuance of Custom Profiles. To avoid potential double counting due to the reduction in medically unnecessary tests, I do not explicitly model the impact of the elimination of Custom Profiles on Medicare claims.

### e.    Expected Impact on Specimen Volume due to US DOJ Investigation and Settlement

131.    At the time of the 2014 Transaction, Millennium knew that Ameritox had suffered significant customer attrition and specimen volume declines following its settlement with the DOJ.[264] Millennium unreasonably failed to account for this risk in the Padres Projections. An April 2015 email from Mr. Price (Millennium's general counsel) to Mr. Kennedy (Millennium's Chief Financial Officer) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮[266] He further added ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[264]    *Ameritox, Ltd. v. Millennium Laboratories* [ML DE 00165024 at 165035], at A636, filed May 24, 2014 (emphasis added):

> "Finally, Ameritox responds that it is only fair to allow the introduction of evidence of this investigation if the Court allows Millennium to introduce evidence of the DOJ investigation of Ameritox and Ameritox's settlement of those allegations. The Court rejects this argument, **because the Court is only allowing evidence regarding the DOJ investigation and settlement to the extent that such evidence was made public, and that evidence is being used to prove Millennium's theory that customers left Ameritox because of such negative publicity**."

*Ameritox, Ltd. v. Millennium Laboratories* [ML DE 00164789 at 165005], at A613, filed May 5, 2014 (emphasis added):

> "Millennium also challenges the Composite Benchmark Model, arguing that Dr. Cantor makes erroneous assumptions regarding Millennium's growth and Ameritox's losses during this period, such as: (1) Dr. Cantor erroneously assumes that all of Millennium's growth in market share in each quarter after the first quarter of 2010 was solely due to the challenged conduct… **(6) she failed to consider alternative causal factors that occurred after the first quarter of 2010, such as…(d) Ameritox's $16.3 million payment to settle a healthcare fraud claim that received widespread press.**"

In a report dated December 13, 2013, Millennium's own expert states that:

> "**Ameritox's sales volumes exhibited a significant flattening and subsequent decline during the period following the False Claims Act Settlement**, signing of the Corporate Integrity Agreement and the RxGuardian judgment. Dr. Cantor's analysis makes no mention of these issues and does not identify the potential impact of each of these issues on her damages calculations."

*See* Rebuttal Expert Report of David S. Williams [ML DE 00495232 at 5248] at 16 (emphasis added).

[265]    Ameritox agreed to a US DOJ settlement in November 2010. *See* Tampa Bay Business Journal, "Ameritox agrees to $16.3M settlement", November 16, 2010. (https://www.bizjournals.com/tampabay/news/2010/11/16/ameritox-agrees-to-163m-settlement.html)

[266]    Email from Kennedy to Hardaway, "Re: Privileged", April 3, 2015 [ML_DE_00597259 at 7260].

---

Expert Report of Yvette R. Austin Smith                                    Adv. Pro. No.17-51840 (LSS) | 73



[267] A June 2015 email from CEO Brock Hardaway noted that [REDACTED] "[268]

132. Based on the above, I have incorporated a 30% reduction (15% reduction each in 2015 and 2016) to the Padres Projections' total volumes assumptions across Millennium's UDT and PGT businesses to account for the reputational impact of an expected US DOJ Settlement.

> ### f.  Expected Impact Due to the Discontinuance of the Free Specimen Cup Agreement

133. According to Millennium, "at its peak" approximately 10% of its customer accounts, representing 16%-17% of total specimen volume, had entered into the free specimen cup agreement.[269] As of the 2014 Transaction, the free specimen cup agreement was at significant risk of discontinuance. Millennium had received advice that the agreement violated anti-kickback statutes and Millennium was subject to an adverse ruling in the pending Ameritox litigation. I incorporated a 1.6% reduction in UDT volume in July 2014 using the analysis performed by Millennium on customers that cancelled their agreements in June 2014, the date of the Ameritox verdict (and only two month after the 2014 Transaction).[270] The 1.6% reduction in specimen volume is conservative, as it ignores customers that may have cancelled prior to (or after) June 2014, which is likely given that the Ameritox complaint against Millennium was filed in April 2011. I also note from the US DOJ Complaint that a number of customers discontinued their business with Millennium prior to 2014.[271] Furthermore, the 1.6% decline ignores any impact on future growth. As alleged in the Ameritox complaint, the specimen cup agreement facilitated higher growth rates for Millennium. It follows that future growth rates may have been lower following the discontinuance of the free specimen cup agreement.

---

[267]  Email from Kennedy to Hardaway, "Re: Privileged", April 3, 2015 [ML_DE_00597259 at 7260]

[268]  Email from Price to Etcheverry, "Re:Fwd Millennium financial model – version 2", June 14, 2015 [ML_DE_00559337 at 9338].

[269]  Millennium Self-Disclosure Statement at p.3 [ML_DE_00670668 at 0670].

[270]  Millennium Cancelled Cup Agreements [2014-10-13 ML_DE_00567499].

[271]  Exhibit 74 to the DOJ Complaint [ML_DE_00629123].

### 2.   PGT Revenue and RxAnte Projections

134.   At the time of the 2014 Transaction, the DOJ investigation was expected to impact specimen volume for the PGT businesses. I modeled this impact similar to the impact modeled for Millennium's UDT business. Starting with the Padres Projections, I apply a 30% reduction in PGT specimen volume growth (15% reductions in January 2015 and 2016) to account for the DOJ investigation. This reduces the PGT specimen volume growth rate from 140% and 37.9% under the Padres Projections for 2015 and 2016 respectively, to 87.0% and 14.4% respectively under the Modified Padres Projections. After the impact of this adjustment, PGT revenue comprises 3.6% and 13.6% of total revenue in 2014 and 2020 respectively (compared to 3.3% and 10.6% respectively under the Padres Projections), a slight increase in the 2020 revenue percentage given the more optimistic UDT assumptions in the Padres Projections. I conservatively assume no other changes to PGT revenue projections in the Padres Projections.

135.   I conservatively assume no changes from the underlying Padres Projections for RxAnte revenue (including no impact from the DOJ investigation). After the impact of the DOJ investigation on PGT and UDT revenue, RxAnte revenue comprises 1.9% and 15.2% of total revenue in 2014 and 2020 respectively.

### F.   EXPENSE PROJECTIONS

136.   To complete the free cash flow analysis under the Modified Padres Projections, I use the same unit costs assumptions as the Padres Projections. Unit costs are calculated by dividing each expense by specimen volume. For example, to calculate the cost of goods sold ("COGS") unit costs, I divided COGS by specimen volume. I calculated unit costs for COGS, operating expenses (including salaries and benefits, insurance, information technology, research and development) and travel and entertainment. To estimate expenses under the Modified Padres Projections, I multiplied the unit costs by the adjusted UDT and PGT volumes discussed above. Similarly, I assume that all fixed costs in the Padres Projections do not change.

G.    SUMMARY OF MODIFIED PADRES PROJECTIONS

137.  Figure 9 through Figure 11 show the collective impact of the revenue adjustments and the expense assumptions described above (*i.e.*, the Modified Padres Projections).

**FIGURE 9: MODIFIED PADRES PROJECTIONS - REVENUE**

Notes:  Modified Padres projection utilizes 2014 Q1 actuals in addition to projections for the rest of the year

138.  As shown in Figure 9, the full impact of the modifications occurs by 2016. Thereafter, NRPS grows in line with the Padres Projections, however, revenue growth remains lower than the Padres Projections due to lower Medicare and commercial specimen volume growth. Under the Modified Padres Projections, 2015 revenue is 27% lower than the Padres Projections and 2016 revenue is 43% lower than the Padres Projections. By the end of the projection period, 2020 revenue is 49% lower than the Padres Projections.

Expert Report of Yvette R. Austin Smith                          Adv. Pro. No.17-51840 (LSS) | 76



**FIGURE 10: MODIFIED PADRES PROJECTIONS - EBITDA**

Notes: Modified Padres projection utilizes 2014 Q1 actuals in addition to projections for the rest of the year

139. Under the Modified Padres Projections shown in Figure 10, EBITDA immediately declines and by 2015 reaches $263 million, or 40% below the Padres Projections, and by 2016 dips to $176 million, or 62% below the Padres Projections. By 2020, projected EBITDA is 67% lower than the Padres Projections. The percentage decline in EBITDA by the end of the projection period is larger than the percentage decline in revenue, as certain fixed costs that must still be incurred by Millennium remain in place. As noted, I retain the same unit cost assumptions as the Padres Projections, and I make no adjustments to designated fixed costs.

140. Figure 11 below shows free cash flow projections. The free cash flow projections reflect the EBITDA projections above, as well as the Padres Projections for income tax rates, capital expenditure, working capital, and reductions in variable costs. For comparability purposes, in

Figure 11, I have used the same definition of free cash flow as the Padres Projections, which includes a deduction for debt amortization.[272]

**FIGURE 11: MODIFIED PADRES PROJECTIONS - FREE CASH FLOW**

Notes:  Modified Padres projects free cash flow only reflects 3 quarters worth of data in 2014.

141. As shown in Figure 11, free cash flow under the Modified Padres Projections starts declining in 2016, following a small increase in 2015. In contrast, the Padres Projections projected a CAGR of approximately 16.8% per annum. In 2015 and 2016, respectively, free cash flow under the Modified Padres Projections equals $38.1 million and negative $15.5 million, as compared to $90.7 million and $95.0 million for the same periods under the Padres Projections.

---

[272]  Free Cash Flow is defined under the Padres Projections as net income, plus (i) depreciation and amortization, and (ii) stock-based compensation, less (i) distributions for shareholder taxes, (ii) increase in working capital, (iii) capital expenditure, and (iv) debt amortization.

### H.   BALANCE SHEET TEST

#### 1.   Discounted Cash Flow Analysis

142. For the balance sheet test, I conduct a discounted cash flow ("DCF") analysis to value Millennium as of April 2014. Given the availability of the necessary data through the first quarter of 2014, I conduct the discounted cash flow analysis as of March 31, 2014. I am not aware of any significant change in the operations or financial condition of Millennium between March 31, 2014 and April 16, 2014 (the date the 2014 Transaction closed). As such, it is reasonable to assume that the valuation as of March 31, 2014 is a reliable indication of value as of April 16, 2014. The DCF analysis is based on the Modified Padres Projections to ensure that the resulting valuation reasonably reflects actual performance and trends, and the reasonably likely risks and difficulties that were known or knowable as of the valuation date —*i.e.*, risks related to: (i) medically unlikely edits (MUEs), (ii) local coverage determinations (LCDs), (iii) the elimination of Custom Profiles, (iv) the investigation by the DOJ, and (v) the elimination of the free specimen cup agreement. Consistent with the Padres Projections, the Modified Padres Projections reflect a seven-year discrete projection period from second quarter of 2014 to fourth quarter of 2020 and a terminal year.

143. Consistent with standard corporate finance methodology, I use the Modified Padres Projections to calculate Millennium's annual unlevered free cash flow as net operating profit after taxes, less investment in working capital and less capital expenditure, and after adding back non-cash charges (*i.e.*, depreciation and amortization). I then discount both the seven-year projected cash flows and the terminal value using a weighted average cost of capital ("WACC") (or discount rate) of 14.8%. The discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014.[273] I also note that FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%.[274] The calculation of Millennium's unlevered free cash flow is shown in 0.

---

[273]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis at pp. 16 and 19, April 30, 2014 [ML_DE_00263273 at 3288 and 3291].

[274]   FTI Consulting, Millennium Health, LLC Enterprise Valuation As of December 18, 2015 at p.7, April 10, 2016 [KPMG-ML-EA15WB-0000743 at 772].

144. To calculate the terminal value, I relied upon the Gordon Growth (or Perpetuity Growth) model. I have projected a long-term growth rate for Millennium free cash flows of 3%, in line with projected longer-term growth of other laboratory companies. As of the end of 2013, U.S. real GDP was expected to grow between 2.7% to 3.4% annually for the period 2014 - 2018.[275] The assumed long-term growth is also broadly in line with the 30-year Treasury bond yield of 3.56% as of the Date of Valuation, a common benchmark for terminal growth rates.[276] The terminal value represents the value of all of Millennium's future unlevered free cash flows beyond the discrete seven-year projection period.

145. The discounted cash flow analysis demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction. The enterprise value (in this instance, equivalent to asset value) of Millennium was $802.9 million compared with $1,761.7 million of outstanding debt. Thus, the face value of Millennium's debt was greater than the value of Millennium's assets. In other words Millennium had a *negative* equity value of $958.9 million, giving effect to the 2014 Transaction (and before consideration of the liabilities relating to the then pending litigation and government investigations, discussed below). As unreasonably small capital is a financial condition short of balance sheet insolvency, the DCF analysis also clearly demonstrates that the 2014 Transaction left Millennium with unreasonably small capital. In Appendix D, I sensitize the valuation to changes in key risk factors. Over a broad range of assumptions with respect to risks to Millennium, that were known or knowable as of the 2014 Transaction, Millennium is consistently shown to be balance sheet insolvent. Millennium's equity value as of the 2014 Transaction never exceeds *negative* $313 million, even under a significantly more optimistic (and unrealistic) view of the relevant risks.

146. In addition to the known business risks and historical trends that necessitate the cash flow adjustments discussed in Section VI.B, Millennium also faced liabilities relating to the then pending litigation and government investigations. These risks included but were not limited to:

---

[275]   Congressional Budget Office (CBO), The Budget and Economic Outlook 2014 to 2024, February 2014.

[276]   30-year treasury rate as of 3/31/2014. Daily yield curve data derived from US Department of the Treasury, available at https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView.aspx?data=yieldYear&year=2014

- Medicare recoupment related to free specimen cup agreements: In August 2014, Millennium estimated that it had received in excess of $90 million in Medicare reimbursement, during the four years prior to June 2014, in connection with customers using Millennium's free cup agreement.[277] The verdict in the Ameritox litigation confirmed that Millennium's free cup agreement violated both the Stark Law and the Anti-Kickback statute. In October 2015, Millennium agreed to resolve claims by the federal government and state Medicaid programs for $256 million.[278] This included Millennium's liability in connection with the Medicare reimbursement connected to the free specimen cups and other medically unnecessary testing.[279]

- Commercial payor litigation: Millennium faced significant risk of "copy-cat" commercial payor litigations based on the Ameritox lawsuit and the DOJ investigation. In an April 2015 email, for example, Martin Price (Millennium's General Counsel)



[280]

- Legal fees:

[281]

- Claim B Universe: Millennium had potential exposure relating to the repayment of Medicare overpayments it received from reimbursements for units of service billed above the MUE thresholds from January 2012 through December 2013. This exposure was later quantified at $42 million, as "Claims Universe B", in Millennium's DOJ settlement.[282]

---

[277] Exhibit K to Millennium Voluntary Self-Referral Disclosure, August 15, 2014 [ML_DE_00514819].

[278] US DOJ Complaint ¶¶ 6, 150, 265 [ML_DE_00629274 at 9341]

[279] US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians", October 19, 2015.

[280] Email from Price to Kennedy, Re: Privileged, April 3, 2015 [ML_DE_00604336].

[281] *Id.*

[282] *See* Administrative Settlement Agreement, October 16, 2015, p. 2 [ML_DE_00101487 at 1488]. Millennium was overpaid $42 million on claim lines at issue in Claims Universe B.

147. None of these amounts are included in the Padres Projections or the Modified Padres Projections. All of these risks — even if resolved for less than the total potential exposure as of the 2014 Transaction —further decreased Millennium's equity value and thus, exacerbated Millennium's balance sheet insolvency as of the 2014 Transaction.[283] For the purpose of the solvency analysis, I have been instructed by counsel to assume that aggregate dollar value of Millennium's exposure, reasonably anticipated as of the 2014 Transaction, was at least $45 million. As this represents only one-half of the billings to Medicare for companies with free specimen cup agreements – and does not include *any* of the other contingent liabilities – this is a conservative estimate of the contingent liabilities facing Millennium at the time of the 2014 Transaction. Based on this assumption, the value of Millennium's equity giving effect to the 2014 Transaction further decreases to *negative* $1,003.9 million.[284]

148. Millennium was balance sheet insolvent over a wide rage of WACCs. As shown in Table 7 below, sensitivity analysis for WACCs ranging from 9.8% to 14.8% shows Millennium had an equity value of *negative* $482.3 million to *negative* $958.9 million, even before accounting for its legal/regulatory exposure.[285]

---

[283] I noted that the consideration and quantification of contingent liabilities for a solvency analysis may differ from the recognition of those liabilities for accounting purposes. Further, I am instructed by counsel that under applicable case law (i) some or all of the above-referenced liabilities might be regarded as "disputed" rather than "contingent" for solvency purposes, (ii) a "disputed" liability is one where, although the amount might be subject to dispute, the facts giving rise to the liability have already occurred as of the time of the subject transfers, and (iii) for solvency purposes, it may be appropriate to value a disputed liability in the amount of its ultimate resolution.  Accordingly, this renders the estimate of Millennium's legal/regulatory liabilities discussed herein even more conservative.

[284] Negative $958.9 million less $45 million = negative $1,003.9 million.

[285] The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies *plus* the size premium adopted by Vantage Point (*i.e.*, 10.0%). However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk.  Thus, 9.8% underestimates an appropriate WACC for Millennium.

**TABLE 7: EXPECTED CASE SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE**

| | | | $ Millions | | |
|---|---|---|---|---|---|
| Discount Rate | Enterprise Value | Net Debt Value | Equity Value Before Contingent Liabilities and Fees | Contingent Liabilities | Equity Value After Contingent Liabilities and Fees |
| 9.8% | 1,279.4 | 1,761.7 | (482.3) | (45.0) | (527.3) |
| 10.8% | 1,135.6 | 1,761.7 | (626.2) | (45.0) | (671.2) |
| 11.8% | 1,024.3 | 1,761.7 | (737.5) | (45.0) | (782.5) |
| 12.8% | 935.5 | 1,761.7 | (826.2) | (45.0) | (871.2) |
| 13.8% | 863.1 | 1,761.7 | (898.6) | (45.0) | (943.6) |
| **14.8%** | 802.9 | 1,761.7 | **(958.9)** | (45.0) | **(1,003.9)** |

Notes and Sources:

Values derived from Table 11: Discounted Cash Flow Analysis (second quarter of 2014 through 2020) assuming different discount rates.

## 2.    Guideline Public Companies

149. I used my standard methodology to attempt to identify comparable companies for use in the Guideline Public Company ("GPC") valuation of Millennium. First, I relied on industry knowledge gained from a combination of my professional experience, industry research and proprietary and non-proprietary industry information obtained by Brattle. Second, I relied on industry information obtained from documents produced in discovery and depositions. Third, I relied on electronically assisted searches using industry classification codes and other descriptive company data. From a combination of these efforts, I developed a list of possible guideline public companies.

150. As part of this methodology I performed an independent analysis based on Standard Industrial Classification ("SIC") codes from the United States Department of Labor SIC Manual, including 8071 Medical Laboratories, 2835 In Vitro and In Vivo Diagnostic Substances, and 8734 Testing Laboratories. A description of these codes is contained in Appendix B. I limited my search to companies geographically located in the United States and Canada with publicly available financials and an enterprise value of at least $100 million. This method returned 30 unique potential GPC's. I also considered the comparable companies identified by Millennium and its financial advisors, which included Vantage Point, Lazard, and FTI Consulting. This method returned 17 unique potential guideline companies.

151.  Combined, these two methods returned a list of 39 unique potential GPC's.[286] I reviewed each of these possible GPC's for comparability, focusing on diagnostic testing, whether the company conducted urinalyses and drugs-of-abuse testing, and the size of the company (as measured by enterprise value and revenue). After careful consideration, I arrived at five potential GPC's with at least a portion of their business that was somewhat similar to Millennium. These include Alere Inc. ("Alere"), Bio-Reference Laboratories Inc. ("Bio-Reference"), LabCorp, Myriad Genetics Inc. ("Myriad"), and Quest.[287]

152.  However, for several reasons, these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value. Drugs of abuse UDT represents a relatively small portion of revenue for each of these five companies. Millennium identifies just two of these companies as competitors – LabCorp and Quest.  However, both LabCorp and Quest were significantly larger and more diversified than Millennium. LabCorp reported that just 3% of its 2013 revenue related to drugs of abuse testing and it was 11 times larger than Millennium.[288] Quest was similarly focussed on other types of laboratory testing[289] and was also approximately 11 times larger than Millennium.[290]

153.  A third company, Alere, identified that 20% of its revenue came from toxicology, however this segment also included testing equipment and services. Alere had a significant focus on analytical software, and also performed diagnostic tests for infectious diseases, cardiology, diabetes, oncology, and women's health.[291]

---

[286]   Millennium's financial advisors returned 17 unique companies, while Brattle's independent analysis returned 30 unique companies. Eight companies appeared in both methodologies, resulting in 39 unique potential companies overall.

[287]   *See* Appendix B. Description of Potential Comparable Companies for a detailed description of these companies.

[288]   LabCorp's 2013 revenue was 9.2 times higher than Millennium. Source: S&P CapIQ.

[289]   The company's "Diagnostic Information Services" business group also include gene-based and esoteric testing and anatomic pathology services in addition to routine testing. Quest was further diversified with its "Diagnostic Solutions" business group, which provides risk assessment services for the life insurance industry and information technology solutions. Quest Diagnostics Incorporated Form 10-K filed for the fiscal year ended December 31, 2013 filed February 18, 2014 at p. 5.

[290]   Quests's 2013 revenue was 11.3 times higher than Millennium. Source: S&P CapIQ.

[291]   *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Alere.

154. Bio-Reference was similar in size to Millennium in terms of revenue and focused on processing laboratory test requisitions. However, Bio-Reference largely focused on diagnosing diseases related to esoteric testing, molecular diagnostics, cancer pathology, genetics, women's health, anatomical pathology, etc. Although the Company's "Routine Testing" segment (40% of net revenues as of Jan. 2014) offered urinalyses and substance abuse tests, this business segment also tested for pregnancy, cholesterol level, and blood cell counts. The Company also had a Medical Information business segment (data analysis) that was unrelated to Millennium's product offerings.[292]

155. Finally, I included Myriad as it operated a genetic testing business. However, unlike Millennium's PGT business, Myriad's focus was on testing for risk of disease, rather than how an individual would respond to medication. Moreover, as noted, PGT represented a very small portion of Millennium's business.[293]

156. Notwithstanding very limited, and ultimately insufficient, comparability between Millennium and the GPCs, I computed valuation multiples based on multiples of enterprise value to EBITDA. For both sets of multiples, I computed the multiples as of the Date of Valuation on a Last Twelve Months ("LTM"), forecasted 2014, and forecasted 2015 basis. The latter two estimates are based on analyst consensus estimates made at the time of the Transaction. The valuation multiples are shown in Table 8.

---

[292] *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Bio-Reference.

[293] *See* Appendix B. Description of Potential Comparable Companies for a more detailed description of Myriad.

**TABLE 8: GUIDELINE PUBLIC COMPANY MULTIPLES**

| | LTM Q1 2014 Multiple | | | | | |
|---|---|---|---|---|---|---|
| | EV / EBITDA | EV / 2014 EBITDA Forecast | EV / 2015 EBITDA Forecast | EV / Revenue | EV / 2014 Revenue Forecast | EV/ 2015 Revenue Forecast |
| Alere | 12.6x | 10.2x | 9.7x | 2.8x | 2.3x | 2.1x |
| Bio-Reference Laboratories | 8.7x | 7.4x | 6.8x | 1.1x | 1.0x | 0.9x |
| Laboratory Corp. of America Holdings | 9.6x | 9.4x | 9.1x | 1.9x | 1.9x | 1.8x |
| Myriad Genetics | 6.7x | 7.1x | 8.6x | 2.6x | 2.7x | 2.7x |
| Quest Diagnostics | 8.3x | 8.0x | 7.8x | 1.6x | 1.6x | 1.6x |
| Minimum | 6.7x | 7.1x | 6.8x | 1.1x | 1.0x | 0.9x |
| Median | 8.7x | 8.0x | 8.6x | 1.9x | 1.9x | 1.8x |
| Mean | 9.2x | 8.4x | 8.4x | 2.0x | 1.9x | 1.8x |
| Maximum | 12.6x | 10.2x | 9.7x | 2.8x | 2.7x | 2.7x |

157. The resulting estimates of Millennium's enterprise value are shown in Table 9 below. However, given the lack of comparability between the GPC's and Millennium, I do not consider these multiples as a reliable measure of value. In its solvency analysis, Vantage Point identified eight comparable companies, which included the five GPCs I identified.[294] Vantage Point similarly noted that none of the companies they identified "were identical or directly comparable" to Millennium.[295]

158. In addition (and as noted above), just prior to the 2014 Transaction, Millennium's management was exploring whether there was an opportunity to sell to a private equity sponsor at a valuation of 6-7x EBITDA.[296] Notwithstanding that Millennium failed to sell the Company at these valuation levels, this would place Millennium at or below the minimum valuation multiples derived from the GPC analysis. This is indicative of the lack of comparability between the GPC companies and Millennium. As a result, I have given zero weight to the GPC analysis in my assessment of the solvency of Millennium.

159. Although I do not explicitly rely on the GPC for my solvency analysis of Millennium, I note that the most likely conclusion of value that results from the GPC methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital.

---

[294]   Vantage Point Advisors, Millennium Lab Holdings II, LLC Solvency Analysis [ML_DE_00263273 at 3292].

[295]   *Id.*, p. 20.

[296]   Email from Sarin to Blake, Re:Millennium update, October 12, 2013, Exhibit 223 [CITI-DE-00071523 at 1524]

Expert Report of Yvette R. Austin Smith                              Adv. Pro. No.17-51840 (LSS) | 86

160. A primary assumption when applying market multiples is that the subject company financial metric, to which the multiple is applied, represents a steady state metric.[297] Given the substantial expected deviation in profitability of Millennium from historical results (due to known or knowable risk factors), references to valuations based on LTM or 2014 revenue or EBITDA should not be considered indicative of Millennium's valuation.  As the Revised Padres Projections demonstrate, the impact of the known or knowable risks were not anticipated to impact Millennium's cash flows until 2015 (and not on a full-year basis, until 2016).  Thus, indications of value derived from Millennium's 2015 financial results are a relatively more accurate estimate of Millennium's value (as compared to LTM or 2014 financial metrics). Table 9 shows that when applying the 2015 forecasted revenue and EBITDA multiples, Millennium's implied equity values are *negative* $1,238 million or only a modest value of $23 million, respectively.  As a company with debt of at least $1.775 billion and equity value of only $23 million, Millennium would have unreasonably small capital.

**TABLE 9: GUIDELINE PUBLIC COMPANY VALUATION ($ MILLIONS)**

| As of April 16th, 2014 | Brattle Model Value | Multiple | | Implied Enterprise Value | | Implied Equity Value | |
|---|---|---|---|---|---|---|---|
| | [A] | [B] | | [C] | | [D] | |
| | | Low | Median | Low | Median | Low | Median |
| Revenue | | | | | | | |
| LTM | 644.2 | 1.1x | 1.9x | 705 | 1,221 | (1,056) | (540) |
| 2014 | 676.9 | 1.0x | 1.9x | 680 | 1,259 | (1,081) | (503) |
| 2015 | 573.1 | 0.9x | 1.8x | 524 | 1,042 | (1,238) | (720) |
| EBITDA | | | | | | | |
| LTM | 371.9 | 6.7x | 8.7x | 2,494 | 3,218 | 733 | 1,456 |
| 2014 | 368.1 | 7.1x | 8.0x | 2,609 | 2,961 | 847 | 1,200 |
| 2015 | 262.6 | 6.8x | 8.6x | 1,785 | 2,253 | 23 | 491 |
| Net Debt | 1,761.7 | | | | | | |

Source and Notes:

[A]: LTM EBITDA figure contains Raven related revenues and costs to calculate EBITDA.

[B]: Retrieved from S&P CapIQ.

[C]: [A] × [B].

---

[297]  Steady state may refer to the nominal amount or to a nominal amount that is expected to grow at a steady growth rate.

[D]: [C] - [Net Debt]. Used Brattle Model Net Debt value of $1,761.7 million.

### 3.   Precedent Transaction Analysis

161.  I also attempted to estimate the enterprise value of Millennium based on the Precedent Transaction methodology. To develop the list of precedent transactions, I screened in Capital IQ for transactions using a keyword search and SIC code analysis. I used the keywords "urine drug," "urine testing," "drug testing," and "toxicology" and additionally searched for transactions that were classified under the same three SIC codes that were used in the Guideline Public Company analysis: 8734 (Testing Laboratories), 8071 (Medical Laboratories), and 2835 (In Vitro and In Vivo Diagnostic Substances). I limited the search results to transactions closed after 1/1/2010 and prior to the Date of Valuation. I further limited the results to transactions in which a majority stake was acquired in the target company, and a transaction value greater than $25 million.

162.  Based on this search criteria, I was unable to identify any precedent transactions for which the target companies were sufficiently comparable to Millennium to produce a reliable estimate of value.

### 4.   Balance Sheet Test Conclusion

163.  Based on the foregoing analysis I concluded that Millennium was rendered balance sheet insolvent and left with unreasonably small capital as a result of the 2014 Transaction.

### I.   ABILITY TO PAY DEBTS TEST

164.  As a second test of solvency, I analyzed Millennium's ability to pay its debt obligations as they became due. Giving effect to the 2014 Transaction, Millennium had total indebtedness of $1.812 billion.[298] Of this amount, $1.775 billion represented the outstanding principal balance of the Term Loan. The Revolver was undrawn as of the Date of Valuation. To assess Millennium's

---

[298]  Term Loan of $1.775 billion plus other debt of $36.7 million. *See* Table 3 and the Confidential Information Memorandum, p. 22.

ability to pay its debts I determined whether Millennium was anticipated to be able to pay the scheduled interest and principal payments on the Term Loan.

165. To project Millennium's unlevered cash flow through December 31, 2020, I relied upon the Modified Padres Projections. All cash flows are projected on a monthly basis. I identified required debt service payments from the Padres Projections. The Term Loan required interest payments of approximately $90 million in 2015, increasing over time in line with projected LIBOR rates, until the final payment at maturity in April 2021.[299] In addition, the Term Loan required an amortization payment of $17.75 million per annum (representing 1% of the beginning Term Loan balance).[300]

166. Beginning in 2016, Millennium starts generating negative free cash flow (*i.e.*, cash flow that is available to make interest payments is negative).[301] By 2018, Millennium has insufficient cash reserves to meet interest payments. In the event that Millennium retains access to the Revolver, the additional $50 million of liquidity allows Millennium to meet interest payments for an additional 12 months. However, by 2019, cash requirements exceed the amount of liquidity available under the Revolver. In total, by maturity in April 2021, Millennium requires $124 million of additional liquidity to meet interest payments.[302]

167. Notwithstanding that the Revolver did not provide sufficient liquidity to meet the projected cash shortfall, any dependence on the Revolver to meet its debt service requirements (even temporarily) is problematic. The credit agreement governing the Revolver required that Millennium be solvent as of the date of any draw down on the Revolver.[303] The definition of solvent in the credit agreement is inclusive of balance sheet solvency as measured in this

---

[299] The Term Loan paid interest at LIBOR plus a margin of 425 basis points. *See* Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB", April 14, 2014, and the revolving credit facility was $50 million, for a total of $1.825 billion.

[300] *See* Padres Projections (ML_DE_00057999), April 12, 2014, tab "Leverage Model," cells Q-V 151.

[301] Free Cash Flow under the Padres Projections is defined as net income, plus (i) depreciation and amortization, and (ii) stock-based compensation, less (i) distributions for shareholder taxes, (ii) increase in working capital, (iii) capital expenditure, and (iv) debt amortization.

[302] The shortfall would be larger, as I have not considered interest payments under the Revolver.

[303] *See* Sections 4.22 and 5.2 of the 2014 Credit Agreement [ML_DE_00602906].

report.[304] In light of Millennium's balance sheet insolvency as of the Date of the Valuation, Millennium would not have retained access to the Revolver. In addition to a solvency requirement, the credit agreement also contained a maintenance covenant requiring that the "Consolidated Leverage Ratio" remain below certain levels.[305] Millennium's continuing failure to comply with these covenants would constitute a technical default for the Revolver under the credit agreement.

168. A review of Millennium's projected cash flow under the expected case indicates that Millennium was anticipated to be in violation of the Consolidated Leverage Ratio covenant starting in the third quarter of 2015 (*see* Figure 12). As a result, Millennium would have been unlikely to have had access to the Revolver. Alternatively, in the event that Millennium had drawn on the revolver prior to the covenant breach, Millennium would have been unable to repay and cancel the Revolver to avoid such covenant breach. Under any scenario, the Revolver would not have been available to meet Millennium's liquidity requirements once it exhausted its cash reserves in 2018.

---

[304] Solvent is defined as:

"Solvent": when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, ( c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured."

See 2014 Credit Agreement [ML_DE_00602906 at 941].

[305] *See* Section 7.1 of the 2014 Credit Agreement [ML_DE_00602906].

**FIGURE 12: LEVERAGE RATIO COVENANT**



Source and Notes:

Padres Projections leverage ratio derived from April 12, 2014 Padres Projections (ML_DE_00057999), 'Leverage Model' Tab. Expected case and reasonable downside case are as defined in prior sections.

169. I further considered Millennium's prospects for refinancing the Term Loan at maturity in April 2021. Even under the expected case projections, the leverage ratio was 8.7 times at December 31, 2020. Under the reasonable downside projections, the leverage ratio was 19.8 times at December 31, 2020. As of December 2013, the median leverage ratio for 'Caa-C' credits was 8.3 times.[306] Moody's defines 'Caa' credits, the highest quality credits in the 'Caa-C' range as "speculative of poor standing and are subject to very high credit risk."[307] Thus, even under the expected case projections, Millennium was above the levels typically associated with Caa-C credits. There was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021.

---

[306] Moody's Financial Metrics Key Ratios By Rating And Industry For North American Non-Financial Corporations: December 2013, tab "App-8". Available at www.moodys.com.

[307] Credit rating definitions are available at www.moodys.com. 'C' credits are "typically in default, with little prospect for recovery of principal or interest."

Expert Report of Yvette R. Austin Smith                    Adv. Pro. No.17-51840 (LSS) | 91

J.   ADEQUATE CAPITAL TEST

170. By definition, a balance sheet insolvent company is a company with unreasonably small capital. Millennium was rendered balance sheet insolvent by the 2014 Transaction. Nonetheless, I undertook a second analysis to assess the reasonableness of Millennium's capital, giving effect to the 2014 Transaction. Under this second analysis, I determined Millennium's financial condition under a reasonable downside scenario because the Padres Projections were not reasonable or prudent when made. If a company is left with unreasonably small capital under a reasonable downside scenario, it follows that the company's unreasonably small capital is reasonably foreseeable.

171. In my reasonable downside scenario, I made two adjustments to the Modified Padres Projections. Both adjustments are consistent with contemporaneous estimates made by Millennium. Specifically, I adjusted the Modified Padres Projections by:

   i.   Increasing the reduction in Medicare NRPS due to LCD from 18.3% to 33.3%, consistent with higher contemporaneous estimates prepared by Millennium.[308] The difference in the estimates are driven by two key assumptions. First, there is an assumed increase in the specimens that are subject to point of care ("POC") testing. Increased POC testing reduces the volume of quantitative testing (reducing NRPS). Second, there is no assumed increase in billings under G0431. Thus, the offset (*i.e.*, increase in NRPS) described above does not occur.

   ii.  Increasing the decline in UDT and PGT specimen volumes due to an expected settlement of the DOJ investigation from 30% to 50%. This is consistent with Millennium's higher estimate of Ameritox's specimen volume decline following its government settlement.[309]

172. As shown in Table 10 below, under a reasonable downside scenario, Millennium had an equity value of negative $1,048.8 million to negative $1,274.8 million at WACCs ranging from 9.8% to

---

[308]  Attachment to the email from Adams to Pencak, Re: Order by drugs v3.xlsx, February 3, 2014 [ML_DE_00060308] (forecasting a 33.3% drop in Medicare NRPS due to LCD impact).

[309]  Internal Millennium emails discussed volume declines ranging from 30% to 50%.
Email from Hardaway to Mulloy, Re: FW: Millennium financial model – version 2.
[ML_DE_00559337 at 9338] (In a June 8, 2015 email, Hardaway conceded that "our volume assumptions [i.e., 10% reduction] were aspirational" and noting that "Ameritox had a roughly 50% drop in volumes and Callaway [sic] had a roughly 30% drop after they each announced DOJ investigations/settlements.")

Expert Report of Yvette R. Austin Smith                          Adv. Pro. No.17-51840 (LSS) | 92

14.8%, without even taking into account Millennium's contingent liabilities. Under the reasonable downside scenario, the negative equity values confirm that it was reasonably foreseeable that the 2014 Transaction would leave Millennium with capital insufficient to sustain operations. In other words, the 2014 Transaction left Millennium with unreasonably small capital.

**TABLE 10: DOWNSIDE CASE SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE**

|  | $ Millions | | |
| --- | --- | --- | --- |
| Discount Rate | Enterprise Value | Net Debt Value | Equity Value Before Contingent Liabilities and Fees |
| 9.8% | 712.9 | 1,761.7 | (1,048.8) |
| 10.8% | 645.0 | 1,761.7 | (1,116.8) |
| 11.8% | 592.3 | 1,761.7 | (1,169.5) |
| 12.8% | 550.2 | 1,761.7 | (1,211.6) |
| 13.8% | 515.7 | 1,761.7 | (1,246.0) |
| **14.8%** | **487.0** | **1,761.7** | **(1,274.8)** |

Notes and Sources:

Values derived from YAS Workpaper 1 (second quarter of 2014 through 2020) assuming different discount rates.

## K.   SOLVENCY CONCLUSION

173. The foregoing analyses show that Millennium was rendered balance sheet insolvent by the 2014 Transaction. Thus, by definition, the 2014 Transaction left Millennium with unreasonably small capital.  The inadequacy of Millennium's capital is confirmed by examining the value of Millennium under a reasonable downside scenario. Finally, the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay as that debt matured.

November 15, 2021

_____        _____
Yvette R. Austin Smith                  Date

# APPENDIX A: SOLVENCY TEST EXHIBITS

## A.1  EXPECTED CASE DCF ANALYSIS

### TABLE 11: DISCOUNTED CASH FLOW ANALYSIS

| | | Input | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | TV |
|---|---|---|---|---|---|---|---|---|---|---|
| Long-Term Industry Growth Rate | [1] | 3% | | | | | | | | |
| WACC | [2] | 14.8% | | | | | | | | |
| Valuation Date | [3] | 3/31/2014 | | | | | | | | |
| Income Tax Rate | [4] | 52.6% | | | | | | | | |
| | | | | | | | | | | |
| EBIT | [5] | | 251,513,148 | 227,713,042 | 152,354,557 | 159,655,306 | 160,355,671 | 166,487,811 | 172,154,148 | |
| Income Tax | [6] | | (132,295,916) | (119,777,060) | (80,138,497) | (83,978,691) | (84,347,083) | (87,572,589) | (90,553,082) | |
| D&A | [7] | | 16,992,365 | 20,960,697 | 19,335,544 | 18,909,765 | 18,704,370 | 22,756,358 | 22,722,173 | |
| Stock-based Comp | [8] | | 2,996,657 | 4,176,250 | 4,385,062 | 4,604,315 | 4,834,531 | 5,102,995 | 5,391,854 | |
| Increase in working capital | [9] | | (6,176,340) | 20,826,415 | 11,898,636 | (2,014,401) | (936,127) | (1,407,164) | (1,420,757) | |
| Capex | [10] | | (12,543,471) | (9,285,371) | (11,812,307) | (19,121,300) | (28,782,070) | (19,589,370) | (19,631,600) | |
| Unlevered Free Cash Flow | [11] | | 120,486,443 | 144,613,973 | 96,022,995 | 78,054,995 | 69,829,292 | 85,778,042 | 88,662,735 | 773,920,487 |
| | | | | | | | | | | |
| Discount Period in Years | [12] | | 0.25 | 1.25 | 2.25 | 3.25 | 4.25 | 5.25 | 6.25 | 6.25 |
| Discount Factor | [13] | | 0.97 | 0.84 | 0.73 | 0.64 | 0.56 | 0.48 | 0.42 | 0.42 |
| | | | | | | | | | | |
| PV of Free Cash Flow | [14] | | 116,410,932 | 121,709,353 | 70,395,850 | 49,846,035 | 38,844,154 | 41,564,472 | 37,423,584 | 326,663,491 |
| NPV of Free Cash Flow | [15] | 802,857,872 | | | | | | | | |
| | | | | | | | | | | |
| Net Debt Amount (March 2014) | [16] | 1,761,746,604 | | | | | | | | |
| | | | | | | | | | | |
| Initial Equity Value | [17] | -958,888,732 | | | | | | | | |

## A.2  EXPECTED CASE EBIT DERIVATION

### TABLE 12: EBIT DERIVATION

| | | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| UDT Revenue | [1] | 485,969,878 | 503,348,741 | 393,916,554 | 400,753,903 | 403,309,079 | 407,100,185 | 410,926,926 |
| PGT Revenue | [2] | 20,236,066 | 45,203,209 | 50,847,042 | 60,873,211 | 68,207,474 | 73,095,944 | 78,319,614 |
| RxAnte Revenue | [3] | 9,569,000 | 24,527,167 | 42,893,995 | 56,164,117 | 69,382,853 | 79,790,281 | 87,769,309 |
| Total Revenue | [4] | 515,774,944 | 573,079,117 | 487,657,592 | 517,791,230 | 540,899,406 | 559,986,409 | 577,015,849 |
| | | | | | | | | |
| UDT Cost of Sales | [5] | 59,650,021 | 71,784,017 | 66,064,739 | 70,265,877 | 74,778,320 | 77,021,670 | 79,332,320 |
| PGT Cost of Sales | [6] | 9,628,539 | 20,085,426 | 22,885,192 | 27,581,585 | 31,366,631 | 33,761,472 | 36,896,574 |
| | | | | | | | | |
| Gross Profit | [7] | 446,496,384 | 481,209,673 | 398,707,660 | 419,943,768 | 434,754,454 | 449,203,267 | 460,786,956 |
| Operating Expenses | [8] | 195,358,046 | 253,996,631 | 246,853,103 | 260,788,461 | 274,898,783 | 283,215,456 | 289,132,808 |
| Operating Income | [9] | 251,138,338 | 227,213,042 | 151,854,557 | 159,155,306 | 159,855,671 | 165,987,811 | 171,654,148 |
| | | | | | | | | |
| Other Income | [10] | 374,810 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 |
| | | | | | | | | |
| EBIT | [11] | 251,513,148 | 227,713,042 | 152,354,557 | 159,655,306 | 160,355,671 | 166,487,811 | 172,154,148 |

## APPENDIX B: COMPARABLE COMPANIES ANALYSIS EXHIBITS

### B.1    DESCRIPTION OF SIC INDUSTRY CODES

| Code | | Description |
|---|---|---|
| 8071 Medical Laboratories | [1] | Establishments primarily engaged in providing professional analytic or diagnostic services to the medical profession, or to the patient on prescription of a physician. |
| 8734 Testing Laboratories | [2] | Establishments primarily engaged in providing testing services. Establishments primarily engaged in performing clinical laboratory testing for the medical profession are classified in Industry 8071. |
| 2835 In Vitro and In Vivo Diagnostic Substances | [3] | Establishments primarily engaged in manufacturing in vitro and in vivo diagnostic substances, whether or not packaged for retail sale. These materials are chemical, biological, or radioactive substances used in diagnosing or monitoring the state of human or veterinary health by identifying and measuring normal or abnormal constituents of body fluids or tissues. |

Sources and Notes:

[1]: SIC Industry Description," NAICS Association, accessed September 21, 2021,

https://www.naics.com/sic-industry-description/?code=8071.

[2]: SIC Industry Description," NAICS Association, accessed September 21, 2021,

https://www.naics.com/sic-industry-description/?code=8734.

[3]: SIC Industry Description," NAICS Association, accessed September 21, 2021,

https://www.naics.com/sic-industry-description/?code=2835.

## B.2    DESCRIPTION OF POTENTIAL COMPARABLE COMPANIES

| Company | Description |
|---|---|
| Alere | Alere Inc. provides diagnostic tests for infectious disease, cardiometabolic disease, and toxicology in the United States and internationally. The company's infectious disease products/services include antibodies, assays, diagnostic products, and a line of automated instrumentation to process tests. The company's cardiometabolic products/services include rapid diagnostic test systems to detect various drugs of abuse, point-of-care analyzers, over-the-counter tests, diabetes products, rapid diagnostic tests, and data management systems for point-of-care testing. Lastly, the Company's toxicology products/services include various device and reagent platforms to detect the illicit and prescription drugs of abuse or alcohol. The company was founded in 1981 and is based in Waltham, Massachusetts. As of October 3, 2017, Alere Inc. operates as a subsidiary of Abbott Laboratories. |
| Bio-Reference Laboratories | Founded in 1981 and headquartered in Elmwood Park, New Jersey, Bio-Reference Laboratories, Inc. provides clinical laboratory testing services for the detection, diagnosis, evaluation, monitoring, and treatment of diseases in the United States. The company focuses on esoteric testing, molecular diagnostics, anatomical pathology, genetics, women's health, and correctional health care services. It offers chemical diagnostic tests, such as blood and urine analysis; blood chemistry; hematology services; serology; radio-immuno analysis; toxicology, including drug screening; pap smears; tissue pathology comprising biopsies; and other tissue analysis, as well as cancer cytogenetic testing, genetic testing, and cytology testing services. The company also operates a clinical knowledge management service unit and a Web-based connectivity portal solution for laboratories and physicians. It serves physicians, geneticists, hospitals, clinics, and correctional and other health facilities. |
| Laboratory Corp. of America Holdings | Laboratory Corporation of America Holdings operates as an independent clinical laboratory company worldwide. It operates in two segments, Labcorp Diagnostics (Dx) and Labcorp Drug Development (DD). It offers various tests, such as blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, hemoglobin A1C and vitamin D products, prostate-specific antigens, tests for sexually transmitted diseases, hepatitis C tests, microbiology cultures and procedures, and alcohol and other substance-abuse tests. In addition, it provides online and mobile applications and end-to-end drug development, medical device, and diagnostic development solutions. The company was founded in 1971 and is headquartered in Burlington, North Carolina. |
| Myriad Genetics | Myriad Genetics, Inc., a molecular diagnostic company, develops and markets predictive, personalized, and prognostic medicine tests in the United States and internationally. The company offers DNA sequencing tests for hereditary and breast and ovarian cancers, personalized medicine tools, DNA genotyping tests, protein quantification tests, prenatal and prenatal screening tests, RNA expression tests, biomarker discovery, and pharmaceutical and clinical services to the pharmaceutical, biotechnology, and medical research industries. Myriad Genetics, Inc. was founded in 1991 and is headquartered in Salt Lake City, Utah. |
| Quest Diagnostics | Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. The company develops and delivers diagnostic information services, such as routine testing, non-routine and advanced clinical testing, anatomic pathology testing, and other diagnostic information services. It offers diagnostic information services to patients, clinicians, hospitals, independent delivery networks, health plans, employers, direct contract entities, and accountable care organizations through a network of laboratories, patient service centers, phlebotomists in physician offices, call centers and mobile paramedics, nurses, and other health and wellness professionals. The company also provides risk assessment services for the life insurance industry; and healthcare organizations and clinicians robust information technology solutions. Quest Diagnostics Incorporated was founded in 1967 and is headquartered in Secaucus, New Jersey. |

Source: S&P CapIQ.

# APPENDIX C: CUSTOM PROFILE EXHIBIT

### TABLE 13: CUSTOM PROFILE REVENUE IMPACT ANALYSIS

| 2013 Millennium Code | Not Billed by Both Ameritox & Aegis | CMS Code Description | NRPS (as of Dec. 2013) |
|---|---|---|---|
| [A] | [B] | [C] | [D] |
| G0431 | | Drug screen, qualitative; multiple drug classes by high complexity test method (e.g., immunoassay, enzyme assay), per patient encounter | 1.71 |
| 82101 | X | Urine alkaloids level | 5.60 |
| 82649 | X | Dihydromorphinone (drug) level | 30.76 |
| 82646 | X | Dihydrocodeinone (drug) measurement | 24.71 |
| 83925 | | Opiates (drug) measurement | 109.72 |
| 80154 | | Benzodiazepines level | 21.60 |
| 82542 | | Chemical analysis using chromatography technique | 112.33 |
| 82544 | | Chemical analysis using chromatography technique | 0.00 |
| 80152 | | Amitriptyline (antidepressant) level | 12.67 |
| 83805 | | Meprobamate (sedative) level | 13.29 |
| 80160 | X | Desipramine level | 12.18 |
| 80174 | X | Imipramine level | 12.18 |
| 83840 | | Methadone level | 19.61 |
| 82145 | | Amphetamine or methamphetamine level | 17.75 |
| 82520 | | Cocaine (drug) level | 17.35 |
| 80173 | X | Haloperidol level | 0.18 |
| 83992 | | PCP drug level | 9.26 |
| 80182 | X | Nortriptyline level | 9.59 |
| 80102 | X | Drug confirmation test | 0.00 |
| 82205 | | Barbiturates level | 23.45 |
| 80184 | X | Phenobarbital level | 11.72 |
| 82055 | | Alcohol (ethanol) level | 2.89 |
| 83516 | | Analysis of substance using immunoassay technique | 0.84 |
| 84311 | | Chemical analysis using spectrophotometry (light) | 8.03 |
| 82570 | | Creatinine level to test for kidney function or muscle injury | 5.94 |
| 83986 | | Body fluid pH level | 4.11 |
| 81003 | | Automated urinalysis test | 2.57 |

| Revenue Impact | | |
|---|---|---|
| Total NRPS of UDT Codes Not Billed by Both | [1] | 106.92 |
| *% Impact on 2013 Revenue* | [2] | *21.81%* |

Sources and Notes:

NRPS contribution information unavailable for 3 codes that Millennium billed CMS in 2013: 83789, 81226, 81225. However, these codes were also billed by either Aegis or Ameritox, and therefore do not impact the analysis.

[A] - [C]: Centers for Medicare & Medicaid Services Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

[D]: 2014-02-05 ML_DE-00054321.xlsx ("Sc. 1 (no - on ill)" tab). *See* column F.

[1]: Sum of [D] for UDT codes not billed by both parties.

[2]:[1] ÷ 490.27 (Total NRPS as of Dec. 2013). Figure retrieved from cell F70 of 2014-02-05 ML_DE_00054321.xlsx ("Sc. 1(no - on ill)" tab).

## APPENDIX D: SENSITIVITY ANALYSIS OF MILLENNIUM'S EQUITY VALUE

### TABLE 14: SENSITIVITY ANALYSIS

| | | Low | Expected | High | Range | Range | Range | Range |
|---|---|---|---|---|---|---|---|---|
| MUE Medicare NRPS Adjustment | [1] | ON | ON | ON | ON | ON | ON | ON |
| LCD Medicare NRPS Reduction | [2] | ON | ON | ON | ON | ON | ON | |
| Elimination of Custom Profile | [3] | ON | ON | ON | ON | ON | | |
| DOJ Settlement Reputational Impact | [4] | ON | ON | ON | ON | | | |
| Cancellation of Free POC Cups | [5] | ON | ON | ON | | | | |
| Initial Equity Valuation | [6] | -833.3 | -958.9 | -1,074.9 | -818.0 to -1,056.1 | -489.7 to -614.6 | -381.0 to -441.1 | -313.2 to -340.0 |

Notes and Sources:

Initial equity valuation derived from YAS Workpaper 1.

All values in the table are after adjusting for Millennium's specimen volume growth assumptions (*see* Section E.1) and for first quarter 2014 actual results. Does not include contingent liabilities.

[1]: Low adjustment consists of lowering expected Medicare NRPS corrections by a multiple of 0.9x and high adjustment consists of increasing Medicare NRPS corrections by a multiple of 1.1x.

[2]: Low adjustment consists of lessening expected -18.3% NRPS impact to -14.3% and high adjustment consists of increasing NRPS impact to -22.3%.

[3]: Low adjustment consists of lessening expected -21.81% NRPS impact to -16.81% and high adjustment consists of increasing NRPS impact to -26.81%.

[4]: Low adjustment consists of lessening expected two-time -15% specimen volume impact to -12% and high adjustment consists of increasing two-time specimen volume impact to -18%.

[5]: Low adjustment consists of lowering expected -1.6% specimen volume impact by a multiple of 0.8x and high adjustment consists of increasing specimen volume impact by a multiple of 1.2x.

## APPENDIX E: DOCUMENTS RELIED UPON OF YVETTE AUSTIN SMITH

**Court Documents**

*Ameritox, Ltd. v. Millennium Laboratories*  (Case 8:11-cv-775-T-24-TBM)

Complaint, April 8, 2011

Rebuttal Expert Report of David S. Williams, December 6, 2013

Jury Verdict, June 16, 2014

*In re: Millennium Lab Holdings II, LLC, et al.,*  (Case 15-12284-LSS)

Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, November 10, 2015

Exhibit 1 (Amended Plan) to Notice of (I) Entry Of Order Confirming Amended Prepackaged Joint Plan of Reorganization of Millennium Lab Holdings II, LLC, et al., and (II) Occurrence of Effective Date, December 14, 2015

Memorandum, February 29, 2019

*Maul et al v. Ameritox, LLC.,*  (Case 8:07-cv-00953-RAL-EAJ)

Second Amended Complaint, October 19, 2009

*United States of America ex rel. Mark McGuire v. Millennium Laboratories, Inc.*  (Case 1:12-cv-10132-NMG, No. 12cv1063 l-NMG, No. 13cv10825-NMG)

Complaint, January 26, 2012

Complaint, April 9, 2012

Complaint, April 10, 2013

United States' Complaint in Intervention, December 19, 2014

Exhibit 3

Exhibit 4

Exhibit 5

Exhibit 7

Exhibit 12

Exhibit 13

Exhibit 39

Exhibit 55

Exhibit 66

Exhibit 74

Administrative Settlement Agreement, October 16, 2015

**Depositions and Exhibits**

Daniel Pencak

Deposition of Daniel Pencak

Exhibit 134

Exhibit 135

Exhibit 137

Exhibit 138

Exhibit 140

Exhibit 141

Exhibit 158

Exhibit 165

Exhibit 165-A

Exhibit 179

Heidi Smith

Exhibit 56

Exhibit 59

Jennifer Mulloy

Exhibit 194

Exhibit 195

Exhibit 198

Exhibit 216

| Jenny Lee |
| --- |
| Exhibit 116 |
| Exhibit 125 |
| Exhibit 131 |

| Martin Price |
| --- |
| Deposition of Martin Price |
| Exhibit 3 |
| Exhibit 5-A |
| Exhibit 9 |
| Exhibit 10 |
| Exhibit 13 |
| Exhibit 14 |
| Exhibit 15 |
| Exhibit 106 |

| Michael Tortora |
| --- |
| Exhibit 223 |
| Exhibit 233 |

| Phillip Ho |
| --- |
| Exhibit 343 |

| **Millennium Documents** |
| --- |
| BMO-ML-00009109 |
| CITI-DE-00017912 |
| JPMC-00031194 |
| JPMC-MIL-CORP-00108741 |
| JPMC-MIL-CORP-00159494 |
| KPMG-ML-EA14WB-0000347 |
| KPMG-ML-EA15WB-0000743 |
| KPMG-ML-EA15WB-0001034 |
| KPMG-ML-EA15WB-0001528 |
| ML_DE_00001946 |
| ML_DE_00034943 |
| ML_DE_00035507 |
| ML_DE_00035508 |
| ML_DE_00044521 |
| ML_DE_00054044 |
| ML_DE_00054258 |
| ML_DE_00054320 |
| ML_DE_00054321 |
| ML_DE_00057999 |
| ML_DE_00058384 |
| ML_DE_00058385 |
| ML_DE_00058388 |
| ML_DE_00060270 |
| ML_DE_00060308 |
| ML_DE_00061777 |
| ML_DE_00068651 |
| ML_DE_00079584 |
| ML_DE_00083249 |
| ML_DE_00134548 |
| ML_DE_00164030 |
| ML_DE_00187601 |
| ML_DE_00202842 |

| |
|---|
| ML_DE_00206157 |
| ML_DE_00206242 |
| ML_DE_00225152 |
| ML_DE_00263273 |
| ML_DE_00269115 |
| ML_DE_00305155 |
| ML_DE_00308623 |
| ML_DE_00465366 |
| ML_DE_00514819 |
| ML_DE_00559337 |
| ML_DE_00559340 |
| ML_DE_00567499 |
| ML_DE_00569414 |
| ML_DE_00594719 |
| ML_DE_00594736 |
| ML_DE_00597259 |
| ML_DE_00601573 |
| ML_DE_00602906 |
| ML_DE_00604336 |
| ML_DE_00670668 |
| ML_DE_00672098 |
| ML_DE_00732288 |
| Suntrust_MIL-DE-00006771 |

**Publicly Available Documents**

*Analyst Reports*

Deutsche Bank, "Q1 Snap Preview: Weather is a Rear-View Mirror Issue," April 14, 2014.

Maxim Group,"Assuming Coverage Laboratory Corp. of America Holdings, Inc.," February 5, 2014.

Piper Jaffray, "Quest Diagnostics Maintain Neutral and Tweaking Estimates for Solstas Following Weak 2014 Outlook," January 30, 2014.

Piper Jaffray, "LabCorp of America Transferring Coverage with a Neutral Rating and $91 Price Target," March 10, 2014.

Morgan Stanley, "Quest Diagnostics Inc. Guidance Reflects Measured View of CY14 Challenges," January 31, 2014.

*Articles*

Barry Meier, "Increase in Urine Testing Raises Ethical Questions," August 1, 2013.

Boston Business Journal, "Woburn-based Calloway Labs, fined $20M in kickback scandal, to close and layoff 240 employees," October 8, 2015.

Christopher Norton, "Ameritox To Pay $16M To Resolve Medicaid FCA Suit," Law 360, November 17, 2010.

Christopher Weaver and Anna Mathews, "Doctors Cash In on Drug Tests for Seniors, and Medicare Pays the Bill; Pain specialists order costly tests for illegal drugs such as cocaine and angel dust, which few seniors ever use," The Wall Street Journal, November 10, 2014.

Debtwire, "Millennium Health completes financial restructuring, emerges from prepackaged Chapter 11," December 21, 2015.

Debtwire, "Millennium Health opt-out lenders, US Trustee attack plan's forced third-party releases," December 8, 2015.

Debtwire, "Millennium Health prepack resolves DOJ settlement; wiped-out sponsors to inject capital in exchange for releases," December 21, 2015.

Fred Schulte and Elizabeth Lucas, "Liquid Gold: Pain Doctors Soak Up Profits By Screening Urine for Drugs," November 6, 2017.

Hawk, PollyBeth, "Ready or Not: Hospital Value-Based Purchasing Poised to Transform Healthcare Reimbursement Model and Introduce New Fraud Targets Under the False Claims Act," Winter, 2013.

Holden Wilen, "Drug Testing Company Plans to Close Columbia Headquarters, Lay Off 99 Employees," Baltimore Business Journal, March 7, 2018.

Jones Day, The Third Circuit Weighs In Again on the Meaning of "Unreasonably Small Capital" in Constructively Fraudulent Transfer Avoidance Litigation , July/August 2016.

Jones Day, Uniform Voidable Transactions Act Approved by Uniform Law Commission to Replace UFTA, September/October 2014,  https://www.jonesday.com/en/insights/2014/10/uniform-voidable-transactions-act-approved-by-uniform-law-commission-to-replace-ufta.

Loanconnector, "Corrected: Millennium Labs launches $1.8B dividend recap loan," March 31, 2014.

Loanconnector, "Millennium labs boosts spread on upsized $1.78B TLB," April 14, 2014.

Patricia Wen, "Calloway Labs of Woburn agrees to $20 million settlement of Medicaid fraud case," March 30, 2012.

Reuters, "U.S. drug testing firm probed for alleged fraud, intimidation," November 16, 2012.

Roger Feldman, Bryan Dowd, and Robert Coulam, "Medicare's Role in Determining Prices throughout the Health Care System," October 2015.

Tampa Bay Business Journal, "Ameritox agrees to $16.3M settlement," November 16, 2010.

Todd Gardner, "Drug Testing Company to Close Greensboro Facility, Lay Off 113," Triad Business Journal, March 8, 2018.

US DOJ, "Millennium Health Agrees to Pay $256 Million to Resolve Allegations of Unnecessary Drug and Genetic Testing and Illegal Remuneration to Physicians," October 19, 2015.

*Books*

Collier on Bankruptcy, 16th edition, 2016.

Fishman, Jay E., Pratt, Shannon P. and Morrison, William J.; Standards of Value: Theory and Applications, John Wiley & Sons, Inc. 2007.

Principles of Corporate Finance, Brealey, Myers, Allen, 10th edition, January 1, 2012.

*Case Law*

*Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056 (3d Cir. 1992).*

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003 (In re Fruehauf Trailer Corp.) , 444 F.3d 203, 210 (3d Cir. 2006)*

*Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.), 348 B.R. 234, 274 (Bankr. D. Del. 2005)*

*Financial Statements and Filings*

Laboratory Corporation of America Holdings Form 10-K for the fiscal year ended December 31, 2013 filed February 25, 2014.

Quest Diagnostics Incorporated Form 10-K filed for the fiscal year ended December 31, 2013 filed February 18, 2014.

*Other Public Sources*

A Strategy for Medicare Payment Reform, Center for American Progress, May 2015.

Center for Behavioral Health Statistics and Quality, Results from the 2012 National Survey on Drug Use and Health: Summary of National Findings 18, 21 (2012), https://www.samhsa.gov/data/sites/default/files/NSDUHresults2012/NSDUHresults2012.pdf.

Centers for Medicare & Medicaid Services 2012 and 2013 Physician and Other Supplier Public Use Files. Data retrieved from https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier on June 22, 2021.

Centers for Medicare & Medicaid Services, *Original Medicare Enrollment: Part A and/or Part B Enrollees by Demographic Characteristics, Calendar Year 2013* 1 (2020), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/CMSProgramStatistics/2013/Downloads/MDCR_ENROLL_AB/CPS_MDCR_ENROLL_AB_11.pdf

Centers for Medicare & Medicaid Services, "What is an LCD?," https://www.cms.gov/Medicare/Coverage/DeterminationProcess/LCDs.

CGOS, https://www.cgsmedicare.com/partb/pubs/news/2012/0412/cope18723.html.

CMS website, https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE.

Congressional Budget Office (CBO), The Budget and Economic Outlook 2014 to 2024, February 2014.

Data Bridge Market Research US Pharmacogenetic Testing Market Industry Trend Report

Department of Health and Human Services Office of Inspector General, "Questionable Billing for Medicare Part B Clinical Laboratory Services," August 2014.

Department of Health and Human Services Office of Inspector General, "Special Fraud Alert: Laboratory Payments to Referring Physicians," June 25, 2014.

Department of Health and Human Services Office of Inspector General, "Comparing Lab Test Payment Rates: Medicare Could Achieve Substantial Savings," June 2013.

Federal Register / Vol. 63, No. 163 / Monday, August 24, 1998 / Notices.

MB&CC, HCPCS Codes, https://www.medicalbillingandcoding.org/hcpcs-codes/.

Medicare Physician and Other Supplier PUF Methodology (https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Downloads/Medicare-Physician-and-Other-Supplier-PUF-Methodology.pdf).

Medicare.gov, "Medicare Advantage Plans," https://www.medicare.gov/sign-up-change-plans/types-of-medicare-health-plans/medicare-advantage-plans.

Moody's Financial Metrics Key Ratios By Rating And Industry For North American Non-Financial Corporations: December 2013, tab "App-8". Available at www.moodys.com.

S&P CapIQ.

S&P credit rating report March 28, 2014.

SIC Industry Description," NAICS Association, accessed Sepember 21, 2021.

The People's Law Dictionary, *Qui Tam Action,* https://dictionary.law.com/default.aspx?selected=1709.

U.S. Department of The Treasury, Resource Center, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/pages/TextView.aspx?data=yieldYear&year=2014.

Uniform Law Commission, *Fraudulent Transfer Act,* https://www.uniformlaws.org/committees/community-home?CommunityKey=4226ae7c-91c0-4ce9-b488-8520dbc39ea3.

United Healthcare Community Plan, https://www.uhccommunityplan.com.

**APPENDIX F: CURRICULUM VITAE**

**Ms. Austin Smith** is Chairman of The Brattle Group and co-leads the firm's M&A Litigation Practice. She specializes in M&A and bankruptcy disputes with subject matter expertise in valuation and credit and solvency analysis. She provides testifying and consulting expert services in litigation and disputes related to mergers and acquisitions, dissenting shareholder actions, leveraged buyouts, financing transactions/recapitalization, debt recharacterization and avoidance actions. Yvette has also served as an expert in international trade subsidy disputes. She has submitted expert oral and written testimony in multiple venues including state courts in Delaware and New York, U.S. federal bankruptcy and district courts, international courts in Canada and Australia and the World Trade Organization and other international arbitration forums.

In addition to opining on valuation, Yvette has also provided expert testimony on market practice and transaction structure in M&A disputes. As representative bankruptcy engagements, Yvette has been retained as a solvency or valuation expert in connection with the bankruptcies of Lehman Brothers (on behalf of JPMorgan Chase), Caesars Entertainment Operating Company (on behalf of Apollo Global Management), Physiotherapy Associates Holdings (on behalf of a litigation trustee), U.S. Steel Canada (on behalf of United States Steel) and Purdue Pharma (on behalf of 58 U.S. states and territories).

Ms. Austin Smith has written a number of publications and presented on valuation and credit analysis, for organizations including the American Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, the Delaware State Bar Association, Thomson Reuters, and Bloomberg Law. She is a contributing author to the Model Merger Agreement for the Acquisition of a Public Company, published by the ABA's Mergers and Acquisitions Committee, and a contributing researcher to The Standard & Poor's Guide to Fairness Opinions: A User's Guide for Fiduciaries. She is Co-Chair of the American Bar Association Joint Task Force on M&A Litigation and is founder and former Co-Chair of the ABA Financial Advisor Task Force.

Ms. Austin Smith has also been a member of the teaching faculty of Harvard University Extension School, where she taught a graduate finance course and a past faculty member of the American Bar Association's National Institute of Negotiating Business Acquisitions.

## Yvette Austin Smith

Ms. Austin Smith serves on the Board of Directors for The Brattle Group and was recently named Board Chair.  She is also the Vice-Chair of the Board of Directors for the Appalachian Mountain Club.

Prior to joining The Brattle Group, Yvette provided investment banking advisory services including mergers and acquisitions, fairness opinions, solvency opinions and commercially reasonable debt opinions.

### AREAS OF EXPERTISE

- Valuation
- M&A Litigation
- Bankruptcy Litigation
- Credit and Solvency Analysis

### EDUCATION

- M.B.A. (Finance) from Columbia University
- Graduate Studies in Mathematical Finance, Courant Institute of Mathematics, New York University
- A.B., Government and Philosophy, Harvard College

### PUBLICATIONS

- "Valuation Analysis of Related Party Transactions," ABI Journal, March 2018.
- "Snapshot of Delaware Public Company Appraisals Post-CKx," *Deal Points*, publication of the American  Bar Association's M&A Committee, Winter 2017.
- "Asset Value Trumps Discounted Cash Flow in Another Bankruptcy Valuation Dispute," Yvette R.  Austin Smith and Evan Cohen, *The Brattle Group: Critical Insights*, July 29, 2014.
- "Rural Metro Redefines Investment Banks' Role in M&A," Yvette R. Austin Smith and Torben Voetmann, *Law360*, March 28, 2014.
- "Solvency Analysis in the Context of Fraudulent Transfer after Eleventh Circuit's TOUSA Reversal," American Bankruptcy Institute's Business Reorganization Committee newsletter, (Volume  11/No. 3),  June 2012.
- "Recent M&A Litigation Provides Updated Guidance for Fairness Opinions," *Deal Points*, publication of  the American Bar Association's M&A Committee, Spring 2012.
- "Why Do Solvency Opinions Fail?"  Spring 2011.
- Contributing author to: *Model Public Company Acquisition Agreement with Commentary*; by The Mergers & Acquisitions Committee of the American Bar Association; Chicago: American Bar Association, August 2011. Authored chapter on determining stock exchange ratios in mergers and  acquisition transactions.
- Contributing author to: The Standard & Poor's Guide to Fairness Opinions: A User's Guide for



2

Fiduciaries; by Phillip J. Clements and Philip Wisler; New York: McGraw Hill, 2005

## TESTIMONY EXPERIENCE

*Snow Phipps Group, LLC, and DecoPac Holdings Inc., Plaintiff, v. KCake Acquisition, Inc., et al., Defendants,* Court of Chancery of the State of Delaware, C.A. No. 2020-0282-KSJM (Deposition testimony, December 2020; Trial testimony, January 2021)

*GiGi Jordan, Plaintiff against Raymond A. Mirra, JR., et al., Defendants,* United States District Court for the District of Delaware, C.A. No. 14-01485-SLR-SRF  (Deposition testimony, December 2020)

*Falcon Distribuidora, Armazenamento e Transporte S.A. v. Hypera S.A.,* International Chamber of Commerce Arbitration No 23896/GSS (Hearing testimony, November 2020)

*In Re Comtech/Gilat Merger Litigation* Court of Chancery of the State of Delaware, C.A. No. 2020-0605-JRS (Deposition testimony, October 2020)

*Dillon Trust Company LLC, et al. v. United States,* Court of Federal Claims Nos. 17-1898T, 17-2022T, 17-2023T  (Deposition Testimony, September 2020)

*IC Power Asia Development Ltd. (Israel), Claimant v. Republic of Guatemala, Respondent,* Under the Arbitration Rules of the United Nations Commission on International Trade Law (Hearing testimony, July 2020)

*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. No. 13-50530.* (Deposition testimony January 2020)

*Canada – Measures Concerning Trade in Commercial Aircraft, World Trade Organization (DS522)* (Testimony at First Substantive Meeting, September 2019)

*Crown Resorts Limited v Commissioner of Taxation Federal Court of Australia Proceedings, No. VID 831, 833 - 837 & 1635 - 1637 of 2018.* (Trial testimony, June 2019)

*The Mangrove Partners Master Fund, Ltd., Petitioner, v. Calamos Asset Management, Inc., Respondent,* Court of Chancery of the State of Delaware, *C.A. No. 2017-0139-JTL.* (Deposition testimony, December 2018)

*Polar Multi-Strategy Master Fund v. The Stars Group Inc.,* Superior Court of Justice – Ontario, *CV-18-599612-00-CL,*  (Hearing testimony, July 2018)

*In re: Physiotherapy Holdings, Inc. et al. in the matter PAH Litigation Trust, Plaintiff v. Water Street Healthcare Partners, L.P. et al., Defendants* (Case No. 13- 12965 (KG)).  United States District Court for the District of Delaware.  (Deposition testimony, May 2018)

*Domain Associates, L.L.C., v. Nimesh Shah,* Court of Chancery of the State of Delaware, *C.A. No. 12921-VCL.* (Deposition testimony, January 2018; Trial testimony, February 2018)



**Yvette Austin Smith**

*Charles Almond as Trustee for the Almond Family 2001 Trust, Almond Investment Fund, LLC, Charles Almond, and Andrew Franklin, Plaintiffs v Glenhill Advisors, LLC, et al., Defendants and Design Within Reach, Inc., Intervenor and Counterclaim Petitioner,* Court of Chancery of the State of Delaware, C.A. No. 10477-CB (Deposition testimony, October 2017; Trial testimony, November 2017)

*Blueblade Capital Opportunities LLC and Blueblade Capital Opportunities, Petitioners, v. Norcraft Companies, Inc., a Delaware Corporation, Respondent,* Court of Chancery of the State of Delaware, C.A. No. 11184-VCS (Deposition testimony, May 2017; Trial testimony, June 2017)

*In re: Caesars Entertainment Operating Company, Inc. et al.* United States Bankruptcy Court Northern District Of Illinois Eastern Division, Case No. 15-01145 ABG. (Expert declaration, December 2016).

*JD Holdings, LLC, et al. v. Jacqueline a. Dowdy, as Trustee of The Revocable Trust of John Q. Hammons, dated December 28, 1989, as Amended and Restated, et al.,* Court Of Chancery of The State of Delaware, Case No. 7480-VCL (Deposition testimony, June 2016).

*George L. Miller, Chapter 7 Trustee v. Sun Capital Partners, Inc. et al,* United States District Court for the District of Delaware, Case No. 13-CV-01996-RGA (Deposition testimony, April 2016).

*In the Matter of the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as Amended and in the Matter of A Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada Inc.* and *In the Matter of A Proposed Plan of Compromise or Arrangement with Respect to U.S. Steel Canada Inc.* Superior Court of Justice - Ontario (Trial testimony, January 2016)

*Nathan Owen v. Energy Services Group et al,* Court of Chancery of the State of Delaware, C.A. No. 8860-CB (Deposition testimony, August 2014; Trial testimony, November 2014)

*Lehman Brothers Holdings Inc. and Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., v. JPMorgan Chase Bank N.A.,* Adversary Proceeding No 10-03266 (JPM), United States Bankruptcy Court for the Southern District of New York. (Deposition testimony, September 2014)

*Out Publishing Inc. v. Lipo Liquidating Corp., et al,* Index No. 07/601855 (Bransten), Supreme Court of the State of New York County of New York Commercial Division. (Deposition testimony, February 2010)



# EXHIBIT 2

## FILED UNDER SEAL

# REDACTED
# EXHIBIT 3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENNIUM LAB HOLDINGS II, LLC, et al., | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| ---------------------------------------------------------------------- | |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE of THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | |
| -against- | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A. and SUNTRUST BANK, | |
| Defendants. | |

**EXPERT REPORT OF AMY HUTTON**

**February 14, 2022**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

I.    Qualifications, Compensation, and Materials Relied Upon ................................................4

    A.    Qualifications ........................................................................................................4

    B.    Compensation........................................................................................................5

    C.    Materials Relied Upon..........................................................................................6

II.    Assignment ......................................................................................................................6

III.    Summary of Opinions ......................................................................................................6

IV.    Summary of Ms. Austin Smith's Solvency Analysis .......................................................13

    A.    Ms. Austin Smith's Modified Padres Projections .................................................15

    B.    Ms. Austin Smith's DCF and comparable companies analyses ...........................18

    C.    Ms. Austin Smith's analysis of Millennium's ability to pay its debts and capital adequacy ...............................................................................................20

V.    Ms. Austin Smith's Discounted Cash Flow Analysis is Flawed and Unreliable .............21

    A.    Ms. Austin Smith's findings depend on a number of assumptions and approaches that are unsupported, flawed, and unreliable.....................................24

        1.    Ms. Austin Smith's valuation depends on application of an incorrect and substantially inflated WACC.....................................................24

        2.    Ms. Austin Smith's treatment of operating expenses is flawed ................29

        3.    Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact of a potential DOJ settlement ..................................32

        4.    Ms. Austin Smith provides no reliable basis for the elimination of the revenue from Millennium's "Emerging Opportunities".......................34

        5.    Ms. Austin Smith's other adjustments related to Millennium's business practices are unfounded, rely on hindsight, and are created based on an ad hoc and unreliable methodology........................................36

    B.    Ms. Austin Smith's analysis is at odds with those completed by financial professionals in the period leading up to the 2014 Transaction ...........................43

        1.    Millennium's management prepared financial projections based on its standard practice .........................................................................44

        2.    Ms. Austin Smith disregards the contemporaneous analyses by various third parties, which contradict her conclusion that Millennium was insolvent .........................................................................46

    C.    Ms. Austin Smith's Modified Padres Projections and her valuation estimate resemble most closely projections and valuations created around Millennium's bankruptcy .......................................................................................52

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

VI.    Comparable Companies Analysis ..................................................................... 54

    A.    Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent under her EBITDA multiples analysis.................................................................. 54

VII.    Ability to Pay Debt Test.................................................................................. 56

    A.    Ms. Austin Smith's conclusion that Millennium would be unable to pay its debts is unreliable ................................................................................. 57

    B.    Ms. Austin Smith fails to engage with the credit ratings for the 2014 Transaction ........................................................................................ 58

VIII.    Capital Adequacy Test ................................................................................... 60

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

## I.    QUALIFICATIONS, COMPENSATION, AND MATERIALS RELIED UPON

### A.  Qualifications

1.    I am a Professor of Business Administration at Boston College's Carroll School of Management.  I joined the Carroll School's faculty in 2006 and was promoted to Full Professor in 2010.  Previously, I served as an Associate Professor at the Tuck School of Business at Dartmouth College, an Assistant and Associate Professor at Harvard Business School, and a visiting scholar at Stanford University's Graduate School of Business.

2.    I have a Ph.D. in Business Administration from the Simon Business School at the University of Rochester, with written qualifiers in Accounting, Finance, and Organizations & Markets.  Before obtaining my Ph.D., I worked for Chemical Bank in its investment banking group for one year.  During that year, I worked on several large transactions, mostly leveraged buyouts, in which Chemical Bank provided the bridge financing for the deals.

3.    In 2003, I was elected to the Board of Directors of Bandag, Inc. (NYSE, Fortune 1500 company), where I served on the Audit and Corporate Governance and Nominating Committees, and, in 2005, I was appointed chair of the Audit Committee.  As a board member, I actively participated in several merger negotiations, and was involved in reviewing the performance and approving the compensation of top executives.  When Bandag acquired a majority interest in Speedco, a privately held company, in 2004, I played an active role in the board's deliberations, including examining the implicit assumptions underlying our financial advisor's use of comparable multiples to value Speedco.  I was also actively engaged in the deliberations and analysis performed in connection with Bridgestone's 2007 acquisition of Bandag for just under $1 billion.

4.    While I have taught various courses over the years, my specialty is Financial Statement Analysis and Valuation ("FSAV"), a capstone case-method course that draws on my real-world experiences, as well as my research and study in the areas of Strategy, Financial Economics, and Accounting.  In my courses, I teach students and executives how to value investment ventures. The FSAV course includes detailed analyses of merger and acquisition ("M&A") transactions.  I teach students how to conduct detailed M&A analyses from assessing the stand-alone value of the target prior to the merger talks to assessing the likely synergies and premium paid.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

5.      My research areas include: empirical assessments of valuation methods, methods for detecting "earnings management" (a term connoting exploitation of opportunities to make accounting decisions that change reported income), effective corporate disclosure strategies, policy changes in response to Regulation Fair Disclosure and the Sarbanes-Oxley Act of 2002, and the roles of capital market intermediaries and regulators in determining market values of company stocks.  In my academic research, I have used statistical techniques to examine how information is incorporated into securities prices, including event studies.

6.      Based on my research, I was named to the 2001 Congressional Review Board, opining on the Securities Industry Association's best practices for equity research.  My research was used in the development of the Global Analyst Research Settlement between the Securities and Exchange Commission and numerous Wall Street firms.[1]

7.      In 2010, I won the Distinguished Contribution to Accounting Literature Award for my "Groundbreaking Research" demonstrating how strong corporate governance combats earnings management.

8.      With over 30,000 Google Scholar citations, my work has appeared in publications such as the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Accounting Review*, *Contemporary Accounting Research*, the *Journal of Accounting Research*, the *Review of Accounting Studies*, the *Harvard Business Review*, and the *Journal of Applied Corporate Finance*. I served as an Editor for the *Accounting Review* from 2011 to 2014.  I also serve as a referee for the *Journal of Financial Economics*, the *Journal of Accounting and Economics*, the *Journal of Accounting Research*, and *Contemporary Accounting Research*.

9.      A copy of my curriculum vitae is attached as **Appendix A.**  A list of my testimony over the last four years is attached as **Appendix B**.

   **B.   Compensation**

10.     I am being compensated at my standard billing rate of $990 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me

---

[1] "SEC Fact Sheet on Global Analyst Research Settlements," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/news/speech/factsheet.htm, accessed on February 7, 2022.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

### C.   Materials Relied Upon

11.   In preparing this report, I have relied upon my education and experience in accounting, corporate finance, valuation, and investments; documents produced in this matter; publicly available information, such as academic articles, analyst reports, and public press; and other materials.  **Appendix C** lists documents and other sources I have relied upon in forming my opinions in this matter.  My work on this matter is ongoing, and I reserve the right to modify or supplement my opinions in the event that I become aware of additional information regarding this matter.

## II.   ASSIGNMENT

12.   I have been retained by counsel for J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank N.A. ("Citi"), SunTrust Bank ("SunTrust"), and BMO Harris Bank, N.A. ("BMO") (together the "Arrangers") to respond to certain opinions set forth in the report of Yvette R. Austin Smith ("Austin Smith Report"), filed on November 15, 2021, which purports to assess whether Millennium Laboratories, LLC ("Millennium" or the "Company") was solvent on April 16, 2014, following the $1.825 billion syndicated term loan transaction ("2014 Transaction").[2]

## III.   SUMMARY OF OPINIONS

13.   In addressing the question of Millennium's solvency at the time of the 2014 Transaction, Ms. Austin Smith conducts several analyses.  My report assesses each of these.  First, Ms. Austin Smith conducts a solvency analysis using the discounted cash flow ("DCF") method and the comparable companies method (referred to as "Guideline Public Companies" in the Austin Smith

---

[2] "For the purpose of the solvency analysis described herein, April 16, 2014 is the date of valuation." Austin Smith Report, ¶ 6.  By entering into the 2014 Transaction, the Company borrowed $1.775 billion under a senior secured credit facility.  The 2014 Transaction "initially also provided for a revolving loan in a principal amount not to exceed $50 million, which was to terminate on April 16, 2019," but it was never utilized and terminated in full as of June 30, 2015.  *In re Millennium Lab Holdings II, LLC, et al.*, "Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings," filed on November 10, 2015 ("Hardaway Declaration"), ¶ 9.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Report).  Then she considers Millennium's ability to pay its debts, and finally she addresses the question of the adequacy of Millennium's capital.

14.    Based on my experience and expertise, my review of the Austin Smith Report, her backup documents and files, and the analyses discussed in further detail below, I have reached the conclusion that Ms. Austin Smith's assertion that her DCF analysis "demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction" is based on flawed and unreliable analyses.[3]  As summarized immediately below and set forth in detail throughout this report, Ms. Austin Smith's analysis of Millennium's solvency and her conclusions rely on unsupported assumptions, suffer from hindsight bias, and reflect flawed applications of widely accepted valuation principles.

- ***Substantially Inflated Discount Rate***:  Ms. Austin Smith's analysis assumes that Millennium's weighted average cost of capital ("WACC") was 14.8%.[4]  But this WACC is inconsistent with other assumptions that she makes in her solvency analysis. For example, while her comparable companies analysis identifies a specific set of *five* comparable companies, her WACC of 14.8% uses a different set of *eight* comparable companies, thereby rendering her WACC estimation internally inconsistent with other opinions in the report.  She also inflates her WACC by improperly including a company-specific risk premium and a small company risk premium.  The inclusion of a company-specific risk premium has no basis in the field of financial economics because the WACC, even according to Ms. Austin Smith, should only include non-diversifiable risks.[5]  Similarly, the inclusion of a small company risk premium is without any theoretical basis; the practice arose from an empirical observation in the 1980s that was later shown to not hold.  Adjusting the WACC to correct these errors results in a WACC of 7.2%—less than half the 14.8% WACC Ms. Austin Smith uses.  Using the corrected WACC of 7.2%—even while accepting Ms. Austin Smith's other assumptions and adjustments (which I do not)—implies an enterprise value of

---

[3] Austin Smith Report, ¶ 145.

[4] Austin Smith Report, ¶ 143.

[5] Austin Smith Report, ¶ 41.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

$1,970.8 million and an equity value of $209.1 million, rendering Millennium balance sheet *solvent*.[6]

- ***Unsupported and Unreliable Revenue and Operating Expenses Adjustments***: Ms. Austin Smith creates "modified projections" for her work in this litigation in which she substantially reduces revenue, by adjusting specimen volume and net revenue per specimen ("NRPS"), as compared to those created by management.[7] Specifically, as of early 2014, she assumes that Millennium's revenue would decline by approximately 28% in the following two years.[8]  By 2018, she assumes that the Company would have just over half of the revenue originally projected by management.[9]  Ms. Austin Smith's analysis, as I discuss below, is unsupported and unreliable, and among other things, it suffers from hindsight bias.  Ms. Austin Smith also asserts that her proposed adjustments are "one-time adjustments," but she fails to acknowledge that their impact affects all subsequent years creating a permanent effect that substantially reduces her estimate of Millennium's enterprise value.  **Exhibit 1** shows the value impact of each of Ms. Austin Smith's adjustments to management projections, while maintaining all her other adjustments and assumptions, using her WACC of 14.8% and the corrected WACC of 7.2%.

> (a)   ***Flawed Operating Expenses Adjustment***:  Ms. Austin Smith fails to offer a reliable basis for her estimate of Millennium's operating expenses.  Despite her substantially reduced projected revenue, she estimates that operating expenses would have increased as a proportion of revenue from 38% in 2014 to 51% of revenue in 2016, a proportionate increase of about one-third.  She provides no basis as to why management would maintain such levels of

---

[6] Ms. Austin Smith estimates the equity value by subtracting the $1,761.7 million of outstanding debt from the enterprise value.  Austin Smith Report, Table 7.

[7] Specimen volume refers to the specimen count and represents "the volume of specimen processed in the laboratory and submitted for payment in the billing system (i.e. excludes rejections and other non-billable specimen included in the specimen count)."  Millennium Laboratories, "Confidential Information Memorandum for Public Side Lenders," March 31, 2014, ML_DE_00269115 ("2014 Confidential Information Memorandum") at ML_DE_00269139.

[8] **Appendix H1A**.

[9] **Appendix H1A**.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

operating expenses if it indeed expected revenues to decline as substantially as she suggests.  Ms. Austin Smith's unsupported assumptions regarding operating expenses imply substantial reductions to Millennium's EBITDA margins without a basis.  Modifying her excess operating expenses alone—even while using her inflated WACC of 14.8%—would increase Millennium's enterprise value by approximately $220.7 million to $1,023.6 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by approximately $645.3 million to $2,616.1 million.

(b)    ***Unsupported Specimen Volume Adjustment Related to a Potential Settlement with the Department of Justice***:  Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact on specimen volume of a potential Department of Justice ("DOJ") settlement.  To reach her estimate of the reputational impact on specimen volume, she uses the volume declines experienced by Ameritox, Ltd. ("Ameritox") and Calloway Laboratories, Inc. ("Calloway") following their respective settlements with the DOJ.  She provides no explanation regarding the causes of the revenue declines for these two companies.  Instead, she assumes without basis that the volume declines were due to reputational effects and does not consider whether they may have been the result of other unrelated factors.  She also fails to explain why Millennium would experience a volume decline similar to those experienced by these two companies.  Modifying this unsupported adjustment alone— even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $383.8 million to $1,186.6 million.  Making this modification and using the corrected WACC

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $1,138.7 million to $3,109.47 million.

(c)     ***Unsupported Elimination of Revenue from "Emerging Opportunities"***:  Ms. Austin Smith provides no reasonable basis for the elimination of the revenue from Millennium's "Emerging Opportunities."  She merely characterizes these revenue as "aspirational" and completely ignores Millennium's business actions related to the "Emerging Opportunities."  Ms. Austin Smith statement that she excludes the "Emerging Opportunities" because they did not appear in a subsequent management model—created more than 13 months later, in June 2015—is inconsistent with fundamental principles of DCF analysis and suffers from hindsight bias.  Eliminating this unsupported adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $192.8 million to $995.7 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $663.6 million to $2,643.5 million.

(d)     ***Ad Hoc Specimen Volume Growth Rate Adjustments***:  Ms. Austin Smith's ad hoc specimen volume growth rate adjustments from 2014 are based on an improper extrapolation of trends from a small sample of quarterly historical data that are inconsistent with longer historical trends and stand at odds with expected growth trends both for Millennium and the industry.  Modifying this ad hoc adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value by $155.0 million to $957.9 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Smith's analysis) would increase Millennium's enterprise value by $499.0 million to $2,469.8 million.

(e) ***Unfounded Specimen Volume and NRPS Adjustments Related to Millennium's Business Practices***:  Ms. Austin Smith adjusts management's projections for the impact of Medically Unlikely Edit ("MUE") denials, the discontinuance of the Point-of-Care ("POC") Free Test Cup program, and the elimination of the custom profiles practice.[10]  She does not provide a basis as to why her adjustments more reasonably incorporate the expected risks related to Millennium's business practices.  In her analyses of MUE denials and POC Free Test Cup program, Ms. Austin Smith relies on hindsight as she uses analyses that Millennium performed in July 2014 and does not establish whether the information was available prior to the 2014 Transaction.  Furthermore, her ad hoc and unsupported adjustment for the elimination of the custom profiles practice—a 21.8% reduction in commercial payors NRPS—is substantially higher than the one management implemented—a 7% reduction in commercial payors NRPS—in 2015, following Millennium's bankruptcy and after certain risks had already materialized and the custom profile practice was eliminated.  She fails to explain why her 21.8% is more appropriate, let alone why it should have been reasonably expected back in April 2014.  Modifying each adjustment alone—even while using the inflated WACC of 14.8%—would increase Millennium's enterprise value between $17.4 million to $101.6 million, to between $820.2 million to $904.4 million.  Making these modifications and using the

---

[10] An MUE is "the maximum units of service that a provider would report under most circumstances for a single beneficiary on a single date of service." "Medically Unlikely Edits," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE, accessed on February 7, 2022. The POC Free Test Cup Program refers to Millennium's practice of "providing point-of-care drug test cups at no charge to certain of its physician customers for use also as a specimen collection device."  Millennium Laboratories, LLC - Voluntary Self-Referral Disclosure, August 15, 2014, ML_DE_00325457 ("Millennium Self-Referral Disclosure") at ML_DE_00325457.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value between $45.2 million to $303.8 million, to between $2,016.0 million to $2,274.6 million.

- **Outlier Results:** Ms. Austin Smith's analysis is at odds with the contemporaneous analyses by various financial professionals, including: the Arrangers; TA Associates (Millennium's private equity sponsor); and Vantage Point Advisors ("VPA") (Millennium's contemporaneous solvency advisor).[11] Notably, Ms. Austin Smith's enterprise value of $802.9 million is well below even the downside scenarios contained in available contemporaneous valuations. In fact, her analysis resembles more closely those prepared around the time of Millennium's bankruptcy in November 2015 (19 months after the 2014 Transaction closed), or indeed after Millennium entered bankruptcy. This includes a valuation conducted by FTI Consulting ("FTI") as of December 2015 that estimated Millennium's enterprise value at $979.5 million, approximately $177 million higher than Ms. Austin Smith's estimate.[12] FTI's analysis was conducted after the adverse events that Ms. Austin Smith claims should have been accounted for had already materialized.

15. Ms. Austin Smith also conducts but then disregards a comparable companies analysis, which shows that Millennium was balance sheet *solvent*, based on her EBITDA multiples

---

[11] J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)"); TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH-00090311, TA_MLH-00090312 ("TA Associates Model"); Vantage Point Advisors, "Millennium Lab Holdings II, LLC Solvency Analysis," April 30, 2014, ML_DE_00263273 ("2014 VPA Solvency Analysis"). Ms. Austin Smith notes that "[t]o accurately calculate value using a Discounted Cash Flow or 'DCF' methodology, the projected cash flows should reflect all relevant information that was known or knowable as of the date of valuation. This was not done at the time of the 2014 Transaction and a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction." Austin Smith Report, ¶ 7. However, she provides no analysis of other contemporaneous analyses or explanation as to why these contemporaneous analyses did not "reflect all relevant information that was known or knowable as of the date of valuation."

[12] FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743 ("FTI December 2015 Valuation") at KPMG-ML-EA15WB-0000767; Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

analysis. Specifically, Ms. Austin Smith finds that Millennium's implied equity value based on her EBITDA multiples ranges between *positive* $23 million and *positive* $1,456 million, which demonstrates that Millennium was balance sheet *solvent*.[13]

16.     Ms. Austin Smith's test of Millennium's ability to pay its debts is flawed because it relies on her unsupported revenue adjustments. Ms. Austin Smith has provided no reliable basis for her adjustments that substantially decrease Millennium's revenue and as a result, constrain its ability to pay its debt. Moreover, the contemporaneous credit rating agencies analyses, which Ms. Austin Smith disregards, concluded that Millennium's credit rating was *not* near default, with S&P noting that the Company had "the capacity to meet its financial commitments" following the 2014 Transaction.[14] Ms. Austin Smith's tests of Millennium's capital adequacy are similarly flawed, as they too rely on her unsupported adjustments.

## IV.     SUMMARY OF MS. AUSTIN SMITH'S SOLVENCY ANALYSIS

17.     In connection with the 2014 Transaction, Millennium put together financial projections ("Padres Projections") for the period 2014 through 2020, consistent with the maturity of the 2014 Transaction.[15] The Padres Projections contained quarterly projections for 2014 and 2015, and annual projections thereafter for Millennium's three lines of business: urine drug testing

---

[13] Austin Smith Report, Table 9.

[14] "Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014 ("S&P Rating"); "Research Update: Millennium Laboratories Inc. Assigned 'B+' Rating And Stable Outlook; $1.82 Billion FirstLien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014 ("S&P Rating Update"); "Moody's Assigns B1 CFR to Millennium Labs; Sr. Secured Credit Facilities Rated B1; Outlook Is Stable," *Moody's*, March 31, 2014 ("Moody's Rating"); "Global Ratings Definitions," *Standard & Poor's*, November 10, 2021, available at https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352, accessed on February 7, 2022, (S&P Global Ratings Definitions").

[15] Millennium Management Projections, April 12, 2014, ML_DE_00057999 ("Padres Projections").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

("UDT"),[16] pharmacogenetic testing ("PGT"), and predictive analytics ("RxAnte").[17]  In her solvency analysis, Ms. Austin Smith adjusts the Padres Projections for the purpose of this litigation ("Modified Padres Projections"), in what she claims to be "the correct solvency framework," in order to "reasonably reflect significant business, reimbursement, legal, and regulatory risks and exposures."[18]  She asserts that "[i]t was known or knowable as of the 2014 Transaction that, as a result of these risks, the Company was very likely to encounter slowing or negative growth and declining profitability."[19]

18.     Ms. Austin Smith then conducts a DCF analysis and a comparable companies analysis to "evaluate the solvency of Millennium as of April 16, 2014."[20]  Based on the DCF analysis Ms. Austin Smith concludes that Millennium "was rendered balance sheet insolvent by the 2014 Transaction."[21]  While her comparable companies analysis suggests that when focusing on EBITDA multiples, Millennium was balance sheet *solvent*, Ms. Austin Smith says that "[d]ue to the limited comparability of the identified public [comparable] companies" she does not rely on the comparable companies analysis to reach any solvency conclusions.[22]  Ms. Austin Smith also purports to examine Millennium's ability to pay its debts and to estimate the Company's capital adequacy.[23]  She concludes that Millennium had inadequate capital after examining a single

---

[16] Millennium also offered Oral Fluid Drug Testing ("ODT"), an alternative to UDT that allows for the testing of individuals that are unable to provide a urine sample.  2014 Confidential Information Memorandum at ML_DE_00269130; Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation") at JPMC-MIL-CORP-00170158.

[17] Following the 2014 Transaction, Millennium was the parent company of two subsidiaries, RxAnte, LLC, and Pain In The Air, LLC.  Millennium itself was a subsidiary of Millennium Lab Holdings II, LLC, which in turn was a subsidiary of Millennium Lab Holdings, Inc.  Pain In The Air, LLC, primarily owned aircrafts, which were leased to Millennium.  Concurrent to the 2014 Transaction, Millennium Lab Holdings, Inc. transferred a 45% ownership stake in Millennium Lab Holdings II, LLC, to TA Associates Holding Corp.  2014 VPA Solvency Analysis at ML_DE_00263276; Confidential Information Memorandum at ML_DE_00269138; Hardaway Declaration, p. 47.

[18] Austin Smith Report, ¶ 106.

[19] Austin Smith Report, ¶ 106.

[20] Austin Smith Report, ¶¶ 6, 142–148, 149–160.

[21] Austin Smith Report, ¶ 173.

[22] Austin Smith Report, ¶ 7.

[23] Austin Smith Report, ¶¶ 164–169, 170–172.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

"downside" scenario and that "the 2014 Transaction encumbered Millennium with debt beyond the Company's ability to pay as that debt matured."[24]

### A.  Ms. Austin Smith's Modified Padres Projections

19.    Ms. Austin Smith starts by adjusting the Padres Projections for the first quarter of 2014 ("1Q2014") and uses the actual 1Q2014 financial results.[25]  Next:

- *Operating Expenses Adjustment*:  Ms. Austin Smith adjusts management's projected operating expenses.  She uses the unit cost assumptions of the Padres Projections and she multiplies the unit costs by the adjusted UDT and PGT specimen volume to estimate operating expenses.[26]  She assumes that all "fixed costs" in the Padres Projections remain unchanged.[27]

- *Specimen Volume Adjustment Related to DOJ Settlement*:  She reduces UDT and PGT specimen volume by 15% in 2015 and another 15% in 2016 (for a total of 30%) to account for the purported reputational impact of the DOJ settlement.[28]

- *Elimination of Revenue from "Emerging Opportunities"*:  Millennium's "Emerging Opportunities" included government contracts with the Department of Defense and

---

[24] Austin Smith Report, ¶ 173.

[25] Austin Smith Report, ¶ 110.  Ms. Austin Smith adjusts management's projected revenue by adjusting specimen volume and NRPS for Medicare and a set of commercial payors for UDT and PGT.  Austin Smith Report, ¶¶ 107–135.  "Millennium separated out billing data for certain large commercial payors including Aetna, Blue-Cross Blue-Shield, Cigna, Humana and UHC.  For the purposes of this analysis, I have defined these payors as the commercial payors." Austin Smith Report, FN 28.  For the remaining payors and RxAnte, Ms. Austin Smith maintains the Padres Projections. Austin Smith Report, ¶ 135.  Millennium's payor mix comprised of government health plans (Medicare, Medicaid, commercially managed government plans, and workers' compensation programs), commercial payors, and self-pay patients. 2014 Confidential Information Memorandum at ML_DE_00269149.  Workers' compensation plans are programs that provide medical coverage for employment-related injuries and occupational diseases.  Self-pay refers to patients who do not have medical insurance and are otherwise not covered by government or commercial payors.  "Workers' Compensation Program," *U.S. Department of the Interior*, available at https://www.doi.gov/pmb/hr/workerscompensation, accessed on February 7, 2022; "Insurance vs. Self Pay," *Kittitas Valley Healthcare*, available at https://www.kvhealthcare.org/patients-and-visitors/billing/insurance-vs-self-pay, accessed on February 7, 2022.

[26] Austin Smith Report, ¶ 136.

[27] Austin Smith Report, ¶ 136.

[28] Austin Smith Report, ¶ 132.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Department of Veteran Affairs, and international opportunities.[29]  Ms. Austin Smith completely removes revenue from "Emerging Opportunities" claiming that they "appear aspirational rather than expected."[30]

- *Specimen Volume Growth Rate Adjustments*:  The Padres Projections assumed a compound annual growth rate ("CAGR") of 9.8% from 2014 through 2018 for Medicare UDT specimen volume growth rate and 9.8% for commercial payors.[31] Ms. Austin Smith decreases the Medicare UDT specimen volume growth rate to 0% in 2014, 2% in 2015, and 3% for 2016 onwards, and the commercial payors growth rate to 10% in 2014, 5% in 2015 and 3% from 2016 onwards.[32]

- *Specimen Volume and NRPS Adjustments Related to Millennium's Business Practices*:

    (a)   Ms. Austin Smith reduces UDT specimen volume by 1.6% in July 2014 following the verdict in the Ameritox litigation to account for the discontinuance of the POC Free Test Cup program.[33]

    (b)   Ms. Austin Smith reduces the monthly Medicare NRPS in the Padres Projections to between $77.7 to $83.7 from January to March 2014, in order to, as she claims, "reflect only allowed billing

---

[29] Lender Presentation at JPMC-MIL-CORP-00170164–0167; Millennium Laboratories, "Management Presentation," March 2014, ML_DE_00058283 ("Management Presentation") at ML_DE_00058293; Millennium Laboratories, "Lender Presentation Audio File," March 31, 2014, JPMC-00089412 ("Lender Presentation Audio") at minute 35:00 ("So we are now one of two companies nationwide that has a federal supply schedule meaning we actually have a ticket to get into the dance to talk to any VA hospital, any Department of Defense local lab service so basically you have to have a federal supply schedule contract in order to provide services to either the VA or to the Department of Defense.  So the opportunity for us we think going forward is significant.  We were awarded the contract in June as I said and in reality we think that market is well over 400 million dollars.")

[30] Austin Smith Report, ¶ 67.

[31] **Appendix H1B**.

[32] Austin Smith Report, ¶ 109.

[33] Austin Smith Report, ¶ 133.  In 2011, Ameritox filed a complaint against Millennium, claiming that Millennium had engaged in anticompetitive behavior, partly due to its POC Free Test Cup program.  A $14.8 million judgment against Millennium was announced in June 2014, two months after the 2014 Transaction closed.  Email from C. Liou to Project Chargers Whole Team, "Millennium v. Amertitox - loss," June 17, 2014, JPMC-MIL-CORP-00165260. The POC Free Test Cup program was discontinued in June 2014 after the Ameritox verdict.  Millennium Self-Referral Disclosure at ML_DE_00325461.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

under MUE limits."[34]  Specifically, Ms. Austin Smith decreases January, February, and March 2014 Medicare NRPS by $69.32, $74.97, and $73.06, respectively.[35]  These decreases correspond to 15.4%, 16.6%, and 16.2% of the 1Q2014 actual Medicare NRPS for each respective month.[36]

(c)  Ms. Austin Smith reduces Medicare NRPS by 18.3% effective as of October 2015, "due to elimination of coverage for certain negative confirmation testing and specimen validity testing" in light of Noridian Healthcare Solutions ("Noridian")'s *draft* local coverage determination ("LCD"), which, as I understand from counsel, was

---

[34] Austin Smith Report, ¶ 118.

[35] YAS Workpaper 1, tabs "MUE w LCD Adjustment," "UDT Revenue," and "Padres UDT NRPS."

[36] The 1Q2014 actual Medicare NRPS for January, February, and March 2014 is $451.6, $451.4, $451.1, respectively.  Hence, for January, Ms. Austin Smith's percentage decrease of Medicare NRPS is 15.4%, i.e., $69.32 over $451.6.2.  The same calculation applies for February and March, 2014.  YAS Workpaper 1, tab "Padres UDT NRPS."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

not implemented until more than a year after the 2014 Transaction.[37]

(d)    Ms. Austin Smith reduces commercial payors NRPS by 21.8% starting in July 2015, "due to the elimination of Custom Profiles and the resulting reduction in medically unnecessary tests."[38]

20.    **Exhibits 2A**, **2B**, and **2C** show Millennium's actual and projected (from the Padres Projections), as well as Ms. Austin Smith's adjusted revenue, adjusted EBITDA, and adjusted EBITDA margins.[39]

### B.   Ms. Austin Smith's DCF and comparable companies analyses

21.    Ms. Austin Smith conducts a DCF analysis to value Millennium as of April 2014[40] and concludes that the Company had an enterprise value of $802.9 million and a negative equity value

---

[37] Austin Smith Report, ¶ 123.  Noridian was the Medicare Administrative Contractor ("MAC") for the State of California starting from August 24, 2013 and hence, Millennium's MAC.  From 2007 to August 24, 2013, Palmetto GBA ("Palmetto") was the MAC for the State of California.  United States' Complaint in Intervention, filed on March 19, 2015, ML_DE_00629274 ("DOJ Complaint") at ML_DE_00629281.  MACs are "multi-state, regional contractors responsible for administering both Medicare Part A and Medicare Part B claims."  "What's a MAC," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC, accessed on February 7, 2022.  LCDs are decisions made by a MAC whether to cover a particular item or service in a MAC's jurisdiction in accordance with section 1862(a)(1)(A) of the Social Security Act.  "Local Coverage Determinations (LCD) challenge," *Medicare*, available at https://www.medicare.gov/claims-appeals/local-coverage-determinations-lcd-challenge, accessed on February 7, 2022.  As I understand from counsel, the Noridian LCD in question was on "Drugs of Abuse Testing" and given a Document ID of CL34692, reflecting its draft status.  Its revision history can be reviewed by inputting its Document ID into the search box on the Medicare Coverage Database Archive website, "MCD Archive," "Medicare Coverage Database Archive," *Centers for Medicare & Medicaid Services*, available at https://localcoverage.cms.gov/mcd_archive/search.aspx?clickon=search, accessed on February 7, 2022.

[38] Austin Smith Report, ¶ 128.

[39] EBITDA refers to "Earnings before Interest, Taxes, Depreciation, and Amortization."  Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice,* 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*"), Chapter 1, p. 17.  Within the Padres Projections, Adjusted EBITDA for Millennium is calculated as Operating Income plus the sum of Depreciation and Amortization, Stock-Based Compensation, Transaction Expenses, and Other Income.  Padres Projections, tabs "LeverageModel" and "Quarterly IS".  Ms. Austin Smith maintains this assumption.

[40] Ms. Austin Smith conducts the DCF analysis as of March 31, 2014 and claims that she is "not aware of any significant change in the operations or financial condition of Millennium between March 31, 2014 and April 16, 2014 (the date the 2014 Transaction closed).  As such, it is reasonable to assume that the valuation as of March 31, 2014 is a reliable indication of value as of April 16, 2014."  Austin Smith Report, ¶ 142.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

of $958.9 million.[41]  For her DCF analysis, Ms. Austin Smith relies on her Modified Padres Projections and uses a seven-year projection period extending from 2Q2014 through 4Q2020 and a terminal year.[42]  To discount the projected cash flows and terminal value, Ms. Austin Smith uses a WACC of 14.8%.[43]  In doing so, she references—without explanation—the WACC that VPA used in its April 2014 solvency analysis, but fails to explain in her report why it is appropriate to adopt.[44]  To estimate the terminal value, Ms. Austin Smith uses the Gordon Growth model (a standard valuation methodology) and assumes a terminal growth rate of 3%, the same that VPA assumed.[45]

22.     For the comparable companies analysis, Ms. Austin Smith identifies five potential comparable companies and uses this set of comparable companies to estimate multiples of

---

[41] Austin Smith Report, ¶¶ 142, 145.  The equity value is the value that remains for the shareholders after any debts have been paid off.  Ms. Austin Smith estimates the equity value of negative $958.9 million by subtracting the $1,761.7 million of outstanding debt from the enterprise value of $802.9 million.

[42] Austin Smith Report, ¶¶ 143–144.  YAS Workpaper 1, tab "DCF".  Ms. Austin Smith, similar to management, assumes that the terminal year is 2021.  The terminal year is the year when the valued company is assumed to reach a steady state.  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 6, p. 255 ("[A] steady state company is also a company that has evolved to the point of generating constant economic returns on its investments.").

[43] Austin Smith Report, ¶ 143 ("I then discount both the seven-year projected cash flows and the terminal value using [WACC] (or discount rate) of 14.8%.  The discount rate is calculated by Vantage Point for the solvency analysis dated April 30, 2014.  I also note that FTI Consulting prepared a valuation analysis for Millennium as of December 18, 2015, which used a similar WACC of 14.0%.").  As I understand, VPA conducted a solvency analysis for Millennium ahead of the 2014 Transaction.  2014 VPA Solvency Analysis.

[44] Ms. Austin Smith also provides results based on several sensitivities to her asserted WACC of 14.8%; for example, she considers a WACC of 9.8%, which is the lowest WACC for which she provides results.  Austin Smith Report, FN 285 ("The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%).  However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk.  Thus, 9.8% underestimates an appropriate WACC for Millennium.").

[45] Austin Smith Report, ¶ 144.  2014 VPA Solvency Analysis at ML_DE_00263288.  A "constant growth perpetuity valuation model for discounting dividends is called the Gordon growth model."  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 1, p. 12.  The "Gordon growth model relates the value of a stock to its expected dividends in the next time period, the cost of equity and the expected growth rate in dividends" and "can be used to value a firm that is in 'steady state' with dividends growing at a rate that can be sustained forever."  Damodaran, A., *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 2nd ed., Wiley, 2002 ("Damodaran, *Investment Valuation*"), Chapter 13, p. 2.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

revenue and EBITDA.[46]  Notably, Ms. Austin Smith's EBITDA multiples analysis yields an implied equity value for Millennium between *positive* $23 million and $1,456 million, i.e., it implies that Millennium was balance sheet *solvent*, which is starkly different from the conclusions in Ms. Austin Smith's own DCF analysis.[47]  Ms. Austin Smith ultimately discards her comparable companies analysis because in her words, "these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value."[48]

### C.  Ms. Austin Smith's analysis of Millennium's ability to pay its debts and capital adequacy

23.  To perform the ability to pay debts test for Millennium, Ms. Austin Smith estimates the Company's unlevered free cash flows using her Modified Padres Projections and assumes the level of Millennium's indebtedness remains constant following the 2014 Transaction.[49] Ms. Austin Smith concludes that by 2018, Millennium would have insufficient cash reserves to meet interest payments.[50]  Ms. Austin Smith purports to consider "Millennium's prospects for refinancing the Term Loan at maturity in April 2021" and notes that "Millennium was above the levels typically associated with Caa-C credits."[51]

24.  To perform the capital adequacy test for Millennium, Ms. Austin Smith creates a single "downside" scenario in which she makes two adjustments to her already substantially negative Modified Padres Projections.  She increases the percentage reduction in Medicare NRPS due to

---

[46] Austin Smith Report, ¶¶ 151, 156.  Valuation multiples are a ratio of an observed measure of an asset's value (such as price) in the numerator to a financial metric of the firm, such as "earnings, book values, or sales" in the denominator.  In relative valuation, multiples are a method to "standardize the values" of an asset to allow for comparison to comparable companies in the market.  Damodaran, *Investment Valuation*, Chapter 17, pp. 1–2. Similarly, "[t]o form a valuation multiple we need both numerators and denominators.  The two numerators most often used in comparables analysis are enterprise value (EV) and equity market capitalization (= market cap or equity market value).  The former measures the market value of all the securities of the company, whereas the latter measures the market value of just the common stock.  Next, we need some denominators.  The most intuitive denominators are proxies for cash flow.  Indeed, all multiples have some deep connection to a cash flow ratio, even if the connection is not apparent."  Metrick, A., and Yasuda, A., *Venture Capital and the Finance of Innovation*, 3rd ed., Wiley, 2021, Kindle Edition ("Metrick and Yasuda, *Venture Capital*"), Chapter 12, p. 184.

[47] Austin Smith Report, Table 9.

[48] Austin Smith Report, ¶ 152.

[49] Austin Smith Report, ¶ 164.

[50] Austin Smith Report, ¶ 166.

[51] Austin Smith Report, ¶ 169.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Noridian's draft LCD from 18.3% to 33.3%.[52]  She also increases her ad hoc assessment of the decline in UDT and PGT specimen volume due to the purported reputational impact of an expected DOJ settlement from 30% to 50% (rather than a decline of 15% in 2015 and 2016, the decline is 25% in each year).[53]  She concludes that under this downside scenario, Millennium's equity value would range from negative $1,048.8 million to $1,274.8 million, leaving "Millennium with capital insufficient to sustain operations."[54]

## V.   MS. AUSTIN SMITH'S DISCOUNTED CASH FLOW ANALYSIS IS FLAWED AND UNRELIABLE

25.   Ms. Austin Smith asserts that her DCF analysis "demonstrates that Millennium was clearly rendered balance sheet insolvent as of the 2014 Transaction.  The enterprise value . . . of Millennium was $802.9 million compared with $1,761.7 million of outstanding debt. . . . In other words Millennium had a negative equity value of $958.9 million, giving effect to the 2014 Transaction."[55]  Ms. Austin Smith's DCF analysis is flawed and unreliable.

26.   Ms. Austin Smith opines without providing an explanation in her report that the proper discount rate for this exercise is a WACC of 14.8%.[56]  Ms. Austin Smith's WACC estimation is incorrect and without basis because of several errors.  Specifically,

- Ms. Austin Smith improperly includes a company-specific risk premium of 5%.

- Ms. Austin Smith incorrectly includes a small company risk premium of 1.9%.  The small company risk premium is inappropriate, does not have a theoretical basis, and is not supported by the academic literature.

- Ms. Austin Smith relies on a different set of comparable companies than the one she relies on in her comparable companies analysis.

---

[52] Austin Smith Report, ¶¶ 170–171.

[53] Austin Smith Report, ¶ 171.

[54] Austin Smith Report, ¶172; Table 10.

[55] Austin Smith Report, ¶ 145.

[56] Ms. Austin Smith does not provide a description of the basis for her estimate of the WACC.  She simply references the 2014 VPA Solvency Analysis.  In FN 285 in the Austin Smith Report, she claims that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%)."  The components of the WACC are provided in the VPA Solvency Analysis Underlying Materials, VP_ML_00002551 ("WACC Underlying Materials"), which as I understand is the underlying analysis of the 2014 VPA Solvency Analysis.  Ms. Austin Smith only references the 2014 VPA Solvency Analysis and not the WACC Underlying Materials.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

27.     Ms. Austin Smith's errors lead to a substantially inflated WACC.  As described below, correcting the above noted errors and inconsistencies in Ms. Austin Smith's WACC yields a corrected WACC of 7.2%, which implies an enterprise value of $1,970.8 million and a *positive* equity value of $209.1 million.  That is, using the corrected WACC, Millennium would be balance sheet *solvent* following the 2014 Transaction, even if one were to accept *all* of the other unsupported adjustments and assumptions Ms. Austin Smith created for this litigation (which I do not).

28.     Ms. Austin Smith's Modified Padres Projections project substantially reduced revenue.  Given her revenue projections, Ms. Austin Smith does not offer a reliable basis for estimating Millennium's projected operating expenses.  While, Ms. Austin Smith projects a revenue decrease of 28% from 2014 to 2016, she projects operating expenses, as a percentage of revenue, to increase from 38% in 2014 to 51% in 2016, a proportionate increase of about one-third, without providing a basis as to why management would maintain such levels of operating expenses if management indeed had expected such substantially reduced revenues.[57]

29.     As detailed below, Ms. Austin Smith performs multiple adjustments to Millennium's specimen volume and NRPS, as well as projected revenue from "Emerging Opportunities," which are unsupported and lack a reliable basis.[58]  She also asserts that her proposed adjustments are "one-time adjustments," but she fails to acknowledge that their impact affects *all subsequent years* creating a *permanent* effect that substantially reduces her estimate of Millennium's enterprise value.[59]

30.     Notably, she relies on hindsight to justify certain of her adjustments.  It is well-settled in the academic literature and standard valuation textbooks that employing hindsight in valuations leads to unreliable results.  For example, a well-known academic paper states that "hindsight should not be used.  Rather, the stream of returns should be estimated using the information

---

[57] **Appendix H1A**; **Exhibit 5C**.

[58] Ms. Austin Smith makes several mechanical adjustments to the Padres Projections, not all of which are described in her report, in order to implement her adjustments.  These mechanical adjustments are apparent in her work-papers and I do not modify or alter several of them.  I modify only the ones I explicitly mention in my report and accompanying exhibits.

[59] Austin Smith Report, ¶ 107.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

available as of the [relevant] time [and] expectations as of that time are particularly relevant."[60] Similarly, a standard valuation textbook notes that dramatic financial reversals are often unanticipated and while "[w]ith the benefit of hindsight, the valuations of [certain companies that experienced dramatic drop in value] (and the analyst recommendations) made in 1992 can be criticized, . . . they were reasonable, given the information available at that time."[61]

31.     Ms. Austin Smith also fails to consider that management projections incorporated a 30% haircut to the NRPS forecasts to account for reimbursement risks.[62]  Ms. Austin Smith however, without support, purports to be able to provide a "better" or "more reasonable" expectation for each risk and ignores management's contemporaneous expectations and the resulting financial projections.

---

[60] Fisher, F.M. and Romaine, R.C. (1990), "Janis Joplin's Yearbook and the Theory of Damages," *Journal of Accounting, Auditing, and Finance*, 5(1), pp. 145–157 at 153.  In this paper, Fisher and Romaine provide an example to illustrate the problems with an approach that relies on hindsight, noting that if one was to lose a yearbook with Janis Joplin's signature prior to her becoming a superstar, that does not mean that one would be deprived of a yearbook containing the autograph of a rock star.  One would be deprived of a yearbook plainly worth as much as a yearbook that contained one or more signatures, i.e., a small amount.  Associated with that yearbook was uncertainty as to whether any of the autographs it contained would ever be worth anything.  The price of the yearbook included the value of the small probability that they would.  It also included the value of the rather more likely outcome that they would not.  A yearbook equally valued by the owner at the time could have been purchased for said small value, and the owner could have, in effect, mitigated the damage by purchasing a replacement and acquiring an essentially identical asset.

[61] Damodaran, *Investment Valuation,* Chapter 1, p. 5.

[62] Padres Projections, tab "Payor Mix"; Email from A. Christoforou to J. Lee, "ML Q&A Tracker," March 30, 2014, JPMC-MIL-CORP-00219684 ("Lender Question Tracker") at JPMC-MIL-CORP-00219685; Citi Model (April 2014).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> **A. Ms. Austin Smith's findings depend on a number of assumptions and approaches that are unsupported, flawed, and unreliable**
>
> **1. Ms. Austin Smith's valuation depends on application of an incorrect and substantially inflated WACC**

32.    Ms. Austin Smith discounts her modified projected cash flows using a WACC of 14.8%.[63] This WACC is obtained by reference to the WACC from the 2014 VPA Solvency Analysis but Ms. Austin Smith provides no other basis, documentation, or analysis for this figure in her report.[64]  Ms. Austin Smith's WACC of 14.8% is incorrect and overstated.  Correcting certain errors in Ms. Austin Smith's WACC results in a WACC of 7.2%.  **Exhibit 4** shows the components of the WACC as asserted by Ms. Austin Smith and the corrections to Ms. Austin Smith's WACC that yield the corrected WACC of 7.2%.  Using this corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would increase Millennium's enterprise value by $1,168.0 million to $1,970.8 million.  This corrected valuation renders Millennium balance sheet *solvent* by $209.8 million.

33.    I also note that the discount rates estimated by the Arrangers are consistent with the corrected WACC of 7.2%.  **Exhibit 3** shows the WACCs estimated by the Arrangers and the average WACC of the Arrangers, which was 7.2%.[65]

---

[63] Austin Smith Report, ¶ 143.  As discussed above, Ms. Austin Smith also acknowledges that FTI used a WACC of 14.0% in December 2015.  Austin Smith Report, ¶ 143.  In addition, Ms. Austin Smith performs her DCF analysis using a WACC of 9.8%, which is the lowest WACC for which she provides sensitivities.  Austin Smith Report, Table 7.  Similar to her 14.8% WACC, Ms. Austin Smith provides no basis or analysis, except for FN 285, in which she states that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies plus the size premium adopted by Vantage Point (i.e., 10.0%).  However, for several reasons that I discuss below in Section 2, these five companies are not sufficiently comparable to Millennium and underestimate Millennium's business risk."

[64] Ms. Austin Smith only states that the WACC is 14.8%, referencing the 2014 VPA Solvency Analysis, and does not provide the components of the WACC.  Austin Smith Report, ¶ 143.  To correct Ms. Austin Smith's WACC, I relied on the WACC Underlying Materials.

[65] The average WACC of 7.2% does not include the BMO WACC as the WACC analysis BMO conducted is not made available to me.  The average WACC is estimated as the average of each of the remaining Arranger's average WACC.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> a)  The company-specific risk premium Ms. Austin Smith includes in the WACC has no basis in financial economics and is inappropriate

34.    Ms. Austin Smith's WACC incorporates a company-specific risk premium of 5%, an adjustment that has no basis in financial theory and the academic literature. **Exhibit 4** shows the corrected WACC, taking out the company-specific risk premium from Ms. Austin Smith's WACC.

35.    A basic principle in finance is that investors earn a return that compensates them for the systematic or non-diversifiable risks they take.[66]  Company-specific risks are diversifiable because they can be diversified by investing in additional assets.  If an investor earns a return for holding a "diversifiable" risk, then they are overcompensated.  Hence, the WACC should not contain a company-specific risk premium because investors can diversify their holdings to offset company-specific risks.  Instead, in a DCF analysis, it is the projected cash flows that should reflect the expected performance of a company, including company-specific risks.[67]  In this context, "expected" performance in the cash flows does not mean an optimistic (or a pessimistic) view of the future that ignores (or exacerbates) opportunities, risks, and uncertainties.  Instead, expected performance reflects the average (or expected) outlook in a forecast, accounting for opportunities, risks, and uncertainties faced by a company.

36.    In fact, Ms. Austin Smith appears to acknowledge that the WACC should only reflect the non-diversifiable risk of the cash flows when she states that "[t]he projected free cash flows of the firm are discounted back to the date of valuation, using a discount rate that reflects both the time value of money and non-diversifiable risk of these cash flows."[68]  In line with this, she appears to

---

[66] Brealey, R.A., Myers, S.C., and Allen, F., *Principles of Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2011 ("Brealey et al., *Principles of Corporate Finance*"), Chapter 1, p. 8.  According to the Capital Asset Pricing Model ("CAPM"), for a diversified investor, company specific risk (called 'idiosyncratic risk' or 'non-systematic risk') does not affect the value of the company.  Metrick and Yasuda, *Venture Capital*, Chapter 4, p. 58 ("The key idea of the CAPM is that beta reflects the covariance of an asset's returns with the returns on the overall market. The higher the beta, the higher the expected return. Beta risk is also called market risk, nondiversifiable risk, or systematic risk. The mathematics and intuition behind the CAPM implies that beta risk is the only kind of risk that affects the expected return of an asset."); Brealey et al., *Principles of Corporate Finance*, Chapter 8, pp. 185, 194; Damodaran, *Investment Valuation*, Chapter 4; Sharpe, W. (1964), "Capital Asset Prices: A Theory of Market Equilibrium Under Conditions of Risk," *Journal of Finance*, 19(3), pp. 425–442 ("Sharpe, 1964") at pp. 436–442.

[67] Damodaran, *Investment Valuation*, Chapter 4, pp. 9, 14–18; Sharpe, 1964, pp. 436–442; Brealey et al., *Principles of Corporate Finance*, Chapter 8, pp. 192–194; Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 330.

[68] Austin Smith Report, ¶ 41.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

exclude the company-specific risk premium from the 9.8% WACC when she states that "[t]he lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies *plus* the size premium adopted by Vantage Point (i.e., 10.0%)."[69]  Notwithstanding this acknowledgement, Ms. Austin Smith uses a WACC that incorporates a company-specific risk premium in her DCF analysis.

> b)  The small company risk premium Ms. Austin Smith includes in the WACC has no basis in financial economics and is inappropriate

37.     Ms. Austin Smith includes a premium of 1.9% in her WACC that she attributes to Millennium having a relatively small capital value.[70]  She provides no basis for including a small company risk premium in her report.  **Exhibit 4** shows the corrected WACC, taking out the small company risk premium from Ms. Austin Smith's WACC.

38.     The small company risk premium originates from the 1980s empirical finding that small stocks (those with lower market capitalizations) outperform, on average, large stocks (those with higher market capitalizations), implying that investors bear additional risks for investing in small companies.[71]  Subsequent studies however showed that the small company risk premium does not exist, i.e., investors do not earn higher returns for investing in small companies, this finding is dominated by a seasonal effect, and that the methods and studies documenting this effect are

---

[69] Austin Smith Report, FN 285 (emphasis in original).

[70] If a small company risk premium were to be used, the corrected discount rate would be 8.6% as demonstrated in **Appendix D**.  **Appendix E1** also shows the value impact on Millennium's equity value of modifying Ms. Austin Smith's adjustments alone, while maintaining all her other adjustments and assumptions, using the corrected WACC of 7.2% and the 8.6% WACC that includes a small company risk premium.  Even with a WACC of 8.6% (which includes a small company risk premium), Millennium would be balance sheet solvent if any single one of Ms. Austin Smith's adjustments pertaining to operating expenses, the purported impact of a DOJ settlement, elimination of "Emerging Opportunities," or specimen volume growth rate were to be removed.  **Appendix E2** shows the combined impact on Millennium's equity value of Ms. Austin Smith's adjustments as well as the impact of removing a portion of that combined impact.

[71] Banz, R. (1981), "The Relationship Between Return and Market Value of Common Stocks," *Journal of Financial Economics,* 9(1), pp. 3–18; Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 335.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

flawed.[72]  For example, Cochrane (2005) notes that "[t]he small-firm effect completely disappeared in 1980" and Ang (2014) states that "[s]ince the mid-1980s, however, there has been no size premium after adjusting for market risk."[73]  Horowitz et. al. (2000) find "no consistent relationship between size and realized returns."[74]  Hirshleifer (2001) notes that the "predictive power vanishes when size is measured by book value or other non-market measures."[75]  Brealey et al. (2011) note that "in the past 25 years small-firm stocks have underperformed just about as often as they have overperformed."[76]  The lack of a small company risk premium is consistent

---

[72] Blume, M.E., and Stambaugh, R.F. (1983), "Biases in Computed Returns: An Application to the Size Effect," *Journal of Financial Economics,* 12(3), pp. 387–404 at p. 388 ("Using daily returns for NYSE and AMEX stocks, we find that (1) the average size effect over the entire year is about 0.05 percent per day . . . and (2) virtually all of this full-year average is attributable to January."); Berk, J. (1995), "A Critique of Size-Related Anomalies," *Review of Financial Studies*, 8(2), pp. 275–286 at p. 284 ("We have shown that, even in an economy in which firm size and risk are unrelated, the logarithm of market value will be inversely related to expected return."); Kim, D. (1997), "A Re-Examination of Firm Size, Book-to-Market, and Earnings Price in the Cross-Section of Expected Stock Returns," *Journal of Financial and Quantitative Analysis,* 32(4), pp. 463–489 at p. 487 ("Firm size is barely significant using monthly returns, but no longer significant in explaining average stock returns using quarterly returns."); Dichev, I. (1998), "Is the Risk of Bankruptcy a Systematic Risk?" *Journal of Finance,* 53(3), pp. 1131–1147 at p. 1132 ("Third, this study finds that the size effect, strong in the 1960s and 1970s, has virtually disappeared since 1980"); Hirshleifer, D. (2001), "Investor Psychology and Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597 at pp. 1538–1539 ("The challenge for the mispricing theory is to explain how irrational investors can remain important while hemorrhaging a great deal of cash. The disappearance of the size effect in the mid-1980s and the inconsistency of the value effect in the last few years is suggestive."); Alquist, R., Israel, R., and Moskowitz, T. (2018), "Fact, Fiction, and the Size Effect," *Journal of Portfolio Management,* 45(1), pp. 1–30, pp. 3–4 ("The facts we present include the following: that the size effect diminished shortly after its discovery and publication; that it is dominated by a January seasonal effect; that it is not applicable or does not work for other asset classes outside of individual equities; that it can be made much stronger when looked at in conjunction with other factors (namely, defensive/quality factors); that the size premium mostly comes from microcap stocks and is difficult to implement in practice; and, finally, that the size effect continues to receive a disproportionate amount of attention relative to other factors with similar or stronger evidence behind them.").

[73] Cochrane, J., *Asset Pricing: Revised Edition*, Princeton University Press, 2005, Chapter 20, p. 452; Ang, A., *Asset Management: A Systematic Approach to Factor Investing*, Oxford University Press, 2014, Chapter 14, pp. 455–456.

[74] Horowitz, J.L., Loughran, T., and Savina, N.E. (2000), "Three Analyses of the Firm Size Premium," *Journal of Empirical Finance,* 7(2), pp. 143–153 at p. 143.

[75] Kent, D. D, Hirshleifer, D., and Subrahmanyam, A. (2001), "Overconfidence, Arbitrage, and Equilibrium Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597, p. 959.

[76] Brealey et al., *Principles of Corporate Finance*, Chapter 8, p. 198.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

with finance theory as there is no theoretical basis that explains why a company's size should affect estimates of its WACC.[77]

        c)  Ms. Austin Smith relies on a different set of comparable companies than the one she relies on in her comparable companies analysis to estimate her WACC

39.     In Ms. Austin Smith's comparable companies analysis, she identifies the following *five* comparable companies:  Alere, Inc. ("Alere"), Bio-Reference Laboratories, Inc. ("Bio-Reference"), Laboratory Corporation of America Holdings ("LabCorp"), Myriad Genetics, Inc. ("Myriad"), and Quest Diagnostics ("Quest").[78]  (Ms. Austin Smith later opines that her set of five comparable companies is "not sufficiently comparable to Millennium to provide a reliable estimate of value," which I address later in this report.[79])  Ms. Austin Smith's 14.8% WACC estimation, however, relies on a set of *eight* comparable companies—these five companies as well as three additional comparable companies (Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.).[80]  Ms. Austin Smith's inclusion of these three additional companies is therefore inconsistent with her comparable companies analysis.  In other words, if VPA's set of comparable companies is appropriate for the WACC estimation, Ms. Austin Smith fails to explain why she does not use that set in her comparable companies analysis.  Conversely, if VPA's set of comparable companies is "not sufficiently comparable" to Millennium, then Ms. Austin Smith does not explain how she relies on that set to estimate the WACC.

40.     This is a methodological inconsistency and had Ms. Austin Smith correctly used her set of comparable companies, the WACC would decrease.  Interestingly, Ms. Austin Smith appears to agree that the WACC must be "compiled" from her set of five comparable companies; in a footnote, she writes that "The lowest WACC in Table 7 (9.8%) corresponds approximately to a WACC compiled from the identified guideline public companies . . . ."[81]— but suggests that she

---

[77] There are some studies that do find the existence of a small company risk premium, if one accounts for cash flow shocks.  Hou, K. and Dijk, M. (2019), "Resurrecting the Size Effect:  Firm Size, Profitability Shocks, and Expected Stock Returns," *The Review of Financial Studies*, 32(7), pp. 2850–2889.  This however implies that, if there is a company size effect, then the adjustment needs to be made on the expected cash flows and not the cost of equity through the inclusion of a small company risk premium.

[78] Austin Smith Report, ¶ 151.

[79] Austin Smith Report, ¶ 152.

[80] 2014 VPA Solvency Analysis at ML_DE_00263292.

[81] Austin Smith Report, FN 285.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

only does it for the 9.8% WACC.  **Exhibit 4** shows the comparable companies correction to Ms. Austin Smith's WACC.

41.     The assumption regarding the set of comparable companies affects Ms. Austin Smith's WACC estimation in two ways, through: (1) the assumption about the Company's market "beta," i.e., the exposure to the market risk,[82] and (2) Ms. Austin Smith's assumption that Millennium's target capital structure equals the industry (defined as the set of comparable companies) average.[83] **Appendix F** provides a detailed description.  Ms. Austin Smith provides no backup material for her analysis, so it is unclear what Ms. Austin Smith's methodology is and whether it is appropriate.

> d)  If Ms. Austin Smith corrected her WACC but held to her other opinions, she would conclude that Millennium was balance sheet solvent at the time of the 2014 Transaction

42.     Adjusting Ms. Austin Smith's WACC to correct her methodological flaws discussed above results in a WACC of 7.2%, substantially lower than the 14.8% WACC she uses.[84]  This implies an enterprise value of $1,970.8 million, without modifying any other adjustments and assumptions that Ms. Austin Smith makes, which renders Millennium balance sheet *solvent* by $209.1 million.  See **Exhibit 1**.

## 2.     Ms. Austin Smith's treatment of operating expenses is flawed

43.     Ms. Austin Smith projects substantially reduced revenue compared to those created by management.  In fact, Ms. Austin Smith's adjustments imply that Millennium's revenue would

---

[82] Beta is the "risk of an individual security relative to the market."  Holthausen and Zmijewski, *Corporate Valuation,* Chapter 8, p. 330.  VPA's comparable companies have an average un-levered beta of 0.77.  Ms. Austin Smith's comparable companies, on the other hand, have an average un-levered beta of 0.72.   Note that while VPA's average un-levered beta is 0.77, VPA uses an un-levered beta of 1 without any explanation.  The correction of WACC incorporates the correction of this error as well.  **Exhibit 4**, and **Appendix D** and **F** presents in detail the WACC corrections.  WACC Underlying Materials, tab "Beta."

[83] WACC Underlying Materials, tabs "Beta" and "WACC"; Austin Smith Report, ¶¶ 143, 151.

[84] While Ms. Austin Smith references FTI's WACC of 14.0%, she does not adjust it for her assumptions and opinions.  Austin Smith Report, ¶ 143.  FTI's WACC includes a company-specific risk premium ("unsystematic risk premium") of 6%, a small company premium of 2.15%, and it is based on a different set of comparable companies (FTI includes four additional companies—Opko Health, Inc., Psychemedics Corp., Sonic Health Limited, and Meridian Bioscience, Inc.— and it excludes Bio-Reference Laboratories).  FTI December 2015 Valuation at KPMG-ML-EA15WB-0000772–0773.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

decrease by approximately 15.3% in 2015 and 14.9% in 2016, and by 2018, Millennium would have just over half of the revenue originally projected by management.[85] While Ms. Austin Smith substantially reduces Millennium's projected revenue, she projects operating expenses, as a proportion of revenue, to increase by more than 34% from 2014 to 2016 without providing a basis as to why management would maintain such levels of operating expenses if management indeed expected revenue to decline as substantially as she suggests it should have decreased.[86] **Exhibit 5A** shows Millennium's historical operating expenses as a percentage of revenue, the Padres Projections, and Ms. Austin Smith's modified operating expenses. Ms. Austin Smith projects not only increasing operating expenses as a proportion of revenue, but also operating expenses to be a substantially higher percentage of revenue compared to the average historical levels and the Padres Projections. Ms. Austin Smith provides no basis for her assumptions in her report.

44. Ms. Austin Smith classifies operating expenses driven by specimen volume as "variable" and those driven by a fixed growth rate as "fixed" operating expenses.[87] She also has a hybrid category of operating expenses that are driven by specimen volume and a fixed growth rate.[88] While Ms. Austin Smith reduces Millennium's projected revenue substantially, she does not offer any basis for failing to adjust operating expenses in a manner consistent with her substantially lower expected revenue. Specifically, for the period 2014–2016, Ms. Austin Smith decreases revenue by approximately 28% but increases "fixed" operating expenses by over 6%.[89] Ms. Austin Smith provides no assessment of why a major revenue reduction, such as the one she

---

[85] **Appendix H1A**.

[86] **Exhibit 5A**. Ms. Austin Smith projects the operating expenses as percentage of revenue to increase from 38% in 2014 to 51% of revenue in 2016. This is an increase of approximately 34% as a proportion of revenue.

[87] YAS Workpaper 1, tabs "Brattle Expense Build" and "Expenses Per Unit Costs." While the fixed operating expenses do not change with specimen volume, they are not fixed in the sense of being constant—they grow based on a fixed growth rate that Ms. Austin Smith adopts from the Padres Projections. For the variable operating expenses, she uses the same unit costs assumptions as in the Padres Projections and estimates operating expenses driven by specimen volume based on her modified projected specimen volume growth rates. Austin Smith Report, ¶ 136 ("I use the same unit costs assumptions as the Padres Projections. Unit costs are calculated by dividing each expense by specimen volume. . . . To estimate expenses under the Modified Padres Projections, I multiplied the unit costs by the adjusted UDT and PGT volumes discussed above.").

[88] Austin Smith Report, ¶ 136; YAS Workpaper 1, tabs "Brattle Expense Build" and "Expenses Per Unit Costs."

[89] "Fixed" operating expenses in the Modified Padres Projections are approximately $119.5 million (18% of projected revenue) in 2014 and grow to approximately $126.9 million (26% of projected revenue) in 2016. This corresponds to a 6% increase. **Exhibit 5C**; YAS Workpaper 1, tabs "Detailed Income Statement" and "Brattle Expense Build."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

projects, would lead to an increase in "fixed" operating expenses, which include expenses such as fixed salaries and wages, education and marketing, or stock compensation expense.[90]  In addition, for 2014–2016, Ms. Austin Smith assumes that "variable" operating expenses decrease by approximately 12%, substantially less than the approximately 28% decrease in her projected revenue.[91]  Ms. Austin Smith again provides no analysis that would explain why variable operating expenses, which include expenses such as volume driven salaries and wages, billing, and variable commissions, should decrease less than projected revenue.

45.     As a result, Ms. Austin Smith's assumptions increase operating expenses from 38% of revenue in 2014 to 51% of revenue in 2016, a proportionate increase of about one-third.[92]  The Padres Projections assumed operating expenses to be 36% of revenue in 2014 and 34% in 2016. Millennium's actual operating expenses were 31% of revenue in 2013.[93]  Put differently, Ms. Austin Smith projects Millennium's operating expenses to increase faster than the Company's revenue.  **Exhibit 5A** shows Millennium's historical and projected, as well as Ms. Austin Smith's modified operating expenses as a percentage of revenue.  She provides no basis in her report as to why management would maintain such levels of operating expenses if management indeed expected the substantially reduced revenues she asserts.[94]  In fact, in July 2015, after the various adverse outcomes had materialized and revenue had declined, Millennium identified ways to cut

---

[90] YAS Workpaper 1, tab "Brattle Expense Build."

[91] "Variable" operating expenses in the Modified Padres Projections are approximately $111.2 million (16% of projected revenue) in 2014 and decline to approximately $98.0 million (20% of projected revenue) in 2016.  This corresponds to a 12% decrease.  **Exhibit 5C**; YAS Workpaper 1, tabs "Detailed Income Statement" and "Brattle Expense Build."

[92] **Exhibit 5C**.

[93] **Exhibit 5A**.

[94] Ms. Austin Smith's operating expenses assumptions result in substantially lower EBITDA margins—*lower* than any contemporaneous estimate and *lower* than many analyses performed around or after the time Millennium filed for bankruptcy, as demonstrated in **Exhibits 7C** and **8C**.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

its operating expenses by $35.7 million (or approximately 15%) per year.[95]  This further suggests that Ms. Austin Smith's proportional increase in operating expenses is without a reliable basis.

46.     Modifying Ms. Austin Smith's operating expenses assumptions by keeping operating expenses constant at her 2014 projected level of 38% of revenue, while using her inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $220.7 million to $1,023.6 million.[96]  **Exhibits 5B** and **5C** show the modification to Ms. Austin Smith's operating expenses.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis), would *increase* her valuation by $645.3 million to $2,616.1 million.  See **Exhibit 1**.

> 3.     **Ms. Austin Smith provides no reliable basis for the specimen volume reduction she applies to account for the purported reputational impact of a potential DOJ settlement**

47.     Ms. Austin Smith asserts that the Padres Projections "unreasonably failed to account" for the "reputational impact" that would follow an "expected" settlement with the DOJ.[97]  To account for the purported "reputational impact of an expected US DOJ Settlement," Ms. Austin Smith uses certain volume declines that she says two other companies—Ameritox and Calloway—experienced following their respective DOJ settlements (in 2010 and 2012), and reduces

---

[95] Management identified the following categories for potential operating expenses reductions: Headcount ("[c]ompany wide reduction in force," "[c]onsolidation of territories"), Commissions ("[e]limination of commissions on unpaid volume"), Consulting Expenses ("[e]limination of outsourced functions whenever possible," "[e]limination of professional fees related to revenue cycle"), and reductions in travel.  Alvarez & Marsal Presentation, "Presentation to the Department of Justice," July 22, 2015, ML_DE_00167434 at ML_DE_00167456 ("The largest contributors to savings will come from headcount and commissions savings that account for 65% of total run-rate savings.").

[96] I modify Ms. Austin Smith's operating expenses by making them constant at her 2014 projected level of 38% of revenue.  This is a conservative assumption as the modification could keep operating expenses constant at the 2013 level of 31% of revenue or the 2014 Padres Projections level of 36% of revenue.  Both modifications would increase Millennium's enterprise value by more than $221 million.  **Exhibit 5A**.

[97] Austin Smith Report, ¶¶ 131–132.  As I understand, on March 27, 2012, Millennium received a subpoena from the DOJ for production of documents in connection with an investigation into federal healthcare offenses.  Email from H. Appel to S. Karanikolaidis, Letter from the United States Attorney to Martin Price, "Re: Subpoena Regarding Millennium Laboratories, Inc.," March 27, 2012, JPMC-MIL-CORP-00214601, JPMC-MIL-CORP-00214602.  As I further understand, the DOJ informed Millennium in December 2014, nine months after the 2014 Transaction, that it would be pursuing claims against the Company.  Hardaway Declaration, ¶ 17.  Following the DOJ investigation, the Company entered into a settlement with the DOJ on May 20, 2015.  Hardaway Declaration, ¶ 27.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium's UDT and PGT specimen volume by 15% in 2015 and by another 15% in 2016.[98] Notably, she references an email dated April 3, 2015 ███████████████████████ ████████████████████████████.[99]  She also references a June 14, 2015 email by Millennium's then-CEO that stated ████████████████████████ ████████████████████████████████████████████ ██████████████████[100]  Ms. Austin Smith, however, provides no evidence corroborating the supposed volume declines at the two companies.  Moreover, she provides no analysis in her report for what caused the revenue declines for these two companies, if they in fact occurred, or whether they were a result of these companies' settlements with the DOJ (due to reputational impact or otherwise).  Ms. Austin Smith provides no explanation for why Millennium's management should have expected to experience a similar volume decline and no explanation as to how Millennium should have predicted this impact more than a year before the emails in question were sent.[101]

48.     Notably, in the same June 2015 email cited by Ms. Austin Smith, Millennium's then-CEO stated that ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████[102]  Ms. Austin Smith has failed to explain how this email provides a basis, in April 2014, for the 30% adjustment that she applies across 2015 and 2016.  In fact, more than a year after the 2014 Transaction, Millennium, with the assistance of Alvarez & Marsal, analyzed the impact of the DOJ investigations on

---

[98] Austin Smith Report, ¶¶ 86, 131–132.

[99] Email from T. Kennedy to B. Hardaway, et al., "RE: Privileged," April 3, 2015, ML_DE_00597259 at ML_DE_00597260.

[100] Austin Smith Report, ¶ 131; Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015, ML_DE_00559337 at ML_DE_00559338.

[101] Austin Smith Report, ¶¶ 131–132.  Ms. Austin Smith models her adjustment of a purported reputational impact of a DOJ settlement as starting in January 2015.  Ms. Austin Smith has failed to provide a basis for such an assumption in her report.  Her adjustment affects specimen volume starting in 2015 in a permanent manner, as she effectively reduces the base of specimen volume that subsequent volume is based on.  Had she assumed a later start date of a potential DOJ settlement, her adjustment would have been smaller.

[102] Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015 ML_DE_00559337 at ML_DE_00559338.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Ameritox and Calloway only to conclude that Millennium would model a decline of 5% starting in July 2015 and a further 10% the following year.[103]

49.     Importantly, Ms. Austin Smith has failed to show that the volume declines for Ameritox and Calloway were not instead the result of the termination of the practices investigated by the DOJ (or, indeed, any other factors), in whole or in part.  Moreover, Ms. Austin Smith separately adjusts the Padres Projections for the termination of the custom profiles and the POC Free Test Cup program, which, as I understand, were among the targets of the DOJ's investigation into Millennium.[104]  In other words, she has no basis for her assertion and provides no evidence in her report, that these volume declines were due to reputational impacts resulting from the DOJ settlements.

50.     Modifying the impact of this adjustment by restoring the UDT and PGT specimen volume declines of 15% in 2015 and 15% in 2016, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $383.8 million to $1,186.6 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $1,138.7 million to $3,109.5 million.  See **Exhibit 1**.

> **4.     Ms. Austin Smith provides no reliable basis for the elimination of the revenue from Millennium's "Emerging Opportunities"**

51.     The Padres Projections included anticipated future revenue from "Emerging Opportunities," which as I understand, included government contracts with the Department of Defense and Department of Veterans Affairs, and international opportunities.[105]  Ms. Austin Smith asserts that "Emerging Opportunities should not form part of the expected cash flows when assessing balance sheet solvency" because "[t]he revenue[] appear aspirational rather than

---

[103] Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model – version 2," June 14, 2015 ML_DE_00559337 at ML_DE_00559338.

[104] Austin Smith Report, ¶¶ 128, 133.

[105] Lender Presentation at JPMC-MIL-CORP-00170167; Management Presentation at ML–DE–00058293; Lender Presentation Audio at minute 35:00.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

expected."[106]  Ms. Austin Smith disregards the actions the Company took in order to realize these opportunities and her characterization relies on the simple observation, which in turn relies on hindsight, that "[t]he Emerging Opportunities do not appear in the subsequent management model dated June 8, 2015."[107]

52.    Indeed, Ms. Austin Smith completely ignores Millennium's business actions related to "Emerging Opportunities," including the federal supply schedule contract that Millennium was awarded in June 2013 and the company internal infrastructure that Millennium had built to assist with the government contracts.[108]  Regarding the government contracts, Millennium stated that it had hired a former Walgreens professional who was experienced in government supply strategy.[109]  Regarding international opportunities, Millennium had a dedicated team and planned to partner with existing companies in emerging markets and license Millennium's technologies.[110]

53.    Moreover, Ms. Austin Smith's rationale is flawed as it is inconsistent with the broadly accepted principles of conducting a DCF analysis in which projected cash flows *should* reflect the *expected future* cash flows.[111]  In other words, Millennium had taken actions so that these "Emerging Opportunities" could materialize and prior to the 2014 Transaction, constituted expected future cash flows.  She does not explain why management should not have expected this revenue given the actions it had taken.

54.    Modifying the impact of this adjustment by restoring the revenue from "Emerging Opportunities," while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's

---

[106] Austin Smith Report, ¶ 67.

[107] Austin Smith Report, ¶ 67.  Ms. Austin Smith simply states that "[t]he Confidential Information Memorandum contains limited discussion on the composition of Emerging Opportunities.  Rather, discussion is limited to a description of the employment background of Elizabeth Peacock, the 'Executive Vice President of Emerging Opportunities.'"  Austin Smith Report, ¶ 67.

[108] Lender Presentation Audio at minutes 34:00–36:00.

[109] Lender Presentation at JPMC-MIL-CORP-00170167; Lender Presentation Audio File at minute 36:20 ("So we went out and hired Walgreens' top person that was running their Department of Defense governmental business and he joined us six weeks ago. . . . He built Walgreens' governmental program over the last several years, a multibillion dollar business.").

[110] Lender Presentation Audio at minutes 37:00–40:00.

[111] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 4, p. 156 ("A financial model is a set of assumptions (or forecast drivers) and relations (or formulas) that produces predictions regarding the future performance of a company.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

enterprise value by $192.8 million to $995.7 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $663.6 million to $2,634.5 million.  See **Exhibit 1**.

> **5.     Ms. Austin Smith's other adjustments related to Millennium's business practices are unfounded, rely on hindsight, and are created based on an ad hoc and unreliable methodology**

55.     Ms. Austin Smith performs additional adjustments to specimen volume and NRPS to account for certain of Millennium's business practices.  Specifically, her adjustments include: reduction of specimen volume growth rates starting from 2014 to reflect her assumed historical and industry trends; reduction of Medicare NRPS to capture the MUE denials and reduction of specimen volume to capture the discontinuance of the POC Free Test Cup program; reduction of NRPS to capture the discontinuance of custom profiles, and the draft Noridian LCD.

56.     Ms. Austin Smith's adjustments to specimen volume growth rates are unsupported and unreliable.  Specifically, Ms. Austin Smith provides no reliable basis for her assertion that management's specimen volume projections were inconsistent with Millennium's historical trends, industry trends, and expected performance.  Without providing adequate basis, she extrapolates Millennium's future trends from a small sample of historical trends and in doing so, relies on a small set of historical data, and disregards without explanation additional available data that contradict her conclusions.  Notably, her assertions about the industry trends are incorrect based on publicly available sources.

57.     In performing her adjustments for the MUE denials and the POC Free Cup Test, Ms. Austin Smith relies on hindsight bias, which renders her analysis flawed and unreliable.  Finally, Ms. Austin Smith provides no reliable basis for the estimated impact of the custom profile elimination and her methodology is ad hoc.

> a)  Ms. Austin Smith's ad hoc specimen volume growth rate adjustments are unsupported and unreliable

58.     Ms. Austin Smith asserts that the Padres Projections were "inconsistent with Millennium's historical trends, Millennium's reasonably anticipated future trends and with broader UDT

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

industry trends."[112]  Specifically, she claims that "the projected specimen CAGR of 9.8% from 2014 to 2018 for Medicare was unreasonably high given declining growth rates and negative growth of 3.4% in the first quarter of 2014 actuals when compared to the fourth quarter of 2013 actuals."[113]  To adjust for these supposed historical and industry trends, she reduces Medicare specimen volume growth rate to 0% in 2014, 2% in 2015, and 3% for 2016 and onwards, and commercial payors specimen volume growth rate to 10% in 2014, 5% in 2015 and 3% from 2016 onwards.[114]

59.    Ms. Austin Smith inappropriately uses Millennium's historical performance to extrapolate its future performance without considering other factors that could affect expectations about future performance.  Relying solely on (a narrow subset of) historical data is inappropriate when projecting future expectations.  When creating projections, one must consider all the factors that would affect future performance including the contemporaneous market conditions, industry conditions and expectations, and company-specific characteristics.[115]  While historical data are useful "in forecasting future growth, they have considerable noise associated with them," especially for young, growth companies, such as Millennium.[116]  Ms. Austin Smith disregards this fundamental principle and instead adjusts Millennium's specimen volume growth rates downwards by simply claiming that they were "inconsistent with contemporaneous trends."[117]

---

[112] Austin Smith Report, ¶ 108.

[113] Austin Smith Report, ¶ 109.

[114] Austin Smith Report, ¶ 109.

[115] Holthausen and Zmijewski. *Corporate Valuation*, Chapter 4, p. 157 ("We conduct a competitive analysis of the company's industry and assess the company's competitive advantage in order to help us identify and forecast the forecast drivers; to help assess the role that general economic, industry, and comparable company factors could have in developing a financial model; and to assess the reasonableness of the forecasts.").

[116] Damodaran, *Investment Valuation*, Chapter 11, p. 11; Damodaran, *Investment Valuation*, Chapter 1, p. 5 ("Mature firms tend to be easier to value than growth firms, and young start-up companies are more difficult to value than companies with established produces and markets.  The problems are not with the valuation models we use, though, but with the difficulties we run into in making estimates for the future.").  Damodaran, *Investment Valuation*, Chapter 1, p. 12 ("If past growth in earnings is not a reliable indicator of future growth at many firms, it becomes even less so at smaller firms.").  Damodaran, *Investment Valuation*, Chapter 1, p. 15 ("[R]apid changes that high growth firms go through over time make historical growth rates unreliable indicators of future growth for these firms.").  Millennium was founded in December 2007 and at the time, concentrated on urine drug testing services.  2014 Confidential Information Memorandum at ML_DE_00269130.

[117] Austin Smith Report, ¶ 109.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

60.     Notably, her specimen volume growth rates appear to be random as she provides no analysis that would show how she estimated them.  Specifically, Ms. Austin Smith's specimen volume growth rate adjustments of 0% in 2014, 2% in 2015, and 3% for 2016 and onwards for Medicare are without any basis.  These numbers are not derived from any empirical analysis; Ms. Austin Smith simply asserts these numbers.

61.     Interestingly, Ms. Austin Smith not only inappropriately relies *only* on historical data but she also considers *only* a subset of the available data.  Specifically, to infer Millennium's future trends, Ms. Austin Smith uses the Company's historical data on quarterly specimen volume from 1Q2012 to 1Q2014 and quarterly specimen volume growth rate from 2Q2012 to 1Q2014, as opposed to using Millennium's available data from 2009, i.e., she disregards three years of additional data (out of the six years for which Millennium has data).[118]  She also uses the specimen volume growth rate changes of only one quarter, between 4Q2013 and 1Q2014.[119]  In other words, Ms. Austin Smith relies on *one* data point (change from 4Q2013 to 1Q2014) to extract expectations about Millennium's long-term performance.  Even if one were to accept Ms. Austin Smith's methodology, which I do not, her reliance on a such a small sample when additional data is available renders her analysis unreliable.

62.     Notably, Ms. Austin Smith's conclusions contradict the available information.  First, she claims that "[a]s shown in Table 9, specimen volumes had been declining since 2009."[120]  Table 9 does not provide data on specimen volume,[121] but her own Table 4 shows that Millennium's specimen volume has been *increasing* every year.  Specifically, it *increased* by 185.0%, 123.0%, 64.4%, and 30.5% between 2009-2010, 2010-2011, 2011-2012, 2012-2013, respectively.[122] While indeed the *growth rate* for the specimen volume *increase* has been declining, Ms. Austin Smith fails to explain why that implies that specimen volume would reasonably be expected to

---

[118] Austin Smith Report, Figure 2; Figure 6; ¶ 109.

[119] Austin Smith Report, ¶¶ 58–59 ("Furthermore, the disparity in growth rates increased over this time period. Indeed, in first quarter of 2014, the quarter immediately prior to the 2014 Transaction, Millennium's Medicare specimen volume contracted by 3.2%, whereas commercial specimen volume grew by 4.4%. . . . The slowing growth trend was even more pronounced for Medicare specimen volume, decreasing to only 12.9% from 2012 to 2013 and contracting by 3.2% from the fourth quarter of 2013 to the first quarter of 2014.").

[120] Austin Smith Report, ¶ 109.

[121] Table 9 provides data on "Guideline Public Company Valuations."  Austin Smith Report, p. 87.

[122] Austin Smith Report, Table 4.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

decrease.  In fact, between 2009 and 2013, Millennium experienced rapid growth as shown by various performance measures.  Net revenue grew at a CAGR of 77%, with annual growth rates between 21% and 149%.[123]  Adjusted EBITDA grew at a CAGR of 74%, with annual growth rates between 7% and 147%.[124]  **Exhibits 2A**, **2B**, and **2C** show CAGRs for Millennium's revenue, EBITDA, and EBITDA margins, as well as the Padres Projections and Ms. Austin Smith's Modified Padres Projections.  Ms. Austin Smith's extrapolated trends are inconsistent with this information.

63.     Moreover, Ms. Austin Smith emphasizes the volume growth rate from a single quarter, 1Q2014.  For example, Ms. Austin Smith states that "between the first quarter of 2012 and first quarter of 2014, quarterly specimen volume growth declined from 14.5% to 2.2%."[125]  But a quarterly growth rate of 2.2% amounts to a growth rate of over 9% on an annualized basis, which is closer to Millennium's projected average annual specimen growth rate of 8.2%.[126]

64.     Ms. Austin Smith also claims that the Padres Projections were inconsistent with "contemporaneous trends" and "projected laboratory testing industry growth" as "the UDT industry, especially quantitative testing, was under significant pressure from government and commercial payors" but fails to provide any support for her assertion.[127]  Between 2007 and 2012, drugs-of-abuse testing, which includes UDT, was one of the three fastest growing clinical lab tests in terms of Medicare Part B spending between 2007 and 2012.[128]  In fact, as I understand, testing for opiates and cannabinoids were among the top 15 fastest growing lab tests in terms of Medicare Part B spending.[129]  By 2014, the U.S. market for pain management was approximately

---

[123] Lender Presentation at JPMC-MIL-CORP-00170161.

[124] Lender Presentation at JPMC-MIL-CORP-00170161.

[125] Austin Smith Report, ¶¶ 59, 78.

[126] To annualize the quarterly growth rate I use the following formula, $(1+2.2\%)^4-1$.

[127] Austin Smith Report, ¶¶ 73, 109.

[128] "Competitive Market Analysis for Laboratory Management Decision Makers," *Laboratory Economics*, 8(10), October 2013 ("Lab Econ Oct 2013"), p. 7.  Overall, Medicare Part B spending on the top 50 clinical lab tests increased by 5.2% per year from 2007 to 2012 (from $2.7 billion to $3.5 billion).  Lab Econ Oct 2013, pp. 7–9.

[129] Lab Econ Oct 2013, p. 7.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

$22.3 billion and was expected to reach $33.8 billion by 2017.[130]  Ms. Austin Smith provides no reliable basis for her adjustments that diverge substantially from these observed industry trends.

65.     Modifying the impact of this adjustment by restoring the specimen volume growth rate, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $155.0 million to $957.8 million.  Making this modification and using the corrected WACC of 7.2% without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $499.0 million to $2,469.8 million.  See **Exhibit 1**.

> b)  Ms. Austin Smith relies on hindsight to perform the adjustments for the MUE denials

66.     To adjust for the impact of MUE claim denials, Ms. Austin Smith calculates "monthly Medicare NRPS decrease between $77.7 and $83.7 from January to March 2014."[131]  To estimate this adjustment, she relies on hindsight as she uses "the total MUE-impacted revenue in 2014 as of July 2014 ($21.9 million)."[132]  Ms. Austin Smith fails to show whether these data were available to Millennium prior to the 2014 Transaction.

67.     Modifying the impact of MUE adjustment by restoring NRPS, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $87.9 million to $890.8 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $217.3 million to $2,188.1 million.  See **Exhibit 1**.

> c)  Ms. Austin Smith relies on hindsight to perform the adjustments for the discontinuance of the POC Free Test Cup Program

68.     Additionally, to estimate the impact of the discontinuance of the POC Free Test Cup program, which as I understand was at issue in the Ameritox litigation, Ms. Austin Smith incorporates "a 1.6% reduction in UDT volume in July 2014" and relies on an analysis that

---

[130] BMO Harris Bank, N.A., "Loan Underwriting Committee Memorandum," March 11, 2014, ML00008506 ("Loan Underwriting Committee Memorandum") at ML00008518.

[131] Austin Smith Report, ¶ 118.

[132] Austin Smith Report, ¶ 117.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Millennium performed in July 2014, using data "on customers that cancelled their agreements in June 2014," following the Ameritox verdict in June 2014.[133]  Ms. Austin Smith fails to show whether these data were available to Millennium prior to the 2014 Transaction.  Moreover, Ms. Austin Smith disregards information that indicates that, at the time of the 2014 Transaction, management expected to prevail on the Ameritox litigation.[134]  Instead, Ms. Austin Smith relies on hindsight, concluding that Millennium should have accurately expected the eventual outcome of the Ameritox litigation.

69.     Modifying the impact of the POC Free Test Cup program adjustment by restoring the volume reduction, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $17.4 million to $820.3 million.  Making this modification and using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $45.2 million to $2,016.0 million.  See **Exhibit 1**.

        d)  Ms. Austin Smith's adjustment for the elimination of custom profiles is ad hoc

70.     Ms. Austin Smith assumes that the practice of using custom profiles would be eliminated and to adjust for this elimination she applies a 21.8% reduction in Millennium's commercial payors NRPS.[135]  She notes that "[a]lthough the Padres Projections do reflect a decline in Millennium's commercial payor NRPS, there is no indication that this projected decline is intended to represent the impact of the likely discontinuance of Custom Profiles."[136]  She also claims that "based on data available as of the 2014 Transaction, the impact of the anticipated

---

[133] Austin Smith Report, ¶ 133.

[134] Deposition of Martin Price, April 12, 2021 ("Price Deposition"), 254:21–25 ("Q: Why were you surprised by the Ameritox verdict? A: I was expecting to succeed on our affirmative claims and to also prevail on the claims brought by Ameritox against the company."); Price Deposition, 192:10–17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Deposition of William Brock Hardaway, July 20, 2021 ("Hardaway Deposition"), 288:21–289:8 (Q: "Do you remember learning about that verdict?  A: It seems like maybe I got a call from Martin, yeah, to give me the update.  Q: And do you remember your -- what your reaction was?  A: Not really, I don't really -- other than being disappointed, feeling like we -- because our counsel had led us to believe that, you know, we should win on virtually every issue.").

[135] Austin Smith Report, ¶ 128.

[136] Austin Smith Report, ¶ 124.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

discontinuance of Custom Profiles should have reasonabl[y] been estimated to cause a much larger decline in commercial payor NRPS."[137]  Ms. Austin Smith provides no reliable basis for her conclusions and the estimated impact of the custom profile elimination.

71.    Moreover, Ms. Austin Smith's methodology for estimating the potential impact of the custom profile elimination is ad hoc.  Specifically, to estimate Millennium's revenue from custom profiles for commercial payors, she analyzes Millennium's revenue from certain Medicare billing codes.[138]  She provides no support for her approach other than a claim that "given the history of commercial payors following the trend of Medicare reimbursement, I considered the Medicare NRPS reduction to be a relevant proxy for Millennium's commercial NRPS reduction following the discontinuance of Custom Profiles."[139]  Ms. Austin Smith does not cite to any source of support for this assumption.[140]  In addition, Ms. Austin Smith assumes that revenue received from these Medicare billing codes pertains to revenue from custom profiles because two other companies, Aegis Sciences Corporation ("Aegis") and Ameritox, did not receive any Medicare reimbursement from these codes.[141]  That is, she compares certain Medicare billing codes among Millennium, Aegis, and Ameritox, and argues that if a billing code is billed by Millennium but not billed by Aegis or Ameritox, then it means that, that billing code is likely "medically unnecessary testing" and hence tied to custom profiles.[142]  Ms. Austin Smith provides no other analysis to show that the billing codes in question were tied to custom profiles and does not explore alternative explanations for why Millennium might have used billing codes not used by Aegis and Ameritox.

72.    Modifying the impact of her adjustment for the discontinuance of custom profiles by restoring the NRPS reduction, while using Ms. Austin Smith's inflated WACC of 14.8% and without making any other modifications to her adjustments and assumptions, would *increase* Millennium's enterprise value by $101.6 million to $904.5 million.  Making this modification and

---

[137] Austin Smith Report, ¶ 125.

[138] Austin Smith Report, ¶ 126.

[139] Austin Smith Report, ¶ 130.

[140] Austin Smith Report, ¶ 130.

[141] Austin Smith Report, ¶¶ 126–127 ("Of the 30 codes for which Millennium received Medicare reimbursement in 2013, there were 9 codes for which neither Ameritox nor Aegis received Medicare reimbursement. . . . In 2013, Millennium derived 21.8% of its Medicare NRPS from these codes.").

[142] Austin Smith Report, ¶ 128.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

using the corrected WACC of 7.2% (without making any other modifications to Ms. Austin Smith's analysis) would *increase* her valuation by $303.8 million to $2,274.6 million.  See **Exhibit 1**.

> **B.  Ms. Austin Smith's analysis is at odds with those completed by financial professionals in the period leading up to the 2014 Transaction**

73.    Millennium's management Padres Projections were based on management's standard approach for budgeting and forecasting analyses.[143]  As I understand, the Padres Projections were shared with VPA, the Arrangers, and TA Associates, who used these projections to perform their own valuation and sensitivity analyses.[144]  Certain elements of the Padres Projections were also shared with the credit rating agencies, S&P and Moody's, who performed the credit rating assessment of the 2014 Transaction.[145]  All of the available contemporaneous analyses concluded that Millennium was solvent.  Ms. Austin Smith completely disregards the contemporaneous analyses completed by these financial professionals leading up to the 2014 Transaction and develops, for purposes of this litigation, an analysis that is starkly at odds with these analyses.

74.    Indeed, Ms. Austin Smith's result resembles more closely the analyses prepared around the time of, or indeed after Millennium's bankruptcy in November 2015, including projections

---

[143] Padres Projections; Deposition of Tim Kennedy, September 30, 2021 ("Kennedy Deposition") at 244:7–22 (Q: "So going back to the first point you made, financial projections.  The financial projections that you did in connection with the 2014 transaction, was that largely what you just described over the last number of minutes in terms of process?  A: You mean for -- you mean the methodology that we'd go through?  Q: Correct.  So let me clarify myself. So the methodology that you used in connection with the 2014 transaction, financial projections, was that the same as the methodology that you just described as that which you generally used at Millennium? . . . THE WITNESS: Yes. I would say, generally speaking, it would be.").

[144] Millennium's $1.775 billion senior secured credit facility was rated by Moody's and S&P on March 31 and March 28, 2014, respectively.  TA Associates is a private equity firm that in 2010 invested $196 million in exchange for warrants and debentures. Deposition of Jennifer M. Mulloy, July 14, 2021 ("Mulloy Deposition") at 21:1-8.  The debentures and warrants were issued by Millennium Lab Holdings, Inc.  As part of the 2014 Transaction, Millennium Lab Holdings, Inc. transferred a 45% membership interest in Millennium to TA Associates "in exchange for the redemption of the outstanding TA warrants in [Millennium] Holdings and in satisfaction of the outstanding TA debentures." 2014 VPA Solvency Analysis at ML_DE_00263276; Mulloy Deposition, 17:20–18:6; Lender Question Tracker at JPMC-MIL-CORP-00219685.

[145] Millennium Laboratories, "Rating Agency Presentation," March 2014, JPMC-MIL-CORP-00011605.  On March 15, 2014, JPMC sent a projection model dated March 14, 2014 to the ratings agencies.  Email from A. Christoforou to D. Diaz, "Millennium Laboratories Meeting Materials," March 14, 2014 JPMC-00053824, JPMC-00053828; Email from A. Christoforou to G. Hessol, "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-MIL-CORP-00193320, JPMC-MIL-CORP-00193324.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

prepared by Millennium's management on June 8, 2015 ("June 2015 Management Projections") and a valuation conducted by FTI on April 2016 based on management projections as of December 2015.[146] These analyses were conducted after the uncertainty regarding certain risks that existed at the time of the 2014 Transaction had resolved, including the Ameritox ruling, the settlement with the DOJ and the required post-settlement operational adjustments, changes in reimbursement trends, and additional regulatory pressures.[147] The cumulative impact of these developments ultimately led to Millennium's bankruptcy on October 15, 2015.[148] **Exhibit 6** shows all available contemporaneous valuation analyses and the FTI (post-bankruptcy) December 2015 valuation analysis.

> 1. **Millennium's management prepared financial projections based on its standard practice**

75.    Millennium's standard practice was to create a budget for the upcoming year and forecasts for subsequent (relevant) years.[149] As I understand, both for the budgeting analysis and the forecasting analysis, management created projections for specimen volume, operating expenses, and reimbursement rates, i.e., NRPS.[150] Specifically, to create the budget for the upcoming year, Millennium's sales representatives offered specimen volume projections that management analyzed.[151] Following the specimen volume projections, management considered "operational

---

[146] June 2015 Management Projections; Austin Smith Report, ¶67; FTI December 2015 Valuation.

[147] Hardaway Declaration, ¶ 28.

[148] Hardaway Declaration, ¶ 28.

[149] Kennedy Deposition, 211:1–4 ("[B]udgeting is taking the current period in which is -- is coming up; for example, we are in 2021, I would do a budget for 2022 and a forecast for every year beyond that.").

[150] Kennedy Deposition, 219:14–223:15 (describing volume, reimbursement, and expense inputs into budget), 228:13-20 (describing forecast process as "very similar to the budget process").

[151] Kennedy Deposition, 219:14–24 ("Q: Okay. So focusing on your time at Millennium, can you generally describe the process that Millennium employed for budgeting. A: Similar to what I described a little earlier. You know, the sales force would basically provide volume projections, then . . . we would all get together and take a look at the sales force volume projections to make a determination as to whether or not it looked reasonable or not."); 229:2-9 (Management examined these projections by reviewing market data on "referral volumes . . . patterns, physicians . . . trends on physician ordering, number of tests per accession, what kind of new tests might be coming out of [the] R&D department, and what do we forecast the ordering capabilities of either your current referral base or even a new referral base . . . based on the type of test that you're coming out with.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

needs for equipment, people and space requirements,"[152] i.e., the operating expenses. To create the forecast for the subsequent (relevant) years, management used the one-year budget and forecasted the long-term specimen volume growth rate of existing business based on a "run rate" model.[153] Management also forecasted new business opportunities.[154] Similar to budgeting, following the projections for long term specimen volume growth, management created the projections for the long term projected expenses.[155] Finally, in forecasting reimbursement rates, management considered coverage policies for each payor, "how many times is a given test or CPT code ordered by a referring physician," and the mix of business by payor.[156]

76.    Ms. Austin Smith disregards how management created the Padres Projections, what information was available at the time, and how management accounted for the industry trends and

[152] Kennedy Deposition, 221:6–8; Deposition of Daniel Pencak, July 12, 2021, 342:13–20 ("Q: In describing the budgeting process, I think you just testified that among the things that you would do is to project costs, project rates and project volumes, is that correct? . . . A: As part of the budgeting process, yes.").

[153] Kennedy Deposition, 235:5–9. I understand that the annualized "run rate" for each year was created based on the monthly number of physician referrals. Kennedy Deposition, 234:22–236:2 ("In month one of a given year, you get one referral. In month two, if you keep that one referral, you now have that referral, and in month two, you sell a second referral. . . . So now you have -- in month one, you have one, in month two, you have two. In month three, you have three, et cetera, all the way through month 12. . . . By the time you get to month 12, you start the following year with 12. . . . And you build another 1, 2, 3, the following year. So in the healthcare business, . . . you'd refer to it as the 'annuity model,' meaning you have a core book of business when you finish. So I would say, for example, if you were exiting 2013, in order to project 2014, you would look at your run rate for '13 and you would annualize that run rate. That would give you a starting point for the subsequent year. Then in the current year, you look at the amount of sales reps you have, the amount of opportunity that you have in order to close new business, okay, in that current year, and you layer that new business volume on top of your base run rate for that year. . . . Typically gives you, you know, your volume.").

[154] Kennedy Deposition, 235:15-25 ("[I]n order to project [the next year], you would look at . . . the amount of opportunity that you have in order to close new business . . . .").

[155] Kennedy Deposition, 238:10–15 ("Q: Fair enough. Now, in the budgeting process, you mentioned how volume drives the way that you think about expenses. Is that also true in the forecasting process? A: Absolutely. Your volume drives expenses."); 238:24 – 239:22 ("So as volume grows, you need more billing -- billers and collectors to bill more of that volume, whereas you don't need more CEOs, CFOs. . . . So there are certain individuals that remain static as time goes by, but others that grow. . . . It could be customer service individuals that would need to grow based on the quantity of, not necessarily the growth in the volume, but the growth in clients that you have. So you need more customer service people. . . . And the volume that you have will drive the need for capital expenditures to acquire additional equipment. So at Millennium, we -- our main equipment were mass specs and -- because, you know, we had many, many mass specs. But if the volume got up to a high enough level, you would have to go out and buy another piece of equipment to accommodate that higher volume level.").

[156] Kennedy Deposition, 236:3–238:9 (noting that "you look at -- payer policy"). Current Procedural Terminology ("CPT") "is a uniform coding system consisting of descriptive terms and identifying codes that are used primarily to identify medical services and procedures furnished by physicians and other health care professionals. These health care professionals use the CPT to identify services and procedures for which they bill public or private health insurance programs." "HCPCS – General Information," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo, accessed on February 7, 2022.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the "reimbursement, legal, and regulatory risks."[157]  Instead, she layers on top her different views regarding the trends and risks at the time of the 2014 Transaction, based on her own view seven years later with the benefit of hindsight and in the context of this litigation.

> **2.**      **Ms. Austin Smith disregards the contemporaneous analyses by various third parties, which contradict her conclusion that Millennium was insolvent**

77.      I understand that Millennium's Padres Projections were shared with VPA, the Arrangers, and TA Associates, who relied on these projections to perform analyses of Millennium's business. Millennium was solvent according to all available contemporaneous analyses.  Ms. Austin Smith disregards these analyses and instead, for the purpose of this litigation, produces results that are starkly at odds with the contemporaneous analyses.  In fact, Ms. Austin Smith, without any analysis or basis, claims that the contemporaneous analyses did not "reflect all relevant information that was known or knowable as of the date of valuation" as "a proper DCF analysis clearly shows that Millennium was rendered balance sheet insolvent as a result of the 2014 Transaction."[158]  **Exhibits 7A**, **7B**, and **7C** show Ms. Austin Smith's revenue, adjusted EBITDA, and adjusted EBITDA margin sensitivities and contemporaneous sensitivities and downside scenarios.

78.      The Arrangers considered various downside scenarios to the Padres Projections and performed sensitivity analyses as part of their due diligence process.[159]  Millennium was *solvent* according to all available contemporaneous analyses by the Arrangers. Specifically:

- As part of the due diligence process, JMPC's internal healthcare coverage team reviewed Millennium's projections and compared them to their available industry

---

[157] Austin Smith Report, ¶ 74.

[158] Austin Smith Report, ¶ 7.

[159] JPMC was the administrative agent and a joint lead arranger of the 2014 Transaction.  Citi was the other joint lead arranger of the 2014 Transaction. SunTrust and BMO were the co-managers for the 2014 Transaction. J.P Morgan Chase Bank, N.A., Credit Agreement Among Millennium Lab Holdings II, LLC, Millennium Laboratories, LLC, and J.P. Morgan Chase Bank, N.A., et al., April 16, 2014, ML_DE_00196568; 2014 Confidential Information Memorandum at ML_DE_00269136; As I understand, SunTrust underwrote 5% of the 2014 Transaction.  Deposition of David M. Felty, July 27, 2021 ("Felty Deposition"), 137:16–22 (Q: "SunTrust provided 5 percent? A: Yes."). As I understand, BMO underwrote 5% of the 2014 Transaction, approximately $90 million.  Deposition of Phillip Ho, July 28, 2021 ("Ho Deposition"), 22:17–19 ("We were . . . 5 percent underwriter of the transaction.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

information.[160]  JPMC also visited the Company's facilities.[161]  JPMC used the Padres Projections to perform a DCF analysis and estimated an enterprise value in the range of $3.9 billion to $4.9 billion.[162]  JPMC "stress test[ed] the [Padres] model" and considered a range of potential downside scenarios and their impact on the Company's ability to service its debt obligations.[163]  Under all of these scenarios, Millennium was projected to remain solvent following the 2014 Transaction.

- Citi performed a valuation analysis in which they "sensitized and pressure tested … all aspects of [Millennium's] model, including the revenue, including the margins,

---

[160] Deposition of Ryan Griswold, July 22, 2021 ("Griswold Deposition"), 159:21–161:9 ("Q: You're accepting the company's assumptions and then as part of your diligence you're testing those assumptions; is that accurate?  A: Testing and -- and sensitizing, yes.  You also have a number of, you know, industry experts that also have to overlay, you know, what they're seeing from, you know, competitors and if the assumptions are sort of wildly off and it doesn't pass the smell test you're doing, you know, very granular quantification or quantifying type sensitivity, but you're also doing the qualification, you know, with the industry knowledge to sort of say, you know, this feels right or this doesn't feel right based on industry knowledge. Q: What industry experts are you referring to?  A: So the healthcare coverage folks who their job is to cover the industry, all the companies that make up that industry.  And if one company has wildly different assumptions than what the industry broadly is sort of saying that, you know, further, you know, raises things that we need to diligence and understand that much further.  So it's not as if somebody off the street with no industry knowledge would look at these assumptions saying, yeah, they look right. It's people that have been doing this their entire career.  Q: And those are internal JPMorgan employees, correct?  A: That's right.").

[161] Griswold Deposition, 31:22–33:7 ("Everything from, you know, multiple . . . calls, site visits, expert -- expert help, you know.").

[162] JPMC Model (April 2014), tab "DCFcredit."  Griswold Deposition, 142:19–143:17, 153:11-154:7 ("[E]ven in that . . . model [there are] growth rates in the outer years [that] are half of what they were in historical periods, and there is very little margin expansion. . . . So the company had high margins.  We're actually assuming a little bit of erosion in those margins.  So it's already a very conservative model to start with, in our minds at the time.").

[163] Griswold Deposition, 141:23-142:3, 143:4-144:4 ("[W]e're all sort of working off of [the Padres Projections] and sensitizing . . . . [T]hen we take it a step further and we say, well, what happens if . . . we're wrong and margins are even lower?  Or revenue growth is slower?  Or the CapEx [capital expenditures] is higher or? Or . . . if they are under a lot of pressure and sensitivities and downsides, can they still service the debt obligation[?]").  As I understand, JPMC did not create downside scenario models.  Griswold Deposition, 149:2–9 ("Q: And I want to go back to I think a clarification that you made at the beginning of that answer and make sure that I understand.  Which is, these are downside scenarios but you did not create a downside model; is that correct? A: I think that's accurate.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

including the CapEx line."[164]  In particular, Citi performed a DCF analysis under three different scenarios:  management case, base case, and downside case.[165]  In the management case, Citi relied on the Padres Projections and estimated an enterprise value in the range of $4.4 billion to $5.4 billion.[166]  In the base case, Citi applied a haircut to management projections, which resulted in an enterprise value in the range of $3.7 billion to $4.5 billion.[167]  In the downside case, Citi applied an additional haircut to management projections, which resulted in an enterprise value in the range of $1.9 billion to $2.2 billion.[168]  In addition, Citi performed a comparable companies analysis, which resulted in an enterprise value in the range of $3.9 billion to $5.1 billion.[169]  Under all these scenarios, including in the most conservative downside scenario, Millennium was projected to remain solvent following the 2014 Transaction.

---

[164] Deposition of Michael Tortora, July 15, 2021 ("Tortora Deposition"), 82:17–23, 125:21–126:3 ("So the general process would be we would participate in and convene a Greenlight committee, which would include a relatively fulsome memo that listed out industry details, the transaction that was being contemplated by that company, the historical and financial performance of the company that we were looking to work with as well as any other benefits, considerations, et cetera of the transaction. We would hold a Greenlight meeting, educate our committee, look to -- looking to formulate an opinion as to whether we thought the transaction was viable and then formulate a plan as to additional diligence that would be needed to complete our analysis.  We would then hold various meetings and phone calls with the company, collect the due diligence material, process and analyze that material and then when that was done, we would convene a final approval meeting with our committee to go over the findings of the due diligence and followup [sic] from any Greenlight meeting we may have had and ultimately approve the transaction or not.").

[165] Citi Model (March 2014) at CITI-T-00000209–0215; Tortora Deposition, 76:11–77:15 ("In our approval process, and specifically in the final approval process and the Final Approval Memo, we generally present three model cases to our committee.  The first one is the management model, which comes directly from the management team . . . We'll then also run what we call the base case, which is a haircut to the management model, whether that's revenue, EBITDA, more CapEx or less CapEx, some type of sensitivity[.] [A]nd then we'll also run a third case, which we call the downside case, which is oftentimes a very Draconian scenario that one even has a hard time envisioning ever happening in real life, but we will run that in order to further sensitize and further make sure that we are comfortable with the cash flow profile of the company's ability, the ability of the business to – to pay its interest expense.").

[166] In the management case, Citi's revenue multiples were 6.4x – 7.8x, and its EBITDA multiples were 11.2x – 13.7x. Citi Model (March 2014) at CITI-T-00000215.

[167] Citi Model (March 2014) at CITI-T-00000211–0212, 215.  Citi decreased management's revenue and adjusted EBITDA CAGR from 7.3% to 5.3% and from 5.9% to 3.7%, respectively.

[168] Citi Model (March 2014) at CITI-T-00000214–0215.  Citi decreased management's revenue and adjusted EBITDA CAGR from 7.3% to 0.3% and from 5.9% to 2.1%, respectively.  Notably, Citi's downside scenario resembles Ms. Austin Smith's adjusted projections, although Citi assumed a lower terminal growth rate (0.0% to 1.0%) compared to Ms. Austin Smith's 3%.  Citi however used a lower WACC of 8.5% to 9.5%.  Austin Smith Report, ¶ 144.

[169] Citi Model (March 2014) at CITI-T-00000215.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

As part of the due diligence process, Citi's internal healthcare coverage team also considered the Company's growth potential based on industry information.[170]

- SunTrust, as part of its due diligence process, "[r]eviewed and analyzed [Millennium's] projected financial performance and sensitized model to develop SunTrust Base and Downside Cases."[171] The base case was developed by SunTrust based on management's projections and was "a more conservative view from what the company present[ed.]"[172] SunTrust estimated Millennium's enterprise value based on its base case to be in the range of $3.4 billion to $4.4 billion.[173] The downside case was meant "to show further stress on the company," and did not reflect "the most likely scenario."[174] SunTrust estimated Millennium's enterprise value based on its downside case to be greater than $2.5 billion.[175] Under all available analyses, Millennium was projected to remain solvent following the 2014 Transaction.[176]

---

[170] Tortora Deposition, 90:2–16 ("In the same way that we would have conducted our diligence in regards to reimbursement, we have industry bankers within healthcare that are experts in the healthcare field that spend all their time talking to different companies and participants within the healthcare industry. So we would have relied upon them and their knowledge and judgment to attempt to measure or quantify how much growth potential was in this – was in this . . . business from an industry perspective and that's what we would have -- we would have relied upon.").

[171] SunTrust Model (March 2014) at SunTrust_MIL-DE-00011781; Felty Deposition, 69:9–19 ("In general, we have a transaction that involves an extensive analysis of the borrower, its historical financial performance, its expected future financial performance given current industry trends, competitive dynamics, and then developing our, you know, different projection models based on different assumptions and determining the companies to -- determining the company's ability to repay the proposed investments, testing the creditworthiness of the borrower."), 70:15–71:2 ("And as part of our due diligence, we don't take those projections at face value and assume those are what we believe will happen, but we develop our own model based on our own analysis of the industry and the company. So that model, which is typically -- and I've only seen it to be more conservative than a management model. It typically, because more consecutive [sic] than a management model, is yet a further -- based on additional diligence beyond just what the company provides to us. So that is one projection alternative, if you will.").

[172] Felty Deposition, 89:23–24; SunTrust Model (March 2014) at SunTrust_MIL-DE-00011801; Felty Deposition, 87:18–24 ("The base case, as I said, is meant to represent what [SunTrust] believe is the most likely outcome, taking into consideration all the factors and information [SunTrust has] available at that time, which could include changes in volume, changes in reimbursement rates, changes in overall industry dynamic").

[173] SunTrust Model (March 2014) at SunTrust_MIL-DE-00011809–1810.

[174] Felty Deposition, 90:22–24; SunTrust Model (March 2014) at SunTrust_MIL-DE-00011807; Felty Deposition, 90:24–91:15 ("But these assumptions that are used for the downside case are not necessarily our view of the realistic risks of the company but a very conservative view. . . . It's simply meant to show unexpected things that might happen that are -- but not necessarily what we believe will happen. So the risks here in this downside case are not what we believed, we believed the company would experience.").

[175] SunTrust Model (March 2014) at SunTrust MIL-DE-00011810.

[176] SunTrust Model (March 2014) at SunTrust-MIL-DE-00011810.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- BMO performed a valuation analysis and considered three scenarios: management case, base case, and downsize case.[177]  As part of the bank's due diligence process, the transaction team "[p]articipated on a six hour due diligence session with management and other arrangers," "[p]articipated on a legal due diligence call," "[r]eviewed the Management Presentation delivered on March 5th regarding [the] potential transaction," "[r]eviewed [the] model provided by the company," "[r]eviewed quarterly compliance certificates," and "participated on quarterly conference calls with management to review actual quarterly financial performance and tracking versus budget," among other items.[178]

79.    As I understand, TA Associates, a private equity firm that invested in Millennium in 2010, adjusted the Padres Projections to reflect higher revenue growth rates and lower EBITDA margins compared to the Padres Projections.[179]  TA Associates performed an investment analysis using TA Associates' required internal rate of return of 25% as the discount rate, which resulted in an enterprise value of $1.7 billion.[180]  TA Associates also performed various sensitivity analyses for WACC and the terminal rate multiples, yielding an enterprise value in the range of $1.6 billion to $3.0 billion.[181]

---

[177] Ho Deposition, 134:17–135:7 ("[Y]ou can see we came up with our own base case.  We--– because we were waiting for the full model from the company. . . .  Q: Do you recall, and specifically with respect to the 2014 transaction, if you did compare BMO's base case to management's base case? . . . A: We would have. . . ."), 135:23–25 ("Q: And BMO also prepared a downside case; is that correct? A: Yes. Yeah. We did that standard."), 134:9–23 ("Well, the base case would have been what we think the most likely performance case projection for the company would be over a certain time period.  Typically, very typically, it's based upon what management and the private equity sponsors provide.  Sometimes we'll adjust it for things we think we want to include, we want to factor in. . . . You can see we came up with our own base case.  We -- because we were waiting for the full model from the company.  So ours was probably a little bit more conservative in terms of growth, but it would have been very similar to what management provided probably").  I have not seen the analysis BMO conducted.

[178] Loan Underwriting Committee Memorandum at ML00008508.

[179] TA Associates assumed 16% CAGR for revenue and EBITDA margins approximately around 40%.  TA Associates Model, tab "2."  Taken together, these adjustments result in free cash flows that are similar to those in the Padres Projections.

[180] TA Associates Model.  An internal rate of return is a discount rate typically used by investment entities, such as private equity firms, to assess the return on their investment.  Using Ms. Austin Smith's WACC in TA Associates' analysis implies an enterprise value of $2,370.5 million.

[181] TA Associates Model, tab "2."

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

80.    VPA, Millennium's solvency advisor, used the Padres Projections in providing its solvency analysis.[182]  In particular, VPA performed a DCF analysis and estimated Millennium's enterprise value to be in the range of $2.2 billion to $2.8 billion.[183]  This range was based on sensitivity analyses that VPA performed.  VPA also performed a comparable companies analysis and estimated Millennium's enterprise value to be in the range of $2.1 billion to $2.3 billion.[184] VPA's estimated enterprise value ranges imply that Millennium was balance sheet solvent. Furthermore, in performing its analyses, VPA noted that "[b]ased on historical performance and recent developments, Management projections indicate reasonable growth in revenue and reasonable EBITDA levels through the projection period."[185]

81.    Ms. Austin Smith fails to apply any of these contemporaneous analyses.  Instead, she creates her own set of projections for the purpose of this litigation, which are substantially lower than management's projections at the time and claims without basis that her projections "reasonably incorporate risk factors that were clearly known or knowable as of the 2014 Transaction."[186]  Based on these projections, she estimates an enterprise value of $802.9 million, which is well *below* even the downside scenarios contained in all of these contemporaneous estimates.  **Exhibit 6** shows the contemporaneous valuations analyses.

---

[182] 2014 VPA Solvency Analysis at ML_DE_00263287.

[183] 2014 VPA Solvency Analysis at ML_DE_00263288.  VPA used two different methods to perform the DCF analysis, the exit multiple method and the Gordon growth method.  Under the exit multiple method, VPA estimated an enterprise value in the range of $2.4 billion to $2.8 billion.  Under the Gordon Growth method, VPA estimated an enterprise value in the range of $2.2 billion to $2.7 billion.  2014 VPA Solvency Analysis at ML_DE_00263288.  In the DCF exit multiple method, VPA used an exit 2020 EBITDA multiple of 6.0x to estimate the terminal value.  2014 VPA Solvency Analysis at ML_DE_00263290.

[184] 2014 VPA Solvency Analysis at ML_DE_00263293.  VPA's comparable companies analysis used revenue and EBITDA multiples.  VPA also performed a guideline transaction analysis and estimated Millennium's enterprise value to be in the range of $2.5 billion to $2.7 billion but noted that "guideline transactions were used for comparison purposes" and that "none of the target companies were identical or directly comparable to the Company."  2014 VPA Solvency Analysis at ML_DE_00263296–3297.

[185] 2014 VPA Solvency Analysis at ML_DE_00263300.

[186] Austin Smith Report, ¶ 7.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### C. Ms. Austin Smith's Modified Padres Projections and her valuation estimate resemble most closely projections and valuations created around Millennium's bankruptcy

82.    As I understand, on November 10, 2015, Millennium filed for bankruptcy.[187]  Various developments led to Millennium's bankruptcy, including reimbursement risks that materialized in a negative way, the proposed settlement with the DOJ and certain U.S. states, projected post-settlement operational adjustments required under a Corporate Integrity Agreement, and additional regulatory pressures.[188]  Notably, Ms. Austin Smith's Modified Padres Projections and valuation results most closely resemble the subsequent projections and valuation analyses created around the Company's bankruptcy and at a time when certain risks, contingent as of April 2014, had actually materialized.

83.    In late December 2014, nine months after the 2014 Transaction, the DOJ informed Millennium that it would pursue certain claims against the Company and filed a civil complaint on March 19, 2015.[189]  On February 9, 2015, Noridian also informed Millennium that as of March 11, 2015, the Company's Medicare billing privileges would be revoked due to "alleged administrative billing abuses relating to claims allegedly submitted by Millennium for services provided, after their dates of death, to 59 Medicare beneficiaries."[190]  On May 20, 2015, the DOJ entered into a settlement agreement with Millennium, which stipulated that the Company would pay $256 million to settle the DOJ and *qui tam* matters.[191]

84.    Following these events, on June 8, 2015, the Company prepared an updated five-year forecast, the June 2015 Management Projections.[192]  On July 22, 2015, the Company informed the DOJ that it was unable to pay the fine and a restructuring would be necessary to facilitate the

---

[187] Hardaway Declaration, p. 45.

[188] Hardaway Declaration, ¶ 28.

[189] Hardaway Declaration, ¶ 17.

[190] Hardaway Declaration, ¶ 18.  The Company received notice of additional basis for Medicare billing revocations in May 2015.  Hardaway Declaration, ¶ 22.

[191] Hardaway Declaration, ¶ 27; Term Sheet between Millennium Health, LLC and the Department of Justice, May 20, 2015, ML_DE_00201432.  The DOJ, along with certain U.S. States, were parties the settlement agreement with Millennium.  The settlement initially provided that the Company would pay $250 million but was later amended for a payment of $256 million.  Hardaway Declaration, FN 7.

[192] Hardaway Declaration, ¶ 28; June 2015 Management Projections.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

settlement payment.[193]  On July 29, 2015, management presented revised projections ("July 2015 Management Projections").[194]  On October 15, 2015, the Restructuring Support Agreement was signed.[195]  On November 10, 2015, more than 18 months after the 2014 Transaction, Millennium declared bankruptcy.  When Millennium filed its prepackaged plan of bankruptcy, it also filed updated projections in its disclosure statement dated November 10, 2015 ("November 2015 Management Projections"), which were subsequently updated resulting in the "December 2015 Management Projections."[196]  In April 2016, FTI performed a valuation analysis for the restructured Company using the December 2015 Management Projections, in which it estimated Millennium's enterprise value at $979.5 million.[197]  This is approximately $177 million *higher* than Ms. Austin Smith's estimate even though it was completed *after* the adverse events Ms. Austin Smith claims should have been accounted for had already materialized.[198]

85.    Ms. Austin Smith's Modified Padres Projections and valuation results most closely resemble these subsequent projections and valuation analyses.  **Exhibit 8A** compares the revenue projections of the June 2015 Management Projections, the July 2015 Management Projections, the November 2015 Management Projections, the December 2015 Management Projections, and Ms. Austin Smith's Modified Padres Projections.  Ms. Austin Smith's projected revenue are *below* the June 2015 Management Projections and only slightly above the July 2015, November 2015, and December 2015 Management Projections.  **Exhibit 8B** shows that similarly, Ms. Austin Smith's EBITDA projections are *below* the June 2015 Management Projections and only slightly above the July 2015, November 2015, and December 2015 Management Projections.  **Exhibit 8C**

---

[193] Hardaway Declaration, ¶ 30.

[194] Millennium Laboratories, "Financial Projections Overview to Lenders," July 29, 2015, ML_DE_00023852.  These projections appear to be similar to the management projections in FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("September 2015 Management Projections").

[195] Hardaway Declaration, ¶ 33.

[196] *In re Millennium Lab Holdings II, LLC, et al.,* "Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization," filed on November 10, 2015, Exhibit H, Financial Projections, p. 5; FTI December 2015 Valuation at KPMG-ML-EA15WB-0000764.

[197] FTI December 2015 Valuation at KPMG-ML-EA15WB-0000745.

[198] Ms. Austin Smith's valuation analysis includes projections for 2014 and 2015, unlike FTI's projection period, which starts in 2016.  YAS Workpaper 1; FTI December 2015 Valuation at KPMG-ML-EA15WB-0000768.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

shows that Ms. Austin Smith's EBITDA margin projections are *lower* than or almost equal to all 2015 management projections.

## VI.   COMPARABLE COMPANIES ANALYSIS

86.   Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent given her own EBITDA multiples analysis.[199] Ms. Austin Smith finds that, based on *EBITDA multiples* Millennium's implied equity value ranges between *positive* $23 million and *positive* $1.5 billion.[200]

> **A.   Ms. Austin Smith conducts and then disregards a comparable companies analysis, which shows that Millennium was balance sheet solvent under her EBITDA multiples analysis**

87.   Ms. Austin Smith identifies five companies as comparable:  Alere, Bio-Reference, LabCorp, Myriad, and Quest.[201]  While she asserts that "for several reasons, these five companies are not sufficiently comparable to Millennium to provide a reliable estimate of value," she proceeds to use them to estimate revenue and EBITDA multiples on the basis of the Last Twelve Months ("LTM"), forecasted 2014, and forecasted 2015.[202]  Based on these multiples, she performs a comparable companies analysis of Millennium.  Ms. Austin Smith then asserts that "the most likely conclusion of value that results from [her comparable companies] methodology is that the 2014 Transaction rendered Millennium insolvent or with inadequate capital."[203]

88.   Specifically, Ms. Austin Smith finds that, when using 2014 and 2015 *revenue multiples* and her substantially reduced forecast of 2014 and 2015 revenue, the implied equity value of

---

[199] Austin Smith Report, ¶¶ 149–160, Table 9.

[200] Austin Smith Report, Table 9.  Ms. Austin Smith also estimates revenue multiples, which yield an implied equity value of negative $1.2 billion to negative $503 million.

[201] Austin Smith Report, ¶ 151.  While Ms. Austin Smith identifies these five comparable companies, she uses a different set of companies as comparables in her various analyses.  For example, when she estimates the adjustment for the purported reputational impact of the DOJ investigation, she looks at Ameritox and Calloway, and when she estimates the impact of custom profile discontinuance, she looks at Ameritox and Aegis.  Austin Smith Report, ¶¶ 128, 131.

[202] Austin Smith Report, ¶¶ 152, 156.

[203] Austin Smith Report, ¶ 159.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Millennium is between negative $503 million and negative $1.238 billion.[204]  However, Ms. Austin Smith fails to establish that revenue multiples are appropriate to value Millennium; it is likely that they are not.  Revenue multiples require that there be similar operating margins across the comparable companies and the company that is being valued.  If this is not the case, revenue multiples can end up "assigning high values to firms that are generating high revenue growth while losing significant amounts of money."[205]  Ms. Austin Smith fails to examine whether Millennium's operating margins were comparable to her set of comparable companies.

89.    By contrast, Ms. Austin Smith finds that, based on *EBITDA multiples*, Millennium's implied equity value ranges between *positive* $23 million and *positive* $1.5 billion.[206]  Ms. Austin Smith's own analysis using EBITDA multiples suggests that Millennium was balance sheet *solvent*, even when using her substantially downward revised EBITDA estimates in her Modified Padres Projections.  While a comparable companies analysis based on EBITDA multiples has various shortcomings, EBITDA multiples are better measures of company values than revenue multiples.[207]

90.    Ms. Austin Smith's comparable companies analysis yields these results even though it incorporates her substantial and inappropriate revenue and cost adjustments to the Padres

---

[204] Austin Smith Report, Table 9.

[205] Damodaran, *Investment Valuation*, Chapter 20, pp. 1–2 ("The biggest disadvantage of focusing on revenue is that it can lull you into assigning high values to firms that are generating high revenue growth while losing significant amounts of money.  Ultimately, a firm has to generate earnings and cash flows for it to have value.  While it is tempting to use price-sales multiples to value firms with negative earnings and book value, the failure to control for differences across firms in costs and profit margins can lead to misleading valuations."); Holthausen and Zmijewski, *Corporate Valuation*, Chapter 14, p. 710 ("Of course, if all a company's earnings-based numbers are negative, we can use revenue multiples, for revenue are never negative.  We know, however, that revenue multiples are more sensitive to differences in comparability – particularly differences in cost structures – than earnings-based multiples.").

[206] Austin Smith Report, Table 9.

[207] Damodaran, *Investment Valuation*, Chapter 18, p. 46 ("[T]he enterprise value to EBITDA multiple is a firm value multiple. In the last two decades, this multiple has acquired a number of adherents among analysts for a number of reasons.  First, there are far fewer firms with negative EBITDA than there are firms with negative earnings per share and thus fewer firms are lost from the analysis.  Second, differences in depreciation methods across different companies – some might use straight line while others use accelerated depreciation – can cause differences in operating income or net income but will not affect EBITDA.  Third, this multiple can be compared far more easily across firms with different financial leverage – the numerator is firm value and the denominator is a pre-debt earnings – than other earnings multiples.  For all of these reasons, this multiple is particularly useful for firms in sectors that require large investments in infrastructure with long gestation periods.").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

Projections.[208]  Correcting either of these sets of adjustments would further increase Millennium's projected EBITDA and revenue, thus increasing the value Ms. Austin Smith would estimate for Millennium using her comparable companies analysis.

## VII.    ABILITY TO PAY DEBT TEST

91.    Ms. Austin Smith also analyzes Millennium's ability to pay its debts as they became due.[209]  Ms. Austin Smith bases this analysis on whether Millennium was projected to have sufficient unlevered free cash flows or cash on hand to make the interest and principal payments required under the 2014 Transaction.[210]  Using her Modified Padres Projections, Ms. Austin Smith concludes that Millennium would not have sufficient unlevered free cash flow or cash on hand to make its required debt payments.[211]  However, as discussed above, Ms. Austin Smith's Modified Padres Projections are flawed and unreliable.  Consequently, her conclusion that Millennium would be unable to pay its debts as they become due is similarly unreliable and unsupported.

92.    Ms. Austin Smith also disregards the analysis and conclusions of the credit rating agencies (S&P and Moody's) that rated Millennium's 2014 Transaction, which included the $1.775 billion Term Loan B and the $50 million revolver.  Both credit rating agencies concluded that Millennium was *not* near default, with S&P noting that the Company had "the capacity to meet its financial commitments on the obligation."[212]

---

[208] Ms. Austin Smith states that "[g]iven the substantial expected deviation in profitability of Millennium from historical results (due to known or knowable risk factors), references to valuations based on LTM or 2014 revenue or EBITDA should not be considered indicative of Millennium's valuation.  As the Revised Padres Projections demonstrate, the impact of the known or knowable risks were not anticipated to impact Millennium's cash flows until 2015 (and not on a full-year basis, until 2016).  Thus, indications of value derived from Millennium's 2015 financial results are a relatively more accurate estimate of Millennium's value (as compared to LTM or 2014 financial metrics)."  Austin Smith Report, ¶ 160.

[209] Austin Smith Report, ¶ 164.

[210] Austin Smith Report, ¶¶ 164–166.

[211] Austin Smith Report, ¶¶ 165–166.

[212] S&P Rating Update; Moody's Rating; "Intro to Credit Ratings," *Standard & Poor's*, available at https://www.spglobal.com/ratings/en/about/intro-to-credit-ratings, accessed on February 9, 2022 ("S&P Intro to Credit Ratings"); "Rating Scale and Definitions," *Moody's*, available at https://www.moodys.com/sites/products/productattachments/ap075378_1_1408_ki.pdf, accessed on February 7, 2022 ("Moody's Rating Scale and Definitions").

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

> **A.  Ms. Austin Smith's conclusion that Millennium would be unable to pay its debts is unreliable**

93.    Ms. Austin Smith concludes that Millennium would be unable to pay interest on its Term Loan B starting in 2018.[213]  Ms. Austin Smith's conclusion relies on using her unsupported Modified Padres Projections.  Removing her adjustments, however, shows that Millennium would be able to pay interest on the Term Loan B throughout the life of the loan.[214]  In fact, modifying only her adjustment to the Padres Projections for the purported reputational impact of the DOJ settlement implies that Millennium would have the ability to make interest payments on the Term Loan B throughout the life of the loan.[215]

94.    Ms. Austin Smith also considers Millennium's "prospects for refinancing the Term Loan at maturity in April 2021" and notes that "Millennium was above the levels typically associated with Caa-C credits."[216]  Specifically, she estimates that under her Modified Padres Projections, Millennium's leverage ratio would be 8.7 times EBITDA by December 31, 2020, which she claims to be near the median leverage ratio of Moody's "Caa-C" rated loans.[217]  Ms. Austin Smith also claims that "[u]nder the reasonable downside projections," Millennium's leverage ratio would be 19.8 times EBITDA by December 31, 2020.[218]  She then concludes that "[t]here was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021."[219]  Ms. Austin Smith provides no other analysis or support.

95.    Modifying her adjustments shows that Millennium's leverage would never exceed 4.7 times EBITDA and would be 1.4 times EBITDA as of December 31, 2020.[220]  In fact, modifying only her adjustment for the purported reputational impact of the DOJ settlement implies that

---

[213] Austin Smith Report, ¶ 166.

[214] **Appendix H2A**.

[215] **Appendix H2B**.

[216] Austin Smith Report, ¶ 169.

[217] Austin Smith Report, ¶ 169.

[218] Austin Smith Report, ¶ 169.

[219] Austin Smith Report, ¶ 169.

[220] **Appendix H3A**.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Millennium's leverage would never exceed 5.3 times EBITDA, and would decline to 4.4 times EBITDA by December 31, 2020.[221]

### B. Ms. Austin Smith fails to engage with the credit ratings for the 2014 Transaction

96.      S&P and Moody's rated Millennium's 2014 Transaction, which included the $1.775 billion Term Loan B and the $50 million revolver, as B+ and B1, respectively.[222]   While S&P and Moody's rated the 2014 Transaction as below investment grade, cautioning about the considerable risks associated with it, they did not offer a rating near or at default.  As I discuss below, Ms. Austin Smith disregards these credit ratings, and the conclusions and analyses of the credit rating agencies.

97.      Credit ratings are an assessment of an issuer's ability to meet its financial obligations and reflect a relative ranking of risk.[223]  In Millennium's case, credit rating agencies assigned a rating that implied that the 2014 Transaction was "considered speculative" and "subject to high credit risk."[224]  The ratings *did not* reflect that the 2014 Transaction was "of poor standing," "near default," or "in default."[225]

98.      S&P assigned the 2014 Transaction a B+ rating.[226]  S&P's rating category B indicates that the issuer "has the capacity to meet its financial commitments on the obligation," but that "[a]dverse business, financial, or economic conditions will likely impair the [issuer's] capacity or

---

[221] **Appendix H3B**.

[222] S&P Rating; S&P Rating Update; Moody's Rating.  S&P and Moody's rated both Millennium and the 2014 Transaction, and each provided the same rating for both.  A typical credit rating scale has a top rating of 'AAA,' which reflects the highest category in the rankings, that is, an opinion on the lowest probability of default; and the lowest rating 'D,' which reflects default.  Credit rating agencies distinguish between investment-grade and below investment grade (or, "speculative" or "high yield"), where bonds rated as Baa3/BBB- and above are classified as investment grade, and bonds rated as Ba1/BB+ and below are classified below investment grade.  "Updated Investor Bulletin: The ABCs of Credit Ratings," *U.S. Securities and Exchange Commission*, October 12, 2017, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_creditratings, accessed on February 7, 2022 ("The ABCs of Credit Ratings"); S&P Intro to Credit Ratings; Moody's Rating Scale and Definitions.

[223] The ABCs of Credit Ratings.

[224] Moody's Rating Scale and Definitions.

[225] Moody's Rating Scale and Definitions.

[226] S&P Rating Update, p. 1.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

willingness to meet its financial commitments on the obligation."[227]  S&P noted that the rating reflected a "stable outlook" and a "meaningful (50%-70%) recovery in the event of a payment default."[228]  S&P's rating reflected the rating agency's expectation that Millennium's (1) revenue growth would "continue outperforming that of the broad laboratory services industry," as S&P forecasted "mid-teens revenue growth in 2014 driven by double-digit volume increases partially offset by single-digit reductions in reimbursement rates," and (2) adjusted EBITDA margin would "gradually contract by around 350 basis points (bps) over the next three years due to reimbursement rate cuts."[229]  In putting together these ratings, S&P considered Millennium's exposure to "industry and competitive developments" and "to Medicare and Medicaid reimbursement" risks, as well as the possibility of "reimbursement rate reductions from Millennium's commercial contracts."[230]  Thus, S&P based its ratings on then-known risks, including reimbursement risks, and cautioned that it could lower the rating in the event that Millennium's "operating performance falls meaningfully short of [its] expectations."[231]

99.     Similarly, Moody's assigned the 2014 Transaction a B1 rating,[232] which indicates that the issuance is "subject to high credit risk."[233]  Moody's rating reflected a "stable rating outlook" and the rating agency's expectation "of continued rapid growth -- which will be largely organic -- and

---

[227] S&P Global Ratings Definitions.

[228] S&P Rating, p. 1.  In fact, Ms. Austin Smith is incorrect when she states that the "[t]otal recovery under the $1.75 billion facility was estimated at 34%" as her estimation incorrectly ignores that, following Millennium's bankruptcy, the $1.75 billion credit facility was "converted into $600 million of new term loans and 100% of the beneficial ownership of Millennium."  Austin Smith Report ¶ 104; Hardaway Declaration, ¶ 38.

[229] S&P Rating Update, p. 2.

[230] S&P Rating Update, p. 2.

[231] S&P Rating Update, p. 3 ("We could lower the rating in the event that Millennium's operating performance falls meaningfully short of our expectations and results in 2014 debt to EBITDA significantly above 5.0x.  This scenario could encompass a single-digit revenue decline coupled with a 300 basis point (bp) EBITDA contraction and could materialize if one of Millennium's large competitors such as Laboratory Corp. or Quest Diagnostics strategically expanded into the pain management drug testing field and won significant market share from Millennium.  In addition, it could be induced by a substantial reimbursement rate cut resulting in lower revenue and compressed margins for Millennium.  Potential emergence of alternative pain management approaches and medications with lower propensity to cause addiction also could significantly curtail the demand for pain management drug testing and adversely affect the company's prospects.").

[232] Moody's Rating, p. 1.

[233] "What is a Credit Rating?," *Moody's*, available at https://ratings.moodys.io/ratings#:~:text=Moody's%20long%2Dterm%20ratings%20are,of%20one%20year%20or%2 0more.&text=Such%20ratings%20use%20Moody's%20Global,in%20the%20event%20of%20default, accessed on February 7, 2022.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

very strong margins" and that the Company's "increased scale and solid free cash flow [would] allow Millennium to quickly reduce leverage through a combination of EBITDA growth and debt repayment."[234]  Moody's considered "the high leverage the [Company would] initially have following the close of the dividend/recapitalization transaction," the fact that Millennium was "relatively small when compared to many other corporate issuers," and that the "majority of Millennium's revenue [would] continue to come from its core toxicology testing service line as the revenue contribution from new services [would] remain relatively modest in the near term."[235] Moody's also cautioned that the rating could be downgraded if Millennium "were to experience operating difficulty in its core business. . . ."[236]

100.    Without basis, Ms. Austin Smith fails to engage with these credit ratings that were created contemporaneously with the 2014 Transaction.

## VIII.   CAPITAL ADEQUACY TEST

101.    Ms. Austin Smith also concludes that Millennium had unreasonably small capital following the 2014 Transaction.[237]  To reach this conclusion she claims that "[i]f a company is left with unreasonably small capital under a reasonable downside scenario, it follows that the company's unreasonably small capital is reasonably foreseeable" and concludes that Millennium would be even more insolvent under what she purports to be a "reasonable downside scenario" than under the Modified Padres Projections.[238]

102.    In her "reasonable downside scenario" Ms. Austin Smith builds on her Modified Padres Projections by making two further adjustments:

---

[234] Moody's Rating, p. 1.

[235] Moody's Rating, p. 1.

[236] Moody's Rating, p. 1 ("Given Moody's expectation that leverage will decline following the debt financed distribution, a downgrade of the rating is not expected in the near term.  However, if the company were to experience operating difficulty in its core business or undertake a significant debt financed acquisition or shareholder initiative, the rating could be downgraded.  More specifically, the rating could be downgraded if debt to EBITDA is expected to be sustained above 5.0 times.").

[237] Austin Smith Report, ¶¶ 170, 172.

[238] Austin Smith Report, ¶¶ 170–172.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

- She assumes that Medicare NRPS would drop by 33% as a result of the Noridian LCD rather than 18.3%.[239]

- She assumes that the purported reputational impact of the DOJ settlement would lead to a 50% decrease in specimen volume rather than 30%.[240]

103.   The extension of the adjustment due to the purported reputational impact of the DOJ settlement to the Padres Projections is similarly unjustified.  As discussed above, she provides no basis for her adoption of an ad hoc 50% decrease in specimen volume from the reputational consequences of the DOJ settlement.  Ms. Austin Smith has failed to establish that this adjustment forms a "reasonable downside scenario," and it suffers from all the flaws of the Modified Padres Projections on which it is based.

104.   In addition, Ms. Austin Smith's capital adequacy test relies on her incorrect and inflated WACC range of 9.8% – 14.8%.[241]  Correcting Ms. Austin Smith's WACC to 7.2% and making no other adjustments to her Modified Padres Projections shows that Millennium was solvent and could have withstood a $209.1 million decrease in enterprise value before becoming insolvent. See **Exhibit 1**.

Signed: _Amy Hutton_ _____

Amy Hutton, Ph.D.

February 14, 2022

---

[239] Austin Smith Report, ¶ 171.

[240] Austin Smith Report, ¶ 171.

[241] Austin Smith Report, ¶ 172.

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 178 of 273

## *In Re Millennium Lab Holdings II, LLC*
## Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
### *($ millions)*

|  | Selected WACCs[3] | |
| --- | --- | --- |
|  | **14.8%** | **7.2%** |
| **Millennium's Enterprise Value Based on Ms. Austin Smith's Modified Padres Projections[4]** | $802.86 | $1,970.83 |
| **Millennium's Equity Value Based on Ms. Austin Smith's Modified Padres Projections[5]** | -$958.89 | $209.08 |
| **Marginal Impact on Millennium's Equity Value[6]** | **Marginal Increase** | |
| Modify Ms. Austin Smith's treatment of operating expenses[7] | $220.73 | $645.30 |
| Modify reduction of 15% in 2015 and 15% in 2016 to UDT and PGT specimen volume due to the purported reputational impact of the DOJ settlement[8] | $383.75 | $1,138.69 |
| Restore Emerging Opportunities[9] | $192.82 | $663.63 |
| Modify Medicare and Commercial Payors UDT specimen volume growth rate adjustments from 2014 through 2020[10] | $155.01 | $498.99 |
| Modify adjustment of 1Q2014 Medicare NRPS for MUE denials[11] | $87.93 | $217.28 |
| Modify 1.6% reduction in UDT specimen volume in July 2014 due to the discontinuance of the POC Free Test Cup Program | $17.36 | $45.20 |
| Modify 21.8% reduction in Commercial Payor's NRPS in July 2015 due to the discontinuance of custom profiles | $101.62 | $303.77 |

## *In Re Millennium Lab Holdings II, LLC*
## Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
### *($ millions)*

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:

[1] Equity value is calculated as the difference between Millennium's enterprise value and $1,761.7 million—the level of outstanding debt incurred by Millennium associated with the Term Loan B transaction.  Austin Smith Report, ¶ 145.  Marginal impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections from the equity value after applying each modification.

[2] I do not modify Ms. Austin Smith's Medicare net revenue per specimen ("NRPS") decrease attributable to the draft Noridian local coverage determination ("LCD"), Austin Smith Report, ¶¶ 120–123.  In addition, I do not modify various other changes in the Modified Padres Projections relative to the Padres Projections, such as the use of actual first quarter 2014 ("1Q2014") financial results as opposed to Padres projections for 1Q2014.  As I do not fully revert Ms. Austin Smith's mechanical changes to the Padres Projections, I refer to the changes described above as modifications to Ms. Austin Smith's adjustments.  Austin Smith Report, ¶ 110.

[3] WACC refers to the Weighted Average Cost of Capital.  14.8% reflects Ms. Austin Smith's WACC, Austin Smith Report, ¶ 143.  7.2% reflects Ms. Austin Smith's Corrected WACC (see Exhibit 4 for a detailed description).

[4] These figures show Millennium's enterprise value at the selected WACCs without any modifications to the Modified Padres Projections.

[5] These figures show Millennium's equity value at the selected WACCs without any modifications to the Modified Padres Projections.  A positive value implies that Millennium would be balance sheet solvent.

[6] A positive marginal impact on equity value associated with a modification means that the modification increases Millennium's equity value relative to the equity value based on the Modified Padres Projections at selected WACCs.

[7] This modification adjusts Ms. Austin Smith's operating expenses to a constant percentage of revenues (38%), which corresponds to Ms. Austin Smith's projected operating expenses as a percentage of revenues in 2014.  The marginal impact reflects the impact on unlevered free cash flow of the difference between Ms. Austin Smith's projected operating expenses in the Modified Padres Projections and operating expenses maintained at 38% of revenues.  (See Section V.A.2 and Exhibit 5C for a detailed description).

[8] UDT refers to Millennium's urine drug testing business.  PGT refers to Millennium's pharmacogenetics business.  DOJ refers to the U.S. Department of Justice.

[9] This modification restores the revenue and expenses associated with the Padres Projections' Emerging Opportunities.

[10] Reflects the impact of modification to Ms. Austin Smith's UDT volume growth rate adjustments for Medicare and Commercial payors.  Ms. Austin Smith reduces Medicare and Commercial Payor specimen volume growth rates to 0.0% in 2014, 2.0% in 2015, and 3.0% in 2016 and onwards, and to 10.0% in 2014, 5.0% in 2015, and 3.0% in 2016 and onwards respectively.  In this modification I restore the Padres Projections' specimen volume growth rates for Medicare and Commercial Payors.  Austin Smith Report, ¶ 109.

[11] MUEs refer to Medically Unlikely Edits.  This item reflects modifications to Ms. Austin Smith's modeling of an NRPS decrease for January, February, and March 2014 (1Q2014) by $77.7, $83.7, and $82.1, respectively.  Austin Smith Report, ¶ 118 and YAS Workpaper 1, "MUE w LCD Adjustment" tab.

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 180 of 273

# In Re Millennium Lab Holdings II, LLC
## Historical and Projected Revenues
### 2009 – 2020



Revenue (millions)

Legend:
- Austin Smith Modified Padres Projections
- Padres Projections
- Historical Values

**CAGR**
Historical Values: 77.3%
Austin Smith Modified Padres Projections: -1.3%
Padres Projections: 8.7%

Data labels:
- 2009: $64.0
- 2010: $161.0
- 2011: $233.0
- 2012: $522.0
- 2013: $633.0
- 2014: $676.9 (Austin Smith Modified); $733.3 (Padres)
- 2015: $573.1 (Austin Smith Modified); $788.8 (Padres)
- 2016: $487.7 (Austin Smith Modified); $853.1 (Padres)
- 2017: $517.8 (Austin Smith Modified); $933.0 (Padres)
- 2018: $540.9 (Austin Smith Modified); $1,008.1 (Padres)
- 2019: $560.0 (Austin Smith Modified); $1,070.6 (Padres)
- 2020: $577.0 (Austin Smith Modified); $1,134.7 (Padres)

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note: Historical values are as reported in the Lender Presentation. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1. In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189). The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189). The fiscal year for Millennium corresponds to a calendar year. The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows: CAGR = (2013 revenue/2009 revenue) ^ (1/4) - 1. The CAGR for the projection period is calculated as follows: CAGR = (2020 revenue/2013 revenue) ^ (1/7) - 1.

**EXHIBIT 2B**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



*In Re Millennium Lab Holdings II, LLC*
**Historical and Projected Adjusted EBITDA**
2009 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note: Historical values are as reported in the Lender Presentation. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1. EBITDA refers to Earnings Before Interest, Taxes, Depreciation, and Amortization. Adjusted EBITDA includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income. In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189). The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189). The fiscal year for Millennium corresponds to a calendar year. The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows: CAGR = (2013 Adjusted EBITDA/2009 Adjusted EBITDA) ^ (1/4) - 1. The CAGR for the projection period is calculated as follows: CAGR = (2020 Adjusted EBITDA/2013 Adjusted EBITDA) ^ (1/7) - 1.



*In Re Millennium Lab Holdings II, LLC*
**Historical and Projected Adjusted EBITDA Margin**
2009 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984 ("2012 Confidential Information Memorandum")

Note: Historical values are as reported in the Lender Presentation. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1. EBITDA refers to Earnings Before Interest, Taxes, Depreciation, and Amortization. Adjusted EBITDA includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income. In 2011, Millennium "changed from a qualitative testing model to a quantitative pricing model" in a "[s]trategic decision to switch to [an] LC-MS/MS" equipment platform that served as a "[k]ey competitive differentiator" (2012 Confidential Information Memorandum at ML_DE_00087037; Lender Presentation at JPMC-MIL-CORP-00170189). The Lender Presentation noted that "[m]anagement understood [this] strategic decision would result in price/EBITDA decline [for 2011]" (Lender Presentation at JPMC-MIL-CORP-00170189). The fiscal year for Millennium corresponds to a calendar year. The Compound Annual Growth Rate ("CAGR") for the historical period is calculated as follows: CAGR = (2013 Adjusted EBITDA margin/2009 Adjusted EBITDA Margin) ^ (1/4) - 1. The CAGR for the projection period is calculated as follows: CAGR = (2020 Adjusted EBITDA Margin/2013 Adjusted EBITDA Margin) ^ (1/7) - 1.

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 182 of 273

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXHIBIT 3



## *In Re Millennium Lab Holdings II, LLC*
## WACCs Employed by Arrangers and Ms. Austin Smith[1]

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Citi Model (March 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)")

Note:
[1] WACC refers to the Weighted Average Cost of Capital.  Arrangers consist of J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank N.A. ("Citi"), BMO Harris Bank, N.A. ("BMO"), and SunTrust Bank ("SunTrust").  I have not seen the valuation analysis BMO conducted.
[2] JPMC conducted base case and downside case valuations.  The same WACC was employed in both of these valuations.
[3] The Average of Arrangers 7.2% is calculated as the average WACC of SunTrust, JPMC, and the midpoint of Citi (9.00%).
[4] Citi conducted base case, management case, and downside case valuations and employed the displayed WACC range (8.50% to 9.50%) across all three valuation scenarios.

## In Re Millennium Lab Holdings II, LLC
## Ms. Austin Smith's Corrected WACC
### Using Comparable Companies Identified in Ms. Austin Smith's
### Comparable Companies Analysis[1]

**Cost of Equity - Modified Capital Asset Pricing Model (CAPM)**[2]

| | Ms. Austin Smith's WACC | | | Ms. Austin Smith's Corrected WACC[3] | | |
|---|---|---|---|---|---|---|
| Risk-free rate | | | 3.2% | | | 3.2% |
| Market equity risk premium | | 6.2% | | | 6.2% | |
| Relevered beta[4] | x | 1.10 | | x | 0.85 | |
| Beta adjusted equity risk premium[5] | | | 6.8% | | | 5.2% |
| Size premium | | | 1.9% | | | 0.0% |
| Company-specific risk adjustment | | | 5.0% | | | 0.0% |
| **Estimated cost of equity** | | | **16.9%** | | | **8.5%** |

**Cost of Debt**[6]

| | Interest Rate | Weight | Weighted Cost | Interest Rate | Weight | Weighted Cost |
|---|---|---|---|---|---|---|
| Pre-tax cost of debt (pro forma) | | | | | | |
| Term Loan B | 5.3% | 97.0% | 5.1% | 5.3% | 97.0% | 5.1% |
| Weighted average pre-tax cost of debt[7] | | | 5.1% | | | 5.1% |
| Tax-effect on cost of debt | | 40.0% | -2.0% | | 40.0% | -2.0% |
| **Estimated after-tax cost of debt** | | | **3.1%** | | | **3.1%** |

| **Weighted Average Cost of Capital (WACC)** | **Cost of Capital** | | **% in Capital Structure** | **Weighted Cost** | **Cost of Capital** | | **% in Capital Structure**[8] | **Weighted Cost** |
|---|---|---|---|---|---|---|---|---|
| Debt | 3.1% | x | 14.6% | 0.4% | 3.1% | x | 23.4% | 0.7% |
| Equity | 16.9% | x | 85.4% | 14.4% | 8.5% | x | 76.6% | 6.5% |
| **Estimated WACC** | | | | **14.8%** | | | | **7.2%** |

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 184 of 273

# *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC
Using Comparable Companies Identified in Ms. Austin Smith's

Comparable Companies Analysis[1]

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*")

Note:
[1] The corrected WACC of 7.2% is based on Ms. Austin Smith's *five* comparable companies from her comparable companies analysis, which are Alere Inc., Bio-Reference Laboratories Inc., Laboratory Corp. of America Holdings, Myriad Genetics Inc., and Quest Diagnostics Inc.  Austin Smith Report, ¶ 151. The WACC of 14.8% is estimated based on a different set of *eight* comparable companies than Ms. Austin Smith's set.  This different set includes three additional companies: Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.  WACC Underlying Materials, "Beta" tab.  For details, see Appendix F.
[2] CAPM refers to the Capital Asset Pricing Model.  According to Holthausen and Zmijewski, *Corporate Valuation*, "[t]he expected return of an individual security in the CAPM is equal to the return on the risk-free asset plus a risk premium. The risk premium is equal to the risk of the security relative to the risk in the market multiplied by the risk premium for holding the market portfolio."  Beta is the "risk of an individual security relative to the market."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.  "The cost of capital in the CAPM [...] is equal to the risk-free rate plus one risk premium."  Holthausen and Zmijewski, *Corporate Valuation*, p. 328.
[3] The WACC Underlying Materials employ a number of rounding conventions, while I use unrounded figures throughout my WACC calculations.  In particular, in the WACC underlying materials, levered betas are rounded to the nearest 0.05 (for example, a beta of 0.82 is rounded down to 0.80.  A beta of 0.83 is rounded up to 0.85).  These rounded values are used in subsequent steps in the WACC calculation.  Cost of equity and cost of debt (weighted by their respective share of capital structure), and the resulting WACC are each rounded to the nearest 0.1%.
[4] For the relevered beta, I use the average of the unlevered betas of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis, as calculated in the WACC Underlying Materials, relevered to the average capital structure of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis. See Appendix F for more details on the de- and re-levering process used to adjust the comparable companies' betas.  According to Holthausen and Zmijewski, *Corporate Valuation*, "we first measure the CAPM common equity betas of the comparable companies and potentially the company we are valuing (if it is publicly traded) and then unlever the common equity betas to measure the unlevered beta for the company we are valuing. Once we measure the unlevered beta for the company we are valuing ... we lever the unlevered beta to measure the equity beta of the company we are valuing."  Holthausen and Zmijewski, *Corporate Valuation*, p. 453.
[5] Beta adjusted equity risk premium is equal to the product of the relevered beta and the market equity risk premium.
[6] The cost of debt reflects lenders "required or expected rate of return, which is based on the timing, magnitude, and riskiness of the expected cash flows."  Holthausen and Zmijewski, *Corporate Valuation*, p. 395.
[7] Cost of debt is weighted by Term Loan B's share of Millennium's pro forma total debt as of March 31, 2014 (97%).  WACC Underlying Materials, "Sources&Uses" tab.
[8] The capital structure represents the capital structure of the comparable companies.  The corrected WACC of 7.2% is estimated using the average capital structure of the five comparable companies identified by Ms. Austin Smith. The 14.8% WACC is based on a different set of eight comparable companies compared to Ms. Austin Smith's five comparable companies.  WACC Underlying Materials, "Beta" tab.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 5A**



*In Re Millennium Lab Holdings II, LLC*
**Historical and Projected Operating Expenses
as a Percentage of Revenue
2009 – 2018**

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147 ("Lender Presentation"); Millennium Laboratories, Inc. and Subsidiary, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2008 and 2009," JPMC-0000302; Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2010 and 2011," JPMC-MIL-CORP-00223784; Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2011 and 2012," JPMC-MILCORP-00191350; Millennium Lab Holdings II, LLC and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2013 and 2014," ML_DE_00024982

Note: Historical operating expenses as a percentage of revenue are calculated as: (Gross Profit Adjusted EBITDA + Depreciation and Amortization) / Net Revenue. Historical Gross Profit, Adjusted EBITDA, and Net Revenue are taken from the Lender Presentation. Historical Depreciation and Amortization is taken from Millennium's audited financials. The values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.

## *In Re Millennium Lab Holdings II, LLC*
## Modified Padres Projections Incremental Operating Expenses



Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 187 of 273

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections")

Note: The cumulative figure in each column represents the total operating expenses projected in the Modified Padres Projections. For instance, in 2015 Ms. Austin Smith projected the total operating expenses to be $254.00 million. The blue segments show what Ms. Austin Smith's operating expenses would have been had they remained constant at 38% of revenue, as Ms. Austin Smith's projected them to be in 2014. In 2014, Ms. Austin Smith projected operating expenses to be $258.93 million. The red segments from 2015 – 2018 show Ms. Austin Smith's "incremental operating expenses." That is, the operating expenses above those that would have represented 38% of revenue. In 2013, historical operating expenses constituted 31% of revenue. YAS Workpaper 1, "IS Detail" tab. In the Padres Projections, operating expenses were projected to constitute 36% of revenue in 2014. YAS Workpaper 1, "LeverageModel" tab.

# *In Re Millennium Lab Holdings II, LLC*
## Modified Padres Projections Operating Expenses as a Percentage of Revenue



Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections")

Note: The blue line (38%) represents Ms. Austin Smith's 2014 projected operating expenses as a percentage of revenue. The bars represent Ms. Austin Smith's projected operating expenses as a percentage of revenue in each year and are separated into their fixed and variable components. Green represents variable operating expenses, while red represents fixed operating expenses. Variable and fixed costs are classified as in the Austin Smith Report (YAS Workpaper 1). The blue columns represent operating expenses associated with RxAnte, which Ms. Austin Smith does not adjust relative to the Padres Projections. The RxAnte operating expenses are not classified as fixed or variable.

## *In Re Millennium Lab Holdings II, LLC*
## Enterprise Value Ranges by Selected Parties[1]



Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 189 of 273

## *In Re Millennium Lab Holdings II, LLC*
## Enterprise Value Ranges by Selected Parties[1]

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1; J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Model (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 ("Citi Model (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 ("SunTrust Model (March 2014)"); TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH_00090311, TA_MLH-00090312 ("TA Associates Model"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); FTI Consulting, "Millennium Health LLC:  Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743 ("FTI December 2015 Valuation"); *In re Millennium Lab Holdings II, LLC, et al.*, Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings, filed on November 10, 2015 ("Hardaway Declaration"); Millennium Management Projections, April 12, 2014, ML_DE_00057999

Note:
[1] Selected parties include J.P. Morgan Chase Bank, N.A. ("JPMC"), Citibank, N.A. ("Citi"), SunTrust Bank ("SunTrust"), and Vantage Point Advisors ("VPA") (Millennium's contemporaneous solvency advisor).  The investment analysis of TA Associates (Millennium's private equity sponsor), which ranges from $1,627 to $3,007, is excluded because they used their internal rate of return (24.3%) to discount the cash flows.  TA Associates Model, "2" tab.
[2] Citi conducted base case, management case, and downside case valuations. The enterprise value range for the base case was $3,718 – $4,517. The enterprise value range for the management case was $4,424 – $5,394.  The enterprise value range for the downside case was $1,861 – $2,242.   Citi Model (March 2014) at CITI-T-00000229–231.
[3] JPMC conducted base case and downside case valuations. The enterprise value range for the base case was $3,674 – $4,737. The enterprise value range for the downside case was $2,571 – $3,277.  JPMC Model (April 2014), "MAIN" and "DCFCredit" tabs.
[4] Following Millennium's bankruptcy in November 2015 (Hardaway Declaration, p. 45), FTI Consulting ("FTI") conducted a valuation of Millennium based on management projections as of December 2015.  FTI December 2015 Valuation.
[5] Austin Smith Report  ¶ 145.
[6] The solvency threshold is the value at which Millennium's enterprise value is equal its net outstanding debt.  Austin Smith Report, Table 7 and "LeverageModel" tab of the Padres Projections.  Values to the right of the solvency threshold imply that Millennium would be balance sheet solvent.
[7] Average of contemporaneous valuations is determined as the average of the averages for Citi, JPMC, SunTrust, and VPA Solvency Analysis.  The average of each selected third party is the average of the midpoints for each valuation scenario considered by that party.  The average does not include BMO because I have not seen the valuation analysis BMO conducted.

Case 17-51840-LSS    Doc 341-7    Filed 02/10/23    Page 190 of 273



*In Re Millennium Lab Holdings II, LLC*
**Selected Contemporaneous Revenue Projection Sensitivities**
2014 – 2020

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 191 of 273

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")



***In Re Millennium Lab Holdings II, LLC***
**Selected Contemporaneous EBITDA Projection Sensitivities**
2014 – 2020

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 192 of 273

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  The adjusted EBITDA figures in the Citi management case and the JPMC management case are consistent with what I have observed in the Padres Projections.  For the remaining projection sensitivites, I have not seen the materials detailing adjustments to EBITDA.

## *In Re Millennium Lab Holdings II, LLC*
## Selected Contemporaneous EBITDA Margin Projection Sensitivities
### 2014 – 2020



Case 17-51840-LSS    Doc 341-7    Filed 02/10/23    Page 193 of 273

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections (April 2014)"); J.P. Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076 ("JPMC Downside Case (April 2014)"); Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163 (Includes "Citi Base Case (March 2014)" and "Citi Downside Case (March 2014)"); SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo", March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758 (Includes "SunTrust Base Case (March 2014)" and "SunTrust Downside Case (March 2014)"); BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990 (Includes "BMO Base Case (March 2014)" and "BMO Downside Case (March 2014)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections and Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  The adjusted EBITDA figures in the Citi management case and the JPMC management case are consistent with what I have observed in the Padres Projections.  For the remaining projection sensitivities, I have not seen the materials detailing adjustments to EBITDA.



# *In Re Millennium Lab Holdings II, LLC*
## Selected Post-Transaction Revenue Projections
### 2014 – 2020

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"); *In re Millennium Lab Holdings II, LLC, et al.,* Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note:  In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015.  The September 2015 projections appear to be the same as the July 2015 projections.

Case 17-51840-LSS    Doc 341-7    Filed 02/10/23    Page 194 of 273



## In Re Millennium Lab Holdings II, LLC
## Selected Post-Transaction EBITDA Projections
## 2014 – 2020

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 195 of 273

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"); In re Millennium Lab Holdings II, LLC, et al., Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note:  The adjusted EBITDA values shown for the Modified Padres Projections are as reported in YAS Workpaper 1.  EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization.  Adjusted EBTIDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income.  For the remaining projections, I have not seen the materials detailing adjustments to EBITDA.  In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015.  The September 2015 projections appear to be the same as the July 2015 projections.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

EXHIBIT 8C

*In Re Millennium Lab Holdings II, LLC*
**Selected Post-Transaction EBITDA Margin Projections**
2014 – 2020

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 ("Modified Padres Projections"); Millennium Management Projections, June 8, 2015, ML_DE_00559340 ("June 2015 Management Projections"); Millennium Laboratories, "Financial Overview to Lenders," July 29, 2015, ML_DE_00023852 ("Management Projections (July 2015)"); FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823 ("Management Projections (September 2015)"; In re Millennium Lab Holdings II, LLC, et al., Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization, filed on November 10, 2015, Exhibit H ("Management Projections (November 2015)"); FTI Consulting, "Millennium Health LLC: Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743, ("Management Projections (December 2015)")

Note: The adjusted EBITDA values shown for the Modified Padres Projections are as reported in YAS Workpaper 1. EBITDA refers to Earnings Before Interest, Taxes, Depreciation and Amortization. Adjusted EBITDA in the Modified Padres Projections and the Padres Projections includes adjustments for Stock-Based Compensation, Transaction Expenses, and Other Income. For the remaining projections, I have not seen the materials detailing adjustments to EBITDA. In addition to the July 2015 projections, Millennium's management produced a set of projections in September 2015. The September 2015 projections appear to be the same as the July 2015 projections.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          APPENDIX A

# AMY HUTTON

550A Fulton Hall
Carroll School of Management
Boston College
140 Commonwealth Ave.
Chestnut Hill, MA 02467
(617) 320-1068
amy.hutton@bc.edu

## EDUCATION

| | |
|---|---|
| 1992 | Ph.D., Business Administration, The Simon Business School, University of Rochester. |
| 1986 | M.B.A., *beta gamma sigma*, Accounting, Finance, and Organizations & Markets, The Simon Business School, University of Rochester. |
| 1985 | B.A., *magna cum laude*, Political Science, University of Rochester. |

## FACULTY APPOINTMENTS

| | |
|---|---|
| 7/1/92-6/30/97 | Assistant Professor of Business Administration, Harvard Business School |
| 7/1/97-6/30/03 | Associate Professor of Business Administration, Harvard Business School |
| 7/1/02-12/31/02 | Visiting Associate Professor of Business Administration, Tuck School of Business at Dartmouth |
| 1/1/03-6/30/03 | Visiting Scholar, Graduate School of Business, Stanford University |
| 7/1/03-6/30/06 | Associate Professor of Business Administration, Tuck School of Business at Dartmouth |
| 7/1/06-6/30/10 | Associate Professor of Business Administration, Carroll School of Management, Boston College |
| 7/1/10-present | Professor of Business Administration, Carroll School of Management, Boston College |
| 7/1/20-present | Ph.D. Program Director, Accounting |

### Teaching Assignments

#### Harvard Business School

| | |
|---|---|
| 1991-1994 | Financial Reporting, Management Accounting and Control |
| 1995-2000 | Business Analysis and Valuation |
| 1998-2001 | Driving Corporate Performance, Executive Education |
| 2000-2001 | Financial Reporting and Control |

#### Tuck School of Business at Dartmouth

| | |
|---|---|
| 2002-2004 | Financial Measurement, Analysis and Reporting |
| Spring 2005 | Financial Reporting and Statement Analysis |
| 2002-2006 | Various Executive Education Programs |

#### Carroll School of Management at Boston College

| | |
|---|---|
| 2006-present | Financial Statement Analysis and Valuation |
| 2009-2011 | Intermediate Accounting II |
| 2018-present | Ph.D. research seminars – Empirical, financial accounting research |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          APPENDIX A

## PUBLICATIONS

### A. Academic Articles[1]

1. ** "Debt-Covenant Violations and Managers' Accounting Responses," *Journal of Accounting and Economics,* May 1994.

2. ** "Detecting Earnings Management" (with Patricia M. Dechow and Richard G. Sloan), *Accounting Review*, April 1995.

3. ** "Causes and Consequences of Earnings Management: An Analysis of Firms Subject to Enforcement Actions by the SEC" (Patricia M. Dechow and Richard G. Sloan), *Contemporary Accounting Research*, Spring 1996.

4. "Economic Consequences of Accounting for Stock-based Compensation" (with Patricia M. Dechow and Richard G. Sloan), *Journal of Accounting Research*, Supplement 1996.

5. "An Empirical Assessment of the Residual Income Valuation Model" (with Patricia M. Dechow and Richard G. Sloan), *Journal of Accounting and Economics*, January 1999.

6. "Stock Performance and Intermediation Changes Surrounding Sustained Increases in Disclosure" (with Paul Healy and Krishna Palepu), *Contemporary Accounting Research,* Fall 1999.

7. "The Relation Between Analysts' Long-Term Earnings Forecasts and Stock Price Performance Following Equity Offerings" (with Patricia M. Dechow and Richard G. Sloan), *Contemporary Accounting Research,* Spring 2000.

8. "Short Sellers, Fundamental Analysis, and Stock Returns" (with Patricia M. Dechow, Lisa Meulbroek, and Richard G. Sloan), *Journal of Financial Economics*, July 2001.

9. "The Role of Supplementary Statements with Management Earnings Forecasts" (with Greg Miller and Douglas Skinner), *Journal of Accounting Research,* December 2003.

10. "Analyst Earnings Forecast Revisions and the Pricing of Accruals" (with Mary Barth), *Review of Accounting Studies*, Spring 2004.

11. "Determinants of Managerial Earnings Guidance Prior to Regulation Fair Disclosure and Bias in Analysts' Earnings Forecasts," *Contemporary Accounting Research*, Winter 2005.

12. "A discussion of 'Corporate Disclosure by Family Firms' " *Journal of Accounting and Economics*, September 2007.

13. "Opaque Financial Reports, R-square, and Crash Risk" (with Alan Marcus and Hassan Tehranian), *Journal of Financial Economics*, October 2009.

14. "Detecting Earnings Management – A New Approach" (with Patricia Dechow, Jung Hoon Kim and Richard Sloan), *Journal of Accounting Research*, May 2012.

---

[1] ** published under the name *Amy Sweeney*.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

15. "Do Managers Always Know Better?  An Examination of the Relative Accuracy of Management and Analyst Forecasts" (with Lian Fen Lee and Susan Shu), *Journal of Accounting Research*, December 2012.

16. "The Role of Social Media in the Capital Market: Evidence from Consumer Product Recalls" (with Lian Fen Lee and Susan Shu), *Journal of Accounting Research*, May 2015.

17. A Discussion of "Aggregate Noise Trader Risk, Mispricing, and Accounting Fundamentals" *Contemporary Accounting Research*, May 2017.

18. "Prior Forecasting Accuracy and Investor Reaction to Management Earnings Forecasts" (with Phillip C. Stocken), *Journal of Financial Reporting*, April 2021.

19. "Regulatory Transparency and the Alignment of Private and Public Enforcement" (with Susan Shu and Xin Zheng), *Journal of Financial Economics*, 2021.

**B. Working Papers**

"The Costs and Benefits of Regulatory Transparency for Public Banks: Evidence from Disclosure of SEC Comment Letters" (with Y. Lin, S. Shu, I Yeung, X. Zheng).

**C. Practitioner Publications**

"Solving the New Equity Puzzle" (with Patricia M. Dechow and Richard G. Sloan), *The Financial Times: Mastering Finance Series,* Summer 1997.

"Best Practice: Four Rules for Taking Your Message to Wall Street," *Harvard Business Revi*ew, May 2001.

"Review of the Securities Industry Association's Best Practices for Research" completed for the House Financial Service Committee, Capital Markets Subcommittee, *Congressional Record*, August 2001.

"Beyond Financial Reporting—An Integrated Approach to Disclosure," *Journal of Applied Corporate Finance*, Fall 2004.

"Roundtable on Corporate Disclosure, National Corporate Finance Forum" (with Donald Chew), *Journal of Applied Corporate Finance*, Fall 2004.

"Bad News Rings True: Supplemental Information Can Enhance Earnings Forecast Credibility" (with Greg Miller and Douglas Skinner), *Investor Relations Quarterly* vol. 6 no. 2, 2004.

**D. Awards**

AAA's **Distinguished Contribution to Accounting Literature Award**, 2010.

Carroll School **Coughlin Distinguished Teaching Award**, 2020.

**E. Citations**    Google Scholar over 31,000   (over 11,600 since 2017)

**PROFESSIONAL ACTIVITIES**

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

Cornerstone Research – Expert

Editor of the *Accounting Review*, June 2011 – June 2014

| | |
|---|---|
| Referee | *Contemporary Accounting Research, Journal of Accounting and Economics, Journal of Accounting Research, Review of Accounting Studies, Journal of Financial Economics*, *Journal of Finance*, *Review of Financial Studies*, American Accounting Association Annual Conferences |
| Member of | American Accounting Association (AAA), 1991-present. Editorial Review Board of the *Accounting Review*, 1994-99, 2014-2017 Research Advisory Committee AAA, 1997-2000. Faculty Development Committee, AAA, 1997-2000. Corporate Accounting Policy Committee, AAA 1999-2001, Chair 2001. Review Board for the House Financial Service Committee, Capital Markets Subcommittee examining Securities Industry Association's proposals governing the standards and practices of research analysts, June 2001. s |
| Board of Advisors | National Industries for the Blind (NIB), 2002-2006 Audit and Finance Committee, NIB, 2004-2006 |
| Directorship | Bandag, Inc., member of audit and corporate governance and nominating committees, June 2003-June 2007; chair of the audit committee May 2005-June 2007.  Bandag acquired by Bridgestone June 2007. |
| Service at Boston College | University Research Committee, January 2007 – January 2010 Accounting Department's Recruiting Committee, January 2007 – present Faculty Guide for Freshmen, Class 2012 Parent Action Committee for the Boston College Children's Center, September 2007 – 2010, 2014-2016. Provost's Advisory Council, September 2009 – July 2011 Promotion & Tenure Committee, July 2010 – July 2012 Student Advisor |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          APPENDIX A

**Invited presentations of working papers:**

Boston College, Columbia University, HBS – Harvard University, MIT Sloan School of Business, New York University, Northwestern University, University of Pennsylvania – Wharton School of Business, Winter/Spring 1991

University of Michigan, January 1993 and March 2011

AAA Northeast Regional Conference, March 1993

Harvard Business School, September 1993, February 1996, May 2002, September 2007, and March 2012

University of Rochester, October 1993, May 2002 and May 2015

Southern Methodist University, April 1994

Financial Decision and Control Conference, Harvard University, July 1993, 1994, and 1998

AAA National Meetings, August 1994, 1995, 1997, 1998, 1999, 2000, 2001 and 2003

Cornell University, September 1994 and November 1997

Mitsui Life Symposium, University of Michigan, October 1994

Columbia University, January 1995 and December 2010

*Contemporary Accounting Research* Conference, April 1995 and 1998

University of Iowa, September 1995

Ohio State University, September 1995, June 2010

*Journal of Accounting Research* Conference, 1996, 2011, and 2014

Stanford University July 1996, May 2013 and December 2019

University of North Carolina, October 1996 and February 1999

Washington University, Fall 1996

University of Georgia, Fall 1996

University of Oregon, Winter 1997

University of Waterloo, April 1997

Michigan State University, September 1997

*Journal of Accounting and Economics* Conference, May 1998

Northwestern University, October 1998

Western AAA Conference, April 1999

University of Texas, Austin, October 1999

Prudential Securities Quantitative Research Conference, December 1999

*The Center for Investment Research,* Corporate Earnings Analysis Seminar, NYC, May 2001.

Tuck School of Business - Dartmouth, September 2001 and May 2005

National Investor Relations Institute (NIRI) Senior Roundtable Nov. 2001

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER          APPENDIX A

**Invited presentations of working papers (continued):**

> M.I.T., Sloan School of Management, May 2002 and May 2006
>
> London Business School, July 2002
>
> University of Washington, November 2002
>
> Emory University, November 2002
>
> Boston College, April 2005
>
> *Journal of Accounting and Economics* Conferences, Discussant 2005
>
> FEA Conference, University of North Carolina, Chapel Hill, Nov. 2005
>
> George Washington University, March 2006
>
> Carnegie Mellon University, January 2007
>
> University of Pennsylvania, Wharton School of Business, April 2007
>
> Boston University, May 2007, May 2013
>
> University of Wisconsin, Madison, Nov. 2007 & Nov. 2009
>
> INSEAD, May 2009
>
> Yale University, November 2014
>
> *Contemporary Accounting Research* Conference, Discussant 2014
>
> IMO Conference, Harvard Business School, Discussant 2016
>
> University of Southern Calf. Oct. 2020
>
> Baruch College Oct. 2020
>
> Wharton School of Business Nov. 2020

**Invited presentations:**

> AAA National Meetings, various years as a discussant and moderator
>
> AAA New Faculty Consortium as a panelist, February 1996
>
> The Conference Board, May 2001 (co-taught Lycos case study with CEO)
>
> SEC / NIRI (National Investor Relations Institute) Symposium on the Effects of Regulation Fair Disclosure, as a panelist May 2001
>
> Securities Industry Association (SIA), Research and Regulation: Analyst Objectivity and Related Issues, as a panelist April 2002
>
> NIRI 2002 Annual Conference: "Disclosure Tactics", June 2002
>
> National Association of Corporate Directors, Corporate Financial Reporting and Disclosure: "The Expanding Role of the Audit Committee", November 2002
>
> Forum on Corporate Finance Annual Meeting, "Earnings Guidance: Taking Back Control of the Disclosure Agenda", Stern School of Business New York University, May 2004
>
> 2005 Financial Services CEO Gathering, Panel Discussion: The Role of the CEO in Dealing with the External Environment, Morgan Stanley, May 2005.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**          **APPENDIX A**

**Invited conferences (that I was able to attend):**

AAA Financial Reporting Conferences, 1991, 1992, 1994 & 1995

Trueblood Seminar Series, Deloitte & Touche, February 1993

AAA New Faculty Consortium, March 1993

Arthur Andersen Accounting Research Symposium, October 1993

Stanford Summer Camp July 1996, Discussant August 2021

AAA Corporate Accounting Polices (CAPs) 1994, 1999 & 2000
   Selected Chairman for the AAA CAPs Conference in 2001

AAA Financial Reporting Conference, The FASB, Dec. 1996 & 1997

*Journal of Accounting and Economics* Conferences, 1993, 2000 through
   2003;  2005 through 2011, 2013 through 2021

*Journal of Accounting Research* Conference, 1994, 2003, 2006, 2008
   through 2011

Financial Decision and Control Conference, Harvard Business School,
   July 1993 through 1998 & 2001

IMO Conference, Harvard Business School
   June 2006, 2007, 2009 through 2011, 2015 through 2019

Stanford Summer Camp, August 2021 (discussant)

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX B**

# AMY HUTTON
## Depositions and Testimony

Deposition Testimony of Amy Hutton in *Move Inc. et al v. Zillow Inc.*, Kings County Superior Court, Washington, Case No. 14-2-07669-0 (April 9, 2016).

Deposition Testimony of Amy Hutton in *Growthquest Capital Inc. v. Volkswagen Aktiengesellschaft*, Ontario Superior Court of Justice, Case No. CV-16-566618-00CP (May 18, 2018).

Deposition Testimony of Amy Hutton in *In Re Banco Bradesco S.A. Securities Litigation*, U.S. District Court, Southern District of New York, Case No. 1:16-cv-04155 (GHW) (December 5, 2018).

Deposition Testimony of Amy Hutton in *In Re Perrigo Company plc Securities Litigation*, U.S. District Court, Southern District of New York, Civil Case No. 19-CV-70 (DLC) (February 24, 2021).

Deposition Testimony of Amy Hutton in *Huntsman International LLC v. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc.*, American Arbitration Association, Case No. 01-17-001-4588 (March 5, 2021).

Arbitration Testimony of Amy Hutton in *Huntsman International LLC v. Albemarle Corporation, Rockwood Specialties Group, Inc., and Rockwood Holdings, Inc.*, American Arbitration Association, Case No. 01-17-001-4588 (May 13, 2021).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                        APPENDIX C

# Documents Relied Upon

### Legal Documents

- *In re Millennium Lab Holdings II, LLC, et al.*, "Declaration of William Brock Hardaway in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings," filed on November 10, 2015.
- *In re Millennium Lab Holdings II, LLC, et al.*, "Offering Memorandum and Solicitation Statement for Out-of-Court Transaction and Disclosure Statement for Prepackaged Plan of Reorganization," filed on November 10, 2015.

### Expert Reports

- Expert Report and Backup Materials of Yvette R. Austin Smith, filed on November 15, 2021.

### Deposition Transcripts

- Deposition of Daniel Pencak, July 12, 2021.
- Deposition of David M. Felty, July 27, 2021.
- Deposition of Jennifer M. Mulloy, July 14, 2021.
- Deposition of Martin Price, April 12, 2021.
- Deposition of Michael Tortora, July 15, 2021.
- Deposition of Phillip Ho, July 28, 2021.
- Deposition of Ryan Griswold, July 22, 2021.
- Deposition of Tim Kennedy, September 30, 2021.
- Deposition of William Brock Hardaway, July 20, 2021.

### Bates Numbered Documents

- Millennium Management Projections, June 8, 2015, ML_DE_00559340
- BMO Harris Bank, N.A., "Loan Underwriting Committee Memorandum," March 11, 2014, ML00008506.
- BMO Harris Bank, N.A., "Credit Approval Memo," BMO-ML-00077990.
- Millennium Laboratories, "Lender Presentation Audio File," March 31, 2014, JPMC-00089412.
- J.P Morgan Chase Bank, N.A., "270 Model," April 2014, JPMC-00005076.
- Millennium Management Projections, April 12, 2014, ML_DE_00057999.
- TA Associates, "Millennium 4Q13 Valuation," April 23, 2014, TA_MLH_00090311, TA_MLH-00090312.
- FTI Consulting, "Millennium Health," September 9, 2015, ML_DE_00086823.
- FTI Consulting, "Millennium Health LLC:  Millennium Health Reporting Unit Fresh Start Accounting Valuation as of December 18, 2015," April 10, 2016, KPMG-ML-EA15WB-0000743.
- VPA Solvency Analysis Underlying Materials, VP_ML_00002551.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                   **APPENDIX C**

- Alvarez & Marsal Presentation, "Presentation to the Department of Justice," July 22, 2015, ML_DE_00167434.
- Citibank, N.A., "Millennium Labs Final Approval Memo," March 13, 2014, CITI-T-00000163.
- J.P. Morgan Chase Bank, N.A., "Credit Agreement Among Millennium Lab Holdings II, LLC, Millennium Laboratories, LLC, and J.P. Morgan Chase Bank, N.A.," April 16, 2014, ML_DE_00196568.
- Email from A. Christoforou to D. Diaz, "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-00053824, JPMC-00053828.
- Email from A. Christoforou to G. Hessol, et al., "Millennium Laboratories Meeting Materials," March 15, 2014, JPMC-MIL-CORP-00193320, JPMC-MIL-CORP-00193324.
- Email from A. Christoforou to J. Lee, "ML Q&A Tracker," March 30, 2014, JPMC-MIL-CORP-00219684.
- Millennium Laboratories, LLC - Voluntary Self-Referral Disclosure, August 15, 2014, ML_DE_00325457.
- Email from C. Liou to Project Chargers Whole Team, "Millennium v. Amertitox - loss," June 17, 2014, JPMC-MIL-CORP-00165260.
- Email from H. Appel to S. Karanikolaidis, Letter from the United States Attorney to Martin Price, "Re: Subpoena Regarding Millennium Laboratories, Inc.," March 27, 2012, JPMC-MIL-CORP-00214601, JPMC-MIL-CORP-00214602.
- Email from M. Price to L. Etcheverry, "Fwd: Millennium financial model - version 2," June 14, 2015, ML_DE_00559337.
- Email from T. Kennedy to B. Hardaway, et al., "RE: Privileged," April 3, 2015, ML_DE_00597259.
- SunTrust Bank, "Millennium Laboratories, Inc. DCC Memo," March 2014, SunTrust_MIL-DE-00011756, SunTrust_MIL-DE-00011758.
- Millennium Laboratories, "Financial Projections Overview to Lenders," July 29, 2015, ML_DE_00023852.
- Millennium Laboratories, "Lender Presentation," March 2014, JPMC-MIL-CORP-00170147.
- Millennium Laboratories, "Management Presentation," March 2014, ML_DE_00058283.
- Millennium Laboratories, "Rating Agency Presentation," March 2014, JPMC-MIL-CORP-00011605.
- Millennium Laboratories, "Confidential Information Memorandum $320 Million Senior Secured Facilities," March 2012, ML_DE_00086984.
- Millennium Laboratories, "Confidential Information Memorandum for Public Side Lenders," March 31, 2014, ML_DE_00269115.
- Vantage Point Advisors, "Millennium Lab Holdings II, LLC Solvency Analysis," April 30, 2014, ML_DE_00263273.
- Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584.
- Term Sheet between Millennium Health, LLC and the Department of Justice, May 20, 2015, ML_DE_00201432.
- United States' Complaint in Intervention, filed on March 19, 2015, ML_DE_00629274.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    APPENDIX C

## Financial Statements

- Millennium Lab Holdings II, LLC and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2013 and 2014," ML_DE_00024982.
- Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2010 and 2011," JPMC-MIL-CORP-00223784.
- Millennium Lab Holdings, Inc. and Subsidiaries, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2011 and 2012," JPMC-MIL-CORP-00191350.
- Millennium Laboratories, Inc. and Subsidiary, "Consolidated Financial Statements for the Fiscal Years Ending December 31, 2008 and 2009," JPMC-00001302.

## Academic Articles

- Alquist, R., Israel, R., and Moskowitz, T. (2018), "Fact, Fiction, and the Size Effect," *Journal of Portfolio Management,* 45(1), pp. 1–30.
- Banz, R. (1981), "The Relationship Between Return and Market Value of Common Stocks," *Journal of Financial Economics*, 9(1), pp. 3–18.
- Berk, J. (1995), "A Critique of Size-Related Anomalies," *Review of Financial Studies,* 8(2), pp. 275–286.
- Blume, M.E., and Stambaugh, R.F. (1983), "Biases in Computed Returns: An Application to the Size Effect," *Journal of Financial Economics,* 12(3), pp. 387–404.
- Dichev, I. (1998), "Is the Risk of Bankruptcy a Systematic Risk?" *Journal of Finance,* 53(3), pp. 1131–1147.
- Fisher, F.M., and Romaine, R.C. (1990), "Janis Joplin's Yearbook and the Theory of Damages," *Journal of Accounting, Auditing, and Finance*, 5(1), pp. 145–157.
- Hirshleifer, D. (2001), "Investor Psychology and Asset Pricing," *Journal of Finance,* 56(4), pp. 1533–1597.
- Kent, D., Hirshleifer, D., and Subrahmanyam, A. (2001), "Overconfidence, Arbitrage, and Equilibrium Asset Pricing," *Journal of Finance,* 56(3), pp. 921–965.
- Kim, D. (1997), "A Re-Examination of Firm Size, Book-to-Market, and Earnings Price in the Cross-Section of Expected Stock Returns," *Journal of Financial and Quantitative Analysis,* 32(4), pp. 463–489.
- Horowitz, J.L., Loughran, T., and Savina, N.E. (2000), "Three Analyses of the Firm Size Premium," *Journal of Empirical Finance,* 7(2), pp. 143–153.
- Hou, K. and Dijk, M. (2019), "Resurrecting the Size Effect:  Firm Size, Profitability Shocks, and Expected Stock Returns," *The Review of Financial Studies*, 32(7), pp. 2850–2889.
- Sharpe, W. (1964), "Capital Asset Prices: A Theory of Market Equilibrium Under Conditions of Risk," *Journal of Finance*, 19(3), pp. 425–442.

## Books

- Ang, A., *Asset Management: A Systematic Approach to Factor Investing*, Oxford University Press, 2014.
- Brealey, R.A., Myers, S.C., and Allen, F., *Principles Corporate Finance*, 10th ed., McGraw-Hill/Irwin, 2011.
- Cochrane, J., *Asset Pricing: Revised Edition*, Princeton University Press, 2005.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX C**

- Damodaran, A., *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 2nd ed., Wiley, 2002.
- Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020.
- Metrick, A. and Yasuda, A., *Venture Capital and the Finance of Innovation*, 3rd ed., Wiley, 2021, Kindle Edition.


**Other Publicly Available Materials**

- "Competitive Market Analysis for Laboratory Management Decision Makers," *Laboratory Economics*, 8(10), October 2013.
- "Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014.
- "Moody's Assigns B1 CFR to Millennium Labs; Sr. Secured Credit Facilities Rated B1; Outlook Is Stable," *Moody's*, March 31, 2014.
- "Research Update: Millennium Laboratories Inc. Assigned 'B+' Rating and Stable Outlook; $1.82 Billion First Lien Rated 'B+' (Recovery: 3)," *Standard & Poor's*, March 28, 2014.
- "HCPCS – General Information," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo, accessed on February 7, 2022.
- "Insurance vs. Self Pay," *Kittitas Valley Healthcare*, available at https://www.kvhealthcare.org/patients-and-visitors/billing/insurance-vs-self-pay, accessed on February 7, 2022.
- "Intro to Credit Ratings," *Standard & Poor's*, available at https://www.spglobal.com/ratings/en/about/intro-to-credit-ratings, accessed on February 9, 2022.
- "Local Coverage Determinations (LCD) challenge," *Medicare*, available at https://www.medicare.gov/claims-appeals/local-coverage-determinations-lcd-challenge, accessed on February 7, 2022.
- "Medically Unlikely Edits," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE, accessed on February 7, 2022.
- "Medicare Coverage Database Archive," *Centers for Medicare & Medicaid Services*, available at https://localcoverage.cms.gov/mcd_archive/search.aspx?clickon=search, accessed on February 7, 2022.
- "Rating Scale and Definitions," *Moody's*, available at https://www.moodys.com/sites/products/productattachments/ap075378_1_1408_ki.pdf, accessed on February 7, 2022.
- "SEC Fact Sheet on Global Analyst Research Settlements," *U.S. Securities and Exchange Commission*, available at https://www.sec.gov/news/speech/factsheet.htm, accessed on February 7, 2022.
- "Updated Investor Bulletin: The ABCs of Credit Ratings," *U.S. Securities and Exchange Commission*, October 12, 2017, available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_creditratings, accessed on February 7, 2022.
- "What's a MAC," *Centers for Medicare & Medicaid Services*, available at https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC, accessed on February 7, 2022.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**                    **APPENDIX C**

- "What is a Credit Rating?," *Moody's*, available at https://ratings.moodys.io/ratings#:~:text=Moody's%20long%2Dterm%20ratings%20are,of%20one%20year%20or%20more.&text=Such%20ratings%20use%20Moody's%20Global,in%20the%20event%20of%20default, accessed on February 7, 2022.
- "Workers' Compensation Program," *U.S. Department of the Interior*, available at https://www.doi.gov/pmb/hr/workerscompensation, accessed on February 7, 2022.
- "Global Ratings Definitions," *Standard & Poor's*, November 10, 2021, available at https://www.spglobal.com/ratings/en/research/articles/190705-s-p-global-ratings-definitions-504352, accessed on February 9, 2022.

Case 17-51840-LSS    Doc 341-7    Filed 02/10/23    Page 210 of 273

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC with Small Company Premium
### Using Comparable Companies Identified in Ms. Austin Smith's
### Comparable Companies Analysis[1]

| Cost of Equity - Modified Capital Asset Pricing Model (CAPM)[2] | Ms. Austin Smith's Corrected WACC | | | Ms. Austin Smith's Corrected WACC with Small Company Premium | | |
|---|---|---|---|---|---|---|
| Risk-free rate | | | 3.2% | | | 3.2% |
| Market equity risk premium | | 6.2% | | | 6.2% | |
| Relevered beta[3] | x | 0.85 | | x | 0.85 | |
| Beta adjusted equity risk premium[4] | | | 5.2% | | | 5.2% |
| Size premium | | | 0.0% | | | 1.9% |
| Company-specific risk adjustment | | | 0.0% | | | 0.0% |
| **Estimated cost of equity** | | | **8.5%** | | | **10.3%** |

| Cost of Debt[5] | Interest Rate | Weight | Weighted Cost | Interest Rate | Weight | Weighted Cost |
|---|---|---|---|---|---|---|
| Pre-tax cost of debt (pro forma) | | | | | | |
| Term Loan B | 5.3% | 97.0% | 5.1% | 5.3% | 97.0% | 5.1% |
| Weighted average pre-tax cost of debt[6] | | | 5.1% | | | 5.1% |
| Tax-effect on cost of debt | | 40.0% | -2.0% | | 40.0% | -2.0% |
| **Estimated after-tax cost of debt** | | | **3.1%** | | | **3.1%** |

| Weighted Average Cost of Capital (WACC) | Cost of Capital | | % in Capital Structure | Weighted Cost | Cost of Capital | | % in Capital Structure[7] | Weighted Cost |
|---|---|---|---|---|---|---|---|---|
| Debt | 3.1% | x | 23.4% | 0.7% | 3.1% | x | 23.4% | 0.7% |
| Equity | 8.5% | x | 76.6% | 6.5% | 10.3% | x | 76.6% | 7.9% |
| **Estimated WACC** | | | | **7.2%** | | | | **8.6%** |

## *In Re Millennium Lab Holdings II, LLC*
## Ms. Austin Smith's Corrected WACC with Small Company Premium
### Using Comparable Companies Identified in Ms. Austin Smith's
### Comparable Companies Analysis[1]

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); VPA Solvency Analysis Underlying Materials, VP_ML_00002551, ("WACC Underlying Materials"); Holthausen, R.W. and Zmijewski, M.E., *Corporate Valuation: Theory, Evidence & Practice*, 2nd ed., Cambridge Business Publishers, 2020 ("Holthausen and Zmijewski, *Corporate Valuation*")

Note:
[1] The corrected WACC of 7.2% is based on Ms. Austin Smith's *five* comparable companies from her comparable companies analysis, which are Alere Inc., Bio-Reference Laboratories Inc., Laboratory Corp. of America Holdings, Myriad Genetics Inc., and Quest Diagnostics Inc.  Austin Smith Report, ¶ 151. The WACC of 14.8% is estimated based on a different set of *eight* comparable companies than Ms. Austin Smith's set.  This different set includes three additional companies: Cepheid, Genomic Health Inc., and Meridian Bioscience, Inc.  WACC Underlying Materials, "Beta" tab.  For details, see Appendix F.
[2] CAPM refers to the Capital Asset Pricing Model.  According to Holthausen and Zmijewski, *Corporate Valuation*, "[t]he expected return of an individual security in the CAPM is equal to the return on the risk-free asset plus a risk premium. The risk premium is equal to the risk of the security relative to the risk in the market multiplied by the risk premium for holding the market portfolio."  Beta is the "risk of an individual security relative to the market."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.  "The cost of capital in the CAPM [...] is equal to the risk-free rate plus one risk premium."  Holthausen and Zmijewski, *Corporate Valuation*, p. 328.
[3] For the relevered beta, I use the average of the unlevered betas of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis, as calculated in the WACC Underlying Materials, relevered to the average capital structure of the five comparable companies identified in Ms. Austin Smith's Comparable Companies analysis. See Appendix F for more details on the de- and re-levering process used to adjust the comparable companies' betas.  According to Holthausen and Zmijewski, *Corporate Valuation*, "we first measure the CAPM common equity betas of the comparable companies and potentially the company we are valuing (if it is publicly traded) and then unlever the common equity betas to measure the unlevered beta for the company we are valuing. Once we measure the unlevered beta for the company we are valuing ... we lever the unlevered beta to measure the equity beta of the company we are valuing."  Holthausen and Zmijewski, *Corporate Valuation*, p. 453.
[4] Beta adjusted equity risk premium is equal to the product of the relevered beta and the market equity risk premium.
[5] The cost of debt reflects lenders "required or expected rate of return, which is based on the timing, magnitude, and riskiness of the expected cash flows."  Holthausen and Zmijewski, *Corporate Valuation*, p. 395.
[6] Cost of debt is weighted by Term Loan B's share of Millennium's pro forma total debt as of March 31, 2014 (97%).  WACC Underlying Materials, "Sources&Uses" tab.
[7] The capital structure represents the capital structure of the comparable companies.  The corrected WACC of 7.2% is estimated using the average capital structure of the five comparable companies identified by Ms. Austin Smith. The 14.8% WACC is based on a different set of eight comparable companies compared to Ms. Austin Smith's five comparable companies.  WACC Underlying Materials, "Beta" tab.

## *In Re Millennium Lab Holdings II, LLC*
## Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]
### *($ millions)*

| | Selected WACCs[3] | | | |
|---|---|---|---|---|
| | **14.8%** | **9.8%** | **8.6%** | **7.2%** |
| Millennium's Enterprise Value Based on Ms. Austin Smith's Modified Padres Projections[4] | $802.86 | $1,279.42 | $1,512.56 | $1,970.83 |
| Millennium's Equity Value Based on Ms. Austin Smith's Modified Padres Projections[5] | -$958.89 | -$482.32 | -$249.18 | $209.08 |
| Marginal Impact on Millennium's Equity Value[6] | | **Marginal Increase** | | |
| Modify Ms. Austin Smith's treatment of operating expenses[7] | $220.73 | $393.33 | $478.19 | $645.30 |
| Modify reduction of 15% in 2015 and 15% in 2016 to UDT and PGT specimen volume due to the purported reputational impact of the DOJ settlement[8] | $383.75 | $690.50 | $841.43 | $1,138.69 |
| Restore Emerging Opportunities[9] | $192.82 | $381.57 | $476.11 | $663.63 |
| Modify Medicare and Commercial Payors UDT specimen volume growth rate adjustments from 2014 through 2020[10] | $155.01 | $293.49 | $362.46 | $498.99 |
| Modify adjustment of 1Q2014 Medicare NRPS for MUE denials[11] | $87.93 | $140.78 | $166.59 | $217.28 |
| Modify 1.6% reduction in UDT specimen volume in July 2014 due to the discontinuance of the POC Free Test Cup Program | $17.36 | $28.74 | $34.30 | $45.20 |
| Modify 21.8% reduction in Commercial Payor's NRPS in July 2015 due to the discontinuance of custom profiles | $101.62 | $183.72 | $224.14 | $303.77 |

Case 17-51840-LSS    Doc 341-7    Filed 02/10/23    Page 212 of 273

*In Re Millennium Lab Holdings II, LLC*

**Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments to the Padres Projections[1][2]**

*($ millions)*

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:

[1] Equity value is calculated as the difference between Millennium's enterprise value and $1,761.7 million—the level of outstanding debt incurred by Millennium associated with the Term Loan B transaction. Austin Smith Report, ¶ 145. Marginal impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections from the equity value after applying each modification.

[2] I do not modify Ms. Austin Smith's Medicare net revenue per specimen ("NRPS") decrease attributable to the draft Noridian local coverage determination ("LCD"), Austin Smith Report, ¶¶ 120–123. In addition, I do not modify various other changes in Ms. Austin Smith's Modified Padres Projections relative to the Padres Projections, such as the use of actual first quarter 2014 ("1Q2014") financial results as opposed to Padres Projections for 1Q2014. As I do not fully revert Ms. Austin Smith's mechanical changes to the Padres Projections, I refer to the changes described above as modifications to Ms. Austin Smith's adjustments. Austin Smith Report, ¶ 110.

[3] WACC refers to the Weighted Average Cost of Capital. 14.8% reflects Ms. Austin Smith's WACC, Austin Smith Report, ¶ 143. See Appendix D for a description of the WACC values.

[4] These figures show Millennium's enterprise value at the selected WACCs without any modifications to Ms. Austin Smith's Modified Padres Projections.

[5] These figures show Millennium's equity value at the selected WACCs without any modifications to Ms. Austin Smith's Modified Padres Projections. A positive value implies that Millennium would be balance sheet solvent.

[6] A positive marginal impact on equity value associated with a modification means that the modification increases Millennium's equity value relative to the equity value based on the Modified Padres Projections at selected WACCs.

[7] This modification adjusts Ms. Austin Smith's operating expenses to a constant percentage of revenues (38%), which corresponds to Ms. Austin Smith's projected operating expenses as a percentage of revenues in 2014. The marginal impact reflects the impact on unlevered free cash flow of the difference between Ms. Austin Smith's projected operating expenses in the Modified Padres Projections and operating expenses maintained at 38% of revenues. (See Section V.C.2 and Exhibit 6C for a detailed description.)

[8] UDT refers to Millennium's urine drug testing business. PGT refers to Millennium's pharmacogenetics business. DOJ refers to the U.S. Department of Justice.

[9] This modification restores the revenue and expenses associated with the Padres Projections' Emerging Opportunities.

[10] Reflects the impact of modification to Ms. Austin Smith's UDT volume growth rate adjustments for Medicare and Commercial payors. Ms. Austin Smith reduces Medicare and Commercial Payor specimen volume growth rates to 0.0% in 2014, 2.0% in 2015, and 3.0% in 2016 and onwards, and to 10.0% in 2014, 5.0% in 2015, and 3.0% in 2016 and onwards respectively. In this modification I restore the Padres Projections' specimen volume growth rates for Medicare and Commercial Payors. Austin Smith Report, ¶ 109.

[11] MUEs refer to Medically Unlikely Edits. This item reflects modifications to Ms. Austin Smith's modeling of an NRPS decrease for January, February, and March 2014 (1Q2014) by $77.7, $83.7, and $82.1, respectively. Austin Smith Report, ¶ 118 and YAS Workpaper 1, "MUE w LCD Adjustment" tab.

Case 17-51840-LSS    Doc 341-7    Filed 02/10/23    Page 213 of 273

## *In Re Millennium Lab Holdings II, LLC*
# Combined Impact on Millennium's Equity Value of Modifications to Ms. Austin Smith's Adjustments at a 8.6% WACC[1]

| Millennium Equity Value at a 8.6% WACC[2] | Combined Impact of Exhibit 1 Adjustments at a 8.6% WACC[3] | Percentage of Combined Impact Applied to Equity Value | Amount of Combined Impact Applied to Equity Value | Equity Value Adjusting for Combined Impact[4] |
|---|---|---|---|---|
| [A] | [B] | [C] | [D] = [B] x [C] | [E] = [A] + [D] |
| -$249.18 | $2,271.72 | 0% | $0.00 | -$249.18 |
| -$249.18 | $2,271.72 | 10% | $227.17 | -$22.01 |
| -$249.18 | $2,271.72 | 20% | $454.34 | $205.16 |
| -$249.18 | $2,271.72 | 30% | $681.51 | $432.33 |
| -$249.18 | $2,271.72 | 40% | $908.69 | $659.50 |
| -$249.18 | $2,271.72 | 50% | $1,135.86 | $886.67 |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] WACC refers to the Weighted Average Cost of Capital.  See Appendix D for a detailed derivation of the WACC figure.
[2] Reflects Millennium's equity value at a 8.6% WACC without any modifications to the Modified Padres projections.
[3] Combined impact on equity value is calculated by subtracting equity value based on the Modified Padres Projections at a 8.6% WACC from the equity value after applying all modifications listed in Exhibit 1 at a 8.6% WACC.  Austin Smith Report, ¶ 145.
[4] Under a 0% modification, the figure reflects Millennium's equity value at a 8.6% WACC without any modifications to the Modified Padres Projections.  A positive value implies that Millennium would be balance sheet solvent following the relevant adjustment to the combined impact.

# Appendix F: WACC Corrections

### A.  Background and definition of the WACC

1.      WACC is the weighted average of the cost of all of a company's sources of capital.[1]  For a company with only debt and equity the WACC is calculated using this formula:

$$WACC = \frac{Debt}{(Debt + Equity)} * (After\ Tax\ Cost\ of\ Debt) + \frac{Equity}{(Debt + Equity)} * (Cost\ of\ Equity)$$

### B.  Cost of Equity

2.      A company's cost of equity is commonly based on the Capital Asset Pricing Model ("CAPM").  In the CAPM, the cost of equity is calculated using the following equation:[2]

$$E(R_i) = R_F + \beta_i * (E(R_M) - R_F)$$

3.      Where $E(R_i)$ represents the expected return for company $i$, $R_F$ represents the risk-free rate, $\beta_i$ represents the company's beta (the covariance of the company's stock returns with the market's returns), and $E(R_M)$ represents the expected return of the market as a whole.  The term $(E(R_M) - R_F)$ is the market risk premium.

4.      A company's beta "indicates the stock's risk relative to the average risk of the stocks in [a] market index."[3]  In the case of a publicly traded company, beta can be directly estimated using the company's publicly available stock returns.[4]  However, it is not possible to directly estimate a beta for companies that are not publicly traded, such as Millennium.  One approach to estimating

---

[1] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 11, p. 485.

[2] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 329.

[3] The relation between beta and systematic risk can be described as: "For example, if a stock has price movements (as a percentage) that are generally the same as the market portfolio on average, then the stock should have a beta equal to 1.  If a stock has a beta of 1, we would expect it to earn a return of 5% above the risk-free return on a day the market earned 5% above the risk-free return.  We would expect it to earn 5% below the risk-free return on a day the market earned 5% below the risk-free return.  If another stock has a beta of 2, we would expect it to earn a return of 10% above the risk-free return on a day the market earned 5% above the risk-free return."  Holthausen and Zmijewski, *Corporate Valuation*, p. 330.

[4] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 338.

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER** **APPENDIX F**

the cost of equity for privately held companies is to use the betas of publicly traded companies that are comparable to the target company.[5]  The WACC Underlying Materials adopt this approach to estimate Millennium's cost of equity.[6]

5.      To account for differences in capital structure when using the betas of comparable companies to estimate the beta of a privately held company it is necessary adjust each estimated beta for the capital structure of the comparable company.[7]  This process is known as de-levering the beta and involves reducing the estimated beta based on the fraction of debt in a company's capital structure to arrive at the company's "unlevered beta" which reflects "the risk of the unlevered assets of a firm."[8]  These unlevered betas form the basis for estimating the privately held company's unlevered beta.  After estimating the unlevered beta for the company, "[i]f we are using the weighted average cost of capital method to value the company, we lever the unlevered [beta] for the expected capital structure, often called the target capital structure, of the company we are valuing in order to measure the company's equity cost of capital."[9]

6.      The WACC Underlying Materials follow this practice and use the following formula to de-lever the estimated betas from the comparable companies:[10]

$$\beta_U = \frac{\beta_L}{1 + ((1 - tax\ rate) * \left(Debt/Equity\right))}$$

7.      Where $\beta_U$ represents the unlevered Beta, $\beta_L$ represents the estimated levered beta, "Debt" refers to the percentage of the company's enterprise value composed of debt, and "Equity" refers

---

[5] Damodaran, *Investment Valuation*, Chapter. 24, p. 6.  Holthausen and Zmijewski, *Corporate Valuation*, p. 437.

[6] VPA Solvency Analysis, VP_ML_00002551, ("WACC Underlying Materials"), tab "Beta."  Holthausen and Zmijewski, *Corporate Valuation*, Chapter 8, p. 340 ("[A] company's equity beta, or systematic risk, has two sources of risk— financial risk and business risk or operating risk.  Financial risk is the risk that results from the fixed cost associated with financial leverage (interest payments or preferred stock dividends—payments with priority over distributions to equityholders).  Financial leverage results from fixed financing costs (interest on debt or preferred dividends).  A company with a higher degree of financial leverage will have a common stock with higher systematic risk, or a higher beta, relative to what its beta would be with lower levels of leverage. We refer to the beta of a company's operating or business risk as its unlevered beta or asset beta.").

[7] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, pp. 437–438.

[8] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 437.

[9] Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 437.

[10] WACC Underlying Materials," "Beta" tab.

to the percentage of the company's enterprise value composed of equity.[11]  To calculate the re-levered beta, the same formula can be used after the appropriate re-arrangement:

$$\beta_L = \beta_U * (1 + (1 - tax\ rate) * (^{Debt}\!/_{Equity}))$$

### C.   Corrections to Ms. Austin Smith's WACC

8.      In estimating Millennium's re-levered beta, the WACC Underlying Materials do not use the average unlevered beta of the comparable companies (which was 0.77), but instead use an unlevered beta of 1.[12]  Since the underlying materials present no support for using 1.0 for the unlevered beta (rather than 0.77),  I instead estimate Millennium's beta based on the average unlevered beta of the comparable companies, in line with the methodology described above.[13]

9.      Moreover, the underlying materials for the WACC estimation use a set of *eight* comparable companies to estimate beta and Millennium's target capital structure.[14]  In correcting Ms. Austin Smith's WACC, I instead use the subset of *five* comparable companies identified in Ms. Austin Smith's comparable companies analysis to estimate Millennium's beta and capital structure.[15]  Specifically, based on Ms. Austin Smith's five comparable companies and using the betas presented in the underlying materials, the average unlevered beta is 0.72 and the average capital structure is 23.4% debt and 76.6% equity and hence, Millennium's re-levered beta is 0.85. The results are shown in **Exhibit 4**.  I make no other corrections.  To avoid any inconsistency, I also use the capital structure based on Ms. Austin Smith's five comparable companies to weight the cost of equity and debt when calculating the WACC.  As shown in **Exhibit 4**, this results in a corrected WACC of 7.2%.

---

[11] See, for example, Holthausen and Zmijewski, *Corporate Valuation*, Chapter 10, p. 452; Damodaran, *Investment Valuation* Chapter 8, p. 20.

[12] WACC Underlying Materials.

[13] I use the betas calculated in the WACC Underlying Materials throughout my analysis.

[14] The companies identified as comparable in the beta estimation of the VPA Solvency Analysis are Alere, Inc., Bio-Reference Laboratories Inc., Cepheid, Genomic Health Inc., Laboratory Corp. of America Holdings, Meridian Bioscience, Inc., Myriad Genetics Inc., and Quest Diagnostics, Inc, ("eight comparable companies"). VPA Solvency Analysis at ML_DE_00263292.

[15] Ms. Austin Smith identifies only a subset of five for her comparable companies analysis, namely, Alere, Bio-Reference Laboratories, Laboratory Corp. of America Holdings, Myriad Genetics, and Quest Diagnostics.  Austin Smith Report, Appendix B.2.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER    **APPENDIX F**

10.     In **Appendix D**, I provide the corrections to the WACC as shown in **Exhibit 4**, but do not remove the size premium in the cost of equity, despite the fact that it lacks academic support. When I include the size premium but otherwise make the same corrections as detailed in **Exhibit 4**, the WACC is 8.6%.  This 8.6% is well below the 10.0% Ms. Austin Smith claims in her report to calculate using her comparable companies with a size premium.[16]  Ms. Austin Smith provides no material or backup for her calculations.

---

[16] Austin Smith Report ¶ 148, FN 285.

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 219 of 273

## *In Re Millennium Lab Holdings II, LLC*
## Selected Fact Witness Depositions

| Witness | Entity | Title |
| --- | --- | --- |
| Martin Price | Millennium Laboratories, LLC | General Counsel |
| William Brock Hardaway | Millennium Laboratories, LLC | Chief Executive Officer |
| Tim Kennedy | Millennium Laboratories, LLC | Chief Financial Officer |
| Jennifer M. Mulloy | TA Associates | Managing Director |
| Daniel Pencak | Millennium Laboratories, LLC | Vice President of Financial Planning and Analysis |
| Ryan Griswold | J.P. Morgan Chase | Vice President, Leveraged Finance |
| David M. Felty | SunTrust | Director |
| Michael Tortora | Citibank | Vice President, Leveraged Finance |
| Phillip Ho | BMO Harris | Director |

Source: Deposition of Martin Price, April 12, 2021; Deposition of William Brock Hardaway, July 20, 2021; Deposition of Tim Kennedy, September 30, 2021; Deposition of Jennifer M. Mulloy, July 14, 2021; Deposition of Daniel Pencak, July 12, 2021; Deposition of Ryan Griswold, July 22, 2021; Deposition of David M. Felty, July 27, 2021; Deposition of Michael Tortora, July 15, 2021; Deposition of Phillip Ho, July 28, 2021.

## *In Re Millennium Lab Holdings II, LLC*
## Padres and Modified Padres Revenue Projections
### *($ Millions)*

| Revenue Projections | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Padres | $733.28 | $788.76 | $853.08 | $933.01 | $1,008.08 | $1,070.62 | $1,134.68 |
| *Annual growth rate* | | 7.6% | 8.2% | 9.4% | 8.0% | 6.2% | 6.0% |
| *Cumulative growth rate since 2014* | | 7.6% | 16.3% | 27.2% | 37.5% | 46.0% | 54.7% |
| Modified Padres | $676.86 | $573.08 | $487.66 | $517.79 | $540.90 | $559.99 | $577.02 |
| *Annual Growth rate* | | -15.3% | -14.9% | 6.2% | 4.5% | 3.5% | 3.0% |
| *Cumulative growth rate since 2014* | | -15.3% | -28.0% | -23.5% | -20.1% | -17.3% | -14.8% |
| *Modified Padres Projections as a Percentage of Padres Projections* | 92.31% | 72.66% | 57.16% | 55.50% | 53.66% | 52.30% | 50.85% |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

## *In Re Millennium Lab Holdings II, LLC*
### Padres and Modified Padres UDT Specimen Volume Projections

| Projection Type | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Compound Annual Growth Rate[1] |
|---|---|---|---|---|---|---|---|---|
| **Combined Projections** | | | | | | | | |
| **Padres** | 2,787,261 | 3,046,046 | 3,350,651 | 3,685,713 | 4,054,287 | 4,257,003 | 4,469,856 | 8.2% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | 5.0% | 5.0% | |
| **Modified Padres** | 2,653,277 | 2,395,870 | 2,162,041 | 2,305,937 | 2,461,021 | 2,534,852 | 2,610,897 | -0.3% |
| *Growth rate* | | -9.7% | -9.8% | 6.7% | 6.7% | 3.0% | 3.0% | |
| **Projections by Payor[2]** | | | | | | | | |
| **Padres** | | | | | | | | |
| Medicare | 517,976 | 566,068 | 622,675 | 684,942 | 753,437 | - | - | 9.8% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | | | |
| Commercial Payors | 946,699 | 1,034,596 | 1,138,056 | 1,251,860 | 1,377,047 | - | - | 9.8% |
| *Growth rate* | | 9.3% | 10.0% | 10.0% | 10.0% | - | - | |
| **Modified Padres** | | | | | | | | |
| Medicare | 423,228 | 359,691 | 313,647 | 323,056 | 332,748 | - | - | -5.8% |
| *Growth rate* | | -15.0% | -12.8% | 3.0% | 3.0% | - | - | |
| Commercial Payors | 917,208 | 830,322 | 733,655 | 755,665 | 778,335 | - | - | -4.0% |
| *Growth rate* | | -9.5% | -11.6% | 3.0% | 3.0% | - | - | |

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] Compound annual growth rate ("CAGR") is the annualized average growth rate between two time periods assuming that growth takes place at an exponentially compounded rate between those two time periods. In this instance, CAGR is calculated as (Specimen Volume in 2020 / Specimen Volume in 2014)^(1/6)-1.
[2] By-payor breakdowns of specimen volume are not available in either the Padres Projections or the Modified Padres Projections between 2019–2020. Commercial payors are those payors in the group consisting of Aetna, Blue Cross Blue Shield, Cigna, Humana, and United Healthcare.

Case 17-51840-LSS   Doc 341-7   Filed 02/10/23   Page 221 of 273

## *In Re Millennium Lab Holdings II, LLC*
## Projected Cash Flows and Term Loan B Required Debt Service Payments
### Modifications to Ms. Austin Smith's Adjustments of the Padres Projections[1]
### ($ Millions)

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance[2] | $50.00 | $62.29 | $85.07 | $106.85 | $181.81 | $260.28 | $367.88 |
| *Plus* : Unlevered Free Cash Flow[3] | $131.86 | $198.41 | $198.87 | $220.77 | $233.97 | $276.43 | $291.82 |
| Total Cash Available to Pay Debt | $181.86 | $260.70 | $283.94 | $327.62 | $415.79 | $536.71 | $659.70 |
| *Less* : Total Mandatory Debt Payments | $119.58 | $175.63 | $177.08 | $145.80 | $155.51 | $168.82 | $134.50 |
| Ending Cash Balance | $62.29 | $85.07 | $106.85 | $181.81 | $260.28 | $367.88 | $525.21 |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections");
         Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015", July 27, 2015, ML_DE_00079584

Note:

[1] Reflects Millennium's projected ending cash balance following the application of the modifications described in Exhibit 1.  Ending cash balance is defined as the beginning cash balance + Unlevered Free Cash Flow - (Term Loan B Interest Payments + Term Loan B Principal Amortization Payments + Term Loan B Cash Sweep - Non-Term Loan B Principal Amortization Payments). A positive ending cash balance indicates that Millennium had the ability to service the interest payments associated with the Term Loan B transaction.

[2] Millennium's minimum operating cash in each year is $50 million.

[3] Unlevered free cash flow for the purposes of this analysis is defined as the free cash flow available to Millennium in the absence of Term Loan B related interest expenses and amortization payments, i.e. Free Cash Flow + Term Loan B Interest Payments + Term Loan B Principal Amortization Payments.

## *In Re Millennium Lab Holdings II, LLC*
## Projected Cash Flows and Term Loan B Required Debt Service Payments
Modification to Ms. Austin Smith's Specimen Volume Adjustment Due to the Impact of the Department of Justice Settlement[1]
*($ Millions)*

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|
| Beginning Cash Balance[2] | $50.00 | $58.68 | $72.55 | $79.66 | $84.73 | $86.07 | $89.76 |
| *Plus*: Unlevered Free Cash Flow[3] | $117.61 | $163.95 | $143.60 | $148.94 | $145.15 | $161.41 | $165.32 |
| Total Cash Available to Pay Debt | $167.61 | $222.63 | $216.15 | $228.61 | $229.88 | $247.48 | $255.08 |
| *Less*: Total Mandatory Debt Payments | $108.93 | $150.07 | $136.49 | $143.87 | $143.81 | $157.72 | $161.76 |
| Ending Cash Balance | $58.68 | $72.55 | $79.66 | $84.73 | $86.07 | $89.76 | $93.32 |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (Includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015", July 27, 2015, ML_DE_00079584

Note:

[1] Reflects Millennium's projected ending cash balance following modification to the adjustment of 15% in 2015 and 15% in 2016 Urinary Drug Testing and Pharmacogenetic specimen volume reduction due to the purported reputational impact of the Department of Justice settlement.  Ending cash balance is defined as the beginning cash balance + Unlevered Free Cash Flow - (Term Loan B Interest Payments + Term Loan B Principal Amortization Payments + Term Loan B Cash Sweep - Non-Term Loan B Principal Amortization Payments).  A positive ending cash balance indicates that Millennium had the ability to service the interest payments associated with the Term Loan B transaction.

[2] Millennium's minimum operating cash in each year is $50 million.

[3] Unlevered free cash flow for the purposes of this analysis is defined as the free cash flow available to Millennium in the absence of Term Loan B related interest expenses and amortization payments, i.e. Free Cash Flow + Term Loan B Interest Payments + Term Loan B Principal Amortization Payments.

### *In Re Millennium Lab Holdings LLC, II*
### Projected Leverage Ratios
Modifications to Ms. Austin Smith's Adjustments of the Padres Projections[1]
*($ Millions)*

| | 1Q2014 | 2Q2014 | 3Q2014 | 4Q2014 | 2014 | 1Q2015 | 2Q2015 | 3Q2015 | 4Q2015 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leverage Ratio**[1] | 4.66x | 4.48x | 4.33x | 4.04x | 4.04x | 3.81x | 3.71x | 3.68x | 3.61x | 3.61x | 3.28x | 2.73x | 2.30x | 1.83x | 1.44x |

Source: Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:
[1] Reflects Millennium's leverage ratio in each period following the implementation of the modifications made to the Modified Padres Projections as outlined in Exhibit 1. Leverage ratio reflects net leverage including PNC notes and capital leases as defined in the Padres Projections.

***In Re Millennium Lab Holdings LLC, II***
**Projected Leverage Ratios**

Modification to Ms. Austin Smith's Specimen Volume Adjustment Due to the Impact of the Department of Justice Settlement[1]
*($ Millions)*

| | 1Q2014 | 2Q2014 | 3Q2014 | 4Q2014 | 2014 | 1Q2015 | 2Q2015 | 3Q2015 | 4Q2015 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leverage Ratio**[1] | 4.66x | 4.73x | 4.76x | 4.62x | 4.62x | 4.57x | 4.70x | 4.90x | 4.85x | 4.85x | 5.26x | 4.97x | 4.89x | 4.61x | 4.39x |

Source:  Expert Report of Yvette R. Austin Smith, filed on November 15, 2021 ("Austin Smith Report"); YAS Workpaper 1 (includes "Modified Padres Projections" and "Padres Projections"); Millennium Laboratories, "Net Revenue per Specimen Trends – 2013 to 2015," July 27, 2015, ML_DE_00079584

Note:

[1] Reflects Millennium's leverage ratio in each period following the adjustment of 15% in 2015 and 15% in 2016 Urinary Drug Testing and Pharmacogenetic Testing specimen volume reduction due to the purported reputational impact of the Department of Justice settlement.  Leverage ratio reflects net leverage including PNC notes and capital leases as defined in the Padres Projections.

# EXHIBIT 4

## FILED UNDER SEAL

# EXHIBIT 5

## FILED UNDER SEAL

# EXHIBIT 6

## FILED UNDER SEAL

# EXHIBIT 7

**Select Directions:**

1       Directions for Capital IQ (PLEASE DON'T IGNORE THESE):

  A       Download Capital IQ Excel Plug-in (if you haven't already).  Within Capital IQ home page go to My Capital IQ -> Downloads -> and select Download Excel Plug-in (www.capitaliq.com/ciqdotnet/downloads/downloads.aspx).  Be sure save the plug-in to your DESKTOP when downloading.  Once the plug-in is downloaded a Capital IQ menu bar will appear in your excel workbook

  B       Adjust the following Capital IQ settings in Excel by going to *Capital IQ  -> Settings,* which will produce a menu box titled *Capital IQ Excel Plug-in Options & Settings* :

    B1      Select *Default Value* under *Formulas* in the left hand column of the *Capital IQ Excel Plug-in Options & Settings* menu box and change the figure in the white field to "-"

    B2      Select *Currency* under *Formulas* in the left hand column of the *Capital IQ Excel Plug-in Options & Settings* menu box and select *USD US Dollar* in the top white field

  C       To update financial data in Excel for *Public Company Trading Comparables Analysis* go to *Capital IQ -> Refresh Data*

2       When modifying roster of trading comps in the *Public Company Trading Comparables Analysis* (see rows 16-30 on worksheet 1) please ensure the same modifications are made to the 3-year historical mean trading multiple calculation (see rows 31-52 on worksheet 1)

3       Please take note of directions provided in the RED COMMENT BOXES located in certain cells of various worksheets

4       Before submitting quarter end valuations please hard code cells that pull data from Capital IQ.  This involves highlighting the cells, hitting CTRL+C, and then hitting ALT+E+S+V to paste the values. The cells that need to be converted are rows 23-51 in Tab 1.

TA_MLH-00090312.001

**Millennium Laboratories**

*Public Company Trading Comparables Analysis*
*Figures in $ millions*

Summary Information:

| | | |
|---|---|---|
| Company Name | | Millennium Laboratories |
| TA Cost - Equity [1] | | $196.0 |
| TA Cost - TEV [1] | | $400.0 |
| Industry | | Specialty Laboratory |
| SIC Code | | |
| Valuation Date | | 31-Dec-13 |
| Latest Filing Date | 12/31/2013 | 31-Dec-13 |
| Date of Last Q Close | | 31-Dec-13 |

Public Trading Comparables: [2]

| | Trailing Twelve Months (TTM) Metrics | | | | | | | | TEV / TTM Revs | | | TEV / TTM EBITDA [2] [4] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Y/Y | Gross | EBITDA | Market Value | | | | 3-yr | % Prem. / | | 3-yr | % Prem. / |
| Company | Revs | EBITDA[4] | Revs (%) | Margin | Margin | Equity | TEV | Current | Mean | (Disc.) [5] | Current | Mean | (Disc.) [5] |
| **Millennium Laboratories** | **$632.6** | **$356.7** | **21.2%** | | **56.4%** | **-** | **-** | **-** | **-** | **-** | **-** | **-** | **-** |
| Laboratory Corp. of America Holdings | $5,776.6 | $1,308.6 | 2.6% | 38.7% | 22.7% | $7,985.7 | $10,495.5 | 1.8x | 2.0x | (8.0%) | 8.0x | 8.4x | (4.4%) |
| Quest Diagnostics Inc. | 7,163.3 | 1,456.3 | (2.8%) | 40.2% | 20.3% | 7,786.2 | 11,050.7 | 1.5x | 1.7x | (9.2%) | 7.6x | 7.7x | (1.7%) |
| Bio-Reference Laboratories Inc. | 715.4 | 100.9 | 8.1% | 45.1% | 14.1% | 706.8 | 739.2 | 1.0x | 1.2x | (10.2%) | 7.3x | 8.3x | (12.1%) |

| | | | Y/Y | Gross | EBITDA | | | Current | Mean | (Disc.) | Current | Mean | (Disc.) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mean: | - | - | 2.6% | 41.3% | 19.0% | - | - | 1.5x | 1.6x | (9.1%) | 7.6x | 8.1x | (6.1%) |
| Median: | - | - | 2.6% | 40.2% | 20.3% | - | - | 1.5x | 1.7x | (9.2%) | 7.6x | 8.3x | (4.4%) |

Quarterly Financial Momentum (Latest Historical Fiscal Year & Projected Fiscal Year):

| | Dec-08A | Mar-09A | Jun-09A | Sep-09A | Dec-09A | Mar-10A | Jun-10A | Sep-10A | Dec-10A | Mar-11A | Jun-11A | Sep-11A | Dec-11A | Mar-12A | Jun-12A | Sep-12A | Dec-12A | Mar-13A | Jun-13A | Sep-13A | Dec-13A | Dec-09A | Dec-10A | Dec-11A | Dec-12A | Dec-13A | Dec-13A |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | Quarter Ended | | | | | | Fiscal Year Ended | | | | | Run-Rate |
| Revenue | $8.2 | $12.7 | $12.4 | $15.0 | $26.2 | $30.8 | $36.5 | $47.0 | $47.5 | $48.6 | $56.1 | $61.1 | $66.8 | $82.3 | $139.8 | $136.9 | $163.2 | $155.8 | $148.3 | $162.2 | $166.4 | $66.3 | $161.8 | $232.6 | $522.2 | $632.6 | $665.6 |
| *% Y/Y Growth* | NA | NM | NM | #DIV/0! | #DIV/0! | 276.9% | 187.9% | 278.7% | 81.3% | 57.9% | 53.6% | 30.0% | 40.6% | 69.2% | 149.4% | 123.8% | 144.3% | 89.4% | 6.0% | 18.5% | 1.9% | 712.4% | 143.9% | 43.8% | 124.5% | 21.2% | 1.9% |
| EBITDA [4] | $5.3 | $9.9 | $8.1 | $9.4 | $15.8 | $19.7 | $23.8 | $30.3 | $30.5 | $23.8 | $28.2 | $30.6 | $32.0 | $39.5 | $92.3 | $86.6 | $111.5 | $83.9 | $84.4 | $98.1 | $90.4 | $43.2 | $104.4 | $114.6 | $329.8 | $356.7 | $361.4 |
| *% Y/Y Growth* | NA | NM | NM | #DIV/0! | #DIV/0! | 269.1% | 139.6% | 275.4% | 93.4% | 20.9% | 18.6% | 0.9% | 4.8% | 65.9% | 226.8% | 183.2% | 248.1% | 112.5% | (8.6%) | 13.2% | (18.9%) | 710.7% | 141.4% | 9.8% | 187.7% | 8.1% | (18.9%) |
| *% Margin* | 65.3% | 78.4% | 65.1% | 62.7% | 60.3% | 64.0% | 65.3% | 64.5% | 64.3% | 49.0% | 50.4% | 50.0% | 47.9% | 48.0% | 66.0% | 63.3% | 68.3% | 53.8% | 56.9% | 60.5% | 54.3% | 65.2% | 64.5% | 49.3% | 63.2% | 56.4% | 54.3% |

*-Portfolio Company Valuation Analysis-*
*(Confidential)*

**TA_MLH-00090312.002**

**Millennium Laboratories**

***Public Company Trading Comparables Analysis***

*Figures in $ millions*

**Differences to Comps (Size, Customers - fewer broader):**

**Differences in Business Model:**
Millennium focuses on urine drug testing for the pain management market.

**Balance Sheet:**

**Pricing Risk if Different than Industry:**

**Additional Data Points (e.g. offers, equity financings, stock option prices)**
N/A.

**Location**
San Diego, CA

**Conclusion**

Public comps have decreased from 8.2x to 7.6x TTM EBITDA.  We would recommend valuing at a 25% discount.  Further, Millennium closed an acquisition in Q4 for ~$50m, but that there are no earnings in TTM EBITDA from this acquisition.  Therefore, from a valuation standpoint, we valued the earnings (at 5.7x, or 25% discount to comps) and then added back the $50m acquisition purchase price to enterprise value to capture the value of the acquisition.

(1) At time of transaction.
(2) Data for publicly-traded comparable companies per Capital IQ.
(3) EBITDA multiples that are negative or greater than 50.0x considered not meaningful (NM).
(4) Based on EBITDA excluding stock-based compensation expense.
(5) Current multiple as a % premium / (discount) to 3-year mean multiple.

Millennium 4Q13.xlsx

*-Portfolio Company Valuation Analysis-*
*(Confidential)*

**TA_MLH-00090312.003**

**Millennium Laboratories**

*DCF Analysis*

*Figures in $ millions*

| | 2010A | 2011A | 2012A | 2013A | 2014E | 2015E | 2016E | 2017E | 2018E | 2019E | Terminal EBITDA [6] | '13-'18 CAGR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $161.8 | $232.6 | $522.2 | $632.6 | $740.2 | $866.0 | $1,013.2 | $1,165.2 | $1,340.0 | $1,541.0 | | 15.8% |
| *% growth* | | 43.8% | 124.5% | 21.2% | 17.0% | 17.0% | 17.0% | 15.0% | 15.0% | 15.0% | | |
| EBITDA | $104.4 | $114.6 | $329.8 | $356.7 | $417.3 | $389.7 | $405.3 | $466.1 | $536.0 | $616.4 | $536.00 | 8.1% |
| *% margin* | 64.5% | 49.3% | 63.2% | 56.4% | 56.4% | 45.0% | 40.0% | 40.0% | 40.0% | 40.0% | | |
| Less: D&A | - | - | - | - | (7.4) | (8.7) | (10.1) | (11.7) | (13.4) | (15.4) | | |
| Unlevered Pre-tax Income | - | - | - | - | $409.9 | $381.0 | $395.2 | $454.4 | $522.6 | $601.0 | | |
| Less: Taxes | - | - | - | - | (153.7) | (142.9) | (148.2) | (170.4) | (196.0) | (225.4) | | |
| Plus: D&A | - | - | - | - | 7.4 | 8.7 | 10.1 | 11.7 | 13.4 | 15.4 | | |
| Less: CapEx | - | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| Less: Increase in Net Working Capital | - | - | - | - | (55.5) | (65.0) | (76.0) | (87.4) | (100.5) | (115.6) | | |
| Unlevered Free Cash Flow | - | - | - | - | $208.1 | $181.9 | $181.1 | $208.3 | $239.5 | $275.5 | 5-Yr | |
| | | | | | *12 ME* | *<-- Indicates Fractional Period -->* | | | | *0 ME* | Total | |
| Unlevered Free Cash Flow (5-Yr Period Ending Q4: 2018) | | | | | $208.1 | $181.9 | $181.1 | $208.3 | $239.5 | $0.0 | $1,018.9 | |
| Discounted Unlevered Free Cash Flow (5-Yr Period Ending Q4: 2018) | | | | | 186.6 | 131.2 | 105.1 | 97.2 | 89.9 | 0.0 | 610.0 | |

| PV Periods - > | 0.500 | 1.500 | 2.500 | 3.500 | 4.500 | 4.500 |
|---|---|---|---|---|---|---|
| 16.0% | 193.2 | 145.6 | 125.0 | 123.9 | 122.8 | 0.0 |
| 18.0% | 191.6 | 141.9 | 119.7 | 116.7 | 113.7 | 0.0 |
| 20.0% | 189.9 | 138.3 | 114.8 | 110.0 | 105.4 | 0.0 |
| 22.0% | 188.4 | 135.0 | 110.2 | 103.8 | 97.9 | 0.0 |

## WACC Calculation

| Capital | Amount | % of Total Cap | Sub Debt Coupon | Cost of Capital Pre-tax | Post-tax |
|---|---|---|---|---|---|
| Equity | $1,585 | 97.0% | | 25.0% | 25.0% |
| Non-TA Debt 1 | 43 | 2.7% | | 4.0% | 2.5% |
| Non-TA Debt 2 | 5 | 0.3% | | 0.0% | 0.0% |
| TA Sub Debt | 0 | 0.0% | 12.0% | 18.0% | 13.5% |
| | | | WACC--> | **24.3%** | |
| Tax Rate | 37.5% | | | | |

**Current Credit Yields**

| Leveraged Loans [1] | | High Yield Bonds [2] | |
|---|---|---|---|
| Ba3/BB- | 3.7% | BB | 4.8% |
| B1/B+ | 3.6% | B | 5.6% |
| B2/B | 4.6% | CCC | 8.6% |
| B3/B- | 5.7% | | |
| Caa1/CCC+ | 6.9% | | |
| Unrated - <$50M EBITDA [3] | 5.7% | | |
| Unrated - >$50M EBITDA [4] | 4.0% | | |

**Valuation Sensitivity**

| | | Terminal Multiple | | | | |
|---|---|---|---|---|---|---|
| | | 5.0x | 6.0x | 7.0x | 8.0x | 9.0x |
| WACC | 16.0% | $1,986.4 | $2,241.6 | $2,496.8 | $2,752.0 | $3,007.2 |
| | 18.0% | 1,855.1 | 2,089.3 | 2,323.6 | 2,557.9 | 2,792.2 |
| | 20.0% | 1,735.6 | 1,951.0 | 2,166.4 | 2,381.8 | 2,597.2 |
| | 22.0% | 1,626.8 | 1,825.2 | 2,023.5 | 2,221.8 | 2,420.1 |

## Valuation

**Free Cash Flows:**

| | |
|---|---|
| 5-Yr Free Cash Flow | $1,018.9 |
| PV of 5-Yr Free Cash Flow [5] | 610.0 |

**Terminal Value:**

| | |
|---|---|
| Terminal TTM EBITDA Mult. | 6.1x |
| Mult by: Terminal EBITDA [6] | 536.0 |
| Terminal Value | 3,276.0 |
| PV of Terminal Value | 1,102.9 |

**Total Enterprise Value (TEV):**

| | |
|---|---|
| PV of Free Cash Flow | $610.0 |
| PV of Terminal Value | 1,102.9 |
| **TEV** | **$1,712.9** |

**DCF Terminal TTM EBITDA Multiple Rationale:**

(1) Standard & Poor's Leveraged Commentary & Data (LCD) as of December 31, 2008
(2) Credit Suisse High Yield Index as of December 31, 2008
(3) Based on average spreads for average institutional spreads for issuers with <$50M EBITDA

(4) Based on average spreads for average institutional spreads for issuers with >$50M EBITDA.
(5) Discounted using mid-year cash flow convention.
(6) Projected TTM EBITDA as of Q4: 2018

## Millennium Laboratories

### *Valuation Summary*
*Figures in $*

|  | Methodology | |
|---|---|---|
|  | **Comps** | **DCF** |
| TTM EBITDA (as of 31-Dec-13) | $356,671,552 | $356,671,552 |
| Mean Multiple of Public Trading Comparables [1] | 7.6x | |
| Discount Factor | 25% | |
| Valuation Multiple | 5.7x | 6.1x |
| Total Enterprise Value (TEV) ex acquisition [2] | $2,044,959,296 | $1,712,948,051 |
| Q4 Acquisition not reflected in TTM EBITDA | $50,000,000 | $50,000,000 |
| Adjusted Enterprise Value (TEV) | $2,094,959,296 | $1,762,948,051 |
| Less: (Debt) (as of 31-Dec-13) | (371,524,652) | (371,524,652) |
| Plus: Cash (as of 31-Dec-13) | 193,084,932 | 193,084,932 |
| Equity Value | $1,916,519,576 | $1,584,508,331 |
| Total Equity Equivalents outstanding (Including Warrants): | 584,132 | 584,132 |
| Value Per Share | $3,280.97 | $2,712.59 |
| Total Share Count (Treasury Method) | 570,573 | 570,573 |
| Value Per Share (Treasury Method) | $3,358.94 | $2,777.05 |
| TA Equity Funds Shares | 245,860 | 245,860 |
| **TA Equity Funds Total Value (Fully Diluted)** | $825,828,949 | $682,765,189 |
| Total TA Equity Funds Cost | $196,000,000 | $196,000,000 |
| Total TA Equity Funds Value as Mult. of Cost | 4.21x | 3.48x |
| Shares Underlying TA Sub Debt Warrants | 0 | 0 |
| **TA Sub Debt Warrants Value (Pre-exercise Price)** | $0 | $0 |
| **TA Subordinated Debt Value** | 0 | 0 |
| **Total TA Sub Debt Funds Value** | $0 | $0 |
| Total TA Sub Debt Funds Cost | $0 | $0 |
| Total TA Sub Debt Funds Value as Mult. of Cost | NA | NA |
| TA Shares | 245,860 | 245,860 |
| Total Equity Equivalents outstanding | 584,132 | 584,132 |
| *% TA Ownership* | *42.1%* | *42.1%* |
| **TA Equity Cushion** | | |
| Net Debt / TTM EBITDA | 0.5x | 0.5x |
| TA Preference Equity / TTM EBITDA | NM | NM |
| Non-TA Junior Equity ("Cushion") / TTM EBITDA | NM | NM |
| TEV / TTM EBITDA | 5.7x | 6.1x |
| *Cushion (as % of TEV)* | *NM* | *NM* |

| Forecast vs. Sponsor YE Review (Circle one) | | Forecast vs. Previous forecast (Circle one) | |
|---|---|---|---|
| EBITDA: | Revenues: | EBITDA: | Revenues: |
| > | > | > | > |
| = | = | = | = |
| < | < | < | < |
| If below provide details: | | If below provide details: | |

(1) Multiple for trading comparables methodology based on mean TEV / TTM EBITDA multiple of outlined publicly-traded comparable companies as of December 31, 2013. Multiple for DCF methodology based on historical 3-year mean TEV / TTM EBITDA multiple of publicly-traded comparable companies as of December 31, 2013.

(2) See DCF Analysis page for calculation of figure for DCF methodology.

## Millennium Laboratories

### *Public Company Trading Comparables Descriptions*

**Laboratory Corp. of America Holdings**

range of testing services used by the medical profession in routine testing, patient diagnosis, and in the monitoring and treatment of disease, as well as specialty testing services. Its routine tests include blood chemistry analyses, urinalyses, blood cell counts, thyroid tests, Pap tests, HIV tests, microbiology cultures and procedures, and alcohol and other substance-abuse tests. The company's specialty tests and related services comprise viral load measurements, genotyping and phenotyping, and host genetic factors for infectious diseases; cytogenetic, molecular cytogenetic, biochemical, and molecular genetic tests for diagnostic genetics; oncology testing; clinical trials testing for pharmaceutical companies, which conducts clinical research trials on new drugs or diagnostic assays; forensic identity testing used in criminal proceedings and parentage evaluation services; allergy testing; and occupational testing for the detection of drug and alcohol abuse. Its customers comprise independent physicians and physician groups, hospitals, managed care organizations, governmental agencies, employers, pharmaceutical companies, and other independent clinical laboratories. As of December 31, 2009, the company operated 38 primary

**Quest Diagnostics Inc.**

Quest Diagnostics Incorporated provides diagnostic testing, information, and services in the United States and internationally. It offers access to diagnostic testing services through its network of laboratories and patient service centers; and interpretive consultation to patients and physicians. The company provides commercial clinical testing services, including routine clinical testing for blood chemistries, complete blood cell counts, urinalyses, pregnancy and other prenatal tests, microbiology testing, alcohol and other substance-abuse tests, and allergy tests; cancer diagnostics, such as anatomic pathology services; and gene-based and other esoteric testing, as well as various risk assessment services for insurance companies. It also provides central laboratory testing in connection with clinical research trials on new drugs, vaccines, and certain medical devices; and clinical testing to employers for the detection of employee use of drugs-of-abuse. In addition, Quest Diagnostics develops and manufactures products that enable healthcare professionals to make healthcare diagnoses, including HerpeSelect ELISA tests that detect patient antibodies to certain types of Herpes Simplex virus, and sells to academic medical centers, hospitals,

**Bio-Reference Laboratories Inc.**

Bio-Reference Laboratories, Inc. provides clinical laboratory testing services primarily in the greater New York metropolitan area. It offers various chemical diagnostic tests, including blood and urine analysis, blood chemistry, hematology services, serology, radioimmuno analysis, toxicology, pap smears, tissue pathology, and other tissue analysis. The company also operates a clinical knowledge management service unit, which uses customer data from laboratory results, pharmaceutical data, claims data, and other data sources to provide administrative and clinical decision support systems. In addition, it operates a Web-based connectivity portal solution for laboratories and physicians. Bio-Reference Laboratories provides its services directly to physicians, geneticists, hospitals, clinics, and correctional and other health facilities. The company was founded in 1981 and is headquartered in Elmwood Park, New Jersey.

**MEDTOX Scientific Inc.**

MEDTOX Scientific, Inc. and its subsidiaries provide forensic and clinical laboratory services. The company also manufactures and distributes diagnostic and related devices. Its Laboratory Services segment offers drugs-of-abuse testing services. It also provides clinical and other laboratory services, including clinical toxicology, clinical testing for occupational health clinics, clinical testing for physician offices, pediatric lead testing, and analysis of heavy and trace metal. In addition, this segment offers services in the area of logistical support, data management, and program management; and pain management products. Further, it provides clinical trial services comprising central laboratory, assay (test) development, bio-analytical, bio-equivalence, and pharmacokinetic testing services for pharmaceutical and biotech companies, clinical research organizations, research organizations, investigators with trial management, and patient recruitment/enrollment and site management organizations. The company's Product Sales segment offers point-of-collection testing (POCT) products for drugs-of-abuse. It primarily provides diagnostic drug screening products, such as PROFILE-II ER and PROFILE-III ER, and PROFILE-IV to hospital markets for drug detection in patients; MEDTOXScan, an electronic reader for use with PROFILE-V device in hospital laboratories and emergency rooms; and VERDICT-II and SURE-SCREEN diagnostic drug screening products for criminal justice and drug rehabilitation markets. This segment also offers coagulation/blood clotting market controls; and distributes diagnostic tests for the detection of alcohol with the EZ-SCREEN Breath Alcohol Test. The company serves public and private companies, drug treatment counseling centers, criminal justice facilities, occupational health clinics, third party administrators, and hospitals. MEDTOX Scientific, Inc. was founded in 1983 and is based in St. Paul, Minnesota.

| Option Holder | Plan | Exercise Price | # of Options | Option Proceeds |
|---|---|---|---|---|
| Jason Bristol | 2010 | 500 | 1550.55 | $775,275 |
| Nick DePriest | 2010 | 500 | 1550.55 | 775,275 |
| Brandon Worley | 2010 | 500 | 1550.55 | 775,275 |
| Elizabeth Peacock | 2010 | 500 | 1550.55 | 775,275 |
| Martin Price | 2010 | 500 | 2046.72 | 1,023,360 |
| Martin Price | 2010 | 500 | 2108.74 | 1,054,370 |
| Tim Scott | 2010 | 690 | 1550.55 | 1,069,880 |
| Heidi Smith | 2010 | 690 | 1550.55 | 1,069,880 |
| Lynn Willis | 2010 | 690 | 1550.55 | 1,069,880 |
| William Brock Harda | 2010 | 2167 | 11547.36 | 25,023,129 |
| Mark Minham | 2010 | 2167 | 2920.66 | 6,329,070 |
| Tim Kennedy | 2010 | 2167 | 1533.67 | 3,323,463 |
| Tim Kennedy | 2013 | 2167 | 656.82 | 1,423,329 |
| | | | **Total** | **$44,487,460** |

# EXHIBIT 8
# FILED UNDER SEAL

# EXHIBIT 9

# THE BUSINESS LAWYER

## Section of Business Law • American Bar Association

### ARTICLES

Going Private at the Intersection of the Market and the Law
*Faith Stevelman*

The Origin, Application, Validity, and Potential Misuse of Rule 10b5-1
*Allan Horwich*

Meeting *Daubert* Standards in Calculating Damages for Shareholder
Class Action Litigation
*Linda Allen*

Tontine or Takeback: Reversion Provisions in Class Action
Settlement Agreements
*Ralph C. Ferrara and Riva Khoshaba Parker*

Solvency Tests
*J.B. Heaton*

Pandora's Ballot Box, Or a Proxy with Moxie? Majority Voting,
Corporate Ballot Access, and the Legend of Martin Lipton
Re-Examined
*J.W. Verret*

Summary of Mendes Hershman Student Writing Contest Prize Essay:
Difficult, Duplicative and Wasteful?: The NASD's Prohibition of Class
Action Arbitration in the Post-*Bazzle* Era
*Matthew Eisler*

### REPORT

Changes in the Model Business Corporation Act—Amendments
Relating to Chapters 8 and 13
*Committee on Corporate Laws, ABA Section of Business Law*

### SURVEY—FEDERAL REGULATION OF SECURITIES

Annual Review of Federal Securities Regulation
*Subcommittee on Annual Review, Committee on Federal Regulation of Securities,
ABA Section of Business Law*

May 2007 • Volume 62 • Number 3

# Solvency Tests

*By J.B. Heaton\**

*This Article explains the basic economic function of solvency tests and the relations among the three solvency tests applied in bankruptcy and corporate law. It also explains why solvency diagnoses can differ, depending on the test that is applied. Although one of these tests— the ability-to-pay test—is probably best, it may suffer from significant measurement error in practice. Multiple solvency tests ultimately make sense because the costs of failing to detect insolvency when it exists exceed the costs of detecting insolvency when it does not exist.*

## INTRODUCTION

Three solvency tests appear in bankruptcy and corporate law:

- a test of whether a firm[1] reasonably can be expected to pay its debts as they come due (the *ability-to-pay solvency test,* sometimes referred to as *cash-flow solvency* or *equitable solvency*),[2]
- a test of whether the fair value of a firm's assets exceed the face value of its liabilities (the *balance-sheet solvency test,* performed on either a *going-concern* or *liquidation* basis),[3] and
- a much less well defined test of whether a firm has adequate capital (the *capital-adequacy solvency test*).[4]

It is easy to identify these tests but hard to apply them in practice.[5] This is nothing new. Commentators in a 1929 *Columbia Law Review* article lamented that "courts have not yet developed any clear-cut principles or rules" for solvency

---

* Partner, Bartlit Beck Herman Palenchar & Scott LLP (Chicago). Please address correspondence to Heaton at Bartlit Beck Herman Palenchar & Scott LLP, 54 West Hubbard Street, Chicago, Illinois 60610, phone 312-494-4425, email: jb.heaton@bartlit-beck.com. The opinions expressed here are the author's own and do not reflect the position of Bartlit Beck Herman Palenchar & Scott LLP, its attorneys or clients. For helpful comments I thank John Byars, Chris Culp, David Evans, Renee McMahon, Adam Mortara, David Parker, Jordan Siev, Joe Smith, Cindy Sobel, and Jamie Sprayregan.

1. References are made to "firm" throughout but nothing prevents the application of this Article's ideas to natural persons.

2. *See infra* notes 25–31 and accompanying text.

3. *See infra* notes 32–48 and accompanying text.

4. *See infra* notes 49–54 and accompanying text.

5. *See, e.g., In re* WorldCom, Inc., No. 02-13533 (AJG), 2003 Bankr. LEXIS 1401, *120 (Bankr. S.D.N.Y. Oct. 31, 2003) ("There are various tests used to determine insolvency under the [New York Debtor and Creditor Law], none of which is generally accepted as the correct test.") (citation omitted); *cf.* United States v. Whitehead, 176 F.3d 1030, 1040 (8th Cir. 1999) (reversing conviction where

983

testing.[6] Seventy-five years later, Delaware's Court of Chancery complained that "it is not always easy to determine whether a company even meets the test for solvency."[7] Practitioners often complain that uncertainty about the application of solvency tests makes it difficult to advise on corporate restructuring.[8] Those involved in high stakes financial litigation spend as much time litigating *how* to determine insolvency as they do litigating *whether* a given firm is insolvent. As the leading bankruptcy treatise notes, litigation on the meaning of insolvency "generates a formidable and, on the surface, not always consistent stream of adjudications."[9]

This Article begins by explaining the basic economic function of solvency tests in bankruptcy and corporate law. Limitations on a firm's activities based on solvency tests—embedded in laws such as fraudulent transfer law, preference law, and the law of fiduciary duties—allow a borrower to increase its debt capacity *ex ante* by protecting creditors *ex post* from actions that make it less likely that the firm will pay its debts. Creditors who know that such limits are in place are willing to lend more money to the firm in the first place. Firms would have little or no debt capacity if there were no controls on their power to intentionally reduce their ability to pay debts after they have borrowed money.[10]

The Article turns next to the real challenge in understanding solvency tests: sorting out the relations among the three solvency tests used in bankruptcy and corporate law. Most of the confusion in the application of these tests traces to the fact that diagnoses of solvency (or insolvency) can differ depending on the solvency test that is applied. Solvency under the ability-to-pay test, for example, does not imply balance-sheet solvency, and *vice versa;* while solvency of neither type implies capital adequacy. It is impossible to gain a good grasp of solvency tests without cataloging the ways that different solvency tests can yield different diagnoses of solvency or insolvency. In general, the three tests measure different things and the indications they give of solvency or insolvency need not agree with each other. Understanding how and why these differences occur is the key to understanding solvency tests and reducing confusion about their application in practice.

The inconsistency that different solvency tests generate compels one to ask an obvious question: is there a best or optimal solvency test among the three that

---

district court failed to instruct jury on definition of "insolvent" because "the term 'insolvent' encompasses distinctly different meanings in the law"); Parkway/Lamar Partners, L.P. v. Tom Thumb Stores, Inc., 877 S.W.2d 848, 849 (Tex. App. 1994) ("The meaning of 'insolvency' is not definitely fixed and it is not always used in the same sense, but its definition depends rather on the business or fact situation to which the term applies.").

6. James C. Bonbright & Charles Pickett, *Valuation to Determine Solvency Under the Bankruptcy Act,* 29 Colum. L. Rev. 582, 620 (1929).

7. Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 790 (Del. Ch. 2004).

8. *See, e.g.,* Richard M. Cieri, Lyle G. Ganske & Heather Lennox, *Breaking Up Is Hard To Do: Avoiding the Solvency-Related Pitfalls In Spinoff Transactions,* 54 Bus. Law. 533 (1999).

9. 2-101 Collier on Bankruptcy ¶ 101.32 [4] (15th rev. ed. 2007).

10. For a technical economic treatment of the role that fraudulent conveyance law plays in increasing debt capacity, see J.B. Heaton, *Incomplete Financial Contracts and Non-Contractual Legal Rules: The Case of Debt Capacity and Fraudulent Conveyance Law,* 9 J. Fin. Intermediation 169 (2000) (demonstrating how fraudulent conveyance law increases debt capacity *ex ante* by protecting creditors *ex post*).

could apply, exclusively, in all cases? From a theoretical perspective the answer is yes. If the right assumptions are made, then it is easy to conclude that the ability-to-pay solvency test is the optimal solvency test. It best captures what creditors care most about—the match between their matured obligations and the firm's cash flow at the contracted payment date—and it does not generate complications that may cause the other tests to indicate insolvency when the firm can, in fact, reasonably expect to pay its debts as they come due, or, the other way around, to indicate solvency when the firm cannot, in fact, reasonably expect to pay its debts as they come due.

The problem, if the other tests are abandoned, is that one needs to be very sure there is an ability to measure the likelihood and amount of future cash flows that may be quite distant. Predicting the future is never easy, and predicting distant future cash flows is no exception. Future cash flows do not sit cooperatively for sampling and inspection. They are notoriously difficult to estimate. By measuring other things that might be correlated with the presence of the inability to pay debts as they come due, like low going concern and liquidation values, other solvency tests add useful information about solvency despite the confusion that multiple, sometimes inconsistent, solvency tests cause. Liquidation-based solvency tests that look to observable market values rather than projected cash flows might be much easier to apply.

One way to think about this question is to view the solvency test for what it really is: a diagnosis of a condition that creditors care about. From the creditors' perspective, insolvency is like a cancer. The cancer is harmful because it will prevent the creditor from being repaid according to its terms. When the cancer is present, the creditor wants the firm to get treatment, especially the "treatment" of avoiding gratuitous asset transfers. Each of the solvency tests is a test for the cancer but the going-concern and liquidation balance-sheet tests are quite crude. They do not so much identify the inability to pay debts as they come due as they identify conditions that are often, but not always, associated with that condition. The ability-to-pay solvency test, to carry the analogy further, is like the actual biopsy that puts cells under a microscope. Because the "biopsy" of the ability-to-pay test is just as easy and no more invasive than the other tests—unlike the real world of cancer diagnosis—why not just skip to the best test? The answer is that the "microscope" of the ability-to-pay solvency test is sometimes just not that good. Also, as with many diseases, the costs to debt capacity of failing to detect insolvency greatly exceed the costs of detecting insolvency when it does not exist. Multiple solvency tests are beneficial even though they may indicate insolvency for a firm diagnosed as solvent under the ability-to-pay solvency test. The cure of avoiding gratuitous asset transfers is never that harmful for firms whose solvency is in doubt and may lead to large increases in *ex ante* debt capacity.

## I. What Solvency Tests Do

Practically since the advent of credit, borrowers have been attracted to illicit actions that might relieve them of their debt burden. English debtors of the Middle

Ages escaped their creditors by hiding in their houses with goods bought on credit, a practice called *keeping house:* English law did not allow creditors to violate the sanctity of a debtor's home for the mere pursuit of debt satisfaction. Debtors could also flee the realm (taking their personal property with them) to places where the King's law could not follow. Some could use legal process and government favors to escape imprisonment for fraudulent asset transfers, or reside with their fortunes in one of the numerous sanctuaries, some as large as cities, where the King's law could not reach.[11]

In modern times, borrowers may try to strip the firm of its assets through mechanisms such as gifts,[12] dividends, or exorbitant salaries and benefits,[13] conducting a leveraged buyout of the borrower's equity in excess of its value,[14] causing the borrower to provide nonrecourse financing to a third party for an overvalued purchase of some asset from the borrower's insiders,[15] causing the borrower to make concessionary personal loans to the borrower's insiders,[16] causing the firm to make loans to shell corporations owned by the borrower's insiders or third parties who share the proceeds with the insiders,[17] or exchanging assets at exaggerated prices benefiting the borrower's insiders.[18]

Generally speaking, solvency tests form parts of laws that increase a borrower's debt capacity *ex ante* by protecting creditors *ex post* from such creditor-harming activities. For example, federal and state fraudulent transfer statutes prohibit asset transfers from insolvent debtors for less than "reasonably equivalent value" or "fair consideration."[19] Insolvent firms may not favor some similarly situated creditors over others.[20] Corporate law prevents an insolvent corporation from paying

---

11. *See generally* Israel Treiman, *Escaping the creditor in the middle ages,* 43 Law Quart. Rev. 230 (1927).

12. *See, e.g.,* French v. Liebmann *(In re French),* 440 F.3d 145 (4th Cir.), *cert. denied,* 127 S.Ct. 72 (2006) (fraudulent transfer of Bahamian property on the eve of bankruptcy).

13. *See, e.g.,* Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 *(In re Freuhauf Trailor Corp.),* 444 F.3d 203 (3d Cir. 2006) (large pension benefit conferred on executives on the eve of bankruptcy was a fraudulent transfer).

14. *See, e.g.,* Wieboldt Stores, Inc. v. Schottenstein, 131 B.R. 655 (N.D. Ill. 1991) (payments made to selling shareholders in leveraged buyout could constitute fraudulent transfers).

15. *Cf.* Kendall v. Sorani *(In re Richmond Produce Co.),* 195 B.R. 455 (N.D. Cal. 1996) (bankruptcy trustee could recover, as fraudulent transfer, amount that company provided to secure letter of credit allowing new buyer to purchase stock from company's former owners).

16. *See, e.g.,* Acequia, Inc. v. Clinton *(In re Acequia, Inc.),* 34 F.3d 800 (9th Cir. 1994) (amounts that corporate founder claimed were personal loans or reimbursements were avoidable fraudulent transfers made by corporation).

17. *Cf.* RTC Mortg. Trust 1995-S/N1 v. Sopher, 171 F. Supp. 2d 192 (S.D.N.Y. 2001) (insolvent company transferred its assets to newly formed company in exchange for stock in the new company that was then distributed to the shareholders of the insolvent company).

18. *See, e.g.,* Breeden v. L.I. Bridge Fund, LLC *(In re Bennett Funding Group, Inc.),* 232 B.R. 565 (Bankr. N.D.N.Y. 1999) (sale of stock warrants to longtime affiliate of debtor at much lower price than value of underlying stock was fraudulent transfer).

19. *See, e.g.,* 11 U.S.C.A. § 548 (West 2004 & Supp. 2007); Uniform Fraudulent Conveyance Act, 7A Pt. II U.L.A. 245 (2006) (promulgated in 1918); Uniform Fraudulent Transfer Act, 7A Pt. II U.L.A. 1 (2006) (promulgated in 1984).

20. *See* 11 U.S.C.A. § 547(b) (West 2004 & Supp. 2007); Freedom Group, Inc. v. Lapham-Hickey Steel Corp. *(In re Freedom Group),* 50 F.3d 408, 411 (7th Cir. 1995) ("The statute reduces the debtor's

dividends or redeeming its stock.[21] Some states, including Delaware, give creditors of an insolvent firm standing to enforce fiduciary duties that a corporation's directors and officers owe to the corporation.[22]

One of the reasons these laws provide such powerful protections to creditors is that they typically do not require the creditor to prove reliance on any particular representation of the debtor. Instead of creditor belief or reliance on anything the debtor says or does, the objective condition of insolvency (or near insolvency) plays the critical role, dividing permissible from impermissible gratuitous transfers. Put simply, there are things a solvent firm may do—such as pay dividends—that an insolvent firm may not, and this restriction on an insolvent firm's activity increases debt capacity dramatically. Testing solvency is key to finding the dividing line.

Given the acknowledged difficulty of solvency testing, why not simply prohibit all potentially credit-harming actions all of the time rather than only when the firm is insolvent? One answer is that a total ban on gratuitous asset transfers would probably lead to much costly fighting between the firm and its creditors about what business decisions amounted to gratuitous asset transfers. It is easy to identify a gift, a dividend, or a share repurchase as a gratuitous asset transfer, but what about an investment in a highly speculative new business?

Alternatively, consider the problem of dealing with contingent claimants, e.g., tort claimants the debtor has wronged and must eventually compensate in or out of court. It can be very hard—and essentially impossible outside a class action settlement—to pay off all tort creditors with any kind of certainty because it is hard to know what possible tort claims may be lurking.[23] If a debtor could make gratuitous

---

ability to play favorites, and hence the anxiety of creditors, and hence the costly melee that such anxiety can engender, by telling the favored creditor that if the debtor goes broke within ninety days after the transfer, the transfer will be undone and the favored creditor tossed back in the pool with the rest of the creditors."); Cent. Va. Cmty. Coll. v. Katz, 126 S. Ct. 990, 1002 (2006) (stating that authority to recover preferences "has been a core aspect of the administration of bankrupt estates since at least the 18th century.").

21. *See, e.g.,* Del. Code Ann. tit. 8, §§ 160 and 174(a) (2001) (prohibiting payment of dividends while the corporation is insolvent or which will render it insolvent); N.Y. Bus. Corp. Law § 510(a) (McKinney 2003) ("A corporation may declare and pay dividends or make other distributions in cash or its bonds or its property, including the shares or bonds of other corporations, on its outstanding shares, except when currently the corporation is insolvent or would thereby be made insolvent...."); Cal. Corp. Code § 501 (West 1990) ("Neither a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders (Section 166) if the corporation or the subsidiary making the distribution is, or as a result thereof would be, likely to be unable to meet its liabilities (except those whose payment is otherwise adequately provided for) as they mature."); ABA Model Bus. Corp. Act § 6.40(c) (2005) ("No distribution may be made if, after giving it effect: (1) the corporation would not be able to pay its debts as they become due in the usual course of business; or (2) the corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.").

22. *See generally* Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772 (Del. Ch. 2004).

23. *See e.g.,* Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp. & Cryovac, Inc. (*In re* W.R. Grace & Co.), 281 B.R. 852, 867–68 (Bankr. D. Del. 2002) (holding that tort claims as they actually existed must be used for purposes of calculating insolvency, even though evidence

asset transfers—including dividends or other distributions—only after it was sure its creditors were paid, it might be nearly impossible for a corporation to reach that kind of certainty about contingent creditors even if it had no other debt.

Thus, while prohibiting all gratuitous transfers would increase debt capacity by better protecting creditors, it probably would reduce firm value, decrease entrepreneurial incentives, and unnecessarily constrain other forms of capital raising, including outside equity. Solvency tests balance the benefits of laws protecting creditors by preventing some gratuitous asset transfers from the firm with the costs of preventing all gratuitous asset transfers or potentially creditor-harming activities.

## II. Solvency Tests in Bankruptcy and Corporate Law

Courts variously describe solvency as a question of fact or a mixed question of fact and law.[24] Whatever the case, all solvency tests ask, one way or another, whether a particular firm can pay its debts. As will be shown, however, the link between the firm's cash flow or assets and the debts to be repaid from them is often quite different, and therein lie the seeds of confusion. Three different solvency tests appear in bankruptcy and corporate law: the *ability-to-pay solvency test,* the *balance-sheet solvency test,* performed on either a *going concern* or *liquidation* basis, and the *capital-adequacy solvency test,* defined in terms of the other tests.

### A. The Ability-to-Pay Solvency Test

The ability-to-pay solvency test asks if the firm can reasonably expect to pay its debts as they come due. In the federal fraudulent conveyance statute, for example, the question is whether the firm "intended to incur, or believed that [it] would incur, debts that would be beyond [its] ability to pay as such debts matured."[25] The Uniform Fraudulent Transfer Act states the test similarly, whether the transferor "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[26] The Uniform Fraudulent Conveyance Act, still the law in the very important jurisdiction of New York, asks whether the debtor "intends or believes that he will incur debts beyond his ability to pay as they mature."[27] The Uniform Commercial Code

---

of the actual level of tort claims was not available at the time of the allegedly fraudulent transfer of company's most profitable division and contemporaneous reasonable estimates supported the inference of solvency.).

24. *See, e.g.,* Lawson v. Ford Motor Co. (*In re* Roblin Indus., Inc.), 78 F.3d 30, 35 (2d Cir. 1996) (insolvency is a question of fact); Brown v. Shell Can. Ltd. (*In re* Tennessee Chem. Co.), 112 F.3d 234, 236 (6th Cir. 1997) (same); Plankinton Bldg. Co. v. Grossman (*In re* Plankinton Bldg. Co.), 148 F.2d 119, 125 (7th Cir.), *cert. denied,* 326 U.S. 729 (1945) (same); Merkel v. Comm'r of Internal Revenue, 192 F.3d 844, 852 (9th Cir. 1999) (same); Cavanaugh v. Comm'r of Internal Revenue, No. 92-9004,1993 U.S. App. LEXIS 2186, *2 (10th Cir. Feb. 9, 1993) (same). Occasionally, courts describe solvency testing as a mixed question of fact and law, see, e.g., Consove v. Cohen (*In re* Roco Corp.), 701 F.2d 978, 981 (1st Cir. 1983); Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1063 (3d Cir. 1992).

25. 11 U.S.C.A. §548(a)(1)(B)(III) (West 2004 & Supp. 2007).

26. Unif. Fraudulent Transfer Act, *supra* note 19, § 4(a)(i).

27. Unif. Fraudulent Conveyance Act, *supra* note 19, § 6.

defines "insolvent" to include both "having generally ceased to pay debts in the ordinary course of business other than as a result of *bona fide* dispute" and "being unable to pay debts as they become due."[28] Sometimes referred to as the "cash flow" solvency test or the "equitable" solvency test, this test asks whether the firm will be able to match its cash sources to its maturing obligations. As one court explains, "[a] broader concept, originating with merchants or traders, is equitable insolvency, or the inability to pay debts as they become due in the ordinary course of business."[29] It is a forward-looking test. It is not enough to be able to meet current obligations; the firm must be able to meet its future obligations as well.[30]

If the ability-to-pay solvency test sounds simple in theory, it is quite difficult to apply in practice. If a firm's cash flows and debt were not subject to any uncertainty at all, then it would be an easy task to verify if the stream of cash flows that will occur through time can be matched to the firm's maturing debt obligations. Standing at any single point in time, one could look ahead to any date and ask whether the cash that the firm will have on hand at that date (that is, cash that it has retained after making prior debt payments) will be sufficient when combined with other cash that the firm can generate at that date to pay its debt obligations at the time. If the answer is yes regardless of what future time is chosen, then the firm can be expected to pay its debts as they mature.

The problem is that neither cash flows (sources of assets) nor debt obligations (liabilities) are certain. A firm's future cash flows normally will be subject to some (usually considerable) uncertainty and the firm may have contingent

---

28. U.C.C. § 1-201(b)(23)(A) and (B) (2006). Subparagraph (C) adds "being insolvent within the meaning of federal bankruptcy law," the balance-sheet test discussed below.

29. Cellar Lumber Co. v. Holley, 224 N.E.2d 360, 363 (Ohio Ct. App. 1967).

30. In *Pereira v. Farace,* 413 F.3d 330, 343 (2d Cir. 2005), *cert. denied,* 126 S.Ct. 2286 (2006), the Second Circuit Court of Appeals seems recently to have made the mistake of reading the ability-to-pay test as dependent on meeting only *current* obligations. The court rejected a finding of insolvency that rested on the debtor's inability to meet its *future* debt repayment obligations and stated:

> The Cash Flow test does not accord exactly with either Delaware definition. The Cash Flow test projects into the future to determine whether capital will remain adequate over time while the Delaware test looks solely at whether the corporation has been paying bills on a timely basis and/ or whether its liabilities exceed its assets. Therefore, the Cash Flow test cannot assist a trier of fact in determining whether a corporation is insolvent under the applicable Delaware law.

*Id.* at 343. This is surely an incorrect reading of Delaware law. The court's reasoning eventually traces to a dictionary definition of insolvency that the Delaware Court of Chancery cited in *Geyer v. Ingersoll Publ'ns Co.,* 621 A.2d 784, 789 (Del. Ch. 1992) ("An entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business. Webster's Ninth New Collegiate Dictionary 626 (1988)."). Nothing in that definition limits the definition of insolvency to the current payment of bills. This is unsurprising because an ability-to-pay test that looked at only the entity's historical rather than prospective ability to pay its debts has little value in deterring credit-harming activities before they happen. Corporations may be balance-sheet insolvent but liquid enough to pay creditors for quite some time. *Cf.* Angelo, Gordon & Co. L.P. v. Allied Riser Commc'ns Corp., 805 A.2d 221 (Del. Ch. 2002) (corporation had sold off all its assets, and although balance-sheet insolvent, had sufficient cash to pay its currently maturing obligations); Harry DeAngelo, Linda DeAngelo & Karen H. Wruck, *Asset Liquidity, Debt Covenants, and Managerial Discretion In Financial Distress: The Collapse of L.A. Gear,* 64 J. Fin. Econ. 3 (April 2002) (high asset liquidity may temporarily give insolvent firms the ability to continue operations by paying current obligations).

liabilities (e.g., related to corporate guarantees, pending lawsuits, letters of credit, etc.). When future cash flows and liabilities are uncertain, what does it mean to have debts beyond the firms "ability to pay"?

One thing is sure: "Ability to pay" cannot mean simply that the firm's *expected* cash flow—the sum of its possible cash flows rated by their respective probabilities—exceeds its debts in a given period of time, because a firm can have a very large expected cash flow even when it is almost certain *not* to pay its debts as they come due.

Consider, for example, a firm that owes a debt requiring a near-term payment of $100 but has no assets or cash on hand to make that payment. Further, assume that before the payment is due the firm either will receive $1000 with a 15% probability, or will receive $0 with an 85% probability. Clearly, there is an 85% probability that the firm will not pay its debt when it comes due; there is an 85% probability that firm will have $0 next period when its $100 debt is due. In this example, there is only a 15% probability that the firm will pay its debts when they come due. If the 15% likelihood comes to pass, and the firm receives $1000, then it will pay off the $100 debt leaving $900 for the firm's owners. The expected cash flow, nevertheless, is $150 because 15% of $1000 plus 85% of $0 equals $150. The example shows that a firm can have an expected cash flow that is higher than its debt even when it is almost sure (in the example, 85% sure) to be unable to pay its debt when it comes due. Ability-to-pay solvency cannot depend on expected cash flows in a probabilistic sense.

If ability-to-pay solvency is not determined by expected cash flows, what measure of ability to pay does make sense? Surely, "ability to pay" does not mean ability to pay with absolute certainty. Nearly any corporation with debt has *some* chance of defaulting on that debt depending on what happens to it in the future. Some default risk is par for the course for virtually any debtor (leaving aside governments that may pay their obligations using their own printable currency). One can conclude that "ability to pay" means something less than an ability to pay with absolute certainty, but surely it means something more than a very low probability, such as 15% noted in the example.

Unfortunately, the case law provides no guidance in this regard. A natural starting place, perhaps, is to consider a firm to have the ability to pay its debts as they come due if there is at least a 50% probability that it will be able to pay all of its debts as they mature. That is, such a firm is "more likely than not" to be able to pay its debts as they mature. A "more likely than not" approach to the ability to pay is not quite as lenient as it might at first sound. If a firm has a 10% probability of defaulting in any one year, for example, and those probabilities are independent through time, then there is a greater than 50% chance that the firm will default on its debt within seven years.[31] Such a firm would be insolvent under an ability-to-pay solvency test with a 50% probability threshold.

---

31. The probability of defaulting is 1 minus the probability of not defaulting: $1 - 0.90^7 = 1 - 0.48 = 0.52$.

## B. The Balance-Sheet Solvency Test

The balance-sheet solvency test asks a different question: Are this firm's assets greater than its liabilities? When the United States Bankruptcy Code defines the word "insolvent" it calls it the "financial condition such that the sum of such entity's debts is greater than all such entity's property, at a fair valuation."[32] Debts are valued at face value for purposes of the balance-sheet solvency test,[33] contingent liabilities are discounted for their probability of occurrence,[34] and neither a positive book balance[35] nor a positive equity trading price[36] implies solvency.

In applying the balance-sheet solvency test, courts struggle with how to value assets and, in particular, whether to value the firm's assets as if the firm continues as a *going concern* (i.e., to assume the firm will continue in operation and generate cash flow from its business) or in *liquidation* (i.e., as if the firm has ceased or will cease doing business and will dispose of its corporate property).[37] The standard

---

32. *See* 11 U.S.C.A. § 101(32)(A) (West 2004 & Supp. 2007); Briden v. Foley, 776 F.2d 379, 382 (1st Cir. 1985) (bankruptcy code definition of insolvency applied in preference case is a "balance-sheet test" that "focuses on the fair market value of the debtor's assets and liabilities within a reasonable time of the transfers"); Orix Credit Alliance, Inc. v. Harvey *ex rel.* Lamar Haddox Contractor, Inc. (*In re* Lamar Haddox Contractor, Inc.), 40 F.3d 118, 121 (5th Cir. 1994) ("Courts often refer to this test as a balance-sheet test, and then engage in the 'fair valuation' of the debts and property shown on the balance-sheet, as required by the statute."). This is the same definition of balance-sheet insolvency used in the Uniform Fraudulent Transfer Act, *supra* note 26. *See* Paragon Health Servs., Inc. v. Cent. Palm Beach Cmty. Mental Health Ctr., Inc., 859 So. 2d 1233, 1236–37 (Fla. Dist. Ct. App. 2003) ("The Uniform Fraudulent Transfer Action defines insolvency as follows: 'A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.' This is referred to as the 'balance sheet' test.") (citations omitted).

33. *See, e.g.,* Hanna v. Crenshaw (*In re* ORBCOMM Global L.P.), Adv. No. 02-1914 (MFW), 2003 Bankr. LEXIS 759, *8 (Bankr. D. Del. June 12, 2003) (holding that "for purposes of determining whether a debtor is insolvent under section 547, the liabilities of the debtor must be valued at face value.").

34. *In re* Xonics Photochemical, Inc., 841 F.2d 198, 200–01 (7th Cir. 1988); Covey v. Commercial Nat'l Bank of Peoria, 960 F.2d 657, 660 (7th Cir. 1992).

35. *See, e.g.,* DeRosa v. Buildex Inc. (*In re* F & S Cent. Mfg. Corp.), 53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985) (" 'Asset values carried on a balance sheet, even if derived in accordance with 'generally accepted accounting principles,' do not necessarily reflect fair value: 'Generally accepted accounting principles' are not synonymous with any specific [valuation] policy.'"); *In re* Lamar Haddox Contractor, 40 F.3d at 121 ("Needless to say, a fair valuation may not be equivalent to the values assigned on a balance sheet. Financial statements reflect the book value of assets, ordinarily the cost of the property reduced by accumulated depreciation. The rate of depreciation is usually the maximum allowed by income tax regulations."); *but cf.* Zeta Consumer Prods. Corp. v. Equistar Chem. L.P. (*In re* Zeta Consumer Prods. Corp.), 291 B.R. 336, 347 (Bankr. D.N.J. 2003) ("Nevertheless, while book value may understate or fail to reflect the fair value of a debtor's assets, it provides some competent evidence as to insolvency and forms a starting point for purposes of the insolvency analysis."); Indus.,Commercial Elec.,Inc. v. Babineau (*In re* Indus. Commercial Elec. Inc.), Adv. No. 02-4591-JBR, 2004 Bankr. LEXIS 438, *22 (Bankr. D. Mass. April 8, 2004) ("In making factual determinations of solvency, it is appropriate to adjust the asset values shown on the most contemporaneous balance sheet available to reflect 'the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.'").

36. *See, e.g., Covey v. Commercial Nat'l Bank of Peoria*, 960 F.2d at 661 (Easterbrook, J.) ("A stumble-bum would pay 1 cent for the most hopelessly insolvent firm, as the deal puts none of the bum's nonexistent assets at risk and could pay off if the debtor unexpectedly strikes it rich.").

37. *See, e.g.,* Chaim J. Fortgang & Thomas Moers Mayer, *Valuation in Bankruptcy*, 32 UCLA L. Rev. 1061, 1063 (1985) ("The choice between 'liquidation values' and 'going concern values' lies at the

approach is to determine first whether, in fact, the debtor was a "going concern" or was "on its deathbed" at a relevant date and then to value the assets according to that finding.[38] The choice is typically difficult, however, because most litigated solvency tests involve an entity that was, at the test date, "midway between a prosperous going concern and a dead enterprise."[39] The choice of going concern or deathbed valuation determines whether the firm is assumed to be sold as a going concern or by piecemeal liquidation.

The cases create an interesting anomaly. By demanding going concern valuation except where a company is about to close its doors, the courts force litigants to construct going concern valuations even where liquidation was the optimal course of conduct on the valuation date. As one court has noted in discussing the fiduciary duties of directors of a distressed firm:

> The maximization of the economic value of the firm might, in circumstances of insolvency, require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying. In other words, the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced in order to meet the legitimate claims of its creditors.[40]

It may seem strange to require a going concern assumption even when reasonable projections demonstrate that the business was doomed to eventual failure. Under such circumstances, the going-concern valuation standard is somewhat absurd in the sense that no real buyer would do what the valuation requires: continue to operate the business.[41] The solution to the conundrum can be found in

---

heart of most disputes over asset valuation in bankruptcy."); *In re* PWS Holding Corp., 228 F.3d 224, 233 (3d Cir. 2000) ("The test of solvency is whether, at the time of the recapitalization, the company's assets exceeded its liabilities. There are two basic approaches to this evaluation: asset by asset evaluation, which ascribes value to each asset and determines solvency by comparing the sum of those assets to total liabilities, and enterprise valuation, which values the business as a going concern and includes intangibles such as relationships with customers and suppliers, and the name, profile, and reputation of the business. The Examiner concluded that it was likely (i.e., that there was a 60–80% chance) that a court would apply the business enterprise analysis.").

38. Sherman v. FSC Realty LLC *(In re* Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing *In re* DAK Indus. Inc., 170 F.3d 1197, 1199–1200 (9th Cir. 1999) and *In re* Taxman Clothing Co., Inc., 905 F.2d 166, 169–70 (7th Cir. 1990)).

39. Bonbright & Pickett, *supra* note 6, at 582. Generally, where a firm is operating at the valuation date and generally paying its bills, courts appear to adopt a going concern standard. *In re DAK Indus. Inc.,* 170 F.3d at 1200 ("In this case, the bankruptcy court determined that DAK was a going concern during the preference period, relying primarily on the fact that DAK continued to conduct business under Chapter 11 protection for two and one-half years. In light of the amount of business transacted by DAK during the preference period and the years that followed, as well as DAK's ability to pay its operating expensing during the same period, this finding was not erroneous."); Diamond v. Osborne, 102 Fed. Appx. 544, 548 (9th Cir. 2004) (company was to be evaluated as a going concern in a preference case where corporation "continued to operate for twenty months after the first transfer in January 1996, and for five months after the last transfer on September 3, 1996; and that during the transfer period ADF had substantial cash flow and over one hundred employees").

40. Prod. Res. Group, L.L.C. v. NCT Group, Inc., 863 A.2d 772, 791 n.60 (Del Ch. 2004).

41. The timeless words of one judge state the situation well:

> The effort [in such valuations] is to find out not what a real buyer and a real seller, under the conditions actually surrounding them, do, but what a purely imaginary buyer will pay a make

the purpose of the solvency test: to prevent gratuitous asset transfers by firms that are to the detriment of creditors. Where a firm actually is operating, it does not make sense to let a going concern insolvent firm make gratuitous asset transfers simply because the firm is liquidation solvent. That is, if liquidation is optimal—in the sense that the firm might even be solvent if liquidated but insolvent if allowed to continue—but the firm chooses not to liquidate, it does not make sense to credit the firm with a higher liquidation value it chooses not to seize for the benefit of its creditors.

If the entity's condition on the test date warrants a liquidation assumption, then that same condition will define the *speed* with which such a hypothetical liquidation takes place. Because the sales price of an asset generally increases when additional time is spent marketing the asset,[42] courts usually avoid assuming that assets are liquidated in fire sale auctions presumably on the assumption that they are never value-maximizing.[43] In *In re Trans World Airlines, Inc.*,[44] for example, the Third Circuit Court of Appeals upheld the finding that 12 to 18 months was a "reasonable" time period over which to assume the sale of an airline's assets:

> The reasonable time should be an estimate of the time that a typical creditor would find optimal: not so short a period that the value of the goods is substantially impaired via a forced sale, but not so long a time that a typical creditor would receive less satisfaction of its claim, as a result of the time value of money and typical business needs, by waiting for the possibility of a higher price. [The 12 to 18 month time frame for TWA's assets] satisfies the requirement of a fair valuation because it identifies, as best it can, the equilibrium point between the two competing concerns of creditors: the desire to maximize the dollar figure from the assets to be sold, and the desire to have the assets sold off quickly to satisfy creditors' claims sooner rather than later.[45]

---

> believe seller, under conditions which do not exist. You are forced to wonder what would have happened if everything had been different from what it was. It is not easy to guess what will take place in Wonderland, as other people than Lewis Carroll's heroine have found out.

McGill v. Commercial Credit Co., 243 Fed. 637, 647 (D. Md. 1917).

42. *See* generally Steven A. Lippman & John J. McCall, *An Operational Measure of Liquidity*, 76 AM. ECON. REV. 43 (Mar. 1986). Of course, courts tend to use the language of lawyers, not economists. *See In re F & S Cent. Mfg. Corp.*, 53 B.R. at 849 ("Fair value is determined by estimating what the debtor's assets would realize if sold in a *prudent* manner in current market conditions.") (emphasis added); *Briden v. Foley*, 776 F.2d at 382 (asset valuation need not be exact but should be reduced by value of assets not readily susceptible to liquidation and payment of debts).

43. *In re Taxman Clothing Co., Inc.* 905 F.2d 166 (7th Cir. 1990) presents a leading example (and explanation) of this approach. The primary issue involved the proper valuation of a clothing company's inventory. The inventory was liquidated at auction for $110,000, but evidence suggested that its going concern value net of selling expenses was $215,000. Choosing the latter value for solvency purposes, the court found that the proper value of the inventory was the profit that could be obtained through sale in the usual course of business. *Id.* at 170–71.

44. Travellers Int'l AG v. Trans World Airlines, Inc. (*In re* Trans World Airlines, Inc.), 134 F.3d 188 (3d Cir.), *cert. denied*, 523 U.S. 1138 (1998).

45. *Id.* at 195. Courts sometimes go to considerable lengths to justify the going concern assumption. Atlanta Knitting Mills v. Nathanson Bros. Co. (*In re* Nathanson Bros. Co.), 64 F.2d 912 (6th Cir. 1933) provides a particularly vivid illustration of the lengths to which a court will go to maintain the going concern assumption:

> The evidence clearly establishes, we think, that prior to the appointment of the receiver [Nathanson Bros.] was confronted with a practical collapse of its lines of credit necessary for the operation

Where circumstances dictate, however, courts will allow the assumption of a fairly quick and harsh liquidation.[46]

> It is well-settled that if a company is only nominally extant, to treat it as a going concern would be misleading and would fictionalize the company's true financial condition. 'Liquidation value is appropriate if at the time in question the business is so close to shutting its doors that a going concern standard is unrealistic.'[47]

Interestingly, however, the value of the firm's assets are defined by some measure of the *present value* of its future cash flows while the firm's debts are valued at *face value*. Debts must be valued at face value for the solvency test to have any meaning at all:

> If holders of claims are fully informed of the debtor's affairs and the asset values are less than the face amount of the claims, they would never value their claims at more than the value of the assets. Likewise, the fully informed debtor would never be willing to pay claimants more than claimants would be willing to take. Thus, the value of the claims would never exceed the value of the assets and insolvency could never occur. If [debts were valued at market value], insolvency could never occur, which is an absurd result.[48]

It is possible that the firm's expected cash flows will be enough to pay the firm's maturing debt obligations but the *present value* of those cash flows is less than the undiscounted *face amount* of the debt. Consider the following example: a firm that will be in business one year. It has $100 face amount of debt that must be repaid

---

> of the business. Like many other companies during the same period, it could not borrow except on the assignment of accounts receivable and trade acceptances at ruinous rates of discount. However, the business had not been discontinued, and the receiver was authorized to continue it.... We do not think that the financial outlook of the debtor corporation, or the intention of its stockholders and directors to continue business or to liquidate at an early date, is determinative of the question. If the business is in fact being conducted at the time of alleged bankruptcy, then the items of property constituting its assets must receive a fair valuation, not as isolated articles separated from the whole, but as parts of the whole and as useful in that relationship. This is all that is meant by going concern value.

*Id.* at 913.

46. Schwinn Plan Committee v. AFS Cycle & Co., Ltd. (*In re* Schwinn Bicycle Co.), 192 B.R. 477, 487 (Bankr. N.D. Ill. 1996) (finding that Schwinn "was not financially viable, was in severe financial distress and was on its 'deathbed' when it filed for bankruptcy and during the prior ninety days"); WRT Creditors Liquidation Trust v. WRT Bankruptcy Litig. Master File (*In re* WRT Energy Corp.), 282 B.R. 343, 369 (Bankr. W.D. La. 2001) ("A liquidation analysis is used to determine 'fair valuation' of assets where the debtor is 'financially dead or mortally wounded.' Liquidation or scrap value of assets must be used because, if the entity is not a going concern at the time of the transfer, 'it would not be proper for the assets to be valued at a going concern value.'") (quoting Langham, Langston & Burnett v. Blanchard, 246 F.2d 529, 532–33 (5th Cir. 1957)).

47. Gillman v. Scientific Research Prods. Inc. of Delaware (*In re* Mama D'Angelo, Inc.), 55 F.3d 552, 555–56 (10th Cir. 1995) (quoting *In re* Vadnais Supply, Inc., 100 B.R. 127, 131 (Bankr. D. Mass. 1989)) (citations omitted).

48. Hanna v. Crenshaw (*In re* ORBCOMM Global L.P.), Adv. No. 02-1914 (MFW), 2003 Bankr. LEXIS 759, *8 (Bankr. D. Del. June 12, 2003) (quoting *In re* Transworld Airlines, Inc., 134 F.3d 188, 197 n.7 (3d Cir. 1998)).

at the end of the year along with $5 of interest. It has no cash or other assets on hand except a project that will generate end of year, one-time, and certain cash flow of $108. After repaying its debt, the firm will pay a dividend of $3 and close its doors. The firm is solvent under the ability-to-pay test. However, suppose that the interest rate necessary to reflect the time value of money is 10%. Then the discount factor—1 divided by 1.10—is approximately 0.91. The present value of $108 (the amount available to pay the debt before the dividend payment is made) is therefore $108 x 0.91 = $98.28, which is less than the $100 face value of debt meaning the firm is balance-sheet insolvent even though it has the ability to pay its debts as they come due.

How can this be? The problem is that there is an important difference between the amount of future cash flows and their present value. Present value must take into account the time value of money and discounts for risk. Here, the future cash flow is high enough to pay the debt at the maturity date but the discount rate makes that future cash flow worth less than the undiscounted face amount of the debt today. There are two disconnects between the value of assets and the face amount of debt. The first disconnect is time. Comparing the present value of anything to the future value of anything else is bound to lead to trouble; it is an apples to oranges comparison. The second disconnect is the possible additional discounting for risk. Firms pay their debts with actual cash flows, not cash flows discounted to reflect their present value given the time to their occurrence and the possible risk that the cash flow will not be realized. The balance-sheet test, while perhaps the most intuitive of solvency tests, is thus plainly imperfect.

## C. The Capital-Adequacy Solvency Test

A capital-adequacy solvency test, while less precisely defined in the law, essentially asks whether the firm is *unlikely* to become insolvent—under the balance-sheet test or the ability-to-pay test. Courts sometimes describe capital inadequacy as something connoting "a condition of financial debility short of insolvency (in either the bankruptcy or equity sense) but which makes insolvency reasonably foreseeable. In other words, a transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency...."[49] Inadequate capital "encompasses difficulties which are short of

---

49. Brandt v. Hicks, Muse & Co., Inc. (*In re* Healthco Intern., Inc.), 208 B.R. 288, 302 (Bankr. D. Mass. 1997) (citing Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1073 (3d Cir. 1992)); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d at 1070 ("Viewed in this light, an 'unreasonably small capital' would refer to the inability to generate sufficient profits to sustain operations. Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable insolvency."); *see also* Bruce A. Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital,* 21 Ind. L. Rev. 469 (1988).

insolvency in any sense but are likely to lead to insolvency at some time in the future."[50]

Financial projections are especially important in evaluating capital adequacy.[51] The financial projections should demonstrate that the firm has an ability to withstand a reasonable range of business and economic fluctuations.[52] "Moreover, the test for unreasonably small 'capital' should include…all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period."[53] However, "[w]hile a company must be adequately capitalized, it does not need resources sufficient to withstand any and all setbacks."[54] Unfortunately, there is no clear answer to the question, "how much 'capital' is enough"? The question requires a normative judgment regarding the probability of insolvency that a given entity (and its creditors) should be forced to bear. This judgment in turn may depend on several factors including the degree of information asymmetry between debtor and lender or regulatory goals.

Capital adequacy can be defined in terms of either the ability-to-pay test or the balance-sheet test, and for the balance-sheet test in either going-concern or liquidation terms. This simply requires us to add a measure of the variability of key items like future cash flows and liquidation values and to set some level of excessive risk. In that case, the firm has adequate capital if it can withstand enough variability to the bad side and still remain solvent. Capital-adequacy tests ask simply whether a firm can withstand some perturbation to the bad side and still remain solvent.

---

50. Vadnais Lumber Supply, Inc. v. Byrne *(In re* Vadnais Lumber Supply, Inc.), 100 B.R. 127, 137 (Bankr. D. Mass. 1989) (citations omitted); *see also* Salisbury v. Tex. Commerce Bank-Houston, N.A. *(In re* WCC Holding Corp.), 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994) ("Unreasonably small assets signifies an inability to generate enough cash flow from operations and the sale of assets to remain financially stable."); Murphy v. Meritor Sav. Bank *(In re* O'Day Corp.), 126 B.R. 370, 407 (Bankr. D. Mass. 1991) ("Unreasonably small capitalization encompasses financial difficulties which are short of equitable insolvency or bankruptcy insolvency. . . .") (internal quotations omitted).

51. *See, e.g.,* MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co., 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("In order to determine the adequacy of capital, a court will look to such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue.") (citations omitted); *In re WRT Energy Corp.,* 282 B.R. at 411 ("In determining unreasonably small capital, courts generally examine cash flow, focusing on whether the debtor was left in a position in which it was unable after the transfer to generate sufficient profits to sustain operations. The test is whether the unreasonably small capital condition and consequent cash flow problems were reasonably foreseeable when viewed objectively at the time of the transaction at issue.") (citation omitted); Garrick A. Hollander, *Defining 'Unreasonably Small Capital' in Fraudulent Conveyance Cases: Ratio Analysis May Provide An Answer,* 49 BUS. LAW. 1185 (1994).

52. *See, e.g., Moody,* 971 F.2d at 1073 ("To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.").

53. *Id.* at 1072 n.24. *See also id.* at 1073 ("Because projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses. . . ."). On the optimism of managerial perceptions of the firm's prospects, see J.B. Heaton, *Managerial Optimism and Corporate Finance,* 31 FIN. MGMT. 33 (Summer 2002).

54. MFS/*Sun Life,* 910 F. Supp. at 944 (citations and quotations omitted).

### III. The Relation Among Ability-to-Pay Solvency, Balance-Sheet Solvency (Going-Concern and Liquidation), and Capital Adequacy

By far the most confusing thing about solvency tests is the fact that different solvency tests can indicate that the same firm is both solvent and insolvent. Most of this confusion goes away when it is acknowledged that ability-to-pay and balance-sheet solvency tests measure different things about the firm.[55] Getting comfortable with these potential inconsistencies is the key to a better understanding of solvency tests as applied in bankruptcy and corporate law.

#### A. Ability-to-Pay Solvency Does Not Imply Going-Concern Balance-Sheet Solvency, Liquidation Balance-Sheet Solvency, or Any Form of Capital Adequacy

##### 1. Ability-to-Pay Solvency Does Not Imply Going-Concern Balance-Sheet Solvency

In general, the ability to pay debts as they come due does not imply that the firm is solvent based upon a going-concern balance-sheet approach. The ability-to-pay solvency test asks simply whether cash flow can be matched to the face value of the maturing debt obligations *in the period that the debt obligation matures*. There is, in essence, no impact of the time value of money, nor are cash flows in a given period reduced in value because of the risk characteristics that investors might attach to them. The test simply is whether cash is likely (where the likelihood necessary to pass the test is of course open to debate) to be sufficient to pay the face value of the debts when they mature.

By contrast, the going-concern balance-sheet test involves *valuation*. Valuation requires both that future cash flows be discounted to present value to reflect a time value of money and that future cash flows be reduced to reflect the value that these risky cash flows have to an investor who might otherwise invest in a risk-free asset. Thus the value of the firm as a going concern reflects future cash flows that are reduced for both the time value of money and risk.[56] It is obvious, then, that the cash flow of a firm which might in *future periods* match maturing debt obligations could nevertheless be reduced to a sufficient degree (to reflect the time value of money and risk) such that the value of the firm will be below the face value of its debt.

Thus, a firm that has the ability to pay its debts in all future periods under the ability-to-pay solvency test may still be deemed insolvent under the going-concern

---

55. Even leading cases seem to miss this point, suggesting instead that different solvency tests measure the same thing. *See, e.g.,* Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 789 (Del. Ch. 1992) ("An entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business. Webster's Ninth New Collegiate Dictionary 626 (1988). That is, an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held."). "That is" suggested that the ability-to-pay test and the balance-sheet test are equivalent. As we shall see below, they are not.

56. *See generally* Tom Copeland, Tim Koller & Jack Murrin, Valuation: Measuring and Managing the Value of Companies (3d ed. 2000).

balance-sheet test. This highlights a little understood problem with going-concern balance-sheet solvency tests. The going-concern balance-sheet solvency test mixes the ability of a firm to pay its debt obligations—the paramount concern of a solvency test—with the value that a particular firm has at a particular point in time given the current price of risk and the time value of money. There may be no good reason to prevent a firm from taking an action that might gratuitously make it going-concern balance-sheet insolvent, provided that it remains able to pay its debts as they come due under the ability-to-pay solvency test.

### 2. Ability-to-Pay Solvency Does Not Imply Liquidation Balance-Sheet Solvency

Perhaps more obviously than with going-concern balance-sheet solvency, ability-to-pay solvency does not imply liquidation balance-sheet solvency. First, of course, one possible liquidation value for the firm's assets is its going-concern value. As has just been shown, the going-concern value of the firm's assets can be below the face value of its debts even when the firm has the ability to pay its debts as they mature. To the extent that liquidation value may be equivalent to going-concern value, ability-to-pay solvency does not imply liquidation balance-sheet solvency either.

Second, liquidation values in particular industries may be low during times when firms are temporarily cash constrained. That is, because the highest valuing buyers of the firm's assets in liquidation may be other firms in its industry, and because industries may experience downturns or credit constraints at the same time, liquidation values may be temporarily low even for a firm that may otherwise expect to pay its debts as they come due. When industries are in recession, large potential gains are available to those who would purchase those assets at distressed prices and sell them when the industry recovers. This effect should drive prices up, but those in a position to detect and/or exploit such bargains are those with the specialized industry knowledge who are, by definition, in a poor position to purchase the assets because of the industry downturn. Thus, prices can remain low in equilibrium, because those with money to buy lack the knowledge to detect the (existing) good buying opportunities. Indeed, any sale-based solvency test will bias toward insolvency if assets are already in the hands of their highest valuing users.[57] Any restriction on the marketability of the firm's assets can also have a large effect on liquidation value.[58]

### 3. Ability-to-Pay Solvency Does Not Imply Capital Adequacy Under Any Test

Because ability-to-pay solvency does not imply either going-concern balance-sheet solvency or liquidation balance-sheet solvency, ability-to-pay solvency nec-

---

57. *See* Andrei Shleifer & Robert W. Vishny, *Liquidation Values and Debt Capacity: A Market Equilibrium Approach*, 47 J. Fin. 1343 (Sept. 1992).
58. *See, e.g.,* Francis A. Longstaff, *How Much Can Marketability Affect Security Values?*, 50 J. Fin. 1767 (Dec. 1995).

essarily cannot imply capital adequacy whether the capital adequacy is for ability-to-pay or balance-sheet solvency. Capital adequacy is a *stricter* test, whether framed in going-concern balance-sheet or liquidation balance-sheet terms. Similarly, ability-to-pay solvency does not imply capital adequacy under the ability-to-pay capital-adequacy test. A firm might have the ability to pay debts as they come due but only barely so. Such a firm can have inadequate capital—judged from the perspective of the ability-to-pay solvency test—even though it is ability-to-pay solvent.[59]

### B.   GOING-CONCERN BALANCE-SHEET SOLVENCY DOES NOT IMPLY ABILITY-TO-PAY SOLVENCY, LIQUIDATION BALANCE-SHEET SOLVENCY, OR CAPITAL ADEQUACY UNDER ANY TEST

#### 1.   Going-Concern Balance-Sheet Solvency Does Not Imply Ability-to-Pay Solvency

Ability-to-pay solvency requires that the firm be able to match cash in a particular period with the amount of debt maturing in that period. A going-concern balance-sheet solvency test, however, requires only that the *discounted sum of future expected cash flows exceed the sum or total amount of debt at face value.* For example, a firm that requires heavy investment in its early-to-intermediate term but which generates cash flows in only the long-term (consider, for example, biotechnology companies that must invest in research and development for long periods of time looking for marketable products) might have a substantial going concern value but no ability to pay debts as they come due.

Put simply, a going-concern balance-sheet solvency test does not concern itself with the possible mismatch between cash flows that make up the discounted sum and cash flows that must be paid to meet maturing debt obligations. This can hide a liquidity problem. That is, a firm may be going-concern balance-sheet solvent but still unable to turn its going concern value into cash as needed at particular points in time to pay a particular debts as they mature. Here again is a problem with going-concern balance-sheet solvency. It can be disconnected from what creditors care most about: getting their debts paid at the contracted amounts on the contracted dates. A firm that was allowed to make a gratuitous asset transfer that left it with a solvent going-concern balance sheet but was then unable to pay its debts as they came due would clearly make creditors even worse off. This will be discussed in detail later, but for now the important thing is to realize the going-concern balance-sheet solvency test does not imply ability-to-pay solvency if the going concern value is illiquid.[60]

---

59. *See* Lee B. Shepard, Note, *Beyond* Moody: *A Re-Examination of Unreasonably Small Capital*, 57 HASTINGS L.J. 891, 895 (2006) ("[I]f a company's projected future cash flow were just enough to pay its debts as they came due and no more, it would be equitably solvent and pass the cash flow test. In either case, the company's creditors would be exposed to a high, and arguably unreasonable, degree of risk. Although some companies left in this condition may prosper and pay its creditors, most will be 'doomed to failure.' Involuntary creditors of such companies are unprotected against the slightest adverse development, foreseen or unforeseen.").

60. For an interesting case study in the interaction between balance-sheet solvency and ability-to-pay insolvency, see Harry DeAngelo, Linda DeAngelo & Stuart C. Gilson, *The Collapse of First Executive*

## 2. Going-Concern Balance-Sheet Solvency Does Not Imply Liquidation Balance-Sheet Solvency

As has been demonstrated, in discussing the ability-to-pay solvency test, going-concern balance-sheet solvency does not necessarily imply liquidation balance-sheet solvency.[61] When asset values are depressed in a particular industry, it may be impossible to sell the going concern value of a firm because the highest valuing users of the firm's assets are likely to be those in the firm's same industry who are unable to pay for the assets because their own fortunes have been affected as well. Of course, this circumstance need not be the case. Vast amounts of money are invested by private equity firms and similar investment funds willing to buy and hold depressed assets, waiting to sell the assets when industry fortunes improve.[62] In general, however, a firm may have a high going-concern balance-sheet value because it has high discounted expected cash flows even while it would be unable to find a buyer for that going-concern value. Indeed, if the firm is already managed by its highest capability manager who might not continue managing were the firm purchased, liquidation value may remain strictly below the current going-concern value simply because the going-concern value in the hands of the purchaser will necessarily be lower than going-concern value in the hands of the current owner, the highest valuing user.

## 3. Going-Concern Balance-Sheet Solvency Does Not Imply Capital Adequacy Under Any Test

Going-concern balance-sheet solvency does not imply capital adequacy under any capital-adequacy test. A firm may be going-concern balance-sheet solvent but only barely so,[63] and thus will not have capital adequacy under a going-concern balance-sheet based capital-adequacy test. Further, because going-concern balance-sheet solvency does not imply ability-to-pay solvency, it immediately follows that going-concern balance-sheet solvency does not imply the stricter condition of ability-to-pay based capital adequacy. The same is true for capital adequacy based on liquidation balance-sheet solvency. Going-concern balance-sheet solvency does not imply liquidation balance-sheet solvency, and therefore cannot imply the stricter condition of liquidation balance-sheet based capital adequacy.

---

*Corporation: Junk Bonds, Adverse Publicity, and the "Run On the Bank" Phenomenon,* 36 J. Fin. Econ. 287 (1994).

61. *See supra* notes 55–60 and accompanying text.

62. *See, e.g.,* Karen Richardson and Serena Ng, *Why Flush Financiers Court Unloved Businesses,* Wall St. J., April 9, 2007, at C1 ("While financiers are betting they can outsmart the public markets by taking on their rejects, the success of these long-shot turnarounds relies on revived interest by public shareholders.").

63. *See* Shepard, *supra* note 59, at 894–95 ("Fraudulent conveyance laws would not be effective if they only applied to debtors rendered insolvent by asset transfers. If so, a company could transfer just enough assets to leave it barely solvent. For example, if a company's assets exceeded its liabilities by $ 1.00, it would be deemed balance sheet solvent and pass the balance sheet test.").

C. Liquidation Balance-Sheet Solvency Does Not Imply
   Ability-to-Pay Solvency, Going-Concern Balance-Sheet
   Solvency, or Capital Adequacy Under Any Test

### 1. Liquidation Balance-Sheet Solvency Does Not imply Ability-to-Pay Solvency

In general, liquidation balance-sheet solvency does not imply ability-to-pay solvency. But it is useful to consider a special case where it does. Consider the case where all the firm's obligations have zero interest rates so that the face value on the firm's balance sheet captures the full value of the firm's future debt obligations. In that particular case liquidation balance-sheet solvency implies ability-to-pay solvency. If the firm's assets can be converted to cash in an amount today that exceeds the face value of its debt, then it follows that the firm can pay those debts as they come due, because at a minimum the firm could simply sell the assets, hold the cash, and pay the face amount of debt as it matures.

Of course, a simplifying fact has been assumed, i.e., that the contracted rate of interest is also a debt obligation and matures on the date interest is due and which may not (and under current accounting rules, will not) appear on the balance sheet as debt. If interest payments on the firm's debt obligations are high enough, then it is possible that the liquidation value of the firm's assets will exceed the face value of debt but the firm will be unable to cover both the face amount of the debt and the large interest payments.[64]

In general, however, the problem is that unless the firm actually does seize on the high liquidation value and hold the cash proceeds to pay off debts as they come due, the implied ability-to-pay solvency may be fleeting. Liquidation values change through time. A firm may have the ability to liquidate its assets today for an amount that would be sufficient to pay its debts as they came due in the future, that does not seize on high liquidation values today it may no longer have that opportunity tomorrow.

Because the ability-to-pay solvency test requires that one look ahead to future time periods, variations in future liquidation values must be simultaneously considered. Unless the liquidation value will be sufficiently high in every period to allow the firm to liquidate its assets and pay off its remaining debts, then liquidation balance-sheet solvency will not imply ability-to-pay solvency. This consideration may explain why the law requires going concern valuation until the firm is on its deathbed; it is unwise to give a firm the benefit of a (potentially temporarily) high liquidation value where the firm does not, in fact, seize that value through liquidation.

### 2. Liquidation Balance-Sheet Solvency Does Not Imply Going-Concern Balance-Sheet Solvency

Liquidation values are typically viewed as being less than going concern values. But liquidation values need not be lower than going concern values. Any

---

64. This, of course, also requires that the firm cannot "call" the debt.

firm whose assets are worth more if owned and operated by other users is a firm whose liquidation value will exceed its going concern value. A going-concern balance-sheet test values assets based on some measure of cash flow to their current user. These two valuations need not lead to the same answer and therefore a firm that is liquidation balance-sheet solvent may be going-concern balance-sheet insolvent.

### 3. Liquidation Balance-Sheet Solvency Does Not Imply Capital Adequacy

For similar reasons as described above, liquidation balance-sheet solvency does not imply capital adequacy under any capital-adequacy test. First, of course, the firm may be liquidation balance-sheet solvent but only barely so, and thus could not withstand even a small perturbation of liquidation value. This means that the firm may be liquidation balance-sheet solvent and not solvent under a liquidation balance-sheet-based capital-adequacy solvency test.

Second, because a firm may be liquidation balance-sheet solvent but insolvent under either a going-concern balance-sheet solvency test or an ability-to-pay solvency test, it necessarily follows that the firm may be liquidation balance-sheet solvent but insolvent under either a going-concern balance-sheet-based capital-adequacy test or ability-to-pay-based capital-adequacy test.

### D. Capital Adequacy Implies Solvency Under the Test on Which It Is Based But Does Not Imply Solvency or Capital Adequacy Under Any Other Test

Capital adequacy under the test on which it is based will always imply solvency under that particular solvency test, because capital adequacy is simply a requirement that the firm be a little more than solvent under that particular test. For the reasons described above, however, capital adequacy under that particular test will not imply solvency or capital adequacy of any other sort. For example, if a firm has adequate capital under an ability-to-pay-based capital-adequacy test, then that implies ability-to-pay solvency because capital adequacy is a stricter test. That is, the firm must be more than solvent under the ability-to-pay solvency test to have adequate capital under an ability-to-pay-based capital-adequacy test.

However, because solvency under one test does not imply solvency under another (and so necessarily does not imply capital adequacy under a capital-adequacy test based on that solvency test), capital adequacy based on that test also does not imply solvency or capital adequacy under any other test. For example, because ability-to-pay solvency does not imply solvency under any other test, and necessarily does not imply capital adequacy under a capital-adequacy test based on that other solvency test, it is also true that ability-to-pay-based capital adequacy does not imply solvency or capital adequacy under either a going-concern or liquidation balance-sheet-based test.

## IV. The Optimal Solvency Test (and Its Limitations)

### A. Ability-to-Pay Solvency Matters Most to Creditors

This Article has demonstrated that there are many ways that solvency tests may give inconsistent diagnoses of solvency. This circumstance is troubling, because laws invoking solvency tests nearly always invoke more than one version. For example, both federal and state fraudulent conveyance laws invoke all three solvency tests and consider the firm to be insolvent for purposes of the fraudulent transfer when it fails any one of them.[65] Even where the law uses only a balance-sheet test—as is the case in federal preference law[66]—there have been two versions of that test the going-concern and liquidation balance-sheet tests, that can give different indications of solvency.[67] Is there a better way to test for solvency? Is it necessary to have this many solvency tests to address the problem that solvency testing seems generally designed to solve: preventing value destroying behavior by those in control of the firm's assets to the detriment of the firm's creditors where the possibility of such behavior will destroy debt capacity?

When one looks at the individual solvency tests—the ability-to-pay solvency test, the going-concern balance-sheet solvency test, the liquidation balance-sheet solvency test, and the various capital-adequacy tests—the answer appears almost obvious, at least from the perspective of maximizing debt capacity. The ability-to-pay solvency test is the "best" or "optimal" solvency test. The ability-to-pay solvency test addresses head on what creditors care most about: the likelihood that the firm will have the cash available to pay debts as they mature at the contracted dates in the contracted amounts. The ability-to-pay capital-adequacy test is, of course, almost the fraternal twin of the ability-to-pay solvency test: a little more severe, not quite identical, but essentially the same test with a slightly higher hurdle.

The remaining tests are suboptimal compared to the ability-to-pay solvency test because they lose information that is important to a creditor while replacing it with information that is less important. Consider first how the other solvency tests lose information that is important to a creditor. A creditor cares most that the firm will have the cash it owes at the time and in the amounts that it has contracted for repayment. This is the simple beauty of the ability-to-pay solvency test which asks only if there is a sufficiently high likelihood that the firm will be able to generate that cash on the dates and the amounts that it has promised to pay.

But whether one looks at the going-concern balance-sheet solvency test or the liquidation balance-sheet solvency test, that information is lost. As has been demonstrated, a firm may be going-concern balance-sheet solvent when it does not have the ability to pay debts as they come due. Recall that this situation may occur

---

65. *See supra* notes 24–54 and accompanying text.

66. *See, e.g.*, 11 U.S.C.A. § 547(b) (West 2004 & Supp. 2007) (employing bankruptcy code's definition of "insolvent," defined in 11 U.S.C.A. § 101(32) (West 2004 & Supp. 2007) to be the "condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation").

67. *See supra* notes 37–48 and accompanying text.

when the firm has cash flows that are mismatched with maturing debt obligations and where the firm does not have the ability to turn going-concern solvency into cash at the times it needs to pay its debts, that is, the going-concern solvency margin is not sufficiently liquid to allow the firm to pay its debts as they mature. But the liquidity of the going-concern solvency margin is a *critical* piece of information for a creditor. A creditor cares primarily about the firm's ability to match cash flows and maturing debt obligations in a time consistent manner that matches cash flows to the creditor's expectations of repayment.

The same information is lost in a liquidation balance-sheet solvency test. For example, a firm may be insolvent under a liquidation balance-sheet solvency test simply because liquidation values are temporarily depressed in the firm's industry. At the same time, however, the firm may still be reasonably expected to generate sufficient cash flow with a sufficiently high likelihood that the firm has the ability to pay its debts as they come due. Again, it is the latter and not the former about which the creditor cares most. The liquidation balance-sheet solvency test may indicate insolvency, but it does so by abstracting from the firm's ability to generate cash flow when that cash is needed to pay the firm's debt obligations, the information that the creditor cares most about. The same is obviously true for both capital-adequacy tests (that is, the going-concern balance-sheet-based and liquidation balance-sheet-based capital-adequacy tests) for the same reasons.

Consider next the lower relevance of the information that the going-concern balance-sheet test and liquidation balance-sheet test give to the creditor in exchange for taking away information about the time consistency of cash flows and maturing debt obligations. A firm may be going-concern balance-sheet insolvent because the necessary adjustments for time value of money and risk reduce the present value of the firm's future cash flows to an amount that is below the face value of its debt. But again this information does not tell the creditor what it needs to know: regardless of the time value and risk-adjusted "present value" of those cash flows, are those cash flows nonetheless sufficiently high with sufficiently high likelihood to meet the firm's obligations under the debt contract? That is, information about valuation (given the current prices of time value and risk in the financial markets) is far less relevant to a creditor than the basic information (unavailable in a going-concern balance-sheet test alone) of whether the firm can match cash flows to maturing debt obligations when it has the obligation to do so.

The same problems apply to the liquidation balance-sheet solvency test. A high current liquidation value is of no solace to a creditor if the firm does not intend to liquidate at the present liquidation value and otherwise is not reasonably expected to pay its debts as they come due. In general, liquidation values will vary over time. Holding constant the firm's inability to pay its debts as they come due, a decline in liquidation value will leave the creditor no better off and probably worse. Here again the liquidation balance-sheet solvency test gives a creditor information that is far less relevant to it than information about the firm's ability to pay its debts as they come due. Liquidation balance-sheet solvency is of little comfort to a creditor with no power to force liquidation (and debt repayment) and who otherwise cannot expect the firm to pay its debts as they come due.

## B. The Value of Multiple Solvency Tests

As has been shown, there are good reasons to deemphasize balance-sheet solvency tests (and corresponding balance-sheet-based capital-adequacy tests) in favor of a much stronger emphasis on the ability-to-pay solvency test. Nevertheless, solvency-test-invoking laws such as fraudulent transfer law essentially deem the firm insolvent any time it fails any one of the tests. How can the overabundance of applied solvency tests be justified when there are good arguments for the use of a single solvency test—the ability-to-pay solvency test—and a single capital-adequacy test—an ability-to-pay solvency-based capital-adequacy test?

Consider what is assumed when one confidently asserts that a creditor could make do with the ability-to-pay solvency test. First, it is implicitly assumed that it is not too difficult to discern the likelihood of future cash flows, even if those cash flows are quite distant in time from the solvency determination date. In fact, however, cash flow projection can be difficult at best and speculative at worst. Empirical evidence on the accuracy of cash flow projections in contexts relevant for solvency testing is not encouraging.[68]

Second, it is assumed that a creditor gains little useful information from a diagnosis of balance-sheet insolvency (whether going-concern or liquidation-based). In fact, there may be considerable useful information in a diagnosis of balance-sheet insolvency even apart from knowledge of ability-to-pay insolvency. Liquidation balance-sheet insolvency has a particular advantage over ability-to-pay solvency tests and going-concern balance-sheet solvency tests when it is based on current market information about liquidation values that is less dependent on particular projections of distant cash flows than are the ability-to-pay solvency test and a going-concern balance-sheet solvency test. To the extent that tools for solvency testing are crude and potentially inaccurate, there may be little confidence in resulting solvency diagnoses.[69] Given the difficulty of cash flow projection, the availability of market prices can be incrementally informative.

Of course, because of measurement error (misestimating cash flows, discount factors, and liquidation values), any of the three non-capital-adequacy solvency tests can give an incorrect diagnosis of insolvency, that is, a given solvency test might correctly classify a firm as solvent when it is in fact solvent, or insolvent when it is in fact insolvent, but it may also give an incorrect measurement: indicating insolvency

---

68. Evidence of upward biased cash flow forecasts abounds in contexts important for solvency testing. Steven N. Kaplan and Richard S. Ruback, *The Valuation of Cash Flow Forecasts: An Empirical Analysis*, 50 J. Fin. 1059 (Sept. 1995) (finding statistically significant upward bias of both operating income and operating margins in connection with leveraged buyouts and recapitalizations); Steven N. Kaplan, *The Effects of Management Buyouts on Operating Performance and Value*, 24 J. Fin. Econ. 217 (1989) (same); Edith Shwalb Hotchkiss, *Postbankruptcy Performance and Management Turnover*, 50 J. Fin. 3 (Mar.1995) (finding statistically significant upward bias of forecasts for the performance of firms exiting bankruptcy).

69. *See, e.g.,* Stuart Gilson, Edith S. Hotchkiss & Richard S. Ruback, *Valuation of Bankrupt Firms*, 13 Rev. Fin. Stud. 43 (2000) (finding very large valuation errors in their study of discounted cash flow methods in bankruptcy); Constructora Maza, Inc. v. Banco de Ponce, 616 F.2d 573, 577 (1st Cir. 1980) ("The determination of the 'fair valuation' of the debtor's assets at a specific time is at best an inexact science, and may often be impossible.").

when the firm is in fact solvent (a false positive for insolvency) or solvency when the firm is insolvent (a false negative for insolvency).

It is much better, in terms of maximizing debt capacity, to mistakenly conclude that a firm is insolvent than to mistakenly conclude that a firm is solvent. If multiple solvency tests are available that are less than perfectly correlated in their measurement error, then it is better to use multiple solvency tests and to pronounce a firm insolvent when any one of those tests indicates insolvency. The costs of preventing gratuitous asset transfers are low for firms that are nearly insolvent (as firms are likely to be those which fail any one of the tests), because they likely have less asset value to waste in the first place. By adding the plausible assumption that the probability of false positives decreases across all candidate tests the further from insolvency the firm is, an interesting result emerges: It may be best to employ several, potentially conflicting solvency tests (including capital-adequacy tests, which are essentially just "perturbations" of other solvency tests), and to prevent gratuitous asset transfers when *any* of these tests is violated.

## CONCLUSION

This Article sorts out some of the confusion that surrounds solvency tests. It explains the basic economic function of solvency tests in bankruptcy and corporate law, the relations among the three dominant solvency tests—the ability-to-pay test, the balance-sheet test, and the capital-adequacy test—and explains why the diagnosis of insolvency can differ depending upon the solvency test that is applied. Although one of these tests—the ability-to-pay test—appears superior, it may suffer from significant measurement error in practice. Because the costs of failing to detect insolvency when it exists exceed the costs of detecting insolvency when it does not exist, applying multiple solvency tests might be beneficial even though they may give conflicting indications of insolvency.

# EXHIBIT 10

FILED

16 APR 19 PM 1:56

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 14-2-07669-0 SEA

THE HONORABLE SEAN O'DONNELL
Noted for Consideration: April 22, 2016
With Oral Argument

SUPERIOR COURT OF THE STATE OF WASHINGTON
FOR KING COUNTY

MOVE, INC., et al.,

                   Plaintiffs,

    v.

ZILLOW, INC., et al.,

                   Defendants.

No. 14-2-07669-0 SEA

DECLARATION OF DR. AMY HUTTON IN
SUPPORT OF ZILLOW INC.'S MOTION TO
EXCLUDE TESTIMONY OF DAMAGES
EXPERT BRADFORD CORNELL
RELATING TO THE TRULIA MERGER and
MOTION FOR PARTIAL SUMMARY
JUDGMENT

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 1
LEGAL130348993.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# TABLE OF CONTENTS

I.    ASSIGNMENT..................................................................................................1

II.   QUALIFICATIONS............................................................................................2

III.  SUMMARY OF OPINIONS................................................................................3

IV.   PROFESSOR CORNELL'S APPLICATION OF THE DCF
      METHODOLOGY FOR DETERMINING STANDALONE MOVE AND
      TRULIA VALUES IS UNRELIABLE................................................................6

      A.    Professor Cornell builds his valuation analyses on unsubstantiated,
            overly optimistic projections of revenue and costs for Move and Trulia...............6

      B.    Professor Cornell improperly calculates the standalone values for
            Move and Trulia..............................................................................10

      C.    Excessive terminal valuations............................................................14

      D.    Professor Cornell fails to use alternative valuation methods to home in
            on intrinsic values............................................................................15

V.    PROFESSOR CORNELL EMPLOYS AN UNRELIABLE
      METHODOLOGY FOR DETERMINING THE ALLEGED IMPACT OF
      SYNERGIES ARISING FROM THE ZILLOW/TRULIA MERGER..........................16

      A.    Professor Cornell uses differing standalone values of Trulia across his
            two merger analyses..........................................................................18

VI.   PROFESSOR CORNELL'S APPROACH IS UNRELIABLE FOR
      ASSESSING LOSS TO MOVE RELATED TO LISTHUB AND THE
      LISTHUB PLATFORM......................................................................................18

      A.    Professor Cornell's calculation of damages to ListHub is internally
            inconsistent and incorrectly calculated................................................18

      B.    Professor Cornell's calculation of the value of the ListHub Platform is
            unreliable, highly speculative, and divorced from reality.........................19

VII.  PROFESSOR CORNELL'S ANALYSIS OF DAMAGES ASSOCIATED
      WITH INCREMENTAL PAGE VIEWS ON REALTOR.COM IS FLAWED..............26

VIII. MOVE'S PUBLIC DISCLOSURES DO NOT DISCLOSE HARM AND
      SUGGEST THAT MOVE SUFFERED NO HARM AT ALL; PROFESSOR
      CORNELL'S FAILURE TO TAKE THE DISCLOSURES INTO
      ACCOUNT RENDERS HIS ANALYSES UNRELIABLE.......................................26

      A.    Background on disclosure requirements for publicly-traded companies.............26

            1)    Item 2.06 - Material Impairments.............................................27

            2)    Item 8.01 – Other Events......................................................27

      B.    No disclosure of harm by Move, Inc....................................................28

            1)    Samuelson's Departure from Move............................................29

            2)    Beardsley's Departure from Move.............................................29

            3)    Retsly Acquisition...............................................................29

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – I

LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

**TABLE OF CONTENTS**
**(continued)**

4)    Trulia Acquisition ...................................................................29

5)    ListHub Termination ...............................................................31

6)    News Corp. Acquisition...........................................................31

IX.    ANALYSIS OF MOVE'S OPERATING PERFORMANCE...........................35

X.    CONCLUSION................................................................................36

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – ii

LEGAL130348993.1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

I, Amy Hutton, declare that I am competent to testify to the following factual statements based on my personal knowledge and review of the depositions and documents from this case or those relevant to the issues in this case:

## I.    ASSIGNMENT

1.    I have been asked by counsel to evaluate, from an accounting perspective, the methodology Professor Bradford Cornell employed in his calculation of damages, as presented in Plaintiffs' Superseding Response and Objections to Defendant Zillow's First Interrogatories (Interrogatory Number 3) dated February 15, 2016, and the accompanying Cornell exhibits. In particular, I have been asked to assess: (1) whether Professor Cornell's analyses comport with commonly accepted methodologies among accounting professionals and (2) whether his estimated damages are reasonable and non-speculative.

2.    I am being compensated for my work on this matter at a rate of $550 per hour. Individuals working at my direction charge rates of $195 to $450 per hour. My compensation is not contingent upon my testimony or on the result of this proceeding.

3.    The opinions and information contained in this report are based on my knowledge and understanding of the record and my knowledge and experience in the accounting profession.[1] My opinions are based on my understanding of Professor Cornell's analysis as included in Plaintiffs' Superseding Response and Objections to Defendant Zillow's First Interrogatories (Interrogatory Number 3) dated February 15, 2016 and the accompanying Cornell exhibits. However, I reserve the right to amend my report to the extent Plaintiffs clarify, supplement, or otherwise modify the disclosure of the alleged trade secrets at issue in the litigation and resulting damages (including, but not limited to, through

---

[1] The citations in my report reference information that I have considered and relied on in forming my opinions. I have also considered and relied on deposition testimony, exhibits and other documents produced in this case, a list of which will be provided with the document production that includes the references in this report.

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 1
LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

ListHub's growth occurs in a vacuum, abstracted from any competitive response. Lacking the grounding in economic reasoning and the context of the industry's competitive dynamics, these projections appear to be overly-speculative and fail to comport with business realities as noted in Move's own 10-K filings:

*Our Software and Services products, including Top Producer®, TigerLead® and ListHubTM, face competition from Market Leader (owned and operated by Trulia, Inc.), CoreLogic's Residential Real Estate productivity tools, Real Estate Digital ("RED"), ALa Mode, Inc. and Fidelity National Information Solutions, Inc., which offer competing solutions to real estate professionals. Top Producer® also competes with horizontal customer relationship management offerings such as Microsoft Corporation's Outlook solution, Best Software Inc.'s ACT! solution, FrontRange Solution, Inc.'s Goldmine product, and Salesforce.com. TigerLead® also competes with lead generation and management product offerings such as BoomTown!, Zurple, Inc., Commissions Inc., and IDX Broker. Certain online media companies such as Classified Ventures, LLC and Market Leader, Inc. are providing drip marketing solutions that incorporate aspects of lead management, which over time could pose a competitive threat to Top Producer® or TigerLead®.[56]*

40.     The competitive responses to the ListHub Platform that already exist (Upstream, Broker Public Portal, FBS Sparks, and other alternatives) suggest that there are various states of the world that Professor Cornell ought to have considered in his DCF analysis. It is commonly accepted that valuation analysis should account for various probable scenarios including competitive responses.[57] An analysis that accounted for competitive responses would provide detailed projections under various states of the world (e.g., worst case, best case and most likely case), taking the resulting valuations multiplied by the

---

[56] Move 2013 10-K, p. 7 (DX 1260, DFS_EXPERT001468).
[57] Paul Healy and Krishna Palepu, *Business Analysis and Valuation Using Financial Statements*, 4th Edition, Cengage Learning, 2007, p. 6-18.

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 24

LEGAL130348993.1

associated probability of each state of the world, and creating an expected value. Importantly, a significant portion of the various scenarios in such an analysis would likely result in a zero or negative value for a startup such as the ListHub Platform.[58] Given that Professor Cornell has assumed what appears to be the very best case scenario (with 100% certainty), incorporating additional states of the world into a detailed analysis would drastically reduce the derived value of the ListHub Platform.[59]

41.     As discussed, highly regarded textbooks highlight that the best approach to forecasting and valuation captures the majority of the value creation during the forecast horizon (i.e., the forecast horizon captures the period over which ROE is substantially higher than cost of equity capital), leaving the terminal value as a sustainable steady state with a minimal difference between ROE and cost of equity capital. Otherwise, the terminal value assumes a sustained competitive advantage for eternity, which is clearly unrealistic.[60] Allowing ROEs in the terminal year to deviate dramatically from the cost of equity capital requires anyone using the valuation analysis to lay a large bet on un-vetted, speculative numbers forecast far into the future.

42.     Most startups fail. Move's own disclosures highlighted the many risk factors.[61] Recent reports suggest a 7% startup success rate.[62] Given the riskiness of the projected cash flows of the ListHub Platform products, management's proposed WACC of 15.3% is not an appropriate discount rate. This discount rate is derived based on the median unlevered beta of a set of publicly-traded companies: Zillow, Trulia, Move, CoreLogix, CoStar Group, Reis and

---

[58] See the discussion of the abandonment option in Russell Lundholm and Richard Sloan, *Equity Valuation and Analysis w/eVal*, 3rd Edition, McGraw-Hill, 2012, pp. 268-272.

[59] While accounting for multiple states of the world would make Professor Cornell's analysis more complete, it would not mitigate the speculative nature of his valuation of the non-existent segments of the ListHub Platform.

[60] For a detailed discussion, see, for example, Russell Lundholm and Richard Sloan, *Equity Valuation and Analysis w/eVal*, 3rd Edition, McGraw-Hill/Irwin, 2012, pp. 171-175.

[61] Move 2013 10-K, pp. 7-8 and 10-20 (DX 1260, DFS_EXPERT001468).

[62] Steve Tobak, "Lies, Damn Lies and Statistics About Entrepreneurs," *Entrepreneur*, October 23, 2014, available at www.entrepreneur.com/article/238800.

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 25

LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

RealPage. Usually, a higher discount rate is applied to new, unproven investments.[63] Moreover, given how sensitive any DCF analysis is to the choice of discount rate, the best approach is to conduct a sensitivity analysis and to present DCF valuations for a range of discount rates, which Professor Cornell did not do.[64]

## VII. PROFESSOR CORNELL'S ANALYSIS OF DAMAGES ASSOCIATED WITH INCREMENTAL PAGE VIEWS ON REALTOR.COM IS FLAWED[65]

43.     Professor Cornell unrealistically assumes that the incremental page views associated with increasing revenues have 100% margins, as he attributes no cost to the additional sales activity needed to monetize these page views. Professor Cornell has testified that including costs associated with sales activity in his analysis would decrease his estimate of damages.[66]

## VIII. MOVE'S PUBLIC DISCLOSURES DO NOT DISCLOSE HARM AND SUGGEST THAT MOVE SUFFERED NO HARM AT ALL; PROFESSOR CORNELL'S FAILURE TO TAKE THE DISCLOSURES INTO ACCOUNT RENDERS HIS ANALYSES UNRELIABLE

### A.     Background on disclosure requirements for publicly-traded companies

44.     "In addition to filing annual reports on Form 10-K and quarterly reports on Form 10-Q, public companies must report certain material corporate events on a more current basis. Form 8-K is the 'current report' companies must file with the SEC to announce major

---

[63] "[F]inancial managers demand a higher rate of return from risky projects … and will set a higher discount rate for… new investment opportunities… Each project should be evaluated at its *own* opportunity cost of capital" (David Brealey and Stewart Myers, *Principles of Corporate Finance*, 6th Edition, McGraw-Hill, 1999, p. 221).

[64] Professor Cornell's own book highlights the need to "[e]mploy sensitivity analysis to isolate those assumptions that have the largest impact on the cash flow forecasts. The rationale for those key assumptions should then be double-checked" (Bradford Cornell, *Corporate Valuation: Tools for Effective Appraisal and Decision Making*, McGraw-Hill, 1993, p. 129).

[65] From an accounting perspective, the fundamental problem with Professor Cornell's Realtor.com damages estimate is his omission of marginal costs associated with sales. I understand that Dr. Athey's report will focus on other errors in Professor Cornell's assessment of damages associated with Realtor.com.

[66] "If there were marginal costs that were meaningful and were not deducted that would inflate the value indicator." (Deposition of Bradford Cornell, February 17, 2016, p. 334).

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 26

LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

events that shareholders should know about."[67] If and when Move's management determined that the departure of its key executives materially affected the operating performance of the company, they should have disclosed this fact to the public under one of the two following items:

### 1)    Item 2.06 - Material Impairments

*A company must disclose certain material write-downs (also called impairments) in an 8-K. (If the company determines the impairment when routinely preparing its financial statements for its periodic report, the company may make the disclosure in the periodic report rather than in an 8-K.) A writedown may occur when a company significantly lowers its estimate of the value of certain assets, such as the value of its brand or of a business it has acquired. The write-down hits the financial statements in two places—as a decrease in assets on the balance sheet and as an expense on the income statement.*[68]

### 2)    Item 8.01 – Other Events

*This is the place where companies may report anything that they believe is important but is not specifically required elsewhere in the 8-K.*[69]

45.    Additionally, under the Sarbanes-Oxley Act of 2002, Section 409, Real Time Issuer Disclosures, issuers are required to disclose to the public, on an urgent basis, information on material changes in their financial condition or operations:

*Section 13 of the Securities Exchange Act of 1934 (15 U.S.C. 78m), as amended by this Act, is amended by adding at the end the following:*

---

[67] "Fast Answers: Form 8-K," U.S. Securities and Exchange Commission, available at www.sec.gov/answers/form8k.htm.
[68] "Investor Bulletin: How to Read an 8-K," U.S. Securities and Exchange Commission, pp. 2-3, available at www.sec.gov/investor/pubs/readan8k.pdf.
[69] "Investor Bulletin: How to Read an 8-K," U.S. Securities and Exchange Commission, p. 5, available at www.sec.gov/investor/pubs/readan8k.pdf.

HUTTON DECL. ISO ZILLOW, INC.'S MOTION
TO EXCLUDE and MOTION FOR PARTIAL
SUMMARY JUDGMENT – 27
LEGAL130348993.1

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

# File a Court document:

## 17-51840-LSS KIRSCHNER v. J.P. Morgan Chase Bank, N.A. et al

Type: ap                        Office: 1 (Delaware)                Judge: LSS

Lead Case: 1-15-bk-12284        Case Flag: SealedDoc(s),
                                MultiDFT, MEDDue

### U.S. Bankruptcy Court

### District of Delaware

Notice of Electronic Filing

The following transaction was received from G. David Dean entered on 10/24/2022 at 9:46 PM EDT and filed on 10/24/2022

**Case Name:**          KIRSCHNER v. J.P. Morgan Chase Bank, N.A. et al
**Case Number:**        17-51840-LSS
**Document Number:** 285

**Docket Text:**
[SEALED] Declaration *of Grant L. Johnson in Opposition to Defendants' Daubert Motion to Exclude the Testimony of Plaintiff's Proposed Expert Yvette Austin Smith* (related document(s)[284]) Filed by MARC S KIRSCHNER. (Attachments: # (1) Exhibits 1 - 10) (Dean, G.)

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**Johnson Declaration re Austin Smith Daubert Opp.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/24/2022] [FileNumber=17749213-0] [18977d950ac7b6bbc97e30fa3c05b721f88ae8526c7cba84b373479c080ff808bb 23edc977e4c34161504e672df622330c97172b19a396b8b53b90303b4acc53]]
**Document description:** Exhibits 1 - 10
**Original filename:**C:\fakepath\Exhibits 1 - 10.pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=983460418 [Date=10/24/2022] [FileNumber=17749213-1] [27acb13169f39761a550fe4fda8d1a752ac98bed4e8cc3e81ff80e3f8f633f3f72 fa87ed625304e5d4904fcb7dcdfbf45874f1f8bb9342143486ccac77158709]]

**17-51840-LSS Notice will be electronically mailed to:**

Stephen J. Astringer on behalf of Defendant BMO Harris Bank N.A.
stephen.astringer@kobrekim.com

Daniel N. Brogan on behalf of Interested Party Millennium Health, LLC
dbrogan@bayardlaw.com, kmccloskey@bayardlaw.com

Mark D. Collins on behalf of Defendant Citibank N.A.
rbgroup@rlf.com;ann-jerominski-2390@ecf.pacerpro.com

Mark D. Collins on behalf of Defendant J.P. Morgan Chase Bank, N.A.
rbgroup@rlf.com;ann-jerominski-2390@ecf.pacerpro.com

G. David Dean on behalf of Plaintiff MARC S KIRSCHNER