**EXHIBIT J**

Redacted Public Version of Declaration of Grant L. Johnson in Further Support of Plaintiff's Daubert Motions to Exclude the Testimony of Defendants' Proposed Experts Amy Hutton and Branka Matevich and Plaintiff's Motion for Partial Summary Judgment [Adv. Docket No. 299]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | |
| MILLENNIUM LAB HOLDINGS II, LLC, | § | Chapter 11 |
| *et al.*, | § | CASE NO. 15-12284 (LSS) |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

| | | |
|---|---|---|
| | § | |
| MARC S. KIRSCHNER solely in his | § | |
| capacity as TRUSTEE of the | § | |
| MILLENNIUM CORPORATE CLAIM | § | |
| TRUST, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | ADVERSARY NO. 17-51840 (LSS) |
| | § | |
| v. | § | |
| | § | |
| J.P. MORGAN CHASE BANK, N.A., | § | |
| CITIBANK N.A., BMO HARRIS BANK, N.A., | § | |
| and SUNTRUST BANK, | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF GRANT L. JOHNSON
IN FURTHER SUPPORT OF PLAINTIFF'S *DAUBERT* MOTIONS TO EXCLUDE THE
TESTIMONY OF DEFENDANTS' PROPOSED EXPERTS AMY HUTTON AND
BRANKA MATEVICH AND PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT**

I, Grant Lawrence Johnson, pursuant to 28 U.S.C. § 1746, declare as follows:

I am an attorney with the law firm of McKool Smith, P.C., counsel to Marc S. Kirschner

in his role as Trustee of the Millennium Corporate Claims Trust. I am admitted *pro hac vice* before

the Court in this action. I submit this declaration in support of Plaintiff's *Daubert* Motions to

Exclude the Testimony of Defendants' Experts Amy Hutton and Branka Matevich and Plaintiff's

Partial Motion for Summary Judgment.

1. Attached hereto as Exhibit 1 are excerpts from the deposition transcript of Amy Hutton.

2. Attached hereto as Exhibit 2 are excerpts from the deposition transcript of Branka Matevich.

3. Attached hereto as Exhibit 3 is a true and correct copy of a July 1, 2022 email from K. Lonergan to C. Viapiano.

4. Attached hereto as Exhibit 4 is a true and correct copy of an August 22, 2022 email from S. Dollar to J. Newcomer.

5. Attached hereto as Exhibit 5 is a true and correct copy of a July 26, 2022 email from J. Newcomer to O. Ongebretson-Schooley.

6. Attached hereto as Exhibit 6 is a true and correct copy of a September 23, 2022 letter from J. Newcomer to Counsel for Defendants.

7. Attached hereto as Exhibit 7 is a true and correct copy of an October 10, 2022 letter from J. Newcomer to Counsel for Defendants.

8. Attached hereto as Exhibit 8 is a true and correct copy of a document entitled "Vantage Point Advisors Corporate Valuation Financial Advisory Services Millennium Lab Holdings Inc. Valuation of 45.0 Percent Membership Interest of Millennium Lab Holdings II, LLC As of April 14, 2014."

9. Attached hereto as Exhibit 9 is a true and correct copy of an August 16, 2022 letter from S. Dollar.

10. Attached hereto as Exhibit 10 is a true and correct copy of an August 19, 2022 letter from E. Murphy.

2

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 23, 2022.                                    */s/ Grant L. Johnson*
New York, New York                                                    Grant L. Johnson

# REDACTED EXHIBIT 1

Page 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
-------------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
          Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,
          Plaintiff,

    - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,
          Defendants.
-------------------------------------------X
                    May 5, 2022
                    10:04 a.m.

          CONFIDENTIAL TRANSCRIPT

          Remote video-teleconference
deposition via Zoom of AMY HUTTON,
pursuant to notice, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.

HUTTON - CONFIDENTIAL

prior to 2014, is the basis for your

criticism in this section, right?

MR. POPOVSKY:  Objection to form.

A.      So the important thing here is that in the context of valuation, it's very important that one do the valuation as of the date and that as one is doing it as of the date, one needs to focus on the information that was available at the time.

One cannot use information that becomes available later; in so doing you create a hindsight bias and that's what I'm pointing out here, that Ms. Austin Smith is using information from July of 2014 without demonstrating that that information was available at the time and the date of her own valuation.

That is not the way we do things appropriately in valuation analysis.

Q.      Got it.

So your result there, then what

HUTTON - CONFIDENTIAL

you do, Dr. Hutton, is you modify the impact of the MUE adjustment by restoring NRPS, right?

MR. POPOVSKY:  Objection to form.

A.      So what I do is, in Exhibit 1, throughout Exhibit 1, I provide you an illustration of the impact of the adjustments that Ms. Austin Smith makes that, in my opinion, the adjustments are unjustified, they are unreliable based on either hindsight, which is not okay to do in a valuation setting, or based on unreliable assumptions.

And so as an illustration I show you one-by-one, if you back out the adjustment that she makes, what the effect is on the value of Millennium.

Q.      Let me ask you this question, I think it is pretty simple.

When you back out Ms. Austin Smith's adjustment, you are going back to management's projection in Padres, right?

MR. POPOVSKY:  Objection to

HUTTON - CONFIDENTIAL

form.

A.      It's a little more complicated than that.

I would like it to be that simple, but the process is actually, when we worked to create my work product that you have, the backup, Exhibit 1, it wasn't as simple.

Now, I think with the MUEs, even in the work that Ms. Austin Smith provided, she provided another --

Q.      I am asking you, the MUE, that was an on/off switch, right?

A.      That was an on/off switch that Ms. Austin Smith provided.

What I do in my Exhibit 1 is I also allow you to see the effect when you use her WACC corrected for the errors and inconsistencies.

And so Exhibit 1 gives it to you both using her incorrect and inflated WACC as well as the 7.2, which is the corrected WACC.

Q.      Okay.

Page 85

HUTTON - CONFIDENTIAL

So MUE, for MUEs, did you revert the cash flow projection, or I should say the revenue projection, to the Padres model?

MR. POPOVSKY:  Objection, asked and answered.

A.    So I take out the effect of the adjustment that Ms. Austin Smith makes.

Q.    Right, and does that put it back to the management's model, and if it does not put it back to management's model, what does it go back to?

MR. POPOVSKY:  Objection to form.

A.    So -- for the MUEs, when I make the one adjustment, it goes back to what the net revenue per specimen would have been in the Padres models absent the adjustment that Ms. Austin Smith made.

Q.    Right.

And so you've restored it to the net revenue per specimen in the Padres model.

My question to you now is, what

HUTTON - CONFIDENTIAL

did you do to independently validate that that was an accurate projection in the Padres model for net revenue per specimen for MUE denials?

A.    So I -- again, in the context of this report, I am taking on Ms. Austin Smith's framework and I'm looking at each of the adjustments that she makes and I am highlighting where the adjustments that she makes are unreliable for various reasons.

And as an illustration, I am providing Exhibit 1 to show the magnitude of the effects of the adjustments that she makes on the valuation of Millennium.

I am not providing an opinion that says the totality of that adjustment should be one way or the other.

What I do provide in Exhibit -- sorry, in Appendix E-2, if we turn to that one, is I provide for you how -- this one is a very interesting appendix.

Here I'm using the 8.6, that includes the small company risk premium

HUTTON - CONFIDENTIAL

just for the purposes of this appendix, and what you see here is quite interesting, is the middle column tells you about the percent of the combined impact of Ms. Austin Smith's adjustments, and you have to basically accept more than 80 percent of her adjustments in totality in order for the equity value to be negative.

So this highlights for you how extreme one has to be in accepting Ms. Austin Smith's extreme adjustments in order to -- all those switches that you might flip lead to a negative equity value in her framework.

Q.    Are you -- okay.

Now that you've finished, I am going to go back to my question, which I'm entitled to an answer to.

What did you do to independently validate that the Padres model was an inaccurate projection for net revenue per specimen based on MUE denials?

MR. POPOVSKY:  Objection to

HUTTON - CONFIDENTIAL

am citing here in footnote 134 the record

for you and the fact witnesses are saying,

there is a question asked, ███ ██████

███████ ███████████ ████ ██ ██ ███ ████████

███ █████ ███ ██████████████ ████ ███ ██

██████████ ████ ███ ██ ████████ ████████

███████ ████ ███ ███ ████████ ██ ████ ██

██ ███ ██████ ████ █████████ ██ ███ ████████

███ ████ ███ █ ████ █████ ██ █████████

████ █████ ████ ██████ ████ ███

███████

          So that --

     Q.       Did you review any contrary

evidence in this matter?

     A.       I don't recall, if there was

anymore evidence I would have put it in

this footnote.

     Q.       So what you're relying on is

what's in this footnote?

     A.       So what I do in my report is to

rebut Ms. Austin Smith.

              To the extent that Ms. Austin

Smith is adjusting for the POC free test

cup program, I analyze the way that she

HUTTON - CONFIDENTIAL

made the adjustment and the basis upon which she makes that adjustment and I highlight very simply that she uses hindsight bias here.

And that's the opinion that's in my report, that's my opinion.

Q.   Assume for me that management became aware of the risks related to the point-of-care free test cup program violating Stark and anti-kickback laws prior to April 2014.

In your opinion, what should management have done to address those risks when it was doing its projections?

MR. POPOVSKY:  Objection to form, lacks foundation, calls for speculation and outside the scope.

