## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MILLENNIUM LAB HOLDINGS II, LLC, et al.,<br><br>　　　　　　　　Debtors. | Chapter 11<br><br>Case No. 15-12284 (LSS) |
| MARC S. KIRSCHNER solely in his capacity as TRUSTEE OF THE MILLENNIUM CORPORATE CLAIM TRUST,<br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>J.P. MORGAN CHASE BANK, N.A., CITIBANK N.A., BMO HARRIS BANK, N.A., and SUNTRUST BANK,<br><br>　　　　　　　　Defendants. | Adv. No. 17-51840 (LSS)<br><br>**Re: Adv. Pro. Docket Nos. 248 & 250** |

### OPINION

#### Defendants' Motion for Summary Judgment [Docket No. 250]

#### Defendants' Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette R. Austin Smith [ Docket No. 248]

Plaintiff initiated this adversary proceeding seeking to recover the $35.3 million arrangement fee paid to Defendants as part of Millennium's 2014 Dividend Recapitalization Transaction as an actual (Count I) or constructive (Count II) fraudulent conveyance. Through that transaction, Millennium borrowed $1.775 billion from a consortium of sixty-one investors. As detailed herein, Millennium used the proceeds of the loan to payoff Defendants' 2012 loan, make distributions/dividends to shareholders of $1.415 million, make certain payments to employees and pay Defendants the $35.3 million arrangement fee. The day prior to the Dividend Recapitalization Transaction, Millennium had $303

million in funded debt; the day after it had $1.775 billion. Millennium's assets were the same.

Defendants' motion to dismiss was previously denied[1] and Defendants return on a motion for summary judgment. Defendants contend there is no evidence of intent to defraud creditors as all parties believed that Millennium could sustain the new debt on the company, so summary judgment must be granted in its favor on Count I. Defendants also contend that they provided reasonably equivalent value for the arrangement fee as they arranged and syndicated the loan, which was funded. Further, Defendants contend that Millennium was not insolvent nor rendered insolvent on account of the Dividend Recapitalization Transaction because Plaintiff's expert's opinion is unreliable. For these reasons, Defendants assert that summary judgment must be granted in its favor on Count II.

Having reviewed the record submitted, I conclude that there are genuine disputes of material fact on both Counts. There were no disinterested parties in the Dividend Recapitalization Transaction and the transaction was designed such that Millennium would end up with no funds at the end of the day. Further, Plaintiff's expert testimony on solvency is not unreliable. As reasonable minds can differ as to the import of the evidence, summary judgment is denied.

---

[1] *Kirschner v. J.P. Morgan Chase Bank, N.A.*, Case No. 15-12284, Adv. Pro. No. 17-51840, 2019 WL 1005657 (Bankr. D. Del. Feb. 28, 2019), ECF No. 52. Citations to the docket refer to the adversary proceeding docket.

**Background**

Millennium Laboratories II, LLC ("Millennium" or "Debtor"[2]) was founded by James Slattery in 2007. In 2010, private equity firm TA Associates acquired a 49% stake in Millennium.[3] Millennium provides laboratory services to the medical community, focusing on urine drug testing which physicians use to monitor their patients' use of prescription medications and to identify drug abuse. In addition to private third-party payors such as insurance companies, Millennium bills Medicare and Medicaid for its services.

Participating in Medicare and Medicaid subjected Millennium to oversight by federal, state and local authorities.[4] Certain of Millennium's business practices attracted the attention of competitors and eventually the Department of Justice. These practices included Millennium's point of care ("POC") test cup program, Millennium's use of custom profiles and Millennium's "troubled practices" review.

Through its POC test cup program, Millennium entered into agreements with physicians to provide them with POC test cups free of charge provided the cups were used for collecting and transporting specimens to Millennium for testing.[5] The POC test cups contained a testing strip providing the physician with immediate, preliminary results.

---

[2] For purposes of this opinion Millennium's change in corporate form is irrelevant, so I will simply use Millennium.

[3] Def. Ex. 3 (Warm Deal Memorandum) at 2. Citations in the form "Def. Ex. __" refer to Defendants' exhibits attached to the Declaration of Mark A. Popovsky in Support of Defendants' Motion for Summary Judgment and Motion to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette R. Austin Smith, ECF No. 252. Citations in the form "Pl. Ex. __" refer to Plaintiff's exhibits attached to Declaration of Grant L. Johnson in Opposition to Defendants' Motion for Summary Judgment, ECF No. 281.

[4] Def. Ex. 2 (Excerpt of Decl. of William Brock Hardaway in Supp. of the Debtors' Chapter 11 Pets. and First Day Pleadings ("First Day Decl.") at ¶ 15.

[5] Def. Ex. 26 (Voluntary Self-Referral Disclosure) at 4; Pl. Ex. 5 (Specimen Collection Cup Letter).

Millennium billed for and conducted "confirmatory testing" to verify the preliminary results and to accurately analyze the specimen.[6] Millennium billed for any cups that were not used for this purpose.[7]

As part of its business operations, Millennium also supplied its customers with order forms that permitted a physician to select from numerous individual diagnostic tests or to choose a "custom profile."[8] A custom profile was created by each doctor practice and was often a battery of 12-18 separate tests. While easier, the use of custom profiles rather than individual, targeted testing, created the risk of performing medically unnecessary tests.

As another part of its business practice, Millennium compiled a list (the "Troubled Practices" list) of those doctor practices which were not sufficiently profitable, the defining metric being the average revenue per specimen tested.[9] Millennium severed (or threatened to sever) its relationship with customers on the Troubled Practices list if their accounts did not become profitable within given timeframes.[10]

Over the years, Millennium sought and/or received advice on the legality of its business practices. As early as 2009, Millennium sought legal advice from Jane Wood of McDonald Hopkins with respect to these practices.[11] In 2010, Millennium received unsolicited advice from its auditor, CodeMap, LLC, which encouraged Millennium to

---

[6] Def. Ex. 26 (Voluntary Self-Referral Disclosure) at 4; Def. Ex. 35 (6-Panel POC Test Requisition).

[7] Pl. Ex. 5 (Specimen Collection Cup Letter).

[8] Def. Ex. 35 (6-Panel POC Test Requisition).

[9] Pl. Ex. 21 (Troubled Practices Presentation to DOJ) at ML_DE_00670150.

[10] Pl. Ex. 21 (Troubled Practices Presentation to DOJ) at ML_DE_00670166.