Q.   If it's outside the scope, just tell me; you're allowed to speculate though, you're an expert.

A.   I have no interest in attempting to speculate on something that I don't have the detailed facts and circumstances, that's not how I operate.

**Page 104**

HUTTON - CONFIDENTIAL

I think very carefully, I make sure I have the facts and circumstances and I analyze; what I was asked to do in this matter was to assess and rebut certain opinions in Ms. Austin Smith's report --

Q.    Is this another one where the switch was an adjustment, yes or no, you turn the switch that Ms. Austin Smith made off and revert it to management's projections in full?

MR. POPOVSKY:   Objection to form, mischaracterizes the prior testimony.

A.    So Ms. Austin Smith's original document did provide a switch for the POC cups.

What I do in Exhibit 1 is I highlight the fact first that Ms. Austin Smith hasn't provided a reliable basis for the adjustment and I illustrate in Exhibit 1 the magnitude of the effect of the adjustment that she makes on the valuation of Millennium for both her incorrect and

Page 105

HUTTON - CONFIDENTIAL

inflated WACC of 14.8 as well as the corrected WACC of 7.2.

Q.      And by --  I want to use your words here, give me one second --  by establishing that magnitude, that's the difference between management's projections and her projections, right?

MR. POPOVSKY:  Objection to form.

Q.      I'm just talking about point-of-care cup testing, not for all of Exhibit 1, I know there are different ones, but for the free point-of-care cup test program adjustment, is the difference that you're talking about the difference between Ms. Austin Smith's number and management's number?

A.      What I do is I back out her adjustment and I demonstrate --  you can figure out what the incremental effect is and I take those incremental effects and I discount them back using 14.8 for 7.2 and I tell you what the magnitude of that adjustment is.

HUTTON - CONFIDENTIAL

That's what I do in Exhibit 1.

Q.    Is your testimony it has nothing to do with management's projection, I don't understand what you're saying, so help me out here.

When you back out her adjustment, are you going back, are you reverting to management's data?

A.    So as I mentioned earlier, in the building of my model that allows us to flip the switches, you know, there is about five pieces where Ms. Austin Smith included a switch in hers, but there are a couple of places where Ms. Austin Smith makes some adjustments that she did not build in as switches.

And so I and my team, we create a spreadsheet where you can make more changes than just the ones she built into hers.

And there are some nuances in the background that are challenging to completely ensure that it is as simple as you're trying to characterize it.

HUTTON - CONFIDENTIAL

And so trying to be very careful in my answer and highlight the fact that what I'm particularly interested in doing in Exhibit 1 is understanding the magnitude of the adjustment, each one at a time, that Ms. Austin Smith made, and so I'm looking at each one of those in isolation.

Q.    Got it.

Let me ask you about this quote from paragraph 69 of your report.

A.    Yes.

Q.    "Modifying the impact of the POC free test cup program adjustment by restoring the volume reduction," do you see that?

A.    Yes.

Q.    What are you restoring the volume reduction to?

A.    She deducted a 1.6 reduction starting in July 2014 and so that's what I'm restoring, I'm putting back in what she took out.

Q.    Right, so you're putting back

Page 108

HUTTON - CONFIDENTIAL

in the adjustment she made to management's Padres model, the 1.6 percent, right?

A.      I am.

Q.      So you are in this instance restoring management's model, right?

MR. POPOVSKY:  Objection to form.

A.      So, again, Ms. Austin Smith made an adjustment and I'm backing it out.

It's not the same, given some of the nuances here, as restoring management's model.

In some instances it is and in some instances it's not and I can't be sure that for this particular one there wasn't some other pieces that were moving around.

Q.      So you don't know for this adjustment whether there are other pieces that you moved around in the background?

MR. POPOVSKY:  Objection to form, mischaracterizes the testimony.

A.      So at the time we were building this spreadsheet, I was very close to all

Page 109

HUTTON - CONFIDENTIAL

the details; now I am not as close to them.

What I recall is that --  I remember seeing exactly where she put in this reduction in the volume and its effect and that's what I'm focused on highlighting for you, is the valuation --

Q.    Let me try to ask it to you this way.

She reduced the UTD volume in July 2014 from the UTD volume of July 2014 in the Padres model, right?

MR. POPOVSKY:  Objection to form.

A.    So the 1.6 reduction in UTD volume, as I recall her worksheet starts with the Padres projections and she layers on top of that or imposes on top of that these various adjustments that she makes.

I also recall that in order for her to do that, there were some nuances in there and what we do is we back out the adjustment that she made.

And so very simply, certainly

HUTTON - CONFIDENTIAL

backing out the adjustment that she made would get you closer to the original model she started with.

Q.    Let's move on from that.

You mentioned the adjustments Ms. Austin Smith made globally.

Was there any adjustment that she made that you considered to be reliable?

A.    That I considered to be reliable?

Q.    Yes.

A.    Is that the question?

There is one adjustment, I wouldn't say I consider it to be reliable, but I did not provide an opinion on it.

Q.    Which was that?

A.    LCD adjustment.

Q.    The Noridian LCD?

A.    Correct.

Q.    Any other adjustments that she made that you thought were not unreliable enough for you to adjust back?

A.    Well, that's not why I didn't

Page 131

HUTTON - CONFIDENTIAL

identified.

Do you hear her testimony in her deposition regarding her view of those five comparable companies?

MR. POPOVSKY:  Object to form.

A.       When I had a chance to look over the rough transcript at a very high level, one of the things I was interested in was what she might say about the WACC given that she said so little about it in her report.

And so I did search for the term WACC in her deposition and I did read around it and I found it quite interesting, fascinating actually, that she makes an argument in her deposition that these five companies are not comparable enough and so she adds the company specific risk premium to the WACC, and I found that fascinating, because it's just --  it's wrong, it's super wrong.

She's using the five companies in the calculation of the WACC in her footnote 285, or the eight if you do the

HUTTON - CONFIDENTIAL

14.8, but she's using it to estimate the beta and the beta is all about systematic risk and what she said in her deposition was that these five companies weren't comparable because Millennium was riskier and so she's adding a company-specific risk factor.

So I did have to scratch my head; when you're trying to get to the beta, you're focused on systematic risk, not company idiosyncratic risk, right.

So if you don't think you've got comparables to estimate your beta, well, you should change your beta estimate, not add some other ad hoc measures of company-specific risk.

And in fact in the underlying materials, Ms. Austin Smith does adjust the beta; the mean of her five companies' beta, as I highlight in Exhibit 4 of my report, is five, yet the beta that she used in the VPA analysis is one, so she's already adjusted the beta.

And then on top of that she

Page 133

HUTTON - CONFIDENTIAL

adds a company-specific risk premium because she says the comparable companies aren't as risky as Millennium, and as I point out in paragraph 35 of my report, the appropriate way to incorporate company-specific risk is not in the discount rate but is in the expected cash flows, which of course Ms. Austin Smith also adjusts, all these adjustments we have been talking about she makes.

So she is adjusting for company-specific risk, these risks that she hasn't described as to how management dealt with them, so she's imposed and layered on top her own adjustments for the risk in the numerator, right, and then on top of that she has made adjustment to the beta from .85 to 1 and then has added a company-specific risk factor.

What I can say as a valuation expert is it is completely improper to do what she has done, to add all of those different pieces in, it is nonsensible.

Q.     I want to be clear on the facts

HUTTON - CONFIDENTIAL

calculated, she did not provide us with details of how she calculated it.

Q.      Right.

Regardless, it's the same number, right; she's not diverging in any way from the contemporaneous WACC used by Millennium from the company it hired to do this work, right?

A.      I don't think of it that way, I don't think of that WACC as belonging to Millennium.

What I'm providing for you in Exhibit 3 is a simple chart of all the different WACCs that were used and it's clear, one, that when you correct Ms. Austin Smith's WACC for the errors and inconsistencies, you get 7.2, and it happens, and this is just by happenstance, to be equal to the average of the WACCs used by the arrangers.

You can think of that as just happenstance where maybe there is something to it.

Q.      Well, is it happenstance or is

HUTTON - CONFIDENTIAL

that in any way the basis of your opinion?

MR. POPOVSKY:  Objection to form.

A.      What it does is it gives more credence to the corrections that I've made in that they're here for a reason, these different points, to show you that when you correct Ms. Austin Smith's WACC for the errors and inconsistency, it comes back in line with the WACCs of the other contemporaneous financial professionals.

Q.      Another contemporaneous financial professional was TA Associates, right?

A.      But TA Associates is a private equity firm and they are not calculating a WACC, they're interested in understanding a hurdle rate and whether the investment that they're making is going to supersede that hurdle rate or not.

So TA Associates is not here because they're not doing a valuation, their analysis is entirely different.

Q.      So TA Associates wasn't doing a

Page 215

HUTTON - CONFIDENTIAL

A.        So what I have is an understanding here and I've seen the Padres model of course and Ms. Austin Smith's description, she calls them variable, hybrid and fixed, I guess my big issue is the fixed costs are not truly fixed, they are growing at a fixed rate.

But she does base her way of thinking about that based on what's in the Padres model.

But the problem is she makes this huge adjustment to revenues and she doesn't think at all or provide any analysis as to how the operating expenses would change given this dramatic adjustment to revenue.

Q.        Is your opinion that management should have been calculating their operating cost as a straight percentage, a single data point percentage, of revenue back in April of 2014?