[11] Def. Ex. 28 (Wood Decl.) ¶ 6.

reconsider its practice of providing free collection cups.[12]  In 2010, Millennium also sought and received advice from Ronald Wisor and Helen Trilling of Hogan Lovells US LLP regarding whether Millennium's programs violated the Stark Law, 42 U.S.C. § 1395nn(a) and/or the federal Anti-Kickback Statute, 42 U.S.C. § 1320a–7b(b).[13]  In 2011 and 2012, Millennium continued to receive advice from Wood and Wisor as well as from Martin Price, first as a partner at Hogan Lovells and then as in-house counsel.[14]

In 2011, Ameritox, Ltd., one of Millennium's competitors, sued Millennium for unfair competition, alleging the free POC test cup program violated the Stark Law and the federal Anti-Kickback statute.[15]  And in March 2012, the DOJ sent Millennium a subpoena requesting, *inter alia*, all documents "relating to the Company's policies or procedures concerning: (a) the sales, marketing, or promotion of urine drug testing/screening (including the confirmation testing of negative results or custom profiles); and (b) the reimbursement process for urine drug testing . . . (including reimbursement for confirmation testing of negative results or . . . from custom profiles)."[16]

By early 2014, Millennium was aware of at least two draft local coverage determinations by Medicare administrators (Palmetto and Noridian) indicating that testing to confirm negative results and specimen validity testing were excluded from Medicare

---

[12] Pl. Ex. 9 (Draft Annual Compliance Audit Report) at ML_DE_00499785-00499787.  Millennium chose not to have CodeMap provide a final audit report. Pl. Ex. 10 (1/19/11 email from Hefty to Price and Trilling; 1/20/11 email from Appel to Hefty).

[13] *See e.g.* Def. Ex. 31 (10/6/10 Letter to Appel from Wisor).

[14] *See e.g.* Pl. Ex. 6 (2/15/11 email from Price to Appel and Wisor); Pl. Ex. 8 (Millennium Laboratories, Inc. Chronology – Legal Advice, Revision 2/13/13).

[15] *Ameritox, Ltd. v. Millennium Labs, Inc.*, 803 F.3d 518, 521–22 (11th Cir. 2015).

[16] Def. Ex. 40 (DOJ Subpoena) at Attachment to Subpoena Duces Tecum ¶ 5.

coverage.[17]  And, as of February 28, 2014, Millennium's internal five-year forecasting assumed a 30% reduction in Medicare reimbursement effective June 1, 2014.[18]

*The Dividend Recapitalization Transaction*

In March 2012, Millennium entered into a Credit Agreement with JPMorgan Chase Bank, N.A., as prior administrative agent (and the other Defendants, as lenders) for a $310 million term loan facility (as subsequently amended and restated, "Term Loan A") and a $20 million revolving credit facility.[19]

Consideration of another financing began in the middle of 2013.[20]  J.P. Morgan Securities LLC ("JPM Securities") reached out to TA Associates to suggest that Millennium could "do a dividend."[21]  To further discussions, a Managing Director, Leveraged Finance at JPM Securities prepared discussion materials providing thoughts on a dividend recapitalization.[22]  JPM Securities presented three options:  1) use of cash on hand to make a dividend, with JPM assisting in obtaining an amendment to current debt documents to permit it, 2) upsizing the current Term Loan A, with JPM Securities assisting, and use of cash on hand to fund a distribution or 3) syndication of a new Term Loan A and Term Loan B in the institutional loan market and use of cash on hand to fund a distribution to

---

[17]  Pl. Exs. 16 (Noridian Draft LCD) at 14-15, 37 (1/20/14 Email from Simmons to Hardaway).

[18]  Pl. Ex. 39 (2/28/14 Email attachment from Kennedy to Pencak) at 1.

[19]  Def. Ex. 2 (First Day Decl.) ¶ 12.

[20]  Def. Ex. 6 (Griswold Dep.) 51:23-53:5.

[20]  *Id.* at 52:11-53:12.

[21]  *Id.* at 52:17-20.

[22]  Pl. Ex. 51 (5/31/13 Discussion Materials).

shareholders.[23]  The three options ranged from a dividend of $120 million (Option 1) to $1,074.3 million (Option 3).[24]

JPM Securities updated its discussion materials in January 2014, providing three new options.[25]  The "Max pro rata" option embodied an upsized Term Loan A option, which provided for a dividend of $509 million.  The "Max 1st lien term loan" option embodied a new $1,455 million Term Loan B to provide distributions/dividends to shareholders of $1,415.7 million.  The "Max dividend" option embodied a new $1,455 million Term Loan B and the paydown of Term Loan A to provide for a $1,539.7 million dividend to shareholders.  On February 13, 2014, Millennium decided to go with the Max dividend option.[26]

On April 14, 2014, Millennium closed on a $1.775 billion term loan facility ("Term Loan B") effectuating the Dividend Recapitalization Transaction.  JPM Securities and Citibank Global Markets Inc. ("Citi") acted as Joint Lead Arrangers and Joint Bookmakers.  JPMorgan Chase Bank acted as Administrative Agent and Citi also acted as Syndication Agent.  BMO Capital Markets Corp. ("BMOC") and SunTrust Bank acted as Co-Managers and Co-Documentation Agents.[27]  The proceeds of the Loan were used primarily to refinance Term Loan A, pay fees to the banks including arrangement fees of $35.3 million

---

[23] *Id.* at 5.

[24] *Id.*

[25] Pl. Ex. 52 (1/21/14 Discussion Materials) at 4.

[26] Pl. Ex. 52 (2/13/14 email from Karanikolaidis to LeeLum).

[27] Def. Ex. 16 (Excerpt of Credit Agreement dated 4/16/14).

("Arrangement Fee"), make a distribution to Millennium's shareholders and pay bonuses to certain Millennium executives as follows:

| | | |
|---|---|---|
| Term Loan A payoff | $ | 303,827,648.00 |
| Arrangement Fee: | | |
| JPM | $ | 19,415,000.00 |
| Citi | $ | 12,355,000.00 |
| BMOC | $ | 1,765,000.00 |
| SunTrust | $ | 1,765,000.00 |
| Distribution to shareholders | $ | 1,415,632,175.76 [28] |

As reflected in the March 16, 2014 Commitment Letter, Defendants each committed to underwrite a certain portion of Term Loan B.[29] Consistent with their intent to syndicate the loan, however, in the month prior to its issuance, JPM Securities and Citi marketed the opportunity to certain sophisticated investors.[30] Ultimately, Term Loan B was syndicated to a group of sixty-one investors.[31] Of Defendants, only SunTrust Bank appears to be a lender under the new facility.

*The Settlement with DOJ*

DOJ took a series of action against Millennium in 2014 and 2015. In December 2014, DOJ informed Millennium that it would be pursuing civil claims and in March 2015, it filed a civil complaint seeking to intervene in pending *qui tam* actions. In February 2015,

---

[28] Expenses were also deducted from the Term Loan B proceeds as well as certain other fees, none of which are relevant to this opinion. The transaction also included a $50 million revolving credit facility, but that is not the subject of this lawsuit.

[29] Def. Ex. 13 (Excerpts of Commitment Letter) (JPM (55%), Citi (35%), BMOC (5%) and SunTrust (5%)).

[30] Pl. Ex. 2 (Confidential Information Memo).