MR. POPOVSKY:   Objection to form, outside the scope.

A.        There is nowhere in my report

HUTTON - CONFIDENTIAL

that I suggest that.

Q.      But you do make an adjustment where you set the operating costs at a fixed percentage of revenue, right?

A.      So you are referring to the fact that for illustrative purposes, I use Ms. Austin Smith's 38 percent expenses as a percent of revenue when I try to illustrate for the decision-makers here what the valuation implications are for her lack of care in providing us with an understanding of how the operating expenses ought to be matched to the revenue that she is adjusting.

So what is particularly surprising and unsettling about her operating expenses is, despite a 30 percent drop in the first couple of years and a nearly 50 percent drop over a four-year period, fixed costs, fixed cost, what she calls fixed costs, increased by 6 percent and she has not explained to us why management should have expected or should have allowed costs to increase,

Page 249

HUTTON - CONFIDENTIAL

context of Calloway and Ameritox, she's not thinking about identifying the change in the business practices.

Q.     Let me see if you answered my question there, yeah, you answered it, okay.

For neither of these are you actually suggesting just double counting by Ms. Austin Smith, is that correct, or is that answer just specific to custom profiles?

A.     It was challenging to figure out precisely whether Ms. Austin Smith is double counting in any of these things, so I did not go out on a limb and argue that she was.

And that's certainly not what I'm doing in paragraph 49.

Q.     I don't know if I've covered this, but what you did then is you removed the entirety of the reputational volume adjustments from Ms. Austin Smith's model, you didn't model, say, the 5 or 10 percent that management later concluded was

Page 250

HUTTON - CONFIDENTIAL

appropriate, you didn't do a sensitivity analysis around that particular element, right?

A.      From what management had said, I don't know if the 5 and 10 percent was because of a change in their business activities or if it was due to a reputational.

What I do in Exhibit 1 is I provide an illustration for the decision-makers as to what the magnitude is of the effect of Ms. Austin Smith's adjustment when you reverse it out.

So that's all that exhibit does, it's illustrative.

Q.      Let's talk about emerging opportunities now.

A.      Sure.

Q.      What standard do companies need to use when they are projecting future revenue from businesses that have not yet started?

MR. POPOVSKY:  Objection to form.

Page 269

HUTTON - CONFIDENTIAL

they intended to do given they were going to license their technology.

Maybe the actual --

Q.      Got it.

So would a technology license -- how would that come in as revenue, would that result in like a specimen and net revenue per specimen number?

A.      I don't know how they would -- given they were still just planning, there's many ways, a licensing agreement can be drawn up, I can't speculate on what form it might have taken eventually.

Q.      And so you restore, after your criticisms of Ms. Austin Smith, you restore a hundred percent of the emerging opportunity revenue, right?

MR. POPOVSKY:  Objection to form.

A.      Again, what I do in Exhibit 1 is I provide an illustration for the deciders here, the decision-makers, as to what the effect is if one takes these revenues and these expenses that are

Page 270

HUTTON - CONFIDENTIAL

removed as a result of Ms. Austin Smith eliminating them, and if you take the net of those revenues and expenses and you discount them back at these different rates to figure out what their value implication is, I provide that in Exhibit 1 so that people understand how important it is, this modification that she made.

Q.      And you, in this case, you don't do 50 percent restoration, you do a hundred percent, simple question, right, you don't, like, sensitize or say, well, I'm only going to reduce her adjustment by some percent, it's just switch, you say they get a hundred percent of the revenue that they modeled from emerging opportunities?

MR. POPOVSKY:  Objection to form.

A.      Again, what I do in Exhibit 1 is illustrated and I provide for the decision-makers --  they are looking at the magnitude of the effects of the adjustments that Ms. Austin Smith makes.

HUTTON - CONFIDENTIAL

in this exercise is I analyze Ms. Austin Smith's report and I was not asked to and I do not analyze anything beyond that, outside of that, I do not analyze whether custom profiles were --  it is not within my realm of expertise whether they were in line with laws or not.

          And at the time that management was making the analysis, the judgment had not been made, so you're asking a question that I can't answer, I haven't considered and I haven't spent the time thinking about.

     Q.     I appreciate --  I think that's good enough, I understand you're not going to testify about that.

          Because you say she hasn't validated the assumption she made, you restored, as you put it --  hold on one second here, I'm sorry, I got lost in my train of thought.

     Q.     You say you restored the NRPS reduction, right?

     A.     Yes; again, as an illustrative

HUTTON - CONFIDENTIAL

exercise I provide the decision-makers with an understanding, if you look at Exhibit 1, of what the magnitude of the valuation implications are of the adjustment that she made by reversing it out and calculating the value of it using both the 14.8 and the 7.2 discount rates.

Q.      Let's go to specimen volume growth trends.

I want to understand what you're doing here, so let me ask this question.

As an academic, do you agree or disagree that historical growth trends can be a starting point for projecting future growth trends?

A.      It can be a starting point, but they are just that, a starting point.

Q.      In your opinion, is there an accepted empirical calculation that can be done to project future growth trends or future growth rates?

MR. POPOVSKY:  Objection to form.

Page 299

HUTTON - CONFIDENTIAL

Q.        Do you subscribe by the 9.8 percent growth rate used by Millennium's management or is that beyond the scope of your opinion too?

A.        That's beyond the scope of my opinion, yes.

Q.        I just want to be clear, you're not criticizing Ms. Austin Smith for projecting the two payor groups differently, right, Medicare verse commercial?

A.        I didn't provide any opinion in my report on her decision to provide separate growth rates.

What I highlight is that the growth rates that she puts forth and how they differ from management are without basis.

Q.        If she only considered one quarter, the quarter where the data shows the growth rates were actually negative, why didn't she use a negative growth rate instead of zero percent for Medicare, if that was really the only consideration

Page 336

C E R T I F I C A T I O N

I, Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and a Notary Public, do hereby certify that the foregoing witness, AMY HUTTON, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

*Jineen Pavesi, RPR, RMR*

JINEEN PAVESI, RPR, RMR, CRR

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MILLENIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

**ERRATA FOR MAY 5, 2022 DEPOSITION OF AMY HUTTON**

| Page | Line(s) | Original | Correction | Reason |
|---|---|---|---|---|
| 12 | 9 | John | Jon | Typographical error |
| 13 | 13 | John | Jon | Typographical error |
| 50 | 15 | that will allow them you can view as either | that you can view to be either | Clarification |
| 53 | 19 | with | for | Clarification |
| 59 | 18 | said | says | Transcription error |
| 62 | 7-8 | relied on it, legal documents. | relied on it. | Clarification |
| 67 | 19-20 | that Department | that the Department | Transcription error |
| 68 | 2 | Austin Smith in | Austin Smith, in | Punctuation error |
| 73 | 8 | Calloway, she | Calloway.  She | Punctuation error |
| 73 | 23 | do, she | do.  She | Punctuation error |

| Page | Line(s) | Original | Correction | Reason |
|---|---|---|---|---|
| 77 | 19 | Now | No | Transcription error |
| 99 | 22-23 | by citing some cases in just textbooks | by citing in some cases just textbooks | Clarification |
| 100 | 8 | on WACC | on a WACC | Transcription error |
| 109 | 16 | UTD | UDT | Typographical error |
| 119 | 24-25 | on estimated | and estimate it | Transcription error |
| 130 | 10 | use if | use them | Transcription error |
| 132 | 22 | five | .85 | Transcription error |
| 136 | 12-13 | weld of diversified | well-diversified | Transcription error |
| 145 | 19-20 | recall.  They are | recall whether they are | Clarification |
| 150 | 3 | derivation | the derivation | Transcription error |
| 150 | 9 | 14 percent | a 14 percent | Transcription error |
| 150 | 17 | and -- but | versus what | Clarification |
| 150 | 18 | analysis | analyses | Transcription error |
| 153 | 13 | emphasize | add a size | Transcription error |
| 155 | 2 | that | of | Transcription error |
| 155 | 4 | up, these | up.  These | Punctuation error |
| 164 | 4 | what this is | what is | Transcription error |
| 164 | 6 | invest, in | invest in, in | Transcription error |
| 164 | 12 | coverable | comparable | Transcription error |
| 165 | 2 | is | is not | Transcription error |
| 166 | 11-12 | not systematic risk, it includes | not only systematic risk, but also it includes | Transcription error |
| 167 | 8 | analysis | analyses | Transcription error |
| 167 | 14 | their | TA Associates' | Clarification |
| 175 | 16 | performs | performed | Transcription error |
| 175 | 17 | analysis | analyses | Transcription error |

| Page | Line(s) | Original | Correction | Reason |
|---|---|---|---|---|
| 175 | 18 | rates yielding enterprise value | rate multiples, yielding an enterprise value | Clarification |
| 181 | 14-15 | analysis, while one that she didn't take into consideration, the analysis done by the contemporaneous | analysis didn't take into consideration the contemporaneous | Transcription error |
| 182 | 2 | 4.8 | 14.8 | Transcription error |
| 190 | 22 | coverable | comparable | Transcription error |
| 196 | 17 | wouldn't | couldn't | Transcription error |
| 197 | 16 | professional | professionals | Transcription error |
| 200 | 3 | seriousness and purpose | seriousness of purpose | Transcription error |
| 202 | 13 | company-specific risk factor to the extent they're usually relatively small, | small company risk factor, as these are usually relatively small increments, | Clarification |
| 202 | 16 | small company | company specific | Clarification |
| 204 | 12 | 8.2 | 8.6 | Correction |
| 206 | 10 | paid | made | Transcription error |
| 216 | 19 | drop in the | drop in revenues in the | Clarification |
| 218 | 20 | this really the | this is really to | Transcription error |
| 221 | 7 | ,. | . | Typographical error |
| 225 | 3 | into cost | into a cost | Transcription error |
| 227 | 9 | fixed | variable | Clarification |
| 232 | 2 | value | volume | Transcription error |
| 232 | 22 | further | far | Clarification |
| 236 | 17-18 | here, Ameritox | here, with Ameritox | Clarification |
| 237 | 12 | experienced what they have arisen from changes in their | may have experienced changes in their | Clarification |
| 241 | 7 | on this matter | in this matter | Transcription error |