[31] Def. Ex. 17 (Lender Allocation).

Nordian Healthcare Solutions, LLC, Millennium's Medicare Administrative Contractor with the Centers for Medicare and Medicaid Services, informed Millennium that its Medicare billing privileges would be revoked for billing abuses. Settlement discussions ensued with the DOJ as well as certain states. In May 2015, Millennium entered into a Term Sheet with the United States and the certain states, which provided for Millennium's payment of $256 million to resolve their allegations. Millennium also entered into a Corporate Integrity Agreement.[32]

**Procedural Posture**

Millennium and affiliated entities filed voluntary bankruptcy petitions on November 10, 2015. Debtor's plan of reorganization was confirmed on December 14, 2015. Plaintiff, in his capacity as the Trustee of the Millennium Corporate Claim Trust created by Debtor's plan, sues Defendants under § 548 of the Bankruptcy Code to recover the Arrangement Fee under theories of both actual and constructive fraudulent conveyance.[33] Defendants and Plaintiff filed cross motions for summary judgment. Defendants and Plaintiff also filed motions *in limine* seeking to exclude all or a portion of the other's expert's testimony. This opinion will address only Defendants' motions.[34]

---

[32] *See generally* Def. Ex. 2 (First Day Declaration) ¶¶ 26-27.

[33] The shareholders were released in the bankruptcy case as part of a settlement in which they paid $325 million to the estate.

[34] Plaintiff's pre-trial motions will be addressed in a subsequent opinion.

## Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. § 1334 and the authority to enter final orders as this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H).[35]

## Legal Standard

To succeed on a motion for summary judgment a movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[36] The movant may support its motion by citing to evidence in the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."[37] Where the moving party establishes the absence of a genuine dispute the burden shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial."[38]

To resolve a motion for summary judgment the court does not "weigh the evidence and determine the truth of the matter[,]" but instead "determine[s] whether there is a genuine issue for trial."[39] "Facts that could alter the outcome are 'material.'"[40] And

---

[35] SunTrust is the only party that specifically consented to the entry of final orders by the court. The other parties made no statement regarding this authority and so have consented. Del. Bankr. L.R. 7012-1.

[36] Fed. R. Civ. P. 56(a) (applicable to adversary proceedings by Fed. R. Bankr. P. 7056).

[37] Fed. R. Civ. P. 56(c)(1).

[38] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[39] *Anderson*, 477 U.S. at 249.

[40] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (citing *Anderson*, 477 U.S. at 248).

disputes are "genuine" if "reasonable minds could differ as to the import of the evidence."[41]

"The inquiry performed is the threshold inquiry of determining whether there is the need for

a trial—whether, in other words, there are any genuine factual issues that properly can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either

party."[42] The court conducts this inquiry viewing the "underlying facts and all reasonable

inferences therefrom in the light most favorable to the party opposing the motion."[43] In its

review, the court may consider all record evidence.[44]

## Discussion

### I.   Actual Fraudulent Conveyance

Defendants seek summary judgment on Count I of the Complaint, by which the

Trustee seeks to recover the Arrangement Fee as an actual fraudulent conveyance. To avoid

transfers pursuant to § 548(a)(1)(A), Trustee must show that the transfers were made within

the two years prior to the bankruptcy filing and with the actual intent to hinder, delay or

defraud creditors.[45] It is the intent of the transferor, not the transferee, that must be

established.[46]

---

[41] *Anderson*, 477 U.S. at 250.

[42] *Id.*

[43] *Blunt v. Lower Merion School Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (quoting *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995)).

[44] Fed. R. Civ. P. 56(c)(3).

[45] *Kirschner*, 2019 WL 1005657, at *2 (citing 11 U.S.C. § 548(a)(1)(A); *Liquidation Tr. of Hechinger Inv. Co. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 550 (D. Del. 2005); *SB Liquidation Tr. v. Preferred Bank (In re Syntax-Brillian Corp.)*, Case No. 08-11407, Adv. Pro. No. 10-51389, 2016 WL 1165634, at *4 (Bankr. D. Del. Feb. 8, 2016)).

[46] *Id.* (citing *Dobin v. Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006)).

Defendants argue that notwithstanding significant document production and depositions of all the principals, Plaintiff has failed to marshal any evidence of an actual intent to hinder, delay or defraud creditors. Defendants point to the depositions of Millennium's Chief Financial Officer, VP of Financial Planning and Analysis and former Chief Executive Officer, among others, to show that each witness denies intending to defraud creditors, and believed at the time, based on advice of counsel, that Millennium would weather the storm of the DOJ investigation and/or would be able to pay debts as they became due. Defendants also argue that any notion of a fraudulent conveyance is belied by the very fact that dozens of sophisticated lenders, with access to full information, agreed to fund Term Loan B. Defendants contend that Trustee conflates poor business judgment with fraudulent intent.

Trustee contends that I should ignore any and all testimony of Millennium's principals as self-serving because they (and Defendants) were focused on their own personal enrichment with no concern about Millennium's ability to satisfy its obligations. Trustee points out that none of the $1.75 billion borrowed remained with Millennium.[47] He also asserts Millennium's intent is evinced by its knowledge of the possibility of adverse outcomes from the DOJ investigation, its choice to listen to only the most favorable advice and its decision to hide details of the ongoing investigation from lenders during the syndication process.

Having reviewed all the evidence, I am unconvinced that summary judgment is appropriate. Trustee identified sufficient evidence from which a trier of fact could infer

---

[47] See Pl. Ex. 58 ("[W]ith our credit rating, surprised [the interest rate] was this high. Probably due to large amount and the fact it's being used for 100% distribution rather than growth in the business.").

fraudulent intent. First, none of Millennium's decision makers were disinterested. James Slattery (Founder and Chairman of the Board of Managers) as well as Howard Appel (President) each received distributions from the proceeds of Term Loan B as equity holders.[48] Slattery knew in advance what he and his children could expect to receive from the Dividend Recapitalization Transaction.[49] In discussions with BMO, Slattery and Appel stated they would "sell today . . . to achieve a simple, clean exit."[50] Afterwards, Appel thanked JPM Securities for facilitating the dividend recapitalization stating "[i]t's more than getting the deal done; you've changed our personal lives for generations to come."[51] Price (General Counsel) received $12.9 million on his vested and unvested stock options and contemporaneously executed a bonus agreement.[52]

Second, Millennium was not entirely forthcoming with the information it provided to potential investors about the risks inherent in its business model. At the same time Term Loan B was being marketed, Millennium was planning meetings with DOJ on its Troubled Practices list and custom profiles among other things. Millennium's lawyers hoped to "get

---

[48] I could not find a definitive list of the members of the Board of Managers, but Defendants do not argue that Millennium's decision makers were not interested. To the extent TA had members on the Board of Managers, it received a distribution from the Dividend Recapitalization in the amount of $624,620,000. Pl. Ex. 76 (Sources and Uses).