-3-

| Page | Line(s) | Original | Correction | Reason |
|---|---|---|---|---|
| 248 | 7 | service | specimen | Transcription error |
| 248 | 21 | service | care test cups | Clarification |
| 248 | 22 | topics of target of | topics of – target of – | Punctuation error |
| 251 | 22 | introductional | international | Typographical error |
| 271 | 13 | eliminates | makes | Clarification |
| 271 | 14 | payors of net | payors net | Clarification |
| 277 | 3 | is | are | Transcription error |
| 279 | 16 | elite | a leap | Transcription error |
| 281 | 3 | has an affirmative | has affirmative | Typographical error |
| 281 | 11 | can | can't | Transcription error |
| 282 | 9 | DOJ, | DOJ investigation, | Clarification |
| 285 | 3 | inclusion | conclusion | Transcription error |
| 290 | 7-9 | from the fourth quarter of 2014 to the first quarter of 20 – fourth quarter of 2013 | from the fourth quarter of 2013 | Clarification |
| 291 | 24 | from | for | Transcription error |
| 292 | 24 | rate that | rate – that | Punctuation error |
| 298 | 14 | i | I | Typographical error |
| 298 | 17-18 | and I'm providing you with raising | and I'm raising | Clarification |
| 302 | 25 | she took as expected in her | she took as the expected case in her | Clarification |
| 305 | 4 | for single quarter, for | from a single quarter, 1Q2014.  For | Transcription error |
| 316 | 17 | ebit | EBITDA | Transcription error |
| 316 | 22-23 | I don't think these companies are all that comparable, I don't rely on this, | "I don't think these companies are all that comparable, I don't rely on this," | Punctuation error |
| 319 | 14 | and RPS | NRPS | Transcription error |

| 323 | 9  | LPO             | LBO                      | Transcription error |
| 333 | 12 | Ms. Austin Smith | Ms. Austin Smith's report | Clarification       |

Amy P. Hutton

Subscribed and sworn to before me

this  8  day of June, 2022

Notary Public

DESHANT ABIELE PAUL
Notary Public - State of New York
NO. 01PA6316886
Qualified in Kings County
My Commission Expires Dec 22, 2022

My Commission Expires: December 22, 2022

# EXHIBIT 2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
-------------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
                Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,
                    Plaintiff,

        - against -

J.P. MORGAN CHASE BANK, N.A., CITIBANK
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,
                    Defendants.
-------------------------------------------X
                        May 11, 2022
                        10:03 a.m.

            CONFIDENTIAL TRANSCRIPT

            Remote video-teleconference
deposition via Zoom of BRANKA MATEVICH,
pursuant to notice, before Jineen Pavesi,
a Registered Professional Reporter,
Registered Merit Reporter, Certified
Realtime Reporter and Notary Public of the
State of New York.

MATEVICH - CONFIDENTIAL

Q.      It's generally understood in the industry that commercial payors follow Medicare's lead in coding and reimbursement rates, not exact matches, but they generally follow Medicare's trends, right?

MR. POPOVSKY:  Objection to form.

A.      Actually, that was part of the issue with drug testing, because different payors had different guidance, different recommendation, different recommendations in terms of what they would reimburse for and what they wouldn't.

And so that was part of the issue in the industry.

Q.      So is your answer that, no, commercial payors generally do not follow Medicare's lead in coding and reimbursement rates?

A.      No, that's not what I said.

Q.      Okay, so --

A.      There is complexities in the industry; without doing an assessment of

MATEVICH - CONFIDENTIAL

that, which I was not asked to do, I can tell you that, yes, there are differences, but I can't speak to the generality because there are dependencies.

Q.      As an expert in the clinical lab industry, is it your general understanding that commercial payors follow Medicare's lead in coding and reimbursement, as a general matter, within your expertise?

MR. POPOVSKY:  Object to the form.

A.      Commercial payors will follow Medicare's recommendation in terms of coding in that they use similar coding, CPT codes.

Regarding reimbursement, it depends on the contractuals, it depends on who the payor is.

So that's what the answer is.

Q.      As a general matter, do commercial payors pay some factor less than Medicare for similar procedures?

A.      That would depend again on the

MATEVICH - CONFIDENTIAL

contract.

In my experience, when Medicare had first come out with some of the pricing and everything, things -- actually, Medicare was the lowest payor when I was in the industry at first.

And through the years there has been an evolutionary process where, you know, at one point, to your statement, their -- contracts were set up as a percent of Medicare and in some cases you had contracts based on other --  looking at cost per life, looking at other things, so there is just complexities involved in that.

Q.     When you, and I will get into your experience doing projections a little more, but I want to sort of focus on this particular issue, if you were looking at a projection back in, let's say, 2012, 2013, 2014 time frame, and you saw a circumstance where Medicare took the lead and, say, was going to no longer cover certain types of codes or procedures, or

MATEVICH - CONFIDENTIAL

they were going to reduce the billing rate that they reimbursed for those codes or procedures, when you were projecting the commercial payor aspect of your business, how would you factor that in?

A.      I would run --

MR. POPOVSKY:  Objection.

THE WITNESS:  Oh, sorry.

A.      Let's go back to the question, can you repeat the question, I just want to make sure I didn't miss anything, and my apologies.

Q.      That's okay, let me break it up some to make it cleaner and make sure you're following along.

Back in the 2014 time frame, early 2014, okay, are you with me?

A.      Yes.

Q.      Let's just assume you encounter a situation where Medicare decided to reduce its reimbursement rate for code, make it up, 103, okay, are you with me?

A.      Yes.

Q.      At that time, projecting from

MATEVICH - CONFIDENTIAL

that date into the future, how would you build projections for the commercial payors for that same billing code?

MR. POPOVSKY:  Objection to form.

A.    So to make sure I understood this perfectly, you're asking me based on my experience and what I would do if I were faced with a Medicare guidance or Medicare rule that came out saying they're going to be lowering reimbursement on a certain code and I would be looking at the impact and making a future projection.

Am I correct in that summary?

Q.    Correct in that summary, but I'm particularly interested in future projections of commercial payors and how that would impact that projection.

MR. POPOVSKY:  Objection to form.

A.    I would run a report based on all the commercial payors and look at the payors and do an assessment based on that.

Q.    In terms of doing that

MATEVICH - CONFIDENTIAL

assessment, would you make some assumptions, because we're talking about future projections, that the commercial payors would come into line with Medicare, at least in part?

MR. POPOVSKY:  Objection to form.

A.        I wouldn't, because it all depends on the contractuals involved, the dates the contracts are changed, there are a lot of dependencies.

So based on your question, you're asking me, I'm looking at commercial payors and I would run that assessment based on commercial payors.

Q.        So Medicare reducing its reimbursement rate would not impact your commercial payor projections at all going forward?

MR. POPOVSKY:  Objection to form, mischaracterizes the testimony.

A.        I didn't say it wouldn't impact it at all; I would have to take it into consideration.

MATEVICH - CONFIDENTIAL

But I wouldn't rely on Medicare billing and then make an assumption that commercial is going to reduce or grow based on just looking at Medicare.

Q.   How would you take it into consideration?

A.   I'd take it into consideration as I build the overall different scenarios, but, again, it would enter into the total view as opposed to just the commercial payor view.

Q.   Are you saying you would take sort of some kind of factor that you would apply to the bottom line revenues or EBITDA, what do you mean it would apply to the total view?

A.   In other words, I would look at the global --  I would look at it globally, you know, as I prepared the projection.

But you asked me specifically about commercial payors and to get back to that, truly I would use commercial payor data, keeping in the back of my mind that,

MATEVICH - CONFIDENTIAL

you know, this is happening, but I would base those commercial payor projections based on commercial payor data.

Q.     But the commercial payor data is historical, right.

So my question is --  and you said you're not saying that a Medicare adjustment would not impact your commercial payor projections at all, so for commercial payors, how would it impact the commercial payor projections; would you apply a factor to commercial payor reimbursement rates because you know when they roll off the current contract later on they're going to adopt a new contract that falls more in line with Medicare?

How, what standard or methodology would you apply to incorporate that into your commercial payor projections?

MR. POPOVSKY:  Objection to form.

A.     It depends on what I was looking at and, based on historical data,

MATEVICH - CONFIDENTIAL

I could review the deltas between Medicare reimbursement and commercial payor reimbursement and take a look at if in fact there is -- there are any parallels to this or what the relationship is between them.

But if I am purely looking at commercial data or commercial projections, I would use commercial data.