[49] Pl. Ex. 87 (Slattery Dep.) 119:25-120:18.

[50] Pl. Ex. 44 (Call Report) at 1 of 4. On the BMO call, the parties also discussed Slattery, Appel and David Cohen (COO) estate planning. *Id.*

[51] Pl. Ex. 68 (4/17/14 email Appel to Hardaway with cc to entire JPM Securities Team). Appel also contemporaneously sought a Palladium Card from JPM. Pl. Ex. 56.

[52] Def. Ex. 27 (Price Dep.) 173:10-174:2; Pl. Exs. 53 (Option Cancellation Agreement), 54 (Closing Compensation and Bonus Agreement).

the government to a favorable decision soon," but were wary of an unfavorable one.[53]

Millennium was also aware that the DOJ was "actively investigating" the issue of "medical

necessity" by issuing subpoenas to Millennium's customers.[54]  On the reimbursement front,

Millennium was receiving reports regarding the American Medical Association's review of

certain drug testing and the negative effect that could have on Millennium's revenue.[55]

Millennium also knew about the ongoing Ameritox litigation.  Nonetheless, Hardaway

(Millennium's CEO) does not remember any specific discussion about a "do nothing

strategy" (i.e. wait to see the outcome of the litigation and government investigation before

doing the Dividend Recapitalization Transaction).[56]  Millennium knew that the litigation

and government investigation risks did not appear in the Confidential Information

Memorandum prepared by JPM Securities.  In fact, Millennium's in-house counsel even

asked its outside attorneys whether syndicate investors could have a claim against

Millennium for this lack of information.[57]

Finally, Hardaway set the tone for meetings with investors when he declared the

"messaging" should be: "we need to refer to this consistently as a Bank Refinancing.  We

are growing company that needs a capital structure to allow for our future needs.  That is all

this is."[58]  This messaging was not true.  The Dividend Recapitalization Transaction was—

---

[53] Pl. Ex. 48 (3/11/14 email from Loucks to Price).

[54] *Id.*

[55] Pl. Ex. 35 (Coding and Reimbursement Assessment for Drugs of Abuse Testing).

[56] Def. Ex. 38 (Hardaway Dep.) 139:24-142:9.

[57] Pl. Ex. 66 (3/27/14 email Price to Silver).

[58] Pl. Ex. 57 (3/21/14 email Hardaway to Appel, Kennedy, Pencak, Smith, Price).

and always was designed to be—a way for Millennium to provide a return to its stockholders.

Only two months after the Dividend Recapitalization Transaction closed, Ameritox received a jury verdict in its favor on claims that Millennium's POC practices violated the Stark Act. Within four months of the closing, Millennium self-reported its practice of providing point-of-care cups to physicians at no charge to "resolve a potential violation of the 'Stark' physician self-referral law."[59]

Defendants have tendered evidence—primarily through deposition testimony—that neither Millennium nor Defendants[60] believed Millennium would become insolvent by virtue of the Dividend Recapitalization Transaction, that the entire transaction, including the dividend to shareholders was disclosed and the litigation was public knowledge. While this creates a material issue of fact, it does not negate the other evidence and inferences that can be drawn therefrom.

For these reasons, Defendants' motion for summary judgment is denied as to Count I.

## II.    *Constructive Fraudulent Conveyance*

Defendants seek summary judgment on Count II of the Complaint, by which the Trustee seeks to recover the Arrangement Fee as a constructive fraudulent conveyance. To

---

[59]  Def. Ex. 26 (Voluntary Self-Referral Disclosure) at 1.

[60]  While the intent of transferees is not determinative in an actual fraudulent conveyance analysis, at best, only Citi was disinterested. JPM, SunTrust and BOMC were each lenders under the 2012 Term A Loan which was repaid from proceeds of Term Loan B. Defendants, and in particular, JPM and Citi, were aware of the government investigations and the civil litigation. Notwithstanding, neither the Rating Agency Presentation nor the Confidential Information Memorandum discuss Millennium's litigation, the DOJ investigation or changes in reimbursements.

avoid transfers pursuant to § 548(a)(1)(B), Trustee must show that (1) a transfer of an interest of the debtor's property occurred within two years of the filing of the bankruptcy petition, (2) the debtor "received less than reasonably equivalent value in exchange for such transfer" and (3) the debtor was either (I) "insolvent on the date of such transfer or was made" or rendered insolvent as a result; (II) "engaged in business or a transaction . . . for which any property remaining with the debtor was an unreasonably small capital;" or (III) intended to incur debts beyond the debtor's ability to repay.[61]

Defendants contend they are entitled to summary judgment on either of two theories. First, Defendants argue that they provided reasonably equivalent value for the Arrangement Fee because the fee was market (or below) and Defendants' collective services resulted in a successful financing. Term Loan B was fully funded by a sixty-one-investor syndicate, and in any event, Defendants underwrote the financing. Second, Defendants argue that the closing of Term Loan B provided Millennium access to broader capital markets in the future.

Trustee does not argue that the Arrangement Fee was above market or that Defendants did not perform services relative to Term Loan B. Rather, Trustee counters that the contracted for services provided no benefit to Millennium because the proceeds from the financing were used to pay off Term Loan A, pay dividends and bonuses to insiders and Defendants' fees. The result of the financing, therefore, was to place an additional $1.4 billion of debt on Millennium without a penny for working capital needs or to promote growth.

---

[61] 11 U.S.C. § 548(a)(1)(B) (omitting inapplicable subsection).

A.    *Reasonably equivalent value*

The Third Circuit employs a two-part test to assess whether a debtor received reasonably equivalent value.  First, the court determines whether the transfer conferred *any* value on the debtor.[62]  To do this "a court must consider whether, 'based on the circumstances that existed at the time' of the transfer, it was 'legitimate and reasonable' to expect some value accruing to the debtor."[63]  The Third Circuit has interpreted "value" to include any direct or indirect benefit,[64] even "the mere 'opportunity' to receive an economic benefit in the future."[65]

Second, if the debtor received value, then the court evaluates whether the value conferred was reasonably equivalent to the value transferred.[66]  This second step is a factual analysis that requires the court  to "look to the 'totality of the circumstances,' including (1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's length relationship between the debtor and the transferee,' and (3) the transferee's good faith."[67]  Because the purpose of fraudulent conveyance laws is estate preservation, the

---

[62]  *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L. Inc.)*, 92 F.3d 139, 152 (3d Cir. 1996).

[63]  *Pension Transfer Corp. v. Beneficiaries Under the Third Amend. to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212 (3d Cir. 2006) (citing *R.M.L.*, 92 F.3d at 152).

[64]  *Liquidation Tr. of Hechinger Inv. Co of Del. v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del.)*, 327 B.R. 537, 552 (D. Del. 2005) (expected cost saving and market synergies from acquisition/merger constituted value).