Q.        I understand that point.

I think what you're saying, for Medicare you'd look back at historic data and maybe try to see what the trend line for commercial compared to Medicare was, is that fair, I am trying to understand your last answer to my question, what would you do?

MR. POPOVSKY:  Objection to form.

A.        I would look to see what the relationship is between the Medicare and commercial payor and I would keep that as a point, depending on what the relationship is and what the delta is.

MATEVICH - CONFIDENTIAL

Q.        Anything else?

A.        It depends on the kind of, you know, review that I'm doing and assessment that I'm doing.

Q.        When would a lower reimbursement rate for Medicare lower your projections for commercial payors, under what circumstances?

MR. POPOVSKY:  Objection to form.

A.        Could you repeat that again, I just want to make sure that I fully understand.

Q.        Under what circumstances would a lower reimbursement rate for Medicare lower your projections for commercial payors?

A.        In comparing --  well, you're asking under what circumstances would lower reimbursement for Medicare lower my projections for commercial, is that correct?

Q.        Yes.

A.        Without running the numbers I

MATEVICH - CONFIDENTIAL

couldn't say, because I would be relying again on Medicare data reimbursements and tying that to commercial data, presupposing there is a relationship.

Q.      Two final questions here.

One, your testimony, I want to be clear, your testimony is there is no general understanding in the industry that commercial rates generally follow Medicare rates?

A.      That's not what I said.

Q.      Okay.

A.      What I said is there are dependencies on that and it would be based on the circumstances, on the commercial payor contracts, there is a number of dependencies, you would have to test those out before you can determine whether or not there is a relationship.

Q.      But my question is the broader industry, right, you're an industry expert.

Can you sitting here today as an expert say yes or no, commercial payor

Page 62

MATEVICH - CONFIDENTIAL

reimbursement rates generally, just generally, are understood to follow Medicare; and if you can't because it has to be down to the billing line item, that's fine, but I am trying to test your understanding of the general UDT industry?

A.      If you're speaking about reimbursements, oftentimes commercial payors will follow the lead of Medicare with regards to reimbursements.

But those reimbursement rates are dependent on the individual payors and under the contractuals that they work under.

Q.      Got it.

You mentioned earlier that at a point in time Medicare was actually the lowest payor in this industry.

What year are you talking about there?

A.      Back in the dark ages.

No, actually we're talking in the Seventies when BRGs first went into effect.

**Page 173**

C E R T I F I C A T I O N

I, Jineen Pavesi, a Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter and a Notary Public, do hereby certify that the foregoing witness, BRANKA MATEVICH, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

*Jineen Pavesi, RPR, RMR*

JINEEN PAVESI, RPR, RMR, CRR

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE
Case No. 15-12284 (LSS)
Jointly Administered
Adv. Pro. No. 17-51840 (LSS)
-------------------------------------------X
In re:
MILLENNIUM LAB HOLDINGS II, LLC, et al.,
            Debtors.
MARC S. KIRSCHNER, solely in his capacity
as TRUSTEE OF THE MILLENNIUM CORPORATE
CLAIM TRUST,
            Plaintiff,
            - against -
J.P. MORGAN CHASE BANK, N.A., CITIBANK,
N.A., BMO HARRIS BANK, N.A. and SUNTRUST
BANK,
            Defendants.
-------------------------------------------X



    CONTINUED CONFIDENTIAL DEPOSITION
        VIA ZOOM VIDEOCONFERENCING
                    OF
              BRANKA MATEVICH
            Friday, May 13, 2022




REPORTED BY:
LINDA J. GREENSTEIN

**Page 177**

**May 13, 2022**

**9:05 A.M. CDT**

Continued Confidential Videotaped Deposition held via Zoom Videoconferencing of Branka Matevich, taken by Plaintiff, before Linda J. Greenstein, a Certified Shorthand Reporter and Notary Public of the State of New York.

**Page 256**

CONFIDENTIAL - BRANKA MATEVICH - VOL. II
medically unnecessary.

Q.    Right.  That was a sort of
different question, though, so --

A.    Oh.

Q.    Are you claiming that every test
billed under codes that were also billed by
Aegis and Ameritox were medically
necessary?

A.    I don't know.

Q.    Okay.  Can you explain to me why
Millennium billed for codes that Aegis did
not?

A.    That in large part has to do
with the test capabilities, the types of
practices, and I can't speak to Millennium.
I can speak to the market.

I can say that based on my
experience, different labs run different
tests, and it's based on their capabilities
as a lab, the tests that are being
requested by physicians.

In some cases parts of the
country that they're -- that they live in
because there are different, you know,

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

types of drug usages, so there's a lot of dependencies.

Q.    So did you do anything that's specific to the facts of Millennium and Aegis to determine whether that's actually the case, that Aegis didn't have capabilities, that Aegis's physicians were not requesting those tests, that -- or wanted those tests, that the geographies mattered, did you do anything specific to the facts here?

MR. POPOVSKY:  Objection to form.

A.    I looked at what Ms. Austin Smith said, was that these were the codes that Aegis and Ameritox billed and that was it.

Anything else would have been outside of the scope of my report.

Q.    Could Aegis perform drug confirmation tests?

A.    It's outside of the scope of my report.  I can tell you that they billed for these codes.

Page 258

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

Q.   Aegis didn't bill for drug confirmation tests.

Could they actually perform drug confirmation tests based on their facilities, do you know?

A.   I don't know.  It was -- that was not something that I needed to -- to know.

Q.   Okay.  How about -- and excuse me for butchering some scientific drug names -- how about desipramine level, could Aegis perform that test?

A.   Desipramine?  I have no idea, because it didn't appear in the codes that Ms. Austin Smith -- you know, that were shown.

Q.   How about imipramine level?

A.   Imipramine?

MR. POPOVSKY:  Same objection.

A.   Again, I don't know because they don't appear on -- on these codes.

Q.   Okay.  How about nortriptyline?

MR. POPOVSKY:  Are you reading

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

from Exhibit A?

MR. NEWCOMER:  Mark, I'd appreciate if you have an objection, stick to an objection.

I'm asking --

MR. POPOVSKY:  Some of that was hard to understand.  I wanted to know if you were reading from the report or if it was coming from somewhere else.

MR. NEWCOMER:  I'm asking about Aegis's testing capabilities.

BY MR. NEWCOMER:

Q.    Did Aegis have the test capability to test for nortriptyline?

A.    I don't know.

Q.    Did it have --

A.    They weren't on that list of codes that were on this report.

Q.    Okay.  Did it have the ability to test for dihydrocodeinone, or at least the measurement of dihydrocodeinone?

A.    Again, I don't know.

Q.    Okay.  How about dihydromorphinone?

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

A.   I don't know.

Q.   How about phenobarbital?

A.   I don't know.

Q.   How about haloperidol?

A.   Haloperidol, I don't know.

Q.   All right.  How about urine alkaloid levels?

A.   I don't know.

Q.   All right.  I'm going to run through this with Ameritox.

Did Ameritox have the test capabilities to test for a drug confirmation?

MR. POPOVSKY:  Same objection for all these questions.

A.   All I can base my -- all I can base my answer on is the codes that show up here that they billed.

Q.   Okay.  My question is, could Ameritox bill for drug confirmation tests -- excuse me -- could it perform drug confirmation tests?

A.   Could it...

I don't know.

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

Q.   All right.   Could it perform desipramine level tests?

A.   The next three are known as the tricyclics band.

Q.   Right.   TCAs?

A.   Yeah, and I don't know.

Q.   Same -- so the imipramine level you don't know?

A.   Imipramine, no.

Q.   Okay.   Nortriptyline, you don't know?

A.   No.

Q.   All right.

Dihydrocodeinone you don't know?

A.   No.

Q.   Dihydromorphinone you don't know?

A.   No.

Q.   Phenobarbital levels you don't know?

A.   No.

Q.   Haloperidol levels you don't know?

A.   No.

Page 262

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

Q.    And urine alkaloid level you don't know; right?

A.    No, no.

Q.    Okay.  If you're to be believed, a quarter to 20 percent of Millennium's billings were for tests that not a single physician at either Ameritox or Aegis considered medically necessary.

Is that your testimony?

MR. POPOVSKY:  Objection to form.

A.    No.  What I can say is that Ameritox and Aegis billed for these particular tests.

Q.    You're looking at Exhibit 7 there; right?

A.    Yes.

Q.    I just want to try to shortchange some of this here.

All right.  Paragraph 44 right up above 45 that we were looking at before, you say Ms. Austin Smith does not use any data on commercial payors.

I just want to find out what

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

Do you think it is accurate to compare Quest billing to Millennium billing to determine whether or not codes that weren't billed by Quest were medically unnecessary, do you think that's a fair comparison -- I did it again.  I asked fair.

A.    I know, I was like they weren't billed, okay.

Q.    Okay.  Do you think it's an accurate comparison?  I think we know what I'm asking here.

Do you think it is an accurate comparison?

MR. POPOVSKY:  Objection to form.

A.    What I looked at is, I ran a report and I looked at the tests that were performed by these laboratories.

And if a laboratory runs it and bills it, I mean, to me it just -- it goes back to Ms. Austin Smith claiming that those tests were -- would be considered medically unnecessary.

**Page 276**

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

And all I can tell you is, I ran a report, I looked at these laboratories that she mentions as competitors, and these laboratories ran these particular tests.