[65]  *Fruehauf Trailer Corp*, 444 F.3d at 214 (quoting *R.M.L.*, 92 F.3d at 148).  There is, however, no "*per se* rule requiring a precise calculation of the cash value of intangible costs and benefits in every case."  *Id.*

[66]  *R.M.L.*, 92 F.3d at 152.

[67]  *Fruehauf Trailer Corp.*, 444 F.3d at 213 (quoting *R.M.L.*, 92 F.3d at 148–49, 153).

question of reasonably equivalent value is viewed from the standpoint of creditors based on the circumstances existing when the transfer took place.[68]

Defendants contend that, without doubt, Debtor received value because Defendants arranged the loan, Term Loan B closed (i.e., the loan was funded) and Defendants committed to fund the entire $1.775 billion. Further, Defendants state that Debtor received indirect benefits in that "the ability to borrow money" has value as does positioning Debtor to have broader access to the capital markets.

Plaintiff contends that no value was provided because the Arrangement Fee was part of a transaction that left nothing for Debtor at the end of the day. Plaintiff also argues that the asserted indirect benefits are not supported as there is no evidence of any actual additional ability to borrow money or broader access to capital markets.

There are genuine disputes of material fact as to whether Debtor received any value from the Dividend Recapitalization Transaction. Initially, because the collapsing doctrine has been raised, I conclude that the Dividend Recapitalization Transaction is a single transaction, not a series of transactions which need to be collapsed. Millennium closed on Term Loan B in order to effectuate the Dividend Recapitalization Transaction and to satisfy other obligations as expressly contemplated when Defendants committed to and syndicated the loan. The proceeds of Term Loan B were both received and paid out at closing: to shareholders and employees, to pay off Term Loan A and to pay the Arrangement Fee. It was, quite simply, one transaction. In evaluating the Arrangement Fee, therefore, I can consider the entire transaction.

---

[68] *In re R.M.L., Inc.*, 92 F.3d 139, 150 (3d Cir. 1996) (quoting *Mellon Bank N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991); *see also Kartzman v. Latoc, Inc. (In re Mall at the Galaxy, Inc.)*, No. 23-1906, 2024 WL 3688721 at * 3 (3d Cir. Aug. 7, 2024) (non-precedential).

To the extent, however, one looks at the factors considered in collapsing multiple

transactions, these are satisfied as well.[69]  Millennium, Defendants and the shareholders all

knew of all parts (or "steps") of the Dividend Recapitalization Transaction, and no one

"step" of the transaction (i.e. raising funds, borrowing funds, loaning funds, payment of the

dividend, payment of the Arrangement Fee) would have occurred on its own.  Certainly,

there would be no Arrangement Fee without the Dividend Recapitalization Transaction.[70]

---

[69] *Hechinger*, 327 B.R. at 546-47 (when considering whether to collapse multiple transactions, the focus is "not on the structure of the transaction but the knowledge and intent of the parties involved in the transaction") (internal citations and quotation marks omitted); *Mervyn's Holdings LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 497 (Bankr. D. Del. 2010) (looking at whether the parties had knowledge of the transaction and whether each transaction would have occurred on its own or was otherwise dependent or conditioned on the other transactions).

[70] Compare *Tabor Court Realty Group Corp.* where the Third Circuit concluded that funds lent to one company, immediately re-lent to a second and ultimately paid out to shareholders was one integrated transaction.  *United States v. Tabor Court Realty Group Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986) ("The two exchanges were part of one integrated transaction.  As the [lower] court concluded: "[t]he $4,085,000 in ITT loan proceeds which were lent immediately by the borrowing companies to Great American were merely passed through the borrowers to Great American and ultimately to the selling stockholders and cannot be deemed consideration received by the borrowing companies.").  Here, of course, there was no intermediate company—the proceeds of Term Loan B went from Defendants to Millennium to the shareholders, Citibank (on Term Loan A), employees and Defendants (as the Arrangement Fee).  *See also Off. Comm. Of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re National Forge Co.)*, 344 B.R. 340, 350 (W.D. Pa. 2006) (footnotes omitted) (applying collapsing doctrine to stock redemption):

> Moreover, the Committee acknowledges that NFC, Holdings and the Lenders were all jointly involved in arranging the financing that would fund the stock redemption. It is undisputed on this record that, on or about March 29, 1999, NFC, Holdings, National Forge Europe Limited, and the Lenders entered into an agreement which permitted NFC and/or Holdings to borrow up to $4 million (secured by liens on NFC's assets) under an existing credit agreement in order to effectuate the stock redemption. (*See* Def.'s Append. in Supp. of Mot. for Summ. Judg. [Doc. # 45] at Ex. A–2.) Those who received distributions under the stock redemption included individuals who were directors, officers or management-level employees of NFC and Holdings, and the mechanics of the stock redemption were spelled out in Holdings' corporate minutes. Given these uncontroverted facts, we conclude that all of the relevant parties to the disputed transfer had knowledge of the stock redemption plan. While the Committee insists that the Defendants' allegations regarding the knowledge and intent of the parties are "replete" with material issues of fact, it provides nothing further by way of explanation or example to buttress its claim.

Looking at the Dividend Recapitalization Transaction as a whole, there are, at least, material facts in dispute as to whether Millennium received reasonably equivalent value in exchange for the Arrangement Fee. As stated before, the transaction left nothing for Millennium. And, viewing this from the creditors' standpoint, a question exists as to the alleged indirect benefits.

The cases cited by Defendants do not compel a different result at this stage. In *Hechinger*, a liquidating trustee brought breach of fiduciary duty and fraudulent conveyance claims against multiple defendants arising out of Hechinger's acquisition and merger with Builders' Square. The court granted summary judgment in favor of all defendants on the fraudulent conveyance claim concluding that the plaintiff failed to show any fact to refute that Hechinger received (indirect) value through the challenged acquisition/merger transaction. In the course of that discussion, the court specifically commented that plaintiff failed to show that the management fee paid by Hechinger was not industry standard, further supporting summary judgment for the recipient of the management fee. In doing so, however, the *Hechinger* court distinguished the bank fee paid to Chase (which fronted a group of 22 lenders providing a $600 million facility for the combined entity). The court granted summary judgment in Chase's favor stating, "[b]ecause the court finds that the

---

In addition, it appears undisputed that each critical step of the stock redemption plan would not have occurred on its own, but instead depended upon the occurrence of the others. For example, NFC would not have sought to borrow the additional $4 million from the Lenders (and the Lenders would not have lent those monies) if not for the purpose of financing the stock redemption. Similarly, NFC would not have undertaken the disputed transfer of $5.7 million to Holdings absent Holdings' intent to use the funds to accomplish the stock redemption. Again, it appears uncontroverted that all parties were aware of the ultimate purpose of loans to NFC, the transfer of loan proceeds from NFC to Holdings, and the distribution of those monies to Holdings' Class B shareholders—namely, the redemption of Holdings' Class B shares.