Q.   Right.  But she concluded that the comparison to these laboratories wouldn't be appropriate, so let me ask you this:

Would you expect, as an industry player, for Quest to bill the same quantity of tests, codes, reimbursement and volumes per code that Millennium did?

A.   That's not germane to this.  I was looking at did they run it or didn't they run it.  It's a very simple question. Did they run it, didn't they run it.

Q.   I get that, but I don't think it answers the question Ms. Austin Smith was trying to answer.

So my question to you is, what did you do to ensure that what you put forth in Exhibit A here answers the question that Ms. Austin Smith was trying to answer?

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

MR. POPOVSKY:  Objection to form.

A.    Ms. Austin Smith made the claim that Aegis and Ameritox, because they didn't run those -- these particular tests, that they weren't medically unnecessary.

Q.    I get that.  But you understand there are inputs into a model, right, like when you're trying to figure something out you've got inputs into the model.

And one of the inputs here was that Ms. Austin Smith looked at those two companies and concluded they were the providers that billed the quantity of tests, codes and reimbursement and volumes per code most similar to Millennium's.

Did you do anything similar for Alere, Bio-Reference, Calloway, Labcorp and Quest?

A.    Well -- so here's the thing.

MR. POPOVSKY:  Objection to form.

A.    Let's say -- and I'm going to go back to Exhibit 7.  Billing code 80152 is

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

run by Aegis, but it's not run by Ameritox.

So is that -- based on Ms. Austin Smith's logic, does that mean that 80152 is medically unnecessary?

Q.    You tell me.

A.    Because you're --

Q.    No, my question is this.  So let me go back to my question, which was -- I'm on a completely different issue here.

Ms. Austin Smith looked at Aegis and Ameritox and concluded that they were the providers that billed the quantity of tests, codes and reimbursements and volumes per code most similar to Millennium's.

Did you do anything similar for Alere, Bio-Reference, Calloway, Labcorp or Quest; yes, no?  Just beyond the scope?  Did you do it?

MR. POPOVSKY:  Objection to form.

A.    I looked at the test codes -- I looked at the test codes that were billed for the ones that she excluded because that's what she used moving forward to make

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

her assumption of medically unnecessary billing.

She did not -- she did not use the volumes that Aegis and Ameritox billed for those codes in her assessment.

Q.    Is that your understanding of what she did, that she didn't use the volumes to select Ameritox and Aegis?

A.    That's not what I said.

Q.    Okay.  Because my question is on how you select the companies to which you're going to compare Millennium.

You've selected five here, Alere, Bio-Reference, Calloway, Labcorp and Quest.

Did you do any investigation into the comparability of their billing criteria to Millennium or did you just choose them because elsewhere Ms. Austin Smith had identified them as competitors?

A.    I wanted to, rather than introducing new competitors, I used the competitors that Ms. Austin Smith lists in -- in her report.

Page 280

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

Q.    Okay.  Did you do any other analysis other than just note that she listed them?

A.    The analysis I did was whether or not they were running these particular test codes that --

Q.    Right.

A.    That Ms. Austin Smith identified as being medically unnecessary.

Q.    Did you do any other analysis to confirm to your satisfaction as an expert that they were appropriate companies to select?

MR. POPOVSKY:  Objection to form.  Asked and answered.

A.    In my industry experience, if I'm comparing whether or not a company runs a test, it has nothing to do with their volumes or the size of the company.

It is, are you running the test, yes or no.

Q.    Yeah, but that's not my question.

My question is, what did you do

Page 281

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

to confirm the comparability of the companies, that to your satisfaction as an expert they should be on this list.

MR. POPOVSKY:   Objection to form.

A.   What I did is, I took Ms. Austin Smith's information that she gave on the companies that she had identified as competition, and then, looking at that, I ran the report based on my industry knowledge of, did they run this test or didn't they.

Q.   Okay.   Anything else?

A.   No.

Q.   Is it your position that Millennium should have assumed that no change in revenue would occur as a result of the Noridian draft local coverage determination?

MR. POPOVSKY:   Objection to form.

A.   That was outside the scope of my report.

Q.   Is it your understanding -- is

Page 353

CONFIDENTIAL - BRANKA MATEVICH - VOL. II

C E R T I F I C A T E

I, Linda J. Greenstein, Professional Shorthand Reporter and Notary Public in and for the State of New York, do hereby certify that, BRANKA MATEVICH, the witness whose deposition is hereinbefore set forth, was duly sworn and that such deposition is a true record of the testimony given by the witness to the best of my skill and ability.

I further certify that I am neither related to or employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of May 2022.

Linda J. Greenstein

My commission expires:    January 30, 2025

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MILLENIUM LAB HOLDINGS II, LLC, *et al.*, | Case No. 15-12284 (LSS) |
| Debtors. | Jointly Administered |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST, | |
| Plaintiff, | Adv. Pro. No. 17-51840 (LSS) |
| v. | |
| J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK, | |
| Defendants. | |

## ERRATA FOR MAY 11 AND MAY 13, 2022 DEPOSITION OF BRANKA MATEVICH

| Page | Line(s) | Original | Correction | Reason |
|---|---|---|---|---|
| 10 | 20 | Jan | Jon | Transcription error |
| 13 | 25 | and that I | and I | Transcription error |
| 15 | 25 | Fluer | Fluur | Transcription error |
| 16 | 4 | Fluer | Fluur | Transcription error |
| 16 | 5 | Fluer | Fluur | Transcription error |
| 16 | 13 | Fluer's | Fluur's | Transcription error |
| 21 | 24 | lab, | lab industry, | Clarification |
| 22 | 21-22 | one of the | what are the | Transcription error |
| 34 | 24 | was a | was at a | Transcription error |
| 39 | 21 | and very | and am very | Transcription error |

| **Page** | **Line(s)** | **Original** | **Correction** | **Reason** |
|---|---|---|---|---|
| 52 | 4 | the | that | Transcription error |
| 61 | 3 | Medicare data reimbursements | Medicare reimbursements data | Clarification |
| 62 | 24 | BRGs | DRGs | Transcription error |
| 77 | 24 | Hart | Heart | Transcription error |
| 80 | 23 | cull | call | Transcription error |
| 88 | 16 | lab. | lab industry. | Clarification |
| 90 | 14 | laboratory and | laboratory industry and | Clarification |
| 102 | 17 | and | if | Transcription error |
| 103 | 17 | cull | call | Transcription error |
| 106 | 16 | around | about | Transcription error |
| 110 | 23 | cull | call | Transcription error |
| 112 | 11 | culled | called | Transcription error |
| 124 | 20 | lab for | lab industry for | Clarification |
| 125 | 6 | max | MACs | Transcription error |
| 125 | 15 | lab and | lab industry and | Clarification |
| 138 | 14 | on | in | Transcription error |
| 204 | 11 | that, in quantity, submitted | in quantity that were submitted | Clarification |
| 209 | 22 | in | into | Transcription error |
| 213 | 14 | faced Millennium | Millennium faced | Transcription error |
| 218 | 6 | resubmit what | resubmit – what | Transcription error |
| 277 | 7 | weren't | were | Clarification |
| 282 | 16 | Noridian the LCD | the Noridian LCD | Transcription error |
| 303 | 7 | on | of | Transcription error |
| 311 | 23 | time, wouldn't | time, the test wouldn't | Clarification |
| 314 | 23-24 | Testing. "Should | Testing Should | Punctuation error |
| 321 | 2 | It's whether | Whether | Clarification |

| Page | Line(s) | Original | Correction | Reason |
|------|---------|----------|------------|--------|
| 335  | 13      | four     | one        | Clarification |

*Branka Matevich*

Branka Matevich

Subscribed and sworn to before me

this _6_ day of June, 2022

Notary Public

01ES6366503 - Kings County

My Commission Expires: 10/30/2025

-3-

# EXHIBIT 3

## David Kellam, Jr.

**From:** Kyle A. Lonergan
**Sent:** Friday, July 1, 2022 10:36 AM
**To:** Viapiano, Christopher Michael
**Cc:** Joshua J. Newcomer; Ostrager, Ann-Elizabeth
**Subject:** MSJ

Christopher:

The Trustee plans to move for summary judgment against the Defendants' affirmative defenses.  The vast majority of them do not apply to fraudulent transfer claims, and others are not supported in the record.  Can you please let us know if Defendants will be withdrawing any of their affirmative defenses and which ones, so we do not needlessly burden the Court with moving against such affirmative defenses?  We are happy to discuss.

Enjoy the holiday weekend.

Thank you,

Kyle

**McKool Smith** | Kyle A. Lonergan
New York | (212) 402-9425

1

# EXHIBIT 4

**From:** Steve Dollar <steve.dollar@nortonrosefulbright.com>
**Date:** August 22, 2022 at 3:08:18 PM EDT
**To:** "Joshua J. Newcomer" <jnewcomer@mckoolsmith.com>, "Kyle A. Lonergan" <klonergan@mckoolsmith.com>
**Cc:** *JDG-Millennium_Civil_Lit <JDG-Millennium_Civil_Lit@sullcrom.com>
**Subject:** RE: Kirschner v. JPMorgan Chase Bank, N.A., et al. (Bankr. D. Del.)

Josh,

As a supplement to our letter of August 16, BMO stands by its asserted affirmative defenses set forth in its Answer filed April 1, 2019. Dkt. 64. However, BMO offers to withdraw certain defenses set forth below. BMO does so purely to expedite this matter and spare the court and parties' time and resources of unnecessary motion practice.