Transaction was not avoidable, the fees paid to Chase are also not avoidable."[71] The court

provides no guidance as to what it would have done in circumstances, such as those before

me, where there is no conclusion that the entire transaction cannot be avoided.

Similarly, *Plassein*[72] provides no guidance. There, after trial, the court found that

plaintiff had not proven lack of reasonably equivalent value. While the *Plassein* court based

its decision on expert testimony regarding the reasonable value of the services rendered to

earn the challenged fees (acquisition fee, management fee, financial advisory fees), it does

not appear that plaintiff asked the court to consider the underlying transactions in its

analysis as the court does not comment on them.

Conversely, the Third Circuit has concluded that a market-based bank commitment

fee may be avoided in appropriate circumstances.[73] In *R.M.L.*, Mellon Bank issued a

commitment letter to provide a $53 million revolving loan to Intershoe. The commitment

letter had multiple contingencies, including an equity infusion. When the equity infusion

did not occur, the deal collapsed and Mellon Bank did not fund the loan. After Intershoe

filed a voluntary bankruptcy case, its creditors' committee sued to recover $515,000 paid to

Mellon Bank in connection with the financing commitment. Mellon Bank argued that the

commitment fees were market rate. Finding that the conditions to Mellon Bank's

commitment to fund were so conditional when issued that the funding was unlikely to

---

[71] *In re Hechinger*, 327 B.R. at 553 n.24.

[72] *Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.)*, 405 B.R. 402 (Bankr. D. Del. 2009) *aff'd* 428 B.R. 64 (D. Del. 2010).

[73] *See generally R.M.L.*, 92 F.3d 139.

occur, the bankruptcy court concluded that Intershoe did not receive reasonably equivalent value for the commitment fees paid.[74] The Third Circuit affirmed.

While *R.M.L.* is factually distinguishable as Term Loan B was funded, the lesson from *R.M.L.* is that market-based fees are not *per se* reasonably equivalent value. The record before me does not establish, as a matter of law, that the value conferred was reasonably equivalent to the value transferred. Trustee points to emails and other evidence that suggest, when viewed in the light most favorable to Trustee, Defendants and Millennium's insiders pushed the Dividend Recapitalization Transaction through for their own personal benefit. Trustee also asserts that Millennium did not receive reasonably equivalent value because the loan proceeds did not remain with Millennium and that any alleged indirect benefits were illusory. Considering the totality of the circumstances, including that Defendants were instrumental in structuring the transaction, genuine disputes of material fact exist as to whether the transfer was the result of an arm's length negotiation or received in good faith. Ultimately, it will be Trustee's burden to establish, by a preponderance of the evidence, that reasonably equivalent value was not received on account of the transfer, but that is an issue for trial.

---

[74] The bankruptcy court did not avoid $127,538.04 in out-of-pocket expenses incurred by Mellon Bank. These expenses were not part of the appeal.

B.  *Insolvency and Defendants' Motion to Strike the Testimony of Plaintiff's Expert Yvette R. Austin Smith*[75]

Defendants next contest Trustee's ability to establish Millennium's insolvency at the

time of, or resulting from, the Dividend Recapitalization Transaction.  To support his

allegations of insolvency, Trustee relies on his proffered expert, Yvette R. Austin Smith, to

establish the necessary facts.  Austin Smith is a principal and chairman of The Brattle

Group, co-leads the firm's Mergers & Acquisitions practice and previously led the firm's

Bankruptcy Restructuring practice.  Her credentials are not challenged.[76]  In her expert

report, Austin Smith opines, among other things, 1) "that Millennium was rendered balance

sheet insolvent as a result of the [Dividend Recapitalization] Transaction," 2) "it was

reasonably foreseeable that the [Dividend Recapitalization] Transaction would leave

Millennium with unreasonably small capital" and 3) "the [Dividend Recapitalization]

---

[75] Defendants first argue that Trustee's solvency argument cannot succeed because it hinges on the collapsing doctrine.  As I have concluded there is only one transaction, this argument fails.  Defendants also argue that "as explained above, [ ] the judge-made exception of the collapsing doctrine was not derived to protect secured lenders who knowingly and willingly participate in a transaction and are compensated for doing so, and it is inappropriate here."  Mem. of Law in Supp. of Defs.' Mot. for Summ. J. 29, ECF No. 251.  This argument was raised at oral argument on the previous motion to dismiss.  In denying the motion to dismiss, I invited briefing on that issue.  *Kirschner*, 2019 WL 1005657, at *7.  While raised in the motion for summary judgment, Defendants still fail to provide an analysis.  Accordingly, I do not consider the argument.

[76] Austin Smith has a master's degree in business administration from Columbia University's Graduate School of Business and has completed additional graduate coursework in financial mathematics at the Courant Institute of Mathematical Sciences at New York University.  She was an instructor teaching a graduate finance course, Business Analysis and Valuation, at Harvard University Extension School.  She has published and presented on valuation and credit analysis for organizations including the American Bar Association, the American Bankruptcy Institute, the National Conference of Bankruptcy Judges, Thomson Reuters, and Bloomberg Law.  Expert Report of Yvette R. Austin Smith ¶¶ 2-3, Ex. 1 to Decl. of Grant L. Johnson in Opp'n to Defs.' Daubert Mot. to Exclude the Test of Pl.'s Proposed Expert Yvette R. Austin Smith, ECF No. 285-1 ("Austin Smith Report").

Transaction encumbered Millennium with debt beyond the company's ability to pay as that debt matured."[77]

Defendants' argument that there is no triable issue of fact on Millennium's solvency in 2014 relies upon their motion to strike certain portions of Austin Smith's report as unreliable. Defendants put forth three reasons why Austin Smith's conclusions should be excluded: 1) Austin Smith incorporated the weighted average cost of capital ("WACC") calculated by Millennium's solvency advisor (Vantage Point) for the Dividend Recapitalization Transaction without explanation or support, 2) the WACC itself is unreliable because it was "derived from an unsound methodology" and 3) Austin Smith's capital adequacy test and ability to pay debts test fail to analyze Millennium's ability to raise capital. Trustee responds that Austin Smith's calculations are reliable, consistent with sound valuation practice, and she considered whether Millennium would be to able refinance the loan.

### 1. Austin Smith's use of Vantage Point's WACC

In her discounted cash flow analysis, Austin Smith uses a weighted average cost of capital of 14.8%. Defendants contend that Austin Smith simply adopted Vantage Point's WACC without any of her own analysis or an understanding of how Vantage Point arrived at that figure. Because of that, Defendants claim that they are unable to effectively cross-examine Austin Smith about the bases for the WACC, why she used it and her methodological choices. Defendants further contend that they are left guessing about how Austin Smith reached her decisions such that Defendants' rebuttal expert, Amy Hutton, could not effectively evaluate and address Austin Smith's opinion.

---

[77] Austin Smith Report ¶ 7.