Second Defense:  The claims set forth in the Complaint are barred, in whole or in part, pursuant to the relevant provisions of the Bankruptcy Code, including, without limitation, 11 U.S.C. §§ 546, 547 only.  BMO does not agree to dismiss this affirmative defense as to 11 U.S.C. §§ 548, 550.

Sixteenth Defense:  The Trustee's claims are barred, in whole or in part, by the doctrine of ratification, waiver, estoppel, laches, acquiescence, in pari delicto, unclean hands, and/or other related equitable doctrines.

As to any defenses that reflect the elements of plaintiff's claims, while BMO agrees that they do not constitute affirmative defenses and that plaintiff bears the burden to prove those elements, BMO does not concede that the Trustee can prove the elements.

BMO otherwise intends to oppose the relief outlined below, and reserves all other rights.

Steve


Steve Dollar
Partner
Norton Rose Fulbright
212.318.3211

# EXHIBIT 5

## David Kellam, Jr.

| | |
|---|---|
| **From:** | Joshua J. Newcomer |
| **Sent:** | Tuesday, July 26, 2022 9:30 AM |
| **To:** | Engebretson-Schooley, Oliver W. |
| **Cc:** | Kyle A. Lonergan; Viapiano, Christopher Michael; Ostrager, Ann-Elizabeth; Popovsky, Mark A.; Petiford, Julie G.; zzExt-lara.buchwald; Joe, Tina Hwa; zzExt-sean.topping; zzExt-steve.dollar; zzExt-jemurphy; Paige Clifton |
| **Subject:** | Re: MSJ |

Ollie:

Thank you.  To make it productive, please be prepared to discuss the bases of the affirmative defenses that you believe should remain active in the case.

Regards,
Josh



**Joshua J. Newcomer**
Principal
Houston, TX
Tel: (713) 485-73*8
www.mckoolsmith.com

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

On Jul 26, 2022, at 8:34 AM, Engebretson-Schooley, Oliver W. <ENGEBRETSONO@sullcrom.com> wrote:

Thanks, Josh.  Monday (8/1) at 9:30 am works for us.  I will circulate a dial-in.

Best,
Ollie

Oliver W. Engebretson-Schooley
T: (202) 956-6967 | C: (929) 302-1984

**From:** Joshua J. Newcomer <jnewcomer@McKoolSmith.com>
**Sent:** Monday, July 25, 2022 9:56 AM
**To:** Engebretson-Schooley, Oliver W. <ENGEBRETSONO@sullcrom.com>; Kyle A. Lonergan <klonergan@mckoolsmith.com>
**Cc:** Viapiano, Christopher Michael <viapianoc@sullcrom.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Popovsky, Mark A. <popovskym@sullcrom.com>; Petiford, Julie G. <petifordj@sullcrom.com>; zzExt-lara.buchwald <lara.buchwald@davispolk.com>; Joe, Tina Hwa <tina.joe@davispolk.com>; zzExt-sean.topping <sean.topping@nortonrosefulbright.com>; zzExt-

1

steve.dollar <steve.dollar@nortonrosefulbright.com>; zzExt-jemurphy <jemurphy@kslaw.com>; Paige Clifton <PClifton@KSLAW.com>
**Subject:** [EXTERNAL] RE: MSJ

Ollie,

Thanks for your email.  We are not available at the times you set out this week, but are available Monday or Tuesday morning next week.  Monday, August 1, we are available from 9:00-10:30 EST.  Tuesday, August 2, we are available from 9:00-noon EST.

Please let us know what times work for you.

Regards,
Josh

**McKool Smith** | Joshua J. Newcomer
Principal | Houston , TX | Tel: (713) 485-7316

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

**From:** Engebretson-Schooley, Oliver W. <ENGEBRETSONO@sullcrom.com>
**Sent:** Friday, July 22, 2022 9:58 AM
**To:** Kyle A. Lonergan <klonergan@mckoolsmith.com>; Joshua J. Newcomer <jnewcomer@McKoolSmith.com>
**Cc:** Viapiano, Christopher Michael <viapianoc@sullcrom.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Popovsky, Mark A. <popovskym@sullcrom.com>; Petiford, Julie G. <petifordj@sullcrom.com>; zzExt-lara.buchwald <lara.buchwald@davispolk.com>; Joe, Tina Hwa <tina.joe@davispolk.com>; zzExt-sean.topping <sean.topping@nortonrosefulbright.com>; zzExt-steve.dollar <steve.dollar@nortonrosefulbright.com>; zzExt-jemurphy <jemurphy@kslaw.com>; Paige Clifton <PClifton@KSLAW.com>
**Subject:** RE: MSJ

Kyle,

I have added counsel for the other defendants to this reply.  We have been considering your request.  Can we set up a call to discuss?  We would like to understand which defenses you believe "do not apply to fraudulent transfer claims [or] are not supported in the record."  We are available at the following times: Tuesday, July 26 at 12:00 p.m. or 4:00 p.m.; Wednesday, July 27 at 10:15 a.m.; and Friday, July 29 at 10:00 a.m.

Best,
Ollie

Oliver W. Engebretson-Schooley
T: (202) 956-6967 | C: (929) 302-1984

**From:** Kyle A. Lonergan <klonergan@mckoolsmith.com>
**Sent:** Friday, July 01, 2022 11:36 AM
**To:** Viapiano, Christopher Michael <viapianoc@sullcrom.com>

**Cc:** Joshua J. Newcomer <jnewcomer@McKoolSmith.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>
**Subject:** [EXTERNAL] MSJ

Christopher:

The Trustee plans to move for summary judgment against the Defendants' affirmative defenses.  The vast majority of them do not apply to fraudulent transfer claims, and others are not supported in the record.  Can you please let us know if Defendants will be withdrawing any of their affirmative defenses and which ones, so we do not needlessly burden the Court with moving against such affirmative defenses?  We are happy to discuss.

Enjoy the holiday weekend.

Thank you,

Kyle



Kyle A. Lonergan
Principal
New York, NY
Tel: (212) 402-0428
www.mckoolsmith.com

NOTICE OF CONFIDENTIALITY: The information contained in and transmitted with this e-mail is SUBJECT TO THE ATTORNEY-CLIENT and ATTORNEY WORK PRODUCT PRIVILEGE and is CONFIDENTIAL. It is intended only for the individual or entity designated above. You are hereby notified that any dissemination, distribution, copying, use or reliance upon the information contained in and transmitted with this e-mail by or to anyone other than the addressee designated above by the sender is unauthorized and strictly prohibited. If you have received this e-mail in error, please notify the sender by reply immediately. Any e-mail erroneously transmitted to you should be immediately destroyed.

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

**\*\*This is an external message from:** jnewcomer@McKoolSmith.com **\*\***

# EXHIBIT 6

# McKool Smith

Joshua J. Newcomer
Direct Dial:  (713) 485-7316
jnewcomer@McKoolSmith.com

600 Travis Street
Suite 7000
Houston, TX 77002

Telephone: (713) 485-7300
Facsimile: (713) 485-7344

September 23, 2022


**VIA E-MAIL**

Mark D. Collins
Robert J. Stearn, Jr.
Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY  10019-6022


Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C.  20006-5215

Stephen M. Miller
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801


Mark A. Popovsky
Ann-Elizabeth Ostrager
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004-2498

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY  10036


Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY  10017

John C. Toro
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA  30309


Christopher A. Ward
POLSINELLI PC
222 Delaware Avenue, Suite 1101
Wilmington, DE  19801

**McKool Smith**
**A Professional Corporation • Attorneys**
**Austin  |  Dallas  |  Houston  |  Los Angeles  |  Marshall  |  New York  |  Washington**

September 23, 2022
Page 2

      RE:    *Kirschner v. JPMorgan Chase Bank, N.A.*, Adv. Pro. No. 17-51840 (LSS)
               (Bankr. D. Del.)

Dear Counsel:

I write to respond to your letters dated August 12, August 16, and August 19, 2022, and to accurately set forth the history of the parties' discussions concerning Defendants' affirmative defenses up to the time of the filing of the Plaintiff Trustee's Motion for Partial Summary Judgment Regarding Defendants' Affirmative Defenses. D.I. 247.

On July 1, 2022, we wrote to inform you that the Trustee planned to move for summary judgment against Defendants' affirmative defenses. In that email, we told you that the "vast majority of the [affirmative defenses] do not apply to fraudulent transfer claims, and others are not supported in the record." We then asked you to notify us if Defendants would be withdrawing any of their affirmative defenses, so that the parties would not burden the Court with unnecessary motion practice. We told you we would be happy to discuss Defendants' affirmative defenses with you.

Defendants did not respond to our email until over three weeks later, on July 25, at which time you said that you had been considering our request and asked to have a call with us "to understand which affirmative defenses you believe 'do not apply to fraudulent transfer claims [or] are not supported in the record.'" The parties set the call up for August 1, 2022, and we requested of you prior to the call: "To make [the call] productive, please be prepared to discuss the bases of the affirmative defenses that you believe should remain active in the case."