Defendants rely on *ZF Meritor*[78] and similar cases which exclude expert testimony when the expert adopts another's data without knowing or understanding the circumstances under which the data was created or the assumptions it was based on.[79]  Since *ZF Meritor*, the Third Circuit and lower courts within the circuit have explained and applied *ZF Meritor* as well as the later Third Circuit decision, *In re SemCrude*.[80]  For example, in *Allscripts*, the court found reliable (for purposes of Rule 702) an expert's opinion relying on the company's internal projections reflected in a report used by a third company (Valuation Research Corporation) that provided a valuation contemporaneous with the challenged transaction. The *Allscripts* court concluded that the expert adequately explained at his deposition why he found the projections to be valid: the projections were GAAP compliant, the Valuation Research report verified the projections using industry standards with which the expert was familiar and the projections were used in connection with the underlying merger at issue. As the court concluded:

> Mr. Ratner's lost profits analysis resembles the analysis admitted in *SemCrude*. The three bases upon which our Court of Appeals distinguished *SemCrude* from *ZF Meritor* exist in some form here. First, Mr. Ratner did not "simply 'rel[y] on a one-page set of profit and volume projections' to calculate damages."  He, like the expert in *SemCrude*, relied on Valuation Research's adoption of those projections "contemporaneously prepared" around Health Grid's merger with

---

[78] *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (affirming district court's exclusion of expert testimony where the expert relied on "a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based.").

[79] *See Allscripts Healthcare, LLC v. Andor Health, LLC*, Civ. Act. No. 21-704-MAK, 2022 WL 3021560, at * 17 n.112 (D. Del. July 29, 2022) (collecting cases).

[80] *In re SemCrude L.P.*, 648 F. App'x. 205, 214 (3d Cir. 2016) (holding the bankruptcy court did not abuse its discretion in admitting the expert testimony where "the Goldman Sachs Report was a contemporaneous report capturing the marketplace value; [the expert] explained the reasons for his reliance on the Goldman Sach's analysis; and [the expert] then adjusted the Goldman Sachs valuation based on his own analysis and judgment while giving cogent reasons to support his conclusions").

Allscripts not "in anticipation of litigation." Mr. Ratner, like the *SemCrude* expert, relied on Valuation Research's use of the Merger Projections because Valuation Research undertook "significant due diligence" to publish a GAAP-compliant valuation of a publicly traded company's merger. Valuation Research's stamp of approval distinguishes this case from the one-page set of unverified projections upon which the expert relied in *ZF Meritor*. Second, Mr. Ratner possesses experience comparable to the experience of the valuators who prepared the Valuation Research report. While Mr. Ratner never worked at Valuation Research like the *SemCrude* expert worked at Goldman Sachs, Mr. Ratner still possesses enough experience in the field to know the methods undergirding Valuation Research's due diligence. Third, Mr. Ratner "did not simply adopt the [Valuation Research report] as his own." Mr. Ratner swore as to his reasons for finding the data in the Valuation Research report reliable. He applied his judgment and experience in the field to determine Valuation Research's adoption of the Merger Projections made the Merger Projections reliable. This satisfies us Mr. Ratner's methods are reliable enough to be admitted.[81]

Austin Smith's determination to use a 14.8% WACC bears striking resemblance to the situation in *Allscripts*. She states in her report that the WACC is the discount rate calculated by Vantage Point for the solvency analysis it presented to Millennium in connection with the Dividend Recapitalization Transaction.[82] At her deposition, Austin Smith explains her review of the Vantage Point report, including that she and her team reviewed a report that described Vantage Point's choice of various premiums. She explains the Capital Asset Pricing Model employed by Vantage Point. She also discusses the comparable companies analysis performed by Vantage Point and explains the sources from

---

[81] *Allscripts*, at *17 (footnotes omitted).

[82] Austin Smith Report ¶ 143. The Vantage Point report was prepared contemporaneously with the dividend recapitalization and was not in anticipation of litigation. *Compare SemCrude*, 648 Fed. App'x at 213-14 (Goldman Sachs valuation was contemporaneously prepared and not in anticipation of litigation).

which Vantage Point identified the risk premiums it chose.[83]  Finally, Austin Smith testifies

that the Capital Asset Pricing Model is a model she regularly uses and is reliable.[84]

Austin Smith further explained why she determined to use the Vantage Point 14.8%

WACC.  She testified about her own comparable companies analysis and that she did not

identify or derive a more accurate estimate of the WACC.[85]  She also testified that

Millennium relied on the 14.8% WACC and that FTI's WACC of 14.0% at the time

("additional market evidence"), supported her conclusion that 14.8% was a reasonable

estimate for the WACC.[86]

---

[83] *See e.g.* Yvette R. Austin Smith Dep. Tr. 135:9-138:20, Ex. 2 to Decl. of Grant L. Johnson in Opp'n to Defs.' Daubert Mot. to Exclude the Test. of Pl.'s Proposed Expert Yvette R. Austin Smith, ECF No. 285-1.

[84] *Id.* at 125:7-14.

[85] *Id.* at 117:4-119:20; 295:22-298:11.

[86] *Id.* at 118:16-119:4. Austin Smith summed it up as follows:

> Q.  Okay.  So just to make sure I understand, you didn't attempt to put your five companies into their analysis and understand what the result would be?

> A.  No, because I was – I was looking to incorporate market information that I did not develop, I was looking for a market information to confirm, be a confirmatory piece of input to the market – to the analysis that I conducted.  So to mix the two together would actually work against that purpose.

> Q.  How is that?

> A.  Because I independently identified a set of five companies, I derived what was the observed WACC implied by those five companies, and I came to the conclusion that that observed WACC did not sufficiently compensate investors for the risk of Millennium cash flows.

> I then sought to understand whether there was market data that was confirmatory of my conclusions.  And in fact, when I looked at the FTI analysis, the Vantage Point analysis and the TA Associates analysis, all of those analyses are confirmatory of my conclusion and actually one of the aspects that I think reinforces the robustness of the analysis is that even using slightly different companies and

Austin Smith's use of the Vantage Point WACC is based on good grounds. Further, it is apparent from a read of her deposition testimony that Defendants were able to—and did—cross examine Austin Smith on the bases of her opinions. Finally, Defendants' expert, Amy Hutton, was also able to respond to Austin Smith's report.[87]

Whether Austin Smith's solvency opinion is credible such that it supports a factual finding that Debtors were rendered insolvent as a result of the Dividend Recapitalization Transaction is not an issue to be resolved at this time.[88] Austin Smith sufficiently explained why she adopted Vantage Point's WACC, the reasons she adopted it and the underlying methodology Vantage Point employed.[89] Accordingly, I decline to exclude her testimony as unreliable on these grounds.[90]

### 2. Reliability of the WACC calculated by Vantage Point

Defendants next seek to exclude portions of Austin Smith's expert report as unreliable because the 14.8% WACC includes a company specific risk premium of 5%. At bottom, Defendants argue that a company specific risk premium is never appropriate as an

---

slightly different either methodologies or inputs, depending how you want to describe it, all arrived at the same conclusion.