When we spoke on August 1, 2022, however, you refused to discuss the bases of your affirmative defenses. Notwithstanding this, as you requested, we identified each of the affirmative defenses that do not apply to fraudulent transfer claims or are not supported by the record. And, as examples, we explained why specific defenses should be withdrawn, such as the statute of limitations defense and 547 defenses. Considering that these are your defenses on which you bear the burden of proof, that we made our withdrawal request one month before the call, and that we asked you to be prepared to discuss the bases for your defenses, your letters' attempts to justify your failure to substantively engage with us ring hollow.

At the end of our call, you told us that you would be in touch with us later that week to set up a further call to discuss the affirmative defenses. We followed up with you on August 3, 2022, to check on the status of setting up that call, but we did not get a response. Instead, we received the above-referenced letters from you shortly before the summary judgment motions were due (and 6 weeks after our withdrawal request on July 1). JPMorgan, Citibank, and SunTrust withdrew only certain defenses, and Bank of Montreal did not withdraw any defenses unconditionally. It was not until after 3 p.m. on the deadline for filing that Bank of Montreal notified us that it was dropping its conditions on withdrawing certain of its defenses.

Defendants' conduct frustrated the Trustee's efforts to avoid the time and work necessary to draft and file the subject motion, including on defenses that Defendants ultimately withdrew at the eleventh hour and on the other defenses that have no basis in law or fact. The Trustee reserves all rights.

September 23, 2022
Page 3


Sincerely,

Joshua J. Newcomer

cc:    Kyle Lonergan
       Marc Kirschner

# EXHIBIT 7

# McKool Smith

Joshua Newcomer
Direct Dial: (713) 485-7316
jnewcomer@McKoolSmith.com

600 Travis Street
Suite 7000
Houston, TX 77002

Telephone: (713) 485-7300
Facsimile: (713) 485-7344

October 10, 2022

**VIA E-MAIL**

Robert J. Stearn, Jr.
Jason M. Madron
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801

Christopher Michael Viapiano
Oliver W. Engebretson-Schooley
Julie G. Petiford
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006-5215

Mark A. Popovsky
Ann-Elizabeth Ostrager
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498

Benjamin S. Kaminetzky
Lara Samet Buchwald
Tina Hwa Joe
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017

Christopher A. Ward
POLSINELLI PC
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801

Stephen Mark Dollar
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022

Stephen M. Miller
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

J. Emmett Murphy
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036

John C. Toro
Paige Nobles Clifton
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309

Page 2

RE:   *Kirschner v. JPMorgan Chase Bank, N.A.*, Adv. Pro. No. 17-51840 (LSS)
      (Bankr. D. Del.)

Dear Counsel:

I write on behalf of Plaintiff Marc Kirschner, solely in his capacity as Trustee of the Millennium Corporate Claim Trust ("Trustee"), in response to your letter dated September 23, 2022.

Served herewith is an amended interrogatory response with the Trustee's verification. This verified amended response resolves the issue you identified in your September 23 letter. Consistent with your letter, we expect that Defendants will now withdraw the defenses identified in your letter, specifically JPMorgan's Eighth and Tenth defenses, SunTrust's 13th and 14th defenses, BMO's 15th, 17th, 18th, 19th, and 20th defenses, and CBNA's defenses found at paragraphs 129-131 of its Answer, in addition to the defenses that each Defendant previously withdrew in their letters dated August 12, August 16, August 16, and August 19, 2022 (along with BMO's email dated August 23).

This is a perfect example of the resources that have been wasted as a result of Defendants' refusal to engage with us after Plaintiff's requested on July 1, 2022 to meet-and-confer with respect to Defendants' affirmative defenses. From the beginning of that process, starting with our July 1 email, we asked you to explain the bases of Defendants' affirmative defenses. On our call on August 1, 2022, we even specifically identified to you Defendants' defenses claiming speculative damages and asked for the basis for them. But, on that call and throughout the process, you failed to engage with us and did not explain the connection between the defenses and an outstanding inquiry you had made to Plaintiff's prior counsel. Had you done so, we could have resolved your concern as we are now doing, without unnecessarily briefing the issue.

The Trustee reserves all rights.

Sincerely,

Joshua Newcomer

# EXHIBIT 8
## FILED UNDER SEAL

# EXHIBIT 9

# NORTON ROSE FULBRIGHT

August 16, 2022

Norton Rose Fulbright US LLP
1301 Avenue of the Americas
New York, New York  10019-6022
United States of America

**Via Email**

Kyle A. Lonergan,
Grant Lawrence Johnson,
McKool Smith,
295 9th Avenue, 50th Floor,
New York, New York 10001

**Steve Dollar**
**Partner**
Direct line +1 212 318 3211
steve.dollar@nortonrosefulbright.com

Joshua J. Newcomer,
McKool Smith,
600 Travis Street, Suite 7000,
Houston, Texas 77002

Tel +1 212 318 3000
Fax +1 212 318 3400

Re:     BMO Harris Bank N.A.'s Affirmative Defenses in *Kirschner v. JPMorgan Chase Bank,*
        *N.A. et al*, Adv. Pro No. 17-51840 (LSS) (Bankr. D. Del.)

Dear Mr. Lonergan & Mr. Newcomer:

As you know, we represent BMO Harris Bank N.A. in the above action (the "Delaware Action"), as well as Bank of Montreal and BMO Capital Markets Corp. in *Kirschner v. JP. Morgan Chase Bank, NA.*, Case No. 17-Civ.-06334 (PGG) (SLC) (the "New York Action").  We write in response to your July 1, 2022 email informing Defendants that the Trustee planned to move for summary judgment against defendants' affirmative defenses.

To date, you have not identified which of BMO's defenses you will challenge, or the basis for doing so.  During our call on August 1, 2022 – which defendants requested to glean information about your request – you declined to state the basis for challenging BMO's affirmative defenses. Instead, you listed off a number of defendants' affirmative defenses and asked defendants to justify their defenses.  Despite repeated requests by JPMorgan's counsel for a list of challenged defenses and their bases, you have failed to provide a list in writing as it pertains to BMO.

BMO stands by its asserted affirmative defenses set forth in its Answer filed April 1, 2019.  Dkt. 64.  However, BMO offers to withdraw certain defenses set forth below in exchange for the Trustee's concession that he will not move to dismiss BMO's remaining affirmative defenses. BMO does so purely to expedite this matter and spare the court and parties' time and resources of unnecessary motion practice.

**Second Defense:**  The claims set forth in the Complaint are barred, in whole or in part, pursuant to the relevant provisions of the Bankruptcy Code, including, without limitation, 11 U.S.C. §§ 546, 547 only.  BMO does not agree to dismiss this affirmative defense as to 11 U.S.C. §§ 548, 550.

**Sixteenth Defense:**  The Trustee's claims are barred, in whole or in part, by the doctrine of ratification, waiver, estoppel, laches, acquiescence, in pari delicto, unclean hands, and/or other related equitable doctrines.

In agreeing to withdraw the defenses set forth above, BMO reserves all other rights and privileges and expressly waives none.

Norton Rose Fulbright US LLP is a limited liability partnership registered under the laws of Texas.

Norton Rose Fulbright US LLP, Norton Rose Fulbright LLP, Norton Rose Fulbright Australia, Norton Rose Fulbright Canada LLP and Norton Rose Fulbright South Africa Inc are separate legal entities and all of them are members of Norton Rose Fulbright Verein, a Swiss verein. Norton Rose Fulbright Verein helps coordinate the activities of the members but does not itself provide legal services to clients. Details of each entity, with certain regulatory information, are available at nortonrosefulbright.com.

NORTON ROSE FULBRIGHT

August 16, 2022
Page 2

Very truly yours,

Steve Dollar

SMD

NORTON ROSE FULBRIGHT

# EXHIBIT 10

# KING & SPALDING

King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036-4003
Tel:  +1 212 556 2100
Fax:  +1 212 556 2222
www.kslaw.com

J. Emmett Murphy
Partner
Direct Dial:  +1 212 556 2191
Direct Fax:  +1 212 556 2222
jemurphy@kslaw.com

August 19, 2022

**VIA E-MAIL**

Kyle A. Lonergan,
Grant Lawrence Johnson
McKool Smith
295 9th Avenue, 50th Floor
New York, New York 10001

Joshua J. Newcomer
McKool Smith
600 Travis Street, Suite 7000
Houston, Texas 77002

> Re:  *Kirschner v. JPMorgan Chase Bank, N.A.*, Adv. Pro. No. 17-51840 (LSS) (Bankr. D. Del.)

Dear Counsel:

I write on behalf of SunTrust Bank ("SunTrust") to follow up on our recent discussions regarding the affirmative defenses asserted in the above-referenced proceeding.  Without repeating the background of our meet-and-confer communications to date (which is fairly stated in the recent letters of SunTrust's co-defendants) SunTrust agrees to withdraw the following defenses:

**Second Defense:**    Plaintiff's claims are barred to the extent the applicable statutes of limitations have expired.

**Third Defense:**    Plaintiff's claims are barred under the doctrine of laches.

**Fourth Defense:**    Plaintiff's claims are barred by the doctrine of unclean hands and/or the doctrines of waiver and estoppel.

**Twelfth Defense:**    Plaintiff has failed to take reasonable and necessary steps to mitigate any alleged damages.

While SunTrust further agrees that any defenses that reflect the elements of the Trustee's claims do not constitute affirmative defenses, SunTrust does not concede that Plaintiff can prove the elements of the asserted claims.

Sincerely,

*/s/ J. Emmett Murphy*

J. Emmett Murphy

cc:      Counsel of record

2