  MR. POPOVSKY: Thank you. I don't have any further questions at this time.

*Id.* at 306:1-307:16.

[87] *See generally* Def. Ex. 65 (Expert Report of Amy Hutton).

[88] "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 595 (1993).

[89] *See ZF Meritor*, 696 F.3d at 292.

[90] *E.g., SemCrude*, 648 F. App'x. at 214.

adjustment to the WACC.[91]  Rather, they argue, any company specific risk must be accounted for by an adjustment to expected cash flows.  To support their position, Defendants rely on the opinion of their hired expert, Amy Hutton, and certain Delaware Chancery Court opinions.  Trustee distinguishes the cases cited by Defendants and argues that Hutton's opinion should be disregarded as inconsistent with precedent, accepted methods of practitioners, and her own prior opinion in another case.[92]

I decline to establish a per se rule that company specific risk may never be accounted for though an adjustment to the WACC and I do not read the cited cases as establishing such a rule.  *In re Orchard Enterprises* is a post-trial decision in which the Chancery Court concluded that it did not believe a company-specific risk premium should be used in a CAPM calculation "especially in a case like this."[93]  The circumstances of that case included: (i) the valuation of a public company in a take-private transaction, (ii) the company's expert sought to use a company-specific risk premium, (iii) that expert "gave overwhelming weight" to management's projections and (iv) that expert was the company's financial advisor in the challenged transaction and had "his hands deep in the dough of the projections used in the fairness opinion and then in his valuation report."[94]  For those, and other reasons, then-Chancellor Strine concluded that "Orchard has failed to convince me of

---

[91] Defs.' Mem. of Law in Supp. of Their Mot. to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette Austin Smith at 16, ECF No. 249 ("The inclusion in the WACC of a company-specific risk premium finds no support in the case law and has no basis in the financial theory and the academic literature.") (internal citation and quotation omitted).

[92] Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Strike Certain Portions of the Rule 26(a)(2) Report of Yvette R. Austin Smith at 26-27, ECF No. 284.

[93] *In re Orchard Enters., Inc.*, C.A. No. 5713–CS, 2012 WL 2923305, at *19 (Del. Ch. July 18, 2012).

[94] *Id.* at *20.

the appropriateness of the company-specific risk premium used by [the company's expert] in his valuation of the company."[95] Further, while recognizing that academics and finance scholars disapprove including company specific risk premiums in the Capital Asset Pricing Model, then-Chancellor Strine recognizes that practitioners use company specific risk to capture risks not reflected in the WACC.[96] Finally, the court acknowledged that adjusting available projections "would involve as much subjectivity as heaping on to the discount rate" even though it would "force more rigor and clarity about the expert's concern."[97, 98]

---

[95] *Id.* at *21.

[96] *Id.* at *19.

[97] *Id.* at *20.

[98] Defendants' other cases are also distinguishable and do not support the exclusion of Austin Smith's expert report on these grounds. *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.* is an earlier then-Vice Chancellor Strine decision in which he chose not to enter the debate about whether company-specific risk premiums can be added to come up with an accurate cost of capital for use in a DCF analysis noting, as he later does in *Orchard Enters*, the dichotomy between an academic approach and a practitioner approach to valuation. 847 A.2d 340, 354 n.28 (Del. Ch. 2004). Interestingly, after making this observation, then-Vice Chancellor Strine constructed his own DCF analysis and chose to use the three-factor Fama and French CAPM cost of capital rather than the original CAPM. *Id.* at 362. In doing so, however, he acknowledged that the Fama-French three-factor model is "not wholly accepted, neither is the original CAPM itself." *Id.* at 363.

*Solar Cells, Inc. v. True N. Partners, LLC* was decided in the context of a motion for a preliminary injunction. No. Civ. A. 19477, 2002 WL 749163 (Del. Ch. Apr. 25, 2002). The court decided for multiple reasons that there was a reasonable probability that it would not find entirely fair an investment banker's valuation of a company (prepared for a merger transaction) that differed materially from the investment banker's valuations made two and six months earlier. In a footnote, the court noted that even the purchaser's litigation expert valued the company higher and only reduced his valuation by applying a 40% "marketability" discount and that this litigation expert had no expertise in the company's industry. In that context, the court made the general observation that the Court of Chancery is "suspicious of expert valuations offered at trial that incorporate subjective measures of company specific risk premia, as subjective measures may easily be employed as a means to smuggle improper risk assumptions into the discount rate so as to affect dramatically the expert's ultimate opinion on value." *Id.* at *6 n.11 (citations omitted). Even with this caution, the court did not rule, as a matter of law, that company specific risk premia are never appropriate in valuing a company. In the matter before me, the 5% company specific risk premium complained about was used by Vantage Point in valuing Millennium at the time of the transaction; it is not first being "smuggle[d]" into risk assumptions by an expert hired for litigation.

Here, on a pretrial motion to strike, I will not exclude this testimony. The valuation before me is of a private company, the expert who is seeking to employ a company specific risk premium was retained by the liquidating trustee (not Millennium) and was not involved in creating management's projections. To the extent that Defendants believe Austin Smith's use of a company specific risk premium is inappropriate on the facts of this case or duplicative of adjustments made to projections, this is an area ripe for cross-examination and/or a counter expert opinion. Accordingly, I decline to exclude her testimony as unreliable on these grounds.[99]

### 3. The ability to pay debts and the capital adequacy tests

In their final argument to exclude the expert report of Austin Smith, Defendants argue that she failed to consider Millennium's ability to refinance the term loan or raise additional capital and therefore her opinions based on the ability to pay debts and capital adequacy tests must be excluded. This argument, however, is belied by Austin Smith's report. Page 91 of her report states, "I further considered Millennium's prospects for refinancing the Term Loan" and concluded that Millennium's leverage ratios placed "Millennium above the levels typically associated with Caa-C credits[, meaning t]here was no reasonable prospect that Millennium would repay the Term Loan at maturity in April 2021."[100] Again, her conclusions are properly the subject of cross-examination. Accordingly, I decline to exclude her testimony on this ground.

Trustee provided facts from which I can infer, when viewed in the light most favorable to Trustee, Millennium did not receive reasonably equivalent value in exchange

---

[99] *SemCrude*, 648 F. App'x. at 214.

[100] Austin Smith Report at ¶ 169.

for the fee paid to Defendants and Millennium was insolvent at the time of the Dividend

Recapitalization Transaction or became insolvent as a result.  Summary judgment on

Trustee's claim for constructive fraudulent transfer will not be granted.

**Conclusion**

      For the reasons set forth above, Defendants' motions are DENIED.

Dated: March 12, 2025

Laurie Selber Silverstein
United States Bankruptcy Judge